**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br>378 N. Main Avenue<br>Tucson, AZ 85701;<br><br>DEFENDERS OF WILDLIFE<br>1130 17th Street, N.W.<br>Washington, DC 20036;<br><br>SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612;<br><br>CONSERVANCY OF SOUTHWEST FLORIDA<br>1495 Smith Preserve Way<br>Naples, Florida 34102;<br><br>FLORIDA WILDLIFE FEDERATION<br>2545 Blairstone Pines Drive<br>Tallahassee, FL 32301;<br><br>MIAMI WATERKEEPER<br>2103 Coral Way<br>Miami, FL 33145; and<br><br>ST. JOHNS RIVERKEEPER<br>2800 University Blvd N<br>Jacksonville, FL 32211,<br><br>     Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460;<br><br>ANDREW WHEELER, in his official capacity as<br>Administrator for the U.S. Environmental<br>Protection Agency,<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460; | **CIVIL NO.** 21-cv-119<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

DAVE ROSS, in his official capacity as Assistant
Administrator for the Office of Water of the U.S.
Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

DAVID FOTOUHI, in his official capacity as Acting
General Counsel for the U.S. Environmental
Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

SUSAN BODINE, in her official capacity as Assistant
Administrator for the Office of Enforcement and Compliance
Assurance for the U.S. Environmental Protection Agency,
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460;

MARY WALKER, in her official capacity as Administrator
for Region 4 of the U.S. Environmental Protection Agency,
61 Forsyth Street SW
Atlanta, GA 30303;

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, NW
Washington, DC 20240;

AURELIA SKIPWITH, in her official capacity as Director
for the U.S. Fish and Wildlife Service,
1849 C Street, NW
Washington, DC 20240;

LEOPOLDO MIRANDA-CASTRO, in his official capacity
as Regional Director for the U.S. Fish and Wildlife Service,
1875 Century Boulevard, Suite 400
Atlanta, GA 30345;

U.S. ARMY CORPS OF ENGINEERS
441 G Street, NW
Washington, DC 20314;

LIEUTENANT GENERAL SCOTT A. SPELLMON, in his
official capacity as Chief of Engineers and Commanding
General of the U.S. Army Corps of Engineers,
441 G Street, NW
Washington, DC 20314; and

COLONEL ANDREW KELLY, in his official capacity as
District Commander of the Jacksonville District for the U.S.
Army Corps of Engineers,
701 San Marco Boulevard
Jacksonville, FL 32207,

     Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This action arises from the U.S. Environmental Protection Agency's ("EPA")

unlawful approval of a state application to assume jurisdiction over the Clean Water Act's

Section 404 permitting program, which regulates the dredging and filling of waters of the United

States, including wetlands essential to water quality, storm and climate resiliency, threatened and

endangered species, and the economy.  EPA's approval is unlawful because the state's program

is not as stringent as federal law and rests on unprecedented arrangements that violate federal

law.  At a December 17, 2020, press conference in Washington, D.C., EPA Administrator

Andrew Wheeler announced the agency's approval of the state of Florida's novel program to

assume jurisdiction over Section 404, described the program as a roadmap, and encouraged other

states to follow suit.  On December 22, 2020, the EPA published its decision in the Federal

Register, purporting to give it immediate effect, in violation of the Administrative Procedure Act

("APA"), and without codifying the program, also in violation of federal law.  The EPA's actions

failed to effectuate a lawful transfer of authority.  Yet the EPA has advised the state that it may

proceed.  The EPA's action will allow the state to violate federal law to the detriment of waters

of the United States and the endangered and threatened species that rely on them, while

depriving those adversely affected of federal rights and remedies.

2.     Underlying the EPA's decision are unlawful actions by the U.S. Fish and Wildlife

Service ("USFWS"), which has failed to ensure no jeopardy to listed species and creates an

unlawful scheme for take liability coverage at the permit level, in contravention of the Endangered Species Act ("ESA"). Also, the U.S. Army Corps of Engineers' ("Corps") list of waters over which it will retain jurisdiction is arbitrarily and capriciously truncated in violation of the Rivers and Harbors Act ("RHA") and the APA.

3.      Defendants' actions threaten to open the floodgates for other states to seek assumption without requiring that those programs meet federal standards, further imperiling waters of the United States and the ESA-listed species that rely on them. As Administrator Wheeler stated at the December 17th press conference, states have already been reaching out to the EPA to follow in Florida's footsteps. Defendants' actions are unlawful and must be set aside.

## INTRODUCTION

4.      Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The impetus for enacting the Clean Water Act was states' failure to control water pollution as evidenced by disasters like the Cuyahoga River catching on fire and the Hudson River filling with raw sewage and toxic waste.

5.      The Clean Water Act Section 404 wetlands permitting program ("404 program") regulates the discharge of dredged or fill materials into waters of the United States, including wetlands, 33 U.S.C. § 1344, and is a vital tool to meet the Clean Water Act's goals, recognizing that the degradation and destruction of wetlands is "among the most severe environmental impacts." See 33 U.S.C. § 1251; 40 C.F.R. § 230.1(a).

6.      Under the federal 404 program, it is the Corps that reviews and, where appropriate, approves permits.

7.     Congress enacted the Endangered Species Act of 1973 ("ESA") to, among other things, "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(2)(b).

8.     Pursuant to Section 7(a)(2) of the ESA, the Corps must engage in formal consultation with USFWS and National Marine Fisheries Service ("NFMS") (collectively, "the Services") whenever it appears that a Section 404 permit applicant's proposed activity may adversely affect listed species.  Through this process, permittees may obtain protection from ESA liability for any incidental harm (called "incidental take") to listed species on a project by project basis.

9.     The Clean Water Act creates a path for states to administer their own dredge and fill permit program, if the state's program is at least as stringent as the federal program.  33 U.S.C. § 1344(h)(1).  The state must submit a "full and complete" application showing that it meets this high bar.  Id. § 1344(g); 40 C.F.R. §§ 233.10, 233.15(a).  In a state 404 program, it is a state agency, rather than the Corps, that reviews 404 permit applications and issues 404 permits.

10.     Before a state may assume the 404 program, the EPA must determine that the state has demonstrated authority to issue permits that assure compliance with the Clean Water Act Section 404(b)(1) Guidelines, which, among other things, prohibit the issuance of 404 permits that would jeopardize the existence of ESA-listed species, or result in the likelihood of destroying or adversely modifying critical habitat identified under the ESA.  33 U.S.C. § 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23.

11.     ESA Section 7(a) consultation between the Services and federal agencies, including the associated incidental take protection, does not extend to projects regulated under state-operated 404 programs.  16 U.S.C. § 1536(a).

12.     Permittees, however, must still comply with the ESA's take prohibition, and must therefore pursue ESA Section 10 consultation with the Services to try to obtain protection from incidental take liability if a project may harm listed species.  16 U.S.C. § 1539.

13.     When the EPA approves a state's 404 program, the Administrator must notify the state and the Corps, and, upon notification from the state that it is administering the program, the Corps must suspend its issuance of permits covered by the state program.  33 U.S.C. § 1344(h)(2)(A).

14.     Transfer of 404 permitting authority to a state is not effective until after notice is published in the Federal Register.  40 C.F.R. § 233.15(h).  As of the effective date of an approved state program, the Corps must suspend all issuance of Section 404 permits in state-regulated waters.  Id.

15.     The APA provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date" subject to certain exceptions not applicable here.  5 U.S.C. § 553(d).

16.     In the many years that Section 404 state assumption has been authorized under the Clean Water Act for programs that meet stringent federal standards, the EPA has approved only two.  In 1984, the EPA approved Michigan's program, and in 1994, the EPA approved New Jersey's program.  See 40 C.F.R. § 233.70 (Michigan), 40 C.F.R. § 233.71 (New Jersey).

17.     In 2005 and in 2012, Florida considered pursuing assumption but abandoned the effort considering conflicts between state and federal law, the high costs associated with administering the program, and permittees' concerns regarding protection against ESA liability.

18.     Many other states, including most recently Arizona, have reached similar conclusions.

19.     On August 20, 2020, Florida applied to the EPA proposing to take over the 404 program without adopting all federal requirements, without demonstrating "no jeopardy" to ESA-listed species, and without adequately identifying the waters over which it would assert jurisdiction.  The state also claimed it would require no funding to administer and enforce the program, even amidst major budget cuts resulting from a pandemic which the state did not address or even acknowledge in the application.

20.     On August 28, 2020, the EPA nonetheless determined that the application was "complete" as of the submission date.

21.     The EPA's "completeness" determination triggered a 120-day deadline to approve or deny the application by December 18, 2020, unless the EPA and Florida agreed to extend the timeline.  See 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).

22.     On August 28, 2020, and at Florida's request, the EPA reversed its long-standing position that agency review of an assumption application was a non-discretionary act, thereby triggering a duty to engage in ESA consultation with the Services.  The EPA agreed with the state that this duty required only a one-time programmatic consultation for purposes of considering the application.

23.     Defendants and the state developed this novel position to facilitate programmatic incidental take coverage to the state and state permittees—an unprecedented, and ultimately unlawful, workaround to the requirements of federal law.

24.     On September 2, 2020, the EPA submitted an "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" to USFWS to initiate formal consultation on Florida's application.  It was dated August 2020.

25.     Also, on September 2, 2020, the EPA sent a letter to NMFS summarily concluding that approval of the state program would have "no effect" on NMFS' jurisdictional marine and anadromous species.  The EPA's conclusion was solely based on an April 15, 2020, letter by NMFS to Florida, stating that no species in NMFS' exclusive jurisdiction would be present "in assumable waters."  NMFS then concurred with the EPA's determination.

26.     The EPA's biological evaluation was largely a cut and paste of a biological assessment drafted by the state and was not independently assessed by the EPA.

27.     On September 16, 2020, the EPA initiated a 45-day public comment period that concluded on November 2, 2020.  See 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553.  The EPA indicated that if approved, the state program would be codified at 40 C.F.R. § 233 subpart H. This was consistent with the agency's codification of the only other two approved state 404 programs.  See 40 C.F.R. § 233.70 (New Jersey); id. § 233.71 (Michigan).

28.     At the October 21, 2020, EPA public hearing on Florida's submission, Plaintiffs' counsel urged the EPA to reverse its completeness determination considering critical omissions in Florida's application.  In an October 23, 2020 letter, Plaintiffs' counsel requested suspension of the public comment period until the deficiencies were cured.  See id. § 233.15(a) (statutory review period shall not begin if the EPA finds that state's submission is incomplete).

29.     The EPA did not respond to Plaintiffs' requests and closed the public comment period on November 2, 2020.

30.     On November 2, 2020, Plaintiffs and many other members of the public submitted comments challenging the legality of the EPA's approval of the state's proposal, the absence of required components prejudicing the opportunity for public comment, and the proposal's failure to meet the requirements for a state-assumed program, particularly as it relates to the protection of threatened and endangered species.  33 U.S.C. § 1344(g)–(h).

31.     On November 19, 2020, USFWS transmitted to the EPA a programmatic biological opinion dated November 17, 2020, regarding Florida's application.  USFWS' biological opinion, in conjunction with a memorandum of understanding between USFWS and the state, purports to authorize a "technical assistance" role outside the parameters of the ESA that would nevertheless grant "[i]ncidental take exemption" to the EPA for its approval and oversight of the state program, and would further grant protection from liability for any take of listed species incidental to state-permitted activities so long as the permittee complied with the conditions of a state-issued permit.

32.     Neither NMFS' April 2020 determination nor USFWS' November 2020 biological opinion was made part of Florida's application or otherwise presented to the public for an opportunity to comment before the EPA acted on the state's application.

33.     On December 17, 2020, EPA Administrator Andrew Wheeler announced the approval of Florida's assumption application at a press conference in Washington, D.C.

34.     On December 22, 2020, the EPA's approval of the state program was published in the Federal Register, with an immediate "applicable" date as of publication.  The notice did not codify the approved program.

35.     On the same day, counsel for Plaintiffs notified the EPA that its failure to codify and failure to comply with the APA rendered the transfer ineffective and that authority to administer the 404 program remained with the Corps.

36.     On December 28, 2020, EPA General Counsel David Fotouhi sent a letter claiming that the transfer was effective upon publication, that the decision was an adjudication rather than a rulemaking, and that the agency intended to codify the program but only for "transparency."

## JURISDICTION AND VENUE

37.     This action arises under the Clean Water Act, 33 U.S.C. §§ 1251–1387, ESA, §§ 1531–44, and the APA, 5 U.S.C. §§ 553, 701–06.

38.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201, 2202.

39.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) as the Defendants include agencies of the United States and officers and employees of the United States acting under their official capacities who reside in this district, and Plaintiff Defenders of Wildlife maintains its principal place of business, and therefore resides, in this judicial district. Id. §§ 1391(c)(2), (e)(1)(C).

## PARTIES

**Plaintiffs**

40.     CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit organization that works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center is incorporated in

California, headquartered in Tucson, Arizona, and maintains an office in the District of Columbia, with field offices throughout the United States and Mexico.

41.     The Center has 81,843 members across the country.  The Center and its members are concerned with, and have concrete interests in, the conservation of imperiled species and the habitats they rely on for survival, including the ones at issue in this suit.  The Center's members and staff have researched, studied, observed, litigated over, and sought protection for federally listed threatened and endangered species in the United States, including listed turtles in Florida. These activities support the Center's mission to save life on earth.  The Center brings this action on behalf of itself and its adversely affected members.

42.     DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit membership organization that is one of the nation's leading advocates for threatened and endangered species and wildlife conservation.  Founded in 1947, Defenders is headquartered in Washington, D.C., and maintains local field offices throughout the country.  Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments. Defenders works toward the recovery of threatened and endangered species by means such as monitoring and engaging in public notices and comments, litigation, research, education, and federal, state, and local advocacy.

43.     Defenders is a science-based conservation organization with more than 1.8 million members and supporters nationwide and around the world.  Defenders and its members aim to protect and restore imperiled species throughout North America by transforming policies and institutions, promoting innovative solutions, and litigating over protections for threatened and endangered species in the United States.  These activities support Defenders' mission to

protect native plants and animals.  Defenders brings this action on behalf of itself and its adversely affected members.

44.     SIERRA CLUB ("Sierra Club") is a national non-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

45.     Headquartered in Oakland, California, the Sierra Club has 67 chapters and more than 808,000 members across the nation.  Sierra Club's concerns include the protection of wetlands and federally listed threatened and endangered species.  The Sierra Club brings this action on behalf of itself and its adversely affected members.

46.     CONSERVANCY OF SOUTHWEST FLORIDA ("Conservancy") is a nonprofit organization that is dedicated to the protection of Southwest Florida's land, water, wildlife, and future through advocacy, science, education, and wildlife rehabilitation.  The Conservancy was founded in 1964 in response to plans to build a road through Rookery Bay and carries on its mission to preserve wetlands and downstream areas important to the health of the ecosystem, economy, and quality of life.

47.     The Conservancy has approximately 3,600 dues-paying members and over 2,000 additional donors and supporters.  The Conservancy's members and staff have researched, studied, observed, and sought protection, including through litigation, for federally listed threatened and endangered species and their habitat in southwest Florida.  These activities support the Conservancy's mission to protect southwest Florida's water, land, and wildlife.  The Conservancy brings this action on behalf of itself and its adversely affected members.

48.     FLORIDA WILDLIFE FEDERATION ("FWF") is a nonprofit corporation established in 1936.  FWF has approximately 9,000 members and 60,000 supporters.  FWF has long supported environmental sustainability and conservation in Florida through education, advocacy, and litigation.

49.     FWF's members and staff have researched, studied, observed, and sought protection, including filing lawsuits, for federally listed threatened and endangered species and their habitat.  These activities support FWF's mission to ensure that wildlife and fragile environment have a voice.  Among other things, FWF is dedicated to protecting the state's waterways, as wildlife cannot thrive where wetlands are drained, waters polluted, and habitats degraded or destroyed.  FWF brings this action on behalf of itself and its adversely affected members.

50.     MIAMI WATERKEEPER ("MWK") is a nonprofit organization whose mission is to defend, protect, and preserve South Florida's watershed through citizen engagement, education and outreach, scientific research, advocacy, and when necessary, legal action.

51.     MWK has 165 members.  MWK's members and staff have researched, studied, observed, patrolled, and sought protection, including filing lawsuits, for South Florida's watershed and the federally listed threatened and endangered species that depend on its freshwater and marine habitats, including listed corals.  These activities support MWK's mission to ensure swimmable, drinkable, fishable water for all.  MWK brings this action on behalf of itself and its adversely affected members.

52.     ST. JOHNS RIVERKEEPER ("St. Johns RK") is a nonprofit organization that provides an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Florida's longest and most significant river for commercial and recreational use.

53.     St. Johns RK has 1,400 members.  St. Johns RK's members and staff have researched, studied, observed, patrolled, and sought protection, including through litigation, for the St. Johns River watershed and the federally listed threatened and endangered species that depend on it.  These activities support St. Johns RK's mission to ensure a thriving watershed that sustains healthy ecosystems for future generations.  St. Johns RK brings this action on behalf of itself and its adversely affected members.

54.     Plaintiffs and their members participated throughout the EPA's rulemaking process on the state's application to assume the 404 program in an attempt to ensure that the EPA abided the requirements of the Clean Water Act, ESA and APA, and to advocate for the protection of endangered species, wetlands and other waterways, as well as the communities that rely on them.  Plaintiffs and their members have monitored, investigated, educated the public, litigated, and provided science-based policy recommendations on development projects and their associated Clean Water Act 404 permits in order to protect the environment and wildlife and intend to continue to do so in the near future.

55.     The above-described conservation, informational, and scientific interests of Plaintiffs and their respective members have been, are being, and—unless the relief prayed for herein is granted—will continue to be adversely affected and irreparably injured by the Defendants' failure to comply with the Clean Water Act, ESA, and APA as described below. Plaintiffs have no adequate remedy at law.

56.     Plaintiffs' interests fall within the zone of interests protected by the laws sought to be enforced in this action.

**Defendants**

57.    U.S. ENVIRONMENTAL PROTECTION AGENCY ("EPA") is an independent executive agency of the United States federal government with responsibility for administering and implementing the Clean Water Act.  The EPA approved Florida's request to assume authority over the Clean Water Act 404 program.

58.    ANDREW WHEELER is the Administrator of the EPA and the highest-ranking official responsible for actions taken by the EPA, including decisions to approve state administration of Clean Water Act Section 404.  Defendant Wheeler is sued in his official capacity.

59.    DAVE ROSS is the Assistant Administrator for EPA Office of Water and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Ross is sued in his official capacity.

60.    DAVID FOTOUHI is the Acting General Counsel for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Fotouhi is sued in his official capacity.

61.    SUSAN BODINE is the Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Bodine is sued in her official capacity.

62.    MARY WALKER is the Regional Administrator for EPA Region 4 and is an official responsible for actions taken by the EPA, including the delegated authority to approve state Clean Water Act programs.  Defendant Walker is sued in her official capacity.

63.     Defendants Wheeler, Ross, Fotouhi, Bodine, Walker and the EPA will collectively be referred to as "EPA."

64.     U.S. FISH AND WILDLIFE SERVICE ("USFWS") is an agency within the U.S. Department of the Interior and has joint delegated responsibilities of administering and implementing the ESA along with NMFS.  USFWS issued the programmatic biological opinion and incidental take statement that are challenged here and underlie the EPA's challenged action.

65.     AURELIA SKIPWORTH is the Director of USFWS and highest-ranking official responsible for actions taken by USFWS, including compliance with and implementation of the ESA.  Defendant Skipworth is sued in her official capacity.

66.     LEOPOLDO MIRANDA-CASTRO is Regional Director of USFWS and is an official responsible for actions taken by USFWS, including the biological opinion and incidental take statement in this case.  Defendant Miranda-Castro is sued in his official capacity.

67.     Defendants Skipworth, Miranda-Castro and USFWS will collectively be referred to as "USFWS."

68.     U.S. ARMY CORPS OF ENGINEERS ("Corps") is a federal agency organized under the U.S. Department of Defense.  The Corps is charged with administering permits under section 404 of the Clean Water Act for the discharge of dredged or fill material into the waters of the United States and ensuring that the requirements of NEPA, the RHA and the ESA are fulfilled in connection with all evaluation and decision-making concerning such permits.  The Corps issued the "retained waters list" that is challenged here and underlies the EPA's challenged action.

69.     LIEUTENANT GENERAL SCOTT A. SPELLMON is the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers and has delegated

responsibilities of administering and implementing the Clean Water Act 404 program. Defendant Spellmon is sued in his official capacity.

70.     COLONEL ANDREW KELLY, is District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is an official responsible for actions taken by the Corps, including the determination of the waters to be retained under the Corps' jurisdiction after state assumption.  Defendant Kelly is sued in his official capacity.

71.     Defendants Spellmon, Kelly, and the Corps will collectively be referred to as "the Corps."

## LEGAL FRAMEWORK

**Administrative Procedure Act**

72.     Pursuant to the Administrative Procedure Act ("APA"), a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be" (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; (3) "without observance of procedure required by law"; or (4) "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (C)–(E).

73.     The APA grants a right of judicial review of final agency actions to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  Id. § 702.

74.     The EPA's approval of Florida's 404 assumption application is unlawful and must be set aside for:  failing to provide an opportunity for notice and comment on a complete program submission; approving a state program that is inconsistent with and violates federal law; relying on unlawful, related actions by USFWS (biological opinion and incidental take

statement); NMFS (jurisdictional determination); the Corps (retained waters list); and making its decision effective immediately upon publication in the Federal Register and without codification.

75. The actions by USFWS and the Corps on which the EPA relied are similarly subject to judicial review under the APA and must be set aside.

**The Clean Water Act**

76. Before the EPA may consider a state 404 assumption application, the state must submit a "full and complete" application including a description of the program it proposes to establish and administer as well as a statement from the attorney general that the laws of the state provide adequate authority to carry out the described program. 33 U.S.C. § 1344(g); 40 C.F.R. § 233.10.

77. A complete program description must include a description of (1) the scope and structure of the state's program, including the extent of the state's jurisdiction and permit review criteria; (2) the state's permitting, administrative, judicial review, and other applicable procedures; (3) the basic organization and structure of the state agencies which will administer the program, specifically addressing the responsibilities of each agency; (4) the funding and staffing available for program administration; (5) estimated anticipated workload; (6) permit application forms, permit forms, and reporting forms; (7) the state's compliance evaluation and enforcement programs, including how the state will coordinate with the EPA and the Corps; (8) the waters of the United States within a state over which the state assumes jurisdiction under the approved program; the waters of the United States within a State over which the Corps retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands; and (9) the specific best management practices proposed to satisfy Section 404 exemptions for construction and maintenance of certain roads. 40 C.F.R. § 233.11.

78.     A complete attorney general's statement must demonstrate that the laws and regulations of the state provide adequate authority to carry out the program and meet the applicable requirements of the federal Section 404 program.  Id. § 233.12(a).  The statement must cite authorities which are "lawfully adopted at the time the statement is signed and which shall be fully effective by the time the program is approved, and, where appropriate, judicial decisions which demonstrate adequate authority."  Id.  Where more than one agency has responsibility for administering the state program, the statement must certify that each agency has full authority to administer the program within its category of jurisdiction.  Id. § 233.12(d).

79.     The submission of a state assumption application sets in motion a timeline for EPA review.  33 U.S.C. § 1344(g)–(h).  The statutory review period shall not begin until a complete application is received by the EPA.  40 C.F.R. § 233.15(a).

80.     The EPA must determine if an application is complete within 30 days, 40 C.F.R. § 233.15(a), and publish notice of the application and provide for a comment period of not less than 45 days including a public hearing within the state, id. § 233.15(e)(1)–(2).  The EPA must determine whether to approve or deny the state's application within 120 days after the date of the receipt of a complete program application.  33 U.S.C. § 1344(h); 40 C.F.R. § 233.15(g).  The EPA must issue a summary of significant comments received and its response to these comments.  40 C.F.R. § 233.15(g).

81.     To approve a state application, the EPA must determine whether the state has "authority with respect to the issuance of permits pursuant to such program" to, among other things:  (1) issue permits "which apply, and assure compliance with" all Section 404 requirements, including Section 404(b)(1) Guidelines; (2) assure that the public "receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling

on each such application;" and (3) "abate violations of the permit or the permit program,

including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C.

§ 1344(h)(1)(A)(i), (1)(C), (1)(G).

82.     The Section 404(b)(1) Guidelines prohibit, among other things, the issuance of

404 permits that would jeopardize the existence of ESA-listed species or result in the likelihood

of destroying or adversely modifying critical habitat identified under the ESA.  40 C.F.R.

§§ 230.10(b)(3), 233.11(a)–(c), 233.23.

**The Endangered Species Act**

83.     Congress enacted the Endangered Species Act of 1973 ("ESA") because human

activities had caused the extinction of many species and other species "[had] been so depleted in

numbers that they are in danger of or threatened with extinction."  16 U.S.C. § 1531(a)(1)–(2).

All species listed as endangered or threatened by the Secretary of Interior are protected by the

ESA, which the Supreme Court has called "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437

U.S. 153, 180 (1978).

84.     Recognizing the need to protect these species and to conserve their habitat,

Congress mandated that all federal departments and agencies seek to conserve endangered and

threatened species.  16 U.S.C. § 1531(c)(1).

85.     Section 7 of the ESA establishes a federal interagency consultation process to

assist agencies in complying with their duty to avoid jeopardy to listed species or destruction or

adverse modification of critical habitat.  Under this process, a federal agency proposing an action

that "may affect" a listed species must prepare and provide to the appropriate expert agency a

description of the proposed action, its effects, and the relevant scientific evidence.  16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(a).

86.     Section 7 of the ESA prohibits agency actions that may jeopardize the survival

and recovery of a listed species or adversely modify its critical habitat:

> Each federal agency shall, in consultation with and with the assistance of the
> Secretary, insure that any action authorized, funded, or carried out by such agency
> (hereinafter in this section referred to as an "agency action") is not likely to
> jeopardize the continued existence of any endangered species or threatened species
> or result in the destruction or adverse modification of habitat of such species which
> is determined by the Secretary . . . to be critical . . . .

16 U.S.C. § 1536(a)(2).

87.     "Action" is defined broadly to encompass "all activities or programs of any kind

authorized, funded, or carried out, in whole or in part, by Federal agencies."  50 C.F.R. § 402.02.

An agency's Section 7 obligations extend to ongoing actions over which the agency retains

authority or discretionary control.

88.     For actions that may adversely affect a listed species or critical habitat, a formal

consultation with the Services is required.  Id. § 402.14.  At the conclusion of a formal

consultation, the Services issue a biological opinion assessing the effects of the action on the

species and its critical habitat, determining whether the action is likely to jeopardize the

continued existence of the species or adversely modify its critical habitat and, if so, offering a

reasonable and prudent alternative that will avoid jeopardy or adverse modification.  16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

89.     Federal agencies must ensure that such actions will not "result in the destruction

or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  Since critical

habitat must be designated outside of a species' current inhabited range under certain

circumstances, the "adverse modification" analysis provides habitat protection even in situations

where the "jeopardy" analysis does not apply.  See Cape Hatteras Access Pres. All. v. U.S. Dep't

of Interior, 344 F. Supp. 2d 108, 131 (D.D.C. 2004); accord Sierra Club v. U.S. Fish and

Wildlife Serv., 245 F.3d 434, 441 (5th Cir. 2001).

90.     Section 9 of the ESA prohibits "take" of endangered species by any person, which

includes private entities, along with state and federal agencies.  16 U.S.C. § 1538(a)(1).  "Take"

means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  Id. §

1532(19).  The Services have defined "harm" to include "significant habitat modification or

degradation which actually kills or injures fish or wildlife by significantly impairing essential

behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50

C.F.R. § 222.102.

91.     If a federal action undergoing consultation will take a listed species, the biological

opinion must include an "incidental take statement" that specifies the amount and extent of

incidental take of listed species that may occur without causing jeopardy or adverse modification

of critical habitat.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The incidental take statement

provides a safe harbor, insulating from take liability activities undertaken in compliance with the

incidental take statement's terms and conditions.  16 U.S.C. § 1536(o)(2).  See Id.

§ 1536(b)(4)(C).  An incidental take statement also serves as a check on the biological opinion's

assumptions and conclusions and provides for monitoring.  50 C.F.R. § 402.14(i)(3).  It must set

out a "trigger" that identifies an unacceptable level of take that invalidates the safe harbor and

requires the agencies to immediately reinitiate consultation.  Id. § 402.14(i)(4).

92.     The ESA implementing regulations provide:

Reinitiation of formal consultation is required and shall be requested by the Federal
agency or by the Service, where discretionary Federal involvement or control over
the action has been retained or is authorized by law and

(a) If the amount or extent of taking specified in the incidental take statement is
exceeded; [or]

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . .

50 C.F.R. § 402.16 & (a)–(b).  If either of these triggers occurs, both the action agency and the expert fish and wildlife agency have a duty to request reinitiation of consultation.  Id.

93.     The Services' regulations reiterate that even when undertaking a programmatic consultation, the action agency is not relieved "of the requirements for considering the effects of the action or actions as a whole."  50 C.F.R. § 402.14(c)(4).

94.     The "action area" to be examined by the Services encompasses "all areas to be *affected directly or indirectly* by the federal action and not merely the immediate area involved in the action."  Id. § 402.02 (emphasis added).

**The Rivers and Harbors Act**

95.     A state 404 program cannot assert jurisdiction over navigable waters of the United States.  33 U.S.C. § 1344(g)(1).

96.     Navigable waters of the United States remain under the Corps' exclusive control pursuant to Section 10 of the Rivers and Harbors Act.  33 U.S.C. § 403.  They include those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  33 C.F.R. § 329.4.

97.     The Corps' exclusive jurisdiction also "extend[s] laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark."  Id. § 329.11(a).

98.     Precise definitions of "navigable waters of the United States" or "navigability" are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies.  Id. § 329.3.

99.     The Corps' determination of navigable waters is made by the division engineer in a report of findings based on criteria set out in the Corps' regulations.  Id. § 329.14(b).  These reports must be reviewed by district counsel before the division engineer issues a final determination.  Id.

100.    Each report must include findings on (1) the name of the waterbody, (2) the river it feeds; (3) its physical characteristics (including the water type, length, approximate discharge volume, fall per mile, extent of tidal influence, range between high and ordinary low water, and improvements to navigation), (4) the nature and location of significant obstructions to navigation or its capability to be used in interstate commerce, (5) authorized projects (including a list of known survey documents or reports describing the waterbody), (6) past or present interstate commerce, (7) the potential use for interstate commerce, (8) the nature of jurisdiction that has been exercised by federal agencies, (9) state or federal court decisions relating to navigability of the waterbody, and (10) the Corps' finding regarding navigability.  Id. § 329.14(c).

101.    Each district of the Corps is required to maintain a tabulated list of final determinations of navigability, and to update these lists "as necessitated by court decisions, jurisdictional inquiries, or other changed conditions."  Id. § 329.16(a).

102.    Since the district's list "represent[s] only those waterbodies for which determinations have been made[,] absence from that list should not be taken as an indication that the waterbody is not navigable."  Id. § 329.16(b).

103.     "Deletions from the list are not authorized" and "changes are not considered final until a determination has been made by the division engineer" following updated findings.  Id. § 329.16(c).

## FIRST CLAIM FOR RELIEF

### EPA'S INTERLOCUTORY COMPLETENESS DETERMINATION VIOLATES THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT

104.     Plaintiffs adopt and incorporate by reference paragraphs 1–103 of this Complaint.

105.     The APA's rulemaking procedures and Clean Water Act regulations require that the public be given notice and an opportunity to comment on a state 404 assumption application. 5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1)–(2).

106.     Pursuant to the APA, "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).  A "rule making" is the "agency process for formulating, amending, or repealing a rule."  Id. § 551(5).

107.     The EPA's decision to approve the transfer of section 404 jurisdiction from the Corps to a state is a rulemaking that must comply with the rulemaking procedures defined by Section 553 of the APA.

108.     The state application was not complete when received by the EPA because it relied on a USFWS programmatic biological opinion that was not in existence at the time of

submission and which would later result from the EPA's formal consultation with USFWS—a process that had not even begun when the application was submitted—to demonstrate that its program would ensure no jeopardy to listed species.

109.    USFWS' programmatic biological opinion and incidental take statement were submitted to the EPA on November 19, 2020, more than two weeks after the close of the public comment period.  Neither was made available to the public for review and comment.

110.    The state application was also not complete because it failed to adequately identify the waters that would be assumed under its proposed program as required by the EPA regulations dictating the contents of an assumption application.  40 C.F.R. § 233.11(h) (requiring assumption applications to include "[a] description" of the waters of the United States to be assumed by the state and to be retained by the Corps).

111.    Rather than provide this information, the state application included an unauthorized, truncated list of retained waters prepared by the Corps.

112.    Without complete information, members of the public were unable to fully evaluate and comment on the impact the EPA's approval would have on waters that are of ecological, historical, cultural, and economic benefit to the public.

113.    Finally, the state application failed to identify any funding for the implementation, operation, and enforcement of a state-level 404 program, as it claimed that no additional resources would be required and it did not identify legislative authorization for the re-purposing of funds.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding *and* manpower which will be available for program administration" (emphasis added)).

114.    The EPA's determination that Florida's application was complete as of its submission on August 20, 2020, was arbitrary, capricious, an abuse of discretion, not in

accordance with the law, unsupported by substantial evidence and otherwise in violation of the

Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344; 40 C.F.R. § 233.15.

115.    The EPA's closure of the comment period before elements of the state's

application were completed was arbitrary, capricious, an abuse of discretion, not in accordance

with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water

Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(g); 40 C.F.R. § 233.10, 233.15(e)(1)–(2).

116.    The EPA's unlawful completeness determination precluded meaningful testing,

denied fairness to affected parties, and precluded the opportunity to develop evidence in the

record necessary for judicial review.  See Small Refiner Lead Phase-Down Task Force v. U.S.

Envtl. Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (stating public notice requirements

under the APA are intended to provide these opportunities).

117.    The EPA's actions and omissions have harmed the Plaintiffs and leave them

without any adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**EPA'S APPROVAL OF FLORIDA'S ASSUMPTION PROGRAM VIOLATES THE
CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT[1]**

118.    Plaintiffs adopt and incorporate by reference paragraphs 1–117 of this Complaint.

119.    The Clean Water Act requires the EPA to determine whether a state seeking to

administer the 404 program has demonstrated that it has authority to, among other things: issue

permits that apply, and assure compliance with, the requirements of Section 404, including the

404(b)(1) Guidelines; assure that the public will have notice and an opportunity for hearing on

---

[1] The EPA also violated the Endangered Species Act by, among other things, relying on the
unlawful programmatic biological opinion from USFWS, unlawfully delegating its Section 7
obligations to non-federal parties, and relying on the unlawful jurisdictional determination by
NMFS.  Plaintiffs intend to amend the complaint to add the ESA claims after the required 60-day
pre-suit notice, 16 U.S.C. § 1540(g)(2)(A)(i), period has expired.

every application; and abate violations of any permit and the permit program via civil and criminal enforcement.  33 U.S.C. § 1344(h)(1); <u>see also</u> 33 U.S.C. § 1344(g)(1); 40 C.F.R. § 233.12.  The EPA may only approve a state program if it meets these criteria.  33 U.S.C. § 1344(h)(2)(A).

120.    The EPA acted unlawfully in approving the state's application as its program did not meet the criteria in many regards, including, but not limited to, those identified below.

121.    As to general permits, Section 404 authorizes the Corps to issue general permits for a duration of five years after the permitting entity determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.  The analysis underlying the issuance of general permits must be re-evaluated before a general permit can be renewed.

122.    The state program violates federal law by purporting to issue scores of general permits without the state permitting authority having made the requisite determinations regarding environmental impact, 40 C.F.R. § 233.21(b), <u>id.</u> § 233.2 (defining director as state agency), relying instead on the Corps' prior determinations.

123.    The state program violates federal law by authorizing these general permits for a duration of five years from the date of EPA approval of the program, unlawfully extending the general permits issued initially by the Corps beyond their statutorily limited five-year duration. 33 U.S.C. § 1344(e)(2).

124.    As to emergency permits, the state program unlawfully expands the circumstances under which emergency permits—those that do not follow the ordinary requirements of Section 404—may issue, in contravention of 40 C.F.R. § 233.22(a).

125.     As to permit conditions, the state program omits important requirements, including the requirement to "minimize" discharges in violation of a permit, <u>Id.</u> § 233.23(c)(4), certain monitoring and reporting requirements, <u>id.</u> § 233.23(c)(7), the requirement that discharges minimize adverse impacts through restoration, in addition to mitigation, <u>id.</u> § 233.23(c)(9), and the requirement of specifically identifying and completely describing the authorized activity, <u>id.</u> § 233.23(c)(1).

126.     As to the permit application process, the state does not require the same level of detailed information as is required under federal law, <u>id.</u> § 233.30(d), and uses different terms that change the information that must be provided, contrary to <u>id.</u> § 233.30(b)(3).

127.     The federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes." <u>Id.</u> § 233.3.  The state program, however, does not include this requirement and conceded that it "did not add this [requirement] to the rule."

128.     As to public notice, the state program does not require that the state provide public notice on receipt of a 404 permit application, in contravention of federal law, which does. <u>Id.</u> § 233.32(a)(1).

129.     As to definitions, the state program does not adopt all definitions in the 404(b)(1) Guidelines, omits definitions of several terms defined under federal law, and adopts more restrictive definitions for certain, critical terms (including "pollution").  <u>Compare</u> <u>id.</u> § 230.3(k) <u>with</u> Fla. Stat. § 403.031(7).

130.     Federal regulations require that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with

permit conditions." 40 C.F.R. § 233.40(a). The state's application failed to demonstrate that it

has, much less maintains, any such a program.

131.     As to general procedures for determining the applicability of permit conditions

relating to the contamination of dredge and fill material, the state restricted the broad federal

duty to "determine the possibility of chemical contamination or physical incompatibility of the

material to be discharged," id. § 230.5, to only situations where that contamination may violate

state water quality standards or toxic effluent standards or prohibitions.

132.     As to general permits, id. § 230.7, the state failed to include the 404(b)(1)

Guidelines' requirement that a general permit may only be issued if "[t]he activities in such

category are similar in nature and similar in their impact upon water quality and in the aquatic

environment." The state also failed to incorporate the 404(b)(1) Guidelines' requirements

governing the process for issuing general permits.

133.     As to restrictions on discharge, id. § 230.10, the state program creates a wholesale

exception for temporary violations of state water quality standards that is not present under

federal law.

134.     As to impacts, the state program fails to incorporate the requirement that a

determination of whether a discharge would cause or contribute to significant degradation of

wetlands or other surface waters be based on factual determinations, evaluations, and tests

required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C

through F, with special emphasis on the persistence and permanence of the effects outlined in

those subparts." Id. § 230.10(c).

135.     As to factual determinations, id. § 230.11, the 404(b)(1) Guidelines lay out

specific, factual determinations that permitting authorities must use to determine the individual,

cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity; contaminants; aquatic ecosystem and organism; and the proposed disposal site.  The state program does not incorporate or apply the guideline's defined set of factual determinations, and it does not require these factual determinations when considering whether to issue a 404 permit.

136.    As to findings of compliance or noncompliance with the restrictions on discharge, id. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration."  Id. § 230.12(b).

137.    The state regulations do not require the agency to make the factual determinations laid out in id. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

138.    The state application also failed to demonstrate adequate criminal enforcement authority.  33 U.S.C. § 1344(g)(1)(G). State law requires a greater degree of intent or knowledge to establish a criminal violation of Section 404 and provides a shorter statute of limitations as compared to federal law for holding criminal violators accountable.  33 U.S.C. §§ 1319(c)(1)(A), (B), 1365(a), (g); 18 U.S.C. § 3282; 28 U.S.C. § 2462; 40 C.F.R. § 233.41(a)(3)(ii).  See United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir. 1999).

139.    The state program failed to adopt or incorporate the wide range of impacts that must be considered under the 404(b)(1) Guidelines when reviewing a permit, other than for

31

aesthetics.  40 C.F.R. §§ 230.20–25 (Subpart C); id. §§ 230.30–32 (Subpart D); id. §§ 230.40–45 (Subpart E); id. §§ 230.50–54 (Subpart F).  But see id. § 230.53 (aesthetics).

140.    The state program failed to adopt or incorporate the 404(b)(1) Guidelines pertaining to compensatory mitigation for loss of wetlands.

141.    The state program failed to define a whole host of terms used in the federal program, id. § 230.92, and uses definitions of comparable terms that conflict with or undermine the substance of the federal definition (for example the state definition of wetlands "creation" does not require "a gain in aquatic resource area and functions," whereas the federal definition of wetlands "establishment" does).

142.    As to general compensatory mitigation requirements, id. § 230.93, the state alters or omits vital portions of this Guideline, thereby creating less stringent requirements for its mitigation program.  For example, the state program weakens the "watershed approach" described in the 404(b)(1) Guidelines, which is necessary to ensuring that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits.  Id. § 230.93(c)(4).  The state program ignores the federal requirements pertaining to site selection for mitigation, id. § 230.93(d)(vi), which are essential to ensuring the mitigation is appropriate and effective.

143.    The state program does not include federal requirements that permit writers document certain findings pertaining to mitigation, id. § 230.93(e)(2)–(3), and omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary."  Id. § 230.93(f)(2).

144.    As to the decision-making process for a permit application, federal rules require that a permit be reviewed for compliance with the 404(b)(1) Guidelines.  Id. § 233.34.

145.    The state program has not adopted or incorporated these guidelines.

146.    As to compliance evaluation programs, federal rules require a state to "maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions."  Id. § 233.40(a).

147.    The state does not maintain a program to identify violations of its current wetlands programs and has not shown it is capable to do so for an assumed 404 program.

148.    State law also does not provide comparable access to the courts for purposes of enforcement and redress as available under federal law.  This deprives affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.

149.    Whereas federal law authorizes any aggrieved party to litigate Section 404 claims, Florida allows only citizens of the state to compel government enforcement of environmental laws, to bring suit against a person or non-governmental entity to enforce environmental laws, to initiate administrative proceedings in federally delegated programs, and to intervene in enforcement proceedings.

150.    State law also severely limits the ability to establish associational standing. Whereas federal law authorizes associational standing based on a single member's injury in fact, Am. Clinical Lab. Ass'n v. Azar, 931 F.3d 1195, 1203 (D.C. Cir. 2019), Florida law requires organizations to demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct.

151.    For purposes of enforcement and redress, state law further conflicts with federal law by creating a mandatory fee-shifting provision that has no analog under the Clean Water Act and discourages or precludes under-resourced individuals and organizations from seeking to vindicate their rights.

152.     State 404 permitting programs must ensure that the state agency will not issue any permit that fails to comply with the requirements of the Clean Water Act and its implementing regulations, including the 404(b)(1) Guidelines.  See 40 C.F.R. § 233.20.

153.     The state program fails to adopt or incorporate by reference all 404(b)(1) Guidelines.

154.     Specifically, the state program fails to satisfy the 404(b)(1) Guidelines requirement to ensure there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act Guidelines.  Id. §§ 233.15(g), 230.10(b)(3).

155.     The state did not demonstrate that its Department of Environmental Protection has the authority to regulate species under state law that it now claims it would exercise in a state-assumed program.

156.     The state's application failed to provide the necessary statement regarding the State's takings law.  Id. § 233.12(c).  Instead, the state relied on the limited and universally applicable chance that a takings case may be reviewed by the Supreme Court of the United States.

157.     The state's application summarily asserted that it could rely on existing resources to administer and enforce a 404 program while failing to disclose, among other things:  (1) the state agency's failure to meet existing regulatory obligations; (2) the significant budget cuts brought on by the global pandemic; and (3) the resource status and needs of other state agencies which the state intends to rely on to fulfill obligations under the Clean Water Act.  Id. §§ 233.1(a), 233.11.

158.    The state also did not demonstrate that it had the legal authority to re-purpose current funding for a new federal program.

159.    The state program did not fully address or disclose all costs that will necessarily be associated with administering a state-level 404 program, including:  (1) initial resources needed to process all pending (160) applications at the time of assumption; (2) resource needs and costs required for compliance and enforcement of the pending applications that are approved; (3) sufficient staffing; (4) an adequate audit process; (5) costs associated with reissuing general permits; (6) the large area of permits where the claimed "85%" overlap of work with the state wetlands program will not be achieved; and (7) several costs associated with implementation.

160.    For these, and other reasons, the EPA's approval of the state's application was arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act, 33 U.S.C. § 1344, and APA, 5 U.S.C. § 706(2).

161.    The EPA's actions and omissions have harmed and will harm the Plaintiffs and leave them without any adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### USFWS' BIOLOGICAL OPINION AND "NO JEOPARDY" DETERMINATION VIOLATE THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT

162.    Plaintiffs adopt and incorporate by reference paragraphs 1–161 of this Complaint.

163.    Section 7 of the ESA requires that a biological opinion "detail[] how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).

164.    In this case, the "agency action" for Section 7 of the ESA was EPA's consideration of the state 404 program.  The ESA therefore required USFWS to make the

relevant determinations regarding the impact of the EPA's approval of the program.  The ESA's implementing regulations specify that a biological opinion must include:  "[a] detailed discussion of the environmental baseline of the listed species and critical habitat [and] [a] detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(1)(ii), (iii).

165.    These requirements apply to the issuance of programmatic biological opinions. 50 C.F.R. § 402.14(c)(4).  USFWS' biological opinion concluded that approval of the state program would result in "no jeopardy."

166.    USFWS stated that its jeopardy analysis relied on:  (1) the status of the species; (2) the environmental baseline, which analyzes the condition of the listed species in the action area, without the consequences to the listed species caused by the proposed action; (3) the effects of the action, which includes all consequences to listed species that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action; and (4) the cumulative effects, which evaluates the effects of future, non-Federal activities in the action area on the species.  16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(g).

167.    In the biological opinion, however, USFWS relied on the biological evaluation submitted by the EPA, which was virtually identical to the biological assessment provided by the state to the EPA in support of its application.

168.    In the biological evaluation, the EPA found the proposed assumption is "likely to adversely affect" 163 species under USFWS's jurisdiction, is "not likely to adversely affect" 9 species, and would have "no effect" on 60 species.

169.    The EPA's conclusions were inconsistent and incomplete.  For example, the EPA found the action would have "no effect" on shortnose sturgeon, Gulf sturgeon, or Atlantic

sturgeon, despite also stating that "the action could result in a [likely to adversely affect] determination" for shortnose sturgeon and that critical habitat for Gulf sturgeon is designated in several Florida rivers.

170.     USFWS' biological opinion also failed to provide a detailed discussion of the environmental baseline and failed to provide a detailed discussion of the effects of the action.

171.     Rather than provide the requisite detailed discussion of the environmental baseline, USFWS' biological opinion incorporated by reference the EPA's biological evaluation.

172.     The biological evaluation in turn does not provide a detailed discussion of the environmental baseline as affects listed species and critical habitats, 50 C.F.R. § 402.02.  Instead, the biological opinion merely includes a chart listing previous 404 permits that involved ESA consultations.

173.     Instead of a detailed discussion of effects on each of the listed species and critical habitats that may result from the EPA's approval of the state program, USFWS' biological opinion—again incorporating the EPA's biological evaluation, which mimics the state's biological assessment—provides only a cursory overview of the harms to species and habitat from general environmental degradation.

174.     The biological evaluation noted that critical habitat is designated for nearly 40 potentially affected species but did not map where critical habitat may exist within the action area or make any effects determinations for critical habitats.

175.     USFWS' biological opinion did not lawfully conduct a jeopardy analysis as to any species or critical habitat.  16 U.S.C. § 1536(a)(2), (b).

176. USFWS' reliance on this insufficient biological evaluation to make determinations required under the ESA was arbitrary and capricious and otherwise not in accordance with the law.

177. USFWS further improperly relied on its memorandum of understanding with the state in making its no jeopardy determination. The memorandum of understanding establishes a process regarding individual permit decisions, not an assessment of whether the federal action for consultation purposes—the EPA's approval of the state's 404 assumption—may jeopardize listed species or adversely modify critical habitat, which requires assessment of the proposed program as a whole.

178. Likewise, USFWS' consideration of the likelihood of jeopardy or adverse modification from the issuance of individual permits does not assess the likelihood of jeopardy or adverse modification from the entire action under consultation—assumed authority for all dredge and fill permits.

179. USFWS' failures to analyze the status of the species, environmental baseline, effects of the action and cumulative effects violate the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A), and render its "no jeopardy" determination unlawful.

## FOURTH CLAIM FOR RELIEF

### USFWS' BIOLOGICAL OPINION AND "INCIDENTAL TAKE STATEMENT" VIOLATE THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT

180. Plaintiffs adopt and incorporate by reference paragraphs 1–179 of this Complaint.

181. The ESA prohibits any person from "taking" an endangered species. 16 U.S.C. § 1538(a)(1)(B). Under Section 4(d), 16 U.S.C. § 1533(d), USFWS has the authority to issue regulations extending the take prohibition to threatened species.

182.   The take prohibition applies to "any person."  16 U.S.C. § 1538(a)(1).  The ESA defines "any person" to include "any officer, employee, agent, department, or instrumentality of the Federal Government."  16 U.S.C. § 1532(13).  The ESA citizen suit provision authorizes suits to enforce the ESA and its implementing regulations against any person, including federal agencies.  Id. § 1540(g)(1).

183.   The EPA, the director of a state-assumed program, and permittees are persons subject to the ESA take prohibition and to ESA citizen suits.

184.   The ESA defines "take" to include "harm."  Id. § 1532(19).

185.   If a federal action undergoing consultation will take a listed species, the biological opinion must include an "incidental take statement" that specifies the amount and extent of incidental take of the listed species that may occur without causing jeopardy or adverse modification, includes "terms and conditions," and provides for monitoring of take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(3).  Incidental take must be incidental and not the purpose of the action.  The incidental take statement insulates from take liability activities undertaken in compliance with its terms and conditions.  16 U.S.C. § 1536(o)(2).  See 16 U.S.C. § 1536(b)(4)(C).

186.   An incidental take statement serves as a check on the biological opinion's assumptions and conclusions.  It must set out a "trigger" that specifies an unacceptable level of take that invalidates the safe harbor and requires the agencies to immediately reinitiate consultation.  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

187.   USFWS' biological opinion fails to specify the amount or extent of incidental take, fails to impose a limit on incidental take, and fails to specify a take-based trigger for reinitiating consultation, all in violation of the ESA.

188.    USFWS' failures precluded the agency from lawful authority to issue an incidental take statement purporting to extend incidental take coverage to the EPA, the state, and state permittees.

189.    USFWS' incidental take statement purports to provide permittees conditional take coverage so long as they comply with all permit conditions imposed by the state agency, as recommended by USFWS.  The nature and adequacy of such conditions is not known because there are no standards or sideboards governing them.  Accordingly, USFWS lacks a reasoned basis for determining the permits and permittee actions in compliance with them will not result in an unacceptable amount of take.

190.    The biological opinion's incidental take statement does not impose a measurable limit on allowable take.  See 50 C.F.R. 402.14(i)(1)(i).  It indicates that USFWS does not know which species will be taken, the locations of take, or the number of individual members of listed species that will be harmed, killed, or otherwise taken as a result of state permits authorizing the discharge of dredged and fill material in waters of the United States.

191.    The Services can use a surrogate to establish a take limit, provided the surrogate is an accurate and credible measure of harm to the listed species.

192.    The biological opinion provides no surrogate measure for the number of individual listed species that can be taken under the delegation without upending the biological opinion's assumptions and no-jeopardy determinations.  It therefore fails to provide a limit on take as required by the ESA and the ESA regulations and no measurable trigger for reinitiation of consultation or elimination of the safe harbor.

193.    The incidental take statement incorporates into its take limit compliance with the process set out in the memorandum of understanding.  In other words, the take limit is the same

as implementation of the action undergoing consultation.  It is the proposed action, rather than a separate limit and check on the biological opinion's no-jeopardy conclusions.

194.     USFWS acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2), in setting the take limit at the level that coincides with full implementation of the action undergoing consultation.

195.     The incidental take statement relies on a future process to minimize take, but that process lacks sideboards to ensure that the take that will not cause jeopardy or be at odds with the biological opinion's assumptions and conclusions.  It provides the EPA take coverage once the delegation is approved without requiring the EPA to implement USFWS' take minimization measures.  As to the EPA, it thereby establishes no limit on the allowable amount of take that the delegation will cause.

196.     The terms and conditions of the incidental take statement require the state to implement all USFWS recommendations to avoid and minimize impacts to listed species and to deny a permit if USFWS makes a jeopardy call.  Neither the biological opinion nor the memorandum of understanding imposes any sideboards to ensure USFWS will make the necessary recommendations to avoid and minimize those impacts.  It was therefore arbitrary and capricious for the agency to claim that those documents are enough to avoid take.

197.     To the extent that the biological opinion and incidental take statement rely on future jeopardy determinations that USFWS may make in its review of individual permits, the biological opinion is abdicating its responsibility to determine whether the delegation is likely to cause jeopardy and punting to future jeopardy determinations on different proposed actions – individual permits versus the delegation of authority over all future permits throughout the entire state and for the indefinite future.  In addition, this abdication of responsibility is replacing the

required Section 7 consultation at the programmatic level for an unauthorized and less protective "technical assistance" review laid out in the biological opinion at the permit-level.

198.    The incidental take statement fails to include any method for recording or monitoring incidental take or to consider the cumulative impact of individual permit decisions.

199.    The incidental take statement relies on an unlawful scheme for purportedly conducting ESA review at the permit level for purposes of take liability coverage for the state and permittees.  The ESA creates two paths for extending take liability coverage, Section 7 (consultation for federal actions) and Section 10 (incidental take permits).  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).  Neither authorizes the scheme that USFWS created and relies upon in the incidental take statement.

200.    USFWS' actions and omissions are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA, 16 U.S.C. § 1536, and APA, 5 U.S.C. § 706(2)(A).

201.    USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**

**EPA'S "NO EFFECT" DETERMINATION VIOLATES
THE CLEAN WATER ACT AND ADMINISTRATIVE PROCEDURE ACT**

202.    Plaintiffs adopt and incorporate by reference paragraphs 1–201 of this Complaint.

203.    On April 15, 2020, NMFS unlawfully concluded that there were no species under its exclusive jurisdiction in assumable waters.  On its face, NMFS' determination failed to consider, much less analyze, all areas that would be affected by Florida's program directly or indirectly, as required under federal law.  See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02.

204.    On August 28, 2020, the EPA determined that consideration of a state 404 program was a discretionary action subject to compliance with the ESA, thereby triggering a duty to consult with USFWS and NMFS.

205.    On September 2, 2020, the EPA initiated formal consultation with USFWS, and transmitted its "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" (dated August 2020) to USFWS.

206.    In the biological evaluation, the EPA concluded that Florida's application would have "no effect" on NFMS jurisdictional species, based solely on the rationale in NMFS' April 15, 2020 letter.

207.    On September 2, 2020, EPA also sent a letter to NMFS confirming there were no changes to the previous species list reviewed by NMFS in April and, relying on NMFS April 15 jurisdictional determination, concluded the state's assumption would have no effect on NMFS's jurisdictional species.

208.    On September 3, 2020, NMFS sent a letter to EPA stating that they concurred with the "no effect" determination in EPA's September 2, 2020 letter.

209.    On October 30, 2020, NMFS in an email to EPA again concurred with EPA's "no effect" determination.

210.    These determinations were all based on NMFS' conclusion that jurisdictional species would not be within assumed waters.

211.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the Clean Water Act and APA.  5 U.S.C. § 706(2); 33 U.S.C. § 1344(h)(1)(A)(i); 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), 233.23(a).

212.    The EPA's actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

### SIXTH CLAIM OF RELIEF

**USFWS' UNLAWFUL SCHEME VIOLATES THE
ADMINISTRATIVE PROCEDURE ACT**

213.    Plaintiffs adopt and incorporate by reference paragraphs 1–212 of this Complaint.

214.    USFWS' incidental take statement, biological opinion, and memorandum of understanding create an ESA scheme that is not authorized by law.

215.    No provision of the ESA authorizes the scheme created by USFWS in the biological opinion, incidental take statement, and memorandum of understanding to give the state a workaround regarding the mechanisms that Congress provided for establishing take limits, extending liability coverage, and determining jeopardy to species.

216.    Section 7 authorizes federal agencies to consult with USFWS.  16 U.S.C. § 1536. Pursuant to that process, USFWS can issue a biological opinion, establish take limits, and provide an incidental take statement that extends protection from ESA liability.  Id. § 1536(b)(c).

217.    USFWS' scheme in this case attempts to replicate that process with a state agency.  However, that is not authorized by the statute or regulations.

218.    Section 10 of the ESA creates a process for non-federal entities, like the state, to obtain permits that would relieve liability for the taking of listed species done incidental to an otherwise lawful activity.  16 U.S.C. § 1539(a)(1)(B).  Pursuant to that process, the applicant completes a conservation plan and submits it to USFWS.  Id. § 1539(a)(2)(A).  After review of the habitat conservation plan and public comments of the plan, USFWS may issue a permit including such terms and conditions as necessary or appropriate to carry out the purposes of the ESA.  Id. § 1539(a)(2)(B).

219.    USFWS did not act pursuant to Section 10 when establishing its scheme.

220.    USFWS' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, in excess of statutory jurisdiction and authority, short of statutory right, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

221.    USFWS' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

### CORPS' RETAINED WATERS DETERMINATION VIOLATES THE RIVERS AND HARBORS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

222.    Plaintiffs adopt and incorporate by reference paragraphs 1–221 of this Complaint.

223.    The Corps cannot delete identified navigable waters from its retained waters list until a determination has been made by the division engineer following the procedures and relying on the findings identified by the Corps' regulations.  33 C.F.R. § 329.14, 16.

224.    In conjunction with the state application, the Corps drastically reduced its retained waters list from 17 to 4 pages long.

225.    The Corps has not provided the public with a justification for its decision to substantially reduce the list of retained waters.

226.    The Corps' actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

227.    The Corps' actions and omissions have harmed and—unless enjoined—will harm the Plaintiffs and leave them without any adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

### EPA'S IMMEDIATE EFFECTIVE DATE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

228.    Plaintiffs adopt and incorporate by reference paragraphs 1–227 of this Complaint.

229.    Pursuant to the APA, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date."  5 U.S.C. § 553(d).  The only exceptions to this rule occur when a rule is:  (1) a substantive rule that "grants or recognizes an exemption or relieves a restriction"; (2) an interpretive rule or statement of policy; or (3) "the agency otherwise provides for good cause found and published with the rule."  5 U.S.C. § 553(d)(1)–(3).

230.    The EPA's approval of a state program constitutes a substantive rule that is subject to the requirements of APA Section 553.  5 U.S.C. §§ 551(4)–(5), 553.

231.    The EPA acted pursuant to delegated authority under the Clean Water Act to approve the state's assumption of jurisdiction over the federal 404 program.  33 U.S.C. § 1344.

232.    As required for a rule of general applicability and legal effect, the EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. 57,853, 57,855 (Sept. 16, 2020).  The agency unlawfully failed to codify the program.

233.    The EPA's decision has a substantive legal effect by (1) requiring public citizens to follow a new legal process under a new set of laws, regulations, and guidance, (2) delegates decision-making authority from the federal government to a state; (3) requires compliance with a different set of laws; (4) transfers enforcement authority from the federal government to a state operating under a different set of laws in state courts rather than federal courts; (5) requires permit applicants to fill out and submit different permit application forms to be submitted to a different permit-issuing entity; (6) strips the Corps of jurisdiction over the federal 404 program;

(7) removes citizens' NEPA rights; (8) restricts citizens' access to the courts; and (9) deprives Tribes' of their right to consult with the federal government—which bears trust obligations to the Tribes—when 404 permits would affect their natural, cultural, and historical resources.

234.    The rule does not grant or recognize an exception or relieve a restriction.

235.    Nor does the rule constitute an interpretation or statement of policy.

236.    The EPA provided no justification in the Federal Register Notice that would support application of the good cause exception.  Nor do the good cause exceptions apply.

237.    The EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter.

238.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

239.    The EPA's immediate effective date for Florida's 404 program must be held unlawful and set aside.

## NINTH CLAIM FOR RELIEF

### EPA'S FAILURE TO CODIFY FLORIDA'S PROGRAM VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

240.    Plaintiffs adopt and incorporate by reference paragraphs 1–239 of this Complaint.

241.    Codification in the Code of Federal Regulations is required for all documents of an agency "having general applicability and legal effect . . . and . . . relied upon by the agency as authority."  44 U.S.C. § 1510(a).

242.    EPA's decision was intended to be a rule of general applicability that would have the legal effect of transferring authority from the Corps to the state and authorizing the state 404 program.

243.    Whenever a rule is subject to codification, the agency must draft its notice as an amendment to the Code of Federal Regulations before submitting it to the Office of the Federal Register.  1 C.F.R. § 21.1(a).  The agency must include in its publication "words of issuance" and "amendatory language that precisely describes the relationship of the new provision to the Code."  Id. § 21.1(b).

244.    The EPA's December 22, 2020, publication of its decision in the Federal Register failed to include "words of issuance" or "amendatory language" codifying the state program into the Code of Federal Regulations.  85 Fed. Reg. 83,553 (Dec. 22, 2020).

245.    The EPA indicated that approval of the Florida 404 program would be codified at 40 C.F.R. 233 subpart H.  85 Fed. Reg. at 57,855.

246.    The EPA has codified in the Code of Federal Regulations its approval of prior states that have assumed 404 jurisdiction.  See 40 C.F.R. § 233.70 (incorporating by reference Michigan's assumption program); 49 Fed. Reg 38,947-01 (approving and codifying Michigan's program into 40 C.F.R. § 233.70); 40 C.F.R. § 233.71 (incorporating by reference New Jersey's assumption program); 59 Fed. Reg. 9,933-01 (approving and codifying New Jersey's assumption program).

247.    The EPA's actions and omissions were arbitrary, capricious, an abuse of discretion, not in accordance with the law, unsupported by substantial evidence, and otherwise in violation of the APA, 5 U.S.C. § 706(2).

248.    The EPA's failure to codify the state program rendered the transfer of authority a nullity.  The subsequent transfer of authority must be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

 (a) Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when making the decision that the state's application was complete;

 (b) Issue a declaratory judgment declaring that the EPA violated the Clean Water Act and APA by taking a final agency action and making findings and conclusions that are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with law, when the agency approved the state's application to assume jurisdiction over the Clean Water Act 404 program;

 (c) Issue a declaratory judgment declaring that USFWS' biological opinion, "no jeopardy" determination, and incidental take statement violated the ESA and APA;

 (d) Issue a declaratory judgment declaring that USFWS' scheme for permit-level ESA "analysis" is not authorized by the law;

 (e) Issue a declaratory judgment declaring that the Corps violated the RHA and APA when producing its retained waters list;

 (f) Issue a declaratory judgment declaring that the EPA violated the APA by providing an immediate-on-publication effective date for its approval of Florida's program;

 (g) Issue a declaratory judgment declaring that the EPA violated the APA by transferring authority without codifying a lawful state program in the Code of Federal Regulations;

 (h) Vacate and set aside the EPA's decision that the state's application is complete;

(i)     Vacate and set aside the EPA's decision to approve the state's application to assume jurisdiction over the Clean Water Act 404 program and remand with instructions for reopening and completing EPA's consideration of Florida's assumption application;

(j)     Vacate and set aside USFWS' programmatic biological opinion and incidental take statement for the challenged EPA decision and remand with instructions for reopening and reinitiating consultation;

(k)     Vacate and set aside the Corps' retained waters list submitted in conjunction with the state's application;

(l)     Hold unlawful and set aside the EPA's December 22, 2020, immediate effective date for the Florida 404 program;

(m)     Enjoin the EPA's approval and transfer of authority to the state;

(n)     Issue any other appropriate injunctive relief;

(o)     Allow the Plaintiffs to recover the reasonable fees, costs, and disbursements of this action, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(p)     Grant such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 14th day of January 2021,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

*\* Appearing under LCvR 83.2(c)(1)*