**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 2

LEGAL STANDARD ................................................................................................. 10

ARGUMENT ............................................................................................................. 11

    I.    EPA's Approval of the State 404 Program was a Substantive Rulemaking that Must Be Codified and Comply with Section 553 of the APA. ............................................. 11

        A.  EPA's Action Was a Substantive Rulemaking. ........................................... 12

        B.  EPA's Action Is a Rule, not a License. ...................................................... 20

    II.  EPA Violated Federal Law by Failing to Provide the Required Delay in Effective Date and Failing to Codify the Approved Components of the State Program. ................................ 22

STANDING ............................................................................................................... 25

    I.    EPA's Actions Foreclosed Plaintiffs from Exercising Their Procedural Right to Seek an Agency Stay Pending Judicial Review. ................................................................. 26

    II.  The Procedural Right to a Delay in Effective Date is Designed to Protect Plaintiffs' Concrete Interests. ................................................................................................. 27

    III.   This Procedural Harm Threatens Plaintiffs' Concrete Interests. .................................. 28

        A.  Because Plaintiffs Could Not Seek an Agency Stay or Reconsideration, There is a Substantial Risk that the State will Grant Permits that Will Harm Plaintiffs' Members' Aesthetic, Recreational, and Other Interests. ..................................... 28

B.   Plaintiffs Were Forced to Divert Resources Away from Core Program Work as a Result of the Immediate Effective Date........................................................................................... 33

IV.   Plaintiffs Suffered Concrete, Substantive Injuries as a Result of EPA's Failure to Codify its Actions.............................................................................................................. 41

V.   Plaintiffs have Satisfied Article III's Causation and Redressability Requirements. ......... 42

CONCLUSION............................................................................................................................... 44

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Am. Clinical Lab. Ass'n v. Azar,
    931 F.3d 1195 (D.C. Cir. 2019) .......................................................................15

Am. Min. Cong. v. Mine Safety & Health Admin.,
    995 F.2d 1106 (D.C. Cir. 1993) .......................................................................18

Bowen v. Georgetown Univ. Hosp.,
    488 U.S. 204 (1988) .........................................................................................21

\* Brock v. Cathedral Bluffs Shale Oil Co.,
    796 F.2d 533 (D.C. Cir. 1986) .................................................................18, 23

City of Dania Beach, Fla. v. Federal Aviation Administration,
    485 F.3d 1181 (D.C. Cir. 2007) .................................................................26, 43

Clean Air Council v. Pruitt,
    862 F.3d 1 (D.C. Cir. 2017) .............................................................................26

Cmty. Nutrition Inst. v. Young,
    818 F.2d 943 (D.C. Cir. 1987) .........................................................................14

Elec. Priv. Info. Ctr. v. FAA,
    892 F.3d 1249 (D.C. Cir. 2018) .......................................................................33

Envtl. Def. Fund v. U.S. Envtl. Prot. Agency,
    No. 4:21-CV-00003-BMM, 2021 WL 402824 (D. Mont. Feb. 1, 2021) ................................43

Fisher v. Pension Benefit Guar. Corp.,
    468 F. Supp. 3d 7 (D.D.C. 2020) .....................................................................10

Fla. Wildlife Fed'n v. Fla. Dep't of Envtl. Prot.,
    No. 14-1644RP, 2014 WL 4627151 (Fla. Div. of Admin. Hearings) ............15, 40

Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,
    404 F. Supp. 2d 1352 (S.D. Fla. 2005) ...........................................................39

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
    528 U.S. 167 (2000) .........................................................................................25

Gen. Motors Corp. v. U.S. Envtl. Prot. Agency,
    363 F.3d 442 (D.C. Cir. 2004) .........................................................................12

Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,
    920 F.3d 1 (D.C. Cir.) .......................................................................................18

Juliana v. United States,
    947 F.3d 1159 (9th Cir. 2020) ..........................................................................43

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992)..............................................................................25, 28, 43

\*    Massachusetts v. U.S. Envtl. Prot. Agency,
    549 U.S. 497 (2007)....................................................................................26, 43

Menominee Indian Tribe of Wisconsin v. Envtl. Prot. Agency,
    947 F.3d 1065 (7th Cir. 2020) ................................................................11, 15, 19

Nance v. U.S. Envtl. Prot. Agency,
    645 F.2d 701 (9th Cir. 1981) ......................................................................23, 28

Nat. Res. Def. Council v. U.S. Dep't of Energy,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019)................................................................27

Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency Adm'r,
    595 F. Supp. 65 (D.D.C. 1984) ..........................................................................16

Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.,
    2020 WL 5995032 (D.D.C. Oct. 10, 2020) .......................................................41

\*    Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
    417 F.3d 1272 (D.C. Cir. 2005) .........................................................................22

\*    Nat'l Ass'n of Home Health Agencies v. Schweiker,
    690 F.2d 932 (D.C. Cir. 1982).............................................................................14

Nat'l Wildlife Fed'n v. Babbitt,
    835 F. Supp. 654 (D.D.C. 1993) ........................................................................18

Ngou v. Schweiker,
    535 F. Supp. 1214 (D.D.C. 1982) ......................................................................43

\*    Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.,
    No. CV 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020)
    .............................................................................................33, 36, 40, 41

Otay Mesa Prop., L.P. v. U.S. Dep't of Interior,
    144 F. Supp. 3d 35 (D.D.C. 2015)......................................................................25

\*    People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,
    797 F.3d 1087 (D.C. Cir. 2015) ..............................................................35, 38, 40

Prowes v. U.S. Dep't of Just.,
    938 F.2d 274, (D.C. Cir. 1991) ...................................................................43

Rowell v. Andrus,
    631 F.2d 699 (10th Cir. 1980) ..........................................................23, 28

\* Safari Club Int'l v. Zinke,
    878 F.3d 316 (D.C. Cir. 2017) ..........................................................20, 21

Sierra Club v. Jewell,
    764 F.3d 1 (D.C. Cir. 2014) ...................................................................28

Sierra Club v. Johnson,
    436 F.3d 1269 (11th Cir. 2006) ...............................................................42

Simmons v. I.C.C.,
    757 F.2d 296 (D.C. Cir. 1985) ..........................................................22, 23

Spokeo, Inc. v. Robins,
    136 S.Ct. 1540 (2016) ...........................................................................25

Sugar Cane Growers Coop. of Fla. v. Veneman,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................26

Summers v. Earth Island Inst.,
    555 U.S. 488 (2009).........................................................................25, 42

United States v. Facebook, Inc.,
    456 F. Supp. 3d 105 (D.D.C. 2020) ..................................................26, 43

**Statutes**

5 U.S.C. § 553(d) ................................................................................... *passim*

5 U.S.C. § 553(e) ...........................................................................19, 26, 27

5 U.S.C. § 705.............................................................................9, 23, 26, 27

5 U.S.C. § 706(2)(A).......................................................................................44

5 U.S.C. § (C)-(D).....................................................................................11, 44

16 U.S.C. § 1536(c)(1)..................................................................................39

16 U.S.C. § 1538(a)(1)(B) ..............................................................................3

16 U.S.C. § 1540(g)(1) ....................................................................................3

33 U.S.C. § 1344(h) .................................................................................2, 24

33 U.S.C. § 1365(d) ............................................................................................16

42 U.S.C. § 4321 ...............................................................................................15

44 U.S.C. § 1510 ...............................................................................................18

44 U.S.C. § 1510(a) .............................................................................7, 11, 12, 22

**Other Authorities**

1 C.F.R. § 8.1 ....................................................................................................18

1 C.F.R. § 21.1(a)–(b) .......................................................................................23

33 C.F.R. §§ 233.70 .............................................................................................7

40 C.F.R. § 230.10(b)(3) ......................................................................................5

40 C.F.R. § 233.15(a) ..........................................................................................2

40 C.F.R. § 233.15(g) ..........................................................................................5

40 C.F.R. § 233.15(h) ........................................................................................24

49 Fed. Reg. 38,947 (1984) ...........................................................................17, 24

59 Fed. Reg. 9,933 (1994) .............................................................................17, 24

85 Fed. Reg. 57,853 (2020) ....................................................................... *passim*

85 Fed. Reg. 80,713 (2020) ..................................................................................6

85 Fed. Reg. 83,553 (2020) ......................................................................6, 16, 22

44 Fla. Admin. Reg. 2321 (2018) ......................................................................29

Fla. Admin. Code Chapter 62 ...................................................................7, 12, 13

Fla. Dep't Envtl. Prot., State 404 Program Applicant's Handbook ....................13

Fla. Stat. § 403.412(2)(f) ..............................................................................16, 41

U.S. Fish & Wildlife Serv., Habitat Conservation Plan Handbook .....................3

## INTRODUCTION

Plaintiff conservation organizations bring this action to enforce federal laws passed by Congress to protect waters of the United States and the endangered species that rely on them. During the prior Administration, the state of Florida saw an opportunity to realize an objective that had been studied, but never considered possible, before: to take over authority to administer Section 404 of the Clean Water Act—which governs dredging and filling of certain waters of the United States, including sensitive wetlands—in one of the most biodiverse states in the country that also enjoys some of the nation's most expansive waterways. Indeed, only two other states— Michigan and New Jersey—had ever assumed such authority before. In Florida, developers had described this goal as their "holy grail." Exhibit 2 at 5 (Umpierre Dec. at ¶ 14). Between 2017 and 2020, developers worked hand in glove with the state, and the state in turn with the U.S. Environmental Protection Agency ("EPA"), to make this dream a reality—specifically, before January 20, 2021.

As that date approached, EPA worked at breakneck speed to deliver the holy grail. Once Florida formally submitted its application on August 20, 2020, EPA deemed the application complete when it was not, reversed its longstanding position on endangered species consultation so as to extend broad protection from incidental take liability to developers, rushed obligations to consult with federally recognized tribes, and tried to publish a midnight rule to relax enforcement requirements for state 404 programs. EPA's final shortcut was to publish its approval of Florida's program on December 22, 2020, without codifying any element of the new legal regime, and to claim to give that action immediate legal effect in violation of the Administrative Procedure Act's ("APA") requirement that 30 days elapse between publication of a rule and its effective date. 5 U.S.C. § 553(d). EPA's actions failed to lawfully effectuate transfer of

authority to the state, which is now administering the program anyway, threatening Plaintiffs' organizational interests, and the aesthetic, recreational, and other interests of its members.

Among other things, EPA's actions have deprived the Plaintiffs of the right to seek an agency stay pending judicial review to protect those interests, denied them rights and remedies available under federal environmental laws, and limited, if not foreclosed, their access to remedies by relegating them to costly state forums with highly restrictive standing requirements and mandatory fee shifting. Meanwhile, business interests are pursuing state permits to drill for oil in the magnificent Big Cypress National Preserve and to build major developments in and around essential habitat for the Florida panther, one of the most endangered animals on the planet. To redress these harms, Plaintiffs move for summary judgment on their Eighth and Ninth Claims for Relief. Dkt. 1 at 46–48 (Compl. ¶¶ 228–48).

## STATEMENT OF FACTS

On August 20, 2020, Florida formally submitted an application to EPA requesting approval to administer Section 404 of the Clean Water Act in waters of the United States. EPA deemed the application "complete" as of the date it was submitted so as to trigger a 120-day clock to render a decision,[1] Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Aug. 28, 2020, A.R. 0641,[2] unless EPA and the state agreed to extend the timeline, even though the application relied on components that were not yet in existence. Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020, A.R. 0051; Letter from Tania Galloni

---

[1] See 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a) (120-day statutory review period begins when EPA receives complete state program submission).
[2] Plaintiffs' citations to the Administrative Record replace the lengthy "EPA-HQ-OW-2018-0640" prefix with "A.R." followed by the document identification number. Where applicable, Plaintiffs also cite the page number of the PDF in accordance with the Court's Standing Order.

et. al, to Kelly Laylock, EPA, Nov. 2, 2020, A.R. 0386 at 16–17.  <u>See also</u> U.S. Envtl. Prot.

Agency, 85 Fed. Reg. 57,853 (Sept. 16, 2020), A.R. 0001 at 3 (stating that EPA received a

"complete" application on August 20, 2020, and intended to decide by December 17, 2020).

On August 27, 2020, and at Florida's request, EPA reversed its longstanding position on

whether the agency was required to engage in Endangered Species Act ("ESA") consultation and

obtain a biological opinion from U.S. Fish and Wildlife Service ("USFWS") for purposes of

considering the state's application, Memorandum from David Ross, EPA, to Mary Walker, EPA,

Aug. 27, 2020, A.R. 0660, so that EPA could use that mechanism to deliver broad protection to

the state and its permittees for incidental harm to listed species.[3]  Notably, the state's August 20,

2020, application relied on a "technical assistance" process that it predicted would be articulated

in an "anticipated" biological opinion even before EPA announced its policy change.[4]

EPA announced the policy change in a memorandum by then-Assistant Administrator

David Ross stating that EPA had "reconsidered its prior position, articulated in 2010, that the

approval of a state or tribal [Clean Water Act] Section 404 program does not trigger ESA Section

7 consultation."  Memorandum from David Ross, EPA, to Mary Walker, EPA, Aug. 27, 2020,

---

[3] The ESA prohibits any person from "taking" (defined as harming) an endangered species and authorizes suits to enforce the ESA and its implementing regulations.  16 U.S.C. §§ 1538(a)(1)(B), 1540(g)(1).  If a federal agency believes its action may adversely affect a protected species, it must consult with USFWS or the National Marine Fisheries Service.  <u>Id.</u> § 1536.  The result of that consultation is a biological opinion, which may also include take liability coverage.  <u>Id.</u>  The avenue for non-federal actors to obtain take liability coverage under the ESA is Section 10, which requires that non-federal actors conduct biological studies and gather appropriate data to create a robust analysis of how their activities will impact a listed species. <u>Id.</u> § 1539; U.S. Fish & Wildlife Serv., Habitat Conservation Plan Handbook, https://www.fws.gov/endangered/what-we-do/hcp_handbook-chapters.html.

[4] <u>See</u> Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the Florida Department of Environmental Protection, Aug. 5, 2020, A.R. 0016-A2 at 5.

A.R. 0660 at 1.  EPA explained that it had been persuaded by Florida's advocacy for a one-time ESA Section 7 programmatic consultation in conjunction with EPA's initial review "as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies" by providing a programmatic incidental take statement, preferable to the status quo of requiring permittees to "avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10," the process authorized by Congress.  Id. at 3.

On September 16, 2020, EPA issued a notice and request for comment on "Florida's Request to Assume Administration of a Clean Water Act Section 404 Program."  U.S. Envtl. Prot. Agency, 85 Fed. Reg. 57,853 (Sept. 16, 2020), A.R. 0001.  The opportunity to comment closed on November 2, 2020.

On October 21, and October 23, 2020, counsel for the Plaintiffs urged EPA to reconsider its determination that the state's assumption application was complete as of submission for three reasons: (1) the failure to demonstrate how the state would ensure no jeopardy to listed species given its reliance on a "technical assistance" process to be outlined in a programmatic biological opinion that was anticipated, but not yet in existence; (2) the failure to adequately identify the waters over which the state would assume jurisdiction; and (3) the failure to demonstrate adequate staffing and resources to administer the program, which the state claimed would not require a penny in additional funding, even at a time when state coffers were under serious strain from the economic impacts of a pandemic, requiring budget cuts.  Florida Assumption Public Hearing Transcripts, Oct. 21, 2020, A.R. 0604 at 5; Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020, A.R. 0051.

4

On November 2, 2020, Plaintiffs submitted extensive public comments identifying deficiencies in the state program on many key matters, such as permit review, permit conditions, general permits, emergency permits, compliance monitoring, and enforcement.  Letter from Tania Galloni et. al, to Kelly Laylock, EPA, Nov. 2, 2020, A.R. 0386.  Among other things, Plaintiffs noted the state's failure to provide a criminal intent standard as stringent as that required by federal law for violations of the permitting program.  Id. at 33.  Plaintiffs also renewed their request that EPA reverse its completeness determination.  Id. at 16–17.

On November 17, 2020, more than two weeks after public comment closed, USFWS issued the programmatic biological opinion and incidental take statement outlining the "technical assistance" process which the state had relied on to claim that it could ensure state 404 permits would not jeopardize the survival and recovery of protected species, 40 C.F.R. §§ 233.15(g), 230.10(b)(3).  U.S. Fish & Wildlife Serv., Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act, Nov. 17, 2020, A.R. 0642.

During this time, EPA also rushed its obligations under the National Historic Preservation Act to consult with federally recognized tribes regarding the state's application. Among other things, EPA provided the tribes only three business days in November, over Thanksgiving weekend, to review and comment on a draft programmatic agreement affecting their rights and interests.  U.S. Envtl. Prot. Agency, Responses to Comments from the National Historic Preservation Act Section 106 Consulting Parties on Florida's Request for Assumption, A.R. 0606 at 2.  The agency finalized that agreement on December 16, 2020, over the objection

of all of the tribes.  Id. at 1–2, 4–35; Programmatic Agreement under the National Historic

Preservation Act Section 106, Dec. 16, 2020, A.R. 0639.

On December 14, 2020, EPA proposed a rule to try to "fix" another deficiency in the

state's proposal: the fact that its mens rea standard for criminal violations of Section 404 is not as

stringent as federal law.  U.S. Envtl. Prot. Agency, 85 Fed. Reg. 80,713 (Dec. 14, 2020)

(proposed rule relating to "Criminal Negligence Standard for State Clean Water Act 402 and 404

Programs").  While EPA claimed that the rule, if promulgated, would continue to require state

programs to have criminal intent standards as stringent as those provided by federal law, the

proposed rule expressly provided that states could adopt "any" criminal negligence standard.  Id.

The public comment period for that proposal closed on January 13, 2021.  As of this filing, the

proposed rule has not been finalized.

On December 17, 2020, then-Administrator Andrew Wheeler announced approval of

Florida's program at a press conference in Washington, D.C., and encouraged other states to

follow Florida's example as a model.  U.S. Envtl. Prot. Agency, EPA Approves Florida's

Request to Administer the Clean Water Act Section 404 Program, YouTube (Dec. 17, 2020),

https://youtu.be/QLUr-sMRRmo; Letter from Mary Walker, EPA, to Governor Ron DeSantis,

Florida, Dec. 17, 2020, A.R. 0566; U.S. Envtl. Prot. Agency, 85 Fed. Reg. 83,553 (Dec. 22,

2020), A.R. 0564.

On December 22, 2020, EPA published notice of its approval of the state program in the

Federal Register, and purported to give this action immediate effect, without invoking good

cause or any other exception to the APA's requirement that at least 30 days elapse between

publication of a rule and its effective date.  5 U.S.C. § 553(d).  EPA also failed to lawfully

effectuate the transfer of authority to the state by failing to codify any aspect of the state

6

program, see 44 U.S.C. § 1510(a) (requiring codification of rules), contrary to what it had done

for the 404 programs in Michigan and New Jersey, 33 C.F.R. §§ 233.70, 233.71, and had

indicated that it would do for the 404 program in Florida.  See U.S. Envtl. Prot. Agency, 85 Fed.

Reg. 57,853 (Sept. 16, 2020), A.R. 0001 at 1 (stating that if EPA approves Florida's 404

program, it will codify the approved program in 40 CFR Part 33 subpart H).  EPA's action gave

legal effect to the state's 404 regulations.  Fla. Admin. Code Chapter 62-331 Summary

(providing that the effective date of the state's 404 rules "will be the effective date of

assumption, which is the date identified by EPA as published in the Federal Register.").

That same day, Plaintiffs' counsel notified EPA and the other federal defendants, as well

as the state, that EPA's transfer of authority was unlawful.  On December 28, 2020, EPA

responded by claiming for the first time that the agency's December 22, 2020, action did not

have to meet the 30-day requirement or codify the state program because it was an informal

adjudicatory order, rather than a rule.  Exhibit 1 at 5 (Crooks Dec. at ¶ 19).

On January 14, 2021, Plaintiffs filed this litigation challenging EPA's actions and those

of the other federal defendants, as unlawful.  Dkt. 1.  On January 15, 2021, EPA published to its

website a prepublication notice of its intention to codify Florida's 404 program.  U.S. Envtl. Prot.

Agency, Pre-Publication Notice: Codifying EPA's Adjudicatory Decision of Florida's Clean

Water Act Section 404 Program Request (Jan. 14, 2021) [hereinafter "Pre-Publication Notice"].[5]

That prepublication notice described the anticipated codification of Florida's program as a "Final

Rule."  Id. at 1.  EPA stated that the agency had "determined that there is good cause for making

this rule final without prior proposal and opportunity for comment because such notice and

_____

[5] https://www.epa.gov/sites/production/files/2021-01/documents/pre-publication_frn_
_fl_404_codification_final_rule_.pdf

opportunity for comment is unnecessary, as it simply codifies the approved Florida CWA

Section 404 program" and, invoking the good cause exception to APA's 30-day requirement,

added that "EPA finds that there is good cause to make this rule effective immediately" because

"this rule merely codifies an adjudication that is already effective."  Id. at 1, 3, 5.

On January 20, 2021, however, the music stopped, and EPA had to sit down, having only

accomplished part of its goals.  That day, President Joe Biden's White House Chief of Staff

Ronald A. Klain issued a memorandum to the incoming White House Senior Staff directing

agency heads to consider postponing by at least 60 days any rule that had been published in the

Federal Register but had not taken effect.  Exhibit 1 at 7 (Crooks Dec. at ¶ 25).  While the

prepublication notice regarding codification remains on EPA's website, it has not been posted on

the Federal Register website, and the codification has not been effectuated.  EPA's proposed rule

on weakening the mens rea requirements for state 404 programs such as Florida's has also not

been finalized.

Absent court intervention, however, the prior Administration's immediate effective date

has blocked the new Administration's authority to consider staying EPA's actions pending

judicial review and has denied Plaintiffs the right to seek that relief to protect their interests.[6]  As

alleged in the Complaint, EPA's approval of Florida's program is built on several significant,

unlawful actions.  Among other things, EPA's approval relies on USFWS' unlawful

programmatic biological opinion and incidental take statement authorizing an unspecified

amount of take for any and all endangered species, while extending protection from liability for

---

[6] By consequence this also has the practical effect of denying new leadership at USFWS and the
Corps of the opportunity to review actions by those agencies related to EPA's approval of the
state program should EPA have the authority to consider a stay pending judicial review.

incidental harm to those species to the state and state permittees, all by relying on a novel

"technical assistance" process not authorized by Congress.  It relies on a truncated list of waters

over which the U.S. Army Corps of Engineers ("Corps") retains jurisdiction, granting expansive

authority to the state.  It also authorizes a state program with less stringent criminal enforcement

provisions.  EPA's action has national implications, as then-Administrator Andrew Wheeler

encouraged other states to follow this model when he announced the decision approving

Florida's program.  Moreover, harms to Florida's wetlands, ecosystems, and species are a threat

to the nation's biodiversity.  Exhibit 5 at 3–4 (Hartl Dec. at ¶¶ 11–13).

As a result of EPA's December 22, 2020, actions, Plaintiffs suffered, and continue to

suffer, harm.  EPA's immediate, unlawful transfer of Section 404 authority from the Corps to the

state diverted Plaintiffs' organizational resources, deprived Plaintiffs of the right to seek an

agency stay under Section 705 of the APA before the action's effective date, and is allowing the

state to administer a permitting program that will authorize the dredging and filling of wetlands,

thereby harming endangered and threatened species, to the detriment of Plaintiffs' organizational

and membership interests.  EPA's unlawful transfer of authority is also depriving the Plaintiffs of

other federal rights and remedies available when the program is administered by the Corps,

including the review of proposed projects under the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321 et seq., and access to the federal courts to challenge individual

permits.

On January 20, 2021, Plaintiffs filed a request with EPA asking that the agency recognize

that the December 22, 2020, transfer of authority to the state was not lawful, or, alternatively, if

EPA lawfully promulgated a rule approving and codifying the components of the state program,

that the agency postpone its effective date pending judicial review.  Exhibit 1 at 5 (Crooks Dec.

at ¶ 19).  So long as EPA's immediate effective date is in force, however, EPA lacks the authority to consider Plaintiffs' stay request.

On January 29, 2021, in accordance with the Court's Standing Order, Dkt. 3 at 4, ¶ 10.a., Plaintiffs filed a notice requesting a pre-motion conference in anticipation of this motion for partial summary judgment.  Dkt. 21.  On February 1, 2021, the Court granted the motion to intervene by the state of Florida and the Florida Department of Environmental Protection ("Florida Intervenors").  Minute Entry (Feb. 1, 2021).  On February 5, 2021, Defendants and Florida Intervenors responded. Dkt. 22, 23.

On February 17, 2021, the Court held a pre-motion conference and set a briefing schedule on Plaintiffs' anticipated motion.  On February 19, 2021, EPA lodged a certified index of the administrative record with the Court, Dkt. 27, for purposes of the present motion,[7] and served that record on the parties.  On February 26, 2021, EPA lodged a corrected index of the administrative record with the Court, Dkt. 28, and served that index, and additional documents, on the parties.  On February 26, 2021, the Florida Chamber of Commerce and Florida Association of Community Developers moved to intervene.  Dkt. 29.  The Court denied the motion without prejudice.  Dkt. 30.

## LEGAL STANDARD

In an APA case, summary judgment "serves as a 'mechanism for deciding, as a matter of law, whether the agency action is ... consistent with the APA standard of review.'"  Fisher v. Pension Benefit Guar. Corp., 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting Cayuga Nation v. Bernhardt, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  The APA provides that a court shall "hold

---

[7] Plaintiffs appreciate EPA's expeditious production of a record for purposes of the present motion.  They reserve the right, however, to move to supplement or complete the record.

10

unlawful and set aside agency action" that is (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or (3) "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D).

## ARGUMENT

Plaintiffs are entitled to summary judgment on their procedural claims that EPA's December 22, 2020, transfer of 404 permitting authority from the Corps to the state was not lawfully effectuated (Count 8, failure to codify, and Count 9, unlawful immediate effective date), to the detriment of their organizational and membership interests.  Dkt. 1 at 46–48 (Complaint ¶¶ 228–48).  EPA's immediate effective date violated the APA, foreclosing Plaintiffs from exercising their right to seek an agency stay pending judicial review.  5 U.S.C. §§ 553(d), 705.  Absent codification in the Code of Federal Regulations, 44 U.S.C. § 1510(a), the transfer of authority has not been lawfully effectuated, and the legal authority to administer Section 404 remains with the Corps.  EPA's action was unlawful and must be set aside.

**I.**   **EPA's Approval of the State 404 Program was a Substantive Rulemaking that Must Be Codified and Comply with Section 553 of the APA.**

EPA's transferring of authority over Section 404 of the Clean Water Act to a state has all the hallmarks of a substantive rulemaking that must be codified and comply with the APA.  See Menominee Indian Tribe of Wisconsin v. Envtl. Prot. Agency, 947 F.3d 1065, 1074–75 (7th Cir. 2020), reh'g denied (May 8, 2020) (Hamilton, J., concurring) (observing that state 404 program is written as a regulation that is promulgated after public notice and comment).  Here, EPA's actions resulted in a change in the legal regime regulating the permitting of dredge and fill activities in assumed waters of the United States located in Florida, which affects the rights and obligations of the public, federally recognized tribes, and state and federal agencies.  The

agency's argument to the contrary—introduced for the first time in response to Plaintiffs' pre-suit letter notifying EPA of these procedural defects—is contrary to the law of this Circuit and the agency's historic practice with regard to state 404 programs.

A.      EPA's Action Was a Substantive Rulemaking.

Three criteria determine whether an agency action constitutes the promulgation of a substantive rule:  (1) whether the action has binding effects on private parties or on the agency; (2) whether the action was published in the Federal Register or Code of Federal Regulations; and (3) the Agency's own characterization of the action.  Gen. Motors Corp. v. U.S. Envtl. Prot. Agency, 363 F.3d 442, 448 (D.C. Cir. 2004).  The ultimate focus of this inquiry is whether the agency action is intended to "ha[ve] the force of law."  Id.  If so, the action is a substantive rulemaking subject to the requirements of the APA, including the 30-day window between promulgation and effectiveness.  5 U.S.C. § 553(d).  And the rule must be codified in the Code of Federal Regulations.  44 U.S.C. § 1510(a).  EPA's action satisfies all three criteria, and, most importantly, has the force of law.

First, it is beyond dispute that EPA's action has the force of law.  Chapter 62-331 of the Florida Administrative Code, the state's 404 regulations, did not become effective until EPA acted; its provisions all bear the effective date of December 22, 2020.  Fla. Admin. Code Chapter 62-331 Summary ("The effective date of the rule will be the effective date of assumption, which

12

is the date identified by EPA as published in the Federal Register.").[8]  These regulations were not previously in effect under state law, and now, as a result of EPA's action, have a binding effect on private parties.  Thus, in a very literal sense, EPA's action gave the state regulatory regime the force of law.

EPA's action affects the rights and obligations of permit applicants, concerned citizens, environmental nonprofits, community organizations, federally recognized tribes, and state and federal agencies.  Those seeking a 404 permit in assumed waters in Florida are now required to follow state processes, rules, and regulations.  Those adversely affected by a state 404 permit, or unpermitted activities, must similarly follow state processes, rules, and regulations, and are now only allowed to seek recourse in state administrative bodies and courts.   EPA's action shifts decision-making and enforcement authority from the federal government to the state, requires compliance with a different set of rules and regulations, requires submission of different permit applications and compliance with different permit forms, provides different notice and comment opportunities for public participation, and subjects permittees and those adversely affected by permit decisions to a different court system with different rights, remedies, and risks.

---

[8] See, e.g., Fla. Admin. Code § 62-331.010 (intent, purpose and implementation) (effective date 12/22/2020); id. § 62-331.020 (regulated activities) (same); id. § 331.030 (definitions) (same); id. § 62-331.040 (procedures for review and agency action on exemption requests) (same); id. § 62-331.050 (individual permits) (same); id. § 62-331.060 (public notice) (same); id. § 331.070 (water quality and coastal zone consistency review) (same); id. § 62-331.080 (modification, suspension, or revocation of permits) (same); id. § 62-331.090 (duration of permits) (same); id. § 62-331.100 (transfer of permit upon change in ownership or control) (same); id. § 62-331.110 (emergency field authorizations) (same); id. § 62-331.120 (fees) (same); id. § 62-331.130 (compensatory mitigation) (same); id. § 62-331.140 (mitigation banks and in-lieu fee programs) (same); id. § 62-331.160 (use of formal determinations) (same); id. § 62-331.200 (policy and purpose of general permits) (same); id. § 62-331.201 (conditions for general permits) (same); id. § 62-331.210–48 (general permits) (same); Fla. Dep't Envtl. Prot., State 404 Program Applicant's Handbook, https://www.flrules.org/gateway/reference.asp?No=Ref-12064 (same).

EPA's actions are similar to the substantive rules at issue in National Association of Home Health Agencies v. Schweiker. In that case, the D.C. Circuit held an agency action constituted a substantive rule because the plaintiffs had lost their right to deal directly with the Secretary of Health and Human Services and had to deal with a different decision-maker. 690 F.2d 932, 949 (D.C. Cir. 1982). Plaintiffs in that case also needed to be retrained and reeducated to implement a new system and operate within the guidelines of the new decision-maker. Here, EPA's actions mean that Plaintiffs no longer engage directly with the Corps on permit applications, and, instead, must now engage with the state. They must also retrain and reeducate themselves and their members to deal with new state 404 systems, processes, rules, and regulations.

The approval also binds the Corps, EPA, and USFWS to follow new processes laid out in memoranda of understanding between those federal agencies and the state. Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 948 (D.C. Cir. 1987) (agency's decision to bind itself and limit its enforcement discretion supported finding the action was a substantive rule). The Corps, for example, agreed to retain authority only over 404 actions in "retained waters," which it defined narrowly, and relinquished its authority to monitor and enforce permits in state assumed waters, which were correspondingly defined broadly. Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army, July 31, 2020, A.R. 0019 at 7; Letter from Tania Galloni et. al, to Kelly Laylock, EPA, Nov. 2, 2020, A.R. 0386 at 7–9. USFWS agreed to a "technical assistance" process and also committed itself to a dispute resolution process for issues pertaining to protected species. Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the Florida Department of Environmental Protection, Aug. 5, 2020, A.R. 0016-A2

at 8–10.  And EPA waived federal review of most categories of 404 permit applications and limited its enforcement authority over activities subject to Section 404 in Florida.  Memorandum of Agreement between the Florida Department of Environmental Protection and the U.S. Environmental Protection Agency, July 31, 2020, A.R. 0018 at 5–6, 9–10.

EPA's action also eliminates the public's rights to environmental review of proposed projects under NEPA—which applies only to federal agency actions like 404 permits issued by the Corps.  NEPA is the magna carta of this country's environmental laws, declaring a national policy to promote efforts which will prevent or eliminate damage to the environment.  42 U.S.C. § 4321.  NEPA plays a key role in allowing public citizens to engage in the decision-making process for federal projects that harm the environment.  Id. § 4332(2)(C) (requiring federal agencies to engage in a process to analyze an action's effects on the human environment).

EPA's action similarly strips federally recognized tribes of their right to consult with the federal government when 404 permits risk harm to the tribes' cultural and historical resources.  Menominee, 947 F.3d at 1073–74 (holding that state 404 permit actions are not "undertakings" that require tribal consultation under federal law).

EPA's action also subjects conservation groups adversely affected by state-issued permits and unpermitted activity in Florida to a state court system that blocks access to the courts unless the organization can demonstrate that a "substantial number" of its members "are substantially affected" by the challenged conduct.  See Fla. Wildlife Fed'n v. Fla. Dep't of Envtl. Prot., No. 14-1644RP, 2014 WL 4627151 at *5, *14 (Fla. Div. of Admin. Hearings Sept. 11, 2014).  Under federal law, by contrast, associational standing may be established on the basis of a single member's harms resulting from the challenged conduct.  See Am. Clinical Lab. Ass'n v. Azar,

931 F.3d 1195, 1203 (D.C. Cir. 2019) (associational standing satisfied by affidavit of one member who suffered injury in fact).

In addition to this restriction of citizens' access to state court, and therefore their ability to challenge permit and 404 program violations, Florida law includes a mandatory fee shifting provision presenting a significant, and, for some, insurmountable, barrier to seeking remedies for permit violations or unpermitted activities.  Under Florida law, the losing party is subject to a mandatory fee-shifting provision that has no analog under federal law.  Fla. Stat. § 403.412(2)(f). The Clean Water Act's citizen suit provisions, by contrast, allow, but do not require, a court to issue fees to a prevailing party as the court deems appropriate.  33 U.S.C. § 1365(d).  See Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency Adm'r, 595 F. Supp. 65, 70 (D.D.C. 1984), aff'd sub nom. Nat. Res. Def. Council, Inc. v. Thomas, 801 F.2d 457 (D.C. Cir. 1986) (explaining that where a Clean Water Act citizen suit is not frivolous, a non-prevailing plaintiff should not be punished or deterred from seeking to enforce the goals of the Act by being required to pay attorney's fees (citing Christiansburg Garment Co. v. U.S. Equal Emp. Opportunity Comm'n, 434 U.S. 412 (1978))).  Together, these state laws operate as a barrier to court access for litigants unwilling or unable to risk an adverse fee award no matter the strength of their case or good faith basis for the challenge.

Second, EPA published approval of the state program in the Federal Register and stated the intention to codify the program in the Code of Federal Regulations, further demonstrating that EPA's consideration of the application constituted a rulemaking that resulted in a rule.  U.S. Envtl. Prot. Agency, 85 Fed. Reg. 83,553 (Dec. 22, 2020), A.R. 0564; U.S. Envtl. Prot. Agency, 85 Fed. Reg. 57,853 (Sept. 16, 2020), A.R. 0001.  Notably, EPA made Florida's application available through the "Federal eRulemaking Portal," and invited public comments to be

16

submitted to the "rulemaking docket."  U.S. Envtl. Prot. Agency, 85 Fed. Reg. 57,853 (Sept. 16, 2020), A.R. 0001 at 1–2.   When EPA invited public comment on the state application, the agency stated that it would codify its approval of the state program in the Code of Federal Regulations.  Id. at 3.  By prepublication notice posted to its website on January 15, 2021, EPA again demonstrated the intention to codify the state program.  And while the prepublication notice has not been posted to the Federal Register, and the codification has not been effectuated, the notice remains on EPA's website as of this filing.

EPA's actions with regard to every other state 404 program the agency has approved similarly involved publication in the Federal Register and codification in the Code of Federal Regulations.  See U.S. Envtl. Prot. Agency, 49 Fed. Reg. 38,947-01 (Oct. 2, 1984) (codified at 40 C.F.R. § 233.70) (Michigan's assumption in 1984); U.S. Envtl. Prot. Agency, 59 Fed. Reg. 9,933-01 (Mar. 2, 1994) (codified at 40 C.F.R. § 233.71) (New Jersey's assumption in 1994).  In the case of Michigan, EPA approved the program on August 1, 1984, and promulgated its approval and codification of the program on October 2, 1984.  49 Fed. Reg. at 38,947.  In the case of New Jersey, EPA approved the program on January 25, 1994, and promulgated its approval and codification of the program on March 2, 1994.  59 Fed. Reg. at 9,933.  While EPA did not delay the effective date of either program for 30 days from the date of publication, the agency did so by expressly claiming an exception to the requirement by stating: "Since this approval, in large part, simply ratifies State regulations and requirements already in effect under State law, EPA is publishing this approval, effective immediately."  49 Fed. Reg. at 38,947 (Michigan); 59 Fed. Reg. at 9,933 (New Jersey).  Had EPA's actions not constituted a substantive rule, there would have been no reason for the agency to claim an exception to the APA's 30-day requirement.

EPA's commitment to codify components of the approved state program in Florida, and its codification of the only other state 404 programs it has approved, demonstrate that EPA's actions constitute substantive rulemakings.  As the D.C. Circuit Court has explained, publication of an action in the Code of Federal Regulations "is the real dividing point" that identifies a rulemaking because the C.F.R. can contain *only* documents "having general applicability and *legal effect*," 44 U.S.C. § 1510 (emphasis added), and must contain only "each Federal *regulation* of general applicability and current or future effect," 1 C.F.R. § 8.1 (emphasis added). Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C. Cir. 1986).

Although EPA's January 15, 2021, prepublication notice claims it intends to codify the program "voluntarily" for "transparency" purposes, codification is a matter of legal, not optional, significance.  U.S. Envtl. Prot. Agency, Pre-Publication Notice: Codifying EPA's Adjudicatory Decision of Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021) [hereinafter "Pre-Publication Notice"]  The law of this Circuit holds that publication in the Code of Federal Regulations is limited *solely* to agency actions of general applicability and legal effect—that is, rules.  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 19 (D.C. Cir.), judgment entered, 762 F. App'x 7 (D.C. Cir. 2019), & cert. denied, 140 S. Ct. 789 (2020) ("By statute, publication in the Code of Federal Regulations is limited to rules 'having general applicability and legal effect.'" (quoting 44 U.S.C. § 1510)).  See Nat'l Wildlife Fed'n v. Babbitt, 835 F. Supp. 654, 661 (D.D.C. 1993) (holding that agency action was a rule because it was generally applicable, had a future effect, and implemented the law); Am. Min. Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) ("44 U.S.C. § 1510 limits publication in that code to rules 'having general applicability and legal effect.'" (quoting Brock, 796 F.2d at 539)).

18

Third, EPA's actions with regard to *every* state approved 404 program, as discussed above, demonstrate that the agency itself has treated these transfers of authority as rulemakings that have culminated in promulgation of a rule codifying the approved components of the state program.  EPA adhered to this position just this past year, in a case involving the scope of Michigan's 404 program.  In that case, the agency took the position that the scope of EPA's transfer of 404 authority to a state could be modified through rulemaking.  Menominee, 947 F.3d at 1070 (pointing out that at oral argument, the agencies said that the Plaintiff Tribe could have sought the requested relief—changing the scope of the state's assumption of the 404 program— by filing a petition for rulemaking under Section 553(e)); Federal Appellees' Br., Menominee Indian Tribe of Wisconsin v. U.S. Envtl. Prot. Agency, No. 19-1130, at 8, ECF 49 (explaining that "the Tribe 'could just directly petition EPA to review ... the scope of the assumption'—that is the scope of Michigan's assumption of Section 404 permitting authority").  Thus, EPA took the position that Michigan's assumption of the 404 program was a rule subject to revision or amendment via rulemaking.

EPA now attempts to disavow its universal historical practice regarding Section 404 of the Clean Water Act by pointing to actions the agency has taken pursuant to a different provision of the Clean Water Act governing a different regulatory program that is not at issue in this case, Section 402, which relates to discharges of pollutants into waters of the United States under the National Pollutant Discharge Elimination System ("NPDES").  EPA's reliance on its practice relating to Section 402 of the Clean Water Act—and a 1978 EPA General Counsel opinion discussing the procedures for *withdrawing* approval for a state program under Section 402 of the Clean Water Act—have no bearing here.  Dkt. 22 at 6 (citing U.S. Envtl. Prot. Agency, Opinion

No. 78-7, Procedures for the Withdrawal of State NPDES Program Approval Pursuant to Section 402(C)(3) of the Clean Water Act, 1978 WL 26926, at *1 (Apr. 18, 1978); Dkt. 23 at 4–5.

Because EPA's action satisfies all three factors of the test to determine whether an agency action is a substantive rulemaking, and unquestionably has the force of law, EPA violated federal law by failing to provide the delay in effective date required by Section 553 of the APA and failing to codify the components of the state program to legally effectuate the state program under the Federal Register Act. A rule is a rule, regardless of what the agency calls it. Safari Club Int'l v. Zinke, 878 F.3d 316, 332 (D.C. Cir. 2017).

## B.    EPA's Action Is a Rule, not a License.

EPA has taken the position that its action was an "informal adjudication" resulting in an "adjudicatory order" that constitutes a "license" rather than a rule. Dkt. 22 at 6; Dkt. 23 at 4–5; Exhibit 1 at 5 (Crooks Dec. at ¶ 19). Accord Pre-publication Notice. For the reasons stated above, however, EPA's action is properly classified as a rule and not a license because it constitutes an agency statement of particular applicability and future effect designed to implement or prescribe law or policy. Safari Club, 878 F.3d at 332 (citing Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 95 (D.C. Cir. 2002) & 5 U.S.C. § 551(4)). As the Supreme Court has explained, an agency's action is a rule and not an order when it is (1) generalized in nature and applicable across the board to a class of parties; and (2) intended for prospective application only, rather than to adjudicate a particular set of disputed facts. Id. (quoting United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 246 (1973)).

As discussed above, EPA's action has general applicability because it gives legal effect to a new state program. It authorizes the state to permit and enforce Section 404 of the Clean Water Act in waters of the United States that have been assumed in Florida. It applies broadly to

an entire class of actions that may occur in the future as the state administers the program.  And, as stated previously, EPA's action affects the rights and obligations of not just the state, but also permit applicants, the public, conservation groups, federally recognized tribes, and state and federal agencies.

As such, EPA's action is similar to the agency action at issue in Safari Club, where the D.C. Circuit found that the challenged agency action was a rule because it applied to all potential future permitting and enforcement actions, and not to individual permittees.  878 F.3d at 333. The court found that the agency action did not adjudicate any dispute between specific parties, but was broad and far-reaching.  Id.  EPA's action here similarly binds all potential future 404 permitting and enforcement actions in state-assumed waters.  There was no "dispute" before the agency, and EPA certainly did not adjudicate any issue between parties in dispute.

EPA's action is also characteristic of a rulemaking because it *only* affects *future* permitting and enforcement actions in the state.  Id.  Accord Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 217 (1988) (Scalia, J., concurring) ("[A] rule is a statement that has legal consequences only for the future.").  As Justice Scalia explained, "Adjudication deals with what the law *was*; rulemaking deals with what the law *will be*."  Id. at 221 (emphasis added).  As in Safari Club, EPA's action did not involve a situation where an agency made factual findings in the course of granting or denying a permit.  878 F.3d at 334.  Rather, the agency's action established standards and processes to be applied to future permit applications and permitting decisions.  Id.  The same is true here.  EPA decided that in the future, the state's legal regime would govern all dredging and filling actions in state-assumed waters of the United States.

EPA attempts to classify its action as an adjudicatory "order" and a "license" by pointing to definitions in the APA.  Dkt. 22 at 6; Dkt. 23 at 4–5.  However, a similar argument was

rejected by this Circuit.  In <u>National Association of Home Builders</u>, the Corps contended that nationwide dredge and fill permits were "licenses" rather than rules because the APA definition of "license" includes a "permit."  <u>Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs</u>, 417 F.3d 1272, 1284 (D.C. Cir. 2005).  Rejecting that "elaborate statutory construction," the court used a "more straightforward" approach and looked to the effect of the agency's action: Each nationwide permit "authorizes a permittee to discharge dredged and fill material (and thereby does not allow others without an individual permit)."  <u>Id.</u>  Thus, it "is a legal prescription of general and prospective application which the Corps has issued to implement the permitting authority the Congress entrusted to it in section 404 of the [Clean Water Act]."  <u>Id.</u>

The court's analysis there dictates the result here.  EPA's action was not a license, but rather authorized (and indeed, gave legal effect to) a new legal permitting authority and legal regime over Section 404 in the state of Florida, with general and prospective application.  As such, EPA's action was a rule.

## II.    EPA Violated Federal Law by Failing to Provide the Required Delay in Effective Date and Failing to Codify the Approved Components of the State Program.

EPA's Federal Register notice publishing notice of its approval of the state program failed to codify the state program and thus failed to lawfully transfer permitting authority to the state.  U.S. Envtl. Prot. Agency, 85 Fed. Reg. 83,553 (Dec. 22, 2020), A.R. 0564.  The notice also purported to make the state's 404 program "applicable immediately" in violation of the APA.  <u>Id.</u> at 1.

An agency must codify final rules in the Code of Federal Regulations.  44 U.S.C. § 1510(a)).  Absent codification in the Code of Federal Regulations, EPA's approval and transfer of authority to Florida have no binding legal effect, and the authority to administer Section 404 legally remains with the Corps.  <u>Simmons v. I.C.C.</u>, 757 F.2d 296, 300 n.2 (D.C. Cir. 1985) (rule

that was not codified did not constitute "binding agency precedent and could not be treated as such"). Codification is required for all agency documents "having general applicability and legal effect ... and ... relied upon by the agency as authority." Simmons, 757 F.2d at 300 n.2 (quoting 44 U.S.C. § 1510(a)). Accord Brock, 796 F.2d at 539. Whenever a rule is subject to codification, the agency must draft its Federal Register notice as an amendment to the Code of Federal Regulations, including "words of issuance" and amendatory language." 1 C.F.R. § 21.1(a)–(b). Thus, EPA was required to codify the state program in the Code of Federal Regulations, which it failed to do.

When an agency proposes a rule, it must follow the procedures set out in Section 553 of the APA, including publishing a notice of proposed rulemaking and giving interested persons an opportunity to participate in the rulemaking through public notice and comment. Id. § 553(b)– (c). When issuing a final rule, the agency must include a statement of the rule's basis and purpose, and must publish the rule in the Federal Register not less than 30 days before its effective date. Id. § 553(c)–(d). Congress enacted APA's 30-day requirement to afford all persons affected by a substantive rule a reasonable time to prepare for the effective date of the rule, ask for reconsideration of the action, and take any other action which the issuance may prompt—including exercising the right to petition the agency to postpone the rule's effective date pursuant to Section 705 of the APA. Nance v. U.S. Envtl. Prot. Agency, 645 F.2d 701, 708–09 (9th Cir. 1981); Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980).

The government and the Florida Intervenors suggest there is a conflict between the APA and the Clean Water Act, Dkt. 22 at 4–5; Dkt. 23 at 3, 5, precluding a delay in effective date. But that is not the case as a matter of fact or law. Nothing in Section 404 prohibits EPA from providing a delayed effective date. The Clean Water Act provides that upon approval of a state

404 assumption application, EPA must notify the Corps of the decision.  33 U.S.C. § 1344(h).

EPA's 404 regulations further provide that EPA must publish notice of the approval in the

Federal Register, that "[t]ransfer of the program to the State shall not be considered effective

until such notice appears in the Federal Register," and that the Corps "shall suspend the

issuance" of 404 permits in state assumed waters "on such effective date."  40 C.F.R.

§ 233.15(h).  The Clean Water Act further provides that transfer of the program does not occur

until a state notifies the Corps that it is administering the program.  Id.  Although the regulations

provide that the transfer may not take effect "until" notice is published in the register, they do not

require that the transfer take effect "on" the date of publication.  Indeed, by statute the transfer

cannot occur until the state advises the Corps that it is administering the program.  Read together,

the statutes require that EPA publish notice of its approval of a state 404 program, delay the

effective date of that approval for 30 days from publication, and effectuate the transfer once the

state notifies the Corps that it is administering the program.  This is also quite reasonable, given

the major efforts a state and all affected parties must undertake to adapt to a new legal regime.

The 120-day statutory requirement also does not preclude EPA from providing a delayed

effective date as required by the APA.  The statute merely requires that EPA

"determine … whether" a state has the authority to assume jurisdiction over the 404 program

within that timeframe, unless it is extended by agreement of the agency and the state.  33 U.S.C.

§ 1344(h)(1).  As demonstrated with EPA's approval of both the Michigan and New Jersey state

programs, the 120-day period does not dictate a particular effective date.  Indeed, Michigan's

program took effect 36 days after approval, and New Jersey's, 76 days after.  49 Fed. Reg. at

38,947 (Michigan); 59 Fed. Reg. at 9,933 (New Jersey).

24

Because EPA's action was a substantive rule having general applicability and legal effect, the failure to codify rendered ineffective EPA's transfer of Section 404 authority to the state. Moreover, EPA's action purportedly making the state's assumption "applicable" the same day that it published its approval in the Federal Register violated the APA. 5 U.S.C. § 553(d). Although the APA contemplates certain exceptions to this rule, EPA invoked none of them here, and none would have applied. EPA's transfer of authority to the state in the absence of codification and a lawful effective date was a legal nullity and must be set aside.

## STANDING

Plaintiffs have been injured by EPA's violations and have standing to pursue their claims. To establish standing, Plaintiffs must show, "by a preponderance of the evidence," Otay Mesa Prop., L.P. v. U.S. Dep't of Interior, 144 F. Supp. 3d 35, 56 (D.D.C. 2015), that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

The Supreme Court has explained that a person who has been accorded a procedural right to protect their concrete interests may "assert that right without meeting all the normal standards for redressability and immediacy." Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009) (emphasis omitted) (citing Lujan, 504 U.S. at 572 n.7). A Plaintiff has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the

decision that allegedly harmed the litigant."  Massachusetts v. U.S. Envtl. Prot. Agency, 549

U.S. 497, 518 (2007).  "A plaintiff asserting procedural injury 'never has to prove that if he had

received the procedure the substantive result would have been altered.'" City of Dania Beach,

Fla. v. Federal Aviation Administration, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting Sugar

Cane Growers, 289 F.3d at 94. Accord Massachusetts, 549 U.S. at 518 (same); United States v.

Facebook, Inc., 456 F. Supp. 3d 105, 109 (D.D.C. 2020) ("A plaintiff asserting a procedural

claim need not allege that an agency would have acted any differently.").

> Here, EPA unlawfully acted to transfer authority over Section 404 to the state without

codification and effective immediately, thereby foreclosing Plaintiffs from exercising their right

to ask the agency to reconsider or stay the action pending judicial review; and blocking Plaintiffs

from the benefit of the Biden Administration's directive to agencies to review and consider

staying any rule that had not taken effect by inauguration day.  As a result of EPA's actions,

Plaintiffs and their members now face harms from the administration of the state program itself,

which is designed to approve permits as quickly as possible, including for major development

projects and a proposal to drill for oil in a national park, and severely restricts access to the

courts for those adversely affected.

## I.  EPA's Actions Foreclosed Plaintiffs from Exercising Their Procedural Right to Seek an Agency Stay Pending Judicial Review.

> Plaintiff organizations have suffered cognizable procedural injuries from EPA's actions,

which have deprived them of the right to petition EPA to postpone a rule's effective date during

the pendency of litigation, 5 U.S.C. § 705, to petition for reconsideration, 5 U.S.C. § 553(e), or

to receive the benefit of the Biden Administration's review of all rules that had not yet taken

effect.  Sugar Cane Growers, 289 F.3d at 94–95.  See Clean Air Council v. Pruitt, 862 F.3d 1, 9

(D.C. Cir. 2017) (agency cannot suspend an effective rule absent notice and comment

rulemaking); <u>Nat. Res. Def. Council v. U.S. Dep't of Energy</u>, 362 F. Supp. 3d 126, 151

(S.D.N.Y. 2019) ("Section 705 only allows an agency to 'postpone the effective date of action

taken by it.'  It does not allow agencies to suspend a rule that has already taken effect.").  Exhibit

1 at 8–11 (Crooks Dec. at ¶¶ 27–35); Exhibit 2 at 5–7 (Umpierre Dec. at ¶¶ 15–19); Exhibit 3 at

4–6 (Silverstein Dec. at ¶¶ 11–16); Exhibit 5 at 8–10 (Hartl Dec. at ¶¶ 27–31); Exhibit 6 at 8—

10 (Carter Dec. at ¶¶ 29–34); Exhibit 7 at 6–9 (Robertson Dec. at ¶¶ 23–31); Exhibit 8 at 8–10

(Rinaman Dec. at ¶¶ 29–37).

   Had EPA acted lawfully and complied with Section 553(d)'s mandated delay in effective

date, EPA's December 22, 2020, action could not have taken effect before January 21, 2021, and

Plaintiffs would have been able to exercise their procedural right to seek reconsideration or an

agency stay pending judicial review to protect their concrete interests.[9]  And EPA's decision

would have been subject to the incoming Administration's directive to agencies to review and

consider staying rules that had not yet gone into effect as of January 20, 2021.  Had EPA

provided the required delay in effective date, its approval of Florida's highly controversial state

404 program would have been covered by the Klain Memo.

## II. The Procedural Right to a Delay in Effective Date is Designed to Protect Plaintiffs' Concrete Interests.

   The procedural right conferred by Section 553(d)'s delay in effective date is designed to

protect Plaintiffs' concrete interests.  The procedural right exists because Congress recognized

that "interested person[s]" have a stake in agency rulemaking, 5 U.S.C. § 553(e), and wanted

them to have the tools necessary to protect their concrete interests.  The "primary purpose" of

---

[9] Although Plaintiffs requested that EPA remedy the procedural violations at issue in this motion and stay any rule it codifies as a result, under EPA's current position, the agency is unable to consider Plaintiffs' stay request without court intervention.

section 553(d)'s delayed effective date is to afford persons affected a reasonable time to prepare for the effective date of a rule, ask for reconsideration of the action, and take any other action which the issuance may prompt—including exercising the right to petition the agency to immediately postpone the rule's effective date.  Nance, 645 F.2d at 708–09; Rowell, 631 F.2d at 703.

## III.      This Procedural Harm Threatens Plaintiffs' Concrete Interests.

By depriving Plaintiffs of the procedural right to petition EPA to postpone the effective date of the transfer of authority over the 404 program, EPA's unlawful action threatens two distinct types of interests: (1) the aesthetic, recreational, and other interests of Plaintiffs and their members; and (2) Plaintiffs' organizational interests in protecting waters of the United States, including wetlands, and the threatened and endangered species which rely on them.

### A.      Because Plaintiffs Could Not Seek an Agency Stay or Reconsideration, There is a Substantial Risk that the State will Grant Permits that Will Harm Plaintiffs' Members' Aesthetic, Recreational, and Other Interests.

Because Plaintiffs were foreclosed from seeking reconsideration or an agency stay pending judicial review, the state is considering permit applications that substantially risk harm to their members' aesthetic, recreational, and other interests by authorizing developers to fill precious wetlands that serve as habitat for threatened and endangered species.  Lujan, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); Sierra Club v. Jewell, 764 F.3d 1, 6 (D.C. Cir. 2014) ("impairment of the affiant's ability to enjoy the 'natural vistas' of the nearby hills from her own home, regardless of the absence (or existence) of any legal right on her part to view or make an entry onto the nearby hills" is sufficiently concrete for injury-in-fact (citing Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 715 (D.C. Cir. 1988))).  The state has consistently

28

indicated that its goal in assuming jurisdiction over the 404 program is to issue permits faster, and to as great an extent as possible, in alignment with the rapid processing schedule for state level permits. 44 Fla. Admin. Reg. 2321 (May 11, 2018) (stating that 404 assumption will allow streamlined permitting procedure for applicants to obtain state level and 404 permits).

In particular, two permit applications currently under review are projects to drill for oil in the Big Cypress National Preserve, which is the nation's first national preserve, consisting of 700,000 acres of a continuous freshwater ecosystem connecting five habitat areas. Exhibit 5 at 10–11 (Hartl Dec. at ¶ 34); Exhibit 4 at 3–14 (Wiley Dec. at ¶¶ 10–25). Big Cypress is the largest continuous acreage of habitat for the critically endangered Florida panther and supports various other listed species. Exhibit 4 at 3–4 (Wiley Dec. at ¶ 11). If approved, these projects would pave the way for oil drilling and production in the preserve for the next 30 years. Id. at 3 (Wiley Dec. at ¶ 10). The Nobles Grade Prospect would cover 21.21 acres and fill 85,000 cubic yards of wetlands in the preserve, and is located near an access point for hiking trails there. Id. at 4–6 (Wiley Dec. at ¶¶ 13–14). The Tamiami Prospect would cover 10.99 acres and fill 46,000 cubic yards of wetlands in the preserve. Id. at 6–8 (Wiley Dec. at ¶¶ 15–16). A number of listed species would be affected by these projects, including the Florida panther and protected bird species. Id. at 4–8, 11–12 (Wiley Dec. at ¶¶ 13–16, 19–20, 22). These permits are particularly concerning because previous seismic activities by the same applicant in 100 square miles of the preserve severely altered the preserve's landscape. Id. at 12–13 (Wiley Dec. at ¶ 23). Aside from the projects' resulting disruptions in water flow and the threat of pollution, the operation of oil drilling facilities in the preserve will harm species within the projects' general vicinity. Id. at 12–13 (Wiley Dec. at ¶ 23).

These impacts to the preserve and the protected species that rely on it would harm Ann Wiley, a member of Plaintiff Center for Biological Diversity ("Center").  Id. at 12–13, (Wiley Dec. at ¶¶ 21–22, 24).  At least monthly, Ms. Wiley recreates in the Big Cypress National Preserve to observe different listed bird species including snail kites and wood storks.  Id. at 2 (Wiley Dec. at ¶ 6).  These projects would also harm Ms. Wiley's professional interests because she works as an ecological tour guide, leading tours in ankle-to-chest deep water in the preserve. Id. at 2 (Wiley Dec. at ¶ 7).

The state is also currently considering a 404 permit application for Troyer Mine, which would destroy 214 acres of wetlands that are part of a conservation area to protect Lee County's shallow aquifers, and are within the consultation areas for many endangered and threatened species, including the Florida panther, Florida bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglades snail kite, and the Florida scrub jay.  Exhibit 1 at 12–15 (Crooks Dec. at ¶¶ 37–47).  In fact, 90% of the project site is in Primary Zone habitat for the critically endangered Florida panther, meaning it is habitat essential for the continued survival and recovery of the species.  Id. at 12–13 (Crooks Dec. at ¶ 39).  Panthers are one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  Id. at 3 (Crooks Dec. at ¶ 12).  Habitat loss is one of the primary risks for panther survival, as are vehicular collisions.  Id. at 12–13 (Crooks Dec. at ¶¶ 39–40). The Troyer Mine project would result in an estimated 2,089 daily truck trips to and from the site. Id. at 13 (Crooks Dec. at ¶ 40).

The loss of these wetlands and the impacts to panthers and their habitat would irreparably harm Amber Crooks, a member and employee of Plaintiff Conservancy of Southwest Florida ("Conservancy").  Ms. Crooks regularly hikes, camps, and tries to observe wildlife, including

panthers, about three and a half miles away in Corkscrew Regional Ecosystem Watershed, which also is located within panther habitat. Id. at 15 (Crooks Dec. at ¶ 47). This is only one of the many projects that if granted would harm Ms. Crooks' use and enjoyment of Florida's natural environment because of their impacts on wetlands, water quality, and species and their habitat. See id. at 15–24 (Crooks Dec. at ¶¶ 48–73).

Another permit currently being considered by the state is for an expansion of the Northern District Wastewater Treatment plant in North Miami. This project would clear 17 acres of wetlands and mangroves. Exhibit 3 at 14–17 (Silverstein Dec. at ¶¶ 36–44). Mangroves provide critical habitat for several protected species in Southeast Florida, including the eastern brown pelican, wood stork, manatee, and American crocodile. Id. at 11–12 (Silverstein Dec. at ¶ 28). They also stabilize shorelines, protecting coastal areas from storm surges, and providing erosion control. Id. Miami is particularly vulnerable to sea-level rise, and these mangroves provide a critical buffer. Id. Moreover, mangroves trap sediments and maintain water quality by absorbing nutrients and other pollutants from the water. Id. This project is particularly concerning because urban Miami Dade County has very limited mangrove cover remaining and removing more mangroves when there are so few left further restricts habitat for protected species. Id. at 16 (Silverstein Dec. at ¶ 40).

The proposed Wastewater Treatment Plant expansion is located immediately adjacent to Oleta River State Park and Biscayne Bay. Id. at 15 (Silverstein Dec. at ¶ 38–39). Florida's largest urban park, Oleta River State Park, is a breathtaking 1,000-acre natural oasis filled with mangrove forests at the mouth of the Oleta River. Id. Oleta River State Park connects to Biscayne Bay, whose waters make up the largest estuary on the coast of southeast Florida, encompassing over 400 square miles of freshwater and saltwater from the Atlantic Ocean. Id. In

addition to its beauty, this area also provides an important natural buffer for storm surge impacts for critical infrastructure during hurricanes.  Id.  Miami Waterkeeper has led recreational and service events at Oleta River State Park.  Id. at 16–17 (Silverstein Dec. at ¶ 43).  Its members, including Dr. Rachel Silverstein, regularly kayak in this area as it is one of the only remaining pristine areas available in the urban core of Miami.  Id. at 16 (Silverstein Dec. at ¶¶ 41–42).  Miami Waterkeeper has also conducted shared information about water quality in this area in partnership with scientists at Florida International University.  Id. at 16–17 (Silverstein Dec. at ¶ 43).  Harms to this habitat would impact Miami Waterkeeper's research interests, its members' recreational and aesthetic interests, and its mission to support sea-level rise resilience in South Florida.  Id. (Silverstein Dec. at ¶ 44).

Finally, the state is considering a permit application for the State Road 836 (Dolphin Expressway Extension).  Exhibit 2 at 11–15 (Umpierre Dec. at ¶¶ 32–41).  This project consists of a six-lane toll road that would extend S.R. 836 by 14 miles through jurisdictional wetlands within an Everglades restoration area; it would fill 360 acres of wetlands and would impact an additional 100 acres of wetlands that are adjacent to Everglades National Park.  Id. at 12–13 (Umpierre Dec. at ¶¶ 36–37).   It would impact several listed species including the wood stork, the Eastern indigo snake, and the Florida bonneted bat.  Id. at 14 (Umpierre Dec. at ¶ 40).  The Everglades spans across 1.5 million acres that stretch over the southern part of Florida and is home to a vast diversity of plants and wildlife across different ecosystems: freshwater sloughs, marl prairies, tropical hammocks, pinelands, cypress, mangroves, coastal lowlands, and marine and estuarine ecosystems.  Id. at 13 (Umpierre Dec. at ¶ 38).  If this project moves forward, it will impact water quality and disrupt fragile ecosystems and natural resources within Everglades National Park.  Id. at 12–13 (Umpierre Dec. at ¶¶ 34–35, 39).  The aesthetic and recreational

interests of Diana Umpierre, a member of Sierra Club, would be harmed by this project.  Id. at

14–15 (Umpierre Dec. at ¶¶ 41–44).  Ms. Umpierre regularly visits Everglades National Park,

typically hiking, observing flora and fauna, and taking photographs.  Id.

**B.     Plaintiffs Were Forced to Divert Resources Away from Core Program Work as a Result of the Immediate Effective Date.**

Because EPA's action gave immediate effect to the state program, Plaintiffs have had to

divert and will continue to need to divert resources away from their core program work.  "'To

establish organizational standing a party must show that it suffers' or will imminently suffer 'a

concrete and demonstrable injury to its activities, distinct from a mere setback to the

organization's abstract social interests ... [and] the presence of a direct conflict between the

defendant's conduct and the organization's mission.'"  Nw. Immigrant Rights Project v. United

States Citizenship & Immigration Servs., No. CV 19-3283 (RDM), 2020 WL 5995206, at *5

(D.D.C. Oct. 8, 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12,

2021) (quoting Elec. Priv. Info. Ctr. v. FAA, 892 F.3d 1249, 1255 (D.C. Cir. 2018)) (alterations

in original).

First, the plaintiff "must show a 'direct conflict between the defendant's conduct and the

organization's mission.'"  Id. at *6.  Second, "the plaintiff must show that it has 'used its

resources to counteract [the asserted] harm.'"  Id. (alterations in original).  Plaintiffs satisfy both

requirements.

There is a direct conflict between Plaintiffs' missions and EPA's immediate transfer of

the 404 program to the state without codification.  Because of EPA's unlawful actions, Plaintiffs'

missions have been and will be substantially impaired.  Plaintiff organizations' missions focus

on: (1) securing a future for all species, great or small, hovering on the brink of extinction,

Exhibit 5 at 2 (Hartl at ¶ 7); (2) protection of all native wild animals and plants in their natural

communities and the preservation of the habitats upon which they depend, including in wetlands and other aquatic environments, Exhibit 6 at 2–6 (Carter Dec. at ¶¶ 5–23); (3) protecting wild places, promoting responsible use of the earth's ecosystems and resources, and enlisting humanity to protect and restore the quality of the natural and human environment, Exhibit 2 at 2–3 (Umpierre Dec. at ¶¶ 6–8); (4) protecting Southwest Florida's land, water, wildlife, and future through advocacy, science, education, and wildlife rehabilitation, Exhibit 1 at 1–2 (Crooks Dec. at ¶¶ 4–7); (5) supporting environmental sustainability and conservation in Florida, Exhibit 7 at 1–2 (Robertson Dec. at ¶¶ 4–7); (6) defending, protecting, and preserving South Florida's watershed, Exhibit 3 at 2 (Silverstein Dec. at ¶¶ 5–6); and (7) providing an independent voice to defend, advocate, and activate others to protect and restore the St. Johns River, Exhibit 8 at 3 (Rinaman Dec. at ¶¶ 10–11).  Plaintiffs accomplish these missions through citizen engagement, education, and outreach, scientific research, advocacy, and legal challenges.

   The immediate and continued unlawful transfer of authority to the state impairs Plaintiffs' missions in three key respects: (1) Plaintiffs were forced to immediately expend resources and staff time to gather information on new and transferred 404 permit applications, and wade through the contents of the state's obtuse permitting database, all while trying to continue their advocacy against pending permit applications threatening their interests and those of their members; (2) Plaintiffs lost the benefit of federal requirements, rights and remedies available under NEPA and Section 7 of the ESA; and (3) Plaintiffs have now been substantially limited in their ability to protect wetlands and species through litigation because of restrictive access to the courts.  Exhibit 1 at 24—28  (Crooks Dec. at ¶¶ 74—82).  Plaintiffs have had to use and will continue to use their resources to counteract these harms.

Plaintiffs were immediately harmed by EPA's action because they were forced to divert resources away from core programmatic actions and focus instead on the immediately effective state 404 program, all to the detriment of their missions.  Plaintiffs have been forced to expend financial resources and staff time to investigate the countless state 404 permit applications that were immediately transferred to the state to prepare their advocacy to protect species and wetlands.  This work includes "researching the labyrinth" of state regulations, policy, and handbooks now in effect, as well as combing through the incomplete and obtuse state website containing permit application documents that are irregularly and inconsistently uploaded to the system. People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA"), 797 F.3d 1087, 1095 (D.C. Cir. 2015). Exhibit 1 at 9–10 (Crooks Dec. at ¶¶ 30–31).

Hundreds of permit applications were transferred to the state, forcing Plaintiffs, such as Conservancy of Southwest Florida "to try to understand the impact and scope of a program that had not been codified, to try to prepare to continue its advocacy against pending permit applications threatening our interests and those of its members."  Exhibit 1 at 8–9 (Crooks Dec. at ¶ 28).  Rather than addressing other timely issues Conservancy faced during this period, it was forced to re-staff projects and host emergency meetings to try to determine: (1) which permits had been transferred from the Corps; (2) what the status of transferred permits was now that those were before the state; and (3) whether new permit applications were being submitted to the state that affected the organization's and its members' interests; 4) assess overall how Florida was administering the program; 5) better understand how the agency MOA/MOUs, Biological Opinion, and state rules would perform in implementation on varied applications; and 6) what the best forms of advocacy would be under the state assumed program.  Id. at 9 (Crooks Dec. at ¶ 29).

Since the state did not have a functional public notice system or website in place, Conservancy had to divert considerable resources to locate information necessary to advocate for and protect its interests, and those of its members.  Id. at 9 (Crooks Dec. at ¶ 30).  Even once Conservancy received instructions from the state on how to search the state's 404 database and where to find future public notices, the state was not set up to start sending public notices.  Id. And even with instructions on how to search for information, Conservancy had to pour through hundreds of data entries to locate the information necessary to determine if projects of concern had been transferred, or if any new projects of concern had requested permits.  Id.  Together, these additional activities placed a substantial burden on Plaintiffs to identify, track, review, and prepare to comment on, and otherwise advocate against, 404 permit applications of concern.  Id. at 10 (Crooks Dec. at ¶ 32).

Now that these 404 applications are being processed by the state, and requests for additional information are being issued, Conservancy is forced to engage in their advocacy on these permits all at once.  Id. at 11 (Crooks Dec. at ¶ 35).  For some of those projects, Conservancy had already submitted comments to the Corps, but will now need to submit new comments based on the new regulatory regime and request a public hearing, all as provided for under the new state program instead of the federal program.  Id.  As such, Conservancy is continuing to divert staff time from other important local and state matters affecting species and water quality.  Id.

This significant workload resulted in Plaintiff Conservancy re-allocating staff time towards this effort and away from core, planned work, just as occurred in Northwest Immigrant Rights Project.  2020 WL 5995206, at *5–6.  A core component of Ms. Crooks' work is panther protection, and she was not able to devote the time she otherwise would have to this work,

including her otherwise planned tasks regarding transportation issues affecting panthers.  Exhibit 1 at 10 (Crooks Dec. at ¶ 33).  Conservancy was also forced to divert resources away from its work providing user-friendly policy information to the public and their members.  Id. at 10 (Crooks Dec. at ¶ 34).  Conservancy aspires to "take the complex matters we work on and break them down to a level that the general public can understand."  Id.  This work educates Conservancy's members and supporters, inspires them to take action, and further attracts supporters and donors to Conservancy.  Id.

In addition, Plaintiffs Defenders of Wildlife ("Defenders") and Florida Wildlife Federation ("FWF") have put a substantial amount of work and resources into the proposed Eastern Collier County Habitat Conservation Plan ("HCP") pursuant to Section 10 of the ESA. Exhibit 6 at 10–11 (Carter Dec. at ¶¶ 35–38).  The Eastern Collier County HCP covers approximately 152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connects the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region.  Id. at 11 (Carter Dec. at ¶ 36).  The species at issue for this HCP include 11 federally listed or candidate species, such as the Florida panther, Florida scrub jay, and Florida bonneted bat.  Id.  Since the state has assumed the 404 process, which relies on a "technical assistance" process for ESA review, the landowners who are party to the HCP are considering abandoning that process.  Id. at 11 (Defenders Dec. at ¶ 37).  Thus, the transfer of the state 404 program threatens substantial work Defenders and FWF have put into the HCP for Eastern Collier County.  Id. at 11 (Defenders Dec. at ¶ 38).  Defenders would have to "redouble [their] efforts advocating for gains that would be lost if the landowners involved in the HCP walk away."  Id.

As occurred in PETA, 797 F.3d at 1095, Plaintiff organizations have also been denied access to critical environmental information, provided as part of a federal agency's NEPA analysis—including, in particular, potential effects that a 404 permit would have on water resources, wetlands, and protected species—which Plaintiffs use to educate the public and to advocate for protections for wetlands and species.  Exhibit 1 at 24–26 (Crooks Dec. at ¶¶ 74–77); Exhibit 2 at 16–18 (Umpierre Dec. at ¶¶ 46–50); Exhibit 3 at 7, 9–10 (Silverstein Dec. at ¶¶ 18, 25); Exhibit 5 at 4, 6–8 (Hartl Dec. at ¶¶ 14, 21, 26); Exhibit 6 at 7, 11 (Carter Dec. at ¶¶ 23–25, 39); Exhibit 7 at 3–4 (Robertson Dec. at ¶ 11–14); Exhibit 8 at 3–5 (Rinaman Dec. at ¶ 15–20). In PETA, the D.C. Circuit found that the U.S. Department of Agriculture's rule that limited access to information about birds harmed PETA because PETA previously used that information to educate the public and as a means to seek redress for bird abuse.  797 F.3d at 1095.  The same impacts are felt by Plaintiffs here.

Because Plaintiffs were unable to seek an agency stay pending judicial review and the state is now operating the program, they have lost the right for projects to undergo environmental review under NEPA and ESA Section 7 consultation.  Exhibit 1 at 24–26 (Crooks Dec. at ¶¶ 74–77); Exhibit 2 at 16–18 (Umpierre Dec. at ¶¶ 46–50); Exhibit 3 at 7, 9–10 (Silverstein Dec. at ¶¶ 18, 25); Exhibit 5 at 4, 6–8 (Hartl Dec. at ¶¶ 14, 21, 26); Exhibit 6 at 6–7, 12 (Carter Dec. at ¶¶ 23–25, 39); Exhibit 7 at 3–4 (Robertson Dec. at ¶¶ 11–14); Exhibit 8 at 3–5 (Rinaman Dec. at ¶¶ 15–20).  Plaintiffs had previously been able to use NEPA analyses and ESA Section 7 consultation to gain information that they used in their advocacy and litigation efforts.  Plaintiffs relied on the NEPA process to assess the risks to wetlands and species and to advocate for adequate protections to avoid or mitigate those risks.  NEPA provides an essential opportunity to environmental advocates to participate in receiving, reviewing, submitting, and assessing

information available to federal agencies before they issue a 404 permit.  In fact, these processes have been the primary resources to gain this information.  Now, Plaintiffs must expend more time and resources to advocate for protections for wetlands and species because they will be forced to do research and engage experts to obtain this information.

Plaintiffs' loss of NEPA and ESA Section 7 rights also severely limits the avenues by which they can challenge 404 permitting actions and ensure protections for wetlands and protected species.  Exhibit 1 at 24–26 (Crooks Dec. at ¶¶ 74–77); Exhibit 2 at 16–18 (Umpierre Dec. at ¶¶ 46–50); Exhibit 3 at 7, 9–10 (Silverstein Dec. at ¶¶ 18, 25); Exhibit 5 at 4, 6–8 (Hartl Dec. at ¶¶ 14, 21, 26); Exhibit 7 at 3–4 (Robertson Dec. at ¶ 11–14); Exhibit 8 at 3–5 (Rinaman Dec. at ¶¶ 15–20).  Agencies are required to consider the information that is presented to them through the NEPA process and must take a hard look at all environmental harms resulting from a federal action.  Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 404 F. Supp. 2d 1352, 1366 (S.D. Fla. 2005), judgment clarified, No. 05-80339-CIV-DMM, 2005 WL 3465181 (S.D. Fla. Nov. 21, 2005).  Similarly, agencies consulting under ESA Section 7 must use the best scientific and commercial data available to evaluate the harms that a project may have on protected species.  16 U.S.C. § 1536(c)(1).  The information developed through these processes is essential to Plaintiffs' assessment of the lawfulness of the agency's ultimate action and may provide the underpinning for a challenge when federal requirements are not met.  Fla. Wildlife Fed'n, 404 F. Supp. 2d at 1366 (vacating 404 permit because agency failed to comply with NEPA).  So long as they are denied rights under NEPA during the pendency of this litigation because the state is not required to follow that statute, the Plaintiffs' ability to carry out their missions will be significantly impaired because they will now need to expend resources to obtain the information that had previously been provided under these statutory schemes.

Finally, as explained in detail above, Plaintiffs are now extremely limited in their ability to enforce their rights in state court.  Exhibit 1 at 26–28 (Crooks Dec. at ¶¶ 78–82); Exhibit 2 at 18–19 (Umpierre Dec. at ¶¶ 51–53); Exhibit 3 at 7–9 (Silverstein Dec. at ¶¶ 18–24); Exhibit 5 at 6–7 (Hartl Dec. at ¶¶ 22–24); Exhibit 6 at 2 (Carter Dec. at ¶¶ 5, 11); Exhibit 7 at 3–5 (Robertson Dec. at ¶¶ 11–18); Exhibit 8 at 3–6 (Rinaman Dec. at ¶¶ 15–22).  In federal court, Plaintiffs can meet liberal standing requirements, afford to litigate based on an administrative record rather than de novo review, and are not faced with the risks of mandatory fee shifting.  Nw. Immigrant Rights, 2020 WL 5995206, at *5–6 (finding organizational standing where agency action restricted Plaintiffs ability to litigate to protect immigrants); PETA, 797 F.3d at 1094–97 (finding organizational standing when agency action precluded Plaintiff from "its normal process" of submitting complaints).  To further their missions, Plaintiffs use every tool in the toolbox, including advocacy, education, and litigation.  However, as a result of EPA's actions, they face substantial barriers to litigate as a way of protecting wetlands and species.  For example, Plaintiffs in the pending litigation have hundreds and thousands of members.  Dkt. 1 at 11–14 (Complaint ¶¶ 41, 43, 45, 47, 48, 53.)  Demonstrating that a "substantial" number of members of a national conservation organization would be affected by a particular permit would be difficult, if not impossible.  Even state-based organizations, such as Plaintiff Florida Wildlife Federation, have been denied access to sue in Florida courts based on this onerous standing requirement.  See Fla. Wildlife Fed'n, 2014 WL 4627151 at *5, *14.  (finding that even if 20 members of Plaintiff Florida Wildlife Federation were harmed by a proposed rule, this was not a substantial number of the organization's members and therefore Plaintiff lacked standing).

In addition, permit challenges in Florida courts require an extraordinary expenditure of funds.  Exhibit 1 at 26–28 (Crooks Dec. at ¶¶ 78–82); Exhibit 2 at 18–19 (Umpierre Dec. at

40

¶¶ 51–53); Exhibit 3 at 7–9 (Silverstein Dec. at ¶¶ 18–24); Exhibit 5 at 6–7 (Hartl Dec. at ¶¶ 22–24); Exhibit 7 at 3–5 (Robertson Dec. at ¶¶ 11–18); Exhibit 8 at 3–6 (Rinaman Dec. at ¶ 15–22). These are not based on an administrative record, and, as a result, require challengers to expend large sums of money to retain expert witnesses to develop evidence for trial.  Litigation over 404 permit violations and unpermitted dredging and filling is even more fraught, as Plaintiffs would be subject to a mandatory attorney-fee shifting provision should they not prevail.  Fla. Stat. § 403.412(2)(f).

The barriers to challenging unlawful permits, and to seeking accountability for permit violations and unpermitted dredging and filling, undermines the Plaintiffs' ability to fulfill their missions and access remedies to protect their institutional and members' interests.  Exhibit 1 at 26–28 (Crooks Dec. at ¶¶ 78–82); Exhibit 2 at 18–19 (Umpierre Dec. at ¶¶ 51–53); Exhibit 3 at 7–9 (Silverstein Dec. at ¶¶ 18–24); Exhibit 5 at 6–7 (Hartl Dec. at ¶¶ 22–24); Exhibit 6 at 2 (Carter Dec. at ¶ 26); Exhibit 7 at 3–5 (Robertson Dec. at ¶¶ 11–18); Exhibit 8 at 3–6 (Rinaman Dec. at ¶ 15–22).  These are cognizable organizational harms.  See Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv., 2020 WL 5995032 (D.D.C. Oct. 10, 2020) (finding that delay in mail ballots harmed organization that has civic engagement program designed to encourage citizens to be fully engaged in democratic process, and that defendant's actions making activities of the organization more difficult resulted in injury to Plaintiff); Nw. Immigrant Rights, 2020 WL 5995206, at *5–6 (finding standing where agency action restricted plaintiffs' ability to litigate in furtherance of their missions).

**IV.   Plaintiffs Suffered Concrete, Substantive Injuries as a Result of EPA's Failure to Codify its Actions.**

Because EPA failed to codify the components of the state program, that program lacks lawful authority.  By allowing a state program to operate without a lawful transfer of authority,

Plaintiffs and their members are facing risks of harm from 404 permits to be issued by the state. Exhibit 1 at 4–8 (Crooks Dec. at ¶¶ 22–26); Exhibit 2 at 16–18 (Umpierre Dec. at ¶¶ 46–50); Exhibit 3 at 7, 9–10 (Silverstein Dec. at ¶¶ 18, 25); Exhibit 5 at 4–5, 6–8 (Hartl Dec. at ¶¶ 14, 21, 26); Exhibit 6 at 8–10 (Carter Dec. at ¶¶ 29–34); Exhibit 7 at 3–4 (Robertson Dec. at ¶ 11–14); Exhibit 8 at 3–5 (Rinaman Dec. at ¶ 15–20).  As such, as discussed above, EPA's actions are causing Plaintiffs' members to suffer a threat of harm to their recreational, aesthetic, and other interests from the anticipated issuance of permit applications that would destroy thousands of acres of wetlands that are vital for the survival and recovery of protected species such as the Florida panther.  Absent this unlawful transfer of authority, the Corps would continue to administer Section 404 in Florida as it has for decades, and Plaintiffs would continue to enjoy rights and protections guaranteed by federal law discussed above, including the public participation process afforded by NEPA, the information provided through Section 7 consultation, and the ability to enforce all these rights in federal court, where Plaintiffs can meet liberal standing requirements and afford to litigate based on an administrative record, unlike the undue barriers that litigation in state court present.  See Sierra Club v. Johnson, 436 F.3d 1269, 1279 (11th Cir. 2006).

**V.      Plaintiffs have Satisfied Article III's Causation and Redressability Requirements.**

Plaintiffs satisfy the causation and redressability requirements. Summers, 555 U.S. at 496.  The deprivation of their procedural rights (and the risk that this presents to their concrete interests) is fairly traceable to EPA's violation of section 553(d)'s mandated delay in effective date.  These injuries would be redressed by a partial final judgment declaring that EPA's actions were unlawful, setting aside the immediate effective date of EPA's rule, and declaring that the

rule may not go into effect before 30 days after it is properly promulgated and codified.[10]  If this Court grants relief, there is at least "some possibility" that the new Administration would grant Plaintiffs' petition to postpone the rule's effective date and thereby protect Plaintiffs' concrete interests pending judicial review.  See Massachusetts, 549 U.S. at 518; Dania Beach, 485 F.3d at 1186; Facebook, 456 F. Supp. 3d at 109.  Indeed, as the Klain Memo demonstrates, the Biden Administration has directed agencies to review and consider staying the final actions of the outgoing Administration.

Plaintiffs' organizational injuries also satisfy the ordinary causation and redressability standards applicable to such harms.  See Lujan, 504 U.S. at 560–61.  Plaintiffs' immediate and ongoing diversion of resources—expending time and resources tracking, preparing for, and advocating against harmful state 404 permits, investigating and researching wetlands and species harms both internally and through hired experts, and litigating in state court, if possible—is the unavoidable result of EPA's violation of Section 553(d)'s delay in effective date and failure to codify.  "Causation can be established even if there are multiple links in the chain, as long as the chain is not hypothetical or tenuous."  See Juliana v. United States, 947 F.3d 1159, 1169 (9th Cir. 2020) (internal quotations and citations removed); Envtl. Def. Fund v. U.S. Envtl. Prot. Agency, No. 4:21-CV-00003-BMM, 2021 WL 402824 (D. Mont. Feb. 1, 2021).  It is likely that

_____

[10] Prowes v. U.S. Department of Justice, sets out the general principle that an agency's failure to provide the required 30-day delay in effective date may be cured by allowing the rule to take effect 30 days following publication.  938 F.2d 274, 275 (D.C. Cir. 1991).  In that case, there was no other issue with the rule's promulgation, and no action that took place during the 30-day period had harmed the plaintiff. The court relied on that fact to find plaintiff's case moot.  Id. See also Ngou v. Schweiker, 535 F. Supp. 1214, 1217–18 (D.D.C. 1982) (providing a reasonable period following judgment when plaintiffs were harmed as a result of actions during the 30-day period).

a favorable decision will redress this injury by delaying temporarily—and possibly forever—the need to address permits authorized by the state program.

## CONCLUSION

For these reasons, EPA's actions violated the APA because it was (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and (3) "without observance of procedure required by law," and must be set aside.  5 U.S.C. § 706(2)(A), (C)– (D).  Plaintiffs therefore respectfully request that the Court grant summary judgment in their favor on their Eighth and Ninth Claims for Relief.

Dated:  March 5, 2021

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

<u>/s/ Anna Sewell</u>
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

\* Appearing under LCvR 83.2(c)(1))

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of March 2021, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org