# Exhibit 1

DocuSign Envelope ID: D470E83B-B49C-43D6-9F55-A2385436ED6F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## DECLARATION OF AMBER CROOKS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Amber Crooks, make the following declaration:

1.     I am a resident of Naples, Florida.

2.     I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.     I am a member of the Conservancy of Southwest Florida ("Conservancy"), and I am also employed by Conservancy as the Environmental Policy Manager.

4.     Conservancy is a 501(c)(3) nonprofit that focuses on environmental conservation in Southwest Florida.  Our water policy work addresses issues at local, statewide, and federal levels.  Conservancy was founded in 1964 and has grown in membership to over 3,600 dues-paying members, and over 2,000 additional donors and supporters.  The mission of Conservancy is to protect the natural environment, species, and habitats of Southwest Florida, summed up in our motto: "Our Water, Land, Wildlife, Future."  We do this through four main program areas:

1

1) Science and Research, 2) Policy and Advocacy, 3) Wildlife Rehabilitation, and

4) Environmental Education.

5. Conservancy's Policy and Advocacy program focuses on protecting water,

wildlife, and land. In protecting wetlands and waterways, we work to promote better water

management and resource protection by working with stakeholders and decision-makers to

ensure that stringent water management tools, regulations, and best practices are in place and

utilized. In protecting wildlife and endangered species, we work to prevent harm by preserving

species' habitats from environmental changes, conserving landscape corridors and critical

habitat, and ensuring that protections are strong to recover imperiled species populations. We

perform this work at the local, state, and federal levels.

6. Conservancy's Wildlife Rehabilitation program operates the von Arx Wildlife

Hospital, which treats approximately 3,800 injured, sick, or orphaned native animals on an

annual basis. These native species include small mammals, birds (including migratory and

protected birds), turtles, gopher tortoises, and many others.

7. Protection of water resources such as wetlands and conservation of native species

are core programmatic areas for Conservancy's policy work.

8. I have a deep personal commitment to the protection and recovery of Florida's

protected species, and I engage in both professional and personal activities to further this

commitment.

9. I have an aesthetic and scientific appreciation of the Florida panther in the wild,

and travel to panther habitats in hopes of viewing and photographing the elusive panther. I enjoy

recreating in panther habitat areas, including hiking, camping, wildlife viewing, and nature

photography.

10.     I graduated with a B.A. in political science from Stetson University in 2003, and I received a Masters of Public Administration in Environmental Policy and Planning from Florida Gulf Coast University in 2011.

11.     Through my work at Conservancy and through my formal education, I have studied endangered species policy issues, including critical habitat designation, Habitat Conservation Plans, and the Florida panther, among other topics.  As the environmental policy manager at Conservancy, I specialize in wildlife policy and am the organization's listed (endangered and threatened) species expert.  Endangered species that my work focuses on include, but are not limited to, Florida panthers, bonneted bats, and smalltooth sawfish.  My job duties also include overseeing policy staff members' technical analysis of issues related to state and federal permitting processes.

12.     Southwest Florida, as a region, has many endangered and threatened species that receive regulatory review by federal agencies as required under the Endangered Species Act ("ESA").  One such species is the Florida panther, one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  According to the U.S. Environmental Protection Agency's ("EPA") Biological Evaluation in this case, this region had the highest concentration of ESA consultations in all of Florida from 2014-2018.  See Exhibit A, Excerpt from ESA Evaluation for Clean Water Act Section 404 Assumption by the State of Florida.

13.     One of the main tools Conservancy uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; utilize geographic information system (GIS) analysis, a data mapping tool that allows us to visually understand the affected geographic environment; review wetland

impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters. As with this case, we also engage in litigation when needed to carry out our organization's goals.

**Conservancy's Engagement on Florida Assumption of Section 404**

14. Conservancy has dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program, in light of the state's poor permitting track record in environmental protection and the state's failure to demonstrate that it would provide the same level of protection, rights and remedies available under federal law, and that its program meets the requirements of federal law.

15. Between 2017 and 2020, I advocated on behalf of Conservancy, against state efforts to pursue assumption on Section 404 in Florida. Among other things, I testified before the state legislature, participated in the state rulemaking process (via comments and hearings), regularly raised concerns directly with the Secretary of Department of Environmental Protection and his staff, and helped engage our membership in advocacy against the proposed program at the state and federal levels.

16. In 2018, we launched a campaign to urge Governor Rick Scott to veto a quickly passed bill that authorized the Department of Environmental Protection to pursue seeking approval from EPA to administer Section 404. This included our supporters sending more than 700 emails in opposition, online advertisements that reached more than 70,000 viewers, and advertisements and opinion pieces published in local newspapers. We submitted comments to the U.S. Army Corps of Engineers ("Corps") as it was considering modification to the list of waters that could be assumed by the state under Section 404. In 2019, we sent an action alert to our members and supporters asking them to contact the new Governor, Ron DeSantis, to urge

him to reverse course on 404 assumption, as he had made promises about protecting our water quality.

17.     From 2018 to 2020, we participated in the state's rulemaking process, the final steps of which were conducted at the height of uncertainty around the coronavirus pandemic (February to April 2020), urging the state not to rush the process when the community was facing a public health emergency involving stay at home orders, closed schools and scarce household supplies, and requiring families to focus on protecting their health, livelihood, and well-being.

18.     After the state submitted its 404 application to EPA in August 2020, and EPA initiated a public comment period in September 2020, Conservancy, along with other Plaintiffs in this action, objected to the incompleteness of the application in October 2020, and in November 2020 submitted comprehensive comments objecting to Florida's proposed program as grossly inadequate and unlawful under federal law.  Those comments are attached here as Exhibits B and C.

19.     After EPA published its notice approving Florida's program and gave it immediate legal effect on December 22, 2020, Conservancy's counsel notified EPA and the other federal defendants, as well as the state, that EPA's transfer of authority was unlawful. Exhibit D.  On December 28, 2020, EPA responded by claiming for the first time that the agency's December 22, 2020, action did not have to meet the 30-day requirement or codify the state program because it was an informal adjudicatory order, rather than a rule.  Exhibit E.

20.     On January 14, 2021, Conservancy joined with the other Plaintiffs in this action to filed the present suit.

21.     Conservancy was harmed, and continues to be harmed, by EPA's decision to make the state-assumed 404 program effective immediately on December 22, 2020, rather than at least 30 days after publication (January 21, 2021), as required for rulemakings, and without lawfully effectuating that transfer through codification.  The unlawful transfer of authority from the Corps to the state harms Conservancy's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests as a result of the state's unlawful administration of the 404 program.

**Conservancy Lost Procedural Rights As a Result of EPA's Unlawful Action**

22.     As a result of EPA's immediate effective date, Conservancy lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of inauguration day. Conservancy would have exercised these rights had they been available.

23.     As to reconsideration, Conservancy was deprived of the right to ask EPA to reconsider its determination that Florida's application was complete, and to allow public comment on the complete application, before the rule took effect.  During the public comment period, Conservancy objected to EPA's completeness determination on at least three bases: (1) the failure to adequately identify the scope of waters that would be assumed by the state; (2) the failure to demonstrate that the state would have the resources to administer a complex federal program without, as it claimed, a cent in additional resources, particularly at a time when the state's coffers are under strain from the economic impacts of the coronavirus pandemic; and (3) the failure to define the "technical assistance" process the state claimed would ensure protection of imperiled species, but that was not laid out until more than two weeks after the public

comment period closed.  Conservancy also was deprived of the right to ask EPA to reconsider its

approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

24.      As a result of EPA's immediate effective date, Conservancy was also denied the

right to ask the agency to postpone the effective date of the rule pending judicial review.  On

January 20, 2021, Conservancy and the other Plaintiffs in this action asked EPA to cure the

immediate effective date and failure to codify violations regarding the state program.  See

Exhibit F, Earthjustice's Letter dated January 20, 2021, "Request for Expedited Action; Ctr. for

Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)."

Conservancy and the other Plaintiffs further requested that if EPA were to properly promulgate

and codify its approval of Florida's program, that the agency also postpone the effective date of

that action pending judicial review.  EPA, however, has adhered to its position that the

immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay

request.  If the court were to remedy these violations, Conservancy would again ask the agency

to postpone the effective date of the rule pending judicial review.

25.      EPA's immediate effective date of December 22, 2020, also foreclosed

Conservancy's ability to benefit from the Biden Administration's review of the rule.  It is my

understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff

Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing

agency heads to review and consider postponing by at least 60 days any rule that had been

published in the Federal Register but had not taken effect. [1]  Had EPA provided the required 30-

day effective date from its publication in the Federal Register, it is my understanding that EPA's

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

approval and transfer of authority to the state would have been covered by the Klain Memo. A review of the unlawful aspects of Florida's 404 program could have resulted in actions to stay the program's effective date and take other remedial measures.

26.     The loss of procedural rights Conservancy has sustained as a result of EPA's immediate transfer of authority to the state, as well as its failure to lawfully effectuate the transfer through codification, has resulted in immediate and on-going organizational and membership harms while the state's unlawful program operates. The state's 404 program causes Conservancy to divert resources, threatens wetlands and wildlife, and undermines Conservancy's ability to fully realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

## Organizational Harms From Immediate Effective Date

27.     I understand that the APA 30-day delay between a rule and its effective date is intended to allow all those affected to prepare for the effect of the rule. As discussed above, the delay allows those adversely affected to request reconsideration of the action, and take other action, such as requesting an agency stay, before the rule's effective date. The delay also allows those affected to prepare for the impact of the rule when it becomes effective.

28.     Here, without the 30-day window between the rule and effective date, Conservancy was unable to adequately prepare for the mass of permits immediately transferred from the Corps to the state, which required a substantial diversion of attention from its planned activities to determining the status and impact of these transfers and what actions the state would take. Conservancy was forced to divert resources from core programmatic work to immediately turn its attention to these questions. This included forcing Conservancy to try to understand the impact and scope of the program's components, which have not been codified, to try to prepare

to continue its advocacy against pending permit applications threatening its interests and those of

its members.  We had to quickly transition our resources from other core programs and towards

trying to learn and stay on top of the state-assumed program.

29.     In this 30-day period, Conservancy had emergency internal meetings to create

strategy plans and re-staff projects so that Conservancy would be able to 1) stay on top of how

Florida was processing new applications and which existing 404 applications would be

transferred from the Corps; 2) ensure we would not miss decision points on applications that

would authorize projects affecting Conservancy's and our members' interests; 3) ensure we

would not miss information or deadlines for applications that could be of concern to

Conservancy;  4) assess overall how Florida was administering the program; 5) better understand

how the agency MOA/MOUs, Biological Opinion, and state rules would perform in

implementation on varied applications; and 6) what the best forms of advocacy would be under

the state assumed program.

30.     In this 30-day window, Conservancy dedicated a significant amount of resources

to tracking the state's "Oculus" search engine to figure out where and how to access 404

application documents and whether and how the state was proceeding with new and transferred

permitting requests.  Conservancy was simultaneously contacting the state via phone and email

to learn the same.  Conservancy also spent time trying to figure out how to sign up to receive

public notices of developments on projects with little to no avail.

31.     Halfway through this 30-day period, we received individual instructions from the

state on how to search Florida's database of transferred and new applications and general

information about where future public notices would be posted.  Once we had this information,

we had to go through hundreds of data entries in the Oculus database to determine if any projects

Conservancy had already been tracking and on which we had submitted comments were transferred to the state (and under what project name and the state 404 application identification number was), as well as attempting to discern whether any new project applications that would be of concern to Conservancy were submitted. Because the state posted records to its Oculus site in a piecemeal fashion, we had to repeatedly call the Corps to ascertain whether the agency transferred individual project applications that Conservancy had been tracking and on which we had submitted comments.

32. Conservancy therefore had to re-allocate our staff time toward this effort, which required us to reduce or eliminate time that would have been spent on other work. This increase in work redirected Conservancy's resources and staff capacity that were dedicated to other aspects of the organization's core planned conservation programs.

33. Although I had planned to monitor the transfer of 404 permitting authority from the federal agency to the state following the program's approval, if EPA had not instituted an immediate effective date, I would not have had to work almost exclusively on this during the weeks that followed the program going into effect immediately on December 22, 2020. A core component of my work is protecting panthers. In the 30 days following the program approval, I was unable to devote the time I otherwise would have to this work, including my otherwise planned tasks regarding transportation issues that affect panthers.

34. We also had to divert resources away from our informational work dedicated to translating policy so that it is more user-friendly for our members and the general public. At Conservancy, we aspire to take the complex matters we work on and break them down to a level that the general public can understand. This includes creating story maps, visuals, PowerPoints, and the like for the public. We then put this information on our website and social media to

educate our members and supporters, inspire them to take action, and further attracts supporters and donors to Conservancy. Because of the hastened need for many of our Policy staff members to address the Florida 404 program and several of the pending applications, we had to shift away from this work or put it on hold until resources became available.

35.     These harms to Conservancy have continued beyond the 30 days following the immediate effective date of the program. Now that 404 applications are being processed and the state is sending Requests for Additional Information ("RAIs") to permit applicants, we are forced to engage in our advocacy work all at once on all the 404 permits we had been tracking. In addition to ensuring our comments on projects that were pending before the Corps were forwarded to the state, we will also have to submit brand new comments to the state for each 404 project impacting our mission, tailored to the specifics of the new program, and request public hearings for each project. Furthermore, because the applications were submitted or transferred at around the same time giving them all similar timeclock start dates, we are having to monitor developments on the permit applications all at once, rather than if the permits had remained on their own natural timeline under the Corps' jurisdiction. As a result, we are continuing to divert staff time from other important local and state matters affecting species and water quality.

**Organizational and Membership Harms From Particular Projects**

36.     EPA's unlawful transfer of authority to the state via an immediate effective date and without codifying the state program, mean that the state is presently administering the 404 program, while Conservancy has been denied the right to request reconsideration or an agency stay pending judicial review, and the ability benefiting from the Klain memo. As a result, the state is poised to issue 404 permits on major projects that will Conservancy's organizational interests and my interests as a member. We are particularly concerned about certain permit

applications that have been transferred by the Corps to the state[2] for major projects, especially given the state's public statements that its objective in assuming jurisdiction over 404 permits is to issue permits quickly.

37.     **Troyer Mine.**  According to DEP's online search portal, as of January 8, 2021, the Corps transferred a 404 permit application by Troyer Brothers Florida, LLC, for construction and operation of a lime rock and fill dirt mine, to the state, in state application number 0292013007.  The proposed project includes the extraction of approximately 256,000 cubic yards of crushed lime rock from the project site.[3]

38.     Troyer Mine would cover 1,803.51 acres and would affect waters that are part of the Big Cypress Swamp Watershed.  The project site is within the consultation areas for several endangered and threatened species, including the Florida panther, bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay.  Additionally, the site has suitable habitat for the threatened eastern indigo snake and wood stork.  Other listed species observed on the site include the bald eagle, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tricolored heron, white ibis, American alligator, and Big Cypress fox squirrel.  The project is also within three wood stork colony Core Foraging Areas.  See Exhibit G, Public Notice, Permit Application No. SAJ-2008-03793.

39.     While the application for Troyer Mine was pending before the Corps, Conservancy submitted public comments opposing the project (see Exhibit H).  Ninety percent

---

[2] https://depedms.dep.state.fl.us/Oculus/servlet/login and
https://prodenv.dep.state.fl.us/DepNexus/public/searchPortal.
[3] State 404 File for Troyer Mine: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_292013/gis-facility!search.

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6E

of the project site is in Florida panther Primary Zone habitat, meaning it is habitat essential for the continued survival and recovery of the species.  This project site is about 90% Primary Zone and Adult Breeding Habitat for the Florida panther.

40.     Vehicular collisions are the leading cause of known deaths for the Florida panther.  Troyer Brother's proposed project would result in an estimated 2,089 daily truck trips to or from the site, adding heavy traffic to already deadly roadways for panthers.

41.     Troyer Mine would also likely destroy 214 acres of wetland that are part of regional flowways, or connected strands of water that comprise a wetland ecosystem within the Density Reduction Groundwater Resource Area of Lee County, a large area of protected wetlands, agricultural lands, and conservation lands.  This area includes preserved lands of Imperial Marsh Preserve, Corkscrew Regional Mitigation Bank, and Southwest Florida International Airport mitigation lands.  Wetlands in this area are critical to preserving aquifers and water supply for Lee County and surrounding areas; for example, water from rain runoff naturally flow to and re-charge the aquifers.  These wetlands also provide panther habitat.  As explained in our attached Comments (Exhibit H), the mining project would likely impact evaporation rates of water supply due to seepage from wetlands into the mines, resulting in a lower water table, with the potential for adjacent wetlands to be drained as a result.

42.     The Troyer Mine project requires both a state-level environmental resource permit ("ERP") and a 404 permit.  In 2011, the state granted Troyer Brother's ERP applications.  In 2019, the state granted modifications to those permits.  On June 29, 2019, while the 404 permit application was before the Corps, the Corps closed the public comment period.

43.     In assuming jurisdiction over the federal 404 program, the state has repeatedly stated that its objective is to grant 404 permit applications quickly.  The state has also claimed in

its 404 application to EPA that the ERP process has an 85% overlap with the 404 application

process, suggesting that once the ERP process has been completed, there is not much more for

the state agency to do to complete its 404 review.[4]

44.     Absent a request for additional information, it typically takes 90 days for FDEP to

process a state-level ERP permit from start to finish: 30 days to make a completeness

determination and 60 days to issue or deny the permit.[5]  For the state 404 program, within 10

days of a completeness determination, DEP must provide public notice of the proposed

application, which opens a 30-day comment period for most permits that is extended to the close

of any public meeting, if one is held.  If EPA does not comment or signal it may comment or

object, FDEP generally has 60 days from the close of the comment period (or its determination

that the application is technically complete) to make a final permit decision.  If a request for

additional information is issued, applicants have 90 days to respond, though, as shown below,

they may respond sooner.

45.     As for Troyer Mine, that the state ERP process has been completed, the federal

404 public comment period has concluded, the Corps has transferred the application to the state,

and the state has not issued an RAI, it appears that there is little left to do to process this 404

application.

46.     If the Troyer Mine permit is granted, Conservancy's ability to challenge the

permit and harms that result from the project will be severely constrained by inadequate and

costly state procedures (including restrictive standing requirements, costly litigation

---

[4] See https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/state-404-program.

[5] See https://floridadep.gov/comm/press-office/content/dep-101-environmental-resource-permitting

requirements because of the need to retain expert witnesses, and the potentially devastating risk

of mandatory fee-shifting laws), that are not comparable to the processes or remedies available

under federal law.  Conservancy will also lose access to information about the project that would

have been provided under NEPA and Section 7 of the ESA.

47.     In addition to harming Conservancy's organizational interests, the Troyer Mine

project would be located approximately three and a half miles away from the public lands I

enjoy, namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike,

camp, and observe the wildlife listed above.  Panthers require huge swaths of territory for

roaming, foraging, and breeding, can have ranges over 200 square miles, and can travel 12 or

more miles a day.  I visit Corkscrew for an annual camping trip with friends, and I plan to return

here as often as possible.  Environmental harms from Troyer Mine, including harms to essential

species habitat, would negatively impact my ability to enjoy these lands and observe wildlife.

48.     **Rural Lands West.**  According to FDEP's online search portal, as of January 11,

2021, the 404 permit application for Rural Lands West was transferred to the state, in state

application number 0396966001.[6]  Interestingly, Corps personnel advised Conservancy that this

404 application was transferred to the state as of December 21, 2020, a day before EPA

published notice of its approval of the state program.

49.     Collier Enterprises Management, Inc., seeks this permit to develop in the Big

Cypress Drainage Basin.  This drainage basin includes critical wetland ecosystems such as

Shaggy Cypress, Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand, which

are proximate or downstream to this proposed project.  Rural Lands West is a project to clear,

---

[6] State 404 File for Rural Lands West:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396966/gis-facility!search.

grade, excavate, dredge, and fill to construct and maintain a mixed-used development consisting

of two golf courses; a commercial town center; an elementary, middle, and high school; and

residential neighborhoods with roads, driveways, parking areas, lakes, drainage management

systems and other associated infrastructure.  The project would discharge 196,217 cubic yards of

fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre

of isolated wetlands in the watershed for the Big Cypress Drainage Basin.  Approximately

27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field

ditches.  The project also would dredge/excavate approximately 2,951,250 cubic yards of native

materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from

1.1 acre of isolated wetlands.  See Exhibit I, Public Notice, Permit Application No. SAJ-2008-

00210.

     50.     While the Rural Lands West application was pending before the Corps,

Conservancy submitted comments in opposition to the project (see Exhibits J and K).

Conservancy owns 1.4 acres of land for conservation purposes that are approximately 1.5 miles

away from Rural Lands West, and another 26 acres of land within 3 miles of the project.

     51.     The project would result in approximately 10,000 new residents arriving to the

area and would impact over 300 acres of wetlands.  The project falls within important regional

flowways and ecosystems.

     52.     Regarding water resources, we additionally raised concerns that Rural Lands

West would be in an impaired water body that does not meet water quality standards, particularly

for nutrients or where nutrients are the pollutant.  Conservancy asked federal agencies for better

hydrological analysis of the impacts of this project on downstream and adjacent wetlands.

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6F

53.     As stated in the comments Conservancy submitted to the Corps in opposition to this project, there would be 4,100 acres of impacts to panther habitat, with 75% of the project in the Primary Zone habitat.  A substantial amount of the project is also in panther Adult Breeding Habitat.  The Rural Lands West project is part of the proposed Eastern Collier Multiple Species Habitat Conservation Plan which the Conservancy opposes, in part, due to loss of panther habitat from projects like Rural Lands West.

54.     The Rural Lands West project requires both a state-level ERP and a 404 permit. In 2018, the state granted Collier Enterprises Management, Inc.'s ERP applications.  The Corps closed the public comment period on the application in 2017.  In assuming jurisdiction over the federal 404 program, the state has repeatedly stated that its objective is to grant 404 permit applications quickly.  After the 404 application was transferred to the state, an RAI was issued on February 5, 2021, meaning it is now over a month into the maximum 90-day window for Collier Enterprises to respond, moving the proposed project further along in the application process.

55.     If the Rural Lands West permit is granted, Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

56.     I would also be personally harmed by the Rural Lands West development.  I regularly hike the public trails at the Florida Panther National Wildlife Refuge. The Refuge

boundary is about four miles from the project site, and I plan to return as often as possible. Environmental harms from the Rural Lands West development project threaten my ability to enjoy these natural areas, hike, and observe wildlife.

57. **Babcock Development.** According to FDEP's online search portal, as of December 28, 2020, Babcock Property Holdings, LLC's 404 permit application to expand its nearly 18,000-acre property development was transferred to the state, in state application number 0396574001.[7] As with Rural Lands West, Corps personnel advised Conservancy that this 404 application was transferred to the state as of December 21, 2020, a day before EPA published notice of its approval of the state program.

58. The proposed modification, which would cover an 8,711-acre project area would be located in the Tidal Caloosahatchee River Watershed, and it would add 113.42 acres of wetland impacts, totaling 553.63 acres of wetland impacts for this project. See Exhibit L, Public Notice, Permit Application No. SAJ-2006-06656.

59. In comments by the Conservancy to the Corps (see Exhibit M), we highlighted potential harms to the caracara Primary Zone buffer, as the caracara is non-migratory and uses this territory year-round. We also highlighted concerns about the Florida bonneted bat, as much of the development site would be within proposed bonneted bat critical habitat.

60. On November 12, 2020, the Corps closed the public comment period. Additionally, the state ERP has been pending since May 27, 2020, but could be granted at any time. Under state law, once an ERP application is received, FDEP has 30 days to determine if it is complete or to seek additional information; once the application is deemed complete, FDEP

---

[7] State 404 File for Babcock Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396574/gis-facility!search.

has 60 days to make a decision on the permit.  For the state 404 permit application, FDEP issued a RAI, which Babcock Property Holdings responded to quickly on March 1, 2021, thus moving the application further along the processing timeline toward a final decision.

61.    Conservancy's ability to challenge the permit and harms that result from Babcock Development will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.   Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

62.    **Bellmar Development.**   According to FDEP's online search portal, as of December 28, 2020, the 404 application for Bellmar Development was transferred to the state, in state application number 396364001.[8]  Collier Enterprises Management, Inc., applied to develop a mixed-use community that would cover about 1,500 acres within the Big Cypress Drainage Basin.  This drainage basin includes critical wetland ecosystems such as the Camp Keais Strand flowway, Picayune Strand, and Fakahatchee Strand which are proximate or downstream to this proposed project.  The development site would also be within proposed critical habitat for the bonneted bat.

63.    The Bellmar project is proposed completely within 100% Primary Zone habitat for the Florida panther, and about 80% of the site is Adult Breeding Habitat for the panther as well. The Bellmar project is part of the proposed Eastern Collier Multiple Species Habitat

---

[8] State 404 File for Bellmar Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396364/gis-facility!search.

Conservation Plan which the Conservancy opposes, in part, due to loss of panther habitat from projects like Bellmar.

64.     The project would likely impact lands that are part of the Florida Panther National Wildlife Refuge, where I love to regularly visit and recreate.  Conservancy also owns property about 3 miles from the proposed project site.

65.     After the 404 application was transferred to the state, an RAI was issued on January 27, 2021, meaning it is now over a month into the maximum 90-day window for Collier Enterprises to respond, moving the proposed project further along in the application process.

66.     Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

67.     **Fleischmann Development.**  According to FDEP's online search portal, as of February 16, 2020, Minto Sabal Bay, LLC's application to construct a residential development with associated infrastructure, amenities, and stormwater management system had been transferred to the state, in state application number 398942001.[9]

68.     Fleischmann Development would encompass 53.7 acres of wetlands.  It would result in the discharge of 169,077 cubic yards of fill material into 26.2 acres of wetlands and 839

---

[9] State 404 file for Fleischmann Development:
https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_398942/gis-facility!search.

cubic yards of fill material into 0.13 acre of other surface waters.  It would also result in the excavation of 72,213 cubic yards of material from 7.46 acres of wetlands.  The project would impact eastern indigo snake habitat and could also impact the wood stork, red-cockaded woodpecker, Florida scrub jay, Florida panther, Florida bonneted bat, and the American crocodile.  See Exhibit N, Public Notice, Permit Application No. SAJ-2019-03152.

69.     While the application had been pending before the Corps, Conservancy submitted comments to the Corps (see Exhibit O), in which we outlined concerns about the gopher tortoise and indigo snake and advocated for better protections for the upland species impacted or potentially impacted by the project.

70.     On July 5, 2020, the Corps closed the public comment period.  Additionally, the state ERP has been pending since July 24, 2020, but could be granted at any time.  Under Florida law, once an ERP application is received, FDEP has 30 days to determine if it is complete or to seek additional information; once the application is deemed complete, FDEP has 60 days to make a decision on the permit, and according to FDEP, there is an 85% overlap between the ERP and 404 permit process.

71.     Conservancy's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  Conservancy will also lose access to information about the project that would have been provided under NEPA and Section 7 of the ESA.

72. Further demonstrating the harms discussed above and below, I have verified additional 404 applications in FDEP's State 404 Program database that have already been transferred to the state, that Conservancy has been monitoring and has already engaged in, and for which the Corps' comment periods have closed:

a. **Vanderbilt Beach Extension**. Collier County seeks to widen and extend a roadway that would impact 3.38 acres of wetlands and panther habitat. Conservancy submitted a comment letter seeking consideration of panther movement in that area.

b. **Immokalee Road Rural Village.** 27th/Pico Boulevard Limited Partnership seeks to construct a mixed-use residential and commercial development in Collier County, which would result in the discharge of 159,091 cubic yards of fill material into 32.87 acres of wetlands and 1,942,195 cubic yards of fill material into 200.64 acres of other surface waters. The project would also involve the excavation of 179,241 cubic yards of material from 11.11 acres of wetlands. The site is within the USFWS designated Focus Area for the Florida panther and is within the USFWS designated consultation area for the crested caracara. Conservancy sent a letter seeking consideration and action on the severe panther roadkill hotspot adjacent to this project.

73. These harms would be pervasive and ongoing. Conservancy has identified and has been monitoring project developments that will likely need a 404 permit in the future:

a. **Old Corkscrew Plantation Mine.** This is a potential mining project that could cover 4,000 acres. It had an active 404 permit application in 2011, but no permit was issued to my knowledge. The project already received its ERP from FDEP in 2011. About 87% of the property is considered Florida panther Adult Breeding Habitat, and the project also contains Florida panther Primary Zone habitat. The following species have been previously

documented on site, including crested caracara, Everglades snail kite, wood stork, Florida

panther, Florida sandhill crane, little blue heron, roseate spoonbill, Big Cypress Fox squirrel,

and Florida black bear. The project also contains Core Foraging Area for four wood stork

colonies.  Based on earlier permit applications, this project would add about 2,300 daily truck

trips onto a roadway that already is deadly for Florida panther-vehicle collisions.  This

project would also be approximately one and a half miles away from the public lands I enjoy,

namely, the Corkscrew Regional Ecosystem Watershed lands where I regularly hike, camp,

and observe wildlife.

b.  **State Road 29.**   This is a project to widen State Road 29 in Collier County, and it

is already beyond the beginning stages of the planning process with the Florida Department

of Transportation.  The State Road 29 project encompasses Florida roadkill hotspots that

threaten panthers, and it is adjacent to the public lands of Big Cypress National Preserve and

the Florida Panther National Wildlife Refuge.  This project would be located directly

adjacent to these key public lands, where I enjoy hiking and other outdoor activities.

c.  **Wilson-Benfield Road.**  This is a project to extend a major roadway in Collier

County, and it would be within or adjacent to the Picayune Strand State Forest. The Picayune

Strand provides habitat for numerous species, including the wood stork, red cockaded

woodpecker, Florida black bear, Florida panther, and others.  This roadway may impact

important downstream resources, fragment wildlife habitat, and alter hydrological

connections.  This project is likely to go forward, as it has already been listed on the Collier

County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan,

which is the federally mandated planning mechanism for local governments to receive

federal funding for transportation projects.  I live about 1.5 miles way from this project area,

and enjoy recreation, such as hiking and wildlife observation, in the Picayune Strand State Forest and plan to continue doing so as often as I can.

d. **I-75 Interchange near Everglades Blvd**. This is a project to construct a new interchange on I-75 in Alligator Alley. An interchange in this area would increase development in Golden Gate Estates and the Rural Lands Stewardship Areas. These areas provide habitat for wildlife such as Florida black bears and Florida panthers, among other species. This project is likely to go forward, as it has already been listed on the Collier County Metropolitan Planning Organization (MPO) 2045 Long Range Transportation Plan, which is the federally mandated planning mechanism for local governments to receive federal funding for transportation projects.

e. **Eden Oak Development**. This is a project to develop a 55-home community on 306 acres along the Caloosahatchee River. The project was previously pending with the Corps starting in 2012, it would have impacted at least 35 acres of mangrove and salt marsh, and it was within smalltooth sawfish critical habitat and Florida manatee critical habitat. The wetlands within this site were recognized by agencies as Aquatic Resources of National Importance. The developer has an active application for development at the local level.

f. **FPL "Sawgrass" Solar Facility**. This is a project by Florida Power & Light to construct a solar facility that would span over 3,000 acres. It would cut through Florida Panther Primary Zone habitat. The project is also adjacent to a roadkill hotspot for Florida panthers.

**Organizational Harms from the State Program**

74. As stated above, because Conservancy was unable to seek agency reconsideration or an agency stay, was foreclosed from benefitting from the Klain memo, and because EPA

unlawfully transferred authority to the state, the state is currently administering its unlawful

Section 404 program.  The state 404 program is and will harm Conservancy as an organization.

75.    Now that Florida has unlawfully assumed the federal 404 program, Conservancy

is harmed by the loss of environmental review of projects under NEPA.  This statute not only

provides more scrutiny for water resources, species and their habitat, but also provides the

Conservancy with vital information to vet the impacts of a proposed project and additional

opportunities for public comment.  In order to carry out our mission of protecting species and

wetlands, we now will be required to hire our own experts to engage in alternatives analyses,

again draining our financial resources that would go elsewhere.

76.    The NEPA review process provides Conservancy with an opportunity to engage

in the Corps decision-making, which can lead to better environmental decisions, opportunities

that are lost now while Florida is allowed to continue administering this 404 program.  For

example, several proposed large-scale mining projects in Lee and Collier counties were subject

to NEPA, under which an environmental impact statement ("EIS") was determined to be

required.  As a result of this decision, two of the applications – which would have impacted over

9,000 acres – were either suspended or withdrawn.  See Exhibit P (correspondence between

permit applicants and the Corps documenting the EIS as the reason for withdrawal/suspension).

77.    The loss of critical information and procedural safeguards afforded by NEPA will

significantly set back our established methods of advocating for and protecting water resources,

species and their habitats, and as the pending 404 project applications discussed above

demonstrate, these losses will occur if Florida assumes the 404 program.  Furthermore, for any of

the projects in which Conservancy determines the need for litigation, a tool employed by our

DocuSign Envelope ID: D470E83B-B40C-43DC-9F55-A2385426EB6F

organization, it is guaranteed that Conservancy would have to divert its resources to engage in state court litigation, or forego litigation completely, damaging our organizational mission.

78.     Furthermore, Conservancy challenges 404 permits in federal court as one of our advocacy tools to further our mission, and we are harmed by the loss of federal court as a venue as a result of Florida assuming the 404 program.  Litigating in federal court provides us with the necessary access to protect the interests of our organizational mission and our members.  We would not have the same access to state courts because of the significantly higher costs of state court litigation and the potential drain on our resources to litigate at the state level.

79.     With assumption, there is now an entirely different legal scheme to challenge wetlands permitting in Florida, through the Division of Administrating Hearings ("DOAH").  Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Conservancy would have to incur considerable expense to hire expert witnesses to bring a legal challenge.  Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Conservancy would have to divert from other programmatic goals if we did not have to litigate in state court.  This also means that Conservancy may be restricted from challenging 404 permits, and will certainly not be able to utilize the same tools as it has under the federal regime.  In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes affords.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case before Florida's Division of Administrative Hearings ("DOAH") can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.  With our limited budget, one permit challenge in state court could eat up a

DocuSign Envelope ID: D470E83B-B40C-43DC-9F5E-A2385426EB6F

significant portion of the policy department's budget.  In order to engage in such costly litigation we would to have to 1) raise additional money to fund these challenges, 2) pull funds from other areas within our existing operating budget, or 3) forego certain litigation, as funding is not included in our budget.  All three options would damage our ability to carry out our mission.

80.     It is my understanding that Conservancy would also risk exposure to a mandatory "fee-shifting" provision in which we risk being liable for the costs and fees to engage in litigation, costs and fees that we would not automatically be subject to if we retained the ability to litigate in federal court.  Such a fee-shifting provision would further diminish our ability to engage in litigation, because we would be required to weigh this financial risk in addition to the above costs, regardless of how strong our claim might be.

81.     It is also my understanding that it would be significantly harder for Conservancy to even bring a lawsuit for environmental harms on behalf of our members, because we would be required to show harm to a significant number of our members under Florida law, rather than to just one member under federal law.

82.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that would be felt personally by me as a member of Conservancy and a long-time resident of Naples.  I regularly partake in outdoor activities such as hiking, camping, observing wildlife, and nature photography.  Some of the areas that I like to visit include, but are not limited to, Big Cypress National Preserve, Fakahatchee Strand Preserve State Park, Picayune Strand State Forest, Collier Seminole State Park, Florida Panther National Wildlife Refuge, Corkscrew Regional Ecosystem Watershed's Corkscrew Marsh, Bird Rookery Swamp and Flint Pen Strand, Corkscrew Swamp

Sanctuary, Stormwater Treatment Area 5, Babcock Ranch Preserve, Fisheating Creek,

Okaloacoochee Slough State Forest and Spirit of the Wild Wildlife Management Area, and

county owned conservation properties such as those in Collier and Lee counties.

83.     If Florida is allowed to continue operating this unlawful 404 program,

Conservancy would be irreparably harmed in its ability to carry out its mission of protecting

native and endangered species, their habitats, and waters.

84.     A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority

to the state, thereby allowing Conservancy to pursue all avenues, as discussed above, including

seeking an agency stay of Florida's administration of the Section 404 pending judicial review.  In

addition, as indicated by the Klain memo, the Biden Administration is focused on reviewing final

actions of the outgoing Administration, and as new leadership of the agency Defendants comes

in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial

review.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

___day of March, 2021.
5

DocuSigned by:

*Amber Crooks*

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102

# Exhibit A

**Figure 4-4  Locations of ESA Consultations in Action Area, 2014 - 2018**



**Figure 4-5   Concentrations of ESA consultations in the Action Area, 2014 - 2018**



# Exhibit B



October 23, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

> **Re:    Request to Reconsider Completeness Determination Regarding
> State of Florida's Application to Assume Administration of a Clean
> Water Act Program (Docket # EPA-HQ-OW-2018-0640-0001; EPA-
> HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write to urge the U.S. Environmental Protection Agency ("EPA") to reconsider its
determination that the State of Florida has submitted a "complete" application to assume
jurisdiction over the Clean Water Act Section 404 program.[1]  As demonstrated below, Florida's
application was not, and is not, complete regarding at least three issues: protection of listed
species, identification of assumed waters, and staffing.  EPA should suspend the public comment
period and review of Florida's application until the State cures these deficiencies and submits a
complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (statutory review period
shall not begin if EPA finds that a State's submission is incomplete).

On September 16, 2020, EPA published a Federal Register notice stating that it had received "a
complete program submission" for 404 assumption from the State of Florida on August 20, 2020.
See Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85
Fed. Reg. 57,853 (Sept. 16, 2020).  Based on its determination that the submission was complete,
EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required
by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e)
and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020.  See
33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40

---

[1] We previously made this request in oral comments at EPA's October 21, 2020, virtual public
hearing on Florida's application.

FLORIDA OFFICES

111 SOUTH MARTIN LUTHER KING JR. BLVD.                                    4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                                                    MIAMI, FL 33137
T: 850.681.0031                                                                              T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG    WWW.EARTHJUSTICE.ORG

C.F.R. § 233.15(a) (120-day statutory review period begins when EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Public notice requirements under the APA are (1) intended to improve the quality of agency rulemaking by ensuring that regulations are tested by exposure to diverse public comment; (2) an essential component of fairness to affected parties; and (3) an opportunity for parties to develop evidence in the record to support their objections to a rule, which in turn enhances the quality of judicial review.  5 U.S.C. § 553; <u>Small Refiner Lead Phase-Down Task Force v. U.S. Env't Prot. Agency</u>, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

In this case, the State of Florida has failed to provide a complete program submission to EPA, and EPA should reverse its determination otherwise.  Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen.

**Incomplete Submission Regarding Endangered Species Act Protections**

First, the State has not demonstrated how it will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision.  33 U.S.C. § 1344(h)(1)(a) (state must demonstrate it has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of  this title"); 40 C.F.R. § 230.10(b)(3) (prohibits issuance of permits that will "[j]eopardize[] the continued existence of species listed as endangered or threatened under the [ESA], or result[] in likelihood of the destruction or adverse modification … [of] critical habitat" unless an exemption is granted by the Endangered Species Committee).  <u>See also</u> 40 C.F.R. § 233.11(a)–(c) (requiring that State assumption application include description of scope and structure of State's proposed program, description of State's permitting procedures, and description of structure and organization of all State agencies that will be involved, including the responsibilities of each and how they will coordinate administration of the program).

Instead, the State has indicated that it will rely on an anticipated programmatic biological opinion and an anticipated, associated incidental take statement it expects will result from a Section 7 consultation that is apparently underway between EPA and U.S. Fish and Wildlife Services and the National Marine Fisheries Services.  <u>See</u> Memorandum of Agreement between Florida Department of Environmental Protection and the United States Environmental Protection Agency, Jul. 31, 2020; Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020.  As this information was not submitted with the State's August 20, 2020, application, the program submission was not complete.  Further, without the

ability to review this critical information, affected parties are unable to provide informed comments on whether Florida will be able to meet the no-jeopardy requirements.

Indeed, it was not until August 27, 2020, that EPA agreed with Florida's novel premise that the agency is required to consult with the Services if a decision to approve a 404 assumption application may affect listed species or designated critical habitat (reversing EPA's prior, longstanding position on this issue).  U.S. Env't Prot. Agency, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals (2020) (Exhibit 1).  EPA indicated that it would henceforth engage in a one-time Section 7 programmatic consultation which would allow the Services to issue "a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program."

EPA further stated that:

> The [programmatic] biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures *that help ensure the state or tribal permitting program and individual permits issued pursuant to that program*, as well as EPA's approval of that program, *do not result in jeopardy to any listed species.  This process*, assuming compliance with any applicable permit conditions or measures, *would* extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and *place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program*.

Id. at 7 (emphasis added).

Taken together, EPA and Florida's positions demonstrate that the yet-to-be-completed consultation, and the yet-to-be-completed biological opinion and incidental take statement that are expected to result from consultation, are an essential component of Florida's assumption application.  As a result, Florida's program submission too is not complete, and EPA's determination to the contrary is in error.

As things stand, Florida cannot possibly establish that its program, and any permits that would issue under the program, comply with federal law.  See, e.g., 33 U.S.C. § 1344(h)(1)(A)(i) (a state plan to assume dredge and fill permitting must comply with the guidelines issued under § 404(b)(1)); 40 C.F.R. § 233.23 (requiring that "[f]or each permit the [state] Director shall establish conditions which assure compliance with all applicable statutory and regulatory requirements, including the 404(b)(1) Guidelines").  And affected parties cannot possibly provide meaningful comment on whether Florida will ensure no jeopardy to listed species, a matter of fundamental fairness to which they are entitled under the APA.

3

**Incomplete Identification of Assumed Waters**

Second, Florida has failed to identify the waters that would be assumed under its proposed program. EPA regulations require an assumption application to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program" and a description of the waters within the state over which the U.S. Army Corps of Engineers retains jurisdiction if the program is approved. 40 C.F.R. § 233.11(h).

To start, Florida has created an unnecessary labyrinth for anyone to try to understand the waters that are implicated in its assumption application. In fact, none of the program-related definitions are provided by statute or in the State's implementing regulations, but rather appear in an applicant handbook. See Fla. Admin. Code Ann. r. 62-331.030 (providing that "Terms used in this Chapter are defined in section 2.0 of the 404 Handbook").
The 404 Handbook, in turn, defines "State-assumed Waters" or "Assumed Waters" by reference to the Florida legislation that authorized (but did not require) the Florida Department of Environmental Protection to pursue assumption. See Fla. Dep't of Env't Prot., State 404 Program Applicant's Handbook § 2.0(b)(47) [hereinafter "404 Handbook"] ("'State-assumed Waters' or 'Assumed Waters' means those waters as defined in Section 373.4146(1), F.S."). Florida Statutes Section 373.4146(1) provides no further clarity, stating simply that "the term 'state assumed waters' means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." In other words, Florida defines state-assumed waters as those waters over which the state assumes jurisdiction.

The 404 Handbook does provide an actual definition for the opposite of state-assumed waters, which are the "Retained Waters." 404 Handbook § 2.0(b)(41). Although Florida's definition does not explain this to the reading public, retained waters are navigable waters over which the U.S. Army Corps of Engineers would retain exclusive permitting jurisdiction under Section 10 of the Rivers and Harbors Act of 1899 if state assumption is granted. 33 U.S.C. § 403. Among other things, Florida explicitly defines "Retained Waters" as including those "identified in the Retained Waters List (Appendix A). 404 Handbook § 2.0(b)(41). Appendix A, in turn, consists of a 4-page list of rivers and creeks, mostly by name only), dated August 23, 2019.

The "Retained Waters List" maintained by the U.S. Army Corps of Engineers ("Corps") for Florida has been the subject of substantial controversy and change since Florida began its efforts to assume the 404 program in 2018. On March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018, "regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes

4

of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption."  U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 2).  On April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District.  Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018), https://www.saj.usace.army.mil/Media/News-Releases/Article/1485269/corps-seeks-public-comment-regarding-water-use-for-navigation (Exhibit 3).

On April 10, 2018, the Corps issued an "Updated Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 . . . closed until further notice."  U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 4).  More than two years later, there has been no "further notice," and no further opportunity for the public to comment on this matter of exceptional public importance, even now that Florida has submitted its 404 application to EPA.

Notably, however, the Corps' list of Retained Waters that appears to be part of Florida's submission to EPA (4 pages long) is drastically reduced as compared to the Retained Waters list supplement produced by the Corps in October 2017 (17 pages long).

Notwithstanding the Corps' abrupt and unexplained change of course in soliciting public comment in 2018, we, and several other members of the public, submitted comments in line with the original deadline of April 18, 2018.  This included comments by Senator Bob Graham, on behalf of the Florida Conservation Coalition, as well as the Sierra Club, Audubon Florida, The Conservancy of Southwest Florida, and Florida's Water and River Keepers.

In our letter, we reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways to determine which waters may be assumable.  This undertaking would require special attention to the rivers, streams and adjacent wetlands located throughout the State.  We further noted that determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies.  These determinations must be based on technical information, hydrology and science.  By necessity, adjacency determinations must be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.  To perform such studies, it will be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 5).  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement stated that "[t]he District makes no claim that these lists are complete or completely accurate."

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urge the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the Dep't of the Army, Apr. 18, 2018 (Exhibit 6).  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction.  Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 7).  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 8).

Florida's 404 program submission to EPA, however, contends with none of this.  It purports to limit the "Retained Waters" to an anemic 4-page list that is vague, incomplete and has not been subject to notice and comment.  Indeed, the list is grossly lacking as it reflects a far more restrictive view of retained waters than the Corps possessed in 2017, and the Corps has failed to engage the public in performing an adequate navigability study that would accurately reflect the scope of exclusive federal jurisdiction.

Moreover, Florida has failed to provide the public with GIS or other mapping that would in fact demonstrate the scope of the jurisdiction it intends to claim if its 404 assumption application is granted.  Without this information, members of the public across the state are unable to evaluate and comment on the impact this proposal will have on the waters that are of ecological and economic benefit to them.  By failing to adequately and accurately identify those waters over which the state would assume jurisdiction, Florida's application is incomplete.

**Incomplete Description of Available Funding and Staffing**

Third, Florida has failed to provide EPA and the public with complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers.  <u>See</u> 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration").

As a preliminary matter, the Florida Department of Environment Protection has stated that its 404 program would also rely on staff and resources from two other state agencies, namely the

Florida Fish and Wildlife Commission and the State Historic Preservation Office, to ensure protection of listed species and cultural resources.  Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020; Operating Agreement between Florida Department of Environmental Protection and the Florida Division of Historical Resources-State Historic Preservation Officer Regarding the State 404 Program, Aug. 6, 2020.  However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.

Instead, Florida relies solely on resources purportedly available at the Department of Environmental Protection.  In doing so, however, Florida completely fails to disclose to EPA that state coffers are under severe strain as a result of the COVID-19 pandemic that since March 2020 has infected more than 750,000 Floridians, and resulted in the deaths of another 16,267 Floridians.  Fla. Dep't of Health, Florida COVID-19 Dashboard, https://fdoh.maps.arcgis.com/apps/opsdashboard/index.html#/8d0de33f260d444c852a615dc7837 c86 (last visited Oct. 23, 2020) (Exhibit 9).

Tax revenues for the state plummeted in April, May and June 2020 as a result of the pandemic.  In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020-2021 budget in response to the crisis.  In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for budget shortfalls resulting from the pandemic.  See Christine Sexton, *Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19*, Tampa Bay Times, Aug. 12, 2020, https://www.tampabay.com/florida-politics/buzz/2020/08/12/florida-agencies-asked-to-cut-85-percent-to-adjust-for-covid-19. (last visited Oct. 23, 2020) (Exhibit 10).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely implement, operate and enforce a Section 404 program—with so much less.  Indeed, as several commenters noted during EPA's October 21, 2020, public hearing on the application, the Department already is unable to meet its obligations to operate and enforce programs already under its purview.  This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and the Department's grossly inadequate record of enforcing its existing programs.

The fact is that resources at the Department have been gutted in recent years.  *Editorial: The Rick Scott Record: An Environmental Disaster*, Tampa Bay Times, Sept. 5, 2014, https://www.tampabay.com/opinion/editorials/editorial-the-rick-scott-record-an-environmental-disaster/2196359/ (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs,

provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship). (last visited Oct. 23, 2020) (Exhibit 11).

The unprecedented budget strains the state is facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.

The Department's claim that it will be able to operate a Section 404 program without any additional funding from the State—a fundamentally flawed premise that the legislature relied on when granting the authority for the state agency to pursue assumption—is untenable.  It either reflects the Department's erroneous belief that Section 404 is merely "duplicative" of state regulations (it is not), demonstrates the Department's intention to treat its pre-existing regulations and Section 404 as one and the same (it may not), or suggests that the Department simply will not adequately implement, operate or enforce a Section 404 program (it cannot).

**Conclusion**

As demonstrated above, Florida has failed to provide EPA with a complete program submission in at least three, critical respects.  EPA should therefore suspend the public comment period and review of Florida's application until the State cures these deficiencies and submits a complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (providing that statutory review period shall not begin if EPA finds that a State's submission is incomplete).

In the alternative, we request that EPA extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (June 6, 1988).

Sincerely,

Bonnie Malloy
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

Tania Galloni
Fla. Bar No. 619221
Christina I. Reichert
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

# Exhibit C



November 2, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

Re:    **Comments in Opposition to State of Florida's Application to Assume Administration of a Clean Water Act Program (Docket # EPA-HQ-OW-2018-0640-0001; EPA-HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write on behalf of several local, state and national conservation organizations devoted to protecting Florida's lands, water and wildlife to urge the U.S. Environmental Protection Agency ("EPA") to deny Florida's request for authorization to assume jurisdiction over permitting under Section 404(a) of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the United States.[1] *See* State of Florida's Program Submission to Assume the Clean Water Act Section 404 Permitting Program (Aug. 20, 2020) [hereinafter "Assumption Application"]; Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85 Fed. Reg. 57,853 (Sept. 16, 2020).  The environmental community, which is comprised of countless Florida families, has steadfastly opposed Florida's effort to assume a Section 404 program because this would jeopardize vital natural resources at a time of unprecedented population growth combined with striking environmental degradation.  These concerns have been echoed by the public, which also has consistently voiced opposition to Florida's proposal.

---

[1] These comments are filed on behalf of Center for Biological Diversity, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper and St. Johns' Riverkeeper.  The comments are also endorsed by Environmental Confederation of Southwest Florida, Friends of the Everglades, the National Parks Conservation Association, Natural Resources Defense Council and Sierra Club.

FLORIDA OFFICES

111 SOUTH MARTIN LUTHER KING JR. BLVD.                                         4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                                                                    MIAMI, FL 33137
T: 850.681.0031                                                                                                  T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG    WWW.EARTHJUSTICE.ORG

**Introduction**

Under the Clean Water Act, the purpose of Section 404 includes restoring and maintaining "the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredge and fill material," recognizing that the degradation and destruction of wetlands is "among the most severe environmental impacts." See 40 C.F.R. § 230.1(a). The Clean Water Act, and the rules promulgated thereunder, create an important, and deservedly complex regulatory framework aimed at achieving these goals.

Florida's proposed program claims no such lofty goals. To the contrary, the State has repeatedly articulated its objectives as streamlining the permit process in order to approve permits more quickly, and at less cost, to developers. To achieve this goal, Florida has proposed a program full of gaps and shortcuts that are not consistent with federal law.

Of particular concern, Florida proposes to take on the consequential responsibility of a Section 404 program without devoting an additional cent of resources to the undertaking. The proposal comes at a time when the State has consistently failed to meet its existing obligations regarding environmental protection, and when it faces severe budget shortfalls as a result of dramatic revenue losses related to the COVID-19 pandemic.

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404. Approving Florida's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

For ease of reference and review, these comments are organized into five main sections. Part I addresses Florida's failure to protect the environment, and its disastrous environmental record even as the State proceeded to pursue assumption. Part II describes Florida's move to enact legislation authorizing assumption, the extensive public opposition to that legislation, and the authorizing legislation's language.

Part III addresses the complex and highly contested matter of identifying assumable versus retained waters in Florida, including the U.S. Army Corps of Engineers' ("Corps") 2018 public notice and comment period that was begun as a result of Florida's intention to pursue assumption, but then abruptly terminated without explanation. Part IV describes the Florida Department of Environmental Protection's ("FDEP") rule-making process for purposes of developing an assumption program, including a highly flawed rule development phase, the publication of incomplete proposed rules, and the limitation of public comment to a time in Florida when the public was most distracted by the emerging coronavirus crisis, and its impact on health, jobs, child care, food security and safety.

In Part V, we outline the gross deficiencies in Florida's application to the EPA, beginning in Section A with the incompleteness of the application.  In Part V. B. we provide a comprehensive review of deficiencies in the application on the merits.

Part V. B.1. includes a detailed review of Florida's failures to demonstrate adequate authority to carry out a Section 404 program, as well as many areas in which the state program is not as stringent as federal law.  The topics addressed include the failure to adopt and comply with all 404(b)(1) Guidelines; unlawful rules related to general permits, emergency permits, permit conditions and permit application processes; the failure to meet coordination requirements, provide for adequate public notice, and ensure adequate process for decisions on permit applications; the failure to meet requirements for compliance evaluation programs; inadequate enforcement authority, including less stringent state criminal liability and inadequate opportunities for public participation in enforcement; and the failure to address the effect of state takings law on implementation of the program.

Part V.B.2. addresses how Florida's scheme fails to ensure protection of listed species under the Endangered Species Act ("ESA").  Part V.B.3. discusses the insufficiency of resources available to FDEP to adequately implement a Section 404 program.  Part V.B.4. outlines the on-going failures in FDEP's enforcement record, demonstrating FDEP's incapacity to adequately enforce existing programs, much less adopt a new one.  Part V.B.5. addresses differences between state and federal access to the courts for purposes of challenging 404 permits and pursuing citizen suits.

Part V.B.6. describes the on-going failure to adequately define assumable versus retained waters in Florida, and provides additional information that must be considered to ensure that the full breadth of retained waters is identified.  Part V.B.7. demonstrates how Florida's waterways, and the public, cannot afford to lose existing federal safeguards under federal law.

Taken separately, and collectively, the gross deficiencies in Florida's submission require that the application be denied.

## I. Florida's Failure to Protect the Environment

Florida enjoys some of the most vast, and valuable, wetlands in the United States. These wetlands provide essential services to support clean water, resilience, and biodiversity. They also provide economic value because of the critical interstate industries, such as tourism, that rely heavily on visitors' attraction to Florida's natural environment.

Yet in recent years, FDEP has been gutted, resulting in devastating harm to Florida's wetlands and water quality.  FDEP has regularly failed to meet its obligations to adequately enforce

environmental protections already under its purview.  It cannot possibly establish that it is capable of doing more, with less, today.

### A.  Florida's Exceptional Waterways

Florida's water resources are stunning and uniquely complex.  The State's distinctive peninsular shape, flat topography and karst terrain create prolific coastlines, rivers, springs and lakes.  With almost 1,200 miles of coastline, more than 7,500 lakes (greater than 10 acres), 33 first-magnitude springs, and approximately 27,561 linear miles of rivers and streams, water is one of Florida's most prominent features.  See Elizabeth Purdum, Florida Waters:  A Water Resources Manual from Florida's Water Management District 49 (2002) (Exhibit 1).

Countless valuable wetlands are widely distributed throughout the State, including the renowned Everglades and Big Cypress Swamp.  See, e.g., Albert Hine, Geology of Florida, 17–18 (2009) (Exhibit 2).  With approximately 11 million acres of wetlands, Florida has more wetlands than any of the other conterminous states.  U.S. Geologic Surv., National Water Summary on Wetland Resources: Water Supply Paper 2425 (1996) (Exhibit 3).  These often shallow wetlands are vast and diverse and include rare habitats such as mangrove swamps and hydric hammocks.  See Purdum, supra, at 49.  In addition to these expansive surface waters, Florida has more groundwater than any other state.  See id.

Florida's waters help sustain some of the world's most diverse species.  Florida lies within the North American Coastal Plan, the World's 36th Biodiversity Hotspot, and is considered the richest area biologically for endemic species.  Zenaida Kotala, Florida Declared a Global Biodiversity Hotspot, UCF Today, Feb. 26, 2016 (Exhibit 4).  Freshwater resources in Florida provide nesting, foraging, wintering and migrating habitats for numerous species of fish and wildlife.  Fla. Fish & Wildlife Conservation Comm'n, Florida's Freshwater Priority Resources: A Guide for Future Management 1 (2018) (Exhibit 5).

These resources are relied on by high numbers of threatened and endangered plants (26% of them rely on wetlands) and animals (45% of them rely on wetlands) and, as such, are designated as critical habitat under the Endangered Species Act.  Id.  Due to having one of the highest rates of habitat loss, Florida's water resources and the species that depend on them are some of the most threatened.  See Denise Rocus & Frank Mazzotti, Threats to Florida's Biodiversity, University of Florida/IFAS Extension (1996) (Exhibit 6); Kotala, supra.

In addition, Florida's waters are critical to several multi-billion dollar industries, including agriculture and tourism, affecting interstate commerce.  See, e.g., Tourism Fast Facts, Visit Florida (last visited Nov. 1, 2020) (Exhibit 7); Florida Agriculture Overview and Statistics, Fla. Dep't of Agric. & Consumer Servs. (last visited Nov. 1, 2020) (Exhibit 8).

**B. Florida's Disastrous Environmental Record**

In recent years, FDEP has grossly failed to meet its existing obligations.  A 2014 Editorial in
Florida's leading paper, the Tampa Bay Times, decried FDEP's recent record as "an
environmental disaster."  Editorial, The Rick Scott Record: An Environmental Disaster, Tampa
Bay Times, Sept. 5, 2014 (Exhibit 9).  FDEP's failures stem from reduced water management
budgets, rushed permitting, weakened enforcement, widespread layoffs provoking a brain drain
of experts in the field, and the replacement of experts with political appointees focused on
advancing business interests rather than environmental stewardship.

A 2016 analysis released by Public Employees for Environmental Responsibility ("PEER")
found that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines
in 28 years, and assessed no penalties in a third of the cases.  Press Release, PEER, Scott's
Undeclared Polluters' Holiday Stains Florida (Aug. 17, 2016) (Exhibit 10); PEER, Report on
Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015
(2016) (Exhibit 11).  See also Jimmy Orth, State Failing to Protect Our Waterways, St. Johns
Riverkeeper, Feb. 1, 2013 (compilation of newspaper articles describing the State's
environmental record) (Exhibit 12).

**II. Florida's Assumption Legislation**

It was against this backdrop of demonstrably inadequate environmental protection that, in 2017,
FDEP sought authorization from the state legislature to pursue assumption of the Section 404
program.  See State Assumption of Federal Section 404 Dredge and Fill Permitting Authority,
S.B. 1402, 2017 Leg. (Fla. 2018) (Exhibit 13).  A similar effort had been considered, but
rejected, in 2005, after FDEP concluded that the complexity of Florida's extensive waterways
weighed against assumption, and that for assumption in Florida to be feasible, several changes to
state and federal law would be required. See Fla. Dep't of Env't Prot., Consolidation of State and
Federal Wetland Permitting Programs Implementation of House Bill 759 (Chapter 2005-273,
Laws of Florida) 2–5 (Sept. 30, 2005) (Exhibit 14).  At that time, FDEP also recognized that
assumption would require "substantial staff resources" in order for the State to be able to take on
the additional responsibilities and workload required under federal law.  Id. at 3–4, 6–7.

A January 19, 2018, bill analysis recognized that FDEP would have to undertake a number of
activities that might generate costs to the agency, including those related to rulemaking,
modifications to its existing applications, databases and permit tracking systems, program
administration, and permit processing.  FDEP assured legislators, however, that it did "not
anticipate an increase in permitting administration expenditures" with assumption, and that it
"believe[d] that, upon assumption, the processing of state 404 permits, as well as enforcement
activities for state 404 permits, can be absorbed without an increase in staffing or administrative

5

costs." Bill Analysis and Fiscal Impact Statement: S.B. 1402, 2017 Leg., at 16 (Fla. Feb. 13, 2018) (Exhibit 15).

FDEP therefore sought no resources from the legislature to develop, implement, operate and enforce Section 404.  FDEP advised legislators it would not even charge permittees a fee for Section 404 permits.  Id.

### A.  Floridians Object to Legislation Authorizing Pursuit of Assumption

On January 22, 2018, Waterkeepers from across Florida urged legislators to reject the proposed legislation, citing concerns about FDEP taking on an additional program without additional resources.  In particular, the Waterkeepers pointed out how FDEP "already woefully under-regulates" stormwater permits delegated to the State by the federal government under the Clean Water Act.  Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Senate Environmental Preservation and Conservation Committee Members, Jan. 22, 2018 (Exhibit 16).

On January 29, 2018, the State's leading paper urged against allowing Florida to undertake assumption in light of FDEP's inadequate resources and performance.  Editorial, Don't Let Florida Take Over Wetlands Permitting, Tampa Bay Times, Feb. 4, 2018 (Exhibit 17) (raising concerns about the reductions in FDEP's workforce and funding for environmental programs; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

In February 2018, the Everglades Coalition issued a resolution opposing the legislation. Everglades Coal., Resolution Opposing SB1402 and HB7043: State Assumption of Federal State 404 Dredge and Fill Permitting Authority (Feb. 2018) (Exhibit 18).  On behalf of its more than 60 member organizations, the Everglades Coalition identified a number of concerns regarding state assumption and the risk to Florida's remaining wetlands, which are critical to cleansing water, recharging groundwater, providing fish and wildlife habitat and storm resiliency. The Coalition concluded that "in the face of increased growth and development, the protection and restoration of the Greater Everglades—an ecosystem largely comprised of wetland habitats—is better accomplished by maintaining the existing oversight from federal agencies."  Id.

On March 9, 2018, former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill, which she observed had been rushed on behalf of those who seek "fast and simple permitting" rather than in the best interests of the State.  Victoria Tschinkel, Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It, Orlando Sentinel, Mar. 9, 2018 (Exhibit 19).  Former Secretary Tschinkel noted, among other things, that "Florida has already

lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control."  Id.

On March 23, 2018, Governor Scott signed the bill into law.  The Governor's signing statement approving the legislation stated that it granted FDEP "the authority *to explore whether the state should* issue 404 permits."  Letter from Gov. Rick Scott to Sec. Kenneth W. Detzner, Mar. 23, 2018 (Exhibit 20) (emphasis added).  Nothing in the legislation required FDEP to proceed with assumption.

### B.  Florida's Statutory Authorization to Pursue Assumption

Florida Statutes § 373.4146 codified the legislation authorizing FDEP to pursue Section 404 assumption.  Id.  Among other things, the statute authorizes FDEP to "adopt any federal requirements, criteria, or regulations necessary to obtain assumption," including "the guidelines specified in 40 C.F.R. part 230 and the public interest review criteria in 33 C.F.R. s. 320.4(a)." Fla. Stat. § 373.4146(2).

The statute provides that "[p]rovisions of state law which conflict with federal requirements identified in subsection (2) do not apply to state administered section 404 permits."  Id. § 373.4146(3).  The statute does not specify, however, what those conflicts are, nor does it enact any changes to state law to resolve state and federal law conflicts.

As set forth in detail below, Florida law conflicts with federal law in several critical respects. Moreover, Florida's proposal does not create a Section 404 program that is as stringent as that which exists under federal law.  The program submission must therefore be denied.

### III. Florida's Assumable Waters, Federal Retained Waters

Florida Statutes § 373.4146 failed to grapple with one of the most critical questions regarding assumption: the question of which waters will be assumed.  Instead, the provision tautologically defines "state assumed waters" as those "waters of the United States that the state assumes permitting authority over pursuant to [Section 404]."  Id. § 373.4146(1).

The question of which waters the State intends to assume jurisdiction over, however, is central to an evaluation of the program.  See 40 C.F.R. § 233.11(h) (state submission must include a "[d]escription of the waters of the United States over which the State assumes jurisdiction [and a] description of the waters over which the federal government retains jurisdiction.").

In light of the centrality of this question for purposes of Florida's interest in assumption, on March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018,

"regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption."  U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 21).[2]

As a result of the Corps' notice, a number of stakeholders across Florida prepared to submit comments on the \question of assumable versus retained waters.  As evidenced by the FDEP's 2005 Report describing the complexity of Florida's waterways, properly identifying the scope of retained waters is essential both to those who seek maximum protection for those vital resources, and for the regulated community that seeks clarity when it comes to permit requirements.

On April 10, 2018, however, the Corps issued an "Updated Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 ... closed until further notice."  U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 23).  The Corps provided no explanation for its sudden reversal.

Notwithstanding the Corps' abrupt and unexplained change of course, many stakeholders proceeded to submit comments in accordance with the original deadline of April 18, 2018.  This included comments by Senator Bob Graham on behalf of the Florida Conservation Coalition, which is comprised of more than 80 organizations, Letter from Bob Graham, Fla. Conservation Coal., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 24), as well as comments by the Sierra Club, Audubon Florida, Conservancy of Southwest Florida, and Florida's Water and River Keepers.  Letter from Amber Crooks, Conservancy of Sw. Fla., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 25); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 26); Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs (Exhibit 27); Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 28).

In a letter we submitted, we reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways to determine which waters may be assumable.  This undertaking would

---

[2] On April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District. Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018) (Exhibit 22).

require special attention to the rivers, streams and adjacent wetlands located throughout the State.  We further noted that determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies.  These determinations would have to be based on technical information, hydrology and science.  By necessity, adjacency determinations would have to be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.  To perform such studies, it would be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 29).

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement included the disclaimer that "[t]he District makes no claim that these lists are complete or completely accurate."  U.S. Army Corps of Eng'rs, Supplement to the Jacksonville District Navigable Waters Lists (Oct. 5, 2017) (Exhibit 30).

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urged the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the U.S. Dep't of the Army, supra.  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction. Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, supra.  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.

The Corps provided no response to any of these public comments.  And, more than two years later, there has been no "further notice" and no further solicitation for comment on the Corps' determinations regarding Florida's retained waters.

## IV. Florida's Section 404 Rule-Making

Meanwhile, Florida proceeded to initiate rule-making to develop its Section 404 program.  Florida's rule-making process was marred by a number of deficiencies throughout.  Those problems have resulted in the State's grossly inadequate program submission now under review.

## A. Florida's Rule Development

On May 11, 2018, FDEP initiated rule development for the purposes of developing its Section 404 program.  FDEP described the purpose and effect of its undertaking as:

> Section 404 of the Clean Water Act (404) provides states the option of assuming administration of the federal dredge and fill permit program in certain waters. By obtaining 404 assumption, Florida will be able to provide a streamlined permitting procedure where an applicant will come to the state to obtain both the Environmental Resource Permitting and 404 authorizations. This will avoid duplication, provide greater certainty to the regulated community, conserve resources, and will afford the state greater control over its natural resources while complying with federal law.

44 Fla. Admin. Reg. 2321 (May 11, 2018).  Notably, FDEP's stated objectives did *not* include enhancing protection of Florida's waterways, ecosystems or communities.  To the contrary, FDEP's objectives were identified as streamlining permitting, avoiding duplication, providing greater certainty to the regulated community, conserving resources and exerting greater "control over [the State's] natural resources."  Id.

FDEP held rule development workshops in Tallahassee on May 30, 2018, in Orlando on May 31, 2018, and in Ft. Myers on June 1, 2018. Although Florida law requires that agencies holding public workshops make available staff who can respond to questions and comments on a rule in development, Fla. Stat. § 120.54(2)(c), members of the public who attended these workshops raised a number of concerns that were left unanswered.  Letter from Tania Galloni, Earthjustice, to Noah Valenstein, Fla. Dep't of Env't Prot., Jul. 9, 2018 (Exhibit 31).

These included questions about how listed species would be protected, which waters would remain under federal jurisdiction, and how FDEP would assume the 404 program without any funding when the state agency is already under-resourced.  Members of the public also expressed concerns about FDEP's reliance on memoranda of agreement that had not been completed or made available to the public for comment.  FDEP responded that the MOAs would be made available for public comment, but they never were.

On October 1, 2018, FDEP issued a Statement of Estimated Regulatory Costs ("SERC").  Fla. Dep't Env't Prot., Statement of Estimated Regulatory Cost, 62-331 (Oct. 1, 2018) (Exhibit 32) [hereinafter "404 Assumption SERC"].  In Florida, a SERC is required whenever a proposed rule is "likely to directly or indirectly increase regulatory costs in excess of $200,000 in the aggregate in this state within 1 year after the implementation of the rule."  Fla. Stat. § 120.54(3)(b)(1)(b). In estimating regulatory costs, a SERC "shall include," among other things, "[a]n economic analysis showing whether the rule directly or indirectly … [i]s likely to increase regulatory costs,

including any transactional costs,[3] in excess of $1 million in the aggregate within 5 years after the implementation of the rule."  Id. § 120.541(2)(a)(3).

In the SERC for its Section 404 program, FDEP estimated that there are an average of 723 permits currently issued by the Corps under Section 404, and that this would total about 3,615 permits over 5 years.  FDEP, however, provided *no estimate* of the resources it would take for the State to review, issue, monitor, and enforce those permits.

FDEP omitted any reference to additional, related tasks that would require resources, such as determining whether the State has jurisdiction over a proposed project under a state-assumed program, providing guidance to applicants on the new requirements and processes, making exemption determinations, reviewing applications that are ultimately not granted, conducting investigations, meeting monitoring and reporting requirements, reviewing and issuing permit modifications and revocation, and public notice and public hearing requirements.

Under Florida law, a SERC must include "[a] good faith estimate of the number of individuals and entities likely to be required to comply with the rule, together with a general description of the types of individuals likely to be affected by the rule."  Id. § 120.541(2)(b).  While FDEP's SERC acknowledged the more than 3,600 additional permits the State would now have jurisdiction over, that number answers only part of the question.  See 404 Assumption SERC at 2–3.  The number of individuals and entities likely to be "required to comply with the rule" includes not only those who are granted permits, but anyone who may seek to discharge dredged or fill material into waters of the United States, and those who make such discharges without authorization.

Similarly, FDEP stated that the only persons likely to be affected are those who are "currently subject to a 404 permit" issued by the Corps.  This response demonstrates that FDEP takes an unduly narrow view of operating a 404 program, and as a consequence, has taken an unreasonably limited view of the number of individuals and entities likely to be affected.  FDEP wholly failed to provide a general description of those who are likely to be affected, other than existing permittees.

A SERC must also include "[a] good faith estimate of the cost to the agency, and to any other state and local government entities, of implementing and enforcing the proposed rule, and any anticipated effect on state or local revenues."  Fla. Stat. § 120.541(2)(c).  FDEP responded to this

---

[3] "Transactional costs" are defined as "direct costs that are readily ascertainable based upon standard business practices, and include filing fees, the cost of obtaining a license, the cost of equipment required to be installed or used or procedures required to be employed in complying with the rule, additional operating costs incurred, the cost of monitoring and reporting, and any other costs necessary to comply with the rule."  Fla. Stat. § 120.541(2)(d).

question by claiming "none."  FDEP's response failed to account for costs to other state agencies it intends to rely on to operate a 404 program, including Florida's Fish and Wildlife Commission and the State Historic Preservation Office.  404 Assumption SERC at 3, E.1, E.3; Assumption Application B, app. c–d, j.

FDEP stated that it "intends to implement the proposed rule with existing resources" and "intends to enforce the proposed rule with existing resources."  404 Assumption SERC at 3, E.1, E.3.  FDEP's response provides no good faith estimate *of the cost* and therefore no reasonable basis to support the conclusion that this cost can be borne by "existing resources."  FDEP's response also begs the question of why the agency has existing resources that are not being used to serve its existing duties under state law, and whether appropriations for existing programs may lawfully be used for other purposes.

In response to the requirement to provide "[a] good faith estimate of the transactional costs likely to be incurred by individuals and entities, including local government entities," Fla. Stat. § 120.541(2)(d), FDEP again stated "none," asserting that "[t]his proposed rule will only affect the department."  404 Assumption SERC at 3-4, E.2, E.4.  Here, FDEP again failed to acknowledge and account for the other state agencies that would incur costs related to a 404 program.

The only costs that FDEP estimated were those related to "multiple 5-year permit applications for large projects that will take more than 5 years to complete," which FDEP estimated would cost $600,000 per year.  But even the bases for this calculation remain unclear.  FDEP did not specify who is expected to bear these costs, and for what exactly.  FDEP did not include in this estimate the cost of the initial permit on the basis that it would be the same as a permit from the Corps, see 404 Assumption SERC at 3, at n. 1, but did not explain whether or why the subsequent permit cost would be any different.  FDEP also averred that these estimated costs would be offset by savings, but again did not specify what those savings would be and to whose benefit they would inure.

FDEP failed to identify the costs it would incur to process each individual 404 permit, or to manage all the general permits over which it seeks to assume jurisdiction, much less to perform all of the additional duties that operating a 404 Program would require.  Yet even if one were to use FDEP's estimate of $5,000 for a long-term project permit renewal as a baseline, that cost alone for the more than 700 permit actions FDEP expects to take would cost $3,500,000 per year.

FDEP summarily added that "[t]here will be an overall cost savings to the regulated public," but did not in any way quantify that statement, provide an estimate of the costs to FDEP and thus to Florida taxpayers, or account for the loss of environmental review necessary to protect Florida's wetlands and the communities and industries that rely on Florida's natural environment.

12

Indeed, the benefits of the proposed program were touted as including costs savings related to *avoiding* review under the National Environmental Policy Act ("NEPA"), the reduction in time to process permits, and "allow[ing] the permittee to access the value of [large] projects sooner than if the permit was issued under the federal 404 program."  404 Assumption SERC at F., G.

### B. Florida's Proposed Rules, Coronavirus Comment Period

On February 19, 2020, FDEP published the totality of its proposed rules, including proposed revisions to Chapter 62-330, the proposed promulgation of Chapter 62-331, the Draft 404 Handbook, and the same SERC.  Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020) (Exhibit 33).  In response to the notice, many affected persons requested that FDEP hold a public hearing, in accordance with Florida law, see Fla. Stat. § 120.54(3)(c)1, which FDEP ultimately set for April 2, 2020.  See, e.g., Letter and Resolution from Everglades Coalition to Heather Mason, Fla. Dep't of Env't Prot., Mar. 9, 2020 (Exhibit 34); Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (Mar. 11, 2020) (Exhibit 35).

On March 1, 2020, however, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the State arising from the novel coronavirus, COVID-19.  See Exec. Order No. 20-51 (Fla. 2020) (Exhibit 36).  On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 posed a risk to the entire state of Florida. See Exec. Order No. 20-52 (Fla. 2020) (Exhibit 37).

On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020. See Orlando Sentinel Staff, Florida Coronavirus Update for Tuesday: Three Field Hospitals Slated to Open; K-12 Schools to Close through April 15; State Announces 7th Death, 216 Positive Tests, Orlando Sentinel, Mar. 17, 2020 (Exhibit 38).  Governor DeSantis also imposed drastic restrictions on certain service industries, including restaurants and bars, to reduce the spread of the virus. See Exec. Order No. 20-68 (Fla. 2020) (Exhibit 39).

On March 19, 2020, we requested that FDEP postpone the hearing until no earlier than May 15, 2020, in light of the emergency conditions facing Floridians and the health, economic and child care hardships Florida families and small businesses suddenly found themselves facing.  Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Mar. 19, 2020 (Exhibit 40).

On March 23, 2020, FDEP issued a superseding notice of hearing, announcing that the public hearing related to this rulemaking would take place via three separate video conferences on April 2, 6, and 10th and that the public comment period for the rulemaking was extended until

midnight on April 17, 2020.  Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (as revised Mar. 23, 2020) (Exhibit 41).

On March 30, 2020, the Florida Conservation Coalition ("FCC") urged FDEP to suspend its rule-making in light of the public health emergency, and to resume at a time when the public could meaningfully participate.  Letter from Bob Graham & Lee Constantine, Fla. Conservation Coal., to Noah Valenstein, Fla. Dep't of Env't Prot., Mar. 30, 2020 (Exhibit 42).  FCC observed that proceeding with rulemaking at this exceptionally difficult time for a struggling public was not "an essential government function or statutorily mandated" and "not necessary to protect the public or the environment."  On March 31, 2020, the Everglades Coalition raised similar concerns.  Letter from Mark Perry & Marisa Carrozzo, Everglades Coal., to Heather Mason, Fla. Dep't of Env't Prot., Mar. 31, 2020 (Exhibit 43).  On April 1, 2020, Governor DeSantis extended the stay at home order until April 30, 2020.  Exec. Order 20-91 (Fla. 2020) (Exhibit 44).

On April 17, 2020, FDEP again notified interested parties that "due to these extenuating circumstances" related to COVID-19, FDEP would hold two additional telephonic hearings on April 24 and April 27, 2020.  FDEP also extended the public comment period for this rulemaking to midnight on April 30, 2020.

On April 20, 2020, as COVID-19 cases in Florida continued to grow exponentially, and Florida families experienced growing unemployment with little relief in sight, Florida's Waterkeepers urged FDEP to suspend rulemaking so the public could meaningfully participate.  Letter from Lisa Rinaman, Waterkeepers Fla., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 20, 2020 (Exhibit 45).  The Waterkeepers again highlighted that proceeding with 404 program rulemaking was far from an essential activity.

FDEP did not heed any of these calls, and ended the opportunity for public comment on April 30, 2020.  This was a time of great uncertainty, especially in parts of the State then hit the hardest with cases of COVID-19, and was well before American society had begun to come to terms with extensive community spread of the coronavirus, and settle into some form of a "new normal."

FDEP's proposal remained fundamentally flawed in several respects, including: (1) FDEP's decision to remove references to memoranda of agreement ("MOA") with federal agencies from the proposed rules, and not to disclose the content of those MOAs so as to allow for public comment before the State submits an application to the EPA, despite having told the public that it would; (2) a lack of clarity around the definition of waters of the United States, retained waters and assumed waters; (3) the failure to properly define administrative boundaries; (4) the risk to Tribes of loss of consultation rights and protections for impacts to adjacent lands; (5) differences between state and federal wetlands delineation methodologies, and the impacts of those

differences; (6) the failure to adopt all Section 404(b)(1) Guidelines; (7) questions around the role of water management districts and FDEP's intentions regarding further delegation; (8) the rationale for proposing the less protective 300 foot buffer, and its lack of basis in science; (9) inadequate consideration of secondary and cumulative impacts; (10) the failure to assess the impacts of proposed general permits and provide those analyses for public input; and (11) the failure to articulate how endangered species would be protected.  Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Apr. 30, 2020 (Exhibit 46).

In response to some of the concerns raised, FDEP acknowledged that key issues were not resolved (including those relating to protection of listed species, which the public was told was part of an MOA process "still in its infancy"), claimed that certain critical topics such as staffing and resources were "outside the scope" of the public comment opportunity, and advised that the public should direct their concerns to the EPA rather than to their state agency crafting the plan that would ultimately be submitted. Id.[4]  FDEP then proceeded to finalize its rules.

That FDEP limited the information available to the public, and then further confined the public comment period to the very time period when Floridians were most focused on their health, jobs and families as a result of statewide public health emergency was a disservice to the public.  It resulted in a grossly inadequate program.  It also deprived the public of a meaningful opportunity to comment and be heard.  It further undermined public confidence in FDEP's responsiveness to the community.  It is emblematic of why the EPA should not entrust administration of the federal Clean Water Act Section 404 program to the State.

**V. Florida's Submission to the EPA**

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404.  Approving the State's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

---

[4] See also Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 2, 2020) (Exhibit 47); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 6, 2020) (Exhibit 48); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 10, 2020) (Exhibit 49); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 24, 2020) (Exhibit 50); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 27, 2020) (Exhibit 51).

### A. EPA Should Reverse Completeness Determination As Florida's Application Fails to Satisfy 40 C.F.R. §233.11

On August 20, 2020, Florida submitted its application package to the EPA.  On August 28, 2020, the EPA acknowledged receipt and deemed the application complete.  Letter from Mary S. Walker, U.S. Env't Prot. Agency, to Gov. Ron DeSantis, Aug. 28, 2020 (Exhibit 52).  On September 16, 2020, EPA published a Federal Register notice stating that it had received "a complete program submission" for 404 assumption from the State of Florida on August 20, 2020. See 85 Fed. Reg. 57,853.

Based on its determination that the submission was complete, the EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020.  See 33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40 C.F.R. § 233.15(a) (120-day statutory review period begins when the  EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Florida's submission, however, is incomplete in at least three critical respects: (1) failing to demonstrate how the State will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision, 33 U.S.C. § 1344(h)(1)(a), 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), given that the State is relying on processes and procedures that have yet to be developed; (2) failing to adequately identify the waters that would be assumed under its proposed program, id. § 233.11(h); (3) failing to provide complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers, id. § 233.11(d).

At the October 21, 2020, the EPA public hearing on Florida's submission, we urged the EPA to reverse its completeness determination in light of critical omissions in Florida's application.  We reiterated and elaborated on those concerns in our October 23, 2020, again requesting reconsideration of the completeness determination, and suspension of the public comment period until the deficiencies are cured.  See id. § 233.15(a) (providing that statutory review period shall not begin if the EPA finds that a State's submission is incomplete).

Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should the EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen.  5 U.S.C. § 553; Small Refiner Lead Phase-Down Task

Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

We fully adopt and incorporate herein the issues raised in the hearing and in our letter.  Letter from Bonnie Malloy, Earthjustice, to Kelly Laycock, U.S. Env't Prot. Agency, Oct. 23, 2020 (Exhibit 53); Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 21, 2020) (Exhibit 54) [hereinafter "Oct. 21, 2020, Hearing Transcript"]; Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 27, 2020) (Exhibit 55) [hereinafter "Oct. 27, 2020, Hearing Transcript"].

And we again urge the EPA to reverse its determination that the application is complete or to extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (Jun. 6, 1988). Alternatively, the EPA should deny the application for incompleteness.

Notwithstanding the fatal deficiencies in Florida's application, stakeholders from across Florida participated in the EPA's hearings on the program submission, which were held virtually on October 21 and October 27, 2020.  Aside from a handful of representatives from industries with a financial interest in accelerated and cheaper permits, the overwhelming view expressed by commenters, including Florida legislators and the Florida Department of Agriculture and Consumer Services, was to oppose Florida's request to assume.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

### B.  EPA Should Deny Florida's Submission on the Merits

As demonstrated below, Florida's application must also be denied on the merits.  Florida's submission fails to provide all components of a complete program submission as required under 40 C.F.R. §§ 233.10(b), 233.11.  It fails to fully describe the State's permitting, administrative, judicial review, and other procedures, id. § 233.11(b), particularly insofar as these are less stringent than, or conflict with, federal law.  It fails to adequately describe all agencies with responsibilities to administer the program, and fails to provide a reasonable accounting of the resources that would be required of each of these agencies to properly implement, operate and enforce a 404 program.  Id. § 233.11(c)-(e).

Florida's submission fails to adequately describe the State's compliance evaluation and enforcement programs, particularly with regard to areas where the State's programs are less stringent than, or conflict with, federal law.  Id. § 233.11(g).  Florida also fails to address how

the State will coordinate enforcement strategy with the Corps and EPA, as required under 40 C.F.R. § 233.11(g).

Florida's description of the waters of the United States over which the State hopes to assume jurisdiction, id. § 233.11(h), is grossly lacking.  The same is true of the State's description of the waters over which the federal government retains jurisdiction, a list that has been unreasonably and unduly reduced by the Corps since the State initiated rulemaking to develop an assumption program.

At its core, Florida's submission fails to demonstrate that the State has adequate legal authority to carry out the program and meet all requirements under the Clean Water Act.  id. § 233.12(a).  The application must therefore be denied.

1. **Florida's Scheme Does Not Grant Adequate Authority to Carry Out Section 404, And is not As Stringent As Federal Law**

To apply for approval to assume the Section 404 program, Florida was required to submit a statement demonstrating "that the laws and regulations of the State … provide adequate authority to carry out the program and meet the applicable requirements of this part."  Id.  The statement must also address the effect of State law regarding the prohibition against takings.  Id. § 233.12(c).  Where more than one agency will have "responsibility for administering" the program, the statement must include certification "that each agency has full authority to administer the program within its category of jurisdiction[.]"  Id.

To meet this requirement, FDEP has submitted a statement by its General Counsel.  Assumption Application C.  The General Counsel's statement, however, fails to establish adequate authority to carry out the program and meet Section 404 requirements.  This includes failures regarding general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement.  Permeating many of these areas, FDEP has also failed to adopt and failed to establish compliance with all Section 404(b)(1) Guidelines.  We begin with those issues first.

a. **Failure to Adopt and Comply with 404(b)(1) Guidelines**

The General Counsel's statement avers broadly that no permit shall issue unless in compliance with the Clean Water Act and Section 404(b)(1) Guidelines, Assumption Application C at 4, but fails to establish that this is in fact the case.  It is evident from Florida's submission that the State declined to adopt the 404(b)(1) Guidelines.  Instead, the State relies on a patchwork of State rules and regulations that, even when cobbled together, fail to satisfy 404(b)(1).  Even when appearing to adopt some of the language in the Guidelines, the State adds qualifications and caveats that

result in a less stringent standard than under federal law.  These failures permeate a number of regulatory requirements, rendering them individually and collectively inadequate under federal law.

The 404(b)(1) Guidelines are intended to "restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."  40 C.F.R. § 230.1(a).  The federal program also creates a presumption against granting a 404 permit by incorporating a "fundamental principle":  "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  Id. § 230.1(c).  The State's purpose, by contrast, is "to provide a streamlined permitting procedure" for ERP and 404 permits.

Rather than incorporating the guiding principles of the 404 program, the State's regulation titled "Intent, Purpose, and Implementation" merely covers methods to be used, conflicts of laws, and coordination between the ERP and 404 permitting programs.  Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020); Fla. Admin. Code 62-331.010.  Through these omissions, the State has failed to satisfy the requirements of the 404(b)(1) Guidelines.

(1) Failure to Adopt 404(b)(1) Definitions

As to the terms used in the State's program, 40 C.F.R. § 230.3, FDEP omits or alters consequential definitions from the 404(b)(1) Guidelines in a manner that limits the breadth and scope of the State's program.  First, the State's program fails to define the following terms that appear in 40 C.F.R. § 230.3:  "carrier of contaminant," "discharge point," "disposal site," "extraction site," "territorial sea," "waters of the United States," and "wetlands."  Without established definitions, neither the public nor the regulated community can have any clear indication as to how the State may interpret and apply those terms.  Moreover, the State's omission of these terms raises the question of whether FDEP's applications will be consistent with 404(b)(1).

Particularly troubling is that the State's definition of "pollution" is much narrower than the federal definition in that it only covers pollution that is at a high enough level or amount to be potentially harmful.  The federal guideline defines "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem."  Id. § 230.3(k).  The Florida definition, by contrast, states that pollution §means alterations "in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property."  Fla. Stat. § 403.031(7).  Tacking these qualifiers onto what constitutes

"pollution" means that the State would include fewer activities under that definition than would fall under the federal regulation's definition.

The State's proposal also does not adopt, reference, or mention the federal definition of waters of the United States. Instead, the proposed program uses the term "state-assumed waters," which it defines as "all waters of the United States that are not retained waters." Fla. Dep't of Env't Prot., State 404 Program Applicants' Handbook § 1.1 [hereinafter "404 Handbook"].[5] Florida's authorizing legislation similarly defines "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules promulgated thereunder." Fla. Stat. § 373.4146(1). This definition has no substance and does not reflect the federal definition of waters of the United States.

The State's definition of "mixing zone" omits important clarifying language that it "should not be considered as a place where wastes and water mix and not as a place where effluents are treated." Compare 40 C.F.R. § 230.3(h) with 404 Handbook § 2.0(25). Without this added description, the FDEP's provision would allow a broader definition of a "mixing zone" that would result in a less stringent State program.

The federal guidelines have separate definitions for dredged material and fill material. 40 C.F.R. § 232.2. "Dredged material" means "material that is excavated or dredged from waters of the United States." Id. And "fill material" means "(1) Except as specified in paragraph (3) of this definition, … material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States. (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States. (3) The term fill material does not include trash or garbage." Id.

The State proposes to cover both definitions in the term "material," Assumption Application B, app. j-3, at 8–9, which is defined as "matter of any kind, such as sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster clutch." Environmental Resource Permit Applicant's Handbook, vo. 1 [hereinafter "ERP Handbook"]. It is difficult to understand how the State's definition could explain what "dredge material" is when it is used as

---

[5] Florida's rules and regulations are obtuse, having relegated key aspects to applicant handbooks rather than providing for them in the rules, which will create confusion for regulators, the regulated community, affected parties, the public and the courts.

an example of "material."  Moreover, the State definition does not include the specifics outlined in the definition of "fill material," which is defined based on the function it performs rather than its physical state.

### (2) Failure to Adopt 404(b)(1) Procedures

As to General Procedures to be Followed, 40 C.F.R. § 230.5, the State largely incorporated this guideline into the 404 Handbook, but then added qualifying language that restricts the permitting conditions that FDEP must address when issuing a state 404 permit.  For example, the federal rule provides that the agency must evaluate dredge and fill material to "determine the possibility of chemical contamination or physical incompatibility of the material to be discharged."  Id.  The State, however, limited this requirement only to situations where chemical contamination may violate state water quality standards or toxic effluent standards or prohibitions.  404 Handbook § 8.2(g).  By restraining its consideration of chemical contamination, the State's program is less restrictive than the federal program.

As to General Permits ("GP"), 40 C.F.R. § 230.7, the State failed to incorporate the full set of requirements for issuance of a GP.  The 404(b)(1) Guidelines state that a GP complies with the guidelines if the permitting authority determines that: (1) "The activity in such category are similar in nature and similar in their impact upon water quality and the aquatic environment"; (2) "The activities in such category will have only minimal adverse effects when performed separately"; and (3) "The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment.  Id. § 230.7(a).  The State's program, however, omits the requirement that GPs may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment."  See Fla. Admin. Code 62-331.200–01.

The State also failed to incorporate the requirements that FDEP must follow when issuing GPs. The 404(b)(1) Guidelines require the permitting authority to "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General Permit."  40 C.F.R. § 230.7(b).  Moreover, the 404(b)(1) Guidelines require that the State complete this evaluation before the GP is issued and must publish the results with the final permit.  Id.  The State, by contrast, has not adopted any procedures for it to follow when considering and issuing GPs.  See Fla. Admin. Code. 62-331.200–01, 62-330.401.  Instead, it takes the position that the State must follow the requirements of 40 C.F.R. pt. 233 when creating a GP, "but this information is not presented in the rule."  Assumption Application B, app. j-3, at 58.  However, 40 C.F.R. § 233.21 requires compliance with the 404(b)(1) Guidelines, and it is unclear how the State could ensure compliance with the guidelines without incorporating them into the State's program.  Notably, and as discussed further below, the State also seeks to issue

21

GPs with the program submitted, even though it has failed to take any of the required steps to do so lawfully.

As to Restrictions on Discharge, 40 C.F.R. § 230.10, federal regulations prohibit any discharge that "causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." Id. Rather than adopting this language, the State has proposed an alternative prohibition that would prohibit discharges that "[c]auses or contributes to violations of any applicable State water quality standard, *except when temporarily within a mixing zone proposed by the applicant and approved by the Agency*." Fla. Admin. Code 62-331.053(2) (emphasis added). Where the 404(b)(1) Guidelines require the permitting authority to "consider" dilution areas when determining whether violations would occur, the State program creates an exemption for temporary violations in those areas.

The State program also fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts." 40 C.F.R. § 230.10(c). However, as described in these comments, the State has failed to fully incorporate the provisions that appear in those subparts. The State also fails to include the requirement to put "special emphasis on the persistence and permanence of the effects" outlined in those subparts.

Regarding the requirement that discharges not jeopardize the continued existence of endangered or threatened species, or result in the likelihood of the destruction or adverse modification of critical habitat, id. § 230.10(b)(3), the State has promulgated language to say that "compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency" "shall be determinative for purposes of evaluating violations of this subparagraph." Fla. Admin. Code 62-331.053(3)(a)(4). As discussed below in Section V.B.2, however, the technical assistance process is still being developed, and depends on other agencies who lack the resources necessary to carry out review of all State 404 permits. FDEP has failed to even submit information related to the available resources of those agencies, much less establish that those resources exist and are adequate.

As to Factual Determinations, 40 C.F.R. § 230.11, the 404(b)(1) Guidelines lay out specific, factual determinations that permitting authorities must use to determine the individual, cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity;

contaminants; aquatic ecosystem and organism; and the proposed disposal site.  Id.  The State's regulations do not incorporate or apply the guideline's defined set of factual determinations. And they do not require FDEP to make the requisite factual determinations when considering whether to issue a 404 permit.

Although Fla. Admin. Code 62-331.053(6) contains broad categories of effects considered to determine whether a permit will cause or contribute to significant degradation of wetlands or other surface waters, that section fails to incorporate the specific effects identified in 40 C.F.R. § 230.11, and leaves broad discretion for FDEP to interpret what effects it will consider.  It also omits consideration of effects on physical substrate, water circulation, fluctuation, salinity, and suspended particulate/turbidity, and only includes vague descriptions of the other potential effects of a proposed project that must be considered.

FDEP also relies on Fla. Admin. Code 62-330.301, but that provision only places obligations on permit applicants to provide "reasonable assurances" that their proposed projects will not cause adverse effects.[6]  The federal guidelines, importantly, obligate *the permitting authority* to make factual findings on those effects, rather than relying whole cloth on assurances submitted by permit applicants.  40 C.F.R. § 230.11.  FDEP has not adopted such a requirement for itself. This regulation also fails to include the full swath of identified effects from Section 230.11.[7]

As to Findings of Compliance or Noncompliance with the Restrictions on Discharge, 40 C.F.R. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration."  40 C.F.R. § 230.12(b).  The state regulations do not require the agency to make the factual determinations laid out in 40 C.F.R. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

### (3) Failure to Adopt 404(b)(1) Consideration of Impacts

Subparts C–F identify a whole host of impacts that must be considered when reviewing a permit and identify the significance of each for purposes of meeting the Clean Water Act's objectives. Florida fails to adopt or implement these considerations for Section 404 permits.  Subpart C requires the permitting authority to consider potential impacts to substrate, suspended particulates/turbidity, water, current patterns and water circulation, normal water fluctuations, ad

---

[6] ERP Handbook § 5.5.4.1 says that the agency makes permitting decisions based on a determination of whether the permit applicant provided these reasonable assurances.  However, determining whether an applicant's assurances are reasonable is a far cry from making the factual determination whether a proposed project will cause adverse effects.

[7] These same flaws are present in the ERP Handbook §§ 10.2.7, 10.2.8, and 11.0.

salinity gradients.  40 C.F.R. §§ 230.20–25.  Subpart D requires the permitting authority to consider potential impacts to endangered species, fish, crustaceans, mollusks, other aquatic organisms, and wildlife.  Id. §§ 230.30–32.  Subpart E requires the permitting authority to consider potential impacts to sanctuaries and refuges, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes.  Id. §§ 230.40–45.  Subpart F requires the permitting authority to consider the potential impacts to water supplies, fisheries, recreation, aesthetics, and parks by defining these categories of effects and outlining specific adverse effects that could occur within each of these categories.  Id. §§ 230.50–54.

Rather than adopt these criteria, the State's submission cites to a patchwork of complicated, piecemeal elements of ERP and state 404 regulations and applicant handbooks in an effort to claim that these constitute an equivalent program.  Assumption Application B, app. j-3, at 79–100.  But they do not add up.

For example, 40 C.F.R. § 230.31 defines "aquatic organisms in the food web," and then describes the possible loss of environmental characteristics and values that could result from dredge and fill activities:

> The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consumption by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced populations. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

Id.  The provisions cited by the State fail to incorporate either the definition or the potential effects laid out in this 404(b)(1) Guideline.  See Fla. Admin. Code 62-330.301(1)(d)–(e) (creating broad conditions for permit issuance that activities not adversely affect functions that serve fish and wildlife or affect the quality of receiving waters such that the state water quality standards are not met); id. 62-330.302(1)(a)(1), (2), (4) (requiring permittees to provide reasonable assurances about broadly defined effects of the proposed activity to the public health, safety, or welfare or the property of others; the conservation of fish and wildlife, including endangered or threatened species and their habitats; fishing, recreational values or marine productivity); ERP Handbook § 10.2.3.1(a)–(b) (generally requiring evaluation of public health and impacts to shellfish harvesting); id. § 10.2.3.4(a)–(b) (generally requiring consideration of effects to sport or commercial fisheries or marine productivity; existing recreational uses of wetlands); id. § 10.2.5 (generally requiring consideration of effects to waters used for shellfish harvesting).

The same omissions are evident for substrate, 40 C.F.R. § 230.20, suspended particulates/ turbidity, id. § 230.21, water, id. § 230.22, current patterns and water circulation, id. § 230.23, normal water fluctuations, id. § 230.24, salinity gradients, id. § 230.25, threatened and endangered species, id. § 230.30, fish, crustaceans, mollusks and other aquatic organisms in the food web, id. § 230.31, wildlife, id. § 230.32, sanctuaries and refuges, id. § 230.40, wetlands, id. § 230.41, mud flats, id. § 230.42, vegetated shallows, id. § 230.43, coral reefs, id. § 230.44, riffle and pool complexes, id. § 230.45, municipal and private water supplies, id. § 230.50, recreational and commercial fisheries, id. § 230.51, water-related recreation, id. § 230.52, and parks, national and historical monuments, national seashores, wilderness areas, research sites and similar preserves, id. § 230.54.

The only provision in Subparts C–F that the State incorporated into its program was for aesthetics.  Compare id. § 230.53 with 404 Handbook § 8.3.2.  For aesthetics, the State incorporated the federal provision word-for-word.  404 Handbook § 8.3.2.  This demonstrates that the State knew how to appropriately adopt the Guidelines, but that it chose not to do so for any of the other categories in Subparts C–F.

### (4) Failure to Adopt 404(b)(1) Compensatory Mitigation

Subpart J outlines the compensatory mitigation program for losses of aquatic resources associated with dredge and fill activities.  Again, here, the State attempts to use a grab bag of ERP and state 404 program regulations and guidelines to cobble together what it identifies as equivalent to the lengthy provisions of Subpart J.  However, the rules contain meaningful omissions and differences so that the State program fails to maintain the stringency of these 404(b)(1) Guidelines.  Many of these issues arise in the failure to use the federal definitions of terms relevant to mitigation.  40 C.F.R. § 230.92.

For example, the 404 Handbook does not include the definitions from § 230.92 for "advance credits," "credit," "days," "debit," "fulfillment of advance credit sales of an in-lieu fee program," "in-lieu fee program instrument," "instrument," "mitigation banking instrument" and "release of credits."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

There are also meaningful changes to the definitions the State did incorporate.  For the definition of "preservation" in the 404 Handbook, the State omits the following language from 40 C.F.R. § 230.92:  "Preservation does not result in a gain of aquatic resource area or functions." Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

The State's definition of "creation," which is intended to incorporate the federal definition of "establishment," omits a vital clarification in the federal definition:  "Establishment results in a gain in aquatic resource area and functions."  Compare 40 C.F.R. § 230.92 with ERP Handbook vo. 1.  This change means that under the State's definition, creation of wetlands could occur even if there is no "gain" in environmental resource functions.

For the definition of "functional capacity," the State points to its definition of "ecological value." The federal guidelines define "functional capacity" as the degree to which an area performs a specific function.  40 C.F.R. § 230.92.  The State's definition of "ecological value," by contrast, is much more restrictive and is couched in "values" as compared to "functions."  Fla. Stat. 373.403(18).  Instead, "ecological value" means the "value of functions performed by uplands, wetlands, and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species.  These functions include, but are not limited to, providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; and natural water storage, natural flow attenuation, and water quality improvement, which enhances fish, wildlife, and listed species utilization."  Id.  These terms are not equivalent.

The State's definition of "temporal loss" omits the following from the federal guideline: "[H]igher compensation ratios may be required to compensate for temporal loss.  When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(49).  This additional language creates substantive requirements for permit writers, and the State program fails to incorporate it.

As to General Compensatory Mitigation Requirements, 40 C.F.R. § 230.93, the State alters or omits vital portions of this Section, thereby creating less stringent requirements for its mitigation program.

The State's tepid incorporation of the watershed approach to compensatory mitigation falls short of the Federal requirements.  The State does not incorporate the federal provision that a watershed approach is "not appropriate in areas where watershed boundaries do not exist, such as marine areas."  <u>Compare</u> 40 C.F.R. § 230.93(c)(2)(v) <u>with</u> 404 Handbook § 8.5.2(a)(4).  The State omits requirements on the amount of information that a permittee must provide to support a watershed approach.  40 C.F.R. § 230.93(c)(3)(iii).  The State program also fails to incorporate the size restrictions for the watershed to be used in a watershed approach intended to ensure that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits.  <u>Id.</u> § 230.93(c)(4).

Regarding site selection criteria, the State ignored the federal factors that must be considered when selecting a mitigation site to ensure that the compensatory mitigation project site is "ecologically suitable for providing the desired aquatic resource functions."  <u>Id.</u> § 230.93(d)(vi).

The State's program does not adopt requirements that would apply to permit writers as they consider different types of mitigation.  The federal rule requires permit writers to document specific findings before permitting out-of-kind compensatory mitigation, a provision absent from the State's program.  <u>Id.</u> § 230.93(e)(2)–(3).  The State's program also omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary."  <u>Id.</u> § 230.93(f)(2).

Lastly, the State's requirements for demonstrating financial responsibility are not as strict as those required under 40 C.F.R. § 230.93(n)(1).  Federal regulations require financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, a standard not incorporated into the State program.  <u>Compare id. with</u> ERP Handbook § 10.3.7.  The State creates an exemption for projects that have a mitigation cost estimate less than $25,000, but the federal rules do not have a threshold below which a financial responsibility demonstration is no longer required.  <u>Compare</u> ERP Handbook § 10.3.7.1 <u>with</u> 40 C.F.R. § 230.93(n)(1).  Rather than giving permit writers the ability to determine the necessary amount of required financial assurances, 40 C.F.R. § 230.93(n)(2), the State instead creates a blanket amount of 110% of the cost estimate.  ERP Handbook § 10.3.7.2.

### b. Unlawful Promulgation of General Permits, 40 C.F.R. §233.21

The General Counsel states that FDEP intends to administer a limited number of regional permits until they expire and that the State "has promulgated a series of general permits."  Assumption Application C at 4.  The State's rules developed for the 404 program submission purport to include dozens of general permits.  Fla. Admin. Code 62-331.210–48.  The State, however, has failed to lawfully promulgate any general permit.

As to a state assumed program, federal regulations provide that "[t]he Director may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  40 C.F.R. § 233.21(b).  The terms "State Director" and "Director" are defined as "the chief administrative officer of any State … operating an approved program[.]"  Id. § 233.2.

The Director of Florida's proposed program, however, has not made *any* determinations that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.  When FDEP proposed to promulgate dozens of general permits modeled after general permits previously developed by the Corps on a national level, the agency provided *zero* evidence of any analysis or study to warrant such a determination.

Instead, FDEP seems to believe that it can simply parrot the language of general permits developed at a national, rather than state, level, and promulgate those for operation at the state level without any process.  But the language of the federal regulation governing general permits is clear:  "[t]he Director may issue a general permit for categories of similar activities *if he determines* that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  Id. § 233.21(b) (emphasis added).  FDEP did not subject these purported general permits to any study, did not notify the public of any basis to support the propriety of such general permits, did not provide an opportunity for the public to comment on the intention to make any determination under this regulation, and has not provided affirmative evidence of having made an independent, fact-based determination.

FDEP cites no legal authority to disregard the plain language of 40 C.F.R. § 233.21(b).  Moreover, FDEP's approach, which purports to give effect to "its" general permits for a duration of five years from the date of the State program's approval, is contrary to five-year limitation on general permits.  FDEP's approach therefore not only fails to rely on a proper determination necessary to support the issuance of general permits.  It also would unlawfully extend general permits issued initially by the Corps beyond their statutorily limited five-year duration.  33 U.S.C. § 1344(e)(2).  This outcome is also unreasonable.  Federal law requires the Corps to review its general permits, and the determinations underlying them, every five years.  To allow Florida to extend the Corps' underlying rationale beyond the five-year statutory limitation to support continued issuance of general permits for years thereafter conflicts with federal law.  Id.

FDEP's proposed program is also less restrictive than 40 C.F.R. § 233.21.  The State's regulation unreasonably restricts its ability to require notice of intent of coverage under a GP, omitting the

federal catchall that the agency can require notice "as appropriate." Compare Fla. Admin. Code 62-331.200(3) with 40 C.F.R. § 233.21(d). The State regulation restricts the notice requirement to specifically identified circumstances and limits FDEP's authority to require notice whenever appropriate.

The State has limited its authority by only allowing FDEP to require an individual permit where "sufficient cause exists," which is then defined as a "likelihood that the project will cause more than minimal adverse environmental effects." Fla. Admin. Code 62-331.200(6). The federal rules, by contrast, allow the Director to do so "based on concerns for the aquatic environment," including compliance with the requirement for GPs to have only minimal individual and cumulative adverse environmental effects. 40 C.F.R § 233.21(e). Further, the State's rules omit the automatic revocation of GP coverage once the agency requires an individual permit. Compare Fla. Admin. Code 62-331.200(6) with 40 C.F.R. § 233.21(e).

### c. Unlawful Expansion of Emergency Permits, 40 C.F.R. §233.22

The General Counsel Statement avers that Fla. Admin. Code 62-331.110 implements the emergency permit requirements of 40 C.F.R. § 233.22, citing only to subsections (b)(3)–(7). Assumption Application C at 5. Importantly, however, the State creates a much broader set of situations when an emergency permit may be granted than what is authorized under federal law.

Under federal regulations, an emergency permit may only be given "if unacceptable harm to life or severe loss of physical property is likely to occur before a permit could be issued or modified under procedures normally required." 40 C.F.R. § 233.22(a). The State, instead, would allow for the issuance of emergency permits to abate emergency conditions which "pose and imminent or existing serious threat or danger and require immediate action to protect public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." Fla. Admin. Code 62-331.110(1).

The State's grant of broader authority to issue emergency permits than what is allowed under federal law reflects a less stringent program than the federal program because emergency permits are granted more quickly and with less opportunity for process and review than regular permits. Compare Fla. Admin. Code 62-331.110 with id. 62-331.050–60.

### d. Unlawful Limitation of Permit Conditions, 40 C.F.R. §233.23

The General Counsel Statement summarily declares that FDEP satisfies the requirements to comply with federal guidelines, even though many of the 404(b)(1) Guidelines are absent from the State rules, see Section V.B.1.a.

Additionally, the State's regulations omit important requirements outlined in 40 C.F.R. § 233.23: The State omits "minimize" from the federal requirement that permittees "take all reasonable steps to minimize or prevent any discharge in violation of this permit."  Compare Fla. Admin. Code 62-331.054(2)(b) with 40 C.F.R. § 233.23(c)(4). The State's regulation omits minimum requirements for individual permits specifying that at least monitoring, reporting, and recordkeeping requirements must include "monitoring and reporting of any expected leachates, reporting of noncompliance, planned changes or transfer of the permit."  Compare Fla. Admin. Code 62-331.054(d) with 40 C.F.R. § 233.23(c)(7).  FDEP's regulations failed to include the requirement that discharges minimize adverse impacts through *restoration*, and instead only includes minimization through mitigation.  Compare Fla. Admin. Code with 40 C.F.R. § 233.23(c)(9).  The State's proposed program also omits the requirement for a specific identification and complete description of the authorized activity, instead relying on permit templates that are not incorporated by regulation and do not operate with the force of law.  40 C.F.R. § 233.23(c)(1).

### e. Unlawful Permit Application Process, 40 C.F.R. § 233.30

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R § 233.30(b)(1)–(4).  Assumption Application C at 6.  However, the State uses different terms that would restrict the information that must be included in a permit application as compared to federal law.  For example, the federal regulations require a description of "methods of discharge" whereas the State uses the term "construction methods," which is not defined by either the State regulations or the 404 Handbook.  Compare Fla. Admin. Code 62-331.060(1)(e) with 40 C.F.R. § 233.30(b)(3).  The plain meanings of the words "construction" and "discharge" are not equivalent.

The State also fails to incorporate the federal requirement regarding how much detail permit applications must include.  Pursuant to 40 C.F.R. § 233.30(d), "[t]he level of detail shall be reasonably commensurate with the type and size of discharge, proximity to critical areas, likelihood of long-lived toxic chemical substances, and potential level of environmental degradation."  Id.  This language appears only in Appendix C of the 404 Handbook, which is described as guidance for conducting an alternatives analysis based on guidance from the Army Corps Jacksonville District.  404 Handbook, app. C.  It is not included as a requirement for permit applications generally and is not incorporated into the rules themselves.

### f. Failure to Meet Coordination Requirements, 40 C.F.R. § 233.3

The federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes."  40 C.F.R. § 233.3.  The General Counsel Statement

fails to provide any information or citation to demonstrate that the State has satisfied this requirement.  Assumption Application C at 6.  Instead, in the Comparison referenced by the General Counsel and added in Florida's assumption package, FDEP admits that they "did not add this [requirement] to the rule," but states that they "plan to engage in this kind of coordination whenever possible."  Assumption Application B, app. j-3, at 32.  FDEP has thus failed to ensure compliance with federal coordination requirements.  That FDEP may "plan" to coordinate "whenever possible" falls far short of the requirement that permits "shall" be coordinated.  Because the State failed to incorporate this requirement into its regulatory program, its program is less stringent than the federal program and must be denied.

### g. Inadequate Public Notice, 40 C.F.R. § 233.32

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(2)–(3) fully satisfies the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e).  Assumption Application C at 6–7.  However, that is not the case.  The federal rules require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit.  40 C.F.R. § 233.32(a).  Florida's regulations, on the other hand, do not require public notice for receipt of a permit application.  Fla. Admin. Code 62-331.060(2)–(3).

### h. Inadequate Process for Decision on Permit Application, 40 C.F.R. § 233.34

The General Counsel Statement rightfully explains that the permit decision-making process requires that permit decisions be reviewed for compliance with 404(b)(1) Guidelines.  Assumption Application C at 7.  However, as we explain in Section V.B.1.a, the State has not adopted or incorporated all of the 404(b)(1) Guidelines.

### i. Failure to Meet Requirements for Compliance Evaluation Programs, 40 C.F.R. § 233.40

The General Counsel Statement claims that the State "has authority to enforce rules and regulations" for the State 404 Program.  Assumption Application C at 9.  However, that statement falls short of the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions."  40 C.F.R. § 233.40(a).  As explained in Section V.B.1.k.5, however, the State does not maintain a program to identify violations in its current programs and has not shown how it would be able to do so for a Section 404 program.  Having authority and actually using that authority to identify and enforce against violations are two very different things.

31

Although the State's regulations may provide authority, the State has categorically failed to show it has the resources to "maintain" such a program.  See Section V.B.1.k.4.

### j. Inadequate Enforcement Authority, 40 C.F.R. § 233.41

The General Counsel claims that Florida law is consistent with and no less stringent than the Clean Water Act enforcement requirements.  Assumption Application C at 10.  A vital aspect of administering a 404 enforcement program, however, is having adequate staffing and resources. As demonstrated further below, FDEP has not established that it has acquired the resources that would be required to administer and enforce a 404 program.  In addition, in light of FDEP's grossly inadequate enforcement record, the EPA cannot reasonably conclude that FDEP would adequately enforce a 404 program when it cannot even adequately enforce the programs currently under its supervision.  See SectionV.B.1.k.4.

#### (1) State Criminal Liability Less Stringent Than Federal Criminal Liability

Significantly, Florida law regarding criminal enforcement is not as stringent as federal law. Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a criminal violation is established by showing (1) a discharge of dredged or filled material, (2) without a required permit or in violation of a permit condition, (3) that is committed willfully or with criminal negligence.  Id.

Under Fla. Stat. § 373.430(1)(a), on the other hand, a criminal violation would require proof of an additional element, namely that the pollution (discharge) "caused actual harm or injury to human health or welfare, animal, plant, or aquatic life or property."  See, e.g., State v. Hamilton, 388 So. 2d 561 (Fla. 1980) (interpreting identical provision to require proof of actual harm or injury to sustain a criminal conviction).

By requiring an additional element of proof, the state law fails to provide as stringent criminal liability as exists under federal law for unlawful discharges of dredged and fill material.

Moreover, Section 309(c) of the Clean Water Act makes it a crime to *negligently* violate "any permit condition […] in a permit issued under section 404 of this title," or to *negligently* "introduce into a sewer system or into a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage [or] causes such treatment works to violate any effluent limitation or condition in any permit."  33 U.S.C. § 1319(c)(1)(A), (B).  The penalty for such a violation is a fine between \$2,500 and \$25,000 per day, per violation and/or imprisonment of up to one year; this penalty is doubled for a second violation.  Id.

Four circuits have held that this provision requires only proof of simple negligence:  the Courts of Appeal for the Third, Fifth, Ninth, and Tenth Circuits.[8]  This creates a conflict between the Clean Water Act and both the federal regulation and the state statute at issue in this matter.

Under Florida law, it is unconstitutional to criminally penalize "mere negligent conduct" since that fails to provide "clearly ascertainable standards of guilt by which a citizen may gauge his conduct."  State v. Hamilton, 388 So. 2d 561, 563-64 (Fla. 1980).  Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  Moreover, this conflict is a matter of Florida constitutional law, and so it cannot be resolved by mere amendment of Florida statutes or regulations.

40 C.F.R. § 233.41(b)(2) states that "*the burden of proof and degree of knowledge or intent required under State law for establishing violations under […] this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act*."  Id. (emphasis added).  Because criminal negligence in the state statute is a higher level of intent that simple negligence in the Clean Water Act, the Florida Statute conflicts with federal law, and does not provide as stringent criminal enforcement as does federal law. See also Idaho Conservation League, Petitioner, v. U.S. Environmental Protection Agency, Case No. 18-72684 (9th Cir. Sep. 10, 2020) (Exhibit 56) (the EPA abused its discretion in approving a state delegated program with a *mens rea* standard greater than the burden of proof required of the EPA).

Lastly, Florida law provides shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  See United States v. Ursitti, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (in case involving a criminal violation of the CWA, citing to § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); see also Joseph J. Lisa, Negligence-Based Environmental Crimes:  Failing to Exercise Due Care Can Be Criminal, 18 Vill. Envtl. L.J. 1, 43 n. 109 (2007) (citing 33 U.S.C. § 3282(a) as the applicable statute of limitations provision for criminal enforcement actions under Section 1319(c)).

The statutes of limitation applicable to violations under state law, however, are between one year and three years, depending on the severity of the offense.  Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud);

---

[8]   United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d at 1120 (9th Cir. 1999).

id. § 373.430(3)–(5) (setting degree of offense depending on the crime); id. § 775.15 (setting for statute of limitations depending on the severity of the offense).

State law regarding criminal enforcement is therefore deficient also in this regard, making its program less stringent than the federal one.

Although 40 C.F.R. § 233.41(d)(1) authorizes the EPA to approve a state program that has less stringent *penalties* than available under federal law,[9] there is nothing in the Clean Water Act that authorizes the EPA to approve a state program with an enforcement scheme that is less stringent than the federal one in terms of criminal culpability, burden of proof and statutes of limitations. To the contrary, these failures render the program non-approvable.

### (2) Public Participation (Enforcement), 40 C.F.R. § 233.41(b)(1)

In addition, pursuant to 40 C.F.R. § 233.41(b)(1), the State "shall provide for public participation in the State enforcement process through either a right of citizen intervention or an assurance that the State will (1) investigate citizen complaints, (2) not oppose citizen intervention, and (3) provide public notice and comment on any proposed settlement of a State enforcement action."  Id. § 230.41(e).  The General Counsel provides a blanket statement that the State has "authority" to comply with these requirements without citing any law or regulation providing that authority.  Assumption Application C at 11.

The General Counsel also relies on the MOA with the EPA to say it has provided assurance that it will comply with 40 C.F.R. § 233.41(e)(2).  Assumption Application C at 11.  The MOA merely states, "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)."  Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III.I (Jul. 31, 2020).  FDEP, however, has failed to identify any requirement in the state law or regulations to ensure compliance with the requirements of 40 C.F.R. § 233.41(e)(2).  Although assurances to the EPA may be helpful, when they are not incorporated into state law, there is a question regarding the extent to which the public is able to enforce those obligations.

### k. Failure to Address Effect of State Takings Law on Successful Implementation of Program, 40 C.F.R. § 233.12

The General Counsel Statement must contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful

---

[9] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application.  Assumption Application B, app. j-3, at 54.

implementation of the State's program.  40 C.F.R. § 233.12(c).  Rather than providing this analysis, the Statement focuses on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States.  Assumption Application C at 12.  This reductionist position completely dodges the requirement to provide an actual analysis of the effect of Florida law on the prohibition against takings, since the blanket statement that takings law is ultimately subject to U.S Supreme Court review would apply to any state's submission or statutory scheme.  The claim also ignores that the U.S. Supreme Court is a court of limited review, which only grants a select number of petitions for certiorari each year.  See *Supreme Court: The Statistics*, 131 Harv. L. Rev. 403, 410 tbl. II(B) (2017) (1.2% of petitions for certiorari were granted review in the 2016 Term).  "Review on a writ of certiorari is not a matter of right, but of judicial discretion" and it "will be granted only for compelling reasons."  Sup. Ct. R. 10.

In addition to relying on a theoretical U.S. Supreme Court backstop, the General Counsel emphasizes that under Florida law, even when a private property owner brings an as-applied challenge to a regulation, that challenge can proceed without invalidating the underlying regulation.  Assumption Application C at 12.  This analysis appears to suggest that as long as the underlying regulatory program remains valid, takings law does not inhibit successful implementation of Florida's program.  However, the real question is whether it is easier for private property owners to bring regulatory takings cases pursuant to Florida law such that less 404 permit mitigation would occur under a State program as compared to a federal program.  The State has not answered that question.

Importantly, the General Counsel Statement completely fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq. ("Harris Act"), which Florida's legislature enacted "to provide a remedy for private landowners where their property has been inordinately burdened by government action, <u>but the government action does not amount to a constitutional taking</u>."  *Cascar, LLC v. City of Coral Gables*, 274 So. 3d 1231, 1234 (Fla. Dist. Ct. App. 2019) (citing Fla. Stat. 70.001(1)) (emphasis added).  The General Counsel failed to flag, much less address, how this Act would not interfere with operation of a 404 program.  Without this explanation, the State has failed to meet the requirements of 40 C.F.R. § 233.12.

## 2.  Florida's Scheme Does Not Ensure Protection of Species Listed Under the Endangered Species Act

Of particular consequence in Florida, the State's assumption application does not comply with the Clean Water Act's 404(b)(1)'s no jeopardy requirement.  The State wholly fails to demonstrate how the state program would ensure no jeopardy to listed species.  FDEP instead relies on an anticipated, future programmatic biological opinion hoped to be produced from the EPA's ESA Section 7 consultation that would improperly punt all ESA determinations to state

agencies.  See Assumption Application B, app. j-2, at 5 (stating "coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the USFWS's biological opinion based on information included in the biological assessment submitted by EPA"); Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020 (Exhibit 57).

Under a programmatic Section 7 consultation, the EPA must review Florida's proposed criteria and process for ensuring state issued permits will not cause jeopardy to listed species.  More importantly, the EPA may only approve Florida's program if it determines the program fulfills the no jeopardy requirement.  40 C.F.R. § 233.15(g).  According to FDEP, "[b]ecause of the terms and conditions anticipated in the Program assumption BiOp and its [Incidental Take Statement ("ITS")], the State 404 program would not issue a permit that would jeopardize the continued existence of a species or adversely modify designated critical habitats."  Fla. Dep't Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida iv (Jul. 24, 2020) (Exhibit 58) [hereinafter "BA"].  FDEP's application however does not contain any such criteria or even the Biological Assessment.  Without the criteria in FDEP's application of how it will achieve this requirement, the EPA cannot (1) determine Florida's application is complete, (2) determine whether Florida can fulfill the guidelines' no jeopardy mandate or (3) approve Florida's assumption.  See 40 C.F.R. §§ 233.1(a), 233.15(g); Letter from Bonnie Malloy, supra.

Even if a programmatic biological opinion were produced prior to the EPA's assumption decision deadline, it was not part of FDEP's application and has not been part of the administrative review process or subject to notice and comment.  40 C.F.R. § 233.15(a), (e) (requiring the EPA to provide a comment period of not less than 45 days on a state's complete application and provide a copy to U.S. Fish & Wildlife Service ("USFWS") and National Marine Fisheries Service ("NMFS") to review and comment).  The EPA would be ignoring its own procedural regulations, and basic tenets of administrative law, to allow Florida to retroactively complete its application and circumvent notice and comment requirements.  The EPA simply cannot approve Florida's assumption application based on a biological opinion outside the

public's scrutiny, when the State is relying on that opinion to claim compliance with requirements to assume jurisdiction over the 404 program.[10]

Tellingly, in anticipation of Florida's application, the EPA sought public comment on whether consultation under ESA Section 7 is required when the EPA reviews a state or tribal request to assume CWA § 404 duties.  85 Fed. Reg. 30,953 (May 21, 2020).  The EPA's former position was that this was a non-discretionary decision and thus did not trigger ESA Section 7 consultation.  Letter from Peter S. Silva, U.S. Env't Prot. Agency, to Steven Brown, Env't Council of the States, Dec. 27, 2010 (Exhibit 59).  Florida, however, urged the EPA to reverse course, and it did.

While we agree that consultation should take place,[11] Florida's proposal (now adopted by the EPA) for how a programmatic biological opinion would be treated as ensuring no jeopardy is gravely flawed.  Moreover, the actual process Florida claims it will follow to ensure no jeopardy has not been finalized, much less submitted for public review and comment.  As a result, two flaws fatal to Florida's application emerge: (1) Florida has not demonstrated that its program will ensure no jeopardy, and (2) the public has been deprived of an opportunity to review Florida's plan and so be able to comment on whether Florida's proposal will ensure no jeopardy.

With over 130 listed species, more than 7,700 lakes (greater than 10 acres), 33 first-magnitude springs, 11 million acres of wetlands, almost 1,200 miles of coastline, and approximately 27,561 linear miles of rivers and streams, water and biodiversity are two of Florida's most prominent features.[12]  Section 7 consultation in Florida therefore will involve analyzing limitless projects blanketing most of the State to determine their potential impacts on numerous listed species. FDEP admits in its Biological Assessment that "[b]ecause of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to

---

[10] Moreover, similar to pesticide registrations, 404 program assumption has broad geographical effects making ESA Section 7 consultation one of the most complex which should generate national consultation procedures like public comment.  See U.S. Fish & Wildlife Servs. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook 5-3 to 5-4 (Mar. 1998) (Exhibit 60) (Comparing 404 program assumption to pesticides registrations which generates national consultation requests); U.S. Env't Prot. Agency, et al, Enhancing Stakeholder Input in the Pesticide Registration Review and ESA Consultation Processes and Development of Economically and Technologically Feasible Reasonable and Prudent Alternatives, Doc. Id. EPA-HQ-OPP-2012-0442-0038 (Mar. 19, 2013) (Exhibit 61) (providing pesticide registrations with public comment because of ensuring protection of the species will benefit from the general public's input).
[11] See Letter from Kristen L. Boyles, Earthjustice, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 62).
[12] See Fla. Fish & Wildlife Conservation Comm'n, Florida's Official Endangered And Threatened Species List, 4 (2018) (Exhibit 63); Purdum, supra; Fla. Dep't of State, Quick Facts (Exhibit 64); U.S. Geologic Survey, supra; Fla. Dep't of Env't Prot., 2016 Integrated Water Quality Assessment for Florida 34 (2016) (Exhibit 65).

where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible this BA." Fla. Dep't of Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida iv (Jul. 24, 2020) (Exhibit 58); see also Letter from James Murphy, Nat'l Wildlife Fed'n, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 66). FDEP, however, expects a programmatic biological opinion to be completed in only a few months' time to allow the EPA to meet its assumption decision deadline (which stems from the erroneous determination that Florida's application was complete when submitted).

ESA Section 7 consultation on whether the EPA's approval of Florida's assumption application will jeopardize listed species is a complex, fact intensive analysis. ESA Section 7(a)(2) first places a procedural obligation on the EPA to initiate consultation with FWS and NMFS "at the earliest possible time" to determine what effects a state's assumption of the Section 404 program may have on endangered and threatened species and their critical habitats. ESA § 7(a)(2) next places a substantive obligation on the EPA to ensure its actions will not jeopardize the continued existence of endangered and threatened species or destroy or adversely modify their critical habitats. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

The ESA's implementing regulations dictate the precise requirements for satisfying this substantive obligation. Letter from Kristen L. Boyles, supra. To fulfill the ESA Section 7 consultation requirement, USFWS and NMFS must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2), (b)(4). Note that even mixed programmatic actions require incidental take statements at the programmatic level if the actions are "reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(6). The agency cannot merely list a state's threatened and endangered species, dismiss further analysis as requiring too much speculation, or punt all meaningful analysis to the state at some future time.

Florida, however, has proposed that USFWS and NMFS engage in a one-time consultation that would only identify procedural requirements for state permitting under Section 404 needed to support the USFWS' determination that assumption would not result in jeopardy to any listed species. Fla. Dep't of Env't Prot., EPA Approval of State Assumption of Clean Water Act Section 404 Program: Streamlined Approach to Address Endangered Species Act Incidental Take Coverage 1–2 (Exhibit 67). FDEP even provided a Biological Assessment to the EPA in hopes to achieve this goal. FDEP's Biological Assessment was never subject to notice and comment during the State's rulemaking process, nor has it been during the EPA's consideration of the State's 404 program application.

Although referenced in Florida's application, the Biological Assessment has proceeded in a parallel process outside the public eye. Like the anticipated programmatic biological opinion, the Biological Assessment is not part of FDEP's application and therefore cannot be relied on to

satisfy the no jeopardy mandate.  Moreover, the Biological Assessment suffers numerous flaws that render it inadequate to support a programmatic biological opinion.

At its core, the Biological Assessment fails to be as protective as the current federal process. First, the Biological Assessment fails to provide site-specific information, thereby preventing the intended state implementing agencies (FDEP and the Florida Fish and Wildlife Conservation Commission ("FWCC")) from even determining the effect of various specific permitting actions. Without site-specific information, FDEP's jeopardy analysis will be flawed.  For example, the Biological Assessment includes only about half a page on the state mammal, the critically endangered Florida Panther, even though it is estimated that the current remaining population is only 120–230 adult individuals[13] and is in danger of extinction.[14]  With such little information, how can FDEP which has no expertise in the subject be able, even at the project level, to conduct the necessary analysis to ensure no jeopardy?

Additionally, the Biological Assessment provides very limited—almost nonexistent—information about the cumulative impacts of the State's assumption program.  The Biological Assessment fails to adequately address the environmental baseline, status of the species, effects of the action, or reasonable and prudent measures designed to reduce any take identified. Instead, these are all punted to the state agencies to decide at the project level.  There are other flaws contained in the Biological Assessment  as well, including but limited to, lack of information on what constitutes "suitable habitat;" unreasonably short timeframe for USFWS to decide if it will comment; FDEP and FWCC will make effect determinations and assume no comment from USFWS if there is silence (no duty to check); designation of the key deer and red cockaded woodpecker as not regularly utilizing wetlands despite their state or county wetland dependent designations.  BA at 87, tbl. 3-1, 23.

While programmatic consultation allows consultation on an agency's multiple actions on a program, including a proposed program or regulation that provides a framework for future proposed actions, 50 C.F.R. § 402.02, under Florida's proposal, the truncated consultation would essentially give the EPA wholesale approval from the USFWS and NMFS for specified and foreseeable actions without any analysis of the effects of the whole action, jeopardy determinations, or take limits, all in direct contravention to the ESA's mandate, implementing regulations, and numerous court holdings.  See, e.g., Conner v. Burford, 848 F.2d 1441, 1453–54 (9th Cir. 1988); N. Slope Borough v. Andrus, 642 F.2d 589, 608 (D.C. Cir. 1980); Wild Fish Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010); Forest Serv. Empls. for Env't Ethics v. U.S. Forest Serv., 726 F. Supp. 2d 1195, 1225–26 (D. Mont. 2010).  Under such an approach,

---

[13] See U.S. Fish and Wildlife Serv., Florida Panther Population Estimate Updated, Feb. 22, 2017 (Exhibit 69); U.S. Fish and Wildlife Serv., Florida Panther Recovery Plan, 3rd rev. at viii (2008) (Exhibit 69).
[14] See U.S. Fish and Wildlife Serv., Florida Panther 5-Year Review 19 (2009) (Exhibit 70).

the USFWS and NMFS will have failed to fully consult on the action and the EPA will not satisfy its burden to ensure that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat.

Indeed, even under a programmatic consultation, if assumption is approved, the jeopardy analysis cannot end there. States like Florida must *still* ensure there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. A state's program must be at least as stringent as the federal program, which expressly requires that both individual and general permits comply with the ESA. Overarching programmatic consultation does not relieve the State of its responsibility to determine at the site-specific permit level whether there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. FDEP's application however is silent on how this will be accomplished.

What is known about the EPA's Section 7 consultation process demonstrates that it is flawed in other respects as well, rendering any potential resulting programmatic biological opinion insufficient. First, NMFS made a critical error when failing to consider the entire area that will be affected by Florida's assumption. See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02. Accordingly, NMFS is not engaging in the Section 7 consultation on Florida's 404 assumption, and the EPA will not satisfy its consultation duty. NMFS instead is merely "assum[ing] that the EPA will make a 'no effect' determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption." Id. This notion is based on NMFS' recent determination that "Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state." See Letter from Cathryne Tortorici, Nat'l Marine Fisheries Serv., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 15, 2020 (Exhibit 71).[15] NMFS' jurisdictional determination however is inconsistent with federal law.

Section 7 consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. 402.02(d). NMFS holds that all of the species under its jurisdiction occur in waters that will be retained under the Corps' jurisdiction and thus the agency need not consult. To the contrary, the "action area" isn't limited to the assumed waters, it also includes areas that would experience downstream impacts. Without consulting NMFS, there will be no consideration of whether the no-jeopardy mandate in

---

[15] Based on NMFS' determination, FDEP's Memorandum of Understanding (MOU) with USFWS and FWCC outlining their plan for state agencies' technical assistance and limited federal oversight excludes NMFS all together.

the Clean Water Act's 404(b)(1) Guidelines is achievable for NMFS' species experiencing downstream impacts.

Next, Florida's proposal is also asking the EPA to delegate its obligations under ESA Section 7(a)(2) to non-federal parties.  FDEP's application and MOU with USFWS and FWCC lay out a process whereby the EPA will rely on a future, abridged programmatic biological opinion that merely instructs FDEP and FWCC to determine at the project level if an activity may affect listed species or critical habitat, determine whether there will be jeopardy, and determine what conditions may be necessary to ensure no jeopardy.  FDEP's proposal unlawfully delegates the initial effects determination to FDEP (and likely the applicant who will be asked to identify whether species are affected).  These determinations must be made by a federal agency.  See 16 U.S.C. § 1536(a)(2); Selkirk Conservation All. v. Forsgren, 336 F.3d 944, 955 (9th Cir. 2003) ("[F]ederal agencies cannot delegate the protection of the environment to public-private accords."); Gerber v. Norton, 294 F.3d 173, 184–86 (D.C. Cir. 2002) (USFWS may not delegate species protection obligations to a private permit applicant).

Yet FDEP's application relies on FWCC's assistance to determine impacts to listed species to justify FDEP's ability to adequately ensure no jeopardy to species and to satisfy the Clean Water Act's 404(b)(1) guidelines. See, e.g., Assumption Application B, app. (a)-1.  FDEP's application and MOU with USFWS and FWCC creates a procedure for FDEP and FWCC to conduct the necessary species analyses and in fact perform more functions than the Corps currently does under the Federal 404 program.  FDEP and FWCC will do initial determinations, determine the adequacy of avoidance measures, and determine the effect of the project.  FDEP is relying on FWCC to "ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone."  Assumption Application B, app. j-2, at 9–10.  While the MOU states USFWS' position is "determinative," there is nothing requiring USFWS to act nor is the MOU incorporated by law.  Id.  Moreover, USFWS' oversight on future permits is limited and highly dependent on their ability—and desire—to respond within the anticipated insanely tight timeclock restrictions.  BA at 77. Indeed, nothing in state law prevents FDEP from ignoring USFWS's recommendations.[16]

Lastly, the Florida Constitution grants FWCC only the power to regulate wildlife and freshwater and marine life.  Fla. Const, art. IV, § 9.  FDEP has not demonstrated that it has the authority to regulate species under state law that it now claims it would exercise in a state-assumed program. In addition, under Florida law, FWCC is constitutionally barred from regulating water pollution. "Unless provided by general law, [FWCC] shall have no authority to regulate matters relating to air and water pollution."  Id.  FWCC therefore cannot lawfully exercise its authority over species

---

[16] Indeed, the fact that some of FDEP's, USFWS', and FWCC's duties and requirements only appear in the MOU raises questions as to their enforceability by affected private citizens.

regulation to act as an essential decision-maker in Section 404, which is a water pollution program.

### 3. FDEP Does Not Have Sufficient Resources to Adequately Implement a State 404 Program

FDEP lacks the necessary the resources to properly implement, operate and enforce a State 404 program, particularly when FDEP has been unable to adequately resource its existing obligations.  The substantial impact the COVID-19 pandemic has had on state coffers only strains FDEP's resources further, undermining its baseless claim that it can take on a 404 program without a cent in additional resources.[17]

FDEP's application summarily asserts it can rely on existing resources to administer and enforce a 404 program while failing to disclose, among other things:  (1) FDEP's failure to meet existing regulatory obligations; (2) the significant budget cuts brought on by the global pandemic; and (3) the resource status and needs of other state agencies on which FDEP expects to rely to fulfill obligations under Section 404.

To determine the adequacy of Florida's authority and ability to administer the Clean Water Act Section 404 program, the EPA must assess the funding and manpower available for program administration and the estimated workload.  40 C.F.R. § 233.1(a); 40 C.F.R. § 233.11.  As raised already to the EPA, the holes in FDEP's application alone require the EPA to deny Florida's application or determine that FDEP's application is incomplete and require an adequate funding and staffing plan before resuming review of its application.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration"); Letter from Bonnie Malloy, supra.

FDEP's fanciful plan entails "reallocat[ing] existing positions and staff time from elsewhere in [FDEP]" (without demonstrating that FDEP has no competing duty to meet its "elsewhere" obligations) and offset the workforce losses to existing programs with new "efficiencies throughout [FDEP]" (without articulating what those efficiencies would be). Assumption Application B, app. e., at 8.  FDEP however only vaguely addresses these supposed "efficiencies" in its application—with a few potential examples like online applications—but fails to identify or quantify the workload or positions these basic efforts would eliminate or quantify gains that might be realized.

---

[17] FDEP has also recently been given more new duties to complete with limited staff and resources. Ryan Dailey, Florida DEP Gets New Duties, Including Septic Systems Oversight, Under New Law, WFSU, Jun. 30, 2020 (Exhibit 72).  The Florida legislature recently transferred authority of septic tank inspection from the Florida Department of Health to FDEP.  FDEP was also directed to update its regulations that apply to storm water systems.  Id.

In short, FDEP asks the EPA to take its word that the agency will figure its way out of having to allocate a single cent to operate and enforce an entire federal wetlands permitting program that has cost other states millions of dollars to undertake.[18]  This fails to demonstrate FDEP's ability to competently administer a state program, and calls into question the adequacy of any program that would not require a penny more to run.

FDEP's 404 Assumption Application likewise does not fully address or disclose all costs that will necessarily be associated with administering a 404 Program.  For example, FDEP fails to address: initial resources needed to process all pending (160) applications at the time of assumption, resource needs and costs required for compliance and enforcement of the pending applications that are approved, sufficient staffing, an adequate audit process, costs associated with reissuing general permits, the large area of permits where the claimed "85%" overlap of work with the ERP Program will not be achieved, and several costs associated with implementation.  See Doug Fry Aff. (Nov. 2, 2020) (Exhibit 73).

More specifically, FDEP will have to take over an estimated 160 pending 404 permit applications but has failed to even identify how many *trained* staff it has or will be needed to address this sudden influx and the necessary compliance and enforcement which will automatically follow.  Id. at 5–8.  FDEP has also not substantiated how they arrived at this 85% overlap figure which would not apply to FDEP's new workload of processing 404 permits for activities permitted under the ERP Program by the Water Management Districts and delegated local governments.  Id. at 15.  For these 404 permits, FDEP would not be processing the ERP permit nor does it have the in-house expertise to do so.  Id. at 15–17.  The projects processed under the ERP program by the Water Management Districts, for instance, are typically much larger in size and scope (i.e., seawall versus 10,000 acre commercial development), require in depth engineering review, involve hydrology expertise, and are more often located in inland freshwater systems (opposed to FDEP's experience with ERP in mainly coastal systems).  Id.

The staffing numbers that FDEP has provided are unrealistically low, id. at 8–10, and have not been supported with the underlying data necessary to evaluate them.  See Assumption Application B, app. e (tables are missing underlying data and limited methodology is unclear). These estimates also failed to account for the time spent reviewing permits that were denied or withdrawn.  Id. at 8.

FDEP's proposal also includes reliance on other state agencies, FWCC and the State Historic Preservation Office ("SHPO"), to ensure protection of listed species and cultural resources.

---

[18] Compare 404 Assumption SERC with Fla. Dep't of Env't Prot., Statement of Estimated Regulatory Cost, 62-330 (2012) (Exhibit 74).

Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020; Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program, Aug. 6, 2020.  However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.  FDEP's memorandums also do not commit these agencies to increasing their budgets to implement the Florida Program. Assumption Application B, app. j-1, j-2.

Interestingly, staff at both of those agencies have even expressed concern with FDEP's plan and their ability to administer the 404 program.  See Email from Lisa Gregg, Special Activity License Program, Fla. Fish & Wildlife Comm'n, to Jennifer Goff, Conservation Planning Services, Fla. Fish & Wildlife Comm'n, Jan. 14, 2020, 11:26 EST ("FDEP permit processors can't keep up with their current workload now and appropriately consider the impacts of proposed actions to fish and wildlife resources even if you hand it to them on a platter, much less if you added to their workload."); Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program at 9 (draft) (rev'd May 29, 2020) (Exhibit 75) (in response to a 15-day response deadline for a permittee' pre-review request SHPO employee stated "Providing consistent comments within 15 days may not be feasible for our Compliance Section.").

The unprecedented budget strains the State is now facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.  Tax revenues for the State plummeted in April, May and June 2020 as a result of the pandemic.  In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020–2021 budget in response to the crisis.  In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for the anticipated $3.4 billion loss for Fiscal year 2020–2021 resulting from the pandemic.  See Christine Sexton, Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19, Tampa Bay Times, Aug. 12, 2020 (Exhibit 76); Fla. Off. of Econ. & Demographic Rsch., Executive Summary:  Revenue Estimating Conference for the General Revenue Fund & Financial Outlook Statement (Aug. 14, 2020) (Exhibit 77).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely administer a new, complex Section 404 program—with so much less.  See, e.g., Doug Fry Aff.  FDEP's claim that it will be able to operate a Section 404 program without any additional funding from the State is untenable as further evidenced by the millions of dollars (ranging from 2–3 million to as much as 18 million) other states pursuing

assumption have estimated it to cost.[19]  FDEP's position can only mean it would treat a 404 program the same as its existing ERP program or suggests that FDEP simply will not adequately implement, operate or enforce a Section 404 program.  Both are indefensible and require the EPA to deny FDEP's assumption application.

### 4.  FDEP's Enforcement Record Continues to Demonstrate an Incapacity to Adequately Enforce Existing Programs, Much Less Adopt New Ones

As was described above, FDEP was gutted in recent years.  Editorial: The Rick Scott Record: An Environmental Disaster, Tampa Bay Times, supra (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs, provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship).

As a result, FDEP has been unable to meet its existing obligations to operate and enforce programs already under its purview.  This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and FDEP's grossly inadequate record of enforcing its existing programs.  See, e.g., Doug Fry Aff. (Exhibit 73); PEER, Report on Enforcement Efforts by the Florida Department of Environmental Protection: Calendar Year 2019 6 (2020) (Exhibit 81).

Year after year, analyses of FDEP's enforcement record have demonstrated an inability or unwillingness to meet enforcement obligations, ensure compliance with existing programs, and ultimately provide requisite protection to the State's valuable natural resources.  See Press Release, PEER, Florida Eco-Noncompliance Rises as Enforcement Wanes, Jun. 22, 2020 (Exhibit 82); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2019 (2020) (Exhibit 81); Press Release, PEER, Fewer Florida Eco-Inspections Equals Less Compliance, Sept. 17, 2019 (Exhibit 83); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2018 (2019) (Exhibit 84); Press Release, PEER, Florida Racks up Second Worst Eco-Enforcement in 30+ Years, Jul. 17, 2018 (Exhibit 85); PEER, Report on Enforcement Efforts By

---

[19] See, e.g., Va. Dept. of Env't Quality, Study of Costs and Benefits of State Assumption of the Federal § 404 Clean Water Act Permitting Program 2 (Dec. 2012), (Exhibit 78) (estimating assumption to cost $18 million over the first 5 years and $3.4 million annually thereafter); Minnesota Federal Clean Water Act Section 404 Permit Program Feasibility Study ix (Jan. 2017), (Exhibit 79) (estimated cost increase for state agencies is 4.796 million per year plus a one-time $3 million cost for developing online permitting systems); Az. Dep't of Env't Quality, Clean Water Act § 404 Assumption Roadmap Review Meeting 22 (Exhibit 80) (estimating assumption to cost $2.5 million annually and to be funded by application fees).

the Florida Department of Environmental Protection Calendar Year 2017 (2018) (Exhibit 86); Press Release, PEER Florida Eco-Enforcement Still Scraping Bottom, Aug. 29, 2017 (Exhibit 87); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2016 (2017) (Exhibit 88).

FDEP's own performance audits and employee testing show that it has failed in many respects to effectively administer its existing ERP Program, the same program the state now touts as the reason why it can so easily assume a 404 program without any additional resources. Internal audit records and employee testing provided to Earthjustice in response to public records requests demonstrate that FDEP has failed to adequately administer the ERP program and show FDEP's consistent inability to properly review permit applications and monitor and enforce issued permits.

For example, in 2013, FDEP staff were tested along with staff from Water Management Districts and specific counties in Florida to assess their skills in delineating wetlands. 2013 Training Test Module Result Summary and Analysis (Exhibit 89) "Though each [FDEP] district tended to have a few relatively high scores, the rest fell across a very wide range, often with the majority being below the statewide average." Id.

The same issues arise when reviewing the audit reports of FDEP staff's ERP permits. For example, the ERP Individual Permit Review for 2015 found that FDEP staff completed site inspections when required in less than half of reviewed examples, most documentation of wetlands impacts was "minimal," and only 24% of projects reviewed that required mitigation provided appropriate mitigation. Allyson Minick & Heather Mason, Submerged Lands & Env't Res. Coordination, Fla. Dep't of Env't Prot., 2015 ERP Individual Permit Reviews 13–14 (as edited 2017) (Exhibit 90). More recent audits of individual permits continue this pattern: few site inspections when required, inadequate mitigation required, and documentation of wetlands impacts missing. See (Exhibit 91) (compilation of individual permit audits provided to Earthjustice in response to public records requests).

Individual audits of compliance and enforcement activities for FDEP's existing ERP program that were provided to Earthjustice in response to public records requests are similarly littered with examples of inadequate documentation, assessment of insufficient or inaccurate penalties, requiring inappropriate or insufficient corrective actions. See (Exhibit 92) (compilation of compliance and enforcement audits provided to Earthjustice in response to public records requests)

Testimony during EPA's public hearings on Florida's assumption application also revealed extensive concerns over FDEP's failure to competently administer many of its other programs as well, such as its Total Maximum Daily Loads Program, Basin Management Action Plans, and

National Pollutant Discharge Elimination System Stormwater Program.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

The consequences of allowing an ill-equipped FDEP to administer the proposed Section 404 program are made all the more stark by the EPA's decision to waive almost all oversight of Florida's program otherwise available under the Clean Water Act, see 33 U.S.C. § 1344(j)-(k), that is not required to be retained under 40 C.F.R. § 233.51(b).  Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III(b) (Jul. 31, 2020).  EPA has not approved an assumption program in decades, and much has changed in the law and wetlands science since the early 1990s.  Never has a state with the vast waterways, wetlands and listed species that Florida enjoys assumed the 404 program.  For EPA to ensure this high-stakes assumption program complies with Section 404, EPA would have to retain the maximum monitoring and oversight possible for a minimum of two years before relinquishing its Section 404(j) authority.

In any event, the fundamental flaws in Florida's proposed program, combined with its utter lack of resources and capacity to undertake a Section 404 program, demonstrate that the application must be denied.

5. **Florida Does Not Afford Comparable Access to the Courts As That Available Under Federal Law**

Critical to citizen enforcement of a Section 404 program, Florida's access to the courts is far more restrictive than that allowed under federal law.  In its description of the "Administrative and Judicial Review" procedures available in Florida, FDEP fails to mention any of the State's several features that make Florida's administrative and judicial review procedures far more restrictive those available under federal law.  Assumption Application B, app. b.

For example, Florida's "Environmental Protection Act" only authorizes "a citizen *of the state*" to maintain an action for injunctive relief to compel government enforcement of environmental laws or against a person or non-governmental entity for violating our environmental laws.  Fla. Stat. § 403.412(2)(a) (emphasis added).  Paragraph (7) similarly states that "[i]n a matter pertaining to a federally delegated or approved program, *a citizen of the state* may initiate an administrative proceeding under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution." Id. § 403.412(7) (emphasis added).  The ability to intervene in proceedings brought under this statute is also limited to "citizens of the state."  Id. § 403.412(5).

Federal law, on the other hand, authorizes citizen suits under the Clean Water Act by "any citizen," 33 U.S.C. § 1365(a) (authorizing suit alleging violation of limitations under the chapter

or against EPA for failure to perform non-discretionary duty or act). The term "citizen" is defined as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Unlike the State's law, federal law does not require the adversely affected person to be a citizen of the state where the interest lies.

In addition, a litigant bringing an action under Fla. Stat. § 403.412 is subject to a mandatory fee-shifting provision that has no analog under the Clean Water Act. Under Fla. Stat. § 403.412(2)(f), attorneys' fees must be imposed in favor of any prevailing party and against the losing party, notwithstanding the good faith or merit of the litigant's position. While the State's statute exempts actions involving a state-issued National Pollution Discharge Elimination System permit from this mandatory fee-shifting provision, there is no such exemption for actions involving a Section 404 permit. Id. § 403.412(2)(f). Mandatory fee shifting under Fla. Stat. § 403.412 operates as a barrier to court access for litigants unwilling or unable to risk an adverse fee award no matter the strength of their case.

The Clean Water Act's citizen suit provisions, by contrast, do not require mandatory fee shifting to the prevailing party. Rather, the court "*may* award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party" as the court deems appropriate. 33 U.S.C. § 1365(d) (emphasis added).

Florida's Administrative Procedure Act also restricts access to courts as compared to federal law, by severely limiting the ability to establish standing. To establish associational standing, for example, organizations must demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct. See Florida Home Builders Ass'n v. U.S. Dep't of Labor, 412 So.2d 351 (Fla. 1982); Farmworker Rights Org., Inc. v. Dep't of Health & Rehab. Servs., 417 So.2d 753, 754–55 (Fla. 1st Dist. Ct. App. 1982) (to establish associational standing under section 120.57(1) organization must demonstrate that "a substantial number of its members, although not necessarily a majority, are substantially affected by the challenged rule," that "the subject matter of the challenged rule is within the association's general scope of interest and activity," and that "the relief requested is of a type appropriate for a trade association to receive on behalf of its members."); St. Johns Riverkeeper, Inc. v. St. Johns River Water Mgmt., 54 So. 3d 1051, 1054 (Fla. Dist. Ct. App. 2011) (under Florida APA, associational standing requires showing of harm to substantial interests of a substantial number of members; finding standing under sections 120.569 and 120.57 where organization had 1,500 members, including 50 in the relevant county, and that there had been more than 1,100 member participant ecological boat trips to the area); Friends of the Everglades, Inc. v. Bd. of Trustees of Int'l Imp. Tr. Fund, 595 So. 2d 186, 188 (Fla. Dist. Ct. App. 1992).

Under federal law, on the other hand, associational standing may be established on the basis of a single member's harms resulting from the challenged conduct. See Sierra Club v. Johnson, 436

48

F.3d 1269, 1279 (11th Cir. 2006) (associational standing of Sierra Club satisfied by affidavit of one member who suffered injury in fact).

Florida's more restrictive access to the courts would deprive affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.  This further demonstrates that the State should not be permitted to assume the program.

### 6.  Florida Has Not Adequately Defined Assumable Waters vs. Retained Waters

As demonstrated above, the issue of identifying Florida's assumable, versus retained, waters is a contentious issue with enormous consequences for the protections that will be afforded to Florida's waterways.  The Corps' sudden retreat to an exceedingly restrictive view of retained waters is unreasonable, and not based in fact.  We object to Florida's unduly expansive view of assumable waters—and to the Corps' unduly restrictive view of retained waters—and fully incorporate the comments raised in our letter to the Corps on April 18, 2018, as well as in our October 23, 2020, letter to EPA.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018, supra; Letter from Bonnie Malloy, supra.

The Corps' failure to follow through on its 2018 notice and comment opportunity for stakeholders to weigh in on this critical question, and the Corps' failure to perform the requisite navigability assessments contemplated with that public notice, undermines the validity of its current view that so few waters belong on its retained list.  To the contrary, federal law requires that the Corps retain jurisdiction over many more important waterways in Florida.  The Corps' ceding jurisdiction over those waters to Florida for purposes of 404 assumption violates the Rivers and Harbors Act and renders EPA approval of such a program untenable.

In addition, the Corps has advised in the MOA between FDEP and the Corps, 40 C.F.R. §233.14, to provide a retained waters GIS layer to the FDEP.  However, this information has not been provided to the public, despite multiple requests, nor, to the undersigned's knowledge, has it been provided to the State.

The Corps has not indicated whether that GIS layer will simply identify retained waters, whether it will actually depict their mean high water lines (MHWL)/ordinary high water marks (OHWM), or the actual pre-determined location of the administrative boundary.  It can be quite difficult for staff and applicants to determine such lines, marks, and boundaries, particularly if an applicant's property is not located directly abutting the MHWL/OHWM (where those lines might be discernable by an applicant without a survey), and can be costly where the lines/marks need to be determined by a registered professional.

The only information provided to the public and the EPA is a list of waters provided in FDEP's application.  404 Handbook B, app. A.  This list however fails to list numerous waterbodies that were previously on the Corps Retained Waters List in 2017 and that were submitted to the Corps during its comment period in 2018 discussed above in section III.  The Conservancy of Southwest Florida and Waterkeepers Florida both submit comments addressing these missing waters which are incorporated herein.  Letter from Amber Crooks, Conservancy of Sw. Fla., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 93); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 94).

Lastly, Florida's adoption of an only 300-foot buffer zone is unreasonable and inadequate.  The only other states to have assumed a 404 program have utilized the more protective 1,000 foot buffer, and no less should be required of Florida in order to satisfy the Clean Water Act.

### 7.  Florida's Waterways, Public Cannot Afford to Lose Existing Federal Safeguards

Florida's unique, and exceptionally valuable, waterways require the maximum protection available under federal law, not a reduction in protections that would follow from FDEP's assumption of Section 404.  History has taught that the availability of NEPA review, and the involvement of the Corps in wetlands permitting, have been essential to safeguarding precious resources in Florida.

### a.  NEPA Safeguards Are Essential Protecting Florida's Wetlands

As stated above, Florida has touted the loss of NEPA review under an assumed state program as a "benefit" and "cost-saving" measure for permit applicants.  It is a massive net loss, however, to the public and to protection of Florida's waterways.

Enacted in response to mounting crises across the nation, NEPA promised to correct the blind eye that American policymakers had long turned to environmental impacts of federal agency actions.  See S. Rep. No. 91-296, at 4–5 (1969) ("As a result of this failure to formulate a comprehensive national policy, environmental decisionmaking largely continues to proceed as it has in the past.  Policy is established by default and inaction. Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.").  Congress recognized that "[t]raditional policies were primarily designed to enhance the production of goods and to increase the gross national product .... [b]ut [that], as a nation, we have paid a price for our material well-being."  Id.  With the understanding that "the Nation cannot continue to pay the price of past abuse," id., Section

101 of NEPA imposes on the national government an obligation "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  NEPA § 101(a), codified at 42 U.S.C. § 4331(a).  The government thus had the "continuing responsibility" to, among other things, "assure for all Americans, safe, healthful, productive, and esthetically and culturally pleasing surroundings."  Id. § 101(b)(2).

NEPA also looked to the future:  Congress committed the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."  Id. § 101(b)(1).  Prior to NEPA, federal policymaking did not systematically consider long-term environmental degradation.  Instead, the "pursuit of narrower, more immediate goals" had fostered increasing "threats to the environment and the Nation's life support system."  See S. Rep. No. 91-296, at 8–9 ("The challenge of environmental management is, in essence, a challenge of modern man to himself. The principal threats to the environment and the Nation's life support system are those that man has himself induced in the pursuit of material wealth, greater productivity, and other important values. These threats—whether in the form of pollution, crowding, ugliness, or in some other form—were not achieved intentionally. They were the spinoff, the fallout, and the unanticipated consequences which resulted from the pursuit of narrower, more immediate goals.").  NEPA was enacted as a change in course, forcing policymakers to consider "the long-range implications of many of the critical environmental problems" facing the nation.  See id. at 8.

To fulfill its promises, NEPA mandated that federal agencies consider the environmental impacts of their decisions.  NEPA § 102.  Congress directed federal agencies to meet three goals: First, federal decisions must be informed by detailed environmental analyses.  Second, decision makers must develop, study, and consider alternative courses of actions allowing a comparison of the potential environmental impacts of such alternatives.  Id. § 102(2)(C)(iii), (E); see Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).  And third, agencies must involve the public in this evaluation and decisionmaking process.

To this end, NEPA requires that the government:

> utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment[.]

NEPA § 102(2)(A).  Agencies must also provide a "detailed statement" on the environmental impacts of proposed decisions "significantly affecting the quality of the human environment" (known as an environmental impact statement or EIS). Id. § 102(2)(C).  Within that detailed statement, agencies must disclose "any" unavoidable adverse environmental effects of the

decision.  Id. § 102(2)(C)(ii).  And they must disclose "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  Id. § 102(2)(C)(v).  Moreover, NEPA does not allow agencies to ignore analytic gaps: agencies must find ways to properly weigh "unquantified environmental amenities and values."  See id. § 102(2)(b).

NEPA directs federal decisionmakers to study and consider alternatives to their decisions, allowing comparisons the environmental impacts of such alternatives.  See id. § 102(2)(C)(iii), (E); Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).  In particular, federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action" in "any proposal which involves unresolved conflicts concerning alternative uses of available resources," even if its impacts do not rise to the level requiring an EIS.  NEPA § 102(2)(E).  See Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).

NEPA mandates inclusion of and disclosure to the public and other governmental entities of environmental impact analyses.  The statute broadly directs agencies to act "in cooperation" with governmental entities and the public in the decision-making process.  NEPA § 101(a).  Further, agencies must make available "advice and information useful in restoring, maintaining, and enhancing the quality of the environment" to "States, counties, municipalities, institutions, and individuals."  Id. § 102(2)(G).

Unfortunately, as explored in more detail herein, Florida's proposed assumption of the Section 404 program conflicts with NEPA's mandate.  The proposal, if accepted, would lead Florida's agencies to make decisions with significant, and sometimes devastating, environmental impacts without ever considering those impacts in advance.  It would raise barriers to public participation.  And at the end of the day, it would lead to poor decisions, increased litigation, and less transparency.

There are many examples where the NEPA process has been essential to improving proposed projects that would otherwise have had devastating impacts in Florida.  The 2005 draft EIS for the Everglades Agricultural Area Reservoir, for example, was the document that first raised issues related to water quality highlighting the need for additional stormwater treatment acreage as part of the project.  The approach to water quality has improved in the most recent iteration of the project earlier this year as environmental groups and agencies acknowledged the importance of adequately addressing this important issue.  The Corps' initial 2018 NEPA analyses helped further refine areas of uncertainty associated with the project that once addressed will improve its final design and performance.  Letter from S. Ansley Samson, Everglades Law Ctr., & Shannon Estenoz, Everglades Found, to Mary B. Neumayr, Council on Env't Quality, Aug. 20, 2018 (Exhibit 95).

The Combined Operations Plan for the southern portion of the Central and Southern Florida (C&SF) Project involved three increments of changes to operations in the southern portion of the C&SF Project (over 3+ years).  Through the associated NEPA processes, environmental and economic stakeholders in South Florida and the Florida Keys were able to articulate proposed operational changes to improve environmental conditions in Florida Bay, relying in part on the information made available in draft EISs and environmental assessments describing the proposed changes.  Stakeholders continue to raise these issues in ongoing discussions of a final operations plan for recently constructed restoration infrastructure.  Because of NEPA, agencies were fully informed of the broad range of stakeholder perspectives and of uncertainties related to the extent to which these projects will deliver the return on taxpayer investment they are intended to produce when operated under certain conditions.  Id.

Florida has no state statutory counterpart to NEPA.  Approving a state 404 program in Florida therefore deprives the public of the procedural protections and opportunity to participate that are available under federal law through NEPA.

State-issued permits would not be held to NEPA standards, or be subject to challenge in federal court for failing to comply with NEPA.  The public would thus be deprived of necessary safeguards to ensure vital protections.

NEPA safeguards under federal law have been vital to protecting wetlands in Florida when federal agencies have fallen short of their obligations.  In Florida Wildlife Federation v. United States Army Corps of Engineers, 401 F. Supp. 2d 1298 (S.D. Fla. 2005), for example, deficiencies in complying with the NEPA process for a major development with significant impacts on wetlands planned for Palm Beach County ultimately resulted in modification and re-location of the project to avoid those impacts. There are many such examples where, when the federal government failed to meet NEPA obligations, the agency was held to account under NEPA, resulting in better process and outcomes for Florida's environment.  (Exhibit 96) (compilation of articles from Florida, Protect NEPA, https://protectnepa.org/success-stories/florida (last visited Nov. 2, 2020)).

**b. The Corps Has Served As Essential Backstop to Harmful FDEP Permit Approvals**

As testimony throughout EPA's public hearings illuminated, the Corps has acted as a backstop for FDEP decisions that were not sufficiently protective of the environment.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.  Whether it is the reduced potential for local political pressure or application of the NEPA process, the Corps does not always agree with FDEP on what is permittable activities.  For example, in 2016, FDEP issued a permit for a mitigation bank known as Long Bar Pointe for 260.8 acres along 2 miles of coastline fronting on

Sarasota Bay to Long Bar Pointe.  Fla. Dep't of Env't Prot., Notice of Intent to Issue Environmental Resource/Mitigation Bank Permit, No. 338349-001, Apr. 28, 2016 (Exhibit 97).  This was a highly controversial project that resulted in the demotion and firing of two FDEP employees who raised concerns over the permit application.  Bruce Ritchie, <u>DEP Employee Suspended in 2012 Speaks Out About Her Experience—and the Future</u>, Politico, Mar. 3, 2017 (Exhibit 98) (Former FDEP employee discussing her demotion and the permittee's ability to pressure FDEP); Kathy Prucnell, <u>Environmentalist Appeals Long Bar-DEP Mitigation Permit</u>, Islander (last visited Oct. 31, 2020) (Exhibit 99); Kathy Prucnell, <u>Trio of FISH, Waterkeeper, McClash Challenge Long Bar Permit</u>, FISH Blog, May 24, 2016 (Exhibit 100).  Months after FDEP's permit approval, the Corps refused to permit the Long Bar Pointe Mitigation Bank finding it did not have the potential to provide sufficient compensatory mitigation to compensate for unavoidable impacts to waters of the United States.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, Sept. 14, 2016 (Exhibit 101).  The Corps denied the mitigation bank application a second time on May 5, 2017.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, May 5, 2017 (Exhibit 102); Hannah Morse, *Corps Denies Long Bar Pointe's Second Mitigation Bank Proposal*, Bradenton Herald, May 5, 2017 (Exhibit 103).  In other words, the Corps did not think it could actually operate as a mitigation bank.

## Conclusion

Based on the foregoing, we respectfully urge EPA to deny Florida's application.

Sincerely,

Tania Galloni
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd.
Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

Bonnie Malloy
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

Christina I. Reichert
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd.
Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
creichert@earthjustice.org

Copies to:

Colonel Andrew Kelly, District Commander
Department of the Army
Jacksonville District Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019
Via Email Andrew.d.kelly@usace.army.mil; CESAJ-OC@usace.army.mil

Leopoldo Miranda, Regional Director
U.S. Fish and Wildlife Services
Regional Director's Office-R4
1875 CENTURY BOULEVARD, SUITE 400
Atlanta, Georgia 30345-3319
Via Email Leopoldo_miranda@fws.gov

Roy E. Crabtree, Ph.D., Regional Administrator
National Marine Fisheries Service
Southeast Regional Office
263 13th Avenue South
St. Petersburg, FL, 33701
Via Email Roy.Crabtree@noaa.gov

# Exhibit D



December 22, 2020

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
wheeler.andrew@epa.gov

> **Re:**   **EPA Approval of Florida's Application to Assume Administration of a Clean Water Act Program (Docket # EPA-HQ-OW-2018-0640-0001; EPA-HQ-OW-2018-0640); Effective Date, Failure to Codify**

Dear Administrator Wheeler:

On December 17, 2020, you announced EPA's approval of Florida's request for authorization to assume jurisdiction over permitting under Section 404(a) of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the United States.  On December 22, 2020, EPA's approval of the program was published in the Federal Register, stating that "Florida's program assumption will be applicable December 22, 2020."  85 Fed. Reg. 83,553 (Dec. 22, 2020).

To the extent EPA intended to convey an immediate effective date for the transfer of 404 authority to the state, we write to advise you that an immediate effective date is in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(d).  Section 553(d) provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date."  Id.  The only exceptions to the 30-day period between publication and effective date occur when the rule is: (1) a substantive rule that "grants or recognizes an exemption or relieves a restriction;" (2) an interpretive rule or statement of policy; or (3) "the agency otherwise provides for good cause found and published with the rule."  Id. § 553(d)(1)– (3).  None of those exceptions apply here.

EPA regulations require that notice of a state program approval be published in the Federal Register, and provide that transfer of an approved 404 program to the state "shall not be considered effective until such notice appears in the Federal Register" and that the U.S. Army Corps of Engineers "shall suspend issuance" of 404 permits in state-assumed waters "on such effective date."  40 C.F.R. § 233.15(h).  The regulations do not authorize an immediate effective date.  To comply with the APA, the transfer of 404 authority to a state is not effective until thirty days following publication of EPA's approval in the Federal Register.

Moreover, EPA's December 22, 2020, approval notice fails to codify the state program in the Code of Federal Regulations, 40 C.F.R. Subpart H – Approved State Programs.  See 85 Fed. Reg. 57,853 (Sept. 16, 2020) ("If EPA approves this program, EPA will also codify the approved program in 40 CFR 233 subpart H.").  Codification is required for all documents of an agency "having general applicability and legal effect ... and ... relied upon by the agency as authority." 44 U.S.C. § 1510(a); 1 C.F.R. § 21.1.

The state program therefore does not have the force of law, and the authority to administer Section 404 of the Clean Water Act in Florida remains with the U.S. Army Corps of Engineers.

Sincerely,

Tania Galloni, Managing Attorney
EARTHJUSTICE
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

cc:   David Fotouhi, Acting General Counsel, U.S. Environmental Protection Agency
      fotouhi.david@epa.gov

      Oliver Potts, Director of the Federal Register, Office of the Federal Register
      oliver.potts@nara.gov

      Lt. General Scott A. Spellmon, Chief of Engineers, U.S. Army Corps of Engineers
      scott.a.spellmon.mil@mail.mil

      Colonel Andrew Kelly, U.S. Army Corps of Engineers,
      andrew.d.kelly@usace.army.mil

      Noah Valenstein, Secretary, Florida Department of Environmental Protection
      noah.valenstein@dep.state.fl.us

      Justin George Wolfe, General Counsel, Florida Department of Environmental Protection
      justin.g.wolfe@dep.state.fl.us

# Exhibit E



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
Washington, D.C. 20460

OFFICE OF
GENERAL COUNSEL

December 28, 2020

Justin G. Wolfe
General Counsel
Florida Department of Environmental Protection
3900 Commonwealth Blvd M.S. 35
Tallahassee, FL 3239

Re:    Effective Date of EPA's Approval of Florida's Application to Assume Administration of the
       Clean Water Act Section 404 Program

Dear Mr. Wolfe:

As you know, on December 17, 2020, EPA approved Florida's request for authorization to
assume jurisdiction over permitting under Section 404(g) of the Clean Water Act of 1972
("CWA"), 33 U.S.C. § 1344, in waters of the United States.  On December 22, 2020, EPA published
notification of its approval of the program in the Federal Register, which stated that "Florida's program
assumption will be applicable December 22, 2020."  85 Fed. Reg. 83,553 (Dec. 22, 2020).  That same
day, EPA received a letter from Earthjustice questioning the effective date of Florida's 404 assumption.  I
am writing to reaffirm that, as of December 22, 2020, Florida's program is in effect.

The applicability date of December 22, 2020 is consistent with the CWA, its implementing regulations,
and the Administrative Procedure Act ("APA").  CWA Section 404(h)(2)(A) provides that if EPA
determines, based on a state program submittal, that a state has the requisite authority to administer the
Section 404 program, EPA shall approve the program and so notify the state and the US Army Corps of
Engineers ("Corps").  As soon as the state notifies the Corps that it is administering the program, the
Corps must suspend issuance of permits for activities with respect to which the state may issue permits.
33 U.S.C. § 1344(h)(2)(A).  On December 23, 2020, Florida notified the Corps that effective December
22, 2020, FDEP is administering the Section 404 program as approved by EPA.

EPA's regulations implementing CWA Section 404(h)(2)(A) clarify the process through which a state
program becomes effective and ensure transparency through Federal Register publication.  Specifically,
pursuant to EPA's regulations, if EPA approves the state's Section 404 program, EPA notifies the state
and the Corps of its decision and publishes notice in the Federal Register.  Transfer of the program to the
state "shall not be considered effective until such notice appears in the Federal Register."  40 C.F.R. §
233.15(h).  Pursuant to the regulatory requirements, EPA notified the state and the Corps of its approval,
and the program became effective on December 22, 2020 (the date that notice was published in the
Federal Register).

The applicability date of December 22, 2020 also is consistent with the requirements of the APA.  Under that statute, a "rule" includes "statements of general or particular applicability and future effect" that "implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  By contrast, an "adjudication" refers to an "agency process for the formulation of an 'order.'"  *Id.* at § 551(7).  "[O]rder" means the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing . . . ."  *Id*. § 551(6).  Agencies may use adjudications to apply general rules to address specialized or fact-specific questions.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947).  EPA's approval of Florida's Section 404 program was an adjudication, not a rulemaking, that applied the existing requirements of CWA Section 404 and 40 C.F.R. part 233 in assessing Florida's application to assume the program.  Therefore, the APA's requirement that the effective date of a rule generally be delayed for 30 days, 5 U.S.C. § 553(d), does not apply to EPA's approval.  Rather, the adjudication was immediately effective pursuant to the program effective date process laid out in the CWA and implementing regulations cited above.

For the same reason that the APA's requirements related to a rule's effective date do not apply to EPA's approval of Florida's Section 404 program, the statutory and regulatory requirements requiring rule codification also do not apply.  The Federal Register Act requires codification in the Code of Federal Regulations for agency documents "having general applicability and legal effect . . . and . . . relied upon by the agency as authority."  44 U.S.C. § 1510(a).  EPA's approval of Florida's program is not an agency rule "having general applicability and legal effect," but rather is an adjudication that applies general rules to Florida's specific program assumption application.  The C.F.R. codification requirement therefore does not apply to EPA's approval of Florida's program.

EPA has stated that it intends to codify the approved program in the C.F.R.  85 Fed. Reg. 57,853 (Sept. 16, 2020) ("If EPA approves this program, EPA will also codify the approved program in 40 C.F.R. 233 subpart H.").  However, as explained above, EPA's approval has taken effect pursuant to the relevant provisions of the CWA and EPA's regulations and is not contingent upon the forthcoming codification.  EPA's plan to codify the program is for the sole purpose of ensuring transparency and clarity about Florida's program for the public, as well as for consistency with the Agency's past practice in approving states' applications for Section 404 program assumption, not because its approval is a rule that requires C.F.R. publication.  Because EPA is not required to codify its approval in the C.F.R., and such codification is immaterial to the effective date of EPA's approval, the fact that it is not yet codified is irrelevant for purposes of the effective date of Florida's Section 404 program.

Congratulations on Florida's assumption of the Section 404 program.  We look forward to cooperating with you in EPA's oversight capacity to ensure the protection of Florida's aquatic resources consistent with the requirements of the CWA.  If you would like to discuss further any of the topics discussed in this letter, please do not hesitate to contact me.


                    Sincerely,


                    David Fotouhi
                    Acting General Counsel

# Exhibit F



January 20, 2021
Via Email sawyers.andrew@epa.gov

Andrew Sawyers, Director
Office of Water
Environmental Protection Agency (EPA)
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

      **Re:**    **Request for Expedited Action; <u>Ctr. for Biological Diversity, et al., v.
Wheeler</u>, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)**

Dear Director Sawyers:

On January 14, 2021, the Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper (collectively, the "Plaintiffs") initiated this litigation to challenge EPA's recent approval of the state of Florida's application to administer a Clean Water Act Section 404 permitting program. 33 U.S.C. § 1344(g)–(h). (<u>See</u> Exhibit 1 (Complaint).) EPA transferred authority to administer Section 404 to the state without giving the state program legal effect by claiming the approval was an "adjudication" rather than a rule, and failing to codify the program. The Administrative Procedure Act ("APA") grants EPA authority to "postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. § 705. We respectfully request that EPA recognize that the transfer of authority was not lawful or, alternatively, if EPA lawfully promulgates a rule approving and codifying the state program, that the agency postpone its effective date.

EPA's approval of Florida's program represents a significant and unlawful departure from longstanding policy and practice. The decision has national implications, as Administrator Andrew Wheeler encouraged other states to follow this model when he announced the decision.[1] First, it relies on an unlawful programmatic biological opinion and incidental take statement authorizing an unknown amount of take for an unknown number of endangered species, while extending protection from liability to the state and state permittees, all by relying on a patently deficient and unenforceable technical assistance process not authorized by Congress. Second, it authorizes a program that shields an entire class of violations from criminal liability by imposing a higher mens rea standard than the negligence standard required by the Clean Water Act.[2]

---

[1] U.S. Envtl. Prot. Agency, <u>EPA Approves Florida's Request to Administer the Clean Water Act Section 404 Program</u>, YouTube (Dec. 17, 2020), https://youtu.be/QLUr-sMRRmo.
[2] The Court of Appeals for the Ninth Circuit recently held that EPA abused its discretion approving a state program on this basis alone. <u>See</u> Idaho Conservation League v. U.S. Envtl. Prot. Agency, 820 F. App'x 627 (9th Cir. 2020). Florida's program suffers a number of other deficiencies as articulated in the complaint, including by asserting jurisdiction over an unprecedented, and unlawful, breadth of waters based on unsupported changes to the Corps' retained waters list. 33 C.F.R. §§ 329.14, 329.16.

If expedited relief is not granted, Plaintiffs in the pending litigation are likely to suffer irreparable harm. While the state unlawfully administers this program, Plaintiffs, the public, and federally recognized tribes are also denied other rights and remedies available under federal law, including the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and the National Historic Preservation Act, 4 U.S.C. §§ 300101 et seq.

### **Request for Expedited Action**

EPA claims to have effectuated the transfer of 404 authority to the state based on a December 22, 2020, notice approving the application effective immediately. (Exhibit 2.) EPA did not publish its approval of the state application as a rule, however, and did not codify the state program. Instead, EPA took the position that the action was an "adjudication," and that codification was optional. (Exhibit 3.) Adjudications, however, are case-specific, individual determinations that are judicial in nature and apply retroactively to parties in the dispute, not to the public at large. Safari Club Int'l v. Zinke, 878 F.3d 316, 332–33 (D.C. Cir. 2017). A rule, by contrast, includes agency actions of general or particular applicability designed to implement the law. 5 U.S.C. § 551(4). If an agency action "has the force of law," then it is a rulemaking. Gen. Motors Corp. v. E.P.A., 363 F.3d 442, 448 (D.C. Cir. 2004). Codification is required for all documents of an agency "having general applicability and legal effect."[3] 44 U.S.C. § 1510(a).

For the transfer to have legal effect, EPA would have to publish the approval of the state program as a rule and codify it. See 49 Fed. Reg 38,947-01 (Michigan program approval published as notice and regulation, codified); 59 Fed. Reg. 9,933-01 (New Jersey program approval published as final rule, codified); 85 Fed. Reg. 57,853, 57,855 (Sept. 16, 2020) (indicating Florida approval would be published and codified). EPA would also have to allow at least 30 days between publication of the rule and its effective date. 5 U.S.C. § 553(d).

Based on the foregoing, we respectfully request that EPA: (1) recognize that the transfer of authority has not been legally effectuated, and so notify the public and the state; (2) alternatively, publish the notice of approval and codification of the state program as a rule, and postpone the effective date of that rule pending judicial review, 5 U.S.C. § 705; and (3) initiate withdrawal of the approval in accordance with 33 U.S.C. § 1344(i), 40 CFR § 233.53(b)–(c).

---

[3] On January 15, 2021, EPA posted to its website a prepublication notice of a rule to codify the state program. (Exhibit 4.) The agency adhered to the position that its prior approval of the program was an adjudication rather than a rulemaking, and that the adjudication effectuated the transfer of authority and gave legal effect to the state program. (Id.) EPA described the anticipated codification of the program as "voluntary and ministerial" (id.) and stated that it did "not affect Florida's authority to administer the CWA 404 program" (id.). The codification rule was not published to the Federal Register website for public inspection by the close of business on January 19, 2021. It also would not cure the agency's failure to promulgate the program approval as a rule.

**Factual Background**

In a December 27, 2010, letter, EPA articulated its position that Section 7 consultation under the Endangered Species Act ("ESA") is not required when the agency transfers authority over Section 404 to a state. (Exhibit 5.) To support this position, EPA relied on National Association of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 673 (2007), which held that the consultation and no jeopardy requirements of Section 7 are not triggered by the transfer of Section 402 National Pollutant Discharge Elimination System ("NPDES") permitting authority to a state because the transfer is not discretionary, but mandated, once certain criteria are met. While EPA recognized some differences between Sections 402 and 404, EPA concluded that the same reasoning applied to transfers of authority under Section 404. (Exhibit 5.)

In 2019, Florida asked EPA to engage in ESA Section 7 consultation with U.S. Fish and Wildlife Services ("USFWS") and National Marine Fisheries Service ("NFMS") for purposes of its consideration of the state's request to assume jurisdiction over the 404 program. Florida made this request for the purpose of securing a programmatic biological opinion and incidental take statement to shield the state and its permittees from incidental take liability without having to follow the process set forth by Congress in Section 10 of the ESA.

On May 21, 2020, EPA invited "public comment on whether it "should reconsider its current position that consultation under Endangered Species Act (ESA) section 7 is not required when the EPA approves a state or tribe's request to assume the Clean Water Act (CWA) section 404 dredged and fill permit program under the CWA." 85 Fed. Reg. 30,953.

While that question was pending before EPA, on August 5, 2020, USFWS and Florida agencies developed a "Memorandum of Understanding" ("MOU") which provided:

> Upon assumption of the Section 404 Program, coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, **which is anticipated to be outlined in the USFWS's biological opinion** based on information included in the biological assessment submitted by EPA.
>
> * * *
>
> **Incidental take for federally listed species** will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption.

(Exhibit 6 (emphasis added).)

On August 20, 2020, Florida submitted its application to assume jurisdiction over the 404 program. The application included an MOU but did not include the technical assistance process that was anticipated to be outlined in a forthcoming biological opinion. On August 28, 2020, EPA deemed the application complete as of the date of submission, triggering a statutory 120-

3

day deadline to approve or deny the application unless EPA and the state agreed to extend the timeline.  (Exhibit 7.)  See 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a).

On August 27, 2020, Assistant Administrator David Ross issued a memorandum announcing that EPA had "reconsidered its prior position, articulated in 2010, that the decision to approve a state or tribal CWA Section 404 program does not trigger ESA Section 7 consultation."  (Exhibit 8.)  EPA explained that it had been persuaded by the state's advocacy for a one-time ESA Section 7 programmatic consultation in conjunction with EPA's initial review of an assumption application "as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies" by providing a programmatic incidental take statement, preferable to the status quo of requiring permittees to "avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10." (Id.)

On September 2, 2020, EPA submitted an "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" to USFWS to initiate formal consultation on Florida's application.

On September 16, 2020, EPA issued a notice and request for comment on "Florida's Request to Assume Administration of a Clean Water Act Section 404 Program."  85 Fed. Reg. 57,853.  The opportunity to comment closed on November 2, 2020.  Id.

On October 21, and October 23, 2020, counsel for the Plaintiffs in this litigation urged EPA to reconsider its determination that the state's assumption application was complete as of submission for three reasons:  (1) the failure to demonstrate how the state would ensure no jeopardy to listed species given its reliance on a "technical assistance" process to be outlined in a programmatic biological opinion that was anticipated, but not yet in existence; (2) the failure to adequately identify the waters over which the state would assume jurisdiction; and (3) the failure to demonstrate adequate staffing and resources to administer the program, which the state claimed would not require a penny in additional funding, even at a time when state coffers were under serious strain from the economic impacts of a pandemic, requiring budget cuts.  (Exhibit 9.)

On November 2, 2020, Plaintiffs submitted extensive public comments identifying deficiencies in the state program on many key matters, such as permit review, permit conditions, general permits, emergency permits, compliance monitoring, and enforcement.  In particular, we noted the state's failure to provide a criminal intent standard as stringent as that required by federal law for violations of the permitting program.  (Exhibit 10.)

On November 17, 2020, more than two weeks after public comment closed, USFWS issued the programmatic biological opinion and incidental take statement outlining the technical assistance process on which the state relied.  These documents were not made available for public comment.  The programmatic biological opinion failed to analyze the status of the species, environmental baseline, effects of the action, or cumulative effects.  16 U.S.C. § 1536.  The incidental take statement failed to specify the amount or extent of incidental take, impose a limit on incidental take, or specify a take-based trigger for reinitiating consultation, all in violation of

4

the ESA.  16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)–(4), 402.16(a).  The incidental take statement extended protection from liability not only to EPA, but also to the state and state permittees so long as they complied with permit conditions created through the technical assistance process that would largely be left in the hands of the state, contrary to federal law.

On December 14, 2020, EPA requested comment on a proposed rule relating to "Criminal Negligence Standard for State Clean Water Act 402 and 404 Programs."  85 Fed. Reg. 80,713.  EPA's proposed rule purported to continue to require state programs to have criminal intent standards as stringent as those provided by federal law, while adding that states could adopt "any" criminal negligence standard.  Public comment closed on January 13, 2020.

On December 17, 2020, Administrator Andrew Wheeler announced approval of Florida's program at a press conference in Washington, D.C., and encouraged other states to follow Florida's example as a model.[4]

On December 22, 2020, EPA published notice of the approval, but failed to codify the program.  85 Fed. Reg. 83,553.  See 44 U.S.C. § 1510(a) (requiring codification of rules).  EPA purported to give the action immediate legal effect, but failed to articulate a lawful basis to do so.  5 U.S.C. § 553(d).

On December 22, 2020, Plaintiffs notified EPA that its failure to codify the program and afford the required 30-day period between publication and effective date meant that the state program did not have the force of law and that the authority to administer the Section 404 program in Florida remained with the U.S. Army Corps of Engineers.  (Exhibit 2.)

On December 28, 2020, EPA responded with a letter to the state, asserting that its December 22, 2020, action was an adjudication, rather than a rule, and that the adjudication did not require a 30-day period between publication and effective date or codification.  (Exhibit 3.)  EPA asserted that this action authorized the state to administer its program.

On January 14, 2021, Plaintiffs filed the currently pending action challenging EPA's decision and related actions as unlawful.  Ctr. for Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. January 14, 2021).  (See Exhibit 1.)

## APA Section 705 Request

Should EPA lawfully promulgate a rule authorizing the state program, Plaintiffs in the pending litigation respectfully request a postponement of the rule's effective date pending judicial review.  To qualify for a Section 705 stay, Plaintiffs must establish that they are likely to succeed on the merits of their claims, that they will suffer irreparable harm absent preliminary relief, that the balance of equities weighs in their favor, and that a preliminary injunction would be in the public interest.  In re Public Service Company of New Hampshire, 1977 WL 45581, at *6 (E.A.B. Aug. 12, 1977).  Plaintiffs have met this standard.

---

[4] U.S. Envtl. Prot. Agency, EPA Approves Florida's Request to Administer the Clean Water Act Section 404 Program, YouTube (Dec. 17, 2020), https://youtu.be/QLUr-sMRRmo.

1. **Likelihood of Success on the Merits.**

Plaintiffs are likely to succeed on the merits of their claims that EPA's approval of the state program violates federal law. For purposes of this stay request, Plaintiffs focus on two, critical violations. First, EPA's approval was unlawful because the state's application failed to demonstrate the authority to ensure "no jeopardy" to listed species and relied on an anticipated programmatic biological opinion and incidental statement that, when finally issued, did not comply with federal law. In addition, the agency failed to provide the public with an opportunity to comment on those elements of the state's application, which were submitted to EPA after the public comment period had ended. Second, EPA's approval was unlawful because it allowed the state to eliminate an entire class of permit violations from criminal liability, thereby allowing the state to administer the program without demonstrating the enforcement authority required by federal law.

A. **USFWS' Programmatic Biological Opinion and Incidental Take Statement, on Which EPA's Approval Relied, Are Unlawful.**

EPA's approval of the state program relied on an unlawful programmatic biological opinion and incidental take statement that failed to include the amount or extent of take, monitoring measures, or reasonable terms and conditions. Additionally, the incidental take statement extends take liability coverage for the state and state permittees for the life of the program through an unlawful and unauthorized "technical assistance" process that gives the state the authority to make all meaningful decisions affecting listed species.

Congress enacted the ESA to, among other things, "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(2)(b). An "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 174 (1978).

The ESA prohibits any person, including private parties, states, and federal agencies, from "taking" an endangered species and authorizes suits to enforce the ESA and its implementing regulations. 16 U.S.C. §§ 1538(a)(1)(B), 1540(g)(1). Congress created two distinct paths to ensure that actions do not jeopardize the survival and recovery of protected species, and which can exempt parties' otherwise lawful actions from incidental take liability: (1) Section 7, Interagency Cooperation, which applies to federal agency actions, id. § 1536; and (2) Section 10, Exceptions, which applies to non-federal actions, id. § 1539. Congress enacted these mechanisms to provide protection from liability only so long as the specific measures developed by Congress to ensure protection of species were followed. USFWS' approach here does not comply with either.

When conducting a programmatic biological opinion, an incidental take statement is not required. 50 C.F.R. § 402.14(i)(6). However, if a federal action undergoing consultation includes an "incidental take statement" then it must specify the amount and extent of incidental take of the listed species that may occur without causing jeopardy or adverse modification,

include "terms and conditions," and provide for monitoring of take.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)–(3).  The statement must specify the permissible level of taking (or "trigger") and specify the impacts such taking will have on affected species.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).  This "trigger" denotes an unacceptable level of take that invalidates the safe harbor that extends take liability coverage and requires the federal agencies to immediately reinitiate consultation.  50 C.F.R. §§ 402.14(i)(4), 402.16(a).  The "trigger" must be rational and cannot be an amount of take that causes jeopardy.  Id. § 402.14(i)(4); Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 911 (9th Cir. 2012).

Section 7 prohibits federal agencies from taking actions that would cause jeopardy to protected species or adversely modify their critical habitat.  16 U.S.C. § 1536(a)(2).  To achieve this substantive mandate, the federal action agency must engage in consultation with USFWS, the National Marine Fisheries Service, or both (the "consulting agencies") if their actions may affect listed species or their designated critical habitat.  If the consulting agency determines that no jeopardy will result from the federal agency's action, but it will result in incidental take, then it may offer take liability coverage through an incidental take statement, so long as the federal agency and its permittees comply with the terms and conditions of the incidental take statement. Id. § 1536(a)(2), (o)(2).[5]

The Section 10 review process is much more stringent.  It often requires applicants to conduct biological studies and gather appropriate data (including species population surveys, species distribution information, and/or habitat modeling and distribution) to obtain the "thorough, up-to-date biological information" required.  (Exhibit 11.)  To obtain incidental take coverage, an applicant must create a "robust analysis" of its activities' impact on listed species, which is more than a mere "tally of how many individuals (or surrogate, e.g., acres of habitat) will be taken."  (Id.)  The Section 10 process also requires USFWS to comply with other federal laws, including the National Environmental Policy Act and National Historic Preservation Act. (Id.)  And it requires USFWS to comply with the ESA, conducting intra-agency consultation to ensure its approval of an HCP and incidental take permit does not jeopardize listed species.  (Id.)

On August 27, 2020, EPA reversed its longstanding position that consideration of a state assumption application did not trigger the Section 7 requirements of the ESA and adopted Florida's preferred approach of a one-time consultation at the time of initial review.  As EPA acknowledged, Florida sought this reversal so that the state and *its* permittees could circumvent Section 10 of the ESA and still obtain protection from liability for incidental take.  On November 17, 2020, USFWS delivered what the state sought:  USFWS used its Section 7 consultation with EPA to issue a programmatic biological opinion and incidental take statement purporting to insulate the state and state permittees from take liability, so long as state permit conditions were met.  However, the consultation established no guidelines or requirements on what those permit

---

[5] See also 50 C.F.R. § 402.01 (Section 7 directs federal agencies to consult to further the purposes of the ESA); id. § 402.11(b) (applicant for federal permit may ask federal agency to engage in consultation); id. § 402.14(a) (federal agency Section 7 duty to determine whether its actions may affect listed species or critical habitat); id. § 402.15 (federal agency duties following issuance of biological opinion).

conditions must contain.  Neither did the statement specify the impacts of incidental take.
USFWS' actions were unlawful, rending EPA's approval unlawful on this basis as well.

USFWS' programmatic biological opinion failed to meet the requirements of the ESA.
To start, USFWS wholly failed to assess the risk of jeopardy to species at the programmatic
level, the very task for which consultation was required.  (Exhibit 12.)  50 C.F.R. § 402.14(c)(4)
(programmatic biological opinion does not relieve the agency "of the requirements for
considering the effects of the action or actions as a whole.").  USFWS sidestepped any
meaningful assessment and instead took the circular position that EPA's approval of the state
program would result in no jeopardy at a programmatic level because state permits would
presumably be required to result in no jeopardy at the permit level.  (Id.)

The incidental take statement acknowledged that USFWS did not know which species
would be taken, the locations of take, or how many members of listed species would be harmed,
killed, or otherwise taken as a result of state permits authorizing the discharge of dredged and fill
material in waters of the United States.  (Id.)  While federal regulations required the agency to
specify the impacts of the action, 50 C.F.R. § 402.14(I)(1)(I), here USFWS instead relied on
EPA's biological evaluation for a generic discussion of impacts to species.  (Id.)  USFWS then
expressly added that, "[w]hile the BE provided a detailed analysis of typical impacts related to
stressors to ESA-listed species, inability to anticipate the locations of future State 404 permit
applications did not allow the Service to conduct site- and species-specific analyses to estimate
the number of individuals that might be affected by the permitted activities."  (Id.)  The
incidental take statement failed to include any method for recording or monitoring incidental
take or to consider the cumulative impact of individual permit decisions.  (Id.)  It also failed to
require EPA to implement take minimization measures.  (Id.)

An incidental take statement serves as a check on a biological opinion's assumptions and
conclusions regarding the extent and amount of authorized take.  50 C.F.R. § 402.14(i)(1).  See
also Salazar, 695 F.3d at 910–11 (explaining purpose of ITS is to "serve[] as a check on the
agency's original decision that the incidental take of listed species resulting from the proposed
action will not [jeopardize the continued existence of the species]" (second alteration in original)
(citation omitted)).

The incidental take statement here failed to identify the amount and extent of incidental
take of listed species that was expected to occur and that would be authorized under the terms of
the ITS.  (Id.)  While USFWS may use surrogates to establish take limits in certain
circumstances, the incidental take statement here made no such attempt.  (Id.)  Having failed to
set a take limit, the incidental take statement then failed to set a trigger for reinitiating
consultation based on exceeding that limit.  (Id.)

USFWS then went a step further.  It extended take liability coverage not only to the
consulting federal agency (EPA), but also to the state and its permittees through an unlawful
process where the state—and not USFWS or any other federal agency—is driving ESA

decisions.  Under the "technical assistance"[6] process set forth by the programmatic biological opinion, it is the state that has the primary role in deciding whether a permit action will jeopardize the survival and recovery of protected species or adversely modify their critical habitat; deciding what effects a permit action will have on listed species; and defining what protective measures, if any, would be required to mitigate those harms.  (Exhibit 12.)  EPA and USFWS are obligated to provide very little, if any, oversight on the state's actions.  (Id.)[7]  There is no Congressional authority to use Section 7 consultation in this way.

Section 7 requires federal agencies to determine the effects of their actions, to consult with USFWS if their actions may adversely affect protected species, and to obtain take liability coverage through an incidental take statement, so long as the federal agency and its permittees comply with the terms and conditions of the incidental take statement.  16 U.S.C. § 1536(a)(2), (o)(2).[8]  At a programmatic level, Section 7 allows agencies to "tier" site-specific biological opinions to a programmatic biological opinion.  Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1063 (9th Cir.), amended, 387 F.3d 968 (9th Cir. 2004) (permitting tiering to programmatic biological opinion); Native Ecosystems Council v. Krueger, 63 F. Supp. 3d 1246, 1250 (D. Mont. 2014), aff'd sub nom. Native Ecosystems Council v. Marten, 883 F.3d 783 (9th Cir. 2018) (requiring federal agency to obtain site-specific biological opinion); Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv., 726 F. Supp. 2d 1195, 1231–32 (D. Mont. 2010) (systemic deferral of site-specific biological opinions unlawful).

Section 7 does not, however, authorize USFWS to allow a state to step in the shoes of a federal agency to conduct site-specific analyses, determine effects on species, set incidental take limits, and establish protection measures.  See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 900 F. Supp. 2d 1151, 1154–55 (D. Nev. 2012), aff'd, 807 F.3d 1031 (9th Cir. 2015) (tiered ESA process included Section 7 programmatic biological opinion site-specific

---

[6] Although the ESA Section 7 Consultation Handbook—a USFWS guidance document cited in the biological opinion—includes technical assistance as a preliminary step available for federal action agencies, it is entirely directed at early discussions with *federal* action agencies about the presence or absence of species, recommendations for additional studies the federal action agency should conduct, notification of candidate species, and assisting federal action agencies outside the United States.  (Exhibit 13.)  It does not discuss or authorize a Section 7 technical assistance process for a state action agency.

[7] See, e.g., (Exhibit 15 at 19 (Programmatic Biological Opinion) ("In some cases, depending upon the project, USFWS may submit recommendations to FDEP/FWC.  In other cases, the species coordination lead will compile a package of proposed measures and transmit it to USFWS for their review and comment."); id. at 18 ("USFWS will review and may suggest modifications or recommend additional protective measures, as needed."); id. at 26 (USFWS may or may not comment on preliminary protection measures); id. at 27 (USFWS will provide recommendations as needed…").)

[8] See also 50 C.F.R. § 402.01 (Section 7 directs federal agencies to consult to further the purposes of the ESA); id. § 402.11(b) (applicant for federal permit may ask federal agency to engage in consultation); id. § 402.14(a) (federal agency Section 7 duty to determine whether its actions may affect listed species or critical habitat); id. § 402.15 (federal agency duties following issuance of biological opinion).

Section 10 incidental take permits for non-federal entities).  There is no indication that Congress intended for Section 7 to give states such authority, much less so as an intentional workaround to Section 10 of the ESA, which Congress enacted to address exemptions from take liability for state actions.  16 U.S.C. § 1539(a)(1)(B).  (<u>Accord</u> Exhibit 11 (USFWS, HCP Handbook at 3-5 (Section 10 applies to "any State").)

Instead of complying with the law, USFWS crafted an unlawful, unauthorized shortcut to the ESA's federal regulatory regime because the agency and the state in close coordination determined the shortcut was worth the payout:  obtaining take coverage for all state 404 permits without the robust analysis required by federal law to ensure species protection at the permit-level.  USFWS' action was therefore arbitrary, capricious, not in accordance with the law, and in excess of statutory authority, as was EPA's reliance on it to approve the state program.  5 U.S.C. § 706.

### B.  EPA Denied Notice and Comment Opportunity on Technical Assistance Process, a Key Element of the State's Application.

EPA's determination that the state met the Clean Water Act's "no jeopardy" requirement relied on three elements of the state's August 20, 2020, application:  (1) an unexecuted MOU between USFWS and state agencies; (2) state regulations that would take effect once assumption was approved; and (3) the state's program description.  (<u>See</u> Exhibit 14 (<u>EPA Response to Comments on State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program</u> 19 (Dec. 16, 2020) [hereinafter "Response"]).)  All three relied on a "technical assistance" process developed by the programmatic biological opinion, which did not exist at the time EPA made its "completeness determination" and was not completed until *after* the public's opportunity for notice and comment ended.

To lawfully approve Florida's program, EPA was required to determine that the state had demonstrated the authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section."  33 U.S.C. § 1344(h)(1)(A)(i).  The 404(b)(1) Guidelines, in turn, required the state to demonstrate that state-issued permits would result in no jeopardy to listed species.  40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c).

The MOU provided that USFWS would give "technical assistance" to state agencies for purposes of ensuring no jeopardy to listed species.  What this process would entail, however, was not defined.  Instead, the MOU stated that "the technical assistance" process was "anticipated to be outlined in the USFWS' biological opinion based on information included in the biological assessment submitted by EPA."  (Exhibit 6.)  The MOU further provided that "[i]ncidental take for federally listed species will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption."  (<u>Id.</u>)  The MOU acknowledged that the state would rely on the expertise of USFWS, while imposing no duty on the Service to lend that expertise.  (<u>Id.</u>)  Neither USFWS' programmatic biological opinion nor EPA's biological assessment (later titled biological evaluation) was submitted with the state's application.  Indeed, neither existed at the time.

The state-promulgated regulations, too, provided that compliance would be accomplished through, and determined by, the forthcoming "consultation … or technical assistance" process between the state and USFWS.  See Fla. Admin. Code § 62-331.051 (applicants for individual permits will be required to provide "data and information for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by," the state agencies and USFWS); id. § 62-331.053(3)(a) (no permit shall be issued that causes jeopardy to listed species or results in adverse modification of critical habitat as determined by compliance with "any requirements resulting from consultation with, or technical assistance by" the state agencies and USFWS); id. § 62-331.010(5) (404 Handbook §§ 1.3.33 (requiring compliance with requirements resulting from the "technical assistance" process); id. § 5.2.3 (referring to the "technical assistance" process)).  By relying on processes that had not yet been articulated or produced, these regulations too did not provide an adequate basis for EPA to find the state had met the "no jeopardy" requirement.

Finally, the program description incorporated the MOU and provided a two-page summary of the process the state intended to follow.  (Exhibit 15 (Program Description, App. a-1 at 21-23).)  While the program description discussed what it contended were binding obligations on USFWS to assist the state and provide recommendations on a project-by-project basis, nothing in the MOU, state-promulgated regulations, or any other document submitted with the state application imposed any such duties on USFWS.  (See id. (federal agency "will" assist in effect determination, USFWS "will" review applications and provide recommendations).)  The state's program description had no legal effect and certainly, it could neither authorize nor require a federal agency to act.

The public had a right to comment on a complete program application.  5 U.S.C. § 553; 40 C.F.R. § 233.15(e)(1).  Public notice and comment rights are (1) intended to improve the quality of agency rulemaking by ensuring that regulations are tested by exposure to diverse public comment; (2) an essential component of fairness to affected parties; and (3) an opportunity for parties to develop evidence in the record to support their objections to a rule, which in turn enhances the quality of judicial review.  Small Refiner Lead Phase-Down Task Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).  The core of the state's demonstration that it had authority to operate a 404 program that would not jeopardize protected species was the "technical assistance" process in the programmatic biological opinion.  Without access to the programmatic biological opinion, the public was denied this opportunity, left in the dark and unable to comment on the "technical assistance" scheme that EPA relied upon to approve the program.

In response to comments objecting to the denial of an opportunity to comment on the technical assistance process laid out in the biological opinion, EPA relied on Cooling Water Intake Structure Coalition v. U.S. Environmental Protection Agency, to argue that because "there is no independent right to public comment with regard to consultations conducted under § 7(a)(2) of the ESA" there was no violation here.  898 F.3d 173 (2d Cir. 2018), amended, 905 F.3d 49, 78 (2d Cir. 2018).  (Exhibit 14.)  EPA's position misses the boat.  The question is not whether there is an abstract right to comment on a biological opinion.  The question is whether the public was afforded a right to comment on Florida's complete application, when that application relied on a

component that did not exist, and was not made available, during the public comment period. While there may not be an independent basis for notice and comment on biological opinions under the ESA, there is a right to comment on a state's assumption application.  EPA denied the Plaintiffs that right.

Permitting the public only to comment on an incomplete application undermined the agency's rulemaking by precluding meaningful testing, denied fairness to affected parties, and precluded the opportunity to develop evidence in the record for judicial review.  5 U.S.C. § 553; Small Refiner Lead Phase-Down Task Force, 705 F.2d at 547.

### C. EPA's Approval Violated the Clean Water Act Because the State Program Failed to Meet Minimum Federal Standards Regarding Enforcement.

Before the EPA could lawfully approve the state 404 program, the agency was also required to determine that the state would have authority "[t]o abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement."  33 U.S.C. § 1344(h)(1)(G).  Specifically, EPA regulations required that "the burden of proof and degree of knowledge or intent required under State law for establishing violations under … this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act."  40 C.F.R. § 233.41(b)(2).  See also id. § 233.1(d) (state 404 program must "be conducted in accordance" with Clean Water Act and implementing regulations, and "may not impose any less stringent requirements for any purpose").

Plaintiffs are likely to succeed on their claim that EPA unlawfully approved the state program because the state requires a degree of knowledge or intent that is "greater than" that required under the Clean Water Act.  See Idaho Conservation League v. U.S. Envtl. Prot. Agency, 820 F. App'x 627 (9th Cir. 2020) (EPA abused its discretion in approving a state delegated program with a mens rea standard greater than intent standard required of the EPA). By requiring a higher degree of intent to establish Section 404 violations, the state does not recognize an entire class of criminal violations that exist under federal law.  The inability to abate an entire class of violations of permits and of the permitting program undermines the deterrent effect of the Clean Water Act's strict provisions, and thereby reduces protections for wetlands and the ecosystems, protected species, and communities that rely on them.  EPA's approval of the state's program notwithstanding the patent failures to meet this minimum federal standard was arbitrary and capricious and not in accordance with the law.

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and attain "water quality which provides for the protection and propagation of fish, shellfish and wildlife and provides for recreation" in response to decades of failures by states to protect and clean waters of the United States.  33 U.S.C. § 1251(a).[9]  Before that time, federal laws protecting the Nation's waters were limited to

---

[9] Montgomery Envtl. Coal. v. Costle, 646 F.2d 568, 574 (D.C. Cir. 1980); H.R. 11,896, 92nd Cong. (1971) & S. 2770, 92nd Cong. (1971) (Clean Water Act bills were written to expand federal authority and control to control and eliminate water pollution across the country).

providing assistance to states in an attempt to incentivize them to do the right thing—an approach that had failed.  US. Envtl. Prot. Agency v. California, 426 U.S. 200, 202-09 (1976); Am. Paper Inst., Inc. v. U.S. Envtl. Pro. Agency, 890 F.2d 869, 870-71 (7th Cir. 1989). Congress made plain that the Clean Water Act set minimum federal standards for all states to follow.  States retained only the flexibility to be more, but never less, protective than the Clean Water Act's foundational protections.  See 33 U.S.C. § 1311(b)(1)(C); PUD No. 1, of Jefferson Cty. v. Wash. Dep't of Ecology, 511 U.S. 700, 705–07 (1994).

Section 404 is an essential component of the Clean Water Act, in that it regulates the discharge of dredged and fill material into waters of the United States, including wetlands.  The Clean Water Act recognizes that the degradation and destruction of wetlands is "among the most severe environmental impacts."  See 33 U.S.C. § 1251; 40 C.F.R. § 230.1(a).  Many developments and similar projects in Florida require 404 permits because of the state's extensive wetlands in waters of the United States.  Particular care is required because Florida's wetlands are also vital to hundreds of threatened and endangered species, filter drinking water into the aquifer, provide resiliency from hurricanes, and support the state's economy.

The Clean Water Act prohibits the discharge of dredged or fill material where there is a less environmentally damaging alternative that is practicable.  40 C.F.R. § 230.10(a).  It further prohibits any discharge that would contribute to violation of water quality standards; violate any applicable toxic effluent standard or prohibition; jeopardize the continued existence of ESA-listed species; result in likely destruction or adverse modification of critical habitat; or violate any requirement by the Secretary of Commerce to protect a marine sanctuary.  Id. § 230.10(b). The Clean Water Act prohibits the permitting of any discharge "which will cause or contribute to significant degradation of the waters of the United States" as determined based on factual findings, evaluations, and tests required under the Section 404(b)(1) Guidelines, "with special emphasis on the persistence and permanence of the effects outlined in" the Guidelines.  Id. § 230.10(c).  Lastly, the Clean Water Act prohibits discharge of dredged or fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  Id. § 230.10(d).

To ensure compliance with these provisions, when a person violates 33 U.S.C. § 1344 by discharging dredged and fill material in the waters of the United States without a 404 permit, or without complying with the terms of a 404 permit, the Clean Water Act authorizes civil and criminal enforcement.  Id. § 1319.  Enforcement serves as a critical safeguard and deterrent to violations of the Clean Water Act.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185; United States v. Earth Sciences, Inc., 599 F.2d 368, 374 (10th Cir. 1978) ("The [Clean Water] Act would be severely weakened if only intentional acts were proscribed. We will not interpret it that narrowly, particularly when the legislative history is clear Congress intended strong regulatory enforcement.").

Congress spoke directly and unambiguously to the mens rea requirement for Clean Water Act violations when stating that "[a]ny person who … negligently violates" a permit issued by the Corps or a state under Section 404 "shall be punished."  U.S.C. § 1319(c)(1).  The standard is simple negligence.  See United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012) (interpreting the plain language of "negligence" to mean ordinary negligence); United States v. Pruett, 681

F.3d 232, 243 (5th Cir. 2012) (same); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005) (same); United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir. 1999) (same).  The simple negligence standard expressly applies to 404 permits violations whether those permits are issued by the Corps or a state.  33 U.S.C. § 1319(c)(1)(A).

The intent standard employed by Florida, on the other hand, is gross or culpable (criminal) negligence.  See Fla. Stat. §§ 373.430(1)(a), 373.430(3)–(4) (requiring willfulness, reckless indifference, or gross careless disregard to establish criminal liability for a pollution offense); id. §§ 373.430(1)(b)–(c), 373.430(5) (requiring willfulness to establish criminal liability for permit violations and false statements).  In Florida, culpable negligence is defined as "reckless indifference or grossly careless disregard of the safety of others."  State v. Greene, 348 So. 2d 3, 4 (Fla. 1977).  It has also been defined as "a gross and flagrant character, evincing reckless disregard for human life or of the safety of persons exposed to its dangerous effects;" or "the entire want of care which would raise the presumption of indifference to consequences;" or "reckless indifference to the rights of others, which is equivalent to an intentional violation of them."  Id.  Unlike simple negligence, culpable negligence encompasses threatened or actual harm to others and can be the basis for violent crimes such as manslaughter.  Such a high bar would exclude an entire class of permit violations that are subject to criminal penalty under federal law.  This is not what Congress intended.

Authorizing the state to require a higher mens rea standard undermines the deterrent effect of the enforcement program Congress enacted in the Clean Water Act.  It also shields those who commit criminal violations of Section 404 in Florida from accountability.

EPA was aware of this defect in the state's application early on, and the matter was also brought to the agency's attention during the public comment period.  EPA approved the application anyway.  In its response to comments, EPA relied on two, unavailing arguments: First, it claimed that Section 404(h) of the Clean Water Act does not "use the words 'all applicable,' 'same,' or any phrase specific to any mens rea standard, let alone the Federal standard, as it did in other parts of [Clean Water Act] Sections 404(h)."  (Exhibit 14 (Response at 75).)  Second, EPA argued that the "general language used to address required state and tribe authorities to abate violations, and the absence of any citation to CWA Section 309, indicates that Congress allowed for variability between state or tribal approaches to certain aspects of enforcement."  (Id. (Response at 75).)

In addition to violating the plain language of the statute, EPA's position is entirely inconsistent with its own regulation on the topic, 40 C.F.R. § 233.1(b)(2), which requires that the mens rea for state programs be "no greater" than that under federal law.[10]  It also allows a state program to be less stringent than federal law, in violation of 40 C.F.R. § 233.1(d).  Moreover, although Section 404(h) may not refer explicitly to Section 319(c) in describing the

---

[10]  Indeed, since 1984, the EPA has required that mens rea standards in state programs under the section 402 and 404 programs be at least as stringent as the standards EPA must meet.  See 40 C.F.R. § 123.27(b); id. § 233.41(b)(2) ("[t]he degree of knowledge or intent required under State law for establishing violations under … this section shall be no greater than the … degree of knowledge or intent EPA must bear when it brings an action under the Act").

requirements for a state-approved program, that does not mean the opposite is true. Section 319(c) in fact explicitly establishes criminal penalties for *negligent* violations of any 404 permit issued by the Corps *or a state*. 33 U.S.C. § 1319(c)(1)(A). See, e.g., United States v. Maury, 695 F. 3d at 246, 256–58 (affirming court's jury instruction on simple negligence, rather than gross negligence, in enforcement action under New Jersey-issued NPDES permit issued pursuant to assumed section 402 program; court cited plain language of statute noting when Congress intends a higher mens rea requirement in other provisions of the Act it explicitly state so). Since 404 permits may only be issued by a state pursuant to an EPA-approved state assumed program, the plain statutory language requires that state 404 programs have a baseline negligence standard for criminal liability.

EPA's statement that it "interprets the Agency's implementing regulations for CWA Section 404 to allow for approved state and tribal programs to have different approaches to criminal enforcement" cannot be squared with the plain language of the agency's own regulation requiring that the mens rea for state 404 enforcement programs be "no greater" than that under federal law. 40 C.F.R. § 233.41(b)(2). As discussed above, the only flexibility afforded by the Clean Water Act is a one-way ratchet, allowing states to be *more*, not less, protective.

EPA argues that this novel interpretation of its own regulation is consistent with the Court of Appeals for the D.C. Circuit's decision in Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency (NRDC), 859 F.2d 156, 181 (D.C. Cir. 1988). NRDC, however, was not a case about the criminal intent necessary to establish a violation. It was a case about the *penalties* that a state program might impose *after* finding a violation. Id. at 180.

Here, EPA approved a program with less stringent enforcement capacity than the federal floor. This authorizes a state program that is *harder* to enforce because of a higher mens rea standard than under federal law. EPA's interpretation creates the very scenario the agency sought to avoid in NRDC: allowing state-assumed programs with higher mens rea standards would be less effective and require EPA to step in to ensure compliance with the Clean Water Act.

The same is true of Akiak Native Community. v. U.S. Environmental Protection Agency, 625 F.3d 1162 (9th Cir. 2010), on which EPA also relied. Id. at 1171–72 (declining to find inadequate enforcement authority where a state lacked authority to impose administrative penalties available to the EPA). Like NRDC, Akiak did not involve criminal liability for Clean Water Act violations. It involved a challenge to Alaska's inability to assess civil penalties administratively compared to the federal Section 402 program. Akiak, 625 F. 3d at 1171. EPA regulations allow EPA flexibility when it comes to a state program's civil penalties, 40 C.F.R. § 233.41(d)(1), but that flexibility does not extend to the criminal intent standard.

Here, by contrast, EPA's action allows Florida, and would allow other states, to exclude an entire class of permit violations from criminal liability. At issue is not *how* a state might abate criminal violations, or what enforcement action a state might take *against* such a violation, but the very definition of what constitutes a criminal violation in the first place. There is nothing in the CWA that authorizes a state program to decline to recognize an entire class of criminal violations at all. To permit this would be to allow a state 404 program to legalize activity that is

patently unlawful under the Clean Water Act.  This conflicts with the plain language of 33 U.S.C. § 1319(c) (establishing negligent actions as criminal violations of the 404 program) and the requirement that state programs demonstrate the authority to "abate violations" under the Act.

EPA's approval of such a program also undermines the deterrent effect that Congress sought by prohibiting negligent violations of Section 404 and the incentives to ensure full compliance with the permitting program.  Ordinary negligence is the lowest form of criminal mens rea aside from strict liability.  It is the failure to use care that a reasonably prudent and careful person would under similar circumstances.  United States v. Hanousek, 176 F.3d at 1120. This mens rea standard allows robust criminal enforcement of permit violations—and therefore greater environmental protections—because it sets a lower bar the government must meet to bring and prevail in an enforcement action and promotes compliance through deterrence.

Nor can the EPA's action be saved by a new rule the agency proposed on December 14, 2020.  (Exhibit 14 (Response at 76).)  First, the EPA's proposed rule was not the law when EPA approved Florida's program on December 17, 2020.  The public comment period, alone, did not conclude until January 13, 2021.  Second, the EPA concedes that the proposed rule "is based on the interpretation of the CWA outlined" in its response to comments on Florida's application, demonstrating that it rendered a decision on Florida's application based on an agency interpretation and regulatory change not lawfully adopted by the agency.  Third, the rule is unreasonable on its face and if adopted will not withstand challenge.  It proposes to maintain the requirement that a state's criminal intent standard be as stringent as EPA's, but then purports to create an exception that allows states to adopt any negligence standard of their choosing.  85 Fed. Reg. 80,713, 80,717–18.  Both things cannot be true.  Fourth, the rule conflicts with the plain meaning of Section 1319.  33 U.S.C. § 1319.

EPA's new interpretation would also allow states to implement inconsistent and contrary levels of water resource protections through differing levels of mens rea.  This contradicts the basic policy and purpose of Congress to provide a minimum baseline of water protections across the nation.  Indeed, the Supreme Court has directed that one state's permitting cannot interfere with another state's implementation and achievement of its water Clean Water Act standards and protections.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Like in Arkansas, a different mens rea in an upstream or bordering state could negatively affect a downstream state's ability to obtain equal and adequate enforcement of standards and permit requirements.

Plaintiffs are therefore likely to succeed on their claim that EPA's approval of the state program was unlawful, as it did not meet the minimum standards of the Clean Water Act and is not as stringent as federal law.

**2.  Absent preliminary relief, Plaintiffs are likely to suffer irreparable harm before the conclusion of this litigation.**

For harm to be irreparable, the harm must be "certain, great, actual, and imminent." Seeger v. U.S. Dep't of Defense, 306 F. Supp. 3d 265, 291 (D.D.C. 2018).  Parties need not show absolutely certainty that the threatened harm will occur but must show certainty in

increased risk that the threatened harm will happen.  See Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 33 (D.D.C. 2019) (finding irreparable harm to plaintiffs' ability to observe whales if certain ocean areas were opened to gillnet fishing, where such opening "is likely" to shift fishing to the locations at issue and "thus increase the risk of … whales becoming entangled in the gear").  Furthermore, parties can establish irreparable harm "even though the precise scope of that harm may not be fully known" because of the government's failure to conduct an environmental evaluation.  Brady Campaign to Prevent Gun Violence v. Salazar, 612 F.Supp.2d 1, 25 (D.D.C. 2009).

Plaintiffs in the pending litigation are at risk of irreparable harm by the state's unlawful operation of the state 404 program.  The state is currently considering permits that are reasonably expected to fill precious wetlands that serve as habitat for threatened and endangered species, and their issuance is imminent.  Because the programmatic biological opinion and incidental take statement are fatally flawed, permits issued pursuant to these are likely not to receive necessary protections to which they are entitled under federal law.  The EPA's failure to properly analyze whether its approval of the state's assumption will cause jeopardy to listed species at a programmatic level and whether the state 404 program will ensure no jeopardy at the permit level, leaves species without the proper protections to ensure their survival and recovery.  USFWS's improper incidental take statement, relied on by EPA, exacerbates these harms by providing a blank check for the take of listed species.  Moreover, because of the state's weakened enforcement regime, there is less deterrence for permit violations, which in turn increases the risk of harm.

For example, the state is currently considering a 404 permit application for Troyer Mine, which would destroy 214 acres of wetlands that are part of a conservation area to protect Lee County's shallow aquifers, and are within the consultation areas for many endangered and threatened species, including the Florida panther, Florida bonneted bat, red cockaded woodpecker, Audubon's crested caracara, the Florida grasshopper sparrow, the Everglade snail kite, and the Florida scrub jay. (Exhibit 16.)  In fact, 90% of the project site is in Primary Zone habitat for the critically endangered Florida panther, meaning it is habitat essential for the continued survival and recovery of the species.  (Id.)  Panthers are one of the most endangered species on the planet, with only 120 to 230 adults remaining in the wild.  (Id.)  Habitat loss is one of the primary risks for panther survival, as are vehicular collisions.  (Id.)  The Troyer Mine project would result in an estimated 2,089 daily truck trips to and from the site.  (Id.)

Plaintiffs have reason to believe that issuance of this permit is imminent, because there is no open public comment period, and the state already issued a state-level Environmental Resources Permit ("ERP") authorizing the project.  In its 404 application, the state averred that existing state requirements overlap by roughly 85% with federal requirements.  (Exhibit 17 (State Application (B), subpart (d) at 2).)  While Plaintiffs strongly disagree, from the state's point of view, the issuance of the ERP permit demonstrates that the project meets about 85% of the criteria for a 404 permit.  The state has also consistently indicated that its goal in assuming jurisdiction over the 404 program is to issue permits faster, and to as great an extent as possible, in alignment with the rapid processing schedule for state permits.  44 Fla. Admin. Reg. 2321 (May 11, 2018).

17

The loss of these wetlands and the impacts to panthers and their habitat would irreparably harm Amber Crooks, a member and employee of Plaintiff Conservancy of Southwest Florida. Ms. Crooks regularly hikes, camps, and tries to observe wildlife, including panthers, less than three miles away in Corkscrew Regional Ecosystem Watershed, which also is located within panther habitat. (Exhibit 16.) This is only one of the many projects that if granted would cause irreparable harm to Ms. Crooks' use and enjoyment of Florida's natural environment because of their impacts on wetlands, water quality, and species and their habitat. (Id.)

Dr. Rachel Silverstein, a member and employee of Miami Waterkeeper, will suffer irreparable harm from the state's anticipated issuance of the Port 1850 LLC project. The Port 1850 project would fill 4.21 acres of mangrove wetlands in Fort Lauderdale, Florida. (Exhibit 18.) The 404 permit application for this project has been transferred to the state. (Id.) As with Troyer Mine, the state has already granted the project's ERP permit. There is no open public comment period. It is therefore reasonable to believe that issuance of the 404 permit is imminent.

Mangroves wetlands like those set to be destroyed by the Port 1850 project provide critical habitat for endangered species. (Id.) Destruction of these mangroves wetlands will also harm threatened Johnson's seagrass, which has been found directly abutting the project area. (Id.) Destruction of mangroves releases large amounts of sediment and nutrients, which can be fatal to seagrasses by causing shading, suffocation, or eutrophication, which can lead to algae blooms. (Id.) Many protected species rely on seagrass for their survival, including the manatee, American crocodile, loggerhead sea turtle, hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, roseate tern, wood stork, and bald eagle. (Id.) Harm to sea turtles is of particular concern because this part of South Florida is home to one of the world's largest loggerhead rookeries and increasing green and leatherback turtle breeding populations. (Id.)

The harms that will likely result from the Port 1850 LLC project will negatively impact Dr. Silverstein's ability to enjoy boating and diving at the mouth of Port Everglades, which is only two miles from the project, where she enjoys observing listed corals and marine wildlife. (Id.)

The state's likely issuance of these permits pursuant to an unlawful 404 program, operating pursuant to an unlawful ESA biological opinion and incidental take statement, is likely to irreparably harm these species and their habitat. Even the loss of a few individual members of an endangered species can constitute irreparable harm. Am. Rivers v. U.S. Army Corp of Eng'rs, 271 F. Supp. 2d 230, 259 (D.D.C. 2003). The Supreme Court has recognized that environmental damage, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987); see also Brady Campaign to Prevent Gun Violence, 612 F. Supp. 2d at 25 ("[E]nvironmental and aesthetic injuries are irreparable."). The permanent loss of these wetlands will have a substantially adverse effect on scenery, wildlife, recreation, and other environmental values. Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 324 (D.C. Cir. 1987).

The ESA "has been regarded as the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Oceana, Inc. v. Pritzker, 75 F. Supp. 3d,

469, 474 (D.D.C. 2014) (internal quotations omitted).  One critical component of that protection is ensuring that actions federal agencies undertake, including in issuing 404 permits and approval of a state's assumption of the 404 program, "do not jeopardize endangered wildlife and flora." Id.  Here, the EPA and USFWS have not performed this necessary analysis at the programmatic-level.  Instead, they have punted the analysis to the state to determine impacts, take limits, and protection measures in a piecemeal fashion at the permit-level through a process not authorized by Congress.  The process does not require the critical analyses contemplated by Section 10 to ensure the full protections afforded to imperiled species under federal law when actions are carried out by state actors and private citizens.  Yet permittees will enjoy protection from incidental take as long as they comply with their 404 permit conditions.  This broad take coverage, combined with reduced liability for permit violations under the state enforcement scheme, will reduce incentives to strictly comply with federal law.

For purposes of assessing irreparable harm, it is also appropriate to consider the obstacles organizations will face to accomplish their primary mission if preliminary relief is not granted. League of Women Voters, 838 F. 3d at 8 (finding irreparable injury to the League from obstacles to their voter registration efforts due to upcoming election); Brady Campaign to Prevent Gun Violence, 612 F.Supp.2d at 24 (granting preliminary injunction finding procedural violation, while not sufficient alone to establish irreparable injury, is "certainly a relevant consideration" and courts have not hesitated to find likelihood of irreparable injury when it is combined with an alleged environmental or aesthetic injury); Fund for Animals v. Norton, 281 F. Supp. 2d 209, 219-222 (D.D.C. 2003) (finding procedural harm from NEPA violation bolstered plaintiffs' case for a preliminary injunction when combined with alleged irreparable aesthetic injuries and granted injunction).

To show irreparable organizational harm for preliminary relief, there is a two-part test: 1) an organization is harmed if the "actions taken by [the defendant] have perceptibly impaired the [organization's] programs," and 2) if so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission."  Id. (brackets in original) (internal quotes omitted).

Plaintiffs and their members will be irreparably harmed because EPA's approval not only authorizes a state program that does not meet federal requirements, it also deprives those who are adversely affected by 404 permits of rights and remedies available under federal law.  Primary among these is the inability to access the state courts to challenge permits in a manner comparable to the ability to access federal courts.

Under federal law, associational standing may be established on the basis of a single member's harms resulting from the challenged conduct.  See Sierra Club v. Johnson, 436 F.3d 1269, 1279 (11th Cir. 2006) (associational standing of Sierra Club satisfied by affidavit of one member who suffered injury in fact).  In Florida that is not the case.  To establish standing in Florida, an organization is required, among other things, to demonstrate that a "substantial

number" of its members would be harmed by the challenged action.[11]  Plaintiffs in the pending litigation have hundreds and thousands of members.  Demonstrating that a substantial number of those members would be affected by a particular permit would be difficult, if not impossible. Even state-based organizations, such as Plaintiff Florida Wildlife Federation, have been denied access to sue based on this onerous standing requirement.  See Fla. Wildlife Fed'n v. Fla. Dep't of Envtl. Prot., Case No. 14-1644RP, 2014 WL 4627151 at *5, 14 (Fla. Div. of Admin. Hearings Sept. 11, 2014) (finding that even if 20 members of Plaintiff were harmed by proposed rule, this was not a substantial number and therefore Plaintiff lacked standing; applying a more relaxed standard for standing than that applied to permit challenges).

In addition, permit challenges under Florida law require an extraordinary expenditure of funds, and the risk of mandatory fee awards, not present under federal law.  Permit challenges under Florida law are not based on an administrative record, and, as a result, require challengers to expend large sums of money to retain expert witnesses and develop evidence.  (Exhibits 16, 18, 19 and 20.)  Litigation to seek a remedy for permit violations is even more fraught, as Plaintiffs would be subject to a mandatory attorney-fee shifting provision should they fail to prevail.  Fla. Stat. § 403.412(2)(f).  With the reduced deterrent effect of state law caused by the absence of criminal liability for negligent violations, more violations of state-issued 404 permits can be expected to occur.  However, Plaintiffs will be deprived of access to the courts to hold permit violators accountable, which will irreparably harm Plaintiffs' ability to protect endangered species and enforce 404 requirements.  (Exhibits 16, 18, 19, and 20.)

The inability to challenge unlawful permits, and to seek accountability for permit violations, undermines the Plaintiffs' ability to fulfill their missions, and access remedies to protect their institutional and members' interests.  (Exhibits 16, 18, 19, and 20.)  These are cognizable irreparable organizational harms.  See NAACP v. USPS, 2020 WL 5995032 (D.D.C. Oct. 10, 2020) (finding that delay in mail ballots caused irreparable harm to organization that has civic engagement program designed to encourage citizens to be fully engaged in democratic process, and that defendant's actions making activities of the organization more difficult resulted in irreparable injury to Plaintiff).

---

[11] See Fla. Home Builders Ass'n v. U.S. Dep't of Labor, 412 So.2d 351 (Fla. 1982); Farmworker Rights Org., Inc. v. Dep't of Health & Rehab. Servs., 417 So.2d 753, 754–55 (Fla. 1st Dist. Ct. App. 1982) (to establish associational standing under section 120.57(1) organization must demonstrate that "a substantial number of its members, although not necessarily a majority, are substantially affected by the challenged rule," that "the subject matter of the challenged rule is within the association's general scope of interest and activity," and that "the relief requested is of a type appropriate for a trade association to receive on behalf of its members."); St. Johns Riverkeeper, Inc. v. St. Johns River Water Mgmt., 54 So.3d 1051, 1054 (Fla. Dist. Ct. App. 2011) (under Florida APA, associational standing requires showing of harm to substantial interests of a substantial number of members; finding standing under sections 120.569 and 120.57 where organization had 1,500 members, including 50 in the relevant county, and that there had been more than 1,100 member participant ecological boat trips to the area); Friends of the Everglades, Inc. v. Bd. of Trustees of Int'l Imp. Tr. Fund, 595 So. 2d 186, 188 (Fla. Dist. Ct. App. 1992).

Lastly, absent preliminary relief, Plaintiff organizations will be deprived of rights and remedies available under the National Environmental Policy Act ("NEPA"), which does not apply to state-issued permits, during the pendency of this litigation. (Exhibits 16, 18, 19, and 20.) So long as the legality of the state program in question, Plaintiffs should not be denied rights under NEPA, which are available while the program is administered by the Corps. (Id.) NEPA provides an essential opportunity to environmental advocates to participate in receiving, reviewing, submitting, and assessing information available to federal agencies before they issue a 404 permit. The same information is essential to assessing the lawfulness of the agency's ultimate action and may provide the underpinning for a challenge when federal requirements are not met. (Id.) Plaintiffs rely on the NEPA process to assess the risks to their organizational interests and missions, and to advocate for adequate protections to avoid or mitigate those risks. (Id.) Should they be denied access to the NEPA process during the pendency of this litigation, the Plaintiffs' ability to carry out their missions will be significantly impaired, causing irreparable harm. (Id.)

Being deprived of information that impairs Plaintiffs from implementing their mission constitutes irreparable harm. Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Security, 387 F. Supp. 3d 33 (D.D.C. 2019) (Plaintiff, with mission to provide free and low-cost legal services to underserved immigrant children, was irreparably harmed by DHS's inability to link unaccompanied children to family members, which hurt ability of Plaintiff to provide advice and consult with clients). Not only do these harms perceptibly impair the work of Plaintiffs, but they also directly conflict with the missions of Plaintiffs. (Exhibits 16, 18, 19, and 20.) See League of Women Voters, 838 F. 3d at 8.

### 3. The Balance of Equities and Public Interest Favor Issuance of a Stay.

The Supreme Court has held that when there is environmental injury, the balance of harm favors preliminary relief because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 545 (1987). Thus, the public has a strong interest in "preservation of the natural environment." Nat'l Wildlife Fed'n v. Andrus, 440 F. Supp. 1245, 1256 (D.D.C. 1977). This interest is particularly strong in this case where the impacts of development will be felt in some of the nation's most prized wetlands recognized for their incredible biodiversity and value in providing clean drinking water, storm resiliency, and economic value.

When weighing the balance of equities, it is imperative "to balance the competing claims of injury and the effect an injunction would have on each party." Fed. Maritime Comm'n v. City of Los Angeles, 607 F. Supp. 2d 192, 203 (D.D.C. 2009). Courts have looked to the harms that will befall the parties with or in the absence of a preliminary injunction, and whether such harms "would be certain and substantial." Sherley v. Sebelius, 644 F. 3d 388, 398-99 (D.C. Cir. 2011) (finding that balance of equities tilted against preliminary injunction where the Court was uncertain that the Plaintiffs would face a "significant additional burden" without the preliminary injunction, but the hardship imposed on others "would be certain and substantial").

EPA's approval of the state 404 program represents a radical departure from prior policy and practice and is ultimately inconsistent with federal law. The balance of equities weigh in favor of maintaining the status quo pending judicial review. This would allow the 404 program to continue to operate as it has for decades, a process to which the public and all affected parties are accustomed and which is consistent with federal law. The "primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition – to preserve the status quo." Aamer v. Obama, 742 F. 3d 1023, 1043 (D.C. Cir. 2014) (internal quotations omitted).

As demonstrated above, Plaintiffs in the pending litigation will suffer irreparable harm if a stay is not granted. Those harms are both substantive, affecting protection for listed species, and procedural, affecting the ability to challenge unlawful actions through an inadequate, and often inaccessible state judicial process. Here, EPA and the other interested federal agencies will only be required to maintain the status quo, continuing to administer the Section 404 program in Florida as they have for decades.

Issuance of a stay is also in the public interest because it would ensure the full protection of the Clean Water Act for wetlands and other waters of the United States in Florida that would otherwise be in jeopardy of irreparable harm through the permitting of dredge and fill under an inadequate and unlawful state program. It would also ensure protection of protected species that rely on those wetlands for feeding grounds, nurseries, and homes.

Beyond the interests of the Plaintiffs in the pending litigation, and those of the public writ large, a stay would also ensure that any permitting decisions impacting the sacred sites, cultural resources, and historic sites of tribes remain subject to the government-to-government consultation that is required when Section 404 is administered by the federal government, rather than a state.

Pursuant to EPA's consultation with tribes during its consideration of Florida's application, impacted tribes voiced significant concerns as to whether EPA's process complied with the trust responsibility imposed by NEPA, executive orders, and the National Historic Preservation Act. Some raised concerns that EPA conducted a hollow, lightning-speed consultation that (1) completely excluded two federally recognized tribes—the Seminole Nation of Oklahoma and the Jena Band of Choctaw Indians; (2) provided tribes *three business days* over a holiday weekend to review and comment on a draft programmatic agreement that did not include tribes as signatories; (3) adopted whole cloth a state-level memorandum of agreement created behind a curtain that excluded most tribes with rights in the state; and (4) applied a presumption that non-reservation lands are not "Indian Country" pursuant to 18 U.S.C. § 1151, unless proven otherwise. (Exhibits 21–24.) EPA's actions upended the longstanding federal-tribal consultation framework and left several substantive issues raised by the tribes unresolved.

By issuing a stay, EPA would ensure the rights of the tribes to engage in consultation on 404 matters affecting their interests pending resolution of the claims in this litigation. Menominee Indian Tribe of Wisconsin v. Envtl. Prot. Agency, 947 F.3d 1065, 1074 (7th Cir. 2020), reh'g denied (May 8, 2020). The tribal right to consultation is invaluable because damage to or destruction of any sacred lands or culturally significant sites would almost by definition

constitute irreparable harm.  Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010); Comanche Nation v. United States, No. CIV-08-849-D, 2008 WL 4426621, at *19 (W.D. Okla. Sept. 23, 2008) (harm to project would "pale in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief").  For the Miccosukee Tribe of Indians of Florida, for example, "[t]he entire way of life of the Tribe and its members, including their cultural, religious, economic, and historical identity, is based upon the Everglades and upon the preservation of the Everglades in its natural state."  (Exhibit 23; see also Exhibit 25 (explaining that state assumption "has placed several obstacles in the way of the Menominee Tribe in [its] efforts to protect [its] cultural, historic, and environmental resources currently under threat of impairment and destruction by the proposed state-permitted mine").)

Protection of these sacred sites also benefits the public because "[t]he importance of these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public."  Co. River Indian Tribes v. Marsh, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985).  Moreover, if the transfer and operation of the state program goes ahead, the Tribes' legally protected procedural interest in consultation could effectively be lost.  Quechan, 755 F. Supp. 2d at 1120.  Tribes affected by Florida's 404 assumption application should not lose these important federal rights while the legality of that program approval remains in question, particularly in light of the tribes' stated, and unresolved, concerns with the state's application and EPA's consultation process.

Lastly, there is a "strong public interest in meticulous compliance with the law by public officials."  Fund for Animals v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993).  See also Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice, No. 95-CV-1702 (GK), 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences…"); Fund for Animals, 814 F. Supp. at 152 ("[A] public interest expressed by Congress was frustrated by approval of this proposal" without compliance with environmental law).  In sum, there is "no question" that the public has an interest in having Congress' environmental mandates "carried out accurately and completely."  Brady Campaign to Prevent Gun Violence, 612 F. Supp. 2d at 26.

In light of all the foregoing, the balance of the equities and public interest favor issuance of the requested stay.

## Conclusion

For the reasons expressed above, Plaintiffs in the pending litigation respectfully request that EPA recognize that the transfer of authority was not lawful or, alternatively, if EPA lawfully promulgates a rule approving and codifying the state program, that the agency postpone its effective date.  For the reasons stated in the Complaint, Plaintiffs further request that EPA initiate withdrawal of the approval in accordance with 33 U.S.C. § 1344(i).

Sincerely,

TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

cc:     Tom Wall, Director, Office of Wetlands, Oceans and Watersheds, EPA,
        wall.tom@epa.gov

        Jim Payne, Deputy General Counsel for Environmental Media and Regional Law Offices,
        payne.james@epa.gov

        Robert Anderson, Principal Deputy Solicitor, U.S. Department of Interior,
        robert.anderson@sol.doi.gov

# Exhibit G



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, JACKSONVILLE DISTRICT
1520 ROYAL PALM SQUARE BLVD, SUITE 310
FORT MYERS, FL 33919

**May 30, 2019**

Regulatory Division
West Branch
Mining Team

# *PUBLIC NOTICE*

Permit Application No. SAJ-2008-03793 (SP-WDD)

TO WHOM IT MAY CONCERN:  The Jacksonville District of the U.S. Army Corps of Engineers (Corps) has received an application for a Department of the Army permit pursuant to Section 404 of the Clean Water Act (33 U.S.C. §1344) as described below:

APPLICANT:  Troyer Brothers Florida LLC
c/o Mr. Aaron Troyer
14700 Troyer Brothers Road
Fort Myers, FL 33913

WATERWAY AND LOCATION:  The project would affect waters of the United States associated with the Big Cypress Swamp Watershed (HUC 03090204).  The project site is located at 14700 Troyer Brothers Road south of State Road 82 in Section 33, Township 45 South, Range 27 East and Sections 4, 9, 16, & 21, Township 46 South, Range 27 East, Fort Myers, Lee County, Florida.

Directions to the site are as follows:  From I-75 exit Dr. Martin Luther King Jr. Blvd (SR 82) and head southeast for approximately 13.80 miles to Troyer Brothers Road and head south approximately 0.02 miles.  Project site begins at this location and heads south.

APPROXIMATE CENTRAL COORDINATES:   Latitude      26.489385°
Longitude    -81.621884°

PROJECT PURPOSE:

Basic:  Construction of a new limestone mine

Overall:  Construction of a new limestone mine and associated rock processing and ancillary operations in Lee County for construction purposes.

EXISTING CONDITIONS:  The wetland and surface water system is a freshwater system.  The predominant existing land use on the 1803.51-acre project site is row crops/fallow row crops (FLUCCS 214/261).  Additional land uses include residential (FLUCCS 110), commercial and services (FLUCCS 140), pine flatwoods (FLUCCS 411), live oak (FLUCCS 427), ditches (FLUCCS 510), mixed wetland hardwoods (FLUCCS 617), willow (FLUCCS 618), hydric melaleuca (FLUCCS 619), cypress

(FLUCCS 621/624), hydric pine flatwoods (FLUCCS 625), freshwater marshes (FLUCCS 641), borrow areas (FLUCCS 742), spoil areas (FLUCCS 743), and roads and highways (FLUCCS 814)  The existing area surrounding the project area consists of agricultural and mining land uses.

PROPOSED WORK:  The applicant seeks authorization to discharge dredged or fill material to construct and operate an FDOT-quality limerock aggregate and fill dirt mine and processing facility, including the extraction of 256,000 cubic yards of aggregate from the 1803.50+/- acres project site.  Approximately 202.79 acres of permanent wetland impacts and 10.8 acres of temporary wetland impacts are proposed to jurisdictional wetlands.

AVOIDANCE AND MINIMIZATION INFORMATION – The applicant has provided the following information in support of efforts to avoid and/or minimize impacts to the aquatic environment:

"This particular site was selected due to the fact that it can be economically mined without adversely impacting the overall water quality and natural water supply within this region, or significantly impacting other natural attributes associated with *the* wetlands and wildlife habitat that exists on this site and on the surrounding conservation lands. Impacts to wetlands are unavoidable due to the need for the size of the mining excavation area to provide an economically justifiable mine while placing the location of the proposed mine pit north to provide an extensive distance buffer between the mine operation area and nearby residences and businesses. Impacts to higher quality wetlands were avoided as much as practicable."

COMPENSATORY MITIGATION – The applicant has offered the following compensatory mitigation plan to offset unavoidable functional loss to the aquatic environment:

"Onsite enhancement and restoration totaling 941.03 acres is proposed to mitigate for wetland impacts."

The Corps notes that the project is within the service areas of five federally-approved wetland mitigation banks and will consider the mitigation hierarchy described in the 2008 Compensatory Mitigation Rule in its review of this project.

CULTURAL RESOURCES:  The Corps is not aware of any known historic properties within the permit area.  By copy of this public notice, the Corps is providing information for review.  Our final determination relative to historic resource impacts is subject to review by and coordination with the State Historic Preservation Officer and those federally recognized tribes with concerns in Florida and the Permit Area.

ENDANGERED SPECIES:  The project site is within the consultation areas for the Florida Panther (*Puma concolor coryi*), Florida bonneted bat (*Eumops floridanus*), Red cockaded woodpecker (*Picoides borealis*), Audubon's crested caracara (*Polyborus*

*plancus audubonii*), the Florida grasshopper sparrow (*Armnodramus savannarum floridanus*), the Everglade snail kite (*Rostrhamus sociabilis plumbeus*), and the Florida scrub jay (*Aphelocoma coerulescens*).  Additionally, the site has suitable habitat for the eastern indigo snake (*Drymarchon corais couperi*) and the wood stork (*Mycteria americana*).

The Corps has determined the proposed project "may affect" the Florida panther (*Puma concolor coryi*).  This determination is based on use of the Panther Key (February 19, 2007).  The Corps will request initiation of formal consultation with the Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act by separate letter.

The Corps has determined the proposed project "may affect" the Florida bonneted bat (*Eumops floridanus*).  This determination is based on the project impacts occurring within the consultation area (2013).  The Corps will request initiation of formal consultation with the Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act by separate letter.

The Corps has determined the proposed project "may affect, but is not likely to adversely affect" the red-cockaded woodpecker (*Picoides borealis*), Audubon's crested caracara (*Polyborus plancus audubonii*), the Florida grasshopper sparrow (*Armnodramus savannarum floridanus*), the Everglade snail kite (*Rostrhamus sociabilis plumbeus*), and the Florida scrub jay (*Aphelocoma coerulescens*).  This determination is based on the project impacts occurring within the consultation area.  The Corps will request initiation of informal consultation with the Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act by separate letter.

The Corps has determined the proposed project "may affect" the eastern indigo snake (*Drymarchon corais couperi*).  This determination was based on use of the Eastern Indigo Snake Programmatic Concurrence Key (August 1, 2017).  The Corps will request initiation of formal consultation with the Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act by separate letter.

The Corps has determined the proposed project "may affect, but is not likely to adversely affect" the wood stork (*Mycteria Americana*) or its designated critical habitat.  This determination was based on use of the U.S. Fish and Wildlife Service (FWS) wood stork key dated May 18, 2010.  No further consultation is necessary.

NOTE:  This public notice is being issued based on information furnished by the applicant.  This information has not been verified or evaluated to ensure compliance with laws and regulation governing the regulatory program.  The jurisdictional line has not been verified by Corps personnel.

AUTHORIZATION FROM OTHER AGENCIES:  Water Quality Certification may be required from the Florida Department of Environmental Protection and/or one of the state Water Management Districts.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to the attention of the District Engineer through the Mining Permits Section, 1520 Royal Palm Square Blvd, Suite 310, Fort Myers, FL 33919 within 30 days from the date of this notice.

The decision whether to issue or deny this permit application will be based on the information received from this public notice and the evaluation of the probable impact to the associated wetlands.  This is based on an analysis of the applicant's avoidance and minimization efforts for the project, as well as the compensatory mitigation proposed.

QUESTIONS concerning this application should be directed to the project manager, William DeFrance, in writing at the Fort Myers Permits Section, 1520 Royal Palm Square Blvd, Suite 310, Fort Myers, FL 33919; by electronic mail at William.D.DeFrance@usace.army.mil; or, by telephone at (239) 334-1975 x0002.

IMPACT ON NATURAL RESOURCES: Coordination with U.S. Fish and Wildlife Service, Environmental Protection Agency (EPA), the National Marine Fisheries Services, and other Federal, State, and local agencies, environmental groups, and concerned citizens generally yields pertinent environmental information that is instrumental in determining the impact the proposed action will have on the natural resources of the area.

EVALUATION: The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including cumulative impacts thereof; among these are conservation, economics, esthetics, general environmental concerns, wetlands, historical properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food, and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people. Evaluation of the impact of the activity on the public interest will also include application of the guidelines promulgated by the Administrator, EPA, under authority of Section 404(b) of the Clean Water Act or the criteria established under authority of Section 102(a) of the Marine Protection Research and Sanctuaries Act of 1972.  A permit will be granted unless its issuance is found to be contrary to the public interest.

The US Army Corps of Engineers (Corps) is soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this determination,

comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

COASTAL ZONE MANAGEMENT CONSISTENCY: In Florida, the State approval constitutes compliance with the approved Coastal Zone Management Plan.  In Puerto Rico, a Coastal Zone Management Consistency Concurrence is required from the Puerto Rico Planning Board.  In the Virgin Islands, the Department of Planning and Natural Resources permit constitutes compliance with the Coastal Zone Management Plan.

REQUEST FOR PUBLIC HEARING: Any person may request a public hearing. The request must be submitted in writing to the District Engineer within the designated comment period of the notice and must state the specific reasons for requesting the public hearing.



## Vegetation Map







PERMIT USE ONLY, NOT FOR CONSTRUCTION



# Troyer Brothers Agricultural Property

**COE Jurisdictional Wetlands to be Permanently Impacted (202.79 ac.)**

**COE Jurisdictional Wetlands to be Temporarily Impacted (10.8 ac.)**

**COE Jurisdictional Wetlands to be Avoided (594.24 ac.)**

Notes:
1. Property and project boundaries are approximate and were obtained from Morris–Depew Associates.
2. Mapping based on photointerpretation of 2015 aerial photography and ground truthing in February 2016.
3. Delineation of jurisdictional wetlands approved by FDEP in April 2009.
4. FLUCCS and impact acreages reflect overall property.

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 27, 2019 3:09:15 p.m.
Drawing: HGS1COLORIMPACT.DWG

**Matchline**

**Color Coded**
**Impact Map – Sheet 1**



*DexBender*
*ENVIRONMENTAL CONSULTING*
FORT MYERS 239–334–3680



# Troyer Brothers Agricultural Property

**Matchline**

0    800    1,600
SCALE    FEET

COE Jurisdictional Wetlands to be
Permanently Impacted (202.79 ac.)

COE Jurisdictional Wetlands to be
Temporarily Impacted (10.8 ac.)

COE Jurisdictional Wetlands to be
Avoided (594.24 ac.)

Notes:
1. Property and project boundaries are approximate and were
   obtained from Morris–Depew Associates.
2. Mapping based on photointerpretation of 2015 aerial
   photography and ground truthing in February 2016.
3. Delineation of jurisdictional wetlands approved by FDEP
   in April 2009.
4. FLUCCS and impact acreages reflect overall property.

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*
February 27, 2019 3:09:15 p.m.
Drawing: HGS1COLORIMPACT.DWG

**Color Coded
Impact Map – Sheet 2**

**DEXBENDER**
ENVIRONMENTAL CONSULTING
FORT MYERS 239–334–3680

# Troyer Brothers Agricultural Property

State Road 82

140
(12.44 ac.)

510D
(0.99 ac.)

214
(15.45 ac.)

814
(25.41 ac.)

743
(2.88 ac.)

510D
(0.38 ac.)

742
(0.75 ac.)

W-2

'621E2'
(12.37 ac.)

W-1

510D
(0.90 ac.)

214
(17.57 ac.)

814

743
(0.40 ac.)

MATCHLINE A

510D

0   300   600
SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP-WET-8.5X11.DWG

*Impact Map - Sheet 1*



DexBENDER
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property

MATCHLINE A

743
(0.40 ac.)

510D
(0.43 ac.)

214
(12.89 ac.)

510D
(0.52 ac.)

**W-3**

743
(0.57 ac.)

618E2
(2.61 ac.)

214
(8.13 ac.)

510D
(0.74 ac.)

624E
(2.02 ac.)

**W-5A**

743

261HE2
(5.34 ac.)

617E
(7.56 ac.)

110
(9.00 ac.)

510D
(0.49 ac.)

742
(0.58 ac.)

742
(0.58 ac.)

743

261
(17.31 ac.)

**W-5B**

617E1
(5.32 ac.)

617E1
(9.25 ac.)

814

510D
(0.26 ac.)

743
(18.61 ac.)

**W-4**
621E1
(14.53 ac.)

618E
(1.87 ac.)

**W-6A**

624E2
(0.70 ac.)

641E1
(163.50 ac.)

624E
(1.95 ac.)

510D
(1.25 ac.)

411E2
(6.20 ac.)

621E2
(2.65 ac.)

641E1
1.24 ac.

621E2
(4.09 ac.)

743

510D

261
(36.69 ac.)

MATCHLINE B

743

| 0 | 300 | 600 |

SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1MP–WET–8.5X11.DWG

*Impact Map – Sheet 2*



DexBender
ENVIRONMENTAL CONSULTING
FORT MYERS 239–334–3680

# Troyer Brothers Agricultural Property



(36.69 ac.)

MATCHLINE B

411E1
(0.27 ac.)

510D
(0.69 ac.)

743

617E3
(18.26 ac.)

641E1
(25.10 ac.)

743

641E1
(2.95 ac.)

427E2
2.51 ac.

W-7

814

743

510D
(0.31 ac.)

261
(34.74 ac.)

510D
(0.45 ac.)

617E2
(15.21 ac.)

743

510D
(0.27 ac.)

214

510D
(0.60 ac.)

617E3

743

617E3
(7.58 ac.)

W-6B

510D
(0.74 ac.)

510D
(0.56 ac.)

743

214

510D
(2.35 ac.)

510D
(1.50 ac.)

510D

743

510D
(5.61 ac.)

743
(1.11 ac.)

617E
3.23 ac.

W-8

641E
(0.83 ac.)

814

641E
(9.07 ac.)

743
(15.19 ac.)

W-9

743

214

510D
(0.63 ac.)

641E1
(5.41 ac.)

W-11

510D
(1.55 ac.)

W-8A

214
(11.60 ac.)

617E2
(2.91 ac.)

641E1
(7.26 ac.)

743
(26.14 ac.)

510D
(0.51 ac.)

619M
(2.05 ac.)

510D

MATCHLINE C

510D
(3.15 ac.)

743

0   300   600

SCALE   FEET

PERMIT USE ONLY, NOT FOR CONSTRUCTION

February 26, 2019 2:02:27 p.m.
Drawing: HGS1MP-WET-8.5X11.DWG

## Impact Map - Sheet 3

DexBENDER
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property



MATCHLINE C

510D
(3.15 ac.)

743

743

214

510D

W-12B
641E1
(1.66 ac.)

743

510D

W-12A
641E1
(5.51 ac.)

510D
(0.45 ac.)

510D

641E1
(40.39 ac.)

W-10

625E1
(17.88 ac.)

814

743

510D
(3.27 ac.)

743

743

510D

214
(637.23 ac.)

510D

621E1
(84.15 ac.)

510D

743

510D

W-18
641E1
(9.69 ac.)

510D

743

510D
(3.96 ac.)

743

617E1
(2.84 ac.)

W-13

743

617E1
(17.37 ac.)

510D

814

619M
(3.84 ac.)

214

743

618E
(0.90 ac.)

MATCHLINE D

510D

0   300   600

SCALE   FEET

PERMIT USE ONLY, NOT FOR CONSTRUCTION

February 26, 2019  2:02:27 p.m.
Drawing: HGS1MP–WET–8.5X11.DWG

*Impact Map – Sheet 4*

**DexBender**
ENVIRONMENTAL CONSULTING
FORT MYERS 239–334–3680



# Troyer Brothers Agricultural Property

Impact Map – Sheet 5

PERMIT USE ONLY, NOT FOR CONSTRUCTION

February 26, 2019 2:02:27 p.m.
Drawing: HGS1MP—WET—8.5X11.DWG

DexBENDER
ENVIRONMENTAL CONSULTING
FORT MYERS 239—334—3680

# Troyer Brothers Agricultural Property

MATCHLINE E

411E1
(16.49 ac.)

617E2
(3.26 ac.)

617E1
(2.99 ac.)

625E1
(62.97 ac.)

W-19

411E2
(1.70 ac.)

411E2
(9.47 ac.)

261
(43.48 ac.)

411E1
(3.69 ac.)

Corkscrew Road

0   300   600
SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019  2:02:27 p.m.
Drawing: HGS1IMP−WET−8.5X11.DWG

## *Impact Map - Sheet 6*



DexBENDER
ENVIRONMENTAL CONSULTING
FORT MYERS 239−334−3680

SECTIONS: 28 and 33
TOWNSHIP: 45 S
RANGE: 27 E

## Troyer Brothers Agricultural Property

SECTIONS: 4, 9, 16, and 21
TOWNSHIP: 46 S
RANGE: 27 E

| FLUCCS | Description | Acreage |
|---|---|---|
| 110 | Residential | 9.00 ac. |
| 140 | Commercial and Services | 12.44 ac. |
| 214 | Row Crops | 702.88 ac. |
| 261 | Fallow Crop Land | 132.22 ac. |
| 261HE2 | Hydric Fallow Crop Land Invaded by Exotics (26-50%) | 5.34 ac. |
| 411E | Pine Flatwoods Invaded by Exotics(5-9%) | 3.69 ac. |
| 411E1 | Pine Flatwoods Invaded by Exotics(10-25%) | 16.76 ac. |
| 411E2 | Pine Flatwoods Invaded by Exotics(26-50%) | 17.37 ac. |
| 427E1 | Live Oak Invaded by Exotics( 10-25%) | 2.51 ac. |
| 510D | Ditches | 42.76 ac. |
| 617E | Mixed Wetland Hardwoods Invaded by Exotics(5-9%) | 6.20 ac. |
| 617E1 | Mixed Wetland Hardwoods Invaded by Exotics(10-25%) | 34.78 ac. |
| 617E2 | Mixed Wetland Hardwoods Invaded by Exotics(26-50%) | 21.38 ac. |
| 617E3 | Mixed Wetland Hardwoods Invaded by Exotics(51-75%) | 33.41 ac. |
| 618E | Willow Invaded by Exotics(5-9%) | 2.77 ac. |
| 618E2 | Willow Invaded by Exotics(26-50%) | 2.61 ac. |
| 619M | Hydric Melaleuca | 9.44 ac. |
| 621E | Cypress Invaded by Exotics(5-9%) | 4.09 ac. |
| 621E1 | Cypress Invaded by Exotics(10-25%) | 199.31 ac. |
| 621E2 | Cypress Invaded by Exotics(26-50%) | 18.84 ac. |
| 624E | Cypress - Pine Invaded by Exotics(5-9%) | 9.03 ac. |
| 624E1 | Cypress - Pine Invaded by Exotics(10-25%) | 20.00 ac. |
| 625E | Hydric Pine Flatwoods Invaded by Exotics(5-9%) | 62.97 ac. |
| 625E1 | Hydric Pine Flatwoods Invaded by Exotics(10-25%) | 17.88 ac. |
| 641E | Freshwater Marshes Invaded by Exotics(5-9%) | 9.90 ac. |
| 641E1 | Freshwater Marshes Invaded by Exotics(10-25%) | 305.20 ac. |
| 742 | Borrow Areas | 1.91 ac. |
| 743 | Berms | 73.40 ac. |
| 814 | Roads and Highways | Total | 25.41 ac. |
| | | | 1,803.5 ac. |

 Wetland Dredge (134.46 ac.)

 Wetland Preserve (594.24 ac.)

 Wetland Fill (68.33 ac.)

 Upland Preserve (39.98 ac.)

 Temporary Impact (10.8 ac.)

Notes:
1. Property and project boundaries are approximate and were obtained from Morris–Depew Associates.
2. Mapping based on photointerpretation of 2015 aerial photography and ground truthing in February 2016.
3. Delineation of jurisdictional wetlands approved by FDEP in April 2009.
4. FLUCCS and impact acreages reflect overall property.

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP–WET–8.5X11.DWG



# Troyer Brothers Agricultural Property

State Road 82

140
(12.44 ac.)

510D
(0.99 ac.)

214
(15.45 ac.)

814
(25.41 ac.)

510D
(0.38 ac.)

743
(2.88 ac.)

742
(0.75 ac.)

W-2

621E2
(12.37 ac.)
W-1

510D
(0.90 ac.)

214
(17.57 ac.)

814

743
(0.40 ac.)

**MATCHLINE A**

510D

0    300    600

*SCALE    FEET*



*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP-WET-8.5X11.DWG

*Wetland Map - Sheet 1*



*DexBender*
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property

MATCHLINE A

743
(0.40 ac.)

510D
(0.43 ac.)

214
(12.89 ac.)

510D
(0.52 ac.)

W-3

743
(0.57 ac.)

618E2
(2.61 ac.)

214
(8.13 ac.)

510D
(0.74 ac.)

624E
(2.02 ac.)

W-5A

743

261HE2
(5.34 ac.)

110
(9.00 ac.)

617E
(7.56 ac.)

510D
(0.49 ac.)

742
(0.58 ac.)

742
(0.58 ac.)

743

261
(17.31 ac.)

W-5B

814

617E1
(5.32 ac.)

617E1
(9.25 ac.)

743
(18.61 ac.)

510D
(0.26 ac.)

W-4

621E1
(14.53 ac.)

618E
(1.87 ac.)

W-6A

641E1
(163.50 ac.)

624E2
(0.70 ac.)

624E
(1.95 ac.)

510D
(1.25 ac.)

411E2
(6.20 ac.)

621E2
(2.65 ac.)

641E1
(1.24 ac.)

621E2
(4.09 ac.)

743

510D

261
(36.69 ac.)

MATCHLINE B

743

0   300   600

SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP-WET-8.5X11.DWG

*Wetland Map - Sheet 2*



**DexBender**
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property

(36.69 ac.)

MATCHLINE B

743

411E1
(0.27 ac.)

510D
(0.69 ac.)

617E3
(18.26 ac.)

641E1
(25.10 ac.)

743

641E1
(2.95 ac.)

427E2
2.51 ac.

W-7

814

743

261
(34.74 ac.)

510D
(0.31 ac.)

510D
(0.45 ac.)

743

617E2
(15.21 ac.)

510D
(0.27 ac.)

214

510D
(0.60 ac.)

617E3

743

510D
(0.56 ac.)

617E3
(7.58 ac.)

W-6B

510D
(0.74 ac.)

743

214

510D
(2.35 ac.)

510D
(1.50 ac.)

510D

743

743
(1.11 ac.)

510D
(5.61 ac.)

617E
(3.23 ac.)

W-8

641E
(0.83 ac.)

814

641E
(9.07 ac.)

W-9

743
(15.19 ac.)

510D
(0.63 ac.)

743

214

510D
(1.55 ac.)

W-8A

641E1
(5.41 ac.)

W-11

641E1
(7.26 ac.)

214
(11.60 ac.)

617E2
(2.91 ac.)

743
(26.14 ac.)

510D
(0.51 ac.)

510D

619M
(2.05 ac.)

MATCHLINE C

510D
(3.15 ac.)

743

0   300   600

SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1MP-WET-8.5X11.DWG

## Wetland Map - Sheet 3

**DexBender**
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property



PERMIT USE ONLY, NOT FOR CONSTRUCTION

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP—WET—8.5X11.DWG

## Wetland Map - Sheet 4

**DexBender**
ENVIRONMENTAL CONSULTING
FORT MYERS 239—334—3680



# Troyer Brothers Agricultural Property

*Wetland Map - Sheet 5*

PERMIT USE ONLY, NOT FOR CONSTRUCTION

# Troyer Brothers Agricultural Property

MATCHLINE E

411E1
(16.49 ac.)

617E2
(3.26 ac.)

617E1
(2.99 ac.)

625E1
(62.97 ac.)

W-19

411E2
(1.70 ac.)

411E2
(9.47 ac.)

261
(43.48 ac.)

411E
(3.69 ac.)

Corkscrew Road

0    300    600

SCALE   FEET

*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP-WET-8.5X11.DWG

*Wetland Map - Sheet 6*



*DEXBENDER*
ENVIRONMENTAL CONSULTING
FORT MYERS 239-334-3680

# Troyer Brothers Agricultural Property

**SECTIONS:** 28 and 33
**TOWNSHIP:** 45 S
**RANGE:** 27 E

**SECTIONS:** 4, 9, 16, and 21
**TOWNSHIP:** 46 S
**RANGE:** 27 E

| FLUCCS | Description | Acreage |
|---|---|---|
| 110 | Residential | 9.00 ac. |
| 140 | Commercial and Services | 12.44 ac. |
| 214 | Row Crops | 702.88 ac. |
| 261 | Fallow Crop Land | 132.22 ac. |
| 261HE2 | Hydric Fallow Crop Land Invaded by Exotics (26-50%) | 5.34 ac. |
| 411E | Pine Flatwoods Invaded by Exotics (5-9%) | 3.69 ac. |
| 411E1 | Pine Flatwoods Invaded by Exotics (10-25%) | 16.76 ac. |
| 411E2 | Pine Flatwoods Invaded by Exotics (26-50%) | 17.37 ac. |
| 427E1 | Live Oak Invaded by Exotics( 10-25%) | 2.51 ac. |
| 510D | Ditches | 42.76 ac. |
| 617E | Mixed Wetland Hardwoods Invaded by Exotics (5-9%) | 6.20 ac. |
| 617E1 | Mixed Wetland Hardwoods Invaded by Exotics(10-25%) | 34.78 ac. |
| 617E2 | Mixed Wetland Hardwoods Invaded by Exotics (26-50%) | 21.38 ac. |
| 617E3 | Mixed Wetland Hardwoods Invaded by Exotics(51-75%) | 33.41 ac. |
| 618E | Willow Invaded by Exotics(5-9%) | 2.77 ac. |
| 618E2 | Willow Invaded by Exotics(26-50%) | 2.61 ac. |
| 619M | Hydric Melaleuca | 9.44 ac. |
| 621E | Cypress Invaded by Exotics (5-9%) | 4.09 ac. |
| 621E1 | Cypress Invaded by Exotics (10-25%) | 199.31 ac. |
| 621E2 | Cypress Invaded by Exotics (26-50%) | 18.84 ac. |
| 624E | Cypress - Pine Invaded by Exotics (5-9%) | 9.03 ac. |
| 624E1 | Cypress - Pine Invaded by Exotics(10-25%) | 20.00 ac. |
| 625E | Hydric Pine Flatwoods Invaded by Exotics(5-9%) | 62.97 ac. |
| 625E1 | Hydric Pine Flatwoods Invaded by Exotics (10-25%) | 17.88 ac. |
| 641E | Freshwater Marshes Invaded by Exotics(5-9%) | 9.90 ac. |
| 641E1 | Freshwater Marshes Invaded by Exotics(10-25%) | 305.20 ac. |
| 742 | Borrow Areas | 1.91 ac. |
| 743 | Berms | 73.40 ac. |
| 814 | Roads and Highways    Total | 25.41 ac. |
| | | 1,803.5 ac. |

 **COE Jurisdictional Wetland (807.82 ac.)**

Notes:
1. Property and project boundaries are approximate and were obtained from Morris Depew Associates.
2. Mapping based on photointerpretation of 2015 aerial photography and ground truthing in February 2016.
3. Delineation of jurisdictional wetlands approved by FDEP in April 2009.
4. FLUCCS and impact acreages reflect overall property.



*PERMIT USE ONLY, NOT FOR CONSTRUCTION*

February 26, 2019 2:02:27 p.m.
Drawing: HGS1IMP–WET–8.5X11.DWG

*Wetland Map - Sheet 7*



DexBender
ENVIRONMENTAL CONSULTING
FORT MYERS 239 334 3680

# Exhibit H



*Protecting Southwest Florida's unique natural environment and quality of life … now and forever.*

July 11, 2019

William DeFrance, Project Manager                                        *Sent via email*
US Army Corps of Engineers
1520 Royal Palm Square Blvd.
Suite 310
Fort Myers, FL 33919

Larry Williams, Field Supervisor
US Fish and Wildlife Service
1339 20th Street
Vero Beach, FL 32960

            RE: Troyer Mine, Lee County (SAJ-2008-03793)

Dear Mr. DeFrance and Mr. Williams:

The Conservancy of Southwest Florida, on behalf of our more than 7,000 members, writes with concerns regarding the proposed Troyer Mine (SAJ-2008-03793). This large project, at over 1,800 acres, is proposed in the heart of Lee County panther habitat and would sever flowways that sustain the Flint Pen Strand. As the Troyer site is surrounded by the Airport Mitigation Park, Sam Galloway Tract Preserve, Imperial Marsh Preserve, and Corkscrew Regional Mitigation Bank, the project also jeopardizes adjacent public preserved lands and regional water resources.

<u>Project Proposes Significant and Adverse Impacts to Listed Species and Their Habitats</u>

We are concerned that the proposed Troyer Mine may adversely affect several listed species. Listed species that have been observed on the site include: Audubon crested caracara, bald eagle, wood stork, Florida sandhill crane, roseate spoonbill, limpkin, little blue heron, snowy egret, tri-colored heron, white ibis, American alligator, and Big Cypress fox squirrel. In addition, the site contains viable habitat for a number of additional listed species, including the Everglades snail kite, the Florida black bear, and the Florida panther.[1] Furthermore, this site is considered essential habitat for the critically endangered Florida panther (about 90% of the site is Primary Zone priority panther habitat, with the remainder being Secondary Zone panther habitat). The mine is proposed adjacent to public lands which are also heavily utilized by the panther and other listed species. The project may adversely affect the panther and other federally-listed species listed under the Endangered Species Act (ESA).

---

[1] Lee County Division of Environmental Sciences, 2018. Staff Report from Department of Community Developments, Division of Environmental Sciences for Troyer Brothers MEPD. June 8, 2018. P. 5-8.

 Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

*Impacts to Crested Caracara*

The Conservancy is concerned about adverse impacts from the proposed Troyer Mine on crested caracaras, including an observation of a foraging caracara in the northern row crops near the entrance to Troyer Farms.[2] While no nests were yet found onsite, suitable habitat is located on-site, particularly between Wetlands W-3 and W-4 that are both slated to be removed.[1] With no change in site design, the project will not only disturb and harass present caracaras, but will also result in loss of occupied habitat within established caracara territories.

The applicant should conduct caracara surveys, consistent with U.S. Fish and Wildlife Survey policy, to account for any nests that are off-site but where the project falls within the 1,500 meter protective buffer area.[3]

A prime objective for caracara recovery is to "protect and enhance currently occupied habitat."[4] Likewise, the USFWS Species Conservation Guidelines require protection practices within the primary zone and secondary zone habitats, such as conservation of pasture and grassland habitats. Habitat loss within this area, as well as the disturbance from mining activities within the area, threaten to harm and harass caracaras. FWS guidelines stipulate that "new construction [within the management zones] that will increase the level of disturbance may adversely affect caracaras." [5]

Therefore, the ACOE and FWS should determine that the project 'may adversely affect' the crested caracara and initiate formal consultation to ensure impacts to nesting and foraging caracaras are avoided and minimized.

*Impacts to Wood Storks*

The proposed Troyer Mine is also within the Core Foraging Area (CFA) of three active wood stork colonies (Exhibit A). Endangered wood storks rely on the hundreds of acres of freshwater marsh and hydric pine flatwoods within the proposed mine site and will be adversely affected by the proposed impacts to 214 acres of wetlands and irrigation ditches on the site.

Not only will the project impact occupied habitat on-site, it will also create an ongoing disturbance impact with the dragline and blasting operating up to 24 hours a day, six days a week, with a total operation of 35 years.[2]

Although the applicant is offering to create littoral wetlands around the mining pits as part of their mitigation required by Lee County, the success of these created habitats and their ability to provide long-term and viable foraging habitat has been questioned by the FWS (Enclosure letter

---

[2] Lee County Division of Environmental Sciences, 2010. Staff Report from Department of Community Developments, Division of Environmental Sciences for Troyer Brothers MEPD. November 2, 2010. P. 4.
[3] US Fish and Wildlife Service, 2017. USFWS Crested Caracara Draft Survey Protocol – Additional Guidance.
[4] Multi-Species Recovery Plan for Florida Audubon's Crested Caracara. P. 4-233.
[5] US Fish and Wildlife Service, April 20, 2004. South Florida Ecological Services Office, Species Conservation Guidelines, Audubon's Crested Caracara. P. 3.

by U.S. Fish and Wildlife Service to Troyer Mine RAI).[6] In fact, the FWS states that this type of created habitat results in high fish numbers; however, these numbers are not a reliable indicator of quality foraging habitat for wading birds.[6] For these types of created habitats, efficacy is negatively affected by loss of organic muck, lack of emergent vegetation diversity, uniform surfaces that lack habitat refuge, and damaging wave energy, etc.[7]

Impacts that may result in take, such as loss of wetlands, should be adequately compensated with tried-and-true and scientifically-supported measures. Thus, the FWS may wish to withhold full compensatory credit until the time that these techniques are fully proven.

*Impacts to Florida Panther*

The Conservancy is very concerned that the proposed Troyer Mine will jeopardize the endangered Florida panther and its habitat. The project will directly destroy 907.6 acres of essential habitat necessary to sustain the panther population, even at its current critically-low status.[8] Additional acreage of panther habitat on site will be degraded and fragmented.

The proposed mining site is located entirely within Primary and Secondary Habitat Zones and 91% of the site is Adult Breeding Habitat for the Florida panther, an area, which as the FWS acknowledges, "supports the breeding population of panthers" (Exhibit B).[9] Kautz et al. (2006)[8] is considered best available science and recognizes the habitat areas delineated in the study as crucial for Florida panther recovery.[10] The area defined as the Primary Zone is the minimum "space to support a population that is barely viable demographically as long as the habitat base remains stable" and therefore advocates for a "no net loss of landscape function or carrying capacity." [8] The delineated habitat zones are essential to long-term viability, survival, and recovery of the species, yet this project proposes to destroy hundreds of acres of habitat. Loss of habitat, particularly in the Lee-Collier area where fragmentation, isolation, and degradation of habitat have been occurring rapidly, will have devastating individual and cumulative effects.

The Florida Panther Recovery Plan indicates that while loss and fragmentation of habitat is the leading threat to the survival of the species, panthers also "avoid areas within their home range with intensification of disturbance".[10]  Being directly adjacent to heavily utilized wildlife habitat, this intensification of use has the potential to seriously impact both the function and value of these areas for the Florida panther and wildlife in general.

---

[6] US Fish and Wildlife Service, 2009. Letter from US Fish and Wildlife Service to US Army Corps of Engineers regarding Troyer Mine. August 14, 2009. P. 7.
[7] US Army Corps of Engineers, 2009. Final Supplemental Environmental Impact Statement on Rock Mining in the Lake Belt Region of Miami-Dad County, Florida, as cited in US Fish and Wildlife Service, 2009. Letter from US Fish and Wildlife Service to US Army Corps of Engineers regarding Troyer Mine. August 14, 2009. P.7.
[8] Kautz, et al (2006). How much is enough? Landscape-scale conservation for the Florida panther. *Biological Conservation*: Vol. 130, p. 118-133. P. 131.
[9] US Fish and Wildlife Service, 2009. Letter from US Fish and Wildlife Service to US Army Corps of Engineers regarding Troyer Mine. August 14, 2009. P. 2.
[10] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan, 3rd Revision.

Glare and light trespass from the mine site will also be detrimental to established Florida panther habitat and the functionality of conservation lands, which is directly adjacent to the mine, as a panther corridor.  Artificial lighting is known to have negative effects on wildlife behavior.[10] The application of this principle on as large a scale as the Troyer Brothers Mine suggests, the lights from the mine site may impact the panther's use of adjacent conservation habitat areas, especially given the possibility of the mine operating 24 hours during emergency situations. These habitat impacts are the unavoidable result of intensification and increased human activity of any mining operation and especially in this case where the mine proposes direct impacts to established panther habitat.

Mining impacts such as blasting, equipment noise, dust, and bright lights could cause increased disturbance and the excavation of mine pits will result in direct and permanent habitat loss, fragmentation of established travel routes, and an increase in incidental vehicular deaths of this endangered species from truck and vehicle traffic generated by the project. The mine operation will significantly increase the number of trucks using SR82 creating a negative and incompatible impact on the existing residents in this area, as well as burden State Road 82/ Immokalee Road by adding 2,089 truck trips daily.

Due to the large loss of habitat acreage and indirect effect of panther mortality due to increased traffic, the project should be denied as proposed. The ACOE and FWS should determine that this project adversely impacts the Florida panther, and initiate formal consultation to avoid and minimize impacts to this species.


Project Proposes Significant and Adverse Impacts to Flowways and Water Resources

Mining within this area of Lee County creates many potential impacts to groundwater availability and impacts to natural areas. These potential impacts include increased evaporation for lakes created for mining, lowered water table, and adjacent wetlands being drained due to seepage from wetlands into the mines. Limerock mining does irreparable damage to groundwater and flowway patterns and levels (Exhibit C), which can never be restored once a property is mined.

The applicant claims that wetland impacts have been avoided and minimized due to selection of this site which they state "can be... mined without adversely impacting the overall water quality and natural water supply within this region, or significantly impacting other attributes associated with the wetlands and wildlife habitat that exists on this site and on the surrounding conservation lands."[11] As explained above, the project will adversely impact listed species. The project will also have negative impacts on water resources as well, as explained below. Therefore, the applicant has not adequately avoided and minimized impacts and does not adequately met the requirements of the Clean Water Act.

---

[11] Army Corps of Engineers, 2019. Troyer Brothers Florida LLC. Public Notice. May 30, 2019.

*Increased Evaporation*

The applicant intends to create one 781 acre mining pit, representing 45% of the overall property. In the dry season when most evaporation occurs, the mine lake elevations decreases resulting in a much lower than normal water elevation.

For example, the nearby Bell Road Mine, which has two lakes of approximately 30 feet in depth, is already impacting the adjacent landowners due to evaporation. In the dry season the Bell Mine lake elevation is lower than the groundwater which causes groundwater to be drawn towards it. The lowering of the lake elevation is caused by evaporation of the lake water being much greater than that from the soils above the aquifer in the area.[12]

The county funded 2009 DHI hydrology report looked at four different land use change scenarios which involved the impact of mining.  On page 12 of the report it states "This modeling has indicated, in general, that the annual averaged ET (evapotranspiration) rates from the DR/GR Area would be higher with greater areal coverage of mining pits.  The surface water outflow rate (runoff) from the DR/GR Area was lower in all the scenarios compared to the ECM (existing conditions model), which is likely related to the greater mining pit coverage.  These results are expected due to the higher ET losses and the lower runoff from mining pits and its effects on the surface water flow in neighboring areas."[13]   Decreasing water flow to the DR/GR area as predicted by this model would be detrimental.

The evidence confirms that the larger Troyer mine lakes will have a significant adverse impact to the adjacent land owners and conservation lands.

*Lowered Water Table*

The funded Lee County Report by DHI states that the creation of mine lakes will lower the dry season groundwater elevation around them and decrease the flow to the Density Reduction/Groundwater Resource area.[13] Creation of the mine lake will lower the areas groundwater elevation in the dry season greater than normal. This will greatly impact the ecology of the DR/GR; plants and animals which have sensitive ecologic requirements during the dry season will also be greatly impacted. Construction of the mine may lower the water table 23 inches further than normal in the dry season in the north part of the property.[12]

*Impacts to Wetlands*

A change of the water table by creation of mine lakes would have an adverse impact on the existing farm lands and wetland areas. The wetland ecosystem depends on the water levels not to go lower than three to six inches below the low point natural hydro-period.[12] Lowering the water table several inches by the mining lakes would have adverse impact upon the wetlands. [14]

---

[12] Dannemiller, Gary (2018). Hydrologic Opinion Report on Impact of Proposed Troyer Mining Upon Adjacent Property, Lee County, Florida.
[13] DHI (2009).Comprehensive Hydrological Study of the Lee County Southeastern Density Reduction/Groundwater Resource (DR/GR) Area.
[14] Richardson, Vepraskas. Wetland Soils,  p 29

The Troyer lands are adjacent to a number of conservation tracts, and the proposed mining has the potential to disrupt and alter hydrology on the adjacent wetlands and uplands.

Besides the impact to the wetlands on adjacent conservation lands, the project is proposing to impact 214 acres of wetlands. Although the applicant plans mitigation, they have not adequately demonstrated avoidance and minimization of these impacts. Further, we are concerned about the impact the direct removal of wetlands will have on wildlife, especially wading birds. As stated previously, no set of conditions can be crafted that will successfully mitigate for the damage caused by the proposed mine.

*Impacts to Flowways and Water Quality*

A water quality issues at the proposed Troyer mine lake has already been anticipated and "resolved" by approving a variance the applicant petitioned with the Bureau of Mining and Mineral Regulation, Department of Environmental Protection, State of Florida. The original petition for variance occurred on February 11, 2009 and it was approved on April 5, 2011. The projected future violation would be for not meeting the dissolved oxygen levels in the lower part of the proposed lakes as required by Sections 373.414(17) and 403.201(1)(a, F.S., and 62-302.530(31), F.A.C. These sections provide for minimum standards for the dissolved oxygen levels in surface waters made by the State of Florida. Creation of deep, large lakes (up to 110 feet deep) brings additional water quality problems.[12] This resolution, crafted nearly a decade ago, does not adequately address or solve the problems created by allowing these deep pits.

Impacts to Surrounding Environmentally-Sensitive Lands and Community Character

The Troyer property is located within Lee County's 83,000 acre DR/GR area. Although this planning area designation is a local one, the DR/GR aims to reduce density, preserve wildlife habitat, and protect vital groundwater resources, which supply over 80% of Lee County's public drinking water and also make up the headwaters of the Estero River, Flint Pen Strand, and the Imperial River/Spring Creek Watersheds. This is a significant environmentally-sensitive area with thousands of acres of preserved lands, and critical natural resources.

*Impacts to Surrounding Public and Conservation Lands*

The DR/GR area also contains several significant publicly-owned lands and conservation lands. The proposed project site itself is surrounded by several regionally significant conservation lands. The site is bounded to the west by the Sam Galloway Tract at the Imperial Marsh Preserve (a 400-acre preserve), and to the east by the Corkscrew Regional Mitigation Bank (a 632-acre preserve), and the Airport Mitigation Park (a 6,000-acre preserve which also connects south to the Flint Pen Strand Preserve and the Corkscrew Regional Ecosystem Watershed) (Exhibit D).

The Conservancy is concerned that the location of this project will jeopardize the functionality of these preserves, both in regards to disturbance affecting its value as wildlife habitat, as well as the hydrological impacts of the mine on these wetland areas. Together with the permanent

physical barrier created by the mining lakes and intensified activity, the proposed project will create a barrier between the preserve lands that encompass it. Due to these impacts, the project should be denied as proposed.

*Impacts to Surrounding Rural Residential Communities*

In addition to public lands, there are a number of rural residential communities in close proximity to the proposed mine. The impacts from locating a mine site so close to these small, rural communities adjacent to the property and along Corkscrew Road is inappropriate and will result in negative impacts to those communities which could change the character of these rural communities. Outside of the DR/GR, but adjacent to the northern boundary of the proposed site, the Lehigh Acres residential community is a more urbanized area, but will be subject to similar impacts like increased truck traffic and noise pollution. Due to the location of the mine and the impacts of its truck traffic, the mine is highly controversial, and also poses a threat to public health and safety.

<u>Troyer Mine Proposes Individual and Cumulative Significant Impacts and Requires EISs</u>

The proposed Troyer Mine, in addition to other reasonably foreseeable actions in the area, pose unacceptable affects both on an individual and a cumulative basis. An individual EIS for the Troyer Mine, as well as a cumulative EIS for mining in the area, is critically needed.

As outlined in the sections above, the Troyer Mine, as an individual project, will significantly impact the human environment, as defined under 40 C.F.R. § 1508.27. The mine will have impacts not just at the site, but also on adjacent landowners and regionally-significant natural resources. As mining will permanently impact the landscape and hydrology of the area, these impacts are immediate, as well as long-lasting. In all of these contexts,[15] the affect is severe[16]: public health and safety is compromised through truck traffic and water resource changes,[17] farmlands and wetlands and ecologically critical areas will be impacted,[18] the proposed project is controversial,[19] the effect of post-mining land use on water resources and wildlife is not known,[20] and listed species under the ESA are adversely affected.[21]

The Council on Environmental Quality has identified that "the increased use of EAs rather than EISs in recent years could exacerbate the cumulative effects problem" and "because EAs focus on whether effects are significant, they tend to underestimate the cumulative effects of their projects."[22]

---

[15] 40 C.F.R. § 1508.27(a).
[16] 40 C.F.R. § 1508.27(b).
[17] 40 C.F.R. § 1508.27(b)(2).
[18] 40 C.F.R. § 1508.27(b)(3).
[19] 40 C.F.R. § 1508.27(b)(4).
[20] 40 C.F.R. § 1508.27(b)(5); US Army Corps of Engineers, Determination to Conduct an Environmental Impact Statement on Limestone Mining Adjacent to Regional Preserved Lands Within the Lee-Collier Limestone Resource Area. P. 4.
[21] 40 C.F.R. § 1508.27(b)(9).
[22] Council on Environmental Quality, Executive Office of the President, January 1997. Considering Cumulative Effects Under the National Environmental Policy Act. P. 4.

As each individual action by the ACOE requires a NEPA analysis, we request that the NEPA analysis for the Troyer Mine be elevated and that an EIS be completed. However, an EIS completed just for the Troyer Mine is insufficient. A cumulative EIS, as was originally proposed by the ACOE in 2010 for mining impacts beyond the scope of the Troyer Mine EIS (and of which included Troyer Mine in its proposed EIS analysis), is necessary to adequately review the effects to the human environment–most specifically the impacts of the loss of tens of thousands of acres of Florida panther habitat in this area. This review, with a scope that includes, at minimum, the geographic range of the entire DR/GR and adjoining Collier County areas and also includes stakeholder participation, is necessary to meet the intent of the CWA, ESA, and NEPA. We request that the Troyer Mine receive an individual EIS, as well as that the cumulative EIS is also completed.

In conclusion, we ask that:

- Due to the adverse impacts to the Florida panther and other listed species, wildlife movements, water resources, and adjacent preserved lands, the project be denied as proposed;

- An individual EIS for the Troyer Mine is pursued; and

- A cumulative EIS for development and mining impacts to critical natural resources and other NEPA factors is pursued by ACOE, in partnership with FWS.

Thank you for your consideration of our letter. Also, we request a written response. If you would like to discuss this matter further, please contact me at (239) 262-0304 ext. 267.

Sincerely,

*Kelly McNab*

Kelly McNab
Environmental Planning Specialist

cc:    Nicole Johnson, Conservancy of Southwest Florida
        Amber Crooks, Conservancy of Southwest Florida

**Exhibit A**



Map 7. Wood Stork Colony Foraging Areas (18 sq. mi.)

**Exhibit B**



**Exhibit C**



**Exhibit D**



# Exhibit I



**US Army Corps of Engineers®**

**Public Notices**

# SAJ-2008-00210 (SP-RMT)

Published July 25, 2017

TO WHOM IT MAY CONCERN: The Jacksonville District of the U.S. Army Corps of Engineers (Corps) has received an application for a Department of the Army (DA) permit pursuant to Section 404 of the Clean Water Act (33 U.S.C. §1344) as described below:

APPLICANT: Collier Enterprises Management, Inc.
c/o Passarella & Associates, Inc.
Attention: Heather Phillips
13620 Metropolis Avenue, Suite 200
Fort Myers, Florida 33912

WATERWAY AND LOCATION: The project site totals approximately 10,264.63 acres located in Sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36; Collier County. The site contains approximately 4490.66 acres of jurisdictional wetlands, 14.71 acres of isolated wetlands and 34.25 acre of other waters of the US (former farm field ditches) located within the Union Canal Watershed (10-HUC # 0309020404) of the Big Cypress Drainage Basin.

Directions to the site are as follows: From 1-75, take exit 111 to Immokalee Road/CR-846 and head east on Immokalee Road for approximately 3.4 miles and turn right (east) on Oil Well Road/CR-858 to the intersection with Oil Well Grade Road. The project site is located north and south of the intersection.

APPROXIMATE CENTRAL COORDINATES: Lat: 26.29055º

Long: -81.49722º

PROJECT PURPOSE:

Basic: Mixed use development.

Overall: Construct a master planned mixed-use community consisting of recreational amenities; a commercial town center; an elementary, middle, and high school; residential neighborhoods with

roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure in east Collier County, Florida.

EXISTING CONDITIONS: A total of 77 Florida Land Use, Cover and Forms Classification System codes (FLUCFCS codes) were identified on the site. A substantial portion of the property land use has been agriculture. The land use types of Cropland and Pastureland (FLUCFCS Code 210), Improved Pasture (Code 211), Unimproved Pasture (Code 212), and Row Crops (Code 214) comprise 48.0 percent (4,978.43± acres) of the project site. The native habitat areas on-site are dominated by Disturbed Cypress, (Code 6219) comprising 29.8 percent of the project site. Native upland habitats are dominated by Disturbed Pine Flatwoods (Code 4119) which comprises 2.6 percent of the site. The other 19.7 percent of the site consists of a variety of different land uses.

PROJECT HISTORY: The applicant submitted an application on 18 January 2008, requesting DA authorization for a similar type of development. The application was withdrawn by the Corps on 20 May 2008, due to the applicants failure to respond to a request for additional information (RAI) required for the public notice (PN).The Corps re-opened the file on 17 June 2008, when the applicant submitted a responses to the Corps RAI and requested the application processing to continue. The application was again withdrawn 18 March 2011, due to the applicant's failure to provide the required information for consultation with the US Fish and Wildlife Service (FWS). The current application (as revised) was received by the Corps on 17 January 2017.

PROPOSED WORK: Clear, grade, excavate, dredge and fill to construct and maintain a master planned mixed-use development consisting of two golf courses; a commercial town center; an elementary, middle, and high school; and residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure. The project would discharge 196,217 cubic yards of fill into 98.25 acres of jurisdictional wetlands and 1,360 cubic yards of materials into 0.68 acre of isolated wetlands. Approximately 27,820 cubic yards of materials would be discharged into 13.90 acres of remnant farm-field ditches. The project also would dredge/excavate approximately 2,951,250 cubic yards of native materials from 197.45 acres of jurisdictional wetlands and 16,500 cubic yards of material from 1.1 acre of isolated wetlands. The project proposes to restore, enhance and preserve wetlands onsite.

AVOIDANCE AND MINIMIZATION INFORMATION: The applicant states the following in support of efforts to avoid and/or minimize impacts to the aquatic environment:

"Rural Lands West utilized the rural land planning strategy adopted for the Collier County Rural Lands Stewardship Area (RLSA) while planning the project. The County has identified certain lands within the RLSA that have low natural resource value and suitable for development of new communities. Under the RLSA program, new communities can only be established on privately owned lands that meet specific suitability criteria and cannot occur on lands designated as Flow-way Stewardship Areas (FSAs) or Habitat Stewardship Areas (HSAs). The RLSA program, identified natural resources including wetlands and listed species habitat, were identified and mapped on a regional scale. FSAs are primarily wetlands located within the Camp Keais Strand

and Okalacoochee Slough, establishing the primary wetland flow-way systems in the RLSA. HSAs include lands whose natural characteristics make them suitable habitat for listed species, and also lands which are contiguous to the listed species habitat that form a continuum of landscape that could improve listed species habitat value. As such, the RLSA program requires the applicant to avoid impacts to significant wetlands and listed species habitat by directing development away from FSAs and HSAs.

In addition, the applicant considered several design alternatives for the project to further minimize the discharge of dredge and fill material to regulated waters. The site plan was designed to utilize the existing (state permitted) agriculture fields for the planned development and to avoid and minimize direct impacts to the natural wetland habitats on-site. The discharges to jurisdictional wetlands are primarily for infrastructure construction such as road crossings and surface water management facilities. Preserves were designed to connect to Camp Keais Strand, which abuts the eastern property boundary. The project will enhance and preserve 93 percent (3,906.71 acres) of wetlands onsite."

COMPENSATORY MITIGATION: To compensate for unavoidable impacts to jurisdictional wetlands the applicant proposes to enhance and preserve 3,906.71± acres of wetlands and restore and preserve 25.59± acres of wetlands. The applicant proposes to conduct the compensatory mitigation activities in phases that correspond to the construction of the project's surface water management basins.

The onsite preserve areas would be comprised of 3932.3 ± acres of wetlands (mostly enhanced with some restored), 48.25± acres of uplands to be restored (not included as wetland compensation), 25.46 ± acres of wetlands of just preservation and other waters to be preserved. A total 4,246.55± acres are to be preserved on site and placed under a conservation easement granted to the South Florida Water Management District (SFWMD) with third party enforcement rights granted to the Corps and the U.S. Fish and Wildlife Service (FWS).

CULTURAL RESOURCES: The Corps is unaware of any known historic properties within the review area. Our final determination relative to historic resource impacts is subject to review by and coordination with the State Historic Preservation Office (SHPO) and those federally recognized tribes with concerns in Florida and the area under review by the Corps, for this proposal.

ENDANGERED SPECIES ACT (ESA): The project site is located in an area where the eastern indigo snake (Drymarchon corais couperi), an ESA listed species, may occur. A species survey conducted of the project site, by the applicant's agent, did not reveal the presence of any indigo snakes or of its commensal species the gopher tortoise. No gopher tortoise burrows were identified during the survey. The ground water levels at the site have been maintained at an elevated levels (for agricultural purposes) for many years which would prevent most of the site to transition into the xeric/dry type of habitats preferred by indigo snakes and the gopher tortoises. In following the Indigo Snake Programmatic Concurrence Key, as amended, the proposal keys out to A., B. The permit instrument, if issued, would contain the Standard Protective Measures for Eastern Indigo

Snake which must be followed during all construction activities. The Corps determined the proposed project "may affect, but is not likely to adversely affect" (MANLAA) the indigo snake. In accordance with the key, Section 7of ESA requirements have been fulfilled and no further consultation with the FWS is required for that species.

The project site is within wood stork (Mycteria americana) core foraging areas. In accordance with the South Florida Programmatic Wood Stork Key the proposal keys as follows: A., B., C., E. Although the project will directly impact potential wood stork foraging habitat, upon completion the project is expected to result in long-term enhanced wood stork foraging habitat in the area; therefore, Corps determined the project MANLAA the wood stork and will requests concurrence from the FWS, via a separate letter.

The project site is within a FWS designated consultation area for the Florida scrub jay (Aphelocoma coerulescens) an ESA listed species. The Florida scrub jay lives only in scrub and scrubby flatwoods habitats found on nearly pure, excessively well-drained sandy soils. Scrub jay habitat is dominated by a layer of evergreen oaks [myrtle oak (Quercus myrtifolia) and/or Archbold oak (Q. inopina), sand live oak (Q. geminata), Chapman oak (Q. chapmanii), and runner oak (Q. minima)], rusty lyonia (Lyonia ferruginea), and Florida rosemary (Ceratiola ericoides). Ground cover is sparse, dominated by saw palmetto (Serenoa repens) and sand palmetto (Sabal etonia). (http://www.fws.gov/northflorida//Species-Accounts/Fla-Scrub-Jay-2005.htm 10/22/2015). The Corps preliminary determination is that the proposal MANLAA the scrub jay and will requests concurrence from the FWS, via a separate letter.

The project site is within a FWS designated consultation area for the Florida grasshopper sparrow [(FGS) (Ammodramus savannarum floridanus)]. The FGS inhabit dry prairie characterized by clumped distribution of bluestem grass (Andropogon spp.), St. John's wort (Hypericum spp.), wiregrass (Aristida spp.), saw palmetto (Serenoa repens) and dwarf oak (Quercus minima) ranging from 30 to 70 centimeters in height. FGS habitat consists of large (greater than 50 ha.) treeless, relatively poorly-drained grassland that have a history of frequent fires. (US-FWS, SE Region, SFESO, Vero Beach, FL, FGSP 5-Year Review: Summary and Evaluation). The Corps preliminary determination is that the proposal MANLAA the FGS and will requests concurrence from the FWS, via a separate letter.

The project site is located within a FWS designated consultation area for the Everglade snail kite (Rostrhamus sociabilis plumbeus). The project site does not contain FWS designated snail kite critical habitat and is not within a Priority Management Zone for the snail kite. The Corps preliminary determination is that the project MANLAA the snail kite and will request concurrence from the FWS, via a separate letter.

The project site is within a FWS designated consultation area for the caracara (Polyborus plancus audubonii).The nearest observed caracara location (# 816, 2008) is located approximately 2.0 miles north of the northern border of the project site. The Corps preliminary determination is that the project MANLAA the caracara and will request concurrence from the FWS, via a separate letter.

The project site is within FWS designated Focus Areas for the Florida Panther (Puma concolor coryi). Use of the Florida Panther Effect Determination Key (February 19, 2007) the proposal keyed as follows: A., B., project is greater than one acre and will have a net increase in vehicle traffic patterns resulting in a "may affect" determination for the panther. Pursuant to Section 7 of ESA the Corps will request the FWS to initiate formal consultation (for this species), via a separate letter.

The project site is within a FWS designated Focal Area for the Florida bonneted bat [FBB (Eumops floridanus)]. In accordance with FBB Effects Determination Key the proposal keys at No. 1. The Corps has determined the proposed project "may affect" the FBB. Pursuant to Section 7 of ESA the Corps will request the FWS to initiate formal consultation (for this species), via a separate letter.

These effect determinations are based on current ESA listed species guidance from the FWS. To be noted, the project site is within the geographical boundaries of a pending Environmental Impact Statement being prepared for the Eastern Collier Multiple Species Habitat Conservation Plan, of which the FWS is the lead agency.

NOTE: This public notice (PN) is being issued based on information furnished by the applicant. This information has not been verified or evaluated to ensure compliance with laws and regulations governing the regulatory program. The jurisdictional line has not been formally verified by Corps personnel.

AUTHORIZATION FROM OTHER AGENCIES: Water Quality Certification may be required from the Florida Department of Environmental Protection and/or the South Florida Water Management District.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to the attention of the District Engineer through the Fort Myers Permits Section, 1520 Royal Palm Square Boulevard Suite 310, Fort Myers, Florida, 33919, within 21 days from the date of this PN.

The decision of whether to issue or deny a permit, for this application, will be based on the information received in response to this PN and the evaluation of the probable impacts to the associated wetlands. This is based on an analysis of the applicant's avoidance and minimization efforts for the project, as well as the compensatory mitigation proposed.

QUESTIONS concerning this application should be submitted in writing to the project manager, Robert Tewis, by mail to the Fort Myers Permits Section, 1520 Royal Palm Square Boulevard Suite 310, Fort Myers, Florida 33919; or via email at robert.m.tewis@usace.army.mil; or faxed to (239)-334-0797. Phone number is (239)-334-1975 X-22.

IMPACT ON NATURAL RESOURCES: Coordination with the FWS, the US Environmental Protection Agency (EPA), the National Marine Fisheries Services (NMFS), and other federal, state,

and local agencies, environmental groups, and concerned citizens generally yields pertinent environmental information that is instrumental in determining the impact the proposed action will have on the natural resources of the area.

EVALUATION: The decision of whether to issue a permit will be based on the evaluation of probable impacts including cumulative effects of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including cumulative impacts thereof; among these are conservation, economics, esthetics, general environmental concerns, wetlands, historical properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food, and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people. Evaluation of the impact of the activity on the public interest will also include application of the guidelines promulgated by the EPA Administrator, under authority of Section 404(b) of the Clean Water Act and/or the criteria established under authority of Section 102(a) of the Marine Protection Research and Sanctuaries Act of 1972. A permit will be authorized unless its issuance is found to be contrary to the public interest.

The US Army Corps of Engineers (Corps) is soliciting comments, to this PN, from the public; Federal, State, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this determination, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

COASTAL ZONE MANAGEMENT CONSISTENCY: In Florida, the State approval constitutes compliance with the approved Coastal Zone Management Plan. In Puerto Rico, a Coastal Zone Management Consistency Concurrence is required from the Puerto Rico Planning Board. In the Virgin Islands, the Department of Planning and Natural Resources permit constitutes compliance with the Coastal Zone Management Plan.

REQUEST FOR PUBLIC HEARING: Any person may request a public hearing. The request must be submitted in writing to the District Engineer within the designated comment period of the notice and must state the specific reasons for requesting the public hearing.

Related Link: **Graphics** /Portals/44/docs/regulatory/Public Notices/2017 07 July/20170725-SAJ-2008-00210-COLLIER-COUNTY-0815-RMT.pdf? ver=7Kb5PoOV2yW_myopbIbdKg%3d%3d

# Exhibit J



**CONSERVANCY**
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE

Protecting Southwest Florida's unique natural environment and quality of life... now and forever

August 15, 2017

Robert Tewis, Project Manager
U.S. Army Corps of Engineers, Fort Meyers Permits Section
1520 Royal Palm Square Boulevard, Suite 310
Fort Meyers, Florida 33919

Larry Williams, State Supervisor
US Fish and Wildlife Service
1339 20th St.
Vero Beach, FL 32960-3559

RE: Public Notice SAJ-2008-00210 (SP-RMT) - Comments Regarding the Development of
Rural Lands West

Dear Mr. Robert Tewis and Mr. Larry Williams:

The Conservancy of Southwest Florida representing over 6,000 supporting families writes to
express our opposition to the proposed Rural Lands West (RLW) development, formerly known
as the Town of Big Cypress (application number SAJ-2008-00210). The Conservancy has
followed the consultative process for this development for nearly a decade. Over this time and
with the current active application, the applicant has failed to adequately address a set of critical
environmental issues raised by the Conservancy and other interested parties. RLW is
significantly larger than the proposed Town of Big Cypress and the new footprint will increase
damage to the Shaggy Cypress wetland system, and therefore has even greater environmental
impacts.   The Conservancy believes that the proposed design, as currently configured, fails to
comply with the federal regulatory provisions of the Endangered Species Act and the Clean
Water Act, as it does not adequately avoid, minimize, and mitigate impacts to wetlands,
environmentally-sensitive lands, and wildlife habitat.  Furthermore, it does not provide adequate
assurances of a *no net loss of landscape function or carrying capacity of the range*[1] for
endangered species such as the Florida panther, which currently inhabit and frequently use the
project area.  Therefore, we respectfully ask that the following information and
recommendations be fully considered in your review and evaluation of the probable impacts,

---

[1] Kautz et al., 2006. How Much is Enough? Landscape Scale Conservation for the Florida Panther.
Biological Conservation, 130. P. 118-119.

 Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

including practicable alternatives, the cumulative effects of this development to wetlands, streams and other aquatic resources, and to wildlife, including to listed species.

## Introduction

The project applicant, Collier Enterprises Management, Inc., ("Collier Enterprises") is seeking a permit under Clean Water Act Section 404, 33 U.S.C. § 1344, to authorize the discharge of dredge and fill material on to wetlands subject to federal jurisdiction under the Clean Water Act. Collier Enterprises proposes to construct a large-scale master planned- mixed-use development consisting of recreational amenities; a commercial town center; schools, residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure on land located within the Primary Zone of habitat for the Florida Panther (*Puma concolor coryi*). The Florida panther is listed as endangered in the federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq. The project site is also potentially home to several other listed species, including the Florida bonneted bat, crested caracara, Everglades snail kite, Florida grasshopper sparrow, Florida scrub jay, wood stork, and eastern indigo snake,[2] several state listed species.[3] The site provides nesting and foraging areas of many species of wildlife.

Impacts to wetlands and water resources include potential changes to flow ways, hydroperiods, and water quality, as well as loss of seasonally-flooded lands that provide important wildlife habitat and floodplain protection. The project falls within, or adjacent to a designated wellfield area.[4] How water supply will be provided to the new development and what impact this will have on aquifer recharge is as yet unknown.

The RLW project site is found within the Rural Lands Stewardship Area (RLSA) of Eastern Collier County, Florida. The original purpose of this designation by the County was to protect the environmental resources on 195,000 acres of important and environmentally sensitive land from over development. The RLW Phase 1 footprint for intensified development lies within significant regional wetlands. These wetlands connect to water systems that flow to, and across critically important environmental lands, including public lands. As currently proposed RLW is within and abutting the Camp Keais Strand –a critical north-south corridor and flowway that connects the Corkscrew Regional Ecosystem Water to the north to the Florida Panther National Wildlife Refuge (FPNWR), Picayune Strand State Forest, and Fakahatchee Strand State Preserve to the south. These waters then flow onward to the Gulf of Mexico and Ten Thousand Islands. RLW is upstream of the FPNWR and is directly east of the County's municipal well field. A new development of this scale, with impervious surfaces and hundreds of acres of new stormwater management "moats" adjacent to important wetland systems will seriously impact water

---

[2] Army Corps of Engineers, 2017. Public Notice, SAJ-2008-00210 (SP-RMT), Rural Lands West. Posted July 25, 2017.
[3] Passarella & Associates, Inc., 2016. Prepared for Collier Enterprises Management, Inc. Rural Lands West Listed Species Survey Report. July 2016.
[4] Collier County, 2010. Wellfield Protection Zone 2010 Map. Accessed from:
http://www.colliergov.net/your-government/decisions-f-r/pollution-control/wellfield-protection.

resources in these areas.   Shallow wetlands on and off site will be affected.  How this will influence the hydrology and affect the water flow in the region, as well as its impact on aquatic life also need to be better understood.

The RLW project site totals 10,264.63 acres. A current Conceptual SRA Master Plan shows 4,073 acres of Phase 1 development will include: residential neighborhoods, roads, schools, parks, a golf course, lakes and new town centers (see Exhibit A). 10,000 new residential dwellings are expected at build out.[5] Five access roads: Big Cypress Parkway, Randall Blvd./Oil Well Road, 56th Ave. NE and 18th Ave. NE will be constructed or expanded by the County to allow residents to carry residents to and from RLW. RLW is proposed as part of the 45,000 acres of intense urban development, under the Eastern Collier Multi-Species Habitat Conservation Plan (ECMSHCP)[6], which is under review by the US Fish and Wildlife Service (FWS) currently and may be further revised.

It is not yet clear whether the Army Corps will continue to actively consider the proposed RLW project while the HCP is under review, or if the project will be consulted on as an individual project by the FWS. The 4,100 acres proposed by RLW should not be considered as additive to the already unacceptable magnitude of development proposed by the ECMSHCP. The FWS is currently reviewing the ECMSHCP, which includes the RLW project, among other development projects within the RLSA, and is drafting an Environmental Impact Statement (EIS) under the National Environmental Policy Act.[7] Through the scoping process –in which this controversial proposal generated nearly 2,500 comments- the FWS identified dozens of concerns that the EIS will hopefully take a hard look at, including wildlife linkages, critical natural lands, listed species and their habitats, transportation, water resources, climate change, environmental justice, human-wildlife conflict, hurricane evaluation, and cultural resources.[8] Consequently, we reserve the right to supplement this comment letter to include further discussion of the proposed project's potential impacts to natural resources based on the future findings of these reports.

However, upon review of materials provided, and in light of the best available science regarding the Florida panther as described below, it is clear that the  Rural Lands West project, either as a standalone project or in combination with the ECMSHCP, is likely to jeopardize the survival and recovery of the Florida panther, adversely affect other listed species, result in unacceptable impacts to wetlands and water resources of regional and national importance, produce unwarranted cumulative impacts. It is, therefore, inconsistent with the public interest.

1.   **Unacceptable Impacts to the Endangered Florida Panther**

---

[5] Collier Enterprises, 2016. Executive Summary, Rural Lands West, SRA Town Plan document. Submitted to Collier County. P. 4.
[6] Eastern Collier Property Owners, 2015. Eastern Collier Multiple Species Habitat Conservation Plan. First Draft, April 2015. Prepared by Stantec Consulting Services.
[7] Federal Register Notice, 2016. Department of the Interior, Fish and Wildlife Service, Draft Environmental Impact Statement; Eastern Collier Multi-Species Habitat Conservation Plan; Collier County, FL. FWS-R4-ES-2016-N037. Vol. 81, No. 58. March 25, 2016.
[8] US Fish and Wildlife Service, 2016. Eastern Collier Multiple Species Habitat Conservation plan. Environmental Impact Statement Draft Scoping Report. June 2016.

If the Army Corps were to permit the project, as currently designed, this would violate Section 7(a) (2) of the ESA[9], by authorizing an activity that is likely to jeopardize the continued existence of the Florida panther. Section 7(a) (2) requires the Army Corps, in consultation with the FWS, to insure that any action authorized, funded or carried out by the Army Corps *is not likely to jeopardize the continued existence of any endangered species*.[10] ESA regulations interpret this provision to prohibit any agency action "that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of *both* the survival and recovery of a listed species in the wild."[11]  Under the Clean Water Act Section 404, Environmental Protection Agency regulations also prohibit the Army Corps from permitting the discharge of dredged or fill material if permitting such a discharge *"jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973".[12]*

Allowing a development of this scale and in this location would directly threaten the species' continued survival and recovery because the site of Rural Lands West is essential to the survival and recovery of the species. The proposed RLW project (which we believe to be Phase 1 of other future development within the Big Cypress Stewardship District as seen in the ECHMSCP proposal)[13] will convert 4,073.30 acres of open land[14] to intensive land uses (suburban and urban).  Approximately 76% (or 3,100 acres) of this land is now found in Primary Zone panther habitat, and 24% (about 980 acres) in Secondary Zone panther habitat (see Exhibit B).

The FWS recognizes Kautz et al as the best available science in the conservation of the Florida panther and the habitat area delineated in their study as crucial for Florida panther recovery[15]. According to Kautz, the area defined as the Primary Zone is the minimum space to support a population that is barely viable demographically as long as the habitat base remains stable. Kautz et al also states that "assessments of potential impacts of proposed developments should strive to achieve no net loss of landscape function or carrying capacity for panthers within the Primary Zone."[16]Similarly, a team of expert panther biologists, known as the Florida Panther Protection Program Technical Panther Review Team (PRT) recommended that lands within the RLSA and ECMSHCP avoid impacts to the Primary Zone, instead directing development toward the Secondary Zone.[17] They also warned that internal roads within the footprint -the Big Cypress

---

[9] 16 U.S.C S1536 (a)(2).
[10] *Ibid.*
[11] 50 C.F.R §402.02 (emphasis added).
[12] 40 C.F.R §230.10 (b)(3).
[13] Eastern Collier Property Owners, 2015. Eastern Collier Multiple Species Habitat Conservation Plan. First Draft, April 2015. Prepared by Stantec Consulting Services.
[14] See attached RLW, Conceptual SRA Master Plan
[15] Kautz et al., 2006. How Much is Enough? Landscape Scale Conservation for the Florida Panther. Biological Conservation, 130. P. 118-119.
[16] *Ibid.* P. 131.
[17] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the Florida Panther Protection Program Proposed for the Rural Lands Stewardship Area of Collier County, Florida. Final Report. P.29. Although the PRT specifically decided to stay neutral regarding the proposed Town of Big Cypress, they produced general recommendations that would be applicable to the proposed RLW

Parkway and Randall Blvd. Extension- could "fragment, degrade or encroach on important habitat."[18] The PRT also identified lands, consistent with similar recommendations made by Smith et al.[19], about buffering the Camp Keais Strand to maintain and improve functionality as a flowway and major wildlife corridor (see Exhibit C).[20]

The FWS 2008 Florida Panther Recovery Plan confirms this position: "to prevent further loss of population viability, habitat conservation efforts should focus on maintaining the total available area, quality, and spatial extent of habitat within the Primary."[21] Latest panther science, Frakes et al., 2015, reinforces Kautz et al. in maintaining protection of the lands within the project site from intensification. Covering a similar area of the project and project impact area as the Primary Zone (see Exhibit D), the Frakes "Adult Breeding Habitat" Zone is "essential to the survival and recovery of the subspecies and should receive the highest priority [for conservation] by regulatory agencies."[22] The majority of the Rural Lands West site is essential for the long-term viability and survival of the existing population and recovery of the critically endangered Florida panther.

The RLW proposal before the Army Corps of Engineers calls for the conversion of 3,100 acres Primary Zone habitat into residential neighborhoods, placing 10,000 new homes in an area heavily utilized by the Florida panther and other wildlife.

<u>The Project Has Increased in Size and Severity of Impact</u>

Since 2008, the scope of Phase 1 of the RLW (formerly known as the Town of Big Cypress (TOBC)) has expanded by approximately 10 %, from 3,699 to 4,073 acres.   It now includes more sections: 1,2,3,10,11,12,13, 24, 25 and 36, compared to the former footprint of sections14, 15,22,23,26,27,34, and 35.

Proposed wetland impacts from construction are projected to increase significantly. The table below compares the applicant's proposal for Town of Big Cypress in 2008, to its current RLW application. Site plan preserves are expected to increase only slightly, see Table 1 below.

project, and noted that if they had decided to include the TOBC in their assessment, they would have recommended additional preserves areas within the project footprint.

[18] *Ibid*. P. 61.

[19] Smith et al., 2006. East Collier County Wildlife Movement Study: SR29, CR846, and CR858 Wildlife Crossing Project. University of Central Florida and University of Florida IFAs. Southwest Florida REC Research Report, SWFREC-IMM-2007-01.

[20] Florida Panther Protection Program Technical Review Team, 2009. Technical Review of the Florida Panther Protection Program Proposed for the Rural Lands Stewardship Area of Collier County, Florida. Final Report. P. 114 (Figure 13).

[21] US Fish and Wildlife Service, 2008. Florida Panther Recovery Plan, Third Revision. P. 89.

[22] Frakes et al., 2015. Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE, 10(7): e0133044. DOI: 10.1371/journal.pone.0133044. P. 15.

| Table 1[23]: Proposed Impacts in Wetland Acreage Required for Construction[24]. | |
|---|---|
| **2008** | **2017** |
| 32.27 acres wetlands for discharge of fill material | 98.25 acres of jurisdictional wetlands for discharge of fill material |
| .16 acres isolated wetlands for discharge of fill material | .68 acres of "isolated wetlands" for discharge of fill material |
| | 13.90 acres of remnant farm field ditches for discharge. |
| 23.34 acres of wetlands excavated | 197.45 acres jurisdictional wetlands dredged/excavated |
| 4.74 acres of "isolated wetlands" excavated. | 1.1 acres if isolated wetlands excavated/dredged. |
| **Tot. 60.51** | **Tot. 311.38** |
| **Site Plan Wetland Enhancement and Preserves** | |
| 91 % | 93% (3,906.71) |

While the applicant does propose to set aside over 3,000 acres for compensatory mitigation, some of these areas already receive some protection from intensification through the Collier County local comprehensive plan and land development code.

Further, these impacts cannot be mitigated by the proposed preservation of off-site lands, because these mitigation lands already function as essential panther habitat. The applicant fails to address the regulatory requirements to avoid and minimize these impacts. As demonstrated below, the applicant has a practicable alternative to further avoid and minimize impacts.

Reliance on the Collier County Rural Lands Stewardship Program to Site Development Does Not Meet ESA Requirements

The Army Corps' Public Notice (SAJ-2008-00210 (SP-RMT) points to the project's utilization of "the rural land planning strategy, adopted from the Collier County's Rural Lands Stewardship Area (RLSA)"[25] to justify the current project footprint and attempts to demonstrate adequate avoidance and minimization. This is wholly inadequate in the face of the applicant's requirement to prove avoidance and minimization under the ESA. The RLSA program (2000-2002) predated what is now widely accepted as best available science with respect to what

---

[23] Source of Table 1 is ACOE P.N. No. SAJ-2008-210, July 2008; and P.N. SAJ-2008-21, July 2017.

[24] The Conservancy notes some inconsistencies between the projected loss of wetlands (311.38 acres) shown in the description of proposed work (as summarized below, and the acreage shown in the tables on p. 27 of the supporting documents provided for the public notice.

[25] Army Corps of Engineers, 2017. Public Notice, SAJ-2008-00210 (SP-RMT), Rural Lands West. Posted July 25, 2017.

specific regions of the South Florida landscape are of high conservation value to support the survival and recovery of the Florida Panther. Sadly, the RLW project has failed to update its analysis and planning by incorporating the best available science of Kautz et al. (2006) and most recently Frakes et al. (2015), to better understand the impact of land use intensification in the area of Eastern Collier County in South Florida.

When the RLSA Overlay was created in 2000, WilsonMiller (now known as Stantec) acknowledged science would continue to evolve, especially regarding our understanding of habitat use and the needs of the endanger Florida Panther.  The WilsonMiller 2000 report stated: "*The analysis involving panther habitat for the Study will be complemented by ongoing computer modeling of potential habitat and development of an updated panther recovery plan by interagency committees led by the U.S. Fish and Wildlife Service.*"[26]

Subsequent analysis of panther habitat, found that agricultural fields, pastures, and other open areas were in some cases highly valuable to panthers. These areas also provide the edge habitat and prey sources, and was recognized in the modeling of the Primary Zone which includes "other natural and non-urban disturbed land cover types between forest patches that serve as landscapes connections that accommodate panther home range and dispersal movements."[27]

At the five-year review of the RLSA in 2007, the Conservancy recommended Collier County staff incorporate panther science into the RLSA program and modify the areas designated for intensification ("Open Lands"). Open Lands are identified as appropriate for intensification per the Collier County RLSA, which would not be an adequate way to demonstrate avoidance and minimization to lands that best available science has shown are critical to the species.

Adverse Impacts Threaten the Florida Panther

In addition to the direct impact to panther habitat through loss, fragmentation, and degradation, the Rural Lands West project will adversely affect the prey base, increase the incidence of road kill of panther, intensify intraspecific aggression, increase human-wildlife interactions, and infringe upon a significant regional wildlife corridor.

Experts have observed, the project site provides a good supply of deer[28], a major item in the panther's prey base.  There have been 166 panther road kills within a 25-mile action area from RLW (see Exhibit E) and are likely to increase based on greater traffic from the 10,000 new residences planned. The applicant has not addressed the impacts of this additional traffic on panthers and other wildlife. The existing large mammal crossings on Oil Well Rd. in the Camp Keais Strand are twenty-four feet in width and eight feet in height and are adequate in size to

[26] WilsonMiller, 2000. Immokalee Study Area Stage 1 Report. P. 4.
[27] Kautz et al., 2006. How Much is Enough? Landscape Scale Conservation for the Florida Panther. Biological Conservation, 130.
[28] Passarella & Associates, June 2009.  Town of Big Cypress Biological Assessment June 2009. Prepared by Passarella & Associates for Collier Enterprises Management, Inc. P.9.

accommodate large mammals, but are mitigation associated with the Town of Ave Maria Development. These crossings should not be considered compensation/mitigation for traffic generated by the RLW project.

Intensifying human presence in this rural area will have other implications, such as more human-wildlife interactions (some of which could be negative or lead to increased depredations). Lake buffer systems and fencing is proposed as a wildlife deterrent, but bears and panther are known to swim (see Exhibit F). There are significant gaps along the fencing on the western side of the project area—adjacent to the Golden Gate Estates where conflicts between large mammals and humans have already occurred. The proposed road Big Cypress Parkway would transverse panther habitat, along the western boundary carrying the RLW residents to home, work, school, and shopping heading north and south.

Telemetry records show that panthers utilize both native land cover and agriculture lands within the Camp Keais and Shaggy Cypress systems, effectively using the entire project boundary area as a vital thoroughfare. Thus, the RLW project may also threaten the integrity of the Camp Keais Strand as the only landscape linkage connecting the Florida Panther National Wildlife Refuge and CREW lands (see Exhibit C).

Through direct and indirect impacts from human presence: lighting, noise, and other disturbance factors, the Rural Lands West project will further contribute to habitat fragmentation and degradation in one of the most important corridors and landscapes of the Florida panther. Any loss in corridor function could exacerbate the confinement of panthers to South Florida, leading to reduced spatial extent of panther habitat, resulting in escalation of road mortalities and intraspecific aggression.

<u>Proposed Design of Preserves and Wildlife Crossings Should be Properly Assessed</u>

The applicant has proposed the RLW footprint around the Shaggy Cypress wetland system, with the expansion of the project from the previously proposed Town of Big Cypress. Although it is our understanding from the application with the South Florida Water Management District that a large mammal crossing is proposed at the 'entrance' to Shaggy Cypress, this area will be surrounded by intense and disruptive residential development. Preliminary review of this footprint in the context of the findings of Frakes et al. 2015 shows that the addition of human presence within the Shaggy Cypress and other internal wetlands, as well as the Camp Keais Strand, will limit the functionality of these areas for the panther. Removing development on the eastern side of the footprint would assist in addressing this issue.

Further, small wildlife crossings are proposed at other locations that are four feet high by six feet wide, to discourage large mammal access to residential areas. The Army Corps should consider these wetland areas to have a loss of function to wildlife since the intent will be to deny access to these hundreds of wetlands. No Panther Habitat Units (PHUs) should be granted for these compensation areas.

*2. Impacts of the RLW on Florida Panther Habitat are Avoidable Through Alternative Site.*

The Corps should not permit the Rural Lands West project as currently proposed because the project will adversely impact the survival and recovery of the Florida panther, and these impacts are avoidable. The Corps has defined the purpose of the RLW development as follows:

Basic: Mixed-use Development
Overall: Construct a master-planned-mixed-use community consisting of recreational amenities; a commercial town center; an elementary, middle, and high school; residential neighborhoods with roads, driveways, parking areas, lakes, drainage management systems and other associated infrastructure in east Collier County[29].

By overlaying the RLW boundaries with a map of the Primary Zone and Frakes et al Adult Breeding Habitat, it becomes apparent that most of the proposed RLW development will overlap essential panther habitat.

These impacts could be avoided by shifting the site plan to acreage owned by the same landowner, North of the currently proposed RLW project site.   The alternative 2,700 acre area is composed of "Open Lands" receiving areas in Collier County's RLSA Program and is outside of panther Primary Zone (see Exhibit G). The site is therefore more appropriate for intensification because it contains less essential panther habitat, wetlands, and other sensitive land and is still large enough to meet the intent of the proposed development project. This footprint would still allow a Town Center for commercial and other non-residential uses located on Oil Well Road.  However, due to the presence of an active crested caracara nest on this northern property, as identified by the applicant's environmental survey, the Conservancy's recommended alternative development footprint should proceed in a phased approach.   Phase One would aim to safeguard the buffer zone of the caracara until the time that the nest has been determined to be abandoned, as defined by USFWS policy.  Phase Two would then allow for development within the caracara buffer zone, if the nest becomes abandoned.

The Service's ESA Section 7 Consultation Handbook, specifies its reviewers must determine "reasonable and prudent alternatives."[30] Additionally, the Clean Water Act similarly stipulates that less damaging alternatives must be considered. If there is a practicable alternative that would have a less adverse impact on the aquatic ecosystem available, "no discharge or fill material shall be permitted."[31] This alternative is a practicable alternative to the current proposal and it is likely to be economically feasible because the applicant already owns the property. The Conservancy asks that you deny the permit until the applicant returns to the Army Corps for review of a development plan that is located outside of the Primary Zone of panther habitat.

---

[29] Army Corps of Engineers, 2017. Public Notice, Permit Application No. SAJ-2008-00210 (SP-RMT). July 25, 2017.
[30] United States Fish and Wildlife Service, 1998. Endangered Species Act Section 7 Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act.
[31] 40 C.F.R. Section 230.

**3. Unacceptable Impacts to Natural Wetlands**

Development of RLW will directly and indirectly impact critical natural wetlands that are of regional and national significance. Although a portion of the site has already been ditched and drained for agriculture, the vast majority of the proposed site was part of the historic Camp Keais Slough system.  The proposed project will involve creating artificial lakes out of wetlands to ring the residential and recreational areas; a large portion of the proposed impacts will be from the placement of the stormwater management system in existing wetlands.  Given the location of this project within and adjacent to key wetland systems, including the project being within a waterbody that is already considered impaired for nutrients, the Conservancy has concerns regarding hydrology, loss of shallow short-hydroperiod wetlands, floodplain compensation, aquifer recharge, and water quality.

A.  Due to the presence of artificial lakes adjacent to and near the wetlands, a substantial amount of water from the wetlands will drain out through subsurface system into the lakes.

The Southwest Florida Regional Planning Council has shared concerns that development of this site would add "permanent hydro-period development lakes…into the landscape and sheet flow hydrology interrupt[ing]and … constrain[ing] flow-ways".[32] The Army Corps of Engineers should consider these hundreds of acres of stormwater management lakes will have an impact on the adjacent wetland systems and flowways, as well as consider the effect of evapotranspiration from these lakes. Particularly in the dry season, low water levels in these lakes would not only allow large mammals access to residential areas, but may also be too low to support desired wetland plant communities.

B.  Adjacent land uses may impact water quality that already does not meet state water quality standards.

RLW is proposed in a WBID that is already considered by the state of Florida as not meeting state water quality standards due to nutrient pollution (see Exhibit H). Ten thousand new residences have the potential to further degrade these waters which flow into more pristine natural lands like the FPNWR. Collier County has a residential fertilizer ordinance that is considered to be one of the least stringent in southwest Florida which could result in loading of additional nutrients to these natural systems through improperly regulated fertilizer use.

C. Hydrologic and drainage analysis for the project area does not suffice to simulate impacts to wetland hydrology.

Prior expert review of the Town of Big Cypress project rendered serious concerns regarding stormwater management. Hydrologic and drainage analysis for the project area was considered for 10-yr 3-day, 25-yr 3-day, and 100-yr 3-day storms; which are basically assumed,

---

[32] Southwest Florida Regional Planning Council. Town of Big Cypress Development of Regional Impact Application for Development Approval. January 2008.

hypothetical extreme events and pre-specified rainfall intensity distribution just to verify the effectiveness of engineering projects, such as roads, embankments, bridges, culverts, retention ponds, other hydraulic structures, food elevations, flooding extent, etc.  This hydrologic analysis for engineering purposes has no relationship with wetland hydrology. To preserve and restore wetlands in the project area, it is mandatory to simulate hydrologic conditions of wetlands under post-project conditions, which should include hydroperiods, areal extent of water areas, and depth of water throughout the year on a daily basis.  Daily real rainfall should be considered for analysis for years over a span of time-periods, including dry years, wet years and average hydrologic years.  Then, a comparison would be made between the pre-project observed hydrologic conditions and the post-project simulated hydrologic conditions of the wetlands.  Until such hydrologic analysis and simulations are performed for wetlands post-project hydrologic conditions of the wetland will remain vague, and wetland preservation and restoration proposals appear to be ineffective. Therefore, a wetland environmental feasibility analysis should be a requirement before issuing a permit for the project. [33]

D. Loss of Short Hydroperiod Wetlands

In addition, the project calls for the destruction of short hydro-period wetlands that serve as important habitat for wading birds, including the threatened wood stork. Further, it has been noted that many of the farm fields become seasonally flooded and are heavily utilized by migratory birds, as well as by state and federally listed species.

**4. The Impacts to Wetlands are Avoidable and therefore, permit issuance would be a violation of the Clean Water Act.**

The landowner's proposal is also inconsistent with the Clean Water Act's regulatory directive that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem".[34] An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." [35] Many of the project's over 300 acres of wetland impacts are due to the applicant's choice to place stormwater management system in existing wetlands. These could be configured to be outside of the wetlands and avoid direct impacts to natural wetland systems.

Further, as mentioned above, the landowner owns property to the north which is sufficient to satisfy the purposes of the RLW project and could avoid direct and indirect impacts to the Shaggy Cypress system, and the system of wetlands south of Oil Well Road.  Thus, a practicable alternative to the proposed site exists, and Clean Water Act regulations consequently should prohibit permitting the project at the currently proposed site.

---

[33] Rabbani, M.G., PhD, PE, PH, 2008. Hydrologic Impacts of the Town of Big Cypress Project on the Wetlands in the Project Area.
[34] 40 C.F.R S230.10 (a).
[35] Ibid. S230.10 (a)(2).

As EPA and the Army Corps recently reiterated in issuing compensatory mitigation rules "impacts must be first avoided and then minimized and compensatory mitigation should be used only for impact that cannot be avoided or minimized."[36] Allowing compensatory mitigation without first requiring avoidance of impact would thus run counter to the intent of the Clean Water Act's preference hierarchy for mitigation options.

## 5. Unacceptable Cumulative Impacts

The proposed RLW development will convert approximately 4,100 acres of panther habitat, diminishing the functionality of adjacent Collier Enterprise lands that are also considered important panther habitat.  This would most likely work to the applicant's advantage in incrementally diminishing the functionality of the lands they intend to convert to development to the north and south of Phase I, as seen in the proposed ECMSHCP. These additional areas of development within the Big Cypress Stewardship District, including other lands identified for development and/or mining in the ECMSHCP are reasonably foreseeable. Additional road projects that are reasonably foreseeable are associated with RLW include a proposed interchange at I-75, extension of existing Vanderbilt Blvd and changes to Randall Blvd which are all a part of Collier County local transportation planning that is underway or will be soon.

A variety of secondary and cumulative impacts from traffic with associated introduction of domestic animal, fugitive lighting, fertilizers/oils and greases, introduction of exotic landscaping plans, yard waste dumping, mosquito control and other pesticides, etc., will result.[37]

Importantly, the RLW project must be seriously reviewed for unacceptable cumulative impacts as the project is not consistent with the Southwest Florida Environmental Impact Statement (SWFLEIS). The Army Corps, EPA, and FWS prepared the SWFLEIS, pursuant to NEPA, to assess the cumulative adverse environmental effects of this permitting program.  The agencies published a Final Environmental Impact Statement in July 2000, and a Record of Decision on August 18, 2003.The SWFLEIS recognized the significant cumulative wetland losses in Lee and Collier Counties due to development in the late 1990s.  According to the SWFLEIS, Corps permits alone approved at least 500 acres of wetland loss annually. The Corps' own detailed analysis since publication of the SWFLEIS confirmed that the agency has permitted the destruction of over 880 wetland acres per year in the SWFLEIS study area of Lee and Collier Counties since the SWFLEIS process began in 1998.  While these figures underestimate actual wetland losses, the inescapable fact is that the Corps permitted wetland losses at a faster rate between 1998 and 2002 than prior to the initiation of the SWFLEIS process.  The high rate of Corps permitted wetland losses in Southwest Florida continues and would be exacerbated by the permitting of RLW.

---

[36] Federal Register. April 10, 2008. P. 19594, 19596,19596.
[37] South Florida Regional Planning Council, 2008. Town of Big Cypress Development of Regional Impact Application for Development Approval.

Please note that the RLW project is not consistent with any of the five ensembles found in the SWFLEIS and thus, it cannot be anticipated that this project would fall within the range of effects reviewed by the SWFLEIS. In all of the ensembles, RLW is shown as agriculture and preserve.

**Conclusion**

The Conservancy of Southwest Florida opposes the current RLW proposal because the location and intensity of the development would result in unacceptable impacts inconsistent with the standards of the Endangered Species Act and Clean Water Act.

We urge you to require the applicant to take the aforementioned actions to appropriately avoid and minimize the environmental impacts associated with this project—including shifting the development footprint of this project to lands owned by the developer to the North of the proposed RLW project site.

Finally, the Conservancy of Southwest Florida requests the Army Corps of Engineers provide a public hearing on the proposed project to allow all public interests to be heard and carefully considered.

We also request that you the Conservancy as an interested stakeholder on any correspondence, or email/mailing distribution list.   If you have any questions or would like to discuss these matters further, please feel free to call me at (239) 262.430.2461.  Thank you very much for your consideration in this matter.

Sincerely,

Alison O. Wescott
Senior Environmental Planning Specialist

13

Exhibit A



Exhibit B

## Rural Lands West - Panther Habitat



Exhibit C



Exhibit D



Exhibit E



Exhibit F





Exhibit G



Exhibit H

## RLSA/HCP Impaired Waterbodies



Created by M. Carrozzo. April 15, 2016

# Exhibit K



*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

February 2, 2018                                                    *Sent as email & USPS*

Robert Tewis, Project Manager
U.S. Army Corps of Engineers, Fort Myers Permits Section
1520 Royal Palm Square Boulevard, Suite 310
Fort Myers, Florida 33919

Larry Williams, State Supervisor
US Fish and Wildlife Service
1339 20th St.
Vero Beach, FL 32960-3559

RE: SAJ-2008-00210 (SP-RMT) Rural Lands West (FKA Town of Big Cypress)

Dear Mr. Robert Tewis and Mr. Larry Williams:

On behalf of the Conservancy of Southwest Florida and our over 7,000 supporting families, we write regarding the application for a new town in eastern Collier County called Rural Lands West (formerly known as Town of Big Cypress), #SAJ-2008-00210.

The Rural Lands West project is proposed on critical lands for state and federally listed species, particularly the endangered Florida panther (see Exhibit A). This project will add about 10,000 new residences on a currently rural landscape, and would impact over 300 acres of wetlands within the Shaggy Cypress and Camp Keais Strand wetland systems. The project is within the Camp Keais Strand, a major flowway between CREW and the Florida Panther National Wildlife Refuge. It is located within an impaired WBID, and is upstream of the Outstanding Florida Waters of the Fakahatchee Strand, as well as the Picayune Strand Everglades Restoration project.

We continue to have serious concerns regarding this project because of its magnitude and location, and we do not believe the project meets the requirements of the Endangered Species Act or Clean Water Act.

Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way | Naples, Florida 34102 | 239.262.0304 | Fax 239.262.0672 | www.conservancy.org

First and foremost, there are practicable design modifications and alternatives that could be made to reduce impacts to wetlands and essential habitats. The applicant owns property to the north of this application that would avoid the most valuable Florida panther habitat, and would also have fewer direct and secondary impacts to wetlands (Exhibit B). We have proposed this alternative solution to your agencies and to the applicant as early as our March 2, 2010 letter. However, instead of making these necessary improvements, the project has grown in size, adding additional impact area that encircles the Shaggy Cypress system, and ballooning the wetland impacts from approximately 60 acres to 300 acres. The project has increased the destruction of 3,700 acres of panther habitat to approximately 4,100 acres.

The current footprint is about 75% Primary Panther Zone habitat, which are the top priority lands supporting the existing panther population and should be avoided per the best available science and the USFWS's own Panther Recovery Plan.

Additional best available panther science by Frakes et al.[1] also demonstrates the project area should be avoided. Exhibit A shows the Rural Lands West footprint with the Kautz et al 2006 zones and the Frakes et al 2015 Adult Breeding Habitat overlain.

Further, Exhibit C demonstrates how the Rural Lands West project will adversely change Adult Breeding Habitat if it were to be permitted. The left side shows the current panther habitat value, and the right side shows the Frakes et al model re-run with the Rural Lands West project in place. The warmer the color, as depicted with reds, oranges, and yellows, the higher the value to adult breeding panthers. Blue and gray colors depict lower value habitat for adult breeding panthers.

As you can see, when considering the impacts from the Rural Lands West project, lands well beyond the 4,000+ acres of impact would become more marginal for the panther, including a significant decrease in the value of lands within the Shaggy Cypress and the Camp Keais Strand (which is one of only two existing south-to-north panther corridors).

Although the applicants propose a panther crossing aiming to allow continued access into Shaggy Cypress north of Oil Well Road, these lands will be degraded from some of the highest value panther habitat lands to marginal value. Most strikingly, the 600 acres of wetlands within the project footprint that are south of Oil Well Road, that will also become surrounded by intense development and human presence, would go from high value lands to no value.

---

[1] Frakes et al. 2015. Landscape Analysis of Adult Florida Panther Habitat. PLoS ONE, 10 (7):e0133044. DOI:10.1371/journal.pone.0133044.P.15.

Researcher Dr. Robert Frakes calculates that Rural Lands West will, in effect, eliminate 14 square kilometers of Adult Breeding Panther habitat as a result of direct and indirect effects, as shown in Exhibit D.

This modeling provides additional evidence to show why the project, as proposed, does not comply with the Endangered Species Act and threatens the Florida panther with jeopardy. Not only is the project proposed in an area inappropriate for development due to panther utilization, but the lands proposed as mitigation –including large portions of a critical corridor and flowway- will become more degraded and fragmented. Further, there are additional modifications that must be made to be more consistent with the Clean Water Act and Endangered Species Act available to the applicant (Exhibit B). We reiterate our prior request to deny this project as proposed.

We appreciate the upcoming Service meeting and hope to discuss this project and other related issues. We would like to request a similar meeting with Army Corps of Engineers in the near future as well. We look forward to reviewing this science-based information together as we continue to discuss solutions to better protect our state's official mammal, other imperiled species, and the quality and quantity of our water resources.

This letter is in addition to our letter dated August 15, 2017. We ask that you include all of the administrative record for Town of Big Cypress to the administrative record for Rural Lands West project, including all of the Conservancy's prior letters and submittals.

If you have any questions, please feel free to contact me at (239) 262-0304, ext. 286. Thank you for considering our comments.

Sincerely,

Amber Crooks
Environmental Policy Manager

Cc: Muriel Blaisdell, Army Corps of Engineers
    Roxanna Hinzman, US Fish and Wildlife Service
    Chuck Kelso, US Fish and Wildlife Service
    Kenneth McDonald, US Fish and Wildlife Service

**Exhibit A**

## Rural Lands West - Panther Habitat



August 7, 2017  Environmental Policy (JT)

**Exhibit B**



## Exhibit C



Maps by Dr. Frakes

**Exhibit D**

|  | Rural Lands West | |
| --- | --- | --- |
|  | Pre-Development | Post-Development |
| No. of cells | 60 | 60 |
| Total P[a] | 36.372 | 23.496 |
| Change_P | - | -12.876 |
| % loss of P | - | 35.4 |
| Minimum P | 0.028 | 0.018 |
| Maximum P | 0.994 | 0.994 |
| Ave_P | 0.606 | 0.392 |
| Std. Dev. | 0.368 | 0.302 |
| Total panther habitat | | |
| in RLW (km$^2$)[b] | 40 | 26 |
| Habitat loss (km$^2$) | - | 14 |
| % Habitat loss | - | 35.0 |

All values were calculated using the Florida panther landscape habitat model (Frakes et al. 2015).

[a]Each of the 60 grid cells within the RLW study area has a P value (probability of panther use) assigned by the model.

Total P is the sum of P values for all cells.

[b]Using a cutoff point of P=0.338 (Frakes et al. 2015).

# Exhibit L



**US Army Corps of Engineers®**

**Public Notices**

# SAJ-2006-06656 (SP-RMT)

Published Oct. 22, 2020

TO WHOM IT MAY CONCERN: The Jacksonville District of the U.S. Army Corps of Engineers (Corps) has received an application for a Department of the Army permit modification pursuant to Section 404 of the Clean Water Act (33 U.S.C. §1344) and Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. §403) as described below:

APPLICANTS:
Babcock Property Holdings, L.L.C. (BPH)
Erica S. Woods, Vice-President
42850 Crescent Loop
Babcock Ranch, Florida 33982
ewoods@kitsonpartners.com
and
Babcock Ranch Community Independent Special District
Bill Vander May, Chairperson
2300 Glades Road, Suite 410W
brcisdengineer@babcockranchcommunityisd.com

WATERWAY AND LOCATION: The project site is located within the Tidal Caloosahatchee River Watershed and contains freshwater forested and herbaceous wetlands. The site is east of Interstate 75 (I-75) and State Road 31 (S.R. 31) and north of County Road 78 (C.R. 78) in Sections 29 & 31-33, Township 41 South, Range 26 East, and Sections 4-10, 15-17, 19-36, Township 42 South, Range 26 East in Charlotte County. Portions of the site are in Sections 1-7 & 9, Township 43 South, Range 26 East Lee County, Florida.

Directions to the site are as follows: From I-75 take Exit 143 onto Bayshore Road east for approximately three miles to the intersection of Bayshore and S.R. 31. Turn north onto S.R. 31 and go approximately 1.5 miles to the intersection of S.R. 31 and C.R. 78. The project site begins at the northeast corner of the intersection of C.R. 78 and S.R. 31. Note: the majority of the proposed modifications are located east of the Curry Canal, with access only through the Babcock Ranch Community (BRC).

APPROXIMATE CENTRAL COORDINATES:
Latitude 26. 777783°

Longitude -81.172245°

PROJECT PURPOSE:
Basic: Mixed Use Residential Development with Commercial, Light Industrial, Recreational and Institutional components.

Overall: The BRC was previously authorized, by the Corps (permit # SAJ-2006-06656), to be a self-sustainable, mixed-use community including a town center, several villages, and hamlets. The proposed post development land uses include residential, retail, office, light industrial, schools, hospital, government support facilities (fire, police), infrastructure (i.e., utilities such as electric power, potable water, wastewater treatment, water reuse, etc.), plus golf, other recreational uses, and preserves.

PROJECT HISTORY: On 31 July 2006 BPH purchased the entire Babcock Ranch property consisting of approximately 91,362 acres, after the previous owner was unable to sell the property to the State of Florida, Lee and Charlotte Counties for preservation. BPH engaged in a two-year, multi-agency and public planning process to define a development plan that included the sale of a portion of the property to the State of Florida and Lee County for permanent preservation, while the site was being approved for the development of the BRC on approximately 17,787 acres of the original 91,362 acres. The planning process resulted in the sale of 73,575 acres of environmentally sensitive lands to the State of Florida and Lee County for permanent preservation, while allowing BPH to retain 17,787 acres for development of the BRC development. Throughout this notice the 73,575-acre portion of the property that was sold to the State of Florida and Lee County for permanent preservation is identified as the "Babcock Ranch Preserve" (BRP). BPH's remaining 17,787 acres included 199.80 acres of future right-of-way (ROW) for the planned widening of S.R. 31; therefore, the final development project size is 17,588 acres. The 17,588 acres (which excludes the ROW area) will be identified as the project site or "onsite" for the purposes of defining impacts and/or mitigation. The BRP is referred to as "off-site" for purposes of defining mitigation.

The Corps issued the authorization for the BRC development on 2 July 2010. Upon completion, the BRC development proposes approximately 19,500 homes, six million square feet (6,000,000 SF) of commercial development, internal roadways, surface water management systems, eight (8) water control structures in canals, utilities, schools, a hospital, fire and police facilities, educational research facilities, golf courses, lakes, trail systems, preserves and open spaces. The proposal included the discharge of approximately 1,066,750 cubic yards (cy) of fill material into 368.93 acres of wetlands and 6.16 acres of other waters of the US and the excavation of 1,900,000 cy of native materials from 60.69 acres of wetlands for a total of 429.62 acres of direct wetland impacts. Impacts were anticipated to occur on an incremental basis, with mitigation being provided on an incremental basis to remain concurrent or ahead of impacts.

The compensatory mitigation required for the wetland impacts of the subject authorization included 227.67 acres of wetland enhancements, creation of 171.25 acres of wetlands (inclusive of wetland transitional zones which did not receive mitigation credit), 1515.02 acres of wetland preservation,

153.78 acres of upland enhancements, and 2,545.70 acres of upland preserves and buffers on-site. BPH also proposed to enhance and manage 43.88 acres of wetlands and 90.50 acres of uplands, and to preserve 2,659.39 acres of wetlands, 2,720.38 acres of upland buffers on adjacent State lands. Existing agricultural lands that are to remain in agricultural use within the State lands total 394.39 acres. The 10,522± acres of mitigation activities were divided among eight (8) different units identified as Mitigation Areas A-H. Mitigation Areas A and E-H are located onsite and total 4,607.83 acres, while Mitigation Areas B-D (5,914.13 acres) are off-site, located on adjacent land within the BRP, as allowed through a Consent of Use with the State of Florida. Additionally, four (4) control structures are to be installed in the Curry Canal and two (2) control structures in the Big Island Canal to enhance and restore hydrology by elongating the hydro-period of upstream wetlands. Three (3) additional on-site mitigation units (Mitigation Areas I-K) were viewed to be in excess of Corps wetland mitigation requirements and therefore were not included as part of the mitigation plan with the original permit issuance.

BPH requested and was authorized a modification to the original permit on 28 September 2018, for the removal of 429.98 acres of land in the northern portion of the BRC, which was purchased by Florida Power & Light (FP&L) for Phase 2 of their solar power facility. That permit modification had no effect on the previously authorized wetland impacts and compensatory mitigation.

EXISTING CONDITIONS: Prior to construction, the BRC boundary included 2,872.15 acres of wetlands and other waters of the US and 14,715.88 acres of uplands. Those wetlands are characterized by freshwater forested and herbaceous habitats with varying degrees of exotic vegetation and hydrologic disturbance. Approximately 50% of the uplands were comprised of disturbed lands (mining operations, improved pastures, and field crops), in which most of the authorized development is located. Natural upland habitats are dominated by pine flatwoods and palmetto prairie.

To date, all development for the BRC has occurred west of the Curry Canal. A total of 252.87 acres of direct wetland impacts have been associated with BRC development west of Curry Canal, while 3,741.49 acres of mitigation (1,378.94 acres of conservation easements over onsite preserves and 2,362.55 acres of offsite preserves in Mitigation Areas C and D) are in various stages of implementation to offset wetland and Endangered Species Act ( ESA) listed species habitat impacts. Of this acreage, mitigation sign-off has been granted (by the Corps) over approximately 305 acres of compensatory mitigation areas A and E and a request for agency sign-off has been made for 769 acres for mitigation area C, Phase 3 and is pending final field review and approval. Three (3) control structures have also been installed in the Curry Canal to restore the hydrology of upstream wetlands within the Curry Preserve system (i.e. mitigation area C within the BRP). The applicants continue to manage future mitigation preserve areas through prescribed burns, which are reported annually in the Interim Panther Management Monitoring report. During the 2019-2020 burn season, BPH conducted prescribed burns on approximately 2,444 acres located within the onsite Mitigation Areas A, F, J, and K.

The development modifications associated with this request are located east of the Curry Canal in

portions of Sections 2, 3, 4, and 9, Township 43 South, Ranges 26 East, in Lee County and Sections 15-16, 20-29, and 32-36, Township 42 South, Range 26 East, in Charlotte County. An 8,710.87-acre project area has been established to focus where the proposed changes in development/preserve layout are largely located. The project area is generally bound to the west by Trout Creek (aka Curry Canal), extending slightly north of Hercules Grade and to east and south consistent with the authorized BRC boundary. Existing conditions within the project area are consistent with pre-development conditions previously reviewed and include 1621.58 acres of wetlands, 41.43 acres of other waters, and 7,047.86 acres of uplands.

Onsite wetlands within the project area include 378.30 acres of wetland shrub, 297.83 acres of cypress, 263.61 acres of freshwater marsh, 260.56 acres of wet prairie, 205.16 acres of cypress, pine, and cabbage palm, 159.92 acres of hydric pine, 36.67 acres of inland slough, 15.25 acres of wetland forested mix, and 4.28 acres of hydric pasture. The surface waters are comprised of 36.47 acres of streams and waterways and 4.96 acres of isolated cow ponds.

Uplands within the project area are comprised of 3333.53 acres of pine flatwoods, 2,416.20 acres of improved pasture, 570.09 acres of field crops, 266.44 acres of palmetto prairie, 138.39 acres of shrub and brush, 124.27 acres of mixed range land, 72.09 acres of oak-pine, 28.51 acres of pine with graminoid understory, 20.48 acres of hardwood-conifer mix, 15.18 acres of live oak, 11.34 acres of pine, oak, and cabbage palm, 5.64 acres of upland scrub, and 1.49 acres of dry prairie.

The project area encompasses portions of mitigation areas A and H in which onsite mitigation has been initiated (conservation easements are recorded and no changes are proposed), as well as areas of future onsite mitigation areas identified, in the original BRC plans, that have not yet been placed under conservation easement (portions of Mitigation Areas E, F, G, J and K). There have been no wetland impacts implemented to date within the project area, except for minor surface water impacts associated with approved trails within portions of Mitigation Areas A and H, consistent with the prior Corps approval.

East and north of the project site are portions of the Babcock Ranch Preserve. To the immediate west of the project site is S.R. 31, then the Fred C. Babcock - Cecil B. Webb Wildlife Management Area (a state preserve); single-family residences; agricultural lands and a mining operation. Several planned residential developments are located south of the project.

PROPOSED WORK: For this modification request approximately 92% (7,996 acres) of the 8,711± -acre project area remains consistent with the original Corps permit (SAJ-2006-06656). Development will occur on 4,451 acres previously approved for development (comprised of 166 acres of wetlands and 4,285 acres of uplands) and preserves are proposed on 3,544 acres of land previously approved as preserves. Approximately 716 acres (8%) of the project area differs from the original authorization.

This request seeks to modify the project footprint within approximately 433 acres (124 acres of wetlands and 309 acres of uplands) located within some portions of mitigation areas F and G to be

converted into development acres. The applicant also seeks to convert 283 acres of development (11 acres of wetlands and 272 acres of uplands) into on-site mitigation preserves. Most of the additional preserve (250± acres) is attributed to the removal of a portion of the authorized development tracts in the southeast portion of the BRC, which will be incorporated into mitigation area K which is contiguous with offsite preserve lands.

An additional 270± acres of natural habitat (235 acres uplands and 35 acres wetlands) considered an "out parcel" or not included within the SAJ-2006-06656 boundary, is also being added to the mitigation plan (Mitigation Area E) as part of the proposed modification. The proposed modifications result in a net loss of 78± acres of wetlands that are adjacent to the approved development tracts. The 553± acres of newly proposed preserves (an increase of 120± acres of preserve in the original permitted conditions) align with adjacent, offsite preserve lands (i.e. the Telegraph Creek Preserve and the Bob Janes Preserve in Lee County and the Babcock Ranch Preserve in Charlotte County). This larger contiguous tract of preserves contributes to the overall regional ecological value of a wildlife corridor, aimed at extending the significance for far ranging species such as the Florida panther, and will be of long term ecological value as the mitigation in these areas is conducted and maintained in perpetuity by the BRCISD, an independent special district (ISD). With this modification, the applicant seeks authorization to incorporate Mitigation Areas I, J, and K into the Corps mitigation plan for the BRC.

The proposed modified development plan east of Curry Canal will result in a total of 279.60 acres of wetland impacts. This acreage includes the 166.18 acres of previously approved wetland impacts within the project boundary plus the approximate 113.42 acres of wetland impacts associated with the modified development plan (124.01 acres of new impacts minus the 10.59 acres of the previously authorized impacts that are being put back into preserve = 113.42 acres net increase). The existing BRC permit authorizes 6.49 acres of surface water impacts within the project area east of the Curry Canal. The modified site plans would include an additional 0.27 acres impacts to a (non-jurisdictional) cow pond (FLUCFCS 525). Construction in the modified project area would require the discharge of approximately 1,213,754 cubic yards of clean fill material into the 279.60 acres of wetlands and 29,772 cubic yards of clean fill into the 6.76 acres of surface water impacts.

The overall modified project would result in the BRC development impacting a total of 553.63 acres of wetlands and will now result in a total of 12,913 acres of compensatory mitigation comprised of wetlands and habitat for listed ESA species. The original Corps permit provided for a 20-year construction timeframe to complete project impacts, with a current expiration date of 2 July 2030. The applicants seek to extend the permit construction window to 2 July 2040, with this modification.

AVOIDANCE AND MINIMIZATION INFORMATION – BPH has provided the following information in support of efforts to avoid and/or minimize impacts to the aquatic environment: The process of avoidance and minimization of wetland and wildlife impacts associated with the BRC began before Kitson & Partners purchased the property in 2006. The BRC was previously part of the 91,362-acre Babcock Ranch. During 2005 and 2006 the State of Florida, Charlotte County and Lee County

formed a public-private partnership with the Babcock Florida Company to purchase 73,575 acres of the Babcock Ranch for perpetual conservation and for sustainable agricultural purposes. The remaining 17,787 acres of private acquisition (± 19% of the greater tract) comprises the outer boundary of what is now known as the BRC. Extensive discussions with state and federal agencies, non-governmental organizations, and concerned citizens were involved in determining the BRC boundary in a collaborative effort to produce a viable and sustainable mixed-use community that met the project's purpose and need.

The BRC's project purpose and need include implementing its development approvals entitling it to build a total of nineteen thousand five hundred (19,500) residential units and six million square feet (6,000,000 SF) of non-residential uses. When the conceptual design for the BRC was formed fifteen (15) years ago, the future demands of the housing and non-residential markets were conceptual projections only and were fully expected to be refined as the BRC was developed over the course of decades. This modification proposes to remove 250± acres currently permitted for development from the southeastern portion of the BRC and substitute those lands with acreage in the internal portion of the BRC which is not currently permitted for development. This modification reflects these updates to the BRC site plan to meet the project's purpose of building 19,500 residential units and 6,000,000 SF of non-residential uses, while continuing to avoid and minimize impacts to the maximum amount practicable and viable.

The BPH began pre-application planning, for this modification, in April 2019, with the goal of providing flexibility of design/product types within the interior portion of the BRC development, while providing additional preserves that would contribute to larger expanses of land with connectivity to off-site preserves. During this planning process, BPH explored design modifications to avoid and minimize adverse impacts within the established BRC boundary/project site.

A total of six (6) options were considered during the evaluation process. The first five (5) options documented the practical design modifications to avoid and minimize impacts from the proposed project. The sixth option was considered to be the most environmentally practicable and economically viable modified design that would meet the project's purpose and need. Details and planning level illustration of the referenced options are contained in the Avoidance and Minimization Report within the Environmental Supplement provided by the applicant and can be found in the administrative file.

The preferred modified plans increase the connectivity of the mitigation preserve areas and as such are expected to provide better long-term contiguous environmental habitat, both on and offsite. The required maintenance of existing flow-ways and substantial supporting upland habitat to wetland preserve areas will result in a regionally valuable mitigation plan. The tracts for development have been designed to concentrate higher densities in the central areas of those tracts and the lower densities are to border adjacent preserves where feasible. Wetland impacts have been limited to areas isolated from larger wetland assemblages to the maximum extent practicable. The wetland impacts proposed with this modification would impact areas that are isolated from the larger conservation landscapes. The proposed modifications to the BRC Mitigation Plan will increase the

continuity of the on-site preserves with the off-site preserve areas, resulting in better long-term habitat connectivity with offsite preserve lands and resulting in an overall net gain of preserved environmental lands.

The wetland preserves being proposed for impacts through the proposed design modification (113± net acres) were already identified as impacted for the panther by the FWS, in their 2009 Biological Opinion. They made that determination because, from a landscape conservation perspective, those wetland preserves, as originally proposed, were internal in the original design of development and thereby isolated. No panther habitat units (panther mitigation) would be derived for the internal preserves. In this situation, the preserve areas on the BRC that abut offsite conservation lands provide greater long-term ecological value than the internal wetland preserves that were proposed to be impacted. The modified design will assist in minimizing human-wildlife conflicts through elimination of the 250± acres in the southeast portion of the property which was originally approved for development.

COMPENSATORY MITIGATION – The applicant has offered the following compensatory mitigation plan to offset unavoidable functional loss to the aquatic environment: Consistent with the prior approval, the BRC Mitigation Plan includes on-site mitigation and offsite mitigation on the BRP. Mitigation on the BRP (Mitigation Areas B, C, and D) remains consistent with the original Corps permit. Modifications are proposed to some portions of on-site Mitigation Areas A, E, F, and G. The applicants also propose to now include on-site Mitigation Areas I, J, and K in the Corps mitigation plan. The acreage of mitigation for impacts to listed species habitat is greater than the acreage of compensatory wetland mitigation, resulting in a mitigation plan that exceeds functional wetland loss, even with the additional wetland impacts proposed with the modified site design east of Curry Canal. Compensatory mitigation is to be implemented on an incremental basis with the intention of remaining current or ahead of construction impacts. Compliance with this condition is being tracked by the Corps through an annual compliance update and by the South Florida Water Management District (SFWMD) through construction/operation permits.

The overall project and site design (including the mitigation plan) are intended to minimize impacts to regionally important habitat and for listed species. The mitigation preserve areas will provide a broad habitat corridor extending east to west and consistent with regional conservation goals of creating a corridor of preserved lands from Lake Okeechobee to Charlotte Harbor. As modified, the BRC Mitigation Plan would include a total of 12,913± acres, comprised of 7,073± acres of onsite mitigation and 5840± acres of offsite mitigation.

As now proposed the on-site mitigation includes enhancing and preserving 2,247.13 acres of wetlands; creating and preserving 368.55 acres of wetlands; enhancing and preserving 4,306.28 acres of uplands (inclusive of upland buffers) and installing six (6) control structures (4 water control structures in Curry Canal and 2 water control structures in Big Island Canal) to extend the hydroperiod of upstream wetlands within the Trout Creek and Telegraph Creek watersheds.

The BRP mitigation totals 5,839.79 acres. The mitigation includes 2,704.43 acres of wetlands to be

enhanced and preserved, and 3,124.27 acres of uplands plus 11.09 acres of trails/road that will remain with no mitigation credit derived.

The BRP wetlands to be enhanced and preserved include 1.21 acres of hydric pasture; 24.42 acres of willow; 0.32 acre of exotic wetland; 1,007.44 acres of cypress; 321.65 acres of cypress, pine/cabbage/palm; 180.78 acres of hydric pine; 270.94 acres of wetland forested mix; 157.66 acres of wetland shrubs; 517.62 acres of freshwater marsh; 210.41 acres of wet prairie and 11.98 acres of streams, waterways and reservoirs.

The BRP uplands consist of 319.34 acres of improved pastures; 73.84 acres of field crops; 7.87 acres of dry prairie,171.01 acres of shrub and brush land; 29.15 acres of palmetto prairie and other shrubs and brush, 5.39 acres of mixed range land, 2,308.35 acres of pine flatwoods, 12.31 acres of live oak, 183.36 acres of hardwood conifer mix, 1.00 acre of upland scrub, 12.65 acres of disturbed land (spoil storage area), and 11.09 acres of roads.

The BRP mitigation areas are adjacent to the on-site mitigation areas and provide a substantial corridor to connect the BRP to the Fred C. Babcock - Cecil B. Webb Wildlife Management Area to the west. All mitigation areas will be maintained free of nuisance and exotic vegetation in perpetuity in accordance with the approved mitigation plan. On-site mitigation areas will be placed under conservation easements as impacts occur. The onsite mitigation areas are protected via conservation easements granted to the SFWMD, with third party enforcement rights granted to the Corps.

CULTURAL RESOURCES: Cultural resource assessments were previously conducted by Archaeological Consultants, Inc. (ACI) during original permitting of the BRC. By correspondence dated 12 August 2020, the Florida Department of State Division of Historical Resources (DHR) stated that based on their review of the previous cultural resource assessment survey (Project File No.: 2020-3050-B), the mitigation areas proposed for impact with this application were sufficiently addressed as part of the overall survey and no further archaeological surveys were recommended. The DHR has determined that the proposed changes to the development plan will have no effect to any historic properties listed, or eligible for listing, in the National Register of Historic Places.

ENDANGERED SPECIES: On 31 August 2009, the U.S. Fish and Wildlife Service (FWS) issued a Biological Opinion for the project which addressed project related impacts to the Florida panther (Puma concolor coryi), wood stork (Mycteria americana), Audubon's crested caracara (Caracara cheriway audubonii), Florida scrub-jay (Aphelocoma coerulescens), red-cockaded woodpecker (Picoides borealis, RCW), Eastern indigo snake (Drymarchon corais couperi), and the beautiful pawpaw (Deeringothamnus pulchellus).

A minor amendment to the BO was issued by the FWS on 9 August 2019, authorizing a change in panther habitat designation over 171.58 acres of land originally intended to remain as farming/nursery operations, from "panther neutral" to "panther impact", to allow development. An additional 435.58 acres of land (panther mitigation) was incorporated into the Telegraph Trail

Preserve (Mitigation Area D), as compensation. The panther mitigation addition was included as wetland mitigation for the BRC when the Corps issued its permit but had not been included for panther mitigation in the 2009 BO.

The 2019 BO amendment also re-evaluated the project's potential effects on the Eastern indigo snake in accordance with the most recent Programmatic Key for indigo snake, as revised in 2017, By the 2017 Key, if the project contains more than 25 acres of indigo snake habitat "a take is likely".

The applicant has provided the results of updated threatened and endangered species surveys conducted for the project and management plans for the above referenced species. Based on the applicant's listed species surveys, the proposed management plans and current site plan, the Corps has made determinations consistent with the 2009 BO that the project may affect but is not likely to adversely affect the RCW, Florida scrub jay, and the beautiful paw-paw and will request concurrence from the FWS with these determinations.

The Corps has completed an evaluation of the current modifications proposed for the BRC and finds the proposed project "may affect" some ESA listed species and/or their designated habitat. Additionally, there has been a newly listed ESA species identified on the property that was not previously considered during prior reviews. Based on the new information, the Corps determined that the modified project "may affect" the Florida bonneted bat [(FBB) Eumops floridanus]. Additionally the Corps has determined that the proposed modified project "may affect" the panther, the wood stork, Audubon's crested caracara, and the indigo snake and will request the FWS to initiate formal consultation for those species The applicant has also requested consultation for one candidate species, the gopher tortoise (Gopherus polyphemus). These determinations will be coordinated with the FWS, via separate letter.

ESSENTIAL FISH HABITAT (EFH): This project is above the mean high water and has no effect on EFH.

NOTE: This public notice is being issued based on information furnished by the applicant. This information has not been verified or evaluated to ensure compliance with laws and regulation governing the regulatory program. The jurisdictional line has been verified by Corps personnel.

AUTHORIZATION FROM OTHER AGENCIES: The SFWMD is processing a modification application for this project. The SFWMD application number is #200526-3536.

COMMENTS: Comments regarding the potential authorization of the work proposed should be submitted in writing to the attention of District Engineer through the Fort Myers Permitting Section, 1520 Royal Palm Square Boulevard, Suite 310, Fort Myers, Florida 33919 within 21 days from the date of this notice.

The decision whether to issue or deny this permit modification application will be based on the information received from this public notice and the evaluation of the probable impact to the

associated wetlands. This is based on an analysis of the applicant's avoidance and minimization efforts for the project, as well as the compensatory mitigation proposed.

QUESTIONS: Questions concerning this application should be directed to the project manager, Robert Tewis, in writing at the Ft. Myers Permits Section, 1520 Royal Palm Square Blvd. Suite 310, Fort Myers, Florida, 33919; by electronic mail at robert.M.Tewis@usace.army.mil; by facsimile transmission at (239)-334-0797; or by telephone at (239)-334-1975 ext. 0012. .

IMPACT ON NATURAL RESOURCES: Coordination with the U.S. Fish and Wildlife Service (FWS), the Environmental Protection Agency (EPA), the National Marine Fisheries Services (NMFS), and other Federal, State, and local agencies, environmental groups, and concerned citizens generally yields pertinent environmental information that is instrumental in determining the impact the proposed action will have on the natural resources of the area.

EVALUATION: The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including cumulative impacts thereof; among these are conservation, economics, esthetics, general environmental concerns, wetlands, historical properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food, and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people. Evaluation of the impact of the activity on the public interest will also include application of the guidelines promulgated by the Administrator, EPA, under authority of Section 404(b) of the Clean Water Act (CWA) or the criteria established under authority of Section 102(a) of the Marine Protection Research and Sanctuaries Act of 1972. A permit will be granted unless its issuance is found to be contrary to the public interest.

The US Army Corps of Engineers (Corps) is soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this determination, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

COASTAL ZONE MANAGEMENT CONSISTENCY: In Florida, the State approval constitutes compliance with the approved Coastal Zone Management Plan (CZMP). In Puerto Rico, a Coastal Zone Management Consistency Concurrence is required from the Puerto Rico Planning Board. In the Virgin Islands, the Department of Planning and Natural Resources permit constitutes

compliance with the Coastal Zone Management Plan.

REQUEST FOR PUBLIC HEARING: Any person may request a public hearing. The request must be submitted in writing to the District Engineer within the designated comment period of the notice and must state the specific reasons for requesting the public hearing.

PUBLIC NOTICE (PN) PUBLISHING: If you are a property owner who might have interest in work being proposed on property adjoining yours a PN for the proposed work has been published on the internet at the following web address:

http://www.saj.usace.army.mil/Missions/Regulatory/PublicNotices.aspx

Please be aware this web address is case sensitive and should be entered as it appears above. In order to view the notice, access the web page provided, left click on the following file number to open the PN for SAJ-2006-06656-(Mod-RMT).

AVAILALBLE HARD COPIES of the PN FOR REVIEWING: Hard copies of this PN and associated site plans will be made available for review within the BRC at the Hatchery Building located at 42881 Lake Babcock Drive, Babcock Ranch, Florida 33982. PLEASE NOTE: Persons wanting to review a hard copy of the PN must call in advance (941-628-7837) to be allowed into the building.
Related Story: **Graphics**
https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/16093


Charlotte County     Lee County     USACE     Jacksonville District

U.S. Army Corps of Engineers     permit     public notice

# Exhibit M



*Protecting Southwest Florida's unique natural environment and quality of life … now and forever.*

November 25, 2020

Robert Tewis, Army Corps of Engineers
Robert.M.Tewis@usace.army.mil

Jewelene Harris, South Florida Water Management District
jsharris@sfwmd.gov

Dear Mr. Tewis and Ms. Harris,

The Conservancy of Southwest Florida, on behalf of it's more than 7,000 members, is writing to provide comment on Permit Application No. SAJ-2006-06656-(SP-RMT) for Babcock Ranch Holdings.[1]

We draw your attention to several specific issues that have not been appropriately addressed by the applicant and are critical in your review of this application. The first area of concern is the potential impacts to crested caracara, particularly their nest sites. While we understand the applicant had indicated it would be difficult to rework site plans, modification of the design should be the priority in order to avoid impacts to the Threatened caracara. This has not been done by Babcock Ranch Holdings and we ask that you direct them to do so. We are requesting a hearing on this project to fully address these issues.

We cannot stress strongly enough that mitigation should only be an option after avoidance and minimization have been exhausted, and we do not believe the applicant has explored those options fully. The caracara Primary Zone buffer is particularly important, and must be avoided not just if practicable but if possible. If avoidance is impossible, any activity in those areas must be minimized to the greatest extent practicable, which includes avoiding construction during breeding season. The caracara is non-migratory uses their territory year round, and has strong nesting site fidelity.[2] Although breeding activity can occur from September through June, the primary breeding season is considered November through April.[3] Nest initiation and egg-laying peak from December through February. Caracaras construct new

---

[1] This is also Application 200526-3536 for the South Florida Water Management District
[2] Morrison, J.L. 2001. Recommended management practices and survey protocols for Audubon's crested caracaras (Caracara cheriway audubonii) in Florida. Technical Report No. 18. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida. P. 4.
[3] US Fish and Wildlife service, 2004. South Florida Ecological Services Office, Species Conservation Guidelines South Florida, Audubon's Crested Caracara. April 20, 2004. P. 6.



Conservancy of Southwest Florida has been awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

1495 Smith Preserve Way  |  Naples, Florida 34102  |  239.262.0304  |  Fax 239.262.0672  |  www.conservancy.org

nests each nesting season, often in the same tree as the previous year.[4]  Thus, as surveying efforts continue we note that the US Fish and Wildlife Services guidelines state that "a nest should not be considered abandoned until it is not used for three consecutive breeding seasons or no other active nests are found within 0.5 km (0.31 mi) of the nest."[5] This map shows the caracara nests that had activity in 2019 and 2020 as provided by the applicant to the South Florida Water Management District as part of their application.



[4] US Fish and Wildlife service, 2004. South Florida Ecological Services Office, Species Conservation Guidelines South Florida, Audubon's Crested Caracara. April 20, 2004. P. 1.
[5] US Fish and Wildlife service, 2004. South Florida Ecological Services Office, Species Conservation Guidelines South Florida, Audubon's Crested Caracara. April 20, 2004. P. 7.

The second concern we want to raise is the impact on the Florida bonneted bat.  Florida bonneted bats are different from most other Florida bat species because they appear to be reproductively active through most of the year, and their large size makes them capable of foraging long distances from their roost[6].  Consequently, this species is vulnerable to disturbances around the roost during a greater portion of the year and considerations about foraging habitat extend further than the localized roost.  Note that the protected species assessment dated August 2017 states "[w]idely scattered pine tree snags with potential bonneted bat cavities were observed."



Figure 1.  Florida Bonneted Bat Consultation Area. Hatched area (Figure 2) identifies the urban development boundary in Miami-Dade and Broward County.  Applicants with projects in this area should contact the Service for specific guidance addressing this area and individual consultation.  The Consultation Key should not be used for projects in this area.

The bonneted bat was listed in 2013, but we do not see in the Biological Opinions for this site to-date, including the amendment in August 9, 2019, that a consultation was completed for this species. The United States Fish and Wildlife Service updated their consultation key for the bat, and Figure 1 shows the consultation area, of which this project falls within.[7]  Before this application can be approved, the applicant needs to provide information to the agencies to determine if there are foraging or roosting bonneted bats on-site or in the vicinity.  We ask that you require this of the applicant.

---

[6] Ober, H. 2016. Annual report to USFWS for calendar year 2016. Permit number TE23583B-1. University of Florida, Department of Wildlife Ecology and Conservation, North Florida Research and Education Center. Quincy, Florida.
[7] https://www.fws.gov/verobeach/ProgrammaticPDFs/20191022_letter_ServicetoCorps_FBB-ProgrammaticKey.pdf

Additionally, as shown on the included map, much of the Babcock Ranch development site is proposed as critical habitat for the Florida Bonneted Bat.[8] Consideration of how the proposal would impact this proposed[9] habitat is also warranted.

It appears that these listed species have not been fully examined and that avoidance measures have not been taken.  Avoidance must occur not just if convenient but if possible, and we believe that it is possible for the applicant to avoid at least the primary zones for active caracara nests and as there is no survey completed for the Florida Bonneted Bat, it is impossible to determine if appropriate avoidance measures are being taken.  Please require a survey prior to the issuance of any permit to ensure appropriate avoidance measures are being taken.

Best Regards,

Julianne Thomas
Senior Environmental Planning Specialist
(239) 262-0304 x 252
juliannet@conservancy.org

Cc: Roxanna Hinzman, USFWS, roxanna_hinzman@fws.gov

---

[8] Shapefile provided by US Fish and Wildlife Service.
[9] Federal Register, Vol. 85, No. 112, P. 35510. June 10, 2020.



Florida_Bonneted_Bat_Proposed_Critical_Habitat
Babcock Ranch Preserve





Miles
0  0.35 0.7    1.4      2.1      2.8



# Exhibit N



**Public Notices**

# SAJ-2019-03152 (SP-ACM)

Published June 5, 2020

TO WHOM IT MAY CONCERN: The Jacksonville District of the U.S. Army Corps of Engineers (Corps) has received an application for a Department of the Army permit pursuant to Section 404 of the Clean Water Act (33 U.S.C. §1344) as described below:

APPLICANT: Minto Sabal Bay, LLC

WATERWAY AND LOCATION: The project, referred to as Fleischmann Parcel, would affect waters of the United States, including wetlands, associated with the Rookery Bay Watershed, West Collier Drainage Basin. The project site is located in Sections 23 and 26, Township 50 South, and Range 25 East, Naples, Collier County. The project is located southeast of the intersection of Bayshore Drive and Holly Avenue, approximately 0.75 mile south of Thomasson Drive.

Directions to the site are as follows: From Exit 101 on Interstate 75, proceed approximately 3.4 miles south on County Road 951. Turn right on Rattlesnake Hammock Road and proceed 7 miles to Bayshore Drive. Turn left and proceed 0.75 mile south.

APPROXIMATE CENTRAL COORDINATES:
Latitude 26.094988°
Longitude -81.767949°

PROJECT PURPOSE:
Basic: Residential development.
Overall: To build a master planned residential development, near Naples, in south Collier County, Florida.

EXISTING CONDITIONS: The 103 acre site contains 53.7 acres of wetlands and 0.1 acre of other surface waters. The wetlands consist of disturbed cypress, pine, shrub, and mangrove. The other surface waters consist of drainage canal.

The property is surrounded to the north and east by Isles of Collier Preserve residential development. The property is bordered to the south and west by undeveloped land. The Avalon Outfall Canal borders the east side of the project.

Vegetation mapping for the property was completed by Passarella and Associates, Inc. (PAI) in July 2019 utilizing the Florida Land Use, Cover and Forms Classification System (FLUCFCS) Level IV. AutoCAD Map 3D 2017 software was used to determine the acreage of each mapping area, produce summaries, and generate the final FLUCFCS map for the Project site.

A brief description of the vegetation communities identified within each FLUCFCS code follows.

Pine Flatwoods, Disturbed (50-100% Exotics) (FLUCFCS Codes 4119 E3-E4)
The canopy vegetation is slash pine (Pinus elliottii) with widely scattered melaleuca (Melaleuca quinquenervia) and earleaf acacia (Acacia auriculiformis). The sub-canopy includes cabbage palm (Sabal palmetto), myrsine (Myrsine cubana), dahoon holly (Ilex cassine), wax myrtle (Morella cerifera), Brazilian pepper (Schinus terebinthifolia), downy rose-myrtle (Rhodomyrtus tomentosa), staggerbush (Lyonia fruticosa), and gallberry (Ilex glabra). The sub-canopy in scattered higher elevation areas contains sand live oak (Quercus geminata) and myrtle oak (Quercus myrtifolia). The ground cover includes downy rose-myrtle, Brazilian pepper, saw palmetto (Serenoa repens), bracken fern (Pteridium aquilinum), swamp fern (Telmatoblechnum serrulatum), greenbriar (Smilax sp.), grapevine (Vitis rotundifolia), poison ivy (Toxicodendron radicans), love vine (Cassytha filiformis), gopher apple (Licania michauxii), running oak (Quercus pumila), and yellow-eyed grass (Xyris sp.). Coverage of exotics exceeds 75 percent in areas mapped as E4.

Drainage Canal (FLUCFCS Code 514)
These excavated other surface water areas are open water shaded by a canopy of melaleuca, downy rose-myrtle, and Brazilian pepper.

Mangrove Swamps, Disturbed (0-24% Exotics) (FLUCFCS Code 6129 E1)
The canopy and sub-canopy vegetation include white mangroves (Laguncularia racemosa), black mangroves (Avicennia germinans), buttonwood (Conocarpus erectus), melaleuca, and Australian pine (Casuarina equisetifolia). The ground cover includes needle rush (Juncus roemerianus), saltgrass (Distichlis spicata), morning glory (Ipomea sp.), umbrella sedge (Fuirena scirpoidea), and saltwort (Batis maritima).

Mangrove Swamps, Disturbed (50-75% Exotics) (FLUCFCS Code 6129 E3)
The canopy and sub-canopy vegetation include buttonwood (Conocarpus erectus), melaleuca, cabbage palm, Brazilian pepper, white mangroves, and black mangroves. The ground cover includes saltgrass and white indigo berry (Randea aculeata).

Cypress/Pine/Cabbage Palm, Disturbed (Exotics 50-100%) (FLUCFCS Codes 6249 E3-E4)
The canopy consists of slash pine, melaleuca, cypress (Taxodium distichum), and cabbage palm. The sub-canopy contains downy rose-myrtle, cabbage palm, cocoplum (Chrysobalanus icaco), wax myrtle, swamp bay (Persea palustris), melaleuca, Brazilian pepper, and myrsine. The ground cover includes gulfdune paspalum (Paspalum monostachyum), swamp fern, sawgrass (Cladium jamaicense), grapevine, swamp lily (Crinum americanum), Old world climbing fern (Lygodium microphyllum), poison ivy, and cabbage palm. Coverage of exotics exceeds 75 percent in areas

mapped as E4.

Pine, Hydric, Disturbed (50-100% Exotics) (FLUCFCS Codes 6259 E3-E4)
The canopy consists of slash pine and melaleuca with some scattered cabbage palm and cypress. The sub-canopy contains slash pine, wax myrtle, myrsine, dahoon holly, swamp bay, saltbush (Baccharis halimifolia), melaleuca, downy rose-myrtle, cypress, cocoplum, and Brazilian pepper. The ground cover includes gulfdune paspalum, swamp fern, sawgrass, snowberry (Chiococca alba), poison ivy, bracken fern, Old world climbing fern, yellow-eyed grass, grapevine, greenbriar, bantam buttons (Syngonanthus flavidulus), and rush fuirena (Fuirena cirpoidea). Coverage of exotics exceeds 75 percent in areas mapped as E4.

Wetland Shrub, Disturbed (50-75% Exotics) (FLUCFCS Code 6319 E3)
The canopy and sub-canopy vegetation includes buttonwood (Conocarpus erectus), melaleuca, cabbage palm, and Australian pine (Casuarina equisetifolia). The ground cover is dominated by saltgrass (Distichlis spicata), with scattered spikerush (Eleocharis sp.), saltwort, sand cordgrass (Spartina alterniflora), needle rush, leather fern (Acrostichum aureum), and glasswort (Salicornia virginica).

PROPOSED WORK: The applicant seeks authorization to construct a residential development with associated infrastructure, amenities, and stormwater management system. The proposed project will result in the discharge of 169,077 cubic yards of fill material into 26.2 acres of wetlands and 839 cubic yards of fill material into 0.13 acre of other surface waters. The proposed project will also excavate 72,213 cubic yards of material from 7.46 acres of wetlands.

AVOIDANCE AND MINIMIZATION INFORMATION – The applicant has provided the following information in support of efforts to avoid and/or minimize impacts to the aquatic environment: To avoid impacts to high natural resource value lands, the project directs development towards lands with less environmental habitat value. The site plan was designed to utilize existing disturbed upland and low-quality wetland habitats and avoid direct and secondary impacts to on-site high quality natural wetland habitats including mangrove. In addition, the applicant avoids developing near existing conservation lands located south of the project.

COMPENSATORY MITIGATION – The applicant has offered the following compensatory mitigation plan to offset unavoidable functional loss to the aquatic environment: In order to offset the loss of wetland functions, the applicant proposes on-site preservation and enhancement of wetlands and uplands. The preservation area contains important habitat for a variety of plant and wildlife species and is located proximate to Rookery Bay National Estuarine Research Reserve. The compensatory mitigation area would be placed in a conservation easement dedicated to the South Florida Water Management District with third party enforcement rights granted to the Corps.

CULTURAL RESOURCES: The Corps is not aware of any known historic properties within the permit area. A cultural resource assessment survey has been completed by the applicant. Our final determination relative to historic resource impacts is subject to review by and coordination with the

State Historic Preservation Officer and those federally recognized tribes with concerns in Florida and the Permit Area.

ENDANGERED SPECIES: The project site is located in an area where the eastern indigo snake (Drymarchon corais couperi) may occur. A species survey conducted of the project site, by the applicant's agent, did not reveal the presence of any eastern indigo snakes, however potential refugia were identified in the form of gopher tortoise burrows. The permit instrument, if issued, would contain the Standard Protective Measures for Eastern Indigo Snake which must be followed during all construction activities. In following the Indigo Snake Programmatic Concurrence Key (dated August 1, 2017), the proposal keys out to A>B>C> "may affect". The applicant has committed to a plan of mitigation that will enhance and preserve land that can provide habitat support for the eastern indigo snake. The Corps determined the proposed project "may affect" the eastern indigo snake and will request formal consultation on this species from the US Fish and Wildlife Service (FWS) via a separate letter.

The project site supports Suitable Foraging Habitat for the wood stork, but is not located within a wood stork (Mycteria americana) core foraging area. The applicant has committed to a plan of mitigation that will enhance and preserve over 20 acres of land that can provide habitat support for the wood stork. The Corps completed an evaluation of the project based upon the FWS Wood Stork Effect Determination Key. Use of the key resulted in the following sequential determination: A>B>C>D> "not likely to adversely affect". Although the project will directly impact potential wood stork foraging habitat, replacement compensation is proposed in accordance with Clean Water Act 404(b)(1) guidelines, the habitat compensation replaces foraging value consisting of wetland enhancement and restoration matching the hydroperiod of wetlands affected, and replacement compensation provides foraging value similar to, or higher than, that of impacted wetlands; therefore, the Corps determined that the project "may affect, but is not likely to adversely affect" (MANLAA), the wood stork and will request concurrence from the FWS via a separate letter.

The Project is located approximately 0.5 mile outside of the Consultation Area for the red-cockaded woodpecker (RCW) (Picoides borealis). No RCWs or cavities in live pine trees have been documented on or near the site during the listed species survey or other fieldwork conducted on the Project site. The Corps has determined the proposed project "may affect, but is not likely to adversely affect", the RCW. This determination is based on the use of the FWS draft Species Conservation Guidelines, South Florida for the RCW (July 12, 2004). According to the Florida Fish and Wildlife Conservation Commission database, the nearest documented historic record of red-cockaded woodpeckers is approximately 3.5 miles northeast of the Project site. No further action is required.

The Project occurs within a FWS Consultation Area for the Florida scrub jay (Aphelocoma coerulescens). The Florida scrub jay lives only in scrub and scrubby flatwoods habitats found on nearly pure, excessively well-drained, sandy soils. Scrub jay habitat is dominated by a layer of evergreen oaks [myrtle oak (Quercus myrtifolia) and/or Archbold oak (Q. inopina), sand live oak (Q. geminate), Chapman oak (Q. chapmanii), and runner oak (Q. minima)], rusty lyonia (Lyonia

ferruginea), and Florida rosemary (Ceratiola ericoides). Ground cover is sparse, dominated by saw palmetto (Serenoa repens) and sand palmetto (S. etonia) (http://www.fws.gov/northflorida//Species-Accounts/Fla-Scrub-Jay-2005.htm 10/22/2015). The project site does not contain suitable Florida scrub jay habitat. Surveys conducted by the applicant found no use of the project site by Florida scrub jay. According to the Florida Fish and Wildlife Conservation Commission database, the nearest documented historic record of Florida scrub jay is approximately 5 miles southeast of the Project site. The Corps determination is that the proposal will have "no effect" on the scrub jay.

The Project site is located within a FWS designated consultation area for the Florida bonneted bat (Eumops floridanus) (FBB). The applicant has conducted a FBB roost and acoustic survey of the Project area. No Florida bonneted bats or their sign were detected during the survey. Both the roost and acoustic survey were negative for the presence of FBB. The Corps utilized the October 2019 FBB Consultation Guideline Key, resulted in the following sequential determination 1a>2a>3b>6>7>10>12a>LAA preliminary determination. However the onsite species survey indicates that there are no FBB onsite, therefore the Corps determination is "may affect, but is not likely to adversely affect", and will request formal consultation from the FWS via a separate letter.

The Project site is located over 6 miles outside of the nearest FWS designated Focus Area for the Florida panther (Puma concolor coryi). Panther telemetry has been reported within one mile of the Project site. There have been no panther vehicular collisions reported on roadways adjacent to the site, however the increase in homes will have an increase in traffic. Using the Florida Panther Effect Determination Key (February 19, 2007), the proposal keyed as follows: A > B> May Effect. The Corps will request formal consultation on this species from the FWS via a separate letter.

The Corps has made the determination of MANLAA for the American crocodile (Crocodylus acutus) and its designated critical habitat. American crocodile nests occurring near the Marco Island Airport, approximately 9 miles to the southeast of this project. The Corps will request informal consultation on this species from the FWS via a separate letter.

ESSENTIAL FISH HABITAT (EFH): This notice initiates consultation with the National Marine Fisheries Service on EFH as required by the Magnuson-Stevens Fishery Conservation and Management Act 1996. The project would only impact freshwater wetlands; therefore, the Corps has determined that no substantial adverse impacts to EFH or Federally managed fisheries in the Gulf of Mexico will result from the proposed action. Our final determination relative to project impacts and the need for mitigation measures is subject to review by and coordination with the National Marine Fisheries Service.

NOTE: This public notice is being issued based on information furnished by the applicant. This information has not been verified or evaluated to ensure compliance with laws and regulation governing the regulatory program.

AUTHORIZATION FROM OTHER AGENCIES: Water Quality Certification may be required from the Florida Department of Environmental Protection and/or one of the state Water Management

Districts.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to the attention of the District Engineer at the above address within 30 days from the date of this notice.

The decision whether to issue or deny this permit application will be based on the information received from this public notice and the evaluation of the probable impact to the associated wetlands. This is based on an analysis of the applicant's avoidance and minimization efforts for the project, as well as the compensatory mitigation proposed.

QUESTIONS concerning this application should be directed to the project manager, Allison Murphy, in writing at the Fort Myers Permits Section, 1520 Royal Palm Square Blvd, Fort Myers, FL 33919; by electronic mail at 1520 Royal Palm Square Blvd, Suite 310, Fort Myers, FL 33919; or, by telephone at (239) 334-1975.

IMPACT ON NATURAL RESOURCES: Coordination with the FWS, the Environmental Protection Agency (EPA), the National Marine Fisheries Services, and other Federal, State, and local agencies, environmental groups, and concerned citizens generally yields pertinent environmental information that is instrumental in determining the impact the proposed action will have on the natural resources of the area.

EVALUATION: The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including cumulative impacts thereof; among these are conservation, economics, aesthetics, general environmental concerns, wetlands, historical properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food, and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people. Evaluation of the impact of the activity on the public interest will also include application of the guidelines promulgated by the Administrator, EPA, under authority of Section 404(b) of the Clean Water Act or the criteria established under authority of Section 102(a) of the Marine Protection Research and Sanctuaries Act of 1972. A permit will be granted unless its issuance is found to be contrary to the public interest.

The Corps is soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this determination, comments are used to assess impacts to endangered species, historic properties, water quality, general

environmental effects, and the other public interest factors listed above. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

COASTAL ZONE MANAGEMENT CONSISTENCY: In Florida, the State approval constitutes compliance with the approved Coastal Zone Management Plan. In Puerto Rico, a Coastal Zone Management Consistency Concurrence is required from the Puerto Rico Planning Board. In the Virgin Islands, the Department of Planning and Natural Resources permit constitutes compliance with the Coastal Zone Management Plan.

REQUEST FOR PUBLIC HEARING: Any person may request a public hearing. The request must be submitted in writing to the District Engineer within the designated comment period of the notice and must state the specific reasons for requesting the public hearing.

Related Story: **Graphics**

https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/14505

Collier County    permit    public notice    USACE

U.S. Army Corps of Engineers    Jacksonville District

# Exhibit O

July 2, 2020


Michael Elgin
Minto Communities USA
4400 W. Sample Road, Suite 200
Coconut Creek, FL 33073

     RE:    Minto Sabal Bay, LLC- Fleischmann Parcel SAJ-2019-03152 (SP-ACM)


Dear Mr. Elgin:

The Conservancy of Southwest Florida, Audubon of the Western Everglades, and the Florida Wildlife Federation are concerned with impacts to threatened and listed species due to the proposed Fleischmann Parcel development. In February 2020, Conservancy staff, along with Florida Wildlife Federation and Audubon of the Western Everglades staff, met with you and the environmental consultants of the proposed project. During this meeting we were made aware of the significant amount of state-designated threatened gopher tortoise individuals and burrows on site (approximately 68 burrows[1]), as well as the plan to develop over all gopher tortoise habitat and transfer tortoises to a Glades County recipient site.

The primary threat to gopher tortoises is destruction of their preferred habitat, particularly upland environments.[2] This is because the gopher tortoise prefers open canopy, forested environments that have sandy and well-drained soils.[3] Unfortunately, this also represents the preferred landscape for human development. Since gopher tortoises are an obligate upland species and their habitat is underrepresented in conservation lands in Florida- this presents a real problem for the species.[4]

It should also be noted that the federally listed eastern indigo snake is known to use gopher tortoise burrows as a refuge, particularly from the cold weather.[5] As this property is located in an area where the eastern indigo snake may occur, we are concerned what impact the project may have on habitat used by this listed species. As logic follows, if the gopher tortoises are protected and burrows are preserved on-site, then potential habitat for the eastern indigo snake will also be protected.

---

[1] Passarella & Associates, Inc. 2019. Isles of Collier Preserves Mixed-Use Planned Unit Development Fleischmann Parcel Amendment Environmental Data.
[2] Florida Fish and Wildlife Conservation Commission. Gopher Tortoise. https://myfwc.com/wildlifehabitats/profiles/reptiles/gopher-tortoise/
[3] Enge, K. M., J. E. Berish, R. Bolt, A. Dziergowski, and H. R. Mushinsky. 2006. Biological status report - gopher tortoise. Florida Fish and Wildlife Conservation Commission, Tallahassee, USA. 60pp.
[4] Ankersen, T. et al. 2003. The Gopher Tortoise and Upland Habitat Protection in Florida: Legal and Policy Considerations. https://www.law.ufl.edu/_pdf/academics/centers-clinics/clinics/conservation/resources/gopher.pdf
[5] USFWS. Eastern Indigo Snake Fact Sheet.

At the February meeting, our groups suggested an on-site preserve within the west central portion of the property, approximately 20-25 acres, that encompasses the most active tortoise burrows (See Attachment A for map). This will prevent having to relocate the majority of tortoises approximately 100 miles away from their native habitat into a fenced- in recipient site with high density of gopher tortoises. A recent study conducted in the Panhandle of Florida suggests that significant health problems in tortoises may arise following translocation and are possibly caused by stress, social disruptions, and/or increased exposure to local pathogens or contaminants.[6] We support maintaining and protecting the gopher tortoises' on-site as to avoid these possible side effects of translocation.

Ideally, the proposed project would avoid the gopher tortoise habitat and all wetland areas. This can be achieved by building more densely within the development footprint in order to maintain the allotted density while still allowing for a gopher tortoise preserve and wetland preservation onsite. However, in order to have this offset of preserve acreage without impacting the project density, the development footprint could be extended into impacted wetlands in the central/southwest portion of the parcel and down the eastern side next to already existing development. If you are able to maintain a gopher tortoise preserve on-site, your community would have the unique opportunity to offer access to this natural community. Access to nature is a highly desirable amenity. This is evidenced in Minto Communities' existing Twin Eagles development off of Immokalee Road. Of course, with an on-site preserve, there must be a proper management plan and escrow fund for maintenance of the tortoise preserve that would be funded by the future HOA in perpetuity. Once a gopher tortoise preserve management plan is drafted, our groups would be more than willing to provide feedback and work as partners on the final language of the plan.

As proposed, this project does not adequately address or protect on-site threatened species like the gopher tortoise or eastern indigo snake. We ask that you reconsider our suggestion and move forward with creating a 20-25 acre preserve within the development will allow for a large number of the gopher tortoises to remain on the property while protecting their preferred habitat. This in turn helps support and protect other species that utilize gopher tortoises burrows and habitat, such as the eastern indigo snake. Our organizations appreciate that you reached out to us initially to gauge our concerns and met with us on February 4, 2020. However, we were disappointed that our follow up meeting request sent on April 10, 2020 has remained unanswered.

We believe we have offered a path forward that can both meet your needs while still ensuring that the native gopher tortoise population can remain intact and we respectfully request that you give this proposal full consideration. Please do not hesitate to reach out with any questions. We

---

[6] Cozad RA, Hernandez SM, Norton TM, Tuberville TD, Stacy NI, Stedman NL and Aresco MJ. 2020. Epidemiological Investigation of a Mortality Event in a Translocated Gopher Tortoise (Gopherus polyphemus) Population in Northwest Florida. Front. Vet. Sci. 7:120. doi: 10.3389/fvets.2020.00120

look forward to discussing this further with you. Thank you for your time and consideration of our concerns.  Please feel free to contact Kelly McNab at kellym@conservancy.org if you have any questions or concerns.


Sincerely,

**Kelly McNab**
Environmental Planning Specialist
Conservancy of Southwest Florida


**Meredith Budd**
Regional Policy Director
Florida Wildlife Federation


**Bradley Cornell**
Southwest Florida Policy Associate
Audubon of the Western Everglades


cc:    Allison Murphy, US Army Corps of Engineers
       Larry Williams, U.S. Fish & Wildlife Service
       Nicole Johnson, Conservancy of Southwest Florida
       Amber Crooks, Conservancy of Southwest Florida

4

Fleischmann Parcel SAJ-2019-03152 (SP-ACM)

Attachment A

## Proposed Location of On-site Gopher Tortoise Preserve



Legend

Fleischmann Parcel

Approximate Location of Preserve

*The proposed preserve site was created by overlaying identified Gopher Tortoise Burrow locations shown on Passarella & Associates October 22, 2019 Listed Species survey map





# Exhibit P



SunTrust Bank Building
215 South Monroe Street
Suite 400
Tallahassee, Florida 32301
P.O. Drawer 11300 (32302)
Telephone: 850.681.6810
Facsimile: 850.521.1460
www.broadandcassel.com

Douglas J. Rillstone, P.A.
Email: drillstone@broadandcassel.com

May 12, 2011

**VIA OVERNIGHT COURIER AND ELECTRONIC MAIL CORRESPONDENCE THIS DATE**

Stephen R. Sullivan
Deputy, South Florida Regulatory Division
Jacksonville District Corps of Engineers
1520 Royal Palms Square Boulevard
Suite 310
Fort Myers, FL 33919

Re:     Corps Application Nos. SAJ-2008-03827 and SAJ-2010-02076
        United States Department of Army Corps of Engineers

        FFD MEPD Project
        Florida Farm Development Land Company, Inc.
        Lee County, Florida

**RECEIVED**

MAY 1 6 2011

JACKSONVILLE DISTRICT
USACE

Dear Mr. Sullivan:

As you may be aware, our office has the pleasure of representing Florida Farm Development Land Company, Inc. in the above-referenced applications. Our client submitted to the United States Department of Army Corps of Engineers ("Corps") Application No. SAJ-2008-03827 which requested authorization for the discharge of dredged or fill material to "waters of the United States" associated with the construction of a limerock mining operation in Lee County, Florida, known as the FFD MEPD project. By correspondence from your office dated December 6, 2010, it appears that the Corps incorporated our client's application into Corps Application No. SAJ-2010-02076 entitled "Limestone Mining Adjacent to Regional Preserve Lands Within Lee – Collier County Limestone Resource Area".

The purpose of this correspondence is to advise the Corps that our client, by operation of this correspondence, hereby withdraws from further consideration its request for authorization for the discharge of dredged or fill material to "waters of the United States" as reflected in Corps Application No. SAJ-2008-03827. To the extent that the Corps has incorporated Corps Application No. SAJ-2008-03827 into Corps Application No. SAJ-2010-02076, this letter also constitutes our client's withdrawal of those components as they pertain to our client's property from further consideration by the Corps.

If you have any questions regarding the foregoing, please do not hesitate to contact this office.

Sincerely yours,

BROAD AND CASSEL

Douglas J. Rillstone, P.A.

BOCA RATON · FT. LAUDERDALE · MIAMI · ORLANDO · TALLAHASSEE · DESTIN · TAMPA · WEST PALM BEACH

Stephen R. Sullivan
United States Department of the Army
Corps of Engineers
May 12, 2011
Page 2 of 2


CC:     Toby Purse
        CFO
        FFD Land Co., Inc.

        Dan Delisi
        AICP – Principal
        DeLisi Fitzgerald, Inc.

        Ken Passarella
        President
        Passarella & Associates, Inc.

        Susan M. Blass
        Project Manager
        Fort Myers Permitting Section
        Corps of Engineers

        Lauren Diaz
        Project Manager
        Fort Myers Permitting Section
        Corps of Engineers

        Linda A. Elligott
        Project Manager
        Fort Myers Permitting Section
        Corps of Engineers

        Tunis McElwain
        Section Chief
        Fort Myers Permitting Section
        Corps of Engineers



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
FORT MYERS REGULATORY OFFICE
1520 ROYAL PALM SQUARE BLVD., SUITE 310
FORT MYERS, FLORIDA 33919

REPLY TO
ATTENTION OF

Regulatory Division
Fort Myers Section
SAJ-2010-02076

JUL 1 8 2011

Mr. Franz Rosinus
Old Corkscrew Plantation, LLC
26811 S. Bay Drive, Suite 350
Bonita Springs, Florida 34134

Dear Mr. Rosinus:

Thank you for the letter submitted on your behalf by Lewis, Longman, & Walker P.A. dated 12 May 2011 indicating you are not in a position to make a determination as to the proposed Environmental Impact Statement (EIS) and do not wish to withdraw Old Corkscrew Plantation, LLC's Department of the Army (DA) permit application. Your application requests authorization from the DA to construct a limerock mining operation. The project is located in wetlands of the Corkscrew – Cocohatchee watershed, approximately 1 mile west of the Lee/Hendry County line between SR-82 and Corkscrew Road, in Sections 2-3, 10-11, 14-15, Township 46 South, Range 27 East, and Section 35, Township 45 South, Range 27 East, Fort Myers, Lee County, Florida.

The Corps of Engineers has reviewed your request pursuant to 33 C.F.R. § 325.2(d)(3). This letter suspends Old Corkscrew Plantation, LLC's DA permit application for a limerock mining operation for one year from the date of this letter.

When you reactivate your DA permit application, you will need to indicate whether you agree to participate in the preparation of an EIS at that time.

You are cautioned that commencement of the proposed work prior to DA authorization may constitute a violation of Federal laws and subject you to possible enforcement action. Receipt of a permit or exemption from the Florida Department of Environmental Protection or Lee County does not obviate the requirement for obtaining a Department of the Army permit.

If you have any questions regarding this letter or the Corps of Engineers' regulatory program, please contact Ms. Susan

SAJ-2010-02076
Page 2


Blass or Ms. Lauren Diaz at the letterhead address, by telephone
at 239-334-1975, or by email at Susan.M.Blass@usace.army.mil or
Lauren.B.Diaz@usace.army.mil.

Sincerely,

Stephen R. Sullivan
Deputy, South Florida
Regulatory Division


Copies furnished:

Passarella & Associates, Inc.
DeLisi Fitzgerald, Inc.
Lewis, Longman, & Walker P.A.



**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
FORT MYERS REGULATORY OFFICE
1520 ROYAL PALM SQUARE BLVD., SUITE 310
FORT MYERS, FLORIDA 33919

REPLY TO
ATTENTION OF

Regulatory Division                                            JUL 1 8 2011
South Permits Branch/Fort Myers Section
SAJ-2010-02076

Troyer Brothers Florida Inc.
14700 Troyer Brothers Road
Fort Myers, FL 33913

Gentlemen:

Thank you for your 26 April 2011 letter requesting the
Corps of Engineers (Corps) to re-visit our significance
determination for the Limestone Mining Adjacent to Regional
Preserved Lands within the Lee-Collier Limestone Resource Area
(LCLRA) Environmental Impact Statement (EIS) as it relates to
your project.  Specifically the letter included a request that
the Corps continue to process Troyer's pending application,
including the Environmental Assessment (EA) associated with it.
Your application requests authorization from the Department of
the Army (DA) to construct a limerock mining operation.  The
project is located in wetlands of the Corkscrew – Cocohatchee
and Imperial watersheds, in Sections 4, 9, 16 and 21, Township
46 South, Range 27 East, approximately 16 miles southeast of
Fort Myers, south of the intersection of State Road 82
(Immokalee Road) and Homestead Road South, between State Road 82
and Corkscrew Road, Lee County, Florida.

At the time the determination to conduct an EIS was made
there were three projects proposed near regional wetland
preserves, cumulatively proposing 418 acres of direct wetland
impacts.  Currently, your application is the only remaining
active application and has proposed impacts of approximately 150
acres. Based on the reduced cumulative impact, the Corps is
willing to conduct a review of your project by means of an EA.
Please be advised that the EA may result in a Finding of
Significant Impact for your project that may require an EIS. If
the EA results in a Finding of No Significant Impact an EIS
would not be required for your project.

You are cautioned that commencement of the proposed work
prior to DA authorization may constitute a violation of Federal
laws and subject you to possible enforcement action. Receipt of

SAJ-2010-02076
Page 2


a permit or exemption from the Florida Department of
Environmental Protection or Lee County does not obviate the
requirement for obtaining a DA permit.

    If you have any questions regarding this letter or the
Corps' regulatory program, please contact Ms. Susan Blass or Ms.
Lauren Diaz at the letterhead address, by telephone at 239-334-
1975, or by email at Susan.M.Blass@usace.army.mil or
Lauren.B.Diaz@usace.army.mil.

                         Sincerely,



                         Stephen R. Sullivan
                         Deputy, South Florida
                         Regulatory Division

Copies furnished:

Douglas J. Durbin, Ph.D., Technical Director and Senior
     Principal, Cardno ENTRIX, doug.durbin@cardno.com
Jack Ruskai, PE Vice President, AIM Engineering & Surveying,
     Inc., jruski@aimengineering.com
Susan Stephens, Vice President, Hopping, Green & Sams,
     susans@hgslaw.com
Cheryl L. Hastings, GFPAC, chastings@gfpac.com
David W. Depew, Ph.D., AICP, LEED AP, President, Morris/Depew,
     planning@m-da.com

K3RDPJPF    Mining Team: SAJ - RD-WM                                    ORM2
orm_regulator   Role    Preferences   [ORM Home]   [ORM Reports]   [JD Viewer]   Logout   Home   Search   SAJ-2010-02076-SMB   Create   References

Folder  Location  Aquatic Resources  Jurisdiction  Impacts/Mitigation  EIS  Map  Letters  Documents  Contacts  Regulators  Comments  Summary
Help

**JOHN P. FELLOWS (K3RDPJPF - SAJ - ORM_REGULATOR)
does not have permissions to edit this folder or its contents
LAUREN B. DIAZ (K3RDSLBD - SAJ - ORM_REGULATOR) is the owner** ×

**DA Number:** SAJ-2010-02076-SMB (LIMESTONE MINING ADJACENT TO REGIONAL PRESERVED LANDS WITHIN THE LEE, COLLIER LIMESTONE RESOURCE AREA )
**Applicant:** No Applicant Found

## Environmental Impact Statement

1. **Begin Date** *     15-Jul-2010
2. **Corp as Lead Agency**   YES
3. **Closure Method** *   Withdrawn
4. **End Date** *     18-Jul-2011
5. **Comments**      SAJ-2008-01734 Old Corkscrew Plantation Mine, 4,204 acre Project Site (Suspended , July 18, 2011)
                     SAJ-2008-03827 Six L's Mine, FFD MEPD, 5,208 acre Project Site (Withdrawn, May 12, 2011)
                     SAJ-2008-03793 Troyer Brothers Mine, 1,803 acre Project Site
                     SAJ-2009-03225 Lost Grove Mine (NPR issued April 4, 2011)

## Fund Tracking

| Select | Source |
|--------|--------|
| ☑ | No Funding Source |
| ☐ | Water Resources Development Act (WRDA) 214/Transportation Agreements Regulator Funded (Corps) |
| ☐ | American Recovery and Reinvestment Act (ARRA)\Project Funded (Others) |
| ☐ | Deepwater Horizon Settlement\RESTORE |
| ☐ | Deepwater Horizon Settlement\National Fish and Wildlife Foundation (NFWF) |
| ☐ | Deepwater Horizon Settlement\National Resources Damage Assessment (NRDA) |

## District-Specific Data Elements (DSDE)

No District-Specific Data Elements Have Been Added To This Action.

## Reopen Options

**Reopen as New Version**   - Please Select - ⌄

## Commands

Reopen   Cancel