# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF DIANA UMPIERRE IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Diana Umpierre, make the following declaration:

1.      I submit this declaration in support of the Sierra Club in the above-captioned action.

2.      I live in Pembroke Pines, Broward County, Florida near the Everglades and the associated Water Conservation Areas, and have lived here since 2000.  I spend a considerable amount of time enjoying and trying to help protect the natural environment and wildlife in South Florida.  I believe our unique ecosystem and wildlife are very important to the communities here and for biodiversity in general.

3.      Accordingly, I became an active member of the Sierra Club in 2014 to help protect and conserve endangered species and natural ecosystems in South Florida.

4.      I became an employee of the Sierra Club in June 2016 and since then have been serving as an Organizing Representative for the Sierra Club's Everglades Restoration Campaign.

5.      Prior to joining Sierra Club, my experience included working as a geoscientist for environmental consulting firms in New Jersey and Florida where I provided geographic data analysis of impacts to ecological sensitive habitats and water quality from planned transportation and water/wastewater projects as part of NEPA environmental assessments. My experience also includes working as a geographer for the South Florida Water Management District ("SFWMD") where I supported regional water supply long-range planning for 16 counties in South Florida, including analysis of geographic data on water resources and of land cover over time to determine wetland impacts.  I assisted the Southeast Florida Regional Climate Change Compact by coordinating with government and academic partners in analyzing, mapping, and communicating sea level rise vulnerability for four counties in Southeast Florida, including Miami-Dade.  I earned my Bachelor of Science degree in Geological Sciences from Cornell University in 1990.

6.      The Sierra Club is a national non-profit grassroots environmental organization with over 800,000 members across the United States dedicated to practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.  Sierra Club's interests encompass a wide range of environmental issues, including wildlife

DocuSign Envelope ID: 427BD3CF-142E-4E6D-9088-2FD860141295

conservation, wilderness preservation, public lands and waters protection, and the protection of clean air and water resources. These activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth.

7.      The Sierra Club headquarters is in Oakland, California. Sierra Club has chapters across the nation, including Florida, with members interested in wildlife and wildlife habitats. Most of the Sierra Club chapters include all-volunteer groups, whose members work to preserve and protect their area's natural resources. Sierra Club's Florida Chapter has over 40,000 members and focuses on protecting Florida's unique natural wonders, including its springs, wetlands and endangered wildlife like the Florida panther and the Florida bonneted bat.

8.      One of the Sierra Club's main national initiatives, the Our Wild America campaign, which includes Everglades restoration efforts, tackles pressing environmental problems including global warming and threats to wildlife. Sierra Club has long advocated for protections for species under the ESA, and has brought litigation to ensure that Federal agencies meet their ESA obligations.

9.      My work involves supporting and expanding volunteer-based grassroots efforts to promote the restoration of the Greater Everglades ecosystem and the protection of its remaining natural wildlife habitats from threats such as water mismanagement, development, and sea level rise.

10.     As an active member, I have advocated for Everglades restoration, the protection of native habitat, and the restoration of natural and clean water flows, which are important for healthy wildlife. I also spend time educating people about the

importance of protecting Florida panther and Florida bonneted bat habitat. I plan to continue participating in these activities in the future.

11.    I am also an active member of the International Dark Sky Association, and have advocated for the protection of the natural nocturnal environment, which is important for wildlife, including nocturnal species like fireflies, the Florida panther and Florida bonneted bat. In 2016, I helped Big Cypress National Preserve become the first National Park Service unit east of Colorado to achieve an International Dark Sky Place designation, in part because this protection is important for the Florida panther and other nocturnal species. I have been assisting volunteers that are working towards similar Dark Sky Place designations for the Florida Panther National Widlife Refuge and Everglades National Park. Therefore, protecting the natural night sky and noctural environment of these conservation areas is very important to me.

12.    EPA's approval of Florida's application to assume control of section 404 permitting undermines Sierra Club's mission. Among other failings, Florida has no lawful plans to ensure that listed species are adequately protected and analyses of section 404 permit applications issued by Florida would no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers ("Corps") instead.

13.    Because section 404 permit applications processed by Florida will not undergo a NEPA analysis or site-specific ESA section 7 consultation, but will be subject to the state's expedited permit review, these projects will be subject to a far less rigorous

environmental review, which increases risk of harm to listed species and their habitat and harms Sierra Club's mission.

14.     The lost of these protections is exacerbated by the fact Florida has taken over this program without obtaining *any* additional resources or staff.  Florida claims this permtting program will be easily streamlined with their current state environmental resource permitting ("ERP") program which has significant differences and is required for projects that impact surface waters.  Florida has also stated throughout the assumption process that they want to process permits faster than the Corps has in the past.  The harm of this handover is detailed in an article written by Craig Pittman wherein he describes how lobbyists for the developers believe this handover is "the Holy Grail."  See Exhibit A.  The bottom line is faster permits prioritizes development over our precious wetlands in Florida.

**Sierra Club Lost Procedural Rights As a Result of EPA's Unlawful Action**

15.     A need for speed was also evident in EPA's approval of Florida's assumption application when EPA announced on December 22, 2020 that its approval of the Florida program was *effective immediately*.  As a result of this immediate effective date, Sierra Club lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of inauguration day.  Sierra Club would have exercised these rights had they been available.

16.     As to reconsideration, Sierra Club was deprived of the right to ask EPA to reconsider its determination that Florida's application was complete, and to allow public comment on the complete application, before the rule took effect.  Sierra Club also was deprived of the right to ask EPA to reconsider its approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

17.     As a result of EPA's immediate effective date, Sierra Club was also denied the right to ask the agency to stay the effective date of the rule pending judicial review.  On January 20, 2021, Sierra Club and the other Plaintiffs in this action asked EPA to cure the immediate effective date and failure to codify violations regarding the state program.  Sierra Club and the other Plaintiffs further requested that if EPA were to properly promulgate and codify its approval of Florida's program, that the agency also postpone the effective date of that action pending judicial review.  EPA, however, has adhered to its position that the immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay request.  If the court were to remedy these violations, Sierra Club would again ask the agency to postpone the effective date of the rule pending judicial review.

18.     EPA's immediate effective date of December 22, 2020, also foreclosed Sierra Club's ability to benefit from the Biden Administration's review of the rule.  It is my understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing agency heads to review and consider postponing by at least 60 days any rule

that had been published in the Federal Register but had not taken effect. [1]  Had EPA

provided the required 30-day effective date from its publication in the Federal Register, it

is my understanding that EPA's approval and transfer of authority to the state would have

been covered by the Klain Memo.  A review of the unlawful aspects of Florida's 404

program could have resulted in actions to stay the program's effective date and take other

remedial measures.

19.    The loss of procedural rights Sierra Club has sustained as a result of

EPA's immediate transfer of authority to the state, as well as its failure to lawfully

effectuate the transfer through codification, has resulted in organizational and

membership harms while the state's unlawful program operates.  The state's 404 program

undermines Sierra Club's ability to realize its mission by depriving the organization of

information, rights and remedies available when Section 404 is administered by the

Corps as it has been for decades.

**Organizational and Membership Harms From Particular Projects**

20.    EPA's  unlawful transfer of authority to the state via an immediate

effective date and without codifying the state program, mean that the state is presently

administering the 404 program, while Sierra Club has been denied the right to request

reconsideration or an agency stay pending judicial review, and the ability benefiting from

the Klain memo.  As a result, the state is poised to issue 404 permits on major projects

that will harm Sierra Club's organizational interests and my interests as a member.  We

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

are particularly concerned about certain permit applications that have been transferred by the Corps to the state for major projects, especially given the state's public statements that its objective in assuming jurisdiction over 404 permits is to issue permits quickly.

21.     Two proposed projects that we are particularly concerned about are oil drilling projects in Big Cypress National Preserve that, if approved, would pave the way for oil drilling and production in the preserve for the next 30 years.

22.     Spanning over 700,000 acres, Big Cypress National Preserve is the nation's first national preserve.  It is a continuous freshwater ecosystem comprised of five habitats that are connected by the water that flows through them, and it is replenished entirely by rainwater.  The water flows from the hardwood hammocks to the pinelands, across the prairies, into the cypress swamps, and then into the estuaries that flow to the Gulf of Mexico.  The freshwaters of Big Cypress are crucial to the health of the neighboring Everglades and critical to the wildlife that inhabit it.  Big Cypress provides habitat for various listed species and has the largest contiguous acreage of habitat for the endangered Florida panther in south Florida.

23.     For the first proposed project I am concerned about, the Nobles Grade Prospect (state 404 application number 323836-004), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad for three vertical wells and an access road in Big Cypress National Preserve for the purposes of oil drilling. [2]  The area would cover 21.21 acres and would result in the filling of 85,000 cubic yards of wetlands in Big

_____

[2] Burnett Oil's ERP / State 404 Application for Nobles Grade Prospect, available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_323836/gis-facility!search.

Cypress. The proposed area is located approximately three miles southwest of the rest stop at Interstate 75 mile marker 63. This rest stop serves as an access point to hiking trails that go directly into the backcountry of Big Cypress.[3]

24.    Big Cypress National Preserve provides habitat for threatened and endangered species. Endangered Species Act-listed species observed or potentially occurring within or near the Nobles Grade proposed project area include the following: the American alligator, eastern indigo snake, bald eagle, Everglade snail kite, wood stork, red-cockaded woodpecker, northern caracara, and the Florida panther.

25.    For the second proposed project I am concerned about, the Tamiami Prospect (state 404 application number 397879-002), Burnett Oil Co., Inc., applied on January 21, 2021, to construct an oil drilling pad and an access road in Big Cypress National Preserve at the eastern boundary of the Preserve for the purposes of oil drilling. The area would cover 10.99 acres and would result in the filling of 46,000 cubic yards of wetlands in Big Cypress.

26.    Endangered Species Act-listed species observed or potentially occurring within or near the Tamiami proposed project area include: the American alligator, eastern indigo snake, Everglade snail kite, wood stork, red-cockaded woodpecker, northern caracara, Florida bonneted bat and the Florida panther.

27.    On February 3, 2021, several conservation groups sent a letter to the Florida Department of Environmental Protection ("FDEP") raising concerns about the

---

[3] National Park Service, Big Cypress, I-75 Mile Marker 63, https://www.nps.gov/bicy/planyourvisit/i-75-mm-63.htm.

impacts of the proposed projects. I have reviewed this letter and incorporate it in this declaration, see Exhibit B, because I share the same concerns regarding these oil projects.

28.    For example, not included and fully analyzed in Burnett Oil's applications are the scope of activities attendant to oil development and drilling and their impacts such as development activities associated with access roads, staging areas and seismic operations and construction of gathering, transmission and distribution pipelines.

29.    Because Big Cypress National Preserve is a continuous ecosystem connected by the flow of freshwater, any disruption to this flow from the oil projects would lead to still or stagnant water directly north and south of the site, altering and disturbing the natural environment on which plant and animal species depend. Similarly, pollution at one location in Big Cypress will affect the remaining habitats to which that water flows, thereby threatening water quality downstream and in turn, threatening the species that rely on this habitat.

30.    Aside from disruptions to the flow of water and the threat of pollution / water quality degradation, the construction and operation of oil drilling infrastructure will negatively impact the species within the vicinity of the projects. Birds and other wildlife will be forced to flee as a result of the noise, artificial light at night, ground vibration, the presence of machinery, vehicles, and humans, and other attendant circumstances described in paragraph 27. Animals that cannot get away risk injury from construction and operation activities.

31.    Burnett Oil's proposed projects are particularly concerning in light of the harmful impacts from previous seismic exploration activities in Big Cypress National

Preserve in 2017 and 2018, when Burnett Oil utilized Vibroseis (seismic vibration technology) to send signals into the earth to locate subsurface oil and natural gas deposits within Big Cypress.  This seismic exploration took place over approximately 110 square miles of the Preserve and resulted in significant environmental damage that is still present today.  The damage included severely altered and rutted wetland soils; removal of dwarf cypress trees, which provide roosting sites for birds and other wildlife above high water levels; significantly diminished vegetation groundcover; the presence of dwarf pond cypress tree stumps that are not re-sprouting and the absence of seedlings for these trees; and uneven ground elevations as a result of the company's reclamation attempts, among other harms.

32.    Another concerning project is the State Road 836 (Dolphin Expressway) Extension (state 404 application number 13-396515-001-SFI).  On March 26, 2019, the Miami-Dade Expressway Authority submitted its initial 404 permit application to the Corps (SAJ-2018-01778 (SP-MLC)).  That 404 permit application was transferred from the Corps to the state (FDEP) on or about December 28, 2020, a few days after state assumption became immediately effective.

33.    While the application was under Corps jurisdiction, on May 22, 2019, the Corps issued a Public Notice "soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity."[4]

---

[4] https://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1855244/saj-2018-01778sp-mlc/.

34.    On July 26, 2019, the Everglades Coalition, comprised of over 60 organizations committed to the health and protection of America's Everglades, including Sierra Club, submitted comments to the Corps opposing the proposed 404 permit, see Exhibit C.

35.    Furthermore, in a letter sent to Florida Governor DeSantis on June 24, 2020, the Everglades Coalition asked him to uphold a recent ruling by Florida Administrative Law Judge Suzanne Van Wyk, which held that the Miami-Dade County Comprehensive Plan Amendment adopted by Miami-Dade County via Ordinance 2018-109 on September 27, 2018, that would allow for the proposed highway extension, demonstrated inconsistency with Everglades restoration efforts, with Miami-Dade County's Comprehensive Development Master Plan, and with state law.  See Exhibit D.

36.    This project purpose is to construct a 14-mile toll road extending the current Dolphin Expressway.[5]  The project will consist of a six-lane toll road extending State Road (SR) 836 through jurisdictional wetlands within the Comprehensive Everglades Restoration Plan's (CERP) footprint.  The project would result in the filling of 360 acres of wetlands and secondary impacts to almost 100 acres of wetlands located in the Bird Drive and North Trail Wetland Basins which are adjacent to the Everglades National Park.  These basins have been set aside as a water quality, water seepage, and habitat buffer for the Park.  Freshwater wetlands are essential to the region for water quality and wildlife benefits.

---

[5] Miami-Dade Expressway Authority State 404 related documents are available at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search.

37.     The Bird Drive Basin in particular has been proposed for the Bird Drive

Recharge Area Project as part of the CERP and is an aquatic resource of national

importance.  CERP was authorized by Congress to "restore, preserve, and protect the

South Florida ecosystem while providing for other water-related needs of the region,

including water supply and flood protection."[6]  A fully-developed plan for the Bird Drive

Basin is not yet in place.  Accordingly, until critical project components have been fully

modeled and defined, a six-lane tollway cutting through the project footprint is premature

and threatens critical federal initiatives to protect and restore Everglades National Park.

38.     Everglades National Park spans across 1.5 million acres that stretches over

the southern part of Florida and is home to a vast diversity of plants and wildlife across

different ecosystems: freshwater sloughs, marl prairies, tropical hammocks, pinelands,

cypress, mangrove, coastal lowlands, marine, and estuarine.  This project would impact

the progress made and on-going efforts to restore water flows and quality, and fragile

ecosystems and natural resources within the Everglades National Park.

39.     In an August 23, 2019 letter to the Corps, the U.S. Environmental

Protection Agency ("EPA") voiced concerns and stated that the project "may have

substantial and unacceptable adverse secondary impacts to the Greater Everglades

wetland ecosytem and direct impacts to 350 acres of freshwater wetlands located in the

Bird Drive Basin and within Congressionally authorized CERP project boundaries that

---

[6] Comprehensive Everglades Restoration Plan (CERP), National Park Service,
https://www.nps.gov/ever/learn/nature/cerp.htm.

are an ARNI [aquatic resource of national importance]".[7]  In a subsequent letter on September 16, 2019, the EPA once again expressed its concerns and that it had "received no additional information from the Corps to address these concerns" and that "the EPA finds that the proposed project will have a substantial and unacceptable impact on aquatic resources of national importance."

40.    According to the Corps' May 2019 public notice, there are several listed species that may use the wetlands that would be affected if the SR 836 extension 404 permit is granted, including the wood stork, the Eastern indigo snake and the Florida bonneted bat.

41.    I am personally and professionally very worried about the federally endangered Florida bonneted bat, the largest bat in Florida.  On June 10, 2020, the U.S. Fish and Wildlife Service proposed critical habitat that includes part of the footprint of the proposed highway project.[8]  Also, I am very concerned that the highway will induce more traffic that would affect the wetlands, water quality, and invite more development. All of which will cause harm to the listed species in this area impeding Sierra Club's mission and my personal use and enjoyment of this area.  Several likely consequences include increased bird and snake road fatalities as this area is very close to a water conservation area and wildlife management area within the Everglades Protection Area.  I am also very concerned about a substantial increase of light pollution in nearby conservation areas that may come from new artificial lighting on the highway and

---

[7] https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396515/gis-facility!search.
[8] https://www.govinfo.gov/content/pkg/FR-2020-06-10/pdf/2020-10840.pdf#page=1.

associated infrastructure, including exit interchanges and parking areas. Increased noise will likely also affect listed species that may be present in this area.

42.    All of these projects are particularly concerning to me, because I love and enjoy visiting the Everglades Protection Area, Everglades National Park, and Big Cypress National Preserve. Over the years I have visited many preserves, but Big Cypress National Preserve is still my most beloved and I visit about four times a year. I also thoroughly enjoy visiting Everglades National Park, which I visit about two to four times a year. During my visits, I typically hike, observe the flora and fauna, stargaze, and take photographs. I enjoy recreating in nature to keep myself healthy, and to observe wildlife. I enjoy getting outdoors to experience the unique environment and native wildlife, including opportunities to see or hear the Florida panther and Florida bonneted bat, of South Florida. I have plans to continue regularly visiting Big Cypress National Preserve and Everglades National Park as well.

43.    I also attend night education events hosted by park rangers at Big Cypress National Preserve. I always look for panthers and fireflies when I am out at night. I plan to continue these activities in the future.

44.    It is important to me to see the natural environment of South Florida preserved in a way that will maintain the integrity of the ecosystem. My personal enjoyment of the ecosystem and natural areas in which I recreate will diminish significantly if ecosystem and species like the panther are harmed. For example, panthers are critical to supporting and maintaining the health of the South Florida ecosystem. Without the panther, or with less panthers in the wild, there will be a domino effect on

the ecosystem and its biodiversity. This substantial alteration of the native ecosystem will fundamentally change the character and way of life in and around South Florida, adversely affecting my use and enjoyment.

**Organizational Harms from the State Program**

45.     As stated above, because Sierra Club was unable to seek agency reconsideration or an agency stay, was foreclosed from benefitting from the Klain memo, and because EPA unlawfully transferred authority to the state without codfictying the program, the state is currently administering its unlawful Section 404 program. The state 404 program is and will harm Sierra Club as an organization.

46.     The state's administration of this unlawful section 404 program will prevent Sierra Club from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us. As an organization, we heavily rely on federal review and analysis of projects that affect wildlife, land conservation, climate, and water. We act on them as needed depending on the impacts of the proposed project. We utilize information required under NEPA, the ESA, and the Clean Water Act to review permit applications. These federal analyses also provide a common baseline for issues, from which we can assess proposed agency actions and their environmental impacts.

47.     Because the state program is in place, we are losing all of the protections that the federal law allows. This means that there will be no federal analysis or comment process on projects and permits. As an organization, we do not have the ability to take on

16

every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

48.    Our organization would be significantly harmed without these federal analyses, because we would be required to hire our own experts in an attempt to otherwise assess and understand impacts of agency actions.  Experts cost thousands of dollars per case, we would no longer be able to review and act on proposals or projects at the rate we normally do.  The loss of information from these analyses will result in additional staff time to triage permits to identify harms to the listed species and their habitats and additional costs in hiring experts.  Our conservation advocacy work would be significantly hindered.

49.    One of the main tools Sierra Club uses to protect species, their habitats, and waters is the public commenting process.  When there is a proposed agency action, we review the applications and documents; determine the scope and effect it would have on the wildlife and waters we seek to protect; review the geographic information and maps that allows us to visually understand the affected geographic environment; review wetland impacts and potential means to avoid, minimize, and mitigate those impacts; review applicable rules and laws; and submit comment letters.  As with this case, we also engage in litigation when needed to carry out our organization's goals.

50.    The loss of critical information and procedural safeguards afforded by NEPA and the ESA will significantly set back our established methods of advocating for and protecting water resources, species and their habitats, and as the pending 404 project applications discussed above demonstrate, these losses will occur if Florida assumes the

404 program.  Furthermore, for any of the projects in which Sierra Club determines the

need for litigation, a tool employed by our organization, it is guaranteed that Sierra Club

would have to divert its resources to engage in state court litigation, or forego litigation

completely, damaging our organizational mission.

51.     In addition to interfering with our ability to comment on projects, the

state's unlawful assumption will hinder our ability to litigate over illegal section 404

permitting actions, when necessary.  Sierra Club challenges 404 permits in federal court

as one of our advocacy tools to further our mission, and we are harmed by the loss of

federal court as a venue as a result of Florida assuming the 404 program because it is

much more difficult and expensive to bring these challenges in Florida's state courts.

52.     It is my understanding that there is a higher bar to establish standing in

Florida state court because we would be required to show that a substantial number of our

members will be affected by the challenged action, while in federal court we are only

required to show that a single member is adversely affected.  It is also my understanding

that Sierra Club would risk exposure to mandatory "fee-shifting" which creates the risk

of liability for the opposing parties' costs and fees to engage in litigation.  We are not

exposed to this same risk in federal court, where the Corps is the section 404 permitting

agency.  The risk of incurring these substantial costs and fees could result in our inability

to challenge illegal permit authorizations in Florida that would cause serious harm to

threatened and endangered species, even if our claims are strong.

53.     With assumption, there is now an entirely different legal scheme to

challenge wetlands permitting in Florida, through the Division of Administrating

Hearings ("DOAH"). Because legal proceedings in front of DOAH are conducted from scratch and are not treated as administrative record review cases, Sierra Club would have to incur considerable expense to hire expert witnesses to bring a legal challenge. Expert witnesses cost upwards of thousands of dollars to retain on a case, which is thousands of dollars Sierra Club would have to divert from other programmatic goals if we did not have to litigate in state court. In state court, we also would not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA processes affords. Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses. A case before DOAH can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time. As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate those projects for our members and Florida's environment.

54.     The lack of procedural safeguards, and in turn, a weaker system for evaluating and testing the environmental impacts of permitting, also significantly increase the risk of harms to Florida's water resources, species, and their habitats, environmental harms that would be felt personally by me as a member of Sierra Club. I regularly partake in outdoor activities such as hiking, camping, observing wildlife, stargazing, and nature photography. Some of the areas that I like to visit include, but are not limited to, Everglades National Park, Big Cypress National Preserve, Fakahatchee Strand Preserve State Park, Florida Panther National Wildlife Refuge, Corkscrew Swamp Sanctuary, Fisheating Creek, Okaloacoochee Slough State Forest and Spirit of the Wild

Wildlife Management Area, and several state, county and municipal-owned natural areas in South Florida.

55.     If Florida is allowed to continue operating this unlawful 404 program, Sierra Club would be irreparably harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

56.     A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority to the state, thereby allowing Sierra Club to pursue all avenues, as discussed above, including seeking an agency stay of Florida's administration of the Section 404 pending judicial review.  In addition, as indicated by the Klain memo, the Biden Administration is focused on reviewing final actions of the outgoing Administration, and as new leadership of the agency Defendants comes in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial review.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on _____ 3/5/2021 _____ by

_Diana Umpierre_
DocuSigned by:
A1CFBA93B2C3410...

_____.

# Exhibit A

Handing federal wetlands permitting to FL DEP is an idea that's all wet | Florida Phoenix

# Handing federal wetlands permitting to FL DEP is an idea that's all wet

By **Craig Pittman** · September 17, 2020



*Roseate spoonbills are pictured at the Blackpoint Drive Wildlife Refuge on Merritt Island. Credit Michael Seeley via Wikimedia Commons*

Florida is best known for its gorgeous beaches, but we also have a lot of wetlands. Bogs, swamps, marshes, you name it, we've got 'em — more than any other state besides Alaska.

Some are famous — everyone's heard of the Everglades — but most are just anonymous soggy spots that help recharge our underground aquifer, filter pollution, soak up floodwaters, and provide valuable habitat for a whole lot of species.

Not everyone is a fan, of course. When John James Audubon visited Florida in 1832, he was blown away by the flocks of roseate spoonbills and other wading birds he found, but he couldn't deal with how wet our landscape was.

"The general wildness, the eternal labyrinth of waters and marshes, interlocked and apparently never ending, the whole surrounded by interminable swamps — all these things had a tendency to depress my spirits," he wrote in a letter to his editor.

If the swamp-hating Audubon were around today, he would no doubt be delighted to hear that the job of protecting our wetlands is on the verge of being handed over entirely to the state Department of Environmental Protection.

Right now, under the Clean Water Act, two federal agencies are in charge of preserving wetlands: the U.S. Army Corps of Engineers, which issues permits for dumping fill in them, and the Environmental Protection Agency, which can veto those permits. But now both are considering handing the job of federal wetlands permitting in Florida over to the state DEP, according to a Federal Register notice published on Sept. 4 seeking public comment over the next 45 days.

Case 1:21-cv-00119-RDM    Document 31-2    Filed 03/05/21    Page 24 of 50

Florida's developers have been pushing for this handover to the state for a couple of decades. In 2005, a lobbyist for Florida developers said that a state takeover of federal wetlands permitting would be "the Holy Grail."

Why? Because they are convinced the state would grant them super-fast permit approvals, no matter how many acres of wetlands they were going to pave over, and because the state doesn't protect as many different types of wetlands as the feds do.

In 2006, the Florida DEP, which already issues state wetland permits, looked into taking over the federal permitting program, something only two other states had done. State officials quickly dropped the idea for one very simple reason: Florida builders were requesting so many permits already that taking over the feds' workload would overwhelm the agency. The state wouldn't have enough people to issue permits, much less follow up to make sure all the permit conditions were being followed.

### Scott the slasher



*Former governor and current Republican U.S. Sen. Rick Scott of Florida. Official Senate portrait; U.S. Senate website.*

That was under then-Gov. Jeb Bush. In 2011, after Rick Scott became governor, he slashed the size of the DEP by more than 600 employees.

Many of those who were ousted had been in place for decades and were considered experts in their fields. He also cut funding for the state's water management districts, which issue some wetland permits.

Under Bush, a pro-business governor, the DEP spent an average of 45 days considering permits before granting them. That was too slow for Scott, who urged the agency to crank them out faster. In 2014, he stood in front of a room full of DEP employees to praise them for cutting the amount of time to get permits to an average of just two days. That means they were processing those permits with all the care and consideration of a batting cage pitching machine shooting out fast balls.

Scott's administration is the one that began pursuing the Holy Grail of a state takeover of federal wetlands permitting. However, Scott's people insisted they could do it without hiring any new people to accommodate the huge increase in workload.



*Republican Gov. Ron DeSantis of Florida. Photo by Joe Raedle/Getty Images*

His staff persuaded the Legislature to pass a bill approving the changeover, and now Gov. Ron DeSantis — who pledged to be more environmentally friendly than Scott — is ready to carry Scott's plan to its fruition.

When I asked DEP press secretary Weesam Khoury if the agency expected the staff to take on this new challenge without hiring any additional workers, she said that the agency "will enhance the protection of Florida's wetlands by having the same statewide team of environmental experts who are already administering Florida's robust wetlands protection program also administer the similar federal … program."

(In other words, no.)

When I asked if that would overwhelm the staff, she said, "The state has more than 400 staff" working on environmental permitting, and "DEP is confident that these knowledgeable staff would be able to work together to handle this slight workload increase."

Putting the DEP in charge of the federal permits "would provide a streamlined permitting procedure," she said. Usually, when state officials say some regulatory function is being "streamlined" that means

Case 1:21-cv-00119-RDM   Document 31-2   Filed 03/05/21   Page 25 of 50

"we're going to hand out permits like they're beads being tossed to the crowd from a Gasparilla float."

To Eric Hughes, this seems particularly worrisome for the future of Florida's valuable wetlands. Hughes spent 37 years at the EPA, most of them dealing with wetland permits in Florida, retiring at the end of 2016. Far from a "slight workload increase," he said, the number of federal wetland permit applications per year tends to fall between 1,500 and 2,000 in Florida.

**'Directly controlled by the governor'**

Not only would DEP permit reviewers face an overwhelming boost in their workload, he said, but the state agency is more likely to face serious political interference in its permitting decisions than the Corps or EPA do.

"These people [at DEP] are directly controlled by the governor," Hughes told me.

Lest you think he's exaggerating, let me point you to the case of the Highlands Ranch Mitigation Bank, a Jacksonville-area project that in 2012 got negative reviews from two water district employees who subsequently found themselves unemployed because they didn't give the politically connected owners what they wanted.

Then, when the DEP's top wetlands expert, Connie Bersok, balked at issuing the permit, she wound up being suspended then removed from reviewing that permit. She had refused an order from the deputy secretary of the DEP to bend the rules to cater to the wishes the applicants. A judge later ruled that she was right about everything.

Bersok retired in 2017 after 30 years, so I called her up to ask what she thought about her former co-workers taking over issuing federal wetlands permits. She called it "a terrible plan."

She also said Khoury's claim of having 400 DEP employees working on wetlands permitting sounded, shall we say, "inflated." The only way to get to 400 is to count every single state employee involved in every kind of permitting, including issuing permits for air pollution and other things that have nothing to do with wetlands.

"We've always been shorthanded," she told me.

A lot of DEP's permitting has been handed off to the state's five water management districts and even to some of the counties, she said. According to Hughes, if the DEP does that with federal wetlands permits, that would be even worse for the wetlands than if DEP handled them alone.

Florida's water boards tend to be run by well-connected gubernatorial appointees from the development and agricultural industries. In 2015, the developer who was chairman of the Southwest Florida Water Management District board pushed through approval of a wetlands permit for a friend and former business partner, then insisted he had no conflict of interest.

Last year, the chairman of the St. Johns River Water Management District faced ethics complaints because he tried hiding conflicts of interest involving permits for clients of his environmental consulting business. One of DeSantis' first actions as governor was to demand the resignations of all nine members of the South Florida water board because they kowtowed to Big Sugar.

**More than just the Everglades**

I asked Khoury if the DEP plans to dump its new federal permitting duties on the water management districts. Instead of saying "no," she replied, "Any consideration for the delegation of the program to the

water management districts would be considered after the program is implemented."

To me that sounds like, "Yes, but we don't want to say anything about that yet."

The funny thing, Bersok said, is that legally the builders and developers aren't getting what they really want. Even if state employees are the ones reviewing federal wetland permits, those permits would not be subject to state deadlines, she explained.

In other words, if the DEP handled the permits the way it should under the Clean Water Act, then the federal wetland permits would not be issued any faster — unless, of course, the permits are just going to be rubber-stamped, especially those involving a developer with major political connections.

Of course, given who's in charge of the federal government right now, that sort of arrangement would not be a considered a deterrent to the feds handing over permitting to the state.

The bottom line, then, is this: A lot of politicians say they're in favor of saving the Everglades. In Florida, it's become the equivalent of supporting motherhood and apple pie.

It's nice to see that one wetland get so much love. But the other wetlands deserve some love too, especially for those of us who like our water clean, our property flood-free, and our spoonbills abundant — no matter what old Mr. Audubon might say.

---

### Craig Pittman

Craig Pittman is a native Floridian. In 30 years at the Tampa Bay Times, he won numerous state and national awards for his environmental reporting. He is the author of five books, including the New York Times bestseller Oh, Florida! How America's Weirdest State Influences the Rest of the Country, which won a gold medal from the Florida Book Awards. His latest, published in January, is Cat Tale: The Wild, Weird Battle to Save the Florida Panther. The Florida Heritage Book Festival recently named him a Florida Literary Legend. He lives in St. Petersburg with his wife and children.



# Exhibit B

**Natural Resources Defense Council • Conservancy of Southwest Florida • National Parks
Conservation Association • Center for Biological Diversity**

February 3, 2021

Noah Valenstein, Secretary
Florida Department of Environmental Protection
*Via electronic mail to*: noah.valenstein@dep.state.fl.us

**RE: Burnett Oil Company, Inc.'s Section 404 Clean Water Act/Environmental Resource
Permit application nos. 323836-004 and 397879-002 to facilitate new oil drilling in the Big
Cypress National Preserve and public records request under Chapter 119, Florida Statutes**

Dear Secretary Valenstein,

The undersigned organizations have repeatedly written to the Department and the National Park
Service, most recently on December 16, 2020, regarding our opposition to Phase I geophysical oil
exploration for the Nobles Grade 3-D Geophysical Seismic Survey in the Big Cypress National
Preserve (Preserve) by the Burnett Oil Company, and its failure to adhere to existing permit
conditions and fully reclaim and properly monitor the related damage. We now write to express
our opposition to the Department's issuance of permits under Section 404 of the Clean Water Act
and Part IV of Chapter 373, Florida Statutes, or any other permits, that would authorize or facilitate
new oil exploration or drilling in the Preserve.

On December 22, 2020, the Environmental Protection Agency (EPA) published in the Federal
Register notice of its approval of the state of Florida's application to assume jurisdiction over the
Clean Water Act's Section 404 permitting program.[1] Conservation organizations are challenging
the EPA's actions in *Center for Biological Diversity v. U.S. Environmental Protection Agency*,
Case No.: 21-cv-119 (D.D.C. January 14, 2021). Public comments submitted in opposition to the
Department's request to assume this program highlighted concerns regarding the unlawfulness of
the proposed program and the lack of analyses, consultation, and public disclosures that would
normally occur under federal law, including the Clean Water Act (CWA), National Environmental
Policy Act (NEPA), Endangered Species Act (ESA), and National Historic Preservation Act
(NHPA).

We recently became aware of state 404 application nos. 323836-004 and 397879-002, submitted
on January 22, 2021, by the Burnett Oil Company to the Department, for Section 404 Clean Water
Act and Environmental Resource Permit authorization to construct oil well pads and access roads
in wetlands in two new locations in the Big Cypress National Preserve. The undersigned
organizations did not receive notice of any permit applications from the Department despite
repeatedly requesting such notice in prior correspondence. We became aware of these permit
applications as a result of an exploratory search of the Department's new Section 404 permit

---

[1] 85 Fed. Reg. 83,553 (Dec. 22, 2020).

program database. The website itself lists no public notices regarding any Section 404 permit. This lack of transparency is concerning and serves as an example of inadequate public notice under the state Section 404 permit program.

It is also unclear whether Burnett Oil has applied for a permit under Chapter 377, Florida Statutes, and we request clarity from the Department on this, as well as the status of obligations under the Endangered Species Act regarding the effects these activities will have on endangered and threatened species, including the Florida panther and Florida bonneted bat, and their critical habitats in the Preserve.

*Existing Damage Caused by Oil Exploration in the Preserve Remains*

As stated most recently in our December 16, 2020 letter, and, in other prior correspondence, we continue to have concerns about the success of the reclamation Burnett Oil has attempted thus far to reclaim the wetland damage caused by its seismic activities in the Preserve in 2017 and 2018, and the lack of compensatory mitigation for the loss of wetland function and endangered Florida panther habitat. Specifically, numerous issues remain with the oil company's monitoring of and reporting on the reclamation, and compensatory mitigation remains incomplete as of the date of this letter. We have shared numerous reports[2] written by our environmental consultants at Quest Ecology, Inc. Most recently, Quest Ecology reviewed the 2020 Reclamation Monitoring Report (dated October 2020) prepared by Turrell, Hall and Associates, Inc. on behalf of Burnett Oil and Quest Ecology continues to identify issues with the reclamation monitoring. To date, we have not received a response regarding the issues with Burnett Oil Company's monitoring raised by Quest Ecology.

The following is a summary of the damage to the Preserve caused by Burnett Oil Company's Phase I seismic survey, as documented by Quest Ecology:[3]

- Wetland soils were severely altered due to rutting and compaction caused by vibroseis and other off-road vehicles driving over them and then re-disturbed by subsequent reclamation attempts. The 33-ton vibroseis vehicles compacted and deeply rutted soils due to their sheer weight. The soils ruts created were almost 2-feet deep and up to 15-feet wide in places;

---

[2] *See* Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report – October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf; Quest Ecology, *Summary of March 6, 2020 Site Assessment within Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration area, Big Cypress National Preserve, Collier County, Florida* (March 15, 2020), available at: https://www.nrdc.org/sites/default/files/final-quest-ecology-memorandum-20200306.pdf; Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at: https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf; Quest Ecology, *Seismic Survey Inspection Report, Big Cypress National Preserve* (June 2019), available at: https://www.nrdc.org/sites/default/files/seismic-survey-inspection-report-20190615.pdf; Quest Ecology, *Phase I Seismic Survey Inspection Report, Big Cypress National Preserve* (May 2018), available at: https://assets.nrdc.org/sites/default/files/seismic-survey-inspection-big-cypress-20180531.pdf?_ga=2.61695279.2044034844.1586532000-1336211018.1533580820.
[3] *Id.*

2

- Despite their small size, dwarf cypress trees can range in age from 31 to 2,500 years. These trees provide important roosting sites and refuge from high water levels for birds and other wildlife. Nonetheless, dwarf cypress trees were cut or run over to make way for the vibroseis vehicles. Plant species and abundance within the representative seismic line inspected is significantly different from adjacent habitats not directly impacted by seismic survey activities—for example, dwarf cypress trees were observed in less than 1% of the seismic line, whereas these trees make up 50% of the plant cover in adjacent undisturbed habitats;
- Average total groundcover was around 5-10% within the seismic line inspected, as opposed to 40-60% in adjacent undisturbed habitats;
- Trees, shrubs, herbaceous species, and epiphytes (primarily consisting of Florida butterfly orchids and State-listed bromeliad species) were conspicuously absent within the seismic survey line observed compared to adjacent undisturbed habitats;[4]
- Dwarf pond cypress tree stumps that were cut with chainsaws by oil company crews—many exceeding two feet in diameter—were abundantly observed in the seismic line inspected and were not re-sprouting;
- Desiccation (drying out) of bromeliads and Florida butterfly orchids on the edges of the seismic lines due to removal of the adjacent dwarf cypress tree canopy important for maintaining temperature and moisture levels;
- Dwarf pond cypress tree seedlings were rarely observed in the seismic line inspected, although they were frequently observed in adjacent undisturbed habitats;
- The extent of torpedograss, a Category I invasive plant species in Florida, appear to have increased since the seismic survey activities began;
- Two native, but potentially nuisance plant species with the potential to spread once established—common reed and Carolina willow—were observed within the seismic survey line observed, suggesting that conditions are favorable for their continued growth and spread into other parts of the Preserve;
- Periphyton cover was significantly reduced within the seismic line observed compared to adjacent undisturbed habitats—periphyton is a critical component of the food web because it provides the primary food source for small consumers such as fish and invertebrates; and
- The oil company's initial reclamation attempts of ground elevations impacted by vibroseis vehicles resulted in a difference of up to seven inches in some locations—the differences in ground elevations will have adverse effects on the natural recruitment of desirable native plants.

Despite Burnett Oil Company's initial reclamation attempts, damage remains. Further, Quest Ecology identified problems with the representations made in the oil company's initial monitoring report, many of which still remain, according to a second monitoring report, including:[5]

---

[4] Notably, "reclamation" requirements include re-grading the soil ruts, but not the replanting of cypress trees or other destroyed or damaged vegetation. Vegetation is supposed to naturally recruit on its own.

[5] Quest Ecology, *Comments on Turrell, Hall & Associates, Inc.'s 2019 Reclamation Monitoring Report – August 30th, 2019 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (January 3, 2020), available at: https://www.nrdc.org/sites/default/files/quest-ecology-memorandum-2019-reclamation-monitoring-report-01032020.pdf.

- The oil company is re-grading soils within 3 inches of adjacent undisturbed areas in places, as opposed to re-grading soil ruts to match original grade, as required by federal and state permits. Meaning, the Preserve is not the same as it was prior to the seismic testing, despite the oil company's claims that there would be no long-term impacts;
- The number of monitoring stations within each designated reclamation area is not proportional to the length of the impacts caused by the oil exploration;
- The number and size of disturbed vegetation monitoring plots are insufficient to yield statistically significant results and do not include the full width of the seismic lines the oil company created;
- It's unclear whether state and federal agencies will base the "success of the reclamation" on individual reclamation areas or the 110-square mile Phase I seismic survey area in its entirety;
- The center of the seismic line is the least disturbed area because it was located between the vibroseis vehicle tires, yet the disturbed vegetation monitoring is taking place there;
- The method for comparing the topographic elevations of adjacent undisturbed areas to reclaimed areas is "biased and inconsistent" with the oil company's permits;
- Fundamental plant community attributes—such as species richness and diversity—between impacted and adjacent, undisturbed areas are not being disclosed; and
- Plant species are misidentified.

It is important for Burnett Oil Company to get the monitoring of the reclamation right from the start. Otherwise, subsequent years of monitoring will not be effective in identifying problems with the oil company's reclamation attempts so they can be promptly corrected. In short, despite the oil company's claims to the contrary, our scientific experts continue to conclude that long-term soil, hydrologic, and vegetation damage will persist as a result of Burnett Oil Company's seismic survey activities.[6]

*Impacts from Proposed Oil Development Must Not be Piecemealed*

In addition to exploration, oil development (drilling and related infrastructure) can have long-lasting impacts. However, it appears that Burnett Oil Company may be piecemealing its permit applications to avoid analyzing and disclosing to the public the secondary and cumulative impacts of the forthcoming oil development, including drilling and any well stimulation techniques, such as hydraulic fracturing or acidizing. It appears from a review of the Department's Section 404 permitting database that Burnett Oil Company is applying for authorization to fill wetlands to construct oil well pads and access roads at two new locations in the Preserve. However, we have not seen any related oil and gas permit applications submitted to the Department, or any federal access permits submitted to the National Park Service, to authorize oil drilling or other development, as of the date of this letter. Therefore, it appears that Burnett Oil Company is seeking authorization for direct wetland impacts associated with preemptive oil drilling activities (filling of wetlands to construct well pads and access roads), without disclosing the full impacts associated with oil development, including secondary and cumulative impacts. This approach thwarts

---

[6] Quest Ecology, *Comments on Turrell, Hall and Associates, Inc.'s 2020 Reclamation Monitoring Report –October 20th, 2020 Burnett Oil Company's Nobles Grade 3-D Seismic Oil and Gas Exploration in the Big Cypress National Preserve* (December 15, 2020), available at: https://www.nrdc.org/sites/default/files/quest-comments-monitoring-report-20201215.pdf.

informed and transparent environmental review and fails to provide the Department with the reasonable assurances required to issue permits for these activities. Impacts associated with oil development that can occur and must be analyzed here are as follows:[7]

### A. Upstream (Well) Development Activities

- Development activities, including those associated with access roads, staging areas, seismic operations, as well as geophysical exploration including surveying/staking, land/tree clearing, explosives use, boring and vehicle traffic.
- Well field development activities, including those associated with production wells, well pads, drilling rigs, pump/well heads, reserve pits, storage tanks, fuel tanks, water tanks, electric equipment, drilling pipe storage, water wells, waterlines, surface water intakes, disposal wells, water impoundments, borrow pits, reserve pits, electric distribution lines, communication towers.
- Construction activities associated with well pads and ancillary features and onsite components, including but not limited to surveying/staking, land/tree clearing, grading, stormwater and erosion and sediment control infrastructure, wetland, stream and sensitive area mitigation/protection, trenching/boring, surface water pumping, spoil/debris, vegetation piles, vehicle traffic, drilling/well pad development and completion activities, office, control, utility, storage and maintenance structures incidental to specific projects.
- Production and operations activities, including those related to access roads, production, gas flaring, vehicle traffic, post-construction stormwater management, maintenance of well pads and ancillary features and components (including supporting infrastructure installation, repair and replacement, equipment upgrades, inspections and repairs, workovers and recompletions, minor amounts of soil disturbance, vegetation maintenance, road maintenance, etc.).
- Decommissioning and reclamation activities, including those associated with vehicle traffic, land/tree clearing, land excavation/backfilling, vegetation restoration and well plugging.

### B. Midstream (Pipeline) Development Activities

- Construction of gathering, transmission and distribution pipelines and associated activities, including but not limited to access roads, staging areas, pipe storage/laydown areas, stream and water crossings, road borings, surveying/staking, land/tree clearing, stormwater and erosion and sediment controls, grading, trenching/boring, stockpiles, pipeline assembly, trench backfilling, vehicle traffic, revegetation and reclamation of surface impacts.
- Construction of surface features, including but not limited to access roads, staging areas and storage yards, booster, compressor and pump stations and related facilities, meter stations, mainline valves, pig launcher/receiver facilities, regular facilities, facilities to process, refine, stabilize and store natural gas and/or other hydrocarbons, communication towers, electric distribution lines, electric substations, capacitor stations, transformer

---

[7] *See* U.S. Fish and Wildlife Service, *Oil & Gas Coalition Multi-State Habitat Conservation Plan*, https://www.fws.gov/northeast/PDF/OG_HCP_EIS_FAQs.pdf.

stations, office/control/utility/storage/maintenance structures incidental to specific projects, parking areas, cathodic protection, storage tanks.

- Operation and maintenance of pipeline and surface facilities, including but not limited to vehicle traffic, equipment upgrades, inspections and repairs/replacements, leak detection, pigging, painting, minor amounts of soil disturbance, vegetation maintenance to preserve the ROW [right-of-way], road maintenance, and odorization.
- Installation of new culverts/ditches, gas flaring, blow downs, and hydrostatic testing and discharge.
- Decommissioning and reclamation of pipeline and surface facilities, including but not limited to vehicle traffic, land excavation/backfilling, and vegetative restoration.

For example, as the photograph below shows, existing oil pads and associated roads in Big Cypress National Preserve are clearly visible in the landscape.



An oil pad and road near Raccoon Point in the Big Cypress National Preserve (January 2019)
Photo credit: Jonathan Milne, LightHawk

C.  *Greenhouse Gas Emissions from Oil Development, including Downstream Activities, and Climate Change*

- A large and growing body of scientific research demonstrates, with ever increasing confidence, that climate change is occurring and is caused by emissions of greenhouse gases (GHGs) from human activities, primarily the use of fossil fuels. The 2018 Intergovernmental Panel on Climate Change (IPCC) Special Report on Global Warming of 1.5°C found that human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, and that warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.[8]

- The 2018 United States Fourth National Climate Assessment found (NCA4), "that the evidence of human-caused climate change is overwhelming and continues to strengthen, that the impacts of climate change are intensifying across the country, and that climate-related threats to Americans' physical, social, and economic well-being are rising."[9] Like the IPCC, the authors of NCA4 found that impacts are already occurring, concluding that "[t]he impacts of global climate change are already being felt in the United States and are projected to intensify in the future—but the severity of future impacts will depend largely on actions taken to reduce GHG emissions and to adapt to the changes that will occur."[10]

- Both the IPCC and National Climate Assessment, respectively, acknowledge the role of fossil fuels in driving climate change.[11][12]

- Research shows that fossil fuels produced from U.S. federal lands are already a significant source of GHG emissions and that together, coal, oil, and natural gas produced on federal lands account for approximately 25 percent of the total fossil fuels produced annually in the United States.[13]

- Federal lands are also a critical carbon sink. The U.S. Geological Survey (USGS) found that in 2014, federal lands of the conterminous United States stored an estimated 83,600 MMT $CO_2$ Eq., in soils (63 percent), live vegetation (26 percent), and dead organic matter (10 percent).79 In addition, the USGS estimated that Federal lands "sequestered an average of 195 MMT $CO_2$ Eq./yr between 2005 and 2014, offsetting approximately 15 percent of the $CO_2$ emissions resulting from the extraction of fossil fuels on Federal lands and their end-use combustion."[14] Here, surface disturbing activities from the oil development will likely reduce the Preserve lands carbon sequestration ability.

---

[8] 2018 Intergovernmental Panel on Climate Change, *Summary for Policymakers, in* Global Warming of 1.5°C: An IPCC Special Report on the Impacts of Global Warming of 1.5°C Above Pre-industrial Levels and Related Global Greenhouse Gas Emission Pathways, in the Context of Strengthening the Global Response to the Threat of Climate Change, Sustainable Development, and Efforts to Eradicate Poverty 6 (Valérie Masson-Delmotte et al. eds., 2018) (attached) [hereinafter, *Summary of IPCC 1.5°C Report*].

[9] U.S. Global Change Research Program, Fourth National Climate Assessment: Volume II Impacts, Risks, and Adaptation in the United States 36 (David Reidmiller et al. eds. 2018)[hereinafter, *NCA4*].

[10] *Id*. at 32.

[11] 2014 Intergovernmental Panel on Climate Change, *Climate Change 2014 Synthesis Report: Contribution of Working Groups I, II, and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* 46 (Rajendra K. Pachauri et al. eds. 2015) [hereinafter, *AR5*].

[12] *NCA4* at 76.

[13] Matthew D. Merrill, et al., Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14: U.S. Geological Survey Scientific Investigations Report 2018-5131 6 (2018)[hereinafter, *USGS 2018 Report*].

[14] *Id*. at 1.

- The Biden-Harris Administration recently issued an executive order acknowledging the climate crisis and the potential climate and other impacts associated with oil and gas activities on public lands,[15] and a memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships.[16]
- The emissions associated with the production of fossil fuels from federal lands can be divided into two categories: (1) direct emissions associated with activities such as construction, drilling, completion, and well operation; and (2) indirect or "downstream" emissions associated with activities such as transportation, processing and end use of those fuels. Since direct emissions from production represent only a small proportion of the life cycle emissions from fossil fuels, agencies must analyze and disclose to the public both the direct and indirect effects for the entire supply chain. This includes emissions from exploration, development, drilling, completion (including hydraulic fracturing), production, gathering, boosting, processing, transportation, transmission, storage, distribution, refining, and end use.
- End uses of fossil fuels include combustion, which is the largest source of energy-related GHG emissions.[17] Other end uses may result in oil or gas being used as a feedstock to create other products rather than being combusted. The creation and use of such products may also result in GHG emissions, and those emissions could be greater or lesser than the GHG emissions caused by combustion.

All of the aforementioned impacts must be analyzed and disclosed together, rather than in a piecemeal fashion.

*Formal Government-to-Government Tribal Consultation is Required*

Additionally, we understand that the areas of the Preserve encompassed in Burnett Oil Company's new permit applications contain identified archaeological and culturally sensitive sites, and that the Miccosukee Tribe of Indians of Florida opposes these permit applications and have requested formal consultation. Formal consultation must also be initiated with the Seminole Tribe of Florida. We oppose any permit applications that adversely impact cultural and archaeological resources or impact the spiritual and cultural traditions of Native American tribes or interfere with sacred landscapes of indigenous peoples.

*Public Records Request under Chapter 119, Florida Statutes*

Finally, we found it difficult to locate and view all of Burnett Oil Company's permit application materials on the Department's state 404 permit MapViewer website and we could not locate any related documents through a project-specific search on the Department's Oculus database, even though the 404 web page directs the public that files are available there. The documents we were

---

[15] The White House, *Executive Order on Tackling the Climate Crisis at Home and Abroad* (January 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.
[16] The White House, *Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships* (January 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/memorandum-on-tribal-consultation-and-strengthening-nation-to-nation-relationships/.
[17] *See* Bureau of Land Management, *Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, DOI-BLM-UT-0000-2021-0001-EA* (Oct. 2020) at 27.

able to locate thus far include the following: NPDES Discharge Control Plans and Details; Section A: General Information for All Activities; Tamiami Prospect; ERP/State 404 Environmental Supplement; and Stormwater Management System Engineering Supplemental Report. We request that the Department treat this as a public records request under Chapter 119, Florida Statutes, seeking any other records[18] related to Burnett Oil Company's Section 404 and Environmental Resource Permit applications, including any correspondence with the Department. If these documents are readily available online, please advise. Please also contact the undersigned before doing anything that would cause the related costs or fees to exceed $150.00.

*Conclusion and Formal Meeting and Notice Request*

Based on the foregoing, we fail to understand how Burnett Oil Company can demonstrate compliance with state and federal laws for issuance of the requested Section 404 Clean Water Act and Environmental Resource Permits. Therefore, we renew our request for a "time out" on further seismic, filling, drilling, or other related activities that the Department, in consultation with the National Park Service, U.S. Fish and Wildlife Service, and Tribal governments can: (1) fully assess the existing damage caused by Burnett Oil Company's seismic testing and require completion of scientifically-based reclamation, monitoring, and compensatory mitigation for the damage that has already occurred; (2) request additional information on the secondary and cumulative impacts associated with new oil development; (3) analyze and disclose this information to the public and Tribal governments; (4) ensure Endangered Species Act obligations will be met; (5) engage in consultation under the National Historic Preservation Act; and (6) engage in meaningful government-to-government Tribal consultation. This is necessary for the Department to evaluate the full picture of the environmental damage already caused by Burnett Oil Company, and to analyze and disclose to the public whether the company can provide scientifically supported reasonable assurances to meet all applicable permit criteria for its proposed oil development activities.

We will continue to attempt to work with state and federal agencies to protect America's first National Preserve, which provides immeasurable values to the Everglades, Tribal and other frontline communities, public water supplies, tourism, wildlife, and the economy.[19] To this end, we respectfully request a meeting with you to further discuss our grave concerns with the adverse impacts that have already occurred to Preserve resources as a result of oil exploration, and the additional adverse impacts that would likely occur if Section 404 and Environmental Resource Permits are issued allowing more oil development. We will also submit detailed comments once

---

[18] "Records" means anything denoted by the use of that word or its singular form in the text of the Freedom of Information Act and includes correspondence, minutes of meetings, memoranda, notes, emails, notices, facsimiles, charts, tables, electronic data, Geographic Information Systems (GIS) data and shape files, aerial imagery and photography, data contained within cell phone applications, video footage, presentations, orders, filings, and other writings (handwritten, typed, electronic, or otherwise produced, reproduced, or stored). This request seeks responsive records in the custody of any Department office.

[19] Frank Ackerman, Ph.D., Synapse Energy Economics, *Why Drill for Oil in Florida? Tiny Industry, Huge Risks* (2018), available at: https://www.nrdc.org/sites/default/files/why-drill-for-oil-in-florida-tiny-industry-huge-risks_2018-10-22.pdf.

we have had a chance to review all of Burnett Oil Company's permit application materials and any documents responsive to our public records request.[20]

Finally, we request Department notification of all activity on the pending permit applications and renew our requests for the Department to notify us of any public notices and/or notices of intent to issue any Department permits to Burnett Oil Company. Please do not hesitate to contact us if you have any questions. Thank you in advance for your consideration.

Sincerely,


Alison Kelly
Senior Attorney
Natural Resources Defense Council
1152 15th Street, NW
Suite 300
Washington, DC 20005
(202) 717-8297
akelly@nrdc.org

Melissa Abdo, Ph.D.
Sun Coast Regional Director
National Parks Conservation Association
777 6th Street, NW Suite 700
Washington, DC 20001
(954) 298-0819
mabdo@npca.org

Nicole Johnson, Director of Environmental Policy
Amber Crooks, Environmental Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, FL 34102
(239) 262-0304
nicolej@conservancy.org
amberc@conservancy.org

Jaclyn Lopez
Florida Director/Senior Attorney
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(727) 490-9190
jlopez@biologicaldiversity.org

---

[20] NRDC also has three outstanding Freedom of Information Act Requests from 2017 and 2018 pending with the National Park Service that have not been fulfilled.

cc:

Scott de la Vega, Acting Secretary, U.S. Department of the Interior
Stan Austin, Southeast Regional Director, U.S. Department of the Interior
Shannon Estenoz, Principal Deputy Assistant Secretary, U.S. Department of the Interior
Pedro Ramos, Superintendent, Everglades and Dry Tortugas National Parks
Thomas Forsyth, Superintendent, Big Cypress National Preserve
Tony Pernas, Chief of Resource Management, Big Cypress National Preserve
Don Hargrove, Regional Minerals Manager, Big Cypress National Preserve
Jane Nishida, Acting Administrator, Environmental Protection Agency
John Blevins, Region IV Administrator, Environmental Protection Agency
Radhika Fox, Acting Assistant Administrator for Water, Environmental Protection Agency
Tom Wall, Director, Office of Wetlands, Oceans and Watersheds, Environmental Protection Agency
John A. Coates, Mining and Minerals Programs Director, Florida Department of Environmental Protection
Cindy Mulkey, Oil and Gas Program Administrator, Florida Department of Environmental Protection
Jon M. Iglehart, South District Director, Florida Department of Environmental Protection
Pierre Bruno, Florida Department of Environmental Protection
Larry Williams, State Supervisor, Florida, U.S. Fish and Wildlife Service
Colonel Andrew Kelly, Jacksonville District Commander, U.S. Army Corps of Engineers
John Policarpo, Chief, Fort Myers Section, U.S. Army Corps of Engineers

# Exhibit C



# Everglades Coalition

1000 Friends of Florida
Arthur R. Marshall Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
Snook and Gamefish Foundation
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
The Urban Environment League of
Greater Miami
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

July 26, 2019

Megan Clouser
Senior Project Manager
U.S. Army Corps of Engineers
9900 SW 107th Avenue, Suite 203
Miami, FL 33176

Re: Opposition to 404 Wetland Degradation Permit Application for 836 Extension Permit Application No. SAJ-2018-01778 (SP-MLC)

Dear Ms. Clouser:

The Everglades Coalition - comprised of 62 organizations committed to the health and protection of America's Everglades - opposes the proposed 404 Wetlands Degradation permit sought by the Miami Dade Expressway Authority (MDX) for the purpose of developing a six-lane toll road extending State Road (SR) 836 through jurisdictional wetlands within the Comprehensive Everglades Restoration Plan's (CERP) footprint. We ask that this permit be denied, and that MDX consider other existing hybrid alternatives that do not bisect the Bird Drive Basin and instead take advantage of existing infrastructure. The detrimental impacts to the CERP footprint are unnecessary and avoidable.

CERP was authorized by Congress to "restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection."[1] While we recognize CERP is not static and uses adaptive management to evolve, we also recognize that preserving the east coast buffer within the ecosystem will likely be more important than ever to improve water quality and eliminate harmful discharges to the east and west as we seek to increase the ability to send more water south to this very transmissive area for aquifer recharge. The proposed project has damaging impacts to CERP. Most notably, the project involves construction of a permanent fixture in a very low-lying area, which will require additional flood and groundwater protection measures. Further, the project's induced development will drive up the cost of land needed for acquisition, potentially eliminating willing sellers. These impacts undermine the goals and benefits of CERP and set a negative precedent.

---

[1] Comprehensive Everglades Restoration Plan (CERP), National Park Service, https://www.nps.gov/ever/learn/nature/cerp.htm.

*Committed to full protection and restoration of America's Everglades*

MDX's current proposal poses a particular threat to the Bird Drive Recharge Area (BDRA) project within CERP. The goals of this project include reducing seepage from Everglades National Park to improve the hydrology of the park's ecosystem, recharge groundwater east of Krome Avenue to improve Miami-Dade County water supply, improve the spatial extent of wetlands, and improve water supply to the South Dade Conveyance System.[2] A fully-developed plan for the Bird Drive Basin (BDB) has not yet been identified. Until critical project components have been fully modeled and defined, a project like this six-lane tollway cutting through the project footprint is premature and threatens critical federal initiatives to protect and restore Everglades National Park.

The Everglades Coalition has opposed the expansion of the SR 836 into the sensitive and CERP-critical wetlands west of the Miami-Dade County Urban Development Boundary (UDB) since 2013. The Everglades Coalition passed a resolution in opposition to the project in May 2013, sent a letter to MDX stating our opposition to the current iteration of their plans in April 2015[3], and sent a letter to the South Florida Water Management District (SFWMD) detailing the impacts this project would have on CERP and the broader Everglades ecosystem in July 2018.[4] The negative impacts of this project on CERP necessitate the denial of the applicant's permit request.

**Impacts to CERP Bird Drive Recharge Area**

The physical presence of a major roadway would undermine CERP viability within the BRDA footprint because a central aspect of the project involves developing the ability to store surface water up to four feet, allowing for aquifer recharge. We are also concerned with how increased light pollution and noise in close proximity to Everglades National Park will not be compatible with wildlife and endangered species that use this area for foraging and nesting such as snail kites, panthers, bonneted bats, and woodstorks.

The BDRA is linked to both upstream CERP projects and the downstream South Dade Conveyance System (SDCS). The BDRA can provide water storage year-round and release water to the SDCS throughout the dry season. Modeling performed by Dr. Thomas Van Lent of the Everglades Foundation demonstrates that the successful implementation of the BDRA project is critical to prevent dry season water shortages in South Dade and to maintain a freshwater head that helps fight against saltwater intrusion at coastal structures.[5] With the full seepage barrier implementation, this recharge may be more important to this region than previously modeled, as the CERP model run only modeled for a seepage barrier that was partially engaged.

At their July 11, 2019 meeting, the South Florida Water Management District (SFWMD) Governing Board discussed the importance of BDRA project's north-south connectivity as a part of overall efforts to restore this critical area of the ecosystem. Specifically, the east coast buffer provided by the project and spatial extent of wetlands were discussed as critical CERP components needed to send clean water south. While the BDRA project was delayed for a restudy purpose in

---

[2] https://www.sfwmd.gov/sites/default/files/documents/bdrupdate_eb_12_14_11.pdf
[3] EVCO Ltr RE: 836/Dolphin Expressway Southwest Extension (Project 83618), 4/3/2015. https://docs.wixstatic.com/ugd/599879_33911d71b9344705b62b72ed3730f649.pdf
[4] EVCO Ltr RE: Re: Kendall Parkway Comprehensive Plan Amendment, State Application Review, 7/31/2018, https://docs.wixstatic.com/ugd/599879_fc6383a4af6c4817b2297aa1a083e666.pdf
[5] Analysis of the Potential for the State Road 836 Expansion to Affect the Comprehensive Everglades Restoration Plan, Thomas Van Lent, 6/18/2019

*Committed to full protection and restoration of America's Everglades*

450 N. Park Road # 301, Hollywood FL 33021  |  www.evergladescoalition.org  |  info@evergladescoalition.org

2008 and currently lacks a specific timeframe for construction and engineering, it is still on track for implementation.[6] The restudy called for a change of course and a "conveyance concept" project was presented to concentrate land acquisition on the western part of Bird Drive Basin, which was approved by the SFWMD in resolution No. 2012-511**:**

A RESOLUTION OF THE GOVERNING BOARD OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT ACCEPTING THE FORMULATION FINDINGS AND RECOMMENDATION OF THE LEADERSHIP OF THE U.S. ARMY CORPS OF ENGINEERS JACKSONVILLE DISTRICT AND THE STAFF OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT REGARDING THE BIRD DRIVE RECHARGE AREA PLAN; ACKNOWLEDGING THAT DISTRICT STAFF WILL COORDINATE WITH THE DEPARTMENT OF INTERIOR TO RECONCILE OBLIGATIONS UNDER LAND AND WATER CONSERVATION FUND GRANTS WITH RESPECT TO CERTAIN PARCELS WITHIN THE BIRD DRIVE BASIN AND SOLICIT IDEAS FOR POSSIBLE INTEGRATION OF DISTRICT OWNED LANDS INTO OTHER REGIONAL PROJECTS; DIRECTING DISTRICT STAFF TO COORDINATE WITH OTHER STAKEHOLDERS TO SOLICIT IDEAS FOR OTHER PROJECTS WITHIN THE REGION; PROVIDING AN EFFECTIVE DATE.

To our knowledge, no further action, including meeting all the benefits described in CERP or satisfying the above highlighted language above has been completed by the SFWMD. The development of this multi-lane highway would constitute a permanent decision that directly impacts up to 500 acres of wetlands and will only worsen our ability to expand the spatial extent of wetlands within the east coast buffer area. Many of these lands are encumbered by federal grant obligations for conservation and there is no mitigation elsewhere that would deliver the same benefits.

**Impacts to other CERP components and Everglades Projects**

This project would also impact the following CERP components as listed in the Yellow Book[7]:
V (L-31N Improvements for Seepage Management), FF (S-356 Structures), BB (Dade/Broward Levee/ Pennsuco Wetlands), S/EE (Central Lake Belt Storage Area), XX (North Lake Belt Storage Area), YY and ZZ. Component V involves the extension of the L-31 N canal along an altered course. The road would intercept the east west running portion of the L-31 N canal and either preclude its use or minimize its effectiveness. All of the other project components previously mentioned either rely in whole or in part on the successful implementation of component V.[8]

---

[6] SFWMD, Bird Drive Basin-Background and Current Status. April 30, 2012.
[7] "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS) for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999
[8] Potential Hydrological Effects of the Proposed 836 Extension on Everglades Restoration (CERP) and the Miami-Dade Consumptive Use Permit (CUP) for the M-D West Wellfield, Christopher McVoy, Ph.D.
June 19, 2019

*Committed to full protection and restoration of America's Everglades*

450 N. Park Road # 301, Hollywood FL 33021 │ www.evergladescoalition.org │ info@evergladescoalition.org



Taken from: "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement (PEIS)
for the Central and Southern Florida Project, Comprehensive Review Study" (Yellow Book), April 1999, Appendix A4,
Alternative D13R, Bird Drive Basin and L-31N Seepage Management, Component Map 7 (pg. A4-59)

The proposed road would also impose on the Pennsuco wetlands north of Tamiami Trail. The Pennsuco wetlands and the BDRA are important components of the East Coast Buffer. The wetlands of the East Coast Buffer provide a boundary between the wetlands of Everglades National Park and the urban core of Miami-Dade and Broward Counties. This buffer is critical to seepage management, groundwater recharge, and wetland protection.

The SFWMD has acquired land in the Pennsuco wetlands area using a myriad of state and federal funding sources, in addition to funding from developers seeking off-site mitigation. On October 25, 2017, the District acquired an additional 1,100 acres within the Pennsuco wetlands via Lake Belt Mitigation funds, bringing approximately 86% of the 12,732 acre Pennsuco wetlands into public ownership.

**Alternatives**

Under 40 C.F.R. § 230.12(a)(3)(i-iv), 404 permits may not be issued if: (i) there is a practicable alternative which would have less adverse impact and does not have other significant adverse environmental consequences, (ii) the discharge will result in significant degradation, (iii) the discharge does not include all appropriate and practicable measures to minimize potential harm, or (iv) there is insufficient information to make a reasonable judgment as to whether the proposed discharge will comply with the Corp's Guidelines for permit issuance.[9]

Practical alternatives exist to this project, and the applicant has not adequately studied or reported these alternatives. The only alternatives explored by MDX were a limited number of alternative road corridors – twelve out of thirteen of which bisect the BDRA. The applicant has failed to sufficiently explore hybrid alternatives which use existing infrastructure in combination with improvements and transit. Only one alternative inside the UDB was evaluated and it was determined as being the most effective way to solve traffic congestion. However, MDX deemed it infeasible because of cost and displacement of existing infrastructure. MDX failed to review real public transit alternatives that would effectively service the existing built environment but has instead chosen an alternative that would incite urban sprawl next to a critical CERP project footprint. We feel that is because the applicant (MDX)'s primary focus is on building expressways and it relies on collecting toll revenues. Therefore, MDX did not adequately vet all transportation alternatives to solve the stated traffic problem. The only viable option is the no action alternative because it (1) does not interfere with a federally-funded project (CERP), (2) is not contrary to USACE guidelines, and (3) forces mass transit to become a priority in Miami-Dade County.

**No Action Alternative**

In a white paper written on behalf of the Transit Alliance Miami, Walter Kulash, a transit and development expert, concludes that **there is no demonstrated need for the SR 836 expansion.** According to The Corridor Evaluation Traffic Technical Memorandum prepared on behalf of MDX, of 112 segments of major arterial and collector streets examined in the traffic study area, only thirteen failed to meet Miami Dade County CDMP multi-mode level of service standards with a volume to capacity ratio of less than 1.20 in either the AM or PM periods. Overall, the Traffic Technical Memorandum failed to show a sufficient current or future need that justifies MDX's proposal for a new multi-lane toll highway.

MDX proposed highway project does not provide the right solution to traffic needs. Studies show that expanding highways creates more traffic over time, not less.[10,11,12,13]  The Kulash report estimates that ten years after the 836 extension opens, the daily vehicle count of induced traffic

[9] 40 C.F.R. § 230.12(a)(3)(i-iv).

[10] Goodwin, Phil. Empirical evidence on induced traffic. Transportation. February 1996, Volume 23, Issue 1, pp 35–54

[11] Milam et al., 'Closing the Induced Vehicle Travel Gap Between Research and Practice', Transportation Research Record: Journal of the Transportation Research Board, 2017, DOI 10.3141/2653-02

[12] Litman. Generated Traffic and Induced Travel Implications for Transport Planning. Victoria Transport Policy Institute, 2017

[13] Schwager, Diane. 'Consequences of the Development of the Interstate Highway System for Transit'. Transit Cooperative Research Program Sponsored by the Federal Transit Administration RESEARCH RESULTS DIGEST. August 1997. http://onlinepubs.trb.org/onlinepubs/tcrp/tcrp_rrd_21.pdf

will be four times greater than the reduction in traffic on the arterial streets that the extension was designed to alleviate. In other words, the induced traffic would be far greater than the intended traffic reduction.[14] As such, a 'No Action' alternative remains the best alternative not only for the health of the Everglades, but also for traffic conditions and congestion reduction on Miami-Dade County's roadways.

**Transit Alternative**

The Kulash report goes on to describe a plan for solving the traffic issues alluded to via major transit improvements along SW 137th Avenue, between SW 136th Street and NW 12th Street. This transit extension would constitute a reasonable extension of Miami Dade County's Strategic Miami Area Rapid Transit (SMART) plan. This plan would result in far greater reduction in vehicle miles traveled and improve traffic services in the area in question far more effectively than the road extension.[15]

In spite of the viability of this alternative – which achieves county traffic goals while protecting the federal investment in CERP – this alternative has not been fully vetted by the applicant. We believe it is premature to grant a 404 wetland fill permit on this project before other reasonable alternatives have been thoroughly considered.

**Road Alternatives**

The Miccosukee Tribe of Indians has consistently indicated that the proposed roadway would have a detrimental impact on adjacent tribal resources. As such, the Tribe has promoted a road expansion alternative that would not impact tribal land or resources and that may have lesser impacts on the Everglades system and ongoing Everglades restoration projects. This alternative would involve linking the SR-836 to the recently widened Krome Avenue via an elevated highway, which makes use of existing infrastructure. This alternative would facilitate vehicle traffic while minimizing wetland degradation and negative impacts to the BDRA.

**Insufficiency of the interlocal agreement**

Much of the supposed protections that MDX has offered for wetland resources are derived from an interlocal agreement, not actual Comprehensive Development Master Plan (CDMP) amendments. An interlocal agreement is a wholly inappropriate tool to use in order to ensure that obligations for ensuring there are no conflicts with CERP projects. At a minimum, these protections would need to be ensured within the four corners of the CDMP in order to be considered legitimate and enforceable. A simple majority of the Miami-Dade County Commission can change the details of the interlocal agreement very easily whereas a CDMP change would require a supermajority from the Commission.

---

[14] Selected Traffic and Transit Issues SR 836 Extension Dade County, Florida, Walter Kulash, Miami Transit Alliance, 12/24/2018
[15] Ibid.

**Conclusion**

The United States of America and the State of Florida have invested hundreds of millions of dollars to protect and restore Everglades National Park through implementation of CERP. Indeed, the U.S. Army Corps of Engineers is a close restoration partner facilitating the planning, construction, and operations of key restoration projects. The proposed SR 836 as offered by MDX represents a significant threat to the viability of CERP components that are essential to supplying clean water to the Everglades and protecting Miami-Dade County's water supply. The member organizations of the Everglades Coalition strongly urge you to deny this permit application on the virtue of its negative impacts on CERP – especially given that there are a number of viable alternatives that have not been fully vetted by the applicant which would eliminate the significant detrimental impacts of the current proposal.

Sincerely,

Mark Perry
Co-Chair

Marisa Carrozzo
Co-Chair

# Exhibit D



# Everglades Coalition

*Sent Via Email*

June 24, 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399-0001
governorron.desantis@eog.myflorida.com

**Re: Miami-Dade County SR-836 Extension Proposal Ruling**

Dear Governor DeSantis and members of the Florida Cabinet:

On behalf of the 61 member organizations of the Everglades Coalition[1] committed to the protection and restoration of America's Everglades, we write to you to ask you to uphold the recent ruling by Administrative Law Judge Suzanne Van Wyk, which held that the proposed expansion of Miami-Dade's SR-836 tollway demonstrated inconsistency with Everglades restoration efforts, is inconsistent with Miami-Dade County's Comprehensive Development Master Plan, and is inconsistent with state law. The proposed 6 lane toll road would snake 14 miles outside of Miami-Dade County's Urban Development Boundary. It would impact water quality and disrupt fragile ecosystems and natural resources on the Miami-Dade County periphery, which the State has invested significant resources toward protecting and preserving for the benefit of all Floridians. We urge you to uphold your record as champions of Florida's Everglades, protect the State's investments, and put an end to the ill-fated campaign that violates state planning law, threatens our Everglades, and would not provide meaningful benefits to Florida residents.

Judge Van Wyk arrived at two clear findings in her order: First, the project's planning did not adequately consider potential for negative impacts to Comprehensive Everglades Restoration Plan projects and goals; nor did the County receive an adequate determination by the South Florida Water Management District that the project would not compromise the goals of CERP. The failure of the county to obtain an adequate determination is particularly concerning in light of the South Florida Water Management District's ongoing plans to construct a CERP project component in the Bird Drive Basin, which the road bisects. Second, the billion-dollar project itself is not an appropriate reaction to transportation data, and would elicit only meager mobility improvements in the target area and virtually no improvement for commuters. Testimony from the county's own experts revealed that drivers would shave a mere 6 minutes off a two-hour commute as a result of this project's implementation[2]. The County CDMP requires that it shift the travel mode from single occupancy vehicle to mass transit[3], and yet no data or analysis proves that the mass transit option listed in the Plan Amendment would actually be used.

---

[1] Abstaining from the Everglades Coalition on this matter were Tropical Audubon Society and Friends of the Everglades.
[2] Trial Tr. *TAS et al v. Miami-Dade County*, Fla. DOAH Case No. 2018-5695GM. Vol. 12, 1881:11-1882:15, July 26, 2019
[3] Miami-Dade Comprehensive Development Master Plan, Policy MT-7C

*Committed to full protection and restoration of America's Everglades*

1000 Friends of Florida
Angler Action Foundation
Audubon Florida
Audubon of Southwest Florida
Audubon of the Western Everglades
Audubon Society of the Everglades
Backcountry Fly Fishers of Naples
Calusa Waterkeeper
Cape Coral Friends of Wildlife
Center for Biological Diversity
Conservancy of Southwest Florida
Defenders of Wildlife
"Ding" Darling Wildlife Society
Earthjustice
Environment Florida
Everglades Foundation
Everglades Law Center
Everglades Trust
Florida Bay Forever
Florida Conservation Voters Education Fund
Florida Defenders of the Environment
Florida Keys Environmental Fund
Florida Native Plant Society
Florida Oceanographic Society
Friends of the Arthur R. Marshall
Loxahatchee National Wildlife Refuge
Friends of the Everglades
Hendry-Glades Audubon Society
International Dark-Sky Association,
FL Chapter
Izaak Walton League of America
Izaak Walton League Florida Division
Izaak Walton League Florida Keys Chapter
Izaak Walton League Mangrove Chapter
Lake Worth Waterkeeper
Last Stand
League of Women Voters of Florida
Martin County Conservation Alliance
Miami Pine Rocklands Coalition
Miami Waterkeeper
National Audubon Society
National Parks Conservation Association
National Wildlife Refuge Association
Natural Resources Defense Council
North Carolina Outward Bound School
Ocean Research & Conservation Association
Peace River Audubon Society
Reef Relief
Sanibel-Captiva Conservation Foundation
Sierra Club
Sierra Club Florida Chapter
Sierra Club Broward Group
Sierra Club Calusa Group
Sierra Club Central Florida Group
Sierra Club Loxahatchee Group
Sierra Club Miami Group
South Florida Audubon Society
Southern Alliance for Clean Energy
The Florida Wildlife Federation
The Institute for Regional Conservation
The National Wildlife Federation
Theodore Roosevelt Conservation
Partnership
Tropical Audubon Society

This project would exert an outsized negative impact on state investments[4], freshwater resources, ecological resources[5], and would negatively impact CERP[6]. The County fell far short of meeting its burden to prove that the tollway would be consistent with Everglades restoration; and it adopted the tollway amendment despite the South Florida Water Management District's claim that the County had not proved the amendment would not cause harm.

The project has also encountered significant criticism at the Federal level. The Federal Government is Florida's partner towards the shared goal of Everglades restoration under CERP, and has invested significant resources towards future projects in the area in question. The office of Florida Senator Marco Rubio has criticized the project on a number of occasions, and the U.S. Department of the Interior and the U.S. Environmental Protection Agency have both expressed their concerns with the proposed project. The U.S. EPA claims the tollway would "incur substantial and unacceptable consequences for the Everglades as a whole"[7].

The EPA went on to say that the area "plays a critical strategic role in the overall plan for restoration of the southern Everglades." As you are aware, South Florida's water-related dilemmas are playing out in real time for both its residents and its wildlife. The Judge found that the new tollway "creates a risk of contamination to the wellfield" and that the Plan Amendment violates the County's requirement to "protect and enhance" wellfields. The Plan Amendment is also inconsistent with the County's requirement to protect the Pennsucco wetlands, an area designated as critical habitat for the threatened and endangered species that is protected by the CDMP.

For all of the problems it creates, the tollway doesn't solve the problem for which it was created. The Judge found that "Not only [did] the data reveal that the improvements in West Kendall, congestion would be … 'meager,' …they provide no support for a finding that the Plan Amendment will … improve the commute time to downtown and other employment centers."[8]

The Judge's summation of the proposal was apt: "commuters will drive 13 miles, outside of the UDB, through active agricultural lands, through environmentally-sensitive lands, and through the West Wellfield, only to connect with the existing expressway operating at [a level of service] lower than it operates at today."[9] Placing this tollway outside of the UDB is inconsistent with the very intent of the UDB, and the proposed tollway, unfortunately, would harm rather than help the people, land, water, and wildlife it would literally and figuratively touch.

We need not convince you of the Everglades' paramount importance to the health and prosperity of Miami-Dade and our state as a whole, and the vital role it plays in so many of our state affairs, from public health to drinking water to tourism. Making the choice to move against this proposal is a straightforward, common-sense decision to protect Floridians from the echoing impacts of a poorly executed plan.

There is no ideal time to engage in a project that offers unproven benefits at the cost of proven harms. It is time to declare an end to this pursuit, and instead turn our attention to proven solutions. When Miami-Dade recovers from the struggles our entire country is facing, a host of alternative infrastructure improvements await, offering the prospect of faster, more convenient, more affordable commutes. We need not spend taxpayer dollars and years navigating thorny legal waters for what would garner a weak return on

---

[4] Department of the Interior Letter
[5] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[6] McVoy Dep. 31:21-31:20, June 24, 2019, *TAS et al v. Miami-Dade County*, DOAH Case No's 2018-5695GM, 2018-5696GM)
[7] August 2019 Letter from EPA to USACE
[8] State of Florida DOAH Order Case No. 18-5695GM p. 56
[9] State of Florida DOAH Order Case No. 18-5695GM p. 44

*Committed to full protection and restoration of America's Everglades*

investment for Floridians. We urge you to recognize the illusory appeal of this proposal as just that—an idea initiated with good intentions, but ultimately not in Florida's best interest.

While the tollway's purported benefits reflect what Miami-Dade's residents rightfully desire—less time spent idling in standstill traffic—this proposal has ultimately painted a picture of a panacea that, sadly, is no more than a mirage. Miami-Dade invested considerable amounts of time and money into pursuing this project, and the truth remains: This road would have negative consequences for the Everglades, for Miami-Dade, and for the state of Florida.

We understand the appeal of the project, and believe that the County had the best interests of its community at heart. When one weighs the costs against the benefits, however, it is clear that this simply does not pan out as a solution to Miami-Dade's problems. We trust that each of you, as proven advocates for the Everglades and pragmatic decisionmakers, will choose to uphold the Judge's ruling and close this chapter, making way for new projects that will benefit and protect us all.

Sincerely,

Mark Perry                          Marisa Carrozzo
Co-Chair                            Co-Chair

CC:

**Shane Strum, Chief of Staff**
Shane.Strum@eog.myflorida.com

**Erin Sumpter, Director of Office of Cabinet Affairs**
Erin.Sumpter@myfloridalegal.com

**Ashley Moody, Attorney General of Florida**
ashley.moody@myfloridalegal.com

**Nicole "Nikki" Fried, Commissioner of Florida Department of Agriculture & Consumer Services**
Nikki.Fried@FDACS.gov

**Jimmy Patronis, Chief Financial Officer of Florida**
CFO.Patronis@myfloridacfo.com

*Committed to full protection and restoration of America's Everglades*