**Exhibit 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**DECLARATION OF RACHEL SILVERSTEIN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Rachel Silverstein, Ph.D., make the following declaration:

1.      I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

2.      I am a resident of Coral Gables, Florida.

3.      I am the Executive Director and Waterkeeper of Miami Waterkeeper, one of the Plaintiffs in this case.  I am also a member of Miami Waterkeeper.  I have been a member of Miami Waterkeeper since 2016.

4.      As Executive Director and Waterkeeper, I lead and oversee all of Miami Waterkeeper's programs and initiatives, utilizing my expertise in marine biology and deep working knowledge of South Florida's waterways, wetlands, and ecosystems.  I hold a Ph.D. in Marine Biology and Fisheries from the University of Miami and a B.S. degree in Ecology, Evolution, and Environmental Biology from Columbia University.

1

5.      Miami Waterkeeper is a 501(c)(3) nonprofit whose mission in South Florida is to ensure swimmable, drinkable, fishable water for all; protect marine ecosystems and habitats; and to ensure resiliency and preparedness for sea-level rise.  We accomplish these goals through legal advocacy, community outreach, and education and scientific research.  Collectively, 80-90% of our organization's work focuses on water quality and marine habitat protection. Founded in 2010, Miami Waterkeeper has over 162 dues-paying members, with an additional 1,437 donors and supporters, and more than 24,865 social media followers.

6.      Miami Waterkeeper's clean water initiatives are specifically grounded on the bedrock protections of the federal Clean Water Act ("CWA").[1]  We work to keep South Florida's waters clean by (a) preventing pollution by training the public to document and report pollution through our 1000 Eyes on the Water program; (b) litigating against polluters who break environmental laws; (c) referring matters to the authorities for investigation and prosecution; (d) regulating and enforcing stormwater runoff violations; (e) preventing algae blooms by working to reduce fertilizer use, stormwater runoff, septic tanks, and sewage spills; (f) protecting against contamination from Miami's aging nuclear power plant; (g) fighting against proposed rules that would allow more toxic and cancer-causing chemicals in Florida's water; (h) training the next generation of environmental leaders and clean water advocates through our Junior Ambassador program; (i) testing popular recreation beaches and waterways for bacteria on a weekly basis; (j) reporting the latest water quality data to the public on theswimguide.org; and (j) working to stop failing septic tanks.

---

[1] Miami Waterkeeper, About Us, Our Focus Areas, Clean Water: https://www.miamiwaterkeeper.org/clean_water ("Swimmable, drinkable, and fishable water is a right granted to all of us under the Clean Water Act").

7.      Miami Waterkeeper's marine ecosystem and habitat protection initiatives focus on protecting wetlands, coral reefs, mangroves, and seagrasses.  Coral reefs and certain types of seagrass, such as Johnson's seagrass, that we work to protect are protected under the Endangered Species Act.  Along with the aforementioned initiatives, additional ways we accomplish this mission include (a) protecting coral reefs from dredging and supporting coral restoration and research; (b) litigating to stop illegal destruction of our natural areas; (c) enforcing the Endangered Species Act ("ESA") and the National Environmental Protection Act ("NEPA"); (d) improving water quality in Biscayne Bay and surrounding waters; (e) producing economic studies that value ecosystem services; (f) supporting efforts to get more fresh water to Biscayne Bay, like the Biscayne Bay Coastal Wetlands project; and (g) conducting key scientific research to inform policy decisions.

8.      Miami Waterkeeper reviews proposed agency actions, and when we determine it is necessary to engage to protect South Florida's waters and marine habitats, the main tools we employ include thorough review of said agency action under NEPA and the ESA, engaging in the comment process; organizing public participation in the comment process[2]; litigation; and public education, i.e. a blog, social media, and/or newsletter posts to our members and followers relying on environmental assessments, environmental impact statements, and biological opinions.

9.      Our legal challenge to the Port Everglades dredging project, beginning in 2016 and ongoing, is an example of how Miami Waterkeeper harnesses the protections of NEPA and

---

[2] As an example, see our Port Everglades Action Alert page: https://www.miamiwaterkeeper.org/port_everglades_action_alert, which documents how we organized over 10,000 comments and circulated a petition that was sent to the U.S. Army Corps of Engineers for stronger protections of coral reefs in response to the Corps' dredging project at Port Everglades in Fort Lauderdale, FL.

ESA to protect ESA-listed coral.  To protect the reefs near Port Everglades from the devastation to coral that occurred in a similar dredging project in Miami (in which we also took legal action), we filed a NEPA and ESA lawsuit against the Army Corps and the National Oceanic Atmospheric Administration ("NOAA").  We argued that by ignoring the unexpected harm that occurred to the reef at Port Miami, the Corps failed to use "best available science" in their Port Everglades environmental analyses.  In response, the Corps acknowledged that its current environmental analysis is neither appropriate nor sufficient and agreed to conduct new environmental studies before starting its planned dredging project to expand Port Everglades.

10.    As discussed in this declaration and for the reasons stated in Plaintiffs' complaint, Miami Waterkeeper is opposed to Florida's assumption of the 404 permitting program because it will result in the loss of NEPA, ESA, and CWA review and analyses, on which we rely when reviewing, commenting on, and challenging permits; and it will make it more challenging, if not impossible, to bring permit challenges in court.  The proposed state 404 projects that would be within Miami Waterkeeper's purview to challenge, as discussed at paragraphs 27-44 below, demonstrate the harms that are and will occur as Florida continues to operate the program, harms that impact Miami Waterkeeper's organizational mission and my and our members' recreational and aesthetic interests.

**Miami Waterkeeper's Lost Procedural Rights As a Result of EPA's Unlawful Actions**

11.    Miami Waterkeeper was harmed by EPA's decision to make the state-assumed 404 program effective immediately on December 22, 2020, rather than at least 30 days after publication (January 21, 2021), as required for rulemakings, and without lawfully effectuating that transfer through codification.  The unlawful transfer of authority from the Corps to the state harms Miami Waterkeeper's ability to carry out its organizational mission of protecting the

environment and wildlife, and harms members' aesthetic, recreational, and other interests as a result of the state's unlawful administration of the 404 program.

12.     As a result of EPA's immediate effective date, Miami Waterkeeper lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of inauguration day. Miami Waterkeeper would have exercised these rights had they been available.

13.     As to reconsideration, Miami Waterkeeper was deprived of the right to ask EPA to reconsider its approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

14.     As a result of EPA's immediate effective date, Miami Waterkeeper was also denied the right to ask the agency to postpone the effective date of the rule pending judicial review.  On January 20, 2021, Miami Waterkeeper and the other Plaintiffs in this action, via Earthjustice's letter "Request for Expedited Action; Ctr. for Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)," asked EPA to cure the immediate effective date and failure to codify violations regarding the state program.  Miami Waterkeeper and the other Plaintiffs further requested that if EPA were to properly promulgate and codify its approval of Florida's program, that the agency also postpone the effective date of that action pending judicial review.  EPA, however, has adhered to its position that the immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay request.  If the court were to remedy these violations, Miami Waterkeeper would again ask the agency to postpone the effective date of the rule pending judicial review.

15.      EPA's immediate effective date of December 22, 2020, also foreclosed Miami

Waterkeeper's ability to benefit from the Biden Administration's review of the rule.  It is my

understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff

Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing

agency heads to review and consider postponing by at least 60 days any rule that had been

published in the Federal Register but had not taken effect. [3]  Had EPA provided the required 30-

day effective date from its publication in the Federal Register, it is my understanding that EPA's

approval and transfer of authority to the state would have been covered by the Klain Memo.  A

review of the unlawful aspects of Florida's 404 program could have resulted in actions to stay

the program's effective date and take other remedial measures.

16.      The loss of procedural rights Miami Waterkeeper has sustained as a result of

EPA's immediate transfer of authority to the state, as well as its failure to lawfully effectuate the

transfer through codification, has resulted in immediate and ongoing organizational and

membership harms while the state's unlawful program operates.  The state's 404 program causes

Miami Waterkeeper to divert resources, threatens wetlands and wildlife, and undermines Miami

Waterkeeper's ability to realize its mission by depriving the organization of information, rights

and remedies available when Section 404 is administered by the Corps as it has been for decades.

**Miami Waterkeeper and Its Members are Harmed by Florida's Assumption of the 404
Permitting Program**

17.      Miami Waterkeeper is harmed, and will continue to be harmed, by Florida's

assumption of the state 404 permitting program.

---

[3] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

18.     Miami Waterkeeper almost exclusively litigates in federal court.  We typically cannot litigate state court claims because of the significantly high costs and drain on our resources to do so.  Permit challenges in state court are not administrative review cases as they are in federal court.  Therefore, we do not have the benefit of environmental analyses and administrative records around which we can build our cases that federal NEPA and ESA litigation affords.  Rather, in state court, we would have to build our cases from the ground up, conducting our own investigations and hiring our own expert witnesses.  A case like this before Florida's Division of Administrative Hearings can easily run upwards of several hundreds of thousands of dollars, factoring in expert witnesses, attorneys' fees, and time.

19.     With an annual operating budget of around $700,000 for our entire organization, one permit challenge in state court could eat up a quarter to half of our budget.  We would to have to 1) raise additional money to fund these challenges, 2) use funds from our existing operating budget, or 3) no longer engage in litigation as an advocacy tool.  Under the first option – raise additional money to fund these challenges – the time spent fundraising would prevent us from carrying out our other programmatic work, and it is unknown whether we would even be successful in raising funds to cover legal costs.  Under the second option – use funds from our existing budget – factoring in our other operating and overhead costs, we would not be able to carry out much of our other robust programmatic work.  Under the third option – abandoning litigation as an advocacy tool – we would no longer have this powerful tool of seeking legal remedies to carry out our organization's mission of protecting South Florida's waters, wetlands, and species' habitats.  All three options would damage our operations, with the first two resulting in a depletion of our time, resources, and money away from our existing program work to the detriment of our ability to actually carry out other work.  The third option would drastically

impede our ability to carry out our organization's mission by eliminating one of the main advocacy tools we use to accomplish our mission, namely, litigation.

20.    On top of the aforementioned irreparable harms, Miami Waterkeeper would be further harmed by the mandatory fee-shifting provision for permit enforcement and 404 unpermitted discharge litigation, which we would not be subject to in federal court. This further financial risk on top of the above-listed costs of litigating in state court means we would effectively have to choose between bringing these challenges in state court or carrying out our other existing programs and initiatives.

21.    Furthermore, even if we somehow were able to raise enough funds to cover state court litigation, we would still face potentially insurmountable hurdles to getting into court, since Florida law requires harm to a significant number of our members to pursue litigation on their behalf, whereas federal law would only require us to show harm to one member.

22.    Miami Waterkeeper also engages in monitoring of pollution, violations of environmental laws, and permit violations. For cases that we do not litigate ourselves, we refer to the appropriate authorities for investigation and criminal prosecution, for which we provide any necessary assistance.

23.    Florida already has a poor track record when it comes to enforcement. For example, because of the Florida Department of Environmental Protection's ("FDEP") failure to investigate and enforce National Pollutant Discharge Elimination System ("NPDES") permit violations under the state-delegated program, Miami Waterkeeper had to undertake this effort itself in several instances. From 2016 to 2018, Miami Waterkeeper took an inventory of NPDES permits along the Miami River and discovered that many of the permits were outdated or that discharges were occurring without a permit. Miami Waterkeeper went through the painstaking

8

process of researching each permit in FDEP's Oculus search engine, a system that is notoriously

not user-friendly, and then had to hire external contractors to carry out inspections, costing

hundreds of dollars of Miami Waterkeeper funds that could have gone toward other

programmatic goals.  We also had to hire graduate students and law students to assist with the

inventory, which further resulted in a diversion of resources to manage the students.  Among the

violations we discovered, four were egregious.  This process culminated in a letter to FDEP

urging them to enforce the NPDES permit program.

24.    Another example of FDEP's poor track record of enforcement is the Turkey

Point Power Plant, a major source of pollution in Miami.  Turkey Point operated under an

expired NPDES permit for almost ten years prior to FDEP issuing a new draft permit.  In 2019,

Miami Waterkeeper submitted comments highlighting the insufficiency of the new permit as to

monitoring and permit compliance, including the fact that the footprint of the site would be

reduced and would therefore fail to regulate areas of the site that discharge waste and that have

historically been polluted.  See Exhibit A, Comments to FDEP's Draft NPDES Permit (Permit

No: FL0001562).  We are currently litigating in federal court a NEPA challenge to the license

renewal of the site's nuclear units.

25.    Aside from litigation and enforcement, the loss of NEPA, ESA, and CWA review

and analyses with Florida's assumption of the 404 program will also harm our organizational

mission.  Without these required evaluations and analyses, we will lose access to information

that allows us to assess projects and understand the impacts of those projects on waters,

wetlands, and species.  This information is necessary to determine how to advocate effectively

and to inform our members and followers of the crucial developments that could impact them.

As a result, we will either be unable to carry out a major aspect of our organizational mission, or

we will be required to expend significant resources hiring experts to provide us with this information we otherwise would have access to.  Either option will cause great harm to Miami Waterkeeper's ability to protect local waters, species, and their habitats.

26.    Overdevelopment, and the resulting environmental harms to South Florida's waters and marine ecosystems, are also more likely to occur with this assumption.  Dense urban development increases contaminated stormwater runoff.  It also leads to increased pressure on the aging sewage infrastructure or an increased number of septic tanks.  Both sewage leaks and septic tanks increase nutrient runoff and bacteria levels, leading to algae blooms and/or public health and recreation implications.  Additionally, without the natural filtration system wetlands provide for stormwater runoff, nutrient runoff to lakes, ponds, ocean, and surrounding bays would increase, leading to increased turbidity and algae blooms that are harmful to marine species and renders waters unsafe for humans.  Nutrient-loading and harmful algal blooms are well-documented problems in Florida, as was seen earlier this year with algal bloom and nutrient loading that caused a massive fish die-off and made parts of Biscayne Bay a temporary dead zone.[4]

**Organizational and Membership Harms From Particular Projects**

24.    EPA's unlawful transfer of authority to the state via an immediate effective date and without codifying the state program, mean that the state is presently administering the 404 program, while Miami Waterkeeper has been denied the right to request reconsideration or an agency stay pending judicial review, and the benefit of the Klain memo.  As a result, the state is poised to issue 404 permits on major projects that will impact Miami Waterkeeper's

---

[4] For further information on this event, see Miami Waterkeeper's coverage: https://www.miamiwaterkeeper.org/fish_kill.

organizational interests and my interests as a member.  We are particularly concerned about certain permit applications that have been transferred by the Corps to the state, especially given the state's public statements that its objective in assuming jurisdiction over 404 permits is to issue permits quickly.

27.    **Port 1850**.  An ongoing project that would be in our purview to challenge is Port 1850 LLC's application to place 44,107 cubic yards of fill within 4.21 acres of mangrove wetlands for the construction of a new commercial warehouse in Fort Lauderdale. See Army Corps of Engineers public notice for this project, attached as Exhibit B.  I have confirmed in the FDEP state 404 database that this project was transferred to the state of Florida on December 28, 2020. [5]

28.    Mangroves and other estuarine environments provide critical habitat for protected species in southeast Florida including the eastern brown pelican, wood stork, manatee, and common snook.  Mangrove forests provide habitat for adult fish and also act as nurseries for juvenile species.  They stabilize shorelines, protecting coastal areas from storm surge and providing erosion control.  Miami is particularly vulnerable to sea level rise, so this protective buffer area is of critical importance.  Mangroves trap sediments and maintain water quality by absorbing nutrients and other pollutants from the water.  See U.S. Fish and Wildlife Service's informational report on mangroves: https://www.fws.gov/verobeach/msrppdfs/mangroves.pdf. Mangroves also absorb carbon dioxide and other greenhouse gases from the atmosphere and store those gases - an important ecosystem service to combat climate change.  Mangrove forests have declined across the state due to overdevelopment.  See FDEP's informational page on

---

[5] State 404 File for Port 1850 Project: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_396518/gis-facility!search.

mangroves: https://floridadep.gov/rcp/rcp/content/floridas-mangroves. For these reasons, mangrove species have been protected by law in the state of Florida. See Florida's Mangrove Trimming and Preservation Act: https://floridadep.gov/sites/default/files/mtpa96_0.pdf.

29.     The smalltooth sawfish is one such species, see Exhibit C, listed as endangered under the Endangered Species Act by the National Marine Fisheries Service. Destruction of mangroves will have a direct, negative impact on this species which uses mangroves for nursery habitat. This area of South Florida where the project is located is part of the historic range for smalltooth sawfish.

30.     Destruction of the mangroves as contemplated in this project will also have an impact on the threatened Johnson's seagrass, which has been found directly abutting the project area. See Exhibit D, National Oceanic and Atmospheric Administration and National Marine Fisheries Service 5-Year Review of Johnson's Seagrass, at 49 (depicting Johnson's seagrass in marine waters directly downstream from project area). Destruction of mangroves releases large amounts of sediment and nutrients, which can be fatal to seagrasses by causing shading, suffocation or eutrophication, which can lead to algae blooms. This harm would likely be severe because Johnson's seagrass reproductive capacity and limited energy storage makes it unlikely to repopulate an extirpated area. See Exhibit E, Seagrasses, USFWS Multi-Species Recovery Plan for South Florida, at 3-603 to 3-604.

31.     Other federally listed species depend on seagrass in South Florida; these include the West Indian manatee, American crocodile, loggerhead sea turtle, hawksbill sea turtle, leatherback sea turtle, Kemp's ridley sea turtle, roseate tern, wood stork, and bald eagle. See Exhibit E at 3-601 (describing species that depend on seagrass) and 3-603 (describing the ecological function of seagrass). Furthermore, the coastal area of South Florida is home to one

of the world's largest loggerhead rookeries and increasing green turtle and leatherback breeding populations.  See Exhibit F, Bovery, Wyneken, *Seasonal Variation in Sea Turtle Density and Abundance in Southeast Florida Current and Surrounding Waters*, at 9.  This area of Fort Lauderdale is also home to the West Indian manatee.

32.    Preservation of these endangered and threatened species are critical to Miami Waterkeeper's mission, and to the recreational and aesthetic interests of Miami Waterkeeper's members.  Miami Waterkeeper has members in Broward County who regularly recreate on the water canals and intercoastal waterway area downstream of the project area, which will be negatively impacted by the destruction of the mangroves. This project site is also approximately two miles west of Eula Johnson State Park, where Miami Waterkeeper has led beach clean-ups with members and the general public and has given lectures and presentations on South Florida marine ecology, habitats, and species.  We have also held a diving "Bioblitz" event and coral identification trainings just offshore of Port Everglades.  Harms to habitat and species are very likely to occur here if this project is allowed to go forward, negatively impacting Miami Waterkeeper's members and Miami Waterkeeper itself in its mission to protect and study marine species and access natural areas to carry out program activities.

33.    Miami Waterkeeper's ability to challenge the permit and harms that result from the project will be severely constrained by inadequate and costly state procedures (including restrictive standing requirements, costly litigation requirements because of the need to retain expert witnesses, and the potentially devastating risk of mandatory fee-shifting laws), that are not comparable to the processes or remedies available under federal law.  The state program also lacks enforcement measures required under federal law, reducing the incentive to comply with permit requirements, further increasing the risk to wetlands and species.

34.     Harms to the waters and species would also affect me personally as a member of Miami Waterkeeper.  I go boating and diving at the mouth of Port Everglades, which is approximately two miles north of the above-cited warehouse project.  When I go boating and diving, I enjoy observing listed coral and other marine wildlife, and I look out for and try to observe species such as manatees, herons, egrets, ibises, ospreys, sea turtles, and dolphins.  My ability to enjoy these waters and wildlife are dependent on there being clean, safe waters.  The approval of this project and likely resulting harms would negatively impact my ability to recreate in this area, due to harms to the waters and wildlife.

35.     In 2021, Miami Waterkeeper began a water quality sampling contract with the City of Fort Lauderdale, which will include routine monitoring of multiple sites within a few miles of project SAJ-2020-01739.  See Exhibit G, Miami Waterkeeper's Water Monitoring Map. Members of the community and followers of Miami Waterkeeper depend on our weekly water quality updates on our mobile platform to gather information about water quality at these sites where they recreate.  These activities include paddle-boarding, kayaking, jet-skiing, and swimming, among others.  Increased development under an unlawful state-assumed program and the aforementioned environmental harms from project SAJ-2020-01739 would impede community members and Waterkeeper followers from engaging in these recreational activities and may negatively impact water quality.

36.     **Northern District Wastewater Treatment Plant Expansion**.  Another project that would affect Miami Waterkeeper's mission and our members' interests is the Miami-Dade County Water and Sewer Department's application to clear 17 acres of wetlands and mangroves for the expansion of the Northern District Wastewater Treatment plant in North Miami.  I have

confirmed in the FDEP state 404 database that this project was transferred to the state of Florida on January 8, 2021.[6]

37.    As explained above, mangroves provide critical habitat for protected species in southeast Florida, and protection of mangroves in this area is important to Miami Waterkeeper's mission and to the recreational and aesthetic interest of Miami Waterkeeper's members.

38.    The proposed project location is immediately adjacent to Oleta River State Park and Biscayne Bay.  As Florida's largest urban park, Oleta River State Park is a breathtaking 1,000-acre natural oasis filled with mangrove forests at the mouth of the Oleta River.  It is a popular area for kayaking, canoeing, hiking, biking, and camping.  Oleta River State Park connects to Biscayne Bay, whose waters make up the largest estuary on the coast of southeast Florida, encompassing over 400 square miles of freshwater and saltwater from the Atlantic Ocean.  Biscayne Bay also receives water from the Everglades. This areas also serves as habitat to numerous aquatic and bird species, protected and otherwise.

39.    Biscayne Bay is a place where visitors flock to take in the vast expanse of the water—whether from hotels, restaurants, and walkways along the shore, or by boat, kayak, snorkeling, swimming, or diving.  In addition to its beauty, this area also provides an important natural buffer for storm surge impacts for critical infrastructure during hurricanes.  Removing mangrove cover from the area would eliminate additional protections that mangroves afford this urban area during major storm events.

---

[6] Florida's 404 File for the Northern District Wastewater Treatment Plant Expansion Project: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_372409/facility!search

40.    Destruction of 17 acres of wetlands and mangroves as contemplated in this project will have a direct impact on protected species in the area, which collectively for Oleta River State Park and Biscayne Bay include the West Indian manatee, sea turtles, eastern brown pelican, wood stork, smalltooth sawfish, American crocodiles, and various other fish and bird species. Urban Miami Dade County presently has very limited mangrove cover.  By removing more mangroves, this project would directly impact what little mangrove habitat exists in the urban core, further reducing already limited habitat for protected species.

41.    As a member of Miami Waterkeeper, I will personally be harmed by this project, which will directly impact mangroves and in turn, the species who rely on them.  Several times a year, I recreate at Oleta River State Park and Biscayne Bay, where I visit with my family, paddleboard, kayak, and boat.  When I visit, I am always on the lookout for manatees, loggerhead sea turtles, hawksbill sea turtles, and many types of fish.  Because these areas are frequently enjoyed by members of the public, even during the pandemic, I have not been able to visit as frequently, but I plan to return to regularly partake of these outdoor activities as soon as it is safe to do so post-pandemic.

42.    Our members also regularly fish, kayak, and observe wildlife in this area, as it is one of the only remaining protected areas to do so in North Biscayne Bay.  The risk of pollution from this project and threats to species harm Miami Waterkeepers' members. North Biscayne Bay is particularly vulnerable to pollution. Last summer, areas of North Bay passed an ecological tipping point and the region experienced a fish kill and algae bloom event that was the most severe in recent memory.

43.    Additionally, adjacent to the site is Florida International University's Biscayne Bay campus.  As Executive Director and Waterkeeper of Miami Waterkeeper, I have conducted

press conferences at this site, with the natural backdrop that highlights the importance of this area.  Miami Waterkeeper has led recreational and service events at Oleta River State Park and shared information about water quality in this area in partnership with scientists at FIU.  Any degradation to water quality from this dredge-and-fill project will impact my and Miami Waterkeeper's ability to engage in these activities.

44.    Harms to this habitat would impact Miami Waterkeeper's research interests, our members' recreational and aesthetic interests, and our mission to support sea-level rise resilience in South Florida.

45.    If Florida is allowed to continue operating this unlawful 404 program, Miami Waterkeeper will be harmed in its ability to carry out its mission of protecting South Florida's waters, wetlands, species, and their habitats.

46.    A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority to the state, thereby allowing Miami Waterkeeper to pursue all avenues, as discussed above, including seeking an agency stay of Florida's administration of the Section 404 pending judicial review.  In addition, as indicated by the Klain memo, the Biden Administration is focused on reviewing final actions of the outgoing Administration, and as new leadership of the agency Defendants comes in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial review.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of March, 2021.

_____

Rachel Silverstein, Ph.D.
Executive Director and Waterkeeper
Miami Waterkeeper
2103 Coral Way, 2nd Floor
Miami, FL 33145

18

# Exhibit A

Mr. Marc Harris, P.E.
Department of Environmental Protection
Bob Martinez Center
Industrial Wastewater Program
2600 Blair Stone Road, Mail Station 3545
Tallahassee, Florida 3239-2400

May 21, 2019

**Re: Comments to FDEP's Draft NPDES Permit (Permit No: FL0001562)**

Dear Mr. Harris,

On behalf of Miami Waterkeeper (MWK) and the National Parks Conservation Association (NPCA), we thank you for the opportunity to provide comments as part of the permitting process for Florida Department of Environmental Protection's (FDEP) proposed draft National Pollutant Discharge Elimination System (NPDES) permit renewal (FDEP File No. FL0001562-012-IW1N) ("draft NPDES permit") for the wastewater treatment and effluent disposal facilities for the ongoing operation of the facility at the Turkey Point Power Plant, owned and operated by Florida Power & Light (FPL). Our organizations, and our more than 1.3 million members and supporters nationwide, have a strong interest in ensuring Turkey Point's operations do not cause detrimental impacts to the surrounding environment, including regional water resources, Biscayne and Everglades National Parks, wildlife, sensitive wetlands, and drinking water supplies. Over the years, the release of pollutants and contaminants from Turkey Point into the surrounding environment has caused significant environmental degradation, including impacts to surface and groundwater. Because this permit will ultimately regulate the discharge of pollutants from Turkey Point and outline important monitoring and reporting requirements, permit specifications will play a large role in determining future impacts of Turkey Point on the surrounding environment and the region's drinking water supply.

## National Parks and Protected Areas

Located directly adjacent to Turkey Point, Biscayne National Park is a national treasure and protects a large portion of the third largest barrier reef ecosystem in the world. It safeguards some of the only living coral reef in the continental United States and is home to vast biodiversity and unique habitats. The park was established "to preserve and protect for the education, inspiration, recreation, and enjoyment of present and future generations a rare combination of terrestrial, marine, and amphibious life in a tropical setting of great natural beauty."[1] Biscayne National Park covers over 172,000 acres, 95% of which is water, and has been designated an Outstanding Florida Water (OFW) under Florida law, as part of Biscayne Bay. The park supports over 600 species of fish, 200 bird species and 21 federally listed threatened or endangered species and protects the longest stretch of mangrove shoreline along the eastern seaboard of the United States. Highly valued recreation activities within Biscayne National Park include snorkeling, paddling, wildlife

---

[1] 16 U.S.C. 410gg

viewing, fishing, camping, hiking, and scuba diving. In 2017, Biscayne was visited by close to 447,000 people. These visitors spent nearly $28 million, supporting a total of 364 jobs and generating a total economic output of around $38.5 million.[2] Turkey Point is also proximate to Everglades National Park, the Biscayne Bay Aquatic Preserve, Crocodile Lake National Wildlife Refuge, and the Florida Keys National Marine Sanctuary. These natural areas offer critical protection to sensitive ecosystems, wildlife, and unique habitats, and support the local economy through recreation opportunities, tourism, and the provision of ecological goods and services. These areas must therefore be protected from any detrimental impacts arising from the operations of Turkey Point.

## Geographic Boundary

The area identified in Figures 1 and 2 of the draft NPDES permit is not specific to the facility governed by the permit. The permit is meant to govern discharges from the Turkey Point Power Plant facility, which covers an area only about half the size of what the permit refers to as "Turkey Point" in the Figures. The Figures depict FPL's property ownership beyond the Turkey Point Power Plant, including the Everglades Mitigation Bank, and in addition, includes segments of publicly owned lands (L31E canal and associated easements, SW Card Sounds Road, etc.). We request that the permit include an accurate description of the boundaries, as well as a remapped boundary to avoid implied authorization of discharge to the mitigation bank or public areas.

Authorizing discharges in the area westward of the actual power plant facility will only exacerbate the problem of the hypersaline plume. The "front" (westernmost line) of this plume of saltwater from the cooling canal system (CCS) is referred to as the interface. The interface is defined as the point where groundwater with total dissolved solids ("TDS") of 10,000 mg/L or greater intercepts groundwater with a lower chloride concentration.[3] FDEP classifies groundwater with a TDS concentration less than 10,000 mg/L as a Class G-II potable water supply and concentrations equal to or greater than that are Class G-III non-potable water.[4] In this case, the interface has been migrating westward since the 1980s and is now about four miles west of the Turkey Point facility, approaching Florida City and the City of Homestead, which are about seven miles west of the facility.[5] The plume, migrating westward at about 15 inches per day,[6] "pose[s] risks to drinking water wells for the Keys and Homestead residents and Everglades restoration projects intended to restore historic freshwater flows to Biscayne Bay."[7]

---

[2] Cullinane Thomas, C., L. Koontz, and E. Cornachione. 2018. 2017 national park visitor spending effects: Economic contributions to local communities, states, and the nation. Natural Resource Report NPS/NRSS/EQD/NRR—2018/1616. National Park Service, Fort Collins, Colorado.

[3] Recommended Order, ACI v. FPL v. FDEP, Case No. 15-1747, page 11, February 2016. Chloride is used as a measure of thee amount of salt in the water.

[4] FLA. ADMIN. CODE 62-520.410(1).

[5] June 7, 2009 memo from Janet Lewellen to Industrial Waste water Division director Mimi Drew, issue sheet.

[6] Map of the Approximate Inland Extent of Saltwater at the Base of the Biscayne Aquifer in the Model Land Area of Miami-Dade County, Florida, 2016, Scientific Investigations Map 3380, Scott Prinos, 2017. https://pubs.usgs.gov/sim/3380/sim3380_pamphlet.pdf.

[7] FDEP Issue Information 2009. Issue Information Cover Sheet, from Division of Water Resources Management to Regulatory Programs, regarding Salt Water Intrusion from the Turkey Point Plant, pdf page 4, July 7, 2009.

The groundwater beneath FPL's CCS was originally classified by FDEP as a Class G-II potable water source prior to the construction of the power plant.[8] Because of groundwater discharges of extremely high salinity, the Biscayne Aquifer—since at least 1982—experienced conditions that no longer met the Class G-II standards for a potable water source.[9] FPL made a request that was granted by FDEP to reclassify the groundwater under its property to a less restrictive Class G-III designation as non-potable water.[10] To prevent excess discharges in areas outside the actual power plant facility, and to prevent threatening and further reclassification of potable water sources, we request the boundary be remapped to accurately reflect what is authorized by this permit.

## Turkey Point's Industrial Wastewater Facility Cooling Canal System Monitoring

Turkey Point is unique among nuclear plants in the United States in that it uses a system of unlined cooling canals to cool water from plant operations. This CCS, in place for more than 40 years, consists of approximately 5,900 acres of former wetlands along the coast of Biscayne Bay and Biscayne National Park. The CCS is used to cool water from nuclear Units 3 & 4 and to dispose of wastewater from the operations of natural gas Unit 5. When the system was constructed under a 1971 consent decree, the CCS was intended to be a closed loop system. However, due to South Florida's porous limestone geology, the CCS is hydrologically connected to the underlying Biscayne Aquifer and, through the Aquifer, to surrounding surface waters.[11] Over the years, water in the CCS has become hypersaline, increasing in density and sinking into groundwater, ultimately creating an underground hypersaline plume. The plume is spreading out into the Biscayne Aquifer "at an average rate of migration to the west estimated between 525 (northern part) and 660 (southern part) feet per year,"[12] towards several wellfields that supply drinking water to the residents of the Florida Keys and southern Miami-Dade County.

The plume is also moving east, under the waters of Biscayne Bay and Biscayne National Park. Moreover, monitoring data indicates that water from the CCS is also hydrologically connected to the waters of Biscayne Bay, with CCS water moving through or under berms.[13] Pollutants from the CCS, including elevated levels of ammonia, phosphorus, TKN, total nitrogen, and chlorophyll a, have been detected in the waters of Biscayne Bay.[14] The addition of excess nutrients like ammonia and phosphorus into the nutrient-limited waters of Biscayne Bay and Biscayne National Park has the potential to stimulate algal growth,[15] which could ultimately lead to seagrass die-offs,

---

[8] Interoffice Memorandum, Bill Keats, FDEP, pdf page 1, August 12, 1983.

[9] David A. Chin, The Cooling-Canal System at the FPL Turkey Point Power Station (n.d.) (completed pursuant to Resolution No. R-517-15 adopted by the Board of County Commissioners).

[10] *Id*.

[11] Hefty, Lee, Miami-Dade Department of Environmental Resources Management, Letter to Phil Coram, Florida Department of Environmental Protection, November 26, 2014.

[12] Florida Department of Environmental Protection Administrative Order in Re: Florida Power & Light Company, Turkey Point Power Plant, FDEP State License No. PA03-45, OGC No. 14-0741, December 23, 2014.

[13] Cox, William L., U.S. Department of Interior National Park Service, Letter to James D. Giattina, U.S. Environmental Protection Agency; Jonathan P. Steverson, Florida Department of Environmental Protection; and Jack Osterholt, Miami-Dade County, May 13, 2016.

[14] Miami-Dade County Report on Biscayne Bay Water Quality Observations associated with the Turkey Point Cooling Canal System operations, March 7, 2016 Memorandum from Mayor Carlos A. Gimenez to Miami-Dade County Board of County Commissioners Chair Jean Monestime and members.

[15] Cox, William, US DOI NPS letter to EPA, DEP, MDC, May 13, 2016.

toxic algal blooms, and severe ecosystem disruption, thus presenting a serious ecological concern. In response to pollution emanating from Turkey Point's CCS, both Miami-Dade County[16] and the Florida Department of Environmental Protection[17] issued Notices of Violation to FPL for violating applicable County and State water quality standards. FPL entered into separate Consent Orders with both Miami-Dade County[18] and FDEP[19] aimed at ceasing CCS discharges into the Biscayne Aquifer and surrounding surface waters, retracting the plume to within Turkey Point property boundaries, mitigating for impacts related to CCS operation, and monitoring in order to detect additional impacts.

To ensure that water from the CCS is not contaminating Biscayne Bay, Biscayne National Park, and surrounding waterways, as required by the Consent Orders and the NPDES program, additional monitoring should be required beyond what is currently included in this draft NPDES permit. The monitoring plan included in this draft NPDES permit is insufficient to determine compliance with the NPDES permit or to characterize the quality and extent of groundwater interacting with surface water. We urge you to include additional monitoring locations targeting surface water in locations near the shoreline adjacent to Turkey Point, nearby waters of the Florida Keys National Marine Sanctuary, and at the boundaries of Outstanding Florida Waterways. Additionally, we request public access to water quality data in a usable format (i.e.: not pdf, locked, or otherwise restricted) including raw hourly, monthly, and annual reports.

Monitoring under the draft NPDES permit will produce salinity values averaged by month. Reporting the data in this way will dilute the actual values of discharges from the CCS into the surrounding water. Given that Biscayne Bay is an Outstanding Florida Water—the highest protection standard a waterbody can be afforded by the State of Florida—monitoring should be a priority to make sure an impairment in any location of the bay is quickly acknowledged and addressed. To do this, we request FDEP include additional sampling locations in this permit and disclose all constituents monitored and methods for surface water quality monitoring. Additionally, we request public access to water quality data including raw hourly, monthly, and annual reports. Finally, we request that FDEP incorporate daily thresholds for salinity and other constituents rather than monthly averages as the permit currently contemplates.

### Surface Water Discharge Ambiguity

Given that the CCS is unlined and sits atop porous limestone, it is hydrologically connected to the surface water via seepage from groundwater.[20] In 1972, the U.S. Atomic Energy Commission prepared an Environmental Impact Statement (EIS) with respect to the CCS. The EIS recognized this hydrological connection and explicitly acknowledged the potential for seepage of CCS water from the groundwater to the surface waters, including Biscayne Bay and Card Sound. The draft NPDES permit makes reference to the 1972 EIS and the potential for CCS contamination to seep

---

[16] Miami-Dade County Department of Regulatory and Economic Resources, Notice of Violation and Orders for Corrective Action, October 2, 2015.

[17] Florida Department of Environmental Protection, Notice of Violation and Orders for Corrective Action, OGC File No: 16-0241, April 25, 2016.

[18] Miami-Dade County Department of Regulatory and Economic Resources, Consent Agreement, October 7, 2015.

[19] Florida Department of Environmental Protection, Consent Order, OGC File No:16-0241, June 20, 2016.

[20] Hefty, *supra* note 2.

from groundwater to surface water but does not explicitly indicate whether or not such seepage is permitted under the conditions of this permit.[21] Instead, the permit says "to the extent that such seepage occurs, it shall not cause or contribute to a violation of the surface water quality standards in Chapter 62-302, F.A.C."

The draft NPDES permit clearly authorizes discharges of pollutants to groundwater but prohibits the discharge of pollutants from a point source to surface waters.[22] This creates some ambiguity about surface water discharges, whether or not seepage constitutes a "point source discharge," and what is covered under the conditions of the permit. By acknowledging seepage to surface waters but prohibiting point source discharges, the permit could be interpreted as authorizing other types of discharge from the CCS to surface waters (e.g. groundwater seepage).

FDEP's definition of "point source" does not appear to apply to discharges into Biscayne Bay through the groundwater via the porous limestone, which is prohibited under the current permit. Because only "point source" discharges are prohibited by the draft NPDES permit, the permit could be interpreted as allowing seepage of industrial wastewater from the CCS into the surface waters of Biscayne Bay. To further this point, the draft permit does not put effluent limitations on these discharges (i.e. discharges to surface waters via seepage through groundwater) and no requirements are included to line or otherwise confine the CCS. That is to say, the draft permit does not articulate permitted seepage direction, volume, flow, salinity or constituent levels, or provide any other guidance on what is or is not permitted with respect to seepage.

Another concern with seepage is that the draft NPDES permit allows for FPL to "freshen" the CCS as required by FDEP's Consent Order.[23] Negotiations between FPL and Miami-Dade County about terms of a partnership agreement may end in a decision to use treated wastewater for this freshening. This reused wastewater will almost certainly contain "micro-constituents" and nutrient pollutants above anti-degradation standards for Biscayne Bay. Should such an agreement be reached before the permit's renewal period, FDEP should amend this draft permit to ensure compliance with Biscayne Bay anti-degradation standards.

A final concern regarding seepage is remediation of discharges in excess of those authorized by the permit. We have concerns about how exceedances of surface water quality standards attributable to discharges by FPL will be addressed. The draft NPDES permit, as written, provides no real remedy for violations. We request that seepage be considered a permitted activity such that in the event of a permit violation, FDEP can initiate a timely enforcement action on the grounds of seepage alone. We request a specific clarification of what constitutes permissible seepage under the permit conditions, including, but not limited to, seepage volume, direction, salinity or constituent composition, or other relevant parameters. As the draft NPDES permit is currently written, the only obligations regarding seepage are ambiguous at best.[24] We request additional water sampling locations and publicly accessible monitoring data; clarification of what is truly authorized under the permit regarding discharges from seepage through groundwater to surface

---

[21] FDEP's Draft NPDES Permit. FPL Turkey Point Power Plant. Permit No: FL0001562, Page 2.
[22] FDEP's Draft NPDES Permit. FPL Turkey Point Power Plant. Permit No: FL0001562, Page 2.
[23] Florida Department of Environmental Protection, Consent Order, OGC File No:16-0241, ¶ 19, June 20, 2016.
[24] FDEP's Draft NPDES Permit. FPL Turkey Point Power Plant. Permit No: FL0001562, Page 2.

waters; language that acknowledges the need for permit amendments if the Miami-Dade County-FPL joint partnership agreement regarding use of treated wastewater for CCS freshening goes through; and clear enumeration of seepage as a permitted activity including clearly defined permit conditions with respect to seepage so as to allow timely enforcement actions by FDEP in the event of a violation.

## Sea Level Rise Impacts

Turkey Point's geographic location makes it particularly susceptible to sea level rise and storm surge impacts. The plant is situated on a low-lying peninsula, bordered by Biscayne Bay to the east and the Everglades to the west. The Turkey Point Nuclear Plant, Units 3 & 4 Subsequent License Renewal Application Environmental Report states that "[t]he ground elevation at the site is typically less than 1 foot above mean sea level."[25] The Environmental Report also notes that "the normal tide range of Biscayne Bay is about 2 feet. Natural (undeveloped) areas are inundated during high tide and can remain under 1 to 3 inches of water at low tide. Tidal flooding is a much more significant surface hydrological feature of the area than is rainfall runoff."[26] South Florida is experiencing, and expected to continue experiencing, increased rates of sea level rise, in addition to increased hurricane and flooding severity.[27] Over the last 100 years, sea level around Turkey Point has risen approximately 9-12 inches.[28] By 2100, sea level could rise between 5 and 6.75 feet according to revised projections by the U.S. Army Corps of Engineers and the National Oceanic and Atmospheric Administration.[29] Presently, FPL estimates only three quarters of a foot of sea level rise.[30]

Thus, it is reasonably foreseeable that, during the life of this permit, Biscayne Bay waters will be at or above the water levels of the CCS and may even surpass the surrounding berms in height during the predicted intensified storm surges, causing waters from the Bay and CCS to mix. As waters recede back into Biscayne Bay, there is the strong possibility that harmful contaminants

---

[25] Applicant's Environmental Report: Operating License Renewal Stage Turkey Point Units 3 & 4 Florida Power & Light Company; Docket Nos. 50-250 and 50-251 Revision 1, Page 2.2-1.

[26] Applicant's Environmental Report: Operating License Renewal Stage Turkey Point Units 3 & 4 Florida Power & Light Company; Docket Nos. 50-250 and 50-251 Revision 1, Page 2.3-1.

[27] South Florida Water Management District, Climate Change & Water Management in South Florida Interdepartmental Climate Change Group, p. 18, November 12, 2009, available at https://www.sfwmd.gov/sites/default/files/documents/climate_change_and_water_management_in_sflorida_12nov2009.pdf; Florida Ocean's and Coastal Council, Climate Change and Sea-Level Rise in Florida: An Update of the Effects of Climate Change on Florida's Ocean & Coastal Resources, December 2010, available at https://floridadep.gov/sites/default/files/Climate%20Change%20and%20Sea-Level%20Rise%20in%20Florida_1.pdf.

[28] National Parks Conservation Association's petition to intervene. South Florida Water Management District, FPL Turkey Point Units 6 & 7, Site Certification Application, First Completeness Review Comments, Exhibit 11, pp. 34-35 July 30, 2009; see Generic Environmental Impact Statement for License Renewal of Nuclear Plants, Supplement 5, Second Renewal, Regarding Subsequent License Renewal for Turkey Point Nuclear Generating Unit Nos. 3 and 4, p. 4-106, March 2019.

[29] FPL Wants to Keep Old Reactors Running. New sea-rise studies could stand in the way.; MIAMI HERALD, 1 June 2018, available at http://www.miamiherald.com/news/local/environment/article212325259.html.

[30] Generic Environmental Impact Statement for License Renewal of Nuclear Plants, Supplement 5, Second Renewal Regarding Subsequent License Renewal for Turkey Point Nuclear Generating Unit Nos. 3 and 4, p. 4-109, March 2019.

will enter the Bay. Additionally, a severe storm could cause a complete breach, or berm failure, which would lead to nutrient-enriched CCS water freely flowing into Biscayne Bay, which may lead to nutrient loading and potentially devastating algal blooms. This is relevant because this scenario would result in a point source discharge to surface waters, which is prohibited under the terms of the permit.

FPL has acknowledged the possibility of storm surges reaching these heights in its illustration titled "Conservative Probable Maximum Storm Surge Analysis Accounts for Sea Level Rise."[31] This illustration highlights the vulnerability of the berms and CCS in future projections of sea level rise and climate variations. The Nuclear Regulatory Commission considered safety concerns relating to the impacts of such storm surges in its Safety Report for Turkey Point proposed Units 6 and 7 but, to our knowledge, has not analyzed the structural integrity or fortification of the berms under such extreme conditions.

In the interest of protecting the health and integrity of our valuable natural resources, limited water supplies, and our national parks and protected places, we strongly urge you to thoroughly analyze the aforementioned environmental impacts as part of the NPDES permitting process. Thank you for your consideration of our comments.

Sincerely,

Rachel Silverstein, Ph.D.
Executive Director & Waterkeeper
Miami Waterkeeper

Caroline McLaughlin
Associate Director – Sun Coast Region
National Parks Conservation Association

---

[31] United States Nuclear Regulatory Commission Official Hearing Exhibit, Florida Power & Light Co. (Turkey Point Nuclear Generating Units 6 & 7), Docket #05200040-05200041, Exhibit #FPL-005-MA-CM01, slide 2, December 12, 2017.

Cc:
Ho Nieh, Director, Office of Nuclear Reactor Regulation, U.S. Nuclear Regulatory Commission
Eric Silagy, President and Chief Executive Officer, Florida Power & Light
Noah Valenstein, Secretary, Florida Department of Environmental Protection
Chairwoman Audrey M. Edmonson and the Miami Dade County Board of Commissioners
Mayor Carlos Gimenez, Miami-Dade County
Lee Hefty, Director Miami-Dade County Department of Environmental Resources Management
Mayor Sylvia Murphy and the Monroe County Board of Commissioners
Margaret Goodro, Superintendent, Biscayne National Park
Pedro Ramos, Superintendent, Everglades National Park
Sarah Fangman, Superintendent, Florida Keys National Marine Sanctuary
Laura Eldridge, Aquatic Preserve Manager, Biscayne Bay Aquatic Preserve

# Exhibit B



**DEPARTMENT OF THE ARMY**
**JACKSONVILLE DISTRICT CORPS OF ENGINEERS**
**4400 PGA BOULEVARD, SUITE 500**
**PALM BEACH GARDENS, FLORIDA 33410**

REPLY TO
ATTENTION OF

**August 11, 2020**

Regulatory Division
South Permits Branch
Palm Beach Gardens Permits Section

# *PUBLIC NOTICE*

Permit Application Number SAJ-2020-01739(SP-JKA)

TO WHOM IT MAY CONCERN:  The Jacksonville District of the U.S. Army Corps of Engineers (Corps) has received an application for a Department of the Army permit pursuant to Section 404 of the Clean Water Act (33 U.S.C. §1344) as described below:

APPLICANT:      Port 1850 LLC
                Attention: Shlomo Melloul
                67 N. Federal Highway
                Dania Beach, FL 33004

WATERWAY AND LOCATION:  The project would affect waters of the United States associated with 4.21 acres of tidal mangrove wetlands.  The project site is located within a 5.11 acre vacant parcel located immediately east of 1900 NE 7th Avenue, Parcel ID: 504226000021, Section 26, Township 42 South, Range 50 East, Dania Beach, Broward County, Florida.

Directions to the site are as follows:  Take Interstate 95 to Exit 26 for Interstate 595 east.  Continue straight for 1.5 miles and take NE 7th avenue toward Port Everglades/International Airport. 1900 NE 7th Street will be on the right and the project area is located immediately east, along the eastern boundary of the 1900 parcel.

APPROXIMATE CENTRAL COORDINATES:   Latitude:  26.072997°
                                    Longitude: - 80.128979°

PROJECT PURPOSE:

Basic:  Commercial Development

Overall:  Provide additional warehouse storage within Eastern Broward County Florida.

EXISTING CONDITIONS:  The wetland system consists of a 4.21 acres of tidal mangroves and 0.26 acres of tidal non-wetland waters.  The onsite vegetation consists within the 4.21 acre mangrove wetland is dominated by mature red (*Rhizophora mangle)* and black mangroves (*Avicennia germinans)* approximately 20-30 feet in height, and appear to be in overall good health.  Standing water was documented within the wetlands by a site visit conducted by Broward County Environmental Resource Management conducted May 22, 2020.  The existing area surrounding the project area

consists of tidal mangrove wetlands, with Port Everglades located east of the project area and Fort Lauderdale International Airport located west of the project area. There are some scattered commercial/industrial development scattered within the mangrove wetlands.

PROPOSED WORK: The applicant seeks authorization to place 44,107 cubic yards of fill within 4.21 acres of tidal mangrove wetlands and 0.26 acres of non-wetland waters for the construction of a new commercial warehouse.

AVOIDANCE AND MINIMIZATION INFORMATION – The applicant has provided the following statement describing their efforts to avoid and/or minimize impacts to the aquatic environment:

"Due to the nature and location of the wetlands, complete avoidance is not a viable alternative as the project would not be a financially feasible development. The existing low elevations of the site, 42.0' wide perimeter berms are required around the entire site. These required berms account for 1.76 acres of the 5.11-acre site, or ±34% of the site. Per a review of the parking and setback requirements for the proposed overall development, the overall size of the development footprint could not be reduced from the current proposed plans. For the site to be economically viable, the remaining 3.35 acres of the site is necessary to be filled and impacts cannot be avoided."

COMPENSATORY MITIGATION – The applicant has offered the following compensatory mitigation plan to offset unavoidable functional loss to the aquatic environment:

The applicant has proposed to purchase 2.4 federal tidal mangrove credits from FP&L Everglades Mitigation Bank to offset the impacts to the 4.21 acres of mangrove wetlands.

CULTURAL RESOURCES: The Corps is not aware of any known historic properties within the permit area. By copy of this public notice, the Corps is providing information for review. Our final determination relative to historic resource impacts is subject to review by and coordination with the State Historic Preservation Officer and, if applicable, those federally recognized tribes with concerns in Florida and the Permit Area.

ENDANGERED SPECIES:   The Corps has determined the proposed project may affect, but is not likely to adversely affect the Eastern indigo snake (*Drymarchon couperi*); wood stork (*Mycteria americana*). The Corps will request U.S. Fish and Wildlife Service concurrence with this determination pursuant to Section 7 of the Endangered Species Act.

The Corps has determined the proposal may affect the Florida Bonneted Bat (*Eumops floridanus)* and American Crocodile (*Crocodylus acutus*). The Corps will request

initiation of formal consultation with the Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act by separate letter.

The Corps has determined the proposal would have no effect on any other listed threatened or endangered species or designated critical habitat.

ESSENTIAL FISH HABITAT (EFH):  This notice initiates consultation with the National Marine Fisheries Service on EFH as required by the Magnuson-Stevens Fishery Conservation and Management Act 1996.  The proposal would impact approximately 4.21 acres of tidal mangrove wetlands and 0.26 acres of tidal non-wetland waters utilized by various life stages of penaeid shrimp complex, reef fish, stone crab, spiny lobster, migratory/pelagic fish, and snapper/grouper complex.  Our initial determination is that the proposed action would have a substantial adverse impact on EFH or Federally managed fisheries in the South Atlantic Region.  Our final determination relative to project impacts and the need for mitigation measures is subject to review by and coordination with the National Marine Fisheries Service.

NOTE:  This public notice is being issued based on information furnished by the applicant.  This information has not been verified or evaluated to ensure compliance with laws and regulation governing the regulatory program.  The jurisdictional line [has/has not] been verified by Corps personnel.

AUTHORIZATION FROM OTHER AGENCIES:  Water Quality Certification may be required from the Florida Department of Environmental Protection and/or one of the state Water Management Districts.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to the attention of the District Engineer through the Palm Beach Gardens Permits Section, 4400 PGA Boulevard, Suite 500, Palm Beach Gardens, Florida 33410 within 30 days from the date of this notice.

The decision whether to issue or deny this permit application will be based on the information received from this public notice and the evaluation of the probable impact to the associated wetlands.  This is based on an analysis of the applicant's avoidance and minimization efforts for the project, as well as the compensatory mitigation proposed.

QUESTIONS concerning this application should be directed to the project manager, Jerilyn Ashworth, in writing at the Palm Beach Gardens Permits Section, 4400 PGA Boulevard, Suite 500, Palm Beach Gardens, Florida 33410; by electronic mail at Jerilyn.Ashworth@usace.army.mil; or, by telephone at (561)472-3516.

IMPACT ON NATURAL RESOURCES: Coordination with U.S. Fish and Wildlife Service, Environmental Protection Agency (EPA), the National Marine Fisheries Services, and other Federal, State, and local agencies, environmental groups, and concerned citizens generally yields pertinent environmental information that is

instrumental in determining the impact the proposed action will have on the natural resources of the area.

EVALUATION: The decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered including cumulative impacts thereof; among these are conservation, economics, esthetics, general environmental concerns, wetlands, historical properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shoreline erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food, and fiber production, mineral needs, considerations of property ownership, and in general, the needs and welfare of the people. Evaluation of the impact of the activity on the public interest will also include application of the guidelines promulgated by the Administrator, EPA, under authority of Section 404(b) of the Clean Water Act or the criteria established under authority of Section 102(a) of the Marine Protection Research and Sanctuaries Act of 1972.  A permit will be granted unless its issuance is found to be contrary to the public interest.

The US Army Corps of Engineers (Corps) is soliciting comments from the public; Federal, State, and local agencies and officials; Indian Tribes; and other Interested parties in order to consider and evaluate the impacts of this proposed activity. Any comments received will be considered by the Corps to determine whether to issue, modify, condition, or deny a permit for this proposal. To make this determination, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

COASTAL ZONE MANAGEMENT CONSISTENCY: In Florida, the State approval constitutes compliance with the approved Coastal Zone Management Plan.  In Puerto Rico, a Coastal Zone Management Consistency Concurrence is required from the Puerto Rico Planning Board.  In the Virgin Islands, the Department of Planning and Natural Resources permit constitutes compliance with the Coastal Zone Management Plan.

REQUEST FOR PUBLIC HEARING: Any person may request a public hearing. The request must be submitted in writing to the District Engineer within the designated comment period of the notice and must state the specific reasons for requesting the public hearing.



NORTH

N.T.S

SUBJECT
SITE



714 East McNab Road
Pompano Beach, Florida 33060
tel. 954.782.1908
fax. 954.782.1108  www.thechappellgroup.com

- Environmental Consultants
- Marina & Wetland Permitting
- Mitigation Design & Monitoring
- T&E Species Surveys
- Phase I ESAs

NSU PORT PROPERTY

PREPARED FOR:

SHLOMO MELLOUL

LOCATION MAP

| Date: 9/12/2019 | Sheet: | of: |
|---|---|---|
| Proj No.: 14-0080.002 | 1 | 1 |

THIS DRAWING AND ALL APPURTENANT MATTER CONTAINS INFORMATION PROPRIETARY TO THE CHAPPELL GROUP, INC. AND IS LOANED SUBJECT TO RETURN UPON DEMAND AND MUST NOT BE REPRODUCED, COPIED, LOANED, REVEALED, NOR LISTED FOR ANY PURPOSE OTHER THAN THAT FOR WHICH IT IS SPECIFICALLY FURNISHED WITHOUT EXPRESSED WRITTEN CONSENT OF THE CHAPPELL GROUP, INC. © THE CHAPPELL GROUP, INC. 2019





NORTH

SCALE
1" = 60'

A

B

B

A

PROPERTY LINE

OVERGROWN

OVERGROWN

OVERGROWN

OVERGROWN

OVERGROWN

OVERGROWN

OVERGROWN

OVERGROWN

(W/ BUILDINGS OBSERVED)

(W/ BUILDINGS OBSERVED)

VACANT

THE LAKE

LEGEND

☐ SUBJECT SITE (± 5.11 ac)

▨ WETLAND IMPACT-FILL (±4.21 ac - ±40,762 yds³)

▨ SURFACE WATER IMPACT-FILL (±0.26 ac - ±3,355 yds³)

NOTES:
1. BOUNDARY AND TOPOGRAPHIC SURVEY PROVIDED BY ECS
LAND SURVEYORS, INC. SURVEY CONDUCTED 3-20-2020.
ELEVATIONS IN NAVD.
2. EXISTING WETLANDS PREVIOUSLY DELINEATED BY TCG 9-13-19
3. FILL QUANTITY (yds³) ESTIMATE FOR PERMIT PURPOSES ONLY

NSU PORT PARCEL

PREPARED FOR:
SHLOMO MELLOUL

DREDGE & FILL PLAN

Date    Sheet:
4/17/2020    2    of:    5
Proj No.:
14-0080.002

THE CHAPPELL GROUP INC

• Environmental Consultants
• Marina & Wetland Permitting
• Mitigation Design & Monitoring
• T&E Species Surveys
• Phase I ESAs

714 East McNab Road
Pompano Beach, Florida 33060
tel: 954-782-1908
fax: 954-782-1108    www.thechappellgroup.com

THIS DRAWING AND ALL APPURTENANT MATTER CONTAINS
INFORMATION PROPRIETARY TO THE CHAPPELL GROUP, INC.
MUST NOT BE REPRODUCED, COPIED, LOANED, REVEALED,
WHICH IT IS SPECIFICALLY FURNISHED WITHOUT EXPRESSED.



NORTH

SCALE
1" = 60'

A

B

B

A

PROPERTY LINE

ONE STORY WAREHOUSE
BUILDING
70,350 S.F.

S 88°06'32" W 662.69'

N 02°16'57" W 335.96'

N 89°09'06" E 689.05'

LEGEND

☐ SUBJECT SITE (± 5.11 ac)

NOTES:
1. SITE PLAN PROVIDED BY PASQUALE KURITZKY ARCHITECTURE, INC.
2. BOUNDARY AND TOPOGRAPHIC SURVEY PROVIDED BY ECS LAND SURVEYORS, INC. SURVEY CONDUCTED 3-20-2020.
ELEVATIONS IN NAVD.
3. EXISTING WETLANDS PREVIOUSLY DELINEATED BY TCG 9-13-19

NSU PORT PARCEL

PREPARED FOR:
SHLOMO MELLOUL

PROPOSED CONDITIONS

| Date: 4/17/2020 | Sheet: 3 | of: 5 |
| Proj No.: 14-0080.002 | | |

THE Chappell GROUP INC

714 East McNab Road
Pompano Beach, Florida 33060
tel 954-782-1908
fax 954-782-1108    www.thechappellgroup.com

• Environmental Consultants
• Marina & Wetland Permitting
• Mitigation Design & Monitoring
• T&E Species Surveys
• Phase I ESAs

THIS DRAWING AND ALL APPURTENANT MATTER CONTAINS INFORMATION PROPRIETARY TO THE CHAPPELL GROUP, INC.

MUST NOT BE REPRODUCED, COPIED, LOANED, REVEALED, WHICH IT IS SPECIFICALLY FURNISHED WITHOUT EXPRESSED



EXISTING CONDITIONS SECTION A-A (TYP.)
N.T.S.

PROPOSED CONDITIONS SECTION A-A (TYP.)
N.T.S.

LEGEND

EXISTING SUBSTRATE

WETLAND IMPACT-FILL (±40,752 yds³)

*NOTE FILL QUANTITY (yds³) ESTIMATE FOR PERMIT PURPOSES ONLY

NSU PORT PARCEL
PREPARED FOR:
SHLOMO MELLOUL

• Environmental Consultants
• Marine & Wetland Permitting
• Mitigation Design & Monitoring
• T&E Species Surveys
• Phase I ESAs

714 East McNab Road
Pompano Beach, Florida 33060
tel: 954-782-1908
fax: 954-782-1108    www.thechappellgroup.com

SECTIONS

Sheet:
4

of:
5

Date:
4/17/2020

Proj No.:
14-0080.002

THIS DRAWING AND ALL APPURTENANT MATTER CONTAINS
INFORMATION PROPRIETARY TO THE CHAPPELL GROUP, INC.

MUST NOT BE REPRODUCED, COPIED, LOANED, REVEALED,

WHICH IT IS SPECIFICALLY FURNISHED WITHOUT EXPRESSED



EXISTING CONDITIONS SECTION B-B (TYP.)
N.T.S.

PROPOSED CONDITIONS SECTION B-B (TYP.)
N.T.S.

**LEGEND**

EXISTING SUBSTRATE

WETLAND IMPACT-FILL (±40,752 yds³)

*NOTE FILL QUANTITY (yds³) ESTIMATE FOR PERMIT PURPOSES ONLY

**NSU PORT PARCEL**
PREPARED FOR:
SHLOMO MELLOUL

THE Chappell GROUP

• Environmental Consultants
• Marina & Wetland Permitting
• Mitigation Design & Monitoring
• T&E Species Surveys
• Phase I ESAs

714 East McNab Road
Pompano Beach, Florida 33060
tel: 954-782-1908
fax: 954-782-1109    www.thechappellgroup.com

| SECTIONS | | |
|---|---|---|
| Sheet: | of: | |
| 5 | 5 | |
| Date: 4/17/2020 | | |
| Proj No.: 14-0080.002 | | |

THIS DRAWING AND ALL APPURTENANT MATTER CONTAINS INFORMATION PROPRIETARY TO THE CHAPPELL GROUP, INC.

MUST NOT BE REPRODUCED, COPIED, LOANED, REVEALED,

WHICH IT IS SPECIFICALLY FURNISHED WITHOUT EXPRESSED

# Exhibit C



# NOAA Fisheries Coronavirus (COVID-19) Update



☐ **Menu**

Search NOAA Fisheries

Our Partners ☐

☐ Regional Fishery Management Councils

☐ Marine Fishery Advisory Committee

☐ Federal Partners

☐ State Partners

☐ Tribal Governments

☐ Non-Government Organizations

Science & Data

Resources & Services                                                                    ☐

About Us                                                                                       ☐



## Protected Status

**ESA ENDANGERED**
*U.S. Population*

**ESA ENDANGERED - FOREIGN**
*Non-U.S. Population*

**CITES APPENDIX I**
*Throughout Its Range*

**SPAW ANNEX II**
*Throughout the Wider Caribbean Region*

## Quick Facts

**WEIGHT**
2 pounds (birth) to several hundred pounds (adult)

**LIFESPAN**
Likely several decades

**LENGTH**
Up to 16 feet

**THREATS**
Habitat loss, Mortality associated with commercial and recreational fisheries gear

**REGION**
Southeast, Foreign

**See Regulatory Actions**



# About The Species

The smalltooth sawfish belongs to a group of fish called elasmobranchs that includes rays, skates, and sharks. Although shark-like in appearance, they are actually rays, as their gills and mouths are found on the underside of their bodies. Sawfish get their name from their distinct rostrum—a long, flat snout edged with teeth—that looks like a saw.

Smalltooth sawfish live in tropical seas and estuaries (semi-enclosed areas where rivers meet the sea) of the Atlantic Ocean. They are most at home in shallow, coastal waters, and sometimes enter the lower reaches of freshwater river systems. In the United States, they can be found off the coast of Florida. Smalltooth sawfish populations have declined dramatically due to habitat loss associated with coastal development and accidental capture in fisheries.

The smalltooth sawfish was the first marine fish to receive federal protection as an endangered species under the Endangered Species Act in 2003. Under the ESA, it is illegal to catch, harm, harass, or kill an endangered sawfish. However, some fishermen catch sawfish as bycatch (i.e., incidentally while fishing for other species). Safe handling and release guidelines have been developed for fishermen to learn how to respond when they incidentally capture sawfish or other protected species. Smalltooth sawfish also are listed as a migratory species threatened with extinction (Appendix I) under the United Nations Environment Programme Convention on the Conservation of Migratory Species of Wild Animals. Participating countries strive to strictly protect these animals, conserving and restoring the places where they live, and mitigating obstacles to migration.

NOAA Fisheries is committed to protecting and rebuilding the U.S. distinct population segment of smalltooth sawfish. Our scientists and partners use a variety of innovative techniques to study and protect smalltooth sawfish, as there is still much to learn about their life history and distribution. To date, we have designated critical habitat, worked with a team of scientists and management partners to develop a recovery plan and continue ongoing public outreach efforts.

## Status

There are few data about historical smalltooth sawfish numbers. Smalltooth sawfish were once found in the Gulf of Mexico from Texas to Florida and along the East Coast from Florida to North Carolina. Their distribution has decreased greatly in U.S. waters over the past century, and today, the species is only found off the coast of Florida.

## Protected Status

### ESA Endangered

*1 distinct population segment*

- U.S. Population

### ESA Endangered - Foreign

*1 distinct population segment*

Non-U.S. Population

**CITES Appendix I**

- Throughout Its Range

**SPAW Annex II**

- Throughout the Wider Caribbean Region

# Appearance

Smalltooth sawfish are olive gray to brown on top and have a white underside. Although sawfish have shark-like bodies, they are actually a type of ray. Their skeletons have no bones and are instead made of cartilage, a firm tissue more flexible than bone. They are named after their "saws" (rostra)—long, flat snouts edged with teeth. Smalltooth sawfish have 22 to 29 teeth on each side of their snout. Smalltooth sawfish look very similar to largetooth sawfish and it can be hard to tell the two species apart.

# Behavior and Diet

Smalltooth sawfish eat a variety of fish and invertebrates (e.g., shrimp and crabs). They use their rostra to slash through schools of fish, swinging it from side to side to impale and stun prey. Their rostra also contain electro-sensitive organs, which can sense the weak amount of electricity produced by other animals. These organs likely help sawfish find shrimp and crabs on the seafloor.

# Where They Live

In the United States, smalltooth sawfish are most often found off the southwest coast of Florida, from about Charlotte Harbor through the Everglades region at the southern tip of the state. Outside the United States, smalltooth sawfish have been confirmed to live in the Bahamas and Sierra Leone (a single confirmed record). However, informal reports suggest they might also be found off the coasts of Honduras, Belize, Cuba, and Guinea Bissau. Smalltooth sawfish use a variety of coastal habitats depending on life stage. During their first 2 years, juveniles live in estuaries and the smaller habitats within them, such as shallow portions of bays, lagoons, and rivers. Once they reach 7 feet, they begin moving out of the shallow estuaries into more coastal habitats. Larger juveniles and adults can be found in estuaries, off beaches, and along deep-water reefs. A number of factors, such as water temperature, water depth, shoreline vegetation, and salinity, affect how and when a particular species uses a habitat. Generally, smalltooth sawfish live in waters warmer than 64°F. Smaller sawfish tend to live in shallow water and move to deeper waters as they grow. For example, in Charlotte Harbor, Florida—an important nursery and research area for smalltooth sawfish—we've learned that juvenile sawfish have an affinity for water that's at least 70°F and less than 3 feet deep.



## Lifespan & Reproduction

Smalltooth sawfish are "yolk-sac viviparous"—their young are attached to yolk sacs that nourish the embryo inside the mother's body and emerge as fully developed pups. The pups are born with their saw fully developed, but it is very flexible and sheathed in a thick gelatinous material to avoid injuring the mother at birth (the sheath dissolves quickly thereafter). A mother smalltooth sawfish can have 7 to 14 pups per litter. Newborn sawfish are approximately 2 feet long at birth and double in size over their first year. Sawfish reach sexual maturity at around 7 years and when they've grown to about 11 feet long. The length of the female smalltooth sawfish gestation period, or pregnancy, is believed to be 12 months and females can give birth every other year.

## Threats

### Habitat Loss

Young sawfish rely on shallow estuarine habitats fringed with vegetation, especially red mangroves, as nursery areas. Development of the waterfront in Florida and other southeastern states has changed or destroyed much of this habitat. This potentially affects areas in which sawfish can give birth and juveniles can survive.

### Bycatch

Historically, sawfish were often accidentally caught in fishing nets, particularly inshore gill nets. Because sawfish have the potential to damage fishing gear and pose a threat to fishermen, they were often killed rather than being released unharmed. While this threat has largely been reduced with the 1995 enactment of the Florida Net Ban Amendment, sawfish are still incidentally caught in a variety of fishing gears today, including shrimp trawls, bottom longlines, and recreational hook-and-line gear.

## Scientific Classification

| Kingdom | Animalia |
|---------|----------|
| Phylum | Chordata |
| Class | Chondrichthyes |
| Order | Rhinopristiformes |
| Family | Pristidae |
| Genus | *Pristis* |
| Species | *pectinata* |

## What We Do

### Conservation & Management

As part of our mission, NOAA Fisheries is committed to the protection and recovery of smalltooth sawfish. Targeted management actions taken to recover this species include:

- Designating critical habitat that protects juvenile habitat.

- Reducing injury and mortality by fisheries and fishing gear.

- Minimizing human interactions and associated injury and mortality through various public outreach efforts, including safe handling and release guidelines for fishermen.

### Science

NOAA Fisheries and our partners conduct various research activities on the biology, behavior, and ecology of the smalltooth sawfish. The results of this research are used to inform management decisions and enhance recovery efforts for this endangered species. Our work includes:

- Field surveys for both juvenile and adult smalltooth sawfish.

- Satellite tagging and active acoustic tracking to monitor short-term movements.

- Passive acoustic tracking to monitor long-term, large-scale movements.

**Learn more about our conservation efforts** 

- Genetic analyses to evaluate diversity, movements, and patterns within the population.

- Population monitoring through encounter records provided by the International Sawfish Encounter Database.

**Learn more about our research** 

---

# How You Can Help



## Protect Shoreline Habitats

Three National Wildlife Refuges in Florida protect smalltooth sawfish habitat. If you visit these refuges or other shallow, coastal areas in southern Florida, remember to keep your distance from sawfish and respect their habitat.

You can also help restore coastal habitats by participating in local mangrove planting and other habitat restoration projects, and by participating in coastal clean-ups.



## Follow Sawfish Safe Handling and Release Guidelines

Under the Endangered Species Act, it is illegal to catch or harm an endangered sawfish. Because  fishermen may catch sawfish incidentally while fishing for other species, safe handling and release guidelines have been developed so they can quickly release hooked sawfish with little or no harm.



## Report Sawfish Sightings

Scientists at the Florida Fish and Wildlife Conservation Commission conduct research on smalltooth sawfish. As part of the research program, the Sawfish Survey asks fishermen, boaters, and beach-goers to report any sawfish they catch or see in the water. Call  (844) 4SAWFISH to make reports and to request information on the species. You can also make reports to sawfish@MyFWC.com or (941) 255-7403, or through the International Sawfish Encounter Database.

# Featured News



**FEATURE STORY**
## Seven Critically Endangered Sawfish Found Dead on the Side of the Road in Florida Everglades
Southeast

**FEATURE STORY**

## Florida Man Sentenced for Killing Endangered Sawfish
Southeast



**FEATURE STORY**

## Where Do They Go?! Biologists Tag Endangered Sawfish to Find Out
Southeast



**FEATURE STORY**

## Saving Endangered Sawfish

Southeast

**View More News** 

---

# Related Species

**Largetooth Sawfish**



**Dwarf Sawfish**



**Green Sawfish**



**Narrow Sawfish**



# Sign up for our newsletter

Stay informed of all the latest regional news around NOAA Fisheries

**Sign Up Now!**

**NOAA FISHERIES**

- About Us
- Laws & Policies
- FishWatch
- NOAA

**FOR RESEARCHERS**

- Published Research
- Science & Data

**CONTACT US**

- Contact Us

Department of Commerce

Media Inquiries

Site Index

Report a Violation

Report a Stranded or Injured Marine Animal

NOAA Staff Directory

**FOLLOW US**

**CAN'T FIND WHAT YOU NEED?**

**TOUR OUR SITE**

**How are we doing? Send us your feedback**



*Science. Service. Stewardship.*

Accessibility  |  EEO  |  FOIA  |  Information Quality  |  Policies & Disclaimer  |  Privacy Policy  |  USA.gov

# Exhibit D

**Endangered Species Act 5-Year Review
Johnson's Seagrass
(*Halophila johnsonii* Eiseman)**

National Oceanic and Atmospheric Administration
National Marine Fisheries Service

November 2007

# 5-Year Review
## Species Reviewed: Johnson's Seagrass (*Halophila johnsonii* Eiseman)

### Table of Contents

| | | |
|---|---|---|
| 1 | General Information | 2 |
| 2 | Review Analysis | 4 |
| 3 | Results | 27 |
| 4 | Recommendations for Future Actions | 27 |
| 5 | Tables | 28 |
| 6 | Figures | 32 |
| 7 | References | 51 |

## 5-Year Review
## Johnson's Seagrass (*Halophila johnsonii* Eiseman)

# 1. GENERAL INFORMATION

## 1.1. Reviewers

*Status Review Team*

Dr. W. Judson Kenworthy, National Oceanic and Atmospheric Administration, Center for Coastal Fisheries and Habitat Research, Beaufort, NC.

Shelley Norton, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Protected Resources Division, St. Petersburg, FL.

Stacey Harter, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Southeast Fisheries Science Center, Panama City Laboratory, FL.

J. Brooke Landry, NOAA Center for Coastal Fisheries and Habitat Research, Beaufort, NC.

*Document Peer Reviewed By*

Dr. Sandy Wyllie Echeverria, Friday Harbor Laboratories, University of Washington, Friday Harbor, WA.

Dr. Timothy Carruthers, University of Maryland, Center for Environmental Science, Cambridge, MD.

Dr. Michael Durako, University of North Carolina Wilmington, Center for Marine Science, Wilmington, NC.

Dr. Robert Virnstein, St. Johns River Water Management District, Palatka, FL.

Ms. Jennifer Kunzelman, Florida Fish and Wildlife Conservation Commission, Fish and Wildlife Research Institute, St. Petersburg, FL.

## 1.2 Methodology Used to Complete the Review

The National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration (NOAA) in conjunction with the Center for Coastal Fisheries and Habitat Research (CCFHR), of the same (NOAA), initiated a 5-year review of Johnson's Seagrass (*Halophila johnsonii* Eiseman) in September 2006. The CCFHR and NMFS solicited information from the public through Federal Register notice (71 FR 60108, October 12, 2006), as well as through personal and written communications with several educational institutions, federal and state governments, and private research organizations. To complete the review, we

2

evaluated all information that has become available on the species since 1997, the date of its last biological status review. Thus, the review is based upon the best scientific and commercial data available.

## 1.3. Background

### 1.3.1. FR notice citation announcing initiation of this review

The notice announcing the initiation of this 5-year review and requesting information from the public was published on October 12, 2006 (71 FR 60108).

### 1.3.2. Species status

The status of this species is "threatened" according to the September 14, 1998, listing.

### 1.3.3. Listing history

FR notice: 63 FR 49035
Date listed: September 14, 1998
Entity listed: *Halophila johnsonii* Eiseman
Classification: threatened

Critical habitat designation
FR notice: 65 FR 17786
Date of notice: April 5, 2000

### 1.3.4. Associated rulemakings

No associated rulemaking has occurred for this species.

### 1.3.5. Review history

***The Distribution, Abundance, and Ecology of Halophila johnsonii Eisemen in the Lower Indian River, Florida*** by W. Judson Kenworthy, Southeast Fisheries Science Center, Beaufort Laboratory, NMFS, NOAA, Beaufort, NC. Submitted to Office of Protected Resources, NMFS, NOAA, Silver Spring, MD, 1993.

***An Updated Biological Status Review and Summary of the Proceedings of a Workshop to Review the Biological Status of the Seagrass, Halophila johnsonii Eiseman*** by W. Judson Kenworthy, Southeast Fisheries Science Center Beaufort Laboratory, NMFS, NOAA, Beaufort, NC. Submitted to Office of Protected Resources, NMFS, NOAA, Silver Spring, MD, October 15, 1997.

### 1.3.6. Recovery plan or outline

National Marine Fisheries Service. 2002. Recovery Plan for Johnson's Seagrass (*Halophila johnsonii* Eiseman).  Prepared by the Johnson's Seagrass Recovery Team for the National Marine Fisheries Service, Silver Spring, MD, 120 pages.

### 1.3.7. Species recovery priority

Johnson's seagrass is assigned a recovery priority of seven, based on a moderate magnitude of threats, a low-moderate recovery potential, and the potential for economic conflict.  The moderate magnitude of threat is derived from the threats discussed in 2.3.2. The recovery potential was considered to be low-moderate, and economic conflict was considered to exist based on anticipated future in-water construction projects (i.e., dredging, dock construction, and projects that adversely modify water quality).

## 2. REVIEW ANALYSIS

### 2.1    Application of the 1996 Distinct Population Segment (DPS) policy

The Endangered Species Act of 1973 (ESA) defines species as including any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate wildlife. This definition limits listings as distinct population segments (DPS) only to vertebrate species of fish and wildlife.  Because the species under review is a plant and the DPS policy is not applicable, the application of the DPS policy to the species listing is not addressed further in this review.

### 2.2    Recovery criteria

#### 2.2.1   Does the species have a final, approved recovery plan containing objective, measurable criteria?

_X_**Yes**
____**No**

Yes, however revisions to criteria two and three should be considered to improve their clarity. Also, the plan would be improved by the addition of threats-based criteria.

#### 2.2.2   Adequacy of recovery criteria

##### 2.2.2.1 Do the recovery criteria reflect the best available and most up-to date information on the biology of the species and its habitat?

___**Yes**
_X_**No**

4

No, the recovery plan was written in 2002, and new data have since become available regarding the species, its genetics, distribution, and habitat.  In addition threats-based criteria and action to address listing factors relevant to species should be added to the recovery plan.  Criteria two and three in the recovery plan should be improved so that progress toward recovery is more measurable.

### 2.2.2.2  Are all of the 5 listing factors that are relevant to the species addressed in the recovery criteria (and is there no new information to consider regarding existing or new threats)?

_X__Yes
____No

Johnson's seagrass was listed as threatened based on a combination of the following factors, described in section 4(a)(1) of the ESA:

- !   Present or threatened destruction, modification, or curtailment of its habitat or range.
- !   Other natural or human-made factors affecting the species' continued existence.
- !   The inadequacy of existing regulatory mechanisms.

### 2.2.3. List the recovery criteria as they appear in the recovery plan, and discuss how each criterion has or has not been met, citing information

1. The species' present geographic range remains stable for at least 10 years or increases,
2. Self-sustaining populations are present throughout the range at distances less than or equal to the maximum dispersal distance to allow for stable vegetative recruitment and genetic diversity, and
3. Populations and supporting habitat in its geographic range have long-term protection (through regulatory action or purchase acquisition).

Criterion 1 has been met.  Monitoring of the northern and southern range limits indicates there have been no significant changes in the past 10 years (see discussion below on Distribution and Abundance).

The status of progress in meeting criterion 2 is still under evaluation.  The definition of self-sustaining populations needs to be clarified in the recovery plan, and the recovery plan needs to be revised to reflect the new information regarding the spatial and temporal fluctuations in *Halophila johnsonii's* distribution, abundance, and population dynamics.  Based on experimental work with clonal fragment dispersal potential, the maximum dispersal distances need to be calculated and compared to reported spatial distribution of the species to better quantify this criteria.  More research is needed to identify the correspondence between genetic diversity and factors which sustain the populations.

Criterion 3 does not appear to be met.  This criterion in particular requires significant re-evaluation to determine specific recovery actions that will help ensure the criterion is met and sustained.  See discussion in 2.3.2.4. on adequacy of existing regulatory mechanisms.

## 2.3. Updated information and current species status

### 2.3.1. Biology and habitat

The last status review for *H. johnsonii* was conducted before the species was formally listed as threatened (Kenworthy, 1997). Since that time, new information has become available on the biology, population ecology, and habitat requirements of *H. johnsonii* including clonality, growth, life history, dispersal mechanisms, population dynamics, physiological ecology, photobiology, phylogeny, genetics, and transplanting. A combination of published and unpublished studies and surveys were reviewed indicating that: 1) there has been no significant change in the overall geographic range of the species, 2) no reports of male flowers or sexual reproduction, and 3) genetic diversity is very low. Clonal growth, unique physiological attributes, and tolerance for a range of water quality conditions and UV light enables H. johnsonii to grow patchily distributed in a wide range of environments.

#### 2.3.1.1. Reproduction and clonality

Like all other seagrasses, *H. johnsonii* is clonal, which refers to plants that have many semi-independent units (ramets) acting together as a single organism (Cook, 1983). Reproduction is achieved primarily by asexual means (Fig. 1a). While all other species of seagrass reproduce sexually, there is still no evidence of sexual reproduction in *H. johnsonii*. All attempts to find seeds and seedlings have failed to detect any evidence of their occurrence (Jewitt-Smith et al., 1997; Hammerstom and Kenworthy, 2003). Likewise, despite widespread sampling and surveys throughout the entire range of the species, no male flowers have ever been reported and confirmed. Female flowers, however, have been documented in both culture and nature (Eiseman and McMillan, 1980; Heidelbaugh et al., 2000). They are common and often very abundant (Heidelbaugh et al., 2000). They have been observed throughout the entire range of the species during all times of the year, but no consistent patterns of spatial or temporal distribution have been observed or reported.

Based on morphological, anatomical, and phylogenetic information (see discussion below), *H. johnsonii* is most closely related to *Halophila ovalis,* a dioecious species which reproduces sexually (Posluszny and Tomlinson, 1990; Freshwater, 1999; Waycott et al., 2002). Based on this apparent relationship between the two species, *H. johnsonii* is presumed to be dioecious. Although male flowers have never been observed, it is not possible to completely rule out their existence and the potential for sexual reproduction. They may occur cryptically in isolation or in the vicinity of females. They may be extremely rare, or they may express themselves only at night, as was the case in a related species, *Halophila hawaiiana* (Herbert, 1986). The uncertainty regarding the existence of male flowers coincides with the fact that *H. johnsonii* seedlings have never been observed; they should not have been missed in the many benthic surveys that have been conducted throughout the species' range.

By comparison, the congeneric *Halophila decipiens* reproduces prolifically by seed and re-establishes populations annually in the same habitat as *H. johnsonii* (Kenworthy, 2000; Hammerstrom et al., 2006). Relative abundance of *H. decipiens* is nearly always an order of magnitude higher than *H. johnsonii* (Kenworthy, 2000, 1992; Virnstein et al., 1997; Virnstein

and Morris, 2007). Since rates of asexual reproduction and clonal growth rates of *H. johnsonii* and *H. decipiens* are nearly identical, the absence or rarity of sexual reproduction is likely contributing to the large difference in abundance between the two species and to the rarity of *H. johnsonii* (Kenworthy, 1992; Bolen, 1997). An important difference between the two species is that *H. johnsonii* is perennial, while *H. decipiens* behaves as an annual plant (Kenworthy, 2000).

Despite the importance of clonality and the absence or rarity of male flowers, it seems unusual that there should be so many female clones and so much energy put into the possibility of sexual reproduction. Until recently, it was unknown whether the pistillate flowers of *H. johnsonii* could produce haploid egg cells that could potentially be fertilized by males. Megagametogenesis, the process of pistil development in sexually reproducing flowering plants, is required to generate a functional haploid gametophyte for fertilization. A recent study by York (2005) demonstrated that meiosis and megagmetophyte development does occur in *H. johnsonii* and that sexual reproduction could take place in the presence of pollen. This precludes the suggestion by Eiseman and McMillan (1980) that *H. johnsonii* may reproduce by apomixis. Apomicts do not undergo meiosis and no haploid cells are formed in the ovaries. Therefore, the search for male flowers and research directed at confirming fertilization potential and viable seed formation should be a high priority in the future.

While sexual reproduction of *H. johnsonii* remains somewhat of a mystery, reproduction by asexual means and clonal growth is well understood. Asexual reproduction occurs when rhizome apical meristems divide and form new leaf pairs, flowers, or rhizome apices (Posluszny and Tomlinson, 1990) (Fig. 1a). On average, new meristems are formed on rhizomes every 2 to 4 days (Kenworthy, 1997; Bolen, 1997). The species spreads and clones expand in local space by rhizome extension and leaf pair formation, eventually forming high density "patches." Widely spaced patches, usually on the order of 1-20 square meters in size, are the most commonly encountered feature of *H. johnsonii* meadows (Virnstein et al., 1997; Kenworthy, 1997, 2000; Virnstein and Morris, 2007; Kenworthy, 2003). Patches can expand rapidly, however, increasing in area at a maximum rate of one square meter per month (Kenworthy, 2003) leading to coalescence of adjacent patches and the formation of larger meadows. To date, the largest reported contiguous meadow was observed in Lake Worth Lagoon and estimated to be 30 acres (Kenworthy, 1997).

Patches can also disappear rapidly. Sometimes they will disappear for several years and then re-establish: a process referred to as "pulsating patches" (Heidelbaugh et al., 2000; Virnstein and Morris, 2007). In the absence of sexual reproduction, one possible explanation for the pulsating patches is dispersal and re-establishment of vegetative fragments, a process which commonly occurs in aquatic plants and has been demonstrated in other seagrasses (DiCarlo et al., 2005), and was also recently confirmed by experimental mesocosm studies with *H. johnsonii* (Hall et al., 2006). *Halophila johnsonii* is a shallow rooted species and vulnerable to uprooting by wind waves, storm events, tidal currents, bioturbation, and motor vessels. It is also vulnerable to burial by sand movement and siltation (Heidelbaugh et al., 2000); all mechanisms capable of disturbing patches and creating clonal fragments for dispersal. Hall et al. (2006) showed that drifting fragments of *H. johnsonii* can remain viable for 4 to 8 days, during which time they can settle, root, and grow. Fragments could drift several kilometers under the influence of wind and tidally driven circulation, providing potential recruits for dispersal and new patch formation.

Fragments are regularly observed either drifting or entangled in drift algae, which behave like tumbleweed and can transport the fragments long distances. In the absence of sexual reproduction, these are likely to be the most common forms of dispersal and patch maintenance.

Clonal plants are, to varying extents, physiologically integrated (Magda et al., 1988). Consequently, resource-starved ramets of clonal plants may be supported by unstressed ramets (Noble and Marshall, 1983; Slade and Hutchings, 1987; Watson, 1984; Oborny et al., 2001). *Halophila johnsonii* exhibits clonal integration; however, it does not significantly modify carbon translocation to support specific ramets (Dean, 2002; Dean and Durako, In Press). Carbon sharing among *H. johnsonii* leaf pairs (ramets) in response to shading stress suggests that plants (genets) with shaded ramets do not exhibit compensatory increases in carbon per gram dry weight compared to plants with un-shaded ramets. In addition, there is no significant directionality in photosynthate allocation to ramets with respect to age or shading. Photosynthate is allocated to ramets proportional to their proximity to the source ramets rather than because of the condition of neighboring ramets, and the amount of allocation decreases rapidly with increasing distance. In short, the physiological strategy exhibited by *H. johnsonii* indicates that it makes surplus photosynthate available to all ramets, preferentially to neighboring ones, but does not selectively supply resources to stressed ramets (Dean and Durako, In Press). This is logical because the fast turnover and short-lived deterministic leaves of *H. johnsonii* may result in no advantage being gained by selectively supporting ramets based on condition or age. Strategies employed by larger seagrasses contrast with this strategy. Larger seagrasses have slower turnover rates that exhibit facultative and directional physiological support for light-stressed ramets (Tomasko and Dawes, 1989).

Observations suggest that *H. johnsonii* exploits unstable environments or newly-created unvegetated patches, with minimal resources allocated to the holding of space (the concept of pulsating patches applies here). Thus, selective support of a stressed ramet by this fast-lived plant could be disadvantageous when new growth is critical. By exhibiting fast-growth and support for all local ramets, *H. johnsonii* may exploit areas in which it could not otherwise compete. It may quickly recruit to locally uninhabited patches and through prolific lateral branching and fast horizontal growth, move out once conditions become unfavorable. While these attributes may allow *H. johnsonii* to compete effectively in periodically disturbed areas such as shallow intertidal fringes, if the distribution of this species becomes limited to stable areas it may eventually be out-competed by more stable-selected plants represented by the larger bodied seagrasses (Durako et al., 2003). In addition, coupled with this species' low capacity for storage and limited physiological integration, vegetative growth over large unsuitable patches may be unlikely, and its ability to recover from widespread habitat loss may be limited. The clonal and reproductive growth characteristics of *H. johnsonii* combine to explain its patchy, non-contiguous, and temporally fluctuating distribution.

### 2.3.1.2. Life History and Population Biology

The apparent absence of sexual reproduction suggests that the life history and maintenance of *H. johnsonii* populations is exclusively dependent on asexual reproduction and clonal growth dynamics. Growth and the occupation of space, as well as the dispersal of the species, depend on the division of apical meristems. The divisions and subsequent differentiation of meristems

(meristem dependence) into the various attributes of the ramets are the foundation of growth and productivity in all seagrasses (Tomlinson, 1974). *H. johnsonii* grows by division of apical meristems on horizontal rhizomes which branch, forming leaf pairs, female flowers, and new lateral branches (Fig.1b). Apical meristem densities can reach hundreds to thousands per square meter (Kenworthy, 1997; Heidelbaugh et al., 2000). This is orders of magnitude higher than most other larger bodied species of seagrass and provides an extraordinary vegetative growth potential. While apical meristems are producing new leaf pairs, they spread horizontally at the front or outside perimeter of a patch. At the same time, older leaf pairs and their rhizomes (either at the center of a patch, or at the rear of a migrating patch) senesce, die, and disintegrate. Even though an individual leaf pair is not motile and has a relatively short life span, the growing apex of a clone continues to move along the bottom. Therefore, at any given point in space a patch of *H. johnsonii* may or may not be constantly present. Given the reported apical densities, the rapid rhizome elongation and patch expansion rates, and the short turnover time of leaf pairs, it is not surprising that there are large spatial and temporal variations in *H. johnsonii* patch distribution and abundance.

The leaf pairs are determinate and live weeks or a few months, at most, if undisturbed, but natural mortality rates are not precisely known for either the leaves or the apical meristems which are, theoretically, immortal. The lateral branches formed on the nodes either abort, remain suppressed, or grow. Physiological and environmental processes controlling branching and growth are not well understood. Rates of node formation and branching, however, are reported to be on the order of one node every 3 to 9 days with 50% to 90% of the nodes forming lateral branches, depending on whether the node is on a primary rhizome axis or a branched rhizome (Bolen, 1997; Kenworthy, 1997; Richmond et al., 2006).

Rhizomes can elongate at rates approaching 0.5 cm * $d^{-1}$ (Bolen, 1997; Kenworthy, 1997), and when combined with prolific branching, individual patches (clones) can expand at extraordinary rates, ranging from 0.3 to 1.0 $m^{-2}$ per month (Kenworthy, 1997; 2003; Greening and Holland, 2003). Whole patch disappearance (mortality) has frequently been reported, as has patch recolonization (Heidelbaugh et al., 2000; Virnstein et al., 1997; Virnstein and Morris, 2007; Kenworthy, 2003; Greening and Holland, 2003). Mortality, or the disappearance of patches, can be caused by a number of processes, including burial from bioturbation and sediment deposition, erosion, herbivory, dessication, and turbidity. *Halophila johnsonii's* canopy is only 2-5 cm tall and may be easily covered by sediments transported during storms or redistributed by macrofaunal bioturbation during the feeding activities of benthic organisms. Mesocosm experiments indicate that clonal fragments can only survive burial for up to a period of 12 days (W.J. Kenworthy, CCFHR, NOAA, Beaufort, NC, unpublished). Therefore, any explanation for longer time intervals between patch loss and patch recolonization, years in some reports (Virnstein and Morris, 2007), must take into account other processes, including widespread vegetative dispersal of clonal fragments (Hall et al., 2006). Development of a population dynamics model incorporating all of the parameters discussed in this section is an essential requirement for obtaining a better understanding of patch dynamics and survival of *H. johnsonii*.

### 2.3.1.3. Physiological Ecology

Observations of its distribution and the results of limited experimental work suggest that *H. johnsonii* has a wider tolerance range for salinity, temperature, and optical water quality conditions than *H. decipiens* (Dawes et al., 1989; Gallegos and Kenworthy, 1996; Durako et al., 2003; Kunzelman et al., 2005; Torquemada et al., 2005). *Halophila decipiens* is more stenohaline than *H. johnsonii*. *Halophila johnsonii* has been observed growing perennially near the mouths of freshwater discharge canals (Gallegos and Kenworthy, 1996), in deeper turbid waters of the interior portion of the Indian River Lagoon (Kenworthy, 2000; Virnstein and Morris, 2007), and in clear water associated with the high energy environments and flood deltas inside ocean inlets (Kenworthy, 1993, 1997; Virnstein et al., 1997; Heidelbaugh et al., 2000; Virnstein and Morris, 2007). This species can colonize and persist in high tidal-energy environments; it has been observed where tidal velocities approach the threshold of motion for unconsolidated sediments (35-40 cm*sec$^{-1}$). Intertidal populations of *H. johnsonii* may be completely exposed at low tides, suggesting high tolerance to desiccation and wide temperature ranges.

Torquemada et al. (2005) investigated the effects of salinity, temperature, and pH variations on growth, survival, and photosynthetic rates of *H. johnsonii*. While tolerance ranges are greater than those for *H. decipiens,* growth and survival are significantly affected by salinity, with maximum growth rates and survival obtained at 30 psu, a significant reduction in both growth and survival at higher and lower salinities, and no growth (i.e., mortality) at 0 and 60 psu (Torquemada et al., 2005). Similar responses to extreme variations in salinity have been observed in several seagrasses, although the extent of the salinity-tolerance ranges do vary. Salinity variations have caused significant reductions in growth (McMillan and Moseley, 1967; Walker, 1985; Walker and McComb, 1990) and survival of seagrasses (McMillan and Moseley, 1967; Pinnerup, 1980; Wortmann et al., 1997; Vermaat et al., 2000).

Torquemada et al. (2005) also found that salinity and temperature alter photosynthetic parameters in *H. johnsonii*. The parameters of photosynthetic efficiency curves, light-saturated photosynthesis ($P_{max}$), and the photosynthetic efficiency at sub-saturating light ($\alpha$) increase significantly up to an optimum of 40 psu, decreasing again at the highest salinities. The greatest decrease in photosynthetic activity occurs in freshwater. Dark respiration rates and compensating irradiance ($I_c$) show minimum values at 40 and 50 psu, while light-saturation point ($I_k$) is maximum at $30 - 50$ psu. No effects of interactions between salinity and temperature were observed by Torquemada et al. (2005), although an increase of temperature alone was shown to produce an increase in $\alpha$, $P_{max}$, respiration rates and $I_k$. An interaction between salinity and pH occurred only in the $P_{max}$ response. In addition, reducing the pH increased $P_{max}$ and $\alpha$ significantly. There was a significant reduction in dark respiration with decreasing pH, but the opposite tendency was observed in the photosynthetic rates. Decreases in pH may lead to increased photosynthesis. Thus, recent global trends of ocean acidification and increasing $CO_2$ concentration may result in environmental conditions that are more conducive to this species (Orth et al., 2006).

While *H. johnsonii* is negatively affected by both extreme hypo- and hyper-salinity conditions, it does tolerate hypersaline conditions better than hyposaline conditions. Most other seagrasses, conversely, are thought to be more sensitive to increased salinity (Ogata and Matsui, 1965; Biebl and McRoy, 1971; Zieman, 1975; Adams and Bate, 1994; Doering and Chamberlain, 1998). The recent results of Torquemada et al. (2005) are consistent with earlier observations by Dawes et al. (1989) who observed positive responses for salinities between 15 and 35 and for temperatures between 10 and 30°C. They concluded that *H. johnsonii* showed a broader tolerance to temperature and salinity fluctuations than *H. decipiens*. The results of both studies indicate that *H. johnsonii* could be seriously affected by salinity variations produced by human activities, such as freshwater discharges through water management practices or brine discharges from seawater desalination plants. Interestingly, salinity changes do not seem to alter the tolerance of this species to other environmental factors, such as temperature or pH (Torquemada et al., 2005).

Since *H. johnsonii* grows intertidally, subtidally, and in the canopy of large bodied seagrasses, it is exposed to a range of light environments. In the subtidal environment it coexists with *H. decipiens*, making comparisons between the two species valuable. *H. johnsonii* and *H. decipiens* exhibit significant differences in photosynthetic characteristics that may, at least partially, explain the different depth distributions of these two species (Durako et al., 2003; Kunzelman et al., 2005). In situ rapid light curves (RLC) indicate that *H. decipiens* has lower maximum relative electron transport rates ($RETR_{max}$) than *H. johnsonii* (Durako et al., 2003). The relatively lower $RETR_{max}$ and $E_k$ (the irradiance where ETR is approaching maximum) and generally higher $\alpha$ (quantum efficiency) measured in situ for *H. decipiens* are in agreement with laboratory-based oxygen-flux measurements (Dawes et al., 1989). Both the oxygen and fluorescence results indicate greater photosynthetic light-efficiency, adaptation to lower irradiances, and inhibition by high irradiances for the more deeply-distributed *H. decipiens*, compared to the shallow-water *H. johnsonii*. $RETR_{max}$ values decrease for intertidal *H. johnsonii* transplanted into subtidal beds, but they increase for both species when transplanted from subtidal to intertidal beds (Durako et al., 2003).

Although photoinhibition (or, more properly, down regulation in the RLC) was evident for both *H. johnsonii* and *H. decipiens* in situ (Durako et al., 2003), the irradiance levels for the onset of down regulation were much lower for the exclusively subtidally-distributed species (537-830 # mol photons $m^{-2}$ $s^{-1}$ for *H. decipiens* versus 1785-2670 # mol photons $m^{-2}$ $s^{-1}$ for *H. johnsonii*). In a previous study using laboratory incubations, *H. johnsonii* did not exhibit photoinhibition at high light intensities, as did *H. decipiens* (Dawes et al., 1989). Within *H. johnsonii* populations, the deeper-growing subtidal plants exhibit greater down regulation than intertidal individuals.

Absorption spectra of leaf pigments (Fig. 2) reveal that *H. johnsonii* contains high levels of ultraviolet-absorbing pigments (UVPs) (Yakovleva and Titlyanov, 2001), which are characteristic of high-light adapted species (Franklin et al., 1996; Hader et al., 1998). UVP levels significantly increased within 4 days for subtidal-to-intertidal reciprocal transplants, indicating that photo-adaptation to higher UV radiation (or PAR) occurs rapidly in *H. johnsonii*, a distinct advantage enabling the plant to grow in shallow water. Absorption spectra for intertidal *H. johnsonii* acetone-soluble leaf pigments exhibited a dominant peak near 345 nm; this UV peak was 30% lower for subtidal plants. Pigment absorption spectra for *H. decipiens* lacked the 345 nm peak, and absorbances, normalized to leaf pairs, were lower across the

11

spectrum. The UVP levels in reciprocal transplants (Durako et al., 2003) also responded to decreasing irradiances in a manner similar to the patterns exhibited by other subtropical seagrasses, decreasing in response to reductions in PAR and UV (Dawson and Dennison, 1996; Detres et al., 2001). *Halophila decipiens* has generally lower Fv/Fm (photosynthetic efficiency, or potential quantum yield, Durako et al., 2003) values compared to *H. johnsonii*, and very low UVP absorbance (Fig. 2). The lack of UVPs may contribute to *H. decipiens*' high mortality when transplanted to shallow sites.

The absorption spectra for acetone extracts of *H. johnsonii* leaves exhibited a peak of 343-348 nm, which could be indicative of Mycosporin-like amino acid (MAA) or flavonoid absorption. Flavonoids are known to protect vascular plants from UV radiation and MAAs are thought to serve this same function in lower organisms (Sinha et al., 1998). MAAs have not, however, been isolated from any vascular plant. Flavonoids are the largest class of naturally occurring UV protecting compounds found in plants. The ability of flavonoids to absorb UVB light can prevent the DNA damage and photosystem damage induced by ultraviolet light (Hollosy, 2002). Anthocyanins can serve a dual purpose by providing not only UV protection to plants but also are the pigments responsible for flower color. The UVP compounds found in *H. johnsonii* are a mixture of two flavone glycosides and three flavone acetylglycosides (Krzysiak, 2006). The production of flavones by angiosperms is not unusual. In fact, flavones are abundant in the plant kingdom, but the largest flavone-containing taxon is the angiosperms (Martens and Mithofer, 2005). Futhermore, the presence of flavone compounds within the *Halophila* genus has previously been observed. Sulphated flavones have been noted in *H. ballonis, H. engelmannii, H. stipulacea,* and *H. ovalis* (McMillan et al., 1980). In addition to *H. johnsonii*, glycosylated flavones have been observed in smaller leaved members of *Halophila* (McMillan et al., 1981). In support of their photo-protection role, the production of flavonoids appears to diminish in *H. johnsonii* when it is transplanted into deeper waters (Durako et al., 2003).

Decreases in Fv/Fm at high irradiance in *H. johnsonii* are due to decreasing Fm (the maximum fluorescence for dark acclimated tissue) rather than increases in Fo (the fluorescence for dark acclimated tissue) (Durako et al., 2003). These changes are indicative of non-photochemical quenching and photo-protection and possible changes to leaf optical properties under increased PAR conditions rather than destruction of photosystem II (PSII) reaction centers (photo-inhibition), and they are consistent with the observed increase in UVPs in the subtidal-to-intertidal transplants (Dawson and Dennison, 1996; Franklin et al., 1996; Gorbunov et al., 2001; Major and Dunton, 2002).

The results of Durako et al. (2003) indicate that photosynthetic tolerance to higher irradiances and presence of UVPs in *H. johnsonii* may allow this species to exploit the shallowest waters without competition from the closely-related, but UVP-lacking, *H. decipiens*. Survival of the shallowest *H. johnsonii* populations, however, may be threatened by other perturbations associated with intertidal fringe areas such as exposure to breaking waves, desiccation at low tides (Björk et al., 1999), and shoreline development activities. While *H. decipiens* may not be able to survive intertidally, its depth range extends much deeper than the 3-4 m maximum depth of occurrence observed for the threatened *H. johnsonii* (Kenworthy, 2000; Hammerstrom et al., 2006). At the lower depth limits, turbidity and other factors affecting light attenuation, such as

increased chlorophyll, are more critical.  Thus, degradation of water quality due to human impacts, which would result in a more narrow depth range, may pose a more significant threat to *H. johnsonii* than continued increases in UV radiation.

### 2.3.1.4. Genetics and Phylogeny

Detailed molecular studies of the genetic diversity of *H. johnsonii* have used  DNA markers including: 1) Randomly Amplified Polymorphic DNA (RAPDs) (Jewitt-Smith et al., 1997; Freshwater, 1999) and, more recently, 2) Amplified Fragment Length Polymorphisms (AFLPs) (Wilson Freshwater, University of North Carolina Wilmington, Center for Marine Science, Wilmington, NC; and Michelle Waycott, James Cook University, Townesville, AU, unpublished).  Freshwater (1999) compared *H. johnsonii* and *H. decipiens* from two locations within *H. johnsonii's* geographic range and found that *H. decipiens* has much more genetic variation than *H. johnsonii* (Fig. 3a).  He demonstrated that there was little or no genetic diversity for *H. johnsonii* within or between isolated patches at Sebastian Inlet and that there was also very little diversity detected among samples taken from seven other locations, ranging from the northernmost limit of the species at Sebastian Inlet to approximately 120 km south at Boca Raton (Fig. 3b).  These findings are in contrast to the high level of RAPD banding pattern variability reported from an earlier study of *H. johnsonii* (Jewitt-Smith et al., 1997).  In the Freshwater study, RAPDs detected the most diversity at two sites, Boynton Beach and Boca Raton, in the south central range of the species.  Five unique RAPD phenotypes were recorded at these two locations and the genetic variation between phenotypes was highest at the Boynton Beach site.  Because these two southern sites may represent unique and genetically distinct semi-isolated populations, both areas were selected and designated as critical habitat in an attempt to protect as much of the known genetic variation as possible.

Studies have shown that the AFLP method detects variation at a different level than that which can be detected using RAPDs.  Since the earlier studies with RAPDs, attempts to use AFLPs have resulted in further confirmation of the relatively low genetic diversity in *H. johnsonii*.  To date, more than 1,000 AFLP loci and 25 RAPD loci have been screened in a combined analysis (Wilson Freshwater, University of North Carolina Wilmington, Center for Marine Science, Wilmington, NC, and Michelle Waycott, James Cook University, Townesville, AU, unpublished).  All show low variability compared to *H. decipiens* (an obligately sexual species-seeder); 80% of the bands of *H. decipiens* were variable and less than 25% of the bands were variable in *H. johnsonii*.  There was no clear geographic pattern to the low variability observed in *H. johnsonii*.  Using an unrooted genetic distance Neighbor Joining Tree, the combined data set suggests that there are "core" genotypes found in different locations representing a colonizing form of *H. johnsonii* (Fig. 4).  Over time, the newer colonizing forms are accumulating a small amount of variation.  This is supported by the observation of the population at Johns Island, just south of Sebastian Inlet.  On the Neighbor Joining Tree, the Johns Island site has a quite distinct genotype cluster, despite physical proximity to the other sites that were sampled.  It is hypothesized that this population is a re-colonizing population after being "lost" due to a disturbance which was documented during a concurrent study of transplanting and patch dynamics (Heidelbaugh et al., 2000).  Current data supports a single or very limited origin to the

population and subsequent vegetative recruitment, over a very long time, evidenced through the accumulation of somatic mutations (variability) and only able to be detected using high resolution genetic markers.

Phylogenetically, *H. johnsonii* is located in what is being referred to as the *H. ovalis* complex (Waycott et al., 2002; Freshwater, 2004). The DNA loci sequenced thus far include the internal transcribed spacer regions of the nuclear-encoded ribosomal RNA genes (ITS) and the chloroplast-encoded *trnL* intron, intergenic spacer regions flanking the *trnL* gene, 5' intergenic region of the *matK* gene, and *matK* intron. Freshwater's (2004) results suggest that the species with complex phyllotaxy (*H. engelmannii*) terminate multiple early diverging lineages within the genus, while all species with simple phyllotaxy (e.g., *ovalis, decipiens, johnsonii*) are resolved in a single monophyletic clade (Fig. 5). Within the clade of species with simple phyllotaxy, there appears to be three major evolutionary lineages: 1) *H. capricorni/H. decipiens*; 2) *H. stipulacea*; and 3) *H. ovalis* complex (*H. ovalis; H. australis; H. hawaiiana; H. johnsonii*, and possibly *H. minor*). The closest relative to *H. johnsonii* in this tree is an *H. ovalis* sequenced from Zanzibar. This is an indication that these lineages may have diverged over an evolutionarily short period and consequently there was not enough time for mutations to have accumulated between the two different divergence events that created the three lineages. This is one possible explanation for the overall *H. ovalis* complex as well. Freshwater postulates that what he is resolving in the *H. ovalis* complex is the relatively rapid and recent divergence of a number of different species. If this is the case, then there may not have been sufficient time for mutations to accumulate between the different lineage divergences, or for mutations to have accumulated in the particular loci sequenced, making the different lineages clearly distinct. The lack of homology between microsatellite loci in *H. ovalis* and both *H. hawaiiana* and *H. johnsonii*, as well as the large amount of variation in RAPD banding patterns found when *H. ovalis* complex taxa are compared, suggests that the *H. ovalis* complex most likely represents distinct species.

In summary, *H. johnsonii* populations sampled thus far exhibit a very low level of genetic diversity and a high degree of clonality. This is consistent with the fact that there are no reports of male flowers or evidence of sexual reproduction, a major process responsible for genetic diversity in plant populations. The sources for the small amount of variation may be a combination of: 1) a founder effect left over from the original colonizing population, 2) past sexual reproduction events if males were ever present, 3) somatic mutations, and 4) vegetative fragment dispersal of clonal diversity. Although low diversity was detected, and given the fact that entire populations disappear and reappear at time scales of months to several years, even the smallest amount of diversity may be at risk of being lost from the species. Likewise new forms of diversity can be introduced into areas by clonal fragment dispersal. These mechanisms need to be confirmed with more sophisticated and precise co-dominant genetic markers. Analysis of dates of origin of the species are now underway using molecular clock calibrations of the genetic distance data and potential dates of origin of the genetic stock (Michelle Waycott, James Cook University, Townesville, AU, study in progress). The information provided by these advanced studies of genetic diversity will be valuable for the development of conservation and management strategies for this species and should be considered in future recovery efforts.

### 2.3.1.5. Distribution and Abundance

*Halophila johnsonii* is found only in southeastern Florida from near Sebastian Inlet (27.855906°, -80.453130°) to Virginia Key (27.747142°, -80.144286°) (Fig. 6 ).  Since the last status review (Kenworthy, 1997), there have not been any reported reductions in the geographic range of the species.  Two survey programs, one in the northern range of the species, between Sebastian Inlet and Jupiter Inlet, conducted by the St. Johns River Water Management District (SJRWMD) (Virnstein and Morris, 2007) and a second, recently initiated survey in the southern range of the species between Jupiter Inlet and Biscayne Bay (Kunzelman, 2007), have confirmed previous observations of *H. johnsonii's* distribution and abundance (Kenworthy, 1997).  Recently, however, the SJRWMD observed *H. johnsonii* 3 km north of the Sebastian River mouth on the western shore of the lagoon (27.884942°, -80.502986°) – a discovery that slightly extends the species' known northern range.  *Halophila johnsonii* grows opportunistically in a patchy, disjunct distribution from the intertidal zone down to depths of approximately 3-4 meters in a wide range of sediment types, salinities, and in variable water quality conditions.

Since the listing, additional surveys funded by NMFS include a random point survey of Hobe Sound and the Jupiter Inlet designated critical habitat area, a random point survey in the region of the Indian River Lagoon that was subjected to intensive hurricanes between Sebastian Inlet and St. Lucie Inlet, and a random point survey of Biscayne Bay.  All three of these surveys employed restricted random sampling designs to assess seagrass and macroalgal abundance and all found *H. johnsonii* was present consistently in only 2%-6% of sampling locations.  In addition to these surveys, a 'data mining' project designed to obtain as much information as possible about *H. johnsonii* distribution from the records of local, county, state, and federal agencies and non-government organizations, has also been completed.

The following discussion of the species' distribution and abundance is broken into three sections.  The first section includes information resulting only from the SJRWMD transects in the Indian River Lagoon and is designated as the "Northern Range Distribution."  Data from the Hobe Sound/Jupiter Inlet random survey and the post-hurricane survey are not discussed further in any detail because analysis of the dataset is still underway.  The second section includes information primarily resulting from the recently initiated transect study between Jupiter Inlet and Biscayne Bay, but also draws from the Biscayne Bay random point survey, and is designated as the "Southern Range Distribution."  The third section discusses distribution information from the data mining project and is designated as such.

### 2.3.1.5.a. Northern Range Distribution

Since 1994, the SJRWMD has monitored 73 permanent transects in the Indian River Lagoon in both summer (June-July) and winter (January-February) (Virnstein et al., 1997; Virnstein and Morris, 2007).  Despite extensive ground-truthing since 1986 and monitoring all 73 transects throughout the Indian River Lagoon beginning in the summer of 1994 (a total of about 25,000 quadrats), *H. johnsonii* has never been found more than 3 km north of the Sebastian Inlet area.  Thirty-five of the 73 permanent SJRWMD transects are located south of Sebastian Inlet, and data from this extensive monitoring effort show that *H. johnsonii* was found at 31 of those 35 transects (between Sebastian Inlet and Jupiter Inlet) during 1994-2007.  Where it does occur, its

distribution is patchy, both spatially and temporally. It occurred in 7.1% (733 of the 10,387 quadrats derived from the 35 transects) of the 1- m$^2$ quadrats (Table 1). It was never observed at more than 23 of the 35 sites during any one season, and it was observed as infrequently as only once. At no single site was it present for all sampling periods. It frequently disappeared from transects only to reappear several months or several years later.

Along transects, *H. johnsonii* was routinely observed to be patchy, and percent cover varied along the length of the transects. It averaged only 4.3% cover over all sampling dates on the 35 transects within its range, and only 0.6% cover when averaged Lagoon-wide over all 73 transects monitored since 1994. Leaf pair density ranged up to 3,813 leaf pairs/ m$^2$ and most of the patches were smaller than 1 m$^2$, and average shoot density was 52.3 shoots/ m$^2$. These values are overestimates of the species' true relative abundance because 8 transects were located specifically in areas where *H. johnsonii* was known to be present.

*Halophila johnsonii* is a perennial species showing no consistent seasonal or year-to-year pattern in these surveys. Although perennial, it exhibited some winter decline. However, during exceptionally mild winters, as in the winter of 2004, *H. johnsonii* can maintain or even increase its abundance from summer to winter.

Although it is more commonly found in monotypic patches, *H. johnsonii* can also grow among low to moderate densities of *Halodule wrightii* and *Syringodium filiforme*, and in deeper water mixed with *H. decipiens* (Kenworthy, 1993, 1997, 2000; Virnstein et al., 1997; Virnstein and Morris, 2007). During monitoring in the northern range, *H. johnsonii* was observed to occur both in monotypic stands and mixed with other species. It co-occurred most commonly with *H. wrightii* (38% of quadrats) and *H. decipiens* (15%), rarely with *S. filiforme* or *H. engelmannii*, and never with *T. testudinum* or *R. maritima* alone. Its percent cover was not well correlated with the percent cover of any other species, the highest correlation being with *H. decipiens* (r$^2$ = 0.17).

Depth of occurrence ranged from 0.03 to 2.5 m within transects. When data from all transects were combined, there was no correlation of *H. johnsonii* abundance with depth, despite observations that at some sites *H. johnsonii* occurred in either very shallow or very deep water. However, the deep edge at some transects was only 0.1 m; at other transects, it was 2.5 m. When all depths of occurrence were standardized (as percent of maximum depth of a transect), *H. johnsonii* was more abundant in the deeper parts of the transects. Most (78% or 574 out of 733) occurrences of *H. johnsonii* were at >70% of maximum transect depth; half were at >90% of maximum depth.

Although it can grow throughout a wide depth range, it often appears to be out-competed in the mid-depth ranges by the larger canopy-forming seagrass species (e.g., *H. wrightii*). Where the larger, canopy-forming species are absent, *H. johnsonii* can grow throughout the full seagrass depth range for the Indian River Lagoon.

*Halophila johnsonii* is rare but gregarious. It occurs in a wide variety of habitat types throughout the northern range of its distribution. It was found on intertidal wave-washed sandy shoals, on the flood deltas near inlets, in deep water, in soft mud, and near the mouths of canals and rivers where presumably water quality is sometimes poor and where salinity fluctuates widely.

### 2.3.1.5.b. Southern Range Distribution

Prior to this review there was no detailed and systematic information on the distribution and abundance for most of the area in the species' southern range (Jupiter Inlet to Biscayne Bay). The 2002 survey of Biscayne Bay, the only large-scale random survey south of Jupiter Inlet, was designed specifically to provide a detailed assessment of *H. johnsonii*'s abundance and distribution near and at the southern limit (Durako, 2002), and to determine if the exact location of the southern limit at Virginia Key had changed significantly since 1974 (Eiseman and McMillan, 1980). In this study, 99 random sampling station locations and 17 additional locations where *H. johnsonii* had previously been observed were visited. *Halophila johnsonii* was only present in 6% of the random sampling stations and in only 29% of the repeat visit sites. One population was encountered south of Norris Cut (the longest record of continuous population persistence) and this location was only 0.6 km to the south and found in a small cove in Virginia Key.

In the summer of 2006, a permanent transect monitoring program was implemented in the southern half of *H. johnsonii's* distribution, and was a collaboration between NMFS and the Florida Fish and Wildlife Research Institute (FWRI). The survey was designed specifically to monitor *H. johnsonii*. Thirty sites were selected from a list of potential locations based on the following criteria: 1) Transects were implemented only where *H. johnsonii* had been observed at least once in the past (suggesting that the environmental conditions were suitable), 2) transects were to be distributed as equally by distance from north to south as possible, and 3) transect sites were preferentially selected in an effort to represent as many different habitat types as possible, though they were not necessarily represented equally.

Of the 30 sites where transects were established, 14 were located in wider areas of the lagoon, 12 were located in narrower canal locations, and 5 were located near inlets. There was a fairly even distribution among the east and west bank of the Intracoastal Waterway (ICW) and sites located on islands in the ICW. Transect sites also varied by shoreline type, including rocky shore, mangrove, rip-rap, and seawall. One transect site was also set-up in each of the designated critical habitat areas located within the southern range.

Transects were sampled in summer 2006, and again in the winter 2007. In summer 2006, *H. johnsonii* was present at 97% of the sites sampled (Fig. 7). The mean frequency of occurrence over all transects sampled was 37% and the mean Braun-Blanquet value was 0.40. *Halophila johnsonii* was only absent from one site in summer 2006. There was little difference in the species' frequency or abundance encountered between the summer and winter sampling period. The lower frequencies for *H. johnsonii* occurred at those sites where larger-bodied seagrasses like *T. testudinum* and *S. filiforme* were more abundant.

17

Neither mean abundance nor the frequency of occurrence of *H. johnsonii* varied significantly between wide lagoon sites and the narrow canal sites. And though there was a trend of higher frequency and higher abundance at inlet sites compared to others, these differences were not significant at the 95% confidence level (non parametric ANOVA equivalent). Also surprising, no significant trend was detected in the frequency or abundance of *H. johnsonii* among sites that differed by shoreline orientation (east bank of ICW, west bank of ICW, island in ICW) or shoreline type (seawall, rip-rap, sand, mangrove). No significant relationships were apparent between the physical parameters sampled and the abundance of *H. johnsonii*.

The southern range transect data support some of the conclusions drawn from previous studies and other surveys. This is a rare species; however, it can be found in relatively high abundance where it does occur. Based on the results of the southern transect sampling, it appears that although it is disjunctly distributed and patchy there is some continuity in the southern distribution, at least during periods of relatively good environmental conditions and no significant large-scale disturbances.

### 2.3.1.5.c. Data Mining Project

The Johnson's seagrass data mining project was designed to identify, collect, and compile both survey and biological data on *H. johnsonii* for the development of a GIS database to be used for tracking its distribution and abundance. The project had two objectives: 1) to catalogue and document as many known occurrences of *H. johnsonii* as possible by obtaining information from various federal, state, and county permit files, academic institutions, and environmental consulting agencies; and 2) to begin production of a detailed baseline distribution map using GIS (Hall, 2005). In addition to an exhaustive search for records of *H. johnsonii* through state and county permit files (Palm Beach County and Dade County Departments of Environmental Resource Management), the 2004 Data Mining Project compiled data from environmental consulting companies (PBS&J, Dial Cordy, and Miller Legg), as well as academic institutions and federal agencies. Most of the state, county, and federal permit files located, as well as some information received from environmental consulting agencies, contained incomplete data, particularly in regard to the exact locations of *H. johnsonii* observations. It was determined necessary to locate and visit as many of the sites as possible. One hundred and seventy-three sites were chosen for re-surveying and 167 of these sites were actually visited in November 2004. Exact coordinates, Braun-Blanquet estimations of seagrass cover, and a number of water quality parameters were recorded at each site.

The results from the data mining project (which included the data compiled from outside sources as well as data collected during the re-surveying) were combined with the updated northern transect survey data, the southern transect survey data, and all other distribution data from *H. johnsonii* studies that have taken place since the data mining project was completed. All data are illustrated in a detailed baseline distribution map for *H. johnsonii*. The 11 panels depict all of the compiled occurrences of *H. johnsonii* throughout its range to date (Figures 8-19). Please note that distribution data received from PBS&J includes their own data as well as data compiled from outside sources during a similar exercise PBS&J completed in 2000 (Gelber et al., 2000).

Any data seen on the maps labeled as "PBS&J" is data that was collected by them for the purpose of their study.  Any data seen on the maps labeled as "PBS&J Areas and Transect Lines" are data they compiled from outside sources.

Map Figures 8 – 19 will be used in future gap analyses and combined with a population dynamics model to examine the continuity of the species distribution, gap distances, and  species dispersal potential, and to evaluate what constitutes a definition of self sustaining populations for recovery criteria 2.  The maps of the Johnson's seagrass critical habitat areas are provided for illustrative purposes only.  For the precise legal definition of Johnson's seagrass critical habitat, please see the description in the final rule (65 FR 17786).

### 2.3.1.6. Habitat and Functional Value

Seagrasses have recently received increasing attention from scientists and managers because of the valuable functional roles they play in coastal ecosystems (Costanza et al., 1997; Larkum et al., 2006).  Functions associated with seagrasses include nutrient recycling, detrital production and export, sediment stabilization, and provision of food and habitat for many stages of numerous marine species.  Very little work has been done on the functional value of *H. johnsonii*, therefore, the functional roles of its closest relative, *H. ovalis*, and other *Halophila* spp. are also considered in this discussion.

The most well-known function of seagrasses is their role as habitat for numerous fishes and invertebrates.  Some species spend their entire lives within seagrass beds and others utilize it only during certain stages of their life cycle (usually the postlarval and juvenile stages).  Heidelbaugh (1999) conducted one of the only studies that examined benthic fauna associated with *H. johnsonii*.  In this study, differences in benthic fauna among *H. johnsonii, H. wrightii,* and bare sand were compared on the flood tidal delta just inside Sebastian Inlet, FL.  *Halophila johnsonii* beds yielded a total of 126 species (69 epifauna and 57 infauna), while 117 species were collected from *H. wrightii* beds and 99 species from bare sand.  The most abundant infaunal organisms belonged to Nematoda while the most abundant epifaunal species were amphipods and tanaids.  The majority of macrofaunal organisms consisted of decapod crustaceans (*Callinectes sapidus*), fishes (*Eucinostomus* sp.), and some gastropods (especially *Bursatella leachii*).  Three hundred and twenty macrofaunal organisms were collected from *H. johnsonii* beds compared to 690 from *H. wrightii* beds and 78 from bare sand.  These results reveal its resource value in that they demonstrate that *H. johnsonii* faunal communities are more ecologically similar to other seagrass species than to bare sand.

Habitat value studies have also been carried out for other species of *Halophila*.  One study compared nekton densities among *H. engelmannii*, *H. wrightii*, and nonvegetated habitats and, similar to the results of the Heidelbaugh (1999) study, found higher densities in the seagrass habitats (King and Sheridan, 2006).  Naked goby (*Gobiosoma bosci*), code goby (*Gobiosoma robustum*), bigclaw snapping shrimp (*Alpheus heterochaelis*), and blue crab (*Callinectes sapidus*) were particularly abundant in *H. engelmannii* beds.  A study in Thailand examining the community structure and abundance of benthic animals in *H. ovalis* beds found 77 different taxa including 33 annelid polychaetes, 25 mollusks, 12 arthropods, and 4 echinoderms (Nakoaka et al., 2002).  Pipefish (*Stigmatopora* spp.) were found in deeper waters (12 – 16 m) of Australia

where *H. ovalis* was present (Kendrick and Hayes, 2003). Scorched mussel (*Brachidontes exustus*), brown crown conch (*Melongena melongena*), mojarra (*Ecinostomas melanopterus*), permit (*Trachinotus falcatus*), and nurse sharks (*Ginglymostoma cirratum*) have all been found associated with *H. baillonii* beds in Belize (Short et al., 2006).

Seagrass beds are one of the primary nursery habitats because of their abundance of prey items as well as the protection they provide from predators (Zieman and Zieman, 1989; Heck et al., 2003). In Queensland, Australia, postlarval and juvenile stages of three commercially important species of prawn (*Metapenaeus bennettae, Penaeus plebejus,* and *P. esculentus*) were all found associated with seagrass beds that included *H. ovalis* (Masel and Smallwood, 2000).

Rapid growth, high turnover rates, and labile tissues make *Halophila* spp. a good source of nutrition for several marine herbivores (Kenworthy et al., 1989; Lanyon, 1991; Preen, 1995; Bolen, 1997). In areas such as Thailand and Moreton Bay, Queensland, dugongs (*Dugong dugong*) preferentially feed on *H. ovalis* (Nakaoka et al., 2002; McMahon, 2003). The Florida manatee (*Trichechus manatus latirostris*) has been observed grazing on *H. johnsonii* near a power plant in Palm Beach, FL (J. Reid, Sirennia Project, U.S.G.S., Gainesville, FL, personal observation). Green turtles (*Chelonia mydas*) are known to eat several species of *Halophila* including *H. ovalis* in the Arabian Gulf (Hasbun et al., 2000; Kannan and Rajagopalan, 2004), *H. decipiens* and *H. hawaiiana* in Hawaii (Russell et al., 2003), and *H. ovalis* in Queensland, Australia (Whiting and Miller, 1998). *Halophila* also provides nutrition for herbivorous fish. Through consumption, the stareye parrotfish (*Calotomus carolinus*) has the ability to control the abundance and distribution of short lived seagrass species such as *H. stipulacea* in Kenya (Mariani and Alcoverro, 1999). Even invertebrates such as the queen conch (*Strombus gigas*) (Thayer et al., 1984) and various species of harpacticoid copepods (Shimode and Shirayama, 2006) have been observed feeding on *Halophila* species.

Seagrasses have long been recognized for their ability to stabilize sediments. It was once assumed, however, that due to its small size and sparse biomass, *Halophila* spp. were not capable of stabilization (den Hartog, 1970). Fonseca (1989) proved this assumption incorrect using a surface-supplied, inverted seawater flume. He found the cumulative effect of *H. decipiens* in reducing sediment erosion was significantly greater than adjacent, unvegetated sand. The degree of sediment stability as compared to bare sand was equivalent to many of the larger seagrass species and was well above that of *S. filiforme*. It is hypothesized that the allocation of leaf biomass and rhizomes at the sediment-water interface is the primary physical basis for the significant sediment stabilization effects of *H. decipiens*. However, being close to the sediment surface also means that it can be buried more quickly. Therefore, even though sediment stabilization by *H. decipiens* is significant, it may only occur in a narrow range and duration of velocities relative to other larger seagrasses. The persistent presence of high density elevated patches of *H. johnsonii* on flood tidal deltas near inlets suggests that it is capable of sediment stabilization.

Seagrasses play an important role in nutrient cycling within systems and can act as both a source and sink for nutrients (Hemminga et al., 1991). Processes that lead to a loss of nutrients from the system include: exudation/leaching from living and dead plant material, export of sloughed leaves and leaf fragments, nutrient transfer by foraging animals, denitrification, and diffusion

from sediment. Processes that result in an increase of nutrients include: nitrogen-fixation, sedimentation, and nutrient uptake by leaves. It is the fluctuation of these processes that leads to interannual variations in net losses or net gains of nutrients, and, therefore, fluctuations in the productivity of seagrass meadows (Hemminga et al., 1991). Connell and Walker (2001) examined nutrient cycling associated with *H. ovalis* in the Swan-Canning estuary in Australia. They discovered that *H. ovalis* takes up and exploits nutrients from the system in the spring when external nutrient resources are in abundance. It then has the ability to store these nutrients and, when external nutrients in the water column are insufficient during the summer to support growth, translocate and utilize these stored internal resources. During these times of year, *H. ovalis* acts as sink for nutrients in the estuary. In contrast, there were large losses of *H. ovalis* biomass in the winter which provides a good source of nutrients in the estuary. The plant material then becomes nutritionally available to consumers after undergoing decomposition to either morphous particulate organic detritus or amorphous detrital aggregates (Robertson et al., 1982).

Bacteria mediate the recycling of nutrients and may be important in regulating the flow of energy from seagrass detritus to consumer organisms (Robertson et al., 1982). Studies in the Salt River Submarine Canyon at St. Croix, U.S. Virgin Islands show that *H. decipiens* is an important source of organic matter and detritus for the Canyon (Josselyn et al., 1983; Josselyn et al., 1986; Kenworthy et al., 1989). Despite its production being less than other seagrasses, *H. decipiens* has a fast turnover time and is a major source of primary production on the floor of the Canyon (Kenworthy et al., 1989). Disturbance and burial of plant material are important mechanisms influencing the disposition of organic matter (Williams et al., 1985; Josselyn et al., 1986). Burial of *H. decipiens* through wave action and animal activities increases the rate of detrital input and retains the detritus within the Canyon (Kenworthy et al., 1989).

Given the similarities between the morphology of other *Halophila* spp. and *H. johnsonii*, it is reasonable to assume that *H. johnsonii* has the same capabilities as these other species to provide important ecological functions and services to the coastal ecosystem of southeastern Florida. Conservation of *H. johnsonii* will not only maintain the diversity of the seagrass communities, but also the important biodiversity and biophysical characteristics of the entire ecosystem.

### 2.3.2. Five Factor Analysis:

#### 2.3.2.1. Present or threatened destruction, modification or curtailment of its habitat or range:

With the exception of trampling, all of the threats to the species identified in the original listing are still present. These include dredging and filling, siltation, shoreline construction and modification, prop scarring, altered water quality, and storm events. According to survey reports, the present geographic range of the southern and northern limits of the species has been stable for at least 10 years. The species distribution throughout its geographic range is extremely rare, patchy, disjunct, and temporally fluctuating. Temporal fluctuations suggest that self-sustaining populations are maintained by a complex process of patch dynamics and dispersal, but the factors influencing patch dynamics on temporal and spatial scales which maintain self sustaining populations are still not well understood; especially with regard to dispersal,

recruitment, and the role of genetic diversity. There are still no male flowers reported and genetic diversity is very low. The absence of sexual reproduction, patchy discontinuous growth, low genetic diversity, and its small size make the isolated populations vulnerable to stochastic events and natural and anthropogenic disturbances. Although the trend analysis for the northern range of the species suggests that the populations are relatively stable and resilient to natural perturbations, there is insufficient monitoring data for the southern range to fully assess the status and trend of self sustaining populations and the species overall in at least 50% of its distribution.

**Trampling**
Originally, trampling was considered a threat but since the last status review there has been no evidence presented to support this activity as a serious threat to the species.

**Dredging and Filling; Siltation; and Construction**
Sediment resuspension, and siltation associated with coastal construction activities and filling negatively affect seagrass by decreasing water transparency, physically burying plants, and modifying tidal current flow such that the plants experience excessive currents beyond their threshold for erosion. Dredging also may increase water depth such that the benthic plant communities are unable to receive enough light to sustain net primary productivity and growth. The Army Corp of Engineers (COE) has federal authority over the issuance of dredge and fill permits. The COE's State (Florida) Programmatic General Permit Program (SPGP) authorizes permits for the construction of docks, boat ramps, piers, maintenance dredging, and the construction of other minor over-water structures. The SPGP has seen an increase in the number of permits authorized between 2000 and 2006 (based on data provided by the COE), except for periods when the U.S. Fish and Wildlife Service (FWS) was involved in litigation over the manatee (*Trichechus manatus latirostris*). Based on the continued increase in permits issued within the range of *H. johnsonii*, we believe dredge and fill, siltation associated with dredging and coastal construction activities, and shading and physical impacts from in- and over-water structures associated with SPGP permitted activities have increased and continue to be a threat.

**Prop Scarring**
Prop scarring and propeller dredging are one of the most severe injuries seagrasses experience because they disturb the sediments and uproot seagrasses, damaging the leaves and the root/rhizome systems, as well as the apical meristems which are responsible for the growth and maintenance of a seagrass meadow. *Halophila johnsonii* is especially vulnerable to these disturbances because it is so shallow rooted. In 2000, there were 131,759 vessels registered within the range of *H. johnsonii* between Indian River County and Miami-Dade County, Florida (http://www.hsmv.state.fl.us/dmv/vslfacts.html). In 2006, the DMV registered 200,187 vessels, an increase of 52% in 6 years. We expect these numbers will continue to increase based on Florida's projected population growth of 18 million in 2006 to 25 million in 2025 (www.propertytaxreform.state.fl/docs/eo06141.pdf). This projected increase in the population will likely lead to an increase in the number of registered vessels and therefore an increase in impacts caused by prop scarring, anchoring, and other associated motor vessel related impacts such as dock construction and maintenance, marina expansion, inlet maintenance dredging, and erosion and sediment resuspension from boat wakes.

**Altered Water Quality**

Turbidity (suspended solids), color, nutrients and chlorophyll are water quality constituents which affect the penetration of light in coastal waters and are major factors controlling the distribution and abundance of seagrasses (Dennison et al., 1993; Kenworthy and Haunert, 1991; Kenworthy and Fonseca, 1996). Most of the increased color and turbidity values in *H. johnsonii's* range are being delivered by high flows of fresh water discharged from water management canals, which also reduce the salinity of the lagoon. Turbidity and nutrients are also derived from wastewater and stormwater discharges, as well as from land runoff and subterranean sources. Storm events, such as hurricanes, and variations in climate (wet seasons vs. dry seasons and wet years vs. dry years) both affect water quality and the potential for impacts from stochastically driven events. Unless they are curtailed by water management and land use practices that curb or eliminate discharges and minimize inputs of sediments and nutrients into the lagoon, it is expected that many unfavorable water quality parameters have the potential to increase in concentration corresponding with future population growth and land use practices.

Based on a Trophic State Index (TSI) of ambient water quality obtained in the northern and central region of the *H. johnsonii* geographic range provided in a long-term monitoring program implemented by the St. Johns River Water Management District, overall estuarine water quality was assessed as mostly good (67%) (Winkler and Ceric, 2006). Only 28% of the stations sampled had fair water quality, while 6% had poor quality. Fifty percent of the sampled estuarine sites were improving, while 6% were degrading, so many more sites were improving than were degrading. Forty-two percent of the lagoon sites had an insignificant trend while 3% had insufficient data to determine a trend. There is a strong positive correlation between seagrass depth distribution and water quality which enables managers to predict where seagrasses will grow based on water quality and the availability of light. As water management experts have now become confident in the correspondence between water quality and seagrass depth distribution, they have begun establishing water quality targets for the Indian River Lagoon based on seagrass as an indicator (Steward et al., 2005). Given that at least half of the stations were indicating long-term improvements in water quality, it can be assumed that seagrass abundance should not be negatively impacted if water and land use management programs continue to be effective. For example, carefully controlling or reducing water flows from discharge canals will moderate salinity fluctuations and reduce turbidity, color, and light attenuation values. However, there may be localized degradation near urbanized sites with multiple water quality problems that are more difficult to manage, such as the vicinity of the St. Lucie Inlet where the discharges from Lake Okeechobee have had significant impacts on water quality and seagrasses (Becky Robbins, South Florida Water Management District, West Palm Beach, FL, personal communication).

There has not been a comprehensive assessment of water quality published or reported for the southern range of *H. johnsonii* similar to the SJRWMD study. However, personal communication with water quality experts at the South Florida Water Management District (SFWMD) (Dan Crean, SFWMD, West Palm Beach, FL) confirm that efforts are underway to synthesize water quality information and to gain a more comprehensive understanding of the long-term status and trends of water quality in *H. johnsonii's* southern range. Of particular

concern is an assessment of the impacts of fluctuations in water quality corresponding with variation in climate, especially "wet years" versus "dry years" variation. Future recovery efforts should include close coordination with the SFWMD and county environmental management agencies in Palm Beach and Dade counties to evaluate the status and trends of water quality in these regions of the species distribution.

**Storms**

Storms, especially tropical storms and hurricanes, can significantly affect estuarine water quality (Steward et al., 2006) and are thus a potential threat to *H. johnsonii*. However, while hurricanes can generate runoff conditions that decrease water quality (e.g., increase turbidity and color), they also produce conditions (wind setup and abrupt water elevation changes) that can increase flushing rates. Thus, the effects of storms can be complex. Between August 14 and September 26, 2004, four tropical storm systems (Charley, Frances, Ivan, and Jeanne) impacted the central Indian River Lagoon. The lagoon received between 72 and 83 cm of rainfall during a 2 month period which generated high stream and canal discharges, wind driven suspended sediments, and significantly reduced salinities and water transparency. In September, salinities in the central Indian River Lagoon segments where *H. johnsonii* occurred dropped from 30 psu or more to 15 psu, color increased from a low of 10 pcu to 100 pcu, and turbidity increased from 3 NTU up to 14 NTU. Evidence of the hurricanes' physical effects on seagrasses (burial, no scour) was limited to just one of the more than 25 sites inspected. Within 2 to 3 months following the hurricane period, most parameters related to water transparency returned to or showed improvement over their pre-hurricane values (February–July 2004). Unseasonably low salinities (20 psu) and moderately high color (20 pcu) were observed through spring 2005, largely attributable to a relatively long residence time and a wetter-than-average spring season in 2005. By the end of the study period (July 2006), the central Indian River Lagoon showed two opposite seagrass trends that began before 2004: an increase in depth limit coverage, but a decline in coverage density. Also, within a limited reach of the central Indian River Lagoon, *R. maritima* increased as *H. wrightii* decreased. It is likely that the persistently low salinities (not color) in 2004–2005 affected the species composition and coverage density. The authors (Steward et al., 2006) concluded that seagrasses are resilient to the acute effects of hurricanes and underscored the need to reduce chronic anthropogenic effects on seagrasses. Furthermore, the post-hurricane random survey in the region of the Indian River Lagoon affected by the four hurricanes indicated the presence of *H. johnsonii* was similar to that reported by the SJRWM district transect surveys prior to the storms. While the species may disappear initially, it returns quickly (Virnstein and Morris, 2007). We expect that hurricanes and other storm events will continue to be a potential threat for the species, but it is uncertain as to whether the frequency and strength of storms will increase and what long-term impacts this can have on *H. johnsonii*. It does appear, however, that *H. johnsonii* is resilient to potential hurricane impacts observed thus far.

In summary, the threats consisting of present or threatened destruction, modification, or curtailment of its range, identified for *H. johnsonii* at the time of listing still exist today and we do not foresee an elimination of the threats.

### 2.3.2.2. Overutilization for commercial, recreational, scientific, or educational purposes:

Not applicable.

### 2.3.2.3. Disease or predation

Although disease has been reported to affect other species of seagrass there are no documented reports of disease that would threaten the geographic range, abundance, and survival of the species by affecting dispersal, recruitment, or genetic diversity. Although herbivory is documented, predation pressure (herbivory) is still not considered a significant threat to the species.

### 2.3.2.4. Inadequacy of existing regulatory mechanisms

It is unclear whether or not existing regulatory mechanisms are adequate because there are no quantitative and comprehensive data bases and programs to track and assess the effects of all local, state, and federal regulatory actions. Federal, state, and local laws, regulations, and conservation management plans provide for the protection and conservation of seagrasses and their habitats. The Fish and Wildlife Coordination Act (FWCA) and the National Estuary Program are just two of the federal conservation measures that protect seagrasses and their habitats. The FWCA provides the basic authority for United States Fish and Wildlife Service (FWS) and NMFS involvement in evaluating proposed water resource development projects. The FWS and NMFS coordinate and consult with various federal agencies to avoid, minimize, and mitigate impacts to seagrasses and their habitats from water development projects. The state of Florida's Environmental Resource Permit (ERP) program regulates dredging, filling, and construction activities in wetlands and other surface waters. The ERP program is designed to ensure that alteration of uplands, wetlands, or surface waters does not degrade water quality, cause flooding, or diminish habitat quality or quantity. Seagrasses are also specifically identified as essential fish habitat (EFH) pursuant to the Magnuson-Stevens Fishery Management and Conservation Act, and are incorporated into fisheries management plans which the South Atlantic Fisheries Management Council, NMFS, and the state of Florida use to manage and conserve fisheries habitat.

The ESA is currently the only law that provides specific protection for *H. johnsonii*. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend are conserved, to provide a program for the conservation of such endangered and threatened species, and to take such appropriate steps to achieve the purposes of the treaties and conventions set forth in subsection (a) of section 2 of the Act." Section 7 of the ESA requires federal agencies to consult with NMFS and FWS to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the existence of any endangered or threatened species or result in destruction or adverse modification of critical habitat. Plants, and especially threatened plants, are not afforded the same level of protection as fish or other wildlife species listed under the ESA (e.g., compare sections 9(a)(1) and 9(a)(2) of the ESA). In addition, no quantitative methods have been developed to assess extinction risk for use in the ESA section 7 context.

The major problem in assessing the effectiveness of regulatory measures is the fact that there are no quantitative and comprehensive programs which compile and track regulatory activities in a manner that can be used to assess the status and trends of impacts and the success of the required

mitigation projects for seagrasses in general, including *H. johnsonii*.  Although these federal and state conservation measures are in place to protect and conserve seagrasses and their habitats, losses of seagrasses and their habitats are still being reported (Orth et al., 2006) and their long-term effects for the species are not fully understood.  Methods should be developed to fully quantify the effectiveness of the existing regulatory measures to determine their relevance in regard to the species status.

### 2.3.2.5. Other natural or manmade factors affecting its continued existence

Comprehensive range-wide surveys of *H. johnsonii* suggest that it has a limited capacity to co-exist with other larger bodied seagrasses.  This suggests that natural and manmade factors which affect the distribution and abundance of *T. testudinum, H. wrightii* and *S. filiforme* could also influence the distribution, abundance, and existence of *H. johnsonii* populations.  Thus, regulatory and conservation measures intended to promote other seagrass species could have a direct effect on *H. johnsonii*.

At the time of the last status review and the formal listing, no consideration was given to global climate change or sea level rise.  Since then, there has been considerable scientific, political, and public discussions about the potential impacts of climate change and sea level rise on coastal marine environments and seagrasses which have not been incorporated into the recovery plan.  Recent scientific information suggests that these topics and their application to seagrass conservation and management should be addressed.  Once the effects of climate change are evaluated, the agency can determine the relevance of this factor on the species status.

## 2.4. Synthesis

There has been no significant change in the northern or southern range limits of *H. johnsonii*.  It continues to have the most limited geographic distribution of any seagrass in the world.  The species distribution is rare, patchy, and disjunct throughout its range, and it has very low genetic diversity.  No male flowers have ever been reported, and there is no evidence of sexual reproduction.  However, female flowers are common and morphologically and physiologically capable of being fertilized if male pollen was available.  It appears that populations are maintained exclusively by a complex process of vegetative fragmentation and dispersal.  Populations disappear and reappear on both short- (months) and long-term (years) time scales.  Factors influencing the process of population maintenance and dispersal are still not well understood and a population dynamics model coupling biology, ecology, and environmental factors affecting growth, reproduction, and mortality is needed in order to better understand how self sustaining populations are maintained.

Presently, it appears that the populations in the northern range of the species (Sebastian Inlet to Jupiter Inlet) are stable and capable of sustaining themselves despite stochastic events related to severe storms and fluctuating climatology.  Longer-term monitoring data are needed to confirm the stability of the southern distribution of the species from Jupiter Inlet to Biscayne Bay.  This comprehensive monitoring program is now underway and should be supported in the future.

There have not been any significant changes in regulatory actions or conservation measures in the past 5 years; however, there are no comprehensive databases available to assess whether conservation and regulatory actions are adequately protecting the species.

Based on our review, we conclude that *H. johnsonii* remains vulnerable to natural and anthropogenic factors and the species still meets the definition of "threatened" under the ESA because it is still likely to become an endangered species within the foreseeable future throughout its range. With the exception of trampling, all of the threats to the species identified in the original listing are still impacting the species' status. These include dredging and filling, shoreline construction and modification, prop scarring, altered water quality, siltation, and storm events. There has been no improvement in the species' status in terms of its risk of extinction since its listing. Finally, no state or local efforts to protect Johnson's seagrass are ameliorating the impacts and threats to the species, even given Florida's rigorous permitting program regarding projects that impact seagrasses generally. Florida has not listed or otherwise identified Johnson's seagrass for specific protections.

We believe our review has complied with the statutory requirement of section 4 (c) (2) of the ESA.

## 3. RESULTS

### 3.1. Recommended classification
    **____** Downlist to Threatened
    ____ Uplist to Endangered
    ____ Delist (indicate reasons for delisting per 50 CFR 424.11):
        ___ Extinction
        ___ Recovery
        ___ Original data for classification in error
  _X__ No change is needed

### 3.2. New Recovery Priority Number __7__

**If applicable, indicate the Listing and Reclassification Priority Number (FWS only)**

Reclassification (from Threatened to Endangered) Priority Number: ____
Reclassification (from Endangered to Threatened) Priority Number: ____
Delisting (removal from list regardless of current classification) Priority Number: ___

## 4. RECOMMENDATIONS FOR FUTURE ACTIONS

Many of the "Actions Needed" identified in the recovery plan on page IX have either been initiated or completed. Future research related actions should include: 1) continuing long-term monitoring in the southern range of the species distribution; 2) continuing development of a spatially articulated population model for evaluating patch dynamics, dispersal distances, and habitat requirements of self sustaining populations; 3) continuing experimental studies to gain a better understanding of the interactions between *H. johnsonii* and other seagrasses and evaluate

how the interactions may be affected by water management, regulatory actions, and land use practices in the species range; 4) continuing research to verify the potential for sexual reproduction in *H. johnsonii;* 5) continuing studies to further examine the genetic diversity of *H. johnsonii* and the implications of diversity indices for long-term conservation and management of the species; and 6) continuing experimental studies to evaluate seagrass transplantation as a tool to assist in the relocation and restoration of *H. johnsonii* populations.

In addition to the research needs, future actions should include a comprehensive evaluation of the existing regulatory mechanisms directly or indirectly applicable to *H. johnsonii*.  Efforts should be directed toward coordinating with local, state, and federal agencies to develop a quantitative database to be used to assess how various regulatory actions (e.g., permitting overwater structures, regulating water discharges, and effectiveness of stormwater controls) are affecting the distribution and abundance of *H. johnsonii*.  In conjunction with these activities, the Johnson's Seagrass Implementation Team should evaluate if management practices and techniques are adequately protecting *H. johnsonii* habitat.

Recovery Criteria 1 has been achieved; however, the Johnson's Seagrass Implementation Team should re-evaluate Recovery Criteria 2 and Criteria 3 to determine if they warrant revisions and if any new information suggests alternative criteria are more appropriate.  Threats based criteria should be added to the Recovery Plan.

The Team should consider actions to develop an outreach program to better inform private and public sectors of the status of *H. johnsonii* and the required actions needed for long-term conservation of the species.  Such actions can include an up-to-date Web page on the status of *H. johnsonii* available to the public and private sectors.

## 5.    TABLES

**Table 1.**  Total number of sites and quadrats with *Halophila johnsonii* (*Hj*) from 1994 to 2007.  The average percent cover is calculated as the average of all sites within *H. johnsonii*'s range (not the seasonal average). Bottom panel shows summary of summer-winter comparisons of frequency of occurrence at transect sites and within quadrats from transects within *H. johnsonii*'s range from 1994-2007 (# = number of transects or quadrats with *H. johnsonii* present and **n** = total sample size).

| SEASON / YEAR | Total sites with *Hj* (out of 35) | Total quadrats sampled | Total quadrats with *Hj* | Average % cover | % Occurrence of *Hj* within quadrats |
|---|---|---|---|---|---|
| Summer 1994 | 12 | 460 | 31 | 3.8 | 6.7 |
| Winter 1995 | 7 | 419 | 8 | 1.0 | 1.9 |
| Summer 1995 | 7 | 399 | 9 | 1.0 | 2.3 |
| Winter 1996 | 4 | 348 | 5 | 0.2 | 1.4 |
| Summer 1996 | 9 | 490 | 17 | 3.3 | 3.5 |
| Winter 1997 | 10 | 487 | 29 | 4.4 | 6.0 |
| Summer 1997 | 15 | 529 | 56 | 4.7 | 10.6 |
| Winter 1998 | 15 | 525 | 30 | 4.1 | 5.7 |

| SEASON / YEAR | Total sites with *Hj* (out of 35) | Total quadrats sampled | Total quadrats with *Hj* | Average % cover | % Occurrence of *Hj* within quadrats |
|---|---|---|---|---|---|
| Summer 1998 | 16 | 543 | 58 | 8.2 | 10.7 |
| Winter 1999 | 9 | 525 | 26 | 2.3 | 5.0 |
| Summer 1999 | 10 | 483 | 38 | 1.5 | 7.9 |
| Winter 2000 | 7 | 429 | 19 | 1.4 | 4.4 |
| Summer 2000 | 14 | 504 | 42 | 3.6 | 8.2 |
| Winter 2001 | 9 | 441 | 29 | 3.3 | 6.6 |
| Summer 2001 | 14 | 519 | 29 | 5.1 | 5.6 |
| Winter 2002 | 11 | 410 | 25 | 4.1 | 6.1 |
| Summer 2002 | 12 | 457 | 32 | 1.8 | 7.0 |
| Winter 2003 | 8 | 69 | 13 | 7.9 | 18.8 |
| Summer 2003 | 14 | 483 | 47 | 3.8 | 9.7 |
| Winter 2004 | 11 | 70 | 19 | 12.8 | 27.1 |
| **SEASON / YEAR** | **Total sites with *Hj* (out of 35)** | **Total quadrats sampled** | **Total quadrats with *Hj*** | **Average % cover** | **% Occurrence of *Hj* within quadrats** |
| Summer 2004 | 23 | 513 | 82 | 7.4 | 16.0 |
| Winter 2005 | 1 | 65 | 1 | 0.9 | 1.5 |
| Summer 2005 | 10 | 458 | 21 | 3.0 | 4.6 |
| Winter 2006 | 5 | 109 | 7 | 3.9 | 6.4 |
| Summer 2006 | 14 | 513 | 45 | 6.0 | 8.8 |
| Winter 2007 | 9 | 139 | 15 | 9.3 | 10.8 |
| **SUMMARY** | **276** of 910 | **10,387** | **733** | **4.3** | **7.1** |

| PARAMETER | SUMMER | | | WINTER | | |
|---|---|---|---|---|---|---|
| | # | n | % | # | n | % |
| Transects with *H. johnsonii* | 170 | 455 | 37.4 | 106 | 455 | 23.3 |
| Quadrats with *H. johnsonii* | 507 | 6,351 | 8.0 | 226 | 4,036 | 5.6 |

**Table 2.** Summary of surveys and studies included in the baseline distribution map shown in Figures 8 through 19.

| ORGANIZATION AND PROJECT | AS SEEN ON LEGENDS IN FIGURES 8-19 | SURVEY METHOD and YEAR |
|---|---|---|
| National Oceanic and Atmospheric Administration and Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute - Hobe Sound and Jupiter Island Study performed to develop monitoring methodology for *H. johnsonii*. | NOAA-FWRI(Hobe Sound/Jupiter Is) | Random quadrat sampling using Braun-Blanquet to measure seagrass cover (2003) |
| National Oceanic and Atmospheric Administration and Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute - Indian River Lagoon Survey | NOAA-FWRI (Northern Random) | Random quadrat sampling using Braun-Blanquet to measure seagrass cover (2005) |
| National Oceanic and Atmospheric Administration and Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute - Southern Range Monitoring Project (Southern Transects) | NOAA-FWRI (Southern Transects) | Permanent transects using Braun-Blanquet to measure seagrass cover in quadrats (2006-2007) |
| National Oceanic and Atmospheric Administration – Study to evaluate the impact of overwater structure on underlying *H. johnsonii* | NOAA Dock Study | Survey using Braun-Blanquet to measure seagrass cover in quadrats along transect (2007) |
| National Oceanic and Atmospheric Administration and Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute - Jupiter Inlet Survey performed to develop monitoring methodology for *H. johnsonii*. | NOAA-FWRI (Jupiter Inlet) | Random quadrat sampling using Braun-Blanquet to measure seagrass cover (2003) |
| Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute - Compiled site surveys from data mining project. | FWRI compiled site surveys | Quadrat sampling (Compiled in 2006 with some data from previous years) |
| University of North Carolina Wilmington and Florida Fish and Wildlife Conservation Commission / Fish and Wildlife Research Institute – Detailed survey and assessment of the baseline distribution of *H. johnsonii* at its southern distributional limit. | UNCW-FWRI | Random quadrat sampling using Braun-Blanquet to measure seagrass cover (2003) |

**Table 2. Continued.**

| ORGANIZATION AND PROJECT | AS SEEN ON LEGENDS IN FIGURES 8-19 | SURVEY METHOD and YEAR |
|---|---|---|
| St. Johns River Water Management District – Distribution and abundance of *H. johnsonii* in the Indian River Lagoon | SJRWMD Transects | Permanent transect sampling using percent cover to measure seagrass (1994-2007) |
| Post, Buckley, Schuh & Jernigan, Inc. – Survey to determine the distributional ecology of *H. johnsonii* in areas not previously inspected. | PBS&J | Transect surveys (2000) |
| Post, Buckley, Schuh & Jernigan, Inc. – Distribution data compiled for the purpose of the report titled "The distributional ecology of the seagrass *Halophila johnsonii.*" Distribution data was received from St. Johns River Water Management District, South Florida Water Management District, Wildpine Ecological Laboratory, Florida Department of Environmental Protection, Florida Fish and Wildlife Conservation Commission, the U.S. Army Corps of Engineers, and the Broward County Department of Planning and Environmental Protection. | PBS&J Areas and Transect Lines | Method and Year both vary |
| Miller Legg and Associates, Inc. – Seagrass surveys around Spoil Island 15 near the Ft. Pierce Inlet North Causeway Bridge to establish appropriate location for placement of barges, at Ft. Pierce Bridge as a feasibility study for the Florida Department of Transportation, and in West Lake Park to document SAV changes after mitigation improvements. | Miller Legg | Site Inspection (2002, 2003, and 2001 respectively) |
| Dial Cordy and Associates, Inc. – Seagrass surveys in areas of proposed dredging including: Palm Beach County Small Navigation Project, Port Everglades Dredge, and Miami Harbor Navigation Project. | Dial Cordy | Site Inspection (2004, 2001, and 2003, respectively) |
| Wildpine Ecological Laboratory, Loxahatchee River District – These include an evaluation of seagrass communities in the southernmost reach of the Indian River Lagoon and a collaborative study with the SFWMD to map seagrass in the central embayment of the Loxahatchee River. | Wildpine Ecol Lab - Loxahatchee River | Transect survey with percent composition recorded (2000) and area perimeter survey measuring density (2004), respectively |
| Palm Beach County Department of Environmental Resource Management – Represents several studies/surveys conducted by PBD-DERM or contracted out to various laboratories or consulting agencies. | PBC-DERM | Seagrass surveys, methods vary (1999 – 2004) |
| Palm Beach County Department of Environmental Resource Management – City of Lake Worth Lagoon Restoration Project | City of Lake Worth Lagoon Wetland Restoration | Site Inspection (1999) |

31

## 6. FIGURES



**Figure 1a.** *Halophila johnsonii*. Leaves are generally 2-5 cm long. Adopted from Eiseman and McMillan (1980).



**Figure 1b.** Photograph of *Halophila johnsonii* showing the genet and individual ramets, the rhizome, a female flower, fruit, nodes, and lateral branching of rhizome.



**Figure 2.** *Halophila johnsonii* (Hjon) and *Halophila decipiens* (Hdec). Mean absorption spectra of 90% acetone leaf extracts for a) intertidal Hjon, b) subtidal Hjon, and c) subtidal Hdec populations at Jupiter Inlet (JI, n=8) and Biscayne Bay (BB, n=4). S and D following name abbreviations indicate shallow or deep populations.



**Figure 3a.** Pie diagram showing the proportion of RAPD phenotypes found in *Halophila decipiens* and *Halophila johnsonii* samples from two sites. More genetic variation detected in *H. decipiens* than in *H. johnsonii*



**Figure 3b.** Pie diagram showing the proportion of RAPD phenotypes for *Halophila johnsonii* samples from sites throughout its geographic range. RAPDs detect only a small amount of variation.



**Figure 4.** An unrooted genetic distance Neighbor Joining Tree by MichelleWaycott, James Cook University, Townesville, AU. (unpublished). The combined data set suggests that there are 'core' genotypes found in seven different locations representing a colonizing form of *H. johnsonii*. See pp. 12 of text for discussion.



**Figure 5.** Maximum likelihood tree resulting from analyses of chloroplast-encoded *trnL* region sequences.  The level of bootstrap support in maximum likelihood (M), parsimony (P), and distance (D) analyses are shown for resolved branches. See pp. 22 of text for discussion.



**Figure 6.** Geographic range of *Halophila johnsonii*: Sebastian Inlet to northern Virginia Key (Kenworthy 1997).



**Figure 7.** Frequency of occurrence for each of the seven seagrass species by transect station from northernmost (HJ1) to southernmost (HJ111) in Summer 2006 and winter 2007. Note that station HJ101 was added in the winter 2007 sampling.



**Figure 8.** *Halophila johnsonii* distribution map 1. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 9.** *Halophila johnsonii* distribution map 2. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 10.** *Halophila johnsonii* distribution map 3. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 11.** *Halophila johnsonii* distribution map 4. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 12.** *Halophila johnsonii* distribution map 5.  Symbols indicate confirmed presence of *H. johnsonii*.  See Table 2 for further information about surveys.



**Figure 13.** *Halophila johnsonii* distribution map 5b. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 14.** *Halophila johnsonii* distribution map 6. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 15.** *Halophila johnsonii* distribution map 7. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 16.** *Halophila johnsonii* distribution map 8. Symbols indicate confirmed presence of *H. johnsonii.* See Table 2 for further information about surveys.



**Figure 17.** *Halophila johnsonii* distribution map 9. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.



**Figure 18.** *Halophila johnsonii* distribution map 10. Symbols indicate confirmed presence of *H. johnsonii*.  See Table 2 for further information about surveys.



**Figure 19.** *Halophila johnsonii* distribution map 11. Symbols indicate confirmed presence of *H. johnsonii*. See Table 2 for further information about surveys.

## 7. REFERENCES

Adams, J.B., Bate, G.C., 1994. The ecological implications of tolerance to salinity by *Ruppia cirrhosa* (Petagna) Grande and *Zostera capensis* Setchell. Botanica Marina 37, 449-456.

Biebl, R., McRoy, C.P., 1971. Plasmatic resistance and rate of respiration and photosynthesis of *Zostera marina* at different salinities and temperatures. Journal of Marine Biology 8, 48-56.

Björk, M., Uku, J., Weil, A., Beer, S., 1999. Photosynthetic tolerances to dessication of tropical intertidal seagrasses. Marine Ecology Progress Series 191, 121-126.

Bolen, L.E., 1997, Growth dynamics of the seagrass *Halophila johnsonii* from a subtropical estuarine lagoon in southeastern Florida, USA. Master of Science, Florida Atlantic University, 65 pp.

Connell, E.L., Walker, D.I., 2001. Nutrient cycling associated with the seagrass *Halophila ovalis* in the Swan-Canning Estuary based on seasonal variations in biomass and tissue nutrients. Hydrological Processes 15, 2401-2409.

Cook, R.E., 1983. Clonal Plant Populations. American Scientist 71, 244-253.

Costanza, R., D'Arge, R., deGroot, R., Farber, S., Grasso, M., Hannon, B., Limburg, K., Naeem, S., O'Neill, R.V., Parvelo, J., Raskin, R.G., Sutton, P., van den Belt, M., 1997. The value of the world's ecosystem services and natural capital. Nature 387, 253-260.

Dawes, C.J., Lobban, C.S., Tomasko, D.A., 1989. A comparison of the physiological ecology of the seagrasses *Halophila decipiens* Ostenfeld and *H. johnsonii* Eiseman from Florida. Aquatic Botany 33, 149-154.

Dawson, S.P., Dennison, W.C., 1996. Effects of ultraviolet and photosynthetically active radiation on five seagrasses. Marine Biology 125, 629-638.

Dean, R.J., 2002. Clonal integration in the threatened seagrass: *Halophila johnsonii* Eiseman. Master of Science, University of North Carolina Wilmington, 57 pp.

Dean, R.J., Durako, M.J., In Press. Physiological integration in the threatened seagrass: *Halophila johnsonii* Eiseman. Bulletin of Marine Science.

den Hartog, D.C., 1970. The seagrasses of the world. North-Holland, Amsterdam.

Dennison, W.C., Orth, R.J., Moore, K.A., Stevenson, J.C., Carter, V., Kollar, S., Bergstrom, P.W., Batiuk, R.A., 1993. Assessing water quality with submersed aquatic vegetation. BioScience 43, 86-94.

Detres, Y., Armstrong, R.A., Connelly, X.M., 2001. Ultraviolet-induced responses in two species of climax tropical marine macrophytes. Journal of Photochemistry and Photobiology. B, Biology 62, 55-66.

DiCarlo, G., Badalamenti, F., Jensen, A.C., Koch, E.W., Riggio, S., 2005. Colonisation process of vegetative fragments of *Posidonia oceanica* (L.) Delile on rubble mounds. Marine Biology 147, 1261-1270.

Doering, P.H., Chamberlain, R.H., 1998. Experimental studies in the salinity tolerance of turtle grass, *Thalassia testudinum.* Workshop on subtropical and tropical seagrass management ecology; responses to environmental stress. Fort Meyers, FL.

Durako, M.J., 2002. Detailed survey and assessment of the baseline distribution of *Halophila johnsonii* at its southern distributional limit. UNCW # 5-50195. Prepared for National Marine Fisheries Service, St. Petersburg, FL.

Durako, M.J., Kunzelman, J.I., Kenworthy, W.J., Hammerstrom, K.K., 2003. Depth-related variability in the photobiology of two populations of *Halophila johnsonii* and *Halophila decipiens.* Marine Biology 142, 1219-1228.

Eiseman, N.J., McMillan, C., 1980. A new species of seagrass, *Halophila johnsonii*, from the Atlantic coast of Florida. Aquatic Botany 9, 15-19.

Fonseca, M.S., 1989. Sediment stabilization by *Halophila decipiens* in comparison to other seagrasses. Estuarine, Coastal, and Shelf Science 29, 501-507.

Franklin, L.A., Seaton, G.G.R., Lovelock, C.E., Larkum, A.W.D., 1996. Photoinhibition of photosynthesis on a coral reef. Plant, Cell and Environment 19, 825-836.

Freshwater, D.W., 1999. Determination of genetic diversity in the threatened species *Halophila johnsonii* Eiseman. Report prepared for the Johnson's Seagrass Recovery Team, 8 pp.

Freshwater, D.W., 2004. "Analyses of genotypic and phylogenetic relationships of *Halophila johnsonii*" and "Preliminary testing of AFLPs for detecting genets of *Halophila johnsonii*". Prepared for the Johnson's Seagrass Implementation Team, 45 pp.

Gallegos, C.L., Kenworthy, W.J., 1996. Seagrass depth limits in the Indian River Lagoon (Florida, USA): Application of the optical water quality model. Estuarine Coastal Shelf Science 42, 267-288.

Gelber, A., Deis, D., Precht, W.F., 2000. The distributional ecology of the seagrass *Halophila johnsonii*: Sebastian Inlet to Biscayne Bay. Prepared for the Florida Department of Transportation. PBS&J, Miami, FL. 18 pp.

Gorbunov, M.Y., Kolber, Z.S., Lesser, M.P., Falkowski, P.G., 2001. Photosynthesis and photoprotection in symbiotic corals. Limnology and Oceanography 46, 75-85.

Greening, H., Holland, N., 2003. Johnson's seagrass (*Halophila johnsonii*) monitoring workshop. Summary report prepared for the Johnson's Implementation Recovery Team. 14 pp.

Hader, D.P., Lebert, M., Figueroa, F.L., Jimenez, C., ViZegla, B., Perez-Rodriguez, E., 1998. Photoinhibition in Mediterranian macroalgae by solar radiation measured on site by PAM fluorescence. Aquatic Botany 61, 225-236.

Hall, F., 2005. Johnson's seagrass data mining project. Summary report prepared for the Johnson's Seagrass Recovery Team. Florida Fish and Wildlife Conservation Commission, Fish and Wildlife Research Institute, St. Petersburg, FL. 27 pp.

Hall, L.M., Hanisak, M.D., Virnstein, R.W., 2006. Fragments of the seagrasses *Halodule wrightii* and *Halophila johnsonii* as potential recruits in Indian River Lagoon, Florida. Marine Ecology Progress Series 310, 109-117.

Hammerstom, K.K., Kenworthy, W.J., 2003. Investigating the existence of a *Halophila johnsonii* sediment seed bank. Report prepared for the Johnson's Seagrass Implementation Team. 19 pp.

Hammerstrom, K.K., Kenworthy, W.J., Fonseca, M.S., Whitfield, P.E., 2006. Seed bank, biomass, and productivity of *Halophila decipiens*, a deep water seagrass on the west Florida continental shelf. Aquatic Botany 84, 110-120.

Hasbun, C.R., Lawrence, A.J., Samour, J.H., Al-Ghais, S.M., 2000. Preliminary observations on the biology of green turtle, *Chelonia mydas*, from the United Arab Emirates. Aquatic Conservation: Marine and Freshwater Ecosystems 10, 311-322.

Heck, K.L., Hays, G., Orth, R.J., 2003. Critical evaluation of the nursery role hypothesis for seagrass meadows. Marine Ecology Progress Series 253, 123-136.

Heidelbaugh, W.S., 1999. Determination of the ecological role of the seagrass *Halophila johnsonii*; a threatened species in southeast Florida. Ph.D., Florida Institute of Technology, Melbourne, FL, 127 pp.

Heidelbaugh, W.S., Hall, L.M., Kenworthy, W.J., Whitfield, P.E., Virnstein, R.W., Morris, L.J., Hanisak, M.D., 2000. Reciprocal transplanting of the threatened seagrass *Halophila johnsonii* (Johnson's seagrass) in the Indian River Lagoon, Florida. In: Bortone, S.A. (Eds.), Seagrasses: Monitoring, Ecology, Physiology, and Management. CRC Press. Boca Raton, FL, 197-210.

Hemminga, M.A., Harrison, P.G., van Lent, F., 1991. The balance of nutrient losses and gains in seagrass meadows. Marine Ecology Progress Series 71, 85-96.

Herbert, D.A., 1986. Staminate flowers of *Halophila hawaiiana*: Description and notes on its flowering ecology. Aquatic Botany 25, 97-102.

Hollosy, F., 2002. Effects of ultraviolet radiation on plant cells. Micron 33, 179-197.

Jewitt-Smith, J., McMillan, C., Kenworthy, W.J., Bird, K.T., 1997. Flowering and genetic banding patterns of *Halophila johnsonii* and conspecifics. Aquatic Botany 59, 323-331.

Josselyn, M.N., Calliet, G.M., Nieson, T.M., Cowen, R., Hurley, A.C., Conner, J., Hawes, S., 1983. Composition, export and faunal utilization of drift vegetation in the Salt River Submarine Canyon. Estuarine, Coastal and Shelf Science 17, 447-465.

Josselyn, M.N., Fonseca, M.S., Niesen, T., Larson, R., 1986. Biomass, production and decomposition of a deep water seagrass, *Halophila decipiens* Ostenf. Aquatic Botany 25, 47-61.

Kannan, P., Rajagopalan, M., 2004. Role of marine macrophytes as feed for green turtle *Chelonia mydas*. Seaweed Research and Utilization 26, 187-192.

Kendrick, A.J., Hayes, G.A., 2003. Patterns in the abundance and size-distribution of sygnathid fishes among habitats in a seagrass-dominated marine environment. Estuarine, Coastal and Shelf Science 57, 631-640.

Kenworthy, W.J., 1992. Protecting fish and wildlife habitat through an understanding of the minimum light requirements of sub-tropical seagrasses of the southeastern United States and Caribbean Basin. Ph.D., North Carolina State University, 75 pp.

Kenworthy, W.J., 1993. The distribution, abundance, and ecology of *Halophila johnsonii* Eisemen in the lower Indian River, Florida. NMFS, Silver Spring, MD, 66 pp.

Kenworthy, W.J., 1997. An Updated Biological Status Review and Summary of the Proceedings of a Workshop to Review the Biological Status of the Seagrass *Halophila johnsonii* Eiseman. Southeast Fisheries Science Center, NMFS, NOAA, Beaufort, NC, 23 pp.

Kenworthy, W.J., 2000. The role of sexual reproduction in maintaining populations of *Halophila decipiens*: implications for the biodiversity and conservation of tropical seagrass ecosystems. Pacific Conservation Biology 5, 260-268.

Kenworthy, W.J., 2003. Proceedings of the Johnson's Seagrass Monitoring Workshop. Johnson's Seagrass Monitoring Workshop, St. Petersburg, FL.

Kenworthy, W.J., Currin, C.A., Fonseca, M.S., Smith, G., 1989. Production, decomposition, and heterotrophic utilization of the seagrass *Halophila decipiens* in a submarine canyon. Marine Ecology Progress Series 51, 277-290.

Kenworthy, W.J., Fonseca, M.S., 1996. Light requirements of seagrasses *Halodule wrightii* and *Syringodium filiforme* derived from the relationship between diffuse light attenuation and maximum depth distribution. Estuaries 19, 740-750.

Kenworthy, W.J., Haunert, D.E., 1991. The light requirements of seagrasses: proceedings of a workshop to examine the capability of water quality criteria, standards, and monitoring programs to protect seagrasses. NOAA Technical Memorandum NMFS-SEFC-287.

King, S.P., Sheridan, P., 2006. Nekton of new seagrass habitats colonizing a subsided salt marsh in Galveston Bay, Texas. Estuaries 29, 286-296.

Krzysiak, A.J., 2006. The isolation and characterization of natural products from marine plants and microorganisms. Master of Science, University of North Carolina Wilmington, 68 pp.

Kunzelman, J.I., 2007. Southern range, permanent transect implementation, summer sampling 2006. Report prepared for the Johnson's Seagrass Recovery Team. Florida Fish and Wildlife Conservation Commission, St. Petersburg, Florida, 23 pp.

Kunzelman, J.I., Durako, M.J., Kenworthy, W.J., Stapleton, A., Wright, J.L.C., 2005. Irradiance-induced changes in the photobiology of *Halophila johnsonii*. Marine Biology 148, 241-250.

Lanyon, J., 1991. The nutritional ecology of the dugong (*Dugong dugong*) in tropical north Queensland. Ph.D., Monash University, Victoria, Australia, 337 pp.

Larkum, A.W.D., Orth, R.J., Duarte, C.M., 2006. Seagrasses: Biology, Ecology and Conservation. Springer, Dordrecht, The Netherlands.

Magda, D., Warembourg, F.R., Labeyrie, V., 1988. Physiological integration among ramets of *Lathyrus sylvestris* L. Translocation of assimilates. Oecologia 77, 255-260.

Major, K.M., Dunton, K.H., 2002. Variations in light-harvesting characteristics of the seagrass, *Thalassia testudinum*: evidence for photoacclimation. Journal of Experimental Marine Biology and Ecology 275, 173-189.

Mariani, S., Alcoverro, T., 1999. A multiple-choice feeding-preference experiment utilizing seagrasses with a natural population of herbivorous fishes. Marine Ecology Progress Series 198, 195-199.

Martens, S., Mithofer, A., 2005. Flavones and flavone synthases. Phytochemistry 66, 2399-2407.

Masel, J.M., Smallwood, D.G., 2000. Habitat usage by postlarval and juvenile prawns in Moreton Bay, Queensland, Australia. Proceedings of the Royal Society of Queensland 109, 107-117.

McMahon, K., 2003. Population dynamics of *Halophila ovalis* after dugong grazing in a dynamic subtropical ecosystem. Gulf of Mexico Science 21, 122.

McMillan, C., Moseley, F.N., 1967. Salinity tolerances of five marine spermatophytes of Redfish Bay, Texas. Ecology 48, 503-506.

McMillan, C., Williams, S., Escobar, L., Zapata, O., 1981. Isozymes, secondary compounds and experimental cultures of Australian seagrasses in *Halophila, Halodule, Zostera, Amphibolis*, and *Posidonia*. Australian Journal of Botany 29, 247-260.

McMillan, C., Zapata, O., Escobar, L., 1980. Sulphonated phenolic compounds in seagrasses. Aquatic Botany 8, 267-278.

Nakaoka, M., Mukai, H., Chunhabundit, S., 2002. Impacts of dugong foraging on benthic animal communities in a Thailand seagrass bed. Ecological Research 17, 625-638.

Noble, J.C., Marshall, C., 1983. The population biology of plants with clonal growth. II. The nutrient strategy and modular physiology of *Carex arenaria*. Journal of Ecology 71, 865-877.

Oborny, B., Czaran, T., Kun, A., 2001. Exploration and exploitation of resource patches by clonal growth: a spatial model on the effect of transport between modules. Ecological Modelling 141, 151-169.

Ogata, E., Matsui, T., 1965. Photosynthesis in several marine plants of Japan as affected by salinity, drying and pH, with attention to their growth habits. Botanica Marina 8, 199-217.

Orth, R.J., Carruthers, T.J.B., Dennison, W.C., Duarte, C.M., Fourqurean, J.W., Heck, K.L., Hughes, A.R., Kendrick, G.A., Kenworthy, W.J., Olyarnik, S., Short, F.T., Waycott, M., Williams, S.L., 2006. A global crisis for seagrass ecosystems. BioScience 56, 987-996.

Pinnerup, S.P., 1980. Leaf production of *Zostera marina* L. at different salinities. Ophelia 1, 219-224.

Posluszny, U., Tomlinson, P.B., 1990. Shoot organization in the seagrass *Halophila* (Hydrocharitaceae). Canadian Journal of Botany 69, 1600-1615.

Preen, T., 1995. Impacts of dugong foraging on seagrass habitats: observational and experimental evidence for cultivation grazing. Marine Ecology Progress Series 124, 201-213.

Richmond, C.E., Hammerstrom, K.K., Kenworthy, W.J., 2006. Development of a stage-based population model for predicting Johnson's seagrass responses to environmental and anthropogenic stressors: Final Report to the Johnson's Seagrass Implementation Team, 6 pp.

Robertson, M., Mills, A.L., Zieman, J.C., 1982. Microbian synthesis of detritus-like particles from dissolved organic carbon released by tropical seagrasses. Marine Ecology Progress Series 7, 279-285.

Russell, D.J., Balazs, G.H., Phillips, R.C., Kam, A.K.H., 2003. Discovery of the seagrass *Halophila decipiens* (Hydrocharitaceae) in the diet of the Hawaiian green turtle *Chelonia mydas*. Pacific Science 57, 393-397.

Shimode, S., Shirayama, Y., 2006. Diel vertical migration and life strategies of two phytal-dwelling harpacticoids, *Ambunguipes rufocincta* and *Eudactylops spectabilis*. Plankton and Benthos Research 1, 42-53.

Short, F.T., Fernandez, E., Vernon, A., Gaeckle, J.L., 2006. Occurrence of *Halophila baillonii* meadows in Belize, Central America. Aquatic Botany 85, 249-251.

Sinha, R.P., Klisch, M., Groniger, A., Hader, D.P., 1998. Ultraviolet-absorbing/screening substances in cyanobacteria, phytoplankton, and macroalgae. Journal of Photochemistry and Photobiology. B, Biology 47, 83-94.

Slade, A.J., Hutchings, M.J., 1987. Clonal integration and plasticity in foraging behavior in *Glechoma hederacea*. Journal of Ecology 75, 1023-1036.

Steward, J.S., Virnstein, R.W., Lasi, M.A., Morris, L.J., Miller, J.D., Hall, L.M., Tweedale, W.A., 2006. The impacts of the 2004 hurricanes on hydrology, water quality, and seagrass in the Central Indian River Lagoon, Florida. Estuaries and Coasts 29, 954-965.

Steward, J.S., Virnstein, R.W., Morris, L.J., Lowe, E.F., 2005. Setting seagrass depth, coverage, and light targets for the Indian River Lagoon, Florida. Estuaries 28, 923-935.

Thayer, G.W., Bjorndal, K.A., Ogden, J.C., Williams, S.L., Zieman, J.C., 1984. Role of larger herbivores in seagrass communities. Estuaries 7, 351-376.

Tomasko, D.A., Dawes, C.J., 1989. Evidence for physiological integration between shaded and unshaded short shoots of *Thalassia testudinum*. Marine Ecology Progress Series 54, 299-305.

Tomlinson, P.B., 1974. Vegetative morphology and meristem dependence - the foundation of productivity in seagrasses. Aquaculture 4, 107-130.

Torquemada, Y.F., Durako, M.J., Lizaso, J.L.S., 2005. Effects of salinity and possible interactions with temperature and pH on growth and photosynthesis of *Halophila johnsonii* Eiseman. Marine Biology 148, 251-260.

Vermaat, J.E., Verhagen, F.C.A., Lindenburg, D., 2000. Contrasting responses in two populations of *Zostera noltii* Hornem. to experimental photoperiod manipulation at two salinities. Aquatic Botany 67, 179-189.

Virnstein, R.W., Morris, L.J., 2007. Distribution and abundance of *Halophila johnsonii* in the Indian River Lagoon: an update. Technical Memorandum # 51. St. Johns River Water Management District, Palatka, Florida, 16 pp.

Virnstein, R.W., Morris, L.J., Miller, J.D., Miller-Myers, R., 1997. Distribution and abundance of *Halophila johnsonii* in the Indian River Lagoon. Technical Memorandum # 24. St. Johns River Water Management District, Palatka, Florida, 14 pp.

Walker, D.I., 1985. Correlations between salinity and growth of the seagrass *Amphibolis antarctica* (Labill.) Sonder & Aschers., in Shark Bay, Western Australia, using a new method for measuring production rate. Aquatic Botany 23, 13-26.

Walker, D.I., McComb, A.J., 1990. Salinity response of the seagrass *Amphibolis antarctica* (Labill.) Sonder & Aschers.: an experimental validation of field results. Aquatic Botany 36, 359-366.

Watson, M.A., 1984. Developmental constraints: Effect on population growth and patterns of resource allocation in a clonal plant. The American Naturalist 123, 411-426.

Waycott, M.D., Freshwater, W., York, R.A., Calladine, A., Kenworthy, W.J., 2002. Evolutionary trends in the seagrass genus *Halophila* (Thouars): insights from molecular phylogeny. Bulletin of Marine Science 7, 1299-1308.

Whiting, S.D., Miller, J.D., 1998. Short term foraging ranges of adult green turtles (*Chelonia mydas*). Journal of Herpetology 32, 330-337.

Williams, S.L., Breda, V.A., Anderson, T.W., Nyden, B.B., 1985. Growth and sediment disturbances of *Caulerpa* sp. (Chlorophyta) in a submarine canyon. Marine Ecology Progress Series 21, 275-281.

Winkler, S., Ceric, A., 2006. 2004 Status and trends in water quality at selected sites in the St. Johns River Water Management District., St. Johns River Water Management District, Technical Publication SJ2006-6, Palatka, FL, 106 pp.

Wortmann, J., Hearne, J.W., Adams, J.B., 1997. A mathematical model of an estuarine seagrass. Ecological Modelling 98, 137-149.

Yakovleva, I.M., Titlyanov, E.A., 2001. Effect of high visible and UV irradiance on subtidal *Chondrus crispus*: stress, photoinhibition and protective mechanisms. Aquatic Botany 71, 47-61.

York, R.S. 2005. Megagametogenesis and Nuclear DNA Content Estimation in *Halophila* (Hydrocaritaceae). A Thesis Submitted to theUniversity of North Carolina Wilmington in Partial Fulfillment of the Requirements for the Degree of Master of Science. Department of Biology and Marine Biology, University of North Carolina Wilmington, Wilmington, NC. 40 pp.Zieman, J.C., 1975. Seasonal variation of turtle grass, *Thalassia testudinum* Konig, with reference to temperature and salinity effects. Aquatic Botany 1, 107-123.

Zieman, J.C., Zieman, R.T., 1989. The ecology of the seagrass meadows of the west coast of Florida: a community profile. U.S. Fish and Wildlife Service Biological Report 85 (7.25). 155 p

NATIONAL MARINE FISHERIES SERVICE
5-YEAR REVIEW
*Halophila johnsonii* Eiseman

**Current Classification:** Threatened

**Recommendation resulting from the 5-Year Review**

_____ Downlist to Threatened
_____ Uplist to Endangered
_____ Delist
__X_ No change is needed

**Review Conducted By:**

W. Judson Kenworthy, National Oceanic and Atmospheric Administration, Center for Coastal Fisheries and Habitat Research, Beaufort, NC.

Shelley Norton, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Protected Resources Division, St. Petersburg, FL.

Stacey Harter, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Southeast Fisheries Science Center, Panama City Laboratory, FL

J. Brooke Landry, National Oceanic and Atmospheric Administration Center for Coastal Fisheries and Habitat Research, Beaufort, NC.

**REGIONAL OFFICE APPROVAL:**

**Regional Administrator, NOAA Fisheries Service**

Approve: _____ Date: 11/5/07

**HEADQUARTERS APPROVAL:**

**Assistant Administrator for Fisheries**

_✓_ Concur        Do Not Concur

Signature _____ Date 11/27/02

# Exhibit E

# Seagrasses

| | |
|---|---|
| **FNAI Global Rank:** | **G2** |
| **FNAI State Rank:** | **S2** |
| **Federally Listed Species in S. FL:** | **11** |
| **State Listed Species in S. FL:** | **26** |

**Turtle grass (*Thalassia testudinum*)** *Photograph courtesy of Florida Department of Environmental*



Seagrasses are submerged vascular plants that can form dense vegetative communities in shallow water estuaries. Though not true grasses, these grass-like plants are termed "seagrasses" because they grow in highly variable salinity environments. Seagrasses are unique in that they carry out their entire life cycle completely submerged in salt water. Worldwide, there are more than 50 species capable of inhabiting this submerged environment, a relatively small number compared with the number of plant species in other environments. In South Florida, seven species of seagrass presently occur throughout this region's estuaries.

Seagrasses are a highly productive, faunally rich, and ecologically important habitat within the coastal lagoons and estuaries of South Florida. In terms of primary productivity, a seagrass bed can produce four to ten times the weight of organic matter as that produced by a cultivated corn field of the same size. Vast, extensive seagrass beds covering hundreds of kilometers may be composed of one to maybe four species. Yet, hundreds to thousands of species of flora and fauna may inhabit these beds, utilizing the food, substrate, and shelter provided by these submerged plants. Rapidly growing seagrass leaves provide food for trophically higher organisms via direct herbivory or from the detrital food web; the canopy structure formed by these leaves offers shelter and protection. This combination of shelter and food availability results in seagrass beds being the richest nursery grounds in South Florida's shallow coastal waters. As such, many commercial and recreational fisheries (*e.g.*, clams, shrimp, lobster, fish) are associated with seagrass beds.

Seagrasses have experienced declines in abundance and distribution due to water quality degradation and through the direct loss of habitat related to dredge and fill activities (*e.g.*, navigation channels, marinas) and boating impacts (*e.g.*, propeller scars and groundings). The degradation of water quality is largely the result of point source pollution (*e.g.*, wastewater discharge, agricultural

runoff, excessive freshwater discharge), nonpoint source pollution (*e.g.*, stormwater runoff, leaching from septic tanks), and the alteration of adjacent watersheds. The subsequent decline in seagrasses has significantly reduced the fisheries resources in South Florida.

Implementation of several protective and restorative measures has improved water quality and radically reduced the rate of habitat loss within South Florida's estuaries. Such measures include the regulation of dredge and fill activities, the elimination of wastewater discharge to surface waters, the treatment of stormwater runoff, and the rehabilitation of adjacent watersheds. Other significant actions include the establishment of management entities designed to preserve and protect biologically unique areas.

## Synonymy

Seagrasses are also referred to as submerged aquatic vegetation and macrophytes, terms that may include both attached and drift macroalgae. FLUCCS codes for the seagrass community include: 510 (stream/waterways), 540 (bays/estuaries), 651 (tidal flats), and 652 (shorelines).

## Distribution

Three seagrass species commonly occur in varying degrees of abundance throughout South Florida's coastal ecosystem: turtle grass (*Thalassia testudinum*), manatee grass (*Syringodium filiforme*), and shoal grass (*Halodule wrightii*) (Zieman 1982). Three other species of seagrass are sparsely distributed within this range: star grass (*Halophila engelmannii*), paddle grass (*Halophila decipiens*), and Johnson's seagrass (*Halophila johnsonii*). In areas of reduced salinity, widgeon grass (*Ruppia maritima*) is often found intermixed with shoal grass. Unlike the other seagrasses, widgeon grass is actually a fresh water plant that has a pronounced salinity tolerance. Hence, its occurrence in estuaries with lowered salinities is commonplace.

The geographic distribution of seagrasses occurs in most of the coastal counties of Florida (Figure 1) (Zieman 1982, Zieman and Zieman 1989). The greatest abundance of seagrasses in the region is in an area that includes Florida Bay and the Florida Keys with approximately 587,770 ha (Sargent *et al*. 1995). The second largest seagrass bed (> 300,000 ha) occurs along the northwest Florida's Big Bend region, an area that extends from north of Tampa Bay to Apalachee Bay in the Florida panhandle (Livingston 1990). Seagrasses extend north of South Florida inshore of barrier islands along both coasts and are found within lagoonal systems, such as Sarasota Bay, Charlotte Harbor, Biscayne Bay, Lake Worth Lagoon, and the Indian River Lagoon. All seven seagrass species that are present in this region are found throughout this range. Turtle grass is most abundant in the Florida Keys and Florida Bay whereas shoal grass and manatee grass are more predominant along both coasts north of Monroe County. The lone exception is Johnson's seagrass, the distribution of which is limited to the east coast of Florida from Sebastian Inlet (Indian River County) to northern Biscayne Bay (Miami-Dade County). Relative to the other six species, Johnson's seagrass comprises less than one percent of the total abundance of seagrasses within its range (Kenworthy 1997).



**Figure 1. The distribution of seagrasses in South Florida (data from Florida Department of Environmental Protection).**

The vertical distribution of seagrasses is controlled primarily by interactions between light availability and wave action and, secondarily, by substrate type and nutrient supply (Day *et al*. 1989). Seagrasses can influence the nature and depth of their own sediment bed by trapping and binding sediment particulates associated with damping wave and tidal energy (Burrell and Schubel 1977). Their physical structure stabilizes sediments and prevents the resuspension of particulate matter, thus helping to maintain water transparency or clarity (Kenworthy and Haunert 1991). Seagrass beds are often associated with substrate composed of a thick layer of highly sorted, fine-grained sediments. The density of seagrasses is typically greater where there is a reduction in wave action and ample nutrients are available in the sediments, although dense seagrass beds can occur in high-energy environments with sandy sediments.

## Description

Seagrasses are vascular plants that can form dense vegetative communities in shallow water estuaries (Day *et al*. 1989). These plants have evolved the ability to carry out their entire life cycle completely submerged in the marine environment.

### Structure and Composition

A remarkable similarity of vegetative appearance, growth, and morphology exists among the seagrasses. They have a linear form exhibited by a root system (rhizomes and roots) below ground and leaf structure (short shoots and leaf blades) above ground. Turtle grass, manatee grass, shoal grass, and widgeon grass are similar in appearance in that their leaves are long and either cylindrical (*i.e.*, manatee grass) or flat. The flat blades are either broad (*i.e.*, turtle grass) or narrow. The *Halophila* species differ from the other seagrasses in that the leaf structure is shorter with the blades resembling tufts or whorls.

Turtle grass is the largest and most robust of South Florida's seagrasses; Johnson's seagrass the most diminutive. Manatee grass is distinctive in having cylindrical leaves which are quite brittle and buoyant. As seagrass blades break off, they are exported from the immediate area by winds and currents. Shoal grass is recognized as the pioneer species in the successional development of seagrass beds.

For all the Florida seagrass species, the leaf structure emanates vertically from the horizontal rhizomes at regular intervals. From the rhizomes, which are just under the sediment surface, emerge the roots and root hairs into the surrounding substrate. Seagrass rhizomes range in diameter from 1 mm (0.04 in) for the *Halophila* group to 1 cm (0.4 in) for turtle grass. These plant components form a well-developed anchoring system and constitute the below-ground biomass of the plant. The leaf structure consists of short shoots from which leaf blades emerge into the water column. Leaf blades from these species range in width from 1 mm to 1 cm (0.04 to 0.4 in) and in length from 5 mm to 1 m (0.2 to 40 in). The leaf varies in shape for the *Halophila* group from oval to linear while the other species are essentially elongate. These components represent the aboveground biomass or standing crop of the plant.

Seagrass biomass consists of the weight of all living plant material (*e.g.*, roots, rhizomes, leaf structure) and is expressed in terms of mass per unit area. Seagrass biomass and the standing crop of seagrass beds are terms used to quantify the density of seagrasses. The majority of seagrass biomass is usually below the sediment surface. The robust root and rhizome system of turtle grass contains between 55 and 90 percent of the plant's total biomass (Zieman and Zieman 1989). Despite shallower, less well-developed roots and rhizomes, both manatee grass and shoal grass have a greater portion of their total biomass (53 to 89 percent) below the sediment surface, followed by widgeon grass with 50 percent (Lewis and Phillips 1980).

Each seagrass species can occur as a monotypic seagrass bed or can be found intermixed with the other species. In the Indian River Lagoon, some seagrass beds consist of all seven species with the *Halophila* species scattered throughout sparser areas within the bed.

## Reproduction

Seagrasses reproduce sexually and asexually (or vegetatively). Vegetative reproduction in seagrasses accounts for their capacity to produce high biomass and extensive areal cover (Zieman and Zieman 1989). Information on sexual reproduction in seagrasses is limited, though there is an abundance of reproductive literature available on turtle grass. This species is sexually dimorphic, producing separate male and female flowers. In South Florida, turtle grass flowers develop in mid-May with fruits appearing 2 to 4 weeks later (Zieman 1982). According to Grey and Moffler (1978), turtle grass may also be dioecious, *i.e.*, separate male and female plants.

Most of the available literature on sexual reproduction for the other species is from studies conducted on the west coast of Florida. Phillips (1960) found flowering widgeon grass in Tampa Bay. Lewis *et al.* (1985) collected flowering manatee grass in the bay and found reproductive specimens of shoal grass in nearby waters. Sexual reproduction in Johnson's seagrass is unknown; male flowers have never been found. Hence, it is believed that Johnson's seagrass disperses primarily through vegetative reproduction.

## Wildlife Species of Concern

Federally listed animal species that depend upon or utilize the seagrass community in South Florida include: American crocodile (*Crocodylus acutus*), green sea turtle (*Chelonia mydas*), loggerhead sea turtle (*Caretta caretta*), hawksbill sea turtle (*Eretmochelys imbricata*), leatherback sea turtle (*Dermochelys coriacea*), Kemp's ridley sea turtle (*Lepidochelys kempii*), roseate tern (*Sterna dougallii dougallii*), wood stork (*Mycteria americana*), bald eagle (*Haliaeetus leucocephalus*), and West Indian manatee (*Trichechus manatus*). Biological accounts and recovery tasks for these species are included in "The Species" section of this recovery plan. For a complete list of State listed species that utilize seagrasses see Appendix C.

The coastal lagoons and estuaries are used as foraging habitat by several species of birds including the osprey (*Pandion haliaetus*), magnificent frigatebird (*Fregata magnificens*), least tern (*Sterna antillarum*), black

skimmer (*Rynchops niger*), American oystercatcher (*Haematopus palliatus*), and eastern brown pelican (*Pelecanus occidentalis*). The State of Florida classifies the osprey, American oystercatcher, eastern brown pelican, and black skimmer as species of special concern, and the least tern as threatened.

The **osprey** is one of four subspecies distributed throughout the world, with *Pandion haliaetus carolinensis* being the North American variant. In Florida, the osprey is afforded the status of a State species of special concern for Monroe County only. The osprey occurs throughout Florida wherever there are sufficient bodies of open water for fishing. Nests are constructed on the tops of cypress, mangrove, and pine trees (Ogden 1996), utility poles, radio towers, channel markers (Schreiber and Schreiber 1977) and even in shrubs or on the ground as in the Florida Bay area (Ogden 1977). In eastern North America, the osprey is considered stable except for the declining Florida Bay population in Everglades NP (Kushlan and Bass 1983; Poole 1989). Ospreys are considered somewhat tolerant to human activity which makes them particularly vulnerable to entanglement in fishing monofilament, striking power lines, hunting, waterfront development, and human-induced changes in food availability (Ogden 1996). This species is highly susceptible to environmental contaminants, although there is no current threat from heavy metals, PCBs, and pesticide contamination.

The **Eastern brown pelican** is a subspecies that occurs along the coastline from Venezuela to Maryland and in the Caribbean. The brown pelican is a marine species that nests and roosts on small islands (mostly < 5 ha) and prefers areas vegetated by mangroves (Nesbitt 1996). Sand bars have also been identified as an important "loafing" habitat (Schreiber and Schreiber 1982). Kushlan and Frohring (1985) reported a 40 percent decrease in numbers of pelicans in South Florida; however, since 1985, the overall status of the population nesting in Florida is improving. Increasing development leading to habitat degradation and decreased water quality are the most serious threats to the eastern brown pelican. In the 1960s and 70s, this species was found to be vulnerable to chemical contamination from pesticides and pollutants, such as DDT, PCBs, and Endrin. Fishing line is another notable source of mortality.

**Wading birds**, such as the roseate spoonbill (*Ajaia ajaja*), reddish egret (*Egretta rufescens*), great egret (*Ardea alba*), snowy egret (*Egretta thula*), little blue heron (*Egretta caerulea*), and tricolored heron (*Egretta tricolor*) frequently feed along the edges of shallow water seagrass beds. The State classifies the roseate spoonbill, reddish egret, snowy egret, little blue heron, and tricolored heron as species of special concern.

Fishes utilize the seagrass community for food and shelter. These include: common snook (*Centropomus undecimalus*), spottail goby (*Gobionellus stigmaturus*), mangrove rivulus (*Rivulus marmoratus*), and the key silverside (*Menidia conchorum*). The State lists the common snook and the mangrove rivulus as species of special concern, and the key silverside as threatened.

The **spottail goby** is a small fish (29 mm [1.14 in] standard length) known from Bermuda, Florida, Cuba, Belize, and Panama (Pezold 1984) with Florida populations ranging from Brevard to Monroe counties. The spottail goby has

*Eastern brown pelican.*
*Original photograph by Betty Wargo.*



been consistently collected in Fort Pierce Inlet in seagrass beds consisting of manatee grass and shoal grass (Gilmore 1988). The spottail goby makes burrows on nearby sand bars in very shallow water (depth < 0.5 m). Physical disturbances and the degradation of water quality are major threats to the spottail goby's seagrass habitat.

The **key silverside**, the smallest known species of *Menidia* (53 mm [2.08 in] standard length), is limited to the Florida Keys from Long Key to Key West. The key silverside swims in shallow, protected, coralline pools surrounded by mangroves and often associated with turtle grass and macroalgae (Duggins *et al.* 1986). While this species is present at other locations within the Middle and Lower Florida Keys (*e.g.*, Long Key, Grassy Key, Big Pine Key, and Cudjoe Key), it seems to have disappeared from Key West. The extent of urban development is greater on Key West than the other islands; thus, the loss of habitat (*e.g.*, mangroves, seagrasses) can result in the extirpation of a small localized population.

## Plant Species of Concern

A federally listed plant species that depends upon or utilizes the seagrass community includes the Johnson's seagrass. Although no biological account is included in this recovery plan, a brief description is provided below. The recovery plan for Johnson's seagrass is being developed by the U.S Department of Commerce's National Marine Fisheries Service.

The federally threatened **Johnson's seagrass** (*Halophila johnsonii*) is one of twelve species of the genus *Halophila*. Johnson's seagrass is rare and exhibits one of the most limited distributions of any seagrasses. Within its limited range (lagoons on the east coast of Florida from Sebastian Inlet to central Biscayne Bay), it is one of the least abundant species. Johnnson's seagrass' limited

reproductive capacity (apparently only asexual) and limited energy storage capacity, makes it unlikely to repopulate an extirpated area. Identifying characteristics of *Halophila johnsonii* include smooth foliage leaves in pairs 10 to 20 mm (0.39 to 0.79 inches) long, a creeping rhizome stem, sessile flowers, and longnecked fruits.

## Ecology

Seagrasses have been identified as an important habitat linked to the productivity of our abundant fisheries (Ogden and Zieman 1977). This high productivity is largely in response to the inherent ecological functions of seagrasses (Zieman and Zieman 1989) which are: (1) seagrass growth is extremely rapid with the leaves growing at about 5 mm (0.20 in) per day and over 10 mm (0.40 in) per day under favorable circumstances; (2) the production of detritus and the promotion of sedimentation provide organic matter for the plants and maintain an active environment for nutrient recycling, *i.e.*, seagrasses take up nutrients from the sediments, transporting them through the plant and releasing them into the water column through the leaves; (3) the pathways for photosynthetically fixed energy is by direct grazing of living plant material, the utilization of detritus from decaying plant matter, or the export of living and detrital plant material from one location to another allowing for the distribution of energy away from its original source; (4) seagrasses stabilize sediments with the roots and rhizomes forming a complex, interlocking matrix, which binds the substrate and with the leaves impeding current flow to reduce water velocity near the sediment-water interface, which promotes settling of suspended particles as well as inhibits the resuspension of organic and inorganic materials; (5) the surface of seagrass leaves provide the substratum for attachments by a myriad of small algae and animals (*e.g.*, crustaceans, worms, sponges, bryozoans), which provide the basis for food to a variety of larger seagrass-associated animals (Virnstein *et al.* 1983); and (6) seagrass beds serve as a place of both food and shelter for the juveniles of a variety of shellfish and finfish of commercial and recreational importance.

In the subtropical waters of South Florida, seagrass beds often bridge large areas between mangrove and coral reef communities. Many organisms that are primarily associated with mangrove communities or coral reefs often feed in adjacent seagrass meadows, which act as a transitional zone between these ecological communities.

The spatial distribution of a given seagrass species is a function of environmental conditions that include light, temperature, salinity, substrate, waves and currents, and the availability of nutrients (Day *et al.* 1989).

## Light

Estuarine seagrasses are most common in soft sediments of semi-sheltered areas where depth and turbidity conditions allow sufficient light levels necessary for growth and maintenance. Morris and Tomasko (1993) indicate that light is the primary environmental factor controlling the survival and the depth distribution of seagrasses. More specifically, light in the range of wavelengths from 400 to 700 nm (known as photosynthetically active radiation) provides the predominant source of energy for seagrass photosynthesis to occur.

Turtle grass, manatee grass, and shoal grass require between 15 and 30 percent of the incident light (*i.e.*, light at the water's surface) for long-term survival; thus, they typically do not grow in water depths greater than 2 m (6.6 ft) for areas north of southern Biscayne Bay. The three species of *Halophila* appear to need less incident light (approximately 6 to 12 percent) in order to survive; hence, their occurrence in water as deep as 3 to 4 m (9.8 to 13.1 ft). Factors that weaken or attenuate light as it travels through the water column are phytoplankton blooms due to nutrient enrichment, turbidity, and water color due to dissolved organic material. Additional factors that affect light availability include shading either by epiphytes (small algae attached to the surface of seagrass blades) or by structures (*e.g.*, docks) located in shallow water seagrass beds.

Another factor that limits the depth distribution of seagrasses is exposure at the shallow end of the depth gradient (Kenworthy and Haunert 1991). Shoal grass usually grows in the shallowest water and tolerates exposure better than the other species. The next zone of seagrass is usually turtle grass, followed by manatee grass with the *Halophila* group in deeper water. In some locations (*i.e.*, around inlets), Johnson's seagrass occurs both on sandbars exposed during low tide as well as in 4-m (13.1-ft) deep tidal channels. Except for southern Biscayne Bay, Florida Bay, and the Florida Keys, the average maximum water depth for the vertical distribution of seagrasses in South Florida is approximately 2 m (6.6 ft). In the relatively clear waters of these areas, seagrasses can be found growing in water usually 6 to 7 m (19.7 to 22.9 ft) deep and even as deep as 10 m (32.8 ft).

As subtidal plants, seagrasses do not tolerate exposure well. When exposed to the air, they lose water continuously until they dry out. Exposed leaves usually die, then break off to be carried away with the current. Normally, the rhizomes are not damaged and the plants continue to produce new leaves.

## Temperature

Turtle grass, manatee grass, and shoal grass prefer temperatures between 20 and 30°C (68 and 86°F), although shoal grass is more eurythermal than the other two species. Shoal grass, which is common in shallow water where temperature variations tend to be greater, has a greater tolerance to lower temperatures than either turtle grass or manatee grass. Seagrasses in deeper water are buffered from cold temperatures because the overlying water has a greater mass to be cooled.

## Salinity

While each of the seagrasses can tolerate considerable short-term salinity fluctuations, they all have an optimum salinity range from 24 to 35 parts per thousand. As expected, shoal grass is broadly euryhaline, while manatee grass is more stenohaline with turtle grass intermediate in its salinity tolerance. The *Halophila* group is also more stenohaline, although Johnson's seagrass may be tolerant of reduced salinities. Widgeon grass, again not a true seagrass, can tolerate freshwater as well as hypersaline conditions.

Although seagrasses may tolerate lowered salinities, the photosynthetic rate in seagrasses is affected by changes in salinity. A decrease in salinity carries a corresponding decrease in the photosynthetic rate of turtle grass. Following the passage of a hurricane through South Florida in 1960, Thomas *et al.* (1961) concluded that the damage to turtle grass by excessive fresh water to have been more severe than the physical effects of the storm surge.

### Sediments

Seagrasses grow in a wide variety of sediments from fine muds to coarse sandy material. As rooted plants, seagrasses require a sufficient depth of sediment for proper development. Sediments anchor the seagrass against the effects of water surge and currents, and provide the matrix for growth and nutrient supply. Sufficient sediment depth and physical stability is the single most important sediment characteristic for seagrass growth and development. Requirements for sediment depths vary with the different seagrass species. Shoal grass can colonize thin sediments in an area of minimal hydraulic stability because of its shallow, surficial root system. Although turtle grass can sparsely colonize thin sediment layers over rock, this species requires at least 10 cm (3.94 in) of sediment to achieve lush growth.

Seagrass blades can also affect the sediments they grow in. Dense seagrass blades greatly affect the concentration of fine-grained particles in sediments (Zieman 1982). For example, turtle grass blades can increase the percentage of fine-grained particles in sediment two to five times. The primary physical effects from seagrass blades are that they increase sedimentation rates, concentrate fine-grained particles, and stabilize the deposition of sediments. One of the ecological functions of a seagrass system is the ability to create a relatively low-energy environment in an area of high energy and turbulence. This is a key element in a plant's efficiency to stabilize sediments.

### Nutrients

The primary constituents of plant material are carbon, nitrogen, and phosphorus. The accessibility of these components as dissolved nutrients is an important factor governing the production of seagrass. In general, seagrasses acquire most of their required inorganic carbon from free $CO_2$ and assimilate nitrogen and phosphorus from the sediments via their roots and rhizomes and from the water column via their leaves.

### Productivity

The major sources of primary production in South Florida's coastal ecosystems are macrophytes, *i.e.*, seagrasses, macroalgae, and mangroves. Algal communities associated with seagrasses include benthic algae (attached to the substrate), drift algae, and epiphytic algae. Seagrass leaves provide a relatively stable substrate for epiphytic algae. The turnover of the epiphytic algal community is relatively rapid, since the lifespan of a single leaf is quite limited. A typical turtle grass leaf has a lifetime of 30 to 60 days (sometimes longer). The standing crop and productivity of epiphytes and their contribution to the trophic food web of a system is highly variable. In nutrient-poor waters, there are few epiphytes and, hence, very little contribution. Conversely, in nutrient-enriched waters, like the Indian River

Lagoon, epiphyte production is high. The relationship between these plants is that of an ectoparasite, *i.e.*, the relationship is beneficial to the epiphyte but detrimental to the seagrass. Thus, in areas of high nutrient supply, epiphyte grazers are extremely important in maintaining seagrass productivity.

Seagrasses themselves are very high in primary production and contribute large quantities of detritus to an ecosystem (Zieman 1982). In Florida Bay and the Keys, the standing crop of turtle grass beds may exceed 1,000 grams of dry weight per meter squared. As such, the contribution of seagrass production to this region's carbon budget may represent over 50 percent of the total production within the estuary. Again, the factors that reduce seagrass production are decreasing light levels, lack of nutrients, and increasing epiphytic growth on the leaves.

## Habitat

The structure of seagrass beds provides living space for a diverse assemblage of mobile and sessile organisms (Harlin 1980, Stoner 1980). Biota present in seagrasses are classified in a scheme that recognizes the central role of the seagrass canopy (leaf blades) in organizing seagrass-associated communities. The principal groups of such organisms are epiphytic (living on plants), epibenthic (living on the sediment surface), infaunal (living within the sediments), and nektonic (living in the water column). Representatives among these groups include invertebrates (*e.g.*, polychaetes, gastropods, bivalves, shrimps, lobsters, crabs, urchins) and vertebrates (*e.g.*, fishes, reptiles, birds, mammals).

Seagrass beds serve as nursery habitat where post-larval stages of invertebrates and fishes develop to juvenile and adult phases (Virnstein *et al.* 1983, Lewis 1984). With their high productivity, extensive surface areas, and high blade densities, seagrasses provide protection from predators, a substrate for the attachment of sessile stages, and a plentiful food source. Notable examples of organisms that benefit directly from their development within seagrass beds include the pink shrimp (*Penaeus duorarum*), spiny lobster (*Panulirus argus*), and several species of recreationally and commercially important fishes [*e.g.*, spotted sea trout (*Cynoscion nebulosus*), red drum (*Sciaenops ocellata*), snook (*Centropomus undecimalis*), mangrove snapper (*Lutjanus griseus*)]. For example, the pink shrimp harvest near the southwest coast of Florida was 4,535,970 kg (10 million pounds) per year prior to 1987. In the Indian River Lagoon, seagrasses have been estimated to provide almost $30,000 per ha annually in economic benefits based on fisheries alone (Virnstein and Morris 1996).

Seagrasses and associated epiphytes provide food for trophically higher organisms by direct herbivory, as detrital food webs within seagrass beds, and as detrital material exported out of a seagrass bed (Zieman 1982). Direct herbivory is best exemplified by green sea turtles and the West Indian manatee grazing in seagrasses. The detrital food web is another pathway of trophic energy transfer. Typically, seagrass blades die and break off from the shoots to form a layer of leaves on the sediment surface. This leaf litter is then subjected to bacteria, fungi, and other microorganisms that contribute to the decomposition of the plant material. The physical breakdown and reduction in particle size of decaying seagrasses facilitates its assimilation by filter feeders

(polychaetes) and deposit feeders (gastropods), which in turn, are fed upon by omnivores (shrimps) and carnivores (fishes).

## Status and Trends

With few exceptions, most of South Florida's coastal ecosystem has been negatively affected either directly or indirectly from a number of man-made activities: hydroperiod alterations, loss of upland vegetation, shoreline modifications (*e.g.*, removal of vegetation, installation of seawalls), construction of causeways and bridges, dredging channels, increasing boat traffic, point-source pollution (*e.g.*, wastewater treatment facilities), nonpoint-source pollution (*e.g.*, stormwater runoff), and oil spills. The majority of these direct and indirect effects are the result of Florida's rapidly expanding population. Between 1970 and 1980, the State's coastal counties increased in population 44 percent, the greatest population increase in the nation during that period. Between 1988 and 2010, South Florida will have four of the top 10 counties nationwide in absolute population change. Specifically, over 1.3 million additional persons are projected to move to Lee, Miami-Dade, Broward, and Palm Beach counties by 2010. This growing population will result in significant losses of habitat and living resources; increase demands on water, energy, waste treatment and its disposal; and continue to diminish the environmental quality of the region. For example, almost 207,000 vessels are registered in Palm Beach, Broward, Miami-Dade, Monroe, Collier, and Lee counties. Aside from the increasing number of registered vessels, the average size and horsepower of these vessels are increasing as well, to the detriment of shallow water seagrasses. As coastal populations increase throughout South Florida, management of this growth to ameliorate the associated direct and indirect effects becomes crucial.

### Water Quality Degradation

Urban, industrial and agricultural development, and the construction of the Central and Southern Florida Flood Control Project by the COE have had a profound effect on the region's coastal habitats. The "urban-developed ridge" of Miami-Dade, Broward, and Palm Beach counties has virtually eliminated the natural community structure and function of over 161 km (100 mi) of the southeast coast. Draining South Florida's interior wetlands into the adjacent estuaries has resulted in increased turbidity as well as nutrient and pollutant loadings (Indian River Lagoon NEP 1996).

While there is a lack of specific information on pesticide loads to South Florida's estuaries, recent studies indicate that pesticides can enter the estuary with stormwater runoff (Pait *et al.* 1992). High concentrations of trace metals (*e.g.*, copper, cadmium, lead, and zinc) are found in specific locations, characteristically near numerous and extensive boating facilities (*e.g.*, marinas). Pathogenic bacteria leaching from septic tanks into nearby estuaries, especially shellfish harvesting areas, pose a public health problem. Nutrients from sewage disposal systems can result in nutrification and eutrophication of nearshore areas.

Water management practices have resulted in the alteration of freshwater flow into the estuaries. Such discharges introduce contaminants and pollutants into these waterbodies. The frequency and timing of freshwater discharges have influenced the loss of seagrasses in Florida Bay (Florida Bay Interagency Working Group 1994). Episodic voluminous freshwater releases (due to excessive rainfall events) through control structures in the Caloosahatchee and St. Lucie rivers have a similar effect on the receiving estuaries, Charlotte Harbor and Indian River Lagoon, respectively, because of the reduction in salinity for extended periods. In addition, such freshwater releases/discharges carry pollutants, primarily nutrients and sediments. During 1990 to 1992, the total nutrient loading related to stormwater runoff into the Indian River Lagoon was estimated to be over 3 million pounds per year.

## Habitat Loss

From the 1920s to the 1960s, Florida's coastal zone underwent tremendous alterations as a result of the lack of proper management of its explosive population increase. During this period, coastal communities arose from the mangrove marshes that dominated South Florida's estuarine landscape. Many of these communities were built by dredging and filling emergent and submerged wetlands for residential development. Associated with such communities were numerous man-made canals and waterways constructed to facilitate the demand for "waterfront" property. Channels were dredged through seagrasses to provide navigational access to and from waterfront properties. Throughout Florida, approximately 7,500 ha (18,532 acres) of submerged land have been filled by dredged material to facilitate residential and commercial development (Zieman 1982). Aside from the direct effect of burial, resuspended particles from spoil deposition reduce light levels thereby restricting primary productivity. Such rampant dredge and fill activities resulted in the destruction of seagrass beds throughout South Florida.

Another threat to seagrass communities has been, and continues to be, the increasing number of boats on Florida's coastal waterways. Used for recreation and/or work, many of these vessels operate in water shallower than their drafts, resulting in propeller scarring of seagrasses. Of the State's 1.1 million ha (2,718,100 acres) of seagrass, more than 70,000 ha (172,970 acres) have been lightly, moderately, or severely scarred by boat propellers (Sargent *et al.* 1995).

As the population began to increase in these newly erected coastal communities, nutrients from sewage discharged into South Florida's estuaries also increased. Nutrient enrichment in these embayments stimulated the production of epiphytes and phytoplankton which in turn inhibited the growth and survival of seagrasses. Hence, the loss of habitat due to physical disturbance and the degradation of water quality resulted in a decline in fisheries resources throughout South Florida's coastal ecosystem.

Aside from habitat degradation, fisheries resources have been dramatically affected by overfishing. With the decline in seagrasses, nursery and rearing habitat were significantly reduced. Furthermore, with an increase in population, there was a concurrent increase in pressure on the existing fish stocks. In Sarasota Bay, spotted seatrout landings were down 50 percent,

although seven times more recreational anglers were using the bay than in the 1950s (Sarasota Bay NEP 1995).

From 1950 to 1985, seagrass coverage declined approximately 35 percent in the Indian River Lagoon (Haddad and Harris 1985). Since the 1950s, seagrasses have declined almost 30 percent in Sarasota Bay (Sarasota Bay NEP 1995). Other estuaries that have experienced similar deceases in seagrass abundance and distribution include Lake Worth Lagoon, Biscayne Bay, Estero Bay, and Charlotte Harbor.

Recent seagrass assessments conducted in 1995 indicate that the overall change in seagrass coverage in the Indian River Lagoon from 1943 to 1992 has been a 20 percent decrease (R.W. Virnstein, SJRWMD, personal communication 1998). While seagrasses declined or disappeared in some sections of the lagoon, they increased in coverage in those areas where inlets have been stabilized and increased in size. Five of the six inlets along the lagoon are man-made; hence, their presence allowed the introduction of clear oceanic water into the lagoon, which influenced the growth of seagrasses near these estuarine connections.

## Florida Bay

For Florida Bay, the decline in seagrasses was not the result of dredge and fill activities. Since most of the bay (220,200 ha [544,114 acres]) is within the boundaries of Everglades NP, it is protected from large-scale human-induced direct physical disturbances. Historically, seagrasses have been the dominant primary producers in Florida Bay. However, since 1987, massive seagrass mortality has occurred in the bay with over 18 percent of the total bay area affected (> 40,000 ha [98,840 acres]). The rate of seagrass "die-off" accelerated in 1992. Such massive habitat loss has substantially affected fish and wildlife resources. As a result of the seagrass die-off, the pink shrimp harvest decreased from 10 million pounds in 1986 to four million pounds in 1987, a decline of 60 percent.

The most likely cause for seagrass die-off appears to be physiological stress from high salinities and high temperatures in the 1980s coupled with the long-term anthropogenic reduction of freshwater inflow to Florida Bay (Florida Bay Interagency Working Group 1994). Additional stressors include sulfide toxicity as a result of photosynthesis/respiration imbalance and a disease which was also probably stress induced. An additional postulated cause of the Bay's seagrass mass mortality is nutrient enrichment from the mainland and the Keys.

## Boating Impacts

Currently, the most common form of physical destruction to seagrasses is the dredging of plant material (blades as well as roots and rhizomes) by boat propellers and vessel groundings on shallow seagrass beds. This form of seagrass destruction, known as "prop scarring," occurs in shallow water areas throughout South Florida. In leading the State in total seagrass coverage, Monroe County also leads in scarred seagrass beds with almost 12,200 ha (30,146 acres). Zieman (1976) estimated that it takes several years for turtle grasses "to begin recovery" from prop scarring. Sargent *et al.* (1995) indicate

that a prop scar within a turtle grass bed averages 3 to 5 years to begin healing. However, a recent study indicates that moderate scarring (*i.e.*, minimal vertical relief in the scar) takes 12 to 15 years to begin recovery (J.W. Kenworthy, NMFS, personal communication 1998). Deeper scars require decades to recover. In Tampa Bay, Lewis and Estevez (1988) indicate complete seagrass-scar recovery may take as long as 10 years. This period is probably much longer in areas of poor water quality and where scarring is severe and repetitive; some scarred beds may never recover.

Another serious form of physical disturbance to seagrasses is from boat wakes. Based on data indicating decreased light penetration associated with weekend boat traffic, Kenworthy *et al.* (1988) found a possible cause-effect relationship between boating activities and increased turbidity. Seagrasses are sensitive to decreased light penetration. Increased boating activity and larger boats have resulted in chronic conditions of resuspended sediments and eroded seagrass beds along the edges of deeper channels, especially in the Upper and Middle Florida Keys (C. Kruer, Florida Keys Environmental Restoration Trust Fund, personal communication 1998).

Once seagrasses are lost within an embayment, that system's capacity to stabilize sediments is also lost. A negative cycle is initiated when resuspended sediments reduce the amount of light available for seagrasses to survive and grow, which reduces seagrass coverage, which reduces sediment stabilization, resulting in additional resuspended sediments.

## Management

Much of Florida's distinctive character lies in the beauty of its natural features, especially its coastal areas. This natural beauty has always been one of Florida's major attractions for both residents and tourists. Ironically, the very features that have attracted people to Florida have been physically altered by the increased population pressure.

It was during the early 1960s that the public became aware of the importance of Florida's coastal environment. During this period, dredge and fill activities were regulated for the first time by the State of Florida. In 1972, the COE authorized dredge and fill activities nationwide in accordance with section 404 of the Clean Water Act. With the passage of the Warren Henderson Wetlands Protection Act of 1984, wetland regulations and permitting were standardized throughout Florida. Once these regulatory measures were implemented, the rate of habitat loss due to physical alterations began to decline.

Not all of the seagrass habitat in South Florida is in peril. Hobe Sound, southern Biscayne Bay, Card Sound, and some areas in the Florida Keys exhibit very healthy seagrass beds. It is those seagrass beds adjacent to urbanized coastal communities that have been ecologically stressed and physically damaged for several years. During the past two decades, several management programs designed to improve water quality and protect biological resources in coastal regions were implemented by the Federal government and the State of Florida. A summary of these management programs and a table listing them follows:

## Aquatic Preserves

To protect the State's distinctive and unique coastal features for the enjoyment of future generations, the Florida Legislature created a series of aquatic preserves around the State in the late 1960s. Aquatic preserves are "submerged lands of exceptional beauty" that are to be maintained in their natural or existing conditions. In 1975, the Florida Aquatic Preserve Act was passed establishing a standardized set of management criteria for all aquatic preserves, both existing and future. Administered by the DEP, this set of management criteria was developed to eliminate or minimize the effects of specific activities on coastal resources such as seagrasses and mangroves. For example, dredging and/or constructing multi-slip docking facilities in seagrass beds is prohibited. There are several aquatic preserve programs around South Florida (Table 1).

## Coastal Zone Management Program

Authorized by the Coastal Zone Management Act of 1972, the Coastal Zone Management (CZM) Program is a voluntary partnership between the Federal government and U.S. coastal states and territories. Through its partnerships, the CZM program serves to preserve, protect, develop, restore, and enhance the resources of the nation's coastal zone; to encourage and assist the states in exercising their responsibilities in the wise use of land and water resources of the coastal zone; and to encourage the preparation of special area management plans designed to protect significant natural resources, influence reasonable coastal-dependent economic growth, improve protection of life and property in hazardous areas, and improve predictability in governmental decision-making. In essence, the CZM program uses a comprehensive resource management approach by balancing land and water uses while protecting sensitive resources.

## National Estuarine Research Reserves

On a national scale, the value of estuaries is tremendously important. These tidally influenced ecological systems provide habitat for millions of birds, mammals, fish, and other wildlife; function as a nursery ground for many marine organisms, including commercially valuable fish species; produce tremendous amounts of organic matter; filter water draining off uplands by removing sediments and nutrients; and function as a natural buffer between the land and the ocean by dissipating storm surges, thereby protecting private property. Recognizing the value of estuaries and the effect human activities would have on them, Congress created the National Estuarine Research Reserve System (NERRS) along with the passage of the Coastal Zone Management Act in 1972. Administered by the National Oceanic and Atmospheric Administration (NOAA), NERRS is dedicated to fostering a system of estuary reserves that represent the wide range of coastal and estuarine habitats found in the United States and its territories. In pursuing this goal, NERRS works with Federal and State authorities to establish, manage and maintain reserves, and to provide for their long-term stewardship. Research and education are the principal program components toward meeting this goal.

## National Marine Sanctuaries

In creating the National Marine Sanctuary Program through the passage of the Marine Protection, Research, and Sanctuaries Act of 1972, Congress was extending the nation's protective interests beyond the estuaries and into the marine environment. Administered by NOAA, the mission of the National Marine Sanctuary Program is to identify, designate, and manage areas of the marine environment with significant ecological, conservation, research, educational, recreational, historical, and aesthetic qualities. The program's goals are to provide enhanced resource protection through conservation and management of the sanctuary; to support, promote, and coordinate scientific research on marine resources of the sanctuary; and to enhance public awareness and wise use of the marine environment.

## National Estuary Programs

Congress continued its efforts toward protecting the nation's estuaries by establishing the National Estuary Program (NEP) under the Water Quality Act of 1987. Administered by the EPA, the NEP identified nationally significant estuaries threatened by pollution and development. The program's goals are to protect and improve water quality and to enhance living coastal resources through the preparation of a comprehensive conservation management plan (CCMP). Implementation of the CCMP ensures the ecological integrity of that particular estuary.

## Surface Water Improvement and Management (SWIM) Programs

Florida's rapidly expanding population increased the number of point and nonpoint sources of pollution and resulted in the destruction of ecological communities. Consequently, many of Florida's natural surface water systems (*e.g.*, lakes, springs, rivers, bays, and estuaries) were becoming degraded, making them unable to support plant and animal life, unfit for recreation, and potentially hazardous to human health. In 1987, the Florida Legislature enacted the Surface Water Improvement and Management (SWIM) Act, which directed the State's five water management districts, with the cooperation of State agencies and local governments, to develop and implement plans to clean up and protect specific waterbodies. Hence, affected waterbodies were prioritized with a common SWIM goal established for each. Essentially, each system shall be improved and managed at a level of quality "that provides aesthetic and recreational pleasure for the people of the State; that provides habitat for native plants, fish, and wildlife, including threatened and endangered species; and that attracts visitors and accrues other economic benefits." Since SWIM, many coastal communities have implemented surface water management programs which have improved the quality of the water discharging into adjacent estuaries, thereby improving water quality within the waterbody itself. The three water management districts responsible for administering the following SWIM programs in South Florida are: St. Johns River Water Management District, South Florida Water Management District, and Southwest Florida Water Management District.

## Florida Bay Program Management Committee

The Interagency Task Force, a multi-agency group established to implement the South Florida Ecosystem Restoration Initiative, created the South Florida Management and Coordination Working Group. The Working Group then created the Florida Bay Program Management Committee (PMC), an eight-member interagency committee, whose purpose was to integrate the science plan of Florida Bay into a regional ecosystem-based science program. Since 1994, the PMC has focused its efforts on integrating the data and developing the models essential for understanding the bay as an ecosystem that is strongly influenced by human forces. By collaborating with the member agencies on a research strategy for Florida Bay, the PMC's goal is to provide the scientific information critical to the restoration of the Bay, *e.g.*, the eventual recolonization of seagrasses throughout the Bay.

Another statewide management initiative is a program with the potential to reduce prop scarring and physical destruction of seagrasses by vessels. To be implemented by local governments, the program components include boater education, installing aids to navigation, increased enforcement, and designating limited-motoring zones. Monroe County is preparing to implement the Channel Marking Master Plan for the Florida Keys, which was completed in January 1998. Despite these measures, the scarring of seagrasses continues in the Keys largely due to an increase in the number of boats and in the number of boaters operating in shallow water seagrass beds.

Federal and State land management programs can extend protection over seagrasses when these submerged resources are within their boundaries. Such programs in South Florida include the Pelican Island NWR, Hobe Sound NWR, Biscayne Bay NP, Everglades NP, Crocodile Lakes NWR, John Pennekamp Coral Reef SP, National Key Deer Refuge, Great White Heron NWR, Key West NWR, Dry Tortugas NP, and J.N. "Ding" Darling NWR.

Currently, many of these management programs are having a beneficial effect on South Florida's estuaries. In some coastal embayments, seagrass coverage is increasing largely due to improved water quality conditions. Since April 1996, treated wastewater is no longer directly discharged into the Indian River Lagoon. The installation of baffle boxes designed to filter stormwater runoff has also improved water quality in the Lagoon. Seagrasses have recovered in parts of Biscayne Bay due to a reduction in turbidity. Boating traffic was eroding the shorelines of spoil islands located in the Bay. Once these shorelines were stabilized, turbidity decreased and water clarity increased. Even the seagrass community in Florida Bay has experienced some degree of recovery. While turtle grass is continuing to decline in western Florida Bay, shoal grass is revegetating some parts of eastern Florida Bay. Treating stormwater runoff has improved water quality conditions in Sarasota Bay by reducing nitrogen and contaminant loadings. Though not within the boundaries of the South Florida Ecosystem, Tampa Bay has experienced increased seagrass coverages, again, as the result of improved water quality conditions.

**Table 1. State and Federal management programs that affect South Florida's estuaries**
listed by program name, date established/designated, and the status of its associated management plan.

| PROGRAM NAME | DESIGNATED | STATUS OF MANAGEMENT PLAN |
|---|---|---|
| **Aquatic Preserves** | | |
| Indian River Lagoon - Malabar to Vero Beach | 1970 | completed 1986 |
|     - Vero Beach to Fort Pierce | 1970 | completed 1985 |
|     - Jensen Beach to Jupiter Inlet | 1973 | completed 1985, revised 1990 |
| North Fork St. Lucie River | 1972 | completed 1984 |
| Loxahatchee River - Lake Worth Creek | 1970 | completed 1984 |
| Biscayne Bay - Cape Florida | 1970 | no plan |
| Biscayne Bay - Card Sound | 1974 | no plan |
| Lignumvitae Key | 1972 | completed 1991 |
| Coupon Bight | 1972 | completed 1992 |
| Cape Romano - Ten Thousand Islands | 1970 | completed 1988 |
| Rookery Bay | 1975 | completed 1988 |
| Estero Bay | 1975 | completed 1983 |
| Pine Island Sound | 1970 | completed 1983 |
| Matlacha Pass | 1972 | completed 1983 |
| Cape Haze | 1975 | completed 1983 |
| Gasparilla Sound - Charlotte Harbor | 1979 | completed 1983 |
| Lemon Bay | 1986 | completed 1992 |
| **Surface Water Improvement and Management (SWIM) Programs** | | |
| Indian River Lagoon - St. Lucie River | 1987 | completed 1989, revised 1994 |
| Indian River Lagoon - Loxahatchee River | 1988 | completed 1989, revised 1994 |
| Biscayne Bay | 1987 | completed 1988, revised 1995 |
| Caloosahatchee | 1987 | no plan |
| Charlotte Harbor | 1988 | completed 1988, revised 1993 |
| **National Estuarine Research Reserves** | | |
| Rookery Bay | 1978 | completed 1995 |
| **National Marine Sanctuaries** | | |
| Florida Keys | 1990 | completed 1996 |
| **National Estuary Programs** | | |
| Sarasota Bay | 1988 | CCMP implemented 1995 |
| Indian River Lagoon | 1990 | CCMP implemented 1995 |
| Charlotte Harbor | 1995 | developing CCMP |

## Literature Cited

Burrell, D.C., and J.R. Schubel. 1977. Seagrass ecosystem oceanography. Pages 195-227 in C.P. McRoy and C. Helfferich (eds.), Seagrass ecosystems. Marcel Dekker, New York, New York.

Day Jr., J.W., C.A.S. Hall, W.M. Kemp, and A. Yanez-Arancibia. 1989. Estuarine ecology. John Wiley & Sons, Inc., New York, New York.

Duggins, C.F., Jr., A.A. Karlin, K. Relyea, and R.W. Yerger. 1986. Systematics of the key silverside, Menidia conchorum with comments on other Menidia species (Pisces: Atherinidae). Tulane Studies in Zoology and Botany 25(2):133-150.

Florida Bay Science Plan [Florida Bay Interagency Working Group]. 1994. Planning document provided to the Interagency Working Group on Florida Bay.

Gilmore, R.G. 1988. Subtropical seagrass fish communities: population dynamics, species guilds, and microhabitat associations in the Indian River Lagoon, Florida. Ph.D. dissertation (unpublished), Florida Institute of Technology, Melbourne, Florida.

Grey, W.F., and M.D. Moffler. 1978. Flowering of the seagrass Thalassia testudinum (Hydrocharitaceae) in Tampa Bay, Florida. Aquatic Botany 2:93-101.

Haddad, K.D., and B.A. Harris. 1985. Assessment and trends of Florida's marine fisheries habitat: an integration of aerial photography and thematic mapper imagery. Pages 130-138 in Anonymous (eds.), Proceedings of machine processing of remotely sensed data with special emphasis on quantifying global process: models, sensor systems, and analytical methods. Laboratory Applications in Remote Sensing. Purdue University, West Lafayette, Indiana.

Harlin, M.M. 1980. Seagrass epiphytes. Pages 117-151 in R.C. Phillips and C.P. McRoy (eds.), Handbook of seagrass biology: an ecosystem perspective. Garland STPM Press, New York, New York.

Indian River Lagoon comprehensive conservation and management plan. 1996. Final Draft. Indian River Lagoon National Estuary Program, Melbourne, Florida.

Kenworthy, J.W. 1997. An updated biological status review and summary of the proceedings of a workshop to review the biological status of the seagrass, Halophila johnsonii Eiseman. Final report submitted to Office of Protected Species, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Silver Spring, Maryland.

Kenworthy, J.W. 1998. Phone conversation. May 20, 1998.

Kenworthy, J.W., and D.E. Haunert. 1991. The light requirements of seagrasses: proceedings of a workshop to examine the capability of water quality criteria, standards and monitoring programs to protect seagrasses from deteriorating water transparency. National Oceanic and Atmospheric Administration Technical memorandum NMFS-SEFC-287.

Kenworthy, J.W., M.S. Fonseca, D.E. McIvor, and G.W. Thayer. 1988. The submarine light regime and ecological status of seagrasses in Hobe Sound, Florida. Annual Report. Beaufort Laboratory, National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Beaufort, North Carolina.

Kruer, C.R. 1998. Phone conversation. May 20, 1998.

Kushlan, J.A., and O.L. Bass, Jr. 1983. Decreases in the southern Florida osprey population, a possible result of food stress. Pages 187-200 *in* D.M. Bird (ed.), Biology and management of bald eagles and ospreys. MacDonald Raptor Research Center, McGill University, Harpell Press, St. Anne de Bellevue, Quebec.

Kushlan, J.A., and P.C. Frohring. 1985. Decreases in the brown pelican population in southern Florida. Colonial Waterbirds 8:83-95.

Lewis, L.J. 1984. Distribution of macrobenthic crustaceans associated with *Thalassia*, *Halodule*, and bare sand substrata. Marine Ecology progress series 19:101-113.

Lewis, R.R., and E.D. Estevez. 1988. The ecology of Tampa Bay: an estuarine profile. U.S. Fish and Wildlife Service, biological report 85 (7.18). Washington, D.C.

Lewis, R.R., and R.C. Phillips. 1980. Seagrass mapping project. Hillsborough County, Florida. Tampa Port Authority.

Lewis, R.R., M.J. Durako, M.D. Moffler, and R.C. Phillips. 1985. Seagrass meadows of Tampa Bay - a review. Pages 216-246 *in* S.F. Treat, J.L. Simon, R.R. Lewis, and R.L. Whitman (eds.), Proceedings in Tampa Bay area scientific information symposium. Florida Sea Grant report 65. Burgess Publication Co., Minneapolis, Minnesota.

Livingston, R.J. 1990. Inshore marine habitats. Pages 561-573 *in* R.L. Myers and J.J. Ewel (eds.), Ecosystems of Florida. University of Central Florida Press, Orlando, Florida.

Morris, L.J., and D.A. Tomasko (eds.). 1993. Proceedings and conclusions of workshops on submerged aquatic vegetation and photosynthetically active radiation. Special publication SJ93-SP13. St. Johns River Water Management District, Palatka, Florida.

Nesbitt, S.A. 1996. Eastern brown pelican. Pages 144-155 *in* Rodgers, J.A. Jr., H.W. Kale II, and H.T. Smith (eds.), Rare and endangered biota of Florida. Volume V. Birds. University Press of Florida, Gainesville, Florida.

Ogden, J.C. 1977. Preliminary report on a study of Florida Bay ospreys. Pages 143-151 *in* J.C. Ogden (ed.), Transactions of the North American osprey research conference. U.S. National Park Service, transactions proceedings series number 2.

Ogden, J.C. 1996. Osprey. Pages 170-178 *in* Rodgers, J.A. Jr., H.W. Kale II, and H. T. Smith (eds.), Rare and endangered biota of Florida. Volume V. Birds. University Press of Florida, Gainesville, Florida.

Ogden, J.C., and J.C. Zieman. 1977. Ecological aspects of coral reef-seagrass bed contracts in the Caribbean. Proceedings of the 3rd international symposium on coral reefs. University of Miami 3:377-382.

Pait, A.S., A.E. DeSouza, and D.R.G. Sarrow. 1992. Agricultural pesticide use in coastal areas: a national summary. National Oceanic and Atmospheric Administration, Strategic Environmental Assessments Division, Rockville, Maryland.

Pezold, F.L., III. 1984. A revision of the gobioid fish genus *Gobionellus*. Ph.D dissertation (unpublished), University of Texas, Austin, Texas.

Phillips, R.C. 1960. Observations on the ecology and distribution of the Florida seagrasses. Florida State Board Conservation. Marine Laboratory. Professional paper series number 2.

Poole, A.F. 1989. Ospreys. A natural and unnatural history. Cambridge University Press, New York, New York.

Sargent, F.J., T.J. Leary, D.W. Crewz, and C.R. Kruer. 1995. Scarring of Florida's seagrasses: assessment and management options. Florida Marine Research Institute technical report TR-1. Florida Marine Research Institute, St. Petersburg, Florida.

Sarasota Bay comprehensive conservation and management plan. 1995. Sarasota Bay National Estuary Program, Sarasota, Florida.

Schreiber, R.W., and E.A. Schreiber. 1977. Observations of ospreys nesting on artificial structures in Charlotte Harbor, Florida. Florida Field Naturalist 5:5-7.

Schreiber, R.W., and E.A. Schreiber. 1982. Essential habitat of the brown pelican in Florida. Florida Field Naturalist 10:9-17.

Stoner, A.W. 1980. The role of seagrass biomass in the organization of benthic macrofaunal assemblages. Bulletin of Marine Science 30 (3):537-551.

Thomas, L.P., D.R. Moore, and R.C. Work. 1961. Effects of Hurricane Donna on the turtle grass beds of Biscayne Bay, Florida. Bulletin of Marine Science 11 (2):191-197.

Virnstein, R.W. 1998. Seagrass ecology conference. October 15, 1998.

Virnstein, R.W., and L.J. Morris. 1996. Seagrass preservation and restoration: a diagnostic plan for the Indian River Lagoon. Technical memorandum no. 14. St. Johns River Water Management District, Palatka, Florida.

Virnstein, R.W., P.S. Mikkelsen, K.D. Cairns, and M.A. Capone. 1983. Seagrass beds versus sand bottoms: the trophic importance of their associated benthic invertebrates. Florida Scientist 46(3/4):363-381.

Zieman, J.C. 1976. The ecological effects of physical damage from motor boats on turtle grass beds in southern Florida. Aquatic Botany 2:127-139.

Zieman, J.C. 1982. The ecology of the seagrasses of south Florida: a community profile. U.S. Fish and Wildlife Service, Office of Biological Services, Washington, D.C. FWS/OBS-82/25.

Zieman, J.C., and R.T. Zieman. 1989. The ecology of the seagrass meadows of the west coast of Florida: a community profile. U.S. Fish and Wildlife Service, biological report 85 (7.25). Washington, D.C.

# Restoration of Seagrasses

**Restoration Objective:** Maintain and increase seagrass habitat in South Florida.

### Restoration Criteria

South Florida can contribute to the protection, enhancement, and restoration of seagrass ecosystems in Florida by maintaining or improving water quality conditions necessary for seagrass growth within the region's estuaries. The protection, enhancement, and restoration of seagrass habitat in South Florida will contribute to the recovery of listed plant and animal species as well as maintain the ecological functions associated with this community, such as high primary and secondary production; enhancing water quality by stabilizing sediments and removing nutrients; and providing shelter, foraging, and nursery habitat for numerous invertebrates and vertebrates important to recreational and commercial fisheries. The preservation of this community will enhance the overall natural setting and visual aesthetics of Florida's coastal landscape and contribute significantly to the economy of South Florida and to the State of Florida.

The restoration objective for seagrass habitat in South Florida will be achieved when: (1) the spatial extent of seagrasses has been identified; (2) the condition of existing seagrasses has been assessed by monitoring specific locations; (3) the relationship between light and water quality to seagrasses has been determined from these monitoring sites; (4) predictive models have been developed that link light attenuation and nutrient loadings to water quality and to epiphyte abundance; (5) the models set pollution load reduction goals to improve or maintain water quality conditions necessary for seagrass survival and growth; (6) management actions have been implemented that result in protecting, enhancing, and restoring seagrasses; and (7) additional protective measures have been implemented to prevent further physical disturbance of seagrass habitat. Increased seagrass distribution and abundance will be used as measures of success to inform the public in recognizing the importance of this community to fisheries resources, wading birds, and listed species such as the Florida manatee.

### Community-level Restoration Actions

1. **Identify the extent of seagrass habitat.** Using existing GIS databases, satellite/thematic images and aerial photographs (scales =1:12,000; 1:24,000; or 1:48,000) coupled with ground-truthing efforts, produce maps of seagrass distribution and abundance as an initial step in evaluating the extent of seagrasses in South Florida. Many of the region's estuaries have already been mapped or are currently being mapped for seagrasses (*e.g.*, Indian River Lagoon, Biscayne Bay, Florida Bay, and the Florida Keys).

   1.1. **Conduct an inventory of seagrass habitat using available satellite/thematic imagery, aerial photographs, and ground-truthing efforts once every 3 years.** Water clarity conditions for aerial photography are best during winter to spring;

however, seagrass abundance is greatest in the summer. Ground-truthing verifies the interpretation of the large-scale aerial photographs.

**1.2.** **Maintain the seagrass data obtained/collected from the inventory in a GIS database.** Digitize the data into a GIS database (*e.g.*, ARC/INFO) from which maps can be produced.

**1.3.** **Create a regionwide classification scheme of seagrass habitat.** Classifying seagrasses as either dense continuous beds (seagrass beds with some sand patches; coverage > 50%) or patchy beds (sand areas with some patches of seagrass; coverage < 50%) improves the repeatability of determining seagrass coverage and is necessary to consistently map seagrass habitat.

**1.4.** **Map the distribution and abundance of seagrasses throughout the region.** Mapping the abundance of seagrasses can identify both "problem" and "healthy" areas. Problem areas can be investigated to identify the cause of the problem. Healthy areas can be designated for protection. Mapping can plot changes in the amount and density of seagrass coverage, thereby providing a trend analysis of this community type.

**2.** **Assess the status and condition of existing seagrass habitat.** Monitoring selected areas within the region will be used to determine if seagrass beds are healthy or stressed and whether conditions are stable, improving, or declining and to what degree.

**2.1.** **Use low-level aerial photography to map the distribution and abundance of seagrasses in a selected area.** Low-level aerial photography can record conditions and document changes in seagrass beds (0.1 to 10 $m^2$ [1.07 to 107.6 $ft^2$] in size) at selected sites on a small scale (0.1 to 10,000 ha [0.3 to 24,710 acres]).

**2.2.** **Establish fixed transects to detect changes in depth distribution, abundance, and species composition of seagrasses.** Sampling fixed transects can reliably detect fine-scale changes in depth distribution, abundance, and species composition over time.

**3.** **Determine the relationship between light and water quality to seagrasses.** Increases in turbidity and nutrients occur both in short pulses and over long periods of time. In order to determine the effects to South Florida's estuaries from episodic events, measurements (*i.e.*, monitoring) of photosynthetically active radiation, water quality, and seagrass cover and abundance need to be taken at the fixed transect sites. Implement site-specific monitoring protocols to identify causes of seagrass decline. Integrating these measurements should identify the effects light and water quality have on seagrasses.

**3.1.** **Implement sampling protocols to measure photosynthetically active radiation.** The sampling methodology includes, but is not limited to, using quantum sensors to measure light at the water's surface and underwater.

**3.2.** **Implement monitoring protocols to sample water quality parameters.** These parameters include, but are not limited to, temperature, salinity, dissolved oxygen, nitrogen, phosphorus, suspended solids, chlorophyll, turbidity, and color.

**3.3.** **Implement sampling protocols to measure seagrass parameters.** These parameters include, but are not limited to, percent cover, biomass, shoot density, canopy height, species composition, productivity, and abundance of drift and epiphytic algae.

4. **Develop predictive models that link light attenuation to water quality and to nutrient loadings and epiphyte abundance.** The most critical factor affecting seagrass distribution and abundance is light availability, which is a function of water quality. Hence, identifying the water quality constituents regulating light availability in the water column is an initial step. Understanding how nutrients and epiphytes affect light availability is just as crucial. These predictive models will be linked to identify pollutant load reduction goals for specific estuaries or specific segments within estuaries.

4.1. **Develop a model that relates light attenuation in the water column to various water quality constituents.** Light attenuation will be modeled based on various water quality constituents influenced by hydrodynamic (circulation) forces. Predicted effects on light in the water column, linked with the findings from the site-specific monitoring, will then provide a predictor of stress imposed on seagrass systems.

4.2. **Develop a model that relates nutrients to abundance of epiphytes and quantifies the resultant light attenuation.** Epiphytes can reduce light reaching the seagrass blade by 50 to 80 percent. Two factors known to influence epiphyte abundance are dissolved nutrients in the water column and grazers (*e.g.*, snails, small crustaceans) on the blade's surface. If grazers are absent, epiphytes can grow unchecked. The epiphyte light attenuation model will address the balance between nutrient effects and grazing effects.

5. **Implement management actions that will improve or maintain water quality conditions necessary for seagrass growth.** Improving the management of potential sources for degradation will provide better water quality, which produces healthy seagrasses and maintains biological productivity.

5.1. **Based on seagrass light requirements, establish pollutant load reduction goals for a specific waterbody or even a segment within a waterbody.** Setting the pollutant load reduction goals for a particular waterbody should result in reduced loadings as predicted by the models. The management actions required to reach the pollutant load reducton goals can include stormwater treatment, wastewater reuse, and best management practices for upland use (*e.g.*, landscaping options such as a reduction in fertilizers).

5.2. **Monitor these waterbodies or segments within them for the predicted responses to the implementation of management actions.** Continue surveying the fixed transects to detect changes in seagrass distribution, abundance, and species composition.

6. **Restore seagrass habitat, where feasible.** Restoration of lost seagrass beds requires adequate mapping of sites known to have been vegetated with seagrasses in the past; reducing excessive nutrients and suspended particulates to allow seagrass beds to recover naturally; and possibly replanting candidate sites.

6.1. **Identify areas wherein stressed or lost seagrass beds are in need of restoration.** Once the pollutant load reduction goals have been set and the management actions implemented, seagrasses should recruit naturally into the site. However, certain conditions may require a site to be replanted with donor specimens from another location.

6.2.    **Rehabilitate seagrass communities where they have been destroyed by human activities (*e.g.*, prop scars) by replanting.**

7.    **Preserve existing seagrass habitat.** Most of South Florida's seagrass beds vegetate submerged land that is in sovereign ownership by the State. Much of this submerged land is under additional protection by the establishment of national parks, national wildlife refuges, a national marine sanctuary as well as the designation of a national estuarine research reserve and several aquatic preserves. Seagrass communities outside of these protective boundaries, especially those parcels in private ownership, require even greater attention. Such areas are often at risk from human activities simply because they do not have the unique resource designations that other areas have within South Florida.

7.1.    **Use existing regulatory authorities to protect seagrass habitat.** Seagrasses are currently protected by law from human activities on State-owned submerged lands within designated aquatic preserves and within the boundaries of federally-designated areas, such as the Florida Keys National Marine Sanctuary, Biscayne NP, Everglades NP, and Rookery Bay National Estuarine Research Reserve. In those instances where seagrasses are damaged within these boundaries, enforcement of existing regulations is necessary.

7.2.    **Prevent the additional degradation of existing seagrass habitat.** Implement a multiple approach management program to reduce prop scarring of shallow water seagrass beds. The management program should include increased boater education, installing channel markers, active enforcement, and establishing limited motoring zones. Over the long term, this comprehensive approach should reduce scarring to levels that do not significantly affect habitat quality and quantity.

7.3.    **Identify and acquire privately-owned submerged land vegetated with seagrasses.** Public acquisition of these few tracts will preserve the seagrass habitat associated with them.

8.    **Promote research.** Because of the problems experienced by Florida Bay, the effect of extensive phytoplankton blooms (*i.e.*, light availability, nutrient regimes) as well as slime mold disease (*i.e.*, *Labyrinthula*) on seagrass communities should continue to be investigated. In addition, the effects of freshwater flows (*i.e.*, quality, quantity, timing, distribution) on seagrasses should be investigated further.

9.    **Increase public awareness**. Present literature, maps, and slide presentations on the importance of seagrass habitat in South Florida's coastal landscape. Emphasize the significance of the ecological functions and economic value associated with this community. Accomplishing this task will enlist support from the public at large to continue the protection, enhancement, and restoration efforts of seagrass habitat.

# Exhibit F

PLOS | ONE

RESEARCH ARTICLE

# Seasonal Variation in Sea Turtle Density and Abundance in the Southeast Florida Current and Surrounding Waters

Caitlin M. Bovery, Jeanette Wyneken*

Department of Biological Sciences, Florida Atlantic University, Boca Raton, Florida, United States of America

* jwyneken@fau.edu





OPEN ACCESS

Citation: Bovery CM, Wyneken J (2015) Seasonal Variation in Sea Turtle Density and Abundance in the Southeast Florida Current and Surrounding Waters. PLoS ONE 10(12): e0145980. doi:10.1371/journal. pone.0145980

Editor: Erik V. Thuesen, The Evergreen State College, UNITED STATES

Received: June 18, 2015

Accepted: December 12, 2015

Published: December 30, 2015

Copyright: © 2015 Bovery, Wyneken. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

Data Availability Statement: All relevant data are within the paper and its Supporting Information files.

Funding: This work was supported by the U.S. Department of Energy, #DE-EE0000319 (http:// energy.gov/eere/office-energy-efficiency-renewable-energy). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript.

Competing Interests: The authors have declared that no competing interests exist.

## Abstract

Assessment and management of sea turtle populations is often limited by a lack of available data pertaining to at-sea distributions at appropriate spatial and temporal resolutions. Assessing the spatial and temporal distributions of marine turtles in an open system poses both observational and analytical challenges due to the turtles' highly migratory nature. Surface counts of marine turtles in waters along the southern part of Florida's east coast were made in and adjacent to the southeast portion of the Florida Current using standard aerial surveys during 2011 and 2012 to assess their seasonal presence. This area is of particular concern for sea turtles as interest increases in offshore energy developments, specifically harnessing the power of the Florida Current. While it is understood that marine turtles use these waters, here we evaluate seasonal variation in sea turtle abundance and density over two years. Density of sea turtles observed within the study area ranged from 0.003 turtles $km^{-2}$ in the winter of 2011 to 0.064 turtles $km^{-2}$ in the spring of 2012. This assessment of marine turtles in the waters off southeast Florida quantifies their in-water abundance across seasons in this area to establish baselines and inform future management strategies of these protected species.

## Introduction

Understanding spatial and temporal distributions is crucial for effective management and conservation strategies of threatened and endangered species. Obtaining such information is especially challenging for highly mobile wildlife that occupy multiple habitats throughout their life cycle. Sea turtles are large marine reptiles that undergo several habitat shifts that are ontogenetic [1–5] and migratory [6–11]. Such habitat changes complicate studies of local and global distributions, necessitating studies that examine in-water distributions at varied spatial and temporal scales [12, 13]. Due to the complex life history of marine turtles [1, 2, 10, 14, 15], knowledge of their spatial and temporal distributions is essential for understanding population structures and focusing conservation efforts. The southeast Atlantic coast of Florida hosts some of the world's largest sea turtle rookeries [16–18] and provides valuable in-water habitat for various life stages and species [19]. Five of the world's sea turtle species, including



loggerhead (*Caretta caretta*), leatherback (*Dermochelys coriacea*), green (*Chelonia mydas*), Kemp's ridley (*Lepidochelys kempii*), and hawksbill (*Eretmochelys imbricata*) turtles, use the waters along the southeastern coast of Florida [19]. Each occupies various pelagic and benthic niches within these waters throughout different life stages [1, 20–23].

Of the five species, the loggerhead [13, 24, 25], leatherback [12, 17], and green [18, 26] turtles migrate and nest regularly in increasing numbers [27] along the southeast coast of Florida, while few hawksbill [28, 29] and Kemp's ridley [28, 30] nests occur annually. Florida's east coast is important as transitional habitat for hatchlings dispersing offshore [31], as well as developmental habitat for turtles originating from a wide range of natal beaches [23]. Large juvenile and adult loggerhead turtles are captured or observed along Florida's Atlantic coast year-round [2, 13, 32, 33]. Similarly, juvenile green turtles are consistently present in Florida's Atlantic waters in a variety of developmental and foraging habitats including nearshore reefs, coastal lagoons, and sea grass beds [33–35]. Most Kemp's ridley turtles present in Florida's Atlantic waters are juveniles undergoing coastal foraging migrations [36–39]. Juvenile hawksbills occur along hard-bottom reefs in southeast Florida [29, 40], yet few studies exist assessing their presence year-round. Very little is known about juvenile leatherback turtles once they leave the nesting beaches [12].

Oceanic currents are important physical features of some habitats used by sea turtles [21, 31, 41–43]. Sea turtles often associate with currents during long-distance movements and as a primary foraging area [21, 41, 43, 44], which in turn can influence the distribution of nests along natal beaches [45]. The Florida Current, the southern portion of the Gulf Stream, is a unique oceanic feature that runs swiftly northward between the southeastern Florida coast and the Bahamas at speeds of up to 2 m s$^{-1}$ at its core located approximately 20 km offshore [46]. Due to its proximity to nesting beaches and developmental habitats in south Florida, it is likely that sea turtle migrations intersect the Florida current and its surrounding waters. The potential for alternative energy development on the outer continental shelf and within the Florida current raises questions about the potential impacts on endangered sea turtles and other marine fauna [46]. Fundamental in the assessment of such concerns is a sound understanding of sea turtle distributions and abundances in and around the Florida current. That data gap necessitates fine-scale examination of sea turtle distributions to understand the potential for interactions with alternative energy industries.

Aerial surveys are commonly used to identify distributions of sea turtles over various spatial and temporal scales [47]. Loggerhead, leatherback, green, and Kemp's ridley turtles have been monitored using aerial surveys in a variety of habitats to assess spatial and temporal variations in presence [48–57] or to estimate density and abundance of a species in a given area [49, 50, 53, 54, 57, 58]. Here we estimate sea turtle density and abundance in a discrete portion of the Florida Current and adjacent waters using systematic aerial survey data and identify trends in the spatial presence and temporal abundance of sea turtles.

## Material and Methods

The Florida Atlantic University IACUC granted a waiver of ethical approval because the animals were not handled, captured or manipulated. The work was authorized under US NMFS Permit Number 14586 "Assessment of sea turtles and marine mammals within the Florida and Gulf Stream Currents in the northern Florida Straits."

### Study area

The study area was defined as waters off the eastern coast of Florida extending south of 26° 43′N, (near West Palm Beach, Florida) to north of 25°40′N, near Miami, Florida (Fig 1). This



**Fig 1. Study area for aerial surveys.** Map includes an (a) inset of the United States of America and (b) the state of Florida showing the region for this study. Hatched area indicates extent of the survey area over which aerial surveys were conducted. Dotted lines representing the core of the Florida Current are meant as approximations for reference. Source: ArcWorld Supplement, Florida Fish and Wildlife Conservation Commission-Fish and Wildlife Research Institute.

doi:10.1371/journal.pone.0145980.g001

area encompasses the southern portion of the Gulf Stream that runs northward between the western Bahamas and the eastern coast of Florida (hereafter the Florida Current). Our study also includes an area that has been identified as a potential site for oceanic energy interests. Structures in the water column have potential to impact wildlife (at various life stages) that use the Florida Current, as well as coastal habitats westward of the current.

## Aerial surveys

To investigate seasonal presence of marine turtles in this study area, systematic aerial surveys were conducted at approximately monthly intervals from 2011–2012 to complete a total of 22,433 km of survey effort. Surveys in 2011 consisted of 12 parallel transects ranging in length from 40–100 km spaced 8 km apart. In 2012, the surveys were optimized using distance sampling methodology [59] and the survey was redesigned to include 16 parallel transects ranging in length from 35–100 km, spaced 4 km apart. All surveys were flown in a high-wing aircraft (Cessna 337) at a constant altitude of 150 m and groundspeed of 185 km h$^{-1}$. Following line transect theory [59, 60], parallel transects were flown east to west to follow an assumed gradient

of sea turtle distributions, and were spaced far enough apart to minimize the likelihood of encountering an individual sea turtle more than once in a single survey.

The crew consisted of a pilot, co-pilot, and two trained observers positioned on opposite sides of the aircraft on each flight. Prior to surveys, observers were trained in survey techniques and their ability to accurately identify species was verified. At the beginning of each transect, environmental conditions were recorded including sea state, glare, and cloud cover to be tested as potential covariates in density estimation. Surveys were only conducted in Beaufort Sea States $\leq 3$ to maximize animal visibility. Upon sighting an animal, the position, species, relative size (S, M, L), number of individuals, sighting angle, and sea state were recorded. Position was recorded using a Garmin 12XL GPS unit with external antenna (15 m accuracy). Sighting angle (declination angle) was recorded using hand-held Suunto™ clinometers (PM-5/360PC). When possible, relative size classes of turtles were estimated by the observers and categorized as small, medium, or large relative for each species to provide rough estimates of the life stages present (small juvenile, large juvenile, adult respectively) in these waters. Where size class was ambiguous between small and medium, the turtles were classified as small; similarly, turtles that were between medium and large were classified as large. Size classification was based on observer knowledge and training prior to flights.

Visualizations of the spatial distributions of all sightings of sea turtles from the surveys and the most commonly sighted species, Loggerhead (*Caretta caretta*) and green turtle (*Chelonia mydas*) were constructed to illustrate spatial patterns and assess proximity to shoreline and the Florida Current in our study. One sea turtle sighting was not used due to a poor GPS reading. Dotted lines denoting the Florida Current are approximate locations for reference and were not used in analyses. Seasons are defined as winter (December-February), spring (March-May), summer (June-August), and fall (September-November) to examine trends in presence of sea turtles. All maps were created using ArcGIS® software by ESRI®.

## Density estimation

Density and abundance of sea turtles was estimated using line transect distance analyses. Distance sampling relies on three key underlying assumptions that are important for reliable estimates of density [59, 60]. First, all animals on the transect line are observed. Due to flat windows, the transect line was not visible in our study. To accommodate for violation of this assumption, left-truncation was employed subtracting 82 m from all recorded perpendicular distances to account for the blind area under the plane [50]. This correction effectively shifted the transect line to the observers' visible range.

Secondly, distance sampling assumes that animals are detected before any movement. In this survey, turtle behavior was recorded so any potential avoidance behavior could be identified to meet the assumption that animals are detected prior to movement. Avoidance behavior was defined conservatively as diving when the plane passed by. Less than 5% of all observed sea turtles were diving.

Lastly, distances are assumed to be measured accurately. To minimize measurement bias, all distances were calculated from the declination angle of the sighting relative to the horizon. This measurement was then used to calculate the perpendicular distance of the animal from the transect line using the formula:

$$Perpedicular\ Distance = h * \tan(90 - \alpha)$$

where *h* is the altitude of the plane (150 m) and $\alpha$ is the declination angle.

Conventional distance sampling (CDS) and multiple covariate distance sampling (MCDS) analyses were performed using Distance v.6.2 [60]. In CDS methodology, the probability of

detection, (detection function), is modeled using the perpendicular distance from the transect line, while MCDS analysis allows the inclusion of covariates in the model of the detection function [59,60]. Density ($\widehat{D}$) is then estimated using a Horowitz-Thompson-like estimator [53,61] in the form of:

$$\widehat{D} = \frac{n}{2wL\widehat{P}_a}$$

in CDS analyses and:

$$\widehat{D} = \frac{1}{2wL}\sum_{i=1}^{n}\frac{1}{\widehat{P}_a(z_i)}$$

in MCDS analyses where $w$ is half the effective strip width, $L$ is the total length of transects, $n$ is the number of turtles observed, $\widehat{P}_a$ is the probability of detection for the $i$th turtle within the covered area ($2wL$) given the observed covariates ($z_i$) where applicable. Seasonal estimates of abundance were obtained from the global model of the probability of detection using stratification by season within year.

Uniform, half-normal, and hazard-rate models of the detection function with cosine, simple polynomial, or hermite polynomial adjustments were tested using CDS to determine the best-fit model. Observer, glare, cloud cover, and sea state were considered as covariates using MCDS analysis to test the same models of the detection function for any influence from those factors. Observers were grouped as primary and secondary for all MCDS analyses. Minimum Akaike's Information Criterion (AIC) was used to select among the candidate CDS and MCDS models.

Key functions tested are uniform (Uni), half-normal (HN), and hazard-rate (HR) with cosine (COS), simple polynomial (SP) or hermite polynomial (HP) adjustment terms. Covariates included in MCDS are observer (OBS), sea state (SS), cloud cover (CC), and glare (GL).

## Results

### Observations

During this study, 218 sea turtles were observed on effort (2011: n = 79; 2012: n = 139) at a sighting rate of 0.01 turtles observed per km surveyed (Table 1). Four species (80% of all observations) were sighted and identified to species: loggerheads (*Caretta caretta*), green turtles (*Chelonia mydas*), leatherbacks (*Dermochelys coriacea*), and Kemp's ridleys (*Lepidochelys kempii*). Spatial distributions of sea turtle sightings revealed that 72.8% of observations (n = 158) occurred within 20 km of the shoreline, west of the estimated core of the Florida Current (Fig 2). The most frequently observed species in our study was the loggerhead turtle (n = 113; 52% of all observations) followed by the green turtle (n = 57, 26%). Distributions for both species were similar within our study area (Fig 3). Leatherbacks (1.8%, n = 4) and Kemp's ridleys (<1%, n = 1) were rare. The low flight altitude allowed for confident identification of most turtles to species. The remaining 20% of sea turtle sightings (n = 43) could not be identified to species due to water clarity and distance from plane, but could be classified as cheloniids (hard-shelled species) and not as leatherbacks. Size classes recorded during the surveys indicated that small juvenile (n = 39), large juvenile (n = 116), and adult (n = 45) life stages were present in these waters.

### Density estimation

After excluding sightings with no declination angle recorded and left-truncating data according to distance sampling methodology, 207 observations were included in the density estimation

**Table 1. Summary of combined aerial survey effort (km), the number of sea turtles sighted (*n*), seasonal estimates of sea turtle density (turtles/km²) and abundance with 95% confidence intervals for each estimate including lower and upper confidence limits (LCL and UCL, respectively).** Seasons are defined as winter (December-February), spring (March-May), summer (June-August), and fall (September-November).

| Year | season | effort (km) | *n* | density ($\hat{D}$) | abundance ($\hat{N}$) | % CV | 95% CI ($\hat{D}$) | | 95% CI ($\hat{N}$) | |
|------|--------|-------------|-----|---------------------|------------------------|------|--------|--------|--------|--------|
| | | | | | | | LCL | UCL | LCL | UCL |
| 2011 | winter | 2481.1 | 3 | 0.003 | 41 | 74% | 0.001 | 0.012 | 11 | 157 |
| | spring | 2598.2 | 30 | 0.030 | 392 | 30% | 0.017 | 0.054 | 218 | 705 |
| | summer | 2608.4 | 30 | 0.030 | 391 | 25% | 0.018 | 0.050 | 237 | 645 |
| | fall | 2612.5 | 10 | 0.010 | 130 | 40% | 0.005 | 0.022 | 59 | 285 |
| 2012 | winter | 3070.5 | 12 | 0.010 | 133 | 32% | 0.006 | 0.019 | 72 | 246 |
| | spring | 2957.8 | 73 | 0.064 | 838 | 18% | 0.045 | 0.092 | 587 | 1195 |
| | summer | 3036.3 | 37 | 0.032 | 414 | 19% | 0.022 | 0.047 | 281 | 608 |
| | fall | 3068.2 | 12 | 0.010 | 133 | 48% | 0.004 | 0.026 | 53 | 333 |
| Total | | 22,433 | 207 | 0.024 | 313 | 12% | 0.019 | 0.030 | 250 | 393 |

doi:10.1371/journal.pone.0145980.t001

analyses. Due to low numbers of turtle observations in some seasons and low numbers of some species, observations were pooled across seasons and species to estimate the probability of detection. Despite rigorous MCDS analysis, results indicated that the best model did not include any of the proposed covariates. Model selection using Akaike's Information Criterion (AIC) identified a hazard-rate model with no adjustments as the best fit for sea turtle detection in this study (Table 2; Fig 4).

Estimates of sea turtle density were generally higher for spring (March-May) and summer (June-August) seasons than during fall (September-November) and winter (December-



**Fig 2. Seasonal sightings of sea turtles from aerial surveys conducted in 2011–2012.** Each symbol represents a single sea turtle. Dotted lines represent the approximate location of the core of the Florida Current. Source: Florida Fish and Wildlife Conservation Commission-Fish and Wildlife Research Institute.

doi:10.1371/journal.pone.0145980.g002



**Fig 3. Sightings of the two most commonly observed sea turtle species in 2011–2012 by season.** Loggerheads (top panels) and green turtles (bottom panels) sighted in each season during 2011–2012 aerial surveys. Note that the highest numbers of loggerheads sighted is in the spring while the highest numbers of green turtles sighted is in the summer. Each symbol represents a single sea turtle. Dotted lines represent the approximate location of the core of the Florida Current. Source: Florida Fish and Wildlife Conservation Commission-Fish and Wildlife Research Institute.

doi:10.1371/journal.pone.0145980.g003

February) in both years (Fig 5). Additionally, estimates for spring 2012 were considerably higher than those for any other season (Table 1).

## Discussion

Aerial surveys are useful for assessing large, highly mobile marine vertebrates that must surface to breathe, such as sea turtles, and provide valuable information on the spatial and temporal shifts in distributions over large areas. However, a key shortcoming of many aerial surveys is relatively restricted temporal coverage, which limits the range of hypotheses that can be tested using these data. Our two-year long, monthly surveys provided a unique temporal perspective on sea turtle habitat use across seasons and in both a major warm water current and adjacent coastal waters. Such data have utility because they highlight spatially and temporally specific shifts in the abundance of these marine fauna. Our study represents the first estimation of the variation in sea turtle density and abundance in the waters offshore of the eastern coast of Florida at the seasonal level and provides a much-needed assessment of annual variation in sea turtle abundance coincident with critical breeding and nesting habitat.

The most frequently observed species, loggerhead (*C. caretta*) and green turtle (*C. mydas*), demonstrated similar spatial distributions within our study area (Fig 3) and correspond with the most abundant species nesting in this area [28]. However, loggerhead sightings increased in spring while green turtle sightings increased markedly in summer (Fig 3). The much smaller numbers of leatherbacks (*D. coriacea*) and Kemp's ridleys (*L. kempii*) made it impossible to draw any conclusions on their spatial distributions. Additionally, no hawksbills (*E. imbricata*) were observed during our surveys. This may be due to morphological similarities between



**Table 2. Akaike's Information Criterion (AIC) values for the conventional distance sampling and multiple covariate distance sampling models of the detection function tested.**

| model | adjustment terms | parameters | AIC | ΔAIC |
|---|---|---|---|---|
| *conventional distance sampling (CDS)* | | | | |
| HR | HP* | 2 | 2329.61 | 0.00 |
| HR | SP* | 2 | 2329.61 | 0.00 |
| HN | SP* | 1 | 2333.73 | 4.12 |
| HN | COS* | 1 | 2333.73 | 4.12 |
| Uni | COS* | 1 | 2334.04 | 4.43 |
| model | | parameters | AIC | ΔAIC |
| *multiple covariate distance sampling (MCDS)* | | | | |
| GL | | 3 | 2331.64 | 2.03 |
| OBS | | 3 | 2331.64 | 2.03 |
| SS | | 4 | 2333.63 | 4.02 |
| OBS SS | | 4 | 2333.64 | 4.02 |
| OBS GL | | 4 | 2333.64 | 4.03 |
| CC | | 5 | 2335.42 | 5.81 |
| OBS SS GL | | 5 | 2335.62 | 6.00 |
| SS GL | | 5 | 2335.63 | 6.02 |
| OBS SS CC | | 7 | 2336.38 | 6.77 |
| CC GL | | 6 | 2337.42 | 7.81 |
| OBS CC | | 6 | 2337.43 | 7.82 |
| OBS CC GL SS | | 8 | 2338.20 | 8.59 |
| SS CC | | 7 | 2339.35 | 9.74 |
| OBS CC GL | | 7 | 2339.43 | 9.82 |
| SS CC GL | | 8 | 2341.35 | 11.74 |

* Indicates no adjustment terms were selected by AIC.

doi:10.1371/journal.pone.0145980.t002



**Fig 4. Plot of the detection function for sea turtles based on the AIC selected Conventional Distance Sampling (CDS) model.** Histogram represents the probability of detection for each distance interval. The curved line is the detection function, showing the probability that a turtle is observed as a function of distance from the transect line.

doi:10.1371/journal.pone.0145980.g004



**Fig 5. Seasonal trend in sea turtle surface density with 95% confidence intervals estimated from conventional distance sampling analysis of aerial surveys.** Turtle densities varied with season in both years. The large peak in spring 2012 corresponded with a larger than normal number of nesting loggerhead turtles.

doi:10.1371/journal.pone.0145980.g005

hawksbill and green sea turtles. Without a positive identification, any observed hawksbills likely were classified as unidentified cheloniids. Loggerhead and green turtles were observed on every survey conducted during our study, demonstrating their presence in these waters year-round and their potential for interaction with any ocean energy technologies that may be placed in this area.

Turtles also displayed a strong affinity for more coastal waters with 72.8% of all observations west of the approximate core of the Florida Current (~20 km offshore). Previous studies show that sea turtles associate with oceanic currents [21,41–44] and post-hatchling loggerhead turtles are carried by the Florida Current to the Gulf Stream into the North Atlantic Gyre [31]. It is assumed that sea turtles of various life stages and all species that hatch in Florida encounter the Florida Current. Our results clearly indicate the presence of these threatened and endangered species in the southeast portion of the Florida Current and its surrounding waters (Fig 5), demonstrating the need for improved assessments of their in-water distributions and movements to more fully understand any impacts of future ocean energy developments.

There were seasonal variations of density and abundance estimates prevalent throughout our study period; higher estimates were during the spring and summer surveys and lower estimates during the fall and winter surveys (Fig 5). The coastal area of South Florida adjacent to our study hosts one of the world's largest loggerhead rookeries [24, 25] and increasing green turtle [18] and leatherback breeding populations [17], so it is reasonable to conclude that breeding and nesting turtles made up a large portion of our sightings during spring and summer (nesting season). Additionally, size classes recorded during surveys indicated larger individuals were identified more often during spring and summer surveys (n = 52) than winter and fall surveys (n = 5). Non-breeding turtles also migrate through Florida's waters en route to northern feeding grounds in the spring and summer months, returning to more southern habitats in the winter and fall months [11, 15]. These breeding and foraging migrations likely hold a large influence over the seasonal shifts in density and abundance observed in this study.

Additionally, the inter-annual variation of our density estimates highlights the potentially large variability in sea turtle behavior. Changes of the magnitudes observed over the two years


can complicate accurate estimation of their spatial and temporal densities. Our estimate of density from spring 2012 was more than twice that from spring 2011 (Table 1, Fig 5). However, there is independent evidence that the trends in density between the two seasons likely are representative; the 2012 nest counts for loggerheads were exceptionally high as compared with 2011 suggesting more turtles were nesting since nests per females is constrained [27]. Thus fluctuations in nesting behavior from year to year should be considered in interpreting results of surveys such as the one described here because such temporal shifts in local abundance impact estimations of sea turtle presence. Our study highlights the need for long term temporal monitoring of in-water sea turtle distributions and movements to examine how density and abundance vary across years.

This study clearly demonstrates the value of aerial surveys in (i) identifying the spatial distributions of marine turtles (protected species) in areas where there is potential for interactions with industry developments and (ii) estimating seasonal changes in density in ways that may be considered the effective management of species.

Despite the achievements of this study, there were several limitations. Selection of the conventional distance sampling (CDS) model over the multiple covariate distance sampling (MCDS) models was likely due to survey design and selection of flight dates for optimal surveying conditions. Because surveys were only conducted in optimal conditions, we effectively minimized the influence sea state and weather conditions that were considered in our MCDS analyses. Hence, inclusion of sea state and weather covariates did not improve the model of the detection function and thereby did not improve estimates of density or abundance. Although this did provide the benefit of removing potential sources of perception bias, it precluded the use of the more rigorous multiple covariate distance sampling methods with our observations.

Our density and abundance estimates are underestimates because they are surface estimates and are not corrected for perception bias or availability bias. Perception bias, animals at the surface that were not detected by observers, could not be addressed because equipment limitations prevented using a "double-platform" approach [59]. Availability bias, presence of animals underwater that cannot be detected by the observers, can be corrected for using concurrent dive profiles to assess the percentage of time spent at the surface. However, the scope and budget of the study prevented simultaneous tracking of turtles with time depth devices during the aerial surveys. Further, variation in dive duration correction is complex and can vary greatly with species, age, and oceanographic factors such as sea surface temperature or depth [62]. Nevertheless, a recent study on the effects of availability and perception bias on the results of aerial surveys for marine turtles in the Torres Strait indicates that uncorrected estimates are likely 20 times lower than estimates corrected for these biases [63]. This further illustrates the importance of this body of water for sea turtle species. Though, this estimate is predominantly based on adjustments for availability bias, it highlights the need for dedicated research that includes bias correction of aerial survey data to provide more robust density and abundance estimates. Finally, sea turtle distributions have been associated with a variety of oceanographic features including sea surface temperature [11, 44, 64], ocean depth or bathymetry [10, 65–67], chlorophyll a concentrations [64, 67], and mesoscale eddies [41], which should also be considered in future studies of sea turtle distributions.

Estimates of density and abundance are of particular interest for management and development of new conservation strategies for imperiled species like sea turtles because they provide valuable baselines for comparisons of changes in habitat uses or marine management outcomes. Aerial survey data for marine turtles have influenced fisheries management, habitat use and protection policies, and water use at local and large spatial scales [48–50, 55]. In our study area, the Florida Current is of particular interest because it has the potential to provide an alternative renewable energy source that may be captured by a variety of kinetic energy current

capture technologies [68]. The combination of existing submerged land leases for energy development, increased interests in developing current capture technologies, and ongoing research on implementation of these technologies necessitates a clear understanding of the potential effects of ocean energy development on sea turtles and other marine life. Establishing these baseline abundance estimates and continuing research to improve our understanding of sea turtle distributions and movements in these waters will aid in assessing the potential for interaction with energy capturing or other interests that share these important waters used by sea turtles.

## Supporting Information

**S1 Dataset. Dataset of sea turtle sightings from aerial surveys in 2011 and 2012 used in distance sampling analyses to estimate density and abundance.**
(PDF)

## Acknowledgments

We thank E. McMichael, J. Perrault, H. P. Hanson, S. Skemp, K. L. Mansfield, The Southeast National Marine Renewable Energy Center, Environmental Aviation Services, G. Alsenas, C. Coley, S. Crist, M. Glider, A. Lolovar, A. Loson, M. Rogers, V. Runge, and A. Taylor. Funding for this research was provided by the U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy through award DE-EE0000319 to the Southeast National Renewable Energy Center at Florida Atlantic University. This manuscript was improved by constructive comments from two anonymous reviewers.

## Author Contributions

Conceived and designed the experiments: CMB JW. Performed the experiments: CMB. Analyzed the data: CMB. Contributed reagents/materials/analysis tools: CMB JW. Wrote the paper: CMB JW. Obtained permits: JW.

## References

1.  Bolten AB. Variation in sea turtle life history patterns: neritic vs. oceanic developmental stages. In: Lutz PL, Musick JA, Wyneken J, editors. The biology of sea turtles, vol II. Boca Raton, Florida: CRC Press; 2002. p. 243–257. doi: 10.1201/9781420040807.ch9

2.  McClellan CM, Read AJ. Complexity and variation in loggerhead sea turtle life history. Biol Lett. 2007; 3: 592–4. doi: 10.1098/rsbl.2007.0355 PMID: 17698451

3.  Reich KJ, Bjorndal KA, Bolten AB. The "lost years" of green turtles: using stable isotopes to study cryptic lifestages. Biol Lett. 2007; 3: 712–714. doi: 10.1098/rsbl.2007.0394 PMID: 17878144

4.  Snover ML. Ontogenetic habitat shifts in marine organisms: Influencing factors and the impact of climate variability. Bull Mar Sci. 2008; 83: 53–67.

5.  Snover ML, Hohn AA, Crowder LB, Macko SA. Combining stable isotopes and skeletal growth marks to detect habitat shifts in juvenile loggerhead sea turtles *Caretta caretta*. Endanger Species Res. 2010; 13: 25–31. doi: 10.3354/esr00311

6.  Arendt MD, Segars AL, Byrd JI, Boynton J, Schwenter JA, Whitaker JD, et al. Migration, distribution, and diving behavior of adult male loggerhead sea turtles (*Caretta caretta*) following dispersal from a major breeding aggregation in the Western North Atlantic. Mar Biol. 2012; 159: 113–125. doi: 10.1007/s00227-011-1826-0

7.  Dodd KC, Byles R. Post-Nesting movements and behavior of loggerhead sea turtles (*Caretta caretta*) departing from East-Central Florida nesting beaches. Chelonian Conserv Biol. 2003; 4: 1–7.

8.  Eckert SA, Bagley D, Kubis S, Ehrhart L, Johnson C, Stewart K, et al. Internesting and postnesting movements and foraging habitats of leatherback sea turtles (*Dermochelys coriacea*) nesting in Florida. Chelonian Conserv Biol. 2006; 5: 239–248. doi: 10.2744/1071-8443(2006)5[239:IAPMAF]2.0.CO;2


9.  Girard C, Tucker AD, Calmettes B. Post-nesting migrations of loggerhead sea turtles in the Gulf of Mexico: dispersal in highly dynamic conditions. Mar Biol. 2009; 156: 1827–1839. doi: 10.1007/s00227-009-1216-z

10. Hart KM, Lamont MM, Fujisaki I, Tucker AD, Carthy RR. Common coastal foraging areas for loggerheads in the Gulf of Mexico: Opportunities for marine conservation. Biol Conserv. Elsevier Ltd; 2012; 145: 185–194. doi: 10.1016/j.biocon.2011.10.030

11. Mansfield KL, Saba VS, Keinath JA, Musick JA. Satellite tracking reveals a dichotomy in migration strategies among juvenile loggerhead turtles in the Northwest Atlantic. Mar Biol. 2009; 156: 2555–2570. doi: 10.1007/s00227-009-1279-x

12. Turtle Expert Working Group. An assessment of the leatherback turtle population in the Atlantic Ocean. 2007. NOAA Tech. Memo. NMFS-SEFSC-555. Available from: http://www.sefsc.noaa.gov/species/turtles/workinggroup.htm.

13. Turtle Expert Working Group. An assessment of the loggerhead turtle population in the western North Atlantic. 2009. NOAA Tech. Memo. NMFS-SEFSC-575. Available from: http://www.sefsc.noaa.gov/species/turtles/workinggroup.htm

14. Hatase H, Sato K, Yamaguchi M, Takahashi K, Tsukamoto K. Individual variation in feeding habitat use by adult female green sea turtles (Chelonia mydas): Are they obligately neritic herbivores? Oecologia. 2006; 149: 52–64. doi: 10.1007/s00442-006-0431-2 PMID: 16683139

15. Musick JA, Limpus C. Habitat utilization and migration in juvenile sea turtles. In: Lutz PL, Musick JA, editors. The biology of sea turtles I. Boca Raton, Florida: CRC Press; 1997. p. 137–163.

16. Chaloupka M, Bjorndal KA, Balazs GH, Bolten AB, Ehrhart LM, Limpus C, et al. Encouraging outlook for recovery of a once severely exploited marine megaherbivore. Glob Ecol Biogeogr. 2008; 17: 297–304. doi: 10.1111/j.1466-8238.2007.00367.x

17. Stewart K, Sims M, Meylan A, Witherington B, Brost B, Crowder LB. Leatherback nests increasing significantly in Florida, USA; trends assessed over 30 years using multilevel modeling. Ecol Appl. 2011; 21: 263–73. doi: 10.1890/09-1838.1 PMID: 21516903

18. Witherington BE. Chelonia mydas—green turtle. In: Meylan PA, editor. Biology and conservation of Florida turtles. Chelonian Research Monographs 3; 2006. p. 90–104.

19. Bovery CM, Wyneken J. Sea turtles in Florida's Atlantic waters. Mar Fish Rev. 2013; 75: 1–12. doi: 10.7755/MFR.75.3.1

20. Casale P, Abbate G, Freggi D, Conte N, Oliverio M, Argano R. Foraging ecology of loggerhead sea turtles Caretta caretta in the central Mediterranean Sea: evidence for a relaxed life history model. Mar Ecol Prog Ser. 2008; 372: 265–276. doi: 10.3354/meps07702

21. Polovina J, Uchida I, Balazs G, Howell EA, Parker D, Dutton P. The Kuroshio Extension Bifurcation Region: A pelagic hotspot for juvenile loggerhead sea turtles. Deep Sea Res Part II Top Stud Oceanogr. 2006; 53: 326–339. doi: 10.1016/j.dsr2.2006.01.006

22. Witherington B, Hirama S, Hardy R. Young sea turtles of the pelagic Sargassum-dominated drift community: habitat use, population density, and threats. Mar Ecol Prog Ser. 2012; 463: 1–22. doi: 10.3354/meps09970

23. Witzell WN, Bass AL, Bresette MJ, Singewald DA, Gorham JC. Origin of immature loggerhead sea turtles (Caretta caretta) at Hutchinson Island, Florida: evidence from mtDNA markers. Fish Bull. 2002; 100: 624–631.

24. Dodd KC. Synopsis of the biological data on the loggerhead sea turtle Caretta caretta (Linnaeus 1758). US Fish Wildl Serv Biol Rep. 1988; 88: 110.

25. Ehrhart LM, Bagely DA, Redfoot WE. Loggerhead sea turtles in the Atlantic Ocean: geographic distribution, abundance, and population status. In: Bolten AB, Witherington BE, editors. Loggerhead Sea Turtles. Washington, D.C.: Smithsonian Institution Press; 2003. p. 157–174.

26. Meylan AB, Witherington BE, Brost B, Rivero R, Kubilis PS. Sea turtle nesting in Florida, USA: assessments of abundance and trends for regionally significant populations of Caretta, Chelonia, and Dermochelys. In: Frick M, Panagopoulou A, Rees AF, Williams K, editors. Book of abstracts Twenty–sixth Annual Symposium on Sea Turtle Biology and Conservation. Int. Sea Turtle Soc., Athens, Greece.; 2006. p. 306–307.

27. Florida Fish and Wildlife Conservation Commission [Internet]. Index Nesting Beach Survey Totals (1989–2014) [cited 2015 Aug 17]. Available from: http://myfwc.com/research/wildlife/sea-turtles/nesting/beach-survey-totals/

28. Meylan A, Schroeder B, Mosier A. Sea turtle nesting activity in the state of Florida, 1979–1992. Florida Mar Res Publ Tech Rep. 1995; 52: 1–51.

29. Meylan AB, Redlow A. Eretmochelys imbricata–hawksbill turtle. In: Meylan PA, editor. Biology and conservation of Florida turtles. Chelonian Research Monographs 3; 2006. p. 105–127.


30. Johnson SA, Bass AL, Libert B, Marshall M, Fulk D. Kemp's ridley (*Lepidochelys kempi*) nesting in Florida. Florida Sci. 1999; 62: 194–204.

31. Mansfield KL, Wyneken J, Porter WP, Luo J. First satellite tracks of neonate sea turtles redefine the "lost years" oceanic niche. Proc R Soc B Biol Sci. 2014; 281: 20133039. doi: 10.1098/rspb.2013.3039

32. Arendt MD, Segars AL, Byrd JI, Boynton J, Whitaker JD, Parker L, et al. Seasonal distribution patterns of juvenile loggerhead sea turtles (*Caretta caretta*) following capture from a shipping channel in the Northwest Atlantic Ocean. Mar Biol. 2012; 159: 127–139. doi: 10.1007/s00227-011-1829-x

33. Ehrhart LM, Redfoot WE, Bagley DA. Marine turtles of the central region of the Indian River Lagoon System, Florida. Florida Sci. 2007; 70: 415–434.

34. Bresette MJ, Witherington BE, Herren RM, Bagley DA, Gorham JC, Traxler SL, et al. Size-class partitioning and herding in a foraging group of green turtles *Chelonia mydas*. Endanger Species Res. 2010; 9: 105–116. doi: 10.3354/esr00245

35. Makowski C, Seminoff J a., Salmon M. Home range and habitat use of juvenile Atlantic green turtles (*Chelonia mydas L.*) on shallow reef habitats in Palm Beach, Florida, USA. Mar Biol. 2005; 148: 1167–1179. doi: 10.1007/s00227-005-0150-y

36. Gitschlag GR. Migration and diving behavior of Kemp's ridley (Garman) sea turtles along the U.S. southeastern Atlantic coast. J Exp Mar Bio Ecol. 1996; 205: 115–135. doi: 10.1016/S0022-0981(96)02602-0

37. Henwood TA, Ogren LH. Distribution and migrations of immature Kemp's ridley turtle (*Lepidochelys kempii*) and green turtles (*Chelonia mydas*) off Florida, Georgia, and South Carolina. Northeast Gulf Sci. 1987; 9: 153–159.

38. Morreale S, Standora E. Western North Atlantic waters: crucial developmental habitat for Kemp's ridley and loggerhead sea turtles. Chelonian Conserv Biol. 2005; 4: 872–882.

39. Schmid J, Barichivich W. Developmental biology and ecology of the Kemp's ridley sea turtle, *Lepidochelys kempii*, in the eastern Gulf of Mexico. Chelonian Conserv Biol. 2005; 4: 828–834.

40. Wood LD. A preliminary assessment of hawksbill turtles (*Eretmochelys imbricata*) in Palm Beach county waters. In: Frick MA, Panagopoulou A, Rees A, Williams K, editors. Book of abstracts Twenty–sixth Annual Symposium on Sea Turtle Biology and Conservation. Athens, Greece: International Sea Turtle Society; 2006. p. 336.

41. Lambardi P, Lutjeharms J, Mencacci R, Hays G, Luschi P. Influence of ocean currents on long-distance movement of leatherback sea turtles in the Southwest Indian Ocean. Mar Ecol Prog Ser. 2008; 353: 289–301. doi: 10.3354/meps07118

42. Luschi P, Hays GC, Papi F. A review of long-distance movements by marine turtles, and the possible role of ocean currents. Oikos. 2003; 103: 293–302. doi: 10.1034/j.1600-0706.2003.12123.x

43. Polovina JJ, Kobayashi DR, Parker DM, Seki MP, Balazs GH. Turtles on the edge: movement of loggerhead turtles (*Caretta caretta*) along oceanic fronts, spanning longline fishing grounds in the central North Pacific, 1997–1998. Fish Oceanogr. 2000; 9: 71–82. doi: 10.1046/j.1365-2419.2000.00123.x

44. Hawkes LA, Broderick AC, Coyne MS, Godfrey MH, Godley BJ. Only some like it hot—quantifying the environmental niche of the loggerhead sea turtle. Divers Distrib. 2007; 13: 447–457. doi: 10.1111/j.1472-4642.2007.00354.x

45. Putman NF, Shay TJ, Lohmann KJ. Is the geographic distribution of nesting in the Kemp's ridley turtle shaped by the migratory needs of offspring? Integr Comp Biol. 2010; 50: 305–14. doi: 10.1093/icb/icq041 PMID: 21558205

46. Hanson HP, Skemp SH, Alsenas GM, Coley CE. Power from the Florida Current: A new perspective on an old vision. Bull Am Meteorol Soc. 2010; 91: 861–866. doi: 10.1175/2010BAMS3021.1

47. Kenney RD, Shoop CR. Aerial surveys for marine turtles. In: McDiarmid RW, Foster MS, Guyer C, Gibbons JW, Chernoff N, editors. Reptile Biodiversity: Standard methods for inventory and monitoring. Berkeley, California: University of California Press; 2012. p. 264–271.

48. Braun-McNeill J, Epperly SP. Spatial and temporal distribution of sea turtles in the Western North Atlantic and the U. S. Gulf of Mexico from marine recreational fishery statistics survey (MRFSS). Mar Fish Rev. 2002; 64: 50–56.

49. Epperly SP, Braun J, Chester AJ. Aerial surveys for sea turtles in North Carolina inshore waters. Fish Bull. 1995; 93: 254–261.

50. Gómez de Segura A, Tomás J, Pedraza SN, Crespo EA, Raga JA. Abundance and distribution of the endangered loggerhead turtle in Spanish Mediterranean waters and the conservation implications. Anim Conserv. 2006; 9: 199–206. doi: 10.1111/j.1469-1795.2005.00014.x

51. Hoffman W, Fritts TH. Sea turtle distribution along the boundary of the Gulf Stream current off eastern Florida. Herpetologica. 1982; 38: 405–409.

52. Jean C, Ciccione S, Ballorain K, Georges J-Y, Bourjea J. Ultralight aircraft surveys reveal marine turtle population increases along the west coast of Reunion Island. Oryx. 2010; 44: 223–229. doi: 10.1017/S003060530999072X

53. Lauriano G, Panigada S, Casale P, Pierantonio N, Donovan G. Aerial survey abundance estimates of the loggerhead sea turtle *Caretta caretta* in the Pelagos Sanctuary, northwestern Mediterranean Sea. Mar Ecol Prog Ser. 2011; 437: 291–302. doi: 10.3354/meps09261

54. Mansfield KL. Sources of mortality, movements, and behavior of sea turtles in Virginia. Dissertation, The College of William and Mary. 2006.

55. McClellan DB. Aerial surveys for sea turtles, marine mammals, and vessel activity along the southeast Florida Coast: 1992–1996. 1996. NOAA Tech Memo NMFS–SEFSC–390. Available from: http://www.sefsc.noaa.gov/turtles/TM_390_McClellan.pdf

56. Schroeder BA, Thompson NB. Distribution of the loggerhead turtle, *Caretta caretta*, and the leatherback turtle, Dermochelys coriacea, in the Cape Canaveral, Florida area: results of aerial surveys. In: Witzell WN, editor. Ecology of east Florida sea turtles: Proceedings of the Cape Canaveral, Florida Sea Turtle Workshop. 1985 Feb 26–27; Cape Canaveral, Florida. NOAA Tech. Rep. NMFS–SEFSC–53. Available from: http://spo.nwr.noaa.gov/tr53.pdf

57. Shoop CR, Kenney RD. Seasonal distributions and abundances of loggerhead and leatherback sea turtles in waters of the Northeastern United States. Herpetol Monogr. 1992; 6: 43–67. doi: 10.2307/1466961

58. Fritts TH, Irvine AB, Jennings RD, Coiium LA, Hoffman W, Mcgehee MA. Turtles, birds, and mammals in the Northern Gulf of Mexico and nearby Atlantic Waters. U.S. Fish and Wildlife Service, Division of Biological Services, Washington, D.C. FWS/OBS-82/65. 1983; 455.

59. Buckland ST, Anderson DR, Burnham KP, Laake JL, Borchers DL, Thomas L. Introduction to distance sampling. Oxford University Press, Oxford, United Kingdom; 2001.

60. Thomas L, Buckland ST, Rexstad EA, Laake JL, Strindberg S, Hedley SL, et al. Distance software: design and analysis of distance sampling surveys for estimating population size. J Appl Ecol. 2010; 47: 5–14. doi: 10.1111/j.1365-2664.2009.01737.x PMID: 20383262

61. Marques TA, Thomas L, Fancy SG, Buckland ST. Improving estimates of bird density using multiple-covariate distance sampling. Auk. 2007; 124: 1229. doi: 10.1642/0004-8038(2007)124[1229:IEOBDU]2.0.CO;2

62. Thomson JA, Cooper AB, Burkholder DA, Heithaus MR, Dill LM. Heterogeneous patterns of availability for detection during visual surveys: spatiotemporal variation in sea turtle dive-surfacing behaviour on a feeding ground. Methods Ecol Evol. 2012; 3: 378–387. doi: 10.1111/j.2041-210X.2011.00163.x

63. Fuentes MMPB, Bell I, Hagihara R, Hamann M, Hazel J, Huth a., et al. Improving in-water estimates of marine turtle abundance by adjusting aerial survey counts for perception and availability biases. J Exp Mar Bio Ecol. Elsevier B.V.; 2015; 471: 77–83. doi: 10.1016/j.jembe.2015.05.003

64. Kobayashi DR, Polovina JJ, Parker DM, Kamezaki N, Cheng I-J, Uchida I, et al. Pelagic habitat characterization of loggerhead sea turtles, *Caretta caretta*, in the North Pacific Ocean (1997–2006): Insights from satellite tag tracking and remotely sensed data. J Exp Mar Bio Ecol. 2008; 356: 96–114. doi: 10.1016/j.jembe.2007.12.019

65. Arendt MD, Segars AL, Byrd JI, Boynton J, Whitaker JD, Parker L, et al. Distributional patterns of adult male loggerhead sea turtles (*Caretta caretta*) in the vicinity of Cape Canaveral, Florida, USA during and after a major annual breeding aggregation. Mar Biol. 2012; 159: 101–112. doi: 10.1007/s00227-011-1793-5

66. Hawkes LA, Witt MJ, Broderick AC, Coker JW, Coyne MS, Dodd M, et al. Home on the range: spatial ecology of loggerhead turtles in Atlantic waters of the USA. Divers Distrib. 2011; 17: 624–640. doi: 10.1111/j.1472-4642.2011.00768.x

67. Seminoff JA, Zárate P, Coyne M, Foley DG, Parker D, Lyon BN, et al. Post-nesting migrations of Galápagos green turtles *Chelonia mydas* in relation to oceanographic conditions: integrating satellite telemetry with remotely sensed ocean data. Endanger Species Res. 2007; 4: 57–72. doi: 10.3354/esr00066

68. Hanson HP, Bozek A, Duerr AES. The Florida Current : A clean but challenging energy resource. Eos, Trans Am Geophys Union. 2011; 92: 3–5. doi: 10.1029/2011EO040001

# Exhibit G