# Exhibit 5

DocuSign Envelope ID: 6CA07553-0D1D-4CBA-98A6-010224319128

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | **CASE NO.** 1:21-cv-00119 (RDM) |

**DECLARATION OF BRETT HARTL IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Brett Hartl, make the following declaration:

1. I am a resident of Prescott, AZ.

2. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3. I am the Government Affairs Director at the Center for Biological Diversity ("Center"), and I work out of both the Center's Washington, D.C., and Arizona offices. I have been with the Center since 2013.

4. I am also a member of the Center and have been a member of the Center since 2013. As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

5. I hold a bachelor's degree from Prescott College in conservation biology, and a law degree from Lewis and Clark Law School. Prior to law school, I spent five years as a field

biologist working with endangered species in the northwest Hawaiian Islands, Kauai, and Southern California.  I also worked in the House of Representatives Natural Resources Committee for Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

      6.      The Center is a member organization incorporated under the laws of the State of California.  It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. The Center has 81,843 active members across the country, including more than 3,519 members in Florida.  The Center is based in Tucson, AZ, and works throughout the entire United States.  Our other major offices are in Washington, D.C.; San Francisco, CA; and Portland, OR.

      7.      The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law.  Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction.  We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

      8.      In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, clean water, and environmental protection broadly.  This includes agency rulemaking and their policy consequences throughout the country.  I coordinate the Center's response and engagement, meet with agency officials, and work with outside stakeholders.  I oversee or am involved with

Freedom of Information Act ("FOIA") requests, formal commenting, advocacy, lobbying, and litigation.

9. Protection of endangered and threatened species is a core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live. The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats for species, and holding federal agencies accountable to their duties to protect species as directed by Congress.

10. Many of the species we work to protect throughout the country rely on healthy, intact wetlands to survive—whether directly or indirectly. Wetlands are therefore vital to our endangered species work. To that end, the Center has longstanding programs to protect freshwater and protected species in the Southeast, which is a hotspot of extinction nationally.

11. One such program is the Southeast Freshwater Extinction Campaign, which seeks to protect the unique and vast aquatic biodiversity of the Southeastern United States. The Southeastern United States has some of the richest aquatic fauna of any temperate area in the world, including globally significant diversity of freshwater mussels, freshwater fish and other species. The Southeast contains two-thirds of North America's species and subspecies of crayfishes and contains more amphibians and aquatic reptiles than any other region. It is also home to the largest number of listed species and extinct species in the lower 48 states. For example, nearly 70% of all freshwater mussel species in North America are either protected under the Act or already extinct, and most of the remaining species are declining and will need

protection under the Endangered Species Act in the future. Loss of these aquatic species in this region represents not only a loss to the nation as a whole but to the entire global biodiversity of freshwater systems.

12. Within the Southeastern United States, Florida has irreplaceable ecosystems not found anywhere else in the country, made up of semi-tropical environments, marine estuary systems, and springs. These include iconic ecosystems such as the Everglades and the Pine Rockland ecosystems. Florida is also home to unique protected species, including but not limited to the West Indian Manatee, frosted flatwoods salamander, wood stork, eastern indigo snake, various species of turtles, smalltooth sawfish, and freshwater mussels. Florida is also home to some of the largest populations of protected sea turtles nationally. Any loss of biodiversity in Florida represents a loss to the nation at large. The uniqueness of these species and ecosystems means these losses cannot be replaced.

13. Florida's wetlands provide key migratory stopover habitats for numerous species of birds that migrate between the United States and Central America, the Caribbean, and South America. Examples of listed species that are migratory and rely on Florida's wetlands include the Red Knot, which migrate from South America to Canada and back each year and the Black Rail, which winters in Florida and migrates to the east coast to breed. Other listed species of birds like the Everglades Snail Kite and Audubon's Caracara rely on Florida's wetland ecosystems year-round.

14. The federal section 404 wetlands permitting program provides a vital check on actions that would otherwise destroy wetlands, and it ensures vital information is gathered to understand how an action impacts wetlands and the species who rely on them. It provides

federally minimum levels of protections that have been instrumental in conservation of protected species.

16. Assumption by the states that is not in strict compliance with federal law is extremely problematic, because it will not provide the same level of transparency and substantive protections that the federal program provides.

16. Unlawful state assumption of 404 programs would harm the Center's ability to protect wildlife, in Florida and around the country.

17. Just as the Center is engaged in litigation in this case to challenge EPA's approval of Florida's program and related federal agency actions, the Center has also been monitoring other states that have expressed an interest in assuming the CWA 404 program. For example, one state we are monitoring closely is Arizona, which since 2018 has been considering changes to its wetlands regulation program that may ultimately include the State applying to assume the 404 program. Wetland and riparian areas in desert environments are particularly critical to wildlife. Nearly 80 percent of all wildlife species, including numerous listed species like the Yellow-billed Cuckoo, SW Willow Flycatcher and narrow-headed gartersnake, are found close to riparian and wetland ecosystems. If Arizona were to assume 404 permitting without sufficient safeguards, many of these species would be harmed.

18. It is my understanding that former U.S. Environmental Protection Agency Administrator Andrew Wheeler, at the press conference announcing EPA's approval of Florida's 404 program, encouraged other states to follow Florida's example as a model. If EPA's approval of Florida's 404 program is permitted, it would set a dangerous precedent of state 404 programs that are inadequate to protect listed species and wetlands.

19. The Center is particularly concerned with how EPA's approval of Florida's 404 program will likely result in increased negative impacts to wildlife and water quality, as follows:

20. I am aware that 404 permits have already been transferred by the Army Corps of Engineers to the State of Florida's Department of Environmental Protection ("DEP") and that new permit applications have been submitted to DEP. I also understand that DEP has begun processing applications. DEP has stated that its intention is to approve permits faster.

21. I believe that with the Florida dredge-and-fill permitting program, the wetlands that would be impacted by development projects would not receive the same level of environmental review that they would otherwise under the dredge-and-fill permitting program administered by the U.S. Army Corps of Engineers and consulting federal agencies like the U.S. Fish and Wildlife Service and National Marine Fisheries Service. If Florida is permitted to continue administering the 404 program, the Center will be prevented from fully assessing and publicly engaging on specific project applications and will be forced to expend significant resources in the process to discover or develop information that would otherwise be afforded by NEPA and the ESA. Additionally, EPA's approval of Florida's assumption program will harm the Center's ability to litigate on behalf of wetland habitats and the species that rely on them.

22. Because legal challenges to state permits would have to be filed in state administrative court, rather than proceed as administrative record cases litigated in federal court, it is my understanding that the Center would be required to spend significant monetary resources to hire expert witnesses to successfully bring legal challenges—monetary resources that would otherwise be put toward other important organizational initiatives and goals. The significant expense involved in bringing expert-driven challenges in state court would also likely mean that

the Center would have to forego challenging permits it would and could otherwise have challenged in federal court.

23. It is also my understanding that it is significantly more difficult to establish standing in state court when compared to federal court. For example, in Florida state court, an organization like the Center is required to show that a *substantial number* of its members will be affected by the challenged action, while in federal court organizations can establish standing based on harms suffered by an individual member. With a national membership, it would be exceedingly difficult, if not impossible, for the Center to establish standing to challenge individual permits under such a state standard.

24. It is also my understanding that, in state court, the Center would be exposed to liability for legal fees and costs under mandatory fee-shifting state law provisions for certain types of permit challenges that it would not be exposed to in federal court. This would hamper the Center's ability to participate in vigorous advocacy for species and habitat because the Center would be required to weigh that significant financial risk—even if the Center had strong legal claims.

25. With Florida's assumption of the 404 program, the lack of project-by-project consultation with U.S. Fish and Wildlife Service under Section 7 or Section 10 of the ESA, and the blanket exemption from incidental take liability extended to the state and state permittees, imperils protected species that the Center's mission is to protect.

26. Moreover, without the information that is made available under the ESA consultation process and NEPA review process—including a robust alternatives analysis—the Center is denied important information about environmental and species impacts, forcing the Center to hire scientific experts to carry out the analysis. This would cost the Center significant

DocuSign Envelope ID: 6CA07553-0D1D-4CBA-98A6-010224319128

financial resources that could have been put toward other organizational priorities and would reduce the number of potentially harmful and concerning projects on which the Center could engage. As a result, the Center and its members do not have access to important information about the effects of wetland destruction on species, nor do we have a clear process to advocate on behalf of endangered and threatened species at the administrative level. This, in turn, harms the Center's interest in meaningfully evaluating how wetland destruction harms endangered and threatened species, and advocating on their behalf. It would also require the Center to hire its own scientific experts to analyze the species effects, which would require the Center to use financial resources it could have put toward other organizational missions.

27. As an organization that is opposed to Florida's assumption of the 404 permitting program, for all of the reasons stated in Plaintiffs' complaint and in this declaration, the Center was harmed by EPA's decision to make the state-assumed 404 program effective immediately on December 22, 2020, rather than at least 30 days after publication (January 21, 2021), as required for rulemakings, and without lawfully effectuating that transfer through codification. The unlawful transfer of authority from the Corps to the state harms the Center's ability to carry out its organizational mission of protecting the environment and wildlife, and harms members' aesthetic, recreational, and other interests as a result of the state's unlawful administration of the 404 program.

28. As a result of EPA's immediate effective date, The Center lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of inauguration day. The Center would have exercised these rights had they been available.

DocuSign Envelope ID: 6CA07553-0D1D-4CBA-98A6-010224319128

29. As to reconsideration, the Center was deprived of the right to ask EPA to reconsider its approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

30. As a result of EPA's immediate effective date, the Center was also denied the right to ask the agency to postpone the effective date of the rule pending judicial review. On January 20, 2021, the Center and the other Plaintiffs in this action, via Earthjustice's letter "Request for Expedited Action; Ctr. for Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)," asked EPA to cure the immediate effective date and failure to codify violations regarding the state program. The Center and the other Plaintiffs further requested that if EPA were to properly promulgate and codify its approval of Florida's program, that the agency also postpone the effective date of that action pending judicial review. EPA, however, has adhered to its position that the immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay request. If the court were to remedy these violations, The Center would again ask the agency to postpone the effective date of the rule pending judicial review.

31. EPA's immediate effective date of December 22, 2020 also foreclosed the Center's ability to benefit from the Biden Administration's review of the rule. It is my understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing agency heads to review and consider postponing by at least 60 days any rule that had been published in the Federal Register but had not taken effect. [1] Had EPA provided the required 30-

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

9

DocuSign Envelope ID: 6CA07553-0D1D-4CBA-98A6-010224319128

day effective date from its publication in the Federal Register, it is my understanding that EPA's approval and transfer of authority to the state would have been covered by the Klain Memo. A review of the unlawful aspects of Florida's 404 program could have resulted in actions to stay the program's effective date and take other remedial measures.

32. The loss of procedural rights the Center has sustained as a result of EPA's immediate transfer of authority to the state, as well as its failure to lawfully effectuate the transfer through codification, has resulted in immediate and ongoing organizational and membership harms while the state's unlawful program operates. The state's 404 program causes the Center to divert resources, threatens wetlands and wildlife, and undermines the Center's ability to realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

33. EPA's unlawful transfer of authority to the state via an immediate effective date and without codifying the state program means that the state is presently administering the 404 program while the Center has been denied the right to request reconsideration or an agency stay pending judicial review, and the ability to benefit from the Klain memo. As a result, the state is poised to issue 404 permits on major projects that will harm the Center's organizational interests the interests of its members.

34. Of particular concern to the Center if Florida is permitted to operate this unlawful 404 program are the proposed Burnett Oil drilling projects, whose 404 applications are currently pending before the state, that would pave the way for oil drilling in Big Cypress National Preserve for the next 30 years. See Declaration of Ann Wiley in Support of Plaintiffs' Partial Motion for Summary Judgment, dated March 3, 2021. Not only will the Center experience the aforementioned harms to its mission of protecting species and the natural environment as these

DocuSign Envelope ID: 6CA07553-0D1D-4CBA-98A6-010224319128

permits are being processed and if approved, the Center's members will be harmed by these projects to develop in our nation's first national preserve. The freshwaters of Big Cypress are vital to the health of the neighboring Everglades and to the wildlife that inhabit it—waters and wildlife that the Center strives to protect and that our members enjoy.

35. If Florida is allowed to continue administering an unlawful dredge-and-fill permitting program, the Center and its members will be harmed in their ability to protect wetlands, imperiled species, and their habitat.

36. A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority to the state, thereby allowing the Center to pursue all avenues, as discussed above, including seeking an agency stay of Florida's administration of the Section 404 pending judicial review. In addition, as indicated by the Klain memo, the Biden Administration is focused on reviewing final actions of the outgoing Administration, and as new leadership of the agency Defendants comes in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial review.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of March 2021, in Prescott, AZ.

*Brett Hartl* (DocuSigned)

Brett Hartl
Government Affairs Director
Center for Biological Diversity
1411 K Street, NW, Ste. 1300
Washington, D.C. 20005