# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **CASE NO.** 1:21-cv-00119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

## DECLARATION OF ANDREW CARTER IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Andrew Carter, make the following declaration:

1. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

2. I have a Ph.D. in Environmental Science and Policy from the Abess Center for Ecosystem Science and Policy at the University of Miami, a J.D. from the University of Miami School of Law, an M.A. in Marine Conservation and Policy from Stony Brook University, and a B.A. in Anthropology and Geography from Hunter College.

3. I am a Senior Conservation Policy Analyst at Defenders of Wildlife ("Defenders") and work in Defenders' national headquarters in Washington, D.C.

4. I work on Defenders' Center for Conservation Innovation team where I research and analyze conservation governance strategies and emerging policy issues to preserve

1

biodiversity and promote habitat and species protection. The scope of my work is nationwide, rather than being trained on one particular region. I have been at Defenders since 2019.

5. Founded in 1947, Defenders is a 501(c)(3) nonprofit membership organization with six regional offices throughout the country.

6. Defenders' mission is to protect species and the habitats upon which they depend. In doing so, we focus on preserving the health of our nation's rich biological heritage (biodiversity).

7. Defenders works to achieve its mission by various means such as policy development, litigation, research, education, and engagement with federal, state, and local governments.

8. Habitat and biodiversity loss are disrupting ecosystems and breaking down the natural barriers that help reduce disease transfer and provide critical ecosystem services such as pollination, water filtration and carbon sequestration. With these services at risk, protecting our wildlife and their habitats is now more important than ever.

9. More than one-third of our country's threatened and endangered species live exclusively in wetlands, and almost half of these imperiled species use wetlands at some point during their lives. Unfortunately, the United States has lost over half of the wetlands in the lower 48 states.

10. Preventing or minimizing water pollution is critically important to protecting marine and aquatic species, as well as species like many birds that rely on healthy wetlands for food and shelter.

11. To that end, Defenders engages in advocacy, including litigation, to protect imperiled marine/aquatic and other species, and their habitats, including wetlands.

12. On a national scale, every species Defenders works to protect is an important species in the web of life. Wildlife has the greatest chance of being secure and thriving if it is supported by a transnational network of conserved public and private lands, rivers and coastal waters, core natural areas, and working landscapes.

13. We approach our work at Defenders with the understanding that local actions have national consequences. For instance, last year I coauthored a paper with two coworkers addressing the need for a monitoring policy framework for the United States Endangered Species Act ("ESA"). Megan Evansen et al., *A Monitoring Policy Framework for the United States Endangered Species Act* (2020). The U.S. Fish and Wildlife Service ("USFWS") is in dire need of a comprehensive national monitoring policy in large part because many listed species have ranges spanning multiple states. Individual state decisions affecting these species in their respective states will affect the likelihood of a species' future existence as a whole. A standardized national monitoring policy is necessary to prevent siloed policymaking and enhance the species' likelihood of survival overall.

14. Defenders has joined other conservationists to achieve our goal "30 by 30," which aims protect at least 30% of the planet by 2030. Integral to that goal is ensuring species and habitat conservation in Florida. Recently, President Biden signed an executive order setting that goal for the federal government.

15. To address the larger issue of biodiversity loss, we at Defenders also engage with communities across the country to protect public lands, restore habitat, limit negative interactions between humans and wildlife, and advocate for protections for imperiled species. Engaging in Florida-based issues is a part of our national strategy because it is a critical piece in the nationwide puzzle of biodiversity preservation.

16. Florida has a large number of species designated as threatened or endangered under the ESA. According to Service data, approximately 131 threatened or endangered species are found in Florida, with about 70% of those species found only in Florida, such as the endangered Florida panther, Florida bonneted bat, and Florida key deer.





17. Florida habitat is also home to populations of imperiled species whose ranges span beyond Florida. For instance, many threatened red knots use Florida as their midpoint to land and refuel during their migration to their Arctic breeding grounds from as far south as Argentina.



18. Some threatened West Indian manatees are known to migrate north to Georgia, South Carolina, and North Carolina or west into Alabama and Louisiana.



4

19. Several species of ESA-listed sea turtles, too, can be found in Florida in addition to coastal areas of other states. For example, the threatened Northwest Atlantic Ocean Distinct Population Segment of the loggerhead sea turtle nests primarily along the Atlantic coast of Florida, South Carolina, Georgia, and North Carolina, and along the Florida and Alabama coasts in the Gulf of Mexico. Endangered hawksbill sea turtles occur in states along the Gulf of Mexico, especially in Texas, and in the United States, their nesting is limited to the southeast coast of Florida and the Florida Keys.




Loggerhead sea turtle. Photo courtesy of Wexor Tmg

Hawksbill sea turtle. Photo courtesy of Kris Mikael Krister

20. Given Florida's importance to achieving Defenders' national mission, projects of mine that are national in scale can require me to work on issues that occur in Florida, such as by reviewing ESA section 7 consultation documents and ESA section 10 habitat conservation plans.

21. EPA's approval of Florida's application to assume control of section 404 permitting undermines Defenders' mission. Among other failings, Florida does not commit any new financial resources to the program, it has no lawful plans to ensure that listed species are adequately protected, and analyses of section 404 permit applications issued by Florida would no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers instead.

22. According to Florida, waters subject to the state 404 program include 11 million acres of wetlands, 7,800 freshwater lakes, 700 springs, numerous underground aquifers and more than 1,700 rivers and streams.

23. Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program.  For example, these projects can cause habitat destruction and fragmentation for endangered Florida bonneted bats, red-cockaded woodpeckers, Florida panthers, and Florida salt marsh voles, as well as threatened American crocodiles and Eastern indigo snakes.  Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA.



6

24. Because section 404 permit applications processed by Florida will not undergo a NEPA analysis or site-specific ESA section 7 consultation, nor will they be subject to Section 10 habitat conservation plans, these projects will likely be subject to a far less rigorous environmental review, which increases risk of harm to listed species and their habitat.

25. The state's administration of this unlawful section 404 program will also prevent Defenders from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us. Without a NEPA analysis, we will not have access to the same level of information regarding a project's environmental impacts as we would for projects reviewed by the Corps.

26. The state's unlawful assumption will interfere with our ability to litigate over illegal section 404 permitting actions, when necessary. It is my understanding that there is a higher bar to establish organizational standing in Florida state court because we would be required to show that a *substantial* number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected. As an organization with nationwide membership, it would be impracticable to make such a showing in every case. It is also my understanding that Defenders would risk exposure to mandatory fee-shifting for certain types of permit litigation, which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency. The risk of incurring these substantial costs and fees could result in our inability to bring certain types of litigation in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

27. Defenders was harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits. These documents were not provided during the public comment period and were completed only after the public comment period closed. Florida's application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion"; however, the biological opinion containing that information was not part of the application, frustrating Defenders' ability to analyze and comment on the process. Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for me to determine whether the state program met that criteria.

28. EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with U.S. Fish and Wildlife Service for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species.

29. Given the unlawful aspects of the state 404 program, Defenders was harmed by EPA's decision to make the state-assumed 404 program effective immediately on December 22, 2020, rather than at least 30 days after publication (January 21, 2021), as required for rulemakings, and without lawfully effectuating that transfer through codification. The unlawful transfer of authority from the Corps to the state harms Defenders' ability to carry out its organizational mission of protecting the environment and wildlife and harms our members' interests as a result of the state's unlawful administration of the 404 program.

8

30. As a result of EPA's immediate effective date, Defenders lost the procedural rights to seek agency reconsideration prior to the transfer going into effect, to seek an agency stay pending judicial review, and to benefit from the incoming Administration's directive to review, and consider staying, rules that had not yet gone into effect as of Inauguration Day. Defenders would have exercised these rights had they been available.

31. As to reconsideration, Defenders was deprived of the right to ask EPA to reconsider its determination that Florida's application was complete, and to allow public comment on the complete application, before the rule took effect. Defenders was also deprived of the right to ask EPA to reconsider its approval of the state program as unlawful, for the reasons stated in Plaintiffs' Complaint.

32. As a result of EPA's immediate effective date, Defenders was also denied the right to ask the agency to postpone the effective date of the rule pending judicial review. On January 20, 2021, Defenders and the other Plaintiffs in this action, via Earthjustice's letter "Request for Expedited Action; Ctr. for Biological Diversity, et al., v. Wheeler, No. 1:21-cv-119-RDM (D.D.C. Jan. 14, 2021)," asked EPA to cure the immediate effective date and failure to codify violations regarding the state program. Defenders and the other Plaintiffs further requested that if EPA were to properly promulgate and codify its approval of Florida's program, that the agency also postpone the effective date of that action pending judicial review. EPA, however, has adhered to its position that the immediate effective date was lawful, prohibiting the agency from considering Plaintiffs' stay request. If the court were to remedy these violations, Defenders would again ask the agency to postpone the effective date of the rule pending judicial review.

9

33.     EPA's immediate effective date of December 22, 2020 also foreclosed Defenders' ability to benefit from the Biden Administration's review of the rule.  It is my understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing agency heads to review and consider postponing by at least 60 days any rule that had been published in the Federal Register but had not taken effect.[1]  Had EPA provided the required 30-day effective date from its publication in the Federal Register, it is my understanding that EPA's approval and transfer of authority to the state would have been covered by the Klain Memo.  A review of the unlawful aspects of Florida's 404 program could have resulted in actions to stay the program's effective date and take other remedial measures.

34.     The loss of procedural rights Defenders has sustained as a result of EPA's immediate transfer of authority to the state, as well as its failure to lawfully effectuate the transfer through codification, has resulted in immediate and ongoing harm while the state's unlawful program operates.  The state's inadequate 404 program causes Defenders to divert resources, threatens wetlands and wildlife, and undermines Defenders' ability to realize its mission by depriving the organization of information, rights and remedies available when Section 404 is administered by the Corps as it has been for decades.

35.     Additionally, Defenders will be harmed if its work on the proposed Eastern Collier County Habitat Conservation Plan ("Eastern Collier HCP") does not go forward as a result of the state's unlawful 404 program.  Depending on the scope of a proposal, the ESA Section 10 HCP process can require rigorous planning that must account for minimizing and

---

[1] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/

10

mitigating impacts to protected species, among other requirements, and depending on the complexity of the plan, can include requirements such as long-term monitoring to ensure the plan's effectiveness.

36.     The proposed Eastern Collier HCP covers approximately 152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region. Defenders has been deeply involved in working on the Eastern Collier HCP, which represents a significant focus of its Florida conservation work, with the goal of protecting species in one of the most biodiverse regions of the country. The species at issue for this HCP include 11 federally listed or candidate species, such as the Florida panther, Florida scrub jay, and Florida bonneted bat.

37.     Defenders is concerned that Florida's unlawful 404 permitting program—which offers incidental take protection through its "technical assistance" process—will create less of an incentive for private developers to want to engage in the HCP process. Indeed, it has come to Defenders staff members' attention that landowners who are party to the Eastern Collier HCP are considering withdrawing from the HCP, now that there is a state 404 assumption program with much lower bars to meet to obtain incidental take authorization and which does not meaningfully account for landscape-scale conservation.

38.     This would represent the loss of an entire body of Defenders' work in Florida to protect endangered and threatened species in this region. It would also mean that Defenders would have to redouble our efforts advocating for the gains that would be lost if the landowners involved in the HCP walk away.

39. The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, would be detrimental to our ability to carry out our organizational mission of protecting wildlife.

40. Due to my work regarding environmental governance at the national level, I am particularly concerned about state-specific actions that could have broader impacts across the country. Allowing an unlawful 404 assumption program could spur other states to apply for and receive authority under section 404 of the Clean Water Act to administer programs that do not comply with federal law.

41. Many states, like Florida, do not appear to have sufficient resources to assume permitting authority over dredge-and-fill operations, and should they receive that authority, wetlands degradation and its corresponding impact on threatened and endangered species could accelerate across the country.

42. It is my understanding that several other states have taken steps to submit their own section 404 assumption applications. Defenders will monitor these developments as they occur and engage in advocacy efforts, as necessary, to oppose unlawful state programs that pose a threat to our mission.

43. If Florida is allowed to continue unlawfully operating the dredge-and-fill permitting program, Defenders and its members would be irreparably harmed in their ability to protect wetlands, imperiled species, and their habitat.

44. A ruling in Plaintiffs' favor would set aside EPA's immediate transfer of authority to the state, thereby allowing Defenders to pursue all avenues, as discussed above, including seeking an agency stay of Florida's administration of the Section 404 program pending judicial review. In addition, as indicated by the Klain memo, the Biden Administration is focused on

reviewing final actions of the outgoing Administration, and as new leadership of the agency Defendants comes in, it is possible that the agencies would grant Plaintiffs relief, particularly pending judicial review.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of March, 2021, in Washington, D.C.

DocuSigned by:

*[signature]*

6DAE3F002F704A3...

Andrew Carter
Senior Conservation Policy Analyst
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036