# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | CASE NO. 1:21-cv-00119 (RDM) |

## DECLARATION OF PRESTON T. ROBERTSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Preston T. Robertson, make the following declaration:

1. I am a resident of Tallahassee, Florida.

2. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

3. I am the President and Chief Executive Office of Florida Wildlife Federation, Inc. ("FWF"), one of the Plaintiffs in this case.

4. FWF is a 501(c)(3) nonprofit that solely focuses on conserving Florida's wildlife, habitat, and natural resources. FWF was founded in 1936 and has grown in membership to over 9,000 members and approximately 60,000 supporters throughout Florida. The mission of FWF is to ensure that wildlife and Florida's fragile environment have a voice which can echoed in our motto: "Wildlife is our Middle Name." We do this through three main outreach areas: 1) Environmental Education, 2) Policy and Advocacy, 3) and Science-based Stewardship.

1

5. FWF's Environmental Education program focuses on educating the public on the importance of protecting Florida's environment. FWF accomplishes this through a distribution of various media focusing on wildlife issues. Our media includes books, videos, and a newsletter aiming to educate the public on the importance of protecting the environment. Additionally, FWF supports wildlife research and environmental preservation.

6. FWF program areas focus on wildlife, land conservation, water, and climate change through our educational materials, policy and advocacy. FWF advocates for the protection of species like the Florida panther and other listed species through connection of existing conservation lands along with road crossings in Southwest Florida. FWF has been a leader in statewide land conservation and advocates for more funding for the Florida Forever program. FWF promotes Everglades restoration, strengthening the environmental resiliency of our rivers and bays and coastal protection for sea turtles and birds. Lastly, FWF pushes for action on the state and federal level to counter climate change with activities such as promoting a ban of oil and gas drilling off of Florida's coastal waters.

7. A majority of FWF's core advocacy work is dedicated to wildlife protection and land conservation.

8. As the President and Chief Executive Officer at FWF, I specialize in advocating for the protection of Florida's wildlife and lands. I have 31 years of experience as an environmental attorney in Florida advocating for the protection of Florida' environment.

9. EPA's approval of Florida's application to assume control of section 404 permitting undermines FWF's mission. Among other failings, Florida does not commit any new financial resources to the program, it relies upon an unlawful technical assistance process regarding its duty to ensure that listed species are adequately protected, and analyses of section

404 permit applications issued by Florida would no longer include review under the National Environmental Policy Act ("NEPA") and consultation under section 7 of the ESA, as they would if 404 authority remained with the U.S. Army Corps of Engineers.

10. Because section 404 permit applications processed by Florida will not undergo a NEPA analysis or site-specific ESA section 7 consultation, these projects will be subject to a far less rigorous environmental review, which increases risk of harm to listed species and their habitat.

11. The state's administration of this section 404 program will prevent FWF from being able to monitor and engage in proposed permits to the same degree that the federal program afforded us. As an organization, we are heavily reliant upon federal review and analysis of projects that affect wildlife, land conservation, climate and water. We review applications that go to the Corps, and we act on them as needed depending on the impacts of the proposed project. We utilize information required under NEPA, the ESA, and the Clean Water Act to review permit applications. These critical federal analyses provide a common baseline for the natural environment and protected species, from which we can assess proposed agency actions and resultant environmental impacts.

12. If the FDEP state assumption of the 404 program were in place, we would lose all of the protections that the federal law allows. This means that there would be no federal analysis or comment process on projects and permits. As an organization, we do not have the ability to take on every advocacy effort so we rely on that federal review to evaluate projects for our members and Florida's environment.

13. Our organization would be significantly harmed without these federal analyses because we would be required to hire our own experts in an attempt to otherwise assess and

3

understand impacts of agency actions. Experts cost thousands of dollars per case, and as a small organization with a staff of only six, we would no longer be able to review and act on proposals or projects at the rate we normally do. The loss of information from these analyses will result in additional staff time to triage permits to identify harms to the listed species and their habitats and additional costs in hiring experts. Therefore, our core program work focused on conservation would be significantly hindered.

14. A primary tool FWF uses to protect species and their habitats is the public commenting process. When there is a proposed agency action, we review the applications and any available federal analyses, determine the scope and effect it would have on wildlife and their habitats that we seek to protect, review applicable rules and laws, and submit comment letters.

15. Under Section 7 of the Endangered Species Act ("ESA"), for example, there is formal consultation. Under the Memorandum of Understanding between Florida and the federal agencies for the state's assumption, projects are not required to go through a formal consultation process. This means that a project would not be required to be subject to an incidental take permit/habitat conservation plan process. These reviews are robust and comprehensive. We often use these processes to comment and engage on these projects.

16. The resulting federal analyses from these processes help us evaluate the impacts on Florida's wildlife and land conservation. Many endangered and threatened species are in Florida and are subject to regulatory review by the agencies, including but not limited to Florida panthers, bonneted bats, nesting turtles, sturgeon, and smalltooth sawfish. These species are important to our members and to the ecological value of Florida. In addition, land conservation protects our watersheds and our species.

17. Many listed species are likely to be adversely affected by projects permitted through Florida's section 404 program. For example, these projects can cause habitat destruction and fragmentation. Florida's program does not adequately protect against these harms, in part because it does not require consultation under Section 7 or a habitat conservation plan under Section 10 of the ESA.

18. In addition to interfering with our ability to comment on projects, the state's unlawful assumption will hinder our ability to litigate over illegal section 404 permitting actions, when necessary. It is my understanding that there is a higher bar to establish standing in Florida state court because we would be required to show that a substantial number of our members will be affected by the challenged action, while in federal court we are only required to show that a single member is adversely affected. It is also my understanding that FWF would risk exposure to mandatory "fee-shifting" which creates the risk of liability for the opposing parties' costs and fees to engage in litigation. We are not exposed to this same risk in federal court, where the Corps is the section 404 permitting agency. The risk of incurring these substantial costs and fees could well result in our inability to challenge illegal permit authorizations in Florida that would cause serious harm to threatened and endangered species, even if our claims are strong.

19. FWF was also harmed by Florida's incomplete application, which failed to include a biological opinion assessing the risk to species from the program, and an incidental take statement authorizing incidental harm of listed species resulting from the state program and state-issued permits. These documents were not provided during the public comment period and were completed only after the public comment period closed. In doing so, the application did not address how endangered species review would occur, how a no-jeopardy determination would be made, or relevant and important information about the take of species. While Florida's

application referred to a "technical assistance" process that it said would be described in "an anticipated biological opinion," the biological opinion containing that information was not part of the application, frustrating FWF's ability to analyze and comment on the process. Florida relied on this missing information when asserting that it complied with the Clean Water Act's Section 404(b)(1) Guidelines to protect listed species and make a finding of no jeopardy. Without being able to review these documents, it was impossible for me to determine that the state program supported that finding.

20.     EPA's ultimate approval of Florida's 404 program, which does not require rigorous section 7 consultation with U.S. Fish and Wildlife Service for permits that may adversely affect protected species, and instead provides a broad exemption from incidental take liability for harm to species, imperils protected species.

21.     As a plaintiff to this case and for the reasons stated in this declaration, it is FWF's position that Florida's 404 program is unlawful and will result in harm to the environment and wildlife that our organization strives to protect. This was reflected in FWF advocacy during the state's 404 application process, during which I was engaged in FWF's review of Florida's proposal during EPA's public comment period and participated in the development of our comments in opposition to the program.

22.     In furtherance of our organizational mission, it is our duty to exercise every legal right and avenue available to halt EPA's approval of Florida's 404 program, and one such avenue would have been to seek agency reconsideration to fix the unlawful elements of the program as discussed in paragraphs 19-20 of this declaration.

23.     EPA's December 22, 2020 action making its approval of the Florida program effective immediately harmed FWF by foreclosing FWF's opportunity to petition EPA for

reconsideration of program approval prior to the transfer of authority taking effect. By making the program effective immediately, FWF was foreclosed from seeking a legal avenue to remedy the unlawful aspects of the program prior to its effective date.

24. FWF was additionally harmed by EPA's December 22, 2020 action making its approval of Florida's program effective immediately because this foreclosed our opportunity to also ask the agency to stay the effective date of the rule pending judicial review.

25. FWF had intended to exercise its right to request that EPA administratively postpone the effective date of its decision under Section 705 of the Administrative Procedure Act ("APA"). By deeming its decision effective immediately, however, EPA abrogated FWF's right to seek a stay from the agency under the APA.

26. If the Court sets aside EPA's decision to make its action effective immediately, FWF would promptly seek a Section 705 stay. On January 20, 2021, FWF and other plaintiffs in this case asked the agency to recognize the unlawfulness of the immediate effective date, take corrective action to promulgate its decision as a rule, and consider plaintiffs' request to stay the effective date of the promulgated rule. EPA, however, has adhered to its position that the effective date was lawful. Under that position, the agency is unable to consider the stay request.

27. If the Court does not grant the requested relief, FWF will be foreclosed from the opportunity of having EPA consider granting a stay request, EPA will be unable to grant such a stay, and the state will continue administering the 404 program, to the detriment of FWF's interests. As a result, FWF and its members would lose a right they otherwise would have had to avoid the state program's serious consequences for their mission pending judicial review.

28. Because FWF was unable to seek a stay, the state will continue to apply its unlawful program for permits that will destroy wetlands and risk significant harm to listed

species. Moreover, FWF will now have substantial difficulty furthering our mission because of the significant barriers for advocacy, as discussed in paragraphs 10-20, above.

29. EPA's December 22, 2020, action also foreclosed FWF's ability to benefit from the Biden Administration's January 20, 2021, action took to stay rules that had not yet gone into effect as of January 20, 2021. It is my understanding that on January 20, 2021, President Joe Biden's White House Chief of Staff Ronald A. Klain issued a memorandum to the incoming White House Senior Staff, directing agency heads to consider postponing by at least 60 days any rule that had been published in the Federal Register but had not taken effect. It is my understanding that this postponement was intended to provide the new Administration an opportunity to review any new or pending rules made by the outgoing Administration. Had EPA provided the required 30-day effective date from its publication in the Federal Register on December 22, 2020, it is my understanding that its decision to approve the state 404 program would have been covered by the Klain Memo.

30. It is my understanding that EPA failed to codify the components of the program that is to operate under Section 404 in Florida in the Federal Register, thereby failing to articulate the components of and give legal effect to the program. Allowing a legally deficient program to operate without a lawful transfer of authority harms FWF's ability to carry out its organizational mission of protecting the environment and wildlife.

31. Absent this unlawful transfer of authority, FWF would continue to enjoy rights and protections guaranteed by federal law, including participation in the lawful 404 program administered by the U.S. Army Corps of Engineers for more than 40 years, FWF would also benefit from the public participation process afforded by NEPA, the protections afforded to species through Section 7 or Section 10 of the ESA whenever a project may affect a listed

species, and the ability to enforce all these rights in federal court, where FWF can meet standing requirements and afford to litigate based on an administrative record, unlike the barriers that litigation in state court present.

32. EPA's approval of Florida's unlawful 404 permitting program, which has faster processing times and less stringent permitting requirements, also increases the likelihood that ESA section 10 Habitat Conservation Plan ("HCP") processes will no longer be utilized. As an alternative to section 7 project-by-project consultation, the ESA section 10 incidental take permit ("ITP") application process for private developers requires an HCP that minimizes and mitigates impacts to protected species. Unlike Florida's 404 application process, which is designed to be completed in a matter of months, development of an HCP is a complex process that can take years to complete in order to ensure that species receive the level of protection Congress intended. It requires different landowners and developers to come together to initiate the process. The beauty of an HCP is that it allows various stakeholders—including environmental conservationists—to work together and create a framework to ensure that environmental interests are considered in the development of the plan; and it can set aside land in perpetuity for wildlife and water resources. All too often, individual development and transportation projects move forward in a piecemeal fashion, which results in a "checkerboard" of habitat destruction and fragmentation across the landscape, to the severe detriment of species dependent on continuous and connected habitat. The HCP process is intended to prevent this.

33. The HCP process is more stringent than Florida's 404 permitting program, in that it requires NEPA analysis and a biological opinion under section 7 of the ESA, among other statutory requirements. The section 10 HCP process also requires long-term monitoring for compliance, including periodic accountings of take, surveys to determine species status in project

areas or mitigation habitats, and progress reports on fulfillment of mitigation requirements. The HCP process would naturally result in greater species and environmental protections than Florida's 404 permitting process because it requires more stringent and detailed standards of review, both before and after the ITP is approved. From the perspective of developers, however, the HCP process is arguably more costly and time-consuming, because it contemplates various development projects, has more stringent standards that must be met for approval, and as a result, is a much lengthier process than the 404 permit program. The HCP process is also much more expensive. The state 404 program creates a disincentive for developers to go the HCP route, because it gives it gives them an easy shot at incidental take protection through a simpler, cheaper "technical assistance" process not contemplated or authorized by Congress. This creates additional risk of loss of environmental and species protection from overdevelopment in the unique and biodiverse state of Florida.

34.     To further FWF's organization goals, FWF has actively engaged on habitat conservation plans in order to obtain protections for listed species and conserve habitat for their survival and recovery. For instance, for years the FWF has worked on the Eastern Collier County HCP ("Eastern Collier HCP") in Southwest Florida, which represents a significant focus of its Florida conservation work because of its importance to protecting species in one of the most biodiverse regions of the country. The Eastern Collier HCP covers approximately 152,000 acres of rural, agricultural, and wild lands in the southwest part of Florida that connect the Florida Panther National Wildlife Refuge and the Big Cypress National Preserve with other protected areas in the region. As proposed, this HCP would keep 70% of the area as either conservation or agricultural lands, with the other 30% set aside for residential and commercial development.

35. As with the loss of use of habitat conservation plans in general, it would be detrimental to FWF's mission if landowners who are party to the Eastern Collier HCP abandoned the HCP in favor of the state 404 assumption program which has a much lower bar to meet to obtain a permit and which does not have the same long-term monitoring requirements. The loss of the Eastern Collier HCP and/or the decrease in protections currently contemplated would represent the loss of an entire body of FWF's work in Florida to protect endangered and threatened species in this region for the past decade. It would also mean that FWF would have to start from scratch in working to protect endangered species in this area, particularly the highly endangered Florida panther. Instead of ensuring species protection through one HCP for numerous development projects, FWF would have to review and challenge problematic developments on a project-by-project basis in state court.

36. The lack of NEPA and ESA site-specific consultation with Florida's 404 program and the hurdles and roadblocks to litigating in state court, as described above, would be detrimental to our ability to carry out our organizational mission of protecting wildlife.

37. If Florida is allowed to unlawfully assume the 404 program, FWF would be harmed in its ability to carry out its mission of protecting native and endangered species, their habitats, and waters.

38. A favorable ruling from this Court would prevent EPA from treating its decision as if it were effective immediately thereby allowing FWF to pursue all avenues, as discussed above, in order to halt Florida's implementation of its permitting program. In addition, a favorable ruling would allow the possibility that the new Administration would grant Plaintiffs' petition to immediately postpone the rule's effective date and thereby protect Plaintiffs' concrete interests. As indicated by executive order, the Biden Administration is focused on reviewing the

final actions of the outgoing Administration. It is likely that a decision favorable to the Plaintiffs will delay temporarily—and possibly forever—issuance of permits authorized by the state program and the associated harms to FWF as outlined above.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of March, 2021.

Preston T. Robertson
2545 Blairstone Pines Dr.
Tallahassee, FL 32301