**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.

       Plaintiffs,

   v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.

       Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

---

**STATE OF FLORIDA AND
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION'S OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS**

---

Jeffrey H. Wood
Jared R. Wigginton
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com
jared.wigginton@bakerbotts.com

Lily N. Chinn
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

BAKER BOTTS L.L.P.

Aaron M. Streett
Harrison Reback
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

*Attorneys for Florida Intervenors*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................3

    I.    Legal Background ...................................................................................... 3

        A.    State Assumption under CWA Section 404 ......................................3

        B.    Federal Oversight of State 404 Programs ......................................5

        C.    EPA's Consistent Use of "Notices" to Approve State CWA Programs ........................................................................................7

    II.    Factual Background ................................................................................... 9

        A.    Florida's Section 404 Program Application ...................................9

        B.    EPA's Review & Approval of Florida's Application ..............................11

        C.    Early Actions under Florida's Section 404 Program ...............................13

STANDARD OF REVIEW ..................................................................................15

ARGUMENT ......................................................................................................17

    I.    Plaintiffs' Claims Against EPA Are Not Justiciable. .......................... 17

        A.    Plaintiffs Lack Article III Standing to Challenge the "Effective Date" of EPA's Approval (Claim 8) .........................................18

            1.    The lack of a 30-day delay in the effective date did not cause any redressable procedural injury to Plaintiffs' or their members' concrete, particularized interests. ........................19

                (i)    The lack of a 30-day delay did not injure any concrete, particularized interest of Plaintiffs or their members.......................................................... 20

                (ii)    Plaintiffs show no causal connection between the timing of when EPA's approval became effective and the substance of the approval. .................................... 27

                (iii)    This claim is not redressable because granting the requested relief would not allow EPA to reconsider its approval. .................................................... 27

            2.    The lack of a 30-day delay has not caused any redressable non-procedural injury to the concrete, particularized interests of Plaintiffs. .................................................28

        B.    Plaintiffs Lack Article III Standing to Challenge the Codification Status of Florida's Program (Claim 9)......................................31

i

C.   Plaintiffs Lack Article III Standing as to Claim 8, Claim 9, and All Other Claims Because Florida's Expanded Role Causes No Actual Injury Relative to the Pre-Assumption Program.........................................33

1.   Florida's program provides robust environmental protection with extensive Federal oversight and involvement, thereby imposing no actual concrete injury to Plaintiffs as compared to the pre-approval status quo. ..................34

2.   Plaintiffs lack associational standing because their members' purported injuries are too speculative. ..........................39

3.   Plaintiffs' alleged organizational injuries do not support their standing.................................................................................42

(i)   There is no direct conflict between EPA's approval and Plaintiffs' respective organizational missions............ 43

(ii)   Plaintiffs' alleged organizational injuries are speculative............................................................................ 43

(iii)   Plaintiffs' alleged organizational injuries based on deprivation of information are not cognizable................. 45

(iv)   Plaintiffs' alleged organizational injuries based on lessened access to Federal courts are not plausible or cognizable.................................................................. 46

(v)   *PETA* is meaningfully different from this case................. 47

D.   Section 404's "Deemed Approved" Provision Renders Plaintiffs' Injuries Non-Redressable and Their Claims Moot by Operation of Law. ........................................................................................................48

1.   "Deemed approved" provisions create unreviewable congressional action....................................................................49

2.   Section 404's deemed approved provision falls within the framework set forth in *AT&T*, *Sprint Nextel*, and *Public Citizen*. ........................................................................................52

3.   Plaintiffs' alleged injuries are not redressable and their claims are moot because a court order vacating EPA's approval notice would automatically trigger a "deemed approved" situation. ......................................................................53

II.   Claims 8 and 9 Fail on the Merits. ....................................................................... 56

A.   EPA Approval Notices Are Effective Upon Publication in the Federal Register and No Additional Waiting Period is Required.............57

B.  Codification in the C.F.R. Is Not a Prerequisite for State
Assumption. ...............................................................................59

C.  Even if the 30-Day Waiting Period and/or Codification Are
Prerequisites, the State of Florida should not be deprived of its
program approval on the basis of such harmless error. ...........................61

CONCLUSION......................................................................................................63

# TABLE OF AUTHORITIES

## Cases

*Agrico Chem. Co. v. Dep't of Envt'l Regulation*,
 406 So. 2d 478 (Fla. 2d DCA 1981) .................................................................36, 37

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
 38 F. Supp. 2d 114 (D.D.C. 1999) ....................................................................61, 62

*Am. Rivers v. FERC*,
 895 F.3d 32 (D.C. Cir. 2018) ..................................................................................45

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
 659 F.3d 13 (D.C. Cir. 2011) ..................................................................................26

*Animal Legal v. Veneman*,
 490 F.3d 725 (9th Cir. 2007) ..................................................................................52

*Arpaio v. Obama*,
 797 F.3d 11 (D.C. Cir. 2015) ............................................................................39, 42

*\*AT&T Corp. v. FCC*,
 369 F.3d 554 (D.C. Cir. 2004) (per curiam) ....................................................49, 50

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
 462 U.S. 87 (1983) ..................................................................................................46

*Butler v. Eaton*,
 141 U.S. 240 (1891) ................................................................................................52

*Byrne v. Clinton*,
 410 F. Supp. 3d 109 (D.D.C. 2019), *aff'd sub nom. Byrne v. Brock*, No. 19-
 7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ........................................15, 16

*California v. Trump*,
 No. CV 19-960 (RDM), 2020 WL 1643858 (D.D.C. Apr. 2, 2020) ................27, 32

*Cantrell v. City of Long Beach*,
 241 F.3d 674 (9th Cir. 2001) ..................................................................................42

*Capeletti Bros. v. Dep't of Gen. Servs.*,
 432 So.2d 1359 (Fla. 1st DCA 1983) ......................................................................36

*Cath. Soc. Serv. v. Shalala*,
 12 F.3d 1123 (D.C. Cir. 1994) ................................................................................29

*City of Dover v. EPA*,
  36 F. Supp. 3d 103 (D.D.C. 2014) ..........................................................................39

*\*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..........................................................................22, 26, 40

*Conservation Force, Inc. v. Jewell*,
  733 F.3d 1200 (D.C. Cir. 2013) ..........................................................................53

*\*Crow Creek Sioux Tribe v. Brownlee*,
  331 F.3d 912 (D.C. Cir. 2003) ..........................................................................33

*\*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ..........................................................................20, 27, 32

*Ctr. for L. & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ..........................................................................19, 20, 21, 31

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ..........................................................................18, 29

*Dep't of Com. v. U.S. House of Representatives*,
  525 U.S. 316 (1999) ..........................................................................16

*Dep't of Transp. v. Pub. Citizen, Inc.*,
  541 U.S. 752 (2004) ..........................................................................46

*Eagle-Picher Indus. v. EPA*,
  759 F.2d 905 (D.C. Cir. 1985) ..........................................................................54

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ..........................................................................24, 45

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ..........................................................................26

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994) ..........................................................................26

*Fla. Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ..........................................................................20, 31, 42

*Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*,
  412 So. 2d 351 (Fla. 1982) ..........................................................................36, 46

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ..........................................................................26, 33

*Friends of Animals v. Bernhardt*,
   961 F.3d 1197 (D.C. Cir. 2020) ......................................................................57

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
   No. CV 18-2029 (RDM), 2021 WL 230139 (D.D.C. Jan. 22, 2021) ......................................16

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*,
   570 F.3d 1210 (11th Cir. 2009) ......................................................................52

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ......................................................................49

*Gottlieb v. Pena*,
   41 F.3d 730 (D.C. Cir. 1994) ......................................................................55

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ......................................................................29

*Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Envt'l Regulation*,
   587 So.2d 1378 (Fla. 1st DCA 1991) ......................................................................36

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ......................................................................19

*Huron v. Berry*,
   12 F. Supp. 3d 46 (D.D.C. 2013) ......................................................................56

*James Madison Ltd. by Hecht v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996) ......................................................................16

*Janko v. Gates*,
   741 F.3d 136 (D.C. Cir. 2014) ......................................................................15

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
   613 F.3d 1112 (D.C. Cir. 2010) ......................................................................61

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) ......................................................................53

*Khadr v. U.S.*,
   529 F.3d 1112 (D.C. Cir. 2008) ......................................................................52

*La. Envt'l Action Network v. Browner*,
   87 F.3d 1379 (D.C. Cir. 1996) ......................................................................38

*Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*,
   No. 91-8088, 1992 WL 322912 (Fla. Div. of Admin. Hr'g, July 23, 1984) ..........................37

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)......................................................................................47, 56

*Marshall Cty. Health Care Auth. v. Shalala,*
   988 F.2d 1221 (D.C. Cir. 1993) ...............................................................16

*\*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010)......................................................................................39, 40

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau,*
   785 F.3d 684 (D.C. Cir. 2015) ...............................................................30

*NAACP, Inc. v. Fla. Bd. of Regents,*
   863 So. 2d 294 (Fla. 2003)......................................................................35, 47

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
   551 U.S. 644 (2007)......................................................................................58

*Nat'l Ass'n of Home Builders v. EPA,*
   667 F.3d 6 (D.C. Cir. 2011) .....................................................................26

*Nat'l Taxpayers Union, Inc. v. United States,*
   68 F.3d 1428 (D.C. Cir. 1995) ................................................................27

*Nat'l Treasury Emps. Union v. United States,*
   101 F.3d 1423 (D.C. Cir. 1996) ..............................................................24

*Ngou v. Schweiker,*
   535 F. Supp. 1214 (D.D.C 1982) .............................................................30

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigration Servs.,*
   No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 9, 2020) ...........29

*Omnipoint Corp. v. FCC,*
   78 F.3d 620 (D.D.C. 1996) ......................................................................62

*Palm Beach Cnty. Envt'l Coal. v. Fla. Dep't of Envt'l Prot.,*
   14 So.3d 1076 (Fla. 4th DCA 2009) .......................................................35

*\*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   797 F.3d 1087 (D.C. Cir. 2015)....................................................24, 43, 44, 47, 48

*\*Prows v. U.S. Dep't of Just.,*
   938 F.2d 274 (D.C. Cir. 1991) ................................................27, 28, 29, 30

*Pub. Citizen, Inc. v. FERC,*
   839 F.3d 1165 (D.C. Cir. 2016) ..............................................................49, 51

*Pub. Citizen, Inc. v. Trump,
  297 F. Supp. 3d 6 (D.D.C. 2018) ............................................................18, 19, 30, 39, 43, 44

Rowell v. Andrus,
  631 F.2d 699 (10th Cir. 1978) .............................................................................................30

Shinseki v. Sanders,
  556 U.S. 396 (2009).............................................................................................................61

Sierra Club v. Jewell,
  764 F.3d 1 (D.C. Cir. 2014).................................................................................................42

Simmons v. I.C.C.,
  757 F.2d 296 (D.C. Cir. 1985).............................................................................................60

Spokeo, Inc. v. Robins,
  136 S. Ct. 1540 (2016)...................................................................................................18, 31

*Sprint Nextel v. FCC,
  508 F.3d 1129 (D.C. Cir. 2007) ...............................................................................49, 50, 51

Summers v. Earth Island Inst.,
  555 U.S. 488 (2009).............................................................................................................31

Theodore Roosevelt Conservation P'ship v. Salazar,
  616 F.3d 497 (D.C. Cir. 2010).............................................................................................45

United States v. Law,
  528 F.3d 888 (D.C. Cir. 2008).............................................................................................29

Walen v. United States,
  246 F. Supp. 3d 449 (D.D.C. 2017) .....................................................................................15

Worth v. Jackson,
  451 F.3d 854 (D.C. Cir. 2006).............................................................................................17

Zevallos v. Obama,
  10 F. Supp. 3d 111 (D.D.C. 2014) .......................................................................................16

## Statutes

5 U.S.C. §551(6), (8) ...............................................................................................................13

5 U.S.C. §553(d) ......................................................................................................................19

5 U.S.C. §553(e) ......................................................................................................................20

5 U.S.C. §704.............................................................................................................................49

5 U.S.C. § 705 ................................................................................................................ 20

5 U.S.C. §706 ................................................................................................................. 61

16 U.S.C. §824d ............................................................................................................ 51

16 U.S.C. §1536 ............................................................................................................ 45

25 U.S.C. §2710(d)(8)(C) ............................................................................................. 51

33 U.S.C. §1251(b) ............................................................................... 1, 3, 5, 48, 54

33 U.S.C. §1344(i) ............................................................................................. 21, 38, 56

33 U.S.C. §1344(a) ......................................................................................................... 7

33 U.S.C. §1344(g) ........................................................................................................ 1

33 U.S.C. §1344(h) ................................................................................................... 5, 21

33 U.S.C. §1344(h)(1)(A) ............................................................................................ 34

33 U.S.C. §§1344(h)(1)(F) ............................................................................................ 6

33 U.S.C. §1344(h)(2)(A) .................................................................................. 7, 14, 25

33 U.S.C. §1344(h)(3) .................................................................. 4, 13, 49, 52, 55, 57

33 U.S.C. §1371(c)(1) ................................................................................................... 45

44 U.S.C. §1510(a) .................................................................................................. 31, 60

47 U.S.C. 272(f)(1) ....................................................................................................... 50

47 U.S.C. §160(c) .................................................................................................... 49, 50

Coastal Zone Management Act, 16 U.S.C. §§1451, et seq. .......................................... 7

Fla. Admin. Code §62-110.106(7)(e)(2) ...................................................................... 35

Fla. Admin. Code §331.052(3)(b) .................................................................................. 5

Fla. Stat. ch. 120 ........................................................................................................... 35

Fla. Stat. §120.56(1)(a) ................................................................................................. 35

Fla. Stat. §120.56(3) ..................................................................................................... 35

Fla. Stat. §120.68 .......................................................................................................... 36

Fla. Stat. §120.569, §120.57 ....................................................................................35

Fla. Stat. §373.4146(2) ...........................................................................................10

Fla. Stat. §403.021(2) ...............................................................................................9

Fla. Stat. §403.412(6) .............................................................................................37

Fla. Stat. §403.412(7) .............................................................................................37

**Regulations**

40 C.F.R. §233.13 ...............................................................................................6, 10

40 C.F.R. §233.14 .................................................................................................10

40 C.F.R. §233.15 .................................................................................................13

40 C.F.R. §233.15(d) ...............................................................................................6

40 C.F.R. §233.15(g) .....................................................................................6, 21, 53

40 C.F.R. §233.15(h) .................................................................................13, 25, 57

40 C.F.R. §233.53(b) .............................................................................................21

40 C.F.R. §233.53(b)-(c) ..........................................................................................6

40 C.F.R. §233.53(c) ............................................................................................7, 9

40 C.F.R. §233.53(c)(1) .....................................................................................22, 38

50 C.F.R. §402.14 .................................................................................................45

## INTRODUCTION

The Florida Constitution and Florida Statutes prioritize protection of the State's water resources. In furtherance of this policy, Florida invests billions of dollars into restoration, protection, and management of these resources under the close purview of the Florida Department of Environmental Protection ("FDEP") and the State's five Water Management Districts. The Federal Clean Water Act ("CWA"), likewise, recognizes the primary responsibility of the States over water resources, 33 U.S.C. § 1251(b), and directly encourages all States to assume responsibility for administering the CWA Section 404 program for the protection of wetlands and other water resources. 33 U.S.C. § 1344(g). Florida accepted Congress' invitation. After enacting new State laws, adopting new State regulations, compiling a voluminous Federal application, engaging in an exhaustive stakeholder engagement process, and standing-up a new regulatory program that builds upon a longstanding State wetlands program, Florida officially obtained approval from the U.S. Environmental Protection Agency ("EPA") on December 17, 2020 for its own Section 404 Program.[1] This was a historic achievement that will benefit Florida's wetlands and citizens.

Throughout the assumption process, the State of Florida, EPA, and the other Federal and State agencies took special care to ensure that Florida's program complied with Federal law while reducing redundancies associated with other existing State water resources programs. Following approval, Florida began administering the new State 404 Program in close coordination with EPA,

---

[1] Florida Intervenors are filing a consolidated opposition brief and cross-motion to dismiss, with less than 65 pages in total combined length. To the extent the Court views the page limitation of Local Civil Rule 7(e) as applicable, Florida Intervenors filed an unopposed motion for leave to file this consolidated submittal. *See* Dkt. 33.

the U.S. Army Corps of Engineers ("Corps"), and other agencies, and in compliance with Federal standards. Florida is proud to lead the way by assuming this important responsibility.

Preferring a Federal program without State assumption, Plaintiffs now seek to frustrate Congress' clear objectives by, among other things, claiming that EPA violated inapplicable procedural requirements that have no bearing on EPA's approval under review. Plaintiffs move for summary judgment on two claims: Claim 8, that EPA should have delayed the effective date of its approval of Florida's program for thirty days; and Claim 9, that EPA was required to codify the approval of Florida's program in the Code of Federal Regulations before it could become effective. Plaintiffs' motion should be denied because they lack standing to raise these procedural claims, and regardless, neither claim has merit.

Relatedly, all of Plaintiffs' claims should be dismissed because they are not justiciable. First, Plaintiffs have not shown that they would suffer any actual or imminent, particularized injury to their or their members' cognizable interests arising from Florida's increased responsibility over Section 404 permitting actions. This is especially true considering EPA's and other Federal agencies' significant role in continuing to oversee Florida's program by reviewing, commenting on, and retaining the authority to take over permit actions that EPA finds objectionable. Additionally, the Florida Program provides numerous opportunities for Plaintiffs' robust participation in the permitting process, including multiple avenues for review (administrative and judicial) and a guaranteed stay of permit approval under State law where review is sought. In short, under Florida's program *as actually approved by EPA* (and not the caricature provided by Plaintiffs), Plaintiffs would suffer no harm relative to the *status quo ante*. Second, due to the statutorily rare "deemed approved" provision in Section 404(h), Plaintiffs' claims are not redressable and are moot by operation of law because under that provision, even if EPA had taken

no action whatsoever following the submittal of Florida's application, Florida's program still would have been "deemed approved." For these reasons, Florida Intervenors' cross-motion to dismiss Plaintiffs' entire action is due to be granted.

## BACKGROUND

### I.    Legal Background

#### A.    State Assumption under CWA Section 404

Built on cooperative federalism, the CWA recognizes shared stewardship responsibilities among the States and Federal government over water resources. 33 U.S.C. § 1251(b). To protect these resources, Congress created two CWA permit programs: one program under Section 402 to control point-source pollution to surface waters (known as the National Pollutant Discharge Elimination System ("NPDES") program) and another under Section 404 to regulate the dredge or fill of surface waters. *Id.* §§ 1342, 1344. Through these programs (as well as Section 401's state water quality certifications), Congress preserved for the States the "primary responsibilities and rights" to prevent water resources pollution, expressly stating: "It is the policy of Congress that the States . . . implement the permit programs under sections [402] and [404]." *Id.* § 1251(b). To that end, Sections 402 and 404 invite States to seek EPA's approval to administer State-level permit programs in place of these federal permit programs. *Id.* §§ 1342(b), 1344(g). Over 40 States have obtained approval to administer State NPDES programs under Section 402, while three States—Michigan, New Jersey, and Florida—have assumed responsibility for administering their own Section 404 programs. EPA has adopted implementing regulations to govern Section 404 State assumptions found at 40 C.F.R. Part 233.

Under CWA Section 404(g), any State may submit an application to EPA to obtain approval to "administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters [that are assumable] within its jurisdiction…" *Id.*

§ 1344(g)(1). A State may assume responsibility for navigable waters under Section 404 if those waters are within the jurisdiction of the State; however, a State may not assume responsibility over waters that are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto." *Id.*; *see also* Mem. from R.D. James (Assistant Secretary of the Army, Civil Works) on Assumable Waters (July 30, 2018) (AR-0662).[2]

In turn, Section 404(h)(1) describes the "authority" that the State must have in place in order to assume the Section 404 program. Among other things, States must possess authority to issue permits that (1) "assure compliance" with applicable Federal CWA guidelines; (2) contain adequate mechanisms for inspecting, monitoring, reporting, recordkeeping, and enforcing violations; and (3) allow for adequate public involvement. *Id.* § 1344(h)(1)(A)-(H). Section 404(h)(2) provides that EPA "shall approve" a State 404 program within 120 days of receiving the application if EPA determines that the State has the legal authority under State law to administer the program consistent with Section 404(h)(1). *Id.* § 1344(g)(2). If EPA determines that the State does not have the necessary authority, EPA must notify the State before the end of the 120-day period and "describe the revisions or modifications necessary" so that the State can resubmit the program for approval. *Id.* § 1344(h)(2)(B).

If EPA "fails to make a determination" on a State application within 120 days of receiving the application, the State program "shall be deemed approved." *Id.* § 1344(h)(3). In that scenario, "the program is deemed approved and the Administrator must so notify the State and the Secretary

---

[2] Florida Intervenors will use Plaintiffs' citation convention for the Administration Record (AR). *See* Dkt. 31 at 2 n. 2.

who shall suspend the issuance of permits under subsections (a) and (e) of section 404 for activities covered by the State program." H. Rep. No. 95-890, at 101 (1977), reprinted in 1977 U.S.C.C.A.N. 4424. EPA "cannot disapprove a [State 404] program because [EPA] has not completed [its] review of it—the disapproval must be a positive one that the State does not have the requisite authority." S. Rep. No. 95-370, at 358 (1977). The Section 404 assumption provisions thus sought to ensure "expedited" transfer of responsibility to the States. 122 Cong. Rec. S28,771-99, S28,774 (1976). In short, Congress created the state assumption process, including the 120-day "deemed approved" requirement, to prevent delays in achieving a congressional policy objective: "that the States ... implement the permit programs under [Section 404]." 33 U.S.C. § 1251(b).

### B.  Federal Oversight of State 404 Programs

After approving a State program, EPA maintains an active role to ensure compliance with the requirements of Federal law. *Id.* § 1344(i)-(j). First, EPA oversees the State permitting process to ensure continued compliance with Federal requirements. *Id.* § 1344(h); 40 C.F.R. § 233, Subpart F ("Federal Oversight"). For example, unless a kind of activity is exempted by EPA under Section 404(k)(1), a State must provide EPA with a "copy of each permit application received by such State and provide notice to [EPA] of every action related to the consideration of such permit application, including each permit proposed to be issued by such State," along with a "copy of each proposed general permit which such State intends to issue." *Id.* § 1344(j). EPA may provide comments or otherwise "object" to the issuance of any permit by the State. *Id.* And EPA may hold a public hearing on its objection. *Id.* Ultimately, if the State rejects EPA's comments or changes, the State must deny the permit or that particular permit must be federalized (*i.e.*, the Corps takes over issuance of that particular permit). *Id.*; *see also* Mem. of Agreement between FDEP and EPA (July 31, 2020) (AR-0018 at 7-9); Fla. Admin. Code § 331.052(3)(b) (AR-0002-A48 at 8-9). Besides EPA and the Corps, other Federal agencies also have significant opportunities for

involvement in State 404 permits. *See, e.g.*, 33 U.S.C. §§ 1344(h)(1)(F) (U.S. Coast Guard); 1344(m) (U.S. Fish and Wildlife Service); *see also* 40 C.F.R. § 233.15(d) (requiring EPA to submit copies of the State's submission to the Corps, FWS, and NMFS); 40 C.F.R. § 233.15(g) (requiring EPA to respond to comments from those agencies).

Second, EPA remains actively involved in the administration of the State program as a whole. Any State seeking to administer its own Section 404 program must enter a memorandum of agreement with EPA that, among other things, requires submission of regular "reports, documents and other information" to EPA along with an "annual report" documenting the State's administration of its program. 40 C.F.R. § 233.13. States are also required to "allow EPA routinely to review State records, reports and files relevant to the administration and enforcement of the approved program." *Id.* § 233.13(b)(2); *see also id.* § 233.52 ("Program reporting").

Third, where a State program does not comply with Federal standards, EPA may seek to withdraw the program. 33 U.S.C. § 1344(i). EPA regulations set forth the withdrawal process, which includes an opportunity for the State to "take corrective action"; an "informal review" to determine whether "cause exists" to commence formal proceedings; a formal hearing on the record that is announced in the Federal Register; completion of proceedings in general conformance with EPA's Consolidated Rules of Practice found at 40 C.F.R. Part 22 (with opportunities for interested parties to intervene as parties or participate as *amici curiae*); a recommended decision by a hearing officer with compilation of a full hearing record; and ultimately a determination by the Administrator of EPA with a "list" of "deficiencies in the program" (if any) and "providing the State a reasonable time, not to exceed 90 days, to take such appropriate corrective action as the Administrator determines necessary." 40 C.F.R. § 233.53(b)-(c). If the State fails to correct the deficiencies, EPA "shall issue a supplementary order withdrawing approval of the State program,"

and such order "shall constitute final Agency action" subject to judicial review under the Administrative Procedure Act. *Id.* § 233.53(c)(8)(vi)-(vii). Withdrawal proceedings can be initiated by EPA "or in response to a petition from an interested person alleging failure of the State to comply" with Federal requirements. 40 C.F.R. § 233.53(c). Thus, the Section 404 assumption process ensures expedited admission of States into the program, with ongoing federal oversight and a careful, deliberate process for correcting or withdrawing deficient State programs.

Where a State has not assumed responsibility for its own Section 404 program or has its program withdrawn, the Corps retains responsibility to issue permits authorizing the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). In that context, where the federal-state roles are reversed from Congress' preferred alignment, States play a supplementary role in the Federal 404 permitting process, including, for example, through the process of certifying that Corps permitting actions comply with State water quality standards pursuant to CWA Section 401, 33 U.S.C. § 1341, and state concurrence review under the Coastal Zone Management Act, 16 U.S.C. §§ 1451, et seq.

### C.     EPA's Consistent Use of "Notices" to Approve State CWA Programs

From the earliest days of the CWA, EPA approved State CWA programs through "notices" that were effective upon transmitting the approval letter to the State. *See, e.g.*, 39 Fed. Reg. 26,061 (July 16, 1974) ("Notice is hereby given that [EPA] has granted requests for approval of [15] State programs listed below …. For each of these States, the permit program … is being administered by the State agency … as of the approval date"). This makes sense because the statute expressly says (1) EPA "shall approve the program and so notify" the State; and (2) after the State provides "subsequent notification" to the Corps that it is "administering such program," the Federal permit process is suspended and transferred to the State. 33 U.S.C. § 1344(h)(2)(A). Thus, the statutory

mechanism for approving a State program is a "notice" from EPA to the State, which in turn immediately triggers the State's ability to begin "administering" the program.

EPA formalized its practice of approving State 404 programs via notices that are effective immediately upon publication in the Federal Register. 53 Fed. Reg. 20,764, 20,767 (June 6, 1988) (adopting 40 C.F.R. Part 233). EPA used "effective immediately" language in the Federal Register notices approving Section 404 programs for Michigan (1984) and New Jersey (1994): "Since this approval, in large part, simply ratifies State regulations and requirements already in effect under State law, EPA is publishing this approval, *effective immediately*." 49 Fed. Reg. 38,947 (Oct. 2, 1984) (emphasis added); 59 Fed. Reg. 9,933 (Mar. 2, 1994) (same language). Likewise, EPA has continued to approve State CWA programs under Section 402 via notices that are effective upon approval. *See, e.g.*, 83 Fed. Reg. 27,769 (Jun. 14, 2018) (approving Idaho application to administer CWA discharge permit program effective upon approval); 73 Fed. Reg. 66,243 (Nov. 7, 2008) (Alaska); 67 Fed. Reg. 79,629 (Dec. 30, 2002) (Arizona); 60 Fed. Reg. 25,718 (May 12, 1995) (Florida); *see also* 63 Fed. Reg. 51,164 (Sep. 24, 1998) (approving the Texas NPDES program effective prior to publication in Federal Register); 66 Fed. Reg. 12,791 (Feb. 28, 2001) (described approval of Maine NPDES program as "notice; final approval" and effective prior to publication in Federal Register).  EPA has consistently treated these notices as orders. Dkt. 35 at 14, 31.

EPA regularly approves State applications  to operate CWA permit programs via informal adjudication. 66 Fed. Reg. at 12,795 (approving Maine's CWA program and explaining that EPA has "long considered a determination to approve or deny a State NPDES program submission to constitute an adjudication"). This has been the consistent position of the agency since at least 1978. *Id.* at 12,795 (explaining that, since "General Counsel Opinion 78–7 (April 18, 1978), EPA has long considered a determination to approve or deny a State NPDES program submission to

constitute an adjudication"); *see also* 63 Fed. Reg. 51,164 (Sep. 24, 1998) (approving the Texas NPDES program and explaining that approval of the state program application is an adjudication). Concomitantly, EPA also uses adjudication when considering withdrawal of a State 404 program. 33 C.F.R. § 233.53(c).

## II.     Factual Background

### A.     Florida's Section 404 Program Application

The Florida Constitution establishes the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources." Fla. Const. Art. II, Sec. 7(a). Florida law further declares that it is "the public policy of [Florida] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id.* § 373.016(3)(a). For decades, the State of Florida, through FDEP, has administered a State permit program known as the Environmental Resource Permit ("ERP") Program, which regulates dredging or filling of wetlands and other surface waters in Florida (among other things). This State program closely resembles the Federal Section 404 program in many respects, although the State program applies to all Florida waters, not merely the "waters of the United States" regulated under Section 404. (AR-0007-A1 at 5-6; AR-0016 at App. J-3, "ERP Comparison with Federal Requirements"; AR-0017 at 3). At the same time, the State of Florida and its citizens have experienced significant delays and challenges in relying upon the Corps for the administration of Section 404 permitting within the State. *See, e.g.*, Letter from Rep. Diaz-Balart (R-FL) and Rep. Alcee Hastings (D-FL) (Nov. 2, 2020) (AR-0416-A2) (explaining that Everglades restoration projects have been "plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers"). The State of Florida believed it could more efficiently run a federally compliant permitting process, so it started efforts to obtain approval for its own program. (AR-0006 at 2; AR-0007-A1 at 5-6).

For many years, the State of Florida considered the possibility of assuming the Federal 404 program. *See, e.g.*, Chapter 2016-195, Law of Florida (legislation in 2016 authorizing FDEP to pursue assumption). In March 2018, the Governor of Florida signed into law a new statute again authorizing FDEP to establish a Section 404 Program. *See* Chapter 2018-88, Laws of Florida (codified at Fla. Stat. § 373.4146). This new law, which expanded upon previous state laws allowing for the pursuit of assumption, sought to "enable the [FDEP] to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program.…" Fla. Stat. § 373.4146(2). In response, FDEP began a lengthy process of adopting comprehensive Section 404 Program regulations, which were initially proposed in February 2020 and finalized in June 2020. This State rulemaking included an extensive public notice and comment process. (AR-0006 at 3). FDEP's regulations creating the State 404 Program are now codified primarily at Chapter 62-331 of the Florida Administrative Code. (AR-0006 at 3; AR-0002-A48). Plaintiffs in this action filed comments in the state rulemaking process opposing FDEP's assumption rules, but they did not seek further administrative or judicial review of the final State regulations. *See, e.g.*, AR-0066.

On August 20, 2020, Florida filed a complete application with EPA to administer a Section 404 Program. (*See* AR-0002 through AR-0020 (including attachments)). Florida's application contained all of the required elements of a State 404 permit program as set forth in 40 C.F.R. § 233.10. This included (among other things): (a) a letter from Florida's Governor requesting program approval; (b) a complete program description as set forth in 40 C.F.R. § 233.11; (c) a State legal opinion as set forth in 40 C.F.R. § 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator as set forth in 40 C.F.R. § 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 C.F.R. § 233.14; and (f) copies of all applicable

State statutes and regulations, including those governing applicable State administrative procedures. Florida's application was available for public review via FDEP's website, EPA's website, and the Federal government's regulatory docket website.[3]

### B.   EPA's Review & Approval of Florida's Application

On August 28, 2020, EPA acknowledged receipt of Florida's complete application (AR-0641), and promptly opened a public comment period and scheduled public hearings. 85 Fed. Reg. 57,853 (Sept. 16, 2020). Over 3,000 comments were submitted. (AR-0568 at 1, 10-13). EPA held public hearings on Florida's Section 404 Program application on October 21 and October 27, 2020, via virtual platforms that allowed remote participation by any member of the public. (AR-0429, AR-0430, AR-0574, AR-0575, AR-0589, AR-0604). EPA designated FDEP as the non-Federal representative for purposes of engaging in consultation with the U.S. Fish and Wildlife Service ("USFWS") under Section 7 of the Endangered Species Act ("ESA") (AR-0635, AR-0636). FDEP submitted a biological evaluation to USFWS concerning the impact of Florida's Section 404 Program on federally listed species and critical habitat (AR-0387-A8), and on November 17, 2020, USFWS issued a biological opinion to accompany EPA's determination concerning Florida's 404 assumption request. (AR-0642 at 12-14).

The State of Florida and FDEP consulted with the Seminole Tribe of Florida, Miccosukee Tribe of Indians of Florida, and other Indian Tribes concerning Florida's assumption of the Section 404 Program. *See* AR-0223 at 6 (discussing Florida's cooperative engagement with Tribes); AR-0431 (letter from the Seminole Tribe of Florida identifying their concerns with assumption while

---

[3]   FDEP, 404 Assumption, https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/404-assumption; EPA, Public Notice: Notice of EPA's Approval of Florida's Clean Water Act Section 404 Assumption Request, https://www.epa.gov/publicnotices/notice-epas-approval-floridas-clean-water-act-section-404-assumption-request; Approval of Florida's Clean Water Act Section 404 Assumption Request, Regulations.gov, https://beta.regulations.gov/document/EPA-HQ-OW-2018-0640-0564.

stating that the "Seminole Tribe sincerely appreciates FDEP's efforts to engage with and incorporate the Seminole Tribes' feedback during development of the 404 Program"). On August 6, 2020, FDEP and the Florida State Historic Preservation Officer ("Florida SHPO") entered into an Operating Agreement whereby FDEP committed to direct engagement with the Florida SHPO and interested Indian Tribes early in the permit application review process. (AR-0016-A1). On December 16, 2020, FDEP entered a Programmatic Agreement with EPA, the Advisory Council on Historic Preservation, and the Florida SHPO for purposes of Section 106 of the National Historic Preservation Act. (AR-0595; AR-0630; AR-0639).

Furthermore, the State of Florida, and FDEP in particular, invested significant time and resources in preparing to assume authority to establish and implement the CWA Section 404 program. For example, in addition to obtaining statutory authority from the State legislature, adopting State regulations via the State of Florida's administrative rulemaking process, preparing all requisite application materials, and complying with extensive Federal regulatory requirements, FDEP held more than a dozen staff training sessions beginning in August 2020 covering all aspects of the Section 404 program, as well as many meetings and interactions with outside stakeholders concerning the establishment and implementation of a Section 404 Program in Florida. (AR-0006 at 3; *see also* Dkt. 4-2 at 6, (Wolfe Decl. ¶ 21)). The State of Florida and FDEP also ensured that the program would have the necessary resources. (AR-0223 at 6-7).

On December 17, 2020, EPA issued a notice determining that the State of Florida "has the necessary authority to operate a CWA Section 404 program in accordance with the requirements found in CWA section 404(g-l) and EPA's implementing regulations," and therefore approved Florida's assumption of the program. *See* AR-0566; *see also* 85 Fed. Reg. 83,553-54 (Dec. 22,

2020) (AR-0564).[4] Under EPA regulations, the Administrator has delegated the authority to approve State 404 program applications to the Regional Administrator. 40 C.F.R. § 233.15. Thus, the approval notice was sent from the EPA Regional Administrator to the Governor of Florida on December 17, 2020. (AR-0566). This letter contains the subject line, "Notice of Approval of Florida's Assumption of the Clean Water Act Section 404 Program," and explains that "Florida's assumption of the CWA Section 404 program is approved," and that "Florida will begin permitting responsibility for these discharges upon publication of EPA's approval in the Federal Register." (AR-0566). Approval of the program became effective upon publication in the Federal Register on December 22, 2020, *see* 85 Fed. Reg. at 83,553, as provided under 40 C.F.R. § 233.15(h).

Thus, FDEP now administers two separate (yet overlapping) wetlands protection programs: the State's 404 Program and the State's ERP program. Projects within State-assumed waters require both an ERP and a State 404 Program authorization.

### C.     Early Actions under Florida's Section 404 Program

On December 23, 2020, FDEP notified the Corps that Florida was now administering the Section 404 Program, as approved by EPA. *See* 33 U.S.C. § 1344(h)(3) ("upon subsequent notification from such State that it is administering such program, [the Corps] shall suspend the issuance of such permits…."). Though not required by statute or regulation, soon after approving Florida's program, EPA commenced the process of formally adding Florida's program to the list of State programs identified in 40 C.F.R. 233.72, where the Michigan and New Jersey programs are currently identified. *See* EPA, Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021), available at

---

[4] This "notice" constitutes an "order" within the meaning of the APA. *See* 5 U.S.C. § 551(6), (8) (defining "order" and "license," respectively).

https://www.epa.gov/sites/production/files/2021-01/documents/pre-publication_frn-_fl_404_codification_final_rule_.pdf.

On December 28, 2020, after Plaintiffs raised concerns with EPA's approval, EPA sent a letter to FDEP reaffirming that Florida's Section 404 Program became effective on December 22, 2020 consistent with governing regulations and the Memorandum of Agreement ("MOA") between FDEP and the Corps. The MOA became effective "at the time of EPA approval of the State 404 Program, which shall be the effective date published in the Federal Register." (AR-0019 at 1); *see also* 33 U.S.C. § 1344(h)(2)(A) (providing that, where the EPA Administrator has approved a State 404 Program, the Administrator shall "so notify (i) such State and (ii) the Secretary, *who upon subsequent notification from such State that it is administering such program*, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program" (emphasis added)).

Contrary to Plaintiffs' fears, FDEP is not rushing the issuance of Section 404 permits. As of April 23, 2021, the Corps had transferred approximately 382 permit applications to FDEP for processing under the State's Section 404 program. For most of those applications, FDEP sent the permit applicant a request for additional information to facilitate FDEP's careful review. All of those applications remain under review at FDEP. As of April 23, 2021, FDEP had issued no new individual permits under the Section 404 program, and 1,243 applications for State Section 404 permits remain pending at FDEP.

Consistent with Federal standards, FDEP has issued non-controversial general permits for routine activities such as bank stabilization projects, utility line activities, small residential development projects, and other activities appropriate for general or regional permits. FDEP maintains a public website in each region that identifies any permit application that FDEP

reasonably expects to result in a "heightened public concern" or likelihood of request for administrative proceedings, based on the size, potential effect on the environment or the public, potential controversial nature, and the location of the activities. *See, e.g.,* FDEP South District, *Projects of Heightened Public Concerns*, available at https://floridadep.gov/south/sd-permitting/content/projects-heightened-public-concerns (accessed Apr. 26, 2021).

In summary, the State of Florida engaged in years of hard work to apply for and obtain approval of its Section 404 program. It took an act of the Florida Legislature, the support of the Governor, and the dedicated efforts of scores of FDEP staff and experts to assemble and prepare the program and related application materials. Federal law guarantees a determination on an application within 120 days, and EPA is to be commended for undertaking and completing an extensive review and public input process consistent with the requirements and timeframes under law. As shown in the voluminous administrative record, EPA took special care to ensure that Florida's program complied with applicable law before correctly approving it. Even after approval, EPA and other Federal agencies maintain an active role in reviewing and overseeing Section 404 permitting actions to ensure that FDEP administers the State's new program consistent with Federal law.

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction, possessing only those powers authorized by the Constitution and an act of Congress. *See, e.g.*, *Janko v. Gates*, 741 F.3d 136, 139 (D.C. Cir. 2014). Plaintiffs bear the burden of establishing that a court has jurisdiction to hear each of their alleged claims. *See Walen v. United States*, 246 F. Supp. 3d 449, 452-53 (D.D.C. 2017).

"In determining whether to grant a motion to dismiss under Rule 12(b)(1), the Court must construe the complaint in plaintiffs' favor and treat all well-pleaded factual allegations as true." *Byrne v. Clinton*, 410 F. Supp. 3d 109, 115–16 (D.D.C. 2019) (citation omitted), *aff'd sub*

*nom. Byrne v. Brock*, No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020). "Although the Court must grant plaintiffs the benefit of all reasonable inferences, the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, and the court need not accept plaintiffs' legal conclusions." *Id.* (internal quotation marks and citation omitted). In making its jurisdictional assessment, "the Court may consider materials beyond the pleadings where appropriate." *Id.* (citations omitted).

"To prevail on a Federal Rule of Civil Procedure 56 motion for summary judgment[,] as opposed to a motion to dismiss,' the moving party 'must establish that there exists no genuine issue of material fact as to justiciability...." *Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. CV 18-2029 (RDM), 2021 WL 230139, at *5 (D.D.C. Jan. 22, 2021) (quoting *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999)). "A fact is 'material' if it is capable of affecting the outcome of a dispute, [] and a dispute is 'genuine' if the evidence is such that a reasonable factfinder—here, the Court—could find in favor of the nonmoving party." *Id.* (citations omitted). "If the Court finds that a genuine issue of material fact exists as to justiciability, it must deny both cross-motions for summary judgment because the Court cannot reach the merits of a case in which justiciability remains substantially in doubt." *Id.*

When reviewing agency actions on the merits under the APA, district courts "do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085, 1096 (D.C. Cir. 1996). "The entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993). Thus, summary judgment simply "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA." *Zevallos v. Obama,* 10 F. Supp. 3d 111, 117 (D.D.C.

16

2014) (citations omitted). Courts review APA claims challenging agency actions under 5 U.S.C. § 706(2).

## ARGUMENT

The Court should dismiss this action in its entirety because Plaintiffs lack standing and seek relief that has been mooted by the passage of time. Although this briefing focuses primarily on Plaintiffs' eighth and ninth claims, those claims are plagued by fundamental justiciability problems that apply equally to all claims. For example, Plaintiffs cannot show how EPA's approval inflicted any non-speculative injury to their or their members' cognizable interests. And given the unique "deemed approved" language in Section 404, none of Plaintiffs' claims are redressable by this Court. These realities necessitate the dismissal of Plaintiffs' entire lawsuit.

Apart from these case-dispositive reasons, Plaintiffs' eighth and ninth claims possess unique jurisdictional flaws: (1) Plaintiffs can show neither the requisite injury to their procedural rights nor causation linking the alleged procedural violations to EPA's substantive decision-making process, and (2) longstanding Circuit precedent (*Prows v. U.S. Dept. of Justice*) renders Plaintiffs' eighth claim non-redressable and moot. Finally, even if Plaintiffs' eighth and ninth claims were justiciable, they would still fail on the merits because, consistent with the Administrative Procedure Act and five decades of EPA practice, EPA's approval notice of the Florida program was properly treated as an adjudication that is not subject to a 30-day waiting period (Claim 8) or C.F.R. codification (Claim 9). Additionally, any error in those respects would be harmless and an inadequate basis to override the clear congressional policy in favor of State programs under the CWA.

## I.     Plaintiffs' Claims Against EPA Are Not Justiciable.

"Three inter-related judicial doctrines—standing, mootness, and ripeness—ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.' " *Worth v. Jackson*, 451

F.3d 854, 855 (D.C. Cir. 2006) (citing U.S. Const. art. III, § 2). Plaintiffs' claims in this case require dismissal because Plaintiffs lack the requisite standing and their claims are moot. For these reasons, Florida Intervenors respectfully request that this Court dismiss Plaintiffs' case in its entirety. At a minimum, Plaintiffs' Claim 8 and Claim 9 must be dismissed for lack of standing and various other justiciability reasons.[5]

### A. Plaintiffs Lack Article III Standing to Challenge the "Effective Date" of EPA's Approval (Claim 8).

Courts assess standing based on "when the suit was filed," and Plaintiffs bear the burden of establishing standing for each claim alleged and form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). For each of their claims, Plaintiffs must establish either "organizational standing" to sue on their own behalf or "associational standing" to sue on behalf of their members. *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018).

To establish their own standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (citation omitted). An injury is "particularized" if it affects the party in a "personal and individual way" and is "concrete" if it actually exists. *Id.* (internal citations omitted).

To establish associational standing, Plaintiffs must show that they (1) have at least one member who would otherwise have standing to sue in her own right; (2) the interests the

---

[5] Consistent with the Court's request for limited briefing at this stage, Florida Intervenors have not raised all of their arguments supporting dismissal of Plaintiffs' claims, especially with regard to issues that are unique to the first through seventh claims. Florida Intervenors expressly reserve their right to raise additional justiciability arguments or other grounds for dismissal in future briefing (if any remains).

association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual member in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977). The first element requires Plaintiffs to "identify at least one *specific* member who has suffered, or is likely to suffer, an injury in fact." *Pub. Citizen,*, 297 F. Supp. 3d at 18.

Plaintiffs lack standing because they have failed to establish any actual or imminent, particularized injury to their or their members' concrete interests that is sufficiently traceable to EPA's approval action and redressable by this Court. Dismissal is therefore required.

### 1. The lack of a 30-day delay in the effective date did not cause any redressable procedural injury to Plaintiffs' or their members' concrete, particularized interests.

Plaintiffs allege that "EPA violated the APA by making its approval effective immediately upon publication in the Federal Register, rather than no less than 30 days thereafter." Dkt. 1 at 47 (Compl., ¶ 237). Their argument is purportedly based on 5 U.S.C. § 553(d), which applies to "rulemakings" and provides that the "required publication or service of a substantive rule shall be made not less than 30 days before its effective date," with certain exceptions. Based on this alleged procedural violation, Plaintiffs ask the court to declare unlawful and set aside EPA's immediate effective date. *Id.*, ¶ 239, *Id.* at 50 (Compl. ¶ Prayer for Relief § (f), (l)). Plaintiffs assert that the lack of a 30-day delay caused procedural injuries to their and their members' concrete, particularized interests, as well as organizational injuries. *See generally* Dkt. 31 at 33-51.

In a procedural injury case, Plaintiffs "have standing only if, *inter alia,* (1) the government violated their procedural rights designed to protect their threatened concrete interest, and (2) the violation resulted in injury to their concrete, particularized interest." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). In this context, the immediacy and redressability requirements of standing are relaxed, meaning Plaintiffs need only show some possibility that the

requested relief would prompt the agency to reconsider the decision that harmed them. *See id.* However, the injury and causation requirements are not relaxed. *Id.* "Establishing causation in the context of a procedural injury requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.' " *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996)).

> **(i)    The lack of a 30-day delay did not injure any concrete, particularized interest of Plaintiffs or their members.**

Plaintiffs contend that the lack of a 30-day delay deprived them of their rights to petition EPA during the pendency of this litigation to postpone the effective date of the approval under 5 U.S.C. § 705, to petition EPA for reconsideration under 5 U.S.C. § 553(e), and to receive the benefits of EPA's decision falling within the scope of the Klain memorandum. Dkt. 31 at 33. In other words, Plaintiffs' theory of procedural injury hinges on claiming that the lack of a 30-day delay impaired alleged secondary procedural rights, which in turn allegedly harmed their concrete, particularized interests. Even if such a procedural-injury bank-shot could ever establish standing, Plaintiffs' arguments fail.

*First*, Plaintiffs and their members lost no procedural rights under APA Section 705 because they had no such rights to begin with. APA Section 705 confers discretion on *the agency* to delay the effective date of a statute pending judicial review; it does not confer on Plaintiffs or their members a statutory right to petition EPA for such a delay. *Compare* 5 U.S.C. § 705 ("[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review") *with* 5 U.S.C. § 553(e) ("[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule"); *see also* Dkt. 35 at 19-21.

Even assuming Plaintiffs and their members possessed a general procedural right to seek an effective-date delay under the APA, Congress eliminated that right in CWA Section 404. Congress provided there that each State is entitled by law to have a decision within 120 days of filing a complete application, which necessarily precluded EPA from staying, revisiting, or restarting the approval process after the 120-day approval timeframe expired on December 17, 2020. *See* 33 U.S.C. § 1344(h); 40 C.F.R. § 233.15(g). This does not leave Plaintiffs without options. Indeed, Congress provided a specific mechanism in CWA Section 404(i) for EPA to alter its approval of a State Section 404 program if the statutory prerequisites for withdrawal are met. *See* 33 U.S.C. § 1344(i); *see also* 40 C.F.R. § 233.53(b). Thus, while Congress did not provide Plaintiffs with a right to seek a delay of the effective date or otherwise seek reconsideration before EPA's approval becomes effective, they may petition for withdrawal of an approved State 404 program. Neither Section 705 nor Section 553(e)'s general, non-time-specific right to seek "issuance, amendment, or repeal" of a rule grant Plaintiffs any rights to seek a *pre*-effective date reconsideration of a State 404 program.

Because Plaintiffs have no right to seek a 30-day delay of the effective date, and *also* lack any derivative procedural rights to petition EPA for a stay or reconsideration before that effective date, their procedural-injury theory falls doubly short of supporting standing. *Ctr. for L. & Educ.*, 396 F.3d at 1157 ("Not all procedural-rights violations are sufficient for standing….").

Plaintiffs' arguments based on the Klain memorandum—a general request from one executive official to the heads of Federal agencies—suffers the same fate. That memorandum merely states, "I ask that you immediately take the following steps," including for "rules that have been issued in any manner, but have not taken effect" to "consider postponing the rules' effective dates for 60 days." Klain Mem., *available at* https://www.whitehouse.gov/briefing-

room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/. An internal executive memorandum that "asks," as opposed to directs, and provides only that an agency "consider," as opposed to affirmatively postpone, qualifying rules does not provide Plaintiffs or their members a basis upon which they can show injury in fact to a protected right, much less one that rises above a speculative level. Absent any right under APA Sections 705 and 553(e) or under the Klain Memorandum, Plaintiffs' and their members' related assertions of procedural injury fail.

*Second*, even assuming that Plaintiffs had the procedural rights they claim, any purported related injury due to the absence of a 30-day delay would be harmless. For instance, Plaintiffs immediately could have sought (and still can seek) a stay of EPA's approval from this court under APA Section 705 or by a motion for a temporary restraining order or a preliminary injunction. Plaintiffs have chosen not to use these opportunities. And Plaintiffs are also free to file a petition for withdrawal of Florida's program. 40 C.F.R. § 233.53(c)(1). Plaintiffs have not availed themselves of this opportunity. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416, 422 (2013) (holding that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").

Furthermore, Plaintiffs have acknowledged that even if EPA had applied the 30-day delay, its approval would have taken effect on January 21, 2021—*i.e.*, less than one day after President Biden took office. *See* Dkt. 21 at 2 n.1. In other words, assuming Plaintiffs were deprived of some secondary procedural right, the only injury Plaintiffs could identify is the missed political and advocacy opportunity *of less than five business hours* during a new presidential administration. As importantly, the administration had already expressly identified and prioritized ***48 EPA actions*** to be reviewed, but this list did not include the Agency's approval of Florida's assumption application. *See* Fact Sheet: List of Agency Actions for Review (Jan. 20, 2021), *available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-

agency-actions-for-review/. This was the case, even though Plaintiffs tried to persuade the incoming administration otherwise before it took office. *See* Dkt. 21 at 6 n.2 (indicating that Plaintiffs asked the incoming administration "to recognize that the transfer of authority was not lawful or, alternatively, if EPA lawfully promulgates a rule approving and codifying the state program, that the agency postpone its effective date pending judicial review"); Dkt. 31-1 at 7, (Crooks Decl. ¶ 24) (acknowledging that Plaintiffs submitted requests to EPA and the Biden Administration's transition team seeking to postpone the effective date without success).

Given this factual context, Plaintiffs cannot base injury in fact on a less-than-one-day window of political opportunity with a new administration that had expressed no specific interest in agreeing with Plaintiffs' concerns. Indeed, three months into the new administration, EPA has not indicated a change in course. To say Plaintiffs' theory of injury is speculative would be an understatement. Plaintiffs' footnote suggestion that but for absence of a 30-day delay, the new administration would have stayed the effective date of EPA's approval, is unsubstantiated. *See* Dkt. 31 at 34 n.9 (stating that "under EPA's current position, the agency is unable to consider Plaintiffs' stay request without court intervention").

*Third*—even assuming Plaintiffs possessed valid procedural rights to seek effective-date delays or reconsideration, that is at most a generalized, procedural injury. Plaintiffs must, but cannot, show how such generalized procedural injuries have harmed or will harm their concrete, particularized interests. All of Plaintiffs' members' asserted harms flow from FDEP's *future* grant of pending permit applications. No member harms stem from the lack of a 30-day delay, for FDEP did not grant any permits between December 22, 2020, and January 21, 2021. Dkt. 31 at 35 (acknowledging that as of the filing of Plaintiffs' brief, "the state is [merely] considering permit applications" and had not granted a single permit application). Regardless, as discussed in greater

detail below, such future harms based on third-party conduct are too speculative to provide standing here. *See infra* Argument I.C.2.

Although Plaintiffs assert multiple organizational injuries allegedly caused by the lack of a 30-day delay, only Plaintiffs' claim that they were forced to immediately divert resources from their core programs between December 22, 2020, and January 21, 2021 is arguably attributable to their eighth claim. Dkt. 31 at 40. But alleging a sufficient organizational injury in this context requires Plaintiffs to show that EPA's approval injured Plaintiffs' organizational interests *and* that Plaintiffs used their resources to counteract that harm. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). No standing exists where a plaintiff's "injury" arises from a self-inflicted budgetary choice, including resources diverted for litigation or investigation in anticipation of litigation, or from resources expended based on "unnecessary alarmism." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*"); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Here, Plaintiffs' purported diversions do not qualify as concrete, particularized organizational injuries because they were self-inflicted, either based on an unsubstantiated fear or designed to manufacture standing for this litigation, and they did not counteract any aspect of EPA's approval.

Plaintiffs contend that the lack of a 30-day delay "forced [them] immediately to expend resources and staff time to gather information on new and transferred 404 permit applications … while trying to continue their advocacy against pending permit applications threatening their interests and those of their members." Dkt. 31 at 41. As a preliminary matter, Plaintiffs failed to identify any "new" permit applications (*i.e.*, not transferred from the Corps) that were filed with

FDEP during the relevant 30-day window where they expended resources. Plaintiffs' assertion of diverted resources to gather information on those permit applications thus is unsubstantiated.

Regardless, Plaintiffs' assertions of being caught off guard by EPA's immediately effective approval and thereby forced to immediately expend resources to counteract the immediacy are not credible. *See, e.g.*, Dkt. 31-1 at 10-12, (Crooks Decl. ¶¶ 29-35) (stating that due to the immediate transfer the Conservancy of Southwest Florida was forced to "quickly transition [its] resources" and to hold "emergency internal meetings"). But this ignores Crooks' concession that she has been advocating against and tracking Florida's assumption of Section 404 authority for her organization since 2017. Dkt. 31-1 at 5 (Crooks Decl. ¶ 15). Additionally, months before its approval, EPA publicly stated that its approval and transfer would be immediately effective on publication of notice. *See* 85 Fed. Reg. at 57,855 ("If EPA approves Florida's program, EPA will notify the State and the Corps and publish notice in the Federal Register. Transfer of the program to the State is not effective until this notice is published."). This public statement was consistent with CWA Section 1344 and Corps regulations, as well as with EPA's 50-year track record of approving State programs via notices that are effective immediately or very soon thereafter.[6] *See infra* Argument II.A. It is common knowledge that an agency action's publication in the Federal Register can occur as soon as one day later, especially where the action is a fairly straightforward public notice of a letter of approval. Plaintiffs thus have been on notice that EPA's approval would be effective immediately upon publication of its notice since Florida submitted its application. Plaintiffs also have had full access to the provisions of Florida's program since it was finalized and codified in State law in June 2020.

---

[6] *See* 33 U.S.C. § 1344(h)(2)(A); 40 C.F.R. § 233.15(h).

Based on these irrebuttable facts, Plaintiffs' lack of preparation was a self-inflicted injury rather than the result of EPA promptly publishing a Federal Register notice. Had Plaintiffs prepared, there would have been no potential immediate harm to counteract, as Plaintiffs already "had planned to monitor the transfer of 404 permitting authority." *See* Dkt. 31-1 at 11, (Crooks Decl. at ¶ 33); *see also Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994). Regardless, any diversion of resources was unnecessary because FDEP issued no permits and there was no harm to counteract between December 22, 2020, and January 21, 2021. Plaintiffs' "programs would have been totally unaffected if [they] had simply refrained from making the re-allocation[s]" they claim. *Fair Emp. Council of Greater Wash., Inc.*, 28 F.3d at 1277. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves [by incurring costs in anticipation of] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416, 422; *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1139–40 (D.C. Cir. 2011) (reaffirming that an organization's diversion of resources in response to actions or inactions does not impart standing (citation omitted)).

Additionally, by all accounts, Plaintiffs' allegedly diverted resources went toward preparing for potential litigation and advocacy related not only to this case but also to potential future challenges. *See, e.g.*, Dkt. 31-1 at 10-12, (Crooks Decl. ¶¶ 29-35); Dkt. 31 at 41 (admitting to gathering information for "advocacy" interests). These diversions constitute self-inflicted budgetary choices. *Food & Water Watch, Inc. v. Vilsack* 808 F.3d 905, 919–20 (D.C. Cir. 2015); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). Furthermore, Plaintiffs have not specifically asserted that any diversion of resources forced them to incur unusual operations costs. *See Nat'l Ass'n of Home Builders v. EPA,* 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's expenditures must be for " 'operational costs beyond those

26

normally expended' to carry out its advocacy mission" (quoting *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C. Cir. 1995)).

Based on the foregoing, Plaintiffs have not shown that the lack of a 30-day delay resulted in any injury to their or their members' interests sufficient to supporting standing for their eighth claim.

> **(ii)      Plaintiffs show no causal connection between the timing of when EPA's approval became effective and the substance of the approval.**

Plaintiffs have not, and cannot, show that the lack of a 30-day delay in the effective date substantively affected EPA's decision-making process and approval of Florida's program. *See Ctr. for Biological Diversity*, 861 F.3d at 184 (noting that "a plaintiff 'must still demonstrate a causal connection between the agency action and the alleged injury' " (citation omitted)). The timing of the effective date, by definition, is a *post*-decision, procedural step. It is thus far afield from notice-and-comment violations and other procedural injuries that readily affect an agency's consideration of a rule. *See California v. Trump*, No. CV 19-960 (RDM), 2020 WL 1643858, at *7 (D.D.C. Apr. 2, 2020). As a result, EPA's approval could not "have been wrongly decided because of" the absence of the 30-day delay. *Ctr. for Biological Diversity*, 861 F.3d at 184. Plaintiffs therefore cannot establish causation and lack standing to raise this procedural-injury claim.

> **(iii)     This claim is not redressable because granting the requested relief would not allow EPA to reconsider its approval.**

In relation to their eighth claim, Plaintiffs seek only declaratory relief and to set aside the immediate effective date. A declaratory ruling from this Court that the 30-day delay applied to EPA's approval would not provide EPA with an opportunity to reconsider its approval that the agency does not already have. Nor would setting aside the immediate effective date. Instead, that merely would move the effective date from December 22, 2020 to January 21, 2021. *See Prows v.*

*U.S. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991) (establishing that the remedy for a 30-day delay violation is to move the rule's effective date to when it should have been). Accordingly, this small shift in the effective date would not redress any of Plaintiffs' claimed organizational injuries (assuming they were otherwise sufficient). It similarly would not redress Plaintiffs' members' claimed injuries because, among other things, FDEP approved no permits between December 22, 2020 and January 21, 2021.

### 2. The lack of a 30-day delay has not caused any redressable non-procedural injury to the concrete, particularized interests of Plaintiffs.

For the same reasons that Plaintiffs' alleged procedural injuries to its concrete, particularized organizational interests fail, Plaintiffs cannot establish that the lack of a 30-day delay caused them any non-procedural injury sufficient to establish standing for their eighth claim. *See supra* Argument I.A.1.i.

Independently, Plaintiffs' eighth claim is not redressable because the court can no longer grant any meaningful relief. The D.C. Circuit, following other courts of appeals, has held that the appropriate remedy for a violation of the 30-day requirement is to "deny[] such a rule effectiveness for the mandated 30 days, allowing it to take effect in full thereafter." *Prows*, 938 F.2d at 275. Applying this rule, EPA's approval would have become effective on January 21, 2021. Accordingly, under *Prows*, Plaintiffs' claim based on this violation is not redressable.[7] *Id.*

Plaintiffs disclose the controlling holding in *Prows*, albeit in the final footnote of their brief. Dkt. 31 at 50 n.10. They assert that *Prows* does not apply because "there was no other issue with the rule's promulgation" in that case, and "no action that took place during the 30-day period had

---

[7] The United States also recognizes that *Prows* controls. Dkt. 35 at 16-19. Although the United States takes the more limited position that *Prows* does not preclude Plaintiffs' standing to raise Claim 8 based on past injury, the United States does not identify what cognizable past injury Plaintiffs actually suffered. As indicated in this brief, any alleged past injury from the lack of a 30-day delay either is not credible or was self-inflicted, such that it provides no basis for standing.

harmed the plaintiff." *Id.* Even if Plaintiffs have sufficiently preserved their position, their attempt to distinguish *Prows* fail. *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigration Servs.*, No. 19-3283 (RDM), 2020 WL 5995206, at \*10 (D.D.C. Oct. 9, 2020) ("[T]he Court is unpersuaded that this brief, conditional assertion in a footnote is sufficient to preserve the issue.").

*First*, as a threshold matter, Plaintiffs' effort to distinguish the facts underlying the alleged Section 553(d) violation in this case from those in *Prows* lacks merit. The rule in *Prows* is not limited to the facts of that case. Instead, speaking to *all* 30-day violations, the court broadly stated: "We join the other circuits that have addressed the matter in holding that violations are remedied by denying such a rule effectiveness for the mandated 30 days, allowing it to take effect in full thereafter." 938 F.2d at 275. This situation falls within the scope of the *Prows* holding. The *Prows* approach has been followed in other cases involving analogous violations within the D.C. Circuit. *See, e.g.*, *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) (rejecting attempt "to distinguish *Prows* on the ground that" a significant substantive defect in the rule at issue "is 'far more fundamental' than the 'procedural' defect" in *Prows*).

*Second*, Plaintiffs suggest that because they have alleged other claims challenging the rule, their eighth claim cannot be considered non-justiciable under *Prows*. But that assertion runs afoul of the rule that standing is assessed on a claim-by-claim basis. *Davis*, 554 U.S. at 734. Regardless, Plaintiffs' argument fails because they did not develop it or provide any legal authority supporting it. *United States v. Law,* 528 F.3d 888, 908 n.11 (D.C. Cir. 2008) (treating "argument as waived because [party] failed to develop it"); *Gov't of Manitoba v. Bernhardt,* 923 F.3d 173, 179,  (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quotation marks and citation omitted)).

*Third*, Plaintiffs argue that *Prows* does not apply because Prows was not harmed during the 30-day period. Plaintiffs rely on a non-binding district court case that predates the D.C. Circuit's *Prows* decision by nearly a decade, and that expressly rejected the Tenth Circuit decision that *Prows* followed—*Ngou v. Schweiker*, 535 F. Supp. 1214, 1217 (D.D.C 1982) (questioning and not applying *Rowell v. Andrus*, 631 F.2d 699, 704 (10th Cir. 1978)). *Cf. Prows*, 938 F.2d at 276 (agreeing with and following *Rowell*). Besides its tension with *Prows*, *Ngou* involved "special circumstances" where the regulation would have cut off presently available cash and medical benefits from the class of over 10,000 refugees with less than three weeks' notice, where no substitute benefits were available to them under either Federal or State law. 535 F. Supp. at 1215, 1217. And even in these extraordinary circumstances, the court's preliminary-injunction remedy was based on preventing direct, imminent harm and limited to making the rule effective 49 days after it was published, as opposed to 30 days. *See id.* at 1217.

As of the filing of this brief, it has been *125 days* since EPA issued its approval, meaning Plaintiffs have had plenty of time to prepare for Florida's assumption. Furthermore, as of April 23, 2021, FDEP has not approved a single individual permit under its assumed authority. Based on this, "the declaratory and injunctive relief Plaintiffs seek would not affect the risk of the underlying harms" they assert—*i.e.*, future permits harming their members' interests or the resources they diverted within the first 30 days—and past harm does not support standing to seek forward-looking relief. *Pub. Citizen*, 297 F. Supp. 3d at 21 n.5 (D.D.C. 2018) (citing *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 689 (D.C. Cir. 2015)). Accordingly, Plaintiffs' eighth claim is non-justiciable.

**B.** **Plaintiffs Lack Article III Standing to Challenge the Codification Status of Florida's Program (Claim 9).**

Plaintiffs present no colorable standing argument for their ninth claim. Plaintiffs allege that EPA is required to codify Florida's CWA Section 404 program before it can take effect and EPA's immediate failure to do so has caused "Plaintiffs and their members … risks of harm from 404 permits to be issued by the state." Dkt. 31 at 48-49. Plaintiffs lack standing to bring this procedural claim.

*First*, in their skeletal one page of argument, Plaintiffs do not even argue—as they must—that the alleged codification requirement constitutes a "procedural right[] designed to protect their [or their members'] threatened concrete interest…." *Ctr. for L. & Educ.*, 396 F.3d at 1157. Nor do they even reference in their argument the statute on which their ninth claim is based—the Federal Register Act, 44 U.S.C. § 1510(a). That statute speaks only to the Administrative Committee of the Federal Register and the President. Nothing within that provision so much as hints that codification requirements are designed to protect Plaintiffs' or their members' concrete, particularized interests. Absent showing that this law was designed to protect their interests, Plaintiffs' claim amounts to a "bare procedural violation" that does not "satisfy the injury-in-fact requirement of Article III." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), *as revised* (May 24, 2016); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009); *Fla. Audubon Soc.*, 94 F.3d at 664 ("The mere violation of a procedural requirement thus does not permit any and all persons to sue to enforce the requirement.").

*Second*, Plaintiffs do not explain how the lack of codification injured their concrete, particularized interest. Instead, ignoring the lack of codification and focusing on EPA's general approval, Plaintiffs declare that absent EPA's approval (not because of the lack of codification), they "would continue to enjoy rights and protections" provided under a federally implemented

Section 404 program and their members would face no risk of harm. *See* Dkt. 31 at 48-49. Without showing that the lack of codification caused Plaintiffs and their members harm to their concrete and particularized interests, Plaintiffs cannot establish standing for this claim. This is especially true since Plaintiffs and their members had actual notice of EPA's approval and the relevant State and Federal regulations are publicly available. FDEP's regulations creating the State 404 Program were finalized in June 2020 and are now codified primarily at Chapter 62-331 of the Florida Administrative Code (AR-0006 at 2-3).

*Third*, Plaintiffs cannot establish causation for this claim. Establishing causation for a procedural violation requires Plaintiff to "establish a causal connection between the omitted procedural step and 'some substantive government decision that may been wrongly decided because of the lack of 'that procedural' step." *California*, No. 19-960 (RDM), 2020 WL 1643858, at *7 (citing *Ctr. for Biological Diversity*, 861 F.3d at 184). The procedural step of codification related to EPA's approval is an after-the-fact step that is wholly unrelated to EPA's substantive approval, and requiring it now could have no bearing on EPA's underlying approval decision. This reality, which the United States agrees with (Dkt. 35 at 21-23), further defeats Plaintiffs' standing on this claim. Florida's program was finalized as a matter of State law nearly one year ago, and these provisions have been publicly available since. Based on the foregoing, Plaintiffs cannot establish the requisite causation for this claim.

*Fourth*, Plaintiffs' ninth claim would not redress Plaintiffs' and their members' asserted injuries. Codification would not, for example, stop Florida's ability to implement its program and issue future permits. For this reason, Plaintiffs' ninth claim is not redressable.

*Fifth*, and finally, Plaintiffs' ninth claim likely will become moot in the immediate future as EPA already has issued a prepublication notice for the codification. *See* Pre-publication Notice:

Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021), https://www.epa.gov/cwa404g/pre-publication-notice-codifying-epas-adjudicatory-decision-floridas-clean-water-act-section. Once that codification clears regulatory review and is published in the Federal Register, Plaintiffs' claim will be moot.

### C. Plaintiffs Lack Article III Standing as to Claim 8, Claim 9, and All Other Claims Because Florida's Expanded Role Causes No Actual Injury Relative to the Pre-Assumption Program.

The standing inquiry is "context-specific, requiring the reviewing court to draw on its experience and common sense." *Food & Water Watch, Inc.*, 808 F.3d at 917 (quotation marks and citation omitted; brackets in original). The context of this challenge—EPA's approval of Florida's assumption application—precludes Plaintiffs from establishing any concrete, particularized injury to support standing for any of their claims. EPA's action is directed to Florida, and Florida's program simply stands in for the Federal program in certain areas of the State, all with the substantial ongoing involvement of the Federal agencies to assure compliance with Federal law. Plaintiffs retain their robust right to participate in the State permitting process as well, and if any particular permit is objectionable, Plaintiffs may challenge that permit, just as they could under the Federal program. Thus, relative to the status quo ante in Florida, EPA's approval of Florida's program causes no concrete, cognizable injury to Plaintiffs. For this reason, Plaintiffs' complaint must be dismissed in its entirety. *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 917 (D.C. Cir. 2003) (finding no standing where the "transfer" to state jurisdiction "effects no legal change that would lessen the protection of the Tribe's cultural heritage" or impede the relevant federal agency from enforcing cultural protection statutes).

1.     **Florida's program provides robust environmental protection with extensive Federal oversight and involvement, thereby imposing no actual concrete injury to Plaintiffs as compared to the pre-approval status quo.**

Plaintiffs' standing theory relies on their largely unspoken contention that Florida's administration of its Section 404 permitting program will cause greater harm to Florida's natural resources than if the Corps were administering the permitting program. Plaintiffs' speculation conflicts with the CWA and cannot constitute a concrete injury.

The CWA's cooperative federalism structure ensures extensive State and Federal coordination that protects the environment. Florida's approved program embodies these goals.

The plain language of Section 404 requires EPA to verify that a State seeking to assume authority has a program with provisions that are at least as protective as the Federal program. *See, e.g.*, 33 U.S.C. § 1344(h)(1)(A) (providing that State program must "apply, and assure compliance with, any applicable requirements of [Section 404], including, but not limited to, the guidelines established under subsection (b)(1)"); *id.* § 1344(h)(1)(B) (requiring State programs "[t]o issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of [the CWA], or to inspect, monitor, enter, and require reports at least to the same extent as required in section 1318"). Such programs must include authority allowing the State "[t]o abate violations of the permit program" including by "civil and criminal penalties and other ways and means of enforcement. *Id.* § 1344(h)(1)(G). And State programs also must "assure continued coordination with Federal and Federal-State water related planning and review processes," and that EPA "receives notice of each application (including a copy thereof) for a permit." *Id.* § 1344(h)(1)(D), (H). Furthermore, State programs must continue to provide the public with notice of, information about, and an opportunity to comment before the State can rule on any application. *Id.* § 1344(h)(1)(C).

34

EPA correctly determined that Florida's program provides protection of water resources that is at least as protective as the Federal program. Besides vigorously protecting the waters of the United States through substantive federal standards, Florida's program includes a system of administrative checks that allow the public to hold the State accountable if it errs in granting or denying a permit. Florida's program does this by providing numerous opportunities for public engagement throughout the permitting process as well as ample opportunities to bring permit challenges under the Florida APA (Fla. Stat. ch. 120) and the Florida Environmental Protection Act (Fla. Stat. § 403.412).

Under Florida law, any person "substantially affected" by an FDEP rule or proposed rule may seek an administrative determination that the rule is invalid. *See* Fla. Stat. § 120.56(1)(a); § 120.569(1). Florida courts have interpreted Chapter 120 liberally to achieve the statutory purpose of increasing public participation in agency decisions. *NAACP, Inc. v. Fla. Bd. of Regents*, 863 So. 2d 294, 298 (Fla. 2003); *Palm Beach Cnty. Envt'l Coal. v. Fla. Dep't of Envt'l Prot.*, 14 So.3d 1076 (Fla. 4th DCA 2009). This includes the opportunity to challenge the validity of an existing rule "at any time during which the rule is in effect." Fla. Stat. § 120.56(3). Likewise, FDEP's issuance of a permit is not final agency action if an administrative challenge is timely filed. *See* Fla. Stat. § 120.569, § 120.57. In Florida, the "administrative hearing process is designed to formulate agency action" so FDEP's "final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the [administrative] proceeding or by settlement." Fla. Admin. Code § 62-110.106(7)(e)(2). Moreover, permit challenges in Florida are *de novo* proceedings where the FDEP's initial determination receives *no deference* and all of the parties—*including any environmental challengers*—have the "opportunity to respond, to present evidence and argument

on all issues involved, [and] to conduct cross-examination and submit rebuttal evidence...." *Id.* § 120.57(1)(b); *see*, *e.g.*, *Hamilton Cnty. Bd. of Cnty. Comm'rs v. Fla. Dep't of Envt'l Regulation*, 587 So.2d 1378, 1387-88 (Fla. 1st DCA 1991). In other words, these *de novo* administrative proceedings are designed to give aggrieved "parties an opportunity to change the agency's mind." *Capeletti Bros. v. Dep't of Gen. Servs.*, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983). If the administrative process results in a final order issuing the permit, Florida law provides for a right to seek judicial review. *See* Fla. Stat. § 120.68.

Plaintiffs incorrectly argue that Florida law "blocks access to the courts unless the organization can demonstrate that a 'substantial number' of its members 'are substantially affected' by the challenged conduct," and they erroneously contrast Florida standing jurisprudence with organizational standing in federal law. Dkt. 31 at 22. Plaintiffs obviously oversimplify Federal standing doctrine, while also failing to acknowledge that Florida law provides significant opportunities for environmental groups to challenge FDEP permitting and regulatory actions.

Indeed, environmental groups have at least three such avenues under Florida law. One, under the seminal case in Florida known as *Agrico Chem. Co. v. Dep't of Envt'l Regulation*, 406 So. 2d 478 (Fla. 2d DCA 1981), plaintiffs have standing to challenge permitting actions if they can demonstrate that their "substantial interests" are determined or affected by the action and their interests fall within the zone of interests of the relevant program. Under the *Agrico* framework, associations have standing if a "substantial number of its members, although not necessarily a majority, are substantially affected' ...." *Fla. Home Builders Ass'n v. Dep't of Labor and Emp't Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982). This is the traditional avenue for environmental plaintiffs to obtain standing in Florida. Two, under separate statutory authority, environmental groups in Florida with "at least 25 current members residing within the county where the activity is

36

proposed" have *automatic standing* to challenge a permitting action. *See* Fla. Stat. § 403.412(6). Three, and most importantly for this case, Florida law expressly provides that, "[i]n a matter pertaining to a federally delegated or approved program," like Florida's Section 404 program, "a citizen of the state may initiate an administrative proceeding under this subsection *if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution*." Fla. Stat. § 403.412(7) (emphasis added). In other words, if Plaintiffs seek to challenge a permitting decision by FDEP under Florida's Section 404 Program, Florida law will simply require them to satisfy Federal standing doctrine. *Id.*

Likewise, Plaintiffs vastly overstate the impact of Florida's fee shifting provision found at Section 403.412(2)(f), which "applies only to circuit court actions for injunctive relief," not administrative actions. *Agrico Chem. Co. v. Dep't of Env't Regulation*, No. 83-2708, 1984 WL 54261, at *2 (Fla. Div. of Admin. Hr'g, June 27, 1984); *accord Lake Hickory Nut Homeowners' Ass'n v. Schofield Corp.*, No. 91-8088, 1992 WL 322912, at *13 (Fla. Div. of Admin. Hr'g, July 23, 1984); (explaining that Section 403.412(2)(f) only "relates to a civil injunction action and not to an administrative proceeding"). FDEP does not seek fees under Section 403.412(2)(f) from environmental groups challenging FDEP permitting actions. Plaintiffs cite no contrary examples.

As importantly, under Florida's program, Federal agencies maintain oversight roles and ongoing involvement in the FDEP Section 404 permitting process. For example, EPA retains an active role in overseeing *each* FDEP permit application, including the authority to federalize permit applications. (AR-0018 at 7-9). In other words, should FDEP propose to grant a permit contrary to Federal law, EPA's review role and retained authority would provide a legal backstop. In this manner, EPA ensures that Florida permitting actions comply with all Federal requirements. Even more, if Florida does not administer its Section 404 program consistent with relevant

statutory and regulatory requirements, EPA has authority to initiate proceedings to withdraw approval and to return the full Section 404 program authority to the Corps. *See* 33 U.S.C. § 1344(i). Any interested person may petition EPA to start withdrawal proceedings. 40 C.F.R. § 233.53(c)(1).

The U.S. Fish and Wildlife Service likewise plays an ongoing, active role to ensure that the implementation of Florida's program protects listed species and designated critical habitat under the ESA. Under the binding biological opinion accompanying EPA's approval, FDEP must involve FWS in permit decisions, accept technical assistance from FWS, incorporate all species- and habitat-protective conditions FWS identifies into the State permit, and issue a notice of intent to deny a permit application if FWS determines that the approval of such a permit would either jeopardize the continued existence of an ESA-listed species or modify such a species' designated critical habitat. (AR-0642 at 27-41, 78-80).

Given this extensive Federal involvement that ensures Florida's administration of its program complies with Federal requirements, Plaintiffs' general assertions of standing based solely on EPA's transfer of authority lack merit. Furthermore, Plaintiffs have proffered no evidence of any concrete, particularized harms to natural resources caused solely by the fact that Florida will be administering some Section 404 permit applications instead of the Corps. Plaintiffs' unsubstantiated and unspecific fear of undefined future harms attributable to some difference in Florida's adjudication of permits versus the Corps' adjudication does not support their standing in this case. *See La. Envt'l Action Network v. Browner*, 87 F.3d 1379, 1383 (D.C. Cir. 1996) (rejecting standing where organization alleged hypothetical "enforcement gap" arising from EPA's adoption of delegation rules setting standards that EPA would use to determine whether to approve State implementation plans under the Clean Air Act, and providing that, even assuming such a gap were created, standing did not exist because the court could not "assume that that gap will affect areas

actually frequented by LEAN's members" as required "to assert . . . concrete and particularized injury"); *City of Dover v. EPA*, 36 F. Supp. 3d 103, 111–12 (D.D.C. 2014) (dismissing challenge to EPA's approval of State's impaired waters list under CWA for lack of standing where no final permit containing the alleged injurious "strict" nitrogen limit had been issued to Plaintiffs). If Plaintiffs' fears come to pass, they may petition EPA to withdraw its approval of Florida's program based on a factual record of violating federal law and seek judicial review of EPA's decision. But Article III of the Constitution prohibits a record-free, speculation-fueled challenge based on the mere transfer of permitting authority, where federal-equivalent requirements and federal-agency involvement remain legally mandated under Florida's program.

### 2.   Plaintiffs lack associational standing because their members' purported injuries are too speculative.

Courts "must reject vague and 'overly speculative' predictions about 'future events.' " *Pub. Citizen*, 297 F. Supp. 3d at 19 (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)). This is especially true for "future actions to be taken by third parties" and for "predictions of future injury that are 'not normally susceptible of labelling as true or false.' " *Arpaio*, 797 F.3d at 21 (internal citations omitted).

Plaintiffs assert that EPA's approval creates a substantial risk of injury to their members' interests based on the mere *possibility* that FDEP—a third party—will grant certain pending permit applications. Dkt. 31 at 35. These assertions of injury are too speculative to support standing for Plaintiffs' claims.

Despite invoking the "substantial risk" principle, Plaintiffs do not cite the Supreme Court's case addressing this issue—*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010). That case requires Plaintiffs to establish that EPA's approval creates (1) a "significant risk" that FDEP will grant the specific permits their members are concerned about; and (2) if granted, these

permits would injure their members' cognizable interests. *Id.* at 153 n.3; 153-55; *Clapper*, 568 U.S. at 414 n.5 (questioning whether the "'substantial risk' standard is relevant and distinct from the 'clearly impending' requirement"). Plaintiffs have not shown and cannot show either element.

*First*, Plaintiffs cannot show that EPA's approval, which merely transferred pending permit applications from the Corps to FDEP, creates any new risk of injury. Regardless of EPA's approval being challenged, those pending applications would have been adjudicated, and Plaintiffs proffer no evidence showing that FDEP would be more likely to grant any specific pending applications than the Corps would. Accordingly, even if FDEP were to grant permit applications of concern, Plaintiffs could not show that, but for EPA's approval, the permits would not have been granted.

*Second*, and regardless, EPA's approval did not create significant risk that the specific permits Plaintiffs' members are concerned about will be granted. Although EPA's approval created the possibility for another agency (FDEP) to grant a pending permit application in the future, that alone does not confer standing, and Plaintiffs acknowledge that FDEP only "is considering permit applications." Dkt. 31 at 35.

Regardless, showing that EPA's approval created a "significant risk" that FDEP would grant the permits Plaintiffs' members are concerned about would not be enough here. Even if FDEP approved a permit *that the Federal agencies would have denied* (a leap that is not justified here), any such approval would still be subject to challenge by third parties in Florida administrative and judicial proceedings. A permit approval is not effective during an administrative challenge, and could ultimately be vacated by the agency or a court of review, which would end any potential future harm at the State level.[8] As a result, Plaintiffs' purported injuries arising are too speculative to confer standing.

---

[8] Plaintiffs also ignore the fact that projects require numerous authorizations before they can proceed to the construction and operation stage. This is especially true for the projects Plaintiffs'

Finally, Plaintiffs' declarations have not shown that third-party construction and operation of any of the identified projects would concretely harm their members' interests. For example, to show concrete harm related to execution of the Nobles Grade Prospect and the Tamiami Prospect, Plaintiffs rely on Ann Wiley's declaration. Dkt. 31-4. Plaintiffs contend that these projects would injure Wiley's recreational and professional interests. Dkt. 31 at 36-37. But these injuries are speculative in light of the scale of these projects in a 700,000-acre preserve, and the fact that Wiley does not establish that she is engaged in recreation or professional interests in the project area or in an area that likely would perceptibly be impacted by the projects. Wiley merely states that the Noble Grades Project "is located approximately three miles southwest" of a "rest stop [that] serves as an access point to hiking trails." Dkt. 31-4 at 5, (Wiley Decl. ¶ 13). She does not state that she regularly uses this rest stop or plans to in the future, or that she can even see the proposed project area from the rest stop. Similarly, Wiley's statement that she leads tours through the Everglades "that go near the boundary of the proposed project site" at an undefined distance from the Tamami Prospect is insufficiently specific to make her alleged harms concrete.

Declarant Crooks' purported injuries fare no better for the Troyer Mine. The closest Crooks gets to that project is recreating in some unspecified part of the 60,000-acre Corkscrew Regional Ecosystem Watershed, where that watershed at its nearest point is "three and a half miles away from the public lands [she] enjoy[s]." Dkt. 31-1 at 16, (Crooks Decl. ¶ 47). Crooks does not claim that she will be able to see the project from where she recreates or that she will experience any

---

members express concern about, including the Noble Grade Prospect, Tamiami Prospect, Troyer Mine, Wastewater Treatment Plant Expansion, and State Road 836. For example, each of these projects must be authorized by an ERP before proceeding to construction. None of the above projects have received such authorization yet, except for the Troyer Mine project, which is awaiting other permit approvals. Notably, the Nobles Grade and Tamiami Prospect projects are also awaiting National Park Service oil and gas operating permits, under 36 C.F.R., Subpart B, which have not yet been issued.

other concrete impacts as a result of the project. Instead, she only declares that vehicle collisions are responsible for some panther deaths, and that the project will increase traffic and the likelihood of more panther deaths to an unknown degree. At most, this creates an undefined increase in the possibility that operations of the project could lead to additional panther deaths, which does not suffice for standing in Federal court.

Plaintiffs also fail to concretely show how the expansion of an existing wastewater treatment plant that is located inland and miles from a state park waterbody and bay would perceptibly impair their members' interests in those waterbodies. Dkt. 31 at 38-39. Nor do Plaintiffs show a concrete or particularized injury due to the State Road 836 project. *Id*. at 39-40. Declarant Umpierre merely expresses worries about future, unknown, and imprecise potential impacts due to the project. If this were sufficient to establish standing, anyone with a concern about Florida's ecosystem could establish standing. Umpierre also does not identify any harm that will perceptibly impair any of her interests given the project's location and where she recreates.

For these reasons, declarants' purported injuries, too, are insufficient to confer standing to Plaintiffs. *Fla. Audubon Soc.*, 94 F.3d at 667 ("The presence of a particularized risk of injury to the plaintiff's interests requires even more exacting scrutiny when the challenged government action is not one located at a particular 'site' "); *cf. Sierra Club v. Jewell*, 764 F.3d 1, 6–7 (D.C. Cir. 2014) (referencing a project's actual interference with natural vistas); *id.* (citing *Cantrell v. City of Long Beach,* 241 F.3d 674, 681 (9th Cir. 2001) (stating that "[i]f an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact").

### 3.    Plaintiffs' alleged organizational injuries do not support their standing.

Plaintiffs have not shown and cannot show that they have organizational standing to bring any of their claims because EPA's approval does not directly conflict with their respective

organizational interests, and because Plaintiffs' alleged injures are speculative, implausible, and non-cognizable. For these reasons, Plaintiffs' lawsuit should be dismissed in its entirety.

Plaintiffs assert that EPA's approval harms them because it creates a substantial risk that they will suffer organizational injuries from diverted resources; lost benefits of Federal requirements, rights, and remedies available under NEPA and Section 7 of the ESA; and restricted access to Federal courts. Dkt. 31 at 41. Based on these alleged injuries, Plaintiffs claim they "have had to use and will continue to use their resources to counteract these harms." *Id.* These assertions fail as explained below.

### (i)     There is no direct conflict between EPA's approval and Plaintiffs' respective organizational missions.

Plaintiffs have not shown the requisite "direct conflict" between EPA's approval and their missions. *PETA*, 797 F.3d at 1093-94; *Pub. Citizen*, 297 F. Supp. 3d at 36–38. EPA's approval of Florida's assumption application has no direct impact on Plaintiffs' mission, and therefore cannot directly conflict with it. Instead, EPA's approval of Florida's assumption application merely transferred limited CWA Section 404 authority to Florida as required under statute so that the State could administer its substantively equivalent program. The only possible conflict with Plaintiffs' missions would occur indirectly, if at all, and only if and when FDEP implements its program in a way that allegedly provides less substantive protection than the Corps' implementation would have. Because EPA's approval was neutral with respect to Plaintiffs' missions, they lack organizational standing to raise their claims.

### (ii)     Plaintiffs' alleged organizational injuries are speculative.

EPA's approval of Florida's assumption application alone causes no direct injury to Plaintiffs' activities. As explained above, Plaintiffs cannot manufacture an injury based on their

alleged past diversion of resources used in an effort to preemptively address unrealized harm based on their fear of Florida's possibly unfavorable future adjudications. *See also supra* Part I.A.1.i.

Plaintiffs' prospective claim that EPA's approval creates a substantial risk of future injury from having to divert their resources also fails. Plaintiffs identify no concrete and particularized future instance where they definitely will divert resources away from core programs due to EPA's approval. Instead, Plaintiffs state that at some undetermined future date they (1) will challenge an unknown (and currently non-existent) FDEP-issued Section 404 permit that will require them to do research and engage experts to obtain [] information" no longer available under Florida's program; and (2) will need to submit "new" comments on unidentified permit applications transferred from the Corps to Florida, despite the fact that Florida's program provides environmental protection substantively equivalent to the Corps' program. Dkt. 31 at 46; Dkt. 31-1 at 12, (Crooks Decl. ¶ 35). These alleged speculative harms cannot confer standing. *See Pub. Citizen*, 297 F. Supp. 3d at 34 (explaining that injury based on an increased risk of harm cannot be based on "vague generalities" or "subjective apprehensions"); *cf. PETA*, 797 F.3d at 1096 (estimating $10,000 of diverted resources and a future $3,000 per year to counteract the specific injury caused by the government's action to date and in the future). Plaintiffs' concerns about some risk that EPA's approval will cause private landowners to back out of a process to establish a habitat conservation plan is equally speculative, improperly relying on the future conduct of multiple third-parties. *Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144 155–56 (D.D.C. 2019) (rejecting standing where injury depends on predictive assumptions potentially involving third parties).

(iii)     **Plaintiffs' alleged organizational injuries based on deprivation of information are not cognizable.**

Establishing an informational injury requires Plaintiffs to show they (1) have "been deprived of information that, on [their] interpretation, a statute requires the government or a third party to disclose it"; and (2) they "suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr.*, 878 F.3d at 378. Plaintiffs cannot make these showings.

Plaintiffs' alleged informational injuries (Dkt. 31 at 45) arising under the National Environmental Policy Act ("NEPA") and the ESA are not cognizable. *First*, although NEPA generally requires the disclosure of information to the general public when triggered, the ESA does not. *See generally* 16 U.S.C. § 1536; 50 C.F.R. § 402.14 (limiting information disclosure to the action agency, consulting agency, and project applicant). Furthermore, with respect to NEPA, Congress decided that EPA action under Section 404, including approval of State 404 programs, is not subject to NEPA. 33 U.S.C. § 1371(c)(1).  Regardless, determining whether NEPA applies is a case-by-case consideration, and even if it does apply to a particular Section 404 permit application, the proposed project may be subject to a categorical exclusion or otherwise not require any environmental review. *Am. Rivers v. FERC,* 895 F.3d 32, 49–50 (D.C. Cir. 2018); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010). Separately, NEPA analysis may still be conducted for projects where FDEP issues a Section 404 permit because that project requires a Federal authorization triggering NEPA (which, for example, is likely the case for the Troyer Mine project referenced by Plaintiffs). These facts make claims of informational injury under NEPA highly speculative.

*Second*, the harm Plaintiffs allegedly suffer—*i.e.*, not receiving information they use to educate the public and advocate—is not the type of harm Congress sought to prevent by requiring

the disclosure of environmental reviews under NEPA. NEPA's "twin aims" are to (1) "place[]
upon an agency the obligation to consider every significant aspect of the environmental impact of
a proposed action"; and (2) "ensure[] that the agency will inform the public that it has indeed
considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v.
Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *see also Dep't of Transp. v. Pub. Citizen,
Inc.*, 541 U.S. 752, 754 (2004). These aims do not include disclosing information to help
organizations use that information for educational and general advocacy purposes.

### (iv) Plaintiffs' alleged organizational injuries based on lessened access to Federal courts are not plausible or cognizable.

Plaintiffs hyperbolically claim that EPA's approval will shut them out of Federal court and
impose related hardships, including more difficult standing requirements, lacking access to an
administrative record, and facing risks of mandatory fee shifting. *See* Dkt. at 47-48. This argument
fails for the reasons described above and below.

*First*, Plaintiffs do not dispute that they still have extensive administrative and judicial
avenues for legal redress. *See supra* Argument I.C.1. Plaintiffs provide no legal authority showing
that their preference for a federal forum and procedural rules suffices to confer standing. Florida
law provides abundant and fair procedures for redress, in addition to Plaintiffs' continual
opportunity to press EPA and other federal agencies to object to or otherwise federalize permits
where warranted.

*Second*, Plaintiffs claim that standing requirements in Federal courts are more liberal for
challenges to *rulemakings*, but they aver nothing about standing requirements related to permit
challenges. Dkt. 31 at 47; *Fla. Home Builders Ass'n*, 412 So. 2d at 353–54 (providing that pursuant
to State statute "an association must demonstrate that a substantial number of its members,
although not necessarily a majority, are 'substantially affected' by the *challenged rule*" (emphasis

46

added)). Moreover, Plaintiffs cite a single and misrepresentative administrative case to incorrectly suggest that "substantial number" is determined solely in relation to an association's total number of members, which would doom Plaintiffs who have "hundreds" of members and some "thousands" of members. Dkt. 31 at 47. Plaintiffs ignore the weightier and well-established Florida Supreme Court cases on associational standing. *See, e.g., NAACP, Inc.*, 863 So. 2d at 299. And, as described above, Plaintiffs overlook that a person who can establish Article III standing automatically has standing in Florida to challenge a Section 404 permit. *Supra* Argument I.C.1.

*Fourth*, and independently, these are all generalized injuries shared by the general public and therefore provide no basis for standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–77 (1992). For these reasons, Plaintiffs lack organizational standing to bring their claims.

### (v)    *PETA* **is meaningfully different from this case.**

Plaintiffs cannot establish standing under *PETA*. In *PETA*, the D.C. Circuit determined that the organization had standing to sue the U.S. Department of Agriculture ("USDA") for failing to issue regulations implementing the Animal Welfare Act ("AWA") as to birds. *PETA*, 797 F.3d at 1094-97. The court found organizational standing because USDA's inaction deprived the organization of (1) AWA information related to birds (USDA inspection reports) and (2) the ability to file USDA complaints against research facilities using birds or exhibitors of birds. *Id.* at 1094-95. In addition, the organization filed declarations identifying actual concrete harm to its organizational activities, including statements about its preexisting filings of USDA complaints as to both non-birds under the AWA, its attempts to file complaints as to birds, and the amount of increased expenditures in response to USDA's inaction. *Id.* at 1094-96.

Plaintiffs' situation does not fit within *PETA*. Unlike the organization in *PETA*, Plaintiffs cannot show EPA's approval entirely precludes Plaintiffs from accessing federal court related to FDEP-issued Section 404 permits. Even if they could, that would merely be the result of the laws

governing State assumption as set by Congress, and Plaintiffs have not concretely established that administrative and State-court litigation in Florida would impose additional costs, legal barriers, or other obstacles vis-à-vis litigating in Federal court. *Supra* Argument I.C.3.

Similarly, Plaintiffs' alleged "loss" of information under *ancillary, non-CWA* federal statutes (information to which Plaintiffs have no legal right in this context) is not comparable to the direct loss of information under the AWA caused by USDA's refusal to take regulatory action. *Supra* Argument I.C.3.iii. Indeed, Plaintiffs cannot show the equivalent "embargo on information" that occurred in *PETA*. 797 F.3d at 1096. Nor do any declarants specifically allege that Plaintiffs will not receive similar substantive information through Florida's permitting process.

Finally, and critically absent here, Plaintiffs completely fail to establish any true past or imminent diversion of organizational resources. As Plaintiffs concede, for at least the past three years, they have "dedicated considerable resources to opposing Florida's assumption of the Clean Water Act's Section 404 program." Dkt. 31-1 at 5-6, (Crooks Decl. ¶¶ 14-18). Based on their admission of expending considerable resources on this issue, Plaintiffs cannot show the requisite "diversion" of resources here. Even if they could, Plaintiffs have failed to allege any actual or imminent *concrete* diversion of resources here. *PETA*, 797 F.3d at 1096 (identifying dollar-amount estimates of time spent because of USDA's withholding of action "not related to this litigation and related expenses" and annual dollar-amount estimates going forward).

### D. Section 404's "Deemed Approved" Provision Renders Plaintiffs' Injuries Non-Redressable and Their Claims Moot by Operation of Law.

Congress intended the States, not the Federal government, to administer the Section 404 program. *See* 33 U.S.C. § 1251(b). In furtherance of that overriding objective, Congress required EPA to act promptly—*within 120 days*—of receipt of a State 404 application. Within that timeframe, EPA must approve the program if the State has the requisite legal authority or EPA

48

must inform the State of any necessary revisions or modifications. *Id*. § 1344(h)(2)(B). If no determination is made within 120 days of receipt of the State application, the State program is "deemed approved." *Id*. § 1344(h)(3). Under D.C. Circuit precedent, this "deemed approved" provision deprives this Court of jurisdiction for a simple reason: *even assuming arguendo* that the Court grants Plaintiffs' requested relief and vacates EPA's approval notice, no relief for Plaintiffs would ensue because Florida's program would then be "deemed approved" by operation of law.

### 1. "Deemed approved" provisions create unreviewable congressional action.

Without "final agency action," claims brought under the APA must be dismissed. *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 & n.4 (D.C. Cir. 2006); *see also* 5 U.S.C. § 704. Importantly here, the D.C. Circuit repeatedly has held that when rules or orders become effective pursuant to a "deemed approved" provision, they are not reviewable as "final agency actions." *See Sprint Nextel v. FCC*, 508 F.3d 1129 (D.C. Cir. 2007); *AT&T Corp. v. FCC*, 369 F.3d 554 (D.C. Cir. 2004) (per curiam); *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016). As these cases demonstrate, when an application is "deemed approved" for lapse of time, there is only "congressional action," not agency action, and thus, nothing is subject to judicial review.

In *Sprint Nextel*, the D.C. Circuit considered a self-certification process that allowed entities to petition the Federal Communications Commission ("FCC") to seek forbearance from the enforcement of certain regulatory requirements. 508 F.3d 1129 (D.C. Cir. 2007). Similar to CWA Section 404(h)(3), the statutory provision in *Sprint Nextel* stated that, if the FCC "does not deny the petition for failure to meet" certain statutory requirements within one year, the "petition shall be deemed granted." 47 U.S.C. § 160(c). Verizon filed a petition for forbearance, and although the FCC considered the possibility of rejecting the petition, the Commissioners

deadlocked 2-2, thereby taking no action before the statutory deadline. Consequently, the FCC issued a statement that the petition was "deemed granted by operation of law." *Sprint Nextel*, 508 F.3d at 1130. Competitors challenged this "approval," and the D.C. Circuit held that the approval was not the result of any reviewable "agency action" under the APA. *Id*. at 1132. The court ruled that "Congress made the decision in [47 U.S.C. § 160(c)) to 'grant' forbearance whenever the [FCC] 'does not deny' a carrier's petition. When the [FCC] failed to deny [the] forbearance petition within the statutory period, Congress' decision—not the agency's—took effect." *Sprint Nextel*, 508 F.3d at 1132. Absent reviewable agency action, there was no cognizable claim under the APA. The *Sprint Nextel* court was not persuaded that, by declining to review the FCC's inaction, it could "enable the [FCC], by simply not acting, to evade judicial review." *Id*. at 1133. "[T]hat," the court held, "is the consequence of the system Congress mandated," not an indication of abuse or bad faith on the part of the agency. *Id.*

The D.C. Circuit stated that this holding was "compelled" by its decision in *AT&T Corp. v. FCC*, 369 F.3d 554. In *AT&T*, Verizon was subject to congressionally imposed restrictions that would expire unless the FCC extended them "by rule or order." *Id*. at 556 (quoting 47 U.S.C. 272(f)(1)). The FCC did not extend them, and AT&T, a competitor, filed a petition for review of the FCC's "decision to permit the sunset to occur." *Id*. at 559. The court dismissed the petition, holding that AT&T had "incorrectly assume[d] that the decision whether to sunset the [relevant] safeguards lies with the FCC." *Id*. at 560. This assumption, the court explained, was "simply wrong" because it was "Congress"—not the FCC—that "made the decision to extinguish the protections of [the safeguards] by operation of law." *Id*.

Almost a decade later, the D.C. Circuit, in *Public Citizen v. FERC*, elaborated upon the holdings in *Sprint Nextel* and *AT&T*. *Public Citizen* involved provisions of the Federal Power Act

that require electric utilities to file their proposed rates with Federal Energy Regulatory Commission ("FERC") and that give FERC discretion to hold hearings to determine whether the rates are just and reasonable. 839 F.3d at 1167; *see* 16 U.S.C. § 824d. If FERC does not hold hearings or suspend the rates within 60 days, the rates "shall go into effect." *Id*. The petitioners in *Public Citizen* sought review of notices that put certain electricity rates into effect after FERC did not render a determination within 60 days. 839 F.3d at 1167-69. Following *Sprint Nextel* and *AT&T*, the D.C. Circuit concluded that there was simply no agency action to review: the action occurred by operation of law. *Id*. at 1170.

The D.C. Circuit held a deemed-approved provision to generate reviewable agency action in only one case, *Amador County v. Salazar*, and that case is clearly distinguishable. 640 F.3d 373 (D.C. Cir. 2011). The statute at issue in *Amador County*, the Indian Gaming Regulatory Act ("IGRA"), differs in a crucial respect from CWA Section 404 as well as from the statutes at issue in *AT&T*, *Sprint Nextel*, and *Public Citizen*. Under IGRA, if the Secretary takes no action on a gaming compact, that request is "considered to have been approved by the Secretary," although "only to the extent the compact is consistent with [IGRA]." 25 U.S.C. § 2710(d)(8)(C). Because of the statutory limitation in IGRA for actions deemed to have occurred for lapse of time (*i.e.*, considered "approved by the Secretary" and "only to the extent" consistent with IGRA), the court in *Amador County* distinguished *Sprint Nextel* and held that the Interior Secretary's inaction was reviewable agency action. In the Section 404 context, no such qualifications exist. Thus, as made clear in D.C. Circuit precedents, where Congress uses "deemed approved" or other similar language, the resulting automatic approval for lapse of time is not subject to judicial review.

2.   **Section 404's deemed approved provision falls within the framework set forth in *AT&T*, *Sprint Nextel*, and *Public Citizen*.**

The *Sprint Nextel*, *AT&T*, and *Public Citizen* decisions should guide this Court to dismiss Plaintiffs' claims. As those cases explain, when Congress enacts "deemed approved" provisions, it is not the relevant agency that acts. Instead, it is Congress, and that decision cannot be challenged under the APA.

Consistent with *Sprint Nextel*, if EPA's approval is set aside, CWA Section 404(h)(3)'s "deemed approved" provision would apply because EPA would not have taken action on Florida's program submission within 120 days. *See* 33 U.S.C. § 1344(h)(3). Indeed, if this Court were to vacate EPA's approval of Florida's program, the legal status of the program would be as if EPA never acted on Florida's request in the first place. *Khadr v. United States*, 529 F.3d 1112, 1116 (D.C. Cir. 2008) (explaining that "[i]t has long been well established" that vacatur of a decision leaves it " 'without any validity, force, or effect,' and requires that it be treated thereafter as though it never existed." (quoting *Butler v. Eaton*, 141 U.S. 240, 244 (1891)); *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,* 570 F.3d 1210, 1218 (11th Cir. 2009) ("Parts of decisions that are vacated and have not been reinstated have no legal effect whatever. They are void." (citation and internal quotation marks omitted)); *Animal Legal v. Veneman*, 490 F.3d 725, 730 (9th Cir. 2007) ("[T]he general rule [is] that when a court vacates an order previously entered, the legal status is the same as if the order never existed."). And, if this Court were to remand EPA's decision, Plaintiffs alleged injuries would still not be redressed because the 120-day statutory time period would have lapsed, rendering Florida's program "deemed approved" per 33 U.S.C. § 1344(h)(3).

The provision does not provide that, as a result of EPA's inaction, the program is, in any way, approved *by EPA*. *See also* 40 C.F.R. § 232.2 (defining "Approved Program" as either a program "approved by the Regional Administrator" or a program "which is deemed approved,"

suggesting programs "deemed approved" are not "approved by the Regional Administrator"). Thus, EPA inaction on a program's deemed approval would not be agency action, but an action of Congress.

> **3.    Plaintiffs' alleged injuries are not redressable and their claims are moot because a court order vacating EPA's approval notice would automatically trigger a "deemed approved" situation.**

It is well-settled that courts lack jurisdiction to hear cases in which the plaintiff fails to identify redressable injuries or asserts moot claims. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (redressability); *see Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (mootness). None of Plaintiffs' alleged injuries are redressable and all of their claims are moot because their requested remedy—vacatur—would necessarily result in the deemed approved situation described above, resulting in no change to the legal landscape and therefore erasing Plaintiffs' claims against EPA. As such, this Court lacks jurisdiction to entertain Plaintiffs' claims.

Section 404's "deemed approved" provision was added by the 1977 CWA amendments: "If the Administrator fails to make a determination with respect to a State program within the 120 days provided, the program is deemed approved and the Administrator must so notify the State and the Secretary who shall suspend the issuance of permits under subsections (a) and (e) of section 404 for activities covered by the State program." H. Rep. No. 95-890, 101 (1977), reprinted in 1977 U.S.C.C.A.N. 4424. In other words, states are entitled to a decision on their Section 404 assumption applications in 120 days or less, and EPA "cannot disapprove a [State 404] program because [EPA] has not completed [its] review of it—the disapproval must be a positive one that the State does not have the requisite authority." S. Rep. No. 95-370, at 358 (1977). While States may voluntarily agree to extend the 120-day timeline, nothing in the statute or regulations require them to do so. 40 C.F.R. § 233.15(g).

Congress established the 120-day "deemed approved" framework to prevent delays in achieving the overarching congressional policy objective: "that the States . . . implement the permit programs under [Section 404]." 33 U.S.C. § 1251(b); *see Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 911 (D.C. Cir. 1985) (noting that "timeliness requirements reflect 'a deliberate congressional choice to impose statutory finality' ") (citation omitted). The legislative history behind Section 404(h) demonstrates Congress' intention that State program approvals should be "expedited." 122 Cong. Rec. S28,771-99, S28,774 (1976). To ensure approvals are expedited, Congress modeled certain aspects of the Section 404 approval process after Section 402's process. *Id.* But Congress went even further by including a "deemed approved" provision that is absent from the Section 402 process. In fact, earlier versions of the 1977 amendments would have granted automatic approval of Section 404 programs to "[a]t least twenty-eight State entities which have obtained approval [under Section 402]," where those states "should be able to assume the [404] program *immediately*." *Id.* (emphasis added). Though the final statutory amendment in 1977 did not include automatic approval for states with Section 402 provisions, the "deemed approved" provision combined with the 120-day timeframe provides an expedited path for States seeking to administer their own Section 404 programs.

In the current case, EPA received a complete description of Florida's program on August 20, 2020. (AR-0569). Receipt of Florida's application triggered a 120-day deadline for EPA to approve Florida's application, *i.e.*, by December 17, 2020. (AR-0569 at 2). EPA and Florida worked intensively to complete a robust process for review, Federal consultation and input, Tribal engagement, and other steps. *See supra* Background II.B (discussing EPA's approval process of Florida's application). At the end of that time period, on December 17, 2020, EPA notified the Governor of Florida that EPA approved Florida's program, which was subsequently published in

the Federal Register a few days later. 85 Fed. Reg. at 83,553. Importantly, if EPA had taken no action on Florida's submission by December 17, 2020, Congress, through operation of law, would have deemed Florida's program approved (and thereby unreviewable). Similarly, if this Court were to set aside EPA's approval, Florida's program would be "deemed approved" because more than 120 days would have passed since EPA received Florida's program description. *See* 33 U.S.C. § 1344(h)(3). And if this were to occur, the legal landscape would not change, and Plaintiffs' alleged injuries would still not be redressed. Furthermore, Plaintiffs' claims against EPA would disappear, thereby divesting this Court of jurisdiction. Therefore, this Court should dismiss all of Plaintiffs' claims for lack of jurisdiction because Plaintiffs' alleged injuries are not redressable and their claims are rendered moot by operation of law.

Even if Plaintiffs could establish standing (which they cannot for the myriad reasons explained above), the "deemed approved" provision categorically places EPA approval of State 404 programs outside of judicial review. Congress established a system where EPA's failure to take *any action* clearly results in no judicial review, so it would be illogical to impose judicial scrutiny over EPA's *affirmative decision* to review, consider, and approve a State program application, especially where Congress provided a clear oversight and withdrawal mechanism to ensure compliance with Federal requirements as the State program is implemented (*see supra* Background I.B). Moreover, binding precedent in this Circuit strongly suggests that EPA loses jurisdiction over a State 404 application once the 120-day timeframe elapses. *See Gottlieb v. Pena*, 41 F.3d 730, 734 (D.C. Cir. 1994) (discussing situations where an agency may lose jurisdiction over a matter for failing to take action within a statutorily required timeframe where Congress has established consequences for inaction).

Likewise, if this Court were to remand EPA's determination without vacatur, which Plaintiffs do not request and Florida opposes, this Court still could not order EPA to take specific actions other than to review its approval in accordance with its non-discretionary duty. *See Huron v. Berry*, 12 F. Supp. 3d 46, 55 (D.D.C. 2013) ("When an action is left to an agency's discretion, a court 'has no power to specify what the action must be.' ") (quoting *Norton*, 542 U.S. at 65). Even in such a situation, EPA could not withdraw its approval without first providing Florida time to take "appropriate corrective actions." *See* 33 U.S.C. § 1344(i). It is merely speculative that this form of relief would redress Plaintiffs' alleged injuries. *Lujan*, 504 U.S. at 561. Thus, Plaintiffs' claims should be dismissed on this basis as well.

## II.      Claims 8 and 9 Fail on the Merits.

Even assuming Plaintiffs assert justiciable claims (which Florida does not believe is the case), their "30-day waiting period" and "codification" claims are meritless; thus, Claims 8 and 9 must be dismissed. Other than one case out of the Ninth Circuit (which was reversed by the U.S. Supreme Court), no court has vacated any prior EPA approval of a State program under Section 402 or Section 404, and certainly not on non-substantive procedural grounds like those raised by Plaintiffs in Claims 8 and 9. Indeed, to prevail on these two claims, Plaintiffs must successfully convince this Court to contravene clear congressional policy in favor of prompt transfers of Section 404 programs to the State and: (1) hold that EPA's approval of a State program is not effective for at least 30 days from the date of publication in the Federal Register, notwithstanding a 50-year track record of EPA approving State programs via notices that are effective immediately or very soon thereafter (and certainly not requiring anything approaching a 30-day waiting period); and (2) hold that EPA's approval of a State program is not effective until codification in the C.F.R., which also has never been recognized by EPA or any court reviewing the almost 50 times when

EPA has approved a State program under CWA Sections 402 or 404. Regardless, to the extent either requirement actually applies, any error would be non-prejudicial in this context.

### A.     EPA Approval Notices Are Effective Upon Publication in the Federal Register and No Additional Waiting Period is Required.

Consistent with its regulations and prior practice, EPA sent a notice letter on December 17, 2020 to the Governor of Florida formally approving Florida's program, which, as provided under 40 C.F.R. § 233.15(h), became effective upon publication in the Federal Register on December 22, 2020. *See* 85 Fed. Reg. at 83,553. Even if EPA took no action within 120 days of receipt of Florida's application, the application would have been "deemed approved" by statute *immediately*. 33 U.S.C. § 1344(h)(3). Yet Plaintiffs perceive error in EPA's decision to make its approval of Florida's program effective upon publication in the Federal Register instead of 30 days after publication. In Plaintiffs' view, the approval of Florida's program should not have been effective until January 21, 2021. Plaintiffs are incorrect.

As a threshold matter, Plaintiffs entirely ignore the proper standard of review used to determine whether EPA's choice of adjudication to approve Florida's assumption application was lawful. Instead of addressing whether EPA abused its broad discretion in deciding to approve Florida's assumption application by adjudication instead of by rulemaking, Plaintiffs' arguments address whether EPA's adjudicatory approval shares any qualities with rulemaking. *Compare, e.g.*, Dkt. 31 at 19 (incorrectly focusing on whether an action has the "force of law," because that characteristic applies to both adjudications and rulemakings), *with Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1206 (D.C. Cir. 2020) ("[I]t is well known that under the APA an agency has virtually unlimited discretion as to the procedures it uses to implement its legal/policy choices."). To do this, Plaintiffs primarily rely on inapposite authority where the question before the court was whether an agency's adoption of a policy statement was, in reality, an adoption of a

rulemaking triggering APA notice-and-comment requirements. Dkt. 31 at 19. When reviewing this distinct issue using the proper legal framework, EPA's choice to approve Florida's assumption application by adjudication was entirely consistent with five decades of EPA practice and was a reasonable exercise of its discretion. *Cf.* Dkt. 35 at 23-29.

Furthermore, in its brief, the United States has shown that EPA's approach here was consistent with the Agency's past practice dating back to the 1970s.  Dkt. 35 at 29-32.

The formal distinctions between adjudication and substantive rules are illusory here. For example, EPA provided greater opportunity for public notice and comment here than would have been required for either adjudication or rulemaking. Plaintiffs acknowledge, as they must, that EPA did not employ a 30-day waiting period when EPA approved the Section 404 programs for Michigan and New Jersey. Nor has EPA applied that waiting period in the many prior instances of EPA approval of State CWA programs. That settled approach is consistent with the statutory and regulatory mandate for prompt approval of State applications. The Supreme Court has cautioned against allowing hyper-technical arguments (like those advanced by Plaintiffs) to subvert the lawful transfer of authority from the Federal to a State government. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (rejecting notion that a "stray statement [in the Federal Register], which could have had no effect on the underlying agency action being challenged, requires that we further delay the transfer of permitting authority to Arizona by remanding to the agency for clarification" (citations omitted)).

In their motion for summary judgment, Plaintiffs dodge this obvious point with a bait-and-switch tactic: they argue that the law requires a 30-day waiting period from the date of publication in the Federal Register and spotlight that the approval of the Michigan and New Jersey programs were not effective for more than 30 days *from the date of the notice of approval*. They fail to

acknowledge that those examples clearly contradict their own theory because one was effective immediately *upon publication in the Federal Register* and the other was effective within 14 days of publication in the Federal Register.

Recognizing this flaw in their line of reasoning, Plaintiffs cite purported "good cause" language in the Federal Register notices for the Michigan and New Jersey approvals. But neither of those notices actually refer to "good cause." The notices simply state: "Since this approval, in large part, simply ratifies State regulations and requirements already in effect under State law, EPA is publishing this approval, *effective immediately*. This will enable [Michigan/New Jersey] to *begin immediately* regulating discharges of dredged or fill material under the federally approved program." 49 Fed. Reg. at 38,947 (emphasis added); 59 Fed. Reg. at 9,933 (same language). A plain reading of those notices reflects that EPA did not view any 30-day waiting period as applicable in the first place.

For the foregoing reasons, Plaintiffs' Claim 8 must fail.

### B.     Codification in the C.F.R. Is Not a Prerequisite for State Assumption.

Plaintiffs contend that EPA's approval had no legal effect because the Agency did not codify Florida's program in the Code of Federal Regulations. Dkt. 31 at 29-32. Plaintiffs' argument lacks merit.

*First*, Plaintiffs' argument fails because under its legal theory the "codification requirement" applies only to substantive rules. As addressed above, EPA reasonably exercised its discretion to approve Florida's assumption application by adjudication.

*Second*, even assuming EPA's adjudicatory approval was a rulemaking, Plaintiffs' legal theory lacks merit. According to Plaintiffs, (1) the Federal Register Act requires the codification of substantive rules, (2) the failure of an agency to codify a substantive rule makes that rule

ineffective, and (3) therefore EPA's failure to codify Florida's program renders the program ineffective. *Id*. The legal premise to Plaintiffs' argument is incorrect.

Citing 44 U.S.C. § 1510(a), Plaintiffs declare that agencies are legally required to codify final substantive rules in the C.F.R. *Id*. at 29. But nothing in that provision *requires* an agency to codify substantive rules. Instead, that provision merely provides that the Administrative Committee of the Federal Register *may require* codification in certain circumstances.

Plaintiffs' reliance on *dicta* in a footnote in *Simmons* is unpersuasive. In *Simmons*, the court held unlawful an Interstate Commerce Committee ("ICC") action because the basis supporting that action was not set forth in the relevant rulemaking but came from a statement of policy that had no general legal effect. *Simmons v. I.C.C.*, 757 F.2d 296, 299-300 (D.C. Cir. 1985). As an aside, the court stated in a footnote that the fact that the ICC had not published the policy statement in the CFR showed that the agency did not intend for that statement to have general applicability (*i.e.*, be legally effective). *Id.* at 300 n.2.

Plaintiffs also reference 1 C.F.R. § 21.1, which does impose a requirement for codification, but importantly, that requirement only applies to a "document that is subject to codification." Plaintiffs fail to identify any authority showing that EPA's approval of a State's assumption application is a document that is subject to codification None exists.

Plaintiffs appear to be asserting that because EPA's approval ultimately allows Florida to administer the State's Section 404 program, EPA is required to publish *Florida's State laws* in the C.F.R. Again, Plaintiffs provide no apposite authority to support this novel position that Federal agencies are required to publish State laws in the C.F.R. That EPA voluntarily has published State programs in the C.F.R. in the past does not translate into a legal obligation for the Agency to do so in the future. *Cf.* Dkt. 35 at 32-33.

Additionally, the Federal Register Act's codification provision was in place in 1968, 82 Stat. 1277, and EPA has never been *required* to await codification to make a State CWA program effective. Where, as here, codification would simply reference the State program that has *already* been adopted into State law and approved by EPA, codification is not material to the validity of the program. Accordingly, Plaintiffs' claim lacks merit.

### C. Even if the 30-Day Waiting Period and/or Codification Are Prerequisites, the State of Florida should not be deprived of its program approval on the basis of such harmless error.

In reviewing APA claims, courts must take "due account . . . of the rule of prejudicial error" (*i.e.*, the "harmless error rule"). 5 U.S.C. § 706. Under this rule, a party alleging that an agency violated the APA must show that the error prejudiced the party, which generally is "not ... a particularly onerous requirement." *See Shinseki v. Sanders*, 556 U.S. 396, 410 (2009); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). If the prejudice is obvious to the court, then the party need not show anything further. *Jicarilla*, 613 F.3d at 1121. However, where the prejudice is not obvious, "the party seeking reversal normally must explain why the erroneous ruling caused harm." *Shinseki*, 556 U.S. at 410.

Assuming it was required, the lack of a 30-day waiting period in this context did not prejudice Plaintiffs or their members. *First*, as explained above, neither Plaintiffs nor their members lost any procedural rights to which they were entitled. The 30-day waiting period is designed to afford persons regulated by action at issue a chance to adjust. Here EPA's approval applied only to Florida, the applicant.  In other words, EPA's approval "imposed no new regulatory burdens or requirements to which" Plaintiffs or their members "had to adjust." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 139–40 (D.D.C. 1999).

*Second*, even assuming the 30-day waiting period was designed to protect them, Plaintiffs suffered no prejudice from its absence because the past presidential administration rejected

Plaintiffs' request, and the new administration (both before and after inauguration) did not take a different stance about EPA's approval during the relevant 30-day time period. Any alleged prejudice from losing five business hours on January 20, 2021, during which time Plaintiffs may have hoped that the new administration would have reversed course is not credible in light of the time that has elapsed since.

*Third*, the proper remedy for such a violation is to simply make the action effective on the alleged correct date—*i.e.*, January 21, 2021. Importantly, Plaintiffs suffered no prejudice during the 30-day window because (1) FDEP did not approve any individual Section 404 permits, let alone the ones Plaintiffs and their members have expressed concern about; and (2) granting the proper relief here would not restore Plaintiffs' alleged movement of their existing resources from one program to another. Regardless, any such "prejudice" from Plaintiffs moving their resources would be "not only negligible, [but also] not of the kind that § 553(d) was principally adopted to protect against." *Am. Bankers Ass'n*, 38 F. Supp. 2d at 140 (citing *Omnipoint Corp. v. FCC*, 78 F.3d 620 at 630 (D.D.C. 1996)).

Likewise, even if codification in the C.F.R. were required here (which it is not), EPA already commenced the codification process (as acknowledged in Plaintiffs' notice).[9] Plaintiffs' brief specifies no prejudice or injury traceable to EPA's delayed codification. Dkt. 31 at 48-49. Nor could Plaintiffs identify any such prejudice from delayed codification, as the only plausible theory of prejudice in that circumstance would be that Plaintiffs lacked notice of the specific provisions of Florida's program due to their lack of codification. Any such argument, which Plaintiffs have not made and therefore waived, would not be credible given that Plaintiffs have

---

[9] *See* EPA, Codifying EPA's Adjudicatory Decision on Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021), available at  https://www.epa.gov/sites/production/files/2021-01/documents/pre-publication_frn-_fl_404_codification_final_rule_.pdf.

been tracking Florida's assumption application, and that Florida's final Section 404 regulatory program has been publicly available since June 2020 when it was finalized.

Accordingly, even if Plaintiffs were correct that a 30-day delay and codification were required, they would not be entitled to relief on Claims 8 and 9 under the rule of harmless error.

## CONCLUSION

Florida is committed—constitutionally, statutorily, and financially—to the protection of the State's water resources. Florida's citizens demand it and deserve it. With shared stewardship responsibilities with Federal agencies, Florida is now fully and properly administering its own Section 404 Program consistent with the congressional objectives set forth in the CWA. Though Plaintiffs may prefer a Federal program, that is not the preference of Congress nor is it the will of the people of Florida. Indeed, Congress' "deemed approval" language precludes Plaintiffs' entire action here. Furthermore, in light of Florida's robust program and the applicable statutory and regulatory structure providing for continued EPA oversight and involvement, neither Plaintiffs nor their members suffer any cognizable injury from EPA's approval of Florida's program that would give them Article III standing to bring their claims. Finally, and independently, Plaintiffs' procedural claims lack merit. Accordingly, Florida Intervenors' cross-motion to dismiss all of Plaintiffs' claims under FRCP 12(b)(1) and 12(b)(6) should be granted, and Plaintiffs' request for partial summary judgment should be denied. Alternatively, and as requested by the United States, partial summary judgment should be entered in the United States' and Florida Intervenors' favor, and Plaintiffs' request for partial summary judgment should be denied.

Dated:  April 26, 2021.                     Respectfully submitted,
                                            BAKER BOTTS L.L.P.


                                            */s/ Jeffrey H. Wood*
                                            Jeffrey H. Wood (D.C. Bar No. 1024647)
                                            Jared R. Wigginton (D.C. Bar No. 1033684)
                                            700 K Street, NW
                                            Washington, D.C. 20001
                                            Phone: (202) 639-7700
                                            jeff.wood@bakerbotts.com
                                            jared.wigginton@bakerbotts.com

                                            Lily N. Chinn (DC Bar No. 979919)
                                            101 California Street
                                            San Francisco, CA 94111
                                            Phone: (415) 291-6200
                                            lily.chinn@bakerbotts.com

                                            Aaron M. Streett (TX Bar No. 24037561)
                                            Harrison Reback (TX Bar No. 24012897)
                                            (*pro hac vice*)
                                            910 Louisiana Street
                                            Houston, TX 77002-4995
                                            Phone: (713) 229-1234
                                            aaron.streett@bakerbotts.com
                                            harrison.reback@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April 2021, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

_/s/ Jeffrey H. Wood_
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com