## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

        *Plaintiffs,*

    v.

MICHAEL S. REGAN, in his official capacity as Administrator, U.S. Environmental Protection Agency,[1] *et al.*,

        *Defendants,*

    and

STATE OF FLORIDA, *et al.*,

        *Defendant-Intervenors.*

Civil Action No. 21-119 (RDM)

## MEMORANDUM OPINION AND ORDER

On February 26, 2021, the Florida Chamber of Commerce ("Chamber") and the Association of Florida Community Developers ("AFCD") moved to intervene in this action. Dkt. 29.  The Court denied their motion without prejudice because it was "unpersuaded that [the Chamber and the AFCD] ha[d] satisfied their burden to demonstrate Article III standing." *Ctr. for Biological Diversity v. Nishida*, No. 21-cv-119, 2021 WL 827189, at *3 (D.D.C. Mar. 4, 2021).  The Court directed that the Chamber and the AFCD could either (1) "renew their motion with a showing that they indeed possess Article III standing" or (2) "move for leave to participate as amici in this matter—a request upon which the Court would look favorably." *Id.*

---

[1]  Michael S. Regan, the current Administrator for the U.S. Environmental Protection Agency, is substituted for Andrew Wheeler pursuant to Federal Rule of Civil Procedure 25(d).

The Chamber and the AFCD choose door one, and, on April 1, 2021, moved once more to intervene in this action under Federal Rules of Civil Procedure 24(a)(2) and 24(b)(1)(B). Dkt. 32. For the reasons that follow, the Chamber and the AFCD's (collectively, "Movants") renewed motion to intervene will be denied.

## I.  BACKGROUND

Congress enacted the Clean Water Act ("CWA") in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U.S.C. § 1251(a). Among the Act's central provisions is 33 U.S.C. § 1311(a), which prohibits "the discharge of any pollutant by any person" into the navigable waters of the United States. "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). And "pollutant," in turn, is defined broadly to include not only traditional contaminants like chemical or biological wastes but also solids such as "dredged spoil, . . . rock, sand, [and] cellar dirt." *Id.* § 1362(6).

The CWA makes some exceptions, however. As relevant here, Section 404(a) of the CWA empowers the Secretary of the Army, acting through the Army Corps of Engineers ("Corps"), to authorize the discharge of "dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a); *see also Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 266 (2009); *Rapanos v. United States*, 547 U.S. 715, 723 (2006). The Secretary's authorizations are provided via what are known as "Section 404 permits," named after the CWA provision giving rise to their existence. 33 U.S.C. § 1344(a); *see also U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016).

The task of managing dredged-material discharge does not fall to the Corps alone. In enacting the CWA, Congress also expressed its desire "to recognize, preserve, and protect the

primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(a). The CWA thus allows States to "implement the permit programs under sections 1342 and 1344" on their own, so long as the EPA first gives them permission to do so. *Id.* To obtain that permission, a State must submit to the EPA "a full and complete description of the program it proposes to establish and administer" as well as "a statement from the attorney general []or [other qualified legal officer] . . . that the laws of such State . . . provide adequate authority to carry out the described program." *Id.* § 1344(g)(1); *see also* 40 C.F.R. § 233.11. The EPA then reviews the State's proposed program for compliance with certain statutory and regulatory criteria. 33 U.S.C. § 1344(h); *see also* 40 C.F.R. §§ 230.10(b)(3), 233.10, 233.11(a), 233.15(a), 233.23; Dkt. 1 at 5 (Compl. ¶¶ 9–10). If the State's program satisfies the applicable criteria, the EPA may authorize the State to issue Section 404 permits. 33 U.S.C. § 1344(g), (h).

That assignment of Section 404 permitting authority is at issue here: In August of 2020, the State of Florida "applied to the EPA proposing to take over the 404 program" within its borders, Dkt. 1 at 7 (Compl. ¶ 19); "[o]n December 17, 2020, [former] EPA Administrator Andrew Wheeler announced the approval of Florida's . . . application;" and "[o]n December 22, 2020, the EPA's approval of the state program was published in the Federal Register, with an immediate "applicable" date as of publication," *id.* at 9 (Compl. ¶¶ 33–34). These decisions are what this case is about.

According to Plaintiffs, a group of environmental nonprofit organizations, the EPA's decision granting Section 404 permitting authority to Florida was procedurally and substantively flawed, violating various provisions of the Clean Water Act, the Administrative Procedure Act, 5 U.S.C. § 706 ("federal APA"), the Endangered Species Act, 16 U.S.C. § 1531, and the Rivers and Harbors Act, 33 U.S.C. § 403. *See generally* Dkt. 1 at 25–48 (Compl. ¶¶ 104–248).

Plaintiffs seek declaratory and injunctive relief, most significantly requesting that the Court "[e]njoin the EPA's approval and transfer of authority [under Section 404] to [Florida]." *Id.* at 50 (Compl. Prayer for Relief).

On April 1, 2021, Movants filed their renewed motion to intervene in this action pursuant to Federal Rules of Civil Procedure 24(a)(2) and (b)(1)(B). Dkt. 32. They explain that certain of their "members are currently subject to the State-administered permitting regime that is the subject of this litigation." *Id.* at 2. Consequently, were Plaintiffs to prevail in this case, Movants' members' applications would be subject to review and adjudication by "the prior, federally administered permitting regime," instead of by Florida. *Id.* That regime, they contend, is "slower, less responsive, and less transparent" than the anticipated Florida regime. *Id.* Movants, accordingly, contend they are entitled "to intervene as a matter of right under Rule 24(a)(2)," or, "[a]t a minimum," should be allowed to permissively intervene under Rule 24(b)(1)(B). *Id.* Although Movants stress that no party to this litigation opposes their invention, *id.*, the Court must assess Article III standing of its own accord, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

## II. LEGAL STANDARD

The D.C. Circuit requires "all would-be intervenors [to] demonstrate Article III standing." [2] *Old Dominion Elec. Coop. v. Fed. Energy Regul. Comm'n*, 892 F.3d 1223, 1232

---

[2] The D.C. Circuit's precedent requiring "*all* would-be intervenors [to] demonstrate Article III standing," *Old Dominion*, 892 F.3d at 1232 (citation omitted) (emphasis added), is (at least arguably) in some tension with the Supreme Court's decision in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) *portions overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). In *McConnell*, the Supreme Court held that it was not required to "address the standing of the intervenor-defendants" because those defendants sought relief "identical" to that pursued by the original defendant, who did have standing. *Id.* at 233 (joined by all nine Justices). The Supreme Court has also held as a corollary, however, that a defendant-intervenor *is* required to demonstrate standing when seeking relief *not* pursued by the original defendant—

(D.C. Cir. 2018) (citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732–733 (D.C. Cir. 2003)).  When, as here, organizational plaintiffs move to intervene, they may establish Article III standing on their own behalves ("organizational standing") "or on behalf of their members ('associational standing')."  *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 36 (D.D.C. 2015); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 142 (D.D.C. 2019); *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  Movants opt for the latter tact, arguing that "associational standing . . . [is] sufficient" to permit their intervention in this matter.  Dkt. 32-1 at 10 n.4.

"To establish associational standing, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *McCarthy*, 139 F. Supp. 3d at 38 (quotation marks omitted); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 591–92

---

for example, when the defendant-intervenor appeals the judgment of the district court while the original defendant acquiesces to that judgment.  *See Diamond v. Charles*, 476 U.S. 54, 64 (1986); *cf. Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1648 (2017) ("[W]e hold[] that . . . an intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff.").

Here, Movants do not argue that *McConnell* relieves them of their obligation to establish standing, even though the extant Defendants have standing, continue to press their rights in this action, and, at least for now, seek the same relief as Movants.  This may be because D.C. Circuit precedent seems emphatically to require Movants to demonstrate standing irrespective of the extant defendants' standing, *see, e.g.*, *Old Dominion*, 892 F.3d at 1232 & n.2; *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015), or, perhaps, because Movants want to establish the right to file an appeal in this case if Plaintiffs prevail and the extant Defendants decline to appeal, *cf. Diamond*, 476 U.S. at 64.  Regardless, because Movants seek intervention without limitation, do not rely on the standing of the extant Defendants, and do not invoke *McConnell* or any similar precedent, the Court will consider whether Movants have established Article III standing.

(D.C. Cir. 2019).  The first of these elements—whether any of Movants' members has standing in their own right—is at issue here.

As the Supreme Court has explained, "[t]he 'irreducible constitutional minimum of standing contains three elements': '(1) injury-in-fact, (2) causation, and (3) redressability.'"  *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Under the first element, injury-in-fact, a plaintiff's complained-of injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.  Under the second element, causation, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party."  *Id.* at 560–61.  And finally, under the third element, redressability, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" of the court.  *Id.* at 561.

## III.  ANALYSIS

Movants identify four injuries to their members that they contend suffice for purposes of establishing Article III standing.  First, Movants contend that their members will lose certain procedural and appellate rights secured by the Florida Administrative Procedure Act ("Florida APA") should Plaintiffs prevail in this action.  Dkt. 32-1 at 12.  Second, Movants assert that their members will lose rights under Florida's Freedom of Information Act ("Florida FOIA") should Plaintiffs prevail.  *Id.* at 12–13.  Third, Movants argue that their members' permit applications will be adjudicated more expeditiously by Florida than they would by the EPA and that the additional waiting period constitutes a cognizable injury.  *Id.* at 13.  "Time lost is money lost," after all.  *Id.*  Finally, Movants argue that their "members would necessarily incur the expense of

resubmitting applications to the" federal government if Florida's Section 404 program is withdrawn. *Id.* at 14.

At least on the current record, none of these theories of injury suffices. Take first Movants' argument that their members will lose certain procedural and appellate rights under the Florida APA should Plaintiffs prevail in this action. *Id.* at 12. As Movants explain, the "review process [under the federal APA] entails a proceeding before a Corps employee (unlike [an] impartial administrative law judge in Florida), based on review of an administrative record (unlike [a] *de novo* trial-like proceeding in Florida). Dkt. 32-1 at 12 n.7 (citing 33 C.F.R. §§ 331.3(a)(1), (a)(3), (b)(2); Fla. Stat. § 120.57(1) (2020)). Consequently, Movants argue, the loss of "the right to a *de novo* proceeding under the Florida APA, complete with discovery and fact-finding adduced through the presentation of evidence before an impartial administrative law judge" constitutes a cognizable, Article III injury. *Id.* at 12.

Movants raised this same argument, nearly word for word, in their original motion to intervene. Dkt. 29-1 at 7–8. The Court rejected that argument, explaining: "Movants do not address whether the loss of these procedural benefits is a cognizable injury under Article III. Nor do they explain how that purported injury is sufficiently imminent, concrete, or non-speculative, considering that there is no evidence before the Court that any of Movants' identifiable members are contemplating bringing proceedings under the Florida APA or are likely to do so anytime soon." *Ctr. for Biological Diversity*, 2021 WL 827189, at *2.

Nothing has changed since then. Movants' members do not aver that they are currently bringing (or are likely soon to bring) proceedings under the Florida APA. Moreover, the review procedures that Movants contend their members might lose appear to apply only once an application has been rejected by the Florida permitting authority. But Movants make no attempt

to identify whether such a rejection is impending or likely.  And the mere prospect that the Florida permitting authorities *might* rule against one of Movants' members in the future on an issue that the member *might* then raise under the Florida APA, where that member would be unable to raise a similar (or equally effective) challenge under the federal APA, is too speculative to support Article III jurisdiction.

Beyond this difficulty, even if Movants' members faced a concrete, non-speculative risk of loss of rights under the Florida APA, they fail to explain why that loss would constitute a cognizable injury under Article III.  Movants only attempt in this regard is to draw an analogy between this case and *Lujan*, where the Supreme Court explained, by way of example, that a person "'living adjacent to the site for proposed construction of a federally licensed dam retains standing to challenge [a] licensing agency's failure to prepare an environmental impact statement, even though [the person] cannot establish with certainty that he statement will cause the license to be withheld or altered.'"  Dkt. 32-1 at 13 (quoting *Lujan*, 504 U.S. at 572).  With this scenario in mind, *Lujan* held that the violation of certain procedural rights can qualify as a cognizable injury under Article III.  But Movants have not alleged a violation or deprivation of any federal, procedural right—they hope, instead, to operate under a distinct, state procedural regime that they believe will generally be more favorable to them.  Movants cite no precedent holding that such an injury is cognizable under Article III.  Given the breadth of the rule that Movants ask the Court to adopt, the Court cannot proceed in the absence of a more developed legal argument and articulation of the bounds of Movants' theory of procedural injury.

Movants' second argument—that their members will lose rights under the Florida FOIA should Plaintiffs prevail—fares no better.  Dkt. 32-1 at 12–13.  Movants explain that "Florida prides itself for having instituted one of the broadest FOIA statutes in the Nation."  *Id.* at 12.

Under Florida's FOIA, "even government attorney-work product is discoverable once litigation concludes[,] . . . and Florida has no deliberative-process exception, which means that the members of the Chamber and the AFCD have the right to access drafts and planning documents from the" relevant Florida permitting authorities.  *Id.* at 12–13 (citations omitted).  And "this Court has recognized," Movants observe, that "the wrongful withholding of information otherwise discoverable via a [FOIA] . . . request constitutes a cognizable injury for purposes of Article III."  *Id.* at 12 (citing *Frank LLP v. CFPB*, 288 F. Supp. 3d 46, 48 (D.D.C. 2017)).

The problem for Movants, though, is that the juxtaposition of (1) the prospect that they might someday seek and obtain some unidentified records under the Florida FOIA that the Florida Section 404 permitting authorities might someday create, with (2) the prospect that they might someday seek and might be unable to obtain under the federal FOIA similar, unidentified records that the federal Section 404 permitting authorities might someday create, is far too inchoate and speculative to support Article III standing.  Moreover, as with Movants' argument regarding the comparative benefits of the Florida APA over the federal APA, they have failed to identify any precedent that has premised Article III standing on such a theory.  This is not a case in which Movants assert the denial of access to information under federal law (or the denial of federal procedural right) but, rather, argue that the greater availability of state records under the Florida FOIA in the abstract supports informational standing.  None of the precedents Movants cite address these circumstances, and Movants fail to identify the contours (or constitutional underpinnings) of the potentially expansive theory of informational standing that they urge the Court to adopt.  Again, without a more developed theory of standing, the Court cannot accept this invitation.

That leaves Movants last two, more substantial, arguments: the speed at which their members' applications will be adjudicated and the cost of resubmitting those applications to the EPA should the Court enjoin the Florida 404 program while Movants' members' applications are pending before State authorities.

The Court begins with Movants' argument that adjudication of their members' permit applications will be (or will likely be) delayed should the permitting process revert back to the federal government. Movants explain this theory of injury as follows: Florida's Department of Environmental Protection currently operates an Environmental Resource Permitting ("ERP") program that, like the Clean Water Act, "regulates activities involving the alteration of surface water flows." *Environmental Resource Permitting Coordination, Assistance, Portals*, Fl. Dep't Env't Prot., https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/environmental-resource-permitting (last visited May 2, 2021, 6:10 PM). Florida generally adjudicates permit applications under its ERP program in less than two months, which is much faster than the EPA adjudicates Section 404 permit applications, a process that can take upwards of three years. Dkt. 32-1 at 11–12. The requirements to obtain an ERP permit are, in many respects, similar to those for Section 404 permits—according to Movants, there is "an 85% overlap" between the "review requirements" of each program. *Id.* Consequently, Movants argue, if Florida were allowed to grant Section 404 permits, it would likely do so much faster than does the EPA. As it stands, after all, Florida apparently does 85% of the permitting work in less than ten percent of the time that it takes the EPA. *Id.*

On the present record, the Court is unpersuaded by this theory of injury. Most notably, the fact that the ERP and Section 404 programs share an 85% overlap in review requirements—a premise that the Court accepts for present purposes—does not support the conclusion that

Florida will complete its review of Section 404 permit applications in just a few weeks longer (that is, the extra 15%) than the time it needed to complete the ERP review process in the past. One can imagine many tasks that largely overlap in their "requirements" but that widely diverge in the time expenditure needed: to paint a ceiling, one needs to purchase the paint, assemble the scaffolding, prepare the surface, and apply the paint. But, even if the first three of these steps (that is, 75% of the steps) are identical in most cases, the painting of the Sistine Chapel is not comparable to other painting jobs. Here, Movants—who bear the burden of proof—fail to explain whether the differences between the ERP and Section 404 permitting regimes covers tasks that are particularly labor intensive. Without that information, the Court cannot determine whether Florida's adjudication of ERP permits signals, as Movants claim, that the State will adjudicate Section 404 permits far faster than does the Corps. And indeed, there is reason to think that such a relationship might not exist. As Movants acknowledge, Florida law *requires* the state to adjudicate ERP permits within 90 days, *see* Fla. Stat. § 120.60, but specifically *exempts* Section 404 permits from this timing requirement, *see* Fla. Stat. § 373.4146(5)(a); *see also* Dkt. 32-1 at 10. Article III requires the harm to Movants' members be "certainly impending" to be cognizable. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). On the present record, the Court cannot say that it is. But, if Movants are correct that Florida will adjudicate Section 404 permit applications in a just a few months and that their members have had Section 404 permit applications pending with the State for at least several weeks, *see*, *e.g.*, Dkt. 32-7 at 2 (Susac Decl. ¶ 4), they should have proof now—or in the near future—that the State Section 404 permitting process represents an "immense improvement in time" over the federal process, Dkt. 32-1 at 7. With that proof in hand, Movants may renew their motion.

Movants' last theory of injury also lacks sufficient support in the present record to satisfy their burden.  Movants argue that, should the Court rule in Plaintiffs' favor, one or more members of the Movant organizations will be required to re-submit their pending Section 404 permit applications to the federal government and will incur expense in doing so.  *Id.* at 14. Movants have not, however, established that it is likely that one or more of their members will have to re-file a pending Section 404 permit application with the Corps if the Court grants Plaintiffs' requested relief.  Indeed, if Movants are correct that the Florida permitting process operates on a two-to-three-month timeline, then, in all likelihood, Movants' members' pending permit applications will be adjudicated *before* the Court issues any decision in this matter.  *See* Minute Entry (Feb. 17, 2020) (briefing on Plaintiffs' partial summary judgment motion to conclude in early June).  And, the prospect that one of Movants' members will file a new permit application in the next few months; that the application will remain pending on the day the Court grants Plaintiffs the relief they seek—assuming that the Court ever does so; that any decision in favor of Plaintiffs will not be stayed; and that the member will need to incur additional costs submitting a federal application should the Court rule in Plaintiffs' favor, is too speculative to support standing.  To be sure, Movants might offer additional evidence showing, for example, that their members have one or more Section 404 permit applications pending at all times and that, if Plaintiffs prevail, at least one such member will incur additional costs related to filing a federal permit application.  But that evidence is not before the Court at this time.[3]

---

[3]  The Court pauses to highlight one further, unaddressed question.  Under the prior federal permitting scheme, Movants' members would, the Court assumes, have to submit one application to receive a Section 404 permit from the Corps but another, separate application to receive an ERP permit from Florida authorities.  Under the current regime, however, it is not clear whether Movants' members submit one application to receive both a Section 404 and ERP permit from Florida or if, instead, two separate applications must still be filed, albeit both with the State.  The Court does not, at this point, express any view on whether differentials in the

*      *      *

The Court is unpersuaded that Movants have satisfied their burden to demonstrate Article III standing and will, accordingly, deny their renewed motion to intervene without prejudice. Dkt. 32.  Movants may later renew their motion if doing so is necessary to preserve their appellate rights or if circumstances change with respect to their standing.  Should Movants renew their motion, they will be required to offer additional evidence establishing that they or their members face a non-speculative, concrete, and cognizable risk of injury.

With that said, the Court will permit Movants to participate in this matter as amici curiae to the same extent they might have otherwise participated as parties.  The Court will treat the brief that Movants have submitted along with their Motion for Leave to File a Response in Opposition to the Plaintiffs' Motion for Partial Summary Judgment on Claims 8 and 9 of the complaint, Dkt. 38, as an amicus brief in support of Defendants.  Movants' counsel will also be permitted to participate in oral argument, if any, on Plaintiff's pending motion, Dkt. 31.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the Motion to Intervene by the Florida Chamber of Commerce and Association of Florida Community Developers, Dkt. 32, is **DENIED** without prejudice; and it is further

---

application process provide sufficient basis for Article III standing.  But the Court notes that this might offer a plausible theory of injury to the extent Movants' members can establish that any rejection of the current Florida permitting regime will require duplication of effort with respect to ERP and Section 404 permits.

**ORDERED** that Movants' Motion for Leave to File a Response in Opposition to the

Plaintiffs' Motion for Partial Summary Judgment on Claims 8 and 9 of the complaint, Dkt. 38, is

**GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 2, 2021