**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | |
| Plaintiffs, | |
| v. | **Civil Action No.** 1:21-cv-119 (RDM) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| Defendants. | |

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' AND
INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DISMISSAL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.      Plaintiffs' Claims Eight and Nine Succeed on the Merits. ................................. 3

    A.   EPA's Approval of the State 404 Program was a Substantive Rulemaking that Must Be

    Codified and Comply with Section 553 of the APA. ............................................... 3

    B.   EPA's Action Affected the Legal Rights and Obligations of Broad Classes of

    Individuals, Bearing All the Characteristics of Substantive Rulemaking. ............................. 3

    C.   EPA Transfer to the State Violated Federal Law. .......................................... 17

II.     Plaintiffs Have Standing on Claims Eight and Nine......................................... 21

    A.   Plaintiffs Have Standing to Challenge EPA's Failure to Provide a Thirty-Day Delay of

    Effective Date, Claim 8. ........................................................................... 21

    B.   Plaintiffs Have Standing to Challenge EPA's Failure to Codify the State Program,

    Claim 9. ............................................................................................ 39

III.    Intervenors' Motion to Dismiss Lacks Merit................................................... 50

    A.   Florida's Objections to Plaintiffs' Standing on All Claims Lack Merit. ...................... 50

    B.   Florida Attempt to Conflate Standing with Merits Issues Should Be Rejected. ............ 61

    C.   Section 404's "Deemed Approved" Language Does Not Moot Plaintiffs' Other Claims

    or Affect Their Redressability. ...................................................................... 63

CONCLUSION............................................................................................................ 69

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Adamski v. McHugh,
    304 F. Supp. 3d 227 (D.D.C. 2015) ...............................................................................40

Alaska Excursion Cruises, Inc. v. United States,
    603 F. Supp. 541 (D.D.C. 1984) ....................................................................................44

Am. Institute of Certified Pub. Accts. v. Internal Revenue Serv.,
    746 Fed. Appx. 1 (D.C. Cir. 2018) ...............................................................................47

\*   Am. Min. Cong. v. Mine Safety & Health Admin.,
    995 F.2d 1106 (D.C. Cir. 1993) ...........................................................................9, 18, 45

Am. Rivers v. Fed. Energy Regul. Comm'n,
    895 F. 3d 32 (D.C. Cir. 2018) .......................................................................................57

Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.,
    659 F.3d 13 (D.C. Cir. 2011) ........................................................................................30

Am. Trucking Ass'n, Inc. v. United States,
    627 F.2d 1313 (D.C. Cir. 1980) ....................................................................................10

Amador Cty. v. Salazar,
    640 F.3d 373 (D.C. Cir. 2011) ................................................................................65, 66

Andrews v. Knowlton,
    509 F.2d 898 (2d Cir. 1975) ..........................................................................................18

Animal Legal Def. Fund v. Veneman,
    490 F.3d 725 (9th Cir. 2007) .........................................................................................67

Arpaio v. Obama,
    797 F.3d 11 (D.C. Cir. 2015) ..................................................................................42, 43

Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n,
    627 F.2d 1151 (D.C. Cir. 1979) ....................................................................................14

AT&T Corp. v. Fed. Commc'n Comm'n,
    369 F.3d 554 (D.C. Cir. 2004) ......................................................................................67

Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,
    462 U.S. 87 (1983) .........................................................................................................57

\*      Bauer v. DeVos,
        325 F. Supp. 3d 74 (D.C. Cir. 2018)................................................................23, 24, 25

        Bowen v. Georgetown Univ. Hosp.,
        488 U.S. 204 (1988)...................................................................................................14

\*      Brock v. Cathedral Bluffs Shale Oil Co.,
        796 F.2d 533 (D.C. Cir. 1986)................................................................................5, 18

        Burkey v. Marberry,
        556 F.3d 142 (3d Cir. 2009).........................................................................................46

        Butler v. Eaton,
        141 U.S. 240 (1891).....................................................................................................67

        California v. U.S. Bureau of Land Mgmt.,
        277 F. Supp. 3d 1106 (N.D. Cal. 2017) ......................................................................23

        Cantrell v. City of Long Beach,
        241 F.3d 674 (9th Cir. 2001) .......................................................................................51

        Catholic Social Service v. Shalala,
        12 F.3d 1123 (D.C. Cir. 1994)......................................................................................35

\*      Cervase v. Off. of the Fed. Reg.,
        580 F.2d 1166 (3d Cir. 1978).......................................................................................47

        Church of Scientology of California v. United States,
        506 U.S. 9 (1992).........................................................................................................68

        Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency,
        259 F. Supp. 2d 9 (D.D.C. 2003).................................................................................60

\*      City of Dania Beach, Fla. v. Fed. Aviation Admin.,
        485 F.3d 1181 (D.C. Cir. 2007)...............................................................................38, 48

\*      City of Waukesha v. U.S. Env't Prot. Agency,
        320 F.3d 228 (D.C. Cir. 2003)...................................................................27, 48, 49, 62

        Clapper v. Amnesty Int'l USA,
        568 U.S. 398 (2013)........................................................................................... passim

        Clarke v. United States,
        915 F.2d 699 (D.C. Cir. 1990)......................................................................................33

        Clean Air Council v. Pruitt,
        862 F.3d 1 (D.C. Cir. 2017).........................................................................................22

iv

Cmty. Nutrition Inst. v. Young,
    818 F.2d 943 (D.C. Cir. 1987) ......................................................................... 6

Crow Creek Sioux Tribe v. Brownlee,
    331 F.3d 912 (D.C. Cir. 2003) .................................................................... 62, 63

Ctr. for Biological Diversity v. Bernhardt,
    442 F. Supp. 3d 97 (D.D.C. 2020) .................................................................. 56

Ctr. for Biological Diversity v. Trump,
    453 F. Supp. 3d 11 (D.D.C. 2020) .................................................................. 40

Ctr. for Biological Diversity v. U.S. Dep't of State,
    No. CV 18-563 (JEB), 2019 WL 2451767 (D.D.C. June 12, 2019) .................. 55

Ctr. for Biological Diversity v. U.S. Marine Corps,
    No. CIV 00-2387 (TFH), 2005 WL 3262901 (D.D.C. Sept. 19, 2005) ............. 56

Ctr. for L. & Educ. v. Dep't of Educ.,
    396 F.3d 1152 (D.C. Cir. 2005) ..................................................................... 49

Cuomo v. U.S. Nuclear Regul. Comm'n,
    772 F. 2d 972 (D.C. Cir. 1985) ...................................................................... 23

Dynalantic Corp. v. U.S. Dep't of Def.,
    115 F.3d 1012 (D.C. Cir. 1997) ..................................................................... 42

Eagle-Picher Indus., Inc. v. U.S. Env't Prot. Agency,
    759 F.2d 905 (D.C. Cir. 1985) ...................................................................... 66

Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,
    878 F.3d 371 (D.C. Cir. 2017) .................................................................. 54, 55

* Env't Def. Fund v. U.S. Env't Prot. Agency,
    No. 4:21-CV-03-BMM, 2021 WL 270246 (D. Mont. Jan. 27, 2021) ............. 22, 42

Epic Sys. Corp. v. Lewis,
    138 S. Ct. 1612 (2018) ............................................................................. 13, 25

Equal Rts. Ctr. v. Post Properties, Inc.,
    633 F.3d 1136 (D.C. Cir. 2011) ..................................................................... 53

Ethyl Corp. v. U.S. Env't Prot. Agency,
    306 F.3d 1144 (D.C. Cir. 2002) ..................................................................... 56

Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.,
    28 F.3d 1268 (D.C. Circ. 1994) ................................................................ 29, 30

Fla. Audubon Soc'y v. Bentsen,
   94 F.3d 658 (D.C. Cir. 1996) ...........................................................25, 37, 48, 49

Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,
   401 F. Supp. 2d 1298 (S.D. Fla. 2005) ...................................................................60

Food & Water Watch, Inc. v. Vilsack,
   808 F.3d 905 (D.C. Cir. 2015) ...............................................................................30

Friends of Animals v. Bernhardt,
   961 F.3d 1197 (D.C. Cir. 2020) .......................................................11, 12, 19, 45

Friends of Animals v. Ross,
   396 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................28

Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,
   570 F.3d 1210 (11th Cir. 2009) .............................................................................67

Gen. Motors Corp. v. U.S. Env't Prot. Agency,
   363 F.3d 442 (D.C. Cir. 2004) .................................................................................6

Gottlieb v. Pena,
   41 F.3d 730 (D.C. Cir. 1994) ................................................................................68

Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,
   920 F.3d 1 (D.C. Cir. 2019) .....................................................................................8

*   Havens Realty Corp. v. Coleman,
   455 U.S. 363 (1982) ...............................................................................................52

*   Idaho Conservation League v. U.S. Env't Prot. Agency,
   820 F. App'x 627 (9th Cir. 2020) ..........................................................................69

Idaho v. Interstate Com. Comm'n,
   35 F.3d 585 (D.C. Cir. 1994) ...........................................................................38, 48

Indep. U.S. Tanker Owners Comm. v. Skinner,
   884 F.2d 587 (D.C. Cir. 1989) .................................................................................9

Jicarilla Apache Nation v. U.S. Dep't of Interior,
   613 F.3d 1112 (D.C. Cir. 2010) .............................................................................29

Juliana v. United States,
   947 F.3d 1159 (9th Cir. 2020) ...............................................................................42

Khadr v. United States,
   529 F.3d 1112 (D.C. Cir. 2008) .............................................................................67

Lewis-Mota v. Sec'y of Labor,
    469 F.2d 478 (2d Cir. 1972)................................................................35, 49

\* Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) ................................................................ *passim*

\* Marseilles Land & Water Co. v. Fed. Energy Regul. Comm'n,
    345 F.3d 916 (D.C. Cir. 2003) ............................................16, 17, 18, 45

Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,
    567 U.S. 209 (2012)................................................................44

Menominee Indian Tribe of Wisconsin v. U.S. Env't. Prot. Agency,
    947 F.3d 1065 (7th Cir. 2020) ................................................................8

Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau,
    785 F.3d 684 (D.C. Cir. 2015) ................................................................37

Morton v. Ruiz,
    415 U.S. 199 (1974)................................................................17

Nance v. U.S. Env't Prot. Agency,
    645 F.2d 701 (9th Cir. 1981) ................................................................17

\* Nat. Res. Def. Council v. U.S. Env't Prot. Agency,
    559 F.3d 561 (D.C. Cir. 2009) ................................................................18

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
    551 U.S. 644 (2007)................................................................9

Nat'l Ass'n of Home Builders v. E.P.A.,
    667 F.3d 6 (D.C. Circ. 2011) ................................................................30

\* Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
    417 F.3d 1272 (D.C. Circ. 2005) ................................................ *passim*

\* Nat'l Ass'n of Home Health Agencies v. Schweiker,
    690 F.2d 932, 948–49 (D.C. Cir. 1982)................................................................7

Nat'l Biodiesel Bd. v. U.S. Env't. Prot. Agency,
    843 F.3d 101 (D.C. Cir. 2016)................................................................15, 16

Nat'l Labor Rev. Bd. v. Bell Aerospace Co.,
    416 U.S. 267 (1974)................................................................11, 15

Nat'l Wildlife Fed'n v. Hodel,
    839 F.2d 694 (D.C. Cir. 1988) ................................................................51

Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,
    358 F. Supp. 3d 66 (D.D.C. 2019) .......................................................................55

Neustar, Inc. v. Fed. Commc'n Comm'n,
    857 F.3d 886 (D.C. Cir. 2017) ...................................................................11, 15

\*    Ngou v. Schweiker
    535 F. Supp. 1214 (D.D.C. 1982) ..........................................................35, 36, 49

\*    Nolan v. United States,
    44 Fed. Cl. 49 (Ct. Cl. 1999) .....................................................................19, 45

Nw. Env't Advocates v. U.S. Env't Prot. Agency,
    537 F.3d 1006 (9th Cir. 2008) ..............................................................................40

Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.,
    496 F.Supp.3d 31, 2020 WL 5995206, (D.D.C. 2020)................................30, 36, 53

\*    Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,
    896 F.3d 520 (D.C. Cir. 2018) .............................................................................29

\*    Omnipoint Corp. v. Fed. Commc'n Comm'n.,
    78 F. 3d 620 (D.C. Cir. 1996) .............................................................................22

In re Pac. Far E. Line, Inc.,
    314 F. Supp. 1339 (N.D. Cal. 1970), aff'd, 472 F.2d 1382 (9th Cir. 1973) ...........................18

\*    PETA v. U.S. Dep't of Agric.,
    797 F.3d 1087 (D.C. Cir. 2015) ................................................................. passim

Prows v. U.S. Dep't of Just.,
    938 F.2d 274 (D.C. Cir. 1991) .................................................................. passim

Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n,
    839 F.3d 1165 (D.C. Cir. 2016) ...........................................................................67

Pub. Citizen, Inc. v. Trump,
    297 F. Supp. 3d 6 (D.D.C. 2018) .........................................................................37

Pub. Citizen v. U.S. Dep't of Just.,
    491 U.S. 440 (1989) .............................................................................................56

Reed v. Salazar,
    744 F. Supp. 2d 98 (D.D.C. 2010) .......................................................................54

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989)..............................................................................................58

Rowell v. Andrus,
    631 F.2d 699 (10th Cir. 1980) ...............................................................17, 34, 35

\*  Safari Club Int'l v. Zinke,
    878 F.3d 316 (D.C. Cir. 2017) ................................................................ *passim*

Scheduled Airlines Traffic Off., Inc. v. U.S. Dep't of Def.,
    87 F.3d 1356 (D.C. Cir. 1996) ...............................................................44, 47

Securities Exchange Comm'n v. Chenery Corp.,
    332 U.S. 194 (1947) ...............................................................................7

Shinseki v. Sanders,
    556 U.S. 396 (2009) ...............................................................................29

Sierra Club v. Fed. Energy Regul. Comm'n,
    867 F.3d 1357 (D.C. Cir. 2017) ...........................................................58

Sierra Club v. Jackson,
    833 F. Supp. 2d 11 (D.D.C. 2012) .....................................................23, 24

\*  Sierra Club v. Jewell,
    764 F.3d 1 (D.C. Cir. 2014) .................................................................51

Spokeo, Inc. v. Robins,
    136 S. Ct. 1540 (2016) .........................................................................40

Sprint Nextel v. Fed. Commc'n Comm'n,
    508 F.3d 1129 (D.C. Cir. 2007) ...........................................................67

Sugar Cane Growers Co-Op. of Fla. v. Veneman,
    289 F.3d 89 (D.C. Cir. 2002) ...............................................................38, 48

Texas All. for Home Care Servs. v. Sebelius,
    681 F.3d 402 (D.C. Cir. 2012) .............................................................40

Texas v. U.S. Env't Prot. Agency,
    726 F.3d 180 (D.C. Cir. 2013) .............................................................16

Theodore Roosevelt Conservation P'ship v. Salazar,
    616 F.3d 497 (D.C. Cir. 2010) .............................................................57

U.S. Dep't of Transp. v. Pub. Citizen, Inc.,
    541 U.S. 752 (2004) ..............................................................................58

U.S. Steel Corp. v. U.S. Env't Prot. Agency,
    595 F.2d 207 (5th Cir. 1979) ...............................................................13

United States v. Fla. E. Coast Ry. Co.,
  410 U.S. 224 (1973) ....................................................................................................16

United States v. Gavrilovic,
  551 F.2d 1099 (8th Cir. 1977) ....................................................................................35

WildEarth Guardians v. Bureau of Land Mgmt.,
  8 F. Supp. 3d 17 (D.D.C. 2014) ..................................................................................58

**Statutes**

5 U.S.C. § 551(4) ..............................................................................................................14, 19

5 U.S.C. § 551(4) ....................................................................................................................17

5 U.S.C. § 553(b) ..............................................................................................................11, 36

5 U.S.C. § 553(c) ........................................................................................................24, 36, 44

5 U.S.C. § 553(d) ...............................................................................................................passim

5 U.S.C. § 553(e) ...................................................................................................21, 22, 26, 69

5 U.S.C. § 555(e) ....................................................................................................................22

5 U.S.C. § 705 ...........................................................................................................17, 22, 25, 26

5 U.S.C. § 706(2) ..................................................................................................29, 39, 62, 69

5 U.S.C. § 1009(d) ..................................................................................................................23

16 U.S.C. § 1536 ...............................................................................................................55, 60

16 U.S.C. § 1540(g)(2)(A) ......................................................................................................50

33 U.S.C. § 1342 ...............................................................................................................10, 67

33 U.S.C. § 1344(i) ..................................................................................................................16

33 U.S.C. § 1344(g) ..........................................................................................................66, 67

33 U.S.C. § 1344(g)(1) ............................................................................................................64

33 U.S.C. § 1344(g)(1), (h) ......................................................................................................65

33 U.S.C. § 1344(g)(3), (h)(1) .................................................................................................10

33 U.S.C. § 1344(h) ..........................................................................................................64, 66

33 U.S.C. § 1344(h)(1) ................................................................................12, 64

33 U.S.C. § 1344(h)(2)(A) .........................................................................12, 13

42 U.S.C. § 4321 ..............................................................................................58

42 U.S.C. § 4332 ..............................................................................................60

44 U.S.C. § 1505(a)(2) .............................................................................17, 44

44 U.S.C. § 1507 .......................................................................................17, 44

44 U.S.C. § 1507(1), (4) ..................................................................................45

44 U.S.C. § 1507(4) .........................................................................................45

44 U.S.C. § 1510 .........................................................................................5, 44

44 U.S.C. § 1510(a) ...................................................................................17, 45

44 U.S.C. § 1510(e) ...................................................................................18, 45

Clean Water Act, 33 U.S.C. § 1251, et seq...........................................*passim*

Fla. Admin. Code Chapter § 62-331 ................................................................3

Fla. Stat. § 120.569 ..........................................................................................60

Fla. Stat. § 430.412 ..........................................................................................60

National Environmental Policy Act, 42 U.S.C. §4321 et seq..............*passim*

Procedures for the Withdrawal of State NPDES Program Approval Pursuant to
    Section 402(c)(3) of the Clean Water Act, 1978 WL 26926 (EPA G.C. Apr.
    18, 1978). ....................................................................................................10

U.S. Fish & Wildlife Serv., <u>ESA Section 7 Consultation Handbook</u> ...........................................56

**Other Authorities**

1 C.F.R. § 5.5 ......................................................................................17, 20, 44

1 C.F.R. § 8.1 .....................................................................................................5

1 C.F.R. § 18.20(a)(1) .................................................................................17, 20

1 C.F.R. § 21.1(a)-(b) .................................................................................17, 20

1 C.F.R. § 21.16(a)(3) .................................................................................17, 20

1 C.F.R. § 21.20(a)-(b)................................................................17, 20

1 C.F.R. § 21.30..............................................................................4

1 C.F.R. § 51.5..............................................................................20

1 C.F.R. § 51.5(b)(1)......................................................................19

1 C.F.R. § 51.7..............................................................................20

33 C.F.R. pt. 323......................................................................17, 18

33 C.F.R. § 230.9..........................................................................57

33 C.F.R. § 233.53(c).....................................................................16

40 C.F.R. pt. 52............................................................................10

40 C.F.R. pt. 62............................................................................10

40 C.F.R. pt. 147..........................................................................10

40 C.F.R. pt. 272..........................................................................10

40 C.F.R. §§ 123.63–64..................................................................10

40 C.F.R. § 230.10(b)(3)................................................................52

40 C.F.R. § 233.1(d)......................................................................65

40 C.F.R. § 233.15(a)...............................................................64, 67

40 C.F.R § 233.15(h).....................................................................13

40 C.F.R. § 233.16(e).....................................................................69

40 C.F.R § 233.53.........................................................................16

40 C.F.R. § 233.53(b)(1)................................................................69

40 C.F.R. §§ 233.70–71............................................................*passim*

40 C.F.R. § 233.72..........................................................................4

40 C.F.R § 1501.9.........................................................................54

40 C.F.R § 1503.1(a)(2)(v)............................................................54

40 C.F.R § 1506.6.........................................................................58

50 C.F.R. § 402.06(b) ...................................................................................56

50 C.F.R. § 402.14 .......................................................................................55

122 Cong. Rec. (1976) ...........................................................................66, 67

49 Fed. Reg. 38,947 (1984) ..........................................................................12

59 Fed. Reg. 9,933 (1994) ............................................................................13

41 Admin. L. Rev. 533, 535–37 (1989) ........................................................45

H.R. Rep. No. 280 (1935) .............................................................................19

H. Rep. No. 95-830 (1977), <u>reprinted in</u> 1977 U.S.C.C.A.N. 4424..................66

H. Rep. No. 1980 (1946)................................................................................23

S. Rep. No. 95-370 (1977) ............................................................................66

Staff of S. Comm. On the Judiciary, 80th Cong., <u>Administrative Procedure</u> at 38,
    <u>reprinted in</u> Administrative Procedure Act Legislative History (Comm. Print
    1945) ........................................................................................................24

## INTRODUCTION

In late December 2020, the prior administration sought to tie the hands of the incoming administration by declaring its approval of Florida's Clean Water Act Section 404 program an "adjudicatory order" that could be effective immediately and by evading the codification process, even though the agency's action sought to modify existing federal regulations.  The Environmental Protection Agency's ("EPA") action prevented Plaintiffs from the ability to seek an agency stay and denied the incoming administration an opportunity to consider that stay request.  And it escaped the incoming administration's directive to pause new rules that had not yet been published or taken effect.  Had the prior administration followed the law, EPA's action could not have taken effect until after Inauguration Day, at the earliest, and—because of the time required to amend and incorporate by reference—likely could not have taken effect until well after.

EPA now defends its actions based on an institutionalist prerogative: asserting a broad scope of authority to decide when to act via an adjudicatory order or a rule.  This defense rests on the erroneous position that EPA could choose adjudication in this case.  But an agency's authority has its limits, and those limits have been crossed here.  EPA was not entitled to authorize a 404 program that creates a new legal regime and modifies existing federal regulations governing dredge and fill activities without promulgating a rule and codifying it.

EPA's challenge to Plaintiffs' standing as to the codification claim—that the violation did not lead to EPA's approval of the program—confuses procedural violations that precede an agency's unlawful decision with legal violations that occur after the agency's unlawful decision.  EPA's argument that Plaintiffs' relief should be limited to injuries sustained before January 21, 2021, ignores the continuing nature of Plaintiffs' injuries resulting from the thirty-day violation, which is tied to the loss of Plaintiffs' right to seek reconsideration or an agency stay, as well as

1

the fact that the thirty-day clock can only run from the lawful promulgation of a rule. And where, as here, that rule modifies existing federal regulations, the clock can only start once the requisite amendatory language has been published.

Because EPA has unlawfully allowed the state to begin administering the 404 program, Plaintiffs' harms are immediate and ongoing, including the unlawful loss of rights under the National Environmental Policy Act ("NEPA") while the state considers hundreds of 404 permit applications that are now before it. Contrary to EPA's argument, vacatur of EPA's approval is not the only remedy that would redress Plaintiffs' harms. Should Plaintiffs prevail on this motion, EPA's "adjudicatory order" will have been found insufficient to effectuate the transfer of Section 404 authority to the state. Although that does not alter the agency's approval of the program, it will require the new administration to decide: (1) whether and when to give effect to that program via the promulgation of a rule that specifies a legal effective date and codifies the approved components of the state program; (2) whether to stay the rule's effectiveness to allow additional time to review, as intended by the Klain Memo; and (3) whether to reconsider or modify the approval. Should the administration decide to give effect to the program, Plaintiffs' harms can be redressed by the opportunity to seek an agency stay pending judicial review.

Florida, for its part, would rather have the case dismissed in its entirety, claiming that none of Plaintiffs' claims are justiciable. But the state's arguments are wrong on the law and wrong on the facts. Florida separately objects to Plaintiffs' standing by arguing over matters that, at best, relate to the merits of substantive claims in the case, involve unsupported and disputed statements of fact, and raise issues not presently before the Court. Florida relies on an alternate reality where its program would have been "deemed approved" had EPA not acted on

it.  But EPA did act.  And Congress surely did not intend the absurd result that an unlawful

program unlawfully approved would be "deemed approved" once a Court finds it unlawful.

For the reasons provided herein, Plaintiffs respectfully submit that their Motion for

Partial Summary Judgment should be granted and the cross-motions denied.

## ARGUMENT

**I.      PLAINTIFFS' CLAIMS EIGHT AND NINE SUCCEED ON THE MERITS.**

**A.      EPA's Approval of the State 404 Program was a Substantive Rulemaking that Must Be Codified and Comply with Section 553 of the APA.**

The form and effect of EPA's action are essential for determining whether EPA acted by

rule or adjudication, and thus, whether EPA was required to comply with the Administrative

Procedure Act's ("APA") rulemaking requirements and whether the agency was required to

codify a rule that purports to modify existing federal regulations.  As the famous adage goes, if it

looks like a duck, swims like a duck, and quacks like a duck, it is a duck.  And this duck is a rule.

**B.      EPA's Action Affected the Legal Rights and Obligations of Broad Classes of Individuals, Bearing All the Characteristics of Substantive Rulemaking.**

As to its effect, EPA's action was clearly intended to have "the force of law."  Dkt. 31 at

26–34.  It created a binding legal effect on private parties and the agency because but for EPA's

actions, Florida would not operate the 404 program in assumed waters.  Id.  Fundamentally,

EPA's approval gave Florida's legal regime effect:  Florida's rules became effective on "the

effective date of assumption, which is the date identified by EPA as published in the Federal

Register."  Fla. Admin. Code Ann. ch. 62-331.  There is no dispute that the state regulations

were not effective until EPA acted.  It altered certain rights and duties of the public, federal and

state agencies, and federally recognized tribes, while simultaneously stripping away others.  It

does not only affect the state (as EPA says), nor are does it affect non-parties solely based on the

precedential impact of the agency's action.  See Dkt. 31 at 21–23.

As to its form, EPA exercised its discretionary authority to evaluate the legal regime a state created to determine if it was as stringent as federal law requires.  The agency published its notice and request for comments in the Federal Register, committed to codify the state program in the Code of Federal Regulations, used the "Federal eRulemaking Portal," and published its ultimate decision in the Federal Register with an "effective date," something required only for rules, compare 1 C.F.R. § 21.30 (rules) with id. §§ 22.1–22.2 (notices).  Dkt. 31 at 23–24.  See also Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army, July 31, 2020, A.R. 0019 at 1 (referring to the "federally approved state program" as 40 C.F.R. § 233.72, which should contain the codified program). Even EPA's memorandum of agreement with Florida anticipated that the EPA would identify an effective date upon publication, as required by APA rulemaking procedures, 5 U.S.C. § 553(d), not that it would become effective immediately "upon publication."  Dkt. 37 at 14 (citing A.R. 0019 at 1).

And, fundamentally, despite EPA's contradictory statements during this litigation, Dkt. 34 at 23–32, EPA has always promulgated a rule that identifies all the components of the state programs and incorporates by reference applicable state statutes, as those state programs modified existing regulations; and the agency continues to adhere to its intent to do so here.  Dkt. 31 at 24; U.S. Env't Prot. Agency, Pre-Publication Notice: Codifying EPA's Adjudicatory Decision of Florida's Clean Water Act Section 404 Program Request (Jan. 14, 2021) [hereinafter "Pre-Publication Notice"].  And in prior state 404 program approvals, EPA articulated a basis for making the transfer of authority effective immediately, thus invoking an exception to the APA's

rulemaking procedures and acknowledging that they apply.  Dkt. 31 at 25.[1]  EPA even conceded

that it must follow rulemaking procedures to alter the scope of a state 404 program.  Dkt. 34 at

32, n.9; Dkt. 31 at 26.  As the D.C. Circuit Court has explained, publication of an agency action

in the Code of Federal Regulations "is the real dividing point" that identifies a rulemaking,

because the Code of Federal Regulations can contain *only* "Federal regulation[s] of general

applicability and current or future effect."  Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d

533, 539 (D.C. Cir. 1986) (citing 44 U.S.C. § 1510; 1 C.F.R. § 8.1).  Dkt. 31 at 25.  The agency

did not decide a discrete dispute between parties nor grant a single individual permit.

 EPA argues that the "force of law" test has no bearing on the classification of its action as

a substantive rule as opposed to an adjudication, because orders have the "force of law" as well.

Dkt. 34 at 27-29.  However, that is not the case.  Nat'l Ass'n of Home Builders v. U.S. Army

Corps of Eng'rs, 417 F.3d 1272, 1284–85 (D.C. Circ. 2005) (deciding agency action was a rule

not an adjudication based on its legal effect); Safari Club Int'l v. Zinke, 878 F.3d 316, 332 (D.C.

Cir. 2017) (explaining orders bind "parties").  Orders have a binding effect on parties to the

adjudication, but do not create rights and responsibilities for the public.

 EPA tries to compare the approval of an entirely new and different regulatory regime to

the approval of a single 404 permit application.  Dkt. 34 at 27–28.  As EPA itself recognized,

individual permits deal with a specific request, authorizing a specific activity, in a specific

location, by a specific actor, in a specific timeframe.  Id.  Here, EPA approved a broad request to

regulate a class of activities across the entire state of Florida by a broad and undefinable class of

actors in perpetuity.  Dkt. 31 at 18–29.  The approval lacks the kind of specificity and limited

---

[1] EPA claims that an agency must explicitly cite the relevant exception to the APA's
requirements to invoke it, but cites no authority for that proposition.  Dkt. 34 at 30–31.  And
EPA has not provided any explanation why an agency would have to explain its reason to give
an adjudicatory order immediate effect.

scope and applicability that individual permit applications entail.  EPA is correct that an individual permit affects the rights and obligations of the individual permit applicant, Dkt. 34 at 28, but here, EPA's action also affects the rights and obligations of innumerable future permit applicants, not just Florida or even future state applicants.  Dkt. 31 at 18–29.  EPA is correct that an individual permit affects the public's interests as to that specific development or wetland destruction, but EPA's action here affects the rights and obligations of tribes, government agencies, permittees, and the public.  Dkt. 31 at 19–23.  EPA is correct that those adversely affected by an individual permit could challenge a federal agency's issuance of a permit, Dkt. 34 at 28, but EPA's action here also forces citizens to pursue such challenges through a costly, expert-driven, de novo trial before a state administrative court without the benefit of an administrative record and with more stringent standing requirements.  Dkt. 31 at 22–23.  As such, individual permits would not satisfy "the force of law" test; EPA's action does.

EPA attempts to distinguish the cases relied upon by Plaintiffs by arguing that they do not decide whether an agency action constituted a rule or an adjudication.  Dkt. 34 at 28.  However, what those cases do evaluate is the character of an agency's action to determine whether it is a substantive rule, precisely the analysis the Court must undertake here.  Dkt. 31 at 19, 21; Gen. Motors Corp. v. U.S. Env't Prot. Agency, 363 F.3d 442, 448–50 (D.C. Cir. 2004); Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 945–47 (D.C. Cir. 1987).  Critically, one of Plaintiffs' cases shows that an agency's action is a substantive rule where it empowers a different regulator and strips the public of its rights to deal with the prior regulator, which is exactly what

EPA did here.  Nat'l Ass'n of Home Health Agencies v. Schweiker, 690 F.2d 932, 948–49 (D.C. Cir. 1982).[2]

EPA cites Securities Exchange Commission ("SEC") v. Chenery Corporation to support the proposition that its approval was "so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule" and that EPA must act on a case-by-case basis. 332 U.S. 194, 203 (1947) (plurality).  Dkt. 34 at 29.  However, EPA's own actions show that is not the case because for every prior 404 approval, EPA has issued regulations capturing the approved state program as providing the general rule for dredge and fill activities in that state. 40 C.F.R. §§ 233.70–71.  Moreover, Chenery is distinguishable.  In Chenery, the SEC denied a group of company leaders' request to benefit from preferred stock purchased with the intent of protecting their interest in a newly organized company.  332 U.S. at 197–99.  The company's leaders challenged this decision, arguing that no general rule prohibited such conduct, and that the SEC could not develop such a rule during an adjudication to decide the issue at stake in the adjudication.  Id. at 199–200.  The Court disagreed, explaining that the SEC can create new standards when faced with "unforeseeable situations" or "specialized problems" during an adjudication or when the agency lacks the experience with a particular problem that would warrant a hard and fast rule.  Id. at 202–03.  Chenery does not stand for the proposition that an agency can issue an order, not a rule, that would create and authorize a new regulatory regime, overseen by a new regulator, covering an entire state, for all future actions, and modifying the existing federal regulations that would otherwise govern the same activities.

[2] Florida's contends that EPA retains significant oversight authority, but the state is the "lead agency," and EPA has waived much of its oversight.  Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army, July 31, 2020, A.R. 0019 at 4–6.  And the Corps—the federal agency that had been administering the Section 404 program—has suspended its issuance of permits while the state assumes that authority.

1.      **EPA's Action Is Properly Classified as a Rule, not an Adjudicatory Order.**

EPA's action satisfies all the requirements to show that it is a rule and not an adjudicatory order.  Dkt. 31 at 27–29.  First, EPA's action has generalized applicability to a broad set of actors in Florida because, as explained above, it gave legal effect to a new state regulatory regime that governs all dredge and fill activities in state-assumed waters.  Id. at 19–23, 27–28.  As with the agency actions in Safari Club, EPA's actions apply to all potential future permitting and enforcement actions, not just a singular action or the acts of a discrete class of individual permittees.  878 F.3d at 333–34.  Second, EPA's action only has prospective effect, affecting only future permitting and enforcement actions in the state.  Id.; Dkt. 31 at 28.  EPA decided what the law "will be" in Florida-assumed waters; it is solely forward-looking.  Third, EPA's action did not involve a situation where an agency made factual findings while adjudicating a dispute or granting an individual permit for a discrete action.  Safari Club, 878 F.3d at 334.  It made no factual findings, and instead asked whether the substantive and procedural laws in Florida were as stringent as federal law.  This inquiry was not fact intensive.  The agency's action established standards and processes to be applied to future permit applications and permitting decisions, like the agency action in Safari Club.  Id. at 333–34.

EPA concedes as it did in Menominee that the agency can only amend the codified provisions of a state 404 program by rulemaking.  Dkt. 34 at 32 n.9.  In near the same breath, EPA claims the codified version of approved state 404 programs are merely memorialized adjudicatory orders, something that does not appear on the face of those approvals.  Dkt. 34 at 29–31.  See also Pre-Publication Notice.  However, the Code of Federal Regulations is reserved for "regulations."  See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 19 (D.C. Cir.), judgment entered, 762 F. App'x 7 (D.C. Cir. 2019), and cert. denied, 140 S. Ct.

789 (2020); <u>Am. Min. Cong. v. Mine Safety & Health Admin.</u>, 995 F.2d 1106, 1109 (D.C. Cir. 1993).  Either EPA's action was a rule or an order.  It cannot be both.

EPA attempts to distinguish its prior practice when approving state 404 programs by pointing out that those actions did not provide a thirty-day delay in effective date and did not explicitly invoke an exception to this requirement.  Dkt. 34 at 29–30.  However, not all exceptions to Section 553(d) need be invoked explicitly.  <u>See</u> <u>Indep. U.S. Tanker Owners Comm. v. Skinner</u>, 884 F.2d 587, 591 (D.C. Cir. 1989) (only Section 553(d)(3) must be invoked explicitly).  The clear implication from EPA's articulated justification for making the state programs effective sooner than thirty days (immediately for New Jersey, fourteen days later for Michigan) is that EPA believed it had to articulate a justification.  If there were no requirement to delay the effective date for thirty days, there would be no reason to explain why the effective date is sooner.

Although the agency's actions under the Clean Water Act's 402 program are not before the Court, EPA relies on its treatment of state 402 approvals to justify its departure from its long-standing practice for 404 program approvals.  Dkt. 34 at 31.  But these programs are not the same.  First, EPA has no discretion when approving state 402 programs, <u>Nat'l Ass'n of Home Builders v. Defs. of Wildlife</u>, 551 U.S. 644, 671–72 (2007), but it does for 404 programs.  Indeed, EPA highlighted some of the differences between the two programs when it recently concluded that it has discretion regarding its approval of state 404 programs.[3]  Unlike for 402, where EPA merely checks the boxes to see if the state program is sufficient, for 404, EPA has discretion when deciding whether to approve a 404 program.  Second, Section 404 explicitly

---

[3] <u>See</u> U.S. Env't Prot. Agency, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals (Aug. 27, 2020), A.R. 0388-A2 at 4–6.

anticipates that the agency will receive "comments" from other agencies, indicating that Congress also understood this approval process to occur via rulemaking.  33 U.S.C. § 1344(g)(3), (h)(1).  See Am. Trucking Ass'n, Inc. v. United States, 627 F.2d 1313, 1317 (D.C. Cir. 1980) (federal agencies submitted comments on rulemaking).  Section 402 does not.  33 U.S.C. § 1342.  Finally, the approval process for these two Clean Water Act programs is written in an opposite fashion:  Section 402 grants automatic approval *unless* EPA finds a state program does not satisfy statutory requirements; Section 404 requires EPA to approve state programs *only if* the agency finds they contain all necessary program components to meet the requirements of federal law.[4]

If EPA seeks to rely on prior practice in other, distinguishable programs that authorize states to assume control over a federal program, examples abound where the agency does codify state programs thus treating them as rules.  See, e.g., 40 C.F.R. pt. 52 (approving and codifying state implementation plans under the Clean Air Act's National Ambient Air Quality Standards program); 40 C.F.R. pt. 62 (same for the Clean Water Act's Section 111(d) and 129); 40 C.F.R. pt. 147 (same for the Safe Drinking Water Act); 40 C.F.R. pt. 272 (same for the Resource Conservation and Recovery Act).  EPA's treatment of approvals under 404 as rules is entirely consistent with its prior practice.  The most relevant practice is what EPA has done for every other state 404 program approval, where it promulgated and codified rules.

---

[4] The root of EPA's practice in approving state 402 programs is a 1978 Office of General Counsel memorandum, Dkt. 34 at 31, setting forth guidance "concerning the procedures for the *withdrawal* of State NPDES program approval."  Procedures for the Withdrawal of State NPDES Program Approval Pursuant to Section 402(c)(3) of the Clean Water Act, 1978 WL 26926, at *1 (EPA G.C. Apr. 18, 1978).  That opinion asks whether withdrawals affect a specific entity, are adjudicative in nature, and involve a dispute that must be resolved, id., which is clearly the case when a state's actions are adjudged to determine if it has failed to operate the program as approved or has fallen short of federal requirements.  See 40 C.F.R. §§ 123.63–64.  Although the opinion says in passing that approvals are adjudications, that statement relies on a rationale that the D.C. Circuit has rejected.  See Nat'l Ass'n of Home Builders, 417 F.3d at 1284.

EPA cites <u>Neustar</u> and <u>Bell Aerospace</u> to claim it has "very broad discretion" to proceed by either adjudication or rulemaking but ignores the origin of that principle. Dkt. 34 at 23( citing <u>Neustar, Inc. v. Fed. Commc'n Comm'n</u>, 857 F.3d 886 (D.C. Cir. 2017); <u>Nat'l Labor Rev. Bd. v. Bell Aerospace Co.</u>, 416 U.S. 267 (1974)).[5]  The principle derives from cases where the rule in question was developed during an adjudication and was used to aid the agency's ultimate decision on a dispute between individual parties.[6] <u>Neustar</u>, 857 F.3d at 895 (resolving "interests in a specific bidding competition" between two specific parties).  The court in <u>Neustar</u> recognized that the "policy or precedent applied" in that adjudication may affect non-parties, but the operation of the order itself would not.  <u>Id.</u>  The same is true in <u>Bell Aerospace</u>, where the Court explained that an agency can decide an individual adjudication using a new standard formulated for the first time in that proceeding and that the new standard (not the adjudicatory order) could affect non-parties.  <u>See</u> 416 U.S. 267 at 292–94.  It is those types of rules—akin to rules developed in case law—that an agency can chose to create by adjudication or rule.  Here, it is the operation of EPA's "adjudicatory order" itself that generally applies to future rights and responsibilities for dredge and fill activities in assumed waters in Florida in perpetuity.  Dkt. 31 at 19–23.

EPA places great weight on the agency not being required to act by rulemaking, Dkt. 34 at 24–25, but that is not the question before the Court.  The question is whether the agency's actions constituted a rulemaking as a matter of law.  As seen in <u>Safari Club</u>'s related case, a court

---

[5] Florida also argues that EPA has broad discretion, citing <u>Friends of Animals v. Bernhardt</u>, 961 F.3d 1197, 1206 (D.C. Cir. 2020), Dkt. 37 at 69.  But that case dealt with whether the agency must act by regulation when revoking an adjudicatory order that the court ruled should have been a regulation, <u>id.</u> at 1205–06, or when the agency sought to reinstate the policies in the revoked order, <u>id.</u> at 1208–09.  The issue here is whether EPA acted by rule or order when it transferred authority to Florida to regulate dredge and fill activities in the State.
[6] Even these rules may be more akin to interpretive rules, statements of policy, or procedural rules, not necessarily substantive rules with binding legal effect.  5 U.S.C. § 553(b).

may determine that an action is a rule, 878 F.3d at 334, even when the agency is not bound to act only by rulemaking.  Friends of Animals, 961 F.3d at 1208–09.

EPA also raises the same plain language argument the Corps advanced in National Association of Home Builders, 417 F.3d at 1284–85.  Dkt. 34 at 24.  But the court rejected the agency's "elaborate statutory construction for the more straightforward one," and held that Clean Water Act Section 404 nationwide permits are rules because the agency action "easily fit[]" within the APA's definition of a "rule":  it constituted "a legal prescription of general and prospective applicability which the Corps has issued to implement" its authority granted by Section 404.  Home Builders, 417 F.3d at 1284–85.  The same is true here.  As the court explained, "'rules is rules' no matter their gloss."  Id. at 1285 (internal citations omitted).

EPA contends that the Clean Water Act favors immediately effective adjudicatory orders. Dkt. 34 at 24–25.  But the statute does not support that position.  The statutory text only requires EPA to decide on the adequacy of a state program within 120 days, not that it must effectuate the transfer of authority within a specific timeframe.  33 U.S.C. § 1344(h)(1).  Rather, without articulating any time constraints, the statute sets out a sequence of events that must occur to effectuate the transfer of authority after the state program is approved: (1) EPA notifies the state and the Corps of the approval; (2) then, the state notifies the Corps "that it is administering such program"; and (3) then, upon such notification, the Corps suspends its regulatory authority in assumed waters.  Id. § 1344(h)(2)(A).  Congress could have, but did not, impose a timeframe for these post-approval steps.  Indeed, in the cases of Michigan and New Jersey—where EPA took the time required to prepare amendatory language for the Code of Federal Regulations—more than thirty to sixty days lapsed between the approval and effective date.  U.S. Envt'l Prot. Agency, 49 Fed. Reg. 38,947-01 (Oct. 2, 1984) (Michigan's program approved on August 1,

1984, effective on October 16, 1984); U.S. Envt'l Prot. Agency, 59 Fed. Reg. 9,933-01 (Mar. 2, 1994) (New Jersey's program approved on January 25, 1994, effective on March 2, 1994).[7]

EPA relies on flawed logic to argue that a prohibition is the same as a positive requirement, and that therefore its regulation should be read as requiring an immediate effective date. Dkt. 34 at 25. EPA's regulation says that "[t]ransfer of the program to the State shall not be considered effective until such notice appears in the Federal Register." 40 C.F.R § 233.15(h). And on "such effective date," the Corps must suspend issuance of Section 404 permits in assumed waters. Id. This language does not support a conclusion that transfer is effective *on* the date notice appears, just that it cannot be effective *before* that notice appears. The EPA's regulation could have said that the transfer becomes effective "upon" publication in the Federal Register, but it does not. Also, under the statute, the Corps must suspend its permitting activities in assumed waters only after the state notifies the Corps that it is administering the program, and there is no specified timeframe for the state to transmit such notice, much less a requirement that the state act immediately. 33 U.S.C. § 1344(h)(2)(A). This plain language can be harmonized with the APA to allow for a thirty-day delay in effective date. See Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1624 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."). It also makes sense since most states would likely take time to prepare for the administration of a major federal wetlands program once it receives approval to administer it.

---

[7] Even if this sequence were intended to occur in rapid succession, EPA could act with the speed necessary to comply with the law. See U.S. Steel Corp. v. U.S. Env't. Prot. Agency, 595 F.2d 207, 213 (5th Cir. 1979) (statutory deadline was not "good cause" to avoid APA requirements).

EPA contends its action was not a rule because its approval only concerned the state of Florida.  Dkt. 34 at 23.  But the APA itself defines rules to include those that are of particular applicability, such as those that apply to a certain class of individuals or to a specific geographical area.  5 U.S.C. § 551(4); Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 218 (1988) ("'[R]ule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person.").  This makes sense here, where existing regulations apply unless the EPA modifies the regulations as to a particular state.

EPA relies heavily on case-specific determinations to argue its action was an adjudication, Dkt. 34 at 25–27, but that language is more appropriately tied to fact-finding that affects the parties to an adjudication.  Adjudicative facts assess past actions to answer questions such as who, what, where, when, how, why, and with what motive or intent.  See Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n, 627 F.2d 1151, 1161–62 (D.C. Cir. 1979).  Legislative facts—those found in rulemakings—help agencies "determine the content of law and of policy and help the [agency] to exercise its judgment or discretion in determining what course of action to take."  Id.  Here, the facts are legislative in nature, as EPA was assessing Florida law as compared to federal law to determine whether to transfer authority over Section 404 to the state.

EPA points to its application of existing law and regulations to say its action was an adjudication, Dkt. 34 at 26, but agencies promulgating rules also rely on their enabling statute and existing regulations.  For example, for nationwide permits, the Corps applies existing permitting regulations to evaluate a broad class of activities to decide whether and how to authorize them.  See Home Builders, 417 F.3d at 1284–85.  The same is true here, where the agency applied existing regulations to evaluate a broad and far-reaching regulatory regime to determine whether and how to authorize assumption.

EPA also argues that its approval was precisely the sort of "case-by-case" review that is a straightforward instance of adjudication, Dkt. 34 at 26, but the cases it relies upon for this argument are distinguishable.  In <u>National Biodiesel Board</u>, EPA was determining whether to allow a specific coalition of foreign companies to use alternative recordkeeping practices through a procedure it had codified.  <u>Nat'l Biodiesel Bd. v. U.S. Env't Prot. Agency</u>, 843 F.3d 101, 1012–15 (D.C. Cir. 2016).  EPA approved the coalition's application and rejected a request from a domestic company to open the application for public notice and comment.  <u>Id.</u>  The domestic company challenged EPA's actions, arguing that its approval was a rule.  <u>Id.</u> at 1018.  The court rejected this argument because EPA's approval affected only the foreign coalition, not any other party.  <u>Id.</u>  Here, EPA's approval affects many other parties.  Dkt. 31 at 19–23.

EPA concedes that its action has only prospective effect but relies on <u>Neustar</u> and <u>Bell Aerospace</u> to undermine the meaningfulness of that fact.  Dkt. 34 at 26.  However, courts in both cases found that only the order's *precedent* could affect third parties in future adjudications involving similar situations, not the operation of the order *itself*.  <u>Neustar</u>, 857 F.3d at 894; <u>Bell Aerospace</u>, 416 U.S. at 292–94.  Here, it is the operation of EPA's approval, not its precedential effect, that will affect third parties in the future.

Despite citing to <u>Safari Club</u>, 878 F.3d 316, for support throughout its brief, EPA seeks to distinguish that case and <u>Home Builders</u>, 417 F.3d 1272, by arguing that EPA's decision was case-specific and fact-bound.  Dkt. 34 at 27.  However, this case is akin to <u>Home Builders</u> and <u>Safari Club</u> because both affect the rights and responsibilities of open classes—here, broad classes of individuals in Florida—and both prescribed behavior—here, the state regulatory regime.  <u>Safari Club</u>, 878 F.3d at 333–34; <u>Home Builders</u>, 417 F.3d at 1284; Dkt. 31 at 28–29.

Finally, EPA cites two distinguishable cases to argue that its action falls on the adjudication side of the "sometimes-fuzzy" boundary between the two.  Dkt. 34 at 24.  Plaintiffs have already distinguished National Biodiesel Board, 843 F.3d at 1017, above.  And Florida East Coast Railroad is equally distinguishable because it does not actually ask whether an agency acted by adjudication or rulemaking, but rather addresses the style of hearing required in the particular action at issue.  United States v. Fla. E. Coast R.R., 410 U.S. 224, 235–38 (1973).

Florida seems to suggest that it is significant that Section 404 anticipates including adjudication in the process required for withdrawing approval of a state program, Dkt. 37 at 20 (citing 33 C.F.R. § 233.53(c)),[8] but this argument ignores what the Clean Water Act says.  The statute contemplates that EPA would use adjudication to assess a state's compliance with the law, and if it found the state lacking, EPA would issue an order defining any necessary corrective actions.  33 U.S.C. § 1344(i).  Only after a state *fails* to comply with that order must EPA act to withdraw its approval of the program.  Id.  The ultimate withdrawal of authority must occur via regulation.  Marseilles Land & Water Co. v. Fed. Energy Regul. Comm'n, 345 F.3d 916, 920 (D.C. Cir. 2003) (agency must amend a rule with a rule).  That adjudication is part of the *withdrawal* process does not answer the question before the Court:  whether EPA's approval of a state program and transfer of authority to that state constituted a rule.

---

[8] Plaintiffs assume Florida intended to cite 40 C.F.R § 233.53 (withdrawal regulations) and not 33 C.F.R. § 233.53 (non-existent).  The rules seem to suggest that if the state fails to come into compliance, EPA could issue an order withdrawing the state program, but that is plainly not true.  Moreover, although the legality of these regulations are not at issue here, if EPA's regulations conflict with the APA, the APA controls.  Texas v. U.S. Env't Prot. Agency, 726 F.3d 180, 195 (D.C. Cir. 2013) ("[A] regulation can never 'trump the plain meaning of a statute.'")

C.       **EPA Transfer to the State Violated Federal Law.**

Because EPA's action was a substantive rule that was intended to be particularly or generally applicable and to have a legally binding effect, the agency was subject to the APA's procedural requirements for rulemakings as well as the Federal Register Act's requirements for giving such an action legal effect through codification.  This makes sense particularly where, as here, existing federal regulations govern dredge and fill activities in every state, 33 C.F.R. pt. 323, unless modified by rule, see 40 C.F.R. §§ 233.70–71.

1.       **EPA Must Comply with Section 553(d)'s Delayed Effective Date.**

Congress enacted the APA's thirty-day requirement to afford all persons affected by a substantive rule a reasonable time to prepare for the effective date of the rule, ask for reconsideration of the action, and take any other action which the issuance may prompt— including exercising the right to petition for a stay of the rule's effective date pursuant to Section 705.  Nance v. U.S. Env't Prot. Agency, 645 F.2d 701, 708–09 (9th Cir. 1981); Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980).  None of the parties dispute that this requirement applies to substantive rulemakings, or that EPA did not provide a thirty-day delay in effective date.  Thus, if EPA's action is properly a rule, as Plaintiffs have shown above, then EPA violated the APA by failing to provide the required delay in effective date.

2.       **EPA's Failure to Codify Means the State Program is not Lawfully in Effect.**

Courts and the Office of the Federal Register have interpreted the Federal Register Act as requiring agencies to publish the codified provisions of their substantive rulemakings for those rules to have legal effect.  44 U.S.C. §§ 1507, 1510(a), 1505(a)(2); 5 U.S.C. §§ 551(4), 553; 1 C.F.R. §§ 5.5, 18.20(a)(1), 21.1(a)–(b), 21.16(a)(3), 21.20(a)–(b); Dkt. 31 at 29–30 (citing cases); Marseilles, 345 F.3d at 920 (rules must be amended by rules); Morton v. Ruiz, 415 U.S. 199, 233–35 & n. 27 (1974) (finding agency's internal requirements were not binding because

they were not published in the Federal Register); <u>Andrews v. Knowlton</u>, 509 F.2d 898, 905 (2d

Cir. 1975) (finding that a rule was never published or codified in the Federal Register, and thus

did not create legally binding rights and obligations); <u>In re Pac. Far E. Line, Inc.</u>, 314 F. Supp.

1339, 1348 (N.D. Cal. 1970), <u>aff'd</u>, 472 F.2d 1382 (9th Cir. 1973) (failure to publish the

regulatory text in the Federal Register rendered the regulation "ineffective"); <u>Nat. Res. Def.</u>

<u>Council v. U.S. Env't Prot. Agency</u>, 559 F.3d 561, 565 (D.C. Cir. 2009) (an unpublished final

rule "can have no legal consequences").  As the D.C. Circuit recognized in <u>Brock</u>, when an

agency takes pains to avoid codifying a final regulation in the Code of Federal Regulations, it

renders the final regulation "useless" as it is not legally binding.  796 F.2d at 539.  Because EPA

did not codify its action, it has no binding legal effect.

       This failure is also significant because the only legally binding and effective regulations

governing dredge and fill activities in waters of the United States in Florida are those

promulgated by EPA and the Corps.  33 C.F.R. pt. 323.  The modification of those regulations is

expressly recognized in the codification of the Michigan and New Jersey programs, where EPA

stated, "[T]he applicable regulatory program for discharges of dredged or fill material into waters

of the United States in [this state] … is the program administered by the [state agency], approved

by EPA, pursuant to section 404 of the [Clean Water Act]."  40 C.F.R. §§ 233.70–71.  No such

modification has been codified as to Florida.  Rules published in the Code of Federal Regulations

remain effective until they expire of their own accord or are amended by later rules.  44 U.S.C.

§ 1510(e); <u>Am. Min. Cong.</u>, 995 F.2d at 1109 ("'[I]f a second rule repudiates or is irreconcilable

with [a prior legislative rule], the second rule must be an amendment of the first; and, of course,

an amendment to a legislative rule must itself be legislative.'"); <u>Marseilles</u>, 345 F.3d at 920

("[A]n administrative agency may not slip by the notice and comment rule-making requirements

needed to amend a rule by merely adopting a de facto amendment to its regulation through adjudication."); <u>Friends of Animals</u>, 961 F.3d at 1205 ("The Supreme Court has explained that § 551 'mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'"); <u>Nolan v. United States</u>, 44 Fed. Cl. 49, 58 (Ct. Cl. 1999).  EPA itself has conceded that the only way to change a codified rule is through a new rule that amends or repeals it.  Dkt. 34 at 32 n.9.

Although EPA purported to transfer authority to the state—and therefore amend the codified regulatory structure governing dredge and fill activities in Florida—it never published a rule amending or repealing the existing regulations.  Therefore, codification is required to legally effectuate those modifications to existing regulations.  To hold otherwise would mean that an agency can decide to change the regulatory landscape governing a particular state without ever codifying the new binding rules or repealing or amending the old ones which, on their face, would continue to apply to that state.  It would mean an agency can make law simply by saying it has done so.  Such a system would breed the type of "utter chaos" Congress intended to avoid when it created the Federal Register Act.  H.R. Rep. No. 280-2 (1935).[9]

---

[9] There is a reason why the former EPA dispensed with these (legally required) niceties.  Had EPA codified the state program as required, it would have had to submit a draft to the Office of the Federal Register at least 20 working days before the rule could be published in the Federal Register.  1 C.F.R. § 51.5(b)(1).  And if EPA had complied with these requirements, the final rule could not have been published in the Federal Register until January 21, 2021, at the earliest. <u>Id.</u>  With a thirty-day delay, the rule could not have taken effect until February 22, 2021.  On January 20, 2021, however, the Klain Memo would have required EPA to "immediately withdraw" the rule so that the new administration could review it.  Memorandum from Ronald A. Klain, Presidential Chief of Staff, to Heads of Executive Departments and Agencies, at 1, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review [hereinafter "Klain Memo"].

EPA argues none of the authority Plaintiffs cited requires a rule to be codified in the Code of Federal Regulations to take legal effect.[10]  Dkt. 34 at 23, 33.  In making this argument, EPA conflates codification with publication in a new version of the Code of Federal Regulations. The Federal Register acts as a daily supplement to the Code of Federal Regulations, which is why "[e]ach document that is subject to codification and published in a daily issue shall be keyed to the Code of Federal Regulations."  1 C.F.R. § 5.5.  Accord id. §§ 18.20(a)(1), 21.1(a)–(b), 21.16(a)(3), 21.20(a)–(b); Office of the Fed. Reg., A Guide to the Rulemaking Process 9 (Electronic Code of Federal Regulations integrates rules when they become effective).[11]  The point is that EPA never codified its action (its approval notice, while published in the Federal Register, did not include amendatory language and was not keyed to the Code of Federal Regulations), which was required to give it binding legal effect and amend or repeal the existing regulatory regime governing dredge and fill activities in Florida.

Florida contends that because EPA would be publishing state laws, Plaintiffs' arguments fail.  Dkt. 37 at 71.  Florida cites no authority to support this proposition and ignores that federal agencies often incorporate non-federal law by reference, thereby making them federal law.  1 C.F.R. § 51.5.  In fact, EPA did just that for New Jersey's and Michigan's programs.  40 C.F.R. §§ 233.70–71.  Only documents previously published in the Federal Register or the U.S. Code cannot be incorporated by reference.  1 C.F.R. § 51.7.

Florida attempts to argue this law does not apply because EPA has never been required to codify its approval of a state 404 program, Dkt. 37 at 72, but that is because it has always done

---

[10] EPA also contends there is no case law requiring orders to be included in the Code of Federal Regulations, Dkt. 34 at 33, but that misses the mark, because EPA's action was a rule.
[11] https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf (last visited May 18, 2021).

so.  Before 2020, there was never an instance where EPA failed to codify its decision to approve

a state 404 program, so no court has had occasion to determine this issue.

## II.     PLAINTIFFS HAVE STANDING ON CLAIMS EIGHT AND NINE.

Plaintiffs have been injured by EPA's violations and have standing to pursue their claims.

Dkt. 31 at 32–51.  Had EPA not acted unlawfully when transferring authority over Section 404 to

the state by failing to codify and provide a thirty-day delay in effective date, Plaintiffs would

have been able to exercise several procedural rights which may have altered, paused, or stopped

implementation of Florida's unlawful program.  Contrary to Defendants' arguments, the loss of

these rights is concrete, non-speculative, and nonexchangeable.  As Plaintiffs and declarants

have laid out in painstaking detail, Dkt. 31 at 35–41, the right to petition for reconsideration or

stay protects concrete interests that are otherwise harmed by the rule.  These interests have now

been, and are being, harmed from the administration of the state program itself, which is

designed to approve permits as quickly as possible (including for major development projects

and a proposal to drill for oil in a national park), eliminates the public's right to NEPA and the

ESA, and severely restricts access to the courts for those adversely affected.

### A.     Plaintiffs Have Standing to Challenge EPA's Failure to Provide a Thirty-Day Delay of Effective Date, Claim 8.

EPA's failure to abide by Section 553(d)'s mandated thirty-day delay foreclosed

Plaintiffs' procedural rights to ask the agency to reconsider or stay the approval pending judicial

review and blocked Plaintiffs from the benefit of the new administration's directive to agencies

to review and consider staying any rule that had not taken effect by Inauguration Day.

#### 1.     Plaintiffs Have Suffered Procedural Injuries.

EPA concedes that Plaintiffs have suffered *past* injuries sufficient for standing and that

Section 553(e) provides Plaintiffs a procedural right to petition the agency for reconsideration.

21

Dkt. 34 at 19.  EPA argues, however, that there is no procedural right to seek a stay,[12] that Plaintiffs never lost their right for reconsideration, and that Plaintiffs' other injuries are outside the remedial scope of a Section 553(d) violation.  Id. at 18.  These arguments fail.

      **a.**      **Section 705 Gives a Procedural Right to Seek a Stay Pending Review.**

As explained in Plaintiffs' Motion, Section 705 affords Plaintiffs a procedural right to request a stay.  Dkt. 31 at 33–36.  See Env't Def. Fund v. U.S. Env't Prot. Agency, No. 4:21-CV-03-BMM, 2021 WL 270246, at *5 (D. Mont. Jan. 27, 2021) ("APA grants Plaintiffs and their members a procedural right to petition to postpone the Final Rule's effective date.").[13]  Indeed, Section 705 makes clear it was designed to protect the interests of those who wish to challenge a rule, like Plaintiffs here.  The section specifically authorizes an agency to postpone a rule "pending judicial review," 5 U.S.C. § 705, and this postponement protects the interests of those who challenge the rule and seek to have the rule postponed until a court determines its lawfulness.  Omnipoint Corp. v. FCC, 78 F. 3d 620, 630 (D.C. Cir. 1996) (emphasis added). There must be a pending legal challenge for this section to authorize a stay, so it is implied that the party that challenged the rule has the right to request the stay.  Section 705's standard for issuing an agency stay and its legislative history confirm this procedural right.[14]

The text sets an equitable standard for the postponement of rules pending judicial review. The agency may postpone if it first finds "that justice so requires."  Id.  This standard necessarily

---

[12] See also Dkt. 37 at 39 (same argument by Florida).

[13] In Environmental Defense Fund the issue of whether Section 705 affords a plaintiff a procedural right was directly before the court, fully briefed by the parties, and the court unambiguously determined such right did exist.  2021 WL 270246 at *5.

[14] Sections 705, 555(e), and 553(e) can be read together to show that Congress intended parties to have a right to seek a stay of the effective date, which EPA must respond to, and which operates as an amendment to the rule.  5 U.S.C. §§ 553(e), 555(e), 705; Clean Air Council v. Pruitt, 862 F.3d 1, 6 (D.C. Cir. 2017) (stay of rule's compliance dates was tantamount to amending or revoking a rule").

considers harm to those challenging the rule and affected by it.  See Bauer v. DeVos, 325 F.

Supp. 3d 74, 107 (D.C. Cir. 2018) (an agency "must weigh the same kinds of equitable

considerations that courts have long applied and must explain why, in light of the pending

litigation, a stay is 'require[d]' to ensure the parties will ultimately obtain an adequate and just

judicial remedy."); California v. U.S. Bureau of Land Mgmt., 277 F. Supp. 3d 1106, 1122 (N.D.

Cal. 2017) ("If the words 'justice so requires' are to mean anything, they must satisfy the

fundamental understanding of justice: that it requires an impartial look at the balance struck

between the two sides of the scale.").  Indeed, the standard to issue an agency stay under Section

705 is normally identical to the four-factor standard for a court to issue a stay or preliminary

injunction, namely, "(1) the likelihood that *the party seeking the stay* will prevail on the merits

…; (2) the likelihood that *the moving party* will be irreparably harmed absent a stay; (3) the

prospect that others will be harmed if the court grants the stay; and (4) the public interest in

granting the stay."  Sierra Club v. Jackson, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) (emphasis

added).  See Bauer, 325 F. Supp. 3d at 105–07; Cuomo v. U.S. Nuclear Regul. Comm'n, 772 F.

2d 972, 974 (D.C. Cir. 1985).  This standard weighs the interests of those challenging the rule

and affected by the stay because those are the interests an agency stay is meant to protect.

      The legislative history shows that Congress intended to create a procedural right:

> This section permits either agencies or courts, *if the proper showing be made*, to
> maintain the status quo.... The authority granted is equitable and should be used
> by both agencies and courts to prevent irreparable injury or afford *parties* an
> adequate judicial remedy.

H. Rep. No. 1980, at 277 (1946) (describing the intent of 5 U.S.C. § 1009(d), the prior version

of Section 705) (emphasis added).[15]  The clear implication from this history is that someone,

other than the agency, must make a showing to the agency to warrant maintaining the status quo.

---

[15] https://www.justice.gov/sites/default/files/jmd/legacy/2014/06/09/houserept-1980-1946.pdf.

The legislative history cited by EPA, Dkt. 34 at 20, similarly explains that the section affords the same authority to courts because "parties could otherwise have no real opportunity to seek judicial review except at their peril."  Staff of S. Comm. On the Judiciary, 80th Cong., Administrative Procedure at 38, reprinted in Administrative Procedure Act Legislative History (Comm. Print 1945).[16]

Defendants' heavy reliance on one short statement that the section "merely confirms administrative authority to grant a stay," does not lead to a contrary result. Dkt. 34 at 20.  First, the provision can at the same time confirm the agency's authority and notify the public of the right to request that interim relief.  After all, for an agency to "grant" a stay, someone must request it.  The legislative history and courts' review of agency stays make clear that the section authorizes the public an opportunity to seek an agency stay.  See, H. Rep. No. 1980, at 277; Bauer, 325 F. Supp. 3d at 105–07.  The fact that an agency has some discretion to grant or deny a stay, once it applies the equitable standard, is irrelevant.  This discretion does not remove the procedural right of an affected person to seek a stay or change the standard the agency must apply before it may grant a stay.  Nor does EPA cite anything to support the proposition.  Even the procedural right provided under Section 553(c), cited by EPA, provides a right to petition, yet the agency still has discretion to grant or deny that petition.  5 U.S.C. § 553(c).

Certainly, EPA has a process for deciding whether to grant or deny stay requests submitted by parties under Section 705.  See, e.g., Sierra Club, 833 F. Supp. 2d at 31–32 (citing EPA's practice in reviewing requests for stays).  Courts are clear that the agency "must do more than pay 'lip service' to the pending litigation ... it must weigh the same kinds of equitable considerations that courts have long applied and must explain why, in light of the pending

---

[16] https://www.justice.gov/sites/default/files/jmd/legacy/2014/02/28/comprint-june-1945.pdf.

litigation, a stay is 'require[d]' to ensure the parties will ultimately obtain an adequate and just judicial remedy." Bauer, 325 F. Supp. 3d at 107.  EPA ignores these requirements when arguing there is no procedural requirement on the agency.  Dkt. 34 at 20.[17]  Here, EPA's action foreclosed a procedural right—an opportunity to seek a stay—that has harmed Plaintiffs' interests.

Florida argues that even if Section 705 provides a "general procedural right," Congress eliminated it with the Clean Water Act's requirement that a state assumption application is deemed approved if not granted or denied by EPA within 120 days.  Dkt. 37 at 21.[18]  "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."  Epic Sys. Corp., 138 S. Ct. at 1624.  Florida has failed to make this showing, nor could it.  Indeed, this argument fails for many reasons, among them the fact that EPA acted within the statutory timeframe.  Moreover, it conflates EPA's approval with a rule's effective date because the Clean Water Act only requires EPA to decide whether to approve or deny a state application within 120 days, not transfer authority within that timeframe.  While Plaintiffs agree there are also withdrawal procedures provided by the Clean Water Act, these procedures in

[17] The cases relied on by EPA, do not hold that procedural rights can only originate from explicit procedural requirements outlined in a statute.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 572, n.2 (1992); Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 664-65 (D.C. Cir. 1996).  Both cases focus on how a plaintiff must show that the loss of a procedural right harmed his interests.  Lujan, 504 U.S. at 572, n.2; Fla. Audubon Soc'y, 94 F.3d at 664–65.  While Florida Audubon Society states a plaintiff must show that defendant's acts omitted a procedural requirement that will likely harm the plaintiff's interest, Plaintiffs have met that burden here.
[18] Florida also argues Plaintiffs' injuries are harmless by contending Plaintiffs have no right to seek a stay, and their arguments fail for the same reasons.  Dkt. 37 at 61.

no way restrict or remove the procedures afforded by the APA, particularly Section 705, which is meant to allow for a stay of a rule pending judicial review.[19]

> **b.      Section 553(e) Gives a Procedural Right to Petition for Reconsideration.**

Section 553(e)'s procedural right to petition an agency for reconsideration applies to rules, not adjudicatory orders, which EPA aptly recognizes.  Dkt. 34 at 10, n.5. While arguing EPA's action was an adjudicatory order, the agency suggests Plaintiffs could seek reconsideration of that order through Section 553(e), which contains the APA's *rulemaking* procedures.  5 U.S.C. § 553(e).  EPA erroneously contends that Plaintiffs have not lost this right, because a request to reconsider can be asserted before or after a rule's effective date.  Dkt. 34 at 10, n.5.  The point, however, is that EPA's position that its action was an adjudication, not a rulemaking, eliminated Plaintiffs' right to petition for reconsideration.  A petition for reconsideration's timing is irrelevant when the right has been foreclosed, a fact EPA dodges.[20]

> **c.      Plaintiffs' Injuries Are Neither Harmless, Nor Self-Inflicted.**

Florida argues that, even if there is a right to an agency stay, any resulting harm is harmless and self-inflicted because Plaintiffs could alleviate their harms by seeking a stay of the approval from the Court under Section 705 or by a motion for temporary restraining order or preliminary injunction.  Dkt. 37 at 33–34.  Florida's argument is meritless as it misconstrues the required showing for an injury-in-fact.  "A violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed

---

[19] Florida argues that Section 553(e) does not allow for a "pre-effective date reconsideration" of the State 404 program.  Dkt. 37 at 32.  Nothing in the statute would have limited Plaintiffs' ability to seek reconsideration of EPA's decision before the rule took effect, had it been properly considered a rule that required a thirty-day delay in effect and codification.  5 U.S.C. § 553(e).
[20] Florida also briefly objects to the fact that Plaintiffs' procedural injuries rely on impairment to "secondary procedural rights," but provides no authority or explanation as to how this delegitimizes Plaintiffs' injuries.  Dkt. 37 at 31.

to protect some threatened concrete interest of the plaintiff." City of Waukesha v. EPA, 320 F.3d 228, 234 (D.C. Cir. 2003) (internal quotation marks omitted).  As explained in Plaintiffs' Motion, the primary purpose of Section 553(d)'s delayed effective date is to afford persons affected a reasonable time to prepare for the effective date of a rule, ask for reconsideration of the action, and take any other action which the issuance may prompt—including exercising the right to petition the agency to immediately postpone the rule's effective date.  Dkt. 31 at 34–35. Had EPA complied with the law, Plaintiffs would have been able to exercise this right pending judicial review to protect their concrete interests.

Plaintiffs have also shown how the loss of the thirty-day delay has harmed, and continues to harm, their organizational and members' interests.[21]  Dkt. 31 at 35–48.  The loss of procedural rights and organizational harms do not all stem from future permits, nor do they solely result in the loss of a missed political opportunity, as Florida claims.[22]  Dkt. 37 at 33–34.  Plaintiffs have already lost their right to a stay, already diverted resources, and will continue to divert resources and suffer harm to their and their members' interests.  Dkt. 31 at 35–48.

Plaintiffs must show the procedural omission caused a harm to their concrete interests, which they have done.  Id.  The right to seek an agency stay is not rendered meaningless or harmless because other procedural rights may exist.  Plaintiffs are under no duty to seek out every avenue for redress to show harm for purposes of standing.  Nor does Florida cite any

---

[21] Florida claims that Plaintiffs have not pointed to *any* non-procedural injuries.  Dkt. 37 at 39. That assertion is patently incorrect, ignoring the lengthy list of immediate and on-going harms to Plaintiffs' concrete interests discussed in Plaintiffs' Motion.  Dkt. 31 at 34–49.

[22] Florida's claim that Plaintiffs spoke with the transition team, Dkt. 37 at 33–34, actually cites to the stay request Plaintiffs sent on January 20, 2021, to EPA (citing Dkt. 21 at 6, n.2; Dkt. 31-1 at 8 (Crooks Dec. ¶ 24)).  The new administration, however, has been precluded from considering Plaintiffs' request because the approval was given immediate effect by the prior administration. Dkt. 31 at 15–17.

support for such propositions.  Indeed, under Florida's theory, a procedural injury could only be sufficient if a plaintiff had no other recourse available or had first exhausted all other avenues.

Florida also argues with respect to Claim 8 (and all other claims) that Plaintiffs' injury arises from self-inflicted budgetary and resource diversion.  Dkt. 37 at 33, 35.  This argument fails because it confuses standing with harmless error, which are distinct inquiries.  See, e.g., Friends of Animals v. Ross, 396 F. Supp. 3d 1 (D.D.C. 2019) (analyzing whether the agency's error was harmless only after concluding that plaintiffs had standing).  Standing does not require Plaintiffs to use Florida's preferred vehicle of procedural challenge.  Standing, instead, addresses whether the Court has jurisdiction over Plaintiffs' case.  A party's decision to remedy an injury via an Article III court versus the EPA Administrator has no bearing on whether the injury itself occurred or whether an Article III court has jurisdiction over the case.  Florida cannot constrict the Court's power to serve its own forum shopping purposes.

Notably, Florida does not cite any cases supporting its argument that Plaintiffs were not injured simply because other, and significantly different, avenues of relief are available.[23] Florida cites only Clapper v. Amnesty International USA for the general proposition that harm cannot be self-inflicted.  568 U.S. 398, 418 (2013).  Clapper however is readily distinguishable from the case at hand because there, plaintiffs feared interception of their overseas communications by the government.  Id. at 415–18.  The court found they lacked standing as the harms complained of would not occur absent a series of events, including decisions by multiple independent actors, none of which were even alleged to have occurred.  Id.  The court concluded

---

[23] Petitioning the EPA to withdraw its approval is fundamentally different from bringing a lawsuit in an Article III court.  The EPA Administrator and an Article III judge make decisions based on different precedent and considerations.  Furthermore, the Administrator's decision cannot be appealed or enforced with a bond, unlike decisions a federal district court judge's decision.

because the risk of harm—government's surveillance—was so speculative, that the costs incurred to countermeasure such hypothetical future harm was self-inflicted.  Id.  Plaintiffs' decision to move for partial summary judgment in an Article III court is not a self-inflicted injury simply because Florida would have preferred that Plaintiffs pursue a different avenue of relief.

As pointed out by Florida, it is not a particularly onerous requirement for a party to show that it was harmed by an agency's violation of the APA, as required by Section 706.  See Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F. 3d 1112, 1121 (D.C. Cir. 2010).  "The harmless error standard of the APA merely requires a showing of prejudice."  Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n, 896 F. 3d 520, 535 (D.C. Cir. 2018).  The Supreme Court has cautioned courts against applying "mandatory presumptions or rigid rules" to determine prejudice; but rather, courts should apply a "case-specific application of judgment."  Jicarilla, 613 F. 3d at 1121.  "Often, the circumstances of the case will make clear to [the court]" that an error was harmful, "and nothing further need be said."  Shinseki v. Sanders, 556 U.S. 396, 410 (2009).  Plaintiffs have clearly demonstrated prejudice from the program's immediate effective date and the agency's failure to codify the program.  Dkt. 31 at 35–48.  Plaintiffs have clearly demonstrated prejudice from the program's immediate effective date and the agency's failure to codify the program.  Plaintiffs are in the best position to explain how they have been hurt by Defendants' errors, see Shineski, 556 U.S. at 410, and Plaintiffs have made that showing.

Florida cites to Fair Employment Council for the proposition that Plaintiffs suffered no injury because their "programs would have been totally unaffected if [they] had simply refrained from making the re-allocation[s]" they claim.  Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1277 (D.C. Cir. 1994); Dkt. 37 at 37.  But in that case, the plaintiff organization had diverted its resources to send black testers for employment at defendant

29

company *before* the defendant discriminated against them; it was not defendant's unlawful discrimination that caused the plaintiff to divert resources, but the plaintiff's own, independent actions. 28 F.3d at 1277.  Here, Plaintiff organizations spent financial and staff resources *after* and *in direct response to* EPA's approval of Florida's program.

Florida also cites <u>Food & Water Watch</u> and <u>ASPCA</u>, for the proposition that Plaintiffs' injury is self-inflicted, and therefore, insufficient for standing.  Dkt. 37 at 37 (citing <u>Food & Water Watch, Inc. v. Vilsack</u>, 808 F.3d 905, 918 (D.C. Cir. 2015) & <u>Am. Soc'y for Prevention of Cruelty to Animals ("ASPCA") v. Feld Ent., Inc.</u>, 659 F.3d 13, 27–28 (D.C. Cir. 2011)).  In both cases, the courts held that there was no causal link between the defendants' actions and the harm alleged.  <u>See</u> <u>Food & Water Watch</u>, 808 F.3d at 915 (plaintiffs' "subjective fear ... d[id] not give rise to standing."); <u>ASPCA</u>, 659 F.3d at 28 (plaintiffs spent resources to show the harms of defendant's practices to show defendant's practices were harmful).

Florida also cites <u>National Association of Home Builders</u> for the proposition that Plaintiffs must assert that they were forced to incur "'operational costs beyond those normally expended' to carry out its advocacy mission."  <u>Nat'l Ass'n of Home Builders v. U.S. Env't Prot. Agency</u>, 667 F.3d 6, 12 (D.C. Cir. 2011); Dkt. 37 at 37.  Plaintiffs have done so.  Plaintiffs alleged that, because of EPA's approval, they had to re-allocate staff time towards gathering information on the massive collection of new and transferred 404 permit applications being considered under a new program with different, and weakened, requirements.  <u>See</u> Dkt. 31 at 41–42; <u>Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.</u>, 496 F. Supp. 3d 31, 45–47 (D.D.C. 2020).  And Plaintiffs have shown that they will be forced to expend more resources than they would normally need to when advocating against and challenging state 404 permits.  Dk. 31 at 42–48.

30

Florida argues that Plaintiffs were not harmed "from losing five business hours on January 20, 2021" within which the new administration could have stayed the rule pursuant to the Klain Memo.  Dkt. 37 at 61–62.  First, EPA approved the program on December 22, 2020, which means January 21, 2021—not January 20—is thirty days following approval of the program, allowing Plaintiffs additional time for the new administration to consider the approval of the state 404 program *and* Plaintiffs' stay request (filed January 20, 2021).  Moreover, the Klain Memo directed agencies under the new administration to review and consider staying final actions of the outgoing administration.[24]  The very purpose of the Klain Memo was for the new administration to review, scrutinize, and consider postponing agency actions such as this one, taking place at the tail end of the Trump Administration.  EPA was aware well in advance of Inauguration Day of the legal flaws with the program, which Plaintiffs and counsel for Plaintiffs brought to its attention, see Dkt. 31 at 4–7, making this exactly the type of rule it could have postponed pursuant to the Klain Memo.

### 2.      Plaintiffs Injuries Are Redressable.

EPA maintains that Plaintiffs may only seek relief for injuries incurred during the thirty-day period mandated by Section 553(d).  Dkt. 34 at 12.  There are two answers, however, to that argument.  First, the thirty-day clock does not lawfully begin to run until the agency has lawfully promulgated a rule that amends existing federal regulations, something EPA has failed to do.  Dkt. 31 at 18–32.  Second, Plaintiffs' experienced immediate harms from the immediate effective date that have continued beyond the initial thirty days.  Dkt. 34 at 41–48.

---

[24] Moreover, had EPA complied with the requirements to incorporate by reference Florida's program, the rule would not have been published on January 20, 2021, and the Klain Memo would have automatically acted to stop its publication.  Klain Memo at 1.

While Plaintiffs' injuries began during the thirty-day period, they did not end there. Id. Because of EPA's violation of Section 553(d), Plaintiffs lost procedural rights and the benefits of additional procedures that, absent a court order, cannot be regained: to seek a stay under Section 705, to seek reconsideration under Section 553, and the applicability of the Klain Memo which stayed rules that had not yet gone into effect as of Inauguration Day (something EPA does not even attempt to rebut).[25] The loss of these rights, and the concomitant harms, began in the thirty-day period and have continued beyond it, as it has deprived Plaintiffs of multiple opportunities to delay the administration of the harmful state 404 program pending litigation and pending the new administration's opportunity to review the program. Dkt. 31 at 29–33, 38–42. These harms are redressable by an order declaring EPA's procedural errors unlawful and setting aside EPA's unlawful action. See id. at 49–51.

EPA misconstrues Plaintiffs' injuries, claiming that most are only prospective in nature and thus not redressable under Claim 8, pointing specifically to harms resulting from the substantial risk the state will grant permits that will harm Plaintiffs' members' interests. Dkt. 34 at 10. EPA is wrong. The continuous nature of Plaintiffs' injuries does not automatically bar relief; their roots are within the thirty-day period. For example, the loss of NEPA rights as these permits are being considered has been immediate. Dkt. 31 at 37–39. These permit applications are not undergoing NEPA review, including critical environmental assessments and impacts

---

[25] While discussing standing and later in its brief, Florida argues that the Klain Memo was merely an internal executive memo which did not direct any action. Dkt. 37 at 22. To the contrary, the memo directed that that agencies immediately refrain from proposing or issuing rules "in any manner . . . until a department or agency head appointed or designated by the President after noon on January 20, 2021, reviews and approves the rule." Klain Memo at 1. For rules sent to Office of the Federal Register but not yet published, agencies must immediately withdraw them from review and approval. Id. For rules already published in the Federal Register that had not taken effect, the memo directs the agencies to consider postponing the rules' effective date and whether to open a public comment period. Id. Florida ignores the reality of how agencies treat the memo, which properly illustrates the harm to Plaintiffs.

analyses, to which the public is entitled, and which the permit applications would be undergoing

if the Corps retained jurisdiction over the applications.  The same is true for the rigorous

consultation requirements under the ESA.  Plaintiffs have therefore lost the opportunity to

participate in the NEPA process and review material generated by the NEPA and ESA processes,

information that is critical to advocating against the projects of most concern or for modification

of those projects.  The harms are happening now, and they only increase with time.  Plaintiffs

need not wait for the ultimate harms to occur—the issuance of a permit that destroys valuable

wetlands—to have standing.  Clapper, 568 U.S. at 414 n.5 ("substantial risk" of harm is

sufficient).

        EPA cites Prows to argue that the only remedy available for Plaintiffs' harms is a

retroactive change in the rule's effective date, and that only harms that occurred during those

first thirty days could be remedied.  Dkt. 34 at 18–19 (citing Prows v. U.S. Department of

Justice, 938 F.2d 274, 275 (D.C. Cir. 1991)).  Similarly, Florida relies on Prows to claim that this

retroactive change must run from the date of publication, and that given the passage of time,

Plaintiffs' harms are no longer redressable.  Dkt. 37 at 38–41.[26]

        However, Prows does not compel those outcomes.  To the contrary, Prows provides that

Plaintiffs may obtain the relief they seek.  The pro se plaintiff in Prows challenged a new

financial program that took effect immediately and an interpretive rule that was released without

notice-and-comment; together they required prisoners to devote 50 percent of their earnings to

"legitimate financial obligations."  938 F.2d at 275.  Because the plaintiff failed to comply with

---

[26] Amici also rely on Prows to argue Plaintiffs' claims are moot, Dkt. 38-1 at 7 (citing Clarke v. United States, 915 F.2d 699 (D.C. Cir. 1990) (en banc)), but their arguments fail for the same reasons iterated here.  Moreover, Clarke similarly does not require the Court to find that Plaintiffs' claims are moot because that case dealt with a challenge to a statute that caused no residual harm after it was superseded by law, which is not the case here.  915 F.2d at 701.

these provisions, he was removed from his position within the thirty-day period of the interpretive rule's issuance.  Id.  The lower court granted plaintiff's first motion for summary judgment and ordered that the prison reinstate him with back pay.  Id.  After he was reinstated, the plaintiff was fired again on a basis "wholly independent" from the previously invalidated program.  Id. at 275–76.  The D.C. Circuit ruled that a "regulation may be saved and held valid after passage of the 30-day notice period" to protect those affected during the thirty-day period without disturbing later action not the product of that violation.  Id. at 276.  Because the plaintiff had already been "made whole" by his reinstatement and backpay, and because his later dismissal had no roots in the thirty-day period, plaintiff's claims were moot.  Id.

Prows does not stand for the proposition that a court may not remedy harm caused to a plaintiff within the thirty-day period following publication of a rule merely because thirty days have passed.  Instead, it plainly holds that if a plaintiff is harmed within the thirty-day period, that harm should be remedied.  In Prows, because the plaintiff's harm had already been remedied, his claim was moot.  That is not the case here.  Plaintiffs' harms began during the thirty-day period following the immediate effective date, have continued, and have not been remedied because Plaintiffs have not been able to seek an agency stay.  The result of that deprivation continues to harm Plaintiffs as the state continues to operate the state program without Plaintiffs having the opportunity to seek an agency stay.  Prows clearly contemplates that if a violation within the thirty days causes ongoing harm beyond the thirty-day period, then that violation may call for a different remedy.

The cases on which Prows relies similarly recognize a flexible approach depending on the nature of the harm.  Rowell, 631 F.2d at 704 (in the context of deciding whether a violation of Section 553(d) wholly voids the underlying regulation, the court found that a regulation

34

"may" be saved after thirty days have passed); id. at 701–02 (plaintiff harmed by increase in lease rates that became effective earlier than thirty days after publication); Lewis-Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir. 1972) (finding immigration directive valid after thirty days had passed, while simultaneously permitting plaintiffs "a reasonable time within which to apply for admission under the same circumstances as if their priority position on the visa approval list were reached" well beyond the expiration of the thirty-day period); United States v. Gavrilovic, 551 F.2d 1099, 1106 (8th Cir. 1977) (vacating convictions based on change in drug law made effective two days after publication, and unlawful conduct occurred during thirty-day period; agency failed to establish good cause exception to thirty-day delay in effective date).

Amici's argument that the D.C. Circuit recently reaffirmed their narrow reading of Prows in Shalala is unfounded.  Dkt. 38-1 at 7 (citing Catholic Social Service v. Shalala, 12 F.3d 1123 (D.C. Cir. 1994)).  Instead, Shalala deals with an entirely different procedural violation, and has no real bearing on this case.  In Shalala, the appellant argued that a rule with both retroactive and prospective effect should be vacated in its entirety because its retroactive effect would be unlawful.  12 F.3d at 1127.  The court disagreed, relying on Prows to hold that the rule could be given prospective legal effect, even if its retroactive application were unlawful.  Id. at 1128.  The case did not extend Prows or reach any of the Prows reasoning relevant to the facts here.

The question of how to remedy a continuous harm originating from the thirty-day period was not before the court in Prows or Shalala.[27]  Indeed, when faced with continuous harms courts have applied the more flexible standard that Prows contemplates.  For instance, the district court in Ngou v. Schweiker, faced with harm to plaintiffs that began during the thirty-day period and would continue thereafter—the loss of financial and medical benefits—enjoined the rule's

---

[27] Plaintiffs do not merge claims to establish standing, as Florida argues, Dkt. 37 at 29, but instead merely point out the rule's many issues, as opposed to the rule before the court in Prows.

effective date for a reasonable period following the court's ruling that plaintiffs were likely to

prevail on their claim that the agency violated Section 553(d).  535 F. Supp. 1214, 1217–18

(D.D.C. 1982).[28]  The court rejected the agency's argument that the only available remedy was a

retroactive thirty-day extension of the rule's effective date, as this "invites violations of section

553(d)."  Id.  "[T]he 30-day notice requirement, like the notice and comment procedures

prescribed in Sections 553(b) and (c), is designed to ensure adequate public participation in the

rule-making process."  Id. at 1216.  Indeed, there are actions citizens can take to influence the

outcome or impact of an agency's decision during the thirty days, like petitions for

reconsideration or stays pending judicial review.  If relief is only retroactive, most violations will

go unredressed as citizens could not file suit and be heard in time for such relief to have any

meaningful effect.  EPA's interpretation would render 553(d) violations virtually

unenforceable.[29]

 EPA conflates one of the substantive claims in Plaintiffs' complaint with the procedural

violations at issue here when arguing that vacatur is the only remedy that will redress Plaintiffs'

injuries.  Dkt. 34 at 9.  Plaintiffs did not request vacatur in this motion.  Rather, they seek an

order declaring that EPA's actions—failure to provide thirty-day delay and failure to codify—are

---

[28] Florida attempts to distinguish this case based on the special circumstances before the court—refugees being immediately denied access to financial and medical benefits.  Dk. 37 at 30.  While the court noted and was sensitive to these facts, the court was also concerned with the how a retroactive delay in effective date would rarely provide any relief for violations in general and would likely foreclose enforcement of Section 553(d).

[29] Florida suggests that Plaintiffs failed to preserve their position distinguishing Prows because Plaintiffs addressed the case in a footnote of their opening brief.  See Dkt. 37 at 28–29.  In the case on which Florida relies, defendants' entire arguments regarding plaintiffs' prudential standing was made in a single sentence in a footnote of their opposition brief, and the court was "unpersuaded [that] a brief, conditional assertion in a footnote" was sufficient to preserve an issue.  See Nw. Immigrant Rts., 496 F. Supp. At 52.  Here, in citing to Prows in their opening brief, Plaintiffs acknowledged a likely counterargument EPA and Florida may raise to their standing claims, but Plaintiffs are not required to proactively raise anticipated counterarguments and then fully respond to them in their opening brief to preserve an issue.

36

unlawful and setting them aside.  Such an order will give the new administration the opportunity,

if it so chooses, to lawfully promulgate and codify the rule with a thirty-day effective date delay,

and the ability to consider an administrative stay, reconsider its action, or stay the decision

consistent with the Klain Memorandum to allow additional time for review.[30]

### 3.    Plaintiffs have Shown EPA's Unlawfully Actions Caused Their Injuries.

Plaintiffs easily meet the causation requirement since the loss of their procedural rights is

directly attributable to EPA's failure to abide by the thirty-day delay, as were Plaintiffs'

diversion of resources and the loss of rights arising under federal laws such as NEPA and the

ESA.  Dkt. 31 at 49–51.  Indeed, EPA does not argue causation is not met for the injuries they

concede exist within the thirty-day period.  Florida, however, claims that causation is not met

because Plaintiffs did not show how the lack of the thirty-day delay affected EPA's substantive

approval of Florida's program.  Dkt. 37 at 27.  Despite Florida's consistent attempts to bring it

in, the approval decision itself is not at issue in this motion.

A procedural-rights plaintiff must show a "causal connection between the government

action that supposedly required the disregarded procedure"—here, codification—"and some

reasonably increased risk of injury to its particularized interest."  Fla. Audubon Soc., 94 F.3d at

664.  Although this standard has not, nor should it, apply to post-decisional procedural rights,

---

[30] Florida argues this relief will not reddress Plaintiffs' harms based on their incorrect
interpretation of Prows and contention that it would "not affect the risk of the underlying harms."
Dkt. 37 at 38-41.  Florida relies on Public Citizen for the proposition that "past harm does not
support standing for forward-looking relief."  Dkt. 37 at 41 (citing Public Citizen, Inc. v. Trump,
297 F. Supp. 3d 6 (D.D.C. 2018)).  Florida fails to acknowledge that past harm is only
insufficient "*if* unaccompanied by any continuing, present adverse effects."  Public Citizen, 297
F. Supp. 3d at 21, n.5 (emphasis added) (citation omitted).  Here, Plaintiffs have shown ongoing
harms, including diversion of resources, and immediate threat of injuries from state permits.
Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau, 785 F.3d 684, 689 (D.C. Cir. 2015)
(plaintiff seeking forward-looking relief must show they are "suffering an ongoing injury or
faces an immediate threat of injury").

Plaintiffs can show that this post-decisional procedure could affect the outcome of EPA's transfer of the program (not the *approval* as Florida claims).  As explained above, the purpose of the thirty-day delay in effective date is to provide Plaintiffs and others with time to take any actions to prepare for the new rule, including protecting their interests and informing agency decision-making through requests for stays and the like.  Therefore, had the thirty-day delay been provided, Plaintiffs could have asserted their procedural rights for a stay or reconsideration, which could have delayed the effective date of the transfer of authority pending judicial review or led the agency to reconsider its action.

Florida's attempt to compare Plaintiffs' injury to notice-and-comment injuries, which by their nature occur prior to a substantive decision, is a red herring.  Dkt. 37 at 38.  These are distinct procedural violations.  Indeed, to hold otherwise would render impossible the vindication of any procedural rights which by their nature occur after a substantive decision is made.  Although there are numerous iterations, explanations, and applications of this basic premise, courts are always careful to clarify that this standard does not require proof that the omitted procedure would have affected the substantive action.  City of Dania Beach, Fla. v. Fed. Aviation Admin., 485 F.3d 1181, 1186 (D.C. Cir. 2007).  The causal connection required between the procedural omission and the agency action only necessitates a plaintiff "to show that the procedural step was connected to the substantive result."  Sugar Cane Growers Co-Op of Fla. v. Veneman, 289 F.3d 89, 94–95 (D.C. Cir. 2002).  The D.C. Circuit has found that "neither the causation requirement nor the redressability requirement for constitutional standing should hinder enforcement of 'procedural rights.'"  Idaho v. Interstate Com. Comm'n, 35 F.3d 585, 591 (D.C. Cir. 1994).  As Plaintiffs have shown, there has been a procedural omission, there are

harms that flow from said procedural omission, and there are harms that flow from EPA's substantive decision; they have more than met this standard.

**B.      Plaintiffs Have Standing to Challenge EPA's Failure to Codify the State Program, Claim 9.**

EPA and Florida challenge Plaintiffs' standing on Claim 9 on their theory that Plaintiffs are solely alleging procedural injuries and have failed to provide the requisite showing to bring the claim.  As EPA recognizes, a procedural rights case typically involves an agency's noncompliance with a procedural requirement that is meant to allow public participation in agency decision-making.  Codification of a rule, however, is meant to give the rule legal authority—change the law or bring a new law into existence.  Here, codification is required to legally transfer a 404 program from the federal government to the state, because doing so requires modification of the existing federal regulations governing dredge and fill activities in that state.  Mere approval of the program does not effectuate the transfer of authority.

Given that the approval of the program constituted a substantive rule, and that substantive rules—particularly where they modify existing federal regulations—must be codified, EPA's failure to codify the rule was an ultra vires act, which violates the APA.  In the alternative, codification may be considered akin to a procedural right in that the act of codification (amending existing federal regulations to give legal effect to a different legal regime for a particular state) provides Plaintiffs with avenues to publicly participate in the shaping of the rule—including seeking to stay its effectiveness or asking for reconsideration.  Under either theory, Plaintiffs have made all the necessary showings required for standing.

**1.      EPA's Failure to Codify Was an Ultra Vires Act.**

A statutory ultra vires claim in the administrative law context arises "when a plaintiff contends that a particular agency action is 'not in accordance with law' under 5 U.S.C.

§ 706(2)(A)," as Plaintiffs do here.  See <u>Adamski v. McHugh</u>, 304 F. Supp. 3d 227, 236 (D.D.C.

2015) (citing <u>Texas Alliance for Home Care Servs. v. Sebelius</u>, 681 F.3d 402, 408 (D.C. Cir.

2012)); <u>see also</u> <u>Nw. Env't Advocates v. U.S. Env't Prot. Agency</u>, 537 F.3d 1006, 1014 (9th Cir.

2008).  To establish standing, Plaintiffs must show that they have suffered an injury in fact that is

fairly traceable to the challenged conduct—here, the illegal transfer of authority—and that the

harm is likely to be redressed—here, by an order declaring the failure to codify unlawful and

setting the action aside.  <u>See</u> <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016) (citing <u>Lujan</u>,

504 U.S. at 560–61).

Although most threshold requirements for an APA claim typically do not apply to ultra

vires claims, for prudential standing, Plaintiffs must fall within the zone of interest of the statute

at issue in all statutorily based cases.  <u>Ctr. for Biological Diversity v. Trump</u>, 453 F. Supp. 3d 11,

39 (D.D.C. 2020) (plaintiffs' interests must "'arguably' fall 'within zone of interests to be

protected or regulated by statute ... violated'" (citation omitted)).  "In other words, the Court

must consider whether these Plaintiffs' interests "systematically, not fortuitously," align with the

interests Congress had "in mind" when enacting these statutes."  <u>Id.</u> (citation omitted).

## 2.   Plaintiffs Have Been Injured by EPA's Failure to Lawfully Transfer the 404 Program to the State.

Contrary to the assertions by EPA, Dkt. 34 at 12, and Florida, Dkt. 37 at 31–32, Plaintiffs

have specified the harms to their concrete interests that they suffer from EPA's failure to codify,

giving legal effect to the state program before existing regulations have been lawfully

modified.[31]  <u>Clapper</u>, 568 U.S. at 414 n.5 ("substantial risk" of harm is sufficient).  The

immediate and ongoing operation of a state 404 program, not codified and therefore not lawfully

---

[31] Florida misconstrues Plaintiffs' position and needlessly focuses on EPA's approval, as opposed to the unlawful transfer of authority from which the harms flow.  Dkt. 37 at 42–43.

effectuated, has harmed and will harm Plaintiffs' organizational mission and their members. Dkt. 31 at 29–33, 38–42.

None of Plaintiffs' injuries were somehow prevented or lessened by Florida's promulgation of *state* regulations, which are just one part the approved state program, as Florida contends, Dkt. 37 at 31–32; nor are they prevented or lessened by EPA's website postings of Florida's incomplete application, as Florida argues, id. at 42–43.  To begin, Florida codified its state 404 program months before EPA approved the program, but they did not become "effective" until EPA acted.  The state's action could not modify existing *federal* regulations, as a state does not have that authority; and EPA has not modified them.  Moreover, Florida's regulations do not cover all components of the approved program, including components comparable to those EPA codified when it approved the 404 programs of Michigan and New Jersey.[32]  40 C.F.R. §§ 233.70–71.

EPA's argument against the sufficiency of Plaintiffs' injuries because they purportedly "all flow" from EPA's approval of Florida's program fares no better.  Dkt. 34 at 21–22.  See Dkt. 37 at 34.  These harms do not flow from the approval, they flow from the illegal transfer of the program.  That the illegal transfer could not occur without EPA approving the state's application is irrelevant.  Because EPA failed to codify the state program, thereby giving it legal effect, Plaintiffs now suffer harms directly from this unlawful action.  Dkt. 31 at 35–49.

---

[32] The issue is also not whether Plaintiffs' received sufficient notice, but whether the program was transferred and law was legally changed.

### 3. Plaintiffs Have Satisfied Causation and Redressability Requirements.

Plaintiffs' injuries also satisfy the ordinary causation and redressability standards applicable to such harms.  See Lujan, 504 U.S. at 560–61; Dkt. 31 at 49–51.  Traceability and redressability are "closely related" concepts, which typically "overlap as two sides of a causation coin."  Dynalantic Corp. v. U.S. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997).  To establish causation, Plaintiffs must show "a causal connection between the injury and the conduct complained of—the injury has to be "'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"  Lujan, 504 U.S. at 560–61 (citation omitted).  To establish redressability, a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561.

To be sure, Plaintiffs have shown that absent EPA's unlawful transfer through a purported adjudication, Plaintiffs would continue to enjoy rights and protections guaranteed by federal law—a harm which could not be any more directly attributable to the decision to illegally transfer the program.  Dkt. 31 at 45–48.  Plaintiffs also have shown ongoing diversion of resources they now suffer because of the unlawful transfer.  Dkt. 31 at 43-48.  That some harms also flow from other unlawful pieces of Florida's program does not render Plaintiffs' injuries here inadequate for purposes of standing.  Nor are these harms self-inflicted or the result of independent action by third parties.  See Juliana v. United States, 947 F.3d 1159, 1169 (9th Cir. 2020); Env't Def. Fund v. U.S. Env't Prot. Agency, No. 4:21-CV-00003-BMM, 2021 WL 270246 (D. Mont. Jan. 27, 2021).

Florida argues that Plaintiffs' injury is speculative because it is the result of independent action by third parties, relying on Arpaio v. Obama, 797 F.3d 11, 21 (D.C. Cir. 2015).  In Arpaio, a county sheriff sued to enjoin the Secretary of Homeland Security from enforcing two federal

programs.  The plaintiff argued that these programs would injure his office by increasing

unlawful entries into the country and, consequently, resources needed for immigration and

criminal enforcement.  Arpaio, 797 F.3d at 18.  The court held that the injury was speculative

because it "relie[d] on a predicted chain of events" set into motion by potential anticipated

reactions of undocumented immigrants abroad.  Id. at 15, 19.  The court held that plaintiff lacked

"standing to complain of harms by third parties the plaintiff expects will act in unreasonable

reliance on current governmental policies that concededly cannot benefit those third parties."  Id.

at 20.

     Here, the action to be taken by a third party is certain:  FDEP will administer the state

404 program to issue permits; those permits will cause wetlands destruction and will likely

impact protected species.  Moreover, the injuries to Plaintiffs began immediately, with the loss of

rights under NEPA.  The plaintiff's' injury in Arpaio, by contrast, was contingent on individual

actions premised on mistaken assumptions of the law, as well as the assumption that immigration

leads to an increase in crime.  Id.  But here, Plaintiffs' injury is a certain result of an agency's

continued operation of a program it has already begun to administer.

     Based on a clear misunderstanding of the relief sought, Florida argues that Plaintiffs have

also failed to show redressability.  Dkt. 37 at 43.  To be clear, Plaintiffs seek an order declaring

that EPA's transfer of authority based on an adjudicatory order was an unlawful ultra vires act

which must be set aside.  Such relief reinstates the status quo ante—no illegal transfer of the

program—thereby suspending the program and remedying the ongoing harms Plaintiffs are

suffering from it.  This gives EPA the opportunity to properly promulgate and codify a rule and,

more importantly, gives Plaintiffs to seek, and EPA the ability to entertain, an administrative stay

pending judicial review, reconsideration of its decision, or a stay pursuant to the Klain

Memorandum.  Florida overlooks all of this with its myopic contention that codification would not stop Florida's unlawfully authorized program.

      4.      **The Statute in Question Are Intended to Protect Plaintiffs' Interests.**

Plaintiffs also satisfy the prudential "zone of interests" test as they can easily show that they were meant to be protected by the statute in question.  For APA challenges, the test can be satisfied by showing that plaintiff is (1) "among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute," or (2) "a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further ... statutory objectives." Scheduled Airlines Traffic Off., Inc. v. U.S. Dep't of Def., 87 F.3d 1356, 1359 (D.C. Cir. 1996) (alterations in original) (citations omitted).  The test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff'" and "the benefit of any doubt goes to the plaintiff." Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012).  Indeed, the test is not "especially demanding" and can be satisfied by "even a slight indicia" that the statute was intended to protect Plaintiffs' interest.  See id.; Alaska Excursion Cruises, Inc. v. United States, 603 F. Supp. 541 (D.D.C. 1984).

The statute in question in this APA claim is the Federal Register Act.  44 U.S.C. §§ 1507, 1510(a), 1505(a)(2); 5 U.S.C. §§ 551(4)–(5), 553; 1 C.F.R. §§ 5.5, 18.20(a)(1), 21.1(a)–(b), 21.16(a)(3), 21.20(a)–(b).  Florida complains that this provision only "speaks to" the Administrative committee of the Federal Register and the President and does not even "hint" that codification requirements are designed to protect Plaintiffs' interests.  Dkt. 37 at 42.  But this overlooks the very purpose of the Act and codification.  Section 1505(a)(2) requires the publication of agency documents having general applicability and legal effect in the Federal Register.  Section 1510 provides that the Code of Federal Regulations will compile agency

documents "having general applicability and legal effect ... [that] are relied upon by the agency

as authority for, or are invoked or used by it in the discharge of, its activities or functions, and

are in effect as to facts arising on or after dates specified by the Administrative Committee."  44

U.S.C. § 1510(a).  The provision continues that the codified documents and those published as

amendments to them in the Federal Register "shall be prima facie evidence of the text of the

documents and of the fact that they are in effect on and after the date of publication."  Id. §

1510(e).  Accordingly, amendments to the Code of Federal Regulations must be published in the

Federal Register.  It also informs the public, and the agency, of the agency's regulations that are

in effect.[33]  Moreover, whereas here existing federal regulations control dredge and fill activities

in Florida waters, and those rules have never been amended or repealed, the Act establishes that

existing, codified regulations bind that behavior.  44 U.S.C. § 1510(e); Am. Min. Cong., 995

F.2d at 1109; Marseilles, 345 F.3d at 920; Friends of Animals, 961 F.3d at 1205; Nolan, 44 Fed.

Cl. at 58.  The Act also makes clear that if a regulation has not been filed for publication it is

invalid against any person without actual notice.  44 U.S.C. § 1507(4).

The unambiguous intent is to provide the public with notice of properly promulgated

regulations.  Indeed, this was the very reason for the Act's creation.  See Randy S. Springer,

Gatekeeping and the Federal Register: An Analysis of the Publication Requirement of Section

552(a)(1)(D) of the Administrative Procedure Act, 41 Admin. L. Rev. 533, 535–37 (1989) ("The

legislative history of the APA emphasizes that the essential function of the Federal Register is to

provide notice of government regulations.").  Agencies are not at liberty to hide what the law is

---

[33] See also 44 U.S.C. § 1507(1), (4) (purpose of publishing documents with general applicability
and legal effect is to give "notice of the contents of the document to a person subject to or
affected by it" and that "publication in the Federal Register of a document creates a rebuttable
presumption . . . it was duly issued, prescribed, or promulgated . . . and that all requirements of
this chapter and the regulations prescribed under it relative to the document have been complied
with.").

by failing to publish their rules.  See, e.g., Burkey v. Marberry, 556 F.3d 142, 145 (3d Cir. 2009) (agency could not avoid publishing rule in Federal Register).  Notice to all interested parties of environmental regulations is essential to allow protected parties as well as regulated parties to be informed and act accordingly to protect their interests.

Here, Plaintiffs have not received actual notice of what the approved program contains. Although EPA and Florida point to published state regulations, it is not at all clear that these reflect the entirety of the approved program, as the state's application contained additional components that are not reflected in state regulations.  Website postings purportedly linking to other portions of the program are a weak substitute for actual notice to the public, where there is no official place containing all components of the program that EPA deems to be part of the approved program.  See, e.g., 33 C.F.R. §§ 233.70–71 (listing the state statutes and regulations, other federal and state statutes, memoranda of agreement, and statements of legal authority which all comprise the approved program, and therefore collectively govern dredge and fill activities in that state).  For example, even the Pre-Publication Notice fails to specify whether the technical assistance process generally described in the programmatic biological opinion is part of the approved state program because that notice would incorporate only documents "submitted as part of the original application" to EPA.  Pre-Publication Notice.[34]  The programmatic biological opinion (which describes the technical assistance process) was not completed until *after* the public comment period closed on the application.  Dkt. 31 at 10–12.[35]  More importantly, Plaintiffs' organizational harms continue to occur and their procedural rights continue to be

---

[34] Although EPA has claimed that the programmatic biological opinion is not part of the state program, there can be no dispute that the state program refers to a technical assistance process (that is described in that biological opinion), which due to lack of codification, has an uncertain legal status.

[35] This issue goes to the merits.  Dkt. 1 at 25–27 (Complaint ¶¶ 104–17).

foreclosed while the state program is allowed to operated without a binding, legally effective rule modifying existing federal regulations.  Dkt. 31 at 35–49.  These harms prevent Plaintiffs from ensuring the state and federal agencies will protect their interests and their member's interests to the full extent intended by Congress.  Am. Inst. of Certified Public Accts. v. Internal Revenue Serv., 746 Fed. App'x 1, 6 (D.C. Cir. 2018) (protected parties include those who "have the incentive to ensure that the agency protects them to the full extent intended by Congress").

Even if actual notice were found under these facts, Plaintiffs are still being harmed by the operation of a program that was not codified, because until or unless the federal regulations are modified, Plaintiffs should have the benefit of the pre-existing legal regime.  Additionally, as the Court of Appeals for the Third Circuit recognized, the Code of Federal Regulations is "intended to give general public rights of access," especially those who by profession must have access to the law.  Cervase v. Off. of the Fed. Reg., 580 F.2d 1166, 1172 (3d Cir. 1978) (Act clearly intended to benefit practicing attorney who must advise others of their legal rights).  As in Cervase, Plaintiffs must have access to these laws in order to protect their mission and interests, including educating members on what the state program entails.  Certainly, Plaintiffs interests do not frustrate the Act's statutory objection and in fact are perfectly aligned.  See Scheduled Airlines Traffic Offices, 87 F.3d at 1359.

**5.  Plaintiffs Have Suffered Procedural Harms Due to EPA's Failure to Codify.**

Should the failure to codify be more appropriately treated as a procedural right, Plaintiffs have likewise made the requisite showing.  As to the showing of injury, for the reasons stated directly above, Plaintiffs have specified the harms that they suffered from EPA's failure to codify, which undermine their ability to protect their institutional and members' interests in species, wetlands, and the environment.  See also Dkt. 31 at 33-40, 43–48, 45–49.  That some harms also flow from other unlawful pieces of Florida's program does not render Plaintiffs'

47

injuries here inadequate.  Rather, the fact Plaintiffs' harms also flow from EPA's substantive

decisions helps satisfy the causation requirement for procedural injuries.

Indeed, the core standard for a procedural-rights plaintiff is to show a "causal connection

between the government action that supposedly required the disregarded procedure"—i.e.,

EPA's approval required codification to modify existing regulations—"and some reasonably

increased risk of injury to its particularized interest."  Fla. Audubon Soc., 94 F.3d at 664.  As

discussed above, this standard does not require proof that the omitted procedure would have

affected the substantive action.  Dania Beach, 485 F.3d at 1186; Sugar Cane Growers, 289 F.3d

at 94–95; Idaho, 35 F.3d at 591.  As Plaintiffs have shown, there has been a procedural omission,

there are harms that flow from said procedural omission, and there are harms that flow from

EPA's substantive decision; they have more than met this standard.

While rightfully acknowledging that Claim 9 is not the typical procedural injury, EPA

relies on City of Waukesha, where the court expounds upon the general causation standard when

applying it to the archetypal, *pre-decisional* procedural right.  320 F.3d at 234; Dkt. 34 at 22.

The court in City of Waukesha, as do other courts facing such rights, describes an "adequate

causal chain" to include a showing that the omitted procedure may have caused the substantive

action to be wrongly decided.  320 F.3d at 234.  By their very nature, such procedures *must* occur

before the agency's substantive action thereby allowing such a showing.  EPA argues that due to

the chronological order of more common procedural rights like notice-and-comment or failure to

perform a required analysis, no post-decisional procedures could ever amount to a procedural

right.  Dkt. 34 at 22.  This is patently incorrect.  Plaintiffs need only point to the procedural right

afforded under Section 553(d) that has been recognized by courts for decades.  More

importantly, neither EPA nor Florida points to any case that holds that post-decisional procedural

rights must show the exact causal chain as a pre-decisional right.  To the contrary, courts have allowed plaintiffs seeking to restore post-decisional procedural rights without finding an issue with causation or demanding this standard.  <u>See</u> <u>e.g.</u>, <u>Ngou</u>, 535 F. Supp. at 1217–18 (granting prospective relief to plaintiff for thirty-day delay claim without discussion of causation); <u>Lewis-Mota</u>, 469 F.2d at 482 (same).

EPA and Florida also fail to acknowledge what Plaintiffs have shown: "that government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff."  <u>Fla. Audubon Soc.</u>, 94 F.3d at 664.  Plaintiffs do not allege a generalized grievance, nor a mere procedural violation without resulting in concrete harms.  <u>See</u> <u>Lujan</u>, 504 U.S. at 573, n.8.  Plaintiffs' concrete interests have been affected.  "Although some sort of connection between the procedural requirement at issue and the substantive action of the agency must be shown, the Supreme Court has held that this requirement is not very stringent."  <u>Waukesha</u>, 320 F.3d at 234.

Finally, Florida complains that Plaintiffs fail to discuss how the alleged procedural right is "designed to protect their [or their members'] threatened concrete interest."  Dkt. 37 at 42.[36] As discussed above, Plaintiffs unquestionably fall within the zone of interest of the Federal Register Act as evidenced by its own plain terms.

---

[36] While arguing this is a procedural right, Florida cites <u>Center for Law and Education v. Department of Education</u> for the proposition that procedural rights plaintiffs must show procedure was designed to protect threatened concrete interest.  396 F.3d 1152, 1157(D.C. Cir. 2005).  To the extent Florida attempts to rely on this case for more than legal principles, it is unpersuasive.  There, advocacy groups were found to be outside the scope of No Child Left Behind Act which seeks to protect the interests of parents, children, and teachers.  <u>Id.</u>  This is readily distinguishable for the Federal Register Act's purpose to provide notice to all.

## III.    INTERVENORS' MOTION TO DISMISS LACKS MERIT.

### A.    Florida's Objections to Plaintiffs' Standing on All Claims Lack Merit.

Florida urges the Court to dismiss Plaintiffs' complaint in its entirety on the basis of standing.  Plaintiffs must show the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation."  Lujan, 504 U.S. at 561.  At the motion to dismiss stage, the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim."  Id.[37]  Florida's arguments fail.

### 1.    Plaintiffs Have Associational Standing Because They Face a Substantial Risk of Harm.

Florida argues that Plaintiffs' injury is speculative, and therefore insufficient to establish standing.  Dkt. 37 at 50–53.  But in fact, Plaintiffs have established that EPA's approval of Florida's program creates a "substantial risk" of harm to their interests.  Clapper, 568 U.S. at 414 n.5; Dkt. 31 at 33–51.  Florida is already considering approving several permits that would injure Plaintiffs—including permits for projects on the Northern District Wastewater Treatment plant, the Burnett Oil Company drilling operation in the Big Cypress National Preserve, Troyer Mine, and State Road 836.  As of this filing, Florida has noticed one of the permits of concern for a thirty-day public comment period, the final step before the state agency may issue the permit.  Exhibit 1 at 1–2 (Crooks Dec. ¶¶ 4–8).  And Plaintiffs have shown that the identified projects would concretely harm their members' interests.  Dkt. 31 at 35–40.  See Lujan, 504 U.S. at 562–

---

[37] As the parties know, Plaintiffs will seek to amend the complaint to add ESA claims that will become ripe once sixty days have passed from Plaintiffs' notice of intent to sue.  16 U.S.C. § 1540(g)(2)(A); Dkt. 1 at 27, n.1.  Plaintiffs submitted the notice of intent to sue to EPA on March 31, 2021, making those claims justiciable beginning on or about May 30, 2021.  To the extent the Court finds deficiencies related to standing as to Claims One through Seven, Plaintiffs respectfully request leave to address those matters in conjunction with these amendments.

63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); Sierra Club v. Jewell, 764 F.3d 1, 6 (D.C. Cir. 2014) ("impairment of the affiant's ability to enjoy the 'natural vistas' of the nearby hills from her own home, regardless of the absence (or existence) of any legal right on her part to view or make an entry onto the nearby hills" is sufficiently concrete for injury-in-fact (citing Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 715 (D.C. Cir. 1988))); id. (citing Cantrell v. City of Long Beach, 241 F.3d 674, 681 (9th Cir. 2001) (stating that "[i]f an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact")).

Florida argues that Plaintiffs' injury is speculative, however, because, "[w]hen considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." Dkt. 37 at 50, 52–53 (citing Arpaio v. Obama, 797 F.3d 11, 21 (D.C. Cir. 2015)). But, as discussed in further depth above, this case is distinguishable from Arpaio. Arpaio's injury was contingent on predicted individual actions premised on mistaken assumptions of the law. Here, the action to be taken by a third party is certain: FDEP will administer the state 404 program to issue permits. Plaintiffs' injury is a certain result of an agency's continued operation of a program it has already begun to administer.

Additionally, contrary to Florida's arguments, Dkt. 37 at 51, Plaintiffs have alleged facts to show that the state would be more likely to grant applications that would harm Plaintiffs' interests: Florida's program weakened the environmental protections of the federal 404 program, which allows the state to approve permits that should not be authorized under federal law. See Dkt. 1 at 27–35 (Complaint ¶¶ 118–161). For example, the state's program fails to satisfy the

404(b)(1) Guidelines requirement to ensure there will be no jeopardy to listed species prior to the

issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act

Guidelines.  40 C.F.R. §§ 233.15(g), 230.10(b)(3).  FDEP is currently considering permits that

would jeopardize listed species and, therefore, should not be authorized under federal law.  The

Troyer Mine Project would destroy 214 acres of wetlands that are part of a conservation area to

protect Lee County's shallow aquifers.  Dkt. 31-1 at 13–16 (Crooks Dec. at ¶¶ 37–47).  Ninety

percent of the project site is in Primary Zone habitat for the critically endangered Florida

panther, meaning it is habitat essential for the continued survival and recovery of the species.  Id.

at 12–13 (Crooks Dec. at ¶ 39).  The project would also significantly increase truck trips to and

from the site, and vehicular collisions are one of the primary risks for panther survival.  Id. at

13–14 (Crooks Dec. at ¶¶ 39–40).  FDEP is also considering a permit for an expansion of the

Northern District Wastewater Treatment plant in North Miami.  This project would clear 17

acres of wetlands and mangroves.  Dkt. 31-3 at 15–18 (Silverstein Dec. at ¶¶ 36–44).

Mangroves provide critical habitat for several protected species in Southeast Florida, including

the eastern brown pelican, wood stork, manatee, and American crocodile.  Id. at 11–12

(Silverstein Dec. at ¶ 28).  Additionally, FDEP is considering a permit application for the State

Road 836 (Dolphin Expressway Extension), which would jeopardize several listed species,

including the wood stork, the Eastern indigo snake, and the Florida bonneted bat.  Dkt. 31-2 at

15 (Umpierre Dec. at ¶ 40).

> **2.      Plaintiffs Have Organizational Standing Because They Undertook Expenditures in Response to, and to Counteract, the Effects of EPA's Approval of Florida's Assumption Program.**

Plaintiffs have organizational standing because EPA's actions "perceptibly impaired"

their ability to conduct their core programs and resulted in a "consequent drain on the

organization[s'] resources."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).  As a

result of EPA's approval, Plaintiffs had to re-allocate staff time towards gathering hard to obtain information on new and transferred 404 permit applications.  See Nw. Immigrant Rights, 2020 WL 5995206, at *5–6; Dkt. 31 at 40–42.

Florida fails to offer any evidence controverting Plaintiffs' declarations.  Instead, the state argues that the stated injuries are speculative based on a mischaracterization of case law.  Florida argues that Plaintiffs' past and future expenditures are speculative because the state has not (yet) issued a 404 permit that will harm Plaintiffs, including during the thirty-day window.  Dkt. 37 at 54–55.  Therefore, according to Florida, any injury is "manufacture[d]" and a result of "preemptively address[ing] unrealized harm based on their fear of Florida's possibly unfavorable future adjudications."  Dkt. 37 at 35, 54–55.  In other words, Plaintiffs "could have chosen not to respond."  Equal Rts. Ctr. v. Post Properties, Inc., 633 F.3d 1136, 1140 (D.C. Cir. 2011).

But the D.C. Circuit's organizational standing analysis does not depend on the "voluntariness or involuntariness of the plaintiffs' expenditures."  Id.  Instead, the Circuit "focus[es] on whether [the plaintiffs] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [unlawful acts] rather than in anticipation of litigation."  Id.  Here, in direct response to EPA's approval of Florida's program, Plaintiffs diverted resources to investigate the countless state 404 permit applications that were immediately transferred to the state as a way of furthering their organizational mission to protect species and wetlands.  See People for the Ethical Treatment of Animals ("PETA") v. U.S. Dep't of Agric., 797 F.3d 1087, 1095 (D.C. Cir. 2015); Dkt. 31 at 40–42.

Florida also argues that Plaintiffs failed to show that they diverted resources as a result of EPA's approval of the state program because Plaintiff Conservancy of Southwest Florida ("Conservancy") previously spent resources opposing the assumption.  Dkt. 37 at 36, 54.  This

argument fails.  Once Florida's program became effective, Conservancy diverted additional resources to determine how the program would function and how to engage in the state process on specific permits.  Dkt. 31 at 41–42.  Whether or not Plaintiffs had advance notice that EPA's approval would be effective immediately upon publication of its notice (which they did not),[38] they diverted resources as a result of the new program.  Indeed, Plaintiffs could not have known too much earlier, since EPA only announced its approval decision three business days before publishing the "applicable immediately" notice in the Federal Register.

### 3.  Plaintiffs Alleged Cognizable Organizational Injuries Due to Loss of Information.

As demonstrated in Plaintiffs' motion, Plaintiff organizations have been denied access to critical environmental information provided as part of a federal agency's NEPA analysis and ESA consultation, which Plaintiffs use to educate the public and to advocate for protections for wetlands and species.  Dkt. 31 at 45–46.[39]  Thus, as a result of EPA's actions, Plaintiff organizations have been harmed because they must now divert their resources to obtain this information by other means, as possible.

Florida cites EPIC to argue that Plaintiffs have not suffered organizational harm due to this loss of information, but the test it relies upon has no bearing on Plaintiffs' organizational harm.  Dkt. 37 at 56 (citing Elec. Priv. Info. Ctr. ("EPIC") v. Presidential Advisory Comm'n on

---

[38] Plaintiffs were not the only ones caught off guard that EPA would decide to circumvent the law so as to give immediate effect to its approval.  The same day EPA released its Pre-Publication Notice with an immediate effective date, the state program administrator apologized to staff that the transfer would happen "a lot earlier" than the agency had anticipated.  See Exhibit 1 at 2–3 (Crooks Dec. ¶¶ 9–12).

[39] NEPA also provides another avenue for advocating for wetlands and challenging section 404 permits.  40 C.F.R § 1503.1(a)(2)(v); Reed v. Salazar, 744 F. Supp. 2d 98, 110 (D.D.C. 2010) (APA provides "cause of action" for NEPA challenges).  And NEPA provides opportunities for Plaintiffs to engage in the decision-making process, including shaping the issues to be evaluated in an environmental impact statement.  40 C.F.R. §§ 1503.1(a)(2)(v), 1501.9.

Election Fraud, 878 F.3d 371 (D.C. Cir. 2017)).  The D.C. Circuit applies the EPIC test to assess

informational standing and the PETA test to assess organizational standing where the injury is a

loss of information.  See Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget, 358 F. Supp. 3d 66,

77 (D.D.C. 2019) (distinguishing between informational standing and organizational standing

where the injury is a loss of information); Ctr. for Biological Diversity v. U.S. Dep't of State,

No. CV 18-563 (JEB), 2019 WL 2451767, at *3 (D.D.C. June 12, 2019) (discussing difference

between informational injury test under EPIC and organizational injury test under PETA).  The

relevant rules and analysis to assess Plaintiffs' organizational standing is PETA, 797 F.3d at

1093–97, which Plaintiffs discuss at great length in their motion and below.  Dkt. 31 at 45–46.[40]

        Even if the Court were to apply the EPIC standards to assess informational loss as it

relates to Plaintiffs' organizational injuries, Florida's arguments fail for five reasons.  First,

despite Florida's contention that the ESA does not require disclosure of information to the

general public, Dkt. 37 at 56, the provisions Florida cites do not show ESA information need not

be released.  16 U.S.C. § 1536 (outlining the general procedure for federal ESA consultation); 50

C.F.R. § 402.14 (same).  Instead, the ESA implementing agencies' long-standing interpretation

and practice under the ESA show that the statute's implementing agencies regularly release

federal consultations to the public, including via websites with biological opinions dating back

---

[40] Even if Plaintiffs were subject to the EPIC informational injury test, and even if they could not
satisfy the test, Plaintiffs still have organizational standing due to suffering other, non-
informational injuries.  See Dkt. 31 at 40–45, 47–48.  The plaintiffs in EPIC, in contrast, alleged
theory of organizational injury based exclusively on informational injury, failed to show the lack
of information caused its injuries, failed to show the document sought would contain the
information it needed, and failed to show that injury was not self-inflicted.  See EPIC, 878 F.3d
at 378–79.

decades.[41]  Additionally, the results and analysis of ESA consultations are closely tied to NEPA

information, which clearly must be released to the public, because the Services' regulations

require that biological opinions be incorporated into NEPA analyses.  50 C.F.R. § 402.06(b);

U.S. Fish & Wildlife Serv., ESA Section 7 Consultation Handbook 88.[42]  In addition to being

disclosed through NEPA and USFWS' established practice, the information contained within

biological opinions must also be disclosed through the Freedom of Information Act ("FOIA").

See Ctr. for Biological Diversity v. U.S. Marine Corps, No. CIV 00-2387 (TFH), 2005 WL

3262901, at *3 (D.D.C. Sept. 19, 2005) (final ESA analysis must be disclosed under FOIA); Pub.

Citizen v. U.S. Dep't of Just., 491 U.S. 440, 449 (1989) (finding informational injury where

Federal Advisory Committee Act information was subject to FOIA disclosure); Ethyl Corp. v.

U.S. Env't Prot. Agency, 306 F.3d 1144, 1147–48 (D.C. Cir. 2002) (finding standing where

plaintiff was deprived of information developed under the Clean Air Act that would have been

disclosed through APA rulemaking procedures).[43]

    Second, Florida's contention that Plaintiffs are not harmed because EPA's approval is not

subject to NEPA, Dkt. 37 at 56, is irrelevant because the Corps' issuance of 404 permits (when

---

[41] Biological Opinions, Nat'l Marine Fisheries Serv.,
https://www.fisheries.noaa.gov/national/endangered-species-conservation/biological-opinions
(last visited May 17, 2021); ECOS/Services/Descriptor/Data Explorer, Section 7 Consultation
Issued Biological Opinions, U.S. Fish & Wildlife Serv., https://ecos.fws.gov/ecp/report/adhoc-
creator?catalogId=species&reportId=bo&columns=%2Fbo@activity_codes,final_date,activity_ti
tles,lead_agencies&sort=%2Fbo@final_date%20asc (last visited May 17, 2021).
[42] https://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited May
17, 2021).
[43] Because the information at issue here is subject to disclosure by law through NEPA and FOIA,
our case is distinguishable from Center for Biological Diversity v. Bernhardt, 442 F. Supp. 3d
97, 107–12 (D.D.C. 2020).  Moreover, unlike that case, Plaintiffs here have alleged with
specificity the harm this lack of information has and will have on Plaintiff organizations.  Dkt. 31
at 45–46.

the federal government rather than a state administers 404) is *subject to NEPA* and those processes and analyses are regularly made public. Dkt. 31 at 45–46.

Third, Florida puts great weight on the fact that some federal actions are categorically exempt from NEPA review.[44] Dkt. 37 at 56. That an agency may sometimes use a categorical exclusion for its actions does not affect the harms Plaintiffs allege because the type of major actions with which Plaintiffs are regularly engaged are not the type normally excluded under the Corps' NEPA regulations, nor would those exclusions likely apply to the specific state permits addressed in Plaintiffs' declarations. Compare 33 C.F.R. § 230.9 with Dkt. 31-1 at 12–25 (Crooks Dec. ¶¶ 36–73).

Fourth, Florida argues that some state permitting projects may still require NEPA analysis where a separate federal action beyond a 404 permit is required. Dkt. 37 at 56 (suggesting the Troyer Mine project may need separate federal authorization). However, that statement alone, without support or authority, fails to rebut in any meaningful way the examples provided by Plaintiffs' declarations to show Plaintiffs' organizational harms. And Florida fails to support its statement that the Troyer Mine project would be subject to NEPA, or identify what the NEPA review entail and for what federal action. Id. at 56.

Fifth, Florida erroneously contends that Congress did not intend NEPA to provide information to the public for them to educate and advocate using that information, Dkt. 37 at 56–57, citing the oft cited "twin aims" of NEPA. Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, 462 U.S. 87, 97–98 (1983) (discussing Congress' intent in terms of the sufficiency of a NEPA

---

[44] Florida's cases simply stand for the proposition that to comply with NEPA, agencies complete one of the three types of NEPA documents: an environmental assessment, an environmental impact assessment, or a categorical exclusion. Am. Rivers v. Fed. Energy Regul. Comm'n, 895 F. 3d 32, 49–50 (D.C. Cir. 2018); Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 504 (D.C. Cir. 2010).

analysis); U.S. Dep't of Transp. v. Pub. Citizen, Inc., 541 U.S. 752, 754 (2004) (NEPA's purpose is to ensure "the public receives information so it may also play a role in the decisionmaking process"). However, NEPA's "declaration of purpose" explicitly states the goal of "enrich[ing] the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. Accord 40 C.F.R § 1506.6 (requiring public involvement and information sharing). As a result, courts have explained that NEPA's twin aims ensure that an agency action's "environmental consequences, and the agency's consideration of them, are disclosed to the public." See, e.g., Sierra Club v. Fed. Energy Regul. Comm'n, 867 F.3d 1357, 1367 (D.C. Cir. 2017); WildEarth Guardians v. Bureau of Land Mgmt., 8 F. Supp. 3d 17, 23 (D.D.C. 2014) (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).

### 4. Plaintiffs' Harms Parallel Those Alleged in PETA.

Beyond merely asserting it, Florida has failed to demonstrate how PETA is "meaningfully" different from this case and therefore not binding upon this court as to standing. See Dkt. 37 at 58–59. Plaintiffs in the present case have demonstrated the same or substantially similar types of organizational harms as the plaintiff in PETA, warranting a finding of standing here. See PETA, 797 F.3d 1087; Dkt. 31 at 42–48.

Just as the organizational plaintiff in PETA had to divert resources to "research the labyrinth of local and state ... statutes, regulations, and policies" to counteract the defendants' inaction, Plaintiffs here were forced to divert resources to research the labyrinth of state regulations, policies, handbooks, technical assistance process, and an incomplete and obtuse state permit database, all because of the immediate and unlawful program transfer. Compare PETA, 797 F.3d at 1095–96 with Dkt. 31 at 42–44. Just as the plaintiff in PETA was denied information critical to their organizational mission because of defendants' inaction, Plaintiffs here have lost crucial environmental information to educate the public and to advocate for

58

wetlands and species protections because of the immediate and unlawful program transfer.

Compare PETA, 797 F.3d at 1095 with Dkt. 31 at 45–46. And just as the defendants' inaction in

PETA precluded the plaintiff from "its normal process" of submitting complaints, Plaintiffs here,

because of the immediate and unlawful program transfer, face such significant procedural and

financial barriers to state permit litigation that they are effectively precluded from pursuing legal

advocacy in furtherance of their organizational mission. Compare PETA, 797 F.3d at 1094–97

with Dkt. 31 at 47–48.

In its attempt to distinguish PETA, Florida argues that Plaintiffs "cannot show EPA's

approval entirely precludes Plaintiffs from accessing federal court related to FDEP-issued

Section 404 permits." Dkt. 37 at 58.[45] EPA's transfer of authority to the state necessarily means

that Plaintiffs must now challenge the issuance of state permits in state court. Any suggestion

that Plaintiffs would be able to challenge in federal court a state agency's decision to issue a state

permit for violations of state laws is unsupported by law. Basic principles of federalism are not

reasonably subject to dispute.

Florida argues that the loss of federal court access could have been "the result of the laws

governing State assumption as set by Congress" had EPA lawfully transferred the program to the

state. See id. at 58–59. But the point is that EPA *unlawfully* transferred the Section 404 permit

program to the state. And therefore Plaintiffs are deprived of rights to which they are otherwise

entitled. That includes access to federal courts, access to NEPA, and access to the ESA.

---

[45] Florida also contends Plaintiffs failed to show how subjection to the state's restrictive court system imposes additional costs and limits access, Dkt. 37 at 48, but that argument fails as discussed above.

Therefore, the harms Plaintiffs have and will suffer regarding loss of federal court access are the direct result of EPA's *unlawful* actions and not the result of United States law.[46]

Despite <u>PETA</u>'s clear connection to the facts in this case, Florida suggests that Plaintiffs failed to experience a loss of information because that information is obtained through NEPA and the ESA, rather than the Clean Water Act.  <u>Id.</u> at 59.  This argument is unavailing, however, because it is a federal agency's consideration of a Clean Water Act permit that *triggers* NEPA and the ESA for purposes of that permit application.  42 U.S.C. § 4332 (NEPA applies to "major Federal actions"); 16 U.S.C. § 1536 (ESA applies to "Federal agencies"); <u>Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs</u>, 401 F.Supp.2d 1298 (S.D. Fla. 2005) (finding Corps' 404 permit required NEPA analysis).  <u>See, e.g.</u>, <u>Citizens Alert Regarding the Env't v. U.S. Env't Prot. Agency</u>, 259 F. Supp. 2d 9, 18 (D.D.C. 2003), <u>aff'd sub nom.</u> <u>Citizens Alert Regarding Env't v. U.S. Env't Prot. Agency.</u>, 102 F. App'x 167 (D.C. Cir. 2004) (NEPA does not apply to state Clean Water Act Section 402 permit).  Because Plaintiffs used that information in their core mission work of educating the public, advocating against harmful projects, and seeking a means to redress wetlands losses and impacts to species, EPA's action has deprived Plaintiffs of the information on which it routinely relies.  Plaintiffs will now be forced to expend resources to try to obtain comparable information.  These injuries to Plaintiffs parallel those alleged by the plaintiff organization in <u>PETA</u>.  <u>Compare</u> <u>PETA</u>, 797 F.3d at 1096 <u>with</u> Dkt. 37 at 59.

---

[46] Indeed, Florida argues Plaintiffs' access to court is not more restricted partly based on their misstatement of the law.  Dkt. 37 at 48.  Florida claims Section 403.412, Florida Statutes, will guarantee permit challengers to have to only meet the Federal standing requirements.  Florida fails to disclose, or realize, that permit challenges are sought pursuant to Section 120.569, Florida Statutes, which has no such language and per case law makes clear a more demanding standard is necessary.  Dkt. 31 at 22.  Section 403.412 ony applies to suits to force the agency to enforce its rules or suits to enjoin third parties from violating the rules.

Florida argues Plaintiffs "completely fail" to establish the diversion of organizational resources because Plaintiffs have diverted resources towards its opposition on the state's unlawful assumption of the 404 program. Dkt. 37 at 59. However, nothing in <u>PETA</u> requires Plaintiffs to provide a numerical estimate of the amount of money they will be required to expend to "hire experts" to provide the information usually provided by agency experts through NEPA and the ESA. Plaintiffs have shown that without "vital" NEPA information, they will either "lose the expert analysis," "be required to expend more staff time," or hire experts costing "thousands of dollars" that would otherwise go towards their programmatic goals. Dkt. 31-8 at 5–6 (Rinaman Dec. ¶ 19–20). <u>See also</u> Dkt. 31-3 at 11 (Silverstein Dec. ¶ 25) (detailing diversion of resources); Dkt. 31-5 at 8–9 (Hartl Dec. ¶ 26) (same); Dkt. 31-1 at 27 (Crooks Dec. ¶ 77) (same); Dkt. 31-2 at 18–19 (Umpierre Dec. ¶ 50) (same). As such, Plaintiffs have shown that they have expended—and must continue to expend—resources due to EPA's unlawful transfer of the Section 404 program to Florida. <u>PETA</u>, 797 F.3d at 1097.

**B.      Florida Attempt to Conflate Standing with Merits Issues Should Be Rejected.**

Florida argues that Plaintiffs lack standing on all claims based on its position that Florida's program "provides robust environmental protection with extensive Federal oversight and involvement, hereby imposing no actual concrete injury to Plaintiffs as compared to the pre-approval status quo." Dkt. 37 at 45–50. Florida also argues that there is no direct conflict between EPA's approval of Florida's program and Plaintiffs' respective organizational missions because EPA's approval merely transferred authority to Florida to "administer its substantively equivalent program." <u>Id.</u> at 54. But of course whether the state program is legally sufficient under federal law is at issue in this litigation. Florida concedes that a conflict could occur if FDEP implements its program "in a way that allegedly provides less substantive protection than the Corps' implementation would have." <u>Id.</u> These arguments go to the merits of several of

61

Plaintiffs' claims—particularly the claim that Florida's program weakened and is not as stringent as environmental protections in violation of the Clean Water Act, 33 U.S.C. § 1344, and the APA, 5 U.S.C. § 706(2).

Florida's arguments that conflate standing and merits issues should be rejected.  "Indeed, in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."  City of Waukesha, 320 F.3d at 235.  Assuming that Plaintiffs would be successful in their claims, Florida's program causes concrete injury to Plaintiffs in two primary ways.  First, it injures Plaintiffs' aesthetic, recreational, and other interests.  Second, it injures Plaintiffs' organizational interests in protecting waters of the United States, including wetlands, and the threatened and endangered species which rely on them.  See City of Waukesha, 320 F.3d at 235 (procedural harm); Dkt. 1 at 27–35 (Complaint ¶¶ 118–161).

Even if the Court were to consider Florida's arguments, Florida's argument fails because it mischaracterizes the facts of this case.  Florida argues that Plaintiffs lack standing because EPA's approval of Florida's assumption application has no relevant legal consequences, relying on Brownlee.  Dkt. 37 at 44 (Crow Creek Sioux Tribe v. Brownlee, 331 F.3d 912 (D.C. Cir. 2003)).  In Brownlee, the Tribe sued to enjoin the implementation of a federal water resources management statute, which would use a memorandum of agreement to transfer federal Pick-Sloan lands from the Corps to the State of South Dakota.  The court held that the Tribe lacked standing because "the transfer effect[ed] no legal change that would lessen the protection of the Tribe's cultural heritage under federal law," including that the Corps would retain all jurisdiction over cultural protection statutes that it held prior to the transfer, and that the Corps would have undiluted enforcement power.  Id. at 917.

The same is not true here.  Unlike in <u>Brownlee</u>, Florida will administer its program "*in lieu* of the permitting program implemented by the Corps," and "[t]he Corps will *not* be responsible for enforcing against unauthorized discharges of dredged or fill material in violation of the CWA which occur in State assumed waters after the effective date of assumption." Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army, July 31, 2020, A.R. 0019 at 1 (emphasis added).  EPA's action also changed EPA's role in protecting Florida's waters by waiving EPA's review of numerous permit categories.  Memorandum of Agreement between the Florida Department of Environmental Protection and the U.S. Environmental Protection Agency, July 31, 2020, A.R. 0018 at 5–6. Furthermore, unlike in <u>Brownlee</u>, where the same substantive law was enforced before and after the transfer, Florida's assumption program is substantively different from—and less protective than—the law that applied before the transfer, namely the federal 404 program.  See <u>Brownlee</u>, 331 F.3d at 917; Dkt. 1 at 27–35 (Complaint ¶¶ 118–161).

## C. Section 404's "Deemed Approved" Language Does Not Moot Plaintiffs' Other Claims or Affect Their Redressability.

Florida also urges the Court to dismiss all of Plaintiffs' claims as "moot" and not redressable because if the Court vacates EPA's approval, the state contends that Florida's program will be "deemed approved" by operation of law.[47]  Dkt. 37 at 60–67.[48]  Florida cites a provision of the Clean Water Act that provides that if EPA fails to act on a state 404 application

---

[47] Florida also argues Claim 9 will be moot "in the immediate future" based on a Pre-Publication Notice issued on January 14, 2021.  Dkt. 37 at 33–34 (citing Pre-Publication Notice).  EPA, the agency in charge of whether that notice is published, has said nothing to that effect.  Notably, the Pre-Publication Notice has been on EPA's website for more than four months since the new administration took office.  Speculation about some future action is insufficient to moot a claim.  More importantly, the notice itself states the intention to publish an "adjudicatory order," not a rule.  Therefore, even if said publication occurs it will fail to moot Plaintiffs' claims.
[48] Amici echo this argument in their brief, and their argument fails for the same reasons.  Dkt. 38-1 at 8.  As Plaintiffs have noted, Claims 8 and 9 do not seek vacatur of EPA's approval.

within 120 days of receiving a complete submission, the application is deemed approved.  33

U.S.C. § 1344(h)(3).  However, if the Court were to vacate EPA's approval, this would not mean

that the agency had never acted.  It did act, and that action is the basis for this litigation.

Moreover, vacatur would likely be premised on a finding that EPA's approval of the state

program was unlawful which, in turn, would likely mean that the state program was unlawful for

purposes of Section 404 of the Clean Water Act.  Florida cites no authority for the notion that a

program found to be illegal by a federal court could then spring back to life as though the same

program submission was "complete" in compliance with federal law and as though the agency

had never acted.  Florida's outlandish position is not support by the statute, legislative history, or

common sense.

　　　　To begin, the 120-day timeframe for EPA to act on a state assumption application only

begins once a complete and adequate state application has been received by EPA.  Section

404(g)(1) requires states to submit a "full and complete description of the program it proposes to

establish and administer under State law."  33 U.S.C. § 1344(g)(1); 40 C.F.R. § 233.15(a).  This

description must include a statement that "the laws of the State … provide adequate authority to

carry out the described program."  33 U.S.C. § 1344(g)(1).  Within 120 days after EPA receives

such a program application, it must decide whether the program satisfies the statutory and

regulatory requirements to take over the 404 program.  Id. § 1344(h)(1).  Therefore, the trigger

for the 120-day period is not just the receipt of an application, but the receipt of a "full and

complete" application that provides that the state can meet the requirements to take over the

Section 404 program.  Absent such an application, the 120-day period is not triggered.  A finding

by this Court that the EPA unlawfully approved the state program because it did not demonstrate

64

the ability to comply with federal law by necessity means that the application was not complete. 40 C.F.R. § 233.1(d).

Additionally, whether Florida's application was complete when submitted is at issue in this litigation. Dkt. 1 at 25–27 (Complaint ¶¶ 104–17). Plaintiffs' first claim for relief alleges that Florida's application was not, in fact, complete as of August 20, 2020; consequently, the 120-day statutory period was never properly triggered. Id. Whether Plaintiffs will ultimately prevail on that claim requires a decision on the merits of that claim and not a matter raised in this motion to dismiss. Indeed, should Plaintiffs succeed on either Claim 1 or Claim 2 (or both), the 120-day period was never lawfully triggered, and Florida's program cannot be "deemed approved."

Florida's argument also assumes that all Plaintiffs' claims would only result in vacatur of EPA's decision, but that is not necessarily the case. Claims 8 and 9, for example, challenge the immediate effective date of EPA's approval and failure to codify the approved program. Id. at 46–48 (Complaint ¶¶ 228–48). The relief sought there is procedural and does not require vacatur of EPA's approval.

Although Florida attempts to distinguish it, this case is similar to Amador County. Dkt. 37 at 62 (citing Amador Cty. v. Salazar, 640 F.3d 373 (D.C. Cir. 2011)). In that case, when the relevant statutory timeframe passed, the application was "deemed approved" only to the extent it was consistent with the law. Amador Cty., 640 F.3d 373, 382 (D.C. Cir. 2011). Similarly, here, the trigger for the 120-day timeframe in Section 404 is tied to substantive requirements that the state present a complete program and explain how it satisfies the statutory requirements to assume the Section 404 program. 33 U.S.C. § 1344(g)(1), (h). The plain language of Section 404 does not provide for *any* application to be deemed approved after 120 days. Instead, only a

complete and adequate application may be "deemed approved" after 120 days have passed, and the question of whether an application is complete and adequate would be reviewable.  Amador Cty., 640 F.3d at 380.

The legislative history does not change the analysis.  Although the 120-day provision aims to force EPA to act on complete and adequate state applications, it is a stretch to argue that Congress intended to "deem approved" a state application that is ruled insufficient or incomplete by a federal court.  None of the documents cited by Florida support this argument.  H. Rep. No. 95-830, 101 (1977), reprinted in 1977 U.S.C.C.A.N. 4424[49] (merely reciting in simpler terms the language in 33 U.S.C. § 1344(g), (h)); S. Rep. No. 95-370, at 358 (1977) (explaining that a state may assume authority of the 404 program as long as it is "in accord with the criteria and with guidelines comparable to those contained in … 404(b)(1)"); 122 Cong. Rec. S28,771-99, S28,774 (1976) (tying state program approval with the adequacy of the state program and its compliance with federal guidelines).[50]  Neither does Eagle-Picher dictate the result urged by Florida.  Eagle-Picher Indus., Inc. v. U.S. Env't Prot. Agency, 759 F.2d 905, 911 (D.C. Cir. 1985) (addressing timeliness requirements for litigation as intending to prevent courts from deciding disputes Congress has determined have been raised to late).

Florida erroneously suggests that an earlier version of the 120-day provision would have automatically permitted at least twenty-eight states to assume the 404 program, but the Congressional Report does not support that statement.  122 Cong. Rec. at S28,774.  And, of course, that never happened.  Instead, it merely explains that twenty-eight states had already assumed the Section 402 program, and that Congress anticipated that those same states "should"

---

[49] Florida appears to have miscited this report as 95-890.  Dkt. 37 at 64.
[50] https://www.govinfo.gov/content/pkg/GPO-CRECB-1976-pt22/pdf/GPO-CRECB-1976-pt22-6-1.pdf.

be able to do the same with Section 404.  Id.  Contrary to Florida's argument, Section 404 is designed so that EPA must decide whether a complete state program complies with the law, and if it fails to do so, the program is deemed approved.  33 U.S.C. § 1344(g); 40 C.F.R. § 233.15(a).  Section 402, by contrast, says that a state program shall be approved unless EPA determines that it does not comply with the law.  33 U.S.C. § 1342.  That Congress structured the approval mechanisms for these programs differently, means that Congress intended for them to operate differently.

None of the cases Florida cites would require the outcome the state advances, but instead deal with the effect that vacatur has on the precedential value and effect of civil and military court decisions.[51]  Therefore, even if EPA's decision is vacated and void, that does not mean that Florida's program would be deemed approved.

Moreover, nowhere in the plain text, statutory context, legislative history, or case law is there even a whisper that Congress contemplated or blessed the absurd situation Florida proposes:  that a court may not vacate an agency's unlawful approval of a legally insufficient state 404 program because if it were to, that program would become lawful by operation of the statute.  If that were what Congress had intended, there would not have been a need to set criteria or a process to consider the state program's sufficiency.  Whatever a state submitted would get approved either by EPA, or if successfully challenged, by the passage of time and operation of

_____

[51] Khadr v. United States, 529 F.3d 1112, 113, 1115–16 (D.C. Cir. 2008) (prior reversal of military judge's order made it a legal nullity divesting court of jurisdiction); Butler v. Eaton, 141 U.S. 240, 244 (1891) (court decision); Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1218 (11th Cir. 2009) (same); Animal Legal Def. Fund v. Veneman, 490 F.3d 725, 730 (9th Cir. 2007) (Thomas, J., concurring) (same).  None require that Florida's program would be deemed approved even if the Court finds it legally deficient and that it failed to meet federal standards.  Sprint Nextel v. FCC, 508 F.3d 1129, 1131–32 (D.C. Cir. 2007) (reviewability of agency's failure to act); AT&T Corp. v. Fed. Commc'n Comm'n, 369 F.3d 554, 556, 561–63 (D.C. Cir. 2004) (per curiam) (same); Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n, 839 F.3d 1165, 1168, 1172–74 (D.C. Cir. 2016) (same).

law.  Moreover, had EPA denied Florida's application, Florida could have challenged that decision and upon vacatur, the state program would similarly be deemed approved, a result that makes no sense.

Florida's remaining arguments as to mootness have no basis in the law and also rely on an alternative ending where EPA never acted on the state's application.[52]  And Florida's remaining redressability arguments similarly rely on the false premise that EPA never acted and/or find no support in the law.

Florida claims that remand would not redress Plaintiffs' injuries, contending that the Court may not order EPA to fix the problems with the state program.  First, as explained above, the Court can vacate EPA's decision.  Second, Florida's argument that EPA loses jurisdiction over a state application after 120 days, Dkt. 37 at 66, has no bearing on its ability to act on Florida's application on remand.  Again, Florida's arguments presuppose that Florida's application was, in fact, complete when submitted and that a federal court's ruling that EPA unlawfully granted that application has no legal effect.  And Gottlieb v. Pena does not support Florida's argument, because the court there held that the statutory deadline at issue did not revoke the agency's jurisdiction.  41 F.3d 730, 733, 737 (D.C. Cir. 1994).  Third, Florida's argument based on cases challenging an agency's *non-action* where such action is committed to agency discretion, have no bearing because EPA did act here.  Dkt. 37 at 67 (citing Huron v. Berry, 12 F. Supp. 3d 46 (D.D.C. 2013) (if agency has not acted, court can only mandate discrete or non-discretionary actions); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004)

---

[52] Florida's baseless argument that the outcome of a case can moot a live controversy, Dkt. 37 at 66, is contrary to the universal understanding that a case is mooted based on an event that occur *during the pendency of a case*, not after it has been decided.  See Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992).  Florida's argument that Plaintiffs could not challenge EPA's nonaction, Dkt. 37 at 66, has absolutely no bearing on whether Plaintiffs can maintain this action.  EPA acted, and final agency actions are subject to judicial review.

(same)).  Finally, the Court could order EPA to address the deficiencies in the program.  there is

precedent for courts remanding state programs to EPA without vacatur.  Idaho Conservation

League v. U.S. Env't Prot. Agency, 820 F. App'x 627, 628 (9th Cir. 2020) (remanding invalid

state 402 program to EPA to "promptly address" the program's deficiencies).  EPA has conceded

that reconsideration is an appropriate mechanism to modify a state Section 404 program.  Dkt. 34

at 32 n.9.

     As a final Hail Mary, Florida argues that if the Court does not vacate EPA's decision,

Plaintiffs' claims are not redressable because it is speculative that EPA would remedy its

unlawful approval through withdrawal.  Dkt. 37 at 67 (citing Lujan, 504 U.S. at 567).  However,

there is precedent for courts remanding state programs to EPA without vacatur.  Idaho

Conservation League, 820 F. App'x at 628 (remanding invalid state 402 program to EPA to

"promptly address" deficiencies).  And, if Plaintiffs prevail, that means EPA's unlawfully

approved an insufficient state program, making it a clear candidate for withdrawal, 40 C.F.R.

§ 233.53(b)(1), amendment, id. § 233.16(e), or reconsideration, 5 U.S.C. § 553(e).[53]  The

situation here is thus not Lujan, where the plaintiffs failed to identify a particular harm, 504 U.S.

at 567; Plaintiffs here have not made such vague allegations of harm, see Dkt. 31 at 32–51.

## CONCLUSION

     For these reasons, EPA's actions violated the APA because it was (1) "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right"; and (3) "without

observance of procedure required by law," and must be set aside.  5 U.S.C. § 706(2)(A), (C)–

---

[53] EPA has conceded that reconsideration is an appropriate mechanism to modify a state Section
404 program.  Dkt. 34 at 32 n.9.

(D).  Plaintiffs therefore respectfully request that the Court grant summary judgment in their favor on their Eighth and Ninth Claims for Relief.

Dated: May 24, 2021

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

* Appearing under LCvR 83.2(c)(1))

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of May 2021, I electronically filed the foregoing

document using the CM/Dkt. system. Service was accomplished by the CM/Dkt. system.


Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org