## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

     Plaintiffs,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY, et al.,

     Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

## SECOND DECLARATION OF AMBER CROOKS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Amber Crooks, make the following declaration:

1.     I am a resident of Naples, Florida.

2.     I am competent to make this declaration.  I provide this declaration based upon my personal knowledge.  I would testify to the facts in this declaration under oath if called upon to do so.

3.     I signed my first declaration in support of Plaintiffs' Partial Motion for Summary Judgment on March 5, 2021.  Dkt. 31-1.  I am providing a second declaration in support of Plaintiffs' Partial Motion for Summary Judgment to provide updates on events that have transpired since my prior declaration regarding the Fleischmann Development, Dkt. 31-1 at 21–22 (Crooks Dec. ¶¶ 67–70), as well as to provide supplemental information regarding my understanding and anticipation of when EPA would transfer the Section 404 program to the state.

4.     **Fleischmann Development (ST404_398942).**  This development was detailed in Dkt. 31-1 at 21–22 (Crooks Dec. ¶¶ 67–70).  As explained there, the Corps transferred the

application for this project to the Florida Department of Environmental Protection ("FDEP") on February 16, 2021. Id. at 21 (Crooks Dec. ¶ 67). Since my prior declaration, the following events have transpired:

5.      On March 17, 2021, FDEP submitted a Request for Additional Information to the applicant. Exhibit A. As detailed within the Request for Additional Information, FDEP's "desire [is] to provide prompt turnaround times on permit applications, and a quicker response to this RAI shortens the timeframe for which a final decision on the application can be made." Id.

6.      After 21 days, on April 7, 2021, the applicant responded to the Request for Additional Information. Exhibit B.

7.      On May 17, 2021, FDEP posted a public notice inviting comments on this proposed development. Exhibit C. The public notice details that the proposed project would destroy over 25 acres of wetlands and "may affect the eastern indigo snake and the Florida panther." Id. at 5.

8.      The public comment period on this development closes on June 16, 2021. Id. at 6. FDEP generally has 60 days from the close of the comment period (or its determination that the application is technically complete) to make a final permit decision. This means FDEP could decide to issue the permit for this project by August 15, 2021.

9.      **Effective Date:** Until the day before the publication of EPA's approval, Conservancy and I had not been anticipating that EPA would publish its approval on December 22, 2020. I also had not been anticipating that the transfer of the Section 404 to the State would be effective immediately. My understanding that the transfer would not occur until several weeks later was informed by emails with FDEP staff.

10.     On December 17, 2020, I emailed with Deputy Secretary John Truitt to discuss the anticipated date of the Federal Register notice expected to announce EPA's decision on Florida's submission package.  Exhibit D.  During that email conversation, I asked about the status of EPA's review of the state's program and was told that, although FDEP had not been informed of a particular date, that staff anticipated publication of the Federal Register notice in mid-January 2021.  Id.

11.     In a follow up email on December 21, 2020, Deputy Secretary John Truitt informed me that the Federal Register notice was scheduled for the following day.  Exhibit E.

12.     An email from one of the FDEP staff members leading the state's assumption process, Heather Mason, that was received in response to a public records request submitted by Earthjustice, indicates that the state also believed the effective date of the program would be later than December 22, 2020.  Exhibit F at 4.  The email was sent December 18, 2020, the Friday before EPA released its prepublication notice of its approval of the state program.  Id.  The email says,

> We just got our implementation date.  The effective date will be December 22, 2020.  I know this is a lot earlier than we discussed, and we will have some things to work out and discuss at today's meeting for sure.  I apologize that we were so wrong with our estimates.  I will explain later at our meeting.

Id.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21st day of May, 2021.

50496CAE7D21435...

Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
1495 Smith Preserve Way
Naples, Florida 34102



# FLORIDA DEPARTMENT OF
# Environmental Protection

South District
PO Box 2549
Fort Myers FL 33902-2549
SouthDistrict@FloridaDEP.gov

Ron DeSantis
Governor

Jeanette Nuñez
Lt. Governor

Noah Valenstein
Secretary

REQUEST FOR ADDITIONAL INFORMATION

March 17, 2021

Michael Elgin
Minto Sabal Bay, LLC
c/o Andy Woodruff
Passarella & Associates, Inc.
13620 Metropolis Ave., Suite 200
Fort Myers, FL 33912
andyw@passarella.net

Re:    First Request for Additional Information (RAI)
       Collier County – State 404
       Site Name: Isles of Collier Preserve
       Site ID: 398492
       DEP Application No.: 0398942-001 SFI

Dear Mr. Woodruff:

As of December 22nd, 2020, the Department assumed authority to implement the dredge and fill permitting program under Section 404 of the Clean Water Act for certain waters in the state (assumed waters). You were advised that your pending application with the U.S. Army Corps of Engineers (SAJ-2019-03152) would not be acted on and subsequently submitted a State 404 application to the Department on February 16, 2021.  A review of your State 404 application and supporting documentation indicates the application is incomplete.  Please provide the information in the attached document and refer to this RAI in your response.

To continue the processing of your application, the Department must receive a response within 90 days of this letter, June 15, 2021, unless a written request for additional time to provide the requested information is submitted and approved. It is the Department's desire to provide prompt turnaround times on permit applications, and a quicker response to this RAI shortens the timeframe for which a final decision on the application can be made. Pursuant to Rule 62-331, F.A.C and Section 120.60, F.S., failure of an applicant to provide timely requested information by the applicant deadline may result in denial of the application. You are encouraged to contact this office to discuss the items requested to assist you in developing a complete and adequate response.

Your processor, Curtis Hardman can be contacted at 239-344-5639, Curtis.Hardman@floridadep.gov. Please submit your response by email to SD_ERP_Permit@floridadep.gov, with a copy to Curtis.Hardman@floridadep.gov. If the submittal is very large, you may post it to a folder on this office's ftp site at: South District Incoming FTP site. After posting the submittal, send an e-mail to

Michael Elgin
 Page 2 of 2
March 17, 2021

SD_ERP_Permit@floridadep.gov, with a copy to Curtis.Hardman@floridadep.gov, alerting us that it
has been posted.


Sincerely,

Megan Mills
Permitting Program Administrator

*v. 1.9*

cc:


Attached: List of Requested Information
          FWC comments
          Seminole Tribe of Florida comments

**Attachment: List of Requested Information**

Michael Elgin
Site Name: Isles of Collier Preserve
Site ID: 398492
DEP Application No.: 0398942-001 SFI

1.  Please provide drawings signed and sealed by a Florida registered professional.  [62-331.053, F.A.C., 62-330.301(1)(i), F.A.C.]

2.  The proposed compensatory mitigation includes a conservation easement to be granted to the SFWMD and to the A.C.O.E. as a third-party beneficiary. The draft easement will need to be revised to include the Department as a Grantee and may require full review by the Department prior to acceptance. Please note that for the proposed mitigation bank credits, federal credits are required to offset impacts under the State 404 Program. Contact your Department processor if you have questions or need guidance. See also, State 404 Program Handbook, section 8.5 and A.H. Volume I, section 10.3.

3.  Please provide pre-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Department to send the public notice. Do not include a return address; it will be added by the Department. Envelopes should be #10 size and stamped with one, US Postal Service first-class forever stamp. [62-331.060(1)(c), F.A.C.]

4.  The proposed project has been sent to commenting entities for review and we are awaiting responses from the State Historic Preservation Office. The Department will forward any requests for additional information from these entities upon receipt. Such requests will become part of this request for additional information. [404 Handbook, section 5.2 and 62-331.051(4), F.A.C.

5.  The Seminole Tribe of Florida has provided comments related to historical resources for the proposed project site, which are attached. Please address this information request in your response.  [62-331.060(2)(a)7., F.A.C.]

6.  The Florida Fish and Wildlife Conservation Commission have provided comments on the application, provided in the attached email. No further action required at this time[404 Handbook, section 5.2 and 62-331.051(4), F.A.C].

7.  Although the wetland boundaries have been approved as part of a formal determination by the SFWMD, a Department CWE must conduct a site visit to verify the delineation of wetlands and other surface waters onsite in accordance with Chapter 62-340, F.A.C. and also to verify the UMAM analysis. Please contact your processor to schedule a site visit.

| From: | Murphy, Ashley |
|-------|----------------|
| To: | SD-ERPcomments |
| Cc: | Florida_404@fws.gov; Hight, Jason; Raininger, Christine |
| Subject: | RE: State 404 Permit App No. 398942-001 SFI Individual / Associated ERP Permit App No. 200724-3945 (Pending In-process SFWMD) / Collier County |
| Date: | Thursday, March 4, 2021 9:38:21 AM |

To the Florida Department of Environmental Protection,

Florida Fish and Wildlife Conservation Commission staff has reviewed the Minto Sabal Bay LLC, Isles of Collier Preserve Residential Development State 404 Program Application (No. 398942-001) for the proposed filling of state-assumed waters in order to construct a stormwater management system as preparation for a residential development in Collier County.

We do not have any questions or need any further information about the project. We are coordinating with the USFWS and developing the affected species list and anticipated effects determination statements for the Public Notice. We anticipate that permit conditions will be required, however final correspondence from FWC/USFWS will be provided during the public comment period.

Include the following to any RAI correspondence being sent to the applicant, and continue to send copies of the Department's RAI and applicant's responses to FWC:

- Note: The Department shall submit any changes to the scope or changes in the project design to FWC upon receipt for review and comment prior to the file being deemed administratively complete.

Sincerely,

Ashley E. Murphy
Biological Scientist IV
Land Use Planning Program
Office of Conservation Planning Services
Florida Fish & Wildlife Conservation Commission
386-867-0028
Isles of Collier Preserve Residential Development_43711

-----Original Message-----
From: Frame, Sierra <Sierra.Frame@floridadep.gov> On Behalf Of SD-ERPcomments
Sent: Friday, February 19, 2021 12:39 PM
To: CompliancePermits@dos.myflorida.com; Conservation Planning Services <conservationplanningservices@MyFWC.com>; Florida_404@fws.gov
Cc: Hardman, Curtis <Curtis.Hardman@FloridaDEP.gov>
Subject: State 404 Permit App No. 398942-001 SFI Individual / Associated ERP Permit App No. 200724-3945 (Pending In-process SFWMD) / Collier County

[EXTERNAL SENDER] Use Caution opening links or attachments

The attached State 404 Program application was submitted to the Submerged Lands and

Environmental Resources Program.  We are currently processing the request as required by Chapters 253, 258, and 373, F.S. This application is being submitted for your review and comment.

Applicant: MINTO SABAL BAY LLC

Project Name: Isles of Collier Preserve (404)

Permit Application Link: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_398942/gis-facility!search

Location Map Link (Clearly Depicting Project Boundaries): Attached

Project Location (such as GPS Coordinates, Township Rage Section (TRS), Street address, parcel ID, etc): 8665 BAYSHORE DR, NAPLES 34112; Parcel ID: VARIOUS PIDS ; Section Township Range: 23-50-25

Project Description: Construction and operation of a Stormwater management system serving 74.44 acres of residential development for a project known as Isles of Collier Preserve - Fleischmann Parcel. The proposed project is an expansion of the existing Basin 7, which was previously permitted as 10.25 acres.

Concurrent Review Information
Is the permit application being submitted for authorizations under both the State 404 program and ERP Program? No

The ERP application also requires FWC and SHPO Review: Yes

DEP requires your response in order to issue a permit. If you do not have adequate information to provide comments at this time, please return written questions and/or request for additional information by the below due date. The requested information will be incorporated into the DEP response to the applicant. If you have no questions at this time but require additional time to prepare final comments, please let us know you intend to provide comments.

DEP received the application information on 2-16-21. DEP must issue a response to the applicant within 30 days of receipt. Return your comments at least two days before the 30-day deadline to allow sufficient time for DEP to process the response.

Return your comments (referencing the applicants name and file number) to our office at the following email address: SD-ERPcomments@floridadep.gov If you have questions, please call me at 239-344-5600. Thank you [Dep Customer Survey]<http://survey.dep.state.fl.us/?refemail=Sierra.Frame@floridadep.gov>

**From:** Chase, Kelly L
**To:** Hardman, Curtis
**Subject:** FW: Florida DEP-State 404 Individual Permit Application No:398942-001 ; Collier County
**Date:** Thursday, March 11, 2021 2:20:48 PM

FYI

**From:** Danielle Simon <daniellesimon@semtribe.com>
**Sent:** Thursday, March 11, 2021 10:34 AM
**To:** Chase, Kelly L <Kelly.L.Chase@FloridaDEP.gov>
**Cc:** THPO Compliance <THPOCompliance@semtribe.com>
**Subject:** RE: Florida DEP-State 404 Individual Permit Application No:398942-001 ; Collier County



## SEMINOLE TRIBE OF FLORIDA
## TRIBAL HISTORIC PRESERVATION OFFICE

TRIBAL HISTORIC
PRESERVATION OFFICE

SEMINOLE TRIBE OF FLORIDA

30290 JOSIE BILLIE HIGHWAY
PMB 1004
CLEWISTON, FL 33440

THPO PHONE: (863) 983-6549
FAX: (863) 902-1117

THPO WEBSITE: WWW.STOFTHPO.COM

TRIBAL OFFICERS

MARCELLUS W. OSCEOLA JR.
CHAIRMAN

MITCHELL CYPRESS
VICE CHAIRMAN

LAVONNE ROSE
SECRETARY

PETER A. HAHN
TREASURER

March 11, 2021

Ms. Kelly L. Chase
ERP/404 Historical and Tribal Resources Coordinator
Florida Department of Environmental Protection
Kelly.L.Chase@FloridaDEP.gov
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400
Office: (850) 245-8580

Subject:  State 404 Individual Permit Application No: 398942-001; Isle of Collier Reserve Residential
Subdivision, Collier County
THPO Compliance Tracking Number:  0032943

In order to expedite the THPO review process:
1. Please correspond via email and provide documents as attachments,
2. Please send all emails to THPOCompliance@semtribe.com,
3. Please reference the THPO Compliance Tracking Number if one has been assigned.

Dear Ms. Chase,

Thank you for contacting the Seminole Tribe of Florida – Tribal Historic Preservation Office (STOF-THPO)

Compliance Section regarding the State 404 Individual Permit Application No: 398942-001; Isle of Collier Reserve Residential Subdivision, Collier County.

The proposed undertaking does fall within the STOF Area of Interest. We have reviewed the documents that you provided pursuant to Section 106 of the National Historic Preservation Act and its implementing authority, 36 CFR 800. In order for us to complete our review we would like to request the following:

- As no previous cultural resource investigations have been conducted within the project APE, and the general area is known to support cultural resources important to the Tribe, we respectfully request the APE be surveyed prior to ground disturbing activities to ensure potentially undocumented cultural resources that may exist within the project APE, including archaeological sites or burial resources, are not negatively impacted by the proposed undertaking.

Please feel free to contact us with any questions or concerns. Thank you!

Respectfully,
Danielle A. Simon, MA, RPA
Compliance Review Specialist
STOF-THPO, Compliance Review Section
30290 Josie Billie Hwy, PMB 1004
Clewiston, FL 33440
Email: daniellesimon@semtribe.com

---

**From:** State_404 <State_404@floridadep.gov>
**Sent:** Monday, February 22, 2021 5:03 PM
**To:** THPO Compliance <THPOCompliance@semtribe.com>
**Cc:** Chase, Kelly L <Kelly.L.Chase@FloridaDEP.gov>; SD-ERPcomments <SD-ERPcomments@dep.state.fl.us>; Hardman, Curtis <Curtis.Hardman@FloridaDEP.gov>
**Subject:** Florida DEP-State 404 Individual Permit Application No:398942-001 ; Collier County

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The Florida Department of Environmental Protection (DEP) received the enclosed State 404 permit application. Attached please find our agency's request for your review and comments.

Project Name: Isle of Collier Reserve residential subdivision
Project Location(s): Sections 23 and 26, Township 50, Range 25
Additional Application Materials: https://depedms.dep.state.fl.us:443/Oculus/servlet/shell?command=hitlist&[freeText=]&[folderName=]&[profile=Permitting_Authorization]&[creator=]&[entityType=any]&[createdDateTo=]&[catalog=45]&[searchBy=Profile]&[sortBy=Document+Date]&[createdDate=]&{County=_EQ_COLLIER}&{District=_EQ_SD}&{Facility-Site+ID=_EQ_ST404_398942}

Please return your comments, questions, or requests for additional information to SD-ERPcomments@dep.state.fl.us by March 17, 2021.In accordance with existing rules and regulations, this date represents 30 days from the date the application was received by DEP.

If you have any questions regarding this application and historic or cultural properties, please contact Kelly L.

Chase, Historic Resources Coordinator and Tribal Liaison, by phone at 850-245-8580 or by email at Kelly.L.Chase@floridadep.gov.



**State 404 Team**
Florida Department of Environmental Protection
Division of Water Resource Management
Submerged Lands & Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399
State_404@FloridaDEP.gov



| | |
|---|---|
| **From:** | SD_ERP_Permit |
| **To:** | Frame, Sierra |
| **Cc:** | Hardman, Curtis |
| **Subject:** | FW: Isles of Collier Preserve (FDEP No. 0398942-001 SFI) (PAI #04WCI1042) |
| **Date:** | Wednesday, April 7, 2021 8:56:19 PM |

Sierra, please download the response and handle for Curtis.

---

**From:** Pamela Zamora <pamelaz@passarella.net>
**Sent:** Wednesday, April 7, 2021 6:02 PM
**To:** SD_ERP_Permit <SD_ERP_Permit@dep.state.fl.us>
**Cc:** Hardman, Curtis <Curtis.Hardman@FloridaDEP.gov>; Michael Elgin (melgin@mintousa.com) <melgin@mintousa.com>; Andy Woodruff <andyw@passarella.net>
**Subject:** Isles of Collier Preserve (FDEP No. 0398942-001 SFI) (PAI #04WCI1042)

This is to report that responses to the FDEP Request for Additional Information dated March 17, 2021 were uploaded this date to the Department's FTP site, in the Passarella folder, in a subfolder labeled Isles of Collier Preserve Responses.  The civil plans prepared by Barraco and Associates, Inc. and referenced in the letter are not attached to the response  letter; they were submitted as a separate file.  Thank you.


Pam Zamora
Administrative Assistant
Passarella & Associates, Inc.
*Offices in Florida and South Carolina*
13620 Metropolis Avenue, Suite 200
Fort Myers, Florida  33912
Phone (239) 274-0067  Fax (239) 274-0069
www.passarella.net

Received
Electronically
April 7, 2021
South District



April 7, 2021


Florida Department of Environmental Protection
South District Office
Attention: Mr. Curtis Hardman
2295 Victoria Avenue, Suite 364
Fort Myers, Florida 33901


RE:    FDEP Application No. 0398942-001 SFI
       Collier County – State 404
       Site ID: 398492
       Site Name: Isles of Collier Preserve
       Project No. 04WCI1042

Dear Curtis,

Please consider this letter and supporting documents as response to the Florida Department of Environmental Protection (FDEP) Request for Additional Information dated March 17, 2021. The FDEP comments are provided in italics, followed by the Applicant's response.

1.  *Please provide drawings signed and sealed by a Florida registered professional. [62-331.053, F.A.C., 62-330.301(1)(i), F.A.C.]*

    **<u>Response</u>**
    Please see the Environmental Resource Permit Plans prepared by Barraco and Associates, Inc. which are being submitted with this response.

2.  *The proposed compensatory mitigation includes a conservation easement to be granted to the SFWMD and to the A.C.O.E. as a third-party beneficiary. The draft easement will need to be revised to include the Department as a Grantee and may require full review by the Department prior to acceptance. Please note that for the proposed mitigation bank credits, federal credits are required to offset impacts under the State 404 Program. Contact your Department processor if you have questions or need guidance. See also, State 404 Program Handbook, section 8.5 and A.H. Volume I, section 10.3.*

    **<u>Response</u>**
    The applicant is aware the South Florida Water Management District (SFWMD) and the FDEP are working on an accepted conservation easement form and anticipates its use when it becomes available. The applicant's mitigation reservation at Panther Island Mitigation Bank includes both state and federal mitigation credits.

Mr. Curtis Hardman
April 7, 2021
Page 2 of 3

3. *Please provide pre-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Department to send the public notice. Do not include a return address; it will be added by the Department. Envelopes should be #10 size and stamped with one, US Postal Service first-class forever stamp. [62-331.060(1)(c), F.A.C.]*

**Response**

Pre-addressed, stamped envelopes for each adjoining property owner are being mailed to the South District office for the FDEP's use.

4. *The proposed project has been sent to commenting entities for review and we are awaiting responses from the State Historic Preservation Office (SHPO). The Department will forward any requests for additional information from these entities upon receipt. Such requests will become part of this request for additional information. [404 Handbook, section 5.2 and 62-331.051(4), F.A.C.*

**Response**

The Cultural Resource Assessment Survey (CRAS) report prepared by Archaeological Consultants, Inc. and the subsequent letter of concurrence from the Division of Historical Resources SHPO are attached.

5. *The Seminole Tribe of Florida (STF) has provided comments related to historical resources for the proposed project site, which are attached. Please address this information request in your response. [62-331.060(2)(a)7., F.A.C.]*

**Response**

We have provided the CRAS report to the STF Tribal Historic Preservation Office. Their email reply stating they have no objections or comments is attached.

6. *The Florida Fish and Wildlife Conservation Commission have provided comments on the application, provided in the attached email. No further action required at this time[404 Handbook, section 5.2 and 62-331.051(4), F.A.C].*

**Response**

Acknowledged.

7. *Although the wetland boundaries have been approved as part of a formal determination by the SFWMD, a Department CWE must conduct a site visit to verify the delineation of wetlands and other surface waters onsite in accordance with Chapter 62-340, F.A.C. and also to verify the UMAM analysis. Please contact your processor to schedule a site visit.*

**Response**

A site visit was conducted with Curtis Hardman on April 1, 2021 to verify the wetland delineation and UMAM analysis.

Mr. Curtis Hardman
April 7, 2021
Page 3 of 3

Should you have any questions regarding this information and submittal items, please do not hesitate to contact me.

Sincerely,

PASSARELLA & ASSOCIATES, INC.

*P. Zamora*

for Andrew Woodruff
Vice President/Senior Ecologist

AW/pz

Enclosures

cc:   Michael Elgin w/enclosures
      Steve Lewis, w/enclosures

# CULTURAL RESOURCE ASSESSMENT SURVEY OF THE FLEISCHMANN ACQUISITION PARCEL COLLIER COUNTY, FLORIDA

**Performed for:**

**Minto Communities- USA**
**4280 Tamiami Trail East, Suite 203/204**
**Naples, Florida 34112**

**Prepared by:**



*Florida's First Choice in Cultural Resource Management*

**Archaeological Consultants, Inc.**
**8110 Blaikie Court, Suite A**
**Sarasota, Florida 34240**
**(941) 379-6206**

**December 2019**

# CULTURAL RESOURCE ASSESSMENT SURVEY
# OF THE FLEISCHMANN ACQUISITION PARCEL
# COLLIER COUNTY, FLORIDA

Performed for:

Minto Communities- USA
4280 Tamiami Trail East, Suite 203/204
Naples, Florida 34112

Conducted by:

Archaeological Consultants, Inc.
8110 Blaikie Court, Suite A
Sarasota, Florida 34240

Marion Almy - Project Manager
Maranda Kles - Project Archaeologist
Garth Kaulens - Archaeologist

December 2019

# EXECUTIVE SUMMARY

Archaeological Consultants, Inc. (ACI) conducted a Cultural Resource Assessment Survey (CRAS) of the Fleischmann Acquisition Parcel for Minto Communities. The project Area of Potential Effect (APE) is approximately 101 acres in size and is located in western Collier County. The APE is located west of Tamiami Trail at the end of Bayshore Drive.

The purpose of this investigation was to locate and identify any cultural resources within the project APE and to assess their significance in terms of eligibility for listing in the National Register of Historic Places (NRHP). As defined in 36 CFR Part § 800.16(d), the APE is the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." Based on the scale and nature of the activities, the project has a limited potential for any indirect (visual or audible) or cumulative effects outside the immediate footprint of construction. Therefore, the APE was limited to the footprint of proposed activities within the existing boundaries of the project. The archaeological and historical field surveys, completed in November 2019, were conducted as due diligence. All work was carried out in accordance with Section 106 of the National Historic Preservation Act of 1966, as amended, and its implementing regulations in 36 CFR Part 800: Protection of Historic Properties, and in conformity with the standards contained in the FDHR's Cultural Resource Management Standards and Operational Manual (FDHR 2003). The resulting survey and report meets specifications in Chapter 1A-46, Florida Administrative Code (FAC), and complies with Chapters 267 and 373, Florida Statutes (FS), as well as Florida's Coastal Management Program. Principal Investigators meet the Secretary of the Interior's Historic Preservation Professional Qualification Standards (48 FR 44716) for archaeology, history, architecture, architectural history, or historic architecture.

Archaeological background research, including a review of the Florida Master Site File (FMSF) and the NRHP, indicated that no previously recorded archaeological sites are located within the APE, however, thirteen sites have been recorded within one mile. A review of relevant site locational information for environmentally similar areas within Collier County indicated a moderate to high potential for prehistoric and/or historic archaeological sites. The background research also indicated that sites, if found would be small campsites (lithic or artifact scatters) or black dirt middens. As a result of visual reconnaissance and subsurface testing, including the excavation of 93 shovel test pits, no archaeological sites were discovered.

A review of the FMSF and the NRHP, indicated that no historic structures (50 years of age or older) had been previously recorded within the APE. In addition, review of the United States Geological Survey (USGS) Naples South quadrangle maps (USGS 1958a, 1958b), the 1954 soil survey (United States Department of Agriculture [USDA] 1954), the 1947 Copeland map (Copeland 1947), and property appraiser's data (Skinner 2019), as well as other pertinent documents and maps, indicated no potential for historic structures. As a result of field survey, no historic structures were found.

Given the results of background research and field survey, the development of the Fleischmann Acquisition Parcel APE will have no effect on any archaeological sites or historic resources that are listed, determined eligible, or which appear to be potentially eligible for listing in the NRHP.

# TABLE OF CONTENTS

**1.0  INTRODUCTION** ......................................................................................................**1-1**
  1.1  Project Description ...........................................................................................1-1
  1.2  Purpose .............................................................................................................1-1
**2.0  ENVIRONMENTAL SETTING** .............................................................................**2-1**
  2.1  Project Location ...............................................................................................2-1
  2.2  Physiography and Geology ..............................................................................2-4
  2.3  Soils and Vegetation........................................................................................2-4
  2.4  Paleoenvironmental Considerations ................................................................2-6
**3.0  CULTURE HISTORY** .............................................................................................**3-1**
  3.1  Paleo-Indian ....................................................................................................3-2
  3.2  Archaic Period .................................................................................................3-2
  3.3  Glades ..............................................................................................................3-3
      3.3.1  Ten Thousand Islands ..........................................................................3-4
  3.4  Colonialism .....................................................................................................3-5
  3.5  Territorial and Statehood.................................................................................3-6
  3.6  Civil War and Aftermath .................................................................................3-8
  3.7  Twentieth Century..........................................................................................3-10
  3.8  Project Area....................................................................................................3-13
**4.0  RESEARCH CONSIDERATIONS AND METHODS** ...........................................**4-1**
  4.1  Background Research and Literature Review ...................................................4-1
      4.1.1  Archaeological Considerations .............................................................4-1
      4.1.2  Historical Considerations .....................................................................4-6
  4.2  Field Methodology ..........................................................................................4-7
  4.3  Inadvertent/Unanticipated Discoveries ...........................................................4-7
  4.4  Laboratory Methods/Curation .........................................................................4-8
**5.0  SURVEY RESULTS AND RECOMMENDATIONS** .............................................**5-1**
  5.1  Archaeological Results.....................................................................................5-1
  5.2  Historical Results .............................................................................................5-3
  5.3  Conclusions ......................................................................................................5-3
**6.0  BIBLIOGRAPHY** ....................................................................................................**6-1**

**APPENDIX**    Survey Log

## LIST OF FIGURES, TABLES, AND PHOTOGRAPHS

**Figure**

Figure 1.1.  Location of the project APE.......................................................................1-2
Figure 2.1.  Environmental setting of the APE..............................................................2-3
Figure 2.2.  Soil types within the APE. .........................................................................2-5
Figure 3.1.  Florida Archaeological Regions.................................................................3-1
Figure 3.2.  1876 Plat of the APE..................................................................................3-9
Figure 3.3.  1962 and 1995 aerial photographs of the APE.........................................3-14
Figure 4.1.  Location of previously recorded archaeological site within one mile of the APE.........4-2
Figure 4.2.  Distribution of sites by elevation (ft amsl)................................................4-4
Figure 5.1.  Location of the shovel tests within the APE. ..............................................5-2


**Table**

Table 2.1.  Soil types within the APE. ...........................................................................2-5
Table 4.1.  Archaeological sites recorded within one mile the APE................................4-1
Table 4.2.  Surveys conducted within one mile the APE. ...............................................4-3
Table 4.3.  Distribution of sites by water type and distance...........................................4-4
Table 4.4.  Distribution of sites by drainage and soil types. ..........................................4-5


**Photo**

Photo 2.1.  Looking west at typical conditions found the southern portion of the APE with black mangrove. .......................................................................................2-1
Photo 2.2.  Looking north at melaleuca wetlands in the south to central portion of the APE..........2-2
Photo 2.3.  Example of dense vegetation in central portion of APE. ...............................2-2
Photo 2.4.  Example of conditions in the northern portion of the APE............................2-4
Photo 5.1.  Example of shovel test with water intrusion at approximately 60 cmbs in central upland area. ....................................................................................5-1
Photo 5.2.  Shovel test in wet area.................................................................................5-3

# 1.0 INTRODUCTION

## 1.1    Project Description

Archaeological Consultants, Inc. (ACI) conducted a Cultural Resource Assessment Survey (CRAS) of the Fleischmann Acquisition Parcel for Minto Communities. The project Area of Potential Effect (APE) is approximately 101 acres in size and is located in western Collier County. The APE is west of Tamiami Trail at the end of Bayshore Drive (**Figure 1**). The intended use of the parcel is residential development.

## 1.2    Purpose

The purpose of this investigation was to locate and identify any cultural resources within the project APE and to assess their significance in terms of eligibility for listing in the National Register of Historic Places (NRHP). As defined in 36 CFR Part § 800.16(d), the APE is the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." Based on the scale and nature of the activities, the project has a limited potential for any indirect (visual or audible) or cumulative effects outside the immediate footprint of construction. Therefore, the APE was limited to the footprint of proposed activities within the existing boundaries of the project. The archaeological and historical field surveys, completed in November 2019, were conducted as due diligence. All work was carried out in accordance with Section 106 of the National Historic Preservation Act of 1966, as amended, and its implementing regulations in 36 CFR Part 800: Protection of Historic Properties, and in conformity with the standards contained in the FDHR's Cultural Resource Management Standards and Operational Manual (FDHR 2003). The resulting survey and report meets specifications in Chapter 1A-46, Florida Administrative Code (FAC), and complies with Chapters 267 and 373, Florida Statutes (FS), as well as Florida's Coastal Management Program. Principal Investigators meet the Secretary of the Interior's Historic Preservation Professional Qualification Standards (48 FR 44716) for archaeology, history, architecture, architectural history, or historic architecture.

Background research preceded the field investigations. Such work provided both an informed set of expectations concerning the kinds of cultural resources that might be anticipated to occur within the project APE, as well as a basis for evaluating any new sites discovered.





**Figure 1.1.** Location of the project APE.



Received
Electronically
April 7, 2021
South District

## 2.0  ENVIRONMENTAL SETTING

Environmental factors such as geology, topography, relative elevation, soils, vegetation, and water are important in determining where archaeological sites are likely to be located. These variables influenced what types of resources were available in a given area, which in turn influenced decisions regarding settlement location and land-use patterns. Because of the influence of these environmental factors upon the inhabitants, a discussion of the environment is included.

### 2.1  Project Location

The approximately 101-acre APE lies in Sections 23 and 26 of Township 50 South, Range 25 East (United States Geological Survey [USGS] Naples South) in Collier County, Florida. The Gulf of Mexico is about 1.5 miles to the west. Historically, the APE and surrounding area is identified as pine flatwoods (Davis 1967). Today, the southern portion of the APE consists of is a brackish water estuary with black mangroves that eventually phases into flooded melaleuca wetlands with sparse pine and Brazilian pepper this continues to the north with dense areas of bay berry and pine (**Photo 2.1**). A few trails were observed throughout the APE, otherwise no ground disturbance were noted.



**Photo 2.1.** Looking west at typical conditions found the southern portion of the APE with black mangrove.

Received
Electronically
April 7, 2021
South District



**Photo 2.2.** Looking north at melaleuca wetlands in the south to central portion of the APE.



**Photo 2.3.** Example of dense vegetation in central portion of APE.

Received
Electronically
April 7, 2021
South District



**Figure 2.1.** Environmental setting of the APE.





**Photo 2.4.** Example of conditions in the northern portion of the APE.

## 2.2    Physiography and Geology

According to White (1970), Collier County is included in the Southern, or Distal, Physiographic Zone and more specifically within the Southwestern Slope, the most prominent geomorphic feature of the county. The Southwestern Slope has an average elevation of less than 8 meters (m) (25 feet [ft]) above mean sea level (amsl), with a southwesterly drainage. The APE lies at an elevation of between 0 to 5 ft amsl. The APE is underlain by the Tamiami formation, which is surficially evidenced by limestone (Scott 1978, 2001; Scott et al. 2001).

## 2.3    Soils and Vegetation

According to the U.S. Department of Agriculture (USDA), the APE is situated within the Holopaw-Malabar-Basinger-Immokalee and Durbin-Wulfert-Canaveral associations. The former is characterized as nearly level, poorly drained, sandy soils on flatwoods and in sloughs, with natural vegetation of South Florida slash pine, scrub cypress, cabbage palm, saw palmetto, waxmyrtle, sand cordgrass, pineland threeawn, gallberry, panicum and chalky bluestem. The latter is characterized as nearly level, very poorly drained and moderately well drained soils in tidal areas and low, narrow ridges with natural vegetation of mangroves, cabbage palms, coconut palms, seagrapes, and various grasses and shrubs (USDA 1998). The soil types information and location within the APE are found **Figure 2.2** and **Table 2.1.**

**Table 2.1.** Soil types within the APE.

| SOIL TYPE & SLOPE | DRAINAGE | ENVIRONMENTAL SETTING |
|---|---|---|
| Basinger fine sand | Poor | Sloughs and poorly defined drainageways |
| Boca, Riviera, limestone sub., and Copeland fine sand, depressional | Very poor | Depressions, cypress swamps, and marshes |
| Estero and puckish soils, freq. flooded | Very poor | Frequently flooded tidal marshes |
| Immokalee fine sand | Poor | Flatwoods |
| Pomello fine sand | Moderately well | Low ridges on flatwoods |





**Figure 2.2.** Soil types within the APE.

## 2.4     **Paleoenvironmental Considerations**

The early environment of the region was different from that seen today. Sea levels were lower, the climate was arid, and fresh water was scarce. An understanding of human ecology during the earliest periods of human occupation in Florida cannot be based on observations of the modern environment because of changes in water availability, botanical communities, and faunal resources. Aboriginal inhabitants would have developed cultural adaptations in response to the environmental changes taking place, which were then reflected in settlement patterns, site types, artifact forms, and subsistence economies.

Due to arid conditions between 16,500 and 12,500 years ago, the perched water aquifer and potable water supplies were absent (Dunbar 1981:95). Palynological studies conducted in Florida and Georgia suggest that between 13,000 and 5000 years ago, this area was covered with an upland vegetation community of scrub oak and prairie (Watts 1969, 1971, 1975). However, the environment was not static. Evidence recovered from the inundated Page-Ladson Site in north Florida has clearly demonstrated that there were two periods of low water tables and dry climatic conditions and two episodes of elevated water tables and wet conditions (Dunbar 2006b).

By 5000 years ago, a climatic event marking a brief return to Pleistocene climatic conditions induced a change toward more open vegetation. Southern pine forests replaced the oak savannahs. Extensive marshes and swamps developed along the coasts and subtropical hardwood forests became established along the southern tip of Florida (Delcourt and Delcourt 1981). Northern Florida saw an increase in oak species, grasses, and sedges (Carbone 1983). At Lake Annie, in south central Florida, pollen cores were dominated by wax myrtle and pine. The assemblage suggests that by this time, a forest dominated by longleaf pine along with cypress swamps and bayheads were present (Watts 1971, 1975). About 5000 years ago, surface water was plentiful in karst terrains and the level of the Floridan aquifer rose to 1.5 m (5 ft) above present levels. With the establishment of warmer winters and cooler summers than in the preceding early Holocene, the fire-adapted pine communities prevailed. These depend on the high summer precipitation caused by the thunderstorms and the accompanying lightning strikes to spark the fires (Watts et al. 1996; Watts and Hansen 1994). The increased precipitation also resulted in the formation of the large swamp systems such as the Okefenokee and Everglades (Gleason and Stone 1994). After this time, modern floral, climatic, and environmental conditions began to be established.



Received
Electronically
April 7, 2021
South District

# 3.0 CULTURE HISTORY

In general, archaeologists summarize the culture history of a given area, that is, an archaeological region, by delineating a sequence of developments to provide a chronology for an archaeological culture that is present in a given geographical area. As a result, archaeological cultures are defined largely in geographical terms but also reflect shared environmental and cultural factors. The APE is situated in the Ten Thousand Islands archaeological region according the Carr and Beriault (Carr and Beriault 1984; Griffin 1988), whereas Milanich's model refers to this area as the Glades archaeological region with the Ten Thousand Islands identified as a subregion (Milanich 1994:277) (**Figure 3.1**). It should be noted that the Ten Thousand Islands regional assignment is one of several competing interpretations for the area, and Griffin (1988) supplies an excellent discussion of alterative groupings. Although models, by definition, are generalizations, the Ten Thousand Islands model appears to provide a better explanatory model for what is known of the prehistory of the project area.



**Figure 3.1.** Florida Archaeological Regions.

The Ten Thousand Islands or Glades region is better understood after the introduction of pottery (ca. 500 BCE [Before Common Era]). Prior to this, regional characteristics of native populations are not easily identified, as malleable materials such as textiles and basketry, which lend themselves to cultural expression, are typically destroyed by environmental processes. With the arrival of pottery, the clay medium provided both a means of cultural expression and an archaeologically durable artifact. Thus, the use of pottery as a marker of cultural diversity probably post-dates the inception of distinct Florida cultures by many centuries.

The local history of the region is divided into four broad periods based initially upon the major governmental powers. The first period, Colonialism, occurred during the exploration and control of

Florida by the Spanish and British from around 1513 until 1821. At that time, Florida became a territory of the United States and 21 years later became a State (Territorial and Statehood). The Civil War and Aftermath (1861-1899) period deals with the Civil War, the period of Reconstruction following the war, and the late 1800s, when the transportation systems were dramatically increased and development throughout the state expanded. The Twentieth Century period has subperiods based on important historic events such as the World Wars, the Boom of the 1920s, and the Depression. Each of these periods evidenced differential development and utilization of the region, thus effecting the historic archeological site distribution.

## 3.1    Paleo-Indian

Current archaeological evidence indicates that the earliest human occupation of the Florida peninsula dates back some 13,500 years ago or ca. 11,500 BCE (Widmer 1988). The earliest occupation is referred to as the Paleo-Indian (or Paleoindian) period and lasted until approximately 7000 BCE. During this time, the climate of South Florida was much drier than today. Sea level was 80 to 130 m (260-425 ft) lower than present and the coast extended approximately 160 (kilometer [km]) (100 miles) seaward on the Gulf coast. With lower sea levels, today's well-watered inland environments were arid uplands (Milanich 1994). Lake Okeechobee, the Caloosahatchee, Myakka, and Peace Rivers, the Big Cypress, and the Everglades were probably dry. Because of drier global conditions and little or no surface water available for evaporation, Florida's rainfall was much lower than at present (Milanich and Fairbanks 1980). Potable water was obtainable at sinkholes where the lower water table could be reached. Plant and animal life were also more diverse around the oases that were frequented by both people and game animals (Milanich 1994; Widmer 1988).

The prevailing environmental conditions were largely uninviting to human habitation during this time (Griffin 1988:191), and given the inhospitable climate, it is not surprising that the population was sparse and sites are uncommon. Exceptions include two sites in Sarasota County, Little Salt Springs (Clausen et al. 1979) and Warm Mineral Springs (Clausen et al. 1975a, 1975b; Cockrell and Murphy 1978) and one site in Date County – the Cutler Fossil Site, (Carr 1986).

Archaeologists hypothesize that this period was characterized by small groups utilizing a hunting and gathering mode of subsistence. Dunbar (2006a:540) suggests that Paleo-Indians identified and migrated to "unexploited resource-rich areas" of food. Permanent sources of water, scarce during this time, were very important in settlement selection as well (Daniel and Wisenbaker 1987). This settlement model, often referred to as the Oasis Hypothesis (Milanich 1994:41), has a high correlation with geologic features in southern Florida such as deep sink holes like those noted in Sarasota and Dade Counties. Sites of this period are most readily identified based on distinctive lanceolate shaped stone projectile points including those of the Simpson and Suwannee types (Bullen 1975). The tool assemblage also included items manufactured of bone, wood, and very likely leather, as well as plant fibers (Clausen et al. 1979).

## 3.2    Archaic Period

The succeeding Archaic Period is divided into the Early Archaic (ca. 7000 to 5000 BCE), Middle Archaic (ca. 5000 to 2000 BCE), and the Late Archaic (ca. 2000 to 500 BCE). According to Widmer (1988), the extreme aridity of the south Florida region during the Early Archaic Period may have caused the abandonment of the area. Sites of this time are rare in southwestern Florida.

Around 4500 BCE, marked environmental changes occurred, which had profound influence upon human settlement and subsistence practices. Humans adapted to this changing environment and

regional and local differences are reflected in the archaeological record (Russo 1994a, 1994b; Sassaman 2008). Among the landscape alterations were rises in sea and water table levels that resulted in the creation of more available surface water. It was during this period that Lake Okeechobee, the Everglades, the Big Cypress, and the Caloosahatchee and Peace Rivers developed. In addition to changed hydrological conditions, this period is characterized by the spread of mesic forests and the beginnings of modern vegetation communities including pine forests and cypress swamps (Griffin 1988; Widmer 1988).

The archaeological record for the Middle Archaic is better understood. Among the material culture inventory are several varieties of stemmed, broad blade projectile points including those of the Newnan, Levy, Marion, and Putnam types (Bullen 1975). At sites where preservation is good, such as sinkholes and ponds, an elaborate bone tool assemblage is recognized along with shell tools and complicated weaving (Beriault et al. 1981; Wheeler 1994). In addition, artifacts have been found in the surrounding upland areas. Along the coast, excavations on both Horr's Island in Collier County and Useppa Island in Lee County (Milanich et al. 1984; Russo 1991) have uncovered pre-ceramic shell middens that date to the Middle Archaic period. The Horr's Island shell ring is accompanied by at least three ceremonial mounds. Large architectural features such as these were designed to divide, separate, and elevate above other physical positions within the settlement as a reflection and reinforcement of the social segmentation of the society (Russo 2008:21).

Mortuary sites, characterized by interments in shallow ponds and sloughs as discovered at the Little Salt Springs Site in Sarasota County (Clausen et al. 1979) and the Bay West Site in Collier County (Beriault et al. 1981), are distinctive of the Middle Archaic. Pre-ceramic cultural horizons beneath tree island sites have been reported in the eastern Everglades (Carr and Beriault 1984; Mowers and Williams 1972; Schwadron 2005). Population growth, as evidenced by the increased number of Middle Archaic sites and accompanied by increased socio-cultural complexity, is assumed for this time (Milanich and Fairbanks 1980; Russo 1994b, 2008; Widmer 1988).

The beginning of the Late (or Ceramic) Archaic Period is similar in many respects to the Middle Archaic but includes the addition of ceramics. The earliest pottery in the south Florida region is fiber-tempered (Orange Plain and Orange Incised), as represented at sites on Key Marco (Cockrell 1970; Widmer 1974). Projectile points of the Late Archaic are primarily stemmed and corner-notched, and include those of the Culbreath, Clay, and Lafayette types (Bullen 1975). Other lithic tools of the Late Archaic include hafted scrapers and ovate and triangular-shaped knives (Milanich and Fairbanks 1980). Archaeological evidence indicates that south Florida was sparsely settled during this time with only a few site recorded.

## 3.3    Glades

The termination of the Late or Ceramic Archaic corresponds to a time of environmental change. The maturing of productive estuarine systems was accompanied by cultural changes leading to the establishment of what John Goggin originally defined as the "Glades Tradition" (Griffin 1988:133). The Glades Tradition was characterized by "the exploitation of the food resources of the tropical coastal waters, with secondary dependence on game and some use of wild plant foods. Agriculture was apparently never practiced, but pottery was extensively used" (Goggin 1949:28). Unlike much of peninsular Florida, the region does not contain deposits of chert, and as such stone artifacts are rare. Instead of stone, shell and bone were used as raw materials for tools (Milanich 1994:302).

Most information concerning the post-500 BCE aboriginal populations is derived from coastal sites where the subsistence patterns are typified by the extensive exploitation of fish and shellfish, wild

plants, and inland game, like deer. Inland sites show a greater, if not exclusive reliance on interior resources. Known inland sites often consist of sand burial mounds and shell and dirt middens along major watercourses, and small dirt middens containing animal bone and ceramic sherds in oak/palm hammocks, or palm tree islands associated with freshwater marshes (Griffin 1988). These islands of dry ground provided space for settlements (Carr 2002).

### 3.3.1   Ten Thousand Islands

**Glades I** - Beginning around 500 BCE, fiber-tempered and semi fiber-tempered pottery of the Late Archaic period was replaced by sand-tempered pottery (Glades plain). This change in tempering agent marks the beginning the Glades cultural tradition. For 700 years, sand-tempered plain pottery dominated the assemblage, but from 200 CE (Common Era) and lasting until 800 CE, Gordon's Pass Incised, Sanibel Incised, and an, as of yet unclassified decorated pottery type, were the predominant decorated types (Carr and Beriault 1984; Griffin 1988). The tremendous increase in Glades I sites within the Big Cypress indicates a dramatic increase in the usage of the area during this time (Widmer 1988), and the geographic extent of the Glades I diagnostics indicates a considerable degree of interchange and interaction (Griffin 1988).

**Glades II** - The Glades II era (800 to 1200 CE) is marked by a tremendous diversity in decorated ceramic types. Goggin (n.d.) described the decorations as being "neatly and cleanly cut and apparently made with swift cutting strokes while the clay is partially dry." Glades IIa (750-900 CE) is identified by the presence of Key Largo Incised, Opa Locka Incised, and Miami Incised. During Glades IIb (900-1100 CE), Key Largo Incised remained the primary decorated ware. The number of sites increased and the period would appear to be one of "relative stability in technology and subsistence" (Griffin 1988:140). From ca. 1100 to 1200 CE there is conspicuous absence of decorated pottery and the number of sites drops dramatically (Griffin 1988:142). This cultural hiatus has been correlated to the NeoAtlantic warm period and associated with high sea levels (Fairbridge 1984:431; Gleason et al. 1984:321).

The Glades III era begins with the reintroduction of decorated ceramics, however, the motifs and techniques are noticeably different from the previous styles. Glades IIIa (1200-1400 CE) is identified by the appearance of Surfside Incised, St. Johns Check Stamped, and Safety Harbor wares. There is an accompanying increase in bone ornaments. Then again, ca. 1400 CE, ceramic decoration ceases with the exception of tooled rim types (Griffin 1988). Griffin hypothesizes that this ceramic style might have been associated with increasing Calusa influence in the area (Griffin 1988:142).

**Glades III** - The Glades III era begins with the reintroduction of decorated ceramics, however, the motifs and techniques are noticeably different from previous styles. There is also an accompanying increase in bone ornaments. Then again, ca. 1400 CE, ceramic decoration ceases with the exception of tooled rim types (Griffin 1988). Griffin hypothesizes that this ceramic style might have been associated with increasing Calusa influence in the area (Griffin 1988:142).

Whereas the earlier cultural periods of the Glades area are defined exclusively by the archaeological record, historical documents provide greater information, including tribal names, for the peoples of the terminal Glades III period. Much of the early historical ethnographic information is derived from the account of Hernando d'Escalante Fontaneda, a Spanish captive of the Calusa (True 1944). During his 17-year captivity, Fontaneda learned of the political structure, economy, social hierarchy, and religion of the south Florida Indians.

### 3.4    Colonialism

The cultural traditions of the native Floridians ended with the European expeditions to the New World. The initial events, authorized by the Spanish crown in the 1500s, ushered in devastating European contact. After Ponce de Leon's landing near St. Augustine and circumnavigation of the peninsula in 1513, official Spanish explorations were confined to the west coast of Florida until 1565. Florida's east coast, lacking deep water harbors like Tampa Bay and Charlotte Harbor, was left to a few shipwrecked sailors from treasure ships which, by 1551, sailed through the Straits of Florida on their way to Spain. When the first Europeans arrived in coastal southwest Florida in the 16th century, they encountered the Calusa, a powerful, complex society ruled by a paramount chief. The principal town of the Calusa is thought to be Mound Key in Estero Bay. Historic documents suggest that the Calusa chief ruled over fifty towns, from which he exacted tribute (Widmer 1988).

Between 1513 and 1558, Spain launched several expeditions of exploration and, ultimately failed, colonization of *La Florida*. Archaeological evidence of contact can be found in the form of European trade goods such as glass beads, bells, and trinkets recovered from village sites. Prior to the settlement of St. Augustine in 1565, European contact with the indigenous peoples was sporadic and brief; however, the repercussions were devastating. The southeastern Native American population of 1500 has been estimated at 1.5 to 2 million (Dobyns 1983). Following exposure to Old World diseases such as bubonic plague, dysentery, influenza, and smallpox, epidemics to which they had no immunity, the Native American population of the New World was reduced by as much as 90% (Ramenofsky 1987). The social consequences of such a swift and merciless depopulation were staggering. Within 87 years of Ponce de Leon's landing, the Mississippian cultures of the Southeast were collapsed (Smith 1987). In 1708, the Spanish government reported that three hundred refugees were all that remained of the original Florida population (Mulroy 1993).

Along the Gulf Coast between Charlotte Harbor and Tampa Bay, Spanish and Cuban fisherfolk established communities, or "ranchos," with the earliest being at Useppa Island and San Carlos Bay (Hammond 1973). There is growing archaeological evidence that the surviving Native Americans of the region were assimilated into these mixed communities (Almy 2001; Hann 1991; Neill 1968; Palov 1999). These west coast ranchos supplied dried fish to Cuban and northern markets until the mid-1830s, when onset of the Seminole Indian Wars and customs control closed the fisheries.

During the two centuries following the settlement of St. Augustine, the Spanish widened their Florida holdings to include the settlement at Pensacola and a garrison at Saint Marks. With the English to the north and the French to the west, the Spanish colony of *La Florida* was extremely fragile. In the early 1700s, Spain invited some of the Lower Creek Indians displaced by British settlements into *La Florida* to provide a hostile buffer against the British (Mulroy 1993). What formed as a border population evolved as other bands of Lower Creek extraction moved into the peninsula. This first migration formed a confederation, which included Cowkeeper and his Alachua band, the Apalachicolas, and the Mikasukis (Mulroy 1993).

The Treaty of Paris (1763) reallocated the English, French, and Spanish holdings in the New World. As a result, Florida was ceded to the English. After this, bands of Upper Creek, Muskogee speakers, began moving into Florida, increasing the Native American population to around two thousand by 1790 (Mulroy 1993). Although cultural distinctions existed between the various Native American groups entering Florida, Europeans collectively called them Seminoles:

> *The word Seminole means runaway or broken off. Hence Seminole is a distinctive appellation, applicable to all the Indians in the Territory of Florida, as all of them run*

*away, or broke off, from the Creek or Nuiscoge [Muskogee] nation* (United States Congress 1837).

The Seminoles formed, at various times, loose confederacies for mutual protection against the new American Nation to the north (Tebeau 1980:72) which considered them to be "*the wildest and fiercest remnant of a tribe which has been distinguished for their ceaseless opposition to the arts of civilization*" (United States Congress 1850). The Seminoles were joined by escaped slaves from South Carolina and Georgia (Porter 1996), "*many of whom were seduced from the service of their masters*" (Jackson et al. 1817-1818). The loss of slave labor, particularly in light of the abolitionists' movement in the northeast, coupled with the anxiety of having a free and hostile slave population immediately to the south, caused great concern among plantation owners. This historically underestimated nuance of the Seminole Wars prompted General Thomas S. Jesup to say "*This you may be assured is a negro and not an Indian War*" (Knetsch 2003:104).

Following the treaty of Paris (1763), the ensuing decades witnessed the American Revolution during which English loyalists immigrated to Florida. Following the Revolution, the second Treaty of Paris (1783) returned Florida to Spain; however, Spanish influence was nominal during this second period of ownership. For the next 36 years, Spain, from the vantage of Florida, watched with growing concern as the infant American Nation to the north gained momentum. When the United States acquired the Louisiana Purchase from France in 1803, Spain was hemmed in by the aggressive young nation.

When the Seminoles began cross border raids from Spanish Florida into the United States, General Andrew Jackson was commissioned to defend the nation. His orders permitted him to cross the international border to pursue Seminoles, but he was to respect Spanish authority. General Jackson's subsequent actions belie either tacit instructions or a personal agenda, as he killed hundreds of Indians and runaway slaves, took control of several Spanish garrisons and towns, confiscated the Spanish royal archives, named an American as governor of the area, and announced that the Spanish economic laws would be replaced by the revenue laws of the United States (Tebeau 1980). This aggression understandably strained relations between the United States and Spain. Spain, who had more pressing concerns with its Central and South American colonies, ceded Florida to the United States in the Adams-Onis Treaty of 1819 in exchange for the territory west of the Sabine River.

## 3.5    **Territorial and Statehood**

Andrew Jackson, named provisional governor of Florida, divided the territory into St. Johns and Escambia Counties. At that time, St. Johns County encompassed all of Florida lying east of the Suwannee River, and Escambia County included the land lying to the west. In the first territorial census in 1825, some 317 persons reportedly lived in South Florida; by 1830, that number had risen to 517 (Tebeau 1980:134).

Although what became known as the First Seminole War (the cross border hostilities between the United States and the Seminoles) was fought in north Florida, the Treaty of Moultrie Creek in 1823, at the end of the war, was to affect the settlement of south Florida. In exchange for occupancy of approximately four million acres of reservation land south of Ocala and north of Charlotte Harbor, the Seminoles relinquished their claim to the remainder of the peninsula (Covington 1958; Mahon 1985). The treaty satisfied neither the Native Americans nor the settlers. The inadequacy of the reservation, the desperate situation of the Seminoles, and the mounting demand of would-be settlers for their removal, soon produced another conflict.

By 1835, the Second Seminole War was underway, initiated with the Seminole attack on Major Dade's company en route to Fort King. Although much of the Second Seminole War occurred in central Florida, as the Seminoles fled southward into the Big Cypress and Everglades of south Florida, U.S. forces pursued them. At approximately the time when engagements were entering this part of the state, a shift in military installation paradigm occurred. In October 1840, U.S. Secretary of War Joel Poinsett advised commander Armistead that the construction of fixed post installations should be discontinued and temporary depots should be adopted (Knetsch 2003). This new strategy was a direct response to the guerilla-like warfare utilized by the Seminoles and an abandonment of European-modeled set piece warfare. Because of this directive, the landscape of south Florida was dotted with depots and only slightly more substantial "forts." The forts of south Florida rarely were as large or permanent as Forts Brooke, King, and Mellon.

The federal government ended the Second Seminole War in 1842 by withdrawing troops from Florida. At the war's end, some of the battle-weary Seminoles were persuaded to emigrate to the Oklahoma Indian Reservation where the federal government had set aside land for them. After much political deliberation over the fate of black Seminoles (Knetsch 2003:126), some 500 black Seminoles were allowed to accompany the "red Seminoles" west (Porter 1996). Those Seminoles who wished to remain in Florida were allowed to do so, but the reservation boundary was redrawn, reducing their lands to the south and west of Lake Istokpoga. In an attempt to prohibit contact between the Seminole and Cuban fisherfolk, the offshore islands were excluded from the territory (Covington 1982:3). The government considered these 2.5 million acres "a temporary hunting and planting reserve" (Covington 1982:3), and continued to pressure the remaining Seminoles to leave by "sending a delegation of their tribe, which have emigrated West, to visit their brethren in Florida, and explain to them the advantages of rejoining their tribe" (United States Congress 1850).

In 1845, the Union admitted the State of Florida with Tallahassee as the state capital and survey and exploration of the Big Cypress and Okeechobee areas was intensified. Tension mounted as the Seminoles watched with growing alarm the passage of military patrols and survey parties, and complaints were made to Indian Agent Captain Casey that such activities made hostilities inevitable (Covington 1982:30). Patrols typically found little remaining of previous military installations, however navigation and location was always in doubt given the limited cartography and featureless swamps. One officer lamented that "The maps represent the shape of the Big Cypress so differently in this portion of it and also the course of the creek Okholoakooche [Okaloacoochee Slough] from what I found that I felt doubts if I had yet reached the right place."

On January 22, 1855, Lt. George Hartsuff, appointed topographical engineer and main surveyor, began exploration of the Big Cypress and Everglades. During this time, he helped establish Forts Simon Drum and Shackleford. When the rainy season set in, in June of 1855, survey was suspended and Hartsuff began work on his field notes and maps. In a sketch furnished to the war department, he showed the exact location of many Indian villages and noted that he had been into the chief haunt of the Indians that contained most of their villages, gardens, and cattle pens (Covington 1982:35). In December, Lieutenant Hartsuff again set out for the Big Cypress with orders to make reconnaissance and take note of any Indian fields and settlements (Covington 1982:1). Within a few days, the company found the charred ashes of Forts Simon Drum and Shackelford. Every Indian village deserted, and they left Billy Bowlegs' village, artillerymen took bunches of planted bananas. Later, in the day, the company received orders to return to Fort Myers and they began the trip westward. They camped for the evening in a small grove south of present day Immokalee; 30 Seminole warriors led by Billy Bowlegs ambushed them at 5:00 AM (Covington 1982:1). In what was perhaps the result of misunderstood aggression, and tragically ill-timed orders (had they only left a day earlier), the Third, and final, Seminole War began.

For the following two and a half years, hit and miss skirmishes extended from the Big Cypress and Everglades to Darby in Pasco County and New Smyrna Beach in Volusia County. Through this period, U.S. military strategy ranged from the use of poorly disciplined militia, to aggressive campaigns, to truce offerings. After several previous betrayals, the Seminoles did not respond to the latter tactic. By the summer of 1857, the focus was on Billy Bowlegs in the Big Cypress. This effort was greatly aided by the use of shallow draft boats (Covington 1982). When found, villages were burned, fields were destroyed, horses and cattle were slaughtered, and Seminoles captured. As Seminole warriors were occupied with hunting or scouting, captured villagers were typically women and children, the wounded, and the elderly

After years of running, struggling to provide for his people, and mounting attacks when possible, Billy Bowlegs finally surrendered to federal forces at Fort Myers. On May 4, 1858, the ship Grey Cloud departed Fort Myers with 123 Seminoles, an addition 45 captives were boarded at Egmont Key, and they set sail for New Orleans where the group would depart for Oklahoma. Although some Seminoles remained in the Big Cypress and the Everglades, the United States government did not deem it worthy to pursue them. This miniscule, half-starved and battle weary population was left to eke out an existence in the swamps of south Florida (Covington 1982).

As settlers moved into the Big Cypress region, cattle ranching served as one of the earliest important economic activities reported in the region. Mavericks left by early Spanish explorers such as DeSoto and Narvaéz provided the stock for the herds raised by the mid-eighteenth century "Cowkeeper" Seminoles. As the Seminoles were pushed further south during the Seminole Wars and their cattle were either sold or left to roam, settlers captured or bought the cattle. By the late 1850s, the cattle industry of southwestern Florida was developing on a significant scale. By 1860, cattlemen from all over Florida drove their herds to Fort Brooke (Tampa) and Punta Rassa for shipment to Cuba, at a considerable profit. During this period, Jacob Summerlin became the first cattle baron of southwestern Florida. Known as the "King of the Crackers," Summerlin herds ranged from Ft. Meade to Ft. Myers (Covington 1957).

## 3.6    Civil War and Aftermath

In 1861, Florida followed South Carolina's lead and seceded from the Union as a prelude to the American Civil War. Florida had much at stake in this war as evidenced in a report released from Tallahassee in June of 1861. It listed the value of land in Florida at $35,127,721 and the value of the slaves at $29,024,513 (Dunn 1989:59). Although the Union blockaded the coast of Florida during the war, the interior of the state saw very little military action. Florida became one of the major contributors of beef to the Confederate government (Shofner 1995:72). Summerlin originally had a contract with them to market thousands of head a year at eight dollars per head. However, by driving his cattle to Punta Rassa and shipping them to Cuba, he received 25 dollars per head (Grismer 1946:83). In an attempt to limit the supply of beef transported to the Confederate government, Union troops stationed at Ft. Myers conducted several raids into the Peace River Valley to seize cattle and destroy ranches. In response, Confederate supporters formed the Cattle Guard Battalion, consisting of nine companies under the command of Colonel Charles J. Mannerlyn (Akerman 1976). The cattlemen and the farmers in the state lived simply. The typical home was a log cabin without windows or chinking, and settlers' diets consisted largely of fried pork, corn bread, sweet potatoes, and hominy. The lack of railway transport to other states, the federal embargo, and the enclaves of Union supporters and Union troops holding key areas such as Jacksonville and Ft. Myers prevented an influx of finished materials. As a result, settlement remained limited until after the Civil War.


Received
Electronically
April 7, 2021
South District

Immediately following the war, the South underwent a period of "Reconstruction" to prepare the Confederate States for readmission to the Union. The program was administered by the U.S. Congress, and on July 25, 1868, Florida officially returned to the Union. After the war ended, southerners who faced reconstruction and rebuilding saw Florida as a frontier full of opportunity and welcome. In southwest Florida, settlers first arrived by ones or twos, drifting through the area. Many of the early arrivals, however, were apparently "squatters" (Tebeau 1966:167). In most of the early settlements, development followed the earlier pattern with few settlers, one or two stores, and a lack of available overland transportation.

In the 1870s, while the region was still part of Monroe County, settlement of Collier County evolved slowly and in isolated pockets. Immokalee, Everglades City, Chokoloskee, Marco, Caxambas, Goodland, and Naples served as the early centers for settlement in the existing Collier County (Tebeau 1966:96). These first permanent pioneers were farmers; the hunters and fisherfolk who had preceded them established only temporary camps. As the land was largely impassable, their market was Key West, a growing city that produced almost none of its own food (Tebeau 1966).

The Homestead Act, created by Congress in 1862, allowed settlers to obtain title to 160 acres by residing on and working the land. The property had to first be surveyed by the government. It was not until the 1875 that H. Jenkins surveyed land within Township 50 South, Range 25 East, including the current APE, and noted 3rd rate land with pine and hammock swamp (State of Florida 1875: 225-229). The resulting plat depicts no historic features proximate to the APE (State of Florida 1876) (**Figure 3.2**).



**Figure 3.2.** 1876 Plat of the APE.

By the early 1880s, the State of Florida faced a financial crisis involving title to public lands. By act of Congress in 1850, the federal government turned over to the states for drainage and

reclamation all "swamp and overflow land." Florida received approximately 10,000,000 acres. To manage that land and the 5,000,000 acres the state had received on entering the Union, the state legislature in 1851 created the Board of Trustees of the Internal Improvement Fund. In 1855, the legislature established the actual fund (the Florida Internal Improvement Fund), in which state lands were to be held. The fund became mired in debt after the Civil War and under state law; no land could be sold until the debt was cleared. In 1881, the Trustees started searching for a buyer capable of purchasing enough acreage to pay off the fund's debt and permit the sale of the remaining millions of acres that it controlled. Hamilton Disston, a member of a prominent Pennsylvania saw manufacturing family, in 1881, entered into agreement with the State of Florida to purchase four million acres of swamp and overflowed land for one million dollars. In exchange, he promised to drain and improve the land. This transaction, which became known as the Disston Purchase, enabled the distribution of large land subsidies to railroad companies, inducing them to begin extensive construction programs for new lines throughout the state. The purchase, although technically legal, was extremely generous with the designation "swamp and overflow land." Grismer (1946) estimates that at least half of the acreage was "high and dry." Disston and the railroad companies, in turn, sold smaller parcels of land to developers and private investors (Tebeau and Carson 1965:252). In 1883, both section 23 and 26 of Township 50 South, Range 25 East, were deeded to Disston's Florida Land and Improvements Company (State of Florida n.d.:22:136-137).

By the late 1880s, squatters were sufficient in numbers to protest when "their land" became the property of Hamilton Disston. Squatters could have purchased the land on which they had taken up residence and constructed improvements, for such a provision was made in the Disston contracts. However, the early settlers believed they should each be permitted to homestead 160 acres of high and dry land. They had not been able to do so because the land was designated "swamp and overflowed" and title to it had been transferred to the state (Tebeau 1966:167).

Disston's purchase included what is now Naples, and formed the Florida Land and Improvement Company. In 1886, Charles Adams bought a parcel from Disston that formed the basis for the Naples Town Improvement Company of Tallahassee. When John Williams and Walter Haldeman, both from Kentucky, decided "Naples" was the perfect place to develop a city, they bought the controlling interest in the Naples Town Improvement Company. They reorganized it, gave it new direction, and renamed it the Naples Company. With Haldeman directing the work, the company was ready, by December 1887, to embark into a new period of full-scale town building and improvement including a hotel, churches, and shops. The name "Naples" is attributed to numerous Florida developers' sales schemes to romanticize the Florida peninsula into a pleasant "Italian" seaside resort. Unfortunately, the only activity for the next few years was on paper - the buying and selling of land; little construction took place (Jamro and Lanterman 1985).

In 1887, the land, which today is Collier County, became part of the newly created Lee County and remained such for 36 years until July 7, 1923 when Collier County was formed with Everglades City as county seat. It was named for Barron Gift Collier, a Memphis born businessperson who promoted the region's development.

## 3.7    Twentieth Century

From 1899 until 1914, the Naples Company struggled but the town slowly grew. In 1914, E. W. Crayton, an Ohio real estate developer with a successful track record in St. Petersburg, purchased the controlling interest in the company and renamed it the Naples Improvement Company. His direction is credited with leading Naples into the future. In 1925, Naples was incorporated and by 1927, reached by two railroad lines (Dean 1991).

In 1911, successful New York City advertiser, Barron Gift Collier, visited Useppa Island. Collier was captivated, "Frankly, I was fascinated with Florida and swept off my feet by what I saw and felt. It was a wonderland with a magic climate, set in a frame of golden sunshine" (Collier County Museum 2010b). Over the next decade, Collier amassed over one million acres in southwest Florida and his property stretched from the Ten Thousand Islands to Useppa Island, and from the coast to the Big Cypress and the Everglades (Clement n.d.). Collier was the largest landholder in the state and created a luxury resort, the Useppa Inn that was visited by corporate giants, presidents, movie stars, authors and sports celebrities. To facilitate development, Collier made a pledge to the Florida State Legislature to complete the Tamiami Trail from Tampa to Miami (Naples Daily News 1976). The roadway was finished in 1928 and as traffic increased, southwest Florida's tourist industry was born (Scupholm 1997). The construction of the Tamiami Trail had a tremendous effect on Seminole settlement patterns. The roadway interrupted traditional canoe routes and as a result, Seminoles were forced to use the Tamiami Canal, which was created during road construction. Many Seminole families moved closer to the Tamiami Trial and Canal to facilitate canoe transportation (Carr 2002).

On July 7, 1923, the state legislature created Collier County and named Everglades City as county seat. Collier became the second largest county in Florida with a land area of 2,032 square miles. At the time of its creation, the county consisted of pine and cypress land and extensive swampland. The towns within the county, Immokalee, Naples, Marco, Caxambas, Chokoloskee, Deep Lake, and Everglades City, were all small settlements separated by almost inaccessible terrain.

Barron Collier was instrumental in bringing modern communications, roadways, and railroads to his namesake county (Collier County Museum 2010a). His promotions eventually opened up the area's enormous agricultural and resort potential, but growth was halted by the Great Depression. Collier County's economy and population remained at a virtual standstill until the end of WWII when a new wave of national prosperity sent thousands of people to Florida (Dean 1991).

Improvements in transportation include the 1921 Atlantic Coast Line (ACL) Railway Company's extension south from LaBelle to Immokalee. The town took on new importance and became a center for inland activity in Collier County (Tebeau 1966). While Barron Collier was promoting the Tamiami Trail, he and his supporters were also making an effort to open a direct highway route from Immokalee to the county seat of Everglades City. By 1923, an unimproved road from LaBelle through Immokalee, terminating at Deep Lake, was depicted on a Florida State Map (Kendrick 1964). This road was completed between Immokalee and Everglades City in the early 1920s (Florida Preservation Services [FPS] 1986). Collier County induced the ACL to continue its line south to Everglades City around 1927. The two projects linked the town with outer areas of the county and the Tamiami Trail. With the arrival of the railroad and road, Immokalee became a center for ranching, farming, and lumbering (Tebeau 1966).

With improved roads, logging companies relocated to the area to harvest the last of the old-growth cypress. From the 1920s to the late 1950s, steam powered mills cut cypress board, which was valued for its durability and imperviousness to water. "Swamp Loggers" would fell the trees and oxen and mules would pull the downed trees to temporary tram railways where they were loaded for transport to the nearby mills. Mill towns like Jerome and Copeland sprung up along SR 29 (Klinkenberg 1994).

Barron Collier, who promoted the region's development and the completion of the Tamiami Trail with his personal fortune, brought modern communications, roads, and railroads. His promotions eventually opened up the area's enormous agricultural and resort potential, but modest signs of growth were halted by the Great Depression. The number of residents in 1925 of 1,256 grew to only 2,883 by 1930 (Tebeau 1966:212). By the mid-1930s, federal programs, implemented by the Roosevelt

administration, started employing large numbers of construction workers, helping to revive the economy of the state. The programs were instrumental in the construction of parks, bridges, and public buildings. However, Collier County's economy and population remained at a virtual standstill until the end of WWII when a new wave of national prosperity sent thousands of people to Florida (Dean 1991).

Like many Florida communities, World War II changed the face of Naples and later added to its growth. Largely, the post-World War II development of Collier County is similar to that of the rest of America: increasing numbers of automobiles and asphalt, an interstate highway system, suburban sprawl, and strip development along major state highways. The county, like most of Florida, experienced a population boom in the 1950s. Florida's population increased from 1,897,414 in 1940 to 1950 in 2,771,305. Collier County's population grew from 5,082 in 1940 to 6,488 in 1950 (Forstall 1995). After the war, car ownership increased, making the American public more mobile, making vacations more inexpensive and easier. Many who had served at Florida's military bases during World War II also returned with their families to live. As veterans returned, the trend in new housing focused on the development of small tract homes in new subdivisions.

In 1949, Naples officially became a city with strict zoning laws promoting a "Naples Image" which denoted homes and lifestyles at the higher end of the scale. The county seat was moved to Naples in 1959 (Dean 1991). Based on maps from the USDA 1954 Soil Survey for Collier County, Florida, a series of trails and tramlines once spread into the swampy interior region of the County from the west coast. The railroad grades in the region appear to have led to a north-south trending line near the coast, running several miles inland. These appear to have been part of the County's cypress and pine timbering industry (USDA 1954).

In 1923, Collier County had one of the largest stands of virgin cypress and pine timber in the country (Tebeau 1966). Roads leading into the Everglades were completed in the 1920s, enabling logging companies to exploit the region's cypress (Klinkenberg 1994). Logging activities in the Big Cypress Swamp and Fakahatchee Strand were prevalent in the 1940s in response to wartime needs (United States Fish and Wildlife [USFWC] n.d.). The cypress was used in the construction of P.T. Boats, and, later, was shipped to Europe to supply the post-war rebuilding efforts (Klinkenberg 1994). Two of the companies with logging operations in the area were the Lee Tidewater Cypress Company and the C. J. Jones Logging Company. The logging industry required the construction of rail lines traversed by steam locomotives, which resulted in the establishment of a number of sawmills and lumber towns within the region. The largest of these towns was Jerome, located off present-day State Road 29, north of US 41 (Tamiami Trail) (Klinkenberg 1994). Two mills, one at Naples and the other at Bonita Springs, reached into the timberlands from the west coast (Tebeau 1966:252). However, because of heavy lumbering activities from the 1940s to 1957, much of the trees were cleared (Florida Department of Environmental Protection [FDEP] n.d.; Tebeau 1966; USFWC n.d.). When the cypress supply was exhausted, logging establishments became ghost towns, and the rail lines were abandoned, leaving only remnant segments of trails and ditches.

SR 951 was created in the 1950s/early 1960s and opened up the Rattlesnake Hammock area to modern development. Local residents harvested cabbage palms from Rattlesnake Hammock to supply the increased demands for landscaping materials in the rapidly expanding Naples area (Beriault 2004). Local cypress was also harvested. Based upon Copeland's 1947 map of Collier and Hendry County, various roads and the label "Belle Meade" are depicted close to the APE, although no development was noted within the APE (Copeland 1947).

In the 1960s, the Golden Gate Estates property was purchased from the Collier family, the Gerry Brothers, and the Lee Tidewater Cypress Company. From the early 1960s to the mid-1970s, draglines and bulldozers operated on the property first as Gulf American and the GAC Properties. The

result was an extensive system of canals and 807 miles of roads on the 113,000-acre Golden Gate Estates development, located north of the APE (Army Corps of Engineers [ACOE] and South Florida Water Management District [SFWMD] 2001). The property was sold as "semi-improved" land in 1.25-, 2.5- and 5-acre tracts. The questionable dealings of GAC Properties were cited in the congressional hearings dealing with the passage of the Interstate Land Sales Full Disclosure Act of 1968 and the development was forced to make partial restitution, amounting to over $17 million, to landowners by the Federal Trade Commission (Carter 1974). State purchase of the property began soon thereafter.

The Picayune Strand State Forest, located north of the APE, is composed of two major tracts of land, the South Golden Gate Estates Tract and the Belle Meade Tract. The South Golden Gate Estates Tract comprised the largest undertaking of the forest. In 1985, a plan was put into place to purchase South Golden Gate Estates using Conservation and Recreation Lands (CARL) funds under the "Save Our Everglades" program. This was an incredibly large undertaking as it involved acquiring land from 17,000 landowners. In 1998, the federal government gave 25 million dollars in aid to the state of Florida to help bring the land acquisitions to completion (ACOE and SFWMD 2001).

The number of permanent Collier County residents grew rapidly from 6,488 in 1950 to 85,000 by 1980. In the 1950s and 1960s, US 41 was widened by adding limerock from nearby quarries. In 1967, SR 84 (Alligator Alley) or the Everglades Parkway, which lies north of the project area, was built. In 1970, FDOT appointed an advisory panel to evaluate possible routes across south Florida for the proposed I-75. The plans were prepared by 1972 and the Interstate was built thereafter, utilizing existing lanes from Alligator Alley for eastbound traffic. Two westbound lanes were built on the vacant strip of land between Alligator Alley and the canal (Duever et al. 1985). From 1980 to 1990, Collier County experienced a 77% percent increase in population and between 1990 and 2000, the population increased 65%. The population continued to increase in the county, albeit at a slower rate of 28% from 2000 to 2010 with an estimate of 357,470 individuals for 2017. Leisure and hospitality (19.4%) and trade, transportation and utilities (18.8%) are the two largest sectors of employment in the county today (Enterprise Florida 2018).

### 3.8    Project Area

Aerial photographs of the project area from 1962 and 1995, available from the Publication of Archival Library & Museum Materials (PALMM) and Google Earth, revealed that no development has taken place on the property (USDA 1962, 1995) (**Figure 3.3**). No historic structures within the APE were noted on the USGS maps, and the Collier County Property Appraiser does not list any structures (Skinner 2019). Additionally, no historic structures were indicated on a 1962 aerial of the APE (USDA 1962), the 1954 county soil survey maps (USDA 1954:Sheets 8 and 4), or the 1947 Copeland map (Copeland 1947).







**Figure 3.3.** 1962 and 1995 aerial photographs of the APE.

## 4.0  RESEARCH CONSIDERATIONS AND METHODS

### 4.1  Background Research and Literature Review

A review of archaeological and historical literature, records and other documents and data pertaining to the project area was conducted. The focus of this research was to ascertain the types of cultural resources known in the project area and vicinity, their temporal/cultural affiliations, site location information, and other relevant data. This included a review of sites listed in the NRHP, the FMSF, cultural resource survey reports, published books and articles, aerial photographs, unpublished manuscripts, and maps. In addition to the NRHP and FMSF, other information relevant to the historical research was obtained from the files of ACI. The FMSF data in this report were obtained in November 2019, which is the most recent edition. However, according to FMSF staff, input may be a month or more behind receipt of reports and site files. No individuals with knowledge of historic or prehistoric activities specific to the APE were encountered during this project; thus, no informant interviews were conducted.

#### 4.1.1  Archaeological Considerations

Background research indicated that no archaeological sites have been recorded within or immediately adjacent to the APE, however 13 archaeological sites are located within one mile of the APE (**Figure 4.1 and Table 4.1**), representing a variety of site types. However, the majority of these sites have been found ineligible for listing on the NRHP. Two sites, 8CR00227 and 8CR00535, both burial mounds, have been found potentially eligible for listing. **Table 4.2** lists the surveys conducted within one mile of the APE.

**Table 4.1.** Archaeological sites recorded within one mile the APE.

| SITE NO. | SITE NAME | SITE TYPE | CULTURE(S) | REFERENCE | SHPO EVAL. |
|---|---|---|---|---|---|
| 8CR00558 | Rosemary | Artifact scatter | Indeterminate | FMSF | Not Evaluated |
| 8CR00227 | Kirkland Mound | Prehistoric burial(s) | Glades III | Austin 2002 | Potentially Eligible |
| 8CR00515 | Gateway Harbor | Prehistoric shell midden | Glades | Austin 2002 | Not Evaluated |
| 8CR00534 | Frog Hammock | Artifact scatter | Glades I | Austin 2002 | Ineligible |
| 8CR00535 | Collier Mound | Prehistoric burial(s) | Glades I | Austin 2002 | Potentially Eligible |
| 8CR00536 | Bayview | Prehistoric shell midden-Redeposited | Prehistoric | Austin 2002 | Ineligible |
| 8CR00537 | Hamilton Midden | Homestead | Glades, 19th-20th Century | Austin 2002 | Ineligible |
| 8CR00538 | Mother-In-Law | Prehistoric shell midden | Glades, 19th-20th Century | Austin 1986 | Not Evaluated |
| 8CR00539 | Mad Dash 1 | Land-terrestrial | Glades | Austin 1986 | Ineligible |
| 8CR00540 | Mad Dash 2 | Land-terrestrial | Prehistoric | Austin 1986 | Ineligible |
| 8CR00579 | Hand Hammock | Homestead | 19th- 20th Century | Austin 2002 | Ineligible |
| 8CR00845 | Myrtifolia Camp | Campsite (prehistoric) | Glades | Beriault 2002 | Ineligible |
| 8CR00846 | Gardens Of Asia | Campsite (prehistoric) | Glades | Beriault 2002 | Ineligible |



Received
Electronically
April 7, 2021
South District



**Figure 4.1**. Location of previously recorded archaeological site within one mile of the APE.

**Table 4.2.** Surveys conducted within one mile the APE.

| SURVEY NO. | AUTHORS | DATE | TITLE |
|---|---|---|---|
| 1108 | Florida Preservation Services | 1986 | Historical/architectural survey of Collier County, Florida. |
| 3904 | Newman | 1995 | An Archaeological Inventory of the Rookery Bay C.A.R.L. Project |
| 7697 | Beriault | 2002 | A Phase I Archaeological Assessment of the Naples Botanical Garden Parcel, Collier County, Florida |
| 8187 | Austin | 1986 | CRAS of the Proposed CDC Naples Development Site, Collier County, Florida |
| 8427 | Austin | 2002a | CRAS of the Proposed CDC DRI, Collier County, Florida |
| 10135 | Austin | 2002b | CRAS of the Proposed Hamilton Harbor Development Site, Collier County, Florida |
| 16364 | Beriault | 2009 | A Phase One CRAS of the Bayview Park Parcel, Collier County, Florida |

Background research and other cultural resource surveys within the general project area. These surveys provide evidence that sites in this part of Collier County are most often found on discrete areas of high ground, such as hammock ridges or locales that rise slightly above the surrounding terrain. Often fresh water such as a marsh, seasonal depression, or a slough is nearby.

Based on these data, background research including a review of the Collier County archaeological predictive maps ACI 1992, 1999), as well as countywide syntheses by the Archaeological and Historical Conservancy (Carr 1988; Dickel 1991), and other regional site location predictive models (ACI 1992, 1999, 2014a, 2014b; Austin 1987; Bellomo and Fuhrmeister 1991; Dickel 1991; Smith 2008) and informed expectations concerning the types of sites likely to occur within the project APE, as well as their probable environmental settings, was generated. As archaeologists have long realized, aboriginal populations did not select their habitation sites and activity areas in a random fashion. Rather, many environmental factors had a direct influence upon site location selection, including soil drainage, distance to water, topography, and proximity to resources. It should be noted that the settlement pattern noted below cannot be applied to sites of the Paleoindian and Early Archaic periods, which precede the onset of modern environmental conditions.

Analysis of the data for the 283 aboriginal archaeological sites, with known locations in the Southwestern Slope physiographic region of Collier County that is outside of National Park Service (NPS) lands, was conducted. The NPS lands were not included as there is not a modern soil survey for that area. Historic archaeological sites and aboriginal archaeological sites that were plotted "per vague verbal description" were deleted from this analysis.

Proximity to water is an important site location feature. Over 84% of the sites are located within 100 m (328 ft) of a water source, and only five of the sites greater than 200 m (656 ft) from a water source (**Table 4.3**). Two-third of the sites are proximate to a wetland or swamp, while about 18% of the sites are associated with lakes and ponds.

**Table 4.3.** Distribution of sites by water type and distance.

| Type | ≤100 m (356 ft) | | ≤200 m (656 ft) | | ≤300 m (984 ft) | | ≤400 m (1312 ft) | | Total | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | Cnt | % | Cnt | % | Cnt | % | Cnt | % | Cn | % |
| Bay | 8 | 2.8% | 2 | 0.7% | | 0.0% | | 0.0% | 10 | 3.5% |
| Creek | 5 | 1.8% | 1 | 0.4% | | 0.0% | | 0.0% | 6 | 2.1% |
| Gulf | 6 | 2.1% | | 0.0% | | 0.0% | | 0.0% | 6 | 2.1% |
| Lake | 1 | 0.4% | | 0.0% | | 0.0% | | 0.0% | 1 | 0.4% |
| Pond | 27 | 9.5% | 19 | 6.7% | 3 | 1.1% | 1 | 0.4% | 50 | 17.7% |
| River | 2 | 0.7% | 2 | 0.7% | | 0.0% | | 0.0% | 4 | 1.4% |
| Swamp | 189 | 66.8% | 16 | 5.7% | 1 | 0.4% | | 0.0% | 206 | 72.8% |
| **Total** | **238** | **84.1%** | **40** | **14.1%** | **4** | **1.4%** | **1** | **0.4%** | **283** | **100.0** |

Elevation can also play a role in site selection, but usually it is at such a scale that it is not decipherable except through very detailed elevation maps or through lidar. Most of the sites in this study are located at five feet amsl (1.5 m) (**Figure 4.2**).



**Figure 4.2.** Distribution of sites by elevation (ft amsl).

Soil types and their drainage characteristics can also be used to assess the likelihood for aboriginal site occurrence (Almy 1978). There are 45 soil types within this study area; of which 36 have recorded archaeological sites (**Table 4.4**). Many of the sites occurred on more than one soil type. This analysis only includes the four types covering the greatest acreage for each site, which totaled 352 soil type occurrences. The column "1", indicates that this soil type had the greatest area of the site, and so on down the line, so that the "4" column had the smallest site acreage. However, this analysis may not prove an accurate representation of the site distribution. While we know the percentage of sites on the various soil types, we do not have an accurate assessment as to how much of each soil type has been surveyed for archaeological sites.

**Table 4.4.** Distribution of sites by drainage and soil types.

| DRAINAGE/Soil Type, % slopes | % of Area | 1 | 2 | 3 | 4 | Total | % of sites | difference |
|---|---|---|---|---|---|---|---|---|
| EXCESSIVELY DRAINED | | | | | | | | |
| Paola fine sand, gently rolling | 0.01% | 1 | | | | 1 | 0.29% | 0.28% |
| **Total** | **0.01%** | **1** | **0** | **0** | **0** | **1** | **0.29%** | **0.28%** |
| MODERATELY WELL DRAINED | | | | | | | | |
| Pomello fine sand, 0-2% | 0.05% | 2 | 1 | | | 3 | 0.86% | 0.81% |
| **Total** | **0.05%** | **2** | **1** | **0** | **0** | **3** | **0.86%** | **0.81%** |
| POORLY DRAINED | | | | | | | | |
| Basinger fine sand, 0-2% | 2.53% | 3 | 5 | 1 | | 9 | 2.58% | 0.05% |
| Basinger fine sand, occasionally flooded | 0.15% | 1 | | | | 1 | 0.29% | 0.14% |
| Boca fine sand, 0-2% | 5.09% | 10 | 3 | | | 13 | 3.72% | -1.36% |
| Ft. Drum and Malabar, high, fine sands | 0.92% | 2 | 1 | | | 3 | 0.86% | -0.06% |
| Hallandale and Boca fine sands | 6.64% | 30 | 5 | | | 35 | 10.03% | 3.38% |
| Hallandale fine sand, 0-2% | 4.86% | 5 | 3 | | | 8 | 2.29% | -2.57% |
| Hilolo, Jupiter, and Margate fine sands | 1.39% | 20 | 4 | | | 24 | 6.88% | 5.48% |
| Holopaw fine sand, 0-2% | 2.60% | 2 | 2 | | | 4 | 1.15% | -1.46% |
| Holopaw fine sand, limestone substratum (ls) | 4.68% | 4 | 6 | | | 10 | 2.87% | -1.82% |
| Immokalee fine sand, 0-2% | 3.81% | 15 | 2 | | | 17 | 4.87% | 1.06% |
| Malabar fine sand, 0-2% | 2.07% | | | | | 0 | 0.00% | -2.07% |
| Myakka fine sand, 0-2% | 0.29% | 2 | 2 | | | 4 | 1.15% | 0.86% |
| Ochopee fine sandy loam | 3.23% | | | | | 0 | 0.00% | -3.23% |
| Ochopee fine sandy loam, low | 4.48% | 1 | | | | 1 | 0.29% | -4.20% |
| Oldsmar fine sand, 0-2% | 1.98% | 2 | 1 | | | 3 | 0.86% | -1.12% |
| Oldsmar fine sand, ls | 1.91% | 1 | | | | 1 | 0.29% | -1.62% |
| Pennsuco silt loam | 1.77% | 4 | | | | 4 | 1.15% | -0.63% |
| Pineda and Riviera fine sands | 0.33% | | | | | 0 | 0.00% | -0.33% |
| Pineda fine sand, ls | 7.39% | 13 | 2 | | | 15 | 4.30% | -3.09% |
| Riviera fine sand, ls | 3.24% | 14 | 1 | | | 15 | 4.30% | 1.06% |
| Riviera, ls-Copeland fine sands | 1.58% | 13 | 3 | | | 16 | 4.58% | 3.01% |
| Tuscawilla fine sand | 0.05% | | | | | 0 | 0.00% | -0.05% |
| Wabasso fine sand, 0-2% | 0.21% | | | | | 0 | 0.00% | -0.21% |
| **POORLY DRAINED Total** | **61.21%** | **142** | **40** | **1** | **0** | **183** | **52.44%** | **-8.77%** |
| SOMEWHAT POORLY DRAINED | | | | | | | | |
| Canaveral-beaches complex | 0.08% | 3 | 2 | | | 5 | 1.43% | 1.35% |
| Satellite fine sand, 0-2% | 0.21% | 20 | | | | 20 | 5.73% | 5.52% |
| **Total** | **0.29%** | **23** | **2** | **0** | **0** | **25** | **7.16%** | **6.88%** |
| VERY POORLY DRAINED | | | | | | | | |
| Boca, Riviera, ls, and Copeland fine sands, depressional (depr) | 23.43% | 74 | 10 | 1 | | 85 | 24.36% | 0.92% |
| Chobee, la, and Dania mucks, depr | 0.17% | 1 | | 1 | | 2 | 0.57% | 0.41% |
| Chobee, Winder, and Gator soils, depr | 0.20% | 1 | 4 | | | 5 | 1.43% | 1.23% |
| Durbin and Wulfert mucks, frequently flooded (ff) | 1.29% | 10 | 1 | | | 11 | 3.15% | 1.86% |
| Estero and Peckish soils, ff | 0.77% | | | | | 0 | 0.00% | -0.77% |
| Holopaw and Okeelanta soils, depr | 0.21% | 1 | 1 | | | 2 | 0.57% | 0.36% |
| Jupiter-Boca complex | 2.02% | 4 | 5 | | | 9 | 2.58% | 0.56% |
| Kesson muck, ff | 1.22% | 1 | | | | 1 | 0.29% | -0.94% |

| DRAINAGE/Soil Type, % slopes | % of Area | 1 | 2 | 3 | 4 | Total | % of sites | difference |
|---|---|---|---|---|---|---|---|---|
| Winder, Riviera, ls, and Chobee soils, depr | 1.57% | 5 | | | | 5 | 1.43% | -0.14% |
| **Total** | **30.88%** | **97** | **21** | **2** | **0** | **120** | **34.38%** | **3.50%** |
| OTHER | | | | | | | | |
| Udorthents, shaped | 0.76% | 1 | 1 | | | 2 | 0.57% | -0.19% |
| Urban land | 1.70% | 10 | | | | 10 | 2.87% | 1.17% |
| Urban land-Aquents complex, organic substratum | 0.34% | 1 | | | | 1 | 0.29% | -0.06% |
| Urban land-Holopaw-Basinger complex | 1.36% | | | | | 0 | 0.00% | -1.36% |
| Urban land-Immokalee-Oldsmar, ls, complex | 0.81% | 4 | | | | 4 | 1.15% | 0.33% |
| Urban land-Matlacha-Boca complex | 0.80% | | | | | 0 | 0.00% | -0.80% |
| Urban land-satellite complex | 0.25% | 1 | 1 | | | 2 | 0.57% | 0.33% |
| Water | 1.51% | 1 | | | | 1 | 0.29% | -1.22% |
| Waters of the Gulf of Mexico | 0.02% | | | | | 0 | 0.00% | -0.02% |
| **Total** | **7.56%** | **18** | **2** | **0** | **0** | **20** | **5.73%** | **-1.83%** |
| **Grand Total** | **100.00%** | **283** | **66** | **3** | **0** | **349** | **100.00%** | **0.00%** |

This portion of Collier County is damp and soggy as evidenced by the fact that 61% of the soils are poorly drained and another 31% of the soils are very poorly drained. The excessively, moderately well, and somewhat poorly drained soils do not even make up 1% of the area. Water, urban land, or reshaped lands underlie the remaining portion of the study area.

Those soils that have a higher percentage of sites as compared to area (2% or greater) are marked in red on the table, while those that seem less likely to be used (-2% or less) are marked in blue. There is a normal distribution of sites relative to the excessively and moderately well drained soil, but there is a clear preference for the somewhat poorly drained Satellite sand, which covers of .3% of the area, but has 7.2% of the sites. The other prime soils include Hallandale and Boca fine sands; Hilolo, Jupiter, and Margate fine sands; and Riviera, limestone substratum-Copeland fine sands. Conversely, there are several soil types that were used significantly less than others. These include Ochopee fine sandy loam, low; Ochopee fine sandy loam; Pineda fine sand, limestone substratum; Hallandale fine sand, 0-2% slopes, and Malabar fine sand 0-2% slopes.

Based on the environmental setting and the proximity of the estuary environments and the presence of elevated ridges the project APE was considered to have a moderate probability for aboriginal archaeological site occurrence. As noted above, most sites in this part of the county are found on discrete areas of high ground, such as hammocks and ridges, and typically near a source of fresh water. The potential for historic period sites is discussed in the following section.

### 4.1.2   Historical Considerations

A review of the FMSF data obtained in November 2019 indicated an absence of historic structures (50 years of age or older) within the APE. A review of the USGS Naples South quadrangle maps (USGS 1958a, 1958b), 1962 and 1995 aerials (USDA 1962, 1995), the 1954 county soil survey maps (USDA 1954:Sheets 8 and 4), and the 1947 Copeland map (Copeland 1947) did not show any structures within the APE, and none was listed on the Collier County Property Appraiser website (Skinner 2019). Additionally, a review of pertinent U.S. military and government maps and documents (Ives 1856; Nash 1930) and other sources (Carr and Steele 1993a; MacCauley 2000; Weisman 1989,

1999) were consulted for information regarding potential historic resources, as well as historic archaeological sites. The potential for historic sites, and historic archaeological sites, was considered low based on the background research.

## 4.2    Field Methodology

The FDHR's Module Three, *Guidelines for Use by Historic Professionals*, indicates that the first stage of archaeological field survey is a reconnaissance of the project area to "ground truth," or ascertain the validity of the predictive model (FDHR 2003). During this part of the survey, the researcher assesses whether the initial predictive model needs adjustment based on disturbance or conditions such as constructed features (i.e., parking lots, buildings, etc.), underground utilities, landscape alterations (i.e., ditches and swales, mined land, dredged and filled land, agricultural fields), or other constraints that may affect the archaeological potential. Additionally, these Guidelines indicate that non-systematic "judgmental" testing may be appropriate in urbanized environments where pavement, utilities, and constructed features make systematic testing unfeasible; in geographically restricted areas such as proposed pond sites; or within project areas that have limited high and moderate probability zones, but where a larger subsurface testing sample may be desired. While predictive models are useful in determining preliminary testing strategies in a broad context, it is understood that testing intervals may be altered due to conditions encountered by the field crew at the time of survey.

Archaeological field survey methods consisted of surface reconnaissance combined with systematic subsurface testing. Shovel tests were placed approximately 50 m (164 ft) intervals, as well as judgmentally, throughout the project APE. Shovel tests were circular and measured approximately 50 centimeters (cm) (20 inches [in]) in diameter by at least 1 m (3.3 ft) in depth unless precluded by water. All soil removed from the shovel tests was screened through a 0.64 cm (0.25 in) mesh hardware cloth to maximize the recovery of artifacts. The locations of all shovel tests were recorded using a GPS unit, and following the recording of relevant data such as stratigraphic profile and artifact finds, all shovel tests were refilled.

Historic field methodology consisted of a survey of the project APE to determine the location of all historic properties believed to be 50 years of age or older, and to ascertain if any resources within the project APE could be eligible for listing in the NRHP. If found, an in-depth study of each identified historic resource would have been conducted, photographs taken, and the information needed for the completion of FMSF forms gathered. In addition to architectural descriptions, each historic resource would have been reviewed to assess style, historic context, condition, and potential NRHP eligibility.

## 4.3    Inadvertent/Unanticipated Discoveries

Occasionally, archaeological deposits, subsurface features or unmarked human remains are encountered during the course of development, even though the project area may have previously received a thorough and professionally adequate cultural resources assessment. Such events are rare, but they do occur. In the event that human remains are encountered during the course of development, the procedures outlined in Chapter 872, *FS* must be followed. However, it was not anticipated that such sites would be found during this survey.

In the event such discoveries are made during the development process, all activities in the immediate vicinity of the discovery will be suspended, and a professional archaeologist will be contacted to evaluate the importance of the discovery. The area will be examined by the archaeologist, who, in consultation with staff of the Florida SHPO, will determine if the discovery is significant or potentially significant. In the event the discovery is found to be not significant, the work may

immediately resume. If, on the other hand, the discovery is found to be significant or potentially significant, then development activities in the immediate vicinity of the discovery will continue to be suspended until such time as a mitigation plan, acceptable to SHPO, is developed and implemented. Development activities may then resume within the discovery area, but only when conducted in accordance with the guidelines and conditions of the approved mitigation plan.

## 4.4    **Laboratory Methods/Curation**

No cultural materials were recovered, thus no laboratory methods were utilized. All project related material (including field notes, maps, and photographs) will be stored at ACI in Sarasota (P19160), unless the client requests otherwise.



Received
Electronically
April 7, 2021
South District

# 5.0  SURVEY RESULTS AND RECOMMENDATIONS

## 5.1    Archaeological Results

Archaeological field survey included surface reconnaissance, systematic subsurface testing. This resulted in the excavation of 93 shovel tests; 73 were placed at 50 m intervals and 23 judgmentally (**Figure 5.1**).  All shovel tests were sterile of prehistoric and historic artifacts, and no artifacts were observed on the surface. As a result, no archaeological sites were identified. A reasonable and good faith effort was made per the regulations laid out in 36 CFR § 800.4(b)(1) (Advisory Council on Historic Preservation n.d.) to test all areas of the APE.

The general stratigraphic profile observed can be divided into three areas within the APE as follows:

- In the north:
  - 0-25 cm:       Dark brown or gray-brown wet sand
  - 25-50 cm:     Brown or light brown wet sand
  - 50-100 cm:   Water

- In the uplands near the center:
  - 0-20 cm:       Dark gray or light gray sand
  - 20-70 cm:     Light gray or light brown wet sand
  - 70-100 cm:   Water

- In the south:
  - 0-10 cm:       Brown muck
  - 10-100 cm:   Water



**Photo 5.1.**  Example of shovel test with water intrusion at approximately 60 cmbs in central upland area.





**Figure 5.1.** Location of the shovel tests within the APE.

Received
Electronically
April 7, 2021
South District



**Photo 5.2.** Shovel test in wet area.

## 5.2   <u>Historical Results</u>

The historical/architectural resource survey indicated an absence of historic resources (50 years of age or older) within the project APE. Thus, no historic resources which are listed, determined eligible, or appear to be considered potentially eligible for listing in the NRHP are located within the project APE.

## 5.3   <u>Conclusions</u>

The results of background research and archaeological field survey, including 93 shovel tests and visual reconnaissance, did not identify any prehistoric or historic archaeological sites within the APE. As a result of the historical/architectural background research and field survey, no historic resources were identified within the APE.

Thus, no archaeological or historical resources listed, determined eligible, or that appear to be potentially eligible for listing in the NRHP were identified within the Fleischmann Acquisition Parcel APE. No further work is recommended.

# 6.0  BIBLIOGRAPHY

Advisory Council on Historic Preservation
    n.d.    Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 Review. Accessed at http://www.achp.gov/docs/reasonable_good_faith_identification.pdf.

Archaeological Consultants, Inc. (ACI)
    1992    Mapping of Areas of Historical/Archaeological Probability in Collier County, Florida. ACI, Sarasota.
    1999    1999 Update Historic/Archaeological Probability Maps and Data Sheets for Collier County Florida. ACI, Sarasota.

Army Corps of Engineers, U.S. and South Florida Water Management District (ACOE SFWMD)
    2001    Final Draft - Project Management Plan, Southern Golden Gate Estates Hydrologic Restoration Project. U.S. Army Corps of Engineers, Jacksonville.

Akerman, Joe A.
    1976    *Florida Cowman: A History of Florida Cattle Raising*. Florida Cattlemen's Association, Kissimmee.

Almy, Maranda M.
    2001    *The Cuban Fishing Ranchos of Southwest Florida 1600-1850s*. Honor's thesis, Department of Anthropology, University of Florida, Gainesville.

Austin, Robert
    1986    Cultural Resource Assessment Survey of the Proposed CDC Naples Development Site, Collier County, Florida. SEARCH, Jonesville.
    2002a    Cultural Resource Assessment of the Proposed CDC DRI, Collier County, Florida. SEARCH, Jonesville.
    2002b    Cultural Resource Assessment of the Proposed Hamilton Harbor Development Site, Collier County, Florida. SEARCH, Jonesville.

Beriault, John G.
    2002    A Phase I Archaeological Assessment of the Naples Botanical Garden Parcel, Collier County, Florida. Archaeological and Historical Conservancy, Davie.
    2004    A Phase I Archaeological Assessment of the Feathers Parcel, Collier County, Florida. *AHC Technical Report* 478. Archaeological and Historical Conservancy, Davie.
    2009    A Phase One Cultural Resource Assessment of the Bayview Park Parcel, Collier County, Florida. Archaeological and Historical Conservancy, Davie.

Beriault, John G., Robert Carr, Jerry Stipp, Richard Johnson, and Jack Meeder
    1981    The Archaeological Salvage of the Bay West Site, Collier County, Florida. *The Florida Anthropologist* 34(2): 39-58.

Bullen, Ripley P.
    1975    *A Guide to the Identification of Florida Projectile Points*. Kendall Books, Gainesville.

Carbone, Victor
    1983    Late Quaternary Environment in Florida and the Southeast. *The Florida Anthropologist* 36(1-2): 3-17.

Carr, Robert S.
    1986    Preliminary Report on Excavations at the Cutler Ridge Fossil Site (8DA2001) in Southern Florida. *The Florida Anthropologist* 39(3, Part 2): 231-232.
    1988    An Archaeological Survey of Collier County, Florida. Archaeological and Historical Conservancy, Miami.
    2002    The Archaeology of Everglades Tree Islands. In *Tree Islands of the Everglades*. Edited by F. H. Sklar and A. Van der Valk. Kluwer Academic Publishers, The Netherlands.

Carr, Robert S. and John G. Beriault
    1984    Prehistoric Man in Southern Florida. In *Environments of South Florida, Past and Present*. Edited by P. J. Gleason, pp. 1-14. Miami Geological Society Memoir 2, Miami.

Carr. Robert S. and David Dickel
    1991    An Archaeological Survey of Collier County, Florida: Phase I. On File DHR, Tallahassee.

Carr, Robert S. and Willard Steele
    1993a    Seminole Heritage Survey, Seminole Sites of Florida. *AHC Technical Report* #74. Archaeological and Historical Conservancy, Davie.
    1993b    An Archaeological Survey and Assessment of the Lely Resort Property, Collier County, Florida. FDHR, Tallahassee.

Carter, Luther
    1974    *The Florida Experience: Land & Water Policy in a Growth State*. John Hopkins University Press, Baltimore.

Clausen, Carl J., H. K. Brooks, and A. B. Wesolowsky
    1975a    The Early Man Site at Warm Mineral Springs, Florida. *Journal of Field Archaeology* 2(3): 191-213.
    1975b    Florida Spring Confirmed as 10,000 Year Old Early Man Site. *Florida Anthropological Society Publications* 7.

Clausen, Carl J., A. D. Cohen, Cesare Emiliani, J. A. Holman, and J. J. Stipp
    1979    Little Salt Spring, Florida: A Unique Underwater Site. *Science* 203(4381): 609-614.

Clement, Gail
    n.d.    *Barron Gift Collier*. Everglades Digital Library, Florida International University. http://everglades.fiu.edu/reclaim/bios/collier.htm.

Cockrell, W. A.
    1970    *Glades I and Pre-Glades Settlement and Subsistence Patterns on Marco Island*. MS Thesis, Department of Anthropology, Florida State University, Tallahassee.

Cockrell, W. A. and Larry E. Murphy
    1978    Pleistocene Man in Florida. *Archaeology of Eastern North America* 6: 1-13.

Collier County Museum
    2010a    *Everglade: New Directions*. Collier County Museum, Naples. http://colliermuseums.com/history/everglades_new_directions.php.
    2010b    *One Man's Vision: Barron Gift Collier*. Collier County Museum, Naples. http://colliermuseums.com/history/barron_collier.php.

Copeland, Graham D.
    1947    *Map of Collier County Florida*. Collier County Board of County Commissioners, Naples.

Covington, James W.
    1957    *The Story of Southwestern Florida*. Volume 1. Lewis Historical Publishing Company, Inc., New York.
    1958    Exploring the Ten Thousand Islands: 1838. *Tequesta* 18: 7-13.
    1982    *The Billy Bowlegs War 1855-1858: The Final Stand of the Seminoles Against the Whites*. The Mickler House Publishers, Chuluota.

Daniel, I. Randolph and Michael Wisenbaker
    1987    *Harney Flats: A Florida Paleo-Indian Site*. Baywood Publishing Co., Inc., Farmingdale.

Davis, John H.
    1967    General Map of Natural Vegetation of Florida. Agricultural Experiment Stations, Institute of Food and Agricultural Sciences, University of Florida, Gainesville.

Dean, Virginia
    1991    *Naples on the Gulf: An Illustrated History*. Windsor Publications, Inc., Chatsworth.

Delcourt, Paul A. and Hazel R. Delcourt
    1981    Vegetation Maps for Eastern North America: 40,000 yr B.P. to the Present. In *Geobotony II*. Edited by R. C. Romans, pp. 123-165. Plenum Publishing Corp., New York.

Dickel, David N.
    1991    An Archaeological Survey of Collier County, Florida. *AHC Technical Report* 38. Archaeological and Historical Conservancy, Davie.

Dobyns, Henry F.
    1983    *Their Numbers Become Thinned*. University of Tennessee Press, Knoxville.

Duever, Michael J., John E. Carlson, John F. Meeder, Linda C. Duever, Lance H. Gunderson, Lawrence A. Riopelle, Taylor R. Alexander, Ronald L. Myers, and Daniel P. Spangler
    1985    The Big Cypress National Preserve. *Research Report* 8. National Audubon Society, New York.

Dunbar, James S.
    1981    The Effect of Geohydrology and Natural Resource Availability on Site Utilization at the Fowler Bridge Mastodon Site (8Hi393c/uw) in Hillsborough County, Florida. In *Report on Phase II Underwater Archaeological Testing at the Fowler Bridge Mastodon Site (8Hi393c/uw), Hillsborough County, Florida*. Edited by J. Palmer, J. S. Dunbar and D. H. Clayton, pp. 63-106. *Interstate 75 Highway Phase II Archaeological Report* 5. FDHR, Tallahassee.
    2006a    Paleoindian Archaeology. In *First Floridians and Last Mastodons: The Page-Ladson Site in the Aucilla River*. Edited by S. D. Webb. Springer, Dordrecht, The Netherlands.
    2006b    Pleistocene-Early Holocene Climate Change: Chronostratigraphy and Geoclimate of the Southeast US. In *First Floridians and Last Mastodons: The Page-Ladson Site in the Aucilla River*. Edited by S. D. Webb, pp. 103-155. Springer, The Netherlands.

Dunn, Hampton
1989    *Back Home: A History of Citrus County, Florida*. Citrus County Historical Society, Inverness.

Enterprise Florida
2018    Collier County. Counties. Enterprise Florida. http://edr.state.fl.us/content/area-profiles/county/Collier.pdf

Fairbridge, Rhodes W.
1984    The Holocene Sea Level Record in South Florida. In *Environments of South Florida: Present and Past II*. Edited by P. J. Gleason, pp. 427-436. Miami Geological Society, Coral Gables.

Florida Department of Environmental Protection (FDEP)
n.d.    Fakahatchee Strand Preserve State Park. FDEP, Tallahassee.

Florida Division of Historical Resources (FDHR)
2003    *Cultural Resource Management Standards and Operational Manual*. FDHR, Tallahassee.

Florida Master Site Files (FMSF)
        Various site file forms. FDHR, Tallahassee.

Forstall, Richard L.
1995    *Population of Counties by Decennial Census*. United States Census Bureau, Population Division. www.census.gov/population/cencounts/fl190090.txt.

Florida Preservation Services (FPS)
1986    Historic/Architectural Survey of Collier County, Florida. Florida Preservation Services, St. Augustine.

Gleason, Patrick J., Arthur D. Cohen, William Smith, H. Kelly Brooks, Peter A. Stone, Robert Goodrick, and William Spackman, Jr.
1984    The Environmental Significance of Holocene Sediments from the Everglades and Saline Tidal Plain. In *Environments of South Florida: Present and Past II*. Edited by P. J. Gleason, pp. 297-351. Miami Geological Society, Coral Gables.

Gleason, Patrick J. and P. Stone
1994    Age, Origin and Landscape Evolution of the Everglades Peatland. In *Everglades: The Ecosystem and Its Restoration*. Edited by S. M. Davis and J. C. Ogden, pp. 149-197. St. Lucie Press, Delray Beach.

Goggin, John M.
1949    Cultural Traditions in Florida Prehistory. In *The Florida Indian and His Neighbors*. Edited by J. W. Griffin, pp. 13-44. Inter-American Center, Winter Park.
n.d.    The Archaeology of the Glades Area, Southern Florida. On file, Southeast Archaeological Center, Tallahassee.

Griffin, John W.
1988    *The Archeology of Everglades National Park: A Synthesis*. National Park Service, Southeast Archaeological Center, Tallahassee.

Grismer, Karl H.
    1946    *The Story of Sarasota*. Florida Grower Press, Tampa.

Hammond, E. A.
    1973    The Spanish Fisheries of Charlotte Harbor. *Florida Historical Quarterly* 51(4): 355-380.

Hann, John H.
    1991    *Missions to Calusa*. University Press of Florida, Gainesville.

Ives, Lieut. J. C.
    1856    *Map of the Peninsula of Florida South of Tampa Bay*. Top Engineers, Sarasota. http://freepages.genealogy.rootsweb.ancestry.com/~crackerbarrel/Ives.html.

Jackson, General Andrew, John C. Calhoun, and others
    1817-1818  Seminole Indians: Message from the President of the United States, Transmitting Copies of Documents in Relation to the Seminole War. E. DeKraft, Washington, D.C.

Jamro, Ron and Gerald L. Lanterman
    1985    *The Founding of Naples*. Friends of Collier County Museum, Naples.

Janus Research
    2007    Cultural Resource Assessment Survey for the US 41 PD&E Study from Collier Boulevard (CR 951) to San Marco Drive (CR 92) Collier County, Florida. Janus Research, Tampa.

Kendrick, Baynard
    1964    *Florida Trails to Turnpikes 1914-1964*. University Press of Florida, Gainesville.

Klinkenberg, Jeff
    1994    Swamp Loggers. *The St. Petersburg Times,* September 18.

Knetsch, Joe
    2003    *Florida's Seminole Wars 1817-1858*. Arcadia Publishing, Charleston.

Mahon, John K.
    1985    *History of the Second Seminole War 1835-1842*. University Press of Florida, Gainesville.

MacCauley, Clay
    2000    *The Seminole Indians of Florida*. University Press of Florida, Gainesville.

Milanich, Jerald T.
    1994    *Archaeology of Precolumbian Florida*. University Press of Florida, Gainesville.

Milanich, Jerald T., Jeffery Chapman, Ann S. Cordell, Stephen H. Hale, and Rochelle A. Marrinan
    1984    Prehistoric Development of Calusa Society in Southwest Florida: Excavations on Useppa Island. In *Perspectives on Gulf Coast Prehistory*. Edited by D. D. Davis, pp. 258-314. University Press of Florida, Gainesville.

Milanich, Jerald T. and Charles H. Fairbanks
    1980    *Florida Archaeology*. Academic Press, New York.

Mowers, Bert and Wilma Williams
    1972    The Peace Camp Site, Broward County, Florida. *The Florida Anthropologist* 25(1): 1-20.

Mulroy, Kevin
    1993    *Freedom on the Border: The Seminole Maroons in Florida, the Indian Territory, Coahuila, and Texas*. Texas Tech University Press, Lubbock.

Nash, Roy
    1930    Report to the Commissioner of Indian Affairs Concerning Conditions among the Seminole Indians of Florida. In *Seminole Indians, Survey of the Seminole Indians of Florida*, Presented by Mr. Fletcher, 1931. U.S. Bureau of Indian Affairs. 71st Congress, 3d Session, Document No. 314. U.S. Government Printing Office, Washington.

Naples Daily News
    1976    The Collier Story. *Naples Daily News,* July 4. Collier County Museum, Vertical File.

Neill, Wilfred T.
    1968    An Indian and Spanish Site on Tampa Bay, Florida. *The Florida Anthropologist* 21(4): 106-116.

Newman, Christine
    1995    An Archaeological Inventory of the Rookery Bay C.A.R.L. Project. FDHR, Tallahassee.

Palov, Maria Z.
    1999    Useppa's Cuban Fishing Community. In *The Archaeology of Useppa Island*. Edited by W. H. Marquardt, pp. 149-169. *Monograph* 3. Institute of Archaeology and Paleoenvironmental Studies, Gainesville.

Porter, Kenneth W.
    1996    *The Black Seminoles*. University Press of Florida, Gainesville.

Ramenofsky, Ann F.
    1987    *Vectors of Death: The Archaeology of European Contact*. University of New Mexico Press, Albuquerque.

Russo, Michael
    1991    *Archaic Sedentism on the Florida Coast: A Case Study from Horr's Island*. Ph.D. dissertation, Department of Anthropology, University of Florida, Gainesville.
    1994a   A Brief Introduction to the Study of Archaic Mounds in the Southeast. *Southeastern Archaeology* 13(2): 89-92.
    1994b   Why We Don't Believe in Archaic Ceremonial Mounds and Why We Should:  The Case from Florida. *Southeastern Archaeology* 13(2): 93-108.
    2008    Late Archaic Shell Rings and Society in the Southeast U.S. *SAA Record* 8(5): 18-22.

Sassaman, Kenneth E.
    2008    The New Archaic, It Ain't What It Used to Be. *The SAA Archaeological Record* 8 (5): 6-8.

Schwadron, Margo
    2005    *Archeological Investigation of Eastern Everglades Tree Island Sites, Everglades National Park*. Paper presented at the Florida Anthropological Society Meeting, Gainesville.

Scott, Thomas M.
    1978    Environmental Geology Series: Orlando Sheet. *Map Series* 85. Florida Department of Natural Resources, Bureau of Geology, Tallahassee.
    2001    Text to Accompany the Geologic Map of Florida. *Open File Report* 80. Florida Geological Survey, Tallahassee.

Scott, Thomas M., Kenneth M. Campbell, Frank R. Rupert, Jonathan D. Arthur, Thomas M. Missimer, Jacqueline M. Lloyd, J. William Yon, and Joel G. Duncan
    2001    Geologic Map of the State of Florida. *Map Series* 146. Florida Geological Survey, Tallahassee.

Scupholm, Carrie
    1997    The Tamiami Trail: Connecting the East and West Coasts of the Sunshine State. *The Society for Commercial Archeology Journal* 15(2): 20-24.

Shofner, Jerrell H.
    1995    *History of Brevard County*. Volume 1. Brevard County Historical Commission, Stuart.

Skinner, Abe
    2019    Records Search. Collier County Property Appraiser, Naples.

Smith, Marvin T.
    1987    *Archaeology of Aboriginal Culture Change in the Interior Southeast: Depopulation during the Early Historic Period*. University Press of Florida, Gainesville.

State of Florida, Department of Environmental Protection
    1875    *Field Notes.* Volume 228. H. Jenkins.
    1876    *Plat. Township 50 South, Range 25 East*. H. Jenkins
    n.d.    *Tract Book*. Volume 22.

Tebeau, Charlton W.
    1966    *Florida's Last Frontier: The History of Collier County*. University of Miami Press, Coral Gables.
    1980    *A History of Florida*. University of Miami Press, Coral Gables.

Tebeau, Charlton W. and Ruby Leach Carson, Eds.
    1965    *Florida -- From Indian Trail to Space Age*. Southern Publishing Co., Delray Beach.

True, David O., Ed.
    1944    *Memoir of D. Escalante Fontaneda Respecting Florida*. University of Miami and South Florida Historical Society, Miami.

United States Congress
    1837    Report from the Secretary of War in Compliance with Resolution of the Senate of the 14th and 18th Instant, Transmitting Copies of Correspondence Relative to the Campaign in Florida. 24th Congress, 2nd Session, May 21, Washington, D.C.
    1850    Hostilities Committed by the Seminole Indians in Florida during the Past Year. 31st Congress, 1st Session, Washington, D.C.

United States Fish and Wildlife Commission (USFWC)
    n.d.    History. Florida Panther National Wildlife Refuge, Naples.

United States Department of Agriculture (USDA)
1954    *Soil Survey Detailed Reconnaissance Collier County, Florida*. U.S. Department of Agriculture, Washington, D.C.
1962    Aerial photograph - 12-14-1962, DSM-1DD-262. PALMM, Gainesville.
1998    *Soil Survey of Collier County Area, Florida*. United States Natural Resources Conservation Service.
1995    Aerial Photograph. 1-26-1995, USGS image (Google Earth)
2018    *Soil Survey Geographic (SSURGO) Database for Florida - May2015*. USDA, NRCS, Fort Worth.

United States Geological Survey (USGS)
1958a    South Naples, FL.
1958b    South Naples, FL. Photorevised 1972.

Watts, William A.
1969    A Pollen Diagram from Mud Lake, Marion County, North-Central Florida. *Geological Society of America Bulletin* 80(4): 631-642.
1971    Post Glacial and Interglacial Vegetational History of Southern Georgia and Central Florida. *Ecology* 51: 676-690.
1975    A Late Quaternary Record of Vegetation from Lake Annie, South-Central Florida. *Geology* 3(6): 344-346.

Watts, William A., Eric C. Grimm, and T. C. Hussey
1996    Mid-Holocene Forest History of Florida and the Coastal Plain of Georgia and South Carolina. In *Archaeology of the Mid-Holocene Southeast*. Edited by K. E. Sassaman and D. G. Anderson, pp. 28-38. University Press of Florida, Gainesville.

Watts, William A. and Barbara C. S. Hansen
1994    Pre-Holocene and Holocene Pollen Records of Vegetation History for the Florida Peninsula and their Climatic Implications. *Palaeogeography, Palaeoclimatology, Palaeoecology* 109: 163-176.

Weisman, Brent Richards
1989    *Like Beads on a String, A Cultural History of the Seminole Indians in North Peninsular Florida*. University of Alabama Press, Tuscaloosa.
1999    *Unconquered People, Florida's Seminole and Miccosukee Indians*. University Press of Florida, Gainesville.

Wheeler, Ryan J.
1994    Early Florida Decorated Bone Artifacts: Style and Aesthetics from Paleo-Indian Through Archaic. *The Florida Anthropologist* 47(1): 47-60.

White, William A.
1970    Geomorphology of the Florida Peninsula. *Geological Bulletin* 51. Florida Department of Natural Resources, Bureau of Geology, Tallahassee.

Widmer, Randolph J.
1974    A Survey and Assessment of the Archaeological Resources on Marco Island, Collier County, Florida. *Miscellaneous Project Report Series* 19. FDHR, Tallahassee.
1988    *The Evolution of the Calusa*. University of Alabama Press, Tuscaloosa.

**APPENDIX**

Survey Log

Page 1

Ent D (FMSF only) _____



# Survey Log Sheet
### Florida Master Site File
### Version 5.0  3/19

Survey # (FMSF only) _____

Consult *Guide to the Survey Log Sheet* for detailed instructions.

## Manuscript Information

**Survey Project** (name and project phase)
CRAS Fleischmann Acquisition Parcel, Phase I

**Report Title** (exactly as on title page)
Cultural Resource Assessment Survey of the Fleischmann Acquisition Parcel, Collier County, Florida

**Report Authors** (as on title page)   1. ACI   3. _____
2. _____   4. _____

**Publication Year** ___2019___   **Number of Pages in Report** (do not include site forms) ___44___

**Publication Information** (Give series, number in series, publisher and city. For article or chapter, cite page numbers. Use the style of *American Antiquity*.)
ACI, Sarasota P19160

**Supervisors of Fieldwork** (even if same as author)  Names  Maranda Kles

**Affiliation of Fieldworkers:**  Organization  Archaeological Consultants Inc   City  Sarasota

**Key Words/Phrases** (Don't use county name, or common words like *archaeology, structure, survey, architecture, etc.*)
1. _____   3. _____   5. _____   7. _____
2. _____   4. _____   6. _____   8. _____

**Survey Sponsors** (corporation, government unit, organization, or person funding fieldwork)
Name  Minto Communities- USA   Organization _____
Address/Phone/E-mail  4280 Tamiami Tr E, Suite 203/204, Naples, FL 34112

**Recorder of Log Sheet**  Maranda Kles   **Date Log Sheet Completed**  12-10-2019

**Is this survey or project a continuation of a previous project?**  ☒No   ☐Yes:  **Previous survey #s (FMSF only)** _____

## Project Area Mapping

**Counties** (select every county in which field survey was done; attach additional sheet if necessary)
1. Collier   3. _____   5. _____
2. _____   4. _____   6. _____

**USGS 1:24,000 Map Names/Year of Latest Revision** (attach additional sheet if necessary)
1. Name  NAPLES SOUTH   Year 1972   4. Name _____   Year ____
2. Name _____   Year ____   5. Name _____   Year ____
3. Name _____   Year ____   6. Name _____   Year ____

## Field Dates and Project Area Description

**Fieldwork Dates: Start** 11-25-2019  **End** 12-5-2019   **Total Area Surveyed** (fill in one) ____ hectares  101.00 acres
**Number of Distinct Tracts or Areas Surveyed** ___1___
**If Corridor** (fill in one for each) Width: ____ meters ____ feet   **Length:** ____ kilometers ____ miles

HR6E066R0319, effective 05/2016
Rule 1A-46.001, F.A.C.

Florida Master Site File / Div. of Historical Resources / R.A. Gray Bldg / 500 S Bronough St., Tallahassee, Florida 32399-0250
Phone 850.245.6440, Fax 850.245.6439, Email: SiteFile@dos.myflorida.com

**Page 2**                          **Survey Log Sheet**                    Survey #_____

## Research and Field Methods

**Types of Survey** (select all that apply):  ☒archaeological  ☒architectural  ☐historical/archival  ☐underwater
☐damage assessment  ☐monitoring report  ☐other(describe): _____

**Scope/Intensity/Procedures**

```
background research; 93 STs (73@50m; 20 judgmental) 0 positive; reconnisance
```

**Preliminary Methods** (select as many as apply to the project as a whole)
☒Florida Archives (Gray Building)    ☒library research- *local public*    ☒local property or tax records    ☒other historic maps    ☐LIDAR
☐Florida Photo Archives (Gray Building)    ☐library-special collection    ☒newspaper files    ☒soils maps or data    ☐other remote sensing
☐Site File property search    ☐Public Lands Survey (maps at DEP)    ☒literature search    ☒windshield survey
☒Site File survey search    ☐local informant(s)    ☒Sanborn Insurance maps    ☒aerial photography
☐other (describe): _____

**Archaeological Methods** (select as many as apply to the project as a whole)
☐Check here if **NO** archaeological methods were used.
☐surface collection, controlled    ☐shovel test-other screen size    ☐block excavation (at least 2x2 m)    ☐metal detector
☐surface collection, uncontrolled    ☐water screen    ☐soil resistivity    ☐other remote sensing
☒shovel test-1/4"screen    ☐posthole tests    ☐magnetometer    ☒pedestrian survey
☐shovel test-1/8" screen    ☐auger tests    ☐side scan sonar    ☐unknown
☐shovel test 1/16"screen    ☐coring    ☐ground penetrating radar (GPR)
☐shovel test-unscreened    ☐test excavation (at least 1x2 m)    ☐LIDAR
☐other (describe): _____

**Historical/Architectural Methods** (select as many as apply to the project as a whole)
☐Check here if **NO** historical/architectural methods were used.
☐building permits    ☐demolition permits    ☐neighbor interview    ☐subdivision maps
☐commercial permits    ☒windshield survey    ☐occupant interview    ☐tax records
☐interior documentation    ☒local property records    ☐occupation permits    ☐unknown
☐other (describe): _____

## Survey Results

**Resource Significance Evaluated?**  ☐Yes  ☒No
**Count of Previously Recorded Resources** _____0_____    **Count of Newly Recorded Resources** _____0_____

**List Previously Recorded Site ID#s with Site File Forms Completed** (attach additional pages if necessary)

**List Newly Recorded Site ID#s** (attach additional pages if necessary)

**Site Forms Used:**    ☐Site File Paper Forms    ☐Site File PDF Forms

# REQUIRED: Attach Map of Survey or Project Area Boundary

| SHPO USE ONLY | SHPO USE ONLY | SHPO USE ONLY |
|---|---|---|

**Origin of Report:**  ☐872  ☐Public Lands  ☐UW  ☐1A32 # _____  ☐Academic  ☐Contract  ☐Avocational
☐Grant Project # _____  ☐Compliance Review: CRAT # _____
**Type of Document:**  ☐Archaeological Survey  ☐Historical/Architectural Survey  ☐Marine Survey  ☐Cell Tower CRAS  ☐Monitoring Report
☐Overview  ☐Excavation Report  ☐Multi-Site Excavation Report  ☐Structure Detailed Report  ☐Library, Hist. or Archival Doc
☐Desktop Analysis  ☐MPS  ☐MRA  ☐TG  ☐Other: _____
**Document Destination:** _Plottable Projects_ ___ ___    **Plotability:** _____



Received
Electronically
April 7, 2021
South District



**Fleischmann Acquisition Parcel**
Township 50 South, Range 25 East, Sections 23 and 26
USGS Naples South
Collier County.



**FLORIDA DEPARTMENT of STATE**

**RON DESANTIS**
Governor

**LAUREL M. LEE**
Secretary of State

Ms. Marion Almy
Archaeological Consultants, Inc.
8110 Blaikie Court, Suite A
Sarasota, Florida 34240

June 10, 2020

RE:    DHR Project File No.: 2020-2768-A,    Received by DHR: May 19, 2020

U.S. Army Corps of Engineers (Corps) Permit No.: SAJ-2020-01294
*Cultural Resource Assessment Survey of the Fleischmann Acquisition Parcel, Collier County, Florida*

Dear Ms. Almy:

Our office received and reviewed the above referenced project for possible effects on historic properties listed, or eligible for listing, on the *National Register of Historic Places* (NRHP). The review was conducted in accordance with Section 106 of the *National Historic Preservation Act of 1966,* as amended, and its implementing regulations in *36 CFR Part 800: Protection of Historic Properties,* and Chapters 267.061 and 373.414, *Florida Statutes,* and implementing state regulations.

In December 2019, Archaeological Consultants, Inc., (ACI) conducted the above referenced cultural resource assessment survey (CRAS) on behalf of Minto Communities in compliance with requirements for U.S. Army Corps of Engineers (Corps) permit no. SAJ-2020-01294. ACI encountered no cultural resources within the 101-acre area of potential effect (APE) during their investigation. ACI concluded that this project will have no effect on cultural resources listed, or eligible for listing, in the NRHP, and recommends no additional work in the APE. Based on the information provided, our office concurs with the results of the survey and we find the submitted report complete and sufficient in accordance with Chapter 1A-46, *Florida Administrative Code*. This project is subject to a Corps review and determination of effects, which we have not yet received. As such, our comments on the project's effects will be provided to the Corps directly upon receipt of their effects determination communication.

If I can be of any further help, or if you have any questions about this letter, please feel free to contact Clete Rooney at *Cletus.Rooney@dos.myflorida.com*.

Sincerely,

Timothy A. Parsons, Ph.D.
Director, Division of Historical Resources
and State Historic Preservation Officer

**Division of Historical Resources**
R.A. Gray Building • 500 South Bronough Street• Tallahassee, Florida  32399
850.245.6300 • 850.245.6436 (Fax) • FLHeritage.com



| | |
|---|---|
| **From:** | Danielle Simon <daniellesimon@semtribe.com> |
| **Sent:** | Thursday, March 25, 2021 8:24 AM |
| **To:** | Kelly.L.Chase@FloridaDEP.gov |
| **Cc:** | THPO Compliance; Andy Woodruff; Hardman, Curtis; Michael Elgin (melgin@mintousa.com); Steve Lewis (slewis@llw-law.com) |
| **Subject:** | RE: THPO Compliance Tracking Number 0032943; State 404 Individual Permit Application No. 398942-001 Isles of Collier Preserve |

### SEMINOLE TRIBE OF FLORIDA
### TRIBAL HISTORIC PRESERVATION OFFICE



TRIBAL HISTORIC
PRESERVATION OFFICE

SEMINOLE TRIBE OF FLORIDA

30290 JOSIE BILLIE HIGHWAY
PMB 1004
CLEWISTON, FL 33440

THPO PHONE: (863) 983-6549
FAX: (863) 902-1117

THPO WEBSITE: WWW.STOFTHPO.COM

**TRIBAL OFFICERS**

MARCELLUS W. OSCEOLA JR.
CHAIRMAN

MITCHELL CYPRESS
VICE CHAIRMAN

LAVONNE ROSE
SECRETARY

PETER A. HAHN
TREASURER

March 25, 2021

Ms. Kelly L. Chase
ERP/404 Historical and Tribal Resources Coordinator
Florida Department of Environmental Protection
Kelly.L.Chase@FloridaDEP.gov
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400
Office: (850) 245-8580

**Subject:** State 404 Individual Permit Application No: 398942-001; Isle of Collier Reserve Residential Subdivision, Collier County
**THPO Compliance Tracking Number:** 0032943

**In order to expedite the THPO review process:**
  1. Please correspond via email and provide documents as attachments,
  2. Please send all emails to THPOCompliance@semtribe.com,
  3. Please reference the THPO Compliance Tracking Number if one has been assigned.

Dear Ms. Chase,

Thank you for contacting the Seminole Tribe of Florida – Tribal Historic Preservation Office (STOF-THPO) Compliance Section regarding the *State 404 Individual Permit Application No: 398942-001; Isle of Collier Reserve Residential Subdivision, Collier County*.

The proposed undertaking does fall within the STOF Area of Interest. We have reviewed the additional information that you kindly provided and completed our assessment pursuant to Section 106 of the National Historic Preservation Act (16 USC 470) as amended and its implementing regulations (36 CFR 800). We have no objections or other comments at this time. Please notify us if any archaeological, historical, or burial resources are inadvertently discovered during project implementation and feel free to contact us with any questions or concerns.

Respectfully,

Danielle A. Simon, MA, RPA
Compliance Review Specialist
STOF-THPO, Compliance Review Section
30290 Josie Billie Hwy, PMB 1004
Clewiston, FL 33440
Email: daniellesimon@semtribe.com

---

**From:** Andy Woodruff <andyw@passarella.net>
**Sent:** Wednesday, March 24, 2021 3:33 PM
**To:** THPO Compliance <THPOCompliance@semtribe.com>
**Cc:** Hardman, Curtis <Curtis.Hardman@FloridaDEP.gov>; Kelly.L.Chase@FloridaDEP.gov; Michael Elgin (melgin@mintousa.com) <melgin@mintousa.com>; Steve Lewis (slewis@llw-law.com) <slewis@llw-law.com>
**Subject:** THPO Compliance Tracking Number 0032943

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Please find attached the Cultural Resources Assessment Survey and Division of Historical Resources concurrence of survey findings associated with State 404 Individual Permit Application No. 398942-001 Isles of Collier Preserve – Fleischmann Parcel. Please let us know if there is anything additional you require to complete Tribal Historic Preservation Office review. Thank you.

Andrew Woodruff
Vice President
Passarella & Associates, Inc.
*Offices in Florida and South Carolina*
13620 Metropolis Avenue, Suite 200
Fort Myers, Florida  33912
Phone (239) 274-0067 office
www.passarella.net
The best way to reach me during this time is via my mobile phone at (239) 707-4925

Confidentiality Note:  The information contained in this transmission is legally privileged and confidential, intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you receive this communication in error, please notify us immediately by telephone call to (239) 274-0067 and delete this message.  Thank you.


Received Electronically
April 7, 2021
South District

ENVIRONMENTAL RESOURCE PERMIT PLANS

FOR

# THE ISLES OF COLLIER PRESERVE

## FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26, TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

## PROJECT DATA

### SITE ADDRESS
BAYSHORE DRIVE
NAPLES, FLORIDA

### PROJECT DATUM
STATE PLANE FLORIDA EAST ZONE (NAVD 1983 (NSRS 2007))
NORTH AMERICAN VERTICAL DATUM (NAVD) 1988

### ZONING
PENDING

### RECORD PLAT
PENDING

### FLOOD ZONE
ACCORDING TO THE FLOOD INSURANCE RATE MAP
NO. 12021C0609H & 12021C0694H, EFFECTIVE DATE:
MAY 16, 2012, THE SUBJECT PARCEL IS LOCATED IN
FLOOD ZONE "AE" (ELEVATION FT NAVD 1988)

### PROPERTY ID NOS.
61836900009
61836100007
61836100007
61836200006
61836201007

### PERMIT REQUIREMENTS

| AGENCY | STATUS | NOTES |
|---|---|---|
| S. FLORIDA WATER MANAGEMENT DISTRICT | PENDING | PERMIT NO. 11-100360-P, APP. NO. 160926-603 |
| CONSTRUCTION PLAN AND PLAT APPLICATION | PENDING | |
| FLORIDA DEPARTMENT OF HEALTH | PENDING | |
| FLORIDA DEPT. OF ENVIRONMENTAL PROTECTION | PENDING | |
| F.D.O.T. CONNECTION PERMIT | N/A | |
| F.D.O.T. DRAINAGE CONNECTION PERMIT | N/A | |
| F.D.O.T. UTILITY PERMIT | N/A | |
| ARMY CORPS OF ENGINEERS | PENDING | |
| F.D.E.P. NOTICE OF INTENT | PENDING | |

NOTE: CONTRACTOR MUST OBTAIN AND KEEP ON FILE A COPY OF ALL PERMITS
REQUIRED PRIOR TO COMMENCEMENT OF ANY CONSTRUCTION ACTIVITY

## DESIGN TEAM

### PROJECT ENGINEER
TIMOTHY B. GAVIN, P.E.

### PROJECT MANAGEMENT
CHRIS VAN BUSKIRK

### DESIGN ENGINEER
AMBER N. GAVIN, P.E.

### PROJECT SURVEYOR
SCOTT A. WHEELER, PSM

### LEAD DESIGN TECHNICIAN
GUY SAPER

### SITE PLANNING
JENNIFER SAPEN, AICP

### DESIGN STAFF
JAMIE L. TODD, E.I.

### LAND PLANNING

### QUALITY CONTROL
CHRIS VAN BUSKIRK

### RECORD DRAWINGS

THESE PLANS MAY HAVE BEEN MODIFIED IN SIZE BY REPRODUCTION.
THIS MUST BE CONSIDERED WHEN OBTAINING SCALED DATA.

ALL DIMENSIONS ARE IN FEET.





PROJECT LOCATION






LOCATION MAP

0   500  1000        2000
SCALE IN FEET

## INDEX OF DRAWINGS

ENGINEER OF RECORD, SIGNATURE AND SEAL APPLY TO THE FOLLOWING PLAN SHEETS, EXCLUDING ANY SUPPLEMENTS

| SHEET | DESCRIPTION | XREF | DRAWING NAME |
|---|---|---|---|
| 1.0 | COVER SHEET AND LOCATION MAP | A | 23780E01.DWG |
| 2.0 | STANDARD NOTES, LEGEND, AND ABBREVIATIONS | - | 23780E02.DWG |
| 3.0 | AERIAL PHOTOGRAPH AND EXISTING CONDITIONS | B | 23780E06.DWG |
| 4.0 | MASTER DRAINAGE PLAN | A | 23780E11.DWG |
| 5,6,6.8 | DETAILED PAVING, GRADING, AND DRAINAGE PLANS | A | 23780E15.DWG |
| 7.0 | TYPICAL SECTION INDICATORS | A | 23780E17.DWG |
| 7.0-7.2 | TYPICAL SECTIONS AND DETAILS | A | 23780E18.DWG |
| 8.0 | CONTROL STRUCTURE AND DRAINAGE DETAILS | - | 23780E40.DWG |
| 9.0 | EROSION CONTROL DETAILS | A | 23780E53.DWG |
| 10.0 | STORMWATER POLLUTION PREVENTION PLAN | A | 23780E2.DWG |

CROSS-REFERENCED DRAWINGS:

| XREF | DESCRIPTION | | DRAWING NAME |
|---|---|---|---|
| A | BASE LINEWORK PLAN | | 23780E00.DWG |
| B | SURVEY LINEWORK PLAN | | 23080000.DWG |

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

Barraco
and Associates, Inc.
CIVIL ENGINEERING · LAND SURVEYING
LAND PLANNING
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
www.barraco.net

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 242-3838
FAX (813) 563-5851
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

Digitally signed
by Timothy B
Gavin
Date:
2020.12.04
15:32:56 -05'00'

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

COVER SHEET
AND
LOCATION MAP

| PROJECT FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 1.0 |



Received Electronically
April 7, 2021
South District

## STANDARD ABBREVIATIONS

NOTE: SEE FLORIDA DEPARTMENT OF TRANSPORTATION STANDARD PLANS ABBREVIATIONS FOR ADDITIONAL ABBREVIATIONS NOT LISTED BELOW.

| | |
|---|---|
| AASHTO | AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS |
| ABD. | ABANDONED |
| AC. | ACRE |
| A.D.A. | AMERICANS WITH DISABILITIES ACT |
| ADJ. | ADJUST |
| A.D.T. | AVERAGE DAILY TRAFFIC |
| A.E. | ACCESS EASEMENT |
| A.A.D.T. | ANNUAL AVERAGE DAILY TRAFFIC |
| AGG. | AGGREGATE |
| A.I.C.P. | AMERICAN INSTITUTE OF CERTIFIED PLANNERS |
| ALT. | ALTERNATE |
| ALUM. | ALUMINUM |
| A.M. | 12:00 MIDNIGHT UNTIL 11:59 NOON |
| A.N.S.I. | AMERICAN NATIONAL STANDARDS INSTITUTE |
| APPL. | APPLICATION |
| APPROX. | APPROXIMATELY |
| ASPH. | ASPHALT |
| ASSY. | ASSEMBLY |
| A.S.T.M. | AMERICAN SOCIETY FOR TESTING MATERIALS |
| AUX. | AUXILIARY |
| AVE. | AVENUE |
| AVG. | AVERAGE |
| B.E. | BURIED ELECTRIC |
| B/L. | BASE LINE |
| BLVD. | BOULEVARD |
| B.M. | BENCHMARK |
| B.O.C. | BACK OF CURB |
| BOT. | BOTTOM |
| B.P. | BORROW PIT |
| BR. | BRIDGE |
| BRG. | BEARING |
| B.T. | BURIED TELEPHONE |
| BTWN. | BETWEEN |
| B/W | BARBED WIRE |
| CALC. | CALCULATED |
| (C) | CALCULATED OR CUT |
| CAP. | CAPACITY |
| CATV. | CABLE TELEVISION |
| C.B. | CATCH BASIN |
| CBC. | CONCRETE BOX CULVERT |
| CBS. | CONCRETE BOX STRUCTURE |
| C/C | CENTER TO CENTER |
| CCMB. | COUNTY COMMISSIONERS MINUTES BOOK |
| C.E. | CONTROL ELEVATION |
| CEM. | CEMENT |
| C.F. | CUBIC FOOT |
| C.I. | CAST IRON |
| C.I.P. | CAST IRON PIPE |
| C/L | CENTER LINE |
| CONC. | CONCRETE |
| C.M. | CONCRETE MONUMENT |
| C.M.P. | CORRUGATED METAL PIPE |
| CO. | COUNTY OR COMPANY |
| C/O | CLEANOUT |
| COL. | COLUMN |
| COM. | COMMERCIAL |
| CONST. | CONSTRUCTION |
| CONT. | CONTRACTOR |
| COORD. | COORDINATE |
| COR. | CORNER |
| C.P. | CONTROL POINT |
| C.R. | CONTROL RADIUS |
| C.S. | CONTROL STRUCTURE |
| CTR. | CENTER |
| C.U.E. | COUNTY UTILITY EASEMENT |
| CULV. | CULVERT |
| C.Y. | CUBIC YARD |
| CYL. | CYLINDRICAL |
| D. | DEGREE OF CURVATURE |
| DA. | DAY(S) |
| (D) | DEED |
| D.A. | DRAINAGE AREA |
| D.B. | DEED BOOK |
| D.B.I. | DITCH BOTTOM INLET |
| DBL. | DOUBLE |
| D.C.S. | DEGREE OF CURVATURE (SPIRAL) |
| D.D.C.V. | DOUBLE DETECTOR CHECK VALVE |
| D.E. | DRAINAGE EASEMENT |
| DECEL. | DECELERATION |
| DEMOBL. | DEMOBILIZATION |
| DEN. | DENSITY |
| DEPT. | DEPARTMENT |
| DET. | DETOUR |
| D.H.W. | DESIGN HIGH WATER |
| DIA. | DIAMETER |
| D.I.P. | DUCTILE IRON PIPE |
| DIR. | DIRECTION |
| DIST. | DISTANCE |
| D.O.T. | DEPARTMENT OF TRANSPORTATION |
| DR. | DRIVE |
| DRWY. | DRIVEWAY |
| D.S. | DESIGN SPEED |
| D.S.W.T | DRY SEASON WATER TABLE |
| DWG. | DRAWING |
| E. | EAST |
| EA. | EACH |
| e. | RATE OF SUPER ELEVATION |
| E.I. | ENGINEERING INTERN |
| EL.orELEV. | ELEVATION |
| ELEC. | ELECTRIC |
| ELLIP. | ELLIPTICAL |
| EMBK. | EMBANKMENT |
| ENCL. | ENCLOSURE |
| E.O.P. | EDGE OF PAVEMENT |
| E.O.W. | EDGE OF WATER |
| EQ. | EQUATION OR EQUAL |
| EQUIP. | EQUIPMENT |
| E.R.C.P. | ELLIPTICAL REINFORCED CONCRETE PIPE |
| ESMT. | EASEMENT |
| ETC. | ET CETERA (AND SO FORTH) |
| E.W. | ENDWALL |
| EXCAV. | EXCAVATION |
| EX. | EXISTING |
| EXP. | EXPANSION |
| EXT. | EXTENSION |
| (F) | FILL |
| F. TO F. | FACE TO FACE |
| F.A.C. | FLORIDA ADMINISTRATIVE CODE |
| F.A.C.B.C. | FLORIDA ACCESSIBILITY CODE FOR BUILDING CONSTRUCTION |
| F.B.C. | FLORIDA BUILDING CODE |
| FD. | FOUND |
| F.D.C. | FIRE DEPARTMENT CONNECTION |
| FDN. | FOUNDATION |
| F.D.O.T. | FLORIDA DEPARTMENT OF TRANSPORTATION |
| FED. | FEDERAL |
| FERT. | FERTILIZER |
| F.E.S. | FLARED END SECTION |
| F.F.E. | FINISHED FLOOR ELEVATION |
| F.H. | FIRE HYDRANT |
| FHWA. | FEDERAL HIGHWAY ADMINISTRATION |
| FIN. | FINISH |
| FL. | FLORIDA |
| FLEX. | FLEXIBLE |
| F.M. | FORCEMAIN |
| F.O.C. | FACE OF CURB |
| F.P.S. | FEET PER SECOND |
| FRAC. | FRACTION |
| FREQ. | FREQUENCY |
| F. | FOOT OR FEET |
| FURN. | FURNISH |
| G. | GRAM |
| GAL. | GALLON |
| GALV. | GALVANIZED |
| GA. | GAUGE OR GAGE |
| GAR. | GARAGE |
| GOV'T. | GOVERNMENT |
| GM. | GROSS MILE |
| GR. | GUARDRAIL |
| GRND. | GROUND |
| GV. | GATE VALVE |
| H. | HEIGHT |
| H.D. | HIGH DENSITY |
| HDWL. | HEADWALL |
| HNDRL. | HANDRAIL |
| HORIZ. | HORIZONTAL |
| H.P. | HIGH PRESSURE OR HORSE POWER |
| H.W. | HIGH WATER |
| HWY. | HIGHWAY |
| HYD. | HYDRANT |
| I. | EXTERNAL ANGLE (DELTA) |
| I.D. | INSIDE DIAMETER |
| I.E. | INVERT ELEVATION |
| IN. | INCH |
| INC. | INCORPORATED |
| INCL. | INCLUDED |
| I.P. | IRON PIPE |
| I.R. | IRON ROD |
| IRR. | IRRIGATION |
| INSTL. | INSTALL OR INSTALLATION |
| INST. NO. | INSTRUMENT NUMBER |
| INT. | INTERSECTION |
| INV. | INVERT |
| J.B. | JUNCTION BOX |
| JCT. | JUNCTION |
| JT. | JOINT |
| K. | RATE OF VERTICAL CURVATURE |
| KM. | KILOMETER |
| KV. | KILOVOLT |
| KVA. | KILOVOLT AMPERES |
| L. | LENGTH, LENGTH OF CURVE |
| L.A. | LIMITED ACCESS |
| LAT. | LATERAL OR LATITUDE |
| LB. | POUND OR LICENSED BUSINESS |
| L.C.R. | LEE COUNTY RECORDS |
| L.C.U. | LEE COUNTY UTILITIES |
| L.C.U.E. | LEE COUNTY UTILITIES EASEMENT |
| L= | ARC LENGTH |
| LF. | LINEAR FOOT |
| L.M.E. | LAKE MAINTENANCE EASEMENT |
| LOC. | LOCATION |
| L.S. | LUMP SUM OR LIFT STATION |
| LT. | LEFT |
| M. | MASS |
| (M) | MEASURED |
| MAINT. | MAINTENANCE |
| MAX. | MAXIMUM |
| MED. | MEDIAN |
| M.E.S. | MITERED END SECTION |
| MG | MILLION GALLONS |
| M.H. | MANHOLE |
| M.H.W. | MEAN HIGH WATER |
| MI. | MILE |
| MIN. | MINIMUM |
| MISC. | MISCELLANEOUS |
| M.L.W. | MEAN LOW WATER |
| MM. | MILLIMETER |
| MOD. | MODIFY OR MODIFIED |
| MON. | MONUMENT |
| M.O.T. | MAINTENANCE OF TRAFFIC |
| M.P.H. | MILES PER HOUR |
| M.S.L. | MEAN SEA LEVEL |
| M.U.T.C.D. | MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES |
| N. | NORTH |
| N/A | NOT APPLICABLE |
| NE. | NORTHEAST |
| NGVD | NATIONAL GEODETIC VERTICAL DATUM OF 1929 |
| NAVD | NORTH AMERICAN VERTICAL DATUM OF 1988 |
| N.G.S. | NATIONAL GEODETIC SURVEY |
| N.H.W. | NORMAL HIGH WATER |
| NM. | NET MILE |
| N.S.R.S. | NATIONAL SPATIAL REFERENCE SYSTEM |
| N.T.S. | NOT TO SCALE |
| NW. | NORTHWEST |
| O.D. | OUTSIDE DIAMETER |
| O.E. | OVERHEAD ELECTRIC |
| OPT. | OPTIONAL |
| O.R. | OFFICIAL RECORD BOOK |
| OZ. | OUNCE |
| (P) | PLAT |
| PAVT. | PAVEMENT |
| P.C. | POINT OF CURVATURE |
| P.E. | PROFESSIONAL ENGINEER |
| PED. | PEDESTRIAN OR PEDESTAL |
| PG. | PAGE |
| P.G.L. | PROFILE GRADE LINE |
| P.I.E. | PRIVATE IRRIGATION EASEMENT |
| P.I.V. | POST INDICATOR VALVE |
| PH | MEASURE OF ACIDITY OR ALKALINITY |
| P.I. | POINT OF INTERSECTION |
| PK. | PARKER-KALON |
| PL. | PROPERTY LINE |
| P.M. | 12:00 NOON UNTIL 11:59 MIDNIGHT |
| P.O.C. | POINT ON CURVE |
| P.P. | POWER POLE |
| P.R.C. | POINT OF REVERSE CURVATURE |
| P.R.M. | PERMANENT REFERENCE MONUMENT |
| PROP. | PROPERTY |
| P.U.E. | PUBLIC UTILITY EASEMENT |
| P.S.I. | POUNDS PER SQUARE INCH |
| P.S.M. | PROFESSIONAL SURVEYOR AND MAPPER |
| P.V.C. | POLYVINYL CHLORIDE PIPE |
| P.V.I. | POINT OF VERTICAL INTERSECTION |
| Q. | PEAK DISCHARGE OR FLOW VOLUME (CFS) |
| QTY. | QUANTITY |
| R. or RAD. | RADIUS |
| RNG. | RANGE |
| REC. | RECORD |
| RECT. | RECTANGULAR |
| R.C.P. | REINFORCED CONCRETE PIPE |
| REINF. | REINFORCED OR REINFORCING |
| REL. | RELOCATED |
| REM. | REMOVED |
| REQ. | REQUIRED |
| RES. | RESIDENCE |
| R.M. | REFERENCE MONUMENT |
| R.P.M. | RAISED REFLECTIVE PAVEMENT MARKERS OR REVOLUTIONS PER MINUTE |
| R.P.P.A. | REDUCED PRESSURE PRINCIPLE ASSEMBLY |
| R.P.Z.D. | REDUCED PRESSURE BACKFLOW PREVENTION DEVICE |
| R.R. | RAILROAD |
| RT. | RIGHT |
| R/W | RIGHT OF WAY |
| S. | SOUTH |
| SAN. | SANITARY |
| SCH. | SCHEDULE |
| SE. | SOUTHEAST |
| SEC. | SECTION |
| SED. | SEDIMENT |
| SG. | SPECIFIC GRAVITY |
| SH. | SHEET |
| SHLDR. | SHOULDER |
| S.H.W.T. | SEASONAL HIGH WATER TABLE |
| SPEC. | SPECIFICATION |
| S.F. | SQUARE FOOT |
| S.P.I. | STANDARD PLAN INDEX |
| S.R. | STATE ROAD |
| ST. | STREET |
| STA. | STATION |
| STAB. | STABILITY OR STABILIZATION |
| STD. | STANDARD |
| STR. | STRUCTURE |
| S.Y. | SQUARE YARD |
| SW. | SOUTHWEST |
| S/W | SIDEWALK |
| T. | THICKNESS |
| TAN. | TANGENT |
| TWP. | TOWNSHIP |
| T.B.M. | TEMPORARY BENCH MARK |
| T.B.D. | TO BE DETERMINED |
| T.B.R. | TO BE REMOVED |
| TEL. | TELEPHONE |
| TEMP. | TEMPORARY |
| TN. | TON |
| T.U.E. | TECHNOLOGY UTILITY ESMT. |
| TYP. | TYPICAL |
| UG. | UNDERGROUND |
| U.E. | UTILITY EASEMENT |
| USC&GS | UNITED STATES COAST AND GEODETIC SURVEY |
| USGS | UNITED STATES GEOLOGICAL SURVEY |
| UTIL. | UTILITIES |
| VAR. | VARIABLE |
| V.C. | VERTICAL CURVE |
| VEH. | VEHICLE |
| V.F. | VERTICAL FOOT |
| VERT. | VERTICAL |
| VOL. | VOLUME |
| W. | WEST |
| WIT. | WITNESS |
| W.M. | WATERMAIN |
| X. | COORDINATE DISTANCE(EAST-WEST) |
| XING. | CROSSING |
| Y. | COORDINATE DISTANCE (NORTH-SOUTH) |
| YR. | YEAR |

## GENERAL NOTES

NOTE: SEE ADDITIONAL NOTES ON SITE DEVELOPMENT PLANS AND DETAIL SHEETS WHICH ARE SPECIFIC TO THIS PROJECT. IN THE EVENT OF A CONFLICT, UTILIZE NOTES ON SITE DEVELOPMENT PLANS.

1. THESE PLANS HAVE BEEN PREPARED IN ACCORDANCE WITH AND ARE GOVERNED BY THE LATEST EDITIONS OF THE F.D.O.T. STANDARD PLANS AND SPECIFICATIONS FOR ROAD AND BRIDGE CONSTRUCTION AND ALL LOCAL CODES. F.D.O.T. DESIGN STANDARD PLANS AND APPLICABLE DESIGN STANDARDS MODIFICATIONS ARE FOUND AT: https://www.fdot.gov/design/standardplans/default.shtm.
2. ALL APPROVALS REQUIRED IN CONJUNCTION WITH THESE NOTES MUST BE OBTAINED IN WRITING BY THE CONTRACTOR. ANY DEVIATIONS FROM THE PLANS AND / OR SPECIFICATIONS MUST BE APPROVED IN ADVANCE BY THE OWNER, ENGINEER, AND APPROPRIATE REGULATORY AGENCY.
3. CONTRACTOR SHALL ENSURE THAT ALL PERMITS ARE IN PLACE PRIOR TO CONSTRUCTION, THAT COPIES OF ALL PERMITS ARE RETAINED ON SITE AT ALL TIMES, AND SHALL ADHERE TO ALL PERMIT CONDITIONS. AT LEAST 72 HOURS PRIOR TO CONSTRUCTION, CONTRACTOR SHALL NOTIFY THE LOCAL MAINTENANCE ENGINEER'S OFFICE TO SECURE GENERAL USE PERMITS AND / OR OTHER PERMITS REQUIRED FOR WORK WITHIN F.D.O.T. RIGHT-OF-WAY.
4. ALL CONSTRUCTION SHALL COMPLY WITH THE LATEST VERSIONS OF THE AMERICANS WITH DISABILITIES ACT (A.D.A.) AND THE FLORIDA ACCESSIBILITY CODE FOR BUILDING CONSTRUCTION (F.A.C.B.C.). MAXIMUM SLOPE IN ACCESSIBLE PARKING SPACES AND LOADING ZONES SHALL NOT EXCEED 2.0% IN ALL DIRECTIONS. MAXIMUM RUNNING SLOPE SHALL NOT EXCEED 5% AND CROSS SLOPE SHALL NOT EXCEED 2% ON ALL SIDEWALKS AND CROSSWALKS.
5. SIDEWALKS ARE DESIGNED AND INTENDED FOR PEDESTRIAN TRAFFIC ONLY. ALL SIDEWALKS AND CURB CUTS SHALL BE IN ACCORDANCE WITH F.D.O.T. S.P.I. 522-002 AND SHALL INCLUDE DETECTABLE WARNING SURFACES. VALLEY GUTTER ADJACENT TO CURB CUTS SHALL DEVIATE FROM STANDARD DETAIL BY NOT EXCEEDING 12:1 SLOPES.
6. THE CONTRACTOR SHALL NOTIFY THE ENGINEER, OWNER'S REPRESENTATIVE AND APPROPRIATE AGENCY A MINIMUM OF 72 HOURS PRIOR TO ALL INSPECTIONS REQUIRED BY THE RESPECTIVE PERMIT.
7. THE CONTRACTOR SHALL NOTIFY THE OWNER AND CONTACT ALL UTILITY COMPANIES FOR LOCATIONS OF EXISTING UTILITIES A MINIMUM OF 72 HOURS PRIOR TO COMMENCING CONSTRUCTION. CONTRACTOR SHALL DETERMINE IF UTILITIES OTHER THAN THOSE SHOWN ON THESE PLANS EXIST. THE LOCATION OF EXISTING UTILITIES, PAVEMENT, VEGETATION, AND OTHER IMPROVEMENTS ARE APPROXIMATE ONLY. THE EXACT SIZES, ELEVATIONS, AND LOCATIONS SHALL BE VERIFIED BY THE CONTRACTOR IN THE FIELD PRIOR TO COMMENCING CONSTRUCTION OR ORDERING MATERIALS. CONTRACTOR SHALL NOTIFY ENGINEER / OWNER OF ANY DISCREPANCIES PRIOR TO CONSTRUCTION.
8. ANY PUBLIC LAND CORNER OR BENCHMARK WITHIN THE LIMITS OF CONSTRUCTION IS TO BE PROTECTED AND, IF IN DANGER OF BEING DESTROYED, MUST BE PROPERLY REFERENCED BY THE CONTRACTOR.
9. EXISTING IMPROVEMENTS SHALL REMAIN UNLESS NOTED OTHERWISE AND SHALL BE RESTORED TO A CONDITION EQUIVALENT TO THAT WHICH EXISTED PRIOR TO COMMENCING CONSTRUCTION AT NO ADDITIONAL COST TO THE OWNER. EXISTING OFF-SITE DRAINAGE PATTERNS SHALL BE MAINTAINED DURING CONSTRUCTION.
10. THE CONTRACTOR SHALL OBTAIN ANY CLEARING, VEGETATION REMOVAL, OR RIGHT-OF-WAY PERMITS REQUIRED FOR THIS PROJECT. ALL DEBRIS SHALL BE REMOVED FROM SITE AND PROPERLY DISPOSED OF.
11. CONTRACTOR SHALL BE RESPONSIBLE FOR MAINTAINING TRAFFIC AND USAGE OF THE EXISTING STREETS ADJACENT TO THE PROJECT. ALL TRAFFIC MAINTENANCE CONTROL SHALL BE IN ACCORDANCE WITH THE LATEST EDITION OF THE FLORIDA MANUAL OF TRAFFIC CONTROL AND SAFE PRACTICES FOR STREET CONSTRUCTION, MAINTENANCE, AND UTILITY OPERATIONS. CONTRACTOR SHALL ASSURE THAT ALL TRAFFIC CONTROL DEVICES MEET ACCEPTABLE STANDARDS AS OUTLINED IN THE LATEST EDITION OF THE AMERICAN TRAFFIC SAFETY SERVICES ASSOCIATION (ATSSA's) "QUALITY STANDARDS FOR WORK ZONE TRAFFIC CONTROL DEVICES", AND SHALL IMMEDIATELY REPAIR, REPLACE, OR CLEAN DAMAGED, DEFACED, OR DIRTY DEVICES. TRAFFIC CONTROL OPERATION PROCEDURES SHALL BE SUBMITTED TO OWNER FOR APPROVAL PRIOR TO BEGINNING CONSTRUCTION. ANY IMPACTS TO TRAFFIC FLOW SHALL BE COORDINATED WITH AND APPROVED BY THE APPROPRIATE LOCAL AGENCY.
12. CONTRACTOR SHALL VERIFY ALL DIMENSIONS AND ELEVATIONS PRIOR TO COMMENCEMENT OF CONSTRUCTION. ANY DISCREPANCIES SHALL BE IMMEDIATELY REPORTED TO THE ENGINEER AND OWNER'S REPRESENTATIVE.
13. THE LOCATIONS OF PROPOSED DRAINAGE STRUCTURES AND UTILITY LINES MAY BE FIELD ADJUSTED TO PRESERVE EXISTING VEGETATION AS APPROVED IN ADVANCE BY THE ENGINEER. UNDERGROUND CONTRACTOR SHALL MINIMIZE THE WORK AREA AND WIDTH OF TRENCHES TO AVOID DISTURBANCES OF NATURAL VEGETATION. EXERCISE CARE TO PROTECT THE ROOTS OF TREES TO REMAIN. WITHIN THE BRANCH SPREAD OF SUCH TREES, PERFORM ALL TRENCHING BY HAND. OPEN THE TRENCH ONLY WHEN UTILITIES CAN BE INSTALLED IMMEDIATELY. PRUNE INJURED ROOTS CLEANLY AND BACKFILL AS SOON AS POSSIBLE. SPOIL FROM TRENCHES SHALL BE PLACED ONLY ON PREVIOUSLY CLEARED AREAS OR AS DIRECTED BY THE OWNER. CONTRACTOR SHALL NOT REMOVE OR DISTURB ANY TREES AND/OR SHRUBS WITHOUT PRIOR APPROVAL BY OWNER.
14. INSTALLATION OF SUBSURFACE CONSTRUCTION, INCLUDING BUT NOT LIMITED TO WATER, SEWER AND IRRIGATION LINES, PUBLIC UTILITIES, AND STORM DRAINAGE IS REQUIRED PRIOR TO COMPACTION OF THE ROADWAY SUBGRADE.
15. SUBGRADE AND LIMEROCK BASE COURSES TO BE COMPACTED TO 98% MINIMUM OF THE MAXIMUM DRY DENSITY AS SPECIFIED BY AASHTO T-180 TESTING. CONTRACTOR SHALL PROVIDE THE ENGINEER SATISFACTORY DENSITY TESTS FOR SUBGRADE AND LIMEROCK PRIOR TO PAYMENT OR FINAL ACCEPTANCE. EXCESS ROAD BASE AND COMPACTED SOIL SHALL BE REMOVED FROM ALL LANDSCAPE AREAS PRIOR TO FINAL GRADING.
16. SWALE ELEVATIONS SHOWN ARE TO TOP OF SOD. CONTRACTOR TO ADJUST SWALE GRADING ACCORDINGLY. ALL UNPAVED AREAS SHALL BE GRADED TO DRAIN TO THE DRAINAGE SYSTEM TO PREVENT STANDING WATER. YARD DRAINS MAY BE ADDED IN GREEN AREAS AS NECESSARY AT THE DIRECTION OF THE LANDSCAPE ARCHITECT OR ENGINEER, AND SHALL HAVE PEDESTRIAN-SAFE GRATES MEETING THE REQUIREMENTS OF H-20 LOADING.
17. BERM ELEVATIONS SHOWN ARE THE MINIMUM REQUIRED. CONTRACTOR MAY EXCEED THE MINIMUM BERM ELEVATION BY UP TO 0.5 FEET PROVIDED ALL SLOPE CRITERIA IS MET. ANY CONSTRUCTION OF BERMS IN EXCESS OF THAT LIMIT MUST BE APPROVED BY THE ENGINEER PRIOR TO CONSTRUCTION.
18. THE CONTRACTOR SHALL NOTIFY THE ENGINEER WITHIN ONE WEEK OF COMPLETION OF DRAINAGE CONTROL STRUCTURES SO THAT ELEVATIONS MAY BE VERIFIED PRIOR TO COMPLETION OF CONSTRUCTION.
19. THE CONTRACTOR IS REQUIRED TO ADJUST ALL EXISTING AND PROPOSED VALVE BOXES, MANHOLE RIMS, GRATES AND OTHER IMPROVEMENTS AS REQUIRED TO MATCH THE FINAL GRADE.
20. THE CONTRACTOR SHALL COORDINATE WITH THE OWNER'S REPRESENTATIVE IN REGARDS TO THE LOCATION, SIZE AND QUANTITY OF ALL CONDUITS FOR UTILITIES, IRRIGATION, LIGHTING, AND OTHER IMPROVEMENTS PRIOR TO CONSTRUCTION OF THE ROADWAY SUBGRADE. CASING AND/OR CONDUIT SHALL HAVE A MINIMUM OF 30" COVER, EXTEND 5' BEYOND THE EDGE OF PAVEMENT, BACK OF CURB AND/OR SIDEWALK AT EACH END, AND ENDS SHALL BE SEALED AND DENOTED WITH MARKING TAPE
21. CONTRACTOR SHALL NOTIFY THE ENGINEER 24 HOURS PRIOR TO PLACING SOD ON AREAS THAT REQUIRE CRITICAL MINIMUM OR MAXIMUM ELEVATIONS IN ORDER FOR ENGINEER TO VERIFY SUCH ELEVATIONS. THE OBLIGATION TO ACHIEVE MINIMUM OR MAXIMUM ELEVATIONS REMAINS WITH THE CONTRACTOR.
22. AT MINIMUM, SOD A 12" STRIP ADJACENT TO ALL PAVEMENT PER F.D.O.T. REQUIREMENTS. SOD ALL UNPAVED DISTURBED AREAS WITHIN F.D.O.T. RIGHT OF WAY. ALL OTHER UNPAVED AREAS DISTURBED DURING CONSTRUCTION SHALL BE SEEDED, FERTILIZED AND MULCHED UNLESS NOTED OTHERWISE.
23. THE CONTRACTOR SHALL REMOVE ALL UNSUITABLE MATERIAL ENCOUNTERED FROM FILL AREAS PRIOR TO PLACEMENT OF FILL AND SUCH MATERIAL SHALL BE STOCKPILED OR REMOVED AS DIRECTED BY OWNER.
24. THE PROPERTY OWNER OR DESIGNATED AUTHORITY IS RESPONSIBLE FOR THE PERPETUAL MAINTENANCE OF ALL FEATURES OF THE SURFACE WATER MANAGEMENT SYSTEM AS SHOWN IN THESE DRAWINGS AND AS REQUIRED BY LOCAL, STATE, AND FEDERAL PERMITS. IT IS FURTHER RECOMMENDED THAT THE SURFACE WATER MANAGEMENT SYSTEM BE INSPECTED SEMI-ANNUALLY.
25. CONTRACTOR SHALL VERIFY DESIGN DETAILS WITH ENGINEER PRIOR TO ORDERING STRUCTURES. STRUCTURE TYPES LABELED ON THE PLANS FOR ITEMS SUCH AS JUNCTION BOXES AND INLETS MAY ONLY BE A REFERENCE TO THE TOP OF THE STRUCTURE. CERTAIN STRUCTURE TYPES REQUIRE A LARGER BOTTOM TO ACCOMMODATE LARGER PIPE SIZES AND/OR PIPE ANGLES. THE APPROPRIATE SIZE AND SHAPE OF THE BOTTOM OF THE STRUCTURE SHALL BE DETERMINED BY THE CONTRACTOR WITH CONSIDERATION GIVEN TO ADJACENT EXISTING OR PROPOSED UTILITIES. THE COST FOR THE ENTIRE STRUCTURE IS INCLUDED IN THE UNIT PRICE FOR THE PRIMARY STRUCTURE.
26. STORM DRAIN PIPE LENGTHS ARE APPROXIMATE AND HAVE BEEN MEASURED FROM INSIDE FACE OF STRUCTURE. SANITARY SEWER PIPE LENGTHS ARE APPROXIMATE AND ARE MEASURED FROM THE CENTER OF STRUCTURE.
27. CONTRACTOR SHALL MAINTAIN MINIMUM SEPARATION BETWEEN UTILITIES AS SHOWN ON "UTILITY LOCATION DETAIL" AND IN ACCORDANCE WITH APPLICABLE LOCAL UTILITY SERVICE PROVIDER REQUIREMENTS.
28. ALL COMPONENTS OF THE POTABLE WATER SYSTEM SHALL BE IN CONFORMANCE WITH AMERICAN NATIONAL STANDARDS INSTITUTE / NSF INTERNATIONAL STANDARD 61. ALL COMPONENTS, INSTALLATION AND TESTING OF THE POTABLE WATER SYSTEM SHALL BE IN ACCORDANCE WITH ALL A.W.W.A. APPLICABLE STANDARDS.
29. CONTRACTOR TO COORDINATE WITH ALL OTHER CONTRACTORS WORKING ON THE PROJECT SITE, THE OWNERS' REPRESENTATIVE, AND WITH ELECTRIC, TELEPHONE, AND CABLE COMPANIES TO ASSURE THAT NO SANITARY SEWER, WATERLINE, OR IRRIGATION SERVICES ARE INSTALLED UNDER PROPOSED TRANSFORMERS.
30. DEFLECTION TESTING IN ACCORDANCE WITH TECHNICAL SPECIFICATIONS FOR GRAVITY SEWER MAY NOT BE UNDERTAKEN UNTIL 30 DAYS AFTER FINAL BACKFILLING OF THE TRENCH IS COMPLETE. SEWER DEFLECTION MAY NOT EXCEED THE MAXIMUM PROVIDED IN THE TECHNICAL SPECIFICATIONS OR 5%, WHICHEVER IS LESS.
31. ALL GRAVITY SEWER MAINS SHALL BE TESTED WITH A MANDREL WITH A DIAMETER OF NOT LESS THAN 95% OF THE INSIDE PIPE DIAMETER. MANDREL TESTS MUST BE PERFORMED WITHOUT USE OF MECHANICAL PULLING DEVICES.
32. NO VEGETATION OR OTHER OBSTRUCTIONS SHALL BE PLACED SO AS TO BLOCK ACCESS OR LINE OF SIGHT TO FIRE HYDRANTS, F.D.C, P.I.V, ETC. IN ACCORDANCE WITH LOCAL FIRE JURISDICTION AND / OR AS SHOWN IN DETAILS.
33. ALL CONSTRUCTION SHALL BE IN ACCORDANCE WITH THE FLORIDA FIRE CODE. SEPARATE PERMITS MAY BE REQUIRED FOR ANY DEDICATED FIRE LINE. UNDERGROUND FIRE LINES MUST MEET REQUIREMENT OF NFPA 24. CONTRACTOR TO VERIFY FIRE LINE SIZE WITH BUILDING PLANS PRIOR TO CONST.

## SYMBOL LEGEND

NOTE: THE SYMBOLS REPRESENTED BELOW ARE STANDARDS UTILIZED BY THIS FIRM AND NOT ALL ARE REQUIRED FOR THE SUBJECT PROJECT.

### DRAINAGE

- VALLEY GUTTER INLET
- DITCH BOTTOM INLET
- DRAINAGE JUNCTION BOX
- MITERED END SECTION
- CONTROL STRUCTURE
- HEADWALL
- FLARED END SECTION
- TYPE 5 INLET (LEFT)
- TYPE 5 INLET (RIGHT)
- TYPE 6 INLET
- TYPE 9 INLET
- TYPE 10 INLET
- YARD DRAIN
- FLOW ARROW

### UTILITIES

- 11.25° BEND
- 22.5° BEND
- 45° BEND
- 90° BEND
- TEE
- REDUCER
- AIR RELEASE VALVE
- WYE
- CROSS
- CAP OR PLUG
- BACTERIOLOGICAL SAMPLE POINT
- PERMANENT BLOW OFF ASSEMBLY
- TEMPORARY BLOW OFF ASSEMBLY
- 45° VERTICAL DEFLECTION
- GATE VALVE
- PLUG VALVE
- SANITARY SEWER MANHOLE
- SINGLE SANITARY SEWER SERVICE
- DOUBLE SANITARY SEWER SERVICE
- CLEANOUT
- PUMP STATION
- SINGLE IRRIGATION SERVICE
- DOUBLE IRRIGATION SERVICE
- SINGLE WATER SERVICE
- DOUBLE WATER SERVICE
- FIRE HYDRANT ASSEMBLY (PLAN VIEW)
- FIRE HYDRANT ASSEMBLY (PROFILE VIEW)
- GATE VALVE (PROFILE VIEW)

### STANDARD CURB TYPES SEE F.D.O.T. STANDARD PLAN INDEX 520-001 FOR ADDITIONAL DETAILS

TYPE "A" CURB
1.33'
0.75'
CURB TRANSITION
8'
2'
1'
VALLEY GUTTER
2'
TYPE "D" CURB
.67'
TYPE "E" CURB
.75'
2.25'
TYPE "F" CURB
0.67'
1.33'

### SIGNAGE AND MARKINGS

- SIGN (PLAN VIEW)
- CONSERVATION SIGN LOCATION
- HANDICAP SYMBOL
- M — MODEL HOMES, MODEL UNITS, MODEL DISPLAY CENTERS.
- LEFT ONLY
- RIGHT ONLY
- LEFT OR RIGHT
- STRAIGHT OR RIGHT
- STRAIGHT OR LEFT
- STRAIGHT, LEFT OR RIGHT
- STRAIGHT

### IDENTIFICATION

- LOT NUMBER
- BUILDING ID NUMBER
- STORM STRUCTURE I.D.
- SANITARY STRUCTURE I.D.
- FIRE HYDRANT LABEL
- SOIL BORING LOCATION
- SECTION LABEL
- NORTH ARROW
- BAR SCALE (0, 30, 60, N.T.S.)

### EROSION CONTROL

NOTE: SEE EROSION CONTROL DETAILS FOR ADDITIONAL INFORMATION.

- INLET PROTECTION
- DOUBLE ROW SILT FENCE
- SINGLE ROW SILT FENCE
- FLOATING TURBIDITY BARRIER

### SURVEYING

- FOUND NAIL AS NOTED
- SET 1/2" IRON ROD WITH CAP STAMPED LB6940
- SET 4"x4" CONC. MONUMENT STAMPED LB6940
- SET P.K. NAIL WITH DISC STAMPED LB6940
- FOUND CONC. MONUMENT AS NOTED
- FOUND IRON PIPE OR IRON ROD AS NOTED
- DRAINAGE INLET
- DRAINAGE MANHOLE
- MITERED END SECTION
- LIGHT POLE
- CONCRETE POWER POLE
- WOOD POWER POLE
- GUY ANCHOR
- GAS LINE MARKER
- TELEPHONE RISER
- WATER BOX
- ELECTRIC BOX
- SIGN
- FIRE HYDRANT
- WATER VALVE
- SANITARY MANHOLE
- SANITARY CLEAN OUT
- SANITARY SEWER VALVE
- BENCH MARK

## QUANTITIES AND PAYMENT

CONTRACTOR SHALL REFER TO THE BID TABULATION AND PROJECT TECHNICAL SPECIFICATIONS FOR NOTES REGARDING THE METHOD OF PAYMENT FOR SPECIFIC PAY ITEMS. ITEMS NOT SPECIFICALLY REFERENCED IN THE SPECIFICATIONS OR BID TABULATION SHALL BE PAID FOR PER THE LATEST VERSION OF THE APPROPRIATE F.D.O.T. DESIGN STANDARD PLANS AND STANDARD SPECIFICATIONS.

## LINETYPE AND HATCHING LEGEND

NOTE: THE DRAWING BELOW IS PROVIDED AS ONLY AN EXAMPLE OF STANDARD LINETYPES AND HATCHING UTILIZED BY THIS FIRM AND IS NOT REPRESENTATIVE OF THE SUBJECT PROJECT.

PROPERTY LINE
BARBED WIRE FENCE
LOT LINE
CHAIN LINK FENCE
GUARD RAIL
DRAINAGE EASEMENT
LITTORAL ZONE
15' (TYP.)
OPTIONAL ENTRY FEATURE/ SIGNAGE
R1-1 STOP SIGN WITH 24" WHITE STOP BAR (TYP.)
20' L.M.E.
R=25'
LAKE
SINGLE ROW SILT FENCE
BRICK PAVERS
UTILITY EASEMENT
DOUBLE ROW SILT FENCE
SECONDARY DRAINAGE
SIDEWALK
PERIMETER BERM
RIGHT-OF-WAY
RIP-RAP (TYP.)
YARD DRAIN
FLOW ARROW (TYP.)
STRUCTURAL BUFFER
UPLAND PRESERVE
BASIN BOUNDARY LINE
CENTERLINE OF ROAD
WETLAND

## STANDARD STREET SIGNS

THE SIGN LEGEND BELOW IS PROVIDED AS A GRAPHICAL REFERENCE TO ONE OR MORE OF THE SIGNS REQUIRED FOR THIS PROJECT. THE LATEST EDITION OF THE MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES (M.U.T.C.D.) SHOULD BE REFERENCED FOR SPECIFIC DETAILS AND LOCATION REQUIREMENTS.

- R1-1 — STOP SIGN - ALL STOP SIGNS SHALL INCLUDE A 24" WIDE PAINTED STOP BAR OR CONTRASTING COLOR OF BRICK PAVERS
- R1-2 — YIELD SIGN
- R5-1 — DO NOT ENTER SIGN
- FTP-20-04, FTP-22-04 — HANDICAP PARKING SIGN
- R2-1 — SPEED LIMIT SIGN
- R4-7 — KEEP RIGHT SIGN
- W16-9P — AHEAD PLAQUE
- W1-6L — LARGE LEFT ARROW (ONE DIRECTION) SIGN
- W1-6R — LARGE RIGHT ARROW (ONE DIRECTION) SIGN
- W1-7 — TWO-DIRECTION LARGE ARROW SIGN
- W11-2 — PEDESTRIAN CROSSING SIGN
- W16-7pL, W16-7pR — DIAGONAL ARROW PLAQUE
- W14-2 — NO OUTLET SIGN
- R6-3 — DIVIDED HIGHWAY SIGN
- OM4-1 — END OF ROADWAY MARKERS
- R3-7L — LEFT LANE MUST TURN LEFT SIGN
- R3-7R — RIGHT LANE MUST TURN RIGHT SIGN
- R6-1L — ONE WAY LEFT SIGN
- R6-1R — ONE WAY RIGHT SIGN
- R3-5L — LEFT TURN ONLY SIGN
- R3-5R — RIGHT TURN ONLY SIGN
- R3-6L — LEFT STRAIGHT OPTIONAL LANE SIGN
- NO PARKING FIRE LANE SIGN

## SIGNING AND PAVEMENT NOTES

1. ALL SIGNING AND PAVEMENT MARKINGS SHALL BE IN ACCORDANCE WITH THE LATEST VERSION OF THE F.D.O.T. STANDARD PLANS FOR ROAD AND BRIDGE CONSTRUCTION, THE F.D.O.T. STANDARD SPECIFICATIONS FOR ROAD AND BRIDGE CONSTRUCTION, THE MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES (M.U.T.C.D.) AND ALL APPLICABLE LOCAL STANDARDS. UTILIZATION OF THE CURRENT M.U.T.C.D. SHALL BE IN ACCORDANCE WITH F.D.O.T. POLICY.
2. DURING CONSTRUCTION, THE CONTRACTOR SHALL COMPLY WITH THE LATEST EDITIONS OF THE "STATE OF FLORIDA MANUAL OF TRAFFIC CONTROL AND SAFE PRACTICES FOR STREET AND HIGHWAY CONSTRUCTION, MAINTENANCE, AND UTILITY OPERATIONS" AND WITH THE "MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES" AND WITH ALL OTHER GOVERNING SAFETY REGULATIONS.
3. PAVEMENT MARKINGS SHALL BE PERMANENT REFLECTIVE TRAFFIC PAINT WITH GLASS BEADS IN ACCORDANCE WITH F.D.O.T. STANDARD SPECIFICATIONS SECTION 710 UNLESS NOTED OTHERWISE. PERMANENT PAVEMENT MARKINGS WITHIN F.D.O.T. RIGHT-OF-WAY SHALL BE THERMOPLASTIC UNLESS NOTED OTHERWISE.
4. MATCH EXISTING PAVEMENT MARKINGS AT EXISTING ROADS. ALL EXISTING PAVEMENT MARKINGS THAT ARE IN CONFLICT WITH PROPOSED MARKINGS SHALL BE REMOVED BY HYDRO-BLASTING. EXISTING SIGNS SHALL REMAIN UNLESS NOTED OTHERWISE.
5. ALL STOP SIGN LOCATIONS SHALL INCLUDE A 24" PAINTED WHITE STOP BAR. AS AN ALTERNATIVE, ROADS WITH PAVER BRICK SURFACES MAY UTILIZE CONTRASTING COLOR PAVERS IN LIEU OF PAINT.
6. THE CONTRACTOR SHALL FURNISH AND INSTALL STREET NAME SIGNS IN ACCORDANCE WITH LOCAL DEVELOPMENT STANDARDS. IF POSSIBLE, STREET NAME SIGNAGE TO BE ATOP ALL STOP SIGNS. DEAD END STREETS SHALL INCLUDE A W14-2P "NO OUTLET" SIGN.
7. THE CONTRACTOR SHALL PROVIDE AND INSTALL BLUE / BLUE REFLECTIVE PAVEMENT MARKERS AT THE CENTER OF THE TRAFFIC LANE NEAREST ALL PROPOSED FIRE HYDRANTS.
8. ALL ROADWAY SIGNING AND PAVEMENT MARKINGS, STREET NAME SIGNS, ETC. (EXCLUDING PROJECT IDENTIFICATION SIGNING) ARE TO BE INCLUDED IN THE LUMP SUM PRICE FOR SIGNING AND MARKING UNLESS A DETAILED BID QUANTITY BREAKDOWN IS PROVIDED.
9. ANY EXISTING SIGN TO REMAIN THAT IS RELOCATED OR DISTURBED DURING CONSTRUCTION SHALL BE RESET TO CURRENT F.D.O.T. S.P.I. 700-010 AND 700-101 FOR HEIGHT, OFFSET AND METHOD OF INSTALLATION. ANY SIGNS DAMAGED BY CONTRACTOR SHALL BE REPLACED AT THE EXPENSE OF THE CONTRACTOR.
10. ALL SIGNS THAT ARE EMBEDDED IN CONCRETE OR ASPHALT SHALL BE INSTALLED IN A F.D.O.T. APPROVED PIPE SLEEVE.

**NOTE: NOT ALL GENERAL NOTES, ABBREVIATIONS, SYMBOLS OR OTHER STANDARDS SHOWN ON THIS SHEET MAY BE APPLICABLE TO THIS PROJECT.**

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26, TOWNSHIP 50 SOUTH, RANGE 25 EAST COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD

TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E02.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:46 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

MASTER = BAI-LEGEND-1-3D.DWG

PLAN REVISIONS

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

STANDARD NOTES, LEGEND, AND ABBREVIATIONS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 2.0 |





Received Electronically
April 7, 2021
South District

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

## THE ISLES OF COLLIER PRESERVE
### FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E05.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:48 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

## AERIAL PHOTOGRAPH AND EXISTING CONDITIONS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 3.0 |

Received Electronically
April 7, 2021
South District

**WATER MANAGEMENT SUMMARY**

| WATER MANAGEMENT CRITERIA | 1A-APT | BASIN 1 | BASIN 2-OFF | BASIN 2 | BASIN 3 | BASIN 4 | BASIN 5 | BASIN 6 | BASIN 7 | BASIN 8 |
|---|---|---|---|---|---|---|---|---|---|---|
| 5-YR, 1-DAY RAINFALL DEPTH | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in | 5.8 in |
| 25-YR, 3-DAY RAINFALL DEPTH | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. | 12.23 in. |
| 100-YR, 3-DAY RAINFALL DEPTH | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. | 14.95 in. |
| **CONTROL ELEVATION (3)** | 2.7' NAVD | 2.7' NAVD | 2.7' NAVD | 2.7' NAVD | 2.7' NAVD | 2.7' NAVD | 1.7' NAVD | 2.2' NAVD | **2.2' NAVD** | 1.2' NAVD |
| PEAK 5-YR, 1-DAY STORM STAGE | 4.6' NAVD | 4.5' NAVD | 5.5' NAVD | 4.1' NAVD | 4.3' NAVD | 4.3' NAVD | 3.6' NAVD | 4.0' NAVD | 3.1' NAVD | 3.1' NAVD |
| PEAK 25-YR, 3-DAY STORM STAGE | 6.2' NAVD | 6.1' NAVD | 6.1' NAVD | 5.3' NAVD | 5.6' NAVD | 5.5' NAVD | 4.7' NAVD | 5.6' NAVD | 4.5' NAVD | 4.9' NAVD |
| PEAK 25-YR, 3-DAY BACK-TO-BACK STORM STAGE | 6.8' NAVD | 6.7' NAVD | 6.2' NAVD | 5.9' NAVD | 6.1' NAVD | 5.8' NAVD | 5.2' NAVD | 6.1' NAVD | - | 5.1' NAVD |
| PEAK 25-YR, 3-DAY STORM DISCHARGE | N/A | 11.6 cfs | N/A | 25.6 cfs | 6.1 cfs | 3.7 cfs | 5.9 cfs | 6.1 cfs | 4.3 cfs | 3.2 cfs |
| PEAK 100-YR, 3-DAY (zero-discharge) STAGE | 7.0' NAVD | 6.9' NAVD | 6.2' NAVD | 6.1' NAVD | 6.3' NAVD | 6.1' NAVD | 5.1' NAVD | 6.4' NAVD | 5.5' NAVD | 5.7' NAVD |
| FEMA FLOOD ELEVATION(S) (5) | 8.0' NAVD | 8.0' NAVD | 8.0' NAVD | 7.0' NAVD | 7.0' NAVD | 7.0' NAVD | 6.0' NAVD | 6.0' NAVD | 6.0' NAVD | 8.0' NAVD |
| **MINIMUM PROPOSED PAVEMENT ELEVATION (4)** | 6.5' NAVD | 6.5' NAVD | 6.3' NAVD | 5.4' NAVD | 5.8' NAVD | 5.6' NAVD | 4.8' NAVD | 5.7' NAVD | **4.3' NAVD** | 5.0' NAVD |
| **MINIMUM PROPOSED PERIMETER BERM ELEVATION (4)** | 6.5' NAVD | 6.5' NAVD | 6.3' NAVD | 6.0' NAVD | 6.1' NAVD | 5.9' NAVD | 5.3' NAVD | 6.2' NAVD | **4.5' NAVD** | 5.2' NAVD |
| **MINIMUM PROPOSED FINISHED FLOOR ELEVATION (4), (5), (6)** | 9.0' NAVD | 9.0' NAVD | 9.0' NAVD | 8.0' NAVD | 8.0' NAVD | 8.0' NAVD | 7.0' NAVD | 7.0' NAVD | **9.0' NAVD** | 9.0' NAVD |

NOTE:

(1) ALL RAINFALL DEPTHS, CONTROL ELEVATIONS, PEAK STORM STAGES, DISCHARGE RATES AND MINIMUM DESIGN ELEVATIONS HAVE BEEN ESTABLISHED UNDER SFWMD ERP #11-02003-P.

(2) ELEVATIONS HAVE BEEN CONVERTED FROM NGVD TO NAVD. THE CONVERSION FACTOR FROM NGVD TO NAVD FOR THIS LOCATION IS (-)1.28', WHICH HAS BEEN ADJUSTED TO THE APPROPRIATE SIGNIFICANT FIGURES AS DESCRIBED BELOW:

(3) WHEN CONVERTING THE PERMITTED CONTROL ELEVATIONS FROM NGVD TO NAVD, THE DATUM CONVERSION HAS BEEN ROUNDED TO (-)1.3' TO MAINTAIN SIGNIFICANT FIGURES.

(4) WHEN CONVERTING THE MINIMUM DESIGN ELEVATIONS, INCLUDING THE PAVEMENT, PERIMETER BERM, AND FINISHED FLOOR ELEVATIONS, THE DATUM CONVERSION HAS BEEN ROUNDED TO (-)1.2' IN ORDER TO MAINTAIN SIGNIFICANT FIGURES AND TO ENSURE THE DESIGN ELEVATIONS REMAIN ABOVE THE PERMITTED MINIMUM REQUIREMENTS.

(5) THE FEMA FLOOD ELEVATION HAS BEEN CONVERTED WITH A DATUM CONVERSION OF (-) 1.3' TO MATCH THE FACTOR UTILIZED IN THE ERP AND TO MATCH THE ADOPTED FEMA FLOOD MAPS. MINIMUM FINISHED FLOOR ELEVATION IS THE GREATER OF FEMA BASE FLOOD ELEVATION +1.0' OR 100 YEAR PEAK STORM STAGE. AN ADDITIONAL +1.0' HAS BEEN APPLIED TO THE MINIMUM PROPOSED F.F.E. TO ALLOW FOR POTENTIAL MAP CHANGES.

(6) FEMA FLOOD ELEVATIONS REFLECT THE HIGHEST BASE FLOOD ELEVATION WITHIN EACH BASIN. IN MANY INSTANCES, SPECIFIC LOTS LIE WITHIN FLOOD ZONES WITH BASE FLOOD ELEVATIONS LOWER THAN THOSE LISTED WITHIN THE WATER MANAGEMENT SUMMARY. SEE DETAILED LOT GRADING PLANS FOR INDIVIDUAL FINISHED FLOOR ELEVATIONS.

BASIN 2 - OFF
FUTURE DEVELOPMENT AREA
BASIN 1A-APT
FUTURE DEVELOPMENT AREA
BASIN BOUNDARY
THOMASSON DRIVE
SHOPS AT HAMMOCK COVE
TAMIAMI TRAIL (U.S. 41)
N
W
E
S
0 250 500 1000
SCALE IN FEET
EX. SINGLE FAMILY PHASE 8
BASIN 1
EX. SINGLE FAMILY PHASE 1
LELY MAIN CANAL EXPANSION
EX. PREVIEW CENTER
EX. MODEL CENTER
EX. AMENITY CENTER
EX. SINGLE FAMILY PHASE 6
EX. SINGLE FAMILY PHASE 10
PROJECT BOUNDARY
EX. SINGLE FAMILY PARCEL "T"
BASIN 8
BASIN 2
EX. SINGLE FAMILY PHASE 2
BASIN 3
PRESERVE
EX. SINGLE FAMILY PHASE 3
BASIN 4
BASIN 7
CYPRESS WATERWAY
EX. SINGLE FAMILY PHASE 7
LELY MANOR CANAL
FPL SUBSTATION
EX. SINGLE FAMILY PHASE 13
BASIN 6
CS-7 OFF
EX. SINGLE FAMILY PHASE 12
PRESERVE (CONSERVATION AREA 6)
TREVISO BAY
EX. SINGLE FAMILY PARCEL "S"
BASIN 5

**LAND USE SUMMARY**

| CONSTRUCTION & OPERATION | |
|---|---|
| LAND USE | BASIN 7 (ACRES) |
| WATER MANAGEMENT | |
| LAKES | 20.78 |
| DRY DETENTION | - |
| PRESERVE AREA | 0.60 |
| RESIDENTIAL TRACTS | |
| PAVEMENT | 9.22 |
| BUILDING | 18.31 |
| PERVIOUS AREA | 25.53 |
| OUTSIDE WMS | |
| AVALON SWALE EXPANSION | 4.14 |
| TOTAL (C&O) | 78.58 |
| UNDISTURBED AREAS (OUTSIDE WMS) | 4.43 |
| CONSERVATION EASEMENT | 29.86 |
| TOTAL (PERMIT) | 112.72 |

GENERAL DRAINAGE NOTES:

1. THE LENGTH OF STORM DRAIN PIPES SHOWN ON PLANS ARE APPROXIMATE AND HAVE BEEN MEASURED FROM THE INSIDE FACE OF STRUCTURE.
2. LOCATIONS OF DRAINAGE STRUCTURES MAY BE FIELD ADJUSTED TO PRESERVE EXISTING VEGETATION AS APPROVED BY THE ENGINEER.
3. THE CONTRACTOR IS REQUIRED TO ADJUST ALL EXISTING AND PROPOSED VALVE BOXES, MANHOLE RIMS, GRATES, ETC. AS REQUIRED TO MATCH PROPOSED GRADES.
4. ALL UNPAVED AREAS DISTURBED DURING CONSTRUCTION SHALL BE SEEDED AND MULCHED UNLESS NOTED OTHERWISE. WATERING WILL BE REQUIRED TO OBTAIN STABILIZATION / GROWTH AND TO PROVIDE DUST CONTROL.
5. EXISTING OFF-SITE DRAINAGE PATTERNS SHALL BE MAINTAINED DURING CONSTRUCTION.
6. SWALE PROFILES SHOWN ARE TO TOP OF SOD. CONTRACTOR TO ADJUST SWALE GRADING ACCORDINGLY.
7. SOD A 24" STRIP BEHIND ALL CONCRETE CURB AND VALLEY GUTTER AND AT EDGE OF PAVEMENT. REMAINING AREAS WITHIN THE DISTURBED AREA SHALL BE SEEDED, FERTILIZED AND MULCHED. ALL SLOPES STEEPER THAN 4:1 TO UTILIZE APPROPRIATE SLOPE STABILIZATION TECHNIQUE PER COLLIER COUNTY LDC SECTION 4.06.05 J.
8. THE CONTRACTOR SHALL REMOVE ALL UNSUITABLE MATERIAL ENCOUNTERED FROM FILL AREAS PRIOR TO PLACEMENT OF FILL. ALL UNSUITABLE MATERIAL EXCAVATED SHALL BE STOCKPILED OR REMOVED AS DIRECTED BY OWNER.
9. THE TOP OF ALL ENDWALLS SHALL BE NO HIGHER THAN 30" BELOW THE LAKE CONTROL ELEVATION. THE CONTRACTOR SHALL REVIEW PROPOSED STRUCTURE LOCATIONS WITH THE ENGINEER AFTER STAKEOUT AND BEFORE COMMENCING CONSTRUCTION. ALL DRAINAGE STRUCTURES TO BE LOCATED ON THE LAKE BANK SHALL BE FIELD ADJUSTED SO AS TO INSET THE STRUCTURE, TO THE GREATEST EXTENT POSSIBLE, IN THE LAKE BANK.
10. YARD DRAINS SHALL BE ADDED IN GREEN AREAS AS NECESSARY AT THE DIRECTION OF THE LANDSCAPE ARCHITECT OR ENGINEER.
11. ALL REAR YARD DRAINAGE TO BE CONSIDERED SECONDARY DRAINAGE, UNLESS OTHERWISE INSTRUCTED BY OWNER.
12. MASTER HOMEOWNER'S ASSOCIATION SHALL BE RESPONSIBLE FOR OPERATION AND MAINTENANCE OF STORM WATER MANAGEMENT SYSTEM.

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26, TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E11.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:49 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

MASTER DRAINAGE PLAN

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 4.0 |















Received Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:50 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.0 |

Received Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:51 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.1 |

Received Electronically
April 7, 2021
South District

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:51 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.2 |





Received Electronically
April 7, 2021
South District

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

# THE ISLES OF COLLIER PRESERVE
## FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:51 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.3 |

Received Electronically
April 7, 2021
South District

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:52 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.4 |























Received Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING

www.barraco.net

2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169

FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:52 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.5 |

Received Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR
MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION
THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL
PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:52 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.6 |

Received Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM.
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:53 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.7 |

Received
Electronically
April 7, 2021
South District

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD

TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E15.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:53 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

DETAILED PAVING, GRADING, AND DRAINAGE PLANS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 5.8 |

Received
Electronically
April 7, 2021
South District

NOTE:

AREAS ON THE BACK SLOPE OF THE 25-YEAR BERM WILL BE PLANTED WITH NATIVE UPLAND SPECIES LISTED IN TABLE 3. PLANTED AREAS WILL INCLUDE THE AREA FROM THE TOP OF THE BERM TO THE TOE OF THE SLOPE ON THE CONSERVATION SIDE OF THE BERM. PLANTINGS WILL INCLUDE A MINIMUM OF THREE OF THE FIVE TREE SPECIES, TWO OF THE THREE SHRUB SPECIES, AND THREE OF THE FIVE GROUND COVER SPECIES.

TABLE 3. NATIVE PLANTING LIST FOR BACKSLOPE OF 25-YEAR BERM

| Common Name | Scientific Name | Minimum Height | Minimum Container Size | Planting Instruction (On Center) |
|---|---|---|---|---|
| Live oak | *Quercus virginiana* | 6 ft. | 3 gal. | 15 ft. |
| Slash pine | *Pinus elliottii* | 6 ft. | 3 gal. | 15 ft. |
| Cabbage palm | *Sabal palmetto* | 6 ft. | 3 gal. | 15 ft. |
| Gumbo-limbo | *Bursera simaruba* | 6 ft. | 3 gal. | 15 ft. |
| Seagrape | *Coccoloba uvifera* | 6 ft. | 3 gal. | 15 ft. |
| Cocoplum | *Chrysobalanus icaco* | 3 ft. | 1 gal. | 8 ft. |
| Myrsine | *Rapanea guanensis* | 3 ft. | 1 gal. | 8 ft. |
| Wax myrtle | *Myrica cerifera* | 3 ft. | 1 gal. | 8 ft. |
| Muhlygrass | *Muhlenbergia capillaris* | 12 in. | 4 in. | 3 ft. |
| Sand cordgrass | *Spartina bakeri* | 12 in. | 4 in. | 3 ft. |
| Fakahatcheegrass | *Tripsacum dactyloides* | 12 in. | 4 in. | 3 ft. |
| Saw palmetto | *Serenoa repens* | 12 in. | 4 in. | 3 ft. |
| Wiregrass | *Aristida stricta* | 12 in. | 4 in. | 3 ft. |

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD

TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E17.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:54 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

TYPICAL SECTION INDICATORS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 6.0 |

Received Electronically
April 7, 2021
South District

NOTES

1. *STRUCTURAL BUFFER TO BE PLANTED IN ACCORDANCE WITH TABLE 3 OF THE "ISLES OF COLLIER PRESERVE (F.K.A. SABAL BAY) SOUTH FLORIDA WATER MANAGEMENT DISTRICT WETLAND MITIGATION/MONITORING/MAINTENANCE PLAN". SEE LANDSCAPE PLAN FOR DETAIL PLANTING REQUIREMENTS.
2. ALL SLOPES ADJACENT TO CONSERVATION AREA SHALL BE PLANTED WITH 100% NATIVE SOUTH FLORIDIAN VEGETATION.

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD

TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E18.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:55 PM |
| PLOT BY | SCOTT DALEY |

**CROSS REFERENCED DRAWINGS**

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

TYPICAL SECTIONS AND DETAILS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 7.0 |





Received Electronically
April 7, 2021
South District
Florida Department of Environmental Protection

NOTES

1. *STRUCTURAL BUFFER TO BE PLANTED IN ACCORDANCE WITH TABLE 3 OF THE "ISLES OF COLLIER PRESERVE (F.K.A. SABAL BAY) SOUTH FLORIDA WATER MANAGEMENT DISTRICT WETLAND MITIGATION/MONITORING/MAINTENANCE PLAN". SEE LANDSCAPE PLAN FOR DETAIL PLANTING REQUIREMENTS.
2. ALL SLOPES ADJACENT TO CONSERVATION AREA SHALL BE PLANTED WITH 100% NATIVE SOUTH FLORIDIAN VEGETATION.

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26, TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E18.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:55 PM |
| PLOT BY | SCOTT DALEY |

**CROSS REFERENCED DRAWINGS**

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | △1 RAI COMMENTS |

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

TYPICAL SECTIONS AND DETAILS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 7.1 |





Received Electronically
April 7, 2021
South District

CONSERVATION TO FILTER MARSH & LAKE
N.T.S.
WETLAND FILTER MARSH
LAKE
SEE LANDSCAPE PLANS FOR LITTORAL PLANTING SCHEDULE
ONSITE CREATED WETLAND
WET SEASON WATER TABLE ELEV. = 2.2'
NATURE PRESERVE AREA
NO CLEARING OR DUMPING ALLOWED
TYPICAL CONSERVATION SIGNAGE
N.T.S.
TYPICAL SF ATTACHED LOT AND GRADING DETAIL
TYPICAL SF DETACHED LOT AND GRADING DETAIL
SIDE LOT LINE
REAR LOT LINE
SCALE IN FEET
22' MIN. FRONT SETBACK
5' SIDEWALK
1% MIN.
NOTES
1. SEE F.D.O.T. STANDARD PLANS INDEX 520-001 FOR ADDITIONAL DETAILS.
2. WHEN USED ON HIGH SIDE OF ROADWAYS, THE CROSS SLOPE OF THE GUTTER SHALL MATCH THE CROSS SLOPE OF THE ADJACENT PAVEMENT. THE THICKNESS OF THE LIP SHALL BE 6", UNLESS OTHERWISE SHOWN ON PLANS.
3. CONCRETE SHALL HAVE A COMPRESSIVE STRENGTH OF 3,000 PSI. WITHIN 28 DAYS UNLESS NOTED OTHERWISE.
2' VALLEY GUTTER
3' VALLEY GUTTER
TYPE "D" CURB
TYPE "A" CURB
TYPE "E" CURB
TYPE "F" CURB
CONCRETE CURB
N.T.S.
NOTES
1. PAVER BRICKS MAY BE UTILIZED IN PLACE OF CONCRETE SIDEWALK. SEE LANDSCAPE PLANS FOR PAVER BRICK LOCATIONS, THICKNESS, SIZE, COLOR, PATTERN, AND SPECIFICATIONS. PAVER BRICK SEALANT OR REPELLANT MAY BE USED AT THE OWNER'S DISCRETION.
2. CONCRETE SHALL HAVE A COMPRESSIVE STRENGTH OF 3,000 PSI. AT 28 DAYS.
3. SIDEWALK SHALL HAVE CONTRACTION JOINTS AT 5" INTERVALS AND AN EXPANSION JOINT EVERY 100'.
4. MAXIMUM LONGITUDINAL SLOPE FOR DISABLED ACCESSIBLE SIDEWALK SHALL BE 1:20.
5. TOP OF SOD TO BE FLUSH WITH SIDEWALK TO PROVIDE POSITIVE SLOPE TO PREVENT PONDING.
6. FIBER REINFORCEMENT MAY BE SUBSTITUTED FOR WIRE MESH REINFORCEMENT AT THE DISCRETION OF THE OWNER.
7. COST OF STABILIZED SUBGRADE FOR SIDEWALK TO BE INCLUDED IN UNIT COST FOR SIDEWALK.
WIDTH VARIES (SEE DETAILED SITE PLANS)
4" THICK REINFORCED CONCRETE
6"x6" W1.4xW1.4 WELDED WIRE MESH
BROOM FINISH
SLOPE VARIES (2% MAX.)
MATCH TOP OF SOD TO SIDEWALK GRADE
12" STABILIZED TYPE B SUBGRADE LBR 40
CONCRETE SIDEWALK
N.T.S.
NOTES
1. SEE "CONCRETE CURB DETAILS" FOR VALLEY GUTTER SECTIONS.
2. VALLEY GUTTER SLOPES SHALL NOT EXCEED 12:1 WHEN WITHIN LIMITS OF SIDEWALK CROSSING TO MEET ADA GUIDELINES.
3. MAINTAIN CONSISTENT FLOW LINE THROUGH CROSSING TO PREVENT PONDING.
CONCRETE SIDEWALK AS SHOWN ON PLANS
DETECTABLE WARNING DEVICE
FLOW LINE
BACK OF CURB
2' VALLEY GUTTER
3' VALLEY GUTTER
EDGE OF PAVEMENT
VALLEY GUTTER SIDEWALK CROSSING
N.T.S.
ON RAMPS THAT ARE PERPENDICULAR WITH THE CURB LINE, THE DOME PATTERN SHALL BE IN-LINE WITH THE DIRECTIONS OF TRAVEL. ON RAMPS INTERSECTING CURBS ON A RADIUS, THE DOME PATTERN SHALL BE IN-LINE WITH THE DIRECTION OF TRAVEL TO THE EXTENT PRACTICAL.
TRUNCATED DOME
INTEGRAL DOME
TRUNCATED DOME
ALL SIDEWALK CURB RAMPS SHALL HAVE DETECTABLE WARNING SURFACES THAT EXTEND THE FULL WIDTH OF THE RAMP AND IN THE DIRECTION OF TRAVEL 24 INCHES FROM THE BACK OF CURB. F.D.O.T. STANDARD PLANS INDEX 522-002.
DETECTABLE WARNING DETAIL
N.T.S.
NOTES
1. ALL REINFORCED STEEL SHALL HAVE MINIMUM TWO INCHES OF COVER.
2. ALL CONCRETE SHALL HAVE COMPRESSIVE STRENGTH OF 3,000 PSI. AT 28 DAYS.
3. CONTRACTOR TO PROVIDE AND INSTALL A NON-WOVEN FILTER FABRIC OVER INLET GRATE DURING CONSTRUCTION.
4. INLET TO BE CONSTRUCTED IN ACCORDANCE WITH CURRENT F.D.O.T. STANDARD PLANS INDEX 425-001 AND 425-010.
PLAN
SECTION A-A
SECTION B-B
VALLEY GUTTER INLET
N.T.S.
NOTES
1. LIMEROCK BASE AND STABILIZED SUBGRADE SHALL BE COMPACTED TO A MINIMUM OF 98% OF MODIFIED PROCTOR (AASHTO T-180).
2. 6" OF LIMEROCK BASE MATERIAL MAY SUBSTITUTED AS AN ALTERNATIVE DESIGN TO THE 12" STABILIZED SUBGRADE.
3. OPTIONAL BRICK PAVER SURFACE MAY BE UTILIZED FOR ALL OR PART OF THE ROADWAY OR PARKING SURFACES.
4. REFERENCE LANDSCAPE PLANS FOR PAVER BRICK LOCATIONS, THICKNESS, SIZE, COLOR, PATTERN, AND SPECIFICATIONS. SEALANT MAY BE UTILIZED AT THE DISCRETION OF OWNER.
5. CONCRETE SHALL HAVE A COMPRESSIVE STRENGTH OF 3,000 PSI. WITHIN 28 DAYS UNLESS NOTED OTHERWISE.
CURB PER PLAN
BRICK PAVERS
GEOTEXTILE FILTER FABRIC
1-1/2" PAVERS SAND LEVELING COURSE
6" LIMEROCK BASE (MIN. LBR 100)
12" STABILIZED TYPE B SUBGRADE LBR 40
ASPHALT PAVEMENT 1-3/4" TYPE S-III*
(1) 1" LIFT & (1) 3/4" LIFT
#5 BARS
1' WIDE CONCRETE RIBBON CURB AT EACH END OF BRICK PAVERS OR AS SHOWN ON PLANS
STRUCTURAL EQUIVALENCY CALCULATIONS:

| STANDARD PAVEMENT SECTION | LAYER COEFFICIENT | THICKNESS | SUBTOTAL |
|---|---|---|---|
| TYPE S-III ASPHALT PAVEMENT | 0.44 / INCH | 1-3/4" | 0.77 |
| LIMEROCK BASE (LBR 100) | 0.18 / INCH | 6" | 1.08 |
| STABILIZED SUBGRADE (LBR 40) | 0.08 / INCH | 12" | 0.96 |
| TOTAL | | | 2.81 |

| PAVER BRICK SECTION | LAYER COEFFICIENT | THICKNESS | SUBTOTAL |
|---|---|---|---|
| ECONOCRETE (1100 PSI)* | 0.44 / INCH | 3-1/8" | 1.38 |
| LIMEROCK BASE | 0.18 / INCH | 10" | 1.80 |
| STABILIZED SUBGRADE (LBR 40) | 0.08 / INCH | 12" | 0.96 |
| TOTAL | | | 4.14 |

*PAVER BRICKS ARE 8,000 PSI. ECONOCRETE USED FOR COMPARISON ONLY.
COST OF BRICK PAVERS, LIMEROCK BASE AND SAND TO BE INCLUDED IN UNIT COST FOR BRICK PAVERS. COST OF SUBGRADE TO BE INCLUDED IN UNIT COST FOR STABILIZED SUBGRADE.
* THE FIRST LIFT SHALL BE PLACED PRIOR TO CERTIFICATE OF COMPLETION FOR SITE WORK. THE SECOND LIFT SHALL BE PLACED PRIOR TO RECEIVING THE CERTIFICATE OF OCCUPANCY FOR THE LAST UNIT IN EACH PHASE OF CONSTRUCTION.
ALL UNPAVED AREAS WITHIN THE RIGHT OF WAY SHALL RECEIVE SOD OR SEED & MULCH.
TYPICAL PAVEMENT SECTION
N.T.S.
EXISTING GROUND
RIP RAP
GEOTEXTILE FABRIC
PIPE
FLOW
DIA.
NOTE:
MINIMUM "H" SHALL BE AT LEAST 1/3 PIPE DIAMETER
ANY TEMPORARY IMPACTS TO WETLAND / PRESERVE AREAS SHALL BE RESTORED TO PRE-DEVELOPMENT CONDITION IMMEDIATELY UPON INSTALLATION OF SPREADER SWALE
SECTION X-X
VARIES
SPREADER SWALE (TYP.)
N.T.S.
Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940
PREPARED FOR
MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM
PROJECT DESCRIPTION
THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL
PART OF SECTIONS 23 & 26, TOWNSHIP 50 SOUTH, RANGE 25 EAST COLLIER COUNTY, FLORIDA
ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET
DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED
FILE NAME 23780E18.DWG
LOCATION J:\23780\DWG\ERP\
PLOT DATE FRI. 12-4-2020 - 2:55 PM
PLOT BY SCOTT DALEY
CROSS REFERENCED DRAWINGS
PLAN REVISIONS
2020-08-17 1 RAI COMMENTS
PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04
TYPICAL SECTIONS AND DETAILS
PROJECT / FILE NO. 23780
SHEET NUMBER 7.2

Received Electronically April 7, 2021 South District



CS-7 OFF CONTROL STRUCTURE DETAIL

TYPE 9 CURB INLET

TYPE "C" INLET

Barraco and Associates, Inc.
CIVIL ENGINEERING · LAND SURVEYING · LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-2600
FAX (813) 342-3601
WWW.MINTO.COM

THE ISLES OF
COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

CONTROL
STRUCTURE AND
DRAINAGE DETAILS

| PROJECT NO. | SHEET NUMBER |
|---|---|
| 23780 | 8.0 |



Received Electronically
April 7, 2021
South District

TEMPORARY EROSION AND SEDIMENT CONTROL DETAILS

NOTE: NOT ALL NOTES, DETAILS, SYMBOLS OR OTHER STANDARDS SHOWN ON THIS SHEET MAY BE APPLICABLE TO THIS PROJECT

TURBIDITY BARRIERS

SOIL TRACKING PREVENTION DEVICE - TYPE "A"

## EROSION CONTROL NOTES:

1. PRIOR TO COMMENCEMENT OF CONSTRUCTION ACTIVITY APPROPRIATE EROSION CONTROL DEVICES SHALL BE INSTALLED TO CONTROL AND REDUCE SOIL EROSION AND SEDIMENT TRANSPORT TO OFF-SITE AREAS. THE CONTRACTOR SHALL MAINTAIN THESE DEVICES THROUGHOUT THE DURATION OF CONSTRUCTION. ALL DEVICES SHALL REMAIN IN PLACE UNTIL PERMANENT EROSION CONTROL IS ESTABLISHED.
2. THE CONTRACTOR SHALL SUPPLEMENT THIS PLAN AS REQUIRED TO CONTROL AND REDUCE SOIL EROSION BASED ON THE CONTRACTORS MEANS, METHODS AND TECHNIQUE OF CONSTRUCTION. IT IS RECOMMENDED THAT THE CONTRACTOR COMPLY WITH THE LATEST EDITIONS OF THE F.D.O.T. STANDARD PLAN INDEX 570-001 (PREVENTION, CONTROL AND ABATEMENT OF EROSION AND WATER POLLUTION) AND THE STATE OF FLORIDA EROSION AND SEDIMENT CONTROL DESIGNER AND REVIEWER MANUAL (THE "E&SC MANUAL").
3. THE DETAILS ON THIS SHEET REPRESENT TYPICAL BEST MANAGEMENT PRACTICES FOR SOIL EROSION CONTROL. THEY MAY NOT SATISFY ALL REQUIREMENTS FOR COMPLIANCE WITH REGULATORY AGENCIES AND / OR SPECIFIC PERMIT CONDITIONS AND ALL MAY NOT APPLY TO THIS PROJECT.
4. THE CONTRACTOR AND/OR OWNER SHALL VERIFY THAT THE RESPONSIBLE ENTITY HAS OBTAINED A NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM (N.P.D.E.S.) GENERAL PERMIT FROM THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (E.P.A.) / F.D.E.P. AND LOCAL REGULATORY AGENCY AT LEAST 48 HOURS PRIOR TO THE START OF CONSTRUCTION. CONTRACTOR SHALL CREATE, IMPLEMENT AND MAINTAIN A STORMWATER POLLUTION PREVENTION PLAN AS REQUIRED BY THE N.P.D.E.S. GENERAL PERMIT.
5. AREAS LOCATED ADJACENT TO WETLAND / UPLAND PRESERVE AREAS SHALL BE STABILIZED WITH SOD (OR AS CALLED FOR ON DETAILED PLANS) IMMEDIATELY UPON ACHIEVING FINAL GRADE.
6. EROSION CONTROL DEVICES WILL BE INSTALLED ALONG THE BOUNDARY OF THE CONSERVATION AREAS, PRESERVES AND/OR WETLAND AREAS PRIOR TO CONSTRUCTION. THESE DEVICES SHALL BE SILT SCREENS AND, IF NECESSARY, SYNTHETIC BALES. THESE DEVICES SHALL REMAIN IN PLACE UNTIL CONSTRUCTION IS COMPLETED AND THE ADJACENT CONSTRUCTION ZONES ARE ESTABLISHED.
7. CONTRACTOR SHALL REMOVE ALL TEMPORARY EROSION CONTROL METHODS UPON COMPLETION OF SOIL STABILIZATION FOR THE PROJECT. AT THAT TIME THE RESPONSIBLE ENTITY SHALL FILE AN N.P.D.E.S. STORMWATER POLLUTION PREVENTION PLAN NOTICE OF TERMINATION WITH THE F.D.E.P.
8. DURING CONSTRUCTION, INLET OPENINGS, WHERE APPROPRIATE, SHALL BE COVERED WITH FILTER FABRIC (MIRAFI 140N OR APPROVED EQUAL) TO PREVENT DEBRIS FROM FALLING INTO THE INLET.
9. CONTRACTOR SHALL UTILIZE APPROPRIATE METHODS TO CONTROL WIND EROSION AND DUST. ALL AREAS SHALL BE STABILIZED AS NECESSARY TO CONTROL EROSION WITHIN 7 DAYS OF FINAL GRADING.
10. FOR ADDITIONAL EROSION CONTROL DETAILS NOT SHOWN ON THIS PLAN, SEE LATEST EDITION OF THE STATE OF FLORIDA EROSION AND SEDIMENT CONTROL DESIGNER AND REVIEWER MANUAL.

## CONTRACTOR RESPONSIBILITIES:

1. PREPARE AND SIGN A NOTICE OF INTENT FORM (N.O.I.) AND SUBMIT TO THE REGULATORY AGENCY ALONG WITH ANY REQUIRED FEES AND ATTACHMENTS, OR ASSURE THAT AN N.O.I. HAS BEEN FILED AS REQUIRED.
2. IMPLEMENT THE STABILIZATION, EROSION CONTROL AND OTHER REQUIREMENTS OF THE S.W.P.P.P / EROSION, SEDIMENTATION AND POLLUTION CONTROL PLAN.
3. PROVIDE QUALIFIED INSPECTORS, AND DOCUMENTATION OF QUALIFICATIONS, FOR THE CONTROLS IMPLEMENTED AT THE JOB SITE.
4. CONDUCT ALL NECESSARY INSPECTIONS AT THE REQUIRED INTERVALS AND PREPARE AND RETAIN WRITTEN DOCUMENTATION OF THOSE INSPECTIONS AND ALL OTHER WRITTEN DOCUMENTATION REQUIRED BY THE GENERAL PERMIT.
5. KEEP A COPY OF THE S.W.P.P.P. / EROSION, SEDIMENTATION AND POLLUTION CONTROL PLAN, ALL N.O.I.'S, PERMIT CERTIFICATES; PERMIT LANGUAGE; SPILL PREVENTION, COUNTERMEASURES, AND CLEANUP ("S.P.C.C.") PLAN; INSPECTION RECORDS; AND OTHER REQUIRED RECORDS ON THE JOB SITE AND POST IN A PROMINENT PLACE NEAR THE JOB SITE ENTRANCE THOSE DOCUMENTS REQUIRED TO BE POSTED UNDER THE TERMS OF THE GENERAL PERMIT.
6. CONTRACTOR SHALL PROVIDE MONTHLY TRAINING SESSIONS FOR ALL ENTITIES AND SUBCONTRACTORS INVOLVED WITH INSTALLING, APPLYING, PERFORMING, MAINTAINING AND INSPECTION OF THE S.W.P.P.P. / EROSION, SEDIMENTATION AND POLLUTION CONTROL PLAN.
7. UPDATE AND MAKE CHANGES TO THE S.W.P.P.P. / EROSION, SEDIMENTATION AND POLLUTION CONTROL PLAN AND SUPPORTING DOCUMENTS (SUCH AS THE B.M.P.'S AND / OR S.P.C.C.) AS NEEDED AND WITH THE APPROVAL OF THE OPERATOR AND THE OPERATOR'S ENGINEER.
8. PREPARE AND SIGN A NOTICE OF TERMINATION (N.O.T.) FORM WHEN SITE WORK CONSTRUCTION IS COMPLETED AND STABILIZATION IS ACHIEVED. TRANSFER THE S.W.P.P.P. / EROSION, SEDIMENTATION AND POLLUTION CONTROL PLAN DOCUMENTS, ALONG WITH ALL N.O.I.'S, PERMIT CERTIFICATES, N.O.T.'S, AND WRITTEN RECORDS REQUIRED BY THE GENERAL PERMIT TO THE OPERATOR FOR ARCHIVING IN BOTH PAPER AND OPTICALLY-SCANNED FORMAT ON A CD.

Barraco and Associates, Inc.
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

THE ISLES OF COLLIER PRESERVE
FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD

TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E50.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:57 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

MASTER = BAI-EROSION-1-3D.DWG

PLAN REVISIONS

PLAN STATUS

APPROVAL SUBMITTAL PLANS
2020-12-04

EROSION CONTROL DETAILS

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 9.0 |



Received Electronically
April 7, 2021
South District

1 TEMPORARY EROSION CONTROL BERM
N.T.S.

2 TEMPORARY EROSION CONTROL BERM @ CONSERVATION
N.T.S.

**Barraco and Associates, Inc.**
CIVIL ENGINEERING - LAND SURVEYING
LAND PLANNING
www.barraco.net
2271 McGREGOR BLVD., SUITE 100
POST OFFICE DRAWER 2800
FORT MYERS, FLORIDA 33902-2800
PHONE (239) 461-3170
FAX (239) 461-3169
FLORIDA CERTIFICATES OF AUTHORIZATION
ENGINEERING 7995 - SURVEYING LB-6940

PREPARED FOR

MINTO COMMUNITIES - USA
4042 PARK OAKS BOULEVARD SUITE 450
TAMPA, FL 33610
PHONE (813) 342-3838
FAX (813) 342-3831
WWW.MINTO.COM

PROJECT DESCRIPTION

# THE ISLES OF COLLIER PRESERVE
## FLEISCHMANN PARCEL

PART OF SECTIONS 23 & 26,
TOWNSHIP 50 SOUTH, RANGE 25 EAST
COLLIER COUNTY, FLORIDA

ENGINEER OF RECORD
TIMOTHY B. GAVIN, P.E., FOR THE FIRM
FLORIDA P.E. NO. 70675 - TIMG@BARRACO.NET

DRAWING NOT VALID WITHOUT SEAL, SIGNATURE AND DATE
© COPYRIGHT 2020, BARRACO AND ASSOCIATES, INC.
REPRODUCTION, CHANGES OR ASSIGNMENTS ARE PROHIBITED

| | |
|---|---|
| FILE NAME | 23780E52.DWG |
| LOCATION | J:\23780\DWG\ERP\ |
| PLOT DATE | FRI. 12-4-2020 - 2:58 PM |
| PLOT BY | SCOTT DALEY |

CROSS REFERENCED DRAWINGS

PLAN REVISIONS

| | |
|---|---|
| 2020-08-17 | 1 RAI COMMENTS |

PLAN STATUS
APPROVAL SUBMITTAL PLANS
2020-12-04

STORMWATER POLLUTION PREVENTION PLAN

| PROJECT / FILE NO. | SHEET NUMBER |
|---|---|
| 23780 | 10.0 |



# FLORIDA DEPARTMENT OF
# Environmental Protection

South District
PO Box 2549
Fort Myers FL 33902-2549
SouthDistrict@FloridaDEP.gov

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Noah Valenstein**
Secretary

**May 17, 2021**

## STATE 404 PROGRAM
## PUBLIC NOTICE

Permit Application No. 0398942-001 SFI

TO WHOM IT MAY CONCERN: The Department of Environmental Protection has received an application for a State 404 Program permit pursuant to 62-331, Florida Administrative Code, as described below:

APPLICANT:    Minto Sabal Bay, LLC
4042 Park Oaks Boulevard, Suite 450
Tampa, Florida 33610
(239) 896-1402

LOCATION: The project site is located in Sections 23 and 26, Township 50 South, and Range 25 East, Naples, Collier County. The project is located southeast of the intersection of Bayshore Drive and Holly Avenue, approximately 0.75 mile south of Thomasson Drive. Collier County Property Appraiser Parcel ID Nos. 61838080008, 61838120007, 61838160009, 61838200008, 61838201007, and 61838240000.

APPROXIMATE CENTRAL COORDINATES:
Latitude 26.094988° Longitude -81.767949°

PROJECT PURPOSE: The project's overall purpose is to construct a master planned residential development near Naples in Collier County.

PROPOSED WORK:
The applicant seeks authorization to construct a residential development with associated roads, infrastructure, and stormwater management system. The proposed project will result in the total discharge of 111,062 cubic yards of fill material into 17.21 acres of wetlands and total excavation of 84,700 cubic yards of material from 8.75 acres of wetlands. Wetland impacts by FLUCFCS Code include 3.48 acres of fill and 0.47 acres of excavation in 6249E3 - Cypress/Pine/Cabbage Palm, Disturbed (50-75% Exotics), 0.19 acres of fill and 0.39 acres of excavation in 6249E4 – Cypress/Pine/Cabbage Palm, Disturbed (76-100% Exotics), 13.49 acres of fill and 7.89 acres of excavation in 6259E4 – Pine, Hydric, Disturbed (76-100% Exotics), and 0.05 acres of fill in 6319E3 – Wetland Shrub, Disturbed (50-75% Exotics). The project will also result in 839 cubic yards of fill material placed into 0.13 acre of other surface waters identified as Drainage Canal (514).

EXISTING CONDITIONS:

The project site contains 53.70 acres of wetlands and 0.13 acre of other surface waters. The native wetland community types are dominated by hydric pine flatwoods (72 percent) with lesser amount of cypress, pine, cabbage palm (16 percent), wetland shrub (7 percent), and mangrove (3 percent). The other surface waters consist of an unvegetated drainage canal. Wet season water level conditions range from near surface elevation to approximately 1 foot above ground surface.

Native upland community types include slash pine (*Pinus elliottii*) and saw palmetto (*Serenoa repens*) flatwoods. Both upland and wetland community types have been disturbed to varying degrees by exotic vegetation including but not limited to melaleuca (*Melaleuca quinquenervia*), earleaf acacia (*Acacia auriculiformis*), Brazilian pepper (*Schinus terebinthifolia*), and downy rose-myrtle (*Rhodomyrtus tomentosa*). In the majority of habitat types the coverage of exotics exceeds 75 percent. The site has a history of off-road vehicular use and trash dumping.

The Avalon Outfall Canal and Isles of Collier Preserve residential development abuts the east side of the project; undeveloped lands including some conservation lands abut the south and west sides of the project; and cleared lands and residential development are located on the north side of the project.

Vegetation descriptions of wetland and other surface water communities are as follows:

Drainage Canal (FLUCFCS Code 514) These excavated other surface water areas are open water shaded by a canopy of melaleuca, downy rose-myrtle, and Brazilian pepper.

Mangrove Swamps, Disturbed (0-24% Exotics) (FLUCFCS Code 6129 E1) The canopy and sub-canopy vegetation include white mangroves (*Laguncularia racemosa*), black mangroves (*Avicennia germinans*), buttonwood (*Conocarpus erectus*), melaleuca, and Australian pine (*Casuarina equisetifolia*). The ground cover includes needle rush (*Juncus roemerianus*), saltgrass (*Distichlis spicata*), morning glory (*Ipomea* sp.), umbrella sedge (*Fuirena scirpoidea*), and saltwort (*Batis maritima*).

Mangrove Swamps, Disturbed (50-75% Exotics) (FLUCFCS Code 6129 E3) The canopy and sub-canopy vegetation include buttonwood (*Conocarpus erectus*), melaleuca, cabbage palm, Brazilian pepper, white mangroves, and black mangroves. The ground cover includes saltgrass and white indigo berry (*Randea aculeata*).

Cypress/Pine/Cabbage Palm, Disturbed (Exotics 50-100%) (FLUCFCS Codes 6249 E3E4) The canopy consists of slash pine, melaleuca, cypress (*Taxodium distichum*), and cabbage palm. The sub-canopy contains downy rose-myrtle, cabbage palm, cocoplum (*Chrysobalanus icaco*), wax myrtle, swamp bay (*Persea palustris*), melaleuca, Brazilian pepper, and myrsine. The ground cover includes gulfdune paspalum (*Paspalum monostachyum*), swamp fern, sawgrass (*Cladium jamaicense*), grapevine, swamp lily (*Crinum americanum*), Old World climbing fern (*Lygodium microphyllum*), poison ivy, and cabbage palm. Coverage of exotics exceeds 75 percent in areas mapped as E4.

Pine, Hydric, Disturbed (50-100% Exotics) (FLUCFCS Codes 6259 E3-E4) The canopy consists of slash pine and melaleuca with some scattered cabbage palm and cypress. The sub-canopy contains slash pine, wax myrtle, myrsine, dahoon holly, swamp bay, saltbush (*Baccharis halimifolia*), melaleuca, downy rose-myrtle, cypress, cocoplum, and Brazilian pepper. The ground cover includes gulfdune

paspalum, swamp fern, sawgrass, snowberry (*Chiococca alba*), poison ivy, bracken fern, Old World climbing fern, yellow-eyed grass, grapevine, greenbriar, bantam buttons (*Syngonanthus flavidulus*), and rush fuirena (*Fuirena cirpoidea*). Coverage of exotics exceeds 75 percent in areas mapped as E4.

Wetland Shrub, Disturbed (50-75% Exotics) (FLUCFCS Code 6319 E3) The canopy and sub-canopy vegetation includes buttonwood (*Conocarpus erectus*), melaleuca, cabbage palm, and Australian pine (*Casuarina equisetifolia*). The ground cover is dominated by saltgrass (*Distichlis spicata*), with scattered spikerush (*Eleocharis* sp.), saltwort, sand cordgrass (*Spartina alterniflora*), needle rush, leather fern (*Acrostichum aureum*), and glasswort (*Salicornia virginica*).

AVOIDANCE AND MINIMIZATION INFORMATION: The project avoids impacts to high natural resource value lands and directs development towards lands with less environmental habitat value. The site plan was designed to utilize existing disturbed upland and low-quality wetland habitats and avoid direct and secondary impacts to on-site high quality natural wetland habitats including mangrove. In addition, the applicant avoids developing near existing conservation lands located south of the project.

COMPENSATORY MITIGATION:
Total wetland impacts are 25.96 acres resulting in a loss of 9.64 functional units. The applicant would provide compensatory mitigation through the on-site preservation and enhancement and off-site mitigation credit purchase at Panther Island Mitigation Bank (PIMB). On-site preservation and enhancement of 29.86 acres will generate 3.79 functional units and provide beneficial wildlife habitat and enhance water quality. The on-site preservation area contains important habitat for a variety of plant and wildlife species and is located proximate to Rookery Bay National Estuarine Research Reserve. An additional 5.85 functional units will be purchased at PIMB. Purchasing mitigation bank credits is associated with the enhancement, restoration, and/or conservation of uplands and wetlands at a site with regional ecologic importance (i.e., PIMB). The implementation of wetland restoration and upland preservation as well as off-site credit purchase will result in no net loss of regional wetland functions and values. The preserve will be encumbered by a conservation easement deeded for conservation purpose.

CULTURAL RESOURCES:
The Department has requested review from the State Historic Preservation Officer (SHPO) and those federally recognized Tribes with concerns in Florida and the permit area. Archeological Consultants, Inc. completed a Cultural Resource Assessment Survey (CRAS) on the entire project area. The investigation revealed no sites of archaeological, historical, or architectural significance. The CRAS was coordinated with both the State Historic Preservation Officer and Tribal Historic Preservation Office. DEP is not aware of any known historic properties within the permit area. By letter dated March 25, 2021, the Tribal Historic Preservation Office had no objections to the project. By letter dated June 10, 2020, the State Historic Preservation Office concurred with the survey results that determined the project will have no effect on cultural resources listed, or eligible for listing, in the National Register of Historic Places, and recommendation of no additional work within the area of potential effect. Our final determination relative to historic resource impacts is subject to review by and coordination with the State Historic Preservation Officer, the Tribal Historic Preservation Officer (THPO), and those federally recognized tribes with concerns in Florida and the Permit Area.

FEDERALLY AND STATE-LISTED SPECIES: The project is located within the U.S. Fish and

Wildlife Service's (USFWS) Consultation Areas for Florida scrub jay (*Aphelocoma coerulescens*, Federally Threatened [FT]), Florida bonneted bat (*Eumops floridanus*, FT), redcockaded woodpecker (*Picoides borealis*, FT), eastern indigo snake (*Drymarchon corais couperi*, FT), wood stork (*Mycteria americana*, FT), American crocodile (*Crocodylus acutus*, FT), and Florida panther (*Puma concolor coryi*, FT). The project may impact the following state listed species: Gopher tortoise (*Gopherus polyphemus*, State Threatened [ST]) and Big Cypress fox squirrel (*Sciurus niger avicennia*, ST) Florida Fish and Wildlife Conservation Commission (FWC) staff have determined the proposed project would have **no effect** on the Florida scrub-jay, Florida bonneted bat, red-cockaded woodpecker, and American crocodile. FWC staff have also determined the proposed project **may affect but is not likely to adversely affect** wood stork and **may affect** the eastern indigo snake and Florida panther.

Florida Scrub-Jay: The project lies within the consultation area for the Florida scrub-jay. This species lives only in the scrub and scrubby flatwoods habitats of Florida. This type of habitat grows only on nearly pure, excessively well-drained sandy soils, and occurs along present coastlines in Florida, on paleodunes of the high central ridges and other ancient shorelines of the Florida Peninsula, and inland on scattered alluvial deposits bordering several major rivers. This species' habitat is dominated by a layer of evergreen oaks [myrtle oak (*Quercus myrtifolia*) and/or Archbold oak (*Q. inopina*), sand live oak (*Q. geminata*), Chapman oak (*Q. chapmanii*), and runner oak (*Q. minima*)], rusty lyonia (*Lyonia ferruginea*), and Florida rosemary (*Ceratiola ericoides*). This layer is rarely greater than two meters in height, except where fire has been suppressed. Ground cover is sparse, dominated by saw palmetto (*Serenoa repens*) and sand palmetto (*Sabal etonia*). Bare sand patches are essential for foraging and acorn-caching. Slash pines (*Pinus elliottii*) and sand pines (*P. clausa*) are widely scattered with usually less than 15 percent cover. Per Existing Conditions described in Fleischmann Parcel Biological Assessment February 2021 (Florida Department of Environmental Protection [FDEP] 404 Assumption), page 16, the existing conditions do not contain nesting or foraging habitat for this species. Based on this information, FWC staff have determined that the project would have "no effect" on this species.

Florida Bonneted Bat: The Florida bonneted bat (FBB) is listed by both FWC staff and USFWS as Federally Endangered and is the largest species of bat in Florida. These bats forage in a variety of habitats including tropical hardwoods, pinelands, mangroves, and manmade habitats such as golf courses. Per Existing Conditions described in Fleischmann Parcel Biological Assessment February 2021 (FDEP 404 Assumption), page 14, an acoustic survey for the Florida bonneted bat was performed from August 19 through September 4, 2019. No Florida bonneted bats were observed or recorded during the survey. The potential impacts to the endangered FBB were evaluated using Florida Bonneted Bat Consultation Guidelines, October 2019. Use of the FBB Consultation Key resulted in the following sequential determination: 1a. > 2a. > 3b. > 6b. = "no effect."

Red-Cockaded Woodpecker: The project lies within the consultation area for the Red-cockaded woodpecker, but the habitat present at the project site does not support foraging or nesting habitat for the species. The Red-cockaded woodpecker lives and forages in mature pine forests, specifically, those with longleaf pines averaging over 80 to 120 years old and loblolly pines averaging 70 to 100 years old. The red-cockaded woodpeckers live in groups with a breeding pair and as many as four helpers, usually male offspring from the previous year. Each group

needs about 200 acres of old pine forest to support its foraging and nesting needs. This type of habitat is not present on-site, therefore, FWC staff determined the proposed project will have "no effect" on the red-cockaded woodpecker.

<u>Eastern Indigo Snake</u>: The potential impacts to the endangered Eastern Indigo snake were evaluated using the USFWS North and South Florida Programmatic 13 Effect Determination Key for the Eastern Indigo Snake (as amended on August 1, 2017). Use of the key resulted in the following sequential determination: A > B > C > "may affect" the eastern indigo snake. This is due to the applicant proposing to follow the USFWS approved *Standard Protection Measures for the Eastern Indigo Snake* during the clearing and construction phases of the project.

<u>Wood Stork</u>: The project site is not located within a core foraging area for any wood stork nesting colony and the mitigation plan for impacts to potential foraging areas onsite includes both on-site and off-site mitigation that may benefit the species. FWC staff utilized the *USFWS South Florida Ecological Services Office Effect Determination Key for the Wood Stork in South Florida*, May 2010. Use of the key resulted in the following sequential determination: A > B > C > D "not likely to adversely affect."

<u>American Crocodile</u>: This project lies within the consultation area for the American crocodile but is not within designated critical habitat for the species. American crocodiles are limited to southern Florida and are usually associated with mangroves. A small portion of the project area contains mangrove trees and open water, but no evidence of the species was found during surveys. Use of the American Crocodile Effect Determination Key resulted in "no effect."

<u>Florida Panther</u>: This project lies within the consultation area for the Florida panther, but is 6 miles outside the focus area. Useable panther habitat exists onsite, but panther telemetry located the nearest panther population within 5 miles to be in the Rookery Bay National Estuarine Research Reserve, which is separated from the project site by Highway 41. Panther habitat units will be purchased to offset impacts from development. The project will result in new traffic patterns, thus use of the Florida Panther Effect Determination Key, February 2007 resulted in the following determination: A > B = "may affect." FWC and USFWS staff will coordinate with the applicant to craft appropriate permit conditions for the State 404 permit.

<u>State-Listed Species</u>: The presence of gopher tortoise burrows and suitable soils indicate that gopher tortoises may be on site. The project area is also within the known range for Big Cypress fox squirrel and limited habitat exists, but none were found during the site visit. FWC staff will work with the applicant to establish any necessary avoidance conditions for the State 404 Permit.

OTHER INFORMATION: This project was previously noticed to the public by the Army Corps of Engineers on June 2020, under SAJ-2019-03152 (SP-ACM) and is being re-noticed under the State 404 Permit Program. Water Quality Certification is subject to issuance of pending Environmental Resource Permit Application No. 200724-3945 by the South Florida Water Management District.

COMMENTS regarding the potential authorization of the work proposed should be submitted in writing to Curtis Hardman at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549 or by electronic mail at **SD-ERPcomments@floridadep.gov,**

within 30 days from the date of this notice. Written comments will be made part of the record and should reference the above permit application number. Objections must be factual, specific, and fully describe the reasons upon which any objection is founded. Any comments received will be considered by the Department to determine whether to issue, modify, condition, or deny a permit for this proposal. Unless a written request is filed with the Department within the 30-day public comment period, the Department may decide on the application without a public meeting.

EVALUATION: The determination as to whether a permit will be issued, or a public meeting held, will be based on an evaluation of all relevant factors, including the public comments received and the effect of the proposed work on the public interest, including, but not limited to, fish, wildlife, historical resources, and pollution. The specific permit decision criteria can be found in Chapter 62-331, Florida Administrative Code.

The Department is soliciting comments from the public; federal, state, and local agencies and officials; Indian Tribes; and other interested parties in order to consider and evaluate the impacts of this proposed activity. To make this consideration, comments are used to assess impacts to endangered species, historic properties, water quality, general environmental effects, and other public interest factors. Comments are also used to determine the need for a public meeting and to determine the overall public interest of the proposed activity.

FOR FURTHER INFORMATION regarding this application, please visit the State 404 Permit File at https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_398942/facility!search or contact the project manager, Curtis Hardman, in writing at Florida Department of Environmental Protection, South District Office, PO Box 2549, Fort Myers, Florida 33902-2549; by electronic mail at Curtis.Hardman@floridadep.gov, or by telephone at (239)344-5639. Please include the permit application number referenced at the top of this page in any correspondence.

REQUEST FOR PUBLIC MEETING: Any person may request a public meeting. The request must be submitted to Curtis Hardman within the designated comment period of the notice and must state the specific reasons for requesting the public meeting.

*Full file can be accessed here*: https://prodenv.dep.state.fl.us/DepNexus/public/electronic-documents/ST404_398942/facility!search

**Christina Reichert**

| | |
|---|---|
| **From:** | Amber Crooks <amberc@conservancy.org> |
| **Sent:** | Thursday, May 20, 2021 2:40 PM |
| **To:** | Christina Reichert |
| **Subject:** | CSWFL-FDEP email 2 |

Here is the other one.

Thank you,
Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
239-776-5601

**From:** Truitt, John <John.Truitt@dep.state.fl.us>
**Sent:** Thursday, December 17, 2020 5:45 PM
**To:** Amber Crooks <amberc@conservancy.org>
**Subject:** Re: Federal register notice question

Amber,

I've been told the normal process can take 3-4 weeks.  I haven't been given a particular date but am presuming mid January based on publication times for prior notices.  If I do get a better idea, I will reach out.

Regards

JJT

On Dec 17, 2020 17:41, Amber Crooks <amberc@conservancy.org> wrote:
Hello Deputy Secretary Truitt,

I hope you are doing well. I was watching the big announcement this morning and wondered if you knew when the federal register notice was going to be published?

I know that EPA is responsible for the federal register notice, but thought you might have an understanding of the timing. In the press conference today, they didn't provide a date or timeframe.

Thank you,
Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
239-776-5601



**Christina Reichert**

| | |
|---|---|
| **From:** | Amber Crooks <amberc@conservancy.org> |
| **Sent:** | Thursday, May 20, 2021 2:40 PM |
| **To:** | Christina Reichert |
| **Subject:** | CSWFL-FDEP email 1 |

Here is one of the emails.

Thank you,
Amber Crooks
Environmental Policy Manager
Conservancy of Southwest Florida
239-776-5601

---

**From:** Truitt, John <John.Truitt@dep.state.fl.us>
**Sent:** Monday, December 21, 2020 10:49 AM
**To:** Amber Crooks <amberc@conservancy.org>
**Subject:** Federal register notice

Amber,

The following website:
https://www.federalregister.gov/public-inspection/current

shows what notices will be published the next business day. On the calendar for tomorrow is the notice approving section 404 assumption.

Regards,

JJT



John J Truitt
Deputy Secretary, Regulatory Programs
Florida Department of Environmental Protection
E-mail:  john.truitt@floridadep.gov
(850)245-2037
3900 Commonwealth Blvd
Tallahassee, FL  32399



| | |
|---|---|
| **From:** | Jackson, Kimberly |
| **To:** | Peterson, Pete; Gorton, Donna |
| **Subject:** | UPDATE |
| **Date:** | Friday, December 18, 2020 2:37:00 PM |
| **Attachments:** | image001.jpg |
| | image002.png |
| | image003.png |

---

*Kimberly Jackson, GISP, GIO*
*FloridaGIO@FloridaDEP.gov*
*850.245.8296  (X- 58296)*

---

**From:** Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 2:33 PM
**To:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>; Allen, Kimber M. <Kimber.M.Allen@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

That's correct. We need map layers like ERP_PA and ERPce, except for ST404 sites, which as far as I understand can be done by duplicating and altering the queries. We'll need different symbology for them, too. I think 1 focus for NEXUS with both layers should be fine.
Thanks,
Camille

---

**From:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 2:26 PM
**To:** Allen, Kimber M. <Kimber.M.Allen@dep.state.fl.us>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>; Mason, Heather <Heather.Mason@FloridaDEP.gov>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

As far as I understand we need  a new layer that will get the Facility Type equal to **ST404_PA** instead of the Facility Type equal to **ERP_PA**..

Jorge

---

**From:** Allen, Kimber M. <Kimber.M.Allen@dep.state.fl.us>
**Sent:** Friday, December 18, 2020 2:18 PM
**To:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>; Mason, Heather <Heather.Mason@FloridaDEP.gov>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

In light of recent even…

You have an existing layers for ERP permits and ERP compliance sites.  If the need is to have the exact same thing for 404 permits,  we can duplicate those queries as a starting point, create views, etc.

Stay tuned….

Kimber

---

**From:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 1:20 PM
**To:** Beasley, Camille <Camille.BeasleyridaDEP.gov>; Mason, Heather <Heather.Mason@FloridaDEP.gov>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; MasKion, Heather <Heather.Mason@FloridaDEP.gov>; Allen, Kimber M.

<Kimber.M.Allen@dep.state.fl.us>
**Subject:** RE: GIS timing for new deadline

Heather/Camille/Dan,

Do you happen to know who put together the queries to produce the GIS layers? Our WRM GIS Team has never done that. The data is pulled from COMET.

Thanks

Jorge

**From:** Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 1:11 PM
**To:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Willis, Dan P.
<Dan.P.Willis@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>; Allen, Kimber M. <Kimber.M.Allen@dep.state.fl.us>
**Subject:** RE: GIS timing for new deadline

Jorge/Camile,

1. I need a separate query that defines each of these two new GIS layers:



2. I also need a GIS checklist for each of these two new GIS layers.

3. Once we create the layers in Dev, they need to go through the process with the DBA, then they will be tested and put in production.

4. Once in production, we will ask Gary to create a map Direct focus, per your needs (a focus with one layer? A focus with both layers? Two focuses? ) and then share that with Efrain, to be referenced in Nexus.  When the queries are constructed, they need to contain the data that will be referenced in Nexus.

*Kimberly Jackson, GISP, GIO*
*FloridaGIO@FloridaDEP.gov*
*850.245.8296  (X- 58296)*

**From:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 1:05 PM
**To:** Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Willis, Dan P.
<Dan.P.Willis@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

I am not sure this will help but Sesh sent this query to Efrain Suarez which it is very similar to the ERP.

Jorge

**From:** Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 12:58 PM
**To:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Willis, Dan P.
<Dan.P.Willis@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

We need to create them and put them in production and in a Map Direct focus for use by Nexus.  We don't write the queries to create the layer (s). We need the query from ????.  That is what I'm finding out.  Please stay tuned.

*Kimberly Jackson, GISP, GIO*
*FloridaGIO@FloridaDEP.gov*
*850.245.8296  (X- 58296)*

**From:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 12:56 PM
**To:** Beasley, Camille <Camille.Beasley@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>; Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

Camille/Kim,

Please correct me if I am wrong but these 2 layers need to be implemented by OTIS or OTIS/GIS, correct



Thanks

Jorge


**From:** Lagos, Jorge
**Sent:** Friday, December 18, 2020 12:45 PM
**To:** Beasley, Camille <Camille.Beasley@FloridaDEP.gov>; Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Cc:** McKee, Sami <Sami.McKee@FloridaDEP.gov>; Lugo, Jeohusua <Jeohusua.Lugo@dep.state.fl.us>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>
**Subject:** RE: GIS timing for new deadline

I will initial them.

Jorge

**From:** Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 12:44 PM
**To:** Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Cc:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Subject:** RE: GIS timing for new deadline

I will have Tribal Areas and Fish Habitats completed today. The checklist needs Jorge's initials, but he won't be in til Monday I think. Should I just send directly to GISlibarian without initials?
I'm not sure who writes the queries for pulling COMET sites to make the ST404 layers. Maybe Parker Hinson? Or I could just submit a service desk ticket.

**From:** Jackson, Kimberly <Kimberly.Jackson@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 12:23 PM
**To:** Beasley, Camille <Camille.Beasley@FloridaDEP.gov>
**Cc:** Lagos, Jorge <Jorge.Lagos@FloridaDEP.gov>
**Subject:** GIS timing for new deadline

Camille,

Is there any way you can use Sami, Jeohusua, or other GIS staff to prepare the following outstanding GIS data over the weekend? I'm especially concerned about the State 404 Program Permits, the State 404 Program Compliance & Enforcement Facilities and the Tribal 404 Notification Areas. If any of these red highlighted data have been submitted today, please let me know so I can update my spreadsheet.

We have to do the processing to get them into the library before we can add them to any of the other applications that need to be tested prior to going into production by Heather's new deadline. I'm afraid if we wait until Jorge is back on Monday to create these data, we can't meet this deadline.

I appreciate your time and reply.



*Kimberly Jackson, GISP, GIO*
*FloridaGIO@FloridaDEP.gov*
*850.245.8296 (X- 58296)*

---

**From:** Mason, Heather <Heather.Mason@FloridaDEP.gov>
**Sent:** Friday, December 18, 2020 11:58 AM
**To:** Keyt, Bob <Bob.Keyt@dep.state.fl.us>; Paladugu, Sesh <Sesh.Paladugu@FloridaDEP.gov>; Peterson, Pete <Pete.Peterson@FloridaDEP.gov>
**Cc:** Rach, Timothy <Timothy.Rach@dep.state.fl.us>; Zimmerman, Jeffrey (Dan) <Jeffrey.Zimmerman@FloridaDEP.gov>; Willis, Dan P. <Dan.P.Willis@dep.state.fl.us>; Beasley, Camille <Camille.Beasley@FloridaDEP.gov>; Harrison, Savanna <Savanna.Harrison@FloridaDEP.gov>; Minick, Allyson <Allyson.Minick@dep.state.fl.us>; Northup, Rebecca <Rebecca.Northup@FloridaDEP.gov>; Steele, Kyle <Kyle.Steele@FloridaDEP.gov>
**Subject:** State 404 Implementation Date

Hi OTIS Folks,

We just got our implementation date. The effective date will be December 22, 2020.

I know this is a lot earlier than we discussed, and we will have some things to work out and discuss at today's meeting for sure.

I apologize that we were so wrong with our estimates. I will explain later at our meeting.

Heather