
**Federal Register** / Vol. 85, No. 180 / Wednesday, September 16, 2020 / Notices **57853**

# ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OW–2018–0640; FRL–10014–54–Region 4]**

## Florida's Request To Assume Administration of a Clean Water Act Section 404 Program

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice and request for comments.

**SUMMARY:** The Clean Water Act (CWA) established the Section 404 program, under which the U.S. Army Corps of Engineers (Corps) may issue permits for the discharge of dredged or fill material into "waters of the United States," as identified in the CWA. Section 404(g)(1) of the CWA authorizes states and tribes to administer their own permit program for the discharge of dredged or fill material into navigable waters, other than those waters that the CWA reserves as subject to Corps jurisdiction. On August 20, 2020, the Environmental Protection Agency (EPA) received from the Governor of the State of Florida, a complete program submission for regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with the CWA. Pursuant to CWA Section 404(h) and EPA's implementing regulations, EPA will hold public hearings and is opening a 45-day comment period. EPA is also initiating a programmatic consultation under Section 106 of the National Historic Preservation Act (NHPA) and is soliciting comments pursuant to NHPA implementing regulations during the 45-day comment period.

**DATES:** Comments on EPA's decision to approve or disapprove under CWA Section 404 must be received on or before November 2, 2020. Comments associated with the consultation under section 106 of the NHPA may also be submitted on or before November 2, 2020. EPA intends to approve or disapprove the State of Florida's request to assume administration of a CWA Section 404 program by December 17, 2020.

**ADDRESSES:** You may send comments on both actions (Florida's request to assume a CWA Section 404 program and EPA's consultation under NHPA section 106), identified by Docket ID No. EPA–HQ–OW–2018–0640, by any of the following methods:

• *www.regulations.gov:* Follow the on-line instructions for submitting comments and accessing the docket and materials related to this notice.

• *Email: 404Assumption-FL@epa.gov.*

• *Mail:* Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303.

*Instructions:* All submissions received must include the Docket ID No. EPA–HQ–OW–2018–0640 for these actions. Comments received may be posted without change to *https://www.regulations.gov/*, including any personal information provided.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/* or email at *404Assumption-FL@epa.gov*, as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing held on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT. For information about registration for these virtual public hearings, please see *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.*

**FOR FURTHER INFORMATION CONTACT:** Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303; (404) 562–9262; email address: *404Assumption-FL@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The State's submission may be read online through the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640, the EPA's Docket Center, available at *https://www.regulations.gov.* The State's submission is also on file and may be inspected and copied (for a per page charge) at the EPA Docket Center Reading Room located at WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. Due to COVID–19, access to the EPA Docket Center Reading Room will be allowed by appointment only. Procedures to make an appointment to visit the EPA Docket Center Reading Room can be found at *https://*

*www.epa.gov/dockets/epa-docket-center-reading-room.*

## Table of Contents

I. General Information
  A. Does this action apply to me?
  B. What should I consider as I prepare my comments?
  C. How can I participate in the virtual public hearing?
II. Background
  A. Clean Water Act Section 404(g)
  B. National Historic Preservation Act Section 106 Consultation
  C. Endangered Species Act Consultation

## I. General Information

### A. Does this action apply to me?

States and tribes that have assumed or are considering assuming the administration of a CWA Section 404 dredged or fill material permitting program as well as regulated entities and members of the public in the State of Florida may be interested in providing input on the issues described in this document.

Tribal and State Historic Preservation Offices as well as members of the public with knowledge of or interest in the identification (and location) of historic properties in the State of Florida, the effects of discharges from dredged or fill activities into waters of the United States on these historic properties, or ways to mitigate or avoid adverse effects of such discharges may be interested in commenting on EPA's consultation on this action under section 106 of the NHPA.

### B. What should I consider as I prepare my comments?

Comments may consider whether the state program meets the requirements of Section 404(g) of the CWA and its implementing regulations. Comments may also consider the impacts of EPA's approval or disapproval of Florida's request on historic sites located within the State of Florida in accordance with section 106 of the NHPA.

Submit your comments, identified by Docket ID No. EPA–HQ–OW–2018–0640, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's docket any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment

**57854**    **Federal Register** / Vol. 85, No. 180 / Wednesday, September 16, 2020 / Notices

is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/ commenting-epa-dockets.*

The EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov/* as there may be a delay in processing mail and faxes. Hand deliveries or couriers will be received by scheduled appointment only. For further information and updates on EPA Docket Center services, please visit us online at *https:// www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our federal partners so that we can respond rapidly as conditions change regarding COVID–19.

*C. How can I participate in the virtual public hearing?*

EPA is deviating from its typical approach because the President has declared a national emergency. Because of current CDC recommendations, as well as state and local orders for social distancing to limit the spread of COVID–19, EPA cannot hold in-person public meetings at this time.

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing held on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT.

EPA will begin pre-registering speakers and listen-only attendees for the hearings upon publication of this notice in the **Federal Register**. For a link to the on-line registration page, please visit *https://www.epa.gov/aboutepa/ about-epa-region-4-southeast.* Immediately following registration, you will receive an email confirming your registration and providing a unique link to the webinar. Speakers will be signed up to speak in the order that their registration is received. The last day to

pre-register to speak at a hearing will be October 9, 2020. On October 20, 2020, EPA will post a general agenda for the hearing that will list the order of pre-registered speakers and their approximate timeslots at: *https:// www.epa.gov/aboutepa/about-epa-region-4-southeast.* Please note that timeslots will be estimated and speakers are encouraged to join the webinar at least 15 minutes prior to the start of their estimated speaking time.

EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule.

Oral comments shall be limited to no more than five (5) minutes. EPA recommends that commenters prepare their oral statement in advance to ensure it can be completed within five minutes. EPA also recommends that commenters also submit the text of their oral comments (with any relevant supplementary information) as written comments to the rulemaking docket. EPA encourages commenters to provide EPA with a copy of their oral testimony electronically (via email) by emailing it to Mr. Kelly Laycock at *404Assumption-FL@epa.gov.*

EPA may ask clarifying questions during the oral testimony but will not respond to the comments at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing. The proceedings of the hearings will be recorded. After the public hearing, verbatim transcripts of the sessions will be included in the rulemaking docket.

Please note that any updates made to any aspect of the hearing will be posted online at *https://www.epa.gov/ aboutepa/about-epa-region-4-southeast.* While EPA expects the hearing to go forward as set forth above, please monitor our website to determine if there are any updates. EPA does not intend to publish a document in the **Federal Register** announcing updates.

To request services for special accommodations, please pre-register for the hearing with Mr. Kelly Laycock at *404Assumption-FL@epa.gov* and describe your needs by October 7, 2020. EPA will seek to arrange special accommodations as needed to support hearing participation if given advanced notice.

## II. Background

*A. Clean Water Act Section 404(g)*

The CWA established the Section 404 program, under which the Secretary of the Army, acting through the Chief of Engineers of the Corps, may issue permits for the discharge of dredged or fill material into waters of the United States as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

The regulations establishing the requirements for the approval of state or tribal programs under section 404 of the CWA were published in the **Federal Register**, at 53 FR 20764, (June 6, 1988) (40 CFR parts 232 and 233), and can be accessed at *https://www.epa.gov/ cwa404g/statutory-and-regulatory-requirements-assumption-under-cwa-section-404.* ''State regulated waters'' are defined in 40 CFR 232.2 as ''those waters of the United States in which the Corps suspends the issuance of Section 404 permits upon approval of a state's section 404 permit program by the Administrator under section 404(h). The program cannot be transferred for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to the high tide line, including wetlands adjacent thereto.'' The Corps retains CWA Section 404 permitting authority over waters of the United States within ''Indian country'' as that term is defined at 18 U.S.C. 1151, unless a tribe has assumed the 404 program within Indian country. *See* 40 CFR 233.1(b).

A state application to administer a Section 404 program must include the following: (a) A letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 CFR 233.11; (c) an Attorney General's statement or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 CFR 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 CFR 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 CFR 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable

state administrative procedures. 40 CFR 233.10.

EPA has reviewed the State of Florida's program submission and consistent with 40 CFR 233.15 has determined that it is a complete request for State program approval that meets the submittal requirements of 40 CFR 233.10. The Governor's request proposes that FDEP administer a permit program for regulated activities in waters regulated by the State under section 404(g)(1), as identified in the Memorandum of Agreement with the Secretary of the Army, in accordance with section 404 of the CWA. The main statutory and regulatory authorities to administer and enforce the State 404 program can currently be found in the State's submission to assume the program and are available on FDEP's web page at *https://floridadep.gov/ water/water/content/water-resource-management-rules.*

The State 404 program would provide for the issuance of general permits and individual permits. The State has adopted 38 general permits which are listed in 62–331 F.S. as part of their package submittal. A complete description of the individual permit process and the standards for granting of an individual permit are found at 62–331 F.S. In addition, there are standard requirements for all regulated activities in State-assumed waters. No permit shall be issued in certain specified circumstances, including when the permit does not comply with the requirements of the CWA or implementing regulations, including the CWA Section 404(b)(1) Guidelines. 40 CFR 233.20. Florida's laws outline a number of requirements applicable to State 404 permits, including that "no dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," and an individual permit cannot be issued if it "[c]auses or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved . . ." by FDEP at 62–331.053 F.S.

Currently, Florida operates the Environmental Resource Permit program (ERP), which regulates the disposal of dredged or fill material into waters of the State under State law. State-regulated activities under ERP that go beyond the purview of the CWA are not subject to EPA approval or oversight under 40 CFR part 233.

The Memorandum of Agreement between FDEP and the Secretary of the Army, available in the docket for this action, identifies procedures for the transfer of all pending permit applications for discharges into the waters assumed by the State. 40 CFR 233.14. Pursuant to the Memorandum of Agreement, existing Section 404 permits already issued by the Corps as of the effective date of State assumption will remain with the Corps during the already approved lifespan of that permit.

The Regional Administrator is required to approve a state request to assume the Section 404 program unless the state program does not meet the requirements of Section 404(h) of the CWA and its implementing regulations. Among other authorities, the state must have: (1) Adequate authority to issue permits which comply with all pertinent requirements of the CWA, including but not limited to, the Section 404(b)(1) Guidelines, and which may be issued for fixed terms not to exceed 5 years; (2) adequate authority, including civil and criminal penalties, to abate violations of the permit or permit program; and (3) authority to ensure that the Administrator, the public, and any other affected state or tribe are given notice of each permit application and that the public and affected states and tribes are provided an opportunity for public hearing before a ruling on each such application. 33 U.S.C. 1344(h)(1).

The procedures for EPA's review and approval or disapproval of a state Section 404 program are outlined in 40 CFR 233.15. In summary, once a state submits an assumption package that is complete, a 120-day statutory review period commences, which may be extended by mutual agreement of the state and EPA. EPA shall provide copies of a complete assumption package within 10 days of receipt to the Corps, the National Marine Fisheries Service (NMFS), and the United States Fish and Wildlife Service (USFWS) for review and comment. Within 90 days of EPA's receipt of a complete program submission, the Corps, FWS, and NMFS shall submit to EPA any comments on the state program. EPA shall publish notice of the state's application in the **Federal Register**, state newspapers, and via mail to interested parties. EPA shall provide for a public comment period of not less than 45 days as well as a public hearing not less than 30 days after such notice is published in the **Federal Register**. EPA shall also provide notice of an opportunity to consult to federally recognized Indian tribes in the state.

Within 120 days of receipt of a complete program submission (unless EPA and the state extend the statutory review period), EPA shall approve or disapprove the program based on whether the state's program fulfills the requirements of the Act and 40 CFR part 233, taking into consideration all comments received. EPA will prepare a summary of significant comments received and responses to these comments, as well as respond individually to comments received from the Corps, USFWS, and NMFS.

If EPA approves Florida's program, EPA will notify the State and the Corps and publish notice in the **Federal Register**. Transfer of the program to the State is not effective until this notice is published. EPA may only disapprove the State's program if it is inconsistent with the requirements of the CWA and 40 CFR part 233. If EPA disapproves the State's program it shall notify the State of the reasons for the disapproval and of any revisions or modifications to the State's program which are necessary to obtain approval. If the State resubmits a program submission remedying the identified problem areas, the approval procedure and statutory review period shall begin upon receipt of the revised submission. EPA maintains oversight of State-issued permits pursuant to 40 CFR 233.50.

If EPA approves this program, EPA will also codify the approved program in 40 CFR 233 subpart H.

## B. National Historic Preservation Act Section 106 Consultation

In accordance with 36 CFR 800.2(d), EPA is providing information and seeking comment on EPA's potential approval of Florida's request to assume a CWA Section 404 program and any potential effects of such approval on historic properties. The National Historic Preservation Act of 1966, as amended, (NHPA) establishes historic preservation as a federal agency policy and provides for the identification and protection of historic properties and resources. Section 106 of the NHPA requires federal agencies to take into account the effects of their undertakings on historic properties that are listed or eligible for listing on the National Register of Historic Places and provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment with regard to such undertakings. The approval of the State of Florida's request to assume the CWA Section 404 program would be an undertaking pursuant to 36 CFR 800.16(y), and therefore, in accordance with Section 106 of the NHPA and the ACHP's implementing regulations at 36 CFR part 800, EPA has initiated consultation regarding this undertaking.

EPA has invited the ACHP, FDEP, the State Historic Preservation Officer (SHPO), and Indian tribes with interests in the State of Florida to participate as consulting parties.

The State's administration of the Section 404 program and its issuance of permits over time has the potential to affect historic properties, including cultural resources or historic properties of religious and cultural significance. FDEP and the SHPO have entered into an Operating Agreement which sets forth a process to identify historic properties that may be impacted by Florida's issuance of Section 404 permits, and to develop recommendations for resolving adverse effects. As discussed in the State's Operating Agreement, such effects could potentially include, but are not limited to, the following:

i. Physical destruction of or damage to all or part of the property, including inundation;

ii. Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access;

iii. Change of the character of the property's use or of physical features within the property's setting, or impacts to the landscape that contribute to its historic significance;

iv. Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features; and

v. Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian Tribe.

Pursuant to the Operating Agreement, if the parties cannot reach agreement on the determination or resolution of effects, they may forward any outstanding issues to EPA for decision-making consistent with EPA's permitting review authorities under 40 CFR 233.50. The Operating Agreement provides comprehensive procedures for assessing the effects of Florida's 404 program on historic properties and therefore will considerably inform EPA's Section 106 consultation.

EPA solicits comments on this undertaking and any potential effects on historic properties at the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640. The comment period closes November 2, 2020.

*C. Endangered Species Act Consultation*

The Endangered Species Act (ESA) Section 7 directs each federal agency to ensure, in consultation with the USFWS and NMFS, that "any action authorized,

funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). EPA views consultation under ESA Section 7 to be required if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. EPA's position is set forth in a memorandum issued by David P. Ross, Assistant Administrator for the Office of Water, dated August 27, 2020, following the consideration of comments received during a public participation process that is outside of the scope of this notice. Accordingly, EPA is conducting ESA Section 7 consultation during the Agency's review of the State of Florida's request to assume administration of a CWA Section 404 program because EPA has determined that the Agency's potential approval of the program may affect ESA-listed species or designated critical habitat. *See https://www.epa.gov/ cwa404g/consultation-cwa-section-404-program-requests-endangered-species-act-and-national-historic* for more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g).

Dated: September 2, 2020.

**Mary Walker,**

*Regional Administrator, EPA Region 4.*

[FR Doc. 2020–19881 Filed 9–15–20; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

**[EPA–OAR–2011–0371; FRL 10014–33–OAR]**

## Proposed Information Collection Request; Comment Request; National Volatile Organic Compounds Emission Standards for Architectural Coatings (Renewal)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) is planning to submit an information collection request (ICR), titled, National Volatile Organic Compounds Emission Standards for Architectural Coatings to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act (PRA). Before doing so, the EPA is soliciting public comments on specific aspects of the proposed information collection as described below. This is a proposed

extension of the ICR, which is currently approved through June 30, 2021. An Agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

**DATES:** Comments must be submitted on or before November 16, 2020.

**ADDRESSES:** Submit your comments, referencing Docket ID No. EPA–OAR–2011–0371, online using *https:// www.regulations.gov/* (our preferred method), by email to *a-and-r-docket@ epa.gov,* or by mail to: EPA Docket Center, Environmental Protection Agency, Mail Code 28221T, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

The EPA's policy is that all comments received will be included in the public docket without change including any personal information provided, unless the comment includes profanity, threats, information claimed to be Confidential Business Information, or other information whose disclosure is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** J. Kaye Whitfield, Sector Policies and Programs Division, Office of Air Quality Planning and Standards, D243–02, Research Triangle Park, North Carolina 27711, telephone number: 919–541–2509; fax number: 919–541–4991; email address: *whitfield.kaye@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Supporting documents which explain in detail the information that the EPA will be collecting are available in the public docket for this ICR. The docket can be viewed online at *https:// www.regulations.gov/.* Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov/* or email, as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https:// www.epa.gov/dockets.* The telephone number for the Docket Center is 202–566–1744.

Pursuant to section 3506(c)(2)(A) of the PRA, the EPA is soliciting comments and information on National Volatile Organic Compounds Emission Standards for Architectural Coatings

*State Statutes and Regulations*

# TABLE OF CONTENTS

<u>Florida Statutes</u>

A. Chapter 120, F.S. – Administrative Procedures Act
B. Chapter 373 – Water Resources
C. Chapter 403 – Environmental Control
D. HB 1091 – Effective July 1, 2020
E. SB 712 – Effective July 1, 2020

<u>Florida Administrative Code</u>

A. Chapter 62-330, F.A.C. – Environmental Resource Permitting
B. Chapter 62-331, F.A.C. – State 404 Program
C. Chapter 62-340, F.A.C. – Delineation of the Landward Extend of Wetlands and Surface Waters
D. Chapter 62-110, F.A.C. – Exceptions to the Uniform Rules of Procedure
E. Chapter 62-4, F.A.C. – Permits

# ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME I (GENERAL AND ENVIRONMENTAL)

**This Volume, including Appendices G, H, and I only is incorporated by reference in subsection 62-330.010(4), F.A.C.**

**Effective _____**

## FOR:

**FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**



**NORTHWEST FLORIDA WATER MANAGEMENT DISTRICT**



**SUWANNEE RIVER WATER MANAGEMENT DISTRICT**



**ST. JOHNS RIVER WATER MANAGEMENT DISTRICT**



**SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT**



**SOUTH FLORIDA WATER MANAGEMENT DISTRICT**



# TABLE OF CONTENTS

**PART I -- BACKGROUND AND PROCEDURES** ........................................................... 4

**1.0   Introduction** ........................................................................................................ 4
   1.1   Overview of Applicant's Handbook ............................................................. 5
   1.2   Contacts and Division of Responsibilities ................................................... 6
   1.3   Other Authorizations and Relationship to Other Governmental Entities ..... 7
   1.4   Statutes and Rules ...................................................................................... 12
   1.6   Enforcement Authority ............................................................................... 18
   1.7   Permission to Inspect, Monitor and Sample ............................................... 18

**2.0   Definitions and Terms** ......................................................................................... 1

**3.0   Regulated Activities** ............................................................................................ 1
   3.1   Permits Not Required .................................................................................. 1
   3.2   Exemptions .................................................................................................. 6
   3.3   Permits Required ......................................................................................... 14
   3.4   Conceptual Approval Permits ...................................................................... 16

**4.0   Preparation and Submittal of Applications and Notices** .................................... 1
   4.1   Pre-application Conference .......................................................................... 1
   4.2   Forms and Submittal Instructions ................................................................ 1
   4.3   Processing Fees ........................................................................................... 7
   4.4   Submittal of Applications, Notices, and Petitions ........................................ 7

**5.0   Processing of, and Agency Action on, Applications and Notices** ...................... 1
   5.1   General Procedures ...................................................................................... 1
   5.2   Review of an Exemption Determination Request .......................................... 1
   5.3   Review of Request to Use a General Permit ................................................. 1
   5.4   Publishing Notices of Exemptions and General Permits ............................... 2
   5.5   Processing Individual and Conceptual Approval Permit Applications ........... 2
   5.6   Activities on State-owned Submerged Lands ............................................... 7

**6.0   Duration, Operation, Modification, and Transfer of Permit** .............................. 1
   6.1   Duration of Permits ..................................................................................... 1
   6.2   Modification of Permits ............................................................................... 3
   6.3   Transfers of Permits and Changes in Ownership .......................................... 4
   6.4   Removal and Abandonment ......................................................................... 5

**7.0   Determinations of the Landward Extent of Wetlands and Other Surface Waters** ... 1
   7.1   Methodology ................................................................................................ 1
   7.2   Formal Determinations ................................................................................. 3
   7.3   Informal Determinations. ............................................................................. 9

**PART II -- CRITERIA FOR EVALUATION** ............................................................... 1

**8.0   Criteria for Evaluation** ........................................................................................ 1
   8.1   Purpose ........................................................................................................ 1
   8.2   Criteria for Evaluation ................................................................................. 1
   8.3   State Water Quality Standards ..................................................................... 3

**9.0   RESERVED** ......................................................................................................... 1

## PART III – ENVIRONMENTAL .......................................................... 1

**10.0    Environmental Considerations**...............................................................1
10.1    Wetlands and other surface waters ......................................................1
10.2    Environmental Criteria..........................................................................2
10.3    Mitigation...............................................................................................24

## PART IV -- EROSION AND SEDIMENT CONTROL ................................... 1

**11.0    Erosion and Sediment Control** ...............................................................1
11.1    Overview...................................................................................................1
11.2    Development of an Erosion and Sediment Control Plan .......................2
11.3    Development of a Stormwater Pollution Prevention Plan (SWPPP) for NPDES Requirements .................2
11.4    Sediment Sump Design Example ...........................................................6

## PART V – OPERATION AND MAINTENANCE-SPECIFIC REQUIREMENTS ............. 1

**12.0    Operation and Maintenance Requirements** ............................................1
12.1    Responsibilities ........................................................................................1
12.2    Procedures for Requesting Conversion from the Construction Phase to the Operation and Maintenance Phase    1
12.3    Operation and Maintenance Entities ....................................................4
12.4    Minimum Operation and Maintenance Standards ...............................7
12.5    Reporting..................................................................................................9
12.6    Recording of Operation and Maintenance Documents and Notice of Permit ...........................10
12.7    Subsequent Transfers .............................................................................10

## APPENDIX A ...................................................................................... 1

**CONTACT INFORMATION AND MAPS FOR AGENCIES IMPLEMENTING THE ERP PROGRAM ......1**

## APPENDIX B ...................................................................................... 1

**OPERATING AND DELEGATION AGREEMENTS BETWEEN THE DEPARTMENT, WATER MANAGEMENT DISTRICTS, and DELEGATED LOCAL GOVERNMENTS**................................................1

## APPENDIX C ...................................................................................... 1

**FORMS**..............................................................................................................1

## APPENDIX D ...................................................................................... 1

**PROCESSING FEES**......................................................................................1

## APPENDIX E ...................................................................................... 1

**OPERATING AGREEMENT BETWEEN** ................................................................1

**JACKSONVILLE DISTRICT USACE, DEP, AND ALL WMDS**................................1

**[Appendices E, F, G, H, I, J and K are located in a separate document because of size; ......................1**

title pages are included here because they are all part of Applicant's Handbook, Volume I] ..............................1

## APPENDIX F .............................................................................................................................1

Bald and Golden Eagle Protection Act ..........................................................................................1

## APPENDIX G .............................................................................................................................1

USFWS Habitat Management Guidelines for the Wood Stork in the Southeast Region ....................1

## APPENDIX H .............................................................................................................................1

National Bald Eagle Management Guidelines ................................................................................1

## APPENDIX I ..............................................................................................................................1

Mine Stormwater Management Systems .......................................................................................1

## APPENDIX J ..............................................................................................................................2

Chapter 62-340, F.A.C. Data Form Guide .....................................................................................2

## APPENDIX K .............................................................................................................................1

Chapter 62-340, F.A.C. Data Form Instructions ...........................................................................1

# PART I -- BACKGROUND AND PROCEDURES

**1.0      Introduction**

The Florida Department of Environmental Protection ("Department" or "DEP") and Florida's five water management districts ("Districts" or "WMDs") developed this Applicant's Handbook to help persons understand the rules, procedures, standards, and criteria that apply to the environmental resource permit (ERP) program under Part IV of Chapter 373 of the Florida Statutes (F.S.).

The Department and each of the Districts implement the ERP program. Several local governments also implement the ERP program under the delegated authority in Section 373.441, F.S. The Applicant's Handbook refers to these entities collectively as "Agencies" and also refers to one or more water management districts as "District" or "Districts" (capitalized), respectively. The term "district" (lower case) generally refers to the main or field offices of either the Department or District. These and other terms are defined in Section 2.0 of this volume of the Applicant's Handbook (hereinafter referred to as "Volume I," or "this volume").

Part IV of Chapter 373, F.S., regulates the construction, alteration, operation, maintenance, abandonment and removal (hereinafter referred to as "activities") of stormwater management systems, dams, impoundments, reservoirs, works and appurtenant works (hereinafter referred to as "projects"). Such projects include dredging and filling in wetlands and other surface waters, as those terms are defined in Sections 373.403(13) and (14), F.S.

The primary ERP program rules are adopted by DEP as Chapter 62-330, of the Florida Administrative Code (F.A.C.), and are also rules of the Districts and delegated local governments in accordance with the authority under Section 373.4131, F.S. The Applicant's Handbook is incorporated by reference in subsection 62-330.010(4), F.A.C., and therefore operates as a rule of the Agencies.

The Districts are:
- Northwest Florida Water Management District (NWFWMD)
- Suwannee River Water Management District (SRWMD)
- St. Johns River Water Management District (SJRWMD)
- Southwest Florida Water Management District (SWFWMD) and
- South Florida Water Management District (SFWMD)

Responsibilities of these Agencies are divided in accordance with Operating and Delegation Agreements incorporated by reference in Chapter 62-113, F.A.C., accessible at: https://floridadep.gov/ogc/ogc/content/operating-agreements. These Agreements operate so that only one agency is responsible for permitting, compliance, and enforcement of an activity, and identify which Agency is responsible for the various types of activities. See Section 1.2, below for additional information on the division of responsibilities between the Agencies.

Chapter 62-330, F.A.C., will control in cases where the information in the Applicant's Handbook conflicts with that rule chapter.

1.1    **Overview of Applicant's Handbook**

This is Volume I of a two-volume ERP Applicant's Handbook. This volume and Chapter 62-330 F.A.C., are adopted by DEP and apply statewide to all activities regulated under Part IV of Chapter 373, F.S. This includes those activities for which the Districts and the delegated local governments are responsible for the review and agency action.

This Volume I provides general background information on the ERP program, including points of contact, a summary of the statutes and rules used to authorize and implement the ERP program, and the forms used to notice or apply to the Agencies for an ERP authorization. This Volume also provides discussion on:

- Activities regulated under Chapter 62-330, F.A.C., and Part IV of Chapter 373, F.S.;
- Types of permits, permit thresholds, and exemptions;
- Procedures used to review exemptions and permits, and that are applicable to inspections, compliance, and enforcement;
- Conditions for issuance of an ERP, including the environmental criteria used for activities located in wetlands and other surface waters;
- Erosion and sediment control practices to prevent water quality violations;
- Operation and maintenance requirements.

**Applicant's Handbook Volume II** is adopted separately by DEP (for use within the NWFWMD) and by the SRWMD, SJRWMD, SWFWMD, and SFWMD (for use within the geographical area of each applicable District). These separate Volumes address regional differences in hydrology, soils, geology, and rainfall specific to each District. Each Volume II provides design and performance standards specific to the geographical area of each District. Volume II applies whether an ERP application is processed and acted on by DEP, a District, or a delegated local government. More specifically, it provides:

- Design and performance standards and criteria for water quality and quantity, including those for specific types of stormwater management systems, dams, impoundments, reservoirs, works, and appurtenant works;
- Standards and criteria pertaining to special basins that may exist within the geographic area of each District;
- Standards and criteria pertaining to flood protection; and
- Design and performance standards for dams.
- The design and performance standards and criteria above are also applicable to inspections, compliance, and enforcement.

**Volume II** primarily applies to activities that require the services of a registered professional to design a stormwater management system. A stormwater management system is defined in Sections 373.403(10) and 403.031(16), F.S., as "a system that is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, overdrainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges from the system." This includes most activities that create new impervious surface or that alter surface water flows.

**Volume II generally is not applicable to the construction, alteration, modification, maintenance, or removal of projects that cause no more than an incidental amount of stormwater runoff, such as**:

- An **individual**, single-family residence, duplex, triplex, or quadruplex **that is not part of a larger plan of development**.
- A "stand-alone" seawall, riprap revetment, other shoreline stabilization structure, and docks and piers.
- "Stand-alone, in-water" projects such as channel dredging, channel markers, mooring piles and buoys, and water testing equipment. Dredged material disposal sites are subject to specific design and performance standards (see **Volume II**).
- Activities that do not add more than a de minimis amount of impervious surface, such as the installation of overland and buried electric and communication transmission and distribution lines.
- Activities that qualify for an exemption in Rule 62-330.051, F.A.C. (see additional discussion in **sections 3.2 through 3.2.7 of this Volume**).
- Activities that qualify for a general permit (as provided in Rules 62-330.410 through 62-330.635, F.A.C., and discussed in **sections 3.1.3 and 4.2.2 of this Volume).**

Activities that qualify for the "10/2" general permit in Section 403.814(12), F.S., are not regulated under Chapter 62-330, F.A.C. (see Section 3.1.3 of this Volume for additional information on this general permit).

Many Districts have "special basins." Activities within those basins must comply with the applicable special basin criteria. Those basins are listed below; detail on the allowable activities in those basins is described in more detail in the Volume II for each District:
- Within the Northwest Florida Water Management District – Special Basin Criteria for Sensitive Karst Areas, **sections 13.0 through 13.4**, including Appendix A, in Volume II
- Within the Suwannee River Water Management District – Section 5.9 of Volume II and Chapter 40B-4, F.A.C. (Works of the District)
- Within the St. Johns River Water Management District – Chapter 40C-41, F.A.C. (Surface Water Management Basin Criteria) and Sections 24.0 through 24.8.3 of Volume II
- Within the South Florida Water Management District –
  - Chapter 40E-41, F.A.C., Surface Water Management Basin and Related Criteria
  - Chapter 40E-62, F.A.C., Works and Lands of the District Management Plans
  - Chapter 40E-63, Everglades Program
  - Rules 62-312.400 through 62-312.460, F.A.C. – activities within the Outstanding Florida Waters of Monroe County

Neither volume of this Handbook applies to "grandfathered activities" as described in **section 3.1.2**, below, except where those projects are modified, altered, abandoned, or removed in such a way as to require a permit under Chapter 62-330, F.A.C.

Throughout the Handbook Volumes, whenever there is a reference to the primary number of a section (such as "section 1.3"), the reference shall apply to all subsections of that section (such as 1.3.1 through 1.3.6), unless specified otherwise. In addition, for brevity, all future references to "this Volume," "Volume I," and "Volume II," represent references to the respective Volume or Volumes of the Applicant's Handbook.

## 1.2    Contacts and Division of Responsibilities

Applications, notices, and inquiries should be sent to the Agency that is responsible for the type of activity, as described in the Operating or Delegation Agreement in effect at the location of the

project. The Operating and Delegation Agreements between the Agencies are incorporated by reference in subsection 62-330.010(3), F.A.C., and are accessible at https://floridadep.gov/ogc/ogc/content/operating-agreements. They identify which Agency is responsible for the review and agency action on particular types of activities. The Operating Agreements between DEP and the SRWMD, SJRWMD, SWFWMD, and SFWMD are fundamentally similar; the Agreement between DEP and the NWFWMD differs due to funding limitations within that District. Each Delegation Agreement is specific to the respective local government that has been delegated to implement the ERP program on behalf of DEP or District.

The geographic boundaries, and office responsibilities, and contact information for the Agencies are shown in **Appendix A**. Section 373.069(2), F.S., contains legal descriptions of the boundaries of each District.

ERP staff of the Agencies may be contacted for additional information regarding such things as:
- How and to whom to submit applications and notices;
- Permit requirements and processing procedures;
- Assistance with interpreting the ERP rules, and completing an application or notice;
- Pre-application meetings;
- The status of applications and notices received; and
- Complaints related to potential violations under Part IV of Chapter 373, F.S.

Copies of application and notice forms, other documents incorporated by reference in Chapter 62-330, F.A.C., and copies of the rules that apply to the ERP program may be obtained at https://floridadep.gov/water/water/content/water-resource-management-rules#ERP .

### 1.3    Other Authorizations and Relationship to Other Governmental Entities

Issuance of a permit or verification of qualification for an exemption or general permit under Chapter 62-330, F.A.C., does not:

(a)    Convey or create to the person any property right, or any interest in the real property;

(b)    Authorize any entrance or activities on property that is not owned or controlled by the person; or

(c)    Relieve persons from obtaining all other required licenses, permits, and authorizations under applicable state, federal, or local statute, rule, or ordinance. Persons are advised to obtain all required authorizations prior to constructing, altering, operating, maintaining, removing, or abandoning projects regulated under the ERP program.

Additional information on the distribution of permit applications to, and coordination with, other governmental agencies is discussed in sections **5.3.5 and 5.5.2 through 5.5.2.2** of this Volume.

### 1.3.1    U.S. Army Corps of Engineers (USACE)

Applicants may wish to consult with the applicable processing office of the USACE (see the Jacksonville District Regulatory Division Sourcebook online), and the local government if they have a wetlands regulatory program regarding any additional permitting and mitigation design considerations that may need to be addressed before, or concurrently with, submitting an application to the Agencies. Such coordination may avoid the need to redesign and modify the project to meet the requirements of those other regulatory agencies.

**1.3.1.1  Federal Coordination, Water Quality Certification, and Coastal Zone Consistency Concurrence**

The USACE, DEP, and the Districts have an Operating Agreement to coordinate the exchange of information between these agencies regarding permitting, compliance, and enforcement of activities regulated under Part IV of Chapter 373, F.S., that also require a Department of the Army (DA) permit under Section 404 of the Clean Water Act, Section 10 of the Rivers and Harbors Act of 1899, or Section 103 of the Marine Protection, Research, and Sanctuaries Act of 1972. Among other things this Agreement:

(a)    Provides the process by which the Agencies and the USACE will facilitate sharing of information.

(b)    Discusses how issuance of an ERP (including a general permit) shall also constitute a water quality certification or waiver thereto under the Clean Water Act for the required DA permit. The DA permits described above cannot be issued without a state water quality certification or waiver thereto.

The State of Florida has waived water quality certification for activities that are exempt from ERP permitting requirements.   See the Operating Agreement for additional information. Additional information on the federal permitting program is available online in the Jacksonville District Regulatory Division Sourcebook.

The State of Florida has provided regional conditions applicable to water quality certifications for the Nationwide Permits issued by the USACE for use in Florida as well as for numerous regional and programmatic general permits issued by the Jacksonville District of the USACE. The Nationwide Permits can be found online in the Jacksonville District Regulatory Division Sourcebook. Applicants are advised that activities that qualify for USACE Nationwide, Regional, or General Permits are still subject to applicable ERP and any other state, local, or regional permitting requirements.

(c)    Discusses how issuance of an ERP (including a general permit) in coastal counties also constitutes a finding of consistency or waiver thereto of the State's statutory authorities under Florida's federally approved coastal zone management program. Any required DA permit cannot be issued without applicable coastal zone consistency concurrence or waiver. Pursuant to Section 380.23(7), F.S., applications for federally permitted or licensed activities that qualify for an exemption under the ERP program are not eligible to be reviewed for federal consistency with Part IV of Chapter 373, F.S. The Corps or any designated Federal, State or local agency administering general permits on behalf of the Corps under 33 C.F.R. § 325.2(b)(2) may presume the Florida's coastal zone consistency concurrence for exempt activities, provided the activity receives any applicable authorization to use and occupy state-owned submerged lands under Chapter 253, F.S., and, for activities located within an Aquatic Preserve, Chapter 258, F.S., and the rules of the Florida Administrative Code adopted thereunder. The Corps or any designated Federal, State or local agency administering general permits on behalf of the Corps can act on the DA permit before the applicable authorization under Chapter 253, F.S., and, as applicable, Chapter 258, F.S., is obtained or granted, because it is understood such authorization must be obtained prior to persons using or occupying state-owned submerged lands.

**1.3.1.2  State Programmatic General Permit (SPGP) and Programmatic General Permits (PGPs)**

The USACE has issued a permit (a SPGP) that delegates to certain Agencies the authority to verify whether certain activities qualify for a federal dredge and fill permit under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899. The SPGP streamlines permitting by not requiring persons who are conducting the activities to be subject to separate permitting review of qualifying activities by the USACE.

The procedures and scope of the SPGP, including any coordination agreements between the USACE and the Agencies to implement the SPGP, can be viewed at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/federal-permits-and-coordination and online in the Jacksonville District Regulatory Division Sourcebook.

The Agency will determine upon receipt of an ERP application or notice if the activity qualifies for the SPGP. These activities are subject to several conditions and limitations, so not all projects within the SPGP activity categories will qualify for the SPGP.

If the requested activity does not qualify for the SPGP, the Agency will notify the applicant so the applicant may submit a separate application to the USACE so they may begin processing any required USACE permit.

The USACE also has issued other PGPs, some of which authorize the Agencies to further eliminate the need for separate federal permitting, for example SAJ 111 within the St. Johns River Water Management District.

More information on the SPGP and other PGPs is available at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/federal-permits-and-coordination  and online in the Jacksonville District Regulatory Division Sourcebook.

### 1.3.2    Relationship to National Pollutant Discharge Elimination System (NPDES) Permit Program

In October of 2000, the U.S. Environmental Protection Agency authorized DEP to implement several components of the National Pollutant Discharge Elimination System (NPDES) permitting program, several of which are related to activities regulated under the ERP program. Although delegated to DEP, NPDES permitting *is a separate federal permit program; **it is not linked to the state ERP***. It also is not delegated to the WMDs at this time. Therefore, applicants are advised to obtain *both* any required NPDES and ERP prior to construction.

Sections 1.3.2 through 1.3.2.2 of this volume are purely informational and are intended to make ERP applicants aware of possible interactions between ERP and NPDES regulatory requirements. In all cases, the procedures, standards and criteria of the applicable NPDES program, as adopted under state and federal law, shall control.

### 1.3.2.1  NPDES Stormwater Construction

The following construction activities are subject to NPDES stormwater permitting, under Section 403.0885, F.S. (see https://floridadep.gov/Water/Stormwater ):

An NPDES stormwater construction generic permit is required for any construction activities

that:

(a)     **Disturb** (includes soil disturbance, clearing, grading, and excavating) one or more acres of land, or disturb less than one acre of land that is part of a **common plan of development or sale**; and

(b)     Discharge stormwater to surface waters of the state or to surface waters of the State through a municipal separate storm sewer system (**MS4**).

Responsible Authorities must apply, separately from the ERP, either for an individual NPDES stormwater construction permit or for coverage under the "Generic Permit for Stormwater Discharge from Large and Small Construction Activities" under paragraph 62-621.300(4)(a), F.A.C., and found at https://www.flrules.org/Gateway/reference.asp?No=Ref-04265, also referred to as the Construction Generic Permit (CGP). The Responsible Authority of a construction activity is ultimately responsible for obtaining and complying with either permit, in addition to all applicable ERP requirements. The CGP allows you to discharge surface stormwater and, optionally, produced groundwater associated with **large** or **small** construction activity to waters of the State, either directly or through an MS4. More information on the CGP is available at https://floridadep.gov/Water/Stormwater.

## 1.3.2.2 NPDES Dewatering

A generic permit has been issued under subsection 62-621.300(2), F.A.C., for any person constructing or operating a system discharging produced ground water (i.e., a dewatering system) from any non-contaminated site activity that discharges by a point source to surface waters of the State; this generic permit is associated with activities that are designed and operated in accordance with the general conditions in Rule 62-621.250, F.A.C. Additional information on this permit is available at: https://floridadep.gov/water/industrial-wastewater. NPDES permit coverage for dewatering operations can also be obtained via the CGP for construction activities, as described in **1.3.2.1, above.**

## 1.3.3     Linkage with State-owned Submerged Lands Authorizations

Activities located on sovereignty submerged lands (as defined in subsection 18-21.003, F.A.C.,) also require a proprietary authorization from the Board of Trustees of the Internal Improvement Trust Fund (Board of Trustees) to use such lands under Chapter 253, F.S., and Chapter 18-21, F.A.C., and, if located in an aquatic preserve, Chapter 258, F.S., and Chapter 18-18 or 18-20, F.A.C. For the purposes of Chapter 62-330, F.A.C., and the Applicant's Handbook, those lands are referred to as "state-owned submerged lands," in Section 2.0(a)94, below. With the exceptions in Section 253.03(7)(b), F.S., and paragraph 18-21.005(1)(a), F.A.C., proprietary authorization is required for most activities on state-owned submerged lands, whether it requires a regulatory permit under Part IV of Chapter 373, F.S., is exempt from permitting, or falls below permitting requirements.

DEP and the Districts act as staff to the Board of Trustees, and, in accordance with the Operating Agreement between the Agencies, will process all applications involving work on state-owned submerged lands (see Appendix A of this Handbook). These Agencies have delegated authority from the Board to approve or deny most projects, but for some types of projects, the final decision to approve or deny the state-owned submerged lands authorization rests with the Governor and Cabinet, who serve as the Board of Trustees (see Rule 18-21.0051, F.A.C.).

The application form adopted as Form 62-330.060(1), includes an application for a permit under Part IV of Chapter 373, F.S., as well as a request for authorization to use state-owned submerged lands, when such lands are involved; applicants are not required to submit a separate application for such authorization. Upon receipt of the application, or of a notice to use a general permit or a determination of an exemption, staff will examine the application or notice to determine whether the activity appears to be located, in whole or in part, on state-owned submerged lands. Where necessary, staff will request a title determination from DEP's Division of State Lands. Staff will then determine if authorization is required to perform the activities on those lands, or if it is automatically authorized [as a Consent by Rule—see subsection 18-21.005(1)(b), F.A.C.]. Activities located in one of the state's Aquatic Preserves must receive a separate written authorization in accordance with Chapter 258, F.S., and Rule 18-18 (within the Biscayne Bay Aquatic Preserve) or 18-20, F.A.C., (in all other Aquatic Preserves) prior to initiating any work. Other activities on state-owned submerged lands are subject to needing a letter of consent, an easement or lease, in accordance with Rule 18-21.005, F.A.C., and Chapter 253, F.S.

The approval or denial of an individually processed ERP application is linked with the approval or denial of any required state-owned submerged lands application under Section 373.427, F.S. This linkage is described in Rules 62-330.075 and 18-21.00401, F.A.C. Activities that require an individually-processed ERP cannot become complete until all required state-owned submerged lands information has been submitted as part of the permit application. In addition, the ERP cannot be issued unless a determination has been made that the related state-owned submerged lands application also can be issued. If an activity meets all the requirements for issuance of an ERP, but does not meet all the requirements for issuance of the state-owned submerged lands authorization, the ERP must be denied. Conversely, if the activity meets all the state-owned submerged lands requirements, but does not meet the conditions for issuance of the ERP, the state-owned submerged lands application and the ERP will be denied.

Activities that qualify for a general permit or an exemption are not linked. In such cases, even though an activity may be authorized by the general permit or exemption, construction, alteration, modification, maintenance, operation, abandonment, or removal of the project may not commence until the required state-owned submerged lands authorization also has been granted.

### 1.3.4  Consumptive Uses of Water

Section 373.406(1), F.S., states that "Nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to affect the right of any natural person to capture, discharge, and use water for purposes permitted by law."

A water use or consumptive use permit, and possibly a water well construction permit, may be required from the applicable District prior to constructing, altering, or operating projects regulated under Chapter 62-330, F.A.C., that also involve or require the withdrawal, reservations, and other uses of water in accordance with the applicable District rules. Some activities requiring a water use or consumptive use permit cannot be issued until the applicable permit under Part IV of Chapter 373, F.S., is complete and receives staff recommendation for approval.

Additional discussion on water use and consumptive uses of water is available at https://floridadep.gov/water-policy, and at the website of each of the Districts.

### 1.3.5   Mine Reclamation

Chapter 378, F.S., requires the reclamation of lands disturbed by mining operations, including lands disturbed by the operation of a borrow pit where the extracted materials will be used offsite for commercial, industrial or construction use. Under the Operating Agreements between DEP and the Districts, a District will process the ERP application for certain mines. However, the Districts do not have delegated authority to process the reclamation authorization. Applicants for mining activities are advised to contact DEP's Mining and Mitigation Program concerning the reclamation requirements. Mine operators are required to provide to DEP either a Conceptual Reclamation Plan or a Notice of Intent to Mine or Mining Other Resources unless exempt by Section 378.804, F.S.

## 1.4   Statutes and Rules

### 1.4.1   Statutes

The ERP program is authorized under Part IV of Chapter 373 F.S. More specifically, Section 373.4131, F.S., authorizes implementation of the statewide ERP rules. Chapter 120, F.S. (Administrative Procedures Act) also governs licensing, rulemaking, and administrative procedures under the ERP program. Chapter 403, F.S. (Environmental Control) governs aspects of the ERP program related to water quality, program implementation, exemptions, and general permits. Copies of these statutes are available at: http://www.leg.state.fl.us/Statutes/index.cfm?Tab=statutes&submenu=1 and from any Agency office.

### 1.4.2   Rules

Chapter 62-330, F.A.C., establishes the types of activities that require a permit, activities that do not require a permit, the procedures for processing a permit, the conditions for issuance of a permit, general permit conditions, and the forms associated with applications, notices, and permits. It also provides for general permits, which are pre-issued for specified activities that have been determined by rule to have minimal individual and cumulative impact.

The following additional rules of the Florida Administrative Code are related to implementing Chapter 62-330, F.A.C. Copies of the current rules are available at: https://www.flrules.org/. Some of these rules have been repealed, but are still applicable to activities that are "grandfathered" (see section 3.1.2 of this Volume); text of the repealed rules is still available, from the websites of the applicable Agency, and from the office of that Agency. This list is not comprehensive; other state, federal and local rules and regulations also may be required for an activity.

- Chapters 28-103 through 28-108, F.A.C. (Uniform Rules of Procedure) — provide uniform rules of procedure for all state agencies regarding activities such as processing of variances, administrative hearings, mediation, and licensing. Many of these uniform procedures have been superseded by exceptions to the uniform rules of procedure in Chapter 62-110, F.A.C. (specific to DEP), and in the rules of the applicable Districts.
- Chapter 62-4 (Permits) —Rule 62-4.242, F.A.C., provides antidegradation requirements for activities located in Outstanding Florida Waters. Rule 62-4.244, F.A.C., provides criteria for mixing zones. Subsection 62-4.050(4)(h), F.A.C., provides the schedule of processing fees required for applications, notices, and petitions for ERP activities that are the responsibility of DEP and the NWFWMD.
- Chapter 62-25, F.A.C. (Regulation of Stormwater Discharge) — applies to stormwater treatment systems that qualify for grandfathering under Sections 373.414(11), (12), (13), (14), (15), (16), or 373.4145(6), F.S. Systems constructed under Chapter 62-25, F.A.C., are authorized to be operated in perpetuity, and maintenance may be conducted under such systems without a permit under

Chapter 62-330, F.A.C., in perpetuity, provided the terms and conditions of the permit, exemption, or other authorization under Chapter 62-25, F.A.C., continue to be met, and provided the work is conducted in a manner that does not cause violations of water quality standards. However, if the system is altered, modified, expanded, abandoned, or removed, it is subject to being regulated by Chapter 62-330, F.A.C.

- Chapter 62-40, F.A.C. (Water Resource Implementation Rule) — provides water resource implementation goals, objectives, and guidance relating to water resources. This includes guiding principles for stormwater and surface water management programs (including the basis for minimum design criteria for the stormwater management systems), flood protection, natural systems protection and management, minimum flows and levels, and protection measures for surface water resources (including the goals for implementation of erosion and sediment control measures).

- Chapter 62-302, F.A.C. (Surface Water Quality Standards) — provides the State's numeric and narrative water quality standards criteria for surface waters, lists the classes of waters in Florida, and lists waters that are designated as Outstanding Florida Waters. Also includes the state's anti-degradation requirements.

- Chapters 62-303 (Identification of Impaired Surface Waters), 62-304, (Total Maximum Daily Loads), and 62-306, F.A.C. (Water Quality Credit Trading) — provide for identification of waters that do not meet state water quality standards and that are subject to pollution limits and recovery plans. Discharges of pollutants that cause or contribute to such impairment are subject to meeting net improvement requirements, as discussed in section 10.2.4.5 of this Volume and Volume II.

  - Sections 62-312.400 through 62-312.460, F.A.C. – establish special procedures and criteria for dredging and filling within the Outstanding Florida Waters in Monroe County that are used in combination with Chapter 62-330, F.A.C. The remainder of this chapter has been repealed, but can continue to be used as it existed prior to the repeal for dredging and filling in surface waters of the state (as defined in Rule 62-312.030, F.A.C.) for applicable activities "grandfathered" under Section 373.414(11), (12), (13), (14), (15), (16), 373.4131(4), or 373.4145(5), F.S. Grandfathered rule sections are retained on DEP website at https://floridadep.gov/water/water/content/water-resource-management-rules#erp.

- Chapter 62-340 (Delineation of the Landward Extent of Wetlands and Surface Waters) — provides the procedures and methodology used by all state and local government agencies in Florida to delineate the landward extent of wetlands and other surface waters.

- Chapter 62-341 (Noticed General Environmental Resource Permits) — All of this chapter was transferred to Chapter 62-330, F.A.C., on June 4, 2012. This chapter now applies only for those activities that can be constructed within the five years of the date notice was received by DEP of the intent to use the applicable noticed general permit, or within five years of the date DEP verified that the requested activities qualified for the noticed general permit, whichever is later. Such activities remain controlled under the rules that existed prior to Chapter 62-330, F.A.C. [10-1-13]. This grandfathered rule is retained on DEP website at https://floridadep.gov/water/water/content/water-resource-management-rules#erp.

- Chapter 62-342 (Mitigation Banks) – applies to projects proposed to be constructed and operated as a mitigation bank, and to persons seeking to purchase mitigation credits from such banks. The criteria of this chapter apply in addition to the permitting requirements of Chapter 62-330, F.A.C.

- Chapter 62-343 (Environmental Resource Permit Procedures) — contains the procedures used by DEP to review and take agency action on applications for ERPs under Part IV of Chapter 373, F.S., that are "grandfathered" under Chapter 62-330, F.A.C. More specifically, it is used in conjunction with the version of Chapter 62-330, F.A.C., in effect prior to October 1, 2013, which identifies the rules of the water management districts that are used when review and agency action

on the ERP is the responsibility of DEP), and Chapter 62-341, F.A.C. (Noticed General Environmental Resource Permits). Together, those rule chapters apply to activities that were permitted, exempt from permitting, or that were subject to an application that was complete prior to the effective date of the rules adopted under Section 373.4131, F.S. This grandfathered rule is retained on DEP website at https://floridadep.gov/water/water/content/water-resource-management-rules#erp.

- Chapter 62-344 (Delegation of the Environmental Resource Permit Program to Local Governments) — provides procedures for delegating all or a portion of the ERP program to qualified local governments.
- Chapter 62-345 (Uniform Mitigation Assessment Method) — in accordance with Section 373.414(18), F.S., this is the sole methodology to be used to determine the amount of mitigation required to offset otherwise unpermittable adverse impacts to wetlands and other surface waters, and the amount of mitigation that is provided by proposed mitigation. This rule does not assess whether the adverse impacts meet other criteria for issuance of a permit, or whether the mitigation is appropriate to offset adverse impacts.
- Chapter 62-346 (Environmental Resource Permitting in Northwest Florida) – applicable to activities within the geographical area of the NWFWMD that were permitted, constructed, exempt from permitting, legally in existence, or subject to an application under that chapter that was complete, including activities that qualified for a noticed general permit under Chapter 62-341, F.A.C., prior to the effective date of the rules adopted under Section 373.4131, F.A.C. This grandfathered rule is retained on DEP website at https://floridadep.gov/water/water/content/water-resource-management-rules#erp.
- Chapter 62-520 (Ground Water Classes, Standards, and Exemptions)
- Chapter 62-532 (Water Well Permitting and Construction Requirements)
- Chapter 62-550 (Drinking Water Standards, Monitoring, and Reporting)
- Chapter 62-555 (Permitting, Construction, Operation, and Maintenance of Public Water Systems)
- Chapter 62-621 Generic Permits) – sets forth procedures to obtain a type of general National Pollutant Discharge Elimination System (NPDES) permit issued under Section 403.0885, F.S., and 40 CFR 122.28, and a type of "Non-NPDES Generic Permit" issued under Section 403.087, F.S. These are alternatives to individual permits for certain wastewater facilities and other activities that: involve the same or substantially similar types of operations; discharge the same types of wastes or engage in the same types of residuals or industrial sludge use or disposal practices; require the same effluent limitations, operating conditions, or standards for residuals or industrial sludge use or disposal; require the same or similar monitoring.
- Chapters 40B-1, 40C-1, 40D-1, and 40E-1, F.A.C. – provide the fee schedules and certain administrative details associated with permitting of applications that are the responsibility of the SRWMD, SJRWMD, SWFWMD, and SFWMD, respectively.
- Chapters 40A-2, 40B-2, 40C-2, 40D-2, and 40E-2, F.A.C. — provide the regulatory requirements covering withdrawals, reservations, and other uses of water.
- Within the SRWMD, Chapter 40B-4, F.A.C., provides the permitting requirements for activities located within Works of the SRWMD. Chapters 40B-4, 40C-4, 40D-4, and 40E-4, F.A.C., also provide the standards and criteria, and general conditions for, issuance of an ERP within the SRWMD, SJRWMD, SWFWMD, and SFWMD, respectively, for an application that was complete or permitted prior to the effective date of the rules adopted under Section 373.4131, F.S., or that were legally in existence on that date. Portions of those rules remain in effect under the ERP program, the text of which is available at https://www.flrules.org/, but most of these rules have been repealed, and are applicable only for grandfathered activities. The text of those rules applicable to grandfathered activities remains available at the website of the respective Agency.
- Chapter 40A-6 (Works of the District) — provides the permitting requirements for activities that withdraw water from, discharge to, are located on, or otherwise use a Works of the NWFWMD,

primarily involving certain lands within Megginnis Creek-Megginnis Arm in Leon County. Chapters 40E-6, 40E-61, 40E-62, and 40E-63, F.A.C., provide the permitting requirements for activities are located on, or otherwise use a Works of the SFWMD, including activities within the Everglades and Lake Okeechobee.

- Chapters 40B-8, 40C-8, 40D-8, and 40E-8 — provide minimum water level and flow requirements for specified surface waters within each applicable District.

- Chapters 40C-40, 40D-40, and 40E-40, F.A.C. – provide the requirements for, conditions for issuance, and general conditions applicable to, standard general, general, and standard permits within the SJRWMD, SWFWMD, and SFWMD, respectively, that were in an application that was complete or permitted prior to the effective date of the rules adopted under Section 373.4131, F.S. The text of these rules applicable to grandfathered activities remains available at the website of the respective Agency.

- Chapters 40A-44 and 40C-44, F.A.C. — rules of the NWFWMD and SJRWMD that provide the permitting requirements for agriculture and, in the NWFWMD, silviculture activities that do not qualify for the exemptions in Section 373.406, F.S.

- Chapters 40B-400, 40C-400, 40D-400, and 40E-400, F.A.C. — rules of the Districts that adopted noticed general permits for activities under the ERP rules in effect prior to the effective date of the rules adopted under Section 373.4131, F.S., as well as the no-noticed general permit applicable within the South Florida Water Management District in Rule 40E-400.315, F.A.C. The text of these rules applicable to grandfathered activities remains available at the website of the respective Agency.

1.5    Administrative Criteria

**1.5.1    Ownership and Control**

(a)    In accordance with Rule 62-330.060, F.A.C., and paragraph 62-330.301(1)(j), F.A.C., an applicant must provide reasonable assurance that permitted activities will be conducted by an entity with financial, legal, and administrative capability of ensuring that the activity will be undertaken in accordance with the terms and conditions of a permit, if issued, and to ensure staff of the Agencies have legal authority to access the land for inspections and monitoring, as discussed in **section 1.7, below**. Compliance with this requirement must be demonstrated through subsections 62-330.060(3) and (4), F.A.C., the certification required in the Application Form 62-330.060(1), and **section 12.0 of this Handbook**.

(b)    In addition to the above, persons proposing to conduct activities on state-owned submerged lands that are riparian to uplands must submit satisfactory evidence of sufficient upland interest in accordance with section 4.2.3(h) of this volume.

**1.5.2    Phased Projects**

Projects developed in phases will normally require the submission of a master plan showing the applicant's contiguous land holdings. The primary concerns of the Agency are to ensure continuity between phases, and satisfactory completion and operation of individual phases if the overall project is not completed as planned. Applicants desiring approval in concept of the master plan should consider submitting an application for a conceptual approval permit encompassing the total master plan. A conceptual approval permit also may be sought for phased construction as part of urban redevelopment or infill. An application to construct the first phase of the overall plan may be included as a part of the initial application for the conceptual approval permit. Procedures for requesting a conceptual approval permit are in Rules 62-330.055 and 62-330.056, F.A.C., and **sections 3.4 through 3.4.6** of this Volume.

Applications to construct or alter phases of a project for which no conceptual permit has been obtained may be considered only when each phase can be constructed, operated, and maintained totally independent of the future phases, and, an overall plan for the full build out is submitted with the application, including an overall schedule for implementing the plan and identification of any future lands that may need to implement the future phases.

**1.5.3    Land Use Considerations**

The proposed land use to be served by an activity regulated under Chapter 62-330, F.A.C., does not have to be consistent with the local government's comprehensive plan or existing zoning for the site. However, it is strongly recommended that an applicant obtain the necessary land use approvals from the affected local government prior to or concurrent with the ERP application, since these approvals often contain conditions which impact the overall project design and, hence, the nature of the proposed activity. By obtaining these local government approvals first or concurrently, the applicant can reduce or eliminate the need for subsequent permit modifications which may be necessary as a result of conditions imposed by the local government.

When permits or authorizations issued or granted by other agencies materially affect the design or footprint of works authorized under Chapter 62-330, F.A.C., the permittee shall contact the Agency to determine if a modification of the permit is necessary under Rule 62-330.315, F.A.C., and sections 6.2 through 6.3.2.3 of this Handbook.

### 1.5.4   Water and Wastewater Service

As applicable, the applicant for an individual permit will be requested to provide information on how utilities, such as wells, sewage treatment or disposal (including septic tanks), lift station wet wells, and sewage force mains within the project area may affect any stormwater treatment and conveyance system, and whether activities to install or alter utility services may involve any work in wetlands or other surface waters, or any work that may affect surface water flows on or off-site, such as through the creation of temporary dikes and trenches during the installation of utility pipes and lines. This includes the status of any existing or proposed water use or consumptive use permit, if applicable. If wastewater disposal is accomplished on-site, additional information normally will be requested regarding separation of wastewater and stormwater systems.

### 1.5.5   Stormwater Management Areas

Areas reserved for stormwater management shall be shown on construction plans and legally reserved for that purpose by dedication on the plat or protected through deed restrictions, easements, or other binding covenants so that subsequent owners or others may not remove such areas from their permitted use. Stormwater management areas, including maintenance easements, shall be connected to a public road or other location from which operation and maintenance access is legally and physically available. Impervious areas designed for purposes such as roads, parking lots, sidewalks, or public access shall not be used as stormwater management areas if the level or duration of standing or flowing water on these areas is a risk to vehicular traffic or pedestrian use.

### 1.5.6   Legal Authorization for Offsite Areas

Applicants proposing to use offsite areas not under their control to satisfy the requirements for issuance in Rule 62-330.301, F.A.C., must obtain legal authorization to do so prior to permit issuance to use the area. For example, an applicant who proposes to locate the outfall pipe from a stormwater basin to the receiving water on an adjacent property owner's land must obtain a drainage easement or other appropriate legal authorization from the adjacent owner. A copy of the legal authorization shall be submitted with the permit application when required to do so under section 4.2.3(d) of this Volume. Authorization to use offsite mitigation areas is discussed in section 10.3.1.2.1 of this Volume.

1.6     **Enforcement Authority**

Parts I and IV of Chapter 373, F.S., provide for the enforcement of Agency rules by administrative and civil complaint. The Agency also has the authority to obtain the assistance of county and city officials in the enforcement of the rules (see Sections 373.603 and 373.609, F.S.). Any person who violates any provisions of Chapter 373 or 403, F.S., the rules adopted thereunder, or orders of the Agency, is subject to civil fines or criminal penalties as provided in Section 373.430, F.S.

1.7     **Permission to Inspect, Monitor and Sample**

Each application must include permission signed by the landowner, easement or lessee holder, or their legal designee that Agency staff may access the property where the proposed activity is located for purposes of inspecting, sampling, and monitoring the land subject to the application to determine whether the activity can meet (and if a permit is issued, is meeting) permitting criteria and permit conditions. If this is not possible, the applicant must supply the Agency with written authorization through other means (such as obtaining permission from leases and easement holders) for staff to enter onto, inspect, and conduct sampling of the site. This is necessary to prevent claims of trespass, and to ensure the applicant, and potential permittee, has approval from the entity that has sufficient real property interest over the land subject to the application to construct, alter, operate, and maintain, or remove, the project.

In the case of an easement, the easement must specifically provide for the right of governmental entities to be on the lands subject to the easement for such purposes as compliance, or such right must flow through necessity from the explicit grant of the easement.

Each permit is subject to the condition that Agency authorized staff, upon proper identification, will have permission to enter, inspect and observe, and collect samples of the activity to ensure compliance with the approved plans and specifications included in the permit. See Part 4 of Form 62-330.060(1) for additional information.

**2.0    Definitions and Terms**

(a)    The definitions and terms below are used for purposes of Chapter 62-330, F.A.C., and this Volume I. **Section 2.1** of each District-specific Volume II contains additional definitions that apply to the design and performance standards and criteria for stormwater management systems, dams, impoundments, reservoirs, works, appurtenant works, and special basins as regulated in that District. Where a definition is in accordance with Florida Statutes, the statutory attribution is given as "[XX]."

1.    "Abandon" or "Abandonment," means cessation of use and maintenance activities or responsibility for a system or part of a system in accordance with Section 373.426, F.S.

2.    "Activity" or "Activities," means construction, alteration, operation, maintenance, abandonment, or removal of any stormwater management system, dam, impoundment, reservoir, works [including dredging or filling, as those terms are defined in Sections 373.403(13) and (14), F.S.], and appurtenant works.

3.    "Alter" means to extend a dam or works beyond maintenance in its original condition, including changes which may increase or diminish the flow or storage of surface water which may affect the safety of such dam or works [Section 373.403(7), F.S.]. Routine custodial maintenance and repairs shall not constitute alterations.

4.    "Agency" means the Department of Environmental Protection, the water management districts, and local governments delegated authority to implement the environmental resource permit program under Part IV of Chapter 373, F.S., in accordance with Section 373.441, F.S.

5.    "Appurtenant works" means any artificial improvements to a dam which might affect the safety of such dam or, when employed, might affect the holding capacity of such dam or of the reservoir or impoundment created by such dam. [Section 373.403(2), F.S.]

6.    "Aquifer" shall mean a geologic formation, group of formations, or part of a formation capable of yielding a significant amount of ground water to wells, springs or surface water.

7.    "Aquatic plant" means a plant, including the roots, which typically floats on water or requires water for its entire structural support, or which will desiccate outside of water.

8.    "Aquatic preserves" means those areas designated in Part II, Chapter 258, F.S.

9.    "Artificial structure" means any object constructed or installed by man which has a water management effect, including, but without limitation thereof, dikes, levees, embankments, ditches, canals, conduits, channels, culverts, and pipes.

10.     "Artificial waters," "artificial waterway," "artificially created waterway," or "artificial watercourse" means bodies of water that were totally excavated from uplands, do not overlap historic wetlands or other surface waters, and were not created as a part of a mitigation plan.

11.     "As-Built drawings" means plans certified by a registered professional that accurately represent the constructed condition of a project, including identifying any substantial deviations from the permitted design. See subparagraph 62-330.310(4)(a)1, F.A.C.

12.     "Borrow pit" means a location where the soil or other natural deposits on or in the earth are removed from their location so as to make them suitable for use to build up land. No processing is involved, except for the use of a scalping screen to remove large rocks, wood, and other debris. The materials are used more for their bulk than their intrinsic qualities.

13.     "Canal" means a man-made trench, the bottom of which is normally covered by water, with the upper edges of its two sides normally above water. [Section 403.803(2), F.S.]

14.     "Canopy" means the plant stratum composed of all woody plants and palms with a trunk four inches or greater in diameter at breast height, except vines.

15.     "Channel" means a trench, the bottom of which is normally covered entirely by water, with the upper edges of one or both of its sides normally below water. [Section 403.803(3), F.S.]

16.     "Common plan of development or sale" or "larger plan of other commercial or residential development" means any activity that facilitates the advancement of land use (such as multiple residences, a residential subdivision, or phased site development) on the subject property, or that comprises a total land area divided into multiple lots, parcels, tracts, tiers, blocks, sites, or units, if such areas are under common ownership or control. This includes any activity on contiguous real property that comprises a total land area divided into parcels, tracts, tiers, blocks, sites, or units, and is served by a common road or road network or common stormwater management systems within that land area. Areas of land that are divided by public or private roads are considered contiguous if such areas are under common ownership or control.

17.     "Completion of construction" means the time when all components of the project are installed and fully functional or when the infrastructure is used for its intended purpose, whichever occurs first. For a phased system, "completion of construction" means the time when all components for a phase of the project are installed and fully functional, or when the infrastructure for a phase is used for its intended purpose, whichever occurs first.

18.     "Construction" means the creation, alteration, or abandonment of any project, including placement of fill, land clearing, earthwork, or the placement or removal of structures. Cutting of trees or removal of vegetation is not considered land clearing, except where it involves stump removal, root raking, or grubbing.

19.    "Construction phase" means that period necessary to construct, alter, abandon, or remove a system in accordance with the terms and conditions of an individual permit.

20.    "Conversion," for purposes of wetland mitigation, means a man-made change to a wetland [as defined in Section 373.019(27), F.S.], or surface water by draining, filling, or other means which results in the permanent change of the wetland or surface water to an upland.

21.    "Coral" means living stony coral and soft coral.

22.    "Creation" means the establishment of new wetlands or surface waters by conversion of other land forms.

23.    "Dam" means any artificial or natural barrier, with appurtenant works, raised to obstruct or impound, or which does obstruct or impound, any of the surface waters of the state [Section 373.403(1), F.S.]

24.    "Department" means the Florida Department of Environmental Protection.

25.    "Diameter at Breast Height (DBH)" means the diameter of a plant's trunk or main stem at a height of 4.5 feet above the ground.

26.    "Direct discharge" means a discharge without prior opportunity for mixing and dilution sufficient to prevent a lowering of the existing ambient water quality.

27.    "Direct Hydrologic Connection" means a surface water connection which occurs on an average of 30 or more consecutive days per year. In the absence of reliable hydrologic records, a continuum of naturally occurring wetlands may be used to establish a direct hydrologic connection.

28.    "Discharge" means to allow or cause water to flow.

29.    "District" means a water management district created pursuant to Section 373.069, F.S.

30.    "Dock" means a fixed or floating structure extending from land out over water, including access walkways, terminal platforms, catwalks, mooring pilings, lifts, davits, and other associated water-dependent structures, used for mooring and accessing vessels.

31.    "Drainage basin" means a subdivision of a watershed [Section 373.403(9), F.S.].

32.    "Drainage ditch" or "irrigation ditch" means a man-made trench that is dug for the purpose of draining water from the land or for transporting water for use on the land and that is not built for navigational purposes. [Section 403.803(7), F.S.]

33.    "Dredging" means excavation, by any means, in surface waters or wetlands, as delineated in Section 373.421(1), F.S. Dredging also means the excavation, or creation, of a water body which is, or is to be, connected to surface waters or

wetlands, as delineated in Section 373.421(1), F.S., directly or via an excavated water body or series of water bodies [Section 373.403(13), F.S.]

34. "Ecological value" means the value of functions performed by uplands, wetlands and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species. These functions include, but are not limited to, providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; and natural water storage, natural flow attenuation, and water quality improvement, which enhances fish, wildlife and listed species utilization. [Section 373.403(18), F.S.]

35. "e-Permitting website" means the Agency's Internet address established to provide for submittal and viewing of applications and notices, responses to requests from the Agencies, reports, certifications, and other submittals.

36. "Embedded" means the placement of transmission or distribution lines, pipes or cables into the bottom of surface waters by minimal displacement of bottom material and without the creation of a trench, or trough, through the use of techniques such as plowing-in, weighing-in, or non-trenching jets.

37. "Endangered or threatened species" means those animal species that are identified as endangered or threatened by the US Fish and Wildlife Service, the National Marine Fisheries Service, or the Florida Fish and Wildlife Conservation Commission, as well as those plant species identified as endangered or threatened when such plants are located in a wetland or other surface water.

38. "Enhancement" means improving the ecological value of wetlands, other surface waters, or uplands in comparison to their current condition.

39. "Entrenchment" means the placement of transmission or distribution lines, pipes or cables into the bottoms of waters of the state by the creation of a defined trench, or trough, through the use of such devices as clamshells, dredges, trenching jets, or other devices that produce similar results.

40. "Estuary" means a semi-enclosed, naturally existing coastal body of water which has a free connection with the open sea and within which seawater is measurably diluted with fresh water derived from riverine systems. [Section 373.403(15), F.S.]

41. "Existing nesting or denning" refers to an upland site that is currently being used for nesting or denning, or is expected, based on reasonable scientific judgment, to be used for such purposes based on past nesting or denning at the site.

42. "Exotic species" means a plant species introduced to Florida, purposefully or accidentally, from a natural range outside of Florida, including naturalized exotic species (an exotic plant that sustains itself outside cultivation) and invasive exotic species (an exotic plant that not only has naturalized, but is expanding on its own in Florida native plant communities). Additional information on Florida's exotic plant species is available at: http://www.fleppc.org/.

43.     "Farm pond" means a pond located on agricultural lands as defined in Section 193.461, F.S, used for agricultural activities as described in Section 403.927, F.S., and constructed, altered, maintained, and operated using the agricultural best management practices as provided in Section 403.927, F.S.

44.     "Filling" means the deposition, by any means, of materials in wetlands or other surface waters, as delineated in Section 373.421(1), F.S. [Section 373.403(14), F.S.]

45.     "Floodplain" means land area subject to inundation by flood waters from a river, watercourse, or lake. Floodplains are delineated according to their estimated frequency of flooding.

46.     "Forested wetlands," for purposes of how this term is used in the exemptions and general permits in Chapter 62-330, F.A.C., means those wetlands where the canopy coverage by trees with a diameter at breast height of greater than 4 inches is greater than 10 percent, as well as those areas required to be planted with tree species to establish or reestablish forested wetlands pursuant to a permit issued, or enforcement action taken, under rules adopted under Part IV of Chapter 373, F.S., or Sections 403.91 through 403.929, F.S. (1984 Supp.), as amended, and those areas where the canopy has been temporarily removed but are expected to revegetate to a forested wetland if use of the area would remain unchanged.

47.     "Governing Board" means the governing board of a water management district created under Section 373.069, F.S.

48.     "Groundwater" means water beneath the surface of the ground, whether or not flowing through known and definite channels [Section 373.019(9), F.S.]

49.     "Herbaceous wetlands," for purposes of how this term is used in the general permits in Chapter 62-330, F.A.C., means those wetlands dominated by non-woody vegetation that have less than a 10 percent canopy coverage of tree species with a diameter at breast height of greater than 4 inches, and/or subcanopy or woody shrub species with a diameter at breast height of one inch to four inches.

50.     "Hydroperiod" means the duration and range of elevation of inundation in a wetland.

51.     "Impaired water" means a water body or water body segment that does not meet its applicable water quality standards as set forth in Chapters 62-302 and 62-4, F.A.C., as determined by the methodology in Part IV of Chapter 62-303, F.A.C., due in whole or in part to discharges of pollutants from point or nonpoint sources.

52.     "Impervious" for purposes of applying permitting thresholds and exemption criteria, means surfaces that do not allow, or minimally allow, the penetration of water, including semi-impervious areas, but excluding wetlands or other surface waters. For other purposes, "impervious" means all artificial surfaces that that are not pervious. Included as examples are building roofs and normal concrete and asphalt pavements.

53.    "Impoundment" means any lake, reservoir, pond, or other containment of surface water occupying a bed or depression in the earth's surface and having a discernible shoreline. [Sections 373.403(3) and 373.019(10), F.S.]

54.    "Insect control impoundment dikes" means artificial structures, including earthen berms, constructed and used to impound waters for the purpose of insect control. [Section 403.803(10), F.S.]

55.    "Isolated wetland" means any area that is determined to be a wetland in accordance with Chapter 62-340, F.A.C., but that does not have any connection to other wetlands or other surface waters via wetlands or other surface waters as determined using Rule 62-340.600, F.A.C.

56.    "Lagoon" means a naturally existing coastal zone depression which is below mean high water and which has permanent or ephemeral communications with the sea, but which is protected from the sea by some type of naturally existing barrier. [Section 373.403(16), F.S.]

57.    "Listed Species" means those species that are endangered or threatened species (as defined in definition 2.0(a)37, above), or species of special concern (as defined in definition 2.0(a)95, below).

58.    "Mail" shall mean when a document is properly addressed, stamped, and deposited in the United States mail, and the postmark date shall be the date of mailing. "Mail" also shall mean when the Agency electronically sends a document to the e-mail address provided to the Agency.

59.    "Maintenance" or "Repair" means remedial work of a nature as may affect the safety of any dam, impoundment, reservoir, or appurtenant work or works, but excludes routine custodial maintenance. [Section 373.403(8), F.S.]

60.    "Material," when used in the context of "filling," means matter of any kind, such as, sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster cultch pursuant to Section 597.010, F.S.

61.    "Mine" means an area of land that is related to the removal from its location of solid substances of commercial value found in natural deposits on or in the earth, so as to make the substances suitable for commercial, industrial, or construction use, but does not include excavation solely in aid of on-site farming or on-site construction, nor the process of prospecting. As used in Chapter 62-330, F.A.C., this does not include mining operations conducted in conjunction with land development that will result in residential, industrial, commercial, or land fill uses at the end of construction. Borrow pits that use extracted material in on-site locations are not mines. For the purposes of this definition, "on-site" means, "within the contiguous limits of an area of land under one ownership or control, and upon which agricultural or construction projects are taking place. Areas of land that are divided by public or private roads are considered contiguous if such areas are under one ownership or control."

**A.H. Volume I**                                                        **[Effective date]**

62. "Mitigation" means an action or series of actions to offset the adverse impacts that would otherwise cause an activity regulated under Part IV of Chapter 373, F.S., to fail to meet the criteria set forth in Sections 10.1.1 through 10.2.8.2 of this Volume. Mitigation usually consists of restoration, enhancement, creation, preservation, or a combination thereof.

63. "Mitigation bank," "Mitigation bank permit," "Mitigation banker" or "banker," "Mitigation credit," and "Mitigation service area" shall have the same meanings as provided in Chapter 62-342, F.A.C.

64. "Natural systems" for the purpose of this rule means an ecological system supporting aquatic and wetland-dependent natural resources, including fish and aquatic and wetland-dependent wildlife habitat.

65. "Nuisance species" means any species of flora or fauna whose noxious characteristics or presence in sufficient number, biomass, or areal extent that prevents, or interferes with, uses or management of resources, and which are native or naturalized in the area where it occurs.

66. "Obstruction" means any fill, structure, work, appurtenant work, or system placed in waters, a floodway, or a work of the district which may impede the flow of water or otherwise result in increased water surface elevations.

67. "Offsite regional mitigation" means mitigation on land off of the site of an activity permitted under Part IV of Chapter 373, F.S., where an applicant proposes to mitigate the adverse impacts of only the applicant's specific activity as a requirement of the permit, which provides regional ecological value, and which is not a mitigation bank permitted under Section 373.4136, F.S. [Section 373.403(22), F.S.]

68. "Operate" or "operation" means to cause to or to allow a project, or a completed independent phase thereof, to function.

69. "Ordinary high water line" or "OHWL," for the regulatory purposes of Chapter 62-330, F.A.C., means that point on the slope or bank where the surface water from the water body ceases to exert a dominant influence on the character of the surrounding vegetation and soils. The OHWL frequently encompasses areas dominated by non-listed vegetation and non-hydric soils.

70. "Other surface waters" means surface waters as described and delineated pursuant to Rule 62-340.600, F.A.C., as ratified by Section 373.4211, F.S., other than wetlands.

71. "Other watercourse" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. [Section 373.019(14), F.S.]

72. "Permit area" means the area where works occur as part of an activity requiring a permit under Part IV of Chapter 373, F.S., and any mitigation, buffer, and preservation areas, and all portions of the stormwater management system serving the project area.

73.    "Pier" means a fixed or floating structure extending from land out over water, that is used primarily for fishing or swimming and not designed or used for mooring or accessing vessels.

74.    "Pollution" is the presence in the outdoor atmosphere or waters of the state of any substances, contaminants, noise, or manmade or human-induced impairment of air or waters or alteration of the chemical, physical, biological, or radiological integrity of air or water in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property, including outdoor recreation unless authorized by applicable law. [Section 403.031(7), F.S.]

75.    "Preservation" means the protection of wetlands, other surface waters or uplands from adverse impacts by placing a conservation easement as defined in and meeting the requirements of Section 704.06, F.S., over the property, or by donation of fee simple interest in the property to an entity having purposes as described in Section 704.06(3), F.S.

76.    "Project" — see "system."

77.    "Project area" means the area where works occur as part of an activity requiring a permit under part IV of Chapter 373, F.S., or Section 403.814, F.S.

78.    "Prospecting" means activities considered normal and reasonably necessary to retrieve samples of subsurface geologic sediments for the specific purpose of locating, mapping, and determining the quality and quantity of sedimentary strata or natural deposits.

79.    "Reclaimed water," except as specifically provided in Chapter 62-610, F.A.C., means water that has received at least secondary treatment and basic disinfection, and is reused after flowing out of a domestic wastewater treatment facility.

80.    "Recreational path" means an improved lane, path, road, trail, or walkway, whether paved, cleared, or hardened with shell, clay, rock, or other materials, to provide a corridor for travel between destinations primarily by walking, biking, or use of non-internal combustion vehicles.

81.    "Regional stormwater management system" means a system designed, constructed, operated, and maintained to collect convey, store, absorb, inhibit, treat, use or reuse stormwater to prevent or reduce flooding, overdrainage, environmental degradation and water pollution or otherwise affect the quantity and quality of discharges from multiple parcels and projects within the drainage area served by the regional system, where the term "drainage area" refers to the land or development that is served by or contributes stormwater to the regional system.

82.    "Regional watershed" means a watershed as delineated in Rule 62-342.200, F.A.C.

83.    "Residential Canal System" means those canals whose uplands are occupied predominantly by residential single-family or multi-family dwelling units.

84.     "Registered Professional" means a professional registered or licensed by and in the State of Florida and practicing under Chapter 471, 472, 481, or 492, F.S.

85.     "Remove" or "removal" means cessation of use and maintenance of a project, or part of a project, accompanied by elimination of all or part of the project.

86.     "Reservoir" means any artificial or natural holding area that contains or will contain the water impounded by a dam. [Section 373.403(4), F.S.]

87.     "Restoration" means converting back to a historic condition those wetlands, surface waters, or uplands that currently exist as a land form that differs from the historic condition. For phosphate mining and reclamation, "restoration" shall mean the recontouring and revegetation of the lands in a manner, consistent with the criteria and standards of Part II of Chapter 378, F.S., which will maintain or improve the water quality and functions of the biological systems present at the site prior to mining.

88.     "Retention" means a system designed to prevent the discharge of a given volume of stormwater runoff into surface waters in the state by complete on-site storage. Examples are systems such as excavated or natural depression storage areas, pervious pavement with subgrade, or above ground storage areas.

89.     "Reuse" means the deliberate application of reclaimed water, in compliance with Department and District rules, for a beneficial purpose.

90.     "Riprap" means a sloping retaining structure or stabilization made to reduce the force of waves and to protect the shore from erosion, and consists of unconsolidated boulders, rocks, or clean concrete rubble with no exposed reinforcing rods or similar protrusions, and having a size large enough to be stable under normal hydrologic, tidal, and wave conditions unless a different specific size is specified by rule or permit.

91.     "Routine custodial maintenance" means those activities described in **section 3.1.1** of this Volume.

92.     "Seasonal High Water Level (SHWL)" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

93.     "Seawall" means a man-made wall or encroachment, except riprap, which is made to break the force of waves and to protect the shore from erosion. [Section 373.403(17), F.S.]

94.     "Semi-impervious" means land surfaces that partially restrict the penetration of water; such as porous concrete and asphalt pavements, gravel, limerock, and certain compacted soils.

95.     "Species of special concern" means those species identified as such by the Florida Fish and Wildlife Conservation Commission.

96.     "State-owned submerged lands" means those lands defined as "sovereignty submerged lands" in Rule 18-21.003, F.A.C., which are: "those lands including but not limited to, tidal lands, islands, sand bars, shallow banks, and lands waterward of the ordinary or mean high water line, beneath navigable fresh water or beneath tidally-influenced waters, to which the State of Florida acquired title on March 3, 1845, by virtue of statehood, and which have not been heretofore conveyed or alienated. For the purposes of [Chapter 18-21] sovereignty submerged lands shall include all submerged lands title to which is held by the Board."

97.     "State water quality standards" means water quality standards adopted pursuant to Chapter 403, F.S. [Section 373.403(11), F.S.], including standards composed of designated most beneficial uses (classification of waters), the numerical and narrative criteria applied to the specific water use or classification, the Florida anti-degradation policy (Rules 62-4.242 and 62-302.300, F.A.C.), and the moderating provisions contained in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C.

98.     "Stormwater" means the flow of water that results from, and that occurs immediately following, a rainfall event.

99.     "Stormwater management system" means a surface water management system that is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, over drainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges from the system. [Sections 373.403(10) and 403.031(16), F.S.]

100.    "Stormwater harvesting" means capturing stormwater for irrigation or other beneficial use.

101.    "Stormwater Retrofit" means a project that adds treatment, attenuation, or flood control to an existing stormwater management system or systems but does not serve new development or redevelopment.

102.    "Stormwater utility" means the entity through which funding for a stormwater management program is obtained by assessing the cost of the program to the beneficiaries based on their relative contribution to its need. It is operated as a typical utility that bills services regularly, similar to water and wastewater services.

103.    "Stream" means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel shall have been dredged or improved does not prevent the watercourse from being a stream. [Section 373.019(20), F.S.]

104.     "Structure" means anything constructed, installed, or portable, the use of which requires a location on a parcel of land. It includes a movable structure while it is located on the land which can be used for housing, business, commercial, agricultural, or office purposes either temporarily or permanently.

105.    "Submerged grassbeds" means any native, herbaceous, submerged vascular plant community that is growing on the bottoms of surface waters waterward of the mean high water line or ordinary high water line.

106.    "Surface water" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface. [Section 373.019(21), F.S.]

107.    "Swale" means a man-made trench that:

(a)    Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than three feet horizontal to one foot vertical;

(b)    Contains contiguous areas of standing or flowing water only following a rainfall event;

(c)    Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and

(d)    Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge. [Section 403.803(14), F.S.]

Note: when a swale is used for stormwater treatment, it must meet the standards and criteria in Volume II.

108.    "System" or "surface water management system" means a stormwater management system, dam, impoundment, reservoir, appurtenant work, or works, or any combination thereof, including areas of dredging or filling, as those terms are defined in Sections 373.403(13) and (14), F.S. For purposes of Chapter 62-330, F.A.C., and this Handbook, the term "project" generally will be used in lieu of the term "system."

109.    "Total land area" means land holdings under common ownership that are contiguous, or land holdings that are served by common surface water management facilities.

110.    "Total maximum daily load," or TMDL, means the sum of the individual wasteload allocations for point sources and the load allocations for nonpoint sources and natural background as defined and applied in Chapter 62-303, F.A.C.

111.    "Traversing work" means any artificial structure or construction that is placed in or across a stream or other watercourse, or an impoundment.

112.    "Uplands" means areas that are not wetlands or other surface waters, as delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by Section 373.4211, F.S.

113.    "Vertical seawall" is a seawall the waterward face of which is at a slope steeper than 75 degrees to the horizontal. A seawall with sloping riprap covering the waterward face to the mean high water line shall not be considered a vertical seawall.

114.    "Vessel," is synonymous with "boat" as referenced in s. 1(b), Art. VII of the State Constitution, and includes every description of watercraft, barge, and airboat, other than a seaplane on the water, used or capable of being used as a means of transportation on water. [Section 327.02(43), F.S.]

115.    "Water" or "waters in the state" means any and all water on or beneath the surface of the ground or in the atmosphere, including natural or artificial watercourses, lakes, ponds, or diffused surface water and water percolating, standing, or flowing beneath the surface of the ground, as well as all coastal waters within the jurisdiction of the state. [Section 373.019(22), F.S.]

116.    "Waters of the state" shall be as defined in Section 403.031(13), F.S.

117.    "Watershed" means the land area that contributes to the flow of water into a receiving body of water. [Sections 373.403(12) and 403.031(18), F.S.]

118.    "Water Management District" or "District" means a Water Management District created pursuant to Section 373.069, F.S.

119.    "Water quality standards" or "State water quality standards" means those standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C.

120.    "Wet detention" means the collection and temporary storage of stormwater in a permanently wet impoundment in such a manner as to provide for treatment through physical, chemical, and biological processes with subsequent gradual release of the stormwater.

121.    "Wetlands," means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto. [Section 373.019(27), F.S.] The landward extent of wetlands is delineated pursuant to Rules 62-340.100 through 62-340.550, F.A.C., as ratified by Section 373.4211, F.S.

122.    "Wetland Normal Pool Elevation" means the elevation of sustained water levels in a wetland during the wet season under normal conditions, as reflected by biological indicators. Normal pool elevation is lower than the SHWL.

123.    "Work of the District" means those projects and works, including, but not limited to, structures, impoundments, wells, streams, and other watercourses, together with the appurtenant facilities and accompanying lands, which have been officially adopted by the Governing Board of the District as "Works of the District." [Section 373.019(28), F.S.]

124.    "Works" means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the state [Section 373.403(5), F.S.] and includes all types of dredging and filling to create, remove, or locate structures in, on, or over wetlands or other surface waters.

125.    "Zone of discharge" means a volume underlying or surrounding the site and extending to the base of a specifically designated aquifer or aquifers, within which an opportunity for the treatment, mixture or dispersion of wastes into receiving ground water is afforded. Generally, stormwater treatment systems have a zone of discharge 100 feet from the system boundary or to the project's property boundary, whichever is less.

(b) Definitions and terms that are not defined above shall be given their ordinary and customary meaning or usage of the trade or will be defined using published, generally accepted dictionaries, together with any rules and statutes of the Agencies that have additional authority over the regulated activities.

**3.0     Regulated Activities**

**3.1     Permits Not Required**

A permit is not required under Chapter 62-330, F.A.C., for activities listed in subsection 62-330.020(1), F.A.C. Components of those provisions are discussed below.

**3.1.1     Routine Custodial Maintenance**

The operation and routine custodial maintenance of projects legally in existence does not require a permit under paragraph 62-330.020(1)(a), F.A.C., provided they:

(a)     Comply with the terms and conditions of any permit, exemption, or other authorization previously granted for the work being operated or maintained;

(b)     Do not alter, modify, expand, abandon, or remove the existing work in a manner as to require a general permit under Rule 62-330.052, F.A.C., or an individual permit under Rule 62-330.054, F.A.C.

(c)     Do not cause or contribute to violations of water quality standards in receiving waters.

(d)     Are routine and custodial, having no more than a minimal adverse impact on the environment. To be considered routine custodial maintenance, the activity must occur on a frequent enough basis to ensure that the project continues to function as originally designed. The Agencies recognize that a partial loss of function will occur over a period of time prior to routine custodial maintenance. However, should the project be allowed to deteriorate over a period of time to the extent that it no longer functions as originally designed or proposed, then restoring the project to its original design is not exempt from the requirements to obtain a permit. Projects are considered to no longer function as designed when they no longer fulfill their originally intended purpose or the repairs needed to restore the project to original design are so extensive that they would cause more than a minimal adverse environmental impact. Some examples of originally intended purposes of projects are:

1.     Stormwater systems;

2.     Irrigation ditches – conveying water from a water source to a water use area;

3.     Drainage ditches – draining lands to enable specific agricultural, residential, commercial or recreational land use;

4.     Drainage ditches – draining lands to enable harvesting, site preparation, and regeneration of silvicultural lands during timber rotations;

5.     Canals – conveying water for flood control or draining lands to enable specific land uses or navigational uses;

6.     Channels – specific navigational uses; and

7.      Dikes – preventing flooding to enable specific agricultural, urban or recreational land uses.

The only instance when repair of a non-functioning project would be routine custodial maintenance is when the project has lost functionality due to a sudden event such as a large storm. In such case, the repair must be conducted as soon as practical after the damage occurs, but in no case later than June 1 of the next calendar year after the damage occurred. This serves to ensure a continuity of function during the wet season, which generally occurs between June and October throughout the state. If this deadline would result in a substantial hardship or would violate principles of fairness, the maintenance entity may seek a variance or waiver from this requirement pursuant to Section 120.542, F.S.

The evaluation of environmental impacts will compare the environmental conditions prior to conducting the proposed maintenance activity with the expected environmental conditions that would result from the proposed maintenance. Environmental impacts that are considered to be more than minimal include: changing water levels in wetlands or other surface waters in a manner that adversely impacts fish and wildlife or their habitat as provided in paragraph 62-330.301(1)(d); changing water levels off-site in a manner that causes flooding or other adverse impacts as described in paragraph 62-330.301(1)(a), (b), or (c), F.A.C.; or causing a violation of state water quality standards in receiving waters, as described in paragraph 62-330.301(1)(e), F.A.C.

### 3.1.2    "Grandfathered Activities"

A permit is not required under Chapter 62-330, F.A.C., to conduct certain activities that are "grandfathered" in accordance with the statutory provisions listed in paragraph 62-330.020(1)(c), F.A.C. Such projects are authorized to remain in existence, to remain operating, or may be constructed under the stormwater, dredge and fill, and management and storage of surface waters (MSSW) statutes and rules that existed prior to certain dates as specified below, as long as the terms and conditions of any issued permit, exemption, or other authorization for such project continue to be met, unless the applicant elects review under Chapter 62-330, F.A.C.:

(a)     The effective date of the ERP program (October 3, 1995) throughout Florida, except within the geographical area of the NWFWMD, for activities under Sections 373.414(11), (12)(a), (13), (14), (15), or (16), F.S. The text of these provisions must be followed very carefully. A copy of those provisions is included in the "References and Design Aids" for Volume I, available at https://floridadep.gov/water/water/content/water-resource-management-rules#erp. The following is just a brief overview, and should not be considered a complete guide to their implementation:

1.      Activities approved under a valid stormwater permit under Chapters 17-25 or 62-25, F.A.C., a dredge and fill permit under Chapters 17-312 or 62-312, F.A.C., or an MSSW permit under the rules of the applicable District in effect prior to October 3, 1995. Most of these permits have now expired, but the operation and maintenance phase of those activities permitted under the stormwater and MSSW rules remains in effect in perpetuity.

2.      Activities within a valid jurisdictional declaratory statement submitted prior to October 3, 1995.

3.      Activities for which an application was pending on June 15, 1994, and complete prior to October 3, 1995, under Chapters 17-25 or 62-25, F.A.C., Chapters 17-312 or 62-312, F.A.C., or a management and storage of surface waters (MSSW) permit under the rules of the applicable District. Most of these applications have already been permitted, denied, or withdrawn.

4.      Projects legally in existence, including those in operation and those that for which construction had commenced in accordance with an exemption under Part IV of Chapter 373, F.S., or Part V of Chapter 403, F.S., prior to October 3, 1995. Most of the exemptions continue to exist in Sections 373.406 and 403.813, F.S.; to the extent an activity meets the terms and conditions of an exemption, a permit under Chapter 62-330, F.A.C., is not required.

5.      Activities associated with mining operations that are included in a conceptual reclamation plan or modification submitted prior to July 1, 1996, under Sections 378.201 through 378.212, and 378.701 through 378.703, F.S.

(b)     The effective date of Phase I of the ERP program within the NWFWMD (October 1, 2007), was limited to certain stormwater management systems that were either legally in existence, permitted under Chapter 62-25, F.A.C., or did not require a permit under that chapter. The effective date of Phase II of the ERP program within the NWFWMD (November 1, 2010), was expanded to all systems, including dredging and filling in, on, or over wetlands and other surface waters, including isolated wetlands. In accordance with Section 373.4145(6), F.S., the following shall continue to be governed by Section 373.4145, F.S., as it was in effect in 1994. The text of these provisions must be followed very carefully — see: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_String= &URL=0300-0399/0373/Sections/0373.414.html; the following is just a brief overview, and should not be considered a complete guide to their implementation.

1.      The operation and routine custodial maintenance of projects legally in existence as long as the terms and conditions of the permit, exemption, or other authorization for such projects continue to be met. Additional discussion on routine custodial maintenance is contained in **section 3.1.1, above.**

2.      Activities approved in a permit issued pursuant to Section 373.4145, F.S. (1994).

3.      Activities proposed in applications under Chapter 62-25, F.A.C., received and completed before November 1, 2010.

4.      Any modification of the plans, terms, and conditions of a permit issued pursuant to Section 373.4145, F.S. (1994) that lessens the environmental impact, except that any such modification shall not extend the time limit for construction beyond two additional years.

These provisions shall not apply to any project that is altered or modified in a manner that: increases the water resource impact; increases the duration for construction beyond two additional years; or involves expansion, abandonment, or removal of a project after October 1, 2013.

(c)     The following shall continue to be governed by the rules adopted by the Agencies under Part IV of Chapter 373, F.S., in effect before the effective date of Chapter 62-330, F.A.C.,

implementing Section 373.4131, F.S., unless the applicant elects review in accordance with Chapter 62-330, F.A.C., as it exists after that date:

1. Operation and maintenance of any project that was legally in existence before October 1, 2013, as long as the terms and conditions of the permit, exemption, or other authorization for such activity continue to be met.

2. Activities determined in writing by the Agency to be exempt from permitting under Part IV of Chapter 373, F.S., including self-certifications submitted to an Agency before October 1, 2013, as long as the terms and conditions of the exemption continue to be met.

3. Activities approved in a permit Part IV of Chapter 373, F.S., before October 1, 2013 and the review of activities proposed in a permit application that was complete before October 1, 2013. This includes any modification of such a permit, including new activities within the originally permitted project area that lessens or does not increase impacts. However, a permit modification under Chapter 62-330, F.A.C., October 1, 2013, is required if:

    a. The project will cause additional or substantially different water resource impacts, or

    b. The project does not qualify as a minor or "letter" modification under Rule 62-330.315, F.A.C.

(d) Appendix D of the NWFWMD Volume II contains guidance on the extent to which alteration of a system previously permitted under Rule 17-4.248, F.A.C. (in effect between March 1, 1979, and February 1, 1982), or Chapter 62-25, F.A.C. (Chapter 17-25, F.A.C., between February 1, 1982, and July 1994), is subject to the permitting requirements of Chapter 62-330, F.A.C.

### 3.1.3 "10/2 General Permit"

Paragraph 62-330.020(1)(d), F.A.C., is a reference to activities in uplands having less than 10 acres of total project area and less than two acres of impervious surface that can qualify for the general permit in Section 403.814(12), F.S. (referred to as the "10/2" general permit). This is not a general permit under Chapter 62-330, F.A.C., and does not require submittal of the notice specified in subsection 62-330.402(1), F.A.C., but does require submittal of an electronic self-certification attesting to compliance with the general permit. DEP has a portal at http://www.fldepportal.com/go/ that enables persons to submit a variety of self-service authorizations for exempt and general permit activities online, including certifying qualification for the 10/2 general permit. DEP's portal can be used regardless of whether regulation of the activity in the absence of the general permit would be the responsibility of the DEP, a WMD, or a delegated local government under the Operating Agreements between the Agencies. **Volume II** contains design and performance standards that are relevant to the design of activities that qualify for this general permit.

### 3.1.4.  Permit Thresholds

Unless it is not regulated or is exempt under subsection 62-330.020(1), F.A.C. (as discussed above in sections **3.1 through 3.1.3**, above), a permit is required for any activity that, by itself or in combination with any other activity conducted after October 1, 2013, cumulatively exceeds any of the thresholds in paragraphs 62-330.020(2)(a) through (j), F.A.C. Some provisions of those thresholds are explained below:

(a)      Examples of impervious or semi-impervious surface area subject to vehicular traffic, as provided in paragraph 62-330.020(2)(b), F.A.C., are roads, parking lots, driveways, and loading zones. The terms "impervious" and "semi-impervious" are defined in paragraphs 2.0(a)51 and 92, respectively, of this Volume. The total impervious and semi-impervious surface areas in paragraph 62-330.020(2)(c), F.A.C., include those areas described in paragraph 62-330.020(2)(b), F.A.C.

(b)      The term "project area," as used in paragraph 62-330.020(2)(d), F.A.C., is defined in paragraph 2.0(a)75 of this Volume, and generally is the area, including mitigation, where works (essentially movement of earth, or construction or alteration of structures) occur as part of an activity requiring a permit.

(c)      As referenced in paragraph 62-330.020(2)(i), F.A.C., District-specific thresholds are in **section 1.2** of each Volume II.

(d)      The term "common plan of development or sale" is defined in section **2.0(a)16**. of this Volume.

(e)      Section 373.4132, F.S. provides additional information on dry storage facilities that are not subject to permitting under paragraph 62-330.020(2)(h), F.A.C.

(f)      Activities that do not exceed the thresholds in paragraphs 62-330.020(2)(a) through (j) must not:

    1.      Cause adverse water quantity impacts to receiving waters and adjacent lands. Volume II applicable to the geographical location of the activity provides design and performance standards for meeting this criterion;

    2.      Cause adverse flooding to on-site or off-site property. Volume II applicable to the geographical location of the activity provides design and performance standards for meeting this criterion;

    3.      Cause adverse impacts to existing surface water storage and conveyance capabilities. Volume II applicable to the geographical location of the activity provides design and performance standards for meeting this criterion;

    4.      Cause or contribute to a violation of the water quality standards. Those standards are contained in Chapter 62-302, F.A.C., and Rule 62-4.242, F.A.C., for all surface waters, including the anti-degradation requirements for Outstanding Florida Waters, and Chapters 62-520 and 62-550, F.A.C., for ground waters; or

    5.      Cause adverse secondary or cumulative impacts to the water resources by itself, or in combination with existing activities. See Sections **10.2.7 and 10.2.8** for

discussion of how the Agency evaluates the potential for secondary and cumulative impacts.

The above do not need to be evaluated by the Agencies prior to conducting activities that do not exceed the thresholds in subsection 62-330.020(2), F.A.C. However, persons are subject to potential enforcement if the construction or operation of such projects results in any of the adverse effects in (f)1 through 5, above, or the project is discovered to exceed the thresholds in subsection 62-330.020(2), F.A.C.

(g)     A "Works of the District" permit pursuant to Chapter 40A-6, F.A.C. (within the NWFWMD), Chapter 40B-4, F.A.C. (within the SRWMD), and Chapter 40E-6, 40E-61, 40E-62, or 40E-63, F.A.C. (within the SFWMD), is required within those WMDs if the activity involves connection with, placement of structures in or across, or otherwise makes use of Works of the District.

## 3.2    Exemptions

A permit is not required for activities that are exempt under Section 373.406, 373.4145(3), or 403.813, F.S., Rule 62-330.051 or 62-330.0511, F.A.C., or Section 1.3 (District-specific exemptions) of the applicable Volume II (see Rule 62-330.020(1)(b), F.A.C.). Explanations of some of those exemptions are provided below.

Except where required by the terms of the exemption, an application or notice to the Agency is not required for activities that meet all the terms and conditions of an exemption. However, such exemptions do not provide the authorization that may be required from other local, state, regional, or federal agencies. For example, exempt activities that occur on state-owned submerged land may require a separate letter of consent, easement, or lease under Chapters 253 and 258, F.S., and Chapters 18-20 and 18-21, F.A.C., as applicable. Activities that are exempt from ERP permitting under Rules 62-330.051 or 62-330.0511, F.A.C., may require separate permitting from the USACE (see **sections 1.3.1 through 1.3.1.2, above**).

If a person desires verification that an activity qualifies for an exemption, and information on potential state-owned submerged lands authorization, the request must be submitted following Rule 62-330.050, F.A.C., and **sections 4.2.1 and 4.4 of this Volume**.

### 3.2.1   Agriculture and Forestry

(a)     Section 373.406(2), F.S., states that "…[N]othing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to affect the right of any person engaged in the occupation of agriculture, silviculture, floriculture, or horticulture to alter the topography of any tract of land, including, but not limited to, activities that may impede or divert the flow of surface waters or adversely impact wetlands, for purposes consistent with the normal and customary practice of such occupation in the area. However, such alteration or activity may not be for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands."

Within the Panhandle, the NWFWMD reviews agricultural and forestry activities that are not exempt using Chapter 40A-44, F.A.C.; they will not require a separate ERP under Chapter 62-330, F.A.C., for those activities. The other Districts regulate agriculture and

silviculture activities that do not qualify for the exemption using Chapter 62-330, F.A.C., and the Applicant's Handbook. The SJRWMD also uses Chapter 40C-44, F.A.C., for such regulation.

(b)     Section 373.406(3), F.S., provides that "Nothing herein, or in any rule, regulation or order adopted pursuant hereto, shall be construed to be applicable to construction, operation, or maintenance of any agricultural closed system." A "closed system" is defined in Section 373.403(6), F.S., and a surface water management permit is not required for such systems. This subsection shall not be construed to eliminate the need to meet generally accepted engineering practices for the design, construction, operation, and maintenance of dams, dikes, or levees.

(c)     The SWFWMD has a voluntary Agricultural Ground and Surface Water Management (AGSWM) program to assist the agriculture industry in implementing best management practices designed to minimize adverse impacts to water resources. See **section 1.3 of the SWFWMD Volume II** for additional information.

(d)     DEP will regulate activities on agricultural or forestry lands that are non-agricultural in nature and that are otherwise the responsibility of DEP in accordance with the Operating Agreements between the Agencies, such as an individual single-family residence, duplex, triplex, or quadruplex that is incidental to an agriculture or forestry activity, or a concentrated animal feeding operation (CAFO) operating under an Industrial Waste Permit issued by DEP.

(e)     Construction or alteration of systems such as roads for future development will not be considered agriculture or silviculture activities, and will be regulated under Chapter 62-330, F.A.C.

**3.2.2    Individual Single-Family Residence, Duplex, Triplex, or Quadruplex**

(a)    Subsection 62-330.051(13), F.A.C., exempts from the noticing and permitting requirements of Chapter 62-330, F.A.C., the construction or private use of an individual, single-family dwelling unit, duplex, triplex, or quadruplex that:

    1.    Is not part of a larger common plan of development or sale;

    2.    Does not involve work in wetlands or other surface waters; and

    3.    Does not require a modification of a permit issued under part IV of Chapter 373, F.S.

This exemption does not apply within the Wekiva River Protection Area within Lake, Seminole, and Orange Counties (see **section 1.2 of the SJRWMD Volume II**).

(b)    Section 403.813(1)(q), F.S., exempts the construction, operation, or maintenance of stormwater management facilities that are designed to serve single-family residential projects, including duplexes, triplexes, and quadruplexes, if they are less than 10 acres total land and have less than 2 acres of impervious surface and if the facilities:

    1.    Comply with all regulations or ordinances applicable to stormwater management and adopted by a city or county;

    2.    Are not part of a larger common plan of development or sale; and

    3.    Discharge into a stormwater discharge facility exempted or permitted by DEP under this chapter which has sufficient capacity and treatment capability as specified in this chapter and is owned, maintained, or operated by a city, county, special district with drainage responsibility, or water management district; however, this exemption does not authorize discharge to a facility without the facility owner's prior written consent.

Activities qualifying for the provisions in **paragraph (a) or (b), above,** are not required to comply with the provisions in the **Volume II**.

**3.2.3    Maintenance Dredging and Maintenance of Insect Control Systems**

Exemptions for certain maintenance activities are provided in Section 403.813(1)(f) and (g), F.S., and are described in detail below. The exemption in Section 403.813(1)(f), F.S., authorizes maintenance dredging of existing manmade canals and channels, including navigation basins and ship's berths; intake and discharge structures; and previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements. The exemption in Section 403.813(1)(g), F.S., addresses the maintenance of existing insect control structures, dikes, and irrigation and drainage ditches. A number of limitations and conditions apply to these exemptions, as summarized below.

(a)    Original design specifications/configurations.

    1.    Section 403.813(1)(f), F.S., requires that no more dredging be performed than is necessary to restore the canals, channels, intake and discharge structures and previously dredged portions of natural water bodies, to original design specifications or configurations. Section 403.813(1)(g), F.S., requires that no more

dredging be performed than is necessary to restore the dike or irrigation or drainage ditch to its original design specifications.

2. The entity claiming the maintenance exemption bears the burden of establishing that its activity qualifies for the exemption, including that the maintenance will not extend a system beyond its original design specifications or configuration. However, there is no requirement for the maintenance entity to provide advance notice to the Agency that they are planning on performing maintenance that qualifies for the exemptions in Sections 403.813(1)(f) or (g), F.S., except for the 30-day notice required for the maintenance dredging of previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements.

Maintenance entities are encouraged to notify the Agency of proposed maintenance and to discuss its planned scope and extent with the Agency. Maintenance entities may also request confirmation from the Agency that they qualify for an exemption. In the event that the planned activity does not qualify for an exemption, such consultation should help to avoid enforcement action by the Agency.

3. Direct evidence of original design can include: plans; historical aerial photographs; surveyed cross sections; soil boring reports, if such borings can distinguish between the original soils and the sediment deposited in a system; and other historical documents. Where such documentation does not clearly establish the original design, eyewitness accounts can be submitted to provide further evidence of the original design specifications or configuration. In addition, indirect evidence can be used. Indirect evidence is evidence from which the original design specifications or configuration can be scientifically deduced. Examples of such indirect evidence include historic information of land uses enabled by the system, and the sizes and capacities of associated systems, such as culverts or weirs. If the maintenance entity cannot reasonably establish the original design of a system, the maintenance exemptions in Sections 403.813(1)(f) and (g), F.S., are not applicable.

(b) The following limitations, conditions, and definitions also apply to the exemption in Section 403.813(1)(f), F.S., for maintenance dredging of existing: canals and channels, including navigation basins and ship's berths; intake and discharge structures; and previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements:

1. Spoil material must be deposited in a self-contained, upland spoil disposal site that will prevent the escape of spoil material into the waters of the state. For the purposes of the exemptions in Sections 403.813(1)(f) and (g), F.S., a self-contained, upland disposal site is a disposal site located entirely in uplands which is designed to prevent the spoil material from reentering waters of the state as defined in Section 403.031(13), F.S. Some examples of self-contained upland spoil disposal sites are:

a. An upland area separated from waters of the state by a berm, such that the spoil material cannot reenter waters of the state;

b.      In a system that has an outer berm or dike, placing the spoil on the inner banks of the dike where it could potentially reenter those interior canals which are not waters of the state, and where the spoil material is prevented from being discharged to waters of the state through the operation of a pump or other type of water control structure; and

c.      In a system involving a road with roadside ditches that are waters of the state, placing spoil in a "V" shaped notch in the center of the road such that it could not be discharged to waters of the state.

Additionally, use of dredged materials to conduct exempt or permitted maintenance of a dike or road shall not be considered spoil disposal, so long as the dredged materials are only used to restore the dike or road to original design specifications and the dredged material is not deposited into wetlands or other surface waters outside of the original dike or road cross section.

2.      Best management practices for erosion and sediment control must be used at the dredge site to prevent bank erosion and scouring and to prevent turbidity, dredged material, and toxic or deleterious substances from discharging into adjacent waters during maintenance dredging. This does not prevent the discharge of water during dredging or from the disposal site, as long as water quality standards are not violated in the receiving waters.

3.      The maintenance dredging shall not cause significant impacts to previously undisturbed natural areas.

4.      Maintenance work must be conducted in accordance with Section 379.2431(2)(d), F.S., which provides that, except as authorized by a permit issued under Section 379.2431(2)(c), F.S., or by the terms of a valid federal permit, the maintenance entity shall not at any time, by any means or in any manner intentionally or negligently:

a.      Annoy, molest, harass, or disturb or attempt to molest, harass, or disturb any manatee;

b.      Injure or harm or attempt to injure or harm any manatee;

c.      Capture or collect or attempt to capture or collect any manatee;

d.      Pursue, hunt, wound, or kill or attempt to pursue, hunt, wound, or kill any manatee; or

e.      Possess, literally or constructively, any manatee or any part of any manatee.

5.      For canals and previously dredged portions of natural water bodies, the exemption only applies to such systems constructed prior to April 3, 1970, or constructed on or after April 3, 1970, pursuant to all necessary state permits.

6.      The exemption does not apply to the removal of any natural or manmade barrier separating a canal or canal system from adjacent waters.

7.    Maintenance dredging shall be limited to a depth of no more than five feet below mean low water for existing manmade canals or intake or discharge structures that have not been previously permitted for construction or maintenance dredging in accordance with necessary state permits or permits issued by the U.S. Army Corps of Engineers (USACE) between April 4, 1970, and October 26, 1975, or when such permits were required, by DEP, the WMD, or the USACE after October 26, 1975.

For canals dredged prior to 1975, where evidence indicates that the canals were dredged to depths deeper than five feet, and no subsequent enforcement action was taken, the maintenance entity is encouraged to notify the Agency at least 30 days prior to dredging, and provide documentation of original design specifications or configurations where such exist so that the Agency can have an opportunity to verify that the exempt conditions apply.

8.    For maintenance dredging of a previously dredged portion of a natural water body, the maintenance entity must notify DEP at least 30 days prior to dredging, and provide documentation of original design specifications or configurations where such exist.

9.    The term "natural water bodies" as used in paragraph 403.813(1)(f), F.S., means those surface water bodies extending waterward from the boundary established pursuant to the methodology in Chapter 62-340, F.A.C., except for those waters that were created solely due to human activity, such as borrow pits, ditches, canals, and artificial impoundments located in areas that were uplands prior to construction. As stated above, the maintenance entity is required to notify the Agency at least 30 days prior to dredging and provide documentation of original design specifications or configurations where such exist for maintenance dredging of previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements. The terms "previously dredged" and "within recorded drainage rights-of-way" are interpreted to apply to dredging originally performed within a right-of-way recorded prior to when these provisions became effective (October 1, 1997, per Chapter 97-22, Laws of Florida).

(c)    The following limitations or conditions also apply to the exemption in Section 403.813(1)(g), F.S., for the maintenance of existing insect control structures, dikes, and irrigation and drainage ditches:

1.    Spoil material must be deposited on a self-contained, upland spoil site that will prevent the escape of spoil material into waters of the state (see **paragraph 3.2.3(b)1, above,** for further explanation of self-contained, upland spoil site);

2.    For insect control structures, if the Department of Health determines that the cost of new spoil disposal is so excessive that it will inhibit proposed insect control, then existing spoil sites or dikes may be used upon notification to DEP. In such cases, turbidity control devices shall be used when the receiving water body is a potable water supply, is designated as shellfish harvesting waters, or functions as a habitat for commercially or recreationally important shellfish or finfish.

**3.2.4    Seawall, Riprap, and other Shoreline Structure Restoration**

Restoration and repair of a seawall, riprap revetment or other shoreline protection structure may be performed without a permit, under any of the following circumstances:

(a)    The work qualifies as routine, custodial maintenance, as discussed in section 3.1.1, above.

(b)    The work is authorized under a *de minimis* exemption, as explained in section 3.2.7, below.

(c)    The work is authorized to be performed without a permit under an Emergency Order issued by the Governor and/or the Secretary of DEP or the Executive Director of a District following a large event, such as a hurricane.

(d)    The work qualifies for an exemption under paragraph 62-330.051(12)(b), F.A.C., and Section 403.813(1)(e), F.S., which authorize restoration as long as no permit is required under Chapter 161, F.S., and the face of the restored structure is within 18 inches from the face of the old structure. Restoration under this exemption is limited to instances where the primary purpose of the project is restoration or replacement of an old or failing structure, and is not to expand or reclaim uplands. Generally, this exemption applies to situations in which:

    1.    The structure has been damaged or destroyed by a discrete event (such as a storm, accident, fire, or other unforeseen circumstance), typically of a localized nature within a period of no longer than one year of the event (which is normally a reasonable time to perform such restoration).

    2.    The restoration or repair is necessary due to degradation of materials over time, erosion (such as from currents or boat wakes), structural failures resulting from poor workmanship or design, or to upgrade materials or raise the height of the structure (such as to prevent overtopping by tides, waves, wakes, or flows). Restoration of structures that have deteriorated over long periods of time may require extensive work, such as backfilling, which may result in adverse individual or cumulative impact to the water resources. For this reason, the following factors will be considered in determining whether the repair or restoration work is exempt, or needs a permit:

        a.    Whether the mean (or ordinary) high water line has shifted landward or waterward of the structure along more than 50 percent of its length (which may or may not run the entire length of the shoreline of the property);

        b.    The structural failure has persisted long enough for wetland or other aquatic communities to become established behind more than 10 percent of the length of the structure (excluding such communities that exist solely due to periodic overtopping by tides, waves or floods);

        c.    The damage or deterioration consists of more than minor cracks or gaps, (such as large sections of the structure that are failing, leaning, or completely missing), and the structure is no longer effectively retaining or stabilizing land; or

> d.    An excessive period of time has elapsed between when the degradation or failure became apparent and the time the repairs are proposed. Consideration will be given when extended time is needed due solely to circumstances beyond the control of the property owner, such as unavailability of contractors.

Furthermore, for the restoration work to qualify for this exemption, the structure must also be (or have been) legally in existence by virtue of:

> 1.    Having been built under an applicable exemption or permit under Part IV of Chapter 373, F.S., or Part V of Chapter 403, F.S.; and was granted any applicable state-owned submerged lands authorization under Chapters 253 and 258, F.S.; or

> 2.    Qualifying as being "grandfathered" (see section 3.1.2, above), such as having been built prior to permitting requirements under the above statutes.

### 3.2.5    Swales

Section 403.813(1)(j), F.S., exempts the construction and maintenance of swales. A swale is defined in Section 403.803(14), F.S., as a manmade trench that:

(a)    Has a top width to depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than 3 feet horizontal to 1-foot vertical;

(b)    Contains contiguous areas of standing or flowing water only following a rainfall event;

(c)    Is planted with vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and

(d)    Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge.

Applicants are advised that the construction of a swale system does not qualify for the exemption under Section 403.813(1)(j), F.S. A "swale system" is a stormwater management system that does not consist entirely of swales. An example is a subdivision served by swales as the primary stormwater management system, but that includes culverted driveway crossings and other pipe conveyance features. Such stormwater management systems must be designed and evaluated to address such things as potential impoundments and flood conveyance restrictions imposed by the culvert crossings and other pipe conveyance features. The entire stormwater management system as a whole must be designed, implemented, operated, and maintained to meet the conditions for issuance of Rule 62-330.301, F.A.C., the applicable Volume II, and the operation and maintenance requirements in **section 6.1.4** and **Part V of this Volume**.

### 3.2.6    Docks and Piers

Subparagraph 62-330.051(5)(b)4, F.A.C., pertains to the exemption in Section 403.813(1)(b), F.S. Section 403.813(1)(b)5, F.S., provides that the installation must be, ". . .the sole dock constructed pursuant to this exemption as measured along the shoreline for a distance of 65 feet, unless the parcel of land or individual lot as platted is less than 65 feet in length along the shoreline, in which case there may be one exempt dock allowed per parcel or lot." This measurement begins where that portion of the structure (typically the access walkway or end of a marginal dock) connects to the

shoreline (the landward extent of wetlands and other surface waters). From that point, there must be a minimum of 65 feet along the shoreline of the parcel or lot before reaching the point where the next access walkway or marginal dock connects to the shoreline of the same parcel or lot. The only exception is if the parcel of land or individual platted lot has less than 65 feet of shoreline. All waterward components of the dock (such as "T" ends, terminal platforms, walkways, finger piers, and boat shelters) must be separated from the waterward components of any other docks on the parcel or lot such that the docks cannot be reasonably be considered one structure. That test is met if there is enough separation between the docks that a person cannot access the next dock through more than extraordinary means (such as having to take a "running leap" or having to place temporary or permanent planks between the docks).

Applicants are advised that in addition to compliance with the regulatory exemption criteria, docks and piers located on state-owned submerged lands (SSL) are subject to the need to obtain a separate authorization, which will include consideration of such things as proximity and setbacks to riparian rights lines, the size of terminal platforms in aquatic preserves, whether the dock or pier includes any non-water dependent uses or activities, the total amount of preemption of state-owned submerged lands, the number of boat slips, the sufficient upland interest of the riparian upland owners, and any income-producing, revenue-generating uses of the dock or pier and associated uplands. See Chapters 18-18, 18-20, and 18-21, F.A.C., for additional information.

### 3.2.7    Other Exemptions

(a)    Section 403.813(1), F.S., provides that no permit shall be required for certain activities under Chapters 373 and 403, F.S. These exemptions are listed in Rule 62-330.051, F.A.C.

(b)    DEP has established additional exemptions by rule for minor activities that have been determined to have no more than minimal individual and cumulative impacts. They are contained in Rule 62-330.051, F.A.C.

(c)    Section 373.406(6), F.S., provides that "Any district or the department may exempt from regulation under this part those activities that the district or department determines will have only minimal or insignificant individual or cumulative adverse impacts on the water resources of the district." The Agencies are authorized to determine, on a case-by-case basis, whether a specific activity comes within this exemption. Requests to qualify for this exemption shall be submitted in writing to the applicable Agency, and such activities shall not commence without a written determination from the Agency confirming qualification for the exemption. These are known as "*de minimis*" exemptions.

Applicants and permittees are advised that dewatering during construction may require a separate consumptive use permit from the applicable District, and potentially an NPDES permit.

### 3.3    Permits Required

Rule 62-330.020, F.A.C., describes activities that require a permit. The types of permits available are general permits, individual permits (which include mitigation bank permits), and conceptual approval permits. These are described below.

### 3.3.1    General Permits

General permits authorize activities specified in Rules 62-330.410 through 62-330.635, F.A.C.

To qualify, a person must submit notice to the Agency of intent to use a general permit following Rule 62-330.402, F.A.C., and **section 4.2.2 of this Volume**. Activities that comply with all the general conditions of Rule 62-330.405, F.A.C., and the specific limitations and conditions for the particular general permit may be initiated 30 days after the Agency receives the notice, unless:

(a)     The Agency responds within 30 days after receiving the notice that the activity does not qualify for the general permit, or that additional information is needed to determine if the activity qualifies for the general permit; or

(b)     The conditions of the general permit require written verification from the Agency prior to initiating the activities.

Notices to use a general permit are not circulated to other parties for comment.

As discussed in **section 3.1.3**, above, the "10/2" general permit in Section 403.814(12), F.S., is not a general permit under Chapter 62-330, F.A.C.

### 3.3.2    Individual Permits

Except where a conceptual approval permit is sought, an individual permit under Rules 62-330.020 and 62-330.054, F.A.C., is required prior to the construction, alteration, operation, maintenance (excluding routine custodial maintenance), abandonment, or removal of projects that:

(a)     Are not exempt in accordance with Rule 62-330.051 or 62-330.0511, F.A.C.;

(b)     Exceed the permitting thresholds in subsection 62-330.020(2), F.A.C.;

(c)     Do not qualify for a general permit under Rules 62-330.410 through 62-330.635, F.A.C.; and

(d)     Do not qualify for the general permit in Section 403.814(12), F.S.

A mitigation bank permit is processed and evaluated as a type of individual permit, but also is processed and evaluated under the Mitigation Bank Permit rule, Chapter 62-342, F.A.C.

A conceptual approval permit is not a type of individual permit, but is processed in the same manner as an individual permit. It is evaluated under Rule 62-330.055 or 62-330.056, F.A.C., as applicable, the conditions for issuance in Rules 62-330.301 and 62-330.302, F.A.C., and the Applicant's Handbook Additional information on conceptual approval permits is contained in **section 3.4**, below.

Applications for individual permits undergo detailed site review and consideration of comments received during processing. Except as provided in Rule 62-330.054(4), F.A.C., an application for an individual permit shall be prepared and submitted following Rule 62-330.060, F.A.C., and **sections 4.2.3 and 4.4 below**, and processed following Rule 62-330.090, F.A.C., and **section 5.5, below.**

### 3.3.2.1  Dry Storage Facilities

An individual permit is required for the construction, alteration, operation, maintenance, abandonment, or removal of any dry storage facility for 10 or more vessels that is functionally associated with a boat launching area, including when the dry storage facility does not involve any work within the landward extent of wetlands and other surface waters (see Section 373.4132, F.S.). Such activities do not qualify for the "10/2" general permit in Section 403.814(12), F.S.

### 3.3.2.2    Alteration, Maintenance, and Operation

A permit is required prior to the alteration, maintenance (other than routine custodial maintenance), or operation of an existing project, including those previously constructed in conformance with an exemption or prior to the existence of state or federal permitting programs, if the alteration or maintenance does not qualify for an exemption under Rule 62-330.051 or 62-330.0511, F.A.C., a general permit under Section 403.814(12), F.S., or the grandfathering provisions summarized in **section 3.1.2**, above.

"Alter" means "to extend a dam or works beyond maintenance in its original condition, including changes that may increase or diminish the flow or storage of surface water which may affect the safety of such dam or works" (see Section 373.403(7), F.S., and **paragraph 2.0(a)3**., above). Alterations that are subject to requiring a permit under Chapter 62-330, F.A.C., include:

(a)    Addition to an existing system;

(b)    Change of any part of an existing activity to capacities or locations different from those originally constructed; or

(c)    Addition of, or changes to an existing project that will result in changes in the rate, volume, or timing of discharges; the point or points of discharge; increased pollutant loading; or that intrude into or otherwise adversely affect wetlands or other surface waters by activities such as rim ditching, draining, filling, or excavation.

"Maintenance," as defined in Section 373.403(8), F.S., and **paragraph** 2.0(a)58, above, includes repairs that exceed routine custodial maintenance, and is subject to the permitting requirements of Chapter 62-330, F.A.C. Routine custodial maintenance is exempt from permitting as discussed in **section 3.1.1, above**.

Except as provided in Chapter 62-330, F.A.C., or in a permit issued thereunder, the construction phase of an individual permit must be converted to an operation phase that extends in perpetuity after construction has been completed in conformance with the terms and conditions of the permit. The terms "operate" and "operation" are defined in **paragraph** 2.0(a)67, above. An application to construct or alter a project also constitutes a request for authorization to operate and maintain the project. General permits under Rules 62-330.410 through 62-330.635, F.A.C, automatically convert to the operation and maintenance phase upon completion of construction performed in compliance with the general permit. Additional information on operation and maintenance of projects is in Rule 62-330.310, F.A.C., and **Part V of this Volume.**

### 3.4    Conceptual Approval Permits

A conceptual approval permit is available, but not required, for activities occurring in phases or over a large land area. Conceptual approval permits are available under Rule 62-330.056, F.A.C., for any type of long-term build out other than for redevelopment or infill, and for redevelopment

or infill under Rule 62-330.055, F.A.C. A conceptual approval permit does not authorize construction, alteration, maintenance, removal, or alteration (a separate individual permit is required for those activities). However, the first phase of construction can be authorized at the same time the conceptual approval permit is issued, as discussed below and in Rule 62-330.056, F.A.C. Construction of redevelopment or infill projects consistent with a conceptual approval permit issued under Rule 62-330.055, F.A.C., can be authorized through the general permit in Rule 62-330.450, F.A.C.

3.4.1     Issuance of a conceptual approval permit is a determination that conceptual plans are, within the extent of detail provided in the application, consistent with applicable rules at the time of issuance. A conceptual approval permit provides the permit holder with a rebuttable presumption that, during the duration of the conceptual approval permit, the design and environmental concepts upon which the conceptual approval permit is based (within the detail provided in the application) will meet applicable rule criteria for issuance of permits for subsequent phases of the project. This presumption is rebuttable at the time of receipt of a complete application to construct or operate future phases, dependent on the factors in subsection 62-330.056(7), F.A.C.

3.4.2     An application for a conceptual approval permit will be reviewed pursuant to the standards, criteria, and procedures for processing individual permits, together with the provisions of Rule 62-330.055 or 62-330.056, as applicable. The permit, if issued, will contain specific conditions necessary to ensure that future applications for permits to construct, alter, operate, maintain, remove, or abandon projects can be issued only if such applications remain consistent with the conceptual approval permit.

3.4.3     Conceptual Approval for Urban Infill and Redevelopment

    (a)      A county or municipality may request a conceptual approval permit under Rule 62-330.055, F.A.C., for redevelopment within an urban redevelopment and infill area or a community redevelopment area created under Chapter 163, F.S. Projects in compliance with the redevelopment conceptual approval permit can be constructed, operated, and maintained under the terms and conditions of the general permit in Rule 62-330.450, F.A.C.

    (b)      An application for redevelopment conceptual approval permit must contain a stormwater master plan developed in coordination with, and approved by, the Agency. The master plan must demonstrate that the urban redevelopment or infill project, as a whole, will provide a net improvement of the quality of stormwater discharge, as determined through a calculated reduction of annual loading of pollutants of concern as determined during the permit application review discharged after development, as compared to the predevelopment condition existing on the date of application for the conceptual permit. For areas that were demolished prior to the application, the predevelopment condition is considered to be the land use five years prior to submittal of the application for the conceptual approval permit.

    (c)      If issued, the urban redevelopment or infill conceptual approval permit will include a ledger that indicates the target annual loading of the pollutants of concern (mass per acre) for each drainage basin within the area covered.

    (d)      A person wishing to construct or alter a project within the urban infill or redevelopment area may use the general permit in Rule 62-330.450, F.A.C., when the design meets the terms and conditions of that general permit. The general permit is available to all qualifying activities within the urban infill or redevelopment conceptual approval permit area.

Construction under the general permit must occur within five years of the date qualification for its use is verified by the Agency for the specific activity subject to the general permit.

(e)     Activities qualifying for the general permits will result in a debit to the master plan ledger of target pollutant loading within the drainage area affected. Once the entire pollutant load target is reached for the receiving waters, no more general permits under Rule 62-330.450, F.A.C., will be available for use under the terms of the issued urban infill or redevelopment conceptual approval permit. However, this does not preclude issuance of subsequent urban infill or redevelopment conceptual approval permits for which the general permit would be available.

**3.4.4**   The duration of a conceptual approval permit is discussed in **section 6.1.5**, below.

**3.4.5**   Modifications of conceptual approval permits and subsequently issued permits for construction, alteration, operation, maintenance, removal, or abandonment shall be in accordance with Rule 62-330.315, F.A.C.

**3.4.6**   Requests to extend the duration of a conceptual approval permit will be reviewed as provided in Rule 62-330.320, F.A.C.

**4.0    Preparation and Submittal of Applications and Notices**

**4.1    Pre-application Conference**

Applicants are encouraged to have a pre-application phone call, meeting (on-site or in the office), or other conference with the applicable Agency staff prior to submitting an application or notice. This should minimize processing steps and potential time delays by assisting the applicant to understand such things as:

(a)    The need for a permit or potential qualification for an exemption or general permit;

(b)    Which agency will be responsible for the review of the application or notice;

(c)    How to prepare the application or notice, including availability of on-line tools that may assist in completing it;

(d)    Information required by the Agency to evaluate an application or notice, including such things as wetland delineations, resources that may be affected, surface water data (such as for water quality, flooding, mean high water, and other surface water elevations), and other hydrologic, environmental, or water quality data;

(e)    Application processing and evaluation procedures;

(f)    The need for a pre-application on-site meeting;

(g)    Adverse impacts that may prevent the proposed activity from meeting applicable permitting or review standards and criteria; and

(h)    Measures that can be taken to reduce or eliminate adverse impacts, and the appropriateness of mitigation to offset remaining adverse impacts.

See **Appendix A of this Volume** for Agency contact information.

**4.2    Forms and Submittal Instructions**

Where available, applicants are encouraged to use the e-Permitting and electronic portals of the Agencies to submit most applications and notices as discussed below. **Appendix A** of this Volume contains the Internet addresses of the Agencies.

**4.2.1    Requesting an Exemption Determination**

Except as noted below, notice to the Agency is **not required** to conduct an activity that qualifies for an exemption. The following are exceptions where prior notice to the Agency is required before conducting an exempt activity:

(a)    Work proposed under Section 373.406(6), F.S., often called the "*de minimis*" exemption; this exemption is used for activities that are expected to have no more than minimal individual and cumulative impact, but are not authorized under a specific exemption or

general permit adopted by rule. These activities must be reviewed on a case-by-case basis to determine qualification for the statutory exemption.

(b)     Maintenance dredging within previously dredged portions of natural water bodies within drainage rights-of-way or drainage easements which have been recorded in the public records of the county, in accordance with Section 403.813(1)(f), F.S.

(c)     The repair, stabilization, paving, or repaving of existing county- or municipally-maintained roads and the repair or replacement of bridges that are part of the roadway under Section 403.813(1)(t), F.S., as superseded by the exemption in paragraph 62-330.051(4)(e), F.A.C.

(d)     Removal by an individual, residential property owner of organic detrital material from freshwater rivers or lakes that have a natural sand or rocky substrate and that are not located in an Aquatic Preserve, in accordance with Section 403.813(1)(u), F.S.

(e)     The construction, operation, maintenance, alteration, abandonment, or removal of minor silvicultural surface water management systems under Rule 62-330.0511, F.A.C. The notice required by this exemption [Form 62-330.0511(1)] must be received by the Agency, but does not require verification of qualification by the Agency prior to commencement of the authorized activities.

A request for a written determination of qualification for an exemption shall follow Rule 62-330.050, F.A.C. Additional information on submitting a notice or letter requesting verification of an exemption is in **section 5.2**, below.

Many exempt activities involving certain categories of in-water work qualify for the USACE SPGP discussed in **section 1.3.1.2**, above. If the activity does not qualify for the SPGP, a separate USACE permit may be required. Applicants must apply separately to USACE using the appropriate federal application form. More information about USACE permitting can be found online in the Jacksonville District Regulatory Division Sourcebook.

### 4.2.2    Preparing a Notice of Intent to Use a General Permit

Available general permits, including the specific limitations and conditions that apply to each are in Rules 62-330.410 through 62-330.635, F.A.C. General conditions applying to all general permits are in Rule 62-330.405, F.A.C.

Rule 62-330.402, F.A.C., contains the procedures to submit a notice of intent to use a general permit, and how it will be reviewed by the Agencies. Persons wishing to use a GP must complete Form 62-330.402(1), "Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit." This form will provide the Agency with information needed to determine if the requested activity is on state-owned submerged lands and if the activity qualifies for the SPGP (see **section 1.3.1.2**, above). The notice must include:

(a)     A location map(s) of sufficient detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity;

(b)     Documentation of the person's real property interest, as described in section 4.2.3(d) below, over the land upon which the activities subject to the notice will be conducted;

(c)     One set of construction plans, drawings, other supporting documents that depict and describe that the proposed activities qualify for the GP requested; and

(d)     The fee required by Rule 62-330.071, F.A.C.

The notice may be submitted electronically or mailed to the Agency as provided in Rule 62-330.010, F.A.C. See **Appendix A** of this Volume for information on who to contact if you have any questions about whether the proposed activity may qualify for a GP, and **section 4.4**, below, for additional information on submitting notices.

Effective July 1, 2012, and amended April 6, 2016, the Florida Legislature established a general permit in Section 403.814(12), F.S., authorizing certain activities located entirely in uplands having a total project area of less than 10 acres and less than two acres of impervious surface. This is not a general permit under Chapter 62-330, F.A.C., and is not subject to the noticing and review provisions of that chapter. Additional information on that general permit is in **section 3.1.3**, above.

### 4.2.3    Preparing an Application for an Individual or Conceptual Approval Permit

Except as provided in Rule 62-330.054(4), F.A.C., applications for individual and conceptual approval permits must be made on Form 62-330.060(1), "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands," available at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/forms-environmental-resource or from the Internet site or office of any of the Agencies (see **Appendix A of this Volume**). It is designed so an applicant will need to complete only those sections applicable to the type of activity proposed. The form requests site and design information needed:

- To distribute, process, and evaluate whether the application meets the standards and criteria for issuance;

- To determine if the requested activity is on state-owned submerged lands, and whether it qualifies for any applicable authorization to use and occupy those lands; and

- To determine whether the activity qualifies for the SPGP (see **section 1.3.1.2, above**).

The submitted application must contain one original mailed or an electronic submittal of the materials requested in the applicable sections of the form, and such other information as is necessary to provide reasonable assurance that the activities proposed in the application meet the conditions for issuance under Rule 62-330.301, F.A.C., the additional conditions for issuance under Rule 62-330.302, F.A.C., and the applicable provisions of the Applicant's Handbook. Those materials include:

(a)     Location maps of detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity;

(b)     Construction plans, drawings, calculations, and other supporting documents that depict and describe the proposed activities;

(c)   The applicable processing fee in accordance with Rule 62-330.071, F.A.C.;

(d)   Documentation of the applicant's real property interest over the land upon which the activities subject to the application will be conducted. Interests in real property typically are evidenced by:

   1.   The applicant being the record title holder.

   2.   The applicant being the holder of a recorded easement conveying the right to utilize the property for a purpose consistent with the authorization requested in the permit application.

   3.   An entity having the right to exercise the power of eminent domain and condemnation authority, in which case the permit shall contain a provision that work cannot begin until proof of ownership is provided to the Agency.

   4.   An entity having a contract to purchase the real property included in the application, in which case the permit shall contain a provision that work cannot begin until proof of ownership is provided to the Agency. The contract to purchase shall be provided to the Agency (financial terms can be redacted). If the contract to purchase does not authorize the Agency to access, inspect, and sample the property, then the applicant shall provide written authorization from the record title holder to enable staff of the Agency to legally access, inspect, and sample the property in accordance with section 4.2.3(f) below.

   5.   An entity that has either obtained or has an application to obtain a permit or other legal authorization from the Florida Department of Transportation, a Water Management District, or local government authorizing construction, operation, and maintenance of parts of the proposed system that will be located on right of way property.

   6.   A lessee of the property included in the application, provided at least one of the following exists:

      a.   The record title owner is a co-applicant on the application.

      b.   The applicant provides a copy of a written agreement with a governmental entity that states that the governmental entity agrees to accept the transfer of the permit if the lease is revoked, terminated or expires and that the governmental entity will accept the operation and maintenance phase of the permit. Documentation must be provided that the governmental entity has a recorded right of entry agreement or access easement to enter upon the property for these purposes.

      c.   The applicant provides a recorded restrictive covenant or other recorded instrument demonstrating that the record title holder agrees to be responsible for the permanent operation and maintenance of the system upon revocation, termination or expiration of the lease.

      d.   Where the lease is on lands owned by a water management district, the government of the State of Florida or the United States, the lessee shall:

1]    Provide a bond made payable to the Agency in an amount sufficient to construct the stormwater management system, or provide other measures suitable for ensuring that the stormwater management system can be completed, removed, or abandoned in the event the lessee, at any time, fails to or cannot complete construction of the system;

2]    Provide an agreement from a person in accordance with Part V of this Volume who agrees to be responsible for operation and maintenance of the system in the event the lessee, at any time, fails to or can no longer operate and maintain the system; or

3]    Provide an easement or other legally-binding document from the landowner or other person with sufficient real property interest in the lands subject to the application giving the Agency and other persons who require it, a right of entry for purposes of inspecting for compliance, monitoring, operating and maintaining, and completing construction as needed to comply with the permit, if issued.

7.    Alternatives such as a recorded option agreement, a judgment of the court, or a certificate of title issued by a clerk of the court, that show that the person or entity has sufficient interest in, or control over, the property to construct, alter, operate, and maintain the project in accordance with Chapter 62-330, F.A.C. Except when it cannot reasonably be provided (such as when there is a court determination, or an inability to locate the record title holder), the recorded documentation shall indicate that the record title holder agrees to accept responsibility for the permit, is agreeable to accept the transfer of the permit, and that the Agency has third party enforcement rights to enforce the terms and conditions of the permit on the property.

8.    Additional persons may be included as co-applicants, provided that one of the persons listed in 1. through 6., above is included as an applicant.

(e)    Applications must be signed by an entity having sufficient real property interest over the land upon which the activities subject to the application will be conducted as described in section 4.2.3(d), above. The applicant may designate an agent to provide materials in support of the application on its behalf. If the applicant is a non-individual entity required by statute or rule to register with the State of Florida Secretary of State, it must be registered, and the person signing the application must have the legal authority to bind the entity with the terms, conditions, and liabilities associated with such application and subsequent permit, if issued. Further, any such entity must maintain their registration with the State of Florida Secretary of State for the duration of the permitted activities.

(f)    Written authorization from the owner, lessee, or easement holder for staff of the Agency to enter onto, inspect, and conduct sampling or monitoring of the site that is subject to the application. If this is not possible, the applicant shall secure other means for staff to access the site in a manner that prevents trespass, and to demonstrate how the applicant will obtain approval from the entity having sufficient real property interest over the land subject to the application to perform the activities proposed prior to undertaking the work.

(g)     Where an operating entity described in **section 12.3.1** of this Volume will be different from the permittee, written confirmation is required from the operating entity that they agree to accept responsibility for operation and maintenance of the activity as set forth in the permit, as further set forth in **section 12.3** of this Volume. Written confirmation is not required if the operation and maintenance entity is approved upon issuance of the permit for the construction phase, or in a permit modification.

(h)     Persons requesting to conduct activities on state-owned submerged land must submit satisfactory evidence of sufficient upland interest in accordance with paragraph 18-21.004(3)(b), F.A.C. (March 2, 2012), and are advised that necessary consent, lease, easement, or other form of authorization as required under the authority of Chapter 253 and, as applicable, Chapter 258, F.S., and the rules adopted thereunder, is required prior to initiating such work. In addition to demonstrating ownership or control in the land as described above, the applicant also must demonstrate that they have the riparian rights to the state-owned submerged lands necessary to conduct the proposed activity under paragraph 18-21.004(3)(b), F.A.C.

For construction of docks and piers when satisfactory evidence of sufficient upland interest is not fee simple title, the applicant's interest must cover the entire shoreline of the adjacent upland fee simple parcel or 65 feet, whichever is less, except as otherwise provided in paragraph 18-21.004(1)(d), F.A.C.

(i)     A separate mangrove alteration or trimming permit under Sections 403.9321 through 403.9333, F.S., is not required when the mangrove trimming or alteration is authorized and conducted as part of and in conformance with a general or individual environmental resource permit, or when necessary to construct projects in conformance with an exemption or general permit under Chapter 62-330, F.A.C.

Submittal of the application is discussed in **section 4.4, below**.

## 4.2.3.1  Conceptual Approval Permits

An application for a conceptual approval permit shall be prepared and submitted in the same manner, and using the same form as an individual permit, as discussed in **section 4.2.3.**, above, except that the application shall be supplemented with the materials discussed in either Rule 62-330.055 or 62-330.056, F.A.C., as applicable.

**4.2.3.2  Mitigation Bank Permits**

An application for a mitigation bank permit shall be prepared and submitted in the same manner, and using the same form as an individual permit, as discussed in Section 4.2.3., above, except that the application shall be supplemented with the materials required in Chapter 62-342, F.A.C.

**4.3    Processing Fees**

Processing fees are required for the Agency to process each permit application, permit modification, petition, and submittal of requests to determine qualification for a general permit or exemption under Chapter 62-330, F.A.C. These fees must be submitted as prescribed by Rule 62-330.071, F.A.C. Additional information on the fees of the Agencies is in **Appendix D of this Volume**.

Processing fees are non-refundable except for the amount of any fees paid that exceed the amount specified for the application or notice under review, as specified above.

An application or notice submitted without the fee will not be considered complete; an Agency shall not be compelled to issue the requested permit, verify qualification for a general permit or exemption, or issue the requested petition until the complete processing fee is paid.

Additional information on processing fees associated with applications and notices is in sections 5.3.2, 5.3.3, 5.3.4, 5.5.3.1, 5.5.3.3, 5.5.3.4, 5.5.3.5 and 5.5.3.7, below.

**4.4    Submittal of Applications, Notices, and Petitions**

All applications, notices, and petitions shall be submitted by mail or via e-permitting (where available) to the correct office of the applicable Agency (see **Appendix A of this Volume),** in accordance with the Operating Agreement or Delegation Agreement between the Agencies [see subsection 62-330.010(5), F.A.C.], except that:

(a)     Submittal of an application or notice for a activity, a portion of which extends beyond the boundary of more than one District, is subject to Section 373.046(6), F.S. It provides that the responsible Agency will be determined based on factors such as the amount and geography of the activity's land area, the location of the activity's discharge or discharges, the type of activity, prior agency history, and the terms and conditions of the Operating Agreement in effect between the Agencies. In the case of activities that are the responsibility of DEP, the Director of the district office or Administrator of the Program processing the application shall have the authority to take the final agency action on the entire application.

(b)     Applications, notices, and requests for activities that are within the geographic limits of a local government delegated responsibility for the ERP program under Chapter 62-344, F.A.C., shall be submitted to that local government or to the Agency in accordance with the terms of the Delegation Agreement with that local government incorporated by reference in Chapter 62-113, F.A.C. The text of those agreements may be viewed at https://floridadep.gov/ogc/ogc/content/operating-agreements.

Paper and electronic copies of applications and notices must be filed during normal business hours with the Agency. Paper and electronic copies of applications or notices received after 5:00 PM (local time) of the office to which the submittal is made shall be deemed as filed as of 8:00 AM on

the next regular business day. Electronic applications or notices to the NWFWMD are received at the District headquarters, which is in the Eastern time zone.

**5.0      Processing of, and Agency Action on, Applications and Notices**

**5.1      General Procedures**

The Agencies are required to follow procedural statutes and rules to review and act on applications and notices, and to provide rights to the public to object to Agency decisions: Chapter 120, F.S. (Florida Administrative Procedures Act), Chapters 28-101 through 28-110, F.A.C. (Uniform Rules of Procedure), and each Agency's adopted Exceptions to the Uniform Rules of Procedure. Additional specific provisions for processing applications and notices under Chapter 62-330, F.A.C., are summarized below.

Except as provided in subsection 62-330.054(4), F.A.C., individual and conceptual approval permits are processed using Rule 62-330.090, F.A.C., and **sections 5.5 through 5.5.5.6, below,** Those sections also address how components of an application that qualify for an exemption or general permit will be processed when they are included in an application for an individual permit.

**5.2      Review of an Exemption Determination Request**

Rule 62-330.050, F.A.C., and **section 4.2.1** above, describe how the Agencies evaluate whether an activity qualifies for an exemption. Persons are reminded that, except as noted in **section 4.2.1**, above, activities that qualify for an exemption may be conducted without formal review or action by the Agency.

**5.3      Review of Request to Use a General Permit**

**5.3.1**   General permits are granted by rule to authorize construction, operation, maintenance, alteration, abandonment, or removal of certain minor projects that have been determined to produce no more than minimal individual and cumulative impacts, provided:

(a)     The activity is designed and implemented to meet the specific limits and conditions in the applicable general permit in Rules 62-330.410 through 62-330.635, F.A.C.

(b)     The activity complies with all the general conditions in Rule 62-330.405, F.A.C.; and

(c)     The person wishing to use a general permit submits to the Agency a completed Form 62-330.402(1), "Notice of Intent to Use an Environmental Resource General Permit", and as discussed in **section 4.2.2, above.**

**5.3.2**   Upon receipt, Agency staff will review the notice form to determine if it provides the information needed to demonstrate qualification for the general permit, including the processing fee required in Rule 62-330.071, F.A.C. If it does not qualify or contain all the required information, the Agency will mail a notification to the person within 30 days of receiving the notice form that the notice contains errors or omissions, or does not qualify for the requested general permit. If the Agency does not mail such notification within 30 days of receipt of the original or an amended notice to use the general permit, the person is authorized to conduct the activity authorized by the general permit, except where the general permit specifically requires Agency acknowledgement of qualification prior to proceeding with construction (see the general permits in Rules 62-330.410, 62-330.412, 62-330.417, 62-330.450, 62-330.475, and 62-330.630, F.A.C.)

5.3.3    The person submitting the notice form will have 60 days from the date of the Agency notification of non-qualification to correct the errors or deficiencies. An additional notice fee will not be required if the correct fee was originally submitted and information demonstrating qualification for the general permit is submitted to the Agency within the 60-day time limit.

5.3.4    If the person decides not to pursue the general permit and instead submits an application for an individual permit for the activity within 60 days of the Agency's notification of non-qualification for the general permit, the Agency will apply the fee submitted for the general permit to the application fee for the individual permit.

5.3.5    Within three business days of receipt of a general permit notice for general permits under Rule 62-330.474, 62-330.475, or 62-330.600, F.A.C., the Agency will send a copy of the notice form to the FWC.

5.3.6    Activities conducted under a general permit are certified to comply with applicable state water quality standards in Section 401, Public Law 92-500 and 33 USC Section 1341, and constitute a finding of consistency concurrence with the state's coastal zone management program

## 5.4    Publishing Notices of Exemptions and General Permits

The Agency will not publish in the newspaper, or require the person requesting qualification for an exemption or general permit to publish notice of receipt of, or Agency action on, the request. The Agency shall provide notice of receipt of permit applications, including notices of intent to use general permits, to persons who have requested to receive such notice within a geographic area in accordance with Section 373.413(3), F.S. Such notice may be provided by e-mail or regular mail. An Agency may require the use of an existing online notification system to request and receive such notices, except where the requestor demonstrates a technical or financial hardship. Such notice will not be directly provided for notice of receipt or Agency action on exemption verifications unless they are part of an application for a permit. Any person who requests to inspect public records will be furnished information in accordance with Section 119.07, F.S.

Persons qualifying for an exemption or general permit are advised that interested parties who become aware of Agency action verifying or denying use of the exemption or general permit may have the rights, under Chapter 120, F.S., to petition for an administrative hearing until their point of entry closes. For this reason, it may be in the best interest of the person proposing the activity to publish, at its expense, a one-time "Notice of Qualification for an Exemption" or "Notice of Qualification to Use a General Permit" in a newspaper of general circulation (under Section 50.031, F.S.) in the county where the activity is located.

## 5.5    Processing Individual and Conceptual Approval Permit Applications

## 5.5.1    Initial Receipt

Processing of an individual permit application, including an application for a conceptual approval or mitigation bank permit, commences upon receipt of the application (see **section 4.2.3**, above), submitted as described in Rule 62-330.060, F.A.C., and **section 4.4, above.**

## 5.5.2    Distribution of Applications and Notices to the Public Prior to Agency Action

Receipt of the application form 62-330.060(1) by the Agency serves to initiate the application process for four separate authorizations:

(a)    Application for an environmental resource permit. This will include distribution of all or parts of the application to interested parties and state agencies who have requested receipt of such application, or notice of its receipt;

(b)    Application for a State 404 Program permit, if the activities will occur within state-assumed waters regulated under Chapter 62-331, F.A.C. This will include distribution of a public notice to interested parties, adjacent property owners, the general public, and applicable state and federal agencies as provided in Chapter 62-331, F.A.C.;

(c)    Application for a State Programmatic General Permit (SPGP), if applicable; and

(d)    Application to use state-owned submerged lands, when the activities appear to be located on, or have the potential to be located on, such lands.


### 5.5.2.1    Distribution to the USACE

As of October 1, 2017, copies of the application form are not forwarded to the USACE. A separate USACE permit may be required for the activity. If a USACE permit is required and the project does not qualify for the SPGP, applicants should send a separate application form to the USACE on the appropriate federal application form. Additional information about federal permitting can be found online in the Jacksonville District Regulatory Division Sourcebook.


### 5.5.2.2    Distribution to Other Agencies

The applicable sections of the application will be distributed to certain state agencies with statutory authority under Florida's approved Coastal Zone Management Program within five working days of receipt of the application, including the Florida Fish and Wildlife Conservation Commission (FWC) and the Department of State, Division of Historical Resources. Those agencies may comment on the application as it is being processed, and may request additional information be provided to them so that they may fully evaluate the application. The Agencies shall consider comments that are timely received in the course of processing the application. As provided by Section 373.428, F.S., these agencies also may object to issuance of the project under the Coastal Zone Management Act. The applicant is not responsible for distributing the application to the above commenting agencies, but may be requested to supply information to them; the applicant is requested to always copy the processing Agency with any materials supplied to those other agencies in response to information related to the application.


### 5.5.2.3    Publishing Notice of Receipt of an Application for an Individual Permit

(a)    Upon receipt by the District of an application for an individual permit to construct or alter a dam, impoundment, reservoir, or appurtenant work, it shall, cause a notice of receipt of the

application to be published in a newspaper having general circulation (meeting the requirements of Section 50.031, F.S.) within the affected area in accordance with Sections 373.116, F.S., 373.118(3), 373.146, and 373.413(3), F.S. In addition, the District may also publish such notice on its website.

(b)    When DEP processes the application, it may publish notice on its website if DEP determines that the activities are reasonably expected to result in a heightened public concern or likelihood of request for administrative proceedings. DEP will base that determination on the size, potential effect on the environment or the public, potential controversial nature, and the location of the activities.

(c)    For applications processed by any Agency, the Agency will provide a notice of receipt of an application to any person who has filed a written request for notification of any pending applications affecting a designated area. Such notice will contain the name and address of the applicant; a brief description of the proposed activity, including any mitigation; the location of the proposed activity, including whether it is located within an Outstanding Florida Water or aquatic preserve; a map identifying the location of the proposed activity; a depiction of the proposed activity; a name or number identifying the application and the office where the application can be inspected; and any other information required by rule. Such persons have certain rights to comment on or object to applications as they are being processed. Again, applicants are not responsible for performing this distribution.

Persons who wish to have their names placed on that mailing list may do so by contacting the local office of the Agency. An Agency may require the use of an existing online notification system to request and receive such notices, except where the requestor demonstrates a technical or financial hardship. Pending applications and their current status also may be viewed at https://floridadep.gov/sec/sec/content/permits-applications-under-review (for DEP), or at the Internet site of the applicable District.

(d)    When noticing is required under Section 253.115, F.S., for activities requiring a lease or easement in, on, or over state-owned submerged lands, the Agency, as staff to the Board of Trustees of the Internal Improvement Trust Fund, is required to provide notice of all property owners within a 500-foot radius of the proposed lease or easement boundary. In such a case, the applicant will be required to forward to the Agency a list of names and addresses from the latest county tax assessment roll in mailing label format. In lieu of the Agency providing notice of application for lease or easement, an applicant may elect to send the notice, provided the notice is sent by certified mail, with the return-receipt card addressed to DEP or District, as applicable.

### 5.5.3    Request for Additional Information

**5.5.3.1** Within 30 days of receipt of the application (see **section 4.2.3., above**) for an individual or conceptual approval permit, and within 30 days of receipt of any additional information provided by the applicant in response to the Agency's timely request for information, the Agency will determine if it contains:

(a)    The applicable information requested in Rule 62-330.060, F.A.C., and Sections A through H, as applicable, of the application;

(b)    The fee required in Rule 62-330.071, F.A.C.;

(c)     Information or exhibits needed to clearly and legibly depict and describe the proposed activity, and its location; and

(d)     Any other additional information to provide the reasonable assurances needed by the Agency to determine if the proposed activity meets the conditions for issuance of a permit in accordance with Rules 62-330.301 and 62-330.302, F.A.C., and the Applicant's Handbook, as well as the information that may be required to concurrently process applications located on state-owned submerged lands in accordance with Rule 62-330.075, F.A.C. Applications for a conceptual approval permit also will be evaluated for the information required in either Rule 62-330.055 or 62-330.056, F.A.C., as applicable. Applications for a mitigation bank permit also will be evaluated for information required in Chapter 62-342, F.A.C.

The Agency may request only that information needed to clarify the additional information, or to answer new questions directly related to the additional information. The request will include citation to the rule that authorizes the Agency to request information on each item pursuant to Section 373.417, F.S.

The applicant may voluntarily submit a written waiver of the above 30-day time clock requirement to allow the Agency additional time to determine if additional information is required; the Agency is not obligated to accept the waiver or to delay sending the request for additional information.

5.5.3.2   An application will be considered incomplete if it does not include all the above items, or if it appears to contain conflicts or errors. If an agent completed the application on behalf of the applicant, the Agency will request any needed information from the agent, and will provide a copy of the request to the applicant. For purposes of the discussion that follows, the term "applicant" will also refer to the agent working on behalf of the applicant as identified in the application.

5.5.3.3   The Agency will inform the applicant within 30 days of receipt of the application, or within 30 days of receipt of additionally received information, whether the proposed activities are exempt from permitting or qualify for a general permit. Any processing fees received in excess of those required under Rule 62-330.071, F.A.C., will be refunded.

5.5.3.4   If a project contains a mixture of activities, one or more of which require an individual permit, and one or more of which are exempt from permitting or qualify for a general permit, all of the proposed activities will be considered together to be part of the application for an individual permit, and will be reviewed by the Agency as a whole, unless the applicant specifically requests in writing, prior to or in conjunction with the submittal of the application for an individual permit, that the Agency determine which components of the entire application qualify for an exemption or general permit. In such a case, the applicant must separately pay the processing fee required under Rule 62-330.071, F.A.C., for the Agency to determine qualification for an exemption, a general permit, or both. If the application contains more than one type of activity qualifying for an exemption, only one exemption verification processing fee will be charged in addition to the required permit application fee, as provided in subsection 62-330.050(6), F.A.C. If the application contains more than one type of activity qualifying for a general permit, a processing fee shall be charged for each general permit verification under subsection 62-330.402(2), F.A.C., in addition to the individual permit application fee.

**5.5.3.5**  The applicant shall have 90 days from the date the Agency makes a timely request for additional information to submit that information to the Agency. If an applicant requires more than 90 days to respond, it must notify the Agency in writing of the circumstances, at which time the application shall remain in active status for one additional period of up to 90 days. Additional extensions shall be granted for good cause shown by the applicant. A showing that the applicant is making a diligent effort to obtain the requested additional information, and that the additional time period is both reasonable and necessary to supply the information, shall constitute good cause. In such case, a specified amount of additional time shall be granted at the mutual consent of the Agency and the applicant. If the applicant chooses not to, or is unable to, respond to the request for additional information within the above time frames, the application shall be administratively denied without prejudice. Such denial is not a determination of the merit of an application and does not preclude the applicant from reapplying at a later time. However, the applicant will not receive a refund of processing fees submitted, and the Agency will not apply those processing fees to a subsequently submitted permit application or notice. An applicant who cannot provide requested information within the above time frames is encouraged to withdraw their application before the Agency takes action to deny it.

**5.5.3.6**  The applicant may submit a written request for an application be deemed complete at any time. Upon receipt of such request, the Agency will begin processing the application and will take Agency action to issue or deny the application within 60 days of that date, or within such additional time as may be provided if the applicant voluntarily waives that time clock.

**5.5.3.7**  An applicant may voluntarily request the application be withdrawn prior to Agency action if the applicant does not or cannot provide the requested information or required processing fees within the above time frames. The applicant will not receive a refund of processing fees, but the Agency will apply processing fees submitted for such withdrawn application to the processing fee required for a new application or notice received from the same applicant, for an activity on all or a part of the same parcel, within 365 days of the date the Agency received the request to withdraw the previous application.

**5.5.4**  **Staff Evaluation and Agency Action**

**5.5.4.1**  Agency staff will commence the technical review when the application for an individual permit is complete. Criteria used in the evaluation will include Rules 62-330.075 (if the activity is located on state-owned submerged lands), 62-330.301 and 62-330.302, F.A.C., **Parts II through V of this Volume,** and **Volume II**, as applicable**.**

The decision to issue or deny a permit will be based on a determination of whether the reasonable assurances required in the above rules and the Handbook have been provided, including the provisions for elimination or reduction of adverse impacts to wetlands and other surface waters, and a determination of whether mitigation is appropriate to offset those adverse impacts.

**5.5.4.2**  A permit shall be approved, denied, or subject to a notice of proposed agency action within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application. By the 60-day deadline, or prior to the expiration of a timely filed waiver, the Agency will either issue a permit (or a Notice of Intent to Issue) if the activity meets the criteria in **section 5.5.4.1, above,** or it will issue a Notice of Denial (or Notice of Intent to Deny) if the activity does not meet the permitting criteria.

**5.5.4.3**  If the Agency determines that the applicant has not provided reasonable assurance that the proposed activity qualifies for issuance of an individual permit, the notice of denial (or notice of intended denial) will explain the basis for the denial, and what changes, in general terms, if any, would address the reasons for denial.

**5.5.5**  **Notice of Agency Action**

**5.5.5.1**  A person may request notice of the intended agency action for a specific application.

**5.5.5.2**  Interested persons, including objectors, may submit information about a proposed activity for Agency review. For Agency staff to properly evaluate the information, those persons are advised to contact the Agency within 14 days of notification of the Agency's receipt of the application if they have questions, objections, comments, or information regarding the proposed activity. Persons may also request public records in accordance with Section 119.07, F.S.

**5.5.5.3**  For applications processed by DEP, it will provide notice of agency action to any person who has filed a written request to be notified of DEP's decision to issue or deny the permit, and to persons who have filed written objections or concerns about the activity. In addition, applicants will be required to publish, at their expense, a one-time notice of the agency decision in a newspaper of general circulation (meeting the requirements of Section 50.031, F.S.) in the county where the activity is located if DEP determines the proposed activities are reasonably expected to result in a heightened public concern or likelihood of request for administrative proceedings. DEP will base that determination on the size, potential effect on the environment or the public, controversial nature, or location of the activities. DEP will furnish the applicant with the notice that is to be published. Notwithstanding DEP's intended agency action, such application shall be denied if the applicant either fails to publish notice, or fails to provide proof of publication within 30 days of DEP's issuance of intended agency action, or within 21 days of the date of publication, whichever occurs sooner. In addition, DEP may also publish such notice on its website.

**5.5.5.4**  For applications processed by a District, the District shall provide notice of agency action or intended agency action to the applicant and to any persons who have requested to receive such notice. The District shall inform the applicant of the right to publish the Agency decision. The District may also publish such notice on its website.

**5.5.5.5**  The Notice of Agency Action, or the permit if there is no prior Notice of Agency Action, will include a notice of rights under Chapter 120, F.S., explaining the time limit for a person to file a petition for a formal administrative hearing.

**5.5.5.6**  Persons who have not been provided with notice of the Agency decision may have the right to petition for an administrative hearing on the activity under Chapter 120, F.S., until their point of entry closes. Therefore, even if not required to publish notice of the Agency's decision, it may be in the applicant's best interest to publish, at its own expense, a one-time notice of the Agency's decision (or intended decision) in a newspaper of general circulation in the county in which the activity is located.

**5.6**  **Activities on State-owned Submerged Lands**

Permit applications (as well as notices requesting qualification for an exemption or general permit) for activities on, or having the potential to be located on, state-owned submerged lands are subject to review by DEP's Division of State Lands for a title determination. Applicants are not responsible for obtaining that determination. If a determination is made that the activity is located on state-owned submerged lands, a separate submerged lands authorization will be required in addition to any required environmental resource permit. The Agency will determine the form of authorization required, and whether such authorization can be approved, as part of the review of the application in accordance with Chapter 253, F.S., and 258, F.S., Chapters 18-18 or 18-20, F.A.C., as applicable, and Chapter 18-21, F.A.C. Processing of individual permit applications for activities on state-owned submerged lands are concurrently processed with the applicable state-owned submerged lands authorization, as described in **section 1.3.3 above**, Rule 62-330.075, F.A.C., and Section 373.427, F.S. For exemptions and general permits, the Agency will attempt to provide the state-owned submerged lands authorization at the same time as the decision to issue, deny, or verify the permit or notice under Chapter 62-330, F.A.C. If the state-owned submerged lands authorizations require execution of a document, such as a lease or easement, construction, alteration, maintenance, or removal of the project should not commence until that document is executed.

**6.0    Duration, Operation, Modification, and Transfer of Permit**

**6.1    Duration of Permits**

**6.1.1    General**

General, individual, and conceptual approval permits are issued with a specified construction phase, as provided in Rule 62-330.320, F.A.C. Upon completion of the construction that is compliant with the terms and conditions of the permit, the permit is then converted to a perpetual operation and maintenance phase. Conversion is either automatic or requires formal action by the Agency; the procedures for the conversion are described below and in Rule 62-330.310, F.A.C. A conceptual approval permit does not authorize construction or operation, but does have an expiration date that is tied to the issuance of subsequent permits for construction or alteration of the activities that are consistent with the conceptual approval permit, as discussed in Rule 62-330.055 and 62-330.056, F.A.C.

**6.1.2    Construction Phase Duration**

**6.1.2.1** General Permits — The construction phase of a general permit is five years and cannot be extended. If construction activities have not been completed within that five year period, a new notice of intent to use the applicable general permit must be submitted, as provided in Rule 62-330.402, F.A.C., and **sections 5.3 through 5.3.6**, above.

**6.1.2.2** Individual Permits — The construction phase of an individual permit typically is five years, but for good cause, may be authorized for a longer duration at the time of issuance of the permit, as described below and in subsection 62-330.320(2), F.A.C. An extension may be requested as a modification to the permit as described in Rule 62-330.315, F.A.C., and **sections 6.1.3 and 6.2**, below.

The construction phase of a permit expires on the date indicated in the permit unless an application is received for an extension of the construction phase prior to expiration of the permit.

If a construction phase is requested for a duration of more than five years, as part of either the initial application or any subsequent modification, the applicant, in each instance, will be required to provide reasonable assurance that:

(a)    The project cannot reasonably be expected to be completed within five years after commencement of construction; and

(b)    The impacts of the activity, considering its nature, size, and any required mitigation, can be accurately assessed and offset where appropriate, and the terms of the permit can be met for the duration of the permit requested.

A mine is an example of a type of project where a construction phase of more than five years is typically requested; in many cases, mine resources are extracted over a period that may exceed 50 years.

**6.1.2.3** A construction phase may include some incidental operation of constructed activities prior to formal conversion to an operation phase. For example, during construction of a stormwater

management system, rainfall events may occur that will discharge stormwater runoff into the system under construction. At such times, the system may be temporarily operated prior to formal conversion to the operation phase, provided such temporary operation does not violate the conditions for issuance of a permit in Rule 62-330.301 and 63-330.302, F.A.C. However, such constructed projects cannot be used for their intended use (such as occupation of a residence, commencement of business transactions for a business, public use of a road, or occupation of parking spaces by the general public within a parking lot) until the project, or the portions of the project that can be operated independently of other portions of the project have been completed and the Permittee has submitted Form 62-330.310(1) "As-Built Certification and Request for Conversion to Operation Phase," in accordance with subparagraph 62-330.350(1)(f)2., F.A.C., certifying as to such completion.

### 6.1.3   Request to Extend the Duration of the Construction Phase after Issuance

After issuance of an individual or conceptual approval permit, *but before the expiration date*, a permittee may request the duration of the permit be extended by sending a permit modification request (electronically or by mail) to the Agency that issued the permit in accordance with Rule 62-330.315, F.A.C., and section **6.2**, below.

If a timely and complete request is received to extend the construction phase of an individual permit, or the duration of a conceptual approval permit, the existing permit shall remain in full force and effect until the Agency takes action on the request for extension. If the request is denied, the permit shall not expire until the last day for requesting review of the Agency order.

### 6.1.4   Operation and Maintenance Phase

The procedures and requirements for converting a permit from the construction phase to the operation and maintenance phase are provided in Rule 62-330.310, F.A.C., the general and special limiting condition in paragraph 62-330.350(1)(g), F.A.C., and **sections 12.1 through 12.2 of this Volume.**

The operation and maintenance phase of all ERPs lasts in perpetuity.

### 6.1.5   Conceptual Approval Permits

The duration of conceptual approval permits is:

The maximum duration of a conceptual approval permit, other than for urban infill and redevelopment, is 20 years, or as otherwise provided in subsection 62-330.056(9), F.A.C., provided authorized construction commences within five years of issuance (see subsection 62-330.056(10), F.A.C.).

The phrases "authorized construction or alteration has begun" in subsection 62-330.056(9), F.A.C., and "construction commenced" in subsection 62-330.056(10), F.A.C., mean that substantive work has been initiated in accordance with a general or individual permit authorizing construction of the project in conformance with the terms and conditions of the conceptual approval permit. Minor clearing, dredging, or filling with an apparent purpose of keeping the permit active will not be considered to meet this requirement.

For urban infill and redevelopment — 20 years, as specified in subsection 62-330.055(7), F.A.C.

**6.2    Modification of Permits**

The permittee may request a modification to an existing, currently valid individual or conceptual approval permit in accordance with Rule 62-330.315, F.A.C., and as summarized below. Changes to activities authorized by a general permit require submittal of a new notice (if the changes result in the project still qualifying for a general permit), or submittal of a new application for an individual permit if the changes cause the activity to exceed the limitations and conditions of the general permit.

6.2.1    Applications for modifications are processed as either minor or major in accordance with Rule 62-330.315, F.A.C., and the following.

(a)    Applications for minor modifications, as described in Rule 62-330.315, F.A.C., other than to modify the permit to reflect a change in ownership or control of the land subject to the permit as provided in subsection 62-330.340(1), F.A.C., and section 6.3.2.1(a)**, below**, may be requested electronically or by letter sent to the Agency that processed the permit. The request must include:

1.    Reference to the permittee name and permit number;

2.    Contact information for the requestor;

3.    A clear statement explaining the nature of the proposed modification

4.    Fully dimensioned or scaled drawings reflecting the proposed modification, if applicable.

(b)    A request to transfer a permit or to add co-permittees to a permit is considered a minor modification, and shall be made in accordance with Rule 62-330.340, F.A.C., and through use of the "Request to Transfer Environmental Resource Permit and/or State 404 Program" Form 62-330.340(1).

(c)    A request that does not qualify as a minor modification is processed as a major modification in accordance with subsection 62-330.315(3), F.A.C.

(d)    Factors that will be considered in determining whether a modification will cause more than minor changes under subsection 62-330.315(2), F.A.C., are whether the proposed activity will:

1.    Increase the project area by more than 10 percent or 1 acre, whichever is less, unless the activities were permitted with stormwater treatment and flood attenuation capability sufficient to meet the permitting requirements for the proposed modification, or unless the increase in project area is to a mitigation bank, in which case any increase in the project area is considered a major modification;

2.    Increase proposed impervious and semi-impervious surfaces by more than 10 percent or 0.5 acres, whichever is less, unless the activities were permitted with stormwater treatment and flood attenuation capability sufficient to meet the permitting requirements for the proposed modification;

3.    Reduce the stormwater treatment or flood attenuation capability of the system, unless the activities were permitted with stormwater treatment and flood

attenuation capability sufficient to meet the permitting requirements for the proposed modification;

4.      Result in additional net loss of regulated floodplain storage;

5.      Result in additional unmitigated impacts to wetlands or other surface waters, unless mitigation is not required pursuant to **section 10.2.2.1 or 10.2.2.2**, below;

6.      Result in more than 10 percent or 0.5 acre, whichever is less, of total additional mitigated impacts to wetlands and other surface waters;

7.      Result in any additional impacts within a designated riparian habitat protection zone;

8.      Cause or contribute to water quality violations that were not anticipated in the issued permit;

9.      Reduce the permitted financial responsibility mechanisms, except in accordance with specific permit conditions that provide for a reduction in such financial responsibility mechanisms;

10.     Result in a net reduction in the area of conservation easement or mitigation within the area which was previously permitted;

11.     Extend the duration of a permit beyond five years from the current permit expiration date except as otherwise provided in Rule 62-330.320(2), F.A.C.;

12.     Require a new site inspection that will require more than minimal staff time to conduct;

13.     Lead to substantially different impacts to the water resources or overall objectives of the District or Department, unless they lessen the impacts of the original permit; or

14.     Otherwise substantially alter the design of the activities or the permit conditions.

(e)      An application for a permit or a request to construct a phase of a project pursuant to Rule 62-330.056, F.A.C., is not a minor modification of the conceptual approval permit.

(f)      Requests to use or release mitigation bank credits shall be reviewed as a minor modification of the relevant mitigation bank permit.

(g)      All modification requests must include payment of the processing fee under Rule 62-330.071, F.A.C.

## 6.3     Transfers of Permits and Changes in Ownership

### 6.3.1     General permits

Projects constructed in accordance with the terms and conditions of a general permit are automatically authorized to be operated and maintained by the permittee and subsequent owners in accordance with subsection 62-330.340(1), F.A.C., and do not require a modification request to the Agency upon change in ownership.

### 6.3.2    Individual and Conceptual Approval Permits

**6.3.2.1**  A modification to an individual or conceptual approval permit is required to reflect any sale, conveyance, or other transfer of ownership or control of the real property, project, or activity covered by the permit, except for transfer to the operation and maintenance entity approved in the permit. Ownership must be demonstrated in accordance with **sections 4.2.3(d) and (e), above**. One of two procedures below is to be used, depending on whether the permit is in the construction phase or the operation and maintenance phase and the timing of the request:

(a)      Upon transfer of ownership or control of the entire real property, project, or activity covered by a permit that is in the operation and maintenance phase, transfer of the permit to the new owner or person in control is automatic if the permittee provides the agency with written notice within 30 days of the change in ownership or control, except as otherwise provided in subsection 62-330.340(1), F.A.C.

(b)      In all other situations a permit modification must be processed under subsections 62-330.340(2) through (4), F.A.C.

A request to transfer a portion of a permitted project shall also include a demonstration that either that portion of the project is capable of functioning independently in compliance with all conditions for permit issuance, or that the transferee has sufficient legal and ownership interest (such as drainage easements, cross drainage agreements or other agreements) to allow the transferee to operate and maintain all other portions of the project when necessary.

### 6.4    Removal and Abandonment

An owner of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works wishing to abandon or remove such project is subject to the provisions of Section 373.426, F.S.

**7.0    Determinations of the Landward Extent of Wetlands and Other Surface Waters**

**7.1    Methodology**

Determinations of the landward extent of wetlands and other surface waters shall be performed using Chapter 62-340, F.A.C., as ratified under Section 373.4211, F.S.

Three types of determinations are available:

(a)    A formal determination, based on a certified survey, an approximate delineation, or a combination thereof, as discussed in **sections 7.2 through 7.2.9**, below;

(b)    An informal determination, as discussed in **section 7.3**, below; and

(c)    A delineation, identification, or verification as part of a request for verification of an exemption, notice of intent to use a general permit, or application for an individual or conceptual approval permit.

**7.1.1    Data Form**

Agency staff shall use Form 62-330.201(1), F.A.C., "Chapter 62-340, F.A.C. Data Form, (effective date), incorporated by reference in Rule 62-330.201(1), F.A.C., to document verification of determinations of the landward extent of wetlands and other surface water for notices and applications for ERP permits and formal or informal determinations of the landward extent of wetlands and other surface waters. The "Chapter 62-340, F.A.C. Data Form Guide" in Appendix J, the "62-340, F.A.C. Data Form Instructions", in Appendix K, and the "Florida Wetland Delineation Manual", which is available for download on the Department website, may be used to assist staff and other environmental professionals in completing the form and performing delineations.

Any time a regulatory agency concludes or determines that an area is a non-wetland surface water, wetland, or upland at least one data point should be documented, *i.e.*, once a conclusion informally or formally has been made by the regulatory agency at least one complete data form supporting that conclusion is required.

The number of data forms required will depend on the size and variability of the site inspection area. There is no size threshold or maximum number of data forms required for an inspection site. Reasonable scientific judgement should be used to determine the number of required data forms on a case by case basis.

(a)    For the delineation of the landward extent of wetlands and other surface waters, at least one delineation data point along the boundary shall be verified and documented by the regulatory agency during the visual site inspection pursuant to Chapter 62-340.100(1), F.A.C. Documentation of a delineation data point shall include two data forms; one representative of the waterward area adjacent to the data point, the other representative of the landward or upland area adjacent to the data point. The two complete data forms at a delineation data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340, F.A.C., and changes in evidence used to determine the boundary delineation at that point.

A delineation data point will be documented for each homogeneous boundary within the site inspection area. If all delineation boundaries on site are homogenous in character, one data point is sufficient for documentation. One delineation data point representative of homogeneous boundaries found in other locations throughout the site is sufficient for documentation.

For purposes of the delineation data point, "homogeneous boundary" means all or part of a site delineation that is sufficiently similar in current condition to be delineated determine the landward extent of wetlands and other surface waters with a particular "test(s)" or interpretation of evidence as contemplated in Chapter 62-340, F.A.C. Characteristics that distinguish homogeneous boundaries may include, but are not limited to:

    1.    plant community type,
    2.    surface water type,
    3.    hydrologic indicators,
    4.    soils,
    5.    alterations to plants, hydrology, or soils,
    6.    hydrologic isolation or connection to waters of the State, or
    7.    other current condition expression which separate it from other boundaries on site.

(b)    For identification or conclusions regarding the absence or presence of a non-wetland surface water, wetland, or upland classification by the regulatory agency within the site inspection area, at least one data form within homogeneous areas of classification shall be verified and documented by the regulatory agency during the visual site inspection pursuant to Chapter 62-340.100(1), F.A.C. Documentation of an identification data point shall include one data form representative of the area of classification. The data form at an identification data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340, F.A.C. and evidence used to determine the upland, wetland, or non-wetland surface water classification.

An identification data point will be documented for each homogeneous area within the site inspection area. If all areas on site are homogenous in character, one data point is sufficient for documentation. One data point representative of homogeneous areas found in other locations throughout the site is sufficient for documentation.

For purposes of the identification data point, "homogeneous area" means all or part of a site inspection area that is sufficiently similar in current condition to classify with a particular "test(s)" or interpretation of evidence as contemplated in Chapter 62-340, F.A.C. Characteristics that distinguish a homogeneous area may include, but are not limited to:

    1.    upland classification,
    2.    wetland classification,
    3.    non-wetland surface water classification,
    4.    hydrologic isolation or connection to waters of the State,
    5.    plant community type,
    6.    surface water type,
    7.    hydrologic indicators,
    8.    soils,
    9.    alterations to plants, hydrology, or soils, or
    10.    other current condition expression which separate it from other areas on site.

**7.2**     **Formal Determinations**

Petitions for formal determinations shall be prepared following the requirements below**,** and submitted to the applicable Agency in accordance with the Operating Agreements incorporated by reference in subsection 62-330.010(5), F.A.C.

**7.2.1**     **Preparation and Submittal of the Petition**

The petition shall contain:

(a)     One copy of completed Form 62-330.201(2), "Petition for a Formal Determination of the Landward Extent of Wetlands and Other Surface Waters," including copies of all items required by that form; and

(b)     The processing fee required in Rule 62-330.071, F.A.C.

(c)     The petition shall be submitted to the Agency office that will have permitting responsibility for the types of activities proposed for the lands subject to the Determination, in accordance with the Operating Agreements incorporated by reference in Chapter 62-113, F.A.C.

**7.2.2**     **Processing the Petition**

(a)     Within 30 days of receipt of a petition for a formal determination of the landward extent of wetlands and other surface waters, and within 30 days of receipt of any additional information submitted by the petitioner in accordance with this subsection, the Agency shall notify the petitioner of any additional information which may be necessary to complete the review of the petition. The applicant may voluntarily submit a written waiver of the above 30-day time clock requirement to allow the Agency additional time to determine if additional information is required. The Agency is not obligated to accept the waiver or to delay sending the request for additional information.

The petitioner shall have 90 days from the date the Agency mails a timely request for additional information to submit that information to the Agency. If a petitioner requires more than 90 days in which to respond to a request for additional information, the petitioner may notify the Agency in writing of the circumstances, at which time the petition shall be held in active status for one additional period of up to 90 days, if approved by the Agency. Additional extensions shall be granted by the reviewing Agency for good cause shown by the petitioner. A showing that the petitioner is making a diligent effort to obtain the requested additional information shall constitute good cause. Failure of a petitioner to provide the timely requested information by the applicable deadline shall result in administrative denial of the petition without prejudice to re-apply.

1.     For petitions processed by DEP, it will complete the determination and issue a notice of intended agency action within 60 days after the petition is deemed complete. The petitioner shall publish, at its own expense, the notice of proposed agency action in a newspaper of general circulation in the affected area. The petitioner shall provide a copy of the proof of publication of the notice of intended agency action to DEP using the format prescribed in subsection 62-110.106(5), F.A.C. The Agency shall send the property owner a copy of the Agency determination if the owner is not the petitioner.

2.      For petitions processed by a District, the District shall complete the determination and shall issue a notice of intended agency action within 60 days after the petition is deemed complete. The petitioner may publish, at its own expense, the notice of proposed agency action in a newspaper of general circulation in the affected area. If published, the petitioner shall provide a copy of the proof of publication of the notice of intended agency action to the District. The District shall send the property owner a copy of the Agency determination if the owner is not the petitioner.

(b)     The petition shall be denied if the Agency determines that the materials submitted to the reviewing agency do not contain all the applicable information required in this subsection, including if the petitioner does not correctly delineate the landward extent of wetlands and other surface waters in accordance with Chapter 62-340, F.A.C. The Agency shall complete the determination and shall issue a notice of intended agency action within 60 days after the petition is deemed complete unless the petitioner provides the reviewing agency with a written waiver of this time limit. A person requesting a formal determination may withdraw the petition without prejudice at any point before final agency action.

(c)     Sections 120.569 or 120.57, F.S., apply to formal determination decisions made by the Agency.

(d)     Prior to the Agency's inspection of real property, the petitioner or its agent shall initially delineate the boundaries of wetlands and other surface waters on the site by flagging the field locations of wetland and other surface water boundaries (for a certified survey or a global positioning system [GPS] approximate delineation), or by depicting the extent of wetlands and other surface waters on the most recent aerials (for an approximate delineation). Limits of the area to be delineated, whether contained within a single property or consisting of multiple properties, shall be clearly marked and easily discernable in the field. This inspection boundary shall be depicted on all aerials and maps clearly identifying the limits of the inspection for the formal determination. An Agency representative will then verify the location of the wetland and other surface water boundaries within the inspection boundary and indicate any necessary adjustments of the petitioner's initial determination to reflect an accurate delineation. When the real property is less than 10 acres, the petitioner may elect to not pre-flag for verification, in which case the reviewing Agency will flag the wetland and other surface water boundaries during its inspection of the site. Verification and documentation of the wetland and other surface water boundaries by the Agency representative shall be conducted in accordance with Chapter 62-340, F.A.C., and section 7.1.1(a), above.

(e)     A petitioner may request a formal determination in the form of a certified survey, an approximate delineation, or combinations thereof, as described below.

1.      When a certified surveyed delineation of the extent of wetlands and other surface waters is used, the survey shall be prepared and certified by a Professional Surveyor and Mapper registered in the State of Florida. The surveyor or the surveyor's representative shall accompany the Agency representative on the delineation verification described in section **7.2.2(f)**, below, and shall have the surveyor survey the verified boundaries of wetlands and other surface waters. The certified survey shall include a legal description of, and acreage contained within, and depict the boundaries of the property for which the determination is sought. The boundaries of wetlands and other surface waters must be witnessed to the property boundaries, and shall be capable of being mathematically reproduced

from the survey. The petitioner must submit to the Agency one electronic copy or three paper copies of the certified survey, along with one copy of the survey depicted on aerial photographs to complete the petition.

2.    When an approximate delineation is used, it shall consist of a depiction of the approximate boundary of wetlands and other surface waters produced by using a GPS, or the boundary of wetlands and other surface waters drawn on rectified aerial photographs, or a combination thereof. The approximate delineation shall be subject to the following:

a.    A range of variability shall be determined for all depictions of approximate wetland and other surface water boundaries by comparing a number of field located flagged points of the delineated wetland and other surface water points field delineated by GPS, to field located and surveyed boundary points. The Agency shall determine the number and location of comparison points using the total linear feet of approximately delineated wetland and other surface water boundaries such that the total number of comparison points reflects at least one specific surveyed comparison point for every 1,000 feet of approximately depicted wetland and other surface water boundary. No fewer than three comparison points shall be performed for each approximate delineation. The applicant may request that artificial waterbodies that were constructed entirely in uplands be excluded from the linear feet calculation when determining the number of required comparison points. This exclusion is limited to artificial waterbodies for which the Agency has confirmed a delineation in accordance with 62-340.600(2)(d), F.A.C., and that meet the definition in paragraph 2.0(a)10 of this Volume, except when the exclusion would result in an approximate delineation with less than three comparison points. For GPS approximate delineations, the petitioner shall provide a survey prepared and certified by a Professional Surveyor and Mapper registered in the State of Florida, to show the relationship of surveyed comparison points to the GPS depicted wetland and other surface water boundaries. The range of variability shall be the greatest deviation measured at the surveyed comparison points. An approximate GPS depiction of wetland and other surface water boundaries cannot be used if the range of variability is equal to or greater than 25 feet.

b.    A range of variability shall be determined for all approximate wetland and other surface water boundaries hand drawn on aerial photographs by comparing a number of specific wetland and other surface water boundary points indicated on the rectified aerial photograph, to field located and surveyed boundary points. The Agency shall determine the number and location of comparison points using the total linear feet of approximately delineated wetland and other surface water boundary such that the total number of comparison points reflects at least one specific surveyed comparison point for every 1,000 feet of approximately delineated wetland and other surface water boundary. No fewer than three comparison points shall be performed for each approximate delineation. The applicant may request that artificial waterbodies that were constructed entirely in uplands be excluded from the linear feet calculation when determining the number of required comparison points. This exclusion is limited to artificial

waterbodies for which the Agency has confirmed a delineation in accordance with 62-340.600(2)(d), F.A.C., and that meet the definition in paragraph 2.0(a)10 of this Volume, except when the exclusion would result in an approximate delineation with less than three comparison points. For approximate wetland and other surface water boundaries hand drawn on an aerial photograph, the petitioner shall provide a specific purpose survey prepared and certified by a Professional Surveyor and Mapper registered in the State of Florida, to show the relationship of surveyed comparison wetland and other surface water boundary points to the aerial photo-interpreted wetland and other surface water boundary points. The range of variability shall be the greatest deviation measured at the surveyed comparison points. An approximate hand-drawn aerial photograph delineation method cannot be used if the range of variability is equal to or greater than 25 feet.

c.      A rectified aerial photograph shall serve as the basis for an approximate delineation hand-drawn on aerial photographs only when the boundaries of wetlands and other surface waters are accurately depicted on the aerial photograph by the clear expression of vegetative or physical signatures of the vegetative communities as verified by ground-truthing. If a submitted rectified aerial photograph does not provide a clear expression of vegetative or physical signatures of the vegetative communities or other surface water features on the property, or cannot be accurately depicted, then the landward extent of wetlands and other surface waters shall be delineated by flagging the boundary, and the formal determination shall be produced using the procedure for a certified survey described above in section 7.2.2(e)1; or by depiction of the approximate wetland and other surface water boundaries field delineated by GPS as described above in section 7.2.2(e)2.a., or a combination thereof.

d.      After any verification and adjustment as required in section **7.2.2(f)**, below, the petitioner shall submit one copy of the following to complete the petition: the hand-drawn wetland and other surface water boundaries on a rectified aerial photograph; or a depiction of the approximate wetlands and other surface waters field-delineated by GPS on a rectified aerial photograph, along with one electronic copy or three paper copies of a survey prepared and certified by a Professional Surveyor and Mapper registered in the State of Florida, to show the relationship of field located surveyed comparison points to the approximate field GPS boundary points or the wetlands and other surface waters boundary drawn on a rectified aerial photograph.

e.      As a condition of an approximate formal determination, when a subsequent permit application includes regulated activities within 200 feet of the landward extent of the approximate delineation, the applicant shall field-establish and flag or stake the exact wetlands and other surface waters boundaries pursuant to Chapter 62-340, F.A.C., at that location for verification by the reviewing Agency. The purpose of the flagging or staking is to identify the line to minimize the potential for unintentional disturbance of the wetlands or other surface waters. If the regulated activities are in such proximity to the field-established line that it is

necessary for the Agency to require the field-established line to be documented as part of the permit application or formal determination, or if required as part of accepting a site-protection instrument proposed by the applicant, the line as field-verified by the reviewing Agency shall be located by a surveyor or mapper registered in the State of Florida. The field-established line does not need to be documented when any of the following exist:

(1)     The project will involve dredging or filling of an entire wetland or other surface water encompassed by the approximate delineation, and the impact meets the requirements of section 10.2.1 of Volume I. If only a portion of the wetlands or other surface waters at that location is proposed for dredging or filling, the need to stake or flag the field-established line or the proposed limits of dredging or filling will be determined by the Agency during processing of the permit application based on factors such as those in (2) through (3) below.

(2)     The precise location of the wetland or other surface water boundary is not needed to demonstrate compliance with section 10.2.7 of Volume I.

(3)     Flagging or staking of the field-established line will not materially affect whether the project impacts can be determined by relying on the approximate delineation.

(f)     Prior to the Agency's inspection of the site the petitioner or their agent shall submit to the reviewing agency a depiction of the delineation of wetlands and other surface waters that have been flagged (for a certified survey or a global positioning system [GPS] approximate delineation) or photointerpreted (for an aerial approximate delineation) on the most recent aerial photographs that depict the property. Verification and documentation of the wetland and other surface water boundaries by the Agency representative shall be conducted in accordance with Chapter 62-340, F.A.C., and section 7.1.1(a), above.

(g)     Pursuant to Section 373.421, F.S., an issued formal determination of the landward extent of wetlands and other surface waters is binding only for the limits of wetlands and other surface waters as defined and delineated under Chapter 62-340, F.A.C.

## 7.2.3   Duration.

A formal determination shall be binding for five years provided physical conditions on the property do not change, other than changes that have been authorized by a permit issued under Part IV, Chapter 373, F.S., so as to alter the boundaries of delineated wetlands or other surface waters during that period.

## 7.2.4   Renewal of Determination. 
A petition for a new formal determination for a property for which a formal determination issued pursuant to this rule already exists shall qualify for a renewal for an additional five years, pursuant to Section 373.421, F.S., at a reduced processing fee under Rule 62-330.071, F.A.C., provided:

**A.H. Volume I**                                                                          **[Effective date]**

(a)     Physical conditions on the property have not altered the boundaries of wetlands or other surface waters during the period of the existing determination, other than changes that have been authorized by a permit issued under Part IV of Chapter 373, F.S. Site conditions shall be documented in accordance with section 7.1.1(a), above;

(b)     The petition is submitted within 60 days prior to the expiration of the existing determination; and

(c)     The methodology in Chapter 62-340, F.A.C., has not been amended since the previous formal determination.

**7.2.5**    **Re-issuance of Determination.** A petition for a new formal determination for a property for which a formal determination was previously issued pursuant to this rule but has since expired shall qualify for a re-issuance for an additional five years at a reduced processing fee under Rule 62-330.071, F.A.C., provided:

(a)     Physical conditions on the property have not altered the boundaries of wetlands or other surface waters during the period of the former determination, other than changes that have been authorized by a permit issued under Part IV of Chapter 373, F.S. (Site conditions shall be documented in accordance with section 7.1.1(a), above);

(b)     The petition is submitted within two years of the expiration of the former determination; and

(c)     The methodology in Chapter 62-340, F.A.C., has not been amended since the previous formal determination.

**7.2.6**    **Revocation of Determination.** The Agency shall revoke a formal determination upon finding that the petitioner has submitted inaccurate information to the Agency such that a substantially different delineation of the boundaries of wetlands or other surface waters would have resulted if the correct information had been submitted (see Section 373.421(4), F.S.).

**7.2.7**    A formal determination issued to a real property owner or other person who has a legal or equitable interest in real property may be transferred to a successor in interest to the party who originally petitioned for the determination. The transfer shall be subject to the existing terms and conditions of the original determination.

**7.2.8**    A copy of the issued formal determination, along with the certified survey depicting the approved wetlands and other surface waters boundaries, shall be sent to the appropriate USACE office and to DEP or the District, as appropriate.

**7.2.9**    Where a petition for a formal determination is requested for lands subject to a violation of Part IV of Chapter 373, F.S., the extent of wetlands and other surface waters will be evaluated as if the violation or non-compliance issue had not occurred.

**7.3**    **Informal Determinations.**

(a)    The Agency may issue informal, non-binding pre-application determinations of wetlands and other surface waters. Such determinations will be performed only as Agency staff time and resources allow. Applicants are strongly advised to contact Agency staff prior to requesting an informal determination, as staff resources to perform these determinations are very limited.

Informal determinations are provided as a public service, and are available only to the property owner, an entity that has the power of eminent domain, or any other person who has a legal or equitable interest in the parcel of property.

(b)    A request for an informal determination by the Agency requires payment of the fee in Rule 62-330.071, F.A.C., but:

   1.    Will be limited to one of the following:

      (a)    Presence or absence identification of wetlands, non-wetland surface waters, or uplands. Verification and documentation shall be conducted in accordance with Chapter 62-340, F.A.C., and section 7.1.1(b), above.

      (b)    Verification of the landward extent of wetlands and other surface waters established using Chapter 62-340, F.A.C., and marked in the field prior to the Agency inspection. Verification and documentation shall be conducted in accordance with Chapter 62-340, F.A.C., and section 7.1.1(a), above.

   2.    Is not an application for a permit.

   3.    Is not subject to the processing review timeframes in Chapter 120 or 373, F.S.

(c)    An informal determination by the Agency, if issued:

   1.    Does not constitute final agency action;

   2.    Is subject to change, and does not bind the Agency, nor does it convey any legal rights, expressed or implied. Persons obtaining an informal pre-application determination are not entitled to rely upon it for purposes of compliance with law or Agency rules.

(d)    An inability of the Agency to perform an informal determination also does not constitute a default of agency action.

## PART II -- CRITERIA FOR EVALUATION

**8.0    Criteria for Evaluation**

**8.1    Purpose**

The criteria explained in this part are those that have been adopted by the Agency in evaluating applications for individual and conceptual approval permits, with the exception of those individual permits described in Rule 62-330.054(4), F.A.C. The staff recommendation to approve any individual or conceptual approval permit will be based upon a determination of whether reasonable assurance has been provided that the activity meets the criteria for evaluation, and whether the applicable permit fee has been submitted. In addition, the staff recommendation to resolve any violation under Chapter 62-330, F.A.C., also will be based upon a determination of whether reasonable assurance has been provided that the activity meets the criteria for evaluation in this part.

General permits are pre-issued, and already contain the limitations and criteria that must be met to qualify to use the specific general permit. Upon receipt of a notice to use a general permit, the Agency's review is limited to determining whether the notice complies with the terms and conditions of the pre-issued permit, in accordance with Chapter 62-330, F.A.C., and whether the applicable permit fee has been submitted.

**8.2    Criteria for Evaluation**

**8.2.1**    To obtain an individual or conceptual approval permit, an applicant must give reasonable assurance that the following major standards contained in Sections 373.042, .413, .414, .416, .426, .429, .4595, F.S., are met:

(a)    The construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work or works will not be harmful to the water resources of the District or Department;

(b)    The operation or maintenance of any stormwater management system, dam, impoundment, reservoir, appurtenant work or works will not be inconsistent with the overall objectives of the District or Department and will not be harmful to the water resources of the District or Department;

(c)    The abandonment or removal of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works will not be inconsistent with the overall objectives of the District or Department; and

(d)    Compliance with applicable additional basin criteria will not be inconsistent with the overall objectives of the District or Department.

**8.2.2    All Individual and Conceptual Approval Permits**

Generally, to obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of a project will meet the Conditions for Issuance in Rule 62-330.301, F.A.C., the applicable Additional Conditions for Issuance in Rule 62-330.302, F.A.C., and the requirements of this Volume, and the applicable parts of Volume II.

**A.H. Volume I**                                                                                          **[Effective date]**

However, when an activity requires an individual permit solely pursuant to section 1.2.3 of Volume II for the SJRWMD, the permit application for such activity shall be reviewed and acted upon in accordance with that section.

### 8.2.3    Activities Discharging into Waters That Do Not Meet Standards

In instances where an applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, and the activity will cause or contribute to this existing condition, mitigation for water quality impacts can consist of water quality enhancement that achieves a net improvement. In these cases, the applicant must propose and agree to implement mitigation measures that will cause net improvement of the water quality in the receiving waters for those contributed parameters that do not meet water quality standards.

### 8.2.4    Flood Damage

Activities shall not cause adverse flooding. Information on design and performance standards to avoid and minimize flood damage is contained in Volume II specific to the geographic area covered by each District.

### 8.2.5    Storage and Conveyance

Floodways and floodplains, and levels of flood flows or velocities of adjacent streams, impoundments or other water courses must not be altered so as to adversely impact the off-site storage and conveyance capabilities of the water resource. Projects that alter existing conveyance systems (such as by rerouting an existing ditch) must not adversely affect existing conveyance capabilities. Also, the applicant shall provide reasonable assurance that proposed velocities are non-erosive or that erosion control measures (such as riprap and concrete lined channels) are sufficient to safely convey the flow. Information on design and performance standards to achieve storage and conveyance requirements are in Volume II specific to the geographic area covered by each District.

### 8.2.6    Low Flow and Base Flow Maintenance

Flows of adjacent streams, impoundments, or other watercourses must not be decreased so as to cause adverse impacts. Information on design and performance standards to achieve low flow and base flow maintenance requirements are contained in Volume II specific to the geographical area covered by each District.

### 8.2.7    Mine Stormwater Management Systems Permitted by DEP

Appendix I in this Volume contains additional criteria when a mine pit is to be used as part of a stormwater management system during mining and reclamation. That Appendix is applicable only for mines for which DEP has permitting, compliance, and enforcement responsibilities under the Agency Operating Agreements, but is not applicable to borrow pits. Specific evaluation criteria, including pre-treatment of stormwater runoff prior to stormwater entering the mine excavation area (mine pit) is needed to provide reasonable assurance that water quantity and quality requirements under Chapter 62-330, F.A.C., are met. The applicant for such a system is strongly encouraged to contact the Department's Mining and Mitigation staff to arrange a pre-application review meeting to discuss project design and monitoring requirements.

**8.3      State Water Quality Standards**

**8.3.1      Surface Water Quality Standards**

State surface water quality standards are set forth in Chapters 62-4 and 62-302, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), 62-4.242(2) and (3), F.A.C., and Rule 62-302.300, F.A.C., and the special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C.

**8.3.2      Ground Water Quality Standards**

State water quality standards for ground water are set forth in Chapter 62-520, F.A.C. In addition to the minimum criteria, Class G-I and G-II ground water must meet primary and secondary drinking water quality standards for public water systems, which are established pursuant to the Florida Safe Drinking Water Act, Sections 403.850 through 403.864, F.S., and are listed in Rules 62-550.310 and 62-550.320, F.A.C.

Only the minimum criteria apply within a zone of discharge, as determined in Rule 62-520.400, F.A.C.

**8.3.3      How Standards are Applied**

The quality of waters discharged to receiving waters is presumed to meet the surface water quality standards in Chapter 62-302, F.A.C., and Rule 62-4.242 and 62-4.244, F.A.C., and the ground water standards in Chapter 62-520, F.A.C., if a project is permitted, constructed, operated, and maintained in accordance with Chapter 62-330, F.A.C., this Volume, and the applicable parts of Volume II.

**9.0    RESERVED**

## PART III – ENVIRONMENTAL

### 10.0    Environmental Considerations

### 10.1    Wetlands and other surface waters

Wetlands are important components of the water resources in the state because they often serve as spawning, nursery and feeding habitats for many species of fish and wildlife, and because they often provide important flood storage, nutrient cycling, detrital production, and recreational and water quality functions. Other surface waters, such as lakes, ponds, reservoirs, other impoundments, streams, rivers, and estuaries, also provide such functions and in addition may provide flood conveyance, navigation, recreation, and water supply functions to the public. Not all wetlands or other surface waters provide all of these functions, nor do they provide them to the same extent. A wide array of biological, physical and chemical factors affect the functioning of any wetland or other surface water community. Maintenance of water quality standards in applicable wetlands and other surface waters is critical to their ability to provide many of these functions. It is the intent of the Agency that the criteria in **sections 10.2 through 10.3.8, below,** be implemented in a manner that achieves a programmatic goal, and a project permitting goal, of no net loss in wetland or other surface water functions. This goal shall not include projects that are exempt by statute or rule, or that are authorized by a general permit. Unless exempted by statute or rule, permits are required for the construction, alteration, operation, maintenance, abandonment, and removal of projects so that the Agency can conserve the beneficial functions of these communities. The term "project" includes areas of dredging or filling, as those terms are defined in Sections 373.403(13) and 373.403(14), F.S.

### 10.1.1    Environmental Conditions for Issuance

The Agency addresses the conservation of these beneficial functions in the permitting process by requiring applicants to provide reasonable assurances that the following conditions for issuance of permits, set forth in Rules 62-330.301 (Conditions for Issuance) and 62-330.302 (Additional Conditions for Issuance), F.A.C., are met. Applicants must provide reasonable assurance that:

(a)    A regulated activity will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters [paragraph 62-330.301(1)(d), F.A.C.];

(b)    A regulated activity located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such an activity significantly degrades or is within an Outstanding Florida Water, that the regulated activity will be clearly in the public interest [subsection 62-330.302(1), F.A.C.];

(c)    A regulated activity will not adversely affect the quality of receiving waters such that the water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including any antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), subsections 62-4.242(2) and (3), and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated [paragraph 62-330.301(1)(e), F.A.C.];

(d)    A regulated activity located in, adjacent to or in close proximity to Class II waters or located in waters classified by the Department of Agriculture and Consumer Services as approved, restricted, conditionally approved, or conditionally restricted for shellfish harvesting will

comply with the additional criteria in **section 10.2.5, of this Volume** [paragraph 62-330.302(1)(c), F.A.C.];

(e)      The construction of vertical seawalls in estuaries and lagoons will comply with the additional criteria in **section 10.2.6, of this Volume** [paragraph 62-330.302(1)(d), F.A.C.];

(f)      A regulated activity will not cause adverse secondary impacts to the water resources [paragraph 62-330.301(1)(f), F.A.C.]; and

(g)      A regulated activity will not cause unacceptable cumulative impacts upon wetlands and other surface waters [paragraph 62-330.302(1)(b), F.A.C.].

## 10.2    Environmental Criteria

Compliance with the conditions for issuance in **section 10.1.1, above,** will be determined through compliance with the criteria explained in **sections 10.2 through 10.3.8, below**.

### 10.2.1    Elimination or Reduction of Impacts

Protection of wetlands and other surface waters is preferred to destruction and mitigation due to the temporal loss of ecological value and uncertainty regarding the ability to recreate certain functions associated with these features. The following factors are considered in determining whether an application will be approved by the Agency: the degree of impact to wetland and other surface water functions caused by a proposed activity; whether the impact to these functions can be mitigated; and the practicability of design modifications for the site that could eliminate or reduce impacts to these functions, including alignment alternatives for a proposed linear system. Design modifications to reduce or eliminate adverse impacts must be explored, as described in **section 10.2.1.1, below**. Adverse impacts remaining after practicable design modifications have been made may be offset by mitigation as described in **sections 10.3 through 10.3.8, below**. An applicant may propose mitigation, or the Agency may suggest mitigation, to offset the adverse impacts caused by regulated activities as identified in **sections 10.2 through 10.2.8.2, below**. To receive Agency approval, an activity cannot cause a net adverse impact on wetland functions and other surface water functions that is not offset by mitigation.

10.2.1.1    Except as provided in **section 10.2.1.2, below**, if the proposed activity will result in adverse impacts to wetland functions and other surface water functions such that it does not meet the requirements of **sections 10.2.2 through 10.2.3.7, below**, then the Agency in determining whether to grant or deny a permit shall consider whether the applicant has implemented practicable design modifications to reduce or eliminate such adverse impacts.

The term "modification" shall not be construed as including the alternative of not implementing the activity in some form, nor shall it be construed as requiring a project that is significantly different in type or function. A proposed modification that is not technically capable of being completed, is not economically viable, or that adversely affects public safety through the endangerment of lives or property is not considered "practicable." A proposed modification need not remove all economic value of the property in order to be considered not "practicable." Conversely, a modification need not provide the highest and best use of the property to be "practicable." In determining whether a proposed modification is practicable, consideration shall also be given to the cost of the modification compared to the environmental benefit it achieves.

**10.2.1.2**   The Agency will not require the applicant to implement practicable design modifications to reduce or eliminate impacts when:

a.   The ecological value of the functions provided by the area of wetland or other surface water to be adversely affected is low, based on a site specific analysis using the factors in **section 10.2.2.3, below**, and the proposed mitigation will provide greater long term ecological value than the area of wetland or other surface water to be adversely affected, or

b.   The applicant proposes mitigation that implements all or part of a plan that provides regional ecological value and that provides greater long term ecological value than the area of wetland or other surface water to be adversely affected.

**10.2.1.3**   Should such mutual consideration of modification and mitigation not result in a permittable activity, the Agency must deny the application. Nothing herein shall imply that the Agency may not deny an application for a permit as submitted or modified, if it fails to meet the conditions for issuance, or that mitigation must be accepted by the Agency.

**10.2.2   Fish, Wildlife, Listed Species and their Habitats**

Pursuant to **section 10.1.1(a), above**, an applicant must provide reasonable assurances that a regulated activity will not impact the values of wetland and other surface water functions so as to cause adverse impacts to:

(a)   The abundance and diversity of fish, wildlife, listed species, and the bald eagle (*Halieaeetus leucocephalus*), which is protected under the Bald and Golden Eagle Protection Act, 16 U.S.C. 668-668d (April 30, 2004); a copy of the Act is in Appendix F; and

(b)   The habitat of fish, wildlife, and listed species.

In evaluating whether an applicant has provided reasonable assurances under these provisions, *de minimis* effects shall not be considered adverse for the purposes of this section.

As part of the assessment of the impacts of regulated activities upon fish and wildlife, the Agency will provide a copy of all notices of applications for individual (including conceptual approval) permits that propose regulated activities in, on, or over wetlands or other surface waters to the Florida Fish and Wildlife Conservation Commission (FWC) for review and comment, in accordance with Section 20.331(10), F.S. In addition, Agency staff may solicit comments from the FWC regarding other applications to assist in the assessment of potential impacts to fish and wildlife and their habitats, particularly with regard to listed species.

The need for a wildlife survey will depend upon the likelihood that the site is used by listed species and the bald eagle, considering site characteristics and the range and habitat needs of such species, and whether the proposed activity will impact that use such that the criteria in **sections 10.2.2 through 10.2.2.3 and section 10.2.7, below,** will not be met. Survey methodologies employed to inventory the site must provide reasonable assurances regarding the presence or absence of the subject listed species. Species-specific wildlife surveys are dependent on seasonality and day/night patterns of animals. Applicants are encouraged to discuss the proposed survey methodologies with the Agencies prior to conducting the survey.

In assessing the likelihood of use of a site by listed species, the sufficiency of proposed survey methodology, and any information provided as reasonable assurance under this section, the Agency will consider comments and recommendations received from the FWC, the U.S. Fish and Wildlife Service, comments from the applicant, and other water-resource related public comments. Scientific literature, and technical assistance documents such as the "*Florida Wildlife Conservation Guide*" at: myfwc.com/conservation/value/fwcg/ (2011), management plans, recovery plans, and habitat and conservation guidelines also will be considered.

**10.2.2.1**    Compliance with **sections 10.2.2 through 10.2.3.7 and 10.2.5 through 10.3.8, below,** will not be required for regulated activities in isolated wetlands less than one half acre in size, unless:

   (a)    The wetland is used by endangered or threatened species;

   (b)    The wetland is located in an area of critical state concern designated pursuant to Chapter 380, F.S.;

   (c)    The wetland is connected by standing or flowing surface water at seasonal high water level to one or more wetlands, and the combined wetland acreage so connected is greater than one half acre; or

   (d)    The Agency establishes that the wetland to be impacted is, or several such isolated wetlands to be impacted are cumulatively, of more than minimal value to fish and wildlife.

**10.2.2.2**    Alterations in wholly-owned ponds that were entirely constructed in uplands and that are less than one acre in area and alterations in drainage ditches that were constructed in uplands will not be required to comply with the provisions of **sections 10.2.2 through 10.2.2.3, 10.2.3 through 10.2.3.7, and 10.2.5 through 10.3.8 below**, unless those ponds or ditches provide significant habitat for endangered or threatened species. This means that, except in cases where those ponds or ditches provide significant habitat for endangered or threatened species, the only environmental criteria that will apply to those ponds or ditches are those included in **sections 10.2.2.4 and 10.2.4 through 10.2.4.5, below.** This provision shall only apply to those ponds and ditches that did not require a permit under Part IV, Chapter 373, F.S., or that were constructed for purposes other than mitigation pursuant to a permit under Part IV, Chapter 373, F.S. This provision does not apply to ditches constructed to divert natural stream flow.

**10.2.2.3**    The assessment of impacts expected as a result of proposed activities on the values of functions will be based on a review of scientific literature, ecologic and hydrologic information, and field inspection. When assessing the value of functions that any wetland or other surface water provides to fish, wildlife, and listed species, the factors that the Agency will consider are:

   (a)    Condition – this factor addresses whether the wetland or other surface water is in a high quality state or has been the subject of past alterations in hydrology, water quality, or vegetative composition. However, areas impacted by activities in violation of an Agency rule, order, or permit adopted or issued pursuant to Chapter 373, F.S., or Part VIII of Chapter 403, F.S. (1984 Supp.) as amended, will be evaluated as if the activity had not occurred;

   (b)    Hydrologic connection – this factor addresses the nature and degree of off-site connection, which may provide benefits to off-site water resources through detrital export, base flow maintenance, water quality enhancement or the provision of nursery habitat;

(c)     Uniqueness – this factor addresses the relative rarity of the wetland or other surface water and its floral and faunal components in relation to the surrounding regional landscape;

(d)     Location – this factor addresses the location of the wetland or other surface water in relation to its surroundings. In making this assessment, the Agency will consult reference materials such as the Florida Natural Areas Inventory, Comprehensive Plans, and maps created by governmental agencies identifying land with high ecological values; and

(e)     Fish and wildlife utilization – this factor addresses use of the wetland or other surface water for resting, feeding, breeding, nesting or denning by fish and wildlife, particularly those that are listed species.

### 10.2.2.4   Water Quantity Impacts to Wetlands and Other Surface Waters

Pursuant to **section 10.1.1(a), above**, an applicant must provide reasonable assurance that the regulated activity will not change the hydroperiod of a wetland or other surface water, so as to adversely affect wetland functions or other surface water functions as follows:

(a)     Whenever portions of a system, such as constructed basins, structures, stormwater ponds, canals, and ditches, could have the effect of reducing the depth, duration or frequency of inundation or saturation in a wetland or other surface water, the applicant must perform an analysis of the drawdown in water levels or diversion of water flows resulting from such activities and provide reasonable assurance that these drawdowns or diversions will not adversely impact the functions that wetlands and other surface waters provide to fish and wildlife and listed species;

(b)     Increasing the depth, duration, or frequency of inundation through changing the rate or method of discharge of water to wetlands or other surface waters or by impounding water in wetlands or other surface waters must also be addressed to prevent adverse effects to functions that wetlands and other surface waters provide to fish and wildlife and listed species. Different types of wetlands respond differently to increased depth, duration, or frequency of inundation. Therefore, the applicant must provide reasonable assurance that activities that have the potential to increase discharge or water levels will not adversely affect the functioning of the specific wetland or other surface water subject to the increased discharge or water level; and

(c)     Whenever portions of an activity could have the effect of altering water levels in wetlands or other surface waters, applicants shall be required to either: monitor the wetland or other surface waters to demonstrate that such alteration has not resulted in adverse impacts; or modify the activity to prevent adverse impacts. Monitoring parameters, methods, schedules, and reporting requirements shall be specified in permit conditions.

### 10.2.3   Public Interest Test

In determining whether a regulated activity located in, on, or over wetlands or other surface waters is not contrary to the public interest, or if such an activity significantly degrades or is within an Outstanding Florida Water, that the regulated activity is clearly in the public interest, the Agency shall consider and balance, and an applicant must address, the following criteria:

(a)     Whether the regulated activity will adversely affect the public health, safety, or welfare or the property of others (subparagraph 62-330.302(1)(a)1, F.A.C.);

(b)     Whether the regulated activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats (subparagraph 62-330.302(1)(a)2, F.A.C.);

(c)     Whether the regulated activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling (subparagraph 62-330.302(1)(a)3, F.A.C.);

(d)     Whether the regulated activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity (subparagraph 62-330.302(1)(a)4, F.A.C.);

(e)     Whether the regulated activity will be of a temporary or permanent nature (subparagraph 62-330.302(1)(a)5, F.A.C.);

(f)     Whether the regulated activity will adversely affect or will enhance significant historical and archaeological resources under the provisions of Section 267.061, F.S. (subparagraph 62-330.302(1)(a)6, F.A.C.); and

(g)     The current condition and relative value of functions being performed by areas affected by the proposed regulated activity (subparagraph 62-330.302(1)(a)7, F.A.C.).

## 10.2.3.1   Public Health, Safety, or Welfare or the Property of Others

In reviewing and balancing the criterion regarding public health, safety, welfare and the property of others in **section 10.2.3(a), above**, the Agency will evaluate whether the regulated activity located in, on, or over wetlands or other surface waters will cause:

(a)     An environmental hazard to public health or safety or improvement to public health or safety with respect to environmental issues. Each applicant must identify potential environmental public health or safety issues resulting from their project. Examples of these issues include: mosquito control; proper disposal of solid, hazardous, domestic or industrial waste; aids to navigation; hurricane preparedness or cleanup; environmental remediation, enhancement or restoration; and similar environmentally related issues. For example, the installation of navigational aids may improve public safety and may reduce impacts to public resources;

(b)     Impacts to areas classified by the Department of Agriculture and Consumer Services as approved, conditionally approved, restricted or conditionally restricted for shellfish harvesting. Activities that would cause closure or a more restrictive classification or management plan for a shellfish harvesting area would result in a negative factor in the public interest balance with respect to this criterion;

(c)     Flooding or alleviate existing flooding on the property of others. There is at least a neutral factor in the public interest balance with respect to the potential for causing or alleviating flooding problems if the applicant meets the water quantity criteria in **Part III of Volume II**; and

(d)     Environmental impacts to the property of others. For example, construction of a ditch that lowers the water table such that off-site wetlands or other surface waters would be partly or

fully drained would be an environmental impact to the property of others. The Agency will not consider impacts to property values.

### 10.2.3.2    Fish and Wildlife and their Habitats

The Agency's public interest review of that portion of a proposed activity in, on, or over wetlands and other surface waters for impacts to "the conservation of fish and wildlife, including endangered or threatened species, or their habitats" is encompassed within the required review of the entire activity under **section 10.2.2, above**. An applicant must always provide the reasonable assurances required under **section 10.2.2, above**.

### 10.2.3.3    Navigation, Water Flow, Erosion and Shoaling

In reviewing and balancing the criterion on navigation, erosion and shoaling in **section 10.2.3(c), above**, the Agency will evaluate whether the regulated activity located in, on or over wetlands or other surface waters will:

(a)      Significantly impede navigability or enhance navigability. The Agency will consider the current navigational uses of the surface waters and will not speculate on uses that may occur in the future. Applicants proposing to construct bridges or other traversing works must address adequate horizontal and vertical clearance for the type of watercraft currently navigating the surface waters. Applicants proposing to construct docks, piers and other works that extend into surface waters must address the continued navigability of these waters. An encroachment into a marked or customarily used navigation channel is an example of a significant impediment to navigability. Applicants proposing temporary activities in navigable surface waters, such as the mooring of construction barges, must address measures for clearly marking the work as a hazard to navigation, including nighttime lighting. The addition of navigational aids may be beneficial to navigation. If an applicant has a U.S. Coast Guard permit issued pursuant to 14 U.S.C. Section 81 or 33 C.F.R. Part 62 for a regulated activity in, on or over wetlands or other surface waters, submittal of this permit with the application may assist the applicant in addressing this criterion.

(b)      Cause or alleviate harmful erosion or shoaling. Applicants proposing activities such as channel relocation, artificial reefs, construction of jetties, breakwaters, groins, bulkheads and beach nourishment must address existing and expected erosion or shoaling in the proposed design. Compliance with erosion control best management practices referenced in **Part IV of this Volume**, will be an important consideration in addressing this criterion. Each permit will have a general condition that requires applicants to utilize appropriate erosion control practices and to correct any adverse erosion or shoaling resulting from the regulated activities.

(c)      Significantly impact or enhance water flow. Applicants must address significant obstructions to sheet flow by assessing the need for structures that minimize the obstruction such as culverts or spreader swales in fill areas. Compliance with the water quantity criteria found in **section 10.2.2.4, above,** shall be an important consideration in addressing this criterion.

### 10.2.3.4    Fisheries, Recreation, Marine Productivity

In reviewing and balancing the criterion regarding fishing or recreational values and marine productivity in **section 10.2.3(d), above,** the Agency will evaluate whether the regulated activity in, on, or over wetlands or other surface waters will cause:

(a)      Adverse effects to sport or commercial fisheries or marine productivity. Examples of activities that may adversely affect fisheries or marine productivity are the elimination or degradation of fish nursery habitat, change in ambient water temperature, change in normal salinity regime, reduction in detrital export, change in nutrient levels, or other adverse effects on populations of native aquatic organisms.

(b)      Adverse effects or improvements to existing recreational uses of a wetland or other surface water. Wetlands and other surface waters may provide recreational uses such as boating, fishing, swimming, waterskiing, hunting, and birdwatching. An example of potential adverse effects to recreational uses is the construction of a traversing work, such as a road crossing a waterway, which could impact the current use of the waterway for boating.

### 10.2.3.5    Temporary or Permanent Nature

When evaluating the other criteria in **section 10.2.3, above,** the Agency will consider the frequency and duration of the impacts caused by the proposed activity. Temporary impacts will be considered less harmful than permanent impacts of the same nature and extent.

### 10.2.3.6    Historical and Archaeological Resources

In reviewing and balancing the criterion regarding historical and archaeological resources in **section 10.2.3(f), above,** the Agency will evaluate whether the regulated activity located in, on, or over wetlands or other surface waters will impact significant historical or archaeological resources. The applicant must map the location of and characterize the significance of any known historical or archaeological resources that may be affected by the regulated activity located in, on or over wetlands or other surface waters. The Agency will provide copies of all individual (including conceptual approval) permit applications to the Division of Historical Resources of the Department of State and solicit its comments regarding whether the regulated activity may adversely affect significant historical and archaeological resources. The applicant will be required to perform an archaeological survey and to develop and implement a plan as necessary to demarcate and protect the significant historical or archaeological resources, if such resources are reasonably expected to be impacted by the regulated activity.

### 10.2.3.7    Current Condition and Relative Value of Functions

When evaluating other criteria in **section 10.2.3, above,** the Agency will consider the current condition and relative value of the functions performed by wetlands and other surface waters affected by the proposed regulated activity. Wetlands and other surface waters that have had their hydrology, water quality, or vegetative composition permanently impacted due to past legal alterations or occurrences, such as infestation with exotic species, usually provide lower habitat value to fish and wildlife. However, if the wetland or other surface water is currently degraded, but is still providing some beneficial functions, consideration will be given to whether the regulated activity will further reduce or eliminate those functions. The Agency will also evaluate the predicted ability of the wetlands or other surface waters to maintain their current functions as part

of the proposed activity once it is developed. Where previous impacts to a wetland or other surface water are temporary in nature, consideration will be given to the inherent functions of these areas relative to seasonal hydrologic changes, and expected vegetative regeneration and projected habitat functions if the use of the subject property were to remain unchanged. When evaluating impacts to mitigation sites that have not reached success pursuant to **section 10.3.6, below**, the Agency shall consider the functions that the mitigation site was intended to offset, and any additional delay or reduction in offsetting those functions that may be caused by impacting the mitigation site. Previous construction or alteration undertaken in violation of Chapter 373, F.S., or Agency rule, order or permit will not be considered as having diminished the condition and relative value of a wetland or other surface water.

## 10.2.4    Water Quality

Pursuant to **section 10.1.1(c), above**, an applicant must provide reasonable assurance that the regulated activity will not cause or contribute to violations of water quality standards in areas where water quality standards apply.

Reasonable assurances regarding water quality must be provided both for the short term and the long term, addressing the proposed construction, alteration, operation, maintenance, removal and abandonment of the project. The following requirements are in addition to the water quality requirements found in **sections 8.2.3 and 8.3 through 8.3.3, above**.

### 10.2.4.1    Short Term Water Quality Considerations

The applicant must address the short term water quality impacts of a proposed activity, including:

(a)      Providing and maintaining turbidity barriers or similar devices for the duration of dewatering and other construction activities in or adjacent to wetlands or other surface waters;

(b)      Stabilizing newly created slopes or surfaces in or adjacent to wetlands and other surface waters to prevent erosion and turbidity;

(c)      Providing proper construction access for barges, boats and equipment to ensure that propeller dredging and rutting from vehicular traffic does not occur;

(d)      Maintaining construction equipment to ensure that oils, greases, gasoline, or other pollutants are not released into wetlands or other surface waters;

(e)      Controlling the discharge from spoil disposal sites; and

(f)      Preventing any other discharge or release of pollutants during construction or alteration that will cause or contribute to water quality standards being violated.

### 10.2.4.2    Long Term Water Quality Considerations

The applicant must address the long term water quality impacts of a proposed activity, including:

(a)      The potential of a constructed or altered water body to cause or contribute to violations of water quality standards due to its depth or configuration. For example, the depth of water bodies must be designed to ensure proper mixing so that the water quality standard for

dissolved oxygen will not be violated in the lower levels of the water body, but the depth should not be so shallow that the bottom sediments are frequently resuspended by boat activity. Water bodies must be configured to prevent the creation of debris traps or stagnant areas that could result in violations of water quality standards.

(b)     Long term erosion, siltation or propeller dredging that will cause turbidity violations.

(c)     Prevention of any discharge or release of pollutants from the activity that will cause water quality standards to be violated.

### 10.2.4.3    Additional Water Quality Considerations for Docking Facilities

Docking facilities, due to their nature, provide potential sources of pollutants to wetlands and other surface waters. If the proposed work has the potential to adversely affect water quality, an applicant proposing the construction, expansion or alteration of a docking facility must address the following factors to provide the required reasonable assurance that water quality standards will not be violated:

(a)     Hydrographic information or studies shall be required for docking facilities of greater than ten boat slips, unless hydrographic information or studies previously conducted in the vicinity of the facility provide reasonable assurance that the conditions of the water body and the nature of the proposed activity do not warrant the need for new information or studies. Hydrographic information or studies also may be required for docking facilities of fewer than ten slips, dependent upon the site specific features described in **section 10.2.4.3(b), below**. In all cases, the design of the hydrographic study, and its complexity, will be dependent upon the specific project design and the specific features of the project site.

(b)     The purpose of the hydrographic information or studies is to document the flushing time (the time required to reduce the concentration of a conservative pollutant to ten percent of its original concentration) of the water at the docking facility. This information is used to determine the likelihood that the facility will accumulate pollutants to the extent that water quality violations will occur. Generally, a flushing time of less than or equal to four days is the maximum that is desirable for docking facilities. However, the evaluation of the maximum desirable flushing time also takes into consideration the size (number of slips) and configuration of the proposed docking facility; the amplitude and periodicity of the tide; the geometry of the subject water body; the circulation and flushing of the water body; the quality of the waters at the project site; the type and nature of the docking facility; the services provided at the docking facility; and the number and type of other sources of water pollution in the area.

(c)     The level and type of hydrographic information or studies that will be required for the proposed docking facility will be determined based upon an analysis of site specific characteristics. As compared to sites that flush in less than four days, sites where the flushing time is greater than four days generally will require additional, more complex levels of hydrographic studies or information to determine whether water quality standards can be expected to be violated by the facility. The degree and complexity of the hydrographic study will be dependent upon the types of considerations listed in **section 10.2.4.3(b), above**, including the potential for the facility, based on its design and location, to add pollutants to the receiving waters. Types of information that can be required include site-specific measurements of: waterway geometry, tidal amplitude, the periodicity of forces that drive

water movement at the site, and water tracer studies that document specific circulation patterns.

(d)     The applicant shall document, through hydrographic information or studies, that pollutants leaving the site of the docking facility will be adequately dispersed in the receiving water body so as to not cause or contribute to violations of water quality standards based on circulation patterns and flushing characteristics of the receiving water body.

(e)     In all cases, the hydrographic studies shall be designed to document the hydrographic characteristics of the project site and surrounding waters. All hydrographic studies must be based on the factors described in **sections (a) through (d), above**. An applicant should consult with the Agency prior to conducting such a study.

(f)     In accordance with Chapters 62-761 and 62-762, F.A.C., applicants are advised that fueling facilities must have secondary containment equipment and shall be located and operated so that the potential for spills or discharges to surface waters and wetlands is minimized.

(g)     The disposal of domestic wastes from boat heads, particularly from liveaboard vessels, must be addressed to prevent improper disposal into wetlands or other surface waters. A liveaboard vessel shall be defined as a vessel docked at the facility that is inhabited by a person or persons for any five consecutive days or a total of ten days within a 30-day period.

(h)     The disposal of solid waste, such as garbage and fish cleaning debris, must be addressed to prevent disposal into wetlands or other surface waters.

(i)     Pollutant leaching characteristics of materials such as treated pilings and anti-fouling paints used on the hulls of vessels must be addressed to ensure that any pollutants that leach from the structures and vessels will not cause violations of water quality standards given the flushing at the site and the type, number and concentration of the likely sources of pollutants.

## 10.2.4.4   Mixing Zones

A temporary mixing zone for water quality during construction or alteration may be requested by the applicant. The Agency shall review such requests pursuant to Rule 62-4.242 and subsection 62-4.244(5), F.A.C.

## 10.2.4.5   Where Ambient Water Quality Does Not Meet Standards

If the site of the proposed activity currently does not meet water quality standards, the applicant must demonstrate compliance with the water quality standards by meeting the provisions in **sections 10.2.4.1, 10.2.4.2, and 10.2.4.3, above,** as applicable, and for the parameters that do not meet water quality standards, the applicant must demonstrate that the proposed activity will not contribute to the existing violation. If the proposed activity will contribute to the existing violation, mitigation may be proposed as described in **section 10.3.1.4, below**.

## 10.2.5   Class II Waters; Waters Approved for Shellfish Harvesting

The special value and importance of shellfish harvesting waters to Florida's economy as existing or potential sites of commercial and recreational shellfish harvesting and as a nursery area for fish and

shellfish is recognized by the Agencies. In accordance with **section 10.1.1(d), above**, the Agency shall deny a permit for a regulated activity located:

(a) In Class II or Class III waters, as designated in Chapter 62-302, F.A.C., that are classified by the Department of Agriculture and Consumer Services (DACS) as "approved," "restricted," "conditionally approved," or "conditionally restricted" for shellfish harvesting. However, the Agency may issue permits or certifications in such waters for: environmental restoration or enhancement; maintenance dredging of navigational channels; the construction of shoreline protection structures; the installation of transmission and distribution lines for carrying potable water, electricity or communication cables in rights-of-way previously used for such lines; or clam and oyster culture. This provision also shall not apply to docking facilities that meet all of the following criteria:

 1. No more than two vessels shall be moored, and no more than two slips constructed in total at a private residential single-family dock, or no more than ten vessels moored and no more than ten slips constructed in total at a private residential multi-family, commercial, or governmental dock at any time;

 2. No overboard discharges of trash, human or animal waste, or fuel shall occur at the dock. For all commercial, governmental, or private residential multi-family docks that will moor vessels that contain, or have the capability of containing, a permanent marine sanitation device, the applicant must provide reasonable assurance that there will not be a discharge of domestic wastes from such vessels at the dock;

 3. Any enclosed, non-water dependent structures shall be located on the uplands;

 4. Prior to the mooring of any vessel at the dock, there shall be existing structures with toilet facilities located on the uplands;

 5. Any proposed boat shelter shall not be enclosed with screens, walls, doors, or windows;

 6. A minimum of one foot clearance must be maintained between the deepest draft of any vessel (including the vessel propulsion unit) moored in the water at the dock and the top of any submerged resources (which includes rooted aquatic macrophyte communities, attached macro-marine algae communities, sponge beds, coral communities, and oyster communities) in the mooring location, as measured at mean low water. The height of rooted aquatic macrophyte communities, attached macro-marine algae communities shall be measured as they exist during the growing season (April through September);

 7. Any structures located over grassbeds shall be designed so as to allow for the maximum practicable amount of light penetration; and

 8. There shall be no overnight occupancy at any time on the dock or on any vessels moored to the dock.

Solely for purposes of this subsection, the term "vessel" shall include all sailboats and motorized boats of any type other than personal watercraft as defined in Section 327.02, F.S.,

whether moored in the water or stored on the dock, in a boat lift, or on a floating vessel platform.

(b)    In any Class II waters that are not classified by DACS as "approved," "restricted," "conditionally approved," or "conditionally restricted" for shellfish harvesting, unless the applicant submits a plan or proposes a procedure to protect those waters and waters in the vicinity. The plan or procedure shall detail the measures to be taken to prevent significant damage to the immediate project area and the adjacent area, and shall provide reasonable assurance that the water quality standards for Class II waters will not be violated.

(c)    In any class of waters where the location of the activity is adjacent or in close proximity to Class II waters, unless the applicant submits a plan or proposes a procedure that demonstrates that the regulated activity will not have a negative effect on the Class II waters and will not result in violations of water quality standards in the Class II waters.

### 10.2.6  Vertical Seawalls

(a)    The construction of vertical seawalls in estuaries or lagoons is prohibited unless one of the following conditions exists:

1.    The proposed construction is located within a port, as defined in Section 315.02 or 403.021, F.S.;

2.    The proposed construction is necessary for the creation of a marina, the vertical seawalls are necessary to provide access to watercraft, or the proposed construction is necessary for public facilities;

3.    The proposed construction is to be located within an existing manmade canal and the shoreline of such canal is currently occupied in whole or in part by vertical seawalls; or

4.    The proposed construction is to be conducted by a public utility when such utility is acting in the performance of its obligation to provide service to the public.

5.    The proposed construction is located within the coastal areas of Collier, Lee, Miami-Dade, and Monroe Counties, or Charlotte Harbor/Peace River in Charlotte County designated by the National Marine Fisheries Service as Critical Habitat for the smalltooth sawfish (*Pristis pectinata*) -- see http://www.nmfs.noaa.gov/pr/species/fish/smalltooth-sawfish.html.

(b)    When considering an application for a permit to repair or replace an existing vertical seawall, the Agency shall require such seawall to be faced with riprap material, or to be replaced entirely with riprap material unless a condition specified in **paragraphs 1 through 5, above,** exists. However, nothing in this subsection shall be construed to hinder any activity previously exempt or permitted under Part IV of Chapter 373, F.S., or permitted under Chapter 161, F.S.

### 10.2.7  Secondary Impacts

Pursuant to **section 10.1.1(f), above,** an applicant must provide reasonable assurances that a regulated activity will not cause adverse secondary impacts to the water resource, as described in **sections (a)**

**through (d), below**. Aquatic or wetland dependent fish and wildlife are an integral part of the water resources that the Agency is authorized to protect under Part IV, Chapter 373, F.S.

Aquatic or wetland dependent species that are listed species are particularly in need of protection, as are: the bald eagle (*Halieaeetus leucocephalus*), which is protected under the Bald and Golden Eagle Protection Act (16 U.S.C. 668-668d) and Rule 68A-16.002, F.A.C.

A proposed activity shall be reviewed under this criterion by evaluating the impacts to: wetland and surface water functions identified in **section 10.2.2, above**, water quality, upland habitat for bald eagles and aquatic or wetland dependent listed species, and historical and archaeological resources. *De minimis* or remotely related secondary impacts will not be considered. Applicants may propose measures such as preservation to prevent secondary impacts. Such preservation shall comply with the land preservation provisions of **section 10.3.8, below**. If such secondary impacts cannot be prevented, the applicant may propose mitigation measures as provided for in **sections 10.3 through 10.3.8, below**.

This secondary impact criterion consists of the following four parts:

(a)     An applicant shall provide reasonable assurance that the secondary impacts from construction, alteration, and intended or reasonably expected uses of a proposed activity will not cause or contribute to violations of water quality standards or adverse impacts to the functions of wetlands or other surface waters as described in **section 10.2.2, above**.

Impacts such as lights from development adjacent to marine turtle nesting beaches, boat traffic generated by a proposed dock, boat ramp or dry dock facility, which cause an increased threat of collision with manatees; impacts to wildlife from vehicles using proposed roads in wetlands or other surface waters; impacts to water quality associated with the use of onsite sewage treatment and disposal systems (e.g., septic tanks and drainfields) or propeller dredging by boats and wakes from boats; and impacts associated with docking facilities as described in **sections 10.2.4.3(f) through (i), above**, will be considered relative to the specific activities proposed and the potential for such impacts. Impacts of groundwater withdrawals upon wetlands and other surface waters that result from the use of wells permitted pursuant to the District consumptive use rules shall not be considered under the rules adopted pursuant to Part IV of Chapter 373, F.S.

Secondary impacts to the habitat functions of wetlands associated with adjacent upland activities will not be considered adverse if buffers, with a minimum width of 15 ft. and an average width of 25 ft., are provided abutting those wetlands that will remain under the permitted design, unless additional measures are needed for protection of wetlands used by bald eagles for nesting, or listed species for nesting, denning, or critically important feeding habitat. The mere fact that a species is listed does not imply that all of its feeding habitat is critically important. Buffers shall be maintained in an undisturbed vegetated condition, except when the permit requires removal of exotic and nuisance vegetation or the planting of appropriate native species to prevent adverse secondary impacts to the habitat functions of the wetlands. Drainage features such as spreader swales and discharge structures are acceptable within the buffer, provided the construction or use of these features does not adversely impact wetlands. Where an applicant elects not to use buffers of the above-described dimensions, buffers of different dimensions, or other measures, may be proposed to provide the required reasonable assurance. Wetlands or other surface waters shall not be filled to achieve this buffer requirement. For example, an undisturbed upland buffer would not be required to be established waterward of areas of wetlands or other surface waters that are

authorized to be filled for other purposes, such as to construct a bulkhead, although this does not relieve the applicant from providing other reasonable assurance demonstrating that the construction, alteration, and intended or reasonably expected uses of a proposed activity will not result in adverse secondary impacts to wetlands and other surface waters. Buffers proposed to protect against secondary impacts shall be allowed to overlap with vegetated natural buffers, except where the Agency determines that such overlap would adversely affect the purposes each buffer is designed to address.

(b)    An applicant shall provide reasonable assurance that the construction, alteration, and intended or reasonably expected uses of a proposed activity will not adversely impact the ecological value of uplands for bald eagles, and aquatic or wetland dependent listed animal species for enabling existing nesting or denning by these species, but not including:

1.    Areas needed for foraging; or

2.    Wildlife corridors, except for those limited areas of uplands necessary for ingress and egress to the nest or den site from the wetland or other surface water.

A list of aquatic or wetland dependent listed species and species having special protection that use upland habitats for nesting and denning may be found at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/documents/listed-wildlife-species-are.

In evaluating whether a proposed activity will adversely impact the ecological value of uplands to the bald eagle and aquatic or wetland dependent listed species, the Agencies shall consider comments received from the Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service, the applicant, and the public (for comments related to this section). Permitting guidelines within management plans, recovery plans, habitat and conservation guidelines, scientific literature, and technical assistance documents such as the "*Florida Wildlife Conservation Guide*" (myfwc.com/conservation/value/fwcg/) also will be considered.

Compliance with the U.S. Fish and Wildlife Service (USFWS) *Habitat Management Guidelines for the Wood Stork in the Southeast Region* (January 1990), available at: http://www.fws.gov/northflorida/WoodStorks/Documents/19900100_gd_Wood-stork-habitat-guidelines-1990.pdf, and reproduced in Appendix G, will provide reasonable assurance that the proposed activity will not adversely impact upland habitat functions described in **paragraph (b)** for the wood stork.

Secondary impacts to the functions of wetlands or uplands for nesting of bald eagles (*Haliaeetus leucocephalus)* will not be considered adverse if the applicant holds a valid authorization from the USFWS pursuant to paragraph 68A-16.002(1), F.A.C., for the same activities proposed by the applicant under Part IV of Chapter 373, F.S., or if the applicant demonstrates compliance with the USFWS *National Bald Eagle Management Guidelines* (May 2007) available at: https://www.fws.gov/northeast/ecologicalservices/pdf/NationalBaldEagleManagementGuidelines.pdf , and reproduced in Appendix H).

For those aquatic or wetland dependent listed animal species for which habitat management guidelines have not been developed, or in cases where an applicant does not propose to use

USFWS or FWC habitat management guidelines, the applicant may propose measures to mitigate adverse impacts to upland habitat functions described in **paragraph (b)** provided to aquatic or wetland dependent listed animal species and species having special protection listed online at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/documents/listed-wildlife-species-are. Such proposals will be evaluated by the Agency to determine if the measures provide reasonable assurance.

(c)     In addition to evaluating the impacts in the area of any dredging and filling in, on, or over wetlands or other surface waters, and as part of the balancing review under **section 10.2.3, above**, the Agency will consider any other associated activities that are very closely linked and causally related to any proposed dredging or filling that have the potential to cause impacts to significant historical and archaeological resources.

(d)     An applicant shall provide reasonable assurance that the following future activities will not result in water quality violations or adverse impacts to the functions of wetlands or other surface waters as described in **section 10.2.2, above:**

1.     Additional phases or expansion of the proposed activity for which plans have been submitted to the Agency or other governmental agencies; and

2.     On-site and off-site activities regulated under Part IV, Chapter 373, F.S., or activities described in Section 403.813(1), F.S., that are very closely linked and causally related to the proposed activity.

As part of this review, the Agency will also consider the impacts of the intended or reasonably expected uses of the future activities on water quality and wetland and other surface water functions.

In conducting the analysis under **section (d)2, above**, the Agency will consider those future projects or activities that would not occur but for the proposed activity, including where the proposed activity would be considered a waste of resources should the future project or activities not be permitted.

Where practicable, proposed activities shall be designed in a fashion that does not necessitate future impacts to wetland and other surface water functions. Activity expansions and future activity phases will be considered in the secondary impact analysis. If the Agency determines that future phases of an activity involve impacts that do not appear to meet permitting criteria, the current application shall be denied unless the applicant can provide reasonable assurance that those future phases can comply with permitting criteria. One way for applicants to establish that future phases or system expansions do not have adverse secondary impacts is for the applicant to obtain a conceptual approval permit for the entire project.

_____

10.2.8    **Cumulative Impacts**

Pursuant to **section 10.1.1(g), above**, an applicant must provide reasonable assurance that a regulated activity will not cause unacceptable cumulative impacts upon wetlands and other surface waters within the same drainage basin as the regulated activity for which a permit is sought. The impact on wetlands and other surface waters shall be reviewed by evaluating the impacts to water quality as set forth in **section 10.1.1(c), above,** and by evaluating the impacts to functions identified in **section 10.2.2, above**.

(a)    If an applicant proposes to mitigate these adverse impacts within the same drainage basin as the impacts, and if the mitigation fully offsets these impacts, then the Agency will consider the regulated activity to have no unacceptable cumulative impacts upon wetlands and other surface waters, and consequently, the condition for issuance in **section 10.1.1(g)** will be satisfied. The drainage basins within each District are reproduced below in **Figures 10.2.8-1 through 10.2.8-5**.

(b)    If an applicant proposes to mitigate adverse impacts through mitigation physically located outside of the drainage basin where the impacts are proposed, an applicant may demonstrate that such mitigation fully offsets the adverse impacts within the impacted drainage basin (as measured from the impacted drainage basin), based on factors such as connectivity of waters, hydrology, habitat range of affected species, and water quality. If the mitigation fully offsets the impacts (as measured from the impacted drainage basin), then the Agency will consider the regulated activity to have no unacceptable cumulative impacts upon wetlands and other surface waters, and consequently, the condition for issuance in section 10.1.1(g), above, will be satisfied. In other words, if the functions provided by the proposed out-of-basin-mitigation will "spill over" into the impacted basin, and are sufficient to offset the impacts within the impacted basin, then the condition for issuance in section 10.1.1(g) will be satisfied.

(c)    When adverse impacts to water quality or adverse impacts to the functions of wetlands and other surface waters, as referenced in paragraphs (a) and (b) above, are not fully offset within the same drainage basin as the impacts, then an applicant must provide reasonable assurance that the proposed activity, when considered with the following activities, will not result in unacceptable cumulative impacts to water quality or the functions of wetlands and other surface waters, within the same drainage basin:

1.    Projects that are existing or activities regulated under Part IV, Chapter 373, F.S., that are under construction or projects for which permits or determinations pursuant to Section 373.421, F.S., or Section 403.914, F.S. (1991), have been sought.

2.    Activities that are under review, approved, or vested pursuant to Section 380.06, F.S., or other activities regulated under Part IV of Chapter 373, F.S., which may reasonably be expected to be located within wetlands or other surface waters, in the same drainage basin, based upon the comprehensive plans, adopted pursuant to Chapter 163, F.S., of the local governments having jurisdiction over the activities, or applicable land use restrictions and regulations.

Only those activities listed in **sections (c)1. and 2., above,** that have similar types of impacts (adverse effects) to those that will be caused by the proposed activity and for which those impacts are not fully offset within the drainage basin, as described in section (a) or (b), above, will be considered. Activities are considered to have similar impacts if they affect similar types of water resources and functions, regardless of whether the activities themselves are similar to one another.

The cumulative impact evaluation is conducted using an assumption that reasonably expected future applications with like impacts will be sought, thus necessitating equitable distribution of acceptable impacts among future applications.



**Figure 10.2.8-1** Drainage Basins within the geographical territory of the Northwest Florida Water Management District (Source: USGS Hydrologic Unit Code (HUC) Basins, 1:24K, HPGN)

1 North Perdido Bay
2 South Perdido Bay
3 Escambia River
4 Pensacola Bay
5 Blackwater River
6 Yellow River
7 Choctawhatchee Bay
8 Pea River
9 Choctawhatchee River
10 St. Andrews Bay
11 Chipola River
12 Apalachicola River
13 Chattahoochee River
14 Apalachicola Bay
15 New River
16 Ochlockonee River
17 St Marks River



**Figure 10.2.8-2**

Drainage Basins for
Cumulative Impacts Evaluation

NOTE FOR NESTED BASINS:

Basins 5, 6, 13, 15, and 19 above are designated as nested basins, which means that these areas are both individual basins and part of larger basins. The effect of this designation is that, for impacts that are outside of a nested area, but within the larger basin of which it is a part, mitigation within the nested area will be considered to be in the same drainage basin for cumulative impact review purposes. For impacts that are located within a nested area, mitigation that is located outside of the nested area but within the larger basin of which it is a part will be considered to be outside of the drainage basin for cumulative impact review purposes.

**Figure 10.2.8-3 Drainage Basins for Cumulative Impact Determinations within the Suwannee River Water Management District**



**Figure 10.2.8-4**



**Figure 10.2.8-5 — Drainage Basins within the South Florida Water Management District**



10.2.8.1    Cumulative impacts are considered unacceptable when the proposed activity, considered in conjunction with the past, present, and future activities as described in **section 10.2.8, above,** would then result in a violation of state water quality standards as set forth in **section 10.1.1(c)above**, or significant adverse impacts to functions of wetlands or other surface waters identified in **section 10.2.2**, **above**, within the same drainage basin when considering the basin as a whole. This analysis asks the question whether the proposed system, considered in conjunction with past, present, and future activities, would be the proverbial "straw that breaks the camel's back" regarding the above referenced water quality or wetland and other surface water functions in the basin.

10.2.8.2    Applicants may propose measures such as preservation to prevent cumulative impacts. Such preservation shall comply with the land preservation provisions in **section 10.3.8, below**. If unacceptable cumulative impacts are expected to occur, based on an evaluation conducted in accordance with **section 10.2.8, above**, the applicant may propose mitigation measures as provided for in **sections 10.3 through 10.3.8, below**.

## 10.3    Mitigation

Mitigation will be approved only after the applicant has complied with the requirements of **sections 10.2.1 through 10.2.1.3, above,** regarding practicable modifications to reduce or eliminate adverse impacts. However, any mitigation proposal submitted for review shall be reviewed concurrently with the analysis of any modification pursuant to **section 10.2, above**. This section establishes criteria to be followed in evaluating mitigation proposals in light of the programmatic and project permitting goal of no net loss of wetland and other surface waters functions.

Mitigation as described in **sections 10.3 through 10.3.8, below,** is required only to offset the adverse impacts to the functions identified in **sections 10.2 through 10.2.8.2, above,** caused by regulated activities. In certain cases, mitigation cannot offset impacts sufficiently to yield a permittable project. Such cases include activities that significantly degrade Outstanding Florida Waters, adversely impact habitat for listed species, or adversely impact those wetlands or other surface waters that are not likely to be successfully recreated.

Applicants are encouraged to consult with Agency staff in pre-application conferences or during the application process to identify appropriate mitigation options.

### 10.3.1    Types of Mitigation

Mitigation usually consists of restoration, enhancement, creation, or preservation of wetlands, other surface waters, or uplands. Uplands that function as a hydrologic contributing area to wetlands, and are necessary to maintain the ecological value of those wetlands, may be appropriate for mitigation of impacts to wetlands, as well as impacts to uplands that are used by bald eagles, and listed aquatic and wetland dependent species for nesting or denning. The evaluation of the appropriateness of incorporating uplands as part of a mitigation plan shall include consideration of the proximity of uplands to wetlands and the degree to which uplands support the functions of the associated wetlands. In some cases, a combination of mitigation types is the best approach to offset adverse impacts resulting from the regulated activity.

Restoration is usually preferred over creation as it often has a greater chance of success due to soil characteristics, hydrologic regime, landscape position, or other factors that favor re-establishment of wetland or other surface water communities. Preservation of important ecosystems can provide an improved level of protection over current regulatory programs when

it ensures that the values of the preserved area are protected and maintained in the long term. Areas proposed to be preserved to prevent secondary or cumulative impacts (**sections 10.2.7 and 10.2.8, above**) may also be considered part of a mitigation plan if those areas also serve to offset adverse impacts.

10.3.1.1    In general, mitigation is best accomplished through creation, restoration, enhancement, or preservation of ecological communities similar to those being impacted. However, when the area proposed to be impacted is degraded, compared to its historic ecological community and hydrologic condition, mitigation is best accomplished through creation, restoration, enhancement or preservation of the ecological community that was historically present. When impacts are proposed to wholly artificial systems, such as borrow pits, ditches, and canals, mitigation is best accomplished through creation, restoration, enhancement or preservation of the native ecological community to which it is most analogous in function. For wetlands or other surface waters that have been altered from their native community type, the historic community type at that location shall be used as a reference, unless the alteration has been of such a degree and extent that a different native community type is now present and self sustaining. Mitigation involving other ecological communities is acceptable if impacts are offset and the applicant demonstrates that greater improvement in ecological value will result.

10.3.1.2    Mitigation can be conducted on-site, off-site, or through the purchase of credits from a mitigation bank, or through a combination of approaches, as long as it offsets anticipated adverse impacts to wetlands and other surface waters and meets all other criteria for permit issuance. Off-site mitigation is preferred when:

(a)    On-site mitigation opportunities are not expected to have comparable long-term viability due to such factors as unsuitable hydrologic conditions or ecologically incompatible existing adjacent land uses or future land uses identified in a local comprehensive plan adopted according to Chapter 163, F.S.; or

(b)    Off-site mitigation will provide greater improvement in ecological value than on-site mitigation.

One example of a project expected to benefit from off-site mitigation is a linear project that cannot effectively implement on-site mitigation due to right-of-way constraints.

10.3.1.2.1 An applicant proposing offsite mitigation must provide reasonable assurance that the permitted mitigation will be conducted by an entity with the financial, legal, and administrative capability to implement the mitigation plan in accordance with the terms and conditions of the permit, if issued, pursuant to Rule 62-330.301(1)(j), F.A.C. Compliance with this requirement can be demonstrated when an entity has sufficient ownership interest or control in the land in accordance with **section 4.2.3(d)** of this Volume.

If the applicant demonstrates compliance with this requirement by providing the Agency with a purchase and sale agreement, the permit, if issued, shall be conditioned to prohibit all construction until ownership is transferred to the permittee. This provision does not apply if the applicant proposes to offset adverse impacts to wetlands or other surface waters through the purchase of credits from a mitigation bank, or participation in regional off-site mitigation pursuant to Section 373.4135, F.S., and does not apply to the Florida Department of Transportation when mitigation is accomplished pursuant to Section 373.4137, F.S.

10.3.1.3    Mitigation through participation in a mitigation bank shall be in accordance with Section 373.4136, F.S., and Chapter 62-342, F.A.C. (Mitigation Banks), except that, for purposes of the maps applicable to regional watersheds, the SJRWMD, SWFWMD, and SFWMDs shall use the maps incorporated by reference in the applicable Volume II.

10.3.1.4    In instances where an applicant is unable to meet water quality standards because existing ambient water quality does not meet standards and the activity will contribute to this existing condition, mitigation for water quality impacts can consist of water quality enhancement. In these cases, the applicant must implement mitigation measures that will cause net improvement of the water quality in the receiving waters for those parameters that do not meet standards. (See Section 373.414(1)(b), F.S.)

10.3.1.5    To offset adverse secondary impacts from regulated activities to habitat functions that uplands provide to bald eagles and listed species evaluated as provided in **section 10.2.7(b), above**, mitigation can include the implementation of management plans, participation in a wildlife mitigation park established by the FWC, or other measures. Measures to offset adverse secondary impacts on wetlands and other surface waters resulting from use of a system can include the incorporation of culverts or bridged crossings designed to facilitate wildlife movement, fencing to limit access, reduced speed zones, or other measures designed to offset the secondary impact.

10.3.1.6    Mitigation for certain mining activities shall be in accordance with Section 373.414(6), F.S. Applicants also are advised that they may elect to use the provisions of Chapter 62-348, F.A.C. (Wetland Permitting and Mitigation for the Mining of Peat for the Horticultural Industry), to provide for alternative wetland mitigation associated with the mining of high-quality peat in accordance with Section 373.414(6)(e), F.S.

10.3.1.7    Except as provided in Section 373.414(6), F.S., mitigation or reclamation required or approved by other agencies for a specific project will be acceptable to the Agency to the extent that such mitigation or reclamation fulfills the requirements of **sections 10.3 through 10.3.8,** and offsets adverse impacts of the same project in accordance with the criteria in **sections 10.2 through 10.2.8.2, above**.

10.3.1.8    Innovative mitigation proposals that deviate from the standard practices described in **sections 10.3 through 10.3.6,** shall be considered on a case-by-case basis to determine whether they offset the adverse impacts. Any donation of money as mitigation shall be in accordance with Sections 373.4135(1)(b), F.S., and 373.414(1)(b), F.S.

10.3.2    **Guidelines for the Amount of Mitigation**

Chapter 62-345, F.A.C., Uniform Mitigation Assessment Method (UMAM), establishes a standardized procedure for assessing functions provided by wetlands and other surface waters, the amount those functions are reduced by proposed impact, and the amount of mitigation needed to offset that impact. The Agency will be responsible for verifying the information provided and applying this assessment method to determine the amount of mitigation necessary to offset the proposed impacts.

Chapter 62-345, F.A.C., also establishes the criteria to award and deduct mitigation bank or regional offsite mitigation area credits. The Agency will be responsible for verifying that information and applying this assessment method to determine the potential amount of mitigation to be provided by the bank or regional offsite mitigation area.

Paragraphs 62-345.100(3), (5), (6), (7), (8), and (9), F.A.C, provide exceptions from the application of UMAM to determine the amount of mitigation necessary to offset adverse impacts.

**10.3.3    Mitigation Proposals**

10.3.3.1    Applicants shall provide reasonable assurance that proposed mitigation will:

(a)    Offset adverse impacts due to regulated activities; and

(b)    Achieve mitigation success by providing viable and sustainable ecological and hydrological functions.

The use of credits from a mitigation bank permitted under Part IV of Chapter 373, F.S., or a Regional Offsite Mitigation Area under Section 373.4135, F.S., is not subject to **sections 10.3.3.2 through 10.3.8, below**.

10.3.3.2    Applicants shall submit detailed plans describing proposed construction, establishment, and management of mitigation areas. These plans shall include the following information, as appropriate for the type of mitigation proposed:

(a)    A soils map of the mitigation area and other soils information pertinent to the specific mitigation actions proposed;

(b)    A topographic map of the mitigation area and adjacent hydrologic contributing and receiving areas;

(c)    A hydrologic features map of the mitigation area and adjacent hydrologic contributing and receiving areas;

(d)    A description of current hydrologic conditions affecting the mitigation area;

(e)    A map of vegetation communities in and around the mitigation area;

(f)    Construction drawings detailing proposed topographic alterations and all structural components associated with proposed activities;

(g)    Proposed construction activities, including a detailed schedule for implementation;

(h)    A vegetation-planting scheme if planting is proposed, and schedule for implementation;

(i)    Sources of plants and soils used in wetland creation or restoration;

(j)    Measures to be implemented during and after construction to avoid adverse impacts related to proposed activities;

(k)    A management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access;

(l)    A proposed monitoring plan to demonstrate mitigation success;

(m)   A description of the activities proposed to control exotic and nuisance species should these become established in the mitigation area. The mitigation proposal must include reasonable measures to assure that these species do not invade the mitigation area in such numbers as to affect the likelihood of success of the project;

(n)   A description of anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented;

(o)   A comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented;

(p)   For mitigation plans with projected implementation costs in excess of $25,000, an itemized estimate of the cost of implementing mitigation as set forth in **section 10.3.7.7, below**;

(q)   Evidence that the applicant has legal access to the mitigation area and authority to perform the mitigation, and documentation granting the Agency a reasonable right of legal access to the mitigation area and the authority to conduct the mitigation should the applicant fail to do so; and

(r)   Any additional necessary supporting information required by Chapter 62-345, F.A.C.


## 10.3.4   Monitoring Requirements for Mitigation Areas

If applicable, applicants shall monitor the progress of mitigation areas until success can be demonstrated as provided in **section 10.3.6, below**. Monitoring parameters, methods, schedules, and reporting requirements will be specified in permit conditions.

## 10.3.5   Protection of Mitigation Areas

Applicants shall propose and be responsible for implementing methods that assure that mitigation areas will not be adversely impacted by incidental encroachment or secondary activities that might compromise mitigation success or long-term viability.

## 10.3.6   Mitigation Success

Mitigation success will be measured in terms of whether the objectives of the mitigation are expected to be realized. The success criteria to be included in permit conditions will specify the minimum requirements necessary to attain a determination of success. The mitigation shall be deemed successful by the Agency when all applicable water quality standards are met, the mitigation area has achieved viable and sustainable ecological and hydrological functions and the specific success criteria contained in the permit are met. If success is not achieved within the time frame specified within the permit, remedial measures shall be required. Monitoring requirements shall remain in effect until success is achieved as specified in the permit. Maintenance requirements shall remain in effect as specified in the permit.

**10.3.7    Financial Responsibility for Mitigation.**

As part of compliance with paragraph 62-330.301(1)(j), F.A.C., where an applicant proposes mitigation, the applicant shall provide proof of financial responsibility to:

(a)    Conduct the mitigation activities;

(b)    Conduct any necessary management of the mitigation site;

(c)    Conduct monitoring of the mitigation;

(d)    Prepare and submit monitoring reports to the Agency; and

(e)    Conduct any necessary corrective action indicated by the monitoring.

**10.3.7.1    Applicants not subject to financial responsibility requirements.**

The following applicants shall not be subject to the financial responsibility requirements in **sections 10.3.7 through 10.3.9**:

(a)    Applicants whose mitigation is deemed successful pursuant to **section 10.3.6, above,** prior to undertaking the construction activities authorized under the permit issued pursuant to Part IV, Chapter 373, F.S.

(b)    Applicants whose mitigation is estimated to cost less than $25,000.

(c)    Federal, state, county and municipal governments; state political subdivisions; investor-owned utilities regulated by the Florida Public Service Commission; and rural electric cooperative.

(d)    Mitigation banks that comply with the financial responsibility provisions of Rule 62-342.700, F.A.C.

**10.3.7.2    Amount of financial responsibility.**

The amount of financial responsibility provided by the applicant shall be in an amount equal to 110 percent of the cost estimate determined pursuant to **section 10.3.7.7, below**, for each phase of the mitigation plan submitted under the requirements of **sections 10.3 through 10.3.8**, and under the requirements of Section 373.414(19)(a), F.S., when mitigation is required for the extraction of limestone and phosphate.

**10.3.7.3    Documentation.**

The permit applicant shall provide draft documentation of the required financial responsibility mechanism described below with the permit application, and shall submit to the Agency the executed or finalized documentation within the time frames specified in the permit.

**10.3.7.4    General Terms for Financial Responsibility Mechanisms.**

In addition to the specific provisions regarding financial responsibility mechanisms set forth in **section 10.3.7.6, below**, the following, as they relate to the specific mechanism proposed, shall be complied with:

(a)    The form and content of all financial responsibility mechanisms shall be approved by the Agency. Forms that have been developed for this purpose are incorporated by reference in subsection 62-330.301(5), F.A.C. The applicant must provide the applicable form or one that is in substantial conformance with that form; any changes must be noted on the face of the form and identified to the Agency for review and approval.

(b)    The financial mechanisms shall name the Agency as sole beneficiary or shall be payable solely to the Agency. If the financial mechanism is of a type that is retained by the beneficiary according to industry standards, the original financial responsibility mechanism shall be retained by the Agency.

(c)    The financial responsibility mechanisms shall be established with a regulated state or national bank, savings and loan association, or other financial institution, licensed or regulated by a federal or state agency and authorized to issue such instruments in the State of Florida. In the case of letters of credit, the letter of credit must be issued by an entity that has authority to issue letters of credit and whose letter of credit operations are regulated and examined by a federal or state agency. In the case of a surety bond, the surety bond must be issued by a surety company registered with the state of Florida.

(d)    The financial responsibility mechanisms shall be effective on or prior to the date that the activity authorized by the permit commences and shall continue to be effective through the date of notification of final release by the Agency in accordance with **section 10.3.7.7.2 below**.

(e)    The financial responsibility mechanisms shall provide that they cannot be revoked, terminated, or cancelled without first providing an alternative financial responsibility mechanism that meets the requirements of **sections 10.3.7 through 10.3.7.9**. Financial mechanisms shall provide that they cannot be revoked, terminated, or cancelled without a 120-day notice to the Agency. Within 90 days of receipt by the permittee of actual or constructive notice of revocation, termination, or cancellation of a financial responsibility mechanism or other actual or constructive notice of cancellation, the permittee shall provide such an alternate financial responsibility mechanism.

(f)    When mitigation is required for the extraction of limestone and phosphate, the financial responsibility mechanism must meet the criteria of Section 373.414(19)(a), F.S.

**10.3.7.5**    If the permittee fails to comply with the terms and conditions of the permit, including any mitigation requirement, such failure shall be deemed a violation of Chapter 62-330, F.A.C., and the permit issued thereunder. In addition to any other remedies for such violation available to it, the Agency may make demand upon the financial mechanism. Notice of intent to make demand shall be as provided in the mechanism or, if none, upon reasonable notice.

**10.3.7.6    Financial Responsibility Mechanisms.**

Financial responsibility for the mitigation, monitoring, and corrective action for each phase of the project may be established by any of the following methods, at the discretion of the applicant:

(a)    Performance bond; when issued in favor of DEP, the applicant shall also establish a standby trust fund agreement;

(b)    Irrevocable letter of credit; when issued in favor of DEP, the applicant shall also establish a standby trust fund agreement;

(c)    Trust fund agreement;

(d)    Deposit of cash or cash equivalent into an escrow account at a regulated financial institution or at the Florida Department of Financial Services; and

(e)    Guarantee bond.

**10.3.7.7    Cost estimates.**

For the purposes of determining the amount of financial responsibility that is required by this subsection, the applicant shall submit a detailed written estimate, in current dollars, of the total cost of conducting the mitigation, including any maintenance and monitoring activities, and the applicant shall comply with the following:

(a)    The cost estimate for conducting the mitigation and monitoring shall include all associated costs for each phase thereof, including earthmoving, planting, structure installation, maintaining and operating any structures, controlling nuisance or exotic species, fire management, consultant fees, monitoring activities, and reports.

(b)    The applicant shall submit the estimates, together with verifiable documentation, to the Agency along with the draft of the financial responsibility mechanism.

(c)    The costs shall be estimated based on a third party performing the work and supplying materials at the fair market value of the services and materials. The source of any cost estimates shall be indicated.

**10.3.7.7.1    Partial Releases.**

The permittee may request the Agency to release portions of the financial responsibility mechanism as parts of the mitigation plan, such as earth moving, construction, or other activities for which cost estimates were submitted in accordance with **section 10.3.7.7**, are successfully completed. The request shall be in writing and include documentation that the activities have been completed and have been paid for or will be paid for upon release of the applicable portion of the financial responsibility mechanism and a revised cost estimate for the completion of the mitigation activities. The Agency shall authorize the release, or shall request the applicable financial institution release, of the portion requested upon verification that the activities have been completed in accordance with the mitigation plans.

**10.3.7.7.2    Final Release.**

Within thirty (30) days of the Agency determining that the mitigation is successful in accordance with **section 10.3.6, above**, the Agency shall so notify the permittee and shall authorize the return and release of all funds held or give written authorization to the appropriate third party for the cancellation or termination of the financial responsibility mechanism.

**10.3.7.8    Financial Responsibility Conditions.**

For applicants subject to the financial responsibility of **sections 10.3.7 through 10.3.7.9,** the Agency will include the following conditions in the permit:

(a)    A permittee must notify the Agency by certified mail of the commencement of a voluntary or involuntary proceeding under Title 11 (Bankruptcy), U.S. Code, naming the permittee as debtor within 10 business days after the commencement of the proceeding.

(b)    A permittee who fulfills the requirements of **sections 10.3.7 through 10.3.7.9,** by obtaining a letter of credit or performance bond will be deemed to be without the required financial assurance in the event of bankruptcy, insolvency, or suspension or revocation of the license or charter of the issuing institution. The permittee must reestablish in accordance with **sections 10.3.7 through 10.3.7.9,** a financial responsibility mechanism within 60 days after such event.

(c)    When transferring a permit, the new owner or person with legal control shall submit documentation to satisfy the financial responsibility requirements of **sections 10.3.7 through 10.3.7.9**. The prior owner or person with legal control of the project shall continue the financial responsibility mechanism until the Agency has approved the permit transfer and substitute financial responsibility mechanism.

**10.3.7.9    Financial Responsibility Mechanisms for Multiple Projects.**

An applicant may use a mechanism specified in **section 10.3.7.6, above** to meet the financial responsibility requirement for multiple projects. The financial responsibility mechanism must include a list of projects, the amount of funds assured for each project, and limit the amount of funds available for each project. The mechanism must be no less than the sum of the funds that would be necessary in accordance with **section 10.3.7.2, above**, as if separate mechanisms had been established for each project. As additional permits are issued that require mitigation, the amount of the financial responsibility mechanism may be increased in accordance with **section 10.3.7.2, above,** and the project added to the list.

**10.3.8    Real property conveyances.**

(a)    All conservation easements, deed restrictions, and restrictive covenants accepted for mitigation purposes shall be granted in perpetuity without encumbrances, unless such encumbrances do not adversely affect the ecological viability of the mitigation. All liens and mortgages shall be released or subordinated to the conservation easement. All conservation easements shall be consistent with Section 704.06, F.S., and shall contain restrictions that ensure the ecological viability of the site.

(b)    All real property conveyances shall be in fee simple and by statutory warranty deed, special warranty deed, or other deed, without encumbrances that adversely affect the

integrity of the preservation. The Agency shall also accept a quit claim deed if necessary to aid in clearing minor title defects or otherwise resolving boundary questions.

(c)     The use of the applicable Form 62-330.301(8) through 62-330.301(17) shall constitute consistency with Section 704.06, F.S. **Where the applicant demonstrates that project specific conditions necessitate deviation from language of the accepted forms, alternative language shall be accepted** provided that it meets the provisions of Section 704.06, F.S. and **section 10. 3. 8** of this Volume. Each of these forms are in **Appendix C** of this Volume, and a copy of the form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

## PART IV -- EROSION AND SEDIMENT CONTROL

**11.0    Erosion and Sediment Control**

**11.1    Overview**

Uncontrolled erosion and sediment from land development activities can result in costly damage to aquatic areas and to both private and public lands. Excessive sediment blocks stormwater conveyance systems, plugs culverts, fills navigable channels, impairs fish spawning, clogs the gills of fish and invertebrates, and suppresses aquatic life.

A plan for minimizing erosion and controlling sediment through the implementation of best management practices (BMPs) must be included with the application for a permit. In addition to the "erosion and sediment control plan" required by **section 11.2**, all projects that disturb one or more acre of land that discharge to waters or a permitted Municipal Separate Stormwater Sewer System (MS4) also will need to develop and implement a Stormwater Pollution Prevention Plan (SWPPP) to obtain coverage under Florida's NPDES Stormwater Construction Generic Permit. Therefore, applicants are advised to comply with the erosion and sediment control requirements in **section 11.3.1, below**.

An effective sediment and erosion control plan is essential for controlling stormwater pollution during construction. An erosion and sediment control plan is a site-specific plan that specifies the location, installation, and maintenance of best management practices to prevent and control erosion and sediment loss at a construction site. The plan is submitted as part of the permit application and must be clearly shown on the construction plans for the development. Erosion and sediment control plans range from very simple for small, single-phase developments to complex for large, multiple phased projects. If, because of unforeseen circumstances such as extreme rainfall events or construction delays, the proposed erosion and sedimentation controls no longer provide reasonable assurance that water quality standards will not be violated, additional erosion and sediment control measures shall be required that must be designed and implemented to prevent violations of water quality standards.

**11.1.1    Erosion and Sediment Control Requirements**

Erosion and sediment control BMPs shall be used as necessary during construction to **retain sediment on-site and assure that any discharges from the site do not cause or contribute to a violation of state water quality standards**. These management practices must be designed according to specific site conditions and shall be shown or clearly referenced on the construction plans for the development. At a minimum, the erosion and sediment control requirements described in this section shall be followed during construction of the project. Additional measures are required if necessary to protect wetlands or prevent off-site flooding. All appropriate contractors must be furnished with the information pertaining to the implementation, operation, and maintenance of the erosion and sediment control plan. In addition, sediment accumulation in the stormwater system from construction activities must be removed prior to final certification of the system to ensure that the designed and permitted storage volume is available.

**11.1.2    Erosion and Sediment Control Principles**

Factors that influence erosion potential include soil characteristics, vegetative cover, topography, climatic conditions, timing of construction, and the areal extent of land clearing activities. The following principles must be considered in planning and undertaking construction and alteration of systems:

**A.H. Volume I**                                                                                              **[Effective date]**

(a)     Plan the development to fit topography, soils, drainage patterns, and vegetation;

(b)     Minimize both the extent of area exposed at one time and the duration of exposure;

(c)     Schedule activities during the dry season or during dry periods whenever possible to reduce the erosion potential;

(d)     Apply erosion control practices to minimize erosion from disturbed areas;

(e)     Apply perimeter controls to protect disturbed areas from off-site runoff and to trap eroded material on-site to prevent sedimentation in downstream areas;

(f)     Keep runoff velocities low and retain runoff on-site;

(g)     Stabilize disturbed areas immediately after final grade has been attained or during interim periods of inactivity resulting from construction delays; and

(h)     Implement a thorough maintenance and follow-up program.

These principles are usually integrated into a system of vegetative and structural measures, along with other management techniques, that are included in an erosion and sediment control plan to minimize erosion and control movement of sediment. In most cases, a combination of limited clearing and grading, limited time of exposure, and a judicious selection of erosion control practices and sediment trapping systems will prove to be the most practical method of controlling erosion and the associated production and transport of sediment. Permit applicants, system designers, and contractors can refer to the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual (June 2007)* and the *Florida Stormwater, Erosion, and Sedimentation Control Inspector's Manual (FDEP July 2008)*, for further information on erosion and sediment control. These manuals provide guidance for the planning, design, construction, and maintenance of erosion and sediment control practices. Both of these manuals are incorporated by reference in subparagraph 62-330.050(9)(b)5., F.A.C.

## 11.2    Development of an Erosion and Sediment Control Plan

An erosion and sediment control plan must be submitted as part of the application as a way of providing reasonable assurance that water quality standards will not be violated during the construction phase of a project. The plan must identify the location, relative timing, and specifications for all erosion and sediment control and stabilization measures that will be implemented as part of the project's construction. The plan must provide for compliance with the terms and schedule of implementing the proposed project, beginning with the initiation of construction activities. The plan may be submitted as a separate document, or may be contained as part of the plans and specifications of the construction documents.

## 11.3    Development of a Stormwater Pollution Prevention Plan (SWPPP) for NPDES Requirements

Although the requirement to develop and submit an SWPPP under a National Pollution Discharge Elimination System (NPDES) permit is not a requirement for a permit under Chapter 62-330, F.A.C., applicants are advised that preparation and adherence to a SWPPP is required where the permitted activity also requires an NPDES construction permit pursuant to subsection 62-621.300(4), F.A.C. Namely, **those construction activities resulting in greater than one acre of soil disturbance discharging to waters of the state or a permitted MS4 must also apply for**

**and receive coverage from DEP under Florida's NPDES Generic Permit for Stormwater Discharge from Large and Small Construction Activities (CGP) before disturbing the soil.** This section of the Handbook is provided to help the design community develop a comprehensive erosion and sediment control plan that satisfies all state requirements and avoid having to revise the plan for the CGP and its associated SWPPP. For purposes **sections 11.3.1 through 11.4, below,** references to the term "applicant" shall mean an applicant for the NPDES permit.

### 11.3.1    Additional Requirements of the Construction Generic Permit

(a)      The following non-stormwater discharges are prohibited:

   1.      Wastewater from washout of concrete;

   2.      Wastewater from washout and cleanout of stucco, paint, form release oils, curing compounds, and other construction materials;

   3.      Fuels, oils, or other pollutants associated with vehicle and equipment operation and maintenance; and

   4.      Soaps or solvents used in vehicle or equipment washing or cleaning.

(b)      Pollution Prevention Controls. The applicant must provide for the design, installation, implementation, and maintenance of effective pollution prevention measures to accomplish all of the following:

   1.      Minimize the discharge of pollutants from equipment and vehicle washing, wheel wash water, and other wash waters. Treat wash waters using a treatment system so that they do not cause or contribute to violations of water quality standards;

   2.      Minimize the exposure of building materials, building products, construction wastes, trash, landscape materials, fertilizers, pesticides, herbicides, detergents, sanitary waste, and other materials present on the site to precipitation and to stormwater;

   3.      Minimize the discharge of pollutants from spills and leaks; and implement chemical spill and leak prevention and response procedures;

   4.      Control wastes, such as discarded building materials, chemicals, litter, and sanitary waste, in accordance with all applicable state, local, and federal regulations;

   5.      Follow all applicable State and local waste disposal, sanitary sewer, and septic system regulations;

   6.      Use proper application rates and methods for fertilizers, herbicides, and pesticides. Set forth how these procedures will be implemented and enforced. Apply nutrients only at rates necessary to establish and maintain vegetation and consistent with all labeling requirements; and

   7.      Limit the application, generation, and migration of toxic substances; and properly store and dispose of toxic materials.

(c)     Erosion and Sediment Controls. The applicant must provide for the design, installation, implementation, and maintenance of appropriate erosion and sediment controls to accomplish all of the following:

1.     Control stormwater volume and velocity within the site to minimize soil erosion;

2.     Control stormwater peak discharge rates and volume to minimize erosion at discharge outfalls and to minimize downstream channel and streambank erosion;

3.     Minimize the amount of soil exposed during the construction activity;

4.     Minimize the disturbance of steep slopes;

5.     Minimize sediment discharges from the site. The design, installation, and maintenance of erosion and sediment controls shall address factors such as the amount, frequency, intensity, and duration of precipitation; the nature of the resulting stormwater; and soil characteristics, including the range of soil particle sizes expected to be present on the site;

6.     Minimize off-site vehicle tracking of sediments onto paved surfaces and the generation of dust. If sediment escapes the construction site, off-site accumulations of sediment must be removed at a frequency sufficient to minimize off-site impacts;

7.     Where feasible, direct stormwater to vegetated areas to increase sediment removal and maximize stormwater infiltration and to provide and maintain natural buffers adjacent to surface waters of the state; and

8.     Minimize soil compaction and preserve topsoil.

(d)     Sediment Basins

1.     For drainage basins with 10 or more disturbed acres at one time, a temporary (or permanent) sediment or wet detention basin providing 3,600 cubic feet of storage per acre drained, or equivalent control measures, shall be provided where attainable until final stabilization of the site. The 3,600 cubic feet of storage area per acre drained does not apply to flows from offsite areas and flows from onsite areas that are either undisturbed or have undergone final stabilization where such flows are diverted around both the disturbed area and the sediment basin. For drainage basins with 10 or more disturbed acres at one time and where a temporary sediment basin providing 3,600 cubic feet of storage per acre drained, or equivalent controls is not attainable, a combination of smaller sediment basins, sediment traps, wet detention systems, and/or other BMPs shall be used. At a minimum, silt fences or equivalent sediment controls are required for all side slope and downslope boundaries of the construction area.

2.     For drainage basins of less than 10 acres, sediment basins and/or sediment traps are recommended but not required. At a minimum, silt fences or equivalent sediment controls are required for all sideslope and downslope boundaries of the construction area.

3.  Areas that will be used for permanent stormwater infiltration treatment (e.g., stormwater retention basins) shall not be used for temporary sediment basins unless appropriate measures are taken to assure removal of accumulated fine sediments, to avoid excessive compaction of soils by construction machinery or equipment, and to ensure that the design and permitted infiltration rate is achieved.

(e)  Maintenance Requirements

The plan shall include a description of procedures that will be followed to ensure the timely maintenance of vegetation, erosion and sediment controls, stormwater management practices, and other protective measures and BMPs so they will remain in good and effective operating condition.

(f)  Inspections

An inspector qualified in accordance with Part II.12. of DEP Document No. 62-621.300(4)(a), effective February 17, 2009, incorporated by reference in paragraph 62-621.300(4)(a), F.A.C., (provided by the owner or operator) shall perform all required site inspections. Site inspections must include all points of discharge into surface waters or an MS4; disturbed areas of the construction site that have not been finally stabilized; areas used for storage of materials that are exposed to precipitation; structural controls; and locations where vehicles enter or exit the site. Site inspections shall be conducted at least once every seven calendar days and within 24 hours of the end of a storm that is 0.50 inches or greater. Inspections shall include:

1.  Disturbed areas and areas used for storage of materials that are exposed to precipitation shall be inspected for evidence of, or the potential for, pollutants entering the stormwater system. The stormwater management system and erosion and sediment control measures identified in the plan shall be observed to ensure that they are operating correctly. Discharge locations or points shall be inspected to ascertain whether erosion and sediment control and stormwater treatment measures are effective in preventing or minimizing the discharge of pollutants, including retaining sediment onsite pursuant to Rule 62-40.432, F.A.C. Locations where vehicles enter or exit the site shall be inspected for evidence of offsite sediment tracking.

2.  Based on the results of the inspection, all maintenance operations needed to assure proper operation of all controls, BMPs, practices, or measures identified in the stormwater pollution prevention plan shall be done in a timely manner, but in no case later than 7 calendar days following the inspection. If needed, pollution prevention controls, BMPs, and measures identified in the plan shall be revised as necessary to assure proper operation of all controls, BMPs, practices, or measures identified in the stormwater pollution prevention plan. Such revisions shall provide for timely implementation of any changes to the plan within 7 calendar days following the inspection.

3.  A report summarizing the scope of the inspection; name(s) and qualifications of personnel making the inspection; the date(s) of the inspection; rainfall data; major observations relating to the implementation of the stormwater pollution prevention plan; and actions taken in accordance with the requirements of this permit, shall be made and retained as part of the stormwater pollution prevention plan. Such

reports shall identify any incidents of non-compliance. Where a report does not identify any incidents of non-compliance, the report shall contain a certification that the facility is in compliance with the stormwater pollution prevention plan and the Generic Permit for Stormwater Discharge from Large and Small Construction Activities.

**11.4    Sediment Sump Design Example**

Example calculations for designing a sediment sump are provided in Section 3 of the "References and Design Aids" for Volume I, available at https://floridadep.gov/water/water/content/water-resource-management-rules#erp.

**PART V – OPERATION AND MAINTENANCE-SPECIFIC REQUIREMENTS**

**12.0    Operation and Maintenance Requirements**

**12.1    Responsibilities**

(a)    In accordance with Rule 62-330.310, F.A.C., and except as provided in **section 12.1.1, below,** upon completion of a project constructed in conformance with an individual permit issued under Part IV of Chapter 373, F.S., the permit must be converted from the construction phase to an operation and maintenance phase.

(b)    Responsibility for operation and maintenance of a regulated activity shall be an obligation in perpetuity as provided in Rule 62-330.310, F.A.C. Such entity or entities must have the financial, legal, and administrative capability to perform operation and maintenance in accordance with Agency rules and permit conditions.

(c)    Conversion of a permit from the construction to the operation and maintenance phase shall follow the procedures in Rule 62-330.310, F.A.C., and **section 12.2, below.**

**12.1.1    Exceptions**

The operation phase of mining projects subject to the land reclamation requirements of Chapter 378, F.S., and that are used solely for and by the mine during its life shall be allowed to terminate, without the need to apply for abandonment of the permit, after the mine, or its subunits, has met the requirements described in the applicable paragraph 62-330.310(7)(a) or (b), F.A.C.

**12.2    Procedures for Requesting Conversion from the Construction Phase to the Operation and Maintenance Phase**

(a)    Automatic Conversion —

1.    In accordance with subsection 62-330.310(5), F.A.C., projects authorized in a General Permit shall automatically convert to an operation and maintenance phase upon completion of the permitted activities in conformance with all the terms and conditions of the permit.

2.    For projects that serve an individual, private single family dwelling unit, duplex, triplex, or quadruplex that are not part of a larger plan of common development proposed by an applicant, upon receipt of a completed Form 62-330.310(3), "Construction Completion and Inspection Certification for Activities Associated with a Private Single-Family Dwelling Unit," the construction phase of the permit shall automatically convert to the operation and maintenance phase. However, if at any time the Agency determines that such an activity was not built in conformance with the terms and conditions of the permit, the permittee shall be subject to enforcement by the Agency and for all measures required to bring the activity into compliance with the permit.

(b)    For projects other than those specified in **sections 12.1.1** and **12.2(a), above** — Submittal of Form 62-330.310(1) "As-Built Certification and Request for Conversion to Operation Phase," in accordance with subparagraph 62-330.350(1)(f)2., F.A.C., shall serve to notify the Agency that the project, or independent portion of the project, is completed (other than

long-term monitoring and any mitigation that will require additional time after construction or alteration to achieve the success criteria specified in the permit) and ready for inspection by the Agency.

1.    Projects not requiring certification by a registered professional shall be certified by the permittee or their authorized agent. Projects designed by a registered professional shall be certified by a registered professional, unless exempted by law.

2.    The person completing Form 62-330.310(1) shall inform the Agency if there are substantial deviations from the plans approved as part of the permit and include as-built drawings with the form.

The plans must be clearly labeled as "as-built" or "record" drawings and shall consist of the permitted drawings that clearly highlight (such as through "red lines" or "clouds") any substantial deviations made during construction. The permittee shall be responsible for correcting the deviations [as verified by a new certification using Form 62-330.310(1)]. Non-substantial deviations do not require a permit modification. Substantial deviations shall be processed as a minor or major modification under Rule 62-330.315, F.A.C. Such modification must be issued by the Agency prior to the Agency approving the request to convert the permit from the construction to the operation and maintenance phase.

3.    The person certifying compliance with the permit shall submit documentation that demonstrates satisfaction of all permit conditions, other than long term monitoring and inspection requirements, along with Form 62-330.310(1).

(c)    When projects authorized by a permit under this chapter are constructed in phases, each phase or independent portion of the permitted project must be completed and the Permittee must have submitted Form 62-330.310(1) "As-Built Certification and Request for Conversion to Operation Phase," in accordance with subparagraph 62-330.350(1)(f)2., F.A.C., certifying as to such completion prior to the use of that phase or independent portion of the project. The request for conversion to the operating phase for any phase or independent portion of the permitted project shall occur before construction of any future work that may rely on that infrastructure for conveyance and water quality treatment and attenuation. Phased construction can include a partial certification.

(d)    Within 60 days of receiving Form 62-330.310(1), the Agency shall approve the request or will notify the permittee of any deficiencies that must be corrected prior to conversion to the operation and maintenance phase. If the Agency fails to take action on the request to convert the permit or notify the permittee of deficiencies, the conversion to operation and maintenance shall be deemed approved.

(e)    If the Agency notifies the permittee of deficiencies that must be corrected, and if the permittee fails to correct those deficiencies in a timely manner, the project will be considered to be not operating in accordance with a permit issued under Chapter 62-330, F.A.C., and the permittee will be subject to enforcement action by the Agency. In such case, the permittee will be responsible for any necessary permit modifications, alterations, or maintenance to bring the project into such compliance, and for submitting any new certifications and requests to convert the permit to the operation and maintenance phase as provided in this section.

(f)    The requirements for submittal of an "as-built certification" contained in a permit issued under Part IV of Chapter 373, F.S., prior to October 1, 2013, the effective date of Chapter 62-330, F.A.C., shall continue to be followed in accordance with the existing permit unless the permittee obtains a modification using the procedures in Rule 62-330.315, F.A.C., to comply with the "as-built certification" requirements of Rules 62-330.310 and 62-330.350, F.A.C., and this section of Volume I.

### 12.2.1 Transfer to the perpetual operation and maintenance entity

(a)    If the permittee is also the operation and maintenance entity, once the activity has been converted to the operation phase as described in **section 12.2, above,** no other action is required under this section.

(b)    In accordance with subparagraph 62-330.350(1)(g)2., F.A.C., if the permittee is not also the operation and maintenance entity, a completed Form 62-330.310(2), "Request for Transfer of Environmental Resource Permit to the Perpetual Operation Entity" must be submitted to transfer the permit to the operation and maintenance entity. If the transfer is to the entity identified in the permit, the submittal of the form does not require a processing fee, and the review shall not require processing as a permit modification under Rule 62-330.315, F.A.C. The form must be signed by a person authorized to represent the operation and maintenance entity, and shall be submitted along with the following, as applicable:

    1.    A copy of the recorded transfer of title to the operation and maintenance entity for the common areas on which the stormwater management system, or other permitted works are located (unless dedicated by plat),

    2.    A copy of all recorded plats,

    3.    Copies of recorded declaration of covenants and restrictions, amendments, and associated exhibits, and

    4.    A copy of the filed articles of incorporation and documentation of the operation and maintenance entity's active corporate status with the Department of State, Division of Corporations, if the entity is a corporation.

(c)    Documents that require recordation in the public records must be recorded in the county where the project is located prior to any lot or unit sales within the project served by the system or work, or upon completion of construction of the system or work, whichever occurs first.

(d)    Within 60 days of receiving a complete request to transfer the permit to the operation and maintenance entity, the Agency shall approve the request, or will notify the permittee that the documentation is insufficient to demonstrate compliance with **Section 12.3, below,** and permit conditions. The permittee shall remain liable until the permit is transferred to the operation and maintenance entity by the Agency. If the Agency fails to take action or notify the permittee of the insufficiencies within 60 days of the request, the transfer shall be deemed approved if the permit has already been certified and converted to the operation phase.

(e)     If a permit modification is required to allow for a new entity or multiple entities to operate and maintain the project, the 60-day time period for Agency action shall not commence until the permit modification is issued.

**12.3     Operation and Maintenance Entities**

12.3.1   An acceptable operation and maintenance entity must have the legal ability to access, monitor, operate, and maintain the permitted project. Typically, this is accomplished through ownership or control of all property on which the permitted project is located by one of the entities listed below. However, alternative methods of achieving the legal requirements necessary for operation and maintenance will be considered by the Agency. Drainage easements, cross drainage agreements, or similar documents may be required for connected systems or systems with common infrastructure to be operated by different entities.

The following entities are acceptable for ensuring that an activity will be operated and maintained in compliance with the requirements of Section 373.416(2), F.A.C., and Chapter 62-330, F.A.C.

(a)     Local government units, including counties and municipalities, Municipal Service Taxing Units, or special taxing units;

(b)     Water control districts created pursuant to Chapter 298, F.S., drainage districts created by special act, special districts defined in Chapter 189, F.S., Community Development Districts created pursuant to Chapter 190, F.S., Special Assessment Districts created pursuant to Chapter 170, F.S., or water management districts created pursuant to Chapter 373, F.S.;

(c)     State or federal agencies;

(d)     Duly constituted communication, water, sewer, stormwater, electrical, or other public utilities;

(e)     Construction permittees, subject to the restrictions below; or

(f)     Non-profit corporations, including homeowners' associations, property owners' associations, condominium owners' or master associations, subject to the restrictions below.

12.3.2   If the proposed operation and maintenance entity falls within paragraph (a), (b), (c), or (d) above, a preliminary letter of intent or statement from such entity must be submitted to the Agency with the permit application, or in a permit modification request, indicating the entity's intention to accept responsibility for operation and maintenance of the permitted system. The letter of intent or statement must clearly indicate what portions of the system will be operated and maintained by the entity, and whether any portions of the system are to be operated and maintained by another entity. If portions of the system are to be operated and maintained by another entity, similar letters of intent or statements must be received from those entities. Upon approval by the Agency, all such identified entities will be responsible for operation and maintenance of the system.

12.3.3   A construction permittee is an acceptable operation and maintenance entity, provided the property on which all of the permitted project is located will continue to be owned or controlled by the construction permittee. When a permittee intends to convey the property to a third party, the permittee will be an approved operation and maintenance entity from the time construction begins until the system is transferred to the established legal entity approved by the Agency. If a permittee intends to convey or

transfer any portion of the property on which the permitted project is located, the permittee may continue to be the long-term operation and maintenance entity only if appropriate drainage easements, cross drainage agreements or similar documents that provide the entity with the legal capability and authority to operate and maintain the permitted project is approved as part of the permit application, are recorded in the official records of the applicable county, and are in effect prior to any conveyance or transfer of the property or conversion of the permit to the operation and maintenance phase, whichever occurs first. Where the property is leased or rented to a third party, the property owner shall continue to be the responsible operation and maintenance entity.

**12.3.4**    Homeowners' associations, property owners' associations, and condominium owners' or master associations (collectively, "Associations") are acceptable operation and maintenance entities only if they have the financial, legal, and administrative capability to provide for the long term operation and maintenance of the project. Accordingly, the applicant must:

(a)    Submit draft Articles of Incorporation, Declaration, Restrictive Covenants, Deed Restrictions or other organizational and operation documents, or draft amendments thereto, that affirmatively assign responsibility to the Association for the operation or maintenance of the project. Model language for Declaration and Restrictive Covenants is included in section 7 of the "References and Design Aids" for Volume I. The Association documents must comply with Chapters 617, 718, 719, and 720, F.S., as applicable.

(b)    Submit documentation that the Association will have sufficient powers (reflected in governing documents where applicable), to:

    1.    Own and convey property;

    2.    Operate and perform maintenance of the permitted project on common property as exempted or permitted by the Agency;

    3.    Establish rules and regulations governing membership or take any other actions necessary for the purposes for which the corporation or association was organized;

    4.    Assess members for the cost of operating and maintaining the common property, including the stormwater management system, and enforce the collection of such assessments;

    5.    Sue and be sued;

    6.    Contract for services to provide for operation and maintenance (if the association contemplates employing a maintenance company);

    7.    Require all owners of real property or units to be members of the corporation or association; and

    8.    Demonstrate that the land on which the system is located is owned or otherwise controlled by the corporation or association to the extent necessary to operate and maintain the system or convey operation and maintenance to another entity.

(c)    Submit documentation that the following covenants and restrictions, will be or have been set forth in the Declaration of Restrictive Covenants, Deed Restrictions, Declaration of

Condominium, or other recorded document setting forth the Association's rules and regulations:

1.     That it is the responsibility of the Association to operate and maintain the system;

2.     The system is owned by the Association or described therein as common property;

3.     That there is a method of assessing and collecting the assessment for operation and maintenance of the system;

4.     That any proposed amendment to the Association's documents affecting the system (including environmental conservation areas and the water management portions of the common areas) must be submitted to the Agency for a determination of whether the amendment necessitates a modification of the environmental resource permit. If a modification is necessary, the Agency will so advise the permittee. The amendment affecting the system may not be finalized until any necessary permit modification is approved by the Agency or the Association is advised that a modification is not necessary;

5.     That the governing provisions of the Association must be in effect for at least 20 years with automatic renewal periods thereafter;

6.     That the Association shall exist in perpetuity. However, should the Association dissolve, the operational documents shall provide that the system shall be transferred to and maintained by one of the entities identified in **sections 12.3.1(a) through (f), above**, who has the powers listed in **section 12.3.4(b)1. through 8., above**, the covenants and restrictions required in **section 12.3.4(c)1. through 9., herein**, and the ability to accept responsibility for the operation and maintenance of the system described in **section 12.3.4(d)1. or 2, below**;

7.     If wetland mitigation monitoring is required by the permit and the operational entity will be responsible to carry out this obligation, the rules and regulations of the Association shall state that it will be the Association's responsibility to complete the task successfully, including meeting all conditions associated with mitigation maintenance and monitoring;

8.     The Agency has the right to take enforcement action, including a civil action for an injunction and penalties, against the Association to compel it to correct any outstanding problems with the system facilities or in mitigation or conservation areas under the responsibility or control of the Association; and

9.     A "Recorded Notice of Environmental Resource Permit," Form No. 62-330.090(1), shall be recorded in the public records of the County(s) where the project is located. The Registered Agent for the Association shall maintain copies of all permitting actions for the benefit of the Association.

(d)     Submit documentation that the Association will have the ability to accept responsibility for the operation and maintenance of the system:

1.      For future phases of the project, if the operation and maintenance entity is proposed for a project that will be constructed in phases, and subsequent phases will utilize the same system as the initial phase or phases; or

2.      Have, either separately or collectively, the responsibility and authority to operate and perform maintenance of the system for the entire project area, if the development scheme contemplates independent operation and maintenance entities for different phases, and the system is integrated throughout the project. That authority must include cross easements for surface water management and the ability to enter and maintain the various portions of the system, should any sub-entity fail to maintain a portion of the system within the project area.

## 12.4    Minimum Operation and Maintenance Standards

(a)     In accordance with Section 373.416(2), F.S., unless revoked or abandoned, all stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works permitted under Part IV of Chapter 373, F.S., must be operated and maintained in perpetuity. The operation and maintenance shall be in accordance with the designs, plans, calculations, and other specifications that are submitted with an application, approved by the Agency, and incorporated as a condition into any permit issued.

(b)     Upon completion of the permitted stormwater management systems, dams, reservoirs, impoundments, appurtenant work, or works, the Agency shall have periodic inspections made to ensure the project was constructed and is being operated in compliance with the terms and conditions of the permit, and in a manner that protects the public health and safety and the natural resources of the state. No person shall refuse immediate entry or access to any authorized representative of the District or DEP who requests entry for purposes of such inspection and presents appropriate credentials.

(c)     Inspections may be performed by Agency staff during and after construction. When needed to ensure a project is being operated and maintained in perpetuity, the permit may require the operation and maintenance entity to conduct the periodic inspections. The required inspection schedule for a specific project will be specified in the permit.

(d)     Some projects **that do not consist of or include a stormwater management system, dam, impoundment, reservoir, or appurtenant work,** whether designed by a registered professional or not, also may be required in the permit to be regularly inspected and monitored to ensure continued compliance with permit conditions and the functioning of the project. This may include individual permits issued for activities at a private residential single-family residence. For example, a residential fill pad may have been permitted with specific requirements for slope drainage or runoff. A dock located in waters with sensitive resources may have been permitted with conditions prohibiting mooring in certain locations, limiting the number or size of boats to be moored at the dock, or with requirements for handrailing or other associated structures. The permit will specify the periodic inspections that will be required, and how the results of the inspections are to be either retained by the permittee or reported to the Agency.

The following are examples of activities as discussed above that are subject to an initial inspection prior to conversion to the operation phase, and then subject to routine

inspections during the operation and maintenance phase. The inspection frequency during the operation and maintenance phase will be determined in the permit:

- Single-family dock (to verify that: handrails are constructed and are maintained to prevent mooring of vessels in shallow waters);
- Multi-slip docking facility (to verify maintenance of manatee protection signs, sewage pumpout facilities, or over-water fueling operation);
- Single-family lot fill (to verify lawn grading and sloping is maintained to reduce discharges of nutrients from lawn runoff entering sensitive waters);
- Seawalls or rip rap (to verify integrity of system or shoreline plantings);
- Lands within a conservation easements (for encroachments, alterations, or exotic/nuisance vegetation removal) in accordance with a permit under this chapter;
- Mitigation sites (to determine compliance with success criteria, including the status of exotic species removals); and
- Other dredging or filling (for example, dredged material sites and dams to ensure functioning and stability of dikes and control structures).

(e)     The efficiency of stormwater management systems, dams, impoundments, and most other projects normally decreases over time without periodic maintenance. For example, a significant reduction in the flow capacity of a stormwater management system often can be attributed to partial blockages of its conveyance system. Once flow capacity is compromised, flooding may result. Therefore, operation and maintenance entities must perform periodic inspections to identify if there are any deficiencies in structural integrity, degradation due to insufficient maintenance, or improper operation of projects that may endanger public health, safety, or welfare, or the water resources. If deficiencies are found, the operation and maintenance entity will be responsible for correcting the deficiencies so that the project is returned to the operational functions required in the permit and contemplated by the design of the project as permitted. The corrections must be done a timely manner to prevent compromises to flood protection and water quality.

(f)     Inspection and reporting frequencies will be included as permit conditions based on site-specific operational and maintenance requirements, considering things as:

1.     The type, nature, and design of the design and performance standards proposed, including any alternative designs such as pervious pavement, green roofs, cisterns, managed aquatic plant systems, stormwater harvesting, wetland treatment trains, low impact designs, alum or polymer injection systems;

2.     The proximity of receiving waters classified as Outstanding Florida Waters in Rule 62-302.700, F.A.C., or impaired for constituents likely to be contained in discharges from the project;

3.     The nature of the site, such as whether it is part of a port or landfill, whether it will impound more than 40 acre-feet of water, or will include above ground impoundments;

4.     The topography, rainfall patterns, and adjacent development surrounding the activity site, including any special basin designations within the District in which the activity is located, as identified in paragraph 62-330.301(1)(k), F.A.C.;

5.      The nature of the underlying soils, geology, and groundwater, and hydrology;

6.      The potential for construction and operation of the project to cause harm to public health, safety, or welfare, or harm to water resources, water quality standards, or water quality; and

7.      Prior compliance history with the proposed design and performance type, including whether the activity characteristics are likely to pose more than a minimal risk for harm.

(g)      Special attention shall be made during inspections to ensure that:

1.      All erosion is controlled and soil is stabilized to prevent sediment discharge to waters in the state;

2.      The system is kept free of debris, trash, garbage, oils and greases, and other refuse;

3.      Stormwater management systems that include oil and grease separators, skimmers, or collection devices are working properly and do not allow the discharge of oils or greases. Oils and greases or other materials removed from such a device during routine maintenance shall be disposed of at a sanitary landfill or by other lawful means; and

4.      All structures within stormwater management systems have not become clogged or choked with vegetative or aquatic growth to such an extent as to render them inoperable.

(h)      Unless otherwise specified in the permit, the operation and maintenance entity must maintain a record of each inspection, including the date of inspection, the name and contact information of the inspector, whether the system was functioning as designed and permitted, and make such record available upon request of the Agency, in accordance with **section 12.5, below**.

(i)      The inspection and reporting requirements contained in a permit issued under Part IV of Chapter 373, F.S., prior to October 1, 2013, the effective date of Chapter 62-330, F.A.C., which implements Section 373.4141, F.S., shall continue to be followed in accordance with the existing permit unless the permittee obtains a modification using the procedures in Rule 62-330.315, F.A.C., to comply with the inspection and reporting requirements of Rule 62-330.311, F.A.C., and this section of the Handbook.

## 12.5    Reporting

(a)      All forms required for reporting can be submitted to the respective Agency Internet site. If the permittee does not use the electronic forms provided on that site, they shall be responsible for retaining records of the inspections and for delivering such records within 30 days of request to the requesting Agency, unless a more rapid delivery is requested for such reasons as the potential for the activity harm to water quality, water resources, public health, or public safety.

(b)     Within 30 days of any failure of a stormwater management system or deviation from the permit, a report shall be submitted electronically or in writing to the Agency using Form 62-330.311(1), "Operation and Maintenance Inspection Certification," describing the remedial actions taken to resolve the failure or deviation.

(c)     The operation and maintenance entity of a regional stormwater management facility must notify the Agency on an annual basis, using Form 62-330.311(2), "Regional Stormwater Management System Annual Report," of all new systems and their associated stormwater volumes that have been allowed to discharge stormwater into the regional facility, and confirming that the maximum allowable treatment volume of stormwater authorized to be accepted by the regional stormwater management facility has not been exceeded.

(d)     A listing of all the forms that are incorporated by reference in Chapter 62-330, F.A.C., is contained in Appendix C of this Volume; copies of which may be obtained from the Agency, as described in Appendix A of this Volume and subsection 62-330.010(5), F.A.C.

## 12.6    Recording of Operation and Maintenance Documents and Notice of Permit

(a)     Operation and maintenance documents required by **section 12.3.4 above**, must be submitted to the Agency for approval prior to recording. Such documents must be recorded in public records of the county where the project is located prior to any lot or unit sales within the project served by the system, or upon completion of construction of the system, whichever occurs first. For those systems that are to be operated and maintained by county or municipal entities, final operation and maintenance documents must be received by the Agency when maintenance and operation of the system is accepted by the local government entity. Failure to submit the appropriate final documents will result in the permittee remaining liable for carrying out maintenance and operation of the permitted system.

(b)     Permittees are advised that the Agency shall cause a "Recorded Notice of Environmental Resource Permit," Form No. 62-330.090(1), to be recorded in the public records of the county where the property is located in accordance with subsection 62-330.090(7), F.A.C., upon issuance of a permit, except for certain types of activities identified in that subsection.

## 12.7    Subsequent Transfers

Transfers of the permitted activity or the real property on which the permitted activity is located once a permit is in the operation and maintenance phase are governed by the procedures described in Rule 62-330.340, F.A.C., and **section 6.3 of this Volume**.

## APPENDIX A

CONTACT INFORMATION AND MAPS FOR AGENCIES IMPLEMENTING THE ERP PROGRAM

The Agencies have divided responsibilities for permitting, compliance, and enforcement in accordance with Operating and Delegation Agreements incorporated by reference in Chapter 62-113, F.A.C., and as referenced in subsection 62-330.010(3), F.A.C.

Applications and notices are to be submitted to the correct agency. However, some applications involve activities, a portion of which extends beyond the boundary of more than one water management district. In such a case, Section 373.046(6), F.S., provides that the responsible Agency will be determined based on factors such as the amount and geography of the activity's land area, the location of the activity's discharge or discharges, the type of activity, prior agency history, and the terms and conditions of the Operating Agreement in effect between the Agencies.

Electronic applications shall be filed through the applicable Agency e-permitting portal or website listed in subsection 62-330.010(7), F.A.C., or at http://flwaterpermits.com/, or at the following Internet site of the applicable District:

SWFWMD: http://www.swfwmd.state.fl.us/permits/

SJRWMD: http://www.sjrwmd.com/permitting/ or https://permitting.sjrwmd.com/epermitting/jsp/start.jsp

SRWMD: https://permitting.sjrwmd.com/srepermitting/jsp/start.jsp

NWFWMD: https://permitting.sjrwmd.com/nwepermitting/jsp/start.jsp

SFWMD: http://my.sfwmd.gov/ePermitting/MainPage.do

## DEPARTMENT OF ENVIRONMENTAL PROTECTION
## DISTRICT AND BRANCH OFFICES

https://floridadep.gov/districts

Northwest District:
    Escambia, Holmes, Okaloosa, Santa Rosa, & Walton Counties
    160 W. Governmental Street, Suite 308
    Pensacola, FL 32502-5740
    https://floridadep.gov/northwest/

    Northwest District Branch Office: Bay, Calhoun, Gulf, Jackson, & Washington Counties
    2353 Jenks Avenue
    Panama City, FL 32405

    Northwest District Branch Office: Franklin, Gadsden, Jefferson, Leon, Liberty, & Wakulla Counties
    2600 Blair Stone Road MS 55
    Tallahassee, FL 32399-3000

Northeast District:
    Alachua, Baker, Bradford, Clay, Columbia, Dixie, Duval, Flagler, Gilchrist, Hamilton, Lafayette, Levy, Madison, Nassau, Putnam, St. Johns, Suwannee, Taylor & Union Counties
    8800 Baymeadows Way West, Suite 100
    Jacksonville, FL 32256-7590
    https://floridadep.gov/northeast/

Central District:
    Brevard, Lake, Marion, Orange, Osceola, Seminole, Sumter & Volusia Counties
    3319 Maguire Boulevard, Suite 232
    Orlando, FL 32803-3767
    https://floridadep.gov/central/

Southwest District:
    Citrus, Hardee, Hernando, Hillsborough, Manatee, Pasco, Pinellas & Polk Counties
    13051 N. Telecom Parkway
    Temple Terrace, FL 33637-0926
    https://floridadep.gov/southwest/

Southeast District:
    Indian River, Okeechobee, St. Lucie, Martin, Palm Beach, Broward & Dade Counties
    400 North Congress Avenue, Third Floor
    West Palm Beach, FL 33401-2913
    https://floridadep.gov/southeast/

South District:
    Charlotte, Collier, DeSoto, Highlands, Hendry, Glades, Lee & Sarasota Counties
    2295 Victoria Avenue, Suite 364
    Fort Myers, FL 33901-2549
    https://floridadep.gov/south/

    South District Marathon Branch Office: Monroe County
    2796 Overseas Highway, Suite 221
    Marathon, FL 33050-4276



## Figure 1A

**WATER MANAGEMENT DISTRICTS**

Water management districts: contact information is available at the Department's site https://floridadep.gov/water-policy/water-policy/content/water-management-districts at the permitting portal http://flwaterpermits.com/  and at individual water management district web sites.

**Northwest Florida Water Management District:**
Contact the nearest Field Office

http://www.nwfwater.com/contact-us/locations/
http://www.nwfwater.com/permits/environmental-resource-permits/

Tallahassee Field Office (ERP)
152 Water Management Dr.
Havana, FL 32333

Crestview Field Office
180 East Redstone Ave.
Crestview, FL 32539

### *Figure 1B:*
### *Northwest Florida Water Management District Geographic Limits*
### *and Office Responsibilities*

*Note: Electronic applications can be submitted to the NWFWMD via the web. Paper applications can be submitted to the office covering the geographic area in which the project is located.*



**Tallahassee Field Office**
152 Water Management Dr.
Havana, FL 32333
Tel. (850) 921-2986
Fax (850) 921-3082
(For applications in Calhoun, Franklin, Gadsden, Gulf, Jackson, Jefferson, Leon, Liberty, and Wakulla counties)

**Crestview Field Office**
180 East Redstone Ave.
Crestview, Florida 32539
Tel. (850) 683-5044
Fax (850) 683-5050
(For applications in Bay, Escambia, Holmes, Okaloosa, Santa Rosa, Walton, and Washington counties)

**A.H. Volume I**

Agency Contacts
Appendix A-5

(This Appendix is not
Incorporated, date)

## SUWANNEE RIVER WATER MANAGEMENT DISTRICT

Contact the Water Supply and Resource Management Department
     http://www.flwaterpermits.com/home/srwmd_inside.jsp
     http://www.SRWMD.state.fl.us

Water Supply and Resource Management Department
9225 CR 49
Live Oak, FL 32060



## ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

Contact the District Headquarters
     http://www.flwaterpermits.com/home/stjohns_inside.jsp
     http://www.SJRWMD.com
     ePermitting: http://floridaswater.com/permitting/

District Headquarters, Division of Permit Data Services
4049 Reid Street
Palatka, Florida 32177-2529

P.O. Box 1429
Palatka, FL 32178-1429



## Southwest Florida Water Management District

Contact the nearest Tampa Service Center or the nearest
Regulation Department office as depicted below:

http://www.flwaterpermits.com/home/swfwmd_inside.jsp
http://www.WaterMatters.org
ePermitting: http://www.swfwmd.state.fl.us/permits/

Tampa Service Office
7601 US Hwy. 301
Tampa, FL 33637-6759



**South Florida Water Management District**

Contact the nearest Service Center or the Regulation Reception Desk

http://www.flwaterpermits.com/home/sfwmd_inside.jsp
http://www.sfwmd.gov/ePermitting
http://my.sfwmd.gov/portal/page/portal/levelthree/permits, or at any of the District's Service Centers online at
http://my.sfwmd.gov/portal/page/portal/xrepository/sfwmd_repository_pdf/motormap.pdf



- **Broward, Miami-Dade, Monroe and Palm Beach counties**
  SFWMD Headquarters
  Building B-1
  3301 Gun Club Road
  West Palm Beach, FL 33406
  Phone: (561) 682-6736

- **Charlotte, Hendry and Lee counties**
  Fort Myers Service Center
  2301 McGregor Blvd.
  Fort Myers, FL 33901
  Phone: (239) 338-2929
  Fax: (239) 338-2936

- **Collier County**
  Big Cypress Basin Service Center
  2660 Horseshoe Drive North
  Naples, FL 34104
  Phone: (239) 263-7615
  Fax: (239) 263-8166

  Or, Fort Myers Service Center
  2301 McGregor Blvd.
  Fort Myers, FL 33901
  Phone: (239) 338-2929
  Fax: (239) 338-2936

- **Glades, Highlands, Martin, Okeechobee and St. Lucie counties**
  Okeechobee Service Center
  3800 NW 16th Blvd., Suite A
  Okeechobee, FL 34972
  Phone: (863) 462-5260
  Fax: (863) 462-5269

- **Orange, Osceola and Polk counties**
  Orlando Service Center
  1707 Orlando Central Parkway
  Orlando, FL 32809
  Phone: (407) 858-6100
  Fax: (407) 858-6121

**Local Governments with Delegated Authority**

1. Broward County:
   Agreement dated 7/19/2001: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/erp-local-program-delegation
   http://www.broward.org/permittingandlicensing/Pages/Default.aspx

   Broward County Environmental Protection and Growth Management Department,
   Environmental Licensing and Building Permitting Division
   1 North University Drive, Suite 201
   Plantation, FL 33324, (954)519-1483

2. Environmental Protection Commission of Hillsborough County:
   Agreement dated 2/9/2012:
   https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/erp-local-program-delegation
   http://fl-hillsboroughcountyepc.civicplus.com/

   Executive Director
   Environmental Protection Commission
   3629 Queen Palm Dr.
   Tampa, FL 33619

## APPENDIX B

OPERATING AND DELEGATION AGREEMENTS BETWEEN THE DEPARTMENT, WATER MANAGEMENT DISTRICTS, and DELEGATED LOCAL GOVERNMENTS

---

The following Operating Agreements have been executed between the Department and the Districts to implement the divisions of responsibilities for implementing the environmental resource permitting program under Part IV of Chapter 373, F.S. These Agreements are cited in subsection 62-330.010(3), F.A.C., and are incorporated by reference in Chapter 62-113, F.A.C.:

#10-1 Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., Between Northwest Florida Water Management District and Department of Environmental Protection, effective October 1, 2013, incorporated by reference in paragraph 62-113.100(3)(aa), F.A.C. (October 1, 2013).

#07-2: Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., between Suwannee River Water Management District and Department of Environmental Protection, dated July 1, 2007, incorporated by reference in paragraph 62-113.100(3)(m), F.A.C., and subsection 40B-400.091(2), F.A.C. (June 7, 2010).

#07-4: Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., between St. Johns River Water Management District and Department of Environmental Protection, dated July 1, 2007, incorporated by reference in paragraph 62-113.100(3)(x), F.A.C., and subsection 40C-4.091(1)(b), F.A.C. (May 27, 2012).

#07-3: Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., Between the Southwest Florida Water Management and Department of Environmental Protection, dated July 1, 2007, incorporated by reference in paragraph 62-113.100(3)(s), F.A.C., and subsection 40D-4.091(2), F.A.C. (August 1, 2012).

#07-1: Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., between South Florida Water Management District and Department of Environmental Protection, dated July 1, 2007, incorporated by reference in paragraph 62-113.100(3)(f), F.A.C., and subsection 40E-4.091(1)(c), F.A.C., May 27, 2012

The following Delegation Agreements have been executed between the Department and Local Governments to delegate responsibilities of the Agencies for implementing the environmental resource permitting program under Part IV of Chapter 373, F.S. These Agreements are in subsection 62-330.010(5), F.A.C., and are incorporated by reference in Chapter 62-113, F.A.C:

#01-1: Delegation Agreement Between the Florida Department of Environmental Protection, the South Florida Water Management District, and Broward County Regarding Implementation of Environmental Resource Permitting, Compliance, and Enforcement, under Part IV, Chapter 373, F.S., dated May 22, 2001, incorporated by reference in paragraph 62-113.100(2)(o), F.A.C.

#11-1: Delegation Agreement Between the Florida Department of Environmental Protection and the Environmental Protection Commission, Hillsborough County, Regarding Implementation of Environmental Resource Permitting, Compliance, and Enforcement, under Part IV, Chapter 373, F.S., effective date December 13, 2011, incorporated by reference in paragraph 62-113.100(2)(p), F.A.C., dated May 22, 2001.

Additional Operating Agreements, Memoranda of Understandings, and Delegation Agreements may be accessed at:
https://floridadep.gov/ogc/ogc/content/operating-agreements

## APPENDIX C
### FORMS

The following forms incorporated for use in Chapter 62-330, F.A.C., (as identified by the Form number) are listed below.

| Form No. | Title |
|---|---|
| Form 62-330.050(1) | "Request for Verification of an Exemption" [http://www.flrules.org/Gateway/reference.asp?No=Ref-02468] |
| Form 62-330.0511(1) | "Notice of Intent to Construct a Minor Silvicultural System" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02510] |
| Form 62-330.060(1) | Section A "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands" [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section B: For Single-Family Projects [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section C: Supplemental Information for Works or Other Activities In, On, Over Wetlands and/or Other Surface Waters [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section D: Supplemental Information For Works or Other Activities Within Surface Waters [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section E: Supplemental Information Required for Works or Other Activities Involving a Stormwater Management System (Other Than a Single-Family Project [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section F: Application For Authorization to Use State-Owned Submerged Lands [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section G: Supplemental Information Required for Mitigation Banks [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section H: Supplemental Information for Stormwater Management Systems for Mines [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Section I: Supplemental Information for State 404 Program Permits [https://www.flrules.org/Gateway/reference.asp?No=Ref-12036] |
|  | Attachments 1-3: Application Form Instructions, Agency Contacts, and Application Fees [http://www.dep.state.fl.us/water/wetlands/erp/forms.htm] |
| Form 62-330.090(1) | "Recorded Notice of Environmental Resource Permit" [http://www.flrules.org/Gateway/reference.asp?No=Ref-09362] |
| Form 62-330.201(1) | "Chapter 62-340, F.A.C., Data Form" [https://www.flrules.org/Gateway/reference.asp?No=Ref-12037] |
| Form 62-330.201(2) | "Petition for a Formal Determination of the Landward Extent of Wetlands and Other Surface Waters" [https://www.flrules.org/Gateway/reference.asp?No=Ref-12038] |
| Form 62-330.301(1) | "Performance Bond To Demonstrate Financial Assurance for Mitigation" [http://www.flrules.org/Gateway/reference.asp?No=Ref-02472] |
| Form 62-330.301(2) | "Irrevocable Letter of Credit to Demonstrate Financial Assurance for Mitigation" [http://www.flrules.org/Gateway/reference.asp?No=Ref-02473] |

**A.H. Volume I**    Forms for Chapter 62-330, F.A.C.    (This Appendix is not Incorporated, date)

Form 62-330.301(3)       "Standby Trust Fund Agreement to Demonstrate Financial Assurance for Mitigation"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02474]

Form 62-330.301(4)       "Trust Fund Agreement to Demonstrate Financial Assurance for Mitigation"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02477]

Form 62-330.301(5)       "Escrow Agreement"

                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02476]

Form 62-330.301(6)       "Guarantee Bond To Demonstrate Financial Assurance for Mitigation"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02488]

Form 62-330.301(8)       "Deed of Conservation Easement, Standard"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02489]

Form 62-330.301(9)       "Deed of Conservation Easement, Standard, With Third Party Beneficiary Rights"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02490]

Form 62-330.301(10)      "Deed of Conservation Easement – Passive Recreational Uses"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02491]

Form 62-330.301(11)      "Deed of Conservation Easement – Riparian Uses"
                         [https://www.flrules.org/Gateway/reference.asp?No=Ref-02492]

Form 62-330.301(12)      "Deed of Conservation Easement for Local Governments"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02493]

Form 62-330.301(13)      "Deed of Conservation Easement with Third Party Beneficiary Rights to the U.S. Army
                          Corps of Engineers"
                         [https://www.flrules.org/Gateway/reference.asp?No=Ref-02494]

Form 62-330.301(14)      "Declaration of Restrictive Covenants"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-02495]

Form 62-330.301(15)      "Declaration of Restrictive Covenants –Insert"
                         [https://www.flrules.org/Gateway/reference.asp?No=Ref-02496]

Form 62-330.301(16)      "Temporary Easement for Construction Access"
                         [https://www.flrules.org/Gateway/reference.asp?No=Ref-02497]

Form 62-330.301(17)      "Permanent Access Easement" [https://www.flrules.org/Gateway/reference.asp?No=Ref-
                         02498]

Form 62-330.301(18)      "Joint Deed of Conservation Easement – Standard (within Broward County),"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-09377]

Form 62-330.301(19)      "Joint Deed of Conservation Easement — Third Party Beneficiary Rights (within
                         Broward County)," [http://www.flrules.org/Gateway/reference.asp?No=Ref-09378]

Form 62-330.301(20)      "Joint Deed of Conservation Easement — Passive Recreational Uses (within Broward
                         County)," [http://www.flrules.org/Gateway/reference.asp?No=Ref-09379]

Form 62-330.301(21)      "Joint Deed of Conservation Easement — Riparian Uses (within Broward County),"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-09380]

Form 62-330.301(22)      "Joint Deed of Conservation Easement — Local Governments (within Broward
                         County)," [http://www.flrules.org/Gateway/reference.asp?No=Ref-09381]

Form 62-330.301(23)      "Joint Deed of Conservation Easement — Third Party Beneficiary Rights to the U.S.
                         Army Corps of Engineers (within Broward County),"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-09382]

Form 62-330.301(24)      "Deed of Conservation Easement for Mitigation Banks – Third Party Beneficiary Rights
                         to the U.S. Army Corps of Engineers,"
                         [http://www.flrules.org/Gateway/reference.asp?No=Ref-09383]

**A.H. Volume I**        Forms for Chapter 62-330, F.A.C.              (This Appendix is not
                                                                       Incorporated, date)

Form 62-330.310(1)   "As-Built Certification and Request for Conversion to Operation Phase" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02499]

Form 62-330.310(2)   "Request For Transfer of Environmental Resource Permit to the Perpetual Operation and Maintenance Entity" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02500]

Form 62-330.310(3)   "Construction Completion and Inspection Certification for Activities Associated With a Private Single-Family Dwelling Unit" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02501]

Form 62-330.311(1)   "Operation and Maintenance Inspection Certification" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02502]

Form 62-330.311(2)   "Regional Stormwater Management System Annual Report" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02503]

Form 62-330.340(1)   "Request to Transfer Environmental Resource Permit and/or State 404 Program Permit" [https://www.flrules.org/Gateway/reference.asp?No=Ref-12039]

Form 62-330.350(1)   "Construction Commencement Notice" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02505]

Form 62-330.360(1)   "Emergency Field Authorization" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02506]

Form 62-330.402(1)   "Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit" [https://www.flrules.org/Gateway/reference.asp?No=Ref-12040]

Form 62-330.417(1)   "Agreement to Maintain Public Access" [http://www.flrules.org/Gateway/reference.asp?No=Ref-02508]

Form 62-330.417(2)   "Agreement to Maintain Public Access and Operate Stormwater System" [https://www.flrules.org/Gateway/reference.asp?No=Ref-02509]

All forms are listed by rule number, which is also the form number, and with the subject title and effective date. Copies of forms may be obtained from the above Internet links, or from any local district or branch office of the Agencies (see subsection 62-330.010(5), F.A.C., and Appendix A).

**APPENDIX D**

PROCESSING FEES

**PROCESSING FEES REQUIRED FOR APPLICATIONS, NOTICES, AND PETITIONS SUBMITTED TO THE AGENCIES ARE ACCESSIBLE AT:**

- Submittals to the Department or the Northwest Florida Water Management District — Rule 62-4.050(4)(h) , F.A.C. [https://www.flrules.org/gateway/ChapterHome.asp?Chapter=62-4]

- Submittals to the Suwannee River Water Management District — Rule 40B-1.706, F.A.C. [https://www.flrules.org/Gateway/reference.asp?No=Ref-02534]

- Submittals to the St. Johns River Water Management District — Rule 40C-1.603, F.A.C. [https://www.flrules.org/Gateway/reference.asp?No=Ref-02535]

- Submittals to the Southwest Florida Water Management District — Rule 40D-1.607, F.A.C. [https://www.flrules.org/Gateway/reference.asp?No=Ref-02536]

- Submittals to the South Florida Water Management District — Rule 40E-1.607, F.A.C. [https://www.flrules.org/Gateway/reference.asp?No=Ref-02537]

These rules are incorporated by reference in Rule 62-330.071, F.A.C.

For applications, notices, or petitions that are the responsibility of a local government delegated to implement Chapter 62-330, F.A.C., in accordance with Section 373.441, F.S., the processing fee shall be submitted to the local government in accordance with the fee schedule of the local government as authorized in the Delegation Agreement between the Department and the local government incorporated by reference in Chapter 62-113, F.A.C.

- Broward County - http://www.broward.org//Environment/Engineering/Pages/Default.aspx

- Hillsborough County - http://www.epchc.org/

**APPENDIX E**

OPERATING AGREEMENT BETWEEN

JACKSONVILLE DISTRICT USACE, DEP, AND ALL WMDS

[Appendices E, F, G, H, I, J and K are located in a separate document because of size; title pages are included here because they are all part of Applicant's Handbook, Volume I]

**A.H. Volume I**        Operating Agreement between Jacksonville        (This Appendix is not
                        District USACE, DEP, and all WMDs                incorporated, date)
                              Appendix E-1

**APPENDIX F**

**Bald and Golden Eagle Protection Act**

**APPENDIX G**

**USFWS Habitat Management Guidelines for the Wood Stork in the Southeast Region**

**APPENDIX H**

**National Bald Eagle Management Guidelines**

**APPENDIX I**

**Mine Stormwater Management Systems**

**APPENDIX J**

**Chapter 62-340, F.A.C. Data Form Guide**

**APPENDIX K**

**Chapter 62-340, F.A.C. Data Form Instructions**

APPENDIX E

**OPERATING AGREEMENT BETWEEN THE JACKSONVILLE DISTRICT OF THE U.S. ARMY CORPS OF ENGINEERS, THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,**
**NORTHWEST FLORIDA WATER MANAGEMENT DISTRICT THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT,**
**THE ST. JOHNS RIVER WATER MANAGEMENT DISTRICT,**
**THE SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT, AND THE SUWANNEE RIVER WATER MANAGEMENT DISTRICT CONCERNING REGULATORY PROGRAMS FOR ACTIVITIES IN WETLANDS AND OTHER SURFACE WATERS, INCLUDING WATERS OF THE UNITED STATES**

**I.     PARTIES, PURPOSE AND GOALS**

**A.     The Parties**

The Parties to this Agreement are the Jacksonville District of the United States Army Corps of Engineers (Corps), Florida Department of Environmental Protection (Department), Northwest Florida Water Management District (NWFWMD), South Florida Water Management District (SFWMD), St. Johns River Water Management District (SJRWMD), Southwest Florida Water Management District (SWFWMD), and Suwannee River Water Management District (SRWMD) (collectively referred to as "Districts"). Where the Department or a District has delegated responsibilities to a local government in accordance with section 373.441, Florida Statutes (F.S.), this Agreement shall also apply to those local governments that have been delegated such authority as of the effective date of this Agreement.

**B.     Purpose**

The purpose of this Agreement is to coordinate the permitting, compliance and enforcement programs of the Parties concerning regulation of activities that affect waters of the United States (WOUS) under the jurisdiction of the Corps, and wetlands and other surface waters under the jurisdiction of the Department or the Districts within the state of Florida. This Agreement shall apply to Department of the Army permits ("DA Permits") issued by the Corps pursuant to Section 404 of the Clean Water Act, Section 10 of the Rivers and Harbors Act of 1899 or Section 103 of the Marine Protection, Research and Sanctuaries Act and to permits issued by the Districts or the Department pursuant to part IV of chapter 373, F.S. ("State permits"). This Agreement describes the interaction between the Parties and is subject to the respective laws and implementing regulations and policies of the Parties.

This Agreement supersedes the Agreement entered on November 30, 1998, entitled "Operating Agreement Between the U.S. Army Corps of Engineers, the Florida Department of Environmental Protection, the South Florida Water Management District, the St. Johns River Water Management District, the Southwest Florida Water Management District, and the Suwannee River Water Management District Concerning Regulatory Programs for Activities in Wetlands

(This Appendix is not incorporated by reference; Effective Date_____)

and Other Surface Waters."

## C.    Goals

It is a goal of the Parties to this Agreement to effectuate efficient, streamlined regulatory programs that govern activities affecting wetlands and other surface waters, including jurisdictional WOUS. Towards this goal, the Parties have established joint application forms and agree, where possible, to coordinate the distribution and review of information received during the permit application review process. Other streamlining measures to be explored and further developed by the Parties include joint field inspections and pre-application meetings, coordinated, complementary enforcement efforts, and the Corps's state programmatic and regional general permits. Additionally, in order to further streamline the permitting process, the agencies agree to continue to jointly review the wetland delineation methodologies of the state and the Corps to identify any differences and explore ways to further resolve or overcome these differences. Further, the Parties may explore methods to integrate the principles of ecosystem management within their existing legal authority in order to achieve more effective environmental protection.

## II.    WATER QUALITY CERTIFICATION

By letter dated January 15, 1998, to the Secretary of the Department of Environmental Protection, the Governor of the State of Florida, under the authority in 33 U.S.C., Sections 1341 and 1362 (the Clean Water Act), and 40 C.F.R. 121.1(e), designated the Department as the agency responsible for certifying compliance with applicable state water quality standards for federal licenses or permits issued by the Corps under Section 404 of the Clean Water Act, 33 U.S.C. 1344. That letter granted the Department the authority to issue, deny, or waive certification of compliance with water quality standards, the authority to identify categories of activities for which water quality certification is waived, and the authority to establish categories of State permits or other authorizations for which the issuance (or denial) of the permit or authorization constitutes a certification (or denial of certification) that the permitted or authorized activity complies with (or fails to comply with) applicable state water quality standards. By letter dated February 2, 1998, to the Administrator of the Environmental Protection Agency, the Secretary of the Department of Environmental Protection, as delegated by the Governor of the State of Florida, designated certain permits under part IV of chapter 373, F.S., and other authorizations as constituting state certification of compliance with state water quality standards unless the permit or other authorization specifically states otherwise, established categories of activities for which water quality certification is waived, and delegated concurrent authority to issue, deny or waive water quality certifications to a District created under section 373.069, F.S., or to the head of a county, municipality or local government local pollution control program where such county, municipality, or local government pollution control program has received delegation of the permitting authority from the Department or a District under section 373.441, F.S. In accordance with these letters, the Parties agree to the following regarding water quality certification.

(This Appendix is not incorporated by reference; Effective Date_____)

**A. Grants or Waivers of Water Quality Certification**

1. Each of the following will constitute the granting of water quality certification by the Department or Districts, unless a State permit is issued pursuant to the net improvement provisions for water quality provided by section 373.414(1 )(b), F.S., or unless otherwise specifically stated in the State permit or authorization.

 (a) Noticed general environmental resource permits and wetland resource general permits under part IV of chapter 373, F.S.

 (b) Standard, general, standard general, individual, or conceptual approval environmental resource permits, and individual wetland resource permits issued under part IV of chapter 373, F.S.

 (c) Management and storage of surface waters permits for agricultural activities or agricultural water management systems issued under part IV of chapter 373, F.S.

 (d) Joint coastal permits issued under section 161.055 and part IV of chapter 373, F.S.

 (e) Individual and conceptual mitigation bank permits issued under part IV of chapter 373, F.S.

 (f) A written final order granting "certification" under one of the following siting acts by the Governor and Cabinet as the Siting Board, the Florida Land and Water Adjudicatory Commission, or by the Department of Environmental Protection, as appropriate:

  (1) The Florida Electric Power Plant Siting Act, sections 403.501- .519, F.S. (2011), as amended;

  (2) The Florida Transmission Line Siting Act, sections 403.501 - .5365, F.S., together with sections 403.537-.539, F.S. (2011), as amended; or

  (3) The Natural Gas Transmission Pipeline Siting Act, sections 403.9401-.9425, F.S. (2011), as amended.

 (g) Consent decrees, orders, or agreements issued by the Department, a District, or a delegated local government under section 373.441, F.S. (hereinafter the term "Department or District' shall also include local governments delegated in accordance with Section 373.441, F.S.), where such consent decree, order, or agreement authorizes activities which would otherwise require a permit under part IV of chapter 373, F.S.

2. Water quality certification will be considered waived for the following:

(a)     Activities, other than agricultural activities or agricultural water management systems, exempt by rule or statute from the requirement to obtain an environmental resource permit and a wetland resource permit under part IV of chapter 373, F.S., including activities that fall below permitting thresholds;

(b)     Agricultural activities or agricultural water management systems exempt by rule or statute from the requirement to obtain an environmental resource permit and a management and storage of surface waters permit under part IV of chapter 373, F.S., including activities that fall below permitting thresholds;

(c)     Activities permitted or authorized, as described in Sections II. A. 1(a) through (g), when the permit or authorization is issued pursuant to the net improvement provisions for water quality provided by paragraph 373.414(1)(b), F.S.;

(d)     Activities permitted or authorized in Sections II. A. 1(a) through (g) when the permit or authorization expressly waives water quality certification.

**B.     Denial of Water Quality Certification**

Unless otherwise stated in the denial document, the denial of the State permit or authorization, listed in Section II.A.1. of this Agreement shall constitute denial of the state water quality certification. Where a final Department or District action on an application for a permit listed in Section II.A.1. of this Agreement cannot be made within the time frames specified in Section II.C. of this Agreement and the application otherwise does not meet the criteria for issuance of a permit, the Department or District may deny water quality certification for the activity described in the permit application in order to meet the time clock requirements in Section II.C.

**C.     Time Frames**

Once the Department or the District determines that an application for a permit listed under Section II.A.1. of this Agreement is complete, the Department or District shall have 365 days to act on the certification, or the certification shall be considered waived.

**D.     Corps Nationwide Permits**

For nationwide permits that have received water quality certification by the Department, or where water quality certification has been waived by the Department or District, no individual water quality certification is necessary. For those Corps nationwide permits that were conditioned upon individual review of the water quality certification by the Department or District, or that have been denied water quality certification by the Department or District, state water quality certification for an individual proposed activity shall be made in accordance with

Sections II. A - C.

### III.    COASTAL ZONE CONSISTENCY CONCURRENCE (CZCC)

In accordance with section 373.428, F.S., final agency action by the Department or District on a permit application submitted under part IV of chapter 373, F.S., that is subject to a consistency review under section 380.23, F.S., shall constitute the state's determination as to whether the activity is consistent with the federally approved Coastal Management Program. The Parties agree to the following procedures regarding coastal zone consistency determinations.

### A.    Determination of Concurrence

The following will constitute a finding of concurrence with the state's coastal zone management program for the activity authorized thereby:

1.    Noticed general environmental resource permits and wetland resource general permits under part IV of chapter 373, F.S.;

2.    Standard, general, standard general, individual, or conceptual approval environmental resource permits and individual wetland resource permits issued under part IV of chapter 373, F.S.;

3.    Joint coastal permits issued under section 161.055 and part IV of chapter 373, F.S.;

4.    Individual and conceptual mitigation bank permits issued under section 161.055 and part IV of chapter 373, F.S.; and

5.    Management and storage of surface waters permits for agricultural activities or agricultural water management systems issued under part IV of chapter 373, F.S.

### B.    Determination of Inconsistency

The denial of a permit listed in Section III. A. of this Agreement    shall constitute a finding that the activity is inconsistent with the state's coastal zone management program.

### C.    Time Frames

The time frame for a coastal zone concurrence begins upon a determination by the Department or the District that an application for a permit listed in Section III.A. of this Agreement is complete. The coastal zone consistency decision must be made within 180 days after the application is considered complete by the Department or District and in accordance with the procedures in 15 C.F.R. 930

(This Appendix is not incorporated by reference; Effective Date_____)

Subpart D. At the end of 180 days, if a determination of coastal zone consistency has not been made, concurrence will be conclusively presumed, unless the applicant and the Department or District have agreed to waive the 180-day time clock pursuant to 15 C.F.R. 930.60(b).

**D.    Corps Nationwide Permits**

For nationwide permits that have been determined to be consistent with the state's coastal zone management program, no individual coastal zone consistency concurrence determination is necessary. For those Corps nationwide permits where consistency with the state coastal zone management program is conditioned upon individual review of the coastal zone management consistency by the state of Florida, or has been denied by Florida, the final consistency concurrence determination for a proposed activity shall be made in accordance with Sections III A - C.

**E.    Exemptions**

Pursuant to section 380.23(7), F.S., applications for federally permitted or licensed activities that qualify for an exemption under section 373.406 or 403.813(1), F.S., are not eligible to be reviewed for federal consistency with part IV of chapter 373, F.S. For purposes of this Agreement, the Corps or any designated Federal, State or local agency administering general permits on behalf of the Corps under 33 C.F.R. § 325.2(b)(2) may presume CZCC by operation of Section 380.23(7), F.S., for such exempt activities, provided the activity receives the applicable authorization to use and occupy state-owned submerged lands under chapter 253, F.S., and, as applicable, chapter 258, F.S., and the rules of the Florida Administrative Code adopted thereunder. For purposes of this agreement, the Corps or any designated Federal, State or local agency administering general permits on behalf of the Corps shall not be precluded from acting on the DA permit before the applicable authorization under chapter 253, F.S., and, as applicable, chapter 258, F.S., is obtained or granted, because it is understood such authorization must be obtained prior to persons using or occupying state-owned submerged lands.

**IV.    PERMIT APPLICATION COORDINATION**

**A.    Joint Application Forms**

The Parties have developed comprehensive, integrated joint permit application forms to initiate processing of permit applications required by each of the Parties. For activities that require a DA Permit and an environmental resource permit under part IV of chapter 373, F.S., the "Joint Application for Environmental Resource Permit/Authorization to Use State Lands/Federal Dredge and Fill Permit," the "Application for a Joint Coastal Permit," or the "Joint Application Forms and Instructions for Wetland Resource Alterations (Dredging & Filling) in the Waters of Florida" will be used. For activities that require a DA Permit and a wetland resource permit under the provisions of Section 373.4145(6) or

373.414(11) - (16), F.S., the "Joint Application For Works in the Waters of Florida" and the "Notice of Intent to Construct Works Pursuant to a Wetland Resource General Permit" will be used.

**B.    Processing of Applications**

Except as provided below for E-permitting, for activities that do not qualify for processing as "green" under the State Programmatic General Permit, once a joint application, a request for permit modification, or a request for verification of exempt status is submitted by an applicant to the Department or District, the responsible agency (in accordance with the division of responsibilities in the Operating Agreements in effect between the Department and Districts) will, forward the following information to the Corps office with responsibility for processing the corresponding DA Permit application. All forwarded materials will include a Department or District application processing number

1.    Forwarding Received Applications;

Within five working days of receipt, the Department or District, as applicable, will forward to the Corps, either by mail or electronically via a mutually agreed upon protocol:

(a)    For WRP applications, a copy of the application, all submitted maps, drawings, and any other information accompanying the application or request;

(b)    For ERP applications, including mitigation banks, that have one or more of the following items provided or identified, one copy of the Notice of Receipt of the Application (Section C of the Joint Application) with its accompanying maps, drawings and any other information accompanying the application or request:

(1)    A completed Corps' Data Entry Sheet;

(2)    Any indication in the application that work is occurring, or appears to be occurring, in, on, or over wetlands and other surface waters.

(3)    A type of DA Permit or enforcement action is requested or is identified as pending, issued or denied at the location of the activity. The Corps number starts with an "SAJ" and the four digit year (prior to 1990 the number started with a two digit year); the number also may include staff initials.

(4)    An indication in the application that a member of the Corps has attended a pre-application meeting.

2.    Forwarding of Applications and Material Received During Processing:

(a)     For WRP and ERP applications, including mitigation banks, that meet the criteria of IV.B.1., the Department or District, as applicable, will, within five working days of sending to the applicant, forward one copy of all Requests for Additional Information (RAIs) to the Corps.

(b)     For those applications not copied to the Corps in which either state or federal wetlands within the proposed activity or future phases are discovered during the evaluation, the Department or District, as applicable, will, within five working days of this discovery, forward the Corps one copy of the Notice of Receipt of the Application (Section C of the Joint Application) with its accompanying maps, drawings, and activity descriptions, together with a copy of any RAIs that have been generated.

(c)     A copy of materials subsequently submitted. Individual Corps offices will coordinate with individual Department and District offices to identify the manner in which the Corps wants such documents forwarded to it.

3.     Forwarding Modifications and Materials:

Within five working days of receipt of a modification request, the Department or District, as applicable, will forward to the Corps, either by mail or electronically via a mutually agreed upon protocol, a copy of the request with all attached maps, drawings, and any other information accompanying the request.

4.     E-Permitting — For Department or District offices that electronically post applications, RAIs, modifications, and related materials to the Internet, an .ftp site, or another site accessible to the Corps, the Department or District shall first coordinate with the Corps to ensure the electronic posting procedure is compatible with the needs of the Corps. If the Department or the District's electronic posting procedure is not compatible with the Corps's requirements, the Department or District shall continue to mail materials to the Corps.

5.     In those cases where the Corps receives a copy of the joint application, an application to modify a permit, a notice to use a noticed general permit, a request to verify qualification for an exemption, or a request to verify that an activity does not require a permit directly from an applicant, the Corps shall retain one copy of the application and all accompanying materials and send all other copies and materials to the appropriate office of the Department or District. The Corps shall include its processing number with this information.

6.     The Department or District shall not be obligated to forward documents or materials to the Corps that are confidential under chapter 119, F.S. In such cases the Corps will request the applicant, permittee, or sponsor to provide such information directly to the Corps as needed.

7.     In those cases where the Corps has made a "no permit required" (NPR) determination on an application that is under review by the Department or District,

the Corps will furnish a copy of the determination to the Department or District. The Corps will include the applicant's name, location, brief project name/description, and, if known, the Department or District application file number. The Department or District will no longer be required to provide information to the Corps subsequent to receiving this notification unless the project is modified to include additional impacts to wetlands or other surface waters.

C.    Mitigation Bank and In-lieu Fee Review

1.    Interagency Review Team

Interagency review of mitigation bank applications and establishment of in-lieu fee programs is required by 33 C.F.R. § 332.8(b) and serves to facilitate a more efficient and effective review of such applications. The Corps's District Engineer will establish an Interagency Review Team (IRT) to review documentation for the establishment and management of mitigation banks and in-lieu fee programs. He or his designated representative serves as Chair of the IRT. In cases where a mitigation bank or in-lieu fee program involves an activity that is proposed to satisfy state statutory requirements, it may be appropriate for either the Department or District to serve as Co-Chair of the IRT. For purposes of this Agreement, the "administering agency" is defined as a member of either the Department or the applicable District. The IRT may include representatives from tribal, state, and local regulatory and resource agencies when such agencies have authorities or mandates directly affecting, or affected by, the establishment, operation, or use of the mitigation bank or in-lieu fee program. The District Engineer will give full consideration to any comments and advice received within time limits specified at 33 C.F.R. § 332.8. The Department and the Districts will give full consideration to any comments and advice received within the time limits specified in chapter 120, F.S. The District Engineer retains final authority for the approval of the instruments and other documentation required by the Corps. The Department and the Districts retain final authority for the approval of state permits or other documentation required by the state.

2.    Team Coordination

An application to the Department or Districts for a mitigation bank shall be coordinated with the Corps in accordance with the Permit Application Coordination section IV. B. of this Agreement. When the Corps receives a mitigation bank or in-lieu-fee prospectus or draft prospectus, copies shall be provided to the Department or applicable District, along with other IRT members. In addition, the IRT shall coordinate, review, and take action on the items required by 33 C.F.R. § 332.8.

D.    **Distribution of Agency Actions**

For applications that meet the criteria of section IV.B.1, IV.B.2, or IV.B.3 above,

the Department or District, as applicable, will, within five working days of sending to the applicant/permittee, forward to the Corps a copy of all final permitting actions, including copies of permits, formal or major permit modifications, permit denials, application withdrawals, exemption verification letters, and the cover letter for formal determinations.

The Corps shall forward to the Department or Districts, as appropriate, copies of notices of intent to issue standard permits, final actions on standard permits, and "no permit required" determinations within five working days of taking such actions.

**V.    MITIGATION FINANCIAL ASSURANCE**

A.    When the type and amount of the financial assurance obtained or required by the Department or District for compensatory mitigation, including mitigation banks, as part of a permit issued under part IV of chapter 373, F.S., adequately addresses the financial assurance requirements of the Corps, the Corps may determine that additional financial assurance is not necessary for that compensatory mitigation project or mitigation bank.

B.    The Corps's concurrence with the Department's or District's financial assurance mechanism shall be subject to the applicant, sponsor, or permittee agreeing to the following requirements:

1.    The Corps shall notify the Department or District in all cases where the Corps is relying on the financial assurance mechanism accepted by the Department or District so that the Department or District can coordinate with the Corps prior to modification, amendment, partial release, termination, or revocation of the financial assurance instrument.

2.    The    financial assurance instrument shall be in    place prior to commencement of the permitted activity.

3.    Disbursements from these    financial assurance instruments can only be made with direction and approval of the Department or District as applicable after prior notice has been given to the Corps in accordance with 4., below.

4.    The Corps permit shall require that the permittee shall provide the Corps written notice at least 120 days in advance of any termination or revocation of any financial assurance instrument by the financial institution, and notice at least 30 days in advance of modifications, amendments, and partial releases.

C.    If, at any time, the Corps determines that the type or amount of the financial assurance mechanism being proposed for a State permit under part IV of chapter 373, F.S., is not sufficient to meet the Corps' requirements for a DA Permit or a mitigation banking instrument or in-lieu fee instrument and those requirements are

within the scope of such state permit, the Corps may require the applicant, sponsor, or permittee for the DA Permit to request that the Department or District modify the permit under part IV of chapter 373, F.S., as applicable, to require an additional amount or alternative type of financial assurance mechanism to meet the Corps' requirements. In such a case:

1.    The financial assurance instrument shall be in place prior to commencing the permitted activity;

2.    Prior to any disbursements under the financial assurance instruments, the Department or District shall coordinate with the Corps at least 30 days prior to such disbursement being made, but the final decision on the disbursement shall be made by the Department or District;

3.    Notification of such disbursements shall be provided to the Corps within 10 days after the disbursement;

4.    The Corps permit shall require that the permittee shall provide the Corps written notice at least 120 days in advance of any termination or revocation of any financial assurance instrument by the financial institution, and notice at least 30 days in advance of modifications, amendments, and partial releases.

Notwithstanding the above, the Department or District is not obligated to accept financial assurance mechanisms that are not required to satisfy the permit requirements under part IV of chapter 373, F.S.

D.    If the Corps requires an alternative type or an additional amount of financial assurance to meet Corps mitigation requirements outside of the scope of the State permit, the Department or District is not obligated to be a party to any instrument related to that assurance.

## VI.    MITIGATION SITE PROTECTION

Long-term protection of a mitigation site or preservation to prevent secondary impacts for a State permit, mitigation bank instrument, or as the result of an enforcement action under part IV of chapter 373, F.S., may be provided through the conveyance of a conservation easement or restrictive covenants in accordance with Section 704.06,
F.  S., or by transfer of title to the Department or District (hereinafter all referred to as "site protection instrument").

In accordance with 33 C.F.R. § 332.7(a)(1), when such a site protection instrument meets the Corps' requirements for mitigation site protection for the corresponding DA Permit for the same activities, the Corps may agree that the site protection instrument granted to the Department or District provides sufficient site protection, and not require an applicant, sponsor, or permittee to provide an amended, additional, or duplicative mitigation site protection instrument. When the Department or District accepts a site protection instrument in the form of a restrictive covenant or deed

(This Appendix is not incorporated by reference; Effective Date_____)

restriction, the Corps may determine that an applicant needs to execute a conservation easement.

A.    When the Department or District agrees to hold or amend a site protection instrument which provides rights to the Corps, the Department and District agree to accept a site protection instrument containing, or that is amended to contain, the following language, unless alternative language is needed on a case-specific basis:

"WHEREAS, the U.S. Army Corps of Engineers Permit No._____(Corps Permit) authorizes certain activities in the waters of the United States and requires this site protection instrument over the lands identified in Exhibit XX as mitigation for such activities;

"Rights of the U.S. Army Corps of Engineers ("Corps"): The Corps, as a third party beneficiary, shall have the right to enforce the terms and conditions of the site protection instrument, including:

"1.    The right to take action to preserve and protect the environmental value of the Property;

"2.  The right to prevent any activity on the Property that is inconsistent with the purpose of this instrument, and to require the restoration of areas or features of the Property that may be damaged by any inconsistent activity;

"3.    The right to enter upon and inspect the Property in a reasonable manner and at reasonable times to determine if Grantor or its successors and assigns are complying with the covenants and prohibitions contained in this instrument;

"4.    The right to enforce this instrument by injunction or proceed at law or in equity to enforce the provisions of this instrument and the covenants set forth herein, to prevent the occurrence of any of the prohibited activities hereinafter set forth, and the right to require Grantor, or its successors and assigns, to restore such areas or features of the Property that may be damaged by unauthorized activities; and

"5. The Grantor, including their successors or assigns, shall provide the Corps at least 60 days advance notice in writing before any action is taken to amend, alter, release, or revoke this instrument. The Grantee shall provide reasonable notice and an opportunity to comment or object to the release or amendment to the U.S. Army Corps of Engineers. The Grantee shall consider any comments or objections from the U.S. Army Corps of Engineers when making the final decision to release or amend such a conservation easement."

B.    When the Corps requires additional protection or additional mitigation lands for an

activity that has a corresponding State permit, mitigation bank instrument, or enforcement instrument under part IV of chapter 373, F.S., and the Department or the District is willing to accept the additional or amended site protection instrument, the instrument shall include the following additional provision:

> "The Grantor, including their successors or assigns, shall provide the Corps at least 60 days advance notice in writing before any action is taken to amend, alter, release, or revoke this instrument. The Grantee shall provide reasonable notice and an opportunity to comment or object to the release or amendment to the U.S. Army Corps of Engineers. The Corps, as third party beneficiary, must approve any amendment, alteration, release or revocation of this instrument, and must approve any proposed structures, work, or activities on the Property that require approval by the Grantee."

C.    When the Department or District does not agree or is unable to modify the permit, mitigation bank instrument, or enforcement instrument under part IV of chapter 373, F.S., or any existing site protection instrument to include the additional mitigation land needed to meet the Corps's requirements, the Department or District may agree to accept a separate mitigation site protection instrument over the additional land. If the Department or District agrees to accept a separate mitigation site protection instrument over the additional land, the Department or District agree that the instrument shall be accepted with the following additional provision:

> "The Grantor, including their successors or assigns, shall provide the Corps at least 60 days advance notice in writing before any action is taken to amend, alter, release, or revoke this instrument. The Grantee shall provide reasonable notice and an opportunity to comment or object to the release or amendment to the U.S. Army Corps of Engineers. The Corps, as third party beneficiary, must approve any amendment, alteration, release or revocation of this instrument, and must approve any proposed structures, work, or activities on the Property that require approval by the Grantee."

D.    In any case where the Department or District agrees to hold or amend a site protection instrument which provides rights to the Corps, as described above, the Corps shall notify the applicable Department or District office within 10 days of any discovery of a violation of the terms and conditions of the site protection instrument, and shall coordinate with the applicable Department or District office prior to requiring restoration of areas or features of the Property that were damaged by unauthorized activities so that any restoration activities receive applicable authorization required under part IV of chapter 373, F.S.

E.    In the event a site protection instrument has already been recorded on behalf of the Department or District for the same activity that will be authorized under a corresponding DA Permit or mitigation bank or in-lieu fee instrument that does not include the "Rights of the Corps" language in VII.A., above, the Corps may require the applicant, permittee, or sponsor to request that the Department or District

modify their respective permit, mitigation bank instrument or enforcement instrument with its associated site protection instrument to include that language.

F.   The Department and the District do not agree to accept a site protection instrument on behalf of the Corps when there is no corresponding permit under part IV of chapter 373, F.S., for the activity that is subject to a DA permit.

G.   In all cases, the Corps shall not request an applicant, permittee, or sponsor to record any site protection instrument granted to the Department or District without first coordinating with and obtaining a letter of concurrence from the applicable office of the Department or District; however, final approval of this request may be required from the District Governing Board. Failure to obtain such written concurrence shall result in any such recorded site protection instrument being considered an invalid conveyance of the interest to the Department or District.

H.   In          any case when the Corps requires the applicant, permittee, or sponsor to obtain an additional site protection instrument, the Corps agrees to take responsibility for all negotiations with the applicant, permittee, or sponsor associated with processing and preparation of the site protection instrument required by the Corps, including review of the title work. The Corps also shall take responsibility for all steps required to have the site protection instrument recorded, including any subsequent amendments or releases of any site protection instrument previously recorded on behalf of the Department or District, and for sending an original copy of the recorded site protection instrument, and any modifications and releases thereto, to the applicable Department or District office that serves the area in which the site protection instrument is recorded. The Corps also agrees to monitor for compliance and pursue needed enforcement, including litigation, to enforce the terms and conditions of the site protection instrument obtained over any lands that were not required to be protected under the permit, mitigation bank instrument, or enforcement instrument under part IV of chapter 373, F.S.

I.   The Parties agree to coordinate in the event compliance monitoring of the protected lands identifies the need for enforcement.

## VII.   COMPLIANCE AND ENFORCEMENT

Upon discovery of an unauthorized or non-compliant activity in WOUS, wetlands, or other surface waters, the Party discovering the activity will notify the appropriate Party to this Agreement regarding the unauthorized or non-compliant activity. The Parties may coordinate their enforcement activities when appropriate in order to maximize limited agency resources and encourage compliance. Regardless of any coordination that may occur, each Party will maintain independent enforcement authority and discretion.

## VIII.   INTERAGENCY MEETINGS

### A.   Permitting Meetings

Subject to fiscal or travel restrictions, each Party agrees to host interagency permitting meetings on a rotating basis. The time and place of all the meetings will be addressed at the beginning of each calendar year. Because interagency meetings between the Parties and other agencies can serve as a good forum to aid communication, exchange information, conduct pre-application meetings, or to resolve outstanding permitting issues, each Party will endeavor to have a representative attend all interagency meetings.

## B.    Enforcement Meetings

Subject to fiscal or travel restrictions, representatives of the Parties' enforcement staff shall endeavor to meet at least annually. If possible, the meeting should take place at Enforcement Workshops hosted by the Department or District, but local meetings in areas of operation are also appropriate and encouraged. The meeting should address issues related to implementation of section VII of this Agreement.

## C.    Cross Training

The Parties agree to provide opportunities, when possible, for cross-training. This may take the form of: providing spaces in formally scheduled training courses; providing training sessions at each others' training events; providing personnel and opportunities for cross-training through developmental assignments; sharing interpretations of agency rules and procedures; and performing joint formal and informal training on other subjects of mutual interest.

## IX.    ELECTRONIC COORDINATION

To the extent practicable, the Parties agree to use electronic media for the transfer of data to facilitate information exchange. The Parties agree to participate in future efforts to enhance electronic communication necessary to achieve their regulatory missions.

## X.    DELEGATED PROGRAMS

Where the Department or Districts delegate to a local government all or a portion of the permitting or enforcement authority under part IV of chapter 373, F.S., the delegation agreement shall include a provision that the local government shall be subject to all the terms and conditions of this Agreement, although the Corps, with the concurrence of the delegating agency, may allow deviations from these terms and conditions.

## XI.    EFFECTIVE DATE

This Agreement shall take effect upon execution by all the Parties. In witness whereof, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on the latest day and year provided below.

(This Appendix is not incorporated by reference; Effective Date_____)

**XII.    TERMINATION**

Any Party who wishes to terminate this Agreement with or without cause shall provide 60 days prior written notice to the other Parties. The notice submitted by the Corps shall be signed by the District Engineer of the Jacksonville District. The notice submitted by a District shall be signed by the Chair of the Governing Board. The notice submitted by the Department shall be signed by the Secretary. By mutual agreement of all Parties, the 60 day notice period may be reduced. Within 30 days of a notice of intent to terminate this Agreement, all Parties shall make good faith efforts to preserve the Agreement by attempting to resolve any basis for the termination. This Agreement also may be terminated by future agreements between the Parties that which expressly supersede this Agreement.

Herschel T. Vinyard Jr.
Secretary
Florida Department of
Environmental Protection

4/4/12
Date

Lad Daniels
Chair, Governing Board
St. Johns River Water
Management District

4|10|12
Date

Joe Collins
Chair, Governing Board
South Florida Water
Management District

4/12/2012
Date

Donald J. Quincey, Jr.
Chair, Governing Board
Suwannee River Water
Management District

8-14-12
Date

Hugh M. Gramling
Vice Chair, Governing Board
Southwest Florida Water
Management District

5/22/12
Date

Alan M. Dodd
Colonel, U. S. Army
District Commander

9-4-12
Date

George Roberts
Chair, Governing Board
Northwest Florida Water
Management District

4/30/12
Date



Appendix E-17

(This Appendix is not incorporated by reference, Effective Date _____)

**APPENDIX F**

**Bald and Golden Eagle Protection Act**

**U.S. Fish and Wildlife Service**                    **Office of Law Enforcement**

## 16 USC 668-668d
## Bald and Golden Eagle Protection Act

## SUBCHAPTER II—PROTECTION OF BALD AND GOLDEN EAGLES

Release date: 2004-04-30

- § 668. Bald and golden eagles
- § 668a. Taking and using of the bald and golden eagle for scientific, exhibition, and religious purposes
- § 668b. Enforcement provisions
- § 668c. Definitions
- § 668d. Availability of appropriations for Migratory Bird Treaty Act

### § 668. Bald and golden eagles

**(a)** Prohibited acts; criminal penalties

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both: Provided, That in the case of a second or subsequent conviction for a violation of this section committed after October 23, 1972, such person shall be fined not more than $10,000 or imprisoned not more than two years, or both: Provided further, That the commission of each taking or other act prohibited by this section with respect to a bald or golden eagle shall constitute a separate violation of this section: Provided further, That one-half of any such fine, but not to exceed $2,500, shall be paid to the person or persons giving information which leads to conviction: Provided further, That nothing herein shall be construed to prohibit possession or transportation of any bald eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to June 8, 1940, and that nothing herein shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to the addition to this subchapter of the provisions relating to preservation of the golden eagle.

**(b)** Civil penalties

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle, commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, may be assessed a civil penalty by the Secretary of not more than $5,000 for each such violation. Each violation shall be a separate offense. No penalty shall be assessed unless such person is given notice and opportunity for a hearing with respect to such violation. In determining the amount of the penalty, the gravity of the violation, and the demonstrated good faith of the person charged shall be considered by the Secretary. For good cause shown, the Secretary may remit or mitigate any such penalty. Upon any failure to pay the penalty assessed under this section, the Secretary may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found or resides or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. In hearing any such action, the court must sustain the Secretary's action if supported by substantial evidence.

**(c)** Cancellation of grazing agreements

The head of any Federal agency who has issued a lease, license, permit, or other agreement authorizing the grazing of domestic livestock on Federal lands to any person who is convicted of a violation of this subchapter or of any permit or regulation issued hereunder may immediately cancel each such lease, license, permit, or other agreement. The United States shall not be liable for the payment of any compensation, reimbursement, or damages in connection with the cancellation of any lease, license, permit, or other agreement pursuant to

**U.S. Fish and Wildlife Service**                    **Office of Law Enforcement**

# 16 USC 668-668d
# Bald and Golden Eagle Protection Act

this section.


## § 668a. Taking and using of the bald and golden eagle for scientific, exhibition, and religious purposes


Whenever, after investigation, the Secretary of the Interior shall determine that it is compatible with the preservation of the bald eagle or the golden eagle to permit the taking, possession, and transportation of specimens thereof for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes, or that it is necessary to permit the taking of such eagles for the protection of wildlife or of agricultural or other interests in any particular locality, he may authorize the taking of such eagles pursuant to regulations which he is hereby authorized to prescribe: Provided, That on request of the Governor of any State, the Secretary of the Interior shall authorize the taking of golden eagles for the purpose of seasonally protecting domesticated flocks and herds in such State, in accordance with regulations established under the provisions of this section, in such part or parts of such State and for such periods as the Secretary determines to be necessary to protect such interests: Provided further, That bald eagles may not be taken for any purpose unless, prior to such taking, a permit to do so is procured from the Secretary of the Interior: Provided further, That the Secretary of the Interior, pursuant to such regulations as he may prescribe, may permit the taking, possession, and transportation of golden eagles for the purposes of falconry, except that only golden eagles which would be taken because of depredations on livestock or wildlife may be taken for purposes of falconry: Provided further, That the Secretary of the Interior, pursuant to such regulations as he may prescribe, may permit the taking of golden eagle nests which interfere with resource development or recovery operations.


## § 668b. Enforcement provisions


**(a)** Arrest; search; issuance and execution of warrants and process
Any employee of the Department of the Interior authorized by the Secretary of the Interior to enforce the provisions of this subchapter may, without warrant, arrest any person committing in his presence or view a violation of this subchapter or of any permit or regulations issued hereunder and take such person immediately for examination or trial before an officer or court of competent jurisdiction; may execute any warrant or other process issued by an officer or court of competent jurisdiction for the enforcement of the provisions of this subchapter; and may, with or without a warrant, as authorized by law, search any place. The Secretary of the Interior is authorized to enter into cooperative agreements with State fish and wildlife agencies or other appropriate State authorities to facilitate enforcement of this subchapter, and by said agreements to delegate such enforcement authority to State law enforcement personnel as he deems appropriate for effective enforcement of this subchapter. Any judge of any court established under the laws of the United States, and any United States magistrate judge may, within his respective jurisdiction, upon proper oath or affirmation showing probable cause, issue warrants in all such cases.
**(b)** Forfeiture
All bald or golden eagles, or parts, nests, or eggs thereof, taken, possessed, sold, purchased, bartered, offered for sale, purchase, or barter, transported, exported, or imported contrary to the provisions of this subchapter, or of any permit or regulation issued hereunder, and all guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid in the taking, possessing, selling, purchasing, bartering, offering for sale, purchase, or barter, transporting, exporting, or importing of any bird, or part, nest, or egg thereof, in violation of this subchapter or of any permit or regulation issued hereunder shall be subject to forfeiture to the United States.
**(c)** Customs laws applied
All provisions of law relating to the seizure, forfeiture, and condemnation of a vessel for violation of the customs laws, the disposition of such vessel or the proceeds from the sale thereof, and the remission or mitigation of such forfeitures, shall apply to the seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this subchapter, insofar as such provisions of law are applicable and not

**U.S. Fish and Wildlife Service**                    **Office of Law Enforcement**

# 16 USC 668-668d
## Bald and Golden Eagle Protection Act

inconsistent with the provisions of this subchapter: Provided, That all powers, rights, and duties conferred or imposed by the customs laws upon any officer or employee of the Treasury Department shall, for the purposes of this subchapter, be exercised or performed by the Secretary of the Interior or by such persons as he may designate.

### § 668c. Definitions

As used in this subchapter "whoever" includes also associations, partnerships, and corporations; "take" includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb; "transport" includes also ship, convey, carry, or transport by any means whatever, and deliver or receive or cause to be delivered or received for such shipment, conveyance, carriage, or transportation.

### § 668d. Availability of appropriations for Migratory Bird Treaty Act

Moneys now or hereafter available to the Secretary of the Interior for the administration and enforcement of the Migratory Bird Treaty Act of July 3, 1918 [16 U.S.C. 703 et seq.], shall be equally available for the administration and enforcement of this subchapter.

**APPENDIX G**

**USFWS Habitat Management Guidelines for the Wood Stork in the Southeast Region**



# HABITAT MANAGEMENT GUIDELINES FOR THE WOOD STORK IN THE SOUTHEAST REGION

B-1

# HABITAT MANAGEMENT GUIDELINES
# FOR THE WOOD STORK IN THE
# SOUTHEAST REGION

Prepared by

John C. Ogden
Acting Program Manager
Wildlife Research
Everglades National Park

for the

Southeast Region
U.S. Fish and Wildlife Service

January 1990

Cover design by
Florida Power & Light Company
Miami, Florida

# HABITAT MANAGEMENT GUIDELINES FOR THE WOOD STORK

# IN THE SOUTHEAST REGION

## Introduction

A number of Federal and state laws and/or regulations prohibit, cumulatively, such acts as harrassing, disturbing, harming, molesting, pursuing, etc., wood storks, or destroying their nests (see Section VII). Although advisory in nature, these guidelines represent a biological interpretation of what would constitute violations of one or more of such prohibited acts. Their purpose is to maintain and/or improve the environmental conditions that are required for the survival and well-being of wood storks in the southeastern United States, and are designed essentially for application in wood stork/human activity conflicts (principally land development and human intrusion into stork use sites). The emphasis is to avoid or minimize detrimental human-related impacts on wood storks. These guidelines were prepared in consultations with state wildlife agencies and wood stork experts in the four southeastern states where the wood stork is listed as Endangered (Alabama, Florida, Georgia, South Carolina).

## General

The wood stork is a gregarious species, which nests in colonies (rookeries), and roosts and feeds in flocks, often in association with other species of long-legged water birds. Storks that nest in the southeastern United States appear to represent a distinct population, separate from the nearest breeding population in Mexico. Storks in the southeastern U.S. population have recently (since 1980) nested in colonies scattered throughout Florida, and at several central-southern Georgia and coastal South Carolina sites. Banded and color-marked storks from central and southern Florida colonies have dispersed during non-breeding seasons as far north as southern Georgia, and the coastal counties in South Carolina and southeastern North Carolina, and as far west as central Alabama and northeastern Mississippi. Storks from a colony in south-central Georgia have wintered between southern Georgia and southern Florida. This U.S. nesting population of wood storks was listed as endangered by the U.S. Fish and Wildlife Service on February 28, 1984 (*Federal Register* 49(4):7332-7335).

Wood storks use freshwater and estuarine wetlands as feeding, nesting, and roosting sites. Although storks are not habitat specialists, their needs are exacting enough, and available habitat is limited enough, so that nesting success and the size of regional populations are closely regulated by year-to-year differences in the quality and quantity of suitable habitat. Storks are especially sensitive to environmental conditions at feeding sites; thus, birds may fly relatively long distances either daily or between regions annually, seeking adequate food resources.

All available evidence suggests that regional declines in wood stork numbers have been largely due to the loss or degradation of essential wetland habitat. An understanding of the qualities of good stork habitat should help to focus protection efforts on those sites

that are seasonally important to regional populations of wood storks. Characteristics of feeding, nesting, and roosting habitat, and management guidelines for each, are presented here by habitat type.

I.     **Feeding habitat.**

A major reason for the wood stork decline has been the loss and degradation of feeding habitat. Storks are especially sensitive to any manipulation of a wetland site that results in either reduced amounts or changes in the timing of food availability.

Storks feed primarily (often almost exclusively) on small fish between 1 and 8 inches in length. Successful foraging sites are those where the water is between 2 and 15 inches deep. Good feeding conditions usually occur where water is relatively calm and uncluttered by dense thickets of aquatic vegetation. Often a dropping water level is necessary to concentrate fish at suitable densities. Conversely, a rise in water, especially when it occurs abruptly, disperses fish and reduces the value of a site as feeding habitat.

The types of wetland sites that provide good feeding conditions for storks include: drying marshes or stock ponds, shallow roadside or agricultural ditches, narrow tidal creeks or shallow tidal pools, and depressions in cypress heads or swamp sloughs. In fact, almost any shallow wetland depression where fish tend to become concentrated, either through local reproduction or the consequences of area drying, may be used by storks.

Nesting wood storks do most of their feeding in wetlands between 5 and 40 miles from the colony, and occasionally at distances as great as 75 miles. Within this colony foraging range and for the 110-150 day life of the colony, and depending on the size of the colony and the nature of the surrounding wetlands, anywhere from 50 to 200 different feeding sites may be used during the breeding season.

Non-breeding storks are free to travel much greater distances and remain in a region only for as long as sufficient food is available. Whether used by breeders or non-breeders, any single feeding site may at one time have small or large numbers of storks (1 to 100+), and be used for one to many days, depending on the quality and quantity of available food. Obviously, feeding sites used by relatively large numbers of storks, and/or frequently used areas, potentially are the more important sites necessary for the maintenance of a regional population of birds.

Differences between years in the seasonal distribution and amount of rainfall usually mean that storks will differ between years in where and when they feed. Successful nesting colonies are those that have a large number of feeding site options, including sites that may be suitable only in years of rainfall extremes. To maintain the wide range of feeding site options requires that many different wetlands, with both relatively short and long annual hydroperiods, be preserved. For example, protecting only the larger wetlands, or those with longer annual hydroperiods, will result in the eventual loss of smaller, seemingly less important wetlands. However, these small scale wetlands are crucial as the only available feeding sites during the wetter periods when the larger habitats are too deeply flooded to be used by storks.

II.    **Nesting habitat.**

Wood storks nest in colonies, and will return to the same colony site for many years so long as that site and surrounding feeding habitat continue to supply the needs of the birds. Storks require between 110 and 150 days for the annual nesting cycle, from the period of courtship until the nestlings become independent. Nesting activity may begin as early as December or as late as March in southern Florida colonies, and between late February and April in colonies located between central Florida and South Carolina. Thus, full term colonies may be active until June-July in south Florida, and as late as July-August at more northern sites. Colony sites may also be used for roosting by storks during other times of the year.

Almost all recent nesting colonies in the southeastern U.S. have been located either in woody vegetation over standing water, or on islands surrounded by broad expanses of open water. The most dominant vegetation in swamp colonies has been cypress, although storks also nest in swamp hardwoods and willows. Nests in island colonies may be in more diverse vegetation, including mangroves (coastal), exotic species such as Australian pine (*Casuarina*) and Brazilian Pepper (*Schinus*), or in low thickets of cactus (*Opuntia*). Nests are usually located 15-75 feet above ground, but may be much lower, especially on island sites when vegetation is low.

Since at least the early 1970's, many colonies in the southeastern U.S. have been located in swamps where water has been impounded due to the construction of levees or roadways. Storks have also nested in dead and dying trees in flooded phosphate surface mines, or in low, woody vegetation on mounded, dredge islands. The use of these altered wetlands or completely "artificial" sites suggests that in some regions or years storks are unable to locate natural nesting habitat that is adequately flooded during the normal breeding season. The readiness with which storks will utilize water impoundments for nesting also suggests that colony sites could be intentionally created and maintained through long-term site management plans. Almost all impoundment sites used by storks become suitable for nesting only fortuitously, and therefore, these sites often do not remain available to storks for many years.

In addition to the irreversible impacts of drainage and destruction of nesting habitat, the greatest threats to colony sites are from human disturbance and predation. Nesting storks show some variation in the levels of human activity they will tolerate near a colony. In general, nesting storks are more tolerant of low levels of human activity near a colony when nests are high in trees than when they are low, and when nests contain partially or completely feathered young than during the period between nest construction and the early nestling period (adults still brooding). When adult storks are forced to leave their nests, eggs or downy young may die quickly (<20 minutes) when exposed to direct sun or rain.

Colonies located in flooded environments must remain flooded if they are to be successful. Often water is between 3 and 5 feet deep in successful colonies during the nesting season. Storks rarely form colonies, even in traditional nesting sites, when they are dry, and may abandon nests if sites become dry during the nesting period. Flooding in colonies may be most important as a defense against mammalian predators. Studies of stork colonies in Georgia and

Florida have shown high rates of raccoon predation when sites dried during the nesting period. A reasonably high water level in an active colony is also a deterrent against both human and domestic animal intrusions.

Although nesting wood storks usually do most feeding away from the colony site (>5 miles), considerable stork activity does occur close to the colony during two periods in the nesting cycle. Adult storks collect almost all nesting material in and near the colony, usually within 2500 feet. Newly fledged storks, near the end of the nesting cycle, spend from 1-4 weeks during the fledging process flying locally in the colony area, and perched in nearby trees or marshy spots on the ground. These birds return daily to their nests to be fed. It is essential that these fledging birds have little or no disturbance as far our as one-half mile within at least one or two quadrants from the colony. Both the adults, while collecting nesting material, and the inexperienced fledglings, do much low, flapping flight within this radius of the colony. At these times, storks potentially are much more likely to strike nearby towers or utility lines.

Colony sites are not necessarily used annually. Regional populations of storks shift nesting locations between years, in response to year-to-year differences in food resources. Thus, regional populations require a range of options for nesting sites, in order to successfully respond to food availability. Protection of colony sites should continue, therefore, for sites that are not used in a given year.

III.    Roosting habitat.

Although wood storks tend to roost at sites that are similar to those used for nesting, they also use a wider range of site types for roosting than for nesting. Non-breeding storks, for example, may frequently change roosting sites in response to changing feeding locations, and in the process, are inclined to accept a broad range of relatively temporary roosting sites. Included in the list of frequently used roosting locations are cypress "heads" or swamps (not necessarily flooded if trees are tall), mangrove islands, expansive willow thickets or small, isolated willow "islands" in broad marshes, and on the ground either on levees or in open marshes.

Daily activity patterns at a roost vary depending on the status of the storks using the site. Non-breeding adults or immature birds may remain in roosts during major portions of some days. When storks are feeding close to a roost, they may remain on the feeding grounds until almost dark before making the short flight. Nesting storks traveling long distances (>40 miles) to feeding sites may roost at or near the latter, and return to the colony the next morning. Storks leaving roosts, especially when going long distances, tend to wait for mid-morning thermals to develop before departing.

IV.    Management zones and guidelines for feeding sites.

To the maximum extent possible, feeding sites should be protected by adherence to the following protection zones and guidelines:

A.    There should be no human intrusion into feeding sites when storks are present. Depending upon the amount of screening vegetation, human activity should be no closer than between 300 feet (where solid vegetation screens exist) and 750 feet (no vegetation screen).

B.   Feeding sites should not be subjected to water management practices that alter traditional water levels or the seasonally normal drying patterns and rates. Sharp rises in water levels are especially disruptive to feeding storks.

C.   The introduction of contaminants, fertilizers, or herbicides into wetlands that contain stork feeding sites should be avoided, especially those compounds that could adversely alter the diversity and numbers of native fishes, or that could substantially change the characteristics of aquatic vegetation. Increase in the density and height of emergent vegetation can degrade or destroy sites as feeding habitat.

D.   Construction of tall towers (especially with guy wires) within three miles, or high power lines (especially across long stretches of open country) within one mile of major feeding sites should be avoided.

V.   **Management zones and guidelines for nesting colonies.**

A.   Primary zone: This is the most critical area, and must be managed according to recommended guidelines to insure that a colony site survives.

1.   Size: The primary zone must extend between 1000 and 1500 feet in all directions from the actual colony boundaries when there are no visual or broad aquatic barriers, and never less than 500 feet even when there are strong visual or aquatic barriers. The exact width of the primary zone in each direction from the colony can vary within this range, depending on the amount of visual screen (tall trees) surrounding the colony, the amount of relatively deep, open water between the colony and the nearest human activity, and the nature of the nearest human activity. In general, storks forming new colonies are more tolerant of existing human activity, than they will be of new human activity that begins after the colony has formed.

2.   Recommended Restrictions:

a.   Any of the following activities within the primary zone, at any time of the year, are likely to be detrimental to the colony:

(1)   Any lumbering or other removal of vegetation, and

(2)   Any activity that reduces the area, depth, or length of flooding in wetlands under and surrounding the colony, except where periodic (less than annual) water control may be required to maintain the health of the aquatic, woody vegetation, and

(3)   The construction of any building, roadway, tower, power line, canal, etc.

b.   The following activities within the primary zone are likely to be detrimental to a colony if they occur when the colony is active:

(1)   Any unauthorized human entry closer than 300 feet of the colony, and

**B-7**



(2) Any increase or irregular pattern in human activity anywhere in the primary zone, and

(3) Any increase or irregular pattern in activity by animals, including livestock or pets, in the colony, and

(4) Any aircraft operation closer than 500 feet of the colony.

B. Secondary Zone: Restrictions in this zone are needed to minimize disturbances that might impact the primary zone, and to protect essential areas outside of the primary zone. The secondary zone may be used by storks for collecting nesting material, for roosting, loafing, and feeding (especially important to newly fledged young), and may be important as a screen between the colony and areas of relatively intense human activities.

1. Size: The secondary zone should range outward from the primary zone 1000-2000 feet, or to a radius of 2500 feet of the outer edge of the colony.

2. Recommended Restrictions:

a. Activities in the secondary zone which may be detrimental to nesting wood storks include:

(1) Any increase in human activities above the level that existed in the year when the colony first formed, especially when visual screens are lacking, and

(2) Any alteration in the area's hydrology that might cause changes in the primary zone, and

(3) Any substantial (>20 percent) decrease in the area of wetlands and woods of potential value to storks for roosting and feeding.

b. In addition, the probability that low flying storks, or inexperienced, newly-fledged young will strike tall obstructions, requires that high-tension power lines be no closer than one mile (especially across open country or in wetlands) and tall trans-mission towers no closer than 3 miles from active colonies. Other activities, including busy highways and commercial and residential buildings may be present in limited portions of the secondary zone at the time that a new colony first forms. Although storks may tolerate existing levels of human activities, it is important that these human activities not expand substantially.

VI.  Roosting site guidelines.

The general characteristics and temporary use-patterns of many stork roosting sites limit the number of specific management recommendations that are possible:

A. Avoid human activities within 500-1000 feet of roost sites during seasons of the year and times of the day when storks may be present. Nocturnal activities in active roosts may be especially disruptive.

B. Protect the vegetative and hydrological characteristics of the more important roosting sites--those used annually and/or used by flocks of 25 or more storks. Potentially, roosting sites may, some day, become nesting sites.

## VII. Legal Considerations.

### A. Federal Statutes

The U.S. breeding population of the wood stork is protected by the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.)(Act). The population was listed as endangered on February 28, 1984 (49 *Federal Register* 7332); wood storks breeding in Alabama, Florida, Georgia, and South Carolina are protected by the Act.

Section 9 of the Endangered Species Act of 1973, as amended, states that it is unlawful for any person subject to the jurisdiction of the United States to take (defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.") any listed species anywhere within the United States.

The wood stork is also federally protected by its listing (50 CFR 10.13) under the Migratory Bird Treaty Act (167 U.S.C. 703-711), which prohibits the taking, killing or possession of migratory birds except as permitted.

### B. State Statutes

#### 1. State of Alabama

Section 9-11-232 of Alabama's Fish, Game, and Wildlife regulations curtails the possession, sale, and purchase of wild birds. "Any person, firm, association, or corporation who takes, catches, kills or has in possession at any time, living or dead, any protected wild bird not a game bird or who sells or offers for sale, buys, purchases or offers to buy or purchase any such bird or exchange same for anything of value or who shall sell or expose for sale or buy any part of the plumage, skin, or body of any bird protected by the laws of this state or who shall take or willfully destroy the nests of any wild bird or who shall have such nests or eggs of such birds in his possession, except as otherwise provided by law, shall be guilty of a misdemeanor...

Section 1 of the Alabama Nongame Species Regulation (Regulation 87-GF-7) includes the wood stork in the list of nongame species covered by paragraph (4). " It shall be unlawful to take, capture, kill, possess, sell, trade for anything of monetary value, or offer to sell or trade for anything of monetary value, the following nongame wildlife species (or any parts or reproductive products of such species) without a scientific collection permit and written permission from the Commissioner, Department of Conservation and Natural Resources,..."

#### 2. State of Florida

Rule 39-4.001 of the Florida Wildlife Code prohibits "taking, attempting to take, pursuing, hunting, molesting, capturing, or killing (collectively defined as "taking"), transporting, storing, serving, buying, selling,

**APPENDIX H**

**National Bald Eagle Management Guidelines**

# NATIONAL BALD EAGLE MANAGEMENT GUIDELINES

## U.S. Fish and Wildlife Service

## May 2007

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................... 1

**LEGAL PROTECTIONS FOR THE BALD EAGLE** ............................................. 2

The Bald and Golden Eagle Protection Act ........................................................ 2

The Migratory Bird Treaty Act ........................................................................... 3

State laws and regulations ................................................................................. 3

Where do bald eagles nest? ............................................................................... 4

When do bald eagles nest? ................................................................................ 5

Chronology of typical reproductive activities of bald eagles in the United States ................................................................................................................... 6

How many chicks do bald eagles raise? ............................................................ 7

What do bald eagles eat? ................................................................................... 7

The impact of human activity on nesting bald eagles ......................................... 7

The impact of human activity on foraging and roosting bald eagles ................... 8

**RECOMMENDATIONS FOR AVOIDING DISTURBANCE AT NEST SITES** ...... 9

Existing Uses .................................................................................................... 10

**ACTIVITY-SPECIFIC GUIDELINES** ............................................................... 10

Alternate nests ................................................................................................. 11

Temporary Impacts .......................................................................................... 11

**RECOMMENDATIONS FOR AVOIDING DISTURBANCE AT FORAGING AREAS AND COMMUNAL ROOST SITES** ................................................................ 14

**ADDITIONAL RECOMMENDATIONS TO BENEFIT BALD EAGLES** ............ 15

**CONTACTS** .................................................................................................... 16

**GLOSSARY** .................................................................................................... 17

**RELATED LITERATURE** ................................................................................ 19

## INTRODUCTION

The bald eagle (*Haliaeetus leucocephalus*) is protected by the Bald and Golden Eagle Protection Act (Eagle Act) and the Migratory Bird Treaty Act (MBTA). The MBTA and the Eagle Act protect bald eagles from a variety of harmful actions and impacts. The U.S. Fish and Wildlife Service (Service) developed these National Bald Eagle Management Guidelines to advise landowners, land managers, and others who share public and private lands with bald eagles when and under what circumstances the protective provisions of the Eagle Act may apply to their activities. A variety of human activities can potentially interfere with bald eagles, affecting their ability to forage, nest, roost, breed, or raise young. The Guidelines are intended to help people minimize such impacts to bald eagles, particularly where they may constitute "disturbance," which is prohibited by the Eagle Act.

The Guidelines are intended to:

(1) Publicize the provisions of the Eagle Act that continue to protect bald eagles, in order to reduce the possibility that people will violate the law,

(2) Advise landowners, land managers and the general public of the potential for various human activities to disturb bald eagles, and

(3) Encourage additional nonbinding land management practices that benefit bald eagles (see Additional Recommendations section).

While the Guidelines include general recommendations for land management practices that will benefit bald eagles, the document is intended primarily as a tool for landowners and planners who seek information and recommendations regarding how to avoid disturbing bald eagles. Many States and some tribal entities have developed state-specific management plans, regulations, and/or guidance for landowners and land managers to protect and enhance bald eagle habitat, and we encourage the continued development and use of these planning tools to benefit bald eagles.

Adherence to the Guidelines herein will benefit individuals, agencies, organizations, and companies by helping them avoid violations of the law. However, the Guidelines themselves are not law. Rather, they are recommendations based on several decades of behavioral observations, science, and conservation measures to avoid or minimize adverse impacts to bald eagles.

The U.S. Fish and Wildlife Service strongly encourages adherence to these guidelines to ensure that bald and golden eagle populations will continue to be sustained. The Service realizes there may be impacts to some birds even if all reasonable measures are taken to avoid such impacts. Although it is not possible to absolve individuals and entities from liability under the Eagle Act or the MBTA, the Service exercises enforcement discretion to focus on those individuals, companies, or agencies that take migratory birds without regard for the consequences of their actions and the law, especially when conservation measures, such as these Guidelines, are available, but have not been implemented. The Service will prioritize its enforcement efforts to focus on those individuals or entities who take bald eagles or their parts, eggs, or nests without implementing appropriate measures recommended by the Guidelines.

1

The Service intends to pursue the development of regulations that would authorize, under limited circumstances, the use of permits if "take" of an eagle is anticipated but unavoidable.  Additionally, if the bald eagle is delisted, the Service intends to provide a regulatory mechanism to honor existing (take) authorizations under the Endangered Species Act (ESA).

During the interim period until the Service completes a rulemaking for permits under the Eagle Act, the Service does not intend to refer for prosecution the incidental "*take*" of any bald eagle under the MBTA or Eagle Act, if such take is in full compliance with the terms and conditions of an incidental take statement issued to the action agency or applicant under the authority of section 7(b)(4) of the ESA or a permit issued under the authority of section 10(a)(1)(B) of the ESA.

The Guidelines are applicable throughout the United States, including Alaska.  The primary purpose of these Guidelines is to provide information that will minimize or prevent violations only of *Federal* laws governing bald eagles.  In addition to Federal laws, many states and some smaller jurisdictions and tribes have additional laws and regulations protecting bald eagles.  In some cases those laws and regulations may be more protective (restrictive) than these Federal guidelines.  If you are planning activities that may affect bald eagles, we therefore recommend that you contact both your nearest U.S. Fish and Wildlife Service Field Office (see the contact information on p.16) and your state wildlife agency for assistance.


## LEGAL PROTECTIONS FOR THE BALD EAGLE

### The Bald and Golden Eagle Protection Act

The Eagle Act (16 U.S.C. 668-668c), enacted in 1940, and amended several times since then, prohibits anyone, without a permit issued by the Secretary of the Interior, from "taking" bald eagles, including their parts, nests, or eggs.  The Act provides criminal and civil penalties for persons who "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or any manner, any bald eagle ... [or any golden eagle], alive or dead, or any part, nest, or egg thereof."  The Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb."  "Disturb'' means:

> "Disturb means to agitate or bother a bald or golden eagle to a degree that
> causes, or is likely to cause, based on the best scientific information available,
> 1) injury to an eagle, 2) a decrease in its productivity, by substantially interfering
> with normal breeding, feeding, or sheltering behavior, or 3) nest abandonment,
> by substantially interfering with normal breeding, feeding, or sheltering behavior."

In addition to immediate impacts, this definition also covers impacts that result from human-induced alterations initiated around a previously used nest site during a time when eagles are not present, if, upon the eagle=s return, such alterations agitate or bother an eagle to a degree that injures an eagle or substantially interferes with normal breeding, feeding, or sheltering habits and causes, or is likely to cause, a loss of productivity or nest abandonment.

2

A violation of the Act can result in a criminal fine of $100,000 ($200,000 for organizations), imprisonment for one year, or both, for a first offense.  Penalties increase substantially for additional offenses, and a second violation of this Act is a felony.

**The Migratory Bird Treaty Act**
The MBTA (16 U.S.C. 703-712), prohibits the taking of any migratory bird or any part, nest, or egg, except as permitted by regulation.  The MBTA was enacted in 1918; a 1972 agreement supplementing one of the bilateral treaties underlying the MBTA had the effect of expanding the scope of the Act to cover bald eagles and other raptors.  Implementing regulations define "take" under the MBTA as "pursue, hunt, shoot, wound, kill, trap, capture, possess, or collect."

Copies of the Eagle Act and the MBTA are available at: http://permits.fws.gov/ltr/ltr.shtml.

**State laws and regulations**
Most states have their own regulations and/or guidelines for bald eagle management.  Some states may continue to list the bald eagle as endangered, threatened, or of special concern.  If you plan activities that may affect bald eagles, we urge you to familiarize yourself with the regulations and/or guidelines that apply to bald eagles in your state.  Your adherence to the Guidelines herein does not ensure that you are in compliance with state laws and regulations because state regulations can be more specific and/or restrictive than these Guidelines.

## NATURAL HISTORY OF THE BALD EAGLE

Bald eagles are a North American species that historically occurred throughout the contiguous United States and Alaska.  After severely declining in the lower 48 States between the 1870s and the 1970s, bald eagles have rebounded and re-established breeding territories in each of the lower 48 states.  The largest North American breeding populations are in Alaska and Canada, but there are also significant bald eagle populations in Florida, the Pacific Northwest, the Greater Yellowstone area, the Great Lakes states, and the Chesapeake Bay region.  Bald eagle distribution varies seasonally.  Bald eagles that nest in southern latitudes frequently move northward in late spring and early summer, often summering as far north as Canada.  Most eagles that breed at northern latitudes migrate southward during winter, or to coastal areas where waters remain unfrozen.  Migrants frequently concentrate in large numbers at sites where food is abundant and they often roost together communally.  In some cases, concentration areas are used year-round: in summer by southern eagles and in winter by northern eagles.

Juvenile bald eagles have mottled brown and white plumage, gradually acquiring their dark brown body and distinctive white head and tail as they mature.  Bald eagles generally attain adult plumage by 5 years of age.  Most are capable of breeding at 4 or 5 years of age, but in healthy populations they may not start breeding until much older.  Bald eagles may live 15 to 25 years in the wild.  Adults weigh 8 to 14 pounds (occasionally reaching 16 pounds in Alaska) and have wingspans of 5 to 8 feet.  Those in the northern range are larger than those in the south, and females are larger than males.

**Where do bald eagles nest?**
Breeding bald eagles occupy "territories," areas they will typically defend against intrusion by other eagles.   In addition to the active nest, a territory may include one or more alternate nests (nests built or maintained by the eagles but not used for nesting in a given year).  The Eagle Act prohibits removal or destruction of both active and alternate bald eagle nests.  Bald eagles exhibit high nest site fidelity and nesting territories are often used year after year. Some territories are known to have been used continually for over half a century.

Bald eagles generally nest near coastlines, rivers, large lakes or streams that support an adequate food supply.  They often nest in mature or old-growth trees; snags (dead trees); cliffs; rock promontories; rarely on the ground; and with increasing frequency on human-made structures such as power poles and communication towers.  In forested areas, bald eagles often select the tallest trees with limbs strong enough to support a nest that can weigh more than 1,000 pounds.  Nest sites typically include at least one perch with a clear view of the water where the eagles usually forage.  Shoreline trees or snags located in reservoirs provide the visibility and accessibility needed to locate aquatic prey.  Eagle nests are constructed with large sticks, and may be lined with moss, grass, plant stalks, lichens, seaweed, or sod.  Nests are usually about 4-6 feet in diameter and 3 feet deep, although larger nests exist.



Copyright *Birds of North America*, 2000

**The range of breeding bald eagles in 2000 (shaded areas).  This map shows only the larger concentrations of nests; eagles have continued to expand into additional nesting territories in many states.  The dotted line represents the bald eagle's wintering range.**

4

National Bald Eagle Management Guidelines                                    May 2007

**When do bald eagles nest?**
Nesting activity begins several months before egg-laying.  Egg-laying dates vary throughout the U.S., ranging from October in Florida, to late April or even early May in the northern United States.  Incubation typically lasts 33-35 days, but can be as long as 40 days.  Eaglets make their first unsteady flights about 10 to 12 weeks after hatching, and fledge (leave their nests) within a few days after that first flight.  However, young birds usually remain in the vicinity of the nest for several weeks after fledging because they are almost completely dependent on their parents for food until they disperse from the nesting territory approximately 6 weeks later.

The bald eagle breeding season tends to be longer in the southern U.S., and re-nesting following an unsuccessful first nesting attempt is more common there as well.  The following table shows the timing of bald eagle breeding seasons in different regions of the country.  The table represents the range of time within which the majority of nesting activities occur in each region and does not apply to any specific nesting pair.  Because the timing of nesting activities may vary within a given region, you should contact the nearest U.S. Fish and Wildlife Service Field Office (see page 16) and/or your state wildlife conservation agency for more specific information on nesting chronology in your area.

5

National Bald Eagle Management Guidelines                                        May 2007

### Chronology of typical reproductive activities of bald eagles in the United States.

| Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | March | April | May | June | July | Aug. |
|---|---|---|---|---|---|---|---|---|---|---|---|

**SOUTHEASTERN U.S. (FL, GA, SC, ~~NC~~, AL, MS, LA, TN, KY, AR, eastern ⅔ of TX)**

Nest Building | | | | | | | | | | | | | | | |

Egg Laying/Incubation | | | | | | | | | | | | | |

Hatching/Rearing Young | | | | | | | | | | | |

Fledging Young | | | | | | | |

**CHESAPEAKE BAY REGION (NC, VA, MD, DE, southern ½ of NJ, eastern ⅔ of PA, panhandle of WV)**

Nest Building | |

Egg Laying/Incubation | | | | | |

Hatching/Rearing Young | | | | |

Fledging Young

**NORTHERN U.S. (ME, NH, MA, RI, CT, NY, northern ½ of NJ, western ⅔ of PA, OH, WV exc. panhandle, IN, IL, MI, WI, MN, IA, MO, ND, SD, NB, KS, CO, UT)**

Nest Building | |

Egg Laying/Incubation | |

Hatching/Rearing Young | |

Fledging Young | | | |

**PACIFIC REGION (WA, OR, CA, ID, MT, WY, NV)**

Nest Building | |

Egg Laying/Incubation | |

Hatching/Rearing Young | |

Fledging Young | | | |

**SOUTHWESTERN U.S. (AZ, NM, OK panhandle, western ⅔ of TX)**

Nest Building | | | | |

Egg Laying/Incubation | | | |

Hatching/Rearing Young | | |

Fledging Young |

**ALASKA**

Nest Building | | | | | |

Egg Laying/Incubation

| (Hatching/Rearing Young | | | |)

Ing Young                                                                Fledg-

| Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | March | April | May | June | July | Aug. |
|---|---|---|---|---|---|---|---|---|---|---|---|

**How many chicks do bald eagles raise?**

The number of eagle eggs laid will vary from 1-3, with 1-2 eggs being the most common. Only one eagle egg is laid per day, although not always on successive days. Hatching of young occurs on different days with the result that chicks in the same nest are sometimes of unequal size.  The overall national fledging rate is approximately one chick per nest, annually, which results in a healthy expanding population.

**What do bald eagles eat?**

Bald eagles are opportunistic feeders.  Fish comprise much of their diet, but they also eat waterfowl, shorebirds/colonial waterbirds, small mammals, turtles, and carrion.  Because they are visual hunters, eagles typically locate their prey from a conspicuous perch, or soaring flight, then swoop down and strike.  Wintering bald eagles often congregate in large numbers along streams to feed on spawning salmon or other fish species,  and often gather in large numbers in areas below reservoirs, especially hydropower dams, where fish are abundant.  Wintering eagles also take birds from rafts of ducks at reservoirs and rivers, and congregate on melting ice shelves to scavenge dead fish from the current or the soft melting ice.  Bald eagles will also feed on carcasses along roads, in landfills, and at feedlots.

During the breeding season, adults carry prey to the nest to feed the young.  Adults feed their chicks by tearing off pieces of food and holding them to the beaks of the eaglets.  After fledging, immature eagles are slow to develop hunting skills, and must learn to locate reliable food sources and master feeding techniques.  Young eagles will congregate together, often feeding upon easily acquired food such as carrion and fish found in abundance at the mouths of streams and shallow bays and at landfills.

**The impact of human activity on nesting bald eagles**

During the breeding season, bald eagles are sensitive to a variety of human activities. However, not all bald eagle pairs react to human activities in the same way.  Some pairs nest successfully just dozens of yards from human activity, while others abandon nest sites in response to activities much farther away.  This variability may be related to a number of factors, including visibility, duration, noise levels, extent of the area affected by the activity, prior experiences with humans, and tolerance of the individual nesting pair. The relative sensitivity of bald eagles during various stages of the breeding season is outlined in the following table.

**Nesting Bald Eagle Sensitivity to Human Activities**

| Phase | Activity | Sensitivity to Human Activity | Comments |
|---|---|---|---|
| I | Courtship and Nest Building | Most sensitive period; likely to respond negatively | Most critical time period.  Disturbance is manifested in nest abandonment.  Bald eagles in newly established territories are more prone to abandon nest sites. |
| II | Egg laying | Very sensitive period | Human activity of even limited duration may cause nest desertion and abandonment of territory for the breeding season. |
| III | Incubation and early nestling period (up to 4 weeks) | Very sensitive period | Adults are less likely to abandon the nest near and after hatching.  However, flushed adults leave eggs and young unattended; eggs are susceptible to cooling, loss of moisture, overheating, and predation; young are vulnerable to elements. |
| IV | Nestling period, 4 to 8 weeks | Moderately sensitive period | Likelihood of nest abandonment and vulnerability of the nestlings to elements somewhat decreases.  However, nestlings may miss feedings, affecting their survival. |
| V | Nestlings 8 weeks through fledging | Very sensitive period | Gaining flight capability, nestlings 8 weeks and older may flush from the nest prematurely due to disruption and die. |

If agitated by human activities, eagles may inadequately construct or repair their nest, may expend energy defending the nest rather than tending to their young, or may abandon the nest altogether.  Activities that cause prolonged absences of adults from their nests can jeopardize eggs or young.  Depending on weather conditions, eggs may overheat or cool too much and fail to hatch.  Unattended eggs and nestlings are subject to predation.  Young nestlings are particularly vulnerable because they rely on their parents to provide warmth or shade, without which they may die as a result of hypothermia or heat stress.  If food delivery schedules are interrupted, the young may not develop healthy plumage, which can affect their survival.  In addition, adults startled while incubating or brooding young may damage eggs or injure their young as they abruptly leave the nest.  Older nestlings no longer require constant attention from the adults, but they may be startled by loud or intrusive human activities and prematurely jump from the nest before they are able to fly or care for themselves.  Once fledged, juveniles range up to ¼ mile from the nest site, often to a site with minimal human activity.  During this period, until about six weeks after departure from the nest, the juveniles still depend on the adults to feed them.

**The impact of human activity on foraging and roosting bald eagles**
Disruption, destruction, or obstruction of roosting and foraging areas can also negatively affect bald eagles.  Disruptive activities in or near eagle foraging areas can interfere with feeding, reducing chances of survival.  Interference with feeding can also result in reduced productivity (number of young successfully fledged).  Migrating and wintering bald eagles often congregate at specific sites for purposes of feeding and sheltering.  Bald eagles rely on established roost sites because of their proximity to sufficient food sources.  Roost sites are usually in mature trees where the eagles are somewhat sheltered from the wind and weather.  Human activities near or within communal roost sites may prevent eagles

8

from feeding or taking shelter, especially if there are not other undisturbed and productive feeding and roosting sites available.  Activities that permanently alter communal roost sites and important foraging areas can altogether eliminate the elements that are essential for feeding and sheltering eagles.

Where a human activity agitates or bothers roosting or foraging bald eagles to the degree that causes injury or substantially interferes with breeding, feeding, or sheltering behavior and causes, or is likely to cause, a loss of productivity or nest abandonment, the conduct of the activity constitutes a violation of the Eagle Act's prohibition against disturbing eagles.  The circumstances that might result in such an outcome are difficult to predict without detailed site-specific information.  If your activities may disturb roosting or foraging bald eagles, you should contact your local Fish and Wildlife Service Field Office (see page 16) for advice and recommendations for how to avoid such disturbance.

### RECOMMENDATIONS FOR AVOIDING DISTURBANCE AT NEST SITES

In developing these Guidelines, we relied on existing state and regional bald eagle guidelines, scientific literature on bald eagle disturbance, and recommendations of state and Federal biologists who monitor the impacts of human activity on eagles.  Despite these resources, uncertainties remain regarding the effects of many activities on eagles and how eagles in different situations may or may not respond to certain human activities. The Service recognizes this uncertainty and views the collection of better biological data on the response of eagles to disturbance as a high priority.  To the extent that resources allow, the Service will continue to collect data on responses of bald eagles to human activities conducted according to the recommendations within these Guidelines to ensure that adequate protection from disturbance is being afforded, and to identify circumstances where the Guidelines might be modified.  These data will be used to make future adjustments to the Guidelines.

To avoid disturbing nesting bald eagles, we recommend (1) keeping a distance between the activity and the nest (distance buffers), (2) maintaining preferably forested (or natural) areas between the activity and around nest trees (landscape buffers), and (3) avoiding certain activities during the breeding season.  The buffer areas serve to minimize visual and auditory impacts associated with human activities near nest sites.  Ideally, buffers would be large enough to protect existing nest trees and provide for alternative or replacement nest trees.

The size and shape of effective buffers vary depending on the topography and other ecological characteristics surrounding the nest site.  In open areas where there are little or no forested or topographical buffers, such as in many western states, distance alone must serve as the buffer.  Consequently, in open areas, the distance between the activity and the nest may need to be larger than the distances recommended under Categories A and B of these guidelines (pg. 12) if no landscape buffers are present.  The height of the nest above the ground may also ameliorate effects of human activities; eagles at higher nests may be less prone to disturbance.

In addition to the physical features of the landscape and nest site, the appropriate size for the distance buffer may vary according to the historical tolerances of eagles to human activities in particular localities, and may also depend on the location of the nest in relation

9

to feeding and roosting areas used by the eagles.  Increased competition for nest sites may lead bald eagles to nest closer to human activity (and other eagles).

Seasonal restrictions can prevent the potential impacts of many shorter-term, obtrusive activities that do not entail landscape alterations (e.g. fireworks, outdoor concerts).  In proximity to the nest, these kinds of activities should be conducted only outside the breeding season.  For activities that entail both short-term, obtrusive characteristics and more permanent impacts (e.g., building construction), we recommend a combination of both approaches: retaining a landscape buffer *and* observing seasonal restrictions.

For assistance in determining the appropriate size and configuration of buffers or the timing of activities in the vicinity of a bald eagle nest, we encourage you to contact the nearest U.S. Fish and Wildlife Service Field Office (see page 16).

**Existing Uses**

Eagles are unlikely to be disturbed by routine use of roads, homes, and other facilities where such use pre-dates the eagles' successful nesting activity in a given area.  Therefore, in most cases *ongoing* existing uses may proceed with the same intensity with little risk of disturbing bald eagles.  However, some *intermittent, occasional, or irregular* uses that pre-date eagle nesting in an area may disturb bald eagles.  For example: a pair of eagles may begin nesting in an area and subsequently be disturbed by activities associated with an annual outdoor flea market, even though the flea market has been held annually at the same location.  In such situations, human activity should be adjusted or relocated to minimize potential impacts on the nesting pair.

## ACTIVITY-SPECIFIC GUIDELINES

The following section provides the Service=s management recommendations for avoiding bald eagle disturbance as a result of new or intermittent activities proposed in the vicinity of bald eagle nests.  Activities are separated into 8 categories (A – H) based on the nature and magnitude of impacts to bald eagles that usually result from the type of activity.  Activities with similar or comparable impacts are grouped together.

In most cases, impacts will vary based on the visibility of the activity from the eagle nest and the degree to which similar activities are already occurring in proximity to the nest site.  Visibility is a factor because, in general, eagles are more prone to disturbance when an activity occurs in full view.  For this reason, we recommend that people locate activities farther from the nest structure in areas with open vistas, in contrast to areas where the view is shielded by rolling topography, trees, or other screening factors.  The recommendations also take into account the existence of similar activities in the area because the continued presence of nesting bald eagles in the vicinity of the existing activities indicates that the eagles in that area can tolerate a greater degree of human activity than we can generally expect from eagles in areas that experience fewer human impacts.  To illustrate how these factors affect the likelihood of disturbing eagles, we have incorporated the recommendations for some activities into a table (categories A and B).

First, determine which category your activity falls into (between categories A – H).  If the activity you plan to undertake is not specifically addressed in these guidelines, follow the recommendations for the most similar activity represented.

10

If your activity is under A or B, our recommendations are in table form.  The vertical axis shows the degree of visibility of the activity from the nest.  The horizontal axis (header row) represents the degree to which similar activities are ongoing in the vicinity of the nest.  Locate the row that best describes how visible your activity will be from the eagle nest.  Then, choose the column that best describes the degree to which similar activities are ongoing in the vicinity of the eagle nest.  The box where the column and row come together contains our management recommendations for how far you should locate your activity from the nest to avoid disturbing the eagles.  The numerical distances shown in the tables are the closest the activity should be conducted relative to the nest.  In some cases we have included additional recommendations (other than recommended *distance* from the nest) you should follow to help ensure that your activity will not disturb the eagles.

**Alternate nests**
For activities that entail permanent landscape alterations that may result in bald eagle disturbance, these recommendations apply to both active and alternate bald eagle nests.  Disturbance becomes an issue with regard to alternate nests if eagles return to breeding purposes and react to land use changes that occurred while the nest was inactive.  The likelihood that an alternate nest will again become active decreases the longer it goes unused.  If you plan activities in the vicinity of an alternate bald eagle nest and have information to show that the nest has not been active during the preceding 5 breeding seasons, the recommendations provided in these guidelines for avoiding disturbance around the nest site may no longer be warranted.  The nest itself remains protected by other provisions of the Eagle Act, however, and may not be destroyed.

If special circumstances exist that make it unlikely an inactive nest will be reused before 5 years of disuse have passed, and you believe that the probability of reuse is low enough to warrant disregarding the recommendations for avoiding disturbance, you should be prepared to provide all the reasons for your conclusion, including information regarding past use of the nest site.  Without sufficient documentation, you should continue to follow these guidelines when conducting activities around the nest site.  If we are able to determine that it is unlikely the nest will be reused, we may advise you that the recommendations provided in these guidelines for avoiding disturbance are no longer necessary around that nest site.

This guidance is intended to minimize disturbance, as defined by Federal regulation.  In addition to Federal laws, most states and some tribes and smaller jurisdictions have additional laws and regulations protecting bald eagles.  In some cases those laws and regulations may be more protective (restrictive) than these Federal guidelines.

**Temporary Impacts**
For activities that have temporary impacts, such as the use of loud machinery, fireworks displays, or summer boating activities, we recommend seasonal restrictions.  These types of activities can generally be carried out outside of the breeding season without causing disturbance.  The recommended restrictions for these types of activities can be lifted for alternate nests within a particular territory, including nests that were attended during the current breeding season but not used to raise young, after eggs laid in another nest within the territory have hatched (depending on the distance between the alternate nest and the active nest).

11

In general, activities should be kept as far away from nest trees as possible; loud and disruptive activities should be conducted when eagles are not nesting; and activity between the nest and the nearest foraging area should be minimized. If the activity you plan to undertake is not specifically addressed in these guidelines, follow the recommendations for the most similar activity addressed, or contact your local U.S. Fish and Wildlife Service Field Office for additional guidance.

If you believe that special circumstances apply to your situation that increase or diminish the likelihood of bald eagle disturbance, or if it is not possible to adhere to the guidelines, you should contact your local Service Field Office for further guidance.

**Category A:**
Building construction, 1 or 2 story, with project footprint of ½ acre or less.
Construction of roads, trails, canals, power lines, and other linear utilities.
Agriculture and aquaculture – new or expanded operations.
Alteration of shorelines or wetlands.
Installation of docks or moorings.
Water impoundment.

**Category B:**
Building construction, 3 or more stories.
Building construction, 1 or 2 story, with project footprint of more than ½ acre.
Installation or expansion of marinas with a capacity of 6 or more boats.
Mining and associated activities.
Oil and natural gas drilling and refining and associated activities.

|  | *If there is no similar activity within 1 mile of the nest* | *If there is similar activity closer than 1 mile from the nest* |
|---|---|---|
| *If the activity will be visible from the nest* | 660 feet. Landscape buffers are recommended. | 660 feet, or as close as existing tolerated activity of similar scope. Landscape buffers are recommended. |
| *If the activity will not be visible from the nest* | Category A: 330 feet. Clearing, external construction, and landscaping between 330 feet and 660 feet should be done outside breeding season.  Category B: 660 feet. | 330 feet, or as close as existing tolerated activity of similar scope. Clearing, external construction and landscaping within 660 feet should be done outside breeding season. |

The numerical distances shown in the table are the closest the activity should be conducted relative to the nest.

12

**Category C.  Timber Operations and Forestry Practices**

- Avoid clear cutting or removal of overstory trees within 330 feet of the nest at any time.

- Avoid timber harvesting operations, including road construction and chain saw and yarding operations, during the breeding season within 660 feet of the nest.  The distance may be decreased to 330 feet around alternate nests within a particular territory, including nests that were attended during the current breeding season but not used to raise young, after eggs laid in another nest within the territory have hatched.

- Selective thinning and other silviculture management practices designed to conserve or enhance habitat, including prescribed burning close to the nest tree, should be undertaken outside the breeding season.  Precautions such as raking leaves and woody debris from around the nest tree should be taken to prevent crown fire or fire climbing the nest tree.  If it is determined that a burn during the breeding season would be beneficial, then, to ensure that no take or disturbance will occur, these activities should be conducted only when neither adult eagles nor young are present at the nest tree (i.e., at the beginning of, or end of, the breeding season, either before the particular nest is active or after the young have fledged from that nest).  Appropriate Federal and state biologists should be consulted before any prescribed burning is conducted during the breeding season.

- Avoid construction of log transfer facilities and in-water log storage areas within 330 feet of the nest.


**Category D.  Off-road vehicle use** (including snowmobiles).  No buffer is necessary around nest sites outside the breeding season.  During the breeding season, do not operate off-road vehicles within 330 feet of the nest.  In open areas, where there is increased visibility and exposure to noise, this distance should be extended to 660 feet.


**Category E.  Motorized Watercraft use** (including jet skis/personal watercraft).  No buffer is necessary around nest sites outside the breeding season.  During the breeding season, within 330 feet of the nest, (1) do not operate jet skis (personal watercraft), and (2) avoid concentrations of noisy vessels (e.g., commercial fishing boats and tour boats), except where eagles have demonstrated tolerance for such activity.  Other motorized boat traffic passing within 330 feet of the nest should attempt to minimize trips and avoid stopping in the area where feasible, particularly where eagles are unaccustomed to boat traffic.   Buffers for airboats should be larger than 330 feet due to the increased noise they generate, combined with their speed, maneuverability, and visibility.


**Category F.  Non-motorized recreation and human entry** (e.g., hiking, camping, fishing, hunting, birdwatching, kayaking, canoeing).  No buffer is necessary around nest sites outside the breeding season.  If the activity will be visible or highly audible from the nest, maintain a 330-foot buffer during the breeding season, particularly where eagles are unaccustomed to such activity.

13

**Category G.  Helicopters and fixed-wing aircraft**.
Except for authorized biologists trained in survey techniques, avoid operating aircraft within 1,000 feet of the nest during the breeding season, except where eagles have demonstrated tolerance for such activity.


**Category H.   Blasting and other loud, intermittent noises**.
Avoid blasting and other activities that produce extremely loud noises within 1/2 mile of active nests, unless greater tolerance to the activity (or similar activity) has been demonstrated by the eagles in the nesting area.  This recommendation applies to the use of fireworks classified by the Federal Department of Transportation as Class B explosives, which includes the larger fireworks that are intended for licensed public display.


### RECOMMENDATIONS FOR AVOIDING DISTURBANCE AT FORAGING AREAS AND COMMUNAL ROOST SITES

1.  Minimize potentially disruptive activities and development in the eagles' direct flight path between their nest and roost sites and important foraging areas.

2.  Locate long-term and permanent water-dependent facilities, such as boat ramps and marinas, away from important eagle foraging areas.

3.  Avoid recreational and commercial boating and fishing near critical eagle foraging areas during peak feeding times (usually early to mid-morning and late afternoon), except where eagles have demonstrated tolerance to such activity.

4.  Do not use explosives within ½ mile (or within 1 mile in open areas) of communal roosts when eagles are congregating, without prior coordination with the U.S. Fish and Wildlife Service and your state wildlife agency.

5.  Locate aircraft corridors no closer than 1,000 feet vertical or horizontal distance from communal roost sites.

14

### ADDITIONAL RECOMMENDATIONS TO BENEFIT BALD EAGLES

The following are additional management practices that landowners and planners can exercise for added benefit to bald eagles.

1.  Protect and preserve potential roost and nest sites by retaining mature trees and old growth stands, particularly within ½ mile from water.

2.  Where nests are blown from trees during storms or are otherwise destroyed by the elements, continue to protect the site in the absence of the nest for up to three (3) complete breeding seasons.  Many eagles will rebuild the nest and reoccupy the site.

3.  To avoid collisions, site wind turbines, communication towers, and high voltage transmission power lines away from nests, foraging areas, and communal roost sites.

4.  Employ industry-accepted best management practices to prevent birds from colliding with or being electrocuted by utility lines, towers, and poles.  If possible, bury utility lines in important eagle areas.

5.  Where bald eagles are likely to nest in human-made structures (e.g., cell phone towers) and such use could impede operation or maintenance of the structures or jeopardize the safety of the eagles, equip the structures with either (1) devices engineered to discourage bald eagles from building nests, or (2) nesting platforms that will safely accommodate bald eagle nests without interfering with structure performance.

6.  Immediately cover carcasses of euthanized animals at landfills to protect eagles from being poisoned.

7.  Do not intentionally feed bald eagles.  Artificially feeding bald eagles can disrupt their essential behavioral patterns and put them at increased risk from power lines, collision with windows and cars, and other mortality factors.

8.  Use pesticides, herbicides, fertilizers, and other chemicals only in accordance with Federal and state laws.

9.  Monitor and minimize dispersal of contaminants associated with hazardous waste sites (legal or illegal), permitted releases, and runoff from agricultural areas, especially within watersheds where eagles have shown poor reproduction or where bioaccumulating contaminants have been documented.  These factors present a risk of contamination to eagles and their food sources.

15

## CONTACTS

The following U.S. Fish and Wildlife Service Field Offices provide technical assistance on bald eagle management:

| | | | | | | |
|---|---|---|---|---|---|---|
| Alabama | Daphne | (251) 441-5181 | | New Hampshire | Concord | (603) 223-2541 |
| Alaska | Anchorage | (907) 271-2888 | | New Jersey | Pleasantville | (609) 646-9310 |
| | Fairbanks | (907) 456-0203 | | New Mexico | Albuquerque | (505) 346-2525 |
| | Juneau | (907) 780-1160 | | New York | Cortland | (607) 753-9334 |
| Arizona | Phoenix | (602) 242-0210 | | | Long Island | (631) 776-1401 |
| Arkansas | Conway | (501) 513-4470 | | North Carolina | Raleigh | (919) 856-4520 |
| California | Arcata | (707) 822-7201 | | | Asheville | (828) 258-3939 |
| | Barstow | (760) 255-8852 | | North Dakota | Bismarck | (701) 250-4481 |
| | Carlsbad | (760) 431-9440 | | Ohio | Reynoldsburg | (614) 469-6923 |
| | Red Bluff | (530) 527-3043 | | Oklahoma | Tulsa | (918) 581-7458 |
| | Sacramento | (916) 414-6000 | | Oregon | Bend | (541) 383-7146 |
| | Stockton | (209) 946-6400 | | | Klamath Falls | (541) 885-8481 |
| | Ventura | (805) 644-1766 | | | La Grande | (541) 962-8584 |
| | Yreka | (530) 842-5763 | | | Newport | (541) 867-4558 |
| Colorado | Lakewood | (303) 275-2370 | | | Portland | (503) 231-6179 |
| | Grand Junction | (970) 243-2778 | | | Roseburg | (541) 957-3474 |
| Connecticut | (See New Hampshire) | | | Pennsylvania | State College | (814) 234-4090 |
| Delaware | (See Maryland) | | | Rhode Island | (See New Hampshire) | |
| Florida | Panama City | (850) 769-0552 | | South Carolina | Charleston | (843) 727-4707 |
| | Vero Beach | (772) 562-3909 | | South Dakota | Pierre | (605) 224-8693 |
| | Jacksonville | (904) 232-2580 | | Tennessee | Cookeville | (931) 528-6481 |
| Georgia | Athens | (706) 613-9493 | | Texas | Clear Lake | (281) 286-8282 |
| | Brunswick | (912) 265-9336 | | Utah | West Valley City | (801) 975-3330 |
| | Columbus | (706) 544-6428 | | Vermont | (See New Hampshire) | |
| Idaho | Boise | (208) 378-5243 | | Virginia | Gloucester | (804) 693-6694 |
| | Chubbuck | (208) 237-6975 | | Washington | Lacey | (306) 753-9440 |
| Illinois/Iowa | Rock Island | (309) 757-5800 | | | Spokane | (509) 891-6839 |
| Indiana | Bloomington | (812) 334-4261 | | | Wenatchee | (509) 665-3508 |
| Kansas | Manhattan | (785) 539-3474 | | West Virginia | Elkins | (304) 636-6586 |
| Kentucky | Frankfort | (502) 695-0468 | | Wisconsin | New Franken | (920) 866-1725 |
| Louisiana | Lafayette | (337) 291-3100 | | Wyoming | Cheyenne | (307) 772-2374 |
| Maine | Old Town | (207) 827-5938 | | | Cody | (307) 578-5939 |
| Maryland | Annapolis | (410) 573-4573 | | | | |
| Massachusetts | (See New Hampshire) | | | | | |
| Michigan | East Lansing | (517) 351-2555 | | | | |
| Minnesota | Bloomington | (612) 725-3548 | | | | |
| Mississippi | Jackson | (601) 965-4900 | | | | |
| Missouri | Columbia | (573) 234-2132 | | | | |
| Montana | Helena | (405) 449-5225 | | | | |
| Nebraska | Grand Island | (308) 382-6468 | | | | |
| Nevada | Las Vegas | (702) 515-5230 | | | | |
| | Reno | (775) 861-6300 | | | | |

National Office
U.S. Fish and Wildlife Service
Division of Migratory Bird Management
4401 North Fairfax Drive, MBSP-4107
Arlington, VA 22203-1610
(703) 358-1714
http://www.fws.gov/migratorybirds

## State Agencies

To contact a state wildlife agency, visit the Association of Fish & Wildlife Agencies' website at http://www.fishwildlife.org/where_us.html

16

## GLOSSARY

The definitions below apply to these National Bald Eagle Management Guidelines:

**Communal roost sites** –  Areas where bald eagles gather and perch overnight – and sometimes during the day in the event of inclement weather.  Communal roost sites are usually in large trees (live or dead) that are relatively sheltered from wind and are generally in close proximity to foraging areas.  These roosts may also serve a social purpose for pair bond formation and communication among eagles.  Many roost sites are used year after year.

**Disturb** – To agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available, 1) injury to an eagle, 2) a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or 3) nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior.

In addition to immediate impacts, this definition also covers impacts that result from human-caused alterations initiated around a previously used nest site during a time when eagles are not present, if, upon the eagle=s return, such alterations  agitate or bother an eagle to a degree that injures an eagle or substantially interferes with normal breeding, feeding, or sheltering habits and causes, or is likely to cause, a loss of productivity or nest abandonment.

**Fledge** – To leave the nest and begin flying.  For bald eagles, this normally occurs at 10-12 weeks of age.

**Fledgling** – A juvenile bald eagle that has taken the first flight from the nest but is not yet independent.

**Foraging area** – An area where eagles feed, typically near open water such as rivers, lakes, reservoirs, and bays where fish and waterfowl are abundant, or in areas with little or no water (i.e., rangelands, barren land, tundra, suburban areas, etc.) where other prey species (e.g., rabbit, rodents) or carrion (such as at landfills) are abundant.

**Landscape buffer** – A natural or human-made landscape feature that screens eagles from human activity (e.g., strip of trees, hill, cliff, berm, sound wall).

**Nest** – A structure built, maintained, or used by bald eagles for the purpose of reproduction. An **active** nest is a nest that is attended (built, maintained or used) by a pair of bald eagles during a given breeding season, whether or not eggs are laid.  An **alternate** nest is a nest that is not used for breeding by eagles during a given breeding season.

**Nest abandonment** – Nest abandonment occurs when adult eagles desert or stop attending a nest and do not subsequently return and successfully raise young in that nest for the duration of a breeding season.  Nest abandonment can be caused by altering habitat near a nest, even if the alteration occurs prior to the breeding season.  Whether the eagles migrate during the non-breeding season, or remain in the area throughout the non-breeding season, nest abandonment can occur at any point between the time the eagles return to the nesting site for the breeding season and the time when all progeny from the breeding season have

17

dispersed.

**Project footprint** – The area of land (and water) that will be permanently altered for a development project, including access roads.

**Similar scope** – In the vicinity of a bald eagle nest, an existing activity is of similar scope to a new activity where the types of impacts to bald eagles are similar in nature, and the impacts of the existing activity are of the same or greater magnitude than the impacts of the potential new activity.  Examples:  (1) An existing single-story home 200 feet from a nest is similar in scope to an additional single-story home 200 feet from the nest; (2) An existing multi-story, multi-family dwelling 150 feet from a nest has impacts of a greater magnitude than a potential new single-family home 200 feet from the nest; (3)  One existing single-family home 200 feet from the nest has impacts of a lesser magnitude than three single-family homes 200 feet from the nest; (4) an existing single-family home 200 feet from a communal roost has impacts of a lesser magnitude than a single-family home 300 feet from the roost but 40 feet from the eagles' foraging area.  The existing activities in examples (1) and (2) are of similar scope, while the existing activities in example (3) and (4) are not.

**Vegetative buffer** – An area surrounding a bald eagle nest that is wholly or largely covered by forest, vegetation, or other natural ecological characteristics, and separates the nest from human activities.

18

## RELATED LITERATURE

Andrew, J.M. and J.A. Mosher.  1981.  Bald eagle nest site selection and nesting habitat in Maryland.  Journal of Wildlife Management 46:382-390.

Anonymous.  1977.  Bald Eagle Habitat Management Guidelines, Forest Service – California Region. U.S Forest Service, San Francisco, CA.

Anthony, R.G.  2001.  Low productivity of bald eagles on Prince of Wales Island, southeast Alaska.  Journal of Raptor Research 35:1-8.

Anthony, R.G., R.W. Frenzel, F.B. Isaacs, and M.G. Garrett.  1994.  Probable causes of nesting failures in Oregon's bald eagle population.  Wildlife Society Bulletin 22:576-582.

Anthony, R.G. and F.B. Isaacs.  1989.  Characteristics of bald eagle nest sites in Oregon.  Journal of Wildlife Management 53:148-158.

Arizona Game and Fish Department.  1999.  Bald Eagle Conservation Assessment and Strategy (draft).

Avian Power Line Interaction Committee (APLIC).  1996.  Suggested Practices for Raptor Protection on Power Lines:  The State of the Art in 1996.  Edison Electric Institute, Raptor Research Foundation, Washington, D.C.

Bangs, E.E., T.N. Bailey and V.D. Berns.  Ecology of nesting bald eagles on the Kenai National Wildlife Refuge, Alaska.  (USFWS staff)

Becker, J.M.  2002.  Response of wintering bald eagles to industrial construction in southeastern Washington.  Wildlife Society Bulletin 30:875-878.

Brauning, D.W. and J.D. Hassinger.  2000. Pennsylvania Recovery and Management Plan for the Bald Eagle (draft).  Pennsylvania Game Commission.  Harrisburg, PA.

Brown, B.T., G.S. Mills, C. Powels, W.A. Russell, G.D. Therres and J.J. Pottie.  1999.  The influence of weapons-testing noise on bald eagle behavior.  Journal of Raptor Research 33:227-232.

Brown, B.T. and L.E. Stevens.  1997.  Winter bald eagle distribution is inversely correlated with human activity along the Colorado River, Arizona.  Journal of Raptor Research31:7-10.

Buehler, D.A.  2000.  Bald Eagle (*Haliaeetus leucocephalus*).  *In* The Birds of North America, No. 506 (A. Poole and F. Gill, eds.).  The Birds of North America, Inc., Philadelphia, PA.

Buehler, D.A., T.J. Mersmann, J.D. Fraser, and J.K.D. Seegar.  1991.  Effects of human activity on bald eagle distribution on the northern Chesapeake Bay.  Journal of Wildlife Management 55:282-290.

Buehler, D.A., T.J. Mersmann, J.D. Fraser, and J.K.D. Seegar.  1991.  Nonbreeding bald eagle communal and solitary roosting behavior and roost habitat on the northern Chesapeake Bay.  Journal of Wildlife Management 55:273-281.

19

Chandler, SK., J.D. Fraser, D.A. Buehler and J.K.D. Seegar.  1995.  Perch trees and shoreline development as predictors of bald eagle distribution on the Chesapeake Bay. Journal of Wildlife Management 59:325-332.

Cline, K.  1985.  Bald Eagles in the Chesapeake:  A Management Guide for Landowners. National Wildlife Federation. Washington, D.C.

Dell, D.D. and P.J. Zwank.  1986.  Impact of a high-voltage transmission line on a nesting pair of southern bald eagles in southeast Louisiana.  Journal of Raptor Research 20(3/4):117-119.

Dunwiddie, P.W. and R.C. Kuntz.  2001.  Long-term trends of bald eagles in winter on the Skagit River, Washington.  Journal of Wildlife Management 65(2):290-299.

Fletcher, R.J. et. al.  1999.  Effects of recreational trails on wintering diurnal raptors along riparian corridors in a Colorado grassland.  Journal of Raptor Research 33(3):233-239.

Fraser, J.D. 1981.  The breeding biology and status of the bald eagle on the Chippewa National Forest.  PhD. Dissertation, University of Minnesota.

Fraser, J.D., LD. Frenzel and J.E. Mathisen.  1985.  The impact of human activities on breeding bald eagles in north-central Minnesota.  Journal of Wildlife Management 49(3):585-592.

Garrett, M.G., J.W. Watson, and R.G. Anthony.  1993.  Bald eagle home range and habitat use in the Columbia River Estuary.  Journal of Wildlife Management 57(1):19-27.

Gerrard J.M. and G.R. Bortolotti.  1988.  The Bald Eagle: Haunts and Habits of a Wilderness Monarch.  Smithsonian Institution Press.  Washington, D.C.

Grier, J.W.  1969.  Bald eagle behavior and productivity responses to climbing to nests. Journal of Wildlife Management 33:961-966.

Grier, J.W. and J.E. Guinn.  2003.  Bald eagle habitats and responses to human disturbance in Minnesota.  Report to the Minnesota Department of Natural Resources.

Grubb, T.G.  1976.  Survey and analysis of bald eagle nesting in western Washington.  M.S. thesis, Univ. of Washington, Seattle.

Grubb, T.G. and R.M. King.  1991.  Assessing human disturbance of breeding bald eagles with classification tree models.  Journal of Wildlife Management 55:500-511.

Grubb, T.G., W.L. Robinson and W.W. Bowerman.  2002.  Effects of watercraft on bald eagles nesting in Voyagers National Park, Minnesota.  Wildlife Society Bulletin 30:156-161.

Grubb, T.G. and W.W. Bowerman.  1997.  Variations in breeding bald eagle response to jets, light planes and helicopters.  Journal of Raptor Research 31:213-222.

20

Grubb, T.G., W.W. Bowerman, A.J. Bath, J.P. Giesy, D.V.C. Weseloh. 2003. Evaluating Great Lakes bald eagle nesting habitat with Bayesian inference. RMRS-RP-45. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station, Fort Collins, CO, 10 pp.

Hansen, J.A. 1977. Population dynamics and night roost requirements of bald eagles wintering in the Nooksack River Valley, WA. Huxley College of Environmental Studies, Western Washington State College, Bellingham, WA. (Problem Series)

Hansen, J.A., M.V. Stalmaster and J.R. Newman. 1980. Habitat characteristics, function, and destruction of bald eagle communal roosts in western Washington. Huxley college of Environmental Studies, Western Washington University.

Hunt, W.G., D.E. Driscoll, E.W. Bianchi, and R.E. Jackman. 1992. Ecology of bald eagles in Arizona. Report to U.S. Bureau of Reclamation, Contract 6-CS-30-04470. BioSystems Analysis Inc., Santa Cruz, California.

Isaacs, F.B and R.G. Anthony. 1987. Abundance, foraging, and roosting of bald eagles wintering in the Harney Basin, Oregon. Northwest Science 61(2), pp. 114-121.

Juenemann, B.G. 1973. Habitat evaluations of selected bald eagle nest sites on the Chippewa National Forest. M.S. thesis, University of Minnesota, Minneapolis.

Keister, G.P., R.G. Anthony and E.J. O'Neill. 1987. Use of communal roosts and foraging area by bald eagles wintering in the Klamath Basin. Journal of Wildlife Management 51(2):415-420.

Knight, R. and S.K. Knight. 1984. Responses of wintering bald eagles to boating activity. Journal of Wildlife Management 48:999-1004.

Linscombe, J.T., T.J. Hess, Jr., and V.L. Wright. 1999. Effects of seismic operations on Louisiana's nesting bald eagles. Proceedings of the Southeastern Association of Fish and Wildlife Agencies. 54:235-242.

Maine (State of) Inland Fisheries and Wildlife Rules. Chapter 8.05 Essential Habitat for Species Listed as Threatened or Endangered.

Mathisen, J.E. 1968. Effects of human disturbance on nesting bald eagles. Journal of Wildlife Management 32(1): 1-6.

McGarigal, K., R.G. Anthony and F.B. Isaacs. 1991. Interactions of humans and bald eagles on the Columbia River estuary. Wildlife Monographs 115:1-47.

McKay, K.J., J.W. Stravers, B.R. Conklin, U. Konig, S. Hawks, C.J. Kohrt, J.S. Lundh and G.V. Swenson. 2001. Potential human impacts on bald eagle reproductive success along the Upper Mississippi River.

McKewan, L.C. and D.H. Hirth. 1979. Southern bald eagle productivity and nest site selection. Journal of Wildlife Management 43:585-594.

Millsap, B.A.  Status of wintering bald eagles in the conterminous 48 States.  1986.  Wildlife Society Bulletin 14:433-440.

Millsap, B.A, T. Breen, E. McConnell, T. Steffer, L. Phillips, N. Douglass, and S. Taylor.  In Press.  Comparative fecundity and survival of bald eagles fledged from suburban and rural natal areas in Florida.  Journal of Wildlife Management 68(4).

Montana Bald Eagle Working Group.  1986.  Montana Bald Eagle Management Plan.  Department of the Interior, Bureau of Land Management.  Billings, MT.

Nesbitt, S.A., M.J. Folk and D.A. Wood.  1993.  Effectiveness of bald eagle habitat protection guidelines in Florida.  Proceedings of the Annual Conference of the Southeast Association of Fish and Wildlife Agencies.

Newman, J.R., W.H. Brennan and L.M. Smith.  1977.  Twelve-year changes in nesting patterns of bald eagles on San Juan Island, Washington.  The Murrelet 58(2)37-39.

Postapulsky, S. 1974.  Raptor reproductive success: some problems with methods, criteria, and terminology. Pages 21-31 in F.N. Hammerstrom, Jr., B.E. Harrell, and R.R. Olendorff, eds. Management of raptors. Raptor Res. Found., Vermillion, S.D.

Rodgers, J.A. and Schwikert, S.T.  2003.  Buffer zone distances to protect foraging and loafing waterbirds from disturbance by airboats in Florida.  Waterbirds 26(4): 437-443.

Russell, D.  1980.  Occurrence and human disturbance sensitivity of wintering bald eagles on the Sauk and Suiattle Rivers, Washington.  In R.L. Knight, G.T. Allen, M.V. Stalmaster and C.W. Servheen [eds.].  Proceedings of the Washington Bald Eagle Symposium.  Nature Conservancy, Seattle, Washington, pp. 165-174.

Shapiro, A.E., F. Montalbano, and D. Mager.  1982.  Implications of construction of a flood control project upon bald eagle nesting activity.  Wilson Bulletin 94(1), pp. 55-63.

Skagen, S.K.  1980.  Behavioral responses of wintering bald eagles to human activity on the Skagit River, Washington.  In R.L.Knight, G.T. Allen, M.V. Stalmaster and C.W. Servheen [eds.].  Proceedings of the Washington Bald Eagle Symposium.  Nature Conservancy, Seattle, Washington, pp. 231-241.

Skagen, S.K., R.L. Knight and G.J.H. Orians.  1991.  Human disturbance of an avian scavenging guild.  Ecological Applications 1:215-225.  (Internet)

Stalmaster, M.V.  1976  Winter ecology and effects of human activity on bald eagles in the Nooksack River Valley, Washington.  MS  Thesis, Western Washington State College, Bellingham.

Stalmaster, M.V.  1980.  Management strategies for wintering bald eagles in the Pacific Northwest.  Proceedings of the Washington Bald Eagle Symposium, pp 49-67.

Stalmaster, M.V. and J.L. Kaiser.  1998.  Effects of recreational activity on wintering bald eagles.  Wildlife Monographs 137:1-46.

22

Stalmaster, M.V. and J.L. Kaiser.  1997.  Flushing responses of wintering bald eagles to military activity.  Journal of Wildlife Management 61:1307-1313.

Stalmaster, M.V. and J.R. Newman.  1978.  Behavioral responses of wintering bald eagles to human activity.  Journal of Wildlife Management 42:506-513.

Steenhof, K.  1978.  Management of Wintering Bald Eagles.  FWS/OBS-78/79.  U.S. Fish and Wildlife Service, Department of the Interior, Washington D.C.

Steidl, R.J. and R.G. Anthony.  2000.  Experimental Effects of Human Activity on Breeding Bald Eagles.  Ecological Applications 10(1), pp. 258-268.

Therres, G.D., M.A. Byrd and D.S. Bradshaw.  1993.  Effects of development on nesting bald eagles:  case studies from Chesapeake Bay.  Transactions of the North American Wildlife and Natural Resources Conference 58:62-69.

U.S. Fish and Wildlife Service.  1979.  Bald Eagle Management Guidelines:  Oregon – Washington.  Portland. OR.

U.S. Fish and Wildlife Service.  1983.   Northern States bald eagle recovery plan.  Appendices E, F, and G.  U.S. Fish and Wildlife Service, Region 6, Denver, CO.

U.S. Fish and Wildlife Service.  1987.  Habitat Management Guidelines for the Bald Eagle in the Southeast Region.  U.S Fish and Wildlife Service, Region 4.  Atlanta, GA.

U.S. Fish and Wildlife Service.  1993.  Bald Eagle Basics.  Anchorage, AK.

U.S. Fish and Wildlife Service.  1993.  Habitat Management Guidelines for Bald Eagles in Texas.  Austin, TX.

U.S. Fish and Wildlife Service and Virginia Department of Game and Inland Fisheries.  2001.  Bald Eagle Protection Guidelines for Virginia.  Gloucester and Richmond, VA.

Watson, J.W.  1993.  Responses of nesting bald eagles to helicopter surveys.  Wildlife Society Bulletin 21:171-178.

Watson, J.W.  2004.  Responses of nesting bald eagles to experimental pedestrian activity.  Journal of Raptor Research 38:295-305.

Wood, P.B.  1999.  Bald eagle response to boating activity in northcentral Florida.  Journal of Raptor Research 33:97-101.

Wood, P.B., T.C. Edwards Jr. and M.W. Collopy.  1989.  Characteristics of bald eagle nesting habitat in Florida.  Journal of Wildlife Management 53(2):441-449.

Young, L.S.  1980.  A quantitative evaluation of human disturbance impacts on breeding eagle ecology of bald eagles in the San Juan Islands, Washington.  Washington Department of Game, Olympia.

**APPENDIX I**

**Mine Stormwater Management Systems**

APPENDIX I

**Mine Stormwater Management Systems**

**1. Applicability**

This Appendix is applicable only for mines for which the Department has permitting, compliance, and enforcement responsibilities under the interagency operating agreements adopted under Rule 62-113.100, F.A.C., but is not applicable to borrow pits.  See paragraphs 2.0(a)12 and 61 of Volume I for more specific definitions of "borrow pits" and "mines," respectively.

Applicants are advised that future changes in land use or development of the project area, subsequent to mining operations and reclamation, may necessitate changes to the stormwater management system and associated operation, maintenance, and monitoring requirements.

**2. Design Options and Considerations**

1. A mine stormwater management system must be designed to accomplish the water quantity and quality objectives specified in Rule 62-330.301(1), F.A.C.  These objectives may be addressed through the following two design options: 1) containment of a specified volume and/or 2) compliance with the stormwater treatment and attenuation criteria provided in the Applicant's Handbook Volume II of the water management district (WMD) where the mine will be located.

2. An industrial wastewater (IW) facility permit, issued in accordance with Chapter 62-620, F.A.C., constitutes authorization to discharge to waters of the state under the National Pollutant Discharge Elimination System (NPDES) Program in accordance with Section 403.0885, F.S.  The water quantity and quality objectives of Rule 62-330.301(1), F.A.C., as described in this appendix, with the exception of water elevation (see Part 2.3.b. below) shall be presumed to be met within the physical boundary of an active IW management system that is permitted under Chapter 62-620, F.A.C., prior to commencement of construction on the basis that the IW permit establishes the following:

   1. The total areal extent of the NPDES system.
   2. The designated discharge outfalls and points within the NPDES system.
   3. Specific conditions regarding effluent limitations; standards and prohibitions at outfalls and discharge points; discharge sampling, reporting requirements, and corrective measures.
   4. Best management practices, pollution prevention procedures, and standard operating procedures for wastewater management.

3. Design considerations intended to meet the objectives of Rule 62-330.301(1), F.A.C., are presented below regarding containment, water elevations, stormwater runoff pretreatment, water and soil quality, and karstic subsurface.

   *a.  Containment*

   Stormwater runoff that is directly or indirectly conveyed to a mine pit may be managed through containment measures to meet water quantity and quality objectives.  An above-grade internal or perimeter berm is an acceptable design method to provide containment.

   Containment will be presumed if the mine pit and/or the above-grade berms have sufficient available storage capacity for a given volume and freeboard at all times throughout the life of the mine.  The required storage capacity shall be calculated using the larger of two design storm events: 1) the 25-year 24-hour design storm event or 2) the required design storm event specified in the Applicant's Handbook Volume II of the WMD where the mine will be located.  A minimum of three feet of freeboard is

# APPENDIX I

## Mine Stormwater Management Systems

recommended for mine pit lakes having fetch lengths of one mile or less. A wave run-up analysis is necessary to determine the appropriate freeboard for a mine pit lake having a fetch length greater than one mile. The freeboard must be measured from the final stage elevation of the applicable WMD's design storm event using the seasonal high water table as the initial stage elevation of the design storm event. The applicant shall demonstrate recovery of the storage capacity for back-to-back required design storm events if the freeboard will be less than three feet. Alternate reasonable assurance may be provided to demonstrate that overtopping will not occur below the required storage capacity.

In lieu of freeboard, stormwater runoff may be discharged through a permanent structure at an elevation above the final stage elevation of the applicable design storm event using the seasonal high water table as the initial stage elevation of the design storm. Discharge design criteria shall be as specified in the applicable WMD's Applicant's Handbook Volume II. The applicant shall demonstrate that offsite discharges shall not cause adverse water quantity impacts to receiving waters and adjacent lands, adverse flooding to onsite or offsite property, adverse impacts to existing surface water storage and conveyance capabilities, or adverse secondary or cumulative impacts to water resources, by itself or in combination with pre-existing activities.

### b. Water Elevations

Dewatering and subsurface excavation have the potential to adversely affect surface water and groundwater elevations. The applicant shall provide reasonable assurance that such adverse effects will not occur by providing a water elevation drawdown or budget analysis or other engineering methodologies (such as recharge through a trench), to demonstrate that the project activity will not adversely affect wetland hydroperiods or cause adverse flooding and environmental impacts to the property of others as a result of changes to water elevations. To provide this assurance, the Department shall require the permittee to take certain measures, as necessary, such as installing piezometers and staff gauges, and monitoring them on a permitted interval. To the extent that an existing water use permit or consumptive use permit addresses the foregoing, such permit may provide reasonable assurance that the stormwater management system will meet these objectives.

### c. Stormwater Runoff Pretreatment

If a mine pit is owned entirely by one person other than the state, surface water quality standards do not apply within that mine pit lake*, except with respect to potential discharges to offsite surface waters and groundwater. Except for activities permitted under 62-620, F.A.C., as provided in paragraph 2.2. above, "contact" runoff that may reasonably be expected to contain potentially-hazardous pollutants may require treatment prior to entering the mine pit or other stormwater management systems. Runoff from entrance roads, parking areas, processing areas, petroleum product storage areas, solid waste storage areas, and equipment maintenance or washdown areas may contain potentially-hazardous pollutants. However, areas associated with material processing, such as washing associated with grading and sorting of sand or limestone extracted from the site, are not considered potential sources of pollutants, provided that no chemicals, except Department-approved water conditioners or pH adjusters, are added to the process water used for transporting, washing, or processing the sand or limestone. Such sources of pollution may require separate management systems to prevent direct discharges to the mine pit, other stormwater management systems, offsite property, or any waters of the state. The applicant is also advised to contact the Department's Industrial Wastewater Program regarding the need and requirements for an IW permit.

### d. Water and Soil Quality

# APPENDIX I

## Mine Stormwater Management Systems

Evaluation of the ambient surface water, if present, and groundwater quality is required.  Typically, to evaluate the ambient groundwater quality, sampling will be required at 5-foot depth intervals to approximately five feet below the proposed depth of extraction.  An alternative sampling interval will be considered, based on available lithologic data and mine depths, when requested by the applicant.  Compliance water quality monitoring shall be required, as necessary, on a permitted interval to provide reasonable assurance based on the site-specific conditions and the proposed activities.  Representative soil characterization shall be required, as necessary, for areas of the property that may be contaminated with potentially-hazardous substances.  Such areas may include existing or historical agricultural areas where potentially-hazardous substances may have been used, fuel storage and fueling areas, and hazardous waste areas within the proposed project area.  Existing soil characterization reports and agency determination letters may be submitted in support of an application.  Sampling shall be conducted in accordance with the current version of DEP's Standard Operating Procedures (DEP-SOP-001/01), as incorporated by reference in Rule 62-160.800, F.A.C.

    *e.  Karstic Subsurface*

The breaching of confining layers or conduit features in karstic or other highly permeable materials, such as limestone, dolomitic limestone, or dolostone, presents a greater potential for direct discharge of untreated stormwater pollutants into groundwater.  The applicant must provide reasonable assurance that groundwater quality standards will not be violated by mining activities that have the potential to penetrate confining layers or flow conduits in karst-sensitive areas.  Runoff from entrance roads, parking areas, processing areas, petroleum product storage areas, solid waste storage areas, and equipment maintenance or washdown areas may contain potentially-hazardous pollutants.  However, areas associated with material processing, such as washing associated with grading and sorting of sand or limestone extracted from the site, are not considered potential sources of pollutants, provided that no chemicals, except Department-approved water conditioners or pH adjusters, are added to the process water used for transporting, washing, or processing the sand or limestone.  Stormwater that is treated by a stormwater management system designed, constructed, and operated in accordance with the applicable Volume II of this handbook, *prior to discharge to the mine excavation*, shall be presumed to not cause or contribute to a water quality violation.  The applicant may propose alternative measures demonstrating that stormwater runoff entering the mine pit will not result in offsite exceedances in water quality standards.

    *   Applicants are advised that a mine pit lake that is subject to federal jurisdiction as a water of the United States may require federal authorization, prior to use for stormwater treatment or other wastewater treatment purposes.*

## 3.  Pre-Application Contact Information

Applicants are strongly advised to request a pre-application meeting with the Department's Mining & Mitigation Program to discuss sample locations, depths, parameters, and frequencies, prior to performing any sampling or installation of piezometers or monitoring wells.  The Mining & Mitigation Program's contact information is as follows:

Department of Environmental Protection
Bob Martinez Center
2600 Blair Stone Road, Mail Station 3577
Tallahassee, Florida 32399-2400

**A.H. Volume I**     **Mine Stormwater Management Systems**     <u>Effective Date</u>

**APPENDIX I**

**Mine Stormwater Management Systems**

MiningAndMitigation@dep.state.fl.us
Telephone: (850) 245-7554
Alternate telephone: (850) 245-8335 (Division of Water Resource
Management) Fax Number: (850) 245-8356
Website: https://floridadep.gov/water/mining-mitigation

# Chapter 62-340, F.A.C. Data Form Guide

Wetland and Other Surface Water Delineation
Version: August 2018 ©



From the Staff of
Wetland Evaluation and Training
Submerged Lands and Environmental Resources Coordination

# Florida Department of Environmental Protection

## Table of Contents                                                                 Page

Appendix A: subsection 62-340.450(1), (2), (3), F.A.C. ................................................3

Chapter 62-340, F.A.C.

    62-340.100 Intent .................................................................................................19

    62-340.200 Definitions ........................................................................................19

    62-340.300 Delineation of Wetlands .................................................................21

    62-340.400 Selection of Appropriate Vegetative Stratum ...............................23

    62-340.450 Vegetative Index ..............................................................................23

    62-340.500 Hydrologic Indicators ....................................................................24

    62-340.550 Wetland Hydrology .........................................................................25

    62-340.600 Surface Waters ...............................................................................25

    62-340.700 Exemptions for Treatment or Disposal Systems ........................26

    62-340.750 Exemptions for Surface Waters or

        Wetlands Created by Mosquito Control Activities ...............................27

Field Identification of Hydric Soils .............................................................................28

Estimating Seasonal High Saturation (SHWT depth) ..................................................28

Stand Alone D-test Indicators ......................................................................................29

Field Determination of Soil Indicator Texture.............................................................30

Tips for Texturing Soils with High Organic Content ("Rub Tests") ...........................31

Tips for Approximating Composition of Soil ("Decant Tests") ..................................31

Tips for Determining Boundary Types of Features in Soil............................................32

Tips for Determining Contrast Between Soil Colors .....................................................32

Round 10X % Coating Charts .......................................................................................34

Feature % Volume Charts ..............................................................................................35

Tips for Determining Shapes of Features in Soil ..........................................................40

Tips for Determining Areal Extents of Plants...............................................................40

Map of Land Resource Regions.....................................................................................41

Map of Major Land Resource Areas..............................................................................42

Hydric Soil Field Indicators for LRRs: P T U ..............................................................43

Hydric Soil Field Indicators Starting Depth Summary Table........................................49

Hydric Soil Field Indicators Simplified Checklist ........................................................50

Glossary from NRCS Field Indicators of Hydric Soils ................................................57

Surface Water Definitions..............................................................................................62

Appendix B: Histosol and Histic Epipedon Definitions ...............................................63

Root Size Estimation Chart and Quantity Classes ........................................................63

NRCS Hydric Soil Technical Notes #4 & #13 ..............................................................64

Appendix C: Hydric Soils Criteria and Technical Standard .........................................65

Supplemental Soil Data..................................................................................................66

FNAI Natural Communities of Florida List...................................................................66

Appendix A2: Common Name Listing of Vegetative Index ..........................................67

Recommended 5-Step Field Wetland Delination Procedure .........................................86

Required and Suggested Field Equipment .....................................................................86

The content of this guide was compiled by members of the Florida Department of Environmental Protection, Submerged Lands and Environmental Resources Coordination, Wetland Evaluation and Training Team. The express purpose of this document is to provide guidance to regulatory staff in order to maintain consistency in the applied field methodologies for wetland delineation pursuant to Chapter 62-340, F.A.C. The information contained in this guide was garnered from various sources pertinent to the field application of wetland delineation methodology outlined in Chapter 62-340, F.A.C. FDEP does

not warrant data provided by other sources for accuracy or for any particular use that may require accurate data. This guide is for information purposes only.

## Appendix A: subsection 62-340.450(1), (2), (3), F.A.C.

**Vegetative Index Plant List**

**Botanical Name/ Common Name/ Wetland Status**

*Abildgaardia ovata*    flat-spike rush FACW
*Acacia auriculiformis*    ear-leaved acacia FAC
*Acer negundo*    box-elder FACW
*Acer rubrum*    red maple FACW
*Acer saccharinum*    silver maple OBL
*Acoelorraphe wrightii*    paurotis palm OBL
*Acrostichum* spp.  leather fern OBL
*Aeschynomene indica*    India joint-vetch FACW
*Aeschynomene pratensis*    meadow joint-vetch OBL
*Agalinis aphylla*    scale-leaf false-foxglove FACW
*Agalinis linifolia*    flax-leaf false-foxglove OBL
*Agalinis maritima*    saltmarsh false-foxglove OBL
*Agalinis pinetorum* (*A. pulchella*)    false-foxglove FACW
*Agalinis purpurea*    large purple false-foxglove FACW
*Agarista populifolia*    hobble-bush FACW
*Agrostis stolonifera*    redtop FACW
*Aletris* spp.    colic-root FAC
*Alisma subcordatum*    subcordate water-plantain OBL
*Alnus serrulata*    hazel alder OBL
*Alopecurus carolinianus*    tufted foxtail FAC
*Alternanthera maritima*    beach alternanthera FACW - Keys only
*Alternanthera paronychioides* smooth chaff-flower FAC - Keys only
*Alternanthera philoxeroides*    alligator-weed OBL
*Alternanthera sessilis*    sessile alligator-weed OBL
*Amaranthus australis*    southern amaranth OBL
*Amaranthus cannabinus*    tidemarsh amaranth OBL
*Amaranthus floridanus*    Florida amaranth OBL
*Ammannia* spp.  toothcup OBL
*Amorpha fruticosa*    indigo-bush FACW
*Amphicarpum muhlenbergianum*    blue maidencane FACW
*Amsonia rigida*    stiff slimpod FACW
*Amsonia tabernaemontana*    eastern slimpod FACW
*Anagallis pumila*    Florida pimpernel FAC
*Andropogon arctatus*  (Campbell) savannah bluestem FAC
*Andropogon brachystachys* (Campbell) short-spike bluestem FAC
*Andropogon gerardii*  (Campbell) big bluestem FAC
*Andropogon glomeratus*  (Campbell) bushy bluestem FACW
*Andropogon liebmanii* var. *pungens*  (Campbell) (*A. mohrii*) Mohr's bluestem FACW
*Andropogon perangustatus*  (Campbell) slim bluestem FAC
*Andropogon virginicus*  (Campbell) broom-sedge FAC
*Annona glabra*    pond apple OBL
*Anthaenantia rufa*    purple silky-scale FACW
*Apteria aphylla*    nodding nixie FACW
*Ardisia* spp.    marlberry FAC
*Arenaria godfreyi*    Godfrey's stitchwort FACW
*Arisaema* spp.    jack-in-the-pulpit; green-dragon FACW

3

*Aristida affinis*    long-leaf three-awn grass OBL
*Aristida purpurascens* (s.l.)    wand-like three-awn grass FACW
*Aristida rhizomophora*    rhizomatous three-awn grass FAC
*Aristida spiciformis*    three-awn bottlebrush FAC
*Aristida stricta*    pineland three-awn grass FAC
*Armoracia aquatica*    lakecress OBL
*Arnoglossum diversifolium*    variable-leaf indian-plantain FACW
*Arnoglossum ovatum*    egg-leaf indian-plantain FACW
*Arnoglossum sulcatum* indian-plantain, Georgia OBL
*Aronia arbutifolia*    red chokeberry FACW
*Arundinaria gigantea*    giant cane FACW
*Arundo donax*    giant reed FAC
*Asclepias connivens*    large-flower milkweed FACW
*Asclepias incarnata*    swamp milkweed OBL
*Asclepias lanceolata*    fen-flower milkweed OBL
*Asclepias longifolia*    long-leaf milkweed FACW
*Asclepias pedicellata*    savannah milkweed FACW
*Asclepias perennis*    aquatic milkweed OBL
*Asclepias rubra*    red milkweed OBL
*Asclepias viridula*    southern milkweed FACW
*Aster carolinianus*    climbing aster OBL
*Aster chapmanii*    savannah aster FACW
*Aster dumosus*    bushy aster FAC
*Aster elliottii*    Elliott's aster OBL
*Aster eryngiifolius*    coyote-thistle aster FACW
*Aster lateriflorus*    calico aster FACW
*Aster spinulosus*    bog aster FACW
*Aster subulatus*    saltmarsh aster OBL
*Aster tenuifolius*    saltmarsh aster OBL
*Aster umbellatus*    flat-top white aster FAC
*Aster vimineus*    small white aster FACW
*Athyrium filix-femina*    subarctic lady fern FACW
*Atriplex patula*    halberd-leaf saltbush FACW
*Avicennia germinans*    black mangrove OBL
*Axonopus* spp.    carpet grass FAC
*Baccharis angustifolia*    false-willow OBL
*Baccharis dioica*    broom-bush false-willow FAC
*Baccharis glomeruliflora*    groundsel tree FAC
*Baccharis halimifolia*    eastern false-willow FAC
*Bacopa* spp.    water-hyssop OBL
*Balduina atropurpurea*    purple honeycomb-head FACW
*Balduina uniflora*    one-flower honeycomb-head FACW
*Bartonia* spp.  screwstem FACW
*Batis maritima*    saltwort OBL
*Betula nigra*    river birch OBL
*Bidens bipinnata*    Spanish needles U
*Bidens pilosa*    white beggar-ticks FAC
*Bidens* spp.    beggar-ticks OBL
*Bigelowia nudata*    rayless golden-rod FACW
*Blechnum serrulatum*    swamp fern FACW
*Boehmeria cylindrica*    small-spike false-nettle OBL

*Boltonia* spp.    boltonia FACW
*Borrichia* spp.    sea oxeye OBL
*Brachiaria purpurascens*    paragrass FACW
*Bucida buceras*    gregory wood FAC
*Bumelia celastrina*    coastal bumelia FAC
*Bumelia lycioides*    buckthorn bumelia FAC
*Bumelia reclinata*    bumelia FAC
*Burmannia* spp.    burmannia OBL
*Byrsonima lucida*    locust-berry FAC - Keys only
*Cacalia suaveolens*    sweet-scent indian-plantain FACW
*Calamovilfa curtissii*    Curtiss' reed grass FACW
*Callitriche* spp.    water-starwort OBL
*Calopogon* spp.    grass-pinks FACW
*Calycocarpum lyonii*    cupseed FACW
*Campanula americana*    American bellflower FAC
*Campanula floridana*    bellflower OBL
*Canna* spp.    canna OBL
*Canna x generalis*    common canna FAC
*Caperonia* spp.    caperonia FACW
*Capparis flexuosa*    caper-tree FACW
*Cardamine bulbosa*    bitter-cress OBL
*Cardamine pensylvanica*    spring-cress OBL
*Carex atlantica*    prickly bog sedge OBL
*Carex comosa*    bearded sedge OBL
*Carex crinita*    fringed sedge OBL
*Carex crus-corvi*    raven-foot sedge OBL
*Carex decomposita*    cypress-knee sedge OBL
*Carex elliottii*    Elliott's sedge OBL
*Carex folliculata*    long sedge OBL
*Carex gigantea*    large sedge OBL
*Carex howei*    Howe's sedge OBL
*Carex hyalinolepis* sedge, shoreline sedge OBL
*Carex leptalea*    bristly-stalk sedge OBL
*Carex louisianica*    Louisiana sedge OBL
*Carex lupulina*    hop sedge OBL
*Carex lurida*    shallow sedge OBL
*Carex* spp.    sedges FACW
*Carex stipata*    stalk-grain sedge OBL
*Carex walteriana*    Walter's sedge OBL
*Carphephorus carnosus*    pineland chaffhead FACW
*Carphephorus odoratissimus*    vanilla plant FAC
*Carphephorus paniculatus*    deer-tongue FAC
*Carphephorus pseudoliatris*    bristle-leaf chaffhead FACW
*Carpinus caroliniana*    American hornbeam FACW
*Carya aquatica*    water hickory FAC
*Casuarina* spp.    casuarina FAC
*Cayaponia quinqueloba*    five-lobe cayaponia FAC
*Celtis laevigata*    sugar-berry; hackberry FACW
*Centella asiatica*    coinwort FACW
*Cephalanthus occidentalis*    buttonbush OBL
*Cestrum diurnum*    day jessamine FAC

5

(This Appendix is not incorporated by reference; Effective Date_____)

*Chamaecyparis thyoides*    Atlantic white cedar OBL
*Chaptalia tomentosa*    sunbonnet; pineland daisy FACW
*Chasmanthium latifolium*    spanglegrass FAC
*Chasmanthium sessiliflorum*    long-leaf Chasmanthium FAC
*Chasmanthium* spp.    spanglegrass FACW
*Chiococca* spp.    snowberry FAC
*Chrysobalanus icaco*    cocoplum FACW
*Cicuta* spp.    water-hemlock OBL
*Cirsium lecontei*    Leconte's thistle FACW
*Cirsium muticum*    swamp thistle OBL
*Cirsium nuttallii*    Nuttall's thistle FACW
*Cladium* spp.    sawgrass OBL
*Cleistes divaricata*    rosebud OBL
*Clethra alnifolia*    sweet pepper bush FACW
*Cliftonia monophylla*    buckwheat-tree FACW
*Colocasia esculenta*    elephant's ear OBL
*Colubrina asiatica*    Asian snakewood FAC
*Commelina erecta*    sandhill dayflower U
*Commelina* spp.    dayflower FACW
*Conocarpus erectus*    buttonwood FACW
*Conoclinium coelestinum*    mistflower FAC
*Coreopsis falcata*    sickle tickseed FACW
*Coreopsis floridana*    Florida tickseed FACW
*Coreopsis gladiata*    southeastern tickseed FACW
*Coreopsis integrifolia*    ciliate-leaf tickseed FACW
*Coreopsis leavenworthii*    Leavenworth's tickseed FACW
*Coreopsis linifolia*    Texas tickseed FACW
*Coreopsis nudata*    Georgia tickseed OBL
*Coreopsis tripteris*    tall tickseed FAC
*Cornus amomum*    silky dogwood OBL
*Cornus foemina*    swamp dogwood FACW
*Crataegus aestivalis*    mayhaw OBL
*Crataegus marshallii*    parsley haw FACW
*Crataegus viridis*    green haw FACW
*Crinum americanum*    southern swamp-lily OBL
*Croton elliottii*    Elliott's croton FACW
*Ctenitis submarginalis*    brown-hair comb fern FACW
*Ctenium* spp.    toothache grass FACW
*Cupaniopsis anacardioides*    carrotwood FAC
*Cuphea aspera*    common waxweed FACW
*Cuphea carthagenensis*    Columbia waxweed FAC
*Cyperus alternifolius*    alternate-leaf flatsedge OBL
*Cyperus articulatus*    jointed flatsedge OBL
*Cyperus cuspidatus*    coastal-plain flatsedge FAC
*Cyperus difformis*    variable flatsedge OBL
*Cyperus distinctus*    marshland flatsedge OBL
*Cyperus drummondii*    flatsedge OBL
*Cyperus entrerianus*    flatsedge OBL
*Cyperus erythrorhizos*    red-root flatsedge OBL
*Cyperus esculentus*    flatsedge FAC
*Cyperus filiculmis*    sandhill flatsedge U

(This Appendix is not incorporated by reference; Effective Date_____)

*Cyperus giganteus*   flatsedge FAC
*Cyperus globulosus*   Baldwin's flatsedge FAC
*Cyperus haspan*   sheathed flatsedge OBL
*Cyperus huarmensis*   black knotty-root flatsedge FAC
*Cyperus lanceolatus*   epiphytic flatsedge OBL
*Cyperus metzii*   flatsedge FAC
*Cyperus ovularis*   flatsedge U
*Cyperus papyrus*   papyrus flatsedge OBL
*Cyperus reflexus*   flatsedge U
*Cyperus refractus*   flatsedge U
*Cyperus retrofractus*   flatsedge U
*Cyperus retrorsus*   flatsedge FAC
*Cyperus rotundus*   purple flatsedge FAC
*Cyperus* **spp.**   flatsedge FACW
*Cyperus tetragonus*   flatsedge U
*Cypselea humifusa*   panal FAC
*Cyrilla racemiflora*   swamp cyrilla FAC
*Decodon verticillatus*   swamp-loosestrife OBL
*Dichondra caroliniensis*   pony-foot FAC
*Dichromena colorata*   starbrush white-top sedge FACW
*Dichromena floridensis*   Everglades white-top sedge FACW
*Dichromena latifolia*   giant white-top sedge OBL
*Dicliptera brachiata*   wild mudwort FACW
*Digitaria pauciflora*   everglades grass FACW
*Digitaria serotina*   dwarf crabgrass FAC
*Diodia virginiana*   button-weed FACW
*Dionaea muscipula*   Venus' flytrap FACW
*Diospyros virginiana*   common persimmon FAC
*Distichlis spicata*   seashore saltgrass OBL
*Drosera brevifolia*   dwarf sundew FACW
*Drosera capillaris*   pink sundew FACW
*Drosera filiformis*   thread-leaf sundew OBL
*Drosera intermedia*   spoon-leaf sundew OBL
*Drosera tracyi*   Gulf coast sundew OBL
*Drymaria cordata*   West Indian chickweed FAC
*Dryopteris ludoviciana*   southern shield-fern FACW
*Dulichium arundinaceum*   three-way sedge OBL
*Dyschoriste humistrata*   swamp dyschoriste FACW
*Echinochloa* spp.   jungle-rice; cockspur grass FACW
*Echinodorus* spp.   burhead OBL
*Eclipta alba*   yerba de Tajo FACW
*Eleocharis* spp.   spikerush OBL
*Elyonurus tripsacoides*   Pan-American balsam-scale FACW
*Elytraria caroliniensis*   Carolina scaly-stem FAC
*Equisetum hyemale*   horsetail FACW
*Eragrostis* spp.   lovegrass FAC
*Erechtites hieraciifolia*   fireweed FAC
*Erianthus brevibarbis*   short-beard plumegrass FACW
*Erianthus giganteus*   sugarcane plumegrass OBL
*Erianthus strictus*   narrow plumegrass OBL
*Erigeron quercifolius*   fleabane FAC

(This Appendix is not incorporated by reference; Effective Date_____)

***Erigeron vernus***   early whitetop fleabane FACW
***Eriocaulon*** spp.   pipewort OBL
***Eriochloa*** spp.   cupgrass FACW
***Erithalis fruticosa***   black torchwood FAC
***Ernodea littoralis***   golden-creeper FAC - Keys only
***Eryngium aquaticum***   corn snakeroot OBL
***Eryngium baldwinii***   Baldwin's coyote-thistle FAC
***Eryngium integrifolium***   blue-flower coyote-thistle FACW
***Eryngium prostratum***   creeping coyote-thistle FACW
***Eryngium yuccifolium***   rattlesnake master FACW
***Erythrodes querceticola***   low erythrodes FACW
***Eulophia alta***   wild coco FACW
***Eupatoriadelphus fistulosus***   joe-pye-weed FACW
***Eupatorium leptophyllum***   marsh thoroughwort OBL
***Eupatorium leucolepis***   white-bract thoroughwort FACW
***Eupatorium mikanioides***   semaphore thoroughwort FACW
***Eupatorium perfoliatum***   boneset FACW
***Eupatorium*** spp.   thoroughworts FAC
***Euphorbia humistrata*** (*Chamaesyce humistrata*)  spreading broomspurge   FACW
***Euphorbia inundata***   Florida spurge FACW
***Euphorbia polyphylla***   many-leaved spurge FACW
***Eustachys glauca*** (*Chloris glauca*)   saltmarsh fingergrass FACW
***Eustachys petraea***   fingergrass FAC
***Eustoma exaltatum***   prairie-gentian FACW
***Euthamia*** spp.   bushy goldenrod FAC
***Evolvulus convolvuloides***   evolvulus FACW
***Evolvulus sericeus***   silky bindweed FACW
***Ficus aurea***   Florida strangler fig FAC
***Fimbristylis annua***   annual fringe-rush FACW
***Fimbristylis puberula***   Vahl's hairy fringe-rush FACW
***Fimbristylis spathacea***   hurricane-grass FAC
***Fimbristylis*** spp.   fringe-rush OBL
***Flaveria bidentis***   yellowtop FAC
***Flaveria floridana***   yellowtop FACW
***Flaveria linearis***   yellowtop FACW
***Flaveria trinervia***   yellowtop FAC
***Forestiera acuminata***   swamp privet FACW
***Forestiera segregata***   Florida privet FAC
***Fothergilla gardenii***   dwarf witch-alder FACW
***Fraxinus americana***   white ash U
***Fraxinus*** spp.   ash OBL
***Fuirena*** spp.   umbrella-sedge OBL
***Galium tinctorium***   stiff marsh bedstraw FACW
***Gaylussacia dumosa***   dwarf huckleberry FAC
***Gaylussacia frondosa***   dangleberry FAC
***Gaylussacia mosieri***   woolly-berry FACW
***Gentiana*** spp.   gentian FACW
***Gleditsia aquatica***   water-locust OBL
***Gleditsia triacanthos***   honey-locust FACW
***Glyceria striata***   fowl mannagrass OBL
***Gordonia lasianthus***   loblolly bay FACW

(This Appendix is not incorporated by reference; Effective Date_____)

*Gratiola hispida*  hispid hyssop FAC
*Gratiola* spp.  hedgehyssop FACW
*Guapira discolor*  blolly FAC - Keys only
*Habenaria* spp.  rein orchid FACW
*Halesia diptera*  silver-bell FACW
*Harperocallis flava*  Harper's beauty FACW
*Hartwrightia floridana*  Florida hartwrightia FACW
*Hedychium coronarium*  ginger FACW
*Helenium amarum*  pasture sneezeweed FAC
*Helenium* spp.  sneezeweed FACW
*Helianthus agrestis*  southeastern sunflower FACW
*Helianthus angustifolius*  swamp sunflower FACW
*Helianthus carnosus*  lakeside sunflower FACW
*Helianthus floridanus*  Florida sunflower FAC
*Helianthus heterophyllus*  wetland sunflower FACW
*Helianthus simulans*  muck sunflower FACW
*Heliotropium curassavicum*  seaside heliotrope FAC
*Heliotropium polyphyllum*  heliotrope FAC
*Heliotropium procumbens*  four-spike heliotrope FACW
*Hemicarpha* spp.  dwarf-bulrush FACW
*Heteranthera reniformis*  kidney-leaf mud-plantain OBL
*Hibiscus aculeatus*  rosemallow FACW
*Hibiscus coccineus*  scarlet rosemallow OBL
*Hibiscus grandiflorus*  swamp rosemallow OBL
*Hibiscus laevis*  halberd-leaf rosemallow OBL
*Hibiscus moscheutos*  swamp rosemallow OBL
*Hibiscus tiliaceus*  sea rosemallow FAC
*Hydrochloa caroliniensis*  watergrass OBL
*Hydrocleis nymphoides*  water-poppy OBL
*Hydrocotyle ranunculoides*  floating pennywort OBL
*Hydrocotyle* spp.  pennywort FACW
*Hydrolea* spp.  false-fiddle-leaf OBL
*Hygrophila* spp.  hygrophila OBL
*Hymenachne amplexicaulis*  trompetilla OBL
*Hymenocallis* spp.  spider-lily OBL
*Hypericum chapmanii*  Chapman's St. John's-wort OBL
*Hypericum cumulicola*  scrub St. John's-wort U
*Hypericum drummondii*  Drummond's St. John's-wort U
*Hypericum edisonianum*  Edison's St. John's-wort OBL
*Hypericum fasciculatum*  marsh St. John's-wort OBL
*Hypericum gentianoides*  pineweed U
*Hypericum hypericoides*  St. Andrew's cross FAC
*Hypericum lissophloeus*  smooth-bark St. John's-wort OBL
*Hypericum microsepalum*  small-sepal St. John's-wort U
*Hypericum nitidum*  Carolina St. John's-wort OBL
*Hypericum prolificum*  shrubby St. John's-wort U
*Hypericum punctatum*  dotted St. John's-wort U
*Hypericum reductum*  Atlantic St. John's-wort U
*Hypericum* spp.  St. John's-wort FACW
*Hypericum tetrapetalum*  four-petal St. John's-wort FAC
*Hypolepis repens*  bead fern FACW

(This Appendix is not incorporated by reference; Effective Date_____)

*Hypoxis* spp.    yellow stargrasses FACW
*Hyptis alata*    musky mint FACW
*Ilex amelanchier*    sarvis holly OBL
*Ilex cassine*    dahoon holly OBL
*Ilex coriacea*    bay-gall holly FACW
*Ilex decidua*    deciduous holly FACW
*Ilex myrtifolia*    myrtle holly OBL
*Ilex opaca* var.*opaca*    American holly FAC
*Ilex verticillata*    winterberry OBL
*Ilex vomitoria*    yaupon holly FAC
*Illicium floridanum*    Florida anise OBL
*Illicium parviflorum*    star anise FACW
*Impatiens capensis*    spotted touch-me-not OBL
*Iris* spp.    iris OBL
*Iris verna*    dwarf iris U
*Isoetes* spp.    quillwort OBL
*Itea virginica*    virginia willow OBL
*Iva frutescens*    marsh elder OBL
*Iva microcephala*    little marsh elder FACW
*Jacquinia keyensis*    joewood FAC
*Juncus marginatus*    rush FACW
*Juncus* spp.    rush OBL
*Juncus tenuis*    rush FAC
*Justicia brandegeana*    shrimp plant U
*Justicia* spp.    water-willow OBL
*Kalmia latifolia*    mountain laurel FACW
*Kosteletzkya pentasperma*    coastal mallow FAC
*Kosteletzkya virginica*    seashore mallow OBL
*Lachnanthes caroliniana*    redroot FAC
*Lachnocaulon anceps*    white-head bogbutton FACW
*Lachnocaulon beyrichianum*    southern bogbutton FACW
*Lachnocaulon digynum*    pineland bogbutton OBL
*Lachnocaulon engleri*    Engler's bogbutton OBL
*Lachnocaulon minus*    Small's bogbutton OBL
*Laguncularia racemosa*    white mangrove OBL
*Laportea canadensis*    Canada wood-nettle FACW
*Leersia* spp.    cutgrass OBL
*Leitneria floridana*    corkwood OBL
*Leptochloa* spp.    sprangle-top FACW
*Leptochloa virgata*    tropic sprangle-top FAC
*Leucothoe* spp.    dog-hobble FACW
*Liatris garberi*    Garber's gayfeather FACW
*Liatris gracilis*    blazing star FAC
*Liatris spicata*    spiked gayfeather FAC
*Lilaeopsis* spp.    lilaeopsis OBL
*Lilium catesbaei*    southern red lily FAC
*Lilium iridollae*    panhandle lily OBL
*Limnobium spongia*    frogbit OBL
*Limnophila* spp.    marshweed OBL
*Limonium carolinianum*    sea-lavender OBL
*Lindera benzoin*    northern spicebush FACW

10

*Lindera melissifolia*    southern spicebush OBL
*Lindernia crustacea*    Malayan false-pimpernel FAC
*Lindernia* spp.    false-pimpernel FACW
*Linum carteri*    Carter's flax FACW
*Linum floridanum*    Florida yellow flax FAC
*Linum medium*    stiff yellow flax FAC
*Linum striatum*    ridged yellow flax FACW
*Linum westii*    West's flax OBL
*Liparis elata* (*L. nervosa*)    tall liparis OBL
*Lipocarpha* spp.    lipocarpha FACW
*Liquidambar styraciflua*    sweetgum FACW
*Liriodendron tulipifera*    tulip tree FACW
*Listera* spp.    twayblade FACW
*Litsea aestivalis*    pondspice OBL
*Lobelia cardinalis*    cardinal flower OBL
*Lobelia floridana*    Florida lobelia OBL
*Lobelia* spp.    lobelia FACW
*Lophiola americana*    golden-crest FACW
*Ludwigia hirtella*    hairy seedbox FACW
*Ludwigia maritima*    seaside seedbox FACW
*Ludwigia* spp.    ludwigia; water-primrose OBL
*Ludwigia suffruticosa*    headed seedbox FACW
*Ludwigia virgata*    savanna seedbox FACW
*Lycium carolinianum*    Christmas berry OBL
*Lycopodium* spp.    clubmoss FACW
*Lycopus* spp.    bugleweed OBL
*Lyonia ligustrina*    maleberry FAC
*Lyonia lucida*    fetter-bush FACW
*Lyonia mariana*    fetter-bush FACW
*Lysimachia* spp.    loosestrife OBL
*Lythrum* spp.    marsh loosestrife OBL
*Macbridea* spp.    birds-in-a-nest FACW
*Macranthera flammea*    flameflower OBL
*Magnolia virginiana* var. *australis* sweetbay magnolia OBL
*Malaxis spicata*    Florida adder's-mouth OBL
*Manilkara bahamensis*    wild dilly FAC - Keys only
*Manisuris cylindrica*    pitted jointgrass FAC
*Manisuris* spp.    jointgrass FACW
*Marshallia graminifolia*    grass-leaf barbara's-buttons FACW
*Marshallia tenuifolia*    slim-leaf barbara's-buttons FACW
*Maxillaria crassifolia*    hidden orchid OBL
*Maytenus phyllanthoides*    Florida mayten FAC
*Mecardonia* spp.    mecardonia FACW
*Melaleuca quinquenervia*    punk tree FAC
*Melanthera nivea*    squarestem FAC
*Melanthium virginicum*    Virginia bunchflower OBL
*Melochia corchorifolia*    chocolate-weed FAC
*Metopium toxiferum*    poison wood FAC
*Micranthemum* spp.    baby tears OBL
*Micromeria brownei* (*Satureja brownei*)    Brown's savory OBL
*Mimosa pigra*    black mimosa FAC

(This Appendix is not incorporated by reference; Effective Date_____)

*Mimulus alatus*    monkey-flower OBL
*Mitreola* spp.    hornpod FACW
*Monanthochloe littoralis*    keygrass OBL
*Morinda royoc*    Keys rhubarb FACW - Keys only
*Morus rubra*    red mulberry FAC
*Muhlenbergia capillaris*    muhly grass OBL
*Muhlenbergia expansa*    cutover muhly FAC
*Muhlenbergia schreberi*    nimblewill FACW
*Murdannia* spp.    dewflower FAC
*Myosurus minimus*    tiny mouse-tail FAC
*Myrica cerifera*    southern bayberry FAC
*Myrica heterophylla*    evergreen bayberry FACW
*Myrica inodora*    odorless bayberry FACW
*Myrsine guianensis*    guiana myrsine FAC
*Nasturtium* spp.    water-cress FAC
*Nelumbo* spp.    water-lotus OBL
*Nemastylis floridana*    fall-flowering pleatleaf FACW
*Nemophila aphylla*    small-flower baby-blue-eyes FACW
*Nephrolepis* spp.    sword ferns FAC
*Neyraudia reynaudiana*    silk reed FAC
*Nuphar luteum*    yellow cow-lily OBL
*Nymphaea* spp.    water-lily OBL
*Nymphoides* spp.    floating-hearts OBL
*Nyssa aquatica*    water tupelo OBL
*Nyssa ogeche*    ogeechee tupelo OBL
*Nyssa sylvatica* var. *biflora*    swamp tupelo OBL
*Oldenlandia* spp.    water bluets FACW
*Onoclea sensibilis*    sensitive fern FACW
*Oplismenus setarius*    woods grass FAC
*Orontium aquaticum*    golden club OBL
*Oryza sativa*    cultivated rice FAC
*Osmunda cinnamomea*    cinnamon fern FACW
*Osmunda regalis*    royal fern OBL
*Oxypolis* spp.    water drop-wort OBL
*Panicum abscissum* (Hall)    cut-throat grass FACW
*Panicum anceps*    beaked panicum FAC
*Panicum commutatum*    panicum FAC
*Panicum dichotomiflorum*    fall panicum FACW
*Panicum dichotomum*    panicum FACW
*Panicum ensifolium*    panic grass OBL
*Panicum erectifolium*    erect-leaf witchgrass OBL
*Panicum gymnocarpon*    savannah panicum OBL
*Panicum hemitomon*    maiden-cane OBL
*Panicum hians*    gaping panicum FAC
*Panicum longifolium*    tall thin panicum OBL
*Panicum pinetorum*    panicum FACW
*Panicum repens*    torpedo grass FACW
*Panicum rigidulum*    red-top panicum FACW
*Panicum scabriusculum*    woolly panicum OBL
*Panicum scoparium*    panicum FACW
*Panicum spretum*    panicum FACW

*Panicum strigosum*   panicum FAC
*Panicum tenerum*   bluejoint panicum OBL
*Panicum tenue*   panicum FAC
*Panicum verrucosum*   warty panicum FACW
*Panicum virgatum*   switchgrass FACW
*Parietaria* spp.   pellitory FAC
*Parnassia* spp.   grass-of-Parnassus OBL
*Paspalidium geminatum*   water panicum OBL
*Paspalum acuminatum*   brook paspalum FACW
*Paspalum boscianum*   bull paspalum FACW
*Paspalum conjugatum*   sour paspalum FAC
*Paspalum dilatatum*   dallisgrass FAC
*Paspalum dissectum*   mudbank paspalum OBL
*Paspalum distichum*   joint paspalum OBL
*Paspalum fimbriatum*   Panama paspalum FAC
*Paspalum floridanum*   Florida paspalum FACW
*Paspalum laeve*   field paspalum FACW
*Paspalum monostachyum*   gulf paspalum OBL
*Paspalum plicatulum*   brown-seed paspalum FAC
*Paspalum praecox*   early paspalum OBL
*Paspalum pubiflorum*   hairy-seed paspalum FACW
*Paspalum repens*   water paspalum OBL
*Paspalum setaceum*   thin paspalum FAC
*Paspalum urvillei*   vasey grass FAC
*Pavonia spicata*   mangrove mallow FACW
*Peltandra* spp.   arum; spoon flower OBL
*Pennisetum purpureum*   elephant ear grass FAC
*Penthorum sedoides*   ditch stonecrop OBL
*Pentodon pentandrus*   Hall's pentodon OBL
*Persea palustris*   swamp bay OBL
*Phalaris* spp.   canary grass FAC
*Philoxerus vermicularis*   silverhead FACW
*Phragmites australis*   common reed OBL
*Phyla* spp.   frog-fruit FAC
*Phyllanthus caroliniensis*   Carolina leaf-flower FACW
*Phyllanthus liebmannianus*   Florida leaf-flower FACW
*Phyllanthus urinaria*   water leaf-flower FAC
*Physostegia godfreyi*   Godfrey's dragon-head OBL
*Physostegia leptophylla*   slender-leaf dragon-head OBL
*Physostegia purpurea*   purple dragon-head FACW
*Physostegia virginiana*   false dragon-head FACW
*Pieris phillyreifolia*   climbing fetter-bush FACW
*Pilea* spp.   clearweed FACW
*Pinckneya bracteata*   (*P. pubens*) fever-tree OBL
*Pinguicula* spp.   butterwort OBL
*Pinus glabra*   spruce pine FACW
*Pinus serotina*   pond pine FACW
*Piriqueta caroliniana*   piriqueta FAC
*Pisonia rotundata*   pisonia FAC - Keys only
*Pithecellobium keyense*   blackbead FAC - Keys only
*Pithecellobium unguis-cati*   catclaw FAC - Keys only

*Planera aquatica*    planer tree OBL
*Platanthera* spp.    fringed orchid OBL
*Platanus occidentalis*    sycamore FACW
*Pleea tenuifolia*    rush-featherling OBL
*Pluchea* spp.    camphor-weed FACW
*Pogonia ophioglossoides*    rose pogonia OBL
*Polygala cymosa*    tall milkwort OBL
*Polygala leptostachys*    sandhill milkwort U
*Polygala lewtonii*    scrub milkwort U
*Polygala polygama*    racemed milkwort U
*Polygala* spp.    milkwort FACW
*Polygala verticillata*    whorled milkwort U
*Polygonum argyrocoleon*    silversheath smartweed U
*Polygonum* spp.    smartweed OBL
*Polygonum virginianum*    jumpseed FACW
*Polypogon* spp.    rabbit-foot grass FAC
*Polypremum procumbens*    rustweed FAC
*Pontederia cordata*    pickerelweed OBL
*Ponthieva racemosa*    shadow-witch FACW
*Populus deltoides*    eastern cottonwood FACW
*Populus heterophylla*    swamp cottonwood OBL
*Proserpinaca* spp.    mermaid-weed OBL
*Psidium cattleianum*    strawberry guava FAC
*Psilocarya* spp.    baldrush OBL
*Psychotria* spp.    wild coffee FAC
*Pteris tripartita*    giant brake FACW
*Ptilimnium capillaceum*    mock bishop-weed FACW
*Pycnanthemum nudum*    coastal-plain mountain-mint FACW
*Quercus laurifolia*    laurel oak FACW
*Quercus lyrata*    overcup oak OBL
*Quercus michauxii*    swamp chestnut oak FACW
*Quercus nigra*    water oak FACW
*Quercus pagoda*    cherry-bark oak FACW
*Quercus phellos*    willow oak FACW
*Randia aculeata*    box briar FAC - Keys only
*Ranunculus* spp.    butter-cup FACW
*Reimarochloa oligostachya*    Florida reimar grass FACW
*Reynosia septentrionalis*    darling plum FAC - Keys only
*Rhapidophyllum hystrix*    needle palm FACW
*Rhexia parviflora*    white meadow-beauty OBL
*Rhexia salicifolia*    panhandle meadow-beauty OBL
*Rhexia* spp.    meadow-beauty FACW
*Rhizophora mangle*    red mangrove OBL
*Rhododendron viscosum*    swamp azalea FACW
*Rhodomyrtus tomentosus*    downy rose-myrtle FAC
*Rhynchospora cephalantha*    clustered beakrush OBL
*Rhynchospora chapmanii*    Chapman's beakrush OBL
*Rhynchospora corniculata*    short-bristle beakrush OBL
*Rhynchospora decurrens*    swamp-forest beakrush OBL
*Rhynchospora divergens*    spreading beakrush OBL
*Rhynchospora grayi*    Gray's beakrush U

(This Appendix is not incorporated by reference; Effective Date_____)

*Rhynchospora harperi*    Harper's beakrush OBL
*Rhynchospora intermedia*    pinebarren beakrush U
*Rhynchospora inundata*    horned beakrush OBL
*Rhynchospora macra*    large beakrush OBL
*Rhynchospora megalocarpa*    giant-fruited beakrush U
*Rhynchospora microcarpa*    southern beakrush OBL
*Rhynchospora miliacea*    millet beakrush OBL
*Rhynchospora mixta*    mingled beakrush OBL
*Rhynchospora oligantha*    few-flower beakrush OBL
*Rhynchospora* spp.    beakrush FACW
*Rhynchospora stenophylla*    Chapman's beakrush OBL
*Rhynchospora tracyi*    Tracy's beakrush OBL
*Rorippa* spp.    yellow-cress OBL
*Rosa palustris*    swamp rose OBL
*Rotala ramosior*    toothcup OBL
*Roystonea* spp.    royal palm FACW
*Rubus* spp.    blackberries FAC
*Rudbeckia fulgida*    orange coneflower FACW
*Rudbeckia graminifolia*    grass-leaf coneflower FACW
*Rudbeckia laciniata*    cut-leaf coneflower FACW
*Rudbeckia mohrii*    Mohr's coneflower OBL
*Rudbeckia nitida*    shiny coneflower FACW
*Ruellia brittoniana*    Britton's wild-petunia FAC
*Ruellia caroliniensis*    wild-petunia FAC
*Ruellia noctiflora*    night-flowering wild-petunia FACW
*Rumex* spp.    dock FACW
*Sabal minor*    dwarf palmetto FACW
*Sabal palmetto*    cabbage palm FAC
*Sabatia bartramii*    Bartram's rose-gentian OBL
*Sabatia calycina*    coast rose-gentian OBL
*Sabatia dodecandra*    large rose-gentian OBL
*Sabatia* spp.    rose-gentian FACW
*Sacciolepis indica*    glenwood grass FAC
*Sacciolepis striata*    American cupscale OBL
*Sachsia polycephala*    sachsia FACW
*Sagittaria* **spp.**    arrowhead OBL
*Salicornia* spp.    glasswort OBL
*Salix* spp.    willow OBL
*Sambucus canadensis*    elderberry FAC
*Samolus* spp.    water pimpernel OBL
*Sapium sebiferum*    Chinese tallow-tree FAC
*Sarracenia minor*    hooded pitcher-plant FACW
*Sarracenia* spp.    pitcher-plant OBL
*Saururus cernuus*    lizard's tail OBL
*Schinus terebinthifolius*    Brazilian pepper-tree FAC
*Schizachyrium* spp.    bluestem FAC
*Schoenolirion croceum*    sunny bells FACW
*Schoenolirion elliottii*    sunny bells FACW
*Schoenus nigricans*    black-sedge FACW
*Scirpus* spp.    bulrush OBL
*Scleria* spp.    nutrush FACW

15

    (This Appendix is not incorporated by reference; Effective Date_____)

*Sclerolepis uniflora*   one-flower hardscale FACW
*Scoparia dulcis*   sweet broom FAC
*Scutellaria floridana*   skullcap FAC
*Scutellaria integrifolia*   rough skullcap FAC
*Scutellaria lateriflora*   blue skullcap OBL
*Scutellaria racemosa*   skullcap OBL
*Sebastiania fruticosa*   gulf sebastian-bush FAC
*Selaginella apoda*   meadow spike-moss FACW
*Senecio aureus*   golden ragwort OBL
*Senecio glabellus*   butterweed OBL
*Sesbania* spp.   rattle-bush FAC
*Sesuvium* spp.   sea-purslane FACW
*Setaria geniculata*   bristle grass FAC
*Setaria magna*   foxtail OBL
*Seymeria cassioides*   black senna FAC
*Sisyrinchium atlanticum*   eastern blue-eye-grass FACW
*Sisyrinchium capillare*   blue-eye-grass FACW
*Sisyrinchium mucronatum*   Michaux's blue-eye-grass FACW
*Sium suave*   water-parsnip OBL
*Solanum bahamense*   canker-berry FACW
*Solanum erianthum*   shrub nightshade FACW
*Solidago elliottii*   Elliott's goldenrod OBL
*Solidago fistulosa*   marsh goldenrod FACW
*Solidago leavenworthii*   Leavenworth's goldenrod FACW
*Solidago patula*   rough-leaf goldenrod OBL
*Solidago rugosa*   wrinkled goldenrod FAC
*Solidago sempervirens*   seaside goldenrod FACW
*Solidago stricta*   willow-leaf goldenrod FACW
*Sophora tomentosa*   coast sophora FACW
*Sparganium americanum*   burreed OBL
*Spartina alterniflora*   saltmarsh cordgrass OBL
*Spartina bakeri*   sand cordgrass FAC
*Spartina cynosuroides*   big cordgrass OBL
*Spartina patens*   saltmeadow cordgrass FACW
*Spartina spartinae*   gulf cordgrass OBL
*Spergularia marina*   saltmarsh sandspurry OBL
*Spermacoce glabra*   smooth button-plant FACW
*Sphagnum* spp.   sphagnum moss OBL
*Sphenoclea zeylanica*   chicken-spike FACW
*Sphenopholis pensylvanica*   swamp wedgescale OBL
*Sphenostigma coelestinum*   Bartram's ixia FACW
*Spigelia loganioides*   pink-root FACW
*Spilanthes americana*   creeping spotflower FACW
*Spiranthes* spp.   ladies'-tresses FACW
*Sporobolus floridanus*   Florida dropseed FACW
*Sporobolus virginicus*   seashore dropseed OBL
*Stachys lythroides*   hedgenettle OBL
*Staphylea trifolia*   American bladdernut FACW
*Stenandrium floridanum*   stenandrium FAC
*Stenanthium gramineum*   eastern feather-bells FACW
*Stillingia aquatica*   corkwood OBL

(This Appendix is not incorporated by reference; Effective Date_____)

*Stillingia sylvatica* var. *tenuis*    marsh queen's-delight FAC
*Stipa avenacioides*    Florida needle grass FAC
*Stokesia laevis*    stokesia FACW
*Strumpfia maritima*    strumpfia FACW - Keys only
*Styrax americana*    snowbell; storax OBL
*Suaeda* spp.    sea-blite OBL
*Suriana maritima*    bay-cedar FAC
*Syngonanthus flavidulus*    bantam-buttons FACW
*Syzygium* spp.    Java plum FAC
*Taxodium ascendens*    pond cypress OBL
*Taxodium distichum*    bald cypress OBL
*Teucrium canadense*    American germander FACW
*Thalia geniculata*    thalia; fire flag OBL
*Thalictrum* spp.    meadow-rue FACW
*Thelypteris* spp.    shield fern FACW
*Thespesia populnea*    seaside mahoe FAC
*Thrinax radiata*    Florida thatch palm FAC - Keys only
*Tilia americana*    American basswood FACW
*Tofieldia racemosa*    coastal false-asphodel OBL
*Toxicodendron vernix*  poison sumac FACW
*Trachelospermum difforme*    climbing-dogbane FACW
*Tradescantia fluminensis*    trailing spiderwort FAC
*Trema* spp.    trema FAC
*Trepocarpus aethusae*    aethusa-like trepocarpus FACW
*Triadenum* spp.    marsh St. John's-wort OBL
*Trianthema portulacastrum*    horse-purslane FACW
*Tridens ambiguus*    savannah tridens FACW
*Tridens strictus*    long-spike tridens FACW
*Triglochin striata*    arrow-grass OBL
*Triphora* spp.    nodding pogonias FACW
*Tripsacum dactyloides*    eastern gama grass FAC
*Typha* spp.    cattail OBL
*Ulmus rubra*    slippery elm U
*Ulmus* spp.    elm FACW
*Urechites lutea*    wild allamanda FACW
*Utricularia* spp.    bladderwort OBL
*Uvularia floridana*    Florida bellwort FACW
*Vaccinium corymbosum*    highbush blueberry FACW
*Vaccinium elliottii*    Elliott's blueberry FAC
*Verbena scabra*    sandpaper vervain FACW
*Verbesina chapmanii*    Chapman's crownbeard FACW
*Verbesina heterophylla*    diverse-leaf crownbeard FACW
*Verbesina virginica*    white crownbeard FAC
*Vernonia angustifolia*    narrow-leaf ironweed U
*Vernonia* spp.    ironweed FACW
*Veronica anagallis-aquatica*    water speedwell OBL
*Veronicastrum virginicum*    culver's-root FACW
*Viburnum dentatum*    arrow-wood FACW
*Viburnum nudum*    possum-haw viburnum FACW
*Viburnum obovatum*    walter viburnum FACW
*Vicia acutifolia*    four-leaf vetch FACW

*Vicia floridana*    Florida vetch FACW
*Vicia ocalensis*    Ocala vetch FACW
*Viola affinis*    Leconte's violet FACW
*Viola esculenta*    edible violet FACW
*Viola lanceolata*    lance-leaf violet OBL
*Viola primulifolia*    primrose-leaf violet FACW
*Websteria confervoides*    water-meal OBL
*Wedelia trilobata*    creeping ox-eye FAC
*Woodwardia areolata*    chainfern OBL
*Woodwardia virginica*    chainfern FACW
*Xanthorhiza simplicissima*    shrubby yellow-root FACW
*Xanthosoma sagittifolium*    elephant ear FACW
*Xyris caroliniana*    Carolina yellow-eyed grass FACW
*Xyris jupicai*    tropical yellow-eyed grass FACW
*Xyris* spp.    yellow-eyed grass OBL
*Yeatesia viridiflora*    green-flower yeatesia FACW
*Zephyranthes atamasco*    atamasco lily FACW
*Zigadenus densus*    crow poison FACW
*Zigadenus glaberrimus*    atlantic deathcamas FACW
*Zizania aquatica*    wildrice OBL
*Zizaniopsis miliacea*    southern wildrice OBL


**Any plant not specifically listed is considered an upland plant except vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of Chapter 62-340, F.A.C. (Effective Date July 1, 1994)**

(This Appendix is not incorporated by reference; Effective Date_____)

# Chapter 62-340, F.A.C.
# Delineation of the Landward Extent of Wetlands and Surface Waters

62-340.100 Intent.
62-340.200 Definitions.
62-340.300 Delineation.
62-340.400 Selection of Appropriate Vegetative Stratum.
62-340.450 Vegetative Index.
62-340.500 Hydrologic Indicators.
62-340.550 Wetland Hydrology.
62-340.600 Surface Waters.
62-340.700 Exemptions for Treatment or Disposal Systems.
62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

**62-340.100 Intent.**
   (1) This rule's intent is to provide a unified statewide methodology for the delineation of the extent of wetlands and surface waters to satisfy the mandate of Section 373.421, F.S. This delineation methodology is intended to approximate the combined landward extent of wetlands as determined by a water management district and the Department immediately before the effective date of this rule. Before implementing the specific provisions of this methodology, the regulating agency shall attempt to identify wetlands according to the definition for wetlands in subsection 373.019(27), F.S., and subsection 62-340.200(19), F.A.C., below. The landward extent of wetlands shall be determined by the dominance of plant species, soils and other hydrologic evidence indicative of regular and periodic inundation or saturation. In all cases, attempts shall be made to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing, without quantitative sampling. If this cannot be accomplished, the quantitative methods in paragraph 62-301.400(1)(c), F.A.C., shall be used unless the applicant or petitioner and regulating agency agree, in writing, on an alternative method for quantitatively analyzing the vegetation on site. The methodology shall not be used to delineate areas which are not wetlands as defined in subsection 62-340.200(19), F.A.C., nor to delineate as wetlands or surface waters areas exempted from delineation by statute or agency rule.
   2) The Department shall be responsible for ensuring statewide coordination and consistency in the delineation of surface waters and wetlands pursuant to this rule, by providing training and guidance to the Department, Districts, and local governments in implementing the methodology.
*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.100.*

**62-340.200 Definitions.**
When used in this chapter, the following terms shall mean:
(1)   "**Aquatic plant**" means a plant, including the roots, which typically floats on water or requires water for its entire structural support, or which will desiccate outside of water.
(2)   "**Canopy**" means the plant stratum composed of all woody plants and palms with a trunk four inches or greater in diameter at breast height, except vines.
(3)  "**Diameter at Breast Height (DBH)**" means the diameter of a plant's trunk or main stem at a height of 4.5 feet above the ground.
(4)  "**Facultative plants**" means those plant species listed in subsection 62-340.450(3), F.A.C., of this chapter. For the purposes of this rule, facultative plants are not indicators of either wetland or upland conditions.
(5)  "**Facultative Wet plants**" means those plant species listed in subsection 62-340.450(2), F.A.C., of this chapter.

(6)   "**Ground Cover**" means the plant stratum composed of all plants not found in the canopy or subcanopy, except vines and aquatic plants.

(7)   "**Ground truthing**" means verification on the ground of conditions on a site.

(8)   "**Hydric Soils**" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

(9)   "**Hydric Soil Indicators**" means those indicators of hydric soil conditions as identified in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation ed. Staff 1992).

(10) "**Inundation**" means a condition in which water from any source regularly and periodically covers a land surface.

(11) "**Obligate plants**" means those plant species listed in subsection 62-340.450(1), F.A.C., of this chapter.

(12) "**Regulating agency**" means the Department of Environmental Protection, the water management districts, state or regional agencies, local governments, and any other governmental entities.

(13) "**Riverwash**" means areas of unstabilized sandy, silty, clayey, or gravelly sediments. These areas are flooded, washed, and reworked by rivers or streams so frequently that they may support little or no vegetation.

(14) "**Saturation**" means a water table six inches or less from the soil surface for soils with a permeability equal to or greater than six inches per hour in all layers within the upper 12 inches, or a water table 12 inches or less from the soil surface for soils with a permeability less than six inches per hour in any layer within the upper 12 inches.

(15) "**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

(16) "**Subcanopy**" means the plant stratum composed of all woody plants and palms, exclusive of the canopy, with a trunk or main stem with a DBH between one and four inches, except vines.

(17) "**Upland plants**" means those plant species, not listed as Obligate, Facultative Wet, or Facultative by this rule, excluding vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of this rule.

(18) "**U.S.D.A.-S.C.S.**" means the United States Department of Agriculture, Soil Conservation Service.

(19) "**Wetlands**," as defined in subsection 373.019(27), F.S., means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.200.*

## 62-340.300 Delineation of Wetlands.

The landward extent (i.e., the boundary) of wetlands as defined in subsection 62-340.200(19), F.A.C., shall be determined by applying reasonable scientific judgment to evaluate the dominance of plant species, soils, and other hydrologic evidence of regular and periodic inundation and saturation as set forth below. In applying reasonable scientific judgment, all reliable information shall be evaluated in

determining whether the area is a wetland as defined in subsection 62-340.200(19), F.A.C.

(1) Before using the wetland delineation methodology described below, the regulating agency shall attempt to identify and delineate the landward extent of wetlands by direct application of the definition of wetlands in subsection 62-340.200(19), F.A.C., with particular attention to the vegetative communities which the definition lists as wetlands and non-wetlands. If the boundary cannot be located easily by use of the definition in subsection 62-340.200(19), F.A.C., the provisions of this rule shall be used to locate the landward extent of a wetland. In applying the provisions of this rule, the regulating agency shall attempt to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing.

(2) The landward extent of a wetland as defined in subsection 62-340.200(19), F.A.C., shall include any of the following areas:

(a) Those areas where the aereal extent of obligate plants in the appropriate vegetative stratum is greater than the areal extent of all upland plants in that stratum, as identified using the method in Rule 62-340.400, F.A.C., and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrological mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(b) Those areas where the areal extent of obligate or facultative wet plants, or combinations thereof, in the appropriate stratum is equal to or greater than 80% of all the plants in that stratum, excluding facultative plants, and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(c) Those areas, other than pine flatwoods and improved pastures, with undrained hydric soils which meet, in situ, at least one of the criteria listed below. A hydric soil is considered undrained unless reasonable scientific judgment indicates permanent artificial alterations to the on site hydrology have resulted in conditions which would not support the formation of hydric soils.

1. Soils classified according to United States Department of Agriculture's *Keys to Soil Taxonomy* (4th ed. 1990) as Umbraqualfs, Sulfaquents, Hydraquents, Humaquepts, Histosols (except Folists), Argiaquolls, or Umbraquults.

2. Saline sands (salt flats-tidal flats).

3. Soil within a hydric mapping unit designated by the U.S.D.A.-S.C.S. as frequently flooded or depressional, when the hydric nature of the soil has been field verified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida. If a permit applicant, or a person petitioning for a formal determination pursuant to subsection 373.421(2), F.S., disputes the boundary of a frequently flooded or depressional mapping unit, the applicant or petitioner may request that the regulating agency, in cooperation with the U.S.D.A.-S.C.S., confirm the boundary. For the purposes of subsection 120.60(2), F.S., a request for a boundary confirmation pursuant to this subparagraph shall have the same effect as a timely request for additional information by the regulating agency. The regulating agency's receipt of

the final response provided by the U.S.D.A.-S.C.S. to the request for boundary confirmation shall have the same effect as a receipt of timely requested additional information.

4. For the purposes of this paragraph only, "pine flatwoods" means a plant community type in Florida occurring on flat terrain with soils which may experience a seasonal high water table near the surface. The canopy species consist of a monotypic or mixed forest of long leaf pine or slash pine. The subcanopy is typically sparse or absent. The ground cover is dominated by saw palmetto with areas of wire grass, gallberry, and other shrubs, grasses, and forbs, which are not obligate or facultative wet species. Pine flatwoods do not include those wetland communities as listed in the wetland definition contained in subsection 62-340.200(19), F.A.C., which may occur in the broader landscape setting of pine flatwoods and which may contain slash pine. Also for the purposes of this paragraph only, "improved pasture" means areas where the dominant native plant community has been replaced with planted or natural recruitment of herbaceous species which are not obligate or facultative wet species and which have been actively maintained for livestock through mechanical means or grazing.

(d) Those areas where one or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present, and which have hydric soils, as identified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida, and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C. These areas shall not extend beyond the seasonal high water elevation.

(3)(a) If the vegetation or soils of an upland or wetland area have been altered by natural or man-induced factors such that the boundary between wetlands and uplands cannot be delineated reliably by use of the methodology in subsection 62-340.300(2), F.A.C., as determined by the regulating agency, and the area has hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a non hydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance, then the most reliable available information shall be used with reasonable scientific judgment to determine where the methodology in subsection 62-340.300(2), F.A.C., would have delineated the boundary between wetlands and uplands. Reliable available information may include, but is not limited to, aerial photographs, remaining vegetation, authoritative site-specific documents, or topographical consistencies.

(b) This subsection shall not apply to any area where regional or site-specific permitted activity, or activities which did not require a permit, under Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., have altered the hydrology of the area to the extent that reasonable scientific judgment, or application of the provisions of Section 62-340.550, F.A.C., indicate that under normal circumstances the area no longer inundates or saturates at a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C.

(c) This subsection shall not be construed to limit the type of evidence which may be used to delineate the landward extent of a wetland under this chapter when an activity violating the regulatory requirements of Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., has disturbed the vegetation or soils of an area.

(4) The regulating agency shall maintain sufficient soil scientists on staff to provide evaluation or consultation regarding soil determinations in applying the methodologies set forth in subsection 62-340.300(2) or (3), F.A.C. Services provided by the U.S.D.A.-S.C.S., or other competent soil scientists, under contract or agreement with the regulating agency, may be used in lieu of, or to augment, agency staff.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.300.*

**62-340.400 Selection of Appropriate Vegetative Stratum.**

Dominance of plant species, as described in paragraphs 62-340.300(2)(a) and 62-340.300(2)(b), F.A.C., shall be determined in a plant stratum (canopy, subcanopy, or ground cover). The top stratum shall be used to determine dominance unless the top stratum, exclusive of facultative plants, constitutes less than 10 percent areal extent, or unless reasonable scientific judgment establishes that the indicator status of the top stratum is not indicative of the hydrologic conditions on site. In such cases, the stratum most indicative of on site hydrologic conditions, considering the seasonal variability in the amount and distribution of rainfall, shall be used. The evidence concerning the presence or absence of regular and periodic inundation or saturation shall be based on in situ data. All facts and factors relating to the presence or absence of regular and periodic inundation or saturation shall be weighed in deciding whether the evidence supports shifting to a lower stratum. The presence of obligate, facultative wet, or upland plants in a lower stratum does not by itself constitute sufficient evidence to shift strata, but can be considered along with other physical data in establishing the weight of evidence necessary to shift to a lower stratum. The burden of proof shall be with the party asserting that a stratum other than the top stratum should be used to determine dominance. Facultative plants shall not be considered for purposes of determining appropriate strata or dominance.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.400.*

**62-340.450 Vegetative Index.**

(1) Obligate Species (See Appendix A)

(2) Facultative Wet Species (See Appendix A)

(3) Facultative Species (See Appendix A)

(4) Nomenclature. Use of plants in this rule is based solely on the scientific names. Common names are included in the above lists for information purposes only. The following references shall be used by the regulating agency to resolve any uncertainty about the nomenclature or taxonomy of any plant listed by a given scientific name in this section: R. Godfrey, Trees, Shrubs and Woody Vines of Northern Florida and Adjacent Georgia & Alabama (Univ. Ga. Press, Athens 1988) and D. Lellinger, Ferns & Fern-Allies of the United States & Canada (Smithsonian Institution Press, Washington D.C. 1985) for all species covered by these references. For all other listed scientific names the following references will be followed unless the species list in this section designates a different authority next to an individual species name: R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Monocotyledons (Univ. Ga. Press, Athens 1979); R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Dicotyledons (Univ. Ga. Press, Athens 1979); D. & H. Correll, Flora of the Bahama Archipelago (A.R. Gantner, Germany 1982). When the species list in this section designates a different authority next to an individual species name, the regulating agency shall resolve any ambiguity in nomenclature by using the name identified in D. Hall, The Grasses of Florida (Doctoral Dissertation, Univ. of Fla., Gainesville 1978); or C. Campbell, Systematics of the Andropogon Virginicus Complex (GRAMINEAE), 64 Journal of the Arnold Arboretum 171-254 (1983).

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.450.*

**62-340.500 Hydrologic Indicators.**

The indicators below may be used as evidence of inundation or saturation when used as provided in Rule 62-340.300, F.A.C. Several of the indicators reflect a specific water elevation. These specific water elevation indicators are intended to be evaluated with meteorological information, surrounding topography and reliable hydrologic data or analyses when provided, to ensure that such indicators reflect inundation or saturation of a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C., and not rare or aberrant events. These specific water elevation indicators are not intended to be extended from the site of the indicator into surrounding areas when reasonable scientific judgment indicates that the surrounding areas are not wetlands as defined in

subsection 62-340.200(19), F.A.C.

(1) **Algal mats**. The presence or remains of nonvascular plant material which develops during periods of inundation and persists after the surface water has receded.

(2) **Aquatic mosses or liverworts on trees or substrates**. The presence of those species of mosses or liverworts tolerant of or dependent on surface water inundation.

(3) **Aquatic plants**. Defined in subsection 62-340.200(1), F.A.C.

(4) **Aufwuchs**. The presence or remains of the assemblage of sessile, attached or free-living, nonvascular plants and invertebrate animals (including protozoans) which develop a community on inundated surfaces.

(5) **Drift lines and rafted debris**. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(6) **Elevated lichen lines**. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

(7) **Evidence of aquatic fauna**. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

(8) **Hydrologic data**. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation Staff 1992).

(9) **Morphological plant adaptations**. Specialized structures or tissues produced by certain plants in response to inundation or saturation which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

(10) **Secondary flow channels**. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

(11) **Sediment deposition**. Mineral or organic matter deposited in or shifted to positions indicating water transport.

(12) **Vegetated tussocks or hummocks**. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

(13) **Water marks**. A distinct line created on fixed objects, including vegetation, by a sustained water elevation.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.500.*


**62-340.550 Wetland Hydrology.**

A wetland delineation using the methodology described above, can be refuted by either reliable hydrologic records or site specific hydrologic data which indicate that neither inundation for at least seven consecutive days, nor saturation for at least twenty consecutive days, occurs during conditions which represent long-term hydrologic conditions. Hydrologic records or site specific hydrologic data must be of such a duration, frequency, and accuracy to demonstrate that the records or data are representative of the long-term hydrologic conditions, including the variability in quantity and seasonality of rainfall. When sufficient amounts of either reliable hydrologic records or site specific hydrologic data are not available to prove that the wetland area of concern does not inundate or saturate as described above, a site-specific field-verified analytic or numerical model may be used to demonstrate that the wetland area no longer inundates or saturates regularly or periodically under typical

long-term hydrologic conditions. Before initiating the use of a model to evaluate if a wetland delineation should be refuted based on hydrologic conditions, the applicant or petitioner shall first meet with the appropriate regulating agency and reach an agreement on the terms of study, including data collection, the specific model, model development and calibration, and model verification. If the data, analyses, or models are deemed inadequate based on the hydrologic conditions being addressed, the regulating agency shall provide a case-by-case review of the applicability of any data, analyses, or models and shall provide specific reasons, based on generally accepted scientific and engineering practices, why they are inadequate.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.550.*

### 62-340.600 Surface Waters.

(1) For the purposes of Section 373.421, F.S., surface waters are waters on the surface of the earth, contained in bounds created naturally or artificially, including, the Atlantic Ocean, the Gulf of Mexico, bays, bayous, sounds, estuaries, lagoons, lakes, ponds, impoundments, rivers, streams, springs, creeks, branches, sloughs, tributaries, and other watercourses. However, state water quality standards apply only to those waters defined in subsection 403.031(13), F.S.

(2) The landward extent of a surface water in the State for the purposes of implementing Section 373.414, F.S., shall be the more landward of the following:

(a) Wetlands as located by Rule 62-340.300, F.A.C., of this chapter;

(b) The mean high water line elevation for tidal water bodies;

(c) The ordinary high water line for non-tidal natural water bodies;

(d) The top of the bank for artificial lakes, borrow pits, canals, ditches and other artificial water bodies with side slopes of 1 foot vertical to 4 feet horizontal or steeper, excluding spoil banks when the canals and ditches have resulted from excavation into the ground; or

(e) The seasonal high water line for artificial lakes, borrow pits, canals, ditches, and other artificial water bodies with side slopes flatter than 1 foot vertical to 4 feet horizontal along with any artificial water body created by diking or impoundment above the ground.

(3) Determinations made pursuant to paragraphs (2)(b) and (2)(c) shall be for regulatory purposes and are not intended to be a delineation of the boundaries of lands for the purposes of title.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211, 403.031(13) FS. History–New 7-1-94, Formerly 17-340.600.*

### 62-340.700 Exemptions for Treatment or Disposal Systems.

(1) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8) and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991):

(a) Works, impoundments, reservoirs, and other watercourses constructed and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(b) Works, impoundments, reservoirs, and other watercourses constructed solely for wastewater treatment or disposal before a construction permit was required under Chapter 403, F.S., and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885,

F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(c) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C., except those permitted as wetland stormwater treatment systems; or

(d) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(2) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1), 373.414(2)(a), 373.414(8), and 373.414(10), F.S.; and subsections 373.414(3) through 373.414(6), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991), except for authority to protect threatened and endangered species in isolated wetlands:

(a) Works, impoundments, reservoirs, and other watercourses of 0.5 acre or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, 40E-4, except those permitted as wetland stormwater treatment systems; or

(b) Works, impoundments, reservoirs, and other watercourses of 0.5 acres or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(3) The exemptions in subsections 62-340.700(1) and (2) shall not apply to works, impoundments, reservoirs or other watercourses that

(a) Are currently wetlands which existed before construction of the stormwater treatment system and were incorporated in it;

(b) Are proposed to be altered through expansion into wetlands or other surface waters; or

(c) Are wetlands created, enhanced, or restored as mitigation for wetland or surface water impacts under a permit issued by the Department or a water management district.

(4) Alterations and maintenance of works, impoundments, reservoirs, and other watercourses exempt under this subsection shall not be considered in determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S.

(5) Works, impoundments, reservoirs, and other watercourses exempt under this subsection, other than isolated wetlands in systems described in subsection 62-340.700(2), F.A.C., above, shall not be delineated under Section 373.421, F.S.

(6) This exemption shall not affect the application of state water quality standards, including those applicable to Outstanding Florida Waters, at the point of discharge to waters as defined in subsection 403.031(13), F.S.

(7) As used in this subsection, "solely for" means the reason for which a work, impoundment, reservoir, or other watercourse is constructed and operated; and such construction and operation would not have occurred but for the purposes identified in subsection 62-340.700(1) or 62-340.700(2), F.A.C. Furthermore, the phrase does not refer to a work, impoundment, reservoir, or other watercourse constructed or operated for multiple purposes. Incidental uses, such as occasional recreational uses, will not render the exemption inapplicable, so long as the incidental uses are not part of the original planned purpose of the work, impoundment, reservoir, or other watercourse. However, for those works,

26

impoundments, reservoirs, or other watercourses described in paragraphs 62-340.700(1)(c) and 62-340.700(2)(a), F.A.C., use of the system for flood attenuation, whether originally planned or unplanned, shall be considered an incidental use, so long as the works, impoundments, reservoirs, and other watercourses are no more than 2 acres larger than the minimum area required to comply with the stormwater treatment requirements of the district or department. For the purposes of this subsection, reuse from a work, impoundment, reservoir, or other watercourse is part of treatment or disposal.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.700.*

**62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.** Construction, alteration, operation, maintenance, removal, and abandonment of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works, in, on or over lands that have become surface waters or wetlands solely because of mosquito control activities undertaken as part of a governmental mosquito control program, and which lands were neither surface waters nor wetlands before such activities, shall be exempt from the rules adopted by the department and water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority granted pursuant to Section 373.414, F.S. (1991). Activities exempted under this section shall not be considered in determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S. This exemption shall not affect the regulation of impacts on other surface waters or wetlands, or the application of state water quality standards to waters as defined in subsection 403.031(13), F.S., including standards applicable to Outstanding Florida Waters.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.750.*

*See <u>The Florida Wetlands Delineation Manual</u> for further clarification.*

**Data Form Guide Notes:**
**Tips from NRCS <u>Field Indicators of Hydric Soils in the United States</u> Version 8.1, 2017:**
- As long as the soil meets the definition of a hydric soil, the lack of an indicator does not preclude the soil from being hydric.
- Concentrate sampling efforts near the wetland edge and, if these soils are hydric, assume that soils in the wetter, interior portions also are hydric. The indicators were developed mostly to identify the boundary of hydric soil areas and generally work best on the margins. Not all of the obviously wetter hydric soils will be identified by the indicators.

## SOIL AND WATER RELATIONSHIPS OF FLORIDA'S ECOLOGICAL COMMUNITIES
July, 1992 Adapted

### <u>Field Identification of Hydric Soils</u>

**Hydric Soil Indicator Concept**

The Hydric Soil Indicator concept is based on the premise that hydric soils develop and exhibit characteristic morphologies that result from repeated periods of saturation and/or inundation for more than a few days. Saturation or inundation when combined with anaerobic microbiological activity in the soil causes a depletion of oxygen. This anaerobiosis promotes biogeochemical processes such as the accumulation of organic matter and the reduction, translocation, and/or accumulation of iron and other reducible elements. These processes result in characteristic morphologies which persist in the soil during both wet and dry periods, making them particularly useful for identifying hydric soils.

Hydric soil indicators are formed predominantly by the accumulation or loss of iron, manganese, sulfur, or carbon compounds. The presence of hydrogen sulfide gas (rotten egg odor) is a strong indicator of a hydric soil, but this indicator is found in only the wettest sites containing sulfur.

**Hydric Soil Indicator Identification Procedure**

To document a hydric soil, dig a hole and describe the soil profile to a depth of approximately 50 cm (20 inches). Using the completed soil description specify which of the Hydric Soil Indicators have been matched. Deeper examination of soil may be required where Hydric Soil Indicators are not easily seen within 50 cm (20 in.) of the surface. It is always recommended that soils be excavated and described as deep as necessary to make reliable interpretations. Examination to less than 50 cm (20 in.) may suffice in soils with surface horizons of organic material or mucky mineral material because these shallow organic accumulations only occur in hydric soils. Depths used in are measured from the muck or mineral soil surface unless otherwise indicated. All colors refer to moist Munsell colors.

### <u>Estimating Seasonal High Saturation</u>

**Introduction**

Seasonal High Water Table (SHWT) is the shallowest depth to free water that stands in an unlined borehole or where the soil moisture tension is zero for a significant period (more than a few weeks). The depth to the estimated SHWT is the used soil interpretation in Florida. This method of estimating SHWT applies only to areas lacking hydrologic modifications. Hydrologic modifications such as ditches and dikes can make the soil either wetter or drier.
By observing soil features, SHWT predictions can be made for hydric soils as well as other soils.

**Field Identification of SHWT**

The procedure for field Identification of SHWT is based on the assumption that, when soils are wet enough, for a long enough duration to develop SHWT, they should exhibit certain visible properties

that are to be used to determine on-site SHWT. All SHWT determinations should be based on field observations of moist soils.

**Procedure**

SHWT is determined by examining soils with a hydric soil indicator in a freshly dug pit for the SHWT indicators listed below. Presence of the shallowest of the SHWT indicators listed below indicates the depth to SHWT.

1. Soils with the following hydric soil indicators have SHWT at or above the surface:
   A1 (Histosol or Histel), A2 (Histic Epipedon), A3 (Black Histic), A4 (Hydrogen Sulfide), A7 (5 cm Mucky Mineral), A8 (Muck Presence) or A9 (1 cm Muck), S4 (Sandy Gleyed Matrix), and F2 (Loamy Gleyed Matrix).

2. Soils with the following hydric soil indicators have SHWT within 6 inches of the surface:
   A5 (Stratified Layers), A6 (Organic Bodies), A11 (Depleted Below Dark Surface), A12 (Thick Dark Surface), S5 (Sandy Redox), S6 (Stripped Matrix), S7 (Dark Surface), S8 (Polyvalue Below Surface), S9 (Thin Dark Surface), F10 (Marl), and F13 (Umbric Surface).
   Depth to SHWT is the depth at which all requirements of a particular indicator are met. For example, if S6 (Stripped Matrix) starts at 4 inches, depth to SHWT is 4 inches or if S7 (Dark Surface) starts at the soil surface, depth to SHWT is the soil surface.

3. Soils with the following hydric soil indicators have SHWT within 12 inches of the surface:
   F3 (Depleted Matrix), F6 (Redox Dark Surface), and F7 (Depleted Dark Surface). Depth to SHWT is the depth at which all requirements of a particular indicator are met.
   For example, if F3 (Depleted Matrix) starts at 8 inches, depth to SHWT is 8 inches.

4. Soils with the following hydric soil indicators lack significant saturation but are inundated for long or very long duration:
   F8 (Redox Depressions) and F12 (Iron/Manganese Masses).

---

**Data Form Guide Note:**
**A stand alone D Test soil field indicator is both a hydric soil field indicator and a hydrologic indicator.**

**The hydric soil field indicators below indicate SHWT at or above the surface, and therefore may also be used as evidence of hydrologic data under subsection 62-340.500(8), F.A.C.** per Soil and Water Relationships of Florida's Ecological Communities (Florida Soil Conservation Staff 1992 Adapted)**:**

**A1 – Histosol or Histel**
**A2 – Histic Epipedon**
**A3 – Black Histic**
**A4 – Hydrogen Sulfide**
**A7 – 5 cm Mucky Mineral**
**A8 – Muck Presence**
**A9 – 1 cm Muck**
**S4 – Sandy Gleyed Matrix**
**F2 – Loamy Gleyed Matrix**

Or **any NRCS hydric soil field indicator** in which all requirements of that indicator are met starting at the soil surface (see SHWT Procedure above)

**The hydric soil field indicator below is also a hydrologic indicator under subsection 62-340.500(11), F.A.C. evidence of sediment deposition:**

**A5 - Stratified Layers**

(This Appendix is not incorporated by reference; Effective Date_____)

# Field Determination of Soil Indicator Texture



## Soil Textures and Their
## Hydric Soil Indicator Prefix Designations:

**A - All texture soils** "All soils" refers to soils with any USDA soil texture, including muck, mucky peat, and peat

**S - Sandy texture soils (soils that will not ribbon)** "Sandy soils" refers to those soils with a USDA soil texture of loamy fine sand and coarser, and does not include muck, mucky peat, or peat.

**F - Fine texture soils (soils that will ribbon)** "Loamy and clayey soils" refers to those soils with

30

USDA soil texture of loamy very fine sand and finer, and does not include muck, mucky peat, or peat.

## Tips for Determining Texture of Soil Materials High in Organic Carbon

### "Five Rub Texture Test"

If soil appears dark, gently (minimal pressure) rub wet soil material between forefinger and thumb and note how it feels.

| # of Rubs | Feeling | Texture |
|-----------|---------|---------|
| ≤ 2 | Gritty | Sandy Mineral[1] |
| 2 | Greasy | *Continue to next rows* |
| 3 to ≤ 5 | Gritty | Sandy Mucky Mineral[1] |
| 3 to ≤ 5 | Plastic[2] | Check % Organic Carbon[3] to determine if Fine Mineral[1] or Fine Mucky Mineral[1] |
| 5 | Greasy | Muck[1] |

[1] Results of this test only indicate texture; check NRCS hydric soil field indicators to determine if all requirements of an indicator are met

[2] Plastic: able to be molded or deformed into various shapes by moderate pressure

[3] Sufficiency of organic carbon* can be approximated using the "Color Test"[4] *not to be confused with organic coating

### "Ten Rub Fiber Test"

If soil material is all or nearly all organic, firmly rub a moist sample 10 times in the palm of one hand with the thumb of the other and estimate proportion of fibers visible with a hand lens.

| Proportion of visible fibers[5] | Organic soil texture |
|-------------------------------|---------------------|
| Less than 1/6 (<17%) | Sapric (Muck) |
| 1/6 to 3/4 (17% - 75%) | Hemic (Mucky Peat) |
| More than 3/4 (>75%) | Fibric (Peat) |

[5] Live roots are not considered

## Tips for Approximating Composition of Soil

### "Decant Tests"

Place a pea sized amount of soil in cupped palm of hand. Holding spray bottle close (~3 in.), thoroughly wet soil, filling but not overflowing palm.

Break apart soil material to make a souplike suspension of particles.

[4]"Color Test"
Keeping solution in palm, note its color.
(Helps to determine if suspended particles are organic or fine mineral.)



Black/Brown → Organic Material

Gray/Cloudy → Clay and/or Silt

"Sand Content Test"
Gently decant liquid solution while keeping solid material in palm.

Spray, muddle, examine, drain, and repeat until solution runs nearly clear.

Spread remaining soil material across palm. Compare amount of sand in relation to original pea sized clump, considering relative loss of fine soil material (clay and silt) indicated by the "Color

Test", to approximate organic vs. mineral (sand, silt, clay) content. See Fig. 7 pg. 60 for dry weight soil texture ratio requirements.

(This Appendix is not incorporated by reference; Effective Date_____)

## Tips for Determining Boundary Types of Features in Soil



**Sharp**
Color gradation is
less than 0.1mm wide

**Clear**
Color gradation is
0.1mm to 2mm wide

**Diffuse**
Color gradation is greater
than 2mm wide

**Figure 1:** Diagram for determining boundary types of features in the matrix.

## Tips for Determining Contrast Between Soil Colors

| ΔHue | ΔValue | ΔChroma | Contrast |
|------|--------|---------|----------|
|      | ≤2     | ≤1      | Faint    |
|      | ≤2     | >1 to <4| Distinct |
| 0    | >2 to <4| <4     | Distinct |
|      | any    | ≥4      | Prominent|
|      | ≥4     | any     | Prominent|
|      | ≤1     | ≤1      | Faint    |
|      | ≤1     | >1 to <3| Distinct |
| 1    | >1 to <3| <3     | Distinct |
|      | any    | ≥3      | Prominent|
|      | ≥3     | any     | Prominent|
|      | 0      | 0       | Faint    |
|      | 0      | >0 to <2| Distinct |
| 2    | >0 to <2| <2     | Distinct |
|      | any    | ≥2      | Prominent|
|      | ≥2     | any     | Prominent|
| 3+   | any    | any     | Prominent|



**Table 1:** Chart of delta hue (Figure 2), delta value, and delta chroma required for each level of color contrast. The last column in each row states what level of contrast exists between two colors when the Δhue, Δvalue, and Δchroma criteria within that row are met.

**\*Note: If both colors have value ≤3 and chroma ≤2, the contrast is faint, regardless of the change in hue.**

**Figure 2:** Relationships among the hues of the Munsell Color System. Solid lines represent hues contained in the *Munsell Soil Color Charts* (2009). Dotted lines represent all other possible 2.5 unit steps. Moving from one hue line to the adjacent hue line represents a delta hue of 1 (2.5 units). Moving from hue N to any other hue the delta hue is 1.

Adapted from the *Soil Survey Manual* (Soil Survey Staff, 1993)

33

## Tips for Determining Contrast Between Soil Colors (continued)



**Figure 3:** Using the 7.5 YR 4/3 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009).



**Figure 4:** Using the 7.5 YR 3/2 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009). Note that because the matrix has value ≤3 and chroma ≤2, all other colors with value ≤3 and chroma ≤2 are faintly contrasting despite the change in hue.

(This Appendix is not incorporated by reference; Effective Date_____)

## Estimating Percent Organic Coating

**The round diagrams represent the appearance of uncoated (clear or white) sand grains versus coated (gray to black) sand grains within a ped face as viewed through a 10X hand lens.**



35




90%                    95%

---

## Estimating Percent Volume
**The squares represent part of a grid drawn on the soil profile to estimate volume of light areas, dark areas, or redox concentrations of larger and smaller sizes.**

2%

5%

10%

 

**15%**

**20%**



**30%**



**40%**



(This Appendix is not incorporated by reference; Effective Date_____)



**50%**

(Note: when a feature (e.g. stripped areas) composes more than 50% of the volume, its color is considered to be the matrix color of the soil profile. When more than two colors are present, the color composing the majority of the volume is the matrix color.)

**60%**

**70%**

**80%**

(This Appendix is not incorporated by reference; Effective Date_____)

**The squares represent part of a grid drawn on the soil profile to estimate volume of plant fibers, oxidized rhizospheres, or other linear features.**



39

**Each square is divided into quarters which depict the same percent volume using features of different sizes. These can also represent areal extents for plants.**



40

(This Appendix is not incorporated by reference; Effective Date_____)

## Tips for Determining Shapes of Features in Soil



**Rounded**
Features with generally curved outlines (do not have to be circular; often amorphous)

**Linear**
Features that are generally long & narrow (typically associated with roots or burrows, sometimes mixing or deposition)

**Angular**
Features with generally straight outlines & defined angles (often resulting from physical mixing of soils)

**Figure 5:** Diagram for determining shape categories of features in the matrix.

## Tips for Estimating Areal Extent of Plant Species

Visualize the noonday shadow that a fully leafed-out canopy or subcanopy tree would cast on the ground below it

Evaluation area

Canopy shadow

Canopy shadow

Estimate the total proportion of the area being evaluated that would be occupied by the shadow

When canopies overlap, count the entire area occupied by each tree's canopy, *i.e.*, double-count the overlapping area

Evaluation area

Total areal extent = 40%

20%
Canopy shadow

20%
Canopy shadow

Total areal extent = 40%

20%

20%

41

(This Appendix is not incorporated by reference; Effective Date_____ )

## Tips for Estimating Areal Extent of Plant Species (continued)



In a dense canopy where many trees overlap one another, the total areal extent of species in the evaluation area may exceed 100%, even if open sky is visible between some canopies

Total areal extent = 130%

**Figure 6:** Diagrams for estimating the areal extents of plants within an evaluation area.

## NRCS Hydric Soil Field Indicators Land Resource Regions of Florida (LRRs)

Most NRCS Hydric Soil Field Indicators are specific to Land Resource Regions (LRR – see glossary). This map depicts the three LRRs in Florida: P, T, and U.

**LRRs**
- P
- T
- U

42

## Major Land Resource Areas (MLRAs)

Two Hydric Soil Field Indicators in Florida (S12 and F22) are specific to Major Land Resource Areas (MLRA – see glossary), which are smaller divisions of LRRs.



This map depicts the MLRA in Florida in which S12 can be

MLRA 153B

This map depicts the three MLRAs in Florida in which F22 can be used.

MLRAs
138
152A
154

43

## Hydric Soil Field Indicators:

Adapted from **Field Indicators of Hydric Soils in the United States, Version 8.1 (USDA NRCS, 2017)** to include Florida-specific indicators per Rule 62-340.300(2)(a)1., (b)1., (c)3., and (d), F.A.C.

**These indicators are subdivided by prefix:**

**A** – for Ａll texture soils
**S** – for Ｓandy texture soils
**F** – for Ｆine texture soils
**LRR or MLRA** – refer to the "Land Resource Region" or the "Major Land Resource Area" in which the indicator may be used

### Data Form Guide Notes

**Soil profile documentation:** The top of the uppermost muck (sapric) or mineral surface is the soil surface/0 inch depth for purposes of Chapter 62-340, F.A.C. Other materials, such as peat (fibric) or mucky peat (hemic) are documented by a "+" before the thickness in inches of each additional layer above the soil surface. (For example: +4 – 0 inches mucky peat, 0 – 3 inches muck)

**Overlying layer(s) requirement:** All mineral layers above any of the layers meeting the requirements of any indicators, except S6, F8, and F12, must have a dominant chroma of 2 or less, or the thickness of the layer(s) with a dominant chroma of more than 2 is less than 6 inches.

-----------------------------------*For use in All texture soils*-----------------------------------

**A1. Histosol -** LRR: **P, T, U**
*Note: This is a stand alone D-Test indicator*
**Classifies as a Histosol (except Folist).**
User Notes: In a Histosol, typically 40 cm (16 inches) or more of the upper 80 cm (32 inches) is organic soil material. Organic soil materials have organic-carbon contents (by weight) of 12 to 18 percent or more, depending on the clay content of the soil. These materials include muck (sapric soil material), mucky peat (hemic soil material), and peat (fibric soil material). See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A2. Histic Epipedon -** LRR: **P, T, U**
*Note: This is a stand alone D-Test indicator*
**A histic epipedon underlain by mineral soil material with chroma of 2 or less.**
User Notes: Most histic epipedons are surface horizons 20 cm (8 inches) or more thick of organic soil material. Aquic conditions or artificial drainage is required. See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A3. Black Histic -** LRR: **P, T, U**
*Note: This is a stand alone D-Test indicator*
**A layer of peat, mucky peat, or muck 20 cm (8 inches) or more thick that starts at a depth of ≤ 15 cm (6 inches) from the soil surface; has hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less; and is underlain by mineral soil material with chroma of 2 or less.**
User Notes: Unlike indicator A2, this indicator does not require proof of aquic conditions or artificial drainage.

**A4. Hydrogen Sulfide -** LRR: **P, T, U**
*Note: This is a stand alone D-Test indicator*
**A hydrogen sulfide odor starting at a depth ≤ 30 cm (12 inches) from the soil surface.**
User Notes: This "rotten egg smell" indicates that sulfate-sulfur has been reduced and therefore the soil is anaerobic.

(This Appendix is not incorporated by reference; Effective Date_____ )

**A5. Stratified Layers -** LRR: **P, T, U**

*Note: This is a stand alone D-Test indicator (qualifies as sediment deposition)*

**Several stratified layers starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least one of the layers has value of 3 or less and chroma of 1 or less, or it is muck, mucky peat, peat, or a mucky modified mineral texture. The remaining layers have chroma of 2 or less. For any sandy material that constitutes the layer with value of 3 or less and chroma of 1 or less, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: Use of this indicator may require assistance from a trained soil scientist with local experience. A stratified layer is depositional and not pedogenic. The minimum organic-carbon content of at least one layer of this indicator is slightly less than is required for indicator A7 (5 cm Mucky Mineral). An undisturbed sample must be observed. Individual strata are dominantly less than 2.5 cm (1 inch) thick. A hand lens is an excellent tool to aid in the identification of this indicator. Many alluvial soils have stratified layers at greater depths; these soils do not meet the requirements of this indicator. Many alluvial soils have stratified layers at the required depths but do not have chroma of 2 or less; these do not meet the requirements of this indicator. The stratified layers occur in any soil texture.

**A6. Organic Bodies -** LRR: **P, T, U**

**Presence of 2 percent or more organic bodies of muck or a mucky modified mineral texture starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Organic bodies typically occur at the tips of fine roots. In order to meet the Organic Bodies indicator, the organic carbon content in organic bodies must meet the requirements of muck or mucky modified textures. The size of the organic body is not specifically defined, but the bodies are commonly 1 to 3 cm (0.5 to 1 inch) in diameter. Many organic bodies do not have the required content of organic carbon and as a result do not meet this indicator. For example, organic bodies of mucky peat (hemic material) and/or peat (fibric material) do not meet the requirements of this indicator, nor does material consisting of partially decomposed root tissue. The Organic Bodies indicator includes the indicator previously named "accretions" (Florida Soil Survey Staff, 1992).

**A7. 5 cm Mucky Mineral -** LRR: **P, T, U**

*Note: This is a stand alone D-Test indicator*

**A layer of mucky modified mineral soil material 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: "Mucky" is a USDA texture modifier for mineral soils. The content of organic carbon is at least 5 percent and ranges to as high as 18 percent. The percentage required depends on the clay content of the soil; the higher the clay content, the higher the content of organic carbon required. For example, a mucky fine sandy soil contains between 5 and 12 percent organic carbon. When the amount of clay is increased as in a mucky sandy loam, the organic carbon content increases to between 7 and 14 percent.

**A8. Muck Presence -** LRR: **U**

*Note: This is a stand alone D-Test indicator*

**A layer of muck with value of 3 or less and chroma of 1 or less, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: The presence of muck of any thickness at a depth ≤ 15 cm (6 inches) is the only requirement. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from 12 to18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to prevent the identification of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

**A9. 1 cm Muck - LRR: P, T**

*Note: This is a stand alone D-Test indicator*

**A layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 1 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Unlike indicator A8 (Muck Presence), this indicator has a minimum thickness requirement of 1 cm. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from 12 to 18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to limit the recognition of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

**A11. Depleted Below Dark Surface - LRR: P, T, U**

**A layer with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less, starting at a depth ≤ 30 cm (12 inches) from the soil surface, and having a minimum thickness of either:**

    **a. 15 cm (6 inches), or**

    **b. 5 cm (2 inches) if the 5 cm consists of fragmental soil material.**

**Organic, loamy, or clayey layer(s) above the depleted or gleyed matrix must have value of 3 or less and chroma of 2 or less starting at a depth ≤15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Any sandy material above the depleted or gleyed matrix must have value of 3 or less and chroma of 1 or less starting at a depth ≤15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Viewed through a 10x or 15x hand lens, at least 70 percent of the visible sand particles must be masked with organic material. Observed without a hand lens, the sand particles appear to be close to 100 percent masked.**

User Notes: This indicator often occurs in Mollisols but also applies to soils with umbric epipedons and dark colored ochric epipedons. For soils with dark colored epipedons more than 30 cm (12 inches) thick, use indicator A12. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

**A12. Thick Dark Surface - LRR: P, T, U**

**A layer at least 15 cm (6 inches) thick with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less starting below 30 cm (12 inches) of the surface. The layer(s) above the depleted or gleyed matrix and starting at a depth ≤ 15 cm (6 inches) from the soil surface must have value of 2.5 or less and chroma of 1 or less to a depth of at least 30 cm (12 inches) and value of 3 or less and chroma of 1 or less in any remaining layers above the depleted or gleyed matrix. In any sandy material above the depleted or gleyed matrix, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: This indicator applies to soils that have a black layer 30 cm (12 inches) or more thick and have value of 3 or less and chroma of 1 or less in any remaining layers directly above a depleted or gleyed matrix. This indicator is most often associated with overthickened soils in concave landscape positions. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

(This Appendix is not incorporated by reference; Effective Date_____)

---------------------------------------*For use in <u>Sandy texture</u> soils*---------------------------------------

#### S4. <u>Sandy Gleyed Matrix</u> - LRR: **P, T, U**

*Note: This is a stand alone D-Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages in the Munsell color book (X-Rite, 2009) that have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. For this indicator, the gleyed matrix only has to be present at a depth ≤ 15 cm (6 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

#### S5. <u>Sandy Redox</u> - LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface that is at least 10 cm (4 inches) thick and has a matrix with 60 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.**

User Notes: "Distinct" and "prominent" are defined in the Glossary. Redox concentrations include iron and manganese masses (reddish mottles) and pore linings (Vepraskas, 1994). Included within the concept of redox concentrations are iron-manganese bodies occurring as soft masses with diffuse boundaries. Common (2 to less than 20 percent) or many (20 percent or more) redox concentrations are required (USDA, NRCS, 2002). If the soil is saturated at the time of sampling, it may be necessary to let it dry to a moist condition for redox features to become visible.

This is a very common indicator of hydric soils and is often used to identify the hydric/nonhydric soil boundary in sandy soils.

#### S6. <u>Stripped Matrix</u> - LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface in which iron-manganese oxides and/or organic matter have been stripped from the matrix and the primary base color of the soil material has been exposed. The stripped areas and translocated oxides and/or organic matter form a faintly contrasting pattern of two or more colors with diffuse boundaries. The stripped zones are 10 percent or more of the volume and are rounded.**

User Notes: This indicator includes the indicator previously named "polychromatic matrix" as well as the term "streaking." Common or many areas of stripped (unmasked) soil materials are required. The stripped areas are typically 1 to 3 cm (0.5 to 1 inch) in size but may be larger or smaller. Commonly, the stripped areas have value of 5 or more and chroma of 2 or less, and the unstripped areas have chroma of 3 and/or 4. The matrix (predominant color) may not have the material with chroma of 3 and/or 4. The mobilization and translocation of oxides and/or organic matter is the important process and should result in a splotchy pattern masked and unmasked soil areas. This may be a difficult pattern to recognize and is more evident when a horizontal slice is observed.

#### S7. <u>Dark Surface</u> - LRR: **P, T, U**

**A layer 10 cm (4 inches) thick, starting at a depth less than or equal to the upper 15 cm (6 inches) of the soil surface, with a matrix value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. The matrix color of the layer directly below the dark layer must have the same colors as those described above or any color that has chroma of 2 or less.**

User Notes: An undisturbed sample must be observed. Many wet soils have a ratio of about 50 percent soil particles that are masked with organic matter and about 50 percent unmasked soil particles, giving the soils a salt-and-pepper appearance. Where the coverage is less than 70 percent, a Dark Surface indicator does not occur.

47

**S8. <u>Polyvalue Below Surface</u> -** LRR: **T, U**

**A layer with value of 3 or less and chroma of 1 or less starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. Directly below this layer, 5 percent or more of the soil volume has value of 3 or less and chroma of 1 or less, and the remainder of the soil volume has value of 4 or more and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black surface or near-surface layer that is less than 10 cm (4 inches) thick and is underlain by a layer in which organic matter has been differentially distributed within the soils by water movement. The mobilization and translocation of organic matter result in splotchy coated and uncoated soil.

**S9. <u>Thin Dark Surface</u> -** LRR: **T, U**

**A layer 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, with value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. This layer is underlain by a layer or layers with value of 4 or less and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black near-surface layer that is at least 5 cm (2 inches) thick and is underlain by a layer in which organic matter has been carried downward by flowing water. The mobilization and translocation of organic matter result in an even distribution of organic matter in the eluvial (E) horizon. The chroma of 1 or less is critical because it limits application of this indicator to only those soils that are depleted of iron. This indicator commonly occurs in hydric Spodosols, but a spodic horizon is not required.

**S12. <u>Barrier Islands 1 cm Muck</u> -** MLRA: **153B**

**In the swale portion of dune-and-swale complexes of barrier islands, a layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 2 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User notes: This indicator is similar to A9 but allows chroma of greater than 1, but not greater than 2. The indicator is limited to dune-and-swale complexes on barrier islands.

-----------------------------------------*For use in <u>Fine texture</u> soils*-----------------------------------------

**F2. <u>Loamy Gleyed Matrix</u> -** LRR: **P, T, U**

*Note: This is a stand alone D-Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 30 cm (12 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages of the Munsell color book (X-Rite, 2009). They have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. The gleyed matrix only has to be present at a depth ≤ 30 cm (12 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

**F3. <u>Depleted Matrix</u> -** LRR: **P, T, U**

**A layer that has a depleted matrix with 60 percent or more chroma of 2 or less and that has a minimum thickness of either:**

    a.  **5 cm (2 inches) if the 5 cm starts at a depth ≤ 10 cm (4 inches) from the soil surface, or**
    b.  **15 cm (6 inches), starting at a depth ≤ 25 cm (10 inches) from the soil surface.**

User Notes: A depleted matrix requires a value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings. The low-chroma matrix must be the result of wetness and not a weathering or parent material feature.

**F6. <u>Redox Dark Surface</u> -** LRR: **P, T, U**
**A layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
    a. **Matrix value of 3 or less and chroma of 1 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings, or**
    b. **Matrix value of 3 or less and chroma of 2 or less and 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings.**

User Notes: This is a very common indicator used to delineate wetland soils that have a dark surface layer. Redox concentrations in mineral soils with a high content of organic matter and a dark surface layer are commonly small and difficult to see. The organic matter masks some or all of the concentrations that may be present. Careful examination is required to see what are commonly brownish redox concentrations in the darkened materials. If the soil is saturated at the time of sampling, it may be necessary to let it dry at least to a moist condition for redox features to become visible. Soils that are wet because of ponding or have a shallow, perched layer of saturation may have any color below the dark surface. It is recommended that delineators evaluate the hydrologic source and examine and describe the layer below the dark colored surface layer when applying this indicator.

**F7. <u>Depleted Dark Surface</u> -** LRR: **P, T, U**
**Redox depletions with value of 5 or more and chroma of 2 or less in a layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
    a. **Matrix value of 3 or less and chroma of 1 or less and 10 percent or more redox depletions, or**
    b. **Matrix value of 3 or less and chroma of 2 or less and 20 percent or more redox depletions.**

User Notes: Care should be taken not to mistake mixing of an E or calcic horizon into the surface layer for depletions. The "pieces" of E and calcic horizons are not redox depletions. Knowledge of local conditions is required in areas where E and/or calcic horizons may be present. In soils that are wet because of subsurface saturation, the layer directly below the dark surface layer should have a depleted or gleyed matrix. Redox depletions should have associated redox concentrations that occur as Fe pore linings or masses within the depletion(s) or surrounding the depletion(s).

**F8. <u>Redox Depressions</u> -** LRR: **P, T, U**
**In closed depressions subject to ponding, 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings in a layer that is 5 cm (2 inches) or more thick and starts at a depth ≤ 10 cm (4 inches) from the soil surface.**

User Notes: This indicator occurs on depressional landforms, such as vernal pools, playa lakes, rainwater basins, "Grady" ponds, and potholes. It does not occur in microdepressions (approximately 1 m) on convex or plane landscapes.

**F10. <u>Marl</u> -** LRR: **U**
**A layer of marl with value of 5 or more and chroma 2 or less starting at a depth ≤ 10 cm (4 inches) from the soil surface.**

User Notes: Marl is a limnic material deposited in water by precipitation of $CaCO_3$ by algae as defined in *Soil Taxonomy* (Soil Survey Staff, 1999). It has a Munsell value of 5 or more and reacts with dilute HCl to evolve $CO_2$. Marl is not the carbonate substrate material associated with limestone bedrock. Some soils have materials with all of the properties of marl, except for the required Munsell value.

These soils are hydric if the required value is present at a depth ≤ 10 cm (4 inches) from the soil surface. Normally, this indicator occurs at the soil surface.

**F12. Iron/Manganese Masses - LRR: P, T**
**On flood plains, a layer 10 cm (4 inches) or more thick with 40 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft iron-manganese masses with diffuse boundaries. The layer starts at a depth ≤ 20 cm (8 inches) from the soil surface. Iron-manganese masses have value and chroma of 3 or less. Most commonly, they are black. The thickness requirement is waived if the layer is the mineral surface layer.**
User Notes: These iron-manganese masses generally are small (2 to 5 mm in size) and have value and chroma of 3 or less. They can be dominated by manganese and therefore have a color approaching black. The low matrix chroma must be the result of wetness and not be a weathering or parent material feature. Iron-manganese masses should not be confused with the larger and redder iron nodules associated with plinthite or with concretions that have sharp boundaries. This indicator occurs on flood plains along rivers, such as the Apalachicola, Congaree, Mobile, Savannah, and Tennessee Rivers.

**F13. Umbric Surface - LRR: P, T, U**
**In depressions and other concave landforms, a layer 25 cm (10 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, in which the upper 15 cm (6 inches) has value of 3 or less and chroma of 1 or less and in which the lower 10 cm (4 inches) has the same colors as those described above or any other color that has chroma of 2 or less.**
User Notes: The thickness requirements may be slightly less than those for an umbric epipedon. Microlows (approximately 1 m) are not considered to be concave landforms. Umbric surfaces in the higher landscape positions, such as side slopes dominated by Humic Dystrudepts, are excluded.

**F22. Very Shallow Dark Surface - MLRA: 138, 152A, 154**
**In depressions and flood plains subject to frequent ponding and/or flooding, one of the following must be observed:**
    **a. If bedrock occurs between 15 cm (6 inches) and 25 cm (10 inches) of the soil surface, a layer at least 15 cm (6 inches) thick starting at a depth ≤ 10 cm (4 inches) from the soil surface with value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same colors as above or any other color that has chroma 2 or less. Or,**
    **b. If bedrock occurs at a depth ≤ 15 cm (6 inches) from the soil surface, more than half of the soil thickness must have value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same colors as above or any other color that has a chroma 2 or less.**

## NRCS Hydric Soil Field Indicators
## Deepest Starting Depth Summary Table

| Depth (in) | Indicator |
|---|---|
| 0 | A2 |
| < 3 | F22(b) |
| 4 | F3(a), F8, F10, F22(a) |
| 6 | A3, A5, A6, A7, A8, A9, A11, A12, S4, S5, S6, S7, S8, S9, S12, F13 |
| 8 | F6, F7, F12 |
| 10 | F3(b) |
| 12 | A4, F2 |
| 16 | A1 |

       (This Appendix is not incorporated by reference; Effective Date_____)

## Hydric Soil Field Indicators Simplified Checklist:

**Hydric Soil Field Indicators Simplified Checklist is adapted from <u>Field Indicators of Hydric Soils in the United States</u>, Version 8.1 (USDA NRCS, 2017) using Florida-specific indicators per Rule 62-340.300(2)(a)1., (b)1., (c)3., and (d), F.A.C. The checklist is composed of Yes/No questions for each indicator. If any question in an indicator is answered No then the indicator is not met. If <u>all</u> of the questions for an indicator are answered Yes then the indicator is met.**

**Data Form Guide Notes:**

Mineral soil texture refers to either sandy, fine, or mucky mineral textures.

Adjacent layers within a soil profile description may be combined to meet a hydric soil field indicator's layer thickness requirements provided the adjacent layers share the required properties referred to in the indicator (*E.g.*, 2 inches of sandy mucky mineral soil and 3 inches of sand with ≥70% organic coating may be combined to meet S7 provided both layers have matrix values of 3 or less and chromas of 1 or less.)

-----------------------------------*For use in <u>All texture</u> soils*-----------------------------------

### A1. <u>Histosol</u>

*Note: This is a stand alone D-Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 16 inches or more thick
        AND
    Starts ≤16 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

    **B.** Organic soil material layer(s) constitutes 2/3 or more of the total thickness of the soil from the ground surface to a layer dense or cemented enough to inhibit root growth (e.g. bedrock, sandstone)
        AND
    Total combined thickness of any mineral soil texture layer(s) between the ground surface and the dense/cemented layer is 4 inches or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a Histosol

### A2. <u>Histic Epipedon</u>

*Note: This is a stand alone D-Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Did the layer(s) form near the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

✓ Is the layer(s) 8 to 16 inches thick

✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a histic epipedon

51

(This Appendix is not incorporated by reference; Effective Date_____)

**A3. Black Histic**

*Note: This is a stand alone D-Test indicator*

- ✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)
- ✓ Does the layer(s) have matrix hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less
- ✓ Is the layer(s) 8 inches or more thick
- ✓ Does the layer(s) start ≤ 6 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)
- ✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

**A4. Hydrogen Sulfide**

*Note: This is a stand alone D-Test indicator*

- ✓ Is there a hydrogen sulfide odor (rotten egg smell)
- ✓ Does the hydrogen sulfide odor start ≤ 12 inches from the soil surface
- ✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:
    - **A.** There are no mineral soil layers above this indicator
    - **B.** All mineral soil above this indicator has a dominant chroma of 2 or less
    - **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

**A5. Stratified Layers**

*Note: This is a stand alone D-Test indicator (as sediment deposition)*

- ✓ Are there several stratified layers due to the alternating deposition of organic matter and mineral soil material deposited by flowing water
- ✓ Do one or more of the stratified layers satisfy either **Option A, B, and/or C**
    - **A.** Layer(s) is composed of organic soil material (peat, mucky peat, and/or muck soil texture)
    - **B.** Layer(s) is composed of mucky mineral soil texture
    - **C.** Layer(s) is composed of sandy or fine soil texture
            AND
            Has value of 3 or less and chroma of 1 or less
            AND
            If layer(s) texture is sandy at least 70% of the visible sand particles are masked with organic material when viewed through a 10x or 15x hand lens
- ✓ Other than the layer(s) meeting Option A, B, and/or C, do all of the remaining stratified layers have chroma of 2 or less
- ✓ Do the stratified layers start ≤ 6 inches from the soil surface

**A6. Organic Bodies**

- ✓ Is there a layer(s) with organic bodies composed of muck or mucky mineral soil texture
- ✓ Are there 2% or more organic bodies within the layer(s)
- ✓ Does the layer(s) start ≤ 6 inches from the soil surface

**A7. 5 cm Mucky Mineral**

*Note: This is a stand alone D-Test indicator*

- ✓ Is there a layer(s) of mucky mineral soil texture
- ✓ Is the layer(s) 2 inches or more thick
- ✓ Does the layer(s) start ≤ 6 inches from the soil surface

**A8. Muck Presence**

*Note: This is a stand alone D-Test indicator*

- ✓ Is the soil profile located within Land Resource Region U
- ✓ Is there a layer(s) of muck soil texture
- ✓ Does the layer(s) have value of 3 or less and chroma of 1 or less

52

          (This Appendix is not incorporated by reference; Effective Date_____)

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A9. 1 cm Muck
*Note: This is a stand alone D-Test indicator*
✓ Is the soil profile located within Land Resource Region P or T
✓ Is there a layer(s) of muck soil texture
✓ Does the layer(s) have value of 3 or less and chroma of 1 or less
✓ Is the layer(s) 0.5 inch or more thick
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A11. Depleted Below Dark Surface
✓ Is there a dark layer(s) that satisfies either **Option A and/or B**

   **A.** Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture
      AND
   Has value of 3 or less and chroma of 2 or less

   **B.** Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
      AND
   Has value of 3 or less and chroma of 1 or less
      AND
   Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
✓ Does the layer(s) immediately below the dark layer(s) satisfy either **Option A and/or B**

   **A.** The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

   **B.** The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

✓ Does the underlying layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less
✓ Does the underlying layer(s) satisfy either **Option A or B**

   **A.** Layer(s) is 6 inches or more thick

   **B.** Layer(s) is 2 inches or more thick
      AND
   Is composed of fragmental soil material

✓ Does the underlying layer(s) with the gleyed or depleted matrix start ≤ 12 inches from the soil surface

## A12. Thick Dark Surface
✓ Is there a dark layer(s) that has value of 2.5 or less and chroma of 1 or less
✓ Does the dark layer(s) satisfy either **Option A and/or B**

   **A.** Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture

   **B.** Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
      AND
   Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) start ≤ 6 inches from the soil surface and extend to a depth of at least 12 inches
✓ Is there a layer(s) below the dark layer(s) that satisfies either **Option A and/or B**

   **A.** The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

   **B.** The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

(This Appendix is not incorporated by reference; Effective Date_____)

✓ Does the lower layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less
✓ Is the lower layer(s) with the gleyed or depleted matrix 6 inches or more thick
✓ Do all remaining layers between the aforementioned dark layer(s) and the layer(s) with the gleyed or depleted matrix have value of 3 or less and chroma of 1 or less

-------------------------------------------*For use in <u>Sandy texture</u> soils*-------------------------------------------

## S4. <u>Sandy Gleyed Matrix</u>
*Note: This is a stand alone D-Test indicator*
✓ Is there a layer(s) of sandy soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S5. <u>Sandy Redox</u>
✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings
✓ Does the matrix of the layer(s) have 60% or more chroma of 2 or less
✓ Is the layer(s) 4 inches or more thick
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S6. <u>Stripped Matrix</u>
✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with two or more **faintly[1] contrasting** colors (Contrast is due to organic matter and/or iron-manganese oxides having been stripped away from the matrix and the primary base color of the soil material has been exposed)
✓ Are there rounded, diffuse[2] boundaries between the faintly contrasting colors
✓ Do the stripped (lighter colored) areas of the faintly contrasting colors compose 10% or more of the layer(s)'s volume
✓ Does the layer(s) start ≤ 6 inches from the soil surface
[1]  See Table 1 (p 32) to determine if contrast is faint
[2]  See Figure 1 (p 32) to determine if boundaries are diffuse

## S7. <u>Dark Surface</u>
✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with matrix value of 3 or less and chroma of 1 or less
✓ Does the dark layer(s)'s matrix have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
✓ Does the dark layer(s) satisfy either **Option A or B**

> **A.** The dark layer(s) is more than 4 inches thick
>
> **B.** The dark layer(s) is exactly 4 inches thick
>   AND
>   The layer directly below has chroma of 2 or less

✓ Does the dark layer(s) start ≤ 6 inches from the soil surface

## S8. <u>Polyvalue Below Surface</u>
✓ Is the soil profile located within Land Resource Region T or U
✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less
✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
✓ Does the soil volume directly below this dark layer(s) to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less, meet both **Criteria 1 <u>and</u> 2**
>   1.  5% or more of the soil volume has value of 3 or less and chroma of 1 or less

54

AND

**2.** The remainder of the soil volume has value of 4 or more and chroma of 1 or less

## S9. <u>Thin Dark Surface</u>
- ✓ Is the soil profile located within Land Resource Region T or U
- ✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less
- ✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
- ✓ Is the dark layer(s) 2 inches or more thick
- ✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
- ✓ Directly below this dark layer(s) is there a layer(s) with value of 4 or less and chroma of 1 or less
- ✓ Does the underlying layer(s) extend to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less

## S12. <u>Barrier Islands 1 cm Muck</u>
- ✓ Is the soil profile located within the swale portion of dune-and-swale complexes of barrier islands in Major Land Resource Area 153B (See p 42)
- ✓ Is there a layer(s) of muck soil texture
- ✓ Does the layer(s) have value of 3 or less and chroma of 2 or less
- ✓ Is the layer(s) 0.5 inch or more thick
- ✓ Does the layer(s) start ≤ 6 inches from the soil surface

-----------------------------------------*For use in <u>Fine texture</u> soils*-----------------------------------------

## F2. <u>Loamy Gleyed Matrix</u>
*Note: This is a stand alone D-Test indicator*
- ✓ Is there a layer(s) of fine soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)
- ✓ Does the layer(s) start ≤ 12 inches from the soil surface
- ✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F3. <u>Depleted Matrix</u>
- ✓ Is there a layer(s) of fine soil texture with a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)
- ✓ Does the layer(s)'s matrix have 60% or more chroma of 2 or less
- ✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 2 inches or more thick
    AND
    Starts ≤ 4 inches from the soil surface

    **B.** Layer(s) is 6 inches or more thick
    AND
    Starts ≤ 10 inches from the soil surface

- ✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F6. <u>Redox Dark Surface</u>

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Does the layer(s) with redox concentrations satisfy either **Option A or B**

    **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
       AND
    Has 2% or more redox concentrations

    **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
       AND
    Has 5% or more redox concentrations

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F7. <u>Depleted Dark Surface</u>

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with redox depletions (lighter areas with associated redox concentrations)

✓ Do the redox depletions have value of 5 or more and chroma of 2 or less

✓ Does the layer(s) with redox depletions satisfy either **Option A and/or B**

    **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
       AND
    Has 10% or more distinct or prominent redox depletions

    **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
       AND
    Has 20% or more distinct or prominent redox depletions

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F8. <u>Redox Depressions</u>

✓ Is the soil profile located within a closed depression subject to ponding

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 5% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Is the layer(s) 2 inches or more thick

✓ Does the layer(s) start ≤ 4 inches from the soil surface

## F10. <u>Marl</u>

✓ Is the soil profile located within Land Resource Region U

✓ Is there a layer(s) of marl material

✓ Does the layer(s) have value of 5 or more and chroma of 2 or less
✓ Does the layer(s) start ≤ 4 inches from the soil surface

**F12. <u>Iron/Manganese Masses</u>**
✓ Is the soil profile located within Land Resource Region P or T
✓ Is the soil profile located within a flood plain
✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings
✓ Do the redox concentrations occur as soft iron-manganese masses
✓ Do the iron-manganese masses have value and chroma of 3 or less
✓ Do the iron-manganese masses have diffuse[3] boundaries
✓ Does 40% or more of the layer(s) have chroma of 2 or less
✓ Does the layer(s) with iron-manganese masses satisfy either **Option A or B**

    **A.** Layer(s) starts at the soil surface

    **B.** Layer(s) is 4 inches or more thick
        AND
      Starts ≤ 8 inches from the soil surface

[3]  See Figure 1 (p 32) to determine if boundaries are diffuse

**F13. <u>Umbric Surface</u>**
✓ Is the soil profile located within a depression or other concave landform
✓ Is there a layer(s) of fine, fine mucky mineral, and/or muck soil texture
✓ Is the layer(s) 10 inches or more thick
✓ Does the layer(s) satisfy both **Criteria 1 <u>and</u> 2**

    **1.** The upper 6 inches of the layer(s) has value of 3 or less and chroma of 1 or less
        AND
    **2.** The lower 4 inches of the layer(s) has chroma of 2 or less
✓ Does the layer(s) start ≤ 6 inches from the soil surface

**F22. <u>Very Shallow Dark Surface</u>**
✓ Is the soil profile located within Major Land Resource Area 138, 152A, or 154 (See p 42)
✓ Is the soil profile located within a depression or flood plain subject to frequent ponding and/or flooding
✓ Is there a dark layer(s) of fine, fine mucky mineral, and/or muck soil texture with value of 2.5 or less and chroma of 1 or less
✓ Does bedrock occur ≤ 10 inches from the soil surface
✓ Does the soil profile satisfy either **Option A or B**

    **A.** The bedrock occurs between 6 and 10 inches from the soil surface
        AND
    The dark layer(s) is 6 inches or more thick
        AND
    Starts ≤ 4 inches from the soil surface

    **B.** The bedrock occurs ≤ 6 inches from the soil surface
        AND
    The dark layer(s) constitutes more than half of the soil thickness
✓ Does all remaining soil between the dark layer(s) and the bedrock have chroma of 2 or less


# Glossary from NRCS <u>Field Indicators of Hydric Soils in the United States</u> Version 8.1, 2017

      (This Appendix is not incorporated by reference; Effective Date_____)

As defined in this Glossary, terms marked with an asterisk (*) have definitions that are slightly different from the definitions in the referenced materials. The definitions in the Glossary are intended to assist users of this document and are not intended to add to or replace definitions in the referenced materials.

**Data Form Guide Note: Definitions expressed in Chapter 62-340, F.A.C. supersede all other definitions contained within this guide when applying the rule.**

**A horizon.** A mineral soil horizon that formed at the surface or below an O horizon where organic material is accumulating. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Accreting areas.** Landscape positions in which soil material accumulates through deposition from higher elevations or upstream positions more rapidly than the rate at which soil material is being lost through erosion.

**Anaerobic.** A condition in which molecular oxygen is virtually absent from the soil.

**Anaerobiosis.** Microbiological activity under anaerobic conditions.

**Aquic conditions.** Conditions in the soil represented by depth of saturation, occurrence of reduction, and redoximorphic features. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Artificial drainage.** The use of human efforts and devices to remove free water from the soil surface or from the soil profile. The hydrology may also be modified by levees and dams, which keep water from entering a site.

**CaCO3 equivalent.** The acid neutralizing capacity of a soil expressed as a weight percentage of CaCO3 (molecular weight of CaCO3 equals 100).

**Calcic horizon.** An illuvial horizon in which carbonates have accumulated to a significant extent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Calcium carbonate.** Calcium carbonate has the chemical formula CaCO3. It effervesces when treated with cold hydrochloric acid.

**Closed depressions.** Low-lying areas that are surrounded by higher ground and have no natural outlet for surface drainage**.**

**COE.** U.S. Army Corps of Engineers.

**Common.** When referring to redox concentrations, redox depletions, or both, "common" represents 2 to 20 percent of the observed surface.

**Concave landscapes.** Landscapes in which the surface curves downward.

**\*Depleted matrix.** For loamy and clayey material (and sandy material in areas of indicators A11 and A12), a depleted matrix refers to the volume of a soil horizon or subhorizon in which the processes of reduction and translocation have removed or transformed iron, creating colors of low chroma and high value. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings. In some areas the depleted matrix may change color upon exposure to air (see Reduced matrix); this phenomenon is included in the concept of depleted matrix. The following combinations of value and chroma identify a depleted matrix:

1. Matrix value of 5 or more and chroma of 1 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

2. Matrix value of 6 or more and chroma of 2 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

3. Matrix value of 4 or 5 and chroma of 2 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings; or

4. Matrix value of 4 and chroma of 1 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.

**Diffuse boundary.** (Figure 1 *p.32*) Used to describe redoximorphic features that grade gradually from one color to another. The color grade is commonly more than 2 mm wide. "**Clear**" is used to describe boundary color gradations intermediate between sharp and diffuse.

**Distinct.**[1] (Table 1 *p.32*) Readily seen but contrasting only moderately with the color to which compared. The contrast is distinct if:

1. Delta hue[2] = 0, then a) Delta value ≤2 and delta chroma >1 to <4, or
                       b) Delta value >2 to <4 and delta chroma <4.
2. Delta hue = 1, then a) Delta value ≤1 and delta chroma >1 to <3, or
                       b) Delta value >1 to <3 and delta chroma <3.
3. Delta hue = 2, then a) Delta value = 0 and delta chroma >0 to <2, or
                       b) Delta value >0 to <2 and delta chroma <2.

[1] Regardless of the magnitude of hue difference, where both colors have value ≤3 and chroma ≤2, the contrast is faint.

[2] Data Form Guide Note: A delta hue of 1 is equal to 2.5 units (Figure 2 *p.32*), as defined in the *Soil Survey Manual* (Soil Survey Staff, 1993)

**E horizon.** A mineral horizon in which the dominant process is loss of silicate clay, iron, and/or aluminum, leaving a concentration of sand and silt particles. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**EPA.** U.S. Environmental Protection Agency.

**Epipedon.** A horizon that has developed at the soil surface. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Faint.** (Table 1 *p.32*) Evident only on close examination. The contrast is faint if:

1. Delta hue = 0, then delta value ≤2 and delta chroma ≤1, or
2. Delta hue = 1, then delta value ≤1 and delta chroma ≤1, or
3. Delta hue = 2, then delta value = 0 and delta chroma = 0, or
Any delta hue if both colors have value ≤3 and chroma ≤2.

**Fe-Mn concretions.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, concretions have concentric layers. See Vepraskas (1994) for a complete discussion.

**Fe-Mn nodules.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, nodules do not have visibly organized internal structure. See Vepraskas (1994) for a complete discussion.

**Few.** When referring to redox concentrations, depletions, or both, "few" represents less than 2 percent of the observed surface.

**Fibric.** See Peat.

**Flood plain.** The nearly level plain that borders a stream and is subject to inundation under flood-stage conditions unless protected artificially. It is usually a constructional landform built of sediment deposited during overflow and lateral migration of the stream.

**Fragmental soil material.** Soil material that consists of 90 percent or more rock fragments. Less than 10 percent of the soil consists of particles 2 mm or smaller.

**Frequently flooded or ponded.** A frequency class in which flooding or ponding is likely to occur often under usual weather conditions (a chance of more than 50 percent in any year, or more than 50 times in 100 years).

**FWS.** U.S. Department of the Interior, Fish and Wildlife Service.

**\*g.** A horizon suffix indicating that the horizon is gray because of wetness but not necessarily that it is gleyed. All gleyed matrices (defined below) should have the suffix "g"; however, not all horizons with the "g" suffix are gleyed. For example, a horizon with the color 10YR 6/2 that is at least seasonally wet, with or without other redoximorphic features, should have the "g" suffix.

**Glauconitic.** Refers to a mineral aggregate that contains a micaceous mineral resulting in a characteristic green color, e.g., glauconitic shale or clay.

**\*Gleyed matrix.** Soils with a gleyed matrix have the following combinations of hue, value, and chroma (the soils are not glauconitic):

1. 10Y, 5GY, 10GY, 10G, 5BG, 10BG, 5B, 10B, or 5PB with value of 4 or more and chroma of 1; or

2. 5G with value of 4 or more and chroma of 1 or 2; or

3. N with value of 4 or more

In some places the gleyed matrix may change color upon exposure to air. (See Reduced matrix). This phenomenon is included in the concept of gleyed matrix.

**\*Hemic.** See Mucky peat.

**Histels.** Organic soils that overlie permafrost and show evidence of cryoturbation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Histic epipedon**. A thick (20- to 60-cm, or 8- to 24- inch) organic soil horizon that is saturated with water at some period of the year (unless the soil is artificially drained) and that is at or near the surface of a mineral soil.

**Histosols.** Organic soils that have organic soil materials in more than half of the upper 80 cm (32 inches) or that have organic materials of any thickness if they overlie rock or fragmental materials that have interstices filled with organic soil materials. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Horizon.** A layer, approximately parallel to the surface of the soil, distinguishable from adjacent layers by a distinctive set of properties produced by soil-forming processes. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Hydric soil definition (1994).** *(See also Ch 62-340, F.A.C. definition)* A soil that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part.

**Hydrogen sulfide odor.** The odor of H2S. It is similar to the smell of rotten eggs.

**Hydromorphic features.** Features in the soil caused or formed by water.

**Layer(s).** A horizon, subhorizon, or combination of contiguous horizons or subhorizons sharing at least one property referred to in the indicators.

**Lithologic discontinuity.** Occurs in a soil that has developed in more than one type of parent material. Commonly determined by a significant change in particle-size distribution, mineralogy, etc. that indicates a difference in material from which the horizons formed.

**LRR.** Land resource region. LRRs are geographic areas characterized by a particular pattern of soils, climate, water resources, and land use. Each LRR is assigned a different letter of the alphabet (A-Z). LRRs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Many.** When referring to redox concentrations, depletions, or both, "many" represents more than 20 percent of the observed surface.

**Marl.** An earthy, unconsolidated deposit consisting chiefly of calcium carbonate mixed with clay in approximately equal proportions; formed primarily under freshwater lacustrine conditions. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Masked.** Through redoximorphic processes, the color of soil particles is hidden by organic material, silicate clay, iron, aluminum, or some combination of these.

**Matrix.** The dominant soil volume that is continuous in appearance. When three colors occur, such as when a matrix, depletions, and concentrations are present, the matrix may represent less than 50 percent of the total soil volume.

**MLRA.** Major land resource areas. MLRAs are geographically associated divisions of land resource regions. MLRAs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Mollic epipedon.** A mineral surface horizon that is relatively thick, dark colored, and humus rich and has high base saturation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Mollisols.** Mineral soils that have a mollic epipedon. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Muck.** Sapric organic soil material in which virtually all of the organic material is so decomposed that identification of plant forms is not possible. Bulk density is normally 0.2 or more. Muck has less than one-sixth fibers after rubbing, and its sodium pyrophosphate solution extract color has lower value and chroma than 5/1, 6/2, and 7/3.

(This Appendix is not incorporated by reference; Effective Date_____)

**\*Mucky modified mineral soil material.** (Figure 7) A USDA soil texture modifier, e.g., mucky sand. Mucky modified mineral soil material that has 0 percent clay has between 5 and 12 percent organic carbon. Mucky modified mineral soil material that has 60 percent clay has between 12 and 18 percent organic carbon. Soils with an intermediate amount of clay have intermediate amounts of organic carbon. Where the organic component is peat (fibric material) or mucky peat (hemic material), mucky mineral soil material does not occur.



**Figure 7:** Percent organic carbon required for organic soil material, mucky modified mineral soil material, and mineral soil material as it is related to content of clay.

**\*Mucky peat.** Hemic organic material, which is characterized by decomposition that is intermediate between that of peat (fibric material) and that of muck (sapric material). Bulk density is normally between 0.1 and 0.2 g/cm3. Mucky peat does not meet the fiber content (after rubbing) or sodium pyrophosphate solution extract color requirements for either peat (fibric) or muck (sapric) soil material.

**Nodules.** See Fe-Mn nodules.

**NRCS.** USDA, Natural Resources Conservation Service (formerly Soil Conservation Service).

**NTCHS.** National Technical Committee for Hydric Soils.

**Organic matter.** Plant and animal residue in the soil in various stages of decomposition.

**Organic soil material.** (Figure 7) Soil material that is saturated with water for long periods or artificially drained and, excluding live roots, has 18 percent or more organic carbon with 60 percent or more clay or 12 percent or more organic carbon with 0 percent clay. Soils with an intermediate amount of clay have an intermediate amount of organic carbon. If the soil is never saturated for more than a few days, it contains 20 percent or more organic carbon. Organic soil material includes muck, mucky peat, and peat.

  **Data Form Guide Note: Generally, organic soil material is 2 cm or smaller and decomposing.**

**\*Peat.** Fibric organic soil material. The plant forms can be identified in virtually all of the organic material. Bulk density is normally <0.1. Peat has three-fourths or more fibers after rubbing, or it has two-fifths or more fibers after rubbing and has sodium pyrophosphate solution extract color of 7/1, 7/2, 8/2, or 8/3.

**Ped.** A unit of soil structure such as a block, column, granule, plate, or prism, formed by natural processes (in contrast with a clod, which is formed artificially).

**Plinthite.** The sesquioxide-rich, humus-poor, highly weathered mixture of clay with quartz and other diluents. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete discussion.

**Ponding.** Standing water in a closed depression that is removed only by percolation, evaporation, or transpiration. The ponding lasts for more than 7 days.

**Pore linings.** Zones of accumulation that may be either coatings on a ped or pore surface or impregnations of the matrix adjacent to the pore or ped. See Vepraskas (1994) for a complete discussion.

**Prominent.** (Table 1 *p.32*) Contrasts strongly in color. Color contrasts more contrasting than faint and distinct are prominent.

**Red parent material.** The parent material with a natural inherent reddish color attributable to the presence of iron oxides, typically hematite (Elless and Rabenhorst, 1994; Elless et al., 1996), occurring as coatings on and occluded within mineral grains. Soils that formed in red parent material have conditions that greatly retard the development and extent of the redoximorphic features that normally occur under prolonged aquic conditions. They typically have a Color Change Propensity Index (CCPI) of <30 (Rabenhorst and Parikh, 2000). Most commonly, the material consists of dark red, consolidated Mesozoic or Paleozoic sedimentary rocks, such as shale, siltstone, and sandstone, or alluvial materials derived from such rocks. Assistance from a local soil scientist may be needed to determine where red parent material occurs.

**Redox concentrations.** Bodies of apparent accumulation of Fe-Mn oxides. Redox concentrations include soft masses, pore linings, nodules, and concretions. For the purposes of the indicators, nodules and concretions are excluded from the concept of redox concentrations unless otherwise specified by specific indicators. See Vepraskas (1994) for a complete discussion.

**Redox depletions.** Bodies of low chroma (2 or less) having value of 4 or more where Fe- Mn oxides have been stripped or where both Fe-Mn oxides and clay have been stripped. Redox depletions contrast distinctly or prominently with the matrix. See Vepraskas (1994) for a complete discussion.

**Redoximorphic features.** Features formed by the processes of reduction, translocation, and/or oxidation of Fe and Mn oxides; formerly called mottles and low-chroma colors. See Vepraskas (1994) for a complete discussion.

**Reduced matrix.** A soil matrix that has low chroma and high value, but in which the color changes in hue or chroma when the soil is exposed to air. See Vepraskas (1994) for a complete discussion.

**\*Reduction.** For the purpose of the indicators, reduction occurs when the redox potential (Eh) is below the ferric-ferrous iron threshold as adjusted for pH. In hydric soils, this is the point when the transformation of ferric iron ($Fe^{3+}$) to ferrous iron ($Fe^{2+}$) occurs.

**Relict features.** Soil morphological features that reflect past hydrologic conditions of saturation and anaerobiosis. See Vepraskas (1994) for a complete discussion.

**\*Sapric.** See Muck.

**Saturation.** *(See also Ch 62-340, F.A.C. definition)* Wetness characterized by zero or positive pressure of the soil water. Almost all of the soil pores are filled with water.

**Sharp boundary.** Used to describe redoximorphic features that grade sharply from one color to another. The color grade is commonly less than 0.1 mm wide.

**Soft masses.** Noncemented redox concentrations, frequently within the soil matrix, that are of various shapes and cannot be removed as discrete units.

**Soil texture.** The relative proportions, by weight, of sand, silt, and clay particles in the soil material less than 2 mm in size.

**Spodic horizon.** A mineral soil horizon that is characterized by the illuvial accumulation of amorphous materials consisting of aluminum and organic carbon with or without iron. The spodic horizon has a minimum thickness, a minimum quantity of oxalate extractable carbon plus aluminum, and/or specific color requirements.

**Stream Terrace.** Flat-topped landforms in a stream valley that flank and are parallel to the stream channel, originally formed by a previous stream level, and representing the abandoned flood plain, stream bed, or valley floor produced during a past state of fluvial erosion or deposition (i.e., currently very rarely or never flooded; inactive cut and fill and/or scour and fill processes). Stream terraces may occur singularly or as a series. Erosional surfaces cut into bedrock and thinly mantled with stream deposits (alluvium) are called "strath terraces." Remnants of constructional valley floors thickly mantled with alluvium are called alluvial terraces.

**Umbric epipedon.** A thick, dark mineral surface horizon with base saturation of less than 50 percent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Vertisol.** A mineral soil with 30 percent or more clay in all layers. These soils expand and shrink, depending on moisture content, and have slickensides or wedge-shaped peds. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Wetland.** *(See also Ch 62-340, F.A.C. definition)* An area that has hydrophytic vegetation, hydric soils, and wetland hydrology, as per the "National Food Security Act Manual" and the 1987 *Corps of Engineers Wetlands Delineation Manual* (United States Army Corps of Engineers, 1987).

---

**Data Form Guide Notes:**

**Surface Water Definitions**

*Definition from §373.019(19) Florida Statutes*
"**Surface water**" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface.

*Definition from §373.019(14) Florida Statutes*
"**Other watercourse**" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted.

*Definition from §62.340.200(15) Florida Administrative Code*
"**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

*From The Florida Wetlands Delineation Manual pg. 37*
**Ordinary high water** is that point on the slope or bank where the surface water from the water body ceases to exert a dominant influence on the character of the surrounding vegetation and soils. The OHWL frequently encompasses areas dominated by non-listed vegetation and non-hydric soils. When the OHWL is not at a wetland edge, the general view of the area may present an "upland" appearance.

*Definition from §403.803(14) Florida Statutes*
"**Swale**" means a manmade trench which:
(a) Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than 3 feet horizontal to 1 foot vertical;
(b) Contains contiguous areas of standing or flowing water only following a rainfall event;
(c) Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and
(d) Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge.

## Appendix B: Histosol and Histic Epipedon Definition
From *Keys to Soil Taxonomy* (Soil Survey Staff, 2014)

**Histosols**
1. Do not have andic soil properties in 60 percent or more of the thickness between the soil surface and either a depth of 60 cm or a densic, lithic, or paralithic contact or duripan if shallower; *and*

2. Have organic soil materials that meet *one or more* of the following:
   a. Overlie cindery, fragmental, or pumiceous materials and/or fill their interstices *and* directly below these materials, have a densic, lithic, or paralithic contact; *or*
   b. When added with the underlying cindery, fragmental, or pumiceous materials, total 40 cm or more between the soil surface and a depth of 50 cm; *or*
   c. Constitute two-thirds or more of the total thickness of the soil to a densic, lithic, or paralithic contact *and* have no mineral horizons or have mineral horizons with a total thickness of 10 cm or less; *or*
   d. Are saturated with water for 30 days or more per year in normal years (or are artificially drained), have an upper boundary within 40 cm of the soil surface, and have a total thickness of *either*:
      1) 60 cm or more if three-fourths or more of their volume consists of moss fibers or if their bulk density, moist, is less than 0.1 g/cm$^3$; *or*
      2) 40 cm or more if they consist either of Sapric or hemic materials, or of fibric materials with lessthan three-fourths (by volume) moss fibers and a bulk density, moist, of 0.1 g/cm$^3$ or more.

**Folists** (excluded from meeting indicator A1): Histosols that are saturated with water for less than 30 cumulative days during normal years (and are not artificially drained).

## Histic Epipedon

The histic epipedon is a layer (one or more horizons) that is characterized by saturation (for 30 days or more, cumulative) and reduction for some time during normal years (or is artificially drained) and e*ither*:

1. Consists of organic soil material that:
   a. Is 20 to 60 cm thick and either contains 75 percent or more (by volume) *Sphagnum* fibers or has a bulk density, moist, of less than 0.1; *or*
   b. Is 20 to 40 cm thick; *or*
2. Is an Ap horizon that, when mixed to a depth of 25 cm, has an organic-carbon content (by weight) of:
   a. 16 percent or more if the mineral fraction contains 60 percent or more clay; *or*
   b. 8 percent or more if the mineral fraction contains no clay; *or*
   c. 8 + (clay percentage divided by 7.5) percent or more if the mineral fraction contains less than 60 percent clay.

Most histic epipedons consist of organic soil material. Item 2 provides for a histic epipedon that is an Ap horizon consisting of mineral soil material. A Histic epipedon consisting of mineral soil material can also be part of a mollic or umbric epipedon.

## Root Size Estimation Chart
Adapted from *Field Book for Describing Sampling Soils* version 3.0 (NRCS 2012)



## Quantity Classes for Redox Features or Roots

| Quantity Class | Few | Common | Many |
| --- | --- | --- | --- |
| **Redox: % of Observed Surface** | Less than 2% | 2% to 20% | Greater than 20% |
| **Roots: Average Count per Area*** | < 1 per area* | 1 to < 5 per area* | ≥ 5 per area* |

*Root assessment area = 1x1cm for <2mm roots, 10x10cm for 2 to <10mm, 100x100cm for ≥10mm

## NRCS National Technical Committee for Hydric Soils

Hydric Soils Technical Notes contain National Technical Committee for Hydric Soils (NTCHS) updates, insights, and clarifications of the publication "Field Indicators of Hydric Soils in the United States" (USDA, NRCS, 1996 and 1998).

**Hydric Soils Technical Note 4: Indicator Insights for Hydric Soil Identification**

Question: I have a soil with layers that meet the color and redoximorphic requirements of several indicators; however, they do not meet any of the thickness requirements. <u>What guidance is there regarding combining layers to meet a hydric soil indicator?</u>

Answer: <u>If layers/indicators are combined, the combination needs to meet the most stringent depth/thickness requirements of the combined indicators.</u>

Example (The following table and guidance were adapted by FDEP staff to summarize Technical Note 4 and do not contain the exact text from this Note):

| Layer | Depth | Matrix Color | Matrix Texture | Notes (RC = redox concentrations) |
|-------|-------|--------------|----------------|-----------------------------------|
| 1 | 0-6 | 10YR 2/1 | fine | None |
| 2 | 6-8 | 10YR 3/1 | fine | RC: 10YR 6/8, 5%, diffuse boundaries |
| 3 | 8-12 | 10YR 5/2 | fine | RC: 10YR 6/8, 10%, diffuse boundaries |
| 4 | 12-20+ | 10YR 6/3 | fine | RC: 10YR 6/8, 15%, diffuse boundaries |

In this example, Layer 2 meets the requirements (except thickness) of indicator F6 – Redox Dark Surface. Layer 3 meets the requirements (except thickness) of indicator F3 – Depleted Matrix. Examining the indicator language, F6 requires a layer 4 inches thick starting within 8 inches; F3 requires a layer 6 inches thick starting within 10 inches. In this case, the soil has F6 starting within 8 inches (at 6) and has F3 starting within 10 inches (at 8); the combined thickness is 6 inches. Therefore, this soil meets the combined color, depth, and thickness requirements and should be documented as meeting hydric soil indicator(s) F6 and F3 (combined).

**Hydric Soils Technical Note 13: Altered Hydric Soils**

The following tables were created by FDEP staff to summarize Technical Note 13 and do not contain the exact text from this Note:

| Altered Hydric Soil Type | What was modified? | Modified by what? | Modified how? | Soil status* | Example |
|--------------------------|--------------------|--------------------|----------------|---------------|---------|
| Artificial | Hydrology or Soil | Human activities | Wetter or lower surface elevation | Hydric | Excavation/irrigation/ water impoundment |
| Drained/ protected | Hydrology | Human activities | Drier or barriers against flooding | Hydric | Ditches/roads/dams/ pumps/levees |
| Historic/ buried | Soil | Human activities | Soil placed on ground surface | Not hydric | Fill/erosional depositions |
| Relict | Hydrology | Geologic activities | Hydrology gone by natural means | Not hydric | Stream downcutting/ seismic activity |

*See Appendix B for NRCS Hydric Soil Criteria

Soils that are no longer hydric may still exhibit redoximorphic features (called relict features), but these can be differentiated from those in contemporary (currently) hydric soils by the following characteristics:

| Feature | Boundary | Nodule and Concretion Surfaces | Macropore Associated Depletions | Pore Linings | Value and Chroma |
|---------|----------|--------------------------------|----------------------------------|--------------|------------------|
| **Contemporary** | Diffuse | Irregular, or Smooth with red to yellow corona | Not overlain by iron rich coating | Continuous around live roots | Value $\geq 4$ Chroma $\geq 4$ |
| **Relict** | Sharp | Smooth | Overlain by iron rich coating | Broken and unrelated to live roots | Value <4 Chroma<4 |

# Appendix C: Hydric Soils Criteria and Technical Standard

Note: Hydric soil criteria, standards, and definitions used by the NRCS may differ from and do not supersede the criteria, standards, and definitions outlined in Chapter 62-340, F.A.C. to identify and delineate wetlands in Florida.

Soils are considered hydric by the NRCS if they:

1. Have a hydric soil indicator, or
2. Meet hydric soils list criteria 3 or 4, or
3. By data meet the Hydric Soil Technical Standard (HSTS).

## Hydric Soils List Criteria (Updated by NTCHS February 2012)

1. All Histels except Folistels and Histosols except Folists; or
2. Map unit components in Aquic suborders, great groups, or subgroups, Albolls suborder, Historthels great group, Histoturbels great group, or Andic, Cumulic, Pachic, or Vitrandic subgroups that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soil meets the definition of a hydric soil;
3. Map unit components that are frequently ponded for long duration or very long duration during the growing season that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soil meets the definition of a hydric soil; or
4. Map unit components that are frequently flooded for long duration or very long duration during the growing season that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soils meet the definition of a hydric soil.

## Glossary of Terms Used in Hydric Soils List Criteria

*Flooded* means a condition in which the soil surface is temporarily covered with flowing water from any source, such as streams overflowing their banks, runoff from adjacent or surrounding slopes, inflow from the high tides, or any combination of sources.

*Frequently flooded, ponded, saturated:* a frequency class in which flooding, ponding, or saturation is likely to occur often under usual weather conditions (more than 50 percent chance in any year, or more than 50 times in 100 years).

*Ponded* means a condition in which water stands in a closed depression. The water is removed only by percolation, evaporation, or transpiration.

*Long duration* means a duration class in which inundation for a single event ranges from 7 days to 1 month.

*Map unit components* means the collection of soils and miscellaneous areas found within a map unit.

*Very long duration* means a duration class in which inundation for a single event is greater than 1 month.

## Hydric Soil Technical Standard (HSTS) (Updated by NTCHS December 2015)

For a soil to be considered hydric by the Natural Resources Conservation Service (NRCS), Anaerobic Conditions and Saturated Conditions must exist for at least 14 consecutive days.

1. Anaerobic Conditions (as documented by a, b, or c below)
   a. Indicator of Reduction in Soils (IRIS) tubes
   b. Oxidation-reduction potential (Eh) measurements using platinum electrodes
   c. Alpha-alpha-dipyridyl dye
2. Saturated Conditions
   • Confirmed by piezometer data.
   • NTCHS recommends that the piezometer data be verified by open well data.

(Onsite precipitation data are needed to confirm normal rainfall conditions)

**Data Form Guide Note:**

**SUPPLEMENTAL SOIL DATA**

**HORIZON CRITERIA – MASTER HORIZON DESIGNATIONS**

**O** Organic soil materials (not limnic)

**A** Mineral; organic matter (humus) accumulation, loss of Fe, Al, clay

(This Appendix is not incorporated by reference; Effective Date_____)

**E** Mineral; loss of Fe, Al, clay, or organic matter
**B** Subsurface accumulation of clay, Fe, Al, Si, humus, CaCO3, CaSO4; or loss of CaCO3; or accumulation of sesquioxides; or subsurface soil structure
**C** Little or no pedogenic alteration, unconsolidated earthy material, soft bedrock
**L** Limnic soil materials
**R** Bedrock, Strongly Cemented to Indurated

## HORIZON CRITERIA – SUFFIX DESIGNATIONS

**a** Highly decomposed organic matter
**b** Buried genetic horizon (not used with C horizons)
**c** Concretions or nodules
**e** Moderately decomposed organic matter
**g** Strong gley
**h** Illuvial organic matter accumulation
**i** Slightly decomposed organic matter
**k** Pedogenic carbonate accumulation
**m** Strong cementation (pedogenic, massive)
**ma** Marl (Used only with L)

**n** Pedogenic, exchangeable sodium accumulation
**o** Residual sesquioxide accumulation (pedogenic)
**p** Plow layer or other artificial disturbance
**r** Weathered or soft bedrock
**s** Illuvial sesquioxide accumulation
**t** Illuvial accumulation of silicate clay
**v** Plinthite
**w** Weak color or structure within B (used only with B)
**z** Pedogenic accumulation of salt more soluble than gypsum

## FNAI NATURAL COMMUNITIES OF FLORIDA

**HARDWOOD FORESTED UPLANDS**
Slope Forest
Upland Hardwood Forest
Mesic Hammock
Rockland Hammock
Xeric Hammock
**HIGH PINE AND SCRUB**
Upland Mixed Woodland
Upland Pine
Sandhill
Scrub
**PINE FLATWOODS AND DRY PRAIRIE**
Wet Flatwoods
Mesic Flatwoods
Scrubby Flatwoods
Pine Rockland
Dry Prairie
**COASTAL UPLANDS**
Beach Dune
Coastal Berm
Coastal Grassland
Coastal Strand
Maritime Hammock
Shell Mound

**SINKHOLES AND OUTCROP COMMUNITIES**
Upland Glade
Sinkhole
Limestone Outcrop
Keys Cactus Barren
**FRESHWATER NON-FORESTED WETLANDS**
PRAIRIES AND BOGS
Seepage Slope
Wet Prairie
Marl Prairie
Shrub Bog
MARSHES
Depression Marsh
Basin Marsh
Coastal Interdunal Swale
Floodplain Marsh
Slough Marsh
Glades Marsh
Slough
**FRESHWATER FORESTED WETLANDS**
CYPRESS/TUPELO
Dome Swamp
Basin Swamp
Strand Swamp
Floodplain Swamp

HARDWOOD
Baygall
Hydric Hammock
Bottomland Forest
Alluvial Forest
**MARINE AND ESTUARINE VEGETATED WETLANDS**
Salt Marsh
Mangrove Swamp
Keys Tidal Rock Barren
**LACUSTRINE**
Clastic Upland Lake
Coastal Dune Lake
Coastal Rockland Lake
Flatwoods/Prairie Lake and Marsh Lake
River Floodplain Lake and Swamp Lake
Sandhill Upland Lake
Sinkhole Lake
**RIVERINE**
Alluvial Stream
Blackwater Stream
Seepage Stream
Spring-run Stream

## Appendix A2: subsection 62-340.450(1), (2), (3), F.A.C. Vegetative Index Plant List by Common Name

**Common Name / Botanical Name / Wetland Status**

**acacia, ear-leaved**    *Acacia auriculiformis*    FAC
**alder, hazel**    *Alnus serrulata*    OBL
**algal bulrush**    *Websteria confervoides*    OBL
**allamanda, wild**    *Urechites lutea*    FACW
**alligator flag**    *Thalia geniculata*    OBL
**alligator-weed**    *Alternanthera philoxeroides*    OBL
**alligator-weed, sessile**    *Alternanthera sessilis*    OBL
**amaranth, Florida**    *Amaranthus floridanus*    OBL
**amaranth, southern**    *Amaranthus australis*    OBL
**amaranth, tidemarsh**    *Amaranthus cannabinus*    OBL
**anise, Florida**    *Illicium floridanum*    OBL
**anise, star**    *Illicium parviflorum*    FACW
**arrowhead**    *Sagittaria* spp.    OBL
**arrow-wood**    *Viburnum dentatum*    FACW
**arum**    *Peltandra* spp.    OBL
**ash**    *Fraxinus* spp.    OBL
**ash, white**    *Fraxinus americana*    U
**aster, bog**    *Aster spinulosus*    FACW
**aster, bushy**    *Aster dumosus*    FAC
**aster, calico**    *Aster lateriflorus*    FACW
**aster, climbing**    *Aster carolinianus*    OBL
**aster, coyote-thistle**    *Aster eryngiifolius*    FACW
**aster, Elliott's**    *Aster elliottii*    OBL
**aster, flat-top white**    *Aster umbellatus*    FAC
**aster, saltmarsh**    *Aster subulatus*    OBL
**aster, saltmarsh**    *Aster tenuifolius*    OBL
**aster, savannah**    *Aster chapmanii*    FACW
**aster, small white**    *Aster vimineus*    FACW
**Australian pine**    *Casuarina* spp.    FAC
**axilflower**    *Mecardonia* spp.    FACW
**azalea, swamp**    *Rhododendron viscosum*    FACW
**baby tears**    *Micranthemum* spp.    OBL
**baby-blue-eyes, small-flower**    *Nemophila aphylla*    FACW
**balsam-scale, Pan-American**    *Elionurus tripsacoides*    FACW
**bantam-buttons**    *Syngonanthus flavidulus*    FACW
**barbara's-buttons, grass-leaf**    *Marshallia graminifolia*    FACW
**barbara's-buttons, slim-leaf**    *Marshallia tenuifolia*    FACW
**basswood, American**    *Tilia americana*    FACW
**bay, swamp**    *Persea palustris*    OBL
**bayberry, evergreen**    *Myrica heterophylla*    FACW
**bayberry, odorless**    *Myrica inodora*    FACW
**bayberry, southern**    *Myrica cerifera*    FAC
**bay-cedar**    *Suriana maritima*    FAC
**beach alternanthera**    *Alternanthera maritima*    FACW
**beach creeper**    *Ernodea littoralis*    FAC
**bedstraw, stiff marsh**    *Galium tinctorium*    FACW
**beefwood**    *Guapira discolor*    FAC
**beggar-ticks**    *Bidens* spp.    OBL

This index is for reference purposes only. Scientific names shall be used in all applications of Ch. 62-340, F.A.C. This index contains all plant species in subsection 62-340.450(1), (2), (3), F.A.C., listed alphabetically by their most widely used common names. In this index, plant species within a genus that has a consistent common name are listed by the common name of their genus, followed by the descriptor. For example, *Quercus nigra* is listed as oak, water. For families or larger taxonomic divisions in which all members are collectively referred to by a consistent common name, such as grasses, sedges, palms, orchids, and ferns, all members are listed under that group name, with the last member alphabetically being underlined to denote the end of the group. Plant species may appear multiple times within this list, as many have multiple common names. However, this list is not exhaustive.

68

**beggar-ticks, white**    *Bidens pilosa (B. alba)*    FAC
**bellflower, American**    *Campanula americana*    FAC
**bellflower, Florida**    *Campanula floridana*    OBL
**bellwort, Florida**    *Uvularia floridana*    FACW
**bindweed, dwarf**    *Evolvulus convolvuloides*    FACW
**bindweed, silky**    *Evolvulus sericeus*    FACW
**birch, river**    *Betula nigra*    OBL
**birds-in-a-nest**    *Macbridea* spp.    FACW
**bitter-cress**    *Cardamine bulbosa*    OBL
**black senna**    *Seymeria cassioides*    FAC
**blackbead**    *Pithecellobium keyensis*    FAC
**blackbead, catclaw**    *Pithecellobium unguis-cati*    FAC
**blackberry**    *Rubus* spp.    FAC
**blackgum**    *Nyssa sylvatica var. biflora*    OBL
**bladdernut, American**    *Staphylea trifolia*    FACW
**bladderpod**    *Sesbania* spp.    FAC
**bladderwort**    *Utricularia* spp.    OBL
**blazing star**    *Liatris gracilis*    FAC
**blolly**    *Guapira discolor*    FAC
**blueberry, Elliott**    *Vaccinium elliottii*    FAC
**blueberry, highbush**    *Vaccinium corymbosum*    FACW
**blue-eye-grass**    *Sisyrinchium capillare*    FACW
**blue-eye-grass, eastern**    *Sisyrinchium atlanticum*    FACW
**blue-eye-grass, Michaux's**    *Sisyrinchium mucronatum*    FACW
**bluestar, eastern**    *Amsonia tabernaemontana*    FACW
**bluethread**    *Burmannia* spp.    OBL
**bluets, water**    *Oldenlandia* spp.    FACW
**bog hemp**    *Boehmeria cylindrica*    OBL
**bogbutton, Engler's**    *Lachnocaulon engleri*    OBL
**bogbutton, pineland**    *Lachnocaulon digynum*    OBL
**bogbutton, Small's**    *Lachnocaulon minus*    OBL
**bogbutton, southern**    *Lachnocaulon beyrichianum*    FACW
**bogbutton, white-head**    *Lachnocaulon anceps*    FACW
**boneset**    *Eupatorium perfoliatum*    FACW
**box briar**    *Randia aculeata*    FAC
**box-elder**    *Acer negundo*    FACW
**bractspike, yellow**    *Yeatesia viridiflora*    FACW
**Brazilian pepper-tree**    *Schinus terebinthifolius*    FAC
**broomspurge, spreading**    *Euphorbia humistrata*    FACW
**buckwheat-tree**    *Cliftonia monophylla*    FACW
**bugleweed**    *Lycopus* spp.    OBL
**bully, buckthorn**    *Bumelia lycioides*    FAC
**bully, Florida**    *Bumelia reclinata*    FAC
**bumelia, buckthorn**    *Bumelia lycioides*    FAC
**bumelia, coastal**    *Bumelia celastrina*    FAC
**bumelia, smooth**    *Bumelia reclinata*    FAC
**bunchflower, Virginia**    *Melanthium virginicum*    OBL
**burhead**    *Echinodorus* spp.    OBL
**burnweed, American**    *Erechtites hieraciifolia*    FAC
**burreed**    *Sparganium americanum*    OBL
**bushy goldenrod**    *Euthamia* spp.    FAC

**butter-cup**    *Ranunculus* spp.   FACW
**butterweed**    *Senecio glabellus*   OBL
**butterwort**    *Pinguicula* spp.   OBL
**buttonbush**    *Cephalanthus occidentalis*   OBL
**button-plant, smooth**    *Spermacoce glabra*   FACW
**button-weed**    *Diodia virginiana*   FACW
**buttonwood**    *Conocarpus erectus*   FACW
**cajeput**    *Melaleuca quinquenervia*   FAC
**camphor-weed**    *Pluchea* spp.   FACW
**canker-berry**    *Solanum bahamense*   FACW
**canna**    *Canna* spp.   OBL
**canna, common**    *Canna x generalis*   FAC
**caperonia**    *Caperonia* spp.   FACW
**caper-tree**    *Capparis flexuosa*   FACW
**cardinal flower**    *Lobelia cardinalis*   OBL
**carrotwood**    *Cupaniopsis anacardioides*   FAC
**catsclaw**    *Pithecellobium unguis-cati*   FAC
**cattail**    *Typha* spp.   OBL
**cayaponia, five-lobe**    *Cayaponia quinqueloba*   FAC
**celestial lily**    *Nemastylis floridana*   FACW
**chaff-flower, beach**    *Alternanthera maritima*   FACW
**chaffhead, bristle-leaf**    *Carphephorus pseudoliatris*   FACW
**chaffhead, hairy**    *Carphephorus paniculatus*   FAC
**chaffhead, pineland**    *Carphephorus carnosus*   FACW
**chamber-bitter**    *Phyllanthus urinaria*   FAC
**chicken-spike**    *Sphenoclea zeylandica*   FACW
**chickweed, West Indian**    *Drymaria cordata*   FAC
**chocolate-weed**    *Melochia corchorifolia*   FAC
**chokeberry, red**    *Aronia arbutifolia*   FACW
**Christmas berry**    *Lycium carolinianum*   OBL
**clearweed**    *Pilea* spp.   FACW
**climbing-dogbane**    *Trachelospermum difforme*   FACW
**clubmoss**    *Lycopodium* spp.   FACW
**cocoplum**    *Chrysobalanus icaco*   FACW
**coinwort**    *Centella asiatica*   FACW
**colic-root**    *Aletris spp*   FAC
**colicwood**    *Myrsine guianensis*   FAC
**coneflower, cut-leaf**    *Rudbeckia laciniata*   FACW
**coneflower, grass-leaf**    *Rudbeckia graminifolia*   FACW
**coneflower, Mohr's**    *Rudbeckia mohrii*   OBL
**coneflower, orange**    *Rudbeckia fulgida*   FACW
**coneflower, Shiny**    *Rudbeckia nitida*   FACW
**coralberry**    *Ardisia* spp.   FAC
**corkwood**    *Leitneria floridana*   OBL
**corkwood**    *Stillingia aquatica*   OBL
**cottonwood, eastern**    *Populus deltoides*   FACW
**cottonwood, swamp**    *Populus heterophylla*   OBL
**coughbush**    *Ernodea littoralis*   FAC
**cowbane**    *Oxypolis* spp.   OBL
**cow-lily, yellow**    *Nuphar luteum*   OBL
**coyote-thistle, Baldwin's**    *Eryngium baldwinii*   FAC
**coyote-thistle, blue-flower**    *Eryngium integrifolium*   FACW

(This Appendix is not incorporated by reference; Effective Date_____)

**coyote-thistle, creeping**    *Eryngium prostratum*    FACW
**creeping ox-eye**    *Wedelia trilobata*    FAC
**croton, Elliott's**    *Croton elliottii*    FACW
**crow poison**    *Zigadenus densus*    FACW
**crownbeard, Chapman's**    *Verbesina chapmanii*    FACW
**crownbeard, diverse-leaf**    *Verbesina heterophylla*    FACW
**crownbeard, white**    *Verbesina virginica*    FAC
**culver's-root**    *Veronicastrum virginicum*    FACW
**cupseed**    *Calycocarpum lyonii*    FACW
**cypress, bald**    *Taxodium distichum*    OBL
**cypress, pond**    *Taxodium ascendens*    OBL
**dangleberry**    *Gaylussacia frondosa*    FAC
**danglepod**    *Sesbania* spp.    FAC
**darling-plum**    *Reynosia septentrionalis*    FAC
**dasheen**    *Colocasia esculenta*    OBL
**dayflower**    *Commelina* spp.    FACW
**dayflower, sandhill**    *Commelina erecta*    U
**deathcamas, Atlantic**    *Zigadenus glaberrimus*    FACW
**deer-tongue**    *Carphephorus paniculatus*    FAC
**desert-thorn, Carolina**    *Lycium carolinianum*    OBL
**devil's claws**    *Pisonia rotundata*    FAC
**dewberry**    *Rubus* spp.    FAC
**dewflower**    *Murdannia* spp.    FAC
**ditch stonecrop**    *Penthorum sedoides*    OBL
**dock**    *Rumex* spp.    FACW
**dog-fennel**    *Eupatorium capillifolium*    FAC
**dog-hobble**    *Leucothoe* spp.    FACW
**dogwood, silky**    *Cornus amomum*    OBL
**dogwood, swamp**    *Cornus foemina*    FACW
**dollarweed**    *Hydrocotyle* spp.    FACW
**doll's daisy**    *Boltonia* spp.    FACW
**dragon-head, false**    *Physostegia virginiana*    FACW
**dragon-head, Godfrey's**    *Physostegia godfreyi*    OBL
**dragon-head, purple**    *Physostegia purpurea*    FACW
**dragon-head, slender-leaf**    *Physostegia leptophylla*    OBL
**drymary**    *Drymaria cordata*    FAC
**duck potato**    *Sagittaria* spp.    OBL
**dwarf morning-glory, bindweed**    *Evolvulus convolvuloides*    FACW
**dwarf morning-glory, silver**    *Evolvulus sericeus*    FACW
**elder, American**    *Sambucus canadensis*    FAC
**elderberry**    *Sambucus canadensis*    FAC
**elephant's ear**    *Colocasia esculenta*    OBL
**elephant's ear**    *Xanthosoma sagittifolium*    FACW
**elm**    *Ulmus* spp.    FACW
**elm, slippery**    *Ulmus rubra*    U
**false buttonweed, smooth**    *Spermacoce glabra*    FACW
**false daisy**    *Eclipta alba*    FACW
**false indigo, bastard**    *Amorpha fruticosa*    FACW
**false-asphodel, coastal**    *Tofieldia racemosa*    OBL
**false-croton**    *Caperonia* spp.    FACW
**falsefennel**    *Eupatorium leptophyllum*    OBL
**false-fiddle-leaf**    *Hydrolea* spp.    OBL

71

**false-foxglove**   *Agalinis pinetorum*   FACW
**false-foxglove, flax-leaf**   *Agalinis linifolia*   OBL
**false-foxglove, large purple**   *Agalinis purpurea*   FACW
**false-foxglove, saltmarsh**   *Agalinis maritima*   OBL
**false-foxglove, scale-leaf**   *Agalinis aphylla*   FACW
**false-nettle**   *Boehmeria cylindrica*   OBL
**false-pimpernel**   *Lindernia* spp.   FACW
**false-pimpernel, Malayan**   *Lindernia crustacea*   FAC
**false-willow, broom-bush**   *Baccharis dioica*   FAC
**false-willow, eastern**   *Baccharis halimifolia*   FAC
**false-willow, saltwater**   *Baccharis angustifolia*   OBL
**feather-bells, eastern**   *Stenanthium gramineum*   FACW
<u>**FERNS**</u>
**bead fern**   *Hypolepis repens*   FACW
**Boston fern**   *Nephrolepis exaltata*   FAC
**brake, giant**   *Pteris tripartita*   FACW
**bramble fern, creeping**   *Hypolepis repens*   FACW
**chainfern, netted**   *Woodwardia aereolata*   OBL
**chainfern, Virginia**   *Woodwardia virginica*   FACW
**cinnamon fern**   *Osmunda cinnamomea*   FACW
**comb fern, brown-hair**   *Ctenitis submarginalis*   FACW
**lady fern, subarctic**   *Athyrium filix-femina*   FACW
**leather fern**   *Acrostichum* spp.   OBL
**maiden fern**   *Thelypteris* spp.   FACW
**marsh fern**   *Thelypteris* spp.   FACW
**royal fern**   *Osmunda regalis*   OBL
**sensitive fern**   *Onoclea sensibilis*   FACW
**shield fern**   *Thelypteris* spp.   FACW
**swamp fern**   *Blechnum serrulatum*   FACW
**sword fern**   *Nephrolepis* spp.   FAC
<u>**wood fern, southern**   *Dryopteris ludoviciana*   FACW</u>
**fetter-bush**   *Lyonia lucida*   FACW
**fetter-bush, climbing**   *Pieris phillyreifolia*   FACW
**fever-tree**   *Pinckneya bracteata*   OBL
**fig, Florida strangler**   *Ficus aurea*   FAC
**fire flag**   *Thalia geniculata*   OBL
**fireweed**   *Erechtites hieraciifolia*   FAC
**flameflower**   *Macranthera flammea*   OBL
**flattop goldenrod**   *Euthamia* spp.   FAC
**flax, Carter's**   *Linum carteri*   FACW
**flax, Florida yellow**   *Linum floridanum*   FAC
**flax, ridged yellow**   *Linum striatum*   FACW
**flax, stiff yellow**   *Linum medium*   FAC
**flax, West's**   *Linum westii*   OBL
**fleabane, early whitetop**   *Erigeron vernus*   FACW
**fleabane, oakleaf**   *Erigeron quercifolius*   FAC
**floating hearts**   *Nymphoides* spp.   OBL
**frogbit**   *Limnobium spongia*   OBL
**frog-fruit**   *Phyla* spp.   FAC
**frostweed**   *Verbesina virginica*   FAC
**gayfeather, garber's**   *Liatris garberi*   FACW
**gayfeather, slender**   *Liatris gracilis*   FAC

72

   (This Appendix is not incorporated by reference; Effective Date_____)

**gayfeather, spiked**    *Liatris spicata*    FAC
**gentian**    *Gentiana* spp.    FACW
**germander, American**    *Teucrium canadense*    FACW
**ginger**    *Hedychium coronarium*    FACW
**gingerlily, white**    *Hedychium coronarium*    FACW
**glasswort**    *Salicornia* spp.    OBL
**goat-weed**    *Scoparia dulcis*    FAC
**golden club**    *Orontium aquaticum*    OBL
**golden creeper**    *Ernodea littoralis*    FAC
**golden-crest**    *Lophiola americana*    FACW
**golden-rod, Elliott's**    *Solidago elliottii*    OBL
**golden-rod, leavenworth's**    *Solidago leavenworthii*    FACW
**golden-rod, marsh**    *Solidago fistulosa*    FACW
**golden-rod, rough-leaf**    *Solidago patula*    OBL
**golden-rod, seaside**    *Solidago sempervirens*    FACW
**golden-rod, willow-leaf**    *Solidago stricta*    FACW
**golden-rod, wrinkled**    *Solidago rugosa*    FAC
**grass-of-parnassus**    *Parnassia* spp.    OBL
**grasswort**    *Lilaeopsis* spp.    OBL

<u>**GRASSES**</u>

**arrowfeather grass**    *Aristida purpurascens*    FACW
**arrow-grass**    *Triglochin striatam*    OBL
**barnyardgrass**    *Echinochloa* spp.    FACW
**basketgrass**    *Oplismenus setarius*    FAC
**blue maidencane**    *Amphicarpum muhlenbergianum*    FACW
**bluestem**    *Schizachyrium* spp.    FAC
**bluestem, big**    *Andropogon gerardii*    FAC
**bluestem, broom-sedge**    *Andropogon virginicus*    FAC
**bluestem, bushy**    *Andropogon glomeratus*    FACW
**bluestem, Mohr's**    *Andropogon liebmanii var. pungensis (A. mohrii)*    FACW
**bluestem, savannah**    *Andropogon arctatus*    FAC
**bluestem, short-spike**    *Andropogon brachystachys*    FAC
**bluestem, slim**    *Andropogon perangustatus*    FAC
**bristlegrass**    *Setaria geniculata*    FAC
**broom-sedge**    *Andropogon virginicus*    FAC
**Burma reed**    *Neyraudia reynaudiana*    FAC
**carpet grass**    *Axonopus* spp.    FAC
**cockspur grass**    *Echinochloa* spp.    FACW
**common reed**    *Phragmites australis*    OBL
**cordgrass, big**    *Spartina cynosuroides*    OBL
**cordgrass, gulf**    *Spartina spartinae*    OBL
**cordgrass, saltmarsh**    *Spartina alterniflora*    OBL
**cordgrass, saltmeadow**    *Spartina patens*    FACW
**cordgrass, sand**    *Spartina bakeri*    FACW
**crabgrass, dwarf**    *Digitaria serotina*    FAC
**crabgrass, twospike**    *Digitaria pauciflora*    FACW
**cupgrass**    *Eriochloa* spp.    FACW
**cupscale, American**    *Sacciolepis striata*    OBL
**cupscale, Indian**    *Sacciolepis indica*    FAC
**cutgrass**    *Leersia* spp.    OBL
**cut-throat grass**    *Panicum abscissum*    FACW
**dallisgrass**    *Paspalum dilatatum*    FAC

73

    (This Appendix is not incorporated by reference; Effective Date_____)

**dropseed, Florida**    *Sporobolus floridanus*    FACW
**dropseed, seashore**    *Sporobolus virginicus*    OBL
**elephantgrass**    *Pennisetum purpureum*    FAC
**everglades grass**    *Digitaria pauciflora*    FACW
**fingergrass, pinewoods**    *Eustachys petraea*    FAC
**fingergrass, saltmarsh**    *Eustachys glauca*    FACW
**fluffgrass, pineland**    *Tridens ambiguus*    FACW
**foxtail, giant**    *Setaria magna*    OBL
**foxtail, knotroot**    *Setaria geniculata*    FAC
**foxtail, tufted**    *Alopecurus carolinianus*    FAC
**gamagrass, eastern**    *Tripsacum dactyloides*    FAC
**giant cane**    *Arundinaria gigantea*    FACW
**giant cutgrass**    *Zizaniopsis miliacea*    OBL
**giant reed**    *Arundo donax*    FAC
**hilograss**    *Paspalum conjugatum*    FAC
**indian rice**    *Zizania aquatica*    OBL
**jointgrass; jointtailgrass**    *Manisuris* spp.    FACW
**jointgrass, pitted**    *Manisuris cylindrica*    FAC
**jungle-rice**    *Echinochloa* spp.    FACW
**keygrass**    *Monanthochloe littoralis*    OBL
**kissimmeegrass**    *Paspalidium geminatum*    OBL
**knotgrass**    *Paspalum distichum*    OBL
**lovegrass**    *Eragrostis* spp.    FAC
**maidencane**    *Panicum hemitomon*    OBL
**mannagrass, fowl**    *Glyceria striata*    OBL
**muhly grass, hairawn**    *Muhlenbergia capillaris*    OBL
**muhly grass, nimblewill**    *Muhlenbergia schreberi*    FACW
**muhly, cutover**    *Muhlenbergia expansa*    FAC
**napiergrass**    *Pennisetum purpureum*    FAC
**needlegrass, Florida**    *Stipa avenacioides*    FACW
**panic grass, cypress**    *Panicum ensifolium*    OBL
**panicum, beaked**    *Panicum anceps*    FAC
**panicum, bluejoint**    *Panicum tenerum*    OBL
**panicum, Eaton's**    *Panicum spretum*    FACW
**panicum, fall**    *Panicum dichotomiflorum*    FACW
**panicum, fringed**    *Panicum strigosum*    FAC
**panicum, Ft Myers**    *Panicum pinetorum*    FACW
**panicum, gaping**    *Panicum hians*    FAC
**panicum, red-top**    *Panicum rigidulum*    FACW
**panicum, savannah**    *Panicum gymnocarpon*    OBL
**panicum, shining**    *Panicum dichotomum*    FACW
**panicum, tall thin**    *Panicum longifolium*    OBL
**panicum, variable**    *Panicum commutatum*    FAC
**panicum, velvet**    *Panicum scoparium*    FACW
**panicum, warty**    *Panicum verrucosum*    FACW
**panicum, white-edge**    *Panicum tenue*    FAC
**panicum, woolly**    *Panicum scabriusculum*    OBL
**paragrass**    *Brachiaria purpurascens*    FACW
**paspalum, brook**    *Paspalum acuminatum*    FACW
**paspalum, brown-seed**    *Paspalum plicatulum*    FAC
**paspalum, bull**    *Paspalum boscianum*    FACW
**paspalum, early**    *Paspalum praecox*    OBL

74

    (This Appendix is not incorporated by reference; Effective Date_____)

**paspalum, field**    *Paspalum laeve*    FACW
**paspalum, Florida**    *Paspalum floridanum*    FACW
**paspalum, gulf**    *Paspalum monostachyum*    OBL
**paspalum, hairy-seed**    *Paspalum pubiflorum*    FACW
**paspalum, joint**    *Paspalum distichum*    OBL
**paspalum, mudbank**    *Paspalum dissectum*    OBL
**paspalum, Panama**    *Paspalum fimbriatum*    FAC
**paspalum, sour**    *Paspalum conjugatum*    FAC
**paspalum, thin**    *Paspalum setaceum*    FAC
**paspalum, water**    *Paspalum repens*    OBL
**plumegrass, narrow**    *Erianthus strictus*    OBL
**plumegrass, short-beard**    *Erianthus brevibarbus*    FACW
**plumegrass, sugarcane**    *Erianthus giganteus*    OBL
**rabbit-foot grass**    *Polypogon* spp.    FAC
**redtop**    *Agrostis stolonifera*    FACW
**reed grass, Curtiss'**    *Calamovilfa curtissii*    FACW
**reimargrass, Florida**    *Reimarochloa oligostachya*    FACW
**rice, cultivated**    *Oryza sativa*    FAC
**saltgrass, seashore**    *Distichlis spicata*    OBL
**sandgrass, Curtiss'**    *Calamovilfa curtissii*    FACW
**silk reed**    *Neyraudia reynaudiana*    FAC
**silky-scale, purple**    *Anthaenantia rufa*    FACW
**spanglegrass**    *Chasmanthium* spp.    FACW
**spanglegrass, indian**    *Chasmanthium latifolium*    FAC
**spanglegrass, long-leaf**    *Chasmanthium sessiliflorum*    FAC
**switchcane**    *Arundinaria gigantea*    FACW
**switchgrass**    *Panicum virgatum*    FACW
**three-awn grass, bottlebrush**    *Aristida spiciformis*    FAC
**three-awn grass, long-leaf**    *Aristida affinis*    OBL
**three-awn grass, pineland**    *Aristida stricta*    FAC
**three-awn grass, rhizomatous**    *Aristida rhizomophora*    FAC
**three-awn grass, wand-like**    *Aristida purpurascens*    FACW
**toothache grass**    *Ctenium* spp.    FACW
**torpedograss**    *Panicum repens*    FACW
**tridens, long-spike**    *Tridens strictus*    FACW
**tridens, savannah**    *Tridens ambiguus*    FACW
**trompetilla**    *Hymenachne amplexicaulis*    OBL
**vaseygrass**    *Paspalum urvillei*    FAC
**watergrass**    *Hydrochloa caroliniensis*    OBL
**West Indian marsh grass**    *Hymenachne amplexicaulis*    OBL
**wildrice, annual**    *Zizania aquatica*    OBL
**wildrice, southern**    *Zizaniopsis miliacea*    OBL
**wiregrass**    *Aristida stricta*    FAC
**witchgrass, cypress**    *Panicum ensifolium*    OBL
**witchgrass, erect-leaf**    *Panicum erectifolium*    OBL
**witchgrass, roughhair**    *Panicum strigosum*    FAC
**witchgrass, shining**    *Panicum dichotomum*    FACW
**witchgrass, variable**    *Panicum commutatum*    FAC
**witchgrass, velvet**    *Panicum scoparium*    FACW
**witchgrass, woolly**    *Panicum scabriusculum*    OBL
**woodoats**    *Chasmanthium* spp.    FACW
**woodoats, indian**    *Chasmanthium latifolium*    FAC

75

**woodoats, long-leaf**  *Chasmanthium sessiliflorum*  FAC
**woodsgrass**  *Oplismenus setarius*  FAC
**green-dragon**  *Arisaema* spp.  FACW
**green-haw**  *Crataegus viridis*  FACW
**gregory wood**  *Bucida buceras*  FAC
**groundsel tree**  *Baccharis glomeruliflora*  FAC
**guava, strawberry**  *Psidium cattleianum*  FAC
**hackberry**  *Celtis laevigata*  FACW
**hardscale, one flower**  *Sclerolepis uniflora*  FACW
**Harper's beauty**  *Harperocallis flava*  FACW
**hartwrightia, Florida**  *Hartwrightia floridana*  FACW
**hatpin**  *Eriocaulon* spp.  OBL
**hatpins, yellow**  *Syngonanthus flavidulus*  FACW
**haw, green**  *Crataegus viridis*  FACW
**haw, may**  *Crataegus aestivalis*  OBL
**haw, parsley**  *Crataegus marshallii*  FACW
**hazel-alder**  *Alnus serrulata*  OBL
**hedgehyssop**  *Gratiola* spp.  FACW
**hedgehyssop, rough**  *Gratiola hispida*  FAC
**hedgenettle**  *Stachys lythroides*  OBL
**heliotrope, four-spike**  *Heliotropium procumbens*  FACW
**heliotrope, pineland**  *Heliotropium polyphyllum*  FAC
**heliotrope, seaside**  *Heliotropium curassavicum*  FAC
**hickory, water**  *Carya aquatica*  OBL
**hobble-bush**  *Agarista populifolia*  FACW
**holly, American**  *Ilex opaca var. opaca*  FAC
**holly, bay-gall**  *Ilex coriacea*  FACW
**holly, dahoon**  *Ilex cassine*  OBL
**holly, deciduous**  *Ilex decidua*  FACW
**holly, myrtle**  *Ilex myrtifolia*  OBL
**holly, sarvis**  *Ilex amelanchier*  OBL
**holly, yaupon**  *Ilex vomitoria*  FAC
**honeycomb-head, one-flower**  *Balduina uniflora*  FACW
**honeycomb-head, purple**  *Balduina atropurpurea*  FACW
**honey-locust**  *Gleditsia triacanthos*  FACW
**hornbeam, American**  *Carpinus caroliniana*  FACW
**hornpod**  *Mitreola* spp.  FACW
**horse-purslane**  *Trianthema portulacastrum*  FACW
**horsetail**  *Equisetum hyemale*  FACW
**huckleberry, dwarf**  *Gaylussacia dumosa*  FAC
**hummingbird-flower**  *Macranthera flammea*  OBL
**hygrophila**  *Hygrophila* spp.  OBL
**hyssop, hispid**  *Gratiola hispida*  FAC
**indian-plantain, egg-leaf**  *Arnoglossum ovatum*  FACW
**indian-plantain, Georgia**  *Arnoglossum sulcatum*  OBL
**indian-plantain, sweet-scent**  *Cacalia suaveolens*  FACW
**indian-plantain, variable-leaf**  *Arnoglossum diversifolium*  FACW
**indigoberry, white**  *Randia aculeata*  FAC
**indigo-bush**  *Amorpha fruticosa*  FACW
**iris**  *Iris* spp.  OBL
**iris, dwarf**  *Iris verna*  U
**ironweed**  *Vernonia* spp.  FACW

**ironweed, narrow-leaf**     *Vernonia angustifolia*   U
**ironwood**   *Carpinus caroliniana*   FACW
**ixia, Bartram's**     *Sphenostigma coelestinum*   FACW
**ixia, fall-flowering**     *Nemastylis floridana*   FACW
**jack-in-the-pulpit**     *Arisaema* spp.   FACW
**Java plum**     *Syzygium* spp.   FAC
**jessamine, day**     *Cestrum diurnum*   FAC
**jewel weed**     *Impatiens capensis*   OBL
**joe-pye-weed**     *Eupatoriadelphus fistulosus*   FACW
**Joewood**     *Jacquinia keyensis*   FAC
**joint-vetch, India**     *Aeschynomene indica*   FACW
**joint-vetch, meadow**     *Aeschynomene pratensis*   OBL
**joyweed, seaside**     *Alternanthera maritima*   FACW
**joyweed, sessile**     *Alternanthera sessilis*   OBL
**joyweed, smooth**     *Alternanthera paronychioides*   FAC
**jumpseed**   *Polygonum virginianum*   FACW
**juniperleaf**   *Polypremum procumbens*   FAC
**justiceweed**   *Eupatorium leucolepis*   FACW
**keygrass**   *Monanthochloe littoralis*   OBL
**lakecress**   *Armoracia aquatica*   OBL
**large gallberry**   *Ilex coriacea*   FACW
**latherleaf**   *Colubrina asiatica*   FAC
**leaf-flower, Carolina**     *Phyllanthus caroliniensis*   FACW
**leaf-flower, Florida**     *Phyllanthus liebmannianus*   FACW
**leaf-flower, water**     *Phyllanthus urinaria*   FAC
**lily, atamasco**     *Zephyranthes atamasco*   FACW
**lily, panhandle**     *Lilium iridollae*   OBL
**lily, southern red**     *Lilium catesbaei*   FAC
**lizard's tail**     *Saururus cernuus*   OBL
**lobelia**     *Lobelia* spp.   FACW
**lobelia, Florida**     *Lobelia floridana*   OBL
**loblolly-bay**     *Gordonia lasianthus*   FACW
**locust-berry**     *Byrsonima lucida*   FAC
**loosestrife**     *Lysimachia* spp.   OBL
**loosestrife, marsh**     *Lythrum* spp.   OBL
**lotus, American**     *Nelumbo* spp.   OBL
**magnolia, sweetbay**     *Magnolia virginiana var. australis*   OBL
**Malabar plum**     *Syzygium* spp.   FAC
**maleberry**     *Lyonia ligustrina*   FAC
**mallow, coastal**     *Kosteletzkya pentasperma*   FAC
**mallow, mangrove**     *Pavonia spicata*   FACW
**mallow, seashore**     *Kosteletzkya virginica*   OBL
**mangrove, black**     *Avicennia germinans*   OBL
**mangrove, red**     *Rhizophora mangle*   OBL
**mangrove, white**     *Laguncularia racemosa*   OBL
**maple, red**     *Acer rubrum*   FACW
**maple, silver**     *Acer saccharinum*   OBL
**marlberry**     *Ardisia* spp.   FAC
**marsh elder**     *Iva frutescens*   OBL
**marsh elder, little**     *Iva microcephala*   FACW
**marsh loosestrife**     *Lythrum* spp.   OBL
**marsh St. John's-wort**     *Triadenum* spp.   OBL

77

**marsh-gentian**    *Eustoma exaltatum*    FACW
**marshpennywort**    *Hydrocotyle* spp.    FACW
**marshweed**    *Limnophila* spp.    OBL
**mayhaw**    *Crataegus aestivalis*    OBL
**mayten, Florida**    *Maytenus phyllanthoides*    FAC
**meadow-beauty**    *Rhexia* spp.    FACW
**meadow-beauty, panhandle**    *Rhexia salicifolia*    OBL
**meadow-beauty, white**    *Rhexia parviflora*    OBL
**meadow-rue**    *Thalictrum* spp.    FACW
**melonleaf, five-lobe**    *Cayaponia quinqueloba*    FAC
**mermaid-weed**    *Proserpinaca* spp.    OBL
**milkweed, aquatic**    *Asclepias perennis*    OBL
**milkweed, fen-flower**    *Asclepias lanceolata*    OBL
**milkweed, large-flower**    *Asclepias connivens*    FACW
**milkweed, long-leaf**    *Asclepias longifolia*    FACW
**milkweed, red**    *Asclepias rubra*    OBL
**milkweed, savannah**    *Asclepias pedicellata*    FACW
**milkweed, southern**    *Asclepias viridula*    FACW
**milkweed, swamp**    *Asclepias incarnata*    OBL
**milkwort**    *Polygala* spp.    FACW
**milkwort, racemed**    *Polygala polygama*    U
**milkwort, sandhill**    *Polygala leptostachys*    U
**milkwort, scrub**    *Polygala lewtonii*    U
**milkwort, tall**    *Polygala cymosa*    OBL
**milkwort, whorled**    *Polygala verticillata*    U
**mille graines**    *Oldenlandia* spp.    FACW
**mimosa, black**    *Mimosa pigra*    FAC
**mistflower**    *Conoclinium coelestinum*    FAC
**miterwort**    *Mitreola* spp.    FACW
**mock bishop-weed**    *Ptilimnium capillaceum*    FACW
**monkey-flower**    *Mimulus alatus*    OBL
**mountain-laurel**    *Kalmia latifolia*    FACW
**mountain-mint, coastal-plain**    *Pycnanthemum nudum*    FACW
**mouse-tail, tiny**    *Myosurus minimus*    FAC
**mudflower**    *Micranthemum* spp.    OBL
**mud-plantain, kidney-leaf**    *Heteranthera reniformis*    OBL
**mudwort, wild**    *Dicliptera brachiata*    FACW
**mulberry, red**    *Morus rubra*    FAC
**musclewood**    *Carpinus caroliniana*    FACW
**musky mint**    *Hyptis alata*    FACW
**myrsine, guiana**    *Myrsine guianensis*    FAC
**nakedwood, Asian**    *Colubrina asiatica*    FAC
**necklacepod, yellow**    *Sophora tomentosa*    FACW
**nettletree**    *Trema* spp.    FAC
**neverwet**    *Orontium aquaticum*    OBL
**nightshade, Bahama**    *Solanum bahamense*    FACW
**nightshade, shrub**    *Solanum erianthum*    FACW
**nodding nixie**    *Apteria aphylla*    FACW
**oak, cherry-bark**    *Quercus pagoda*    FACW
**oak, laurel**    *Quercus laurifolia*    FACW
**oak, overcup**    *Quercus lyrata*    OBL
**oak, swamp chestnut**    *Quercus michauxii*    FACW

78

(This Appendix is not incorporated by reference; Effective Date_____)

**oak, water**    *Quercus nigra*    FACW
**oak, willow**    *Quercus phellos*    FACW
**obedient plant**    *Physostegia virginiana*    FACW
<u>ORCHIDS</u>
**adder's-mouth, Florida**    *Malaxis spicata*    OBL
**fringed orchid**    *Platanthera* spp.    OBL
**grass-pinks**    *Calopogon* spp.    FACW
**hidden orchid**    *Maxillaria crassifolia*    OBL
**jug orchid**    *Erythrodes querceticola*    FACW
**ladies'-tresses**    *Spiranthes* spp.    FACW
**liparis, tall**    *Liparis elata*    OBL
**noddingcaps**    *Triphora* spp.    FACW
**pogonia, rose**    *Pogonia ophioglossoides*    OBL
**pogonias, nodding**    *Triphora* spp.    FACW
**rein orchid**    *Habenaria* spp.    FACW
**rosebud orchid**    *Cleistes divaricata*    OBL
**shadow-witch**    *Ponthieva racemosa*    FACW
**snakemouth orchid**    *Pogonia ophioglossoides*    OBL
**twayblade**    *Listera* spp.    FACW
**widelip orchid**    *Liparis elata*    OBL
**<u>wild coco    Eulophia alta    FACW</u>**
**ox-eye, creeping**    *Wedelia trilobata*    FAC
**oxeye, seaside**    *Borrichia* spp.    OBL
<u>PALMS</u>
**palm, bluestem**    *Sabal minor*    FACW
**palm, cabbage**    *Sabal palmetto*    FAC
**palm, Florida thatch**    *Thrinax radiata*    FAC
**palm, needle**    *Rhapidophyllum hystrix*    FACW
**palm, paurotis**    *Acoelorraphe wrightii*    OBL
**palm, royal**    *Roystonea* spp.    FACW
**<u>palmetto, dwarf    Sabal minor    FACW</u>**
**panal**    *Cypselea humifusa*    FAC
**paperbark tree**    *Melaleuca quinquenervia*    FAC
**parsley-haw**    *Crataegus marshallii*    FACW
**peatmoss**    *Sphagnum* spp.    OBL
**pellitory**    *Parietaria* spp.    FAC
**pennywort**    *Hydrocotyle* spp.    FACW
**penny-wort, floating**    *Hydrocotyle ranunculoides*    OBL
**pentodon, Hall's**    *Pentodon pentandrus*    OBL
**persimmon, common**    *Diospyros virginiana*    FAC
**pickerelweed**    *Pontederia cordata*    OBL
**picklewort**    *Salicornia* spp.    OBL
**pimpernel, Florida**    *Anagallis pumila*    FAC
**pimpernel, water**    *Samolus* spp.    OBL
**pine, pond**    *Pinus serotina*    FACW
**pine, spruce**    *Pinus glabra*    FACW
**pineland daisy**    *Chaptalia tomentosa*    FACW
**pineweed**    *Hypericum gentianoides*    U
**pink-root**    *Spigelia loganioides*    FACW
**pipestem**    *Agarista populifolia*    FACW
**pipewort**    *Eriocaulon* spp.    OBL
**pitcher-plant**    *Sarracenia* spp.    OBL

(This Appendix is not incorporated by reference; Effective Date_____)

**pitcher-plant, hooded**   *Sarracenia minor*   FACW
**planer tree**   *Planera aquatica*   OBL
**planetree, American**   *Platanus occidentalis*   FACW
**pleatleaf, fall-flowering**   *Nemastylis floridana*   FACW
**poison sumac**   *Toxicodendron vernix*   FACW
**poisonwood**   *Metopium toxiferum*   FAC
**pond apple**   *Annona glabra*   OBL
**pondberry**   *Lindera melissaefolia*   OBL
**pondlily, yellow**   *Nuphar luteum*   OBL
**pondspice**   *Litsea aestivalis*   OBL
**pony-foot**   *Dichondra caroliniensis*   FAC
**popcorn tree**   *Sapium sebiferum*   FAC
**portia tree**   *Thespesia populnea*   FAC
**possum-haw**   *Viburnum nudum*   FACW
**potatotree**   *Solanum erianthum*   FACW
**prairie-gentian**   *Eustoma exaltatum*   FACW
**pride-of-Big-Pine**   *Strumpfia maritima*   FACW
**primrosewillow**   *Ludwigia* spp.   OBL
**privet, swamp**   *Forestiera acuminata*   FACW
**punk tree**   *Melaleuca quinquenervia*   FAC
**queen's-delight, marsh**   *Stillingia sylvatica var. tenuis*   FAC
**quillwort**   *Isoetes* spp.   OBL
**ragwort, golden**   *Senecio aureus*   OBL
**rainlily**   *Zephyranthes atamasco*   FACW
**raspberry**   *Rubus* spp.   FAC
**rattlebox; rattle-bush**   *Sesbania* spp.   FAC
**rattlesnake master**   *Eryngium yuccifolium*   FACW
**rayless golden-rod**   *Bigelowia nudata*   FACW
**redgal**   *Morinda royoc*   FACW
**redroot**   *Lachnanthes caroliniana*   FAC
**redstem**   *Ammannia* spp.   OBL
**rose myrtle, downy**   *Rhodomyrtus tomentosus*   FAC
**rose, swamp**   *Rosa palustris*   OBL
**rose-apple**   *Syzygium* spp.   FAC
**rose-gentian**   *Sabatia* spp.   FACW
**rose-gentian, Bartram's**   *Sabatia bartramii*   OBL
**rose-gentian, coast**   *Sabatia calycina*   OBL
**rose-gentian, large**   *Sabatia dodecandra*   OBL
**rosemallow**   *Hibiscus aculeatus*   FACW
**rosemallow, crimson-eyed**   *Hibiscus moscheutos*   OBL
**rosemallow, halberd-leaf**   *Hibiscus laevis*   OBL
**rosemallow, scarlet**   *Hibiscus coccineus*   OBL
**rosemallow, sea**   *Hibiscus tiliaceus*   FAC
**rosemallow, swamp**   *Hibiscus grandiflorus*   OBL
**rush**   *Juncus* spp.   OBL
**rush, grassleaf**   *Juncus marginatus*   FACW
**rush, path**   *Juncus tenuis*   FAC
**rush, shore**   *Juncus marginatus*   FACW
**rush-featherling**   *Pleea tenuifolia*   OBL
**rustweed**   *Polypremum procumbens*   FAC
**sachsia**   *Sachsia polycephala*   FACW
**saffron plum**   *Bumelia celastrina*   FAC

**saltbush**    *Baccharis halimifolia*    FAC
**saltbush, halberd-leaf**    *Atriplex patula*    FACW
**saltwort**    *Batis maritima*    OBL
**sandmat, spreading**    *Euphorbia humistrata*    FACW
**sandspurry, saltmarsh**    *Spergularia marina*    OBL
**sandwort, Godfrey's**    *Arenaria godfreyi*    FACW
**savory, Brown's**    *Micromeria brownei*    OBL
**sawgrass**    *Cladium* spp.    OBL
**scaly-stem, Carolina**    *Elytraria caroliniensis*    FAC
**scouring-rush**    *Equisetum hyemale*    FACW
**screwstem**    *Bartonia* spp.    FACW
**sea myrtle**    *Baccharis halimifolia*    FAC
**sea oxeye**    *Borrichia* spp.    OBL
**sea-blite**    *Suaeda* spp.    OBL
**sea-lavender**    *Limonium carolinianum*    OBL
**sea-purslane**    *Sesuvium* spp.    FACW
**seaside mahoe**    *Thespesia populnea*    FAC
**sebastian-bush, gulf**    *Sebastiana fruticosa*    FAC
**<u>SEDGES</u>**
**baldrush**    *Psilocarya* spp.    OBL
**beakrush**    *Rhynchospora* spp.    FACW
**beakrush, Chapman's**    *Rhynchospora chapmanii*    OBL
**beakrush, clustered**    *Rhynchospora cephalantha*    OBL
**beakrush, few-flower**    *Rhynchospora oligantha*    OBL
**beakrush, giant-fruited**    *Rhynchospora megalocarpa*    U
**beakrush, Gray's**    *Rhynchospora grayi*    U
**beakrush, Harper's**    *Rhynchospora harperi*    OBL
**beakrush, horned**    *Rhynchospora inundata*    OBL
**beakrush, large**    *Rhynchospora macra*    OBL
**beakrush, millet**    *Rhynchospora miliacea*    OBL
**beakrush, mingled**    *Rhynchospora mixta*    OBL
**beakrush, narrow**    *Rhynchospora stenophylla*    OBL
**beakrush, pinebarren**    *Rhynchospora intermedia*    U
**beakrush, short-bristle**    *Rhynchospora corniculata*    OBL
**beakrush, southern**    *Rhynchospora microcarpa*    OBL
**beakrush, spreading**    *Rhynchospora divergens*    OBL
**beakrush, swamp-forest**    *Rhynchospora decurrens*    OBL
**beakrush, Tracy's**    *Rhynchospora tracyi*    OBL
**black-sedge**    *Schoenus nigricans*    FACW
**bogrush, black**    *Schoenus nigricans*    FACW
**bulrush**    *Scirpus* spp.    OBL
**dwarf-bulrush**    *Hemicarpha* spp.    FACW
**fimbry**    *Fimbristylis* spp.    OBL
**fimbry, annual**    *Fimbristylis annua*    FACW
**fimbry, hairy**    *Fimbristylis puberula*    FACW
**flatsedge**    *Cyperus* spp.    FACW
**flatsedge, alternate-leaf**    *Cyperus alternifolius*    OBL
**flatsedge, Asian**    *Cyperus metzii*    FAC
**flatsedge, baldwin**    *Cyperus globulosus*    FAC
**flatsedge, bentawn**    *Cyperus reflexus*    U
**flatsedge, black**    *Cyperus huarmensis*    FAC
**flatsedge, coastal-plain**    *Cyperus cuspidatus*    FAC

81

    (This Appendix is not incorporated by reference; Effective Date_____)

**flatsedge, Drummond's**    *Cyperus drummondii*    OBL
**flatsedge, epiphytic**    *Cyperus lanceolatus*    OBL
**flatsedge, giant**    *Cyperus giganteus*    FAC
**flatsedge, globe**    *Cyperus ovularis*    U
**flatsedge, hammock**    *Cyperus tetragonus*    U
**flatsedge, jointed**    *Cyperus articulatus*    OBL
**flatsedge, marshland**    *Cyperus distinctus*    OBL
**flatsedge, papyrus**    *Cyperus papyrus*    OBL
**flatsedge, pinebarrenf**    *Cyperus retrorsus*    FAC
**flatsedge, purple**    *Cyperus rotundus*    FAC
**flatsedge, red-root**    *Cyperus erythrorhizos*    OBL
**flatsedge, rough**    *Cyperus retrofractus*    U
**flatsedge, sandhill**    *Cyperus filiculmis*    U
**flatsedge, sheathed**    *Cyperus haspan*    OBL
**flatsedge, variable**    *Cyperus difformis*    OBL
**flatsedge, woodrush**    *Cyperus entrerianus*    OBL
**flatsedge, yellow**    *Cyperus esculentus*    FAC
**flatspike rush**    *Abildgaardia ovata*    FACW
**fringe-rush**    *Fimbristylis* spp.    OBL
**fringe-rush, annual**    *Fimbristylis annua*    FACW
**fringe-rush, Vahl's**    *Fimbristylis puberula*    FACW
**halfchaff sedge**    *Lipocarpha* spp.    FACW
**hurricane-grass**    *Fimbristylis spathacea*    FAC
**nut-grass, purple**    *Cyperus rotundus*    FAC
**nut-grass, yellow**    *Cyperus esculentus*    FAC
**nutrush**    *Scleria* spp.    FACW
**sedge**    *Carex* spp.    FACW
**sedge, bearded**    *Carex comosa*    OBL
**sedge, bristly-stalk**    *Carex leptalea*    OBL
**sedge, cypress-knee**    *Carex decomposita*    OBL
**sedge, Elliott's**    *Carex elliottii*    OBL
**sedge, fringed**    *Carex crinita*    OBL
**sedge, hop**    *Carex lupulina*    OBL
**sedge, Howe's**    *Carex howei*    OBL
**sedge, large**    *Carex gigantea*    OBL
**sedge, long**    *Carex folliculata*    OBL
**sedge, Louisiana**    *Carex louisianica*    OBL
**sedge, prickly bog**    *Carex atlantica*    OBL
**sedge, raven-foot**    *Carex crus-corvi*    OBL
**sedge, shallow**    *Carex lurida*    OBL
**sedge, shoreline**    *Carex hyalinolepis*    OBL
**sedge, stalk-grain**    *Carex stipata*    OBL
**sedge, Walter's**    *Carex walteriana*    OBL
**spikerush**    *Eleocharis* spp.    OBL
**three-way sedge**    *Dulichium arundinaceum*    OBL
**umbrella-sedge**    *Fuirena* spp.    OBL
**white-top sedge, Everglades**    *Dichromena floridensis*    FACW
**white-top sedge, giant**    *Dichromena latifolia*    OBL
**white-top sedge, starbrush**    *Dichromena colorata*    FACW
**seedbox**    *Ludwigia* spp.    OBL
**seedbox, hairy**    *Ludwigia hirtella*    FACW
**seedbox, headed**    *Ludwigia suffruticosa*    FACW

82

    (This Appendix is not incorporated by reference; Effective Date_____)

**seedbox, savanna**    *Ludwigia virgata*   FACW
**seedbox, seaside**    *Ludwigia maritima*   FACW
**seepweed**    *Suaeda* spp.   OBL
**seven-sisters**    *Crinum americanum*   OBL
**shaggytuft**    *Stenandrium floridanum*   FACW
**she-oak**    *Casuarina* spp.   FAC
**shrimp plant**    *Justicia brandegeana*   U
**silver-bell**    *Halesia diptera*   FACW
**silverhead**    *Philoxerus vermicularis*   FACW
**silverling**    *Baccharis glomeruliflora*   FAC
**skullcap, blue**    *Scutellaria lateriflora*   OBL
**skullcap, Florida**    *Scutellaria floridana*   FAC
**skullcap, rough**    *Scutellaria integrifolia*   FAC
**skullcap, South American**    *Scutellaria racemosa*   OBL
**skyflower**    *Hydrolea* spp.   OBL
**slimpod, eastern**    *Amsonia tabernaemontana*   FACW
**slimpod, stiff**    *Amsonia rigida*   FACW
**smartweed**    *Polygonum* spp.   OBL
**smartweed, silversheath**    *Polygonum argyrocoleon*   U
**smooth chaff-flower**    *Alternanthera paronychioides*   FAC
**snakeherb, swamp**    *Dyschoriste humistrata*   FACW
**snakeroot, corn**    *Eryngium aquaticum*   OBL
**snakewood, Asian**    *Colubrina asiatica*   FAC
**sneezeweed**    *Helenium* spp.   FACW
**sneezeweed, pasture**    *Helenium amarum*   FAC
**snowbell**    *Styrax americana*   OBL
**snowberry**    *Chiococca* spp.   FAC
**spadeleaf**    *Centella asiatica*   FACW
**Spanish needles**    *Bidens bipinnata*   U
**spatterdock**    *Nuphar luteum*   OBL
**speedwell, water**    *Veronica anagallis-aquatica*   OBL
**sphagnum moss**    *Sphagnum* spp.   OBL
**spicebush, northern**    *Lindera benzoin*   FACW
**spicebush, southern**    *Lindera melissaefolia*   OBL
**spider-lily**    *Hymenocallis* spp.   OBL
**spiderwort, trailing**    *Tradescantia fluminensis*   FAC
**spike-moss, meadow**    *Selaginella apoda*   FACW
**spindle-root**    *Ludwigia hirtella*   FACW
**spoon flower**    *Peltandra* spp.   OBL
**spotflower, creeping**    *Spilanthes americana*   FACW
**sprangle-top**    *Leptochloa* spp.   FACW
**sprangle-top, tropic**    *Leptochloa virgata*   FAC
**spring-cress**    *Cardamine pensylvanica*   OBL
**spurge, Florida**    *Euphorbia inundata*   FACW
**spurge, many-leaved**    *Euphorbia polyphylla*   FACW
**squarestem**    *Melanthera nivea*   FACW
**St. Andrew's cross**    *Hypericum hypericoides*   FAC
**St. John's-wort**    *Hypericum* spp.   FACW
**St. John's-wort, Atlantic**    *Hypericum reductum*   U
**St. John's-wort, Carolina**    *Hypericum nitidum*   OBL
**St. John's-wort, Chapman's**    *Hypericum chapmanii*   OBL
**St. John's-wort, dotted**    *Hypericum punctatum*   U

83

**St. John's-wort, Drummond's**    *Hypericum drummondii*  U
**St. John's-wort, Edison's**    *Hypericum edisonianum*  OBL
**St. John's-wort, four-petal**    *Hypericum tetrapetalum*  FAC
**St. John's-wort, marsh**    *Triadenum* spp.  OBL
**St. John's-wort, peelbark**    *Hypericum fasciculatum*  OBL
**St. John's-wort, scrub**    *Hypericum cumulicola*  U
**St. John's-wort, shrubby**    *Hypericum prolificum*  U
**St. John's-wort, small-sepal**    *Hypericum microsepalum*  U
**St. John's-wort, smooth-bark**    *Hypericum lissophloeus*  OBL
**St. John's Susan**    *Rudbeckia nitida*  FACW
**staggerbush, piedmont**    *Lyonia mariana*  FACW
**stargrasses, yellow**    *Hypoxis* spp.  FACW
**stitchwort, Godfrey's**    *Arenaria godfreyi*  FACW
**Stoke's aster**    *Stokesia laevis*  FACW
**storax**    *Styrax americana*  OBL
**string-lily**    *Crinum americanum*  OBL
**stripeseed**    *Piriqueta caroliniana*  FAC
**sugar-berry**    *Celtis laevigata*  FACW
**sumpweed, bigleaf**    *Iva frutescens*  OBL
**sunbonnet**    *Chaptalia tomentosa*  FACW
**sundew, dwarf**    *Drosera brevifolia*  FACW
**sundew, Gulf coast**    *Drosera tracyi*  OBL
**sundew, pink**    *Drosera capillaris*  FACW
**sundew, spoon-leaf**    *Drosera intermedia*  OBL
**sundew, thread-leaf**    *Drosera filiformis*  OBL
**sunflower, Florida**    *Helianthus floridanus*  FAC
**sunflower, lakeside**    *Helianthus carnosus*  FACW
**sunflower, muck**    *Helianthus simulans*  FACW
**sunflower, southeastern**    *Helianthus agrestis*  FACW
**sunflower, swamp**    *Helianthus angustifolius*  FACW
**sunflower, wetland**    *Helianthus heterophyllus*  FACW
**sunny bells, white**    *Schoenolirion elliottii*  FACW
**sunny bells, yellow**    *Schoenolirion croceum*  FACW
**swamp-lily, southern**    *Crinum americanum*  OBL
**swamp-loosestrife**    *Decodon verticillatus*  OBL
**swampprivet, eastern**    *Forestiera acuminata*  FACW
**swampprivet, Florida**    *Forestiera segregata*  FAC
**swampweed**    *Hygrophila* spp.  OBL
**sweet broom**    *Scoparia dulcis*  FAC
**sweet pepper bush**    *Clethra alnifolia*  FACW
**sweetbay**    *Magnolia virginiana var. australis*  OBL
**sweetgum**    *Liquidambar styraciflua*  FACW
**sycamore, American**    *Platanus occidentalis*  FACW
**tallow-tree, Chinese**    *Sapium sebiferum*  FAC
**thistle, Leconte's**    *Cirsium lecontei*  FACW
**thistle, Nuttall's**    *Cirsium nuttallii*  FACW
**thistle, swamp**    *Cirsium muticum*  OBL
**thoroughwort, marsh**    *Eupatorium leptophyllum*  OBL
**thoroughwort, semaphore**    *Eupatorium mikanioides*  FACW
**thoroughwort, white-bract**    *Eupatorium leucolepis*  FACW
**thoroughworts**    *Eupatorium* spp.  FAC
**tickseed, ciliate-leaf**    *Coreopsis integrifolia*  FACW

84

    (This Appendix is not incorporated by reference; Effective Date_____)

**tickseed, Florida**    *Coreopsis floridana*    FACW
**tickseed, Georgia**    *Coreopsis nudata*    OBL
**tickseed, Leavenworth's**    *Coreopsis leavenworthii*    FACW
**tickseed, sickle**    *Coreopsis falcata*    FACW
**tickseed, southeastern**    *Coreopsis gladiata*    FACW
**tickseed, tall**    *Coreopsis tripteris*    FAC
**tickseed, Texas**    *Coreopsis linifolia*    FACW
**titi, black**    *Cliftonia monophylla*    FACW
**titi, swamp**    *Cyrilla racemiflora*    FAC
**toothcup**    *Ammannia* spp.    OBL
**toothcup**    *Rotala ramosior*    OBL
**torchwood, black**    *Erithalis fruticosa*    FAC
**touch-me-not, spotted**    *Impatiens capensis*    OBL
**trema**    *Trema* spp.    FAC
**tulip tree**    *Liriodendron tulipifera*    FACW
**tupelo, ogeechee**    *Nyssa ogeche*    OBL
**tupelo, swamp**    *Nyssa sylvatica var. biflora*    OBL
**tupelo, water**    *Nyssa aquatica*    OBL
**turtleweed**    *Batis maritima*    OBL
**twinflower, swamp**    *Dyschoriste humistrata*    FACW
**vanillaleaf; vanilla plant**    *Carphephorus odoratissimus*    FAC
**Venus' flytrap**    *Dionaea muscipula*    FACW
**vervain, sandpaper**    *Verbena scabra*    FACW
**vetch, Florida**    *Vicia floridana*    FACW
**vetch, four-leaf**    *Vicia acutifolia*    FACW
**vetch, Ocala**    *Vicia ocalensis*    OBL
**viburnum, possum-haw**    *Viburnum nudum*    FACW
**viburnum, walter**    *Viburnum obovatum*    FACW
**violet, edible**    *Viola esculenta*    FACW
**violet, lance-leaf**    *Viola lanceolata*    OBL
**violet, Leconte's**    *Viola affinis*    FACW
**violet, primrose-leaf**    *Viola primulifolia*    FACW
**Virginia willow**    *Itea virginica*    OBL
**water drop-wort**    *Oxypolis* spp.    OBL
**water snowflake**    *Nymphoides* spp.    OBL
**water-cress**    *Nasturtium* spp.    OBL
**water-elm**    *Planera aquatica*    OBL
**water-hemlock**    *Cicuta* spp.    OBL
**water-hoarhound**    *Lycopus* spp.    OBL
**water-hyssop**    *Bacopa* spp.    OBL
**water-lily**    *Nymphaea* spp.    OBL
**water-locust**    *Gleditsia aquatica*    OBL
**water-lotus**    *Nelumbo* spp.    OBL
**water-meal**    *Websteria confervoides*    OBL
**water-parsnip**    *Sium suave*    OBL
**water-plantain, subcordate**    *Alisma subcordatum*    OBL
**waterpod**    *Hydrolea* spp.    OBL
**water-poppy**    *Hydrocleis nymphoides*    OBL
**water-primrose**    *Ludwigia* spp.    OBL
**water-starwort**    *Callitriche* spp.    OBL
**water-willow**    *Justicia* spp.    OBL
**wax myrtle**    *Myrica cerifera*    FAC

**waxweed, Columbia**    *Cuphea carthagenensis*   FAC
**waxweed, common**    *Cuphea aspera*   FACW
**wedgescale, swamp**    *Sphenopholis pensylvanica*   OBL
**white-cedar, Atlantic**    *Chamaecyparis thyoides*   OBL
**whitenymph**    *Trepocarpus aethusae*   FACW
**wild coffee**    *Psychotria* spp.   FAC
**wild corndog**    *Typha* spp.   OBL
**wild dilly**    *Manilkara bahamensis*   FAC
**wild petunia**    *Ruellia caroliniensis*   FAC
**wild taro**    *Colocasia esculenta*   OBL
**wild-petunia, Britton's**    *Ruellia brittoniana*   FAC
**wild-petunia, night-flowering**    *Ruellia noctiflora*   FACW
**willow**    *Salix* spp.   OBL
**winterberry**    *Ilex verticillata*   OBL
**witch-alder, dwarf**    *Fothergilla gardenii*   FACW
**wood-nettle, Canada**    *Laportea canadensis*   FACW
**wood-sage**    *Teucrium canadense*   FACW
**woolly-berry**    *Gaylussacia mosieri*   FACW
**yellow stargrasses**    *Hypoxis* spp.   FACW
**yellow-cress**    *Rorippa* spp.   OBL
**yellow-eyed grass**    *Xyris* spp.   OBL
**yellow-eyed-grass, Carolina**    *Xyris caroliniana*   FACW
**yellow-eyed-grass, Richard's**    *Xyris jupicai*   FACW
**yellow-poplar**    *Liriodendron tulipifera*   FACW
**yellow-root, shrubby**    *Xanthorhiza simplicissima*   FACW
**yellowtop, clustered**    *Flaveria trinervia*   FAC
**yellowtop, coastalplain**    *Flaveria bidentis*   FAC
**yellowtop, Florida**    *Flaveria floridana*   FACW
**yellowtop, narrowleaf**    *Flaveria linearis*   FACW
**yerba de Tajo**    *Eclipta alba*   FACW

A.H. Volume I, Appendix J                    (This Appendix is not incorporated by reference; Effective Date_____)

**Recommended 5-Step Field Wetland Delineation Procedure**

1. Identify the indisputable wetland area and the indisputable upland area.
2. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where the <u>vegetation</u> meets A or B test criteria.
3. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where hydrologic indicators are present.
4. Between the vegetation test boundary and the hydrologic indicator boundary, identify the most landward hydric soil boundary.
5. Applying the wetland definition and reasonable scientific judgment, evaluate and modify if necessary the most landward boundary of the wetland based on the A, B, C, or D tests delineated by the previous steps.

**Required Equipment for the Implementation of Chapter 62-340, F.A.C.**

Sharpshooter Shovel (minimum soil examination of 20 inch+)
Munsell Soil Color Charts
Hand Lens (10x-15x)
Soil survey map for inspection area
Soil knife
Spray bottle (misting)
Tape measure

**Suggested Equipment for the Implementation of Chapter 62-340, F.A.C.**

FDEP Data Form Guide
FDEP Chapter 62-340, F.A.C. Data Form
Appropriate plant identification manuals
Appropriate soil information documents
A copy of Chapter 62-340, F.A.C.
Florida Wetlands Delineation Manual
Compass
Camera with extra batteries
Towel
Pens and pencils
Permanent Markers – two colors preferably
GPS Units
Flagging tape
Pin flags
4-foot level
First Aid
Sunscreen
Insect Repellent
Plant presses
Auger
Waterproof equipment case

(This Appendix is not incorporated by reference; Effective Date_____)

## Chapter 62-340, F.A.C. Data Form Instructions

**Introduction**

The purpose of the Chapter 62-340, F.A.C. Data Form (hereafter Form) is to record relevant information at a specific point to demonstrate whether the point is a wetland, a non-wetland surface water, or an upland according to the methodology set forth in Ch. 62-340, F.A.C. The Form is intended to be filled out after the field evaluator has made a determination.

Any time a regulatory agency concludes that an area is a non-wetland surface water, wetland, or upland at least one data point should be documented, i.e., once a conclusion informally or formally has been made by the regulatory agency at least one complete data form supporting that conclusion is required.

The number of data forms required will depend on the size and variability of the site inspection area. There is no size threshold or maximum number of data forms required for an inspection site. Reasonable scientific judgement should be used to determine the number of required data forms on a case by case basis.

(a)       For the delineation of the landward extent of wetlands and other surface waters, at least one delineation data point along the boundary shall be verified and documented by the regulatory agency during the visual site inspection pursuant to Chapter 62-340.100(1) F.A.C. Documentation of a delineation data point shall include two data forms; one representative of the waterward area adjacent to the data point, the other representative of the landward or upland area adjacent to the data point. The two complete data forms at a delineation data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340 F.A.C. and changes in evidence used to determine the boundary delineation at that point.

A delineation data point will be documented for each homogeneous boundary within the site inspection area. If all delineation boundaries on site are homogenous in character, one data point is sufficient for documentation. One delineation data point representative of homogeneous boundaries found in other locations throughout the site is sufficient for documentation.

For purposes of the delineation data point, "homogeneous boundary" means all or part of a site delineation that is sufficiently similar in current condition to be delineated determine the landward extent of wetlands and other surface waters with a particular "test(s)" or interpretation of evidence as contemplated in Chapter 62-340 F.A.C. Characteristics that distinguish homogeneous boundaries may include, but are not limited to:

1.       plant community type,
2.       surface water type,
3.       hydrologic indicators,
4.       soils,
5.       alterations to plants, hydrology, or soils,
6.       hydrologic isolation or connection to waters of the State, or
7.       other current condition expression which separate it from other boundaries on site.

(b)    For identification or conclusions regarding the absence or presence of a non-wetland surface water, wetland, or upland classification by the regulatory agency within the site inspection area, at least one data form within homogeneous areas of classification shall be verified and documented by the regulatory agency during the visual site inspection pursuant to Chapter 62-340.100(1) F.A.C.

Documentation of an identification data point shall include one data form representative of the area of classification. The data form at an identification data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340 F.A.C. and evidence used to determine the upland, wetland, or non-wetland surface water classification.

An identification data point will be documented for each homogeneous area within the site inspection area. If all areas on site are homogenous in character, one data point is sufficient for documentation. One data point representative of homogeneous areas found in other locations throughout the site is sufficient for documentation.

For purposes of the identification data point, "homogeneous area" means all or part of a site inspection area that is sufficiently similar in current condition to classify with a particular "test(s)" or interpretation of evidence as contemplated in Chapter 62-340 F.A.C. Characteristics that distinguish a homogeneous area may include, but are not limited to:

1.    upland classification,
2.    wetland classification,
3.    non-wetland surface water classification,
4.    hydrologic isolation or connection to waters of the State,
5.    plant community type,
6.    surface water type,
7.    hydrologic indicators,
8.    soils,
9.    alterations to plants, hydrology, or soils, or
10.    other current condition expression which separate it from other areas on site.

This instructional document provides explanations of each question in the Form and guidance on how to answer them. Numbered (and lettered) bullet points, as well as anything denoted by "#" in this document refer directly to the corresponding question with that number in the Form. Citations from Chapter 62-340, F.A.C. (hereafter 62-340) and associated references are given to show where questions are drawn from and provide further clarity. For any question on the Form that requires an open-ended explanation that will not fit in the space provided, write "See note [#]" and continue the explanation with its identifying number in the "Notes" section at the end.

**Site Information**
1.    The date on which the field data were collected on site. If the data were collected over multiple days, select the earliest date and note the other collection dates in the Notes section.
2.    The staff that were present on site at the time of data collection, denoted at minimum by first initial and last name.

3.  The initials of the staff member(s) that recorded data on this Form. A space for initials is provided in later sections to document the "plant recorder" and "soil describer" if completed by multiple parties.

4.  The county in which the point being described lies.

5.  The name of the larger site within which a point is being described (*e.g.*, a project name or parcel owner's name). If a tracking number exists (*e.g.*, from PA) include this as well.

6.  A unique name to identify the specific point being described (*e.g.,* the delineation flag number closest to the point or a unique combination of letters and numbers). It is also recommended to take a GPS reading if possible and record the coordinates here. Write this identifier at the top of each of the other sheets in the Form in the box labeled "Point ID/Location". This will identify the sheets in case they get separated.

7.  If the location of the described point is not going to be surveyed, attempt to locate at least 2, but preferably 3 or more stationary objects nearby that are easily identifiable and expected to remain in their fixed location indefinitely, such as utility poles, survey markers, road intersections, corners of buildings, etc. Standing at each object, record the compass bearing and the distance to the described point. This will allow triangulation to the point's location in the future.

8.  The legal condition of the site.
    - If the point is unaltered or if all alterations at the point are exempt, authorized, permitted, or grandfathered select "Authorized or legal condition".
    - If any unauthorized alterations have occurred at the point, select "Unauthorized or illegal condition".

9.  The type of evaluation being performed on site.
    - If only the presence or absence of a wetland or other surface water is being determined, select "Identification."
    - If a boundary between a wetland or other surface water and an upland is being marked, select "Delineation".

    Then select whether the point being described is in a wetland, a non-wetland surface water, or an upland. If the point lies within both a wetland and another type of surface water, select "Wetland".

    ➢ ***For identifications, the data form should characterize the entire homogenous area being identified, whereas for delineations, the data forms should characterize the change on either side of the boundary at a specific point.***

**Vegetation**

10. Appropriate vegetative stratum: 62-340.400
    - The Rule defines 3 plant strata (Canopy, Subcanopy, and Groundcover) in 62-340.200
    - If vegetation is absent from the area, select "Vegetation Absent at Point" and skip to #14. Otherwise, select one stratum using the guidelines in 62-340.400, F.A.C.
    - The top stratum shall be used unless either:
      o The top stratum constitutes less than 10% areal extent, in which case the next lower stratum shall be used, as long as that stratum constitutes 10% areal extent or is the groundcover stratum. OR
      o The top stratum is not indicative of hydrologic conditions on site, in which case the stratum most indicative of hydrologic conditions shall be used. Either

subcanopy or ground cover may be selected depending on which is most indicative of hydrologic conditions.

> ***Facultative plants shall not be considered in the determination of areal extent or appropriateness of strata.***

> ***All evidence shall be considered when shifting to a lower stratum (e.g. number or wetland species compared to upland species, landform, plant community type, regional specificity); the statuses of plant(s) in a lower stratum are not by themselves sufficient evidence to shift strata.***

- Explain why the stratum was selected. "Normal expression" may be sufficient when the top stratum is used. Additional explanations may include: selective clearing of only wetland or upland tree species; planting of only upland or wetland species; recruitment of invasive exotic species.

11. Plant List 62-340.200(2),(6),(16), 62-340.400, 62-340.450

- Select an evaluation area for the plant community.
  - The area should be just large enough to capture the species diversity and abundance of the plant community at the described point.
  - The area should not extend into different hydrologic conditions or adjacent plant communities – this may dictate the shape of the area.
- Record the scientific name of each plant species in the evaluation area in the "Binomial of Observed Species" column.
  - Nomenclature from 62-340.450 must be used, regardless of taxonomic changes.
  - Record all plants in all three strata. Use one line per species.
  - Recorded plants must have their main stem rooted within the evaluation area.
- Record the 62-340.450 status (Upland, Facultative, Facultative Wet, or Obligate) in the "Status" column.
  - Select one of the following status abbreviations: U, F, FW, or O.
  - > ***Exotic species that naturalized on or after July 1, 1994 are considered Facultative. Otherwise, all species were given a status, so those naturalized prior to July 1, 1994 but not listed in 62-340.450 are Upland.***
  - > ***If desired for land management or mitigation assessment purposes, names and percentages of vines and aquatic plants may be included within the notes section but not in section 11.***
- For each listed species, record its percent areal extent in the Canopy, Subcanopy, and Groundcover strata (defined in 62-340.200) in the appropriately named columns.
  - See "Tips for Determining Areal Extent of Plants" In the "Chapter 62-340, F.A.C. Data Form Guide" (hereafter "Guide") for guidance.
  - For species not fully leafed out, evaluate areal extent as it would be when fully leafed out. Do not evaluate dead plants nor attempt to predict plants that would be present under different circumstances. This plant list reflects the conditions on the day of the evaluation, as is. If needed, past or predicted (e.g. when no vegetation is present) plant lists should be documented in the notes section.
- Refer to the stratum selected in #10. Use the numbers only from the column of the selected stratum. For each species in the selected stratum, transfer the areal

extent from the selected stratum column to the status column (Upland, Facultative, Fac. Wet, or Obligate) that corresponds to that species.

- Use the boxes at the bottom right of the table to total the areal extents in the Upland, Facultative, Fac. Wet, and Obligate columns.

12. A Test vegetation: 62-340.300(2)(a)

- For percent Obligate and percent Upland transfer the percent areal extent total from the Obligate and Upland columns in #11.
- Evaluate whether the total areal extent of Obligate plants is greater than that of Upland plants. If they are equal, select "No".

13. B Test vegetation: 62-340.300(2)(b)

- Add the totals from the Obligate and Fac. Wet columns in #11 to determine their combined value.
- Add the total from the Upland column in #11 to the Obligate and Fac. Wet total to determine their combined value.
- Divide the first result by the second result and multiply by 100 to obtain the percent of Obligate and Fac. Wet plants in relation to all plants, excluding Facultative.

📷 Vegetative Photo Tips:

- Document unknown plants by photographing features used in identification.
- Take plant community shots in each of the four cardinal directions (North, South, East, and West) at the described point. Plant community shots should include enough detail to identify species in the canopy, subcanopy, and ground cover. Additional shots may include canopy, subcanopy, or groundcover areal extents.

**Soils**

14. Indicate the Land Resource Region or, if necessary, the Major Land Resource Area where the described point is located.

- The Land Resource Regions can be determined in two NRCS publications "Field Indicators of Hydric Soils in the United States" (hereafter "NRCS FIHSUS") or "Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin".
- There are two hydric soil field indicators (S12 & F22) which require a specific Major Land Resource Area. The Major Land Resource Areas can be determined in the NRCS publication "Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin".

15. Determine if it is possible to examine and describe a soil profile.

- If it is possible to examine and describe any depth of soil, whether the soil is naturally or artificially occurring in that environment, select "Yes".
- If it is not possible to examine the soil due to it being in an inaccessible area, under water, composed of rock or a cemented layer, no soil present, etc.; select "No", explain why, and skip to #18.

16. Describe the soil profile.

- Determine the different horizons (i.e. layers) of the soil profile. Horizon is defined in the glossary of NRCS FIHSUS. NRCS horizon designations (*e.g.*, O, A, E) are not necessary nor recommended for Chapter 62-340, F.A.C. soil profile descriptions.

➢ ***Soil material is defined in "Keys to Soil Taxonomy" as both mineral material less than 2 mm in diameter and decomposing organic material that is less than 20 mm in its smallest dimension. All material not meeting these requirements is considered nonsoil. Fragmental soil material (defined in the glossary of NRCS FIHSUS) should be treated as soil in the profile description and noted as fragmental in the notes column.***

- Determine the beginning and ending depth in inches for each horizon.
  - o  The 0-inch depth is the soil surface, which is the muck or mineral surface (whether natural or fill) according to "Soil and Water Relationships of Florida's Ecological Communities".
  - o  If peat, mucky peat, or a nonsoil with an accessible soil underneath exists on top of the muck or mineral surface, the beginning depth will begin with a '+' and the number of inches above the muck (e.g.+3 -0) or mineral surface the horizon starts.

- Determine the Matrix hue, value, and chroma for each horizon.
  - o  Matrix is defined in the glossary of NRCS FIHSUS.
  - ➢ ***The Matrix color should be determined in moist condition using a "Munsell Soil Color" book without sunglasses and ideally with normal sunlight (e.g. not early in the morning, late in the day, or under smoky conditions). With practice, compensation can be made for the differences unless the light is so subdued that the distinctions between colors chips are not apparent.***
  - o  For nonsoil horizons, write N/A.

- Determine the Matrix texture for each horizon.
  - o  Recommended Matrix textures are peat, mucky peat, muck, mucky mineral, marl (as defined in glossary and described in the Introduction of NRCS FIHSUS), sand, and fine (defined below). See the Guide for "Field Determination of Soil Indicator Texture" and "Tips for Determining Texture of Soil materials with High Organic Content".
  - o  Sand refers to USDA textures of loamy fine sand and coarser.
  - o  Fine refers to USDA textures of loamy very fine sand and finer.
  - o  "Mucky" as in mucky peat or mucky mineral is a texture modifier and does not constitute the presence of muck.  See "NRCS FIHSUS" for definition of muck, mucky modified mineral soil material, and mucky peat.
  - o  For nonsoil horizons, write N/A.

- Determine the percentage of sand in the Matrix masked with organic material.
  - ➢ ***Determinations are conducted with a 10x or 15x hand lens. See "Estimating Percent Organic Carbon" in the Guide. A hand lens is strongly recommended for consistency and legal challenges, in lieu of the naked eye, due to:***
    - ▪ ***No NRCS guidance for distance of the observer from the soil being assessed (i.e. 6 inches or 6 feet),***
    - ▪ ***No NRCS guidance for the lighting conditions under which the soil is being assessed (i.e. shade or full sun),***
    - ▪ ***No NRCS percentage definition for "particles appear to be close to 100% masked" (i.e. 99% or 85%)***

- ▪ ***No NRCS guidance regarding vision requirements of the observer estimating organic coating percentages (i.e. 20/20 or 20/15 vision).***
  - o For Matrix values ≤ 3 in only sandy matrix soil layers, estimate percent organic coatings of the sand.
  - o While sand may be visible within the horizon, the sand is not the matrix for textures of peat, mucky peat, muck, or mucky mineral layers, therefore, percent organic coating is not required to determine hydric soil status. Likewise, mucky mineral sand will not contain less than 70% organic coating and therefore, also does not require organic coating estimates to determine hydric soil status.
  - o If the Matrix has a value higher than 3, write N/A, as these colors are unlikely to approach 70% or more organic coating in sandy matrix soils.
- Describe any soil features contained within the horizon and record any other relevant notes. There may be more than one of each type of feature within a horizon. If no features are present in the horizon, write "None".
  - o DAs are areas darker than the Matrix's color. LAs are areas lighter than the Matrix's color. These are larger characteristics of the horizon and not micro-characteristics such as: sparsely dispersed value differences between single grains of sand, finely dispersed value differences between single grains of sand giving a salt and pepper appearance, or inclusions of shell fragments. For DA and LA areas record in moist condition the hue, value, and chroma; percent volume in the layer; the boundary (sharp, clear, diffuse; defined in the glossary of NRCS FIHSUS); and the shape (rounded, linear, angular; see "Tips for Determining Shapes of Features in Soil" in the Guide). Percent organic coating of sand is not required for DAs and LAs.
  - o RCs are redox concentrations, which are defined in the glossary of NRCS FIHSUS. For these areas record in moist condition the hue, value, and chroma; percent volume in the layer; the boundary (sharp, clear, diffuse); and the shape (rounded, linear, angular).
  - o OBs are organic bodies. Organic bodies must have a muck or mucky mineral texture. There are no size requirements for OBs, but generally 1- 3 cm in diameter. For OBs record the texture and the percent volume in the horizon. Percent organic coating of sand is not required for OBs.
  - o Features generally must have a percent volume less than the Matrix's percent volume for each horizon, and the sum of the Matrix's and all features' volumes in a horizon must equal 100%. One exception may be a high percentage of redox concentrations making the matrix of the layer appear to be a high chroma matrix when in fact these are hydric soil features occurring in a lower chroma matrix.  Another exception may be a horizon with abundant organic bodies of muck or mucky mineral texture within a sandy matrix. The matrix is not muck or mucky mineral, the matrix is sandy with many and numerous hydric soil indicators in the form of organic bodies.
  - o Note if the horizon has been nonhydrologically physically mixed (PM) to the extent that the disturbance is a dominant characteristic of the horizon or is precluding reliable identification of hydric soil field indicators.
  - o Note if the horizon is nonsoil and describe the type of material.

- o Note if the horizon is fill, as defined in 62-330, F.A.C.
- o Note if the fill material has blended in with natural soil material or developed contemporary hydric soil features (i.e. not imported within the fill material).
- o Describe any significant features (DAs, LAs, RCs, OBs), inclusions (features that are not the same soil texture as the Matrix), or nonsoil materials within the fill horizon.

17. Check off which Hydric Soil Field Indicators are present, if any, and specify their beginning and ending depths.

- Hydric soil field indicator requirements may be found in <u>NRCS FIHSUS</u>. See the <u>Guide</u> for a "Hydric Soil Field Indicators Simplified Checklist".
- A hydric soil field indicator is only met and should only be selected if all the required characteristics, including depth, are documented within the soil profile description.
- If hydric soil field indicators are combined, both indicators must be checked and documented (see example below).

> ***NRCS periodically updates <u>FIHSUS</u> so check for additional hydric soil field indicators within the appropriate LRR or MLRA. If an indicator is met which is not included within the list in #17, identify the indicator and its beginning and ending depths.***

> ***National Technical Committee for Hydric Soils Technical Note 4 explains how to combine certain indicators to satisfy their unmet thickness requirements.***

*Documentation Example:*

| Indicator Present | Begin Depth | End Depth |
|---|---|---|
| 1. S5/F3 ▾ | 5 | 14+ |

18. Determine if there is any nonsoil at or within 12 inches of the ground surface.

- Is there an impenetrable layer at the soil surface or within 12 inches of the soil surface, if so, select "yes."
- If the entire upper 12 inches is composed of soil material, select "no".
- If it is impossible to examine the soil profile due to it being in an inaccessible area, underwater, physically mixed, hydrologically mixed, or otherwise disturbed, such that hydric soil field indicators cannot express or be reliably identified, select "Indeterminable".

19. Determine the hydric status of the soil.

- If one or more of the hydric soil field indicators in #17 are checked, select "Hydric".
- Select "Hydric" if the soil is in a reliable condition and meets the definition of hydric soil in 62-340.200(8). This definition may be met without a hydric soil field indicator being present. See Notes above "Field Identification of Hydric Soils," as well as the "Hydric Soil Technical Standard (HSTS)" in the Guide.
- Select "Non-hydric" if the soil is in a reliable condition and no hydric soil field indicators are checked in #17 or if the definition of hydric soil in 62-340.200(8) is not met.

- Select "Inconclusive" if the soil profile is in an unreliable condition (i.e. disturbed/mixed soil, insufficient evaluation depth due to presence of nonsoil or standing water, lack of site access, etc.) and hydric status cannot be evaluated.
- Explain the reason for the hydric status selected. "See #17" may be sufficient if the soil was hydric due to one or more hydric soil field indicators being checked.

20. Note whether the depth of the soil profile is 20 inches or greater from the soil surface according to <u>Soil and Water Relationships of Florida's Ecological Communities</u>. If the profile is less than 20 inches from the soil surface explain why. Explanation options are not limited to the examples provided in the Data Form.

   ➢ **Length of shovel is not an appropriate limitation of profile depth**.

21. Determine the height or depth of the observed standing water from the soil surface.

- Select whether the water level is above the soil surface or below (in the soil pit). If the water table is below, ideally, wait enough time for the water table to stabilize before taking a measurement. Alternatively, estimate depth to water table from observed lateral side wall intrusion of water.
- If no standing water is observed or no lateral water intrusion is observed in the soil pit, select "Not Observed" and leave the space provided for the measurement blank.

📷 Soil Profile Photo Tips:

- Each soil photo should be taken in either full sun or full shade, in a moist condition, cleaned (with all smearing removed and no shovel slices within the profile), preferably as a flat trench-cut 16-20 inch profile instead of a conical spoil plug. Ensure the soil profile has not been crushed, compacted, contains shovel cuts through the profile, or otherwise altered during the process of removing the profile.
- Soil Profile ID photograph-
  - Demarcate each horizon (i.e. layer) by scoring the soil profile surface so the depths of each layer are easily identifiable within the photo.
  - Take a photo of the entire soil profile with scale (i.e. measuring tape at soil surface). Angle of photo should be 90° to the profile face. Include the 62-340 Data Form sheet with box 1-9 visible within the photo to document point ID location information.
  - Ensure the background does not visually interfere with the edges of the soil profile being photographed. Interferences such as side cast material from cleaning, backgrounds of similar color and texture, etc. make distinction of colors and patterns difficult.
  - ➢ **If a peat or mucky peat layers are present two profile ID photographs will be necessary. The first photo shall document the entire length of the profile with the measuring tape or scale device beginning at the top including any peat or mucky peat layer(s). The second photo will show the tape measure or scale device beginning at the muck or mineral surface (i.e. 0 inches) and shall be used for purposes of describing the profile.**
- Soil Profile
  - Follow the same procedures in the Soil profile ID above, but remove the Data form, and frame the photo as close to the soil profile as possible while including all layers.
- Soil horizon

- o Take photos of each horizon pointing out any distinguishing features (DAs, LAs, OBs, RCs) with scale. Take close-ups of
- Cross sections (soil horizon/critical depth)
  - o Cross section the middle of each individual soil horizon, horizontally, taking photos of any distinguishing features or characteristics (DAs, LAs, OBs, RCs) with scale.
  - o When needed, cross section photos at the 6 inch depth (for sandy soils) or other critical depth for meeting a hydric soil field indicator should be taken. If hydric soil field indicator(s) begin(s) at the soil surface photograph the surface of the soil profile close-up.
- Other Hydric Soil Characteristics or Features
  - o Photograph characteristics used in determining hydric condition of soils (e.g. muck smeared fingers, results of fiber rub test, color of decant test water, etc.)
  - o Photograph any inclusions of shell, charcoal, fill material, texture, or other lithologic discontinuities, etc.
- Photograph the water table
  - o Photograph if the water level is above the soil surface or below (in the soil pit). If the water table is below, ideally, wait enough time for the water table to stabilize before taking a measurement and photographing. Alternatively, estimate depth to water table from observed lateral sidewall intrusion of water and photograph the evidence of intrusion, pointing out the lateral sidewall seepage.

**Hydrology**

22. Hydrologic indicators 62-340.500
  - ➢ Investigate the area immediately around the described point (no further than the area used to evaluate the plant community) for each of the 13 listed Hydrologic Indicators.
    - o For any indicator present and representative of normal wet season or high water hydrology, check the corresponding box in the "Present at or near…" column
    - o For any indicator present that is not representative of normal wet season or high water hydrology, e.g. resulting from rare or aberrant events, check the corresponding box in the "Present but not reflective…" column.
  - ➢ ***For identifications, the data form should characterize the entire homogenous area being identified and all hydrologic indicators, whereas for delineations, the data forms should characterize the change on either side of the boundary at a specific point.***
  - ➢ If the site investigation is being performed during the dry season or a drought, or if it is believed that a Hydrologic Indicator that is currently absent would be present during normal wet season or high water conditions, check the corresponding box in the "Predicted…" column.
  - ➢ If the described point is the waterward area adjacent to the data point side of the delineation boundary, investigate the area within 100 feet waterward of the point for each of the 13 listed Hydrologic Indicators.
    - o For any indicator present within the 100 ft area, check the corresponding box in the "Within 100 ft…" column.

- o These indicators are **not** considered for purposes of meeting the A, B, or D Tests at the data point, but offer details of the larger landscape context of the point.
- ➢ For any checked indicators, provide all relevant supporting information in the corresponding box in the last column.
    - o For any indicator that expresses in different forms (aquatic moss, aquatic plants, rafted debris, aquatic fauna, hydrologic data, morphological plant adaptations, tussocks or hummocks) describe the indicator type and the species on which it expresses (e.g., *Lemna sp.,* crayfish chimneys, A8 Muck Presence, adventitious roots on *Hypericum spp.,* tussocked *Andropogon*).
    - o For any indicator within 100 ft of the point (checked in the "Within 100 ft…" column), record its approximate distance and compass direction from the point along with the name of the species on which it expresses.
    - o For any indicator that reflects a water elevation (algal mats, aquatic mosses, aquatic plants, or rafted debris deposited on surfaces; elevated lichen lines, hydrologic data, adventitious roots as morphological plant adaptations, tussocks or hummocks, water marks) measure its height from the ground and record the measurement and the species name of the species on which it expresses.
    - o If the "Present but not reflective…" box is checked for any indicator, explain why it is not reflective of normal hydrology.
- ➢ To determine the estimated Seasonal High Water at the point, review the recorded indicators present at the point for any that reflected a water elevation, including any indicators of inundation at or above the soil surface.
    - o If the described point is within an Upland select "N/A".
    - o If there are no indicators that reflect a water elevation, select "No water level indicators".
    - o If any indicators reflect an inundation water elevation, determine the highest elevation from either the ground surface (begins at the peat, mucky peat, muck, or mineral surface) or soil surface (begins at the muck or mineral surface).
        - If the ground and soil surface are the same at the described point, record the highest water elevation as is and select "Above soil surface".
        - If there is a difference between ground and soil surface or if the soil surface elevation is unknown, record the highest water elevation as is and select "Above ground surface".
        - If indicators reflect inundation without reflecting a specific elevation (e.g. algal mats on the ground), record the Seasonal High Water as 0 and select "Above ground surface" or "Above soil surface" using the above guidelines.
23. If any of the 13 listed Hydrologic Indicators were checked in the "Present at or very near…" or "Predicted…" columns, select "Yes", otherwise, select "No".

📷 Hydrologic Indicator Photo Tips:
- Take photos documenting the observed hydrologic indicators.
    - o Include a visible scale such as a measuring tape or ruler. Use a level pointer (e.g. soil knife, stick, finger) to help visually identify height of feature.

- Hold the camera level to the height of the indicator so the photo accurately depicts the height of the measured indicator.
- Photos depicting water level indicators consistently on several specimens are also recommended, if available.

**Criteria Tests**

24. Delineation by Wetland Definition §62-340.300(1),
    a) Determine if a wetland delineation resulting in a wetland boundary has been performed.
       - If the "Work Type" selected in #9 is "Delineation" and the Data Form is describing a point on either side of a wetland boundary, select "Yes".
       - If the "Work Type" selected in #9 is "Identification" or if the delineated line is a non-wetland surface water boundary, select "No" and skip to #25.
    b) Determine if the wetland boundary could be easily delineated using the definition of wetlands.
       - If the boundary could be easily delineated by the individual evaluator by following a clear break in the vegetative community, topographic elevations, landform type, regional or site specific hydrologic indicators or soil changes, etc., indicative of a frequency and duration of inundation or saturation sufficient to support the wetland definition, select "Yes".
       - If the boundary could not be easily located in this manner and more in-depth inspection was necessary, select "No".

25. A & B Test Wetland Criteria §62-340.300(2)(a),(b),
    a) A Test vegetation: 62-340.300(2)(a)
       Consult #10 and #12 to select answer. If "Vegetation Absent at Point" skip to #25f.
    b) B Test vegetation: 62-340.300(2)(b)
       Consult #13 to select answer.
    c) A & B Test hydric soils: 62-340.300(2)(a)1 and (b)1
       Consult #19 to select answer, unless #19 was "Inconclusive" due to nonhydrological mixing of the profile. In this case, use any available evidence or data to determine whether a hydric soil would be present if not for the mixing of the profile. If a hydric soil would be present, select "Yes", otherwise select "Indeterminable".
    d) A & B Test other soils or substrates: 62-340.300(2)(a)1,2 and (b)1,2 and 62-340.200(13)
       If the substrate is composed of Riverwash (defined in 62-340.200(13)), nonsoil (see #18), rock outcrop-soil complex, or located in an artificially created wetland area, select Yes, otherwise select No.
       - Rock Outcrop-Soil Complex refers to areas where the underlying rock substrate has been exposed in multiple locations. While some of these areas have been labeled in Map Units as a soil type with the words Rock Outcrop Complex, any area with exposed bare rock mixed in with the surrounding soil would meet this requirement. See the NRCS publication Soil Survey Manual for more details.

- Artificially created wetland areas could consist of ditches, borrow pits, mitigation creation sites, etc.

e) A & B Test hydrologic indicators: 62-340.300(2)(a)3 and (b)3
   Consult #23 to select answer.

f) A Test criteria summary: 62-340.300(2)(a)
   Consult note under #25f to select answer.

g) B Test criteria summary: 62-340.300(2)(b)
   Consult note under #25g to select answer.

h) A & B Test reliability: 62-340.300(3)
   If evaluation of any of the answers in #25a-e was affected by conditions or alterations on the site, natural or man-made, such that any answers were incomplete, indeterminable, or unreliable, select "Yes".

26. C Test Criteria

a) C Test conditional requirements: 62-340.300(2)(c)4
   If the point meets any of the C-test definitions of pine flatwoods, improved pasture, or drained soils, select "Yes", select which of the three definitions are met, and skip to #26d and select "No".

   ➢ *If any facultative wet or obligate species are present in the ground cover, the point is __NOT__ pine flatwoods or improved pasture.*

   ➢ *If any contemporary hydric soil field indicators are present, the point does __NOT__ have drained soils.*

b) C Test saline sands and soil taxonomy: 62-340.300(2)(c)1,2

   - If the described point is within a salt flat or tidal flat select "Yes".

   - If the soil at the point has been field verified as an Umbraqualf, Sulfaquent, Hydraquent, Humaquept, Histosols (except Folists), Argiaquoll, or Umbraquult by a soil scientist according to *Keys to Soil Taxonomy* (USDA, 4th ed. 1990), select "Yes". If field verification by a soil scientist was not attempted, select "No".

   ➢ *If hydric soil field indicator A1 – Histosol has been checked in #17, then a Histosol has been field verified, select "Yes."*

c) C Test map unit designations: 62-340.300(2)(c)3

   - If the described point lies within a USDA-NRCS Soil Survey Map Unit that is designated as frequently flooded, depressional, or water __and__ if a hydric soil field indicator has been met (see #16), select "Yes".

      ➢ *Map Units may be designated by name (e.g., "Felda fine sand, depressional") and/or by the information in the "Water Features" table within the Soil Survey. Those with a Flooding Frequency of "frequent" are frequently flooded, and those with a Ponding Frequency of "frequent" or a High Water Table above the soil surface are depressional.*

   - If the map unit is not frequently flooded, depressional, or water, select "No".

   - If the soil was determined to be non-hydric, select "No".

   - If the map unit is frequently flooded, depressional, or water but the soil was determined to be inconclusive, select "Inconclusive".

   - Record the map unit name regardless of the answer selected.

d) C Test criteria summary: 62-340.300(2)(c)

Consult under #26d to select answer.
   e) C Test reliability: 62-340.300(3)
      If evaluation of any of the answers in #26a-c was affected by conditions or
      alterations on the site, natural or man-made, such that any answers were
      incomplete, indeterminable, or unreliable, select "Yes".

27. D Test Criteria
   a) D Test hydric soils: 62-340.300(2)(d)
      • If a hydric soil field indicator was checked in #17, select "Yes".
      • If a hydric soil field indicator was not checked in #17, select "No", even if the
        definition of hydric soil was met. Then skip to #27d and select "No".
      • If the soil was deemed "Inconclusive" in #19, select "Inconclusive" and do not
        attempt to predict if a hydric soil would be present but for any disturbance.
        Then skip to #27d and select "No".
   b) D Test hydric soils that are hydrologic indicators: 62-340.300(2)(d), 62-
      340.500(8),(11)
      If any hydric soil field indicator in #17 began at the soil surface (0-inch depth), or
      if any of the "stand-alone D-Test" indicators listed in this question were checked
      in #17, select "Yes".
      • If indicator A5 was checked, make sure that Sediment Deposition is marked
        as "Present at or very near…" in #22
      • If A1, A2, A3, A4, A7, A8, A9, S4, or F2 were checked or if any other indicator
        began at the soil surface, make sure that Hydrologic Data is marked as
        "Present at or very near…" in #22.
   c) D Test hydrologic indicator: 62-340.300(2)(d)
      This answer should match the answer given in #23.
   d) D Test criteria summary: 62-340.300(2)(d)
      The D Test is met if #27a was answered "Yes" and at least one of #27b or #27c
      was answered "Yes". If these criteria are met, select "Yes".
   e) D Test reliability: 62-340.300(3)
      If evaluation of any of the answers in #27a-c was affected by conditions or
      alterations on the site, natural or man-made, such that any answers were
      incomplete, indeterminable, or unreliable, select "Yes".


**Altered Sites Tests**
28. Determine if any conditions or alterations on the site, natural or man-made, have
    masked or eliminated expression of any wetland indicators (*e.g.*, plants, soils,
    hydrologic indicators) such that the wetland cannot be completely or reliably identified
    or delineated.
    • If #25h, 26e, or 27e were answered "Yes", select "Yes".
    • If the criteria tests could be evaluated reliably but more abundant, diverse, or
      persuasive evidence would be present but for the alterations, select "Yes".
    • If there are no alterations, select "No" and skip to #32.
    • If alterations have occurred on a site, but all wetland indicators are expressing
      normally and reliably and on-site evidence is deemed sufficient, select "No" and
      skip to #32.

> ➢ **Selecting "No" may possibly limit utilization of other reliable information in the documentation.**

29. Authorized or Legally Altered Vegetation and Soils: 62-340.300(3)(a)
   a) Determine if the vegetation on site has been altered by authorized or legal activities (*e.g.*, by mowing, planting, tree harvesting, fire, landscaping, herbicide, site preparation, etc.) such that its expression is incomplete or unreliable.
      - If so, select "Yes" and describe the alterations and their effects on vegetation.
      - If vegetation was not affected by alterations or if any alterations were unauthorized, select "No".
   b) Determine if the soils on site have been altered by authorized or legal activities (*e.g.*, by animals such as hogs or livestock, or by authorized plowing, disking, scalping, filling, shallow rutting, etc.) such that they cannot be evaluated completely or reliably.
      - If so, select "Yes" and describe the alterations and their effects on the soils.
      - If soils were not affected by alterations or if any alterations were unauthorized, select "No".
      - If "No" was selected for both 29a and 29b, indicating the vegetation and soils were not affected by any legal or authorized alterations, skip to #30.
   c) Select which of the four criteria tests could not be completely or reliably evaluated due to the legal alterations to vegetation or soils on site. These answers will often reflect those in #25h, 26e, and 27e.
   d) Determine if the described point would be identified or delineated as a wetland using the methodology in 62-340.300 if the altering activities were stopped and the site given time to recover normal expression of vegetation and soils. Use reasonable scientific judgement and the most reliable available information to make this determination. A reference point in an unaltered or more reliable condition, described on a separate Data Form, is recommended if possible.
      - If the point would be a wetland given normal expression, select "Yes".
      - Otherwise, select "No", explain why this conclusion was reached, and skip to #30.
   e) If #29d was answered "Yes", indicate which components of 62-340.300 would express following the cessation of legal alterations.
      - Include evidence that is currently present as well as evidence that is predicted to be present.
      - "Plants" can refer to the vegetative community, A and B test plant ratios, or both.
   f) Select which tests are predicted to be passed following the cessation of alterations, including tests that are currently being passed.
      > ➢ *If a wetland has been determined to be present using any of the 62-340.300 tests, "Wetland Definition" should be selected.*
      - Explain why it is believed that these tests would be passed. "See [reference point name]" is sufficient when a reference point has been described on a separate Form. Otherwise, list whatever evidence was used in the conclusion.

30. Authorized or Legally Altered Hydrology: 62-340.300(3)(b)
   a) Determine if authorized or permitted activities have altered wetland hydrology in a way that either lowers the water table or raises the soil surface, thereby reducing wetland hydrology.
      - If so, select "Yes", and explain the alteration and its effects.

- If hydrology has been unchanged or if frequency or duration of saturation or inundation has increased, select "No" and skip to #31.
- If the site is and has always been an upland, select "No" and skip to #31.
- If the decreased hydrology is a result of unauthorized activities (including water use permits that are out of compliance), select "No" and skip to #31.

b) Determine if the authorized activities have completely eliminated wetland hydrology at the described point (i.e. point has been converted to upland). If wetland hydrology was reduced but not fully eliminated, select "No" and skip to #31. Otherwise, select "Yes".

c) Determine if elimination of wetland hydrology was accomplished solely by dredging or filling activities authorized by Part IV of Chapter 373, F.S. and if the elimination is therefore permanent.
- If so, select "Yes". This means that the point is now legally converted to an upland. Skip to #31.
- If wetland hydrology was eliminated by activities in Part II of Chapter 373, F.S., such as water use permits, select "No". These areas are still considered wetlands even if they lack wetland hydrology and may temporarily not be expressing wetland characteristics.
- If wetland hydrology was eliminated by temporary alterations such as surface water pumps, or by temporary conditions such as droughts, select "No". These areas are still considered wetlands even if they lack wetland hydrology and may temporarily not be expressing wetland characteristics.

d) If the elimination of wetland hydrology is temporary or not authorized by Part IV of Chapter 373, F.S., indicate which components of 62-340.300 would express following the cessation of hydrologic alterations and return of normal wetland hydrology.
- Include evidence that is currently present as well as evidence that is predicted to be present with the return of wetland hydrology.
- "Plants" can refer to the vegetative community, A and B test plant ratios, or both.

e) Select which tests are predicted to be passed following the cessation of alterations, including tests that are currently being passed.
- ➢ *If a wetland has been determined to be present using any of the 62-340.300 tests, "Wetland Definition" should be selected.*
- Explain why it is believed that these tests would be passed. "See [reference point name]" is sufficient when a reference point in an unaltered or more reliable condition has been described on a separate Form. Otherwise, list whatever evidence was used in the conclusion.

31. Illegal or Unauthorized Altered Sites: 62-340.300(3)(c)

a) Determine if any alterations that are in violation of regulatory requirements have occurred at the described point and have affected normal expression of any wetland characteristics.
- If so, select "Yes" and describe the alterations and how they have affected the normal wetland condition.
- Otherwise, select "No" and skip to #32.

b) Select which of the four criteria tests could not be completely or reliably evaluated due to the unauthorized alterations on site. These answers will often reflect those in #25h, 26e, and 27e.

c) Determine if the described point would have been identified or delineated as a wetland immediately prior to the unauthorized alterations. Use reasonable scientific judgement and all available information to make this determination in a forensic manner. A reference point in an unaltered or more reliable condition, described on a separate Data Form, is recommended if possible.
- If the point would have been a wetland immediately prior to the unauthorized alterations, or if it is still currently a wetland despite the alterations, select "Yes".
- Otherwise, select "No", explain why this area was an upland immediately prior to the unauthorized alteration and how the conclusion was reached, then skip to #32.

d) If #31c was answered "Yes", predict which components of 62-340.300 would have been present immediately prior to the unauthorized alterations.
- Include evidence that is currently present as well as evidence that is predicted to have been present.
- "Plants" can refer to the vegetative community, A and B test plant ratios, or both.

e) Select which tests would have been passed immediately prior to the alterations, including tests that are currently being passed.
- ➢ ***If a wetland has been determined to be present using any of the 62-340.300 tests, "Wetland Definition" should be selected.***
- Explain why it is believed that these tests would have been passed. "See [reference point name]" is sufficient when a reference point has been described on a separate Form. Otherwise, list whatever evidence was used in the conclusion.

**Summaries**

32. Wetland and Other Surface Water Summary

a) Wetland Summary
- If the described point is in a **normal condition** with no alterations, use reasonable scientific judgement to determine if the conclusions made in #25f, 25g, 26d, and 27d are reliable and if the described point meets the wetland definition in 62-340.200(19).
  - ○ If any of the criteria tests were reliably passed or if the definition of wetlands was met, select "Yes" and indicate which tests were reliably passed.
  - ➢ ***If a wetland has been determined to be present using any of the 62-340.300 tests, "Wetland Definition" should be selected.***
  - ○ If any answers in #25f, 25g, 26d, and 27d are different from the answers to #32 (*i.e.,* a criteria test was deemed unreliable), explain how this conclusion was reached with reasonable scientific judgement.
- If **authorized or legal alterations to plants or soils** have occurred at the described point, this answer should reflect those in #29d, e, and f.
- If **authorized or legal alterations to hydrology** have occurred at the described point, this answer should reflect those in #30c, d, and e. If dredge or fill alterations authorized by Part IV of Chapter 373, F.S. have permanently and completely eliminated wetland hydrology at the point, the point has legally been converted to an upland.
- If **unauthorized or illegal alterations** affected any aspect of normal wetland expression, this answer should reflect those in #31c, d, and e.

- If any of the **altered sites tests** were used, summary answers 31e are likely to differ from those in #25f, 25g, 26d, and 27d; if they do, explain why. "See #[29, 30, or 31]" may be a sufficient explanation if all relevant details have been documented in that section.

b) Mean High Water: 62-340.600(2)(b)
  - If there are no tidal water bodies nearby, select "No".
  - If a licensed Professional Land Surveyor has located the Mean High Water Line of a tidal water body and the point is located at or waterward of that line, select "Yes".
  - If a survey is not currently available, select "MHWL unknown".
  - ***Determination of Mean High Water for 62-340 is not for purposes of title.***

c) Ordinary High Water: 62-340.600(2)(c)
  - If there are no bodies of open water within a distance close enough to exert a dominant influence on the hydrology of the point, select "No".
  - If an open water body exists nearby that is natural (not man-made) and non-tidal, determine its Ordinary High Water Line by direct field observation.
    o If the described point is at or waterward of this line, select "Yes".
    ➢ ***Ordinary High Water is defined on page 37 of The "Florida Wetlands Delineation Manual", which is available for download on the Department's website, and on page 6 of the Form.***
    ➢ ***Water bodies must have little to no emergent vegetation and have standing or flowing water during normal wet season or high water that exerts an influence on the landscape. They may be ephemeral.***
    ➢ ***For non-tidal natural water systems only, the 2.33 return frequency interval (i.e. Mean Annual Flood) may be an acceptable approximation for Ordinary High Water***
    ➢ ***Determination of Ordinary High Water for 62-340 is not for purposes of title.***

d) Top of Bank: 62-340.600(2)(d)
  - If the point is not in or near an artificially created water body or watercourse with side slopes of 1 foot vertical to 4 feet horizontal or steeper, select "No".
  - If the point is in or near an artificially created water body or watercourse with side slopes of 1 foot vertical to 4 feet horizontal or steeper, determine where the top of the bank is.
    o If the point is at or waterward of the top of the bank, select "Yes".
    o Do not include spoil banks from excavation when determining top of bank.

e) Seasonal High Water: 62-340.600(2)(e)
  - If there are no artificially created water bodies or watercourses with side slopes flatter than 1 foot vertical to 4 feet horizontal within a distance close enough to exert an influence on the hydrology of the point, select "No".
  - If an artificially created water body or watercourse with side slopes flatter than 1 foot vertical to 4 feet horizontal exists nearby, determine its Seasonal High Water Line.
    o If the described point is at or waterward of this line, select "Yes".
    ➢ ***Seasonal High Water is defined in 62-340.200(15)***

2. Photographs
  a) Take photographs of the evidence used to draw conclusions about wetland or other surface waters at the described point. Photo documentation tips may be found in the relevant sections above. Recommended photos include, but are not limited to:

- Vegetation: landscape photos in the four cardinal directions, plant species important to the identification or delineation of the surface water, unusual plant morphology, etc.
- Soil: soil profile with ID, soil profile close-up, soil horizon(s) close-up, hydric soil indicator(s) close-up, unusual soil characteristics, landscape location of soil pit, observed water in soil pit, etc.
- Hydrology: hydrologic indicators, hydrologic indicator height from ground with tape measure, non-wetland surface water indicators (*e.g.*, basal scarring, stained leaves, drainage patterns), nearby water bodies or water control structures that may influence area hydrology, etc.

b) For each photo, record the number from the memory card that identifies the photo. This will allow easy identification of the photo when downloaded to a computer. If multiple photos are taken of the same subject, these can be listed within the same metadata box.

c) Specify what is in the photo. Include a compass direction for landscape photos.

d) Write the initials of who took each photo. This should match a name listed in #2. Photos cannot be used as evidence in litigation without a known photographer.

**Optional Video Documentation Suggestions**

- Video documentation of the same features and characteristics in the photo tips above may be taken in video format as well.
- Videos should include a statement of who is shooting the video, any other person in the video, the date recorded, the location of the site and location of the video on the site with minimal narration, explanation, or background noise.

**Notes**

Record any relevant information that was not captured in another part of the form

- General description and conditions of the site and its surrounding landscape
- Current or recent weather conditions
- Information relied upon for determination of non-wetland surface water boundaries
- Features that are not specified in 62-340.500 as indicators of wetland hydrology, but that were used in conjunction with reasonable scientific judgment to guide conclusions (*e.g.*, indicators used by the Army Corps)
- Text that would not fit in the space provided in another part of the form
  o Write "See note [#]" in the space provided
  o Begin text with matching [#] in Notes section
- Species of vines and aquatic plants with areal extents
- Indicate results of a fiber rub test or decant test if instrumental to a hydric soil determination. Document with photos as applicable.

**References**

Florida Department of Environmental Protection, Wetlands Evaluation and Delineation Section. 1995. *The Florida Wetlands Delineation Manual.* K.M. Gilbert, J.D. Tobe, R. W. Cantrell, M.E. Sweeley, and J.R. Cooper (eds.).

Florida Department of Environmental Protection, Submerged Lands and Environmental Resources Coordination program. April 2017. *Chapter 62-340, F.A.C. Data Form Guide.* C.J. Beasley, S.L. Hinrichs, and E.D. Hickman (eds.).

Gretag-Macbeth. 2000. Munsell Color. New Windsor, NY.

Soil Science Division Staff. 2017. *Soil Survey Soil.* C. Ditzler, K. Scheffe, and H.C. Monger (eds.). USDA Handbook 18. Government Printing Office, Washington D.C.

United States Department of Agriculture, Natural Resources Conservation Service. 2016. *Field Indicators of Hydric Soils in the United States*, Version 8.0. L.M. Vasilas, G.W. Hurt, and C.V. Noble (eds.). USDA, NRCS, in cooperation with the National Technical Committee for Hydric Soils.

United States Department of Agriculture, Natural Resources Conservation Service. 2006. *Land Resource Regions and Major Land Resource Areas of the United States, the Caribbean, and the Pacific Basin.* U.S. Department of Agriculture Handbook 296.

United States Department of Agriculture, National Technical Committee for Hydric Soils. *Hydric Soils Technical Note 4: Indicator Insights for Hydric Soil Identification.* Retrieved from https://www.nrcs.usda.gov/wps/portal/nrcs/detail/soils/use/hydric/?cid=nrcs142p2_053979

# SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

# ENVIRONMENTAL RESOURCE PERMIT

# APPLICANT'S HANDBOOK

# VOLUME II

## DESIGN REQUIREMENTS FOR

## STORMWATER TREATMENT AND MANAGEMENT SYSTEMS

## WATER QUALITY AND WATER QUANTITY

**FOR USE WITHIN THE GEOGRAPHIC LIMITS OF THE SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT**

**EFFECTIVE June 1, 2018**



**Volume II is incorporated by reference in 40D-1.660, F.A.C.**

# TABLE OF CONTENTS

**PART I – INTRODUCTION, ORGANIZATION, APPLICABILITY**.................................. **1**

**1.0 INTRODUCTION** ................................................................................ **1**
   1.1  Objectives ................................................................................ 2
   1.2  Thresholds ............................................................................... 3
   1.3  District-Specific Exemptions ...................................................... 3
      1.3.1  Agricultural Exemption Determinations Available Through the District's Agricultural
           Ground and Surface Water Management System Program…………….………….….. 4
      1.3.2  Process for Obtaining Agricultural Exemptions…………………………………………4
   1.4  Criteria and Flexibility............................................................. 5
   1.5  Simultaneous Reviews……………………………………………………………………6

**PART II – GENERAL CRITERIA**…………………………………………………...…**7**

**2.0 GENERAL DESIGN AND PERFORMANCE CRITERIA FOR ALL STORMWATER
MANAGEMENT SYSTEMS** ............................................................ **7**
   2.1 Definitions and Terms ……………………………………………………………… 7
   2.2 Professional Certification ........................................................... 9
   2.3 Tailwater Considerations ........................................................... 9
      2.3.1 Tailwater for Water Quality Design ...................................... 10
      2.3.2 Tailwater for Water Quantity Design .................................... 10
      2.3.3 Regulated Systems. ......................................................... 10
   2.4  Retrofits of Existing Stormwater Management Systems ................. 10
      a. Stormwater Retrofits…………………………………………………….…………….10
      b. Stormwater Quality Retrofits…………………………………………………………11
      c. Stormwater Quantity (Flood Control) Retrofits………………………………………11
   2.5  District Drainage Basins and Watersheds ................................. 12
   2.6  Flexibility in State Transportation Projects and Facilities .............. 12
   Figure 2.5 Drainage Basins and Watersheds within the SWFWMD…………………… 14
   2.7 Inspections to Ensure Proper Operation and Maintenance…………………………13

**PART III – STORMWATER QUANTITY/FLOOD CONTROL** ...................................... **15**

**3.0 GENERAL STORMWATER QUANTITY AND FLOOD CONTROL
REQUIREMENTS** ........................................................................ **15**
   3.1 Discharges .......................................................................... 15
   3.2 Flood Protection .................................................................... 16
   3.3 Flood Plain Encroachment....................................................... 17
   3.4 100-Year Flood Level Determinations ........................................ 17
   3.5 Minimum Drainage ................................................................ 18
   3.6 Water Conservation, Low Flow and Base Flow Maintenance .......... 18
      3.6.1 Minimum Flows and Levels .............................................. 18
      3.6.2 Water Withdrawals ........................................................ 19
   3.7 Historic Basin Storage ............................................................ 19
   3.8 Off-site Lands ...................................................................... 19
   3.9 Isolated Wetlands ................................................................. 19
   3.10 Rural or Minor Subdivisions ................................................... 19

**PART IV – STORMWATER QUALITY**.................................................................**20**

**4.0 PURPOSE**.........................................................................................................**20**
    4.1 Retention and Detention Criteria ........................................................................20
        a. Wet Detention Systems ......................................................................................20
        b. Detention with Effluent Filtration System (Manmade Underdrains) .................21
        c. On-line Retention Treatment Systems................................................................22
        d. Off-line Retention Treatment Systems...............................................................22
        e. Underground Exfiltration Treatment Systems ....................................................23
        f.  Discharges to Outstanding Florida Waters........................................................23
        g. Where Ambient Water Quality Does Not Meet Standards .................................23
        h. Off-Site Treatment Volumes ..............................................................................24
    4.2 Public Supply Wells ...........................................................................................24
    4.3 Sewage Treatment Percolation Ponds ..............................................................24
    4.4 Solid Waste Facilities.........................................................................................24
    4.5 Alterations to Existing Public Roadway Projects ...............................................24
    4.6 Water Quality Monitoring ...................................................................................25
    4.7 General and Special Conditions Related to Water Quality Monitoring by Permittees........25
    4.8 Compensating Stormwater Treatment...............................................................26
        4.8.1 Overtreatment..........................................................................................26
        4.8.2 Off-site Compensation..............................................................................27
    4.9 Rural or Minor Subdivisions ..............................................................................27

**PART V – CONSTRUCTION DESIGN REQUIREMENTS**..............................**28**

**5.0 DESIGN CRITERIA** .........................................................................................**28**
    5.1 Discharge Structures .........................................................................................28
    5.2 Control Devices/Bleed-Down Mechanisms for Detention Systems....................29
    5.3 Maintenance Considerations..............................................................................29
    5.4 Retention and Detention Areas ..........................................................................29
        5.4.1 Dimensional Criteria (as measured at or from the control elevation)........29
        5.4.2 Maintenance Access.................................................................................30
    5.5 Exfiltration Systems Dimensional Criteria..........................................................30
    5.6 Management of Runoff for Impervious and Semi-Impervious Areas...................30
    5.7 Stagnant Water Conditions................................................................................30
    5.8 Sediment Sumps ...............................................................................................31
    5.9 Dam Safety ........................................................................................................31
    5.10 Rural or Minor Residential Subdivisions..........................................................31
    5.11 Sensitive Karst Areas......................................................................................32

**PART VI – DESIGN INFORMATION**......................................................................**34**

**6.0 DESIGN CRITERIA** .........................................................................................**34**
    6.1 Antecedent Conditions.......................................................................................34
    6.2 Rainfall Volume ..................................................................................................34
    6.3 Rainfall Distribution............................................................................................34
    6.4 Open Surface Storage .......................................................................................34
    6.5 Ground Surface Infiltration.................................................................................34
    6.6 Subsurface Exfiltration.......................................................................................35
    6.7 Runoff.................................................................................................................35
    6.8 Allowable Discharges.........................................................................................35

**APPENDICES** ………………………………………………………................................…..36

## PART I – INTRODUCTION, ORGANIZATION, APPLICABILITY

### 1.0 Introduction

To assist applicants seeking Environmental Resource Permits (ERPs), an Applicant's Handbook has been prepared as part of the overall effort to promote greater statewide consistency in the administration of Chapter 62-330, Florida Administrative Code (F.A.C.). The ERP Applicant's Handbook is presented in two volumes. **Applicant's Handbook Volume I** (General and Environmental), is applicable statewide and contains the following:

- Background information on the ERP program, including points of contact;

- A summary of the statutes and rules that are used to authorize and implement the ERP program;

- A summary of the types of permits, permit thresholds, and exemptions;

- A discussion of the environmental criteria used for ERP evaluations;

- A discussion of the erosion and sediment control requirements for ERP projects, and

- A discussion of requirements for system operation and maintenance.

Each Water Management District has adopted an ERP Applicant's Handbook Volume II ("Volume II") which contains the District-specific design and performance criteria for stormwater quantity, flood control, stormwater quality and any special basin criteria or other requirements that are applicable within the geographic area of the specific water management district. This Volume II (Design Requirements for Stormwater Treatment and Management Systems – Water Quality and Water Quantity) is intended for use only within the jurisdictional boundaries of the Southwest Florida Water Management District.

Together, Applicant's Handbook Volumes I and II set forth the usual procedures and information used by District staff in the review of permit applications. The overall objective of the review is to ensure that the activities authorized by an ERP are not harmful to the water resources of the District and not inconsistent with the public interest or the overall objectives of the District.

This Volume II is intended to be applicable to those types of projects that involve stormwater management systems that consist of more than just incidental dredging or filling and which require an individual permit or authorization pursuant to Section 403.814(12), F.S. ("10-2 Permits."). Many minor "stand-alone" activities or works generally will not give rise to water quantity, flood control or water quality concerns that must be addressed in accordance with the performance standards and design criteria set forth in this Volume II. However, if a project requires consideration of water quantity, water quality or flood impacts and specific measures or design features in order to demonstrate reasonable assurance that all required conditions for permit issuance have been met, Volume II will be applicable.

Volume II provides specific, detailed information to help applicants meet the water quality, water quantity, flood control, construction and design requirements applicable within this District. It is

incorporated by reference in Rule 40D-1.660, F.A.C., as well as in Rule 62-330.010, F.A.C., and, as such, Volume II constitutes rules of the District and DEP.  The term "Agency" or "District," when used in the Applicant's Handbook Volumes I or II, or in Chapter 62-330, F.A.C., refers to the DEP, this District, all Water Management Districts or a delegated local government, as applicable, in accordance with the division of responsibilities specified in the Operating Agreements as discussed in subsection 62-330.010(3), F.A.C., except where a specific agency is otherwise identified. The Applicant's Handbook Volumes I and II are written to provide more detail and clarity for the public in understanding the statutory and rule provisions that implement the ERP program, and are intended to be written in an understandable, "user-friendly" format.

Pursuant to Subsection 373.4131(1)(c), F.S., the statewide ERP rules set forth in Chapter 62-330, F.A.C., are to rely primarily on the rules of the DEP and water management districts in effect immediately prior to the effective date of the new statewide rules. Accordingly, history notes are provided for the various sections and paragraphs of this Volume II to identify the source of the particular provision as being the District's Environmental Resource Permitting Information Manual Part B, Basis of Review (BOR) (effective date 12/29/2011) and in some cases the Northwest Florida Water Management District (NWFWMD) Applicant's Handbook Volume I or Volume II (effective date 11/20/2010) or other source as applicable.  Most of the provisions of this Volume II contain material transferred directly from Chapters 1, 3 through 6 of the District's ERP BOR, with no substantive changes or only minimal changes as needed for standardized formatting or to reference related provisions in Chapter 62-330, F.A.C., or in Volume I. To promote a more consistent statewide approach, the NWFWMD Applicant's Handbook, drafted and adopted by DEP for use within that District, served as the model for the development of the Applicant's Handbook Volumes I and II. Where appropriate, some provisions contained in NWFWMD's Applicant's Handbook that described the same practice or approach used in this District for addressing water quality, water quantity or flood control requirements are included in this Volume II.  Additional provisions are also added pursuant to guidance from DEP, to promote statewide consistency.

*History Note:  Adapted from NWFWMD Applicant's Handbook Volume II, Part I.*

## 1.1 Objectives.

Pursuant to Part IV of Chapter 373, F.S., and Chapter 62-330, F.A.C., the District is responsible for permitting the construction, alteration, operation, maintenance, repair, abandonment or removal of surface water management systems within its jurisdictional boundaries, in accordance with its Operating Agreement with DEP. A copy of the Operating Agreement is included in the Appendix for reference. The objective of this Applicant's Handbook Volumes I and II is to identify the usual procedures and information used by the District in permit application review. The objective of the review is to ensure that the permit will authorize activities or situations which are not harmful to the water resources of the District nor inconsistent with the public interest or the overall objectives of the District.

*History Note: Transferred from SWFWMD Environmental Resource Permitting Information Manual, Part B, Basis of Review, section 1.1.*

**1.2 Thresholds.**

Thresholds for permitting are set forth in subsection 62-330.020(2), F.A.C., and apply statewide. There are currently no additional District-specific thresholds applicable within this District.  If any are established in the future, they will be set forth in this section.

*History Note:  New 10-1-13*

**1.3 District-Specific Exemptions.**

In addition to the exemptions set forth in Section 62-330.051, F.A.C., the specific activities described below are exempt from the requirement to obtain an ERP in this District:

(1)  The operation and maintenance of a surface water management system which:
(a)  Was constructed before October 1, 1984; or
(b)  Was constructed or was being constructed on or before December 9, 1999, and was not required to obtain a District permit under exemptions existing at the time.

(2)  The following mining activities:
(a)  Any system for a mining or mining related activity which has a valid permit issued by the District or the Department pursuant to Rule 40D-45.041, F.A.C. This exemption shall be for the plans, terms and conditions approved in the permit issued pursuant to Chapter 40D-45, F.A.C. If an operator of a system previously permitted under Chapter 40D-45, F.A.C., proposes to alter such system, the alteration shall be reviewed under the provisions of Chapter 62-330, F.A.C.
(b)  Phosphate mining, phosphate mining related surface water management systems, and reclamation and restoration conducted in accordance with Chapter 62C-16, F.A.C., within the District, provided that all the following conditions are met.
1.  Activities associated with mining operations as defined by and subject to Sections 378.201 through .212, F.S., and included in a conceptual reclamation plan or modification application submitted prior to July 1, 1996, shall continue to be exempt under this subsection.
2.  The location of any existing point of discharge authorized in a previous permit issued by the Department, the Department of Environmental Regulation, or the District shall not be changed, and the volume and frequency of such discharge shall not be exceeded.
3.  Natural drainage from off-site up gradient areas shall not be interrupted so as to cause damage to off-site property or the public, and natural drainage patterns on undisturbed lands shall be maintained to the maximum extent achievable without adversely altering the time, stage, volume and point or manner of discharge or dispersion.

(3)  Proposed normal and necessary farming operations as are customary for the area that can be conducted in an environmentally sustainable manner, provided such operations and facilities:
(a)  Do not cause adverse water quantity or offsite flooding impacts;
(b)  Do not involve activities in wetlands or other surface waters for which mitigation would be required; and
(c)  Do not adversely impact water quality in offsite receiving waters.
Persons desiring to qualify for this exemption should submit site drainage and conservation plans for the proposed normal and necessary farming operations which incorporate Natural Resource

Conservation Service, Florida Department of Agriculture and Consumer Services, or equivalent conservation standards or best management practices in accordance with Section 1.3.2 below. Following a meeting with District agricultural regulatory staff and verification that the operations, facilities, and plans comply with paragraphs (a) through (c), above, the District will provide written notice of the exemption, if qualified.

*History note:  (1) formerly 40D-4.051(2); (2) formerly 40D-4.051(5) and 40D-4.053; and (3) formerly 40D-4.051(4) with amendments; F.A.C.*

## 1.3.1 Agricultural Exemption Determinations Available Through the District's Agricultural Ground and Surface Water Management System Program.

Historically, the construction, alteration, operation, maintenance (excluding routine custodial maintenance), abandonment or removal of agricultural surface water management systems has required an Environmental Resource Permit (ERP) unless expressly exempt by statute or rule. Many agricultural operations are exempt pursuant to the statutory exemption set forth in subsection 373.406(2), F.S. Additionally, since 1990, the District has implemented a rule-specific agricultural exemption formerly expressed in subsection 40D-4.051(4), F.A.C., an updated version of which is now set forth in Volume II Section 1.3(3) above. This exemption provision has been updated to align with amendments to the statutory agricultural exemption that became effective July 1, 2011. For many years the District has also provided services and resources to assist farmers and other agriculturalists in meeting environmental and agricultural design requirements through incentive-based and ecosystem-based resource management practices. These services and exemption determinations continue to be provided through the District's Agricultural Ground and Surface Water Management System (AGSWM) program, which promotes voluntary implementation of best management practices (BMPs) and other environmentally beneficial farming principles as a passive alternative to environmental resource permitting.

The District's AGSWM program relies upon technical assistance available from the United States Department of Agriculture Natural Resources Conservation Service (NRCS) that encourages agriculturalists to use resource management system (RMS) conservation planning and to practice good water management. The NRCS specializes in RMS conservation planning, which may provide farmers with a viable alternative to the usual permitting procedures. The District's Ag Team, which consists of professional engineering and environmental staff who specialize in agricultural operations, is available to offer assistance to farmers seeking either verification of exemption from ERP requirements or other on-site review and guidance regarding sustainable agricultural practices. Conservation planning techniques of the NRCS further complement District Ag Team efforts to help facilitate surface water and water use regulation (permitting or exemption) for qualifying agricultural projects.

## 1.3.2 Process for Obtaining Agricultural Exemptions.

The District will continue to provide confirmation of qualification of exemption from permitting through the District's voluntary AGSWM program for farmers desiring to avail themselves of the District's specific agricultural-related exemption, as well as confirmation of exemption pursuant to the statutory exemption set forth in subsection 373.406(2), F.S., and any other applicable statutory or rule exemption for agricultural activities. Written requests for verification of exemption must comply with the requirements of section 62-330.050, F.A.C., and must include the fee specified in section 40D-1.607, F.A.C.

4

Farmers seeking an agricultural exemption determination are encouraged to contact the District's Ag Team as a first step. The District's Ag Team is based in the Tampa Permitting Office and is available for meetings in any of the District's service offices. Persons desiring to qualify for the exemption set forth in section 1.3(3) above will be expected to submit appropriate site-specific drainage and conservation plans for the proposed operations and demonstrate adherence to applicable nutrient, pest, drainage, irrigation or other conservation standards and BMPs that are adopted or recognized by NRCS, the Florida Department of Agriculture and Consumer Services (FDACS), or other equivalent source.  The grower may contact the NRCS to obtain a federally prescribed RMS plan of site-specific BMPs that may be used as part of the District's agricultural exemption confirmation process. The local NRCS office for specific regions may be found at the NRCS website. DACS' Office of Agricultural Water Policy also has adopted by rule certain statewide BMP manuals for major commodity crops such as citrus, container nurseries, cow/calf operations, sod, vegetable and agronomic crops, and specialty fruit and nut crops. Implementation of the FDACS-prescribed BMPs provides a presumption of compliance with statewide water quality discharge standards. The FDACS-adopted BMPs and manuals can also be found at the NRCS website.

Following an on-site meeting with District agricultural regulatory staff, review of submitted material and confirmation that the proposed operations, facilities, and plans will comply with the provisions of section 1.3(3) above, the District will provide written notice of verification of exemption.

Exemption from permitting for agricultural activities is also established pursuant to subsection 373.406(2), F.S., (known as the statutory agricultural exemption). This provision allows persons engaged in the occupation of agriculture, silviculture, floriculture or horticulture to alter the topography of any tract of land, including but not limited to activities that may impede or divert the flow of surface waters or adversely impact wetlands, for purposes consistent with the normal and customary practice of such occupation in the area; provided that such alteration is not for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands. This exemption applies to lands classified as agricultural pursuant to section 193.461, F.S., and to activities requiring an ERP pursuant to Part IV of Chapter 373, F.S. This exemption does not apply to any activities previously authorized by an ERP or a management and storage of surface waters permit issued pursuant to Part IV of Chapter 373, F.S., or a dredge and fill permit issued pursuant to Chapter 403, F.S.  While a District determination of exemption from permitting on the basis of this statutory exemption is not required in order for such activities to be exempt, the AGSWM program can be used to obtain District verification of this exemption.

## 1.4  Criteria and Flexibility.

The criteria contained in this Volume II were established with the primary goal of meeting District water resource objectives as set forth in Chapter 373, F.S. Performance criteria are used where possible. However, the criteria set forth in this Volume II are designed to be flexible. Other methods of meeting the overall objectives and the conditions for issuance set forth in Rules 62-330.301 and 62-330.302, F.A.C., will be considered depending on the magnitude of specific or cumulative impacts.  Reasonable assurance in the form of plans, test results, or other information must be provided by the applicant to demonstrate that the alternative design meets the conditions for permit issuance.

Compliance with the criteria herein constitutes a presumption that the proposed activity is in conformance with the conditions for issuance set forth in Rules 62-330.301 and 62-330.302, F.A.C.  Pursuant to Section 373.4131, F.S., if a stormwater management system is designed in

accordance with the criteria in this Volume II or if a system is constructed, operated and maintained for stormwater treatment in accordance with a valid Environmental Resource Permit or exemption under Part IV of Chapter 373, F.S., the discharges from the system are presumed not to violate applicable state water quality standards.

*History Note:  Transferred from SWFWMD Environmental Resource Permitting Information Manual, Part B, Basis of Review, section 1.3.*

## 1.5  Simultaneous Reviews.

Applicants seeking an Environmental Resource Permit typically will also need to obtain additional permits or approvals from other agencies and may have to comply with other legal or regulatory constraints. Because of the time requirements for processing permits, it is advisable for the applicant to contact other interested agencies, organizations, and affected citizens prior to submitting a formal application to the District.  Summaries of meetings and copies of responses from appropriate parties should be included in the application.

It may be in the applicant's best interest to seek simultaneous reviews from all agencies with jurisdiction over the proposed activity. This provision is not intended to preclude the submission of an application to this District prior to receiving other necessary approvals. However, coordinating the review of this application with all appropriate agencies of local government will help ensure that the final design approved by the District meets the requirements of all agencies. Applicants should note the possibility that additional requirements from agencies of local government not contained within the final approved design may necessitate a permit modification.

Issuance of an Environmental Resource Permit by the District does not relieve the applicant of the responsibility to obtain all necessary federal, state, local or special district permits or authorizations.

*History Note:  Transferred from SWFWMD ERP Information Manual Part B, Basis of Review, Section 1.4, with amendments.*

## PART II — GENERAL CRITERIA

**2.0  General Design and Performance Criteria for all Stormwater Management Systems.**

This Volume II applies to the design of stormwater management systems that require a permit under Chapter 62-330, F.A.C., other than systems that qualify for a general permit, and applies to the design of projects that qualify for a "10/2" permit.  All stormwater management systems must be designed, constructed, operated and maintained in accordance with the stormwater quality criteria and stormwater quantity/flood control criteria set forth in this Volume II.

*History Note: Adapted from NWFWMD AH II, sections 2.0 and 2.1.*

**2.1  Definitions and Terms.**

The following terms are addressed in this Volume II and apply within the Southwest Florida Water Management District.  These terms are in addition to the definitions and terms that apply statewide and which are provided in Applicant's Handbook Volume I or in Chapter 62-330, F.A.C., or applicable statutes**:**

### 2.1.1  "Aquitard"

A tightly compacted soil structure that retards but does not prevent flow of water to or from an adjacent aquifer.  It does not allow water to pass through it fast enough to be used as a water supply, but if breached, could allow mixing of water sources between adjacent aquifers.

### 2.1.2 "Closed Drainage Basin"

A drainage basin in which the runoff does not have a surface outfall up to and including the 100-year flood level.

### 2.1.3  "Control Device"

The element of a discharge structure which allows the gradual release of water under controlled conditions.  This is sometimes referred to as the bleed-down mechanism or "bleeder."  Examples include orifices, notches, weirs, and effluent filtration systems.

### 2.1.4 "Control Elevation"

The lowest elevation at which water can be released through the control device.  This is sometimes referred to as the invert elevation.

### 2.1.5 "Detention"

The delay of storm runoff prior to discharge into receiving waters.

### 2.1.6 "Detention Volume"

The volume of open surface storage behind the discharge structure measured between the overflow elevation and control elevation.

### 2.1.7 "Directly Connected Impervious Areas"

Unless otherwise specifically stated in this Volume II, directly connected impervious areas as considered in the calculation of volumes for treatment systems are those impervious and semi-impervious areas hydraulically connected to the treatment system directly or by pipes or ditches.

### 2.1.8 "Discharge Structure"

A structural device, usually of concrete, metal, etc., through which water is discharged from a project to the receiving water.

### 2.1.9 "Drainage Basin"

A subdivision of a watershed.  A map showing District drainage basins is provided as Figure 2.6.

### 2.1.10 "Elevation"

The height in feet above mean sea level according to the appropriate established vertical data, such as North American Vertical Datum (NAVD) or National Geodetic Vertical Datum (NGVD).

### 2.1.11 "Historic Basin Storage"

The depression storage available on the site in the pre-development condition.  The volume of storage is that which exists up to the required design storm.

### 2.1.12 "Historic Discharge"

The peak rate and/or amount of runoff which leaves a parcel of land by gravity from an undisturbed/existing site, or the legally allowable discharge at the time of permit application.

### 2.1.13 "Hydroperiod"

The duration of inundation in a wetland.

### 2.1.14 "Normal Water Level"

The design starting water elevation used when determining stage/storage design computations in a retention or detention area.  A retention or detention system may have two (2) designated "normal water levels" associated with it if the system is designed for both water quality and water quantity.

### 2.1.15 "Off-line Treatment System"

A system only for water quality treatment that collects project runoff and has no direct discharge capability other than percolation and evaporation. Off-line treatment systems provide storage of the treatment volume off-line from the primary conveyance path of flood discharges. A system utilizing detention with effluent filtration is not an off-line treatment system.

### 2.1.16 "On-line Treatment System"

A dual purpose system that collects project runoff for both water quality and water quantity requirements. Water quality volumes can be recovered through percolation, evaporation, filtration or detention.

### 2.1.17 "Open Drainage Basin"

Open drainage basins are all basins not meeting the definition of a closed drainage basin.

### 2.1.18 "Overflow Elevation"

The design elevation of a discharge structure at or below which water is contained behind the structure, except for that which leaks or bleeds out, through a control device down to the control elevation.

### 2.1.19 "Regulated Activity"

The construction, alteration, operation, maintenance, abandonment or removal of a system regulated pursuant to Part IV, Chapter 373, F.S., or Part V, Chapter 403, F.S.

### 2.1.20 "Surface Water or Stormwater Management System Facilities"

All components of a permitted surface water or stormwater management system including but not limited to all inlets, ditches, culverts, water control structures, retention and detention areas, ponds, lakes, floodplain compensation areas, wetlands and other surface waters and any associated buffer areas, and wetland mitigation areas.

### 2.1.21 "Water Management Areas"

Areas to be utilized for the conveyance or storage of surface water, mitigation, or perpetual operation and maintenance purposes.

*History Note: SWFWMD ERP Information Manual Part B, Basis of Review, section 1.7 (definitions that are now contained in Volume I are not included); 2.1.21 transferred from Basis of Review section 2.6.2.2.5.*

## 2.2 Professional Certification.

All construction plans, reports, specifications and supporting calculations submitted to the District for stormwater management systems that require the services of a registered professional must be signed, sealed, and dated by such registered professional.   A "registered professional" is defined in Applicant's Handbook Volume I section 2.0(a)84.

*History Note: Adapted from NWFWMD AH II section 2.3. Amended        .*

## 2.3 Tailwater Considerations.

"Tailwater" refers to the receiving water elevation (or pressure) at the final discharge point of the stormwater management system.  Tailwater is an important component of the design and operation

of nearly all stormwater management systems and can affect any of the following management objectives of the system:

(a)    Peak discharge from the stormwater management system;

(b)    Peak stage in the stormwater management system;

(c)    Level of flood protection in the project;

(d)    Recovery of peak attenuation and stormwater treatment volumes; and

(e)    Control elevations, normal water elevation regulation schedules, and ground water management.

*History Note:  Adapted from NWFWMD AH II section 2.7.*

### 2.3.1  Tailwater For Water Quality Design.

Stormwater management systems designed in accordance with the water quality design provisions in Part III of this Volume II must provide a gravity or pumped discharge that effectively operates (i.e., meets applicable rule criteria) under tailwater conditions. Acceptable criteria for demonstrating effective tailwater conditions include such criteria as mean annual high tide for tidal areas and mean annual wet-season high water elevation.

*History Note:  Adapted from NWFWMD AH II section 2.7.1.*

### 2.3.2  Tailwater for Water Quantity Design.

Stormwater management systems designed in accordance with the water quantity provisions of Part IV of this Volume II must consider tailwater conditions.  Receiving water stage can affect the amount of flow that will discharge from the project to the receiving water.  Applicants are advised to use an appropriate time-stage relationship for a storm equal to the project design storm. Variable tailwater stages should be considered if they have a significant influence on the design.

*History Note:  adapted from NWFWMD AH II section 2.7.1; last sentence transferred from BOR 7.7.3*

### 2.3.3   Regulated Systems.

Design and maintained stage elevations should be available either from the local jurisdiction or the District.  Stages for frequencies other than the design will be estimated by the District upon request from the applicant.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.7.1.*

### 2.4  Retrofits of Existing Stormwater Water Management Systems.

a.  A **stormwater retrofit project** is typically proposed by a county, municipality, state agency, or water management district to provide new or additional treatment or attenuation capacity, or improved flood control to an existing stormwater management system or systems. Stormwater retrofit projects shall not be proposed or implemented for the purpose of

providing the water quality treatment or flood control needed to serve new development or redevelopment.  Example components of stormwater retrofit projects include:

1.  Construction or alteration that will add additional treatment or attenuation capacity and capability to an existing stormwater management system;

2.  Modification, reconstruction, or relocation of an existing stormwater management system or stormwater discharge facility;

3.  Stabilization of eroding banks through measures such as adding attenuation capacity to reduce flow velocities, planting of sod or other vegetation, and installation of rip rap boulders ; or

4.  Excavation or dredging of sediments or other pollutants that have accumulated as a result of stormwater runoff and stormwater discharges.

**b.  Stormwater Quality Retrofits.**

1.  The applicant for a stormwater quality retrofit project must provide reasonable assurance that the retrofit project itself will, at a minimum provide additional water quality treatment such that there is a net reduction of the stormwater pollutant loading into receiving waters.  Examples are:

(a)  Addition of treatment capacity to an existing stormwater management system such that it reduces stormwater pollutant loadings to receiving waters;

(b)  Adding treatment or attenuation capability to an existing developed area when either the existing stormwater management system or the developed area has substandard stormwater treatment and attenuation capabilities, compared to what would be required for a new system requiring a permit under Part IV of Chapter 373, F.S.; or

(c)  Removing pollutants generated by, or resulting from, previous stormwater discharges.

2.  If the applicant has conducted, and the Agency has approved, an analysis that provides reasonable assurance that the proposed stormwater quality retrofit will provide the intended pollutant load reduction from the existing system or systems, the project will be presumed to comply with the water quality conditions for issuance discussed in Part IV of this Volume II.

3.  The pollutants of concern will be determined on a case-by-case basis during the permit application review and will be based upon factors such as the type and intensity of land use, existing water quality data within the area subject to the retrofit, and the degree of impairment or water quality violations in the receiving waters.

**c.  Stormwater Quantity (Flood Control) Retrofits.**

1.  The applicant for a stormwater quantity retrofit project must provide reasonable assurance that the retrofit project will reduce existing flooding problems in such a way that it does not cause any of the following:

(a)    A net reduction in water quality treatment provided by the existing stormwater management system or systems; or

(b)    Increased discharges of untreated stormwater entering adjacent or receiving waters.

2.  If the applicant has conducted, and the Agency has approved, an analysis that provides reasonable assurance that the stormwater quantity retrofit project will comply with the above, the project will be presumed to comply with the applicable water quantity conditions for issuance discussed in Part III of this Volume II.

d.    The applicant for any stormwater retrofit project must design, implement, and operate the project so that it:

1.  Will not cause or contribute to a water quality violation;

2.  Does not reduce stormwater treatment capacity or increase discharges of untreated stormwater.  Where existing ambient water quality does not meet water quality standards the applicant must demonstrate that the proposed activities will not cause or contribute to a water quality violation.  If the proposed activities will contribute to the existing violation, measures shall be proposed that will provide a net improvement of the water quality in the receiving waters for those parameters that do not meet standards.

3.  Does not cause any adverse water quality impacts in receiving waters; or

4.  Will not cause or contribute to increased flooding of adjacent lands or cause new adverse water quantity impacts to receiving waters.

*History Note:  Derived from NWFWMD Applicant's Handbook Volume II, section 2.10*

## 2.5   District Drainage Basins and Watersheds.

Pursuant to paragraph 62-330.302(1)(b), F.A.C., cumulative impacts upon wetlands and other surface waters are analyzed by evaluating impacts to water quality and functions provided by wetlands and other surface waters within the same drainage basin. A regulated activity shall not cause unacceptable cumulative impacts upon wetlands and other surface waters within the same drainage basin as the regulated activity for which a permit is sought. Further information on cumulative impact assessment appears in section 10.2.8 of Volume I. The District's adopted drainage basins for cumulative impact analysis and watersheds for mitigation bank purposes are the same and are set forth in Figure 2.5 which follows at the end of this chapter.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review Appendix 6 and Appendix 4 Exhibit 1*

## 2.6   Flexibility for State Transportation Projects and Facilities.

With regard to state linear transportation projects and facilities, the Agencies shall be governed by subsection 373.413(6), F.S. (2012).

*History Note: New.*

**2.7    Inspections to Ensure Proper Operation and Maintenance**

(a)    In accordance with subsection 62-330.311(1), F.A.C., stormwater management systems, dams, impoundments, reservoirs, appurtenant work, and works designed by a registered professional shall be inspected and documented by the registered professional as follows, unless otherwise specified in the permit.  Permit conditions will specify the required inspection cycle, typically in accordance with the timelines outlined below:

| TYPE OF SYSTEM | REINSPECTION SCHEDULE AFTER TRANSFER TO OPERATIONS PHASE |
| --- | --- |
| Retention | Once every 5 years |
| Wet Detention | Once every 5 Years |
| Detention with Effluent Filtration | Once every 2 Years |
| Underground Exfiltration | Once every 2 Years |

(b)    Activities designed by a registered professional shall be inspected by that same registered professional, or by a similarly-registered professional in accordance with the inspection frequency and terms required in the permit.

(c)    Additional information on operation and maintenance requirements is contained in **Section 12.4 of Volume I** and in Rule 62-330.311, F.A.C.

*History Note: New          .*

Figure 2.5



## PART III -- STORMWATER QUANTITY/FLOOD CONTROL

### 3.0  General Stormwater Quantity and Flood Control Requirements.

Pursuant to the Conditions for Issuance in Section 62-330.301, F.A.C., an applicant must provide reasonable assurance that the proposed construction, alteration, operation, maintenance, removal or abandonment of the works or other activities regulated under ERP rules:

    a.  Will not cause adverse water quantity impacts to receiving waters and adjacent lands;

    b.  Will not cause adverse flooding to on-site or off-site property;

    c.  Will not cause adverse impacts to existing surface water storage and conveyance capabilities; and

    d.  Will not adversely impact the maintenance of surface or ground water levels or surface water flows established pursuant to Section 373.042, F.S., or Chapter 40D-8, F.A.C.

Utilization of the design criteria in this Part III will provide reasonable assurance of compliance with these conditions for issuance unless credible historical evidence of past flooding or the physical capacity of the downstream conveyance or receiving waters indicates that the conditions for issuance will not be met without consideration of storm events of different duration, frequency, or rainfall depth. In those instances, applicants shall be required to provide additional analyses using storm events of different duration, frequency, or rainfall depth than those referenced below, or to adjust the volume, rate or timing of discharges, to provide reasonable assurance of compliance with the conditions for issuance. Pre-application meetings are encouraged for projects in flood-prone areas to determine whether additional analysis is necessary to demonstrate reasonable assurance of compliance with the conditions for issuance.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.1*

### 3.1  Discharges.

Off-site discharge is limited to amounts which will not cause adverse off-site impacts.

    a.  For a project or portion of a project located within an open drainage basin, the allowable discharge is:

        1.  historic discharge, which is the peak rate at which runoff leaves a parcel of land by gravity under existing site conditions, or the legally allowable discharge at the time of permit application; or

        2.  amounts determined in previous District permit actions relevant to the project.

    b.  Except in situations as described in Section 3.0 above, off-site discharges and peak stages for the existing and developed conditions shall be computed using the Southwest Florida Water Management District's 24-hour, 25-year rainfall maps and the Natural Resources Conservation Service type II Florida Modified 24-hour rainfall distribution with an antecedent moisture condition II. See Appendix A for these items.

15

c.  For a project or portion of a project discharging to a tidal water body, the peak discharge requirements of this section are not required, provided that the rate of discharge does not cause adverse impacts.  Examples of tidal water bodies are the Gulf of Mexico and the Gulf Intracoastal Waterway, including manmade portions of the Gulf Intracoastal Waterway.

d.  For a project or portion of a project located within a closed drainage basin, the required retention volume shall be the post-development runoff volume less the pre-development runoff volume computed using the Southwest Florida Water Management District's 24-hour/100-year rainfall map and the Natural Resources Conservation Service type II Florida Modified 24-hour rainfall distribution with an antecedent moisture condition II.  The total post development volume leaving the site shall be no more than the total pre-development volume leaving the site for the design 100-year storm.  The rate of runoff leaving the site shall not cause adverse off-site impacts. Maintenance of pre-development off-site low flow may be required in hydrologically sensitive areas.

e. Except in situations as described in 3.1.f below, the proposed stormwater management system shall not be required to account for storm events less frequent than the 25-year event for the rate of discharge in an open basin or the 100-year event for the volume of discharge in a closed basin.

f. For a project or portion of a project discharging to an open basin with limited downstream conveyance capacity (volume sensitive) or a basin that contains retention storage, then storage modeling or additional retention volume up to the 24-hour/100-year storm shall be provided such that the project stormwater discharge shall not cause adverse onsite or offsite impacts.

g. When not in conflict with the objectives of recharge, dewatering, or maintaining ground water levels, projects serviced by a permitted or approved regional surface water management system may discharge stormwater runoff at the rate and volume established by the agency operating the regional stormwater system. The permittee must provide written verification from the operating agency stating the acceptable rate and volume of stormwater runoff from the project.

*History Note:   SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.2. (subsection c is added).  Amended        .*

## 3.2  Flood Protection.

Flood protection for structures shall be provided as follows:

(a) Residential buildings shall have the lowest floor elevated above the 100-year flood elevation for that site.

(b) Industrial, commercial or other non-residential buildings susceptible to flood damage should have the lowest floor elevated above the 100-year flood elevation.  Unless a higher elevation is required by applicable building code requirements, non-residential structures alternatively may be designed and constructed so that below the 100-year flood elevation the structure and attendant utility facilities are watertight and capable of resisting the effects of the regulatory flood. The design should take into account flood velocities, duration, rate of rise, hydrostatic and hydrodynamic forces, the effect of buoyancy and impacts from debris.

(c) Accessory buildings may be constructed below the 100-year flood elevation provided there is minimal potential for significant damage by flooding. An accessory building is a structure on the same parcel of property as a principal structure and the use of which is incidental to the use of the principal structure and not for human habitation.  For example, a residential structure may have a detached garage, a carport, or storage shed for garden tools as accessory structures. Other examples of accessory structures include gazebos, picnic pavilions, boathouses, pole barns, storage sheds, and similar buildings.  Applicants are cautioned that potential water quality impacts caused by flooding of contents housed in a structure will be considered in allowing a reduced finished floor elevation.

(d) Applicants are advised that local ordinances and the Florida Building Code may require higher minimum floor elevations.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.3.  Amended      .*

### 3.3  Flood Plain Encroachment.

No net encroachment into the flood plain, up to that encompassed by the 100-year event, which will adversely affect conveyance, storage, water quality or adjacent lands, will be allowed. Any required compensating storage shall be equivalently provided between the lowest level of encroachment and the 100-year flood level to allow storage function during all lesser flood events.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.4.  Amended      .*

### 3.4  100-Year Flood Level Determinations.

    a.  Flood elevations shall be determined using the most accurate information available, which can include:
       1.  Actual data, including water level, stream flow and rainfall records;
       2.  Hydrologic/hydraulic modeling;
       3.  Federal Flood Insurance Rate Maps and supporting flood study data; or
       4.  Floodplain analysis studies.
    b.  Site-specific data for observed and measured flood elevations shall be compared to modeled or existing study data to verify accuracy.
    c.  The 24-hour/100-year storm shall be used to determine the 100-year flood elevation except in those circumstances where credible historical evidence exists that higher flood stages have occurred, and can be expected to re-occur, following more frequent storm events.  In those cases, the 100-year flood elevation shall be determined using a 100-year storm of sufficient duration to exceed the flood stages observed following more frequent events.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.4.1.  Amended      .*

### 3.5  Minimum Drainage.

Commercial and industrial projects to be subdivided for sale are required to install a minimum drainage system as described in (a) and (b) below.  Projects permitted in such a manner shall require deed restrictions which notify lot or tract purchasers of the amount of additional on-site storm water management system necessary to provide flood attenuation and any additional retention/detention required for water quality purposes.

a.   The required water quality system must have treatment capacity for one inch of runoff if wet detention is used, or one-half inch of runoff if retention, effluent filtration or exfiltration is used, from the total developed site and contributing offsite area.

b.   A stormwater collection and conveyance system must be provided to interconnect the retention/detention system with the project outfall, including access points to the system available to each individual lot or tract.  The system shall be sized to limit discharge under full build-out design conditions to the allowable discharge.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.5.*

### 3.6  Water Conservation, Low Flow and Base Flow Maintenance.

Where practicable, systems shall be designed to:

a.   maintain water tables, base flows and low flows at the highest practicable level. The depth to which the water table can be lowered will be determined based on the potential adverse impact on recharge, the effect on water resources (quality and quantity), and the necessity for fill and its impact on existing natural upland vegetation; and

b.   preserve site environmental values; and

c.   not waste freshwater through overdrainage; and

d.   not lower water tables which would adversely affect existing legal uses; and

e.   preserve site groundwater recharge characteristics; and

f.   retain water on-site for use and re-use for irrigation and other reasonable beneficial uses.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, section 4.6.*

### 3.6.1  Minimum Flows and Levels.

In addition to the design considerations in Section 3.6 above, the system shall not reduce or suppress the flow of a watercourse or the level of water in a wetland or other surface water or the level of ground water below a minimum flow or level that has been established pursuant to Section 373.042, F.S.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.6.1.*

### 3.6.2  Water Withdrawals.

The effects of water withdrawals shall not be considered as the ambient condition in the design of stormwater management systems permitted under Chapter 62-330, F.A.C., except to the extent that the long term success of mitigation would be adversely affected by such water withdrawals.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review Section 4.6.2.*

### 3.7  Historic Basin Storage.

Provision must be made to replace or otherwise mitigate the loss of historic basin storage provided by the project site.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.7.*

### 3.8  Offsite Lands.

The application shall include provisions to allow drainage from off-site upgradient areas to downgradient areas without adversely altering the time, stage, volume, point or manner of discharge or dispersion and without degrading water quality.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.8.*

### 3.9  Isolated Wetlands.

Isolated wetlands wholly owned or controlled by the applicant may be used for flood attenuation purposes when not in conflict with environmental or public use considerations.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 4.9.*

### 3.10  Rural or Minor Subdivisions.

Rural or minor residential subdivisions constructed and operated in accordance with the design and construction criteria specified in Section 5.10 will be presumed to provide reasonable assurance of compliance with the water quantity-related conditions for issuance described in Part III of this Volume II.

*History Note:  Adapted from 40D-40.301, F.A.C. (9/5/2010).  Amended        .*

# PART IV -- STORMWATER QUALITY

## 4.0  Purpose.

Projects shall be designed so that discharges will meet applicable state water quality standards. Projects designed using the criteria found in this section shall be presumed to provide reasonable assurance of compliance with the state water quality standards referenced in Section 62-330.301(1)(e), F.A.C.  The applicant may also provide reasonable assurance of compliance with state water quality standards by the use of alternative methods that will provide treatment equivalent to systems designed using the criteria specified in this section.  If the applicant chooses to use alternative methods the District will determine whether the applicant has provided reasonable assurance based on information specific to the proposed design and submitted by the applicant.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.1.*

## 4.1  Retention and Detention Criteria.

The volume of runoff to be treated from a site shall be determined by the type of treatment system, i.e., wet detention, detention with effluent filtration, on-line retention treatment system, or off-line retention treatment system. If off-site run-off is not prevented from combining with on-site runoff prior to treatment, then treatment must be provided for the combined off-site/project runoff.

### a.  Wet Detention Systems.

1.  A wet detention treatment system shall treat one inch of runoff from the contributing area.

2.  A manmade wet detention system shall include a minimum of 35 percent littoral zone, concentrated at the outfall, for biological assimilation of pollutants.  The percentage of littoral zone is based on the ratio of vegetated littoral zone to the surface area of the pond at the control elevation.  The littoral zone shall be no deeper than 3.5 feet below the design overflow elevation. The treatment volume should not cause the pond level to rise more that 18 inches above the control elevation. Mulching and/or planting is desirable but not required, unless the soils in the proposed littoral zone are not capable of supporting wetland vegetation.  In this case mulching will be required. Native vegetation that becomes established in the littoral zone must be maintained as part of the operation permit.

3.  Isolated natural wetlands can be used as a wet detention system when not in conflict with environmental or public use considerations.

(a)  If the required treatment volume cannot be detained within the limits of the isolated wetland boundaries and range of natural water levels, expansion of the wetland will be allowed when it can be shown that the excavation will not adversely impact the wetland.

(b)  The treatment volume cannot adversely impact the wetland so that it fluctuates beyond the range of natural water levels. The available volume is determined based on site-specific conditions and an analysis of the isolated wetland to be used.

20

(c)  Provisions must be made to remove sediment, oils and greases from runoff entering the wetland.  This can be accomplished through incorporation of sediment sumps, baffles and dry grassed swales or a combination thereof.  Normally, a dry grassed swale system designed for detention of the first one-fourth inch of runoff with an overall depth of no more than 4 inches will satisfy the requirement for prior removal of sediment, oils and greases.

4.  The wet detention system's treatment volume shall be discharged in no less than 120 hours (5 days) with no more than one-half the total volume being discharged within the first 60 hours (2.5 days).

5.  Due to the detention time required for wet detention systems, only that volume which drains below the overflow elevation within 36 hours may be counted as part of the volume required for water quantity storage under Part III of this Volume II.

6.  Concepts and methods for determining design pool requirements for an alternative wet detention designs system through Conservation Wet Detention designs can be found in Appendix B.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.2.a.1-5. Amended   .*

**b.  Detention with Effluent Filtration System (Manmade Underdrains).**

1.  A detention with effluent filtration system shall treat the runoff from the first one inch of rainfall; or as an option for projects or project subunits with drainage areas less than 100 acres, the first one-half inch of runoff.  In determining the runoff from one inch of rainfall, the applicant must provide calculations determining runoff from the directly connected impervious and semi-impervious areas separately from any other contributing area.

2.  Filtration systems shall have a minimum of 0.5 feet of vertical head between the center line of the perforated pipe and the normal water elevation or the pond bottom of the system.  The seasonal high water level must be at least one foot below the center line of the perforated pipe (measured from the lowest point of the perforated pipe), or separated by structural means from the hydraulic contribution of the surrounding water table.  The stormwater must pass through a minimum of two feet of the filter material before entering the perforated pipe.

3.  Filtration systems shall have pore spaces large enough to provide sufficient flow capacity so that the permeability of the filter is equal to or greater than the surrounding soil.  The design shall ensure that the filter medium particles do not move.  The filter material shall be of a quality sufficient to satisfy the requirements listed below, but these requirements are not intended to preclude the use of multilayered filters nor the use of materials to increase ion exchange, precipitation or pollutant absorption capacity of the filter.  The requirements are:

(a)  Washed material meeting FDOT road and bridge specifications for silica sand and quart gravels, or mixtures thereof (less than 1 percent silt, clay and organic matter), unless filter cloth is used which is suitable to retain the silt, clay and organic matter within the filter; calcium carbonate aggregate is not an acceptable substitute;

(b)  Uniformity coefficient 1.5 or greater; and

(c) Effective grain size of 0.20 to 0.55 millimeters in diameter.

4. The total detention volume shall again be available within 36 hours.

5. The treatment volume can be counted as part of the storage required for water quantity storage under Part III of this Volume II.

6. Maintenance of filter includes proper disposal of spent filter material.

7. The design of the system must be such that the water velocities and associated flow path through the storage pond do not cause the accumulated pollutants to be flushed out of the treatment pond up to the 25-year, 24-hour design storm.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.2.b.  Amended         .*

### c.  On-line Retention Treatment Systems.

1. An on-line retention treatment system shall treat the runoff from the first one-inch of rainfall; or as an option for projects or project sub-units with drainage areas less than 100 acres, the first one-half inch of run-off.  In determining the runoff from one-inch of rainfall, the applicant must provide calculations determining runoff from the directly connected impervious and semi-impervious areas separately from any other contributing area.

2. Total treatment volume shall again be available within 72 hours, however, only that volume which can again be available within 36 hours may be counted as part of the volume required for water quantity storage under Part III of this Volume II.

3. The design of the system must be such that the water velocities and associated flow path through the storage pond do not cause the accumulated pollutants to be flushed out of the treatment pond up to the 25-year, 24-hour design storm.

*History Note:  SWFWMD ERP Information Manual -Part B, Basis of Review, Section 5.2.c. Amended         .*

### d.  Off-line Retention Treatment Systems.

1. Off-line retention treatment systems shall treat the runoff from the first one-inch of rainfall; or as an option for projects or project sub-units with drainage areas less than 100 acres, the first one-half inch of runoff.  In determining the runoff from one-inch of rainfall, the applicant must provide calculations determining run-off from the directly connected impervious and semi-impervious areas separately from any other contributing area.

2. Total treatment volume shall again be available within 72 hours, however, only that volume which can again be available within 36 hours may be counted as part of the volume required for water quantity storage under Part III of this Volume II.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.2.d. Amended         .*

**e. Underground Exfiltration Treatment Systems.**

1.  Systems shall be designed for the volumes specified in Section 4.1(d) for off-line treatment systems.

2.  Systems must have the capacity to retain the required retention volume without considering discharges.

3.  The seasonal high water level must be at least one foot below the bottom of the exfiltration pipe.

4.  Systems should not be proposed for projects to be operated by entities other than single owners or entities with full time maintenance staffs.

5.  A safety factor of 2.0 or more shall be applied to the exfiltration design to allow for geological uncertainties by dividing the exfiltration rate by the safety factor.

6.  Total system required volume shall again be available within 72 hours.

7.  Due to the maintenance requirements and life expectancy of exfiltration systems, the treatment volume required in Section 4.1(d) cannot be counted as part of the storage volumes required under Section 3.1 of Volume II.

8.  Exfiltration systems shall comply with the following construction requirements:

    (a)  Pipe diameter must be a minimum of 12 inches;

    (b)  Trench width must be a minimum of 3 feet;

    (c)  Rock material in trenches must be enclosed in filter material; and

    (d)  Maintenance sumps must be provided in inlets.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Sections 5.7 and 6.5.*
*Amended          .*

**f.  Discharges to Outstanding Florida Waters.**

Projects discharging directly into Outstanding Florida Waters (OFW) shall be required to provide treatment for a volume 50 percent more than required for the selected treatment system (wet detention, detention with effluent filtration, on-line retention or off-line retention).

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.2.e.*

**g.  Where Ambient Water Quality Does Not Meet Standards.**

In instances where an applicant is unable to meet water quality standards because existing ambient water quality does not meet standards and the system will contribute to this existing condition, mitigation for water quality impacts can consist of water quality enhancement.  In these cases, the applicant must implement mitigation measures that are proposed by or acceptable to the applicant

that will cause net improvement of the water quality in the receiving waters for those contributed parameters that do not meet standards.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 3.2.4.5.*

### h.  Off-site Treatment Volumes.

Off-site treatment volumes shall be the total runoff from one-inch of rainfall over the contributing off-site area.  The runoff from the directly connected impervious and semi-impervious contributing areas shall be determined separately from the runoff from the other contributing areas.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.2.f.*

## 4.2  Public Supply Wells.

Stormwater retention and detention systems are classified as moderate sanitary hazards with respect to public and private drinking water wells.  Stormwater treatment facilities shall not be constructed within 100 feet of an existing public water supply well and shall not be constructed within 75 feet of an existing private drinking water well.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.3 and NWFWMD Applicant's Handbook Volume II, Section 4.3.2. Amended                      .*

## 4.3  Sewage Treatment Percolation Ponds.

Above ground pond dikes shall not be located within 200 feet of water bodies or 100 feet of dry retention areas.  The applicant may propose specific alternative measures that are equivalent to these criteria in their effectiveness to protect the water resources and adjacent property. The applicant shall provide the District with reasonable assurance of no adverse impact to the water resources or adjacent property, based on the plans, calculations and other information specific to the design proposed.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.4.*

## 4.4  Solid Waste Facilities.

Surface water management systems for Class I and II solid waste facilities, as defined in Chapter 62-7, F.A.C., shall be designed and constructed to maintain the integrity of the landfill at all times including construction, operation, closure and post closure.  Applicants should consult with District staff prior to submittal of an application to determine the specific requirements which will apply for a particular project.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 5.5.*

## 4.5  Alterations to Existing Public Roadway Projects.

Alterations to existing public roadway projects will be required to treat a volume equal to those specified in Section 4.1 and the contributing area according to the following options:

a.  The contributing area(s) to be used in calculating the required treatment volume will be:

1.  For off-line treatment systems and on-line treatment systems, including wet-detention, which provide storage of the treatment volume off-line from the primary conveyance path of flood discharges, use the area of new pavement.

2.  For all other on-line treatment systems, including wet-detention, use the entire on-site directly connected impervious areas contributing to the system; directly connected impervious areas are those new and existing pavement areas connected to the treatment systems by pavement or pipe that contribute untreated runoff.

b.  When alterations involve extreme hardship, in order to provide direct treatment of new project area, the District will consider proposals to satisfy the overall public interest that shall include equivalent treatment of alternate existing pavement areas to achieve the required pollution abatement. For example, existing untreated contributing areas not otherwise required to be included for treatment may be included for treatment by the system in lieu of direct treatment of new project area when the pollution abatement is equivalent and benefits the same receiving waters.

c.  Existing treatment capacity being displaced by any roadway project will require additional compensating treatment volume. Additional volume is also required for projects that discharge directly to OFW's. (See Section **4.1.f.**)

Subsection 373.413(6), F.S. (2012), also requires that Agencies exercise flexibility in the permitting of stormwater management systems associated with the construction or alteration of systems serving state transportation projects and facilities.

*History Note:  SWFWMD ERP Information Manual Part B Basis of Review, Section 5.8.*

## 4.6  Water Quality Monitoring.

All non-exempt surface water management systems will be evaluated based on the ability of the system to prevent degradation of receiving waters and its ability to conform to state water quality standards.

*History Note:  SWFWMD ERP Information Manual Part B Basis of Review, Section 5.9.*

## 4.7  General and Special Conditions Related To Water Quality Monitoring By Permittees.

a.  If the applicant utilizes design criteria found in Part IV of Volume II, monitoring will not be required.

b.  Monitoring shall be required when the applicant proposes design criteria not found in Part IV of Volume II, and does not have specific test data or other data to support that state water quality standards will be met.

c.  Monitoring may be required in cases where there may be a real and immediate concern regarding degradation of quality in the receiving waters, regardless of the pollutant removal efficiency of the drainage system.

d. The reason for the monitoring requirement will be stated in each permit for which water quality monitoring is required, along with the monitoring schedule and the parameters of interest. Samples will be collected at discharge locations unless other locations are identified in the monitoring schedule. Monitoring schedules will require the periodic collection of samples. Permittees will also be required to collect samples during storm events, provide the rate of discharge and total discharge quantities at the time of sample collection, if necessary to ensure that state water quality standards will be met.

e. Permits for projects not requiring water quality monitoring at the time of permit issuance will include a statement that water quality monitoring will be required in the future if necessary to ensure that state water quality standards are being met. This should not be construed as an indication that the District is contemplating the implementation of a program of intensive water quality monitoring by all permittees.

*History Note:  SWFWMD ERP Information Manual Part B Basis of Review, Sections 5.10, 5.11 and 5.13. Amended        .*

## 4.8  Compensating Stormwater Treatment.

Occasionally, applicants find that it is impractical to construct a stormwater management system to capture the runoff from a portion of the project site due to on-site conditions such as extreme physical limitations, availability of right-of-way, or maintenance access. Two methods have been developed to compensate for the lack of treatment for a portion of a project. The first method is to treat the runoff that is captured to a greater extent than required by rule (i.e., "overtreatment"). The second method is to provide treatment for an off-site area which currently is not being treated (i.e., "off-site compensation"). Each method is designed to furnish the same level of treatment as if the runoff from the entire project site were captured and treated in accordance with the provisions of this Volume.

Either of these methods will only be allowed as a last resort and the applicant is strongly encouraged to schedule a pre-application conference with District staff to discuss the project if these alternatives are being considered.  Other rule criteria, such as peak discharge attenuation, will still have to be met if the applicant utilizes these methods. Each alternative is described in more detail in the following sections.

*History Note:  NWFWMD AH II section 2.11.*

## 4.8.1   Overtreatment.

Overtreatment means to treat the runoff from the project area that does flow to a treatment system to a higher level than the rule requires, to make up for the lack of treatment for a portion of the project.  The average treatment efficiency of the areas treated and the areas not treated must meet the pollutant removal goals of Chapter 62-40, F.A.C., (i.e., 80% removal for discharges to Class III waters and 95% removal for systems which discharge to OFWs). To meet these goals, the area not being treated generally must be small (less than 10%) in relation to the area which is captured and treated. Staff can aid in determining the proper level of overtreatment for a particular situation.

*History Note:  NWFWMD AH II Section 2.11.1.*

26

### 4.8.2    Off-site Compensation.

Off-site compensation means to provide treatment to compensate for the lack of treatment for portions of the proposed project. The following conditions must be met when utilizing off-site compensation:

(a)  The off-site area must be in the same watershed and benefit the same receiving water body as the proposed project, and should be in the closest vicinity practicable to the location of those untreated stormwater discharge(s) requiring compensating treatment; and

(b)  The applicant shall use modeling or other data analysis techniques that provide reasonable assurance that the compensating treatment system removes at least the same amount of stormwater pollution loading as was estimated from the untreated project area.

*History Note:  NWFWMD AH II Section 2.11.2.*

### 4.9  Rural or Minor Subdivisions.

Rural or minor residential subdivisions constructed and operated in accordance with the design and construction criteria specified in Section 5.10 will be presumed to provide reasonable assurance of compliance with the water quality-related conditions for issuance described in Part IV of Volume II.

*History Note:  Adapted from 40D-40.301, F.A.C.*

## PART V –CONSTRUCTION DESIGN REQUIREMENTS

### 5.0  Design Criteria.

The design criteria and construction requirements applicable within this District for stormwater management system discharge or control structures, retention and detention areas and other system features are set forth in Part V of Volume II.  To assist the applicant, additional reference materials and figures useful in designing stormwater management systems appear in the Appendices and should be consulted.

*History Note:  New 10-1-13.  Amended          .*

### 5.1  Discharge Structures.

a.  The construction design for all surface water systems shall be adequate to meet all design criteria and performance standards referred to in this rule. Provision shall be made for the controlled release of water volumes in excess of that caused by the design storm event to ensure adequate performance of the system and its continued safe operation.  Construction designs shall include adequate provisions to allow operation and maintenance activities and to prevent unauthorized operation of operable structures.

b.  All design discharges shall be made through structural discharge facilities.  Discharge structures shall be fixed so that discharge cannot be made below the control elevation, except that emergency operation devices may be designed and installed with secure locking mechanisms.

c.  Non-operable discharge structures shall not be constructed so that they are operable.

d.  Discharge structures shall include gratings for safety and maintenance purposes.  The use of trash collection screens is desirable.

e.  Discharge structures for water quality systems shall include a "baffle" system to encourage discharge from the center of the water column rather than the top or bottom.  Discharge structures from areas with greater than 50 percent impervious and semi-impervious area or from systems with inlets in paved areas shall include a baffle, skimmer, or other mechanism suitable for preventing oil and grease from discharging from detention and on-line treatment systems.

f.  Direct discharges, such as through culverts, stormdrains, weir structures, etc., will be allowed to receiving waters which by virtue of their large capacity, configuration, etc. are easily able to absorb concentrated discharges. Examples of such receiving waters include existing storm sewer systems and man-made ditches, canals and lakes.

g.  Indirect discharges, such as overflow and spreader swales, are required where the receiving water or its adjacent supporting ecosystem might be degraded by a direct discharge. The discharge structure must discharge into the overflow, spreader swale, etc. which in turn releases the water to the actual receiving water. Affected receiving waters include natural streams, lakes, marshes, isolated wetlands and land naturally receiving overland sheet flow.

h.  Pumped systems will only be allowed for single owner or governmental agency operation entities, unless perpetual operation ability can be guaranteed.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.1.*

**5.2  Control Devices/Bleed-Down Mechanisms for Detention Systems.**

a.  When not in conflict with meeting the District's pre-/post-peak discharge requirement or a more restrictive local government discharge requirement, gravity control devices normally shall be designed to discharge one-half of the detention volume required by Part III of Volume II, within 24 hours.  Devices incorporating dimensions smaller than six square inches of cross sectional area or two inches minimum dimension or less than 20 degrees for "V" notches shall include a device to eliminate clogging.  Such devices include baffles, grates, pipe elbows, etc.

b.  Gravity control devices for wet detention water treatment systems as specified in Part IV of Volume II are required to be designed to meet the bleed-down times specified therein. Devices incorporating dimensions smaller than those indicated in a. above, must include a device to eliminate clogging. Such devices include baffles, grates, pipe elbows, etc.

c.  Wet detention systems designed for both water treatment (quality) and attenuation of the design storm (quantity) must incorporate the requirements of a. and b. above.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.2. Amended          .*

**5.3 Maintenance Considerations.** The design of retention areas shall incorporate consideration of sediment removal, regular maintenance and vegetation harvesting procedures.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.3.*

**5.4  Retention and Detention Areas.**

**5.4.1  Dimensional Criteria (as measured at or from the control elevation).**

a.  Width - Wet detention water quality treatment systems shall be designed with a 100 foot minimum width for linear areas in excess of 200 feet in length.  Area and width requirements will be waived for projects to be operated by single owner entities, or entities with full time maintenance staffs with a particular interest in maintaining the area, e.g., golf courses.  Treatment areas not meeting the above width to length ratio will be approved if the permittee can demonstrate that the design of the system will maximize circulation by location of inflow and outflow points.

b.  Depth - The detention or retention area shall not be excavated to a depth that breaches an aquitard such that it would allow for lesser quality water to pass, either way, between the two systems.  In those geographical areas of the District where there is not an aquitard present, the depth of the pond shall not be excavated to within two (2) feet of the underlying limestone which is part of a drinking water aquifer.

c.  Side slopes – for purposes of public safety, water quality treatment and maintenance, all retention or detention areas should have stabilized side slopes no steeper than 4:1 (horizontal: vertical) out to a depth of two feet below the control elevation.  Except as provided for in paragraph 5.4.1(d), constructed side slopes steeper than 3.5:1 (horizontal: vertical) shall be considered a substantial deviation from the permitted design.

d. For purposes of public safety, side slopes designed or permitted steeper than 4:1 will require a six foot chain link fence or other protection sufficient to prevent accidental incursion into the retention or detention area. In determining the sufficiency of other protection measures, consideration shall be given to the depth and morphometry of the detention or retention area, surrounding land uses, degree of public access, and likelihood of accidental incursion.

e. For wet detention systems, the bottom elevation of the pond must be at least one foot below the control elevation.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.4.1 for subsections a – d; Section 1.7.4 for subsection e.   Amended        .*

## 5.4.2  Maintenance Access.

Perimeter maintenance and operation easements, with a minimum width of 20 feet and slopes no steeper than 4:1 (horizontal: vertical), should be provided landward of the control elevation water line.  Widths less than 20 feet are allowed when it can be demonstrated that equipment can enter and perform the necessary maintenance for the system.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.4.2.*

## 5.5  Exfiltration Systems Dimensional Criteria.

Exfiltration systems shall comply with the following construction requirements:

a. Pipe diameter must be a minimum of 12 inches;

b. Trench width must be a minimum of 3 feet;

c. Rock material in trenches must be enclosed in filter material; and

d. Maintenance sumps must be provided in inlets.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.5.*

## 5.6  Management of Runoff from Impervious and Semi-Impervious Areas.

Runoff shall be discharged from impervious and semi-impervious surfaces into retention areas, or through detention devices, filtering and cleansing devices, or subjected to some type of Best Management Practice (BMP) prior to discharge from the project site. For projects, which include substantial paved areas, such as shopping centers, large highway intersections with frequent stopped traffic, and high density developments, provisions shall be made for the removal of oil, grease and sediment from storm water discharges.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.6.*

## 5.7  Stagnant Water Conditions.

Configurations which create stagnant water conditions, such as dead end canals, are prohibited, regardless of the type of development.

*History Note: SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.7.*

**5.8  Sediment Sumps.**

Sediment sumps shall comply with the following**:**

    a.  Sumps shall remove a particle size of 0.1 mm in diameter (approximately a No. 100 sieve size) unless it can be shown another grain size is more appropriate for the site.

    b.  Sumps shall be designed for an inflow rate equal to the design peak flow rate of the project's internal storm water system.

    c.  A maintenance schedule for sediment and vegetation removal must be included.

*History Note: SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.8.*

**5.9  Dam Safety.**

All dams must be designed, constructed, operated and maintained consistent with accepted engineering and dam safety practices as applied to local conditions, considering such factors as type of materials, type of soils and degree of compaction, hydrologic capacity, construction techniques and hazard rating. A document that provides useful information for this purpose is *Design of Small Dams,* U.S. Department of the Interior, Bureau of Reclamation, Third Edition, 2006.

*History Note: Adapted from NWFWMD AH I Section 8.4.7.*

**5.10  Rural or Minor Residential Subdivisions.**

    a.  Rural or minor residential subdivisions typically are designed to have large multi-acre lots and minimal roadways that, together, result in a relatively small amount of additional impervious or semi-impervious surfaces compared to pre-developed conditions. Rural or minor residential subdivisions that are designed in accordance with the following parameters will be considered to not cause significant adverse impacts to occur individually or cumulatively and will meet the applicable water quality and water quantity design criteria for permit issuance:

    (1)  The proposed activities will occur in, on or over less than 100 square feet of wetlands or other surface waters. Road or driveway crossings of ditches constructed in uplands will not be counted against the 100 square foot limit.

    (2)  The activities will not utilize pumps for storm water management.

    (3)  The activities will not utilize storm drainage facilities larger than one 24-inch diameter pipe, or its equivalent.

    (4)  Discharges from the site will meet state water quality standards.

    (5)  The proposed building floors will be above the 100 year flood elevation.

    (6)  The surface water management system can be effectively operated and maintained.

(7)  Roadways within the subdivision will consist of paved or unpaved stabilized roads with an unyielding subgrade.

(8)  The drainage system will not act in a manner that would divert and channelize large areas of overland sheet flow, thereby creating point source discharges that will adversely affect wetlands, or areas beyond the applicant's perpetual control.

(9)  Point discharges will not exceed the capacity of receiving waters.

(10)  All terminal discharge structures are designed to withstand the 25-year, 24-hour post-development discharge without functional failure.

(11)  The proposed post-development impervious and semi-impervious surfaces will not exceed a five percent (5%) increase over pre-developed conditions.

(12)  Proposed or projected construction will maintain a minimum 75 foot vegetated buffer, which includes a 25 foot perpetually undisturbed buffer upland of all wetlands and other surface waters. Only the 25 foot perpetually undisturbed buffer will be required adjacent to an isolated wetland entirely located within an individual residential lot.

(13)  Proposed or projected construction will maintain a minimum 75 foot buffer adjacent to all project boundaries.

b. The applicant's demonstration of compliance with this subsection shall include provision of a typical lot layout showing proposed driveways, buildings, and other impervious and semi-impervious areas and the anticipated percentage of impervious and semi-impervious surfaces resulting from projected construction on individual residential lots.

c.  The boundaries of the surface water management system, wetlands, surface waters and buffers shall be recorded in plats or easements and included in any declaration of covenants, conditions, easements and restrictions and shall be identified in all sales contracts by the developer. These recorded documents shall be perpetual and applicable to all future sales of property within the development. Language shall also be contained in the recorded documents notifying all individual lot owners that permits are required if any of the following items are proposed:

(1)  Alteration to the surface water management system; or

(2)  Encroachment into the wetlands, wetland buffers, or adjacent off-site property line buffers.

*History note:  Transferred from 40D-40.301(1) and (2), F.A.C.*

## 5.11 Sensitive Karst Areas.

"Karst" is a geologic term used to describe areas where landscapes have been affected by the dissolution of limestone or dolostone, including areas where the formation of sinkholes is relatively common.  In parts of the District, limestone (or dolostone) that makes up or comprises the Floridan Aquifer System occurs at or near the land surface. Sediments overlying the limestone can be highly permeable. Due to its chemical composition, limestone is susceptible to dissolution when

it interacts with slightly acidic water. "Sensitive karst areas" reflect areas with hydrogeologic and geologic characteristics relatively more conducive to potential contamination of the Floridan Aquifer System from surface pollutant sources. The formation of karst-related features, such as sinkholes, is also more likely to occur in these areas.

Especially in sensitive karst areas, stormwater management systems must be designed and constructed to prevent direct discharge of untreated stormwater into the Floridan Aquifer System. Systems also must be designed and constructed in a manner that avoids breaching an aquitard and such that construction excavation will not allow direct mixing of untreated water between surface waters and the Floridan Aquifer System. The system shall also be designed to prevent the formation of solution pipes or other types of karst features in any known sensitive karst area. Test borings located within the footprint of a proposed stormwater management pond must be plugged in a manner to prevent mixing of surface and ground waters.

As provided in paragraph 5.4.1(b) of this Volume II, in areas where karst conditions are present, the detention or retention area shall not be excavated to a depth that breaches an aquitard such that it would allow for lesser quality water to pass, either way, between the two systems.

Figures depicting conditions that may occur when retention or detention ponds are constructed in sensitive karst areas appear in Appendix C.

*History Note:  Adapted from NWFWMD AH II sections 17.1 and 17.3; SWFWMD ERP Information Manual Part B, Basis of Review, Section 6.4.1.b.  Amended          .*

# PART VI – DESIGN INFORMATION

## 6.0  Design Criteria.

The design criteria set forth in this section are applicable within this District.

*History Note:  New*

## 6.1  Antecedent Conditions.

Within this District, the antecedent condition will be the normal average wet season (AMC II).

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.1.*

## 6.2  Rainfall Volume.

The rainfall isohyetal maps in APPENDIX A of this Volume II will be used to determine rainfall amounts.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.2; Part D Project Design Aids.*

## 6.3  Rainfall Distribution.

The Natural Resource Conservation Service Type II Florida Modified rainfall distribution will be used unless the applicant demonstrates that a different distribution better characterizes the actual rainfall distribution based on rainfall record.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.3.*

## 6.4  Open Surface Storage.

If open surface storage is to be considered in the review, the applicant must submit stage-storage computations. If open surface storage plus discharge is to be considered, the stage discharge computations will also be submitted. Actual rather than allowable discharges shall be used in routing.  Discharges will be based on the tailwater resulting from the normal seasonal high water elevation of the receiving waters.  For extreme events, such as the 100-year frequency, discharge will be based on the tailwater resulting from a 100-year flood on the receiving waters.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.4.1.*

## 6.5  Ground Surface Infiltration.

Ground surface infiltration will be reviewed on the basis of commonly accepted procedures. Suggested commonly accepted procedures include: the U.S. Department of Agriculture, Soil Conservation Service Technical Paper No. 149, "A Method for Estimating Volume and rate of Runoff in Small Watersheds" (1973); the U.S. Department of Agriculture, Soil Conservation Service Technical Release No. 55, "Urban Hydrology for Small Watersheds" (1975); or the Rational Method as discussed in the State of Florida Department of Transportation, "Drainage Manual" (January 2013) or Hydrology Handbook (February 2012) or standard civil engineering

textbooks.  Site-specific test data should be submitted to support other methods of calculating ground surface infiltration.

Additional, more current references and design aids are listed in Appendix D.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.5.1, with updated references.*

### 6.6  Subsurface Exfiltration.

Subsurface exfiltration will be reviewed only on the basis of representative or actual test data submitted by the applicant.  Tests shall be consistent as to elevation, location, soils, etc., with the system design to which the test data will be applied.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.5.2.*

### 6.7  Runoff.

The usual methods of computation of runoff used by project designers and acceptable to the District are as follows:

      a.  Rainfall minus losses and storage.

      b.  Soil Conservation Service design methods (see, for example, U.S. Department of Agriculture, Soil Conservation Service, "National Engineering Handbook, Section 4, Hydrology." Additional, more current reference sources and design aids can be found in Appendix D.)

      c.  Rational method, for systems serving projects of less than 10 acres total contributing area. Suggested references and design aids are listed in Appendix D.

      d.  Other alternative methods and criteria proposed by the applicant that are functionally equivalent to the criteria in District rules.  The applicant shall provide the District with reasonable assurance of such equivalency based on the submitted plans, calculations and other information.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.6.*

### 6.8 Allowable Discharges.

Peak discharge, for purposes of meeting maximum allowable discharges, is computed as the maximum average discharge over a time period equal to the time of concentration of the contributory area.

*History Note:  SWFWMD ERP Information Manual Part B, Basis of Review, Section 7.8.1*

**APPENDICES**

APPENDIX A -    Part D of SWFWMD ERP Information Manual Rainfall Maps (July 1996)

APPENDIX B -    Conservation Wet Detention Alternative Treatment Design Technical Memorandum Concepts and Methods

APPENDIX C -    Figures Relating to Water Quality Provisions, Water Quantity Provisions and Retention Systems Within Sensitive Karst Areas

APPENDIX D -    Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., Between Southwest Florida Water Management District and Department of Environmental Protection (July 1, 2007)

APPENDIX E -    Flexibility for State Transportation Projects and Facilities

APPENDIX A

ENVIRONMENTAL RESOURCE PERMITTING

INFORMATION MANUAL

PART D

Project Design Aids

July 1996

Pages D-1 through D-12

## Southwest Florida Water Management District

# PART D
## PROJECT DESIGN AIDS

## ENVIRONMENTAL RESOURCE PERMITTING

## INFORMATION MANUAL



## MANAGEMENT AND STORAGE OF SURFACE WATERS

*JULY 1996*

D-1

## TABLE OF CONTENTS
## PART D – PROJECT DESIGN AIDS

PAGE

TABLE OF CONTENTS (PART D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2

1. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-3
2. RAINFALL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-4
   FIGURE D-1 – 24-HOUR, 2-YEAR RETURN PERIOD RAINFALL MAP . . . D-5
   FIGURE D-2 – 24-HOUR, 2.33 (MAF) RETURN PERIOD RAINFALL MAP. D-6
   FIGURE D-3 – 24-HOUR, 5-YEAR RETURN PERIOD RAINFALL MAP . . . D-7
   FIGURE D-4 – 24-HOUR, 10-YEAR RETURN PERIOD RAINFALL MAP . . D-8
   FIGURE D-5 – 24-HOUR, 25-YEAR RETURN PERIOD RAINFALL MAP . . D-9
   FIGURE D-6 – 24-HOUR, 50-YEAR RETURN PERIOD RAINFALL MAP . . D-10
   FIGURE D-7 – 24-HOUR, 100-YEAR RETURN PERIOD RAINFALL MAP . D-11
   RAINFALL DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-12
   TABLE D-1 – RAINFALL RATIOS (ACCUMULATED 24-HOUR TOTAL) . . D-13

## INTRODUCTION

The Southwest Florida Water Management District has developed "Part D, Project Design Aids" to provide consistency in the parameters used by District Staff in their review for environmental resource permitting of surface water management systems.

The design aids were selected solely on their ability to support the intent of the requirements in the environmental resource permitting rules for management and storage of surface waters and to identify some common and useful techniques for evaluating regulatory aspects of surface water management systems. The use of these design aids for purposes other than those stated in this manual may not be within the realm of their intended use and could result in a sub-standard design in some circumstances. It is therefore, incumbent upon the individual designer to exercise sound engineering judgment in the utilization of the information presented to ensure the overall integrity of the system and regulatory compliance.

Rainfall

A. Rainfall Duration

The Southwest Florida Water Management District is utilizing a 24-hour storm event as the standard storm duration for design and analysis purposes for water quantity permitting evaluation of surface water management systems.

B. Determination of Rainfall Depths

The Southwest Florida Management District has developed rainfall maps for a 24-hour storm duration for the 2-year, 2.33-year, 5-year, 10-year, 25-year, 50-year, and 100-year return periods, as shown in FIGURES D-1 through D-7. These rainfall maps will be utilized to determine a depth of rainfall in inches for a specific return period. This depth will be used for design and analysis purposes for evaluation of surface water and stormwater management systems.

C. Procedure for Determination of the Appropriate Rainfall Amount

1. The approximate location of the project site is to be located on the appropriate rainfall frequency map.

2. For projects located on an isohyets use the rainfall amount for that line.

3. For projects east of the most eastern isohyets use that eastern most isohyets as the rainfall amount.

4. For projects between two isohyets the rainfall amount is a straight line interpolation between the two isohyets. The next higher isohyets line may be used rather than interpolating.

5. For projects west of the most western isohyets use that western most isohyets as the rainfall amount.

D-4

SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

### Figure D-1
### Twenty-Four-Hour Two-Year Return Period
### Rainfall Map



SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

**Figure D-2**
**Twenty-Four-Hour Mean Annual Return Period (2.33 years)**
**Rainfall Map**



SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

### Figure D-3
### Twenty-Four-Hour Five-Year Return Period
### Rainfall Map





SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

**Figure D-5**
**Twenty-Four-Hour Twenty-Five-Year Return Period**
**Rainfall Map**

SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

**Figure D-6**
**Twenty-Four-Hour Fifty-Year Return Period**
**Rainfall Map**

SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT

### Figure D-7
### Twenty-Four-Hour One-Hundred-Year Return Period
### Rainfall Map



D-11

D. Rainfall Distribution

The USDA-Natural Resources Conservation Service [formerly Soil Conservation Service (SCS)] Type II Florida Modified Rainfall distribution shown in TABLE D-1 is recommended for use in the analysis of the water quantity portion of the rule. Other distributions which produce similar results may also be used if appropriate.

## TABLE D-1

### RAINFALL RATIOS (ACCUMULATED 24-HOUR TOTAL)

| TIME (HR | SCS TYPE II FL. MODIFIED |
|---|---|
| 0.0 | .000 |
| 0.5 | .006 |
| 1.0 | .012 |
| 1.5 | .019 |
| 2.0 | .025 |
| 2.5 | .032 |
| 3.0 | .039 |
| 3.5 | .047 |
| 4.0 | .054 |
| 4.5 | .062 |
| 5.0 | .071 |
| 5.5 | .080 |
| 6.0 | .089 |
| 6.5 | .099 |
| 7.0 | .110 |
| 7.5 | .122 |
| 8.0 | .134 |
| 8.5 | .148 |
| 9.0 | .164 |
| 9.5 | .181 |
| 10.0 | .201 |
| 10.5 | .226 |
| 11.0 | .258 |
| 11.5 | .308 |
| 12.0 | .607 |
| 12.5 | .719 |
| 13.0 | .757 |
| 13.5 | .785 |
| 14.0 | .807 |
| 14.5 | .826 |
| 15.0 | .842 |
| 15.5 | .857 |
| 16.0 | .870 |
| 16.5 | .882 |
| 17.0 | .893 |
| 17.5 | .904 |
| 18.0 | .913 |
| 18.5 | .923 |
| 19.0 | .931 |
| 19.5 | .940 |
| 20.0 | .948 |
| 20.5 | .955 |
| 21.0 | .962 |
| 21.5 | .969 |
| 22.0 | .976 |
| 22.5 | .983 |
| 23.0 | .989 |
| 23.5 | .995 |
| 24.0 | 1.000 |

D-13

# APPENDIX B

## CONSERVATION WET DETENTION
### Alternative Treatment Design Technical Memorandum
### Concepts and Methods

**BACKGROUND:**

This memorandum provides guidelines for concepts and methods for the Conservation Wet Detention alternative treatment design option. Conservation Wet Detention utilizes a design pool[1] below the pond control elevation for achieving stormwater quality treatment and is a viable alternative to wet detention treatment systems designed based on the presumptive criteria in the Environmental Resource Permit Applicant's Handbook Volume II (AH VII.)

Reference 62-330.301(1)(e), Florida Administrative Code and AH VII, Sections 1.4, 4.0, and 4.1.a, 5.2 and 5.4.

**DESCRIPTION:**

Procedure:

Chapter 62-330, F.A.C. and the AH VII include provisions for applicants to incorporate alternative design options to demonstrate a project will meet the conditions for issuance set forth in Rules 62-330.301 and 62-330.302, F.A.C. One frequently used water quality design alternative is the Conservation Wet Detention treatment design.

The Conservation Wet Detention design method is based on fundamental components of the presumptive design guidelines for wet detention included in AH VII. Wet detention treatment systems provide water quality treatment using a design pool in association with water tolerant vegetation. If adequate residence time is provided, pollutants can be removed through settling, adsorption to soils and uptake by aquatic biota.

Section 5.4.1.e of the AH VII requires that the bottom elevation of a wet detention pond must be at least one foot below the control elevation. The intent of this requirement is to maintain a permanent wet pool which supports residual aquatic biota, dilutes influent stormwater runoff and extends the residence time of water passing through the system. Wet detention design guidelines in Sections 4.1 and 5.2 of the AH VII also require that wet detention pond discharge structures be designed with a gravity drawdown control device (bleed down device). The bleed down device allows no more than one-half of the detained treatment volume, stored between the overflow elevation down to seasonal high water level (SHWL) or control elevation, to discharge within the first 60 hours. Pool volume below the control elevation that intermixes with the SHWL is the permanent wet pool

**CONSERVATION WET DETENTION:** The following criteria provide an acceptable

---

[1] Design pool = treatment volume + permanent wet pool volume

alternative method of achieving design pool and gravity discharge configuration when it is justified to provide all or part of the treatment volume below SHWL or control elevation, without design pool bleed down (refer to Figure 1 and Table A for design and performance standards). If all other criteria are in compliance with the AH VII, monitoring will normally not be required.

a) In the interest of water conservation, discharge devices below SHWL shall be avoided; and

b) Design pool volume below the control elevation[2] to 8 feet depth[3] must be equal to one inch of runoff plus the calculated volume based on average residence time of 14 days and average total rainfall during the wet season (122 days, June through September); and

c) The minimum design pool volume below the control elevation to 8 feet depth must be no less than 1.667 inches of runoff from the contributing area; and

d) Systems discharging directly into Outstanding Florida Waters (OFW) shall provide treatment volume 50% more than required for systems discharging to other receiving waters; and

e) The gravity overflow weir shall be multi-stage, first having a "v"-notch[4] or other gravity drawdown control device sized to discharge 1/2 inch of detention runoff from the contributing area in 24 hours with 10 inches maximum head (refer to Figure 3); and having a broad crested weir for higher discharges, including the 25 year, 24 hour event; and

f) The control elevation ("v"-notch or other gravity control device) shall be above SHWL in the pond and above wet season tailwater in the receiving water, but no higher than 2 feet above SHWL; and

g) For gravity discharge systems with treatment volume below SHWL, credit for water quantity (discharge attenuation) storage shall be allowed above control elevation and SHWL, if the "v"-notch or other gravity control device meets the requirements of e) above, and Section 5.2.a of the AH VII; and

---

[2] Longer residence time associated with the design pool for a wet detention system without a bleed down device is presumed to offset the benefits of extended detention drawdown of treatment volume by a bleed down device.

[3] Pond bottom depth may be more or less 8 feet below control elevation, but permanent wet pool volume credit is limited to no deeper than 8 feet, since stratification and low light penetration may hamper proper mixing and biological processes below this depth. A maximum bottom depth of 12 feet is recommended to minimize the potential for anaerobic conditions and release of nutrients and metals from bottom sediments. Lesser depths are desirable, especially for small ponds.

[4] The "v"-notch weir sized as stated creates a minimum pond area and fluctuation to enhance surface aeration, circulation and mixing in the design pool. The minimum pond area is equivalent to 5% of the contributing area, as recommended by Reference 1.

h) At least 35% of the pond bottom, based on area at control elevation, must extend below SHWL to help sustain the required littoral area; and the 35% littoral area shall extend 2 feet maximum below the control elevation; and

Wet detention systems shall be specifically designed to maximize circulation, mixing and residence time of inflow within the design pool by means such as: maximum separation of inflow and outflow points, locating inflow inverts below the control elevation, use of multi-cell ponds or flow baffles and other locally effective means to avoid "dead" storage areas.

**EXAMPLES:**

### AGRICULTURAL EXAMPLE
CALCULATION OF WET DETENTION DESIGN POOL VOLUME

Given:    A citrus grove project near Arcadia, FL.; Project area = drainage area = 320 Ac.; Composite Rational runoff coefficient = 0.30; Discharge to Class III waters from a wet detention system.

Required:   1. Calculate the treatment volume; and

2. Calculate the permanent wet pool volume to be retained below the control elevation to 8 feet depth. It must be the greater of: a) the volume calculated to provide an average residence time of 14 days based on average total wet season rainfall of 31.04 inches; or, b) the volume produced by 0.667 inches of runoff from the contributing area; and

3. Calculate the average minimum pond area.

1. Calculate the treatment volume (Q) as 1 inch of runoff -

$$(Q) = (320 \text{ Ac.}) (1 \text{ inch}) (1 \text{ ft./12 in.}) = \textbf{26.67 Ac.-ft.(AF)}$$

2. Calculate the permanent wet pool volume ($V_B$) -

a) Based on 14 day residence volume ($V_R$) -

$$(V_R) = (A) (C) (P) (R) (1 \text{ ft./12 in.})$$

Where,
(A) = Project area = drainage area = 320 Ac.
(C) = Composite Rational runoff coefficient = 0.30
(P) = Historic average wet season rainfall rate for Arcadia, Bradenton, Brooksville, Lakeland and Ocala gauging stations = (31.04 in./122 days)
(R) = Residence time = 14 days

$$(V_R) = (320) (0.30) (31.04/122) (14) (1/12) = \textbf{28.50 AF}$$

B-3

NOTE: Refer to Figure 2 for graphic solution of 14 day residence volumes for various project types and sizes.

b) As 0.667 inches of runoff ($V_{min}$) -

$(V_{min})$ = (320 Ac.) (0.667 inch) (1 ft./12 in.) = **17.78** AF

Since ($V_R$) is more than ($V_{min}$), **28.50** AF is correct for permanent wet pool volume ($V_B$) in this case.

Therefore, the wet detention system design pool volume
= (Q) **26.67** AF + ($V_B$) **28.50** AF = **55.17** AF.

3. Calculate the average minimum pond area ($A_s$) -

Based on treatment volume below control elevation of "v"-notch weir, 1/2 inch runoff and 10 in. maximum head or based on design pool volume at maximum depth -

1) Based on 10 in. **maximum** head on the "v"-notch:
$(V_W)$ = (320 Ac.) (0.50 inch) (1 ft./12 in.) = 13.33 AF

$(A_s)$ = (13.33 AF/0.833 ft.) = **16.00** Ac.

2) Based on design pool volume [(Q) + ($V_B$) = 55.17 AF] at maximum depths:

55.17 AF = [(0.35)(2 ft.)($A_s$)] + [(0.65)(8 ft.)($A_s$)]

$(A_s)$ = (55.17 AF)/(5.9) = **9.35** Ac.

Check Max. head (H) = ($V_W$)/($A_s$),

$(V_W)$ = 13.33 AF; ($A_s$) = 9.35 Ac.

(H) = (13.33/9.35) = 1.425 Ft. = 17.1 in. > 10 in.

Therefore, the correct minimum pond area is **16.00** Ac.

### COMMERCIAL EXAMPLE (WITH OFFSITE RUNOFF)
CALCULATION OF WET DETENTION DESIGN POOL VOLUME

Given:    A shopping plaza project near Oneco, FL.; Project area = 16 Ac.; Drainage area = 18 Ac.; Composite Rational runoff coefficients: project site = 0.90; offsite = 0.45; drainage area = 0.85; Discharge to Class III waters from a wet detention system.

Required:     1. Calculate the treatment volume; and

2. Calculate the permanent wet pool volume to be retained below the control elevation to 8 feet depth. It must be the greater of:  a) the volume calculated to provide an average residence time of 14 days based on average total wet season rainfall of 31.04 inches; or, b) the volume produced by 0.667 inches of runoff from the contributing area; and

3. Calculate the average minimum pond area.

1. Calculate the treatment volume (Q)

a) For project site, as 1 inch of runoff ($Q_P$) -

$(Q_P)$ = (16 Ac.) (1 inch) (1 ft./12 in.) = **1.33** Ac.-ft.(AF)

b) For offsite, as runoff from first inch of rainfall ($Q_O$) -

$(Q_O)$ = (2 Ac.) (1 inch) (0.45) (1 ft./12 in.) = **0.08** AF

Therefore, (Q) = $(Q_P)$ **1.33** AF + $(Q_O)$ **0.08** AF = **1.41** AF

2. Calculate the permanent wet pool volume ($V_B$) -

a) Based on 14 day residence volume ($V_R$) -

$(V_R)$= (A) (C) (P) (R) (1 ft./12 in.)

Where,
(A) = Project site + offsite = drainage area = 18 Ac.
(C) = Composite Rational runoff coefficient = 0.85
(P) = Historic average wet season rainfall rate for Arcadia, Bradenton,
      Brooksville, Lakeland and Ocala gauging stations = (31.04 in./122 days)
(R) = Residence time = 14 days

$(V_R)$ = (18) (0.85) (31.04/122) (14) (1/12) = **4.54** AF

NOTE: Refer to Figure 2 for graphic solution of 14 day residence volumes for various project types and sizes.

b) As 0.667 inches of runoff ($V_{min}$) -

$(V_{min})$ = (18 Ac.) (0.667 inch) (1 ft./12 in.) = **1.00** AF

Since ($V_R$) is more than ($V_{min}$), **4.54** AF is correct for permanent wet pool volume ($V_B$) in this case.
Therefore, the wet detention system design pool volume
     = (Q) **1.41** AF + ($V_B$) **4.54** AF = **5.95** AF.

B-5

3. Calculate the average minimum pond area ($A_S$) -

Based on treatment volume below control elevation of "v"-notch weir, 1/2 inch runoff and 10 in. maximum head or based on design pool volume at maximum depth -

1) Based on 10 in. **maximum** head on the "v"-notch:

$(V_W) = (18 \text{ Ac.}) (0.50 \text{ inch}) (1 \text{ ft./12 in.}) = 0.75 \text{ AF}$

$(A_S) = (0.75 \text{ AF}/0.833 \text{ ft.}) = \textbf{0.90} \text{ Ac.}$

2) Based on design pool volume [$(Q) + (V_B) = 5.95$ AF] at maximum depths (i.e., 35% @ 2' and 65% @ 8' depth):

$5.95 \text{ AF} = [(0.35)(2 \text{ ft.})(A_S)] + [(0.65)(8 \text{ ft.})(A_S)]$

$(A_S) = (5.95 \text{ AF})/(5.9) = \textbf{1.01} \text{ Ac.}$

Check Max. head (H) = $(V_W)/(A_S)$,

$(V_W) = 0.75 \text{ AF}; (A_S) = 1.01 \text{ Ac.}$

$(H) = (0.75/1.01) = 0.743 \text{ Ft.} = 8.9 \text{ in.} < 10 \text{ in.}$

Therefore, the correct minimum pond area is **1.01** Ac.

### RESIDENTIAL EXAMPLE (WITH DISCHARGE TO OFW)
CALCULATION OF WET DETENTION DESIGN POOL VOLUME

Given:      A residential subdivision project near Sarasota, FL.; Project area = Drainage Area = 40 Ac.; Composite Rational runoff coefficient = 0.85; Discharge to OFW from a wet detention system.

Required:   1. Calculate the treatment volume; and

2. Calculate the permanent wet pool volume to be retained below the control elevation to 8 feet depth. It must be the greater of: a) the volume calculated to provide an average residence time of 14 days based on average total wet season rainfall of 31.04 inches; or, b) the volume produced by 0.667 inches of runoff from the contributing area; and

3. Calculate the average minimum pond area.

1. Calculate the treatment volume (Q)

a) For project site, as 1 inch of runoff ($Q_P$) -

B-6

$$(Q_P) = (40 \text{ Ac.}) (1 \text{ inch}) (1 \text{ ft./12 in.}) = \textbf{3.33} \text{ Ac.-ft.(AF)}$$

b) For OFW discharge, provide 50% more treatment volume

$$(Q_{ofw}) = 3.33 \text{ AF} + 3.33 AF(0.50) = \textbf{5.00} \text{ AF}$$

2. Calculate the permanent wet pool volume ($V_B$) -

a) Based on 14 day residence volume ($V_R$) -

$$(V_R) = (A) (C) (P) (R) (1 \text{ ft./12 in.})$$

Where,
(A) = Project site = drainage area = 40 Ac.
(C) = Composite Rational runoff coefficient = 0.85
(P) = Historic average wet season rainfall rate for Arcadia, Bradenton,
   Brooksville, Lakeland and Ocala gauging stations = (31.04 in./122 days)
(R) = Residence time = 14 days

$$(V_R) = (40) (0.85) (31.04/122) (14) (1/12) = \textbf{10.09} \text{ AF}$$

NOTE: Refer to Figure 2 for graphic solution of 14 day residence volumes for various project types and sizes.

b) As 0.667 inches of runoff ($V_{min}$) -

$$(V_{min}) = (40 \text{ Ac.}) (0.667 \text{ inch}) (1 \text{ ft./12 in.}) = \textbf{2.22} \text{ AF}$$

Since ($V_R$) is more than ($V_{min}$), **10.09 AF** is correct for permanent wet pool volume ($V_B$) in this case.

Therefore, the wet detention system design pool volume
   = ($Q_{ofw}$) **5.00** AF + ($V_B$) **10.09** AF = **15.09** AF.

3. Calculate the average minimum pond area ($A_S$) -

Based on treatment volume below control elevation of "v"-notch weir, 1/2 inch runoff and 10 in. maximum head or based on design pool volume at maximum depth -

3) Based on 10 in. **maximum** head on the "v"-notch:

$$(V_W) = (40 \text{ Ac.}) (0.50 \text{ inch}) (1 \text{ ft./12 in.}) = 1.67 \text{ AF}$$

$$(A_S) = (1.67 \text{ AF}/0.833 \text{ ft.}) = \textbf{2.00} \text{ Ac.}$$

4) Based on design pool volume [($Q_{ofw}$) + ($V_B$) = 15.09 AF] at maximum depths (i.e., 35% @ 2' and 65% @ 8' depth):

$$15.09 \text{ AF} = [(0.35)(2 \text{ ft.})(A_S)] + [(0.65)(8 \text{ ft.})(A_S)]$$

$$(A_S) = (15.09 \text{ AF})/(5.9) = \mathbf{2.56} \text{ Ac.}$$

Check Max. head $(H) = (V_W)/(A_S)$,

$$(V_W) = 1.67 \text{ AF}; \quad (A_S) = 2.56 \text{ Ac.}$$

$$(H) = (1.67/2.56) = 0.652 \text{ Ft.} = 7.8 \text{ in.} < 10 \text{ in.}$$

Therefore, the correct minimum pond area is **2.56** Ac.

## REFERENCES:

1. "The Florida Development Manual: A Guide to Sound Land and Water Management," June 1988, FDER

2. "Design of Urban Runoff Quality Controls," Proceedings of an Engineering Foundation Conference held in July 1988, American Society of Civil Engineers, 1989

## ATTACHMENT(S):

Figure 1    Conservation Wet Detention Discharge Structure End View and Discharge Structure Instream View

Figure 2    14 Day Residence Volume in Acre-Feet Per Acre of Contributing Area – DISTRICT-WIDE.

Figure 3    Discharge Equations for "V"–Notch and Rectangular Notch Weirs

Table A    Conservation Wet Detention, Conservation Design Pool Below SHWL Without Discharge.

## FIGURE 1
## Conservation Wet Detention
Discharge Structure End View and Discharge Structure Instream View



\* Skimmer clearances must be
adequate to avoid excessive
constriction of flow during
the design storm.

**Table A**
**Conservation Wet Detention**
Conservation Design Pool Below SHWL Without Discharge

| MANMADE WET DETENTION DESIGN AND PERFORMANCE STANDARDS | |
|---|---|
| **Treatment Volume/Depth** | 1" runoff from on-site; runoff from first 1" of rainfall from offsite |
| **Draw Down Time** | Not required for treatment volume |
| **Permanent Design Pool Volume** | Rainy season 14 day residence vol. plus treatment vol.; min. 1.667 in. runoff |
| **Other Criteria for System Design** | • 35% littoral zone @ control elev.; concentrated at outfall<br>• V-notch weir sized to discharge 1/2 in. runoff in 24 hrs., 10" max. flux. above SHWL/control elev.<br>• Littoral zone 2' max. depth below control elevation<br>• Design pool, 8' max. depth; 25% min. pond bottom below SHWL.<br>• Sediment sump and skimmer usually required<br>• Mulching or planting required if soils are unsuitable<br>• Side slopes 4H:1V unless safety fenced<br>• Inflow/outflow points must maximize circulation<br>• Control elev. not lower than SHWL and tailwater, nor higher than 2' above SHWL. |

**FIGURE 2**
14 Day Residence Volume in Acre-Feet Per Acre of Contributing Area – DISTRICT-WIDE



14 Day Residence Volume in Acre-Feet per Acre of Contributing Area - DISTRICT WIDE

**Rainy Season Rainfall**

Arcadia - 31.26 in./yr.
Bradenton - 33.70
Brooksville - 32.40
Lakeland - 28.55
Ocala - 29.33
*Average* - 31.04 in./yr.

**Equation Derivation**

$V_B = (C)(P)(A)(R)$

(C) = Given for watershed
(P) = (31.04/122) = 0.2544 in/day
(A) = 1 AC.
(R) = 14 days

$V_B = (C)(0.2544)(1)(14)(1/12)$

$V_B = 0.2968(C)$

**Steps for Using Graph**

1. Given rational coefficient (C)
2. Given watershed area (A AC.)
3. Enter (C) axis
4. Intersect (V_B) axis
5. Read (V_B) axis
6. Multiply (V_B) by (A AC.) to find permanent wet pool volume in Acre-Feet

RATIONAL RUNOFF COEFFICIENT (C)

14 DAY RESIDENCE VOLUME (V_B) (AF/Ac. WATERSHED)

## FIGURE 3
### Discharge Equations for "V"-Notch and Rectangular Notch Weirs

**"V"-Notch Weirs:**



The total flow over a "v"-notch weir is approximated by the equation:

$$Q = C \tan(\Theta/2)H^{5/2}$$

where the Coefficient of Discharge "C" is assumed to be 2.5 for v-notch weirs.

**Rectangular Notch Weirs:**



The total flow over a rectangular notch weir is approximated by the equation:

$$Q = C L H^{3/2}$$

where the Coefficient of Discharge "C" for a broad crested rectangular weir having a 6" breadth ranges between 2.8 and 3.3 for Head "H" ranging between 0.20 feet and 0.83 feet, respectively. [Reference Brater and King's Handbook of Hydraulics, Sixth Edition, Table 5-3, Page 5-40]

NOTE: Calculations for determining the size of a "v"-notch or rectangular notch weir to discharge a mixing volume in approximately 24-hours, should be based on a falling head analysis from the top of the weir notch down to an elevation no higher than 0.04 feet above the weir invert. The falling head analysis must also consider the pond stage – area data between the top of the weir notch and the weir invert elevation.

## APPENDIX C

## Figures Relating to Water Quality Provisions, Water Quantity Provisions and Retention Systems Within Sensitive Karst Areas



Figure 1. Oil Skimmer Detail for a Typical Outfall Structure (N.T.S.)



Figure 2. Typical Wet Detention Outfall Structure (N.T.S.)



Figure 3. Typical Wet Detention Outfall Structure with "V"-notch Weir (N.T.S.)



Figure 4. On-line treatment system.



Figure 5.   Off-line treatment system.



Figure 6.  Diversion box (N.T.S.).

Generalized geologic section in Sensitive Karst Area with limestone at and near land surface



Figure 7.  Generalized geologic section in Sensitive Karst Area with limestone at and near land surface



Figure 8. Retention basin added to Figure 7.



Figure 9. Retention pond with solution pipe

**APPENDIX D**


**OPERATING AGREEMENT CONCERNING REGULATION
UNDER PART IV, CHAPTER 373, F.S., BETWEEN
SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT AND
DEPARTMENT OF ENVIRONMENTAL PROTECTION**


Effective July 1, 2007

OPERATING AGREEMENT CONCERNING
REGULATION UNDER PART IV, CHAPTER 373, F.S.,
BETWEEN
SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT
AND
DEPARTMENT OF ENVIRONMENTAL PROTECTION

## I. INTENT

The Southwest Florida Water Management District (DISTRICT) and the State of Florida Department of Environmental Protection (DEPARTMENT) enter into this operating agreement (Agreement) to further streamline environmental permitting, while protecting the environment. This Agreement divides responsibility between the DISTRICT and the DEPARTMENT for the exercise of their authority regarding permits, compliance, and enforcement under Part IV, Chapter 373, F.S. This Agreement also divides responsibility between the DISTRICT and DEPARTMENT regarding formal wetland determinations pursuant to Subsection 373.421(2) through (5), F.S. It is a goal of this Agreement that the division of responsibilities provide no reduction in levels of compliance monitoring and enforcement and, where possible, allow increased levels of compliance monitoring and enforcement.

This Agreement supersedes the following agreements: Operating Agreement Concerning Management and Storage of Surface Waters Regulation, and Wetland Resource Regulation Between Southwest Florida Water Management District and Department of Environmental Regulation, dated August 10, 1992; First Amendment to Operating Agreement Concerning Management and Storage of Surface Waters Regulation, and Wetland Resource Regulation Between Southwest Florida Water Management District and Department of Environmental Regulation, dated February 17, 1994; Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., Between Southwest Florida Water Management District and Department of Environmental Protection, dated September 27, 1994; and Operating Agreement Concerning Regulation Under Part IV, Chapter 373, F.S., and Aquaculture General Permits Under Section 403.814, F.S., Between Southwest Florida Water Management District and Department of Environmental Protection, dated October 27, 1998.

As a future step to further increase the efficiency and effectiveness of environmental permitting, the DISTRICT and the DEPARTMENT shall jointly pursue further integration and streamlining of federal and state wetlands regulations.

## II. RESPONSIBILITIES OF DISTRICT AND DEPARTMENT

### A. DEPARTMENT Responsibilities

1.    Permits and Variances

The DEPARTMENT shall review and take final action on all applications for permits and petitions for variances, under Part IV, Chapter 373, F.S., and variances or waivers under Section 120.542, F.S., for the project types listed in a. through t. below. The permit applications encompassed within the DEPARTMENT'S responsibilities hereunder include those submitted for wetland resource (dredge and fill) permits and management and storage of surface waters (MSSW) permits, pursuant to Subsections 373.414(11) through (16), F.S., as well as those submitted for environmental resource permits.

a.    All solid waste management facilities that require a permit under Chapter 403, F.S. However, the DISTRICT shall review and take final action on permit applications when the solid waste management facility qualifies for a solid waste general permit and is merely an incidental component of a project for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

b.    Hazardous waste facilities that require a permit under Chapter 403, F.S. However, the DISTRICT shall review and take final action on permit applications when the storage of hazardous waste is merely an incidental component of a project for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

c.    Domestic or industrial wastewater treatment, storage, transmission, effluent disposal, or water reuse facilities that require a permit under Chapter 403, F.S. This includes all facilities and activities located at the domestic or industrial wastewater treatment facility; all reuse sites permitted under Parts II or IV, Chapter 62-610, F.A.C.; treatment facility; all reuse sites permitted under Part VI, Chapter 62-610, F.A.C.; and wetlands land application sites permitted under Part VI, Chapter 62-610, F.A.C.; and wetlands created using reclaimed water from domestic wastewater or industrial wastewater sources. However, the DISTRICT shall review and take final action on permit applications for:

(1)    Water reuse sites permitted under Part III, Chapter 62-610, F.A.C., such as facilities for the storage and application of reclaimed water to irrigate crops, golf courses, or other landscapes;

(2)    Activities involving the application of reclaimed water to rehydrate wetlands or to provide artificial recharge to reduce or mitigate drawdown impacts due to well withdrawals;

(3)    Those facilities that are subject to any of the requirements of Chapters 40D-4 or 40D-40, F.A.C., through a system or activity which is not fully

2

contained on the domestic or industrial wastewater facility site, but which is part of a larger project for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement;

(4)   Those facilities that qualify for a general or generic permit pursuant to Rules 62-660.801, F.A.C. (General Permit for a Wastewater Disposal System for a Laundromat), 62-660.802, F.A.C. (General Permit for a Pesticide Waste Degradation System), 62-660.803, F.A.C. (General Permit for Car Wash Systems), 62-660.805, F.A.C. (General Permit for Disposal of Tomato Wash), or 62-621.300(2), F.A.C. (Generic Permit for Discharge of Produced Ground Water from any Non-Contaminated Site Activity); and

(5)   Those facilities in which the industrial wastewater component is merely an HVAC (heating, ventilation, and air conditioning) cooling tower discharge, or other industrial wastewater treatment facility which is merely an incidental component of a project for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

d.   Potable water facilities that require a permit under Chapter 403, F.S. This includes drinking water treatment plants as well as distribution mains. However, the DISTRICT shall review and take final action on permit applications for distribution lines that are fully contained within systems for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement;

e.   All mines as defined in Chapter 378, F.S. However, the DISTRICT shall review and take final action on permit applications for sand, shell, and clay mines, other than fuller's earth, mines that do not involve processing other than the use of a scalping screen to remove large rocks, wood, and debris.

f.   Power plants and electrical distribution and transmission lines and other facilities related to the production, transmission and distribution of electricity. However, the DISTRICT shall review and take final action on electrical distribution lines fully contained within any larger plan of development for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

g.   Communication cables and lines. However, the DISTRICT shall review and take final action on communication cables and lines fully contained within any larger plan of development for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

h.   Natural gas or petroleum exploration, production, and distribution activities and facilities, product pipelines, and other facilities related to the exploration, production, and distribution of natural gas and petroleum. However, the DISTRICT shall review and take final action on natural gas distribution lines fully contained within any

larger plan of development for which the DEPARTMENT does not review and take final action on permit applications under any other paragraph in Section II.A.1. of this Agreement.

    i.    Docking facilities, boardwalks, shore protection structures and piers, including the adjacent docking and boating related development and navigational dredging. Adjacent docking and boating related development includes parking areas for the docking facility, dry storage facilities, boat sale and supply facilities, maintenance and repair facilities, associated seafood loading and processing facilities, restaurants, harbor master and marina administration facilities. Residential development and other commercial development are not considered docking or boating related. The DEPARTMENT shall also review and take final action on permit applications for docking, boating related, boardwalk, shore protection or pier projects which include existing project related commercial or residential development that does not have a previously issued DISTRICT permit under Part IV, Chapter 373, F.S., and which do not propose new project related commercial or residential development. The DISTRICT shall review and take final action on permit applications for all docking facilities, boardwalks, shore protection structures and piers, including adjacent docking and boating related development and navigational dredging, whenever such facilities are part of a larger plan of other commercial or residential development that has received or requires a permit under Part IV, Chapter 373, F.S.

    j.    Systems proposed in whole or in part seaward of the coastal construction control line (CCCL). The CCCL has been established in the following counties: Pinellas through those portions of Charlotte within the area of the DISTRICT. In counties where a CCCL has not been established, systems proposed in whole or in part seaward of a point 50 feet above the mean high water line at any riparian coastal location fronting the Gulf of Mexico shoreline, exclusive of bays, inlets, rivers, bayous, creeks, passes, and the like.

    k.    Projects constructed, operated or maintained by the DISTRICT. However, activities of the DISTRICT permitted under Sections 403.91 through 403.929, F.S., or the rules adopted pursuant to those statutes, and activities of the DISTRICT which did not require a permit under such statutes or rules, shall not require a permit under Part IV, Chapter 373, F.S., provided such activities are part of a project which was commenced prior to October 3, 1995.

    l.    Navigational dredging constructed, operated or maintained by governmental entities except where associated with a larger project that is otherwise the responsibility of the DISTRICT for review and final action.

    m.    Seaports and adjacent seaport related development where the applicant or property owner is a port authority as defined in Subsection 315.02(2), F.S.

    n.    A system serving or consisting of up to three contiguous parcels of land under single ownership where each parcel contains or is proposed to contain only one

single-family dwelling unit, i.e. detached single-family, duplex, triplex or quadraplex (hereinafter referred to as a residential unit), except where the residential unit is only an incidental part of a parcel that is otherwise used for agricultural activities for which a permit has been issued or is required under Part IV, Chapter 373, F.S.

o.    The following systems in wetlands or other surface waters when they are not part of a larger plan of development for which the DISTRICT reviews and takes final agency action under any other paragraph of this Agreement: boat ramps, ski jumps, ski slalom courses, aids to navigation, mooring buoys and fields, piling supported structures which are not physically connected to uplands, aquatic plant management activities regulated under Chapter 369, F.S., fish, attractors, artificial reefs, treasure salvage, archeological research or exploration, and removal of organic detrital material.

p.    Temporary systems proposed for commercial film productions.

q.    High speed rail facilities under Sections 341.8201 through 341.842, F.S.

r.    Aquaculture activities not exempt pursuant to Subsection 373.406(8), F.S.

s.    All activities on sovereignty submerged lands leased by the Division of Recreation and Parks, except those proposed by the DEPARTMENT.

t.    Projects constructed, operated or maintained by the U.S. Army Corps of Engineers.

## 2.    Formal Determinations

The DEPARTMENT shall review and take final action on petitions for formal determinations of the extent of wetlands and other surface waters pursuant to Section 373.421, F.S., filed by entities regarding properties on which they propose to undertake activities for which the DEPARTMENT would have permitting responsibility under this Agreement.

The DEPARTMENT shall provide the DISTRICT with copies of formal determinations of the extent of wetlands or other surface waters issued by the DEPARTMENT.

## 3.    Mitigation Banks and Regional Offsite Mitigation Area Agreements (ROMA)

The DEPARTMENT shall review and take final action on all permit applications for mitigation banks and ROMA agreement proposals, under Sections 373.4135 and 373.4136, F.S., filed by one of the following:

a.    Entities proposing to use DISTRICT-owned lands.

b.    Governmental entities, excluding the DEPARTMENT, proposed solely to offset the impacts of single-family residential units, pursuant to Subsection 373.4135(6),

F.S., for which the DEPARTMENT reviews and takes final action under Section II.A.1. of this Agreement.

     o.    The DISTRICT.

## B. DISTRICT Responsibilities

1.    **Permits and Variances**

The DISTRICT shall review and take final action on all applications for permits, petitions for variances, and petitions for formal determination under Part IV, Chapter 373, F.S., and variances and waivers under Section 120.542, F.S., except for those identified as the DEPARTMENT'S responsibility under this Agreement, and except as provided in Section II.E. of this Agreement. The permit applications encompassed within the DISTRICT'S responsibility hereunder include those submitted for wetland resource permits and MSSW permits under Subsections 373.414(11) through (16), F.S., as well as those submitted for environmental resource permits. The DISTRICT shall provide the DEPARTMENT with copies of formal determinations of the extent of wetlands or other surface waters issued by the DISTRICT.

2.    **DEPARTMENT Projects**

The DISTRICT shall review and take action on projects constructed, operated or maintained by the DEPARTMENT. However, activities of the DEPARTMENT permitted under Sections 403.91 through 403.929, F.S., or the rules adopted pursuant to those statutes, and activities of the DEPARTMENT which did not require a permit under such statutes or rules, shall not require a permit under Part IV, Chapter 373, F.S., provided such activities are part of a project which was commenced prior to October 3, 1995.

### C. Incorrectly Submitted Applications and Petitions; Modifications

Permit applications, petitions for variances or waivers, and petitions for formal determinations submitted to the incorrect agency pursuant to the terms of this Agreement shall be forwarded to the correct agency for further processing within 10 days of receipt, except where the agencies mutually agree that the application may be retained by the incorrect agency, in which case a special case agreement shall be executed in accordance with Section II.D. of this Agreement. A refund of any fee submitted to the incorrect agency that does not retain processing of the application shall be made to the applicant. Prior to transferring the application, the incorrect receiving agency shall coordinate with the proper reviewing agency and the applicant in order to inform all parties that the application has been submitted incorrectly and is being forwarded.

Notwithstanding Sections II.A. and II.B. of this Agreement permit modification requests shall be processed by the agency issuing the original permit. If the permit has been modified, the agency that issued the last modification to the permit shall process the modification. However, the following two exceptions apply:

1.    The DEPARTMENT shall process all modifications to permits for the following activities:

    a.    Solid waste management facilities as described in Section II.A.1.a. of this Agreement;

    b.    Mining projects as described in Section II.A.1.e. of this Agreement, when the modification involves the addition of new lands to the permit or the expansion of mining activities into areas not previously approved for mining; and

    c.    Seaports and seaport related development as described in Section II.A.1.n. of this Agreement.

2.    Alterations to stormwater systems previously authorized under Rules 17-25.040 or 62-25.040, F.A.C., shall not be considered as modifications under the provisions of this Section, and shall be processed by the agency that would have responsibility for reviewing and taking final agency action on the system under Sections II.A. and II.B. of this Agreement.

### D. Special Cases

By written agreement between the DISTRICT and the DEPARTMENT, responsibilities may deviate from the responsibilities outlined in Sections II.A., II.B., or II.C. above. Instances where this may occur include the following:

1.    An extensive regulatory history or a proprietary interest by either the DISTRICT or the DEPARTMENT with a particular project that would make a deviation result in more efficient and effective regulation. This may include activities on lands with a conservation easement held by the other agency;

2.    Simplification of the regulation of a project that crosses water management district boundaries;

3.    The incorrect agency has begun processing an application or petition and transfer of the application or petition would be inefficient; or

4.    Circumstances in which a deviation would result in the application or petition being more efficiently or effectively processed.

The Governing Board may delegate authority to staff to execute special case agreements.

## III. DELEGATION OF AUTHORITY: MIXING ZONES, ZONES OF DISCHARGE, VARIANCES

A.    The DEPARTMENT delegates authority to the DISTRICT to review and take final action on requests for zones of mixing in surface waters and zones of discharge in ground water, in accordance with Sections 62-4.242, 62-4.244, 62-28.700, 62-522.400 and 62-522.410, F.A.C., when the requests are associated with a permit application for which the DISTRICT is responsible under the terms of this Agreement.

B.    The DEPARTMENT delegates the authority to the DISTRICT to take action on petitions for variances or waivers from state water quality standards in accordance with Sections 120.542, 373.414(17) and 403.201, F.S., when the petition is associated with a permit application for which the DISTRICT is responsible under the terms of this Agreement.

## IV. COMPLIANCE MONITORING AND ENFORCEMENT

### A. Division of Responsibilities

Each agency shall perform compliance monitoring on all projects for which that agency has issued a permit, consent order, final order, or for which a consent final judgment or final judgment has been entered to determine compliance with the conditions thereof and will enforce said conditions by taking appropriate enforcement action where necessary. However, if the DEPARTMENT or the DISTRICT modifies a permit previously issued by the other agency, pursuant to this Agreement, the agency modifying the permit shall thereafter determine compliance with the permit and enforce all provisions or conditions of that permit.

Each agency shall investigate activities regulated under Part IV, Chapter 373, F.S., that are undertaken without the required permits, and take appropriate enforcement action, when it has permitting responsibilities for those activities under this Agreement.

When a violation of Part IV, Chapter 373, F.S., also constitutes a violation of Chapters 253 or 258, F.S., and the resolution of the violation under Part IV, Chapter 373, F.S., does not resolve the violation under Chapters 253 or 258, F.S., the DISTRICT shall coordinate compliance and enforcement actions with the DEPARTMENT, and shall forward a copy of the enforcement documentation generated on those violations to the DEPARTMENT for its use in addressing the violation under Chapters 253 or 258, F.S.

### B. Special Cases

By written agreement between the DISTRICT and the DEPARTMENT, enforcement responsibilities for specific cases may deviate from the responsibilities outlined in Section IV.A. of this Agreement. Instances where this may occur include:

8

1.    The case also includes activities that may be violations of rules of the DISTRICT or the DEPARTMENT that are not the subject of this Agreement;

2.    The case involves activities that cross water management district boundaries; or

3.    Deviation would result in the case being more effectively or efficiently handled.

The Governing Board may delegate authority to staff to execute special case agreements.

## V. EMERGENCIES

In a declared emergency, pooling of staff resources and deviations from the terms of this Agreement may be in the best interest of the public service and protecting or restoring property and environmental resources. Therefore, notwithstanding the divisions of responsibilities specified in this Agreement, where the Governor has issued an Executive Order which declares an emergency and the DISTRICT and the DEPARTMENT have issued emergency orders to implement the Executive Order, either party to this Agreement can review and take agency action·on any activities regulated under Part IV, Chapter 373, F.S., that are authorized by an emergency order during the duration of the emergency orders of the DISTRICT and the DEPARTMENT.

## VI. INTERAGENCY COMMITTEE

In order to seek consistency in the Environmental Resource Permit (ERP) Program and to facilitate the implementation of the DEPARTMENT'S responsibilities under Subsection 373.026(7), F.S., and Section 62-340.100, F.A.C., the DISTRICT and the DEPARTMENT agree to form and participate in an ERP Committee (Committee). The Committee shall meet at least twice a year, but may meet more frequently as issues arise that require interagency coordination. The Committee shall provide a forum for the DEPARTMENT and water management districts to coordinate and communicate regarding the following:

1.    Joint training efforts to maximize the use of training resources and ensure that adequate training is provided.

2.    Promotion of consistent interpretation and implementation of ERP rules.

3.    Proposed amendments to ERP rules.

4.    Development of consistent ERP compliance and enforcement.

5.    Future revisions to the DISTRICT and the DEPARTMENT operating agreements regarding the ERP program.

9

6.    Development of a statewide BRP data set and a computer data exchange methodology.

7.    Such other activities that the committee deems necessary or desirable to achieve and maintain the goals of this Agreement.

## VII.  EFFECTIVE DATE

This Agreement shall take effect July 1, 2007.

Applications, petitions, and enforcement cases, under Part IV, Chapter 373, F.S., which are pending on the effective date of this Agreement shall continue to be processed by the agency to which application or petition was made or which initiated the enforcement case, except when the DISTRICT and the DEPARTMENT agree, and in the case of an aquaculture activity the applicant also agrees, that an application, petition or enforcement case should be transferred in order to provide for more efficient processing and enforcement.    Applications and petitions received after the effective date of this Agreement will be processed as described in Section II of this Agreement.

AGREED TO this  1 st  day of  July , 2007.

SOUTHWEST FLORIDA WATER
MANAGEMENT DISTRICT

Talmadge G. "Jerry" Rice
Chair, Governing Board
2379 Broad Street
Brooksville, FL 34604-6899

STATE OF FLORIDA DEPARTMENT
OF ENVIRONMENTAL PROTECTION

Michael W. Sole
Secretary
2600 Blair Stone Road
Tallahassee, FL 32399-2400

10

## APPENDIX E

## FLEXIBILITY FOR STATE TRANSPORTATION PROJECTS AND FACILITIES

State linear transportation projects and facilities (collectively referred to as "projects" in this section) often have unique design limitations. In recognition of this, subsection 373.413(6), F.S., requires the Agency to consider and balance the expenditure of public funds for stormwater treatment with the benefits to the public in providing the most cost-efficient and effective method of achieving the treatment objectives of stormwater management systems when reviewing such projects. To accomplish this, alternatives to on-site treatment for water quality will be considered, including regional stormwater treatment systems, off-site compensating treatment. and incorporation of off-site runoff into the treatment system for the project.

The incorporation or comingling of off-site runoff into the treatment system for the project is often a more cost effective design when compared to routing off-site runoff around the system. In most cases the comingling of off-site stormwater runoff into the system will also provide for increased pollutant removal when compared to the design option of routing it around the system even if the system is designed to only meet the design and performance standards of Volume II for the runoff from just the on-site project area. However, for undeveloped or unimproved offsite areas co-mingling into an onsite FOOT retention type treatment system, the design capacity of the on-site system may need to be evaluated in order to ensure that there is no harm to the existing conditions. Such instances should be evaluated on a case-by-case basis.

# ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II

## FOR USE WITHIN THE GEOGRAPHIC LIMITS OF THE SOUTH FLORIDA WATER MANAGEMENT DISTRICT

### EFFECTIVE MAY 22, 2016

**Volume II (including Appendices A, B, C, D and E)
is incorporated by reference in
Rule 40E-4.091(1)(a) and Rule 62-330.010, F.A.C.**





**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II
FOR USE WITHIN THE GEOGRAPHIC LIMITS OF THE
SOUTH FLORIDA WATER MANAGEMENT DISTRICT
MAY 22, 2016**

## Table of Contents

PART 1 – INTRODUCTION, ORGANIZATION, APPLICABILITY ................................................. 4

1.0 INTRODUCTION ........................................................................................................... 4
1.1 CRITERIA OBJECTIVES ................................................................................................ 5
1.2 DISTRICT-SPECIFIC THRESHOLDS ............................................................................... 5
1.3 DISTRICT-SPECIFIC EXEMPTIONS ............................................................................... 6

PART II – GENERAL CRITERIA ................................................................................. 6

2.0 GENERAL CRITERIA FOR ALL STORMWATER MANAGEMENT SYSTEMS ......................... 6
2.1 DEFINITIONS ............................................................................................................. 6
2.2 PROFESSIONAL CERTIFICATION .................................................................................. 8
2.3 WATER AND WASTEWATER SERVICE AND CONCURRENT PROCESSING ......................... 8
2.4 RETROFITS OF EXISTING STORMWATER MANAGEMENT SYSTEMS ............................... 9
2.5 FLEXIBILITY FOR STATE TRANSPORTATION PROJECTS AND FACILITIES ...................... 11

PART III – STORMWATER QUANTITY/FLOOD CONTROL ........................................ 11

3.1 GENERAL ................................................................................................................ 11
3.2 DISCHARGE RATE .................................................................................................... 11
3.3 DESIGN STORM ....................................................................................................... 11
    3.3.1 Methodologies ................................................................................................ 11
    3.3.2 Aggregate Discharge ..................................................................................... 12
    3.3.3 Upper Soil Zone Storage and Surface Storage............................................. 12
3.4 FLOOD PROTECTION OF BUILDING FLOORS ............................................................... 13
3.5 FLOOD PROTECTION OF ROADS AND PARKING LOTS ................................................. 13
3.6 FLOOD PLAIN ENCROACHMENT ................................................................................. 14
3.7 HISTORIC BASIN STORAGE ...................................................................................... 14
3.8 OFFSITE LANDS ...................................................................................................... 14
3.9 MINIMUM DRAINAGE ................................................................................................ 14
3.10 OVERDRAINAGE AND WATER CONSERVATION ......................................................... 15
3.11 DETENTION AND CONTROL ELEVATIONS .................................................................. 15
3.12 LAKE-WETLAND SEPARATION ................................................................................. 15
3.13 WATER SUPPLY SOURCES ...................................................................................... 16

PART IV – STORMWATER QUALITY .......................................................................... 16

4.1 STATE STANDARDS .................................................................................................. 16
    4.1.1 How Standards are Applied............................................................................ 16
    4.1.2 Erosion and Sediment Control Criteria for Stormwater Management Systems....................... 17
    4.1.3 Direct Discharges to Outstanding Florida Waters ......................................... 17
    4.1.4 Projects Discharging to Impaired Waters or to Outstanding Florida Waters................................ 17
4.2 RETENTION / DETENTION CRITERIA ........................................................................... 17
    4.2.1 Volumetric Requirements ............................................................................... 17
    4.2.2 Land Use and Coverage Criteria .................................................................. 18
4.3 INCORPORATION OF NATURAL AREAS AND EXISTING WATERBODIES ........................... 20
4.4 UNDERGROUND EXFILTRATION SYSTEMS .................................................................. 20
4.5 SEWAGE TREATMENT PERCOLATION PONDS .............................................................. 20

4.6 CRITERIA FOR CREATION OF WATERBODIES.................................................................20
4.7 IMPERVIOUS AREAS ........................................................................................................21
4.8 STAGNANT WATER CONDITIONS ...................................................................................21
4.9 WATER QUALITY MONITORING .......................................................................................21
4.10 SOLID WASTE FACILITIES .............................................................................................23

PART V – WATER MANAGEMENT SYSTEM DESIGN AND CONSTRUCTION CRITERIA ................. 24

5.1 DISCHARGE STRUCTURES .............................................................................................24
5.2 CONTROL DEVICES/BLEED-DOWN MECHANISMS FOR DETENTION SYSTEMS ...........25
5.3 RETENTION SYSTEMS .....................................................................................................25
    5.3.1 Description .................................................................................................................25
    5.3.2  Retention Basin Construction ...................................................................................26
    5.3.3 Dry Retention/Detention Areas (Not Applicable to Natural or Mitigation Wetland Areas).........26
5.4 WET DETENTION DESIGN AND PERFORMANCE CRITERIA............................................26
    5.4.1 Pond Configuration ...................................................................................................26
    5.4.2 Wet Retention/Detention Area Dimensional Criteria (As Measured at or from the Control
    Elevation) ...........................................................................................................................26
5.5 MAINTENANCE ACCESS AND EASEMENTS ...................................................................28
5.6 EXFILTRATION SYSTEMS ................................................................................................28
    5.6.1 Description.................................................................................................................28
    5.6.2 Construction ..............................................................................................................28
5.7 REQUIRED DESIGN INFORMATION AND ASSUMPTIONS ...............................................29
    5.7.1 Antecedent Conditions ..............................................................................................29
    5.7.2 Rainfall......................................................................................................................29
    5.7.3 Evapotranspiration ....................................................................................................30
    5.7.4 Storage .....................................................................................................................30
        5.7.4.1 Open Surface......................................................................................................30
    5.7.5 Infiltration and Percolation.........................................................................................31
        5.7.5.2 Subsurface..........................................................................................................31
    5.7.6 Runoff .......................................................................................................................31
    5.7.7 Receiving Water Stage...............................................................................................31
    5.7.8 Runoff Coefficient and Curve Number for Stormwater Management Ponds .............32
5.8 INSPECTION AND MAINTENANCE ...................................................................................32

APPENDICES ...........................................................................................................................33

    APPENDIX A: SFWMD - ALLOWABLE DISCHARGE FORMULAS.........................................1
    APPENDIX B: ABOVE GROUND IMPOUNDMENTS ...............................................................3
    APPENDIX C: ISOHYETAL MAPS........................................................................................11
    APPENDIX D: SFWMD BASINS...........................................................................................20
    APPENDIX E: PROCEDURE FOR ENVIRONMENTAL RESOURCE PERMIT WATER QUALITY EVALUATIONS
    FOR APPLICATIONS INVOLVING DISCHARGES TO OUTSTANDING FLORIDA WATERS AND WATER BODIES
    THAT DO NOT MEET STATE WATER QUALITY STANDARDS ............................................21

## PART 1 – INTRODUCTION, ORGANIZATION, APPLICABILITY

## 1.0 INTRODUCTION

This **Applicant's Handbook Volume II** accompanies Chapter 62-330, Fla. Admin. Code (F.A.C.), and the "**Environmental Resource Permit Applicant's Handbook Volume I (General and Environmental)**" **(Applicant's Handbook Volume I)**.— **Applicant's Handbook Volume I** is applicable to all environmental resource permit applications, and provides background information on the environmental resource permit (ERP) program, including:

- Points of contact;
- A summary of the statutes and rules that are used to authorize and implement the ERP program;
- A summary of the types of permits, permit thresholds, and exemptions;
- Procedures used to review exemptions and permits;
- Conditions for issuance of an ERP, including the environmental criteria used for activities located in wetlands and other surface waters;
- Erosion and sediment control practices to prevent water quality violations; and
- Operation and maintenance requirements.

This Volume is designed to be applicable only to those ERP applications that involve the design of a stormwater management system that requires a permit as provided in Chapter 62-330, F.A.C., or Section 403.814(12) F.S. This volume also contains South Florida Water Management District (District) specific appendices for regionally-specific criteria such as basin maps for cumulative impact assessments (see Applicant's Handbook Volume I, Section 10.2.8), mitigation bank service area determination (refer to Chapter 62-342, F.A.C), and above ground impoundments.

Projects that qualify for a general permit in Section 403.814(12), F.S., are not regulated under Chapter 62-330, F.A.C. However, **Applicant's Handbook Volume II** contains design and performance standards that are relevant to the design of projects that qualify for that general permit.

This Volume provides specific, detailed water quality and quantity design and performance criteria for stormwater management systems regulated by the District through the ERP program authorized under Part IV of Chapter 373, F.S. This Volume explains, and provides more detail on, the rule criteria for stormwater quality and quantity contained in Chapter 62-330, F.A.C.  In cases where conflicting or ambiguous interpretations of the information in this Volume results in uncertainty, the final determination of appropriate procedures to be followed will be made using Chapters 120 and 373, F.S., applicable F.A.C. rule chapters, and best professional judgment of Agency staff.

**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II**
**Effective: MAY 22, 2016**

Both Applicant's Handbook Volumes I and II are adopted by reference in Chapter 62-330, F.A.C. Applicant's Handbook Volume II is also incorporated in Rule 40E-4.091, F.A.C. Both Applicant's Handbook Volumes I and II are rules of the Department and the District. The term "Agency," where used in this Volume, shall apply to the Department, the District, or a delegated local government, as applicable, in accordance with the division of responsibilities specified in the Operating Agreements incorporated by reference in subsection 62-330.010(5) and Rule 40E-4.091, F.A.C., except where a specific Agency is otherwise identified. Volume II applies whether an ERP application is processed and acted on by the Department, a District, or a delegated local government. The Handbooks are written to provide more detail and clarity to the public in understanding the statutory and rule provisions that implement the ERP program.

## 1.1 Criteria Objectives

The criteria contained herein were established with the primary goal of meeting water resource objectives as set forth in Part IV of Chapter 373, F.S. Performance criteria are used where possible. Other methods of meeting overall objectives of the District and which meet the conditions for issuance set forth in Rules 62-330.301 and 62-330.302, F.A.C., will be considered. Compliance with the criteria herein constitutes a presumption that the project proposal is in conformance with the conditions for issuance set forth in Rules 62-330.301 and 62-330.302, F.A.C.  Pursuant to Section 373.4131, F.S., if a stormwater management system is designed in accordance with the criteria in this Handbook or if a system is constructed, operated, and maintained for stormwater treatment in accordance with a valid Environmental Resource Permit or exemption under Part IV of Chapter 373, the discharges from the system are presumed not to violate applicable state water quality standards.

An applicant may propose alternative designs to those provided in this Volume for consideration by the Agency.  However, reasonable assurance in the form of plans, test results, or other information must be provided by the applicant to demonstrate that the alternative design meets the conditions for issuance (Rules 62-330.301 and 62-330.302, F.A.C.).

## 1.2 District-Specific Thresholds

Within Miami-Dade County, an ERP is not required for the construction, alteration or operation of a stormwater water management system in uplands provided that system meets all of the conditions below:

1. The project area is less than 40 acres with positive stormwater outfall or the project area is less than 320 acres with less than 160 acres of impervious area, and no positive stormwater outfall;
2. The design plans and calculations are signed and sealed by a registered professional;
3. The system meets the criteria specified in Rules 62-330.301 and 62-330.302, F.A.C.; and
4. The system is not located in natural water bodies, wetlands, waters of the state, or

an Outstanding Florida Water as listed in Rule 62-302.700, F.A.C.

## 1.3 District-Specific Exemptions

There are no exemptions specific to the South Florida Water Management District geographical area.  All applicable exemptions can be found in Rules 62-330.051-.0511, F.A.C.

## PART II – GENERAL CRITERIA

## 2.0 General Criteria for all Stormwater Management Systems

This Volume applies to the design of stormwater management systems that require a permit under Chapter 62-330, F.A.C., or a general permit as provided under Section 403.814(12), F.S. Additional special basin criteria within SFWMD can be found in Chapter 40E-41, F.A.C (for Western C-9 Basin, Kissimmee River Basin, C-51 Basin, and the Water Preserve Area Basins of Palm Beach and Broward Counties), Chapter 40E-61 F.A.C (for the Lake Okeechobee Basin), and Chapter 40E-63, F.A.C (for the Everglades Agricultural Area).

## 2.1 Definitions

The definitions set forth in Applicant's Handbook Volume I, Section 2.0(a) are applicable to Volume II.

**2.1.1  "Agency" -** The Department of Environmental Protection or South Florida Water Management District or a delegated local government, as applicable, in accordance with division of responsibilities specified in the Operating Agreements incorporated by reference in subsection 62-330.010(5), and Rule 40E-4.091, F.A.C.

**2.1.2 "Control device" -** Element of a discharge structure which allows the gradual release of water under controlled conditions. It is sometimes referred to as the bleed-down mechanism, or "bleeder".

**2.1.3 "Control elevation" -** The lowest elevation at which water can be released through the control device.

**2.1.4 "Department" -** The Department of Environmental Protection.

**2.1.5 "Detention" -** The delay of stormwater runoff prior to discharge into receiving waters.

**2.1.6 "Detention volume" -** The volume of open surface storage behind the discharge structure between the overflow elevation and control elevation.

**2.1.7 "District" -** The South Florida Water Management District.

**2.1.8 "Elevation" -** Height in feet above mean sea level according to National Geodetic Vertical Datum (NGVD) or North American Vertical Datum 88 (NAVD).

**2.1.9 "Exfiltration trench" -** A subsurface retention system consisting of a conduit such as perforated pipe surrounded by natural or artificial aggregate which temporarily stores and infiltrates stormwater runoff.

**2.1.10 "Historic discharge" -** The peak rate at which runoff leaves a parcel of land by gravity in an undisturbed/natural state, or the legally allowable discharge in effect at the time of permit application.

**2.1.11 "Impervious" -** Land surfaces which do not allow, or minimally allow, the penetration of water. Examples include building roofs, normal concrete and asphalt pavements, and some fine grained soils such as clays.

**2.1.12 "Mean annual higher high tide" -** The arithmetic mean of the higher high water elevations observed at a location or tidal station over the National Tidal Datum Epoch. Only the higher high water of each pair of high waters of the tidal day is included in the mean.

**2.1.13 "Overflow elevation" -** Design elevation of a discharge structure at which, or below which, water is contained behind the structure, except for that which leaks out, or bleeds out, through a control device down to the control elevation.

**2.1.14 "Regulated activity" -** The construction, alteration, operation, maintenance, abandonment or removal of a surface water management system, including dredging and filling, regulated pursuant to Part IV, Chapter 373, F.S.

**2.1.15 "Retention" -** The prevention of stormwater runoff from direct discharge into receiving waters. Examples include systems which discharge through percolation, exfiltration, filtered bleed-down and evapotranspiration processes.

**2.1.16 "Retention/detention area (dry)" -** Water storage area with bottom elevation at least one foot above the control elevation of the area. Sumps, mosquito control swales and other minor features may be at a lower elevation.

**2.1.17 "Retention/detention area (wet)" -** A water storage area with bottom elevation lower than one foot above the control elevation of the area.

**2.1.18 "Staff Report" -** A written report prepared by Agency staff setting forth staff's conclusions and recommendations based on review of an application. The description of the project in the Staff Report shall take precedence over application data contained in Agency permit files, since numerous project changes are often made by applicants during application processing, the results of which may only be reflected in the Staff Report. Staff Reports serve as notice of proposed agency action.

**2.1.19 "State water quality standards"** – Water quality standards adopted pursuant to Chapter 403, F.S. [Section 373.403(11), F.S.], including standards composed of designated most beneficial uses (classification of waters), the numerical and narrative criteria applied to the specific water use or classification, the Florida anti-degradation policy (Rules 62-4.242, 62-302.300, F.A.C.), and the moderating provisions contained in Chapters 62-4 (2/17/2016) [http://www.flrules.org/Gateway/reference.asp?No=Ref-06802], 62-302 (2/17/2016) [http://www.flrules.org/Gateway/reference.asp?No=Ref-06803], 62-520 (7/12/2009) [http://www.flrules.org/Gateway/reference.asp?No=Ref-02977], and 62-550, F.A.C. (7/7/2015) [http://www.flrules.org/Gateway/reference.asp?No=Ref-06804], incorporated by reference herein and in Rule 40E-4.091, F.A.C. Copies of Chapters 62-4, 62-302, 62-520 and 62-550, F.A.C., are available at no cost by contacting the South Florida Water Management District Clerk's Office, 3301 Gun Club Road, West Palm Beach, FL 33406 (800) 432-2045, ext. 2087, or (561) 682-2087.

**2.1.20 "Surface Water Management System" or "System" -** A stormwater management system, dam, impoundment, reservoir, appurtenant work or works, or any combination thereof. The terms "surface water management system" or "system" include areas of dredging or filling as defined by Section 373.403(13) and (14), F.S., respectively.

**2.1.21 "Tailwater" -** The receiving water elevation (or pressure) at the final discharge point of the stormwater management system.

**2.1.22 "Water management areas" -** Areas to be utilized for the conveyance, treatment or storage of stormwater.

**2.1.23 "Wet detention systems" -** Permanently wet ponds which are designed to slowly release collected stormwater runoff through an outlet structure.

## 2.2 Professional Certification

All construction plans and supporting calculations submitted to the Agency for surface water management systems that require the services of a registered professional must be signed, sealed, and dated by a registered professional.

## 2.3 Water and Wastewater Service and Concurrent Processing

(a)    Potable water, irrigation and wastewater facilities must be identified. An applicant for an environmental resource permit must provide documentation on how these services are to be provided. If wastewater disposal is accomplished on-site, additional information shall be requested regarding separation of waste and stormwater management systems.

(b)    For environmental resource permits, if on-site consumptive water use withdrawals are also proposed for which a District water use permit is required, the environmental resource and water use permits must be

processed simultaneously. These requirements are dependent upon site specific water resource limitations. It is recommended that the applicant contact Agency staff prior to filing an application to determine whether the proposed project necessitates simultaneous environmental resource and water use permitting.

## 2.4  Retrofits of Existing Stormwater Management Systems

(a)    A stormwater retrofit project is typically proposed by a county, municipality, state agency, or water management district to provide new or additional treatment or attenuation capacity, or improved flood control to an existing stormwater management system or systems. Stormwater retrofit projects shall not be proposed or implemented for the purpose of providing the water quality treatment or flood control needed to serve new development or redevelopment.

Example components of stormwater retrofit projects are:

1.    Construction or alteration that will add additional treatment or attenuation capacity and capability to an existing stormwater management system;

2.    Modification, reconstruction, or relocation of an existing stormwater management system or stormwater discharge facility;

3.    Stabilization of eroding banks through measures such as adding attenuation capacity to reduce flow velocities, planting of sod or other vegetation, and installation of rip rap boulders;

4.    Excavation or dredging of sediments or other pollutants that have accumulated as a result of stormwater runoff and stormwater discharges.

(b)    Stormwater Quality Retrofits

1.    The applicant for a stormwater quality retrofit project must provide reasonable assurance that the retrofit project itself will, at a minimum provide additional water quality treatment such that there is a net reduction of the stormwater pollutant loading into receiving waters. Examples are:

a.    Addition of treatment capacity to an existing stormwater management system such that it reduces loadings of stormwater pollutants of concern to receiving waters;

b.    Adding treatment or attenuation capability to an existing developed area when either the existing stormwater management system or the developed area has substandard stormwater treatment and attenuation capabilities, compared

to what would be required for a new system requiring a permit under Part IV of Chapter 373, F.S.; or

    c.    Removing pollutants generated by, or resulting from, previous stormwater discharges.

2. If the applicant has conducted, and the Agency has approved, an analysis that provides reasonable assurance that the proposed stormwater quality retrofit will provide the intended pollutant load reduction from the existing system or systems, the project will be presumed to comply with the requirements in Part IV of this Volume.

3. The pollutants of concern will be determined on a case-by-case basis during the permit application review based upon factors such as the type and intensity of land use, existing water quality data within the area subject to the retrofit, and the degree of impairment or water quality violations in the receiving waters.

(c) Stormwater Quantity (Flood Control) Retrofits

The applicant for a stormwater quantity retrofit project must provide reasonable assurance that the retrofit project will reduce existing flooding problems in such a way that it does not cause any of the following:

1. A net reduction in water quality treatment provided by the existing stormwater management system or systems;
2. Increased discharges of untreated stormwater entering adjacent or receiving waters;

If the applicant has conducted, and the Agency has approved, an analysis that provides reasonable assurance that the stormwater quantity retrofit project will comply with the above, the project will be presumed to comply with the requirements in Part III of this Volume.

(d) The applicant for any stormwater retrofit project must design, construct, operate, and maintain the project so that it:

1. Will not cause or contribute to a water quality violation;
2. Does not reduce stormwater treatment capacity or increase discharges of untreated stormwater. Where existing ambient water quality does not meet water quality standards the applicant must demonstrate that the proposed activities will not cause or contribute to a water quality violation. If the proposed activities will contribute to the existing violation, measures shall be proposed that will provide a net improvement of the water quality in the receiving waters for those parameters that do not meet standards.

3.      Does not cause any adverse water quality impacts in receiving waters; or

4.      Will not cause or contribute to increased flooding of adjacent lands or cause new adverse water quantity impacts to receiving waters.

## 2.5 Flexibility for State Transportation Projects and Facilities

With regard to state linear transportation projects and facilities the Agencies shall be governed by subsection 373.413(6), F.S. (2012).

## PART III – STORMWATER QUANTITY/FLOOD CONTROL

## 3.1 General

This document refers to flood and drought frequency impacts interchangeably with rainfall frequency. Additional calculations may be required to identify other combinations of site conditions and rainfall frequencies which might result in impacts of the specified frequency. Examples include designs affected by spring tides, fluctuating tides and fluctuating receiving water stages.

## 3.2 Discharge Rate

Off-site discharge rate is limited to rates not causing adverse impacts to existing off-site properties, and:

(a)      Historic discharge rates; or
(b)      Rates determined in previous Agency permit actions; or
(c)      Rates specified in District criteria (see Appendix A to this Volume).

## 3.3 Design Storm

Unless otherwise specified by previous Agency permits or criteria, a storm event of 3 day duration and 25 year return frequency shall be used in computing off-site discharge rates. Applicants are advised that local drainage districts or local governments may require more stringent design storm criteria. An applicant who demonstrates its project is subject to unusual site specific conditions may, as a part of the permit application process, request an alternate discharge rate.

### 3.3.1  Methodologies

An acceptable peak discharge analysis typically consists of generating pre-development and post-development runoff hydrographs, routing the post-development hydrograph through a detention basin, and sizing an overflow structure to control post-development discharges at or below pre-development rates.  Acceptable design techniques also include the use of grassed waterways, and any other storage capability that the particular system may have.

Peak discharge computations shall consider the duration, frequency, and intensity of rainfall, the antecedent moisture conditions, upper soil zone and surface storage, time of concentration, tailwater conditions, changes in land use or land cover, and any other changes in topographic and hydrologic characteristics. Large systems shall be divided into sub-basins according to artificial or natural drainage divides to allow for more accurate hydrologic simulations.

Peak discharge calculations must make proper use of the SCS Peak Rate Factor or K' Factor. The Peak Rate Factor reflects the effect of watershed storage on the hydrograph shape and directly and significantly impacts the peak discharge value. As such, K' must be based on the true watershed storage of runoff, and not on the slope of the landscape which is more accurately accounted for in the time of concentration. However, the average slope of natural watersheds is highly interrelated with the surface storage potential. Land development will generally result in a reduction of natural storage. As a result, the K' value should either increase or remain constant, but never decrease. In most cases, post-development conditions will include detention storage areas; this storage should be accounted for by routing the hydrograph based on a defined stage-storage-discharge relationship and should therefore not be considered in determining K'. However, in some cases where surface storage is maintained, K' may be reduced to same value used in the pre-development condition.

### 3.3.2  Aggregate Discharge

Where multiple off-site discharges are designed to occur, if the combined discharges meet all other requirements of Chapter 62-330, F.A.C., and discharge to the same receiving waterbody, the Agency will allow the total post-development peak discharge not to exceed the pre-development peak discharge for the combined discharges rather than for each individual discharge.

### 3.3.3  Upper Soil Zone Storage and Surface Storage

In most instances, the upper soil zone storage and surface storage capacities will have an effect on the pre-development and post-development peak discharges and shall be considered in these computations. Any generally accepted and well-documented method may be used to develop the upper soil zone storage and surface storage values.

(a)     The soil zone storage at the beginning of a storm shall be estimated by using reasonable and appropriate parameters consistent with generally accepted engineering and scientific principles to reflect drainage practices, average wet season water table elevation, the antecedent moisture condition (generally AMC II) and any underlying soil characteristics that would limit or prevent percolation of storm water into the entire soil column. The soil storage used in the computation shall not exceed the difference between the maximum soil water capacity and the field capacity (for example, gravitational water) for the

12

soil columns above any impervious layer or seasonal groundwater table. Refer to Section 5.7.4.2 for additional soil storage criteria.

(b)    Surface storage, including that available in wetlands and low-lying areas, shall be considered as depression storage.  Depression storage shall be analyzed for its effect on peak discharge and the time of concentration.  Depression storage can also be considered in post-development storage routing which requires development of stage-storage relationships. If depression storage is considered, then both pre-development and post-development storage routing must be considered.

## 3.4 Flood Protection of Building Floors

Building floors shall be at or above the 100 year flood elevations, as determined from the most appropriate information, including Federal Flood Insurance Rate Maps. Both tidal flooding and the 100 year, 3 day storm event shall be considered in determining elevations.

Lower floor elevations will be considered for agricultural buildings which are non-residential and are not routinely accessed by the public. For example, agricultural structures such as barns or equipment sheds normally qualify for a lower finished floor elevation. Applicants are cautioned that potential water quality impacts caused by flooding of contents housed in a structure will be considered in allowing a reduced finished floor elevation.

## 3.5 Flood Protection of Roads and Parking Lots

Many local governments have criteria for the protection of roads and parking lots from flooding.

(a)    In cases where criteria are not specified by the local government with jurisdiction, the following design criteria for drainage and flood protection shall be used:

        frequency -    5 years
        duration -    1 day (road centerlines)
                          1 hour (parking lots served by exfiltration systems)

(b)    If the local government with jurisdiction has set flood protection criteria for roads and parking lots within commercial projects, the Agency will not require the applicant to meet Agency road and parking lot flood protection criteria. This shall only be allowed for commercial projects which are to remain single owner projects.  Such criteria may provide lesser degrees of flood protection than required under Agency criteria. Projects which are not permitted pursuant to Agency criteria will be special conditioned, as notice to the permittee and local government, that a substandard design has been permitted. The applicant shall, however, meet Agency criteria for water quality, off-site discharge and building floor elevations.

13

(c)    In each basin, the minimum roadway crown elevation shall be at least 2 feet higher than the control elevation, in order to protect the road subgrade.

## 3.6 Flood Plain Encroachment

No net encroachment into the floodplain, between the average wet season water table and that encompassed by the 100 year event, which will adversely affect the existing rights of others, will be allowed.

## 3.7 Historic Basin Storage

Provision must be made to replace or otherwise mitigate the loss of historic basin storage provided by the project site.

## 3.8 Offsite Lands

Onsite works such as swales and dikes shall be used to allow the passage of drainage from offsite areas to downstream areas. Diking of project development areas or other equivalent methods shall be used to contain water at or above stages identified in the project discharge computations.

## 3.9 Minimum Drainage

(a)    Residential projects shall have systems with the calculated ability to discharge by surface flow or subsurface percolation at least 3/8 inch per day during or subsequent to the storm of the allowable discharge frequency and duration, so that lowering of the water surface elevations within the water management system to the maximum depth compatible with the environmental protection or other constraints as described in 3.10, will occur in 12 days or less.

(b)  1.    Commercial and industrial projects to be subdivided for sale, where the initial permittee will not build the entire system, are required to have installed by the initial permittee, as a minimum,

a.    The required water quality system for one inch of runoff detention or one half inch of runoff retention in the master system for the total developed site. The individual sites must provide the remainder (2.5" x % impervious - one inch) which may be in exfiltration trench. The master system must be in a legally defined common area. The master system cannot utilize exfiltration trench.

b.    A stormwater collection and conveyance system to interconnect the retention/detention system with the outfall, with access points to the system available to each individual lot or tract. The system shall be sized to limit discharge under design conditions to the allowable discharge.

2.  Projects permitted in such manner will require deed restrictions which identify to lot or tract purchasers:

    a.  The amount of additional on-site storm water management system necessary to provide flood protection for specific design events,

    b.  Any additional retention/detention required for water quality purposes, and

    c.  The assumed percent impervious, or impervious area used in design calculations.

## 3.10 Overdrainage and Water Conservation

Systems shall be designed to:

(a)  maintain existing water table elevations in existing wellfield cones of depression;

(b)  preserve site environmental values (see Section 10.0 of Applicant's Handbook Volume I);

(c)  not waste freshwater;

(d)  not lower water tables which would adversely affect the existing rights of others; and

(e)  preserve site ground water recharge characteristics.

## 3.11 Detention and Control Elevations

Detention and control elevations shall be set to accomplish 3.10 and are subject to the following criteria:

(a)  Wetland protection elevations;

(b)  Consistency with surrounding land and project control elevations and water tables;

(c)  Possible restrictions by other agencies to include tree protection and landscape ordinances;

(d)  Consistency with water use permits; and

(e)  A maximum depth of six feet below natural ground.

## 3.12 Lake-Wetland Separation

Lakes which potentially may adversely affect wetland areas shall be separated from the wetland preservation, creation, or restoration areas by a minimum distance as determined by the following criteria:

(a)  A separation distance (shortest distance between the wetland jurisdictional line and the edge of water in the proposed waterbody at the proposed control elevation) producing a gradient less than or equal to 0.005 using the difference in the elevation of the jurisdictional boundary of the wetland and

the basin control elevation to calculate the driving head. Staff will consider elevations differing from the jurisdictional boundary of the wetland to calculate the driving head. The applicant will be required to submit monitoring data or other relevant hydrologic data from the site to substantiate the reason for using a different starting elevation. Existing conditions alone will not be considered sufficient reason to use a different elevation if there is evidence that activities on or adjacent to the project site may be responsible for lowering water tables which may be currently having an adverse impact on the subject wetlands. In these cases, preservation of the wetlands cannot be assured by simply maintaining the existing conditions.

(b)    If the gradient resulting from any separation distance and the driving head as defined above is between 0.005 and 0.015, then calculations will be required which demonstrate that the drawdown in the adjacent wetland(s) will be of a magnitude which will not result in adverse impacts on the wetland. A drawdown of more than 12 vertical inches in a 90-day period with no recharge shall be presumed to be an adverse impact.

(c)    If the gradient is equal to or greater than 0.015, then construction of an impermeable barrier or other equivalent action must be taken to mitigate for the impact of the proposed excavation between the wetland and the excavation.

(d)    The Agency will review modeling results which demonstrate that a gradient equal to or greater than 0.015 will not have an adverse impact on the adjacent wetland. Model input data shall be derived from a detailed soil profile constructed from a minimum of three separate sampling locations with permeability testing results on selected samples. Two-dimensional modeling may be necessary to represent the site geometry.

## 3.13 Water Supply Sources

An evaluation of the impact of the proposed surface water management system on sources of water supply must be submitted with the surface water management application. Cumulative impacts which may result from the construction and operation of the proposed surface water management system must be evaluated in conjunction with the cumulative withdrawals of existing legal uses of water.

## PART IV – STORMWATER QUALITY

## 4.1 State Standards

Projects shall be designed and operated so that off-site discharges will meet State water quality standards.

### 4.1.1  How Standards are Applied

The quality of stormwater discharged to receiving waters is presumed to meet the surface water standards in Chapters 62-4 and 62-302, F.A.C., and the groundwater standards in Chapters 62-520 and 62-550 F.A.C., if the system is permitted, constructed, operated and maintained in accordance with Chapter 62-330, F.A.C., and Part III, Part IV, and Part V of this Volume. However, this presumption is rebuttable. The volume of runoff to be treated from a site shall be determined by the type of treatment system. If off-site runoff is not prevented from combining with on-site runoff prior to treatment, then treatment must be provided for the combined off-site and project runoff.

## 4.1.2 Erosion and Sediment Control Criteria for Stormwater Management Systems

Land clearing activities, including the construction of stormwater management systems, shall be designed, constructed, and maintained at all times so that erosion and sedimentation from the system, including the areas served by the system, do not cause violations of applicable state water quality standards in receiving waters. Further, because sedimentation of offsite lands can lead to public safety concerns, erosion and sediment controls shall be designed and implemented to retain sediment on-site as required by subsection 62-40.432(2), F.A.C. In particular, the erosion and sediment control requirements described in Part IV of Applicant's Handbook Volume I shall be followed during construction of the system.

## 4.1.3 Direct Discharges to Outstanding Florida Waters

Systems which have a direct discharge to an OFW, must provide an additional fifty percent of the required treatment.

## 4.1.4 Projects Discharging to Impaired Waters or to Outstanding Florida Waters

Systems discharging to a waterbody that has been identified as impaired by the Department of Environmental Protection pursuant to 403.067, F.S., or to an Outstanding Florida Water, shall be designed in accordance with the procedures in Appendix E.

## 4.2 Retention / Detention Criteria

4.2.1 Volumetric Requirements

   (a)    Retention, detention, or both retention and detention in the overall system, including swales, lakes, canals, greenways, etc., shall be provided for one of the three following criteria or equivalent combinations thereof:

       1.    Wet detention volume shall be provided for the first inch of runoff from the developed project, or the total runoff of 2.5 inches times the percentage of imperviousness, whichever is greater.

       2.    Dry detention volume shall be provided equal to 75 percent of the above amounts computed for wet detention.

       3.    Retention volume shall be provided equal to 50 percent of the above amounts computed for wet detention. Retention volume included in

flood protection calculations requires a guarantee of long term operation and maintenance of system bleed-down ability. Examples of such guarantee include evidence of excellent soil percolation rates, such as coastal ridge sands, or an operations entity which specifically reserves funds for operation, maintenance and replacement (example: Orange County MSTU). (NOTE: Orange County subdivision regulation criteria for retention - published by Orange County in Orange County Subdivision Regulations - may be utilized for Orange County MSTU projects in lieu of Agency retention criteria where retention volumes exceed one half inch.

(b)  Systems with inlets in grassed areas will be credited with up to 0.2 inches of the required wet detention amount for the contributing areas. Full credit will be based on a ratio of 10:1 impervious area (paved or building area) to pervious area (i.e. the grassed area) with proportionately less credit granted for greater ratios.

## 4.2.2 Land Use and Coverage Criteria

(a)  Commercial or industrial zoned projects shall provide at least one-half inch of dry detention or retention pretreatment as part of the required retention / detention, unless reasonable assurances can be offered that hazardous materials will not enter the project's surface water management system. Such assurances include, for example, deed restrictions on property planned for re-sale, type of occupancy, recorded lease agreements, local government restrictive codes, ordinances, licenses, and separate containment systems designed to prevent discharge.

(b)  Projects having greater than 40% impervious area and which discharge directly to the following receiving waters shall provide at least one half inch of dry detention or retention pretreatment as part of the required retention/detention. Receiving waters being addressed are:

1.  Lake Okeechobee and the Kissimmee River.

2.  Waterbodies designated as Class I or Class II waters by the Florida Department of Environmental Protection;

3.  Canals back-pumped to Lake Okeechobee or to the Conservation areas, or proposed for back-pumping;

4.  Other areas, such as the Savannas in St. Lucie and Martin Counties; the Six Mile Cypress Strand; the Big Cypress area of Collier County; and lands acquired by the District pursuant to Section 373.59, F.S. Water Management Lands Trust Fund (Save Our Rivers); and mitigation bank lands;

5.  Outstanding Florida Waters as defined in Chapter 62-302, F.A.C.; and Aquatic Preserves as created and provided for in Chapter 258, F.S.; and

6.  Waterbodies within a District permitted public water supply wellfield cone-of-depression which are not separated from the aquifer by strata at least ten feet thick and having an average saturated

18

hydraulic conductivity of less than 0.1 foot per day; where the cone-of-depression is defined by one of the following:

a.  in those areas of the District where no local wellfield protection ordinance has been adopted by the local governing body, the one foot drawdown line as expressed in the water table aquifer under conditions of no rainfall and 100 days of pumpage at the permitted average daily pumpage rate (where significant canal recharge is indicated, canal recharge representative of a 1 in 100 year drought will be considered);

b.  Chapter 27, Article XIII, Wellfield Protection Ordinance, Broward County Code of Ordinances, last amended September 28, 1999, http://www.flrules.org/Gateway/reference.asp?No=Ref-00052. This information is incorporated by reference herein and in Rule 40E-4.091, F.A.C.  Copies are available at no cost by contacting the South Florida Water Management District Clerk's Office, 3301 Gun Club Road, West Palm Beach, FL 33406 (800) 432-2045, ext. 2087, or (561) 682-2087.

c.  Dade County Wellfield Protection Ordinance contour showing maximum limits (Section 24-43 Protection of Public Potable Water Supply Wells; Chapter 24 Environmental Protection; Code of Metropolitan Dade County, Florida; Codified through Ordinance No. 11-01, enacted January 20, 2011 (Supp. No. 68))  http://www.flrules.org/Gateway/reference.asp?No=Ref-00053. This information is incorporated by reference herein and in Rule 40E-4.091, F.A.C.  Copies are available at no cost by contacting the South Florida Water Management District Clerk's Office, 3301 Gun Club Road, West Palm Beach, FL 33406 (800) 432-2045, ext. 2087, or (561) 682-2087.

(c)  Water surface and roofed areas can be deducted from site areas only for water quality pervious/impervious calculations. The water surface area meeting dimensional criteria may also be subtracted from the total site area when making final water quality treatment volume calculations.

(d)  In cases of widening existing urban public highway projects, the District shall reduce the water quality requirements, if the applicant provides documentation which demonstrates that all reasonable design alternatives have been considered, and which provides evidence that the alternatives are all cost-prohibitive.

(e)  Pursuant to subsection 62-555.312(3), F.A.C., stormwater retention and detention systems are classified as moderate sanitary hazards with respect to public and private drinking water wells.  Stormwater treatment facilities shall not be constructed within 100 feet of a public drinking water well, and shall not be constructed within 75 feet of a private drinking water well.

## 4.3 Incorporation of Natural Areas and Existing Waterbodies

Natural areas and existing waterbodies may be used for retention/detention purposes when not in conflict with environmental (see subsection 10.2.2.4 of Applicant's Handbook Volume I), water quality, (see Sections 10.2.4 through 10.2.4.5 of Applicant's Handbook Volume I) or public use considerations. Candidate areas for such purposes include:

(a)    Previously degraded areas;
(b)    Man-made areas such as borrow pits;
(c)    Extensive areas which have the ability to absorb impacts easily; and
(d)    Areas incorporated into a system with mitigation features.

## 4.4 Underground Exfiltration Systems

(a)    Systems shall be designed for the retention volumes specified in Section 4.2.1 for retention systems, exfiltrated over one hour for retention purposes, prior to overflow, and based on test data for the site. (Note: such systems will not be acceptable on projects to be operated by entities other than single owners or entities with full-time maintenance staff.)

(b)    A safety factor of two or more shall be applied to the design to allow for geological uncertainties.

(c)    A dry system is one with the pipe invert at or above the average wet season water table.

## 4.5 Sewage Treatment Percolation Ponds

Above-ground percolation pond dikes shall not be within 200 feet of water management lakes or 100 feet of dry retention/detention areas, or the applicant must provide reasonable assurance that effluent will not migrate into the water management lakes or detention areas.  Reasonable assurance may be provided by:

(a)    Documentation of volume and rate of application of effluent to the percolation ponds, and

(b)    Submittal of net flow analyses.

## 4.6 Criteria for Creation of Waterbodies

The creation of waterbodies shall meet both of the following criteria:

(a)    Entrapped salt water, resulting from inland migration of salt water or penetration of the freshwater/salt water interface, will not adversely impact existing legal water users.

(b)    Excavation of the water body shall not penetrate a water-bearing formation exhibiting poorer water quality for example, in terms of chloride concentrations.

## 4.7 Impervious Areas

Runoff shall be discharged from impervious surfaces through retention areas, detention devices, filtering and cleansing devices, or subjected to some other type of Best Management Practice (BMP) prior to discharge from the project site. For projects which include substantial paved areas, such as shopping centers, large highway intersections with frequent stopped traffic, and high density developments, provisions shall be made for the removal of oil, grease and sediment from storm water discharges.

## 4.8 Stagnant Water Conditions

Configurations which create stagnant water conditions such as hydraulically dead end canals are to be avoided, regardless of the type of development.

## 4.9 Water Quality Monitoring

All new drainage projects will be evaluated based on the ability of the system to prevent degradation of receiving waters and the ability to conform to State water quality standards.

### 4.9.1

(a)    There are areas within the District where water quality considerations are extremely important, because of the sensitivity of the area. These areas include:

1.    Lake Okeechobee and the Kissimmee River.
2.    Waterbodies designated as Class I or Class II waters by the Florida Department of Environmental Protection.
3.    Canals back-pumped to Lake Okeechobee or to the Conservation areas, or proposed for back-pumping.
4.    Sensitive areas, such as the Savannas in St. Lucie and Martin Counties, the Six Mile Cypress Strand and Estero Bay Aquatic Preserve in Lee County and the Big Cypress area of Collier County.
5.    Outstanding Florida Waters as defined in Chapter 62-302, F.A.C.

(b)    New developments which plan to utilize sensitive areas for disposal of stormwater will be given more detailed evaluation by the Agency Staff. In addition, new projects entailing a more intensified land use, such as industrial parks, and planning to discharge to a sensitive receiving water, directly or indirectly, shall be required to institute a water quality monitoring program if the applicant is unable to provide adequate assurances (by such means as routing drainage of areas where polluting materials would be located away from the stormwater management system; developing restrictive covenants, or similar documents, which would have the effect of prohibiting polluting materials on the project site; or proposing other

21

methods of assurance) that degradation of the receiving body water quality will not occur. The following listing of land use intensity is in ascending order.

1. Wetlands (including transition zones adjacent thereto)
2. Forested lands
3. Rangeland
4. Agricultural
5. Urban and built-up land

**4.9.2**  Monitoring is required for sites with high pollutant generating potential, such as industrial sites, and Class I and II solid waste disposal sites.

**4.9.3** There are two reasons for requiring water quality monitoring by permittees, as follows:

(a)    Such data can be used to determine if the pollution abatement practices incorporated into the design for the drainage system are functioning properly.

(b)    In some cases there may be a real and immediate concern regarding degradation of quality in the receiving waters, regardless of the apparent pollutant removal efficiency of the drainage system.

**4.9.4** The reason for the monitoring requirement will be stated in the Staff Report for each permit. Also included in the permit will be the monitoring and reporting schedules and the parameters of interest. Each monitoring program will be designed specifically for the land use or individual project in question and will include applicable surface and ground water sampling. Staff shall specify applicable project specific parameters such as those listed in Chapter 62-302, F.A.C. The applicant shall use a Florida Department of Health certified laboratory for all water quality analysis. It is recommended that the applicant submit final results from the laboratory. Examples of records to be supplied are as follows: sample date, sample location with D for discharge or N for no discharge, water discharge rates (cfs) and concentration values of indicated elements or compounds, date and time of analysis.

**4.9.5** As a general rule, monitoring required of permittees will be confined to points within their boundaries. If additional sampling is needed in order to assess off-site impacts of the projects, the responsible party will be named in the permit. The determination of the responsible party will be based upon the accessibility of the monitoring site to the permittee.

**4.9.6** Applicants are advised that Staff Reports written and Permits issued for projects not requiring monitoring at this time will normally include a statement to the effect that water quality monitoring may be required in the future. This should not be construed as an indication that the Agency is contemplating the implementation of a program of intensive water quality monitoring by all permittees. If water quality problems develop in specific

22

areas, however, permittees will be put on notice in this manner that they may have to determine the quality of the water which they are discharging.

## 4.10 Solid Waste Facilities

(a)   Stormwater management systems for Class I and II solid waste facilities, as defined by Chapter 62-701, F.A.C., shall be so designed, constructed, and operated as to maintain the integrity of the landfill at all times (during construction, operation, closure and post closure). Applicant must provide assurances that:

    1.   All flows will be conveyed at non-erosive velocities;

    2.   The project is designed to minimize erosion.

(b)   Design features in support of this requirement include features such as:

    1.   Slopes adequate to promote runoff but not affect slope stability;

    2.   Intermediate benches or swales which reduce runoff velocities and limit erosion;

    3.   Vegetation of closed portion of landfill.

(c)   Class I and II landfill projects shall provide adequate assurance that leachate will not enter the stormwater management system. This assurance may be provided through affirmative demonstration that the requirement of Chapter 62-701, F.A.C. for design and emplacement of liners, leachate collection systems, and treatment and disposal of leachate will be met.

(d)   Borrow pits shall not be included in the stormwater management system unless the applicant can affirmatively demonstrate that leachate will not enter the borrow pit, and that the water quality standards in Chapters 62-4 and 62-302, F.A.C.), will be met.

(e)   Dewatering operations at active, unlined landfills will not be permitted.

(f)   For Class I and II landfills the Agency shall require additional Best Management Practices, such as:

    1.   Detention in excess of the quantities stated in Section 4.2;

    2.   Dry detention areas;

    3.   Dry conveyance swales with adequate dimensions to permit maintenance;

    4.   Filter mechanisms for additional water quality enhancement prior to discharge;

    5.   Skimmers in front of discharge structures to restrict discharge of floatable materials;

    6.   Screw gates on water control structures capable of restricting discharge of poor quality surface water; or

    7.   Vegetation of appropriate portions of the water management system, such as conveyance swales.

(g)   To provide information for assessing the need for Best Management Practices at a specific site, Agency staff will require a hydrogeologic investigation that shall, at a minimum, provide information on:

1.     The hydrogeologic properties of the formations underlying the landfill, including aquifer and characteristics, groundwater elevations and direction and rate of groundwater flow;

2.     Location of existing wells within one-half mile of the site perimeter;

3.     Locations and specifications of existing or proposed monitor wells;

4.     The location and chemical composition of any known leachate plumes.

(h)     Applicants should consult with Agency staff prior to or at pre-application meetings to determine the specific requirements which will apply for a particular project.

## PART V – WATER MANAGEMENT SYSTEM DESIGN AND CONSTRUCTION CRITERIA

### 5.1 Discharge Structures

(a)     All design discharges shall be made through structural discharge facilities. Earth berms shall be used only to disperse or collect sheet flows from or to ditches, swales or other flow conveyance mechanisms served by discharge structures.

(b)     Discharge structures shall be fixed so that discharge cannot be made below the control elevation, except that emergency devices may be installed with secure locking devices. Use of emergency devices must be coordinated with Agency personnel prior to opening or as soon as possible thereafter. The Agency's Executive Director or secretary is authorized to specify the use of emergency devices pursuant to Rule 40E-1.611, F.A.C.

(c)     Discharge structures must be non-operable unless approved otherwise.

(d)     It is recommended that discharge structures include gratings for safety and maintenance purposes. The use of trash collection screens is desirable.

(e)     Discharge structures shall include a baffle system to encourage discharge from the center of the water column rather than the top or bottom. Discharge structures from areas with greater than 50 percent impervious area or from systems with inlets in paved areas shall include a baffle, skimmer, or other mechanism suitable for preventing oil and grease from discharging to or from retention/detention areas. Designs must assure sufficient clearance between the skimmer and concrete structure or pond bottom to ensure that the hydraulic capacity of the structure is not affected.

(f)     Direct discharges, such as through culverts, stormdrain, and weir structures, will be allowed to receiving waters which by virtue of their large capacity, or configuration are easily able to absorb concentrated discharges. Such receiving waters include existing storm sewer systems and man-made ditches, canals and lakes.

(g)     Indirect discharges, such as overflow and spreader swales, are required where the receiving water or its adjacent supporting ecosystem might be degraded by a direct discharge. The discharge structure would therefore

24

discharge, for example, into the overflow or spreader swale, which in turn would release the water to the actual receiving water. Such receiving waters include, for example, natural streams, lakes, wetlands and land naturally receiving overland sheetflow. Spreader swales shall be of a length sufficient to reduce discharge velocities to the receiving waters to historic rates or rates less than two feet per second.

(h)    Pumped systems will only be allowed for single owner or governmental agency operation entities, unless perpetual operation ability can be assured.

## 5.2 Control Devices/Bleed-down Mechanisms for Detention Systems

(a)    Agency criteria require that gravity control devices shall be sized based upon a maximum design discharge of one half inch of the detention volume in 24 hours.  The devices shall incorporate dimensions no smaller than 6 square inches of cross sectional area, two inches minimum dimension, and 20 degrees for "V" notches.  Systems which are limited by a discharge structure with an orifice no larger than the minimum dimensions described herein shall be presumed to meet the discharge quantity criteria except for projects which are required to have zero discharge. Applicants are advised that local drainage districts or local governments may have more stringent gravity control device criteria.

(b)    Gravity control devices shall be of a "V" or circular shaped configuration whenever possible, to increase detention time during minor events.

(c)    Pumped control devices, if pump discharge is permitted, shall be sized based on a design discharge of 20 percent of the detention volume in one day.

## 5.3 Retention systems

### 5.3.1 Description

Stormwater retention works best using a variety of retention systems throughout the project site.  Examples of retention systems include:

- Man-made or natural depressional areas where the basin bottom is graded flat and turf is established to promote infiltration and stabilize the basin slopes;
- Shallow landscaped areas designed to store stormwater; and
- Vegetated swales with swale blocks or raised inlets.

Soil permeability and water table conditions must be such that the retention system can percolate the desired runoff volume within a specified time following a storm event.  After drawdown has been completed, the basin shall not hold any water, thus the system is

normally "dry." Unlike detention basins, the treatment volume for retention systems is not discharged to surface waters.

Besides pollution control, retention systems can be utilized to promote the recharge of ground water to prevent saltwater intrusion in coastal areas or to maintain groundwater levels in aquifer recharge areas.

### 5.3.2  Retention Basin Construction

Since stormwater management systems are often exposed to poor quality surface runoff during construction and fine particles of clay, silt, and organics at the bottom of a retention basin create a poor infiltrating surface, retention basin construction methods and the overall sequence of site construction must retain the effectiveness of retention basins and assure that the basin is not rendered inoperable prior to completion of site development.

### 5.3.3 Dry Retention/Detention Areas (Not Applicable to Natural or Mitigation Wetland Areas)

(a)    Dry retention/detention areas shall have mechanisms for returning the groundwater level in the area to the control elevation. The bleed-down rate for these systems is the same as in section 5.2.(a), herein.

(b)    Mosquito control ditches or other appropriate features for such purpose, shall be incorporated into the design of dry retention/detention areas.

(c)    The design of dry retention/detention areas shall incorporate considerations for regular maintenance and vegetation harvesting procedures.

### 5.4  Wet Detention Design and Performance Criteria

### 5.4.1 Pond Configuration

The flow path of water from the inlets to the outlet of the pond must be maximized to promote good mixing with no dead spots, minimize short circuiting, and maximize pollutant removal efficiency and mixing.

If short flow paths are unavoidable, the effective flow path can be increased by adding diversion barriers such as islands, peninsulas, or baffles to the pond. Inlet structures shall be designed to dissipate the energy of water entering the pond.

### 5.4.2 Wet Retention/Detention Area Dimensional Criteria (As Measured at or from the Control Elevation)

(a)    Area - 0.5 acre minimum

(b)    Width - 100 feet minimum for linear areas in excess of 200 feet length. Irregular shaped areas may have narrower reaches but shall average at least 100 feet.

(c)    Depth - Shallow, littoral areas are desirable for water quality enhancement purposes. Such areas are defined for purposes of this criteria as the portion of wet retention/detention bodies shallower than 6 feet as measured from below the control elevation. The minimum shallow, littoral area shall be the lesser of 20 percent of the wet retention/detention area or 2.5 percent of the total of the retention/detention area (including side slopes) plus the basin contributing area.

(d)    Side slopes for wet retention/detention and attenuation areas - for purposes of public safety, water quality enhancement and maintenance, all wet retention /detention areas shall be designed with side slopes no steeper than 4:l (horizontal:vertical) from top of bank out to a minimum depth of two feet below the control elevation, or an equivalent substitute. Constructed side slopes steeper than 3.5:1 (horizontal:vertical) shall be considered a substantial deviation during the consideration of operation permit issuance. Side slopes shall be topsoiled, and stabilized through seeding or planting from 2 feet below to 1 foot above the control elevation to promote vegetative growth. Side slope vegetation growth survival shall be a consideration of operation permit issuance. Side slope dimensional criteria for above ground impoundments are set forth in Appendix B.

(e)    Alternative Side Slope Criteria for Golf Course Wet Retention/Detention Areas Adjacent to Tee Areas, Bunkers, and Greens - The design and final constructed side slopes adjacent to tee areas, bunkers, and greens contiguous to golf course wet retention/detention areas shall be no steeper than 2:1 (horizontal:vertical) for the area above the permitted control elevation. For purposes of this rule, the tee area is limited to an area specifically constructed and designated as the location from which a golfer makes his/her first shot toward a designated hole. The green is the area of shortest grass around the hole. Bunkers (sand traps) consist of a prepared area of ground, often a hollow, from which turf or soil has been removed and replaced with sand-like material.

For those portions of the wet retention/detention areas adjacent to tee areas, bunkers, and greens with final constructed side slopes steeper than 3.5:1 (horizontal:vertical), the final constructed side slopes below the control elevation shall not be steeper than 8:1 (horizontal:vertical) to a depth of two feet below the control elevation or equivalent substitute. Side slopes shall be topsoiled and stabilized through seeding or planting from 2 feet below to 1 foot above the control elevation. Side slope vegetation growth survival shall be a consideration of operation permit issuance.

(f)    Bulkheads - Bulkheads shall be allowed for no more than 40 percent of the shoreline length, but compensating littoral zone must be provided based on

27

appropriate maximum allowable side slope including local government requirements.

## 5.5 Maintenance Access and Easements

Minimum perimeter maintenance and operation easements of 20 feet width at slopes no steeper than 4:l (horizontal:vertical) shall be provided beyond the control elevation water line. These easements shall be legally reserved to the operation entity and for that purpose by dedication on the plat, deed restrictions, easements, or other equivalent documents, so that subsequent owners or others may not remove such areas from their intended use. Water management areas, including 20 foot wide maintenance easements at a minimum, shall be connected to a public road or other location from which operation and maintenance access is legally and physically available.

## 5.6 Exfiltration Systems

### 5.6.1 Description

In an exfiltration system, stormwater shall pass through a perforated pipe and infiltrate through the trench walls and bottom into the shallow groundwater aquifer thereby increasing the storage available in the trench and promoting infiltration by making delivery of the runoff more effective and evenly distributed over the length of the system.

When an exfiltration trench is utilized, soil permeability and water table conditions must be such that the trench system can percolate the required stormwater runoff treatment volume within a specified time following a storm event. The trench system shall be returned to a normally "dry" condition when drawdown of the treatment volume is completed. Like retention basins, the treatment volume in exfiltration trench systems shall not be discharged to surface waters.

Besides pollution control, exfiltration trench systems can be utilized to promote the recharge of ground water and to prevent saltwater intrusion in coastal areas, or to maintain groundwater levels in aquifer recharge areas.

### 5.6.2 Construction

During construction, measures must be taken to limit the parent soil and debris entering the trench. The use of an aggregate with minimal fines is recommended.

Exfiltration systems must conform with the following requirements:

(a)    Pipe diameter - 12" minimum;
(b)    Trench width - 3' minimum;
(c)    Rock in trench must be enclosed in filter material, at least on the top and sides; and
(d)    Maintenance sumps in inlets.

## 5.7  REQUIRED DESIGN INFORMATION AND ASSUMPTIONS

### 5.7.1 Antecedent Conditions

Antecedent conditions shall be average wet season elevations for water table or other water surfaces.

### 5.7.2 Rainfall

Distributions and intensities should be consistent with one or more of these Reference Sources:

(a)    Appendix C of this Handbook, Isohyetal Maps from SFWMD Technical Memorandum, *Frequency Analysis of One and Three Day Rainfall Maxima for central and southern Florida*, Paul Trimble, October 1990, and the following distribution table:

| Time (hours) | Cumulative Percentage of Peak One Day Rainfall |
|---|---|
| 0 | 0 |
| 24 | 14.6 |
| 48 | 35.9 |
| 58 | 57.2 |
| 59 | 62.8 |
| 59.5 | 67.8 |
| 59.75 | 82.8 |
| 60 | 101.5 |
| 60.5 | 108.8 |
| 61 | 112.6 |
| 62 | 117.7 |
| 72 | 135.9 |

100% One Day Rainfall

(b)    Actual gage data analyzed by accepted statistical methods;

(c)    U.S. Department of Agriculture, Soil Conservation Service, "Rainfall Frequency Atlas of Alabama, Florida, Georgia and South Carolina for Durations from 30 Minutes to 24 Hours and Return Periods from 1 to 100 years" (1978), http://www.flrules.org/Gateway/reference.asp?No=Ref-02975 , incorporated by reference herein and in Rule 40E-4.091, F.A.C.

(d)    Florida Department of Transportation "Drainage Manual, Appendix B: IDF Curves, Precipitation Data, Rainfall Distributions" (August 2001) http://www.flrules.org/Gateway/reference.asp?No=Ref-02981, incorporated by reference herein and in Rule 40E-4.091, F.A.C.

Copies of the materials incorporated by reference in (c) and (d) above are available at no cost by contacting the South Florida Water Management District Clerk's Office, 3301 Gun Club Road, West Palm Beach, FL  33406, (800) 432-2045, ext. 2087, or (561) 682-2087.

## 5.7.3 Evapotranspiration

Amounts can be estimated as follows:

(a)    Groundwater depth 0 to 1' - 0.3" ET/day
(b)    Groundwater depth 1' to 2.5' - 0.2" ET/day
(c)    Groundwater depth 2.5' to 4' - 0.1" ET/day
(d)    Groundwater depth below 4' - 0" ET/day

## 5.7.4 Storage

### 5.7.4.1 Open Surface

If open surface storage is to be considered in the review, the Applicant shall submit stage-storage computations. If open surface storage plus discharge is to be considered, the stage- discharge computations shall also be submitted. Actual rather than allowable discharges shall be used in routing. For the more extreme events, such as 100 year frequency, discharge should be ignored because the high tail water stage in the receiving water effectively prevents any but a negligible discharge. In such cases a mass accounting of on-site water will suffice, if the applicant can demonstrate that no adverse impacts will occur to adjacent areas.

### 5.7.4.2 Ground

The Soil Conservation Service has made the following estimate of soil storage capability for the normal sandy soils found within the District in their average natural state:

| Depth to Water Table | Cumulative Water Storage |
|---|---|
| 1' | 0.6" |
| 2' | 2.5" |
| 3' | 6.6" |
| 4' | 10.9" |

30

(a)    For the same sandy soils which have been compacted intentionally or incidental to earthwork operations, the cumulative storage shall be reduced 25 percent. An applicant may submit site-specific soil storage capability data.

(b)    Groundwater storage beneath impervious surfaces generally appears impractical to any great degree because of the trapped air which water cannot displace. It further appears impractical below four feet depths, except in high sandy coastal ridge areas, because of the relationship between infiltration rates and runoff rates in most parts of south Florida.

## 5.7.5 Infiltration and Percolation

### 5.7.5.2 Subsurface

Subsurface exfiltration will be reviewed only on the basis of representative or actual test data submitted by the Applicant. Test parameters such as elevation, location, and soils, shall be consistent with those of the designed system. The Dade County Department of Environmental Resource Management and Florida Department of Transportation are suggested as reference sources to Applicants for test procedures and design and maintenance performance of subsurface exfiltration systems.

## 5.7.6 Runoff

The usual methods of computation are as follows:

(a)    Rainfall minus losses and storage.

(b)    U.S. Department of Agriculture, Natural Resources Conservation Service, "National Engineering Handbook, Section 4, Part 630, Chapter 10 – 2004 http://www.flrules.org/Gateway/reference.asp?No=Ref-02983.         Peak factors used for natural systems shall not exceed "257" unless project specific site conditions warrant use of a larger peak factor.

(c)    Rational method, for water quality retention/detention purposes.

Copies of the material referenced in (b) above is available at no cost by contacting the South Florida Water Management District Clerk's Office, 3301 Gun Club Road, West Palm Beach, FL  33406, (800) 432-2045, ext. 2087, or (561) 682-2087.

5.7.7 Receiving Water Stage

(a)    Tailwater for Water Quantity Design
Stormwater management systems must consider tailwater conditions. Receiving water stage can affect the amount of flow that will discharge from the project to the receiving water.  This stage may be such that tailwater exists in portions of the project system, reducing the effective flow or storage area.

31

The stage in the receiving water shall be considered to be the maximum stage which would exist in the receiving water from a storm equal to the project design storm. Lower stages may be used if the applicant can show that the flow from his project will reach the receiving water prior to the time of maximum stage in the receiving water.

(b) Regulated Systems

Applicants are advised that design and maintained stage elevations are available either from the respective local jurisdiction or the Agency. Stages for the Agency's system for frequencies other than the design will be estimated by the Agency upon request from the Applicant.

(c) Non-regulated Systems

It is recommended that the Applicant compute receiving water stages for such systems from the best available data and submit the results to the Agency for review and concurrence before utilizing such results in further computations.

(d) Any System

Variable tailwater stages shall be considered if they have a significant influence on the design.

## 5.7.8 Runoff Coefficient and Curve Number for Stormwater Management Ponds

Stormwater management ponds, including dry retention ponds, detention ponds with filtration, dry detention ponds with underdrains, and wet detention ponds, shall be considered as impervious area for calculating composite runoff coefficients (C), and composite curve numbers.

## 5.8 Inspection and Maintenance

Inspection and maintenance standards are described in **section 12.4 of Volume I** and Rule 62-330.311, F.A.C. See **Appendix B** for inspection and reporting requirements for above-ground impoundments.

**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II**
**Effective: MAY 22, 2016**

# APPENDICES

Appendix A         SFWMD - Allowable Discharge Formulas

Appendix B         Above Ground Impoundments

Appendix C         Isohyetal Maps from SFWMD Technical Memorandum,
                   *Frequency Analysis of One and Three Day Rainfall Maxima*
                   *for central and southern Florida,* Paul Trimble, October 1990.

Appendix D         SFWMD Basins for Cumulative Impact Assessments &
                   Mitigation Bank Service Areas

Appendix E         Procedure for Environmental Resource Permit Water Quality
                   Evaluations for Applications Involving Discharges to
                   Outstanding Florida Waters and Water Bodies that Do Not
                   Meet State Water Quality Standards

**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II**
**Effective: MAY 22, 2016**

## Appendix A: SFWMD - ALLOWABLE DISCHARGE FORMULAS

| Canal | Allowable Runoff | Design Frequency |
|-------|------------------|------------------|
| C-1 | $Q = (\frac{112}{\sqrt{A}} + 31)\,A$ | 10 year |
| C-2 | Essentially unlimited inflow by gravity connections southeast of Sunset Drive:<br>    54 CSM northwest of Sunset Drive | 200 year + |
| C-4 | Essentially unlimited inflow by gravity connections east<br>    of S.W. 87th Avenue | 200 year + |
| C-6 | Essentially unlimited inflow by gravity connections east<br>    of FEC Railroad | 200 year + |
| C-7 | Essentially unlimited inflow by gravity connection | 100 year + |
| C-8 | Essentially unlimited inflow by gravity connection | 200 year + |
| C-9 | Essentially unlimited inflow by gravity connection east<br>    of Red Road; 20 CSM pumped, unlimited gravity with development limitations west of Red Road or Flamingo Blvd. | 100 year + |
| C-10 | -------------------------------------------- | 200 year + |
| C-11 | 20 CSM west of 13A;40 CSM east of 13A | ------------ |
| C-12 | 90.6 CSM | 25 year |
| C-13 | 75.9 CSM | 25 year |
| C-14 | 69.2 CSM | 25 year |
| C-15 | 70.0 CSM | 25 year |
| C-16 | 62.6 CSM | 25 year |
| C-17 | 62.7 CSM | 25 year |
| C-18 | 41.6 CSM | 25 year |
| C-19 | 57.8 CSM | ------------ |
| C-23 | 31.5 CSM | 10 year |
| C-24 | 30.25 CSM | 10 year |
| C-25 | $Q = (\frac{47}{\sqrt{A}} + 28)\,A$ (Under Review) | 10 year |
| C-38 | 31.1 CSM (subject to restrictions of Basin Rule) | 10 year |
| C-40, 41, 41A | 35.4 CSM | 10 year |
| Hillsboro Canal (east of S-39) | 35 CSM | 25 year |
| North New River (east of S-34) | 70.8 CSM | 25 year |
| Everglades Ag. Area (all canals) | 20 CSM | 5 year |
| L-28 | 11.8 CSM | ------------ |
| C-51 | 35 CSM east of Turnpike; 27 CSM west of Turnpike<br>    (subject to restrictions of Basin Rule) | 10 year |
| C-100, 100A, 100B, 100C, 100D: | $Q = (\frac{104}{\sqrt{A}} + 43)\,A$ | 10 year |
| C-102 | $Q = (\frac{119}{\sqrt{A}} + 25)\,A$ | 10 year |
| C-103N, C103-S | $Q = (\frac{107}{\sqrt{A}} + 39)\,A$ | 10 year |

A-1

**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II**
**Effective: MAY 22, 2016**

| | | |
|---|---|---|
| C-110 | $Q = \left(\dfrac{137}{\sqrt{A}} + 9\right) A$ | 10 year |
| C-111 | $Q = \left(\dfrac{117}{\sqrt{A}} + 29\right) A$ | 10 year |
| C-113 | $Q = \left(\dfrac{104}{\sqrt{A}} + 3\right) A$ | 10 year |

**Definitions:**

Q =   Allowable runoff in cfs (cubic feet per second)      CSM = cfs per square mile
A =   Drainage area in square miles

## APPENDIX B: ABOVE GROUND IMPOUNDMENTS

## 1.0 INTRODUCTION

### 1.1 Purpose

This Appendix to the Applicant's Handbook Volume II for use within the geographic limits of the South Florida Water Management District has been prepared to elaborate on the criteria and standards applicable to above ground impoundments in accordance with the definition and requirements for "dams" in Part IV of Chapter 373, F.S. The content herein is not intended to be all inclusive of all possible situations, but is intended to provide guidelines and basic performance criteria wherever possible on design criteria for the situations commonly encountered for most typical south Florida situations. Because dam performance is a function of construction, operation and maintenance as well as design, information on those subjects is included. The basic responsibility for dam performance remains vested in the owner or permittee through appropriate representation by his registered professional in accordance with State laws.

### 1.2 Classification

Upon request or application receipt District staff will classify impoundments or dams as "Major" or "Minor" for application review purposes in accordance with the following provisions:

**1.2.1** Major - Impoundments located where failure would cause significant damage to the property of other than the permittee, could involve loss of human life, would create a public health hazard, or would cause irreversible environmental or water quality damage; maximum water depths above surrounding ground levels would generally exceed four feet.

**1.2.2** Minor - Impoundments generally located in rural areas where failure would generally limit significant damage to the property of the permittee, would not involve loss of human life, would not create a public health hazard, and would not cause irreversible environmental or water quality damage; maximum water depths above surrounding ground levels would generally be limited to four feet, except where dam break analysis influence lines (six inch depth and two feet per second velocity) are limited to the land of the permittee and others, including the public, are not involved. It may be necessary that the permittee's land be legally restricted by such means as a unity of title to insure perpetual single ownership.

## 1.3 Certification responsibility

**1.3.1** Major impoundments are considered to be individually engineered structures involving the disciplines of geotechnical, soils, foundation, and/or structural engineering and are therefore required to be certified in accordance with State law by registered professionals.

**1.3.2** Minor impoundments are considered to be general site improvements and may therefore be certified in accordance with State law as part of the overall surface water management system by registered professionals.

## 1.4 Information submittals

**1.4.1** Major impoundments require the submittal of all design, construction, operation and maintenance information necessary for complete review of the impoundment. Information to be submitted in addition to design calculations includes:

a. Proposed construction schedule
b. Safe filling and draining schedules
c. Design of seepage and water level monitoring programs
d. Operation and maintenance manual
e. Influence lines for dam break analysis (6 inch depth and 2 feet per second velocity)
f. Emergency response and evacuation plan (if appropriate)

Review by the District will be done for purposes of confirming that reasonable assurances are offered that the intent of District policies and general engineering principles will be met. The review is not intended to supplant the registered professional's initiative, judgment, expertise, experience and/or responsibility. When necessary the District may retain outside expertise to participate in the review.

**1.4.2** Minor impoundments require only the submittal of the usual surface water management permit information. It is understood that the registered professional may perform calculations, tests, etc. for his/her own purposes or to meet State law and which may not be submitted.

## 2.0 DESIGN GUIDELINES

## 2.1 Major impoundments

**2.1.1** Structural stability - All elements and appurtenant works for impoundments shall be designed for all possible conditions up to and including maximum water depths and in accordance with generally accepted engineering principles for such works, which include consideration of site preparation, construction materials, geological conditions, storm conditions, settlement, erosion, operation and maintenance and vandalism. More specific guidelines are as follows:

A-4

**2.1.1.1**  Dikes - shall be designed based on field test data of subsurface conditions and actual procedures and materials to be used in construction. Seepage and piping shall be considered and cutoff walls and toe drains included where necessary. Dimensions shall be such as to allow maintenance by normal equipment.  Recommended side slopes for vegetated earth should be no steeper than 2 1/2:1 (horizontal to vertical) for external slopes and 3:1 (horizontal to vertical) for internal slopes. Top widths should be of sufficient width to allow safe vehicular access and no less than twelve feet. Dike toes should be continually accessible by vehicle by relatively level to berms of at least ten feet width. Dikes and toe berms should be widened at strategic points for vehicular turnaround or where necessary to load stockpiled material to be used for dike repair.

**2.1.1.2**   Structures - Discharge and other structures should be located to be accessible from the top of the dike during storm conditions for emergency operation and maintenance if necessary. They should be of permanent low maintenance materials, preferably reinforced concrete. The location and design should be such that dike integrity is maintained. Trash racks, seepage rings and vandalism protection should be included. A preferable design would consist of an inlet box which does not interfere with normal dike sideslopes and a conduit under the dike to an outfall endwall. Erosion protection, energy dissipators, etc. would be necessary at strategic points including the outfall.

**2.1.2** Hydraulics - Unless more stringent criteria should apply because of other jurisdictional standards or unusual risks, the minimum District standards are as follows:

**2.1.2.1** Maximum water depth as determined by routing a three day precipitation (distributed according to the Applicant's Handbook Volume II, Section 5.7.2) through the inflow and outflow structures with rainfall on the reservoir. Three day precipitation amounts may vary between thirty six and fifty six inches depending on site specific conditions and risk management considerations. District staff will advise on request.

**2.1.2.2**  Design water depth - As determined by routing the project allowable discharge design event through the inflow and outflow structures with rainfall on the reservoir. The three day 25 year event should typically be used as a minimum.

**2.1.2.3**  Minimum freeboard above maximum water depth - Three feet minimum or that required to prevent overtopping or failure due to hurricane force winds as derived from the South Florida Building Code.

**2.1.2.4**  Discharge structure – Applicant's Handbook Volume II allowable discharge for reservoir at maximum water depth with 100 year tailwater flood elevation, or Applicant's Handbook allowable discharge for reservoir at design water depth and non-limiting tailwater, unless more accurate site specific tailwater elevations are applicable and substantiated by the applicant.

**2.1.2.5**  Return overflow - Impoundments must contain an outflow discharge structure which returns water to the area from which inflow occurs. Therefore a separate structure

will be necessary for pump filled impoundments to allow return flow under the conditions of maximum or design water depths in the reservoir with pumps continuing to operate. For gravity filled impoundments this structure will actually be the inflow structure since reservoir and project stages will be the same.

**2.1.2.6**  Emergency discharge gates - Discharge structures should include emergency gates which can only be opened with District permission. Return overflow structures must include emergency gates to be operated at the discretion of the permittee or at the direction of the District.

**2.1.2.7**  Pumps-The pumps used to fill impoundment serving multiple owners, when allowed, should be multiple pumps of the same sizes to allow interchange of parts. Electric pumps should have standby fuel operated power systems.

**2.1.2.8**  Seepage collection systems - A safety factor of three shall be utilized for hydraulic conveyance design purposes.

**2.1.3**  Floodplain encroachment and setbacks - Impoundments shall not be located within floodplains or shall otherwise provide compensation and setbacks as provided in Section 3.6 in the Applicant's Handbook Volume II.  Impoundments located in flat areas of diffused flow shall have the toe of dikes set back at least fifty feet from property lines to allow historic sheet flow to move around the impoundments. Greater dimensions or swale construction may be required if steep slopes, very large contributing areas, etc. would cause that dimension to be inadequate. Smaller dimensions may be allowed if the applicant can demonstrate smaller dimensions will suffice.

**2.1.4**  Environmental and water quality - The provisions of the Applicant's Handbook Volume I and Volume II apply. Since many impoundments are utilized for wetland management and/or mitigation, it may be necessary to set control elevations and emergency gate bottoms above natural ground levels in order to prevent wetland overdrainage.

**2.1.5**  Emergency repair material - Appropriate amounts of type, quantity and location of emergency repair materials shall be included in design plans.

## 2.2    Minor impoundments

**2.2.1** Structural stability - The same general comments apply as for Major impoundments with specific guidelines as follows:

**2.2.1.1**  Dikes - Designs shall be in accordance with commonly accepted engineering principles and State laws. Dikes external to the permittee's property shall meet the dimensional and access criteria for Major impoundments to the degree necessary to meet the intent of Section 1.2.1. Internal dikes may be of lesser standards, but sideslopes should be no steeper than 2:1 (horizontal to vertical) and top widths no less than five feet.

**2.2.1.2** Structures - Discharge and other structures should be as for Major impoundments.

**2.2.2**  Hydraulics - The same general comments apply as for Major impoundments with specific standards as follows:

**2.2.2.1** Maximum water depth - The maximum water depth equals the design water depth as described for Major impoundments.

**2.2.2.2**  Minimum freeboard above maximum water depth - Equal to the maximum water depth dimensions but not less than two feet, no more than three feet.

**2.2.2.3**  Discharge structure – Applicant's Handbook Volume II allowable discharge for reservoirs at design water depth and non-limiting tailwater, unless more accurate site specific tailwater elevations are applicable and substantiated by the applicant.

**2.2.2.4**  Return overflow - Same as for Major impoundments.

**2.2.2.5**  Emergency discharge gates - Same as for Major impoundments except installation is optional.

**2.2.2.6**  Pumps - Same as for Major impoundments.

**2.2.2.7**  Seepage collection systems - Optional.

**2.2.3**  Floodplain encroachment and setbacks - Same as for Major impoundments.

**2.2.4**  Environmental and water quality - Same as for Major impoundments.

**2.2.5**  Emergency repair material - Optional.

## 3.0  CONSTRUCTION

Construction certification is a requirement of all permits for both Major and Minor impoundments, and it is therefore the responsibility of the registered professional to satisfy himself/herself and the State laws as to construction compliance with design. Changes to permitted design would require the need for As-Built plans to satisfy certification. Major changes, including changes to permit authorization or special or limiting conditions would require a permit modification prior to implementation. The District expects continual construction observation to be the minimum requirement necessary to

evidence ability to perform certification on Major impoundments. Certification must indicate that construction has been satisfactorily completed so that routine operation and maintenance may commence.

## 4.0 OPERATION AND MAINTENANCE

## 4.1 Reporting

Inspection of impoundment conditions, repairs, etc. will be a continuing process required by permit special condition. Inspection reports are to be retained by the permittee and copies made available to the District upon request. It is the basic responsibility of the permittee to initiate interim reporting and/or more detailed reporting to the District as conditions change, emergencies or problems arise, etc. It is expected that Major impoundments will be reported in accordance with the operation and maintenance manual and emergency response and evacuation plan adopted at the time of permit issuance, with updates as necessary.

## 4.2 Primary subjects of interest

### 4.2.1 Major impoundments

### 4.2.1.l Dikes and seepage collection system

a.    Vegetation conditions
b.    Erosion
c.    Evidence of boils, piping, unusual seepage
d.    Slope stability, surface cracking
e.    Settlement
f.    Travelway conditions
9.    High and low water marks
h.    Presence of aquatic vegetation in supposed dry areas
i.    Monitoring system condition and monitoring data
j.    Adequacy and condition of emergency repair material
k.    Short and long term repair and modification recommendations

### 4.2.1.2 Structures and pumps

a.    Materials conditions
b.    Operational conditions
c.    Evidence of vandalism
d.    Settlement and erosion
e.    Freedom from trash problems
f.    Short and long term repair and modification recommendations

### 4.2.1.3 Impoundment area

a.      Vegetation changes
b.      Evidence of encroachment and misuse of land

### 4.2.1.4 Emergency response plan

a.      Land use changes in area of influence
b.      Topographic changes causing change in area of influence
c.      Changes in participants, addresses, phone numbers, etc. involved in
        emergency response plan
d.      Evidence of contact update with involved emergency management
        officials

### 4.2.2 Minor impoundments

### 4.2.2.1 Dikes

a.      Vegetation conditions
b.      Erosion, settlement, cracking, stability
c.      Short term repair and modification recommendations

### 4.2.2.2 Structures and pumps

a.      Structural conditions
b.      Operational conditions
c.      Short term repair and modification recommendations

### 4.2.2.3 Impoundment area

a.      Vegetation changes
b.      Evidence of encroachment and misuse of land

### 4.3 Typical special condition

**4.3.1**   Upon completion of construction, and on an annual basis (in March of each year),
the permittee shall have an inspection performed to assess the structural adequacy of all
above-ground dikes, control structures, levees and berms behind which water is to be
contained and where failure could impact off-site areas.  A registered professional shall
perform each inspection and prepare each report.  These reports shall be signed and
sealed by the registered professional performing the inspection, kept on file by the
permittee and made available to the South Florida Water Management District (SFWMD)
personnel upon request.  If deficiencies are found that will affect the performance of the
impoundment, a report which is signed and sealed by the registered professonal
performing the inspection shall be submitted to the District which includes, but is not
limited to, the proposed technique and schedule for repair of any deficiencies noted.

## 5.0 REFERENCES

Agencies with impoundment experience and publications:
a.    U.S. Army Corps of Engineers
b.    U.S. Department of Interior, Bureau of Reclamation
c.    U S Department of Agriculture, Soil Conservation Service

ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II
Effective: MAY 22, 2016

### Appendix C: Isohyetal Maps
from SFWMD Technical Memorandum, *Frequency Analysis of One and Three Day Rainfall Maxima for central and southern Florida*, Paul Trimble, October 1990.



Figure C-1

A-11



FIGURE C-2.  1-DAY RAINFALL: 3-YEAR RETURN PERIOD



FIGURE C-3.  1-DAY RAINFALL: 5-YEAR RETURN PERIOD



FIGURE C-4.  1-DAY RAINFALL: 10-YEAR RETURN PERIOD



FIGURE C-5.  1-DAY RAINFALL: 25-YEAR RETURN PERIOD



FIGURE C-6.  1-DAY RAINFALL: 100-YEAR RETURN PERIOD



FIGURE C-7. 3-DAY RAINFALL: 10-YEAR RETURN PERIOD



FIGURE C-8.  3-DAY RAINFALL: 25-YEAR RETURN PERIOD



FIGURE C-9.   3-DAY RAINFALL: 100-YEAR RETURN PERIOD

**ENVIRONMENTAL RESOURCE PERMIT APPLICANT'S HANDBOOK VOLUME II**
**Effective: MAY 22, 2016**

## APPENDIX D: SFWMD Basins
### for Cumulative Impact Assessments & Mitigation Bank Service Areas



**Cumulative Impact Basins**

- 0 -Lake Arbuckle - Other District
- Other District
- 1 - Reedy Creek
- 2 - Shingle Creek
- 3-Boggy Creek
- 4 - Lake Hart
- 5 - Lake Tohopekaliga
- 6 - Lake Gentry
- 7 - Lake Hatchineha
- 8 - Lake Kissimmee
- 9 - North Kissimmee
- 10 - Middle Kissimmee
- 11 - South Kissimmee
- 12 - C-25
- 13 - C-24
- 14 - C-23
- 15 - Nubbin Slough
- 16 - Fisheating Creek
- 17 - St. Lucie
- 18 - C-44
- 19 - Loxahatchee River
- 20 - Everglades
- 21 - Lake Okeechobee
- 22 - East Caloosahatchee
- 23 - West Caloosahatchee
- 24 - Tidal Caloosahatchee
- 25 - Estero Bay
- 26 - West Collier
- 27 - East Collier
- 28 - L-28 Interceptor
- 29 - Eastern Palm Beach County
- 30 - New River
- 31 - East Everglades
- 32 - Biscayne Bay
- SFWMD North Boundary

# Chapter 62-340, F.A.C.
# Data Form Guide

Wetland and Other Surface Water Delineation
Version: February 2021 ©



From the Staff of
Wetland Evaluation and Training
Submerged Lands and Environmental Resources Coordination
Florida Department of Environmental Protection

The content of this guide was compiled by members of the Florida Department of Environmental Protection, Submerged Lands and Environmental Resources Coordination, Wetland Evaluation and Training Team. The express purpose of this document is to provide guidance to regulatory staff in order to maintain consistency in the applied field methodologies for wetland delineation pursuant to Chapter 62-340, F.A.C. The information contained in this guide was garnered from various sources pertinent to the field application of wetland delineation methodology outlined in Chapter 62-340, F.A.C. FDEP does not warrant data provided by other sources for accuracy or for any particular use that may require accurate information. This guide is for information purposes only.

**Table of Contents**                                                     **Page**

Appendix A: subsection 62-340.450(1), (2), (3), F.A.C................................. 4
Chapter 62-340, F.A.C.
62-340.100 Intent............................................................................... 21
62-340.200 Definitions...................................................................... 22
62-340.300 Delineation of Wetlands. ............................................... 23
62-340.400 Selection of Appropriate Vegetative Stratum. ........................... 27
62-340.450 Vegetative Index............................................................. 27
62-340.500 Hydrologic Indicators. .................................................... 28
62-340.550 Wetland Hydrology. ........................................................ 30
62-340.600 Surface Waters................................................................ 30
62-340.700 Exemptions for Treatment or Disposal Systems ....................... 31
62-340.750 Exemptions for Surface Waters or
        Wetlands Created by Mosquito Control Activities................................. 33
Surface Water Definitions.................................................................. 34
Field Identification of Hydric Soils..................................................... 35
Estimating Seasonal High Saturation (SHWT depth) .................................. 36
Stand-alone D Test Indicators............................................................ 37
Field Determination of Soil Indicator Texture ......................................... 38
Tips for Texturing Soils with High Organic Content ("Rub Tests") ............ 38
Tips for Approximating Composition of Soil ("Volume Tests").................. 39
Tips for Determining Boundary Types of Features in Soil ......................... 40
Tips for Determining Contrast Between Soil Colors.................................. 40
Round 10X % Coating Charts............................................................ 42
Feature % Volume Charts ................................................................. 43
Tips for Determining Shapes of Features in Soil ..................................... 48
Tips for Determining Areal Extent of Plants.......................................... 48
Map of Land Resource Regions.......................................................... 49
Map of Major Land Resource Areas .................................................... 50
Hydric Soil Field Indicators Simplified Checklist ................................... 51
Glossary from NRCS Field Indicators of Hydric Soils ............................ 60
Hydric Soil Field Indicators for LRRs: P T U......................................... 67
Hydric Soil Field Indicators Starting Depth Summary Table....................... 73
Appendix B: Histosol and Histic Epipedon Definitions ............................ 74
NRCS Hydric Soil Technical Notes #4 & #13 ........................................ 75
Appendix C: Hydric Soils Criteria and Technical Standard ........................ 76
Root Size Estimation Chart and Quantity Classes ..................................... 77
Supplemental Soil Data .................................................................... 78
FNAI Natural Communities of Florida List ........................................... 78
Appendix A2: Common Name Listing of Vegetative Index ........................ 79
Recommended 5-Step Field Wetland Delineation Procedure ....................... 95
Required and Suggested Field Equipment ............................................. 95

# Appendix A: subsection 62-340.450(1), (2), (3), F.A.C.

## Vegetative Index Plant List *(See Appendix A2 (p. 79) for plants listed by common name)*

### Botanical Name/ Common Name/ Wetland Status

*Abildgaardia ovata*　flat-spike rush FACW

*Acacia auriculiformis*　ear-leaved acacia FAC

*Acer negundo*　box-elder FACW

*Acer rubrum*　red maple FACW

*Acer saccharinum*　silver maple OBL

*Acoelorraphe wrightii*　paurotis palm OBL

*Acrostichum* spp.　leather fern OBL

*Aeschynomene indica*　India joint-vetch FACW

*Aeschynomene pratensis*　meadow joint-vetch OBL

*Agalinis aphylla*　scale-leaf false-foxglove FACW

*Agalinis linifolia*　flax-leaf false-foxglove OBL

*Agalinis maritima*　saltmarsh false-foxglove OBL

*Agalinis pinetorum* (*A. pulchella*)　false-foxglove FACW

*Agalinis purpurea*　large purple false-foxglove FACW

*Agarista populifolia*　hobble-bush FACW

*Agrostis stolonifera*　redtop FACW

*Aletris* spp.　colic-root FAC

*Alisma subcordatum*　subcordate water-plantain OBL

*Alnus serrulata*　hazel alder OBL

*Alopecurus carolinianus*　tufted foxtail FAC

*Alternanthera maritima*　beach alternanthera FACW - Keys only

*Alternanthera paronychioides* smooth chaff-flower FAC - Keys only

*Alternanthera philoxeroides*　alligator-weed OBL

*Alternanthera sessilis*　sessile alligator-weed OBL

*Amaranthus australis*　southern amaranth OBL

*Amaranthus cannabinus*　tidemarsh amaranth OBL

*Amaranthus floridanus*　Florida amaranth OBL

*Ammannia* spp.　toothcup OBL

*Amorpha fruticosa*　indigo-bush FACW

*Amphicarpum muhlenbergianum*　blue maidencane FACW

*Amsonia rigida*　stiff slimpod FACW

*Amsonia tabernaemontana*　eastern slimpod FACW

*Anagallis pumila*　Florida pimpernel FAC

*Andropogon arctatus* (Campbell) savannah bluestem FAC

*Andropogon brachystachys* (Campbell) short-spike bluestem FAC

*Andropogon gerardii* (Campbell) big bluestem FAC

*Andropogon glomeratus* (Campbell) bushy bluestem FACW

*Andropogon liebmanii* var. *pungensis* (Campbell)
　　　　　(*A. mohrii*) Mohr's bluestem FACW

*Andropogon perangustatus* (Campbell) slim bluestem FAC

*Andropogon virginicus* (Campbell) broom-sedge FAC

*Annona glabra*　pond apple OBL

*Anthaenantia rufa*　purple silky-scale FACW

*Apteria aphylla*　nodding nixie FACW

*Ardisia* spp.    marlberry FAC
*Arenaria godfreyi*    Godfrey's stitchwort FACW
*Arisaema* spp.    jack-in-the-pulpit; green-dragon FACW
*Aristida affinis*    long-leaf three-awn grass OBL
*Aristida purpurascens* (s.l.)    wand-like three-awn grass FACW
*Aristida rhizomophora*    rhizomatous three-awn grass FAC
*Aristida spiciformis*    three-awn bottlebrush FAC
*Aristida stricta*    pineland three-awn grass FAC
*Armoracia aquatica*    lakecress OBL
*Arnoglossum diversifolium*    variable-leaf indian-plantain FACW
*Arnoglossum ovatum*    egg-leaf indian-plantain FACW
*Arnoglossum sulcatum* indian-plantain, Georgia OBL
*Aronia arbutifolia*    red chokeberry FACW
*Arundinaria gigantea*    giant cane FACW
*Arundo donax*    giant reed FAC
*Asclepias connivens*    large-flower milkweed FACW
*Asclepias incarnata*    swamp milkweed OBL
*Asclepias lanceolata*    fen-flower milkweed OBL
*Asclepias longifolia*    long-leaf milkweed FACW
*Asclepias pedicellata*    savannah milkweed FACW
*Asclepias perennis*    aquatic milkweed OBL
*Asclepias rubra*    red milkweed OBL
*Asclepias viridula*    southern milkweed  FACW
*Aster carolinianus*  climbing aster OBL
*Aster chapmanii*    savannah aster FACW
*Aster dumosus*    bushy aster FAC
*Aster elliottii*    Elliott's aster OBL
*Aster eryngiifolius*    coyote-thistle aster FACW
*Aster lateriflorus*    calico aster FACW
*Aster spinulosus*    bog aster FACW
*Aster subulatus*    saltmarsh aster OBL
*Aster tenuifolius*    saltmarsh aster OBL
*Aster umbellatus*    flat-top white aster FAC
*Aster vimineus*    small white aster FACW
*Athyrium filix-femina*    subarctic lady fern FACW
*Atriplex patula*    halberd-leaf saltbush FACW
*Avicennia germinans*    black mangrove OBL
*Axonopus* spp.    carpet grass FAC
*Baccharis angustifolia*    false-willow OBL
*Baccharis dioica*    broom-bush false-willow FAC
*Baccharis glomeruliflora*    groundsel tree FAC
*Baccharis halimifolia*    eastern false-willow FAC
*Bacopa* spp.    water-hyssop OBL
*Balduina atropurpurea*    purple honeycomb-head FACW
*Balduina uniflora*    one-flower honeycomb-head FACW
*Bartonia* spp.  screwstem FACW
*Batis maritima*    saltwort OBL

*Betula nigra*   river birch OBL
*Bidens bipinnata*   Spanish needles U
*Bidens pilosa*   white beggar-ticks FAC
*Bidens* spp.   beggar-ticks OBL
*Bigelowia nudata*   rayless golden-rod FACW
*Blechnum serrulatum*   swamp fern FACW
*Boehmeria cylindrica*   small-spike false-nettle OBL
*Boltonia* spp.   boltonia FACW
*Borrichia* spp.   sea oxeye OBL
*Brachiaria purpurascens*   paragrass FACW
*Bucida buceras*   gregory wood FAC
*Bumelia celastrina*   coastal bumelia FAC
*Bumelia lycioides*   buckthorn bumelia FAC
*Bumelia reclinata*   bumelia FAC
*Burmannia* spp.   burmannia OBL
*Byrsonima lucida*   locust-berry FAC - Keys only
*Cacalia suaveolens*   sweet-scent indian-plantain FACW
*Calamovilfa curtissii*   Curtiss' reed grass FACW
*Callitriche* spp.   water-starwort OBL
*Calopogon* spp.   grass-pinks FACW
*Calycocarpum lyonii*   cupseed FACW
*Campanula americana*   American bellflower FAC
*Campanula floridana*   bellflower OBL
*Canna* spp.   canna OBL
*Canna x generalis*   common canna FAC
*Caperonia* spp.   caperonia FACW
*Capparis flexuosa*   caper-tree FACW
*Cardamine bulbosa*   bitter-cress OBL
*Cardamine pensylvanica*   spring-cress OBL
*Carex atlantica*   prickly bog sedge OBL
*Carex comosa*   bearded sedge OBL
*Carex crinita*   fringed sedge OBL
*Carex crus-corvi*   raven-foot sedge OBL
*Carex decomposita*   cypress-knee sedge OBL
*Carex elliottii*   Elliott's sedge OBL
*Carex folliculata*   long sedge OBL
*Carex gigantea*   large sedge OBL
*Carex howei*   Howe's sedge OBL
*Carex hyalinolepis* sedge, shoreline sedge OBL
*Carex leptalea*   bristly-stalk sedge OBL
*Carex louisianica*   Louisiana sedge OBL
*Carex lupulina*   hop sedge OBL
*Carex lurida*   shallow sedge OBL
*Carex* spp.   sedges FACW
*Carex stipata*   stalk-grain sedge OBL
*Carex walteriana*   Walter's sedge OBL
*Carphephorus carnosus*   pineland chaffhead FACW

*Carphephorus odoratissimus*   vanilla plant FAC
*Carphephorus paniculatus*   deer-tongue FAC
*Carphephorus pseudoliatris*   bristle-leaf chaffhead FACW
*Carpinus caroliniana*   American hornbeam FAC
*Carya aquatica*   water hickory OBL
*Casuarina* spp.   casuarina FAC
*Cayaponia quinqueloba*   five-lobe cayaponia FAC
*Celtis laevigata*   sugar-berry; hackberry FACW
*Centella asiatica*   coinwort FACW
*Cephalanthus occidentalis*   buttonbush OBL
*Cestrum diurnum*   day jessamine FAC
*Chamaecyparis thyoides*   Atlantic white cedar OBL
*Chaptalia tomentosa*   sunbonnet; pineland daisy FACW
*Chasmanthium latifolium*   spanglegrass FAC
*Chasmanthium sessiliflorum*   long-leaf Chasmanthium FAC
*Chasmanthium* spp.   spanglegrass FACW
*Chiococca* spp.   snowberry FAC
*Chrysobalanus icaco*   cocoplum FACW
*Cicuta* spp.   water-hemlock OBL
*Cirsium lecontei*   Leconte's thistle FACW
*Cirsium muticum*   swamp thistle OBL
*Cirsium nuttallii*   Nuttall's thistle FACW
*Cladium* spp.   sawgrass OBL
*Cleistes divaricata*   rosebud OBL
*Clethra alnifolia*   sweet pepper bush FACW
*Cliftonia monophylla*   buckwheat-tree FACW
*Colocasia esculenta*   elephant's ear OBL
*Colubrina asiatica*   Asian snakewood FAC
*Commelina erecta*   sandhill dayflower U
*Commelina* spp.   dayflower FACW
*Conocarpus erectus*   buttonwood FACW
*Conoclinium coelestinum*   mistflower FAC
*Coreopsis falcata*   sickle tickseed FACW
*Coreopsis floridana*   Florida tickseed FACW
*Coreopsis gladiata*   southeastern tickseed FACW
*Coreopsis integrifolia*   ciliate-leaf tickseed FACW
*Coreopsis leavenworthii*   Leavenworth's tickseed FACW
*Coreopsis linifolia*   Texas tickseed FACW
*Coreopsis nudata*   Georgia tickseed OBL
*Coreopsis tripteris*   tall tickseed FAC
*Cornus amomum*   silky dogwood OBL
*Cornus foemina*   swamp dogwood FACW
*Crataegus aestivalis*   mayhaw OBL
*Crataegus marshallii*   parsley haw FACW
*Crataegus viridis*   green haw FACW
*Crinum americanum*   southern swamp-lily OBL
*Croton elliottii*   Elliott's croton FACW

***Ctenitis submarginalis***   brown-hair comb fern FACW
***Ctenium*** spp.   toothache grass FACW
***Cupaniopsis anacardioides***   carrotwood FAC
***Cuphea aspera***   common waxweed FACW
***Cuphea carthagenensis***   Columbia waxweed FAC
***Cyperus alternifolius***   alternate-leaf flatsedge OBL
***Cyperus articulatus***   jointed flatsedge OBL
***Cyperus cuspidatus***   coastal-plain flatsedge FAC
***Cyperus difformis***   variable flatsedge OBL
***Cyperus distinctus***   marshland flatsedge OBL
***Cyperus drummondii***   flatsedge OBL
***Cyperus entrerianus***   flatsedge OBL
***Cyperus erythrorhizos***   red-root flatsedge OBL
***Cyperus esculentus***   flatsedge FAC
***Cyperus filiculmis***   sandhill flatsedge U
***Cyperus giganteus***   flatsedge FAC
***Cyperus globulosus***   Baldwin's flatsedge FAC
***Cyperus haspan***   sheathed flatsedge OBL
***Cyperus huarmensis***   black knotty-root flatsedge FAC
***Cyperus lanceolatus***   epiphytic flatsedge OBL
***Cyperus metzii***   flatsedge FAC
***Cyperus ovularis***   flatsedge U
***Cyperus papyrus***   papyrus flatsedge OBL
***Cyperus reflexus***   flatsedge U
***Cyperus refractus***   flatsedge U
***Cyperus retrofractus***   flatsedge U
***Cyperus retrorsus***   flatsedge FAC
***Cyperus rotundus***   purple flatsedge FAC
***Cyperus*** **spp.**   flatsedge FACW
***Cyperus tetragonus***   flatsedge U
***Cypselea humifusa***   panal FAC
***Cyrilla racemiflora***   swamp cyrilla FAC
***Decodon verticillatus***   swamp-loosestrife OBL
***Dichondra caroliniensis***   pony-foot FAC
***Dichromena colorata***   starbrush white-top sedge FACW
***Dichromena floridensis***   Everglades white-top sedge FACW
***Dichromena latifolia***   giant white-top sedge OBL
***Dicliptera brachiata***   wild mudwort FACW
***Digitaria pauciflora***   everglades grass FACW
***Digitaria serotina***   dwarf crabgrass FAC
***Diodia virginiana***   button-weed FACW
***Dionaea muscipula***   Venus' flytrap FACW
***Diospyros virginiana***   common persimmon FAC
***Distichlis spicata***   seashore saltgrass OBL
***Drosera brevifolia***   dwarf sundew FACW
***Drosera capillaris***   pink sundew FACW
***Drosera filiformis***   thread-leaf sundew OBL

***Drosera intermedia***   spoon-leaf sundew OBL
***Drosera tracyi***   Gulf coast sundew OBL
***Drymaria cordata***   West Indian chickweed FAC
***Dryopteris ludoviciana***   southern shield-fern FACW
***Dulichium arundinaceum***   three-way sedge OBL
***Dyschoriste humistrata***   swamp dyschoriste FACW
***Echinochloa*** spp.   jungle-rice; cockspur grass FACW
***Echinodorus*** spp.   burhead OBL
***Eclipta alba***   yerba de Tajo FACW
***Eleocharis*** spp.   spikerush OBL
***Elyonurus tripsacoides***   Pan-American balsam-scale FACW
***Elytraria caroliniensis***   Carolina scaly-stem FAC
***Equisetum hyemale***   horsetail FACW
***Eragrostis*** spp.   lovegrass FAC
***Erechtites hieraciifolia***   fireweed FAC
***Erianthus brevibarbis***   short-beard plumegrass FACW
***Erianthus giganteus***   sugarcane plumegrass OBL
***Erianthus strictus***   narrow plumegrass OBL
***Erigeron quercifolius***   fleabane FAC
***Erigeron vernus***   early whitetop fleabane FACW
***Eriocaulon*** spp.   pipewort OBL
***Eriochloa*** spp.   cupgrass FACW
***Erithalis fruticosa***   black torchwood FAC
***Ernodea littoralis***   golden-creeper FAC - Keys only
***Eryngium aquaticum***   corn snakeroot OBL
***Eryngium baldwinii***   Baldwin's coyote-thistle FAC
***Eryngium integrifolium***   blue-flower coyote-thistle FACW
***Eryngium prostratum***   creeping coyote-thistle FACW
***Eryngium yuccifolium***   rattlesnake master FACW
***Erythrodes querceticola***   low erythrodes FACW
***Eulophia alta***   wild coco FACW
***Eupatoriadelphus fistulosus***   joe-pye-weed FACW
***Eupatorium leptophyllum***   marsh thoroughwort OBL
***Eupatorium leucolepis***   white-bract thoroughwort FACW
***Eupatorium mikanioides***   semaphore thoroughwort FACW
***Eupatorium perfoliatum***   boneset FACW
***Eupatorium*** spp.   thoroughworts FAC
***Euphorbia humistrata*** (*Chamaesyce humistrata*)   spreading broomspurge FACW
***Euphorbia inundata***   Florida spurge FACW
***Euphorbia polyphylla***   many-leaved spurge FACW
***Eustachys glauca*** (*Chloris glauca*)   saltmarsh fingergrass FACW
***Eustachys petraea***   fingergrass FAC
***Eustoma exaltatum***   prairie-gentian FACW
***Euthamia*** spp.   bushy goldenrod FAC
***Evolvulus convolvuloides***   evolvulus FACW
***Evolvulus sericeus***   silky bindweed FACW
***Ficus aurea***   Florida strangler fig FAC

9

*Fimbristylis annua*   annual fringe-rush FACW
*Fimbristylis puberula*   Vahl's hairy fringe-rush FACW
*Fimbristylis spathacea*   hurricane-grass FAC
*Fimbristylis* spp.   fringe-rush OBL
*Flaveria bidentis*   yellowtop FAC
*Flaveria floridana*   yellowtop FACW
*Flaveria linearis*   yellowtop FACW
*Flaveria trinervia*   yellowtop FAC
*Forestiera acuminata*   swamp privet FACW
*Forestiera segregata*   Florida privet FAC
*Fothergilla gardenii*   dwarf witch-alder FACW
*Fraxinus americana*   white ash U
*Fraxinus* spp.   ash OBL
*Fuirena* spp.   umbrella-sedge OBL
*Galium tinctorium*   stiff marsh bedstraw FACW
*Gaylussacia dumosa*   dwarf huckleberry FAC
*Gaylussacia frondosa*   dangleberry FAC
*Gaylussacia mosieri*   woolly-berry FACW
*Gentiana* spp.   gentian FACW
*Gleditsia aquatica*   water-locust OBL
*Gleditsia triacanthos*   honey-locust FACW
*Glyceria striata*   fowl mannagrass OBL
*Gordonia lasianthus*   loblolly bay FACW
*Gratiola hispida*   hispid hyssop FAC
*Gratiola* spp.   hedgehyssop FACW
*Guapira discolor*   blolly FAC - Keys only
*Habenaria* spp.   rein orchid FACW
*Halesia diptera*   silver-bell FACW
*Harperocallis flava*   Harper's beauty FACW
*Hartwrightia floridana*   Florida hartwrightia FACW
*Hedychium coronarium*   ginger FACW
*Helenium amarum*   pasture sneezeweed FAC
*Helenium* spp.   sneezeweed FACW
*Helianthus agrestis*   southeastern sunflower FACW
*Helianthus angustifolius*   swamp sunflower FACW
*Helianthus carnosus*   lakeside sunflower FACW
*Helianthus floridanus*   Florida sunflower FAC
*Helianthus heterophyllus*   wetland sunflower FACW
*Helianthus simulans*   muck sunflower FACW
*Heliotropium curassavicum*   seaside heliotrope FAC
*Heliotropium polyphyllum*   heliotrope FAC
*Heliotropium procumbens*   four-spike heliotrope FACW
*Hemicarpha* spp.   dwarf-bulrush FACW
*Heteranthera reniformis*   kidney-leaf mud-plantain OBL
*Hibiscus aculeatus*   rosemallow FACW
*Hibiscus coccineus*   scarlet rosemallow OBL
*Hibiscus grandiflorus*   swamp rosemallow OBL

*Hibiscus laevis*   halberd-leaf rosemallow OBL
*Hibiscus moscheutos*   swamp rosemallow OBL
*Hibiscus tiliaceus*   sea rosemallow FAC
*Hydrochloa caroliniensis*   watergrass OBL
*Hydrocleis nymphoides*   water-poppy OBL
*Hydrocotyle ranunculoides*   floating pennywort OBL
*Hydrocotyle* spp.   pennywort FACW
*Hydrolea* spp.   false-fiddle-leaf OBL
*Hygrophila* spp.   hygrophila OBL
*Hymenachne amplexicaulis*   trompetilla OBL
*Hymenocallis* spp.   spider-lily OBL
*Hypericum chapmanii*   Chapman's St. John's-wort OBL
*Hypericum cumulicola*   scrub St. John's-wort U
*Hypericum drummondii*   Drummond's St. John's-wort U
*Hypericum edisonianum*   Edison's St. John's-wort OBL
*Hypericum fasciculatum*   marsh St. John's-wort OBL
*Hypericum gentianoides*   pineweed U
*Hypericum hypericoides*   St. Andrew's cross FAC
*Hypericum lissophloeus*   smooth-bark St. John's-wort OBL
*Hypericum microsepalum*   small-sepal St. John's-wort U
*Hypericum nitidum*   Carolina St. John's-wort OBL
*Hypericum prolificum*   shrubby St. John's-wort U
*Hypericum punctatum*   dotted St. John's-wort U
*Hypericum reductum*   Atlantic St. John's-wort U
*Hypericum* spp.   St. John's-wort FACW
*Hypericum tetrapetalum*   four-petal St. John's-wort FAC
*Hypolepis repens*   bead fern FACW
*Hypoxis* spp.   yellow stargrasses FACW
*Hyptis alata*   musky mint FACW
*Ilex amelanchier*   sarvis holly OBL
*Ilex cassine*   dahoon holly OBL
*Ilex coriacea*   bay-gall holly FACW
*Ilex decidua*   deciduous holly FACW
*Ilex myrtifolia*   myrtle holly OBL
*Ilex opaca* var.*opaca*   American holly FAC
*Ilex verticillata*   winterberry OBL
*Ilex vomitoria*   yaupon holly FAC
*Illicium floridanum*   Florida anise OBL
*Illicium parviflorum*   star anise FACW
*Impatiens capensis*   spotted touch-me-not OBL
*Iris* spp.   iris OBL
*Iris verna*   dwarf iris U
*Isoetes* spp.   quillwort OBL
*Itea virginica*   virginia willow OBL
*Iva frutescens*   marsh elder OBL
*Iva microcephala*   little marsh elder FACW
*Jacquinia keyensis*   joewood FAC

*Juncus marginatus*   rush FACW
*Juncus* spp.   rush OBL
*Juncus tenuis*   rush FAC
*Justicia brandegeana*   shrimp plant U
*Justicia* spp.   water-willow OBL
*Kalmia latifolia*   mountain laurel FACW
*Kosteletzkya pentasperma*   coastal mallow FAC
*Kosteletzkya virginica*   seashore mallow OBL
*Lachnanthes caroliniana*   redroot FAC
*Lachnocaulon anceps*   white-head bogbutton FACW
*Lachnocaulon beyrichianum*   southern bogbutton FACW
*Lachnocaulon digynum*   pineland bogbutton OBL
*Lachnocaulon engleri*   Engler's bogbutton OBL
*Lachnocaulon minus*   Small's bogbutton OBL
*Laguncularia racemosa*   white mangrove OBL
*Laportea canadensis*   Canada wood-nettle FACW
*Leersia* spp.   cutgrass OBL
*Leitneria floridana*   corkwood OBL
*Leptochloa* spp.   sprangle-top FACW
*Leptochloa virgata*   tropic sprangle-top FAC
*Leucothoe* spp.   dog-hobble FACW
*Liatris garberi*   Garber's gayfeather FACW
*Liatris gracilis*   blazing star FAC
*Liatris spicata*   spiked gayfeather FAC
*Lilaeopsis* spp.   lilaeopsis OBL
*Lilium catesbaei*   southern red lily FAC
*Lilium iridollae*   panhandle lily OBL
*Limnobium spongia*   frogbit OBL
*Limnophila* spp.   marshweed OBL
*Limonium carolinianum*   sea-lavender OBL
*Lindera benzoin*   northern spicebush FACW
*Lindera melissifolia*   southern spicebush OBL
*Lindernia crustacea*   Malayan false-pimpernel FAC
*Lindernia* spp.   false-pimpernel FACW
*Linum carteri*   Carter's flax FACW
*Linum floridanum*   Florida yellow flax FAC
*Linum medium*   stiff yellow flax FAC
*Linum striatum*   ridged yellow flax FACW
*Linum westii*   West's flax OBL
*Liparis elata* (*L. nervosa*)   tall liparis OBL
*Lipocarpha* spp.   lipocarpha FACW
*Liquidambar styraciflua*   sweetgum FACW
*Liriodendron tulipifera*   tulip tree FACW
*Listera* spp.   twayblade FACW
*Litsea aestivalis*   pondspice OBL
*Lobelia cardinalis*   cardinal flower OBL
*Lobelia floridana*   Florida lobelia OBL

12

*Lobelia* spp.   lobelia FACW
*Lophiola americana*   golden-crest FACW
*Ludwigia hirtella*   hairy seedbox FACW
*Ludwigia maritima*   seaside seedbox FACW
*Ludwigia* spp.   ludwigia; water-primrose OBL
*Ludwigia suffruticosa*   headed seedbox FACW
*Ludwigia virgata*   savanna seedbox FACW
*Lycium carolinianum*   Christmas berry OBL
*Lycopodium* spp.   clubmoss FACW
*Lycopus* spp.   bugleweed OBL
*Lyonia ligustrina*   maleberry FAC
*Lyonia lucida*   fetter-bush FACW
*Lyonia mariana*   fetter-bush FACW
*Lysimachia* spp.   loosestrife OBL
*Lythrum* spp.   marsh loosestrife OBL
*Macbridea* spp.   birds-in-a-nest FACW
*Macranthera flammea*   flameflower OBL
*Magnolia virginiana* var. *australis* sweetbay magnolia OBL
*Malaxis spicata*   Florida adder's-mouth OBL
*Manilkara bahamensis*   wild dilly FAC - Keys only
*Manisuris cylindrica*   pitted jointgrass FAC
*Manisuris* spp.   jointgrass FACW
*Marshallia graminifolia*   grass-leaf barbara's-buttons FACW
*Marshallia tenuifolia*   slim-leaf barbara's-buttons FACW
*Maxillaria crassifolia*   hidden orchid OBL
*Maytenus phyllanthoides*   Florida mayten FAC
*Mecardonia* spp.   mecardonia FACW
*Melaleuca quinquenervia*   punk tree FAC
*Melanthera nivea*   squarestem FACW
*Melanthium virginicum*   Virginia bunchflower OBL
*Melochia corchorifolia*   chocolate-weed FAC
*Metopium toxiferum*   poison wood FAC
*Micranthemum* spp.   baby tears OBL
*Micromeria brownei* (*Satureja brownei*)   Brown's savory OBL
*Mimosa pigra*   black mimosa FAC
*Mimulus alatus*   monkey-flower OBL
*Mitreola* spp.   hornpod FACW
*Monanthochloe littoralis*   keygrass OBL
*Morinda royoc*   Keys rhubarb FACW - Keys only
*Morus rubra*   red mulberry FAC
*Muhlenbergia capillaris*   muhly grass OBL
*Muhlenbergia expansa*   cutover muhly FAC
*Muhlenbergia schreberi*   nimblewill FACW
*Murdannia* spp.   dewflower FAC
*Myosurus minimus*   tiny mouse-tail FAC
*Myrica cerifera*   southern bayberry FAC
*Myrica heterophylla*   evergreen bayberry FACW

13

*Myrica inodora*   odorless bayberry FACW
*Myrsine guianensis*   guiana myrsine FAC
*Nasturtium* spp.   water-cress OBL
*Nelumbo* spp.   water-lotus OBL
*Nemastylis floridana*   fall-flowering pleatleaf FACW
*Nemophila aphylla*   small-flower baby-blue-eyes FACW
*Nephrolepis* spp.   sword ferns FAC
*Neyraudia reynaudiana*   silk reed FAC
*Nuphar luteum*   yellow cow-lily OBL
*Nymphaea* spp.   water-lily OBL
*Nymphoides* spp.   floating-hearts OBL
*Nyssa aquatica*   water tupelo OBL
*Nyssa ogeche*   ogeechee tupelo OBL
*Nyssa sylvatica* var. *biflora*   swamp tupelo OBL
*Oldenlandia* spp.   water bluets FACW
*Onoclea sensibilis*   sensitive fern FACW
*Oplismenus setarius*   woods grass FAC
*Orontium aquaticum*   golden club OBL
*Oryza sativa*   cultivated rice FAC
*Osmunda cinnamomea*   cinnamon fern FACW
*Osmunda regalis*   royal fern OBL
*Oxypolis* spp.   water drop-wort OBL
*Panicum abscissum* (Hall)   cut-throat grass FACW
*Panicum anceps*   beaked panicum FAC
*Panicum commutatum*   panicum FAC
*Panicum dichotomiflorum*   fall panicum FACW
*Panicum dichotomum*   panicum FACW
*Panicum ensifolium*   panic grass OBL
*Panicum erectifolium*   erect-leaf witchgrass OBL
*Panicum gymnocarpon*   savannah panicum OBL
*Panicum hemitomon*   maiden-cane OBL
*Panicum hians*   gaping panicum FAC
*Panicum longifolium*   tall thin panicum OBL
*Panicum pinetorum*   panicum FACW
*Panicum repens*   torpedo grass FACW
*Panicum rigidulum*   red-top panicum FACW
*Panicum scabriusculum*   woolly panicum OBL
*Panicum scoparium*   panicum FACW
*Panicum spretum*   panicum FACW
*Panicum strigosum*   panicum FAC
*Panicum tenerum*   bluejoint panicum OBL
*Panicum tenue*   panicum FAC
*Panicum verrucosum*   warty panicum FACW
*Panicum virgatum*   switchgrass FACW
*Parietaria* spp.   pellitory FAC
*Parnassia* spp.   grass-of-Parnassus OBL
*Paspalidium geminatum*   water panicum OBL

*Paspalum acuminatum*   brook paspalum FACW
*Paspalum boscianum*    bull paspalum FACW
*Paspalum conjugatum*    sour paspalum FAC
*Paspalum dilatatum*    dallisgrass FAC
*Paspalum dissectum*    mudbank paspalum OBL
*Paspalum distichum*    joint paspalum OBL
*Paspalum fimbriatum*    Panama paspalum FAC
*Paspalum floridanum*    Florida paspalum FACW
*Paspalum laeve*    field paspalum FACW
*Paspalum monostachyum*    gulf paspalum OBL
*Paspalum plicatulum*    brown-seed paspalum FAC
*Paspalum praecox*    early paspalum OBL
*Paspalum pubiflorum*    hairy-seed paspalum FACW
*Paspalum repens*    water paspalum OBL
*Paspalum setaceum*    thin paspalum FAC
*Paspalum urvillei*    vasey grass FAC
*Pavonia spicata*    mangrove mallow FACW
*Peltandra* spp.    arum; spoon flower OBL
*Pennisetum purpureum*    elephant ear grass FAC
*Penthorum sedoides*    ditch stonecrop OBL
*Pentodon pentandrus*    Hall's pentodon OBL
*Persea palustris*    swamp bay OBL
*Phalaris* spp.    canary grass FAC
*Philoxerus vermicularis*    silverhead FACW
*Phragmites australis*    common reed OBL
*Phyla* spp.    frog-fruit FAC
*Phyllanthus caroliniensis*    Carolina leaf-flower FACW
*Phyllanthus liebmannianus*    Florida leaf-flower FACW
*Phyllanthus urinaria*    water leaf-flower FAC
*Physostegia godfreyi*    Godfrey's dragon-head OBL
*Physostegia leptophylla*    slender-leaf dragon-head OBL
*Physostegia purpurea*    purple dragon-head FACW
*Physostegia virginiana*    false dragon-head FACW
*Pieris phillyreifolia*    climbing fetter-bush FACW
*Pilea* spp.    clearweed FACW
*Pinckneya bracteata*    (*P. pubens*) fever-tree OBL
*Pinguicula* spp.    butterwort OBL
*Pinus glabra*    spruce pine FACW
*Pinus serotina*    pond pine FACW
*Piriqueta caroliniana*    piriqueta FAC
*Pisonia rotundata*    pisonia FAC - Keys only
*Pithecellobium keyense*    blackbead FAC - Keys only
*Pithecellobium unguis-cati*    catclaw FAC - Keys only
*Planera aquatica*    planer tree OBL
*Platanthera* spp.    fringed orchid OBL
*Platanus occidentalis*    sycamore FACW
*Pleea tenuifolia*    rush-featherling OBL

*Pluchea* spp.    camphor-weed FACW

*Pogonia ophioglossoides*    rose pogonia OBL

*Polygala cymosa*    tall milkwort OBL

*Polygala leptostachys*    sandhill milkwort U

*Polygala lewtonii*    scrub milkwort U

*Polygala polygama*    racemed milkwort U

*Polygala* spp.    milkwort FACW

*Polygala verticillata*    whorled milkwort U

*Polygonum argyrocoleon*    silversheath smartweed U

*Polygonum* spp.    smartweed OBL

*Polygonum virginianum*    jumpseed FACW

*Polypogon* spp.    rabbit-foot grass FAC

*Polypremum procumbens*    rustweed FAC

*Pontederia cordata*    pickerelweed OBL

*Ponthieva racemosa*    shadow-witch FACW

*Populus deltoides*    eastern cottonwood FACW

*Populus heterophylla*    swamp cottonwood OBL

*Proserpinaca* spp.    mermaid-weed OBL

*Psidium cattleianum*    strawberry guava FAC

*Psilocarya* spp.    baldrush OBL

*Psychotria* spp.    wild coffee FAC

*Pteris tripartita*    giant brake FACW

*Ptilimnium capillaceum*    mock bishop-weed FACW

*Pycnanthemum nudum*    coastal-plain mountain-mint FACW

*Quercus laurifolia*    laurel oak FACW

*Quercus lyrata*    overcup oak OBL

*Quercus michauxii*    swamp chestnut oak FACW

*Quercus nigra*    water oak FACW

*Quercus pagoda*    cherry-bark oak FACW

*Quercus phellos*    willow oak FACW

*Randia aculeata*    box briar FAC - Keys only

*Ranunculus* spp.    butter-cup FAC

*Reimarochloa oligostachya*    Florida reimar grass FACW

*Reynosia septentrionalis*    darling plum FAC - Keys only

*Rhapidophyllum hystrix*    needle palm FACW

*Rhexia parviflora*    white meadow-beauty OBL

*Rhexia salicifolia*    panhandle meadow-beauty OBL

*Rhexia* spp.    meadow-beauty FACW

*Rhizophora mangle*    red mangrove OBL

*Rhododendron viscosum*    swamp azalea FACW

*Rhodomyrtus tomentosus*    downy rose-myrtle FAC

*Rhynchospora cephalantha*    clustered beakrush OBL

*Rhynchospora chapmanii*    Chapman's beakrush OBL

*Rhynchospora corniculata*    short-bristle beakrush OBL

*Rhynchospora decurrens*    swamp-forest beakrush OBL

*Rhynchospora divergens*    spreading beakrush OBL

*Rhynchospora grayi*    Gray's beakrush U

*Rhynchospora harperi*    Harper's beakrush OBL
*Rhynchospora intermedia*    pinebarren beakrush U
*Rhynchospora inundata*    horned beakrush OBL
*Rhynchospora macra*    large beakrush OBL
*Rhynchospora megalocarpa*    giant-fruited beakrush U
*Rhynchospora microcarpa*    southern beakrush OBL
*Rhynchospora miliacea*    millet beakrush OBL
*Rhynchospora mixta*    mingled beakrush OBL
*Rhynchospora oligantha*    few-flower beakrush OBL
*Rhynchospora* spp.    beakrush FACW
*Rhynchospora stenophylla*    Chapman's beakrush OBL
*Rhynchospora tracyi*    Tracy's beakrush OBL
*Rorippa* spp.    yellow-cress OBL
*Rosa palustris*    swamp rose OBL
*Rotala ramosior*    toothcup OBL
*Roystonea* spp.    royal palm FACW
*Rubus* spp.    blackberries FAC
*Rudbeckia fulgida*    orange coneflower FACW
*Rudbeckia graminifolia*    grass-leaf coneflower FACW
*Rudbeckia laciniata*    cut-leaf coneflower FACW
*Rudbeckia mohrii*    Mohr's coneflower OBL
*Rudbeckia nitida*    shiny coneflower FACW
*Ruellia brittoniana*    Britton's wild-petunia FAC
*Ruellia caroliniensis*    wild-petunia FAC
*Ruellia noctiflora*    night-flowering wild-petunia FACW
*Rumex* spp.    dock FACW
*Sabal minor*    dwarf palmetto FACW
*Sabal palmetto*    cabbage palm FAC
*Sabatia bartramii*    Bartram's rose-gentian OBL
*Sabatia calycina*    coast rose-gentian OBL
*Sabatia dodecandra*    large rose-gentian OBL
*Sabatia* spp.    rose-gentian FACW
*Sacciolepis indica*    glenwood grass FAC
*Sacciolepis striata*    American cupscale OBL
*Sachsia polycephala*    sachsia FACW
*Sagittaria* **spp.**    arrowhead OBL
*Salicornia* spp.    glasswort OBL
*Salix* spp.    willow OBL
*Sambucus canadensis*    elderberry FAC
*Samolus* spp.    water pimpernel OBL
*Sapium sebiferum*    Chinese tallow-tree FAC
*Sarracenia minor*    hooded pitcher-plant FACW
*Sarracenia* spp.    pitcher-plant OBL
*Saururus cernuus*    lizard's tail OBL
*Schinus terebinthifolius*    Brazilian pepper-tree FAC
*Schizachyrium* spp.    bluestem FAC
*Schoenolirion croceum*    sunny bells FACW

17

*Schoenolirion elliottii*   sunny bells FACW
*Schoenus nigricans*   black-sedge FACW
*Scirpus* spp.   bulrush OBL
*Scleria* spp.   nutrush FACW
*Sclerolepis uniflora*   one-flower hardscale FACW
*Scoparia dulcis*   sweet broom FAC
*Scutellaria floridana*   skullcap FAC
*Scutellaria integrifolia*   rough skullcap FAC
*Scutellaria lateriflora*   blue skullcap OBL
*Scutellaria racemosa*   skullcap OBL
*Sebastiania fruticosa*   gulf sebastian-bush FAC
*Selaginella apoda*   meadow spike-moss FACW
*Senecio aureus*   golden ragwort OBL
*Senecio glabellus*   butterweed OBL
*Sesbania* spp.   rattle-bush FAC
*Sesuvium* spp.   sea-purslane FACW
*Setaria geniculata*   bristle grass FAC
*Setaria magna*   foxtail OBL
*Seymeria cassioides*   black senna FAC
*Sisyrinchium atlanticum*   eastern blue-eye-grass FACW
*Sisyrinchium capillare*   blue-eye-grass FACW
*Sisyrinchium mucronatum*   Michaux's blue-eye-grass FACW
*Sium suave*   water-parsnip OBL
*Solanum bahamense*   canker-berry FACW
*Solanum erianthum*   shrub nightshade FACW
*Solidago elliottii*   Elliott's goldenrod OBL
*Solidago fistulosa*   marsh goldenrod FACW
*Solidago leavenworthii*   Leavenworth's goldenrod FACW
*Solidago patula*   rough-leaf goldenrod OBL
*Solidago rugosa*   wrinkled goldenrod FAC
*Solidago sempervirens*   seaside goldenrod FACW
*Solidago stricta*   willow-leaf goldenrod FACW
*Sophora tomentosa*   coast sophora FACW
*Sparganium americanum*   burreed OBL
*Spartina alterniflora*   saltmarsh cordgrass OBL
*Spartina bakeri*   sand cordgrass FACW
*Spartina cynosuroides*   big cordgrass OBL
*Spartina patens*   saltmeadow cordgrass FACW
*Spartina spartinae*   gulf cordgrass FAC
*Spergularia marina*   saltmarsh sandspurry OBL
*Spermacoce glabra*   smooth button-plant FACW
*Sphagnum* spp.   sphagnum moss OBL
*Sphenoclea zeylanica*   chicken-spike FACW
*Sphenopholis pensylvanica*   swamp wedgescale OBL
*Sphenostigma coelestinum*   Bartram's ixia FACW
*Spigelia loganioides*   pink-root FACW
*Spilanthes americana*   creeping spotflower FACW

*Spiranthes* spp.    ladies'-tresses FACW
***Sporobolus floridanus***    Florida dropseed FACW
***Sporobolus virginicus***    seashore dropseed OBL
***Stachys lythroides***    hedgenettle OBL
***Staphylea trifolia***    American bladdernut FACW
***Stenandrium floridanum***    stenandrium FACW
***Stenanthium gramineum***    eastern feather-bells FACW
***Stillingia aquatica***    corkwood OBL
***Stillingia sylvatica*** var. ***tenuis***    marsh queen's-delight FAC
***Stipa avenacioides***    Florida needle grass FACW
***Stokesia laevis***    stokesia FACW
***Strumpfia maritima***    strumpfia FACW - Keys only
***Styrax americana***    snowbell; storax OBL
***Suaeda*** spp.    sea-blite OBL
***Suriana maritima***    bay-cedar FAC
***Syngonanthus flavidulus***    bantam-buttons FACW
***Syzygium*** spp.    Java plum FAC
***Taxodium ascendens***    pond cypress OBL
***Taxodium distichum***    bald cypress OBL
***Teucrium canadense***    American germander FACW
***Thalia geniculata***    thalia; fire flag OBL
***Thalictrum*** spp.    meadow-rue FACW
***Thelypteris*** spp.    shield fern FACW
***Thespesia populnea***    seaside mahoe FAC
***Thrinax radiata***    Florida thatch palm FAC - Keys only
***Tilia americana***    American basswood FACW
***Tofieldia racemosa***    coastal false-asphodel OBL
***Toxicodendron vernix*** poison sumac FACW
***Trachelospermum difforme***    climbing-dogbane FACW
***Tradescantia fluminensis***    trailing spiderwort FAC
***Trema*** spp.    trema FAC
***Trepocarpus aethusae***    aethusa-like trepocarpus FACW
***Triadenum*** spp.    marsh St. John's-wort OBL
***Trianthema portulacastrum***    horse-purslane FACW
***Tridens ambiguus***    savannah tridens FACW
***Tridens strictus***    long-spike tridens FACW
***Triglochin striata***    arrow-grass OBL
***Triphora*** spp.    nodding pogonias FACW
***Tripsacum dactyloides***    eastern gama grass FAC
***Typha*** spp.    cattail OBL
***Ulmus rubra***    slippery elm U
***Ulmus*** spp.    elm FACW
***Urechites lutea***    wild allamanda FACW
***Utricularia*** spp.    bladderwort OBL
***Uvularia floridana***    Florida bellwort FACW
***Vaccinium corymbosum***    highbush blueberry FACW
***Vaccinium elliottii***    Elliott's blueberry FAC

*Verbena scabra*    sandpaper vervain FACW
*Verbesina chapmanii*    Chapman's crownbeard FACW
*Verbesina heterophylla*    diverse-leaf crownbeard FACW
*Verbesina virginica*    white crownbeard FAC
*Vernonia angustifolia*    narrow-leaf ironweed U
*Vernonia* spp.    ironweed FACW
*Veronica anagallis-aquatica*    water speedwell OBL
*Veronicastrum virginicum*    culver's-root FACW
*Viburnum dentatum*    arrow-wood FACW
*Viburnum nudum*    possum-haw viburnum FACW
*Viburnum obovatum*    walter viburnum FACW
*Vicia acutifolia*    four-leaf vetch FACW
*Vicia floridana*    Florida vetch FACW
*Vicia ocalensis*    Ocala vetch OBL
*Viola affinis*    Leconte's violet FACW
*Viola esculenta*    edible violet FACW
*Viola lanceolata*    lance-leaf violet OBL
*Viola primulifolia*    primrose-leaf violet FACW
*Websteria confervoides*    water-meal OBL
*Wedelia trilobata*    creeping ox-eye FAC
*Woodwardia areolata*    chainfern OBL
*Woodwardia virginica*    chainfern FACW
*Xanthorhiza simplicissima*    shrubby yellow-root FACW
*Xanthosoma sagittifolium*    elephant ear FACW
*Xyris caroliniana*    Carolina yellow-eyed grass FACW
*Xyris jupicai*    tropical yellow-eyed grass FACW
*Xyris* spp.    yellow-eyed grass OBL
*Yeatesia viridiflora*    green-flower yeatesia FACW
*Zephyranthes atamasco*    atamasco lily FACW
*Zigadenus densus*    crow poison FACW
*Zigadenus glaberrimus*    atlantic deathcamas FACW
*Zizania aquatica*    wildrice OBL
*Zizaniopsis miliacea*    southern wildrice OBL

**Any plant not specifically listed is considered an upland plant except vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of Chapter 62-340, F.A.C. (Effective Date July 1, 1994)**

# Chapter 62-340, F.A.C.
# Delineation of the Landward Extent of Wetlands and Surface Waters

62-340.100 Intent.
62-340.200 Definitions.
62-340.300 Delineation.
62-340.400 Selection of Appropriate Vegetative Stratum.
62-340.450 Vegetative Index.
62-340.500 Hydrologic Indicators.
62-340.550 Wetland Hydrology.
62-340.600 Surface Waters.
62-340.700 Exemptions for Treatment or Disposal Systems.
62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

## 62-340.100 Intent.

(1) This rule's intent is to provide a unified statewide methodology for the delineation of the extent of wetlands and surface waters to satisfy the mandate of Section 373.421, F.S. This delineation methodology is intended to approximate the combined landward extent of wetlands as determined by a water management district and the Department immediately before the effective date of this rule. Before implementing the specific provisions of this methodology, the regulating agency shall attempt to identify wetlands according to the definition for wetlands in subsection 373.019(27), F.S., and subsection 62-340.200(19), F.A.C., below. The landward extent of wetlands shall be determined by the dominance of plant species, soils and other hydrologic evidence indicative of regular and periodic inundation or saturation. In all cases, attempts shall be made to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing, without quantitative sampling. If this cannot be accomplished, the quantitative methods in paragraph 62-301.400(1)(c), F.A.C., shall be used unless the applicant or petitioner and regulating agency agree, in writing, on an alternative method for quantitatively analyzing the vegetation on site. The methodology shall not be used to delineate areas which are not wetlands as defined in subsection 62-340.200(19), F.A.C., nor to delineate as wetlands or surface waters areas exempted from delineation by statute or agency rule.

(2) The Department shall be responsible for ensuring statewide coordination and consistency in the delineation of surface waters and wetlands pursuant to this rule, by providing training and guidance to the Department, Districts,

21

and local governments in implementing the methodology.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.100.*

## 62-340.200 Definitions.

When used in this chapter, the following terms shall mean:

(1)  "**Aquatic plant**" means a plant, including the roots, which typically floats on water or requires water for its entire structural support, or which will desiccate outside of water.

(2)  "**Canopy**" means the plant stratum composed of all woody plants and palms with a trunk four inches or greater in diameter at breast height, except vines.

(3)  "**Diameter at Breast Height (DBH)**" means the diameter of a plant's trunk or main stem at a height of 4.5 feet above the ground.

(4)  "**Facultative plants**" means those plant species listed in subsection 62-340.450(3), F.A.C., of this chapter. For the purposes of this rule, facultative plants are not indicators of either wetland or upland conditions.

(5)  "**Facultative Wet plants**" means those plant species listed in subsection 62-340.450(2), F.A.C., of this chapter.

(6)  "**Ground Cover**" means the plant stratum composed of all plants not found in the canopy or subcanopy, except vines and aquatic plants.

(7)  "**Ground truthing**" means verification on the ground of conditions on a site.

(8)  "**Hydric Soils**" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

(9)  "**Hydric Soil Indicators**" means those indicators of hydric soil conditions as identified in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation ed. Staff 1992).

(10)  "**Inundation**" means a condition in which water from any source regularly and periodically covers a land surface.

(11)  "**Obligate plants**" means those plant species listed in subsection 62-340.450(1), F.A.C., of this chapter.

(12)  "**Regulating agency**" means the Department of Environmental Protection, the water management districts, state or regional agencies, local governments, and any other governmental entities.

(13)  "**Riverwash**" means areas of unstabilized sandy, silty, clayey, or gravelly sediments. These areas are flooded, washed, and reworked by rivers or streams so frequently that they may support little or no vegetation.

(14)  "**Saturation**" means a water table six inches or less from the soil surface for soils with a permeability equal to or greater than six inches per

hour in all layers within the upper 12 inches, or a water table 12 inches or less from the soil surface for soils with a permeability less than six inches per hour in any layer within the upper 12 inches.

(15)  "**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

(16)  "**Subcanopy**" means the plant stratum composed of all woody plants and palms, exclusive of the canopy, with a trunk or main stem with a DBH between one and four inches, except vines.

(17)  "**Upland plants**" means those plant species, not listed as Obligate, Facultative Wet, or Facultative by this rule, excluding vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of this rule.

(18)  "**U.S.D.A.-S.C.S.**" means the United States Department of Agriculture, Soil Conservation Service.

(19)  "**Wetlands**," as defined in subsection 373.019(27), F.S., means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.200.*

## 62-340.300 Delineation of Wetlands.

The landward extent (i.e., the boundary) of wetlands as defined in subsection 62-340.200(19), F.A.C., shall be determined by applying reasonable scientific judgment to evaluate the dominance of plant species, soils, and other hydrologic evidence of regular and periodic inundation and saturation as set forth below. In applying reasonable scientific judgment, all reliable information shall be evaluated in determining whether the area is a wetland as defined in subsection 62-340.200(19), F.A.C.

(1) Before using the wetland delineation methodology described below, the regulating agency shall attempt to identify and delineate the landward extent of wetlands by direct application of the definition of wetlands in subsection 62-340.200(19), F.A.C., with particular attention to the vegetative communities which the definition lists as wetlands and non-wetlands. If the boundary cannot be located easily by use of the definition in subsection 62-340.200(19), F.A.C., the provisions of this rule shall be used to locate the landward extent of a wetland. In applying the provisions of this rule, the regulating agency shall attempt to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing.

(2) The landward extent of a wetland as defined in subsection 62-340.200(19), F.A.C., shall include any of the following areas:

(a) Those areas where the areal extent of obligate plants in the appropriate vegetative stratum is greater than the areal extent of all upland plants in that stratum, as identified using the method in Rule 62-340.400, F.A.C., and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrological mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(b) Those areas where the areal extent of obligate or facultative wet plants, or combinations thereof, in the appropriate stratum is equal to or greater than 80% of all the plants in that stratum, excluding facultative plants, and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

3. One or more of the hydrologic indicators listed in Rule 62-340.500,

24

F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(c) Those areas, other than pine flatwoods and improved pastures, with undrained hydric soils which meet, in situ, at least one of the criteria listed below. A hydric soil is considered undrained unless reasonable scientific judgment indicates permanent artificial alterations to the on site hydrology have resulted in conditions which would not support the formation of hydric soils.

1. Soils classified according to United States Department of Agriculture's *Keys to Soil Taxonomy* (4th ed. 1990) as Umbraqualfs, Sulfaquents, Hydraquents, Humaquepts, Histosols (except Folists), Argiaquolls, or Umbraquults.

2. Saline sands (salt flats-tidal flats).

3. Soil within a hydric mapping unit designated by the U.S.D.A.-S.C.S. as frequently flooded or depressional, when the hydric nature of the soil has been field verified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida. If a permit applicant, or a person petitioning for a formal determination pursuant to subsection 373.421(2), F.S., disputes the boundary of a frequently flooded or depressional mapping unit, the applicant or petitioner may request that the regulating agency, in cooperation with the U.S.D.A.-S.C.S., confirm the boundary. For the purposes of subsection 120.60(2), F.S., a request for a boundary confirmation pursuant to this subparagraph shall have the same effect as a timely request for additional information by the regulating agency. The regulating agency's receipt of the final response provided by the U.S.D.A.-S.C.S. to the request for boundary confirmation shall have the same effect as a receipt of timely requested additional information.

4. For the purposes of this paragraph only, "pine flatwoods" means a plant community type in Florida occurring on flat terrain with soils which may experience a seasonal high water table near the surface. The canopy species consist of a monotypic or mixed forest of long leaf pine or slash pine. The subcanopy is typically sparse or absent. The ground cover is dominated by saw palmetto with areas of wire grass, gallberry, and other shrubs, grasses, and forbs, which are not obligate or facultative wet species. Pine flatwoods do not include those wetland communities as listed in the wetland definition contained in subsection 62-340.200(19), F.A.C., which may occur in the broader landscape setting of pine flatwoods and which may contain slash pine. Also for the purposes of this paragraph only, "improved pasture" means areas where the dominant native plant community has been replaced with planted or natural recruitment of herbaceous species which are not obligate or facultative wet species and which have been actively

maintained for livestock through mechanical means or grazing.

(d) Those areas where one or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present, and which have hydric soils, as identified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida, and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C. These areas shall not extend beyond the seasonal high water elevation.

(3)(a) If the vegetation or soils of an upland or wetland area have been altered by natural or man-induced factors such that the boundary between wetlands and uplands cannot be delineated reliably by use of the methodology in subsection 62-340.300(2), F.A.C., as determined by the regulating agency, and the area has hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a non hydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance, then the most reliable available information shall be used with reasonable scientific judgment to determine where the methodology in subsection 62-340.300(2), F.A.C., would have delineated the boundary between wetlands and uplands. Reliable available information may include, but is not limited to, aerial photographs, remaining vegetation, authoritative site-specific documents, or topographical consistencies.

(b) This subsection shall not apply to any area where regional or site-specific permitted activity, or activities which did not require a permit, under Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., have altered the hydrology of the area to the extent that reasonable scientific judgment, or application of the provisions of Section 62-340.550, F.A.C., indicate that under normal circumstances the area no longer inundates or saturates at a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C.

(c) This subsection shall not be construed to limit the type of evidence which may be used to delineate the landward extent of a wetland under this chapter when an activity violating the regulatory requirements of Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., has disturbed the vegetation or soils of an area.

(4) The regulating agency shall maintain sufficient soil scientists on staff to

provide evaluation or consultation regarding soil determinations in applying the methodologies set forth in subsection 62-340.300(2) or (3), F.A.C. Services provided by the U.S.D.A.-S.C.S., or other competent soil scientists, under contract or agreement with the regulating agency, may be used in lieu of, or to augment, agency staff.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.300.*

## 62-340.400 Selection of Appropriate Vegetative Stratum.

Dominance of plant species, as described in paragraphs 62-340.300(2)(a) and 62-340.300(2)(b), F.A.C., shall be determined in a plant stratum (canopy, subcanopy, or ground cover). The top stratum shall be used to determine dominance unless the top stratum, exclusive of facultative plants, constitutes less than 10 percent areal extent, or unless reasonable scientific judgment establishes that the indicator status of the top stratum is not indicative of the hydrologic conditions on site. In such cases, the stratum most indicative of on site hydrologic conditions, considering the seasonal variability in the amount and distribution of rainfall, shall be used. The evidence concerning the presence or absence of regular and periodic inundation or saturation shall be based on in situ data. All facts and factors relating to the presence or absence of regular and periodic inundation or saturation shall be weighed in deciding whether the evidence supports shifting to a lower stratum. The presence of obligate, facultative wet, or upland plants in a lower stratum does not by itself constitute sufficient evidence to shift strata, but can be considered along with other physical data in establishing the weight of evidence necessary to shift to a lower stratum. The burden of proof shall be with the party asserting that a stratum other than the top stratum should be used to determine dominance. Facultative plants shall not be considered for purposes of determining appropriate strata or dominance.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.400.*

## 62-340.450 Vegetative Index.

(1)     Obligate Species (See Appendix A)

(2)     Facultative Wet Species (See Appendix A)

(3)     Facultative Species (See Appendix A)

(4)     Nomenclature. Use of plants in this rule is based solely on the scientific names. Common names are included in the above lists for information purposes only. The following references shall be used by the regulating agency to resolve any uncertainty about the nomenclature or taxonomy of any plant listed by a given scientific name in this section: R.

Godfrey, Trees, Shrubs and Woody Vines of Northern Florida and Adjacent Georgia & Alabama (Univ. Ga. Press, Athens 1988) and D. Lellinger, Ferns & Fern-Allies of the United States & Canada (Smithsonian Institution Press, Washington D.C. 1985) for all species covered by these references. For all other listed scientific names the following references will be followed unless the species list in this section designates a different authority next to an individual species name: R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Monocotyledons (Univ. Ga. Press, Athens 1979); R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Dicotyledons (Univ. Ga. Press, Athens 1979); D. & H. Correll, Flora of the Bahama Archipelago (A.R. Gantner, Germany 1982). When the species list in this section designates a different authority next to an individual species name, the regulating agency shall resolve any ambiguity in nomenclature by using the name identified in D. Hall, The Grasses of Florida (Doctoral Dissertation, Univ. of Fla., Gainesville 1978); or C. Campbell, Systematics of the Andropogon Virginicus Complex (GRAMINEAE), 64 Journal of the Arnold Arboretum 171-254 (1983). *Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.450.*

## 62-340.500 Hydrologic Indicators.

The indicators below may be used as evidence of inundation or saturation when used as provided in Rule 62-340.300, F.A.C. Several of the indicators reflect a specific water elevation. These specific water elevation indicators are intended to be evaluated with meteorological information, surrounding topography and reliable hydrologic data or analyses when provided, to ensure that such indicators reflect inundation or saturation of a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C., and not rare or aberrant events. These specific water elevation indicators are not intended to be extended from the site of the indicator into surrounding areas when reasonable scientific judgment indicates that the surrounding areas are not wetlands as defined in subsection 62-340.200(19), F.A.C.

(1) **Algal mats**. The presence or remains of nonvascular plant material which develops during periods of inundation and persists after the surface water has receded.

(2) **Aquatic mosses or liverworts on trees or substrates**. The presence of those species of mosses or liverworts tolerant of or dependent on surface water inundation.

(3) **Aquatic plants**. Defined in subsection 62-340.200(1), F.A.C.

(4) **Aufwuchs**. The presence or remains of the assemblage of sessile, attached or free-living, nonvascular plants and invertebrate animals

28

(including protozoans) which develop a community on inundated surfaces.

(5)   **Drift lines and rafted debris**. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(6)   **Elevated lichen lines**. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

(7)   **Evidence of aquatic fauna**. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

(8)   **Hydrologic data**. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation Staff 1992).

(9)   **Morphological plant adaptations**. Specialized structures or tissues produced by certain plants in response to inundation or saturation which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

(10) **Secondary flow channels**. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

(11) **Sediment deposition**. Mineral or organic matter deposited in or shifted to positions indicating water transport.

(12) **Vegetated tussocks or hummocks**. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

(13) **Water marks**. A distinct line created on fixed objects, including vegetation, by a sustained water elevation.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.500.*

## 62-340.550 Wetland Hydrology.

A wetland delineation using the methodology described above, can be refuted by either reliable hydrologic records or site specific hydrologic data which indicate that neither inundation for at least seven consecutive days, nor saturation for at least twenty consecutive days, occurs during conditions which represent long-term hydrologic conditions. Hydrologic records or site specific hydrologic data must be of such a duration, frequency, and accuracy to demonstrate that the records or data are representative of the long-term hydrologic conditions, including the variability in quantity and seasonality of rainfall. When sufficient amounts of either reliable hydrologic records or site specific hydrologic data are not available to prove that the wetland area of concern does not inundate or saturate as described above, a site-specific field-verified analytic or numerical model may be used to demonstrate that the wetland area no longer inundates or saturates regularly or periodically under typical long-term hydrologic conditions. Before initiating the use of a model to evaluate if a wetland delineation should be refuted based on hydrologic conditions, the applicant or petitioner shall first meet with the appropriate regulating agency and reach an agreement on the terms of study, including data collection, the specific model, model development and calibration, and model verification. If the data, analyses, or models are deemed inadequate based on the hydrologic conditions being addressed, the regulating agency shall provide a case-by-case review of the applicability of any data, analyses, or models and shall provide specific reasons, based on generally accepted scientific and engineering practices, why they are inadequate.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.550.*

## 62-340.600 Surface Waters.

(1) For the purposes of Section 373.421, F.S., surface waters are waters on the surface of the earth, contained in bounds created naturally or artificially, including, the Atlantic Ocean, the Gulf of Mexico, bays, bayous, sounds, estuaries, lagoons, lakes, ponds, impoundments, rivers, streams, springs, creeks, branches, sloughs, tributaries, and other watercourses. However, state water quality standards apply only to those waters defined in subsection 403.031(13), F.S.

(2) The landward extent of a surface water in the State for the purposes of implementing Section 373.414, F.S., shall be the more landward of the following:

   (a) Wetlands as located by Rule 62-340.300, F.A.C., of this chapter;
   (b) The mean high water line elevation for tidal water bodies;
   (c) The ordinary high water line for non-tidal natural water bodies;

(d) The top of the bank for artificial lakes, borrow pits, canals, ditches and other artificial water bodies with side slopes of 1 foot vertical to 4 feet horizontal or steeper, excluding spoil banks when the canals and ditches have resulted from excavation into the ground; or

(e) The seasonal high water line for artificial lakes, borrow pits, canals, ditches, and other artificial water bodies with side slopes flatter than 1 foot vertical to 4 feet horizontal along with any artificial water body created by diking or impoundment above the ground.

(3) Determinations made pursuant to paragraphs (2)(b) and (2)(c) shall be for regulatory purposes and are not intended to be a delineation of the boundaries of lands for the purposes of title.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211, 403.031(13) FS. History–New 7-1-94, Formerly 17-340.600.*

## 62-340.700 Exemptions for Treatment or Disposal Systems.

(1) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8) and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991):

(a) Works, impoundments, reservoirs, and other watercourses constructed and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(b) Works, impoundments, reservoirs, and other watercourses constructed solely for wastewater treatment or disposal before a construction permit was required under Chapter 403, F.S., and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(c) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated

solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C., except those permitted as wetland stormwater treatment systems; or

(d) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(2) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1), 373.414(2)(a), 373.414(8), and 373.414(10), F.S.; and subsections 373.414(3) through 373.414(6), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991), except for authority to protect threatened and endangered species in isolated wetlands:

(a) Works, impoundments, reservoirs, and other watercourses of 0.5 acre or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, 40E-4, except those permitted as wetland stormwater treatment systems; or

(b) Works, impoundments, reservoirs, and other watercourses of 0.5 acres or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(3) The exemptions in subsections 62-340.700(1) and (2) shall not apply to works, impoundments, reservoirs or other watercourses that

(a) Are currently wetlands which existed before construction of the stormwater treatment system and were incorporated in it;

(b) Are proposed to be altered through expansion into wetlands or other surface waters; or

(c) Are wetlands created, enhanced, or restored as mitigation for wetland or surface water impacts under a permit issued by the Department or a water management district.

(4) Alterations and maintenance of works, impoundments, reservoirs, and other watercourses exempt under this subsection shall not be considered in

determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S.

(5) Works, impoundments, reservoirs, and other watercourses exempt under this subsection, other than isolated wetlands in systems described in subsection 62-340.700(2), F.A.C., above, shall not be delineated under Section 373.421, F.S.

(6) This exemption shall not affect the application of state water quality standards, including those applicable to Outstanding Florida Waters, at the point of discharge to waters as defined in subsection 403.031(13), F.S.

(7) As used in this subsection, "solely for" means the reason for which a work, impoundment, reservoir, or other watercourse is constructed and operated; and such construction and operation would not have occurred but for the purposes identified in subsection 62-340.700(1) or 62-340.700(2), F.A.C. Furthermore, the phrase does not refer to a work, impoundment, reservoir, or other watercourse constructed or operated for multiple purposes. Incidental uses, such as occasional recreational uses, will not render the exemption inapplicable, so long as the incidental uses are not part of the original planned purpose of the work, impoundment, reservoir, or other watercourse. However, for those works, impoundments, reservoirs, or other watercourses described in paragraphs 62-340.700(1)(c) and 62-340.700(2)(a), F.A.C., use of the system for flood attenuation, whether originally planned or unplanned, shall be considered an incidental use, so long as the works, impoundments, reservoirs, and other watercourses are no more than 2 acres larger than the minimum area required to comply with the stormwater treatment requirements of the district or department. For the purposes of this subsection, reuse from a work, impoundment, reservoir, or other watercourse is part of treatment or disposal.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.700.*

## 62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

Construction, alteration, operation, maintenance, removal, and abandonment of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works, in, on or over lands that have become surface waters or wetlands solely because of mosquito control activities undertaken as part of a governmental mosquito control program, and which lands were neither surface waters nor wetlands before such activities, shall be exempt from the rules adopted by the department and water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority granted pursuant to Section 373.414, F.S. (1991). Activities exempted under

this section shall not be considered in determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S. This exemption shall not affect the regulation of impacts on other surface waters or wetlands, or the application of state water quality standards to waters as defined in subsection 403.031(13), F.S., including standards applicable to Outstanding Florida Waters.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History– New 7-1-94, Formerly 17-340.750.*

*See* <u>*The Florida Wetlands Delineation Manual*</u> *for further clarification.*

---

## Data Form Guide Notes:
### <u>Surface Water Definitions</u>

*Definition from §373.019(19) Florida Statutes*
"**Surface water**" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface.

*Definition from §373.019(14) Florida Statutes*
"**Other watercourse**" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted.

*Definition from §62.340.200(15) Florida Administrative Code*
"**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

*From* <u>*The Florida Wetlands Delineation Manual*</u> *pg. 37*
**Ordinary high water** is that point on the slope or bank where the surface water from the water body ceases to exert a dominant influence on the character of the surrounding vegetation and soils. The OHWL frequently encompasses areas dominated by non-listed vegetation and non-hydric soils. When the OHWL is not at a wetland edge, the general view of the area may present an "upland" appearance.

*Definition from §403.803(14) Florida Statutes*
"**Swale**" means a manmade trench which:
(a) Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than 3 feet horizontal to 1 foot vertical;
(b) Contains contiguous areas of standing or flowing water only following a rainfall event;
(c) Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and
(d) Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge.

34

**Data Form Guide Notes:**

**Tips from Field Indicators of Hydric Soils in the United States V8.2, 2018**

- As long as the soil meets the definition of a hydric soil, the lack of an indicator does not preclude the soil from being hydric.
- Concentrate sampling efforts near the wetland edge and, if these soils are hydric, assume that soils in the wetter, interior portions also are hydric. The indicators were developed mostly to identify the boundary of hydric soil areas and generally work best on the margins. Not all of the obviously wetter hydric soils will be identified by the indicators.

## SOIL AND WATER RELATIONSHIPS OF FLORIDA'S ECOLOGICAL COMMUNITIES

July, 1992
Adapted

### Field Identification of Hydric Soils

**Hydric Soil Indicator Concept**

The Hydric Soil Indicator concept is based on the premise that hydric soils develop and exhibit characteristic morphologies that result from repeated periods of saturation and/or inundation for more than a few days. Saturation or inundation when combined with anaerobic microbiological activity in the soil causes a depletion of oxygen. This anaerobiosis promotes biogeochemical processes such as the accumulation of organic matter and the reduction, translocation, and/or accumulation of iron and other reducible elements. These processes result in characteristic morphologies which persist in the soil during both wet and dry periods, making them particularly useful for identifying hydric soils.

Hydric soil indicators are formed predominantly by the accumulation or loss of iron, manganese, sulfur, or carbon compounds. The presence of hydrogen sulfide gas (rotten egg odor) is a strong indicator of a hydric soil, but this indicator is found in only the wettest sites containing sulfur.

**Hydric Soil Indicator Identification Procedure**

To document a hydric soil, dig a hole and describe the soil profile to a depth of approximately 50 cm (20 inches). Using the completed soil description specify which of the Hydric Soil Indicators have been matched. Deeper examination of soil may be required where Hydric Soil Indicators are not easily seen within 50 cm (20 in.) of the surface. It is always recommended that soils be excavated and described as deep as necessary to make reliable interpretations. Examination to less than 50 cm (20 in.) may suffice in soils with surface horizons of organic material or mucky mineral material because these shallow organic accumulations only occur in hydric soils. Depths used in are measured from the muck or mineral soil surface unless otherwise indicated. All colors refer to moist Munsell colors.

# Estimating Seasonal High Saturation

## Introduction

Seasonal High Water Table (SHWT) is the shallowest depth to free water that stands in an unlined borehole or where the soil moisture tension is zero for a significant period (more than a few weeks). The depth to the estimated SHWT is the used soil interpretation in Florida. This method of estimating SHWT applies only to areas lacking hydrologic modifications. Hydrologic modifications such as ditches and dikes can make the soil either wetter or drier.

By observing soil features, SHWT predictions can be made for hydric soils as well as other soils.

## Field Identification of SHWT

The procedure for field Identification of SHWT is based on the assumption that, when soils are wet enough, for a long enough duration to develop SHWT, they should exhibit certain visible properties that are to be used to determine on-site SHWT. All SHWT determinations should be based on field observations of moist soils.

## Procedure

SHWT is determined by examining soils with a hydric soil indicator in a freshly dug pit for the SHWT indicators listed below. Presence of the shallowest of the SHWT indicators listed below indicates the depth to SHWT.

1. Soils with the following hydric soil indicators have SHWT at or above the surface:

A1 (Histosol or Histel), A2 (Histic Epipedon), A3 (Black Histic), A4 (Hydrogen Sulfide), A7 (5 cm Mucky Mineral), A8 (Muck Presence) or A9 (1 cm Muck), S4 (Sandy Gleyed Matrix), and F2 (Loamy Gleyed Matrix).

2. Soils with the following hydric soil indicators have SHWT within 6 inches of the surface:

A5 (Stratified Layers), A6 (Organic Bodies), A11 (Depleted Below Dark Surface), A12 (Thick Dark Surface), S5 (Sandy Redox), S6 (Stripped Matrix), S7 (Dark Surface), S8 (Polyvalue Below Surface), S9 (Thin Dark Surface), F10 (Marl), and F13 (Umbric Surface). Depth to SHWT is the depth at which all requirements of a particular indicator are met.

For example, if S6 (Stripped Matrix) starts at 4 inches, depth to SHWT is 4 inches or if S7 (Dark Surface) starts at the soil surface, depth to SHWT is the soil surface.

36

    3. Soils with the following hydric soil indicators have SHWT within 12 inches of the surface:

F3 (Depleted Matrix), F6 (Redox Dark Surface), and F7 (Depleted Dark Surface). Depth to SHWT is the depth at which all requirements of a particular indicator are met.

For example, if F3 (Depleted Matrix) starts at 8 inches, depth to SHWT is 8 inches.

    4. Soils with the following hydric soil indicators lack significant saturation but are inundated for long or very long duration:

      F8 (Redox Depressions) and F12 (Iron/Manganese Masses).

---

**Data Form Guide Note:**
**A stand-alone D Test soil field indicator is both a hydric soil field indicator and a hydrologic indicator.**

**The hydric soil field indicators below indicate SHWT at or above the surface, and therefore may also be used as evidence of hydrologic data under subsection 62-340.500(8), F.A.C.** per Soil and Water Relationships of Florida's Ecological Communities (Florida Soil Conservation Staff 1992 Adapted)**:**

**A1 – Histosol or Histel**
**A2 – Histic Epipedon**
**A3 – Black Histic**
**A4 – Hydrogen Sulfide**
**A7 – 5 cm Mucky Mineral**
**A8 – Muck Presence**
**A9 – 1 cm Muck**
**S4 – Sandy Gleyed Matrix**
**F2 – Loamy Gleyed Matrix**

Or **any NRCS hydric soil field indicator** in which all requirements of that indicator are met starting at the soil surface (see Data Form Guide page 36)

**The hydric soil field indicator below is also a hydrologic indicator under subsection 62-340.500(11), F.A.C. evidence of sediment deposition:**

**A5 - Stratified Layers**

## Field Determination of Soil Indicator Texture

Place a ball of soil between the thumb and forefinger. Attempt to form a ribbon of uniform thickness (~2mm) and width which will extend over the forefinger.

Does the soil form a ribbon?

No               Yes



**Sandy Texture Soil**          **Fine Texture Soil**
Use only **A** or **S** indicators      Use only **A** or **F** indicators

---

## Tips for Determining Texture of Soil Materials High in Organic Carbon

### "Five Rub Texture Test"

If soil appears dark, gently (minimal pressure) rub wet soil material between forefinger and thumb 2 times, then 3 more times (5 total) and note how it feels.

| # of Rubs | Feeling | Texture |
|-----------|---------|---------|
| ≤ 2 | Gritty | Sandy Mineral[1] |
| 2 | Greasy | *Continue to next rows* |
| 3 to ≤ 5 | Gritty | Sandy Mucky Mineral[1] |
| 3 to ≤ 5 | Plastic[2] | Check % Organic Carbon[3] to determine if Fine Mineral[1] or Fine Mucky Mineral[1] |
| 5 | Greasy | Muck[1] |

[1] Results of this test only approximate texture; check NRCS hydric soil field indicators to determine if all requirements of an indicator are met

[2] Plastic: able to be molded or deformed into various shapes by moderate pressure

[3] Sufficiency of organic carbon* can be approximated using the "Color Test" (pg. 39)
  *not to be confused with organic coating of sand particles*

### "Ten Rub Fiber Test"

If soil material is all or nearly all organic and has visible, partly decomposed plant materials, firmly rub a moist sample 10 times in the palm of one hand with the thumb of the other and estimate the proportion of fibers visible with a hand lens.

| Proportion of visible fibers[4] | Organic soil texture |
|---------------------------------|----------------------|
| Less than 1/6 (<17%) | Sapric (Muck) |
| 1/6 to 3/4 (17% - 75%) | Hemic (Mucky Peat) |
| More than 3/4 (>75%) | Fibric (Peat) |

[4] Live roots are not considered

## Tips for Approximating Composition of Soil

### "Volume Tests"

Create two equal pea-sized clumps of soil. Place one aside as reference, and place other in cupped palm of hand. Holding spray bottle close (~3 in.), thoroughly wet soil, filling but not overflowing palm.

Break apart soil material to make a souplike suspension of particles.

### "Color Test"

Keeping solution in palm, note its color.

| | | |
|---|---|---|
| If solution is dark brown to black, suspended particles are primarily organic. Proceed to "sand content test." | If solution is slightly cloudy or milky but still dark, suspended particles are organic and silt/clay. Proceed to "sand content test," but adjust sand volume thresholds using reasonable scientific judgment. | If solution is mid to light gray, suspended particles are mostly silt and/or clay, and soil is most likely fine mineral texture. |

### "Sand Content Test"

Gently decant liquid solution while keeping solid material in palm.

Spray, muddle, examine, drain, and repeat until solution runs nearly clear.

Separate any undecomposed organic material or nonsoil from sand in palm of hand. Compare volume of sand in relation to original (reference) pea sized clump, considering relative loss of fine soil material (silt/clay) indicated by "color test", to approximate the organic vs. mineral (sand/silt/clay) content. Percent volume of sand left in palm after organic content has been "washed" away approximates lab-determined organic carbon dry weight percentages as below. Adjust thresholds if "color test" indicated fine soil material presence.



**Figure 1:** Interpretation of "Sand Content Test" results if "Color Test" solution is black/brown. If solution is cloudy, percent organic carbon thresholds are higher. Adjust sand volume thresholds accordingly.

## Tips for Determining Boundary Types of Features in Soil



Not discernible with naked eye

0.1 mm  0.8 mm  1.3 mm  1.7 mm  2.1 mm  2.6 mm  3.3 mm

### Sharp
Color gradation is less than 0.1mm wide

### Clear
Color gradation is 0.1mm to 2mm wide

### Diffuse
Color gradation is greater than 2mm wide

**Figure 2:** Diagram for determining boundary types of features in the matrix.

## Tips for Determining Contrast Between Soil Colors

**Table 1:** Chart of delta hue (Figure 3), delta value, and delta chroma required for each level of color contrast. The last column in each row states what level of contrast exists between two colors when the Δhue, Δvalue, and Δchroma criteria within that row are met.

**\*Note: If both colors have value ≤3 and chroma ≤2, the contrast is faint, regardless of the change in hue.**

| ΔHue | ΔValue | ΔChroma | Contrast |
|---|---|---|---|
| 0 | ≤2 | ≤1 | Faint |
| | ≤2 | >1 to <4 | Distinct |
| | >2 to <4 | <4 | Distinct |
| | any | ≥4 | Prominent |
| | ≥4 | any | Prominent |
| 1 | ≤1 | ≤1 | Faint |
| | ≤1 | >1 to <3 | Distinct |
| | >1 to <3 | <3 | Distinct |
| | any | ≥3 | Prominent |
| | ≥3 | any | Prominent |
| 2 | 0 | 0 | Faint |
| | 0 | >0 to <2 | Distinct |
| | >0 to <2 | <2 | Distinct |
| | any | ≥2 | Prominent |
| | ≥2 | any | Prominent |
| 3+ | any | any | Prominent |

**Figure 3:** Relationships among the hues of the Munsell Color System. Solid lines represent hues contained in the *Munsell Soil Color Charts* (2009). Dotted lines represent all other possible 2.5 unit steps. Moving from one hue line to the adjacent hue line represents a delta hue of 1 (2.5 units). Moving from hue N to any other hue the delta hue is 1.



Adapted from the *Soil Survey Manual* (Soil Survey Staff, 1993)

# Tips for Determining Contrast Between Soil Colors (continued)



**Figure 4:** Using the 7.5 YR 4/3 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009).



**Figure 5:** Using the 7.5 YR 3/2 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009). Note that because the matrix has value ≤3 and chroma ≤2, all other colors with value ≤3 and chroma ≤2 are faintly contrasting despite the change in hue.

# Estimating Percent Organic Coating

**The round diagrams represent the appearance of uncoated (clear or white) sand grains versus coated (gray to black) sand grains within a ped face as viewed through a 10X hand lens.**





90%    95%

## Estimating Percent Volume

**The squares represent part of a grid drawn on the soil profile to estimate volume of light areas, dark areas, or redox concentrations of larger and smaller sizes.**

2%

5%

10%

43





**50%**

(Note: when a feature (e.g. stripped areas) composes more than 50% of the volume, its color is considered to be the matrix color of the soil profile. When more than two colors are present, the color composing the majority of the volume is the matrix color.)

**60%**

**70%**

**80%**

**The squares represent part of a grid drawn on the soil profile to estimate volume of plant fibers, oxidized rhizospheres, or other linear features.**



**Each square is divided into quarters which depict the same percent volume using features of different sizes. These can also represent areal extents for plants.**



## Tips for Determining Shapes of Features in Soil



| **Rounded** | **Linear** | **Angular** |
|---|---|---|
| Features with generally curved outlines (do not have to be circular; often amorphous) | Features that are generally long & narrow (typically associated with roots or burrows, sometimes mixing or deposition) | Features with generally straight outlines & defined angles (often resulting from physical mixing of soils) |

**Figure 6:** Diagram for determining shape categories of features in the matrix.

## Tips for Estimating Areal Extent of Plant Species

Visualize the noonday shadow that a fully leafed-out canopy or subcanopy tree would cast on the ground below it

Evaluation area

Canopy shadow

Canopy shadow

Estimate the total proportion of the area being evaluated that would be occupied by the shadow

When canopies overlap, count the entire area occupied by each tree's canopy, *i.e.*, double-count the overlapping area

Evaluation area

Total areal extent = 40%

20%
Canopy shadow

20%
Canopy shadow

20%

20%

Total areal extent = 40%

## Tips for Estimating Areal Extent of Plant Species (continued)



In a dense canopy where many trees overlap one another, the total areal extent of species in the evaluation area may exceed 100%, even if open sky is visible between some canopies

Total areal extent = 130%

**Figure 7:** Diagrams for estimating the areal extents of plants within an evaluation area.

## NRCS Hydric Soil Field Indicators
## Land Resource Regions of Florida (LRRs)

Most NRCS Hydric Soil Field Indicators are specific to Land Resource Regions (LRR – see glossary). This map depicts the three LRRs in Florida: P, T, and U.

**LRRs**

P

T

U

49

## Major Land Resource Areas (MLRAs)

Two Hydric Soil Field Indicators in Florida (S12 and F22) are specific to Major Land Resource Areas (MLRA – see glossary), which are smaller divisions of LRRs.



This map depicts the MLRA in Florida in which S12 can be used.

**MLRA 153B**

This map depicts the three MLRAs in Florida in which F22 can be used.

**MLRAs**
138
152A
154

## Hydric Soil Field Indicators Simplified Checklist:

Hydric Soil Field Indicators Simplified Checklist is adapted from <u>Field Indicators of Hydric Soils in the United States</u>, Version 8.2 (USDA NRCS, 2018) using Florida-specific indicators per Rule 62-340.300(2)(a)1., (b)1., (c)3., and (d), F.A.C. The checklist is composed of Yes/No questions for each indicator. If any question in an indicator is answered No then the indicator is not met. If <u>all</u> of the questions for an indicator are answered Yes then the indicator is met.

### Data Form Guide Notes:

**Soil profile documentation:** The top of the uppermost muck (sapric) or mineral surface is the soil surface, or 0 inch depth for purposes of Chapter 62-340, F.A.C. Other materials, such as peat (fibric) or mucky peat (hemic) are documented by a "+" before the thickness in inches of each additional layer above the soil surface. (For example: +4 – 0 inches mucky peat, 0 – 3 inches muck)

Mineral soil texture refers to either sandy, fine, or mucky mineral textures.

Adjacent layers within a soil profile description may be combined to meet a hydric soil field indicator's layer thickness requirements provided the adjacent layers share the required properties referred to in the indicator (*E.g.*, 2 inches of sandy mucky mineral soil and 3 inches of sand with ≥70% organic coating may be combined to meet S7 provided both layers have matrix values of 3 or less and chromas of 1 or less.)

--------------------------------*For use in <u>All texture</u> soils*--------------------------------

### A1. <u>Histosol</u>

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 16 inches or more thick
        AND
        Starts ≤ 16 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

    **B.** Organic soil material layer(s) constitutes 2/3 or more of the total thickness of the soil from the ground surface to a layer dense or cemented enough to inhibit root growth (e.g. bedrock, sandstone)
        AND
        Total combined thickness of any mineral soil texture layer(s) between the ground surface and the dense/cemented layer is 4 inches or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a Histosol

## A2. Histic Epipedon

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Did the layer(s) form near the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

✓ Is the layer(s) 8 to 16 inches thick

✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a histic epipedon

## A3. Black Histic

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Does the layer(s) have matrix hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less

✓ Is the layer(s) 8 inches or more thick

✓ Does the layer(s) start ≤ 6 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

## A4. Hydrogen Sulfide

*Note: This is a stand-alone D Test indicator*

✓ Is there a hydrogen sulfide odor (rotten egg smell)

✓ Does the hydrogen sulfide odor start ≤ 12 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## A5. Stratified Layers

*Note: This is a stand-alone D Test indicator (as sediment deposition)*

✓ Are there several stratified layers due to the alternating deposition of organic matter and mineral soil material deposited by flowing water

✓ Do one or more of the stratified layers satisfy either **Option A, B, and/or C**

   **A.** Layer(s) is composed of organic soil material (peat, mucky peat, and/or muck soil texture)

   **B.** Layer(s) is composed of mucky mineral soil texture

   **C.** Layer(s) is composed of sandy or fine soil texture
      AND

> Has value of 3 or less and chroma of 1 or less
>> AND
>
> If layer(s) texture is sandy at least 70% of the visible sand particles are masked with organic material when viewed through a 10x or 15x hand lens

✓ Other than the layer(s) meeting Option A, B, and/or C, do all of the remaining stratified layers have chroma of 2 or less

✓ Do the stratified layers start ≤ 6 inches from the soil surface

## A6. **Organic Bodies**
✓ Is there a layer(s) with organic bodies composed of muck or mucky mineral soil texture

✓ Are there 2% or more organic bodies within the layer(s)

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A7. **5 cm Mucky Mineral**
*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of mucky mineral soil texture

✓ Is the layer(s) 2 inches or more thick

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A8. **Muck Presence**
*Note: This is a stand-alone D Test indicator*

✓ Is the soil profile located within Land Resource Region U

✓ Is there a layer(s) of muck soil texture

✓ Does the layer(s) have value of 3 or less and chroma of 1 or less

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A9. **1 cm Muck**
*Note: This is a stand-alone D Test indicator*

✓ Is the soil profile located within Land Resource Region P or T

✓ Is there a layer(s) of muck soil texture

✓ Does the layer(s) have value of 3 or less and chroma of 1 or less

✓ Is the layer(s) 0.5 inch or more thick

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A11. **Depleted Below Dark Surface**
✓ Is there a dark layer(s) that satisfies either **Option A and/or B**

> **A.** Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture
>> AND
>
> Has value of 3 or less and chroma of 2 or less

> **B.** Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
>> AND
>
> Has value of 3 or less and chroma of 1 or less
>> AND
>
> Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) start < 6 inches from the soil surface

✓ Does the layer(s) immediately below the dark layer(s) satisfy either **Option A and/or B**

   **A.** The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

   **B.** The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

✓ Does the underlying layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less

✓ Does the underlying layer(s) satisfy either **Option A or B**

   **A.** Layer(s) is 6 inches or more thick

   **B.** Layer(s) is 2 inches or more thick
      AND
   Is composed of fragmental soil material

✓ Does the underlying layer(s) with the gleyed or depleted matrix start ≤ 12 inches from the soil surface

## A12. <u>Thick Dark Surface</u>

✓ Is there a dark layer(s) that has value of 2.5 or less and chroma of 1 or less

✓ Does the dark layer(s) satisfy either **Option A and/or B**

   **A.** Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture

   **B.** Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
      AND
   Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) start < 6 inches from the soil surface and extend to a depth of at least 12 inches

✓ Is there a layer(s) below the dark layer(s) that satisfies either **Option A and/or B**

   **A.** The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

   **B.** The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

✓ Does the lower layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less

✓ Is the lower layer(s) with the gleyed or depleted matrix 6 inches or more thick

✓ Do all remaining layers between the aforementioned dark layer(s) and the layer(s) with the gleyed or depleted matrix have value of 3 or less and chroma of 1 or less

------------------------------*For use in __Sandy texture__ soils*------------------------------

## S4. **Sandy Gleyed Matrix**

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of sandy soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S5. **Sandy Redox**

✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Does the matrix of the layer(s) have 60% or more chroma of 2 or less

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S6. **Stripped Matrix**

✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with two or more **faintly[1] contrasting** colors (Contrast is due to organic matter and/or iron-manganese oxides having been stripped away from the matrix and the primary base color of the soil material has been exposed)

✓ Are there rounded, diffuse[2] boundaries between the faintly contrasting colors

✓ Do the stripped (lighter colored) areas of the faintly contrasting colors compose 10% or more of the layer(s)'s volume

✓ Does the layer(s) start ≤ 6 inches from the soil surface

[1]  See Table 1 (p 40) to determine if contrast is faint
[2]  See Figure 2 (p 40) to determine if boundaries are diffuse

## S7. **Dark Surface**

✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with matrix value of 3 or less and chroma of 1 or less

✓ Does the dark layer(s)'s matrix have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) satisfy either **Option A or B**

**A.** The dark layer(s) is more than 4 inches thick

**B.** The dark layer(s) is exactly 4 inches thick
    AND
The layer directly below has chroma of 2 or less

✓ Does the dark layer(s) start ≤ 6 inches from the soil surface

## S8. **Polyvalue Below Surface**

✓ Is the soil profile located within Land Resource Region T or U

✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less

- ✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
- ✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
- ✓ Does the soil volume directly below this dark layer(s) to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less, meet both **Criteria 1 and 2**
    1. 5% or more of the soil volume has value of 3 or less and chroma of 1 or less AND
    2. The remainder of the soil volume has value of 4 or more and chroma of 1 or less

## S9. <u>Thin Dark Surface</u>
- ✓ Is the soil profile located within Land Resource Region T or U
- ✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less
- ✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
- ✓ Is the dark layer(s) 2 inches or more thick
- ✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
- ✓ Directly below this dark layer(s) is there a layer(s) with value of 4 or less and chroma of 1 or less
- ✓ Does the underlying layer(s) extend to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less

## S12. <u>Barrier Islands 1 cm Muck</u>
- ✓ Is the soil profile located within the swale portion of dune-and-swale complexes of barrier islands in Major Land Resource Area 153B (See p 50)
- ✓ Is there a layer(s) of muck soil texture
- ✓ Does the layer(s) have value of 3 or less and chroma of 2 or less
- ✓ Is the layer(s) 0.5 inch or more thick
- ✓ Does the layer(s) start ≤ 6 inches from the soil surface

-------------------------------*For use in **Fine texture** soils*-------------------------------

## F2. Loamy Gleyed Matrix

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of fine soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

✓ Does the layer(s) start ≤ 12 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F3. Depleted Matrix

✓ Is there a layer(s) of fine soil texture with a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

✓ Does the layer(s)'s matrix have 60% or more chroma of 2 or less

✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 2 inches or more thick
        AND
    Starts ≤ 4 inches from the soil surface

    **B.** Layer(s) is 6 inches or more thick
        AND
    Starts ≤ 10 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F6. Redox Dark Surface

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Does the layer(s) with redox concentrations satisfy either **Option A and/or B**

    **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
        AND
    Has 2% or more redox concentrations

    **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
        AND
    Has 5% or more redox concentrations

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

57

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F7. <u>Depleted Dark Surface</u>

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with redox depletions (lighter areas with associated redox concentrations)

✓ Do the redox depletions have value of 5 or more and chroma of 2 or less

✓ Does the layer(s) with redox depletions satisfy either **Option A and/or B**

   **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
      AND
   Has 10% or more distinct or prominent redox depletions

   **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
      AND
   Has 20% or more distinct or prominent redox depletions

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F8. <u>Redox Depressions</u>

✓ Is the soil profile located within a closed depression subject to ponding

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 5% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Is the layer(s) 2 inches or more thick

✓ Does the layer(s) start ≤ 4 inches from the soil surface

## F10. <u>Marl</u>

✓ Is the soil profile located within Land Resource Region U

✓ Is there a layer(s) of marl material

✓ Does the layer(s) have value of 5 or more and chroma of 2 or less

✓ Does the layer(s) start ≤ 4 inches from the soil surface

## F12. <u>Iron/Manganese Masses</u>

✓ Is the soil profile located within Land Resource Region P or T

✓ Is the soil profile located within a flood plain

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings
✓ Do the redox concentrations occur as soft iron-manganese masses
✓ Do the iron-manganese masses have value and chroma of 3 or less
✓ Do the iron-manganese masses have diffuse boundaries[3]
✓ Does 40% or more of the layer(s) have chroma of 2 or less
✓ Does the layer(s) with iron-manganese masses satisfy either **Option A or B**

    **A.** Layer(s) starts at the soil surface

    **B.** Layer(s) is 4 inches or more thick
        AND
    Starts ≤ 8 inches from the soil surface

[3] See Figure 2 (p 40) to determine if boundaries are diffuse

## F13. <u>Umbric Surface</u>

✓ Is there a layer(s) of fine, fine mucky mineral, and/or muck soil texture
✓ Is the layer(s) 10 inches or more thick
✓ Does the layer(s) satisfy both **Criteria 1 and 2**

    **1.** The upper 6 inches of the layer(s) has value of 3 or less and chroma of 1 or less
        AND

    **2.** The lower 4 inches of the layer(s) has chroma of 2 or less

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## F22. <u>Very Shallow Dark Surface</u>

✓ Is the soil profile located within Major Land Resource Area 138, 152A, or 154 (See p 50)
✓ Is the soil profile located within a depression or flood plain subject to frequent ponding and/or flooding
✓ Is there a dark layer(s) of fine, fine mucky mineral, and/or muck soil texture with value of 2.5 or less and chroma of 1 or less
✓ Does bedrock occur ≤ 10 inches from the soil surface
✓ Does the soil profile satisfy either **Option A or B**

    **A.** The bedrock occurs between 6 and 10 inches from the soil surface
        AND
    The dark layer(s) is 6 inches or more thick
        AND
    Starts ≤ 4 inches from the soil surface

    **B.** The bedrock occurs ≤ 6 inches from the soil surface
        AND
    The dark layer(s) constitutes more than half of the soil thickness

✓ Does all remaining soil between the dark layer(s) and the bedrock have chroma of 2 or less

# Glossary from NRCS Field Indicators of Hydric Soils in the United States Version 8.2, 2018

As defined in this Glossary, terms marked with an asterisk (*) have definitions that are slightly different from the definitions in the referenced materials. The definitions in the Glossary are intended to assist users of this document and are not intended to add to or replace definitions in the referenced materials.

**Data Form Guide Note: Definitions expressed in Chapter 62-340, F.A.C. supersede all other definitions contained within this guide when applying the rule.**

**A horizon.** A mineral soil horizon that formed at the surface or below an O horizon where organic material is accumulating. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Accreting areas.** Landscape positions in which soil material accumulates through deposition from higher elevations or upstream positions more rapidly than the rate at which soil material is being lost through erosion.

**Anaerobic.** A condition in which molecular oxygen is virtually absent from the soil.

**Anaerobiosis.** Microbiological activity under anaerobic conditions.

**Aquic conditions.** Conditions in the soil represented by depth of saturation, occurrence of reduction, and redoximorphic features. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

***Artificial drainage.** The use of human efforts and devices to remove free water from the soil surface or from the soil profile. The hydrology may also be modified by levees and dams, which keep water from entering a site.

**CaCO3 equivalent.** The acid neutralizing capacity of a soil expressed as a weight percentage of CaCO3 (molecular weight of CaCO3 equals 100).

**Calcic horizon.** An illuvial horizon in which carbonates have accumulated to a significant extent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Calcium carbonate.** Calcium carbonate has the chemical formula CaCO3. It effervesces when treated with cold hydrochloric acid.

**Closed depressions.** Low-lying areas that are surrounded by higher ground and have no natural outlet for surface drainage.

**COE.** U.S. Army Corps of Engineers.

**Common.** When referring to redox concentrations, redox depletions, or both, "common" represents 2 to 20 percent of the observed surface.

**Concave landscapes.** Landscapes in which the surface curves downward.

***Depleted matrix.** For loamy and clayey material (and sandy material in areas of indicators A11 and A12), a depleted matrix refers to the volume of a soil horizon or subhorizon in which the processes of reduction and translocation have removed or transformed iron, creating colors of low chroma and high value. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent

60

redox concentrations occurring as soft masses or pore linings. In some areas the depleted matrix may change color upon exposure to air (see Reduced matrix); this phenomenon is included in the concept of depleted matrix. The following combinations of value and chroma identify a depleted matrix:

1. Matrix value of 5 or more and chroma of 1 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

2. Matrix value of 6 or more and chroma of 2 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

3. Matrix value of 4 or 5 and chroma of 2 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings; or

4. Matrix value of 4 and chroma of 1 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.

**Diffuse boundary.** (Figure 2 *p.40*) Used to describe redoximorphic features that grade gradually from one color to another. The color grade is commonly more than 2 mm wide. "**Clear**" is used to describe boundary color gradations intermediate between sharp and diffuse.

**Distinct.**[1] (Table 1 *p.40*) Readily seen but contrasting only moderately with the color to which compared. The contrast is distinct if:

1. Delta hue[2] = 0, then a) Delta value $\leq$2 and delta chroma >1 to <4, or
        b) Delta value >2 to <4 and delta chroma <4.

2. Delta hue = 1, then a) Delta value $\leq$1 and delta chroma >1 to <3, or
        b) Delta value >1 to <3 and delta chroma <3.

3. Delta hue = 2, then a) Delta value = 0 and delta chroma >0 to <2, or
        b) Delta value >0 to <2 and delta chroma <2.

[1]Regardless of the magnitude of hue difference, where both colors have value $\leq$3 and chroma $\leq$2, the contrast is faint.

[2]Data Form Guide Note: A delta hue of 1 is equal to 2.5 units (Figure 3 *p.40*), as defined in the *Soil Survey Manual* (Soil Survey Staff, 1993)

**E horizon.** A mineral horizon in which the dominant process is loss of silicate clay, iron, and/or aluminum, leaving a concentration of sand and silt particles. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**EPA.** U.S. Environmental Protection Agency.

**Epipedon.** A horizon that has developed at the soil surface. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Faint.** (Table 1 *p.40*) Evident only on close examination. The contrast is faint if:

1. Delta hue = 0, then delta value $\leq$2 and delta chroma $\leq$1, or

2. Delta hue = 1, then delta value $\leq$1 and delta chroma $\leq$1, or

3. Delta hue = 2, then delta value = 0 and delta chroma = 0, or

Any delta hue if both colors have value $\leq$3 and chroma $\leq$2.

**Fe-Mn concretions.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, concretions have concentric layers. See Vepraskas (1994) for a complete discussion.

**Fe-Mn nodules.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, nodules do not have visibly organized internal structure. See Vepraskas (1994) for a complete discussion.

**Few.** When referring to redox concentrations, redox depletions, or both, "few" represents less than 2 percent of the observed surface.

**Fibric.** See Peat.

**Flood plain.** The nearly level plain that borders a stream and is subject to inundation under flood-stage conditions unless protected artificially. It is usually a constructional landform built of sediment deposited during overflow and lateral migration of the stream.

**Fragmental soil material.** Soil material that consists of 90 percent or more rock fragments. Less than 10 percent of the soil consists of particles 2 mm or smaller.

**Frequently flooded or ponded.** A frequency class in which flooding or ponding is likely to occur often under usual weather conditions (a chance of more than 50 percent in any year, or more than 50 times in 100 years).

**FWS.** U.S. Department of the Interior, Fish and Wildlife Service.

**\*g.** A horizon suffix indicating that the horizon is gray because of wetness but not necessarily that it is gleyed. All gleyed matrices (defined below) should have the suffix "g"; however, not all horizons with the "g" suffix are gleyed. For example, a horizon with the color 10YR 6/2 that is at least seasonally wet, with or without other redoximorphic features, should have the "g" suffix.

**Glauconitic.** Refers to a mineral aggregate that contains a micaceous mineral resulting in a characteristic green color, e.g., glauconitic shale or clay.

**\*Gleyed matrix.** Soils with a gleyed matrix have the following combinations of hue, value, and chroma (the soils are not glauconitic):

1. 10Y, 5GY, 10GY, 10G, 5BG, 10BG, 5B, 10B, or 5PB with value of 4 or more and chroma of 1; or
2. 5G with value of 4 or more and chroma of 1 or 2; or
3. N with value of 4 or more

In some places the gleyed matrix may change color upon exposure to air. (See Reduced matrix). This phenomenon is included in the concept of gleyed matrix.

**\*Hemic.** See Mucky peat.

**Histels.** Organic soils that overlie permafrost and show evidence of cryoturbation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Histic epipedon**. A thick (20- to 60-cm, or 8- to 24- inch) organic soil horizon that is saturated with water at some period of the year (unless the soil is artificially drained) and that is at or near the surface of a mineral soil.

**Histosols.** Organic soils that have organic soil materials in more than half of the upper 80 cm (32 inches) or that have organic materials of any thickness if they overlie rock or fragmental materials that have interstices filled with organic soil materials. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Horizon.** A layer, approximately parallel to the surface of the soil, distinguishable from adjacent layers by a distinctive set of properties produced by soil-forming processes. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Hydric soil definition (1994).** *(See also Ch 62-340, F.A.C. definition)* A soil that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part.

**Hydrogen sulfide odor.** The odor of $H_2S$. It is similar to the smell of rotten eggs.

**Hydromorphic features.** Features in the soil caused or formed by water.

**Layer(s).** A horizon, subhorizon, or combination of contiguous horizons or subhorizons sharing the properties required by the indicator.

**Lithologic discontinuity.** Occurs in a soil that has developed in more than one type of parent material. Commonly determined by a significant change in particle-size distribution, mineralogy, etc. that indicates a difference in material from which the horizons formed.

**LRR.** Land resource region. LRRs are geographic areas characterized by a particular pattern of soils, climate, water resources, and land use. Each LRR is assigned a different letter of the alphabet (A-Z). LRRs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Many.** When referring to redox concentrations, redox depletions, or both, "many" represents more than 20 percent of the observed surface.

**Marl.** An earthy, unconsolidated deposit consisting chiefly of calcium carbonate mixed with clay in approximately equal proportions; formed primarily under freshwater lacustrine conditions. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Masked.** Through redoximorphic processes, the color of soil particles is hidden by organic material, silicate clay, iron, aluminum, or some combination of these.

**Matrix.** The dominant soil volume that is continuous in appearance. When three colors occur, such as when a matrix, depletions, and concentrations are present, the matrix may represent less than 50 percent of the total soil volume.

**MLRA.** Major land resource areas. MLRAs are geographically associated divisions of land resource regions. MLRAs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Mollic epipedon.** A mineral surface horizon that is relatively thick, dark colored, and humus rich and has high base saturation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Mollisols.** Mineral soils that have a mollic epipedon. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Muck.** Sapric organic soil material in which virtually all of the organic material is so decomposed that identification of plant forms is not possible. Bulk density is normally 0.2 or more. Muck has less than one-sixth fibers after rubbing, and its sodium pyrophosphate solution extract color has lower value and chroma than 5/1, 6/2, and 7/3.

***Mucky modified mineral soil material.** (Figure 8) A USDA soil texture modifier, e.g., mucky sand. Mucky modified mineral soil material that has 0 percent clay has between 5 and 12 percent organic carbon. Mucky modified mineral soil material that has 60 percent clay has between 12 and 18 percent organic carbon. Soils with an intermediate amount of clay have intermediate amounts of organic carbon. Where the organic component is peat (fibric material) or mucky peat (hemic material), mucky mineral soil material does not occur.



**Figure 8:** Percent organic carbon required for organic soil material, mucky modified mineral soil material, and mineral soil material as it is related to content of clay.

***Mucky peat.** Hemic organic material, which is characterized by decomposition that is intermediate between that of peat (fibric material) and that of muck (sapric material). Bulk density is normally between 0.1 and 0.2 g/cm3. Mucky peat does not meet the fiber content (after rubbing) or sodium pyrophosphate solution extract color requirements for either peat (fibric) or muck (sapric) soil material.

**Nodules.** See Fe-Mn nodules.

**NRCS.** USDA, Natural Resources Conservation Service (formerly Soil Conservation Service).

**NTCHS.** National Technical Committee for Hydric Soils.

**Organic matter.** Plant and animal residue in the soil in various stages of decomposition.

**Organic soil material.** (Figure 8) Soil material that is saturated with water for long periods or artificially drained and, **excluding live roots**, has 18 percent or more organic carbon with 60 percent or more clay or 12 percent or more organic carbon with 0 percent clay. Soils with an intermediate amount of clay have an intermediate amount of organic carbon. If the soil is never saturated for more than a few days, it contains 20 percent or more organic carbon. Organic soil material includes muck, mucky peat, and peat.

**Data Form Guide Note: Generally, organic soil material is 2 cm or smaller and decomposing.**

**\*Peat.** Fibric organic soil material. The plant forms can be identified in virtually all of the organic material. Bulk density is normally <0.1. Peat has three-fourths or more fibers after rubbing, or it has two-fifths or more fibers after rubbing and has sodium pyrophosphate solution extract color of 7/1, 7/2, 8/2, or 8/3.

**Ped.** A unit of soil structure such as a block, column, granule, plate, or prism, formed by natural processes (in contrast with a clod, which is formed artificially).

**Plinthite.** The sesquioxide-rich, humus-poor, highly weathered mixture of clay with quartz and other diluents. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete discussion.

**Ponding.** Standing water in a closed depression that is removed only by percolation, evaporation, or transpiration. The ponding lasts for more than 7 days.

**Pore linings.** Zones of accumulation that may be either coatings on a ped or pore surface or impregnations of the matrix adjacent to the pore or ped. See Vepraskas (1994) for a complete discussion.

**Prominent.** (Table 1 *p.40*) Contrasts strongly in color. Color contrasts more contrasting than faint and distinct are prominent.

**Red parent material.** The parent material with a natural inherent reddish color attributable to the presence of iron oxides, typically hematite (Elless and Rabenhorst, 1994; Elless et al., 1996), occurring as coatings on and occluded within mineral grains. Soils that formed in red parent material have conditions that greatly retard the development and extent of the redoximorphic features that normally occur under prolonged aquic conditions. They typically have a Color Change Propensity Index (CCPI) of <30 (Rabenhorst and Parikh, 2000). Most commonly, the material consists of dark red, consolidated Mesozoic or Paleozoic sedimentary rocks, such as shale, siltstone, and sandstone, or alluvial materials derived from such rocks. Assistance from a local soil scientist may be needed to determine where red parent material occurs.

**Redox concentrations.** Bodies of apparent accumulation of Fe-Mn oxides. Redox concentrations include soft masses, pore linings, nodules, and concretions. For the purposes of the indicators, nodules and concretions are excluded from the concept of redox concentrations unless otherwise specified by specific indicators. See Vepraskas (1994) for a complete discussion.

**Redox depletions.** Bodies of low chroma (2 or less) having value of 4 or more where Fe- Mn oxides have been stripped or where both Fe-Mn oxides and clay have been stripped. Redox depletions contrast distinctly or prominently with the matrix. See Vepraskas (1994) for a complete discussion.

**Redoximorphic features.** Features formed by the processes of reduction, translocation, and/or oxidation of Fe and Mn oxides; formerly called mottles and low-chroma colors. See Vepraskas (1994) for a complete discussion.

**Reduced matrix.** A soil matrix that has low chroma and high value, but in which the color changes in hue or chroma when the soil is exposed to air. See Vepraskas (1994) for a complete discussion.

**\*Reduction.** For the purpose of the indicators, reduction occurs when the redox potential (Eh) is below the ferric-ferrous iron threshold as adjusted for pH. In hydric soils, this is the point when the transformation of ferric iron ($Fe^{3+}$) to ferrous iron ($Fe^{2+}$) occurs.

**Relict features.** Soil morphological features that reflect past hydrologic conditions of saturation and anaerobiosis. See Vepraskas (1994) for a complete discussion.

**\*Sapric.** See Muck.

**Saturation.** *(See also Ch 62-340, F.A.C. definition)* Wetness characterized by zero or positive pressure of the soil water. Almost all of the soil pores are filled with water.

**Sharp boundary.** (Figure 2 *p.40*) Used to describe redoximorphic features that grade sharply from one color to another. The color grade is commonly less than 0.1 mm wide.

**Soft masses.** Noncemented redox concentrations, frequently within the soil matrix, that are of various shapes and cannot be removed as discrete units.

**Soil texture.** The relative proportions, by weight, of sand, silt, and clay particles in the soil material less than 2 mm in size.

**Spodic horizon.** A mineral soil horizon that is characterized by the illuvial accumulation of amorphous materials consisting of aluminum and organic carbon with or without iron. The spodic horizon has a minimum thickness, a minimum quantity of oxalate extractable carbon plus aluminum, and/or specific color requirements.

**Stream Terrace.** Flat-topped landforms in a stream valley that flank and are parallel to the stream channel, originally formed by a previous stream level, and representing the abandoned flood plain, stream bed, or valley floor produced during a past state of fluvial erosion or deposition (i.e., currently very rarely or never flooded; inactive cut and fill and/or scour and fill processes). Stream terraces may occur singularly or as a series. Erosional surfaces cut into bedrock and thinly mantled with stream deposits (alluvium) are called "strath terraces." Remnants of constructional valley floors thickly mantled with alluvium are called alluvial terraces.

**Umbric epipedon.** A thick, dark mineral surface horizon with base saturation of less than 50 percent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Vertisol.** A mineral soil with 30 percent or more clay in all layers. These soils expand and shrink, depending on moisture content, and have slickensides or wedge-shaped peds. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Wetland.** *(See also Ch 62-340, F.A.C. definition)* An area that has hydrophytic vegetation, hydric soils, and wetland hydrology, as per the *National Food Security Act Manual* and the 1987 *Corps of Engineers Wetlands Delineation Manual* (Environmental Laboratory, 1987).

**Hydric Soil Field Indicators:**

Adapted from <u>**Field Indicators of Hydric Soils in the United States**</u>, **Version 8.2 (USDA NRCS, 2018)** to include Florida-specific indicators per Rule 62-340.300(2)(a)1, (b)1, (c)3, and (d), F.A.C.

**These indicators are subdivided by prefix:**

**A - <u>A</u>ll texture soils** "All soils" refers to soils with any USDA soil texture, including muck, mucky peat, and peat.

**S - <u>S</u>andy texture soils** "Sandy soils" refers to those soils with a USDA soil texture of loamy fine sand and coarser (does not include mucky peat or peat).

**F - <u>F</u>ine texture soils** "Loamy and clayey soils" refers to those soils with USDA soil texture of loamy very fine sand and finer (does not include mucky peat or peat).

**LRR or MLRA – refer to the "Land Resource Region" or the "Major Land Resource Area" in which the indicator may be used**

**Overlying layer(s) requirement:** All mineral layers above any of the layers meeting the requirements of any indicators, except S6, F8, and F12, must have a dominant chroma of 2 or less, or the thickness of the layer(s) with a dominant chroma of more than 2 is less than 6 inches.

------------------------------*For use in <u>All texture</u> soils*------------------------------

**A1. <u>Histosol</u> -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**Classifies as a Histosol (except Folist).**
User Notes: In a Histosol, typically 40 cm (16 inches) or more of the upper 80 cm (32 inches) is organic soil material. Organic soil materials have organic-carbon contents (by weight) of 12 to 18 percent or more, depending on the clay content of the soil. These materials include muck (sapric soil material), mucky peat (hemic soil material), and peat (fibric soil material). See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A2. <u>Histic Epipedon</u> -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A histic epipedon underlain by mineral soil material with chroma of 2 or less.**
User Notes: Most histic epipedons are surface horizons 20 cm (8 inches) or more thick of organic soil material. Aquic conditions or artificial drainage is required. See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A3. <u>Black Histic</u> -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A layer of peat, mucky peat, or muck 20 cm (8 inches) or more thick that starts at a depth of ≤ 15 cm (6 inches) from the soil surface; has hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less; and is underlain by mineral soil material with chroma of 2 or less.**
User Notes: Unlike indicator A2, this indicator does not require proof of aquic conditions or artificial drainage.

**A4. <u>Hydrogen Sulfide</u> -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A hydrogen sulfide odor starting at a depth ≤ 30 cm (12 inches) from the soil surface.**
User Notes: This "rotten egg smell" indicates that sulfate-sulfur has been reduced to hydrogen sulfide gas and therefore the soil is anaerobic.

**A5. <u>Stratified Layers</u> -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator (qualifies as sediment deposition)*
**Several stratified layers starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least one of the layers has value of 3 or less and chroma of 1 or less, or it is muck, mucky peat,**

**peat, or a mucky modified mineral texture. The remaining layers have chroma of 2 or less. For any sandy material that constitutes the layer with value of 3 or less and chroma of 1 or less, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: Use of this indicator may require assistance from a trained soil scientist with local experience. A stratified layer is depositional and not pedogenic. The minimum organic-carbon content of at least one layer of this indicator is slightly less than is required for indicator A7 (5 cm Mucky Mineral). An undisturbed sample must be observed. Individual strata are dominantly less than 2.5 cm (1 inch) thick. A hand lens is an excellent tool to aid in the identification of this indicator. Many alluvial soils have stratified layers at greater depths; these soils do not meet the requirements of this indicator. Many alluvial soils have stratified layers at the required depths but do not have chroma of 2 or less; these do not meet the requirements of this indicator. The stratified layers occur in any soil texture.

## A6. <u>Organic Bodies</u> - LRR: **P, T, U**

**Presence of 2 percent or more organic bodies of muck or a mucky modified mineral texture starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Organic bodies typically occur at the tips of fine roots. In order to meet the Organic Bodies indicator, the organic carbon content in organic bodies must meet the requirements of muck or mucky modified textures. The size of the organic body is not specifically defined, but the bodies are commonly 1 to 3 cm (0.5 to 1 inch) in diameter. Many organic bodies do not have the required content of organic carbon and as a result do not meet this indicator. For example, organic bodies of mucky peat (hemic material) and/or peat (fibric material) do not meet the requirements of this indicator, nor does material consisting of partially decomposed root tissue. The Organic Bodies indicator includes the indicator previously named "accretions" (Florida Soil Survey Staff, 1992).

## A7. <u>5 cm Mucky Mineral</u> - LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A layer of mucky modified mineral soil material 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: "Mucky" is a USDA texture modifier for mineral soils. The content of organic carbon is at least 5 percent and ranges to as high as 18 percent. The percentage required depends on the clay content of the soil; the higher the clay content, the higher the content of organic carbon required. For example, a mucky fine sand soil contains between 5 and 12 percent organic carbon. When the amount of clay is increased as in a mucky sandy loam, the organic carbon content increases to between 7 and 14 percent.

## A8. <u>Muck Presence</u> - LRR: **U**
*Note: This is a stand-alone D Test indicator*
**A layer of muck with value of 3 or less and chroma of 1 or less, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: The presence of muck of any thickness at a depth of ≤ 15 cm (6 inches) is the only requirement. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from 12 to18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to prevent the identification of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

## A9. <u>1 cm Muck</u> - LRR: **P, T**
*Note: This is a stand-alone D Test indicator*
**A layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 1 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Unlike indicator A8 (Muck Presence), this indicator has a minimum thickness requirement of 1 cm. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from12 to18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to limit the recognition of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

**A11. <u>Depleted Below Dark Surface</u> - LRR: P, T, U**
**A layer with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less, starting at a depth ≤ 30 cm (12 inches) from the soil surface, and having a minimum thickness of either:**
> **a. 15 cm (6 inches), or**
> **b. 5 cm (2 inches) if the 5 cm consists of fragmental soil material.**

**Organic, loamy, or clayey layer(s) above the depleted or gleyed matrix must have value of 3 or less and chroma of 2 or less starting at a depth <15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Any sandy material above the depleted or gleyed matrix must have value of 3 or less and chroma of 1 or less starting at a depth ≤15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Viewed through a 10x or 15x hand lens, at least 70 percent of the visible sand particles must be masked with organic material. Observed without a hand lens, the sand particles appear to be close to 100 percent masked.**

User Notes: This indicator often occurs in Mollisols but also applies to soils with umbric epipedons and dark colored ochric epipedons. For soils with dark colored epipedons more than 30 cm (12 inches) thick, use indicator A12. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

**A12. <u>Thick Dark Surface</u> - LRR: P, T, U**
**A layer at least 15 cm (6 inches) thick with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less starting below 30 cm (12 inches) of the surface. The layer(s) above the depleted or gleyed matrix and starting at a depth <15 cm (6 inches) from the soil surface must have value of 2.5 or less and chroma of 1 or less to a depth of at least 30 cm (12 inches) and value of 3 or less and chroma of 1 or less in any remaining layers above the depleted or gleyed matrix. In any sandy material above the depleted or gleyed matrix, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: This indicator applies to soils that have a black layer 30 cm (12 inches) or more thick and have value of 3 or less and chroma of 1 or less in any remaining layers directly above a depleted or gleyed matrix. This indicator is most often associated with overthickened soils in concave landscape positions. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

*For use in Sandy texture soils*--------------------------

**S4. <u>Sandy Gleyed Matrix</u> -** LRR: **P, T, U**

*Note: This is a stand-alone D Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages in the Munsell color book (X-Rite, 2009) that have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. For this indicator, the gleyed matrix only has to be present at a depth ≤ 15 cm (6 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

**S5. <u>Sandy Redox</u> -** LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface that is at least 10 cm (4 inches) thick and has a matrix with 60 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.**

User Notes: "Distinct" and "prominent" are defined in the Glossary. Redox concentrations include iron and manganese masses (reddish mottles) and pore linings (Vepraskas, 1994). Included within the concept of redox concentrations are iron-manganese bodies occurring as soft masses with diffuse boundaries. Common (2 to less than 20 percent) or many (20 percent or more) redox concentrations are required (USDA, NRCS, 2002). If the soil is saturated at the time of sampling, it may be necessary to let it dry to a moist condition for redox features to become visible.

This is a very common indicator of hydric soils and is often used to identify the hydric/nonhydric soil boundary in sandy soils.

**S6. <u>Stripped Matrix</u> -** LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface in which iron-manganese oxides and/or organic matter have been stripped from the matrix and the primary base color of the soil material has been exposed. The stripped areas and translocated oxides and/or organic matter form a faintly contrasting pattern of two or more colors with diffuse boundaries. The stripped zones are 10 percent or more of the volume and are rounded.**

User Notes: This indicator includes the indicator previously named "polychromatic matrix" as well as the term "streaking." Common or many areas of stripped (unmasked) soil materials are required. The stripped areas are typically 1 to 3 cm (0.5 to 1 inch) in size but may be larger or smaller. Commonly, the stripped areas have value of 5 or more and chroma of 2 or less, and the unstripped areas have chroma of 3 and/or 4. The matrix (predominant color) may not have the material with chroma of 3 and/or 4. The mobilization and translocation of oxides and/or organic matter is the important process and should result in a splotchy pattern of masked and unmasked soil areas. This may be a difficult pattern to recognize and is more evident when a horizontal slice is observed.

**S7. <u>Dark Surface</u> -** LRR: **P, T, U**

**A layer 10 cm (4 inches) thick, starting at a depth less than or equal to the upper 15 cm (6 inches) from the soil surface, with a matrix value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. The matrix color of the layer directly below the dark layer must have the same colors as those described above or any color that has chroma of 2 or less.**

User Notes: An undisturbed sample must be observed. Many wet soils have a ratio of about 50 percent soil particles that are masked with organic matter and about 50 percent unmasked soil particles, giving the soils a salt-and-pepper appearance. Where the coverage is less than 70 percent, the Dark Surface indicator does not occur.

**S8. Polyvalue Below Surface -** LRR: **T, U**

**A layer with value of 3 or less and chroma of 1 or less starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. Directly below this layer, 5 percent or more of the soil volume has value of 3 or less and chroma of 1 or less, and the remainder of the soil volume has value of 4 or more and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black surface or near-surface layer that is less than 10 cm (4 inches) thick and is underlain by a layer in which organic matter has been differentially distributed within the soils by water movement. The mobilization and translocation of organic matter result in splotchy coated and uncoated soil.

**S9. Thin Dark Surface -** LRR: **T, U**

**A layer 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, with value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. This layer is underlain by a layer or layers with value of 4 or less and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black near-surface layer that is at least 5 cm (2 inches) thick and is underlain by a layer in which organic matter has been carried downward by flowing water. The mobilization and translocation of organic matter result in an even distribution of organic matter in the eluvial (E) horizon. The chroma of 1 or less is critical because it limits application of this indicator to only those soils that are depleted of iron. This indicator commonly occurs in hydric Spodosols, but a spodic horizon is not required.

**S12. Barrier Islands 1 cm Muck -** MLRA: **153B**

**In the swale portion of dune-and-swale complexes of barrier islands, a layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 2 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: This indicator is similar to A9 but allows chroma of greater than 1, but not greater than 2. The indicator is limited to dune-and-swale complexes on barrier islands.

**---------------------------*For use in Fine texture soils*-----------------------------**

**F2. Loamy Gleyed Matrix -** LRR: **P, T, U**

*Note: This is a stand-alone D Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 30 cm (12 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages of the Munsell color book (X-Rite, 2009) that have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. The gleyed matrix only has to be present at a depth ≤ 30 cm (12 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

**F3. Depleted Matrix -** LRR: **P, T, U**

**A layer that has a depleted matrix with 60 percent or more chroma of 2 or less and that has a minimum thickness of either:**

      **a. 5 cm (2 inches) if the 5 cm starts at a depth ≤ 10 cm (4 inches) from the soil surface, or**

      **b. 15 cm (6 inches) if the 5 cm starts at a depth ≤ 25 cm (10 inches) from the soil surface.**

User Notes: A depleted matrix requires a value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils

71

with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings. The low-chroma matrix must be the result of wetness and not a weathering or parent material feature.

**F6. Redox Dark Surface -** LRR: **P, T, U**
**A layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
  a. **Matrix value of 3 or less and chroma of 1 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings, or**
  b. **Matrix value of 3 or less and chroma of 2 or less and 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings.**
User Notes: This is a very common indicator used to delineate wetland soils that have a dark surface layer. Redox concentrations in mineral soils with a high content of organic matter and a dark surface layer are commonly small and difficult to see. The organic matter masks some or all of the concentrations that may be present. Careful examination is required to see what are commonly brownish redox concentrations in the darkened materials. If the soil is saturated at the time of sampling, it may be necessary to let it dry at least to a moist condition for redox features to become visible. Soils that are wet because of ponding or have a shallow, perched layer of saturation may have any color below the dark surface. It is recommended that delineators evaluate the hydrologic source and examine and describe the layer below the dark colored surface layer when applying this indicator.

**F7. Depleted Dark Surface -** LRR: **P, T, U**
**Redox depletions with value of 5 or more and chroma of 2 or less in a layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
  a. **Matrix value of 3 or less and chroma of 1 or less and 10 percent or more redox depletions, or**
  b. **Matrix value of 3 or less and chroma of 2 or less and 20 percent or more redox depletions.**
User Notes: Care should be taken not to mistake mixing of an E or calcic horizon into the surface layer for depletions. The "pieces" of E and calcic horizons are not redox depletions. Knowledge of local conditions is required in areas where E and/or calcic horizons may be present. In soils that are wet because of subsurface saturation, the layer directly below the dark surface layer should have a depleted or gleyed matrix. Redox depletions should have associated redox concentrations that occur as Fe pore linings or masses within the depletion(s) or surrounding the depletion(s).

**F8. Redox Depressions -** LRR: **P, T, U**
**In closed depressions subject to ponding, 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings in a layer that is 5 cm (2 inches) or more thick and starts at a depth ≤ 10 cm (4 inches) from the soil surface.**
User Notes: This indicator occurs on depressional landforms, such as vernal pools, playa lakes, rainwater basins, "Grady" ponds, and potholes. It does not occur in microdepressions (approximately 1 m) on convex or plane landscapes.

**F10. Marl -** LRR: **U**
**A layer of marl with value of 5 or more and chroma 2 or less starting at a depth ≤ 10 cm (4 inches) from the soil surface.**
User Notes: Marl is a limnic material deposited in water by precipitation of $CaCO_3$ by algae as defined in *Soil Taxonomy* (Soil Survey Staff, 1999). It has a Munsell value of 5 or more and reacts with dilute HCl to evolve $CO_2$. Marl is not the carbonatic substrate material associated with limestone bedrock. Some soils have materials with all of the properties of marl, except for the required Munsell value. These soils are hydric if the required value is present at a depth ≤ 10 cm (4 inches) from the soil surface. Normally, this indicator occurs at the soil surface.

**F12. Iron/Manganese Masses - LRR: P, T**
**On flood plains, a layer 10 cm (4 inches) or more thick with 40 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft iron-manganese masses with diffuse boundaries. The layer starts at a depth ≤ 20 cm (8 inches) from the soil surface. Iron-manganese masses have value and chroma of 3 or less. Most commonly, they are black. The thickness requirement is waived if the layer is the mineral surface layer.**

User Notes: These iron-manganese masses generally are small (2 to 5 mm in size) and have value and chroma of 3 or less. They can be dominated by manganese and therefore have a color approaching black. The low matrix chroma must be the result of wetness and not be a weathering or parent material feature. Iron-manganese masses should not be confused with the larger and redder iron nodules associated with plinthite or with concretions that have sharp boundaries. This indicator occurs on flood plains along rivers, such as the Apalachicola, Congaree, Mobile, Savannah, and Tennessee Rivers.

**F13. Umbric Surface - LRR: P, T, U**
**A layer 25 cm (10 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, in which the upper 15 cm (6 inches) has value of 3 or less and chroma of 1 or less and in which the lower 10 cm (4 inches) has the same colors as those described above or any other color that has chroma of 2 or less.**

User Notes: The thickness requirements may be slightly less than those for an umbric epipedon.

**F22. Very Shallow Dark Surface - MLRA: 138, 152A, 154**
**In depressions and flood plains subject to frequent ponding and/or flooding, one of the following must be observed:**

    a. **If bedrock occurs between 15 cm (6 inches) and 25 cm (10 inches) of the soil surface, a layer at least 15 cm (6 inches) thick starting at a depth ≤ 10 cm (4 inches) from the soil surface with value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same colors as above or any other color that has chroma 2 or less; or,**

    b. **If bedrock occurs at a depth ≤ 15 cm (6 inches) from the soil surface, more than half of the soil thickness must have value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same color as above or any other color that has a chroma 2 or less.**

---

# NRCS Hydric Soil Field Indicators
## Deepest Starting Depth Summary Table

| Depth (in) | Indicator |
|:---:|:---:|
| 0 | A2 |
| < 3 | F22(b) |
| 4 | F3(a), F8, F10, F22(a) |
| 6 | A3, A5, A6, A7, A8, A9, A11, A12, S4, S5, S6, S7, S8, S9, S12, F13 |
| 8 | F6, F7, F12 |
| 10 | F3(b) |
| 12 | A4, F2 |
| 16 | A1 |

# Appendix B: Histosol and Histic Epipedon Definition
From *Keys to Soil Taxonomy* (Soil Survey Staff, 2014)

## Histosols

1. Do not have andic soil properties in 60 percent or more of the thickness between the soil surface and either a depth of 60 cm or a densic, lithic, or paralithic contact or duripan if shallower; *and*
2. Have organic soil materials that meet *one or more* of the following:
   a. Overlie cindery, fragmental, or pumiceous materials and/or fill their interstices *and* directly below these materials, have a densic, lithic, or paralithic contact; *or*
   b. When added with the underlying cindery, fragmental, or pumiceous materials, total 40 cm or more between the soil surface and a depth of 50 cm; *or*
   c. Constitute two-thirds or more of the total thickness of the soil to a densic, lithic, or paralithic contact *and* have no mineral horizons or have mineral horizons with a total thickness of 10 cm or less; *or*
   d. Are saturated with water for 30 days or more per year in normal years (or are artificially drained), have an upper boundary within 40 cm of the soil surface, and have a total thickness of *either*:
      1) 60 cm or more if three-fourths or more of their volume consists of moss fibers or if their bulk density, moist, is less than 0.1 $g/cm^3$; *or*
      2) 40 cm or more if they consist either of sapric or hemic materials, or of fibric materials with less than three-fourths (by volume) moss fibers and a bulk density, moist, of 0.1 $g/cm^3$ or more.

**Folists** (excluded from meeting indicator A1)
Histosols that are saturated with water for less than 30 cumulative days during normal years (and are not artificially drained).

## Histic Epipedon

The histic epipedon is a layer (one or more horizons) that is characterized by saturation (for 30 days or more, cumulative) and reduction for some time during normal years (or is artificially drained) and e*ither*:

1. Consists of organic soil material that:
   a. Is 20 to 60 cm thick and either contains 75 percent or more (by volume) *Sphagnum* fibers or has a bulk density, moist, of less than 0.1; *or*
   b. Is 20 to 40 cm thick; *or*
2. Is an Ap horizon that, when mixed to a depth of 25 cm, has an organic-carbon content (by weight) of:
   a. 16 percent or more if the mineral fraction contains 60 percent or more clay; *or*
   b. 8 percent or more if the mineral fraction contains no clay; *or*
   c. 8 + (clay percentage divided by 7.5) percent or more if the mineral fraction contains less than 60 percent clay.

Most histic epipedons consist of organic soil material. Item 2 provides for a histic epipedon that is an Ap horizon consisting of mineral soil material. A Histic epipedon consisting of mineral soil material can also be part of a mollic or umbric epipedon.

# NRCS National Technical Committee for Hydric Soils

Hydric Soils Technical Notes contain National Technical Committee for Hydric Soils (NTCHS) updates, insights, and clarifications of the publication "Field Indicators of Hydric Soils in the United States" (USDA, NRCS, 1996 and 1998).

## Hydric Soils Technical Note 4: Indicator Insights for Hydric Soil Identification

**Question**: I have a soil with layers that meet the color and redoximorphic requirements of several indicators; however, they do not meet any of the thickness requirements. <u>What guidance is there regarding combining layers to meet a hydric soil indicator?</u>

**Answer**: <u>If layers/indicators are combined, the combination needs to meet the most stringent depth/thickness requirements of the combined indicators.</u>

**Example** (The following table and guidance were adapted by FDEP staff to summarize Technical Note 4 and do not contain the exact text from this Note):

| Layer | Depth | Matrix Color | Matrix Texture | Notes (RC = redox concentrations) |
|-------|-------|--------------|----------------|-----------------------------------|
| 1 | 0-6 | 10YR 2/1 | fine | None |
| 2 | 6-8 | 10YR 3/1 | fine | RC: 10YR 6/8, 5%, diffuse boundaries |
| 3 | 8-12 | 10YR 5/2 | fine | RC: 10YR 6/8, 10%, diffuse boundaries |
| 4 | 12-20+ | 10YR 6/3 | fine | RC: 10YR 6/8, 15%, diffuse boundaries |

In this example, Layer 2 meets the requirements (except thickness) of indicator F6 – Redox Dark Surface. Layer 3 meets the requirements (except thickness) of indicator F3 – Depleted Matrix. Examining the indicator language, F6 requires a layer 4 inches thick starting within 8 inches; F3 requires a layer 6 inches thick starting within 10 inches. In this case, the soil has F6 starting within 8 inches (at 6) and has F3 starting within 10 inches (at 8); the combined thickness is 6 inches. Therefore, this soil meets the combined color, depth, and thickness requirements and should be documented as meeting hydric soil indicator(s) F6 and F3 (combined).

**Hydric Soils Technical Note 13: Altered Hydric Soils**
(The following tables were created by FDEP staff to summarize Technical Note 13 and do not contain the exact text from this Note):

| Altered Hydric Soil Type | What was modified? | Modified by what? | Modified how? | Soil status* | Example |
|---|---|---|---|---|---|
| **Artificial** | Hydrology or Soil | Human activities | Wetter or lower surface elevation | Hydric | Excavation/irrigation/ water impoundment |
| **Drained/ protected** | Hydrology | Human activities | Drier or barriers against flooding | Hydric | Ditches/roads/dams/ pumps/levees |
| **Historic/ buried** | Soil | Human activities | Soil placed on ground surface | Not hydric | Fill/erosional depositions |
| **Relict** | Hydrology | Geologic activities | Hydrology gone by natural means | Not hydric | Stream downcutting/ seismic activity |

*See Appendix C for NRCS Hydric Soil Criteria

Soils that are no longer hydric may still exhibit redoximorphic features (called relict features), but these can be differentiated from those in contemporary (currently) hydric soils by the following characteristics:

| Feature | Boundary | Nodule and Concretion Surfaces | Macropore Associated Depletions | Pore Linings | Value and Chroma |
|---|---|---|---|---|---|
| **Contemporary** | Diffuse | Irregular, or smooth w/ red to yellow corona | Not overlain by iron rich coating | Continuous around live roots | Value $\geq 4$ Chroma $\geq 4$ |
| **Relict** | Sharp | Smooth | Overlain by iron rich coating | Broken, unrelated to live roots | Value $< 4$ Chroma $< 4$ |

## Appendix C: Hydric Soils Criteria and Technical Standard

Note: Hydric soil criteria, standards, and definitions used by the NRCS may differ from and do not supersede the criteria, standards, and definitions outlined in Chapter 62-340, F.A.C. to identify and delineate wetlands in Florida.

Soils are considered hydric by the NRCS if they:
1. Have a hydric soil indicator, or
2. Meet hydric soils list criteria 3 or 4, or
3. By data meet the Hydric Soil Technical Standard (HSTS).

**Hydric Soils List Criteria**
(Updated by NTCHS February 2012)

1. All Histels except Folistels and Histosols except Folists; or
2. Map unit components in Aquic suborders, great groups, or subgroups, Albolls suborder, Historthels great group, Histoturbels great group, or Andic, Cumulic, Pachic, or Vitrandic subgroups that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soil meets the definition of a hydric soil;
3. Map unit components that are frequently ponded for long duration or very long duration during the growing season that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soil meets the definition of a hydric soil; or

76

4. Map unit components that are frequently flooded for long duration or very long duration during the growing season that:
   a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
   b. Show evidence that the soils meet the definition of a hydric soil.

## Glossary of Terms Used in Hydric Soils List Criteria

Note: The following definitions are specific to the NRCS Hydric Soils List Criteria and do not supersede any conflicting definitions contained within Chapter 62-340, F.A.C.

*Flooded* means a condition in which the soil surface is temporarily covered with flowing water from any source, such as streams overflowing their banks, runoff from adjacent or surrounding slopes, inflow from the high tides, or any combination of sources.
*Frequently flooded, ponded, saturated:* a frequency class in which flooding, ponding, or saturation is likely to occur often under usual weather conditions (more than 50 percent chance in any year, or more than 50 times in 100 years).
*Ponded* means a condition in which water stands in a closed depression. The water is removed only by percolation, evaporation, or transpiration.
*Long duration* means a duration class in which inundation for a single event ranges from 7 days to 1 month.
*Map unit components* means the collection of soils and miscellaneous areas found within a map unit.
*Very long duration* means a duration class in which inundation for a single event is greater than 1 month.

## Hydric Soil Technical Standard (HSTS)
(Updated by NTCHS December 2015)

For a soil to be considered hydric by the Natural Resources Conservation Service (NRCS), Anaerobic Conditions <u>and</u> Saturated Conditions must exist for at least 14 consecutive days.
1. Anaerobic Conditions (as documented by a, b, or c below)
   a. Indicator of Reduction in Soils (IRIS) tubes
   b. Oxidation-reduction potential (Eh) measurements using platinum electrodes
   c. Alpha-alpha-dipyridyl dye
2. Saturated Conditions
   • Confirmed by piezometer data.
   • NTCHS recommends that the piezometer data be verified by open well data.
(Onsite precipitation data are needed to confirm normal rainfall conditions)

## Root Size Estimation and Quantity Classes
Adapted from *Field Book for Describing Sampling Soils* version 3.0 (NRCS 2012)

| Very Fine (<1mm) | Fine (1 to <2mm) | Medium (2 to <5mm) | Coarse (5 to <10mm) | Very Coarse (≥10mm) |
|---|---|---|---|---|

1 mm    2 mm    5 mm    10 mm

| Quantity Class | Few | Common | Many |
|---|---|---|---|
| Roots: Average Count per Area* | <1 per area* | 1 to <5 per area* | ≥5 per area* |

*Root assessment area = 1x1cm for roots <2mm, 10x10cm for 2 to <10mm, 100x100cm for ≥10mm

77

**Data Form Guide Note:**
## SUPPLEMENTAL SOIL DATA

### HORIZON CRITERIA – MASTER HORIZON DESIGNATIONS

**O** Organic soil materials (not limnic)
**A** Mineral; organic matter (humus) accumulation, loss of Fe, Al, clay
**E** Mineral; loss of Fe, Al, clay, or organic matter
**B** Subsurface accumulation of clay, Fe, Al, Si, humus, CaCO3, CaSO4; or loss of CaCO3; or
   accumulation of sesquioxides; or subsurface soil structure
**C** Little or no pedogenic alteration, unconsolidated earthy material, soft bedrock
**L** Limnic soil materials
**R** Bedrock, Strongly Cemented to Indurated

### HORIZON CRITERIA – SUFFIX DESIGNATIONS

**a** Highly decomposed organic matter
**b** Buried genetic horizon (not used with C horizons)
**c** Concretions or nodules
**e** Moderately decomposed organic matter
**g** Strong gley
**h** Illuvial organic matter accumulation
**i** Slightly decomposed organic matter
**k** Pedogenic carbonate accumulation
**m** Strong cementation (pedogenic, massive)
**ma** Marl (Used only with L)

**n** Pedogenic, exchangeable sodium accumulation
**o** Residual sesquioxide accumulation (pedogenic)
**p** Plow layer or other artificial disturbance
**r** Weathered or soft bedrock
**s** Illuvial sesquioxide accumulation
**t** Illuvial accumulation of silicate clay
**v** Plinthite
**w** Weak color or structure within B (used only with B)
**z** Pedogenic accumulation of salt more soluble
   than gypsum

## FNAI NATURAL COMMUNITIES OF FLORIDA

**HARDWOOD FORESTED UPLANDS**
Slope Forest
Upland Hardwood Forest
Mesic Hammock
Rockland Hammock
Xeric Hammock
**HIGH PINE AND SCRUB**
Upland Mixed Woodland
Upland Pine
Sandhill
Scrub
**PINE FLATWOODS AND DRY PRAIRIE**
Wet Flatwoods
Mesic Flatwoods
Scrubby Flatwoods
Pine Rockland
Dry Prairie
**COASTAL UPLANDS**
Beach Dune
Coastal Berm
Coastal Grassland
Coastal Strand
Maritime Hammock
Shell Mound

**SINKHOLES AND OUTCROP COMMUNITIES**
Upland Glade
Sinkhole
Limestone Outcrop
Keys Cactus Barren
**FRESHWATER NON-FORESTED WETLANDS**
PRAIRIES AND BOGS
Seepage Slope
Wet Prairie
Marl Prairie
Shrub Bog
MARSHES
Depression Marsh
Basin Marsh
Coastal Interdunal Swale
Floodplain Marsh
Slough Marsh
Glades Marsh
Slough
**FRESHWATER FORESTED WETLANDS**
CYPRESS/TUPELO
Dome Swamp
Basin Swamp
Strand Swamp
Floodplain Swamp

HARDWOOD
Baygall
Hydric Hammock
Bottomland Forest
Alluvial Forest
**MARINE AND ESTUARINE VEGETATED WETLANDS**
Salt Marsh
Mangrove Swamp
Keys Tidal Rock Barren
**LACUSTRINE**
Clastic Upland Lake
Coastal Dune Lake
Coastal Rockland Lake
Flatwoods/Prairie Lake and
   Marsh Lake
River Floodplain Lake and
   Swamp Lake
Sandhill Upland Lake
Sinkhole Lake
**RIVERINE**
Alluvial Stream
Blackwater Stream
Seepage Stream
Spring-run Stream

**Appendix A2: subsection 62-340.450(1), (2), (3), F.A.C.**

## Vegetative Index Plant List by Common Name

**Common Name / Botanical Name / Wetland Status**

**acacia, ear-leaved**    *Acacia auriculiformis*    FAC
**alder, hazel**    *Alnus serrulata*    OBL
**algal bulrush**    *Websteria confervoides*    OBL
**allamanda, wild**    *Urechites lutea*    FACW
**alligator flag**    *Thalia geniculata*    OBL
**alligator-weed**    *Alternanthera philoxeroides*    OBL
**alligator-weed, sessile**    *Alternanthera sessilis*    OBL
**amaranth, Florida**    *Amaranthus floridanus*    OBL
**amaranth, southern**    *Amaranthus australis*    OBL
**amaranth, tidemarsh**    *Amaranthus cannabinus*    OBL
**anise, Florida**    *Illicium floridanum*    OBL
**anise, star**    *Illicium parviflorum*    FACW
**arrowhead**    *Sagittaria* spp.    OBL
**arrow-wood**    *Viburnum dentatum*    FACW
**arum**    *Peltandra* spp.    OBL
**ash**    *Fraxinus* spp.    OBL
**ash, white**    *Fraxinus americana*    U
**aster, bog**    *Aster spinulosus*    FACW
**aster, bushy**    *Aster dumosus*    FAC
**aster, calico**    *Aster lateriflorus*    FACW
**aster, climbing**    *Aster carolinianus*    OBL
**aster, coyote-thistle**    *Aster eryngiifolius*    FACW
**aster, Elliott's**    *Aster elliottii*    OBL
**aster, flat-top white**    *Aster umbellatus*    FAC
**aster, saltmarsh**    *Aster subulatus*    OBL
**aster, saltmarsh**    *Aster tenuifolius*    OBL
**aster, savannah**    *Aster chapmanii*    FACW
**aster, small white**    *Aster vimineus*    FACW
**Australian pine**    *Casuarina* spp.    FAC
**axilflower**    *Mecardonia* spp.    FACW
**azalea, swamp**    *Rhododendron viscosum*    FACW
**baby tears**    *Micranthemum* spp.    OBL
**baby-blue-eyes, small-flower**    *Nemophila aphylla*    FACW
**balsam-scale, Pan-American**    *Elionurus tripsacoides*    FACW
**bantam-buttons**    *Syngonanthus flavidulus*    FACW
**barbara's-buttons, grass-leaf**    *Marshallia graminifolia*    FACW
**barbara's-buttons, slim-leaf**    *Marshallia tenuifolia*    FACW
**basswood, American**    *Tilia americana*    FACW
**bay, swamp**    *Persea palustris*    OBL
**bayberry, evergreen**    *Myrica heterophylla*    FACW
**bayberry, odorless**    *Myrica inodora*    FACW
**bayberry, southern**    *Myrica cerifera*    FAC
**bay-cedar**    *Suriana maritima*    FAC
**beach alternanthera**    *Alternanthera maritima*    FACW
**beach creeper**    *Ernodea littoralis*    FAC
**bedstraw, stiff marsh**    *Galium tinctorium*    FACW
**beefwood**    *Guapira discolor*    FAC
**beggar-ticks**    *Bidens* spp.    OBL
**beggar-ticks, white**    *Bidens pilosa (B. alba)*    FAC
**bellflower, American**    *Campanula americana*    FAC
**bellflower, Florida**    *Campanula floridana*    OBL
**bellwort, Florida**    *Uvularia floridana*    FACW
**bindweed, dwarf**    *Evolvulus convolvuloides*    FACW
**bindweed, silky**    *Evolvulus sericeus*    FACW
**birch, river**    *Betula nigra*    OBL
**birds-in-a-nest**    *Macbridea* spp.    FACW
**bitter-cress**    *Cardamine bulbosa*    OBL

This index is for reference purposes only. Scientific names shall be used in all applications of Ch. 62-340, F.A.C. This index contains all plant species in subsection 62-340.450(1), (2), (3), F.A.C., listed alphabetically by their most widely used common names. In this index, plant species within a genus that has a consistent common name are listed by the common name of their genus, followed by the descriptor. For example, *Quercus nigra* is listed as oak, water. For families or larger taxonomic divisions in which all members are collectively referred to by a consistent common name, such as grasses, sedges, palms, orchids, and ferns, all members are listed under that group name, with the last member alphabetically being underlined to denote the end of the group. Plant species may appear multiple times within this list, as many have multiple common names. However, this list is not exhaustive.

**black senna**   *Seymeria cassiodes*   FAC
**blackbead**   *Pithecellobium keyensis*   FAC
**blackbead, catclaw**   *Pithecellobium unguis-cati*   FAC
**blackberry**   *Rubus* spp.   FAC
**blackgum**   *Nyssa sylvatica var. biflora*   OBL
**bladdernut, American**   *Staphylea trifolia*   FACW
**bladderpod**   *Sesbania* spp.   FAC
**bladderwort**   *Utricularia* spp.   OBL
**blazing star**   *Liatris gracilis*   FAC
**blolly**   *Guapira discolor*   FAC
**blueberry, Elliott**   *Vaccinium elliottii*   FAC
**blueberry, highbush**   *Vaccinium corymbosum*   FACW
**blue-eye-grass**   *Sisyrinchium capillare*   FACW
**blue-eye-grass, eastern**   *Sisyrinchium atlanticum*   FACW
**blue-eye-grass, Michaux's**   *Sisyrinchium mucronatum*   FACW
**bluestar, eastern**   *Amsonia tabernaemontana*   FACW
**bluethread**   *Burmannia* spp.   OBL
**bluets, water**   *Oldenlandia* spp.   FACW
**bog hemp**   *Boehmeria cylindrica*   OBL
**bogbutton, Engler's**   *Lachnocaulon engleri*   OBL
**bogbutton, pineland**   *Lachnocaulon digynum*   OBL
**bogbutton, Small's**   *Lachnocaulon minus*   OBL
**bogbutton, southern**   *Lachnocaulon beyrichianum*   FACW
**bogbutton, white-head**   *Lachnocaulon anceps*   FACW
**boneset**   *Eupatorium perfoliatum*   FACW
**box briar**   *Randia aculeata*   FAC
**box-elder**   *Acer negundo*   FACW
**bractspike, yellow**   *Yeatesia viridiflora*   FACW
**Brazilian pepper-tree**   *Schinus terebinthifolius*   FAC
**broomspurge, spreading**   *Euphorbia humistrata*   FACW
**buckwheat-tree**   *Cliftonia monophylla*   FACW
**bugleweed**   *Lycopus* spp.   OBL
**bully, buckthorn**   *Bumelia lycioides*   FAC
**bully, Florida**   *Bumelia reclinata*   FAC
**bumelia, buckthorn**   *Bumelia lycioides*   FAC
**bumelia, coastal**   *Bumelia celastrina*   FAC
**bumelia, smooth**   *Bumelia reclinata*   FAC
**bunchflower, Virginia**   *Melanthium virginicum*   OBL
**burhead**   *Echinodorus* spp.   OBL
**burnweed, American**   *Erechtites hieraciifolia*   FAC
**burreed**   *Sparganium americanum*   OBL
**bushy goldenrod**   *Euthamia* spp.   FAC
**butter-cup**   *Ranunculus* spp.   FACW
**butterweed**   *Senecio glabellus*   OBL
**butterwort**   *Pinguicula* spp.   OBL
**buttonbush**   *Cephalanthus occidentalis*   OBL
**button-plant, smooth**   *Spermacoce glabra*   FACW
**button-weed**   *Diodia virginiana*   FACW
**buttonwood**   *Conocarpus erectus*   FACW
**cajeput**   *Melaleuca quinquenervia*   FAC
**camphor-weed**   *Pluchea* spp.   FACW
**canker-berry**   *Solanum bahamense*   FACW
**canna**   *Canna* spp.   OBL
**canna, common**   *Canna x generalis*   FAC
**caperonia**   *Caperonia* spp.   FACW
**caper-tree**   *Capparis flexuosa*   FACW
**cardinal flower**   *Lobelia cardinalis*   OBL
**carrotwood**   *Cupaniopsis anacardioides*   FAC
**catsclaw**   *Pithecellobium unguis-cati*   FAC
**cattail**   *Typha* spp.   OBL
**cayaponia, five-lobe**   *Cayaponia quinqueloba*   FAC

**celestial lily**    *Nemastylis floridana*    FACW
**chaff-flower, beach**    *Alternanthera maritima*    FACW
**chaffhead, bristle-leaf**    *Carphephorus pseudoliatris*    FACW
**chaffhead, hairy**    *Carphephorus paniculatus*    FAC
**chaffhead, pineland**    *Carphephorus carnosus*    FACW
**chamber-bitter**    *Phyllanthus urinaria*    FAC
**chicken-spike**    *Sphenoclea zeylandica*    FACW
**chickweed, West Indian**    *Drymaria cordata*    FAC
**chocolate-weed**    *Melochia corchorifolia*    FAC
**chokeberry, red**    *Aronia arbutifolia*    FACW
**Christmas berry**    *Lycium carolinianum*    OBL
**clearweed**    *Pilea* spp.    FACW
**climbing-dogbane**    *Trachelospermum difforme*    FACW
**clubmoss**    *Lycopodium* spp.    FACW
**cocoplum**    *Chrysobalanus icaco*    FACW
**coinwort**    *Centella asiatica*    FACW
**colic-root**    *Aletris spp*    FAC
**colicwood**    *Myrsine guianensis*    FAC
**coneflower, cut-leaf**    *Rudbeckia laciniata*    FACW
**coneflower, grass-leaf**    *Rudbeckia graminifolia*    FACW
**coneflower, Mohr's**    *Rudbeckia mohrii*    OBL
**coneflower, orange**    *Rudbeckia fulgida*    FACW
**coneflower, Shiny**    *Rudbeckia nitida*    FACW
**coralberry**    *Ardisia* spp.    FAC
**corkwood**    *Leitneria floridana*    OBL
**corkwood**    *Stillingia aquatica*    OBL
**cottonwood, eastern**    *Populus deltoides*    FACW
**cottonwood, swamp**    *Populus heterophylla*    OBL
**coughbush**    *Ernodea littoralis*    FAC
**cowbane**    *Oxypolis* spp.    OBL
**cow-lily, yellow**    *Nuphar luteum*    OBL
**coyote-thistle, Baldwin's**    *Eryngium baldwinii*    FAC
**coyote-thistle, blue-flower**    *Eryngium integrifolium*    FACW
**coyote-thistle, creeping**    *Eryngium prostratum*    FACW
**creeping ox-eye**    *Wedelia trilobata*    FAC
**croton, Elliott's**    *Croton elliottii*    FACW
**crow poison**    *Zigadenus densus*    FACW
**crownbeard, Chapman's**    *Verbesina chapmanii*    FACW
**crownbeard, diverse-leaf**    *Verbesina heterophylla*    FACW
**crownbeard, white**    *Verbesina virginica*    FAC
**culver's-root**    *Veronicastrum virginicum*    FACW
**cupseed**    *Calycocarpum lyonii*    FACW
**cypress, bald**    *Taxodium distichum*    OBL
**cypress, pond**    *Taxodium ascendens*    OBL
**dangleberry**    *Gaylussacia frondosa*    FAC
**danglepod**    *Sesbania* spp.    FAC
**darling-plum**    *Reynosia septentrionalis*    FAC
**dasheen**    *Colocasia esculenta*    OBL
**dayflower**    *Commelina* spp.    FACW
**dayflower, sandhill**    *Commelina erecta*    U
**deathcamas, Atlantic**    *Zigadenus glaberrimus*    FACW
**deer-tongue**    *Carphephorus paniculatus*    FAC
**desert-thorn, Carolina**    *Lycium carolinianum*    OBL
**devil's claws**    *Pisonia rotundata*    FAC
**dewberry**    *Rubus* spp.    FAC
**dewflower**    *Murdannia* spp.    FAC
**ditch stonecrop**    *Penthorum sedoides*    OBL
**dock**    *Rumex* spp.    FACW
**dog-fennel**    *Eupatorium capillifolium*    FAC
**dog-hobble**    *Leucothoe* spp.    FACW
**dogwood, silky**    *Cornus amomum*    OBL

81

**dogwood, swamp**    *Cornus foemina*    FACW
**dollarweed**    *Hydrocotyle* spp.    FACW
**doll's daisy**    *Boltonia* spp.    FACW
**dragon-head, false**    *Physostegia virginiana*    FACW
**dragon-head, Godfrey's**    *Physostegia godfreyi*    OBL
**dragon-head, purple**    *Physostegia purpurea*    FACW
**dragon-head, slender-leaf**    *Physostegia leptophylla*    OBL
**drymary**    *Drymaria cordata*    FAC
**duck potato**    *Sagittaria* spp.    OBL
**dwarf morning-glory, bindweed**    *Evolvulus convolvuloides*    FACW
**dwarf morning-glory, silver**    *Evolvulus sericeus*    FACW
**elder, American**    *Sambucus canadensis*    FAC
**elderberry**    *Sambucus canadensis*    FAC
**elephant's ear**    *Colocasia esculenta*    OBL
**elephant's ear**    *Xanthosoma sagittifolium*    FACW
**elm**    *Ulmus* spp.    FACW
**elm, slippery**    *Ulmus rubra*    U
**false buttonweed, smooth**    *Spermacoce glabra*    FACW
**false daisy**    *Eclipta alba*    FACW
**false indigo, bastard**    *Amorpha fruticosa*    FACW
**false-asphodel, coastal**    *Tofieldia racemosa*    OBL
**false-croton**    *Caperonia* spp.    FACW
**falsefennel**    *Eupatorium leptophyllum*    OBL
**false-fiddle-leaf**    *Hydrolea* spp.    OBL
**false-foxglove**    *Agalinis pinetorum*    FACW
**false-foxglove, flax-leaf**    *Agalinis linifolia*    OBL
**false-foxglove, large purple**    *Agalinis purpurea*    FACW
**false-foxglove, saltmarsh**    *Agalinis maritima*    OBL
**false-foxglove, scale-leaf**    *Agalinis aphylla*    FACW
**false-nettle**    *Boehmeria cylindrica*    OBL
**false-pimpernel**    *Lindernia* spp.    FACW
**false-pimpernel, Malayan**    *Lindernia crustacea*    FAC
**false-willow, broom-bush**    *Baccharis dioica*    FAC
**false-willow, eastern**    *Baccharis halimifolia*    FAC
**false-willow, saltwater**    *Baccharis angustifolia*    OBL
**feather-bells, eastern**    *Stenanthium gramineum*    FACW

**FERNS**

**bead fern**    *Hypolepis repens*    FACW
**Boston fern**    *Nephrolepis exaltata*    FAC
**brake, giant**    *Pteris tripartita*    FACW
**bramble fern, creeping**    *Hypolepis repens*    FACW
**chainfern, netted**    *Woodwardia areolata*    OBL
**chainfern, Virginia**    *Woodwardia virginica*    FACW
**cinnamon fern**    *Osmunda cinnamomea*    FACW
**comb fern, brown-hair**    *Ctenitis submarginalis*    FACW
**lady fern, subarctic**    *Athyrium filix-femina*    FACW
**leather fern**    *Acrostichum* spp.    OBL
**maiden fern**    *Thelypteris* spp.    FACW
**marsh fern**    *Thelypteris* spp.    FACW
**royal fern**    *Osmunda regalis*    OBL
**sensitive fern**    *Onoclea sensibilis*    FACW
**shield fern**    *Thelypteris* spp.    FACW
**swamp fern**    *Blechnum serrulatum*    FACW
**sword fern**    *Nephrolepis* spp.    FAC
**wood fern, southern**    *Dryopteris ludoviciana*    FACW
**fetter-bush**    *Lyonia lucida*    FACW
**fetter-bush, climbing**    *Pieris phillyreifolia*    FACW
**fever-tree**    *Pinckneya bracteata*    OBL
**fig, Florida strangler**    *Ficus aurea*    FAC
**fire flag**    *Thalia geniculata*    OBL
**fireweed**    *Erechtites hieraciifolia*    FAC

82

**flameflower**    *Macranthera flammea*    OBL
**flattop goldenrod**    *Euthamia* spp.    FAC
**flax, Carter's**    *Linum carteri*    FACW
**flax, Florida yellow**    *Linum floridanum*    FAC
**flax, ridged yellow**    *Linum striatum*    FACW
**flax, stiff yellow**    *Linum medium*    FAC
**flax, West's**    *Linum westii*    OBL
**fleabane, early whitetop**    *Erigeron vernus*    FACW
**fleabane, oakleaf**    *Erigeron quercifolius*    FAC
**floating hearts**    *Nymphoides* spp.    OBL
**frogbit**    *Limnobium spongia*    OBL
**frog-fruit**    *Phyla* spp.    FAC
**frostweed**    *Verbesina virginica*    FAC
**gayfeather, garber's**    *Liatris garberi*    FACW
**gayfeather, slender**    *Liatris gracilis*    FAC
**gayfeather, spiked**    *Liatris spicata*    FAC
**gentian**    *Gentiana* spp.    FACW
**germander, American**    *Teucrium canadense*    FACW
**ginger**    *Hedychium coronarium*    FACW
**gingerlily, white**    *Hedychium coronarium*    FACW
**glasswort**    *Salicornia* spp.    OBL
**goat-weed**    *Scoparia dulcis*    FAC
**golden club**    *Orontium aquaticum*    OBL
**golden creeper**    *Ernodea littoralis*    FAC
**golden-crest**    *Lophiola americana*    FACW
**golden-rod, Elliott's**    *Solidago elliottii*    OBL
**golden-rod, leavenworth's**    *Solidago leavenworthii*    FACW
**golden-rod, marsh**    *Solidago fistulosa*    FACW
**golden-rod, rough-leaf**    *Solidago patula*    OBL
**golden-rod, seaside**    *Solidago sempervirens*    FACW
**golden-rod, willow-leaf**    *Solidago stricta*    FACW
**golden-rod, wrinkled**    *Solidago rugosa*    FAC
**grass-of-parnassus**    *Parnassia* spp.    OBL
**grasswort**    *Lilaeopsis* spp.    OBL

## GRASSES

**arrowfeather grass**    *Aristida purpurascens*    FACW
**arrow-grass**    *Triglochin striatam*    OBL
**barnyardgrass**    *Echinochloa* spp.    FACW
**basketgrass**    *Oplismenus setarius*    FAC
**blue maidencane**    *Amphicarpum muhlenbergianum*    FACW
**bluestem**    *Schizachyrium* spp.    FAC
**bluestem, big**    *Andropogon gerardii*    FAC
**bluestem, broom-sedge**    *Andropogon virginicus*    FAC
**bluestem, bushy**    *Andropogon glomeratus*    FACW
**bluestem, Mohr's**    *Andropogon liebmanii var. pungensis (A. mohrii)*    FACW
**bluestem, savannah**    *Andropogon arctatus*    FAC
**bluestem, short-spike**    *Andropogon brachystachys*    FAC
**bluestem, slim**    *Andropogon perangustatus*    FAC
**bristlegrass**    *Setaria geniculata*    FAC
**broom-sedge**    *Andropogon virginicus*    FAC
**Burma reed**    *Neyraudia reynaudiana*    FAC
**carpet grass**    *Axonopus* spp.    FAC
**cockspur grass**    *Echinochloa* spp.    FACW
**common reed**    *Phragmites australis*    OBL
**cordgrass, big**    *Spartina cynosuroides*    OBL
**cordgrass, gulf**    *Spartina spartinae*    OBL
**cordgrass, saltmarsh**    *Spartina alterniflora*    OBL
**cordgrass, saltmeadow**    *Spartina patens*    FACW
**cordgrass, sand**    *Spartina bakeri*    FACW
**crabgrass, dwarf**    *Digitaria serotina*    FAC
**crabgrass, twospike**    *Digitaria pauciflora*    FACW

**cupgrass**   *Eriochloa* spp.   FACW
**cupscale, American**   *Sacciolepis striata*   OBL
**cupscale, Indian**   *Sacciolepis indica*   FAC
**cutgrass**   *Leersia* spp.   OBL
**cut-throat grass**   *Panicum abscissum*   FACW
**dallisgrass**   *Paspalum dilatatum*   FAC
**dropseed, Florida**   *Sporobolus floridanus*   FACW
**dropseed, seashore**   *Sporobolus virginicus*   OBL
**elephantgrass**   *Pennisetum purpureum*   FAC
**everglades grass**   *Digitaria pauciflora*   FACW
**fingergrass, pinewoods**   *Eustachys petraea*   FAC
**fingergrass, saltmarsh**   *Eustachys glauca*   FACW
**fluffgrass, pineland**   *Tridens ambiguus*   FACW
**foxtail, giant**   *Setaria magna*   OBL
**foxtail, knotroot**   *Setaria geniculata*   FAC
**foxtail, tufted**   *Alopecurus carolinianus*   FAC
**gamagrass, eastern**   *Tripsacum dactyloides*   FAC
**giant cane**   *Arundinaria gigantea*   FACW
**giant cutgrass**   *Zizaniopsis miliacea*   OBL
**giant reed**   *Arundo donax*   FAC
**hilograss**   *Paspalum conjugatum*   FAC
**indian rice**   *Zizania aquatica*   OBL
**jointgrass; jointtailgrass**   *Manisuris* spp.   FACW
**jointgrass, pitted**   *Manisuris cylindrica*   FAC
**jungle-rice**   *Echinochloa* spp.   FACW
**keygrass**   *Monanthochloe littoralis*   OBL
**kissimmeegrass**   *Paspalidium geminatum*   OBL
**knotgrass**   *Paspalum distichum*   OBL
**lovegrass**   *Eragrostis* spp.   FAC
**maidencane**   *Panicum hemitomon*   OBL
**mannagrass, fowl**   *Glyceria striata*   OBL
**muhly grass, hairawn**   *Muhlenbergia capillaris*   OBL
**muhly grass, nimblewill**   *Muhlenbergia schreberi*   FACW
**muhly, cutover**   *Muhlenbergia expansa*   FAC
**napiergrass**   *Pennisetum purpureum*   FAC
**needlegrass, Florida**   *Stipa avenacioides*   FACW
**panic grass, cypress**   *Panicum ensifolium*   OBL
**panicum, beaked**   *Panicum anceps*   FAC
**panicum, bluejoint**   *Panicum tenerum*   OBL
**panicum, Eaton's**   *Panicum spretum*   FACW
**panicum, fall**   *Panicum dichotomiflorum*   FACW
**panicum, fringed**   *Panicum strigosum*   FAC
**panicum, Ft Myers**   *Panicum pinetorum*   FACW
**panicum, gaping**   *Panicum hians*   FAC
**panicum, red-top**   *Panicum rigidulum*   FACW
**panicum, savannah**   *Panicum gymnocarpon*   OBL
**panicum, shining**   *Panicum dichotomum*   FACW
**panicum, tall thin**   *Panicum longifolium*   OBL
**panicum, variable**   *Panicum commutatum*   FAC
**panicum, velvet**   *Panicum scoparium*   FACW
**panicum, warty**   *Panicum verrucosum*   FACW
**panicum, white-edge**   *Panicum tenue*   FAC
**panicum, woolly**   *Panicum scabriusculum*   OBL
**paragrass**   *Brachiaria purpurascens*   FACW
**paspalum, brook**   *Paspalum acuminatum*   FACW
**paspalum, brown-seed**   *Paspalum plicatulum*   FAC
**paspalum, bull**   *Paspalum boscianum*   FACW
**paspalum, early**   *Paspalum praecox*   OBL
**paspalum, field**   *Paspalum laeve*   FACW
**paspalum, Florida**   *Paspalum floridanum*   FACW
**paspalum, gulf**   *Paspalum monostachyum*   OBL

84

**paspalum, hairy-seed**    *Paspalum pubiflorum*    FACW
**paspalum, joint**    *Paspalum distichum*    OBL
**paspalum, mudbank**    *Paspalum dissectum*    OBL
**paspalum, Panama**    *Paspalum fimbriatum*    FAC
**paspalum, sour**    *Paspalum conjugatum*    FAC
**paspalum, thin**    *Paspalum setaceum*    FAC
**paspalum, water**    *Paspalum repens*    OBL
**plumegrass, narrow**    *Erianthus strictus*    OBL
**plumegrass, short-beard**    *Erianthus brevibarbus*    FACW
**plumegrass, sugarcane**    *Erianthus giganteus*    OBL
**rabbit-foot grass**    *Polypogon* spp.    FAC
**redtop**    *Agrostis stolonifera*    FACW
**reed grass, Curtiss'**    *Calamovilfa curtissii*    FACW
**reimargrass, Florida**    *Reimarochloa oligostachya*    FACW
**rice, cultivated**    *Oryza sativa*    FAC
**saltgrass, seashore**    *Distichlis spicata*    OBL
**sandgrass, Curtiss'**    *Calamovilfa curtissii*    FACW
**silk reed**    *Neyraudia reynaudiana*    FAC
**silky-scale, purple**    *Anthaenantia rufa*    FACW
**spanglegrass**    *Chasmanthium* spp.    FAC
**spanglegrass, indian**    *Chasmanthium latifolium*    FAC
**spanglegrass, long-leaf**    *Chasmanthium sessiliflorum*    FAC
**switchcane**    *Arundinaria gigantea*    FAC
**switchgrass**    *Panicum virgatum*    FACW
**three-awn grass, bottlebrush**    *Aristida spiciformis*    FAC
**three-awn grass, long-leaf**    *Aristida affinis*    OBL
**three-awn grass, pineland**    *Aristida stricta*    FAC
**three-awn grass, rhizomatous**    *Aristida rhizomophora*    FAC
**three-awn grass, wand-like**    *Aristida purpurascens*    FACW
**toothache grass**    *Ctenium* spp.    FACW
**torpedograss**    *Panicum repens*    FACW
**tridens, long-spike**    *Tridens strictus*    FACW
**tridens, savannah**    *Tridens ambiguus*    FACW
**trompetilla**    *Hymenachne amplexicaulis*    OBL
**vaseygrass**    *Paspalum urvillei*    FAC
**watergrass**    *Hydrochloa caroliniensis*    OBL
**West Indian marsh grass**    *Hymenachne amplexicaulis*    OBL
**wildrice, annual**    *Zizania aquatica*    OBL
**wildrice, southern**    *Zizaniopsis miliacea*    OBL
**wiregrass**    *Aristida stricta*    FAC
**witchgrass, cypress**    *Panicum ensifolium*    OBL
**witchgrass, erect-leaf**    *Panicum erectifolium*    OBL
**witchgrass, roughhair**    *Panicum strigosum*    FAC
**witchgrass, shining**    *Panicum dichotomum*    FACW
**witchgrass, variable**    *Panicum commutatum*    FAC
**witchgrass, velvet**    *Panicum scoparium*    FACW
**witchgrass, woolly**    *Panicum scabriusculum*    OBL
**woodoats**    *Chasmanthium* spp.    FACW
**woodoats, indian**    *Chasmanthium latifolium*    FAC
**woodoats, long-leaf**    *Chasmanthium sessiliflorum*    FAC
**woodsgrass**    *Oplismenus setarius*    FAC
**green-dragon**    *Arisaema* spp.    FACW
**green-haw**    *Crataegus viridis*    FACW
**gregory wood**    *Bucida buceras*    FAC
**groundsel tree**    *Baccharis glomeruliflora*    FAC
**guava, strawberry**    *Psidium cattleianum*    FAC
**hackberry**    *Celtis laevigata*    FACW
**hardscale, one flower**    *Sclerolepis uniflora*    FACW
**Harper's beauty**    *Harperocallis flava*    FACW
**hartwrightia, Florida**    *Hartwrightia floridana*    FACW
**hatpin**    *Eriocaulon* spp.    OBL

**hatpins, yellow**   *Syngonanthus flavidulus*   FACW
**haw, green**   *Crataegus viridis*   FACW
**haw, may**   *Crataegus aestivalis*   OBL
**haw, parsley**   *Crataegus marshallii*   FACW
**hazel-alder**   *Alnus serrulata*   OBL
**hedgehyssop**   *Gratiola* spp.   FACW
**hedgehyssop, rough**   *Gratiola hispida*   FAC
**hedgenettle**   *Stachys lythroides*   OBL
**heliotrope, four-spike**   *Heliotropium procumbens*   FACW
**heliotrope, pineland**   *Heliotropium polyphyllum*   FAC
**heliotrope, seaside**   *Heliotropium curassavicum*   FAC
**hickory, water**   *Carya aquatica*   OBL
**hobble-bush**   *Agarista populifolia*   FACW
**holly, American**   *Ilex opaca var. opaca*   FAC
**holly, bay-gall**   *Ilex coriacea*   FACW
**holly, dahoon**   *Ilex cassine*   OBL
**holly, deciduous**   *Ilex decidua*   FACW
**holly, myrtle**   *Ilex myrtifolia*   OBL
**holly, sarvis**   *Ilex amelanchier*   OBL
**holly, yaupon**   *Ilex vomitoria*   FAC
**honeycomb-head, one-flower**   *Balduina uniflora*   FACW
**honeycomb-head, purple**   *Balduina atropurpurea*   FACW
**honey-locust**   *Gleditsia triacanthos*   FACW
**hornbeam, American**   *Carpinus caroliniana*   FACW
**hornpod**   *Mitreola* spp.   FACW
**horse-purslane**   *Trianthema portulacastrum*   FACW
**horsetail**   *Equisetum hyemale*   FACW
**huckleberry, dwarf**   *Gaylussacia dumosa*   FAC
**hummingbird-flower**   *Macranthera flammea*   OBL
**hygrophila**   *Hygrophila* spp.   OBL
**hyssop, hispid**   *Gratiola hispida*   FAC
**indian-plantain, egg-leaf**   *Arnoglossum ovatum*   FACW
**indian-plantain, Georgia**   *Arnoglossum sulcatum*   OBL
**indian-plantain, sweet-scent**   *Cacalia suaveolens*   FACW
**indian-plantain, variable-leaf**   *Arnoglossum diversifolium*   FACW
**indigoberry, white**   *Randia aculeata*   FAC
**indigo-bush**   *Amorpha fruticosa*   FACW
**iris**   *Iris* spp.   OBL
**iris, dwarf**   *Iris verna*   U
**ironweed**   *Vernonia* spp.   FACW
**ironweed, narrow-leaf**   *Vernonia angustifolia*   U
**ironwood**   *Carpinus caroliniana*   FACW
**ixia, Bartram's**   *Sphenostigma coelestinum*   FACW
**ixia, fall-flowering**   *Nemastylis floridana*   FACW
**jack-in-the-pulpit**   *Arisaema* spp.   FACW
**Java plum**   *Syzygium* spp.   FAC
**jessamine, day**   *Cestrum diurnum*   FAC
**jewel weed**   *Impatiens capensis*   OBL
**joe-pye-weed**   *Eupatoriadelphus fistulosus*   FACW
**Joewood**   *Jacquinia keyensis*   FAC
**joint-vetch, India**   *Aeschynomene indica*   FACW
**joint-vetch, meadow**   *Aeschynomene pratensis*   OBL
**joyweed, seaside**   *Alternanthera maritima*   FACW
**joyweed, sessile**   *Alternanthera sessilis*   OBL
**joyweed, smooth**   *Alternanthera paronychioides*   FAC
**jumpseed**   *Polygonum virginianum*   FACW
**juniperleaf**   *Polypremum procumbens*   FAC
**justiceweed**   *Eupatorium leucolepis*   FACW
**keygrass**   *Monanthochloe littoralis*   OBL
**lakecress**   *Armoracia aquatica*   OBL
**large gallberry**   *Ilex coriacea*   FACW

**latherleaf**   *Colubrina asiatica*   FAC
**leaf-flower, Carolina**   *Phyllanthus caroliniensis*   FACW
**leaf-flower, Florida**   *Phyllanthus liebmannianus*   FACW
**leaf-flower, water**   *Phyllanthus urinaria*   FAC
**lily, atamasco**   *Zephyranthes atamasco*   FACW
**lily, panhandle**   *Lilium iridollae*   OBL
**lily, southern red**   *Lilium catesbaei*   FAC
**lizard's tail**   *Saururus cernuus*   OBL
**lobelia**   *Lobelia* spp.   FACW
**lobelia, Florida**   *Lobelia floridana*   OBL
**loblolly-bay**   *Gordonia lasianthus*   FACW
**locust-berry**   *Byrsonima lucida*   FAC
**loosestrife**   *Lysimachia* spp.   OBL
**loosestrife, marsh**   *Lythrum* spp.   OBL
**lotus, American**   *Nelumbo* spp.   OBL
**magnolia, sweetbay**   *Magnolia virginiana var. australis*   OBL
**Malabar plum**   *Syzygium* spp.   FAC
**maleberry**   *Lyonia ligustrina*   FAC
**mallow, coastal**   *Kosteletzkya pentasperma*   FAC
**mallow, mangrove**   *Pavonia spicata*   FACW
**mallow, seashore**   *Kosteletzkya virginica*   OBL
**mangrove, black**   *Avicennia germinans*   OBL
**mangrove, red**   *Rhizophora mangle*   OBL
**mangrove, white**   *Laguncularia racemosa*   OBL
**maple, red**   *Acer rubrum*   FACW
**maple, silver**   *Acer saccharinum*   OBL
**marlberry**   *Ardisia* spp.   FAC
**marsh elder**   *Iva frutescens*   OBL
**marsh elder, little**   *Iva microcephala*   FACW
**marsh loosestrife**   *Lythrum* spp.   OBL
**marsh St. John's-wort**   *Triadenum* spp.   OBL
**marsh-gentian**   *Eustoma exaltatum*   FACW
**marshpennywort**   *Hydrocotyle* spp.   FACW
**marshweed**   *Limnophila* spp.   OBL
**mayhaw**   *Crataegus aestivalis*   OBL
**mayten, Florida**   *Maytenus phyllanthoides*   FAC
**meadow-beauty**   *Rhexia* spp.   FACW
**meadow-beauty, panhandle**   *Rhexia salicifolia*   OBL
**meadow-beauty, white**   *Rhexia parviflora*   OBL
**meadow-rue**   *Thalictrum* spp.   FACW
**melonleaf, five-lobe**   *Cayaponia quinqueloba*   FAC
**mermaid-weed**   *Proserpinaca* spp.   OBL
**milkweed, aquatic**   *Asclepias perennis*   OBL
**milkweed, fen-flower**   *Asclepias lanceolata*   OBL
**milkweed, large-flower**   *Asclepias connivens*   FACW
**milkweed, long-leaf**   *Asclepias longifolia*   FACW
**milkweed, red**   *Asclepias rubra*   OBL
**milkweed, savannah**   *Asclepias pedicellata*   FACW
**milkweed, southern**   *Asclepias viridula*   FACW
**milkweed, swamp**   *Asclepias incarnata*   OBL
**milkwort**   *Polygala* spp.   FACW
**milkwort, racemed**   *Polygala polygama*   U
**milkwort, sandhill**   *Polygala leptostachys*   U
**milkwort, scrub**   *Polygala lewtonii*   U
**milkwort, tall**   *Polygala cymosa*   OBL
**milkwort, whorled**   *Polygala verticillata*   U
**mille graines**   *Oldenlandia* spp.   FACW
**mimosa, black**   *Mimosa pigra*   FAC
**mistflower**   *Conoclinium coelestinum*   FAC
**miterwort**   *Mitreola* spp.   FACW
**mock bishop-weed**   *Ptilimnium capillaceum*   FACW

**monkey-flower**   *Mimulus alatus*   OBL
**mountain-laurel**   *Kalmia latifolia*   FACW
**mountain-mint, coastal-plain**   *Pycnanthemum nudum*   FACW
**mouse-tail, tiny**   *Myosurus minimus*   FAC
**mudflower**   *Micranthemum* spp.   OBL
**mud-plantain, kidney-leaf**   *Heteranthera reniformis*   OBL
**mudwort, wild**   *Dicliptera brachiata*   FACW
**mulberry, red**   *Morus rubra*   FAC
**musclewood**   *Carpinus caroliniana*   FACW
**musky mint**   *Hyptis alata*   FACW
**myrsine, guiana**   *Myrsine guianensis*   FAC
**nakedwood, Asian**   *Colubrina asiatica*   FAC
**necklacepod, yellow**   *Sophora tomentosa*   FACW
**nettletree**   *Trema* spp.   FAC
**neverwet**   *Orontium aquaticum*   OBL
**nightshade, Bahama**   *Solanum bahamense*   FACW
**nightshade, shrub**   *Solanum erianthum*   FACW
**nodding nixie**   *Apteria aphylla*   FACW
**oak, cherry-bark**   *Quercus pagoda*   FACW
**oak, laurel**   *Quercus laurifolia*   FACW
**oak, overcup**   *Quercus lyrata*   OBL
**oak, swamp chestnut**   *Quercus michauxii*   FACW
**oak, water**   *Quercus nigra*   FACW
**oak, willow**   *Quercus phellos*   FACW
**obedient plant**   *Physostegia virginiana*   FACW

**ORCHIDS**

  **adder's-mouth, Florida**   *Malaxis spicata*   OBL
  **fringed orchid**   *Platanthera* spp.   OBL
  **grass-pinks**   *Calopogon* spp.   FACW
  **hidden orchid**   *Maxillaria crassifolia*   OBL
  **jug orchid**   *Erythrodes querceticola*   FACW
  **ladies'-tresses**   *Spiranthes* spp.   FACW
  **liparis, tall**   *Liparis elata*   OBL
  **noddingcaps**   *Triphora* spp.   FACW
  **pogonia, rose**   *Pogonia ophioglossoides*   OBL
  **pogonias, nodding**   *Triphora* spp.   FACW
  **rein orchid**   *Habenaria* spp.   FACW
  **rosebud orchid**   *Cleistes divaricata*   OBL
  **shadow-witch**   *Ponthieva racemosa*   FACW
  **snakemouth orchid**   *Pogonia ophioglossoides*   OBL
  **twayblade**   *Listera* spp.   FACW
  **widelip orchid**   *Liparis elata*   OBL
  **wild coco**   *Eulophia alta*   FACW
**ox-eye, creeping**   *Wedelia trilobata*   FAC
**oxeye, seaside**   *Borrichia* spp.   OBL

**PALMS**

  **palm, bluestem**   *Sabal minor*   FACW
  **palm, cabbage**   *Sabal palmetto*   FAC
  **palm, Florida thatch**   *Thrinax radiata*   FAC
  **palm, needle**   *Rhapidophyllum hystrix*   FACW
  **palm, paurotis**   *Acoelorraphe wrightii*   OBL
  **palm, royal**   *Roystonea* spp.   FACW
  **palmetto, dwarf**   *Sabal minor*   FACW
**panal**   *Cypselea humifusa*   FAC
**paperbark tree**   *Melaleuca quinquenervia*   FAC
**parsley-haw**   *Crataegus marshallii*   FACW
**peatmoss**   *Sphagnum* spp.   OBL
**pellitory**   *Parietaria* spp.   FAC
**pennywort**   *Hydrocotyle* spp.   FACW
**penny-wort, floating**   *Hydrocotyle ranunculoides*   OBL
**pentodon, Hall's**   *Pentodon pentandrus*   OBL

**persimmon, common**   *Diospyros virginiana*   FAC
**pickerelweed**   *Pontederia cordata*   OBL
**picklewort**   *Salicornia* spp.   OBL
**pimpernel, Florida**   *Anagallis pumila*   FAC
**pimpernel, water**   *Samolus* spp.   OBL
**pine, pond**   *Pinus serotina*   FACW
**pine, spruce**   *Pinus glabra*   FACW
**pineland daisy**   *Chaptalia tomentosa*   FACW
**pineweed**   *Hypericum gentianoides*   U
**pink-root**   *Spigelia loganioides*   FACW
**pipestem**   *Agarista populifolia*   FACW
**pipewort**   *Eriocaulon* spp.   OBL
**pitcher-plant**   *Sarracenia* spp.   OBL
**pitcher-plant, hooded**   *Sarracenia minor*   FACW
**planer tree**   *Planera aquatica*   OBL
**planetree, American**   *Platanus occidentalis*   FACW
**pleatleaf, fall-flowering**   *Nemastylis floridana*   FACW
**poison sumac**   *Toxicodendron vernix*   FACW
**poisonwood**   *Metopium toxiferum*   FAC
**pond apple**   *Annona glabra*   OBL
**pondberry**   *Lindera melissaefolia*   OBL
**pondlily, yellow**   *Nuphar luteum*   OBL
**pondspice**   *Litsea aestivalis*   OBL
**pony-foot**   *Dichondra caroliniensis*   FAC
**popcorn tree**   *Sapium sebiferum*   FAC
**portia tree**   *Thespesia populnea*   FAC
**possum-haw**   *Viburnum nudum*   FACW
**potatotree**   *Solanum erianthum*   FACW
**prairie-gentian**   *Eustoma exaltatum*   FACW
**pride-of-Big-Pine**   *Strumpfia maritima*   FACW
**primrosewillow**   *Ludwigia* spp.   OBL
**privet, swamp**   *Forestiera acuminata*   FACW
**punk tree**   *Melaleuca quinquenervia*   FAC
**queen's-delight, marsh**   *Stillingia sylvatica var. tenuis*   FAC
**quillwort**   *Isoetes* spp.   OBL
**ragwort, golden**   *Senecio aureus*   OBL
**rainlily**   *Zephyranthes atamasco*   FACW
**raspberry**   *Rubus* spp.   FAC
**rattlebox; rattle-bush**   *Sesbania* spp.   FAC
**rattlesnake master**   *Eryngium yuccifolium*   FACW
**rayless golden-rod**   *Bigelowia nudata*   FACW
**redgal**   *Morinda royoc*   FACW
**redroot**   *Lachnanthes caroliniana*   FAC
**redstem**   *Ammannia* spp.   OBL
**rose myrtle, downy**   *Rhodomyrtus tomentosus*   FAC
**rose, swamp**   *Rosa palustris*   OBL
**rose-apple**   *Syzygium* spp.   FAC
**rose-gentian**   *Sabatia* spp.   FACW
**rose-gentian, Bartram's**   *Sabatia bartramii*   OBL
**rose-gentian, coast**   *Sabatia calycina*   OBL
**rose-gentian, large**   *Sabatia dodecandra*   OBL
**rosemallow**   *Hibiscus aculeatus*   OBL
**rosemallow, crimson-eyed**   *Hibiscus moscheutos*   OBL
**rosemallow, halberd-leaf**   *Hibiscus laevis*   OBL
**rosemallow, scarlet**   *Hibiscus coccineus*   OBL
**rosemallow, sea**   *Hibiscus tiliaceus*   FAC
**rosemallow, swamp**   *Hibiscus grandiflorus*   OBL
**rush**   *Juncus* spp.   OBL
**rush, grassleaf**   *Juncus marginatus*   FACW
**rush, path**   *Juncus tenuis*   FAC
**rush, shore**   *Juncus marginatus*   FACW

**rush-featherling**    *Pleea tenuifolia*    OBL
**rustweed**    *Polypremum procumbens*    FAC
**sachsia**    *Sachsia polycephala*    FACW
**saffron plum**    *Bumelia celastrina*    FAC
**saltbush**    *Baccharis halimifolia*    FAC
**saltbush, halberd-leaf**    *Atriplex patula*    FACW
**saltwort**    *Batis maritima*    OBL
**sandmat, spreading**    *Euphorbia humistrata*    FACW
**sandspurry, saltmarsh**    *Spergularia marina*    OBL
**sandwort, Godfrey's**    *Arenaria godfreyi*    FACW
**savory, Brown's**    *Micromeria brownei*    OBL
**sawgrass**    *Cladium* spp.    OBL
**scaly-stem, Carolina**    *Elytraria caroliniensis*    FAC
**scouring-rush**    *Equisetum hyemale*    FACW
**screwstem**    *Bartonia* spp.    FACW
**sea myrtle**    *Baccharis halimifolia*    FAC
**sea oxeye**    *Borrichia* spp.    OBL
**sea-blite**    *Suaeda* spp.    OBL
**sea-lavender**    *Limonium carolinianum*    OBL
**sea-purslane**    *Sesuvium* spp.    FACW
**seaside mahoe**    *Thespesia populnea*    FAC
**sebastian-bush, gulf**    *Sebastiana fruticosa*    FAC

**SEDGES**

**baldrush**    *Psilocarya* spp.    OBL
**beakrush**    *Rhynchospora* spp.    FACW
**beakrush, Chapman's**    *Rhynchospora chapmanii*    OBL
**beakrush, clustered**    *Rhynchospora cephalantha*    OBL
**beakrush, few-flower**    *Rhynchospora oligantha*    OBL
**beakrush, giant-fruited**    *Rhynchospora megalocarpa*    U
**beakrush, Gray's**    *Rhynchospora grayi*    U
**beakrush, Harper's**    *Rhynchospora harperi*    OBL
**beakrush, horned**    *Rhynchospora inundata*    OBL
**beakrush, large**    *Rhynchospora macra*    OBL
**beakrush, millet**    *Rhynchospora miliacea*    OBL
**beakrush, mingled**    *Rhynchospora mixta*    OBL
**beakrush, narrow**    *Rhynchospora stenophylla*    OBL
**beakrush, pinebarren**    *Rhynchospora intermedia*    U
**beakrush, short-bristle**    *Rhynchospora corniculata*    OBL
**beakrush, southern**    *Rhynchospora microcarpa*    OBL
**beakrush, spreading**    *Rhynchospora divergens*    OBL
**beakrush, swamp-forest**    *Rhynchospora decurrens*    OBL
**beakrush, Tracy's**    *Rhynchospora tracyi*    OBL
**black-sedge**    *Schoenus nigricans*    FACW
**bogrush, black**    *Schoenus nigricans*    FACW
**bulrush**    *Scirpus* spp.    OBL
**dwarf-bulrush**    *Hemicarpha* spp.    FACW
**fimbry**    *Fimbristylis* spp.    OBL
**fimbry, annual**    *Fimbristylis annua*    FACW
**fimbry, hairy**    *Fimbristylis puberula*    FACW
**flatsedge**    *Cyperus* spp.    FACW
**flatsedge, alternate-leaf**    *Cyperus alternifolius*    OBL
**flatsedge, Asian**    *Cyperus metzii*    OBL
**flatsedge, baldwin**    *Cyperus globulosus*    FAC
**flatsedge, bentawn**    *Cyperus reflexus*    U
**flatsedge, black**    *Cyperus huarmensis*    FAC
**flatsedge, coastal-plain**    *Cyperus cuspidatus*    FAC
**flatsedge, Drummond's**    *Cyperus drummondii*    OBL
**flatsedge, epiphytic**    *Cyperus lanceolatus*    OBL
**flatsedge, giant**    *Cyperus giganteus*    FAC
**flatsedge, globe**    *Cyperus ovularis*    U
**flatsedge, hammock**    *Cyperus tetragonus*    U

**flatsedge, jointed**   *Cyperus articulatus*   OBL
**flatsedge, marshland**   *Cyperus distinctus*   OBL
**flatsedge, papyrus**   *Cyperus papyrus*   OBL
**flatsedge, pinebarrenf**   *Cyperus retrorsus*   FAC
**flatsedge, purple**   *Cyperus rotundus*   FAC
**flatsedge, red-root**   *Cyperus erythrorhizos*   OBL
**flatsedge, rough**   *Cyperus retrofractus*   U
**flatsedge, sandhill**   *Cyperus filiculmis*   U
**flatsedge, sheathed**   *Cyperus haspan*   OBL
**flatsedge, variable**   *Cyperus difformis*   OBL
**flatsedge, woodrush**   *Cyperus entrerianus*   OBL
**flatsedge, yellow**   *Cyperus esculentus*   FAC
**flatspike rush**   *Abildgaardia ovata*   FACW
**fringe-rush**   *Fimbristylis* spp.   OBL
**fringe-rush, annual**   *Fimbristylis annua*   FACW
**fringe-rush, Vahl's**   *Fimbristylis puberula*   FACW
**halfchaff sedge**   *Lipocarpha* spp.   FACW
**hurricane-grass**   *Fimbristylis spathacea*   FAC
**nut-grass, purple**   *Cyperus rotundus*   FAC
**nut-grass, yellow**   *Cyperus esculentus*   FAC
**nutrush**   *Scleria* spp.   FACW
**sedge**   *Carex* spp.   FACW
**sedge, bearded**   *Carex comosa*   OBL
**sedge, bristly-stalk**   *Carex leptalea*   OBL
**sedge, cypress-knee**   *Carex decomposita*   OBL
**sedge, Elliott's**   *Carex elliottii*   OBL
**sedge, fringed**   *Carex crinita*   OBL
**sedge, hop**   *Carex lupulina*   OBL
**sedge, Howe's**   *Carex howei*   OBL
**sedge, large**   *Carex gigantea*   OBL
**sedge, long**   *Carex folliculata*   OBL
**sedge, Louisiana**   *Carex louisianica*   OBL
**sedge, prickly bog**   *Carex atlantica*   OBL
**sedge, raven-foot**   *Carex crus-corvi*   OBL
**sedge, shallow**   *Carex lurida*   OBL
**sedge, shoreline**   *Carex hyalinolepis*   OBL
**sedge, stalk-grain**   *Carex stipata*   OBL
**sedge, Walter's**   *Carex walteriana*   OBL
**spikerush**   *Eleocharis* spp.   OBL
**three-way sedge**   *Dulichium arundinaceum*   OBL
**umbrella-sedge**   *Fuirena* spp.   OBL
**white-top sedge, Everglades**   *Dichromena floridensis*   FACW
**white-top sedge, giant**   *Dichromena latifolia*   OBL
**white-top sedge, starbrush**   *Dichromena colorata*   FACW
**seedbox**   *Ludwigia* spp.   OBL
**seedbox, hairy**   *Ludwigia hirtella*   FACW
**seedbox, headed**   *Ludwigia suffruticosa*   FACW
**seedbox, savanna**   *Ludwigia virgata*   FACW
**seedbox, seaside**   *Ludwigia maritima*   FACW
**seepweed**   *Suaeda* spp.   OBL
**seven-sisters**   *Crinum americanum*   OBL
**shaggytuft**   *Stenandrium floridanum*   FACW
**she-oak**   *Casuarina* spp.   FAC
**shrimp plant**   *Justicia brandegeana*   U
**silver-bell**   *Halesia diptera*   FACW
**silverhead**   *Philoxerus vermicularis*   FACW
**silverling**   *Baccharis glomeruliflora*   FAC
**skullcap, blue**   *Scutellaria lateriflora*   OBL
**skullcap, Florida**   *Scutellaria floridana*   FAC
**skullcap, rough**   *Scutellaria integrifolia*   FAC
**skullcap, South American**   *Scutellaria racemosa*   OBL

**skyflower**    *Hydrolea* spp.  OBL
**slimpod, eastern**    *Amsonia tabernaemontana*  FACW
**slimpod, stiff**    *Amsonia rigida*  FACW
**smartweed**    *Polygonum* spp.  OBL
**smartweed, silversheath**    *Polygonum argyrocoleon*  U
**smooth chaff-flower**    *Alternanthera paronychioides*  FAC
**snakeherb, swamp**    *Dyschoriste humistrata*  FACW
**snakeroot, corn**    *Eryngium aquaticum*  OBL
**snakewood, Asian**    *Colubrina asiatica*  FAC
**sneezeweed**    *Helenium* spp.  FACW
**sneezeweed, pasture**    *Helenium amarum*  FAC
**snowbell**    *Styrax americana*  OBL
**snowberry**    *Chiococca* spp.  FAC
**spadeleaf**    *Centella asiatica*  FACW
**Spanish needles**    *Bidens bipinnata*  U
**spatterdock**    *Nuphar luteum*  OBL
**speedwell, water**    *Veronica anagallis-aquatica*  OBL
**sphagnum moss**    *Sphagnum* spp.  OBL
**spicebush, northern**    *Lindera benzoin*  FACW
**spicebush, southern**    *Lindera melissaefolia*  OBL
**spider-lily**    *Hymenocallis* spp.  OBL
**spiderwort, trailing**    *Tradescantia fluminensis*  FAC
**spike-moss, meadow**    *Selaginella apoda*  FACW
**spindle-root**    *Ludwigia hirtella*  FACW
**spoon flower**    *Peltandra* spp.  OBL
**spotflower, creeping**    *Spilanthes americana*  FACW
**sprangle-top**    *Leptochloa* spp.  FACW
**sprangle-top, tropic**    *Leptochloa virgata*  FAC
**spring-cress**    *Cardamine pensylvanica*  OBL
**spurge, Florida**    *Euphorbia inundata*  FACW
**spurge, many-leaved**    *Euphorbia polyphylla*  FACW
**squarestem**    *Melanthera nivea*  FACW
**St. Andrew's cross**    *Hypericum hypericoides*  FAC
**St. John's-wort**    *Hypericum* spp.  FACW
**St. John's-wort, Atlantic**    *Hypericum reductum*  U
**St. John's-wort, Carolina**    *Hypericum nitidum*  OBL
**St. John's-wort, Chapman's**    *Hypericum chapmanii*  OBL
**St. John's-wort, dotted**    *Hypericum punctatum*  U
**St. John's-wort, Drummond's**    *Hypericum drummondii*  U
**St. John's-wort, Edison's**    *Hypericum edisonianum*  OBL
**St. John's-wort, four-petal**    *Hypericum tetrapetalum*  FAC
**St. John's-wort, marsh**    *Triadenum* spp.  OBL
**St. John's-wort, peelbark**    *Hypericum fasciculatum*  OBL
**St. John's-wort, scrub**    *Hypericum cumulicola*  U
**St. John's-wort, shrubby**    *Hypericum prolificum*  U
**St. John's-wort, small-sepal**    *Hypericum microsepalum*  U
**St. John's-wort, smooth-bark**    *Hypericum lissophloeus*  OBL
**St. John's Susan**    *Rudbeckia nitida*  FACW
**staggerbush, piedmont**    *Lyonia mariana*  FACW
**stargrasses, yellow**    *Hypoxis* spp.  FACW
**stitchwort, Godfrey's**    *Arenaria godfreyi*  FACW
**Stoke's aster**    *Stokesia laevis*  FACW
**storax**    *Styrax americana*  OBL
**string-lily**    *Crinum americanum*  OBL
**stripeseed**    *Piriqueta caroliniana*  FAC
**sugar-berry**    *Celtis laevigata*  FACW
**sumpweed, bigleaf**    *Iva frutescens*  OBL
**sunbonnet**    *Chaptalia tomentosa*  FACW
**sundew, dwarf**    *Drosera brevifolia*  FACW
**sundew, Gulf coast**    *Drosera tracyi*  OBL
**sundew, pink**    *Drosera capillaris*  FACW

**sundew, spoon-leaf**   *Drosera intermedia*   OBL
**sundew, thread-leaf**   *Drosera filiformis*   OBL
**sunflower, Florida**   *Helianthus floridanus*   FAC
**sunflower, lakeside**   *Helianthus carnosus*   FACW
**sunflower, muck**   *Helianthus simulans*   FACW
**sunflower, southeastern**   *Helianthus agrestis*   FACW
**sunflower, swamp**   *Helianthus angustifolius*   FACW
**sunflower, wetland**   *Helianthus heterophyllus*   FACW
**sunny bells, white**   *Schoenolirion elliottii*   FACW
**sunny bells, yellow**   *Schoenolirion croceum*   FACW
**swamp-lily, southern**   *Crinum americanum*   OBL
**swamp-loosestrife**   *Decodon verticillatus*   OBL
**swampprivet, eastern**   *Forestiera acuminata*   FACW
**swampprivet, Florida**   *Forestiera segregata*   FAC
**swampweed**   *Hygrophila* spp.   OBL
**sweet broom**   *Scoparia dulcis*   FAC
**sweet pepper bush**   *Clethra alnifolia*   FACW
**sweetbay**   *Magnolia virginiana var. australis*   OBL
**sweetgum**   *Liquidambar styraciflua*   FACW
**sycamore, American**   *Platanus occidentalis*   FACW
**tallow-tree, Chinese**   *Sapium sebiferum*   FAC
**thistle, Leconte's**   *Cirsium lecontei*   FACW
**thistle, Nuttall's**   *Cirsium nuttallii*   FACW
**thistle, swamp**   *Cirsium muticum*   OBL
**thoroughwort, marsh**   *Eupatorium leptophyllum*   OBL
**thoroughwort, semaphore**   *Eupatorium mikanioides*   FACW
**thoroughwort, white-bract**   *Eupatorium leucolepis*   FACW
**thoroughworts**   *Eupatorium* spp.   FAC
**tickseed, ciliate-leaf**   *Coreopsis integrifolia*   FACW
**tickseed, Florida**   *Coreopsis floridana*   FACW
**tickseed, Georgia**   *Coreopsis nudata*   OBL
**tickseed, Leavenworth's**   *Coreopsis leavenworthii*   FACW
**tickseed, sickle**   *Coreopsis falcata*   FACW
**tickseed, southeastern**   *Coreopsis gladiata*   FACW
**tickseed, tall**   *Coreopsis tripteris*   FAC
**tickseed, Texas**   *Coreopsis linifolia*   FACW
**titi, black**   *Cliftonia monophylla*   FACW
**titi, swamp**   *Cyrilla racemiflora*   FAC
**toothcup**   *Ammannia* spp.   OBL
**toothcup**   *Rotala ramosior*   OBL
**torchwood, black**   *Erithalis fruticosa*   FAC
**touch-me-not, spotted**   *Impatiens capensis*   OBL
**trema**   *Trema* spp.   FAC
**tulip tree**   *Liriodendron tulipifera*   FACW
**tupelo, ogeechee**   *Nyssa ogeche*   OBL
**tupelo, swamp**   *Nyssa sylvatica var. biflora*   OBL
**tupelo, water**   *Nyssa aquatica*   OBL
**turtleweed**   *Batis maritima*   OBL
**twinflower, swamp**   *Dyschoriste humistrata*   FACW
**vanillaleaf; vanilla plant**   *Carphephorus odoratissimus*   FAC
**Venus' flytrap**   *Dionaea muscipula*   FACW
**vervain, sandpaper**   *Verbena scabra*   FACW
**vetch, Florida**   *Vicia floridana*   FACW
**vetch, four-leaf**   *Vicia acutifolia*   FACW
**vetch, Ocala**   *Vicia ocalensis*   OBL
**viburnum, possum-haw**   *Viburnum nudum*   FACW
**viburnum, walter**   *Viburnum obovatum*   FACW
**violet, edible**   *Viola esculenta*   FACW
**violet, lance-leaf**   *Viola lanceolata*   OBL
**violet, Leconte's**   *Viola affinis*   FACW
**violet, primrose-leaf**   *Viola primulifolia*   FACW

**Virginia willow**   *Itea virginica*   OBL
**water drop-wort**   *Oxypolis* spp.   OBL
**water snowflake**   *Nymphoides* spp.   OBL
**water-cress**   *Nasturtium* spp.   OBL
**water-elm**   *Planera aquatica*   OBL
**water-hemlock**   *Cicuta* spp.   OBL
**water-hoarhound**   *Lycopus* spp.   OBL
**water-hyssop**   *Bacopa* spp.   OBL
**water-lily**   *Nymphaea* spp.   OBL
**water-locust**   *Gleditsia aquatica*   OBL
**water-lotus**   *Nelumbo* spp.   OBL
**water-meal**   *Websteria confervoides*   OBL
**water-parsnip**   *Sium suave*   OBL
**water-plantain, subcordate**   *Alisma subcordatum*   OBL
**waterpod**   *Hydrolea* spp.   OBL
**water-poppy**   *Hydrocleis nymphoides*   OBL
**water-primrose**   *Ludwigia* spp.   OBL
**water-starwort**   *Callitriche* spp.   OBL
**water-willow**   *Justicia* spp.   OBL
**wax myrtle**   *Myrica cerifera*   FAC
**waxweed, Columbia**   *Cuphea carthagenensis*   FAC
**waxweed, common**   *Cuphea aspera*   FACW
**wedgescale, swamp**   *Sphenopholis pensylvanica*   OBL
**white-cedar, Atlantic**   *Chamaecyparis thyoides*   OBL
**whitenymph**   *Trepocarpus aethusae*   FACW
**wild coffee**   *Psychotria* spp.   FAC
**wild corndog**   *Typha* spp.   OBL
**wild dilly**   *Manilkara bahamensis*   FAC
**wild petunia**   *Ruellia caroliniensis*   FAC
**wild taro**   *Colocasia esculenta*   OBL
**wild-petunia, Britton's**   *Ruellia brittoniana*   FAC
**wild-petunia, night-flowering**   *Ruellia noctiflora*   FACW
**willow**   *Salix* spp.   OBL
**winterberry**   *Ilex verticillata*   OBL
**witch-alder, dwarf**   *Fothergilla gardenii*   FACW
**wood-nettle, Canada**   *Laportea canadensis*   FACW
**wood-sage**   *Teucrium canadense*   FACW
**woolly-berry**   *Gaylussacia mosieri*   FACW
**yellow stargrasses**   *Hypoxis* spp.   FACW
**yellow-cress**   *Rorippa* spp.   OBL
**yellow-eyed grass**   *Xyris* spp.   OBL
**yellow-eyed-grass, Carolina**   *Xyris caroliniana*   FACW
**yellow-eyed-grass, Richard's**   *Xyris jupicai*   FACW
**yellow-poplar**   *Liriodendron tulipifera*   FACW
**yellow-root, shrubby**   *Xanthorhiza simplicissima*   FACW
**yellowtop, clustered**   *Flaveria trinervia*   FAC
**yellowtop, coastalplain**   *Flaveria bidentis*   FAC
**yellowtop, Florida**   *Flaveria floridana*   FACW
**yellowtop, narrowleaf**   *Flaveria linearis*   FACW
**yerba de Tajo**   *Eclipta alba*   FACW

## Recommended 5-Step Field Wetland Delineation Procedure

1. Identify the indisputable wetland area and the indisputable upland area.
2. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where the <u>vegetation</u> meets A or B test criteria.
3. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where hydrologic indicators are present.
4. Between the vegetation test boundary and the hydrologic indicator boundary, identify the most landward hydric soil boundary.
5. Applying the wetland definition and reasonable scientific judgment, evaluate and modify if necessary the most landward boundary of the wetland based on the A, B, C, or D tests delineated by the previous steps.

## Required Equipment for the Implementation of Chapter 62-340, F.A.C.

FDEP Chapter 62-340, F.A.C. Data Form
FDEP Data Form Guide
Sharpshooter Shovel (minimum soil examination of 20 inch+)
Munsell Soil Color Charts
Hand Lens (10x-15x)
Soil survey map for inspection area
Soil knife
Spray bottle (misting)
Tape measure
Compass
Camera (not a personal phone)

## Suggested Equipment for the Implementation of Chapter 62-340, F.A.C.

Appropriate plant identification manuals
Appropriate soil information documents
A copy of Chapter 62-340, F.A.C.
Florida Wetlands Delineation Manual
Towel
Pens and pencils
Permanent Markers
GPS Units
Flagging tape
Pin flags
4-foot level
Line level and string
Extra camera batteries
First Aid
Sunscreen
Insect Repellent
Plant presses
Auger
Waterproof equipment case