# Request for Verification of an Exemption

**Instructions**: This form is used to request verification whether an activity qualifies for an exemption from the Environmental Resource Permit (ERP) requirements of Sections 373.406 or 403.813(1) of the Florida Statutes (F.S.) and Rule 62-330.051 of the Florida Administrative Code (F.A.C.); and from the State 404 Program requirements of Rule 62-331, F.A.C. Alternatively, you can use the on-line self-certification site of the applicable Agency for activities that qualify for a self-certification (see below).

Notice is **not required** to conduct most exempt activities However, verification of such qualification is helpful for the following reasons:

- Certain projects in retained waters may qualify for the State Programmatic General Permit (SPGP). If the project qualifies for and receives SPGP authorization, you do not need to apply separately to the Corps; and
- To provide assurance to persons who are unsure whether the requested work qualifies for an exemption. If it does not, the information provided will expedite the process of applying for the applicable ERP and/or State 404 Program permit.

Prior notice to the Agency **is required** before conducting one or more of the following:

- Activities having minimal impact under Section 373.406(6), F.S., often referred to as a "*de minimis*" exemption.
- Maintenance dredging under Section 403.813(1)(f), F.S., and paragraph 62-330.050(7)(a), F.A.C., when the dredging is within previously dredged portions of natural water bodies within drainage rights-of-way or drainage easements which have been recorded in the public records of the county.
- The repair, stabilization, or paving of existing county-maintained roads and the repair or replacement of bridges that are part of the roadway under Section 403.813(1)(t), F.S., and paragraph 62-330.050(4)(e), F.A.C.
- Removal by an individual, residential property owner of organic detrital material from freshwater rivers or lakes that have a natural sand or rocky substrate and that are not located in an Aquatic Preserve under Section 403.813(1)(u), F.S., and paragraph 62-330.050(3)(b), F.A.C.
- Maintenance dredging at seaports under Section 403.813(3), F.S., and paragraph 62-330.050(7)(g), F.A.C.
- Minor silvicultural surface water management systems under Rule 62-330.0511, F.A.C. (Note—do not use THIS form for that notice; instead use the procedures in Rule 62-330.0511, F.A.C.)
- Dry borrow pits of less than five acres located entirely in uplands in accordance with subsection 62-330.051(16), F.A.C.

Exempt activities on state-owned submerged lands (SSL), other than those excepted in paragraph 18-21.0051(1)(a), F.A.C., must also be authorized by the Board of Trustees of the Internal Improvement Trust Fund (BOT). Authorization to use SSL is not linked with regulatory exemptions; therefore, it is possible to qualify for a regulatory exemption, yet not be authorized to conduct the activity until the separate SSL authorization is granted. If an activity may be located in, on, or over SSL, we recommend completing Section F of the Environmental Resource Permit Application form.

Requests to "self-certify" a private, single-family dock or a boat lift associated with such a dock must be submitted to the Department's Internet site at: http://www.fldepportal.com/go/ and CANNOT be made using this form. However, requests to verify construction of a dock or boat lift that does not qualify for self-certification may be made using this form.

Any submittal requesting verification of an exemption must also include:

- Location map(s) of sufficient detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity.
- One set of plans and drawings, calculations, environmental information, and other supporting documents that clearly and legibly depict and describe the proposed activities in sufficient detail to demonstrate that the work qualifies for the exemption.
- The required fee.

     

**We recommend contacting your local Corps district office if your project is not within state-assumed waters regulated under Chapter 62-331, F.A.C., does not qualify for the State Programmatic General Permit (SPGP), and you are not sure whether the project requires separate Corps authorization. If Corps authorization is required, you will need to submit the appropriate federal application form separately to the Corps. Corps contact information may be found online in the Jacksonville District Regulatory Division website.**

**Please identify the exemption(s) you are requesting to use:**

☐  Subsection/Paragraph 62-330.      (      ), F.A.C.
☐  Section 373.406(6), F.S. (known as the "*de minimis*" exemption — see section 3.2.7(c) of Applicant's Handbook Volume I for additional information)
☐  Section 373.406(      ), F.S.
☐  Section 373.4145(6)(      ), F.S. (for certain "grandfathered" activities in the Panhandle of Florida)
☐  Section 403.813(1)(      ), F.S. (generally, "dredge and fill" exemptions)
☐  40 CFR § 232.3(c)(      ) (State 404 Program exemptions incorporated in 62-331.020, F.A.C.)
☐  I do not know the exemption number

Please provide numbers for additional or other exemptions if you are requesting to use more than one in one of the above list categories:

## *Part 1: General Information*

### A.  Contact

Last Name:                        First Name:                        Middle:

Title:          Company:

Address:

City:          State:                    Zip:

Home Telephone:                    Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### B.  Land Owner(s) (if different or in addition to contact identified above)

Last Name:                        First Name:                        Middle:

Title:          Company:

Address:

City:          State:                    Zip:

Home Telephone:                    Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail:☐

**C.  Consultant/Agent (if different or in addition to contact identified above)**

Last Name:                          First Name:                     Middle:

Title:              Company:

Address:

City:              State:                        Zip:

Home Telephone:                     Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail:☐

**D.  Location of Proposed Activities**

Tax Parcel Identification Number:

Address:

City:              County:                        Zip:

Latitude (DMS)           °        ′        ″      Longitude (DMS)        °        ′        ″

**E.  Name of Project** (if there is one):

**F.  Date Activity is Proposed:**        To Commence:               To be Completed:

**G.  Proposed Activities** (be specific; use additional sheets as necessary)

Describe in general terms the proposed project, system, or activity (including materials to be used and construction methods), and means of accessing the property (for construction, maintenance, and inspections, including any need for an access easement):

**H.  Is any work proposed in wetlands or other surface waters?** ☐ Yes  ☐ No. If yes, please specifically describe, with specific references as to how the limits of the proposed work will comply with the terms and conditions of the above exemption:

**I.**  Please provide a description of all **sediment and erosion controls** to be used during the completion of this activity (such as use of turbidity screens and silt fences):

## *Part 2: Acknowledgement*

I understand this form is being provided solely to seek verification of qualification to use one or more Environmental Resource Permit (ERP) and/or State 404 Program exemption(s), and that I am NOT requesting the Agency to process this form as an application for a permit.

**☐    By checking this box**, I hereby waive, in accordance with Rule 62-330.050(10), F.A.C., the 30-day deadline for issuance of the verification set forth in Rule 62-330.050(4), F.A.C. in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP exemption and State 404 Program authorization be issued at the same time. *(This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times).* If this box is checked and the Agency determines that no State 404 Program authorization is required, the Agency(ies) will continue to abide by subsection 62-330.050(4), F.A.C.

I understand that the Agency will make a reasonable effort to determine, within 30 days of receipt of this form, whether the proposed activities qualify for an exemption, unless this timeframe has been waived, above. If they do not, the Agency will provide its determination that the requested activity does not meet the terms and conditions of an ERP or State 404 Program exemption, at which time I may provide a new form with additional or modified information, or I may submit an application for an ERP and/or State 404 Program permit. In either case, denial of qualification to use an exemption will be made without prejudice, pending submittal of clarification of any errors or omissions contained in this form or other information that demonstrates compliance with the terms and conditions of the exemption.

Typed/Printed Name:                          Signature: _____          Date:

**Certification of Sufficient Real Property Interest and Authorization for Staff to Access to the Property:**
**I certify that:**

I, or the person I represent, hereby certify that I, or that person, possess sufficient real property interest in or control, as defined in **Section 4.2.3(d) of Applicant's Handbook Volume I**, over the land upon which the activities described in this form are proposed, and that I have, or that landowner has given me, legal authority to grant permission for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed activities specified in this form. If such sufficient real property interest is based on an entity having *the power of eminent domain and condemnation authority*, I/we shall make appropriate arrangements to enable staff of the Agency to access, inspect, and sample the property as described above.

Typed/Printed Name:                          Signature: _____          Date:

(Corporate Title if applicable):

## *Part 3: Submittal and Fees*

This form and the appropriate fee should be submitted to the agency having regulatory authority for the activity. Operating Agreements between the Department and the water management districts spell out which agency will process any given application. For more information go to https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/submitting-erp.

This form may be submitted online; to do so, follow the online submittal requirements of the agency:

- **Florida Department of Environmental Protection:**
  **http://www.fldepportal.com/go/**

- **Northwest Florida Water Management District:**
  **https://permitting.sjrwmd.com/nwepermitting/jsp/start.jsp**
- **Suwannee River Water Management District:**
  **https://permitting.sjrwmd.com/srepermitting/jsp/start.jsp**
- **St. Johns River Water Management District:**
  **https://permitting.sjrwmd.com/epermitting/jsp/AccountOverview.do?command=init**
- **Southwest Florida Water Management District:**
  **http://www.swfwmd.state.fl.us/permits/epermitting/**
- **South Florida Water Management District:**
  **http://my.sfwmd.gov/ePermitting/MainPage.do**

If submitting a paper version of this form, please see (Appendix A) of the Environmental Resource Permit Applicant's Handbook Volume I for submittal locations.

# Application for

# Individual and Conceptual Approval

# Environmental Resource Permit,

# State 404 Program Permit,

# and Authorization to Use State-Owned

# Submerged Lands

Florida Department of Environmental Protection/

Water Management Districts

Effective [date]



**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**,
Page 1 of 10

**Instructions for Use of This Form:**

This form is designed to assist you in submitting a complete application. All applications must include Section A-General Information for All Activities. Sections B through H list typical information that is needed based on the proposed activities and are only required as applicable. Part 1-C of Section A will guide you to the correct sections needed based on your proposed activities. Applicants are advised to consult Chapter 62-330, F.A.C., and the Environmental Resource Permit Applicant's Handbook Volumes I and II for information regarding the ERP permitting process and requirements while preparing their application. Internet addresses for Chapter 62-330, F.A.C., and the Applicant's Handbook, Agency contact information, and additional instructions for this form can be found in Attachment 1.

# What Sections of the Application Must I Fill Out?

| Type of Activity | Section A | Section B | Section C | Section D | Section E | Section F | Section G | Section H | Section I |
|---|---|---|---|---|---|---|---|---|---|
| Fill in wetlands or waters for a single family residence? | Y | Y | N | N | N | N | N | N | Y, if in assumed waters |
| Docks, shoreline stabilization, seawalls associated with a single family residence? | Y | Y | N | N | N | Y, as needed | N | N | Y, if in assumed waters |
| Wetland impacts (other than association with an individual residence)? | Y | N | Y | N | N | N | N | N | Y, if in assumed waters |
| Boating facilities, a marina, jetty, reef, or dredging? | Y | N | Y | Y | N | Y, as needed | N | N | Y, if in assumed waters |
| Any work on state owned submerged land? | Y | N | Y | N | N | Y | N | N | Y, if in assumed waters |
| Construction of a stormwater management system? | Y | N | Y, as needed | N | Y | N | N | N | N |
| Constructing a mitigation bank? | Y | N | Y | N | Y, as needed | N | Y | N | Y, if in assumed waters |
| Creating a mine? | Y | N | Y, as needed | N | N | N | N | Y | Y, if in assumed waters |

**If you have any questions, or would like assistance completing this form, please contact the staff of the nearest office of either the Florida Department of Environmental Protection (DEP) or a Water Management District (WMD) (see Attachment 2).**

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                              **Section A**,
Page 2 of 10

# Section A:
# General Information for All Activities

## Part 1: Name, Application Type, Location, and Description of Activity

A.  Name of project, including phase if applicable:

B.  This is for (check all that apply):

☐  Construction and operation of **new** works, activities, and/ or a stormwater management system

☐  **Conceptual Approval** of proposed works, activities and/ or a stormwater management system

☐  Modification or alteration of **existing** works, activities, and/or a stormwater management system. Provide the existing DEP or WMD permit #, if known:        Note: Minor modifications do not require completion of this form, and may instead be requested by letter in accordance with section 6.2 of Applicant's Handbook Volume I.

☐  **Maintenance or repair** of works, activities, and/ or a stormwater management system previously permitted by the DEP or WMD. Provide existing permit #, if known:

☐  Abandonment or removal of works, activities, and/ or a stormwater management system.

Provide existing DEP or WMD permit #, if known:

☐  Operation of an **existing unpermitted** work, activity, and/or stormwater management system.

☐  Construction of additional phases of a permitted work, activity, or system.

Provide the existing DEP or WMD permit #, if known:

☐  A State 404 Program authorization:

☐ Exemption   ☐ General Permit   ☐ Individual Permit

If requesting an Exemption or General Permit provide Rule #, if known:

☐   **By checking this box**, I hereby voluntarily waive, in accordance with Rule 62-330.090(8), F.A.C., the agency action deadlines in section 5.5.3 of Volume I in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP and State 404 Program authorizations be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.) If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency will continue to abide by section 5.5.3 of Volume I.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)
**Section A,**                                                                                     Page 3 of 10

C.  **List the type of activities proposed. Check all that apply**, **and provide the supplemental information requested in each of the referenced application sections.** Please also reference Applicant's Handbook Volumes I and II for the type of information that may be needed.

☐  Activities associated with one single-family residence, duplex, triplex, or quadruplex that do not qualify for an exemption or a General Permit: **Provide the information requested in Section B. Do not complete Section C.**

☐  Activities within wetlands or surface waters, or within 25 feet of a wetland or surface water, (not including the activities associated with an individual single-family residence). Examples include dredging, filling, outfall structures, docks, piers, over-water structures, shoreline stabilization, mitigation, reclamation, and restoration/enhancement. **Provide the information requested in Section C.**

☐  Activities within navigable or flowing surface waters such as a multi-slip dock or marina, dry storage facility, dredging, bridge, breakwaters, reefs, or other offshore structures: **In addition to Section C, also provide the information requested in Section D.**

☐  Activities that are (or may be) located within, on, or over state-owned submerged lands (See Chapter 18-21, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=18-21): **In addition to Section B or C, also provide the information requested in Section F.**

☐  Construction or alteration of a stormwater management system serving residential, commercial, transportation, industrial, agricultural, or other land uses, or a solid waste facility (excluding mines that are regulated by DEP). **Provide the information requested in Section E.**

☐  Creation or modification of a Mitigation Bank (refer to Chapter 62-342, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=62-342): **Provide the information requested in Section G.**

☐  Mines (as defined in Section 2.0 of Applicant's Handbook Volume I) that are regulated by the DEP: **Provide the information requested in Section H.**

☐  Other, describe:        Please contact the Agency to determine which additional sections of the application are needed. See Attachment 2 for Agency contacts.

D.  Describe in general terms the proposed project, system, works, or other activities. For permit modifications, please briefly describe the changes requested to the permit:

E.  Project/Activity Street/Road Address or other location (if applicable):
City:                    County(ies):                    Zip:

Note: For utility, road, or ditch/canal activities, provide a starting and ending point using street names and nearest house numbers or provide length of project in miles along named streets or highways.

F.  Project location map and Section, Township, and Range information (use additional sheets if needed)

**Please attach a location map showing the location and boundaries of the proposed activity in relation to major intersections or other landmarks. The map should also contain a north arrow and a graphic scale; show Section(s), Township(s), and Range(s); and must be of sufficient detail to allow a person unfamiliar with the site to find it.**

Section(s):        Township:        Range:        Land Grant name, if applicable:

Section(s):        Township:        Range:

1.  Section(s):        Township:                Range:

G.  Latitude (DMS)        °        '        "  Longitude (DMS)        °        '        "  (Taken from central location of the activity). Explain source for obtaining latitude and longitude (i.e. U.S.G.S. Quadrangle Map, GPS, online resource):

H.  Tax Parcel Identification Number(s):

[Number may be obtained from property tax bill or from the county property appraiser's office; if on multiple parcels, provide multiple Tax Parcel Identification Numbers]

I.  Directions to Site (from major roads; include distances and landmarks as applicable):        .

J.  Project area or phase area:        acres

K.  Name of waterbody(ies) (if known) in which activities will occur or into which the system will discharge:

**The following questions (M-O) are not applicable to activities related to an individual single-family residence, including a dock, pier, and/or seawall associated with that residence.**

L.  Is it part of a larger plan of development or sale?        ☐ yes  ☐ no

M.  Impervious or semi-impervious area excluding wetlands and other surface waters (if applicable):

        acres or        square feet

N.  Volume of water the system is capable of impounding (if applicable):

Normal Pool:        acre-feet.  Depth        ft.
Maximum Pool:        acre-feet.  Depth        ft.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)        **Section A**,
Page 5 of 10

Case 1:21-cv-00119-RDM    Document 52    Filed 06/22/21    Page 11 of 168


**Part 2: Supplemental Information, and Permit History**

A.  Is this an application to modify an existing Environmental Resource Permit or to construct or implement part of a multi-phase project, such as a project with a Conceptual Approval permit?  ☐ Yes   ☐ No (If you answered "yes", please provide permit numbers below*):*

| Agency | Date | Permit/Application No. | Project Name |
|--------|------|------------------------|--------------|
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |

B.  Indicate if there have been any **pre-application meeting(s)** with the DEP, WMD, or delegated local government, or other discussions, meetings, or coordination with other stakeholders or agencies about the proposed project, system or activity. If so, please provide the date(s), location(s) of the meeting, and the name(s) of Agency staff that attended the meeting(s):

| Agency | Date | Location | Meeting Attendees |
|--------|------|----------|-------------------|
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |

C.  **Attach a depiction (plan and section views), which clearly shows the works or other activities proposed to be constructed.** Use multiple sheets, if necessary, a scale sufficient to show the location and type of works, and include a north arrow and a key to any symbols used. **Specific information to be included in the plans is based on the activities proposed and is further described in Sections B-H**. However, supplemental information may be required based on the specific circumstances or location of the proposed works or other activies.

D.  Processing Fee: **Please submit the application processing fee along with this application form and supplemental information.** Processing fees vary based on the size of the activity, the type of permit applied for, and the reviewing Agency. Please reference Appendix D of Applicant's Handbook Volume I to determine the appropriate fee.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                     **Section A**,
Page 6 of 10

## Part 3:  Applicant and Associated Parties Information

Instructions: Please complete the following sections. For corporations, list a person who is a registered agent or officer of the corporation who has the legal authority to bind the corporation.

### A.  Applicant (Entity Must Have Sufficient Real Property Interest)
☐ **This is a Contact Person for Additional Information**

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone:                             E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### B.  Land Owner(S) (If Different or in Addition to Applicant)
☐ **Check here if land owner is also a co-applicant**

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone:                             E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### C.  Operation and Maintenance Entity(see Applicant's Handbook I, Section 12.3)

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone:                             E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### D.  Co-Applicant (If Different or In Addition to Applicant and Owner)

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                    **Section A**,
Page 7 of 10

**E.   Registered Professional Consultant**
☐This is a contact person for additional information

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**F.   Environmental Consultant**
☐This is a contact person for additional information

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**G.   Agent Authorized to Secure Permit (If Different from Consultant)**

Last Name:                              First Name:                              Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                                  Zip:
Home Telephone:                         Work Telephone:
Cell Phone
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**If necessary, please add additional pages for other contacts and property owners related to this project.**

**H.   Real Property Interest**

    a.   Permits are only issued to entities having sufficient real property interest as described in Section 4.2.3(d) of Applicant's Handbook Volume I. **Please attach evidence of the applicant's real property interest over the land upon which the activities subject to the application will be conducted, including mitigation areas (if applicable).** Refer to Sections 4.2.3(d)-(e) for sufficient real property interest documentation.

    b.   For activities that require a recorded notice in accordance with rule 62-330.090(7), F.A.C., please provide either the complete legal description of the property or a copy of the pages of the document recorded in the public records that contains the complete legal description. If the land upon which the proposed activities are to occur is not owned by the applicant, the applicant must also provide copies of any right-of-way, leases, easements, or other legal agreement which authorizes the applicant to perform the activities on those lands.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                    **Section A**,
Page 8 of 10

## Part 4: Signatures and Authorization to Access Property

Instructions: For multiple applicants please provide a separate Part 4 for each applicant. For corporations, the application must be signed by a person authorized to bind the corporation. A person who has sufficient real property interest (see Section 4.2.3(d) of Applicant's Handbook Volume I) is required in (B) to authorize access to the property, except when the applicant has the power of eminent domain.


**A.**   By signing this application form, I am applying for the permit and any proprietary authorizations identified above, according to the supporting data and other incidental information filed with this application. I am familiar with the information contained in this application and represent that such information is true, complete and accurate. I understand this is an application and not a permit, and that work prior to approval is a violation. I understand that this application and any permit issued or proprietary authorization issued pursuant thereto does not relieve me of any obligation for obtaining any other required federal, state, water management district, or local permit prior to commencement of construction. I agree to operate and maintain the permitted system unless the permitting agency authorizes transfer of the permit to a different responsible operation and maintenance entity. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S. and 18 U.S.C. Section 1001.


Typed/Printed Name of Applicant or          Signature of Applicant or Applicant's           Date
Applicant's Authorized Agent                Authorized Agent


(Corporate Title if applicable)


**B.   Certification of Sufficient Real Property Interest And Authorization For Staff To Access The Property:**

**I certify that:**

☐ **I possess sufficient real property interest in or control, as defined in Section 4.2.3 (d) of Applicant's Handbook Volume I,** over the land upon which the activities described in this application are proposed and I have legal authority to grant permission to access those lands. I hereby grant permission, evidenced by my signature below, for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed works and other activities specified in this application, upon advance notice. I authorize these agents or personnel to enter the property as many times as may be necessary to make such review, inspection, and/ or sampling. Further, if a permit is granted, upon advance notice, I agree to provide entry to the project site for such agents or personnel with proper identification to determine compliance with permit conditions and permitted plans and specifications.

            **OR**

☐ I represent an entity having **the power of eminent domain and condemnation authority**, and I/we shall make appropriate arrangements to enable staff of the Agency to legally access, inspect, and sample the property as described above.


Typed/Printed Name                          Signature                                        Date


(Corporate Title if applicable)


**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                              **Section A**,
                                                                                                          Page 9 of 10

**C.  Designation of Authorized Agent (If Applicable):**

I hereby designate and authorize          to act on my behalf, or on behalf of my corporation, as the agent in the processing of this application for the permit and/or proprietary authorization indicated above and to furnish, on request, supplemental information in support of the application. In addition, I authorize the above-listed agent to bind me, or my corporation, to perform any requirements which may be necessary to procure the permit or authorization indicated above. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S., and 18 U.S.C. Section 1001.

‾‾‾‾‾‾
Typed/Printed Name of Applicant                 Signature of Applicant                              Date

(Corporate Title if applicable)

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                          **Section A**,
                                                                                                                          Page 10 of 10

# Section B:
# For Single-Family Projects

Instructions: This section is for providing supplemental information required for works or other activities involving one individual single-family (including a duplex, triplex or quadruplex) residential property that do not qualify for an exemption or general permit. This is intended to be used in conjunction with the Applicant's Handbook, Vol. I & II, and the State 404 Program Applicant's Handbook. The Agency will also provide a copy of the application to the Florida Fish and Wildlife Conservation Commission, the Department of State's Division of Historical Resources, and other agencies as applicable for review. Activities reviewed under the State 404 Program will be placed on public notice upon receipt of an administratively complete application. Project modifications may be required as a result of comments received by those agencies or through public notice. The supplemental information required by this section is in addition to the information required by Section A of the application.

## Part I: Project Information Summary

1. Does the project include construction of any docks, piers, or other types of over-water structures or mooring areas?
   ☐ yes (complete items a. through f., below)     ☐ no (skip to #2)

   a. Total square feet of structure(s) over water:
      existing:            new:              proposed total:

   b. Type of materials (e.g., treated wood, plastic, concrete, etc.) for the:
      dock structure:                    pilings:

   c. Proposed dock plank spacing (if applicable):

   d. Number of in-water slips or mooring areas for vessels:
      existing:            new:              proposed total:

   e. Please indicate the size (length and draft) and type of vessels that will be mooring at the dock or structure:

   f. Please address how the dock, pier, or other structures or mooring areas will not significantly impede navigation within the waterbody:

2. Does the project include construction of any shoreline stabilization, such as riprap revetment, living shoreline, or seawall?
   ☐ yes (complete items a. through f., below)     ☐ no (skip to #3)

   a. Linear feet of shoreline (at the mean or ordinary high water line) proposed to be stabilized or modified:

   b. Describe the existing condition of the shoreline, including vegetation:

   c. Is the proposed shoreline stabilization limited solely to repair/replacement of existing structures of the same type and design?
      ☐ Yes           ☐ No           ☐ I don't know

   d. Type(s) of shoreline stabilization proposed (check all that apply):
      ☐ living shoreline   ☐ vertical seawall   ☐ riprap or other sloped revetment

     

e. Please describe the type(s) of material (e.g. riprap, treated wood, concrete, plastic or steel sheetpile) to be used to construct the shoreline stabilization structure(s). If riprap is proposed, describe the type and average diameter or size:

f. If the project involves construction or repair of any vertical seawalls, will it be located entirely within a manmade canal that is currently occupied (at least in part) by vertical seawalls?
☐ Yes        ☐ No        ☐ Not applicable/no vertical seawalls proposed
*If the answer is "no", it is recommended that you contact the reviewing agency prior to submitting your application.*

3. Does the project include construction of any boat ramp or launch area?
☐ yes (complete items a. through e., below)        ☐ no (skip to #4)

a. Material to be used as a base and surface fill:

b. Methods and materials for side slope stabilization:

c. Method and equipment to be used during dredging and construction:

d. Approximate amount of material that needs to be dredged, if any. Please indicate the total square footage of area and the number of cubic yards of material.

e. Approximate amount of fill material, if any. Please indicate the total square footage of area and the number of cubic yards of material.

4. Does the project include any other type of dredging or filling of wetlands or other surface waters?
☐ yes (complete items a. through f., below)        ☐ no (skip to #5)

a. Total square feet of the area(s) to be dredged:

b. Total square feet of the area(s) to be filled:

c. Total volume of material to be dredged:            cubic yards

d. Final depth of proposed dredge area in feet, relative to mean low water (tidal waters) or ordinary or seasonal high water (for non-tidal waters):

e. Methods and equipment to be used during dredging and/or filling:

f. How and where will dredged material be stored and disposed? *Include a description of any temporary stockpile areas and best management practices (BMPs)*:

5. Total area of work (dredging, filling, construction, alteration, or removal) in, on, or over wetlands or other surface waters:            square feet;            acres

6. Please provide the name (if known) of the wetland or other surface waterbody in which the proposed work or activities will occur. *Be advised that individual waterbodies or wetlands, or geographic areas, may have certain legal designations that affect the permitting requirements for your project. Examples of such designations include Aquatic Preserves, Outstanding Florida Waters, Special Basins, Riparian Habitat Protection Zones, Class II or other classified shellfishing waters, and impaired waters. It is recommended that you contact your local agency office to determine if your project is located within any such waters prior to submitting your application.*
Waterbody:            ☐ I don't know

**Part II: Environmental Considerations**

1. **Elimination or Reduction of Impacts (Avoidance and Minimization)** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.1 through 10.2.1.3)*

   Please describe measures taken to eliminate or reduce impacts to wetlands and other surface waters.

   *If all practicable modifications have been made to reduce or eliminate adverse impacts to wetland or surface water functions, including functions provided to fish, wildlife and listed species, and adverse impacts remain, mitigation may be required. It is recommended that you discuss mitigation requirements with the reviewing agency, prior to submitting this application. For more information, refer to Applicant's Handbook, Vol. I, s. 10.2.2 through 10.2.2.4, and s. 10.3 through 10.3.8; and the State 404 Program Applicant's Handbook s. 8.5., if applicable. If you have a mitigation proposal, you may include it with your application submittal.*

2. **Public Interest Test** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.3 through 10.2.3.7)*

   **You are not required to complete this question – it is optional.** Please be advised that the reviewing agency will determine whether the proposed activity will be ***not contrary*** to the public interest, **OR** if such activity will significantly degrade or is located within an Outstanding Florida Water (OFW), that the activity will be ***clearly in*** the public interest. To make this determination, the agency will consider the following:

   a. Whether the regulated activity will adversely affect public health, safety, or the welfare or the property of others

   b. Whether the regulated activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats

   c. Whether the regulated activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling

   d. Whether the regulated activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity

   e. Whether the regulated activity will be of a temporary or permanent nature

   f. Whether the regulated activity will adversely affect significant historical and archaeological resources, under the provisions of section 267.061, F.S.

   g. Whether the regulated activity will adversely affect the current condition and relative value of functions being performed by areas affected by the proposed regulated activity.

   If you wish to describe additional measures taken to place your project clearly in (or not contrary to) the public interest, as described above, please do so here:

3. **Water Quality** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.4 through 10.2.4.5)*

   Please describe how the proposed project will be designed to not violate water quality standards. *Include descriptions of all proposed turbidity, erosion, and sedimentation control measures:*

**4.  Secondary Impacts** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.7)*

Will an upland buffer, **with a minimum width of 15' and an average width of at least 25'**, be provided between the proposed project and all wetlands and other surface waters to be preserved, enhanced, restored, or created?  ☐ Yes    ☐ No

If no, please describe how the project will be designed and constructed to avoid adverse secondary impacts to the water resource:

**5.  Water Quantity** *(Refer to the Design and Performance Guidance for an Individual Private, Residential Single-Family Residence Involving Dredging or Filling in Wetlands or Other Surface Waters found in Applicant's Handbook, Vol. I, References and Design Aids)*

Please describe how the proposed project will be designed and constructed to avoid causing the following:

Adverse water quantity impacts to receiving waters and adjacent lands:

Adverse flooding to on-site or off-site property:

Adverse impacts to existing surface water storage and conveyance capabilities.

**Part III: Plans**
Attach depictions (plan and section views), which clearly show all proposed structures or works. Use multiple sheets if necessary. Plans should be scaled, dimensioned, and legible. Use a scale sufficient to show the location and type of works. *Be advised that certain items may require the services of a Florida registered professional.* At a minimum, plans must include the information listed below as applicable, based on the activity proposed:

**1.  All Activities**
☐ Project location map that clearly depicts the location of all proposed activities
☐ Location of property lines, including linear feet of shoreline owned by the applicant
☐ Mean high water line (MHWL) (tidal waters) or ordinary (or seasonal) high water line (OHWL) (non-tidal waters)
☐ The location and dimensions (length, width, height) of all existing and proposed structures or works located in, on, or over wetlands or other surface waters, within the project area
☐ Detailed cross-section views with complete dimensions
☐ The boundaries, size (square feet and acres), and type of each wetland (including herbaceous, forested, mangroves, seagrass, and other submerged/emergent vegetation) and other surface water in the project area
☐ Clearly shade or hatch each dredge or fill area, and label with the area (acres and square feet) and volume (cubic yards)
☐ Location and type of all proposed turbidity, erosion, and sedimentation control measures

**2.  Docks, Piers, Boat Slips, and Ramps**
☐ Profile-view drawings that clearly show the elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters) and water depth, in relation to mean low water (tidal waters) or ordinary or seasonal low water (non-tidal waters) at mooring sites and the bottom of the boat ramp (if applicable)
☐ Show width of waterway and the path and distance between the waterward end of the structure and the nearest marked navigation channel
☐ Number each slip
☐ Show and label width of deck planks and plank spacing

**3. Seawalls and Other Shoreline Stabilization**

☐ Location of the proposed structures in relation to MHWL (tidal waters), or OHWL (non-tidal waters), including measurements from at least 3 fixed structures or in relation to the existing structure(s), and location of new structure

☐ Cross-section drawings depicting the proposed shoreline stabilization structures (including geotextile fabric, anchors/tiebacks, and other features, if applicable) that clearly show the slope ratio (horizontal:vertical)

☐ Show how your structure will tie into neighboring structures, if applicable

☐ For living shorelines, identify the proposed plant species, and for each species, indicate the locations, spacing, and elevations relative to the mean high and low (for tidal waters) or ordinary or seasonal high (for non-tidal waters) water line

**NOTE: If any part of your project has a potential to be located on state-owned submerged lands (i.e., waterward of the line of mean or ordinary high water of rivers, streams, bays, bayous, sounds, the Gulf of Mexico, the Atlantic Ocean, or natural lakes), please complete Section F of this application, as a separate authorization may be required to conduct activities on such lands.**

# Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters

Instructions: **This section is for applications that do not involve activities associated with an individual single-family residence, duplex, triplex, or quadruplex. For those activities, please use Section B.** This form is to be completed if the proposed work or activity will occur in, on, over, or within 25 feet of a wetland or other surface water. The supplemental information required by this section is in addition to the information required by Section A of the application.

## Part 1: Wetland or Other Surface Water Impact Summary

1. Describe the basic purpose of the project or activity:

2. Total area of work (dredging, filling, construction, alteration, or removal) in, on, or over wetlands or other surface waters:        sq. ft.;        ac.

3. Total volume of material to be dredged or filled in wetlands or other surface waters:
   a. to be dredged:        cubic yards,
   b. to be filled:        cubic yards.

4. Identify the seasonal high water level (SHWL) and wetland normal pool elevations for each wetland or surface water within the project site. For tidal wetlands and/or surface waters provide the elevation of mean high and mean low water. Include an aerial photograph showing the location of each sampling location, dates, datum, and methods used to determine these elevations.

5. Name of waterbody(ies) (if applicable & if known) in which work will occur?

6. Is the activity proposed in an Outstanding Florida Water or Aquatic Preserve?
   ☐ yes, name:        ☐ no        ☐ I don't know

7. Has there ever been a formal or informal wetland determination for the project site? If yes, provide the identifying number and/or a copy of the jurisdictional map.

8. Provide a map(s) of the project area and vicinity delineating USDA/NRCS soil types.

9. Provide recent aerials legible for photointerpretation (no photocopies) with a scale of 1" = 400 ft, or more detailed, with project boundaries and wetland boundaries delineated on the aerial.

10. Provide maps accurately portraying the existing and proposed natural vegetative community types and land cover classifications using recognized classification schemes. Suggested sources include: the Florida Natural Areas Inventory Guide to the Natural Communities of Florida (2010) available at http://www.fnai.org/naturalcommguide.cfm, or the Florida Land Use and Cover Classification System (FLUCCS) (FDOT 1999, available at http://www.dot.state.fl.us/surveyingandmapping/documentsandpubs/fluccmanual1999.pdf). For

     

vegetated areas dominated by exotic vegetation, use the descriptors representative of the native community type that was present prior to exotic infestation.

11. Impact Summary Tables (located at the end of this section):
    a. For all projects, complete Table 1, 2 and 3 as applicable.
    b. For shoreline stabilization projects, provide the information requested in Table 4.

12. If the activity is located on state owned submerged lands and requires a lease or easement, provide a list of names and addresses from the latest county tax assessment roll of all property owners located within a 500 ft. radius of the proposed lease or easement boundary in mailing label format, or you may elect to send notice to those persons by certified mail, with the return-receipt card addressed to the DEP or water management district, as applicable, in accordance with subsection 18-21.005(3), F.A.C., and Section 253.115, F.S. Attach additional sheets if necessary.
    1. Name:
       Mailing Address:
       City, State, Zip Code:

    2. Name:
       Mailing Address:
       City, State, Zip Code:

    3. Name:
       Mailing Address:
       City, State, Zip Code:

    4. Name:
       Mailing Address:
       City, State, Zip Code:

    5. Name:
       Mailing Address:
       City, State, Zip Code:

    6. Name:
       Mailing Address:
       City, State, Zip Code:

**Part 2: Environmental Considerations**

Note: for many questions, a state statute/Applicant's Handbook Volume I (AH I)/State 404 Program Applicant's Handbook section is cited to assist the applicant in addressing these questions.

1. Elimination or Reduction of Impacts (Avoidance and Minimization). Describe measures taken to eliminate or reduce impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.1*).

2. Fish, Wildlife, Listed Species, and their Habitats. Provide results of any wildlife assessments that have been conducted on the project site and provide any comments, biological opinions, formal or informal consultation decisions, or recommended actions you have received pertaining to the project from the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service. (*Refer to AH I Section 10.2.2*).

3. Water quantity impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.2.4 and AH II*).

    a. Does the activity include a proposed surface water management system with a control elevation different than the wetland normal pool elevation(s) of existing or proposed created wetlands or other surface waters?

    b. If yes to (a), provide documentation (e.g. drawdown assessment or other methods) that shows the proposed surface water management system will not change the hydroperiod of the existing or created wetland or other surface water.

4. Public Interest Test. Please describe how the proposed activity will **not be contrary** to the public interest, OR if such an activity significantly degrades or is located within an Outstanding Florida Water (OFW), that the regulated activity will be **clearly in** the public interest (*Refer to AH I Section 10.2.3*).

    a. Please describe how the project will be designed to avoid adverse effects to public health, safety, or the welfare or the property of others.

    b. Please describe how the project will be designed to avoid adverse effects to the conservation of fish and wildlife, including endangered or threatened species, or their habitats.

    c. Please describe how the project will be designed to avoid adverse effects to navigation or the flow of water or cause harmful erosion or shoaling.

    d. Please describe how the project will be designed to avoid adverse effects to the fishing or recreational values or marine productivity in the vicinity of the activity.

    e. Will the project be of a temporary or permanent nature?

    f. Please describe how the project will be designed to avoid adverse impacts to significant historical and archaeological resources, under the provisions of section 267.061, F.S.

    g. Please describe how the project will be designed to avoid adverse effects to the current condition and relative value of functions being performed by areas affected by the proposed regulated activity.

5. Water Quality.
Provide a description of how water quality will be maintained in wetlands and other surface waters that will be preserved or will remain undisturbed, both on and offsite. Please address both short-term (such as during construction) and long-term water quality considerations (*Refer to AH I Section 10.2.4*).

6. Class II Waters; Waters approved for shellfish harvesting *(Refer to AH I Section 10.2.5).*

    a. Will the project occur in Class II that are NOT approved for shellfish harvesting? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(a).*

    b. Is the project located adjacent to or in close proximity to Class II waters? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(b).*

c.  Is the project located in Class II or Class III waters that are classified as "approved", "restricted", "conditionally approved", or "conditionally restricted"? If yes, demonstrate that the project meets the requirements of *AH I Section 10.2.5(c)*.

7. Vertical seawalls. Are vertical seawalls proposed in an estuary or lagoon as part of the project? If yes, please describe how the project meets the requirements of *AH I Section 10.2.6*.

8. Secondary Impacts (*AH I Section 10.2.7*).

a.  Will an upland buffer, with a minimum width of 15' and an average width of 25', be provided between the proposed activities and existing wetlands or wetlands to be preserved, enhanced, restored, or created? Provide the location and dimension of all buffers on the plans.         If not, demonstrate that secondary impacts will not occur or describe how they will be offset.

b.  If listed species are present or may be present, then coordination with wildlife agencies is needed. Have you coordinated with the FFWCC and/or USFWS? If so, please provide correspondence from the wildlife agencies indicating concurrence with the species management plan(s).

c.  What measures will be taken to avoid impacts to wetland-dependent wildlife and/or listed species that use uplands for nesting or denning?

d.  Describe whether there are any other relevant activities that are very closely linked and causally related to any proposed dredging or filling in wetlands or other surface waters that have the potential to cause impacts to significant historical and archaeological resources.

e.  Are there additional future phases or extensions of the proposed activities that are not shown? If yes, please describe.

9. Cumulative Impacts. Is the proposed mitigation located within the same drainage basin (*Refer to AH I Figures 10.2.8.1 – 10.2.8.5*) as the proposed wetland impacts?         If not, please submit a Cumulative Impact Evaluation in accordance with *AH I Section 10.2.8*.

10. Mitigation Plan (*Refer to AH I Section 10.3*).

a.  If a mitigation bank is proposed to offset wetland/other surface water impacts, provide:

i.  the name of the bank:         . A letter of reservation from the banker will be required once the application has been evaluated.
ii. If the mitigation bank was assessed using UMAM, provide UMAM worksheets for impact area(s). If the bank was assessed using a method other than UMAM, then prepare the impact assessment using the same method.

b.  If mitigation is proposed to offset wetland/other surface water impacts, please provide a mitigation plan that includes, at a minimum, the following:

i.  ☐ Proposed mitigation narrative:
    (1) ☐ Describe the current and proposed condition for each type of mitigation component (restoration, enhancement, creation, preservation), including:
        (a) ☐ Describe current and proposed vegetation

       (b) ☐ Describe current and proposed hydrologic conditions for the proposed mitigation.

       (c) ☐ Describe the soil types from NRCS maps and confirm if actual soil conditions appear to match.

   (2) ☐ Provide details of the proposed construction/mitigation activities including phasing and timing, as appropriate.

   (3) ☐ Identify measures that will be implemented during and after construction to avoid adverse impacts related to the proposed activities.

   (4) ☐ A mitigation implementation and monitoring schedule with dates.

   (5) ☐ Identify the success criteria.

   (6) ☐ Describe the anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented.

   (7) ☐ Provide a comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented.

ii. ☐ Provide a Management Plan that includes, as appropriate, aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access.

iii. ☐ Maps:

   (1) ☐ Soil map (include soil names/codes, hydrologic soil groups and hydric soil types).

   (2) ☐ Topographic map of the mitigation area and adjacent contributing and receiving areas.

   (3) ☐ Hydrologic features map of the mitigation area and adjacent contributing and receiving areas.

   (4) ☐ Vegetative communities map (using FLUCCS or other appropriate classification system).

   (5) ☐ For all maps, identify source.

iv. Provide the necessary supporting information for the application of sections 62-345.400 - .600 (Uniform Mitigation Assessment Method (UMAM)). To meet this requirement, submittal of UMAM worksheets is acceptable for impact and mitigation areas.

v. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a draft Conservation Easement document or other form of restrictive covenant that provides for protection of the mitigation area in perpetuity. Standard forms, as described in subsection 62-330.301(6), F.A.C., are available from the Agency or on its website.

vi. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a cost estimate for completing the mitigation, including monitoring and maintenance.

vii. If onsite and/or offsite applicant-responsible mitigation is proposed and the proposed mitigation exceeds $25,000, please provide a draft financial assurance document. Standard forms, as described in subsection 62-330.301(5), F.A.C., are available from the agency or on its website.

viii. Identify the entity responsible for monitoring, maintenance, and long-term stewardship of the mitigation area (i.e. the landowner or homeowner association, not the consultant or contractor that will do the work).

> Note: If your project is in retained waters, it is highly recommended that you coordinate the design of any mitigation plan that also may be required for the Corps permit to meet the requirements of both permits. Pre-application meetings with both the applicable Agency and the Corps can help you to choose a mitigation option that is acceptable to both the applicable Agency and the Corps.

**Part 3: Plans**

Plans: The information listed in the checklist below represents the typical information required on the submitted project plans. The Plans checklists in each application section are cumulative unless otherwise noted. Separate plans for each application section are not required.

1. ☐ Include the following on the construction plans and cross sections:

   a. ☐ An Existing Conditions sheet showing the entire project and wetland/other surface water boundaries. Include the following: Acreage and type (herbaceous, forested or other surface water) of each wetland/other surface water.
   b. ☐ A Proposed Conditions sheet showing the entire project and wetland/other surface water boundaries with construction plan overlay.
   c. ☐ A Proposed Wetland Impact sheet that includes the following:
      i. ☐ Acreage and type (herbaceous, forested, or other surface water) of each wetland/other surface water to be impacted.
      ii. ☐ Proposed upland buffers with dimensions.
      iii. ☐ Identify the seasonal high water and wetland normal pool elevations on the plans.
   d. ☐ Include wetland boundaries on all construction plan sheets.

2. ☐ If onsite and/or offsite applicant-responsible mitigation is proposed, submit mitigation plans and cross sections including, at a minimum:

   a. ☐ existing conditions plan sheet identifying upland and wetland communities and acreage of each, topography, drainage patterns, and location of cross-section detail.
   b. ☐ proposed conditions plan sheet identifying proposed improvements by type (restoration, enhancement, creation, preservation), acreage of each, topography, drainage patterns, and location of cross-section detail.
   c. ☐ monitoring plan sheet including proposed improvements, monitoring transects, photostations, and mitigation signage (if applicable).
   d. ☐ cross-section and/or profile detail(s) sheet(s) including representative section of each type of mitigation component. Include existing and proposed conditions and representative elevations.
   e. ☐ planting schedule, plant species including common and scientific names divided into three sections (canopy, shrub, herbaceous) by mitigation component, quantity, spacing, size, and elevation range.

**Table 1 - Project Wetland (WI) And Other Surface Water (SW) And Impact Summary**

| WL & SW ID | UMAM ASSESSMENT AREA NAME(S) | WL & SW TYPE | WL & SW SIZE (acres) | WL & SW NOT IMPACTED (acres) | TEMPORARY WL &SW IMPACT SIZE (acres) | TEMPORARY WL & SW IMPACT TYPE | PERMANENT WL &SW IMPACT SIZE (acres) | PERMANENT WL & SW IMPACT TYPE | MITIGATION ID |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | | |

Comments:

Codes (multiple entries per cell not allowed):

- Wetland & Surface Water ID: Include ID on submitted wetland and surface water impact maps
- Wetland Type: from an established wetland classification system
- Impact Type:  D=dredge;  F=fill;  H=change hydrology;  S=shading;  C=clearing;  O=other

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C**, Page 7 of 10

**Table 2 - Project On-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **PROJECT TOTALS:** | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):

• Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C**, Page 8 of 10

**Table 3 - Project Off-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):
- Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C**, Page 9 of 10

**Table 4 - Shoreline Stabilization**

| Stabilization | Linear Ft. New | Linear Ft. Replaced | Linear Ft. Repaired | Linear Ft. Removed | Slope H: V: | Toe Width (Ft.) |
|---|---|---|---|---|---|---|
| Natural Vegetation (living shoreline) | | | | | **N/A** | **N/A** |
| Rip Rap + Vegetation | | | | | | |
| Rip Rap | | | | | | |
| Seawall + Rip Rap | | | | | | |
| Vertical Seawall | | | | | | |
| Other Shoreline Stabilization Type | | | | | | |

Size of Rip Rap

Type of Rip Rap

# Section D: Supplemental Information for Works or Activities Within Surface Waters
## (Other Than a Single-Family Project)

Instructions: This section is to be completed for projects that involve works such as dredging of channels, breakwaters, jetties, shoreline protection structures, reefs, piers, marinas and other docking facilities, bridges, causeways, and other structures or activities within surface waters that involve boating activities or that will, or have the potential to, substantively alter water flow and circulation or affect the bottom profile of open surface waters. This section is not intended for activities associated with individual single-family residential property or activities that are located entirely within wetlands.

This section must be used in conjunction with sections A and C. Activities that occur (or that may occur) on state-owned submerged lands will also require section F. Other sections may also be required, based on the scope of the proposed activities. All items required under this section are in addition to those required under other sections, as applicable.

## Part I: General Project Information

Please identify all proposed activities (select all that apply):

- ☐ Pier, dock, wharf, mooring field, marina (including dry storage associated with a boat launch), boat ramp, ski course or other boating-related activity
- ☐ Breakwater, groin, jetty, shoreline stabilization structures, artificial reefs, intake or discharge structures, subaqueous utility lines, or other submerged structures
- ☐ Bridge, causeway, culverted crossing, or other traversing work or structure
- ☐ Dredging (for navigation channels, boat basins, or other purposes) or filling in surface waters
- ☐ Any other structures, works, or other in-water activities

### A. Piers, Docks, Boat Ramps, Marinas, Mooring Fields, And Other Boating-Related Activities
☐ Not applicable

1. Please provide a detailed description of the proposed activities and uses of the facility; include a description of the existing activities and uses, if applicable. For example, "reconfigure existing 20-slip multifamily residential docking facility to create a 35-slip commercial marina with boat ramp, 4 temporary mooring areas and a fuel dock":

2. Does the proposed facility, including existing structures and activities, consist *solely* of a pier, observation platform, or other over-water structure that will not accommodate the mooring of vessels or any other boating-related activities?
   ☐ Yes (Skip to question #8)      ☐ No

3. Please describe the types and the maximum size (length and draft) of vessels expected to use or proposed to be mooring at the facility.

4. Please complete the table below. Information provided should concur with that provided on the plans/drawings:

     

| TOTALS: | Existing | Proposed |
|---|---|---|
| Square Feet* over the water | | |
| # of wet slips (permanent**) | | |
| # of wet slips (temporary***) | | |
| # of dry slips**** | | |

    * Total square footage of all structures (fixed or floating) over wetlands or surface waters
    ** Slips and other areas designed for overnight or longer-term mooring
    *** Short-term mooring areas, such as accessory docks, fuel docks, etc.
    **** Includes upland boat storage, such as trailer parking spaces and dry storage racks

5. Is there is at least one foot of clearance at mean low water between the top of all submerged resources (such as seagrass beds, corals, etc.) or the submerged bottom (if such resources are absent) and the deepest draft of any vessels expected to use the proposed facility, along the route(s) of ingress/egress between the proposed facility and a marked navigation channel? *If vessels will not have this clearance, the applicant may be required to provide other assurances that the project will not cause adverse secondary, cumulative and/or water quality impacts.*

        ☐ Yes, vessels will have at least 1' clearance at MLW   ☐ No/I'm not sure

6. Please specify whether the facility will provide:

    Liveaboard slips:       ☐ Yes; Number:    ☐ No
    Fueling facilities:      ☐ Yes; Number:    ☐ No
    Sewage pump-outs:    ☐ Yes; Number:    ☐ No
    Other boating-related supplies or services (e.g. boat maintenance or washdown areas, fish cleaning stations, etc.):  ☐ Yes; Describe:    ☐ No

7. Did you answer "yes" to any item in question #6, above?

    ☐ Yes; please complete the items below    ☐ No; (Skip to question #8)

Please provide a facility management plan to address maintenance and unexpected spills of fuels or other pollutants. This plan should include, at a minimum, the following information, as applicable to the proposed project/activities:

    a.  ☐ An education plan for all employees as it relates to fueling, sewage and gray water pump-out operations, waste management, and facility maintenance;
    b.  ☐ A spill response plan for fuel and oil that clearly identifies spill response procedures, responsible parties and emergency contact telephone numbers, and containment and cleanup equipment;
    c.  ☐ Locations of fuel shut-off valves and (if floating docks are utilized) assurance that if floating docks separate, fuel lines will not continue to discharge fuel into surface waters;
    d.  ☐ Plan for maintenance of gray water collection and return systems;
    e.  ☐ Plan for maintenance of garbage and fish cleaning systems to prevent disposal into wetlands or other surface waters;

8. Please describe the design and type(s) of materials that will be used to construct the proposed facility (check all that apply):

Main pier/access walkways:     ☐ Piling-supported     ☐ Floating     ☐ Wharf/bulkhead

Finger piers (if applicable):     ☐ Piling-supported     ☐ Floating

Other Structures (please list and describe):

Pilings:     ☐ treated wood; type (e.g. CCA, ACQ, etc.), if known:
If pilings will be of treated wood materials, will they be completely wrapped (in sleeves of impermeable PVC, plastic, or similar material) from at least one foot below the mud line to at least one foot above the mean high water line (or seasonal high water line in non-tidal waters)? ☐ Yes ☐ No

☐ concrete/steel     ☐ plastic/composite     ☐ other

Decking:     ☐ wood     ☐ plastic/composite     ☐ grated     ☐ floating docks/other

**B. Breakwaters, Jetties, Groins, Artificial Reefs, Intake or Discharge Structures, Subaqueous Utility Lines, or Other Submerged Structures** ☐ Not applicable

1. Please describe the nature and purpose of the proposed structure(s). For example, "construct a 200-foot-long, 20 foot wide offshore breakwater to protect a restored living shoreline from waves and boat wakes from the nearby channel":

2. Please describe the design and type(s) of structures that are proposed (check all that apply):

   ☐ Breakwater (structures generally designed to attenuate wave energy and typically located entirely waterward of, and oriented parallel or oblique to the shoreline)
   ☐ Jetty or groin (structures generally designed to alter longshore currents or sediment transport, and typically extending waterward from the shore at an angle perpendicular or oblique to the shoreline)
   ☐ Seawall or revetment (hardened shoreline stabilization structure located along the shoreline)
   ☐ Artificial reef, fish attractor or similar structure
   ☐ Submerged intake, outfall, utility line, or similar structure
   ☐ Other; please describe:

3. Please provide a description of the existing erosional or depositional conditions of at the site, including amounts of natural and artificial shoreline, type(s) of vegetation, rates of erosion/deposition, and supporting documentation, such as surveys, rectified aerials, or other photographs:

4. Please provide a detailed description of all proposed activities that includes, at a minimum, the following information, as applicable:

   a. ☐ Summary of the proposed construction materials, method(s), and equipment (including types and drafts of vessels that will be used)

b. ☐ Description of proposed turbidity control and monitoring method(s), and other best management practices
c. ☐ Description of any proposed measures for the protection of listed species and their habitats

5. Please describe how the project will be designed and constructed in a manner that will not cause adverse effects to navigation. Include the following, as applicable:

a. ☐ Descriptions vessels (if any) customarily using the water body in the vicinity of the project, including representative types (e.g. sail, motor, etc.), sizes (length, width, draft), and use (e.g. recreational, commercial, military, etc.)
b. ☐ Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation
c. ☐ The minimum navigation clearance at mean low water for all proposed submerged structures
d. ☐ Proposed navigational safety features (advisory signs, lighting, etc.) for structures
e. ☐ If structures are proposed within 100 feet of any navigation channel or shipping fairway, provide an assessment of the navigational safety requirements or recommendations for the proposed project from the U.S. Coast Guard, if available

**C. Bridge, Causeway, Culvert, Traversing Work, or Structure**    ☐ Not applicable

1. Please describe the nature and purpose of the proposed structure(s), works, or activities. *For example, "construct a 30-foot-wide, piling-supported bridge to support a 2-lane road":*

2. Will the proposed structure(s) support or accommodate motorized vehicular traffic?
☐ Yes    ☐ No (for pedestrian or non-motorized traffic, only)

3. Please describe the design and type(s) of structures that are proposed (check all that apply):

☐ free-spanning bridge (i.e. with no supporting structures in wetlands or surface waters)
☐ piling-supported (or trestle) bridge
☐ causeway
☐ culverted crossing
☐ other traversing work or structure; please describe:

Pilings/supports:
☐ Not applicable
☐ treated wood; type (e.g. CCA, ACQ, etc.), if known:
☐ concrete/steel    ☐ other
If pilings will be of treated wood materials, will they be completely wrapped (in sleeves of impermeable PVC, plastic, or similar material) from at least one foot below the mud line to at least one foot above the mean high water line (or seasonal high water line in non-tidal waters)?
☐ Yes    ☐ No

Surface:

    ☐ pavement (concrete or asphalt)    ☐ grated    ☐ wood    ☐ other

If the roadway will support motorized vehicular traffic, please provide a detailed description of how stormwater and other potential sources of runoff and pollution will be managed. Include supporting calculations, figures, or other documents, prepared by a Florida-registered professional, if applicable:    ☐ Not applicable

Fill and design:

    ☐ Earthen fill; please describe type, specifications, and source (if known):

    ☐ Riprap or other armored revetment; please describe type, specifications, and source (if known) of proposed materials:

    ☐ Vegetated shoreline; please describe species, sizes, planting spacing (on-center) and elevations (relative to mean or ordinary high and low water), application methods, and source (if known), as applicable, of all proposed plants, sod, or seed:

Culverts:

    ☐ Box        ☐ round/elliptical        ☐ other

    ☐ Please describe, in detail, the number, type, and dimensions of all proposed culverts:

Other works or structures:

    ☐ Please describe, in detail, the purpose, design, and dimensions of all other proposed traversing work or structures:

4. Please provide a detailed description of the proposed construction activities that includes, at a minimum, the following information, as applicable:

    a. ☐ Summary of the proposed construction method(s) and equipment, including types of vessels or vehicles

    b. ☐ A detailed plan for all proposed turbidity control and monitoring method(s), at all dredging or filling locations, and at proposed spoil offloading, disposal, or dewatering locations

    c. ☐ Description of any proposed measures for the protection of listed species and their habitats, including statements of whether all work will be limited exclusively to daylight hours

    d. ☐ For causeways, culverts, and traversing works, a description of construction methods and sequencing that ensures that construction of the proposed project will not impound waters, cause flooding, or cause adverse impacts to wetlands or surface waters, including surface water flows or levels

5. Please describe how the project will be designed and constructed to avoid adverse effects to navigation. Include the following, as applicable:

    a. ☐ Descriptions of representative types of vessels (if any) customarily using the water body in the vicinity of the project, including

    b. ☐ Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation

    c.  ☐  The minimum navigational clearance beneath the proposed structure(s), at mean (or ordinary) high water

    d.  ☐  The minimum navigational clearance, at mean low water for all proposed submerged structures (if applicable)

    e.  ☐  If within 100 feet of a federally maintained or regulated navigation channel or shipping fairway, an assessment of the navigational safety requirements or recommendations (advisory signs, lighting, etc.) for the proposed project from the U.S. Coast Guard

**D.  Dredging (For Navigation Basins, Channels, Or Other Purposes) and/or Filling**    ☐ Not applicable

1.  Please describe the nature and purpose of the proposed dredging or filling activities. For example, "dredge a 1,000 foot long, 50 foot wide navigation channel to a depth of six feet mean low water, to serve a commercial marina":

2.  Please provide a detailed description of all proposed dredging and filing activities that includes, at a minimum, the following information, as applicable:

    a.  ☐  Summary of the proposed dredging and filling method(s) (e.g. clamshell, hydraulic, etc.) and equipment, including types of vessels

    b.  ☐  A detailed plan for all proposed turbidity control and monitoring method(s) at all dredging or filling locations, and at proposed spoil offloading, disposal, or dewatering locations

    c.  ☐  Description of any proposed measures for the protection of listed species and their habitats, including statements of whether all work will be limited exclusively to daylight hours

3.  Please describe how the project will be designed and constructed to avoid adverse effects to navigation. Include the following, as applicable:

    a.  ☐  Descriptions of representative types of vessels (if any) customarily using the water body in the vicinity of the project, including

    b.  ☐  Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation

    c.  ☐  A description of construction methods and sequencing that ensures that the proposed project will not obstruct local navigation during construction

    d.  ☐  If within 100 feet of a federally maintained or regulated navigation channel or shipping fairway, an assessment of the navigational safety requirements or recommendations (advisory signs, lighting, etc.) for the proposed project from the U.S. Coast Guard

    e.  ☐  For projects that include in-water filling of submerged lands, the minimum navigation clearance at mean low water for all proposed fill areas (if applicable)

4.  For dredging projects, please describe how dredged spoil material will be managed and disposed. At a minimum, this description should include:

    a.  ☐  Grain size distribution and silt/clay content percentage of the material proposed to be dredged (the reviewing agency may require additional sediment testing, based upon the percentage of silt/clay sediments)

    b.  ☐  Proposed dredging, pumping, and outfall design, including turbidity containment, pipe hydraulic specifications and spillway placement and hydraulic design

c. ☐ Calculations regarding the spoil area volume requirements including bulking factors, surface overflow rate, settling times, freeboard, etc.

d. ☐ Description of how spoil material will be ultimately disposed of, including proposed stabilization methods and post-closure storm retention/detention capacity

e. ☐ If flocculents, coagulants, or other additives are proposed (to aid with dewatering or settling), provide the names, descriptions, Material Safety Data Sheets, proposed application rates, and ecotoxicity data and testing methods for all such additives

## Part II: Hydrographic Information

The following information is necessary to determine whether the proposed activities may cause or contribute to a violation of state water quality standards. This information is required for activities or facilities that may either add pollutants to, or result in an adverse change to the patterns of flow, circulation, erosion, deposition, or littoral transport of a waterbody. Additional information may be required, such as water and sediment testing data, tidal conditions, tidal current measurements, bathymetric surveys, and simulations of hydrodynamic conditions and water quality, to fully assess the potential adverse impacts associated with your project. Please complete and provide all items as appropriate for your proposed project. Failure to do so may delay the processing of your application.

1. **Complete item 1. only if you are not providing additional information under Part II, with your application.** *Selecting options here does not relieve you of the need to submit information at a later time, if necessary to fully assess the potential adverse environmental impacts associated with your project.* I certify that, (check as appropriate for your project):

☐ I have been informed by the reviewing agency, during a pre-application meeting or conference, that hydrographic information, testing, and/or hydrographic analysis will not be required for my project. *Please identify the date and location of the meeting and the agency staff members who participated.*

☐ My project consists solely of the modification, construction, or operation of a docking facility that will accommodate the mooring of fewer than 10 vessels, including dry storage, when associated with a boat ramp or launch, **AND I have not been previously informed by the reviewing agency that hydrographic information will be required.**

☐ I am submitting a certification from a Florida-registered professional clearly stating that, due to the design, nature, and/or location of the proposed structures, works, or other activities, that the project does not have the potential to add pollutants to, or result in an adverse change to, the patterns of flow, circulation, erosion, deposition, or littoral transport of a waterbody; **AND I have not been previously informed by the reviewing agency that hydrographic information will be required.** *A copy of the Florida-registered professional's certification must be included with this application.*

If none of the above apply, please provide all applicable items listed in items 2. through 7., below, based on the specific works or activities proposed for construction, alteration, maintenance, abandonment, or removal, as part of your project. In addition, a hydrographic report (including complete hydrodynamics and water quality analysis) may be necessary based upon the particulars of your project.

2. All structures or works

a. ☐ Existing water body bathymetry and shoreline topography, if applicable

b. ☐ Structural details for the proposed structure(s)
c. ☐ Sediment grain size distribution and silt/clay content percentage within project area and adjacent areas
d. ☐ For activities in tidal waters, mean high and low water elevations, range, and periodicity

3. Piers, docks, wharves, marinas, mooring fields, and other boating-related activities (refer to Applicant's Handbook, Volume I, s. 10.2.4)    ☐ Not applicable

a. ☐ Details of existing and proposed systems including all dimensions (length, width, depth), location of junctions, connections to open waters, and dead-end(s), if applicable.
b. ☐ Site-specific characteristics of the wind field
c. ☐ For tidal systems, provide the longest path length, phase lag, and the flow amplitude (at mid-tide) between the head or center of the system to open waters
d. ☐ For non-tidal systems, provide the water surface elevation difference between the head (or center) and mouth of the system, and provide representative flow conditions at selected locations
e. ☐ Estimate the time needed to reduce the concentration of a hypothetical conservative pollutant, placed at the head of the system, to ten percent (10%) of initial
f. ☐ Verify (e.g. by using a tracer dye) the model(s) used to determine the advective/dispersive characteristics of the system. Provide a concentration gradient map depicting the size, distance of travel, and time of dispersion to the 10% concentration isopleth

4. Breakwaters, groins, jetties, seawalls, and revetments    ☐ Not applicable

a. ☐ Monthly averaged wave height, direction, and period for the project area shoreline
b. ☐ Wind data (direction and velocity) for project area
c. ☐ Estimate the mean annual and mean monthly littoral drift direction and volume
d. ☐ Existing structures within the zone of influence of proposed structures
e. ☐ Existing shoreline topography – dune crest to offshore bar break
f. ☐ Estimated changes in littoral transport, erosion, and deposition rates and patterns due to the proposed structures

5. Bridges, causeways, and culverts    ☐ Not applicable

a. ☐ For tidal waters, the maximum, minimum, and mean flow volumes and amplitudes, at ebb and flood tide
b. ☐ For non-tidal waters, the maximum, minimum, and mean flow volume and amplitude and mean range and periodicity of the water level variation
c. ☐ Existing circulation patterns in the waterway at the location of the proposed structure
d. ☐ Culvert or channel dimensions, cross-sectional area, and invert elevations
e. ☐ Maximum design discharge, and change in flow due to change in culvert or channel cross-section, if applicable
f. ☐ Drainage basin map and backwater calculations for area served by culvert, if applicable
g. ☐ Existing and proposed flow cross-sections and volumes at high and low water, for specified storm (flood) events, if applicable

6. Basins, channels, residential canals, and canal networks    ☐ Not applicable

a. ☐ Maximum and mean tidal flow rates for ebb and flood along the channel
b. ☐ Baseline bathymetry for the existing channel and adjacent areas

c.  ☐  Detailed descriptions of all areas of erosion and deposition, including existing deeps that can result in debris traps and zones of stratified water

7.  Outfalls and intakes          ☐ Not applicable

   a.  ☐  Design maximum and normal operational flows for the outfall/intake and criteria used
   b.  ☐  Dimensions and invert elevations for the proposed structures
   c.  ☐  Details of the construction at the shoreline/waterline intercept


## Part III: Plans

Provide plan and section view drawings that clearly show the facility, structure, or other works to be constructed, as applicable for the proposed project. Drawings must be signed and sealed by a Florida-registered professional, and must be of a scale sufficient to show the location and dimensions of all works. Use multiple sheets, if necessary. This information is **in addition to** that required under Section C (and others, if applicable) of the application.

1.  All structures

   Plan-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐  The location and orientation of all corresponding section, profile, and detail drawings
   b.  ☐  Location of the riparian upland parcel or property boundary lines, if applicable
   c.  ☐  Mean high water line (MHWL), ordinary high water line (OHWL), or safe upland line (SUL)
   d.  ☐  Complete dimensions (length, width, height) of all structures, works, or other activities in, on, or over wetlands or surface waters, including existing structures within 100 feet of the proposed facility
   e.  ☐  Separate and label square footage of structure over wetlands, open water, and uplands
   f.  ☐  Existing and proposed water depths throughout project area – isobaths or spot elevations must be clearly labeled with depths depicted in relation to mean low water (MLW), controlled water elevation (in non-tidal waters where the water is fairly controlled), mean annual low water (in other non-tidal waters), or an established vertical datum
   g.  ☐  Show proposed turbidity, erosion, and sedimentation control locations

   Section- and profile-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐  Complete dimensions of all proposed structures, including elevation above mean high water or ordinary high water (as applicable)
   b.  ☐  Water depth at mooring sites (mean low water, ordinary low water, or seasonal low water)
   c.  ☐  In tidal areas – approximate tidal range

2.  Piers, docks, marinas, boat ramps, and other docking or boating-related facilities          ☐ Not applicable

   Plan-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐  Show and label width of deck planks and plank spacing, or if grated decking is to be used, provide technical specifications

b. ☐ Show the locations of all proposed sewage pumpouts, fuel pumps, and spill cleanup equipment
c. ☐ Show the locations of all proposed informational signage (manatee awareness, fueling safety, etc.)
d. ☐ Number each slip
e. ☐ Width of waterway and the location of the navigation channel and water depths (in relation to MLW) and distance along the most direct route(s) between the facility and the nearest marked navigation channel(s)

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

a. ☐ Elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters), and water depth at mooring sites and the bottom of the boat ramp (if applicable)
b. ☐ Structural details of all proposed pilings, anchors, moorings, buoys, and similar structures

3. Basins, channels, and other dredging and/or filling works or activities        ☐ Not applicable

Plan-view drawings should include the following:

a. ☐ The location, boundaries, and water depths (in relation to MLW) of all nearby navigation channels
b. ☐ The locations and detail drawings of all proposed navigational safety markers (signs, lights, etc.) for the structure(s)
c. ☐ The location, dimensions, and engineering specifications (including BMPs) for all proposed dredged material offloading, management, and disposal sites, if applicable

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

a. ☐ Representative section and/or profile views of all proposed structures that clearly show the existing and proposed depths, widths, and side slopes of all dredge and fill areas in relation to MHWL and MLWL (tidal waters), OHWL (non-tidal waters), and the submerged bottom, at representative locations

4. Groins, jetties, seawalls, revetments, and artificial reefs        ☐ Not applicable

Plan-view drawings should include the following:

a. ☐ The location and water depths (in relation to MLW) of all nearby navigation channels
b. ☐ The locations and detail drawings of all proposed navigational safety markers (signs, lights, etc.) for the structure(s)

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

a. ☐ Representative section and/or profile views of all proposed structures that clearly show the height, width and side slopes of each structure in relation to MHWL and MLWL (tidal waters), OHWL (non-tidal waters), and the submerged bottom, at representative locations

5. Bridges, causeways, culverted crossings, and other traversing works or structures ☐ Not applicable

Plan-view drawings should include the following, as applicable to the proposed activity:

a. ☐ Width of waterway and the location, orientation, and water depths (in relation to MLW) of the navigation channel (if applicable)
b. ☐ Dimensions and technical specifications of the road, decking, or other surface, including drainage features, if applicable

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

a. ☐ Elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters)
b. ☐ Representative sections through the culvert or channel

# Section E: Supplemental Information Required for Works or Other Activities Involving a Stormwater Management System
### (Other Than a Single-Family Project)

Instructions: The information listed in the checklists below represents the level of information that is usually required to evaluate an application. Information can be provided within reports, plans, and documents. The level of information required for a specific project will vary depending on the nature and location of the site and the activity proposed. Conceptual approvals generally do not require the same level of detail as a construction permit. However, providing a greater level of detail will reduce the need to submit additional information at a later date. If an item does not apply to your project, proceed to the next item. The supplemental information required by this section is in addition to the information required by Section A of the application.

**Part 1: Stormwater Management System Summary**

Provide drainage calculations, signed and sealed by an appropriate registered professional, and supporting documentation demonstrating that the proposed project meets the conditions for issuance under 62-330.301(1)(a),(b),(c),(e), F.A.C. The drainage calculations should include, but not necessarily be limited to, the following:

1. General Site Information:

    a. ☐ Provide pre-development and post-development drainage map(s), as appropriate, that include drainage patterns and basin boundaries with acreage served by each hydraulically separate system, showing the direction of flows, including any off-site runoff being routed through or around the system; topographic information; and connections between wetlands and other surface waters.

    b. ☐ Provide the results of any percolation tests, where appropriate, and soil borings that are representative of the actual site conditions. Identify the wet season high water table elevations, soil profiles, and hydraulic conductivity. Include dates, datum, and methods used to determine these soil parameters.

    c. ☐ Identify the onsite hydrologic soil classification (e.g. Type A, B/D, D). Reference the source, such as the USDA/NRCS Soil Survey, used in estimating the onsite hydrologic soil classification. Provide maps, as appropriate, with the project limits delineated.

    d. ☐ Identify the seasonal high water or mean high tide elevation for receiving waters/wetlands into which runoff will be discharged. Include dates, datum, and methods used to determine these elevations.

    e. ☐ Identify the name of each receiving waterbody to which the proposed stormwater management system will discharge:          .

    f. ☐ Indicate the existing land use and land cover.

    g. ☐ Provide the acreage and percentages of the total project, of the following:
        1. Impervious surfaces (excluding buildings, wetlands, and other surface waters);

     

2. Buildings;
3. Pervious surfaces (green areas not including wetlands);
4. Lakes, canals, retention areas, other open water areas; and
5. Wetlands (Please compare to Section C to ensure consistency in wetland acreages).

h. ☐ Provide the location and description of any nearby existing offsite features (such as wetlands and other surface waters, stormwater management ponds, and buildings or other structures) which might be affected by or affect the proposed construction or development.

2. Water Quality Analysis:

a. ☐ Provide a description of the proposed stormwater treatment methodology that addresses the type of treatment, pollution abatement volumes, and recovery analysis.

b. ☐ Is the receiving waterbody known to be impaired and/or have an established Total Maximum Daily Load (TMDL) or Basin Management Action Plan (BMAP)? If so, please provide specific descriptions of all water quality parameters for which the waterbody is known to be impaired. For more information about water quality, impaired waters, and to determine whether a TMDL has been adopted in your project area, refer to: https://floridadep.gov/dear/water-quality-evaluation-tmdl/content/final-tmdl-reports. To determine whether a BMAP exists, or is being developed in your project area, refer to: https://floridadep.gov/dear/water-quality-restoration/content/basin-management-action-plans-bmaps.

☐ yes ☐ no ☐ don't know

If yes, provide calculations demonstrating that the proposed project will not contribute to violations of state water quality standards in accordance with the applicable Applicant's Handbook, Vol. II.

c. ☐ Does the project have a direct discharge to Class I or II waters; Outstanding Florida Waters (OFW); or Class III waters, which are approved, conditionally approved, restricted, or conditionally restricted for shellfish harvesting? *To determine whether your project is within or will discharge to an OFW, or for more information about OFWs in general, refer to: https://floridadep.gov/dear/water-quality-standards/content/outstanding-florida-waters.*

☐ yes ☐ no ☐ don't know

If yes, additional treatment in accordance with the applicable Applicant's Handbook, Vol. II, may be required.

d. ☐ Provide construction plans and calculations that address the required treatment volume and recovery, as well as stage-storage and design elevations, which demonstrate compliance with the appropriate water quality treatment criteria in the applicable Applicant's Handbook, Vol. II.

e. ☐ Provide a description of the engineering methodology, assumptions, and references for the parameters listed above and a copy of all computations, engineering plans, and specifications used to analyze the system. If a computer program is used for the analysis, provide the name of the program, a description of the program, input and output data, and justification for model selection.

3. Water Quantity Analysis:

Provide calculations and documentations demonstrating that the project, as proposed, meets the applicable design criteria as indicated in the applicable Applicant's Handbook, Vol. II. Typically, the information would include, at a minimum, but not necessarily limited to, the following:

a. ☐ For projects requiring pre-development analysis, provide an analysis of the pre-development peak rate of discharge and/or volume of runoff for all design storm events. Account for all onsite depressional storage and offsite contributing area. Please refer to the

applicable Applicant's Handbook, Vol. II for the design storm event(s) that apply to your project.

b. ☐ Provide an analysis of the post-development peak rate of discharge and/or volume of runoff for all applicable design storm events. Account for all onsite storage and offsite contributing area. Please refer to the applicable Applicant's Handbook, Vol. II for the design storm event(s) and criteria that apply to your project.

These analyses should include:

1. ☐ Runoff characteristics, including area, runoff curve number or runoff coefficient, and time of concentration for each drainage basin in the pre-development and post-development condition;

2. ☐ Design storms used including rainfall depth, duration, frequency, and distribution;

3. ☐ Runoff hydrograph(s) for each drainage basin for all required design storm event(s);

4. ☐ Stage-storage computations for any area, such as a reservoir, closed basin, detention area, or channel, used in storage routing;

5. ☐ Stage-discharge computations for any storage areas at a selected control point, such as control structure or natural restriction;

6. ☐ Flood routings through on-site conveyance and storage areas;

7. ☐ Water surface profiles in the primary drainage system for each required design storm event(s);

8. ☐ Runoff peak rates and volumes discharged from the site for each required design storm event(s);

9. ☐ Design tailwater elevation(s) for each storm event at all points of discharge (include source or method of estimate); and

10. ☐ Pump specifications and operating curves for range of possible operating conditions (if used in system).

c. ☐ Provide a description of the engineering methodology, assumptions, and references for the parameters listed above, and a copy of all such computations, engineering plans, and specifications used to analyze the system. If a computer program is used for the analysis, provide the name of the program, input and output data, justification for model selection, and, if necessary, a description of the program.

4. Floodplain Analysis (where applicable).

a. ☐ If the project is in a known floodplain of a stream or other water course, identify the appropriate floodplain boundary and approximate flooding elevations of any lake, stream, or other watercourse located on or adjacent to the site.

b. ☐ For traversing works, in accordance with the applicable Applicant's Handbook, Vol. II, provide:

1. ☐ Hydraulic calculations for all proposed traversing works; and

2. ☐ Water surface profiles showing upstream impact of traversing works.

c. ☐ For impacts to regulated floodplains, in accordance with the applicable Applicant's Handbook, Vol. II, provide:

1. ☐ Location and volume of encroachment within regulated floodplain(s); and

2. ☐ Plans and calculations for compensating floodplain storage, if necessary, and calculations required for determining minimum building and road flood elevations.

**Part 2: Construction Plans**

1. Provide clear, construction level detailed plans for the system. The plans must be signed and sealed by an appropriate registered professional as required by law. These plans should include cumulative information from all applicable sections, as well as the following:

   a. ☐ Project area boundary and total land area (as defined in A.H. Vol. I, subsection 2.0(a)(107), including distances and orientation from roads or other landmarks.

   b. ☐ Existing topography extending at least 100 feet off the project area. All topography shall include location and description of benchmarks, reference to NGVD 1929 or NAVD 1988 along with the conversion factor.

   c. ☐ Proposed site plan with acreage, including the following:
      1. ☐ plan view of proposed development, including impervious surfaces and water management areas;
      2. ☐ land cover and natural communities*;
      3. ☐ wetlands and other surface waters*;
      4. ☐ undisturbed uplands*;
      5. ☐ aquatic communities*;
      6. ☐ proposed buffers*;
      7. ☐ proposed impacts to wetlands and other surface waters, and any proposed connections/outfalls to other surface waters or wetlands, (if applicable); and
      8. ☐ onsite wetland mitigation areas*.
      9. ☐ For phased projects, provide a master development plan clearly delineating the limits of each phase of construction.
      *Information should reflect that provided in Section C.

   d. ☐ Paving, Grading, and Drainage Information, which includes, but is not necessarily limited to, the following:
      1. ☐ Existing topography;
      2. ☐ Boundaries of wetlands and other surface waters and upland buffers (see Section C);
      3. ☐ Plan view of proposed development;
      4. ☐ Proposed elevations and/or profiles, including:
         a) ☐ roadway, parking, and pavement grades;
         b) ☐ floor slabs, walkways, and other paved surfaces;
         c) ☐ earthwork grades for pervious landscaped areas; and
         d) ☐ perimeter site grading, tying back into existing grades.
      5. ☐ Location of all water management areas, including elevations, dimensions, side slopes, and design water depths;
      6. ☐ Location, size, and invert elevations of existing and proposed stormwater conveyance systems;
      7. ☐ Vegetative cover plan for all on-site and off-site earth surfaces disturbed by construction; and
      8. ☐ Rights-of-way and easements for the system, including all on-site and off-site areas to be reserved for water management purposes (including access), and rights-of-way and easements for the existing drainage system, if any.

   e. ☐ Stormwater detail information, including but not necessarily limited to, the following:
      1. ☐ Cross section of all stormwater management areas, including elevations, dimensions, side slopes, and proposed stabilization measures (with location of the cross section(s) shown on the corresponding plan view);
      2. ☐ Detail of all proposed control structures, including elevations, dimensions, and skimmer, where applicable; and

      3. ☐ Details of proposed stormwater management systems, such as underdrains, exfiltration trenches, vaults, and other proposed Best Management Practices (BMPs).

    f.  ☐ Location and description of any nearby existing offsite features (such as wetland and other surface waters, stormwater management ponds, and building or other structures) which might be affected by or affect the proposed construction or development.

## Part 3:  Construction Schedule and Techniques

Provide a construction schedule and a description of construction techniques, sequencing, and equipment. This information should include, as applicable, the following.

    a.  ☐ Access and staging of equipment;

    b.  ☐ Location and details of the erosion, sediment, and turbidity control measures to be implemented during each phase of construction and all permanent control measures to be implemented in post-development conditions.

    c.  ☐ The location of disposal site(s) for any excavated material, including temporary and permanent disposal sites.

    d.  ☐ A demolition plan for any existing structures to be removed.

    e.  ☐ Dewatering plan details. If dewatering is required, detail the dewatering proposal including the methods that are proposed to contain the discharge, methods of isolating dewatering areas, and indicate the period dewatering structures will be in place. **Note: A Consumptive Use or Water Use permit may be required for dewatering.**

    f.  ☐ Methods for transporting equipment and materials to and from the work site. If barges are required for access, provide the low water depths and draft of the fully loaded barge;

## Part 4:  Operation and Maintenance and Legal Documentation:

    a.  ☐ Describe the overall maintenance and operation schedule for the proposed system.

    b.  ☐ Identify the entity (or entities) that will be responsible for operating and maintaining the system (or parts of the system) to demonstrate that the entity (or entities) meet(s) the requirements of section 12.3 of the Applicant's Handbook, Vol. I.

        1. ☐ If different from the permittee, provide a draft document enumerating the enforceable affirmative obligations on the entity to properly operate and maintain the system for its expected life and documentation of the entity's financial responsibility for long-term maintenance.

        2. ☐ If the proposed operation and maintenance entity is not a property owner's association, provide proof of the existence of an entity or the future acceptance of the system by an entity which will operate and maintain the system.

    c.  ☐ Provide drafts of all proposed conservation easements, stormwater management system easements, draft property owner's association documents, and plats for the property containing the proposed system.

    d.  ☐ Provide legal reservations for access to the treatment system for maintenance and operation by future maintenance entities for subdivided projects.

    e.  ☐ Provide indication of how water and wastewater service will be supplied.

f. ☐ Provide a copy of the boundary survey and/or legal description and acreage of the total land area of contiguous property owned/controlled by the applicant.

g. ☐ If any associated land agreements are required to implement the proposed activities, such as flowage easements across lands not owned by the applicant, include such documentation. If negotiations are underway, but not yet concluded, regarding such land use agreements, please indicate that and provide an anticipated date for providing that documentation. A permit cannot be issued for an activity to use lands that are not owned by the applicant or for which the applicant does not hold a sufficient real property interest to use those lands.

**Part 5: Water Use**

a. ☐ Describe how irrigation will be provided to the project. Will the surface water system be used for water supply, including landscape irrigation, or recreation?

b. ☐ If a Consumptive Use or Water Use permit has been issued for the project, state the permit number:

c. ☐ If a Consumptive Use or Water Use permit has not been issued for the project, indicate if such a permit will be required. ☐ yes ☐ no ☐ don't know
   If yes, please indicate when the application for a permit will be submitted:

d. ☐ Indicate how any existing wells located within the project site will be utilized or abandoned.

**Part 6:  Special Basin Information**

a. Is your project within a special basin as described in the applicable Applicant's Handbook, Vol. II?

☐ yes ☐ no ☐ don't know

b. If yes, please demonstrate that the project will meet the applicable special basin criteria.

# Section F:  Application for Authorization to Use State-Owned Submerged Lands

Instructions: If you were referred to this section from Section A, please provide the following additional information. Please note that if your proposed project is on state-owned submerged lands and the below requested information is not provided, your application will be considered incomplete. All items required under this section are in addition to those required under other sections, as applicable.

**Part 1: Type of Authorization Requested**

**Please check the most applicable activity that applies to your project(s):**

A.  Exceptions: The following activities do not require authorization to use state-owned submerged lands. If you are certain that your project (including all components/phases) qualifies, please check the appropriate box, and no further action is required to complete this section.

- ☐ Construction or maintenance of a county water or sewer system under Section 153.04, F.S.
- ☐ Removal of material from the area adjacent to an intake or discharge structure under 403.813(1)(f), F.S.
- ☐ Removal of organic detrital material under Section 403.813(1)(r) or (u), F.S.
- ☐ Construction of floating vessel platforms under Section 403.813(1)(s), F.S.
- ☐ Trimming or alteration of mangroves under Sections 403.9321 through 403.9334, F.S.

B.  Consent by Rule: Except for activities authorized under Section 253.77(4), F.S., no application or written authorization for the use of state-owned submerged lands is required for an activity that complies with the criteria listed in subparagraphs 18-21.005(1)(b)1. through 5., F.A.C., and that is exempt from the requirements of obtaining a permit under the provisions of:

- • Section 403.813(1)(a) and (b), F.S., provided that the structure is the only dock or pier on a parcel and it is not a private residential multi-family dock with three or more slips.
- • Section 403.813(1)(c), (d), (e), and (f), F.S., provided that no severance fee is required under Rule 18-21.011, F.A.C., and the existing activity has a valid Board of Trustees authorization.
- • Section 403.813(1)(g), (h), and (i), F.S., provided that no private residential multi-family dock or pier is constructed.
- • Section 403.813(1)(k), F.S., provided that any channel markers delineate existing and authorized or permitted navigation channels.

Such activities must still comply with the General Conditions for Authorizations under subsection 18-21.004(7), F.A.C. Agency staff will determine whether the proposed project qualifies for Consent by Rule. Be advised that if your project does not qualify for an Exception or Consent by Rule for one of the reasons listed above, then it will require one of the forms of authorization listed below.

C.  Letter of Consent: Written authorization is required for each of the following activities:

- ☐ One minimum-size private residential single-family dock (see definition in Rule 18-21.003, F.A.C.).
- ☐ Private residential single-family or multi-family docks, piers, boat ramps, and similar existing and proposed activities that cumulatively preempt no more than 10 square feet of sovereignty submerged land for each linear foot of the applicant's riparian shoreline, along sovereignty

     

submerged land on the affected waterbody within a single plan of development (see "preempted area" definition in Rule 18-21.003, F.A.C.).

☐ Private channels that provide access to an upland single-family or multi-family residential parcel and that measures no more than 10 square feet of sovereignty submerged land for each linear foot of the applicant's riparian shoreline along sovereignty submerged land on the affected waterbody within a single plan of development.

☐ Seawalls, bulkheads, or other shoreline stabilization structures no more than three feet waterward of mean or ordinary high water.

☐ Placement, replacement, or repair of riprap, groins, breakwaters, or intake and discharge structures no more than ten feet waterward of the line of mean or ordinary high water.

☐ Restoration and nourishment of naturally occurring sandy beaches, including borrow areas to be used for five years or less.

☐ Artificial reefs or fish attractors that are constructed for public use.

☐ Public docks or piers that are exempt from permit requirements under Section 403.813(1), F.S., or that qualify as minimum-size docks or piers or are less than or equal to the 10:1 preempted area to shoreline ratio; public boat ramps; public channels; or public swimming areas, provided that all such structures or activities are owned and operated by governmental entities and any revenues collected are used solely for operation and maintenance of the structure or adjacent public recreational facilities.

☐ Ski course buoys and ski jumps not associated with revenue-generating water skiing activities.

☐ Removal of wrecked, abandoned, or derelict vessels or structures.

☐ Habitat restoration.

D. Lease: A state-owned submerged land lease is required for the following activities.

☐ Private residential single-family or multi-family docks or piers, other docks or piers, boat ramps, or other similar activities that do not qualify for a letter of consent.

☐ Private residential multi-family docks designed or used to moor three or more vessels within aquatic preserves.

☐ Docks designed or used to moor ten or more vessels in Monroe County.

☐ Commercial/industrial docks, as defined in Rule 18-18.004, F.A.C., in Biscayne Bay Aquatic Preserve, as required by paragraph 18-18.006(3)(c), F.A.C.

☐ All revenue-generating activities.

☐ Oil and gas exploration and development.

☐ Open-water mooring fields.

☐ Mining.

E. Easement: A state-owned submerged land easement is required for the following public or private activities.

☐ Utility crossings and rights of way.

☐ Road and bridge crossings and rights of way, including such structures built prior to the need to obtain an easement when proposed for modification or repair.

☐ Groins, breakwaters, and shoreline protection structures, except when constructed as part of a docking facility that requires a lease.

☐ Public navigation projects other than public channels.

☐ Private residential channels that do not qualify for a letter of consent and channels that provide access to revenue-generating facilities in uplands.

☐ Oil, gas, and other pipelines.

☐ Intake and discharge structures more than 10 feet waterward of the mean or ordinary high

water line.
- [ ] Spoil disposal sites.
- [ ] Borrow areas that will be used for longer than five years for beach nourishment.
- [ ] Public water management projects other than public channels.
- [ ] Treasure salvage (Cultural Resource Recovery).

**Part 2: Submittal Requirements**

If state-owned submerged lands will be affected by your project, we will notify you in writing, and the items in this section will also be required. For expediency, if you acknowledge or believe that your project affects state-owned submerged lands you may submit the items in the appropriate section of Part 2 prior to receiving written confirmation of state ownership. This will not jeopardize any future claim of ownership.

Unless your proposed project qualifies for an Exception or Consent by Rule, as described in Part 1 A or B, then your application to use state-owned submerged lands must include the following items, as applicable to your project.

A.  All applications for Letter of Consent, Lease, or Easement must include the following:

- [ ] Satisfactory evidence of sufficient upland interest to the extent required by paragraph 18-21.004(3)(b), F.A.C.
- [ ] Detailed statement of the proposed activity.
- [ ] If dredging is proposed, an estimate of the number of cubic yards of sovereignty materials to be removed showing how the amount was calculated.

B.  Applications for a **Letter of Consent** shall also include the following:

- [ ] Multiple boat slip facilities may require an affidavit certifying that the facility will not be a revenue generating/income producing facility.
- [ ] Two copies of a dimensioned site plan drawing(s) with the following requirements:
    a. Utilizing an appropriate scale;
    b. Showing the approximate location of the mean high/ordinary high/or safe upland line;
    c. Showing the location of the shoreline vegetation, if existing;
    d. Showing the location of the proposed structures and any existing structures;
    e. Showing the applicant's upland parcel property lines;
    f. Showing the riparian lines; and
    g. Showing the primary navigation channels or direction to the center of the affected waterbody.

C.  Applications for **Leases** shall also include the following:

- [ ] Lease processing fee as specified in subparagraph 18-21.008(1)(a)8, F.A.C.
- [ ] Location of the proposed activity including: county; section, township and range; affected waterbody; and a vicinity map, preferably a reproduction of the appropriate portion of United States Geological Survey quadrangle map.
- [ ] Two prints of a survey prepared, signed, and sealed by a person properly licensed by the Board of Professional Surveyors and Mappers, including the following:
    a. Use an appropriate scale;
    b. Show the location of ordinary or mean high water;
    c. Show the location of the shoreline vegetation, if existing;
    d. Show the location of the proposed structures and any existing structures;

     e.  Show the applicant's upland parcel property lines;

     f.  Show the primary navigation channels or direction to the center of the affected waterbody

     g.  Show the riparian lines;

     h.  Include a legal description of the preempted area to be leased; and

     i.  For those lease applications in the Florida Keys, indicate the water depths referenced to mean low water within the lease area and out to the navigation channel.

☐ Noticing information as required by subsection 18-21.005(3), F.A.C.

☐ Billing Information Form, which provides billing information; sales tax information; and other data required in accordance with Section 24.115(4), F.S.

☐ Computation of the total square footage of preempted sovereignty land to be leased.

D.  Applications for **Easements** shall also include the following:

☐ Easement processing fee as specified in either (for public easements) paragraph 18-21.009(1)(g), or (for private easements) paragraph 18-21.010(1)(i), F.A.C.

☐ Vicinity map.

☐ Detailed statement of proposed use and satisfactory evidence of need for installation of telecommunication lines and associated conduits that are subject to the provisions of paragraph 18-21.004(2)(I), F.A.C. If the applicant is a local governing body, the request shall be by official resolution or minutes.

☐ Two prints of a survey prepared by a Licensed Florida Surveyor and Mapper, including the following:

     a.  Use an appropriate scale;

     b.  Showing boundaries of the parcel sought;

     c.  Showing ownership lines of the riparian uplands;

     d.  Showing the line of ordinary or mean high water;

     e.  Showing the location of the shoreline vegetation, if existing;

     f.  Showing the location of any proposed or existing structures;

     g.  Showing the riparian lines; and

     h.  Legal description and acreage of the parcel sought.

☐ Noticing information as required by subsection 18-21.005(3), F.A.C.

# Section G: Supplemental Information Required for Mitigation Banks

Instructions: Please provide the information requested below if you are applying for a mitigation bank permit or a mitigation bank conceptual approval in accordance with Chapter 62-342, F.A.C. To obtain a mitigation bank permit, the applicant must provide reasonable assurance in accordance with 373.4136(1), F.S. that:

a) The proposed mitigation bank will improve ecological conditions of the regional watershed;
b) The proposed mitigation bank will provide viable and sustainable ecological and hydrological functions for the proposed mitigation service area;
c) The proposed mitigation bank will be effectively managed in perpetuity;
d) The proposed mitigation bank will not destroy areas with high ecological value;
e) The proposed mitigation bank will achieve mitigation success;
f) The proposed mitigation bank will be adjacent to lands that will not adversely affect the perpetual viability of the mitigation bank due to unsuitable land uses or conditions;
g) Any surface water management system to be constructed, altered, operated, maintained, abandoned, or removed within the mitigation bank will meet the requirements of the rules adopted under Part IV of Chapter 373, F.S., including Section E of the application;
h) It has sufficient legal or equitable interest in the property to ensure perpetual protection and management of the land within a mitigation bank; and
i) It can meet the financial responsibility requirements prescribed for mitigation banks.

In addition, a phased Mitigation Bank must demonstrate that each phase independently meets the mitigation bank establishment and operation requirements above (Section 373.4136, F.S.).

**Part 1: Location of The Proposed Mitigation Bank (62-342.450(1), F.A.C.)**

Please provide the following information:

1. ☐ A map, at regional scale, of the mitigation bank in relation to the regional watershed and proposed mitigation service area;

2. ☐ A vicinity map showing the mitigation bank in relation to adjacent lands and off-site areas of ecological or hydrologic significance which could affect the long-term viability or ecological value of the bank;

3. ☐ A recent aerial photo of the mitigation bank (in color; 11x17 inches or greater) identifying boundaries of the project area and showing the proposed assessment areas;

4. ☐ One or more historical aerial photos of the mitigation bank (no photocopies) identifying boundaries of the project area and the proposed assessment areas, if substantially different from current conditions;

5. ☐ A highway map showing points of access to the mitigation bank for site inspection; and

     

6. ☐ A legal description of the proposed mitigation bank.

**Part 2: Ecological Significance (62-342.450(2), F.A.C.)**

Please provide the following information:

1. ☐ A description of the ecological significance of the proposed mitigation bank to the regional watershed in which is it is located

**Part 3: Current Site Conditions (62-342.450(3), F.A.C.)**

Please provide the following information:

1. ☐ A soils map of the mitigation bank site;

2. ☐ A topographic map of the mitigation bank site and adjacent hydrologic contributing and receiving areas;

3. ☐ A hydrologic features map of the mitigation bank and adjacent hydrologic contributing and receiving areas;

4. ☐ Current hydrologic conditions in the mitigation bank site;

5. ☐ A vegetation communities map of the mitigation bank site and site-specific descriptions of each significantly different aerial signature or assessment area, including the native community types, a species list of the dominant canopy and groundcover plants, its structure relative to reference condition, and historical impacts;

6. ☐ Ecological benefits currently provided to the regional watershed by the mitigation bank site;

7. ☐ Adjacent lands, including existing land uses and conditions, projected land uses according to comprehensive plans adopted pursuant to Chapter 163, F.S., by local governments having jurisdiction, and any special designations or classifications associated with adjacent lands or waters; and,

8. ☐ A disclosure statement of any material fact which may affect the contemplated use of the property.

**Part 4: Mitigation Plan (62-342.450(4), F.A.C.)**

Please provide the following information:

1. ☐ Proposed construction/mitigation activities, including a detailed schedule for implementation;

2. ☐ The proposed vegetation enhancement activities, such as plant removal/eradication, planting, seeding, or prescribed fire, and detailed schedule for implementation;

3. ☐ Measures to be implemented during and after construction/implementation to avoid adverse impacts related to proposed activities;

4. ☐ A detailed perpetual management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species

control, fire management,  control of access, and inspection and implementation schedule of each activity; and

5. ☐ A proposed monitoring plan to demonstrate mitigation success.

**Part 5: Assessment of Improvements in Ecological Value (62-342.450(5), F.A.C.)**

Please provide the following information:

1. ☐ A description of anticipated site conditions in the mitigation bank after the mitigation plan is successfully implemented, including proposed community map and GIS shapefile, and proposed quantitative and qualitative success criteria;

2. ☐ A comparison of current fish and wildlife habitat and utilization functions to those after the mitigation plan is successfully implemented; and

3. ☐ A description of the expected ecological benefits to the regional watershed and the timeframe to achieve these benefits.

**Part 6: Evidence of Sufficient Legal or Equitable Interest in the Property (62-342.450(6), F.A.C.)**

Please provide the following information:

1. ☐ Evidence of sufficient legal or equitable interest in the property which is to become the mitigation bank to meet the requirements of Rule 62-342.650, F.A.C.

**Part 7: Financial Responsibility (62-342.450(7), F.A.C.)**

Please provide the following information:

1. ☐ Cost estimates and draft documentation of financial responsibility for the construction and implementation phase and the perpetual management phase of the mitigation bank meeting the requirements of 62-342.700, F.A.C.

**Part 8: Additional Information (62-342.450(8), F.A.C.)**

Please provide the following information:

1. ☐ Any additional information which the Agency requests or would need in order to evaluate whether the proposed Mitigation Bank meets the criteria of Section 373.4136, F.S., and this chapter.

2. ☐ Any engineering calculations and/or computer modeling (such as hydrograph or staging) needed to assess the effects of the project on the hydrologic characteristics of the mitigation bank site and upstream and downstream areas.

**Part 9: Land Use Restrictions (62-342.650)**

Please provide the following information:

1. ☐ Documentation in the form of: (a) a draft warranty deed for the fee interest to be conveyed to the Agency, or (b) a draft conservation easement to be conveyed to both the Department and the District in accordance with Rule 62-342.650, F.A.C.;
2. ☐ A boundary survey of the real property interest being conveyed. The survey must be certified by a land surveyor and mapper registered in the State of Florida;
3. ☐ A certified appraisal or other documentation demonstrating the market value of the property or interest to be conveyed to determine the appropriate amount of title insurance;
4. ☐ A marketable title commitment issued to the Agency as beneficiary in an amount at least equal to the fair market value;
5. ☐ A Phase I environmental audit; and
6. ☐ If applicable, evidence that all abandoned personal property, solid waste, or hazardous substances have been removed from the property.

# Section H:
# Supplemental Information for Stormwater Management Systems for Mines

Instructions: The supplemental information required by this section is in addition to the information required by Section A and Section C (if applicable) of this application. This section is only required for mines for which the Department has permitting, compliance, and enforcement responsibilities under the interagency operating agreements with the water management districts and mines within assumed waters regulated under Chapter 62-331, F.A.C., but is not applicable to borrow pits.

***The design options and considerations applicable to stormwater management systems for mines are referenced in Section 8.2.7 and described in Appendix I of Volume I of the Applicant's Handbook. The applicant is strongly encouraged to contact the Department to arrange a pre-application review meeting prior to finalizing the proposed project activities, including monitoring well and piezometer installation and water quality sampling. The information requested below represents the level of information that is usually required to evaluate an application. Information can be provided within reports, plans and other documents. Provide a response after each item below indicating specifically where in the reports, plans, and other documents the information will be found. If an item does not apply to your project, indicate that it does not and proceed to the next item. The level of information required for a specific project will vary depending on the nature and location of the site and the activities proposed. Conceptual approvals generally do not require as much detail as a construction permit. However, providing a greater level of detail will reduce the need to submit additional information at a later date.***

**Part 1:  Project Information and Environmental Considerations**

a. ☐ Provide a detailed description of the proposed activities, including specifics about the stormwater management system(s), water treatment methodologies, and operation and maintenance procedures for the construction (during-mining and reclamation) and post-reclamation (also known as "operation" or "post-development") conditions.

b. ☐ Respond to the following items if Section C was not completed (because the proposed work or activity will not occur in, on, over, or within 25 feet of a wetland or other surface water):
   1. ☐ Identify the seasonal high water or mean high tide elevation and normal pool or mean low tide elevation for each wetland and other surface water, both within and contiguous to the proposed permit area. Include an aerial photograph identifying each area, the elevation source and datum, and method of evaluation.
   2. ☐ Describe how the proposed project will be designed to avoid adverse effects to public health, safety, or welfare or the property of others.

c. ☐ Provide the results of percolation tests, soil boring logs, cross-sections, and stratigraphic thickness contour maps, if available, that are representative of the actual site conditions to the proposed excavation depth(s). Provide the hydraulic conductivity values and proposed average and maximum depths of excavation.

d. ☐ Provide a hydrostratigraphic column that is representative of the proposed project site. Describe the hydrostratigraphic units and define all aquifer(s) and/or aquiclude(s) (semiconfining/confining beds) present at the project site. Identify the wet season high water table elevations for the proposed project area. Include the dates, datum, and methods used to determine these parameters.

e. ☐ Changes to pre-construction groundwater elevations on the proposed mining site may adversely impact the hydrology of onsite or offsite wetlands and other surface waters (including lakes, streams, and spring discharges). Provide the following:
   1. ☐ A hydrologic analysis, such as a seepage analysis, water budget analysis, and/or drawdown analysis, for the existing, construction, and post-reclamation conditions. State

     

the assumptions, scope of the analysis, the source(s) of the data used in the calculation(s) and the name of the computer model or program, if used. If applicable, provide input and output Geographic Information System (GIS) data layers in digital format that were used in the hydrological analysis. Provide the relevant metadata, including data sources and map projection systems. Input and output data tables, such as excel, access, or a similar format, should also be provided in digital format.

    2. ☐ For a proposed water elevation maintenance system, such as a recharge system, provide a plan view drawing of the system indicating the source and routing of the water; a cross section drawing of the hydration system, injection well, or recharge ditch in relation to features such as the mine-cut face, cast overburden/seepage face, the ground surface, the overburden and matrix layers, and the water table; and a monitoring and maintenance plan for the system.

f. ☐ Provide a water level monitoring plan for any avoided wetlands and other surface waters adjacent to the proposed project boundary or excavation. The monitoring plan shall include a staff gauge and/or piezometer location map, monitoring instrumentation, data collection methods, data recording and/or downloading frequency, available remedial measures, a typical gauge/piezometer schematic and datum, and reporting frequency and report contents. Propose a monitoring period that starts prior to mining and ends after the completion of reclamation.

g. ☐ Identify public water supply wells within 1000 feet of the proposed extraction area. Identify the wellfield cone of depression, if available, well depths and screen or open-hole intervals, and source of information for public water supply wells.

h. ☐ To the extent possible, through publically available information and field reconnaissance from the project boundary, identify private water supply wells located within 1000 feet of the proposed extraction area. This shall not be construed to require trespassing on the property of others. Provide the well construction details, if available.

i. ☐ Provide ambient surface water and groundwater quality characterization for the proposed project for intervals extending to the proposed depth of mining. The applicant is strongly encouraged to arrange a pre-application meeting prior to performing monitoring well installation and water quality sampling activities.

j. ☐ If the proposed project site is located within a mile of a karst-sensitive area, a springshed, other karst features, or a public supply wellfield, submit a geotechnical assessment report, which includes a location map of these features. Provide information about site grading or other stormwater management practices designed to direct runoff from any areas that are potential sources of pollutants into stormwater treatment areas that are designed, constructed, operated, and maintained in compliance with the requirements of the applicable Applicant's Handbook, Volume II, prior to any discharge to the mine excavation.

k. ☐ If a floating dredge will be used, specify the approximate depth and area that will need to be excavated before the dredge will become operational. Describe the initial excavation method, including the approximate length of time from initiation of excavation to the time that the floating dredge will become operational. If temporary dewatering will be conducted, please provide the projected drawdown of the water table in the avoided wetlands. If necessary based on the results, provide protective measures such as the construction of recharge ditches. Describe any measures that will be used to manage the extracted water.

l. ☐ If the water table will be augmented to use a floating dredge, specify the water source (e.g. offsite recycled wastewater) and pumping and conveyance system details.

m. ☐ If the proposed project area is in the watershed of a first order stream (headwater), second order stream, etc., of a river where Minimum Flows and Levels (MFLs) have been established, provide a water quantity simulation representing the peak severance/dewatering conditions to demonstrate that the proposed activity will not contribute to violations of the established MFLs.

n. ☐ Following reclamation, if a mine pit or reclaimed created lake will connect to offsite wetlands or other surface waters during storms less than the 25-year, 24-hour design storm event, or if the water body will have more than one property owner, then the water body meets the definition for

"waters of the state". Waters of the state must meet the surface water quality standards of Chapter 62-302, F.A.C. To demonstrate the absence of such a connection, the applicant must show through volumetric calculations or hydrologic modeling that the mine pit or reclaimed created lake will have sufficient capacity when operating at the average annual water elevation (normal pool) for the storage of direct runoff and rainfall for the 25-year, 24-hour design storm event. If the proposed project will result in waters of the state in the post-reclamation condition, provide reasonable assurance that the surface water quality standards will be met.

o. ☐ Identify the classification(s) (e.g. Class F-1, G-1, G-II, G-III and G-IV) of the groundwater in the proposed project area and immediate vicinity according to the designated uses provided in Rule 62-520.410, F.A.C.

p. ☐ Provide the names, locations, and storage conditions for any chemicals that will be stored onsite. This includes all pH adjusters, water conditioners, and other material that will be used in the process water. Additionally, include how the chemicals will be utilized, e.g. blasting, vehicle maintenance, vegetation maintenance, and process water treatment. Identify separate containment areas on the construction plans that meet the requirements of the applicable Applicant's Handbook, Volume II for equipment maintenance and the storage of petroleum and hazardous substances.

q. ☐ For previously-mined lands that are proposed for construction, provide the following:
    1. ☐ Bathymetric map for each existing lake.
    2. ☐ Identify the existing lakes to be excavated deeper and the proposed maximum depth of excavation.
    3. ☐ Identify any onsite lake that has penetrated a confining layer between the water table aquifer and a deeper aquifer.
    4. ☐ Provide a discussion of the existing site-specific geology (including sand tailings, waste clay disposal, and overburden deposition and orientation, if known) and aquifers and aquitards.

r. ☐ Provide all of the known historical and current activity information for the project area, such as specific crops grown, vehicle maintenance, waste disposal, and indicate the aerial extent of each activity on a plan map. Provide soil sample quality data, a summary of the soil characterization procedures, and sampling results. The applicant is strongly encouraged to arrange a pre-application meeting prior to performing soil sampling activities.

s. ☐ Provide a hydrological analysis, as applicable, for proposed wetland mitigation (excluding permitted mitigation banks). If applicable, provide input and output GIS data layers in digital format that were used in the hydrological analysis. Provide the relevant metadata, including data sources and map projection systems. Input and output data tables, such as Excel, Access, or a similar format should also be provided in digital format. The hydrological analysis shall evaluate the wetland types and appropriate hydroperiods, historical and proposed hydrologic conditions, including whether the wetlands were perched, surface water dependent, seepage dependent, or groundwater-supported. Propose monitoring locations for piezometers and staff gauges, construction details, the measurement frequency, the data collection methodology, and reporting format.

t. ☐ Applicants that elect to use alternative wetland mitigation associated with the mining of high-quality peat, in accordance with Section 373.414(6)(e), F.S., shall provide all information required by Chapter 62-348, F.A.C.

u. ☐ If onsite and/or offsite applicant-responsible mitigation is proposed, submit a cost estimate for completing the mitigation, including monitoring and maintenance, as required by Section C of the application. For phosphate and limestone mines only, mitigation costs shall be presented as provided by Section 373.414(19), F.S. If the proposed mitigation costs exceeds $25,000, provide draft financial assurance documents, as required by Section C of the application.

v. ☐ For phosphate and heavy mineral mines, provide, within the footprint of the current ERP application, the number of acres of land mined before July 1, 1975; land mined from June 30, 1975 to the present; land to be mined; land disturbed before June 1, 1975; land disturbed from June 30, 1975 to present; land to be disturbed; land to remain undisturbed; and the sum of these acres.

w. ☐ For fuller's earth mines, provide, within the footprint of the current ERP application, the number of acres of land mined or disturbed before July 1, 1975; land mined or disturbed from July 1, 1975 to October 1, 1986; land mined or disturbed from October 2, 1986 to present; land to be mined or disturbed, land to remain undisturbed; and the sum of these acres.

x. ☐ For limestone and other resources mines that began operations on or before October 1, 1986, provide, within the footprint of the current ERP application, a figure that shows areas disturbed by mining operations on or before January 1, 1989 and the number of acres and current status for each area. Examples of status include: reclaimed, reclamation in progress, mined out, mining, disturbed only, stock piles, overburden piles, and tailings disposal. Include aerial photographs as a basis for this figure.

y. ☐ For phosphate, heavy mineral and fuller's earth mines, provide, within the footprint of the current ERP application, the information below in acres for lands mined or disturbed prior to July 1, 1975. For limestone and other resources mines that began operations on or before October 1, 1986, provide the information below in acres for lands mined or disturbed on or before January 1, 1989.

|  | In Use* | Unreclaimed | Reclaimed |
|---|---|---|---|
| 1. ☐ Mined only |  |  |  |
| 2. ☐ Mined – waste disposal use |  |  |  |
| 3. ☐ Disturbed only |  |  |  |
| 4. ☐ Disturbed by waste disposal |  |  |  |
| 5. ☐ Total<br>*For mining operations |  |  |  |

z. ☐ For above grade settling or disposal areas provide the geometric characteristics of each area, including the average dike height (feet), dike crest elevation (feet & datum), maximum operating water level (feet & datum), crest width (feet), outside and inside slopes (below and above grade), effective area (acres), effective depth (feet & datum), effective pit bottom depth below grade (feet), and effective storage volume (acre-feet).

aa. ☐ For phosphate mines, estimate the following information for each disposal site:

| Waste Clay Disposal Site Designation | Site 1 | Site 2 | Site 3 | Site 4 |
|---|---|---|---|---|
| Disposal Acres |  |  |  |  |
| Dam Height Above Grade (ft.) |  |  |  |  |
| Minimum/Maximum/Average |  |  |  |  |
| Type of Disposal |  |  |  |  |
| Cap Thickness (ft.) |  |  |  |  |
| Average Storage Depth (ft.) |  |  |  |  |
| Storage (acre-feet) |  |  |  |  |
| Infill Rate (Dry Tons/yr.) |  |  |  |  |
| Percent Solids in Fill* |  |  |  |  |
| Immediate Percent Solids** |  |  |  |  |

     * At entry into CSA        **Point at which self-weight consolidation begins

bb. ☐ For phosphate mines, provide the following drainage information and acreages based on the Florida Land Use Cover and Forms Classification System, Level III:

| Drainage Information | Pre-mining Quantity | Pre-mining Acres | Post-reclamation Quantity | Post-reclamation Acres |
|---|---|---|---|---|
| 1st order drainage basins | | | | |
| 2nd order drainage basins | | | | |
| wetlands under 20 acres | | | | |
| wetlands 20 acres or over | | | | |
| Lakes (waterbodies) | | | | |

cc. ☐ If the proposed project will include stream disturbances, provide a stream assessment and mitigation/reclamation plan that includes maps and an analysis of the existing streams. Identify the stream type (Rosgen Level II or other classification system approved by the Department), flow type (perennial, intermittent, or ephemeral), stream order, stream habitat quality, and channel lengths. Distinguish between natural streams and ditched or channelized natural steams and identify which streams are proposed for disturbance. The plan shall also describe how the streams proposed for disturbance will be reclaimed and include the reference reach or regional curve information used in the design, stream type, stream order, individual stream lengths and designs (dimension, pattern, and profile), and stream construction specifics, including construction staking, erosion control, streambank construction, riparian corridor revegetation, and in-stream habitat creation.

**Part 2: Construction Plans**

Provide clear, construction level detailed plans for the proposed project, including specifications, plan (overhead) views, cross section views (with the locations of cross section shown on the corresponding plan view) and profile (longitudinal) views. Include a scale, scale bar, county name, Section, Township, and Range, and a north arrow on each sheet. The plans must be signed, dated, and sealed by an appropriate Florida-licensed professional. These plans shall include cumulative information from all applicable sections of the application.

a. ☐ Provide the project, permit, and property boundaries and total acreages, including distances and orientation from roads or other landmarks on a recent aerial legible for photo interpretation with a scale of 1 inch = 400 feet, or more detailed. The project boundary shall only include the portions of the property that will be altered or disturbed by permitted activities, e.g. surface areas where there will be construction, alteration, operation, maintenance or repair; abandonment; or removal of any stormwater management system, dam, impoundment, reservoir, work (including dredging or filling), or appurtenant work. The permit boundary includes the proposed project areas and mitigation areas. Include the date of the photo.

b. ☐ Provide individual plans for the existing, during–mining (and intermediate stages, if necessary), and post-reclamation conditions. Include the following:

1. ☐ Topography extending at least 100 feet off the permit area shown on a recent aerial map. All topography shall include location and description of benchmarks referenced to NGVD 1929 or NAVD 1988 along with the conversion factor(s) if the application documents refer to more than one datum. Blend the proposed contours into the undisturbed contours in the construction and post-reclamation conditions.

2. ☐ US Geological Survey topographic map.

3. ☐ Provide existing and proposed maps accurately describing the vegetative community and landscape types. Generally, this is best done using the Florida Land Use and Cover Classification System (FLUCCS) (FDOT 1999) or the Florida Natural Areas Inventory

Guide to the Natural Communities of Florida. Additional or alternative descriptions may also be used if the overall submittal provides a clear, complete, and scientifically accepted description of all vegetative community and landscape types. For vegetated areas dominated by exotic vegetation, use the descriptors representative of the native community type that was present prior to exotic infestation. Also identify each community with a unique identification number which must be consistent in all exhibits.

4. ☐ Wetlands and other surface waters to be impacted or avoided and mitigation areas, including acreages.

5. ☐ Undisturbed upland buffers adjacent to wetlands and other surface waters, including width of each buffer.

6. ☐ Areas and acreages to be excavated, the proposed mine cells and sequence of mining or excavation.

7. ☐ Staging/temporary overburden storage areas, product stockpiles areas, processing areas, and waste disposal areas (e.g. disposal areas for humate, waste clays, and tailings).

8. ☐ Utility, pipeline, equipment, dredge, and dragline crossings and corridors. Distinguish between temporary (single use) and long-term crossings and corridors. Provide an approximate length of time and schedule to perform the construction and removal activities for each crossing or corridor.

9. ☐ Impervious surfaces (including directly connected impervious surfaces), vehicle parking areas, and haul roads, including stormwater management systems for these areas.

10. ☐ Internal and external perimeter berms.

11. ☐ Recirculation ditches, recharge ditches, and stormwater ditches.

12. ☐ Connections/outfalls to wetlands or other surface waters.

13. ☐ Normal mine operation water elevation, the seasonal high and low water elevations, and the average annual water elevation.

14. ☐ All water management structures, volumes, and invert elevations.

15. ☐ Where the proposed water management system for a mine will partially replace an existing surface water management system, provide drainage plans and reports showing how the system outside of the mine will function as mining and reclamation proceed.

16. ☐ For phased projects where each phase is a stand-alone system, provide a master development plan clearly delineating the limits of each phase of construction.

17. ☐ For post-reclamation plans, show how areas subject to the reclamation requirements of Chapter 378, F.S., will meet the standards of the applicable reclamation rules. A separate Conceptual Reclamation Plan or a Notice of Intent to Mine shall be provided prior to the start of mining activities in accordance with the applicable reclamation rules. For mines using the provisions of Section 373.414(6)(b) or (c), F.S., for wetland mitigation, the Conceptual Reclamation Plan shall be provided with the ERP application.

c. ☐ Where agricultural ditches are present, illustrate how the area hydrology will be altered due to the proposed project. Provide plan drawings that show the internal, perimeter, and surrounding agricultural ditches for the existing, construction, and post-reclamation conditions. Clearly indicate whether the perimeter ditches are within or outside the project area. Flow direction arrows (include any seasonal flow reversals with an explanation of use, if applicable) and proposed alterations to the ditches must be shown in each drawing. Provide maps that clearly depict the progression of ditch severance as the stormwater management system expands.

d. ☐ Paving, grading, and drainage information for the existing, construction (and intermediate stages, if necessary), and post-reclamation conditions, which includes, but is not necessarily limited to, the following:

    1. ☐ Plan view of proposed construction, including processing area and water quality treatment areas.
    2. ☐ Proposed elevations and/or profiles, including datum.
    3. ☐ Roadway, parking, and pavement grades.
    4. ☐ Floor slabs, walkways, and other paved surfaces.
    5. ☐ Earthwork grades for pervious landscaped areas.
    6. ☐ Perimeter site grading, tying back into existing grades.
    7. ☐ Location of all water management areas, including elevations, dimensions, side slopes, and design water depths.
    8. ☐ Location, size, and invert elevations of existing and proposed stormwater conveyance systems.
    9. ☐ Vegetative cover plan for all on-site and off-site earth surfaces disturbed by construction.
    10. ☐ Rights-of-way and easements for the system, including all on-site and off-site areas to be reserved for water management purposes (including access), and rights-of-way and easements for the existing drainage system, if any.

e. ☐ Stormwater detail information, including but not necessarily limited to, the following:

    1. ☐ Cross section of all stormwater management areas, including elevations, dimensions, crest widths, side slopes, and proposed stabilization measures (with location of the cross section(s) shown on the corresponding plan view).
    2. ☐ Provision for permanent stabilization of the slopes through the establishment of permanent vegetative cover or other appropriate methods.
    3. ☐ Detail of all proposed control structures, including elevations, dimensions, and skimmer, where applicable.
    4. ☐ Details of proposed stormwater management systems, such as underdrains, exfiltration trenches, vaults, and other proposed Best Management Practices (BMPs).

f. ☐ Provide a cross sectional view of the reclamation lake(s) and shoreline. Show the lake configuration, including side slopes and grade-break; elevations for the shoreline; lake bottom elevation; the average (normal pool), seasonal high, and seasonal low water elevations; littoral zone; vegetation cover designation; and associated control structures.

g. ☐ For limestone mines, provide a cross-sectional view of reclaimed sheer walls, including transition shelves and other means of access control. Refer to Rule 62C-36.008, F.A.C., for sheer wall design requirements. Provide a plan view showing the location and extent of areas to be reclaimed with sheer walls. For fuller's earth and other resources (gravel, sand, clay) mines provide a cross-sectional view of reclaimed high walls. Provide a plan view showing the location and extent of areas to be reclaimed with high walls. Refer to Rules 62C-38.008 or 62C-39.008, F.A.C., fuller's earth and other resources, respectively, for limits on steepness of slopes. Provide the appropriate geotechnical engineering study whenever the proposed slopes will be steeper than the limits provided by rule.

h. ☐ Provide groundwater elevation contour maps showing existing, construction, and post-reclamation elevations extending at least 100 feet off the proposed permit area. All elevations shall be referenced to the common benchmark or datum (NGVD/NAVD) being utilized for the permit area. Cite the date and data source for the existing condition. If the elevations are compiled data, identify if the contours represent average seasonal high water, average annual, or seasonal low water table elevations.

i. ☐ Provide a Federal Emergency Management Agency (FEMA) flood map (include the proposed permit boundary on the map).

j.  ☐ If the proposed project will impede or restrict the flow of offsite stormwater runoff, provide plan and cross-section figures showing the locations and elevations of the proposed berms and water control structures (to prevent erosion) that will allow offsite runoff to either enter the stormwater management system or be routed around the project area. Present these drainage conditions for the construction and post-reclamation scenarios.

k.  ☐ Provide the location of any nearby existing offsite features (such as wetland and other surface waters, municipal well fields, large irrigation wells, stormwater management ponds, gas pipelines, and buildings or other structures) which might be affected by or affect the proposed permit activities.

l.  ☐ Provide the digital GIS data layers for the wetlands, Land Reclamation Units, and mandatory mined areas and relevant metadata, including the source data and map projection systems for the existing and post-reclamation conditions for the proposed project.

***Part 3: Stormwater Drainage and Treatment Information and Analyses***

Provide drainage calculations signed, dated, and sealed by an appropriate Florida-licensed professional, and supporting documentation demonstrating that the proposed project meets the conditions for issuance under Rules 62-330.301(1)(a), (b), (c), and (e), F.A.C. **Larger mines or more complex mine plans require one or more intermediate stage maps or GIS data layers and drainage calculations to explain how the proposed water management system and offsite flows will change as mining and reclamation progress.** The plans and calculations shall include the following:

a.  ☐ Provide separate drainage maps for the existing, construction, and post-reclamation conditions that include the drainage patterns and basin/sub-basin boundaries. Provide the acreage for each basin/sub-basin and include flow direction arrows showing any off-site runoff being routed through or around the system, topographic information, and connections between wetlands and other surface waters below the 25-year 24-hour design storm event applied to the average annual water table. Merge the construction and post-reclamation elevation contours with the existing elevation contours in areas that will remain undisturbed.

b.  ☐ Identify the existing and proposed onsite hydrologic soil names and classifications (e.g. Type A, C, B/D, D). Reference the source, such as the U.S. Department of Agriculture/Natural Resource Conservation Service Soil Survey (NRCS), used in estimating the existing onsite hydrologic soil name and classifications. Provide maps, as appropriate, on which the permit area has been delineated.

c.  ☐ Indicate the existing and post-reclamation land use and land cover. Provide the acreages and percentages of the total project, for the following:

    1.  ☐ Impervious surfaces (and directly-connected impervious surfaces) excluding buildings, wetlands and other surface waters;
    2.  ☐ Buildings;
    3.  ☐ Pervious surfaces (green areas not including wetlands);
    4.  ☐ Lakes, canals, retention areas, other open water areas; and
    5.  ☐ Wetlands (Please refer to Section C to ensure consistency in wetland acreages).

d.  ☐ Identify the wetland and/or waterbody that will receive discharge from the stormwater management system. Provide the receiving wetland/waterbody seasonal high water or mean high tide elevation, including the dates, datum, and methods used to determine these elevations.

e. ☐ Provide mine-wide drainage analyses for the existing and post-reclamation peak rates of discharge, volumes of runoff, and peak stages for the appropriate design storm events demonstrating that the proposed project meets the stormwater design criteria in the applicable Applicant's Handbook, Volume II. Account for all onsite depressional storage and offsite contributing areas. Refer to the applicable Volume II for the design storm event(s) that applies to the project area. Typically, the information includes the following:

    1. ☐ Runoff characteristics, including area; runoff curve number or runoff coefficient; hydrologic soil classifications; and time of concentration for each drainage basin/subbasin in the existing and post-reclamation conditions;

    2. ☐ Design storms used including rainfall depth, duration, frequency, and distribution;

    3. ☐ Runoff hydrograph(s) for each basin/subbasin, for the required design storm event(s);

    4. ☐ Stage-storage computations for any area such as a reservoir, closed basin/subbasin, detention area, or channel, used in storage routing;

    5. ☐ Stage-discharge computations for any storage areas at a selected control point, such as a flow control structure or natural flow restriction;

    6. ☐ Flood routings through on-site flow conveyance and storage areas;

    7. ☐ Water surface profiles in the primary drainage system for each required design storm event(s);

    8. ☐ Runoff peak rates and volumes discharged from the site for each required design storm event(s);

    9. ☐ Design tailwater elevation(s) (peak stages) for each storm event at all points of discharge (include source or method of estimate);

    10. ☐ Pump specifications and operating curves for range of possible operating conditions (if used in the system); and

    11. ☐ Discharge rate comparisons for the mean annual, 25-year and 100-year, 24-hour design storm events and necessary erosion control measures and locations.

f. ☐ Provide a description of the engineering methodology, assumptions, and references for the drainage parameters listed above, and a copy of all computations, engineering plans, and design specifications used to analyze the system. Include basin-node-reach schematics and show the time of concentrations, flow conveyance structures, and flow comparison locations (Flow Evaluation Points or Critical Points) in the engineering plans and/or drainage maps. If a computer model is used for the analysis, provide the name of the model, the input and output GIS data layers listed below in digital format that were used in the hydrological analysis. Provide the relevant metadata, including the source data and map projection systems, for the existing and post-reclamation conditions for the proposed project. The data layers shall include the project boundary, topography, basins, land use, evaluation points, nodes, reaches, drainage patterns, time of concentration, and hydrologic soil groups. Provide the input and output data tables in digital table format, such as Excel, Access, or a similar format.

g. ☐ If there will be no discharge, provide sufficient freeboard in compliance with Appendix I of the Applicant's Handbook, Volume I, in the stormwater management system to prevent the occurrence of overtopping. Provide the basis for determination of the freeboard, such as staging the applicable design storm event on the seasonal high water elevation (or control elevation) plus an effective freeboard. Perform a wave run-up analysis, if required.

h. ☐ For traversing works, in accordance with the applicable Applicant's Handbook, Volume II, provide the following:

    1. ☐ Hydraulic calculations for all proposed traversing works; and

2. ☐ Water surface profiles showing upstream impact of traversing works.

i. ☐ For impacts to regulated floodplains, in accordance with the applicable Applicant's Handbook, Volume II, provide the following:

1. ☐ Location and volume of encroachment within regulated floodplain(s); and
2. ☐ Plans and calculations for compensating floodplain storage, if necessary, and calculations required for determining minimum flood elevations for buildings and roads.

j. ☐ For treatment other than or prior to containment, provide construction plans and calculations that address the required treatment volume and recovery, as well as stage-storage and design elevations, which demonstrate compliance with the water quality treatment design criteria in the applicable Applicant's Handbook, Volume II. If a computer model is used for the analysis, provide the name and a description of the model, the input and output data, and a justification for the model selected.

k. ☐ If the receiving waterbody is known to be impaired, and/or has an established Total Maximum Daily Load (TMDL) or Basin Management Action Plan (BMAP), provide specific descriptions of all water quality parameters for which the waterbody is known to be impaired. Provide reasonable assurance that the proposed project will not contribute to violations of state water quality standards for TMDLs in accordance with the applicable Applicant's Handbook, Volume II.

l. ☐ If the proposed project will have a direct discharge to a Class I, Class II, Outstanding Florida Waters (OFW), or Class III waters that are approved, conditionally approved, restricted, or conditionally restricted for shellfish harvesting, provide additional water quality treatment in accordance with the applicable Volume II.

## Part 4: Construction Schedule and Techniques

Provide a construction schedule and a description of construction techniques, sequencing, and equipment. This information shall include, as applicable, the following.

a. ☐ Access and staging of equipment.

b. ☐ Location and details of the temporary erosion, sediment, and turbidity control measures to be implemented during each phase of construction and all permanent control measures to be implemented in post-reclamation condition.

c. ☐ A demolition plan for any existing structures to be removed.

d. ☐ Dewatering plan details. Provide the dewatering location(s), methods to contain the discharge, methods of isolating dewatering areas, the period of time the dewatering structures will be in place, and the hydrologic monitoring plan. Contact the appropriate water management district regarding the need and requirements for a Consumptive Use or Water Use permit for dewatering.

e. ☐ Methods for transporting equipment and materials to and from the work site. If barges are required for access, provide the low water depths and draft of the fully loaded barge.

f. ☐ Describe the measures that will be taken to protect and secure monitoring wells, piezometers, and staff gauges during mining and reclamation activities so that they will be available for water quality and/or quantity sampling through the duration of the permit. Also, describe how the elevations of the monitoring equipment will be surveyed and a schedule, if the elevations will be intermittently confirmed.

g.  ☐ Identify the schedules and parties responsible for completing hydrologic and vegetative monitoring, record drawings, and as-built certifications for the proposed project when completed.

h.  ☐ Provide a detailed "Erosion and Sediment Control Plan" in accordance with the requirements of the Applicant's Handbook, Volume I, Part IV, Erosion and Sediment Control.

i.  ☐ Provide the projected production and disposal schedule for waste materials, such as waste clay, humate, and tailings, by year and location. Provide the total storage capacity for each disposal location and the remaining capacity (if it is an existing disposal location).

j.  ☐ Provide a production and utilization schedule for the backfill materials to demonstrate that there is sufficient backfill material available to construct the proposed post-reclamation elevations.


**Part 5:  Operation and Maintenance and Legal Documentation**

a.  ☐ Describe the overall maintenance and operation schedule for the proposed system.

b.  ☐ Identify the entity (or entities) that will be responsible for operating and maintaining the system (or parts of the system) to demonstrate that the entity (or entities) meet(s) the requirements of Section 12.3 of the Applicant's Handbook, Volume I. Provide information for the construction and post-reclamation conditions.

c.  ☐ If different from the permittee, provide a draft document enumerating the enforceable affirmative obligations on the entity to properly operate and maintain the system for its expected life, and documentation of the entity's financial responsibility for long-term maintenance.

d.  ☐ If the proposed operation and maintenance entity is not a property owner's association, provide proof of the existence of an entity or the future acceptance of the system by an entity which will operate and maintain the system.

e.  ☐ Provide drafts of all proposed conservation easements, stormwater management system easements, draft property owner's association documents, and survey plats for the property containing the proposed system. For onsite and/or offsite applicant-responsible mitigation proposed for preservation (as defined in Volume I), submit draft conservation easement documents or other forms of restrictive covenants, as required by Section C of the application.

f.  ☐ Provide legal reservations for access to the treatment system for maintenance and operation by future maintenance entities for subdivided projects.

g.  ☐ Provide a description or letters from utility providers documenting how potable water and wastewater service will be supplied.

h.  ☐ Provide a copy of the boundary survey and/or legal description and acreage of the total land area within the permit boundary, including all areas with proposed works or activities, and any mitigation areas.

**Part 6:  Water Use**

a.  ☐ Identify if any part of the stormwater management system will be used as a water supply source, e.g. for irrigation or recreation.

b.  ☐ If a Consumptive Use or Water Use permit has been issued for the project, provide the permit number:

c.  ☐ If a Consumptive Use or Water Use permit has not been issued for the project, indicate if such a permit will be required and when the application will be submitted.

d.  ☐ Indicate how any existing water use wells (private or public) located within the project site will be utilized or properly abandoned.

**Part 7:  Special Basin Information**

a.  Is the proposed project located within a Special Basin identified in the applicable Applicant's Handbook, Volume II?

☐ yes  ☐ no  ☐ don't know

b.  If yes, please demonstrate that the project will meet the applicable Special Basin criteria.

# Section I:
# Supplemental Information for State 404 Program Permits

State 404 Program authorization is required for activities within state-assumed waters under Chapter 62-331, F.A.C. The following information is necessary to facilitate the State 404 Program review when a project is within state-assumed waters.

1. Identify the project purpose. (*Describe the purpose and need for the proposed project. Why are you proposing the work? How will you use the proposed structure(s); and/or, how will the proposed fill area(s) be used?*) Include a description of any related activities that may be developed as a result of the proposed project. Provide the approximate dates you plan to both begin and complete all work:

2. List all other certificates or approvals/denials received or pending from federal, state, or local agencies for work affecting wetlands and/or other surface waters encompassed by the overall project site: (*You need not have obtained all other permits before applying for a State 404 Program permit.*)

| Agency | Action Type | ID Number | Date Applied | Date Approved/Denied |
|--------|-------------|-----------|--------------|----------------------|
|        |             |           |              |                      |
|        |             |           |              |                      |
|        |             |           |              |                      |

4. Identify the specific reason/need for the proposed activity (What will the activity be used for and why? Include activities that are linked to or reasonably related to the proposed activity.)

5. Provide an alternatives analysis as described in the 404 Handbook, Appendix C.

6. Describe any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity. Include the name(s) of those listed species or critical habitat areas. Describe any actions proposed to be taken to avoid or minimize adverse effects to listed species. Provide any other available data and information necessary for purposes of reviewing impacts to state and federal listed species.

7. Clearly show location and extent of all wetlands and other surface waters, delineated in accordance with Chapter 62-340, F.A.C. Label all special aquatic sites (e.g., wetlands, sanctuaries and refuges, mudflats, vegetated shallows, and riffle and pool complexes). Each type of boundary (for example, ordinary high water line, mean high water line, wetlands, or other special aquatic sites) must be clearly annotated and/or symbolized to ensure they are differentiable on the map. Unless indicated below, all wetlands and other surface waters on the site, as delineated in accordance with Chapter 62-340, F.A.C., that will be impacted by the proposed activities will be evaluated for permitting purposes under Section 404 of the Clean Water Act.

Check this box if you do not accept that all or a portion of the wetlands and other surface waters on the site are jurisdictional under Section 404 of the Clean Water Act, and provide documentation demonstrating which wetlands and other surface waters on the site are not jurisdictional, using reasonable scientific judgement.

     

8. Provide the complete names and full correct mailing address of the owners (public and private) of properties contiguous to the overall project site where the work is proposed. You may also provide email addresses, if available. Use additional sheets as necessary. (*This information may be obtained from your County Property Appraiser Office, which is typically accessible on the Internet; this information is needed so that, if required, the contiguous owners may be notified of the proposed activity (for example, through a public notice.*)

    1.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

    2.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

    3.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

    4.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

    5.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

    6.  Name:
        Mailing Address:
        City, State, Zip Code:
        Email:

# Petition for a Formal Determination
## of the Landward Extent of Wetlands and
## Other Surface Waters

Instructions: This form constitutes a petition to the Agency for a formal determination of the extent of wetlands and other surface waters in accordance with Chapter 62-340, F.A.C. Submit this form with the requested copies of supporting information and the non-refundable fee (please contact the appropriate agency for current fee schedule). Refer to Section 62-330.201, F.A.C., for procedural information.

## Part 1: Applicant and Associated Parties Information

### A. Property Owner

Last Name:                        First Name:                    Middle:

Title:                Company:

Address:

City:                State:                        Zip:

Home Telephone:                    Work Telephone:

Cell Phone:                        E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes ☐ no

### B. Petitioner/Entity to Receive Formal Determination

Company:                        Title:

Last Name:                        First Name:                    Middle:

Address:

City:                State:                        Zip:

Home Telephone:                    Work Telephone:

Cell Phone:                        E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes ☐ no

### C. Agent

Last Name:                        First Name:                    Middle:

Title:                Company:

Address:

City:                State:                        Zip:

Home Telephone:                    Work Telephone:

Cell Phone:                        E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes ☐ no

     

**D.  Individual Who Established the Boundary Line**

Last Name:                                First Name:                          Middle:

Title:                        Company:

Address:

City:                    State:                        Zip:

Home Telephone:                      Work Telephone:

Cell Phone:                        E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes  ☐ no

## Part 2:  Project Information

A.  Name of Property/Project:_____ Acreage: _____

    Address:  _____

    City: _____ County: _____ Zip: _____

    Tax Parcel ID No.: _____ Section/Township/Range: _____

B.  Amount of Fee Submitted:

C.  If the project includes any areas for which Agency permits, applications, declaratory statements, or Consent Orders have been received, list name, file numbers, type of activity, and provide a copy of all pertinent documents:

    DEP:  _____

    WMD:  _____

    Corps:  _____

D.  Have you had a pre-application conference with Agency Staff? ☐ yes  ☐ no

    If yes, with whom?        _____ Date(s): _____

    For What Purpose?        _____

E.  Have any Agency Staff or USDA/NRCS soil science personnel previously visited the site? ☐ yes ☐ no   ☐ I'm not sure

    If yes, with whom?        _____ Date(s): _____

    For What Purpose?        _____

F.  Briefly describe past and present land use activities within the boundaries of the property for which this determination is sought.

G.  Please provide an original USGS Topo Quad(s) with the property boundaries depicted. USGS Topo Quad Map(s) Name:

Form 62-330.201(2) – Petition for a Formal Determination of the Landward Extent of Wetlands
And Other Surface Waters
Incorporated by reference in paragraph 62-330.201(2)(b), F.A.C. (effective date )                    Page **2** of 4

H.  Please submit three copies (no photocopies) of the most recent aerial photographs at a scale of 1 in. equals 200 ft. or more detailed which accurately reflect the current conditions on site. Clearly delineate on the photos the boundaries of the area to be inspected. Show on at least one aerial the direction of surface water flow throughout the property, all major roads, and the north bearing. The date and scale of the attached photo(s) is:

I.  Provide a copy of a USDA/NRCS(SCS) soil survey with the project boundaries delineated, if available for the county. The Sheet No.(s) of the soil survey is:

J.  Property boundaries must be clearly flagged or marked in the field prior to the site inspection. Indicate how the boundaries will be identified:

K.  Attach documentation showing petitioner's legal or equitable interest in the property, or if petitioner has the power of eminent domain, please indicate on an attached paper by what authority petitioner has such power.

L.  Attach a legal description of the property for which this determination is sought.

M.  Select the form (type) of verification requested for the formal determination (see section 7.2.2(e) of Applicant's Handbook Volume I):
☐ a certified survey,  ☐ an approximate delineation,  ☐ a combination (certified survey and approximate delineation)

If a combination is requested, please clearly identify the portions of the determination that will be processed by certified survey and the portions that will be processed by approximate delineation.

In order for your petition to be deemed complete, the Agency must receive the verified delineation as described in section 7.2.2(e) of Applicant's Handbook Volume I.

## Part 3: Certification

A.  I certify that the petitioner has a legal or equitable interest in the property or that the petitioner is an entity which has the power of eminent domain.

B.  I understand I have to provide any additional information/data that may be necessary to complete this petition.

C.  I am familiar with the information contained in this petition, and to the best of my knowledge and belief, such information is true, complete, and accurate. I further certify that I possess the authority to petition for a formal determination in accordance with Section 373.421, F.S., or am acting as the duly authorized agent of person with such authority. I understand that knowingly making any false statement or representation in this petition is a violation of Chapter 373, F.S., and Chapter 837, F.S.


Typed/Printed Name of Petitioner or Agent              Signature of Petitioner or Agent


Corporate Title (if applicable)                              Date

An agent may sign above if the petitioner completes the following:

I hereby designate and authorize the agent listed above to act on my behalf as my agent in the processing of this petition for a formal determination and to furnish, upon request, supplemental information in support of the petition. I am familiar with the information contained in this petition, and to the best of my knowledge and belief, such information is true, complete, and accurate. I further certify that I possess the authority to petition for a formal determination in accordance with section 373.421, F.S. I understand that knowingly making any false statement or representation in this petition is a violation of Chapter 373, F.S., and Chapter 837, F.S.

Typed/Printed Name of Petitioner                    Signature of Petitioner

Corporate Title (if applicable)                          Date

Person authorizing access to the property must complete the following:

I certify that I either own the property described in this petition or I have legal authority to allow access to the property, and that I consent to a formal determination being made on the property as described in Chapter 62-340, F.A.C. I authorize representatives or personnel from the Agency to enter the property as many times as may be necessary to make the formal determination, or to perform a post-site inspection for the purpose of quality control/quality analysis, up to 12 months from the date of final agency action, and I will provide access throughout the property sufficient to perform the determination or inspection. I agree to indemnify and defend the Agency for all liability it may incur from accessing the property including, but not limited to, actions for trespass. I will attach to this petition documentation demonstrating that I am the owner of the property or that I have legal authority to allow access to the property.

Typed/Printed Name of Petitioner                    Signature

Corporate Title (if applicable)                          Date

Form 62-330.201(2) – Petition for a Formal Determination of the Landward Extent of Wetlands
And Other Surface Waters
Incorporated by reference in paragraph 62-330.201(2)(b), F.A.C. (effective date )                    Page **4** of 4

# Request to Transfer
# Environmental Resource and/or State 404 Program Permit

Instructions: To be completed, executed, and submitted by the new owner to the Agency within 30 days after any transfer of ownership or control of the real property where the permitted activity is located.

Use of this form is not required when a valid ERP permit is in the operation and maintenance phase. In such case, the owner must notify the Agency in writing within 30 days of a change in ownership or control of the entire real property, project, or activity covered by the permit. The notification may be by letter or email, or through use of this form, and must be sent to the office that issued the permit. A processing fee is not required for this notice. The permit shall automatically transfer to the new owner or person in control, except in cases of abandonment, revocation, or modification of a permit as provided in Sections 373.426 and 373.429, F.S. (2013). If a permittee fails to provide written notice to the Agency within 30 days of the change in ownership or control, or if the change does not include the entire real property or activity covered by the permit, then the transfer must be requested using this form.

Permit No(s):                    Application No(s).:                  Acres to be Transferred:

Permitted Project:               Proposed Project Name (if different):

Phase of Project (if applicable):

I hereby notify the Agency that I have acquired ownership or control of the land on which the permitted system is located through the sale or other legal transfer of the land. By signing below, I hereby certify that I have sufficient real property interest or control in the land in accordance with subsection 4.2.3(d) of Applicant's Handbook Volume I; attached is a copy of my title, easement, or other demonstration of ownership or control in the land, including any revised plats, as recorded in the Public Records. I request that the permit(s) be modified to reflect that I agree to be the new permittee. By so doing, I acknowledge that I have examined the permit terms, conditions, and drawings, and agree to accept all rights and obligations as permittee, including agreeing to be liable for compliance with all of the permit terms and conditions and to be liable for any corrective actions required as a result of any violations of the permit after approval of this modification by the Permitting Agency. Also attached are copies of any recorded restrictive covenants, articles of incorporation, and certificate of incorporation that may have been changed as a result of my assuming ownership or control of the lands. As necessary, I agree to furnish the Agency with demonstration that I have the ability to provide for the operation and maintenance of the system for the duration of the permit in accordance with subsection 12.3 of Applicant's Handbook Volume I.

Name of Proposed Permittee:

Mailing Address:

City:                            State:                              Zip:

Telephone:                       E-mail:

_____          _____
Signature of Proposed Permittee                           Date:

_____
Name and Title

Enclosures:
☐ Copy of title, easement, or other demonstration of ownership or control in the land, as recorded in the Public Records ☐ Copy of current plat(s) (if any), as recorded in the Public Records
☐ Copy of current recorded restrictive covenants and articles of incorporation (if any)
☐ Other

     

# Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit

**Instructions**: This form is for projects that qualify for a General Permit in accordance with Chapter 62-330 F.A.C., and/or Chapter 62-331, F.A.C. General Permits (GP) are provided for certain activities that have been determined to have minimal impacts to the water resources of the state when conducted in compliance with the terms and conditions of the general permit. Complete and submit this form to the appropriate agency as identified in Part 3 below.

If activity is located on, or has the potential to be located on, state-owned sovereignty submerged lands (SSL), the reviewing Agency will begin processing the request for state-owned sovereignty submerged lands authorization. If you know that your project is located on SSL, (i.e., waterward of the line of mean or ordinary high water of rivers, streams, bays, bayous, sounds, the Gulf of Mexico, the Atlantic Ocean, or certain natural lakes, we recommend completing Section F of the Environmental Resource Permit Application. You are not required to complete Section F to receive a General Permit, but it will help the agency process the SSL authorization. Both authorizations are required prior to construction on SSL.

## Part 1: General Information

**A.  Rule section number of the GP(s) for which you are applying:**
      62-330.          / 62-331.          ,F.A.C.

> **We recommend contacting your local Corps district office if your project is not within state-assumed waters regulated under Chapter 62-331, F.A.C., does not qualify for the State Programmatic General Permit (SPGP) and you are not sure whether the project requires separate Corps authorization. If Corps authorization is required, you will need to submit the appropriate federal application form separately to the Corps. Corps contact information may be found online at the Jacksonville District Regulatory Division website.**

**B.  Applicant ☐ This is a Contact Person for Additional Information**

Name: Last:                              First:                          Middle:

Title:                    Company:

Address:

City:                     State:          Zip:

Home Telephone:                               Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via ☐ US Mail

     

**C.   Consultant/Agent** ☐ **This is a Contact Person for Additional Information**

Name: Last:                          First:                          Middle:

Title:                    Company:

Address:

City:                    State:          Zip:

Home Telephone:                              Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via ☐ US Mail

**D.   Land Owner(s) (If Different or in Addition to Applicant Identified Above)**

Name: Last:                          First:                          Middle:

Title:                    Company:

Address:

City:                    State:          Zip:

Home Telephone:                              Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail: ☐

**E.   Location of proposed activities:**

Tax Parcel Identification Number:

Address:

City:                          County:                          Zip:

Latitude (DMS)          °          '          "          Longitude (DMS)          °          '          "

**F.   Date activity is proposed**:     To Commence:                    To be Completed:

**G.   Describe in general terms the proposed project, system, or activity:**

**H.   Describe wetland and aquatic habitats to be affected:**

**I.   Construction methods and schedule:**

**J.   Additional information that demonstrates that you qualify for the general permit, addressing all the parameters, thresholds, and conditions required in the general permit**.

**K. Additional information for State 404 Program General Permits (available within state-assumed waters only - leave blank if not applicable)**

1. Describe the project purpose (*Describe the purpose and need for the proposed project. Why are you proposing the work? How will you use the proposed structure(s); and/or, how will the proposed fill area(s) be used?*):

2. Describe direct and indirect adverse environmental effects the activity will cause, including the anticipated amount of loss of wetlands, other special aquatic sites, and other waters expected to result from the activity. Include acres and square feet of impact. If this notice is for a linear project that includes multiple "single and complete projects", include quantity of impact for each single and complete crossing. (see section 3.2.1 of the 404 Handbook):

3. If the General Permit specifically requires mitigation, or if the proposed activity will result in the loss of more than 1/10 acre of wetlands, describe proposed mitigation measures (see preferential mitigation hierarchy in Rule 62-331.130, F.A.C.). If no mitigation is proposed, explain why the adverse environmental effects are no more than minimal and why compensatory mitigation should not be required. The Agency shall determine if the described mitigation or explanation is appropriate and sufficient.

4. List any other State 404 Program general permits or individual permits used or intended to be used to authorize any part of the proposed project or any related activity, including, but not limited to other separate and distant crossings for linear projects that require a GP but do not require pre-construction notification:

5. Include a delineation of wetlands, other special aquatic sites, and other waters, such as lakes and ponds, and perennial, intermittent, and ephemeral streams, on the project site. Wetland delineations shall be prepared in accordance with Chapter 62-340, F.A.C.

6. Describe any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity. Include the name(s) of those listed species or critical habitat areas. Describe any actions proposed to be taken to avoid or minimize adverse effects to listed species.

7. If the activity might have the potential to cause effects to a historic property listed on, determined to be eligible for listing on, or potentially eligible for listing on, the National Register of Historic Places, describe which historic property might have the potential to be affected by the proposed activity and include a vicinity map indicating the location of the historic property (see paragraph 62-331.200(3)(j), F.A.C.)

8. If the activity will occur in a component of the National Wild and Scenic River System, or is a river officially designated by congress as a "study river" for possible inclusion in the system while the river is in an official study status, identify the Wild and Scenic River or the "study river" (see paragraph 62-331.200(3)(d), F.A.C.)

9. For activities that require permission from the Corps pursuant to 33 U.S.C. 408 because it will alter or temporarily or permanently occupy or use a Corps federally authorized civil works project, include a statement confirming that a written request for section 408 permission has been submitted to the Corps office having jurisdiction over that Corps project. The permittee is responsible for obtaining such permission separately from the Corps. Failure to obtain permission from the Corps may subject you to enforcement action by the Corps.

## Part 2: Certification

I hereby certify I have read and will conduct the above activities in accordance with the criteria, limitations, and specific conditions of the general permit(s) identified in Part 1 Section A, and in accordance with the general conditions of Rule 62-330.405, and/or 62-331.201, F.A.C, as applicable. Unless otherwise provided in Chapter 62-330, F.A.C., or unless the timeframes in 62-330.402(4), F.A.C. have been waived below, activities conducted pursuant to an ERP general permit may commence thirty (30) days after providing written notice to the Department of Environmental Protection or the Water Management District, along with any required additional documentation which may be required to fulfill the requirements of the general permit, unless the Agency responds that the proposed work does not qualify for a general permit. For State 404 Program general permits that require pre-construction notice under Chapter 62-331, F.A.C., the activity shall not commence until the permittee receives written confirmation of qualification for the general permit from the Agency. If both an ERP and State 404 Program general permit is required for such projects, the activity shall not commence until thirty (30) days after notice is received by the Agency, or until written confirmation of qualification for the State 404 Program general permit is received by the permittee, whichever is later.

I understand I may have to provide any additional information/data that may be necessary to provide reasonable assurance or evidence that the proposed project will comply with the applicable state water quality standards or other environmental standards both before construction and after the process is completed.

I further acknowledge that work done under the general permit(s) may also require the review and approval of other federal, state, or local agencies, and that commencement of construction before such federal, state, or local agency approvals or permits are obtained may subject me to enforcement action and fines or penalties by such agencies. Further, the work shall be conducted in a manner that does not violate applicable water quality standards.

☐ **By checking this box**, I hereby voluntarily waive, in accordance with subsection 62-330.402(7), F.A.C., the 30-day or 60-day deadline in subsection 62-330.402(4), F.A.C., in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP general permit and State 404 Program be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions for the ERP and State 404 Program are issued at different times). If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency(ies) will continue to abide by subsection 62-330.402(4), F.A.C.


Typed/Printed Name of Applicant or Agent       Signature of Applicant or Agent       Date

An Agent May Sign Above If Applicant Completes the Following:
I hereby designate and authorize the agent listed in Item Part 1 Section C to act on my behalf as my agent in the processing of this permit application and to furnish on request, supplemental information in support of the application.


Typed/Printed Name of Applicant              Signature of Applicant              Date
(And corporate title, if applicable)

**Certification of Sufficient Real Property Interest and Authorization for Staff to Access the Property:**

**I certify that:**

☐ **I possess sufficient real property interest in or control, as defined in Section 4.2.3(d) of Applicant's Handbook Volume I,** over the land upon which the activities described in this application are proposed and I have legal authority to grant permission to access those lands. I hereby grant permission, evidenced by my signature below, for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed works and other activities specified in this application. I authorize these agents or personnel to enter the property as many times as may be necessary to make such review, inspection, and/ or sampling. Further, I agree to provide entry to the project site for such agents or personnel to monitor and inspect permitted work if a permit is granted.

      **OR**

☐ I represent an entity having **the power of eminent domain and condemnation authority**, and I/we shall make appropriate arrangements to enable staff of the Agency to access, inspect, and sample the property as described above.

_____

Typed/Printed Name of Applicant        Signature of Applicant        Date
(And corporate title, if applicable)

## Part 3: Submittal

In addition to the information described in this form, any Notice of Intent to use a General Permit must also include the following, as described in Section 4.2.2 of the Applicant's Handbook, Volume I:

- Location map(s) of sufficient detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity.
- One set of plans and drawings, calculations, environmental information, and other supporting documents that clearly and legibly depict and describe the proposed activities in sufficient detail to demonstrate that the work qualifies for the specified General Permit(s).
- The required fee made payable to the appropriate agency.

Fees for the appropriate agency are established in the rules adopted in subsection 62-330.071(1), F.A.C., as listed below:

       Rule 62-4.050, F.A.C. (Department of Environmental Protection or the Northwest Florida Water Management District)
       Rule 40B-1.706, F.A.C. (Suwannee River Water Management District)
       Rule 40C-1.603, F.A.C. (St. Johns River Water Management District)
       Rule 40D-1.607, F.A.C. (Southwest Florida Water Management District)
       Rule 40E-1.607, F.A.C. (South Florida Water Management District)

Operating Agreements between the Department and the water management districts specify which agency will process any given application. For copies of the operating agreements, go to https://floridadep.gov/ogc/ogc/content/operating-agreements

This application form may be submitted online; to do so, follow the on-line submittal requirements of the agency:

     o    **Florida Department of Environmental Protection: http://www.fldepportal.com/go/**
     o    **Northwest Florida Water Management District:**
          **https://permitting.sjrwmd.com/nwepermitting/jsp/start.jsp**
     o    **Suwannee River Water Management District:**
          **https://permitting.sjrwmd.com/srepermitting/jsp/start.jsp**

- o **St. Johns River Water Management District:**
  **https://permitting.sjrwmd.com/epermitting/jsp/AccountOverview.do?command=init**
- o **Southwest Florida Water Management District:**
  **http://www.swfwmd.state.fl.us/permits/epermitting/**
- o **South Florida Water Management District: http://my.sfwmd.gov/ePermitting/MainPage.do**

If submitting a paper application, please see Appendix A of Applicant's Handbook, Volume I for submittal locations.

**40D-1.660 Publications, Forms and Agreements Incorporated by Reference.**

The following documents are hereby incorporated by reference and are applicable to this chapter and chapters 40D-40 and 40D-400, F.A.C.:

(1) Environmental Resource Permitting Information Manual Part B, Basis of Review http://www.flrules.org/Gateway/reference.asp?No=Ref-00788, Environmental Resource Permit Applications within the Southwest Florida Water Management District, December 29, 2011. This document is available from the District's website at www.WaterMatters.org or from the District upon request.

(2) Operating Agreement Concerning Regulation Under chapter 373, Part IV, F.S., Between Southwest Florida Water Management District and Department of Environmental Protection, dated July 1, 2007. This document is available from the District's website at www.waterMatters.org or from the District upon request.

(3) Chapter 62-344, F.A.C., Delegation of Environmental Resource Program to Local Governments (8/29/1995), available from the Florida Department of Environmental Protection at 2600 Blair Stone Road, Tallahassee, Florida 32399-2400.

(4) Memorandum of Understanding Between the Southwest Florida Water Management District and the Environmental Protection Commission of Hillsborough County Regarding Coordination of Regulatory Activities, dated October 19, 2005, available from the District upon request.

(5) Operating Agreement Between the U.S. Army Corps of Engineers and the Southwest Florida Water Management District (SWFWMD) Located within the Geographical Limits of the SWFWMD in Florida, Pursuant to Programmatic General Permit (PGP) PGP-SAJ-95, effective March 24, 2008, available from the District upon request.

(6) Mitigation Bank Form Documents. The following forms are incorporated herein by reference and are available from the District's website at www.watermatters.org or from the District upon request:

(a) Mitigation Bank Performance Bond to Demonstrate Construction and Implementation Financial Assurance, Form MB/PB (4/09);

(b) Mitigation Bank Irrevocable Letter of Credit to Demonstrate Construction and Implementation Financial Assurance, Form MB/ILC (4/09);

(c) Mitigation Bank Trust Fund Agreement to Demonstrate Construction and Implementation Financial Assurance, Form MB/CIFA (4/09); and

(d) Mitigation Bank Trust Fund Agreement to Demonstrate Perpetual Management Financial Responsibility, Form MB/PMFA (4/09).

(7) Southwest Florida Water Management District Environmental Resource Permitting Applicant's Handbook Volume II (6-1-18) https://www.flrules.org/Gateway/reference.asp?No=Ref-09430 is also available at the District's website and from the District upon request. Applicant's Handbook Volume II applies only to permit applications, exemptions, notices and petitions for formal or informal delineations that are processed under the statewide environmental resource permit rule to be adopted by the Department of Environmental Protection as chapter 62-330, F.A.C.

*Rulemaking Authority 373.044, 373.046, 373.113, 373.171, 373.414 FS. Law Implemented 373.0361, 373.079(4)(a), 373.083(5), 373.114, 373.171, 373.403, 373.413, 373.4135, 373.4136, 373.414, 373.4144, 373.416, 373.429, 373.441 FS. History–New 4-2-87, Amended 3-1-88, 9-11-88, 10-1-88, 4-1-91, 11-16-92, 1-30-94, 10-3-95, 12-26-95, 5-26-96, 7-23-96, 4-17-97, 4-12-98, 7-2-98, 12-3-98, 7-28-99, 8-3-00, 9-20-00, 6-12-01, 10-11-01, 2-27-02, 7-29-02, 3-26-03, 7-22-03, 8-3-03, 3-11-04, 6-7-04, 2-1-05, 6-30-05, 10-19-05, 2-8-06, 5-2-06, 7-1-07, 9-25-07(1), 9-25-07(4), 11-26-07, 5-12-08, 5-20-08, 6-22-08, 5-12-09, 5-17-09, 8-30-09, 11-2-09, 11-3-09, 12-9-09, 9-5-10, 12-8-10, 12-12-11, 12-29-11, 10-1-13, Formerly 40D-4.091, Amended 6-1-18.*

# STATE 404 PROGRAM
# APPLICANT'S HANDBOOK

**This Handbook, including Appendices A and B only is
incorporated by reference in subsection 62-331.010(5), F.A.C.**

**Effective [date]**

## FOR:



**FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

# Table of Contents

| | | |
|---|---|---|
| 1.0 | **Introduction** | 4 |
| 1.1 | State-assumed Waters | 4 |
| 1.2 | Using this Handbook | 5 |
| 1.3 | Other Authorizations and Relationship to Other Governmental Entities | 5 |
| 1.3.1 | Additional Authorizations from the Corps of Engineers | 5 |
| 1.3.1.1 | Section 408 Authorization | 6 |
| 1.3.1.2 | Authorization Under Section 10 of the Rivers and Harbors Act | 6 |
| 1.3.2 | Other Authorizations | 6 |
| 1.3.3 | Endangered Species Authorizations | 6 |
| 1.4 | Use of Regulatory Guidance Letters | 7 |
| | | |
| 2.0 | **Definitions and Terms** | 7 |
| | | |
| 3.0 | **Regulated Activities** | 11 |
| 3.1 | Exemptions | 11 |
| 3.1.1 | Agriculture and Forestry Exemptions | 12 |
| 3.2 | Permits Required | 12 |
| 3.2.1 | General Permits | 12 |
| 3.2.1.1 | General Permits Not Requiring Notice of Intent to use a General Permit | 13 |
| 3.2.1.2 | General Permits Requiring a Notice of Intent to Use a General Permit | 13 |
| 3.2.1.3 | Frac-out Plan | 13 |
| 3.2.2 | Individual Permits | 14 |
| | | |
| 4.0 | **Preparation and Submittal of Applications and Notices** | 14 |
| 4.1 | Determining if a Project is within State-Assumed or Retained Waters | 14 |
| 4.2 | Pre-application Conferences | 18 |
| 4.3 | Forms and Submittal Instructions | 19 |
| 4.4 | Processing Fees | 20 |
| | | |
| 5.0 | **Processing of, and Agency Action on, Applications and Notices** | 20 |
| 5.1 | General Procedures | 21 |
| 5.2 | Coordination with Other Agencies, States, and Tribes | 22 |
| 5.2.1 | Water Management Districts | 22 |
| 5.2.2 | Florida Division of Historical Resources/State Historic Preservation Office | 22 |
| 5.2.3 | Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service, and National Marine Fisheries Service | 23 |
| 5.2.4 | United States Army Corps of Engineers | 24 |
| 5.2.5 | United States Environmental Protection Agency | 25 |
| 5.2.6 | Federally Recognized Tribes | 26 |
| 5.2.7 | Adjacent States – Alabama and Georgia | 26 |
| 5.3 | Processing Individual Permit Applications | 26 |
| 5.3.1 | Public Notice | 26 |
| 5.3.2 | Long-Term Conceptual Planning for Projects that will Take More Than One Phase to Complete | 27 |
| 5.3.3 | Continuation of Permits and Review for a New Permit for an Existing Project | 29 |

**6.0**    **Duration, Modification, and Transfer of Permits**...................................................**30**

**7.0**    **Determination and Review of the Landward Extent of State-Assumed Waters** ..............**30**
7.1    Use of ERP Formal Determinations ...................................................................30
7.2    Informal Determinations ....................................................................................30

**8.0**    **Criteria for Review of State 404 Program Individual Permits**............................**31**
8.1    Administratively and Technically Complete Applications..................................31
8.2    Sequence of Review ...........................................................................................31
8.3    Review Criteria Unique to State 404 Program Permits ......................................32
8.3.1    Alternatives Analysis........................................................................................33
8.3.2    Aesthetics Review .............................................................................................33
8.3.3    Mitigation hierarchy .........................................................................................33
8.3.4    Permit signatures ..............................................................................................33
8.3.5    Cumulative Effects ...........................................................................................34
8.3.6    Secondary Effects .............................................................................................34
8.4    ERP Criteria Not Applicable to State 404 Program Permits ..............................36
8.5    Compensatory Mitigation ..................................................................................36
8.5.1    Compensatory Mitigation Hierarchy ................................................................36
8.5.2    Watershed approach ..........................................................................................38
8.5.3    Permit Specific Conditions for Compensatory Mitigation ................................40
8.5.4    Timing of Compensatory Mitigation ................................................................40
8.5.5    Use of Preservation as Compensatory Mitigation .............................................41
8.5.6    Additional Considerations for Permittee-Responsible Compensatory Mitigation Projects........41
8.5.6.1    Monitoring ......................................................................................................41
8.5.6.2    Adaptive Management ....................................................................................41
8.5.6.3    Long-term Protection and Management .........................................................42

**APPENDIX A** ...........................................................................................................**43**

**Retained Waters List** ..............................................................................................**43**

**APPENDIX B** ...........................................................................................................**47**

**Excerpts from 40 CFR Part 232** ...........................................................................**47**

**APPENDIX C** ...........................................................................................................**54**

**Guidance for Conducting an Alternatives Analysis**.............................................**54**

**APPENDIX D** ...........................................................................................................**61**

**307(a)(1) List of Toxic Pollutants (Codified in 40 CFR § 401.15)**.......................**61**

## 1.0    Introduction

The Florida Department of Environmental Protection ("Department" or "DEP") developed this Applicant's Handbook to help persons understand the rules, procedures, standards, and criteria that apply to the State 404 Program under Part IV of Chapter 373 of the Florida Statutes (F.S.).

The Department administers and implements the State 404 Program. In the event the Department seeks and receives approval from EPA pursuant to 40 CFR 233.16 to modify the program to delegate implementation of the State 404 Program to Florida's five Water Management Districts ("Districts"), the Districts may then implement the program with Department oversight. The State 404 Program Applicant's Handbook refers to these entities collectively as "Agencies" and also refers to one or more water management districts as "District" or "Districts" (capitalized), respectively. The term "district" (lower case) generally refers to the main or field offices of either the Department or District.

The Districts are:
- Northwest Florida Water Management District (NWFWMD)
- Suwannee River Water Management District (SRWMD)
- St. Johns River Water Management District (SJRWMD)
- Southwest Florida Water Management District (SWFWMD)
- South Florida Water Management District (SFWMD)

The primary State 404 Program rules are adopted by DEP as Chapter 62-331 of the Florida Administrative Code (F.A.C.). This Applicant's Handbook is incorporated by reference in subsection 62-331.010(5), F.A.C., and therefore operates as a rule of the Agencies.

If the Department delegates implementation of the State 404 Program to the Districts, the responsibilities of those Agencies will be divided in accordance with Operating and Delegation Agreements incorporated by reference in Chapter 62-113, F.A.C., accessible at: https://floridadep.gov/ogc/ogc/content/operating-agreements. Until such delegation occurs, the Department will be responsible for reviewing and acting upon requests for verification of exemption from, and notices and applications for, State 404 Program permits.

The State 404 Program is a separate permitting program from the Environmental Resource Permitting program (ERP) under Chapter 62-330, F.A.C., and agency action for State 404 Program verifications, notices, or permits shall be taken independently from ERP agency action. The applicant may choose to have the State 404 Program and ERP agency actions issued concurrently to help ensure consistency and reduce the need for project modifications that may occur when the agency actions are issued at different times.

Chapter 62-331, F.A.C., references Chapter 62-330, F.A.C., ERP Applicant's Handbook Volume I ("Volume I"), and Chapter 62-345, F.A.C., where requirements under Section 404 of the Clean Water Act (CWA) overlap with existing ERP requirements. State 404 Program rules, which include Chapter 62-331, F.A.C., and the 404 Handbook, will control where there is conflict between these and the referenced ERP rules, including Volume I, and other state laws.

## 1.1    State-assumed Waters

Section 404 of the CWA provides that the U.S. Army Corps of Engineers (Corps) is the agency authorized to issue CWA section 404 dredge and fill program permits for activities within waters of the United States. However, the CWA includes provisions that allow a state to assume administration of a 404 program in certain waters (state-assumed waters). The CWA does not define state-assumed

waters; rather, it describes waters that a state cannot assume and for which jurisdiction remains with the Corps (retained waters). State-assumed waters then are all waters of the United States that are not retained waters. Retained waters are defined in section 2.0 of this Handbook and listed in Appendix A. Activities within retained waters will generally still require a state ERP authorization and a separate federal authorization from the Corps. To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise.

See section 4.1 of this Handbook for examples showing how to determine whether a project is in state-assumed or retained waters.

## 1.2    Using this Handbook

Requirements of section 404 of the CWA overlap significantly with the ERP program. To eliminate redundancy and streamline reviews, the State 404 Program rules and this Handbook reference existing ERP rules and Handbook sections wherever possible. Projects within state-assumed waters that are not otherwise exempt from permitting will require both a State 404 Program authorization and an ERP authorization. Processing of both authorizations will begin concurrently upon receipt of an application for a project, except where the activities requiring a State 404 permit are proposed to occur in a later phase of a project that will take more than the maximum permit duration allowed under federal law to complete. In such cases an applicant may apply for the State 404 permit at a later date. Activities that require both an ERP and a State 404 permit shall not commence before both permits are obtained.

This Handbook will assist applicants and staff in conducting the concurrent reviews, outlines the different timeframes for review, and encourages applicants to waive ERP timeframes in favor of State 404 Program timeframes, where applicable, to ensure consistency (see section 5.0). This Handbook also outlines any requirements in addition to those required under the ERP program and identifies those ERP rules that do not apply to State 404 Program permits.

## 1.3    Other Authorizations and Relationship to Other Governmental Entities

Issuance of a permit or verification of qualification for an exemption or general permit under Chapter 62-331, F.A.C., does not:

- Convey or create to the person any property right, or any interest in the real property;
- Authorize any entrance or activities on property that is not owned or controlled by the person; or
- Relieve persons from obtaining all other required licenses, permits, and authorizations under applicable state, federal, or local statute, rule, or ordinance. Persons are advised to obtain all required authorizations prior to commencement of activities required under the State 404 program.

Additional information on the distribution of public notice to, and coordination with, other governmental agencies is discussed in section 5.2 of this Handbook.

### 1.3.1    Additional Authorizations from the Corps of Engineers

Some projects may require an additional authorization from the Corps. More information about these authorizations, briefly described below, may be found online in the Jacksonville District Regulatory Division Sourcebook, or by contacting your local Corps office.

#### 1.3.1.1 Section 408 Authorization

The Corps has many civil works projects within the state of Florida. Examples include dams, levies, navigation, and flood control projects. Some of these projects are located within or in proximity to state-assumed waters. Many such projects are located within residential communities. Parties other than the Corps may need to alter or occupy the projects and their associated lands. Reasons for alteration may include project improvements, relocation of part of the project, or installing utilities or other non-project features. In accordance with Section 14 of the Rivers and Harbors Act (RHA) (33 U.S.C. Part 408) (Section 408), the Corps must review requests for modification of federal projects by non-federal interests. If Section 408 authorization is needed, such authorization must be obtained from the Corps prior to project commencement.

#### 1.3.1.2 Authorization Under Section 10 of the Rivers and Harbors Act

In accordance with Section 10 of the Rivers and Harbors Act (RHA), the Corps has regulatory jurisdiction over all obstructions and alterations of navigable waters of the United States, the construction of any structures in or over navigable waters of the United States, and any work affecting the course, location, condition, or capacity of navigable waters of the United States, as defined in 33 C.F.R. Part 329. This includes permit authority under Section 10 of the RHA for those waters based solely on historic use (Section 10 historic waters). While the Corps retains authority over Section 10 historic waters, upon the effective date of the State 404 Program, the State assumes authority over Section 404 permitting within Section 10 historic waters. Therefore, discharges of dredged or fill material in Section 10 historic waters may require a separate Section 10 permit from the Corps in addition to the State 404 permit.

Some projects within Section 10 waters may qualify for authorization under the State Programmatic General Permit (SPGP). More information about SPGP is available in the Jacksonville District Regulatory Division Sourcebook or on the Agency website.

### 1.3.2    Other Authorizations

Additional authorizations may be required from the Department, Water Management District, or other federal, state, and local agencies. These include, but are not limited to:

- Environmental Resource Permit (ERP)
- State-owned Submerged Lands Authorization
- National Pollutant Discharge Elimination System (NPDES) Authorization
- Well Construction Permit
- Consumptive Use or Water Use Permit
- Works of the District Permit
- Generic Permit for Discharge of Produced Groundwater
- Coastal Construction Permit
- Local building permits

### 1.3.3    Endangered Species Authorizations

Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Services (NMFS) for permits reviewed under the State 404 Program.

### 1.4     Use of Regulatory Guidance Letters

Regulatory Guidance Letters (RGLs) issued by the Corps and/or EPA to assist with implementation of Section 404 of the CWA may be also be used by the state to assist with implementation of the State 404 Program, when current and applicable. Regulatory Guidance Letters, or sections of letters, that conflict with other applicable state rules, statutes, agreements, or processes shall not be used. Current RGLs can be found in the Corps' Jacksonville District Regulatory Division Sourcebook.

### 2.0     Definitions and Terms

(a)  Where the definitions in Chapters 62-330 and 62-345, F.A.C., do not conflict with this section, those definitions shall be used.

(b)  The following additional definitions and terms below are used solely for purposes of Chapter 62-331, F.A.C., and this Handbook.

1.  "Act" or "CWA" means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 U.S.C. 1251, *et seq.*

2.  "Activity" for the purposes of the State 404 Program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (see Appendix B). The terms "dredge", "fill", "dredging", and "filling", when used within Chapter 62-331, F.A.C., or this Handbook shall be interchangeable with "activity" as defined herein.

3.  "Adaptive Management" means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects. It requires consideration of the risk, uncertainty, and dynamic nature of compensatory mitigation projects and guides modification of those projects to optimize performance. It includes the selection of appropriate measures that will ensure that the aquatic resource functions are provided and involves analysis of monitoring results to identify potential problems of a compensatory mitigation project and the identification and implementation of measures to rectify those problems.

4.  "Adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other state-assumed waters by man-made dikes or barriers, natural river berms, beach dunes, and the like are considered adjacent wetlands.

5.  "Administratively complete" means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

6.  "Agency" means the Department of Environmental Protection ("Department"), or the water management districts ("Districts"), where the Districts are delegated authority to implement the State 404 Program by the Department, and such delegation has been approved by EPA in accordance with 40 CFR Part 233.

7.  "Aquatic environment" and "aquatic ecosystem" mean state-assumed waters, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals. (Also see "Natural systems" definition in Volume I, section 2.0)

8.  "Best management practices" (BMPs) means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of wetlands and other surface waters from permitted activities. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with Chapter 62-331, F.A.C., and prevent violation of state water quality standards. Examples include, but are not limited to, placement of turbidity curtains or silt fence, stabilizing slopes, limiting work to appropriate weather and light conditions, and clearly marking work and staging areas in the field.

9.  "Buffer" means an upland, wetland, and/or riparian area that protects and/or enhances aquatic resource functions associated with wetlands, rivers, streams, lakes, marine, and estuarine systems from disturbances associated with adjacent land uses.

10. "Burial Resources" means human remains, meaning all physical remains of a human body of a person of American Indian ancestry, even if in fragmentary form unless it is determined that the human remain had been freely given or naturally shed by the individual from whose body it was obtained, such as hair made into ropes or nets or individual teeth. For the purposes of determining cultural affiliation, human remains incorporated into a funerary object, sacred object, or object of cultural patrimony, are considered as part of that item and as a cultural resource item.

11. "Compensatory Mitigation" means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved.

12. "Compensatory Mitigation Project" means compensatory mitigation implemented by the permittee as a requirement of a permit (i.e., permittee-responsible mitigation), or by a mitigation bank or in-lieu fee program.

13. "Condition," as it is used in the mitigation section of this Handbook, means the relative ability of an aquatic resource to support and maintain a community of organisms having a species composition, diversity, and functional organization comparable to reference aquatic resources in the region.

14. "Contaminant" means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants. The list of toxic pollutants is incorporated in paragraph 62-620.100(3)(k), F.A.C., and reproduced in Appendix D of this Handbook.

15. "Functions," as used in the mitigation section of this Handbook, means the physical, chemical, and biological processes that occur in ecosystems.

16. "Historical Resources Assessment Survey" or "Cultural Resources Assessment Survey" means a survey of the project site which meets the requirements set forth in Chapter 1A-46, F.A.C., Archaeological and Historical Report Standards and Guidelines.

17. "Historic Resource," "Historic Property," or "Cultural Resource" means any prehistoric or historic district, site, building, object, or other real or personal property of historical, architectural, or archeological value, and folklife resources. These properties or resources may include, but are not limited to, monuments, memorials, Indian habitations, ceremonial sites, abandoned settlements, sunken or abandoned ships, engineering works, treasure trove, artifacts, or other objects with intrinsic historical or archeological value, or any part thereof, relating to the history, government and culture of the state. (Source Section 267.021(3), F.S.).

18. "Impact" or "Adverse impact", as those terms relate to compensatory mitigation review, means adverse effect.

19. "In-kind" means a resource of a similar structural and functional type to the impacted resource.

20. "In-lieu fee program" means a program involving the restoration, creation, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for 404 permits. Similar to a mitigation bank, an in-lieu fee program sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the in-lieu fee program sponsor. The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument.

21. "Interagency Review Team" (IRT) means an interagency group of federal, tribal, state, and/or local regulatory and resource agency representatives that reviews documentation for, and advises the Corps district engineer on, the establishment and management of a mitigation bank or an in-lieu fee program.

22. "Material permit modification" and "material changes in the scope of the project" mean, for the purposes of applying Section 373.4146(5), F.S., only those modifications or changes, including changes to any long-term planning document appended to a permit pursuant to section 5.3.2., that result in a significant increase in the total project environmental impact, including but not limited to wildlife impacts, or a significant increase in the impact to state-assumed or retained waters.

23. "Mean high tide line," for purposes of identifying retained waters, means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

24. "Mitigation Bank," for the purposes of the State 404 Program only, means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by State 404 Program permits. In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor. The operation and use of a mitigation bank are governed by a mitigation banking instrument.

25. "Mixing zone" means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a dredge or fill activity where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water.

26. "Off-site," for purposes of the mitigation section of this Handbook, means an area that is neither located on the same parcel of land as the impact site, or on a parcel of land contiguous to the parcel containing the impact site.

27. "On-site," for purposes of the mitigation section of this Handbook, means an area located on the same parcel of land as the impact site, or on a parcel of land contiguous to the impact site.

28. "Ordinary high water mark," for purposes of identifying retained waters, means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

29. "Out-of-kind" means a resource of a different structural and functional type from the impacted resource.

30. "Performance standards" are observable or measurable physical (including hydrological), chemical and/or biological attributes that are used to determine if a compensatory mitigation project meets its objectives.

31. "Permittee-responsible mitigation" means an aquatic resource restoration, creation, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility.

32. "Pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by the Atomic Energy Act, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the CWA reflects that ''radioactive materials'' as included within the definition of ''pollutant'' in section 502 of the CWA means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term "pollutant", are radium

and accelerator produced isotopes. See Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1 (1976).

33. "Practicable" means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes.

34. "Practicable alternative" means other choices available and capable of being carried out after taking into consideration cost, existing technology, and logistics considering overall project purposes, and may require an area not owned by the applicant which could reasonably have been obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity.

35. "Project" means all activities which the applicant plans to undertake pursuant to the entire scope of the project and includes all avoidance, minimization, and mitigation measures proposed by the applicant. To provide for a holistic review of projects that will take more than the maximum permit duration allowed under federal law to complete, the term includes all phases thereof, which phases may be temporal or geographic.

36. "Project area" or "Project site" means that portion of the state-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area.

37. "Re-establishment" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions. (see "Restoration")

38. "Reference aquatic resources" or "Reference site" are a set of aquatic resources that represent the full range of variability exhibited by a regional class of aquatic resources as a result of natural processes and anthropogenic disturbances.

39. "Rehabilitation" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function but does not result in a gain in aquatic resource area. (see "Restoration")

40. "Restoration," for the purposes of the State 404 Program, means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: re-establishment and rehabilitation.

41. "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

42. "Riparian areas" are lands adjacent to streams, rivers, lakes, and estuarine-marine shorelines. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality.

43. "Service Area" means the geographic area within which impacts can be mitigated at a specific mitigation bank or an in-lieu fee program, as designated in its instrument.

44. "Services" mean the benefits that human populations receive from functions that occur in ecosystems.

45. "Special aquatic sites" means sanctuaries and refuges under state and federal laws or local ordinances, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region.

46. "Sponsor" means any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank or in-lieu fee program.

47. "State-assumed Waters" or "Assumed Waters" means those waters as defined in Section 373.4146(1), F.S.

48. "Technically complete" means an application where each application item is adequate to allow the Agency to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met.

49. "Temporal loss" or "time lag" is the time that passes between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site.

50. "Tribe" means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a federal Indian reservation.

51. "Watershed approach" means an analytical process for making mitigation decisions that support the sustainability or improvement of aquatic resources in a watershed. It involves consideration of watershed needs, and how locations and types of compensatory mitigation projects address those needs. A landscape perspective is used to identify the types and locations of mitigation projects that will benefit the watershed and offset losses of aquatic resource functions and services caused by activities authorized by Section 404 permits. The watershed approach may involve consideration of landscape scale, historic and potential aquatic resource conditions, past and projected aquatic resource impacts in the watershed, and terrestrial connections between aquatic resources when determining mitigation requirements for Section 404 permits.

52. "Watershed plan" means a plan developed by federal, tribal, state, and/or local government agencies or appropriate non-governmental organizations, in consultation with relevant stakeholders, for the specific goal of aquatic resource restoration, creation, enhancement, and preservation. A watershed plan addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses. Watershed plans may also identify priority sites for aquatic resource restoration and protection. Examples of watershed plans include special area management plans, advance identification programs, and wetland management plans.

## 3.0    Regulated Activities

### 3.1    Exemptions

A permit is not required under Chapter 62-331, F.A.C., for activities listed under 40 CFR § 232.3 (Appendix B), subject to the limitations described therein. Notice to the Agency is not required to conduct an exempt activity, except where the activity also requires an ERP authorization. Activities that qualify for an exemption pursuant to 40 CFR § 232.3 and an ERP exemption that does not require prior notice to the Agency may be conducted without notice.

If a person desires verification that an activity qualifies for an exemption the request shall be submitted in accordance with Rule 62-331.040, F.A.C.

### 3.1.1 Agriculture and Forestry Exemptions

The exemptions applying to agriculture and forestry activities under 40 CFR § 232.3 are different from the exemptions available under ERP. The exemptions for agriculture in Section 373.406(2), F.S., Rules 62-330.051, and 62-330.0511, F.A.C., allow new activities within wetlands and other surface waters, while the State 404 Program exemption under 40 CFR § 232.3 may require a permit for such activities. Please read the requirements of both program's exemptions carefully when deciding if an activity is exempt or needs a permit. If you are unsure, contact your local Agency office or apply for a verification of exemption.

### 3.2 Permits Required

Rule 62-331.020, F.A.C., describes activities that require a permit. The types of permits available are general permits and individual permits. These are described below.

### 3.2.1 General Permits

General permits authorize activities specified in Rules 62-331.200 and subsequently numbered rules in Chapter 62-331, F.A.C.

General permits are available for categories of similar activities which have been determined to cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.

State 404 Program general permits are reviewed by DEP and EPA for re-authorization every five years. This means that general permits are only valid during that five-year period beginning at the time they are authorized (or re-authorized). If a permittee cannot perform the work in the time before the general permit expires, a new general permit or, if the general permit is not re-authorized, an individual permit will be required.

The Agency reserves the right to require an individual permit for any activity covered by a general permit if the Agency determines that the activity will have more than a minimal adverse effect, either individually or cumulatively, on the environment.

The Agency may administer, upon agreement with the Corps, Corps regional general permits that are still effective upon the date of assumption for projects within assumed waters, where appropriate, until the date that they expire. The Department shall keep a list of any regional general permits administered by the state after the date of assumption.

The same general permit cannot be used more than once for the same "single and complete" project, unless specifically stated within the general permit. "Single and complete", for the purposes of the general permits under Chapter 62-331, F.A.C., is defined below.

**Single and complete linear project:** A linear project is a project constructed for the purpose of getting people, goods, or services from a point of origin to a terminal point, which often involves multiple crossings of one or more waterbodies at separate and distant locations. The term "single and complete project" is defined as that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all

crossings of a single state-assumed water (i.e., a single waterbody) at a specific location. For linear projects crossing single or multiple waterbodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of general permit authorization. However, individual channels in a braided stream or river, or individual arms of a large, irregularly shaped wetland or lake, etc., are not separate waterbodies, and crossings of such features cannot be considered separately. If the Agency determines that multiple "single and complete" projects will cause significant adverse cumulative impacts, an individual permit shall be required for the project(s).

**Single and complete non-linear project:** For non-linear projects, the term ''single and complete project'' is defined as the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. A single and complete non-linear project must have independent utility (see below).

**Independent utility:** A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate, single and complete projects with independent utility.

### 3.2.1.1 General Permits Not Requiring Notice of Intent to use a General Permit

Notice to the Agency is not required for those activities covered under a general permit where notice is not specifically required in the language of the general permit, or by Rule 62-331.200, F.A.C. Special attention should be made by the permittee to ensure that all of the conditions for the general permit are met, including any requirements for coordination with other agencies or tribes.

If you are unsure whether your project requires submittal of a notice of intent, it is recommended that you contact your local Agency office for assistance or submit a notice for review in accordance with Rule 62-331.200, F.A.C.

### 3.2.1.2 General Permits Requiring a Notice of Intent to Use a General Permit

General permits requiring notice of intent shall be submitted to the Agency as described in section 4.2 of this Handbook and processed by the Agency in accordance with section 5.3, below.

### 3.2.1.3 Frac-out Plan

A frac-out plan is required for projects involving horizontal directional drilling or jack-and-bore activities under the general permit in Rule 62-331.215, F.A.C. The purpose of the plan is to minimize adverse, unauthorized, impacts to state-assumed waters in case of a drilling fracture. The plan shall contain, at a minimum, the following information:

- Proposed methods to prevent violations of water quality standards (BMPs)
- Measures used to prevent and detect frac-out during the drilling operation
- Release procedures
- A drilling mud containment plan
- Agency notification contact information

### 3.2.2    Individual Permits

Regulated activities that are not exempt under subsection 62-331.020(1), F.A.C., (40 CFR § 232.3, Appendix B) and that do not qualify for a State 404 Program general permit will require an individual permit. Individual permits are so named because they require individual, case-by-case review by the Agency. Individual permits are subject to the public notice requirements of Rule 62-331.060, F.A.C., and will be processed in accordance with Rule 62-331.052, F.A.C., and section 5.0 of this Handbook.

### 4.0    Preparation and Submittal of Applications and Notices

Applications and notices shall be prepared and submitted as described below.

### 4.1    Determining if a Project is within State-Assumed or Retained Waters

Projects within retained waters go to the Corps for processing, and projects within state-assumed waters go to the State Agency for processing.

The definition of retained waters, as stated in section 2.0, above, is:

"Those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The Corps also retains permitting authority for projects within "Indian country" as that term is defined at 18 U.S.C. § 1151 (provided below):

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means

    (a)  all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

    (b)  all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

    (c)  all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

A list of "Indian country" can be found online in the Corps' Jacksonville District Regulatory Division Sourcebook.

For the purposes of determining retained or state-assumed waters, the boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA.

The following illustrations demonstrate how to determine the administrative boundary of retained waters:

Example 1: Project with dredge and fill activity both waterward and landward of the 300-foot guide line. The 404 permit application would be processed by the Corps.



Example 2: Projects with dredge and fill activity and project boundaries waterward and/or landward of the 300-foot guide line. Projects 1 and 2 are retained and the 404 application will be processed by the Corps. Project 3 does not include any dredge or fill activities waterward of the 300 foot guide line, and therefore is not retained by the Corps, and the 404 application will be processed by the state Agency.



Example 3: A linear project including dredge and fill activities waterward of the 300 foot guide line. Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guide line within the project boundary, the project is within retained waters, and the 404 application will be processed by the Corps.



## 4.2    Pre-application Conferences

Applicants are encouraged to have a pre-application phone call, meeting (on-site or in the office), or other conference with the applicable Agency staff, prior to submitting an application or notice. Pre-application conferences may help streamline processing steps and potential time delays by assisting the applicant to understand such things as:

(a)  The need for a permit or potential qualification for an exemption or general permit, including a determination of what combination of ERP/State 404 Program authorizations will be required;

(b)  Which Agency or Agencies will be responsible for the review of the application or notice;

(c) How to prepare the application or notice, including availability of on-line tools that may assist in completing it, and how to use the long-term conceptual planning process in section 5.3.2 of this Handbook;

(d) Information required by the Agency to evaluate an application or notice, including such things as wetland delineations, resources that may be affected, alternatives analysis, surface water data, and other hydrologic, environmental, or water quality data;

(e) Application processing, public notice, and evaluation procedures;

(f) The need for a pre-application on-site meeting;

(g) Avoiding adverse impacts that may prevent the proposed activity from meeting applicable permitting or review standards and criteria;

(h) The existence of available project alternatives;

(i) Measures that can be taken to reduce or eliminate adverse impacts, and the appropriateness of compensatory mitigation to offset any remaining adverse impacts; and

(j) The potential for the project to impact tribal waters or tribal cultural resources (see section 5.2.6 for more information about tribal resources and coordination).

See Appendix A of Volume I for Agency contact information.

**4.3     Forms and Submittal Instructions**

Applicants are encouraged to use the e-Permitting and electronic portals of the Agencies to submit most applications and notices as discussed below. Appendix A of Volume I contains the internet addresses of the Agencies.

Application and notice forms available:
- Form 62-330.050 – Request for Verification of an Exemption
- Form 62-330.402(1) – Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit
- Form 62-330.060 – Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands

Table 4.3, below, is a matrix identifying which application form should be submitted to the Agency depending on what combination of ERP and State 404 Program authorizations are needed.

| Authorizations Needed | 404 Exemption | 404 General Permit | 404 Individual Permit |
|---|---|---|---|
| **No ERP** | Use form 62-330.050 | Use form 62-330.402(1) | Use form 62-330.060 |
| **ERP Exemption** | Use form 62-330.050 | Use form 62-330.402(1) | Use form 62-330.060 |
| **ERP General Permit** | Use form 62-330.402(1) | Use form 62-330.402(1) | Use form 62-330.060 |
| **ERP Individual Permit** | Use form 62-330.060 | Use form 62-330.060 | Use form 62-330.060 |
| **ERP Conceptual Approval Permit** | Use form 62-330.060 | Use form 62-330.060 | Use form 62-330.060 |

*Table 4.3 – Application form matrix.*

## 4.4    Processing Fees

There shall be no processing fees for State 404 Program verifications, notices, applications, or permits.

## 5.0    Processing of, and Agency Action on, Applications and Notices

Where the processing timeframes and agency action procedures in Chapter 62-330, F.A.C., Applicant's Handbook Volume I, and Chapter 120, F.S., do not conflict with the requirements of the State 404 Program, those processing timeframes shall be used, as outlined in this Handbook. Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.

For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.

It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete. The Agencies **highly recommend** that applicants make this choice for the following reasons:

- **Potential ERP modification fee savings.** If the ERP is issued before the State 404 Program authorization, and during the State 404 Program review process, it is found that modifications to the project are required for a project to be permittable under the State 404 Program, the applicant will be required to apply for, and pay the fee for, a modification of

the issued ERP permit. If the ERP issuance timeframes are waived, the ERP would still be considered in review, and modifications could be made without an additional application or fee.

- **Less paperwork.** Fewer permit documents for staff to draft and fewer for the permittee to track.
- **More consistency.** The Agency or Agencies will be better able to ensure that the conditions of each authorization do not conflict.
- **Streamlined review.** The Agency or Agencies are able to work on the review process until both authorizations are issued. Additional reviews for modification, if needed, and the time required to draft two or more separate agency action documents, would be lessened resulting in a cleaner, simpler process for everyone.

If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete, unless the activity is exempt under Chapter 62-330, F.A.C., or qualifies for a general permit under Chapter 62-330, F.A.C. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met.

## 5.1    General Procedures

The Agencies are required to follow procedural statutes and rules to review and act on applications and notices, and to provide rights to the public to object to Agency decisions. These statutes and rules include: Chapter 120, F.S., (Florida Administrative Procedures Act), Chapters 28-101 through 28-110, F.A.C., (Uniform Rules of Procedure), and each Agency's adopted Exceptions to the Uniform Rules of Procedure.

In acknowledgement that procedures required under Section 404 of the CWA may conflict with the above state procedural statutes and rules, Section 373.4146, F.S., provides the following:

- The Department may adopt any federal requirements, criteria, or regulations necessary to obtain assumption;
- Provisions of state law which conflict with the federal requirements do not apply to state administered section 404 permits;
- The Department must grant or deny an application for a state administered section 404 permit within the time allowed for permit review under 40 CFR Part 233, subparts D and F.
- The Department is specifically exempted from the time limitations provided in Sections 120.60 and 373.4141, F.S., for state administered section 404 permits [default provisions and processing timeframes];
- The decision by the Department to approve the reissuance (i.e, the issuance of a new permit) of any state administered section 404 permit issued pursuant to this section is subject to Sections 120.569 and 120.57, F.S., only with respect to any material permit modification or material changes in the scope of the project as originally permitted.

Additional specific provisions for processing applications and notices under Chapter 62-331, F.A.C., are summarized in the sections below.

**5.2       Coordination with Other Agencies, States, and Tribes**

Coordination with other State or federal agencies, other states, and tribes may be required during review of a notice or application for a State 404 Program authorization. These coordination requirements are described in the sections below.

**5.2.1    Water Management Districts**

When a proposed activity includes agricultural activities and the State 404 Program permit or verification of qualification for an exemption is processed by the Department, the Department shall consult with the District within whose boundaries the project lies to determine whether the proposed activity may be considered "normal farming, silviculture or ranching" activities, and whether the activity may be considered "ongoing" for the purposes of the exemption in 40 CFR Part 232.3(c)(1).

Until such time the Department delegates, upon EPA approval, the State 404 Program to the Districts, Department and District staff shall coordinate review of the ERP and State 404 permits to the greatest extent practicable. Such coordination shall include:

- When an application or notice that contains activities within state-assumed waters is received by the District, the District shall forward a copy of the application or notice to the appropriate local office of the Department.
- Department staff shall accompany District staff on the initial site visit to verify the delineation of wetlands and other surface waters for the State 404 Program permit.
- The Department and District shall communicate frequently to streamline the permit reviews and ensure consistency between the ERP and State 404 authorization.

**5.2.2    Florida Division of Historical Resources/State Historic Preservation Office**

The State Historic Preservation Office (SHPO) shall review proposed projects to determine whether the project is likely to have an adverse effect on properties listed, or eligible for listing on the National Register of Historic Places. If the Agency or SHPO determine that the project as proposed may have adverse effects to properties listed or eligible to be listed in the National Register of Historic Places, the Agency, applicant, and SHPO shall consult to resolve the adverse effects prior to the final determination by SHPO. SHPO may provide any of the following determinations for the project:

- Request for additional information, and/or a request for a Cultural Resources Assessment Survey (CRAS);
- No effect to historic properties;
- No adverse effect to historic properties;
- Conditional no adverse effect to historic properties (recommended project modifications and/or special conditions for the permit);
- Adverse effect to historic properties; or
- (For general permit applications) Request that the project be evaluated as an individual permit because of potential historical resources concerns.

If SHPO sends a request for additional information or a CRAS, or recommends project modifications, the information shall be included in an Agency request for additional information. Once the additional information is received by the Agency, the additional information shall be immediately forwarded to SHPO for review and additional determination.

(a) General Permits – Pre-coordination with SHPO is required for those activities that may qualify for a general permit without notice to the Agency (no-notice general permit). Pre-coordination shall be the responsibility of the prospective permittee, and shall be conducted in accordance with paragraph 62-331.200(3)(j+), F.A.C.

If use of a general permit requires notice to the Agency, the Agency shall forward a copy of the notice to SHPO for review. A prospective permittee may choose to pre-coordinate with SHPO, in which case the prospective permittee shall submit a copy of the outcome of such review with the notice.

(b) Individual permits that also require an ERP individual permit – The Agency shall send a copy of the application to SHPO upon receipt and shall include a notice to SHPO that the project also requires a State 404 Program permit. At such time that the Agency publishes the public notice for the project in accordance with Rule 62-331.060, F.A.C., a copy of the public notice shall be sent to SHPO. The notice shall contain the ERP application and/or permit number. SHPO may have additional comments pertaining to the State 404 authorization, or may state that any information sent to the Agency during the ERP review period shall also apply to the State 404 Program review.

(c) Individual permits that do not require an ERP individual permit – The agency shall send SHPO a copy of the public notice in accordance with Rule 62-331.060, F.A.C.

If an agency, such as FDOT, is the applicant and has previously coordinated with SHPO on the project, and there have been no changes to the project following coordination, the agency may submit proof of concurrence or a determination by SHPO for the proposed project with the application for a State 404 permit.

### 5.2.3 Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service, and National Marine Fisheries Service

The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when the Agency determines that the project may have the potential to affect listed species.

To determine whether a project may have the potential to affect listed species, the Agency may use available resources such as scientific literature, species keys, and habitat maps, or it may observe signs that the site is used by listed species during the site visit. If the Agency determines that a listed species may be affected, the Agency shall seek consultation with or technical assistance by FWC, FWS, and NMFS, as applicable, regarding the proposed project. The Agency shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat.   For individual permits, the Agency shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment. If the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level,

the Agency shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C.

If the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the FWS or NMFS and the species and activities described in the State 404 permit application are covered in the Biological Opinion, HCP/ITP or similar agreement, then no additional avoidance and minimization measures pertaining to federal listed species shall be required. Upon receipt of such documentation, the Agency shall provide the document to FWS or NMFS for review.

Federal agency applicants that have pre-coordinated with FWS or NMFS, as appropriate, through a National Environmental Policy Act (NEPA) process shall submit the outcome of such coordination as part of the application for a State 404 permit.

### 5.2.4    United States Army Corps of Engineers

The Agency shall coordinate with the Corps as follows:

(a) Pending Corps Section 404 permit applications upon the date of assumption – on the effective date of the State program, the Corps will transfer all pending applications for permits under section 404 of the CWA within state-assumed waters to the Department for processing.

(b) Application screening – When an application is received by either the Corps or the Agency, the application will be screened using the Retained Waters List (Appendix A) and corresponding GIS layer to determine if the proposed activity will occur within retained waters. When a proposed activity falls within retained waters, the Agency will, within five calendar days of receipt, refer the applicant to the Corps. Likewise, when a proposed activity falls within state-assumed waters, the Corps will, within five calendar days of receipt, refer the applicant to the Agency.

(c) Projects requiring Section 408 authorization (see section 1.3.1.1, above) – If a project is likely to affect a Corps Civil Works project, the Agency will, within 5 days of receipt of the application, inform the Corps and instruct the applicant to contact the appropriate Corps Section 408 contact person for information about how to obtain a Section 408 authorization separately from the Corps. The Corps will notify the Agency within 14 days of receipt of the notification about whether the project requires Section 408 authorization. The Agency shall include a special condition in the permit requiring that the permittee obtain Section 408 permission prior to construction.

(d) Emergency permits – The Agencies shall consult with the Corps as soon as possible after receipt of a request for an emergency permit in state-assumed waters. The purpose of this consultation is to determine whether an emergency project may affect Corps civil works projects, Section 10 waters, navigation, Indian lands, or other Corps concerns.

(e) Unsatisfied EPA objection or requirement – If the Agency has received an EPA objection or requirement for a permit condition during the public comment period in Rule 62-331.060, F.A.C., and the Agency neither satisfies EPA's objections or requirement for a permit condition, nor denies the permit, the Corps shall process the permit application. In such cases,

the Agency shall provide a copy of the application file to the Corps to facilitate the Corps' review.

### 5.2.5    United States Environmental Protection Agency

The Agency shall coordinate with EPA as follows:

(a) Waiver of review – EPA has oversight authority over the State 404 Program and may review individual permit applications and draft general permits. Federal law provides that EPA may waive review of certain categories of permits. EPA has waived review of all but the following categories of permits:

1. Draft general permits. These are drafts of any general permit that the State intends to add to Chapter 62-331, F.A.C. The term "draft general permit" does not mean each project subsequently authorized under an approved general permit.
2. Projects with reasonable potential for affecting endangered or threatened species as determined by the USFWS/NMFS;
3. Projects with reasonable potential for adverse impacts on waters of another state or tribe;
4. Projects that include discharges of dredged or fill material known or suspected to contain toxic pollutants in toxic amounts or hazardous substances in reportable quantities;
5. Projects located in proximity of a public water supply intake. For the purpose of the State 404 Program, proximity means 1000 feet from the intake;
6. Projects within critical areas established under state or federal law, including but not limited to national and state parks; fish and wildlife sanctuaries or refuges; national and historical monuments; wilderness areas and preserves; sites identified or proposed under the National Historic Preservation Act; and components of the National Wild and Scenic Rivers System;
7. Projects impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites;
8. Projects impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity;

In addition, the following projects shall be reviewed by EPA, even if they would otherwise not require EPA review under 1. Through 8., above:

1. Any project that EPA requests to review within 30 days of receipt of the public notice under Rule 62-331.060, F.A.C.;
2. Any project that the Agency requests EPA to review, at the Agency's discretion; and
3. Any project where the Agency fails to accept the recommendations of an affected state or tribe received during the public comment period.

Review of the above projects occurs upon receipt of the public notice by EPA. EPA may comment on, provide notice to the Agency of its intent to comment on, object to, make recommendations with respect to, or notify the Agency that it is reserving its right to object to, a permit application as described in Rule 62-331.052(3), F.A.C.

**5.2.6    Federally Recognized Tribes**

The Agency shall send a copy of the public notice required in Rule 62-331.060, F.A.C., to a potentially affected tribe for any individual permit applications where the project has the potential to affect tribal waters or resources. The tribes may submit public comments or suggest project modifications or permit conditions to prevent adverse effects to tribal waters and resources. If the Agency chooses not to accept the recommendations of the tribe, the Agency shall submit the recommendations to EPA with an explanation of the Agency's reasons for not accepting the recommendations. EPA shall then review the project in accordance with paragraph 62-331.052(3)(b), F.A.C.

The Agency shall consult with the tribes as necessary for notices of intent to use general permits within tribal areas of concern. The tribes may provide information to assist the Agency in determining whether the project is likely to have more than minimal adverse effect on tribal waters or resources. If the Agency determines, based on information from the tribe, or information from the State Historic Preservation Office or Tribal Historic Preservation Office, that the project is likely to have more than minimal adverse effects on tribal waters or resources, the Agency shall require the applicant to apply for an individual permit for the project.

**5.2.7    Adjacent States – Alabama and Georgia**

The Agency shall send a copy of the public notice required in Rule 62-331.060, F.A.C., for any project that has the potential to affect the waters of an adjacent state. Typically, this would include projects within waters that straddle the border of the adjacent state, where the project is in close proximity to the border. The adjacent state may submit public comments or suggest project modifications or permit conditions to prevent adverse effects to that state's waters. If the Agency chooses not to accept the recommendations of the adjacent state, the Agency shall submit the recommendations to EPA with an explanation of the Agency's reasons for not accepting the recommendations. EPA shall then review the project in accordance with paragraph 62-331.052(3)(b), F.A.C.

**5.3    Processing Individual Permit Applications**

Applications for individual permits shall be processed in accordance with Rule 62-331.052, F.A.C., this section, and section 8.0 of this Handbook.

**5.3.1    Public Notice**

Public notice shall be conducted in accordance with Rule 62-331.060, F.A.C.

(a)  Public notices shall be prepared by the Agency and shall contain:

  1. The name and address of the applicant and, if different, the address or location of the activity(ies) regulated by the permit.
  2. The name, address, and telephone number of a person to contact for further information.
  3. A brief description of the comment procedures and procedures to request a public meeting, including deadlines.
  4. A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be

erected on fills, and a description of the type, composition and quantity of materials to be used as fill.

5. A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area.

6. A paragraph describing the various evaluation factors on which decisions are based.

7. Any other information which would significantly assist interested parties in evaluating the likely impact of the proposed activity.

(b) Notice of public meeting shall also contain the information in (a)1. through 7., above, and the following information:

1. Time, date, and place of meeting.
2. Reference to the date of any previous public notices relating to the permit.
3. Brief description of the nature and purpose of the meeting.

### 5.3.2 Long-Term Conceptual Planning for Projects that will Take More Than One Phase to Complete

State 404 permits are limited in duration under federal law. Larger projects may need to be completed in phases so as not to exceed the maximum per-permit duration. Such projects may include, but are not limited to, residential, governmental, or commercial developments, linear transportation, and mining activities. To provide some regulatory certainty to applicants of these larger projects, subsection 62-331.051(2), F.A.C., provides that all activities reasonably related to the project shall be included in the same permit application, which means that the applicant should provide sufficient information for the Agency to review the entire scope of the project. This will enable the Agency to assess whether the project as a whole meets the requirements of Chapter 62-331, F.A.C., and this Handbook.

The following steps shall be taken to facilitate efficient permitting and planning for larger projects that are expected to be completed in phases:

(a) Pre-application meeting

The applicant shall schedule a pre-application meeting with agency staff to discuss the entire scope of the project. The agency shall provide information and guidance to the applicant, including, but not limited to, such topics as project purpose and description, project alternatives and the alternatives analysis (see Appendix C), methods to avoid and minimize impacts to state-assumed waters, cumulative impacts, mitigation information, permitting strategy, and materials that should be included with the applications. The agency may provide a non-binding "pre-review" for any material that the applicant has prepared at this stage. The most helpful element to have ready for "pre-review" is the alternatives analysis required by Rule 62-331.053, F.A.C. The alternatives analysis shall be prepared for the entire project and shall be attached as an appendix to the long-term planning document in (b), below.

(b)  Phasing the project

The applicant shall divide the project into phases. Each phase shall contain activities that can reasonably be expected to be completed within no more than the maximum permit duration allowed under federal law. The applicant shall create a long-term planning document that explains how the project is phased, what activities are expected to be completed within each phase, an expected permitting timeframe for each phase, and an assessment of cumulative impacts. The long-term planning document shall be made part of the project file that goes out on public notice and federal review if required under 40 CFR § 233.51. The agency shall provide the applicant with information and guidance, as needed.

(c)  Permitting

The applicant shall apply for one phase at a time. Permits issued under this section shall be for a fixed term not to exceed the maximum permit duration allowed under federal law. During its review of the first phase of the project, the Agency shall analyze and review the entire project, as proposed in the long-term planning document, under all 404 requirements. This analysis and review shall become part of the project file and be a basis of the agency action on the first phase, and the long-term planning document shall be incorporated into the permit.

The Agency shall depend on this analysis and review for subsequent phases of the same project except to the extent:

1.  There are changes to state water quality standards that would be affected by activities described in the long-term planning document that have not already been authorized for construction or operation;
2.  There have been amendments to Florida law governing special basin criteria that would affect future activities described in the long-term planning document that have not already been authorized for construction;
3.  There are substantive changes in the site characteristics that would affect whether the design concepts described in the long-term planning document can continue to be reasonably expected to meet the conditions for authorizing construction of future phases. This shall include such things as changes in the designation of listed species, and changes to nesting, denning, and critical designation status of listed species that exist within the lands served by the project area; and
4.  There have been material changes in the scope of the project, as defined in section 2.0 of this Handbook.

Subsequent review by the Agency shall be limited to those changes enumerated above. In order for the Agency to determine whether there have been any changes in the scope of the project, any changes to the most up-to-date version of the long-term planning document shall be included with the permit application for each subsequent phase with a summary of any changes made to the document since the previous phase was permitted. The most recent version of the long-term planning document shall be attached as an appendix to all subsequent permits issued for the project. The permit shall be clearly labeled with the following caveat:

"This permit authorizes one phase of a multi-phase project. The long term planning document, attached as Appendix [X], does not reflect the scope of activities authorized by this permit. Authorized activities are described in the body of the permit document and depicted in

> Appendix [X] (drawings). It is a violation of Part IV of Chapter 373, F.S., and the Clean Water Act to conduct unauthorized dredge and fill activities."

Immediately prior to conclusion of each permit, the Department shall conduct a site inspection to verify site conditions and impacts are as anticipated and permitted. It is highly recommended that the applicant apply for the next phase one year before the permit for the previous phase expires or is projected to be completed – whichever is sooner. This will give the Agency time to process the application for the next phase, including putting the project out on public notice and potential federal agency review. While the Agency shall follow the expedited review procedures in subsection 62-331.052(1) and subparagraph 62-331.060(3)(b)5., F.A.C., allowing one year for processing will help prevent project delays and will help provide a seamless transition between phases.  Activities identified in a permit may be administratively continued as described in Section 5.3.3.

### 5.3.3    Continuation of Permits and Review for a New Permit for an Existing Project

State 404 Permits cannot be extended beyond the duration allowed under federal law or renewed. Large projects that are expected to take more than the maximum duration allowed under federal law to complete shall follow the long-term planning provisions in section 5.3.2. However, occasionally projects will take more than the maximum duration allowed under federal law to complete because of unexpected project delays. Unexpected project delays can occur for many reasons such as discreet storm events, labor or supply shortages, unanticipated number of inclement weather days, etc. If this occurs, the permittee shall apply for a new permit. If applicable, the permittee may request that the Agency use the original application for a new permit as described in (a), below.

If the permittee applies for a new permit at least 180 days before expiration of the original permit, the original permit may be administratively continued until the new permit is issued (i.e. the permittee may continue work under the original permit until the new permit is issued).

If the permittee does not apply for a new permit at least 180 days before expiration of the original permit, the permittee shall stop work on or before the original expiration date. A new permit must be obtained prior to commencement of work.

(a) An applicant may request that the Agency use the original application form and materials for a new permit when:

    1. There have been no material changes to site conditions, including use of the site by listed species, since the original permit was issued other than activities authorized in the original permit;
    2. Where the project is in compliance with the original permit; and
    3. State 404 Program rules applicable to the project have not changed.

Upon receipt of a request to use the original application for a new permit, the Agency shall conduct a site visit to verify that 1. and 2., above, have been met.

(b) If there are any changes in site conditions, State 404 program rules, proposed modifications, or if the project is found to be out of compliance with the original permit, the applicant shall submit a new application.

(c) Any application for a new permit for an existing project shall provide the following additional information:

    1. A description of work already completed under the original permit;

    2. A description of work that has not yet been completed (if requested pursuant to (a), above, the description should be limited to work that was authorized in the original permit);

    3. The reason for the unexpected delay;

    4. The amount of time needed to finish the project (no more than the maximum duration allowed under federal law).

An application for a new permit will be processed as a new individual permit, including all public notice requirements. An application that includes unfinished activities authorized in a previously issued State 404 Program permit, where the application is received prior to expiration of the original permit for the activities, shall be subject to the provisions of Subsection 373.4146(5), F.S., as applicable.

## 6.0    Duration, Modification, and Transfer of Permits

(a) Duration of permits shall be in accordance with Rule 62-331.090, F.A.C.

(b) Individual permits become effective when they are signed by the Agency and the applicant. Each State 404 Individual permit, when issued, shall contain a signature page with signature blocks for the person who has authority to sign permits for the district where the permit is issued and for the applicant. The applicant shall sign the page and send it back to the Agency for Agency signature.

(c) Individual permits cannot be extended beyond the duration allowed under federal law but may be administratively continued while an application for a new permit is under review in accordance with section 5.3.3 of this Handbook when unexpected project delays cause a project to require more time to complete.

## 7.0    Determination and Review of the Landward Extent of State-Assumed Waters

Determination and review of the landward extent of state-assumed waters shall be conducted in accordance with subsection 62-331.010(3), F.A.C., and section 7.1 of Volume I.

## 7.1    Use of ERP Formal Determinations

Valid formal determinations conducted in accordance with subsection 62-330.201(2), F.A.C., and section 7.2 of Volume I shall be accepted for State 404 Program permits.

## 7.2    Informal Determinations

Informal determinations may be requested by the applicant in accordance with section 7.3 of Volume I.

**8.0    Criteria for Review of State 404 Program Individual Permits**

State 404 Program permits are processed using ERP criteria, the additional criteria in Chapter 62-331, F.A.C., Volume I, and this Handbook. The ERP review covers most criteria. Those are described in Volume I. Any additional criteria not described in Volume I, as well as those ERP criteria that conflict with the State 404 Program, are described in this section.

**8.1    Administratively and Technically Complete Applications**

There are two types of "completeness" for applications for a State 404 Program individual permit.

(a) Administratively complete is defined in section 2.0. Administratively complete means the project is complete enough to go out on public notice but may not have all details worked out. To be complete enough for public notice, the project design should be nearly finalized, and environmental information submitted with the application should be detailed enough to provide a good description of project environmental impacts in the notice. A project shall not be administratively complete if the alternatives analysis required by subsection 62-331.053(1), F.A.C., has not been submitted.

(b) Technically complete is defined in section 2.0. A technically complete application includes all information required for the Agency to commence review as described in section 8.2, below.

Applicants should strive to submit applications that are as technically complete as possible. Pre-application meetings as described in section 5.0 are important and can assist an applicant in submitting a complete application.

**8.2    Sequence of Review**

Upon receipt of a technically complete application, the Agency will follow the sequence of review for processing applications summarized below. The sequence is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of the previous steps. The Agency must address all the applicable State 404 Program permitting conditions in reaching a permitting decision for a project.

(a) Determine whether the activity qualifies for a State 404 Program exemption or general permit. If it is not covered by an exemption or general permit, then:

(b) Review practicable alternatives to the proposed activity. Alternatives may include not dredging or filling in state-assumed waters (avoidance) or dredging or filling in an alternative aquatic site with potentially less damaging environmental consequences. The applicant shall submit an alternatives analysis as required by Rule 62-331.053, F.A.C. Guidance for completing the alternatives analysis can be found in Appendix C.

(c) Review the proposed project area boundaries. For the purposes of the State 404 Program only, the project area includes all areas of dredging or filling in state-assumed waters, and any proposed mixing zones, where applicable. Mixing zones shall be reviewed in accordance with Chapter 62-331, F.A.C., and as provided in Rule 62-4.242, and subsection 62-4.244(5), F.A.C.

(d) Evaluate the various physical and chemical components which characterize the non-living environment of the proposed site, the substrate and the water including its dynamic characteristics consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(e) Identify and evaluate any special or critical characteristics of the proposed project site and surrounding areas which might be affected by use of such site, related to their living communities or human uses consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(f) Review the information submitted with the application to determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C., will be met.

(g) Evaluate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA. Check for physical incompatibility of the material to be used as fill (examples – 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) if a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species).

(h) If there is a reasonable probability that contaminants are present, including chemical contamination, the Agency shall require the applicant to conduct appropriate sediment, elutriate, and/or water quality tests, as applicable.

(i) Identify appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity, as described in Volume I, section 10.2.1, except 10.2.1.2, which is not applicable to the State 404 Program. Avoidance should be considered first, and then minimization only if avoidance is not practicable.

(j) Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(k) Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. This is a determination of whether the project, including mitigation, is permittable under the State 404 Program.

(l) Prepare a written determination on each application outlining the permitting decision and the rationale for the decision. The determination shall be dated, signed, and included in the official record prior to final action on the application. The Technical Staff Report from step 10 (subsection (j)), above, shall be included in or attached to the determination.

### 8.3    Review Criteria Unique to State 404 Program Permits

The following criteria are unique to the State 404 Program and will need to be considered in addition to the criteria for an ERP in Chapter 62-330, F.A.C., to meet the requirements of the State 404 Program. This list is a summary provided for convenience:

### 8.3.1    Alternatives Analysis

Some aspects of the alternatives analysis are similar to the requirements in Volume I, section 10.2.1 regarding elimination and reduction of impacts. The State 404 Program differs from ERP in that it requires more documentation (see subsection 62-331.053(1), F.A.C.), and allows the "No project alternative" (or "No action alternative") to be considered.

### 8.3.2    Aesthetics Review

Aesthetics shall be considered as part of the evaluation of potential adverse effects on human-use characteristics that may occur as a result of the proposed activities.

Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners.

Possible loss of values (adverse effects) include: The dredge or fill projects can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting project areas, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredging or filling can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners.

The Agency shall also consider any comments received during the public comment period that apply to aesthetics.

### 8.3.3    Mitigation hierarchy

Mitigation for State 404 Program permits is generally evaluated in accordance with Volume I, section 10.3, like ERP. However, in addition to those requirements, the federal mitigation hierarchy described in section 8.5.1 of this Handbook, shall apply to any mitigation for State 404 Program permits.

### 8.3.4    Permit signatures

The Permittee, as well as the Agency, must sign an individual permit before it is considered effective.

After making a permitting decision, The Agency will draft the permit, and will send the draft permit to the applicant for review. If the applicant accepts the permit and conditions, the applicant shall sign the signature page and send the document back to the Agency using regular mail services or electronically. The Agency will then sign the permit and send the signed permit to the Permittee. The date that the Agency signs the permit will be the effective date of the permit. The Permittee must receive the fully executed permit before conducting any activity authorized in the permit.

**8.3.5    Cumulative Effects**

Unlike ERP reviews, the CWA does not limit analysis of cumulative effects to the resources within the impacted drainage basin. However, the drainage basin is a good starting point for review and will often be found to be the appropriate scale. Some projects will require cumulative effects reviewed on a larger or smaller scale depending on the size, project purpose, and resources proposed for impact. When reviewing cumulative effects, the Agency shall identify resources of concern and determine the potentially effected resource area(s). Compensatory mitigation for cumulative impacts shall comply with Volume I, section 10.2.8.

Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual dredge or fill activities. Although the impact of a particular activity may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

Cumulative effects attributable to dredge or fill activities in wetlands and other surface waters should be predicted to the extent reasonable and practical. The Agency shall collect information and solicit information from other sources, such as other permitting agencies, governmental agencies, or the public, about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications and monitoring and enforcement of existing permits.

**8.3.6    Secondary Effects**

Secondary effects are effects on an aquatic ecosystem that are associated with a dredge or fill activity, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered and documented during the decision-making process concerning the evaluation of individual permit applications.

Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and growth induced by improved access. Activities to be conducted on uplands created by fill activities in wetlands or other surface waters may have secondary impacts within those waters which should be considered in evaluating the impact of creating those uplands.

In addition to the secondary impact analysis categories identified in Volume I, section 10.2.7, the CWA requires secondary impact analysis on the following categories:

(a)    Sanctuaries and refuges
Sanctuaries and refuges consist of areas designated under state and federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources. Sanctuaries and refuges may be affected by dredge or fill activities which will: Disrupt the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;

1.    Create unplanned, easy and incompatible human access to remote aquatic areas;
2.    Create the need for frequent maintenance activity;
3.    Result in the establishment of undesirable competitive species of plants and animals; or

4. Change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices;

(b) Human use characteristics
Categories include:

1. Municipal and private water supplies. Activities can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Activities may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers.

2. Recreational and commercial fisheries. Activities can affect the suitability of recreational and commercial fishing grounds as habitat for populations of consumable aquatic organisms. Activities can result in the chemical contamination of recreational or commercial fisheries. They may also interfere with the reproductive success of recreational and commercially important aquatic species through disruption of migration and spawning areas. The introduction of pollutants at critical times in their life cycle may directly reduce populations of commercially important aquatic organisms or indirectly reduce them by reducing organisms upon which they depend for food. Any of these impacts can be of short duration or prolonged, depending upon the physical and chemical impacts of the discharge and the biological availability of contaminants to aquatic organisms.

3. Water-related recreation. Water-related recreation encompasses activities undertaken for amusement and relaxation. Recreational activities encompass two broad categories of use: consumptive, such as harvesting resources by hunting and fishing; and non-consumptive, such as canoeing and sight-seeing. Activities may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, dissolved oxygen, dissolved materials, toxic materials, pathogenic organisms, quality of habitat, and the aesthetic qualities of sight, taste, odor, and color.

4. Aesthetics. Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners. Dredge or fill activities can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredge or fill activities can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners.

5. Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves. These preserves consist of areas designated under federal and state laws or local ordinances to be managed for their aesthetic, educational, historical, recreational, or scientific value. Dredge or fill activities in such areas may modify the aesthetic, educational, historical, recreational and/or scientific qualities thereby reducing or eliminating the uses for which such sites are set aside and managed.

## 8.4     ERP Criteria Not Applicable to State 404 Program Permits

Section 373.4146, F.S., provides that provisions of state law that conflict with federal requirements pertaining to Section 404 permits do not apply to state administered section 404 permits (State 404 Program permits). The following rules and statutes applicable to ERP are not applicable to State 404 Program Permits. This list may not be exhaustive.

Statutes:

- Section 120.60, F.S., pertaining to default of processing timeframes;
- Section 373.4141, F.S., containing timeframes for review of ERP permits;
- Certain provisions of Section 373.414, F.S., pertaining to mining mitigation;
- Any provision of Chapter 378, F.S., pertaining to "life-of-the-mine" permits;
- Sections 378.212(1)(g), and 378.404(9), F.S., pertaining to variances for certain mining reclamation activities;
- Subsection 378.403(19), F.S., containing a definition of "Wetlands" with special provisions for certain areas included in an approved conceptual reclamation plan or modification application;
- Section 252.363(1)(a)3., F.S., pertaining to the tolling and extension of permits pursuant to part IV of Chapter 373, F.S., when the Governor declares a state of emergency, if the State 404 permit would be extended beyond the duration allowed under federal law.

Rules:

- Paragraph 62-345.600(1)(b), F.A.C., pertaining to time lag for phosphate and heavy minerals mines;
- Volume I, Section 10.2.1.2 providing certain exceptions for reduction or elimination of impacts;
- Rule 62-348.600, F.A.C., pertaining to mitigation for high fiber peat mines.

## 8.5     Compensatory Mitigation

Compensatory mitigation for State 404 Program permits shall be conducted in accordance with Rule 62-331.130, F.A.C., and this section.

### 8.5.1     Compensatory Mitigation Hierarchy

When considering options for successfully providing the required compensatory mitigation, the Agency shall consider the type and location options in the order presented in paragraphs (a) through (e) of this section. It is recognized that flexibility may be needed to address watershed

needs and allow for the consideration of mitigation projects that are environmentally preferable based on a watershed approach, if such projects are consistent with this section.

Subject to the provisions in paragraphs (a) through (e), below, and section 8.5.2 of this Handbook, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable. Compensatory mitigation projects should not be located where they will increase risks to aviation by attracting wildlife to areas where aircraft-wildlife strikes may occur (e.g., near airports).

(a)  Mitigation bank credits. When permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by the purchase of mitigation bank credits.

Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful.

Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the Agency shall give preference to the use of mitigation bank credits when these considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate, as, for example, where an in-lieu fee program has released credits available from a specific approved in-lieu fee project, or a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis.

(b)  Corps authorized in-lieu fee program credits. Where permitted impacts are located within the service area of a Corps authorized in-lieu fee program, and the in-lieu fee program has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the in-lieu fee program.

In-lieu fee projects typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. They also devote significant resources to identifying and addressing high-

priority resource needs on a watershed scale, as reflected in their compensation planning framework. For these reasons, the Agency shall give preference to in- lieu fee program credits over permittee-responsible mitigation, where these considerations are applicable. However, as with the preference for mitigation bank credits, these same considerations may be used to override this preference where appropriate. Additionally, in cases where permittee-responsible mitigation is likely to successfully meet performance standards before advance credits secured from an in-lieu fee program are fulfilled, the Agency shall also consider this factor in deciding between in-lieu fee mitigation and permittee-responsible mitigation.

(c) Permittee-responsible mitigation under a watershed approach. Where permitted impacts are not in the service area of an approved mitigation bank or in-lieu fee program that has the appropriate number and resource type of credits available, permittee-responsible mitigation is the only option. Where practicable and likely to be successful and sustainable, the resource type and location for the required permittee-responsible compensatory mitigation shall be determined using the principles of a watershed approach as outlined in section 8.5 of the 404 Handbook.

(d) Permittee-responsible mitigation through on-site and in-kind mitigation. In cases where a watershed approach is not practicable, the Agency shall consider opportunities to offset anticipated aquatic resource impacts by requiring on-site and in-kind compensatory mitigation. The Agency shall also consider the practicability of on-site compensatory mitigation and its compatibility with the proposed project.

(e) Permittee-responsible mitigation through off-site and/or out-of-kind mitigation. If, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (d), above, the Agency determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the Agency shall require that this alternative compensatory mitigation be provided.

## 8.5.2    Watershed approach

The Agency shall use a watershed approach to establish compensatory mitigation requirements in State 404 Program permits to the extent appropriate and practicable. Where a watershed plan is available, the Agency will determine whether the plan is appropriate for use in the watershed approach for mitigation. In cases where the Agency determines that an appropriate watershed plan is available, the watershed approach shall be based on that plan. Where no such plan is available, the watershed approach shall be based on information provided by the applicant or available from other sources. The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of mitigation sites.

(a) Considerations

1. A watershed approach to mitigation considers the importance of landscape position and resource type of mitigation projects for the sustainability of aquatic resource functions within the watershed. Such an approach considers how the types and locations of mitigation projects will provide the desired aquatic resource functions and will continue

to function over time in a changing landscape. It also considers the habitat requirements of important species, habitat loss or conversion trends, sources of watershed impairment, and current development trends, as well as the requirements of other regulatory and non-regulatory programs that affect the watershed, such as storm water management or habitat conservation programs. It includes the protection and maintenance of terrestrial resources, such as non-wetland riparian areas and uplands, when those resources contribute to or improve the overall ecological functioning of aquatic resources in the watershed. Mitigation requirements determined through the watershed approach shall not focus exclusively on specific functions (e.g., water quality or habitat for certain species), but shall provide, where practicable, the suite of functions typically provided by the affected aquatic resource.

2. Locational factors (e.g., hydrology, surrounding land use) are important to the success of mitigation for impacted habitat functions and may lead to siting of such mitigation away from the project area. However, consideration shall also be given to functions and services (e.g., water quality, flood control, shoreline protection) that will likely need to be addressed at or near the impacted areas.

3. A watershed approach may include on-site mitigation, off-site mitigation (including mitigation banks or in-lieu fee programs), or a combination of on-site and off-site mitigation.

4. A watershed approach to mitigation shall include, to the extent practicable, inventories of historical and existing aquatic resources, including identification of degraded aquatic resources, and identification of immediate and long-term aquatic resource needs within watersheds that can be met through permittee-responsible mitigation projects, mitigation banks, or in-lieu fee programs. Planning efforts shall identify and prioritize aquatic resource restoration, creation, and enhancement activities, and preservation of existing aquatic resources that are important for maintaining or improving ecological functions of the watershed. The identification and prioritization of resource needs shall be as specific as possible, to enhance the usefulness of the approach in determining mitigation requirements.

(b) Information Needs

1. In the absence of a watershed plan determined by the Agency to be appropriate for use in the watershed approach, the Agency shall use a watershed approach based on analysis of information regarding watershed conditions and needs, including potential sites for aquatic resource restoration activities and priorities for aquatic resource restoration and preservation. Such information includes: Current trends in habitat loss or conversion; cumulative impacts of past development activities, current development trends, the presence and needs of sensitive species; site conditions that favor or hinder the success of mitigation projects; and chronic environmental problems such as flooding or poor water quality.

2. This information may be available from sources such as wetland maps; soil surveys; U.S. Geological Survey topographic and hydrologic maps; aerial photographs; information on rare, endangered and threatened species and critical habitat; local ecological reports or studies; and other information sources that could be used to identify locations for suitable mitigation projects in the watershed.

(c)  Watershed Scale

The cumulative impact basins described in Volume I, section 10.2.8 shall be used when considering watershed scale in mitigation for State 404 Program permits.

### 8.5.3  Permit Specific Conditions for Compensatory Mitigation

(a)  The compensatory mitigation requirements for a permit, including the amount and type of compensatory mitigation, shall be clearly stated in the specific conditions of the individual or general permit verification. The specific conditions must be enforceable.

(b)  For an individual permit that requires permittee-responsible mitigation, the specific conditions shall:

    1. Identify the party responsible for providing the compensatory mitigation;

    2. Incorporate the final mitigation plan approved by the Agency;

    3. State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and

    4. Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.

(c)  For a general permit activity that requires permittee-responsible mitigation, the specific conditions shall describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification shall also include a specific condition that states that the permittee cannot commence work until the Agency approves the final mitigation plan, unless the Agency determines that such a specific condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, specific conditions of the general permit verification shall also address the requirements of paragraph (b), above.

(d)  If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the specific conditions shall indicate whether a mitigation bank or in-lieu fee program will be used and specify the number and resource type of credits the permittee is required to purchase. In the case of an individual permit, the specific condition shall also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the specific conditions shall either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required credits shall be approved by the Agency prior to purchasing credits.

### 8.5.4  Timing of Compensatory Mitigation

Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the authorized impacts. Temporal loss shall be compensated for in accordance with appropriate calculations for time lag in accordance with Rule 62-345.600, F.A.C., except paragraph 62-345.600(1)(b), F.A.C., which is not applicable to the State 404 Program.

**8.5.5    Use of Preservation as Compensatory Mitigation**

(a)  Preservation may be used to provide compensatory mitigation when all the following criteria are met:

1. The resources to be preserved provide important physical, chemical, or biological functions for the watershed;

2. The resources to be preserved contribute significantly to the ecological sustainability of the watershed. In determining the contribution of those resources to the ecological sustainability of the watershed, the Agency shall use appropriate quantitative assessment tools, where available;

3. Preservation is determined by the Agency to be appropriate and practicable;

4. The resources are under threat of destruction or adverse modifications; and

5. The preserved site will be permanently protected through an appropriate real estate or other legal instrument as described in Volume I, section 10.3.8.

(b)  Where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the Agency where preservation has been identified as a high priority using a watershed approach described in section 8.5.2 of this Handbook, but compensation ratios shall be higher.

**8.5.6    Additional Considerations for Permittee-Responsible Compensatory Mitigation Projects**

**8.5.6.1 Monitoring**

The compensatory mitigation plan shall provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period shall be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the Agency shall reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. The Agency may also extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The Agency shall revise monitoring requirements when remediation or adaptive management is required.

**8.5.6.2 Adaptive Management**

(a)  If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee shall notify the Agency. Any significant modification of the compensatory mitigation project requires approval from the Agency.

(b)  If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party shall notify the Agency as soon as possible. The Agency shall evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The Agency shall consider

whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project.

(c) The Agency, in consultation with the responsible party (and other state, federal, tribal, and local agencies, as appropriate), will determine the appropriate measures. The measures may include, but are not limited to, site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives.

(d) Performance standards shall be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards shall also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

### 8.5.6.3 Long-term Protection and Management

(a) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the Agency before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site.

(b) The permit conditions shall identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions shall, where applicable, contain provisions allowing the permittee to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the Agency. The land stewardship entity need not be identified in the original permit, as long as the future transfer of long-term management responsibility is approved by the Agency.

(c) A long-term management plan shall include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs.

(d) Any provisions necessary for long-term financing shall be addressed in the original permit. The Agency shall require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site.

(e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts.

## APPENDIX A

### Retained Waters List

### August 23, 2019

The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (below), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary.

## Rivers and Creeks

Acosta Creek
Alafia River
Alaqua Creek
Alexander Springs Creek
Alligator Creek (Sarasota County)
Alligator Lake-Lake Gentry Canal
Amelia River
Anclote River (Upstream to 7 Springs Blvd)
Apalachicola River
Arlington River
Aucilla River
Axle Creek
Banana River
Barrentine Creek
Barron River
Basin Creek
Bayou Marcus
Bear Creek (Bay County)
Bear Creek (Putnam County)
Belcher Canal
Bells River
Bessy Creek
Big Coldwater Creek (Also East Fork and West Fork)
Big Davis Creek
Big Fishweir Creek
Big Juniper Creek
Big Marco River
Big Muddy Creek
Big Mulberry Branch
Billy Creek
Black Creek
Black Creek (Walton County)
Black Water Creek
Blackwater River (Santa Rosa and Okaloosa Counties)
Blind Creek
Blockhouse Creek
Blounts Branch
Blue Creek (Lake County)
Blue Hole Creek
Blue Springs Run
Bluff Branch

Boathouse Creek
Bogey Branch
Boggy Creek (Orange and Osceola Counties)
Bonnet Creek (Seminole County)
Botts Creek
Bowlees Creek
Box Branch (Duval County)
Boynton Canal
Braden River (Downstream of Ward Lake Dam (Bill Evers Reservoir))
Bradley Creek
Bray Creek
Brick-Alligator Lake Canal
Britt Creek (Martin and St Lucie Counties)
Broad River
Brothers River
Broward Creek
Broward River
Browns Creek
Buck Creek (Charlotte County)
Buckhorn Creek (Hillsborough County)
Bull Creek (Flagler County)
Bulow Creek
Bumblebee Creek
Burnt Mill Creek (Bay County)
Butcher Pen Creek
Butler Creek
C-15 Canal
C-17 Canal
C-18 Canal
C-23 Canal
C-24 Canal
C-51 Canal / West Palm Beach Canal
Cabbage Creek (St Johns County)
Callaway Creek
Caloosahatchee River
Camp Branch (Putnam County)
Caney Branch (Duval County)
Canoe Creek (Osceola County)

Capo Creek
Carpenter Creek
Carrabelle River
Casa Cola Creek
Cat Creek (Franklin County)
Cedar Creek (Putnam County)
Cedar Point Creek (Duval County)
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek (Duval County)
Clapboard Creek
Clark Creek (Gulf County)
Clarkes Creek
Clear Creek (Escambia County)
Cocohatchee River
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Branch
Cow Creek (Putnam County)
Cowhead Creek (Duval County)
Cracker Branch (St Johns County, St Johns River)
Cradle Creek
Craig Creek
Crane Creek (Brevard County, Melbourne)
Crooked Creek (Bay County)
Crooked Creek (Martin County)
Crooked River (Franklin County)
Crooked River (Lake County)
Cross Creek (Alachua County)
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek (Lee County)
Danforth Creek
Dania Cut-off canal

Days Creek
Dead River (Kissimmee River)
Dead River (Lake County, Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek (St Johns County)
Deer Creek (Duval County)
Depot Creek
Dillaberry Branch
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek (St Johns County)
East River (Washington and Bay Counties)
Eau Gallie River
Econfina River
Econlockhatchee River
Egans Creek
Eightmile Creek (Escambia County)
Elbow Branch (Putnam County)
Elbow Creek
Elevenmile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek (Putnam County)
Fisheating Creek (Downstream of Fort Center)
Fishing Creek
Fitzpatrick Creek
Fivemile Creek (St Lucie County)
Flora Branch
Forked Creek
Fort George River
Fourmile Creek (Walton County)
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek (Duval County)
Goodbys Creek
Governors Creek
Graham Creek
Grog Branch
Guana River
Gulley Creek
Haines Creek (a.k.a. Haynes Creek)
Half Creek
Halifax River
Hannah Mills Creek

Harney River
Harrison Creek (Nassau County)
Harrys Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek (Flagler County)
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River
Hillsborough River (Downstream of Tampa Water Development Dam)
Hitchens Canal
Hog Creek (Martin County)
Hogan Creek
Hogpen Creek (Duval County)
Holiday Harbor (Duval County)
Holmes Creek (Jackson County)
Hominy Branch
Homosassa River
Honey Creek (Volusia County)
Hontoon Dead River
Hopkins Creek
Horseshoe Creek (Bay and Gulf Counties)
Hospital Creek
Howard Creek (St Lucie County)
Hudson Bayou
Hulett Branch
Huston Creek
Imperial River
Inconstanton Creek
Indian Creek (Hernando County)
Indian Creek (St Johns County)
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek (Nassau County)
Jackson River
Joe River
Johnson Creek (Dixie County)
Johnson Creek (Gulf County)
Johnson Slough (Clay County)
Jolly River
Jones Creek (Duval County)
Jones Swamp Creek
Julington Creek
Juniper Creek (Lake County)
Karen Canal
Kendall Creek
Kentucky Branch
Kestner Creek
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal

Lake Ashby Canal (and Deep Creek)
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal
Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek (Clay County)
Little Cedar Creek (Duval County)
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek (Lake County)
Little Manatee River
Little Mud Creek (St Lucie County)
Little Pottsburg Creek
Little River (Biscayne Bay)
Little Rocky Creek (Walton and Okaloosa Counties)
Little Saint Marys River
Little Trout River
Little Wekiva Creek
Lofton Creek
Lolly Creek
Long Branch (Duval County)
Long Creek (Flagler County)
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River (Downstream of Lake Manatee Dam)
Marshall Creek (St Johns County)
Mason Branch (St Johns County)
Matanzas River
McCoy Creek
McCullough Creek (St Johns County)
McGirts Creek
McQueen Creek
Miami Canal
Miami River

Middle River
Middle River (South and North Fork)
Mill Branch (Putnam County)
Mill Log Creek
Mills Creek (Nassau County)
Moccasin Branch (St Johns County)
Moccasin Slough
Moncrief Creek
Monroe Canal (Seminole County)
Moore's Creek (St Lucie County)
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek (Putnam County)
Murphy Creek
Myakka River
Myakkahatchee Creek (Sarasota County)
Nassau River
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New Rose Creek
Newcastle Creek
Nichols Creek
Ninemile Creek (Duval County)
NN Creek (Brevard County)
Norris Dead River
North Fork Saint Lucie River
North New River Canal
Ochlockonee River (Portion downstream starting 500 feet south of the ramp at Jack Langston Drive, Sopchoppy, FL.)
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek (Duval County)
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Pancho Creek
Pea River
Peace River (Upstream to 0.64 river miles north of old railroad bridge at SW River Street, Ft Ogden, FL)
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch (Clay County)
Peters Creek

Phelps Creek
Philippe Creek
Pine Barren Creek
Pine Log Creek (Bay and Washington Counties)
Pinhook River
Pithlachascotee River (Upstream to the private road bridge that is approximately 2,200 feet upstream of Rowan Road)
Plummer Creek
Polly Creek
Pond Creek (Santa Rosa County)
Poppolton Creek
Porpoise Creek (Dixie County)
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Red House Branch
Reedy Creek (Osceola and Orange Counties)
Ribault River
Rice Creek (Putnam County)(One directly off the St Johns River)
Robinson Creek (St Johns County)
Rock Springs Run
Rocky Creek (Hillsborough County)
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Francis Dead River
Saint Johns River
Saint Lucie Canal
Saint Lucie River
Saint Marks River (Wakulla, Leon and Jefferson Counties)
Saint Marys River
Saint Sebastian River
Salt Creek (Dixie County)
Salt Creek (Flagler County)
Salt Run
Salt Springs Run (Marion County)
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek (Bay County)
Sandy Run
Saul Creek (Downstream of Sauls Creek Road)
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek (Brevard County)
Shark River

Shell Creek (Charlotte County) (Downstream of dam for Shell Creek Reservoir)
Shingle Creek (Osceola and Orange Counties)
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glen Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek (Dixie County)
Sisters Creek
Sixmile Creek
Sixteenmile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek (Lake County)
Snell Creek
Soap Creek
Soldier Creek (Escambia County)
Soldier Creek (Seminole County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork Saint Lucie River
South Port Canal
Spring Creek (Wakulla County)
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St. Cloud Canal
Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River (St Johns County)
Suwannee River (Downstream of Purvis Landing and Boat Ramp)
Sweetwater Creek (Hillsborough County)
Swimming Pen Creek
Tarpon River
Taylor Creek (Okeechobee County)
Tenmile Creek (St Lucie County)
Terrapin Creek
Thomas Creek (Nassau and Duval Counties)
Thomas Mill Run
Three Otter Creek
Tiger Creek (Polk County)
Tocoi Creek
Tolomato River
Tomoka River

Trout -Coon Lake Canal
Trout Creek (St Johns County)
Trout River
Turkey Creek (Brevard County)
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River (Up to and
  including Wakulla Springs)
Walker Creek (Nassau County)

Wares Creek (Downstream of
  Bridge for 12th Ave W
  Bradenton FL)
Warner Creek
Weeki Wachee River
Wekiva River (Seminole and
  Lake Counties)
Weohyakapka Creek
West Branch Blockhouse Creek
West Palm Beach Canal
West Run Cracker Branch
Wetappo Creek
Wharf Creek
Whitney River

Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River
  (Downstream of the Inglis
  Dam and the Inglis Bypass
  Spillway in Citrus County)
Woodruff Creek
Wrights Creek (Homes County)
Ximanies Creek
Yellow River
Zeigler Dead River

## Lakes

Adams Lake (Volusia County)
Ajay Lake
Alligator Lake (Osceola County)
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake (Lake County)
Clark Lake (Volusia County)
Clear Lake (Orange County)
Coon Lake
Crescent Lake (Putnam-Flagler
  Counties)
Cypress Lake (Osceola County)
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter (Volusia County)
Lake Dora
Lake Emma (Lake County)
Lake Eustis
Lake Florence (Brevard County)
Lake Gentry
Lake George (Putnam-Volusia
  Counties)
Lake Griffin (Lake County)
Lake Harney
Lake Harris (Lake County)
Lake Hart (Orange County)
Lake Hatchineha
Lake Hellen Blazes
Lake Ida (Palm Beach County)
Lake Istokpoga

Lake Jackson (Osceola County)
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa (Lake County)
Lake Lucy (Lake County)
Lake Mangonia
Lake Marion (Polk County)
Lake Mary Jane
Lake Minnehaha (Lake County)
Lake Minneola
Lake Monroe
Lake Myrtle (Osceola County)
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Preston
Lake Rosalie
Lake Seminole (Gadsden,
  Jackson Counties)
Lake Seminole (Pinellas County)
Lake Susan (Lake County)
Lake Tarpon
Lake Tohopekaliga
Lake Washington (Brevard
  County)
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris (Lake County)
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maule Lake
Mud Lake (Lake County)
Orange Lake (Alachua County)

Powell Lake (Bay and Walton
  Counties)
Puzzle Lake (Seminole and
  Volusia Counties)
Rodman Reservoir
Ruth Lake
Salt Lake (Pinellas County)
Sawgrass Lake (Brevard
  County)
Silver Lake (Brevard County)
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake
Tiger Lake
Trout Lake (Osceola County)

## APPENDIX B

### Excerpts from 40 CFR Part 232

### Select Definitions from 40 CFR § 232.2

***Discharge of dredged material.***

(1) Except as provided below in paragraph (2), the term *discharge of dredged material* means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:

    (i) The addition of dredged material to a specified discharge site located in waters of the United States;

    (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

    (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:

    (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.

    (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

    (iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

    (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized landclearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized landclearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

    (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant

to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at §232.2(r) of this chapter.

(iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

### *Discharge of fill material.*

(1) The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

(i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable

waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

**40 CFR § 232.3 Activities not requiring permits.**

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be subject to any applicable toxic effluent standard or prohibition and shall require a section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

> Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

> (1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

>> (ii)(A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (*i.e.*, ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

>> (B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

> (2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge

abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3) Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, wiers, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4) Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5) Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6) Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i) Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii) All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii) The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv) The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v) Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi) In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii) The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix) The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x) Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi) The discharge shall not be located in the proximity of a public water supply intake;

(xii) The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv) The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv) All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d) For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.

Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in section 404(r) of the Act are exempt from section 404 permit requirements, but may be subject to other State or Federal requirements.



## APPENDIX C

### Guidance for Conducting an Alternatives Analysis

*(Based on guidance issued by the Corps of Engineers Jacksonville District –*
*"Information for Preparing an Alternatives Analysis Under Section 404", June 2014)*

As part of the individual permit application review process, proposed projects undergo an alternatives analysis using Rule 62-331.053, F.A.C., and this section. A permit cannot be issued if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, as long as the alternative does not have other significant adverse environmental consequences.

The level of detail in an alternatives analysis shall be commensurate with the scale of the adverse environmental effects of the project. Analysis of projects proposing greater adverse environmental effects shall be more detailed and explore a wider range of alternatives than projects proposing lesser effects.

Below are suggested steps to follow in providing the necessary information for the Agency to consider in the alternatives analysis:

Step 1: Define Purpose and Need

At the beginning of an alternatives analysis, the applicant shall clearly state the overall project purpose and need (examples are below). Significant thought shall be applied when developing the project purpose as it will drive much of the alternatives analysis. The overall project purpose must be specific enough to define a permit applicant's needs, but not so restrictive to preclude other alternatives. It shall also not be too wide-ranging without consideration for the applicant's real needs, as the geographic boundaries in the purpose define the scope of the analysis. For example:

1) *To develop a 225-lot single-family residential development at the southeast intersection of Interstate 10 and Toledo Blade Boulevard.*

   This example is too restrictive because there are no alternative sites to consider. It also unnecessarily details the exact number of lots, which can reduce the number of reasonable or practicable alternatives.

2) *To develop a residential development in Northwest Florida.*

   This example is too wide in scope if the applicant is actually focusing on a certain portion of a certain city or county to locate the project. This would also create an unmanageable number of alternatives.

3) *To develop a single-family residential subdivision near Interstate 10 in Crestview, Florida, to meet local demand for this type of housing.*

   This is an appropriate overall project purpose as it narrows the geographic scope to a reasonable and manageable size. It clearly defines what the project involves (single-family residences rather than "housing" that could also mean townhouses or apartments), the actual target market area (near Interstate 10 in Crestview), and the need for the project (local demand).

The applicant's proposed overall project purpose will be carefully considered, but if the Agency cannot concur with it as submitted, the Agency is required to modify it. Once the Agency has placed the project on public notice, the applicant must use the overall project purpose as stated in that public notice or the overall project purpose as provided back to the applicant if the Agency has modified their original project

purpose. If the applicant has already performed an alternatives analysis using a project purpose the Agency cannot concur with, (e.g., it is too restrictive or too broad in geographic scope), the analysis may need to be revised to accurately include reasonable and practicable alternatives.

Additional information about the proposed overall project purpose shall also be provided, including details about the relevant market conditions and area, location, history, and other factors that influence or constrain the intended nature, size, level of quality, price class, or other characteristics of the project. Information that further describes why particular geographic boundaries were chosen also will assist the Agency in its review.

Step 2: Identify Alternatives

The applicant must list and briefly describe alternatives that could meet the overall project purpose. This list, at a minimum, must include the following information:

1) The applicant's preferred alternative (the project proposed in the permit application)

2) Alternatives that would involve no dredging or filling in state-assumed waters. This "No-Action" alternative comprises one or more alternatives that would not involve a dredging or filling in state-assumed waters, which could involve reconfiguring the project to avoid all state-assumed waters on the site, siting the project entirely in uplands offsite, or no-action, i.e. not implementing the project. Although the "No-Action" alternative might not seem reasonable initially, it must always be included in the analysis. The no-action alternative can serve several purposes. First, it may be a reasonable alternative, especially for situations where the impacts are great, and the need is relatively minor. Second, it can serve as a benchmark, enabling decision makers to compare the magnitude of the environmental effects of the action alternatives.

3) Alternative offsite locations, including those that might involve less adverse impact to state-assumed waters.

4) Onsite alternatives that would involve less adverse impact to state-assumed waters. These include modifications to the alignments, site layouts, or design options in the physical layout and operation of the project to reduce the amount of impacts to state-assumed waters.

5) Alternatives that would involve greater adverse impact to state-assumed waters but avoid or minimize other significant adverse environmental consequences including offsite and onsite options (Alternatives that meet these criteria are uncommon).

Alternatives that are clearly unreasonable shall be identified and eliminated (not evaluated further). For example, alternative sites that are far too small to accommodate the project or that lie outside the geographic boundaries identified in the overall project purpose can be eliminated. This step of the analysis is not intended to rule out alternatives that are "unreasonable" according to the applicant, but those that would be considered "unreasonable" to an objective third-party. The Agency will verify that the criteria used for screening alternatives are objective and not so restrictive that they eliminate actual reasonable alternatives. The applicant must list the alternatives that were initially considered then eliminated from further study because the applicant feels they failed to pass this first round of screening. The Agency will review this list and determine if elimination of these alternatives is appropriate.

The maximum number of reasonable alternatives to study further will vary and depends on the nature and scope of the proposed project; however, there typically should be multiple alternatives to consider. The number of alternatives listed should be greater for projects involving greater impacts. This is the

preliminary list of reasonable alternatives; alternatives that are not practicable will be eliminated from further consideration in the later stages of the analysis.

In many instances, there will be alternatives determined to be both unreasonable and impracticable, as these terms can be nearly synonymous when used in these analyses. Regardless of whether the applicant identifies an alternative as unreasonable or as impracticable, it is imperative the applicant describe, in the context of the overall project purpose and need for the project, why each non-selected alternative should be eliminated from further analysis. The Agency must be able to independently review and verify this information and each step in the applicant's alternative analysis.

Step 3: Describe and Analyze Alternatives for Practicability

This step also addresses onsite and offsite alternatives and determines which are practicable and which are not. Practicable is defined here as meaning the alternative is available, is able to achieve the overall project purpose, and is feasible considering cost, existing technology, and/or logistics in light of the overall project purpose.

Alternatives shall be clearly listed and numbered for ease of reference and comparison. *At a minimum,* the following information for each alternative site examined shall be provided:

1) *General site information:*

   a) specific parcel information including, but not limited to; parcel ID numbers, aerial photos, location maps, FLUCCS codes and GPS coordinates;

   b) presence, quantity and quality of state-assumed waters;

   c) County/City zoning designation;

   d) the presence of any federally-listed threatened or endangered species or their critical habitat, and/or the presence of any historical properties or resources; and,

   e) site infrastructure (Will the site require new access roads/infrastructure? What are the potential impacts associated with these improvements?).

2) *The practicability of each alternative:*

   a) Practicability: alternatives that are practicable are those that are available and capable of being done by the applicant after considering the following (in light of the project purpose):

      i) Cost (For example, the costs associated with various infrastructure components such as roadways or utilities, including upgrades to existing infrastructure components or the need to establish new infrastructure components, may affect the viability of a particular alternative. A location far from all existing infrastructure (roads, water, sewer, and/or electricity) might not be practicable considering the costs associated with upgrading/establishing the infrastructure necessary to use that site. However, just because one alternative costs more than another, this does not mean that the more expensive alternative is entirely impracticable. Cost is analyzed in the context of the overall cost of the project and whether it is unreasonably expensive or exorbitant. In addition, cost is an objective, industry-neutral inquiry that does not consider an individual applicant's financial standing. The data used for any cost or financial feasibility analysis must be current with respect to the time of the alternatives analysis.);

   ii)  Existing Technology (The alternatives examined shall consider the limitations of existing technology yet incorporate the most efficient/least-impacting construction methods currently available. For example, alternatives to mining limestone or other minerals may not be practicable considering a lack of technology to allow replacement of that mineral resource in the mass-production of concrete; however, engineered retaining walls can be incorporated into an alternative that substantially minimizes wetland impacts by eliminating fill slopes.); and,

   iii)  Logistics (The alternatives examined may incorporate an examination of various logistics associated with the project, i.e., placement of facilities within a required distance, utilization of existing storage or staging areas, and/or safety concerns. Examples of alternatives that may not be practicable considering logistics are a land-locked parcel that cannot be accessed by public roads or a site that is too small to meet the overall project purpose).

b)  Availability: If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative. The applicant shall consider and anticipate alternatives available during the timeframe that the Agency conducts its alternatives analysis. An evaluation of availability for purchase and projected cost of such a purchase may be incorporated into this discussion.

c)  Other information: any other information that conveys the practicability of the alternatives reviewed in consideration of the overall project purpose shall be included.

An alternatives comparison matrix (see example below) is an effective way to present and compare the main parameters that were considered during the evaluation.

To allow for an objective evaluation, the comparison of the plan(s) for the proposed and alternative sites shall be framed for "yes" or "no" answers. A narrative shall accompany the matrix defining the practicability factors chosen and further explaining any "no" answers with objective and verifiable data. Practicability of the "no-action" alternative also must be addressed in this narrative and, if applicable, also included in the matrix. The information shall explain the consequences on the applicant and the public if the project is not implemented. Any remaining alternatives that are found to be practicable will move on to the next and final step.

If an alternative can be easily documented to be a more environmentally damaging alternative and this can be clearly described within the narrative and matrix, then this step and the following step can be combined. This will save the applicant time and expense; however, it is only appropriate for alternatives where this distinction is clear.

Example Alternative Comparison Matrix for Practicability

| Category | Practicability Factor | Alternative 1 Applicant's Preferred Alternative | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|---|
| Availability - Zoning | Existing Zoning Appropriate or Potential for Zoning Change? | YES Zoned for this project type | YES Zoned for this project type | YES Zoned for this project type | YES Zoned for agriculture but County has expressed support for the project | YES Zoned for this project type |
| Availability - Acquisition | Available for Acquisition? | YES Applicant owns the parcel | YES | YES | YES | YES |
| Cost – Acquisition | Reasonable Acquisition Costs? | YES Applicant owns the parcel | YES | YES | YES | NO Seller will only sell all 350 acres without subdividing |
| Cost – Historic or Cultural Resource Mitigation | Costs feasible for mitigating impacts to historic and cultural resources found onsite? | YES No historic or cultural resources found onsite | YES No historic or cultural resources found onsite | YES No historic or cultural resources found onsite | NO If impacts to historic resources allowed, costs to mitigate those impacts will increase project costs from $xxxx to $xxxx | YES No historical or cultural resources found onsite |
| Cost – Other | Other Costs Feasible? | YES | YES Additional costs for extensive retaining walls | YES | NO Costs to connect to utilities will increase project costs from $xxxx to $xxxx | NO Extensive use of retaining walls and construction of two bridges increase project costs from $xxxx to $xxxx |
| Existing Technology | Topography and other Site Conditions Feasible for Construction of Project? | YES | YES With extensive use of engineered retaining walls and drainage systems | YES | YES | YES With extensive use of retaining walls and bridges over Clear Creek |
| Logistics – Parcel Size | Sufficient Parcel Size? | YES 40 acres | YES 48 acres | NO 21 acres | NO 17 acres | YES 350 acres |
| Logistics – Utilities | Availability of Utilities? | YES | YES | YES | NO 6 miles to existing water, sewer, and power | YES |
| Logistics – Access | Availability for Access? | YES County right-of-way on east property boundary | YES County right-of-way to northwest property corner | NO Landlocked by private parcels and request for an easement was denied | NO Landlocked by private parcels and request for an easement was denied | YES County right-of-way to west side of property |

Step 4: Identify the Least Environmentally Damaging Practicable Alternative

1) The Least Environmentally Damaging Practicable Alternative (LEDPA) must be selected. Therefore, using the same numbering system from the step above, identify the environmental impacts for each remaining practicable alternate site. For each remaining site:

   a) describe the impacts (beneficial or adverse) to the aquatic ecosystem associated with each of the remaining alternatives

   b) describe the overall (beneficial or adverse) environmental impacts associated with each of the remaining alternatives

   c) be specific and quantitative in the identification of impacts (Rather than "Alternative A would result in a large impact to low quality wetlands and ditches that are sparsely vegetated and impact some wildlife." use "Alternative A would result in filling over 2.1 acres of fire-suppressed wet pine flatwoods wetland and 1.2 acres of wet ditches that contain scattered emergent wetland vegetation. Using the Uniform Mitigation Assessment Method, the function and value of the flatwoods wetland and ditch system have been calculated at 0.6 and 0.2, respectively. Work affecting 0.7-acre of potential flatwoods salamander habitat would also result from siting the project at this location."

2) If multiple practicable alternatives remain, and/or many environmental/relevant factors are involved, another matrix that contains only environmental/relevant parameters (e.g., wetland functional units, listed species, high value upland habitat, historic properties) can be used to assist in illustrating the proposed LEDPA. Emphasis shall be placed on impacts to the aquatic environment through functional unit loss of wetlands or other state-assumed waters that would be affected or eliminated by each alternative. An example matrix is below.

**Example Environmental Factor Matrix**

| Environmental Factors | Alternative 1 Applicant's Preferred Alternative | Alternative 2 |
|---|---|---|
| Wetland Impacts (Acres) | 2.0 | 6.0 |
| Loss in Wetland Function (UMAM Functional Units) | 1.4 | 3.9 |
| Impacts to Federally Listed Threatened or Endangered Species | No | No |
| LEDPA | Yes | No |

3) Conclude the alternatives analysis with a description of the alternative proposed to be the LEDPA, reiterating the rationale for this determination. Additionally, the rationale shall include statements clearly demonstrating how the following presumptions have been rebutted:

   a) If a project does not need to be in a specific aquatic site, such as a wetland, to meets its basic purpose (i.e., the project is not "water-dependent"), it is presumed that alternatives that do not affect special aquatic sites are available.

b)  If a project involves dredging or filling in a special aquatic site, a practicable alternative located in uplands is presumed to have less adverse impact on the aquatic ecosystem.

## APPENDIX D

## 307(a)(1) List of Toxic Pollutants (Codified in 40 CFR § 401.15)

**§ 401.15 Toxic pollutants.** The following comprise the list of toxic pollutants designated pursuant to section 307(a)(1) of the Act:

1. Acenaphthene
2. Acrolein
3. Acrylonitrile
4. Aldrin/dieldrin [1] ([1] effluent standard promulgated (40 CFR Part 129).)
5. Antimony and compounds [2] ([2] the term compounds shall include organic and inorganic compounds.)
6. Arsenic and compounds
7. Asbestos
8. Benzene
9. Benzidine
10. Beryllium and compounds
11. Cadmium and compounds
12. Carbon tetrachloride
13. Chlordane (technical mixture and metabolites)
14. Chlorinated benzenes (other than di-chlorobenzenes)
15. Chlorinated ethanes (including 1,2-di-chloroethane, 1,1,1-trichloroethane, and hexachloroethane)
16. Chloroalkyl ethers (chloroethyl and mixed ethers)
17. Chlorinated naphthalene
18. Chlorinated phenols (other than those listed elsewhere; includes trichlorophenols and chlorinated cresols)
19. Chloroform
20. 2-chlorophenol
21. Chromium and compounds
22. Copper and compounds
23. Cyanides
24. Ddt and metabolites [1]
25. Dichlorobenzenes (1,2-, 1,3-, and 1,4-di-chlorobenzenes)
26. Dichlorobenzidine
27. Dichloroethylenes (1,1-, and 1,2-dichloroethylene)
28. 2,4-dichlorophenol
29. Dichloropropane and dichloropropene
30. 2,4-dimethylphenol
31. Dinitrotoluene
32. Diphenylhydrazine
33. Endosulfan and metabolites
34. Endrin and metabolites [1]
35. Ethylbenzene
36. Fluoranthene
37. Haloethers (other than those listed elsewhere; includes chlorophenylphenyl ethers, bromophenylphenyl ether, bis(dichloroisopropyl) ether, bis-(chloroethoxy) methane and polychlorinated diphenyl ethers)
38. Halomethanes (other than those listed elsewhere; includes methylene chloride, methylchloride, methylbromide, bromoform, dichlorobromomethane
39. Heptachlor and metabolites
40. Hexachlorobutadiene
41. Hexachlorocyclohexane
42. Hexachlorocyclopentadiene
43. Isophorone

44. Lead and compounds
45. Mercury and compounds
46. Naphthalene
47. Nickel and compounds
48. Nitrobenzene
49. Nitrophenols (including 2,4-dinitrophenol, dinitrocresol)
50. Nitrosamines
51. Pentachlorophenol
52. Phenol
53. Phthalate esters
54. Polychlorinated biphenyls (pcbs) [1]
55. Polynuclear aromatic hydrocarbons (including benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenz-anthracenes, and indenopyrenes)
56. Selenium and compounds
57. Silver and compounds
58. 2,3,7,8-tetrachlorodibenzo-p-dioxin (tcdd)
59. Tetrachloroethylene
60. Thallium and compounds
61. Toluene
62. Toxaphene [1]
63. Trichloroethylene
64. Vinyl chloride
65. Zinc and compounds

**Environmental Protection Agency**                    **§ 232.3**

that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

(vii) *High tide line.* The term *high tide line* means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

(4) *Applicability date.* This definition is applicable beginning on February 6, 2020.

[53 FR 20773, June 6, 1988, as amended at 58 FR 8182, Feb. 11, 1993; 58 FR 45037, Aug. 25, 1993; 64 FR 25123, May 10, 1999; 66 FR 4575, Jan. 17, 2001; 67 FR 31142, May 9, 2002; 73 FR 79645, Dec. 30, 2008; 80 FR 37117, June 29, 2015; 83 FR 5209, Feb. 6, 2018]

## § 232.3 Activities not requiring permits.

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be subject to any applicable toxic effluent standard or prohibition, and shall require a section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

NOTE: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with constuction of dikes, drainage ditches or other works or structures used to effect such conversion. A conversion of section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

(1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

(ii)(A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (*i.e.,* ongong) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

(B) Activities which bring an area into farming, silviculture or ranching

323

use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3) Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, wiers, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4) Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5) Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6) Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i) Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii) All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii) The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv) The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v) Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi) In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii) The design, construction and maintenance of the road crossing shall not disrupt the migration or other

movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix) The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x) Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi) The discharge shall not be located in the proximity of a public water supply intake;

(xii) The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic River System;

(xiv) The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv) All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d) For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill

material into waters of the United States, and as such never require a section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.

NOTE: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/nonwetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage

within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming). In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in section 404(r) of the Act are exempt from section 404 permit requirements, but may be subject to other State or Federal requirements.

# PART 233—404 STATE PROGRAM REGULATIONS

## Subpart A—General

Sec.
233.1  Purpose and scope.
233.2  Definitions.
233.3  Confidentiality of information.
233.4  Conflict of interest.

## Subpart B—Program Approval

233.10  Elements of a program submission.
233.11  Program description.
233.12  Attorney General's statement.
233.13  Memorandum of Agreement with Regional Administrator.
233.14  Memorandum of Agreement with the Secretary.
233.15  Procedures for approving State programs.
233.16  Procedures for revision of State programs.

## Subpart C—Permit Requirements

233.20  Prohibitions.
233.21  General permits.
233.22  Emergency permits.
233.23  Permit conditions.

## Subpart D—Program Operation

233.30  Application for a permit.
233.31  Coordination requirements.
233.32  Public notice.
233.33  Public hearing.
233.34  Making a decision on the permit application.
233.35  Issuance and effective date of permit.
233.36  Modification, suspension or revocation of permits.
233.37  Signatures on permit applications and reports.
233.38  Continuation of expiring permits.
233.39  Electronic reporting.

## Subpart E—Compliance Evaluation and Enforcement

233.40  Requirements for compliance evaluation programs.
233.41  Requirements for enforcement authority.

## Subpart F—Federal Oversight

233.50  Review of and objection to State permits.
233.51  Waiver of review.
233.52  Program reporting.
233.53  Withdrawal of program approval.

## Subpart G—Eligible Indian Tribes

233.60  Requirements for eligibility.
233.61  Determination of Tribal eligibility.

(4) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a source.

(5) The term "construction" means any placement, assembly, or installation of facilities or equipment (including contractual obligations to purchase such facilities or equipment) at the premises where such equipment will be used, including preparation work at such premises.

**(b) Categories of sources; Federal standards of performance for new sources**

(1)(A) The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter shall revise) a list of categories of sources, which shall, at the minimum, include:

   pulp and paper mills;
   paperboard, builders paper and board mills;
   meat product and rendering processing;
   dairy product processing;
   grain mills;
   canned and preserved fruits and vegetables processing;
   canned and preserved seafood processing;
   sugar processing;
   textile mills;
   cement manufacturing;
   feedlots;
   electroplating;
   organic chemicals manufacturing;
   inorganic chemicals manufacturing;
   plastic and synthetic materials manufacturing;
   soap and detergent manufacturing;
   fertilizer manufacturing;
   petroleum refining;
   iron and steel manufacturing;
   nonferrous metals manufacturing;
   phosphate manufacturing;
   steam electric powerplants;
   ferroalloy manufacturing;
   leather tanning and finishing;
   glass and asbestos manufacturing;
   rubber processing; and
   timber products processing.

(B) As soon as practicable, but in no case more than one year, after a category of sources is included in a list under subparagraph (A) of this paragraph, the Administrator shall propose and publish regulations establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one hundred and twenty days after publication of such proposed regulations, such standards with such adjustments as he deems appropriate. The Administrator shall, from time to time, as technology and alternatives change, revise such standards following the procedure required by this subsection for promulgation of such standards. Standards of performance, or revisions thereof, shall become effective upon promulgation. In establishing or revising Federal standards of performance for new sources under this section, the Administrator shall take into consideration the cost of achieving such effluent reduction, and any non-water quality, environmental impact and energy requirements.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards and shall consider the type of process employed (including whether batch or continuous).

(3) The provisions of this section shall apply to any new source owned or operated by the United States.

**(c) State enforcement of standards of performance**

Each State may develop and submit to the Administrator a procedure under State law for applying and enforcing standards of performance for new sources located in such State. If the Administrator finds that the procedure and the law of any State require the application and enforcement of standards of performance to at least the same extent as required by this section, such State is authorized to apply and enforce such standards of performance (except with respect to new sources owned or operated by the United States).

**(d) Protection from more stringent standards**

Notwithstanding any other provision of this chapter, any point source the construction of which is commenced after October 18, 1972, and which is so constructed as to meet all applicable standards of performance shall not be subject to any more stringent standard of performance during a ten-year period beginning on the date of completion of such construction or during the period of depreciation or amortization of such facility for the purposes of section 167 or 169 (or both) of title 26 whichever period ends first.

**(e) Illegality of operation of new sources in violation of applicable standards of performance**

After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source.

(June 30, 1948, ch. 758, title III, § 306, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 854.)

DISCHARGES FROM POINT SOURCES IN UNITED STATES VIRGIN ISLANDS ATTRIBUTABLE TO MANUFACTURE OF RUM; EXEMPTION; CONDITIONS

Discharges from point sources in the United States Virgin Islands in existence on Aug. 5, 1983, attributable to the manufacture of rum not to be subject to the requirements of this section under certain conditions, see section 214(g) of Pub. L. 98–67, set out as a note under section 1311 of this title.

**§ 1317. Toxic and pretreatment effluent standards**

**(a) Toxic pollutant list; revision; hearing; promulgation of standards; effective date; consultation**

(1) On and after December 27, 1977, the list of toxic pollutants or combination of pollutants subject to this chapter shall consist of those toxic pollutants listed in table 1 of Committee Print Numbered 95–30 of the Committee on Public Works and Transportation of the House of Representatives, and the Administrator shall publish, not later than the thirtieth day after

December 27, 1977, that list. From time to time thereafter, the Administrator may revise such list and the Administrator is authorized to add to or remove from such list any pollutant. The Administrator in publishing any revised list, including the addition or removal of any pollutant from such list, shall take into account toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms, and the nature and extent of the effect of the toxic pollutant on such organisms. A determination of the Administrator under this paragraph shall be final except that if, on judicial review, such determination was based on arbitrary and capricious action of the Administrator, the Administrator shall make a redetermination.

(2) Each toxic pollutant listed in accordance with paragraph (1) of this subsection shall be subject to effluent limitations resulting from the application of the best available technology economically achievable for the applicable category or class of point sources established in accordance with sections 1311(b)(2)(A) and 1314(b)(2) of this title. The Administrator, in his discretion, may publish in the Federal Register a proposed effluent standard (which may include a prohibition) establishing requirements for a toxic pollutant which, if an effluent limitation is applicable to a class or category of point sources, shall be applicable to such category or class only if such standard imposes more stringent requirements. Such published effluent standard (or prohibition) shall take into account the toxicity of the pollutant, its persistence, degradability, the usual or potential presence of the affected organisms in any waters, the importance of the affected organisms and the nature and extent of the effect of the toxic pollutant on such organisms, and the extent to which effective control is being or may be achieved under other regulatory authority. The Administrator shall allow a period of not less than sixty days following publication of any such proposed effluent standard (or prohibition) for written comment by interested persons on such proposed standard. In addition, if within thirty days of publication of any such proposed effluent standard (or prohibition) any interested person so requests, the Administrator shall hold a public hearing in connection therewith. Such a public hearing shall provide an opportunity for oral and written presentations, such cross-examination as the Administrator determines is appropriate on disputed issues of material fact, and the transcription of a verbatim record which shall be available to the public. After consideration of such comments and any information and material presented at any public hearing held on such proposed standard or prohibition, the Administrator shall promulgate such standard (or prohibition) with such modification as the Administrator finds are justified. Such promulgation by the Administrator shall be made within two hundred and seventy days after publication of proposed standard (or prohibition). Such standard (or prohibition) shall be final except that if, on judicial review, such standard was not based on substantial evidence, the Administrator shall promulgate a revised standard.

Effluent limitations shall be established in accordance with sections 1311(b)(2)(A) and 1314(b)(2) of this title for every toxic pollutant referred to in table 1 of Committee Print Numbered 95–30 of the Committee on Public Works and Transportation of the House of Representatives as soon as practicable after December 27, 1977, but no later than July 1, 1980. Such effluent limitations or effluent standards (or prohibitions) shall be established for every other toxic pollutant listed under paragraph (1) of this subsection as soon as practicable after it is so listed.

(3) Each such effluent standard (or prohibition) shall be reviewed and, if appropriate, revised at least every three years.

(4) Any effluent standard promulgated under this section shall be at that level which the Administrator determines provides an ample margin of safety.

(5) When proposing or promulgating any effluent standard (or prohibition) under this section, the Administrator shall designate the category or categories of sources to which the effluent standard (or prohibition) shall apply. Any disposal of dredged material may be included in such a category of sources after consultation with the Secretary of the Army.

(6) Any effluent standard (or prohibition) established pursuant to this section shall take effect on such date or dates as specified in the order promulgating such standard, but in no case, more than one year from the date of such promulgation. If the Administrator determines that compliance within one year from the date of promulgation is technologically infeasible for a category of sources, the Administrator may establish the effective date of the effluent standard (or prohibition) for such category at the earliest date upon which compliance can be feasibly attained by sources within such category, but in no event more than three years after the date of such promulgation.

(7) Prior to publishing any regulations pursuant to this section the Administrator shall, to the maximum extent practicable within the time provided, consult with appropriate advisory committees, States, independent experts, and Federal departments and agencies.

(b) Pretreatment standards; hearing; promulgation; compliance period; revision; application to State and local laws

(1) The Administrator shall, within one hundred and eighty days after October 18, 1972, and from time to time thereafter, publish proposed regulations establishing pretreatment standards for introduction of pollutants into treatment works (as defined in section 1292 of this title) which are publicly owned for those pollutants which are determined not to be susceptible to treatment by such treatment works or which would interfere with the operation of such treatment works. Not later than ninety days after such publication, and after opportunity for public hearing, the Administrator shall promulgate such pretreatment standards. Pretreatment standards under this subsection shall specify a time for compliance not to exceed three years from the date of promulgation and shall be established to prevent the discharge of any pollut-

ant through treatment works (as defined in section 1292 of this title) which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works. If, in the case of any toxic pollutant under subsection (a) of this section introduced by a source into a publicly owned treatment works, the treatment by such works removes all or any part of such toxic pollutant and the discharge from such works does not violate that effluent limitation or standard which would be applicable to such toxic pollutant if it were discharged by such source other than through a publicly owned treatment works, and does not prevent sludge use or disposal by such works in accordance with section 1345 of this title, then the pretreatment requirements for the sources actually discharging such toxic pollutant into such publicly owned treatment works may be revised by the owner or operator of such works to reflect the removal of such toxic pollutant by such works.

(2) The Administrator shall, from time to time, as control technology, processes, operating methods, or other alternatives change, revise such standards following the procedure established by this subsection for promulgation of such standards.

(3) When proposing or promulgating any pretreatment standard under this section, the Administrator shall designate the category or categories of sources to which such standard shall apply.

(4) Nothing in this subsection shall affect any pretreatment requirement established by any State or local law not in conflict with any pretreatment standard established under this subsection.

### (c) New sources of pollutants into publicly owned treatment works

In order to insure that any source introducing pollutants into a publicly owned treatment works, which source would be a new source subject to section 1316 of this title if it were to discharge pollutants, will not cause a violation of the effluent limitations established for any such treatment works, the Administrator shall promulgate pretreatment standards for the category of such sources simultaneously with the promulgation of standards of performance under section 1316 of this title for the equivalent category of new sources. Such pretreatment standards shall prevent the discharge of any pollutant into such treatment works, which pollutant may interfere with, pass through, or otherwise be incompatible with such works.

### (d) Operation in violation of standards unlawful

After the effective date of any effluent standard or prohibition or pretreatment standard promulgated under this section, it shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition or pretreatment standard.

### (e) Compliance date extension for innovative pretreatment systems

In the case of any existing facility that proposes to comply with the pretreatment standards of subsection (b) of this section by applying an innovative system that meets the requirements of section 1311(k) of this title, the owner or operator of the publicly owned treatment works receiving the treated effluent from such facility may extend the date for compliance with the applicable pretreatment standard established under this section for a period not to exceed 2 years—

(1) if the Administrator determines that the innovative system has the potential for industrywide application, and

(2) if the Administrator (or the State in consultation with the Administrator, in any case in which the State has a pretreatment program approved by the Administrator)—

(A) determines that the proposed extension will not cause the publicly owned treatment works to be in violation of its permit under section 1342 of this title or of section 1345 of this title or to contribute to such a violation, and

(B) concurs with the proposed extension.

(June 30, 1948, ch. 758, title III, § 307, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 856; amended Pub. L. 95–217, §§ 53(a), (b), 54(a), Dec. 27, 1977, 91 Stat. 1589–1591; Pub. L. 100–4, title III, § 309(a), Feb. 4, 1987, 101 Stat. 41.)

#### AMENDMENTS

1987—Subsec. (e). Pub. L. 100–4 added subsec. (e).

1977—Subsec. (a)(1). Pub. L. 95–217, § 53(a), substituted "On and after December 27, 1977, the list of toxic pollutants or combination of pollutants subject to this chapter shall consist of those toxic pollutants listed in table 1 of Committee Print Numbered 95–30 of the Committee on Public Works and Transportation of the House of Representatives, and the Administrator shall publish, not later than the thirtieth day after December 27, 1977, that list" for "The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter revise) a list which includes any toxic pollutant or combination of such pollutants for which an effluent standard (which may include a prohibition of the discharge of such pollutants or combination of such pollutants) will be established under this section" and inserted provision for the revision of the list and for the finality of the Administrator's determination except when that determination is arbitrary and capricious.

Subsec. (a)(2). Pub. L. 95–217, § 53(a), expanded provisions covering effluent limitations and the establishment of effluent standards (or prohibitions), introduced provisions relating to the application of the best available technology economically achievable for the applicable category or class of point sources established in accordance with sections 1311(b)(2)(A) and 1314(b)(2) of this title, inserted provision that published effluent standards take into account the extent to which effective control is being or may be achieved under other regulatory authority, inserted provision for a sixty day minimum period following publication of proposed effluent standards for written comment, substituted two hundred and seventy days for six months as the period following publication of proposed standards during which period standards (or prohibitions) must be promulgated, and inserted provision for the finality of effluent limitations (or prohibitions) except if, on judicial review, the standard was not based on substantial evidence.

Subsec. (a)(3). Pub. L. 95–217, § 53(a), struck out provision for the immediate promulgation of revised effluent standards (or prohibitions) for pollutants or combinations of pollutants if, after public hearings, the Administrator found that a modification of such proposed standards (or prohibitions) was justified. See subsec. (a)(2) of this section.

Subsec. (a)(6). Pub. L. 95–217, §53(b), inserted provision that if the Administrator determines that compliance with effluent standards (or prohibitions) within one year from the date of promulgation is technologically infeasible for a category of sources, the Administrator may establish the effective date of the effluent standard (or prohibition) for that category at the earliest date upon which compliance can be feasibly attained by sources within such category, but in no event more than three years after the date of such promulgation.

Subsec. (b)(1). Pub. L. 95–217, §54(a), inserted provision that if, in the case of any toxic pollutant under subsection (a) of this section introduced by a source into a publicly owned treatment works, the treatment by the works removes all or any part of the toxic pollutant and the discharge from the works does not violate that effluent limitation or standard which would be applicable to the toxic pollutant if it were discharged by the source other than through a publicly owned treatment works, and does not prevent sludge use or disposal by the works in accordance with section 1345 of this title, then the pretreatment requirements for the sources actually discharging the toxic pollutant into the publicly owned treatment works may be revised by the owner or operator of the works to reflect the removal of the toxic pollutant by the works.

### CHANGE OF NAME

Committee on Public Works and Transportation of House of Representatives treated as referring to Committee on Transportation and Infrastructure of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress.

### INCREASE IN EPA EMPLOYEES

Pub. L. 100–4, title III, §309(b), Feb. 4, 1987, 101 Stat. 41, provided that: ''The Administrator shall take such actions as may be necessary to increase the number of employees of the Environmental Protection Agency in order to effectively implement pretreatment requirements under section 307 of the Federal Water Pollution Control Act [33 U.S.C. 1317].''

### § 1318. Records and reports; inspections

#### (a) Maintenance; monitoring equipment; entry; access to information

Whenever required to carry out the objective of this chapter, including but not limited to (1) developing or assisting in the development of any effluent limitation, or other limitation, prohibition, or effluent standard, pretreatment standard, or standard of performance under this chapter; (2) determining whether any person is in violation of any such effluent limitation, or other limitation, prohibition or effluent standard, pretreatment standard, or standard of performance; (3) any requirement established under this section; or (4) carrying out sections 1315, 1321, 1342, 1344 (relating to State permit programs), 1345, and 1364 of this title—

(A) the Administrator shall require the owner or operator of any point source to (i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods (including where appropriate, biological monitoring methods), (iv) sample such effluents (in accordance with such methods, at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (v) provide such other information as he may reasonably require; and

(B) the Administrator or his authorized representative (including an authorized contrac-

tor acting as a representative of the Administrator), upon presentation of his credentials—

(i) shall have a right of entry to, upon, or through any premises in which an effluent source is located or in which any records required to be maintained under clause (A) of this subsection are located, and

(ii) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under clause (A), and sample any effluents which the owner or operator of such source is required to sample under such clause.

#### (b) Availability to public; trade secrets exception; penalty for disclosure of confidential information

Any records, reports, or information obtained under this section (1) shall, in the case of effluent data, be related to any applicable effluent limitations, toxic, pretreatment, or new source performance standards, and (2) shall be available to the public, except that upon a showing satisfactory to the Administrator by any person that records, reports, or information, or particular part thereof (other than effluent data), to which the Administrator has access under this section, if made public would divulge methods or processes entitled to protection as trade secrets of such person, the Administrator shall consider such record, report, or information, or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18. Any authorized representative of the Administrator (including an authorized contractor acting as a representative of the Administrator) who knowingly or willfully publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information which is required to be considered confidential under this subsection shall be fined not more than $1,000 or imprisoned not more than 1 year, or both. Nothing in this subsection shall prohibit the Administrator or an authorized representative of the Administrator (including any authorized contractor acting as a representative of the Administrator) from disclosing records, reports, or information to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter or when relevant in any proceeding under this chapter.

#### (c) Application of State law

Each State may develop and submit to the Administrator procedures under State law for inspection, monitoring, and entry with respect to point sources located in such State. If the Administrator finds that the procedures and the law of any State relating to inspection, monitoring, and entry are applicable to at least the same extent as those required by this section, such State is authorized to apply and enforce its procedures for inspection, monitoring, and entry with respect to point sources located in such State (except with respect to point sources owned or operated by the United States).

#### (d) Access by Congress

Notwithstanding any limitation contained in this section or any other provision of law, all information reported to or otherwise obtained by

## Transfer of State 404 Program General Permit Verification

Instructions: To be completed, executed, and submitted to the Agency at the time of sale of a property subject to a general permit under Chapter 62-331, F.A.C.

Permit No: _____
Address Associated with Permit: _____

Transferor (previous owner/permittee) Information

Name: _____

Telephone Number: _____

Email address: _____
Transferee (new owner) Information

Name: _____

Telephone Number: _____

Email address: _____

When the structures or work authorized by the State 404 Program general permit are still in existence at the time the property is transferred, the terms and conditions of the permit, including any special conditions, will continue to be binding on the new owner(s) of the property.

I, [transferor], wish to transfer ownership of the State 404 Program general permit (No. _____) to [transferee] upon the transfer of ownership of the property associated with said permit.

I [transferee], upon Agency validation of this transfer, accept ownership of the State 404 Program general permit (No. _____), along with the liabilities associated with compliance with the terms and conditions set forth in it.

_____
Signature of Transferor                              Date

_____
Signature of Transferee                              Date

Enclosure:

☐ Attach a copy of the general permit to be transferred.

# Certification of Compliance
# with a State 404 Program General Permit

Instructions: To be completed, executed, and submitted to the Agency within 30 days of completion of the authorized activity.

Permit No:                              Permittee's Name:

Permittee's Address:

Telephone Number:

Location of the Work:

Date Work Started:                    Date Work Completed:

PROPERTY IS INACCESSIBLE WITHOUT PRIOR NOTIFICATION: YES         NO
TO SCHEDULE AN INSPECTION, PLEASE CONTACT                    AT

Description of the Work (e.g., bank stabilization, residential or commercial filling, docks, dredging, etc.):

Acreage or Square Feet of Impacts to state-assumed waters:

Describe Mitigation completed (if applicable):

Describe any Deviations from Permit (attach drawing(s) depicting the deviations):

I certify that all work, and mitigation (if applicable) was done in accordance with the limitations and conditions as described in the permit. Any deviations as described above are depicted on the attached drawing(s).

_____            _____
Signature of Permittee                                            Date:

_____
Name and Title

Enclosures:
☐ Attached drawing(s) depicting deviations from the permit (if any)
☐ Other

TITLE 16—CONSERVATION

## § 667f–3. Authorization of appropriations for mitigating losses caused by waterfowl depredation

There are authorized to be appropriated such sums as may be necessary to reimburse the Commodity Credit Corporation for its investment in the grain transferred pursuant to sections 667f to 667f–3 of this title.

(July 3, 1956, ch. 512, § 4, 70 Stat. 492.)

### CODIFICATION

Section was formerly classified to section 445 of Title 7, Agriculture, prior to editorial reclassification and renumbering as this section.

## § 667g. Requisition of surplus grain; prevention of starvation of resident game birds and other resident wildlife; utilization by State agencies; reimbursement for packaging and transporting

For the purpose of meeting emergency situations caused by adverse weather conditions or other factors destructive of important wildlife resources, the States are authorized, upon the request of the State fish and game authority or other State agency having similar authority and a finding by the Secretary of the Interior that any area of the United States is threatened with serious damage or loss to resident game birds and other resident wildlife from starvation, to requisition from the Commodity Credit Corporation grain acquired by the Corporation through price support operations. Such grain may thereafter be furnished to the particular State for direct and sole utilization by the appropriate State agencies for purposes of sections 667g to 667g–2 of this title in such quantities as mutually agreed upon by the State and the Commodity Credit Corporation and subject to such regulations as may be considered desirable by the Corporation. The Corporation shall be reimbursed by the particular State in each instance for the expense of the Corporation in packaging and transporting such grain for purposes of sections 667g to 667g–2 of this title.

(Pub. L. 87–152, § 1, Aug. 17, 1961, 75 Stat. 389.)

### CODIFICATION

Section was formerly classified to section 447 of Title 7, Agriculture, prior to editorial reclassification and renumbering as this section.

## § 667g–1. Requisition and use of grain for prevention of starvation of migratory birds; reimbursement for packaging and transporting

Upon a finding by the Secretary of the Interior that migratory birds are threatened with starvation in any area of the United States, the Secretary is authorized to requisition from the Commodity Credit Corporation grain acquired by that Corporation through price support operations in such quantities as may be mutually agreed upon. The Commodity Credit Corporation shall be reimbursed by the Secretary for its expense in packaging and transporting of such grain for purposes of sections 667g to 667g–2 of this title.

(Pub. L. 87–152, § 2, Aug. 17, 1961, 75 Stat. 389.)

### CODIFICATION

Section was formerly classified to section 448 of Title 7, Agriculture, prior to editorial reclassification and renumbering as this section.

## § 667g–2. Authorization of appropriations for reimbursement of Commodity Credit Corporation

There are authorized to be appropriated such sums as may be necessary to reimburse the Commodity Credit Corporation for its investment in grain transferred pursuant to sections 667g to 667g–2 of this title.

(Pub. L. 87–152, § 3, Aug. 17, 1961, 75 Stat. 389.)

### CODIFICATION

Section was formerly classified to section 449 of Title 7, Agriculture, prior to editorial reclassification and renumbering as this section.

## SUBCHAPTER II—PROTECTION OF BALD AND GOLDEN EAGLES

## § 668. Bald and golden eagles

### (a) Prohibited acts; criminal penalties

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall knowingly, or with wanton disregard for the consequences of his act take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner any bald eagle commonly known as the American eagle or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, shall be fined not more than $5,000 or imprisoned not more than one year or both: *Provided,* That in the case of a second or subsequent conviction for a violation of this section committed after October 23, 1972, such person shall be fined not more than $10,000 or imprisoned not more than two years, or both: *Provided further,* That the commission of each taking or other act prohibited by this section with respect to a bald or golden eagle shall constitute a separate violation of this section: *Provided further,* That one-half of any such fine, but not to exceed $2,500, shall be paid to the person or persons giving information which leads to conviction: *Provided further,* That nothing herein shall be construed to prohibit possession or transportation of any bald eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to June 8, 1940, and that nothing herein shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to the addition to this subchapter of the provisions relating to preservation of the golden eagle.

### (b) Civil penalties

Whoever, within the United States or any place subject to the jurisdiction thereof, without being permitted to do so as provided in this subchapter, shall take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any

manner, any bald eagle, commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, or whoever violates any permit or regulation issued pursuant to this subchapter, may be assessed a civil penalty by the Secretary of not more than $5,000 for each such violation. Each violation shall be a separate offense. No penalty shall be assessed unless such person is given notice and opportunity for a hearing with respect to such violation. In determining the amount of the penalty, the gravity of the violation, and the demonstrated good faith of the person charged shall be considered by the Secretary. For good cause shown, the Secretary may remit or mitigate any such penalty. Upon any failure to pay the penalty assessed under this section, the Secretary may request the Attorney General to institute a civil action in a district court of the United States for any district in which such person is found or resides or transacts business to collect the penalty and such court shall have jurisdiction to hear and decide any such action. In hearing any such action, the court must sustain the Secretary's action if supported by substantial evidence.

### (c) Cancellation of grazing agreements

The head of any Federal agency who has issued a lease, license, permit, or other agreement authorizing the grazing of domestic livestock on Federal lands to any person who is convicted of a violation of this subchapter or of any permit or regulation issued hereunder may immediately cancel each such lease, license, permit, or other agreement. The United States shall not be liable for the payment of any compensation, reimbursement, or damages in connection with the cancellation of any lease, license, permit, or other agreement pursuant to this section.

(June 8, 1940, ch. 278, §1, 54 Stat. 250; Pub. L. 86–70, §14, June 25, 1959, 73 Stat. 143; Pub. L. 87–884, Oct. 24, 1962, 76 Stat. 1246; Pub. L. 92–535, §1, Oct. 23, 1972, 86 Stat. 1064.)

#### REFERENCES IN TEXT

Prior to the addition to this subchapter of the provisions relating to preservation of the golden eagle, referred to in subsec. (a), means prior to Oct. 24, 1962, the date such provisions were enacted by Pub. L. 87–884 as an amendment of this section and section 668a of this title.

#### AMENDMENTS

1972—Pub. L. 92–535 designated existing provisions as subsec. (a), substituted "shall knowingly, or with wanton disregard for the consequences of his act take" for "shall take", increased fine and imprisonment terms from $500 or six months to $5,000 or one year, and inserted provisions that a second conviction carry a penalty of $10,000 fine or imprisonment of not more than two years, that each taking constitute a separate offense, and that informers be rewarded one-half of the fine not exceeding $2,500, and added subsecs. (b) and (c).

1962—Pub. L. 87–884 extended prohibitions against the enumerated acts to the golden eagle and changed proviso by substituting "bald eagle", "June 8, 1940" and "and that nothing in said sections shall be construed to prohibit possession or transportation of any golden eagle, alive or dead, or any part, nest, or egg thereof, lawfully taken prior to the addition to said sections of the provisions relating to preservation of the golden eagle" for "such eagle," "the effective date of said sec-

tions" and "but the proof of such taking shall lie upon the accused in any prosecution under said sections", respectively.

1959—Pub. L. 86–70 struck out "except the Territory of Alaska," after "subject to the jurisdiction thereof,".

#### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with this subchapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§102(e), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

#### LEGISLATIVE INTENT

Enacting clause of act June 8, 1940, provided:

"Whereas the Continental Congress in 1782 adopted the bald eagle as the national symbol; and

"Whereas the bald eagle thus became the symbolic representation of a new nation under a new government in a new world; and

"Whereas by that act of Congress and by tradition and custom during the life of this Nation, the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and

"Whereas the bald eagle is now threatened with extinction: Therefore

"Be it enacted * * *", etc.

### § 668a. Taking and using of the bald and golden eagle for scientific, exhibition, and religious purposes

Whenever, after investigation, the Secretary of the Interior shall determine that it is compatible with the preservation of the bald eagle or the golden eagle to permit the taking, possession, and transportation of specimens thereof for the scientific or exhibition purposes of public museums, scientific societies, and zoological parks, or for the religious purposes of Indian tribes, or that it is necessary to permit the taking of such eagles for the protection of wildlife or of agricultural or other interests in any particular locality, he may authorize the taking of such eagles pursuant to regulations which he is hereby authorized to prescribe: *Provided*, That on request of the Governor of any State, the Secretary of the Interior shall authorize the taking of golden eagles for the purpose of seasonally protecting domesticated flocks and herds in such State, in accordance with regulations established under the provisions of this section, in such part or parts of such State and for such periods as the Secretary determines to be necessary to protect such interests: *Provided further*, That bald eagles may not be taken for any purpose unless, prior to such taking, a permit to do so is procured from the Secretary of the Interior: *Provided further*, That the Sec-

retary of the Interior, pursuant to such regulations as he may prescribe, may permit the taking, possession, and transportation of golden eagles for the purposes of falconry, except that only golden eagles which would be taken because of depredations on livestock or wildlife may be taken for purposes of falconry: *Provided further,* That the Secretary of the Interior, pursuant to such regulations as he may prescribe, may permit the taking of golden eagle nests which interfere with resource development or recovery operations.

(June 8, 1940, ch. 278, § 2, 54 Stat. 251; Pub. L. 87–884, Oct. 24, 1962, 76 Stat. 1246; Pub. L. 92–535, § 2, Oct. 23, 1972, 86 Stat. 1065; Pub. L. 95–616, § 9, Nov. 8, 1979, 92 Stat. 3114.)

AMENDMENTS

1978—Pub. L. 95–616 authorized taking of golden eagle nests which interfere with resource development or recovery operations.

1972—Pub. L. 92–535 inserted proviso that the Secretary of the Interior may permit the taking, possession, and transportation of golden eagles for the purposes of falconry with exception that only golden eagles that cause depredations on livestock and wildlife may be taken for falconry.

1962—Pub. L. 87–884 extended provisions of section to the golden eagle, permitted the taking of specimens for the religious purposes of Indian tribes and authorized the taking of golden eagles for purpose of seasonally protecting domesticated flocks and herds.

POLICY CONCERNING DISTRIBUTION OF EAGLE FEATHERS FOR NATIVE AMERICAN RELIGIOUS PURPOSES

Memorandum of President of the United States, Apr. 29, 1994, 59 F.R. 22953, provided:

Memorandum for the Heads of Executive Departments and Agencies

Eagle feathers hold a sacred place in Native American culture and religious practices. Because of the feathers' significance to Native American heritage and consistent with due respect for the government-to-government relationship between the Federal and Native American tribal governments, this Administration has undertaken policy and procedural changes to facilitate the collection and distribution of scarce eagle bodies and parts for this purpose. This memorandum affirms and formalizes executive branch policy to ensure that progress begun on this important matter continues across the executive branch.

Today, as part of an historic meeting with all federally recognized tribal governments, I am directing executive departments and agencies (hereafter collectively "agency" or "agencies") to work cooperatively with tribal governments and to reexamine broadly their practices and procedures to seek opportunities to accommodate Native American religious practices to the fullest extent under the law.

As part of these efforts, agencies shall take steps to improve their collection and transfer of eagle carcasses and eagle body parts ("eagles") for Native American religious purposes. The success of this initiative requires the participation, and is therefore the responsibility, of all Federal land managing agencies, not just those within the Department of the Interior. I therefore direct each agency responsible for managing Federal lands to diligently and expeditiously recover salvageable eagles found on lands under their jurisdiction and ensure that the eagles are promptly shipped to the National Eagle Repository ("Repository"). To assist agencies in this expanded effort, the Secretary of the Interior shall issue guidelines to all relevant agencies for the proper shipment of eagles to the Repository. After receiving these guidelines, agencies shall immediately adopt policies, practices, and procedures necessary in accordance with these guidelines to recover and transfer eagles to the Repository promptly.

I support and encourage the initial steps taken by the Department of the Interior to improve the distribution of eagles for Native American religious purposes. In particular, the Department of the Interior shall continue to adopt policies and procedures and take those actions necessary to:

(a) ensure the priority of distribution of eagles, upon permit application, first for traditional Native American religious purposes, to the extent permitted by law, and then to other uses;

(b) simplify the eagle permit application process quickly and to the greatest extent possible to help achieve the objectives of this memorandum;

(c) minimize the delay and ensure respect and dignity in the process of distributing eagles for Native American religious purposes to the greatest extent possible;

(d) expand efforts to involve Native American tribes, organizations, and individuals in the distribution process, both at the Repository and on tribal lands, consistent with applicable laws;

(e) review means to ensure that adequate refrigerated storage space is available to process the eagles; and

(f) continue efforts to improve the Repository's ability to facilitate the objectives of this memorandum.

The Department of the Interior shall be responsible for coordinating any interagency efforts to address continuing executive branch actions necessary to achieve the objectives of this memorandum.

We must continue to be committed to greater intergovernmental communication and cooperation. In addition to working more closely with tribal governments, we must enlist the assistance of, and cooperate with, State and local governments to achieve the objectives of this memorandum. I therefore request that the Department of the Interior work with State fish and game agencies and other relevant State and local authorities to facilitate the objectives of this memorandum.

With commitment and cooperation by all of the agencies in the executive branch and with tribal governments, I am confident that we will be able to accomplish meaningful progress in the distribution of eagles for Native American religious purposes.

The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

## § 668b. Enforcement provisions

### (a) Arrest; search; issuance and execution of warrants and process

Any employee of the Department of the Interior authorized by the Secretary of the Interior to enforce the provisions of this subchapter may, without warrant, arrest any person committing in his presence or view a violation of this subchapter or of any permit or regulations issued hereunder and take such person immediately for examination or trial before an officer or court of competent jurisdiction; may execute any warrant or other process issued by an officer or court of competent jurisdiction for the enforcement of the provisions of this subchapter; and may, with or without a warrant, as authorized by law, search any place. The Secretary of the Interior is authorized to enter into cooperative agreements with State fish and wildlife agencies or other appropriate State authorities to facilitate enforcement of this subchapter, and by said agreements to delegate such enforcement authority to State law enforcement personnel as he deems appropriate for effective enforcement of this subchapter. Any judge of any court established under the laws of the United States, and any United States magistrate judge may, within his respective jurisdiction, upon

proper oath or affirmation showing probable cause, issue warrants in all such cases.

**(b) Forfeiture**

All bald or golden eagles, or parts, nests, or eggs thereof, taken, possessed, sold, purchased, bartered, offered for sale, purchase, or barter, transported, exported, or imported contrary to the provisions of this subchapter, or of any permit or regulation issued hereunder, and all guns, traps, nets, and other equipment, vessels, vehicles, aircraft, and other means of transportation used to aid in the taking, possessing, selling, purchasing, bartering, offering for sale, purchase, or barter, transporting, exporting, or importing of any bird, or part, nest, or egg thereof, in violation of this subchapter or of any permit or regulation issued hereunder shall be subject to forfeiture to the United States.

**(c) Customs laws applied**

All provisions of law relating to the seizure, forfeiture, and condemnation of a vessel for violation of the customs laws, the disposition of such vessel or the proceeds from the sale thereof, and the remission or mitigation of such forfeitures, shall apply to the seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this subchapter, insofar as such provisions of law are applicable and not inconsistent with the provisions of this subchapter: *Provided,* That all powers, rights, and duties conferred or imposed by the customs laws upon any officer or employee of the Treasury Department shall, for the purposes of this subchapter, be exercised or performed by the Secretary of the Interior or by such persons as he may designate.

(June 8, 1940, ch. 278, § 3, 54 Stat. 251; Pub. L. 90–578, title IV, § 402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub. L. 92–535, § 3, Oct. 23, 1972, 86 Stat. 1065; Pub. L. 101–650, title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

AMENDMENTS

1972—Pub. L. 92–535 substituted provisions relating to enforcement of this subchapter including arrest, without warrant, issuance and execution of warrants and process, search, forfeiture, and applicability of certain customs laws, for provisions incorporating provisions of section 706 in haec verba.

CHANGE OF NAME

"United States magistrate judge" substituted for "United States magistrate" in subsec. (a) pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28, Judiciary and Judicial Procedure. Previously, "United States magistrate" substituted for "United States commissioner" in subsec. (a) pursuant to Pub. L. 90–578. See chapter 43 (§ 631 et seq.) of Title 28.

TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with this subchapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(e), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix

to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

**§ 668c. Definitions**

As used in this subchapter "whoever" includes also associations, partnerships, and corporations; "take" includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb; "transport" includes also ship, convey, carry, or transport by any means whatever, and deliver or receive or cause to be delivered or received for such shipment, conveyance, carriage, or transportation.

(June 8, 1940, ch. 278, § 4, 54 Stat. 251; Pub. L. 92–535, § 4, Oct. 23, 1972, 86 Stat. 1065.)

AMENDMENTS

1972—Pub. L. 92–535 substituted "poison, wound, kill, capture, trap, collect, molest" for "wound, kill, capture, trap, collect, or otherwise willfully molest".

**§ 668d. Availability of appropriations for Migratory Bird Treaty Act**

Moneys now or hereafter available to the Secretary of the Interior for the administration and enforcement of the Migratory Bird Treaty Act of July 3, 1918 [16 U.S.C. 703 et seq.], shall be equally available for the administration and enforcement of this subchapter.

(June 8, 1940, ch. 278, § 5, 54 Stat. 251.)

REFERENCES IN TEXT

The Migratory Bird Treaty Act, referred to in text, is act July 3, 1918, ch. 128, 40 Stat. 755, as amended, which is classified generally to subchapter II (§ 703 et seq.) of chapter 7 of this title. For complete classification of this Act to the Code, see section 710 of this title and Tables.

SUBCHAPTER III—ENDANGERED SPECIES OF FISH AND WILDLIFE

**§§ 668aa to 668cc–6. Repealed. Pub. L. 93–205, § 14, Dec. 28, 1973, 87 Stat. 903**

The provisions of sections 668aa to 668cc–6, which, pursuant to section 12(d) of Pub. L. 91–135, Dec. 5, 1969, 83 Stat. 283, were known as the "Endangered Species Conservation Act of 1969", are covered by section 1531 et seq. of this title.

Section 668aa, Pub. L. 89–669, § 1, Oct. 15, 1966, 80 Stat. 926; Pub. L. 91–135, § 12(a), (e), Dec. 5, 1969, 83 Stat. 282, 283, set out the Congressional findings, declaration of policy, and statement of purposes in seeking the protection of endangered species of fish and wildlife.

Section 668bb, Pub. L. 89–669, § 2, Oct. 15, 1966, 80 Stat. 926; Pub. L. 91–135, § 12(b), (c), Dec. 5, 1969, 83 Stat. 282, set out the powers and duties of the Secretary of the Interior in carrying out the mandate of the Endangered Species Conservation Act of 1969.

Section 668cc, Pub. L. 89–669, § 3, Oct. 15, 1966, 80 Stat. 927, covered the Secretary's duty to cooperate with the States, area administration, management agreements, and disposition of revenues.

Section 668cc–1, Pub. L. 91–135, § 1, Dec. 5, 1969, 83 Stat. 275, defined "Secretary", "fish or wildlife", "United States", and "person".

## SUBCHAPTER II—MIGRATORY BIRD TREATY

### § 703. Taking, killing, or possessing migratory birds unlawful

#### (a) In general

Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972, and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976.

#### (b) Limitation on application to introduced species

##### (1) In general

This subchapter applies only to migratory bird species that are native to the United States or its territories.

##### (2) Native to the United States defined

###### (A) In general

Subject to subparagraph (B), in this subsection the term "native to the United States or its territories" means occurring in the United States or its territories as the result of natural biological or ecological processes.

###### (B) Treatment of introduced species

For purposes of paragraph (1), a migratory bird species that occurs in the United States or its territories solely as a result of intentional or unintentional human-assisted introduction shall not be considered native to the United States or its territories unless—

(i) it was native to the United States or its territories and extant in 1918;

(ii) it was extirpated after 1918 throughout its range in the United States and its territories; and

(iii) after such extirpation, it was reintroduced in the United States or its territories as a part of a program carried out by a Federal agency.

(July 3, 1918, ch. 128, § 2, 40 Stat. 755; June 20, 1936, ch. 634, § 3, 49 Stat. 1556; Pub. L. 93–300, § 1, June 1, 1974, 88 Stat. 190; Pub. L. 101–233, § 15, Dec. 13, 1989, 103 Stat. 1977; Pub. L. 108–447, div. E, title I, § 143(b), Dec. 8, 2004, 118 Stat. 3071.)

### AMENDMENTS

2004—Pub. L. 108–447 designated existing provisions as subsec. (a), inserted heading, and added subsec. (b).

1989—Pub. L. 101–233 struck out "and" after "1936," and inserted before period at end "and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976".

1974—Pub. L. 93–300 substituted ", any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof" for ", or any part, nest, or egg of any such bird", and ", and the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972," for period at end.

1936—Act June 20, 1936, amended section generally. Prior to amendment, text read as follows: "Unless and except as permitted by regulations made as hereinafter provided, it shall be unlawful to hunt, take, capture, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer to purchase, purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time or in any manner, any migratory bird, included in the terms of the convention between the United States and Great Britain for the protection of migratory birds concluded August sixteenth, nineteen hundred and sixteen, or any part, nest, or egg of any such bird."

### EFFECTIVE DATE OF 1974 AMENDMENT

Pub. L. 93–300, § 3, June 1, 1974, 88 Stat. 190, provided that: "The amendments made by this Act [amending this section] shall take effect on the date on which the President proclaims the exchange of ratifications of the convention between the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment, concluded March 4, 1972, or on the date of the enactment of this Act [June 1, 1974], whichever date is later."

### EFFECTIVE DATE OF 1936 AMENDMENT

Act June 20, 1936, ch. 634, § 3, 49 Stat. 1556, provided in part that the amendment by section 3 is effective as of the day aforesaid, meaning the day on which the President shall proclaim the exchange of ratifications of the convention between the United States and the United Mexican States for the protection of migratory birds and game mammals concluded Feb. 7, 1936, or on June 20, 1936, whichever date is later. Such proclamation was made on June 30, 1937. See section 1 of act June 20, 1936, ch. 634, 49 Stat. 1555.

### ELIMINATION OF BARRIERS TO IMPROVE AT-RISK BRIDGES

Pub. L. 114–94, div. A, title I, § 1439, Dec. 4, 2015, 129 Stat. 1433, provided that:

"(a) TEMPORARY AUTHORIZATION.—

"(1) IN GENERAL.—Until the Secretary of the Interior takes the action described in subsection (b), the take of nesting swallows to facilitate a construction project on a bridge eligible for funding under title 23, United States Code, with any component condition rating of 3 or less (as defined by the National Bridge Inventory General Condition Guidance issued by the Federal Highway Administration) is authorized under the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.) between April 1 and August 31.

"(2) MEASURES TO MINIMIZE IMPACTS.—

"(A) NOTIFICATION BEFORE TAKING.—Prior to the taking of nesting swallows authorized under paragraph (1), any person taking that action shall submit to the Secretary of the Interior a document that contains—

"(i) the name of the person acting under the authority of paragraph (1) to take nesting swallows;

"(ii) a list of practicable measures that will be undertaken to minimize or mitigate significant adverse impacts on the population of that species;

"(iii) the time period during which activities will be carried out that will result in the taking of that species; and

"(iv) an estimate of the number of birds, by species, to be taken in the proposed action.

"(B) NOTIFICATION AFTER TAKING.—Not later than 60 days after the taking of nesting swallows authorized under paragraph (1), any person taking that action shall submit to the Secretary of the Interior a document that contains the number of birds, by species, taken in the action.

"(b) AUTHORIZATION OF TAKE.—

"(1) IN GENERAL.—The Secretary of the Interior, in consultation with the Secretary [of Transportation], shall promulgate a regulation under the authority of section 3 of the Migratory Bird Treaty Act (16 U.S.C. 704) authorizing the take of nesting swallows to facilitate bridge repair, maintenance, or construction—

"(A) without individual permit requirements; and

"(B) under terms and conditions determined to be consistent with treaties relating to migratory birds that protect swallow species occurring in the United States.

"(2) TERMINATION.—On the effective date of a final rule [promulgated] under this subsection by the Secretary of the Interior, subsection (a) shall have no force or effect.

"(c) SUSPENSION OR WITHDRAWAL OF TAKE AUTHORIZATION.—If the Secretary of the Interior, in consultation with the Secretary [of Transportation], determines that taking of nesting swallows carried out under the authority provided in subsection (a)(1) is having a significant adverse impact on swallow populations, the Secretary of the Interior may suspend that authority through publication in the Federal Register."

PUBLICATION OF LIST

Pub. L. 108–447, div. E, title I, §143(c), Dec. 8, 2004, 118 Stat. 3072, provided that:

"(1) IN GENERAL.—Not later than 90 days after the date of enactment of this section [Dec. 8, 2004], the Secretary of the Interior shall publish in the Federal Register a list of all nonnative, human-introduced bird species to which the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.) does not apply. As necessary, the Secretary may update and publish the list of species exempted from protection of the Migratory Bird Treaty Act.

"(2) PUBLIC COMMENT.—Before publishing the list under paragraph (1), the Secretary shall provide adequate time for public comment.

"(3) EFFECT OF SECTION.—Nothing in this subsection shall delay implementation of other provisions of this section [amending this section and enacting provisions set out as notes under this section and section 710 of this title] or amendments made by this section that exclude nonnative, human-introduced bird species from the application of the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.)."

RELATIONSHIP OF PUB. L. 108–447 TO TREATIES

Pub. L. 108–447, div. E, title I, §143(d), Dec. 8, 2004, 118 Stat. 3072, provided that: "It is the sense of Congress that the language of this section [amending this section and enacting provisions set out as notes under this section and section 710 of this title] is consistent with the intent and language of the 4 bilateral treaties implemented in this section."

INCIDENTAL TAKING OF MIGRATORY BIRDS DURING MILITARY READINESS ACTIVITIES

Pub. L. 107–314, div. A, title III, §315, Dec. 2, 2002, 116 Stat. 2509, provided that:

"(a) INTERIM AUTHORITY FOR INCIDENTAL TAKINGS.—During the period described in subsection (c), section 2 of the Migratory Bird Treaty Act (16 U.S.C. 703) shall not apply to the incidental taking of a migratory bird by a member of the Armed Forces during a military readiness activity authorized by the Secretary of Defense or the Secretary of the military department concerned.

"(b) IDENTIFICATION OF MEASURES TO MINIMIZE IMPACT OF ACTIVITIES.—During the periods described in subsections (c) and (d), the Secretary of Defense shall, in consultation with the Secretary of the Interior, identify measures—

"(1) to minimize and mitigate, to the extent practicable, any adverse impacts of authorized military readiness activities on affected species of migratory birds; and

"(2) to monitor the impacts of such military readiness activities on affected species of migratory birds.

"(c) PERIOD OF APPLICATION FOR INTERIM AUTHORITY.—The period described in this subsection is the period beginning on the date of the enactment of this Act [Dec. 2, 2002] and ending on the date on which the Secretary of the Interior publishes in the Federal Register a notice that—

"(1) regulations authorizing the incidental taking of migratory birds by members of the Armed Forces have been prescribed in accordance with the requirements of subsection (d);

"(2) all legal challenges to the regulations and to the manner of their promulgation (if any) have been exhausted as provided in subsection (e); and

"(3) the regulations have taken effect.

"(d) INCIDENTAL TAKINGS AFTER INTERIM PERIOD.—(1) Not later than the expiration of the one-year period beginning on the date of the enactment of this Act, the Secretary of the Interior shall exercise the authority of that Secretary under section 3(a) of the Migratory Bird Treaty Act (16 U.S.C. 704(a)) to prescribe regulations to exempt the Armed Forces for the incidental taking of migratory birds during military readiness activities authorized by the Secretary of Defense or the Secretary of the military department concerned.

"(2) The Secretary of the Interior shall exercise authority under paragraph (1) with the concurrence of the Secretary of Defense.

"(e) LIMITATION ON JUDICIAL REVIEW.—An action seeking judicial review of regulations prescribed pursuant to this section or of the manner of their promulgation must be filed in the appropriate Federal court by not later than the expiration of the 120-day period beginning on the date on which such regulations are published in the Federal Register. Upon the expiration of such period and the exhaustion of any legal challenges to the regulations pursuant to any action filed in such period, there shall be no further judicial review of such regulations or of the manner of their promulgation.

"(f) MILITARY READINESS ACTIVITY.—(1) In this section the term 'military readiness activity' includes—

"(A) all training and operations of the Armed Forces that relate to combat; and

"(B) the adequate and realistic testing of military equipment, vehicles, weapons, and sensors for proper operation and suitability for combat use.

"(2) The term does not include—

"(A) the routine operation of installation operating support functions, such as administrative offices, military exchanges, commissaries, water treatment facilities, storage facilities, schools, housing, motor pools, laundries, morale, welfare, and recreation activities, shops, and mess halls;

"(B) the operation of industrial activities; or

"(C) the construction or demolition of facilities used for a purpose described in subparagraph (A) or (B)."

ARCTIC TUNDRA HABITAT EMERGENCY CONSERVATION

Pub. L. 106–108, Nov. 24, 1999, 113 Stat. 1491, provided that:

"SECTION 1. SHORT TITLE.

"This Act may be cited as the 'Arctic Tundra Habitat Emergency Conservation Act'.

"SEC. 2. FINDINGS AND PURPOSES.

"(a) FINDINGS.—The Congress finds the following:

"(1) The winter index population of mid-continent light geese was 800,000 birds in 1969, while the total population of such geese is more than 5,200,000 birds today.

"(2) The population of mid-continent light geese is expanding by over 5 percent each year, and in the absence of new wildlife management actions it could grow to more than 6,800,000 breeding light geese in 3 years.

"(3) The primary reasons for this unprecedented population growth are—

"(A) the expansion of agricultural areas and the resulting abundance of cereal grain crops in the United States;

"(B) the establishment of sanctuaries along the United States flyways of migrating light geese; and

"(C) a decline in light geese harvest rates.

"(4) As a direct result of this population explosion, the Hudson Bay Lowlands Salt-Marsh ecosystem in Canada is being systematically destroyed. This ecosystem contains approximately 135,000 acres of essential habitat for migrating light geese and many other avian species. Biologists have testified that one-third of this habitat has been destroyed, one-third is on the brink of devastation, and the remaining one-third is overgrazed.

"(5) The destruction of the Arctic tundra is having a severe negative impact on many avian species that breed or migrate through this habitat, including the following:

"(A) Canada Goose.

"(B) American Wigeon.

"(C) Dowitcher.

"(D) Hudsonian Godwit.

"(E) Stilt Sandpiper.

"(F) Northern Shoveler.

"(G) Red-Breasted Merganser.

"(H) Oldsquaw.

"(I) Parasitic Jaeger.

"(J) Whimbrel.

"(K) Yellow Rail.

"(6) It is essential that the current population of mid-continent light geese be reduced by 50 percent by the year 2005 to ensure that the fragile Arctic tundra is not irreversibly damaged.

"(b) PURPOSES.—The purposes of this Act are the following:

"(1) To reduce the population of mid-continent light geese.

"(2) To assure the long-term conservation of mid-continent light geese and the biological diversity of the ecosystem upon which many North American migratory birds depend.

"SEC. 3. FORCE AND EFFECT OF RULES TO CONTROL OVERABUNDANT MID-CONTINENT LIGHT GEESE POPULATIONS.

"(a) FORCE AND EFFECT.—

"(1) IN GENERAL.—The rules published by the Service on February 16, 1999, relating to use of additional hunting methods to increase the harvest of mid-continent light geese (64 Fed. Reg. 7507–7517) and the establishment of a conservation order for the reduction of mid-continent light geese populations (64 Fed. Reg. 7517–7528), shall have the force and effect of law.

"(2) PUBLIC NOTICE.—The Secretary, acting through the Director of the Service, shall take such action as is necessary to appropriately notify the public of the force and effect of the rules referred to in paragraph (1).

"(b) APPLICATION.—Subsection (a) shall apply only during the period that—

"(1) begins on the date of the enactment of this Act [Nov. 24, 1999]; and

"(2) ends on the latest of—

"(A) the effective date of rules issued by the Service after such date of the enactment to control overabundant mid-continent light geese populations;

"(B) the date of the publication of a final environmental impact statement for such rules under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C)); and

"(C) May 15, 2001.

"(c) RULE OF CONSTRUCTION.—This section shall not be construed to limit the authority of the Secretary or the Service to issue rules, under another law, to regulate the taking of mid-continent light geese.

"SEC. 4. COMPREHENSIVE MANAGEMENT PLAN.

"(a) IN GENERAL.—Not later than the end of the period described in section 103(b) [probably means section 3(b)], the Secretary shall prepare, and as appropriate implement, a comprehensive, long-term plan for the management of mid-continent light geese and the conservation of their habitat.

"(b) REQUIRED ELEMENTS.—The plan shall apply principles of adaptive resource management and shall include—

"(1) a description of methods for monitoring the levels of populations and the levels of harvest of mid-continent light geese, and recommendations concerning long-term harvest levels;

"(2) recommendations concerning other means for the management of mid-continent light goose populations, taking into account the reasons for the population growth specified in section 102(a)(3) [probably means section 2(a)(3)];

"(3) an assessment of, and recommendations relating to, conservation of the breeding habitat of mid-continent light geese;

"(4) an assessment of, and recommendations relating to, conservation of native species of wildlife adversely affected by the overabundance of mid-continent light geese, including the species specified in section 102(a)(5) [probably means section 2(a)(5)]; and

"(5) an identification of methods for promoting collaboration with the Government of Canada, States, and other interested persons.

"(c) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to carry out this section $1,000,000 for each of fiscal years 2000 through 2002.

"SEC. 5. DEFINITIONS.

"In this Act:

"(1) MID-CONTINENT LIGHT GEESE.—The term 'mid-continent light geese' means Lesser snow geese (Anser caerulescens caerulescens) and Ross' geese (Anser rossii) that primarily migrate between Canada and the States of Alabama, Arkansas, Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Wisconsin, and Wyoming.

"(2) SECRETARY.—The term 'Secretary' means the Secretary of the Interior.

"(3) SERVICE.—The term 'Service' means the United States Fish and Wildlife Service."

§ 704. Determination as to when and how migratory birds may be taken, killed, or possessed

(a) Subject to the provisions and in order to carry out the purposes of the conventions, referred to in section 703 of this title, the Secretary of the Interior is authorized and directed, from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg thereof, and to adopt suitable regulations permitting and

governing the same, in accordance with such determinations, which regulations shall become effective when approved by the President.

(b) It shall be unlawful for any person to—

(1) take any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area; or

(2) place or direct the placement of bait on or adjacent to an area for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over the baited area.

(July 3, 1918, ch. 128, § 3, 40 Stat. 755; June 20, 1936, ch. 634, § 2, 49 Stat. 1556; 1939 Reorg. Plan No. II, § 4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433; Pub. L. 105–312, title I, § 102, Oct. 30, 1998, 112 Stat. 2956.)

### AMENDMENTS

1998—Pub. L. 105–312 designated existing provisions as subsec. (a) and added subsec. (b).

1936—Act June 20, 1936, substituted "conventions" for "convention" in two places.

### EFFECTIVE DATE OF 1936 AMENDMENT

Act June 20, 1936, ch. 634, § 2, 49 Stat. 1556, provided in part that the amendment by section 2 is effective as of the day aforesaid (June 30, 1937). See note under section 703 of this title.

### TRANSFER OF FUNCTIONS

Transfer of functions of Secretary of Agriculture to Secretary of the Interior by Reorg. Plan, No. II of 1939, see Transfer of Functions note set out under section 701 of this title.

### DELEGATION OF FUNCTIONS

For delegation to Secretary of the Interior of authority vested in President, see Ex. Ord. No. 10752, Feb. 12, 1958, 23 F.R. 973, set out as a note under section 715j of Title 15, Commerce and Trade.

Secretary of the Interior empowered to promulgate regulations under this section without approval, ratification, or other action of President, see section 2(b) of Ex. Ord. No. 10250, June 5, 1951, 16 F.R. 5385, set out as a note under section 301 of Title 3, The President.

### BAITING OF MIGRATORY GAME BIRDS

Pub. L. 115–334, title XII, § 12601, Dec. 20, 2018, 132 Stat. 5003, provided that:

"(a) DEFINITIONS.—In this section:

"(1) NORMAL AGRICULTURAL OPERATION.—The term 'normal agricultural operation' has the meaning given the term in section 20.11 of title 50, Code of Federal Regulations (as in effect on the date of enactment of this Act [Dec. 20, 2018]).

"(2) POST-DISASTER FLOODING.—The term 'post-disaster flooding' means the destruction of a crop through flooding in accordance with practices required by the Federal Crop Insurance Corporation for agricultural producers to obtain crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) on land on which a crop was not harvestable due to a natural disaster (including any hurricane, storm, tornado, flood, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, drought, fire, snowstorm, or other catastrophe that is declared a major disaster by the President in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170)) in the crop year—

"(A) in which the natural disaster occurred; or

"(B) immediately preceding the crop year in which the natural disaster occurred.

"(3) RICE RATOONING.—The term 'rice ratooning' means the agricultural practice of harvesting rice by cutting the majority of the aboveground portion of the rice plant but leaving the roots and growing shoot apices intact to allow the plant to recover and produce a second crop yield.

"(b) REGULATIONS TO EXCLUDE RICE RATOONING AND POST-DISASTER FLOODING.—Not later than 30 days after the date of enactment of this Act, the Secretary of the Interior, in consultation with the Secretary of Agriculture, shall revise part 20 of title 50, Code of Federal Regulations, to clarify that rice ratooning and post-disaster flooding, when carried out as part of a normal agricultural operation, do not constitute baiting.

"(c) REPORTS.—Not less frequently than once each year—

"(1) the Secretary of Agriculture shall submit to the Secretary of the Interior a report that describes any changes to normal agricultural operations across the range of crops grown by agricultural producers in each region of the United States in which the official recommendations described in section 20.11(h) of title 50, Code of Federal Regulations (as in effect on the date of enactment of this Act), are provided to agricultural producers; and

"(2) the Secretary of the Interior, in consultation with the Secretary of Agriculture and after seeking input from the heads of State departments of fish and wildlife or the Regional Migratory Bird Flyway Councils of the United States Fish and Wildlife Service, shall publicly post a report on the impact that rice ratooning and post-disaster flooding have on the behavior of migratory game birds that are hunted in the area in which rice ratooning and post-disaster flooding, respectively, have occurred."

### REPORT ON EFFECTS OF 1998 AMENDMENTS

Pub. L. 105–312, title I, § 104, Oct. 30, 1998, 112 Stat. 2956, provided that: "Not later than 5 years after the date of enactment of this Act [Oct. 30, 1998], the Secretary of the Interior shall submit to the Committee on Environment and Public Works of the Senate and the Committee on Resources [now Committee on Natural Resources] of the House of Representatives a report analyzing the effect of the amendments made by section 2 [probably should be section 102, which amended this section], and the general practice of baiting, on migratory bird conservation and law enforcement efforts under the Migratory Bird Treaty Act (16 U.S.C. 701 et seq.) [16 U.S.C. 703 et seq.]."

## § 705. Transportation or importation of migratory birds; when unlawful

It shall be unlawful to ship, transport, or carry, by any means whatever, from one State, Territory, or district to or through another State, Territory, or district, or to or through a foreign country, any bird, or any part, nest, or egg thereof, captured, killed, taken, shipped, transported, or carried at any time contrary to the laws of the State, Territory, or district in which it was captured, killed, or taken, or from which it was shipped, transported, or carried. It shall be unlawful to import any bird, or any part, nest, or egg thereof, captured, killed, taken, shipped, transported, or carried contrary to the laws of any Province of the Dominion of Canada in which the same was captured, killed, or taken, or from which it was shipped, transported, or carried.

(July 3, 1918, ch. 128, § 4, 40 Stat. 755; June 20, 1936, ch. 634, § 4, 49 Stat. 1556; 1939 Reorg. Plan No. II, § 4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433; Pub. L. 91–135, § 10, Dec. 5, 1969, 83 Stat. 282.)

### AMENDMENTS

1969—Pub. L. 91–135 repealed second par., which prohibited shipment of wild game mammals or parts thereof by any person of the United States to and from Mexico, except by permit from the Secretary of the Interior.

1936—Act June 20, 1936, inserted last sentence.

### EFFECTIVE DATE OF 1969 AMENDMENT

Pub. L. 91–135, § 11, Dec. 5, 1969, 83 Stat. 282, provided that: "The provisions of sections 1 through 10 of this Act [enacting sections 668cc–1 to 668cc–6 of this title and amending this section, sections 851, 852, 852a, and 852d of this title, and sections 43, 44, 3054, and 3112 of Title 18, Crimes and Criminal Procedure] shall be effective one hundred and eighty days after the date of enactment of this Act [Dec. 5, 1969]."

### EFFECTIVE DATE OF 1936 AMENDMENT

Act June 20, 1936, ch. 634, § 4, 49 Stat. 1556, provided in part that the amendment by section 4 is effective as of the day aforesaid (June 30, 1937). See note under section 703 of this title.

### TRANSFER OF FUNCTIONS

Transfer of functions of Secretary of Agriculture to Secretary of the Interior by Reorg. Plan No. II of 1939, see Transfer of Functions note set out under section 701 of this title.

### § 706. Arrests; search warrants

Any employee of the Department of the Interior authorized by the Secretary of the Interior to enforce the provisions of this subchapter shall have power, without warrant, to arrest any person committing a violation of this subchapter in his presence or view and to take such person immediately for examination or trial before an officer or court of competent jurisdiction; shall have power to execute any warrant or other process issued by an officer or court of competent jurisdiction for the enforcement of the provisions of this subchapter; and shall have authority, with a search warrant, to search any place. The several judges of the courts established under the laws of the United States, and United States magistrate judges may, within their respective jurisdictions, upon proper oath or affirmation showing probable cause, issue warrants in all such cases. All birds, or parts, nests, or eggs thereof, captured, killed, taken, sold or offered for sale, bartered or offered for barter, purchased, shipped, transported, carried, imported, exported, or possessed contrary to the provisions of this subchapter or of any regulation prescribed thereunder shall, when found, be seized and, upon conviction of the offender or upon judgment of a court of the United States that the same were captured, killed, taken, sold or offered for sale, bartered or offered for barter, purchased, shipped, transported, carried, imported, exported, or possessed contrary to the provisions of this subchapter or of any regulation prescribed thereunder, shall be forfeited to the United States and disposed of by the Secretary of the Interior in such manner as he deems appropriate.

(July 3, 1918, ch. 128, § 5, 40 Stat. 756; 1939 Reorg. Plan No. II, § 4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433; Pub. L. 90–578, title IV, § 402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub. L. 95–616, § 3(h)(1), Nov. 8, 1978, 92 Stat. 3111; Pub. L. 101–650, title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

### AMENDMENTS

1978—Pub. L. 95–616 made provisions respecting seizures and judgment of court applicable to birds, or parts, nests, or eggs sold or offered for sale, bartered or offered for barter, purchased, imported and exported and substituted "any regulation prescribed thereunder" in two places for "any regulations made pursuant thereto" and "any regulation made pursuant thereto" and provision for disposition of the birds, etc., by Secretary of the Interior in such manner as he deems appropriate for prior provision for such disposition as directed by court having jurisdiction.

### CHANGE OF NAME

"United States magistrate judges" substituted for "United States magistrates" in text pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28, Judiciary and Judicial Procedure. Previously, "United States magistrates" substituted in text for "United States commissioners" pursuant to Pub. L. 90–578. See chapter 43 (§ 631 et seq.) of Title 28.

### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with protection of certain birds under this subchapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(e), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

Transfer of functions of Secretary of Agriculture to Secretary of the Interior by Reorg. Plan No. II of 1939, see Transfer of Functions note set out under section 701 of this title.

### § 707. Violations and penalties; forfeitures

(a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

(b) Whoever, in violation of this subchapter, shall knowingly—

(1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

(2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

(c) Whoever violates section 704(b)(2) of this title shall be fined under title 18, imprisoned not more than 1 year, or both.

(d) All guns, traps, nets and other equipment, vessels, vehicles, and other means of transpor-

tation used by any person when engaged in pursuing, hunting, taking, trapping, ensnaring, capturing, killing, or attempting to take, capture, or kill any migratory bird in violation of this subchapter with the intent to offer for sale, or sell, or offer for barter, or barter such bird in violation of this subchapter shall be forfeited to the United States and may be seized and held pending the prosecution of any person arrested for violating this subchapter and upon conviction for such violation, such forfeiture shall be adjudicated as a penalty in addition to any other provided for violation of this subchapter. Such forfeited property shall be disposed of and accounted for by, and under the authority of, the Secretary of the Interior.

(July 3, 1918, ch. 128, § 6, 40 Stat. 756; June 20, 1936, ch. 634, § 2, 49 Stat. 1556; Pub. L. 86–732, Sept. 8, 1960, 74 Stat. 866; Pub. L. 99–645, title V, § 501, Nov. 10, 1986, 100 Stat. 3590; Pub. L. 105–312, title I, § 103, Oct. 30, 1998, 112 Stat. 2956.)

AMENDMENTS

1998—Subsec. (a). Pub. L. 105–312, § 103(1), substituted "$15,000" for "$500".

Subsecs. (c), (d). Pub. L. 105–312, § 103(2), (3), added subsec. (c) and redesignated former subsec. (c) as (d).

1986—Subsec. (b). Pub. L. 99–645 substituted "shall knowingly" for "shall" in introductory provisions.

1960—Pub. L. 86–732 designated existing provisions as subsec. (a), inserted "Except as otherwise provided in this section", and added subsecs. (b) and (c).

1936—Act June 20, 1936, substituted "conventions" for "convention".

EFFECTIVE DATE OF 1936 AMENDMENT

Act June 20, 1936, ch. 634, § 2, 49 Stat. 1556, provided in part that the amendment by section 2 is effective as of the day aforesaid (June 30, 1937). See note under section 703 of this title.

TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other official in Department of the Interior under this subchapter to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see Transfer of Functions note set out under section 706 of this title.

§ 708. State or Territorial laws or regulations

Nothing in this subchapter shall be construed to prevent the several States and Territories from making or enforcing laws or regulations not inconsistent with the provisions of said conventions or of this subchapter, or from making or enforcing laws or regulations which shall give further protection to migratory birds, their nests, and eggs, if such laws or regulations do not extend the open seasons for such birds beyond the dates approved by the President in accordance with section 704 of this title.

(July 3, 1918, ch. 128, § 7, 40 Stat. 756; June 20, 1936, ch. 634, § 2, 49 Stat. 1556.)

AMENDMENTS

1936—Act June 20, 1936, substituted "conventions" for "convention".

EFFECTIVE DATE OF 1936 AMENDMENT

Act June 20, 1936, ch. 634, § 2, 49 Stat. 1556, provided in part that the amendment by section 2 is effective as of

the day aforesaid (June 30, 1937). See note under section 703 of this title.

§ 709. Omitted

CODIFICATION

Section, act July 3, 1918, ch. 128, § 8, 40 Stat. 756, authorized taking and use of migratory birds, nests, or eggs for scientific or propagating purposes until adoption and approval, pursuant to section 704 of this title, of regulations dealing therewith. Regulations were promulgated by Proc. July 31, 1918, 40 Stat. 1812.

§ 709a. Authorization of appropriations

There is hereby authorized to be appropriated, from time to time, out of any money in the Treasury not otherwise appropriated, such amounts as may be necessary to carry out the provisions and to accomplish the purposes of said conventions and of this subchapter and regulations made pursuant thereto, and the Secretary of the Interior is authorized out of such moneys to employ in the city of Washington and elsewhere such persons and means as he may deem necessary for such purpose and may cooperate with local authorities in the protection of migratory birds and make the necessary investigations connected therewith.

(July 3, 1918, ch. 128, § 9, as added June 20, 1936, ch. 634, § 5, 49 Stat. 1556; amended 1939 Reorg. Plan No. II, § 4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433.)

EFFECTIVE DATE

Act June 20, 1936, ch. 634, § 5, 49 Stat. 1556, provided in part that this section is effective as of the day aforesaid (June 30, 1937). See Effective Date of 1936 Amendment note set out under section 703 of this title.

TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other official in Department of the Interior under this subchapter to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see Transfer of Functions note set out under section 706 of this title.

Transfer of functions of Secretary of Agriculture to Secretary of the Interior by Reorg. Plan No. II of 1939, see Transfer of Functions note set out under section 701 of this title.

AVAILABILITY OF FUNDS

Act June 20, 1936, ch. 634, § 6, 49 Stat. 1557, provided: "That all moneys now or hereafter available for administration and enforcement of said Act approved July 3, 1918 [this subchapter], shall be equally available for the administration and enforcement of said Act as hereby amended."

§ 710. Partial invalidity; short title

If any clause, sentence, paragraph, or part of this subchapter, which shall be known by the short title of the "Migratory Bird Treaty Act", shall, for any reason, be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, or part thereof directly involved in the controversy in which such judgment shall have been rendered.

(July 3, 1918, ch. 128, §§ 1, 10, 40 Stat. 755, 757.)

CODIFICATION

The provisions of this section relating to short title are from section 1 of act July 3, 1918, and the provisions relating to severability are from section 10 of that act.

SHORT TITLE OF 2004 AMENDMENT

Pub. L. 108–447, div. E, title I, § 143(a), Dec. 8, 2004, 118 Stat. 3071, provided that: "This section [amending section 703 of this title and enacting provisions set out as notes under section 703 of this title] may be cited as the 'Migratory Bird Treaty Reform Act of 2004'."

SHORT TITLE OF 1998 AMENDMENT

Pub. L. 105–312, title I, § 101, Oct. 30, 1998, 112 Stat. 2956, provided that: "This title [amending sections 704 and 707 of this title and enacting provisions set out as a note under section 704 of this title] may be cited as the 'Migratory Bird Treaty Reform Act of 1998'."

## § 711. Breeding and sale for food supply

Nothing in this subchapter shall be construed to prevent the breeding of migratory game birds on farms and preserves and the sale of birds so bred under proper regulation for the purpose of increasing the food supply.

(July 3, 1918, ch. 128, § 12, 40 Stat. 757.)

## § 712. Treaty and convention implementing regulations; seasonal taking of migratory birds for essential needs of indigenous Alaskans to preserve and maintain stocks of the birds; protection and conservation of the birds

(1) In accordance with the various migratory bird treaties and conventions with Canada, Japan, Mexico, and the Union of Soviet Socialist Republics, the Secretary of the Interior is authorized to issue such regulations as may be necessary to assure that the taking of migratory birds and the collection of their eggs, by the indigenous inhabitants of the State of Alaska, shall be permitted for their own nutritional and other essential needs, as determined by the Secretary of the Interior, during seasons established so as to provide for the preservation and maintenance of stocks of migratory birds.

(2) The Secretary of the Interior is authorized to issue such regulations as may be necessary to implement the provisions of the convention between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916, the convention between the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the convention between the United States and the Government of Japan for the protection of migratory birds in danger of extinction, and their environment concluded March 4, 1972, and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environment concluded November 19, 1976.

(Pub. L. 95–616, § 3(h)(2), (3), Nov. 8, 1978, 92 Stat. 3112.)

CODIFICATION

Par. (1) of section 3(h) of Pub. L. 95–616 amended section 706 of this title. Pars. (2) and (3) of such section 3(h) were redesignated (1) and (2) for codification purposes.

Section was enacted as part of the Fish and Wildlife Improvement Act of 1978, and not as part of the Migratory Bird Treaty Act which comprises this subchapter.

## SUBCHAPTER III—MIGRATORY BIRD CONSERVATION

## § 715. Short title

This subchapter shall be known by the short title of "Migratory Bird Conservation Act."

(Feb. 18, 1929, ch. 257, § 1, 45 Stat. 1222.)

SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–215, § 1, Feb 17, 1976, 90 Stat. 189, provided: "That this Act [amending sections 668dd, 715a, 715k–3, 715k–5, 718a, 718b, and 718d of this title] may be cited as the 'Wetlands Loan Extension Act of 1976'."

## § 715a. Migratory Bird Conservation Commission; creation; composition; duties; approval of areas of land and water recommended for purchase or rental

A commission to be known as the Migratory Bird Conservation Commission, consisting of the Secretary of the Interior, as chairman, the Administrator of the Environmental Protection Agency, the Secretary of Agriculture and two Members of the Senate, to be selected by the President of the Senate, and two Members of the House of Representatives to be selected by the Speaker, is created and authorized to consider and pass upon any area of land, water, or land and water that may be recommended by the Secretary of the Interior for purchase or rental under this subchapter, and to fix the price or prices at which such area may be purchased or rented; and no purchase or rental shall be made of any such area until it has been duly approved for purchase or rental by said commission. Any Member of the House of Representatives who is a member of the commission, if reelected to the succeeding Congress, may serve on the commission notwithstanding the expiration of a Congress. Any vacancy on the commission shall be filled in the same manner as the original appointment. The ranking officer of the branch or department of a State to which is committed the administration of its game laws, or his authorized representative, and in a State having no such branch or department, the governor thereof, or his authorized representative, shall be a member ex officio of said commission for the purpose of considering and voting on all questions relating to the acquisition, under this subchapter, of areas in his State. For purposes of this subchapter, the purchase or rental of any area of land, water, or land and water includes the purchase or rental of any interest in any such area of land, water, or land and water.

(Feb. 18, 1929, ch. 257, § 2, 45 Stat. 1222; 1939 Reorg. Plan No. II, § 4(f), (h), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433; Pub. L. 90–261, Mar. 2, 1968, 82 Stat. 39; Pub. L. 94–215, § 4, Feb. 17, 1976, 90 Stat. 190; Pub. L. 101–233, § 13, Dec. 13, 1989, 103 Stat. 1977.)

AMENDMENTS

1989—Pub. L. 101–233 substituted "Administrator of the Environmental Protection Agency" for "Secretary of Transportation".

1976—Pub. L. 94–215 inserted provision including in the purchase or rental of any area of land, water, or

## STANDARD MANATEE CONDITIONS FOR IN-WATER WORK
### 2011

The permittee shall comply with the following conditions intended to protect manatees from direct project effects:

a.   All personnel associated with the project shall be instructed about the presence of manatees and manatee speed zones, and the need to avoid collisions with and injury to manatees.  The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing manatees which are protected under the Marine Mammal Protection Act, the Endangered Species Act, and the Florida Manatee Sanctuary Act.

b.   All vessels associated with the construction project shall operate at "Idle Speed/No Wake" at all times while in the immediate area and while in water where the draft of the vessel provides less than a four-foot clearance from the bottom.  All vessels will follow routes of deep water whenever possible.

c.   Siltation or turbidity barriers shall be made of material in which manatees cannot become entangled, shall be properly secured, and shall be regularly monitored to avoid manatee entanglement or entrapment.  Barriers must not impede manatee movement.

d.   All on-site project personnel are responsible for observing water-related activities for the presence of manatee(s).  All in-water operations, including vessels, must be shutdown if a manatee(s) comes within 50 feet of the operation.  Activities will not resume until the manatee(s) has moved beyond the 50-foot radius of the project operation, or until 30 minutes elapses if the manatee(s) has not reappeared within 50 feet of the operation. Animals must not be herded away or harassed into leaving.

e.   Any collision with or injury to a manatee shall be reported immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1-888-404-3922.  Collision and/ or injury should also be reported to the U.S. Fish and Wildlife Service in Jacksonville (1-904-731-3336) for north Florida or in Vero Beach (1-772-562-3909) for south Florida, and emailed to FWC at ImperiledSpecies@myFWC.com.

f.   Temporary signs concerning manatees shall be posted prior to and during all in-water project activities.  All signs are to be removed by the permittee upon completion of the project.  Temporary signs that have already been approved for this use by the FWC must be used.  One sign which reads *Caution: Boaters* must be posted.  A second sign measuring at least 8½ " by 11" explaining the requirements for "Idle Speed/No Wake" and the shut down of in-water operations must be posted in a location prominently visible to all personnel engaged in water-related activities.  These signs can be viewed at http:// www.myfwc.com/WILDLIFEHABITATS/manatee_sign_vendors.htm.  Questions concerning these signs can be forwarded to the email address listed above.

# CAUTION: MANATEE HABITAT

## All project vessels

# IDLE SPEED / NO WAKE

When a manatee is within 50 feet of work
all in-water activities must

# SHUT DOWN

Report any collision with or injury to a manatee:

**Wildlife Alert:**

# 1-888-404-FWCC(3922)

cell *FWC or #FWC





**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Southeast Regional Office
263 13th Avenue South
St. Petersburg, FL 33701

**SEA TURTLE AND SMALLTOOTH SAWFISH CONSTRUCTION CONDITIONS**

The permittee shall comply with the following protected species construction conditions:

a.   The permittee shall instruct all personnel associated with the project of the potential presence of these species and the need to avoid collisions with sea turtles and smalltooth sawfish.  All construction personnel are responsible for observing water-related activities for the presence of these species.

b.   The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing sea turtles or smalltooth sawfish, which are protected under the Endangered Species Act of 1973.

c.   Siltation barriers shall be made of material in which a sea turtle or smalltooth sawfish cannot become entangled, be properly secured, and be regularly monitored to avoid protected species entrapment.  Barriers may not block sea turtle or smalltooth sawfish entry to or exit from designated critical habitat without prior agreement from the National Marine Fisheries Service's Protected Resources Division, St. Petersburg, Florida.

d.   All vessels associated with the construction project shall operate at "no wake/idle" speeds at all times while in the construction area and while in water depths where the draft of the vessel provides less than a four-foot clearance from the bottom.  All vessels will preferentially follow deep-water routes (e.g., marked channels) whenever possible.

e.   If a sea turtle or smalltooth sawfish is seen within 100 yards of the active daily construction/dredging operation or vessel movement, all appropriate precautions shall be implemented to ensure its protection.  These precautions shall include cessation of operation of any moving equipment closer than 50 feet of a sea turtle or smalltooth sawfish.  Operation of any mechanical construction equipment shall cease immediately if a sea turtle or smalltooth sawfish is seen within a 50-ft radius of the equipment.  Activities may not resume until the protected species has departed the project area of its own volition.

f.   Any collision with and/or injury to a sea turtle or smalltooth sawfish shall be reported immediately to the National Marine Fisheries Service's Protected Resources Division (727-824-5312) and the local authorized sea turtle stranding/rescue organization.

g.   Any special construction conditions, required of your specific project, outside these general conditions, if applicable, will be addressed in the primary consultation.

Revised: March 23, 2006
O:\forms\Sea Turtle and Smalltooth Sawfish Construction Conditions.doc

