

# SUBCHAPTER J—SUPERFUND, EMERGENCY PLANNING, AND COMMUNITY RIGHT-TO-KNOW PROGRAMS

## PART 300—NATIONAL OIL AND HAZARDOUS SUBSTANCES POLLUTION CONTINGENCY PLAN

### Subpart A—Introduction

Sec.
300.1   Purpose and objectives.
300.2   Authority and applicability.
300.3   Scope.
300.4   Abbreviations.
300.5   Definitions.
300.6   Use of number and gender.
300.7   Computation of time.

### Subpart B—Responsibility and Organization for Response

300.100  Duties of President delegated to federal agencies.
300.105  General organization concepts.
300.110  National Response Team.
300.115  Regional Response Teams.
300.120  On-scene coordinators and remedial project managers: general responsibilities.
300.125  Notification and communications.
300.130  Determinations to initiate response and special conditions.
300.135  Response operations.
300.140  Multi-regional responses.
300.145  Special teams and other assistance available to OSCs/RPMs.
300.150  Worker health and safety.
300.155  Public information and community relations.
300.160  Documentation and cost recovery.
300.165  OSC reports.
300.170  Federal agency participation.
300.175  Federal agencies: additional responsibilities and assistance.
300.180  State and local participation in response.
300.185  Nongovernmental participation.

### Subpart C—Planning and Preparedness

300.200  General.
300.205  Planning and coordination structure.
300.210  Federal contingency plans.
300.211  OPA facility and vessel response plans.
300.212  Area response drills.
300.215  Title III local emergency response plans.
300.220  Related Title III issues.

### Subpart D—Operational Response Phases for Oil Removal

300.300  Phase I—Discovery or notification.
300.305  Phase II—Preliminary assessment and initiation of action.
300.310  Phase III—Containment, countermeasures, cleanup, and disposal.
300.315  Phase IV—Documentation and cost recovery.
300.317  National response priorities.
300.320  General pattern of response.
300.322  Response to substantial threats to public health or welfare of the United States.
300.323  Spills of national significance.
300.324  Response to worst case discharges.
300.335  Funding.

### Subpart E—Hazardous Substance Response

300.400  General.
300.405  Discovery or notification.
300.410  Removal site evaluation.
300.415  Removal action.
300.420  Remedial site evaluation.
300.425  Establishing remedial priorities.
300.430  Remedial investigation/feasibility study and selection of remedy.
300.435  Remedial design/remedial action, operation and maintenance.
300.440  Procedures for planning and implementing off-site response actions.

### Subpart F—State Involvement in Hazardous Substance Response

300.500  General.
300.505  EPA/State Superfund Memorandum of Agreement (SMOA).
300.510  State assurances.
300.515  Requirements for state involvement in remedial and enforcement response.
300.520  State involvement in EPA-lead enforcement negotiations.
300.525  State involvement in removal actions.

### Subpart G—Trustees for Natural Resources

300.600  Designation of federal trustees.
300.605  State trustees.
300.610  Indian tribes.
300.612  Foreign trustees.
300.615  Responsibilities of trustees.

### Subpart H—Participation by Other Persons

300.700  Activities by other persons.

## Subpart I—Administrative Record for Selection of Response Action

300.800  Establishment of an administrative record.
300.805  Location of the administrative record file.
300.810  Contents of the administrative record file.
300.815  Administrative record file for a remedial action.
300.820  Administrative record file for a removal action.
300.825  Record requirements after the decision document is signed.

## Subpart J—Use of Dispersants and Other Chemicals

300.900  General.
300.905  NCP Product Schedule.
300.910  Authorization of use.
300.915  Data requirements.
300.920  Addition of products to Schedule.

## Subpart K—Federal Facilities [Reserved]

## Subpart L—National Oil and Hazardous Substances Pollution Contingency Plan; Involuntary Acquisition of Property by the Government

300.1105  Involuntary acquisition of property by the government.

APPENDIX A TO PART 300—THE HAZARD RANKING SYSTEM
APPENDIX B TO PART 300—NATIONAL PRIORITIES LIST
APPENDIX C TO PART 300—SWIRLING FLASK DISPERSANT EFFECTIVENESS TEST, REVISED STANDARD DISPERSANT TOXICITY TEST, AND BIOREMEDIATION AGENT EFFECTIVENESS TEST
APPENDIX D TO PART 300—APPROPRIATE ACTIONS AND METHODS OF REMEDYING RELEASES
APPENDIX E TO PART 300—OIL SPILL RESPONSE

AUTHORITY: 33 U.S.C. 1321(d); 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p.351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

## Subpart A—Introduction

SOURCE: 59 FR 47416, Sept. 15, 1994, unless otherwise noted.

### § 300.1  Purpose and objectives.

The purpose of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) is to provide the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants.

### § 300.2  Authority and applicability.

The NCP is required by section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. 9605, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. 99–499, (hereinafter CERCLA), and by section 311(d) of the Clean Water Act (CWA), 33 U.S.C. 1321(d), as amended by the Oil Pollution Act of 1990 (OPA), Pub. L. 101–380. In Executive Order (E.O.) 12777 (56 FR 54757, October 22, 1991), the President delegated to the Environmental Protection Agency (EPA) the responsibility for the amendment of the NCP. Amendments to the NCP are coordinated with members of the National Response Team (NRT) prior to publication for notice and comment. This includes coordination with the Federal Emergency Management Agency (FEMA) and the Nuclear Regulatory Commission in order to avoid inconsistent or duplicative requirements in the emergency planning responsibilities of those agencies. The NCP is applicable to response actions taken pursuant to the authorities under CERCLA and section 311 of the CWA, as amended.

### § 300.3  Scope.

(a) The NCP applies to and is in effect for:

(1) Discharges of oil into or on the navigable waters of the United States, on the adjoining shorelines, the waters of the contiguous zone, into waters of the exclusive economic zone, or that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (See sections 311(c)(1) and 502(7) of the CWA).

(2) Releases into the environment of hazardous substances, and pollutants or contaminants which may present an imminent and substantial danger to public health or welfare of the United States.

(b) The NCP provides for efficient, coordinated, and effective response to

discharges of oil and releases of hazardous substances, pollutants, and contaminants in accordance with the authorities of CERCLA and the CWA. It provides for:

(1) The national response organization that may be activated in response actions. It specifies responsibilities among the federal, state, and local governments and describes resources that are available for response.

(2) The establishment of requirements for federal, regional, and area contingency plans. It also summarizes state and local emergency planning requirements under SARA Title III.

(3) Procedures for undertaking removal actions pursuant to section 311 of the CWA.

(4) Procedures for undertaking response actions pursuant to CERCLA.

(5) Procedures for involving state governments in the initiation, development, selection, and implementation of response actions, pursuant to CERCLA.

(6) Listing of federal trustees for natural resources for purposes of CERCLA and the CWA.

(7) Procedures for the participation of other persons in response actions.

(8) Procedures for compiling and making available an administrative record for response actions.

(9) National procedures for the use of dispersants and other chemicals in removals under the CWA and response actions under CERCLA.

(c) In implementing the NCP, consideration shall be given to international assistance plans and agreements, security regulations and responsibilities based on international agreements, federal statutes, and executive orders. Actions taken pursuant to the provisions of any applicable international joint contingency plans shall be consistent with the NCP, to the greatest extent possible. The Department of State shall be consulted, as appropriate, prior to taking any action which may affect its activities.

(d) Additionally, the NCP applies to and is in effect when the Federal Response Plan and some or all its Emergency Support Functions (ESFs) are activated.

§ 300.4 **Abbreviations.**

(a) *Department and Agency Title Abbreviations:*

ATSDR—Agency for Toxic Substances and Disease Registry
CDC—Centers for Disease Control
DOC—Department of Commerce
DOD—Department of Defense
DOE—Department of Energy
DOI—Department of the Interior
DOJ—Department of Justice
DOL—Department of Labor
DOS—Department of State
DOT—Department of Transportation
EPA—Environmental Protection Agency
FEMA—Federal Emergency Management Agency
GSA—General Services Administration
HHS—Department of Health and Human Services
NIOSH—National Institute for Occupational Safety and Health
NOAA—National Oceanic and Atmospheric Administration
OSHA—Occupational Health and Safety Administration
RSPA—Research and Special Programs Administration
USCG—United States Coast Guard
USDA—United States Department of Agriculture

NOTE: Reference is made in the NCP to both the Nuclear Regulatory Commission and the National Response Center. In order to avoid confusion, the NCP will spell out Nuclear Regulatory Commission and use the abbreviation "NRC" only with respect to the National Response Center.

(b) *Operational Abbreviations:*

ACP—Area Contingency Plan
ARARs—Applicable or Relevant and Appropriate Requirements
CERCLIS—CERCLA Information System
CRC—Community Relations Coordinator
CRP—Community Relations Plan
DRAT—District Response Advisory Team
DRG—District Response Group
ERT—Environmental Response Team
ESF—Emergency Support Function
FCO—Federal Coordinating Officer
FRERP—Federal Radiological Emergency Response Plan
FRP—Federal Response Plan
FS—Feasibility Study
HRS—Hazard Ranking System
LEPC—Local Emergency Planning Committee
NCP—National Contingency Plan
NPFC—National Pollution Funds Center
NPL—National Priorities List
NRC—National Response Center
NRS—National Response System
NRT—National Response Team
NSF—National Strike Force

NSFCC—National Strike Force Coordination Center
O&M—Operation and Maintenance
OSC—On-Scene Coordinator
OSLTF—Oil Spill Liability Trust Fund
PA—Preliminary Assessment
PIAT—Public Information Assist Team
RA—Remedial Action
RCP—Regional Contingency Plan
RD—Remedial Design
RERT—Radiological Emergency Response Team
RI—Remedial Investigation
ROD—Record of Decision
RPM—Remedial Project Manager
RRC—Regional Response Center
RRT—Regional Response Team
SAC—Support Agency Coordinator
SEMS—Superfund Enterprise Management System
SERC—State Emergency Response Commission
SI—Site Inspection
SMOA—Superfund Memorandum of Agreement
SONS—Spill of National Significance
SSC—Scientific Support Coordinator
SUPSALV—United States Navy Supervisor of Salvage
USFWS—United States Fish and Wildlife Service

[59 FR 47416, Sept. 15, 1994, as amended at 79 FR 65592, Nov. 5, 2014]

**§ 300.5  Definitions.**

Terms not defined in this section have the meaning given by CERCLA, the OPA, or the CWA.

*Activation* means notification by telephone or other expeditious manner or, when required, the assembly of some or all appropriate members of the RRT or NRT.

*Alternative water supplies* as defined by section 101(34) of CERCLA, includes, but is not limited to, drinking water and household water supplies.

*Applicable requirements* means those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site. Only those state standards that are identified by a state in a timely manner and that are more stringent than federal requirements may be applicable.

*Area Committee* (AC) as provided for by CWA sections 311(a)(18) and (j)(4), means the entity appointed by the President consisting of members from qualified personnel of federal, state, and local agencies with responsibilities that include preparing an area contingency plan for an area designated by the President.

*Area contingency plan* (ACP) as provided for by CWA sections 311(a)(19) and (j)(4), means the plan prepared by an Area Committee that is developed to be implemented in conjunction with the NCP and RCP, in part to address removal of a worst case discharge and to mitigate or prevent a substantial threat of such a discharge from a vessel, offshore facility, or onshore facility operating in or near an area designated by the President.

*Bioremediation agents* means microbiological cultures, enzyme additives, or nutrient additives that are deliberately introduced into an oil discharge and that will significantly increase the rate of biodegradation to mitigate the effects of the discharge.

*Burning agents* means those additives that, through physical or chemical means, improve the combustibility of the materials to which they are applied.

*CERCLA* is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986.

*CERCLIS* was the abbreviation for the CERCLA Information System. This system has been retired and has been replaced with SEMS, the Superfund Enterprise Management System.

*Chemical agents* means those elements, compounds, or mixtures that coagulate, disperse, dissolve, emulsify, foam, neutralize, precipitate, reduce, solubilize, oxidize, concentrate, congeal, entrap, fix, make the pollutant mass more rigid or viscous, or otherwise facilitate the mitigation of deleterious effects or the removal of the pollutant from the water. Chemical agents include biological additives, dispersants, sinking agents, miscellaneous oil spill control agents, and burning agents, but do not include sorbents.

*Claim* for purposes of a release under CERCLA, means a demand in writing for a sum certain; for purposes of a discharge under CWA, it means a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident.

*Claimant* as defined by section 1001 of the OPA means any person or government who presents a claim for compensation under Title I of the OPA.

*Coastal waters* for the purposes of classifying the size of discharges, means the waters of the coastal zone except for the Great Lakes and specified ports and harbors on inland rivers.

*Coastal zone* as defined for the purpose of the NCP, means all United States waters subject to the tide, United States waters of the Great Lakes, specified ports and harbors on inland rivers, waters of the contiguous zone, other waters of the high seas subject to the NCP, and the land surface or land substrata, ground waters, and ambient air proximal to those waters. The term coastal zone delineates an area of federal responsibility for response action. Precise boundaries are determined by EPA/USCG agreements and identified in federal regional contingency plans.

*Coast Guard District Response Group* (DRG) as provided for by CWA sections 311(a)(20) and (j)(3), means the entity established by the Secretary of the department in which the USCG is operating, within each USCG district, and shall consist of: the combined USCG personnel and equipment, including marine firefighting equipment, of each port in the district; additional prepositioned response equipment; and a district response advisory team.

*Community relations* means EPA's program to inform and encourage public participation in the Superfund process and to respond to community concerns. The term "public" includes citizens directly affected by the site, other interested citizens or parties, organized groups, elected officials, and potentially responsible parties (PRPs).

*Community relations coordinator* means lead agency staff who work with the OSC/RPM to involve and inform the public about the Superfund process and response actions in accordance with the interactive community relations requirements set forth in the NCP.

*Contiguous zone* means the zone of the high seas, established by the United States under Article 24 of the Convention on the Territorial Sea and Contiguous Zone, which is contiguous to the territorial sea and which extends nine miles seaward from the outer limit of the territorial sea.

*Cooperative agreement* is a legal instrument EPA uses to transfer money, property, services, or anything of value to a recipient to accomplish a public purpose in which substantial EPA involvement is anticipated during the performance of the project.

*Damages* as defined by section 1001 of the OPA means damages specified in section 1002(b) of the Act, and includes the cost of assessing these damages.

*Discharge* as defined by section 311(a)(2) of the CWA, includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, or dumping of oil, but excludes discharges in compliance with a permit under section 402 of the CWA, discharges resulting from circumstances identified and reviewed and made a part of the public record with respect to a permit issued or modified under section 402 of the CWA, and subject to a condition in such permit, or continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 402 of the CWA, that are caused by events occurring within the scope of relevant operating or treatment systems. For purposes of the NCP, discharge also means substantial threat of discharge.

*Dispersants* means those chemical agents that emulsify, disperse, or solubilize oil into the water column or promote the surface spreading of oil slicks to facilitate dispersal of the oil into the water column.

*Drinking water supply* as defined by section 101(7) of CERCLA, means any raw or finished water source that is or may be used by a public water system (as defined in the Safe Drinking Water Act (42 U.S.C. 300 *et seq.*) or as drinking water by one or more individuals.

*Environment* as defined by section 101(8) of CERCLA, means the navigable waters, the waters of the contiguous

zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act (16 U.S.C. 1801 *et seq.*); and any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

*Exclusive economic zone*, as defined by OPA section 1001, means the zone established by Presidential Proclamation Numbered 5030, dated March 10, 1983, including the ocean waters of the areas referred to as "eastern special areas" in Article 3(1) of the Agreement between the United States of America and the Union of Soviet Socialist Republics on the Maritime Boundary, signed June 1, 1990.

*Facility* as defined by section 101(9) of CERCLA, means any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or any site or area, where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel. As defined by section 1001 of the OPA, it means any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: Exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes.

*Feasibility study* (FS) means a study undertaken by the lead agency to develop and evaluate options for remedial action. The FS emphasizes data analysis and is generally performed concurrently and in an interactive fashion with the remedial investigation (RI), using data gathered during the RI. The RI data are used to define the objectives of the response action, to develop remedial action alternatives, and to undertake an initial screening and detailed analysis of the alternatives. The term also refers to a report that describes the results of the study.

*Federal Radiological Emergency Response Plan* (FRERP) means the interagency agreement for coordinating the response of various agencies, under a variety of statutes, to a large radiological accident. The Lead Federal Agency (LFA), defined by the FRERP, activates the FRERP for any peacetime radiological emergency which, based upon its professional judgment, is expected to have a significant radiological effect within the United States, its territories, possessions, or territorial waters and that could require a response by several federal agencies.

*Federal Response Plan* (FRP) means the agreement signed by 27 federal departments and agencies in April 1987 and developed under the authorities of the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 *et seq.*) and the Disaster Relief Act of 1974 (42 U.S.C. 3231 *et seq.*), as amended by the Stafford Disaster Relief Act of 1988.

*First federal official* means the first federal representative of a participating agency of the National Response Team to arrive at the scene of a discharge or a release. This official coordinates activities under the NCP and may initiate, in consultation with the OSC, any necessary actions until the arrival of the predesignated OSC. A state with primary jurisdiction over a site covered by a cooperative agreement will act in the stead of the first federal official for any incident at the site.

*Fund* or *Trust Fund* means the Hazardous Substance Superfund established by section 9507 of the Internal Revenue Code of 1986.

*Ground water* as defined by section 101(12) of CERCLA, means water in a saturated zone or stratum beneath the surface of land or water.

*Hazard Ranking System* (HRS) means the method used by EPA to evaluate the relative potential of hazardous substance releases to cause health or safety problems, or ecological or environmental damage.

*Hazardous substance* as defined by section 101(14) of CERCLA, means: Any

substance designated pursuant to section 311(b)(2)(A) of the CWA; any element, compound, mixture, solution, or substance designated pursuant to section 102 of CERCLA; any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act (42 U.S.C. 6901 *et seq.*) has been suspended by Act of Congress); any toxic pollutant listed under section 307(a) of the CWA; any hazardous air pollutant listed under section 112 of the Clean Air Act (42 U.S.C. 7521 *et seq.*); and any imminently hazardous chemical substance or mixture with respect to which the EPA Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act (15 U.S.C. 2601 *et seq.*). The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance in the first sentence of this paragraph, and the term does not include natural gas, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

*Indian tribe* as defined by section 101(36) of CERCLA, means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village but not including any Alaska Native regional or village corporation, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians. "Indian tribe," as defined by OPA section 1001, means any Indian tribe, band, nation, or other organized group or community, but not including any Alaska Native regional or village corporation, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians and has governmental authority over lands belonging to or controlled by the tribe.

*Inland waters,* for the purposes of classifying the size of discharges, means those waters of the United States in the inland zone, waters of the

Great Lakes, and specified ports and harbors on inland rivers.

*Inland zone* means the environment inland of the coastal zone excluding the Great Lakes and specified ports and harbors on inland rivers. The term inland zone delineates an area of federal responsibility for response action. Precise boundaries are determined by EPA/USCG agreements and identified in federal regional contingency plans.

*Lead administrative trustee* means a natural resource trustee who is designated on an incident-by-incident basis for the purpose of preassessment and damage assessment and chosen by the other trustees whose natural resources are affected by the incident. The lead administrative trustee facilitates effective and efficient communication during response operations between the OSC and the other natural resource trustees conducting activities associated with damage assessment, and is responsible for applying to the OSC for access to response operations resources on behalf of all trustees for initiation of a damage assessment.

*Lead agency* means the agency that provides the OSC/RPM to plan and implement response actions under the NCP. EPA, the USCG, another federal agency, or a state (or political subdivision of a state) operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA, or designated pursuant to a Superfund Memorandum of Agreement (SMOA) entered into pursuant to subpart F of the NCP or other agreements may be the lead agency for a response action. In the case of a release of a hazardous substance, pollutant, or contaminant, where the release is on, or the sole source of the release is from, any facility or vessel under the jurisdiction, custody, or control of Department of Defense (DOD) or Department of Energy (DOE), then DOD or DOE will be the lead agency. Where the release is on, or the sole source of the release is from, any facility or vessel under the jurisdiction, custody, or control of a federal agency other than EPA, the USCG, DOD, or DOE, then that agency will be the lead agency for remedial actions and removal actions other than emergencies. The federal

agency maintains its lead agency responsibilities whether the remedy is selected by the federal agency for non-NPL sites or by EPA and the federal agency or by EPA alone under CERCLA section 120. The lead agency will consult with the support agency, if one exists, throughout the response process.

*Management of migration* means actions that are taken to minimize and mitigate the migration of hazardous substances or pollutants or contaminants and the effects of such migration. Measures may include, but are not limited to, management of a plume of contamination, restoration of a drinking water aquifer, or surface water restoration.

*Miscellaneous oil spill control agent* is any product, other than a dispersant, sinking agent, surface washing agent, surface collecting agent, bioremediation agent, burning agent, or sorbent that can be used to enhance oil spill cleanup, removal, treatment, or mitigation.

*National Pollution Funds Center* (NPFC) means the entity established by the Secretary of Transportation whose function is the administration of the Oil Spill Liability Trust Fund (OSLTF). Among the NPFC's duties are: providing appropriate access to the OSLTF for federal agencies and states for removal actions and for federal trustees to initiate the assessment of natural resource damages; providing appropriate access to the OSLTF for claims; and coordinating cost recovery efforts.

*National Priorities List* (NPL) means the list, compiled by EPA pursuant to CERCLA section 105, of uncontrolled hazardous substance releases in the United States that are priorities for long-term remedial evaluation and response.

*National response system* (NRS) is the mechanism for coordinating response actions by all levels of government in support of the OSC/RPM. The NRS is composed of the NRT, RRTs, OSC/RPM, Area Committees, and Special Teams and related support entities. The NRS is capable of expanding or contracting to accommodate the response effort required by the size or complexity of the discharge or release.

*National Strike Force* (NSF) is a special team established by the USCG, including the three USCG Strike Teams, the Public Information Assist Team (PIAT), and the National Strike Force Coordination Center. The NSF is available to assist OSCs/RPMs in their preparedness and response duties.

*National Strike Force Coordination Center* (NSFCC), authorized as the National Response Unit by CWA sections 311(a)(23) and (j)(2), means the entity established by the Secretary of the department in which the USCG is operating at Elizabeth City, North Carolina with responsibilities that include administration of the USCG Strike Teams, maintenance of response equipment inventories and logistic networks, and conducting a national exercise program.

*Natural resources* means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone defined by the Magnuson Fishery Conservation and Management Act of 1976), any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

*Navigable waters* means the waters of the United States, including the territorial seas.

(1) For purposes of the Clean Water Act, 33 U.S.C. 1251 *et seq.* and its implementing regulations, subject to the exclusions in paragraph (2) of this definition, the term ''waters of the United States'' means:

(i) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(ii) All interstate waters, including interstate wetlands;

(iii) The territorial seas;

(iv) All impoundments of waters otherwise identified as waters of the United States under this section;

(v) All tributaries, as defined in paragraph (3)(iii) of this definition, of

waters identified in paragraphs (1)(i) through (iii) of this definition;

(vi) All waters adjacent to a water identified in paragraphs (1)(i) through (v) of this definition, including wetlands, ponds, lakes, oxbows, impoundments, and similar waters;

(vii) All waters in paragraphs (1)(vii)(A) through (E) of this definition where they are determined, on a case-specific basis, to have a significant nexus to a water identified in paragraphs (1)(i) through (iii) of this definition. The waters identified in each of paragraphs (1)(vii)(A) through (E) of this definition are similarly situated and shall be combined, for purposes of a significant nexus analysis, in the watershed that drains to the nearest water identified in paragraphs (1)(i) through (iii) of this definition. Waters identified in this paragraph shall not be combined with waters identified in paragraph (1)(vi) of this definition when performing a significant nexus analysis. If waters identified in this paragraph are also an adjacent water under paragraph (1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required.

(A) *Prairie potholes.* Prairie potholes are a complex of glacially formed wetlands, usually occurring in depressions that lack permanent natural outlets, located in the upper Midwest.

(B) *Carolina bays and Delmarva bays.* Carolina bays and Delmarva bays are ponded, depressional wetlands that occur along the Atlantic coastal plain.

(C) *Pocosins.* Pocosins are evergreen shrub and tree dominated wetlands found predominantly along the Central Atlantic coastal plain.

(D) *Western vernal pools.* Western vernal pools are seasonal wetlands located in parts of California and associated with topographic depression, soils with poor drainage, mild, wet winters and hot, dry summers.

(E) *Texas coastal prairie wetlands.* Texas coastal prairie wetlands are freshwater wetlands that occur as a mosaic of depressions, ridges, intermound flats, and mima mound wetlands located along the Texas Gulf Coast.

(viii) All waters located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (iii) of this definition and all waters located within 4,000 feet of the high tide line or ordinary high water mark of a water identified in paragraphs (1)(i) through (v) of this definition where they are determined on a case-specific basis to have a significant nexus to a water identified in paragraphs (1)(i) through (iii) of this definition. For waters determined to have a significant nexus, the entire water is a water of the United States if a portion is located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (iii) of this definition or within 4,000 feet of the high tide line or ordinary high water mark. Waters identified in this paragraph shall not be combined with waters identified in paragraph (1)(vi) of this definition when performing a significant nexus analysis. If waters identified in this paragraph are also an adjacent water under paragraph (1)(vi), they are an adjacent water and no case-specific significant nexus analysis is required.

(2) The following are not "waters of the United States" even where they otherwise meet the terms of paragraphs (1)(iv) through (viii) of this definition.

(i) Waste treatment systems (other than cooling ponds meeting the criteria of this paragraph) are not waters of the United States.

(ii) Prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other Federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

(iii) The following ditches:

(A) Ditches with ephemeral flow that are not a relocated tributary or excavated in a tributary.

(B) Ditches with intermittent flow that are not a relocated tributary, excavated in a tributary, or drain wetlands.

(C) Ditches that do not flow, either directly or through another water, into a water identified in paragraphs (1)(i) through (iii) of this definition.

(iv) The following features:

(A) Artificially irrigated areas that would revert to dry land should application of water to that area cease;

(B) Artificial, constructed lakes and ponds created in dry land such as farm and stock watering ponds, irrigation ponds, settling ponds, fields flooded for rice growing, log cleaning ponds, or cooling ponds;

(C) Artificial reflecting pools or swimming pools created in dry land;

(D) Small ornamental waters created in dry land;

(E) Water-filled depressions created in dry land incidental to mining or construction activity, including pits excavated for obtaining fill, sand, or gravel that fill with water;

(F) Erosional features, including gullies, rills, and other ephemeral features that do not meet the definition of tributary, non-wetland swales, and lawfully constructed grassed waterways; and

(G) Puddles.

(v) Groundwater, including groundwater drained through subsurface drainage systems.

(vi) Stormwater control features constructed to convey, treat, or store stormwater that are created in dry land.

(vii) Wastewater recycling structures constructed in dry land; detention and retention basins built for wastewater recycling; groundwater recharge basins; percolation ponds built for wastewater recycling; and water distributary structures built for wastewater recycling.

(3) In this definition, the following terms apply:

(i) *Adjacent.* The term *adjacent* means bordering, contiguous, or neighboring a water identified in paragraphs (1)(i) through (v) of this definition, including waters separated by constructed dikes or barriers, natural river berms, beach dunes, and the like. For purposes of adjacency, an open water such as a pond or lake includes any wetlands within or abutting its ordinary high water mark. Adjacency is not limited to waters located laterally to a water identified in paragraphs (1)(i) through (v) of this definition. Adjacent waters also include all waters that connect segments of a water identified in paragraphs (1)(i) through (v) or are located at the head of a water identified in paragraphs (1)(i) through (v) of this definition and are bordering, contiguous, or neigh-

boring such water. Waters being used for established normal farming, ranching, and silviculture activities (33 U.S.C. 1344(f)) are not adjacent.

(ii) *Neighboring.* The term *neighboring* means:

(A) All waters located within 100 feet of the ordinary high water mark of a water identified in paragraphs (1)(i) through (v) of this definition. The entire water is neighboring if a portion is located within 100 feet of the ordinary high water mark;

(B) All waters located within the 100-year floodplain of a water identified in paragraphs (1)(i) through (v) of this definition and not more than 1,500 feet from the ordinary high water mark of such water. The entire water is neighboring if a portion is located within 1,500 feet of the ordinary high water mark and within the 100-year floodplain;

(C) All waters located within 1,500 feet of the high tide line of a water identified in paragraphs (1)(i) or (1)(iii) of this definition, and all waters within 1,500 feet of the ordinary high water mark of the Great Lakes. The entire water is neighboring if a portion is located within 1,500 feet of the high tide line or within 1,500 feet of the ordinary high water mark of the Great Lakes.

(iii) *Tributary* and *tributaries.* The terms *tributary* and *tributaries* each mean a water that contributes flow, either directly or through another water (including an impoundment identified in paragraph (1)(iv) of this definition), to a water identified in paragraphs (1)(i) through (iii) of this definition that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark. These physical indicators demonstrate there is volume, frequency, and duration of flow sufficient to create a bed and banks and an ordinary high water mark, and thus to qualify as a tributary. A tributary can be a natural, man-altered, or man-made water and includes waters such as rivers, streams, canals, and ditches not excluded under paragraph (2) of this definition. A water that otherwise qualifies as a tributary under this definition does not lose its status as a tributary if, for any length, there are one or more constructed breaks (such as

bridges, culverts, pipes, or dams), or one or more natural breaks (such as wetlands along the run of a stream, debris piles, boulder fields, or a stream that flows underground) so long as a bed and banks and an ordinary high water mark can be identified upstream of the break. A water that otherwise qualifies as a tributary under this definition does not lose its status as a tributary if it contributes flow through a water of the United States that does not meet the definition of tributary or through a non-jurisdictional water to a water identified in paragraphs (1)(i) through (iii) of this definition.

(iv) *Wetlands.* The term *wetlands* means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

(v) *Significant nexus.* The term *significant nexus* means that a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity of a water identified in paragraphs (1)(i) through (iii) of this definition. The term ''in the region'' means the watershed that drains to the nearest water identified in paragraphs (1)(i) through (iii) of this definition. For an effect to be significant, it must be more than speculative or insubstantial. Waters are similarly situated when they function alike and are sufficiently close to function together in affecting downstream waters. For purposes of determining whether or not a water has a significant nexus, the water's effect on downstream (1)(i) through (iii) waters shall be assessed by evaluating the aquatic functions identified in paragraphs (3)(v)(A) through (I) of this definition. A water has a significant nexus when any single function or combination of functions performed by the water, alone or together with similarly situated waters in the region, contributes significantly to the chemical, physical, or biological integrity of the nearest water identified in paragraphs (1)(i) through (iii) of

this definition. Functions relevant to the significant nexus evaluation are the following:

(A) Sediment trapping,

(B) Nutrient recycling,

(C) Pollutant trapping, transformation, filtering, and transport,

(D) Retention and attenuation of flood waters,

(E) Runoff storage,

(F) Contribution of flow,

(G) Export of organic matter,

(H) Export of food resources, and

(I) Provision of life cycle dependent aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area) for species located in a water identified in paragraphs (1)(i) through (iii) of this definition.

(vi) *Ordinary high water mark.* The term *ordinary high water mark* means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

(vii) *High tide line.* The term *high tide line* means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

(4) *Applicability date.* This definition is applicable beginning on February 6, 2020.

*Offshore facility* as defined by section 101(17) of CERCLA and section

311(a)(11) of the CWA, means any facility of any kind located in, on, or under any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel.

*Oil* as defined by section 311(a)(1) of the CWA, means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil. Oil, as defined by section 1001 of the OPA means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include petroleum, including crude oil or any fraction thereof, which is specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601) and which is subject to the provisions of that Act.

*Oil Spill Liability Trust Fund* (OSLTF) means the fund established under section 9509 of the Internal Revenue Code of 1986 (26 U.S.C. 9509).

*On-scene coordinator* (OSC) means the federal official predesignated by EPA or the USCG to coordinate and direct responses under subpart D, or the government official designated by the lead agency to coordinate and direct removal actions under subpart E of the NCP.

*Onshore facility* as defined by section 101(18) of CERCLA, means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under any land or non-navigable waters within the United States; and, as defined by section 311(a)(10) of the CWA, means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under any land within the United States other than submerged land.

*On-site* means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action.

*Operable unit* means a discrete action that comprises an incremental step toward comprehensively addressing site problems. This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of a release, or pathway of exposure. The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site. Operable units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

*Operation and maintenance* (O&M) means measures required to maintain the effectiveness of response actions.

*Person* as defined by section 101(21) of CERCLA, means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States government, state, municipality, commission, political subdivision of a state, or any interstate body. As defined by section 1001 of the OPA, "person" means an individual, corporation, partnership, association, state, municipality, commission, or political subdivision of a state, or any interstate body.

*Pollutant or contaminant* as defined by section 101(33) of CERCLA, shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under section 101(14) (A) through (F) of CERCLA, nor does it include natural gas, liquified

**Environmental Protection Agency**

§ 300.5

natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas). For purposes of the NCP, the term pollutant or contaminant means any pollutant or contaminant that may present an imminent and substantial danger to public health or welfare of the United States.

*Post-removal site control* means those activities that are necessary to sustain the integrity of a Fund-financed removal action following its conclusion. Post-removal site control may be a removal or remedial action under CERCLA. The term includes, without being limited to, activities such as relighting gas flares, replacing filters, and collecting leachate.

*Preliminary assessment* (PA) under CERCLA means review of existing information and an off-site reconnaissance, if appropriate, to determine if a release may require additional investigation or action. A PA may include an on-site reconnaissance, if appropriate.

*Public participation,* see the definition for community relations.

*Public vessel* as defined by section 311(a)(4) of the CWA, means a vessel owned or bareboat-chartered and operated by the United States, or by a state or political subdivision thereof, or by a foreign nation, except when such vessel is engaged in commerce.

*Quality assurance project plan* (QAPP) is a written document, associated with all remedial site sampling activities, which presents in specific terms the organization (where applicable), objectives, functional activities, and specific quality assurance (QA) and quality control (QC) activities designed to achieve the data quality objectives of a specific project(s) or continuing operation(s). The QAPP is prepared for each specific project or continuing operation (or group of similar projects or continuing operations). The QAPP will be prepared by the responsible program office, regional office, laboratory, contractor, recipient of an assistance agreement, or other organization. For an enforcement action, potentially responsible parties may prepare a QAPP subject to lead agency approval.

*Release* as defined by section 101(22) of CERCLA, means any spilling, leaking, pumping, pouring, emitting, emptying,

discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes: Any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine; release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act, or, for the purposes of section 104 of CERCLA or any other response action, any release of source, byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. 7901 *et seq.*); and the normal application of fertilizer. For purposes of the NCP, release also means threat of release.

*Relevant and appropriate requirements* means those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under federal environmental or state environmental or facility siting laws that, while not "applicable" to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site. Only those state standards that are identified in a timely manner and are more stringent than federal requirements may be relevant and appropriate.

*Remedial design* (RD) means the technical analysis and procedures which follow the selection of remedy for a site and result in a detailed set of plans and specifications for implementation of the remedial action.

*Remedial investigation* (RI) is a process undertaken by the lead agency to determine the nature and extent of the problem presented by the release. The RI emphasizes data collection and site characterization, and is generally performed concurrently and in an interactive fashion with the feasibility study. The RI includes sampling and monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for remedial action and to support the evaluation of remedial alternatives.

*Remedial project manager* (RPM) means the official designated by the lead agency to coordinate, monitor, or direct remedial or other response actions under subpart E of the NCP.

*Remedy or remedial action* (RA) means those actions consistent with permanent remedy taken instead of, or in addition to, removal action in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternative water supplies, any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment and, where appropriate, post-removal site control activities. The term includes the costs of permanent relocation of residents and businesses and community facilities (including the cost of providing "alternative land of equivalent value" to an Indian tribe pursuant to CERCLA section 126(b)) where EPA determines that, alone or in combination with other measures, such relocation is more cost-effective than, and environmentally preferable

to, the transportation, storage, treatment, destruction, or secure disposition off-site of such hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes off-site transport and off-site storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials. For the purpose of the NCP, the term also includes enforcement activities related thereto.

*Remove or removal* as defined by section 311(a)(8) of the CWA, refers to containment and removal of oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare of the United States (including, but not limited to, fish, shellfish, wildlife, public and private property, and shorelines and beaches) or to the environment. For the purpose of the NCP, the term also includes monitoring of action to remove a discharge. As defined by section 101(23) of CERCLA, remove or removal means the cleanup or removal of released hazardous substances from the environment; such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment; such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances; the disposal of removed material; or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare of the United States or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of CERCLA, post-removal site control, where appropriate, and any emergency assistance which may be provided under the Disaster Relief Act of 1974. For the purpose of the NCP, the term also includes enforcement activities related thereto.

*Removal costs* as defined by section 1001 of the OPA means the costs of removal that are incurred after a discharge of oil has occurred, or in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident.

*Respond or response* as defined by section 101(25) of CERCLA, means remove, removal, remedy, or remedial action, including enforcement activities related thereto.

*Responsible party* as defined by section 1001 of the OPA, means the following:

(1) Vessels—In the case of a vessel, any person owning, operating, or demise chartering the vessel.

(2) Onshore Facilities—In the case of an onshore facility (other than a pipeline), any person owning or operating the facility, except a federal agency, state, municipality, commission, or political subdivision of a state, or any interstate body, that as the owner transfers possession and right to use the property to another person by lease, assignment, or permit.

(3) Offshore Facilities—In the case of an offshore facility (other than a pipeline or a deepwater port licensed under the Deepwater Port Act of 1974 (33 U.S.C. 1501 *et seq.*)), the lessee or permittee of the area in which the facility is located or the holder of a right of use and easement granted under applicable state law or the Outer Continental Shelf Lands Act (43 U.S.C. 1301–1356) for the area in which the facility is located (if the holder is a different person than the lessee or permittee), except a federal agency, state, municipality, commission, or political subdivision of a state, or any interstate body, that as owner transfers possession and right to use the property to another person by lease, assignment, or permit.

(4) Deepwater Ports—In the case of a deepwater port licensed under the Deepwater Port Act of 1974 (33 U.S.C. 1501–1524), the licensee.

(5) Pipelines—In the case of a pipeline, any person owning or operating the pipeline.

(6) Abandonment—In the case of an abandoned vessel, onshore facility, deepwater port, pipeline, or offshore facility, the person who would have been responsible parties immediately prior to the abandonment of the vessel or facility.

*SARA* is the Superfund Amendments and Reauthorization Act of 1986. In addition to certain free-standing provisions of law, it includes amendments to CERCLA, the Solid Waste Disposal Act, and the Internal Revenue Code. Among the free-standing provisions of law is Title III of SARA, also known as the "Emergency Planning and Community Right-to-Know Act of 1986" and Title IV of SARA, also known as the "Radon Gas and Indoor Air Quality Research Act of 1986." Title V of SARA amending the Internal Revenue Code is also known as the "Superfund Revenue Act of 1986."

*SEMS* is the abbreviation for the Superfund Enterprise Management System. SEMS is EPA's comprehensive data management system that inventories and tracks information about releases addressed or needing to be addressed by the CERCLA Superfund program. SEMS consolidates legacy systems including CERCLIS into a single integrated platform. SEMS contains information for potential and confirmed hazardous waste sites addressed under the Superfund remedial and removal programs. SEMS includes sites in the active site inventory and archived sites. The active site inventory includes sites on the NPL, and sites not on the NPL where site assessment, removal, remedial, enforcement, cost recovery, or oversight activities are being planned or conducted. Archived sites include non-NPL sites that were formerly in the active site inventory which have no further site assessment, removal, remedial, enforcement, cost recovery or oversight needed under the Federal Superfund program based on available information. New information may warrant return of an archive site to the active inventory. Inclusion of a specific site or area in SEMS does not represent a determination of any party's liability, nor does it represent a finding that any response action is necessary."

*Sinking agents* means those additives applied to oil discharges to sink floating pollutants below the water surface.

*Site inspection* (SI) means an on-site investigation to determine whether

§ 300.5                                    40 CFR Ch. I (7–1–19 Edition)

there is a release or potential release and the nature of the associated threats. The purpose is to augment the data collected in the preliminary assessment and to generate, if necessary, sampling and other field data to determine if further action or investigation is appropriate.

*Size classes* of discharges refers to the following size classes of oil discharges which are provided as guidance to the OSC and serve as the criteria for the actions delineated in subpart D. They are not meant to imply associated degrees of hazard to public health or welfare of the United States, nor are they a measure of environmental injury. Any oil discharge that poses a substantial threat to public health or welfare of the United States or the environment or results in significant public concern shall be classified as a major discharge regardless of the following quantitative measures:

(1) *Minor discharge* means a discharge to the inland waters of less than 1,000 gallons of oil or a discharge to the coastal waters of less than 10,000 gallons of oil.

(2) *Medium discharge* means a discharge of 1,000 to 10,000 gallons of oil to the inland waters or a discharge of 10,000 to 100,000 gallons of oil to the coastal waters.

(3) *Major discharge* means a discharge of more than 10,000 gallons of oil to the inland waters or more than 100,000 gallons of oil to the coastal waters.

*Size classes* of releases refers to the following size classifications which are provided as guidance to the OSC for meeting pollution reporting requirements in subpart B. The final determination of the appropriate classification of a release will be made by the OSC based on consideration of the particular release (e.g., size, location, impact, etc.):

(1) *Minor release* means a release of a quantity of hazardous substance(s), pollutant(s), or contaminant(s) that poses minimal threat to public health or welfare of the United States or the environment.

(2) *Medium release* means a release not meeting the criteria for classification as a minor or major release.

(3) *Major release* means a release of any quantity of hazardous substance(s), pollutant(s), or contaminant(s) that poses a substantial threat to public health or welfare of the United States or the environment or results in significant public concern.

*Sorbents* means essentially inert and insoluble materials that are used to remove oil and hazardous substances from water through adsorption, in which the oil or hazardous substance is attracted to the sorbent surface and then adheres to it; absorption, in which the oil or hazardous substance penetrates the pores of the sorbent material; or a combination of the two. Sorbents are generally manufactured in particulate form for spreading over an oil slick or as sheets, rolls, pillows, or booms. The sorbent material may consist of, but is not limited to, the following materials:

(1) Organic products—
(i) Peat moss or straw;
(ii) Cellulose fibers or cork;
(iii) Corn cobs;
(iv) Chicken, duck, or other bird feathers.
(2) Mineral compounds—
(i) Volcanic ash or perlite;
(ii) Vermiculite or zeolite.
(3) Synthetic products—
(i) Polypropylene;
(ii) Polyethylene;
(iii) Polyurethane;
(iv) Polyester.

*Source control* action is the construction or installation and start-up of those actions necessary to prevent the continued release of hazardous substances or pollutants or contaminants (primarily from a source on top of or within the ground, or in buildings or other structures) into the environment.

*Source control maintenance measures* are those measures intended to maintain the effectiveness of source control actions once such actions are operating and functioning properly, such as the maintenance of landfill caps and leachate collection systems.

*Specified ports and harbors* means those ports and harbor areas on inland rivers, and land areas immediately adjacent to those waters, where the USCG acts as predesignated on-scene

20

coordinator. Precise locations are determined by EPA/USCG regional agreements and identified in federal Regional Contingency Plans and Area Contingency Plans.

*Spill of national significance* (SONS) means a spill that due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge.

*State* means the several states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction. For purposes of the NCP, the term includes Indian tribes as defined in the NCP except where specifically noted. Section 126 of CERCLA provides that the governing body of an Indian tribe shall be afforded substantially the same treatment as a state with respect to certain provisions of CERCLA. Section 300.515(b) of the NCP describes the requirements pertaining to Indian tribes that wish to be treated as states under CERCLA.

*Superfund Memorandum of Agreement* (SMOA) means a nonbinding, written document executed by an EPA Regional Administrator and the head of a state agency that may establish the nature and extent of EPA and state interaction during the removal, pre-remedial, remedial, and/or enforcement response process. The SMOA is not a site-specific document although attachments may address specific sites. The SMOA generally defines the role and responsibilities of both the lead and the support agencies.

*Superfund state contract* is a joint, legally binding agreement between EPA and a state to obtain the necessary assurances before a federal-lead remedial action can begin at a site. In the case of a political subdivision-lead remedial response, a three-party Superfund state contract among EPA, the state, and political subdivision thereof, is required before a political subdivision takes the lead for any phase of remedial response to ensure state involvement pursuant to section 121(f)(1) of CERCLA. The Superfund state contract may be amended to provide the state's CERCLA section 104 assurances before a political subdivision can take the lead for remedial action.

*Support agency* means the agency or agencies that provide the support agency coordinator to furnish necessary data to the lead agency, review response data and documents, and provide other assistance as requested by the OSC or RPM. EPA, the USCG, another federal agency, or a state may be support agencies for a response action if operating pursuant to a contract executed under section 104(d)(1) of CERCLA or designated pursuant to a Superfund Memorandum of Agreement entered into pursuant to subpart F of the NCP or other agreement. The support agency may also concur on decision documents.

*Support agency coordinator* (SAC) means the official designated by the support agency, as appropriate, to interact and coordinate with the lead agency in response actions under subpart E of this part.

*Surface collecting agents* means those chemical agents that form a surface film to control the layer thickness of oil.

*Surface washing agent* is any product that removes oil from solid surfaces, such as beaches and rocks, through a detergency mechanism and does not involve dispersing or solubilizing the oil into the water column.

*Tank vessel* as defined by section 1001 of the OPA means a vessel that is constructed or adapted to carry, or that carries oil or hazardous material in bulk as cargo or cargo residue, and that:

(1) is a vessel of the United States;

(2) operates on the navigable waters; or

(3) transfers oil or hazardous material in a place subject to the jurisdiction of the United States.

*Threat of discharge or release*, see definitions for discharge and release.

*Threat of release*, see definition for release.

*Treatment technology* means any unit operation or series of unit operations

that alters the composition of a hazardous substance or pollutant or contaminant through chemical, biological, or physical means so as to reduce toxicity, mobility, or volume of the contaminated materials being treated. Treatment technologies are an alternative to land disposal of hazardous wastes without treatment.

*Trustee* means an official of a federal natural resources management agency designated in subpart G of the NCP or a designated state official or Indian tribe or, in the case of discharges covered by the OPA, a foreign government official, who may pursue claims for damages under section 107(f) of CERCLA or section 1006 of the OPA.

*United States* when used in relation to section 311(a)(5) of the CWA, means the states, the District of Columbia, the Commonwealth of Puerto Rico, the Northern Mariana Islands, Guam, American Samoa, the United States Virgin Islands, and the Pacific Island Governments. United States, when used in relation to section 101(27) of CERCLA and section 1001(36) of the OPA, includes the several states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

*Vessel* as defined by section 101(28) of CERCLA, means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water; and, as defined by section 311(a)(3) of the CWA, means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water other than a public vessel.

*Volunteer* means any individual accepted to perform services by the lead agency which has authority to accept volunteer services (examples: See 16 U.S.C. 742f(c)). A volunteer is subject to the provisions of the authorizing statute and the NCP.

*Worst case discharge* as defined by section 311(a)(24) of the CWA, means, in the case of a vessel, a discharge in adverse weather conditions of its entire cargo, and, in the case of an offshore facility or onshore facility, the largest foreseeable discharge in adverse weather conditions.

[59 FR 47416, Sept. 15, 1994, as amended at 60 FR 16054, Mar. 29, 1995; 79 FR 65592, Nov. 5, 2014; 80 FR 37119, June 29, 2015; 83 FR 5209, Feb. 6, 2018]

## § 300.6  Use of number and gender.

As used in this regulation, words in the singular also include the plural and words in the masculine gender also include the feminine and vice versa, as the case may require.

## § 300.7  Computation of time.

In computing any period of time prescribed or allowed in these rules of practice, except as otherwise provided, the day of the event from which the designated period begins to run shall not be included. Saturdays, Sundays, and federal legal holidays shall be included. When a stated time expires on a Saturday, Sunday, or legal holiday, the stated time period shall be extended to include the next business day.

## Subpart B—Responsibility and Organization for Response

SOURCE: 59 FR 47424, Sept. 15, 1994, unless otherwise noted.

## § 300.100  Duties of President delegated to federal agencies.

In Executive Orders 12580 and 12777, the President delegated certain functions and responsibilities vested in him by the CWA, CERCLA, and the OPA.

## § 300.105  General organization concepts.

(a) Federal agencies should:

(1) Plan for emergencies and develop procedures for addressing oil discharges and releases of hazardous substances, pollutants, or contaminants;

(2) Coordinate their planning, preparedness, and response activities with one another;

(3) Coordinate their planning, preparedness, and response activities with affected states, local governments, and private entities; and

**Environmental Protection Agency**                                          **§ 300.105**

(4) Make available those facilities or resources that may be useful in a response situation, consistent with agency authorities and capabilities.

(b) Three fundamental kinds of activities are performed pursuant to the NCP:

(1) Preparedness planning and coordination for response to a discharge of oil or release of a hazardous substance, pollutant, or contaminant;

(2) Notification and communications; and

(3) Response operations at the scene of a discharge or release.

(c) The organizational elements created to perform these activities are:

(1) The NRT, responsible for national response and preparedness planning, for coordinating regional planning, and for providing policy guidance and support to the Regional Response Teams (RRTs). NRT membership consists of representatives from the agencies specified in § 300.175(b).

(2) RRTs, responsible for regional planning and preparedness activities before response actions, and for providing advice and support to the OSC or RPM when activated during a response. RRT membership consists of

designated representatives from each federal agency participating in the NRT together with state and (as agreed upon by the states) local government representatives.

(3) The OSC and the RPM, primarily responsible for directing response efforts and coordinating all other efforts at the scene of a discharge or release. The other responsibilities of OSCs and RPMs are described in § 300.135.

(4) Area Committees, responsible for developing, under direction of the OSC, ACPs for each area designated by the President. Responsibilities of Area Committees are described in § 300.205(c).

(d) The basic framework for the response management structure is a system (e.g., a unified command system) that brings together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response, where the OSC maintains authority.

(e)(1) The organizational concepts of the national response system are depicted in the following Figures 1a and 1b:

National Response System Concepts: Response

*Figure 1a*



Environmental Protection Agency                                   § 300.105



Figure 1b

National Response System Concepts: Planning

(2) The standard federal regional boundaries (which are also the geographic areas of responsibility for the RRTs) are shown in the following Figure 2:



Figure 2 -- Standard Regional Boundaries for Ten Regions

**Environmental Protection Agency** §300.110

(3) The USCG District boundaries are shown in the following Figure 3:



Figure 3

[59 FR 47424, Sept. 15, 1994, as amended at 72 FR 31753, June 8, 2007]

**§300.110  National Response Team.**

National planning and coordination is accomplished through the NRT.

(a) The NRT consists of representatives from the agencies named in § 300.175(b). Each agency shall designate a member to the team and sufficient alternates to ensure representation, as agency resources permit. The NRT will consider requests for membership on the NRT from other agencies. Other agencies may request membership by forwarding such requests to the chair of the NRT.

(b) The chair of the NRT shall be the representative of EPA and the vice chair shall be the representative of the USCG, with the exception of periods of activation because of response action. During activation, the chair shall be the member agency providing the OSC/RPM. The vice chair shall maintain records of NRT activities along with national, regional, and area plans for response actions.

(c) While the NRT desires to achieve a consensus on all matters brought before it, certain matters may prove unresolvable by this means. In such cases, each agency serving as a participating agency on the NRT may be accorded one vote in NRT proceedings.

(d) The NRT may establish such bylaws and committees as it deems appropriate to further the purposes for which it is established.

(e) The NRT shall evaluate methods of responding to discharges or releases; shall recommend any changes needed in the response organization; and shall recommend to the Administrator of EPA changes to the NCP designed to improve the effectiveness of the national response system, including drafting of regulatory language.

(f) The NRT shall provide policy and program direction to the RRTs.

(g) The NRT may consider and make recommendations to appropriate agencies on the training, equipping, and protection of response teams and necessary research, development, demonstration, and evaluation to improve response capabilities.

(h) Direct planning and preparedness responsibilities of the NRT include:

(1) Maintaining national preparedness to respond to a major discharge of oil or release of a hazardous substance, pollutant, or contaminant that is beyond regional capabilities;

(2) Publishing guidance documents for preparation and implementation of SARA Title III local emergency response plans;

(3) Monitoring incoming reports from all RRTs and activating for a response action, when necessary;

(4) Coordinating a national program to assist member agencies in preparedness planning and response, and enhancing coordination of member agency preparedness programs;

(5) Developing procedures, in coordination with the NSFCC, as appropriate, to ensure the coordination of federal, state, and local governments, and private response to oil discharges and releases of hazardous substances, pollutants, or contaminants;

(6) Monitoring response-related research and development, testing, and evaluation activities of NRT agencies to enhance coordination, avoid duplication of effort, and facilitate research in support of response activities;

(7) Developing recommendations for response training and for enhancing the coordination of available resources among agencies with training responsibilities under the NCP;

(8) Reviewing regional responses to oil discharges and hazardous substance, pollutant, or contaminant releases, including an evaluation of equipment readiness and coordination among responsible public agencies and private organizations; and

(9) Assisting in developing a national exercise program, in coordination with the NSFCC, to ensure preparedness and coordination nationwide.

(i) The NRT will consider matters referred to it for advice or resolution by an RRT.

(j) The NRT should be activated as an emergency response team:

(1) When an oil discharge or hazardous substance release:

(i) Exceeds the response capability of the region in which it occurs;

(ii) Transects regional boundaries; or

(iii) Involves a substantial threat to the public health or welfare of the United States or the environment, substantial amounts of property, or substantial threats to natural resources;

(2) If requested by any NRT member.

**Environmental Protection Agency** §300.115

(k) When activated for a response action, the NRT shall meet at the call of the chair and may:

(1) Monitor and evaluate reports from the OSC/RPM and recommend to the OSC/RPM, through the RRT, actions to combat the discharge or release;

(2) Request other federal, state, and local governments, or private agencies, to provide resources under their existing authorities to combat a discharge or release, or to monitor response operations; and

(3) Coordinate the supply of equipment, personnel, or technical advice to the affected region from other regions or districts.

**§300.115  Regional Response Teams.**

(a) Regional planning and coordination of preparedness and response actions is accomplished through the RRT. In the case of a discharge of oil, preparedness activities will be carried out in conjunction with Area Committees, as appropriate. The RRT agency membership parallels that of the NRT, as described in §300.110, but also includes state and local representation. The RRT provides:

(1) The appropriate regional mechanism for development and coordination of preparedness activities before a response action is taken and for coordination of assistance and advice to the OSC/RPM during such response actions; and

(2) Guidance to Area Committees, as appropriate, to ensure inter-area consistency and consistency of individual ACPs with the RCP and NCP.

(b) The two principal components of the RRT mechanism are a standing team, which consists of designated representatives from each participating federal agency, state governments, and local governments (as agreed upon by the states); and incident-specific teams formed from the standing team when the RRT is activated for a response. On incident-specific teams, participation by the RRT member agencies will relate to the technical nature of the incident and its geographic location.

(1) The standing team's jurisdiction corresponds to the standard federal regions, except for Alaska, Oceania in the Pacific, and the Caribbean area, each of which has a separate standing RRT. The role of the standing RRT includes communications systems and procedures, planning, coordination, training, evaluation, preparedness, and related matters on a regionwide basis. It also includes coordination of Area Committees for these functions in areas within their respective regions, as appropriate.

(2) The role of the incident-specific team is determined by the operational requirements of the response to a specific discharge or release. Appropriate levels of activation and/or notification of the incident-specific RRT, including participation by state and local governments, shall be determined by the designated RRT chair for the incident, based on the RCP. The incident-specific RRT supports the designated OSC/RPM. The designated OSC/RPM directs response efforts and coordinates all other efforts at the scene of a discharge or release.

(c) The representatives of EPA and the USCG shall act as co-chairs of RRTs except when the RRT is activated. When the RRT is activated for response actions, the chair shall be the member agency providing the OSC/RPM.

(d) Each participating agency should designate one member and at least one alternate member to the RRT. Agencies whose regional subdivisions do not correspond to the standard federal regions may designate additional representatives to the standing RRT to ensure appropriate coverage of the standard federal region. Participating states may also designate one member and at least one alternate member to the RRT. Indian tribal governments may arrange for representation with the RRT appropriate to their geographical location. All agencies and states may also provide additional representatives as observers to meetings of the RRT.

(e) RRT members should designate representatives and alternates from their agencies as resource personnel for RRT activities, including RRT work planning, and membership on incident-specific teams in support of the OSCs/RPMs.

(f) Federal RRT members or their representatives should provide OSCs/

29

RPMs with assistance from their respective federal agencies commensurate with agency responsibilities, resources, and capabilities within the region. During a response action, the members of the RRT should seek to make available the resources of their agencies to the OSC/RPM as specified in the RCP and ACP.

(g) RRT members should nominate appropriately qualified representatives from their agencies to work with OSCs in developing and maintaining ACPs.

(h) Affected states are encouraged to participate actively in all RRT activities. Each state governor is requested to assign an office or agency to represent the state on the appropriate RRT; to designate representatives to work with the RRT in developing RCPs; to plan for, make available, and coordinate state resources; and to serve as the contact point for coordination of response with local government agencies, whether or not represented on the RRT. The state's RRT representative should keep the State Emergency Response Commission (SERC), described in § 300.205(d), apprised of RRT activities and coordinate RRT activities with the SERC. Local governments are invited to participate in activities on the appropriate RRT as provided by state law or as arranged by the state's representative. Indian tribes are also invited to participate in such activities.

(i) The standing RRT shall recommend changes in the regional response organization as needed, revise the RCP as needed, evaluate the preparedness of the participating agencies and the effectiveness of ACPs for the federal response to discharges and releases, and provide technical assistance for preparedness to the response community. The RRT should:

(1) Review and comment, to the extent practicable, on local emergency response plans or other issues related to the preparation, implementation, or exercise of such plans upon request of a local emergency planning committee;

(2) Evaluate regional and local responses to discharges or releases on a continuing basis, considering available legal remedies, equipment readiness, and coordination among responsible public agencies and private organizations, and recommend improvements;

(3) Recommend revisions of the NCP to the NRT, based on observations of response operations;

(4) Review OSC actions to ensure that RCPs and ACPs are effective;

(5) Encourage the state and local response community to improve its preparedness for response;

(6) In coordination with Area Committees and in accordance with any applicable laws, regulations, or requirements, conduct advance planning for use of dispersants, surface washing agents, surface collecting agents, burning agents, bioremediation agents, or other chemical agents in accordance with subpart J of this part;

(7) Be prepared to provide response resources to major discharges or releases outside the region;

(8) Conduct or participate in training and exercises as necessary to encourage preparedness activities of the response community within the region;

(9) Meet at least semiannually to review response actions carried out during the preceding period, consider changes in RCPs, and recommend changes in ACPs;

(10) Provide letter reports on RRT activities to the NRT twice a year, no later than January 31 and July 31. At a minimum, reports should summarize recent activities, organizational changes, operational concerns, and efforts to improve state and local coordination; and

(11) Ensure maximum participation in the national exercise program for announced and unannounced exercises.

(j)(1) The RRT may be activated by the chair as an incident-specific response team when a discharge or release:

(i) Exceeds the response capability available to the OSC/RPM in the place where it occurs;

(ii) Transects state boundaries;

(iii) May pose a substantial threat to the public health or welfare of the United States or the environment, or to regionally significant amounts of property; or

(iv) Is a worst case discharge, as described in § 300.324. RCPs shall specify detailed criteria for activation of RRTs.

**Environmental Protection Agency**                                   **§ 300.120**

(2) The RRT will be activated during any discharge or release upon a request from the OSC/RPM, or from any RRT representative, to the chair of the RRT. Requests for RRT activation shall later be confirmed in writing. Each representative, or an appropriate alternate, should be notified immediately when the RRT is activated.

(3) During prolonged removal or remedial action, the RRT may not need to be activated or may need to be activated only in a limited sense, or may need to have available only those member agencies of the RRT who are directly affected or who can provide direct response assistance.

(4) When the RRT is activated for a discharge or release, agency representatives shall meet at the call of the chair and may:

(i) Monitor and evaluate reports from the OSC/RPM, advise the OSC/RPM on the duration and extent of response, and recommend to the OSC/RPM specific actions to respond to the discharge or release;

(ii) Request other federal, state, or local governments, or private agencies, to provide resources under their existing authorities to respond to a discharge or release or to monitor response operations;

(iii) Help the OSC/RPM prepare information releases for the public and for communication with the NRT;

(iv) If the circumstances warrant, make recommendations to the regional or district head of the agency providing the OSC/RPM that a different OSC/RPM should be designated; and

(v) Submit pollution reports to the NRC as significant developments occur.

(5) At the regional level, a Regional Response Center (RRC) may provide facilities and personnel for communications, information storage, and other requirements for coordinating response. The location of each RRC should be provided in the RCP.

(6) When the RRT is activated, affected states may participate in all RRT deliberations. State government representatives participating in the RRT have the same status as any federal member of the RRT.

(7) The RRT can be deactivated when the incident-specific RRT chair determines that the OSC/RPM no longer requires RRT assistance.

(8) Notification of the RRT may be appropriate when full activation is not necessary, with systematic communication of pollution reports or other means to keep RRT members informed as to actions of potential concern to a particular agency, or to assist in later RRT evaluation of regionwide response effectiveness.

(k) Whenever there is insufficient national policy guidance on a matter before the RRT, a technical matter requiring solution, a question concerning interpretation of the NCP, or a disagreement on discretionary actions among RRT members that cannot be resolved at the regional level, it may be referred to the NRT, described in § 300.110, for advice.

**§ 300.120  On-scene coordinators and remedial project managers: general responsibilities.**

(a) The OSC/RPM directs response efforts and coordinates all other efforts at the scene of a discharge or release. As part of the planning and preparedness for response, OSCs shall be predesignated by the regional or district head of the lead agency. EPA and the USCG shall predesignate OSCs for all areas in each region, except as provided in paragraphs (c) and (d) of this section. RPMs shall be assigned by the lead agency to manage remedial or other response actions at NPL sites, except as provided in paragraphs (c) and (d) of this section.

(1) The USCG shall provide OSCs for oil discharges, including discharges from facilities and vessels under the jurisdiction of another federal agency, within or threatening the coastal zone. The USCG shall also provide OSCs for the removal of releases of hazardous substances, pollutants, or contaminants into or threatening the coastal zone, except as provided in paragraph (b) of this section. The USCG shall not provide predesignated OSCs for discharges or releases from hazardous waste management facilities or in similarly chronic incidents. The USCG shall provide an initial response to discharges or releases from hazardous waste management facilities within

31

the coastal zone in accordance with Department of Transportation (DOT)/EPA Instrument of Redelegation (May 27, 1988) except as provided by paragraph (b) of this section. The USCG OSC shall contact the cognizant RPM as soon as it is evident that a removal may require a follow-up remedial action, to ensure that the required planning can be initiated and an orderly transition to an EPA or state lead can occur.

(2) EPA shall provide OSCs for discharges or releases into or threatening the inland zone and shall provide RPMs for federally funded remedial actions, except in the case of state-lead federally funded response and as provided in paragraph (b) of this section. EPA will also assume all remedial actions at NPL sites in the coastal zone, even where removals are initiated by the USCG, except as provided in paragraph (b) of this section.

(b) In general, USCG Captains of the Port (COTP) shall serve as the designated OSCs for areas in the coastal zone for which an ACP is required under CWA section 311(j) and EPA Regional Administrators shall designate OSCs for areas in the inland zone for which an ACP is required under CWA section 311(j).

(c) For releases of hazardous substances, pollutants, or contaminants, when the release is on, or the sole source of the release is from, any facility or vessel, including vessels bareboat-chartered and operated, under the jurisdiction, custody, or control of DOD, DOE, or other federal agency:

(1) In the case of DOD or DOE, DOD or DOE shall provide OSCs/RPMs responsible for taking all response actions; and

(2) In the case of a federal agency other than EPA, DOD, or DOE, such agency shall provide OSCs for all removal actions that are not emergencies and shall provide RPMs for all remedial actions.

(d) DOD will be the removal response authority with respect to incidents involving DOD military weapons and munitions or weapons and munitions under the jurisdiction, custody, or control of DOD.

(e) The OSC is responsible for overseeing development of the ACP in the area of the OSC's responsibility. ACPs

shall, as appropriate, be accomplished in cooperation with the RRT, and designated state and local representatives. In contingency planning and removal, the OSC coordinates, directs, and reviews the work of other agencies, Area Committees, responsible parties, and contractors to assure compliance with the NCP, decision document, consent decree, administrative order, and lead agency-approved plans applicable to the response.

(f) The RPM is the prime contact for remedial or other response actions being taken (or needed) at sites on the proposed or promulgated NPL, and for sites not on the NPL but under the jurisdiction, custody, or control of a federal agency. The RPM's responsibilities include:

(1) Fund-financed response: The RPM coordinates, directs, and reviews the work of EPA, states and local governments, the U.S. Army Corps of Engineers, and all other agencies and contractors to assure compliance with the NCP. Based upon the reports of these parties, the RPM recommends action for decisions by lead agency officials. The RPM's period of responsibility begins prior to initiation of the remedial investigation/feasibility study (RI/FS), described in § 300.430, and continues through design, remedial action, deletion of the site from the NPL, and the CERCLA cost recovery activity. When a removal and remedial action occur at the same site, the OSC and RPM should coordinate to ensure an orderly transition of responsibility.

(2) Federal-lead non-Fund-financed response: The RPM coordinates, directs, and reviews the work of other agencies, responsible parties, and contractors to assure compliance with the NCP, Record of Decision (ROD), consent decree, administrative order, and lead agency-approved plans applicable to the response. Based upon the reports of these parties, the RPM shall recommend action for decisions by lead agency officials. The RPM's period of responsibility begins prior to initiation of the RI/FS, described in § 300.430, and continues through design and remedial action and the CERCLA cost recovery activity. The OSC and RPM shall ensure orderly transition of responsibilities from one to the other.

**Environmental Protection Agency**                              **§ 300.130**

(3) The RPM shall participate in all decision-making processes necessary to ensure compliance with the NCP, including, as appropriate, agreements between EPA or other federal agencies and the state. The RPM may also review responses where EPA has preauthorized a person to file a claim for reimbursement to determine that the response was consistent with the terms of such preauthorization in cases where claims are filed for reimbursement.

(g)(1) Where a support agency has been identified through a cooperative agreement, Superfund Memorandum of Agreement (SMOA), or other agreement, that agency may designate a support agency coordinator (SAC) to provide assistance, as requested, by the OSC/RPM. The SAC is the prime representative of the support agency for response actions.

(2) The SAC's responsibilities may include:

(i) Providing and reviewing data and documents as requested by the OSC/RPM during the planning, design, and cleanup activities of the response action; and

(ii) Providing other assistance as requested.

(h)(1) The lead agency should provide appropriate training for its OSCs, RPMs, and other response personnel to carry out their responsibilities under the NCP.

(2) OSCs/RPMs should ensure that persons designated to act as their on-scene representatives are adequately trained and prepared to carry out actions under the NCP, to the extent practicable.

**§ 300.125  Notification and communications.**

(a) The National Response Center (NRC), located at USCG Headquarters, is the national communications center, continuously manned for handling activities related to response actions. The NRC acts as the single point of contact for all pollution incident reporting, and as the NRT communications center. Notice of discharges and releases must be made telephonically through a toll free number or a special local number (Telecommunication Device for the Deaf (TDD) and collect

calls accepted). (Notification details appear in §§ 300.300 and 300.405.) The NRC receives and immediately relays telephone notices of discharges or releases to the appropriate predesignated federal OSC. The telephone report is distributed to any interested NRT member agency or federal entity that has established a written agreement or understanding with the NRC. The NRC evaluates incoming information and immediately advises FEMA of a potential major disaster situation.

(b) The Commandant, USCG, in conjunction with other NRT agencies, shall provide the necessary personnel, communications, plotting facilities, and equipment for the NRC.

(c) Notice of an oil discharge or release of a hazardous substance in an amount equal to or greater than the reportable quantity must be made immediately in accordance with 33 CFR part 153, subpart B, and 40 CFR part 302, respectively. Notification shall be made to the NRC Duty Officer, HQ USCG, Washington, DC, telephone (800) 424–8802 or (202) 267–2675. All notices of discharges or releases received at the NRC will be relayed immediately by telephone to the OSC.

**§ 300.130  Determinations to initiate response and special conditions.**

(a) In accordance with CWA and CERCLA, the Administrator of EPA or the Secretary of the department in which the USCG is operating, as appropriate, is authorized to act for the United States to take response measures deemed necessary to protect the public health or welfare or environment from discharges of oil or releases of hazardous substances, pollutants, or contaminants except with respect to such releases on or from vessels or facilities under the jurisdiction, custody, or control of other federal agencies.

(b) The Administrator of EPA or the Secretary of the department in which the USCG is operating, as appropriate, is authorized to initiate and, in the case of a discharge posing a substantial threat to public health or welfare of the United States is required to initiate and direct, appropriate response activities when the Administrator or Secretary determines that any oil or CWA hazardous substance is discharged

or there is a substantial threat of such discharge from any vessel or offshore or onshore facility into or on the navigable waters of the United States, on the adjoining shorelines to the navigable waters, into or on the waters of the exclusive economic zone, or that may affect natural resources belonging to, appertaining to, or under exclusive management authority of the United States; or

(c) The Administrator of EPA or the Secretary of the department in which the USCG is operating, as appropriate, is authorized to initiate appropriate response activities when the Administrator or Secretary determines that any hazardous substance is released or there is a threat of such a release into the environment, or there is a release or threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare of the United States.

(d) In addition to any actions taken by a state or local government, the Administrator of EPA or the Secretary of the department in which the USCG is operating may request the U.S. Attorney General to secure the relief from any person, including the owner or operator of the vessel or facility necessary to abate a threat or, after notice to the affected state, take any other action authorized by section 311 of the CWA or section 106 of CERCLA as appropriate, including issuing administrative orders, that may be necessary to protect the public health or welfare, if the Administrator or Secretary determines:

(1) That there may be an imminent and substantial threat to the public health or welfare of the United States or the environment of the United States, including fish, shellfish, and wildlife, public and private property, shorelines, beaches, habitats, and other living and nonliving natural resources under the jurisdiction or control of the United States, because of an actual or threatened discharge of oil or a CWA hazardous substance from any vessel or offshore or onshore facility into or upon the navigable waters of the United States; or

(2) That there may be an imminent and substantial endangerment to the public health or welfare of the United States or the environment because of a release of a CERCLA hazardous substance from a facility.

(e) Response actions to remove discharges originating from operations conducted subject to the Outer Continental Shelf Lands Act shall be in accordance with the NCP.

(f) Where appropriate, when a discharge or release involves radioactive materials, the lead or support federal agency shall act consistent with the notification and assistance procedures described in the appropriate Federal Radiological Plan. For the purpose of the NCP, the FRERP (24 CFR part 2401) is the appropriate plan. Most radiological discharges and releases do not result in FRERP activation and should be handled in accordance with the NCP. However, releases from nuclear incidents subject to requirements for financial protection established by the Nuclear Regulatory Commission under the Price-Anderson amendments (section 170) of the Atomic Energy Act are specifically excluded from CERCLA and NCP requirements.

(g) Removal actions involving nuclear weapons should be conducted in accordance with the joint Department of Defense, Department of Energy, and FEMA Agreement for Response to Nuclear Incidents and Nuclear Weapons Significant Incidents (January 8, 1981).

(h) If the situation is beyond the capability of state and local governments and the statutory authority of federal agencies, the President may, under the Disaster Relief Act of 1974, act upon a request by the governor and declare a major disaster or emergency and appoint a Federal Coordinating Officer (FCO) to coordinate all federal disaster assistance activities. In such cases, the OSC/RPM would continue to carry out OSC/RPM responsibilities under the NCP, but would coordinate those activities with the FCO to ensure consistency with other federal disaster assistance activities.

(i) In the event of a declaration of a major disaster by the President, the FEMA may activate the Federal Response Plan (FRP). A FCO, designated by the President, may implement the FRP and coordinate and direct emergency assistance and disaster relief of

**Environmental Protection Agency**                                                          **§ 300.135**

impacted individuals, business, and public services under the Robert T. Stafford Disaster Relief Act. Delivery of federal assistance is facilitated through twelve functional annexes to the FRP known as Emergency Support Functions (ESFs). EPA coordinates activities under ESF #10—Hazardous Materials, which addresses preparedness and response to hazardous materials and oil incidents caused by a natural disaster or other catastrophic event. In such cases, the OSC/RPM should coordinate response activities with the FCO, through the incident-specific ESF #10 Chair, to ensure consistency with federal disaster assistance activities.

**§ 300.135  Response operations.**

(a) The OSC/RPM, consistent with §§ 300.120 and 300.125, shall direct response efforts and coordinate all other efforts at the scene of a discharge or release. As part of the planning and preparation for response, the OSCs/RPMs shall be predesignated by the regional or district head of the lead agency.

(b) The first federal official affiliated with an NRT member agency to arrive at the scene of a discharge or release should coordinate activities under the NCP and is authorized to initiate, in consultation with the OSC, any necessary actions normally carried out by the OSC until the arrival of the predesignated OSC. This official may initiate federal fund-financed actions only as authorized by the OSC or, if the OSC is unavailable, the authorized representative of the lead agency.

(c) The OSC/RPM shall, to the extent practicable, collect pertinent facts about the discharge or release, such as its source and cause; the identification of potentially responsible parties; the nature, amount, and location of discharged or released materials; the probable direction and time of travel of discharged or released materials; whether the discharge is a worst case discharge as discussed in § 300.324; the pathways to human and environmental exposure; the potential impact on human health, welfare, and safety and the environment; whether the discharge or release poses a substantial threat to the public health or welfare of the United States as discussed in

§ 300.322; the potential impact on natural resources and property which may be affected; priorities for protecting human health and welfare and the environment; and appropriate cost documentation.

(d) The OSC's/RPM's efforts shall be coordinated with other appropriate federal, state, local, and private response agencies. OSCs/RPMs may designate capable persons from federal, state, or local agencies to act as their on-scene representatives. State and local governments, however, are not authorized to take actions under subparts D and E of the NCP that involve expenditures of the Oil Spill Liability Trust Fund or CERCLA funds unless an appropriate contract or cooperative agreement has been established. The basic framework for the response management structure is a system (e.g., a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, where the OSC maintains authority.

(e) The OSC/RPM should consult regularly with the RRT and NSFCC, as appropriate, in carrying out the NCP and keep the RRT and NSFCC, as appropriate, informed of activities under the NCP.

(f) The OSC/RPM shall advise the support agency as promptly as possible of reported releases.

(g) The OSC/RPM should evaluate incoming information and immediately advise FEMA of potential major disaster situations.

(h) In those instances where a possible public health emergency exists, the OSC/RPM should notify the Department of Health and Human Services (HHS) representative to the RRT. Throughout response actions, the OSC/RPM may call upon the HHS representative for assistance in determining public health threats and call upon the Occupational Safety and Health Administration (OSHA) and HHS for assistance on worker health and safety issues.

(i) All federal agencies should plan for emergencies and develop procedures for dealing with oil discharges and releases of hazardous substances, pollutants, or contaminants from vessels and

35

facilities under their jurisdiction. All federal agencies, therefore, are responsible for designating the office that coordinates response to such incidents in accordance with the NCP and applicable federal regulations and guidelines.

(j)(1) The OSC/RPM shall ensure that the trustees for natural resources are promptly notified of discharges or releases.

(2) The OSC or RPM shall coordinate all response activities with the affected natural resource trustees and, for discharges of oil, the OSC shall consult with the affected trustees on the appropriate removal action to be taken.

(k) Where the OSC/RPM becomes aware that a discharge or release may affect any endangered or threatened species or their habitat, the OSC/RPM shall consult with the Department of Interior (DOI), or the Department of Commerce (DOC) (NOAA) and, if appropriate, the cognizant federal land managing agency.

(l) The OSC/RPM is responsible for addressing worker health and safety concerns at a response scene, in accordance with § 300.150.

(m) The OSC shall submit pollution reports to the RRT and other appropriate agencies as significant developments occur during response actions, through communications networks or procedures agreed to by the RRT and covered in the RCP.

(n) OSCs/RPMs should ensure that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response, to the extent practicable, consistent with the requirements of § 300.155 of this part.

### § 300.140   Multi-regional responses.

(a) If a discharge or release moves from the area covered by one ACP or RCP into another area, the authority for response actions should likewise shift. If a discharge or release affects areas covered by two or more ACPs or RCPs, the response mechanisms of each applicable plan may be activated. In this case, response actions of all regions concerned shall be fully coordinated as detailed in the RCPs and ACPs.

(b) There shall be only one OSC and/or RPM at any time during the course of a response operation. Should a discharge or release affect two or more areas, EPA, the USCG, DOD, DOE, or other lead agency, as appropriate, shall give prime consideration to the area vulnerable to the greatest threat, in determining which agency should provide the OSC and/or RPM. The RRT shall designate the OSC and/or RPM if the RRT member agencies who have response authority within the affected areas are unable to agree on the designation. The NRT shall designate the OSC and/or RPM if members of one RRT or two adjacent RRTs are unable to agree on the designation.

(c) Where the USCG has initially provided the OSC for response to a release from hazardous waste management facilities located in the coastal zone, responsibility for response action shall shift to EPA or another federal agency, as appropriate.

### § 300.145   Special teams and other assistance available to OSCs/RPMs.

(a) The NSF is a special team established by the USCG, including the three USCG Strike Teams, the Public Information Assist Team (PIAT), and the NSFCC. The NSF is available to assist OSCs/RPMs in their preparedness and response duties.

(1) The three Strike Teams (Atlantic, Gulf, and Pacific) provide trained personnel and specialized equipment to assist the OSC in training for spill response, stabilizing and containing the spill, and in monitoring or directing the response actions of the responsible parties and/or contractors. The OSC has a specific team designated for initial contact and may contact that team directly for any assistance.

(2) The NSFCC can provide the following support to the OSC:

(i) Technical assistance, equipment and other resources to augment the OSC staff during spill response.

(ii) Assistance in coordinating the use of private and public resources in support of the OSC during a response to or a threat of a worst case discharge of oil.

(iii) Review of the area contingency plan, including an evaluation of equipment readiness and coordination among responsible public agencies and private organizations.

**Environmental Protection Agency**                                    **§ 300.145**

(iv) Assistance in locating spill response resources for both response and planning, using the NSFCC's national and international computerized inventory of spill response resources.

(v) Coordination and evaluation of pollution response exercises.

(vi) Inspection of district prepositioned pollution response equipment.

(3) PIAT is an element of the NSFCC staff which is available to assist OSCs to meet the demands for public information during a response or exercise. Its use is encouraged any time the OSC requires outside public affairs support. Requests for PIAT assistance may be made through the NSFCC or NRC.

(b)(1) The Environmental Response Team (ERT) is established by EPA in accordance with its disaster and emergency responsibilities. The ERT has expertise in treatment technology, biology, chemistry, hydrology, geology, and engineering.

(2) The ERT can provide access to special decontamination equipment for chemical releases and advice to the OSC/RPM in hazard evaluation; risk assessment; multimedia sampling and analysis program; on-site safety, including development and implementation plans; cleanup techniques and priorities; water supply decontamination and protection; application of dispersants; environmental assessment; degree of cleanup required; and disposal of contaminated material.

(3) The ERT also provides both introductory and intermediate level training courses to prepare response personnel.

(4) OSC/RPM or RRT requests for ERT support should be made to the EPA representative on the RRT; EPA Headquarters, Director, Emergency Response Division; or the appropriate EPA regional emergency coordinator.

(c) Scientific Support Coordinators (SSCs) may be designated by the OSC (and RPM in the case of EPA SSCs) as the principal advisors for scientific issues, communication with the scientific community, and coordination of requests for assistance from state and federal agencies regarding scientific studies. The SSC strives for a consensus on scientific issues affecting the response, but ensures that differing opinions within the community are communicated to the OSC/RPM.

(1) Generally, SSCs are provided by NOAA in the coastal zones, and by EPA in the inland zone. OSC/RPM requests for SSC support can be made directly to the SSC assigned to the area or to the agency member of the RRT. NOAA SSCs can also be requested through NOAA's SSC program office in Seattle, WA. NOAA SSCs are assigned to USCG Districts and are supported by a scientific support team that includes expertise in environmental chemistry, oil slick tracking, pollutant transport modeling, natural resources at risk, environmental tradeoffs of countermeasures and cleanup, and information management.

(2) During a response, the SSC serves on the federal OSC's/RPM's staff and may, at the request of the OSC/RPM, lead the scientific team and be responsible for providing scientific support for operational decisions and for coordinating on-scene scientific activity. Depending on the nature and location of the incident, the SSC integrates expertise from governmental agencies, universities, community representatives, and industry to assist the OSC/RPM in evaluating the hazards and potential effects of releases and in developing response strategies.

(3) At the request of the OSC, the SSC may facilitate the OSC's work with the lead administrative trustee for natural resources to ensure coordination between damage assessment data collection efforts and data collected in support of response operations.

(4) SSCs support the Regional Response Teams and the Area Committees in preparing regional and area contingency plans and in conducting spill training and exercises. For area plans, the SSC provides leadership for the synthesis and integration of environmental information required for spill response decisions in support of the OSC.

(d)(1) SUPSALV has an extensive salvage/search and recovery equipment inventory with the requisite knowledge and expertise to support these operations, including specialized salvage, firefighting, and petroleum, oil and lubricants offloading capability.

(2) When possible, SUPSALV will provide equipment for training exercises in support of national and regional contingency planning objectives.

(3) The OSC/RPM may request assistance directly from SUPSALV. Formal requests are routed through the Chief of Naval Operations (N312).

(e) For marine salvage operations, OSCs/RPMs with responsibility for monitoring, evaluating, or supervising these activities should request technical assistance from DOD, the Strike Teams, or commercial salvors as necessary to ensure that proper actions are taken. Marine salvage operations generally fall into five categories: afloat salvage; offshore salvage; river and harbor clearance; cargo salvage; and rescue towing. Each category requires different knowledge and specialized types of equipment. The complexity of such operations may be further compounded by local environmental and geographic conditions. The nature of marine salvage and the conditions under which it occurs combine to make such operations imprecise, difficult, hazardous, and expensive. Thus, responsible parties or other persons attempting to perform such operations without adequate knowledge, equipment, and experience could aggravate, rather than relieve, the situation.

(f) Radiological Emergency Response Teams (RERTs) have been established by EPA's Office of Radiation Programs (ORP) to provide response and support for incidents or sites containing radiological hazards. Expertise is available in radiation monitoring, radionuclide analysis, radiation health physics, and risk assessment. RERTs can provide on-site support including mobile monitoring laboratories for field analyses of samples and fixed laboratories for radiochemical sampling and analyses. Requests for support may be made 24 hours a day via the NRC or directly to the EPA Radiological Response Coordinator in the Office of Radiation Programs. Assistance is also available from DOE and other federal agencies.

(g)(1) DRGs assist the OSC by providing technical assistance, personnel, and equipment, including pre-positioned equipment. Each DRG consists of all Coast Guard personnel and equipment, including marine firefighting equipment, in its district, additional pre-positioned equipment, and a District Response Advisory Team (DRAT) that is available to provide support to the OSC in the event that a spill exceeds local response capabilities. Each DRG:

(i) Shall provide technical assistance, equipment, and other resources, as available, when requested by an OSC through the USCG representative to the RRT;

(ii) Shall ensure maintenance of all USCG response equipment within its district;

(iii) May provide technical assistance in the preparation of the ACP; and

(iv) Shall review each of those plans that affect its area of geographic responsibility.

(2) In deciding where to locate personnel and pre-positioned equipment, the USCG shall give priority emphasis to:

(i) The availability of facilities for loading and unloading heavy or bulky equipment by barge;

(ii) The proximity to an airport capable of supporting large military transport aircraft;

(iii) The flight time to provide response to oil spills in all areas of the Coast Guard district with the potential for marine casualties;

(iv) The availability of trained local personnel capable of responding in an oil spill emergency; and

(v) Areas where large quantities of petroleum products are transported.

(h) The NPFC is responsible for implementing those portions of Title I of the OPA that have been delegated to the Secretary of the department in which the Coast Guard is operating. The NPFC is responsible for addressing funding issues arising from discharges and threats of discharges of oil. The NPFC:

(1) Issues Certificates of Financial Responsibility to owners and operators of vessels to pay for costs and damages that are incurred by their vessels as a result of oil discharges;

(2) Provides funding for various response organizations for timely abatement and removal actions related to oil discharges;

(3) Provides equitable compensation to claimants who sustain costs and damages from oil discharges when the responsible party fails to do so;

(4) Recovers monies from persons liable for costs and damages resulting from oil discharges to the full extent of liability under the law; and

(5) Provides funds to initiate natural resource damage assessments.

### §300.150  Worker health and safety.

(a) Response actions under the NCP will comply with the provisions for response action worker safety and health in 29 CFR 1910.120. The NRS meets the requirements of 29 CFR 1910.120 concerning use of an incident command system.

(b) In a response action taken by a responsible party, the responsible party must assure that an occupational safety and health program consistent with 29 CFR 1910.120 is made available for the protection of workers at the response site.

(c) In a response taken under the NCP by a lead agency, an occupational safety and health program should be made available for the protection of workers at the response site, consistent with, and to the extent required by, 29 CFR 1910.120. Contracts relating to a response action under the NCP should contain assurances that the contractor at the response site will comply with this program and with any applicable provisions of the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 *et seq.*) (OSH Act) and state laws with plans approved under section 18 of the OSH Act.

(d) When a state, or political subdivision of a state, without an OSHA-approved state plan is the lead agency for response, the state or political subdivision must comply with standards in 40 CFR part 311, promulgated by EPA pursuant to section 126(f) of SARA.

(e) Requirements, standards, and regulations of the OSH Act and of state OSH laws not directly referenced in paragraphs (a) through (d) of this section, must be complied with where applicable. Federal OSH Act requirements include, among other things, Construction Standards (29 CFR part 1926), General Industry Standards (29 CFR part 1910), and the general duty

requirement of section 5(a)(1) of the OSH Act (29 U.S.C. 654(a)(1)). No action by the lead agency with respect to response activities under the NCP constitutes an exercise of statutory authority within the meaning of section 4(b)(1) of the OSH Act. All governmental agencies and private employers are directly responsible for the health and safety of their own employees.

### §300.155  Public information and community relations.

(a) When an incident occurs, it is imperative to give the public prompt, accurate information on the nature of the incident and the actions underway to mitigate the damage. OSCs/RPMs and community relations personnel should ensure that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response. They should coordinate with available public affairs/community relations resources to carry out this responsibility by establishing, as appropriate, a Joint Information Center bringing together resources from federal and state agencies and the responsible party.

(b) An on-scene news office may be established to coordinate media relations and to issue official federal information on an incident. Whenever possible, it will be headed by a representative of the lead agency. The OSC/RPM determines the location of the on-scene news office, but every effort should be made to locate it near the scene of the incident. If a participating agency believes public interest warrants the issuance of statements and an on-scene news office has not been established, the affected agency should recommend its establishment. All federal news releases or statements by participating agencies should be cleared through the OSC/RPM. Information dissemination relating to natural resource damage assessment activities shall be coordinated through the lead administrative trustee. The designated lead administrative trustee may assist the OSC/RPM by disseminating information on issues relating to damage assessment activities. Following termination of removal activity, information dissemination on damage assessment activities

shall be through the lead administrative trustee.

(c) The community relations requirements specified in §§ 300.415, 300.430, and 300.435 apply to removal, remedial, and enforcement actions and are intended to promote active communication between communities affected by discharges or releases and the lead agency responsible for response actions. Community Relations Plans (CRPs) are required by EPA for certain response actions. The OSC/RPM should ensure coordination with such plans which may be in effect at the scene of a discharge or release or which may need to be developed during follow-up activities.

### § 300.160 Documentation and cost recovery.

(a) For releases of a hazardous substance, pollutant, or contaminant, the following provisions apply:

(1) During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal, state, or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment. Where applicable, documentation shall state when the NRC received notification of a release of a reportable quantity.

(2) The information and reports obtained by the lead agency for Fund-financed response actions shall, as appropriate, be transmitted to the chair of the RRT. Copies can then be forwarded to the NRT, members of the RRT, and others as appropriate.

(3) The lead agency shall make available to the trustees of affected natural resources information and documentation that can assist the trustees in the determination of actual or potential natural resource injuries.

(b) For discharges of oil, documentation and cost recovery provisions are described in § 300.315.

(c) Response actions undertaken by the participating agencies shall be carried out under existing programs and authorities when available. Federal agencies are to make resources available, expend funds, or participate in response to discharges and releases under their existing authority. Interagency agreements may be signed when necessary to ensure that the federal resources will be available for a timely response to a discharge or release. The ultimate decision as to the appropriateness of expending funds rests with the agency that is held accountable for such expenditures. Further funding provisions for discharges of oil are described in § 300.335.

(d) The Administrator of EPA and the Administrator of the Agency for Toxic Substances and Disease Registry (ATSDR) shall assure that the costs of health assessment or health effect studies conducted under the authority of CERCLA section 104(i) are documented in accordance with standard EPA procedures for cost recovery. Documentation shall include information on the nature of the hazardous substances addressed by the research, information concerning the locations where these substances have been found, and any available information on response actions taken concerning these substances at the location.

### § 300.165 OSC reports.

(a) As requested by the NRT or RRT, the OSC/RPM shall submit to the NRT or RRT a complete report on the removal operation and the actions taken. The RRT shall review the OSC report and send to the NRT a copy of the OSC report with its comments or recommendations within 30 days after the RRT has received the OSC report.

(b) The OSC report shall record the situation as it developed, the actions taken, the resources committed, and the problems encountered.

### § 300.170 Federal agency participation.

Federal agencies listed in § 300.175 have duties established by statute, executive order, or Presidential directive which may apply to federal response actions following, or in prevention of, the discharge of oil or release of a hazardous substance, pollutant, or contaminant. Some of these agencies also have duties relating to the restoration,

**Environmental Protection Agency**                                §300.175

rehabilitation, replacement, or acquisition of equivalent natural resources injured or lost as a result of such discharge or release as described in subpart G of this part. The NRT, RRT, and Area Committee organizational structure, and the NCP, RCPs and ACPs, described in §300.210, provide for agencies to coordinate with each other in carrying out these duties.

(a) Federal agencies may be called upon by an OSC/RPM during response planning and implementation to provide assistance in their respective areas of expertise, as described in §300.175, consistent with the agencies' capabilities and authorities.

(b) In addition to their general responsibilities, federal agencies should:

(1) Make necessary information available to the Secretary of the NRT, RRTs, Area Committees, and OSCs/RPMs.

(2) Provide representatives to the NRT and RRTs and otherwise assist RRTs and OSCs, as necessary, in formulating RCPs and ACPs.

(3) Inform the NRT, RRTs, and Area Committees, consistent with national security considerations, of changes in the availability of resources that would affect the operations implemented under the NCP.

(c) All federal agencies are responsible for reporting releases of hazardous substances from facilities or vessels under their jurisdiction or control in accordance with section 103 of CERCLA.

(d) All federal agencies are encouraged to report releases of pollutants or contaminants and must report discharges of oil, as required in 40 CFR part 110, from facilities or vessels under their jurisdiction or control to the NRC.

**§300.175  Federal agencies: additional responsibilities and assistance.**

(a) During preparedness planning or in an actual response, various federal agencies may be called upon to provide assistance in their respective areas of expertise, as indicated in paragraph (b) of this section, consistent with agency legal authorities and capabilities.

(b) The federal agencies include:

(1) USCG, as provided in 14 U.S.C. 1–3, is an agency in DOT, except when operating as an agency in the United States Navy (USN) in time of war. The USCG provides the NRT vice chair, co-chairs for the standing RRTs, and predesignated OSCs for the coastal zone, as described in §300.120(a)(1). The USCG maintains continuously manned facilities which can be used for command, control, and surveillance of oil discharges and hazardous substance releases occurring in the coastal zone. The USCG also offers expertise in domestic and international fields of port safety and security, maritime law enforcement, ship navigation and construction, and the manning, operation, and safety of vessels and marine facilities. The USCG may enter into a contract or cooperative agreement with the appropriate state in order to implement a response action.

(2) EPA chairs the NRT and co-chairs, with the USCG, the standing RRTs; provides predesignated OSCs for all inland areas for which an ACP is required under CWA section 311(j) and for discharges and releases occurring in the inland zone and RPMs for remedial actions except as otherwise provided; and generally provides the SSC for responses in the inland zone. EPA provides expertise on human health and ecological effects of oil discharges or releases of hazardous substances, pollutants, or contaminants; ecological and human health risk assessment methods; and environmental pollution control techniques. Access to EPA's scientific expertise can be facilitated through the EPA representative to the Research and Development Committee of the National Response Team; the EPA Office of Research and Development's Superfund Technical Liaisons or Regional Scientists located in EPA Regional offices; or through EPA's Office of Science Planning and Regulatory Evaluation. EPA also provides legal expertise on the interpretation of CERCLA and other environmental statutes. EPA may enter into a contract or cooperative agreement with the appropriate state in order to implement a response action.

41

§ 300.175                                           40 CFR Ch. I (7–1–19 Edition)

(3) FEMA provides guidance, policy and program advice, and technical assistance in hazardous materials, chemical, and radiological emergency preparedness activities (including planning, training, and exercising). FEMA's primary point of contact for administering financial and technical assistance to state and local governments to support their efforts to develop and maintain an effective emergency management and response capability is the Preparedness, Training, and Exercises Directorate.

(4) DOD has responsibility to take all action necessary with respect to releases where either the release is on, or the sole source of the release is from, any facility or vessel under the jurisdiction, custody, or control of DOD. In addition to those capabilities provided by SUPSALV, DOD may also, consistent with its operational requirements and upon request of the OSC, provide locally deployed USN oil spill equipment and provide assistance to other federal agencies on request. The following two branches of DOD have particularly relevant expertise:

(i) The United States Army Corps of Engineers has specialized equipment and personnel for maintaining navigation channels, for removing structural repairs, and for performing maintenance to hydropower electric generating equipment. The Corps can also provide design services, perform construction, and provide contract writing and contract administrative services for other federal agencies.

(ii) The U.S. Navy Supervisor of Salvage (SUPSALV) is the branch of service within DOD most knowledgeable and experienced in ship salvage, shipboard damage control, and diving. The USN has an extensive array of specialized equipment and personnel available for use in these areas as well as specialized containment, collection, and removal equipment specifically designed for salvage-related and open-sea pollution incidents.

(5) DOE generally provides designated OSCs/RPMs that are responsible for taking all response actions with respect to releases where either the release is on, or the sole source of the release is from, any facility or ves-

sel under its jurisdiction, custody, or control, including vessels bareboat-chartered and operated. In addition, under the FRERP, DOE provides advice and assistance to other OSCs/RPMs for emergency actions essential for the control of immediate radiological hazards. Incidents that qualify for DOE radiological advice and assistance are those believed to involve source, byproduct, or special nuclear material or other ionizing radiation sources, including radium, and other naturally occurring radionuclides, as well as particle accelerators. Assistance is available through direct contact with the appropriate DOE Radiological Assistance Program Regional Office.

(6) The Department of Agriculture (USDA) has scientific and technical capability to measure, evaluate, and monitor, either on the ground or by use of aircraft, situations where natural resources including soil, water, wildlife, and vegetation have been impacted by fire, insects and diseases, floods, hazardous substances, and other natural or man-caused emergencies. The USDA may be contacted through Forest Service emergency staff officers who are the designated members of the RRT. Agencies within USDA have relevant capabilities and expertise as follows:

(i) The Forest Service has responsibility for protection and management of national forests and national grasslands. The Forest Service has personnel, laboratory, and field capability to measure, evaluate, monitor, and control as needed, releases of pesticides and other hazardous substances on lands under its jurisdiction.

(ii) The Agriculture Research Service (ARS) administers an applied and developmental research program in animal and plant protection and production; the use and improvement of soil, water, and air; the processing, storage, and distribution of farm products; and human nutrition. The ARS has the capabilities to provide regulation of, and evaluation and training for, employees exposed to biological, chemical, radiological, and industrial hazards. In emergency situations, the ARS can identify, control, and abate pollution in the areas of air, soil, wastes, pesticides, radiation, and toxic substances for ARS facilities.

(iii) The Soil Conservation Service (SCS) has personnel in nearly every county in the nation who are knowledgeable in soil, agronomy, engineering, and biology. These personnel can help to predict the effects of pollutants on soil and their movements over and through soils. Technical specialists can assist in identifying potential hazardous waste sites and provide review and advice on plans for remedial measures.

(iv) The Animal and Plant Health Inspection Service (APHIS) can respond in an emergency to regulate movement of diseased or infected organisms to prevent the spread and contamination of nonaffected areas.

(v) The Food Safety and Inspection Service (FSIS) has responsibility to prevent meat and poultry products contaminated with harmful substances from entering human food channels. In emergencies, the FSIS works with other federal and state agencies to establish acceptability for slaughter of exposed or potentially exposed animals and their products. In addition they are charged with managing the Federal Radiological Emergency Response Program for the USDA.

(7) DOC, through NOAA, provides scientific support for response and contingency planning in coastal and marine areas, including assessments of the hazards that may be involved, predictions of movement and dispersion of oil and hazardous substances through trajectory modeling, and information on the sensitivity of coastal environments to oil and hazardous substances and associated clean-up and mitigation methods; provides expertise on living marine resources and their habitats, including endangered species, marine mammals and National Marine Sanctuary ecosystems; provides information on actual and predicted meteorological, hydrological, ice, and oceanographic conditions for marine, coastal, and inland waters, and tide and circulation data for coastal and territorial waters and for the Great Lakes.

(8) HHS assists with the assessment, preservation, and protection of human health and helps ensure the availability of essential human services. HHS provides technical and nontechnical assistance in the form of advice,

guidance, and resources to other federal agencies as well as state and local governments.

(i) The principal HHS response comes from the U.S. Public Health Service and is coordinated from the Office of the Assistant Secretary for Health, and various Public Health Service regional offices. Within the Public Health Service, the primary response to a hazardous materials emergency comes from Agency for Toxic Substances and Disease Registry (ATSDR) and the Centers for Disease Control (CDC). Both ATSDR and CDC have a 24-hour emergency response capability wherein scientific and technical personnel are available to provide technical assistance to the lead federal agency and state and local response agencies on human health threat assessment and analysis, and exposure prevention and mitigation. Such assistance is used for situations requiring evacuation of affected areas, human exposure to hazardous materials, and technical advice on mitigation and prevention. CDC takes the lead during petroleum releases regulated under the CWA and OPA while ATSDR takes the lead during chemical releases under CERCLA. Both agencies are mutually supportive.

(ii) Other Public Health Service agencies involved in support during hazardous materials incidents either directly or through ATSDR/CDC include the Food and Drug Administration, the Health Resources and Services Administration, the Indian Health Service, and the National Institutes of Health.

(iii) Statutory authority for HHS/National Institutes for Environmental Health Sciences (NIEHS) involvement in hazardous materials accident prevention is non-regulatory in nature and focused on two primary areas for preventing community and worker exposure to hazardous materials releases: Worker safety training and basic research activities. Under section 126 of SARA, NIEHS is given statutory authority for supporting development of curricula and model training programs for waste workers and chemical emergency responders.

Under section 118(b) of the Hazardous Materials Transportation and Uniform Safety Act (HMTUSA) (49 U.S.C. 1802 *et*

*seq.*), NIEHS also administers the Hazmat Employee Training Program to prepare curricula and training for hazardous materials transportation workers. In the basic research arena, NIEHS is authorized under section 311 of SARA to conduct a hazardous substance basic research and training program to evaluate toxic effects and assess human health risks from accidental releases of hazardous materials. Under Title IX, section 901(h) of the Clean Air Act Amendments, NIEHS also is authorized to conduct basic research on air pollutants, as well as train physicians in environmental health. Federal research and training in hazardous materials release prevention represents an important non-regulatory activity and supplements ongoing private sector programs.

(9) DOI may be contacted through Regional Environmental Officers (REOs), who are the designated members of RRTs. Department land managers have jurisdiction over the national park system, national wildlife refuges and fish hatcheries, the public lands, and certain water projects in western states. In addition, bureaus and offices have relevant expertise as follows:

(i) United States Fish and Wildlife Service (USFWS) and other Bureaus: Anadromous and certain other fishes and wildlife, including endangered and threatened species, migratory birds, and certain marine mammals; waters and wetlands; and effects on natural resources.

(ii) The National Biological Survey performs research in support of biological resource management; inventories, monitors, and reports on the status and trends in the Nation's biotic resources; and transfers the information gained in research and monitoring to resource managers and others concerned with the care, use, and conservation of the Nation's natural resources. The National Biological Survey has laboratory/research facilities.

(iii) Geological Survey: Geology, hydrology (ground water and surface water), and natural hazards.

(iv) Bureau of Land Management: Minerals, soils, vegetation, wildlife, habitat, archaeology, and wilderness; and hazardous materials.

(v) Minerals Management Service: Oversight of offshore oil and gas exploration and production facilities and associated pipelines and pipeline facilities under the Outer Continental Shelf Lands Act and the CWA; oil spill response technology research; and establishing oil discharge contingency planning requirements for offshore facilities.

(vi) Bureau of Mines: Analysis and identification of inorganic hazardous substances and technical expertise in metals and metallurgy relevant to site cleanup.

(vii) Office of Surface Mining: Coal mine wastes and land reclamation.

(viii) National Park Service: General biological, natural, and cultural resource managers to evaluate, measure, monitor, and contain threats to park system lands and resources; archaeological and historical expertise in protection, preservation, evaluation, impact mitigation, and restoration of cultural resources; emergency personnel.

(ix) Bureau of Reclamation: Operation and maintenance of water projects in the West; engineering and hydrology; and reservoirs.

(x) Bureau of Indian Affairs: Coordination of activities affecting Indian lands; assistance in identifying Indian tribal government officials.

(xi) Office of Territorial Affairs: Assistance in implementing the NCP in American Samoa, Guam, the Pacific Island Governments, the Northern Mariana Islands, and the Virgin Islands.

(10) The Department of Justice (DOJ) can provide expert advice on complicated legal questions arising from discharges or releases, and federal agency responses. In addition, the DOJ represents the federal government, including its agencies, in litigation relating to such discharges or releases. Other legal issues or questions shall be directed to the federal agency counsel for the agency providing the OSC/RPM for the response.

(11) The Department of Labor (DOL), through OSHA and the states operating plans approved under section 18 of the OSH Act, has authority to conduct

safety and health inspections of hazardous waste sites to assure that employees are being protected and to determine if the site is in compliance with:

(i) Safety and health standards and regulations promulgated by OSHA (or the states) in accordance with section 126 of SARA and all other applicable standards; and

(ii) Regulations promulgated under the OSH Act and its general duty clause. OSHA inspections may be self-generated, consistent with its program operations and objectives, or may be conducted in response to requests from EPA or another lead agency, or in response to accidents or employee complaints. OSHA may also conduct inspections at hazardous waste sites in those states with approved plans that choose not to exercise their jurisdiction to inspect such sites. On request, OSHA will provide advice and consultation to EPA and other NRT/RRT agencies as well as to the OSC/RPM regarding hazards to persons engaged in response activities. OSHA may also take any other action necessary to assure that employees are properly protected at such response activities. Any questions about occupational safety and health at these sites may be referred to the OSHA Regional Office.

(12) DOT provides response expertise pertaining to transportation of oil or hazardous substances by all modes of transportation. Through the Research and Special Programs Administration (RSPA), DOT offers expertise in the requirements for packaging, handling, and transporting regulated hazardous materials. DOT, through RSPA, establishes oil discharge contingency planning requirements for pipelines, transport by rail and containers or bulk transport of oil.

(13) The Department of State (DOS) will lead in the development of international joint contingency plans. It will also help to coordinate an international response when discharges or releases cross international boundaries or involve foreign flag vessels. Additionally, DOS will coordinate requests for assistance from foreign governments and U.S. proposals for conducting research at incidents that occur in waters of other countries.

(14) The Nuclear Regulatory Commission will respond, as appropriate, to releases of radioactive materials by its licensees, in accordance with the NRC Incident Response Plan (NUREG–0728) to monitor the actions of those licensees and assure that the public health and environment are protected and adequate recovery operations are instituted. The Nuclear Regulatory Commission will keep EPA informed of any significant actual or potential releases in accordance with procedural agreements. In addition, the Nuclear Regulatory Commission will provide advice to the OSC/RPM when assistance is required in identifying the source and character of other hazardous substance releases where the Nuclear Regulatory Commission has licensing authority for activities utilizing radioactive materials.

(15) The General Services Administration (GSA) provides logistic and telecommunications support to federal agencies. During an emergency situation, GSA quickly responds to aid state and local governments as directed by other federal agencies. The type of support provided might include leasing and furnishing office space, setting up telecommunications and transportation services, and advisory assistance.

§300.180 State and local participation in response.

(a) Each state governor is requested to designate one state office/representative to represent the state on the appropriate RRT. The state's office/representative may participate fully in all activities of the appropriate RRT. Each state governor is also requested to designate a lead state agency that will direct state-lead response operations. This agency is responsible for designating the lead state response official for federal and/or state-lead response actions, and coordinating/communicating with any other state agencies, as appropriate. Local governments are invited to participate in activities on the appropriate RRT as may be provided by state law or arranged by the state's representative. Indian tribes wishing to participate should assign one person or office to represent the

45

tribal government on the appropriate RRT.

(b) Appropriate local and state officials (including Indian tribes) will participate as part of the response structure as provided in the ACP.

(c) In addition to meeting the requirements for local emergency plans under SARA section 303, state and local government agencies are encouraged to include contingency planning for responses, consistent with the NCP, RCP, and ACP in all emergency and disaster planning.

(d) For facilities not addressed under CERCLA or the CWA, states are encouraged to undertake response actions themselves or to use their authorities to compel potentially responsible parties to undertake response actions.

(e) States are encouraged to enter into cooperative agreements pursuant to sections 104 (c)(3) and (d) of CERCLA to enable them to undertake actions authorized under subpart E of the NCP. Requirements for entering into these agreements are included in subpart F of the NCP. A state agency that acts pursuant to such agreements is referred to as the lead agency. In the event there is no cooperative agreement, the lead agency can be designated in a SMOA or other agreement.

(f) Because state and local public safety organizations would normally be the first government representatives at the scene of a discharge or release, they are expected to initiate public safety measures that are necessary to protect public health and welfare and that are consistent with containment and cleanup requirements in the NCP, and are responsible for directing evacuations pursuant to existing state or local procedures.

§ 300.185 Nongovernmental participation.

(a) Industry groups, academic organizations, and others are encouraged to commit resources for response operations. Specific commitments should be listed in the RCP and ACP. Those entities required to develop tank vessel and facility response plans under CWA section 311(j) must be able to respond to a worst case discharge to the maximum extent practicable, and shall commit sufficient resources to imple-

ment other aspects of those plans in accordance with the requirements of 30 CFR part 254, 33 CFR parts 150, 154, and 155; 40 CFR part 112; and 49 CFR parts 171 and 194.

(b) The technical and scientific information generated by the local community, along with information from federal, state, and local governments, should be used to assist the OSC/RPM in devising response strategies where effective standard techniques are unavailable. Such information and strategies will be incorporated into the ACP, as appropriate. The SSC may act as liaison between the OSC/RPM and such interested organizations.

(c) ACPs shall establish procedures to allow for well organized, worthwhile, and safe use of volunteers, including compliance with §300.150 regarding worker health and safety. ACPs should provide for the direction of volunteers by the OSC/RPM or by other federal, state, or local officials knowledgeable in contingency operations and capable of providing leadership. ACPs also should identify specific areas in which volunteers can be used, such as beach surveillance, logistical support, and bird and wildlife treatment. Unless specifically requested by the OSC/RPM, volunteers generally should not be used for physical removal or remedial activities. If, in the judgment of the OSC/RPM, dangerous conditions exist, volunteers shall be restricted from on-scene operations.

(d) Nongovernmental participation must be in compliance with the requirements of subpart H of this part if any recovery of costs will be sought.

## Subpart C—Planning and Preparedness

SOURCE: 59 FR 47440, Sept. 15, 1994, unless otherwise noted.

§ 300.200 General.

This subpart summarizes emergency preparedness activities relating to discharges of oil and releases of hazardous substances, pollutants, or contaminants; describes the three levels of contingency planning under the national response system; and cross-references state and local emergency preparedness activities under SARA Title III,

**Environmental Protection Agency**                                    **§ 300.205**

also known as the "Emergency Planning and Community Right-to-Know Act of 1986" but referred to herein as "Title III." Regulations implementing Title III are codified at 40 CFR subchapter J.

**§ 300.205  Planning and coordination structure.**

(a) *National.* As described in § 300.110, the NRT is responsible for national planning and coordination.

(b) *Regional.* As described in § 300.115, the RRTs are responsible for regional planning and coordination.

(c) *Area.* As required by section 311(j) of the CWA, under the direction of the federal OSC for its area, Area Committees comprising qualified personnel of federal, state, and local agencies shall be responsible for:

(1) Preparing an ACP for their areas (as described in § 300.210(c));

(2) Working with appropriate federal, state, and local officials to enhance the contingency planning of those officials and to assure pre-planning of joint response efforts, including appropriate procedures for mechanical recovery, dispersal, shoreline cleanup, protection of sensitive environmental areas, and protection, rescue, and rehabilitation of fisheries and wildlife; and

(3) Working with appropriate federal, state, and local officials to expedite decisions for the use of dispersants and other mitigating substances and devices.

(d) *State.* As provided by sections 301 and 303 of Title III, the SERC of each state, appointed by the Governor, is to designate emergency planning districts, appoint Local Emergency Planning Committees (LEPCs), supervise and coordinate their activities, and review local emergency response plans, which are described in § 300.215. The SERC also is to establish procedures for receiving and processing requests from the public for information generated by Title III reporting requirements and to designate an official to serve as coordinator for information.

(e) *Local.* As provided by sections 301 and 303 of Title III, emergency planning districts are designated by the SERC in order to facilitate the preparation and implementation of emergency plans. Each LEPC is to prepare a local emergency response plan for the emergency planning district and establish procedures for receiving and processing requests from the public for information generated by Title III reporting requirements. The LEPC is to appoint a chair and establish rules for the LEPC. The LEPC is to designate an official to serve as coordinator for information and designate in its plan a community emergency coordinator.

(f) As required by section 311(j)(5) of the CWA, a tank vessel, as defined under section 2101 of title 46, U.S. Code, an offshore facility, and an onshore facility that, because of its location, could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters, adjoining shorelines, or exclusive economic zone must prepare and submit a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance.

(g) The relationship of these plans is described in Figure 4.

47



*Figure 4*

**Relationship of Plans**

§ 300.210  Federal contingency plans.

There are three levels of contingency plans under the national response system: The National Contingency Plan, RCPs, and ACPs. These plans are available for inspection at EPA regional offices or USCG district offices. Addresses and telephone numbers for these offices may be found in the United States Government Manual, issued annually, or in local telephone directories.

(a) *The National Contingency Plan.* The purpose and objectives, authority, and scope of the NCP are described in §§ 300.1 through 300.3.

(b) *Regional Contingency Plans.* The RRTs, working with the states, shall develop federal RCPs for each standard federal region, Alaska, Oceania in the

**Environmental Protection Agency**  §300.210

Pacific, and the Caribbean to coordinate timely, effective response by various federal agencies and other organizations to discharges of oil or releases of hazardous substances, pollutants, or contaminants. RCPs shall, as appropriate, include information on all useful facilities and resources in the region, from government, commercial, academic, and other sources. To the greatest extent possible, RCPs shall follow the format of the NCP and be coordinated with state emergency response plans, ACPs, which are described in §300.210(c), and Title III local emergency response plans, which are described in §300.215. Such coordination should be accomplished by working with the SERCs in the region covered by the RCP. RCPs shall contain lines of demarcation between the inland and coastal zones, as mutually agreed upon by USCG and EPA.

(c) *Area Contingency Plans.* (1) Under the direction of an OSC and subject to approval by the lead agency, each Area Committee, in consultation with the appropriate RRTs, Coast Guard DRGs, the NSFCC, SSCs, LEPCs, and SERCs, shall develop an ACP for its designated area. This plan, when implemented in conjunction with other provisions of the NCP, shall be adequate to remove a worst case discharge under §300.324, and to mitigate or prevent a substantial threat of such a discharge, from a vessel, offshore facility, or onshore facility operating in or near the area.

(2) The areas of responsibility may include several Title III local planning districts, or parts of such districts. In developing the ACP, the OSC shall coordinate with affected SERCs and LEPCs. The ACP shall provide for a well coordinated response that is integrated and compatible, to the greatest extent possible, with all appropriate response plans of state, local, and nonfederal entities, and especially with Title III local emergency response plans.

(3) The ACP shall include the following:

(i) A description of the area covered by the plan, including the areas of special economic or environmental importance that might be damaged by a discharge;

(ii) A description in detail of the responsibilities of an owner or operator and of federal, state, and local agencies in removing a discharge, and in mitigating or preventing a substantial threat of a discharge;

(iii) A list of equipment (including firefighting equipment), dispersants, or other mitigating substances and devices, and personnel available to an owner or operator and federal, state, and local agencies, to ensure an effective and immediate removal of a discharge, and to ensure mitigation or prevention of a substantial threat of a discharge (this may be provided in an appendix or by reference to other relevant emergency plans (e.g., state or LEPC plans), which may include such equipment lists);

(iv) A description of procedures to be followed for obtaining an expedited decision regarding the use of dispersants; and

(v) A detailed description of how the plan is integrated into other ACPs and tank vessel, offshore facility, and onshore facility response plans approved by the President, and into operating procedures of the NSFCC.

(4)(i) In order to provide for coordinated, immediate and effective protection, rescue, and rehabilitation of, and minimization of risk of injury to, fish and wildlife resources and habitat, Area Committees shall incorporate into each ACP a detailed annex containing a Fish and Wildlife and Sensitive Environments Plan that is consistent with the RCP and NCP. The annex shall be prepared in consultation with the USFWS and NOAA and other interested natural resource management agencies and parties. It shall address fish and wildlife resources and their habitat, and shall include other areas considered sensitive environments in a separate section of the annex, based upon Area Committee recommendations. The annex will provide the necessary information and procedures to immediately and effectively respond to discharges that may adversely affect fish and wildlife and their habitat and sensitive environments, including provisions for a response to a worst case discharge. Such information shall include the identification of appropriate agencies and

their responsibilities, procedures to notify these agencies following a discharge or threat of a discharge, protocols for obtaining required fish and wildlife permits and other necessary permits, and provisions to ensure compatibility of annex-related activities with removal operations.

(ii) The annex shall:

(A) Identify and establish priorities for fish and wildlife resources and their habitats and other important sensitive areas requiring protection from any direct or indirect effects from discharges that may occur. These effects include, but are not limited to, any seasonal or historical use, as well as all critical, special, significant, or otherwise designated protected areas.

(B) Provide a mechanism to be used during a spill response for timely identification of protection priorities of those fish and wildlife resources and habitats and sensitive environmental areas that may be threatened or injured by a discharge. These include as appropriate, not only marine and freshwater species, habitats, and their food sources, but also terrestrial wildlife and their habitats that may be affected directly by onshore oil or indirectly by oil-related factors, such as loss or contamination of forage. The mechanism shall also provide for expeditious evaluation and appropriate consultations on the effects to fish and wildlife, their habitat, and other sensitive environments from the application of chemical countermeasures or other countermeasures not addressed under paragraph (e)(4)(iii).

(C) Identify potential environmental effects on fish and wildlife, their habitat, and other sensitive environments resulting from removal actions or countermeasures, including the option of no removal. Based on this evaluation of potential environmental effects, the annex should establish priorities for application of countermeasure and removal actions to habitats within the geographic region of the ACP. The annex should establish methods to minimize the identified effects on fish and wildlife because of response activities, including, but not limited to: Disturbance of sensitive areas and habitats; illegal or inadvertent taking or disturbance of fish and wildlife or

specimens by response personnel; and fish and wildlife, their habitat, and environmentally sensitive areas coming in contact with various cleaning or bioremediation agents. Furthermore, the annex should identify the areas where the movement of oiled debris may pose a risk to resident, transient, or migratory fish and wildlife, and other sensitive environments and should discuss measures to be considered for removing such oiled debris in a timely fashion to reduce such risk.

(D) Provide for pre-approval of application of specific countermeasures or removal actions that, if expeditiously applied, will minimize adverse spill-induced impacts to fish and wildlife resources, their habitat, and other sensitive environments. Such pre-approval plans must be consistent with paragraphs (c)(4)(ii)(B) and (C) of this section and subpart J requirements, and must have the concurrence of the natural resource trustees.

(E) Provide monitoring plan(s) to evaluate the effectiveness of different countermeasures or removal actions in protecting the environment. Monitoring should include "set-aside" or "control" areas, where no mitigative actions are taken.

(F) Identify and plan for the acquisition and utilization of necessary response capabilities for protection, rescue, and rehabilitation of fish and wildlife resources and habitat. This may include appropriately permitted private organizations and individuals with appropriate expertise and experience. The suitable organizations should be identified in cooperation with natural resource law enforcement agencies. Such capabilities shall include, but not be limited to, identification of facilities and equipment necessary for deterring sensitive fish and wildlife from entering oiled areas, and for capturing, holding, cleaning, and releasing injured wildlife. Plans for the provision of such capabilities shall ensure that there is no interference with other OSC removal operations.

(G) Identify appropriate federal and state agency contacts and alternates responsible for coordination of fish and wildlife rescue and rehabilitation and protection of sensitive environments; identify and provide for required fish

**Environmental Protection Agency**

and wildlife handling and rehabilitation permits necessary under federal and state laws; and provide guidance on the implementation of law enforcement requirements included under current federal and state laws and corresponding regulations. Requirements include, but are not limited to procedures regarding the capture, transport, rehabilitation, and release of wildlife exposed to or threatened by oil, and disposal of contaminated carcasses of wildlife.

(H) Identify and secure the means for providing, if needed, the minimum required OSHA and EPA training for volunteers, including those who assist with injured wildlife.

(I) Define the requirements for evaluating the compatibility between this annex and non-federal response plans (including those of vessels, facilities, and pipelines) on issues affecting fish and wildlife, their habitat, and sensitive environments.

### § 300.211  OPA facility and vessel response plans.

This section describes and cross-references the regulations that implement section 311(j)(5) of the CWA. A tank vessel, as defined under section 2101 of title 46, U.S. Code, an offshore facility, and an onshore facility that, because of its location, could reasonably expect to cause substantial harm to the environment by discharging into or on the navigable waters, adjoining shorelines, or exclusive economic zone must prepare and submit a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance. These response plans are required to be consistent with applicable Area Contingency Plans. These regulations are codified as follows:

(a) For tank vessels, these regulations are codified in 33 CFR part 155;

(b) For offshore facilities, these regulations are codified in 30 CFR part 254;

(c) For non-transportation related onshore facilities, these regulations are codified in 40 CFR 112.20;

(d) For transportation-related onshore facilities, these regulations are codified in 33 CFR part 154;

§ 300.300

(e) For pipeline facilities, these regulations are codified in 49 CFR part 194; and

(f) For rolling stock, these regulations are codified in 49 CFR part 106 et al.

### § 300.212  Area response drills.

The OSC periodically shall conduct drills of removal capability (including fish and wildlife response capability), without prior notice, in areas for which ACPs are required by § 300.210(c) and under relevant tank vessel and facility response plans.

### § 300.215  Title III local emergency response plans.

This section describes and cross-references the regulations that implement Title III. These regulations are codified at 40 CFR part 355.

(a) Each LEPC is to prepare an emergency response plan in accordance with section 303 of Title III and review the plan once a year, or more frequently as changed circumstances in the community or at any facility may require. Such Title III local emergency response plans should be closely coordinated with applicable federal ACPs and state emergency response plans.

(b) [Reserved]

### § 300.220  Related Title III issues.

Other related Title III requirements are found in 40 CFR part 355.

## Subpart D—Operational Response Phases for Oil Removal

SOURCE: 59 FR 47444, Sept. 15, 1994, unless otherwise noted.

### § 300.300  Phase I—Discovery or notification.

(a) A discharge of oil may be discovered through:

(1) A report submitted by the person in charge of a vessel or facility, in accordance with statutory requirements;

(2) Deliberate search by patrols;

(3) Random or incidental observation by government agencies or the public; or

(4) Other sources.

(b) Any person in charge of a vessel or a facility shall, as soon as he or she has knowledge of any discharge from

such vessel or facility in violation of section 311(b)(3) of the CWA, immediately notify the NRC. If direct reporting to the NRC is not practicable, reports may be made to the USCG or EPA predesignated OSC for the geographic area where the discharge occurs. The EPA predesignated OSC may also be contacted through the regional 24-hour emergency response telephone number. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest Coast Guard unit. In any event such person in charge of the vessel or facility shall notify the NRC as soon as possible.

(c) Any other person shall, as appropriate, notify the NRC of a discharge of oil.

(d) Upon receipt of a notification of discharge, the NRC shall promptly notify the OSC. The OSC shall ensure notification of the appropriate state agency of any state which is, or may reasonably be expected to be, affected by the discharge. The OSC shall then proceed with the following phases as outlined in the RCP and ACP.

§ 300.305  Phase II—Preliminary assessment and initiation of action.

(a) The OSC is responsible for promptly initiating a preliminary assessment.

(b) The preliminary assessment shall be conducted using available information, supplemented where necessary and possible by an on-scene inspection. The OSC shall undertake actions to:

(1) Evaluate the magnitude and severity of the discharge or threat to public health or welfare of the United States or the environment;

(2) Assess the feasibility of removal; and

(3) To the extent practicable, identify potentially responsible parties.

(c) Where practicable, the framework for the response management structure is a system (e.g., a unified command system), that brings together the functions of the federal government, the state government, and the responsible party to achieve an effective and efficient response, where the OSC maintains authority.

(d) Except in a case when the OSC is required to direct the response to a discharge that may pose a substantial threat to the public health or welfare of the United States (including but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States), the OSC may allow the responsible party to voluntarily and promptly perform removal actions, provided the OSC determines such actions will ensure an effective and immediate removal of the discharge or mitigation or prevention of a substantial threat of a discharge. If the responsible party does conduct the removal, the OSC shall ensure adequate surveillance over whatever actions are initiated. If effective actions are not being taken to eliminate the threat, or if removal is not being properly done, the OSC should, to the extent practicable under the circumstances, so advise the responsible party. If the responsible party does not respond properly the OSC shall take appropriate response actions and should notify the responsible party of the potential liability for federal response costs incurred by the OSC pursuant to the OPA and CWA. Where practicable, continuing efforts should be made to encourage response by responsible parties.

(1) In carrying out a response under this section, the OSC may:

(i) Remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time;

(ii) Direct or monitor all federal, state, and private actions to remove a discharge; and

(iii) Remove and, if necessary, destroy a vessel discharging, or threatening to discharge, by whatever means are available.

(2) If the discharge results in a substantial threat to the public health or welfare of the United States (including, but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States), the OSC must direct all response efforts, as provided in § 300.322(b) of this part. The OSC should declare as expeditiously as practicable to spill response participants that the federal government will

**Environmental Protection Agency** §300.310

direct the response. The OSC may act without regard to any other provision of the law governing contracting procedures or employment of personnel by the federal government in removing or arranging for the removal of such a discharge.

(e) The OSC shall ensure that the natural resource trustees are promptly notified in the event of any discharge of oil, to the maximum extent practicable as provided in the Fish and Wildlife and Sensitive Environments Plan annex to the ACP for the area in which the discharge occurs. The OSC and the trustees shall coordinate assessments, evaluations, investigations, and planning with respect to appropriate removal actions. The OSC shall consult with the affected trustees on the appropriate removal action to be taken. The trustees will provide timely advice concerning recommended actions with regard to trustee resources potentially affected. The trustees also will assure that the OSC is informed of their activities in natural resource damage assessment that may affect response operations. The trustees shall assure, through the lead administrative trustee, that all data from the natural resource damage assessment activities that may support more effective operational decisions are provided in a timely manner to the OSC. When circumstances permit, the OSC shall share the use of non-monetary response resources (*i.e.*, personnel and equipment) with the trustees, provided trustee activities do not interfere with response actions. The lead administrative trustee facilitates effective and efficient communication between the OSC and the other trustees during response operations and is responsible for applying to the OSC for non-monetary federal response resources on behalf of all trustees. The lead administrative trustee is also responsible for applying to the NPFC for funding for initiation of damage assessment for injuries to natural resources.

§300.310  Phase  III—Containment, countermeasures, cleanup, and disposal.

(a) Defensive actions shall begin as soon as possible to prevent, minimize, or mitigate threat(s) to the public health or welfare of the United States or the environment. Actions may include but are not limited to: Analyzing water samples to determine the source and spread of the oil; controlling the source of discharge; measuring and sampling; source and spread control or salvage operations; placement of physical barriers to deter the spread of the oil and to protect natural resources and sensitive ecosystems; control of the water discharged from upstream impoundment; and the use of chemicals and other materials in accordance with subpart J of this part to restrain the spread of the oil and mitigate its effects. The ACP prepared under §300.210(c) should be consulted for procedures to be followed for obtaining an expedited decision regarding the use of dispersants and other products listed on the NCP Product Schedule.

(b) As appropriate, actions shall be taken to recover the oil or mitigate its effects. Of the numerous chemical or physical methods that may be used, the chosen methods shall be the most consistent with protecting public health and welfare and the environment. Sinking agents shall not be used.

(c) Oil and contaminated materials recovered in cleanup operations shall be disposed of in accordance with the RCP, ACP, and any applicable laws, regulations, or requirements. RRT and Area Committee guidelines may identify the disposal options available during an oil spill response and may describe what disposal requirements are mandatory or may not be waived by the OSC. ACP guidelines should address: the sampling, testing, and classifying of recovered oil and oiled debris; the segregation, temporary storage, and stockpiling of recovered oil and oiled debris; prior state disposal approvals and permits; and the routes; methods (e.g. recycle/reuse, on-site burning, incineration, landfilling, etc.); and sites for the disposal of collected oil, oiled debris, and animal carcasses; and procedures for obtaining waivers, exemptions, or authorizations associated with handling or transporting waste materials. The ACPs may identify a hierarchy of preferences for disposal alternatives, with recycling (reprocessing) being the most preferred, and other alternatives preferred based

53

on priorities for health or the environment.

### § 300.315 Phase IV—Documentation and cost recovery.

(a) All OSLTF users need to collect and maintain documentation to support all actions taken under the CWA. In general, documentation shall be sufficient to support full cost recovery for resources utilized and shall identify the source and circumstances of the incident, the responsible party or parties, and impacts and potential impacts to public health and welfare and the environment. Documentation procedures are contained in 33 CFR part 136.

(b) When appropriate, documentation shall also be collected for scientific understanding of the environment and for research and development of improved response methods and technology. Funding for these actions is restricted by section 6002 of the OPA.

(c) OSCs shall submit OSC reports to the NRT or RRT, only if requested, as provided by § 300.165.

(d) OSCs shall ensure the necessary collection and safeguarding of information, samples, and reports. Samples and information shall be gathered expeditiously during the response to ensure an accurate record of the impacts incurred. Documentation materials shall be made available to the trustees of affected natural resources. The OSC shall make available to trustees of the affected natural resources information and documentation in the OSC's possession that can assist the trustees in the determination of actual or potential natural resource injuries.

(e) Information and reports obtained by the EPA or USCG OSC shall be transmitted to the appropriate offices responsible for follow-up actions.

### § 300.317 National response priorities.

(a) Safety of human life must be given the top priority during every response action. This includes any search and rescue efforts in the general proximity of the discharge and the insurance of safety of response personnel.

(b) Stabilizing the situation to preclude the event from worsening is the next priority. All efforts must be focused on saving a vessel that has been involved in a grounding, collision, fire,

or explosion, so that it does not compound the problem. Comparable measures should be taken to stabilize a situation involving a facility, pipeline, or other source of pollution. Stabilizing the situation includes securing the source of the spill and/or removing the remaining oil from the container (vessel, tank, or pipeline) to prevent additional oil spillage, to reduce the need for follow-up response action, and to minimize adverse impact to the environment.

(c) The response must use all necessary containment and removal tactics in a coordinated manner to ensure a timely, effective response that minimizes adverse impact to the environment.

(d) All parts of this national response strategy should be addressed concurrently, but safety and stabilization are the highest priorities. The OSC should not delay containment and removal decisions unnecessarily and should take actions to minimize adverse impact to the environment that begins as soon as a discharge occurs, as well as actions to minimize further adverse environmental impact from additional discharges.

(e) The priorities set forth in this section are broad in nature, and should not be interpreted to preclude the consideration of other priorities that may arise on a site-specific basis.

### § 300.320 General pattern of response.

(a) When the OSC receives a report of a discharge, actions normally should be taken in the following sequence:

(1) Investigate the report to determine pertinent information such as the threat posed to public health or welfare of the United States or the environment, the type and quantity of polluting material, and the source of the discharge.

(2) Officially classify the size (i.e., minor, medium, major) and type (i.e., substantial threat to the public health or welfare of the United States, worst case discharge) of the discharge and determine the course of action to be followed to ensure effective and immediate removal, mitigation, or prevention of the discharge. Some discharges that are classified as a substantial threat to the public health or welfare

**Environmental Protection Agency**                                    **§ 300.322**

of the United States may be further classified as a spill of national significance by the Administrator of EPA or the Commandant of the USCG. The appropriate course of action may be prescribed in §§ 300.322, 300.323, and 300.324.

(i) When the reported discharge is an actual or potential major discharge, the OSC shall immediately notify the RRT and the NRC.

(ii) When the investigation shows that an actual or potential medium discharge exists, the OSC shall recommend activation of the RRT, if appropriate.

(iii) When the investigation shows that an actual or potential minor discharge exists, the OSC shall monitor the situation to ensure that proper removal action is being taken.

(3) If the OSC determines that effective and immediate removal, mitigation, or prevention of a discharge can be achieved by private party efforts, and where the discharge does not pose a substantial threat to the public health or welfare of the United States, determine whether the responsible party or other person is properly carrying out removal. Removal is being done properly when:

(i) The responsible party is applying the resources called for in its response plan to effectively and immediately remove, minimize, or mitigate threat(s) to public health and welfare and the environment; and

(ii) The removal efforts are in accordance with applicable regulations, including the NCP. Even if the OSC supplements responsible party resources with government resources, the spill response will not be considered improper, unless specifically determined by the OSC.

(4) Where appropriate, determine whether a state or political subdivision thereof has the capability to carry out any or all removal actions. If so, the OSC may arrange funding to support these actions.

(5) Ensure prompt notification of the trustees of affected natural resources in accordance with the applicable RCP and ACP.

(b) Removal shall be considered complete when so determined by the OSC in consultation with the Governor or Governors of the affected states. When

the OSC considers removal complete, OSLTF removal funding shall end. This determination shall not preclude additional removal actions under applicable state law.

**§ 300.322   Response to substantial threats to public health or welfare of the United States.**

(a) As part of the investigation described in § 300.320, the OSC shall determine whether a discharge results in a substantial threat to public health or welfare of the United States (including, but not limited to, fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States). Factors to be considered by the OSC in making this determination include, but are not limited to, the size of the discharge, the character of the discharge, and the nature of the threat to public health or welfare of the United States. Upon obtaining such information, the OSC shall conduct an evaluation of the threat posed, based on the OSC's experience in assessing other discharges, and consultation with senior lead agency officials and readily available authorities on issues outside the OSC's technical expertise.

(b) If the investigation by the OSC shows that the discharge poses or may present a substantial threat to public health or welfare of the United States, the OSC shall direct all federal, state, or private actions to remove the discharge or to mitigate or prevent the threat of such a discharge, as appropriate. In directing the response in such cases, the OSC may act without regard to any other provision of law governing contracting procedures or employment of personnel by the federal government to:

(1) Remove or arrange for the removal of the discharge;

(2) Mitigate or prevent the substantial threat of the discharge; and

(3) Remove and, if necessary, destroy a vessel discharging, or threatening to discharge, by whatever means are available.

(c) In the case of a substantial threat to public health or welfare of the United States, the OSC shall:

55

(1) Assess opportunities for the use of various special teams and other assistance described in §300.145, including the use of the services of the NSFCC, as appropriate;

(2) Request immediate activation of the RRT; and

(3) Take whatever additional response actions are deemed appropriate, including, but not limited to, implementation of the ACP as required by section 311(j)(4) of the CWA or relevant tank vessel or facility response plan required by section 311(j)(5) of the CWA. When requested by the OSC, the lead agency or RRT shall dispatch appropriate personnel to the scene of the discharge to assist the OSC. This assistance may include technical support in the agency's areas of expertise and disseminating information to the public. The lead agency shall ensure that a contracting officer is available on scene, at the request of the OSC.

## § 300.323 Spills of national significance.

(a) A discharge may be classified as a spill of national significance (SONS) by the Administrator of EPA for discharges occurring in the inland zone and the Commandant of the USCG for discharges occurring in the coastal zone.

(b) For a SONS in the inland zone, the EPA Administrator may name a senior Agency official to assist the OSC in communicating with affected parties and the public and coordinating federal, state, local, and international resources at the national level. This strategic coordination will involve, as appropriate, the NRT, RRT(s), the Governor(s) of affected state(s), and the mayor(s) or other chief executive(s) of local government(s).

(c) For a SONS in the coastal zone, the USCG Commandant may name a National Incident Commander (NIC) who will assume the role of the OSC in communicating with affected parties and the public, and coordinating federal, state, local, and international resources at the national level. This strategic coordination will involve, as appropriate, the NRT, RRT(s), the Governor(s) of affected state(s), and the mayor(s) or other chief executive(s) of local government(s).

## § 300.324 Response to worst case discharges.

(a) If the investigation by the OSC shows that a discharge is a worst case discharge as defined in the ACP, or there is a substantial threat of such a discharge, the OSC shall:

(1) Notify the NSFCC;

(2) Require, where applicable, implementation of the worst case portion of an approved tank vessel or facility response plan required by section 311(j)(5) of the CWA;

(3) Implement the worst case portion of the ACP required by section 311(j)(4) of the CWA; and

(4) Take whatever additional response actions are deemed appropriate.

(b) Under the direction of the OSC, the NSFCC shall coordinate use of private and public personnel and equipment, including strike teams, to remove a worst case discharge and mitigate or prevent a substantial threat of such a discharge.

## § 300.335 Funding.

(a) The OSLTF is available under certain circumstances to fund removal of oil performed under section 311 of the CWA. Those circumstances and the procedures for accessing the OSLTF are described in 33 CFR part 136. The responsible party is liable for costs of federal removal and damages in accordance with section 311(f) of the CWA, section 1002 of the OPA, and other federal laws.

(b) Where the OSC requests assistance from a federal agency, that agency may be reimbursed in accordance with the provisions of 33 CFR part 136. Specific interagency reimbursement agreements may be used when necessary to ensure that the federal resources will be available for a timely response to a discharge of oil.

(c) Procedures for funding the initiation of natural resource damage assessment are covered in 33 CFR part 136.

(d) Response actions other than removal, such as scientific investigations not in support of removal actions or law enforcement, shall be provided by the agency with legal responsibility for those specific actions.

(e) The funding of a response to a discharge from a federally owned, operated, or supervised facility or vessel is the responsibility of the owning, operating, or supervising agency if it is a responsible party.

(f) The following agencies have funds available for certain discharge removal actions:

(1) DOD has two specific sources of funds that may be applicable to an oil discharge under appropriate circumstances. This does not consider military resources that might be made available under specific conditions.

(i) Funds required for removal of a sunken vessel or similar obstruction of navigation are available to the Corps of Engineers through Civil Works Appropriations, Operations and Maintenance, General.

(ii) USN may conduct salvage operations contingent on defense operational commitments, when funded by the requesting agency. Such funding may be requested on a direct cite basis.

(2) Pursuant to Title I of the OPA, the state or states affected by a discharge of oil may act where necessary to remove such discharge. Pursuant to 33 CFR part 136 states may be reimbursed from the OSLTF for the reasonable costs incurred in such a removal.

## Subpart E—Hazardous Substance Response

Source: 55 FR 8839, Mar. 8, 1990, unless otherwise noted.

### § 300.400  General.

(a) This subpart establishes methods and criteria for determining the appropriate extent of response authorized by CERCLA and CWA section 311(c):

(1) When there is a release of a hazardous substance into the environment; or

(2) When there is a release into the environment of any pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare of the United States.

(b) *Limitations on response.* Unless the lead agency determines that a release constitutes a public health or environmental emergency and no other person with the authority and capability to

respond will do so in a timely manner, a removal or remedial action under section 104 of CERCLA shall not be undertaken in response to a release:

(1) Of a naturally occurring substance in its unaltered form, or altered solely through naturally occurring processes or phenomena, from a location where it is naturally found;

(2) From products that are part of the structure of, and result in exposure within, residential buildings or business or community structures; or

(3) Into public or private drinking water supplies due to deterioration of the system through ordinary use.

(c) *Fund-financed action.* In determining the need for and in planning or undertaking Fund-financed action, the lead agency shall, to the extent practicable:

(1) Engage in prompt response;

(2) Provide for state participation in response actions, as described in subpart F of this part;

(3) Conserve Fund monies by encouraging private party response;

(4) Be sensitive to local community concerns;

(5) Consider using treatment technologies;

(6) Involve the Regional Response Team (RRT) in both removal and remedial response actions at appropriate decision-making stages;

(7) Encourage the involvement and sharing of technology by industry and other experts; and

(8) Encourage the involvement of organizations to coordinate responsible party actions, foster site response, and provide technical advice to the public, federal and state governments, and industry.

(d) *Entry and access.* (1) For purposes of determining the need for response, or choosing or taking a response action, or otherwise enforcing the provisions of CERCLA, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), has the authority to enter any vessel, facility, establishment or other place, property, or location described in paragraph (d)(2) of this section and conduct, complete, operate, and maintain any

response actions authorized by CERCLA or these regulations.

(2)(i) Under the authorities described in paragraph (d)(1) of this section, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), may enter:

(A) Any vessel, facility, establishment, or other place or property where any hazardous substance or pollutant or contaminant may be or has been generated, stored, treated, disposed of, or transported from;

(B) Any vessel, facility, establishment, or other place or property from which, or to which, a hazardous substance or pollutant or contaminant has been, or may have been, released or where such release is or may be threatened;

(C) Any vessel, facility, establishment, or other place or property where entry is necessary to determine the need for response or the appropriate response or to effectuate a response action; or

(D) Any vessel, facility, establishment, or other place, property, or location adjacent to those vessels, facilities, establishments, places, or properties described in paragraphs (d)(2)(i)(A), (B), or (C) of this section.

(ii) Once a determination has been made that there is a reasonable basis to believe that there has been or may be a release, EPA, or the appropriate federal agency, and a state or political subdivision operating pursuant to a contract or cooperative agreement under CERCLA section 104(d)(1), is authorized to enter all vessels, facilities, establishments, places, properties, or locations specified in paragraph (d)(2)(i) of this section, at which the release is believed to be, and all other vessels, facilities, establishments, places, properties, or locations identified in paragraph (d)(2)(i) of this section that are related to the response or are necessary to enter in responding to that release.

(3) The lead agency may designate as its representative solely for the purpose of access, among others, one or more potentially responsible parties, including representatives, employees, agents, and contractors of such parties.

EPA, or the appropriate federal agency, may exercise the authority contained in section 104(e) of CERCLA to obtain access for its designated representative. A potentially responsible party may only be designated as a representative of the lead agency where that potentially responsible party has agreed to conduct response activities pursuant to an administrative order or consent decree.

(4)(i) If consent is not granted under the authorities described in paragraph (d)(1) of this section, or if consent is conditioned in any manner, EPA, or the appropriate federal agency, may issue an order pursuant to section 104(e)(5) of CERCLA directing compliance with the request for access made under § 300.400(d)(1). EPA or the appropriate federal agency may ask the Attorney General to commence a civil action to compel compliance with either a request for access or an order directing compliance.

(ii) EPA reserves the right to proceed, where appropriate, under applicable authority other than CERCLA section 104(e).

(iii) The administrative order may direct compliance with a request to enter or inspect any vessel, facility, establishment, place, property, or location described in paragraph (d)(2) of this section.

(iv) Each order shall contain:

(A) A determination by EPA, or the appropriate federal agency, that it is reasonable to believe that there may be or has been a release or threat of a release of a hazardous substance or pollutant or contaminant and a statement of the facts upon which the determination is based;

(B) A description, in light of CERCLA response authorities, of the purpose and estimated scope and duration of the entry, including a description of the specific anticipated activities to be conducted pursuant to the order;

(C) A provision advising the person who failed to consent that an officer or employee of the agency that issued the order will be available to confer with respondent prior to effective date of the order; and

(D) A provision advising the person who failed to consent that a court may impose a penalty of up to $25,000 per

**Environmental Protection Agency** §300.400

day for unreasonable failure to comply with the order.

(v) Orders shall be served upon the person or responsible party who failed to consent prior to their effective date. Force shall not be used to compel compliance with an order.

(vi) Orders may not be issued for any criminal investigations.

(e) *Permit requirements.* (1) No federal, state, or local permits are required for on-site response actions conducted pursuant to CERCLA sections 104, 106, 120, 121, or 122. The term *on-site* means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action.

(2) Permits, if required, shall be obtained for all response activities conducted off-site.

(f) *Health assessments.* Health assessments shall be performed by ATSDR at facilities on or proposed to be listed on the NPL and may be performed at other releases or facilities in response to petitions made to ATSDR. Where available, these health assessments may be used by the lead agency to assist in determining whether response actions should be taken and/or to identify the need for additional studies to assist in the assessment of potential human health effects associated with releases or potential releases of hazardous substances.

(g) *Identification of applicable or relevant and appropriate requirements.* (1) The lead and support agencies shall identify requirements applicable to the release or remedial action contemplated based upon an objective determination of whether the requirement specifically addresses a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site.

(2) If, based upon paragraph (g)(1) of this section, it is determined that a requirement is not applicable to a specific release, the requirement may still be relevant and appropriate to the circumstances of the release. In evaluating relevance and appropriateness, the factors in paragraphs (g)(2)(i) through (viii) of this section shall be examined, where pertinent, to determine whether a requirement addresses problems or situations sufficiently similar to the circumstances of the release or remedial action contemplated, and whether the requirement is well-suited to the site, and therefore is both relevant and appropriate. The pertinence of each of the following factors will depend, in part, on whether a requirement addresses a chemical, location, or action. The following comparisons shall be made, where pertinent, to determine relevance and appropriateness:

(i) The purpose of the requirement and the purpose of the CERCLA action;

(ii) The medium regulated or affected by the requirement and the medium contaminated or affected at the CERCLA site;

(iii) The substances regulated by the requirement and the substances found at the CERCLA site;

(iv) The actions or activities regulated by the requirement and the remedial action contemplated at the CERCLA site;

(v) Any variances, waivers, or exemptions of the requirement and their availability for the circumstances at the CERCLA site;

(vi) The type of place regulated and the type of place affected by the release or CERCLA action;

(vii) The type and size of structure or facility regulated and the type and size of structure or facility affected by the release or contemplated by the CERCLA action;

(viii) Any consideration of use or potential use of affected resources in the requirement and the use or potential use of the affected resource at the CERCLA site.

(3) In addition to applicable or relevant and appropriate requirements, the lead and support agencies may, as appropriate, identify other advisories, criteria, or guidance to be considered for a particular release. The "to be considered" (TBC) category consists of advisories, criteria, or guidance that were developed by EPA, other federal agencies, or states that may be useful in developing CERCLA remedies.

(4) Only those state standards that are promulgated, are identified by the state in a timely manner, and are more stringent than federal requirements

59