may be applicable or relevant and appropriate. For purposes of identification and notification of promulgated state standards, the term *promulgated* means that the standards are of general applicability and are legally enforceable.

(5) The lead agency and support agency shall identify their specific requirements that are applicable or relevant and appropriate for a particular site. These agencies shall notify each other, in a timely manner as described in § 300.515(d), of the requirements they have determined to be applicable or relevant and appropriate. When identifying a requirement as an ARAR, the lead agency and support agency shall include a citation to the statute or regulation from which the requirement is derived.

(6) Notification of ARARs shall be according to procedures and timeframes specified in § 300.515 (d)(2) and (h)(2).

(h) *Oversight.* The lead agency may provide oversight for actions taken by potentially responsible parties to ensure that a response is conducted consistent with this part. The lead agency may also monitor the actions of third parties preauthorized under subpart H of this part. EPA will provide oversight when the response is pursuant to an EPA order or federal consent decree.

(i) *Other.* (1) This subpart does not establish any preconditions to enforcement action by either the federal or state governments to compel response actions by potentially responsible parties.

(2) While much of this subpart is oriented toward federally funded response actions, this subpart may be used as guidance concerning methods and criteria for response actions by other parties under other funding mechanisms. Except as provided in subpart H of this part, nothing in this part is intended to limit the rights of any person to seek recovery of response costs from responsible parties pursuant to CERCLA section 107.

(3) Activities by the federal and state governments in implementing this subpart are discretionary governmental functions. This subpart does not create in any private party a right to federal response or enforcement action. This subpart does not create any duty of the federal government to take any response action at any particular time.

[55 FR 8839, Mar. 8, 1990, as amended at 59 FR 47447, Sept. 15, 1994]

**§ 300.405  Discovery or notification.**

(a) A release may be discovered through:

(1) A report submitted in accordance with section 103(a) of CERCLA, *i.e.*, reportable quantities codified at 40 CFR part 302;

(2) A report submitted to EPA in accordance with section 103(c) of CERCLA;

(3) Investigation by government authorities conducted in accordance with section 104(e) of CERCLA or other statutory authority;

(4) Notification of a release by a federal or state permit holder when required by its permit;

(5) Inventory or survey efforts or random or incidental observation reported by government agencies or the public;

(6) Submission of a citizen petition to EPA or the appropriate federal facility requesting a preliminary assessment, in accordance with section 105(d) of CERCLA;

(7) A report submitted in accordance with section 311(b)(5) of the CWA; and

(8) Other sources.

(b) Any person in charge of a vessel or a facility shall report releases as described in paragraph (a)(1) of this section to the National Response Center (NRC). If direct reporting to the NRC is not practicable, reports may be made to the United States Coast Guard (USCG) on-scene coordinator (OSC) for the geographic area where the release occurs. The EPA predesignated OSC may also be contacted through the regional 24-hour emergency response telephone number. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest USCG unit. In any event, such person in charge of the vessel or facility shall notify the NRC as soon as possible.

(c) All other reports of releases described under paragraph (a) of this section, except releases reported under paragraphs (a)(2) and (6) of this section,

**Environmental Protection Agency**

§ 300.410

shall, as appropriate, be made to the NRC.

(d) The NRC will generally need information that will help to characterize the release. This will include, but not be limited to: Location of the release; type(s) of material(s) released; an estimate of the quantity of material released; possible source of the release; and date and time of the release. Reporting under paragraphs (b) and (c) of this section shall not be delayed due to incomplete notification information.

(e) Upon receipt of a notification of a release, the NRC shall promptly notify the appropriate OSC. The OSC shall notify the Governor, or designee, of the state affected by the release.

(f)(1) When the OSC is notified of a release that may require response pursuant to § 300.415(b), a removal site evaluation shall, as appropriate, be promptly undertaken pursuant to § 300.410.

(2) When notification indicates that removal action pursuant to § 300.415(b) is not required, a remedial site evaluation shall, if appropriate, be undertaken by the lead agency pursuant to § 300.420, if one has not already been performed.

(3) If radioactive substances are present in a release, the EPA Radiological Response Coordinator should be notified for evaluation and assistance either directly or via the NRC, consistent with §§ 300.130(e) and 300.145(f).

(g) Release notification made to the NRC under this section does not relieve the owner/operator of a facility from any obligations to which it is subject under SARA Title III or state law. In particular, it does not relieve the owner/operator from the requirements of section 304 of SARA Title III and 40 CFR part 355 and § 300.215(f) of this part for notifying the community emergency coordinator for the appropriate local emergency planning committee of all affected areas and the state emergency response commission of any state affected that there has been a release. Federal agencies are not legally obligated to comply with the requirements of Title III of SARA.

[55 FR 8839, Mar. 8, 1990, as amended at 59 FR 47447, Sept. 15, 1994]

§ 300.410   Removal site evaluation.

(a) A removal site evaluation includes a removal preliminary assessment and, if warranted, a removal site inspection.

(b) A removal site evaluation of a release identified for possible CERCLA response pursuant to § 300.415 shall, as appropriate, be undertaken by the lead agency as promptly as possible. The lead agency may perform a removal preliminary assessment in response to petitions submitted by a person who is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant pursuant to § 300.420(b)(5).

(c)(1) The lead agency shall, as appropriate, base the removal preliminary assessment on readily available information. A removal preliminary assessment may include, but is not limited to:

(i) Identification of the source and nature of the release or threat of release;

(ii) Evaluation by ATSDR or by other sources, for example, state public health agencies, of the threat to public health;

(iii) Evaluation of the magnitude of the threat;

(iv) Evaluation of factors necessary to make the determination of whether a removal is necessary; and

(v) Determination of whether a non-federal party is undertaking proper response.

(2) A removal preliminary assessment of releases from hazardous waste management facilities may include collection or review of data such as site management practices, information from generators, photographs, analysis of historical photographs, literature searches, and personal interviews conducted, as appropriate.

(d) A removal site inspection may be performed if more information is needed. Such inspection may include a perimeter (i.e., off-site) or on-site inspection, taking into consideration whether such inspection can be performed safely.

(e)(1) As part of the evaluation under this section, the OSC shall determine whether a release governed by CWA section 311(c)(1), as amended by OPA section 4201(a), has occurred.

(2) If such a release of a CWA hazardous substance has occurred, the OSC shall determine whether the release results in a substantial threat to the public health or welfare of the United States. Factors to be considered by the OSC in making this determination include, but are not limited to, the size of the release, the character of the release, and the nature of the threat to public health or welfare of the United States. Upon obtaining relevant elements of such information, the OSC shall conduct an evaluation of the threat posed, based on the OSC's experience in assessing other releases, and consultation with senior lead agency officials and readily available authorities on issues outside the OSC's technical expertise.

(f) A removal site evaluation shall be terminated when the OSC or lead agency determines:

(1) There is no release;

(2) The source is neither a vessel nor a facility as defined in § 300.5 of the NCP;

(3) The release involves neither a hazardous substance, nor a pollutant or contaminant that may present an imminent and substantial danger to public health or welfare of the United States;

(4) The release consists of a situation specified in § 300.400(b)(1) through (3) subject to limitations on response;

(5) The amount, quantity, or concentration released does not warrant federal response;

(6) A party responsible for the release, or any other person, is providing appropriate response, and on-scene monitoring by the government is not required; or

(7) The removal site evaluation is completed.

(g) The results of the removal site evaluation shall be documented.

(h) The OSC or lead agency shall ensure that natural resource trustees are promptly notified in order that they may initiate appropriate actions, including those identified in subpart G of this part. The OSC or lead agency shall coordinate all response activities with such affected trustees.

(i) If the removal site evaluation indicates that removal action under § 300.415 is not required, but that remedial action under § 300.430 may be necessary, the lead agency shall, as appropriate, initiate a remedial site evaluation pursuant to § 300.420.

[59 FR 47448, Sept. 15, 1994]

§ 300.415  Removal action.

(a)(1) In determining the appropriate extent of action to be taken in response to a given release, the lead agency shall first review the removal site evaluation, any information produced through a remedial site evaluation, if any has been done previously, and the current site conditions, to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable, to determine whether they can and will perform the necessary removal action promptly and properly.

(3) This section does not apply to removal actions taken pursuant to section 104(b) of CERCLA. The criteria for such actions are set forth in section 104(b) of CERCLA.

(b)(1) At any release, regardless of whether the site is included on the National Priorities List (NPL), where the lead agency makes the determination, based on the factors in paragraph (b)(2) of this section, that there is a threat to public health or welfare of the United States or the environment, the lead agency may take any appropriate removal action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release.

(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this section:

(i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants

**Environmental Protection Agency**                    **§ 300.415**

in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

(3) If the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat to public health or welfare of the United States or the environment. The lead agency shall, at the earliest possible time, also make any necessary determinations pursuant to paragraph (b)(4) of this section.

(4) Whenever a planning period of at least six months exists before on-site activities must be initiated, and the lead agency determines, based on a site evaluation, that a removal action is appropriate:

(i) The lead agency shall conduct an engineering evaluation/cost analysis (EE/CA) or its equivalent. The EE/CA is an analysis of removal alternatives for a site.

(ii) If environmental samples are to be collected, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(A) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(B) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in planning and documenting the removal action.

(5) CERCLA fund-financed removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site, unless the lead agency determines that:

(i) There is an immediate risk to public health or welfare of the United States or the environment; continued response actions are immediately required to prevent, limit, or mitigate an emergency; and such assistance will not otherwise be provided on a timely basis; or

(ii) Continued response action is otherwise appropriate and consistent with the remedial action to be taken.

(c)(1) In carrying out a response to a release of a CWA hazardous substance, as described in CWA section 311(c)(1), as amended by OPA section 4201(a), the OSC may:

(i) Remove or arrange for the removal of a release, and mitigate or prevent a substantial threat of a release, at any time;

(ii) Direct or monitor all federal, state, and private actions to remove a release; and

(iii) Remove and, if necessary, destroy a vessel releasing or threatening to release CWA hazardous substances, by whatever means are available.

(2) If the investigation by the OSC under § 300.410 shows that the release of a CWA hazardous substance results in a substantial threat to public health or welfare of the United States, the OSC shall direct all federal, state, or private actions to remove the release or to mitigate or prevent the threat of such a release, as appropriate. In directing the response, the OSC may act without regard to any other provision of law governing contracting procedures or employment of personnel by the federal government to:

(i) Remove or arrange for the removal of the release;

(ii) Mitigate or prevent the substantial threat of the release; and

(iii) Remove and, if necessary, destroy a vessel releasing, or threatening to release, by whatever means are available.

(3) In the case of a release of a CWA hazardous substance posing a substantial threat to public health or welfare of the United States, the OSC shall:

(i) Assess opportunities for the use of various special teams and other assistance described in § 300.145, as appropriate;

(ii) Request immediate activation of the RRT; and

(iii) Take whatever additional response actions are deemed appropriate. When requested by the OSC, the lead agency or RRT shall dispatch appropriate personnel to the scene of the release to assist the OSC. This assistance may include technical support in the agency's areas of expertise and disseminating information to the public in accordance with § 300.155. The lead agency shall ensure that a contracting officer is available on-scene, at the request of the OSC.

(d) Removal actions shall, to the extent practicable, contribute to the efficient performance of any anticipated long-term remedial action with respect to the release concerned.

(e) The following removal actions are, as a general rule, appropriate in the types of situations shown; however, this list is not exhaustive and is not intended to prevent the lead agency from taking any other actions deemed necessary under CERCLA, CWA section 311, or other appropriate federal or state enforcement or response authorities, and the list does not create a duty on the lead agency to take action at any particular time:

(1) Fences, warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls, for example, run-off or run-on diversion—where needed to reduce migration of hazardous substances or pollutants or contaminants off-site or to prevent precipitation or run-off from other sources, for example, flooding, from entering the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments or drainage or closing of lagoons—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Excavation, consolidation, or removal of highly contaminated soils from drainage or other areas—where such actions will reduce the spread of, or direct contact with, the contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

(8) Containment, treatment, disposal, or incineration of hazardous materials—where needed to reduce the likelihood of human, animal, or food chain exposure; or

(9) Provision of alternative water supply—where necessary immediately to reduce exposure to contaminated household water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

(f) Where necessary to protect public health or welfare, the lead agency shall request that FEMA conduct a temporary relocation or that state/local officials conduct an evacuation.

(g) If the lead agency determines that the removal action will not fully address the threat posed by the release and the release may require remedial action, the lead agency shall ensure an orderly transition from removal to remedial response activities.

(h) CERCLA removal actions conducted by states under cooperative agreements, described in subpart F of this part, shall comply with all requirements of this section.

(i) Facilities operated by a state or political subdivision at the time of disposal require a state cost share of at least 50 percent of Fund-financed response costs if a Fund-financed remedial action is conducted.

(j) Fund-financed removal actions under CERCLA section 104 and removal actions pursuant to CERCLA section 106 shall, to the extent practicable considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under

**Environmental Protection Agency**                                   **§ 300.415**

federal environmental or state environmental or facility siting laws. Waivers described in § 300.430(f)(1)(ii)(C) may be used for removal actions. Other federal and state advisories, criteria, or guidance may, as appropriate, be considered in formulating the removal action (see § 300.400(g)(3)). In determining whether compliance with ARARs is practicable, the lead agency may consider appropriate factors, including:

(1) The urgency of the situation; and

(2) The scope of the removal action to be conducted.

(k) Removal actions pursuant to section 106 or 122 of CERCLA are not subject to the following requirements of this section:

(1) Section 300.415(a)(2) requirement to locate responsible parties and have them undertake the response;

(2) Section 300.415(b)(2)(vii) requirement to consider the availability of other appropriate federal or state response and enforcement mechanisms to respond to the release;

(3) Section 300.415(b)(5) requirement to terminate response after $2 million has been obligated or 12 months have elapsed from the date of initial response; and

(4) Section 300.415(g) requirement to assure an orderly transition from removal to remedial action.

(l) To the extent practicable, provision for post-removal site control following a CERCLA Fund-financed removal action at both NPL and non-NPL sites is encouraged to be made prior to the initiation of the removal action. Such post-removal site control includes actions necessary to ensure the effectiveness and integrity of the removal action after the completion of the on-site removal action or after the $2 million or 12-month statutory limits are reached for sites that do not meet the exemption criteria in paragraph (b)(5) of this section. Post-removal site control may be conducted by:

(1) The affected state or political subdivision thereof or local units of government for any removal;

(2) Potentially responsible parties; or

(3) EPA's remedial program for some federal-lead Fund-financed responses at NPL sites.

(m) OSCs/RPMs conducting removal actions shall submit OSC reports to the RRT as required by § 300.165.

(n) *Community relations in removal actions.* (1) In the case of all CERCLA removal actions taken pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a spokesperson shall be designated by the lead agency. The spokesperson shall inform the community of actions taken, respond to inquiries, and provide information concerning the release. All news releases or statements made by participating agencies shall be coordinated with the OSC/RPM. The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies.

(2) For CERCLA actions where, based on the site evaluation, the lead agency determines that a removal is appropriate, and that less than six months exists before on-site removal activity must begin, the lead agency shall:

(i) Publish a notice of availability of the administrative record file established pursuant to § 300.820 in a major local newspaper of general circulation or use one or more other mechanisms to give adequate notice to a community within 60 days of initiation of on-site removal activity;

(ii) Provide a public comment period, as appropriate, of not less than 30 days from the time the administrative record file is made available for public inspection, pursuant to § 300.820(b)(2); and

(iii) Prepare a written response to significant comments pursuant to § 300.820(b)(3).

(3) For CERCLA removal actions where on-site action is expected to extend beyond 120 days from the initiation of on-site removal activities, the lead agency shall by the end of the 120-day period:

(i) Conduct interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns, information needs, and how or when citizens would like to be involved in the Superfund process;

(ii) Prepare a formal community relations plan (CRP) based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the response; and

(iii) Establish at least one local information repository at or near the location of the response action. The information repository should contain items made available for public information. Further, an administrative record file established pursuant to subpart I for all removal actions shall be available for public inspection in at least one of the repositories. The lead agency shall inform the public of the establishment of the information repository and provide notice of availability of the administrative record file for public review. All items in the repository shall be available for public inspection and copying.

(4) Where, based on the site evaluation, the lead agency determines that a CERCLA removal action is appropriate and that a planning period of at least six months exists prior to initiation of the on-site removal activities, the lead agency shall at a minimum:

(i) Comply with the requirements set forth in paragraphs (n)(3)(i), (ii), and (iii) of this section, prior to the completion of the EE/CA, or its equivalent, except that the information repository and the administrative record file will be established no later than when the EE/CA approval memorandum is signed;

(ii) Publish a notice of availability and brief description of the EE/CA in a major local newspaper of general circulation or use one or more other mechanisms to give adequate notice to a community pursuant to § 300.820;

(iii) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written and oral comments after completion of the EE/CA pursuant to § 300.820(a). Upon timely request, the lead agency will extend the public comment period by a minimum of 15 days; and

(iv) Prepare a written response to significant comments pursuant to § 300.820(a).

[59 FR 47448, Sept. 15, 1994, as amended at 80 FR 17706, Apr. 2, 2015]

## § 300.420 Remedial site evaluation.

(a) *General.* The purpose of this section is to describe the methods, procedures, and criteria the lead agency shall use to collect data, as required, and evaluate releases of hazardous substances, pollutants, or contaminants. The evaluation may consist of two steps: a remedial preliminary assessment (PA) and a remedial site inspection (SI).

(b) *Remedial preliminary assessment.* (1) The lead agency shall perform a remedial PA on all sites entered into the SEMS remedial assessment active inventory as defined in § 300.5 to:

(i) Eliminate from further consideration those sites that pose no threat to public health or the environment;

(ii) Determine if there is any potential need for removal action;

(iii) Set priorities for site inspections; and

(iv) Gather existing data to facilitate later evaluation of the release pursuant to the Hazard Ranking System (HRS) if warranted.

(2) A remedial PA shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release. A remedial PA shall also include an off-site reconnaissance as appropriate. A remedial PA may include an on-site reconnaissance where appropriate.

(3) If the remedial PA indicates that a removal action may be warranted, the lead agency shall initiate removal evaluation pursuant to § 300.410.

(4) In performing a remedial PA, the lead agency may complete the EPA Preliminary Assessment form, available from EPA regional offices, or its equivalent, and shall prepare a PA report, which shall include:

(i) A description of the release;

(ii) A description of the probable nature of the release; and

(iii) A recommendation on whether further action is warranted, which lead agency should conduct further action, and whether an SI or removal action or both should be undertaken.

(5) Any person may petition the lead federal agency (EPA or the appropriate federal agency in the case of a release or suspected release from a federal facility), to perform a PA of a release

**Environmental Protection Agency**    §300.420

when such person is, or may be, affected by a release of a hazardous substance, pollutant, or contaminant. Such petitions shall be addressed to the EPA Regional Administrator for the region in which the release is located, except that petitions for PAs involving federal facilities should be addressed to the head of the appropriate federal agency.

(i) Petitions shall be signed by the petitioner and shall contain the following:

(A) The full name, address, and phone number of petitioner;

(B) A description, as precisely as possible, of the location of the release; and

(C) How the petitioner is or may be affected by the release.

(ii) Petitions should also contain the following information to the extent available:

(A) What type of substances were or may be released;

(B) The nature of activities that have occurred where the release is located; and

(C) Whether local and state authorities have been contacted about the release.

(iii) The lead federal agency shall complete a remedial or removal PA within one year of the date of receipt of a complete petition pursuant to paragraph (b)(5) of this section, if one has not been performed previously, unless the lead federal agency determines that a PA is not appropriate. Where such a determination is made, the lead federal agency shall notify the petitioner and will provide a reason for the determination.

(iv) When determining if performance of a PA is appropriate, the lead federal agency shall take into consideration:

(A) Whether there is information indicating that a release has occurred or there is a threat of a release of a hazardous substance, pollutant, or contaminant; and

(B) Whether the release is eligible for response under CERCLA.

(c) *Remedial site inspection.* (1) The lead agency shall perform a remedial SI as appropriate to:

(i) Eliminate from further consideration those releases that pose no significant threat to public health or the environment;

(ii) Determine the potential need for removal action;

(iii) Collect or develop additional data, as appropriate, to evaluate the release pursuant to the HRS; and

(iv) Collect data in addition to that required to score the release pursuant to the HRS, as appropriate, to better characterize the release for more effective and rapid initiation of the RI/FS or response under other authorities.

(2) The remedial SI shall build upon the information collected in the remedial PA. The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling.

(3) If the remedial SI indicates that removal action may be appropriate, the lead agency shall initiate removal site evaluation pursuant to §300.410.

(4) Prior to conducting field sampling as part of site inspections, the lead agency shall develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples, and the type of analyses, and

(ii) The quality assurance project plan (QAPP), which describes policy, organization, and functional activities, and the data quality objectives and measures necessary to achieve adequate data for use in site evaluation and hazard ranking system activities.

(5) Upon completion of a remedial SI, the lead agency shall prepare a report that includes the following:

(i) A description/history/nature of waste handling;

(ii) A description of known contaminants;

(iii) A description of pathways of migration of contaminants;

(iv) An identification and description of human and environmental targets; and

(v) A recommendation on whether further action is warranted.

[55 FR 8839, Mar. 8, 1990, as amended at 79 FR 65592, Nov. 5, 2014]

**§ 300.425 Establishing remedial priorities.**

(a) *General.* The purpose of this section is to identify the criteria as well as the methods and procedures EPA uses to establish its priorities for remedial actions.

(b) *National Priorities List.* The NPL is the list of priority releases for long-term remedial evaluation and response.

(1) Only those releases included on the NPL shall be considered eligible for Fund-financed remedial action. Removal actions (including remedial planning activities, RI/FSs, and other actions taken pursuant to CERCLA section 104(b)) are not limited to NPL sites.

(2) Inclusion of a release on the NPL does not imply that monies will be expended, nor does the rank of a release on the NPL establish the precise priorities for the allocation of Fund resources. EPA may also pursue other appropriate authorities to remedy the release, including enforcement actions under CERCLA and other laws. A site's rank on the NPL serves, along with other factors, including enforcement actions, as a basis to guide the allocation of Fund resources among releases.

(3) Federal facilities that meet the criteria identified in paragraph (c) of this section are eligible for inclusion on the NPL. Except as provided by CERCLA sections 111(e)(3) and 111(c), federal facilities are not eligible for Fund-financed remedial actions.

(4) Inclusion on the NPL is not a precondition to action by the lead agency under CERCLA sections 106 or 122 or to action under CERCLA section 107 for recovery of non-Fund-financed costs or Fund-financed costs other than Fund-financed remedial construction costs.

(c) *Methods for determining eligibility for NPL.* A release may be included on the NPL if the release meets one of the following criteria:

(1) The release scores sufficiently high pursuant to the Hazard Ranking System described in appendix A to this part.

(2) A state (not including Indian tribes) has designated a release as its highest priority. States may make only one such designation; or

(3) The release satisfies all of the following criteria:

(i) The Agency for Toxic Substances and Disease Registry has issued a health advisory that recommends dissociation of individuals from the release;

(ii) EPA determines that the release poses a significant threat to public health; and

(iii) EPA anticipates that it will be more cost-effective to use its remedial authority than to use removal authority to respond to the release.

(d) *Procedures for placing sites on the NPL.* Lead agencies may submit candidates to EPA by scoring the release using the HRS and providing the appropriate backup documentation.

(1) Lead agencies may submit HRS scoring packages to EPA anytime throughout the year.

(2) EPA shall review lead agencies' HRS scoring packages and revise them as appropriate. EPA shall develop any additional HRS scoring packages on releases known to EPA.

(3) EPA shall compile the NPL based on the methods identified in paragraph (c) of this section.

(4) EPA shall update the NPL at least once a year.

(5) To ensure public involvement during the proposal to add a release to the NPL, EPA shall:

(i) Publish the proposed rule in the FEDERAL REGISTER and solicit comments through a public comment period; and

(ii) Publish the final rule in the FEDERAL REGISTER, and make available a response to each significant comment and any significant new data submitted during the comment period.

(6) Releases may be categorized on the NPL when deemed appropriate by EPA.

(e) *Deletion from the NPL.* Releases may be deleted from or recategorized on the NPL where no further response is appropriate.

(1) EPA shall consult with the state on proposed deletions from the NPL prior to developing the notice of intent to delete. In making a determination to delete a release from the NPL, EPA shall consider, in consultation with the state, whether any of the following criteria has been met:

**Environmental Protection Agency**                    **§ 300.430**

(i) Responsible parties or other persons have implemented all appropriate response actions required;

(ii) All appropriate Fund-financed response under CERCLA has been implemented, and no further response action by responsible parties is appropriate; or

(iii) The remedial investigation has shown that the release poses no significant threat to public health or the environment and, therefore, taking of remedial measures is not appropriate.

(2) Releases shall not be deleted from the NPL until the state in which the release was located has concurred on the proposed deletion. EPA shall provide the state 30 working days for review of the deletion notice prior to its publication in the FEDERAL REGISTER.

(3) All releases deleted from the NPL are eligible for further Fund-financed remedial actions should future conditions warrant such action. Whenever there is a significant release from a site deleted from the NPL, the site shall be restored to the NPL without application of the HRS.

(4) To ensure public involvement during the proposal to delete a release from the NPL, EPA shall:

(i) Publish a notice of intent to delete in the FEDERAL REGISTER and solicit comment through a public comment period of a minimum of 30 calendar days;

(ii) In a major local newspaper of general circulation at or near the release that is proposed for deletion, publish a notice of availability or use one or more other mechanisms to give adequate notice to a community of the intent to delete;

(iii) Place copies of information supporting the proposed deletion in the information repository, described in §300.430(c)(2)(iii), at or near the release proposed for deletion. These items shall be available for public inspection and copying; and

(iv) Respond to each significant comment and any significant new data submitted during the comment period and include this response document in the final deletion package.

(5) EPA shall place the final deletion package in the local information repository once the notice of final deletion has been published in the FEDERAL REGISTER.

[55 FR 8839, Mar. 8, 1990, as amended at 80 FR 17706, Apr. 2, 2015]

**§ 300.430   Remedial investigation/feasibility study and selection of remedy.**

(a) *General*—(1) *Introduction.* The purpose of the remedy selection process is to implement remedies that eliminate, reduce, or control risks to human health and the environment. Remedial actions are to be implemented as soon as site data and information make it possible to do so. Accordingly, EPA has established the following program goal, expectations, and program management principles to assist in the identification and implementation of appropriate remedial actions.

(i) *Program goal.* The national goal of the remedy selection process is to select remedies that are protective of human health and the environment, that maintain protection over time, and that minimize untreated waste.

(ii) *Program management principles.* EPA generally shall consider the following general principles of program management during the remedial process:

(A) Sites should generally be remediated in operable units when early actions are necessary or appropriate to achieve significant risk reduction quickly, when phased analysis and response is necessary or appropriate given the size or complexity of the site, or to expedite the completion of total site cleanup.

(B) Operable units, including interim action operable units, should not be inconsistent with nor preclude implementation of the expected final remedy.

(C) Site-specific data needs, the evaluation of alternatives, and the documentation of the selected remedy should reflect the scope and complexity of the site problems being addressed.

(iii) *Expectations.* EPA generally shall consider the following expectations in developing appropriate remedial alternatives:

(A) EPA expects to use treatment to address the principal threats posed by a site, wherever practicable. Principal

threats for which treatment is most likely to be appropriate include liquids, areas contaminated with high concentrations of toxic compounds, and highly mobile materials.

(B) EPA expects to use engineering controls, such as containment, for waste that poses a relatively low long-term threat or where treatment is impracticable.

(C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment. In appropriate site situations, treatment of the principal threats posed by a site, with priority placed on treating waste that is liquid, highly toxic or highly mobile, will be combined with engineering controls (such as containment) and institutional controls, as appropriate, for treatment residuals and untreated waste.

(D) EPA expects to use institutional controls such as water use and deed restrictions to supplement engineering controls as appropriate for short- and long-term management to prevent or limit exposure to hazardous substances, pollutants, or contaminants. Institutional controls may be used during the conduct of the remedial investigation/feasibility study (RI/FS) and implementation of the remedial action and, where necessary, as a component of the completed remedy. The use of institutional controls shall not substitute for active response measures (e.g., treatment and/or containment of source material, restoration of ground waters to their beneficial uses) as the sole remedy unless such active measures are determined not to be practicable, based on the balancing of trade-offs among alternatives that is conducted during the selection of remedy.

(E) EPA expects to consider using innovative technology when such technology offers the potential for comparable or superior treatment performance or implementability, fewer or lesser adverse impacts than other available approaches, or lower costs for similar levels of performance than demonstrated technologies.

(F) EPA expects to return usable ground waters to their beneficial uses wherever practicable, within a time-frame that is reasonable given the particular circumstances of the site. When restoration of ground water to beneficial uses is not practicable, EPA expects to prevent further migration of the plume, prevent exposure to the contaminated ground water, and evaluate further risk reduction.

(2) *Remedial investigation/feasibility study.* The purpose of the remedial investigation/feasibility study (RI/FS) is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy. Developing and conducting an RI/FS generally includes the following activities: project scoping, data collection, risk assessment, treatability studies, and analysis of alternatives. The scope and timing of these activities should be tailored to the nature and complexity of the problem and the response alternatives being considered.

(b) *Scoping.* In implementing this section, the lead agency should consider the program goal, program management principles, and expectations contained in this rule. The investigative and analytical studies should be tailored to site circumstances so that the scope and detail of the analysis is appropriate to the complexity of site problems being addressed. During scoping, the lead and support agencies shall confer to identify the optimal set and sequence of actions necessary to address site problems. Specifically, the lead agency shall:

(1) Assemble and evaluate existing data on the site, including the results of any removal actions, remedial preliminary assessment and site inspections, and the NPL listing process.

(2) Develop a conceptual understanding of the site based on the evaluation of existing data described in paragraph (b)(1) of this section.

(3) Identify likely response scenarios and potentially applicable technologies and operable units that may address site problems.

(4) Undertake limited data collection efforts or studies where this information will assist in scoping the RI/FS or accelerate response actions, and begin to identify the need for treatability studies, as appropriate.

(5) Identify the type, quality, and quantity of the data that will be collected during the RI/FS to support decisions regarding remedial response activities.

(6) Prepare site-specific health and safety plans that shall specify, at a minimum, employee training and protective equipment, medical surveillance requirements, standard operating procedures, and a contingency plan that conforms with 29 CFR 1910.120 (l)(1) and (l)(2).

(7) If natural resources are or may be injured by the release, ensure that state and federal trustees of the affected natural resources have been notified in order that the trustees may initiate appropriate actions, including those identified in subpart G of this part. The lead agency shall seek to coordinate necessary assessments, evaluations, investigations, and planning with such state and federal trustees.

(8) Develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs. Sampling and analysis plans shall be reviewed and approved by EPA. The sampling and analysis plans shall consist of two parts:

(i) The field sampling plan, which describes the number, type, and location of samples and the type of analyses; and

(ii) The quality assurance project plan, which describes policy, organization, and functional activities and the data quality objectives and measures necessary to achieve adequate data for use in selecting the appropriate remedy.

(9) Initiate the identification of potential federal and state ARARs and, as appropriate, other criteria, advisories, or guidance to be considered.

(c) *Community relations.* (1) The community relations requirements described in this section apply to all remedial activities undertaken pursuant to CERCLA section 104 and to section 106 or section 122 consent orders or decrees, or section 106 administrative orders.

(2) The lead agency shall provide for the conduct of the following community relations activities, to the extent practicable, prior to commencing field work for the remedial investigation:

(i) Conducting interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the Superfund process.

(ii) Preparing a formal community relations plan (CRP), based on the community interviews and other relevant information, specifying the community relations activities that the lead agency expects to undertake during the remedial response. The purpose of the CRP is to:

(A) Ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions, including site analysis and characterization, alternatives analysis, and selection of remedy;

(B) Determine, based on community interviews, appropriate activities to ensure such public involvement, and

(C) Provide appropriate opportunities for the community to learn about the site.

(iii) Establishing at least one local information repository at or near the location of the response action. Each information repository should contain a copy of items made available to the public, including information that describes the technical assistance grants application process. The lead agency shall inform interested parties of the establishment of the information repository.

(iv) Informing the community of the availability of technical assistance grants.

(3) For PRP actions, the lead agency shall plan and implement the community relations program at a site. PRPs may participate in aspects of the community relations program at the discretion of and with oversight by the lead agency.

(4) The lead agency may conduct technical discussions involving PRPs and the public. These technical discussions may be held separately from, but contemporaneously with, the negotiations/settlement discussions.

(5) In addition, the following provisions specifically apply to enforcement actions:

(i) Lead agencies entering into an enforcement agreement with de minimis parties under CERCLA section 122(g) or cost recovery settlements under section 122(h) shall publish a notice of the proposed agreement in the FEDERAL REGISTER at least 30 days before the agreement becomes final, as required by section 122(i). The notice must identify the name of the facility and the parties to the proposed agreement and must allow an opportunity for comment and consideration of comments; and

(ii) Where the enforcement agreement is embodied in a consent decree, public notice and opportunity for public comment shall be provided in accordance with 28 CFR 50.7.

(d) *Remedial investigation.* (1) The purpose of the remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives. To characterize the site, the lead agency shall, as appropriate, conduct field investigations, including treatability studies, and conduct a baseline risk assessment. The RI provides information to assess the risks to human health and the environment and to support the development, evaluation, and selection of appropriate response alternatives. Site characterization may be conducted in one or more phases to focus sampling efforts and increase the efficiency of the investigation. Because estimates of actual or potential exposures and associated impacts on human and environmental receptors may be refined throughout the phases of the RI as new information is obtained, site characterization activities should be fully integrated with the development and evaluation of alternatives in the feasibility study. Bench- or pilot-scale treatability studies shall be conducted, when appropriate and practicable, to provide additional data for the detailed analysis and to support engineering design of remedial alternatives.

(2) The lead agency shall characterize the nature of and threat posed by the hazardous substances and hazardous materials and gather data necessary to assess the extent to which the release poses a threat to human health or the environment or to support the analysis and design of potential response actions by conducting, as appropriate, field investigations to assess the following factors:

(i) Physical characteristics of the site, including important surface features, soils, geology, hydrogeology, meteorology, and ecology;

(ii) Characteristics or classifications of air, surface water, and ground water;

(iii) The general characteristics of the waste, including quantities, state, concentration, toxicity, propensity to bioaccumulate, persistence, and mobility;

(iv) The extent to which the source can be adequately identified and characterized;

(v) Actual and potential exposure pathways through environmental media;

(vi) Actual and potential exposure routes, for example, inhalation and ingestion; and

(vii) Other factors, such as sensitive populations, that pertain to the characterization of the site or support the analysis of potential remedial action alternatives.

(3) The lead and support agency shall identify their respective potential ARARs related to the location of and contaminants at the site in a timely manner. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner (see § 300.400(g)(3)).

(4) Using the data developed under paragraphs (d)(1) and (2) of this section, the lead agency shall conduct a site-specific baseline risk assessment to characterize the current and potential threats to human health and the environment that may be posed by contaminants migrating to ground water or surface water, releasing to air, leaching through soil, remaining in the soil, and bioaccumulating in the food chain. The results of the baseline risk assessment will help establish acceptable exposure levels for use in developing remedial alternatives in the FS, as described in paragraph (e) of this section.

**Environmental Protection Agency** §300.430

(e) *Feasibility study.* (1) The primary objective of the feasibility study (FS) is to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected. The lead agency may develop a feasibility study to address a specific site problem or the entire site. The development and evaluation of alternatives shall reflect the scope and complexity of the remedial action under consideration and the site problems being addressed. Development of alternatives shall be fully integrated with the site characterization activities of the remedial investigation described in paragraph (d) of this section. The lead agency shall include an alternatives screening step, when needed, to select a reasonable number of alternatives for detailed analysis.

(2) Alternatives shall be developed that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed through each pathway by a site. The number and type of alternatives to be analyzed shall be determined at each site, taking into account the scope, characteristics, and complexity of the site problem that is being addressed. In developing and, as appropriate, screening the alternatives, the lead agency shall:

(i) Establish remedial action objectives specifying contaminants and media of concern, potential exposure pathways, and remediation goals. Initially, preliminary remediation goals are developed based on readily available information, such as chemical-specific ARARs or other reliable information. Preliminary remediation goals should be modified, as necessary, as more information becomes available during the RI/FS. Final remediation goals will be determined when the remedy is selected. Remediation goals shall establish acceptable exposure levels that are protective of human health and the environment and shall be developed by considering the following:

(A) Applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws, if available, and the following factors:

(*1*) For systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety;

(*2*) For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ and $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ risk level shall be used as the point of departure for determining remediation goals for alternatives when ARARs are not available or are not sufficiently protective because of the presence of multiple contaminants at a site or multiple pathways of exposure;

(*3*) Factors related to technical limitations such as detection/quantification limits for contaminants;

(*4*) Factors related to uncertainty; and

(*5*) Other pertinent information.

(B) Maximum contaminant level goals (MCLGs), established under the Safe Drinking Water Act, that are set at levels above zero, shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCLGs are relevant and appropriate under the circumstances of the release based on the factors in §300.400(g)(2). If an MCLG is determined not to be relevant and appropriate, the corresponding maximum contaminant level (MCL) shall be attained where relevant and appropriate to the circumstances of the release.

(C) Where the MCLG for a contaminant has been set at a level of zero, the MCL promulgated for that contaminant under the Safe Drinking Water Act shall be attained by remedial actions for ground or surface waters that are current or potential sources of drinking water, where the MCL is relevant and appropriate under the circumstances of the release based on the factors in §300.400(g)(2).

(D) In cases involving multiple contaminants or pathways where attainment of chemical-specific ARARs will result in cumulative risk in excess of $10^{-4}$, criteria in paragraph (e)(2)(i)(A) of this section may also be considered when determining the cleanup level to be attained.

(E) Water quality criteria established under sections 303 or 304 of the Clean Water Act shall be attained where relevant and appropriate under the circumstances of the release.

(F) An alternate concentration limit (ACL) may be established in accordance with CERCLA section 121(d)(2)(B)(ii).

(G) Environmental evaluations shall be performed to assess threats to the environment, especially sensitive habitats and critical habitats of species protected under the Endangered Species Act.

(ii) Identify and evaluate potentially suitable technologies, including innovative technologies;

(iii) Assemble suitable technologies into alternative remedial actions.

(3) For source control actions, the lead agency shall develop, as appropriate:

(i) A range of alternatives in which treatment that reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants is a principal element. As appropriate, this range shall include an alternative that removes or destroys hazardous substances, pollutants, or contaminants to the maximum extent feasible, eliminating or minimizing, to the degree possible, the need for long-term management. The lead agency also shall develop, as appropriate, other alternatives which, at a minimum, treat the principal threats posed by the site but vary in the degree of treatment employed and the quantities and characteristics of the treatment residuals and untreated waste that must be managed; and

(ii) One or more alternatives that involve little or no treatment, but provide protection of human health and the environment primarily by preventing or controlling exposure to hazardous substances, pollutants, or contaminants, through engineering controls, for example, containment, and,

as necessary, institutional controls to protect human health and the environment and to assure continued effectiveness of the response action.

(4) For ground-water response actions, the lead agency shall develop a limited number of remedial alternatives that attain site-specific remediation levels within different restoration time periods utilizing one or more different technologies.

(5) The lead agency shall develop one or more innovative treatment technologies for further consideration if those technologies offer the potential for comparable or superior performance or implementability; fewer or lesser adverse impacts than other available approaches; or lower costs for similar levels of performance than demonstrated treatment technologies.

(6) The no-action alternative, which may be no further action if some removal or remedial action has already occurred at the site, shall be developed.

(7) As appropriate, and to the extent sufficient information is available, the short- and long-term aspects of the following three criteria shall be used to guide the development and screening of remedial alternatives:

(i) *Effectiveness.* This criterion focuses on the degree to which an alternative reduces toxicity, mobility, or volume through treatment, minimizes residual risks and affords long-term protection, complies with ARARs, minimizes short-term impacts, and how quickly it achieves protection. Alternatives providing significantly less effectiveness than other, more promising alternatives may be eliminated. Alternatives that do not provide adequate protection of human health and the environment shall be eliminated from further consideration.

(ii) *Implementability.* This criterion focuses on the technical feasibility and availability of the technologies each alternative would employ and the administrative feasibility of implementing the alternative. Alternatives that are technically or administratively infeasible or that would require equipment, specialists, or facilities that are not available within a reasonable period of time may be eliminated from further consideration.

(iii) *Cost.* The costs of construction and any long-term costs to operate and maintain the alternatives shall be considered. Costs that are grossly excessive compared to the overall effectiveness of alternatives may be considered as one of several factors used to eliminate alternatives. Alternatives providing effectiveness and implementability similar to that of another alternative by employing a similar method of treatment or engineering control, but at greater cost, may be eliminated.

(8) The lead agency shall notify the support agency of the alternatives that will be evaluated in detail to facilitate the identification of ARARs and, as appropriate, pertinent advisories, criteria, or guidance to be considered.

(9) *Detailed analysis of alternatives.* (i) A detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage. The lead and support agencies must identify their ARARs related to specific actions in a timely manner and no later than the early stages of the comparative analysis. The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner.

(ii) The detailed analysis consists of an assessment of individual alternatives against each of nine evaluation criteria and a comparative analysis that focuses upon the relative performance of each alternative against those criteria.

(iii) *Nine criteria for evaluation.* The analysis of alternatives under review shall reflect the scope and complexity of site problems and alternatives being evaluated and consider the relative significance of the factors within each criteria. The nine evaluation criteria are as follows:

(A) *Overall protection of human health and the environment.* Alternatives shall be assessed to determine whether they can adequately protect human health and the environment, in both the short- and long-term, from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during development of remediation goals consistent with §300.430(e)(2)(i). Overall protection of human health and the environment draws on the assessments of other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs.

(B) *Compliance with ARARs.* The alternatives shall be assessed to determine whether they attain applicable or relevant and appropriate requirements under federal environmental laws and state environmental or facility siting laws or provide grounds for invoking one of the waivers under paragraph (f)(1)(ii)(C) of this section.

(C) *Long-term effectiveness and permanence.* Alternatives shall be assessed for the long-term effectiveness and permanence they afford, along with the degree of certainty that the alternative will prove successful. Factors that shall be considered, as appropriate, include the following:

(*1*) Magnitude of residual risk remaining from untreated waste or treatment residuals remaining at the conclusion of the remedial activities. The characteristics of the residuals should be considered to the degree that they remain hazardous, taking into account their volume, toxicity, mobility, and propensity to bioaccumulate.

(*2*) Adequacy and reliability of controls such as containment systems and institutional controls that are necessary to manage treatment residuals and untreated waste. This factor addresses in particular the uncertainties associated with land disposal for providing long-term protection from residuals; the assessment of the potential need to replace technical components of the alternative, such as a cap, a slurry wall, or a treatment system; and the potential exposure pathways and risks posed should the remedial action need replacement.

(D) *Reduction of toxicity, mobility, or volume through treatment.* The degree to which alternatives employ recycling or treatment that reduces toxicity, mobility, or volume shall be assessed, including how treatment is used to address the principal threats posed by the site. Factors that shall be considered, as appropriate, include the following:

(*1*) The treatment or recycling processes the alternatives employ and materials they will treat;

(*2*) The amount of hazardous substances, pollutants, or contaminants that will be destroyed, treated, or recycled;

(*3*) The degree of expected reduction in toxicity, mobility, or volume of the waste due to treatment or recycling and the specification of which reduction(s) are occurring;

(*4*) The degree to which the treatment is irreversible;

(*5*) The type and quantity of residuals that will remain following treatment, considering the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents; and

(*6*) The degree to which treatment reduces the inherent hazards posed by principal threats at the site.

(E) *Short-term effectiveness.* The short-term impacts of alternatives shall be assessed considering the following:

(*1*) Short-term risks that might be posed to the community during implementation of an alternative;

(*2*) Potential impacts on workers during remedial action and the effectiveness and reliability of protective measures;

(*3*) Potential environmental impacts of the remedial action and the effectiveness and reliability of mitigative measures during implementation; and

(*4*) Time until protection is achieved.

(F) *Implementability.* The ease or difficulty of implementing the alternatives shall be assessed by considering the following types of factors as appropriate:

(*1*) Technical feasibility, including technical difficulties and unknowns associated with the construction and operation of a technology, the reliability of the technology, ease of undertaking additional remedial actions, and the ability to monitor the effectiveness of the remedy.

(*2*) Administrative feasibility, including activities needed to coordinate with other offices and agencies and the ability and time required to obtain any necessary approvals and permits from other agencies (for off-site actions);

(*3*) Availability of services and materials, including the availability of ade-

quate off-site treatment, storage capacity, and disposal capacity and services; the availability of necessary equipment and specialists, and provisions to ensure any necessary additional resources; the availability of services and materials; and availability of prospective technologies.

(G) *Cost.* The types of costs that shall be assessed include the following:

(*1*) Capital costs, including both direct and indirect costs;

(*2*) Annual operation and maintenance costs; and

(*3*) Net present value of capital and O&M costs.

(H) *State acceptance.* Assessment of state concerns may not be completed until comments on the RI/FS are received but may be discussed, to the extent possible, in the proposed plan issued for public comment. The state concerns that shall be assessed include the following:

(*1*) The state's position and key concerns related to the preferred alternative and other alternatives; and

(*2*) State comments on ARARs or the proposed use of waivers.

(I) *Community acceptance.* This assessment includes determining which components of the alternatives interested persons in the community support, have reservations about, or oppose. This assessment may not be completed until comments on the proposed plan are received.

(f) *Selection of remedy*—(1) Remedies selected shall reflect the scope and purpose of the actions being undertaken and how the action relates to long-term, comprehensive response at the site.

(i) The criteria noted in paragraph (e)(9)(iii) of this section are used to select a remedy. These criteria are categorized into three groups.

(A) *Threshold criteria.* Overall protection of human health and the environment and compliance with ARARs (unless a specific ARAR is waived) are threshold requirements that each alternative must meet in order to be eligible for selection.

(B) *Primary balancing criteria.* The five primary balancing criteria are long-

term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment; short-term effectiveness; implementability; and cost.

(C) *Modifying criteria.* State and community acceptance are modifying criteria that shall be considered in remedy selection.

(ii) The selection of a remedial action is a two-step process and shall proceed in accordance with §300.515(e). First, the lead agency, in conjunction with the support agency, identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment. Second, the lead agency shall review the public comments and consult with the state (or support agency) in order to determine if the alternative remains the most appropriate remedial action for the site or site problem. The lead agency, as specified in §300.515(e), makes the final remedy selection decision, which shall be documented in the ROD. Each remedial alternative selected as a Superfund remedy will employ the criteria as indicated in paragraph (f)(1)(i) of this section to make the following determination:

(A) Each remedial action selected shall be protective of human health and the environment.

(B) On-site remedial actions selected in a ROD must attain those ARARs that are identified at the time of ROD signature or provide grounds for invoking a waiver under §300.430(f)(1)(ii)(C).

(*1*) Requirements that are promulgated or modified after ROD signature must be attained (or waived) only when determined to be applicable or relevant and appropriate and necessary to ensure that the remedy is protective of human health and the environment.

(*2*) Components of the remedy not described in the ROD must attain (or waive) requirements that are identified as applicable or relevant and appropriate at the time the amendment to the ROD or the explanation of significant difference describing the component is signed.

(C) An alternative that does not meet an ARAR under federal environmental or state environmental or facility siting laws may be selected under the following circumstances:

(*1*) The alternative is an interim measure and will become part of a total remedial action that will attain the applicable or relevant and appropriate federal or state requirement;

(*2*) Compliance with the requirement will result in greater risk to human health and the environment than other alternatives;

(*3*) Compliance with the requirement is technically impracticable from an engineering perspective;

(*4*) The alternative will attain a standard of performance that is equivalent to that required under the otherwise applicable standard, requirement, or limitation through use of another method or approach;

(*5*) With respect to a state requirement, the state has not consistently applied, or demonstrated the intention to consistently apply, the promulgated requirement in similar circumstances at other remedial actions within the state; or

(*6*) For Fund-financed response actions only, an alternative that attains the ARAR will not provide a balance between the need for protection of human health and the environment at the site and the availability of Fund monies to respond to other sites that may present a threat to human health and the environment.

(D) Each remedial action selected shall be cost-effective, provided that it first satisfies the threshold criteria set forth in §300.430(f)(1)(i)(A) and (B). Cost-effectiveness is determined by evaluating the following three of the five balancing criteria noted in §300.430(f)(1)(i)(B) to determine overall effectiveness: long-term effectiveness and permanence, reduction of toxicity, mobility, or volume through treatment, and short-term effectiveness. Overall effectiveness is then compared to cost to ensure that the remedy is cost-effective. A remedy shall be cost-effective if its costs are proportional to its overall effectiveness.

(E) Each remedial action shall utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. This requirement shall be fulfilled by selecting the alternative that satisfies paragraph (f)(1)(ii)(A) and (B) of this section and

77

provides the best balance of trade-offs among alternatives in terms of the five primary balancing criteria noted in paragraph (f)(1)(i)(B) of this section. The balancing shall emphasize long-term effectiveness and reduction of toxicity, mobility, or volume through treatment. The balancing shall also consider the preference for treatment as a principal element and the bias against off-site land disposal of un-treated waste. In making the deter-mination under this paragraph, the modifying criteria of state acceptance and community acceptance described in paragraph (f)(1)(i)(C) of this section shall also be considered.

(2) *The proposed plan.* In the first step in the remedy selection process, the lead agency shall identify the alter-native that best meets the require-ments in § 300.430(f)(1), above, and shall present that alternative to the public in a proposed plan. The lead agency, in conjunction with the support agency and consistent with § 300.515(e), shall prepare a proposed plan that briefly de-scribes the remedial alternatives ana-lyzed by the lead agency, proposes a preferred remedial action alternative, and summarizes the information relied upon to select the preferred alter-native. The selection of remedy process for an operable unit may be initiated at any time during the remedial action process. The purpose of the proposed plan is to supplement the RI/FS and provide the public with a reasonable opportunity to comment on the pre-ferred alternative for remedial action, as well as alternative plans under con-sideration, and to participate in the se-lection of remedial action at a site. At a minimum, the proposed plan shall:

(i) Provide a brief summary descrip-tion of the remedial alternatives evalu-ated in the detailed analysis estab-lished under paragraph (e)(9) of this section;

(ii) Identify and provide a discussion of the rationale that supports the pre-ferred alternative;

(iii) Provide a summary of any for-mal comments received from the sup-port agency; and

(iv) Provide a summary explanation of any proposed waiver identified under paragraph (f)(1)(ii)(C) of this section from an ARAR.

(3) *Community relations to support the selection of remedy.* (i) The lead agency, after preparation of the proposed plan and review by the support agency, shall conduct the following activities:

(A) Publish a notice of availability and brief analysis of the proposed plan in a major local newspaper of general circulation;

(B) Make the proposed plan and sup-porting analysis and information avail-able in the administrative record re-quired under subpart I of this part;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for sub-mission of written and oral comments on the proposed plan and the sup-porting analysis and information lo-cated in the information repository, in-cluding the RI/FS. Upon timely re-quest, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the site at issue regarding the proposed plan and the supporting analysis and information;

(E) Keep a transcript of the public meeting held during the public com-ment period pursuant to CERCLA sec-tion 117(a) and make such transcript available to the public; and

(F) Prepare a written summary of significant comments, criticisms, and new relevant information submitted during the public comment period and the lead agency response to each issue. This responsiveness summary shall be made available with the record of deci-sion.

(ii) After publication of the proposed plan and prior to adoption of the se-lected remedy in the record of decision, if new information is made available that significantly changes the basic features of the remedy with respect to scope, performance, or cost, such that the remedy significantly differs from the original proposal in the proposed plan and the supporting analysis and information, the lead agency shall:

(A) Include a discussion in the record of decision of the significant changes and reasons for such changes, if the lead agency determines such changes could be reasonably anticipated by the public based on the alternatives and

other information available in the proposed plan or the supporting analysis and information in the administrative record; or

(B) Seek additional public comment on a revised proposed plan, when the lead agency determines the change could not have been reasonably anticipated by the public based on the information available in the proposed plan or the supporting analysis and information in the administrative record. The lead agency shall, prior to adoption of the selected remedy in the ROD, issue a revised proposed plan, which shall include a discussion of the significant changes and the reasons for such changes, in accordance with the public participation requirements described in paragraph (f)(3)(i) of this section.

(4) *Final remedy selection.* (i) In the second and final step in the remedy selection process, the lead agency shall reassess its initial determination that the preferred alternative provides the best balance of trade-offs, now factoring in any new information or points of view expressed by the state (or support agency) and community during the public comment period. The lead agency shall consider state (or support agency) and community comments regarding the lead agency's evaluation of alternatives with respect to the other criteria. These comments may prompt the lead agency to modify aspects of the preferred alternative or decide that another alternative provides a more appropriate balance. The lead agency, as specified in § 300.515(e), shall make the final remedy selection decision and document that decision in the ROD.

(ii) If a remedial action is selected that results in hazardous substances, pollutants, or contaminants remaining at the site above levels that allow for unlimited use and unrestricted exposure, the lead agency shall review such action no less often than every five years after initiation of the selected remedial action.

(iii) The process for selection of a remedial action at a federal facility on the NPL, pursuant to CERCLA section 120, shall entail:

(A) Joint selection of remedial action by the head of the relevant depart-

ment, agency, or instrumentality and EPA; or

(B) If mutual agreement on the remedy is not reached, selection of the remedy is made by EPA.

(5) *Documenting the decision.* (i) To support the selection of a remedial action, all facts, analyses of facts, and site-specific policy determinations considered in the course of carrying out activities in this section shall be documented, as appropriate, in a record of decision, in a level of detail appropriate to the site situation, for inclusion in the administrative record required under subpart I of this part. Documentation shall explain how the evaluation criteria in paragraph (e)(9)(iii) of this section were used to select the remedy.

(ii) The ROD shall describe the following statutory requirements as they relate to the scope and objectives of the action:

(A) How the selected remedy is protective of human health and the environment, explaining how the remedy eliminates, reduces, or controls exposures to human and environmental receptors;

(B) The federal and state requirements that are applicable or relevant and appropriate to the site that the remedy will attain;

(C) The applicable or relevant and appropriate requirements of other federal and state laws that the remedy will not meet, the waiver invoked, and the justification for invoking the waiver;

(D) How the remedy is cost-effective, *i.e.,* explaining how the remedy provides overall effectiveness proportional to its costs;

(E) How the remedy utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and

(F) Whether the preference for remedies employing treatment which permanently and significantly reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants as a principal element is or is not satisfied by the selected remedy. If this preference is not satisfied, the record of decision must explain why a remedial action involving such

reductions in toxicity, mobility, or volume was not selected.

(iii) The ROD also shall:

(A) Indicate, as appropriate, the remediation goals, discussed in paragraph (e)(2)(i) of this section, that the remedy is expected to achieve. Performance shall be measured at appropriate locations in the ground water, surface water, soils, air, and other affected environmental media. Measurement relating to the performance of the treatment processes and the engineering controls may also be identified, as appropriate;

(B) Discuss significant changes and the response to comments described in paragraph (f)(3)(i)(F) of this section;

(C) Describe whether hazardous substances, pollutants, or contaminants will remain at the site such that a review of the remedial action under paragraph (f)(4)(ii) of this section no less often than every five years shall be required; and

(D) When appropriate, provide a commitment for further analysis and selection of long-term response measures within an appropriate time-frame.

(6) *Community relations when the record of decision is signed.* After the ROD is signed, the lead agency shall:

(i) Publish a notice of the availability of the ROD in a major local newspaper of general circulation; and

(ii) Make the record of decision available for public inspection and copying at or near the facility at issue prior to the commencement of any remedial action.

### § 300.435  Remedial design/remedial action, operation and maintenance.

(a) *General.* The remedial design/remedial action (RD/RA) stage includes the development of the actual design of the selected remedy and implementation of the remedy through construction. A period of operation and maintenance may follow the RA activities.

(b) *RD/RA activities.* (1) All RD/RA activities shall be in conformance with the remedy selected and set forth in the ROD or other decision document for that site. Those portions of RD/RA sampling and analysis plans describing the QA/QC requirements for chemical and analytical testing and sampling procedures of samples taken for the purpose of determining whether cleanup action levels specified in the ROD are achieved, generally will be consistent with the requirements of § 300.430(b)(8).

(2) During the course of the RD/RA, the lead agency shall be responsible for ensuring that all federal and state requirements that are identified in the ROD as applicable or relevant and appropriate requirements for the action are met. If waivers from any ARARs are involved, the lead agency shall be responsible for ensuring that the conditions of the waivers are met.

(c) *Community relations.* (1) Prior to the initiation of RD, the lead agency shall review the CRP to determine whether it should be revised to describe further public involvement activities during RD/RA that are not already addressed or provided for in the CRP.

(2) After the adoption of the ROD, if the remedial action or enforcement action taken, or the settlement or consent decree entered into, differs significantly from the remedy selected in the ROD with respect to scope, performance, or cost, the lead agency shall consult with the support agency, as appropriate, and shall either:

(i) Publish an explanation of significant differences when the differences in the remedial or enforcement action, settlement, or consent decree significantly change but do not fundamentally alter the remedy selected in the ROD with respect to scope, performance, or cost. To issue an explanation of significant differences, the lead agency shall:

(A) Make the explanation of significant differences and supporting information available to the public in the administrative record established under § 300.815 and the information repository; and

(B) Publish a notice that briefly summarizes the explanation of significant differences, including the reasons for such differences, in a major local newspaper of general circulation; or

(ii) Propose an amendment to the ROD if the differences in the remedial or enforcement action, settlement, or consent decree fundamentally alter the basic features of the selected remedy with respect to scope, performance, or

**Environmental Protection Agency**                                §300.435

cost. To amend the ROD, the lead agency, in conjunction with the support agency, as provided in §300.515(e), shall:

(A) Issue a notice of availability and brief description of the proposed amendment to the ROD in a major local newspaper of general circulation;

(B) Make the proposed amendment to the ROD and information supporting the decision available for public comment;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written or oral comments on the amendment to the ROD. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the facility at issue;

(E) Keep a transcript of comments received at the public meeting held during the public comment period;

(F) Include in the amended ROD a brief explanation of the amendment and the response to each of the significant comments, criticisms, and new relevant information submitted during the public comment period;

(G) Publish a notice of the availability of the amended ROD in a major local newspaper of general circulation; and

(H) Make the amended ROD and supporting information available to the public in the administrative record and information repository prior to the commencement of the remedial action affected by the amendment.

(3) After the completion of the final engineering design, the lead agency shall issue a fact sheet and provide, as appropriate, a public briefing prior to the initiation of the remedial action.

(d) *Contractor conflict of interest.* (1) For Fund-financed RD/RA and O&M activities, the lead agency shall:

(i) Include appropriate language in the solicitation requiring potential prime contractors to submit information on their status, as well as the status of their subcontractors, parent companies, and affiliates, as potentially responsible parties at the site.

(ii) Require potential prime contractors to certify that, to the best of their knowledge, they and their potential subcontractors, parent companies, and affiliates have disclosed all information described in §300.435(d)(1)(i) or that no such information exists, and that any such information discovered after submission of their bid or proposal or contract award will be disclosed immediately.

(2) Prior to contract award, the lead agency shall evaluate the information provided by the potential prime contractors and:

(i) Determine whether they have conflicts of interest that could significantly impact the performance of the contract or the liability of potential prime contractors or subcontractors.

(ii) If a potential prime contractor or subcontractor has a conflict of interest that cannot be avoided or otherwise resolved, and using that potential prime contractor or subcontractor to conduct RD/RA or O&M work under a Fund-financed action would not be in the best interests of the state or federal government, an offeror or bidder contemplating use of that prime contractor or subcontractor may be declared non-responsible or ineligible for award in accordance with appropriate acquisition regulations, and the contract may be awarded to the next eligible offeror or bidder.

(e) *Recontracting.* (1) If a Fund-financed contract must be terminated because additional work outside the scope of the contract is needed, EPA is authorized to take appropriate steps to continue interim RAs as necessary to reduce risks to public health and the environment. Appropriate steps may include extending an existing contract for a federal-lead RA or amending a co-operative agreement for a state-lead RA. Until the lead agency can reopen the bidding process and recontract to complete the RA, EPA may take such appropriate steps as described above to cover interim work to reduce such risks, where:

(i) Additional work is found to be needed as a result of such unforeseen situations as newly discovered sources, types, or quantities of hazardous substances at a facility; and

(ii) Performance of the complete RA requires the lead agency to rebid the contract because the existing contract

does not encompass this newly discovered work.

(2) The cost of such interim actions shall not exceed $2 million.

(f) *Operation and maintenance.* (1) Operation and maintenance (O&M) measures are initiated after the remedy has achieved the remedial action objectives and remediation goals in the ROD, and is determined to be operational and functional, except for ground- or surface-water restoration actions covered under § 300.435(f)(4). A state must provide its assurance to assume responsibility for O&M, including, where appropriate, requirements for maintaining institutional controls, under § 300.510(c).

(2) A remedy becomes "operational and functional" either one year after construction is complete, or when the remedy is determined concurrently by EPA and the state to be functioning properly and is performing as designed, whichever is earlier. EPA may grant extensions to the one-year period, as appropriate.

(3) For Fund-financed remedial actions involving treatment or other measures to restore ground- or surface-water quality to a level that assures protection of human health and the environment, the operation of such treatment or other measures for a period of up to 10 years after the remedy becomes operational and functional will be considered part of the remedial action. Activities required to maintain the effectiveness of such treatment or measures following the 10-year period, or after remedial action is complete, whichever is earlier, shall be considered O&M. For the purposes of federal funding provided under CERCLA section 104(c)(6), a restoration activity will be considered administratively "complete" when:

(i) Measures restore ground- or surface-water quality to a level that assures protection of human health and the environment;

(ii) Measures restore ground or surface water to such a point that reductions in contaminant concentrations are no longer significant; or

(iii) Ten years have elapsed, whichever is earliest.

(4) The following shall not be deemed to constitute treatment or other measures to restore contaminated ground or surface water under § 300.435(f)(3):

(i) Source control maintenance measures; and

(ii) Ground- or surface-water measures initiated for the primary purpose of providing a drinking-water supply, not for the purpose of restoring ground water.

## § 300.440  Procedures for planning and implementing off-site response actions.

(a) *Applicability.* (1) This section applies to any remedial or removal action involving the off-site transfer of any hazardous substance, pollutant, or contaminant as defined under CERCLA sections 101 (14) and (33) ("CERCLA waste") that is conducted by EPA, States, private parties, or other Federal agencies, that is Fund-financed and/or is taken pursuant to any CERCLA authority, including cleanups at Federal facilities under section 120 of CERCLA, and cleanups under section 311 of the Clean Water Act (except for cleanup of petroleum exempt under CERCLA). Applicability extends to those actions taken jointly under CERCLA and another authority.

(2) In cases of emergency removal actions under CERCLA, emergency actions taken during remedial actions, or response actions under section 311 of the Clean Water Act where the release poses an immediate and significant threat to human health and the environment, the On-Scene Coordinator (OSC) may determine that it is necessary to transfer CERCLA waste off-site without following the requirements of this section.

(3) This section applies to CERCLA wastes from cleanup actions based on CERCLA decision documents signed or consent decrees lodged after October 17, 1986 ("post-SARA CERCLA wastes") as well as those based on CERCLA decision documents signed and consent decrees lodged prior to October 17, 1986 ("pre-SARA CERCLA wastes"). Pre-SARA and post-SARA CERCLA wastes are subject to the same acceptability criteria in § 300.440(b)(1) and (2).

(4) EPA (usually the EPA Regional Office) will determine the acceptability under this section of any facility selected for the treatment, storage, or

disposal of CERCLA waste. EPA will determine if there are relevant releases or relevant violations at a facility prior to the facility's initial receipt of CERCLA waste. A facility which has previously been evaluated and found acceptable under this rule (or the preceding policy) is acceptable until the EPA Regional Office notifies the facility otherwise pursuant to § 300.440(d).

(5) Off-site transfers of those laboratory samples and treatability study CERCLA wastes from CERCLA sites set out in paragraphs (a)(5)(i) through (iii) of this section, are not subject to the requirements of this section. However, those CERCLA wastes may not be transferred back to the CERCLA site unless the Remedial Project Manager or OSC assures the proper management of the CERCLA waste samples or residues and gives permission to the laboratory or treatment facility for the samples and/or residues to be returned to the site.

(i) Samples of CERCLA wastes sent to a laboratory for characterization;

(ii) RCRA hazardous wastes that are being transferred from a CERCLA site for treatability studies and that meet the requirements for an exemption for RCRA under 40 CFR 261.4(e); and

(iii) Non-RCRA wastes that are being transferred from a CERCLA site for treatability studies and that are below the quantity threshold established at 40 CFR 261.4(e)(2).

(b) *Acceptability criteria*—(1) *Facility compliance.* (i) A facility will be deemed in compliance for the purpose of this rule if there are no relevant violations at or affecting the unit or units receiving CERCLA waste:

(A) For treatment to standards specified in 40 CFR part 268, subpart D, including any pre-treatment or storage units used prior to treatment;

(B) For treatment to substantially reduce its mobility, toxicity or persistence in the absence of a defined treatment standard, including any pre-treatment or storage units used prior to treatment; or

(C) For storage or ultimate disposal of CERCLA waste not treated to the previous criteria at the same facility.

(ii) Relevant violations include significant deviations from regulations, compliance order provisions, or permit

conditions designed to: ensure that CERCLA waste is destined for and delivered to authorized facilities; prevent releases of hazardous waste, hazardous constituents, or hazardous substances to the environment; ensure early detection of such releases; or compel corrective action for releases. Criminal violations which result in indictment are also relevant violations. In addition, violations of the following requirements may be considered relevant:

(A) Applicable subsections of sections 3004 and 3005 of RCRA or, where applicable, other Federal laws (such as the Toxic Substances Control Act and subtitle D of RCRA);

(B) Applicable sections of State environmental laws; and

(C) In addition, land disposal units at RCRA subtitle C facilities receiving RCRA hazardous waste from response actions authorized or funded under CERCLA must be in compliance with RCRA section 3004(o) minimum technology requirements. Exceptions may be made only if the unit has been granted a waiver from these requirements under 40 CFR 264.301.

(2) *Releases.* (i) Release is defined in § 300.5 of this part. Releases under this section do not include:

(A) *De minimis* releases;

(B) Releases permitted under Federal programs or under Federal programs delegated to the States (Federally permitted releases are defined in § 300.5), except to the extent that such releases are found to pose a threat to human health and the environment; or

(C) Releases to the air that do not exceed standards promulgated pursuant to RCRA section 3004(n), or absent such standards, or where such standards do not apply, releases to the air that do not present a threat to human health or the environment.

(ii) Releases from units at a facility designated for off-site transfer of CERCLA waste must be addressed as follows:

(A) *Receiving units at RCRA subtitle C facilities.* CERCLA wastes may be transferred to an off-site unit regulated under subtitle C of RCRA, including a facility regulated under the permit-by-rule provisions of 40 CFR 270.60 (a), (b) or (c), only if that unit is not releasing

any hazardous waste, hazardous constituent, or hazardous substance into the ground water, surface water, soil or air.

(B) *Other units at RCRA subtitle C land disposal facilities.* CERCLA wastes may not be transferred to any unit at a RCRA subtitle C land disposal facility where a non-receiving unit is releasing any hazardous waste, hazardous constituent, or hazardous substance into the ground water, surface water, soil, or air, unless that release is controlled by an enforceable agreement for corrective action under subtitle C of RCRA or other applicable Federal or State authority. For purposes of this section, a RCRA "land disposal facility" is any RCRA facility at which a land disposal unit is located, regardless of whether the land disposal unit is the receiving unit.

(C) *Other units at RCRA subtitle C treatment, storage, and permit-by-rule facilities.* CERCLA wastes may not be transferred to any unit at a RCRA subtitle C treatment, storage or permit-by-rule facility, where a release of any hazardous waste, hazardous constituent, or hazardous substance from non-receiving units poses a significant threat to public health or the environment, unless that release is controlled by an enforceable agreement for corrective action under subtitle C of RCRA or other applicable Federal or State authority.

(D) *All other facilities.* CERCLA wastes should not be transferred to any unit at an other-than-RCRA subtitle C facility if the EPA Regional Office has information indicating that an environmentally significant release of hazardous substances has occurred at that facility, unless the release is controlled by an enforceable agreement for corrective action under an applicable Federal or State authority.

(iii) Releases are considered to be "controlled" for the purpose of this section as provided in § 300.440 (f)(3)(iv) and (f)(3)(v). A release is not considered "controlled" for the purpose of this section during the pendency of administrative or judicial challenges to corrective action requirements, unless the facility has made the requisite showing under § 300.440(e).

(c) *Basis for determining acceptability.* (1) If a State finds that a facility within its jurisdiction is operating in noncompliance with state law requirements including the requirements of any Federal program for which the State has been authorized, EPA will determine, after consulting with the State as appropriate, if the violation is relevant under the rule and if so, issue an initial determination of unacceptability.

(2) If a State finds that releases are occurring at a facility regulated under State law or a Federal program for which the State is authorized, EPA will determine, after consulting with the State as appropriate, if the release is relevant under the rule and if so, issue an initial determination of unacceptability.

(3) EPA may also issue initial determinations of unacceptability based on its own findings. EPA can undertake any inspections, data collection and/or assessments necessary. EPA will then notify with the State about the results and issue a determination notice if a relevant violation or release is found.

(d) *Determination of unacceptability.* (1) Upon initial determination by the EPA Regional Office that a facility being considered for the off-site transfer of any CERCLA waste does not meet the criteria for acceptability stated in § 300.440(b), the EPA Region shall notify the owner/operator of such facility, and the responsible agency in the State in which the facility is located, of the unacceptability finding. The notice will be sent by certified and first-class mail, return receipt requested. The certified notice, if not acknowledged by the return receipt card, should be considered to have been received by the addressee if properly sent by regular mail to the last address known to the EPA Regional Office.

(2) The notice shall generally: state that based on available information from a RCRA Facility Assessment (RFA), inspection, or other data sources, the facility has been found not to meet the requirements of § 300.440; cite the specific acts, omissions, or conditions which form the basis of these findings; and inform the owner/operator of the procedural recourse available under this regulation.

**Environmental Protection Agency** §300.440

(3) A facility which was previously evaluated and found acceptable under this rule (or the preceding policy) may continue to receive CERCLA waste for 60 calendar days after the date of issuance of the notice, unless otherwise determined in accordance with paragraphs (d)(8) or (d)(9) of this section.

(4) If the owner or operator of the facility in question submits a written request for an informal conference with the EPA Regional Office within 10 calendar days from the issuance of the notice, the EPA Regional Office shall provide the opportunity for such conference no later than 30 calendar days after the date of the notice, if possible, to discuss the basis for the underlying violation or release determination, and its relevance to the facility's acceptability to receive CERCLA cleanup wastes. State representatives may attend the informal conference, submit written comments prior to the informal conference, and/or request additional meetings with the EPA Region, relating to the unacceptability issue during the determination process. If no State representative is present, EPA shall notify the State of the outcome of the conference. An owner/operator may submit written comments by the 30th day after issuance of the notice, in addition to or instead of requesting an informal conference.

(5) If the owner or operator neither requests an informal conference nor submits written comments, the facility becomes unacceptable to receive CERCLA waste on the 60th day after the notice is issued (or on such other date designated under paragraph (d)(9) of this section). The facility will remain unacceptable until such time as the EPA Regional Office notifies the owner or operator otherwise.

(6) If an informal conference is held or written comments are received, the EPA Region shall decide whether or not the information provided is sufficient to show that the facility is operating in physical compliance with respect to the relevant violations cited in the initial notice of unacceptability, and that all relevant releases have been eliminated or controlled, as required in paragraph (b)(2) of this section, such that a determination of acceptability would be appropriate. EPA

will notify the owner/operator in writing whether or not the information provided is sufficient to support a determination of acceptability. Unless EPA determines that information provided by the owner/operator and the State is sufficient to support a determination of acceptability, the facility becomes unacceptable on the 60th calendar day after issuance of the original notice of unacceptability (or other date established pursuant to paragraphs (d)(8) or (d)(9) of this section).

(7) Within 10 days of hearing from the EPA Regional Office after the informal conference or the submittal of written comments, the owner/operator or the State may request a reconsideration of the unacceptability determination by the EPA Regional Administrator (RA). Reconsideration may be by review of the record, by conference, or by other means deemed appropriate by the Regional Administrator; reconsideration does not automatically stay the determination beyond the 60-day period. The owner/operator will receive notice in writing of the decision of the RA.

(8) The EPA Regional Administrator may decide to extend the 60-day period if more time is required to review a submission. The facility owner/operator shall be notified in writing if the Regional Administrator extends the 60 days.

(9) The EPA Regional Office may decide that a facility's unacceptability is immediately effective (or effective in less than 60 days) in extraordinary situations such as, but not limited to, emergencies at the facility or egregious violations. The EPA Region shall notify the facility owner/operator of the date of unacceptability, and may modify timeframes for comments and other procedures accordingly.

(e) *Unacceptability during administrative and judicial challenges of corrective action decisions.* For a facility with releases that are subject to a corrective action permit, order, or decree, an administrative or judicial challenge to the corrective action (or a challenge to a permit modification calling for additional corrective action) shall not be considered to be part of a corrective action "program" controlling those releases and shall not act to stay a determination of unacceptability under this

rule. However, such facility may remain acceptable to receive CERCLA waste during the pendency of the appeal or litigation if:

(1) It satisfies the EPA Regional Office that adequate interim corrective action measures will continue at the facility; or

(2) It demonstrates to the EPA Regional Office the absence of a need to take corrective action during the short-term, interim period.

Either demonstration may be made during the 60-day review period in the context of the informal conference and RA reconsideration.

(f) *Re-evaluating unacceptability.* If, after notification of unacceptability and the opportunity to confer as described in §300.440(d), the facility remains unacceptable, the facility can regain acceptability. A facility found to be unacceptable to receive CERCLA wastes based on relevant violations or releases may regain acceptability if the following conditions are met:

(1) *Judgment on the merits.* The facility has prevailed on the merits in an administrative or judicial challenge to the finding of noncompliance or uncontrolled releases upon which the unacceptability determination was based.

(2) *Relevant violations.* The facility has demonstrated to the EPA Region its return to physical compliance for the relevant violations cited in the notice.

(3) *Releases.* The facility has demonstrated to the EPA Region that:

(i) All releases from receiving units at RCRA subtitle C facilities have been eliminated and prior contamination from such releases is controlled by a corrective action program approved under subtitle C of RCRA;

(ii) All releases from other units at RCRA subtitle C land disposal facilities are controlled by a corrective action program approved under subtitle C of RCRA;

(iii) All releases from other units at RCRA subtitle C treatment and storage facilities do not pose a significant threat to human health or the environment, or are controlled by a corrective action program approved under subtitle C of RCRA.

(iv) A RCRA subtitle C corrective action program may be incorporated into a permit, order, or decree, including the following: a corrective action order under RCRA section 3008(h), section 7003 or section 3013, a RCRA permit under 40 CFR 264.100 or 264.101, or a permit under an equivalent authority in a State authorized for corrective action under RCRA section 3004(u). Releases will be deemed controlled upon issuance of the order, permit, or decree which initiates and requires completion of one or more of the following: a RCRA Facility Investigation, a RCRA Corrective Measures Study, and/or Corrective Measures Implementation. The release remains controlled as long as the facility is in compliance with the order, permit, or decree, and enters into subsequent agreements for implementation of additional corrective action measures when necessary, except during periods of administrative or judicial challenges, when the facility must make a demonstration under §300.440(e) in order to remain acceptable.

(v) Facilities with releases regulated under other applicable Federal laws, or State laws under a Federally-delegated program may regain acceptability under this section if the releases are deemed by the EPA Regional Office not to pose a threat to human health or the environment, or if the facility enters into an enforceable agreement under those laws to conduct corrective action activities to control releases. Releases will be deemed controlled upon the issuance of an order, permit, or decree which initiates and requires one or more of the following: a facility investigation, a corrective action study, and/or corrective measures implementation. The release remains controlled as long as the facility is in compliance with the order, permit, or decree, and enters into subsequent agreements for implementation of additional corrective measures when necessary, except during periods of administrative or judicial challenges, when the facility must make a demonstration under §300.440(e) in order to remain acceptable.

(4) Prior to the issuance of a determination that a facility has returned to acceptability, the EPA Region shall

**Environmental Protection Agency** §300.505

notify the State in which the facility is located, and provide an opportunity for the State to discuss the facility's acceptability status with EPA.

(5) An unacceptable facility may be reconsidered for acceptability whenever the EPA Regional Office finds that the facility fulfills the criteria stated in §300.440(b). Upon such a finding, the EPA Regional Office shall notify the facility and the State in writing.

[58 FR 49215, Sept. 22, 1993]

## Subpart F—State Involvement in Hazardous Substance Response

SOURCE: 55 FR 8853, Mar. 8, 1990, unless otherwise noted.

### §300.500  General.

(a) EPA shall ensure meaningful and substantial state involvement in hazardous substance response as specified in this subpart. EPA shall provide an opportunity for state participation in removal, pre-remedial, remedial, and enforcement response activities. EPA shall encourage states to enter into an EPA/state Superfund Memorandum of Agreement (SMOA) under §300.505 to increase state involvement and strengthen the EPA/state partnership.

(b) EPA shall encourage states to participate in Fund-financed response in two ways. Pursuant to §300.515(a), states may either assume the lead through a cooperative agreement for the response action or may be the support agency in EPA-lead remedial response. Section 300.515 sets forth requirements for state involvement in EPA-lead remedial and enforcement response and also addresses comparable requirements for EPA involvement in state-lead remedial and enforcement response. Section 300.520 specifies requirements for state involvement in EPA-lead enforcement negotiations. Section 300.525 specifies requirements for state involvement in removal actions. In addition to the requirements set forth in this subpart, 40 CFR part 35, subpart O, "Cooperative Agreements and Superfund State Contracts for Superfund Response Actions," contains further requirements for state participation during response.

### §300.505  EPA/State Superfund Memorandum of Agreement (SMOA).

(a) The SMOA may establish the nature and extent of EPA and state interaction during EPA-lead and state-lead response (Indian tribes meeting the requirements of §300.515(b) may be treated as states for purposes of this section). EPA shall enter into SMOA discussions if requested by a state. The following may be addressed in a SMOA:

(1) The EPA/state or Indian tribe relationship for removal, pre-remedial, remedial, and enforcement response, including a description of the roles and the responsibilities of each.

(2) The general requirements for EPA oversight. Oversight requirements may be more specifically defined in cooperative agreements.

(3) The general nature of lead and support agency interaction regarding the review of key documents and/or decision points in removal, pre-remedial, remedial, and enforcement response. The requirements for EPA and state review of each other's key documents when each is serving as the support agency shall be equivalent to the extent practicable. Review times agreed to in the SMOA must also be documented in site-specific cooperative agreements or Superfund state contracts in order to be binding.

(4) Procedures for modification of the SMOA (e.g., if EPA and a state agree that the lead and support agency roles and responsibilities have changed, or if modifications are required to achieve desired goals).

(b) The SMOA and any modifications thereto shall be executed by the EPA Regional Administrator and the head of the state agency designated as lead agency for state implementation of CERCLA.

(c) Site-specific agreements entered into pursuant to section 104(d)(1) of CERCLA shall be developed in accordance with 40 CFR part 35, subpart O. The SMOA shall not supersede such agreements.

(d)(1) EPA and the state shall consult annually to determine priorities and make lead and support agency designations for removal, pre-remedial, remedial, and enforcement response to be conducted during the next fiscal year and to discuss future priorities and

long-term requirements for response. These consultations shall include the exchange of information on both Fund- and non-Fund-financed response activities. The SMOA may describe the time-frame and process for the EPA/state consultation.

(2) The following activities shall be discussed in the EPA/state consultations established in the SMOA, or otherwise initiated and documented in writing in the absence of a SMOA, on a site-specific basis with EPA and the state identifying the lead agency for each response action discussed:

(i) Pre-remedial response actions, including preliminary assessments and site inspections;

(ii) Hazard Ranking System scoring and NPL listing and deletion activities;

(iii) Remedial phase activities, including remedial investigation/feasibility study, identification of potential applicable or relevant and appropriate requirements (ARARs) under federal and state environmental laws and, as appropriate, other advisories, criteria, or guidance to be considered (TBCs), proposed plan, ROD, remedial design, remedial action, and operation and maintenance;

(iv) Potentially responsible party (PRP) searches, notices to PRPs, response to information requests, PRP negotiations, oversight of PRPs, other enforcement actions pursuant to state law, and activities where the state provides support to EPA;

(v) Compilation and maintenance of the administrative record for selection of a response action as required by subpart I of this part;

(vi) Related site support activities;

(vii) State ability to share in the cost and timing of payments; and

(viii) General CERCLA implementation activities.

(3) If a state is designated as the lead agency for a non-Fund-financed action at an NPL site, the SMOA shall be supplemented by site-specific enforcement agreements between EPA and the state which specify schedules and EPA involvement.

(4) In the absence of a SMOA, EPA and the state shall comply with the requirements in § 300.515(h). If the SMOA does not address all of the requirements specified in § 300.515(h), EPA and

the state shall comply with any unaddressed requirements in that section.

§ 300.510   State assurances.

(a) A Fund-financed remedial action undertaken pursuant to CERCLA section 104(a) cannot proceed unless a state provides its applicable required assurances. The assurances must be provided by the state prior to the initiation of remedial action pursuant to a Superfund state contract for EPA-lead (or political subdivision-lead) remedial action or pursuant to a cooperative agreement for a state-lead remedial action. The SMOA may not be used for this purpose. Federally recognized Indian tribes are not required to provide CERCLA section 104(c)(3) assurances for Fund-financed response actions. Further requirements pertaining to state, political subdivision, and federally recognized Indian tribe involvement in CERCLA response are found in 40 CFR part 35, subpart O.

(b)(1) The state is not required to share in the cost of state- or EPA-lead Fund-financed removal actions (including remedial planning activities associated with remedial actions) conducted pursuant to CERCLA section 104 unless the facility was operated by the state or a political subdivision thereof at the time of disposal of hazardous substances therein and a remedial action is ultimately undertaken at the site. Such remedial planning activities include, but are not limited to, remedial investigations (RIs), feasibility studies (FSs), and remedial design (RD). States shall be required to share 50 percent, or greater, in the cost of all Fund-financed response actions if the facility was publicly operated at the time of the disposal of hazardous substances. For other facilities, except federal facilities, the state shall be required to share 10 percent of the cost of the remedial action.

(2) CERCLA section 104(c)(5) provides that EPA shall grant a state credit for reasonable, documented, direct, out-of-pocket, non-federal expenditures subject to the limitations specified in CERCLA section 104(c)(5). For a state to apply credit toward its cost share, it must enter into a cooperative agreement or Superfund state contract. The

**Environmental Protection Agency** §300.510

state must submit as soon as possible, but no later than at the time CERCLA section 104 assurances are provided for a remedial action, its accounting of eligible credit expenditures for EPA verification. Additional credit requirements are contained in 40 CFR part 35, subpart O.

(3) Credit may be applied to a state's future cost share requirements at NPL sites for response expenditures or obligations incurred by the state or a political subdivision from January 1, 1978 to December 11, 1980, and for the remedial action expenditures incurred only by the state after October 17, 1986.

(4) Credit that exceeds the required cost share at the site for which the credit is granted may be transferred to another site to offset a state's required remedial action cost share.

(c)(1) Prior to a Fund-financed remedial action, the state must also provide its assurance in accordance with CERCLA section 104(c)(3)(A) to assume responsibility for operation and maintenance of implemented remedial actions for the expected life of such actions. In addition, when appropriate, as part of the O&M assurance, the state must assure that any institutional controls implemented as part of the remedial action at a site are in place, reliable, and will remain in place after the initiation of O&M. The state and EPA shall consult on a plan for operation and maintenance prior to the initiation of a remedial action.

(2) After a joint EPA/State inspection of the implemented Fund-financed remedial action under §300.515(g), EPA may share, for any extension period established in §300.435(f)(2), in the cost of the operation of the remedy to ensure that the remedy is operational and functional. In the case of restoration of ground or surface water, EPA shall share in the cost of the State's operation of ground- or surface-water restoration remedial actions as specified in §300.435(f)(3).

(d) In accordance with CERCLA sections 104 (c)(3)(B) and 121(d)(3), if the remedial action requires off-site storage, destruction, treatment, or disposal, the state must provide its assurance before the remedial action begins on the availability of a hazardous waste disposal facility that is in compliance with CERCLA section 121(d)(3) and is acceptable to EPA.

(e)(1) In accordance with CERCLA section 104(c)(9), EPA shall not provide any remedial action pursuant to CERCLA section 104 until the state in which the release occurs enters into a cooperative agreement or Superfund state contract with EPA providing assurances deemed adequate by EPA that the state will assure the availability of hazardous waste treatment or disposal facilities which:

(i) Have adequate capacity for the destruction, treatment, or secure disposition of all hazardous wastes that are reasonably expected to be generated within the state during the 20-year period following the date of such cooperative agreement or Superfund state contract and to be destroyed, treated, or disposed;

(ii) Are within the state, or outside the state in accordance with an interstate agreement or regional agreement or authority;

(iii) Are acceptable to EPA; and

(iv) Are in compliance with the requirements of Subtitle C of the Solid Waste Disposal Act.

(2) This rule does not address whether or not Indian tribes are states for purposes of this paragraph (e).

(f) EPA may determine that an interest in real property must be acquired in order to conduct a response action. However, as provided in CERCLA section 104(j)(2), EPA may acquire an interest in real estate in order to conduct a remedial action only if the State in which the interest to be acquired is located provides assurances, through a contract, cooperative agreement or otherwise, that the State will accept transfer of the interest upon completion of the remedial action. For purposes of this paragraph, "completion of the remedial action" is the point at which operation and maintenance (O&M) measures would be initiated pursuant to §300.435(f). The State may accept a transfer of interest at an earlier point in time if agreed upon in writing by the State and EPA. Indian tribe assurances are to be provided as set out at 40 CFR part 35, subpart O, §35.6110(b)(2).

[55 FR 8853, Mar. 8, 1990, as amended at 59 FR 35854, July 14, 1994]

§ 300.515                                          40 CFR Ch. I (7-1-19 Edition)

### § 300.515 Requirements for state involvement in remedial and enforcement response.

(a) *General.* (1) States are encouraged to undertake actions authorized under subpart E. Section 104(d)(1) of CERCLA authorizes EPA to enter into cooperative agreements or contracts with a state, political subdivision, or a federally recognized Indian tribe to carry out Fund-financed response actions authorized under CERCLA, when EPA determines that the state, the political subdivision, or federally recognized Indian tribe has the capability to undertake such actions. EPA will use a cooperative agreement to transfer funds to those entities to undertake Fund-financed response activities. The requirements for states, political subdivisions, or Indian tribes to receive funds as a lead or support agency for response are addressed at 40 CFR part 35, subpart O.

(2) For EPA-lead Fund-financed remedial planning activities, including, but not limited to, remedial investigations, feasibility studies, and remedial designs, the state agency acceptance of the support agency role during an EPA-lead response shall be documented in a letter, SMOA, or cooperative agreement. Superfund state contracts are unnecessary for this purpose.

(3) Cooperative agreements and Superfund state contracts are only appropriate for non-Fund-financed response actions if a state intends to seek credit for remedial action expenses under § 300.510.

(b) *Indian tribe involvement during response.* To be afforded substantially the same treatment as states under section 104 of CERCLA, the governing body of the Indian tribe must:

(1) Be federally recognized; and

(2) Have a tribal governing body that is currently performing governmental functions to promote the health, safety, and welfare of the affected population or to protect the environment within a defined geographic area; and

(3) Have jurisdiction over a site at which Fund-financed response, including pre-remedial activities, is contemplated.

(c) *State involvement in PA/SI and National Priorities List process.* EPA shall ensure state involvement in the listing and deletion process by providing states opportunities for review, consultation, or concurrence specified in this section.

(1) EPA shall consult with states as appropriate on the information to be used in developing HRS scores for releases.

(2) EPA shall, to the extent feasible, provide the state 30 working days to review releases which were scored by EPA and which will be considered for placement on the National Priorities List (NPL).

(3) EPA shall provide the state 30 working days to review and concur on the Notice of Intent to Delete a release from the NPL. Section 300.425 describes the EPA/state consultation and concurrence process for deleting releases from the NPL.

(d) *State involvement in RI/FS process.* A key component of the EPA/state partnership shall be the communication of potential federal and state ARARs and, as appropriate, other pertinent advisories, criteria, or guidance to be considered (TBCs).

(1) In accordance with §§ 300.400(g) and 300.430, the lead and support agencies shall identify their respective potential ARARs and communicate them to each other in a timely manner, *i.e.,* no later than the early stages of the comparative analysis described in § 300.430(e)(9), such that sufficient time is available for the lead agency to consider and incorporate all potential ARARs without inordinate delays and duplication of effort. The lead and support agencies may also identify TBCs and communicate them in a timely manner.

(2) When a state and EPA have entered into a SMOA, the SMOA may specify a consultation process which requires the lead agency to solicit potential ARARs at specified points in the remedial planning and remedy selection processes. At a minimum, the SMOA shall include the points specified in § 300.515(h)(2). The SMOA shall specify timeframes for support agency response to lead agency requests to ensure that potential ARARs are identified and communicated in a timely manner. Such timeframes must also be documented in site-specific agreements. The SMOA may also discuss

90

**Environmental Protection Agency** §300.515

identification and communication of TBCs.

(3) If EPA in its statement of a proposed plan intends to waive any state-identified ARARs, or does not agree with the state that a certain state standard is an ARAR, it shall formally notify the state when it submits the RI/FS report for state review or responds to the state's submission of the RI/FS report.

(4) EPA shall respond to state comments on waivers from or disagreements about state ARARs, as well as the preferred alternative when making the RI/FS report and proposed plan available for public comment.

(e) *State involvement in selection of remedy.* (1) Both EPA and the state shall be involved in preliminary discussions of the alternatives addressed in the FS prior to preparation of the proposed plan and ROD. At the conclusion of the RI/FS, the lead agency, in conjunction with the support agency, shall develop a proposed plan. The support agency shall have an opportunity to comment on the plan. The lead agency shall publish a notice of availability of the RI/FS report and a brief analysis of the proposed plan pursuant to §300.430(e) and (f). Included in the proposed plan shall be a statement that the lead and support agencies have reached agreement or, where this is not the case, a statement explaining the concerns of the support agency with the lead agency's proposed plan. The state may not publish a proposed plan that EPA has not approved. EPA may assume the lead from the state if agreement cannot be reached.

(2)(i) EPA and the state shall identify, at least annually, sites for which RODs will be prepared during the next fiscal year, in accordance with §300.515(h)(1). For all EPA-lead sites, EPA shall prepare the ROD and provide the state an opportunity to concur with the recommended remedy. For Fund-financed state-lead sites, EPA and the state shall designate sites, in a site-specific agreement, for which the state shall prepare the ROD and seek EPA's concurrence and adoption of the remedy specified therein, and sites for which EPA shall prepare the ROD and seek the state's concurrence. EPA and the state may designate sites for which

the state shall prepare the ROD for non-Fund-financed state-lead enforcement response actions (*i.e.*, actions taken under state law) at an NPL site. The state may seek EPA's concurrence in the remedy specified therein. Either EPA or the state may choose not to designate a site as state-lead.

(ii) State concurrence on a ROD is not a prerequisite to EPA's selecting a remedy, *i.e.*, signing a ROD, nor is EPA's concurrence a prerequisite to a state's selecting a remedy at a non-Fund-financed state-lead enforcement site under state law. Unless EPA's Assistant Administrator for Solid Waste and Emergency Response or Regional Administrator concurs in writing with a state-prepared ROD, EPA shall not be deemed to have approved the state decision. A state may not proceed with a Fund-financed response action unless EPA has first concurred in and adopted the ROD. Section 300.510(a) specifies limitations on EPA's proceeding with a remedial action without state assurances.

(iii) The lead agency shall provide the support agency with a copy of the signed ROD for remedial actions to be conducted pursuant to CERCLA.

(iv) On state-lead sites identified for EPA concurrence, the state generally shall be expected to maintain its lead agency status through the completion of the remedial action.

(f) *Enhancement of remedy.* (1) A state may ask EPA to make changes in or expansions of a remedial action selected under subpart E.

(i) If EPA finds that the proposed change or expansion is necessary and appropriate to the EPA-selected remedial action, the remedy may be modified (consistent with §300.435(c)(2)) and any additional costs paid as part of the remedial action.

(ii) If EPA finds that the proposed change or expansion is not necessary to the selected remedial action, but would not conflict or be inconsistent with the EPA-selected remedy, EPA may agree to integrate the proposed change or expansion into the planned CERCLA remedial work if:

(A) The state agrees to fund the entire additional cost associated with the change or expansion; and

91

(B) The state agrees to assume the lead for supervising the state-funded component of the remedy or, if EPA determines that the state-funded component cannot be conducted as a separate phase or activity, for supervising the remedial design and construction of the entire remedy.

(2) Where a state does not concur in a remedial action secured by EPA under CERCLA section 106, and the state desires to have the remedial action conform to an ARAR that has been waived under §300.430(f)(1)(ii)(C), a state may seek to have that remedial action so conform, in accordance with the procedures set out in CERCLA section 121(f)(2) .

(g) *State involvement in remedial design/remedial action.* The extent and nature of state involvement during remedial design and remedial action shall be specified in site-specific cooperative agreements or Superfund state contracts, consistent with 40 CFR part 35, subpart O. For Fund-financed remedial actions, the lead and support agencies shall conduct a joint inspection at the conclusion of construction of the remedial action to determine that the remedy has been constructed in accordance with the ROD and with the remedial design.

(h) *Requirements for state involvement in absence of SMOA.* In the absence of a SMOA, EPA and the state shall comply with the requirements in §300.515(h). If the SMOA does not address all of the requirements specified in §300.515(h), EPA and the state shall comply with any unaddressed requirements in that section.

(1) *Annual consultations.* EPA shall conduct consultations with states at least annually to establish priorities and identify and document in writing the lead for remedial and enforcement response for each NPL site within the state for the upcoming fiscal year. States shall be given the opportunity to participate in long-term planning efforts for remedial and enforcement response during these annual consultations.

(2) *Identification of ARARs and TBCs.* The lead and support agencies shall discuss potential ARARs during the scoping of the RI/FS. The lead agency shall request potential ARARs from the support agency no later than the time that the site characterization data are available. The support agency shall communicate in writing those potential ARARs to the lead agency within 30 working days of receipt of the lead agency request for these ARARs. The lead and support agencies may also discuss and communicate other pertinent advisories, criteria, or guidance to be considered (TBCs). After the initial screening of alternatives has been completed but prior to initiation of the comparative analysis conducted during the detailed analysis phase of the FS, the lead agency shall request that the support agency communicate any additional requirements that are applicable or relevant and appropriate to the alternatives contemplated within 30 working days of receipt of this request. The lead agency shall thereafter consult the support agency to ensure that identified ARARs and TBCs are updated as appropriate.

(3) *Support agency review of lead agency documents.* The lead agency shall provide the support agency an opportunity to review and comment on the RI/FS, proposed plan, ROD, and remedial design, and any proposed determinations on potential ARARs and TBCs. The support agency shall have a minimum of 10 working days and a maximum of 15 working days to provide comments to the lead agency on the RI/FS, ROD, ARAR/TBC determinations, and remedial design. The support agency shall have a minimum of five working days and a maximum of 10 working days to comment on the proposed plan.

(i) *Administrative record requirements.* The state, where it is the lead agency for a Fund-financed site, shall compile and maintain the administrative record for selection of a response action under subpart I of this part unless specified otherwise in the SMOA.

## § 300.520 State involvement in EPA-lead enforcement negotiations.

(a) EPA shall notify states of response action negotiations to be conducted by EPA with potentially responsible parties during each fiscal year.

**Environmental Protection Agency**    **§ 300.600**

(b) The state must notify EPA of such negotiations in which it intends to participate.

(c) The state is not foreclosed from signing a consent decree if it does not participate substantially in the negotiations.

**§ 300.525  State involvement in removal actions.**

(a) States may undertake Fund-financed removal actions pursuant to a cooperative agreement with EPA. State-lead removal actions taken pursuant to cooperative agreements must be conducted in accordance with § 300.415 on removal actions, and 40 CFR part 35, subpart O.

(b) States are not required under section 104(c)(3) of CERCLA to share in the cost of a Fund-financed removal action, unless the removal is conducted at an NPL site that was operated by a state or political subdivision at the time of disposal of hazardous substances therein and a Fund-financed remedial action is ultimately undertaken at the site. In this situation, states are required to share, 50 percent or greater, in the cost of all removal (including remedial planning) and remedial action costs at the time of the remedial action.

(c) States are encouraged to provide for post-removal site control as discussed in § 300.415(k) for all Fund-financed removal actions.

(d) States shall be responsible for identifying potential state ARARs for all Fund-financed removal actions and for providing such ARARs to EPA in a timely manner for all EPA-lead removal actions.

(e) EPA shall consult with a state on all removal actions to be conducted in that state.

## Subpart G—Trustees for Natural Resources

SOURCE: 59 FR 47450, Sept. 15, 1994, unless otherwise noted.

**§ 300.600  Designation of federal trustees.**

(a) The President is required to designate in the NCP those federal officials who are to act on behalf of the public as trustees for natural resources. Federal officials so designated will act pursuant to section 107(f) of CERCLA, section 311(f)(5) of the CWA, and section 1006 of the OPA. Natural resources means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled (hereinafter referred to as "managed or controlled") by the United States (including the resources of the exclusive economic zone).

(b) The following individuals shall be the designated trustee(s) for general categories of natural resources, including their supporting ecosystems. They are authorized to act pursuant to section 107(f) of CERCLA, section 311(f)(5) of the CWA, or section 1006 of the OPA when there is injury to, destruction of, loss of, or threat to natural resources, including their supporting ecosystems, as a result of a release of a hazardous substance or a discharge of oil. Notwithstanding the other designations in this section, the Secretaries of Commerce and the Interior shall act as trustees of those resources subject to their respective management or control.

(1) *Secretary of Commerce.* The Secretary of Commerce shall act as trustee for natural resources managed or controlled by DOC and for natural resources managed or controlled by other federal agencies and that are found in, under, or using waters navigable by deep draft vessels, tidally influenced waters, or waters of the contiguous zone, the exclusive economic zone, and the outer continental shelf. However, before the Secretary takes an action with respect to an affected resource under the management or control of another federal agency, he shall, whenever practicable, seek to obtain the concurrence of that other federal agency. Examples of the Secretary's trusteeship include the following natural resources and their supporting ecosystems: marine fishery resources; anadromous fish; endangered species and marine mammals; and the resources of National Marine Sanctuaries and National Estuarine Research Reserves.

(2) *Secretary of the Interior.* The Secretary of the Interior shall act as

trustee for natural resources managed or controlled by the DOI. Examples of the Secretary's trusteeship include the following natural resources and their supporting ecosystems: migratory birds; anadromous fish; endangered species and marine mammals; federally owned minerals; and certain federally managed water resources. The Secretary of the Interior shall also be trustee for those natural resources for which an Indian tribe would otherwise act as trustee in those cases where the United States acts on behalf of the Indian tribe.

(3) *Secretary for the land managing agency.* For natural resources located on, over, or under land administered by the United States, the trustee shall be the head of the department in which the land managing agency is found. The trustees for the principal federal land managing agencies are the Secretaries of DOI, USDA, DOD, and DOE.

(4) *Head of authorized agencies.* For natural resources located in the United States but not otherwise described in this section, the trustee shall be the head of the federal agency or agencies authorized to manage or control those resources.

(5) *Additional trustees for the Deepwater Horizon Oil Spill.* The Administrator of EPA and the Secretary of Agriculture shall act as trustees in connection with injury to, destruction of, loss of, or loss of use of natural resources, including their supporting ecosystems, resulting from the Deepwater Horizon Oil Spill.

[59 FR 47450, Sept. 15, 1994, as amended at 79 FR 36431, June 27, 2014]

## § 300.605   State trustees.

State trustees shall act on behalf of the public as trustees for natural resources, including their supporting ecosystems, within the boundary of a state or belonging to, managed by, controlled by, or appertaining to such state. For the purposes of subpart G of this part, the definition of the term *state* does not include Indian tribes. The governor of a state is encouraged to designate a state lead trustee to coordinate all state trustee responsibilities with other trustee agencies and with response activities of the RRT and OSC. The state's lead trustee

would designate a representative to serve as contact with the OSC. This individual should have ready access to appropriate state officials with environmental protection, emergency response, and natural resource responsibilities. The EPA Administrator or USCG Commandant or their designees may appoint the state lead trustee as a member of the Area Committee. Response strategies should be coordinated between the state and other trustees and the OSC for specific natural resource locations in an inland or coastal zone and should be included in the Fish and Wildlife and Sensitive Environments Plan annex of the ACP.

## § 300.610   Indian tribes.

The tribal chairmen (or heads of the governing bodies) of Indian tribes, as defined in § 300.5, or a person designated by the tribal officials, shall act on behalf of the Indian tribes as trustees for the natural resources, including their supporting ecosystems, belonging to, managed by, controlled by, or appertaining to such Indian tribe, or held in trust for the benefit of such Indian tribe, or belonging to a member of such Indian tribe, if such resources are subject to a trust restriction on alienation. When the tribal chairman or head of the tribal governing body designates another person as trustee, the tribal chairman or head of the tribal governing body shall notify the President of such designation. Such officials are authorized to act when there is injury to, destruction of, loss of, or threat to natural resources, including their supporting ecosystems as a result of a release of a hazardous substance.

## § 300.612   Foreign trustees.

Pursuant to section 1006 of the OPA, foreign trustees shall act on behalf of the head of a foreign government as trustees for natural resources belonging to, managed by, controlled by, or appertaining to such foreign government.

## § 300.615   Responsibilities of trustees.

(a) Where there are multiple trustees, because of coexisting or contiguous natural resources or concurrent jurisdictions, they should coordinate and

**Environmental Protection Agency**                                   **§ 300.615**

cooperate in carrying out these responsibilities.

(b) Trustees are responsible for designating to the RRTs and the Area Committees, for inclusion in the RCP and the ACP, appropriate contacts to receive notifications from the OSCs/RPMs of discharges or releases.

(c)(1) Upon notification or discovery of injury to, destruction of, loss of, or threat to natural resources, trustees may, pursuant to section 107(f) of CERCLA, or section 311(f)(5) of the CWA, take the following or other actions as appropriate:

(i) Conduct a preliminary survey of the area affected by the discharge or release to determine if trust resources under their jurisdiction are, or potentially may be, affected;

(ii) Cooperate with the OSC/RPM in coordinating assessments, investigations, and planning;

(iii) Carry out damage assessments; or

(iv) Devise and carry out a plan for restoration, rehabilitation, replacement, or acquisition of equivalent natural resources. In assessing damages to natural resources, the federal, state, and Indian tribe trustees have the option of following the procedures for natural resource damage assessments located at 43 CFR part 11.

(2) Upon notification or discovery of injury to, destruction of, loss of, or loss of use of, natural resources, or the potential for such, resulting from a discharge of oil occurring after August 18, 1990, the trustees, pursuant to section 1006 of the OPA, are to take the following actions:

(i) In accordance with OPA section 1006(c), determine the need for assessment of natural resource damages, collect data necessary for a potential damage assessment, and, where appropriate, assess damages to natural resources under their trusteeship; and

(ii) As appropriate, and subject to the public participation requirements of OPA section 1006(c), develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship;

(3)(i) The trustees, consistent with procedures specified in the Fish and Wildlife and Sensitive Environments

Plan Annex to the Area Contingency Plan, shall provide timely advice on recommended actions concerning trustee resources that are potentially affected by a discharge of oil. This may include providing assistance to the OSC in identifying/recommending preapproved response techniques and in predesignating shoreline types and areas in ACPs.

(ii) The trustees shall assure, through the lead administrative trustee, that the OSC is informed of their activities regarding natural resource damage assessment that may affect response operations in order to assure coordination and minimize any interference with such operations. The trustees shall assure, through the lead administrative trustee, that all data from the natural resource damage assessment activities that may support more effective operational decisions are provided in a timely manner to the OSC.

(iii) When circumstances permit, the OSC shall share the use of federal response resources (including but not limited to aircraft, vessels, and booms to contain and remove discharged oil) with the trustees, providing trustee activities do not interfere with response actions. The lead administrative trustee facilitates effective and efficient communication between the OSC and the other trustees during response operations and is responsible for applying to the OSC for non-monetary federal response resources on behalf of all trustees. The lead administrative trustee is also responsible for applying to the NPFC for funding for initiation of damage assessment for injuries to natural resources.

(d) The authority of federal trustees includes, but is not limited to the following actions:

(1) Requesting that the Attorney General seek compensation from the responsible parties for the damages assessed and for the costs of an assessment and of restoration planning; and

(2) Participating in negotiations between the United States and potentially responsible parties to obtain PRP-financed or PRP-conducted assessments and restorations for injured resources or protection for threatened

resources and to agree to covenants not to sue, where appropriate.

(3) Requiring, in consultation with the lead agency, any person to comply with the requirements of CERCLA section 104(e) regarding information gathering and access.

(4) Initiating damage assessments, as provided in OPA section 6002.

(e) Actions which may be taken by any trustee pursuant to section 107(f) of CERCLA, section 311(f)(5) of the CWA, or section 1006 of the OPA include, but are not limited to, any of the following:

(1) Requesting that an authorized agency issue an administrative order or pursue injunctive relief against the parties responsible for the discharge or release; or

(2) Requesting that the lead agency remove, or arrange for the removal of, or provide for remedial action with respect to, any oil or hazardous substances from a contaminated medium pursuant to section 104 of CERCLA or section 311 of CWA.

## Subpart H—Participation by Other Persons

SOURCE: 59 FR 47452, Sept. 15, 1994, unless otherwise noted.

### § 300.700 Activities by other persons.

(a) *General.* Except as provided (e.g., in CWA section 311(c)), any person may undertake a response action to reduce or eliminate a release of a hazardous substance, pollutant, or contaminant.

(b) *Summary of CERCLA authorities.* The mechanisms available to recover the costs of response actions under CERCLA are, in summary:

(1) Section 107(a), wherein any person may receive a court award of his or her response costs, plus interest, from the party or parties found to be liable;

(2) Section 111(a)(2), wherein a private party, a PRP pursuant to a settlement agreement, or certain foreign entities may file a claim against the Fund for reimbursement of response costs;

(3) Section 106(b), wherein any person who has complied with a section 106(a) order may petition the Fund for reimbursement of reasonable costs, plus interest; and

(4) Section 123, wherein a general purpose unit of local government may apply to the Fund under 40 CFR part 310 for reimbursement of the costs of temporary emergency measures that are necessary to prevent or mitigate injury to human health or the environment associated with a release.

(c) *Section 107(a) cost recovery actions.* (1) Responsible parties shall be liable for all response costs incurred by the United States government or a state or an Indian tribe not inconsistent with the NCP.

(2) Responsible parties shall be liable for necessary costs of response actions to releases of hazardous substances incurred by any other person consistent with the NCP.

(3) For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:

(i) A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup; and

(ii) Any response action carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA, will be considered "consistent with the NCP."

(4) Actions under § 300.700(c)(1) will not be considered "inconsistent with the NCP," and actions under § 300.700(c)(2) will not be considered not "consistent with the NCP," based on immaterial or insubstantial deviations from the provisions of 40 CFR part 300.

(5) The following provisions of this part are potentially applicable to private party response actions:

(i) Section 300.150 (on worker health and safety);

(ii) Section 300.160 (on documentation and cost recovery);

(iii) Section 300.400(c)(1), (4), (5), and (7) (on determining the need for a Fund-financed action); (e) (on permit requirements) except that the permit waiver does not apply to private party response actions; and (g) (on identification of ARARs) except that applicable requirements of federal or state law may not be waived by a private party;

(iv) Section 300.405(b), (c), and (d) (on reports of releases to the NRC);

(v) Section 300.410 (on removal site evaluation) except paragraphs (f)(5) and (6);

(vi) Section 300.415 (on removal actions) except paragraphs (a)(2), (b)(2)(vii), (b)(5), and (g); and including §300.415(j) with regard to meeting ARARs where practicable except that private party removal actions must always comply with the requirements of applicable law;

(vii) Section 300.420 (on remedial site evaluation);

(viii) Section 300.430 (on RI/FS and selection of remedy) except paragraph (f)(1)(ii)(C)(6) and that applicable requirements of federal or state law may not be waived by a private party; and

(ix) Section 300.435 (on RD/RA and operation and maintenance).

(6) Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements stated therein:

(i) Section 300.155 (on public information and community relations);

(ii) Section 300.415(n) (on community relations during removal actions);

(iii) Section 300.430(c) (on community relations during RI/FS) except paragraph (c)(5);

(iv) Section 300.430(f)(2), (3), and (6) (on community relations during selection of remedy); and

(v) Section 300.435(c) (on community relations during RD/RA and operation and maintenance).

(7) When selecting the appropriate remedial action, the methods of remedying releases listed in appendix D of this part may also be appropriate to a private party response action.

(8) Except for actions taken pursuant to CERCLA sections 104 or 106 or response actions for which reimbursement from the Fund will be sought, any action to be taken by the lead agency listed in paragraphs (c)(5) through (c)(7) may be taken by the person carrying out the response action.

(d) *Section 111(a)(2) claims.* (1) Persons, other than those listed in paragraphs (d)(1)(i) through (iii) of this section, may be able to receive reimbursement of response costs by means of a claim against the Fund. The categories of persons excluded from pursuing this claims authority are:

(i) Federal government;

(ii) State governments, and their political subdivisions, unless they are potentially responsible parties covered by an order or consent decree pursuant to section 122 of CERCLA; and

(iii) Persons operating under a procurement contract or an assistance agreement with the United States with respect to matters covered by that contract or assistance agreement, unless specifically provided therein.

(2) In order to be reimbursed by the Fund, an eligible person must notify the Administrator of EPA or designee prior to taking a response action and receive prior approval, *i.e.,* "preauthorization," for such action.

(3) Preauthorization is EPA's prior approval to submit a claim against the Fund for necessary response costs incurred as a result of carrying out the NCP. All applications for preauthorization will be reviewed to determine whether the request should receive priority for funding. EPA, in its discretion, may grant preauthorization of a claim. Preauthorization will be considered only for:

(i) Removal actions pursuant to §300.415;

(ii) CERCLA section 104(b) activities; and

(iii) Remedial actions at National Priorities List sites pursuant to §300.435.

(4) To receive EPA's prior approval, the eligible person must:

(i) Demonstrate technical and other capabilities to respond safely and effectively to releases of hazardous substances, pollutants, or contaminants; and

(ii) Establish that the action will be consistent with the NCP in accordance with the elements set forth in paragraphs (c)(5) through (8) of this section.

(5) EPA will grant preauthorization to a claim by a party it determines to

be potentially liable under section 107 of CERCLA only in accordance with an order issued pursuant to section 106 of CERCLA, or a settlement with the federal government in accordance with section 122 of CERCLA.

(6) Preauthorization does not establish an enforceable contractual relationship between EPA and the claimant.

(7) Preauthorization represents EPA's commitment that if funds are appropriated for response actions, the response action is conducted in accordance with the preauthorization decision document, and costs are reasonable and necessary, reimbursement will be made from the Superfund, up to the maximum amount provided in the preauthorization decision document.

(8) For a claim to be awarded under section 111 of CERCLA, EPA must certify that the costs were necessary and consistent with the preauthorization decision document.

(e) *Section 106(b) petition.* Subject to conditions specified in CERCLA section 106(b), any person who has complied with an order issued after October 16, 1986 pursuant to section 106(a) of CERCLA, may seek reimbursement for response costs incurred in complying with that order unless the person has waived that right.

(f) *Section 123 reimbursement to local governments.* Any general purpose unit of local government for a political subdivision that is affected by a release may receive reimbursement for the costs of temporary emergency measures necessary to prevent or mitigate injury to human health or the environment subject to the conditions set forth in 40 CFR part 310. Such reimbursement may not exceed $25,000 for a single response.

(g) *Release From Liability.* Implementation of response measures by potentially responsible parties or by any other person does not release those parties from liability under section 107(a) of CERCLA, except as provided in a settlement under section 122 of CERCLA or a federal court judgment.

(h) *Oil Pollution Act Claims.* Claims are authorized to be presented to the OSLTF under section 1013 of the OPA, for certain uncompensated removal costs or uncompensated damages resulting from the discharge, or substantial threat of discharge, of oil from a vessel or facility into or upon the navigable waters, adjoining shorelines, or exclusive economic zone of the United States. Anyone desiring to file a claim against the OSLTF may obtain general information on the procedure for filing a claim from the Director, National Pollution Funds Center, Suite 1000, 4200 Wilson Boulevard, Arlington, Virginia 22203–1804, (703) 235–4756.

## Subpart I—Administrative Record for Selection of Response Action

SOURCE: 55 FR 8859, Mar. 8, 1990, unless otherwise noted.

### § 300.800  Establishment of an administrative record.

(a) *General requirement.* The lead agency shall establish an administrative record that contains the documents that form the basis for the selection of a response action. The lead agency shall compile and maintain the administrative record in accordance with this subpart.

(b) *Administrative records for federal facilities.* (1) If a federal agency other than EPA is the lead agency for a federal facility, the federal agency shall compile and maintain the administrative record for the selection of the response action for that facility in accordance with this subpart. EPA may furnish documents which the federal agency shall place in the administrative record file to ensure that the administrative record includes all documents that form the basis for the selection of the response action.

(2) EPA or the U.S. Coast Guard shall compile and maintain the administrative record when it is the lead agency for a federal facility.

(3) If EPA is involved in the selection of the response action at a federal facility on the NPL, the federal agency acting as the lead agency shall provide EPA with a copy of the index of documents included in the administrative record file, the RI/FS workplan, the RI/FS released for public comment, the proposed plan, any public comments received on the RI/FS and proposed plan, and any other documents EPA may request on a case-by-case basis.

**Environmental Protection Agency**    **§ 300.810**

(c) *Administrative record for state-lead sites.* If a state is the lead agency for a site, the state shall compile and maintain the administrative record for the selection of the response action for that site in accordance with this subpart. EPA may require the state to place additional documents in the administrative record file to ensure that the administrative record includes all documents which form the basis for the selection of the response action. The state shall provide EPA with a copy of the index of documents included in the administrative record file, the RI/FS workplan, the RI/FS released for public comment, the proposed plan, any public comments received on the RI/FS and proposed plan, and any other documents EPA may request on a case-by-case basis.

(d) *Applicability.* This subpart applies to all response actions taken under section 104 of CERCLA or sought, secured, or ordered administratively or judicially under section 106 of CERCLA, as follows:

(1) Remedial actions where the remedial investigation commenced after the promulgation of these regulations; and

(2) Removal actions where the action memorandum is signed after the promulgation of these regulations.

(e) For those response actions not included in paragraph (d) of this section, the lead agency shall comply with this subpart to the extent practicable.

**§ 300.805  Location of the administrative record file.**

(a) The lead agency shall establish a docket at an office of the lead agency or other central location at which documents included in the administrative record file shall be located and a copy of the documents included in the administrative record file shall also be made available for public inspection at or near the site at issue, except as provided below:

(1) Sampling and testing data, quality control and quality assurance documentation, and chain of custody forms, need not be located at or near the site at issue or at the central location, provided that the index to the administrative record file indicates the location and availability of this information.

(2) Guidance documents not generated specifically for the site at issue need not be located at or near the site at issue, provided that they are maintained at the central location and the index to the administrative record file indicates the location and availability of these guidance documents.

(3) Publicly available technical literature not generated for the site at issue, such as engineering textbooks, articles from technical journals, and toxicological profiles, need not be located at or near the site at issue or at the central location, provided that the literature is listed in the index to the administrative record file or the literature is cited in a document in the record.

(4) Documents included in the confidential portion of the administrative record file shall be located only in the central location.

(5) The administrative record for a removal action where the release or threat of release requires that on-site removal activities be initiated within hours of the lead agency's determination that a removal is appropriate and on-site removal activities cease within 30 days of initiation, need be available for public inspection only at the central location.

(b) Where documents are placed in the central location but not in the file located at or near the site, such documents shall be added to the file located at or near the site upon request, except for documents included in paragraph (a)(4) of this section.

(c) The lead agency may make the administrative record file available to the public in microform, computer telecommunications, or other electronic means.

[55 FR 8859, Mar. 8, 1990, as amended at 78 FR 16614, Mar. 18, 2013]

**§ 300.810  Contents of the administrative record file.**

(a) *Contents.* The administrative record file for selection of a response action typically, but not in all cases, will contain the following types of documents:

(1) Documents containing factual information, data and analysis of the factual information, and data that may

form a basis for the selection of a response action. Such documents may include verified sampling data, quality control and quality assurance documentation, chain of custody forms, site inspection reports, preliminary assessment and site evaluation reports, ATSDR health assessments, documents supporting the lead agency's determination of imminent and substantial endangerment, public health evaluations, and technical and engineering evaluations. In addition, for remedial actions, such documents may include approved workplans for the remedial investigation/feasibility study, state documentation of applicable or relevant and appropriate requirements, and the RI/FS;

(2) Guidance documents, technical literature, and site-specific policy memoranda that may form a basis for the selection of the response action. Such documents may include guidance on conducting remedial investigations and feasibility studies, guidance on determining applicable or relevant and appropriate requirements, guidance on risk/exposure assessments, engineering handbooks, articles from technical journals, memoranda on the application of a specific regulation to a site, and memoranda on off-site disposal capacity;

(3) Documents received, published, or made available to the public under § 300.815 for remedial actions, or § 300.820 for removal actions. Such documents may include notice of availability of the administrative record file, community relations plan, proposed plan for remedial action, notices of public comment periods, public comments and information received by the lead agency, and responses to significant comments;

(4) Decision documents. Such documents may include action memoranda and records of decision;

(5) Enforcement orders. Such documents may include administrative orders and consent decrees; and

(6) An index of the documents included in the administrative record file. If documents are customarily grouped together, as with sampling data chain of custody documents, they may be listed as a group in the index to the administrative record file.

(b) *Documents not included in the administrative record file.* The lead agency is not required to include documents in the administrative record file which do not form a basis for the selection of the response action. Such documents include but are not limited to draft documents, internal memoranda, and day-to-day notes of staff unless such documents contain information that forms the basis of selection of the response action and the information is not included in any other document in the administrative record file.

(c) *Privileged documents.* Privileged documents shall not be included in the record file except as provided in paragraph (d) of this section or where such privilege is waived. Privileged documents include but are not limited to documents subject to the attorney-client, attorney work product, deliberative process, or other applicable privilege.

(d) *Confidential file.* If information which forms the basis for the selection of a response action is included only in a document containing confidential or privileged information and is not otherwise available to the public, the information, to the extent feasible, shall be summarized in such a way as to make it disclosable and the summary shall be placed in the publicly available portion of the administrative record file. The confidential or privileged document itself shall be placed in the confidential portion of the administrative record file. If information, such as confidential business information, cannot be summarized in a disclosable manner, the information shall be placed only in the confidential portion of the administrative record file. All documents contained in the confidential portion of the administrative record file shall be listed in the index to the file.

§ 300.815  Administrative record file for a remedial action.

(a) The administrative record file for the selection of a remedial action shall be made available for public inspection at the commencement of the remedial investigation phase. At such time, the lead agency shall publish in a major local newspaper of general circulation a notice or use one or more other

**Environmental Protection Agency** §300.825

mechanisms to give adequate notice to a community of the availability of the administrative record file.

(b) The lead agency shall provide a public comment period as specified in §300.430(f)(3) so that interested persons may submit comments on the selection of the remedial action for inclusion in the administrative record file. The lead agency is encouraged to consider and respond as appropriate to significant comments that were submitted prior to the public comment period. A written response to significant comments submitted during the public comment period shall be included in the administrative record file.

(c) The lead agency shall comply with the public participation procedures required in §300.430(f)(3) and shall document such compliance in the administrative record.

(d) Documents generated or received after the record of decision is signed shall be added to the administrative record file only as provided in §300.825.

[55 FR 8859, Mar. 8, 1990, as amended at 80 FR 17706, Apr. 2, 2015]

### §300.820  Administrative record file for a removal action.

(a) If, based on the site evaluation, the lead agency determines that a removal action is appropriate and that a planning period of at least six months exists before on-site removal activities must be initiated:

(1) The administrative record file shall be made available for public inspection when the engineering evaluation/cost analysis (EE/CA) is made available for public comment. At such time, the lead agency shall publish in a major local newspaper of general circulation a notice or use one or more other mechanisms to give adequate notice to a community of the availability of the administrative record file.

(2) The lead agency shall provide a public comment period as specified in §300.415 so that interested persons may submit comments on the selection of the removal action for inclusion in the administrative record file. The lead agency is encouraged to consider and respond, as appropriate, to significant comments that were submitted prior to the public comment period. A written response to significant comments sub-

mitted during the public comment period shall be included in the administrative record file.

(3) The lead agency shall comply with the public participation procedures of §300.415(m) and shall document compliance with §300.415(m)(3)(i) through (iii) in the administrative record file.

(4) Documents generated or received after the decision document is signed shall be added to the administrative record file only as provided in §300.825.

(b) For all removal actions not included in paragraph (a) of this section:

(1) Documents included in the administrative record file shall be made available for public inspection no later than 60 days after initiation of on-site removal activity. At such time, the lead agency shall publish in a major local newspaper of general circulation a notice or use one or more other mechanisms to give adequate notice to a community of the availability of the administrative record file.

(2) The lead agency shall, as appropriate, provide a public comment period of not less than 30 days beginning at the time the administrative record file is made available to the public. The lead agency is encouraged to consider and respond, as appropriate, to significant comments that were submitted prior to the public comment period. A written response to significant comments submitted during the public comment period shall be included in the administrative record file.

(3) Documents generated or received after the decision document is signed shall be added to the administrative record file only as provided in §300.825.

[55 FR 8859, Mar. 8, 1990, as amended at 80 FR 17706, Apr. 2, 2015]

### §300.825  Record requirements after the decision document is signed.

(a) The lead agency may add documents to the administrative record file after the decision document selecting the response action has been signed if:

(1) The documents concern a portion of a response action decision that the decision document does not address or reserves to be decided at a later date; or

(2) An explanation of significant differences required by §300.435(c), or an amended decision document is issued,

§ 300.900                                    40 CFR Ch. I (7–1–19 Edition)

in which case, the explanation of significant differences or amended decision document and all documents that form the basis for the decision to modify the response action shall be added to the administrative record file.

(b) The lead agency may hold additional public comment periods or extend the time for the submission of public comment after a decision document has been signed on any issues concerning selection of the response action. Such comment shall be limited to the issues for which the lead agency has requested additional comment. All additional comments submitted during such comment periods that are responsive to the request, and any response to these comments, along with documents supporting the request and any final decision with respect to the issue, shall be placed in the administrative record file.

(c) The lead agency is required to consider comments submitted by interested persons after the close of the public comment period only to the extent that the comments contain significant information not contained elsewhere in the administrative record file which could not have been submitted during the public comment period and which substantially support the need to significantly alter the response action. All such comments and any responses thereto shall be placed in the administrative record file.

## Subpart J—Use of Dispersants and Other Chemicals

SOURCE: 59 FR 47453, Sept. 15, 1994, unless otherwise noted.

### § 300.900   General.

(a) Section 311(d)(2)(G) of the CWA requires that EPA prepare a schedule of dispersants, other chemicals, and other spill mitigating devices and substances, if any, that may be used in carrying out the NCP. This subpart makes provisions for such a schedule.

(b) This subpart applies to the navigable waters of the United States and adjoining shorelines, the waters of the contiguous zone, and the high seas beyond the contiguous zone in connection with activities under the Outer Continental Shelf Lands Act, activities

under the Deepwater Port Act of 1974, or activities that may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States, including resources under the Magnuson Fishery Conservation and Management Act of 1976.

(c) This subpart applies to the use of any chemical agents or other additives as defined in subpart A of this part that may be used to remove or control oil discharges.

### § 300.905   NCP Product Schedule.

(a) *Oil Discharges.* (1) EPA shall maintain a schedule of dispersants and other chemical or bioremediation products that may be authorized for use on oil discharges in accordance with the procedures set forth in § 300.910. This schedule, called the NCP Product Schedule, may be obtained from the Emergency Response Division (5202–G), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. The telephone number is 703–603–8760.

(2) Products may be added to the NCP Product Schedule by the process specified in § 300.920.

(b) *Hazardous Substance Releases.* [Reserved]

[59 FR 47453, Sept. 15, 1994, as amended at 65 FR 47325, Aug. 2, 2000]

### § 300.910   Authorization of use.

(a) RRTs and Area Committees shall address, as part of their planning activities, the desirability of using appropriate dispersants, surface washing agents, surface collecting agents, bioremediation agents, or miscellaneous oil spill control agents listed on the NCP Product Schedule, and the desirability of using appropriate burning agents. RCPs and ACPs shall, as appropriate, include applicable preauthorization plans and address the specific contexts in which such products should and should not be used. In meeting the provisions of this paragraph, preauthorization plans may address factors such as the potential sources and types of oil that might be spilled, the existence and location of environmentally sensitive resources that might be impacted by spilled oil,

**Environmental Protection Agency**  §300.915

available product and storage locations, available equipment and adequately trained operators, and the available means to monitor product application and effectiveness. The RRT representatives from EPA and the states with jurisdiction over the waters of the area to which a preauthorization plan applies and the DOC and DOI natural resource trustees shall review and either approve, disapprove, or approve with modification the preauthorization plans developed by Area Committees, as appropriate. Approved preauthorization plans shall be included in the appropriate RCPs and ACPs. If the RRT representatives from EPA and the states with jurisdiction over the waters of the area to which a preauthorization plan applies and the DOC and DOI natural resource trustees approve in advance the use of certain products under specified circumstances as described in the preauthorization plan, the OSC may authorize the use of the products without obtaining the specific concurrences described in paragraphs (b) and (c) of this section.

(b) For spill situations that are not addressed by the preauthorization plans developed pursuant to paragraph (a) of this section, the OSC, with the concurrence of the EPA representative to the RRT and, as appropriate, the concurrence of the RRT representatives from the states with jurisdiction over the navigable waters threatened by the release or discharge, and in consultation with the DOC and DOI natural resource trustees, when practicable, may authorize the use of dispersants, surface washing agents, surface collecting agents, bioremediation agents, or miscellaneous oil spill control agents on the oil discharge, provided that the products are listed on the NCP Product Schedule.

(c) The OSC, with the concurrence of the EPA representative to the RRT and, as appropriate, the concurrence of the RRT representatives from the states with jurisdiction over the navigable waters threatened by the release or discharge, and in consultation with the DOC and DOI natural resource trustees, when practicable, may authorize the use of burning agents on a case-by-case basis.

(d) The OSC may authorize the use of any dispersant, surface washing agent, surface collecting agent, other chemical agent, burning agent, bioremediation agent, or miscellaneous oil spill control agent, including products not listed on the NCP Product Schedule, without obtaining the concurrence of the EPA representative to the RRT and, as appropriate, the RRT representatives from the states with jurisdiction over the navigable waters threatened by the release or discharge, when, in the judgment of the OSC, the use of the product is necessary to prevent or substantially reduce a hazard to human life. Whenever the OSC authorizes the use of a product pursuant to this paragraph, the OSC is to inform the EPA RRT representative and, as appropriate, the RRT representatives from the affected states and, when practicable, the DOC/DOI natural resources trustees of the use of a product, including products not on the Schedule, as soon as possible. Once the threat to human life has subsided, the continued use of a product shall be in accordance with paragraphs (a), (b), and (c) of this section.

(e) Sinking agents shall not be authorized for application to oil discharges.

(f) When developing preauthorization plans, RRTs may require the performance of supplementary toxicity and effectiveness testing of products, in addition to the test methods specified in §300.915 and described in appendix C to part 300, due to existing site-specific or area-specific concerns.

**§300.915  Data requirements.**

(a) *Dispersants.* (1) Name, brand, or trademark, if any, under which the dispersant is sold.

(2) Name, address, and telephone number of the manufacturer, importer, or vendor.

(3) Name, address, and telephone number of primary distributors or sales outlets.

(4) Special handling and worker precautions for storage and field application. Maximum and minimum storage temperatures, to include optimum ranges as well as temperatures that will cause phase separations, chemical

103

changes, or other alterations to the effectiveness of the product.

(5) Shelf life.

(6) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.

(7) Effectiveness. Use the Swirling Flask effectiveness test methods described in appendix C to part 300. Manufacturers shall submit test results and supporting data, along with a certification signed by responsible corporate officials of the manufacturer and laboratory stating that the test was conducted on a representative product sample, the testing was conducted using generally accepted laboratory practices, and they believe the results to be accurate. A dispersant must attain an effectiveness value of 45 percent or greater to be added to the NCP Product Schedule. Manufacturers are encouraged to provide data on product performance under conditions other than those captured by these tests.

(8) *Dispersant Toxicity.* For those dispersants that meet the effectiveness threshold described in paragraph (a)(7) above, use the standard toxicity test methods described in appendix C to part 300. Manufacturers shall submit test results and supporting data, along with a certification signed by responsible corporate officials of the manufacturer and laboratory stating that the test was conducted on a representative product sample, the testing was conducted using generally accepted laboratory practices, and they believe the results to be accurate.

(9) The following data requirements incorporate by reference standards from the 1991 or 1992 Annual Books of ASTM Standards. American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.[1]

[1] Copies of these standards may be obtained from the publisher. Copies may be inspected at the U.S. Environmental Protection Agency Superfund Docket, located at 1235 Jefferson Davis Highway, First Floor, Arlington, VA 22202 or send mail to Mail Code 5305G,

(i) Flash Point—Select appropriate method from the following:

(A) ASTM—D 56–87, "Standard Test Method for Flash Point by Tag Closed Tester;"

(B) ASTM—D 92–90, "Standard Test Method for Flash and Fire Points by Cleveland Open Cup;"

(C) ASTM—D 93–90, "Standard Test Methods for Flash Point by Pensky-Martens Closed Tester;"

(D) ASTM—D 1310–86, "Standard Test Method for Flash Point and Fire Point of Liquids by Tag Open-Cup Apparatus;" or

(E) ASTM—D 3278–89, "Standard Test Methods for Flash Point of Liquids by Setaflash Closed-Cup Apparatus."

(ii) Pour Point—Use ASTM—D 97–87, "Standard Test Method for Pour Point of Petroleum Oils."

(iii) Viscosity—Use ASTM—D 445–88, "Standard Test Method for Kinematic Viscosity of Transparent and Opaque Liquids (and the Calculation of Dynamic Viscosity)."

(iv) Specific Gravity—Use ASTM—D 1298–85(90), "Standard Test Method for Density, Relative Density (Specific Gravity), or API Gravity of Crude Petroleum and Liquid Petroleum Products by Hydrometer Method."

(v) pH—Use ASTM—D 1293–84(90), "Standard Test Methods for pH of Water."

(10) Dispersing Agent Components. Itemize by chemical name and percentage by weight each component of the total formulation. The percentages will include maximum, minimum, and average weights in order to reflect quality control variations in manufacture or formulation. In addition to the chemical information provided in response to the first two sentences, identify the major components in at least the following categories: surface active agents, solvents, and additives.

(11) Heavy Metals, Cyanide, and Chlorinated Hydrocarbons. Using standard test procedures, state the concentrations or upper limits of the following materials:

(i) Arsenic, cadmium, chromium, copper, lead, mercury, nickel, zinc,

1200 Pennsylvania Ave., NW., Washington, DC, or at the Office of the Federal Register, 1100 L Street, NW., Room 8401, Washington, DC 20408.

plus any other metals that may be reasonably expected to be in the sample. Atomic absorption methods should be used and the detailed analytical methods and sample preparation shall be fully described.

(ii) Cyanide. Standard calorimetric procedures should be used.

(iii) Chlorinated hydrocarbons. Gas chromatography should be used and the detailed analytical methods and sample preparation shall be fully described. At a minimum, the following test methods shall be used for chlorinated hydrocarbon analyses: EPA Method 601—Purgeable halocarbons (Standard Method 6230 B) and EPA Method 608—Organochlorine pesticides and PCBs (Standard Method 6630 C).[2]

(12) The technical product data submission shall include the identity of the laboratory that performed the required tests, the qualifications of the laboratory staff, including professional biographical information for individuals responsible for any tests, and laboratory experience with similar tests. Laboratories performing toxicity tests for dispersant toxicity must demonstrate previous toxicity test experience in order for their results to be accepted. It is the responsibility of the submitter to select competent analytical laboratories based on the guidelines contained herein. EPA reserves the right to refuse to accept a submission of technical product data because of lack of qualification of the analytical laboratory, significant variance between submitted data and any laboratory confirmation performed by EPA, or other circumstances that would result in inadequate or inaccurate information on the dispersing agent.

_____
[2] These test methods may be obtained from: Standard Methods for the Examination of Water and Wastewater, 17th Edition, American Public Health Association, 1989; or Method 601—Purgeable halocarbons, 40 CFR part 136 and Method 608—Organochlorine pesticide and PCBs, 40 CFR part 136. Copies may be inspected at the U.S. Environmental Protection Agency Superfund Docket, located at 1235 Jefferson Davis Highway, First Floor, Arlington, VA 22202 or send mail to Mail Code 5305G, 1200 Pennsylvania Ave., NW., Washington, DC, or at the Office of the Federal Register, 1100 L Street, NW., Room 8401, Washington, DC 20408.

(b) *Surface washing agents.* (1) Name, brand, or trademark, if any, under which the surface washing agent is sold.

(2) Name, address, and telephone number of the manufacturer, importer, or vendor.

(3) Name, address, and telephone number of primary distributors or sales outlets.

(4) Special handling and worker precautions for storage and field application. Maximum and minimum storage temperatures, to include optimum ranges as well as temperatures that will cause phase separations, chemical changes, or other alterations to the effectiveness of the product.

(5) Shelf life.

(6) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.

(7) Toxicity. Use standard toxicity test methods described in appendix C to part 300.

(8) Follow the data requirement specifications in paragraph (a)(9) of this section.

(9) Surface Washing Agent Components. Itemize by chemical name and percentage by weight each component of the total formulation. The percentages will include maximum, minimum, and average weights in order to reflect quality control variations in manufacture or formulation. In addition to the chemical information provided in response to the first two sentences, identify the major components in at least the following categories: surface active agents, solvents, and additives.

(10) *Heavy Metals, Cyanide, and Chlorinated Hydrocarbons.* Follow specifications in paragraph (a)(11) of this section.

(11) Analytical Laboratory Requirements for Technical Product Data. Follow specifications in paragraph (a)(12) of this section.

(c) *Surface collecting agents.* (1) Name, brand, or trademark, if any, under which the product is sold.

(2) Name, address, and telephone number of the manufacturer, importer, or vendor.

(3) Name, address, and telephone number of primary distributors or sales outlets.

(4) Special handling and worker precautions for storage and field application. Maximum and minimum storage temperatures, to include optimum ranges as well as temperatures that will cause phase separations, chemical changes, or other alterations to the effectiveness of the product.

(5) Shelf life.

(6) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.

(7) *Toxicity.* Use standard toxicity test methods described in appendix C to part 300.

(8) Follow the data requirement specifications in paragraph (a)(9) of this section.

(9) Test to Distinguish Between Surface Collecting Agents and Other Chemical Agents.

(i) Method Summary—Five milliliters of the chemical under test are mixed with 95 milliliters of distilled water and allowed to stand undisturbed for one hour. Then the volume of the upper phase is determined to the nearest one milliliter.

(ii) Apparatus.

(A) Mixing Cylinder: 100 milliliter subdivisions and fitted with a glass stopper.

(B) Pipettes: Volumetric pipette, 5.0 milliliter.

(C) Timers.

(iii) Procedure—Add 95 milliliters of distilled water at 22 °C, plus or minus 3 °C, to a 100 milliliter mixing cylinder. To the surface of the water in the mixing cylinder, add 5.0 milliliters of the chemical under test. Insert the stopper and invert the cylinder five times in ten seconds. Set upright for one hour at 22 °C, plus or minus 3 °C, and then measure the chemical layer at the surface of the water. If the major portion of the chemical added (75 percent) is at the water surface as a separate and easily distinguished layer, the product is a surface collecting agent.

(10) Surface Collecting Agent Components. Itemize by chemical name and percentage by weight each component

of the total formulation. The percentages should include maximum, minimum, and average weights in order to reflect quality control variations in manufacture or formulation. In addition to the chemical information provided in response to the first two sentences, identify the major components in at least the following categories: surface action agents, solvents, and additives.

(11) Heavy Metals, Cyanide, and Chlorinated Hydrocarbons. Follow specifications in paragraph (a)(11) of this section.

(12) Analytical Laboratory Requirements for Technical Product Data. Follow specifications in paragraph (a)(12) of this section.

(d) *Bioremediation Agents.* (1) Name, brand, or trademark, if any, under which the agent is sold.

(2) Name, address, and telephone number of the manufacturer, importer, or vendor.

(3) Name, address, and telephone number of primary distributors or sales outlets.

(4) Special handling and worker precautions for storage and field application. Maximum and minimum storage temperatures.

(5) Shelf life.

(6) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.

(7) Bioremediation Agent Effectiveness. Use bioremediation agent effectiveness test methods described in appendix C to part 300.

(8) Bioremediation Agent Toxicity [Reserved].

(9) Biological additives.

(i) For microbiological cultures, furnish the following information:

(A) Listing of each component of the total formulation, other than microorganisms, by chemical name and percentage by weight.

(B) Listing of all microorganisms by species.

(C) Percentage of each species in the composition of the additive.

(D) Optimum pH, temperature, and salinity ranges for use of the additive,

**Environmental Protection Agency** §300.915

and maximum and minimum pH, temperature, and salinity levels above or below which the effectiveness of the additive is reduced to half its optimum capacity.

(E) Special nutrient requirements, if any.

(F) Separate listing of the following, and test methods for such determinations: Salmonella, fecal coliform, Shigella, Staphylococcus Coagulase positive, and Beta Hemolytic Streptococci.

(ii) For enzyme additives, furnish the following information:

(A) Listing of each component of the total formulation, other than enzymes, by chemical name and percentage by weight.

(B) Enzyme name(s).

(C) International Union of Biochemistry (I.U.B.) number(s).

(D) Source of the enzyme.

(E) Units.

(F) Specific Activity.

(G) Optimum pH, temperature, and salinity ranges for use of the additive, and maximum and minimum pH, temperature, and salinity levels above or below which the effectiveness of the additive is reduced to half its optimum capacity.

(H) Enzyme shelf life.

(I) Enzyme optimum storage conditions.

(10) For nutrient additives, furnish the following information:

(i) Listing of each component of the total formulation by chemical name and percentage by weight.

(ii) Nutrient additive optimum storage conditions.

(11) Analytical Laboratory Requirements for Technical Product Data. Follow specifications in paragraph (a)(12) of this section.

(e) *Burning Agents.* EPA does not require technical product data submissions for burning agents and does not include burning agents on the NCP Product Schedule.

(f) *Miscellaneous Oil Spill Control Agents.* (1) Name, brand, or trademark, if any, under which the miscellaneous oil spill control agent is sold.

(2) Name, address, and telephone number of the manufacturer, importer, or vendor.

(3) Name, address, and telephone number of primary distributors or sales outlets.

(4) Brief description of recommended uses of the product and how the product works.

(5) Special handling and worker precautions for storage and field application. Maximum and minimum storage temperatures, to include optimum ranges as well as temperatures that will cause phase separations, chemical changes, or other alternatives to the effectiveness of the product.

(6) Shelf life.

(7) Recommended application procedures, concentrations, and conditions for use depending upon water salinity, water temperature, types and ages of the pollutants, and any other application restrictions.

(8) Toxicity. Use standard toxicity test methods described in appendix C to part 300.

(9) Follow the data requirement specifications in paragraph (a)(9) of this section.

(10) Miscellaneous Oil Spill Control Agent Components. Itemize by chemical name and percentage by weight each component of the total formulation. The percentages should include maximum, minimum, and average weights in order to reflect quality control variations in manufacture or formulation. In addition to the chemical information provided in response to the first two sentences, identify the major components in at least the following categories: surface active agents, solvents, and additives.

(11) Heavy Metals, Cyanide, and Chlorinated Hydrocarbons. Follow specifications in paragraph (a)(11) of this section.

(12) For any miscellaneous oil spill control agent that contains microbiological cultures, enzyme additives, or nutrient additives, furnish the information specified in paragraphs (d)(9) and (d)(10) of this section, as appropriate.

(13) Analytical Laboratory Requirements for Technical Product Data. Follow specifications in paragraph (a)(12) of this section.

(g) *Sorbents.* (1) Sorbent material may consist of, but is not limited to, the following materials:

107

(i) Organic products—
(A) Peat moss or straw;
(B) Cellulose fibers or cork;
(C) Corn cobs;
(D) Chicken, duck, or other bird feathers.
(ii) Mineral compounds—
(A) Volcanic ash or perlite;
(B) Vermiculite or zeolite.
(iii) Synthetic products—
(A) Polypropylene;
(B) Polyethylene;
(C) Polyurethane;
(D) Polyester.

(2) EPA does not require technical product data submissions for sorbents and does not include sorbents on the NCP Product Schedule.

(3) Manufacturers that produce sorbent materials that consist of materials other than those listed in paragraph (g)(1) of this section shall submit to EPA the technical product data specified for miscellaneous oil spill control agents in paragraph (f) of this section and EPA will consider listing those products on the NCP Product Schedule under the miscellaneous oil spill control agent category. EPA will inform the submitter in writing, within 60 days of the receipt of technical product data, of its decision on adding the product to the Schedule.

(4) Manufacturers. OSCs may request a written certification from manufacturers that produce sorbent materials that consist solely of the materials listed in paragraph (g)(1) of this section prior to making a decision on the use of a particular sorbent material. The certification at a minimum shall state that the sorbent consists solely of the materials listed in § 300.915(g)(1) of the NCP. The following statement, when completed, dated, and signed by a sorbent manufacturer, is sufficient to meet the written certification requirement:

[SORBENT NAME] is a sorbent material and consists solely of the materials listed in § 300.915(g)(1) of the NCP.

(h) *Mixed products.* Manufacturers of products that consist of materials that meet the definitions of two or more of the product categories contained on the NCP Product Schedule shall submit to EPA the technical product data specified in this section for each of those product categories. After review of the submitted technical product

data, and the performance of required dispersant effectiveness and toxicity tests, if appropriate, EPA will make a determination on whether and under which category the mixed product should be listed on the Schedule.

[59 FR 47453, Sept. 15, 1994, as amended at 65 FR 47325, Aug. 2, 2000]

### § 300.920 Addition of products to Schedule.

(a) *Dispersants.* (1) To add a dispersant to the NCP Product Schedule, submit the technical product data specified in § 300.915(a) to the Emergency Response Division (5202–G), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. A dispersant must attain an effectiveness value of 45 percent or greater in order to be added to the Schedule.

(2) EPA reserves the right to request further documentation of the manufacturers' test results. EPA also reserves the right to verify test results and consider the results of EPA's verification testing in determining whether the dispersant meets listing criteria. EPA will, within 60 days of receiving a complete application as specified in § 300.915(a) of this part, notify the manufacturer of its decision to list the product on the Schedule, or request additional information and/or a sample of the product in order to review and/or conduct validation sampling. If EPA requests additional information and/or a product sample, within 60 days of receiving such additional information or sample, EPA will then notify the manufacturer in writing of its decision to list or not list the product.

(3) Request for review of decision. (i) A manufacturer whose product was determined to be ineligible for listing on the NCP Product Schedule may request EPA's Administrator to review the determination. The request must be made in writing within 30 days of receiving notification of EPA's decision to not list the dispersant on the Schedule. The request shall contain a clear and concise statement with supporting facts and technical analysis demonstrating that EPA's decision was incorrect.

(ii) The Administrator or his designee may request additional information from the manufacturer, or from

**Environmental Protection Agency**                      **§ 300.1105**

any other person, and may provide for a conference between EPA and the manufacturer, if appropriate. The Administrator or his designee shall render a decision within 60 days of receiving the request, or within 60 days of receiving requested additional information, if appropriate, and shall notify the manufacturer of his decision in writing.

(b) *Surface washing agents, surface collecting agents, bioremediation agents, and miscellaneous oil spill control agents.* (1) To add a surface washing agent, surface collecting agent, bioremediation agent, or miscellaneous oil spill control agent to the NCP Product Schedule, the technical product data specified in § 300.915 must be submitted to the Emergency Response Division (5202–G), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. If EPA determines that the required data were submitted, EPA will add the product to the Schedule.

(2) EPA will inform the submitter in writing, within 60 days of the receipt of technical product data, of its decision on adding the product to the Schedule.

(c) The submitter may assert that certain information in the technical product data submissions, including technical product data submissions for sorbents pursuant to § 300.915(g)(3), is confidential business information. EPA will handle such claims pursuant to the provisions in 40 CFR part 2, subpart B. Such information must be submitted separately from non-confidential information, clearly identified, and clearly marked "Confidential Business Information." If the submitter fails to make such a claim at the time of submittal, EPA may make the information available to the public without further notice.

(d) The submitter must notify EPA of any changes in the composition, formulation, or application of the dispersant, surface washing agent, surface collecting agent, bioremediation agent, or miscellaneous oil spill control agent. On the basis of this data, EPA may require retesting of the product if the change is likely to affect the effectiveness or toxicity of the product.

(e) The listing of a product on the NCP Product Schedule does not con-

stitute approval of the product. To avoid possible misinterpretation or misrepresentation, any label, advertisement, or technical literature that refers to the placement of the product on the NCP Product Schedule must either reproduce in its entirety EPA's written statement that it will add the product to the NCP Product Schedule under § 300.920(a)(2) or (b)(2), or include the disclaimer shown below. If the disclaimer is used, it must be conspicuous and must be fully reproduced. Failure to comply with these restrictions or any other improper attempt to demonstrate the approval of the product by any NRT or other U.S. Government agency shall constitute grounds for removing the product from the NCP Product Schedule.

DISCLAIMER

[PRODUCT NAME] is on the U.S. Environmental Protection Agency's NCP Product Schedule. This listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [PRODUCT NAME] on an oil discharge. This listing means only that data have been submitted to EPA as required by subpart J of the National Contingency Plan, § 300.915.

## Subpart K—Federal Facilities [Reserved]

## Subpart L—National Oil and Hazardous Substances Pollution Contingency Plan; Involuntary Acquisition of Property by the Government

SOURCE: 62 FR 34602, June 26, 1997, unless otherwise noted.

### § 300.1105  Involuntary acquisition of property by the government.

(a) Governmental ownership or control of property by involuntary acquisitions or involuntary transfers within the meaning of CERCLA section 101(20)(D) or section 101(35)(A)(ii) includes, but is not limited to:

(1) Acquisitions by or transfers to the government in its capacity as a sovereign, including transfers or acquisitions pursuant to abandonment proceedings, or as the result of tax delinquency, or escheat, or other circumstances in which the government

109

involuntarily obtains ownership or control of property by virtue of its function as sovereign;

(2) Acquisitions by or transfers to a government entity or its agent (including governmental lending and credit institutions, loan guarantors, loan insurers, and financial regulatory entities which acquire security interests or properties of failed private lending or depository institutions) acting as a conservator or receiver pursuant to a clear and direct statutory mandate or regulatory authority;

(3) Acquisitions or transfers of assets through foreclosure and its equivalents (as defined in 40 CFR 300.1100(d)(1)) or other means by a Federal, state, or local government entity in the course of administering a governmental loan or loan guarantee or loan insurance program; and

(4) Acquisitions by or transfers to a government entity pursuant to seizure or forfeiture authority.

(b) Nothing in this section or in CERCLA section 101(20)(D) or section 101(35)(A)(ii) affects the applicability of 40 CFR 300.1100 to any security interest, property, or asset acquired pursuant to an involuntary acquisition or transfer, as described in this section.

NOTE TO PARAGRAPHS (a)(3) AND (b OF THIS SECTION: Reference to 40 CFR 300.1100 is a reference to the provisions regarding secured creditors in CERCLA sections 101(20)(E)–(G), 42 U.S.C. 9601(20)(E)–(G). *See* Section 2504(a) of the Asset Conservation, Lender Liability, and Deposit Insurance Protection Act, Public Law, 104–208, 110 Stat. 3009–462, 3009–468 (1996).

APPENDIX A TO PART 300—THE HAZARD RANKING SYSTEM

*Table of Contents*

List of Figures
List of Tables
1.0. Introduction.
1.1 Definitions.
2.0 Evaluations Common to Multiple Pathways.
2.1 Overview.
2.1.1 Calculation of HRS site score.
2.1.2 Calculation of pathway score.
2.1.3 Common evaluations.
2.2 Characterize sources.
2.2.1 Identify sources.
2.2.2 Identify hazardous substances associated with a source.
2.2.3 Identify hazardous substances available to a pathway.
2.3 Likelihood of release.
2.4 Waste characteristics.
2.4.1 Selection of substance potentially posing greatest hazard.
2.4.1.1 Toxicity factor.
2.4.1.2 Hazardous substance selection.
2.4.2 Hazardous waste quantity.
2.4.2.1 Source hazardous waste quantity.
2.4.2.1.1 Hazardous constituent quantity.
2.4.2.1.2 Hazardous wastestream quantity.
2.4.2.1.3 Volume.
2.4.2.1.4 Area.
2.4.2.1.5 Calculation of source hazardous waste quantity value.
2.4.2.2 Calculation of hazardous waste quantity factor value.
2.4.3 Waste characteristics factor category value.
2.4.3.1 Factor category value.
2.4.3.2 Factor category value, considering bioaccumulation potential.
2.5 Targets.
2.5.1 Determination of level of actual contamination at a sampling location.
2.5.2 Comparison to benchmarks.
3.0 Ground Water Migration Pathway.
3.0.1 General considerations.
3.0.1.1 Ground water target distance limit.
3.0.1.2 Aquifer boundaries.
3.0.1.2.1 Aquifer interconnections.
3.0.1.2.2 Aquifer discontinuities.
3.0.1.3 Karst aquifer.
3.1 Likelihood of release.
3.1.1 Observed release.
3.1.2 Potential to release.
3.1.2.1 Containment.
3.1.2.2 Net precipitation.
3.1.2.3 Depth to aquifer.
3.1.2.4 Travel time.
3.1.2.5 Calculation of potential to release factor value.
3.1.3 Calculation of likelihood of release factor category value.
3.2 Waste characteristics.
3.2.1 Toxicity/mobility.
3.2.1.1 Toxicity.
3.2.1.2 Mobility.
3.2.1.3 Calculation of toxicity/mobility factor value.
3.2.2 Hazardous waste quantity.
3.2.3 Calculation of waste characteristics factor category value.
3.3 Targets.
3.3.1 Nearest well.
3.3.2 Population.
3.3.2.1 Level of contamination.
3.3.2.2 Level I concentrations.
3.3.2.3 Level II concentrations.
3.3.2.4 Potential contamination.
3.3.2.5 Calculation of population factor value.
3.3.3 Resources.
3.3.4 Wellhead Protection Area.
3.3.5 Calculation of targets factor category value.
3.4 Ground water migration score for an aquifer.

3.5 Calculation of ground water migration pathway score.
4.0 Surface Water Migration Pathway.
4.0.1 Migration components.
4.0.2 Surface water categories.
4.1 Overland/flood migration component.
4.1.1 General considerations.
4.1.1.1 Definition of hazardous substance migration path for overland/flood migration component.
4.1.1.2 Target distance limit.
4.1.1.3 Evaluation of overland/flood migration component.
4.1.2 Drinking water threat.
4.1.2.1 Drinking water threat-likelihood of release.
4.1.2.1.1 Observed release.
4.1.2.1.2 Potential to release.
4.1.2.1.2.1 Potential to release by overland flow.
4.1.2.1.2.1.1 Containment.
4.1.2.1.2.1.2 Runoff.
4.1.2.1.2.1.3 Distance to surface water.
4.1.2.1.2.1.4 Calculation of factor value for potential to release by overland flow.
4.1.2.1.2.2 Potential to release by flood.
4.1.2.1.2.2.1 Containment (flood).
4.1.2.1.2.2.2 Flood frequency.
4.1.2.1.2.2.3 Calculation of factor value for potential to release by flood.
4.1.2.1.2.3 Calculation of potential to release factor value.
4.1.2.1.3 Calculation of drinking water threat-likelihood of release factor category value.
4.1.2.2 Drinking water threat-waste characteristics.
4.1.2.2.1 Toxicity/persistence.
4.1.2.2.1.1 Toxicity.
4.1.2.2.1.2 Persistence.
4.1.2.2.1.3 Calculation of toxicity/persistence factor value.
4.1.2.2.2 Hazardous waste quantity.
4.1.2.2.3 Calculation of drinking water threat-waste characteristics factor category value.
4.1.2.3 Drinking water threat-targets.
4.1.2.3.1 Nearest intake.
4.1.2.3.2 Population.
4.1.2.3.2.1 Level of contamination.
4.1.2.3.2.2 Level I concentrations.
4.1.2.3.2.3 Level II concentrations.
4.1.2.3.2.4 Potential contamination.
4.1.2.3.2.5 Calculation of population factor value.
4.1.2.3.3 Resources.
4.1.2.3.4 Calculation of drinking water threat-targets factor category value.
4.1.2.4 Calculation of the drinking water threat score for a watershed.
4.1.3 Human food chain threat.
4.1.3.1 Human food chain threat-likelihood of release.
4.1.3.2 Human food chain threat-waste characteristics.
4.1.3.2.1 Toxicity/persistence/bioaccumulation.
4.1.3.2.1.1 Toxicity.
4.1.3.2.1.2 Persistence.
4.1.3.2.1.3 Bioaccumulation potential.
4.1.3.2.1.4 Calculation of toxicity/persistence/bioaccumulation factor value.
4.1.3.2.2 Hazardous waste quantity.
4.1.3.2.3 Calculation of human food chain threat-waste characteristics factor category value.
4.1.3.3 Human food chain threat-targets.
4.1.3.3.1 Food chain individual.
4.1.3.3.2 Population.
4.1.3.3.2.1 Level I concentrations.
4.1.3.3.2.2 Level II concentrations.
4.1.3.3.2.3 Potential human food chain contamination.
4.1.3.3.2.4 Calculation of population factor value.
4.1.3.3.3 Calculation of human food chain threat-targets factor category value.
4.1.3.4 Calculation of human food chain threat score for a watershed.
4.1.4 Environmental threat.
4.1.4.1 Environmental threat-likelihood of release.
4.1.4.2 Environmental threat-waste characteristics.
4.1.4.2.1 Ecosystem toxicity/persistence/bioaccumulation.
4.1.4.2.1.1 Ecosystem toxicity.
4.1.4.2.1.2 Persistence.
4.1.4.2.1.3 Ecosystem bioaccumulation potential.
4.1.4.2.1.4 Calculation of ecosystem toxicity/persistence/bioaccumulation factor value.
4.1.4.2.2 Hazardous waste quantity.
4.1.4.2.3 Calculation of environmental threat-waste characteristics factor category value.
4.1.4.3 Environmental threat-targets.
4.1.4.3.1 Sensitive environments.
4.1.4.3.1.1 Level I concentrations.
4.1.4.3.1.2 Level II concentrations.
4.1.4.3.1.3 Potential contamination.
4.1.4.3.1.4 Calculation of environmental threat-targets factor category value.
4.1.4.4 Calculation of environmental threat score for a watershed.
4.1.5 Calculation of overland/flood migration component score for a watershed.
4.1.6 Calculation of overland/flood migration component score.
4.2 Ground water to surface water migration component.
4.2.1 General Considerations.
4.2.1.1 Eligible surface waters.
4.2.1.2 Definition of hazardous substance migration path for ground water to surface water migration component.
4.2.1.3 Observed release of a specific hazardous substance to surface water in-water segment.
4.2.1.4 Target distance limit.
4.2.1.5 Evaluation of ground water to surface water migration component.
4.2.2 Drinking water threat.

4.2.2.1 Drinking water threat-likelihood of release.
4.2.2.1.1 Observed release.
4.2.2.1.2 Potential to release.
4.2.2.1.3 Calculation of drinking water threat-likelihood of release factor category value.
4.2.2.2 Drinking water threat-waste characteristics.
4.2.2.2.1 Toxicity/mobility/persistence.
4.2.2.2.1.1 Toxicity.
4.2.2.2.1.2 Mobility.
4.2.2.2.1.3 Persistence.
4.2.2.2.1.4 Calculation of toxicity/mobility/persistence factor value.
4.2.2.2.2 Hazardous waste quantity.
4.2.2.2.3 Calculation of drinking water threat-waste characteristics factor category value.
4.2.2.3 Drinking water threat-targets.
4.2.2.3.1 Nearest intake.
4.2.2.3.2 Population.
4.2.2.3.2.1 Level I concentrations.
4.2.2.3.2.2 Level II concentrations.
4.2.2.3.2.3 Potential contamination.
4.2.2.3.2.4 Calculation of population factor value.
4.2.2.3.3 Resources.
4.2.2.3.4 Calculation of drinking water threat-targets factor category value.
4.2.2.4 Calculation of drinking water threat score for a watershed.
4.2.3 Human food chain threat.
4.2.3.1 Human food chain threat-likelihood of release.
4.2.3.2 Human food chain threat-waste characteristics.
4.2.3.2.1 Toxicity/mobility/persistence/bioaccumulation.
4.2.3.2.1.1 Toxicity.
4.2.3.2.1.2 Mobility.
4.2.3.2.1.3 Persistence.
4.2.3.2.1.4 Bioaccumulation potential.
4.2.3.2.1.5 Calculation of toxicity/mobility/persistence/bioaccumulation factor value.
4.2.3.2.2 Hazardous waste quantity.
4.2.3.2.3 Calculation of human food chain threat-waste characteristics factor category value.
4.2.3.3 Human food chain threat-targets.
4.2.3.3.1 Food chain individual.
4.2.3.3.2 Population.
4.2.3.3.2.1 Level I concentrations.
4.2.3.3.2.2 Level II concentrations.
4.2.3.3.2.3 Potential human food chain contamination.
4.2.3.3.2.4 Calculation of population factor value.
4.2.3.3.3 Calculation of human food chain threat-targets factor category value.
4.2.3.4 Calculation of human food chain threat score for a watershed.
4.2.4 Environmental threat.
4.2.4.1 Environmental threat-likelihood of release.

4.2.4.2 Environmental threat-waste characteristics.
4.2.4.2.1 Ecosystem toxicity/mobility/persistence/bioaccumulation.
4.2.4.2.1.1 Ecosystem toxicity.
4.2.4.2.1.2 Mobility.
4.2.4.2.1.3 Persistence.
4.2.4.2.1.4 Ecosystem bioaccumulation potential.
4.2.4.2.1.5 Calculation of ecosystem toxicity/mobility/persistence/bioaccumulation factor value.
4.2.4.2.2 Hazardous waste quantity.
4.2.4.2.3 Calculation of environmental threat-waste characteristics factor category value.
4.2.4.3 Environmental threat-targets.
4.2.4.3.1 Sensitive environments.
4.2.4.3.1.1 Level I concentrations.
4.2.4.3.1.2 Level II concentrations.
4.2.4.3.1.3 Potential contamination.
4.2.4.3.1.4 Calculation of environmental threat-targets factor category value.
4.2.4.4 Calculation of environmental threat score for a watershed.
4.2.5 Calculation of ground water to surface water migration component score for a watershed.
4.2.6 Calculation of ground water to surface water migration component score.
4.3 Calculation of surface water migration pathway score.
5.0 Soil Exposure and Subsurface Intrusion Pathway.
5.0.1 Exposure components.
5.1 Soil exposure component.
5.1.0 General considerations.
5.1.1 Resident population threat.
5.1.1.1 Likelihood of exposure.
5.1.1.2 Waste characteristics.
5.1.1.2.1 Toxicity.
5.1.1.2.2 Hazardous waste quantity.
5.1.1.2.3 Calculation of waste characteristics factor category value.
5.1.1.3 Targets.
5.1.1.3.1 Resident individual.
5.1.1.3.2 Resident population.
5.1.1.3.2.1 Level I concentrations.
5.1.1.3.2.2 Level II concentrations.
5.1.1.3.2.3 Calculation of resident population factor value.
5.1.1.3.3 Workers.
5.1.1.3.4 Resources.
5.1.1.3.5 Terrestrial sensitive environments.
5.1.1.3.6 Calculation of resident population targets factor category value.
5.1.1.4 Calculation of resident population threat score.
5.1.2 Nearby population threat.
5.1.2.1 Likelihood of exposure.
5.1.2.1.1 Attractiveness/accessibility.
5.1.2.1.2 Area of contamination.
5.1.2.1.3 Likelihood of exposure factor category value.
5.1.2.2 Waste characteristics.
5.1.2.2.1 Toxicity.

**Environmental Protection Agency**    **Pt. 300, App. A**

5.1.2.2.2  Hazardous waste quantity.
5.1.2.2.3  Calculation of waste characteristics factor category value.
5.1.2.3  Targets.
5.1.2.3.1  Nearby individual.
5.1.2.3.2  Population within 1 mile.
5.1.2.3.3  Calculation of nearby population targets factor category value.
5.1.2.4  Calculation of nearby population threat score.
5.1.3  Calculation of soil exposure component score.
5.2  Subsurface intrusion component.
5.2.0  General considerations.
5.2.1  Subsurface intrusion component.
5.2.1.1  Likelihood of exposure.
5.2.1.1.1  Observed exposure.
5.2.1.1.2  Potential for exposure.
5.2.1.1.2.1  Structure containment.
5.2.1.1.2.2  Depth to contamination.
5.2.1.1.2.3  Vertical migration.
5.2.1.1.2.4  Vapor migration potential.
5.2.1.1.2.5  Calculation of potential for exposure factor value.
5.2.1.1.3  Calculation of likelihood of exposure factor category value.
5.2.1.2  Waste characteristics.
5.2.1.2.1  Toxicity/degradation.
5.2.1.2.1.1  Toxicity.
5.2.1.2.1.2  Degradation.
5.2.1.2.1.3  Calculation of toxicity/degradation factor value.
5.2.1.2.2  Hazardous waste quantity.
5.2.1.2.3  Calculation of waste characteristics factor category value.
5.2.1.3  Targets.
5.2.1.3.1  Exposed individual.
5.2.1.3.2  Population.
5.2.1.3.2.1  Level I concentrations.
5.2.1.3.2.2  Level II concentrations.
5.2.1.3.2.3  Population within area(s) of subsurface contamination.
5.2.1.3.2.4  Calculation of population factor value.
5.2.1.3.3  Resources.
5.2.1.3.4  Calculation of targets factor category value.
5.2.2  Calculation of subsurface intrusion component score.
5.3  Calculation of the soil exposure and subsurface intrusion pathway score.
6.0  Air Migration Pathway.
6.1  Likelihood of release.
6.1.1  Observed release.
6.1.2  Potential to release.
6.1.2.1  Gas potential to release.
6.1.2.1.1  Gas containment.
6.1.2.1.2  Gas source type.
6.1.2.1.3  Gas migration potential.
6.1.2.1.4  Calculation of gas potential to release value.
6.1.2.2  Particulate potential to release.
6.1.2.2.1  Particulate containment.
6.1.2.2.2  Pariculate source type.
6.1.2.2.3  Particulate migration potential.
6.1.2.2.4  Calculation of particulate potential to release value.

6.1.2.3  Calculation of potential to release factor value for the site.
6.1.3  Calculation of likelihood of release factor category value.
6.2  Waste characteristics.
6.2.1  Toxicity/mobility.
6.2.1.1  Toxicity.
6.2.1.2  Mobility.
6.2.1.3  Calculation of toxicity/mobility factor value.
6.2.2  Hazardous waste quantity.
6.2.3  Calculation of waste characteristics factor category value.
6.3  Targets.
6.3.1  Nearest individual.
6.3.2  Population.
6.3.2.1  Level of contamination.
6.3.2.2  Level I concentrations.
6.3.2.3  Level II concentrations.
6.3.2.4  Potential contamination.
6.3.2.5  Calculation of population factor value.
6.3.3  Resources.
6.3.4  Sensitive environments.
6.3.4.1  Actual contamination.
6.3.4.2  Potential contamination.
6.3.4.3  Calculation of sensitive environments factor value.
6.3.5  Calculation of targets factor category value.
6.4  Calculation of air migration pathway score.
7.0  Sites Containing Radioactive Substances.
7.1  Likelihood of release/likelihood of exposure.
7.1.1  Observed release/observed contamination/observed exposure.
7.1.2  Potential to release/potential for exposure.
7.2  Waste characteristics.
7.2.1  Human toxicity.
7.2.2  Ecosystem toxicity.
7.2.3  Persistence/degradation.
7.2.4  Selection of substance potentially posing greatest hazard.
7.2.5  Hazardous waste quantity.
7.2.5.1  Source hazardous waste quantity for radionuclides.
7.2.5.1.1  Radionuclide constituent quantity (Tier A).
7.2.5.1.2  Radionuclide wastestream quantity (Tier B).
7.2.5.1.3  Calculation of source hazardous waste quantity value for radionuclides.
7.2.5.2  Calculation of hazardous waste quantity factor value for radionuclides.
7.2.5.3  Calculation of hazardous waste quantity factor value for sites containing mixed radioactive and other hazardous substances.
7.3  Targets.
7.3.1  Level of contamination at a sampling location.
7.3.2  Comparison to benchmarks.
7.3.3  Weighting of targets within an area of subsurface contamination.

113