**Environmental Protection Agency**                                    **§ 761.61**

cleanup, disapproving of the self-implementing cleanup, or requiring additional information. If the EPA Regional Administrator does not respond within 30 calendar days of receiving the notice, the person submitting the notification may assume that it is complete and acceptable and proceed with the cleanup according to the information the person provided to the EPA Regional Administrator. Once cleanup is underway, the person conducting the cleanup must provide any proposed changes from the notification to the EPA Regional Administrator in writing no less than 14 calendar days prior to the proposed implementation of the change. The EPA Regional Administrator will determine in his or her discretion whether to accept the change, and will respond to the change notification verbally within 7 calendar days and in writing within 14 calendar days of receiving it. If the EPA Regional Administrator does not respond verbally within 7 calendar days and in writing within 14 calendar days of receiving the change notice, the person who submitted it may deem it complete and acceptable and proceed with the cleanup according to the information in the change notice provided to the EPA Regional Administrator.

(iii) Any person conducting a cleanup activity may obtain a waiver of the 30-day notification requirement, if they receive a separate waiver, in writing, from each of the agencies they are required to notify under this section. The person must retain the original written waiver as required in paragraph (a)(9) of this section.

(4) *Cleanup levels.* For purposes of cleaning, decontaminating, or removing PCB remediation waste under this section, there are four general waste categories: bulk PCB remediation waste, non-porous surfaces, porous surfaces, and liquids. Cleanup levels are based on the kind of material and the potential exposure to PCBs left after cleanup is completed.

(i) *Bulk PCB remediation waste.* Bulk PCB remediation waste includes, but is not limited to, the following non-liquid PCB remediation waste: soil, sediments, dredged materials, muds, PCB sewage sludge, and industrial sludge.

(A) *High occupancy areas.* The cleanup level for bulk PCB remediation waste in high occupancy areas is ≤1 ppm without further conditions. High occupancy areas where bulk PCB remediation waste remains at concentrations >1 ppm and ≤10 ppm shall be covered with a cap meeting the requirements of paragraphs (a)(7) and (a)(8) of this section.

(B) *Low occupancy areas.* (*1*) The cleanup level for bulk PCB remediation waste in low occupancy areas is ≤25 ppm unless otherwise specified in this paragraph.

(*2*) Bulk PCB remediation wastes may remain at a cleanup site at concentrations >25 ppm and ≤50 ppm if the site is secured by a fence and marked with a sign including the $M_L$ mark.

(*3*) Bulk PCB remediation wastes may remain at a cleanup site at concentrations >25 ppm and ≤100 ppm if the site is covered with a cap meeting the requirements of paragraphs (a)(7) and (a)(8) of this section.

(ii) *Non-porous surfaces.* In high occupancy areas, the surface PCB cleanup standard is ≤10 μg/100 cm² of surface area. In low occupancy areas, the surface cleanup standard is <100 μg/100 cm² of surface area. Select sampling locations in accordance with subpart P of this part or a sampling plan approved under paragraph (c) of this section.

(iii) *Porous surfaces.* In both high and low occupancy areas, any person disposing of porous surfaces must do so based on the levels in paragraph (a)(4)(i) of this section. Porous surfaces may be cleaned up for use in accordance with § 761.79(b)(4) or § 761.30(p).

(iv) *Liquids.* In both high and low occupancy areas, cleanup levels are the concentrations specified in § 761.79(b)(1) and (b)(2).

(v) *Change in the land use for a cleanup site.* Where there is an actual or proposed change in use of an area cleaned up to the levels of a low occupancy area, and the exposure of people or animal life in or at that area could reasonably be expected to increase, resulting in a change in status from a low occupancy area to a high occupancy area, the owner of the area shall clean up the

area in accordance with the high occupancy area cleanup levels in paragraphs (a)(4)(i) through (a)(4)(iv) of this section.

(vi) The EPA Regional Administrator, as part of his or her response to a notification submitted in accordance with §761.61(a)(3) of this part, may require cleanup of the site, or portions of it, to more stringent cleanup levels than are otherwise required in this section, based on the proximity to areas such as residential dwellings, hospitals, schools, nursing homes, playgrounds, parks, day care centers, endangered species habitats, estuaries, wetlands, national parks, national wildlife refuges, commercial fisheries, and sport fisheries.

(5) *Site cleanup.* In addition to the options set out in this paragraph, PCB disposal technologies approved under §§761.60 and 761.70 are acceptable for on-site self-implementing PCB remediation waste disposal within the confines of the operating conditions of the respective approvals.

(i) *Bulk PCB remediation waste.* Any person cleaning up bulk PCB remediation waste shall do so to the levels in paragraph (a)(4)(i) of this section.

(A) Any person cleaning up bulk PCB remediation waste on-site using a soil washing process may do so without EPA approval, subject to all of the following:

(*1*) A non-chlorinated solvent is used.

(*2*) The process occurs at ambient temperature.

(*3*) The process is not exothermic.

(*4*) The process uses no external heat.

(*5*) The process has secondary containment to prevent any solvent from being released to the underlying or surrounding soils or surface waters.

(*6*) Solvent disposal, recovery, and/or reuse is in accordance with relevant provisions of approvals issued according to paragraphs (b)(1) or (c) of this section or applicable paragraphs of §761.79.

(B) Bulk PCB remediation waste may be sent off-site for decontamination or disposal in accordance with this paragraph, provided the waste is either dewatered on-site or transported off-site in containers meeting the requirements of the DOT Hazardous Materials

Regulations (HMR) at 49 CFR parts 171 through 180.

(*1*) Removed water shall be disposed of according to paragraph (b)(1) of this section.

(2) Any person disposing off-site of dewatered bulk PCB remediation waste shall do so as follows:

(i) Unless sampled and analyzed for disposal according to the procedures set out in §§761.283, 761.286, and 761.292, the bulk PCB remediation waste shall be assumed to contain ≥50 ppm PCBs.

(ii) Bulk PCB remediation wastes with a PCB concentration of <50 ppm shall be disposed of in accordance with paragraph (a)(5)(v)(A) of this section.

(iii) Bulk PCB remediation wastes with a PCB concentration ≥50 ppm shall be disposed of in a hazardous waste landfill permitted by EPA under section 3004 of RCRA, or by a State authorized under section 3006 of RCRA, or a PCB disposal facility approved under this part.

(iv) The generator must provide written notice, including the quantity to be shipped and highest concentration of PCBs (using extraction EPA Method 3500B/3540C or Method 3500B/3550B followed by chemical analysis using EPA Method 8082 in SW–846 or methods validated under subpart Q of this part) at least 15 days before the first shipment of bulk PCB remediation waste from each cleanup site by the generator, to each off-site facility where the waste is destined for an area not subject to a TSCA PCB Disposal Approval.

(3) Any person may decontaminate bulk PCB remediation waste in accordance with §761.79 and return the waste to the cleanup site for disposal as long as the cleanup standards of paragraph (a)(4) of this section are met.

(ii) *Non-porous surfaces.* PCB remediation waste non-porous surfaces shall be cleaned on-site or off-site for disposal on-site, disposal off-site, or use, as follows:

(A) For on-site disposal, non-porous surfaces shall be cleaned on-site or off-site to the levels in paragraph (a)(4)(ii) of this section using:

(*1*) Procedures approved under §761.79.

(*2*) Technologies approved under §761.60(e).

(3) Procedures or technologies approved under paragraph (c) of this section.

(B) For off-site disposal, non-porous surfaces:

(1) Having surface concentrations <100 µg/100 cm² shall be disposed of in accordance with paragraph (a)(5)(i)(B)(2)(ii) of this section. Metal surfaces may be thermally decontaminated in accordance with §761.79(c)(6)(i).

(2) Having surface concentrations ≥100 µg/100 cm² shall be disposed of in accordance with paragraph (a)(5)(i)(B)(2)(iii) of this section. Metal surfaces may be thermally decontaminated in accordance with §761.79(c)(6)(ii).

(C) For use, non-porous surfaces shall be decontaminated on-site or off-site to the standards specified in §761.79(b)(3) or in accordance with §761.79(c).

(iii) *Porous surfaces.* Porous surfaces shall be disposed on-site or off-site as bulk PCB remediation waste according to paragraph (a)(5)(i) of this section or decontaminated for use according to §761.79(b)(4), as applicable.

(iv) *Liquids.* Any person disposing of liquid PCB remediation waste shall either:

(A) Decontaminate the waste to the levels specified in §761.79(b)(1) or (b)(2).

(B) Dispose of the waste in accordance with paragraph (b) of this section or an approval issued under paragraph (c) of this section.

(v) *Cleanup wastes.* Any person generating the following wastes during and from the cleanup of PCB remediation waste shall dispose of or reuse them using one of the following methods:

(A) Non-liquid cleaning materials and personal protective equipment waste at any concentration, including non-porous surfaces and other non-liquid materials such as rags, gloves, booties, other disposable personal protective equipment, and similar materials resulting from cleanup activities shall be either decontaminated in accordance with §761.79(b) or (c), or disposed of in one of the following facilities, without regard to the requirements of subparts J and K of this part:

(1) A facility permitted, licensed, or registered by a State to manage munic-

ipal solid waste subject to part 258 of this chapter.

(2) A facility permitted, licensed, or registered by a State to manage non-municipal non-hazardous waste subject to §§257.5 through 257.30 of this chapter, as applicable.

(3) A hazardous waste landfill permitted by EPA under section 3004 of RCRA, or by a State authorized under section 3006 of RCRA.

(4) A PCB disposal facility approved under this part.

(B) Cleaning solvents, abrasives, and equipment may be reused after decontamination in accordance with §761.79.

(6) *Cleanup verification*—(i) *Sampling and analysis.* Any person collecting and analyzing samples to verify the cleanup and on-site disposal of bulk PCB remediation wastes and porous surfaces must do so in accordance with subpart O of this part. Any person collecting and analyzing samples from non-porous surfaces must do so in accordance with subpart P of this part. Any person collecting and analyzing samples from liquids must do so in accordance with §761.269. Any person conducting interim sampling during PCB remediation waste cleanup to determine when to sample to verify that cleanup is complete, may use PCB field screening tests.

(ii) *Verification.* (A) Where sample analysis results in a measurement of PCBs less than or equal to the levels specified in paragraph (a)(4) of this section, self-implementing cleanup is complete.

(B) Where sample analysis results in a measurement of PCBs greater than the levels specified in paragraph (a)(4) of this section, self-implementing cleanup of the sampled PCB remediation waste is not complete. The owner or operator of the site must either dispose of the sampled PCB remediation waste, or reclean the waste represented by the sample and reinitiate sampling and analysis in accordance with paragraph (a)(6)(i) of this section.

(7) *Cap requirements.* A cap means, when referring to on-site cleanup and disposal of PCB remediation waste, a uniform placement of concrete, asphalt, or similar material of minimum thickness spread over the area where remediation waste was removed or left

in place in order to prevent or minimize human exposure, infiltration of water, and erosion. Any person designing and constructing a cap must do so in accordance with §264.310(a) of this chapter, and ensure that it complies with the permeability, sieve, liquid limit, and plasticity index parameters in §761.75(b)(1)(ii) through (b)(1)(v). A cap of compacted soil shall have a minimum thickness of 25 cm (10 inches). A concrete or asphalt cap shall have a minimum thickness of 15 cm (6 inches). A cap must be of sufficient strength to maintain its effectiveness and integrity during the use of the cap surface which is exposed to the environment. A cap shall not be contaminated at a level ≥1 ppm PCB per Aroclor™ (or equivalent) or per congener. Repairs shall begin within 72 hours of discovery for any breaches which would impair the integrity of the cap.

(8) *Deed restrictions for caps, fences and low occupancy areas.* When a cleanup activity conducted under this section includes the use of a fence or a cap, the owner of the site must maintain the fence or cap, in perpetuity. In addition, whenever a cap, or the procedures and requirements for a low occupancy area, is used, the owner of the site must meet the following conditions:

(i) Within 60 days of completion of a cleanup activity under this section, the owner of the property shall:

(A) Record, in accordance with State law, a notation on the deed to the property, or on some other instrument which is normally examined during a title search, that will in perpetuity notify any potential purchaser of the property:

(*1*) That the land has been used for PCB remediation waste disposal and is restricted to use as a low occupancy area as defined in §761.3.

(*2*) Of the existence of the fence or cap and the requirement to maintain the fence or cap.

(*3*) The applicable cleanup levels left at the site, inside the fence, and/or under the cap.

(B) Submit a certification, signed by the owner, that he/she has recorded the notation specified in paragraph (a)(8)(i)(A) of this section to the EPA Regional Administrator.

(ii) The owner of a site being cleaned up under this section may remove a fence or cap after conducting additional cleanup activities and achieving cleanup levels, specified in paragraph (a)(4) of this section, which do not require a cap or fence. The owner may remove the notice on the deed no earlier than 30 days after achieving the cleanup levels specified in this section which do not require a fence or cap.

(9) *Recordkeeping.* For paragraphs (a)(3), (a)(4), and (a)(5) of this section, recordkeeping is required in accordance with §761.125(c)(5).

(b) *Performance-based disposal.* (1) Any person disposing of liquid PCB remediation waste shall do so according to §761.60(a) or (e), or decontaminate it in accordance with §761.79.

(2) Any person disposing of non-liquid PCB remediation waste shall do so by one of the following methods:

(i) Dispose of it in a high temperature incinerator approved under §761.70(b), an alternate disposal method approved under §761.60(e), a chemical waste landfill approved under §761.75, or in a facility with a coordinated approval issued under §761.77.

(ii) Decontaminate it in accordance with §761.79.

(3) Any person may manage or dispose of material containing <50 ppm PCBs that has been dredged or excavated from waters of the United States:

(i) In accordance with a permit that has been issued under section 404 of the Clean Water Act, or the equivalent of such a permit as provided for in regulations of the U.S. Army Corps of Engineers at 33 CFR part 320.

(ii) In accordance with a permit issued by the U.S. Army Corps of Engineers under section 103 of the Marine Protection, Research, and Sanctuaries Act, or the equivalent of such a permit as provided for in regulations of the U.S. Army Corps of Engineers at 33 CFR part 320.

(c) *Risk-based disposal approval.* (1) Any person wishing to sample, cleanup, or dispose of PCB remediation waste in a manner other than prescribed in paragraphs (a) or (b) of this section, or store PCB remediation waste in a manner other than prescribed in §761.65, must apply in writing to the Regional Administrator in the Region where the

**Environmental Protection Agency**                                   **§ 761.62**

sampling, cleanup, disposal, or storage site is located, for sampling, cleanup, disposal, or storage occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for sampling, cleanup, disposal, or storage occurring in more than one EPA Region. Each application must include information described in the notification required by paragraph (a)(3) of this section. EPA may request other information that it believes necessary to evaluate the application. No person may conduct cleanup activities under this paragraph prior to obtaining written approval by EPA.

(2) EPA will issue a written decision on each application for a risk-based method for PCB remediation wastes. EPA will approve such an application if it finds that the method will not pose an unreasonable risk of injury to health or the environment.

[63 FR 35448, June 29, 1998, as amended at 64 FR 33761, June 24, 1999; 72 FR 57239, Oct. 9, 2007; 74 FR 30232, June 25, 2009]

**§ 761.62  Disposal of PCB bulk product waste.**

PCB bulk product waste shall be disposed of in accordance with paragraph (a), (b), or (c) of this section. Under some of these provisions, it may not be necessary to determine the PCB concentration or leaching characteristics of the PCB bulk product waste. When it is necessary to analyze the waste to make either of these determinations, use the applicable procedures in subpart R of this part to sample the waste for analysis, unless EPA approves another sampling plan under paragraph (c) of this section.

(a) *Performance-based disposal.* Any person disposing of PCB bulk product waste may do so as follows:

(1) In an incinerator approved under § 761.70.

(2) In a chemical waste landfill approved under § 761.75.

(3) In a hazardous waste landfill permitted by EPA under section 3004 of RCRA, or by a State authorized under section 3006 of RCRA.

(4) Under an alternate disposal approval under § 761.60(e).

(5) In accordance with the decontamination provisions of § 761.79.

(6) For metal surfaces in contact with PCBs, in accordance with the thermal decontamination provisions of § 761.79(c)(6).

(7) In accordance with a TSCA PCB Coordinated Approval issued under § 761.77.

(b) *Disposal in solid waste landfills.* (1) Any person may dispose of the following PCB bulk product waste in a facility permitted, licensed, or registered by a State as a municipal or non-municipal non-hazardous waste landfill:

(i) Plastics (such as plastic insulation from wire or cable; radio, television and computer casings; vehicle parts; or furniture laminates); preformed or molded rubber parts and components; applied dried paints, varnishes, waxes or other similar coatings or sealants; caulking; Galbestos; non-liquid building demolition debris; or non-liquid PCB bulk product waste from the shredding of automobiles or household appliances from which PCB small capacitors have been removed (shredder fluff).

(ii) Other PCB bulk product waste, sampled in accordance with the protocols set out in subpart R of this part, that leaches PCBs at <10 µg/L of water measured using a procedure used to simulate leachate generation.

(2) Any person may dispose of PCB bulk product waste other than those materials meeting the conditions of paragraph (b)(1) of this section, (e.g., paper or felt gaskets contaminated by liquid PCBs) in a facility that is permitted, licensed, or registered by a State to manage municipal solid waste subject to part 258 of this chapter or non-municipal non-hazardous waste subject to §§ 257.5 through 257.30 of this chapter, as applicable, if:

(i) The PCB bulk product waste is segregated from organic liquids disposed of in the landfill unit.

(ii) Leachate is collected from the landfill unit and monitored for PCBs.

(3) Any release of PCBs (including but not limited to leachate) from the landfill unit shall be cleaned up in accordance with § 761.61.

(4)(i) Any person disposing off-site of PCB bulk product waste regulated under paragraph (b)(1) of this section at a waste management facility not having a commercial PCB storage or

disposal approval must provide written notice to the facility a minimum of 15 days in advance of the first shipment from the same disposal waste stream. The notice shall state that the PCB bulk product waste may include components containing PCBs at ≥50 ppm based on analysis of the waste in the shipment or application of a general knowledge of the waste stream (or similar material) which is known to contain PCBs at those levels, and that the PCB bulk product waste is known or presumed to leach <10 µg/L PCBs.

(ii) Any person disposing off-site of PCB bulk product waste regulated under paragraph (b)(2) of this section at a waste management facility not having a commercial PCB storage or disposal approval must provide written notice to the facility a minimum of 15 days in advance of the first shipment from the same disposal waste stream and with each shipment thereafter. The notice shall state that the PCB bulk product waste may include components containing PCBs at ≥50 ppm based on analysis of the waste in the shipment or application of a general knowledge of the waste stream (or similar material) which is known to contain PCBs at those levels, and that the PCB bulk product waste is known or presumed to leach ≥10 µg/L PCBs.

(5) Any person disposing of PCB bulk product waste must maintain a written record of all sampling and analysis of PCBs or notifications made under this paragraph for 3 years from the date of the waste's generation. The records must be made available to EPA upon request.

(6) Requirements in subparts C, J, and K of this part do not apply to waste disposed of under paragraph (b) of this section.

(c) *Risk-based disposal approval.* (1) Any person wishing to sample or dispose of PCB bulk product waste in a manner other than prescribed in paragraphs (a) or (b) of this section, or store PCB bulk product waste in a manner other than prescribed in §761.65, must apply in writing to the Regional Administrator in the Region where the sampling, disposal, or storage site is located, for sampling, disposal, or storage occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for sampling, disposal, or storage occurring in more than one EPA Region. Each application must contain information indicating that, based on technical, environmental, or waste-specific characteristics or considerations, the proposed sampling, disposal, or storage methods or locations will not pose an unreasonable risk or injury to health or the environment. EPA may request other information that it believes necessary to evaluate the application. No person may conduct sampling, disposal, or storage activities under this paragraph prior to obtaining written approval by EPA.

(2) EPA will issue a written decision on each application for a risk-based sampling, disposal, or storage method for PCB bulk product wastes. EPA will approve such an application if it finds that the method will not pose an unreasonable risk of injury to health or the environment.

(d) *Disposal as daily landfill cover or roadbed.* Bulk product waste described in paragraph (b)(1) of this section may be disposed of:

(1) As daily landfill cover as long as the daily cover remains in the landfill and is not released or dispersed by wind or other action; or

(2) Under asphalt as part of a road bed.

[63 FR 35451, June 29, 1998, as amended at 64 FR 33761, June 24, 1999; 72 FR 57239, Oct. 9, 2007; 74 FR 30232, June 25, 2009]

§ 761.63   PCB household waste storage and disposal.

PCB household waste, as defined at §761.3, managed in a facility permitted, licensed, or registered by a State to manage municipal or industrial solid waste, or in a facility with an approval to dispose of PCB bulk product waste under §761.62(c), is not subject to any other requirements of part 761 of this chapter. PCB household waste stored in a unit regulated for storage of PCB waste must not be commingled with PCB waste.

[63 FR 35452, June 29, 1998]

## §761.64 Disposal of wastes generated as a result of research and development activities authorized under §761.30(j) and chemical analysis of PCBs.

This section provides disposal requirements for wastes generated during and as a result of research and development authorized under §761.30(j). This section also provides disposal requirements for wastes generated during the chemical analysis of samples containing PCBs under part 761, including §§761.30, 761.60, 761.61, 761.62, and 761.79. For determining the presence of PCBs in samples, chemical analysis includes: sample preparation, sample extraction, extract cleanup, extract concentration, addition of PCB standards, and instrumental analysis.

(a) Portions of samples of a size designated in a chemical extraction and analysis method for PCBs and extracted for purposes of determining the presence of PCBs or concentration of PCBs are unregulated for PCB disposal under this part.

(b) All other wastes generated during these activities are regulated for disposal based on their concentration at the time of disposal as follows:

(1) Liquid wastes, including rinse solvents, must be disposed of according to §761.61(a)(5)(iv).

(2) Non-liquid wastes must be disposed of in the same manner as non-liquid cleaning materials and personal protective equipment waste according to §761.61(a)(5)(v)(A).

[63 FR 35452, June 29, 1998]

## §761.65 Storage for disposal.

This section applies to the storage for disposal of PCBs at concentrations of 50 ppm or greater and PCB Items with PCB concentrations of 50 ppm or greater.

(a)(1) *Storage limitations.* Any PCB waste shall be disposed of as required by subpart D of this part within 1-year from the date it was determined to be PCB waste and the decision was made to dispose of it. This date is the date of removal from service for disposal and the point at which the 1-year time frame for disposal begins. PCB/radioactive waste removed from service for disposal is exempt from the 1-year time limit provided that the provisions in

paragraphs (a)(2)(ii) and (a)(2)(iii) of this section are followed and the waste is managed in accordance with all other applicable Federal, State, and local laws and regulations for the management of radioactive material.

(2) *One-year extension.* Any person storing PCB waste that is subject to the 1-year time limit for storage and disposal in paragraph (a)(1) of this section may provide written notification to the EPA Regional Administrator for the Region in which the PCB waste is stored that their continuing attempts to dispose of or secure disposal for their waste within the 1-year time limit have been unsuccessful. Upon receipt of the notice by the EPA Regional Administrator, the time for disposal is automatically extended for 1 additional year (2 years total) if the following conditions are met:

(i) The notification is received by the EPA Regional Administrator at least 30 days before the initial 1-year time limit expires and the notice identifies the storer, the types, volumes, and locations of the waste and the reasons for failure to meet the initial 1-year time limit.

(ii) A written record documenting all continuing attempts to secure disposal is maintained until the waste is disposed of.

(iii) The written record required by paragraph (a)(2)(ii) of this section is available for inspection or submission if requested by EPA.

(iv) Continuing attempts to secure disposal were initiated within 270 days after the time the waste was first subject to the 1-year time limit requirement, as specified in paragraph (a)(1) of this section. Failure to initiate and continue attempts to secure disposal throughout the total time the waste is in storage shall automatically disqualify the notifier from receiving an automatic extension under this section.

(3) *Additional extensions.* Upon written request, the EPA Regional Administrator for the Region in which the wastes are stored or the appropriate official at EPA Headquarters, may grant additional extensions beyond the 1-year extension authorized in paragraph (a)(2) of this section. At the time of the

request, the requestor must supply specific justification for the additional extension and indicate what measures the requestor is taking to secure disposal of the waste or indicate why disposal could not be conducted during the period of the prior extension. The EPA Regional Administrator or the appropriate official at EPA Headquarters may require, as a condition to granting any extension under this section, specific actions including, but not limited to, marking, inspection, recordkeeping, or financial assurance to ensure that the waste does not pose an unreasonable risk of injury to health or the environment.

(4) *Storage at an approved facility.* Increased time for storage may be granted as a condition of any TSCA PCB storage or disposal approval, by the EPA Regional Administrator for the Region in which the PCBs or PCB Items are to be stored or disposed of, or by the appropriate official at EPA Headquarters, if EPA determines that there is a demonstrated need or justification for additional time, that the owner or operator of the facility is pursuing relevant treatment or disposal options, and that no unreasonable risk of injury to health or the environment will result from the increased storage time. In making this determination, EPA will consider such factors as absence of any approved treatment technology and insufficient time to complete the treatment or destruction process. EPA may require as a condition of the approval that the owner or operator submit periodic progress reports.

(b) Except as provided in paragraphs (b)(2), (c)(1), (c)(7), (c)(9), and (c)(10) of this section, after July 1, 1978, owners or operators of any facilities used for the storage of PCBs and PCB Items designated for disposal shall comply with the following storage unit requirements:

(1) The facilities shall meet the following criteria:

(i) Adequate roof and walls to prevent rain water from reaching the stored PCBs and PCB Items;

(ii) An adequate floor that has continuous curbing with a minimum 6 inch high curb. The floor and curbing must provide a containment volume equal to at least two times the internal volume of the largest PCB Article or PCB Container or 25 percent of the total internal volume of all PCB Articles or PCB Containers stored there, whichever is greater. PCB/radioactive wastes are not required to be stored in an area with a minimum 6 inch high curbing. However, the floor and curbing must still provide a containment volume equal to at least two times the internal volume of the largest PCB Container or 25 percent of the total internal volume of all PCB Containers stored there, whichever is greater.

(iii) No drain valves, floor drains, expansion joints, sewer lines, or other openings that would permit liquids to flow from the curbed area;

(iv) Floors and curbing constructed of Portland cement, concrete, or a continuous, smooth, non-porous surface as defined at § 761.3, which prevents or minimizes penetration of PCBs.

(v) Not located at a site that is below the 100-year flood water elevation.

(2) No person may store PCBs and PCB Items designated for disposal in a storage unit other than one approved pursuant to paragraph (d) of this section or meeting the design requirements of paragraph (b) of this section, unless the unit meets one of the following conditions:

(i) Is permitted by EPA under section 3004 of RCRA to manage hazardous waste in containers, and spills of PCBs are cleaned up in accordance with subpart G of this part.

(ii) Qualifies for interim status under section 3005 of RCRA to manage hazardous waste in containers, meets the requirements for containment at § 264.175 of this chapter, and spills of PCBs are cleaned up in accordance with subpart G of this part.

(iii) Is permitted by a State authorized under section 3006 of RCRA to manage hazardous waste in containers, and spills of PCBs are cleaned up in accordance with subpart G of this part.

(iv) Is approved or otherwise regulated pursuant to a State PCB waste management program no less stringent in protection of health or the environment than the applicable TSCA requirements found in this part.

(v) Is subject to a TSCA Coordinated Approval, which includes provisions for

storage of PCBs, issued pursuant to §761.77.

(vi) Has a TSCA PCB waste management approval, which includes provisions for storage, issued pursuant to §761.61(c) or §761.62(c).

(c)(1) The following PCB Items may be stored temporarily in an area that does not comply with the requirements of paragraph (b) of this section for up to thirty days from the date of their removal from service, provided that a notation is attached to the PCB Item or a PCB Container (containing the item) indicating the date the item was removed from service:

(i) Non-leaking PCB Articles and PCB Equipment;

(ii) Leaking PCB Articles and PCB Equipment if the PCB Items are placed in a non-leaking PCB Container that contains sufficient sorbent materials to absorb any liquid PCBs remaining in the PCB Items;

(iii) PCB Containers containing non-liquid PCBs such as contaminated soil, rags, and debris; and

(iv) PCB containers containing liquid PCBs at concentrations of ≥50 ppm, provided a Spill Prevention, Control and Countermeasure Plan has been prepared for the temporary storage area in accordance with part 112 of this chapter and the liquid PCB waste is in packaging authorized in the DOT Hazardous Materials Regulations at 49 CFR parts 171 through 180 or stationary bulk storage tanks (including rolling stock such as, but not limited to, tanker trucks, as specified by DOT).

(2) Non-leaking and structurally undamaged PCB Large High Voltage Capacitors and PCB-Contaminated Electrical Equipment that have not been drained of free flowing dielectric fluid may be stored on pallets next to a storage facility that meets the requirements of paragraph (b) of this section. PCB-Contaminated Electrical Equipment that has been drained of free flowing dielectric fluid is not subject to the storage provisions of §761.65. Storage under this subparagraph will be permitted only when the storage facility has immediately available unfilled storage space equal to 10 percent of the volume of capacitors and equipment stored outside the facility. The capacitors and equipment temporarily stored outside the facility shall be checked for leaks weekly.

(3) Any storage area subject to the requirements of paragraph (b) or paragraph (c)(1) of this section shall be marked as required in subpart C §761.40(a)(10).

(4) No item of movable equipment that is used for handling PCBs and PCB Items in the storage units and that comes in direct contact with PCBs shall be removed from the storage unit area unless it has been decontaminated as specified in §761.79.

(5) All PCB Items in storage shall be checked for leaks at least once every 30 days. Any leaking PCB Items and their contents shall be transferred immediately to properly marked non-leaking containers. Any spilled or leaked materials shall be immediately cleaned up and the materials and residues containing PCBs shall be disposed of in accordance with §761.61. Records of inspections, maintenance, cleanup and disposal must be maintained in accordance with §761.180(a) and (b).

(6) Except as provided in paragraphs (c)(6)(i) and (c)(6)(ii) of this section, any container used for the storage of liquid or non-liquid PCB waste shall be in accordance with the requirements set forth in the DOT Hazardous Materials Regulations (HMR) at 49 CFR parts 171 through 180. PCB waste not subject to the HMR (i.e., PCB wastes at concentrations of <20 ppm or <1 pound of PCBs regardless of concentration) must be packaged in accordance with Packaging Group III, unless other hazards associated with the PCB waste cause it to require packaging in accordance with Packaging Groups I or II. For purposes of describing PCB waste not subject to DOT's HMR on a manifest, one may use the term "Non-DOT Regulated PCBs."

(i) Containers other than those meeting HMR performance standards may be used for storage of PCB/radioactive waste provided the following requirements are met:

(A) Containers used for storage of liquid PCB/radioactive wastes must be non-leaking.

(B) Containers used for storage of non-liquid PCB/ radioactive wastes must be designed to prevent the build-up of liquids if such containers are

stored in an area meeting the containment requirements of paragraph (b)(1)(ii) of this section, as well as all other applicable State or Federal regulations or requirements for control of radioactive materials.

(C) Containers used to store both liquid and non-liquid PCB/radioactive wastes must meet all regulations and requirements pertaining to nuclear criticality safety. Acceptable container materials currently include polyethylene and stainless steel provided that the container material is chemically compatible with the wastes being stored. Other containers may be used to store both liquid and non-liquid PCB/radioactive wastes if the users are able to demonstrate, to the appropriate Regional Administrator and other appropriate regulatory authorities (i.e., Nuclear Regulatory Commission, Department of Energy or the Department of Transportation), that the use of such containers is protective of health and the environment as well as public health and safety.

(ii) The following DOT specification containers that conform to the requirements of 49 CFR, chapter I, subchapter C in effect on September 30, 1991, may be used for storage and transportation activities that are not subject to DOT regulation, and may be used on a transitional basis as permitted at 49 CFR 171.14. For liquid PCBs: Specification 5 container without removable head, Specification 5B container without removable head, Specification 6D overpack with Specification 2S or 2SL polyethylene containers, or Specification 17E container. For non-liquid PCBs: Specification 5 container, Specification 5B container, or Specification 17C container.

(7) Stationary storage containers for liquid PCBs can be larger than the containers specified in paragraph (c)(6) of this section provided that:

(i) The containers are designed, constructed, and operated in compliance with Occupational Safety and Health Standards, 29 CFR 1910.106, *Flammable and combustible liquids*. Before using these containers for storing PCBs, the design of the containers must be reviewed to determine the effect on the structural safety of the containers that will result from placing liquids with

the specific gravity of PCBs into the containers (see 29 CFR 1910.106(b)(1)(i)(*f*)).

(ii) The owners or operators of any facility using containers described in paragraph (c)(7)(i) of this section, shall prepare and implement a Spill Prevention Control and Countermeasure (SPCC) Plan as described in part 112 of this title. In complying with 40 CFR part 112, the owner or operator shall read "oil(s)" as "PCB(s)" whenever it appears. The exemptions for storage capacity, 40 CFR 112.1(d)(2), and the amendment of SPCC plans by the Regional Administrator, 40 CFR 112.4, shall not apply unless some fraction of the liquids stored in the container are oils as defined by section 311 of the Clean Water Act.

(8) PCB Items shall be dated on the item when they are removed from service for disposal. The storage shall be managed so that the PCB Items can be located by this date. Storage containers provided in paragraph (c)(7) of this section, shall have a record that includes for each batch of PCBs the quantity of the batch and date the batch was added to the container. The record shall also include the date, quantity, and disposition of any batch of PCBs removed from the container.

(9) Bulk PCB remediation waste or PCB bulk product waste may be stored at the clean-up site or site of generation for 180 days subject to the following conditions:

(i) The waste is placed in a pile designed and operated to control dispersal of the waste by wind, where necessary, by means other than wetting.

(ii) The waste must not generate leachate through decomposition or other reactions.

(iii) The storage site must have:

(A) A liner that is designed, constructed, and installed to prevent any migration of wastes off or through the liner into the adjacent subsurface soil, ground water or surface water at any time during the active life (including the closure period) of the storage site. The liner may be constructed of materials that may allow waste to migrate into the liner. The liner must be:

(*1*) Constructed of materials that have appropriate chemical properties and sufficient strength and thickness

**Environmental Protection Agency** §761.65

to prevent failure due to pressure gradients (including static head and external hydrogeologic forces), physical contact with the waste or leachate to which they are exposed, climatic conditions, the stress of installation, and the stress of daily operation.

(2) Placed upon a foundation or base capable of providing support to the liner and resistance to pressure gradients above and below the liner to prevent failure of the liner due to settlement, compression, or uplift.

(3) Installed to cover all surrounding earth likely to be in contact with the waste.

(B) A cover that meets the requirements of paragraph (c)(9)(iii)(A) of this section, is installed to cover all of the stored waste likely to be contacted with precipitation, and is secured so as not to be functionally disabled by winds expected under normal seasonal meteorological conditions at the storage site.

(C) A run-on control system designed, constructed, operated, and maintained such that:

(1) It prevents flow onto the stored waste during peak discharge from at least a 25-year storm.

(2) It collects and controls at least the water volume resulting from a 24-hour, 25-year storm. Collection and holding facilities (e.g., tanks or basins) must be emptied or otherwise managed expeditiously after storms to maintain design capacity of the system.

(iv) The provisions of this paragraph may be modified under §761.61(c).

(10) Owners or operators of storage facilities shall establish and maintain records as provided in §761.180.

(d) *Approval of commercial storers of PCB waste.* (1) All commercial storers of PCB waste shall have interim approval to operate commercial facilities for the storage of PCB waste until August 2, 1990. Commercial storers of PCB waste are prohibited from storing any PCB waste at their facilities after August 2, 1990 unless they have submitted by August 2, 1990 a complete application for a final storage approval under paragraph (d)(2) of this section. The period of interim approval shall continue until EPA makes a final decision on the storage application at which time such interim approval shall terminate.

(2) The Regional Administrator for the region in which the storage facility is located (or the appropriate official at EPA Headquarters, if the commercial storage area is ancillary to a disposal facility for which an official at EPA Headquarters has approval authority)shall grant written, final approval to engage in the commercial storage of PCB waste upon a determination that the criteria in paragraph (d)(2)(i) through (d)(2)(vii) of this section have been met by the applicant:

(i) The applicant, its principals, and its key employees responsible for the establishment or operation of the commercial storage facility are qualified to engage in the business of commercial storage of PCB waste.

(ii) The facility possesses the capacity to handle the quantity of PCB waste which the owner or operator of the facility has estimated will be the maximum quantity of PCB waste that will be handled at any one time at the facility.

(iii) The owner or operator of the unit has certified compliance with the storage facility standards in paragraphs (b) and (c)(7) of this section.

(iv) The owner or operator has developed a written closure plan for the facility that is deemed acceptable by the Regional Administrator (or the appropriate official at EPA Headquarters, if the commercial storage area is ancillary to a disposal facility permitted by an official at EPA Headquarters) under the closure plan standards of paragraph (e) of this section.

(v) The owner or operator has included in the application for final approval a demonstration of financial responsibility for closure that meets the financial responsibility standards of paragraph (g) of this section.

(vi) The operation of the storage facility will not pose an unreasonable risk of injury to health or the environment.

(vii) The environmental compliance history of the applicant, its principals, and its key employees may be deemed to constitute a sufficient basis for denial of approval whenever in the judgment of the appropriate EPA official

211

that history of environmental civil violations or criminal convictions evidences a pattern or practice of noncompliance that demonstrates the applicant's unwillingness or inability to achieve and maintain compliance with the regulations.

(3) Applicants for storage approvals shall submit a written application that includes any relevant information bearing upon the qualifications of the facility's principals and key employees to engage in the business of commercial storage of PCB wastes. This information shall include, but is not limited to:

(i) The identification of the owner and the operator of the facility, including all general partners of a partnership, any limited partner of a partnership, any stockholder of a corporation or any participant in any other type of business organization or entity who owns or controls, directly or indirectly, more than 5 percent of each partnership, corporation, or other business organization and all officials of the facility who have direct management responsibility for the facility.

(ii) The identification of the person responsible for the overall operations of the facility (i.e., a plant manager, superintendent, or a person of similar responsibility) and the supervisory employees who are or will be responsible for the operation of the facility.

(iii) Information concerning the technical qualifications and experience of the persons responsible for the overall operation of the facility and the employees responsible for handling PCB waste or other wastes.

(iv) Information concerning any past State or Federal environmental violations involving the same business or another business with which the principals or supervisory employees were affiliated directly that occurred within 5 years preceding the date of submission and which relate directly to violations that resulted in either a civil penalty (irrespective of whether the matter was disposed of by an adjudication or by a without prejudice settlement) or judgment of conviction whether entered after trial or a plea, either of guilt or nolo contendere or civil injunctive relief and involved

storage, disposal, transport, or other waste handling activities.

(v) A list of all companies currently owned or operated in the past by the principals or key employees identified in paragraphs (d)(3)(i) and (d)(3)(ii) of this section that are or were directly or indirectly involved with waste handling activities.

(vi) The owner's or operator's estimate of maximum PCB waste quantity to be handled at the facility.

(vii) A written statement certifying compliance with paragraph (b) or (c) of this section and containing a certification as defined in §761.3.

(viii) A written closure plan for the facility, as described in paragraph (e) of this section.

(ix) The current closure cost estimate for the facility, as described in paragraph (f) of this section.

(x) A demonstration of financial responsibility to close the facility, as described in paragraph (g) of this section.

(4) The written approval issued by EPA shall include, but not be limited to, the following:

(i) The determination that the applicant has satisfied the requirements set forth in paragraph (d)(2) of this section, and a brief statement setting forth the basis for the determination.

(ii) Incorporation of the closure plan submitted by the facility owner or operator and approved by EPA.

(iii) A condition imposing a maximum PCB storage capacity which the facility shall not exceed during its PCB waste storage operations. The maximum storage capacity imposed under this condition shall not be greater than the estimated maximum inventory of PCB waste included in the owner's or operator's application for final approval.

(iv) Such other conditions as deemed necessary by EPA to ensure that the operations of the PCB storage facility will not pose an unreasonable risk of injury to health or the environment.

(5) Storage areas at transfer facilities are exempt from the requirement to obtain approval as a commercial storer of PCB waste under this paragraph, unless the same PCB waste is stored at these facilities for a period of time greater than 10 consecutive days between destinations.

**Environmental Protection Agency**                                    **§ 761.65**

(6) Storage areas at RCRA-permitted facilities may be exempt from the separate TSCA storage approval requirements in this paragraph (d) upon a showing to the Regional Administrator's satisfaction that the facility's existing RCRA closure plan is substantially equivalent to this rule's closure plan standards, and that such facility's closure cost estimate and financial assurance demonstration account for maximum PCB waste inventories, and the requirements of paragraph (d)(3)(i) through (d)(3)(v) and (d)(3)(vii) of this section are met. A pay-in period of longer than 3 years after approval of the storage facility pursuant to this rule, will be acceptable to EPA if that pay-in period has already been established for a valid RCRA facility or previously approved TSCA facility.

(7) Storage areas ancillary to TSCA-approved disposal facilities may be exempt from a separate facility approval provided all of the following conditions are met:

(i) The current disposal approval contains an expiration date.

(ii) The current disposal approval's closure and financial responsibility conditions specifically extend to storage areas ancillary to disposal.

(iii) The current disposal approval's closure and financial responsibility conditions provide for annual adjustments for inflation, and for modification when changes in operation would affect closure costs.

(iv) The current disposal approval contains conditions on closure and financial responsibility that are at least as stringent as those in paragraphs (e) and (g) of this section. However, the provision for a 3-year closure trust pay-in period, as specified in paragraph (g)(1)(i) of this section, would be waived in a case in which an approved TSCA facility or RCRA facility that covers PCB storage has a longer pay-in period for the trust.

(v) The current disposal approval satisfies the requirements of paragraph (d)(3)(i) through (d)(3)(v) of this section.

(8) The approval of any existing TSCA-approved disposal facility ancillary to a commercial storage facility that is deficient in any of the conditions of paragraph (d)(7)(i) through (d)(7)(v) of this section shall be called in by the Regional Administrator (or the appropriated official at EPA Headquarters, if approval was granted by an official at EPA Headquarters). The approval shall be modified to meet the requirements of paragraph (d)(7) of this section within 180 days of the effective date of this final rule, or a separate application for approval of the storage facility may be submitted to the Regional Administrator or the Director, Office of Resource Conservation and Recovery, in the cases where an official at EPA Headquarters issued the approval.

(e) *Closure.* (1) A commercial storer of PCB waste shall have a written closure plan that identifies the steps that the owner or operator of the facility shall take to close the PCB waste storage facility in a manner that eliminates the potential for post-closure releases of PCBs which may present an unreasonable risk to human health or the environment. An acceptable closure plan must include, at a minimum, all of the following:

(i) A description of how the PCB storage areas of the facility will be closed in a manner that eliminates the potential for post-closure releases of PCBs into the environment.

(ii) An identification of the maximum extent of storage operations that will be open during the active life of the facility, including an identification of the extent of PCB storage operations at the facility relative to other wastes that will be handled at the facility.

(iii) An estimate of the maximum inventory of PCB wastes that could be handled at one time at the facility over its active life, and a detailed description of the methods or arrangements to be used during closure for removing, transporting, storing, or disposing of the facility's inventory of PCB waste, including an identification of any off-site facilities that will be used.

(iv) A detailed description of the steps needed to remove or decontaminate PCB waste residues and contaminated containment system components, equipment, structures, and soils during closure in accordance with the levels specified in the PCB Spills Cleanup Policy in subpart G of this part, including a description of the

213

methods for sampling and testing of surrounding soils, and the criteria for determining the extent of removal or decontamination.

(v) A detailed description of other activities necessary during the closure period to ensure that any post-closure releases of PCBs will not present unreasonable risks to human health or the environment. This includes activities such as ground-water monitoring, run-on and run-off control, and facility security.

(vi) A schedule for closure of each area of the facility where PCB waste is stored or handled, including the total time required to close each area of PCB waste storage or handling, and the time required for any intervening closure activities.

(vii) An estimate of the expected year of closure of the PCB waste storage areas, if a trust fund is opted for as the financial mechanism.

(2) A written closure plan determined to be acceptable by EPA under this section shall become a condition of any approval granted under paragraph (d) of this section.

(3) A separate and new closure plan need not be submitted in cases where a facility is currently covered by a TSCA approval or a RCRA permit, upon a showing to the satisfaction of the Regional Administrator (or the appropriate official at EPA Headquarters, if the commercial storage area is ancillary to a disposal facility for which an official at EPA Headquarters has approval authority) that the existing closure plan is substantially equivalent to closure plans required under paragraphs (d) through (g) of this section, and that the plan adequately accounts for PCB waste inventories.

(4) The commercial storer of PCB waste shall submit a written request to the Regional Administrator (or the Director, Office of Resource Conservation and Recovery, if an official at EPA Headquarters approved the closure plan) for a modification to its storage approval to amend its closure plan, whenever:

(i) Changes in ownership, operating plans, or facility design affect the existing closure plan.

(ii) There is a change in the expected date of closure, if applicable.

(iii) In conducting closure activities, unexpected events require a modification of the approved closure plan.

(5) The Regional Administrator or the Director, appropriate official at EPA Headquarters, if an official at EPA Headquarters approved the closure plan, may modify the existing closure plan under the conditions described in paragraph (e)(4) of this section.

(6) Commercial storers of PCB waste shall comply with the following closure schedule:

(i) The commercial storer shall notify in writing the Regional Administrator or the Director, Office of Resource Conservation and Recovery, if an official at EPA Headquarters approved the closure plan, at least 60 days prior to the date on which final closure of its PCB storage facility is expected to begin.

(ii) The date when a commercial storer of PCB waste "expects to begin closure" shall be no later than 30 days after the date on which the storage facility received its final quantities of PCB waste. For good cause shown, EPA may extend the date for commencement of closure for an additional 30-day period.

(iii) Within 90 days after receiving the final quantity of PCB waste for storage, a commercial storer of PCB waste shall remove all PCB waste in storage at the facility from the facility in accordance with the approved closure plan. For good cause shown, EPA may approve a reasonable extension to the period for removal of the PCB waste.

(iv) A commercial storer of PCB waste shall complete closure activities in accordance with the approved closure plan and within 180 days after receiving the final quantity of PCB waste for storage at the facility. For good cause shown, EPA may approve a reasonable extension to the closure period.

(7) During the closure period, all contaminated system component equipment, structures, and soils shall be disposed of in accordance with the disposal requirements of subpart D of this part, or, if applicable, decontaminated in accordance with the levels specified in the PCB Spills Cleanup Policy at subpart G of this part. When PCB waste

is removed from the storage facility during closure, the owner or operator becomes a generator of PCB waste subject to the generator requirements of subpart J of this part.

(8) Within 60 days of completion of closure of each facility for the storage of PCB waste, the commercial storer of PCB waste shall submit to the Regional Administrator (or the Director, Office of Resource Conservation and Recovery, if an official at EPA Headquarters approved the closure plan), by registered mail, a certification that the PCB storage facility has been closed in accordance with the approved closure plan. The certification shall be signed by the owner or operator and by an independent registered professional engineer.

(f) *Closure cost estimate.* (1) A commercial storer of PCB wastes shall have a detailed estimate, in current dollars, of the cost of closing the facility in accordance with its approved closure plan. The closure cost estimate shall be in writing, be certified by the person preparing it (using the certification defined in §761.3) and comply with all of the following criteria:

(i) The closure cost estimate shall equal the cost of final closure at the point in the PCB storage facility's active life when the extent and manner of PCB storage operations would make closure the most expensive, as indicated by the facility's closure plan.

(ii) The closure cost estimate shall be based on the costs to the owner or operator of hiring a third party to close the facility, and the third party shall not be either a corporate parent or subsidiary of the owner or operator, or member in joint ownership of the facility.

(iii) The owner or operator shall include in the estimate the current market costs for off-site commercial disposal of the facility's maximum estimated inventory of PCB wastes, except that on-site disposal costs may be used if on-site disposal capacity will exist at the facility at all times over the life of the PCB storage facility.

(iv) The closure cost estimate may not incorporate any salvage value that may be realized with the sale of wastes, facility structures or equipment, land,

or other assets associated with the facility at the time of closure.

(2) During the active life of the PCB storage facility, the commercial storer of PCB waste shall adjust annually for inflation the closure cost estimate within 60 days prior to the anniversary date of the establishment of the financial instruments used to demonstrate financial responsibility for closure, except that owners or operators who use the financial test or corporate guarantee shall adjust their closure cost estimates for inflation within 30 days after the close of the storer's fiscal year. The adjustment may be made by recalculating the maximum costs of closure in current dollars, or by using an inflation factor derived from the most recent Implicit Price Deflator for Gross National Product published by the U.S. Department of Commerce in its *Survey of Current Business.* The Implicit Price Deflator for Gross National Product is included in a monthly publication titled *Economic Indicators,* which is available from the Superintendent of Documents, Government Printing Office, Washington, DC 20402. The inflation factor used in the latter method is the result of dividing the latest published annual Deflator by the Deflator for the previous year. The adjustment to the closure cost estimate is then made by multiplying the most recent closure cost estimate by the latest inflation factor.

(3) Where EPA approves a modification to the facility's closure plan, and that modification increases the cost of closure, the owner or operator shall revise the closure cost estimate no later than 30 days after the modification is approved. Any such revision shall also be adjusted for inflation in accordance with paragraph (f)(2) of this section.

(4) The owner or operator of the facility shall keep at the facility during its operating life the most recent closure cost estimate, including any adjustments resulting from inflation or from modifications to the closure plan.

(g) *Financial assurance for closure.* A commercial storer of PCB waste shall establish financial assurance for closure of each PCB storage facility that he owns or operates. In establishing financial assurance for closure, the commercial storer of PCB waste may

choose from the following financial assurance mechanisms or any combination of mechanisms:

(1) The "closure trust fund," as specified in § 264.143(a) of this chapter, except for paragraph (a)(3) of § 264.143. For purposes of this paragraph, the following provisions also apply:

(i) Payments into the trust fund shall be made annually by the owner or operator over the remaining operating life of the facility as estimated in the closure plan, or over 3 years, whichever period is shorter. This period of time is hereafter referred to as the "pay-in period." For an existing facility, the first payment must be made within 30 calendar days after EPA has notified the facility of its conditional approval. Interim approval to operate is canceled and the application is denied if EPA does not receive verification that the payment was made in that 30-day period.

(ii) For a new facility, the first payment into the closure trust fund shall be made before EPA grants final approval of the application and before the facility may accept the initial shipment of PCB waste for commercial storage. A receipt from the trustee shall be submitted by the owner or operator to the Regional Administrator (or the Director, Office of Resource Conservation and Recovery, if the commercial storage area is ancillary to a disposal facility approved by an official at EPA Headquarters) before this initial delivery of PCB waste. The first payment shall be at least equal to the current closure cost estimate, divided by the number of years in the pay-in period, except as provided in paragraph (g)(7) of this section for multiple mechanisms. Subsequent payments shall be made no later than 30 days after each anniversary date of the first payment. The amount of each subsequent payment shall be determined by subtracting the current value of the trust fund from the current closure cost estimate, and dividing this difference by the number of years remaining in the pay-in period.

(iii) If an owner or operator of a facility existing on the effective date of this paragraph establishes a trust fund to meet the financial assurance requirements of this paragraph, and the value of the trust fund is less than the current closure cost estimate when a final approval is granted for the facility, the amount of the current closure cost estimate still to be paid into the trust fund shall be paid in over the pay-in period as defined in paragraph (g)(1)(i) of this section. Payments shall continue to be made no later than 30 days after each anniversary date of the first payment made into the trust fund. The amount of each payment shall be determined by subtracting the current value of the trust fund from the current closure cost estimate, and dividing this difference by the number of years remaining in the pay-in period.

(iv) The submission of a trust agreement with the wording specified in § 264.151(a)(1) of this chapter, including any reference to hazardous waste management facilities, shall be deemed to be in compliance with the requirement to submit a trust agreement under this subpart.

(2) The "surety bond guaranteeing payment into a closure trust fund," as specified in § 264.143(b) of this chapter, including the use of the surety bond instrument specified at § 264.151(b) of this chapter and the standby trust specified at § 264.143(b)(3) of this chapter. The use of the surety bonds, surety bond instruments, and standby trust agreements specified in §§ 264.143(b) and 264.151(b) of this chapter shall be deemed to be in compliance with this subpart.

(3)(i) The "surety bond guaranteeing performance of closure," as specified at § 264.143(c) of this chapter, except for paragraph (c)(5) of § 264.143 of this chapter. The submission and use of the surety bond instrument specified at § 264.151(c) of this chapter and the standby trust specified at § 264.143(c)(3) of this chapter shall be deemed to be in compliance with the requirements under this subpart relating to the use of surety bonds and standby trust funds.

(ii) For the purposes of this paragraph, and under the terms of the bond, the surety shall become liable on the bond obligation when the owner or operator fails to perform as guaranteed by the bond. Liability is established by a final administrative determination pursuant to section 16 of TSCA that

**Environmental Protection Agency**                                    **§ 761.65**

the owner or operator has failed to perform final closure in accordance with the closure plan and other approval or regulatory requirements when required to do so.

(4)(i) The "closure letter of credit" specified in § 264.143(d) of this chapter, except for paragraph (d)(8). The submission and use of the irrevocable letter of credit instrument specified in § 264.151(d) of this chapter and the standby trust specified in § 264.143(d)(3) of this chapter shall be deemed to be in compliance with the requirements of this subpart relating to the use of letters of credit and standby trust funds.

(ii) For the purposes of this paragraph, the Regional Administrator (or the appropriate official at EPA Headquarters, if the commercial storage area is ancillary to a disposal facility for which an official at EPA Headquarters has approval authority) may draw on the letter of credit following a final administrative determination pursuant to section 16 of TSCA that the owner or operator has failed to perform final closure in accordance with the closure plan and other approval or regulatory requirements when required to do so.

(5) "Closure insurance," as specified in § 264.143(e) of this chapter, utilizing the certificate of insurance for closure specified at § 264.151(e) of this chapter. The use of closure insurance as specified in § 264.143(e) of this chapter and the submission and use of the certificate of insurance specified in § 264.151(e) of this chapter shall be deemed to be in compliance with the requirements of this subpart relating to the use of closure insurance.

(6) The "financial test and corporate guarantee for closure," as described in § 264.143(f) of this chapter, including a letter signed by the owner's or operator's chief financial officer as specified at § 264.151(f) of this chapter and, if applicable, the written corporate guarantee specified at § 264.151(h) of this chapter. The use of the financial test and corporate guarantee specified in § 264.143(f) of this chapter, the submission and use of the letter specified in § 264.151(f) of this chapter, and the submission and use of the written corporate guarantee specified at § 264.151(h) of this chapter shall be

deemed to be in compliance with the requirements of this subpart relating to the use of financial tests and corporate guarantees.

(7) The corporate guarantee as specified in § 264.143(f)(10) of this chapter.

(8) The use of multiple financial mechanisms, as specified in § 264.143(g) of this chapter is permitted.

(9) A modification to a facility storing PCB waste that increases the maximum storage capacity indicated in the permit requires that a new financial assurance mechanism be established or an existing one be amended. When such a modification occurs, the Director of the Federal or State issuing authority must be notified in writing no later than 30 days from the completion of the modification. The new or revised financial assurance mechanism must be established and activated no later than 30 days after the Director of the Federal or State issuing authority is notified of the completion of the modification, but prior to the use of the modified portion of the facility.

(h) *Release of owner or operator.* Within 60 days after receiving certifications from the owner or operator and an independent registered professional engineer that final closure has been completed in accordance with the approved closure plan, EPA will notify the owner or operator in writing that the owner or operator is no longer required by this section to maintain financial assurance for final closure of the facility, unless EPA has reason to believe that final closure has not been completed in accordance with the approved closure plan. EPA shall provide the owner or operator with a detailed written statement stating the reasons why EPA shall provide the owner or operator with a detailed written statement stating the reasons why he believed closure was not conducted in accordance with the approved closure plan.

(i) *Laboratories and samples.* (1) A laboratory is conditionally exempt from the notification and approval requirements for a commercial storer under § 761.65 (d) through (h) when it stores samples held for disposal in a facility that complies with the standards in § 761.65 (b)(1)(i) through (b)(1)(iv).

217

(2) A laboratory sample is exempt from the manifesting requirements in §§ 761.210 through 761.213 when:

(i) The sample is being transported to a laboratory for the purpose of testing.

(ii) The sample is being transported back to the sample collector after testing.

(iii) The sample is being stored by the sample collector before transport to a laboratory for testing.

(iv) The sample is being stored in a laboratory before testing.

(v) The sample is being stored in a laboratory after testing but before it is returned to the sample collector.

(vi) The sample is being stored temporarily in the laboratory after testing for a specific purpose (for example, until conclusion of a court case or enforcement action where further testing of the sample may be necessary).

(3) In order to qualify for the exemption in paragraph (i)(2)(i) and (i)(2)(ii) of this section, a sample collector shipping samples to a laboratory and a laboratory returning samples to a sample collector must:

(i) Comply with applicable U.S. Department of Transportation (DOT) or U.S. Postal Service (USPS) shipping requirements, found respectively in 49 CFR 173.345 and U.S. Postal Regulations 652.2 and 652.3.

(ii) Assure that the following information accompanies the sample:

(A) The sample collector's name, mailing address, and telephone number.

(B) The laboratory's name, mailing address, and telephone number.

(C) The quantity of the sample.

(D) The date of shipment.

(E) A description of the sample.

(iii) Package the sample so that it does not leak, spill, or vaporize from its packaging.

(4) When the concentration of the PCB sample has been determined, and its use is terminated, the sample must be properly disposed. A laboratory must either manifest the PCB waste to a disposer or commercial storer, as required under §§ 761.210 through 761.213, retain a copy of each manifest, as required under §§ 761.213 and 761.214, and follow up on exception reporting, as required under § 761.217, or return the sample to the sample collector who

must then properly dispose of the sample. If the laboratory returns the sample to the sample collector, the laboratory must comply with the shipping requirements set forth in paragraphs (i)(3)(i) through (i)(3)(iii) of this section.

(j) *Changes in ownership or operational control of a commercial storage facility.* The date of transfer of interim status or final approval shall be the date the EPA Regional Administrator (or appropriate official at EPA Headquarters) provides written approval of the transfer. EPA will provide a final written decision within 90 days of receipt of the complete new or amended application. The Agency will approve the transfer if the following conditions are met:

(1) The transferee has established financial assurance for closure pursuant to paragraph (g) of this section using a mechanism effective as of the date of final approval so that there will be no lapse in financial assurance for the transferred facility.

(2) The transferor or transferee has resolved any deficiencies (e.g., technical operations, closure plans, cost estimates, etc.) the Agency has identified in the transferor's application.

(k) *States and the Federal Government.* States and the Federal Government are exempt from the requirements of paragraphs (f) and (g) of this section.

(Sec. 6, Pub. L. 94–469, 90 Stat. 2020 (15 U.S.C. 2605)

[44 FR 31542, May 31, 1979. Redesignated at 47 FR 19527, May 6, 1982, and amended at 47 FR 37359, Aug. 8, 1982; 49 FR 28191, July 10, 1984; 53 FR 12524, Apr. 15, 1988; 54 FR 52746, Dec. 21, 1989; 55 FR 695, Jan. 8, 1990; 55 FR 26205, June 27, 1990; 58 FR 15809, Mar. 24, 1993; 58 FR 34205, June 23, 1993; 58 FR 59374, Nov. 9, 1993; 63 FR 35439, 35452, June 29, 1998; 72 FR 57239, 57240 Oct. 9, 2007; 74 FR 30232, June 25, 2009; 77 FR 54830, Sept. 6, 2012]

**§ 761.70  Incineration.**

This section applies to facilities used to incinerate PCBs required to be incinerated by this part.

(a) *Liquid PCBs.* An incinerator used for incinerating PCBs shall be approved by EPA pursuant to paragraph (d) of this section. Requests for approval of incinerators to be used in more than one region must be submitted to the

Director, Office of Resource Conservation and Recovery, except for research and development involving less than 500 pounds of PCB material (see §761.60(i)(2)). Requests for approval of incinerators to be used in only one region must be submitted to the appropriate Regional Administrator. The incinerator shall meet all of the requirements specified in paragraphs (a)(1) through (9) of this section, unless a waiver from these requirements is obtained pursuant to paragraph (d)(5) of this section. In addition, the incinerator shall meet any other requirements which may be prescribed pursuant to paragraph (d)(4) of this section.

(1) Combustion criteria shall be either of the following:

(i) Maintenance of the introduced liquids for a 2-second dwell time at 1200 °C (±100 °C) and 3 percent excess oxygen in the stack gas; or

(ii) Maintenance of the introduced liquids for a 1½ second dwell time at 1600 °C(±100 °C) and 2 percent excess oxygen in the stack gas.

(2) Combustion efficiency shall be at least 99.9 percent computed as follows:

Combustion efficiency = $[C_{CO_2}/(C_{CO_2} + C_{CO})]100$

where

$C_{CO_2}$ = Concentration of carbon dioxide.
$C_{CO}$ = Concentration of carbon monoxide.

(3) The rate and quantity of PCBs which are fed to the combustion system shall be measured and recorded at regular intervals of no longer than 15 minutes.

(4) The temperatures of the incineration process shall be continuously measured and recorded. The combustion temperature of the incineration process shall be based on either direct (pyrometer) or indirect (wall thermocouple-pyrometer correlation) temperature readings.

(5) The flow of PCBs to the incinerator shall stop automatically whenever the combustion temperature drops below the temperatures specified in paragraph (a)(1) of this section.

(6) Monitoring of stack emission products shall be conducted:

(i) When an incinerator is first used for the disposal of PCBs under the provisions of this regulation;

(ii) When an incinerator is first used for the disposal of PCBs after the incinerator has been modified in a manner which may affect the characteristics of the stack emission products; and

(iii) At a minimum such monitoring shall be conducted for the following parameters:

(a) $O_2$; (b) CO; (c) $CO_2$; (d) Oxides of Nitrogen ($NO_X$); (e) Hydrochloric Acid (HCl); (f) Total Chlorinated Organic Content (RCl); (g) PCBs; and (h) Total Particulate Matter.

(7) At a minimum monitoring and recording of combustion products and incineration operations shall be conducted for the following parameters whenever the incinerator is incinerating PCBs:

(i) $O_2$; (ii) CO; and (iii) $CO_2$. The monitoring for $O_2$ and CO shall be continuous. The monitoring for $CO_2$ shall be periodic, at a frequency specified by the Regional Administrator or appropriate official at EPA Headquarters.

(8) The flow of PCBs to the incinerator shall stop automatically when any one or more of the following conditions occur, unless a contingency plan is submitted by the incinerator owner or operator and approved by the Regional Administrator or appropriate official at EPA Headquarters. The contingency plan indicates what alternative measures the incinerator owner or operator would take if any of the following conditions occur:

(i) Failure of monitoring operations specified in paragraph (a)(7) of this section;

(ii) Failure of the PCB rate and quantity measuring and recording equipment specified in paragraph (a)(3) of this section; or

(iii) Excess oxygen falls below the percentage specified in paragraph (a)(1) of this section.

(9) Water scrubbers shall be used for HCl control during PCB incineration and shall meet any performance requirements specified by EPA. Scrubber effluent shall be monitored and shall comply with applicable effluent or pretreatment standards, and any other State and Federal laws and regulations. An alternate method of HCl control may be used if the alternate method has been approved by EPA. (The HCl neutralizing capability of cement kilns

219

is considered to be an alternate method.)

(b) *Nonliquid PCBs.* An incinerator used for incinerating nonliquid PCBs, PCB Articles, PCB Equipment, or PCB Containers shall be approved by EPA pursuant to paragraph (d) of this section. Requests for approval of incinerators to be used in more than one region must be submitted to the Director, Office of Resource Conservation and Recovery except for research and development involving less that 500 pounds of PCB material (see § 761.60(i)(2)). Requests for approval of incinerators to be used in only one region must be submitted to the appropriate Regional Administrator. The incinerator shall meet all of the requirements specified in paragraphs (b)(1) and (2) of this section unless a waiver from these requirements is obtained pursuant to paragraph (d)(5) of this section. In addition, the incinerator shall meet any other requirements that may be prescribed pursuant to paragraph (d)(4) of this section.

(1) The mass air emissions from the incinerator shall be no greater than 0.001g PCB/kg of the PCB introduced into the incinerator.

(2) The incinerator shall comply with the provisions of paragraphs (a)(2), (3), (4), (6), (7), (8)(i) and (ii), and (9) of this section.

(c) *Maintenance of data and records.* All data and records required by this section shall be maintained in accordance with § 761.180, Records and monitoring.

(d) *Approval of incinerators.* Prior to the incineration of PCBs and PCB Items the owner or operator of an incinerator shall receive the written approval of the Agency Regional Administrator for the region in which the incinerator is located, or the appropriate official at EPA Headquarters. Approval from the appropriate official at EPA Headquarters may be effective in all ten EPA regions. Such approval shall be obtained in the following manner:

(1) *Application.* The owner or operator shall submit to the Regional Administrator or the Director, Office of Resource Conservation and Recovery an application which contains:

(i) The location of the incinerator;

(ii) A detailed description of the incinerator including general site plans and design drawings of the incinerator;

(iii) Engineering reports or other information on the anticipated performance of the incinerator;

(iv) Sampling and monitoring equipment and facilities available;

(v) Waste volumes expected to be incinerated;

(vi) Any local, State, or Federal permits or approvals; and

(vii) Schedules and plans for complying with the approval requirements of this regulation.

(2) *Trial burn.* (i) Following receipt of the application described in paragraph (d)(1) of this section, EPA shall determine if a trial burn is required and notify the person who submitted the report whether a trial burn of PCBs and PCB Items must be conducted. EPA may require the submission of any other information that EPA finds to be reasonably necessary to determine the need for a trial burn. Such other information shall be restricted to the types of information required in paragraphs (d)(1)(i) through (vii) of this section.

(ii) If EPA determines that a trial burn must be held, the person who submitted the report described in paragraph (d)(1) of this section shall submit to the Regional Administrator or the Director, Office of Resource Conservation and Recovery a detailed plan for conducting and monitoring the trail burn. At a minimum, the plan must include:

(A) Date trial burn is to be conducted;

(B) Quantity and type of PCBs and PCB Items to be incinerated;

(C) Parameters to be monitored and location of sampling points;

(D) Sampling frequency and methods and schedules for sample analyses; and

(E) Name, address, and qualifications of persons who will review analytical results and other pertinent data, and who will perform a technical evaluation of the effectiveness of the trial burn.

(iii) Following receipt of the plan described in paragraph (d)(2)(ii) of this section, EPA will approve the plan, require additions or modifications to the plan, or disapprove the plan. If the plan

is disapproved, EPA will notify the person who submitted the plan of such disapproval, together with the reasons why it is disapproved. That person may thereafter submit a new plan in accordance with paragraph (d)(2)(ii) of this section. If the plan is approved (with any additions or modifications which EPA may prescribe), EPA will notify the person who submitted the plan of the approval. Thereafter, the trial burn shall take place at a date and time to be agreed upon between EPA and the person who submitted the plan.

(3) *Other information.* In addition to the information contained in the report and plan described in paragraphs (d)(1) and (2) of this section, EPA may require the owner or operator to submit any other information that the EPA finds to be reasonably necessary to determine whether an incinerator shall be approved.

NOTE: The Regional Administrator will have available for review and inspection an Agency manual containing information on sampling methods and analytical procedures for the parameters required in §761.70(a) (3), (4), (6), and (7) plus any other parameters he/she may determine to be appropriate. Owners or operators are encouraged to review this manual prior to submitting any report required in §761.70.

(4) *Contents of approval.* (i) Except as provided in paragraph (d)(5) of this section, the Regional Administrator or the appropriate official at EPA Headquarters may not approve an incinerator for the disposal of PCBs and PCB Items unless he finds that the incinerator meets all of the requirements of paragraphs (a) and/or (b) of this section.

(ii) In addition to the requirements of paragraphs (a) and/or (b) of this section, EPA may include in an approval any other requirements that EPA finds are necessary to ensure that operation of the incinerator does not present an unreasonable risk of injury to health or the environment from PCBs. Such requirements may include a fixed period of time for which the approval is valid.

(5) *Waivers.* An owner or operator of the incinerator may submit evidence to the Regional Administrator or the Director, Office of Resource Conservation and Recovery that operation of the incinerator will not present an unreasonable risk of injury to health or the environment from PCBs, when one or more of the requirements of paragraphs (a) and/or (b) of this section are not met. On the basis of such evidence and any other available information, EPA may, in its discretion, find that any requirement of paragraphs (a) and (b) of this section is not necessary to protect against such a risk, and may waive the requirements in any approval for that incinerator. Any finding and waiver under this paragraph must be stated in writing and included as part of the approval.

(6) *Persons approved.* An approval will designate the persons who own and who are authorized to operate the incinerator, and will apply only to such persons, except as provided in paragraph (d)(8) of this section.

(7) *Final approval.* Approval of an incinerator will be in writing and signed by the appropriate EPA official. The approval will state all requirements applicable to the approved incinerator.

(8) *Transfer of property.* Any person who owns or operates an approved incinerator must notify EPA at least 30 days before transferring ownership in the incinerator or the property it stands upon, or transferring the right to operate the incinerator. The transferor must also submit to EPA, at least 30 days before such transfer, a notarized affidavit signed by the transferee which states that the transferee will abide by the transferor's EPA incinerator approval. Within 30 days of receiving such notification and affidavit, EPA will issue an amended approval substituting the transferee's name for the transferor's name, or EPA may require the transferee to apply for a new incinerator approval. In the latter case, the transferee must abide by the transferor's EPA approval until EPA issues the new approval to the transferee.

(Sec. 6, Pub. L. 94–469, 90 Stat. 2020 (15 U.S.C. 2605)

[44 FR 31542, May 31, 1979. Redesignated at 47 FR 19527, May 6, 1982, and amended at 48 FR 13185, Mar. 30, 1983; 49 FR 28191, July 10, 1984; 53 FR 12524, Apr. 15, 1988; 58 FR 15809, Mar. 24, 1993; 63 FR 35439, June 29, 1998; 72 FR 57240, Oct. 9, 2007; 74 FR 30233, June 25, 2009]

§ 761.71　High efficiency boilers.

(a) To burn mineral oil dielectric fluid containing a PCB concentration of ≥50 ppm, but <500 ppm:

(1) The boiler shall comply with the following criteria:

(i) The boiler is rated at a minimum of 50 million BTU hours.

(ii) If the boiler uses natural gas or oil as the primary fuel, the carbon monoxide concentration in the stack is ≤50 ppm and the excess oxygen is at least 3 percent when PCBs are being burned.

(iii) If the boiler uses coal as the primary fuel, the carbon monoxide concentration in the stack is ≤100 ppm and the excess oxygen is at least 3 percent when PCBs are being burned.

(iv) The mineral oil dielectric fluid does not comprise more than 10 percent (on a volume basis) of the total fuel feed rate.

(v) The mineral oil dielectric fluid is not fed into the boiler unless the boiler is operating at its normal operating temperature (this prohibits feeding these fluids during either start up or shut down operations).

(vi) The owner or operator of the boiler:

(A) Continuously monitors and records the carbon monoxide concentration and excess oxygen percentage in the stack gas while burning mineral oil dielectric fluid; or

(B) If the boiler will burn <30,000 gallons of mineral oil dielectric fluid per year, measures and records the carbon monoxide concentration and excess oxygen percentage in the stack gas at regular intervals of no longer than 60 minutes while burning mineral oil dielectric fluid.

(vii) The primary fuel feed rates, mineral oil dielectric fluid feed rates, and total quantities of both primary fuel and mineral oil dielectric fluid fed to the boiler are measured and recorded at regular intervals of no longer than 15 minutes while burning mineral oil dielectric fluid.

(viii) The carbon monoxide concentration and the excess oxygen percentage are checked at least once every hour that mineral oil dielectric fluid is burned. If either measurement falls below the levels specified in this section, the flow of mineral oil dielec-

tric fluid to the boiler shall be stopped immediately.

(2) Thirty days before any person burns mineral oil dielectric fluid in the boiler, the person gives written notice to the EPA Regional Administrator for the EPA Region in which the boiler is located and that the notice contains the following information:

(i) The name and address of the owner or operator of the boiler and the address of the boiler.

(ii) The boiler rating in units of BTU/hour.

(iii) The carbon monoxide concentration and the excess oxygen percentage in the stack of the boiler when it is operated in a manner similar to the manner in which it will be operated when mineral oil dielectric fluid is burned.

(iv) The type of equipment, apparatus, and procedures to be used to control the feed of mineral oil dielectric fluid to the boiler and to monitor and record the carbon monoxide concentration and excess oxygen percentage in the stack.

(3) When burning mineral oil dielectric fluid, the boiler must operate at a level of output no less than the output at which the measurements required under paragraph (a)(2)(iii) of this section were taken.

(4) Any person burning mineral oil dielectric fluid in a boiler obtains the following information and retains the information for 5 years at the boiler location:

(i) The data required to be collected under paragraphs (a)(1)(vi) and (vii) of this section.

(ii) The quantity of mineral oil dielectric fluid burned in the boiler each month.

(b) To burn liquids, other than mineral oil dielectric fluid, containing a PCB concentration of ≥50 ppm, but <500 ppm:

(1) The boiler shall comply with the following criteria:

(i) The boiler is rated at a minimum of 50 million BTU/hour.

(ii) If the boiler uses natural gas or oil as the primary fuel, the carbon monoxide concentration in the stack is ≤50 ppm and the excess oxygen is at least 3 percent when PCBs are being burned.

(iii) If the boiler uses coal as the primary fuel, the carbon monoxide concentration in the stack is ≤100 ppm and the excess oxygen is at least 3 percent when PCBs are being burned.

(iv) The waste does not comprise more than 10 percent (on a volume basis) of the total fuel feed rate.

(v) The waste is not fed into the boiler unless the boiler is operating at its normal operating temperature (this prohibits feeding these fluids during either start up or shut down operations).

(vi) The owner or operator of the boiler must:

(A) Continuously monitor and record the carbon monoxide concentration and excess oxygen percentage in the stack gas while burning waste fluid; or

(B) If the boiler will burn <30,000 gallons of waste fluid per year, measure and record the carbon monoxide concentration and excess oxygen percentage in the stack gas at regular intervals of no longer than 60 minutes while burning waste fluid.

(vii) The primary fuel feed rate, waste fluid feed rate, and total quantities of both primary fuel and waste fluid fed to the boiler must be measured and recorded at regular intervals of no longer than 15 minutes while burning waste fluid.

(viii) The carbon monoxide concentration and the excess oxygen percentage must be checked at least once every hour that the waste is burned. If either measurement falls below the levels specified in either (a)(1)(ii) or (a)(1)(iii) of this section, the flow of waste to the boiler shall be stopped immediately.

(2) Prior to any person burning these liquids in the boiler, approval must be obtained from the EPA Regional Administrator for the EPA Region in which the boiler is located and any persons seeking such approval must submit to the EPA Regional Administrator a request containing at least the following information:

(i) The name and address of the owner or operator of the boiler and the address of the boiler.

(ii) The boiler rating in units of BTU/hour.

(iii) The carbon monoxide concentration and the excess oxygen percentage in the stack of the boiler when it is op-erated in a manner similar to the manner in which it will be operated when low concentration PCB liquid is burned.

(iv) The type of equipment, apparatus, and procedures to be used to control the feed of mineral oil dielectric fluid to the boiler and to monitor and record the carbon monoxide concentration and excess oxygen percentage in the stack.

.(v) The type of waste to be burned (e.g., hydraulic fluid, contaminated fuel oil, heat transfer fluid, etc.).

(vi) The concentration of PCBs and of any other chlorinated hydrocarbon in the waste and the results of analyses using the ASTM International methods as follows: Carbon and hydrogen content using ASTM D3178–84, nitrogen content using ASTM E258–67 (Reapproved 1987), sulfur content using ASTM D2784–89, ASTM D1266–87, or ASTM D129–64 (Reapproved 1978), chlorine content using ASTM D808–87, water and sediment content using either ASTM D2709–88 or ASTM D1796–83 (Reapproved 1990), ash content using ASTM D482–87, calorific value using ASTM D240–87, carbon residue using either ASTM D2158–89 or ASTM D524–88, and flash point using ASTM D93–09 (all standards incorporated by reference in §761.19).

(vii) The quantity of wastes estimated to be burned in a 30-day period.

(viii) An explanation of the procedures to be followed to ensure that burning the waste will not adversely affect the operation of the boiler such that combustion efficiency will decrease.

(3) On the basis of the information in paragraph (b)(2) of this section and any other available information, the Regional Administrator may, at his/her discretion, find that the alternate disposal method will not present an unreasonable risk of injury to health or the environment and approve the use of the boiler.

(4) When burning PCB wastes, the boiler must operate at a level of output no less than the output at which the measurements required under paragraph (b)(2)(iii) of this section were taken.

(5) Any person burning liquids in boilers approved as provided in paragraph (b)(3) of this section, must obtain the following information and retain the information for 5 years at the boiler location:

(i) The data required to be collected in paragraphs (b)(1)(vi) and (b)(1)(vii) of this section.

(ii) The quantity of low concentration PCB liquid burned in the boiler each month.

(iii) The analysis of the waste required by paragraph (b)(2)(vi) of this section taken once a month for each month during which low concentration PCB liquid is burned in the boiler.

[63 FR 35454, June 29, 1998, as amended at 77 FR 2464, Jan. 18, 2012]

### § 761.72 Scrap metal recovery ovens and smelters.

Any person may dispose of residual PCBs associated with PCB-Contaminated articles regulated for disposal under § 761.60(b), metal surfaces in PCB remediation waste regulated under § 761.61, or metal surfaces in PCB bulk product waste regulated under §§ 761.62(a)(6) and 761.79(c)(6), from which all free-flowing liquids have been removed:

(a) In a scrap metal recovery oven:

(1) The oven shall have at least two enclosed (i.e., negative draft, no fugitive emissions) interconnected chambers.

(2) The equipment with all free-flowing liquid removed shall first be placed in the primary chamber at room temperature.

(3) The primary chamber shall operate at a temperature between 537 °C and 650 °C for a minimum of 2½ hours and reach a minimum temperature of 650 °C (1,202 °F) once during each heating cycle or batch treatment of unheated, liquid-free equipment.

(4) Heated gases from the primary chamber must feed directly into the secondary chamber (i.e., afterburner) which must operate at a minimum temperature of 1,200 °C (2,192 °F) with at least a 3 percent excess oxygen and a retention time of 2.0 seconds with a minimum combustion efficiency of 99.9 percent according to the definition in § 761.70(a)(2).

(5) Heating of the primary chamber shall not commence until the secondary chamber has reached a temperature of 1,200 ±100 °C (2,192 ° ±180 °F).

(6) Continuous emissions monitors and recorders for carbon dioxide, carbon monoxide, and excess oxygen in the secondary chamber and continuous temperature recorders in the primary and secondary chambers shall be installed and operated while the primary and secondary chambers are in operation to assure that the two chambers are within the operating parameters in paragraphs (a)(3) through (a)(5) of this section.

(7) Emissions from the secondary chamber must be vented through an exhaust gas stack in accordance with either:

(i) State or local air regulations or permits, or

(ii) The standards in paragraph (a)(8) of this section.

(8) Exhaust gas stack emissions shall be for: particulates <0.015 grains/dry standard cubic foot, sulfur dioxide <35 parts per million by volume (ppmv), nitrogen oxide <150 ppmv, carbon monoxide <35 ppmv, and hydrogen chloride <35 ppmv.

(9) A measurement of the temperature in the secondary chamber at the time the primary chamber starts heating must be taken, recorded and retained at the facility for 3 years from the date each charge is introduced into the primary chamber.

(b) By smelting:

(1) The operating temperature of the hearth must be at least 1,000 °C at the time it is charged with any PCB-Contaminated non-porous surface.

(2) Each charge containing a PCB-Contaminated item must be added into molten metal or a hearth at ≥1,000 °C.

(3) Successive charges may not be introduced into the hearth in less than 15-minute intervals.

(4) The smelter must operate in compliance with any applicable emissions standards in part 60 of this chapter.

(5) The smelter must have an operational device which accurately measures directly or indirectly, the temperature in the hearth.

(6) Take, record and retain at the disposal facility for 3 years from the date each charge is introduced, a reading of

**Environmental Protection Agency**                                          **§ 761.75**

the temperature in the hearth at the time it is charged with a non-porous surface item.

(c)(1) Scrap metal recovery ovens and smelters must either have a final permit under RCRA (part 266, subpart H of this chapter and § 270.66 of this chapter) or be operating under a valid State air emissions permit which includes a standard for PCBs.

(2) Scrap metal recovery ovens and smelters disposing of PCBs must provide notification as disposers of PCBs, are not required to submit annual reports, and shall otherwise comply with all applicable provisions of subparts J and K of this part, as well as other applicable Federal, State, and local laws and regulations.

(3) In lieu of the requirements in paragraph (c)(1) of this section, upon written request by the owner or operator of a scrap metal recovery oven or smelter, the EPA Regional Administrator, for the Region where the oven or smelter is located, may make a finding in writing, based on a site-specific risk assessment, that the oven or smelter does not pose an unreasonable risk of injury to health or the environment because it is operating in compliance with the parameters and conditions listed in paragraph (a) or (b) of this section even though the oven or smelter does not have a RCRA or State air permit as required by paragraph (c)(1) of this section. The written request shall include a site-specific risk assessment.

(d) PCB liquids, other liquid waste qualifying as waste oils which may be used as provided for at § 761.20(e), or PCB remediation waste, other than PCB-Contaminated articles, may not be disposed of in a scrap metal recovery oven or smelter unless approved or otherwise allowed under subpart D of this part.

[63 FR 35455, June 29, 1998, as amended at 64 FR 33761, June 24, 1999]

**§ 761.75  Chemical waste landfills.**

This section applies to facilities used to dispose of PCBs in accordance with the part.

(a) *General.* A chemical waste landfill used for the disposal of PCBs and PCB Items shall be approved by the Agency Regional Administrator pursuant to

paragraph (c) of this section. The landfill shall meet all of the requirements specified in paragraph (b) of this section, unless a waiver from these requirements is obtained pursuant to paragraph (c)(4) of this section. In addition, the landfill shall meet any other requirements that may be prescribed pursuant to paragraph (c)(3) of this section.

(b) *Technical requirements.* Requirements for chemical waste landfills used for the disposal of PCBs and PCB Items are as follows:

(1) *Soils.* The landfill site shall be located in thick, relatively impermeable formations such as large-area clay pans. Where this is not possible, the soil shall have a high clay and silt content with the following parameters:

(i) In-place soil thickness, 4 feet or compacted soil liner thickness, 3 feet;

(ii) Permeability (cm/sec), equal to or less than $1 \times 10^{-7}$;

(iii) Percent soil passing No. 200 Sieve, >30;

(iv) Liquid Limit, >30; and

(v) Plasticity Index >15.

(2) *Synthetic membrane liners.* Synthetic membrane liners shall be used when, in the judgment of the Regional Administrator, the hydrologic or geologic conditions at the landfill require such a liner in order to provide at least a permeability equivalent to the soils in paragraph (b)(1) of this section. Whenever a synthetic liner is used at a landfill site, special precautions shall be taken to insure that its integrity is maintained and that it is chemically compatible with PCBs. Adequate soil underlining and soil cover shall be provided to prevent excessive stress on the liner and to prevent rupture of the liner. The liner must have a minimum thickness of 30 mils.

(3) *Hydrologic conditions.* The bottom of the landfill shall be above the historical high groundwater table as provided below. Floodplains, shorelands, and groundwater recharge areas shall be avoided. There shall be no hydraulic connection between the site and standing or flowing surface water. The site shall have monitoring wells and leachate collection. The bottom of the landfill liner system or natural in-place soil barrier shall be at least fifty feet from the historical high water table.

225

(4) *Flood protection.* (i) If the landfill site is below the 100-year floodwater elevation, the operator shall provide surface water diversion dikes around the perimeter of the landfill site with a minimum height equal to two feet above the 100-year floodwater elevation.

(ii) If the landfill site is above the 100-year floodwater elevation, the operators shall provide diversion structures capable of diverting all of the surface water runoff from a 24-hour, 25-year storm.

(5) *Topography.* The landfill site shall be located in an area of low to moderate relief to minimize erosion and to help prevent landslides or slumping.

(6) *Monitoring systems*—(i) *Water sampling.* (A) For all sites receiving PCBs, the ground and surface water from the disposal site area shall be sampled prior to commencing operations under an approval provided in paragraph (c) of this section for use as baseline data.

(B) Any surface watercourse designated by the Regional Administrator using the authority provided in paragraph (c)(3)(ii) of this section shall be sampled at least monthly when the landfill is being used for disposal operations.

(C) Any surface watercourse designated by the Regional Administrator using the authority provided in paragraph (c)(3)(ii) of this section shall be sampled for a time period specified by the Regional Administrator on a frequency of no less than once every six months after final closure of the disposal area.

(ii) *Groundwater monitor wells.* (A) If underlying earth materials are homogenous, impermeable, and uniformly sloping in one direction, only three sampling points shall be necessary. These three points shall be equally spaced on a line through the center of the disposal area and extending from the area of highest water table elevation to the area of the lowest water table elevation on the property.

(B) All monitor wells shall be cased and the annular space between the monitor zone (zone of saturation) and the surface shall be completely backfilled with Portland cement or an equivalent material and plugged with Portland cement to effectively prevent percolation of surface water into the well bore. The well opening at the surface shall have a removable cap to provide access and to prevent entrance of rainfall or stormwater runoff. The well shall be pumped to remove the volume of liquid initially contained in the well before obtaining a sample for analysis. The discharge shall be treated to meet applicable State or Federal discharge standards or recycled to the chemical waste landfill.

(iii) *Water analysis.* As a minimum, all samples shall be analyzed for the following parameters, and all data and records of the sampling and analysis shall be maintained as required in §761.180(d)(1). Sampling methods and analytical procedures for these parameters shall comply with those specified in 40 CFR part 136 as amended in 41 FR 52779 on December 1, 1976.

(A) PCBs.

(B) pH.

(C) Specific conductance.

(D) Chlorinated organics.

(7) *Leachate collection.* A leachate collection monitoring system shall be installed above the chemical waste landfill. Leachate collection systems shall be monitored monthly for quantity and physicochemical characteristics of leachate produced. The leachate should be either treated to acceptable limits for discharge in accordance with a State or Federal permit or disposed of by another State or Federally approved method. Water analysis shall be conducted as provided in paragraph (b)(6)(iii) of this section. Acceptable leachate monitoring/collection systems shall be any of the following designs, unless a waiver is obtained pursuant to paragraph (c)(4) of this section.

(i) *Simple leachate collection.* This system consists of a gravity flow drainfield installed above the waste disposal unit liner. This design is recommended for use when semi-solid or leachable solid wastes are placed in a lined pit excavated into a relatively thick, unsaturated, homogenous layer of low permeability soil.

(ii) *Compound leachate collection.* This system consists of a gravity flow drainfield installed above the waste disposal unit liner and above a secondary installed liner. This design is recommended for use when semi-liquid

**Environmental Protection Agency** §761.75

or leachable solid wastes are placed in a lined pit excavated into relatively permeable soil.

(iii) *Suction lysimeters.* This system consists of a network of porous ceramic cups connected by hoses/tubing to a vacuum pump. The porous ceramic cups or suction lysimeters are installed along the sides and under the bottom of the waste disposal unit liner. This type of system works best when installed in a relatively permeable unsaturated soil immediately adjacent to the bottom and/or sides of the disposal facility.

(8) *Chemical waste landfill operations.* (i) PCBs and PCB Items shall be placed in a landfill in a manner that will prevent damage to containers or articles. Other wastes placed in the landfill that are not chemically compatible with PCBs and PCB Items including organic solvents shall be segregated from the PCBs throughout the waste handling and disposal process.

(ii) An operation plan shall be developed and submitted to the Regional Administrator for approval as required in paragraph (c) of this section. This plan shall include detailed explanations of the procedures to be used for recordkeeping, surface water handling procedures, excavation and backfilling, waste segregation burial coordinates, vehicle and equipment movement, use of roadways, leachate collection systems, sampling and monitoring procedures, monitoring wells, environmental emergency contingency plans, and security measures to protect against vandalism and unauthorized waste placements. EPA guidelines entitled "Thermal Processing and Land Disposal of Solid Waste" (39 FR 29337, Aug. 14, 1974) are a useful reference in preparation of this plan. If the facility is to be used to dispose of liquid wastes containing between 50 ppm and 500 ppm PCB, the operations plan must include procedures to determine that liquid PCBs to be disposed of at the landfill do not exceed 500 ppm PCB and measures to prevent the migration of PCBs from the landfill. Bulk liquids not exceeding 500 ppm PCBs may be disposed of provided such waste is pretreated and/or stabilized (e.g., chemically fixed, evaporated, mixed with dry inert absorbant) to reduce its liquid content

or increase its solid content so that a non-flowing consistency is achieved to eliminate the presence of free liquids prior to final disposal in a landfill. PCB Container of liquid PCBs with a concentration between 50 and 500 ppm PCB may be disposed of if each container is surrounded by an amount of inert sorbant material capable of absorbing all of the liquid contents of the container.

(iii) Ignitable wastes shall not be disposed of in chemical waste landfills. Liquid ignitable wastes are wastes that have a flash point less than 60 °C (140 °F) as determined by the following method or an equivalent method: Flash point of liquids shall be determined by a Pensky-Martens Closed Cup Tester, using the protocol specified in ASTM D93–09, or the Setaflash Closed Tester using the protocol specified in ASTM D3278–89 (all standards incorporated by reference in §761.19).

(iv) Records shall be maintained for all PCB disposal operations and shall include information on the PCB concentration in liquid wastes and the three dimensional burial coordinates for PCBs and PCB Items. Additional records shall be developed and maintained as required in §761.180.

(9) *Supporting facilities.* (i) A six foot woven mesh fence, wall, or similar device shall be placed around the site to prevent unauthorized persons and animals from entering.

(ii) Roads shall be maintained to and within the site which are adequate to support the operation and maintenance of the site without causing safety or nuisance problems or hazardous conditions.

(iii) The site shall be operated and maintained in a manner to prevent safety problems or hazardous conditions resulting from spilled liquids and windblown materials.

(c) *Approval of chemical waste landfills.* Prior to the disposal of any PCBs and PCB Items in a chemical waste landfill, the owner or operator of the landfill shall receive written approval of the Agency Regional Administrator for the Region in which the landfill is located. The approval shall be obtained in the following manner:

(1) *Initial report.* The owner or operator shall submit to the Regional Administrator an initial report which contains:

(i) The location of the landfill;

(ii) A detailed description of the landfill including general site plans and design drawings;

(iii) An engineering report describing the manner is which the landfill complies with the requirements for chemical waste landfills specified in paragraph (b) of this section;

(iv) Sampling and monitoring equipment and facilities available;

(v) Expected waste volumes of PCBs;

(vi) General description of waste materials other than PCBs that are expected to be disposed of in the landfill;

(vii) Landfill operations plan as required in paragraph (b) of this section;

(viii) Any local, State, or Federal permits or approvals; and

(ix) Any schedules or plans for complying with the approval requirements of these regulations.

(2) *Other information.* In addition to the information contained in the report described in paragraph (c)(1) of this section, the Regional Administrator may require the owner or operator to submit any other information that the Regional Administrator finds to be reasonably necessary to determine whether a chemical waste landfill should be approved. Such other information shall be restricted to the types of information required in paragraphs (c)(1)(i) through (ix) of this section.

(3) *Contents of approval.* (i) Except as provided in paragraph (c)(4) of this section the Regional Administrator may not approve a chemical waste landfill for the disposal of PCBs and PCB Items, unless he finds that the landfill meets all of the requirements of paragraph (b) of this section.

(ii) In addition to the requirements of paragraph (b) of this section, the Regional Administrator may include in an approval any other requirements or provisions that the Regional Administrator finds are necessary to ensure that operation of the chemical waste landfill does not present an unreasonable risk of injury to health or the environment from PCBs. Such provisions may include a fixed period of time for which the approval is valid.

The approval may also include a stipulation that the operator of the chemical waste landfill report to the Regional Administrator any instance when PCBs are detectable during monitoring activities conducted pursuant to paragraph (b)(6) of this section.

(4) *Waivers.* An owner or operator of a chemical waste landfill may submit evidence to the Regional Administrator that operation of the landfill will not present an unreasonable risk of injury to health or the environment from PCBs when one or more of the requirements of paragraph (b) of this section are not met. On the basis of such evidence and any other available information, the Regional Administrator may in his discretion find that one or more of the requirements of paragraph (b) of this section is not necessary to protect against such a risk and may waive the requirements in any approval for that landfill. Any finding and waiver under this paragraph will be stated in writing and included as part of the approval.

(5) *Persons approved.* Any approval will designate the persons who own and who are authorized to operate the chemical waste landfill, and will apply only to such persons, except as provided by paragraph (c)(7) of this section.

(6) *Final approval.* Approval of a chemical waste landfill will be in writing and will be signed by the Regional Administrator. The approval will state all requirements applicable to the approved landfill.

(7) *Transfer of property.* Any person who owns or operates an approved chemical waste landfill must notify EPA at least 30 days before transferring ownership in the property or transferring the right to conduct the chemical waste landfill operation. The transferor must also submit to EPA, at least 30 days before such transfer, a notarized affidavit signed by the transferee which states that the transferee will abide by the transferor's EPA chemical waste landfill approval. Within 30 days of receiving such notification and affidavit, EPA will issue an amended approval substituting the transferee's name for the transferor's name, or EPA may require the transferee to apply for a new chemical waste

**Environmental Protection Agency**                    **§ 761.77**

landfill approval. In the latter case, the transferee must abide by the transferor's EPA approval until EPA issues the new approval to the transferee.

(Sec. 6, Pub. L. 94-469, 90 Stat. 2020 (15 U.S.C. 2605)

[44 FR 31542, May 31, 1979. Redesignated at 47 FR 19527, May 6, 1982, and amended at 48 FR 5730, Feb. 8, 1983; 49 FR 28191, July 10, 1984; 53 FR 12524, Apr. 15, 1988; 53 FR 21641, June 9, 1988; 57 FR 13323, Apr. 16, 1992; 63 FR 35456, June 29, 1998; 77 FR 2464, Jan. 18, 2012]

## § 761.77  Coordinated approval.

(a) *General requirements.* Notwithstanding any other provision of this part, the EPA Regional Administrator for the Region in which a PCB disposal or PCB commercial storage facility described in paragraphs (b) and (c) of this section is located may issue a TSCA PCB Coordinated Approval to the persons described in those paragraphs if the conditions listed in this section are met. A TSCA PCB Coordinated Approval will designate the persons who own and who are authorized to operate the facilities described in paragraphs (b) and (c) of this section and will apply only to such persons. All requirements, conditions, and limitations of any other permit or waste management document cited or described in paragraphs (b) and (c) of this section, as the technical or legal basis on which the TSCA PCB Coordinated Approval is issued, are conditions of the TSCA PCB Coordinated Approval.

(1) Persons seeking a TSCA PCB Coordinated Approval shall submit a request for approval by certified mail, to the EPA Regional Administrator for the Region in which the activity will take place. Persons seeking a TSCA PCB Coordinated Approval for a new PCB activity shall submit the request for approval at the same time they seek a permit, approval, or other action for a PCB waste management activity under any other Federal or State authority.

(i) The request for a TSCA PCB Coordinated Approval shall include a copy of the letter from EPA announcing or confirming the EPA identification number issued to the facility for conducting PCB activities; the name, organization, and telephone number of the person who is the contact point for

the non-TSCA Federal or State waste management authority; a copy of the relevant permit or waste management document specified in paragraphs (b) and (c) of this section, including all requirements, conditions, and limitations, if the EPA Regional Administrator does not have a copy of the document, or a description of the waste management activities to be conducted if a permit or other relevant waste management document has not been issued; and a certification that the person who owns or operates the facility is aware of and will adhere to the TSCA PCB reporting and recordkeeping requirements at subparts J and K of this part.

(ii) The EPA Regional Administrator shall review the request for completeness, for compliance with the requirements of paragraphs (b) and (c) of this section, and to ensure that the PCB activity for which approval is requested will not present an unreasonable risk of injury to health or the environment. The EPA Regional Administrator shall either:

(A) Issue a written notice of deficiency explaining why the request for approval is deficient. If appropriate, the EPA Regional Administrator may either:

(1) Request additional information to cure the deficiency.

(2) Deny the request for a TSCA PCB Coordinated Approval.

(B) Issue a letter granting or denying the TSCA PCB Coordinated Approval. If the EPA Regional Administrator grants the TSCA PCB Coordinated Approval, he or she may acknowledge the non-TSCA approval meets the regulatory requirements under TSCA as written, or require additional conditions the EPA Regional Administrator has determined are necessary to prevent unreasonable risk of injury to health or the environment.

(C) If the EPA Regional Administrator denies a request for a Coordinated Approval under paragraphs (a)(1)(ii)(A) or (a)(1)(ii)(B) of this section, the person who requested the TSCA PCB Coordinated Approval may submit an application for a TSCA Disposal Approval.

229

(2) The EPA Regional Administrator may issue a notice of deficiency, revoke the TSCA PCB Coordinated Approval, require the person to whom the TSCA PCB Coordinated Approval was issued to submit an application for a TSCA PCB approval, or bring an enforcement action under TSCA if he or she determines that:

(i) Conditions of the approval relating to PCB waste management activities are not met.

(ii) The PCB waste management process is being operated in a manner which may result in an unreasonable risk of injury to health or the environment.

(iii) The non-TSCA approval expires, is revoked, is suspended, or otherwise ceases to be in full effect.

(3) Any person with a TSCA PCB Coordinated Approval must notify the EPA Regional Administrator in writing within 5 calendar days of changes relating to PCB waste requirements in the non-TSCA waste management document which serves as the basis for a TSCA PCB Coordinated Approval. Changes in the ownership of a commercial storage facility which holds a TSCA PCB Coordinated Approval shall be handled pursuant to § 761.65(j).

(b) Any person who owns or operates a facility that he or she intends to use to landfill PCB wastes; incinerate PCB wastes; dispose of PCB wastes using an alternative disposal method that is equivalent to disposal in an incinerator approved under § 761.70 or a high efficiency boiler operating in compliance with § 761.71; or stores PCB wastes may apply for a TSCA PCB Coordinated Approval. The EPA Regional Administrator may approve the request if the EPA Regional Administrator determines that the activity will not pose an unreasonable risk of injury to health or the environment and the person:

(1)(i) Has a waste management permit or other decision or enforcement document which exercises control over PCB wastes, issued by EPA or an authorized State Director for a State program that has been approved by EPA and is no less stringent in protection of health or the environment than the applicable TSCA requirements found in this part; or

(ii) Has a PCB waste management permit or other decision or enforcement document issued by a State Director pursuant to a State PCB waste management program no less stringent in protection of health or the environment than the applicable TSCA requirements found in this part; or

(iii) Is subject to a waste management permit or other decision or enforcement document which is applicable to the disposal of PCBs and which was issued through the promulgation of a regulation published in Title 40 of the Code of Federal Regulations.

(2) Complies with the terms and conditions of the permit or other decision or enforcement document described in paragraph (b)(1) of this section.

(3) Unless otherwise waived or modified in writing by the EPA Regional Administrator, complies with § 761.75(b); § 761.70(a)(1) through (a)(9), (b)(1) and (b)(2), and (c); or the PCB storage requirements at §§ 761.65(a), (c), and (d)(2), as appropriate.

(4) Complies with the reporting and recordkeeping requirements in subparts J and K of this part.

(c) A person conducting research and development (R&D) into PCB disposal methods (regardless of PCB concentration), or conducting PCB remediation activities may apply for a TSCA PCB Coordinated Approval. The EPA Regional Administrator may approve the request if the EPA Regional Administrator determines that the activity will not pose an unreasonable risk of injury to health or the environment and the person:

(1)(i) Has a permit or other decision and enforcement document, issued or otherwise agreed to by EPA, or permit or other decision and enforcement document issued by an authorized State Director for a State program that has been approved by EPA, which exercises control over the management of PCB wastes, and that person is in compliance with all terms and conditions of that document; or

(ii) Has a permit, which exercises control over the management of PCB wastes, issued by a State Director pursuant to a State PCB disposal program no less stringent than the requirements in this part.

**Environmental Protection Agency**                    **§ 761.79**

(2) Complies with the terms and conditions of that permit or other decision and enforcement document.

(3) Complies with the reporting and recordkeeping requirements in subparts J and K of this part.

[63 FR 35456, June 29, 1998]

### § 761.79 Decontamination standards and procedures.

(a) *Applicability.* This section establishes decontamination standards and procedures for removing PCBs, which are regulated for disposal, from water, organic liquids, non-porous surfaces (including scrap metal from disassembled electrical equipment), concrete, and non-porous surfaces covered with a porous surface, such as paint or coating on metal.

(1) Decontamination in accordance with this section does not require a disposal approval under subpart D of this part.

(2) Materials from which PCBs have been removed by decontamination in accordance with this section may be distributed in commerce in accordance with § 761.20(c)(5).

(3) Materials from which PCBs have been removed by decontamination in accordance with this section may be used or reused in accordance with § 761.30(u).

(4) Materials from which PCBs have been removed by decontamination in accordance with this section, not including decontamination waste and residuals under paragraph (g) of this section, are unregulated for disposal under subpart D of this part.

(5) Any person decontaminating porous surfaces other than concrete under paragraph (b)(4) of this section and non-porous surfaces covered with a porous surface, such as paint or coating on metal, under paragraph (b)(3) or (c)(6) of this section must obtain an alternative decontamination approval in accordance with paragraph (h) of this section.

(6) Any person engaging in decontamination under this section is responsible for determining and complying with all other applicable Federal, State, and local laws and regulations.

(b) *Decontamination standards.* Chopping (including wire chopping), dis-

tilling, filtering, oil/water separation, spraying, soaking, wiping, stripping of insulation, scraping, scarification or the use of abrasives or solvents may be used to remove or separate PCBs, to the following standards, from liquids, concrete, or non-porous surfaces.

(1) The decontamination standard for water containing PCBs is:

(i) Less than 200 µg/L (i.e., <200 ppb PCBs) for non-contact use in a closed system where there are no releases;

(ii) For water discharged to a treatment works (as defined in § 503.9(aa) of this chapter) or to navigable waters, <3 µg/L (approximately <3 ppb) or a PCB discharge limit included in a permit issued under section 307(b) or 402 of the Clean Water Act; or

(iii) Less than or equal to 0.5 µg/L (i.e., approximately ≤0.5 ppb PCBs) for unrestricted use.

(2) The decontamination standard for organic liquids and non-aqueous inorganic liquids containing PCBs is <2 milligrams per kilogram (i.e., <2 ppm PCBs).

(3) The decontamination standard for non-porous surfaces in contact with liquid and non-liquid PCBs is:

(i) For unrestricted use:

(A) For non-porous surfaces previously in contact with liquid PCBs at any concentration, where no free-flowing liquids are currently present, ≤10 micrograms PCBs per 100 square centimeters (≤10 µg/100 cm²) as measured by a standard wipe test (§ 761.123) at locations selected in accordance with subpart P of this part.

(B) For non-porous surfaces in contact with non-liquid PCBs (including non-porous surfaces covered with a porous surface, such as paint or coating on metal), cleaning to Visual Standard No. 2, Near-White Blast Cleaned Surface Finish, of the National Association of Corrosion Engineers (NACE). A person shall verify compliance with standard No. 2 by visually inspecting all cleaned areas.

(ii) For disposal in a smelter operating in accordance with § 761.72(b):

(A) For non-porous surfaces previously in contact with liquid PCBs at any concentration, where no free-flowing liquids are currently present, <100 µg/100 cm² as measured by a standard

wipe test (§ 761.123) at locations selected in accordance with subpart P of this part.

(B) For non-porous surfaces in contact with non-liquid PCBs (including non-porous surfaces covered with a porous surface, such as paint or coating on metal), cleaning to Visual Standard No. 3, Commercial Blast Cleaned Surface Finish, of the National Association of Corrosion Engineers (NACE). A person shall verify compliance with standard No. 3 by visually inspecting all cleaned areas.

(4) The decontamination standard for concrete is ≤10 μg/100 cm² as measured by a standard wipe test (§ 761.123) if the decontamination procedure is commenced within 72 hours of the initial spill of PCBs to the concrete or portion thereof being decontaminated.

(c) *Self-implementing decontamination procedures.* The following self-implementing decontamination procedures are available as an alternative to the measurement-based decontamination methods specified in paragraph (b) of this section. Any person performing self-implementing decontamination must comply with one of the following procedures.

(1) Any person decontaminating a PCB Container must do so by flushing the internal surfaces of the container three times with a solvent containing <50 ppm PCBs. Each rinse shall use a volume of the flushing solvent equal to approximately 10 percent of the PCB Container capacity.

(2) Any person decontaminating movable equipment contaminated by PCBs, tools, and sampling equipment may do so by:

(i) Swabbing surfaces that have contacted PCBs with a solvent;

(ii) A double wash/rinse as defined in subpart S of this part; or

(iii) Another applicable decontamination procedure in this section.

(3) Any person decontaminating a non-porous surface in contact with free-flowing mineral oil dielectric fluid (MODEF) at levels ≤10,000 ppm PCBs must do so as follows:

(i) Drain the free-flowing MODEF and allow the residual surfaces to drain for an additional 15 hours.

(ii) Dispose of drained MODEF according to paragraph (g) of this section.

(iii) Soak the surfaces to be decontaminated in a sufficient amount of clean (containing <2 ppm PCBs) performance-based organic decontamination fluid (PODF) such that there is a minimum of 800 ml of PODF for each 100 cm² of contaminated or potentially contaminated surface for at least 15 hours at ≥20 °C.

(iv) Approved PODFs include:

(A) Kerosene.

(B) Diesel fuel.

(C) Terpene hydrocarbons.

(D) Mixtures of terpene hydrocarbons and terpene alcohols.

(v) Drain the PODF from the surfaces.

(vi) Dispose of the drained PODF in accordance with paragraph (g) of this section.

(4) Any person decontaminating a non-porous surface in contact with free-flowing MODEF containing >10,000 ppm PCB in MODEF or askarel PCB (up to 70 percent PCB in a mixture of trichlorobenzenes and tetrachlorobenzenes) must do so as follows:

(i) Drain the free-flowing MODEF or askarel and allow the residual surfaces to drain for an additional 15 hours.

(ii) Dispose of drained MODEF or askarel according to paragraph (g) of this section.

(iii) Soak the surfaces to be decontaminated in a sufficient amount of clean PODF (containing <2 ppm PCBs) such that there is a minimum of 800 ml of PODF for each 100 cm² of contaminated or potentially contaminated surface for at least 15 hours at ≥20 °C.

(iv) Approved PODFs include:

(A) Kerosene.

(B) Diesel fuel.

(C) Terpene hydrocarbons.

(D) Mixtures of terpene hydrocarbons and terpene alcohols.

(v) Drain the PODF from the surfaces.

(vi) Dispose of the drained PODF in accordance with paragraph (g) of this section.

(vii) Resoak the surfaces to be decontaminated, pursuant to paragraph (c)(3)(iii) of this section, in a sufficient amount of clean PODF (containing <2

**Environmental Protection Agency**                                   **§ 761.79**

ppm PCBs) such that there is a minimum of 800 ml of PODF for each 100 cm² of surface for at least 15 hours at ≥20 °C.

(viii) Drain the PODF from the surfaces.

(ix) Dispose of the drained PODF in accordance with paragraph (g) of this section.

(5) Any person decontaminating piping and air lines in an air compressor system must do so as follows:

(i) Before decontamination proceeds, disconnect or bypass the air compressors and air dryers from the piping and air lines and decontaminate the air compressors and air dryers separately in accordance with paragraphs (b), (c)(1) through (c)(4), or (c)(6) of this section. Dispose of filter media and desiccant in the air dyers based on their existing PCB concentration.

(ii) Test the connecting line and appurtenances of the system to assure that there is no leakage. Test by introducing air into the closed system at from 90 to 100 pounds per square inch (psi). Only if there is a pressure drop of <5 psi in 30 minutes may decontamination take place.

(iii) When there is no leakage, fill the piping and air lines with clean (containing <2 ppm PCBs) solvent. Solvents include PODF, aqueous potassium hydroxide at a pH between 9 and 12, or water containing 5 percent sodium hydroxide by weight.

(iv) Circulate the solvent to achieve turbulent flow through the piping and air lines in the air compressor system until the total volume of solvent circulated equals 10 times the total volume of the particular article being decontaminated, then drain the solvent. Calculate the total volume of solvent circulated by multiplying the pump rate by the time of pumping. Turbulent flow means a Reynolds number range from 20,000 to 43,000. Refill the system with clean solvent and repeat the circulation and drain process.

(6) Any person using thermal processes to decontaminate metal surfaces in contact with PCBs, as required by § 761.62(a)(6), must use one of the following options:

(i) Surfaces in contact with liquid and non-liquid PCBs at concentrations <500 ppm may be decontaminated in a

scrap metal recovery oven or smelter for purposes of disposal in accordance with § 761.72.

(ii) Surfaces in contact with liquid or non-liquid PCBs at concentrations ≥500 ppm may be smelted in a smelter operating in accordance with § 761.72(b), but must first be decontaminated in accordance with § 761.72(a) or to a surface concentration of <100 µg/100 cm².

(d) *Decontamination solvents.* (1) Unless otherwise provided in paragraphs (c)(3) through (c)(5) of this section, the solubility of PCBs in any solvent used for purposes of decontamination under this section must be 5 percent or more by weight.

(2) The solvent may be reused for decontamination so long as its PCB concentration is <50 ppm.

(3) Solvent shall be disposed of under paragraph (g) of this section.

(4) Other than as allowed in paragraphs (c)(3) and (c)(4) of this section, solvents may be tested and validated for performance-based decontamination of non-porous surfaces contaminated with MODEF or other PCB liquids, in accordance with the self-implementing procedures found in subpart T of this part. Specific conditions for the performance-based testing from this validation are determined in the validation study.

(e) *Limitation of exposure and control of releases.* (1) Any person conducting decontamination activities under this section shall take necessary measures to protect against direct release of PCBs to the environment from the decontamination area.

(2) Persons participating in decontamination activities shall wear or use protective clothing or equipment to protect against dermal contact or inhalation of PCBs or materials containing PCBs.

(f) *Sampling and recordkeeping.* (1) Confirmatory sampling is required under paragraph (b) of this section. For liquids described in paragraphs (b)(1) and (b)(2) of this section, sample in accordance with §§ 761.269 and 761.272. For non-porous surfaces and concrete described in paragraphs (b)(3) and (b)(4) of this section, sample in accordance with subpart P of this part. A written record of such sampling must be established and maintained for 3 years from the

date of any decontamination under this section. The record must show sampling locations and analytical results and must be retained at the site of the decontamination or a copy of the record must be made available to EPA in a timely manner, if requested. In addition, recordkeeping is required in accordance with §761.180(a) for all wastes generated by a decontamination process and regulated for disposal under this subpart.

(2) Confirmatory sampling is not required for self-implementing decontamination procedures under paragraph (c) of this section. Any person using these procedures must retain a written record documenting compliance with the procedures for 3 years after completion of the decontamination procedures (e.g., video recordings, photographs).

(g) *Decontamination waste and residues.* Decontamination waste and residues shall be disposed of at their existing PCB concentration unless otherwise specified.

(1) Distillation bottoms or residues and filter media are regulated for disposal as PCB remediation waste.

(2) PCBs physically separated from regulated waste during decontamination (such as by chopping, shredding, scraping, abrading or oil/water separation, as opposed to solvent rinsing and soaking), other than wastes described in paragraph (g)(1) of this section, are regulated for disposal at their original concentration.

(3) Hydrocarbon solvent used or reused for decontamination under this section that contains <50 ppm PCB must be burned and marketed in accordance with the requirements for used oil in §761.20(e), disposed of in accordance with §761.60(a) or (e), or decontaminated pursuant to this section.

(4) Chlorinated solvent at any PCB concentration used for decontamination under this section shall be disposed of in an incinerator operating in compliance with §761.70, or decontaminated pursuant to this section.

(5) Solvents ≥50 ppm other than those described in paragraphs (g)(3) and (g)(4) of this section shall be disposed of in accordance with §761.60(a) or decontaminated pursuant to this section.

(6) Non-liquid cleaning materials and personal protective equipment waste at any concentration, including non-porous surfaces and other non-liquid materials such as rags, gloves, booties, other disposable personal protective equipment, and similar materials resulting from decontamination shall be disposed of in accordance with §761.61(a)(5)(v).

(h) *Alternative decontamination or sampling approval.* (1) Any person wishing to decontaminate material described in paragraph (a) of this section in a manner other than prescribed in paragraph (b) of this section must apply in writing to the Regional Administrator in the Region where the activity would take place, for decontamination activity occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for decontamination activity occurring in more than one EPA Region. Each application must describe the material to be decontaminated and the proposed decontamination method, and must demonstrate that the proposed method is capable of decontaminating the material to the applicable level set out in paragraphs (b)(1) through (b)(4) of this section.

(2) Any person wishing to decontaminate material described in paragraph (a) of this section using a self-implementing procedure other than prescribed in paragraph (c) of this section must apply in writing to the Regional Administrator in the Region where the activity would take place, for decontamination activity occurring in a single EPA Region; or to the Director, Office of Resource Conservation and Recovery, for decontamination activity occurring in more than one EPA Region. Each application must describe the material to be decontaminated and the proposed self-implementing decontamination method and must include a proposed validation study to confirm performance of the method.

(3) Any person wishing to sample decontaminated material in a manner other than prescribed in paragraph (f) of this section must apply in writing to the Regional Administrator in the Region where the activity would take place, for decontamination activity occurring in a single EPA Region; or to

**Environmental Protection Agency**                          **§ 761.80**

the Director, Office of Resource Conservation and Recovery, for decontamination activity occurring in more than one EPA Region. Each application must contain a description of the material to be decontaminated, the nature and PCB concentration of the contaminating material (if known), the decontamination method, the proposed sampling procedure, and a justification for how the proposed sampling is equivalent to or more comprehensive than the sampling procedure required under paragraph (f) of this section.

(4) EPA may request additional information that it believes necessary to evaluate the application.

(5) EPA will issue a written decision on each application for risk-based decontamination or sampling. No person may conduct decontamination or sampling under this paragraph prior to obtaining written approval from EPA. EPA will approve an application if it finds that the proposed decontamination or sampling method will not pose an unreasonable risk of injury to health or the environment.

[63 FR 35457, June 29, 1998, as amended at 64 FR 33761, June 24, 1999; 72 FR 57240, Oct. 9, 2007; 74 FR 30233, June 25, 2009]

## Subpart E—Exemptions

**§ 761.80  Manufacturing, processing and distribution in commerce exemptions.**

(a) The Administrator grants the following petitioner(s) an exemption for 1 year to process and distribute in commerce PCBs for use as a mounting medium in microscopy:

(1) McCrone Accessories Components, Division of Walter C. McCrone Associates, Inc., 2820 South Michigan Avenue, Chicago, IL. 60616.

(2) [Reserved]

(b) The Administrator grants the following petitioner(s) an exemption for 1 year to process and distribute in commerce PCBs for use as a mounting medium in microscopy, an immersion oil in low fluorescence microscopy and an optical liquid:

(1) R.P. Cargille Laboratories, Inc., 55 Commerce Road, Cedar Grove, N.J. 07009.

(2) [Reserved]

(c) The Administrator grants the following petitioner(s) an exemption for 1 year to export PCBs for use in small quantities for research and development:

(1) Accu-Standard, New Haven, CT. 06503.

(2) ManTech, Research Triangle Park, NC 27709.

(d) The Administrator grants the following petitioner(s) an exemption for 1 year to import (manufacture) into the United States, small quantities of existing PCB fluids from electrical equipment for analysis:

(1) Unison Transformer Services, Inc., Tarrytown, N.Y. 10591, provided each of the following conditions are met:

(i) The samples must be shipped in 5.0 ml or less, hermetically sealed vials.

(ii) The exemption is limited to no more than 250 total samples per year.

(iii) Unison makes quarterly inspections of its laboratories to ensure that proper safety procedures are being followed.

(iv) Unison annually notifies and describes to EPA its attempts to have samples analyzed abroad.

(2) [Reserved]

(e) The Administrator grants a class exemption to all research and development (R&D) facilities for a period of 1 year to manufacture or import PCBs for use solely in the manufacturer or importer's own research for the development of PCB disposal technologies. Each person that wishes to be part of the exemption must meet the following conditions:

(1) A petition for an exemption from the PCB prohibition on manufacture PCBs must be received by EPA 60 days prior to engaging in these activities.

(2) Requests for renewal must be filed pursuant to § 750.11 of this chapter. EPA will deem any properly filed request for the renewal of the exemption by any member of the class as a renewal request for the entire class.

(3) The quantity of the PCBs manufactured annually must not exceed 500 grams by total weight of pure PCBs. Any person who wishes to manufacture or import more than 500 grams of PCBs in 1 year must receive written approval from the Director, National Program

235

Chemicals Division to exceed the limitations established by this provision. The Director, National Program Chemicals Division may grant approval without further rulemaking. Any increase granted will be in writing and will extend only for a maximum of the time remaining in a specific exemption year.

(4) The owner or operator of the facility must notify the EPA Regional Administrator in writing 30 days prior to the commencement of R&D activities that include the manufacture or import of PCBs under the exemption, unless the facility has obtained a PCB R&D approval from EPA pursuant to § 761.60(e), § 761.60(i)(2), § 761.70(a), or § 761.70(b) and the approval contains a provision allowing the manufacture of PCBs.

(5) Records are maintained of their PCB activities for a period of 3 years after ceasing operations. The records must include the sources and the annual amounts of PCBs received if imported and the type and annual amount of PCBs that were manufactured.

(6) All PCBs and materials containing PCBs, regardless of concentration, remaining from the disposal-related studies must be disposed of according to § 761.60(j)(1)(vi), or decontaminated pursuant to § 761.79, based on the original PCB concentration.

(f) The Administrator grants the following petitioner(s) an exemption for 1 year to manufacture PCBs for use in small quantities for research and development:

(1) California Bionuclear Corp., Sun Valley, CA 91352 (ME–13).

(2) Foxboro Co., North Haven, CT 06473 (ME–6).

(3) ULTRA-Scientific, Inc.,Hope, RI 02831 (ME–99.1).

(4) Midwest Research Institute, Kansas City, MO 64110 (ME–70.1).

(5) Pathfinder Laboratories, St. Louis, MO 63146 (A division of Sigma Aldridge Corporation, St. Louis, MO, 63178 (ME–76).

(6) Radian Corp., Austin, TX 78766 (ME–81.2).

(7) Wellington Sciences USA, College Station, TX 77840 (ME–104.1).

(8) Accu-Standard, 25 Science Park, New Haven, CT. 06503.

(g) The Administrator grants a class exemption to all processors and distributors of PCBs in small quantities for research and development provided that the following conditions are met:

(1) All processors and distributors must maintain records of their PCB activities for a period of 5 years.

(2) Any person or company which expects to process or distribute in commerce 100 grams (.22 lb) or more PCBs in 1 year must report to EPA identifying the sites of PCB activities and the quantity of PCBs to be processed or distributed in commerce.

(h) The Administrator grants the following petitioners an exemption for 1 year to process and distribute in commerce PCBs for analytical reference samples derived from actual waste materials:

(1) R.T. Corporation, Laramie, WY 82070.

(2) [Reserved]

(i) The Administrator grants a class exemption to all persons who manufacture, import, process, distribute in commerce, or export PCBs, or analytical reference samples derived from PCB waste material, provided the PCBs are manufactured, imported, processed, distributed in commerce, or exported solely for the purpose of R&D and the following conditions are met:

(1) Notification in the form of a petition for an exemption from the PCB prohibitions on manufacture, import, processing, distribution in commerce, or export is received by EPA 60 days prior to engaging in these activities.

(2) Requests for renewal are filed pursuant to §§ 750.11 and 750.31 of this chapter. EPA will deem any properly filed request for the renewal of the exemption by any member of the class as a renewal request for the entire class.

(3) The PCBs are packaged in one or more hermetically sealed containers of a volume of no more than 5.0 ml each. Analytical reference samples derived from PCB waste material may be packaged in a container larger than 5.0 ml when packaged pursuant to applicable DOT performance standards.

(4) The quantity of PCBs manufactured, imported, processed, distributed in commerce, or exported annually must not exceed 500 grams by total weight of pure PCBs. Any person who

**Environmental Protection Agency**                              **§ 761.80**

expects to manufacture, import, process, distribute in commerce, or export more than 500 grams of PCBs in 1 year or to exceed the 5.0 ml packaging requirement must obtain a written approval from the Director, National Program Chemicals Division and must identify the sites of PCB activities and the quantity of PCBs to be manufactured, imported, processed, distributed in commerce, or exported. Each request must include a justification. The Director, National Program Chemicals Division, may grant approval without further rulemaking. Any increase granted will be in writing and will extend only for a maximum of the time remaining in a specific exemption year.

(5) All treated and untreated PCB regulated material and material coming into contact with regulated material must be stored and disposed of according to subpart D of this part, or decontaminated pursuant to § 761.79.

(6) All PCB materials must be distributed in DOT-authorized packaging.

(7) Records are maintained of their PCB activities for a period of 3 years after ceasing operations. The records must include the sources and the annual amounts of PCBs received if imported, the annual amount of PCBs that were manufactured, the annual amount of PCBs that were processed and/or distributed in commerce (to include export), and the persons to whom the PCBs were shipped.

(j) The Administrator grants the United States Defense Logistics Agency's April 23, 2013 petition for an exemption for 1 year beginning on October 1, 2014, to import up to 1,014,222 pounds of PCBs and PCB Items stored or in use in Japan as identified in its petition for disposal.

(k)–(l) [Reserved]

(m) The Administrator grants the following petitioner(s) an exemption for 1 year to process and export small quantities of PCBs for research and development:

(1) Chem Service, Inc., West Chester, PA 19380 (PDE–41).

(2) Foxboro Co., North Haven, CT 06473 (ME–6).

(3) PolyScience Corp., Niles, IL 60648 (PDE–178).

(4) ULTRA-Scientific, Inc., Hope, RI 02831 (PDE–282.1).

(5) Supelco, Inc., Bellefonte, PA 16823–0048 (PDE–41.2).

(6) Radian Corp., Austin, TX 78766 (PDE–182.1).

(7) Restek Corporation, Bellefonte, PA

(n) The 1-year exemption granted to petitioners in paragraphs (a) through (c)(1), (d), (f), and (m)(1) through (m)(6) of this section shall be renewed automatically as long as there is no increase in the amount of PCBs to be processed and distributed, imported (manufactured), or exported, nor any change in the manner of processing and distributing, importing (manufacturing), or exporting of PCBs. If there is such a change, a new exemption petition must be submitted to EPA and it will be addressed through an exemption rulemaking. In such a case, the activities granted under the existing exemption may continue until the new petition is addressed by rulemaking, but must conform to the terms of the existing exemption approved by EPA. The 1-year exemption granted to petitioners in paragraphs (c)(2), (h) and (m)(7) of this section may be extended pursuant to 40 CFR 750.11(e) or 750.31(e).

(o) The 1-year class exemption granted to all processors and distributors of PCBs in small quantities for research and development in paragraph (g) of this section shall be renewed automatically unless information is submitted affecting EPA's conclusion that the class exemption, or the activities of any individual or company included in the exemption, will not pose an unreasonable risk of injury to health or the environment. EPA will evaluate the information, issue a proposed rule for public comment, and issue a final rule affecting the class exemption or individuals or companies included in the class exemption. Until EPA issues a final rule, individuals and companies included in the class exemption will be allowed to continue processing and distributing PCBs in small quantities for research and development.

[55 FR 38999, Sept. 24, 1990, as amended at 59 FR 16998, Apr. 11, 1994; 63 FR 35460, June 29, 1998; 68 FR 4941, Jan. 31, 2003; 72 FR 53158, Sept. 18, 2007; 79 FR 58270, Sept. 29, 2014]

§ 761.91                                    40 CFR Ch. I (7-1-19 Edition)

## Subpart F—Transboundary Shipments of PCBs for Disposal

Source: 61 FR 11107, Mar. 18, 1996, unless otherwise noted.

### § 761.91 Applicability.

This subpart establishes requirements under section 6 of TSCA applicable to the transboundary shipments of PCBs and PCB Items into and out of the United States for disposal. Nothing in this subpart is intended to obviate or otherwise alter obligations applicable to imported or exported PCBs and PCB Items under foreign laws, international agreements or arrangements, other United States statutes and regulations, other sections of TSCA (e.g., sections 13 and 14), or laws of the various States of the United States. No provision of this section shall be construed to affect or limit the applicability of any requirement applicable to transporters of PCB waste under regulations issued by the U.S. Department of Transportation (DOT) and set forth at 49 CFR parts 171-180.

### § 761.93 Import for disposal.

(a) *General provisions.* No person may import PCBs or PCB Items for disposal without an exemption issued under the authority of TSCA section 6(e)(3).

(b) [Reserved]

[63 FR 35460, June 29, 1998]

### § 761.97 Export for disposal.

(a) General provisions. No person may export PCBs or PCB Items for disposal without an exemption, except that:

(1) PCBs and PCB Items at concentrations <50 ppm (or <10 µg PCB/100 cm² if no free-flowing liquids are present) may be exported for disposal.

(2) For the purposes of this section, PCBs and PCB Items of unknown concentrations shall be treated as if they contain ≥50 ppm.

(b) [Reserved]

[61 FR 11107, Mar. 18, 1996, as amended at 63 FR 35460, June 29, 1998]

### § 761.99 Other transboundary shipments.

For purposes of this subpart, the following transboundary shipments are not considered exports or imports:

(a) PCB waste generated in the United States, transported outside the Customs Territory of the United States (including any residuals resulting from cleanup of spills of such wastes in transit) through another country or its territorial waters, or through international waters, and returned to the United States for disposal.

(b) PCB waste in transit, including any residuals resulting from cleanup of spills during transit, through the United States (e.g., from Mexico to Canada, from Canada to Mexico).

(c) PCB waste transported from any State to any other State for disposal, regardless of whether the waste enters or leaves the customs territory of the United States, provided that the PCB waste or the PCBs from which the waste was derived were present in the United States on January 1, 1979, and have remained within the United States since that date.

[63 FR 35461, June 29, 1998, as amended at 66 FR 17478, Mar. 30, 2001]

## Subpart G—PCB Spill Cleanup Policy

Source: 52 FR 10705, Apr. 2, 1987, unless otherwise noted.

### § 761.120 Scope.

(a) *General.* This policy establishes criteria EPA will use to determine the adequacy of the cleanup of spills resulting from the release of materials containing PCBs at concentrations of 50 ppm or greater. The policy applies to spills which occur after May 4, 1987.

(1) Existing spills (spills which occurred prior to May 4, 1987, are excluded from the scope of this policy for two reasons:

(i) For old spills which have already been discovered, this policy is not intended to require additional cleanup where a party has already cleaned a spill in accordance with requirements imposed by EPA through its regional offices, nor is this policy intended to

interfere with ongoing litigation of enforcement actions which bring into issue PCB spills cleanup.

(ii) EPA recognizes that old spills which are discovered after the effective date of this policy will require site-by-site evaluation because of the likelihood that the site involves more pervasive PCB contamination than fresh spills and because old spills are generally more difficult to clean up than fresh spills (particularly on porous surfaces such as concrete). Therefore, spills which occurred before the effective date of this policy are to be decontaminated to requirements established at the discretion of EPA, usually through its regional offices.

(2) EPA expects most PCB spills subject to the TSCA PCB regulations to conform to the typical spill situations considered in developing this policy. This policy does, however, exclude from application of the final numerical cleanup standards certain spill situations from its scope: Spills directly into surface waters, drinking water, sewers, grazing lands, and vegetable gardens. These types of spills are subject to final cleanup standards to be established at the discretion of the regional office. These spills are, however, subject to the immediate notification requirements and measures to minimize further environmental contamination.

(3) For all other spills, EPA generally expects the decontamination standards of this policy to apply. Occasionally, some small percentage of spills covered by this policy may warrant more stringent cleanup requirements because of additional routes of exposure or significantly greater exposures than those assumed in developing the final cleanup standards of this policy. While the EPA regional offices have the authority to require additional cleanup in these circumstances, the Regional Administrator must first make a finding based on the specific facts of a spill that additional cleanup must occur to prevent unreasonable risk. In addition, before a final decision is made to require additional cleanup, the Regional Administrator must notify the Director, Office of Resource Conservation and Recovery of his/her finding and the basis for the finding.

(4) There may also be exceptional spill situations that requires less stringent cleanup or a different approach to cleanup because of factors associated with the particular spill. These factors may mitigate expected exposures and risks or make cleanup to these requirements impracticable.

(b) *Spills that may require more stringent cleanup levels.* For spills within the scope of this policy, EPA generally retains, under §761.135, the authority to require additional cleanup upon finding that, despite good faith efforts by the responsible party, the numerical decontamination levels in the policy have not been met. In addition, EPA foresees the possibility of exceptional spill situations in which site-specific risk factors may warrant additional cleanup to more stringent numerical decontamination levels than are required by the policy. In these situations, the Regional Administrator has the authority to require cleanup to levels lower than those included in this policy upon finding that further cleanup must occur to prevent unreasonable risk. The Regional Administrator will consult with the Director, Office of Resource Conservation and Recovery, prior to making such a finding.

(1) For example, site-specific characteristics, such as short depth to ground water, type of soil, or the presence of a shallow well, may pose exceptionally high potential for ground water contamination by PCBs remaining after cleanup to the standards specified in this policy. Spills that pose such a high degree of potential for ground water contamination have not been excluded from the policy under paragraph (d) of this section because the presence of such potential may not be readily apparent. EPA feels that automatically excluding such spills from the scope of the policy could result in the delay of cleanup—a particularly undesirable outcome if potential ground water contamination is, in fact, a significant concern.

(2) In those situations, the Regional Administrator may require cleanup in addition to that required under §761.125(b) and (c). However, the Regional Administrator must first make a finding, based on the specific facts of

a spill, that additional cleanup is necessary to prevent unreasonable risk. In addition, before making a final decision on additional cleanup, the Regional Administrator must notify the Director, Office of Resource Conservation and Recovery of his finding and the basis for the finding.

(c) *Flexibility to allow less stringent or alternative requirements.* EPA retains the flexibility to allow less stringent or alternative decontamination measures based upon site-specific considerations. EPA will exercise this flexibility if the responsible party demonstrates that cleanup to the numerical decontamination levels is clearly unwarranted because of risk-mitigating factors, that compliance with the procedural requirements or numerical standards in the policy is impracticable at a particular site, or that site-specific characteristics make the costs of cleanup prohibitive. The Regional Administrator will notify the Director, Office of Resource Conservation and Recovery of any decision and the basis for the decision to allow less stringent cleanup. The purpose of this notification is to enable the Director, Office of Resource Conservation and Recovery to ensure consistency of spill cleanup standards under special circumstances across the regions.

(d) *Excluded spills.* (1) Although the spill situations in paragraphs (d)(2) (i) through (vi) of this section are excluded from the automatic application of final decontamination standards under § 761.125 (b) and (c), the general requirements under § 761.125(a) do apply to these spills. In addition, all of these excluded situations require practicable, immediate actions to contain the area of contamination. While these situations may not always require more stringent cleanup measures, the Agency is excluding these scenarios because they will always involve significant factors that may not be adequately addressed by cleanup standards based upon typical spill characteristics.

(2) For the spill situations in paragraphs (d)(2)(i) through (vi) of this section, the responsible party shall decontaminate the spill in accordance with site-specific requirements established by the EPA regional offices.

(i) Spills that result in the direct contamination of surface waters (surface waters include, but are not limited to, "waters of the United States" as defined in part 122 of this chapter, ponds, lagoons, wetlands, and storage reservoirs).

(ii) Spills that result in the direct contamination of sewers or sewage treatment systems.

(iii) Spills that result in the direct contamination of any private or public drinking water sources or distribution systems.

(iv) Spills which migrate to and contaminate surface waters, sewers, or drinking water supplies before cleanup has been completed in accordance with this policy.

(v) Spills that contaminate animal grazing lands.

(vi) Spills that contaminate vegetable gradens.

(e) *Relationship of policy to other statutes.* (1) This policy does not affect cleanup standards or requirements for the reporting of spills imposed, or to be imposed, under other Federal statutory authorities, including but not limited to, the Clean Water Act (CWA), the Resource Conservation and Recovery Act (RCRA), and the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA) as amended by the Superfund Amendments and Reauthorization Act (SARA). Where more than one requirement applies, the stricter standard must be met.

(2) The Agency recognizes that the existence of this policy will inevitably result in attempts to apply the standards to situations within the scope of other statutory authorities. However, other statutes require the Agency to consider different or alternative factors in determining appropriate corrective actions. In addition, the types and magnitudes of exposures associated with sites requiring corrective action under other statutes often involve important differences from those expected of the typical, electrical equipment-type spills considered in developing this policy. Thus, cleanups under other statutes, such as RCRA corrective actions or remedial and response