actions under SARA may result in different outcomes.

[52 FR 10705, Apr. 2, 1987, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30234, June 25, 2009]

### §761.123 Definitions.

For purposes of this policy, certain words and phrases are used to denote specific materials, procedures, or circumstances. The following definitions are provided for purposes of clarity and are not to be taken as exhaustive lists of situations and materials covered by the policy.

*Double wash/rinse* means a minimum requirement to cleanse solid surfaces (both impervious and nonimpervious) two times with an appropriate solvent or other material in which PCBs are at least 5 percent soluble (by weight). A volume of PCB-free fluid sufficient to cover the contaminated surface completely must be used in each wash/rinse. The wash/rinse requirement does not mean the mere spreading of solvent or other fluid over the surface, nor does the requirement mean a once-over wipe with a soaked cloth. Precautions must be taken to contain any runoff resulting from the cleansing and to dispose properly of wastes generated during the cleansing.

*High-concentration PCBs* means PCBs that contain 500 ppm or greater PCBs, or those materials which EPA requires to be assumed to contain 500 ppm or greater PCBs in the absence of testing.

*High-contact industrial surface* means a surface in an industrial setting which is repeatedly touched, often for relatively long periods of time. Manned machinery and control panels are examples of high-contact industrial surfaces. High-contact industrial surfaces are generally of impervious solid material. Examples of low-contact industrial surfaces include ceilings, walls, floors, roofs, roadways and sidewalks in the industrial area, utility poles, unmanned machinery, concrete pads beneath electrical equipment, curbing, exterior structural building components, indoor vaults, and pipes.

*High-contact residential/commercial surface* means a surface in a residential/commercial area which is repeatedly touched, often for relatively long periods of time. Doors, wall areas below 6 feet in height, uncovered flooring, windowsills, fencing, bannisters, stairs, automobiles, and children's play areas such as outdoor patios and sidewalks are examples of high-contact residential/commercial surfaces. Examples of low-contact residential/commercial surfaces include interior ceilings, interior wall areas above 6 feet in height, roofs, asphalt roadways, concrete roadways, wooden utility poles, unmanned machinery, concrete pads beneath electrical equipment, curbing, exterior structural building components (e.g., aluminum/vinyl siding, cinder block, asphalt tiles), and pipes.

*Impervious solid surfaces* means solid surfaces which are nonporous and thus unlikely to absorb spilled PCBs within the short period of time required for cleanup of spills under this policy. Impervious solid surfaces include, but are not limited to, metals, glass, aluminum siding, and enameled or laminated surfaces.

*Low-concentration PCBs* means PCBs that are tested and found to contain less than 500 ppm PCBs, or those PCB-containing materials which EPA requires to be assumed to be at concentrations below 500 ppm (i.e., untested mineral oil dielectric fluid).

*Nonimpervious solid surfaces* means solid surfaces which are porous and are more likely to absorb spilled PCBs prior to completion of the cleanup requirements prescribed in this policy. Nonimpervious solid surfaces include, but are not limited to, wood, concrete, asphalt, and plasterboard.

*Nonrestricted access areas* means any area other than restricted access, outdoor electrical substations, and other restricted access locations, as defined in this section. In addition to residential/commercial areas, these areas include unrestricted access rural areas (areas of low density development and population where access is uncontrolled by either man-made barriers or naturally occurring barriers, such as rough terrain, mountains, or cliffs).

*Other restricted access (nonsubstation) locations* means areas other than electrical substations that are at least 0.1 kilometer (km) from a residential/commercial area and limited by man-made

barriers (e.g., fences and walls) to substantially limited by naturally occurring barriers such as mountains, cliffs, or rough terrain. These areas generally include industrial facilities and extremely remote rural locations. (Areas where access is restricted but are less than 0.1 km from a residential/commercial area are considered to be residential/commercial areas.)

*Outdoor electrical substations* means outdoor, fenced-off, and restricted access areas used in the transmission and/or distribution of electrical power Outdoor electrical substations restrict public access by being fenced or walled off as defined under §761.30(l)(1)(ii). For purposes of this TSCA policy, outdoor electrical substations are defined as being located at least 0.1 km from a residential/commercial area. Outdoor fenced-off and restricted access areas used in the transmission and/or distribution of electrical power which are located less than 0.1. km from a residential/commercial area are considered to be residential/commercial areas.

*PCBs* means polychlorinated biphenyls as defined under §761.3. As specified under §761.1(b), no requirements may be avoided through dilution of the PCB concentration.

*Requirements and standards* means:

(1) "Requirements" as used in this policy refers to both the procedural responses and numerical decontamination levels set forth in this policy as constituting adequate cleanup of PCBs.

(2) "Standards" refers to the numerical decontamination levels set forth in this policy.

*Residential/commercial areas* means those areas where people live or reside, or where people work in other than manufacturing or farming industries. Residential areas include housing and the property on which housing is located, as well as playgrounds, roadways, sidewalks, parks, and other similar areas within a residential community. Commercial areas are typically accessible to both members of the general public and employees and include public assembly properties, institutional properties, stores, office buildings, and transportation centers.

*Responsible party* means the owner of the PCB equipment, facility, or other source of PCBs or his/her designated agent (e.g., a facility manager or foreman).

*Soil* means all vegetation, soils and other ground media, including but not limited to, sand, grass, gravel, and oyster shells. It does not include concrete and asphalt.

*Spill* means both intentional and unintentional spills, leaks, and other uncontrolled discharges where the release results in any quantity of PCBs running off or about to run off the external surface of the equipment or other PCB source, as well as the contamination resulting from those releases. This policy applies to spills of 50 ppm or greater PCBs. The concentration of PCBs spilled is determined by the PCB concentration in the material spilled as opposed to the concentration of PCBs in the material onto which the PCBs were spilled. Where a spill of untested mineral oil occurs, the oil is presumed to contain greater than 50 ppm, but less than 500 ppm PCBs and is subject to the relevant requirements of this policy.

*Spill area* means the area of soil on which visible traces of the spill can be observed plus a buffer zone of 1 foot beyond the visible traces. Any surface or object (e.g., concrete sidewalk or automobile) within the visible traces area or on which visible traces of the spilled material are observed is included in the spill area. This area represents the minimum area assumed to be contaminated by PCBs in the absence of precleanup sampling data and is thus the minimum area which must be cleaned.

*Spill boundaries* means the actual area of contamination as determined by postcleanup verification sampling or by precleanup sampling to determine actual spill boundaries. EPA can require additional cleanup when necessary to decontaminate all areas within the spill boundaries to the levels required in this policy (e.g., additional cleanup will be required if postcleanup sampling indicates that the area decontaminated by the responsible party, such as the spill area as defined in this section, did not encompass the actual boundaries of PCB contamination).

*Standard wipe test* means, for spills of high-concentration PCBs on solid surfaces, a cleanup to numerical surface

standards and sampling by a standard wipe test to verify that the numerical standards have been met. This definition constitutes the minimum requirements for an appropriate wipe testing protocol. A standard-size template (10 centimeters (cm) × 10 cm) will be used to delineate the area of cleanup; the wiping medium will be a gauze pad or glass wool of known size which has been saturated with hexane. It is important that the wipe be performed very quickly after the hexane is exposed to air. EPA strongly recommends that the gauze (or glass wool) be prepared with hexane in the laboratory and that the wiping medium be stored in sealed glass vials until it is used for the wipe test. Further, EPA requires the collection and testing of field blanks and replicates.

[52 FR 10705, Apr. 2, 1987; 52 FR 23397, June 19, 1987]

**§ 761.125 Requirements for PCB spill cleanup.**

(a) *General.* Unless expressly limited, the reporting, disposal, and precleanup sampling requirements in paragraphs (a) (1) through (3) of this section apply to all spills of PCBs at concentrations of 50 ppm or greater which are subject to decontamination requirements under TSCA, including those spills listed under § 761.120(b) which are excluded from the cleanup standards at paragraphs (b) and (c) of this section.

(1) *Reporting requirements.* The reporting in paragraphs (a)(1) (i) through (iv) of this section is required in addition to applicable reporting requirements under the Clean Water Act (CWA) or the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA). For example, under the National Contingency Plan all spills involving 1 pound or more by weight of PCBs must currently be reported to the National Response Center (1-800-424-8802). The requirements in paragraphs (a)(1) (i) through (iv) of this section are designed to be consistent with existing reporting requirements to the extent possible so as to minimize reporting burdens on governments as well as the regulated community.

(i) Where a spill directly contaminates surface water, sewers, or drinking water supplies, as discussed under § 761.120(d), the responsible party shall notify the appropriate EPA regional office and obtain guidance for appropriate cleanup measures in the shortest possible time after discovery, but in no case later than 24 hours after discovery.

(ii) Where a spill directly contaminates grazing lands or vegetable gardens, as discussed under § 761.120(d), the responsible party shall notify the appropriate EPA regional office and proceed with the immediate requirements specified under paragraph (b) or (c) of this section, depending on the source of the spill, in the shortest possible time after discovery, but in no case later than 24 hours after discovery.

(iii) Where a spill exceeds 10 pounds of PCBs by weight and is not addressed in paragraph (a)(1) (i) or (ii) of this section, the responsible party will notify the appropriate EPA regional office and proceed to decontaminate the spill area in accordance with this TSCA policy in the shortest possible time after discovery, but in no case later than 24 hours after discovery.

(iv) Spills of 10 pounds or less, which are not addressed in paragraph (a)(1) (i) or (ii) of this section, must be cleaned up in accordance with this policy (in order to avoid EPA enforcement liability), but notification of EPA is not required.

(2) *Disposal of cleanup debris and materials.* All concentrated soils, solvents, rags, and other materials resulting from the cleanup of PCBs under this policy shall be properly stored, labeled, and disposed of in accordance with the provisions of subpart D of this part.

(3) *Determination of spill boundaries in the absence of visible traces.* For spills where there are insufficient visible traces yet there is evidence of a leak or spill, the boundaries of the spill are to be determined by using a statistically based sampling scheme.

(b) *Requirements for cleanup of low-concentration spills which involve less than 1 pound of PCBs by weight (less than 270 gallons of untested mineral oil)*—(1) *Decontamination requirements.* Spills of less than 270 gallons of untested mineral oil, low-concentration PCBs, as defined under § 761.123, which involve less than 1 pound of PCBs by weight (e.g., less than 270 gallons of untested

mineral oil containing less than 500 ppm PCBs) shall be cleaned in the following manner:

(i) Solid surfaces must be double washed/rinsed (as defined under § 761.123); except that all indoor, residential surfaces other than vault areas must be cleaned to 10 micrograms per 100 square centimeters (10 μg/100 $cm^2$) by standard commercial wipe tests.

(ii) All soil within the spill area (i.e., visible traces of soil and a buffer of 1 lateral foot around the visible traces) must be excavated, and the ground be restored to its original configuration by back-filling with clean soil (i.e., containing less than 1 ppm PCBs).

(iii) Requirements of paragraphs (b)(1) (i) and (ii) of this section must be completed within 48 hours after the responsible party was notified or became aware of the spill.

(2) *Effect of emergency or adverse weather.* Completion of cleanup may be delayed beyond 48 hours in case of circumstances including but not limited to, civil emergency, adverse weather conditions, lack of access to the site, and emergency operating conditions. The occurrence of a spill on a weekend or overtime costs are not acceptable reasons to delay response. Completion of cleanup may be delayed only for the duration of the adverse conditions. If the adverse weather conditions, or time lapse due to other emergency, has left insufficient visible traces, the responsible party must use a statistically based sampling scheme to determine the spill boundaries as required under paragraph (a)(3) of this section.

(3) *Records and certification.* At the completion of cleanup, the responsible party shall document the cleanup with records and certification of decontamination. The records and certification must be maintained for a period of 5 years. The records and certification shall consist of the following:

(i) Identification of the source of the spill (e.g., type of equipment).

(ii) Estimated or actual date and time of the spill occurrence.

(iii) The date and time cleanup was completed or terminated (if cleanup was delayed by emergency or adverse weather: the nature and duration of the delay).

(iv) A brief description of the spill location.

(v) Precleanup sampling data used to establish the spill boundaries if required because of insufficient visible traces, and a brief description of the sampling methodology used to establish the spill boundaries.

(vi) A brief description of the solid surfaces cleaned and of the double wash/rinse method used.

(vii) Approximate depth of soil excavation and the amount of soil removed.

(viii) A certification statement signed by the responsible party stating that the cleanup requirements have been met and that the information contained in the record is true to the best of his/her knowledge.

(ix) While not required for compliance with this policy, the following information would be useful if maintained in the records:

(A) Additional pre- or post-cleanup sampling.

(B) The estimated cost of the cleanup by man-hours, dollars, or both.

(c) *Requirements for cleanup of high-concentration spills and low-concentration spills involving 1 pound or more PCBs by weight (270 gallons or more of untested mineral oil).* Cleanup of low-concentration spills involving 1 lb or more PCBs by weight and of all spills of materials other than low-concentration materials shall be considered complete if all of the immediate requirements, cleanup standards, sampling, and recordkeeping requirements of paragraphs (c) (1) through (5) of this section are met.

(1) *Immediate requirements.* The four actions in paragraphs (c)(1) (i) through (iv) of this section must be taken as quickly as possible and within no more than 24 hours (or within 48 hours for PCB Transformers) after the responsible party was notified or became aware of the spill, except that actions described in paragraphs (c)(1) (ii) through (iv) of this section can be delayed beyond 24 hours if circumstances (e.g., civil emergency, hurricane, tornado, or other similar adverse weather conditions, lack of access due to physical impossibility, or emergency operating conditions) so require for the duration of the adverse conditions. The occurrence of a spill on a weekend or

overtime costs are not acceptable reasons to delay response. Owners of spilled PCBs who have delayed cleanup because of these types of circumstances must keep records documenting the fact that circumstances precluded rapid response.

(i) The responsible party shall notify the EPA regional office and the NRC as required by §761.125(a)(1) or by other applicable statutes.

(ii) The responsible party shall effectively cordon off or otherwise delineate and restrict an area encompassing any visible traces plus a 3-foot buffer and place clearly visible signs advising persons to avoid the area to minimize the spread of contamination as well as the potential for human exposure.

(iii) The responsible party shall record and document the area of visible contamination, noting the extent of the visible trace areas and the center of the visible trace area. If there are no visible traces, the responsible party shall record this fact and contact the regional office of the EPA for guidance in completing statistical sampling of the spill area to establish spill boundaries.

(iv) The responsible party shall initiate cleanup of all visible traces of the fluid on hard surfaces and initiate removal of all visible traces of the spill on soil and other media, such as gravel, sand, oyster shells, etc.

(v) If there has been a delay in reaching the site and there are insufficient visible traces of PCBs remaining at the spill site, the responsible party must estimate (based on the amount of material missing from the equipment or container) the area of the spill and immediately cordon off the area of suspect contamination. The responsible party must then utilize a statistically based sampling scheme to identify the boundaries of the spill area as soon as practicable.

(vi) Although this policy requires certain immediate actions, as described in paragraphs (c)(1)(i) through (iv) of this section, EPA is not placing a time limit on completion of the cleanup effort since the time required for completion will vary from case to case. However, EPA expects that decontamination will be achieved promptly in all cases and will consider promptness of completion in determining whether the responsible party made good faith efforts to clean up in accordance with this policy.

(2) *Requirements for decontaminating spills in outdoor electrical substations.* Spills which occur in outdoor electrical substations, as defined under §761.123, shall be decontaminated in accordance with paragraphs (c)(2) (i) and (ii) of this section. Conformance to the cleanup standards under paragraphs (c)(2) (i) and (ii) of this section shall be verified by post-cleanup sampling as specified under §761.130. At such times as outdoor electrical substations are converted to another use, the spill site shall be cleaned up to the nonrestricted access requirements under paragraph (c)(4) of this section.

(i) Contaminated solid surfaces (both impervious and non-impervious) shall be cleaned to a PCB concentration of 100 micrograms (μg)/100 square centimeters ($cm^2$) (as measured by standard wipe tests).

(ii) At the option of the responsible party, soil contaminated by the spill will be cleaned either to 25 ppm PCBs by weight, or to 50 ppm PCBs by weight provided that a label or notice is visibly placed in the area. Upon demonstration by the responsible party that cleanup to 25 ppm or 50 ppm will jeopardize the integrity of the electrical equipment at the substation, the EPA regional office may establish an alternative cleanup method or level and place the responsible party on a reasonably timely schedule for completion of cleanup.

(3) *Requirements for decontaminating spills in other restricted access areas.* Spills which occur in restricted access locations other than outdoor electrical substations, as defined under §761.123, shall be decontaminated in accordance with paragraphs (c)(3) (i) through (v) of this section. Conformance to the cleanup standards in paragraphs (c)(3) (i) through (v) of this section shall be verified by postcleanup sampling as specified under §761.130. At such times as restricted access areas other than outdoor electrical substations are converted to another use, the spill site shall be cleaned up to the nonrestricted access area requirements of paragraph (c)(4) of this section.

(i) High-contact solid surfaces, as defined under § 761.163 shall be cleaned to 10 μg/100 $cm^2$ (as measured by standard wipe tests).

(ii) Low-contact, indoor, impervious solid surfaces will be decontaminated to 10 μg/100 $cm^2$.

(iii) At the option of the responsible party, low-contact, indoor, nonimpervious surfaces will be cleaned either to 10 μg/100 $cm^2$ or to 100 μg/100 $cm^2$ and encapsulated. The Regional Administrator, however, retains the authority to disallow the encapsulation option for a particular spill situation upon finding that the uncertainties associated with that option pose special concerns at that site. That is, the Regional Administrator would not permit encapsulation if he/she determined that if the encapsulation failed the failure would create an imminent hazard at the site.

(iv) Low-contact, outdoor surfaces (both impervious and nonimpervious) shall be cleaned to 100 μg/100 $cm^2$.

(v) Soil contaminated by the spill will be cleaned to 25 ppm PCBs by weight.

(4) *Requirements for decontaminating spills in nonrestricted access areas.* Spills which occur in nonrestricted access locations, as defined under § 761.123, shall be decontaminated in accordance with paragraphs (c)(4) (i) through (v) of this section. Conformance to the cleanup standards at paragraphs (c)(4) (i) through (v) of this section shall be verified by postcleanup sampling as specified under § 761.130.

(i) Furnishings, toys, and other easily replaceable household items shall be disposed of in accordance with the provisions of subpart D of this part and replaced by the responsible party.

(ii) Indoor solid surfaces and high-contact outdoor solid surfaces, defined as high contact residential/commercial surfaces under § 761.123, shall be cleaned to 10 μg/100 $cm^2$ (as measured by standard wipe tests).

(iii) Indoor vault areas and low-contact, outdoor, impervious solid surfaces shall be decontaminated to 10 μg/100 $cm^2$.

(iv) At the option of the responsible party, low-contact, outdoor, nonimpervious solid surfaces shall be either cleaned to 10 μg/100 $cm^2$ or cleaned to 100 μg/100 $cm^2$ and encapsulated. The Regional Administrator, however, retains the authority to disallow the encapsulation option for a particular spill situation upon finding that the uncertainties associated with that option pose special concerns at that site. That is, the Regional Administrator would not permit encapsulation if he/she determined that if the encapsulation failed the failure would create an imminent hazard at the site.

(v) Soil contaminated by the spill will be decontaminated to 10 ppm PCBs by weight provided that soil is excavated to a minimum depth of 10 inches. The excavated soil will be replaced with clean soil, i.e., containing less than 1 ppm PCBs, and the spill site will be restored (e.g., replacement of turf).

(5) *Records.* The responsible party shall document the cleanup with records of decontamination. The records must be maintained for a period of 5 years. The records and certification shall consist of the following:

(i) Identification of the source of the spill, e.g., type of equipment.

(ii) Estimated or actual date and time of the spill occurrence.

(iii) The date and time cleanup was completed or terminated (if cleanup was delayed by emergency or adverse weather: the nature and duration of the delay).

(iv) A brief description of the spill location and the nature of the materials contaminated. This information should include whether the spill occurred in an outdoor electrical substation, other restricted access location, or in a nonrestricted access area.

(v) Precleanup sampling data used to establish the spill boundaries if required because of insufficient visible traces and a brief description of the sampling methodology used to establish the spill boundaries.

(vi) A brief description of the solid surfaces cleaned.

(vii) Approximate depth of soil excavation and the amount of soil removed.

(viii) Postcleanup verification sampling data and, if not otherwise apparent from the documentation, a brief description of the sampling methodology and analytical technique used.

(ix) While not required for compliance with this policy, information on

the estimated cost of cleanup (by man-hours, dollars, or both) would be useful if maintained in the records.

[52 FR 10705, Apr. 2, 1987, as amended at 53 FR 40884, Oct. 19, 1988; 63 FR 35461, June 29, 1998; 72 FR 57241, Oct. 9, 2007]

**§761.130 Sampling requirements.**

Postcleanup sampling is required to verify the level of cleanup under §761.125(c) (2) through (4). The responsible party may use any statistically valid, reproducible, sampling scheme (either random samples or grid samples) provided that the requirements of paragraphs (a) and (b) of this section are satisfied.

(a) The sampling area is the greater of (1) an area equal to the area cleaned plus an additional 1-foot boundary, or (2) an area 20 percent larger than the original area of contamination.

(b) The sampling scheme must ensure 95 percent confidence against false positives.

(c) The number of samples must be sufficient to ensure that areas of contamination of a radius of 2 feet or more within the sampling area will be detected, except that the minimum number of samples is 3 and the maximum number of samples is 40.

(d) The sampling scheme must include calculation for expected variability due to analytical error.

(e) EPA recommends the use of a sampling scheme developed by the Midwest Research Institute (MRI) for use in enforcement inspections: "Verification of PCB Spill Cleanup by Sampling and Analysis." Guidance for the use of this sampling scheme is available in the MRI report "Field Manual for Grid Sampling of PCB Spill Sites to Verify Cleanup." Both the MRI sampling scheme and the guidance document are available on EPA's PCB Web site at *http://www.epa.gov/pcb*, or from the Program Management, Communications, and Analysis Office, Office of Resource Conservation and Recovery (5305P), 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001. The major advantage of this sampling scheme is that it is designed to characterize the degree of contamination within the entire sampling area with a high degree of confidence while using fewer samples than any other grid or random sampling scheme. This sampling scheme also allows some sites to be characterized on the basis of composite samples.

(f) EPA may, at its discretion, take samples from any spill site. If EPA's sampling indicates that the remaining concentration level exceeds the required level, EPA will require further cleanup. For this purpose, the numerical level of cleanup required for spills cleaned in accordance with §761.125(b) is deemed to be the equivalent of numerical cleanup requirements required for cleanups under §761.125(c) (2) through (4). Using its best engineering judgment, EPA may sample a statistically valid random or grid sampling technique, or both. When using engineering judgment or random "grab" samples, EPA will take into account that there are limits on the power of a grab sample to dispute statistically based sampling of the type required of the responsible party. EPA headquarters will provide guidance to the EPA regions on the degree of certainty associated with various grab sample results.

[52 FR 10705, Apr. 2, 1987, as amended at 60 FR 34465, July 3, 1995; 72 FR 57241, Oct. 9, 2007; 74 FR 30234, June 25, 2009]

**§761.135 Effect of compliance with this policy and enforcement.**

(a) Although a spill of material containing 50 ppm or greater PCBs is considered improper PCB disposal, this policy establishes requirements that EPA considers to be adequate cleanup of the spilled PCBs. Cleanup in accordance with this policy means compliance with the procedural as well as the numerical requirements of this policy. Compliance with this policy creates a presumption against both enforcement action for penalties and the need for further cleanup under TSCA. The Agency reserves the right, however, to initiate appropriate action to compel cleanup where, upon review of the records of cleanup or EPA sampling following cleanup, EPA finds that the decontamination levels in the policy have not been achieved. The Agency also reserves the right to seek penalties where the Agency believes that the responsible party has not made a good faith effort to comply with all

provisions of this policy, such as prompt notification of EPA of a spill, recordkeeping, etc.

(b) EPA's exercise of enforcement discretion does not preclude enforcement action under other provisions of TSCA or any other Federal statute. This includes, even in cases where the numerical decontamination levels set forth in this policy have been met, civil or criminal action for penalties where EPA believes the spill to have been the result of gross negligence or knowing violation.

## Subparts H–I [Reserved]

## Subpart J—General Records and Reports

### § 761.180 Records and monitoring.

This section contains recordkeeping and reporting requirements that apply to PCBs, PCB Items, and PCB storage and disposal facilities that are subject to the requirements of the part.

(a) *PCBs and PCB Items in service or projected for disposal.* Beginning February 5, 1990, each owner or operator of a facility, other than a commercial storer or a disposer of PCB waste, using or storing at any one time at least 45 kilograms (99.4 pounds) of PCBs contained in PCB Container(s), or one or more PCB Transformers, or 50 or more PCB Large High or Low Voltage Capacitors shall develop and maintain at the facility, or a central facility provided they are maintained at that facility, all annual records and the written annual document log of the disposition of PCBs and PCB Items. The written annual document log must be prepared for each facility by July 1 covering the previous calendar year (January through December). The annual document log shall be maintained for at least 3 years after the facility ceases using or storing PCBs and PCB Items in the quantities prescribed in this paragraph. Annual records (manifests and certificates of disposal) shall be maintained for the same period. The annual records and the annual document log shall be available for inspection at the facility where they are maintained by authorized representatives of EPA during normal business hours, and each owner or operator of a facility subject to these requirements shall know the location of these records. All records and annual documents required to be prepared and maintained by this section prior to February 5, 1990 shall continue to be maintained at the facility for the same time as the annual records and the annual document log. The annual document required for 1989 shall cover the period from January 1, 1989 to February 5, 1990.

(1) The annual records shall include the following:

(i) All signed manifests generated by the facility during the calendar year.

(ii) All Certificates of Disposal that have been received by the facility during the calendar year.

(iii) Records of inspections and cleanups performed in accordance with §761.65(c)(5).

(2) The written annual document log shall include the following:

(i) The name, address, and EPA identification number of the facility covered by the annual document log and the calendar year covered by the annual document log.

(ii) The unique manifest number of every manifest generated by the facility during the calendar year, and from each manifest and for unmanifested waste that may be stored at the facility, the following information:

(A) For bulk PCB waste (*e.g.*, in a tanker or truck), its weight in kilograms, the first date it was removed from service for disposal, the date it was placed into transport for off-site storage or disposal, and the date of disposal, if known.

(B) The serial number (if available) or other means of identifying each PCB Article (*e.g.*, transformer or capacitor), the weight in kilograms of the PCB waste in each transformer or capacitor, the date it was removed from service for disposal, the date it was placed in transport for off-site storage or disposal, and the date of disposal, if known.

(C) A unique number identifying each PCB Container, a description of the contents of each PCB Container, such as liquid, soil, cleanup debris, etc., including the total weight of the material in kilograms in each PCB Container, the first date material placed in

each PCB Container was removed from service for disposal, and the date each PCB Container was placed in transport for off-site storage or disposal, and the date of disposal (if known).

(D) A unique number identifying each PCB Article Container, a description of the contents of each PCB Article Container, such as pipes, capacitors, electric motors, pumps, etc., including the total weight in kilograms of the content of each PCB Article Container, the first date a PCB Article placed in each PCB Article Container was removed from service for disposal, and the date the PCB Article Container was placed in transport for off-site storage or disposal, and the date of disposal (if known.)

(iii) The total number by specific type of PCB Articles and the total weight in kilograms of PCBs in PCB Articles, the total number of PCB Article Containers and total weight in kilograms of the contents of PCB Article Containers, the total number of PCB Containers and the total weight in kilograms of the contents of PCB Containers, and the total weight in kilograms of bulk PCB waste that was placed into storage for disposal or disposed during the calendar year.

(iv) The total number of PCB Transformers and total weight in kilograms of PCBs contained in the transformers remaining in service at the end of the calendar year.

(v) The total number of Large High or Low Voltage PCB Capacitors remaining in service at the end of the calendar year.

(vi) The total weight in kilograms of any PCBs and PCB Items in PCB Containers, including the identification of container contents, remaining in service at the facility at the end of the calendar year.

(vii) For any PCBs or PCB item received from or shipped to another facility owned or operated by the same generator, the information required under paragraph (a)(2)(ii)(A) through (a)(2)(ii)(D) of this section.

(viii) [Reserved]

(ix) Whenever a PCB Item, excluding small capacitors, with a concentration of ≥50 ppm is distributed in commerce for reuse pursuant to § 761.20(c)(1), the name, address, and telephone number of the person to whom the item was transferred, date of transfer, and the serial number of the item or the internal identification number, if a serial number is not available, must be recorded in the annual document log. The serial number or internal identification number shall be permanently marked on the equipment.

(3) [Reserved]

(4) For purposes of this paragraph, PCB Voltage Regulators shall be recorded as PCB Transformers.

(b) *Disposers and commercial storers of PCB waste.* Beginning February 5, 1990, each owner or operator of a facility (including high efficiency boiler operations) used for the commercial storage or disposal of PCBs and PCB Items shall maintain annual records on the disposition of all PCBs and PCB items at the facility and prepare and maintain a written annual document log that includes the information required by paragraphs (b)(2) of this section for PCBs and PCB Items that were handled as PCB waste at the facility. The written annual document log shall be prepared by July 1 for the previous calendar year (January through December). The written annual document log shall be maintained at each facility for at least 3 years after the facility is no longer used for the storage or disposal of PCBs and PCB Items except that, in the case of chemical waste landfills, the annual document log shall be maintained at least 20 years after the chemical waste landfill is no longer used for the disposal of PCBs and PCB Items. The annual records shall be maintained for the same period. The annual records and written annual document log shall be available at the facility for inspection by authorized representatives of the EPA. All records and annual documents required to be prepared and maintained by this section prior to February 5, 1990 shall continue to be maintained at the facility for the same time as the annual records and the annual document log. The annual document for 1989 shall cover the period from January 1, 1989 to February 5, 1990. From the written annual document log the owner or operator of a facility must prepare the annual report containing the information required by paragraphs (b)(3)(i) through (b)(3)(vi) of

this section for PCBs and PCB Items that were handled as PCB waste at the facility during the previous calendar year (January through December). The annual report must be submitted by July 15 of each year for the preceding calendar year. If the facility ceases commercial PCB storage or disposal operations, the owner or operator of the facility shall provide at least 60 days advance written notice to the Regional Administrator for the region in which the facility is located of the date the facility intends to begin closure. d

(1) The annual records shall include the following:

(i) All signed manifests generated or received at the facility during the calendar year.

(ii) All Certificates of Disposal that have been generated or received by the facility during the calendar year.

(iii) Records of inspections and cleanups performed in accordance with §761.65(c)(5).

(2) The written annual document log shall include the following:

(i) The name, address, and EPA identification number of the storage or disposal facility covered by the annual document log and the calendar year covered by the annual document log.

(ii) For each manifest generated or received by the facility during the calendar year, the unique manifest number and the name and address of the facility that generated the manifest and the following information:

(A) For bulk PCB waste (*e.g.*, in a tanker or truck), its weight in kilograms, the first date PCB waste placed in the tanker or truck was removed from service for disposal, the date it was received at the facility, the date it was placed in transport for off-site disposal (if applicable), and the date of disposal, (if known).

(B) The serial number or other means of identifying each PCB Article, not in a PCB Container or PCB Article Container, the weight in kilograms of the PCB waste in the PCB Article, the date it was removed from service for disposal, the date it was received at the facility, the date it was placed in transport for off-site disposal (if applicable), and the date of disposal (if known).

(C) The unique number assigned by the generator identifying each PCB Container, a description of the contents of each PCB Container, such as liquid, soil, cleanup debris, etc., including the total weight of the PCB waste in kilograms in each PCB Container, the first date PCB waste placed in each PCB Container was removed from service for disposal, the date it was received at the facility, the date each PCB Container was placed in transport for off-site storage or disposal (as applicable), and the date the PCB Container was disposed of (if known).

(D) The unique number assigned by the generator identifying each PCB Article Container, a description of the contents of each PCB Article Container, such as pipes, capacitors, electric motors, pumps, etc., including the total weight in kilograms of the PCB waste in each PCB Article Container, the first date a PCB Article placed in each PCB Article Container was removed from service for disposal, the date it was received at the facility, the date each PCB Article Container was placed in transport for off-site storage or disposal (as applicable), and the date the PCB Article Container was disposed of (if known).

(E) Disposers of PCB waste shall include the confirmed date of disposal for items in paragraphs (b)(2)(ii)(A) through (b)(2)(ii)(D) of this section.

(iii) For any PCB waste disposed at a facility that generated the PCB waste or any PCB waste that was not manifested to the facility, the information required under paragraph (b)(2)(ii)(A) through (b)(2)(ii)(E) of this section.

(3) The owner or operator of a PCB disposal facility (including an owner or operator who disposes of his/her own waste and does not receive or generate manifests) or a commercial storage facility shall submit an annual report, which briefly summarizes the records and annual document log required to be maintained and prepared under paragraphs (b)(1) and (b)(2) of this section to the EPA Regional Administrator of the Region in which the facility is located by July 15 of each year, beginning with July 15, 1991. The first annual report submitted on July 15, 1991, shall be for the period starting February 5, 1990, and ending December

31, 1990. The annual report shall contain no confidential business information. The annual report shall consist of the information listed in paragraphs (b)(3)(i) through (b)(3)(vi) of this section.

(i) The name, address, and EPA identification number of the facility covered by the annual report for the calendar year.

(ii) A list of the numbers of all signed manifests of PCB waste initiated or received by the facility during that year.

(iii) The total weight in kilograms of bulk PCB waste, PCB waste in PCB Transformers, PCB waste in PCB Large High or Low Voltage Capacitors, PCB waste in PCB Article Containers, and PCB waste in PCB Containers in storage at the facility at the beginning of the calendar year, received or generated at the facility, transferred to another facility, or disposed of at the facility during the calendar year. The information must be provided for each of these categories, as appropriate.

(iv) The total number of PCB Transformers, the total number of PCB Large High or Low Voltage Capacitors, the total number of PCB Article Containers, and the total number of PCB Containers in storage at the facility at the beginning of the calendar year, received or generated at the facility, transferred to another facility, or disposed of at the facility during the calendar year. The information must be provided for each of these categories, as appropriate.

(v) The total weight in kilograms of each of the following PCB categories: bulk PCB waste, PCB waste in PCB Transformers, PCB waste in PCB Large High or Low Voltage Capacitors, PCB waste in PCB Article Containers, and PCB waste in PCB Containers remaining in storage for disposal at the facility at the end of the calendar year.

(vi) The total number of PCB Transformers, the total number of PCB Large High or Low Voltage Capacitors, the total number of PCB Article Containers, and the total number of PCB Containers remaining in storage for disposal at the facility at the end of the calendar year.

(vii) The requirement to submit annual reports to the Regional Administrator continues until the submission of the annual report for the calendar year during which the facility ceases PCB storage or disposal operations. Storage operations have not ceased until all PCB waste, including any PCB waste generated during closure, has been removed from the facility.

(4) Whenever a commercial storer of PCB waste accepts PCBs or PCB Items at his storage facility and transfers the PCB waste off-site to another facility for storage or disposal, the commercial storer of PCB waste shall initiate a manifest under subpart K of this part for the transfer of PCBs or PCB Items to the next storage or disposal facility.

NOTE: Any requirements for weights in kilograms of PCBs may be calculated values if the internal volume of PCBs in containers and transformers is known and included in the reports, together with any assumptions on the density of the PCBs contained in the containers or tranformers. If the internal volume of PCBs is not known, a best estimate may be used.

(5) For purposes of this paragraph, PCB Voltage Regulators shall be recorded and reported as PCB Transformers.

(c) *Incineration facilities.* Each owner or operator of a PCB incinerator facility shall collect and maintain for a period of 5 years from the date of collection the following information, in addition to the information required in paragraph (b) of this section:

(1) When PCBs are being incinerated, the following continuous and short-interval data:

(i) Rate and quantity of PCBs fed to the combustion system as required in §761.70(a)(3);

(ii) Temperature of the combustion process as required in §761.70(a)(4); and

(iii) Stack emission product to include $O_2$, CO, and $CO_2$ as required in §761.70(a)(7).

(2) When PCBs are being incinerated, data and records on the monitoring of stack emissions as required in §761.70(a)(6).

(3) Total weight in kilograms of any solid residues generated by the incineration of PCBs and PCB Items during the calendar year, the total weight in kilograms of any solid residues disposed of by the facility in chemical waste landfills, and the total weight in kilograms of any solid residues remaining on the facility site.

(4) When PCBs and PCB Items are being incinerated, additional periodic data shall be collected and maintained as specified by the Regional Administrator pursuant to § 761.70(d)(4).

(5) Upon any suspension of the operation of any incinerator pursuant to § 761.70(a)(8), the owner or operator of such an incinerator shall prepare a document. The document shall, at a minimum, include the date and time of the suspension and an explanation of the circumstances causing the suspension of operation. The document shall be sent to the appropriate Regional Administrator within 30 days of any such suspension.

(d) *Chemical waste landfill facilities.* Each owner or operator of a PCB chemical waste landfill facility shall collect and maintain until at least 20 years after the chemical waste landfill is no longer used for the disposal of PCBs the following information in addition to the information required in paragraph (b) of this section:

(1) Any water analysis obtained in compliance with § 761.75(b)(6)(iii); and

(2) Any operations records including burial coordinates of wastes obtained in compliance with § 761.75(b)(8)(ii).

(e) *High efficiency boiler facilities.* Each owner or operator of a high efficiency boiler used for the disposal of liquids between 50 and 500 ppm PCB shall collect and maintain for a period of 5 years the following information, in addition to the information required in paragraph (b) of this section:

(1) For each month PCBs are burned in the boiler the carbon monoxide and excess oxygen data required in § 761.71(a)(1)(viii) and § 761.71(b)(1)(viii);

(2) The quantity of PCBs burned each month as required in § 761.71(a)(1)(vii) and § 761.71(b)(1)(vii); and

(3) For each month PCBs (other than mineral oil dielectric fluid) are burned, chemical analysis data of the waste as required in § 761.71(b)(2)(vi).

(f) *Retention of special records by storage and disposal facilities.* In addition to the information required to be maintained under paragraphs (b), (c), (d) and (e) of this section, each owner or operator of a PCB storage or disposal facility (including high efficiency boiler operations) shall collect and maintain for the time period specified in paragraph (b) of this section the following data:

(1) All documents, correspondence, and data that have been provided to the owner or operator of the facility by any State or local government agency and that pertain to the storage or disposal of PCBs and PCB Items at the facility.

(2) All documents, correspondence, and data that have been provided by the owner or operator of the facility to any State or local government agency and that pertain to the storage or disposal of PCBs and PCB Items at the facility.

(3) Any applications and related correspondence sent by the owner or operator of the facility to any local, State, or Federal authorities in regard to waste water discharge permits, solid waste permits, building permits, or other permits or authorizations such as those required by §§ 761.70(d) and 761.75(c).

(g) *Reclassification records.* If you reclassify electrical equipment using the procedures in § 761.30(a)(2)(v) or § 761.30(h)(2)(v), you must keep records showing that you followed the required reclassification procedures. Where these procedures require testing, the records must include copies of pre- and post-reclassification PCB concentration measurements from a laboratory using quality control and quality assurance procedures. You must make these records available promptly to EPA or to any party possessing the equipment through sale, loan, lease, or for servicing. You must retain the records for at least 3 years after you sell or dispose of the equipment.

(Sec. 6, Pub. L. 94–469, 90 Stat. 2020 (15 U.S.C. 2605)

[44 FR 31542, May 31, 1979. Redesignated at 47 FR 19527, May 6, 1982, and further redesignated at 47 FR 37360, Aug. 25, 1982; 49 FR 28191, July 10, 1984; 53 FR 12524, Apr. 15, 1988; 54 FR 52750, Dec. 21, 1989; 55 FR 26205, June 27, 1990; 58 FR 34205, June 23, 1993; 63 FR 35461, June 29, 1998; 66 FR 17619, Apr. 2, 2001; 77 FR 54830, Sept. 6, 2012]

**§761.185 Certification program and retention of records by importers and persons generating PCBs in excluded manufacturing processes.**

(a) In addition to meeting the basic requirements of §761.1(f) and the definition of excluded manufacturing processes at §761.3, manufacturers with processes inadvertently generating PCBs and importers of products containing inadvertently generated PCBs must report to EPA any excluded manufacturing process or imports for which the concentration of PCBs in products leaving the manufacturing site or imported is greater than 2 micrograms per gram (2 μg/g, roughly 2 ppm) for any resolvable gas chromatographic peak. Such reports must be filed by October 1, 1984 or, if no processes or imports require reports at the time, within 90 days of having processes or imports for which such reports are required.

(b) Manufacturers required to report by paragraph (a) of this section must transmit a letter notifying EPA of the number, the type, and the location of excluded manufacturing processes in which PCBs are generated when the PCB level in products leaving any manufacturing site is greater than 2 μg/g for any resolvable gas chromatographic peak. Importers required to report by paragraph (a) of this section must transmit a letter notifying EPA of the concentration of PCBs in imported products when the PCB concentration of products being imported is greater than 2 μg/g for any resolvable gas chromatographic peak. Persons must also certify the following:

(1) Their compliance with all applicable requirements of §761.1(f), including any applicable requirements for air and water releases and process waste disposal.

(2) Whether determinations of compliance are based on actual monitoring of PCB levels or on theoretical assessments.

(3) That such determinations of compliance are being maintained.

(4) If the determination of compliance is based on a theoretical assessment, the letter must also notify EPA of the estimated PCB concentration levels generated and released.

(c) Any person who reports pursuant to paragraph (a) of this section:

(1) Must have performed either a theoretical analysis or actual monitoring of PCB concentrations.

(2) Must maintain for a period of three years after ceasing process operations or importation, or for seven years, whichever is shorter, records containing the following information:

(i) *Theoretical analysis.* Manufacturers records must include: the reaction or reactions believed to be generating PCBs; the levels of PCBs generated; and the levels of PCBs released. Importers records must include: the reaction or reactions believed to be generating PCBs and the levels of PCBs generated; the basis for all estimations of PCB concentrations; and the name and qualifications of the person or persons performing the theoretical analysis; or

(ii) *Actual monitoring.* (A) The method of analysis.

(B) The results of the analysis, including data from the Quality Assurance Plan.

(C) Description of the sample matrix.

(D) The name of the analyst or analysts.

(E) The date and time of the analysis.

(F) Numbers for the lots from which the samples are taken.

(d) The certification required by paragraph (b) of this section must be signed by a responsible corporate officer. This certification must be maintained by each facility or importer for a period of three years after ceasing process operation or importation, or for seven years, whichever is shorter, and must be made available to EPA upon request. For the purpose of this section, a responsible corporate officer means:

(1) A president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation.

(2) The manager of one or more manufacturing, production, or operating facilities employing more than 250 persons or having gross annual sales or expenditures exceeding $25,000,000 (in second quarter 1980 dollars), if authority to sign documents has been assigned or

delegated to the manager in accordance with corporate procedures.

(e) Any person signing a document under paragraph (d) of this section shall also make the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate information. Based on my inquiry of the person or persons directly responsible for gathering information, the information is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for falsifying information, including the possibility of fines and imprisonment for knowing violations.

Dated: ____________________

Signature: ____________________

(f) This report must be submitted to the Document Control Office (DCO) (7407M), Office of Pollution Prevention and Toxics (OPPT), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001, ATTN: PCB Notification. This report must be submitted by October 1, 1984 or within 90 days of starting up processes or commencing importation of PCBs.

(g) This certification process must be repeated whenever process conditions are significantly modified to make the previous certification no longer valid.

(Sec. 6, Pub. L. 94–469, 90 Stat. 2020 (15 U.S.C. 2605))

[49 FR 28191, July 10, 1984; 49 FR 33019, Aug. 20, 1984, as amended at 53 FR 12524, Apr. 15, 1988; 58 FR 34205, June 23, 1993; 59 FR 33697, June 30, 1994; 60 FR 34465, July 3, 1995; 71 FR 33642, June 12, 2006]

### § 761.187 Reporting importers and by persons generating PCBs in excluded manufacturing processes.

In addition to meeting the basic requirements of §761.1(f) and the definition of excluded manufacturing process at §761.3, PCB-generating manufacturing processes or importers of PCB-containing products shall be considered "excluded manufacturing processes" only when the following conditions are met:

(a) Data are reported to the EPA by the owner/operator or importer concerning the total quantity of PCBs in product from excluded manufacturing processes leaving any manufacturing site in any calendar year when such quantity exceeds 0.0025 percent of that site's rated capacity for such manufacturing processes as of October 1, 1984; or the total quantity of PCBs imported in any calendar year when such quantity exceeds 0.0025 percent of the average total quantity of such product containing PCBs imported by such importer during the years 1978, 1979, 1980, 1981 and 1982.

(b) Data are reported to the EPA by the owner/operator concerning the total quantity of inadvertently generated PCBs released to the air from excluded manufacturing processes at any manufacturing site in any calendar year when such quantity exceeds 10 pounds.

(c) Data are reported to the EPA by the owner/operator concerning the total quantity of inadvertently generated PCBs released to water from excluded manufacturing processes from any manufacturing site in any calendar year when such quantity exceeds 10 pounds.

(d) These reports must be submitted to the Document Control Office (DCO) (7407M), Office of Pollution Prevention and Toxics (OPPT), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001, ATTN: PCB Notification.

(Sec. 6, Pub. L. 94–469, 90 Stat. 2020 (15 U.S.C. 2605))

[49 FR 28192, July 10, 1984, as amended at 53 FR 12524, Apr. 15, 1988; 58 FR 34205, June 23, 1993; 59 FR 33697, June 30, 1994; 60 FR 34465, July 3, 1995; 71 FR 33642, June 12, 2006]

### § 761.193 Maintenance of monitoring records by persons who import, manufacture, process, distribute in commerce, or use chemicals containing inadvertently generated PCBs.

(a) Persons who import, manufacture, process, distribute in commerce, or use chemicals containing PCBs present as a result of inadvertent generation or recycling who perform any actual monitoring of PCB concentrations must maintain records of any such monitoring for a period of three years after a process ceases operation or importing ceases, or for seven years, whichever is shorter.

(b) Monitoring records maintained pursuant to paragraph (a) of this section must contain:

(1) The method of analysis.

(2) The results of the analysis, including data from the Quality Assurance Plan.

(3) Description of the sample matrix.

(4) The name of the analyst or analysts.

(5) The date and time of the analysis.

(6) Numbers for the lots from which the samples are taken.

(Sec. 6, Pub. L. 94-469, 90 Stat. 2020 (15 U.S.C. 2605)

[49 FR 28193, July 10, 1984, as amended at 58 FR 34205, June 23, 1993]

## Subpart K—PCB Waste Disposal Records and Reports

SOURCE: 54 FR 52752, Dec. 21, 1989, unless otherwise noted.

### § 761.202 EPA identification numbers.

(a) *General.* Any generator, commercial storer, transporter, or disposer of PCB waste who is required to have an EPA identification number under this subpart must notify EPA of his/her PCB waste handling activities, using the notification procedures and form described in § 761.205. EPA will confirm the EPA identification number of facilities already assigned one, and will assign an EPA identification number to facilities that do not have one.

(b) *Prohibitions.* After June 4, 1990:

(1) A generator of PCB waste shall not:

(i) Process, store, dispose of, transport, or offer for transportation PCB waste without having received an EPA identification number from the Agency. A generator of PCB waste who is exempted from notification under § 761.205(c)(1) or who notifies EPA in a timely manner under § 761.205(c)(2)(i), but has not yet received a unique identification number, shall be regarded as having received from EPA the identification number "40 CFR PART 761."

(ii) Offer the PCB waste to transporters, disposers, or commercial storers of PCB waste who have not received an EPA identification number.

(2) A transporter of PCB waste shall not:

(i) Transport PCB waste without having received an EPA identification number from EPA.

(ii) Deliver PCB waste to transporters, disposers, or commercial storers of PCB waste that have not received an EPA identification number.

(3) A commercial storer of PCB waste shall not accept any PCB waste for storage without having received an EPA identification number from EPA.

(4) A disposer of PCB waste shall not accept any PCB waste for disposal without having received an EPA identification number from EPA. A disposer of PCB waste who owns more than one disposal facility or mobile treatment unit shall not accept waste unless the disposer has received an EPA identification number for each facility or mobile unit.

(c) *PCB waste handled prior to effective date of this subpart.* Generators (other than generators exempt from notification under § 761.205(c)(1)), commercial storers, transporters, and disposers of PCB waste who are required to have EPA identification numbers under this subpart, and who were engaged in PCB waste handling activities on or prior to February 5, 1990, are not subject to the prohibitions of paragraph (b) of this section if they have applied for an EPA identification number in accordance with the applicable notification procedures of § 761.205. Such persons shall use the EPA identification number "40 CFR PART 761," or a number assigned to the persons by EPA or a State under RCRA, until EPA issues to such persons a specific identification number under § 761.205(a), (b), or (c).

(d) *PCB waste first handled after effective date of this subpart.* Generators (other than generators exempt from notification under § 761.205(c)(1)), commercial storers, transporters, and disposers of PCB waste who are required to have EPA identification numbers under this subpart, and who first engage in PCB waste activities after February 5, 1990, are subject to the prohibitions in paragraph (b) of this section.

### § 761.205 Notification of PCB waste activity (EPA Form 7710-53).

(a)(1) All commercial storers, transporters, and disposers of PCB waste

who were engaged in PCB waste handling activities on or prior to February 5, 1990 shall notify EPA of their PCB waste activities by filing EPA Form 7710–53 with EPA by no later than April 4, 1990. Upon receiving the notification form, EPA will assign an EPA identification number to each entity that notifies.

(2) All generators (other than generators exempt from notification under paragraph (c)(1) of this section), commercial storers, transporters, and disposers of PCB waste who first engage in PCB waste handling activities after February 5, 1990, shall notify EPA of their PCB waste activities by filing EPA Form 7710–53 with EPA prior to engaging in PCB waste handling activities.

(3) Any person required to notify EPA under this section shall file with EPA Form 7710–53. Copies of EPA Form 7710–53 are available on EPA's Web site at *http://www.epa.gov/pcb*, or from the Program Management, Communications, and Analysis Office, Office of Resource Conservation and Recovery (5305P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001. Descriptive information and instructions for filling in the form are included in paragraphs (a)(4)(i) through (vii) of this section.

(4) All of the following information shall be provided to EPA on Form 7710–53:

(i) The name of the facility, and the name of the owner or operator of the facility.

(ii) EPA identification number, if any, previously issued to the facility.

(iii) The facility's mailing address.

(iv) The location of the facility.

(v) The facility's installation contact and telephone number.

(vi) The type of PCB waste activity engaged in at the facility.

(vii) Signature of the signer of the certification statement, typed or printed name and official title of signer, and date signed.

(viii) EPA has determined that the information in paragraphs (a)(4)(i) through (a)(4)(vii) of this section shall not be treated as confidential business information. This information will be disclosed to the public without further notice to the submitter unless the submitter provides a written justification (submitted with the notification form) which demonstrates extraordinary reasons why the information should be entitled to confidential treatment.

(b) Generators (other than those generators exempt from notification under paragraph (c)(1) of this section), commercial storers, transporters, and disposers of PCB waste who have previously notified EPA or a State of hazardous waste activities under RCRA shall notify EPA of their PCB waste activities under this part by filing EPA Form 7710–53 with EPA by no later than April 4, 1990. The notification shall include the EPA identification number previously issued by EPA or the State and upon receipt of the notification, EPA shall verify and authorize the use of the previously issued identification number for PCB waste activities.

(c)(1) Generators of PCB waste need not notify EPA and receive unique EPA identification numbers under this section, unless their PCB waste activities are described in paragraph (c)(2) of this section. Generators exempted from notifying EPA under this paragraph shall use the generic identification number "40 CFR PART 761" on the manifests, records, and reports which they shall prepare under this subpart, unless such generators elect to use a unique EPA identification number previously assigned to them under RCRA by EPA or a State.

(2) Generators of PCB waste who use, own, service, or process PCBs or PCB Items shall notify EPA of their PCB waste activities only if they own or operate PCB storage facilities subject to the storage requirements of § 761.65 (b) or (c)(7). Such generators shall notify EPA in the following manner:

(i) Generators storing PCB waste subject to the storage requirements of § 761.65 (b) or (c)(7) shall notify EPA by filing EPA Form 7710–53 with EPA by no later than April 4, 1990.

(ii) Generators who desire to commence storage of PCB waste after February 5, 1990 shall notify EPA and receive an EPA identification number before they may commence storage of PCBs at their facilities established under § 761.65 (b) or (c)(7).

(iii) A separate notification shall be submitted to EPA for each PCB storage facility owned or operated by generators of PCB waste. Upon receiving these notifications, EPA will assign generators unique EPA identification numbers for each storage facility notifying EPA under this section.

(d) Persons required to notify under this section shall file EPA Form 7710–53 with EPA by mailing the form to the following address: Document Control Officer, Office of Resource Conservation and Recovery (5305P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001.

(e) The requirements under this section to notify EPA and obtain EPA identification numbers shall in no case excuse compliance by any person subject to the 1-year limit on storage prior to disposal under §761.65(a).

(f) When a facility has previously notified EPA of its PCB waste handling activities using EPA Form 7710-53 and those activities change, the facility must resubmit EPA Form 7710-53 to reflect those changes no later than 30 days from when a change is made. Examples of when a PCB waste handler must renotify the Agency include, but are not limited to the following: the company changes location of the facility; or the company had notified solely as engaging in a certain type of PCB waste handling activity and now wishes to engage in another PCB waste activity (e.g., previously only commercially stored PCB waste and now wishes to transport PCB waste).

[54 FR 52752, Dec. 21, 1989, as amended at 58 FR 15809, Mar. 24, 1993; 58 FR 34205, June 23, 1993; 59 FR 33697, June 30, 1994; 63 FR 35461, June 29, 1998; 72 FR 57241, Oct. 9, 2007; 74 FR 30234, June 25, 2009]

### §761.207 The manifest—general requirements.

(a) A generator who transports, or offers for transport PCB waste for commercial off-site storage or off-site disposal, and commercial storage or disposal facility who offers for transport a rejected load of PCB waste, must prepare a manifest on EPA Form 8700–22, and, if necessary, a continuation sheet, according to the instructions included in the appendix of 40 CFR Part 262. The generator shall specify:

(1) For each bulk load of PCBs, the identity of the PCB waste, the earliest date of removal from service for disposal, and the weight in kilograms of the PCB waste. (Item 14—Special Handling Instructions box)

(2) For each PCB Article Container or PCB Container, the unique identifying number, type of PCB waste (e.g., soil, debris, small capacitors), earliest date of removal from service for disposal, and weight in kilograms of the PCB waste contained. (Item 14—Special Handling Instructions box)

(3) For each PCB Article not in a PCB Container or PCB Article Container, the serial number if available, or other identification if there is no serial number, the date of removal from service for disposal, and weight in kilograms of the PCB waste in each PCB Article. (Item 14—Special Handling Instructions box)

NOTE 1 TO PARAGRAPH (a): EPA Form 8700–22A is not required as the PCB manifest continuation sheet. In practice, form 8700–22A does not have adequate space to list required PCB-specific information for several PCB articles. However, if form 8700–22A fits the needs of the user community, the form is permissible.

NOTE 2 TO PARAGRAPH (a): PCB waste handlers should use the Part 262 appendix instructions as a guide, but should defer to the Part 761 manifest regulations whenever there is any difference between the Part 761 requirements and the instructions in the appendix to Part 262. The differences should be minimal.

NOTE 3 TO PARAGRAPH (a): PCBs are not regulated under RCRA, thus do not have a RCRA waste code. EPA does not require boxes 13 and 31 on forms 8700–22 and 8700–22A (if used), respectively, to be completed for shipments only containing PCB waste. However, some States track PCB wastes as State-regulated hazardous wastes, and assign State hazardous waste codes to these wastes. In such a case, the user should follow the State instructions for completing the waste code fields.

(b) A generator must designate on the manifest one facility which is approved to handle the PCB waste described on the manifest.

(c) A generator may also designate on the manifest one alternate facility which is approved to handle his PCB

waste in the event an emergency prevents delivery of the waste to the primary designated facility.

(d) If the transporter is unable to deliver the PCB waste to the designated facility or the alternate facility, the generator must either designate another facility or instruct the transporter to return the PCB waste.

(e) The requirements of this section apply only to PCB wastes as defined in § 761.3. This includes PCB wastes with PCB concentrations below 50 ppm where the PCB concentration below 50 ppm was the result of dilution; these PCB wastes are required under § 761.1(b) to be managed as if they contained PCB concentrations of 50 ppm and above. An example of such a PCB waste is spill cleanup material containing <50 ppm PCBs when the spill involved material containing PCBs at a concentration of ≥50 ppm. However, there is no manifest requirement for material currently below 50 ppm which derives from pre-April 18, 1978, spills of any concentration, pre-July 2, 1979, spills of <500 ppm PCBs, or materials decontaminated in accordance with § 761.79.

(f) The requirements of this subpart do not apply to the transport of PCB wastes on a public or private right-of-way within or along the border of contiguous property under the control of the same person, even if such contiguous property is divided by a public or private right-of-way.

[77 FR 54830, Sept. 6, 2012, as amended at 80 FR 37995, July 2, 2015]

### § 761.208 Obtaining manifests.

(a)(1) A generator may use manifests printed by any source so long as the source of the printed form has received approval from EPA to print the manifest under 40 CFR 262.21 (c) and (e). A registered source may be a:

(i) State agency;

(ii) Commercial printer;

(iii) PCB waste generator, transporter or, designated facility; or

(iv) PCB waste broker or other preparer who prepares or arranges shipments of PCB waste for transportation.

(2) A generator must determine whether the generator state or the consignment state for a shipment regulates PCB waste as a State-regulated hazardous waste. Generators also must determine whether the consignment state or generator state requires the generator to submit any copies of the manifest to these states. In cases where the generator must supply copies to either the generator's state or the consignment state, the generator is responsible for supplying legible photocopies of the manifest to these states.

(b) [Reserved]

[77 FR 54831, Sept. 6, 2012]

### § 761.209 Number of copies of a manifest.

The manifest consists of at least the number of copies which will provide the generator, each transporter, and the owner or operator of the designated facility with one copy each for their records and another copy to be returned to the generator.

[77 FR 54831, Sept. 6, 2012]

### § 761.210 Use of the manifest—Generator requirements.

(a) The generator must:

(1) Sign the manifest certification by hand; and

(2) Obtain the handwritten signature of the initial transporter and date of acceptance on the manifest; and

(3) Retain one copy, in accordance with § 761.214(a)(1).

(b) The generator must give the transporter the remaining copies of the manifest.

(c) For shipments of PCB waste within the United States solely by water (bulk shipments only), the generator must send three copies of the manifest dated and signed in accordance with this section to the owner or operator of the designated facility. Copies of the manifest are not required for each transporter.

(d) For rail shipments of PCB waste within the United States which originate at the site of generation, the generator must send at least three copies of the manifest dated and signed in accordance with this section to:

(1) The next non-rail transporter, if any; or

(2) The designated facility if transported solely by rail.

(e) For rejected shipments of PCB waste that are returned to the generator by the designated facility (following the procedures of §761.215(f)), the generator must:

(1) Sign either:

(i) Item 20 of the new manifest if a new manifest is used for the returned shipment; or

(ii) Item 18c of the original manifest if the original manifest is used for the returned shipment;

(2) Provide the transporter a copy of the manifest;

(3) Within 30 days of delivery of the rejected shipment, send a copy of the manifest to the designated facility that returned the shipment to the generator; and

(4) Retain at the generator's site a copy of each manifest for at least three years from the date of delivery.

[77 FR 54831, Sept. 6, 2012]

### §761.211 Manifest system—Transporter requirements.

(a)(1) A transporter shall not accept PCB waste from a generator unless it is accompanied by a manifest signed by the generator in accordance with §761.210(a)(1), except that a manifest is not required if any one of the following conditions exists:

(i) The shipment of PCB waste consists solely of PCB wastes with PCB concentrations below 50 ppm, unless the PCB concentration below 50 ppm was the result of dilution, in which case §761.1(b) requires that the waste be managed as if it contained PCBs at the concentration prior to dilution.

(ii) The PCB waste is accepted by the transporter for transport only to a storage or disposal facility owned or operated by the generator of the PCB waste.

(2) [Reserved]

(b) Before transporting the PCB waste, the transporter must sign and date the manifest acknowledging acceptance of the PCB waste from the generator. The transporter must return a signed copy to the generator before leaving the generator's property.

(c) The transporter shall ensure that the manifest accompanies the PCB waste.

(d) A transporter who delivers PCB waste to another transporter or to the designated facility must:

(1) Obtain the date of delivery and the handwritten signature of that transporter or of the owner or operator of the designated facility on the manifest; and

(2) Retain one copy of the manifest in accordance with §761.214; and

(3) Give the remaining copies of the manifest to the accepting transporter or designated facility.

(e) The requirements of paragraphs (c), (d) and (f) of this section do not apply to water (bulk shipment) transporters if:

(1) The PCB waste is delivered by water (bulk shipment) to the designated facility; and

(2) A shipping paper containing all the information required on the manifest (excluding EPA identification number, generator certification, and signatures) accompanies the PCB waste; and

(3) The delivering transporter obtains the date of delivery and handwritten signature of the owner or operator of the designated facility on either the manifest or the shipping paper; and

(4) The person delivering the PCB waste to the initial water (bulk shipment) transporter obtains the date of delivery and signature of the water (bulk shipment) transporter on the manifest and forwards it to the designated facility; and

(5) A copy of the shipping paper or manifest is retained by each water (bulk shipment) transporter in accordance with §761.214.

(f) For shipments involving rail transportation, the requirements of paragraphs (c), (d) and (e) do not apply and the following requirements do apply:

(1) When accepting PCB waste from a non-rail transporter, the initial rail transporter must:

(i) Sign and date the manifest acknowledging acceptance of the PCB waste;

(ii) Return a signed copy of the manifest to the non-rail transporter;

(iii) Forward at least three copies of the manifest to:

(A) The next non-rail transporter, if any; or,

(B) The designated facility, if the shipment is delivered to that facility by rail;

(iv) Retain one copy of the manifest and rail shipping paper in accordance with §761.214.

(2) Rail transporters must ensure that a shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator certification, and signatures) accompanies the PCB waste at all times.

NOTE: Intermediate rail transporters are not required to sign either the manifest or shipping paper.

(3) When delivering PCB waste to the designated facility, a rail transporter must:

(i) Obtain the date of delivery and handwritten signature of the owner or operator of the designated facility on the manifest or the shipping paper (if the manifest has not been received by the facility); and

(ii) Retain a copy of the manifest or signed shipping paper in accordance with §761.214.

(4) When delivering PCB waste to a non-rail transporter a rail transporter must:

(i) Obtain the date of delivery and the handwritten signature of the next non-rail transporter on the manifest; and

(ii) Retain a copy of the manifest in accordance with §761.214.

(5) Before accepting PCB waste from a rail transporter, a non-rail transporter must sign and date the manifest and provide a copy to the rail transporter.

[77 FR 54832, Sept. 6, 2012]

**§761.212 Transporter compliance with the manifest.**

(a) The transporter must deliver the entire quantity of PCB waste which he has accepted from a generator or a transporter to:

(1) The designated facility listed on the manifest; or

(2) The alternate designated facility, if the PCB waste cannot be delivered to the designated facility because an emergency prevents delivery; or

(3) The next designated transporter.

(b)(1) If the PCB waste cannot be delivered in accordance with paragraph (a) of this section because of an emergency condition other than rejection of the waste by the designated facility, then the transporter must contact the generator for further directions and must revise the manifest according to the generator's instructions.

(2) If PCB waste is rejected by the designated facility while the transporter is on the facility's premises, then the transporter must obtain the following:

(i) For a partial load rejection, a copy of the original manifest that includes the facility's date and signature, and the Manifest Tracking Number of the new manifest that will accompany the shipment, and a description of the partial rejection in the discrepancy block of the original manifest. The transporter must retain a copy of this manifest in accordance with §761.214, and give the remaining copies of the original manifest to the rejecting designated facility. If the transporter is forwarding the rejected part of the shipment to an alternate facility or returning it to the generator, the transporter must obtain a new manifest to accompany the shipment, and the new manifest must include all of the information required in 40 CFR 761.215(e)(1) through (6) or (f)(1) through (6).

(ii) For a full load rejection that will be taken back by the transporter, a copy of the original manifest that includes the rejecting facility's signature and date attesting to the rejection, the description of the rejection in the discrepancy block of the manifest, and the name, address, phone number, and Identification Number for the alternate facility or generator to whom the shipment must be delivered. The transporter must retain a copy of the manifest in accordance with §761.214, and give a copy of the manifest containing this information to the rejecting designated facility. If the original manifest is not used, then the transporter must obtain a new manifest for the shipment and comply with 40 CFR 761.215(e)(1) through (6).

(iii) No provision of this section shall be construed to affect or limit the applicability of any requirement applicable to transporters of PCB waste under regulations issued by the Department

of Transportation (DOT) and set forth at 49 CFR Part 171.

[77 FR 54832, Sept. 6, 2012]

**§ 761.213 Use of manifest—Commercial storage and disposal facility requirements.**

(a)(1) If a commercial storage or disposal facility receives PCB waste accompanied by a manifest, the owner, operator or his/her agent must sign and date the manifest as indicated in paragraph (a)(2) of this section to certify that the PCB waste covered by the manifest was received, that the PCB waste was received except as noted in the discrepancy space of the manifest, or that the PCB waste was rejected as noted in the manifest discrepancy space.

(2) If a commercial storage or disposal facility receives an off-site shipment of PCB waste accompanied by a manifest, the owner or operator, or his agent, shall:

(i) Sign and date, by hand, each copy of the manifest;

(ii) Note any discrepancies (as defined in § 761.215(a)) on each copy of the manifest;

(iii) Immediately give the transporter at least one copy of the manifest;

(iv) Within 30 days of delivery, send a copy of the manifest to the generator; and

(v) Retain at the facility a copy of each manifest for at least three years from the date of delivery.

(b) If a commercial storage or disposal facility receives, from a rail or water (bulk shipment) transporter, PCB waste which is accompanied by a shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator's certification, and signatures), the owner or operator, or his agent, must:

(1) Sign and date each copy of the manifest or shipping paper (if the manifest has not been received) to certify that the PCB waste covered by the manifest or shipping paper was received;

(2) Note any significant discrepancies (as defined in § 761.215(a)) in the manifest or shipping paper (if the manifest has not been received) on each copy of the manifest or shipping paper.

NOTE TO PARAGRAPH (b)(2): The Agency does not intend that the owner or operator of a facility whose procedures include waste analysis must perform that analysis before signing the shipping paper and giving it to the transporter. Section 761.215(a), however, requires reporting an unreconciled discrepancy discovered during later analysis.

(3) Immediately give the rail or water (bulk shipment) transporter at least one copy of the manifest or shipping paper (if the manifest has not been received);

(4) Within 30 days after the delivery, send a copy of the signed and dated manifest or a signed and dated copy of the shipping paper (if the manifest has not been received within 30 days after delivery) to the generator; and

NOTE TO PARAGRAPH (b)(4): Section 761.210(c) requires the generator to send three copies of the manifest to the facility when PCB waste is sent by rail or water (bulk shipment).]

(5) Retain at the facility a copy of the manifest and shipping paper (if signed in lieu of the manifest at the time of delivery) for at least three years from the date of delivery.

(c) Whenever an off-site shipment of PCB waste is initiated from a commercial storage or disposal facility, the owner or operator of the commercial storage or disposal facility shall comply with the manifest requirements that apply to generators of PCB waste (§ 761.207).

[77 FR 54833, Sept. 6, 2012]

**§ 761.214 Retention of manifest records.**

(a)(1) A generator must keep a copy of each manifest signed in accordance with § 761.210(a) for three years or until he receives a signed copy from the designated facility which received the PCB waste. This signed copy must be retained as a record for at least three years from the date the waste was accepted by the initial transporter. A generator subject to annual document requirements under § 761.180 shall retain copies of each manifest for the period required by § 761.180(a).

(2) A transporter of PCB waste must keep a copy of the manifest signed by

the generator, himself, and the next designated transporter or the owner or operator of the designated facility for a period of three years from the date the PCB waste was accepted by the initial transporter.

(b) For shipments delivered to the designated facility by water (bulk shipment), each water (bulk shipment) transporter must retain a copy of the shipping paper containing all the information required in § 761.211(e)(2) for a period of three years from the date the PCB waste was accepted by the initial transporter.

(c) For shipments of PCB waste by rail within the United States:

(1) The initial rail transporter must keep a copy of the manifest and shipping paper with all the information required in § 761.211(f)(2) for a period of three years from the date the PCB waste was accepted by the initial transporter; and

(2) The final rail transporter must keep a copy of the signed manifest (or the shipping paper if signed by the designated facility in lieu of the manifest) for a period of three years from the date the PCB waste was accepted by the initial transporter.

NOTE TO PARAGRAPH (c): Intermediate rail transporters are not required to keep records pursuant to these regulations.

(d) A generator must keep a copy of each Exception Report for a period of at least three years from the due date of the report.

(e) The periods of retention referred to in this Section are extended automatically during the course of any unresolved enforcement action regarding the regulated activity or as requested by the Administrator.

[77 FR 54833, Sept. 6, 2012]

### § 761.215 Manifest discrepancies.

(a) Manifest discrepancies are:

(1) Significant differences (as defined by paragraph (b) of this section) between the quantity or type of PCB waste designated on the manifest or shipping paper, and the quantity and type of PCB waste a facility actually receives; or

(2) Rejected wastes, which may be a full or partial shipment of PCB waste that the designated facility cannot accept.

(b) Significant differences in quantity are: For bulk waste, variations greater than 10 percent in weight or variations greater than 10 percent in weight of PCB waste in containers; for batch waste, any variation in piece count, such as a discrepancy of one PCB Transformer or PCB Container or PCB Article Container in a truckload. Significant differences in type are obvious differences which can be discovered by inspection or waste analysis, such as the substitution of solids for liquids or the substitution of high concentration PCBs (above 500 ppm) with lower concentration materials.

(c) Upon discovering a significant difference in quantity or type, the owner or operator must attempt to reconcile the discrepancy with the waste generator or transporter (e.g., with telephone conversations). If the discrepancy is not resolved within 15 days after receiving the waste, the owner or operator must immediately submit to the Regional Administrator a letter describing the discrepancy and attempts to reconcile it, and a copy of the manifest or shipping paper at issue.

(d)(1) Upon rejecting the PCB waste, the facility must consult with the generator prior to forwarding the waste to another facility that can manage the waste. If it is impossible to locate an alternative facility that can receive the waste, the facility may return the rejected waste to the generator. The facility must send the waste to the alternative facility or to the generator within 60 days of the rejection identification.

(2) While the facility is making arrangements for forwarding rejected wastes to another facility under this section, it must ensure that either the delivering transporter retains custody of the waste, or, the facility must provide for secure, temporary custody of the waste, pending delivery of the waste to the first transporter designated on the manifest prepared under paragraph (e) or (f) of this section.

(e) Except as provided in paragraph (e)(7) of this section, for full or partial load rejections that are to be sent off-

site to an alternate facility, the facility is required to prepare a new manifest in accordance with §761.207(a) and the following instructions:

(1) Write the generator's U.S. EPA ID number in Item 1 of the new manifest. Write the generator's name and mailing address in Item 5 of the new manifest. If the mailing address is different from the generator's site address, then write the generator's site address in the designated space for Item 5.

(2) Write the name of the alternate designated facility and the facility's U.S. EPA ID number in the designated facility block (Item 8) of the new manifest.

(3) Copy the manifest tracking number found in Item 4 of the old manifest to the Special Handling and Additional Information Block of the new manifest, and indicate that the shipment is a rejected waste from the previous shipment.

(4) Copy the manifest tracking number found in Item 4 of the new manifest to the manifest reference number line in the Discrepancy Block of the old manifest (Item 18a).

(5) Write the DOT description for the rejected load in Item 9 (U.S. DOT Description) of the new manifest and write the container types, quantity, and volume(s) of waste.

(6) Sign the Generator's/Offeror's Certification to certify, as the offeror of the shipment, that the waste has been properly packaged, marked and labeled and is in proper condition for transportation, and mail a signed copy of the manifest to the generator identified in Item 5 of the new manifest.

(7) For full load rejections that are made while the transporter remains present at the facility, the facility may forward the rejected shipment to the alternate facility by completing Item 18b of the original manifest and supplying the information on the next destination facility in the Alternate Facility space. The facility must retain a copy of this manifest for its records, and then give the remaining copies of the manifest to the transporter to accompany the shipment. If the original manifest is not used, then the facility must use a new manifest and comply with paragraphs (e)(1), (2), (3), (4), (5), and (6) of this section.

(f) Except as provided in paragraph (f)(7) of this section, for rejected wastes that must be sent back to the generator, the facility is required to prepare a new manifest in accordance with §761.207(a) and the following instructions:

(1) Write the facility's U.S. EPA ID number in Item 1 of the new manifest. Write the facility's name and mailing address in Item 5 of the new manifest. If the mailing address is different from the facility's site address, then write the facility's site address in the designated space for Item 5 of the new manifest.

(2) Write the name of the initial generator and the generator's U.S. EPA ID number in the designated facility block (Item 8) of the new manifest.

(3) Copy the manifest tracking number found in Item 4 of the old manifest to the Special Handling and Additional Information Block of the new manifest, and indicate that the shipment is a rejected waste from the previous shipment.

(4) Copy the manifest tracking number found in Item 4 of the new manifest to the manifest reference number line in the Discrepancy Block of the old manifest (Item 18a).

(5) Write the DOT description for the rejected load in Item 9 (U.S. DOT Description) of the new manifest and write the container types, quantity, and volume(s) of waste.

(6) Sign the Generator's/Offeror's Certification to certify, as offeror of the shipment, that the waste has been properly packaged, marked and labeled and is in proper condition for transportation.

(7) For full load rejections that are made while the transporter remains at the facility, the facility may return the shipment to the generator with the original manifest by completing Item 18a and 18b of the manifest and supplying the generator's information in the Alternate Facility space. The facility must retain a copy for its records and then give the remaining copies of the manifest to the transporter to accompany the shipment. If the original manifest is not used, then the facility must use a new manifest and comply with paragraphs (f)(1), (2), (3), (4), (5), (6), and (8) of this section.

(8) For full or partial load rejections that are returned to the generator, the facility must also comply with the exception reporting requirements in §761.217(a).

(g) If a facility rejects a waste after it has signed, dated, and returned a copy of the manifest to the delivering transporter or to the generator, the facility must amend its copy of the manifest to indicate the rejected wastes in the discrepancy space of the amended manifest. The facility must also copy the manifest tracking number from Item 4 of the new manifest to the Discrepancy space of the amended manifest, and must re-sign and date the manifest to certify to the information as amended. The facility must retain the amended manifest for at least three years from the date of amendment, and must within 30 days, send a copy of the amended manifest to the transporter and generator that received copies prior to their being amended.

[77 FR 54833, Sept. 6, 2012]

### §761.216 Unmanifested waste report.

(a) If a facility accepts for storage or disposal any PCB waste from an off-site source without an accompanying manifest, or without an accompanying shipping paper as described by §761.211(e), and the owner or operator of the commercial storage or disposal facility cannot contact the generator of the PCB waste, then he shall notify the Regional Administrator of the EPA region in which his facility is located of the unmanifested PCB waste so that the Regional Administrator can determine whether further actions are required before the owner or operator may store or dispose of the unmanifested PCB waste, and additionally the owner or operator must prepare and submit a letter to the Regional Administrator within 15 days after receiving the waste. The unmanifested waste report must contain the following information:

(1) The EPA identification number, name and address of the facility;

(2) The date the facility received the waste;

(3) The EPA identification number, name and address of the generator and the transporter, if available;

(4) A description and the quantity of each unmanifested PCB waste the facility received;

(5) The method of storage or disposal for each PCB waste;

(6) Signature of the owner or operator of the facility or his authorized representative; and,

(7) A brief explanation of why the waste was unmanifested, if known.

(8) The disposition made of the unmanifested waste by the commercial storage or disposal facility, including:

(i) If the waste was stored or disposed by that facility, was the generator identified and was a manifest subsequently supplied.

(ii) If the waste was sent back to the generator, why and when.

(b) [Reserved]

[77 FR 54834, Sept. 6, 2012]

### §761.217 Exception reporting.

(a)(1) A generator of PCB waste, who does not receive a copy of the manifest with the handwritten signature of the owner or operator of the designated facility within 35 days of the date the waste was accepted by the initial transporter, shall immediately contact the transporter and/or the owner or operator of the designated facility to determine the status of the PCB waste.

(2) A generator of PCB waste subject to the manifesting requirements shall submit an Exception Report to the EPA Regional Administrator for the Region in which the generator is located if the generator has not received a copy of the manifest with the hand written signature of the owner or operator of the designated facility within 45 days of the date the waste was accepted by the initial transporter. The exception report shall be submitted to EPA no later than 45 days from the date on which the generator should have received the manifest. The Exception Report shall include the following:

(i) A legible copy of the manifest for which the generator does not have confirmation of delivery;

(ii) A cover letter signed by the generator or his authorized representative explaining the efforts taken to locate the PCB waste and the results of those efforts.

(b) For rejected shipments of PCB waste that are forwarded to an alternate facility by a designated facility using a new manifest (following the procedures of §761.215(e)(1) through (6)), the generator must comply with the requirements of paragraph (a) of this section, as applicable, for the shipment forwarding the material from the designated facility to the alternate facility instead of for the shipment from the generator to the designated facility. For purposes of paragraph (a) of this section for a shipment forwarding such waste to an alternate facility by a designated facility:

(1) The copy of the manifest received by the generator must have the handwritten signature of the owner or operator of the alternate facility in place of the signature of the owner or operator of the designated facility, and

(2) The 35- and 45-day timeframes begin the date the waste was accepted by the initial transporter forwarding the PCB waste shipment from the designated facility to the alternate facility.

[77 FR 54835, Sept. 6, 2012]

**§761.218 Certificate of disposal.**

(a) For each shipment of manifested PCB waste that the owner or operator of a disposal facility accepts by signing the manifest, the owner or operator of the disposal facility shall prepare a Certificate of Disposal for the PCBs and PCB Items disposed of at the facility, which shall include:

(1) The identity of the disposal facility, by name, address, and EPA identification number.

(2) The identity of the PCB waste affected by the Certificate of Disposal including reference to the manifest number for the shipment.

(3) A statement certifying the fact of disposal of the identified PCB waste, including the date(s) of disposal, and identifying the disposal process used.

(4) A certification as defined in §761.3.

(b) The owner or operator of the disposal facility shall send the Certificate of Disposal to the generator identified on the manifest which accompanied the shipment of PCB waste within 30 days of the date that disposal of each item of PCB waste identified on the manifest was completed unless the generator and the disposer contractually agree to another time frame.

(c) The disposal facility shall keep a copy of each Certificate of Disposal among the records that it retains under §761.180(b).

(d)(1) Generators of PCB waste shall keep a copy of each Certificate of Disposal that they receive from disposers of PCB waste among the records they retain under §761.180(a).

(2) Commercial storers of PCB waste shall keep a copy of each Certificate of Disposal that they receive from disposers of PCB waste among the records they retain under §761.180(b).

[54 FR 52752, Dec. 21, 1984, as amended at 63 FR 35462, June 29, 1998]

**§761.219 One-year exception reporting.**

(a) A disposer of PCB waste shall submit a One-year Exception Report to the EPA Regional Administrator for the Region in which the disposal facility is located no later than 45 days from the end of the 1-year storage for disposal date when the following occurs:

(1) The disposal facility receives PCBs or PCB Items on a date more than 9 months from the date the PCBs or PCB Items were removed from service for disposal, as indicated on the manifest or continuation sheet; and

(2) Because of contractual commitments or other factors affecting the facility's disposal capacity, the disposer of PCB waste could not dispose of the affected PCBs or PCB Items within 1 year of the date of removal from service for disposal.

(b) A generator or commercial storer of PCB waste who manifests PCBs or PCB Items to a disposer of PCB waste shall submit a One-year Exception Report to the EPA Regional Administrator for the Region in which the generator or commercial storer is located no later than 45 days from the date the following occurs:

(1) The generator or commercial storer transferred the PCBs or PCB Items to the disposer of PCB waste on a date within 9 months from the date of removal from service for disposal of the

affected PCBs or PCB Items, as indicated on the manifest or continuation sheet; and

(2) The generator or commercial storer either has not received within 13 months from the date of removal from service for disposal a Certificate of Disposal confirming the disposal of the affected PCBs or PCB Items, or the generator or commercial storer receives a Certificate of Disposal confirming disposal of the affected PCBs or PCB Items on a date more than 1 year after the date of removal from service.

(c) The One-year Exception Report shall include:

(1) A legible copy of any manifest or other written communication relevant to the transfer and disposal of the affected PCBs or PCB Items.

(2) A cover letter signed by the submitter or an authorized representative explaining:

(i) The date(s) when the PCBs or PCB Items were removed from service for disposal.

(ii) The date(s) when the PCBs or PCB Items were received by the submitter of the report, if applicable.

(iii) The date(s) when the affected PCBs or PCB Items were transferred to a designated disposal facility.

(iv) The identity of the transporters, commercial storers, or disposers known to be involved with the transaction.

(v) The reason, if known, for the delay in bringing about the disposal of the affected PCBs or PCB Items within 1 year from the date of removal from service for disposal.

(d) PCB/radioactive waste that is exempt from the 1-year storage for disposal time limit pursuant to §761.65(a)(1) is also exempt from the exception reporting requirements of paragraphs (a), (b), and (c) of this section.

[77 FR 54835, Sept. 6, 2012]

## Subpart L [Reserved]

## Subpart M—Determining a PCB Concentration for Purposes of Abandonment or Disposal of Natural Gas Pipeline: Selecting Sample Sites, Collecting Surface Samples, and Analyzing Standard PCB Wipe Samples

SOURCE: 63 FR 35462, June 29, 1998, unless otherwise noted.

### § 761.240 Scope and definitions.

(a) Use these procedures to select surface sampling sites for natural gas pipe to determine its PCB surface concentration for abandonment-in-place or removal and disposal off-site in accordance with §761.60(b)(5).

(b) "Pipe segment" means a length of natural gas pipe that has been removed from the pipeline system to be disposed of or reused, and that is usually approximately 12.2 meters (40 feet) or shorter in length. Pipe segments are usually linear.

(c) "Pipeline section" means a length of natural gas pipe that has been cut or otherwise separated from the active pipeline, usually for purposes of abandonment, and that is usually longer than 12.2 meters in length. Pipeline sections may be branched.

### § 761.243 Standard wipe sample method and size.

(a) Collect a surface sample from a natural gas pipe segment or pipeline section using a standard wipe test as defined in §761.123. Detailed guidance for the entire wipe sampling process appears in the document entitled, "Wipe Sampling and Double Wash/Rinse Cleanup as Recommended by the Environmental Protection Agency PCB Spill Cleanup Policy," dated June 23, 1987 and revised on April 18, 1991. This document is available on EPA's Web site at *http://www.epa.gov/pcb*, or from the Program Management, Communications, and Analysis Office, Office of Resource Conservation and Recovery (5305P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001.

(b) Collect a surface sample from a minimum surface area of 100 $cm^2$ at each sampling site selected. The EPA

Regional Administrator may approve, in writing, requests to collect a sample from smaller surface areas, when <100 $cm^2$ of surface eligible for sampling is present; e.g., when sampling a small diameter pipe, a small valve, or a small regulator. When smaller surfaces are sampled, convert the measurement to the equivalent measurement for 100 $cm^2$ for purposes of comparison to standards based on 100 $cm^2$.

[63 FR 35462, June 29, 1998, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30235, June 25, 2009]

**§ 761.247 Sample site selection for pipe segment removal.**

(a) *General.* (1) Select the pipe segments to be sampled by following the directions in paragraph (b) of this section.

(2) Locate the proper position along the length of the pipe segment that you have selected for sampling, by following the directions in paragraph (c) of this section.

(3) Select the proper sampling position around the circumference of the pipe segment that you have selected for sampling, by following the directions in paragraph (d) of this section.

(4) Prior to removing pipe from the ground or lifting the pipe from its location during former operations, mark the top side of the pipe.

(5) Do not sample if there are free-flowing liquids in the pipe segment. Free-flowing liquids must be removed prior to sampling.

(b) *Selecting pipe segments to sample.* Select the pipe segment(s) that you will sample from a length of pipe or group of pipe segments, as follows:

(1) Do not sample a pipe segment that is longer than 12.2 meters (40 feet). If a segment is longer than 12.2 meters in length, cut the segment so that all resulting segments are 12.2 meters or less in length.

(2) Determine which pipe segments to sample as follows:

(i) When a length of pipe having seven or fewer segments is removed for purposes of disposal, sample each pipe segment.

(ii) When removing a length of pipe having multiple contiguous segments less than 3 miles in total length, take samples from a total of seven segments.

(A) Sample the first and last segments removed.

(B) Select the five additional segments according to one of the two following procedures:

(*1*) Assign all segments a unique sequential number. Then select five numbers using a random number table or random number generator. If the random number generator or random number table produces either the first pipe segment, the last pipe segment, or any previously selected segment, select another random number until there are seven different numbers, each corresponding to a different pipe segment.

(*2*) Divide the total number of segments by six. Round the resulting quotient off to the nearest whole number. The resulting number is the interval between the segments you will sample. For example, cut a 2.9 mile length of pipeline into 383 segments of approximately 40 feet each. Sample the first (number 1) and last (number 383) segments. To determine which additional five segments to sample, divide the total number of segments, 383, by 6. Round up the resulting number in this example, 63.8, to the next whole number, 64. Add 64 to the number of each preceding pipe segment five separate times to select five additional pipe segments for sampling. In this example, the first pipe segment has the number 1, add 64 to 1 to select segment 65. Next, add 64 to 65 to select segment 129. Continue in this fashion to select all seven segments: 1, 65, 129, 193, 257, 321, and 383.

(iii) When removing a length of pipe having multiple contiguous segments more than 3 miles in total length for purposes of disposal, take samples of each segment that is ½ mile distant from the segment previously sampled. Sample a minimum of seven segments.

(c) *Selecting the sampling position—length.* Select the sampling position along the length of the pipe segment, as follows:

(1) Take samples at the end upstream of the former gas flow of each segment removed.

(2) If the pipe segment is cut with a torch or other high temperature heat source, take the sample at least 15 cm

(6 inches) inside the cut end of the pipe segment.

(3) If the pipe segment is cut with a saw or other mechanical device, take the sample at least 2 cm (1 inch) inside the end of the pipe segment.

(4) If the sample site location selected in the procedure at paragraph (c)(2) or (c)(3) of this section is a porous surface (for example, there is significant corrosion so that the wipe material will be shredded), then move the sample site further inside the pipe segment (away from the end of the pipe or pipe segment) until there is no such porous surface. For purposes of this subpart, natural gas pipe with a thin porous corrosion preventive coating is a non-porous surface.

(5) If there is not a non-porous surface accessible by paragraphs (c)(2) and (c)(3) of this section, use one of the following three options:

(i) Sample the downstream end of the pipe segment using the same sample site location procedure as for the upstream end.

(ii) Select another pipe segment using the random selection procedure described in paragraph (b) of this section.

(iii) If there is no other pipe segment in the population to be sampled and both ends of a pipe segment have porous surfaces at all possible sample collection sites, then assume that the pipe segment contains ≥50 ppm PCB but <500 ppm PCB.

(d) *Selecting the sample position—circumference.* Based on the mark on the top of the pipe segment made prior to removing pipe from the ground or lifting the pipe from its location during former operations, sample the inside center of the bottom of the pipe being sampled. Make sure the sample is centered on the bottom of the pipe segment; that is, sample an equal area on both sides of the middle of the bottom of the pipe segment for the entire length of the sample.

[63 FR 35462, June 29, 1998, as amended at 64 FR 33762, June 24, 1999]

### § 761.250 Sample site selection for pipeline section abandonment.

This procedure is for the sample site selection for a pipeline section to be abandoned, in accordance with § 761.60(b)(5)(i)(B).

(a) *General.* (1) Select sample collection sites in the pipeline section(s) by following the directions in paragraph (b) of this section.

(2) Select the proper sampling position along the pipe by following the directions in § 761.247 (c) and (d).

(3) Assure, by visual inspection, the absence of free-flowing liquids in the pipe by affirming no liquids at all liquid collection points and all ends of the pipeline section to be abandoned.

(b) *Selection sample collection sites.* At a minimum, sample all ends of all pipeline sections to be abandoned in place.

(1) If the pipeline section to be abandoned is between the pressure side of one compressor station and the suction side of the next compressor station downstream of the former gas flow, at a minimum, sample all ends of the abandoned pipe.

(2) If the pipeline section to be abandoned is longer than the distance between the pressure side of one compressor station and the suction side of the next compressor station downstream of the former gas flow, divide the pipeline section, for purposes of sampling, into smaller pipeline sections no longer than the distance from the pressure side of one compressor station to the suction side of the next compressor station downstream of the former gas flow. Consider each of the smaller sections to be a separate abandonment and sample each one, at a minimum, at all ends.

(3) Use the following procedure to locate representative sample collection sites in pipeline sections at points other than the suction and pressure side of compressor stations, or the ends of the pipeline section to be abandoned.

(i) First, assign a unique identifying sequential number to each kilometer or fraction of a kilometer length of pipe within the entire pipeline section.

(ii) Use a random number table or a random number generator to select each representative sample collection site from a complete list of the sequential identification numbers.

(iii) Samples may be collected by removing any covering soil, cutting the

pipe to gain access to the sampling location, and collecting the surface sample with the pipe in place, rather than completely removing the pipeline sections to collect the surface sample.

[63 FR 35462, June 29, 1998, as amended at 64 FR 33762, June 24, 1999]

### §761.253 Chemical analysis.

(a) Extract PCBs from the standard wipe sample collection medium and clean-up the extracted PCBs in accordance with either Method 3500B/3540C or Method 3500B/3550B from EPA's SW-846, Test Methods for Evaluating Solid Waste, or a method validated under subpart Q of this part. Use Method 8082 from SW-846, or a method validated under subpart Q of this part, to analyze these extracts for PCBs.

(b) Report all PCB sample concentrations in μg/100 $cm^2$ (16 square inches) of surface sampled. If sampling an area smaller than 100 $cm^2$, report converted sample concentrations in accordance with §761.243(b).

### §761.257 Determining the regulatory status of sampled pipe.

(a) For purposes of removal for disposal of a pipe segment that has been sampled, the sample results for that segment determines its PCB surface concentration. Determine the PCB surface concentration of a segment which was not sampled as follows:

(1) If the unsampled pipe segment is between two pipe segments which have been sampled, assume that the unsampled segment has the same PCB surface concentration as the nearest sampled pipe segment.

(2) If an unsampled pipe segment is equidistant between two pipe segments which have been sampled, assume the PCB surface concentration of the unsampled segment to be the arithmetic mean of the PCB surface concentrations measured in the two equidistant, sampled, pipe segments.

(b) For purposes of abandonment of a pipeline section, assume that the PCB surface concentration for an entire pipeline section is the arithmetic mean of the PCB surface concentrations measured at the ends of the pipeline section. If additional representative samples were taken in a pipeline section, assume that the PCB surface concentration for the entire pipeline section is the arithmetic mean of the concentrations measured in all representative samples taken.

(c) For purposes of removal for disposal under §761.60(b)(5)(ii)(A)(*1*) or abandonment under §761.60(b)(5)(i)(B), if the surface PCB concentration of a pipe segment, determined by direct measurement or in accordance with paragraph (a) of this section, or of a pipeline section as determined in accordance with paragraph (b) of this section, is >10 μg/100 $cm^2$, but <100 μg/100 $cm^2$, then that segment or section is PCB-Contaminated.

## Subpart N—Cleanup Site Characterization Sampling for PCB Remediation Waste in Accordance with §761.61(a)(2)

SOURCE: 63 FR 35464, June 29, 1998, unless otherwise noted.

### §761.260 Applicability.

This subpart provides a method for collecting new data for characterizing a PCB remediation waste cleanup site or for assessing the sufficiency of existing site characterization data, as required by §761.61(a)(2).

### §761.265 Sampling bulk PCB remediation waste and porous surfaces.

(a) Use a grid interval of 3 meters and the procedures in §§761.283 and 761.286 to sample bulk PCB remediation waste that is not in a container and porous surfaces.

(b) Use the following procedures to sample bulk PCB remediation waste that is in a single container.

(1) Use a core sampler to collect a minimum of one core sample for the entire depth of the waste at the center of the container. Collect a minimum of 50 $cm^3$ of waste for analysis.

(2) If more than one core sample is taken, thoroughly mix all samples into a composite sample. Take a subsample of a minimum of 50 $cm^3$ from the mixed composite for analysis.

(c) Use the following procedures to sample bulk PCB remediation waste that is in more than one container.

(1) Segregate the containers by type (for example, a 55-gallon drum and a

roll-off container are types of containers).

(2) For fewer than three containers of the same type, sample all containers.

(3) For more than three containers of the same type, list the containers and assign each container an unique sequential number. Use a random number generator or table to select a minimum of 10 percent of the containers from the list, or select three containers, whichever is the larger.

(4) Sample the selected container(s) according to paragraph (b) of this section.

**§ 761.267 Sampling non-porous surfaces.**

(a) Sample large, nearly flat, non-porous surfaces by dividing the surface into roughly square portions approximately 2 meters on each side. Follow the procedures in § 761.302(a).

(b) It is not necessary to sample small or irregularly shaped surfaces.

**§ 761.269 Sampling liquid PCB remediation waste.**

(a) If the liquid is single phase, collect and analyze one sample. There are no required procedures for collecting a sample.

(b) If the liquid is multi-phasic, separate the phases, and collect and analyze a sample from each liquid phase. There are no required procedures for collecting a sample from each single phase liquid.

(c) If the liquid has a non-liquid phase which is >0.5 percent by total weight of the waste, separate the non-liquid phase from the liquid phase and sample it separately as a non-liquid in accordance with § 761.265.

**§ 761.272 Chemical extraction and analysis of samples.**

Use either Method 3500B/3540C or Method 3500B/3550B from EPA's SW-846, Test Methods for Evaluating Solid Waste, or a method validated under subpart Q of this part, for chemical extraction of PCBs from individual and composite samples of PCB remediation waste. Use Method 8082 from SW-846, or a method validated under subpart Q of this part, to analyze these extracts for PCBs.

**§ 761.274 Reporting PCB concentrations in samples.**

(a) Report all sample concentrations for non-liquid PCBs on a dry weight basis as micrograms of PCBs per gram of sample (ppm by weight). Report surface sampling results as μg/100 $cm^2$. Divide 100 $cm^2$ by the surface area and multiply this quotient by the total number of micrograms of PCBs on the surface to obtain the equivalent measurement of micrograms per 100 $cm^2$.

(b) Report all sample concentrations for liquid PCBs on a wet weight basis as micrograms of PCBs per gram of sample (ppm by weight).

## Subpart O—Sampling To Verify Completion of Self-Implementing Cleanup and On-Site Disposal of Bulk PCB Remediation Waste and Porous Surfaces in Accordance With § 761.61(a)(6)

SOURCE: 63 FR 35465, June 29, 1998, unless otherwise noted.

**§ 761.280 Application and scope.**

Follow the procedures in this subpart when sampling to verify completion of the cleanup for self-implementing, on-site disposal of bulk PCB remediation waste and porous surfaces consistent with the levels of § 761.61(a)(4)(i) and (iii). The objective of this subpart is not to search for new contamination. Confirmation of compliance with the cleanup levels in § 761.61(a)(4) is only verifiable for the area sampled in accordance with this subpart. Do not make conclusions or extrapolations about PCB concentrations outside of the area which has been cleaned up and verified based on the results of this verification sampling.

**§ 761.283 Determination of the number of samples to collect and sample collection locations.**

This section addresses how to determine the number of samples to collect and sample collection locations for bulk PCB remediation waste and porous surfaces destined to remain at a cleanup site after cleanup.

(a) *Minimum number of samples*. (1) At each separate cleanup site at a PCB remediation waste location, take a minimum of three samples for each type of bulk PCB remediation waste or porous surface at the cleanup site, regardless of the amount of each type of waste that is present. There is no upper limit to the number of samples required or allowed.

(2) This is an example of how to calculate the minimum number of required samples at a PCB remediation waste location. There are three distinct cleanup sites at this example location: a loading dock, a transformer storage lot, and a disposal pit. The minimum number of samples to take appears in parentheses after each type of waste for each cleanup site. The PCB remediation wastes present at the loading dock are concrete (three samples) and clay soil (three samples). The non-liquid PCB remediation wastes present at the transformer storage lot are oily soil (three samples), clay soil (three samples) and gravel (three samples). The PCB remediation wastes present at the disposal pit are sandy soil (three samples), clay soil (three samples), oily soil (three samples), industrial sludge (three samples), and gravel (three samples).

(b) *Selection of sample locations—general*. (1)(i) Use a square-based grid system to overlay the entire area to be sampled. Orient the grid axes on a magnetic north-south line centered in the area and an east-west axis perpendicular to the magnetic north-south axis also centered in the area.

(ii) If the site is recleaned based on the results of cleanup verification conducted in accordance with §761.61(a)(6), follow the procedures in paragraph (b) of this section for locating sampling points after the recleaning, but reorient the grid axes established in paragraph (b)(1)(i) of this section by moving the origin one meter in the direction of magnetic north and one meter in the direction east of magnetic north.

(2) Mark out a series of sampling points 1.5 meters apart oriented to the grid axes. The sampling points shall proceed in every direction to the extent sufficient to result in a two-dimensional grid completely overlaying the sampling area.

(3) Collect a sample at each point if the grid falls in the cleanup area. Analyze all samples either individually or according to the compositing schemes provided in the procedures at §761.289. So long as every sample collected at a grid point is analyzed as either an individual sample or as part of a composite sample, there are no other restrictions on how many samples are analyzed.

(c) *Selection of sample locations—small cleanup sites*. When a cleanup site is sufficiently small or irregularly shaped that a square grid with a grid interval of 1.5 meters will not result in a minimum of three sampling points for each type of bulk PCB remediation waste or porous surface at the cleanup site, there are two options.

(1) Use a smaller square grid interval and the procedures in paragraph (b) of this section.

(2) Use the following coordinate-based random sampling scheme. If the site is recleaned based on the results of cleanup verification conducted in accordance with §761.61(a)(6), follow the procedures in this section for locating sampling points after the recleaning, but select three new pairs of sampling coordinates.

(i) Beginning in the southwest corner (lower left when facing magnetic north) of the area to be sampled, measure in centimeters (or inches) the maximum magnetic north-south dimension of the area to be sampled. Next, beginning in the southwest corner, measure in centimeters (or inches) the maximum magnetic east-west dimension of the area to be sampled. Designate the north-south and east-west dimensions (describing the west and south boundaries, respectively, of the area to be sampled), as the reference axes of a square-based grid system.

(ii) Use a random number table or random number generator to select a pair of coordinates that will locate the sample within the area to be sampled. The first coordinate in the pair is the measurement on the north-south axis. The second coordinate in the pair is the measurement on the east-west axis. Collect the sample at the intersection of an east-west line drawn through the measured spot on the north-south axis, and a north-south line drawn through the measured spot on the east-west

axis. If the cleanup site is irregularly shaped and this intersection falls outside the cleanup site, select a new pair of sampling coordinates. Continue to select pairs of sampling coordinates until three are selected for each type of bulk PCB remediation waste or porous surface at the cleanup site.

(d) *Area of inference.* Analytical results for an individual sample point apply to the sample point and to an area of inference extending to four imaginary lines parallel to the grid axes and one half grid interval distant from the sample point in four different directions. The area of inference forms a square around the sample point. The sides of the square are parallel to the grid axes and one grid interval in length. The sample point is in the center of the square area of inference. The area of inference from a composite sample is the total of the areas of the individual samples included in the composite.

### § 761.286 Sample size and procedure for collecting a sample.

At each selected sampling location for bulk PCB remediation waste or porous surfaces, collect at least 20 milliliters of waste, or a portion of sufficient weight for the chemical analyst to measure the concentration of PCBs and still have sufficient analytical detection sensitivity to reproducibly measure PCBs at the levels designated in § 761.61(a)(4). Use a core sampler having a diameter ≥2 cm and ≤3 cm. Collect waste to a maximum depth of 7.5 cms.

### § 761.289 Compositing samples.

Compositing is a method of combining several samples of a specific type of bulk PCB remediation waste or porous surface from nearby locations for a single chemical analysis. There are two procedures for compositing bulk PCB remediation waste samples. These procedures are based on the method for selecting sampling site locations in § 761.283(b) and (c). The single chemical analysis of a composite sample results in an averaging of the concentrations of its component samples. The area of inference of a composite is determined by the area of inference of each of its component samples as described in § 761.283(d). Compositing is not mandatory. However, if compositing is used, it must be performed in accordance with the following procedures.

(a) *Compositing in the field or in a laboratory.* Compositing may occur either in the field or in a laboratory. Prepare composite samples using equal volumes of each constituent or component sample. Composited samples must be from the same type of bulk PCB remediation waste or porous surface (see the example at § 761.283(a)(2)). Mix composite samples thoroughly. From each well-mixed composite sample, take a portion of sufficient weight for the chemical analyst to measure the concentration of PCBs and still have sufficient analytical detection sensitivity to reproducibly measure PCBs at the levels designated in § 761.61(a)(4).

(b)(1) *Compositing from samples collected at grid points in accordance with § 761.283(b).* There are two kinds of composite sampling procedures depending on the original source of contamination of the site.

(i) The first procedure is for sites with multiple point sources of contamination (such as an old electrical equipment storage area, a scrap yard, or repair shop) or for unknown sources of contamination. Under this compositing scheme, composite a maximum of nine samples for each type of bulk PCB remediation waste or porous surface at the cleanup site. The maximum dimensions of the area enclosing a nine grid point composite is two grid intervals bounded by three collinear grid points (3.0 meters or approximately 10 feet long). Take all samples in the composite at the same depth. Assure that composite sample areas and individually analyzed samples completely overlay the cleanup site.

(ii) The second procedure is for a single point source of contamination, such as discharge into a large containment area (e.g., pit, waste lagoon, or evaporation pond), or a leak onto soil from a single drum or tank. Single point source contamination may be from a one-time or continuous contamination. Composites come from two stages: an initial compositing area centered in the area to be sampled, and subsequent compositing areas forming concentric square zones around the initial

compositing area. The center of the initial compositing area and each of the subsequent compositing areas is the origin of the grid axes.

(A) *Definition of the initial compositing area.* The initial compositing area is based on a square that contains nine grid points, is centered on the grid origin, and has sides two grid intervals long. The initial compositing area has the same center as this square and sides one half a grid interval more distant from the center than the square. The initial compositing area has sides three grid intervals long.

(B) *Definition of subsequent compositing areas.* Subsequent composite sampling areas are in concentric square zones one grid interval wide around the initial compositing area and around each successive subsequent compositing area. The inner boundary of the first subsequent compositing area is the outer boundary of the initial compositing area. The outer boundary of the first subsequent compositing area is centered on the grid origin, has sides one grid interval more distant from the grid origin than the inner boundary, and is two grid intervals longer on a side than the inner boundary. The inner boundary of each further subsequent compositing area is the outer boundary of the previous subsequent compositing area. The outer boundary of each further subsequent compositing area is centered on the grid origin, has sides one grid interval more distant from the grid origin than the inner boundary, and is two grid intervals longer on a side than the inner boundary.

(C) *Taking composite samples from the initial and subsequent compositing areas.* (*1*) Select composite sampling areas from the initial compositing area and subsequent compositing areas such that all grid points in the initial compositing area and subsequent compositing areas are part of a composite or individual sample.

(*2*) A person may include in a single composite sample a maximum of all nine grid points in the initial compositing area. The maximum number of grid points in a composite sample taken from a subsequent compositing area is eight. These eight grid points must be adjacent to one another in the subsequent compositing area, but need not be collinear.

(2) *Compositing from samples taken at grid points or pairs of coordinates in accordance with §761.283(c).* Samples collected at small sites are based on selecting pairs of coordinates or using the sample site selection procedure for grid sampling with a smaller grid interval.

(i) *Samples collected from a grid having a smaller grid interval.* Use the procedure in paragraph (b)(1)(i) of this section to composite samples and determine the area of inference for composite samples.

(ii) *Samples collected from pairs of coordinates.* All three samples must be composited. The area of inference for the composite is the entire area sampled.

**§761.292 Chemical extraction and analysis of individual samples and composite samples.**

Use either Method 3500B/3540C or Method 3500B/3550B from EPA's SW-846, Test Methods for Evaluating Solid Waste, or a method validated under subpart Q of this part, for chemical extraction of PCBs from individual and composite samples of PCB remediation waste. Use Method 8082 from SW-846, or a method validated under subpart Q of this part, to analyze these extracts for PCBs.

**§761.295 Reporting and recordkeeping of the PCB concentrations in samples.**

(a) Report all sample concentrations for bulk PCB remediation waste and porous surfaces on a dry weight basis and as micrograms of PCBs per gram of sample (ppm by weight).

(b) Record and keep on file for 3 years the PCB concentration for each sample or composite sample.

**§761.298 Decisions based on PCB concentration measurements resulting from sampling.**

(a) For grid samples which are chemically analyzed individually, the PCB concentration applies to the area of inference as described in §761.283(d).

(b) For grid samples analyzed as part of a composite sample, the PCB concentration applies to the area of inference of the composite sample as described in § 761.283(d) (i.e., the area of inference is the total of the areas of the individual samples included in the composite).

(c) For coordinate pair samples analyzed as part of a composite sample, in accordance with §§ 761.283(c)(2) and 761.289(b)(2)(ii), the PCB concentration applies to the entire cleanup site.

## Subpart P—Sampling Non-Porous Surfaces for Measurement-Based Use, Reuse, and On-Site or Off-Site Disposal Under § 761.61(a)(6) and Decontamination Under § 761.79(b)(3)

SOURCE: 63 FR 35467, June 29, 1998, unless otherwise noted.

### § 761.300 Applicability.

This subpart provides sample site selection procedures for large, nearly flat non-porous surfaces, and for small or irregularly shaped non-porous surfaces. This subpart also provides procedures for analyzing the samples and interpreting the results of the sampling. Any person verifying completion of self-implementing cleanup and on-site disposal of non-porous surfaces under § 761.61(a)(6), or verifying that decontamination standards under § 761.79(b)(3) are met, must use these procedures.

### § 761.302 Proportion of the total surface area to sample.

(a) *Large nearly flat surfaces*. Divide the entire surface into approximately 1 meter square portions and mark the portions so that they are clearly identified. Determine the sample location in each portion as directed in § 761.304.

(1) For large nearly flat surfaces contaminated by a single source of PCBs with a uniform concentration, assign each 1 meter square surface a unique sequential number.

(i) For three or fewer 1 meter square areas, sample all of the areas.

(ii) For four or more 1 meter square areas, use a random number generator or table to select a minimum of 10 percent of the areas from the list, or to select three areas, whichever is more.

(2) For other large nearly flat surfaces, sample all of the one meter square areas.

(b) *Small or irregularly shaped surfaces*. For small surfaces having irregular contours, such as hand tools, natural gas pipeline valves, and most exterior surfaces of machine tools, sample the entire surface. Any person may select sampling locations for small, nearly flat surfaces in accordance with § 761.308 with the exception that the maximum area in § 761.308(a) is <1 meter square.

(c) *Preparation of surfaces*. Drain all free-flowing liquids from surfaces and brush off dust or loose grit.

### § 761.304 Determining sample location.

(a) For 1 square meter non-porous surface areas having the same size and shape, it is permissible to sample the same 10 cm by 10 cm location or position in each identical 1 square meter area. This location or position is determined in accordance with § 761.306 or § 761.308.

(b) If some 1 square meter surfaces for a larger non-porous surface area have different sizes and shapes, separately select the 10 cm by 10 cm sampling position for each different 1 square meter surface in accordance with § 761.308.

(c) If non-porous surfaces have been cleaned and the cleaned surfaces do not meet the applicable standards or levels, surfaces may be recleaned and resampled. When resampling surfaces previously sampled to verify cleanup levels, use the sampling procedures in §§ 761.306 through 761.316 to resample the surfaces. If any sample site selected coincides with a previous sampling site, restart the sample selection process until all resampling sites are different from any previous sampling sites.

### § 761.306 Sampling 1 meter square surfaces by random selection of halves.

(a) Divide each 1 meter square portion where it is necessary to collect a surface wipe test sample into two equal (or as nearly equal as possible) halves. For example, divide the area into top

and bottom halves or left and right halves. Choose the top/bottom or left/right division that produces halves having as close to the shape of a circle as possible. For example, a square is closer to the shape of a circle than is a rectangle and a rectangle having a length to width ratio of 2:1 is closer to the shape of a circle than a rectangle having a length to width ratio of 3:1.

(b) Assign a unique identifier to each half and then select one of the halves for further sampling with a random number generator or other device (i.e., by flipping a coin).

(c) Continue selecting progressively smaller halves by dividing the previously selected half, in accordance with paragraphs (a) and (b) of this section, until the final selected half is larger than or equal to 100 $cm^2$ and smaller than 200 $cm^2$.

(d) Perform a standard PCB wipe test on the final selected halves from each 1 meter square portion.

(e) The following is an example of applying sampling by halves. Assume that the area to sample is a 1 meter square surface area (a square that has sides 1 meter long). Assign each half to one face of a coin. After flipping the coin, the half assigned to the face of the coin that is showing is the half selected.

(1) Selecting the first half:

(i) For a square shape the top/bottom halves have the same shape as the left/right halves when compared to a circle, i.e., regardless of which way the surface is divided, each half is 1 half meter wide by 1 meter long. Therefore, divide the area either top/bottom or left/right. For selecting the first half, this example will select from left/right halves.

(ii) A coin flip selects the left half. The dimensions of this selected surface area are 1 meter high and ½ meter wide.

(2) Selecting the second half:

(i) If the next selection of halves was left/right, the halves would be rectangles four times as long as they are wide (¼ meter wide and 1 meter high). Halves selected from top/bottom would be square (½ meter on a side). Therefore, select the next halves top/bottom, because the shape of the top/bottom halves (square) is closer to the shape of a circle than the shape of the left/right halves (long narrow rectangles).

(ii) A coin flip selects the top half. The dimensions of this selected surface area are ½ meter high and ½ meter wide.

(3) Selecting the third half:

(i) Just as for the selection of the first half, which divided the original square area, both the left/right and the top/bottom halves have the same shape when compared to a circle (both are rectangles having the same dimensions). Therefore, choose either left/right or top/bottom halves. This example will select from left/right halves.

(ii) A coin flip selects the right half. The dimensions of this selected surface are ¼ meter by ½ meter.

(4) Selecting the fourth half:

(i) If the next selection of halves was left/right, the halves would be rectangles four times as long as they are wide (⅛ meter wide and ½ meter high. Halves selected from top/bottom would be square (¼ meter on a side). Therefore, select the next halves top/bottom, because the shape of the top/bottom halves (square) are closer to the shape of a circle than the shape of the left/right halves (long narrow rectangles).

(ii) A coin flip selects the bottom half. The dimensions of this selected surface area are ¼ meter high and ¼ meter wide.

(5) Selecting the fifth half:

(i) Just as for the selection of the first and third halves, both the left/right and the top/bottom halves have the same shape when compared to a circle (both are rectangles having the same dimensions). Therefore, choose either left/right or top/bottom halves. This example will select from left/right halves.

(ii) A coin flip selects the right half. The dimensions of the selected surface are ⅛ meter by ¼ meter.

(6) Selecting the sixth half:

(i) If the next selection of halves was left/right, the halves would be rectangles four times as long as they are wide (1/16 meter wide and ¼ meter high. Halves selected from top/bottom would be square (⅛ meter on a side). Therefore, select the next halves top/bottom, because the shape of the top/bottom halves (square) are closer to the shape

of a circle than the shape of the left/right halves (long narrow rectangles).

(ii) A coin flip selects the top half. The dimensions of this selected surface are ⅛ meter high and ⅛ meter wide or 12.5 cm by 12.5 cm.

(7) Collect a standard wipe test sample in the sixth half. Since the dimensions of half of the sixth half would be 12.5 cm by 6.25 cm, the area (approximately 78 $cm^2$) would be less than the required 100 $cm^2$ minimum area for the standard wipe test. Therefore, no further sampling by halves is necessary. Take the standard wipe test samples of the entire selected sixth half.

### § 761.308 Sample selection by random number generation on any two-dimensional square grid.

(a) Divide the surface area of the non-porous surface into rectangular or square areas having a maximum area of 1 square meter and a minimum dimension of 10 centimeters.

(b) Measure the length and width, in centimeters, of each area created in paragraph (a) of this section. Round off the number of centimeters in the length and the width measurements to the nearest centimeter.

(c) For each 1 square meter area created in accordance with paragraph (a) of this section, select two random numbers: one each for the length and width borders measured in paragraph (b) of this section. An eligible random number can be from zero up to the total width, minus 10 centimeters.

(d) Locate the 10 centimeter by 10 centimeter sample.

(1) Orient the 1 square meter surface area so that, when you are facing the area, the length is left to right and the width is top to bottom. The origin, or reference point for measuring selected random numbers of centimeters to the sampling area, is on the lower left corner when facing the surface.

(2) Mark the random number selected for the length distance, in centimeters, from the origin to the right (at the bottom of the area away from the origin).

(3) From the marked length distance on the bottom of the area, move perpendicularly up from the bottom of the area into the area for the distance randomly selected for the width.

(4) Use the point determined in paragraph (d)(3) of this section as the lower left corner of the 10 centimeter by 10 centimeter sample.

### § 761.310 Collecting the sample.

Use the standard wipe test as defined in § 761.123 to sample one 10 centimeter by 10 centimeter square (100 $cm^2$) area to represent surface area PCB concentrations of each square meter or fraction of a square meter of a nearly flat, non-porous surface. For small surfaces, use the same procedure as for the standard wipe test, only sample the entire area, rather than 10 centimeter by 10 centimeter squares.

### § 761.312 Compositing of samples.

For a surface originally contaminated by a single source of PCBs with a uniform concentration, it is permissible to composite surface wipe test samples and to use the composite measurement to represent the PCB concentration of the entire surface. Composite samples consist of more than one sample gauze extracted and chemically analyzed together resulting in a single measurement. The composite measurement represents an arithmetic mean of the composited samples.

(a) *Compositing samples from surfaces to be used or reused.* For small or irregularly shaped surfaces or large nearly flat surfaces, if the surfaces are contaminated by a single source of PCBs with a uniform concentration, composite a maximum of three adjacent samples.

(b) *Compositing samples from surfaces to be disposed of off-site or on-site.* (1) For small or irregularly shaped surfaces, composite a maximum of three adjacent samples.

(2) For large nearly flat surfaces, composite a maximum of 10 adjacent samples.

### § 761.314 Chemical analysis of standard wipe test samples.

Perform the chemical analysis of standard wipe test samples in accordance with § 761.272. Report sample results in micrograms per 100 $cm^2$.

**§ 761.316 Interpreting PCB concentration measurements resulting from this sampling scheme.**

(a) For an individual sample taken from an approximately 1 meter square portion of the entire surface area and not composited with other samples, the status of the portion is based on the surface concentration measured in that sample. If the sample surface concentration is not equal to or lower than the cleanup level, by inference the entire 1 meter area, and not just the immediate area where the sample was taken, is not equal to or lower than the cleanup level.

(b) For areas represented by the measurement results from compositing more than one 10 centimeter by 10 centimeter sample, the measurement for the composite is the measurement for the entire area. For example, when there is a composite of 10 standard wipe test samples representing 9.5 square meters of surface area and the result of the analysis of the composite is 20 μg/100 $cm^2$, then the entire 9.5 square meters has a PCB surface concentration of 20 μg/100 $cm^2$, not just the area in the 10 cm by 10 cm sampled areas.

(c) For small surfaces having irregular contours, where the entire surface was sampled, measure the surface area. Divide 100 $cm^2$ by the surface area and multiply this quotient by the total number of micrograms of PCBs on the surface to obtain the equivalent measurement of micrograms per 100 $cm^2$.

## Subpart Q—Self-Implementing Alternative Extraction and Chemical Analysis Procedures for Non-liquid PCB Remediation Waste Samples

SOURCE: 63 FR 35468, June 29, 1998, unless otherwise noted.

**§ 761.320 Applicability.**

This subpart describes self-implementing comparison testing requirements for chemical extraction and chemical analysis methods used as an alternative to the methods required in § 761.272 or § 761.292. Any person conducting comparison testing under this subpart must comply with the requirements of § 761.80(i), including notification. Use alternative methods only after successful completion of these comparison testing requirements and after documentation of the results of the testing.

**§ 761.323 Sample preparation.**

(a) The comparison study requires analysis of a minimum of 10 samples weighing at least 300 grams each. Samples of PCB remediation waste used in the comparison study must meet the following three requirements.

(1) The samples must either be taken from the PCB remediation waste at the cleanup site, or must be the same kind of material as that waste. For example, if the waste at the cleanup site is sandy soil, you must use the same kind of sandy soil in the comparison study. Do not use unrelated materials such as clay soil or dredged sediments in place of sandy soil.

(2) PCB remediation waste may contain interferences which confound or hamper sample extraction and chemical analysis. These interferences may be from chemicals or other attributes preexisting in the waste material, resulting from the PCB contamination source, or resulting from treatment to remove or destroy PCBs. Comparison study samples must also contain these interfering materials to demonstrate successful analysis in their presence. For example, a PCB remediation waste may have been co-disposed with chlorobenzene solvents or chlorinated pesticides. These chlorinated compounds would have to be present in the comparison study compounds at the same levels found, or at the highest levels expected to be found, in the PCB remediation waste. As another example, for PCB remediation waste which had been solvent washed with liquid amines to remove PCBs, comparison study samples would have to contain concentrations of these amines at the same levels found, or at the highest levels expected to be found, in the PCB remediation waste.

(b) Prior to initiating the comparison study, confirm the following PCB concentrations in the comparison study samples using the methods specified in § 761.292. All samples of non-liquid PCB

remediation waste must have PCB concentrations between 0.1 and 150 ppm.

(1) A minimum of three comparison study samples must have PCB concentrations above the cleanup level specified for the site in § 761.61(a)(4) and a minimum of three comparison study samples must have PCB concentrations below the specified cleanup level.

(2) At least one comparison study sample must have a PCB concentration ≥90 percent and ≤100 percent of the cleanup level.

(3) At least one comparison study sample must have a PCB concentration ≥100 percent and ≤110 percent of the cleanup level.

(c) If the comparison study samples do not have the concentrations or concentration ranges required by paragraph (b) of this section, for purposes of use in this chemical extraction and chemical analysis comparison study, a person may adjust PCB concentrations by dilution. Any excess material resulting from the preparation of these samples, which is not used as an analytical sample, is regulated as the PCB concentration in the component having the highest PCB concentration of the component materials in the sample.

**§ 761.326 Conducting the comparison study.**

Extract or analyze the comparison study samples using the alternative method. For an alternative extraction method or alternative analytical method to be comparable to the methods required in § 761.292, all of the following conditions must be met.

(a) All samples having PCB concentrations greater than or equal to the level of concern, as measured by the methods required in § 761.292, are found to be greater than or equal to the level of concern as measured by the alternative method (no false negatives).

(b) Only one sample which contains PCBs at a level less than the level of concern, as measured by the methods required in § 761.292, is found to have a PCB concentration greater than the level of concern as measured by the alternative method (false positive); and all other samples which contain PCBs at levels less than the level of concern, as measured by the methods required in § 761.292, are found by the alternative method to have PCBs less than the level of concern (there are no additional false positives).

## Subpart R—Sampling Non-Liquid, Non-Metal PCB Bulk Product Waste for Purposes of Characterization for PCB Disposal in Accordance With § 761.62, and Sampling PCB Remediation Waste Destined for Off-Site Disposal, in Accordance With § 761.61

SOURCE: 63 FR 35469, June 29, 1998, unless otherwise noted.

**§ 761.340 Applicability.**

Use the procedures specified in this subpart to sample the following types of waste when it is necessary to analyze the waste to determine PCB concentration or leaching characteristics for storage or disposal.

(a) Existing accumulations of non-liquid, non-metal PCB bulk product waste.

(b) Non-liquid, non-metal PCB bulk product waste from processes that continuously generate new waste.

(c) Non-liquid PCB remediation waste from processes that continuously generate new waste, that will be sent off-site for disposal.

**§ 761.345 Form of the waste to be sampled.**

PCB bulk product waste and PCB remediation waste destined for off-site disposal must be in the form of either flattened or roughly conical piles. This subpart also contains a procedure for contemporaneous sampling of waste as it is being generated.

**§ 761.346 Three levels of sampling.**

To select a sample of the waste and prepare it for chemical extraction and analysis, there are three required levels of random sampling.

(a) First, select a single 19-liter (5 gallon) portion from a composite accumulated either contemporaneously with the generation of the waste or by sampling an existing pile of waste. Collection procedures for the first level of sampling from existing piles of waste

are in § 761.347. Collection procedures for the first level of sampling from a contemporaneous generation of waste are in § 761.348. Compositing requirements and requirements for the subsampling of composite samples to result in a single 19-liter sample are in § 761.350. Send the 19-liter sample to the laboratory for the second and third levels of sampling, including particle size reduction for leach testing and drying as required by § 761.1(b)(4).

(b) Second, at the laboratory, select one quarter of the 19-liter sample. Procedures the laboratory must use for this second level of sample selection appear in § 761.353.

(c) Third, select a 100 gram subsample from the second level subsample. Procedures the laboratory must use for this third level of sample selection appear in § 761.355.

**§ 761.347 First level sampling—waste from existing piles.**

(a) *General.* Sample piles that are either specifically configured for sampling (see paragraph (b) of this section) or that are of conical shape (see paragraph (c) of this section). If sampling from either of these shapes is not possible, conduct contemporaneous sampling, in accordance with the procedures in § 761.348, or obtain the approval of the Regional Administrator for an alternate sampling plan in accordance with § 761.62(c).

(b) *Specifically configured piles.* A specifically configured pile is a single flattened pile in the shape of a square or rectangle having no restrictions on length or width but restricted to 30 cm (1 foot) in depth. A square shaped pile facilitates sampling site selection for the first level sample. Select eight 19-liter samples from the pile and composite them into one 19-liter sample as follows:

(1) Divide the pile into quarters.

(2) Divide each of the quarter sections into quarters (i.e., into sixteenths of the original pile).

(3) Select two sixteenths from each of the four quarters, according to one of the two following options:

(i) Randomly select the two sixteenths from one quarter and sample the sixteenths occupying the same positions in each of the other three quarters.

(ii) Randomly select two sixteenths from each of the four quarters (i.e., perform a random selection four different times).

(4) At this point the eight selected sixteenths undergo further division and sample selection. Divide each of the eight selected sixteenths into four equal parts. Using a random number generator or random number table, select one of the four equal parts from each of the eight equal areas. If each of the four equal parts has a volume >76 liters when projected downwards 30 cm, continue to divide each selected area into four equal parts, and select one of the parts, until each selected area has a volume of <76 liters but ≥19 liters. When projected to a depth of 30 cm, a square having a 25 cm side or a circle having a diameter of approximately 28.5 cm equals a volume of approximately 19 liters. The volume of 76 liters is equal to the volume enclosed by a square having a side of 50 cm (or other shape having an area of 250 $cm^2$) projected to a depth of 30 cm.

(5) Take one sample of approximately 19 unsorted liters of waste from each of the eight selected areas. Place each sample into a separate 19-liter container, allowing only sufficient space at the top of the container to secure the lid.

(6) Composite the eight 19-liter samples in accordance with § 761.350.

(c) *Conical-shaped piles.* If it is necessary to sample a pile which is too large to be spread on the site to a uniform thickness of 1 foot or 30 cm, or if there are too many piles to spread out in the space available, use the following procedure to sample the piles. This procedure assumes that the shape of the piles is analogous to a cone; that is, having a circular base with PCB bulk product waste or PCB remediation waste destined for off-site disposal stacked up uniformly to a peak that is a point centered above the center of the circular base. Collect eight 19-liter samples as follows:

(1) *Collecting samples from more than one pile.* If the PCB bulk product waste or PCB remediation waste consists of more than one pile or container, assign

each pile or container an integer number and then generate seven random integer numbers to select the piles from which you will collect samples. It is possible that this random selection procedure will result in selecting the same pile number more than once, even if seven or more piles are present. If so, sample the pile once and restart the sampling collection process to collect additional samples. Do not collect multiple samples from the same location in the pile.

(2) *Collecting samples from a single pile.* If only one pile or container is present, collect all eight samples from the same pile.

(3) *Setting up the sample site selection system from a pile.* Locate a sample in a pile by the use of three parameters: a particular radial direction, "r," from the peak at the center of the pile to the outer edge at the base of the pile; a point, "s," along that radial direction between the peak of the pile and the outer edge of the base of the pile; and a depth, "t", beneath point "s." The top of the sample material will be below depth *t*, at point *s*, on radius *r*. Use a rod, dowel, stake, or broom handle as a marker. Nail or otherwise fasten to the top of the marker two pieces of string or cord of sufficient length and strength to reach from the top of the marker at the top of the pile to the farthest peripheral edge at the bottom of the pile, when the marker is positioned at the top or apex of the pile. Pound or push the marker into the top center (apex) of the pile, downward toward the center of the base. Insert the marker for at least 30 cm or one foot until the marker is rigidly standing on its own, even when the cord is pulled tight to the bottom peripheral edge of the pile. Ensure that the marker protrudes from the top of the pile sufficiently to allow the strings to move easily around the pile when they are pulled tight. Select the three parameters and the sampling location as follows:

(i) Determine the radial component (r) of the location for each sample.

(A) Tie to a stake or otherwise fasten one of the strings at "b," the bottom of the pile, as a reference point for finding *r*.

(B) Measure the circumference "c," the distance around the bottom of the pile. Determine *r* from *b* in one of two ways:

(*1*) Multiply *c* by a randomly generated fraction or percentage of one.

(*2*) Select a random number between one and the total number of centimeters in *c*.

(C) Locate *r* by starting at *b*, the place where the fixed string meets the base of the pile, and travel clockwise around the edge of the pile at the base for the distance you selected in paragraph (c)(3)(i)(B) of this section.

(D) Fasten the second string at the selected distance. The second string marks the first parameter *r*.

(ii) Determine the second parameter s of the location for each sample.

(A) Measure the distance, *l*, along the string, positioned in paragraph (c)(3)(i)(D) of this section, from the top to the bottom of the pile at the selected radial distance *r*. Determine the distance *s* from *l* in one of two ways:

(*1*) Multiply *l* by a randomly generated fraction or percentage of one.

(*2*) Select a random number between one and the total number of centimeters in *l*.

(B) Mark, for example by placing a piece of tape on the string positioned according to paragraph (c)(3)(i)(D) of this section, the distance *s*, up from the bottom of the pile on the string at *r*.

(iii) Determine the third and final parameter *t* of the location for each sample.

(A) Mark and number 1 cm intervals from one end of a rigid device, for example a rod, dowel, stake, or broom handle, for measuring the distance from the top of the pile to the bottom at the point *s* selected in paragraph (c)(3)(ii)(B) of this section. The marked and numbered device shall be of sufficient strength to be forced down through the maximum depth of the pile and sufficient length to measure the depth of the waste in the pile at any point.

(B) Take the measuring device, constructed according to paragraph (c)(3)(iii)(A) of this section, and at position s, push the end of the device marked with zero straight down into the pile until it reaches the bottom of the pile or ground level. The vertical

distance "v" is the number of centimeters from the surface of the pile at point s on the string to the bottom of the pile or ground level. Read the distance *v* on the measuring device at the surface of the pile. From the distance *v*, determine *t*, in one of two ways:

(*1*) Randomly generate a fraction of one and multiply the fraction times v.

(*2*) Select a random number between zero and the total number of centimeters of the vertical distance *v*.

(iv) Dig a hole straight down into the pile for *t* centimeters (inches) from the surface of the pile at *s*.

(v) At depth *t*, directly under the s mark on the string, outline the top of the sample container and collect (shovel) all waste under the outline in the following order of preference in paragraphs (c)(3)(v)(A) through (c)(3)(v)(C) of this section. It is possible that some of the eight sampling locations will not provide 19 liters of sample.

(A) For a depth of 30 cm.

(B) Until the container is full.

(C) Until the ground level is reached.

(d) *Compositing the samples*. Composite the eight 19-liter samples and subsample in accordance with § 761.350. Send the subsample to a laboratory for further sampling as described in §§ 761.353 and 761.355 and for chemical extraction and analysis. If there is insufficient sample for a 19-liter sample from the composite sample composed of the eight iterations of sample site selection, according to the procedures in paragraphs (c)(3)(i) through (c)(3)(v) of this section, select additional sample sites, collect additional samples and composite the additional waste in the samples until a minimum of 19 liters is in the composite.

[63 FR 35469, June 29, 1998, as amended at 64 FR 33762, June 24, 1999]

### § 761.348 Contemporaneous sampling.

Contemporaneous sampling is possible when there is active generation of waste and it is possible to sample the waste stream as it is generated. Collect eight 19-liter samples as follows.

(a) Collect each sample by filling a 19-liter (5 gallon) container at a location where the PCB bulk product waste is released from the waste generator onto a pile or into a receptacle container before the waste reaches the pile or receptacle container.

(b) Determine a sample collection start time using a random number generator or a random number table to select a number between 1 and 60. Collect the first sample at the randomly selected time in minutes after start up of the waste output, or if the waste is currently being generated, after the random time is selected. For example, if the randomly selected time is 35, begin collection 35 minutes after the start up of waste generation. Similarly, if waste output is ongoing and the random start determination occurred at 8:35 a.m., collect the first sample at 9:10 a.m. (35 minutes after the random start determination).

(c) Collect seven more samples, one every 60 minutes after the initial sample is collected. If the waste output process stops, stop the 60-minute interval time clock. When the process restarts, restart the 60-minute interval time clock and complete the incomplete 60-minute interval.

(d) Composite the eight 19-liter samples and subsample in accordance with § 761.350.

### § 761.350 Subsampling from composite samples.

(a) *Preparing the composite*. Composite the samples (eight from a flattened pile; eight or more from a conical pile; eight from waste that is continuously generated) and select a 19-liter subsample for shipment to the chemical extraction and analysis laboratory for further subsampling. There are two options for the preparation of the composite:

(1) *Option one*. Place all of the contents of all 19-liter samples that you collected into a 209 liter (55 gallon) drum or similar sized, cylinder-shaped container. Completely close the container, and roll it 10 or more complete revolutions to mix the contents.

(2) *Option two*. Add the 19-liter samples one at a time to a 209 liter (55 gallon) drum. Between the addition of each 19-liter sample, stir the composite using a broom handle or similar long, narrow, sturdy rod that reaches the bottom of the container. Stir the mixture for a minimum of 10 complete revolutions of the stirring instrument

around the container at a distance approximately half way between the outside and center of the container.

(b) *Selecting a 19-liter subsample from the composite.* Once the composite is mixed, pour the mixture of waste out on a plastic sheet and either divide it into 19-liter size piles or make one large pile.

(1) From 19-liter sized piles, use a random number generator or random number table to select one of the piles.

(2) From one large pile, flatten the pile to a depth of 30 cm and divide it into 4 quarters of equal size. Use a random number generator or random number table to select one quarter of the pile. Further divide the selected quarter pile into 19-liter portions and use a random number generator or random number table to select one 19-liter portion. A square having a 25 cm side or a circle having a diameter of approximately 28.5 cm when projected downwards 30 cm equals approximately 19 liters.

(c) *Transferring the sample to the analytical laboratory.* Place the selected 19-liter subsample in a container, approved for shipment of the sample, to the chemical extraction and analysis laboratory, for the next step in sample selection in accordance with §761.353.

**§761.353 Second level of sample selection.**

The second level of sample selection reduces the size of the 19-liter subsample that was collected according to either §761.347 or §761.348 and subsampled according to §761.350. The purpose of the sample size reduction is to limit the amount of time required to manually cut up larger particles of the waste to pass through a 9.5 millimeter (mm) screen.

(a) *Selecting a portion of the subsample for particle size reduction.* At the chemical extraction and analysis laboratory, pour the 19-liter subsample onto a plastic sheet or into a pan and divide the subsample into quarters. Use a random number generator or random number table to select one of these quarters.

(b) *Reduction of the particle size by the use of a 9.5 mm screen.* Collect the contents of the selected quarter of waste resulting from conducting the procedures in paragraph (a) of this section and shake the waste in a 9.5 mm screen. Separate the waste material which passes through the screen from the waste material which does not pass through the screen. Manually cut or otherwise reduce the size of all parts of the waste portion which did not pass through the 9.5 mm screen, such that each part of the waste shall pass through the 9.5 mm screen by shaking.

(c) *Drying the reduced particle size waste.* Dry all of the waste portion resulting from conducting the procedures in paragraph (b) of this section, from 10 to 15 hours in a drying oven at 100 °C. Allow the dried waste to cool to room temperature.

(d) *Mixing the dried waste.* Place all of the waste resulting from conducting the procedures in paragraph (c) of this section in a 19-liter pail or similarly sized, cylinder-shaped container. Mix the dried material according to one of the two following options:

(1) *First mixing option.* Completely close the container and roll the container a minimum of 10 complete revolutions to mix the contents.

(2) *Second mixing option.* Use a sturdy stirring rod, such as a broom handle or other device that reaches the bottom of the container, to stir the waste for a minimum of 10 complete revolutions around the container at a distance approximately half way between the outside and the center of the container.

**§761.355 Third level of sample selection.**

The third level of sample selection further reduces the size of the subsample to 100 grams which is suitable for the chemical extraction and analysis procedure.

(a) Divide the subsample resulting from conducting the procedures in §761.353 of this part into 100 gram portions.

(b) Use a random number generator or random number table to select one 100 gram size portion as a sample for a procedure used to simulate leachate generation.

(c) Dry the 100 gram sample, selected after conducting the procedure in paragraph (b) of this section, for 10 to 15 hours in a drying oven at 100 °C and cool it to the analytical laboratory

room temperature before analysis using a procedure used to simulate leachate generation. This sample was dried previously in the larger quantity sample at the second level of sampling (§ 761.353(c)) and is dried a second time here (in the third level of sample selection). This dried and cooled sample must weigh at least 50 grams.

(d) If the dried and cooled sample weighs <50 grams, select additional 100 gram portions of sample one at a time by repeating the directions in paragraph (b) and (c) of this section, and add each additional 100 gram portion of sample to the first 100 gram portion until at least 50 grams of dried material is in the sample to be analyzed using a procedure used to simulate leachate generation.

### § 761.356 Conducting a leach test.

No method is specified as a procedure used to simulate leachate generation.

### § 761.357 Reporting the results of the procedure used to simulate leachate generation.

Report the results of the procedure used to simulate leachate generation as micrograms PCBs per liter of extract from a 100 gram sample of dry bulk product waste. Divide 100 grams by the grams in the sample and multiply this quotient by the number of micrograms PCBs per liter of extract to obtain the equivalent measurement from a 100 gram sample.

### § 761.358 Determining the PCB concentration of samples of waste.

Use either Method 3500B/3540C or Method 3500B/3550B from EPA's SW-846, Test Methods for Evaluating Solid Waste, or a method validated under subpart Q of this part, for chemical extraction of PCBs from individual and composite samples of PCB bulk product waste. Use Method 8082 from SW-846, or a method validated under subpart Q of this part, to analyze these extracts for PCBs.

### § 761.359 Reporting the PCB concentrations in samples.

Report all sample concentrations as ppm by weight on a dry weight basis.

## Subpart S—Double Wash/Rinse Method for Decontaminating Non-Porous Surfaces

SOURCE: 63 FR 35472, June 29, 1998, unless otherwise noted.

### § 761.360 Background.

The double wash/rinse procedure is used to quickly and effectively remove PCBs on surfaces. It is important to select and use the proper cleanup equipment, to conduct the procedure correctly so as not to redistribute PCBs, and to comply with disposal requirements for all cleanup materials.

### § 761.363 Applicability.

The double wash/rinse procedure includes two washing steps and two rinsing steps. The two washing and rinsing steps are slightly different depending on whether a contaminated surface was relatively clean before the spill (see § 761.372), or whether the surface was coated or covered with dust, dirt, grime, grease or another absorbent material (see § 761.375).

### § 761.366 Cleanup equipment.

(a) Use scrubbers and absorbent pads that are not dissolved by the solvents or cleaners used, and that do not shred, crumble, or leave visible fragments on the surface. Scrubbers and absorbent pads used to wash contaminated surfaces must not be reused. Scrubbers and absorbent pads for rinsing must not contain ≥2 ppm PCBs. Scrubbers and absorbent pads used in the second rinse of contaminated surfaces may be reused to wash contaminated surfaces.

(b) Capture and contain all solvents and cleaners for reuse, decontamination, or disposal. Clean organic solvents contain <2 ppm PCBs. Clean water contains <3 ppb PCBs.

### § 761.369 Pre-cleaning the surface.

If visible PCB-containing liquid is present on the surface to be cleaned, thoroughly wipe or mop the entire surface with absorbent paper or cloth until no liquid is visible on the surface.

**§ 761.372 Specific requirements for relatively clean surfaces.**

For surfaces that do not appear dusty or grimy before a spill, such as glass, automobile surfaces, newly-poured concrete, and desk tops, use the double wash/rinse procedures in this section.

(a) *First wash.* Cover the entire surface with organic solvent in which PCBs are soluble to at least 5 percent by weight. Contain and collect any runoff solvent for disposal. Scrub rough surfaces with a scrub brush or disposable scrubbing pad and solvent such that each 900 $cm^2$ (1 square foot) of the surface is always very wet for 1 minute. Wipe smooth surfaces with a solvent-soaked, disposable absorbent pad such that each 900 $cm^2$ (1 square foot) is wiped for 1 minute. Any surface <1 square foot shall also be wiped for 1 minute. Wipe, mop, and/or sorb the solvent onto absorbent material until no visible traces of the solvent remain.

(b) *First rinse.* Wet the surface with clean rinse solvent such that the entire surfaces is very wet for 1 minute. Drain and contain the solvent from the surface. Wipe the residual solvent off the drained surface using a clean, disposable absorbent pad until no liquid is visible on the surface.

(c) *Second wash.* Repeat the procedures in paragraph (a) of this section. The rinse solvent from the first rinse (paragraph (b) of this section) may be used.

(d) *Second rinse.* Repeat the procedures in paragraph (b) of this section.

**§ 761.375 Specific requirements for surfaces coated or covered with dust, dirt, grime, grease, or another absorbent material.**

(a) *First wash.* Cover the entire surface with concentrated or industrial strength detergent or non-ionic surfactant solution. Contain and collect all cleaning solutions for proper disposal. Scrub rough surfaces with a scrub brush or scrubbing pad, adding cleaning solution such that the surface is always very wet, such that each 900 $cm^2$ (1 square foot) is washed for 1 minute. Wipe smooth surfaces with a cleaning solution-soaked disposable absorbent pad such that each 900 $cm^2$ (1 square foot) is wiped for 1 minute. Wash any surface <1 square foot for 1 minute. Mop up or absorb the residual cleaner solution and suds with a clean, disposable, absorbent pad until the surface appears dry. This cleaning should remove any residual dirt, dust, grime, or other absorbent materials left on the surface during the first wash.

(b) *First rinse.* Rinse off the wash solution with 1 gallon of clean water per square foot and capture the rinse water. Mop up the wet surface with a clean, disposable, absorbent pad until the surface appears dry.

(c) *Second wash.* Follow the procedure in § 761.372(a).

(d) *Second rinse.* Follow the procedure in § 761.372(b).

**§ 761.378 Decontamination, reuse, and disposal of solvents, cleaners, and equipment.**

(a) *Decontamination.* Decontaminate solvents and non-porous surfaces on equipment in accordance with the standards and procedures in § 761.79(b) and (c).

(b) *Reuse.* A solvent may be reused so long as its PCB concentration is <50 ppm. Decontaminated equipment may be reused in accordance with § 761.30(u). Store solvents and equipment for reuse in accordance with § 761.35.

(c) *Disposal.* Dispose of all solvents, cleaners, and absorbent materials in accordance with § 761.79(g). Dispose of equipment in accordance with § 761.61(a)(5)(v)(A), or decontaminate in accordance with § 761.79(b) or (c). Store for disposal equipment, solvents, cleaners, and absorbent materials in accordance with § 761.65.

## Subpart T—Comparison Study for Validating a New Performance-Based Decontamination Solvent Under § 761.79(d)(4)

SOURCE: 63 FR 35473, June 29, 1998, unless otherwise noted.

**§ 761.380 Background.**

This subpart provides self-implementing criteria for validating the conditions for use in performance-based decontamination of solvents other than those listed in § 761.79(c)(3) and (c)(4). Any person may use this subpart for validating either a chemical formulation or a product with a

trade name whether or not the constituents of the product are proprietary.

**§ 761.383 Applicability.**

Use the self-implementing decontamination procedure only on smooth, non-porous surfaces that were once in contact with liquid PCBs. Decontamination procedures under this subpart shall exactly parallel § 761.79(c)(3) and (c)(4), except that the procedures described in § 761.79(c)(3)(iii) and (c)(3)(iv) and (c)(4)(iii), (c)(4)(iv) and (c)(4)(vii) may be revised to contain parameters validated in accordance with this subpart.

**§ 761.386 Required experimental conditions for the validation study and subsequent use during decontamination.**

The following experimental conditions apply for any solvent:

(a) *Temperature and pressure.* Conduct the validation study and perform decontamination at room temperature (from ≥15 °C to ≤30 °C) and at atmospheric pressure.

(b) *Agitation.* Limit the movement in the solvent to the short-term movement from placing the contaminated surface into the soak solvent and from removing the surface from the soak solvent.

(c) *Time of soak.* Soak the surface for a minimum of 1 hour.

(d) *Surface conditions for the validation study.* Prior to beginning the validation study, ensure that there are no free-flowing liquids on surfaces and that surfaces are dry (i.e., there are no liquids visible without magnification). Also ensure that surfaces are virtually free from non-liquid residues, corrosion, and other defects which would prevent the solvent from freely circulating over the surface.

(e) *Confirmatory sampling for the validation study.* Select surface sample locations using representative sampling or a census. Sample a minimum area of 100 cm$^2$ on each individual surface in the validation study. Measure surface concentrations using the standard wipe test, as defined in § 761.123, from which a standard wipe sample is generated for chemical analysis. Guidance for wipe sampling appears in the document entitled "Wipe Sampling and Double Wash/Rinse Cleanup as Recommended by the Environmental Protection Agency PCB Spill Cleanup Policy," available on EPA's Web site at *http://www.epa.gov/pcb*, or from the Program Management, Communications, and Analysis Office, Office of Resource Conservation and Recovery (5305P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001.

(f) *Concentration of PCBs.* The method validated may be used only to decontaminate surfaces containing PCBs at concentrations on which the validation study was performed and lower concentrations.

[63 FR 35473, June 29, 1998, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30235, June 25, 2009]

**§ 761.389 Testing parameter requirements.**

There are no restrictions on the variable testing parameters described in this section which may be used in the validation study. The conditions demonstrated in the validation study for these variables shall become the required conditions for decontamination using the solvent being validated and shall replace the comparable conditions in § 761.79(b)(3) through (b)(6). There are limited potential options for varying a single requirement in this section. If you change one of these variable requirements, change it only in the way listed in this section and do not change any other validated conditions. If you desire to change more than one of the requirements in this section, you must conduct a new study to validate the decontamination under the desired conditions.

(a) The study apparatus is not standardized. Critical components of the study are the PCB material (for example MODEF or some other spiking solution), the volume of the soaking solvent, and the area of the contaminated surface. The EPA study used beakers and shallow dishes as the experimental vessels to contain the surface and solvent during the soaking process. In order to minimize surface-to-volume ratios, it is convenient to utilize flat contaminated surfaces and shallow solvent containers. During the validation

study, use the same ratio of contaminated surface area to soak solvent volume as would be used during actual decontamination. It is also permissible to use a smaller surface area to soaking solvent volume than used in the validation study, so long as all other required parameters are used as validated in the confirmation required in § 761.386 (a) through (f), and paragraphs (a) through (c) of this section. Do not use a larger surface-area-to-solvent-volumes ratio or different kind of solvent based on the results of the validation study.

(b) Except for the minimum soak time of 1 hour (as required in § 761.386(c)), the length of soak time is not otherwise restricted in the validation study. The soak time used in the validation study, however, is a use requirement for subsequent decontamination using the solvent being validated. It is permissible to use longer soak times for decontamination than the soak time used in the validation study, if all other parameters required in § 761.386, and paragraphs (a) and (c) of this section are used.

(c) There is no restriction on the kind of material containing PCBs to use to create the surface contamination for the validation study. There is also no restriction on the level of starting PCB surface concentration. It is permissible to use lower concentrations of PCB than the concentration used in the validation study, if all other parameters required in § 761.386 (a) through (f), and paragraphs (a) through (c) of this section are used.

**§ 761.392 Preparing validation study samples.**

(a)(1) To validate a procedure to decontaminate a surface contaminated with a spill from liquid of a known concentration, contaminate (spike) the surface to be used in the validation study as follows:

(i) Use a spiking solution made of PCBs mixed with a solvent to contaminate clean surfaces. Clean surfaces are surfaces having PCB surface concentrations <1 μg/100 $cm^2$ before intentionally contaminating the surface.

(ii) Prior to contaminating a surface for the validation study, mark the surface sampling area to assure that it is completely covered with the spiking solution.

(iii) Deliver the spiking solution onto the surface, covering all of the sampling area. Contain any liquids which spill or flow off the surface. Allow the spiking solution to drip drain off into a container and then evaporate the spiking solution off the contaminated surface prior to beginning the validation study. Contaminate a minimum of eight surfaces for a complete validation study.

(iv) As a quality control step, test at least one contaminated surface to determine the PCB concentration to verify that there are measurable surface levels of PCBs resulting from the contamination before soaking the surface in the decontamination solvent. The surface levels of PCBs on the contaminated surfaces must be ≥20 μg/100 $cm^2$.

(2) To validate a procedure to decontaminate a specified surface concentrations of PCBs as measured by a standard wipe sample, contaminate a minimum of 10 surfaces. Contaminate all the surfaces identically following the procedures in paragraph (a)(1) of this section and measure the PCB surface concentrations of at least three of the surfaces using a standard wipe test to establish a surface concentration to be included in the standard operating procedure. The surface levels of PCBs on the contaminated surfaces must be ≥20 μg/100 $cm^2$.

(b) [Reserved]

**§ 761.395 A validation study.**

(a) Decontaminate the following prepared sample surfaces using the selected testing parameters and experimental conditions. Take a standard wipe sample of the decontaminated surface.

(1) At least one uncontaminated surface. The surface levels of PCBs on the uncontaminated surface must be <1 μg/100 $cm^2$.

(2) At least seven contaminated surfaces.

(b)(1) Use SW-846, Test Methods for Evaluating Solid Waste methods for sample extraction and chemical analysis as follows: Use Method 3500B/3540C or Method 3500B/3550B for the extraction and cleanup of the extract and

Method 8082 for the chemical analysis, or methods validated under subpart Q of this part.

(2) Report all validation study surface sample concentrations on the basis of micrograms of PCBs per 100 $cm^2$ of surface sampled.

(c) Following completion of the validation study, measurements from the contaminated surfaces must have an arithmetic mean of ≤10 μg/100 $cm^2$. If the arithmetic mean is >10 μg/100 $cm^2$, then the validation study failed and the solvent may not be used for decontamination under §761.79(d)(4) according to the parameters tested.

**§761.398 Reporting and recordkeeping.**

(a) Submit validation study results to the Director, Office of Resource Conservation and Recovery (5301P), Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001, prior to the first use of a new solvent for alternate decontamination under §761.79(d)(4). The use of a new solvent is not TSCA Confidential Business Information (CBI). From time to time, EPA will confirm the use of validated new decontamination solvents and publish the new solvents and validated decontamination procedures in the FEDERAL REGISTER.

(b) Any person may begin to use solvent validated in accordance with this subpart at the time results are submitted to EPA.

(c) Record all testing parameters and experimental conditions from the successful validation study into a standard operating procedure (SOP) for reference whenever the decontamination procedure is used. Include in the SOP the identity of the soaking solvent, the length of time of the soak, and the ratio of the soak solvent to contaminated surface area during the soaking process. Also include in the SOP the maximum concentration of PCBs in the spilled material and the identity of the spilled material, and/or the measured maximum surface concentration of the contaminated surface used in the validation study. Record and keep the results of the validation study as an appendix to the SOP. Include in this appendix, the solvent used to make the spiking solution, the PCB concentration of the spiking solution used to contaminate the surfaces in the validation study, and all of the validation study testing parameters and experimental conditions.

[63 FR 35473, June 29, 1998, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30235, June 25, 2009]

## PART 763—ASBESTOS

### Subparts A–D [Reserved]

### Subpart E—Asbestos-Containing Materials in Schools

Sec.
763.80 Scope and purpose.
763.83 Definitions.
763.84 General local education agency responsibilities.
763.85 Inspection and reinspections.
763.86 Sampling.
763.87 Analysis.
763.88 Assessment.
763.90 Response actions.
763.91 Operations and maintenance.
763.92 Training and periodic surveillance.
763.93 Management plans.
763.94 Recordkeeping.
763.95 Warning labels.
763.97 Compliance and enforcement.
763.98 Waiver; delegation to State.
763.99 Exclusions.
APPENDIX A TO SUBPART E OF PART 763—INTERIM TRANSMISSION ELECTRON MICROSCOPY ANALYTICAL METHODS—MANDATORY AND NONMANDATORY—AND MANDATORY SECTION TO DETERMINE COMPLETION OF RESPONSE ACTIONS
APPENDIX B TO SUBPART E OF PART 763 [RESERVED]
APPENDIX C TO SUBPART E OF PART 763—ASBESTOS MODEL ACCREDITATION PLAN
APPENDIX D TO SUBPART E OF PART 763—TRANSPORT AND DISPOSAL OF ASBESTOS WASTE
APPENDIX E TO SUBPART E OF PART 763—INTERIM METHOD OF THE DETERMINATION OF ASBESTOS IN BULK INSULATION SAMPLES

### Subpart F [Reserved]

### Subpart G—Asbestos Worker Protection

763.120 What is the purpose of this subpart?
763.121 Does this subpart apply to me?
763.122 What does this subpart require me to do?
763.123 May a State implement its own asbestos worker protection plan?