

## ENVIRONMENTAL PROTECTION AGENCY

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

### Research and Special Programs Administration

## DEPARTMENT OF THE INTERIOR

### Minerals Management Service

## DEPARTMENT OF LABOR

### Occupational Safety and Health Administration

[FRL–5512–8]

### The National Response Team's Integrated Contingency Plan Guidance

**AGENCY:** Environmental Protection Agency (EPA), U.S. Coast Guard (USCG), Minerals Management Service (MMS), Research and Special Programs Administration (RSPA), Occupational Safety and Health Administration (OSHA).

**ACTION:** Notice.

**SUMMARY:** The U.S. Environmental Protection Agency, as the chair of the National Response Team (NRT), is announcing the availability of the NRT's Integrated Contingency Plan Guidance ("one plan"). This guidance is intended to be used by facilities to prepare emergency response plans. The intent of the NRT is to provide a mechanism for consolidating multiple plans that facilities may have prepared to comply with various regulations into one functional emergency response plan or integrated contingency plan (ICP). This notice contains the suggested ICP outline as well as guidance on how to develop an ICP and demonstrate compliance with various regulatory requirements. The policies set out in this notice are intended solely as guidance.

**ADDRESSES:** Additional copies of this one-plan guidance can be obtained by writing to the following address: William Finan, U.S. Environmental Protection Agency, Mail Code 5101, 401 M Street SW, Washington, DC 20460. Copies of the ICP Guidance are also available by calling the EPCRA/RCRA/Superfund Hotline at (800) 424–9346 (in the Washington, DC, metropolitan area, (703) 412–9810). In addition, this guidance is available electronically at the home page of EPA's Chemical Emergency Preparedness and Prevention Office (http://www.epa.gov/swercepp/).

**FOR FURTHER INFORMATION CONTACT:** William Finan, U.S. Environmental Protection Agency, Mail Code 5101, 401 M Street, SW., Washington, DC 20460, at (202) 260–0030 (E-Mail homepage.ceppo@epamail.epa.gov—please include "one plan" in the subject line). In addition, the EPCRA/RCRA/Superfund Hotline can answer general questions about the guidance.

For further information and guidance on complying with specific regulations, contact: for EPA's Oil Pollution Prevention Regulation: Bobbie Lively-Diebold, U.S. Environmental Protection Agency, Mail Code 5203G, 401 M Street, SW., Washington, DC 20460, at (703) 356–8774 (E-Mail Lively.Barbara@epamail.epa.gov), or the SPCC Information Line at (202) 260–2342); for the U.S. Coast Guard's Facility Response Plan Regulation: LCDR Mark Hamilton, U.S. Coast Guard, Commandant (G–MOR), 2100 2nd Street, SW., Washington, DC 20593, at 202–267–1983 (E-Mail M.Hamilton/G-M03@CGSMTP.uscg.mil); for DOT/RSPA's Pipeline Response Plan Regulation: Jim Taylor, U.S. Department of Transportation, Room 2335, 400 7th Street, SW., Washington, DC 20590 at (202) 366–8860 (E-Mail OPATEAM@RSPA.DOT.GOV); for pertinent OSHA regulations, contact either your Regional or Area OSHA office; for DOI/MMS' Facility Response Plan Regulation: Larry Ake, U.S. Department of the Interior—Minerals Management Service, MS 4700, 381 Elden Street, Herndon, VA 22070–4817 at (703) 787–1567 (E-Mail Larry__Ake@SMTP.MMS.GOV); for EPA's Risk Management Program Regulation: William Finan (see above); and for RCRA's Contingency Planning Requirements, contact the EPCRA/RCRA/Superfund Hotline (see above).

The NRT welcomes comments on specific implementation issues related to this guidance. Please provide us with information about the successful use of this guidance, about problems with using this guidance, as well as suggestions for improving the guidance. Send comments to William Finan (see above) or to any of the other people listed in the previous paragraph.

**SUPPLEMENTARY INFORMATION:**

### Presidential Review Findings

Section 112(r)(10) of the Clean Air Act required the President to conduct a review of federal release prevention, mitigation, and response authorities. The Presidential Review was delegated to EPA, in coordination with agencies and departments that are members of the National Response Team (NRT). The Presidential Review concluded that, while achieving its statutory goals to protect public safety and the environment, the current system is complex, confusing, and costly. It identified several key problem areas and recommended a second phase to address these issues. One of the issues identified by the Presidential Review is the multiple and overlapping federal requirements for facility emergency response plans.

### NRT Policy Statement

This one-plan guidance is intended to be used by facilities to prepare emergency response plans for responding to releases of oil and non-radiological hazardous substances. The intent of NRT is to provide a mechanism for consolidating multiple plans that facilities may have prepared to comply with various regulations into one functional emergency response plan or integrated contingency plan (ICP). A number of statutes and regulations, administered by several federal agencies, include requirements for emergency response planning. A particular facility may be subject to one or more of the following federal regulations:
• EPA's Oil Pollution Prevention Regulation (SPCC and Facility Response Plan Requirements)—40 CFR part 112.7(d) and 112.20–.21;
• MMS's Facility Response Plan Regulation—30 CFR part 254;
• RSPA's Pipeline Response Plan Regulation—49 CFR part 194;
• USCG's Facility Response Plan Regulation—33 CFR part 154, Subpart F;
• EPA's Risk Management Programs Regulation—40 CFR part 68;
• OSHA's Emergency Action Plan Regulation—29 CFR 1910.38(a);
• OSHA's Process Safety Standard—29 CFR 1910.119;
• OSHA's HAZWOPER Regulation—29 CFR 1910.120; and
• EPA's Resource Conservation and Recovery Act Contingency Planning Requirements—40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52.

In addition, facilities may also be subject to state emergency response planning requirements that this guidance does not specifically address. Facilities are encouraged to coordinate development of their ICP with relevant state and local agencies to ensure compliance with any additional regulatory requirements.

Individual agencies' planning requirements and plan review procedures are not changed by the advent of the ICP format option. This one-plan guidance has been developed

to assist facilities in demonstrating compliance with the existing federal emergency response planning requirements referenced above. Although it does not relieve facilities from their current obligations, it has been designed specifically to help meet those obligations. Adherence to this guidance is not required in order to comply with federal regulatory requirements. Facilities are free to continue maintaining multiple plans to demonstrate federal regulatory compliance; however, the NRT believes that an integrated plan prepared in accordance with this guidance is a preferable alternative.

The NRT realizes that many existing regulations pertaining to contingency planning require review by a specific agency to determine compliance with applicable requirements. It is not the intent of the NRT to modify existing agency review procedures or to supersede the requirements of a regulation.

This one-plan guidance was developed through a cooperative effort among numerous NRT agencies, state and local officials, and industry and community representatives. The NRT and the agencies responsible for reviewing and approving federal response plans to which the ICP option applies agree that integrated response plans prepared in the format provided in this guidance will be acceptable and be the federally preferred method of response planning. The NRT realizes that alternate formats for integrating multiple plans already exist and that others likely will be developed. Certain facilities may find those formats more desirable than the one proposed here. The NRT believes that a single functional plan is preferable to multiple plans regardless of the specific format chosen. While they are acceptable, other formats may not allow the same ease of coordination with external plans. In any case, whatever format a facility chooses, no individual NRT agency will require an integrated response planning format differing from the ICP format described here. The NRT anticipates that future development of all federal regulations addressing emergency response planning will incorporate use of the ICP guidance. Also, developers of state and local requirements will be encouraged to be consistent with this document.

The ICP guidance does not change existing regulatory requirements; rather, it provides a format for organizing and presenting material currently required by the regulations. Individual regulations are often more detailed than the ICP guidance. To ensure full compliance, facilities should continue to read and comply with all of the federal regulations that apply to them. Furthermore, facilities submitting an ICP (in whatever format) for agency or department review will need to provide a cross-reference to existing regulatory requirements so that plan reviewers can verify compliance with these requirements. The guidance contains a series of matrices designed to assist owners and operators in consolidating various plans and documenting compliance with federal regulatory requirements. (See Attachments 2 and 3.) The matrices can be used as the basis for developing a cross-reference to various regulatory requirements.

This guidance also provides a useful contingency planning template for owners and operators of facilities not subject to the federal regulations cited previously.

Integrated Contingency Plan Philosophy

The ICP will minimize duplication in the preparation and use of emergency response plans at the same facility and will improve economic efficiency for both the regulated and regulating communities. Facility expenditures for the preparation, maintenance, submission, and update of a single plan should be much lower than for multiple plans.

The use of a single emergency response plan per facility will eliminate confusion for facility first responders who often must decide which of their plans is applicable to a particular emergency. The guidance is designed to yield a highly functional document for use in varied emergency situations while providing a mechanism for complying with multiple agency requirements. Use of a single integrated plan should also improve coordination between facility response personnel and local, state, and federal emergency response personnel.

The adoption of a standard plan format should facilitate integration of plans within a facility, in the event that large facilities may need to prepare separate plans for distinct operating units. The ICP concept should also allow coordination of facility plans with plans that are maintained by local emergency planning committees (LEPCs),[1] Area Committees,[2] co-operatives, and mutual aid organizations. In some cases, there are specific regulatory requirements to ensure that facility plans are consistent with external planning efforts. Industry use of this guidance along with active participation on local and Area Committees will improve the level of emergency preparedness and is therefore highly encouraged.

In some areas, it may be possible to go beyond simple coordination of plans and actually integrate certain information from facility plans with corresponding areas of external plans. The adoption of a single, common ICP outline such as the one proposed in this guidance would facilitate a move toward integration of facility plans with local, state, and federal plans.

The projected results described above will ultimately serve the mutual goal of the response community to more efficiently and effectively protect public health, worker safety, the environment, and property.

Scope

This one-plan guidance is provided for any facility subject to federal contingency planning regulations and is also recommended for use by other facilities to improve emergency preparedness through planning. In this context, the term "facility" is meant to have a wide connotation and may include, but is not limited to, any mobile or fixed onshore or offshore building, structure, installation, equipment, pipe, or pipeline.

Facility hazards need to be addressed in a comprehensive and coordinated manner. Accordingly, this guidance is broadly constructed to allow for facilities to address a wide range of risks in a manner tailored to the specific needs of the facility. This includes both physical and chemical hazards associated with events such as chemical releases, oil spills, fires, explosions, and natural disasters.

Organizational Concepts

The ICP format provided in this one-plan guidance (See Attachment 1) is organized into three main sections: an introductory section, a core plan, and a series of supporting annexes. It is important to note that the elements contained in these sections are not new concepts, but accepted emergency response activities that are currently addressed in various forms in existing contingency planning regulations. The goal of the NRT is not to create new planning requirements, but to provide a mechanism to consolidate existing concepts into a single functional plan structure. This approach would provide a consistent basis for addressing

---

[1] LEPC plans are developed by LEPCs in coordination with facility emergency response coordinators under section 303 of the Emergency Planning and Community Right-to-Know Act.

[2] Area Contingency Plans are developed by Area Committees pursuant to section 4202(a)(6) of the Oil Pollution Act of 1990 (OPA).

emergency response concerns as it gains widespread use among facilities.

The introduction section of the plan format is designed to provide facility response personnel, outside responders, and regulatory officials with basic information about the plan and the entity it covers. It calls for a statement of purpose and scope, a table of contents, information on the current revision date of the plan, general facility information, and the key contact(s) for plan development and maintenance. This section should present the information in a brief factual manner.

The structure of the sample core plan and annexes in this guidance is based on the structure of the National Interagency Incident Management System (NIIMS) Incident Command System (ICS). NIIMS ICS is a nationally recognized system currently in use by numerous federal, state, and local organizations (e.g., some Area Committees under OPA). NIIMS ICS is a type of response management system that has been used successfully in a variety of emergency situations, including releases of oil or hazardous substances. NIIMS ICS provides a commonly understood framework that allows for effective interaction among response personnel. Organizing the ICP along the lines of the NIIMS ICS will allow the plan to dovetail with established response management practices, thus facilitating its ease of use during an emergency.

The core plan is intended to contain essential response guidance and procedures. Annexes would contain more detailed supporting information on specific response management functions. The core plan should contain frequent references to the response critical annexes to direct response personnel to parts of the ICP that contain more detailed information on the appropriate course of action for responders to take during various stages of a response. Facility planners need to find the right balance between the amount of information contained in the core plan versus the response critical annexes (Annexes 1 through 3). Information required to support response actions at facilities with multiple hazards will likely be contained in the annexes. Planners at facilities with fewer hazards may choose to include most if not all information in the core plan. Other annexes (e.g., Annexes 4 through 8) are dedicated to providing information that is non-critical at the time of a response (e.g., cross-references to demonstrate regulatory compliance and background planning information). Consistent with the goal of keeping the size of the ICP

as manageable as practicable, it is not necessary for a plan holder to provide its field responders with all of the compliance documentation (e.g., Annexes 4 through 8) that it submits to regulatory agencies. Similarly, it may not be necessary for a plan holder to submit all annexes to every regulatory agency for review.

Basic headings are consistent across the core plan and annexes to facilitate ease of use during an emergency. These headings provide a comprehensive list of elements to be addressed in the core plan and response annexes and may not be relevant to all facilities. Planners should address those regulatory elements that are applicable to their particular facilities. Planners at facilities with multiple hazards will need to address most, if not all, elements included in this guidance. Planners at facilities with fewer hazards may not need to address certain elements. If planners choose to strictly adopt the ICP outline contained in this guidance but are not required by regulation to address all elements of the outline, they may simply indicate "not applicable" for those items where no information is provided. A more detailed discussion of the core plan and supporting annexes follows.

*Core Plan*

The core plan is intended to reflect the essential steps necessary to initiate, conduct, and terminate an emergency response action: recognition, notification, and initial response, including assessment, mobilization, and implementation. This section of the plan should be concise and easy to follow. A rule of thumb is that the core plan should fit in the glovebox of a response vehicle. The core plan need not detail all procedures necessary under these phases of a response but should provide information that is time critical in the earliest stages of a response and a framework to guide responders through key steps necessary to mount an effective response. The response action section should be convenient to use and understandable at the appropriate skill level.

The NRT recommends the use of checklists or flowcharts wherever possible to capture these steps in a concise easy-to-understand manner. The core plan should be constructed to contain references to appropriate sections of the supporting annexes for more detailed guidance on specific procedures. The NRT anticipates that for a large, complex facility with multiple hazards the annexes will contain a significant amount of information on specific procedures to

follow. For a small facility with a limited number of hazard scenarios, the core plan may contain most if not all of the information necessary to carry out the response thus obviating the need for more detailed annexes. The checklists, depending on their size and complexity, can be in either the core or the support section.

The core plan should reflect a hierarchy of emergency response levels. A system of response levels is commonly used in emergency planning for classifying emergencies according to seriousness and assigning an appropriate standard response or series of response actions to each level. Both complex and simple industrial facilities use a system of response levels for rapidly assessing the seriousness of an emergency and developing an appropriate response. This process allows response personnel to match the emergency and its potential impacts with appropriate resources and personnel. The concept of response levels should be considered in developing checklists or flowcharts designed to serve as the basis for the core plan. Note that for those facilities subject to planning requirements under OPA, response levels in the core plan may not necessarily correspond to discharge planning amounts (e.g., average most probable discharge, maximum most probable discharge, and worst case discharge).

Facility owners and operators should determine appropriate response levels based on 1) the need to initiate time-urgent response actions to minimize or prevent unacceptable consequences to the health and safety of workers, the public, or the environment; and 2) the need to communicate critical information concerning the emergency to offsite authorities. The consideration and development of response levels should, to the extent practicable, be consistent with similar efforts that may have been taken by the LEPC, local Area Committee, or mutual aid organization. Response levels, which are used in communications with offsite authorities, should be fully coordinated and use consistent terminology.

*Annexes*

The annexes are designed to provide key supporting information for conducting an emergency response under the core plan as well as document compliance with regulatory requirements not addressed elsewhere in the ICP. Annexes are not meant to duplicate information that is already contained in the core plan, but to augment core plan information. The annexes should relate to the basic

headings of the core plan. To accomplish this, the annexes should contain sections on facility information, notification, and a detailed description of response procedures under the response management system (i.e, command, operations, planning, logistics, and finance). The annexes should also address issues related to post accident investigation, incident history, written follow-up reports, training and exercises, plan critique and modification process, prevention, and regulatory compliance, as appropriate.

The ICP format contained in this guidance is based on the NIIMS ICS. If facility owners or operators choose to follow fundamental principles of the NIIMS ICS, then they may adopt NIIMS ICS by reference rather than having to describe the system in detail in the plan. The owner or operator should identify where NIIMS ICS documentation is kept at the facility and how it will be accessed if needed by the facility or requested by the reviewing agency. Regardless of the response management system used, the plan should include an organization chart, specific job descriptions,[3] a description of information flow ensuring liaison with the on-scene coordinator (OSC), and a description of how the selected response management system integrates with a Unified Command.[4] If a system other than NIIMS ICS is used, the plan should also identify how it differs from NIIMS or provide a detailed description of the system used.

The NRT anticipates that the use of linkages (i.e., references to other plans) when developing annexes will serve several purposes. Linkages will facilitate integration with other emergency plans within a facility (until such plans can be fully incorporated into the ICP) and

with external plans, such as LEPC plans and Area Contingency Plans (ACPs). Linkages will also help ensure that the annexes do not become too cumbersome. The use of references to information contained in external plans does not relieve facilities from regulatory requirements to address certain elements in a facility-specific manner and to have information readily accessible to responders. When determining what information may be linked by reference and what needs to be contained in the ICP, response planners should carefully consider the time critical nature of the information. If instructions or procedures will be needed immediately during an incident response, they should be presented for ready access in the ICP. The following information would not normally be well-suited for reference to documents external to the ICP: core plan elements, facility and locality information (to allow for quick reference by responders on the layout of the facility and the surrounding environment and mitigating actions for the specific hazard(s) present), notification procedures, details of response management personnel's duties, and procedures for establishing the response management system. Although linkages provide the opportunity to utilize information developed by other organizations, facilities should note that many LEPC plans and ACPs may not currently possess sufficient detail to be of use in facility plans or the ICP. This information may need to be developed by the facility until detailed applicable information from broader plans is available.

In all cases, referenced materials must be readily available to anticipated plan users. Copies of documents that have been incorporated by reference need not be submitted unless it is required by regulation. The appropriate sections of referenced documents that are unique to the facility, those that are not nationally recognized, those that are required by regulation, and those that could not reasonably be expected to be in the possession of the reviewing agency, should be provided when the plan is submitted for review and/or approval. Discretion should be used when submitting documents containing proprietary data. It is, however, necessary to identify in the ICP the specific section of the document being incorporated by reference, where the document is kept, and how it will be accessed if needed by the facility or requested by the reviewing agency. In addition, facility owners or operators are reminded to take note of submission

requirements of specific regulations when determining what materials to provide an agency for review as it may not be necessary to submit all parts of an ICP to a particular agency.

As discussed previously, this guidance contains a series of matrices designed to assist owners and operators in the plan consolidation process and in the process of ensuring and documenting compliance with regulatory requirements. The matrix in Attachment 2 to this guidance displays areas of current regulations that align with the suggested elements contained in this guidance document. When addressing each element of the ICP outline, plan drafters can refer to this matrix to identify specific regulatory requirements related to that element. The matrices in Attachment 3 to this guidance display regulatory requirements as contained in each of the regulations listed in the NRT policy statement above (which are applicable to many facilities) along with an indication of where in the suggested ICP outline these requirements should be addressed. If a facility chooses to follow the ICP outline, these matrices can be included as Annex 8 to a facility's ICP to provide the necessary cross-reference for plan reviewers to document compliance with various regulatory requirements. To the extent that a plan deviates from the suggested ICP outline, plan drafters will have to alter the matrices to ensure that the location of regulatory requirements within the ICP is clearly identified for plan reviewers.

### Integrated Contingency Plan Elements

Presented below is a list of elements to be addressed in the ICP and a brief explanation, displayed in italicized text, of the nature of the information to be contained in that section of the ICP. Attachment 1 presents the complete outline of the ICP without the explanatory text. As discussed previously, the elements are organized into three main sections: plan introduction, core plan, and response annexes.

### Section I—Plan Introduction Elements

1. Purpose and Scope of Plan Coverage

*This section should provide a brief overview of facility operations and describe in general the physical area, and nature of hazards or events to which the plan is applicable. This brief description will help plan users quickly assess the relevancy of the plan to a particular type of emergency in a given location. This section should also include a list of which regulation(s) are being addressed in the ICP.*

---

[3] OPA 90 planning requirements for marine transfer facilities (33 CFR 154.1035) require job descriptions for each spill management team member regardless of the response management system employed by the facility.

[4] Under NIIMS ICS, the command module has traditionally been represented by a single incident commander (supported by a command staff) who directs efforts of and receives input from the four supporting functional areas (planning, logistics, operations, and finance). More recently, a Unified Command System as described in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) found at 40 CFR part 300 has been used for larger spill responses where the command module is comprised of representatives from the federal government (i.e., federal on-scene coordinator), state government (state on-scene coordinator), and the responsible party working in a cooperative manner. Unified Command allows all parties who have jurisdictional or functional responsibility for the incident to jointly develop a common set of incident objectives and strategies. Such coordination should be guided by procedures found in the NCP (see figure 1a at 40 CFR 300.105(e)(1)) and the applicable Area Contingency Plan.

## 2. Table of Contents

*This section should clearly identify the structure of the plan and include a list of annexes. This will facilitate rapid use of the plan during an emergency.*

## 3. Current Revision Date

*This section should indicate the date that the plan was last revised to provide plan users with information on the currency of the plan. More detailed information on plan update history (i.e., a record of amendments) may be maintained in Annex 6 (Response Critique and Plan Review and Modification Process).*

## 4. General Facility Identification Information

a. Facility name
b. Owner/operator/agent (include physical and mailing address and phone number)
c. Physical address of the facility (include county/parish/borough, latitude/longitude, and directions)
d. Mailing address of the facility (correspondence contact)
e. Other identifying information (e.g., ID numbers, SIC Code, oil storage start-up date)
f. Key contact(s) for plan development and maintenance
g. Phone number(s) for key contact(s)
h. Facility phone number
i. Facility fax number

*This section should contain a brief profile of the facility and its key personnel to facilitate rapid identification of key administrative information.*

## Section II - Core Plan Elements

### 1. Discovery

*This section should address the initial action the person(s) discovering an incident will take to assess the problem at hand and access the response system. Recognition, basic assessment, source control (as appropriate), and initial notification of proper personnel should be addressed in a manner that can be easily understood by everybody in the facility. The use of checklists or flowcharts is highly recommended.*

### 2. Initial Response

a. Procedures for internal and external notifications (i.e., contact, organization name, and phone number of facility emergency response coordinator, facility response team personnel, federal, state, and local officials)
b. Establishment of a response management system
c. Procedures for preliminary assessment of the situation, including an identification of incident type, hazards involved, magnitude of the problem, and resources threatened
d. Procedures for establishment of objectives and priorities for response to the specific incident, including:
(1) Immediate goals/tactical planning (e.g., protection of workers and public as priorities)
(2) Mitigating actions (e.g., discharge/release control, containment, and recovery, as appropriate)
(3) Identification of resources required for response
e. Procedures for implementation of tactical plan
f. Procedures for mobilization of resources

*This section should provide for activation of the response system following discovery of the incident. It should include an established 24-hour contact point (i.e., that person and alternate who is called to set the response in motion) and instructions for that person on who to call and what critical information to pass. Plan drafters should also consider the need for bilingual notification. It is important to note that different incident types require that different parties be notified. Appropriate federal, State, and local notification requirements should be reflected in this section of the ICP. Detailed notification lists may be included here or in Annex 2, depending upon the variety of notification schemes that a facility may need to implement. For example, the release of an extremely hazardous substance will require more extensive notifications (i.e., to State Emergency Response Commissions (SERCs) and LEPCs) than a discharge of oil. Even though no impacts or awareness are anticipated outside the site, immediate external notifications are required for releases of CERCLA and EPCRA substances. Again, the use of forms, such as flowcharts, checklists, call-down lists, is recommended.*

*This section should instruct personnel in the implementation of a response management system for coordinating the response effort. More detailed information on specific components and functions of the response management system (e.g., detailed hazard assessment, resource protection strategies) may be provided in annexes to the ICP.*

*This part of the plan should then provide information on problem assessment, establishment of objectives and priorities, implementation of a tactical plan, and mobilization of resources. In establishing objectives and priorities for response, facilities should perform a hazard assessment using resources such as Material Safety Data Sheets (MSDSs) or the Chemical Hazard Response Information System (CHRIS) manual. Hazardous Materials Emergency Planning Guide (NRT–1), developed by the NRT to assist community personnel with emergency response planning, provides guidance on developing hazard analyses. If a facility elects to provide detailed hazard analysis information in a response annex, then a reference to that annex should be provided in this part of the core plan.*

*Mitigating actions must be tailored to the type of hazard present. For example, containment might be applicable to an oil spill (i.e., use of booming strategies) but would not be relevant to a gas release. The plan holder is encouraged to develop checklists, flowcharts, and brief descriptions of actions to be taken to control different types of incidents. Relevant questions to ask in developing such materials include:*

- *What type of emergency is occurring?*
- *What areas/resources have been or will be affected?*
- *Do we need an exclusion zone?*
- *Is the source under control?*
- *What type of response resources are needed?*

### 3. Sustained Actions

*This section should address the transition of a response from the initial emergency stage to the sustained action stage where more prolonged mitigation and recovery actions progress under a response management structure. The NRT recognizes that most incidents are able to be handled by a few individuals without implementing an extensive response management system. This section of the core plan should be brief and rely heavily on references to specific annexes to the ICP.*

### 4. Termination and Follow-Up Actions

*This section should briefly address the development of a mechanism to ensure that the person in charge of mitigating the incident can, in coordination with the federal or state OSC as necessary, terminate the response. In the case of spills, certain regulations may become effective once the "emergency" is declared over. The section should describe how the orderly demobilization of response resources will occur. In addition, follow-up actions associated with termination of a response (e.g., accident investigation, response critique, plan review, written follow-up reports) should also be outlined in this section. Plan drafters*

may reference appropriate annexes to the ICP in this section of the core plan.

## Section III—Annexes

## Annex 1. Facility and Locality Information

a. Facility maps
b. Facility drawings
c. Facility description/layout, including identification of facility hazards and vulnerable resources and populations on and off the facility which may be impacted by an incident

This annex should provide detailed information to responders on the layout of the facility and the surrounding environment. The use of maps and drawings to allow for quick reference is preferable to detailed written descriptions. These should contain information critical to the response such as the location of discharge sources, emergency shut-off valves and response equipment, and nearby environmentally and economically sensitive resources and human populations (e.g., nursing homes, hospitals, schools). The ACP and LEPC plan may provide specific information on sensitive environments and populations in the area. EPA Regional Offices, Coast Guard Marine Safety Offices, and LEPCs can provide information on the status of efforts to identify such resources. Plan holders may need to provide additional detail on sensitive areas near the facility. In addition, this annex should contain other facility information that is critical to response and should complement but not duplicate information contained in part 4 of the plan introduction section containing administrative information on the facility.

## Annex 2. Notification

a. Internal notifications
b. Community notifications
c. Federal and state agency notifications

This annex should detail the process of making people aware of an incident (i.e., who to call, when the call must be made, and what information/data to provide on the incident). The incident commander is responsible for ensuring that notifications are carried out in a timely manner but is not necessarily responsible for making the notifications. ACPs, Regional Contingency Plans (RCPs), and LEPC plans should be consulted and referenced as a source of information on the roles and responsibilities of external parties that are to be contacted. This information is important to help company responders understand how external response officials fit into the picture. Call-down lists must be readily accessible to ensure

rapid response. Notification lists provided in the core plan need not be duplicated here but need to be referenced.

## Annex 3. Response Management System

This annex should contain a general description of the facility's response management system as well as contain specific information necessary to guide or support the actions of each response management function (i.e., command, operations, planning, logistics, and finance) during a response.

a. General

If facility owners or operators choose to follow the fundamental principles of NIIMS ICS (see discussion of annexes above), then they may adopt NIIMS ICS by reference rather than having to describe the response management system in detail in the plan. In this section of Annex 3, planners should briefly address either 1) basic areas where their response management system is at variance with NIIMS ICS or 2) how the facility's organization fits into the NIIMS ICS structure. This may be accomplished through a simple organizational diagram.

If facility owners or operators choose not to adopt the fundamental principles of NIIMS ICS, this section should describe in detail the structure of the facility response management system. Regardless of the response management system used, this section of the annex should include the following information:

• Organizational chart;
• Specific job description for each position; [5]
• A detailed description of information flow; and
• Description of the formation of a unified command within the response management system.

b. Command

(1) List facility Incident Commander and Qualified Individual (if applicable) by name and/or title and provide information on their authorities and duties.

This section of Annex 3 should describe the command aspects of the response management system that will be used (i.e., reference NIIMS ICS or detail the facility's response management system). The location(s) of predesignated command posts should also be identified.

(2) Information (i.e., internal and external communications).

This section of Annex 3 should address how the facility will disseminate information internally (i.e., to facility/response employees) and externally (i.e., to the public). For example, this section might address how the facility would interact with local officials to assist with public evacuation and other needs. Items to consider in developing this section include press release statement forms, plans for coordination with the news media, community relations plan, needs of special populations, and plans for families of employees.

(3) Safety.

This section of Annex 3 should include a process for ensuring the safety of responders. Facilities should reference responsibilities of the safety officer, federal/state requirements (e.g., HAZWOPER), and safety provisions of the ACP. Procedures for protecting facility personnel should be addressed (i.e., evacuation signals and routes, sheltering in place).

(4) Liaison—Staff Mobilization.

This section of Annex 3 should address the process by which the internal and external emergency response teams will interact. Given that parallel mobilization may be occurring by various response groups, the process of integration (i.e., unified command) should be addressed. This includes a process for communicating with local emergency management especially where safety of the general public is concerned.

c. Operations

(1) Operational response objectives
(2) Discharge or release control
(3) Assessment/monitoring
(4) Containment
(5) Recovery
(6) Decontamination
(7) Non-responder medical needs, including information on ambulances and hospitals
(8) Salvage plans

This section of Annex 3 should contain a discussion of specific operational procedures to respond to an incident. It is important to note that response operations are driven by the type of incident. That is, a response to an oil spill will differ markedly from a response to a release of a toxic gas to the air. Plan drafters should tailor response procedures to the particular hazards in place at the facility. A facility with limited hazards may have relatively few procedures. A larger more complex facility with numerous hazards is likely to have a series of procedures

---

[5] OPA 90 planning requirements for marine transfer facilities (33 CFR 154.1035) require job descriptions for each spill management team member regardless of the response management system employed by the facility.

designed to address the nuances associated with each type of incident.

d. Planning

(1) Hazard assessment, including facility hazards identification, vulnerability analysis, prioritization of potential risks.

*This section of Annex 3 should present a detailed assessment of all potential hazards present at the facility, an analysis of vulnerable receptors (e.g., human populations, both workers and the general public, environmentally sensitive areas, and other facility-specific concerns) and a discussion of which risks deserve primary consideration during an incident. NRT–1 contains guidance on conducting a hazard analysis. Also, ACPs and LEPC plans may provide information on environmentally sensitive and economically important areas, human populations, and protection priorities. Plan drafters should address the full range of risks present at the facility. By covering actions necessary to respond to a range of incident types, plan holders can be prepared for small, operational discharges and large catastrophic releases. One approach that is required by certain regulations, such as the Clean Air Act (CAA) and OPA is to develop planning scenarios for certain types and sizes of releases (i.e., worst case discharge). Facilities may address such planning scenarios and associated calculations in this section of Annex 3 or as part of a separate annex depending on the size and complexity of the facility.*

(2) Protection

*This section of Annex 3 should present a discussion of strategies for protecting the vulnerable receptors identified through the hazard analysis. Primary consideration should be given to minimizing those risks identified as a high priority. Activities to be considered in developing this section include: population protection; protective booming; dispersant use, in-situ burning, bioremediation; water intake protection; wildlife recovery/ rehabilitation; natural remediation; vapor suppression; and monitoring, sampling, and modeling. ACPs and LEPC plans may contain much of this information.*

(3) Coordination with natural resource trustees.

*This section should address coordination with government natural resource trustees. In their role as managers of and experts in natural resources, trustees assist the federal OSC in developing or selecting removal actions to protect these resources. In this role, they serve as part of the*

response organization working for the federal OSC. A key area to address is interaction with facility response personnel in protection of natural resources.

*Natural resource trustees are also responsible to act on behalf of the public to present a claim for and recover damages to natural resources injured by an oil spill or hazardous substance release. The process followed by the natural resource trustees, natural resource damage assessment (NRDA), generally involves some data collection during emergency response. NRDA regulations provide that the process may be carried out in cooperation with the responsible party. Thus, the facility may wish to plan for how that cooperation will occur, including designation of personnel to work with trustees in NRDA.*

(4) Waste management.

*This section should address procedures for the disposal of contaminated materials in accordance with federal, state, and local requirements.*

e. Logistics

(1) Medical needs of responders
(2) Site security
(3) Communications (internal and external resources)
(4) Transportation (air, land, water)
(5) Personnel support (e.g., meals, housing, equipment)
(6) Equipment maintenance and support

*This section of the Annex 3 should address how the facility will provide for the operational needs of response operations in each of the areas listed above. For example, the discussion of personnel support should address issues such as: volunteer training; management; overnight accommodations; meals; operational/ administrative spaces; and emergency procedures. The NRT recognizes that certain logistical considerations may not be applicable to small facilities with limited hazards.*

f. Finance/procurement/administration
(1) Resource list
(2) Personnel management
(3) Response equipment
(4) Support equipment
(5) Contracting
(6) Claims procedures
(7) Cost documentation

*This section of Annex 3 should address the acquisition of resources (i.e., personnel and equipment) for the response and monitoring of incident-related costs. Lists of available equipment in the local and regional area and how to procure such equipment as necessary should be*

included. Information on previously established agreements (e.g., contracts) with organizations supplying personnel and equipment (e.g., oil spill removal organizations) also should be included. This section should also address methods to account for resources expended and to process claims resulting from the incident.

Annex 4. Incident Documentation
a. Post accident investigation
b. Incident history

*This annex should describe the company's procedures for conducting a follow-up investigation of the cause of the accident, including coordination with federal, State, and local officials. This annex should also contain an accounting of incidents that have occurred at the facility, including information on cause, amount released, resources impacted, injuries, response actions, etc. This annex should also include information that may be required to prove that the facility met its legal notification requirements with respect to a given incident, such as a signed record of initial notifications and certified copies of written follow-up reports submitted after a response.*

Annex 5. Training and Exercises/Drills

*This annex should contain a description of the training and exercise program conducted at the facility as well as evidence (i.e., logs) that required training and exercises have been conducted on a regular basis. Facilities may follow appropriate training or exercise guidelines (e.g., National Preparedness for Response Exercise Program Guidelines) as allowed under the various regulatory requirements.*

Annex 6. Response Critique and Plan Review and Modification Process

*This annex should describe procedures for modifying the plan based on periodic plan review or lessons learned through an exercise or a response to an actual incident. Procedures to critique an actual or simulated response should be a part of this discussion. A list of plan amendments (i.e., history of updates) should also be contained in this annex. Plan modification should be viewed as a part of a facility's continuous improvement process.*

Annex 7. Prevention

*Some federal regulations that primarily address prevention of accidents include elements that relate to contingency planning (e.g., EPA's RMP and SPCC regulations and OSHA's Process Safety Standard). This annex is designed to allow facilities to include*

*prevention-based requirements (e.g., maintenance, testing, in-house inspections, release detection, site security, containment, fail safe engineering) that are required in contingency planning regulations or that have the potential to impact response activities covered in a contingency plan. The modular nature of the suggested plan outline provides planners with necessary flexibility to include prevention requirements in the ICP. This annex may not need to be submitted to regulatory agencies for review.*

Annex 8. Regulatory Compliance and Cross-Reference Matrices

*This annex should include information necessary for plan reviewers to determine compliance with specific regulatory requirements. To the extent that plan drafters did not include regulatory required elements in the balance of the ICP, they should be addressed in this annex. This annex should also include signatory pages to convey management approval and certifications required by the regulations, such as certification of adequate response resources and/or statements of regulatory applicability as required by regulations under OPA authority. Finally, this annex should contain cross-references that indicate where specific regulatory requirements are addressed in the ICP for each regulation covered under the plan. As discussed previously, Attachment 3 contains a series of matrices designed to fulfill this need in those instances where plan drafters adhere to the outline contained in this guidance.*

Attachment 1—ICP Outline

*Section I—Plan Introduction Elements*

1. Purpose and Scope of Plan Coverage
2. Table of Contents
3. Current Revision Date
4. General Facility Identification Information
   a. Facility name
   b. Owner/operator/agent (include physical and mailing address and phone number)
   c. Physical address of the facility (include county/parish/borough, latitude/longitude, and directions)

d. Mailing address of the facility (correspondence contact)
e. Other identifying information (e.g., ID numbers, SIC Code, oil storage start-up date)
f. Key contact(s) for plan development and maintenance
g. Phone number for key contact(s)
h. Facility phone number
i. Facility fax number

*Section II—Core Plan Elements*

1. Discovery
2. Initial Response
   a. Procedures for internal and external notifications (i.e., contact, organization name, and phone number of facility emergency response coordinator, facility response team personnel, federal, state, and local officials)
   b. Establishment of a response management system
   c. Procedures for preliminary assessment of the situation, including an identification of incident type, hazards involved, magnitude of the problem, and resources threatened
   d. Procedures for establishment of objectives and priorities for response to the specific incident
   (1) Immediate goals/tactical planning (e.g., protection of workers and public as priorities)
   (2) Mitigating actions (e.g., discharge/release control, containment, and recovery, as appropriate)
   (3) Identification of resources required for response
   e. Procedures for implementation of tactical plan
   f. Procedure for mobilization of resources
3. Sustained Actions
4. Termination and Follow-Up Actions

*Section III—Annexes*

Annex 1. Facility and Locality Information

a. Facility maps
b. Facility drawings
c. Facility description/layout, including identification of facility hazards and vulnerable resources and populations on and off the facility which may be impacted by an incident

Annex 2. Notification

a. Internal notifications
b. Community notifications
c. Federal and state agency notifications

Annex 3. Response Management System

a. General
b. Command

(1) List facility Incident Commander and Qualified Individual (if applicable) by name and/or title and provide information on their authorities and duties
(2) Information (i.e., internal and external communications)
(3) Safety
(4) Liaison—Staff mobilization
c. Operations
(1) Operational response objectives
(2) Discharge or release control
(3) Assessment/monitoring
(4) Containment
(5) Recovery
(6) Decontamination
(7) Non-responder medical needs including information on ambulances and hospitals
(8) Salvage plans
d. Planning
(1) Hazard assessment, including facility hazards identification, vulnerability analysis, prioritization of potential risks
(2) Protection
(3) Coordination with natural resource trustees
(4) Waste management
e. Logistics
(1) Medical needs of responders
(2) Site security
(3) Communications (internal and external resources)
(4) Transportation (air, land, water)
(5) Personnel support (e.g., meals, housing, equipment)
(6) Equipment maintenance and support
f. Finance/procurement/administration
(1) Resource list
(2) Personnel management
(3) Response equipment
(4) Support equipment
(5) Contracting
(6) Claims procedures
(7) Cost documentation

Annex 4. Incident Documentation

a. Post accident investigation
b. Incident history

Annex 5. Training and Exercises/Drills

Annex 6. Response Critique and Plan Review and Modification Process

Annex 7. Prevention

Annex 8. Regulatory Compliance and Cross-Reference Matrices

BILLING CODE 6560-50-P

**Attachment 2: ICP Development Matrix**

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| **Section I - Plan Introduction Elements** | | | | | | | |
| 1. Purpose and scope of plan coverage | 264.51 265.51 279.52(b)(1) 264.52(a) 265.52(a) 279.52(b)(2)(i) | | | | 38(a)(1) [1] 119(c) 272(d) | (l) [2] (p)(8) (q)(1) | |
| 2. Table of contents | | 112.20(0) Appendix F | 1035(a)(4) [3] 1030(b) | Appendix A | | | |
| 3. Current revision date | | F1.2 | 1035(a)(6) | | | | |
| 4. General facility identification information | | | | 194.107(d)(1)(x) 194.113 194.113(b)(1) | | | |
| a. Facility name | | F1.2 F1.9 | 1035(a)(1) | | | | |
| b. Owner/operator/agent | | 112.20(h)(2) F1.2 F2.0 | 1035(a)(3) | 194.113(a)(1) A-1 | | | |
| c. Physical address and directions | | 112.20(h)(2) F1.2 F2.0 | 1035(a)(1) 1035(a)(2) 1035(e) | 194.113(a)(2) 194.113(b)(3),(4) A-1 | | | |
| d. Mailing address | | 112.20(h)(2) | 1035(a)(1) | 194.113(a)(1) | | | |
| e. Other identifying information | | | | | | | |

[1] All citations refer to part 1910 unless otherwise noted.
[2] All citations refer to 29 CFR 1910.120 unless otherwise noted.
[3] All citations refer to part 154 unless otherwise noted.

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| f. Key contact(s) for plan development and maintenance | | | | | 38(a)(2)(vi) | (l)(2)(i),(ii)<br>(p)(8)(ii)(A),(B)<br>(q)(2)(i),(vi) | |
| g. Phone number for key contact(s) | | F1.2<br>F2.1 | | | | | |
| h. Facility phone number | | | 1035(a)(1) | | | | |
| i. Facility fax number | | | 1035(a)(1) | | | | |
| **Section II - Core Plan Elements** | | | | | | | |
| 1. Discovery | 264.52(d)<br>265.52(d)<br>279.52(b)(2)(iv) | 112.200(b)(6)<br>F1.6.1, F1.6.2 | 1035(b)(3)(i) | 194.107(d)(1)(ii)<br>A-3 | 119(n) | (l)(2)(iii)<br>(p)(8)(ii)(C)<br>(q)(2)(iii) | 68.95(a)(1)(ii) |
| 2. Initial response | 264.55<br>265.55<br>279.52(b)(5) | 112.200(b)(7)(i)<br>F1.3.6<br>F1.7 | 1035(b)(2)(ii)<br>1035(b)(3)(i)<br>1035(b)(3)(ii) | A-2 | 38(a)(2)(i)<br>38(a)(2)(ii)<br>119(n) | (l)(2)(ix)<br>(p)(8)(ii)(I)<br>(q)(2)(ix) | 68.95(a)(1)(iii) |
| a. Procedures for internal and external notifications | 264.56(a)(1),(2)<br>265.56(a)(1),(2)<br>279.52(b)(6)(i)(A),(B)<br>264.56(d)(1),(2)<br>265.56(d)(1),(2)<br>279.52(b)(6)(iv)(A),(B) | 112.200(b)(1)(iii)<br>112.200(b)(3)(iii)<br>112.200(b)(3)(iii)<br>112.200(b)(3)(iv)<br>F1.2<br>F1.3.1 | 1026<br>1035(a)(3)<br>1035(b)(3)(i)<br>1035(e)(2) | 194.107(d)(1)(ii)<br>194.113(b)(2)<br>A-1, A-4(b)(2)<br>A-2<br>A-5 | 38(a)(2)(v)<br>38(a)(2)(iv)<br>38(a)(3)(ii)<br>165 | (l)(2)(ix)<br>(p)(8)(ii)(I)<br>(q)(2)(ix) | 68.95(a)(1)(i) |
| b. Establishment of a response management structure | 264.37<br>265.37<br>279.52(a)(6)<br>264.52(c)<br>265.52(c)<br>279.52(b)(2)(iii) | 112.200(b)(1)(iv)<br>112.200(b)(3)(v)<br>F1.3.4 | 1035(b)(3)(iii) | 194.107(d)(1)(iv)<br>A-4<br>A-9 | | (l)(2)(i),(ii)<br>(p)(8)(ii)(A),(B)<br>(q)(2)(i),(ii)<br>(q)(6)(i) | |
| c. Preliminary assessment | 264.56(b),(c)<br>265.56(b),(c)<br>279.52(b)(6)(ii),(iii) | 112.200(b)(3)(ix)<br>112.200(b)(4)<br>F1.4, F1.4.2 | 1035(b)(3)<br>1035(b)(4)(i) | 194.107(d)(1)(ii) | 38(a)(2)(i)<br>38(a)(2)(ii) | (l)(2)(i)<br>(l)(3)(vii)<br>(p)(8)(ii)(A)<br>(q)(2)(i)<br>(q)(3)(ii),(iii) | |

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| d. Establishment of objectives and priorities for response, including: (1) Immediate goals/tactical planning (2) Mitigating actions (3) Response resources | 264.52(e) 265.52(e) 279.52(b)(2)(v) | 112.20(h)(3)(iv) 112.20(h)(1)(vii) 112.20(h)(3)(v) 112.20(h)(3)(ix) 112.20(h)(7) F1.3.3 F1.7.1, F1.7.3 | 1350(c)(2) 1350(b)(3)(iv),(v) | 194.107(d)(3)(iii) 194.107(d)(1)(iv) | 38(a)(4) 119(n) | (l)(2)(vi),(vii) (p)(8)(ii)(F),(H) (p)(2)(vi),(vii) (p)(8)(iv)(F) (p)(3)(iii),(iii),(iv), (vi),(vii) | |
| e. Implementation of tactical plan | 264.52(e) 265.52(e) 279.52(b)(2)(v) | 112.20(h)(3)(ix) 112.20(h)(7) | 1350(b)(2)(iii) 1350(b)(3) 1350(b)(4)(iii) | 194.107(d)(1)(iv) A-3 | 38(a)(2)(iii) | (l)(3)(vii) (p)(8)(iv)(F) (q)(3)(xii) | |
| f. Mobilization of resources | 264.52(e) 265.52(e) 279.52(b)(2)(v) | 112.20(h)(7) F1.7.1 | 1350(b)(2)(iii) 1350(b)(3) 1350(b)(4)(iii) | 194.115 194.107(d)(1)(iv) A-1 A-3 | | (l)(2)(x) (p)(8)(i)(C) (q)(3)(ix) | |
| 3. Sustained actions | | 112.20(h)(7) | 1350(b)(3) | 194.107(d)(1)(iv) A-9 | 38(a)(2)(iii) | (l)(2)(x) (p)(8)(i)(C) (q)(2)(x) | 68.95(a)(1)(iii) |
| 4. Termination and follow-up actions | 264.56(l) 265.56(l) | 112.20(h)(7) | 1350(b)(3) | | | (l)(2)(x) (p)(8)(i)(C) (q)(2)(x) | 68.95(a)(1)(viii) |
| Section III - Annexes | | | | | | | |
| 1. Facility and locality information | | 112.20(h)(2) F1.2 F2.0 | 1350(c) 1350(e)(1) | 194.107(d)(1)(i) 194.113 194.113(b)(1) | | | |
| a. Facility maps | | 112.20(h)(1)(viii) F1.9 | | 194.113(b)(2) A-9 | | | |
| b. Facility drawings | | 112.20(h)(1)(viii) 112.20(h)(9) F1.9 | 1350(e) | A-9 | | | |
| c. Facility description/layout | | F1.9 | 1350(b)(4) | A-9 | | (l)(3)(i)(A) (p)(8)(v)(A)(A)(1) | |

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| **2. Notification** | 264.52(d) <br> 265.52(d) <br> 279.52(b)(2)(iv) <br> 264.56(a)(1)(2) <br> 265.56(a)(1)(2) <br> 279.52(b)(6)(iii)(A),(B) <br> 264.56(a)(1)(2) <br> 265.56(a)(1)(2) <br> 279.52(b)(6)(iv)(A),(B) | 112.20(h)(1)(vi) |  | 194.107(d)(1)(ii) <br> A-2 | 119(n) <br> 165(b)(1) <br> 165(b)(4) <br> 272(.l) | (l)(3)(i)(B) <br> (l)(2)(x) <br> (p)(8)(ii)(D) <br> (p)(8)(iv)(A)(2) <br> (q)(2)(ix) | 68.95(a)(1)(i) |
| **a. Internal** |  | 112.20(h)(3)(iii) <br> F1.3.1 | 1035(b)(1)(i) <br> 1035(b)(1)(ii) <br> 1035(e)(2) | 194.107(d)(1)(iv) | 119(n) <br> 165(b)(1) | (l)(2)(ix) <br> (p)(8)(ii)(iii) |  |
| **b. Community** |  | 112.20(h)(3)(iii) <br> 112.20(h)(3)(ix) <br> F1.3.1 | 1035(b)(1)(i) <br> 1035(b)(1)(ii) <br> 1035(e)(2) |  | 119(n) | (p)(8)(ii)(A),(B), (l) <br> (q)(2)(i),(ii),(ix) |  |
| **c. Federal and state agency** |  | 112.20(h)(3)(ii) <br> 112.20(h)(3)(x) <br> F1.3.1 | 1035(b)(1)(i) <br> 1035(b)(1)(ii) <br> 1035(e)(2) | 194.107(d)(1)(vi) |  | (p)(8)(ii)(A),(B),(l) <br> (q)(2)(i),(ii),(ix) |  |
| **3. Response management structure** |  | 112.20(h)(1)(v) <br> 112.20(h)(3)(v) <br> F1.3.4 | 1035(c)(3)(iii) | 194.107(d)(1)(v) <br> A-9 |  | (q)(3)(i) |  |
| **a. General** | 264.52(c) <br> 265.52(c) <br> 279.52(b)(2)(iii) |  | 1035(b)(3)(iii) |  |  | (q)(3)(i) |  |
| **b. Command** |  |  |  |  |  | (q)(3)(i) |  |
| **(1) Facility incident commander and qualified individual** | 264.55 <br> 265.55 <br> 279.52(b)(5) | 112.20(h)(1)(i) <br> F1.2.5 | 1026 | A-4 |  | (q)(3)(i) |  |
| **(2) Information** | 264.56(a)(1)(2) <br> 265.56(a)(1)(2) <br> 279.52(b)(6)(iii)(A),(B) | 112.20(h)(3)(ii) | 1035(b)(3)(iii) <br> 1035(e)(4) | 194.107(d)(1)(v) | 38(a)(2)(ii) <br> 38(a)(5)(iii) | (q)(3)(i) |  |
| **(3) Safety** | 264.52(d) <br> 265.52(d) <br> 279.52(b)(2)(vi) | 112.20(h)(1)(v) <br> 112.20(h)(3)(vii) <br> 112.20(h)(3)(viii) <br> F1.3.5 | 1035(b)(3)(iii) <br> 1035(e)(5) |  | 38(a)(2)(i) <br> 38(a)(2)(iii) <br> 38(a)(2)(iv) <br> 38(a)(4) | (q)(2)(iv),(v) <br> (p)(8)(ii)(D),(F) <br> (p)(2)(iv),(vi) <br> (q)(3)(vii),(viii) |  |
| **(4) Liaison** |  |  | 1035(b)(3)(iii) |  | 38(a)(2)(vi) | (l)(2)(x),(ii) <br> (p)(8)(iii)(A),(B) <br> (q)(2)(x),(ii) |  |

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| c. Operations | | | 1035(b)(3)(iii) | 194.107(d)(1)(v) | 38(a)(2)(i)-(iv) | (q)(3)(iii)(A)(v) | |
| (1) Response objectives | | | 1035(b)(2)(iii) 1035(b)(4)(iii) | | 38(a)(1) | (q)(3)(iii) | |
| (2) Discharge or release control | | 112.20(b)(3)(i) 112.20(b)(7)(iv) 112.20(b)(1)(vii) | 1035(b)(2) 1035(b)(2)(iii) 1035(b)(4)(iii) | 194.107(d)(1)(v) A-3 | | | |
| (3) Assessment/ monitoring | 264.56(b)(i),(d),(f) 265.56(b)(i),(d),(f) 279.52(b)(6)(i),(iii), (iv),(vi) | 112.20(b)(3)(ix) F1.7.1 | 1035(b)(2)(iii) 1035(b)(3) 1035(b)(4)(iii) | | 38(a)(3)(ii) 38(a)(4) | (q)(3)(ii) | |
| (4) Containment | 264.56(e) 265.56(e) 279.52(b)(6)(iv) | 112.20(b)(1)(vii) 112.20(b)(3)(i) 112.20(b)(7)(iv) F1.7.3 | 1035(b)(2)(iii) 1035(b)(3)(iv) 1035(b)(4)(iii) | 194.107(d)(1)(v) | | | |
| (5) Recovery | 264.56(e) 265.56(e) 279.52(b)(6)(iv) | 112.20(b)(3)(i) 112.20(b)(7)(iii) F1.7.3 | 1035(b)(2)(iii) 1035(b)(3)(iv) 1035(b)(4)(iii) | 194.107(d)(1)(v) | | | |
| (6) Decontamination | 264.56(b)(2) 265.56(b)(2) 279.52(b)(6)(viii)(B) | 112.20(b)(7)(viii) F1.7.2 | | 194.107(d)(1)(v) | | (k) (k)(2)(vii) (p)(8)(ii)(G) (q)(2)(vii) (q)(3)(ix) | |
| (7) Non-responder medical needs | | | 1035(e)(5) | | 38(a)(2)(iv) | (k)(2)(viii) (p)(8)(ii)(H) (q)(2)(viii) | 68.95(a)(1)(ii) |
| (8) Salvage plans | | | | 194.107(d)(1)(v) | | | |
| d. Planning | | | 1029 1035(b)(4)(ii) | 194.107(a) 194.115 | 38(a)(1) 38(a)(4) | (k)(2)(i),(ix) (q)(1) (q)(2)(i),(ix) | |
| (1) Hazard assessment | | 112.20(b)(3)(ix) 112.20(b)(4) 112.20(b)(5) 112.20(b)(7)(iii) F1.4.1-F1.4.3 F1.5.1, F1.5.2 | 1029 1035(b)(4)(ii) | 194.105 194.113(b)(6) | 38(a)(4) | (k)(1)(ii)(C),(D) (p)(8)(iv)(A)(1),(F) (q)(3)(ii) | 68.20-36 68.50 68.67 |
| (2) Protection | | 112.20(b)(7)(v) 112.20(b)(7)(iv) F1.7.1, F1.7.3 | 1035(b)(4) | | | (k)(2)(vi),(vii) (p)(8)(ii)(D),(E),(K) (q)(2)(vi),(vii),(v) (q)(3)(iii) | |

Federal Register / Vol. 61, No. 109 / Wednesday, June 5, 1996 / Notices    28655

| ICP Elements | RCRA (40 CFR part 264, Subpart D, 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| (3) Coordination with natural resource trustees | | 112.20(g) | 030(f) | 194.107(c) | | | |
| (4) Waste management | 264.56(k)(1) 265.56(k)(1) 279.52(b)(6)(viii)(A) 264.56(g) 265.56(g) 279.52(b)(6)(viii) | 112.20(h)(7)(iv) F1.7.2 | 035(k)(5) | 194.107(d)(1)(iv) | | (l)(3)(iii) (p)(8)(iv)(B) (q)(2)(xii) | 68.95(a)(1)(ii) |
| e. Logistics | | | 035(h)(3)(iii) | | | | |
| (1) Medical needs | | | 035(e)(5) | | 38(a)(2)(iv) | (l)(2)(viii) (p)(8)(ii)(H) (q)(2)(vii) | |
| (2) Site security | | 112.20(h)(10) F1.10 | | | | (l)(2)(v) (p)(8)(i)(E) (q)(2)(v) | |
| (3) Communications | | 112.20(h)(3)(iv) 112.20(h)(3)(vi) F1.3.3 | 035(e)(3) | 194.107(d)(1)(iv) A-2 | 38(a)(3) 119(e)(3)(iii) 165(b) | (q)(3)(vi) | |
| (4) Transportation | | | | | | | |
| (5) Personnel support | | 112.20(h)(1)(iv) 112.20(h)(1)(vi) 112.20(h)(3)(i-ii) 112.20(h)(3)(v) 112.20(h)(3)(vii) F1.3.5 | | | 38(a)(5)(i) | (l)(2)(vi) (p)(8)(i)(B) (q)(2)(ii) (q)(3)(vi),(v) | |
| (6) Equipment maintenance and support | | 112.20(h)(1)(iv) 112.20(h)(3)(vi) 112.20(h)(8) F1.3.3 F1.8.1 | 035(b)(3)(iv) 035(e)(3) 1057 | 194.107(d)(1)(viii) | 119(l)(4) 119(j)(5) 165(d) | (l)(2)(xi) (p)(8)(ii)(K) (q)(2)(xi) | 68.95(a)(2) |
| f. Finance/procurement/ administration | | 112.20(h)(3)(ix) | 028 035(b)(3)(iii) | | | | |
| (1) Resource list | 264.52(e) 265.52(e) 279.52(b)(2)(v) | 112.20(h)(1)(iv) 112.20(h)(3)(vi) F1.3.2 F1.7.1 | 035(b)(3)(iv) 035(e)(3) | | | | |
| (2) Personnel | | 112.20(h)(1)(v) 112.20(h)(3)(v) F1.3.4 | 035(b)(3)(iv) | | | | |

| ICP Elements | RCRA (40 CFR part 264, Subpart D, and 40 CFR part 265, Subpart D, and 40 CFR 279.52) | EPA's Oil Pollution Prevention Regulation (40 CFR part 112) | USCG-FRP (33 CFR part 154) | DOT/RSPA-FRP (49 CFR part 194) | OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119) | OSHA HAZWOPER (29 CFR 1910.120) | CAA RMP (40 CFR part 68) |
|---|---|---|---|---|---|---|---|
| (3) Response equipment | 264.52(e)<br>265.52(e)<br>279.52(b)(2)(v) | 112.20(h)(3)(iv)<br>112.20(h)(3)(vi)<br>F1.3.3<br>F1.7.1 | 1035(b)(2)(ii)<br>1035(b)(4)(iii)<br>1035(c)(3)<br>Appendix C | | | (l)(2)(e)<br>(p)(8)(ii)(K)<br>(q)(2)(xi) | |
| (4) Support equipment | 264.52(e)<br>265.52(e)<br>279.52(b)(2)(v) | F1.3.2<br>F1.7.1 | 1035(c)(3) | | | | |
| (5) Contracting | | 112.20(h)(3)(ii) | 1028(a)(1)<br>1035(c)(3) | 194.115 | | | |
| (6) Claims procedures | | | | | | | |
| (7) Cost documentation | | | | | | | |
| 4. Incident documentation | | | | | 38(a)(2)(iii)<br>119(e)(3)(vii) | (l)(2)(e)<br>(p)(8)(ii)(M)<br>(q)(2)(x) | |
| a. Post-accident investigation | 264.56(j)<br>265.56(j)<br>279.52(b)(6)(ix) | | | | 119(m) | (l)(2)(e)<br>(p)(8)(ii)(M)<br>(q)(2)(x) | 68.60<br>68.81 |
| b. Incident history | | 112.20(h)(4)<br>F1.4.4 | | | 119(e)(3)(ii) | | 68.42 |
| 5. Training and exercises/drills | | 112.20(h)(8)<br>112.21<br>F1.8.2, F1.8.3 | 1035(e)<br>1050<br>1055<br>Appendix D | 194.107(d)(1)(vii)<br>194.107(d)(1)(ix)<br>194.117<br>A-6<br>A-7 | 38(a)(5)<br>119(g)(1)(l) | (l)(3)(iv)<br>(p)(8)(iii)<br>(q)(6) | 68.95(a)(3) |
| 6. Response critique and plan review and modification process | 264.54<br>265.54<br>279.52(b)(4) | 112.20(g) | 1035(a)(6)<br>1035(d)<br>1065 | 194.107(d)(1)(x)<br>194.111<br>194.119<br>194.121<br>A-8 | 119(l)<br>119(o)(1) | (l)(2)(e)<br>(p)(8)(ii)(U)<br>(q)(2)(x) | 68.95(a)(4) |
| 7. Prevention | | | | | | (l)(2)(iii)<br>(p)(8)(ii)(C)<br>(q)(2)(iii) | |

BILLING CODE 6560–50–C

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES

| | ICP Citation(s) |
|---|---|
| **RCRA (40 CFR Part 264 Subpart D [1], 40 CFR Part 265 Subpart D [2], 40 CFR Part 279.52(b) [3])** | |
| 264.52　Content of contingency plan: | |
| 　(a) Emergency response actions.[4] | |
| 　(b) Amendments to SPCC plan. | |
| 　(c) Coordination with State and local response parties [5] | II.2.b;III.3.a. |
| 　(d) Emergency coordinator(s) | II.2.a; III.2. |
| 　(e) Detailed description of emergency equipment on-site | II.2.d.(3);　II.2.e;　II.2.f;　III.3.f.(1);　III.3.f.(3); III.3.f.(4). |
| 　(f) Evacuation plan if applicable | III.3.b.(3). |
| 264.53　Copies of contingency plan. | |
| 264.54　Amendment of contingency plan | III.6. |
| 264.55　Emergency coordinator | II.2.a; III.3.b.(1). |
| 264.56　Emergency procedures: | |
| 　(a) Notification | II.2.a; III.2; III.3.b.(2). |
| 　(b) Emergency identification/characterization | II.2.c; III.3.c.(3). |
| 　(c) Health/environmental assessment | II.2.c; III.3.c.(3). |
| 　(d) Reporting | II.2.a; III.2; III.3.c.(3). |
| 　(e) Containment | III.3.c.(2); III.3.c.(4). |
| 　(f) Monitoring | III.3.b.(3); III.3.c.(3). |
| 　(g) Treatment, storage, or disposal of wastes | III.3.d.(4). |
| 　(h) Cleanup procedures:. | |
| 　　(1) Disposal | III.3.d.(4). |
| 　　(2) Decontamination | III.3.c.(6). |
| 　(i) Follow-up procedures | II.4. |
| 　(j) Follow-up report | III.4.a. |
| 265.52　Content of contingency plan: | |
| 　(a) Emergency response actions.[6] | |
| 　(b) Amendments to SPCC plan. | |
| 　(c) Coordination with State and local response parties [7] | II.2.b; III.3.a. |
| 　(d) Emergency coordinator(s) | II.2.a; III.2. |
| 　(e) Detailed description of emergency equipment on-site | II.2.d.(3);　II.2.e;　II.2.f;　III.3.f.(1);　III.3.f.(3); III.3.f.(4). |
| 　(f) Evacuation plan if applicable | III.3.b.(3). |
| 265.53　Copies of contingency plan. | |
| 265.54　Amendment of contingency plan | III.6. |
| 265.55　Emergency coordinator | II.2.a; III.3.b.(1). |
| 265.56　Emergency procedures: | |
| 　(a) Notification | II.2.a; III.2; III.3.b.(2). |
| 　(b) Emergency identification/characterization | II.2.c; III.3.c.(3). |
| 　(c) Health/environmental assessment | II.2.c; III.3.c.(3). |
| 　(d) Reporting | II.2.a; III.2; III.3.c.(3). |
| 　(e) Containment | III.3.c.(2); III.3.c.(4). |
| 　(f) Monitoring | III.3.b.(3); III.3.c.(3). |
| 　(g) Treatment, storage, or disposal of wastes | III.3.d.(4). |
| 　(h) Cleanup procedures: | |
| 　　(1) Disposal | III.3.d.(4). |
| 　　(2) Decontamination | III.3.c.(6). |
| 　(i) Follow-up procedures | II.4. |
| 　(j) Follow-up report | III.4.a. |
| 279.52(b)(2)　Content of contingency plan: | |
| 　(i) Emergency response actions [8] | |
| 　(ii) Amendments to SPCC plan. | |
| 　(iii) Coordination with State and local response parties [9] | II.2.b; III.3.a. |
| 　(iv) Emergency coordinator(s) | II.2.a; III.2. |
| 　(v) Detailed description of emergency equipment on-site | II.2.d.(3);　II.2.e;　II.2.f;　III.3.f.(1);　III.3.f.(3); III.3.f(4). |
| 　(vi) Evacuation plan if applicable | III.3.b.(3). |
| (3) Copies of contingency plan. | |
| (4) Amendment of contingency plan | III.6. |
| (5) Emergency coordinator | II.2.a; III.3.b.(1). |
| (6) Emergency procedures: | |
| 　(i) Notification | II.2.a; III.2; III.3.b.(2). |
| 　(ii) Emergency identification/characterization | II.2.c; III.3.c.(3). |
| 　(iii) Health/environmental assessment | II.2.c; III.3.c.(3). |
| 　(iv) Reporting | II.2.a; III.2; III.3.c.(3). |
| 　(v) Containment | III.3.c.(2); III.3.c.(4). |
| 　(vi) Monitoring | III.3.b.(3); III.3.c.(3). |
| 　(vii) Treatment, storage, or disposal of wastes | III.3.d.(4). |
| 　(viii) Cleanup procedures: | |
| 　　(A) Disposal | III.3.d.(4). |
| 　　(B) Decontamination | III.3.c.(6). |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

| | ICP Citation(s) |
|---|---|
| (ix) Follow-up report .............................................................................................. | III.4.a. |
| **EPA's Oil Pollution Prevention Regulation (40 CFR 112)** | |
| 112.7(d)(1)  Strong spill contingency plan and written commitment of manpower, equipment, and materials.[10][11] | |
| 112.20(g)  General response planning requirements ................................................. | III.3.d.(3); III.6. |
| 112.20(h) Response plan elements ............................................................................ | I.2; II.8. |
| (1) Emergency response action plan (Appendix F1.1): | |
| (i) Identity and telephone number of qualified individual (F1.2.5) ...................... | III.3.b.(1). |
| (ii) Identity of individuals/organizations to contact if there is a discharge (F1.3.1) .......... | III.2. |
| (iii) Description of information to pass to response personnel in event of a reportable spill (F1.3). | II.2.a. |
| (iv) Description of facility's response equipment and its location (F1.3.2) ...................... | II.2.d.(3);    III.3.e.(3);    III.3.e.(6);    III.3.f.(1); III.3.f.(3). |
| (v) Description of response personnel capabilities (F1.3.4) ...................... | II.2.b; III.3; III.3.e.(5); III.3.f.(2); |
| (vi) Plans for evacuation of the facility and a reference to community evacuation plans (F1.3.5). | III.3.b.(3); III.3.e.(5) |
| (vii) Description of immediate measures to secure the source (F1.7.1) ...................... | II.2.d.(2); III.3.c.(2); III.3.c.(4). |
| (viii) Diagram of the facility (F1.9) ...................... | III.1.a–b. |
| (2) Facility information (F1.2, F2.0) ...................... | I.4.b–d; III.1. |
| (3) Information about emergency responses: | |
| (i) Identity of private personnel and equipment to remove to the maximum extent practicable a WCD or other discharges (F1.3.2, F1.3.4). | III.3.c.(2); III.3.c.(4)–(5); III.3.e.(5). |
| (ii) Evidence of contracts or other approved means for ensuring personnel and equipment availability. | III.3.e.(5); III.3.f.(5) |
| (iii) Identity and telephone of individuals/organizations to be contacted in event of a discharge (F1.3.1). | II.2.a; III.2.b–d; III.3.b.(2). |
| (iv) Description of information to pass to response personnel in event of a reportable spill (F1.3.1). | II.2.a. |
| (v) Description of response personnel capabilities (F1.3.4) ...................... | II.2.b; III.3; III.3.e.(5); III.3.f.(2). |
| (vi) Description of a facility's response equipment, location of the equipment, and equipment testing (F1.3.2, F1.3.3). | II.2.d.(3);    III.3.e.(3);    III.3.e.(6);    III.3.f.(1); III.3.f.(3). |
| (vii) Plans for evacuation of the facility and a reference to community evacuation plans as appropriate (F1.3.5). | III.3.b.(3); III.3.e.(5). |
| (viii) Diagram of evacuation routes (F1.9) ...................... | III.3.b.(3). |
| (ix) Duties of the qualified individual (F1.3.6) ...................... | II.2.c;   II.2.d.(1);   I.2.e;   III.2.b–c;   III.3.c.(3); III.3.d.(1); III.3.f. |
| (4) Hazard evaluation (F1.4) ...................... | II.2.c; III.3.d.(1); III.4.b. |
| (5) Response planning levels (F1.5, F1.5.1, F1.5.2) ...................... | II.3.d.(1). |
| (6) Discharge detection systems (F1.6, F1.6.1, F1.6.2) ...................... | II.1. |
| (7) Plan implementation (F1.7) ...................... | II.2.d–f; II.3; II.4. |
| (i) Response actions to be carried out (F1.7.1.1) ...................... | II.2; III.3.d.(2). |
| (ii) Description of response equipment to be used for each scenario (F1.7.1.1) .......... | III.3.d.(1). |
| (iii) Plans to dispose of contaminated cleanup materials (F1.7.2) ...................... | III.3.c.(5)–(6) |
| (iv) Measures to provide adequate containment and drainage of spilled oil (F1.7.3) ...... | III.3.c.(2); III.3.c.(4); III.3.d.(2); III.3.d.(4). |
| (8) Self-inspection, drills/exercises, and response training (F1.8.1–F1.8.3.2) ...................... | III.3.e.(6); III.5. |
| (9) Diagrams (F1.9) ...................... | III.1.b. |
| (10) Security systems (F1.10) ...................... | III.3.e.(2). |
| (11) Response plan cover sheet (F2.0). | |
| 112.21  Facility response training and drills/exercises (F1.8.2, F1.8.3) ...................... | III.5. |
| Appendix F Facility-Specific Response Plan:[12] | I.2. |
| 1.0  Model Facility-Specific Response Plan. | |
| 1.1  Emergency Response Action Plan. | |
| 1.2  Facility Information ...................... | I.3; I.4.a; I.4.b–c; I.4.h; II.2.a; III.1. |
| 1.3  Emergency Response Information: | |
| 1.3.1  Notification ...................... | II.2.a; III.2.a–c. |
| 1.3.2  Response Equipment List ...................... | II.2.d.(3); III.3.e.(3); III.3.f.(1); III.3.f.(3)–(4). |
| 1.3.3  Response Equipment Testing/Deployment ...................... | III.3.e.(6). |
| 1.3.4  Personnel ...................... | II.2.b; III.3; III.3.f.(2). |
| 1.3.5  Evacuation Plans ...................... | III.3.b.(3); III.3.e.(5). |
| 1.3.6  Qualified Individual's Duties ...................... | III.2. |
| 1.4  Hazard Evaluation ...................... | II.2.c. |
| 1.4.1  Hazard Identification ...................... | III.1.c; III.3.d.(1). |
| 1.4.2  Vulnerability Analysis ...................... | II.2.c; III.3.d.(1). |
| 1.4.3  Analysis of the Potential for an Oil Spill ...................... | III.3.d.(1). |
| 1.4.4  Facility Reportable Oil Spill History ...................... | III.4.b. |
| 1.5  Discharge Scenarios: | |
| 1.5.1  Small and Medium Discharges ...................... | III.3.d.(1). |
| 1.5.2  Worst Case Discharge ...................... | III.3.d.(1). |
| 1.6  Discharge Detection Systems: | |
| 1.6.1  Discharge Detection By Personnel ...................... | II.1. |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

|  | ICP Citation(s) |
|---|---|
| 1.6.2  Automated Discharge Detection | II.1. |
| 1.7  Plan Implementation | II.2. |
| 1.7.1  Response Resources for Small, Medium, and Worst Case Spills | II.2.d.(3); II.2.f; III.3.c.(3); III.3.d.(2); III.3.f.(1); III.3.f.(3)–(4). |
| 1.7.2  Disposal Plans | III.3.c.(5)–(6); III.3.d.(4). |
| 1.7.3  Containment and Drainage Planning | II.2.d; III.3.c.(4); III.3.d.(2). |
| 1.8  Self-Inspection, Drills/Exercises, and Response Training: |  |
| 1.8.1  Facility Self-Inspection | III.3.e.(6). |
| 1.8.2  Facility Drills/Exercises | III.5. |
| 1.8.3  Response Training | III.5. |
| 1.9  Diagrams | I.4; III.1.a–c. |
| 1.10  Security | III.3.e.(2). |
| 2.0  Response Plan Cover Sheet | I.4.b; I.4.c; I.4.h; III.1. |
| **USCG FRP (33 CFR part 154)** |  |
| 154.1026  Qualified individual and alternate qualified individual | II.2.a; III.3.b.(1). |
| 154.1028  Availability of response resources by contract or other approved means | III.3.f or III.8; III.3.f.(5). |
| 154.1029  Worst case discharge | III.3.d.(1). |
| 154.1030  General response plan contents:. |  |
| (a) The plan must be written in English. |  |
| (b) Organization of the plan [13] | I.2. |
| (c) Required contents. |  |
| (d) Sections submitted to COTP. |  |
| (e) Cross-references | III.8. |
| (f) Consistency with NCP and ACPs | III.3.d.(3). |
| 154.1035  Significant and substantial harm facilities: | III.1. |
| (a) Introduction and plan content | III.1. |
| (1) Facility's name, physical and mailing address, county, telephone, and fax | I.4.a; I.4.c–d; I.4.h–i |
| (2) Description of a facility's location in a manner that could aid in locating the facility | I.4.c. |
| (3) Name, address, and procedures for contacting the owner/operator on 24-hour basis. | I.4.b; II.2.a |
| (4) Table of contents | I.2. |
| (5) Cross index, if appropriate | III.8. |
| (6) Record of change(s) to record information on plan updates | I.3; III.6. |
| (b) Emergency Response Action Plan: |  |
| (1) Notification procedures: |  |
| (i) Prioritized list identifying person(s), including name, telephone number, and role in plan, to be notified in event of threat or actual discharge. | II.2.a; III.2.a–c. |
| (ii) Information to be provided in initial and follow-up notifications to federal, state, and local agencies. | III.3.b; III.2.a–c. |
| (2) Facility's spill mitigation procedures [14] | II.2.d.(2); III.3.c.(2). |
| (i) Volume(s) of persistent and non-persistent oil groups. | II.2. |
| (ii) Prioritized procedures/task delegation to mitigate or prevent a potential or actual discharge or emergencies involving certain equipment/scenarios. | II.2. |
| (iii) List of equipment and responsibilities of facility personnel to mitigate an average most probable discharge. | II.2.e–f; III.3.f.(3); III.3.c.(1)–(5). |
| (3) Facility response activities [15] | II.2.c; II.2.e–f; II.3; II.4; III.3.c.(3). |
| (i) Description of facility personnel's responsibilities to initiate/supervise response until arrival of qualified individual. | II.1; II.2. |
| (ii) Qualified individual's responsibilities/authority | II.2. |
| (iii) Facility or corporate organizational structure used to manage response actions | II.2.b;    II.3;    III.3.a;    III.3.b.(2)–(4);    III.3.c; III.3.d.(1); III.3.e–f. |
| (iv) Oil spill response organization(s)/spill management team available by contract or other approved means. | II.2.d.(3); III.3.c.(4)–(5); III.3.e.(6); III.3.f.(1)–(2); III.3.f.(5). |
| (v) For mobile facilities that operate in more than one COTP, the oil spill response organization(s)/spill management team in the applicable geographic-specific appendix. | II.2.d.(3). |
| (4) Fish and wildlife sensitive environments | III.1.c; III.3.d.(1)–(2). |
| (i) Areas of economic importance and environmental sensitivity as identified in the ACP that are potentially impacted by a WCD. | II.2.c. |
| (ii) List areas and provide maps/charts and describe response actions. |  |
| (iii) Equipment and personnel necessary to protect identified areas | II.2.e–f; III.3.f.(3); III.3.c.(1)–(5). |
| (5) Disposal plan | III.3.d.(4). |
| (c) Training and exercises | III.5. |
| (d) Plan review and update procedures | III.6. |
| (e) Appendices | I.4.c; III.1.b. |
| (1) Facility specific information | III.1. |
| (2) List of contacts | II.2.a; III.2.a–c; III.3.b.(1). |
| (3) Equipment lists and records | III.3.e.(3); III.3.e.(6); III.3.f.(1); III.3.f.(3)–(5). |
| (4) Communications plan | III.3.b.(2). |
| (5) Site-specific safety and health plan | III.3.b.(3); III.3.c.(7); III.3.e. (1). |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

|  | ICP Citation(s) |
|---|---|
| (6) List of acronyms and definitions. |  |
| (7) A geographic-specific appendix. |  |
| 154.1040   Specific requirements for substantial harm facilities. |  |
| 154.1041   Specific response information to be maintained on mobile MTR facilities. |  |
| 154.1045   Groups I–IV petroleum oils. |  |
| 154.1047   Group V petroleum oils. |  |
| 154.1050   Training ......................................................................................................... | III.5. |
| 154.1055   Drills ............................................................................................................. | III.5. |
| 154.1057   Inspection and maintenance of response resources ..................................... | III.3.e.(6). |
| 154.1060   Submission and approval procedures. |  |
| 154.1065   Plan revision and amendment procedures ...................................................... | III.6. |
| 154.1070   Deficiencies. |  |
| 154.1075   Appeal Process. |  |
| Appendix C—Guidelines for determining and evaluating required response resources for facility response plans. | III.3.f.(3). |
| Appendix D—Training elements for oil spill response plans .............................................. | III.5. |

DOT/RSPA FRP (49 CFR Part 194)

|  |  |
|---|---|
| 194.101   Operators required to submit plans. |  |
| 194.103   Significant and substantial harm: operator's statement ...................................... | III.8. |
| 194.105   Worst case discharge ....................................................................................... | III.3.d.(1). |
| 194.107   General response plan requirements: |  |
| (a) Resource planning requirements ................................................................... | III.3.d. |
| (b) Language requirements. |  |
| (c) Consistency with NCP and ACP(s) ............................................................... | III.3.d.(3); III.8. |
| (d) Each response plan must include: |  |
| (1) Core Plan Contents: |  |
| (i) An information summary as required in 194.113 ................................ | I.4; III.1. |
| 194.113(a)   Core plan information summary: |  |
| (1) Name and address of operator ...................................................................... | I.4.b; I.4.d. |
| (2) Description of each response zone ................................................................ | I.4.c. |
| (b) Response zone appendix information summary: |  |
| (1) Core plan information summary ...................................................................... | I.4; III.1. |
| (2) Name^O^S^A^A^O Submission and approval procedures ............................... | III.6. |
| 194.121   Response plan review and update procedures ...................................................... | III.6. |
| ^Apendix^S^A^Aecommended guidelines for the preparation of response plans ..................... | I.2. |
| Section 1—Information summary ......................................................................................... | I.4.b–c; II.2.a; II.2.f; III.8. |
| Section 2—Notification procedures .................................................................................... | II.2.a; III.2; III.3.b.(2); III.3.e.(3). |
| Section 3—Spill detection and on-scene spill mitigation procedures ................................. | II.1; II.2.e–f; III.3.c.(2). |
| Section 4—Response activities ........................................................................................... | II.2.b; III.3.b.(1). |
| Section 5—List of contacts ................................................................................................ | II.2.a. |
| Section 6—Training procedures .......................................................................................... | III.5. |
| Section 7—Drill procedures ................................................................................................. | III.5. |
| Section 8—Response plan review and update procedures ................................................. | III.6. |
| Section 9—Response zone appendices ............................................................................... | II.2.b; II.3; III.1.a–c; III.3. |

OSHA Emergency Action Plans (29 CFR 1910.38(a)) and Process Safety (29 CFR 1910.119)

|  |  |
|---|---|
| 1910.38(a)   Emergency action plan: |  |
| (1) Scope and applicability .................................................................................. | III.3.c.(1); III.3.d. |
| (2) Elements: |  |
| (i) Emergency escape procedures and emergency escape route assignments .............. | II.2; II.2.c; III.3.b.(3); III.3.c. |
| (ii) Procedures to be followed by employees who remain to operate critical plant operations before they evacuate. | II.2; II.2.c; II.2.e; III.3.c. |
| (iii) Procedures to account for all employees after emergency evacuation has been completed. | II.2.a; III.3.b.(2); III.3.b.(3); III.3.c; III.4. |
| (iv) Rescue and medical duties for those employees who are to perform them ............. | III.3.b.(3); III.3.c; III.3.c.(7); III.3.e.(1). |
| (v) The preferred means of reporting fires and other emergencies ............................... | II.2.a; III.3.b. |
| (vi) Names or regular job titles of persons or departments who can be contacted for further information or explanation of duties under the plan. | I.4.f; II.2.a; III.3.b.(2); III.3.b.(4). |
| (3) Alarm system [16] ........................................................................................... | II.2.a; III.3.c.(3); III.3.e.(3). |
| (4) Evacuation ..................................................................................................... | II.2.d; III.3.b.(3); III.3.c.(3); III.3.d; III.3.d.(1). |
| (5) Training ........................................................................................................... | III.3.e.(5); III.5. |
| 1910.119   Process safety management of highly hazardous chemicals: |  |
| (e)(3)(ii) Investigation of previous incidents ...................................................................... | III.4; III.4.b. |
| (e)(3)(iii) Process hazard analysis requirements ................................................................ | III.3.e.(3). |
| (g)(1)(ii) Employee training in process/operating procedures ............................................ | III.5. |
| (j)(4) Inspection/testing of process equipment .................................................................. | III.3.e.(6). |
| (j)(5) Equipment repair ........................................................................................................ | III.3.e.(6). |
| (l) Management of change(s) .............................................................................................. | III.5. |
| (m) Incident investigation .................................................................................................... | III.4.a. |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

| | ICP Citation(s) |
|---|---|
| (n) Emergency planning and response | I.1; II.1; II.2; II.2.d; III.2; III.2.a; III.2.b. |
| (o)(1) Certification of compliance | III.6. |
| 1910.165   Employee alarm systems: | |
| (b) General requirements | III.3.e.(3). |
| (b)(1) Purpose of alarm system | III.2; III.2.a. |
| (b)(4) Preferred means of reporting emergencies | III.2. |
| (d) Maintenance and testing | III.3.e.(6). |
| 1910.272   Grain handling facilities: | |
| (d) Development/implementation of emergency action plan | I.1; III.2. |

**OSHA HAZWOPER (29 CFR 1910.120)**

| | |
|---|---|
| 1910.120(k)   Decontamination | III.3.c.(6). |
| 1910.120(l)   Emergency response program | I.1. |
| (1) Emergency response plan: | |
| (i) An emergency response plan shall be developed and implemented by all employers within the scope of this section to handle anticipated emergencies prior to the commencement of hazardous waste operations. | |
| (ii) Employers who will evacuate their employees from the workplace when an emergency occurs, and who do not permit any of their employees to assist in handling the emergency, are exempt from the requirements of this paragraph if they provide an emergency action plan complying with section 1910.38(a) of this part. | |
| (2) Elements of an emergency response plan: | |
| (i) Pre-emergency planning and coordination with outside parties | I.4.f; II.2.b;   II.2.c;   III.2.b;   III.2.c;   III.3.b.(4); III.3.d. |
| (ii) Personnel roles, lines of authority, and communication | I.4.f; II.2.b; III.2.a; III.2.c; III.3.b.(4); III.3.e.(4). |
| (iii) Emergency recognition and prevention | II.1; III.7. |
| (iv) Safe distances and places of refuge | III.3.b.(3); III.3.d.(2). |
| (v) Site security and control | III.3.d.(2); III.3.e.(2). |
| (vi) Evacuation routes and procedures | II.2.d; III.3.b.(3) |
| (vii) Decontamination procedures | III.3.c.(6). |
| (viii) Emergency medical treatment and response procedures | II.2.d; III.3.c.(7); III.3.e.(1). |
| (ix) Emergency alerting and response procedures | II.2; II.2.a; II.2.f; II.4; III.2; III.2.a; III.2.b; III.2.c; III.3.d. |
| (x) Critique of response and follow-up | II.3; III.4; III.4.a; III.6. |
| (xi) PPE and emergency equipment | III.3.e.(6);   III.3.f.(3);   III.3.d.(2);   III.3.e.(6); III.3.f.(3). |
| (3) Procedures for handling emergency incidents: | |
| (i) Additional elements of emergency response plans: | |
| (A) Site topography, layout, and prevailing weather conditions | III.1.c. |
| (B) Procedures for reporting incidents to local, state, and federal government agencies. | II.2.a; III.2. |
| (ii) The emergency response plan shall be a separate section of the Site Safety and Health Plan. | |
| (iii) The emergency response plan shall be compatible with the disaster, fire, and/or emergency response plans of local, state, and federal agencies. | III.3.e. |
| (iv) The emergency response plan shall be rehearsed regularly as part of the overall training program for site operations. | III.5. |
| (v) The site emergency response plan shall be reviewed periodically and, as necessary, be amended to keep it current with new or changing site conditions or information. | |
| (vi) An employee alarm system shall be installed in accordance with 29 CFR 1910.165 to notify employees of an emergency situation; to stop work activities if necessary; to lower background noise in order to speed communications; and to begin emergency procedures. | |
| (vii) Based upon the information available at time of the emergency, the employer shall evaluate the incident and the site response capabilities and proceed with the appropriate steps to implement the site emergency response plan. | II.2.c; II.2.d. |
| 1910.120(p)(8)   Emergency response program: | I.1 |
| (i) Emergency response plan. | |
| (ii) Elements of an emergency response plan: | |
| (A) Pre-emergency planning and coordination with outside parties | I.4.f;   II.2.b;   II.2.b;   III.2.b;   III.2.c;   III.3.b.(4); III.3.d. |
| (B) Personnel roles, lines of authority, and communication | I.4.f; II.2.b; III.2.c; II.2.c; III.3.b.(4); III.3.e.(4). |
| (C) Emergency recognition and prevention | II.1; III.7 |
| (D) Safe distances and places of refuge | III.3.b.(3); III.3.d.(2) |
| (E) Site security and control | III.3.d.(2); III.3.e.(2) |
| (F) Evacuation routes and procedures | II.2.d; III.3.b.(3). |
| (G) Decontamination procedures | III.3.c.(6). |
| (H) Emergency medical treatment and response procedures | II.2.d; III.3.c.(7); III.3.e.(1). |
| (I) Emergency alerting and response procedures | II.2; II.2.a; II.2.f; II.4; III.2; III.2.a; III.2.b; III.2.c; III.3.d. |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

|  | ICP Citation(s) |
|---|---|
| (J) Critique of response and follow-up | II.3; III.4; III.4.a; III.6. |
| (K) PPE and emergency equipment | III.3.e.(6);    III.3.f.(3);    III.3.d.(2);    III.3.e.(6); III.3.f.(3). |
| (iii) Training | III.5. |
| (iv) Procedures for handling emergency incidents: |  |
| (A) Additional elements of emergency response plans: |  |
| (1) Site topography, layout, and prevailing weather conditions | III.1.c; III.3.d.(1). |
| (2) Procedures for reporting incidents to local, state, and federal government agencies. | II.2.a; III.2. |
| (B) The emergency response plan shall be compatible and integrated with the disaster, fire and/or emergency response plans of local, state, and federal agencies. | III.3.e. |
| (C) The emergency response plan shall be rehearsed regularly as part of the overall training program for site operations. |  |
| (D) The site emergency response plan shall be reviewed periodically and, as necessary, be amended to keep it current with new or changing site conditions or information. |  |
| (E) An employee alarm system shall be installed in accordance with 29 CFR 1910.165. |  |
| (F) Based upon the information available at the time of the emergency, the employer shall evaluate the incident and the site response capabilities and proceed with the appropriate steps to implement the site emergency response plan | II.2.d; II.2.e; III.3.d.(1). |
| 1910.120(q)  Emergency response to hazardous substance releases: |  |
| (1) Emergency response plan | III.3.1. |
| (2) Elements of an emergency response plan: |  |
| (i) Pre-emergency planning and coordination with outside parties | I.4.f;  II.2.b;  II.2.c;  III.2.b;  III.2.c;  III.3.b.(4); III.3.d. |
| (ii) Personnel roles, lines of authority, training, and communication | I.4.f; II.2.b; III.2.b; III.2.c; III.3.b.(4); III.3.e.(4). |
| (iii) Emergency recognition and prevention | II.1; III.7. |
| (iv) Safe distances and places of refuge | III.3.b.(3); III.3.d.(2). |
| (v) Site security and control | III.3.d.(2); III.3.e.(2). |
| (vi) Evacuation routes and procedures | II.2.d; III.3.b.(3). |
| (vii) Decontamination procedures | III.3.c.(6). |
| (viii) Emergency medical treatment and response procedures | II.2.d; III.3.c.(7); III.3.e.(1). |
| (ix) Emergency alerting and response procedures | II.2; II.2.a; II.2.f; II.4; III.2; III.2.a; III.2.b; III.2.c; III.3.d. |
| (x) Critique of response and follow-up | II.3; III.4; III.4.a; III.6. |
| (xi) PPE and emergency equipment | III.3.e.(6);    III.3.f.(3);    III.3.d.(2);    III.3.e.(6); III.3.f.(3). |
| (xii) Emergency response plan coordination and integration | III.3.e; III.8. |
| (3) Procedures for handling emergency response: |  |
| (i) The senior emergency response official responding to an emergency shall become the individual in charge of a site-specific Incident Command System (ICS). | II.2.b; III.3; III.3.a; III.3.b; III.3.b.(1); III.3.b.(2); III.3.e.(3). |
| (ii) The individual in charge of the ICS shall identify, to the extent possible, all hazardous substances or conditions present and shall address as appropriate site analysis, use of engineering controls, maximum exposure limits, hazardous substance handling procedures, and use of any new technologies. | II.2.c; II.2.d; III.3.c.(3). |
| (iii) Implementation of appropriate emergency operations and use of PPE | II.2.c; II.2.d; II.2.e; III.3.c; III.3.c.(1); III.3.d.(1); III.3.d.(2). |
| (iv) Employees engaged in emergency response and exposed to hazardous substances presenting an inhalation hazard or potential inhalation hazard shall wear positive pressure self-contained breathing apparatus while engaged in emergency response. | II.2.d. |
| (v) The individual in charge of the ICS shall limit the number of emergency response personnel at the emergency site, in those areas of potential or actual exposure to incident or site hazards, to those who are actively performing emergency operations. | III.3.c; III.3.e.(5). |
| (vi) Backup personnel shall stand by with equipment ready to provide assistance or rescue. | II.2.d; III.3.e.(5). |
| (vii) The individual in charge of the ICS shall designate a safety official, who is knowledgeable in the operations being implemented at the emergency response site. | II.2.d; III.3.b.(3). |
| (viii) When activities are judged by the safety official to be an IDLH condition and/or to involve an imminent danger condition, the safety official shall have authority to alter, suspend, or terminate those activities. | III.3.b.(3). |
| (ix) After emergency operations have terminated, the individual in charge of the ICS shall implement appropriate decontamination procedures. | III.3.c.(6). |

ATTACHMENT 3: REGULATORY CROSS-COMPARISON MATRICES—Continued

|  | ICP Citation(s) |
|---|---|
| (x) When deemed necessary for meeting the tasks at hand, approved self-contained compressed air breathing apparatus may be used with approved cylinders from other approved self-contained compressed air breathing apparatus provided that such cylinders are of the same capacity and pressure rating. |  |
| (4) Skilled support personnel. |  |
| (5) Specialist employees. |  |
| (6) Training | III.5. |
| (7) Trainers. |  |
| (8) Refresher training. |  |
| (9) Medical surveillance and consultation. |  |
| (10) Chemical protective clothing. |  |
| (11) Post-emergency response operations. |  |

**EPA's Risk Management Program (40 CFR Part 68)**

| | |
|---|---|
| 68.20–36  Offsite consequence analysis ................................................................................ | III.3.d.(1). |
| 68.42  Five-year accident history ...................................................................................... | III.4.b. |
| 68.50  Hazard review ......................................................................................................... | III.3.d.(1). |
| 68.60  Incident investigation ............................................................................................. | III.4.a |
| 68.67  Process hazards analysis ....................................................................................... | III.3.d.(1) |
| 68.81  Incident investigation ............................................................................................. | III.4.a |
| 68.95(a)  Elements of an emergency response program: |  |
| (1) Elements of an emergency response plan: |  |
| (i) Procedures for informing the public and emergency response agencies about accidental releases. | II.2.a; III.2. |
| (ii) Documentation of proper first-aid and emergency medical treatment necessary to treat accidental human exposures. | III.3.c.(7); III.3.e.(1). |
| (iii) Procedures and measures for emergency response after an accidental release of a regulated substance. | II.1; II.2; II.3; II.4; III.3.a–c. |
| (2) Procedures for the use of emergency response equipment and for its inspection, testing, and maintenance. | III.3.e.(6). |
| (3) Training for all employees in relevant procedures ........................................................... | III.5. |
| (4) Procedures to review and update the emergency response plan ..................................... | III.6. |
| 68.95(b)  Compliance with other federal contingency plan regulations. |  |
| 68.95(c)  Coordination with the community emergency response plan. |  |

**Notes to Attachment 3**

[1] Facilities should be aware that most states have been authorized by EPA to implement RCRA contingency planning requirements in place of the federal requirements listed. Thus, in many cases state requirements may not track this matrix. Facilities must coordinate with their respective states to ensure an ICP complies with state RCRA requirements.

[2] Facilities should be aware that most states have been authorized by EPA to implement RCRA contingency planning requirements in place of the federal requirements listed. Thus, in many cases state requirements may not track this matrix. Facilities must coordinate with their respective states to ensure an ICP complies with state RCRA requirements.

[3] Facilities should be aware that most states have been authorized by EPA to implement RCRA contingency planning requirements in place of the federal requirements listed. Thus, in many cases state requirements may not track this matrix. Facilities must coordinate with their respective states to ensure an ICP complies with state RCRA requirements.

[4] Section 264.56 is incorporated by reference at §264.52(a).

[5] Incorporates by reference §264.37.

[6] Section 265.56 is incorporated by reference at §265.52(a).

[7] Incorporates by reference §265.37.

[8] Section 279.52(b)(6) is incorporated by reference at §279.52(b)(2)(i).

[9] Incorporates by reference §279.52(a)(6).

[10] Non-response planning parts of this regulation (e.g., prevention provisions) require a specified format.

[11] If a facility is required to develop a strong oil spill contingency plan under this section, the requirement can be met through the ICP.

[12] The appendix further describes the required elements in 120.20(h). It contains regulatory requirements as well as recommendations.

[13] Specific plan requirements for sections listed under 154.1030(b) are contained in 154.1035(a)–(g).

[14] Note: Sections 154.1045 and 154.1047 contain requirements specific to facilities that handle, store, or transport Group I–IV oils and Group V oils, respectively.

[15] Ibid.

[16] Section 1910.38(a)(3) incorporates 29 CFR 1910.165 by reference.

Dated: April 18, 1996.

Elliott P. Laws,

*Assistant Administrator, Office of Solid Waste and Emergency Response, U.S. Environmental Protection Agency.*

Dated: April 22, 1996.

Rear Admiral James C. Card,

*Chief, Marine Safety and Environmental Protection Directorate, U.S. Coast Guard.*

Dated: April 18, 1996.

Richard B. Felder,

*Associate Administrator for Pipeline Safety, Research and Special Programs Administration, U.S. Department of Transportation.*

Dated: April 18, 1996.

John B. Moran,

*Director of Policy, Occupational Safety and Health Administration, Department of Labor.*

Dated: April 18, 1996.

Thomas Gernhofer,

*Associate Director, Offshore Minerals Management, Minerals Management Service, Department of the Interior.*

[FR Doc. 96–13712 Filed 6–4–96; 8:45 am]

BILLING CODE 6560–50–P





# United States Department of the Interior

FISH AND WILDLIFE SERVICE
South Florida Ecological Services Office
1339 20th Street
Vero Beach, Florida 32960

February 19, 2007

David S. Hobbie
Chief, Regulatory Division
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019

Dear Mr. Hobbie:

The Fish and Wildlife Service (Service) has reviewed your letter dated December 20, 2006, referencing the development of a revised Panther Key, which will assist the Corps project managers in their effect determinations as prescribed under Section 7(a) (2) of the Endangered Species Act of 1973 as amended (Act) (87 Stat 884 16 U S C 1531 *et seq*) and its implementing regulations at 50 CFR Section 402. The original Panther Key has been used since August 8, 2003, by the Corps to evaluate all applications for a Department of Army permit under Section 404 of the Clean Water Act for projects in the consultation area. The Florida panther consultation area was depicted in the Service's interim Standard Local Operating Procedures for Endangered Species (SLOPES) for the Florida Panther (Service 2000).

In our original 2000 evaluation we provided a consultation area map (MAP) to assist the Corps in determining which projects may have an effect of the Florida panther. The MAP was generated by the Service by overlaying existing and historical panther telemetry data on a profile of Florida and providing a connecting boundary surrounding most of these points. Since the development of the MAP, we have received more accurate and up-to-date information on Florida panther habitat usage. Specifically we have received two documents that the Service believes reflect the common panther habitat usage profiles. These documents are the publications by Kautz et al. (2006) and Thatcher et al. (2006). Based on the information in these documents, we changed the boundaries of the MAP to better reflect areas where we believe project may have an effect on the Florida panther and provided this map to you in correspondence dated December 8, 2006. Upon receipt of this information, you provided a revised Panther Key and Rationale, dated December 20, 2006, and labeled as Panther Key and Rationale-January 2007. You also requested concurrence from the Service that the utilization of the Panther Key-January 2007 may affect but is not likely to adversely affect the Florida panther.

To assist the Corps in developing a Panther Key that fully reflects the Service's desire to identify those projects that may have an effect on the Florida panther and the need for consultation with the Service, we are providing a revised Panther Key and Rationale – February 19, 2007, that we believe meets this objective (enclosed).



Page 2

We have used Kautz et al. (2006) and Thatcher et al. (2006) to outline a Panther Focus Area, where we believe sufficient data are present that, in most cases, warrants consultation with the Service. In addition, panther research data, including scientific publications, telemetry, photographs, tracks, prey kills, and other verifiable evidence, provide direct evidence of the presence of, and use of areas by panthers, in locations that may or may not be within the Panther Focus Area or original MAP. For example, panther mortality by vehicle interactions is a significant threat; although a proposed project may not be within the Panther Focus Area, traffic generated by the project in or adjacent to the Panther Focus Area may increase risk of panther-vehicle mortality, warranting consultation with the Service.

The key and rationale provide guidelines to help us identify when proposals may affect the panther. As always, information obtained in the future will help us refine these guidelines further, or possibly identify additional issues for consideration. As an important partner in our program to conserve and the Florida panther, your cooperation and assistance are greatly appreciated. Again, thank you for your cooperation and effort in protecting federally listed species. If you have any questions, please do not hesitate to contact either myself or Allen Webb at 772-562-3909.

Sincerely yours,

Paul Souza
Field Supervisor
South Florida Ecological Services Office

Enclosure

cc: Noreen Walsh, ARD-Ecological Services, U.S. FWS

David S. Hobbie                                                                 Page 3

Kautz, R., R. Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm,
       F. Mazzotti, R. McBride, L. Richardson, and K. Root.  2006.  How Much Is Enough?
       Landscape-scale Conservation for the Florida Panther.  Biological Conservation.

Thatcher, C., F.T. van Manen, and J.D. Clark.  2006.  An assessment of habitat north of the
       Calssoahatchee River for Florida panthers.  Final Report to U.S. Fish and Wildlife
       Service.  University of Tennessee; Knoxville, Tennessee.

U.S. Fish and Wildlife Service (Service). 2000. Florida panther final interim standard local
       operating procedures (SLOPES) for endangered species. Fish and Wildlife Service;
       Vero Beach, Florida.

David S. Hobbie                                                                    Page 4

Enclosure

Florida Panther Effect Determination Key<br>February 19, 2007

A.    Project is not within Panther Focus Area …………………………………………. B

      Project is within Panther Focus Area………………………………………… C


B.    Project will have no increase and/or change in vehicle traffic patterns or other
      identifiable effects to panthers or their habitat…………………………….. *No effect*

      Project is greater than 1 acre in size and will have a net increase and/or change in vehicle
      traffic patterns or other identifiable effects to panthers or their habitat ……… *May affect*
      Consultation with the Service is requested[1]

C.    Project is less than 1 acre…….………………*May affect, not likely to adversely affect*

      Project is greater than 1 acre………………………………………………*May affect*
      Consultation with the Service is requested[1]

---

1 Consultation may be concluded informally or formally depending on project effects.

David S. Hobbie                                                                                          Page 5


Rationale for the
Florida Panther Effect Determination Key
February 19, 2007

The following discussion provides background for terms used in the key and areas
delineated on the accompanying map.

Panther Focus Area (see accompanying map)

The Panther Focus Area was based on results from recent panther habitat models south
of the Caloosahatchee River and north of the Caloosahatchee River (Kautz et al. 2006
and Thatcher et al. 2006). In addition, marked panthers have been found throughout
the delineated area.

The Kautz et al. (2006) model of landscape components important to Florida panther
habitat conservation was based on an analysis of panther habitat use and forest patch
size south of the Caloosahatchee River. This model was used in combination with
radio-telemetry records, home range overlaps, land use/land cover data, and satellite
imagery to delineate primary and secondary areas that would comprise a landscape
mosaic of cover types that are especially important to support the current panther
breeding population south of the Caloosahatchee River.

Thatcher et al. (2006) developed a habitat model using Florida panther home ranges in
south Florida to identified landscape conditions (land-cover types, habitat patch size
and configuration, road density and other human development activities, and other
similar metrics) north of the Caloosahatchee River that were similar to those associated
with the current panther breeding population south of the Caloosahatchee River.

The Panther Focus Area south of the Caloosahatchee River is divided into Primary,
Secondary, and Dispersal Zones. North of the Caloosahatchee River it is named the
Primary Dispersal/Expansion Area.

   *Primary Zone* is currently occupied and supports the only known breeding
   population of Florida panthers in the world. These lands are important to the long-
   term viability and persistence of the panther in the wild.

   *Secondary Zone* lands are contiguous with the Primary Zone and although these
   lands are used to a lesser extent by panthers, they are important to the long-term
   viability and persistence of the panther in the wild. Panthers use these lands in a
   much lower density than in the Primary Zone.

   *Dispersal Zone* is a known corridor between the Panther Focus Area south of the

David S. Hobbie                                                                                  Page 6

Caloosahatchee River to the Panther Focus Area north of the Caloosahatchee River. This zone is necessary to facilitate the dispersal of panthers and future panther population expansion to areas north of the Caloosahatchee River.  Marked panthers have been known to use this zone.

*Primary Dispersal/Expansion Area* is the Fisheating Creek/Babcock-Webb Wildlife Management Area region.  These are lands identified by Thatcher et al. (2006) as potential panther habitat with the shortest habitat connection to the Panther Focus Area in south Florida.  Several collared and uncollared male panthers have been documented in this area since 1973, and the last female documented north of the Caloosahatchee River was found in this area.

In addition, the Thatcher Model Dispersal Pathways delineate model locations that show some areas where panthers have historically moved to areas further north.

*Thatcher Model Dispersal Pathways* are the most likely dispersal routes, based on Thatcher's (2006) least-cost pathways model, to potential habitats to the north. Panthers have historically been documented in this area.

Project Analysis

Projects within the Panther Focus Area can negatively affect panthers in different ways, such as loss and fragmentation of habitat, loss of available prey, increase potential for traffic related mortalities, and increase potential for human/panther interactions.

In addition, projects outside the Panther Focus Area, depending on type and size, can affect panthers and habitat used by panthers in different ways such as increasing traffic within or adjacent to the Panther Focus Area, changing hydrological conditions that affect the habitats that support panther or panther prey in the Panther Focus Area, increasing potential for human/panther interactions, and modifying habitat that provides some functional value for panthers.

Net Increase in Traffic

A net increase in traffic in or adjacent to the Panther Focus Area such as an increase in the number of trips per day averaged over a week is considered a traffic increase that may lead to adverse effects for purposes of this key.

Other Identifiable Effects

Dispersing panthers are known to occur outside of the Panther Focus Area.  South of the Caloosahatchee River, where the only breeding population of panthers is known to exist, a project is considered to potentially have an effect on panthers if it occurs in

David S. Hobbie                                                                        Page 7

non-urbanized lands in areas adjacent to the Panther Focus Area (e.g., agricultural lands) where panthers have been documented.

Although non-urban lands outside of the Panther Focus Area do not provide the same habitat value as natural lands within the Panther Focus Area, they do provide important buffers between urban developments and the Panther Focus Area, dispersal and travel routes between higher quality habitats, refugia areas for sub-adult males, and foraging habitat for panther prey species. Generally, areas adjacent to the Panther Focus Area are defined as areas within the Service's 2000 consultation boundary (Service 2000) where urbanization has not replaced lower intensity land uses. Areas that have become urbanized no longer have habitat that can sustain panthers, although additional traffic generated in or adjacent to the Panther Focus Area from development in these locations may affect panthers.

Two-Mile Radius Buffer

A project is also considered to potentially have an effect on panthers if there has been documented physical evidence of panther occurrence within a two-mile radius of a project within the past two years. Documented physical evidence of panther occurrence includes telemetry locations, as well as photographs, tracks, prey kills, and other verifiable evidence that may be available.

Comiskey et al (2000) in the article "Panthers and Forests in South Florida: an Ecological Perspective" referenced that the mean movement distance between sequential telemetry locations was 6.6 km (4.1 miles) for males and 3.2 km (1.99 miles) for females. If flights to monitor panther telemetry are normally three times a week, generally every other day, the travel distance between two points per day would be roughly half the distance between the two points, roughly 2 miles for the male panther. In their habitat analysis, Comiskey et al (2000) considered lands within a circle where the radius is equal to the mean movement distance between sequential telemetry locations, as panther habitat. Following this approach, we believe land alterations within a two-mile radius of a verified panther occurrence, both north and south of the Caloosahatchee River, may potentially have an effect on the panther.

Projects Less than One Acre

On an individual basis, single-family residential developments on lots no larger than one acre will not have a measurable effect on panthers. Panthers are a wide ranging species, and individually, a one acre habitat change is not likely to adversely affect panthers. However, collectively they may have an effect and therefore regular monitoring and reporting of these effects are important.

<u>Monitoring and Reporting Effects</u>

David S. Hobbie                                                                                      Page 8

For the Service to monitor effects, it is important for the Corps to monitor the number of permits and provide information to the Service regarding the number of permits issued that were determined "may affect, not likely to adversely affect."  It is requested that information on date, Corps identification number, project acreage, project wetland acreage, latitude and longitude in decimal degrees, and county parcel identification number of these projects be sent to the Service quarterly.

Determination

With a determination of "no effect" or "may affect, not likely to adversely affect" ("NLAA") as outlined in this key, the requirements of section 7 of the Endangered Species Act are fulfilled and no further action is required.

A determination of "may affect" in the key may be concluded in either a "may affect, not likely to adversely affect" and written concurrence or "may adversely affect" and formal consultation with the Service is requested.

Literature Cited

Comiskey, E. J., O. L. Bass, Jr., L. J. Gross, R. T. McBride, and R. Salinas.  2002. Panthers and forests in south Florida: an ecological perspective.  Conservation Ecology 6:18.

Kautz, R., R. Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm, F. Mazzotti, R. McBride, L. Richardson, and K. Root.  2006. How much is enough? Landscape-scale conservation for the Florida panther.  Biological Conservation 130:118-133.

Thatcher, C. A., F. T. van Manen, and J. D. Clark.  2006.  An assessment of habitat north of the Caloosahatchee River for Florida panthers.  Leetown Science Center, Southern Appalachian Research Branch, U.S. Geological survey, Knoxville, Tennessee, USA.

U.S. Fish and Wildlife Service (Service).  2000.  Florida panther final interim standard local operating procedures (SLOPES) for endangered species. Fish and Wildlife Service; Vero Beach, Florida.

David S. Hobbie                                                                                      Page 9




to do any and all lawful acts necessary or appropriate to further the purposes of the TPIA Program.

(Pub. L. 101–628, title XI, §1106, Nov. 28, 1990, 104 Stat. 4503.)

## § 4606. Distribution of appropriate items

The Secretary is authorized to distribute pamphlets and other such appropriate items in order to promote the purposes of the TPIA Program.

(Pub. L. 101–628, title XI, §1107, Nov. 28, 1990, 104 Stat. 4503.)

## § 4607. Slogan and logo

The ''Take Pride in America'' slogan and logo, which are registered by the Department of the Interior, and the goodwill associated with such slogan and logo, shall be administered pursuant to the TPIA Program.

(Pub. L. 101–628, title XI, §1108, Nov. 28, 1990, 104 Stat. 4503.)

## § 4608. Authorization of appropriations

### (a) Department of the Interior

There are authorized to be appropriated to the Secretary such sums as may be necessary to carry out the purposes of this chapter, not to exceed the amount expended for such purposes for fiscal year 1990.

### (b) Other Federal agencies

There are authorized to be appropriated to other Federal departments and agencies such sums as may be necessary to carry out the provisions of any other Take Pride in America programs established by such departments or agencies.

(Pub. L. 101–628, title XI, §1109, Nov. 28, 1990, 104 Stat. 4503.)

## CHAPTER 67—AQUATIC NUISANCE PREVENTION AND CONTROL

SUBCHAPTER I—GENERAL PROVISIONS

Sec.
4701. Findings and purposes.
4702. Definitions.

SUBCHAPTER II—PREVENTION OF UNINTENTIONAL INTRODUCTIONS OF NONINDIGENOUS AQUATIC SPECIES

4711. Repealed.
4712. National ballast water management information.
4713. Armed services ballast water programs.
4714. Ballast water management demonstration program.

SUBCHAPTER III—PREVENTION AND CONTROL OF AQUATIC NUISANCE SPECIES DISPERSAL

4721. Establishment of Task Force.
4722. Aquatic nuisance species program.
4723. Regional coordination.
4724. State aquatic nuisance species management plans.
4725. Relationship to other laws.
4726. International cooperation.
4727. Intentional introductions policy review.
4728. Brown tree snake control program.
4729. Coastal Aquatic Invasive Species Mitigation Grant Program and Mitigation Fund.
Sec.
4730. Great Lakes and Lake Champlain Invasive Species Program.

SUBCHAPTER IV—AUTHORIZATION OF APPROPRIATIONS

4741. Authorization of appropriations.

SUBCHAPTER V—COOPERATIVE ENVIRONMENTAL ANALYSES

4751. Environmental impact analyses.

## SUBCHAPTER I—GENERAL PROVISIONS

## § 4701. Findings and purposes

### (a) Findings

The Congress finds that—

(1) the discharge of untreated water in the ballast tanks of vessels and through other means results in unintentional introductions of nonindigenous species to fresh, brackish, and saltwater environments;

(2) when environmental conditions are favorable, nonindigenous species become established, may compete with or prey upon native species of plants, fish, and wildlife, may carry diseases or parasites that affect native species, and may disrupt the aquatic environment and economy of affected nearshore areas;

(3) the zebra mussel was unintentionally introduced into the Great Lakes and has infested—

(A) waters south of the Great Lakes, into a good portion of the Mississippi River drainage;

(B) waters west of the Great Lakes, into the Arkansas River in Oklahoma; and

(C) waters east of the Great Lakes, into the Hudson River and Lake Champlain;

(4) the potential economic disruption to communities affected by the zebra mussel due to its colonization of water pipes, boat hulls and other hard surfaces has been estimated at $5,000,000,000 by the year 2000, and the potential disruption to the diversity and abundance of native fish and other species by the zebra mussel and ruffe, round goby, and other nonindigenous species could be severe;

(5) the zebra mussel was discovered on Lake Champlain during 1993 and the opportunity exists to act quickly to establish zebra mussel controls before Lake Champlain is further infested and management costs escalate;

(6) in 1992, the zebra mussel was discovered at the northernmost reaches of the Chesapeake Bay watershed;

(7) the zebra mussel poses an imminent risk of invasion in the main waters of the Chesapeake Bay;

(8) since the Chesapeake Bay is the largest recipient of foreign ballast water on the East Coast, there is a risk of further invasions of other nonindigenous species;

(9) the zebra mussel is only one example of thousands of nonindigenous species that have become established in waters of the United States and may be causing economic and ecological degradation with respect to the natural resources of waters of the United States;

(10) since their introduction in the early 1980's in ballast water discharges, ruffe—

(A) have caused severe declines in populations of other species of fish in Duluth Harbor (in Minnesota and Wisconsin);

(B) have spread to Lake Huron; and

(C) are likely to spread quickly to most other waters in North America if action is not taken promptly to control their spread;

(11) examples of nonindigenous species that, as of October 26, 1996, infest coastal waters of the United States and that have the potential for causing adverse economic and ecological effects include—

(A) the mitten crab (Eriocher sinensis) that has become established on the Pacific Coast;

(B) the green crab (Carcinus maenas) that has become established in the coastal waters of the Atlantic Ocean;

(C) the brown mussel (Perna perna) that has become established along the Gulf of Mexico; and

(D) certain shellfish pathogens;

(12) many aquatic nuisance vegetation species, such as Eurasian watermilfoil, hydrilla, water hyacinth, and water chestnut, have been introduced to waters of the United States from other parts of the world causing or having a potential to cause adverse environmental, ecological, and economic effects;

(13) if preventive management measures are not taken nationwide to prevent and control unintentionally introduced nonindigenous aquatic species in a timely manner, further introductions and infestations of species that are as destructive as, or more destructive than, the zebra mussel or the ruffe infestations may occur;

(14) once introduced into waters of the United States, aquatic nuisance species are unintentionally transported and introduced into inland lakes and rivers by recreational boaters, commercial barge traffic, and a variety of other pathways; and

(15) resolving the problems associated with aquatic nuisance species will require the participation and cooperation of the Federal Government and State governments, and investment in the development of prevention technologies.

**(b) Purposes**

The purposes of this chapter are—

(1) to prevent unintentional introduction and dispersal of nonindigenous species into waters of the United States through ballast water management and other requirements;

(2) to coordinate federally conducted, funded or authorized research, prevention[1] control, information dissemination and other activities regarding the zebra mussel and other aquatic nuisance species;

(3) to develop and carry out environmentally sound control methods to prevent, monitor and control unintentional introductions of nonindigenous species from pathways other than ballast water exchange;

(4) to understand and minimize economic and ecological impacts of nonindigenous

aquatic nuisance species that become established, including the zebra mussel; and

(5) to establish a program of research and technology development and assistance to States in the management and removal of zebra mussels.

(Pub. L. 101–646, title I, §1002, Nov. 29, 1990, 104 Stat. 4761; Pub. L. 104–182, title III, §308(a), Aug. 6, 1996, 110 Stat. 1689; Pub. L. 104–332, §2(a)(1), (h)(1), Oct. 26, 1996, 110 Stat. 4073, 4091.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original ''this Act'', which, to reflect the probable intent of Congress, was translated as reading ''this title'' meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out below and Tables.

AMENDMENTS

1996—Pub. L. 104–332, §2(h)(1), made technical amendment to Pub. L. 101–646, §1002, which enacted this section.

Subsec. (a)(2), (3). Pub. L. 104–332, §2(a)(1)(A), added pars. (2) and (3) and struck out former pars. (2) and (3) which read as follows:

''(2) when environmental conditions are favorable, nonindigenous species, such as the zebra mussel (Dreissena polymorpha), become established and may disrupt the aquatic environment and economy of affected coastal areas;

''(3) the zebra mussel was unintentionally introduced into the Great Lakes and, if left uncontrolled, is expected to infest over two-thirds of the continental United States through the unintentional transportation of larvae and adults by vessels operating in inland waters;''.

Subsec. (a)(4). Pub. L. 104–332, §2(a)(1)(B)(i), inserted ''by the zebra mussel and ruffe, round goby, and other nonindigenous species'' after ''other species''.

Subsec. (a)(5). Pub. L. 104–182 added par. (5).

Subsec. (a)(6) to (15). Pub. L. 104–332, §2(a)(1)(B)(ii), (C), (D), added pars. (6) to (15).

SHORT TITLE OF 1996 AMENDMENT

Pub. L. 104–332, §1(a), Oct. 26, 1996, 110 Stat. 4073, provided that: ''This Act [enacting sections 4713 and 4714 of this title, amending sections 941 to 941g, 4701, 4702, 4711, 4712, 4721 to 4728, 4741 and 4751 of this title, section 42 of Title 18, Crimes and Criminal Procedure, and section 2761 of Title 33, Navigation and Navigable Waters, enacting provisions set out as a note under this section, and amending provisions set out as notes under this section, section 941 of this title, and section 2701 of Title 33] may be cited as the 'National Invasive Species Act of 1996'.''

SHORT TITLE

Pub. L. 101–646, title I, §1001, Nov. 29, 1990, 104 Stat. 4761, as amended by Pub. L. 104–332, §2(h)(1), Oct. 26, 1996, 110 Stat. 4091, provided that: ''This title [enacting this chapter and amending section 42 of Title 18, Crimes and Criminal Procedure] may be cited as the 'Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990'.''

AQUATIC INVASIVE SPECIES PREVENTION

Pub. L. 113–121, title I, §1039(b), June 10, 2014, 128 Stat. 1237, provided that:

''(1) MULTIAGENCY EFFORT TO SLOW THE SPREAD OF ASIAN CARP IN THE UPPER MISSISSIPPI AND OHIO RIVER BASINS AND TRIBUTARIES.—

''(A) IN GENERAL.—The Director of the United States Fish and Wildlife Service, in coordination

---

[1] So in original. Probably should be followed by a comma.

TITLE 16—CONSERVATION

with the Secretary [of the Army], the Director of the National Park Service, and the Director of the United States Geological Survey, shall lead a multiagency effort to slow the spread of Asian carp in the Upper Mississippi and Ohio River basins and tributaries by providing technical assistance, coordination, best practices, and support to State and local governments in carrying out activities designed to slow, and eventually eliminate, the threat posed by Asian carp.

''(B) BEST PRACTICES.—To the maximum extent practicable, the multiagency effort shall apply lessons learned and best practices such as those described in the document prepared by the Asian Carp Working Group entitled 'Management and Control Plan for Bighead, Black, Grass, and Silver Carps in the United States' and dated November 2007, and the document prepared by the Asian Carp Regional Coordinating Committee entitled 'FY 2012 Asian Carp Control Strategy Framework' and dated February 2012.

''(2) REPORT TO CONGRESS.—

''(A) IN GENERAL.—Not later than December 31 of each year, the Director of the United States Fish and Wildlife Service, in coordination with the Secretary, shall submit to the Committee on Appropriations and the Committee on Environment and Public Works of the Senate and the Committee on Appropriations, the Committee on Natural Resources, and the Committee on Transportation and Infrastructure of the House of Representatives and make publicly available a report describing the coordinated strategies established and progress made toward the goals of controlling and eliminating Asian carp in the Upper Mississippi and Ohio River basins and tributaries.

''(B) CONTENTS.—Each report submitted under subparagraph (A) shall include—

''(i) any observed changes in the range of Asian carp in the Upper Mississippi and Ohio River basins and tributaries during the 2-year period preceding submission of the report;

''(ii) a summary of Federal agency efforts, including cooperative efforts with non-Federal partners, to control the spread of Asian carp in the Upper Mississippi and Ohio River basins and tributaries;

''(iii) any research that the Director determines could improve the ability to control the spread of Asian carp;

''(iv) any quantitative measures that the Director intends to use to document progress in controlling the spread of Asian carp; and

''(v) a cross-cut accounting of Federal and non-Federal expenditures to control the spread of Asian carp.''

CONSTRUCTION OF 1996 AMENDMENT

Pub. L. 104–332, § 3, Oct. 26, 1996, 110 Stat. 4092, provided that: ''Nothing in this Act [see Short Title of 1996 Amendment note above] or the amendments made by this Act is intended to affect the authorities and responsibilities of the Great Lakes Fishery Commission established under article II of the Convention on Great Lakes Fisheries between the United States of America and Canada, signed at Washington on September 10, 1954 (hereafter in this section referred to as the 'Convention'), including the authorities and responsibilities of the Great Lakes Fishery Commission—

''(1) for developing and implementing a comprehensive program for eradicating or minimizing populations of sea lamprey in the Great Lakes watershed; and

''(2) carrying out the duties of the Commission specified in the Convention (including any amendment thereto) and the Great Lakes Fishery Act of 1956 (16 U.S.C. 931 et seq.).''

REPORT ON ESTABLISHMENT OF PROGRAM

Pub. L. 102–567, title II, § 203(b), Oct. 29, 1992, 106 Stat. 4281, provided that: ''Not later than one year after the date of the enactment of this Act [Oct. 29, 1992], the Secretary of Commerce shall submit a report to Congress on progress toward establishing a nonindigenous aquatic nuisance prevention and control program within the National Oceanic and Atmospheric Administration and projected funding for such a program for the following five fiscal years.''

§ 4702. Definitions

As used in this chapter, the term—

(1) ''aquatic nuisance species'' means a nonindigenous species that threatens the diversity or abundance of native species or the ecological stability of infested waters, or commercial, agricultural, aquacultural or recreational activities dependent on such waters;

(2) ''Assistant Secretary'' means the Assistant Secretary of the Army (Civil Works);

(3) ''ballast water'' means any water and associated sediments used to maintain the trim and stability of a vessel;

(4) ''Director'' means the Director of the United States Fish and Wildlife Service;

(5) ''exclusive economic zone'' means the Exclusive Economic Zone of the United States established by Proclamation Number 5030, dated March 10, 1983, and the equivalent zone of Canada;

(6) ''environmentally sound'' methods, efforts, actions or programs means methods, efforts, actions or programs to prevent introductions or control infestations of aquatic nuisance species that minimize adverse impacts to the structure and function of an ecosystem and adverse effects on non-target organisms and ecosystems and emphasize integrated pest management techniques and nonchemical measures;

(7) ''Great Lakes'' means Lake Ontario, Lake Erie, Lake Huron (including Lake St. Clair), Lake Michigan, Lake Superior, and the connecting channels (Saint Mary's River, Saint Clair River, Detroit River, Niagara River, and Saint Lawrence River to the Canadian[1] Border), and includes all other bodies of water within the drainage basin of such lakes and connecting channels.

(8) ''Great Lakes region'' means the 8 States that border on the Great Lakes;

(9) ''Indian tribe'' means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional corporation (as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)) that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians;

(10) ''interstate organization'' means an entity—

(A) established by—

(i) an interstate compact that is approved by Congress;

(ii) a Federal statute; or

(iii) a treaty or other international agreement with respect to which the United States is a party; and

(B)(i) that represents 2 or more—

(I) States or political subdivisions thereof; or

---

[1] So in original. Probably should be ''Canadian''.

(II) Indian tribes; or

(ii) that represents—

(I) 1 or more States or political subdivisions thereof; and

(II) 1 or more Indian tribes; or

(iii) that represents the Federal Government and 1 or more foreign governments; and

(C) has jurisdiction over, serves as forum for coordinating, or otherwise has a role or responsibility for the management of, any land or other natural resource;

(11) "nonindigenous species" means any species or other viable biological material that enters an ecosystem beyond its historic range, including any such organism transferred from one country into another;

(12) "Secretary" means the Secretary of the department in which the Coast Guard is operating;

(13) "Task Force" means the Aquatic Nuisance Species Task Force established under section 4721 of this title;

(14) "territorial sea" means the belt of the sea measured from the baseline of the United States determined in accordance with international law, as set forth in Presidential Proclamation Number 5928, dated December 27, 1988;

(15) "Under Secretary" means the Under Secretary of Commerce for Oceans and Atmosphere;

(16) "waters of the United States" means the navigable waters and the territorial sea of the United States; and

(17) "unintentional introduction" means an introduction of nonindigenous species that occurs as the result of activities other than the purposeful or intentional introduction of the species involved, such as the transport of nonindigenous species in ballast or in water used to transport fish, mollusks or crustaceans for aquaculture or other purposes.

(Pub. L. 101–646, title I, § 1003, Nov. 29, 1990, 104 Stat. 4762; Pub. L. 102–580, title III, § 302(b)(2), Oct. 31, 1992, 106 Stat. 4839; Pub. L. 104–332, § 2(a)(2), (h)(1), (3), Oct. 26, 1996, 110 Stat. 4074, 4091.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", which, to reflect the probable intent of Congress, was translated as reading "this title" meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

Proclamation Number 5030, referred to in par. (5), is set out under section 1453 of this title.

The Alaska Native Claims Settlement Act, referred to in par. (9), is Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688, as amended, which is classified generally to chapter 33 (§ 1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 43 and Tables.

Presidential Proclamation Number 5928, referred to in par. (14), is set out under section 1331 of Title 43.

AMENDMENTS

1996—Pub. L. 104–332, § 2(h)(1), (3), made technical amendment to Pub. L. 101–646, § 1003, which enacted this section.

Par. (1). Pub. L. 104–332, § 2(a)(2)(A), redesignated par. (2) as (1) and struck out former par. (1) which read as follows: "'appropriate Committees' means the Committee on Public Works and Transportation and the Committee on Merchant Marine and Fisheries in the House of Representatives and the Committee on Environment and Public Works and Committee on Commerce, Science, and Transportation in the Senate; and".

Par. (2). Pub. L. 104–332, § 2(a)(2)(B), substituted "'Assistant Secretary' means" for "'assistant Secretary' means".

Pub. L. 104–332, § 2(a)(2)(A), redesignated par. (3) as (2). Former par. (2) redesignated (1).

Pars. (3) to (7). Pub. L. 104–332, § 2(a)(2)(A), redesignated pars. (4) to (8) as (3) to (7), respectively. Former par. (3) redesignated (2).

Par. (8). Pub. L. 104–332, § 2(a)(2)(D), added par. (8).

Pub. L. 104–332, § 2(a)(2)(A), redesignated par. (8) as (7).

Pars. (9), (10). Pub. L. 104–332, § 2(a)(2)(D), added pars. (9) and (10).

Pub. L. 104–332, § 2(a)(2)(C), redesignated pars. (9) and (10) as (11) and (12), respectively.

Pars. (11) to (17). Pub. L. 104–332, § 2(a)(2)(C), redesignated pars. (9) to (15) as (11) to (17), respectively.

1992—Par. (1). Pub. L. 102–580 inserted "the Committee on Public Works and Transportation and" after "means".

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

SUBCHAPTER II—PREVENTION OF UNINTENTIONAL INTRODUCTIONS OF NONINDIGENOUS AQUATIC SPECIES

§ 4711. Repealed. Pub. L. 115–282, title IX, § 903(a)(2)(A)(i), Dec. 4, 2018, 132 Stat. 4354

Section, Pub. L. 101–646, title I, § 1101, Nov. 29, 1990, 104 Stat. 4763; Pub. L. 102–580, title III, § 302(b)(1), Oct. 31, 1992, 106 Stat. 4839; Pub. L. 102–587, title IV, § 4002, Nov. 4, 1992, 106 Stat. 5068; Pub. L. 104–332, § 2(b)(2), Oct. 26, 1996, 110 Stat. 4075, related to aquatic nuisance species in waters of United States.

EFFECTIVE DATE OF REPEAL

Pub. L. 115–282, title IX, § 903(a)(2)(A), Dec. 4, 2018, 132 Stat. 4354, provided that the repeal of this section by section 903(a)(2)(A) is effective beginning on Dec. 4, 2018.

§ 4712. National ballast water management information

(a) Studies on introduction of aquatic nuisance species by vessels

(1) Ballast exchange study

The Task Force, in cooperation with the Secretary, shall conduct a study—

(A) to assess the environmental effects of ballast water exchange on the diversity and abundance of native species in receiving estuarine, marine, and fresh waters of the United States; and

(B) to identify areas within the waters of the United States and the exclusive economic zone, if any, where the exchange of ballast water does not pose a threat of infestation or spread of aquatic nuisance species

in the Great Lakes and other waters of the United States.

**(2) Biological study**

The Task Force, in cooperation with the Secretary, shall conduct a study to determine whether aquatic nuisance species threaten the ecological characteristics and economic uses of Lake Champlain and other waters of the United States other than the Great Lakes.

**(3) Shipping study**

The Secretary shall conduct a study to determine the need for controls on vessels entering waters of the United States, other than the Great Lakes, to minimize the risk of unintentional introduction and dispersal of aquatic nuisance species in those waters. The study shall include an examination of—

(A) the degree to which shipping may be a major pathway of transmission of aquatic nuisance species in those waters;

(B) possible alternatives for controlling introduction of those species through shipping; and

(C) the feasibility of implementing regional versus national control measures.

**(b) Ecological and ballast water discharge surveys**

**(1) Ecological surveys**

**(A) In general**

The Task Force, in cooperation with the Secretary, shall conduct ecological surveys of the Chesapeake Bay, San Francisco Bay, and Honolulu Harbor and, as necessary, of other estuaries of national significance and other waters that the Task Force determines—

(i) to be highly susceptible to invasion by aquatic nuisance species resulting from ballast water operations and other operations of vessels; and

(ii) to require further study.

**(B) Requirements for surveys**

In conducting the surveys under this paragraph, the Task Force shall, with respect to each such survey—

(i) examine the attributes and patterns of invasions of aquatic nuisance species; and

(ii) provide an estimate of the effectiveness of ballast water management and other vessel management guidelines issued and regulations promulgated under this subchapter in abating invasions of aquatic nuisance species in the waters that are the subject of the survey.

**(2) Ballast water discharge surveys**

**(A) In general**

The Secretary, in cooperation with the Task Force, shall conduct surveys of ballast water discharge rates and practices in the waters referred to in paragraph (1)(A) on the basis of the criteria under clauses (i) and (ii) of such paragraph.

**(B) Requirements for surveys**

In conducting the surveys under this paragraph, the Secretary shall—

(i) examine the rate of, and trends in, ballast water discharge in the waters that are the subject of the survey; and

(ii) assess the effectiveness of voluntary guidelines issued, and regulations promulgated, under this subchapter in altering ballast water discharge practices to reduce the probability of accidental introductions of aquatic nuisance species.

**(3) Columbia River**

The Secretary, in cooperation with the Task Force and academic institutions in each of the States affected, shall conduct an ecological and ballast water discharge survey of the Columbia River system consistent with the requirements of paragraphs (1) and (2).

**(c) Reports**

**(1) Ballast exchange**

Not later than 18 months after November 29, 1990, and prior to the effective date of the regulations issued under section 4711(b) of this title (as in effect on the day before December 4, 2018), the Task Force shall submit a report to the Congress that presents the results of the study required under subsection (a)(1) and makes recommendations with respect to such regulations.

**(2) Biological and shipping studies**

Not later than 18 months after November 29, 1990, the Secretary and the Task Force shall each submit to the Congress a report on the results of their respective studies under paragraphs (2) and (3) of subsection (a).

**(d) Negotiations**

The Secretary, working through the International Maritime Organization, is encouraged to enter into negotiations with the governments of foreign countries concerning the planning and implementation of measures aimed at the prevention and control of unintentional introductions of aquatic nuisance species in coastal waters.

**(e) Regional research grants**

Out of amounts appropriated to carry out this subsection for a fiscal year, the Under Secretary may—

(1) make available not to exceed $750,000 to fund research on aquatic nuisance species prevention and control in the Chesapeake Bay through grants, to be competitively awarded and subject to peer review, to universities and research institutions;

(2) make available not to exceed $500,000 to fund research on aquatic nuisance species prevention and control in the Gulf of Mexico through grants, to be competitively awarded and subject to peer review, to universities and research institutions;

(3) make available not to exceed $500,000 to fund research on aquatic nuisance species prevention and control for the Pacific Coast through grants, to be competitively awarded and subject to peer review, to universities and research institutions;

(4) make available not to exceed $500,000 to fund research on aquatic nuisance species prevention and control for the Atlantic Coast

through grants, to be competitively awarded and subject to peer review, to universities and research institutions; and

(5) make available not to exceed $750,000 to fund research on aquatic nuisance species prevention and control in the San Francisco Bay-Delta Estuary through grants, to be competitively awarded and subject to peer review, to universities and research institutions.

**(f) National ballast information clearinghouse**

**(1) In general**

The Secretary shall develop and maintain, in consultation and cooperation with the Task Force and the Smithsonian Institution (acting through the Smithsonian Environmental Research Center), a clearinghouse of national data concerning—

(A) ballasting practices;

(B) compliance with the guidelines issued pursuant to section 4711(c) of this title (as in effect on the day before December 4, 2018); and

(C) any other information obtained by the Task Force under subsection (b).

**(2) Ballast water reporting requirements**

**(A) In general**

The owner or operator of a vessel subject to this chapter shall submit to the National Ballast Information Clearinghouse, by not later than 6 hours after the arrival of the vessel at a United States port or place of destination, the ballast water management report form approved by the Office of Management and Budget numbered OMB 1625–0069 (or a successor form), unless the vessel is operating exclusively on a voyage between ports or places within contiguous portions of a single Captain of the Port Zone.

**(B) Multiple discharges**

The owner or operator of a vessel subject to this chapter may submit a single report under subparagraph (A) for multiple ballast water discharges within a single port or place of destination during the same voyage.

**(C) Advance report to States**

A State may require the owner or operator of a vessel subject to this chapter to submit directly to the State, or to an appropriate regional forum, a ballast water management report form—

(i) not later than 24 hours prior to arrival at a United States port or place of destination in the State, if the voyage of the vessel is anticipated to exceed 24 hours; or

(ii) before departing the port or place of departure, if the voyage of the vessel to the United States port or place of destination is not anticipated to exceed 24 hours.

**(3) Vessel reporting data**

**(A) Dissemination to States**

On receipt of a ballast water management report under paragraph (2), the National Ballast Information Clearinghouse shall—

(i) in the case of a form submitted electronically, immediately disseminate the report to interested States; or

(ii) in the case of a form submitted by means other than electronically, disseminate the report to interested States as soon as practicable.

**(B) Availability to public**

Not later than 30 days after the date of receipt of a ballast water management report under paragraph (2), the National Ballast Information Clearinghouse shall make the data in the report fully and readily available to the public in a searchable and fully retrievable electronic format.

**(4) Report**

**(A) In general**

Not later than July 1, 2019, and annually thereafter, the Secretary shall prepare and submit a report in accordance with this paragraph.

**(B) Contents**

Each report under this paragraph shall synthesize and analyze the data described in paragraph (1) for the preceding 2-year period to evaluate nationwide status and trends relating to—

(i) ballast water delivery and management; and

(ii) invasions of aquatic nuisance species resulting from ballast water.

**(C) Development**

The Secretary shall prepare each report under this paragraph in consultation and cooperation with—

(i) the Task Force; and

(ii) the Smithsonian Institution (acting through the Smithsonian Environmental Research Center).

**(D) Submission**

The Secretary shall—

(i) submit each report under this paragraph to—

(I) the Task Force;

(II) the Committee on Commerce, Science, and Transportation of the Senate; and

(III) the Committee on Transportation and Infrastructure of the House of Representatives; and

(ii) make each report available to the public.

**(5) Working group**

Not later than 1 year after December 4, 2018, the Secretary shall establish a working group, including members from the National Ballast Information Clearinghouse and States with ballast water management programs, to establish a process for compiling and readily sharing Federal and State commercial vessel reporting and enforcement data regarding compliance with this chapter.

(Pub. L. 101–646, title I, § 1102, Nov. 29, 1990, 104 Stat. 4764; Pub. L. 104–332, § 2(c), (g), (h)(1), Oct. 26, 1996, 110 Stat. 4081, 4091; Pub. L. 105–362, title XV, § 1502(d), Nov. 10, 1998, 112 Stat. 3295; Pub. L. 115–282, title IX, § 903(a)(2)(B), (h)(1), Dec. 4, 2018, 132 Stat. 4354, 4362.)

REFERENCES IN TEXT

Section 4711 of this title (as in effect on the day before December 4, 2018), referred to in subsecs. (c)(1) and

(f)(1)(B), means section 4711 of this title as in effect prior to repeal by Pub. L. 115–282, title IX, §903(a)(2)(A)(i), Dec. 4, 2018, 132 Stat. 4354.

This chapter, referred to in subsec. (f)(2), was in the original "this title", meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

This chapter, referred to in subsec. (f)(5), was in the original "this Act", which, to reflect the probable intent of Congress, was translated as reading "this title" meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

### Amendments

2018—Subsec. (c)(1). Pub. L. 115–282, §903(a)(2)(B)(i), inserted "(as in effect on the day before December 4, 2018)" after "section 4711(b) of this title".

Subsec. (f)(1)(B). Pub. L. 115–282, §903(a)(2)(B)(ii), inserted "(as in effect on the day before December 4, 2018)" after "section 4711(c) of this title".

Subsec. (f)(2) to (5). Pub. L. 115–282, §903(h)(1), added pars. (2) to (5) and struck out former par. (2). Prior to amendment, text of par. (2) read as follows: "In consultation and cooperation with the Task Force and the Smithsonian Institution (acting through the Smithsonian Environmental Research Center), the Secretary shall prepare and submit to the Task Force and the Congress, on a biennial basis, a report that synthesizes and analyzes the data referred to in paragraph (1) relating to—

"(A) ballast water delivery and management; and

"(B) invasions of aquatic nuisance species resulting from ballast water."

1998—Subsec. (f)(2). Pub. L. 105–362 substituted "biennial basis" for "biannual basis" in introductory provisions.

1996—Pub. L. 104–332, §2(h)(1), made technical amendment to Pub. L. 101–646, §1102, which enacted this section.

Pub. L. 104–332, §2(c)(1), substituted "management information" for "control program" in section catchline.

Subsec. (a)(1). Pub. L. 104–332, §2(c)(2)(A), inserted ", in cooperation with the Secretary," before "shall conduct" in introductory provisions.

Subsec. (a)(2). Pub. L. 104–332, §2(c)(2), inserted ", in cooperation with the Secretary," before "shall conduct" and "Lake Champlain and other" after "economic uses of".

Subsec. (b). Pub. L. 104–332, §2(c)(3), added subsec. (b) and struck out heading and text of former subsec. (b). Text read as follows: "The Secretary and the Task Force shall cooperate in conducting their respective studies under this section."

Subsec. (c). Pub. L. 104–332, §2(g), substituted "Congress" for "appropriate Committees" in pars. (1) and (2).

Subsecs. (e), (f). Pub. L. 104–332, §2(c)(4), added subsecs. (e) and (f).

## § 4713. Armed services ballast water programs

### (a) Department of Defense vessels

Subject to operational conditions, the Secretary of Defense, in consultation with the Secretary, the Task Force, and the International Maritime Organization, shall implement a ballast water management program for seagoing vessels of the Department of Defense to minimize the risk of introduction of nonindigenous species from releases of ballast water.

### (b) Coast Guard vessels

Subject to operational conditions, the Secretary, in consultation with the Task Force and the International Maritime Organization, shall implement a ballast water management program for seagoing vessels of the Coast Guard to minimize the risk of introduction of nonindigenous species from releases of ballast water.

(Pub. L. 101–646, title I, §1103, as added Pub. L. 104–332, §2(d), Oct. 26, 1996, 110 Stat. 4083.)

### Transfer of Functions

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

## § 4714. Ballast water management demonstration program

### (a) "Technologies and practices" defined

For purposes of this section, the term "technologies and practices" means those technologies and practices that—

(1) may be retrofitted—

(A) on existing vessels or incorporated in new vessel designs; and

(B) on existing land-based ballast water treatment facilities;

(2) may be designed into new water treatment facilities;

(3) are operationally practical;

(4) are safe for a vessel and crew;

(5) are environmentally sound;

(6) are cost-effective;

(7) a vessel operator is capable of monitoring; and

(8) are effective against a broad range of aquatic nuisance species.

### (b) Demonstration program

#### (1) In general

During the 18-month period beginning on the date that funds are made available by appropriations pursuant to section 4741(e) of this title, the Secretary of the Interior and the Secretary of Commerce, with the concurrence of and in cooperation with the Secretary, shall conduct a ballast water management demonstration program to demonstrate technologies and practices to prevent aquatic nonindigenous species from being introduced into and spread through ballast water in the Great Lakes and other waters of the United States.

#### (2) Location

The installation and construction of the technologies and practices used in the demonstration program conducted under this subsection shall be performed in the United States.

#### (3) Vessel selection

In demonstrating technologies and practices on vessels under this subsection, the Secretary of the Interior and the Secretary of Commerce, shall—

(A) use only vessels that—
(i) are approved by the Secretary;
(ii) have ballast water systems conducive to testing aboard-vessel or land-based technologies and practices applicable to a significant number of merchant vessels; and
(iii) are—
(I) publicly or privately owned; and
(II) in active use for trade or other cargo shipment purposes during the demonstration;

(B) select vessels for participation in the program by giving priority consideration—
(i) first, to vessels documented under chapter 121 of title 46;
(ii) second, to vessels that are a majority owned by citizens of the United States, as determined by the Secretary; and
(iii) third, to any other vessels that regularly call on ports in the United States; and

(C) seek to use a variety of vessel types, including vessels that—
(i) call on ports in the United States and on the Great Lakes; and
(ii) are operated along major coasts of the United States and inland waterways, including the San Francisco Bay and Chesapeake Bay.

**(4) Selection of technologies and practices**

In selecting technologies and practices for demonstration under this subsection, the Secretary of the Interior and the Secretary of Commerce shall give priority consideration to technologies and practices identified as promising by the National Research Council Marine Board of the National Academy of Sciences in its report on ships' ballast water operations issued in July 1996.

**(5) Report**

Not later than 3 years after October 26, 1996, the Secretary of the Interior and the Secretary of Commerce shall prepare and submit a report to the Congress on the demonstration program conducted pursuant to this section. The report shall include findings and recommendations of the Secretary of the Interior and the Secretary of Commerce concerning technologies and practices.

**(c) Authorities; consultation and cooperation with International Maritime Organization and Task Force**

**(1) Authorities**

In conducting the demonstration program under subsection (b), the Secretary of the Interior may—
(A) enter into cooperative agreements with appropriate officials of other agencies of the Federal Government, agencies of States and political subdivisions thereof, and private entities;
(B) accept funds, facilities, equipment, or personnel from other Federal agencies; and
(C) accept donations of property and services.

**(2) Consultation and cooperation**

The Secretary of the Interior shall consult and cooperate with the International Maritime Organization and the Task Force in carrying out this section.

(Pub. L. 101–646, title I, §1104, as added Pub. L. 104–332, §2(d), Oct. 26, 1996, 110 Stat. 4083.)

SUBCHAPTER III—PREVENTION AND CONTROL OF AQUATIC NUISANCE SPECIES DISPERSAL

**§ 4721. Establishment of Task Force**

**(a) Task Force**

There is hereby established an "Aquatic Nuisance Species Task Force".

**(b) Membership**

Membership of the Task Force shall consist of—
(1) the Director;
(2) the Under Secretary;
(3) the Administrator of the Environmental Protection Agency;
(4) the Commandant of the United States Coast Guard;
(5) the Assistant Secretary;
(6) the Secretary of Agriculture; and
(7) the head of any other Federal agency that the chairpersons designated under subsection (d) deem appropriate.

**(c) Ex officio members**

The chairpersons designated under subsection (d) shall invite representatives of the Great Lakes Commission, the Lake Champlain Basin Program, the Chesapeake Bay Program, the San Francisco Bay-Delta Estuary Program, and State agencies and other governmental entities to participate as ex officio members of the Task Force.

**(d) Chairpersons**

The Director and the Under Secretary shall serve as co-chairpersons of the Task Force and shall be jointly responsible, and are authorized to undertake such activities as may be necessary, for carrying out this subchapter in consultation and cooperation with the other members of the Task Force.

**(e) Memorandum of understanding**

Within six months of November 29, 1990, the Director and the Under Secretary shall develop a memorandum of understanding that describes the role of each in jointly carrying out this subchapter.

**(f) Coordination**

Each Task Force member shall coordinate any action to carry out this subchapter with any such action by other members of the Task Force, and regional, State and local entities.

(Pub. L. 101–646, title I, §1201, Nov. 29, 1990, 104 Stat. 4765; Pub. L. 104–182, title III, §308(b), Aug. 6, 1996, 110 Stat. 1689; Pub. L. 104–332, §2(e)(2), (h)(1), Oct. 26, 1996, 110 Stat. 4085, 4091.)

REFERENCES IN TEXT

This subchapter, referred to in subsecs. (d) to (f), was in the original "this subtitle", meaning subtitle C (§§1201–1209) of title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4765, which enacted this subchapter and amended section 42 of Title 18, Crimes and Criminal Procedure.

AMENDMENTS

1996—Pub. L. 104–332, §2(h)(1), made technical amendment to Pub. L. 101–646, §1201, which enacted this section.

Subsec. (b)(5) to (7). Pub. L. 104–332, §2(e)(2)(A), struck out "and" at end of par. (5), added par. (6), and redesignated former par. (6) as (7).

Subsec. (c). Pub. L. 104–332, §2(e)(2)(B), inserted "the Chesapeake Bay Program, the San Francisco Bay-Delta Estuary Program," before "and State agencies".

Pub. L. 104–182 inserted ", the Lake Champlain Basin Program," after "Great Lakes Commission".

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

## § 4722. Aquatic nuisance species program

### (a) In general

The Task Force shall develop and implement a program for waters of the United States to prevent introduction and dispersal of aquatic nuisance species; to monitor, control and study such species; and to disseminate related information.

### (b) Content

The program developed under subsection (a) shall—

(1) identify the goals, priorities, and approaches for aquatic nuisance species prevention, monitoring, control, education and research to be conducted or funded by the Federal Government;

(2) describe the specific prevention, monitoring, control, education and research activities to be conducted by each Task Force member;

(3) coordinate aquatic nuisance species programs and activities of Task Force members and affected State agencies;

(4) describe the role of each Task Force member in implementing the elements of the program as set forth in this subchapter;

(5) include recommendations for funding to implement elements of the program; and

(6) develop a demonstration program of prevention, monitoring, control, education and research for the zebra mussel, to be implemented in the Great Lakes and any other waters infested, or likely to become infested in the near future, by the zebra mussel.

### (c) Prevention

#### (1) In general

The Task Force shall establish and implement measures, within the program developed under subsection (a), to minimize the risk of introduction of aquatic nuisance species to waters of the United States, including—

(A) identification of pathways by which aquatic organisms are introduced to waters of the United States;

(B) assessment of the risk that an aquatic organism carried by an identified pathway may become an aquatic nuisance species; and

(C) evaluation of whether measures to prevent introductions of aquatic nuisance species are effective and environmentally sound.

#### (2) Implementation

Whenever the Task Force determines that there is a substantial risk of unintentional introduction of an aquatic nuisance species by an identified pathway and that the adverse consequences of such an introduction are likely to be substantial, the Task Force shall, acting through the appropriate Federal agency, and after an opportunity for public comment, carry out cooperative, environmentally sound efforts with regional, State and local entities to minimize the risk of such an introduction.

### (d) Monitoring

The Task Force shall establish and implement monitoring measures, within the program developed under subsection (a), to—

(1) detect unintentional introductions of aquatic nuisance species;

(2) determine the dispersal of aquatic nuisance species after introduction; and

(3) provide for the early detection and prevention of infestations of aquatic nuisance species in unaffected drainage basins.

### (e) Control

#### (1) In general

The Task Force may develop cooperative efforts, within the program established under subsection (a), to control established aquatic nuisance species to minimize the risk of harm to the environment and the public health and welfare. For purposes of this chapter, control efforts include eradication of infestations, reductions of populations, development of means of adapting human activities and public facilities to accommodate infestations, and prevention of the spread of aquatic nuisance species from infested areas. Such control efforts shall be developed in consultation with affected Federal agencies, States, Indian Tribes, local governments, interjurisdictional organizations, and other appropriate entities. Control actions authorized by this section shall be based on the best available scientific information and shall be conducted in an environmentally sound manner.

#### (2) Decisions

The Task Force or any other affected agency or entity may recommend that the Task Force initiate a control effort. In determining whether a control program is warranted, the Task Force shall evaluate the need for control (including the projected consequences of no control and less than full control); the technical and biological feasibility and cost-effectiveness of alternative control strategies and actions; whether the benefits of control, including costs avoided, exceed the costs of the program; the risk of harm to non-target organisms and ecosystems, public health and welfare; and such other considerations the Task Force determines appropriate. The Task Force shall also determine the nature and extent of control of target aquatic nuisance species that is feasible and desirable.

**(3) Programs**

If the Task Force determines in accordance with paragraph (2) that control of an aquatic nuisance species is warranted, the Task Force shall develop a proposed control program to achieve the target level of control. A notice summarizing the proposed action and soliciting comments shall be published in the Federal Register, in major newspapers in the region affected, and in principal trade publications of the industries affected. Within 180 days of proposing a control program, and after consultation with affected governmental and other appropriate entities and taking into consideration other comments received, the Task Force shall complete development of the proposed control program.

**(f) Research**

**(1) Priorities**

The Task Force shall, within the program developed under subsection (a), conduct research concerning—

(A) the environmental and economic risks and impacts associated with the introduction of aquatic nuisance species into the waters of the United States;

(B) the principal pathways by which aquatic nuisance species are introduced and dispersed;

(C) possible methods for the prevention, monitoring and control of aquatic nuisance species; and

(D) the assessment of the effectiveness of prevention, monitoring and control methods.

**(2) Protocol**

Within 90 days of November 29, 1990, the Task Force shall establish and follow a protocol to ensure that research activities carried out under this subchapter do not result in the introduction of aquatic nuisance species to waters of the United States.

**(3) Grants for research**

The Task Force shall allocate funds authorized under this chapter for competitive research grants to study all aspects of aquatic nuisance species, which shall be administered through the National Sea Grant College Program and the Cooperative Fishery and Wildlife Research Units. Grants shall be conditioned to ensure that any recipient of funds follows the protocol established under paragraph (2) of this subsection.

**(g) Technical assistance**

The Task Force shall, within the program developed under subsection (a), provide technical assistance to State and local governments and persons to minimize the environmental, public health, and safety risks associated with aquatic nuisance species, including an early warning system for advance notice of possible infestations and appropriate responses.

**(h) Education**

The Task Force shall, with the program developed under subsection (a), establish and implement educational programs through Sea Grant Marine Advisory Services and any other avail-able resources that it determines to be appropriate to inform the general public, State governments, governments of political subdivisions of States, and industrial and recreational users of aquatic resources in connection with matters concerning the identification of aquatic nuisance species, and control methods for such species, including the prevention of the further distribution of such species.

**(i) Zebra mussel demonstration program**

**(1) Zebra mussel**

**(A) In general**

The Task Force shall, within the program developed under subsection (a), undertake a program of prevention, monitoring, control, education and research for the zebra mussel to be implemented in the Great Lakes and any other waters of the United States infested or likely to become infested by the zebra mussel, including—

(i) research and development concerning the species life history, environmental tolerances and impacts on fisheries and other ecosystem components, and the efficacy of control mechanisms and means of avoiding or minimizing impacts;

(ii) tracking the dispersal of the species and establishment of an early warning system to alert likely areas of future infestations;

(iii) development of control plans in coordination with regional, State and local entities; and

(iv) provision of technical assistance to regional, State and local entities to carry out this section.

**(B) Public facility research and development**

The Assistant Secretary, in consultation with the Task Force, shall develop a program of research, technology development, and demonstration for the environmentally sound control of zebra mussels in and around public facilities. The Assistant Secretary shall collect and make available, through publications and other appropriate means, information pertaining to such control methods.

**(C) Voluntary guidelines**

Not later than 1 year after October 26, 1996, the Task Force shall develop and submit to the Secretary voluntary guidelines for controlling the spread of the zebra mussel and, if appropriate, other aquatic nuisance species through recreational activities, including boating and fishing. Not later than 4 months after the date of such submission, and after providing notice and an opportunity for public comment, the Secretary shall issue voluntary guidelines that are based on the guidelines developed by the Task Force under this subparagraph.

**(2) Dispersal containment analysis**

**(A) Research**

The Administrator of the Environmental Protection Agency, in cooperation with the National Science Foundation and the Task Force, shall provide research grants on a competitive basis for projects that—

(i) identify environmentally sound methods for controlling the dispersal of aquatic nuisance species, such as the zebra mussel; and

(ii) adhere to research protocols developed pursuant to subsection (f)(2).

**(B) Authorization of appropriations**

There are authorized to be appropriated to the Environmental Protection Agency to carry out this paragraph, $500,000.

**(3) Dispersal barrier demonstration**

**(A) In general**

The Assistant Secretary, in consultation with the Task Force, shall investigate and identify environmentally sound methods for preventing and reducing the dispersal of aquatic nuisance species between the Great Lakes-Saint Lawrence drainage and the Mississippi River drainage through the Chicago River Ship and Sanitary Canal, including any of those methods that could be incorporated into the operation or construction of the lock system of the Chicago River Ship and Sanitary Canal.

**(B) Report**

Not later than 18 months after October 26, 1996, the Assistant Secretary shall issue a report to the Congress that includes recommendations concerning—

(i) which of the methods that are identified under the study conducted under this paragraph are most promising with respect to preventing and reducing the dispersal of aquatic nuisance species; and

(ii) ways to incorporate those methods into ongoing operations of the United States Army Corps of Engineers that are conducted at the Chicago River Ship and Sanitary Canal.

**(C) Authorization of appropriations**

There are authorized to be appropriated to the Department of the Army such sums as are necessary to carry out the dispersal barrier demonstration project directed by this paragraph.

**(4) Contributions**

To the extent allowable by law, in carrying out the studies under paragraphs (2) and (3), the Administrator of the Environmental Protection Agency and the Secretary of the Army may enter into an agreement with an interested party under which that party provides in kind or monetary contributions for the study.

**(5) Technical assistance**

The Great Lakes Environmental Research Laboratory of the National Oceanic and Atmospheric Administration shall provide technical assistance to appropriate entities to assist in the research conducted pursuant to this subsection.

**(j) Implementation**

**(1) Regulations**

The Director, the Secretary, and the Under Secretary may issue such rules and regulations as may be necessary to implement this section.

**(2) Participation of others**

The Task Force shall provide opportunities for affected Federal agencies which are not part of the Task Force, State and local government agencies, and regional and other entities with the necessary expertise to participate in control programs. If these other agencies or entities have sufficient authority or jurisdiction and expertise and where this will be more efficient or effective, responsibility for implementing all or a portion of a control program may be delegated to such agencies or entities.

**(k) Reports**

(1) Not later than 12 months after November 29, 1990, the Task Force shall submit a report describing the program developed under subsection (a), including the research protocol required under subsection (f)(2), to the Congress.

(2) On an annual basis after the submission of the report under paragraph (1), the Task Force shall submit a report to the Congress detailing progress in carrying out this section.

(Pub. L. 101–646, title I, § 1202, Nov. 29, 1990, 104 Stat. 4766; Pub. L. 104–332, § 2(e)(3), (4), (g), (h)(1), Oct. 26, 1996, 110 Stat. 4085, 4087, 4091; Pub. L. 109–234, title II, § 2309, June 15, 2006, 120 Stat. 457.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (e)(1) and (f)(3), was in the original "this Act", which, to reflect the probable intent of Congress, was translated as reading "this title" meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

AMENDMENTS

2006—Subsec. (i)(3)(C). Pub. L. 109–234 substituted "such sums as are necessary to carry out the dispersal barrier demonstration project directed by this paragraph" for ", to carry out this paragraph, $750,000".

1996—Pub. L. 104–332, § 2(h)(1), made technical amendment to Pub. L. 101–646, § 1202, which enacted this section.

Subsec. (f)(1)(A). Pub. L. 104–332, § 2(e)(3)(A), inserted "and impacts" after "economic risks".

Subsec. (i). Pub. L. 104–332, § 2(e)(3)(B), designated existing provisions as par. (1), redesignated former pars. (1) and (2) as subpars. (A) and (B), respectively, and former subpars. (A) to (D) of par. (1) as cls. (i) to (iv), respectively, of subpar. (A), inserted new par. (1) heading, substituted "The Assistant Secretary, in consultation with the Task Force, shall develop a program of research, technology development, and demonstration for the environmentally sound control of zebra mussels in and around public facilities." for "The Assistant Secretary, in consultation with the Task Force, shall develop a program of research and technology development for the environmentally sound control of zebra mussels in and around public facilities." in subpar. (B), and added subpar. (C) and pars. (2) to (5).

Subsec. (j)(1). Pub. L. 104–332, § 2(e)(4), substituted "The Director, the Secretary," for "Not later than 18 months after November 29, 1990, the Director".

Subsec. (k). Pub. L. 104–332, § 2(g), substituted "Congress" for "appropriate Committees" in pars. (1) and (2).

### § 4723. Regional coordination

#### (a) Great Lakes panel

##### (1) In general

Not later than 30 days following November 29, 1990, the Task Force shall request that the Great Lakes Commission (established under Article IV of the Great Lakes Compact to which the Congress granted consent in the Act of July 24, 1968, P.L. 90–419) convene a panel of Great Lakes region representatives from Federal, State and local agencies and from private environmental and commercial interests to—

(A) identify priorities for the Great Lakes region with respect to aquatic nuisance species;

(B) make recommendations to the Task Force regarding programs to carry out section 4722(i) of this title;

(C) assist the Task Force in coordinating Federal aquatic nuisance species program activities in the Great Lakes region;

(D) coordinate, where possible, aquatic nuisance species program activities in the Great Lakes region that are not conducted pursuant to this chapter;

(E) provide advice to public and private individuals and entities concerning methods of controlling aquatic nuisance species; and

(F) submit annually a report to the Task Force describing activities within the Great Lakes region related to aquatic nuisance species prevention, research,[1] control.

##### (2) Consultation

The Task Force shall request that the Great Lakes Fishery Commission provide information to the panel convened under this subsection on technical and policy matters related to the international fishery resources of the Great Lakes.

##### (3) Canadian participation

The panel convened under this subsection is encourage[2] to invite representatives from the Federal, provincial or territorial governments of Canada to participate as observers.

#### (b) Western regional panel

Not later than 30 days after October 26, 1996, the Task Force shall request a Western regional panel, comprised of Western region representatives from Federal, State, and local agencies and from private environmental and commercial interests, to—

(1) identify priorities for the Western region with respect to aquatic nuisance species;

(2) make recommendations to the Task Force regarding an education, monitoring (including inspection), prevention, and control program to prevent the spread of the zebra mussel west of the 100th Meridian pursuant to section 4722(i) of this title;

(3) coordinate, where possible, other aquatic nuisance species program activities in the Western region that are not conducted pursuant to this chapter;

(4) develop an emergency response strategy for Federal, State, and local entities for stem-

ming new invasions of aquatic nuisance species in the region;

(5) provide advice to public and private individuals and entities concerning methods of preventing and controlling aquatic nuisance species infestations; and

(6) submit annually a report to the Task Force describing activities within the Western region related to aquatic nuisance species prevention, research, and control.

#### (c) Additional regional panels

The Task Force shall—

(1) encourage the development and use of regional panels and other similar entities in regions in addition to the Great Lakes and Western regions (including providing financial assistance for the development and use of such entities) to carry out, with respect to those regions, activities that are similar to the activities described in subsections (a) and (b); and

(2) cooperate with regional panels and similar entities that carry out the activities described in paragraph (1).

(Pub. L. 101–646, title I, §1203, Nov. 29, 1990, 104 Stat. 4769; Pub. L. 104–332, §2(e)(5), (h)(1), Oct. 26, 1996, 110 Stat. 4087, 4091.)

REFERENCES IN TEXT

Act of July 24, 1968, referred to in subsec. (a)(1), is Pub. L. 90–419, July 24, 1968, 82 Stat. 414, which is not classified to the Code.

This chapter, referred to in subsecs. (a)(1)(D) and (b)(3), was in the original "this Act", which, to reflect the probable intent of Congress, was translated as reading "this title" meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

AMENDMENTS

1996—Pub. L. 104–332, §2(h)(1), made technical amendment to Pub. L. 101–646, §1203, which enacted this section.

Pub. L. 104–332, §2(e)(5)(A), substituted "Regional" for "Great Lakes regional" in section catchline.

Pub. L. 104–332, §2(e)(5)(B)–(F), designated existing provisions as subsec. (a) and inserted subsec. heading, redesignated former subsec. (a) as par. (1), and former pars. (1) to (6) as subpars. (A) to (F), respectively, of par. (1), in par. (1) inserted "region" before "representatives" in introductory provisions and after "Great Lakes" in subpars. (A), (C), (D), and (F), redesignated subsecs. (b) and (c) as pars. (2) and (3), respectively, of subsec. (a), substituted "this subsection" for "this section" in those pars., and added subsecs. (b) and (c).

### § 4724. State aquatic nuisance species management plans

#### (a) State or interstate invasive species management plans

##### (1) In general

After providing notice and opportunity for public comment, the Governor of each State may prepare and submit, or the Governors of the States and the governments of the Indian tribes involved in an interstate organization, may jointly prepare and submit—

(A) a comprehensive management plan to the Task Force for approval which identifies

---

[1] So in original. Probably should be followed by "and".

[2] So in original. Probably should be "encouraged".

those areas or activities within the State or within the interstate region involved, other than those related to public facilities, for which technical, enforcement, or financial assistance (or any combination thereof) is needed to eliminate or reduce the environmental, public health, and safety risks associated with aquatic nuisance species, particularly the zebra mussel; and

(B) a public facility management plan to the Assistant Secretary for approval which is limited solely to identifying those public facilities within the State or within the interstate region involved for which technical and financial assistance is needed to reduce infestations of zebra mussels.

**(2) Content**

Each plan shall, to the extent possible, identify the management practices and measures that will be undertaken to reduce infestations of aquatic nuisance species. Each plan shall—

(A) identify and describe State and local programs for environmentally sound prevention and control of the target aquatic nuisance species;

(B) identify Federal activities that may be needed for environmentally sound prevention and control of aquatic nuisance species and a description of the manner in which those activities should be coordinated with State and local government activities;

(C) identify any authority that the State (or any State or Indian tribe involved in the interstate organization) does not have at the time of the development of the plan that may be necessary for the State (or any State or Indian tribe involved in the interstate organization) to protect public health, property, and the environment from harm by aquatic nuisance species; and

(D) a schedule of implementing the plan, including a schedule of annual objectives, and enabling legislation.

**(3) Consultation**

(A) In developing and implementing a management plan, the State or interstate organization should, to the maximum extent practicable, involve local governments and regional entities, Indian tribes, and public and private organizations that have expertise in the control of aquatic nuisance species.

(B) Upon the request of a State or the appropriate official of an interstate organization, the Task Force or the Assistant Secretary, as appropriate under paragraph (1), may provide technical assistance in developing and implementing a management plan.

**(4) Plan approval**

Within 90 days after the submission of a management plan, the Task Force or the Assistant Secretary in consultation with the Task Force, as appropriate under paragraph (1), shall review the proposed plan and approve it if it meets the requirements of this subsection or return the plan to the Governor or the interstate organization with recommended modifications.

**(b) Grant program**

**(1) State grants**

The Director may, at the recommendation of the Task Force, make grants to States with management plans approved under subsection (a) for the implementation of those plans.

**(2) Application**

An application for a grant under this subsection shall include an identification and description of the best management practices and measures which the State proposes to utilize in implementing an approved management plan with any Federal assistance to be provided under the grant.

**(3) Federal share**

(A) The Federal share of the cost of each comprehensive management plan implemented with Federal assistance under this section in any fiscal year shall not exceed 75 percent of the cost incurred by the State in implementing such management program and the non-Federal share of such costs shall be provided from non-Federal sources.

(B) The Federal share of the cost of each public facility management plan implemented with Federal assistance under this section in any fiscal year shall not exceed 50 percent of the cost incurred by the State in implementing such management program and the non-Federal share of such costs shall be provided from non-Federal sources.

**(4) Administrative [1] costs**

For the purposes of this section, administrative costs for activities and programs carried out with a grant in any fiscal year shall not exceed 5 percent of the amount of the grant in that year.

**(5) In-kind contributions**

In addition to cash outlays and payments, in-kind contributions of property or personnel services by non-Federal interests for activities under this section may be used for the non-Federal share of the cost of those activities.

**(c) Enforcement assistance**

Upon request of a State or Indian tribe, the Director or the Under Secretary, to the extent allowable by law and in a manner consistent with section 141 [2] of title 14, may provide assistance to a State or Indian tribe in enforcing an approved State or interstate invasive species management plan.

(Pub. L. 101–646, title I, § 1204, Nov. 29, 1990, 104 Stat. 4770; Pub. L. 104–332, § 2(e)(6), (h)(1), Oct. 26, 1996, 110 Stat. 4089, 4091.)

REFERENCES IN TEXT

Section 141 of title 14, referred to in subsec. (c), was redesignated section 701 of title 14 by Pub. L. 115–282, title I, § 106(b), Dec. 4, 2018, 132 Stat. 4203, and references to section 141 of title 14 deemed to refer to such redesignated section, see section 123(b)(1) of Pub. L. 115–282, set out as a References to Sections of Title 14 as Redesignated by Pub. L. 115–282 note preceding section 101 of Title 14, Coast Guard.

---

[1] So in original. Probably should be "Administrative".
[2] See References in Text note below.

AMENDMENTS

1996—Pub. L. 104–332, § 2(h)(1), made technical amendment to Pub. L. 101–646, § 1204, which enacted this section.

Subsec. (a). Pub. L. 104–332, § 2(e)(6)(A)(i), substituted "State or interstate invasive species management plans" for "State plan" in heading.

Subsec. (a)(1). Pub. L. 104–332, § 2(e)(6)(A)(i)(I), substituted "After providing notice and opportunity for public comment, the Governor of each State may prepare and submit, or the Governors of the States and the governments of the Indian tribes involved in an interstate organization, may jointly prepare and submit" for "The Governor of each State may, after notice and opportunity for public comment, prepare and submit" in introductory provisions.

Subsec. (a)(1)(A). Pub. L. 104–332, § 2(e)(6)(A)(ii)(II), (III), inserted "or within the interstate region involved" after "within the State" and substituted "technical, enforcement, or financial assistance (or any combination thereof)" for "technical and financial assistance".

Subsec. (a)(1)(B). Pub. L. 104–332, § 2(e)(6)(A)(ii)(III), inserted "or within the interstate region involved" after "within the State".

Subsec. (a)(2)(B). Pub. L. 104–332, § 2(e)(6)(A)(iii)(I), struck out "and" at end.

Subsec. (a)(2)(C). Pub. L. 104–332, § 2(e)(6)(A)(iii)(III), added subpar. (C). Former subpar. (C) redesignated (D).

Subsec. (a)(2)(D). Pub. L. 104–332, § 2(e)(6)(A)(iii)(II), (IV), redesignated subpar. (C) as (D) and inserted ", and enabling legislation" before period.

Subsec. (a)(3)(A). Pub. L. 104–332, § 2(e)(6)(A)(iv)(I), inserted "or interstate organization" after "the State" and "Indian tribes," after "local governments and regional entities,".

Subsec. (a)(3)(B). Pub. L. 104–332, § 2(e)(6)(A)(iv)(II), inserted "or the appropriate official of an interstate organization" after "a State".

Subsec. (a)(4). Pub. L. 104–332, § 2(e)(6)(A)(v), inserted "or the interstate organization" after "the Governor".

Subsec. (b)(1). Pub. L. 104–332, § 2(e)(6)(B), struck out "or the Assistant Secretary, as appropriate under subsection (a)," after "The Director" and substituted "management plans approved under subsection (a)" for "approved management plans".

Subsec. (c). Pub. L. 104–332, § 2(e)(6)(C), added subsec. (c).

## § 4725. Relationship to other laws

### (a) Consistency with environmental laws

All actions taken by Federal agencies in implementing the provisions of section 4722 of this title shall be consistent with all applicable Federal, State, and local environmental laws.

### (b) Effect of chapter

#### (1) In general

Except as provided in paragraph (2), nothing in this chapter shall affect the authority of any State or political subdivision thereof to adopt or enforce control measures for aquatic nuisance species, or diminish or affect the jurisdiction of any State over species of fish and wildlife.

#### (2) Exception

Any discharge incidental to the normal operation of a vessel, including any discharge of ballast water (as those terms are defined in subsections (a) and (p)(1) of section 1322 of title 33), shall be regulated in accordance with that section.

### (c) Effect of compliance

Compliance with the control and eradication measures of any State or political subdivision

thereof regarding aquatic nuisance species shall not relieve any person of the obligation to comply with the provisions of this subchapter.

(Pub. L. 101–646, title I, § 1205, Nov. 29, 1990, 104 Stat. 4771; Pub. L. 104–332, § 2(h)(1), Oct. 26, 1996, 110 Stat. 4091; Pub. L. 115–282, title IX, § 903(h)(2), Dec. 4, 2018, 132 Stat. 4363.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (b)(1), was in the original "this title", meaning title I of Pub. L. 101–646, Nov. 29, 1990, 104 Stat. 4761, known as the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990, which is classified principally to this chapter. For complete classification of title I to the Code, see Short Title note set out under section 4701 of this title and Tables.

AMENDMENTS

2018—Subsec. (a). Pub. L. 115–282, § 903(h)(2)(C), designated first sentence as subsec. (a) and inserted heading.

Subsec. (b). Pub. L. 115–282, § 903(h)(2)(B), (D), designated second sentence as subsec. (b)(1), inserted subsec. (b) and par. (1) headings, substituted "Except as provided in paragraph (2), nothing" for "Nothing", and added par. (2).

Subsec. (c). Pub. L. 115–282, § 903(h)(2)(A), designated third sentence as subsec. (c) and inserted heading.

1996—Pub. L. 104–332 made technical amendment to Pub. L. 101–646, § 1205, which enacted this section.

## § 4726. International cooperation

### (a) Advice

The Task Force shall provide timely advice to the Secretary of State concerning aquatic nuisance species that infest waters shared with other countries.

### (b) Negotiations

The Secretary of State, in consultation with the Task Force, is encouraged to initiate negotiations with the governments of foreign countries concerning the planning and implementation of prevention, monitoring, research, education, and control programs related to aquatic nuisance species infesting shared water resources.

(Pub. L. 101–646, title I, § 1206, Nov. 29, 1990, 104 Stat. 4771; Pub. L. 104–332, § 2(h)(1), Oct. 26, 1996, 110 Stat. 4091.)

AMENDMENTS

1996—Pub. L. 104–332 made technical amendment to Pub. L. 101–646, § 1206, which enacted this section.

## § 4727. Intentional introductions policy review

Within one year of November 29, 1990, the Task Force shall, in consultation with State fish and wildlife agencies, other regional, State and local entities, potentially affected industries and other interested parties, identify and evaluate approaches for reducing the risk of adverse consequences associated with intentional introduction of aquatic organisms and submit a report of their findings, conclusions and recommendations to the Congress.

(Pub. L. 101–646, title I, § 1207, Nov. 29, 1990, 104 Stat. 4771; Pub. L. 104–332, § 2(g), (h)(1), Oct. 26, 1996, 110 Stat. 4091.)

AMENDMENTS

1996—Pub. L. 104–332, § 2(h)(1), made technical amendment to Pub. L. 101–646, § 1207, which enacted this section.

Pub. L. 104–332, § 2(g), substituted "Congress" for "appropriate Committees".

## § 4728. Brown tree snake control program

The Task Force shall, within the program developed under subsection (a),[1] undertake a comprehensive, environmentally sound program in coordination with regional, territorial, State and local entities to control the brown tree snake (Boiga irregularis) in Guam and other areas where the species is established outside of its historic range.

(Pub. L. 101–646, title I, § 1209, Nov. 29, 1990, 104 Stat. 4772; Pub. L. 104–332, § 2(h)(1), Oct. 26, 1996, 110 Stat. 4091.)

AMENDMENTS

1996—Pub. L. 104–332 made technical amendment to Pub. L. 101–646, § 1209, which enacted this section.

## § 4729. Coastal Aquatic Invasive Species Mitigation Grant Program and Mitigation Fund

**(1) Definitions**

In this section:

**(A) Coastal zone**

The term "coastal zone" has the meaning given the term in section 1453 of this title.

**(B) Eligible entity**

The term "eligible entity" means—
(i) a State;
(ii) a unit of local government;
(iii) an Indian Tribe;
(iv) a nongovernmental organization; and
(v) an institution of higher education.

**(C) Exclusive Economic Zone**

The term "Exclusive Economic Zone" means the Exclusive Economic Zone of the United States, as established by Presidential Proclamation 5030, dated March 10, 1983 (16 U.S.C. 1453 note).

**(D) Foundation**

The term "Foundation" means the National Fish and Wildlife Foundation established by section 3701(a) of this title.

**(E) Fund**

The term "Fund" means the Coastal Aquatic Invasive Species Mitigation Fund established by paragraph (3)(A).

**(F) Program**

The term "Program" means the Coastal Aquatic Invasive Species Mitigation Grant Program established under paragraph (2)(A).

**(G) Secretary**

The term "Secretary" means the Secretary of Commerce.

**(2) Grant program**

**(A) Establishment**

The Secretary and the Foundation shall establish a program, to be known as the "Coastal Aquatic Invasive Species Mitigation Grant Program", under which the Secretary and the Foundation shall award grants to eligible entities in accordance with this paragraph.

**(B) Purposes**

The purposes of the Program are—
(i) to improve the understanding, prevention, and mitigation of, and response to, aquatic invasive species in—
(I) the coastal zone; and
(II) the Exclusive Economic Zone;

(ii) to support the prevention and mitigation of impacts from aquatic invasive species in the coastal zone; and

(iii) to support the restoration of Pacific Island habitats, marine, estuarine, and Great Lakes environments in the coastal zone and the Exclusive Economic Zone that are impacted by aquatic invasive species.

**(C) Use of grants**

**(i) In general**

A grant awarded under the Program shall be used for an activity to carry out the purposes of the Program, including an activity—

(I) to develop and implement procedures and programs, including permissible State ballast water inspection programs, to prevent, detect, control, mitigate, and rapidly or progressively eradicate aquatic invasive species in the coastal zone or the Exclusive Economic Zone, particularly in areas with high numbers of established aquatic invasive species;

(II) to restore habitat impacted by an aquatic invasive species;

(III) to develop new shipboard and land-based ballast water treatment system technologies and performance standards to prevent the introduction of aquatic invasive species;

(IV) to develop mitigation measures to protect natural and cultural living resources, including shellfish, from the impacts of aquatic invasive species; or

(V) to develop mitigation measures to protect infrastructure, such as hydroelectric infrastructure, from aquatic invasive species.

**(ii) Prohibition on funding litigation**

A grant awarded under the Program may not be used to fund litigation in any matter.

**(D) Administration**

Not later than 90 days after December 4, 2018, the Foundation, in consultation with the Secretary, shall establish the following:
(i) Application and review procedures for awarding grants under the Program.
(ii) Approval procedures for awarding grants under the Program, including a requirement for consultation with—
(I) the Secretary of the Interior; and
(II) the Administrator.

(iii) Performance accountability and monitoring measures for activities funded by a grant awarded under the Program.

[1] So in original. Probably should be "subsection (a) of section 4722 of this title,".

(iv) Procedures and methods to ensure accurate accounting and appropriate administration of grants awarded under the Program, including standards of record-keeping.

**(E) Matching requirement**

Each eligible entity that receives a grant under the Program shall provide, in cash or through in-kind contributions from non-Federal sources, matching funds to carry out the activities funded by the grant in an amount equal to not less than 25 percent of the cost of the activities.

**(F) Funding**

The Secretary and the Foundation are authorized to use the amounts available in the Fund to award grants under the Program.

**(3) Mitigation Fund**

**(A) Establishment**

There is established in the Treasury of the United States a trust fund, to be known as the "Coastal Aquatic Invasive Species Mitigation Fund", consisting of such amounts as are appropriated or credited to the Fund in accordance with this paragraph or section 9602 of title 26.

**(B) Transfers to Fund**

**(i) Appropriation**

There is authorized to be appropriated from the Treasury to the Fund, for each fiscal year, an amount equal to the amount of penalties assessed for violations of subsection (p) of section 1322 of title 33 during the preceding fiscal year.

**(ii) Additional authorization**

In addition to the amounts transferred to the Fund under clause (i), there is authorized to be appropriated to the Fund $5,000,000 for each fiscal year.

**(C) Use of Fund**

Subject to appropriations, the amounts in the Fund shall be available to the Secretary and the Foundation to award grants under the Program.

(Pub. L. 115–282, title IX, § 903(f), Dec. 4, 2018, 132 Stat. 4357.)

REFERENCES IN TEXT

Presidential Proclamation 5030, referred to in par. (1)(C), is Proc. No. 5030, Mar. 10, 1983, 48 F.R. 10605, which is set out as a note under section 1453 of this title.

CODIFICATION

Section was enacted as part of the Vessel Incidental Discharge Act of 2018 and also as part of the Frank LoBiondo Coast Guard Authorization Act of 2018, and not as part of the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990 which comprises this chapter.

Section is comprised of subsec. (f) of section 903 of Pub. L. 115–282. For classification to the Code of other provisions of section 903, see Tables.

**§ 4730. Great Lakes and Lake Champlain Invasive Species Program**

**(1) Definitions**

In this section:

**(A) Administrator**

The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(B) Aquatic nuisance species**

The term "aquatic nuisance species" has the meaning given that term in subsection (p)(1) of section 1322 of title 33.

**(C) Director**

The term "Director" means the Director of the Great Lakes National Program Office established by section 1268(b) of title 33.

**(D) Great Lakes and Lake Champlain Systems**

The term "Great Lakes and Lake Champlain Systems" includes—

(i) Lake Champlain; and

(ii) all bodies of water (including wetlands) within—

(I) the Great Lakes System (as defined in section 1268(a)(3) of title 33); or

(II) the Lake Champlain drainage basin (as defined in section 1270(g) of title 33).

**(E) Program**

The term "Program" means the Great Lakes and Lake Champlain Invasive Species Program established under paragraph (2)(A).

**(2) Establishment of program**

**(A) In general**

The Administrator shall establish within the Great Lakes National Program Office a program, to be known as the "Great Lakes and Lake Champlain Invasive Species Program"—

(i) in collaboration with—

(I) the Director of the United States Fish and Wildlife Service;

(II) the Administrator of the National Oceanic and Atmospheric Administration;

(III) the Director of the United States Geological Survey; and

(IV) the Secretary of the department in which the Coast Guard is operating; and

(ii) in consultation with—

(I) the head of Great Lakes Aquatic Nonindigenous Species Information System of the National Oceanic and Atmospheric Administration; and

(II) the head of Great Lakes Environmental Research Laboratory of the National Oceanic and Atmospheric Administration.

**(B) Purposes**

The purposes of the Program shall be—

(i) to monitor for the introduction and spread of aquatic nuisance species into or within the Great Lakes and Lake Champlain Systems;

(ii) to detect newly introduced aquatic nuisance species prior to the establishment of the aquatic nuisance species in the Great Lakes and Lake Champlain Systems;

(iii) to inform, and assist with, management and response actions to prevent or

stop the establishment or spread of an aquatic nuisance species;

(iv) to establish a watch list of candidate aquatic nuisance species that may be introduced or spread, and that may survive and establish, within the Great Lakes and Lake Champlain Systems;

(v) to monitor vectors likely to be contributing to the introduction or spread of aquatic nuisance species, including ballast water operations;

(vi) to work collaboratively with the Federal, State, local, and Tribal agencies to develop criteria for prioritizing and distributing monitoring efforts;

(vii) to develop, achieve type approval for, and pilot shipboard or land-based ballast water management systems installed on, or available for use by, commercial vessels operating solely within the Great Lakes and Lake Champlain Systems to prevent the spread of aquatic nuisance species populations within the Great Lakes and Lake Champlain Systems; and

(viii) to facilitate meaningful Federal and State implementation of the regulatory framework in this section, including monitoring, shipboard education, inspection, and compliance conducted by States.

**(3) Methodology**

The Program shall seek—

(A) to build on—

(i) existing aquatic nuisance species monitoring efforts; and

(ii) efforts to develop criteria for prioritizing and distributing monitoring efforts, geographically and among taxa, in the Great Lakes and Lake Champlain Systems;

(B) to advance early detection and monitoring, and capacity to control the establishment and spread, of aquatic nuisance species within the Great Lakes and Lake Champlain Systems;

(C) to identify opportunities to interdict the introduction and spread of aquatic nuisance species through sound science and technological advancements;

(D) to assess the risk of aquatic nuisance species introduction and spread via the range of vectors active within the Great Lakes and Lake Champlain Systems;

(E) to advance the development of type-approved ballast water management system (as defined in subsection (p)(1) of section 1322 of title 33[1] equipment for commercial, nonseagoing vessels that operate solely within the Great Lakes System (as defined in section 1268(a)(3) of title 33);

(F) to immediately make available to the public information regarding—

(i) the detection of new aquatic nuisance species within the Great Lakes and Lake Champlain Systems; or

(ii) the spread of aquatic nuisance species within the Great Lakes and Lake Champlain Systems;

(G) to annually submit to appropriate individuals and entities in each affected region a report describing the findings and activities of the Program;

(H) to identify roles and responsibilities of Federal agencies in aquatic nuisance species monitoring and response; and

(I) to provide resource assistance to States implementing State-level programs to enter into partnerships with Federal agencies in enforcing the requirements under subsection (p) of section 1322 of title 33.

**(4) Collaboration**

In carrying out and developing the Program, the Director shall collaborate with—

(A) applicable Federal, State, local, and Tribal agencies; and

(B) such other research entities or stakeholders as the Director determines to be appropriate.

**(5) Data availability**

The Director shall—

(A) make the data collected under the Program available on a publicly accessible internet website, including in an annual summary report; and

(B) in coordination with the entities identified under paragraph (4), develop communication and notification protocols for the purpose of communicating the range of aquatic nuisance species and any identification of a new aquatic nuisance species introduced to the Great Lakes and Lake Champlain Systems.

**(6) Report to Congress**

**(A) In general**

Not later than December 31, 2019, the Director shall submit to Congress a report summarizing the outcomes of activities carried out under the Program.

**(B) Contents**

The report under subparagraph (A) shall include—

(i) a description of activities carried out under the Program, including an explanation of how those activities help to achieve the purposes described in paragraph (2)(B);

(ii) an analysis of Federal, State, and local efforts to enhance multidisciplinary approaches to achieve the purposes described in paragraph (2)(B);

(iii) recommendations relating to activities that would contribute to achievement of the purposes described in paragraph (2)(B); and

(iv) recommendations to improve the efficiency and effectiveness of the Program.

**(7) Authorization of appropriations**

There is authorized to be appropriated to carry out the Program $50,000,000 for each of fiscal years 2019 through 2023.

(Pub. L. 115–282, title IX, §903(g), Dec. 4, 2018, 132 Stat. 4359.)

CODIFICATION

Section was enacted as part of the Vessel Incidental Discharge Act of 2018 and also as part of the Frank

---

[1] So in original. Probably should be followed by a closing parenthesis.

LoBiondo Coast Guard Authorization Act of 2018, and not as part of the Nonindigenous Aquatic Nuisance Prevention and Control Act of 1990 which comprises this chapter.

Section is comprised of subsec. (g) of section 903 of Pub. L. 115–282. For classification to the Code of other provisions of section 903, see Tables.

## SUBCHAPTER IV—AUTHORIZATION OF APPROPRIATIONS

### § 4741. Authorization of appropriations

#### (a) Prevention of unintentional introductions

There are authorized to be appropriated to develop and implement the provisions of subchapter II—

(1) $500,000 until the end of fiscal year 1992 to the Secretary to carry out sections 4711[1] and 4712(a)(3) of this title;

(2) $2,000,000 until the end of fiscal year 1992 to the Director and Under Secretary to carry out the studies under sections 4712(a)(1) and 4712(a)(2[2] of this title;

(3) to the Secretary to carry out section 4711[1] of this title—

(A) $2,000,000 for each of fiscal years 1997 and 1998; and

(B) $3,000,000 for each of fiscal years 1999 through 2002;

(4) for each of fiscal years 1997 through 2002, to carry out paragraphs (1) and (2) of section 4712(b) of this title—

(A) $1,000,000 to the Department of the Interior, to be used by the Director; and

(B) $1,000,000 to the Secretary; and

(5) for each of fiscal years 1997 through 2002—

(A) $3,000,000, which shall be made available from funds otherwise authorized to be appropriated if such funds are so authorized, to the Under Secretary to carry out section 4712(e) of this title; and

(B) $500,000 to the Secretary to carry out section 4712(f) of this title.

#### (b) Task Force and aquatic nuisance species program

There are authorized to be appropriated for each of fiscal years 1997 through 2002 to develop and implement the provisions of subchapter III—

(1) $6,000,000 to the Department of the Interior, to be used by the Director to carry out sections 4722 and 4728 of this title;

(2) $1,000,000 to the Department of Commerce, to be used by the Under Secretary to carry out section 4722 of this title;

(3) $1,625,000, which shall be made available from funds otherwise authorized to be appropriated if such funds are so authorized, to fund aquatic nuisance species prevention and control research under section 4722(i) of this title at the Great Lakes Environmental Research Laboratory of the National Oceanic and Atmospheric Administration, of which $500,000 shall be made available for grants, to be competitively awarded and subject to peer review, for research relating to Lake Champlain;

(4) $5,000,000 for competitive grants for university research on aquatic nuisance species under section 4722(f)(3) of this title as follows:

(A) $2,800,000, which shall be made available from funds otherwise authorized to be appropriated if such funds are so authorized, to fund grants under section 1124 of title 33;

(B) $1,200,000 to fund grants to colleges for the benefit of agriculture and the mechanic arts referred to in section 322 of title 7; and

(C) $1,000,000 to fund grants through the Cooperative Fisheries and Wildlife Research Unit Program of the United States Fish and Wildlife Service;

(5) $3,000,000 to the Department of the Army, to be used by the Assistant Secretary to carry out section 4722(i)(1)(B) of this title; and

(6) $300,000 to the Department of the Interior, to be used by the Director to fund regional panels and similar entities under section 4723 of this title, of which $100,000 shall be used to fund activities of the Great Lakes Commission.

#### (c) Grants for State management programs

There are authorized to be appropriated for each of fiscal years 1997 through 2002 $4,000,000 to the Department of the Interior, to be used by the Director for making grants under section 4724 of this title, of which $1,500,000 shall be used by the Director, in consultation with the Assistant Secretary, for management of aquatic nuisance vegetation species.

#### (d) Intentional introductions policy review

There are authorized to be appropriated for fiscal year 1991, $500,000 to the Director and the Under Secretary to conduct the intentional introduction policy review under section 4727 of this title.

#### (e) Ballast water management demonstration program

There are authorized to be appropriated $2,500,000 to carry out section 4714 of this title.

#### (f) Research

There are authorized to be appropriated to the Director $1,000,000 to carry out research on the prevention, monitoring, and control of aquatic nuisance species in Narragansett Bay, Rhode Island. The funds shall be made available for use by the Department of Environmental Management of the State of Rhode Island.

(Pub. L. 101–646, title I, § 1301, Nov. 29, 1990, 104 Stat. 4772; Pub. L. 102–186, § 4(b)(2), Dec. 4, 1991, 105 Stat. 1283; Pub. L. 104–332, § 2(f), (h)(1), Oct. 26, 1996, 110 Stat. 4090, 4091.)

REFERENCES IN TEXT

Section 4711 of this title, referred to in subsec. (a)(1), (3), was repealed by Pub. L. 115–282, title IX, § 903(a)(2)(A)(i), Dec. 4, 2018, 132 Stat. 4354.

CODIFICATION

"Section 322 of title 7" substituted in subsec. (b)(4)(B) for "the first section of the Act of August 30, 1890 (26 Stat. 417, chapter 841; 7 U.S.C. 322)". Section 1 of the act of Aug. 30, 1890, is classified to sections 322 and 323 of Title 7, Agriculture, but only section 322 refers to agriculture and the mechanic arts.

---

[1] See References in Text note below.

[2] So in original. Probably should be followed by a closing parenthesis.

AMENDMENTS

1996—Pub. L. 104–332, § 2(h)(1), made technical amendment to Pub. L. 101–646, § 1301, which enacted this section.

Subsec. (a)(3). Pub. L. 104–332, § 2(f)(1)(B), added par. (3) and struck out former par. (3) which read as follows: "$1,000,000 for each of fiscal years 1993, 1994, and 1995 to the Secretary for implementation and enforcement of the regulations promulgated under section 4711 of this title."

Subsec. (a)(4), (5). Pub. L. 104–332, § 2(f)(1)(A), (C), added pars. (4) and (5).

Subsec. (b). Pub. L. 104–332, § 2(f)(2)(A), substituted "1997 through 2002" for "1991, 1992, 1993, 1994, and 1995" in introductory provisions.

Subsec. (b)(1) to (7). Pub. L. 104–332, § 2(f)(2)(B), added pars. (1) to (6) and struck out former pars. (1) to (7) which read as follows:

"(1) $7,000,000 to the Director to carry out sections 4722 and 4728 of this title;

"(2) $5,000,000 to the Under Secretary to carry out section 4722 of this title;

"(3) $1,125,000 to fund aquatic nuisance species prevention and control research under section 4722(i) of this title at the Great Lakes Environmental Research Laboratory of the National Oceanic and Atmospheric Administration;

"(4) $5,000,000 for competitive grants for university research on aquatic nuisance species under section 4722(f)(3) of this title as follows:

"(A) $3,375,000 to fund grants under the National Sea Grant College Program Act (33 U.S.C. 1121 et seq.), and of this amount, $2,500,000 to fund grants in the Great Lakes region; and

"(B) $1,675,000 to fund grants through the Cooperative Fisheries and Wildlife Research Unit Program of the United States Fish and Wildlife Service;

"(5) $500,000 to fund Sea Grant Marine Advisory Services education and technical assistance related to infestations of zebra mussels under sections 4722(g) and (h) of this title;

"(6) $200,000 to fund aquatic nuisance species prevention and control activities of the Great Lakes Commission; and

"(7) $2,000,000 to the Assistant Secretary to carry out section 4722(i)(2) of this title."

Subsec. (c). Pub. L. 104–332, § 2(f)(3), added subsec. (c) and struck out heading and text of former subsec. (c). Text read as follows: "There are authorized to be appropriated for each of fiscal years 1991, 1992, 1993, 1994, and 1995 to make grants under section 4724 of this title—

"(1) $2,500,000 to the Director; and

"(2) $5,000,000 to the Assistant Secretary."

Subsecs. (e), (f). Pub. L. 104–332, § 2(f)(4), added subsecs. (e) and (f).

1991—Subsec. (b)(4)(A). Pub. L. 102–186 amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "$3,375,000 to fund grants under section 1125 of title 33, and of this amount, $2,500,000 to fund grants in the Great Lakes region; and".

SUBCHAPTER V—COOPERATIVE ENVIRONMENTAL ANALYSES

§ 4751. Environmental impact analyses

The Secretary of State, in consultation with the Council on Environmental Quality, is encouraged to enter into negotiations with the governments of Canada and Mexico to provide for reciprocal cooperative environmental impact analysis of major Federal actions which have significant transboundary effects on the quality of the human environment in the United States, Canada, and Mexico.

(Pub. L. 101–646, title I, § 1401, Nov. 29, 1990, 104 Stat. 4773; Pub. L. 104–332, § 2(h)(1), Oct. 26, 1996, 110 Stat. 4091.)

AMENDMENTS

1996—Pub. L. 104–332 made technical amendment to Pub. L. 101–646, § 1401, which enacted this section.

CHAPTER 68—PACIFIC YEW CONSERVATION AND MANAGEMENT

§§ 4801 to 4805. Omitted

CODIFICATION

Sections 4801 to 4805 were omitted as expired pursuant to section 4807 of this title.

Section 4801, Pub. L. 102–335, § 2, Aug. 7, 1992, 106 Stat. 859, related to findings, purposes, and definitions.

Section 4802, Pub. L. 102–335, § 3, Aug. 7, 1992, 106 Stat. 860, related to Pacific yew conservation and management.

Section 4803, Pub. L. 102–335, § 4, Aug. 7, 1992, 106 Stat. 861, related to research regarding ecology of Pacific yew, development of alternative methods of procuring taxol, and propagation of species.

Section 4804, Pub. L. 102–335, § 5, Aug. 7, 1992, 106 Stat. 861, related to collection and sale of Pacific yew resources.

Section 4805, Pub. L. 102–335, § 6, Aug. 7, 1992, 106 Stat. 862, related to construction of chapter with other laws.

SHORT TITLE

Pub. L. 102–335, § 1(a), Aug. 7, 1992, 106 Stat. 859, provided that Pub. L. 102–335 (this chapter) could be cited as the "Pacific Yew Act".

§ 4806. Repealed. Pub. L. 105–362, title IX, § 901(a)(1), Nov. 10, 1998, 112 Stat. 3289

Section, Pub. L. 102–335, § 7, Aug. 7, 1992, 106 Stat. 862; Pub. L. 103–437, § 6(d)(43), Nov. 2, 1994, 108 Stat. 4585, related to report to Congress concerning sufficiency of Pacific yew harvests to supply taxol required for medicinal purposes and concerning Pacific yew inventory required by section 4802(d) of this title.

§ 4807. Omitted

CODIFICATION

Section, Pub. L. 102–335, § 7, formerly § 8, Aug. 7, 1992, 106 Stat. 862; renumbered § 7 and amended Pub. L. 105–362, title IX, § 901(a)(2), Nov. 10, 1998, 112 Stat. 3289, provided that if the Secretary of Health and Human Services, the Secretary of Agriculture, and the Secretary of the Interior concluded that quantities of taxol sufficient to satisfy medicinal demands were available from sources other than the Pacific yew, they were to jointly notify Congress, at which time the requirements of this chapter would expire. Such a conclusion was transmitted to Congress by the Secretaries in a letter dated Jan. 26, 1998.

A prior section 7 of Pub. L. 102–335 was classified to section 4806 of this title prior to repeal by Pub. L. 105–362.

CHAPTER 69—WILD EXOTIC BIRD CONSERVATION

| Sec. | |
|---|---|
| 4901. | Findings. |
| 4902. | Statement of purpose. |
| 4903. | Definitions. |
| 4904. | Moratoria on imports of exotic birds covered by Convention. |
| 4905. | List of approved species. |
| 4906. | Qualifying facilities. |
| 4907. | Moratoria for species not covered by Convention. |
| 4908. | Call for information. |
| 4909. | Petitions. |
| 4910. | Prohibited acts. |
| 4911. | Exemptions. |
| 4912. | Penalties and regulations. |