# Permit Streamlining Quality Enhancement Strategies (QES) for Wetland Impact Minimization

## 1. OBJECTIVES:

In adherence to the below policies and guidelines the Florida Department of Transportation (FDOT) will follow the Quality Enhancement Strategies (QES) for FDOT capacity improvement projects. These QES's would be aimed at providing reasonable assurances to the regulatory agencies that FDOT projects have been designed to minimize wetland impacts as much as is practicable while conforming to acceptable design criteria without jeopardizing public safety.

Presidential Executive Order 11990 entitled " Protection of Wetlands", dated May 2, 1977 establishes a National Policy to "avoid to the extent possible the long-term and short-term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative." In implementing this Presidential Executive Order, the U.S. Department of Transportation set forth its policy on wetlands in USDOT Order 5660.1A " Preservation of the Nation's Wetlands", dated August 24, 1978, which is "to assure the protection, preservation and enhancement of the Nation's wetlands to the fullest extent practicable during the planning, construction and operation of transportation facilities and projects. New construction in wetlands shall be avoided unless there is no practicable alternative to the construction and the proposed action includes all practicable measures to minimize harm to wetlands which may result from such construction. In making a finding of no practicable alternative, economic, environmental and other factors may be taken into account. Some additional cost alone will not necessarily render alternatives or minimization measures impracticable since additional cost would normally be recognized as necessary and justified to meet national wetland policy objectives."

In carrying out US DOT Order 5660.1 A, the Federal Highway Administration has implemented its wetland policy through the Technical Advisory T 6640.8A, dated October 30, 1987, which provides guidance on the preparation of environmental documents including the assessment of project impacts on wetlands. The Technical Advisory prescribes a wetland evaluation methodology which, in part, calls for:
- An evaluation of all project alternatives including avoidance alternatives,
- A formal wetlands finding stating that no practical alternatives to the wetland taking exist, if such is the case, and, among others,
- An evaluation of all practicable measures to minimize harm to wetlands.

## 2. IMPLEMENTATION:

A. Perform early identification and quantification of wetland locations and preliminary impacts during Efficient Transportation Decision Making (ETDM) screening, Project Development and Environment (PD&E) and Design.

B. Determine possible wetland avoidance strategies and verify validity of alignment alternatives from the Preliminary Engineering Report.

C. Perform alternative design analysis.

1. Reduce roadway and pond footprint in order to avoid and/or minimize wetland impacts. Considerations may include:

Roadway:
    A. Median widths
    B. Fill slopes
    C. Shoulder widths
    D. Guardrail
    E. Bridge vs. embankment

Stormwater Ponds:
    A. Siting of pond sites
    B. Consider alternative treatment methods

2. Quantify wetland impacts and propose compensatory mitigation in accordance with state and federal regulations.
3. Evaluate safety aspects.
4. Provide cost of alternatives.

    D. Document interagency coordination and consideration of Environmental Technical Advisory Team (ETAT) comments during project development.

3. BENEFITS:

Implementation of these strategies will allow early identification and reduction of environmental impacts thereby streamlining the regulatory and production process.

**STANDARD PROTECTION MEASURES FOR THE EASTERN INDIGO SNAKE**
**U.S. Fish and Wildlife Service**
**August 12, 2013**

The eastern indigo snake protection/education plan (Plan) below has been developed by the U.S. Fish and Wildlife Service (USFWS) in Florida for use by applicants and their construction personnel. At least **30 days prior** to any clearing/land alteration activities, the applicant shall notify the appropriate USFWS Field Office via e-mail that the Plan will be implemented as described (North Florida Field Office: jaxregs@fws.gov; South Florida Field Office: verobeach@fws.gov; Panama City Field Office: panamacity@fws.gov). As long as the signatory of the e-mail certifies compliance with the below Plan (including use of the attached poster and brochure), no further written confirmation or "approval" from the USFWS is needed and the applicant may move forward with the project.

If the applicant decides to use an eastern indigo snake protection/education plan other than the approved Plan below, written confirmation or "approval" from the USFWS that the plan is adequate must be obtained. At least 30 days prior to any clearing/land alteration activities, the applicant shall submit their unique plan for review and approval. The USFWS will respond via e-mail, typically within 30 days of receiving the plan, either concurring that the plan is adequate or requesting additional information. A concurrence e-mail from the appropriate USFWS Field Office will fulfill approval requirements.

The Plan materials should consist of: 1) a combination of posters and pamphlets (see **Poster Information** section below); and 2) verbal educational instructions to construction personnel by supervisory or management personnel before any clearing/land alteration activities are initiated (see **Pre-Construction Activities** and **During Construction Activities** sections below).

## POSTER INFORMATION

Posters with the following information shall be placed at strategic locations on the construction site and along any proposed access roads (a final poster for Plan compliance, to be printed on 11" x 17" or larger paper and laminated, is attached):

**DESCRIPTION**: The eastern indigo snake is one of the largest non-venomous snakes in North America, with individuals often reaching up to 8 feet in length. They derive their name from the glossy, blue-black color of their scales above and uniformly slate blue below. Frequently, they have orange to coral reddish coloration in the throat area, yet some specimens have been reported to only have cream coloration on the throat. These snakes are not typically aggressive and will attempt to crawl away when disturbed. Though indigo snakes rarely bite, they should NOT be handled.

**SIMILAR SNAKES:** The black racer is the only other solid black snake resembling the eastern indigo snake. However, black racers have a white or cream chin, thinner bodies, and WILL BITE if handled.

**LIFE HISTORY:** The eastern indigo snake occurs in a wide variety of terrestrial habitat types throughout Florida. Although they have a preference for uplands, they also utilize some wetlands

1

and agricultural areas. Eastern indigo snakes will often seek shelter inside gopher tortoise burrows and other below- and above-ground refugia, such as other animal burrows, stumps, roots, and debris piles. Females may lay from 4 - 12 white eggs as early as April through June, with young hatching in late July through October.

**PROTECTION UNDER FEDERAL AND STATE LAW:** The eastern indigo snake is classified as a Threatened species by both the USFWS and the Florida Fish and Wildlife Conservation Commission. "Taking" of eastern indigo snakes is prohibited by the Endangered Species Act without a permit. "Take" is defined by the USFWS as an attempt to kill, harm, harass, pursue, hunt, shoot, wound, trap, capture, collect, or engage in any such conduct. Penalties include a maximum fine of $25,000 for civil violations and up to $50,000 and/or imprisonment for criminal offenses, if convicted.

Only individuals currently authorized through an issued Incidental Take Statement in association with a USFWS Biological Opinion, or by a Section 10(a)(1)(A) permit issued by the USFWS, to handle an eastern indigo snake are allowed to do so.

**IF YOU SEE A <u>LIVE</u> EASTERN INDIGO SNAKE ON THE SITE:**

- Cease clearing activities and allow the live eastern indigo snake sufficient time to move away from the site without interference;
- Personnel must NOT attempt to touch or handle snake due to protected status.
- Take photographs of the snake, if possible, for identification and documentation purposes.
- Immediately notify supervisor or the applicant's designated agent, **and** the appropriate USFWS office, with the location information and condition of the snake.
- If the snake is located in a vicinity where continuation of the clearing or construction activities will cause harm to the snake, the activities must halt until such time that a representative of the USFWS returns the call (within one day) with further guidance as to when activities may resume.

**IF YOU SEE A <u>DEAD</u> EASTERN INDIGO SNAKE ON THE SITE:**

- Cease clearing activities and immediately notify supervisor or the applicant's designated agent, **and** the appropriate USFWS office, with the location information and condition of the snake.
- Take photographs of the snake, if possible, for identification and documentation purposes.
- Thoroughly soak the dead snake in water and then freeze the specimen. The appropriate wildlife agency will retrieve the dead snake.

**Telephone numbers of USFWS Florida Field Offices to be contacted if a live or dead eastern indigo snake is encountered:**

**North Florida Field Office – (904) 731-3336**
**Panama City Field Office – (850) 769-0552**
**South Florida Field Office – (772) 562-3909**

2

## PRE-CONSTRUCTION ACTIVITIES

1. The applicant or designated agent will post educational posters in the construction office and throughout the construction site, including any access roads. The posters must be clearly visible to all construction staff. A sample poster is attached.

2. Prior to the onset of construction activities, the applicant/designated agent will conduct a meeting with all construction staff (annually for multi-year projects) to discuss identification of the snake, its protected status, what to do if a snake is observed within the project area, and applicable penalties that may be imposed if state and/or federal regulations are violated. An educational brochure including color photographs of the snake will be given to each staff member in attendance and additional copies will be provided to the construction superintendent to make available in the onsite construction office (a final brochure for Plan compliance, to be printed double-sided on 8.5" x 11" paper and then properly folded, is attached). Photos of eastern indigo snakes may be accessed on USFWS and/or FWC websites.

3. Construction staff will be informed that in the event that an eastern indigo snake (live or dead) is observed on the project site during construction activities, all such activities are to cease until the established procedures are implemented according to the Plan, which includes notification of the appropriate USFWS Field Office. The contact information for the USFWS is provided on the referenced posters and brochures.

## DURING CONSTRUCTION ACTIVITIES

1. During initial site clearing activities, an onsite observer may be utilized to determine whether habitat conditions suggest a reasonable probability of an eastern indigo snake sighting (example: discovery of snake sheds, tracks, lots of refugia and cavities present in the area of clearing activities, and presence of gopher tortoises and burrows).

2. If an eastern indigo snake is discovered during gopher tortoise relocation activities (i.e. burrow excavation), the USFWS shall be contacted within one business day to obtain further guidance which may result in further project consultation.

3. Periodically during construction activities, the applicant's designated agent should visit the project area to observe the condition of the posters and Plan materials, and replace them as needed. Construction personnel should be reminded of the instructions (above) as to what is expected if any eastern indigo snakes are seen.

## POST CONSTRUCTION ACTIVITIES

Whether or not eastern indigo snakes are observed during construction activities, a monitoring report should be submitted to the appropriate USFWS Field Office within 60 days of project completion. The report can be sent electronically to the appropriate USFWS e-mail address listed on page one of this Plan.

3

# As-Built Certification By Professional Engineer

Instructions: Within sixty (60) days of completion of the authorized work, submit this form and one set of as-built engineering drawings by electronic or standard mail to the Agency office where the permit was issued.

Permit No:                                    Permittee's Name:

Location of the Work:

Date Work Started:                    Date Work Completed:

Description of the Work:

Acreage or Square Feet of Impacts to state-assumed waters:

Describe Mitigation completed (if applicable):

Describe any Deviations from Permit (attach drawing(s) depicting the deviations):

I hereby certify that the authorized work, including any mitigation required by Special Conditions to the permit, has been accomplished in accordance with the permit with any deviations noted above. This determination is based upon on-site observation, scheduled and conducted by me or by a project representative under my direct supervision. I have enclosed one set of as-built engineering drawings.

_____          _____
Signature of Engineer                                              Date:

_____          _____
Name (Please type or print legibly)                          FL Reg. Number

Company Name and Address

(Affix Seal)

_____          _____
Date                                              Telephone Number

Enclosures:
☐ Attached drawing(s) depicting deviations from the permit (if any)
☐ Other

# STATE 404 PROGRAM
# EMERGENCY FIELD AUTHORIZATION

The Choose an item. has determined that emergency conditions exist as a result of (insert a description of event precipitating emergency conditions and a description of the emergency conditions):


that require immediate action, as authorized herein, to protect the public health, safety, or welfare; the health of animals, fish, or aquatic life; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses.

Field Authorization Number:

Date of Issuance:                              Expiration Date:

Owner:

Authorized Entity:

        Name

        Street Address

        City                              State           Zip

        Telephone Number                  Email Address


**1. Project Location:**

[Please attach the location map or site directions.]

Water body name, if applicable:

County:                    Section:              Township:              Range:

Or    Street Address and Nearest Intersection:



Requested by:                              Date Received:

**2.     Authorized Activity: This Emergency Field Authorization authorizes the activity described below, and as further detailed in the attached aerial photographs or plans, as applicable (include a description of the type and estimated quantity of materials to be used as fill):**



**3.     Provide addresses for owners of property adjacent to the property where the activity will occur:**

**4.    This Emergency Field Authorization is subject to the following general conditions:** This authorization is effective as of the date of issuance shown above, and expires on the date of expiration shown above, unless otherwise extended by the Agency. All work must be completed by the date of expiration of this authorization or the expiration date of any extension.

a.    All activities will be implemented as set forth in the plans, specifications, or performance criteria as approved in this Emergency Field Authorization and any attachments hereto. Only the activities specifically described in this permit are authorized.

b.    Activities undertaken in accordance with this authorization will be conducted in a manner that does not cause, or contribute to, violations of state water quality standards.

c.    This authorization does not waive the requirement to obtain any other federal, state, or local permits or other authorizations that may be required.

d.    Any structure(s) rebuilt pursuant to this Emergency Field Authorization must comply with all applicable local, state, and federal building standards, and the requirements of the Federal Emergency Management Act (FEMA).

e.    The authorized entity shall provide access to authorized Agency representatives to enter the property at any reasonable time to inspect the facility. The authorized entity or its representative shall either accompany Agency staff onto the property or make provision for access onto the property.

f.    This authorization does not convey any property right, or any interest in real property, nor does it authorize any entrance upon or activities on property that is not owned or controlled by the authorized entity.

g.     By accepting this authorization, the authorized entity agrees that it is solely responsible for compliance with the terms of the authorization. The permittee shall comply with all conditions of this permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of the Clean Water Act as well as a violation of the State 404 Program.

h.    This authorization does not authorize reconstruction of any structures or land that did not legally exist before the emergency.

i.    The authorized entity will hold and save the Agency harmless from any and all damages, claims, or liabilities that may arise by reason of the activities authorized by this Emergency Field Authorization or use of the authorized system.

j.    The authorized entity will immediately notify the Agency in writing of any previously provided information that is later discovered to be inaccurate.

k.    The authorized activity shall not cause any adverse water resource impacts.

l.    If the special condition for restoration is checked in 5., below, the site shall be restored as described in the special condition.

m.    The permittee shall inform the Agency of any expected or known actual noncompliance.

**5.    This Field Authorization is subject to the following checked special conditions (Agency shall fill out this section):**

☐    Storing or stockpiling of material is authorized only in uplands (or specific location described). No materials may be stored or stockpiled in wetlands.

☐    Best management practices for erosion control will be implemented and maintained at all times during construction to prevent siltation and turbid discharges in excess of state water quality standards. Methods will include, but are not limited to, the use of staked hay bales, staked filter cloth, sodding, seeding, and mulching; staged construction; and the installation of turbidity screens around the project site. The authorized entity will be responsible for ensuring that erosion controls are inspected and maintained daily during all phases of construction, and until all disturbed areas are sufficiently stabilized to prevent erosion, siltation, or turbid discharges.

☐    All wetlands or other surface waters adjacent to the project site will be protected from erosion, sedimentation, siltation, scouring, excessive turbidity, or dewatering.

☐   Dredging is limited to that necessary to remove sediment deposited from the emergency event. No dredging in excess of amounts attributable to the emergency event is authorized.

☐   Agency staff must be notified in advance of any proposed construction dewatering. If the dewatering activity is likely to result in offsite discharge or sediment transport into wetlands or surface waters, a written dewatering plan must be submitted to and approved by the Agency prior to any dewatering. Dewatering activity pursuant to this Emergency Field Authorization may not exceed the permitting thresholds in Chapter ☐ 40A-2, F.A.C. (NWFWMD); ☐ 40B-2, F.A.C. (SRWMD); ☐ 40C-2, F.A.C. (SJRWMD); ☐ 40D-2, F.A.C. (SWFWMD); or ☐ 40E-2, F.A.C. (SFWMD).

☐   Where shoreline stabilization is required, riprap will consist of unconsolidated boulders, rocks, or clean concrete rubble without exposed reinforcing rods or similar protrusions.
The riprap will be free of sediment, debris, and toxic or otherwise harmful substances.
The riprap shall have a diameter of 12 to 36 inches. Filter cloth will be placed under the riprap to prevent shoreline erosion and leaching of shoreline soils through the riprap.

☐   Trimming or alteration of mangroves will be supervised or conducted by a professional mangrove trimmer in order to minimize damage to mangroves.

☐   Activities shall not disturb marked or known marine turtle nests or  damage existing native salt-tolerant or submerged vegetation, threatened, and endangered species, or historical and archeological resources.

☐   The authorized entity is required to maintain documentation (such as photos) of the condition of structures or lands as they existed prior to initiating any activities authorized under this Emergency Field Authorization, and provide such documentation to the Agency if requested.

☐   Restoration of the project site shall be accomplished as follows:

☐   Within 90 days of completion of issuance of this Emergency Field Authorization, the authorized entity will apply for a state 404 Program permit for the activity.

**5.  This Emergency Field Authorization is issued this**     day of           20    , by:

Printed Name                          Title

**6.  The undersigned has read the foregoing and agrees to comply with the conditions contained herein. The undersigned acknowledges that any deviation from the attached drawings or conditions of this Emergency Field Authorization may result in enforcement action, including financial penalties.**

Owner/Authorized Agent Signature         Date

Printed Name                          Title

cc:     (Water Management District, if applicable)
        City
        County

**[Insert Notice of Rights]**

**CHAPTER 62-4**
**PERMITS**

| | |
|---|---|
| 62-4.001 | Scope of Part I |
| 62-4.020 | Definitions |
| 62-4.021 | Transferability of Definitions (Repealed) |
| 62-4.030 | General Prohibition |
| 62-4.040 | Exemptions |
| 62-4.050 | Procedures to Obtain Permits and Other Authorizations; Applications |
| 62-4.052 | Regulatory Program and Surveillance Fees for Wastewater Facilities or Activities Discharging to Surface Waters |
| 62-4.053 | Annual Operating License Fees for Public Water Systems |
| 62-4.055 | Permit Processing |
| 62-4.060 | Consultation (Repealed) |
| 62-4.070 | Standards for Issuing or Denying Permits; Issuance; Denial |
| 62-4.080 | Modification of Permit Conditions |
| 62-4.090 | Renewals |
| 62-4.100 | Suspension and Revocation |
| 62-4.110 | Financial Responsibility (Repealed) |
| 62-4.120 | Transfer of Permits |
| 62-4.130 | Plant Operation – Problems |
| 62-4.150 | Review (Repealed) |
| 62-4.160 | Permit Conditions |
| 62-4.200 | Scope of Part II |
| 62-4.210 | Construction Permits (Repealed) |
| 62-4.220 | Operation Permit for New Sources (Repealed) |
| 62-4.240 | Operation Permits for Water Pollution Sources (Repealed) |
| 62-4.241 | Whole Effluent Toxicity Limits |
| 62-4.242 | Antidegradation Permitting Requirements; Outstanding Florida Waters; Outstanding National Resource Waters |
| 62-4.243 | Exemptions from Water Quality Criteria |
| 62-4.244 | Mixing Zones: Surface Waters |
| 62-4.246 | Sampling, Testing Methods, and Method Detection Limits for Water Pollution Sources |
| 62-4.249 | Preservation of Rights (Repealed) |
| 62-4.250 | Water Pollution Temporary Operation Permits; Conditions (Repealed) |
| 62-4.510 | Scope of Part III |
| 62-4.520 | Definition |
| 62-4.530 | Procedures |
| 62-4.540 | General Conditions for All General Permits |

**62-4.001 Scope of Part I.**

This part sets forth procedures on how to obtain a permit from the State of Florida Department of Environmental Protection. This part also provides requirements and procedures for the issuance, denial, renewal, extension, transfer, modification, suspension, and revocation of any permit required by the Department of Environmental Protection. Except as otherwise provided in Chapter 62-330, F.A.C., or in the rules adopted by reference thereunder, this part shall not apply to activities regulated under Part IV of Chapter 373, F.S. However, this Part shall continue to apply to those activities grandfathered under Sections 373.4131(4), 373.414(11), (12)(a), (13), (14), (15), (16), and 373.4145(6), F.S. This Part shall not preclude the application of any other permit requirements or procedures for certain types of facilities as contained in other chapters of Title 62, F.A.C.

*Rulemaking Authority 373.026, 373.043, 373.044, 373.109, 373.113, 373.4131, 373.4145, 373.418, 403.021, 403.031, 403.061, 403.087, 403.088 FS. Law Implemented 373.026, 373.044, 373.109, 373.409, 373.413, 373.4135, 373.414(9), (11), (12)(a), (13), (14), (15), (16), 373.4145, 373.418, 373.421, 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.01, Amended 8-31-88, Formerly 17-4.001,*

*Amended 7-4-95, 10-1-07, 10-1-13.*

**62-4.020 Definitions.**

When used in this chapter, unless the context clearly indicates otherwise, the following words shall mean:

(1) "Annual Average Flow" is the long-term harmonic mean flow of the receiving water, or an equivalent flow based on generally accepted scientific procedures in waters for which such a mean cannot be calculated. For waters for which flow records have been kept for at least the last three years, "long-term" shall mean the period of record. For all other waters, "long-term" shall mean three years (unless the Department finds the data from that period not representative of present flow conditions, based on evidence of land use or other changes affecting the flow) or the period of records sufficient to show a variation of flow of at least three orders of magnitude, whichever period is less. For nontidal portions of rivers and streams, the harmonic mean ($Q_{hm}$) shall be calculated as:

$$Q_{hm} = \frac{n}{\dfrac{1}{Q_1} + \dfrac{1}{Q_2} + \dfrac{1}{Q_3} + \dfrac{1}{Q_4} + \dfrac{1}{Q_5} + \ldots + \dfrac{1}{Q_n}}$$

in which each Q is an individual flow record and n is the total number of records. In lakes and reservoirs, the annual average flow shall be based on the hydraulic residence time, which shall be calculated according to generally accepted scientific procedures, using the harmonic mean flows for the inflow sources. In tidal estuaries and coastal systems or tidal portions of rivers and streams, the annual average flow shall be determined using methods described in EPA publication no. 600/6-85/002b pages 142-227, incorporated by reference in paragraph 62-4.246(9)(k), F.A.C., or by other generally accepted scientific procedures, using the harmonic mean flow for any freshwater inflow. If there are insufficient data to determine the harmonic mean then the harmonic mean shall be estimated by methods as set forth in the EPA publication *Technical Support Document for Water Quality-Based Toxics Control* (March 1991), incorporated by reference in paragraph 62-4.246(9)(d), F.A.C., or other generally accepted scientific procedures. In situations with seasonably variable effluent discharge rates, hold-and-release treatment systems, and effluent-dominated sites, annual average flow shall mean modeling techniques that calculate long-term average daily concentrations from long-term individual daily flows and concentrations in accordance with generally accepted scientific procedures.

(2) "Approved Analytical Method" shall mean any of the analytical methods approved under Chapter 62-160, F.A.C.

(3) "Commission" is the State of Florida Environmental Regulation Commission.

(4) "Construction permit" is the legal authorization granted by the Department to construct, expand, modify, or make alterations to any installation and to temporarily operate and test such new or modified installations.

(5) "Department" is the State of Florida Department of Environmental Regulation or its delegatee as provided in the Operating Agreements Concerning Management and Storage of Surface Water Regulation and Wetland Resource Regulation adopted by reference in Rule 62-101.040, F.A.C.

(6) "Environmental restoration and enhancement" means activities, other than those proposed as mitigation for a permit required under Part IV of Chapter 373, F.S., conducted by government, research, education or charitable entities that are either not-for-profit or non-profit, that have the sole objective of restoring or enhancing water resources, including water quality and the functions wetlands and other surface waters provide to fish and wildlife, through measures such as: restoring hydrology and water circulation; re-establishing native vegetation; or otherwise restoring more desirable natural conditions that existed prior to human-induced disturbances.

(7) "Installation" is any structure, equipment, facility, or appurtenances thereto, operation or activity which is or may be a source of pollution as defined in Chapter 403, F.S. Installation includes dredging and filling as these terms are defined in Section 403.911, F.S.

(8) "Method Detection Limit (MDL)" is the smallest concentration of an analyte of interest that can be measured and reported with 99% confidence that the concentration will be greater than zero. The MDLs are determined from the analysis of a given matrix containing the analyte at a specified level. Determination of MDLs shall follow procedures determined in Appendix B to part 136 of 40 CFR, 1990, incorporated here by reference, or equivalent procedures complying with Chapter 62-160, F.A.C.

(9) "Operation permit" is the legal authorization granted by the Department to operate or maintain any installation for a specified period of time.

(10) "Permit condition" is a statement or stipulation which is issued with a permit and which must be complied with.

(11) "Permit" is the legal authorization to engage in or conduct any construction, operation, modification, or expansion of any installation, structure, equipment, facility, or appurtenances thereto, operation, or activity which will reasonably be expected to be a source of pollution.

(12) "Practical Quantification Limit (PQL)" is the lowest level that can be reliably achieved during routine laboratory operating conditions within specified limits of precision and accuracy, as reflected in the Department's list of PQLs under subsection 62-4.246(4), F.A.C., or an alternative level established through equivalent procedures complying with Chapter 62-160, F.A.C.

(13) "Secretary" is the Secretary of the Department.

(14) "Temporary operation permit" is the legal authorization limited to a specified time granted by the Department to operate, maintain, construct, modify, expand, or make alterations to any installation in accordance with Section 403.088, F.S.

(15) "Equivalent Clean Closure" is available for interim status land disposal units that certified clean closure under 40 CFR Part 265 standards prior to March 19, 1987. These facilities must make an equivalency demonstration to meet 40 CFR Part 264 closure standards or the facility must obtain a closure permit containing post closure requirements.

*Rulemaking Authority 373.026, 373.043, 373.414, 373.418, 403.061, 403.805 FS. Law Implemented 373.109, 373.413, 373.414, 373.4145, 403.021, 403.031, 403.061, 403.087, 403.088, 403.802, 403.817 FS. History–New 3-4-72, Revised 5-17-72, Amended 6-10-75; Joint Administrative Procedures Committee Objection Filed – See FAR Vol. 1, No. 28, 1-12-76; Joint Administrative Procedures Committee Objection Withdrawn – See FAR Vol. 3, No. 30, 7-29-77, Amended 3-11-81, 10-16-84, 12-10-84, Formerly 17-4.02, Amended 3-18-86, 8-31-88, 6-4-92, 11-16-92, 7-11-93, Formerly 17-4.020, Amended 4-3-03.*

### 62-4.021 Transferability of Definitions.

*Rulemaking Authority 403.061, 403.062, 403.087, 403.504, 403.704, 403.804, 403.805 FS. Law Implemented 403.021, 403.061, 403.087, 403.088, 403.141, 403.161, 403.182, 403.502, 403.702, 403.708 FS. History–New 3-1-79, Amended 8-31-88, Formerly 17-4.021, Repealed 12-7-15.*

### 62-4.030 General Prohibition.

Any stationary installation which will reasonably be expected to be a source of pollution shall not be operated, maintained, constructed, expanded, or modified without the appropriate and valid permits issued by the Department, unless the source is exempted by Department rule. The Department may issue a permit only after it receives reasonable assurance that the installation will not cause pollution in violation of any of the provisions of Chapter 403, F.S., or the rules promulgated thereunder. A permitted installation may only be operated, maintained, constructed, expanded or modified in a manner that is consistent with the terms of the permit.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 3-4-70, Revised 5-17-72, Formerly 17-4.03, Amended 8-31-88, Formerly 17-4.030.*

### 62-4.040 Exemptions.

(1) The following installations are exempted from the permit requirements of this chapter. The following exemptions do not relieve any installation from any other requirements of Chapter 403, F.S., or rules of the Department. Other installations may be exempted under other chapters of Title 62.

(a) Structural changes which will not change the quality, nature or quantity of air and water contaminant emissions or discharges or which will not cause pollution.

(b) Any existing or proposed installation which the Department shall determine does not or will not cause the issuance of air or water contaminants in sufficient quantity, with respect to its character, quality or content, and the circumstances surrounding its location, use and operation, as to contribute significantly to the pollution problems within the State, so that the regulation thereof is not reasonably justified. Such a determination is agency action and is subject to Chapter 120, F.S. Such determination shall be made in writing and filed by the Department as a public record. Such determination may be revoked if the installation is substantially modified or the basis for the exemption is determined to be materially incorrect.

(2) These exemptions do not apply to the discharge to waters of the state from any article, machine, equipment, contrivance or their exhaust system, which contains water-borne radioactive material in concentrations above the natural radioactive background concentration in the receiving water.

*Rulemaking Authority 403.061, 403.805 FS. Law Implemented 403.021, 403.031, 403.087, 403.088, 403.802, 403.805, 403.813 FS. History–New 3-4-72, Formerly 17-4.03(2), Amended 5-17-72, 8-7-73, 6-10-75; Joint Administrative Procedures Committee Objection filed – See FAR Vol. 1, No. 28, 7-18-75, Amended 10-26-75, 7-8-76; Joint Administrative Procedures Objection withdrawn – See FAR Vol. 3, No. 30, 7-29-77, Amended 7-13-78, 3-1-79, 3-11-81, 7-8-82, 3-31-83, 3-15-84, 12-10-84; Joint Administrative Procedures Committee Objection filed – See FAR Vol. 11, No. 11, 3-15-85, Amended 5-8-85; Amendments effective 6-24-85 – See Chapter 85-334, Laws of Florida; Joint Administrative Procedures Committee Objection withdrawn – See FAR Vol. 11, No. 51, 12-20-85, Formerly 17-4.04, Amended 3-17-86, 8-31-88, Formerly 17-4.040.*

**62-4.050 Procedures to Obtain Permits and Other Authorizations; Applications.**

(1) Any person desiring to obtain a permit from the Department shall apply on forms prescribed by the Department and shall submit such additional information as the Department by law may require.

(2) All applications and supporting documents shall be filed with the Department.

(3) To ensure protection of public health, safety, and welfare, any construction, modification, or operation of an installation which may be a source of pollution, or of a public drinking water supply, shall be in accordance with sound professional engineering practices pursuant to Chapter 471, F.S.; and all final geological papers or documents involving the practice of the profession of geology shall be in accordance with sound professional geological practices pursuant to Chapter 492, F.S. All applications for a Department permit shall be certified by a professional engineer registered in the State of Florida except, when the application is for renewal of an air pollution operation permit at a non-Title V source as defined in Rule 62-210.200, F.A.C., or where professional engineering is not required by Chapter 471, F.S. Where required by Chapter 471 or 492, F.S., applicable portions of permit applications and supporting documents which are submitted to the Department for public record shall be signed and sealed by the professional(s) who prepared or approved them.

(4) Processing fees are as follows:

(a) Air Pollution Permits.

1. Construction Permit Fee for an Emissions Unit Requiring Prevention of Significant Deterioration or Nonattainment Area Preconstruction Review. The processing fee for a construction permit for an emissions unit requiring a Prevention of Significant Deterioration (PSD) or Nonattainment Area (NAA) preconstruction review pursuant to Rule 62-212.400 or 62-212.500, F.A.C., respectively, shall be $7,500.00.

2. Construction Permit Fee for an Emissions Unit Not Requiring Prevention of Significant Deterioration or Nonattainment Area Preconstruction Review. No processing fee shall be required for a construction permit for an emissions unit not requiring Prevention of Significant Deterioration (PSD) or Nonattainment Area (NAA) preconstruction review, if the facility containing the emissions unit holds an air operation permit issued pursuant to Chapter 62-213, F.A.C. For any such emissions unit at a facility not holding a Chapter 62-213, F.A.C., air operation permit, the processing fee shall be as follows:

| | |
|---|---|
| a. Construction permit for an emissions unit having potential emissions of 100 or more tons per year of any single pollutant. | $5,000.00 |
| b. Construction permit for an emissions unit having potential emissions of 50 or more tons per year, but less than 100 tons per year, of any single pollutant. | $4,500.00 |
| c. Construction permit for an emissions unit having potential emissions of 25 or more tons per year, but less than 50 tons per year, of any single pollutant. | $2,000.00 |
| d. Construction permit for an emissions unit having potential emissions of 5 or more tons per year, but less than 25 tons per year, of any single pollutant. | $1,000.00 |
| e. Construction permit for an emissions unit having potential emissions of less than 5 tons per year of each pollutant. | $250.00 |
| 3. Operation Permit Fee for an Emissions Unit at a Non-Title V Source. | |
| a. Operation permit for an emissions unit required to measure actual emissions by stack sampling. | $1,500.00 |
| b. Operation permit for an emissions unit required to measure actual emissions by any method other than stack sampling (such as visible emissions observation or continuous emissions monitoring). | $1,000.00 |
| c. Operation permit for an emissions unit not required to measure actual emissions. | $750.00 |

4. Similar Emissions Unit Fee. Where new or existing multiple emissions units located at the same facility are substantially similar in nature, the applicant may submit a single application and any required permit fee for construction or operation of the

emissions units at the facility. To be considered substantially similar each of the emissions units must be substantially similar in regard to each of the following: nominal description or type of emissions unit; type of fuel burned; type of material processed, stored, or handled; type of air pollution control equipment; regulated pollutants emitted; applicable emissions standards; and applicable regulatory control criteria. For a construction permit, the single application fee shall be the fee that would apply for a single emissions unit with emissions that equal the total of the potential emissions of all of the substantially similar emissions units at the facility. The fee for an operation permit for a group of similar emissions units at the same facility, submitted under the same application and with the same emissions testing or monitoring requirements, shall be the fee that would apply to any emissions unit in the group if each emissions unit were being permitted singly.

5. Multiple Emissions Unit Fee. If the Department issues a single construction or operation permit covering multiple emissions units or groups of similar emissions units at a facility, the permit processing fee shall be the sum of the fees applicable to each emissions unit and group of similar emissions units covered by the permit.

(b) Domestic Wastewater Facility Permits.

1. Preliminary Design Report reviews for Types I, II, and III domestic wastewater facilities as defined in Rule 62-600.200, F.A.C. For new domestic wastewater facilities, the fee for review of a preliminary design report shall be in addition to the application processing fee.

|  |  | Type II | Type III |
|---|---|---|---|
| a. Treatment plant with or without reuse/disposal system | $5,000.00 | $3,750.00 | $1,200.00 |
| b. Reuse/land application system and associated transmission/distribution facilities, when applied for separately from the treatment facility | $5,000.00 | $3,750.00 | $1,200.00 |
| c. Residuals/septage management facility | $7,500.00 | $4,000.00 | $1,200.00 |
| d. Limited wet weather discharge | $1,000.00 | $800.00 | $600.00 |

2. Wastewater permits for Types I, II, and III domestic wastewater facilities as defined in Rule 62-600.200, F.A.C.

|  | Type I | Type II | Type III |
|---|---|---|---|
| a. Treatment plant with or without reuse/disposal system | $5,000.00 | $3,000.00 | $1,000.00 |
| b. Reuse/land application system and associated transmission/distribution facilities, when applied for separately from the treatment facility | $5,000.00 | $3,000.00 | $1,000.00 |
| c. Residuals/septage management facility | $7,500.00 | $4,000.00 | $1,000.00 |
| d. Limited wet weather discharge | $1,000.00 | $800.00 | $600.00 |

e. Wastewater permits for Type III facilities having a permitted capacity of less than 10,000 gallons per day shall be $600.

3. Wastewater Permit for a surface water discharge, when applied for separately from the treatment facility.

| a. Type I facility | $2,000.00 |
|---|---|
| b. Type II facility | $1000.00 |
| c. Type III facility | $500.00 |

4. Minor revisions, as defined in Rule 62-620.200, F.A.C., to wastewater permits for domestic wastewater facilities other than minor modifications of permits listed in paragraph 62-4.050(4)(s), F.A.C.

| a. Type I facility | $500.00 |
|---|---|
| b. Type II facility | $300.00 |
| c. Type III facility | $100.00 |

5. Substantial revisions, as defined in Rule 62-620.200, F.A.C., to wastewater permits for domestic wastewater facilities shall require a new wastewater permit application and applicable fee. The applicable application fee shall be:

a. For substantial revisions resulting from substantial modifications to the facility which require an antidegradation determination as specified in Rule 62-4.242, F.A.C., or which increase the permitted capacity of the treatment, reuse, or disposal system, the preliminary design report fee specified in subparagraph (4)(b)1.

b. For substantial revisions resulting from substantial modifications to the facility, but which do not require an antidegradation determination as specified in Rule 62-4.242, F.A.C., and which do not increase the permitted capacity of the treatment, reuse, or disposal system, 50 percent of the preliminary design report fee specified in subparagraph (4)(b)1.

c. For substantial revisions not associated with substantial modifications to the facility, 20 percent of the applicable application fee specified in subparagraph (4)(b)2.

6. Generic Permit for domestic wastewater treatment facilities.

| | |
|---|---|
| a. Treatment facility with permitted capacity of 10,000 gallons per day up to 100,000 gallons per day shall be | $1,000.00 |
| b. Treatment facility with permitted capacity less than 10,000 gallons per day shall be | $600.00 |

7. Construction Permit for domestic wastewater collection/transmission system.

| | |
|---|---|
| a. Domestic wastewater collection/transmission system serving 10 or more | $500.00 |
| Equivalent Dwelling Units (EDUs). An EDU is equal to 3.5 persons | |
| b. Domestic wastewater collection/transmission system serving less than 10 EDUs | $300.00 |

(c) Industrial Wastewater Facility Permits.

1. Wastewater permits for Group 1 industrial wastewater treatment facilities which discharge process wastewater, as defined in Rule 62-620.200, F.A.C., from the following industry categories: Citrus Processing; Textiles; Organic Chemicals, Plastics, and Synthetic Fibers; Inorganic Chemicals; Soaps and Detergents; Fertilizer Manufacturing; Petroleum Refining; Iron and Steel Manufacturing; Nonferrous Metals; Phosphate Manufacturing; Steam Electric Power Generating; Asbestos Manufacturing; Pulp, Paper, and Paper Board; Builders Paper and Board Mills; Coal Mining; Phosphate Mining and Beneficiation; Ore Mining and Dressing; Paint Formulating; Ink Formulating; Gum and Wood Chemicals Manufacturing; Pesticides Chemicals Manufacturing; Explosives Manufacturing; Battery Manufacturing; Mechanized Scallop Processing; Distilled, Rectified, and Blended Liquors; Sugar Cane Processing.

| | |
|---|---|
| a. Surface water discharges | $7,500.00 |
| b. Non-surface water discharges only | $6,000.00 |

2. Wastewater permits for Group 2 industrial wastewater treatment facilities which discharge process wastewater, as defined in Rule 62-620.200, F.A.C., from the following industry categories: Cement Manufacturing; Leather Tanning and Finishing; Glass Manufacturing; Rubber Processing; Carbon Black Manufacturing; Metal Molding and Casting; Coil Coating; Porcelain Enameling; Aluminum Forming; Copper Forming; Electrical and Electronic Components; Nonferrous Metals Forming and Metal Powders.

| | |
|---|---|
| a. Surface water discharges | $5,000.00 |
| b. Non-surface water discharges only | $4,000.00 |

3. Wastewater permits for Group 3 industrial wastewater treatment facilities which discharge process wastewater, as defined in Rule 62-620.200, F.A.C., from the following industry categories: Bulk Oil Terminals, Drawdown and Loading Rack Discharges; Dairy Products; Canned and Preserved Fruits and Vegetables; Canned and Preserved Seafood; Concrete Batch Plants; Timber Products; Mineral Mining and Processing; Peat Mining; Plastic Molding and Forming; Aquaculture Facilities.

| | |
|---|---|
| a. Surface water discharges | $2,500.00 |
| b. Non-surface water discharges only | $2,000.00 |
| 4. Wastewater permits for Group 4 industrial wastewater treatment facilities which discharge industrial wastewater from the following: Animal Feeding Operations, Feedlots, Egg Production Facilities. | |
| a. Feedlots with greater than the number of animals listed in subsection 62-670.200(3), or Rule 62-620.435, F.A.C. | $2,500.00 |
| b. Feedlots, Other | $1,500.00 |
| c. Egg Production Facility, Major | $2,500.00 |
| d. Egg Production Facility, Other | $1,500.00 |

| | |
|---|---|
| 5. Wastewater permits for Group 5 industrial wastewater treatment facilities which discharge concentrate and regenerant from Reverse Osmosis, Membrane Softening, Ultrafiltration, Ion Exchange Units, and similar processes at Drinking Water Treatment Facilities. | $6,000.00 |
| a. Design daily discharge flow of greater than 500,000 gpd | $4,000.00 |
| b. Design daily discharge flow of greater than 100,000 gpd up to 500,000 gpd | $4,000.00 |
| c. Design daily discharge flow of greater than 10,000 gpd up to 100,000 gpd | $2,000.00 |
| d. Design daily discharge flow of 10,000 gpd or less | $750.00 |
| 6. Wastewater permits for Group 6 industrial wastewater treatment facilities which discharge once-through non-contact cooling water. | |
| a. Greater than 100 million BTU/hour heat loss | $6,000.00 |
| b. Greater than 20 million BTU/hour, up to 100 million BTU/hour | $3,000.00 |
| c. Greater than 1 million BTU/hour, up to 20 million BTU/hour heat loss | $1,500.00 |
| d. 1 million BTU/hour, or less, heat loss | $1,000.00 |
| 7. Wastewater permits for industrial wastewater treatment facilities in industry categories not specified in Groups 1 through 3 which discharge process wastewater to surface waters, or industrial wastewater treatment facilities which discharge non-process wastewater, as defined in Rule 62-620.200, F.A.C., but excluding once-through non-contact cooling water, to surface waters. | |
| a. Design daily flow of greater than 500,000 gpd | $5,000.00 |
| b. Design daily flow of greater than 100,000 gpd up to 500,000 gpd | $3,000.00 |
| c. Design daily flow of greater than 50,000 gpd up to 100,000 gpd | $2,000.00 |
| d. Design daily flow of 50,000 gpd or less | $1,000.00 |
| 8. Wastewater permits for industrial wastewater treatment facilities in industry categories not specified in Groups 1 through 3 which discharge process wastewater to other than surface waters, or industrial wastewater treatment facilities which discharge non-process wastewater, as defined in Rule 62-620.200, F.A.C., but excluding once-through non-contact cooling water, to other than surface waters. | |
| a. Design daily flow of greater than 500,000 gpd | $4,000.00 |
| b. Design daily flow of greater than 100,000 gpd up to 500,000 gpd | $2,500.00 |
| c. Design daily flow of greater than 50,000 gpd up to 100,000 gpd | $1,500.00 |
| d. Design daily flow of 50,000 gpd or less | $750.00 |
| 9. Wastewater permits for industrial wastewater treatment facilities which recycle the wastewater and have no discharge to surface or ground waters, and are not otherwise exempt from permitting. | |
| a. Facilities recycling greater than 10,000 gpd | $500.00 |
| b. Facilities recycling 10,000 gpd or less | $100.00 |
| 10. Minor revisions, as defined in subsection 62-620.200(24), F.A.C., to wastewater permits for industrial wastewater facilities other than minor modifications of permits listed in paragraph 62-4.050(4)(q), F.A.C. | |
| a. Facilities which have no discharge to surface or ground waters | $100.00 |
| b. All others | $250.00 |

11. Substantial revisions, as defined in subsection 62-620.200(45), F.A.C., to wastewater permits for existing industrial wastewater facilities shall require a new wastewater permit application and applicable fee. The applicable fee shall be:

a. For substantial revisions resulting from substantial modifications to the facility which require an antidegradation determination as specified in Rule 62-4.242, F.A.C., or which increase the permitted capacity of the treatment or disposal system, the full applicable application fee.

b. For substantial revisions resulting from substantial modifications to the facility, but which do not require an antidegradation determination as specified in Rule 62-4.242, F.A.C., and which do not increase the permitted capacity of the treatment or disposal system, 50 percent of the applicable application fee.

c. For substantial revisions not associated with substantial modifications to the facility, 20 percent of the applicable application fee or $250.00, whichever is greater.

12. The fee for review of engineering reports for new industrial facilities shall be in the same amount as the applicable

application processing fee for the facility and shall be in addition to the application processing fee.

   13. Industrial wastewater general and generic permits.

| | |
|---|---|
| a. General and generic permits requiring Professional Engineer or Professional Geologist certification | $500.00 |
| b. General and generic permits not requiring Professional Engineer or Professional Geologist certification | $100.00 |
| 14. Collection systems for industrial wastewater treatment facilities. | $500.00 |
| 15. A permitted facility which falls in more than one of the fee categories in subparagraphs (4)(c)1. through 8., shall not be subject to multiple fees, but shall pay the larger of the fees. | |
| (d) Stormwater facilities or activities regulated under Section 403.0885, F.S. | |
| 1. Generic Permit for Stormwater Discharge from Large and Small Construction Activities. | |
| a. Activities disturbing 5 or more acres (large) | $400.00 |
| b. Activities disturbing 1 acre of land or greater and less than 5 acres (small) | $250.00 |
| 2. Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity | $500.00 |
| 3. No Exposure Certification for Exclusion from NPDES Stormwater Permitting | $200.00 |
| 4. Stormwater discharge associated with industrial activity permitted under Chapter 62-620, F.A.C. | $1,000.00 |
| 5. Generic Permit for Discharge of Stormwater from Phase II Municipal Separate Storm Sewer Systems (MS4s): | |
| a. Phase II MS4s in jurisdiction with a population of 50,000 or greater as determined by the 2000 Decennial Census by the U.S. Bureau of Census | $11,700.00 |
| b. Phase II MS4s in a jurisdiction with a population of greater than 10,000 but less than 50,000 as determined by the 2000 Decennial Census by the U.S. Bureau of Census | $7,988.00 |
| c. Phase II MS4s in a jurisdiction with a population of 10,000 or less as determined by the 2,000 Decennial Census by the U.S. Bureau of Census; Florida Department of Transportation facilities | $5,625.00 |
| (e) Wetland Resource Management (Dredge and Fill) Permits. This paragraph pertains to projects that have been grandfathered according to Sections 373.414(11) (1994 Supp.), (12)(a) (1994 Supp.), (13), (14), (15) or (16), F.S., and projects, or portions thereof, located in the Northwest Florida Water Management District. | |
| 1. Dredge and fill construction projects up to and including 5 years: | |
| a. Standard form projects including dredge and fill activities that affect 10 or more acres of jurisdictional area pursuant to subsection 62-312.070(2), F.A.C. | $4,000.00 |
| b. Standard form construction projects that involve the construction of new docking facilities pursuant to Rule 62-312.070, F.A.C., that provide: | |
| (I) 50 or more new boat slips | $4,000.00 |
| (II) 25 to 49 new boat slips | $4,000.00 |
| (III) 10 to 24 new boat slips | $2,480.00 |
| (IV) 3 to 9 new boat slips | $830.00 |
| (V) 0 to 2 new boat slips | $500.00 |
| c. Short form construction projects involving dredging or filling of 9.99 acres or less of jurisdictional area, pursuant to subsection 62-312.070(2), F.A.C. | $830.00 |
| d. Short form construction projects involving the construction of new docking or boardwalk facilities, pursuant to Rule 62-312.070, F.A.C., that provide: | |
| (I) 0 to 2 new boat slips | $500.00 |
| (II) 3 to 9 new boat slips | $830.00 |
| (III) The addition of 3 to 20 docking slips to existing functional docking facilities where the total facility will not exceed 50 slips and the existing and proposed slips are not associated with commercial facilities or facilities which provide supplies or services required for boating activities. | $760.00 |
| e. Short form and standard form projects solely for environmental restoration or enhancement activities, provided such activities are not associated with a mitigation bank and are not being implemented as mitigation for other activities that require a permit under Part IV of Chapter 373, F.S. | $250.00 |
| 2. Dredge and fill construction permits in excess of 5 years: | |
| a. Short form permits from 6 years up to and including 10 years | $4,950.00 |

| | |
|---|---|
| b. Standard form permits for 6 years | $10,650.00 |
| c. Standard form permits for 7 years | $12,430.00 |
| d. Standard form permits for 8 years | $14,200.00 |
| e. Standard form permits for 9 years | $15,980.00 |
| f. Standard form permits for 10 years | $17,750.00 |
| g. Standard form permits for 11 years | $19,530.00 |
| h. Standard form permits for 12 years | $21,300.00 |
| i. Standard form permits for 13 years | $23,080.00 |
| j. Standard form permits for 14 years | $24,850.00 |
| k. Standard form permits for 15 years | $25,000.00 |
| l. Standard form permits for 16 years | $25,000.00 |
| m. Standard form permits for 17 years | $25,000.00 |
| n. Standard form permits for 18 years | $25,000.00 |
| o. Standard form permits for 19 years | $25,000.00 |
| p. Standard form permits for 20 years | $25,000.00 |
| q. Standard form permits for 21 years | $25,000.00 |
| r. Standard form permits for 22 years | $25,000.00 |
| s. Standard form permits for 23 years | $25,000.00 |
| t. Standard form permits for 24 years | $25,000.00 |
| u. Standard form permits for 25 years | $25,000.00 |
| v. 6 to 10-year permits for beach restoration projects approved pursuant to Chapter 161, F.S., and to maintenance dredge navigation channels, port harbors, turning basins and harbor berths located within deepwater ports, pursuant to Section 403.816, F.S. | $5,000.00 |
| w. Permits for phosphate and attapulgite mines with a duration of greater than 25 years pursuant to the provisions of Section 373.414(15), F.S. | $25,000.00 |
| x. Modifications involving permits issued pursuant to Section 403.816, F.S., or Chapter 62-45, F.A.C. | $1,000.00 |
| y. 6 to 25-year permits pursuant to Chapter 62-45, F.A.C., and all permits under Section 403.816, F.S. | $5,000.00 |
| z. Short form and standard form projects solely for environmental restoration or enhancement activities, provided such activities are not associated with a mitigation bank and are not being implemented as mitigation for other activities that require a permit under Part IV of Chapter 373, F.S. | $250.00 |
| 3. Mitigation Banks | |
| a. Mitigation Bank Permit, other than Conceptual Approval Permit | $6,050.00 |
| b. Credit Release (credit available for sale) | $330.00 |
| c. Credit Withdrawal (actual use of credit) | $0.00 |
| d. Mitigation Bank Conceptual Approval Permit | $6,050.00 |
| e. Major modifications involving changes to one or more of the following components: service area; credit assessment; success or release criteria; hydrologic structures or alterations; construction or mitigation design that does not increase the project area; elimination of lands; or monitoring or management plans: | |
| (I) Affecting one of the above components | $1,340.00 |
| (II) Affecting two of the above components | $2,680.00 |
| (III) Affecting three of the above components | $4,020.00 |
| 4. Modifications: | |
| a. Major modifications of Standard Form and Short Form Permits, as determined by Rule 62-312.100, F.A.C., and mitigation banks under Chapter 62-342, F.A.C., that increase the project area or involve four or more of the components listed in sub-subparagraph 62-4.050(4)(e)3.e., F.A.C., other than for Class I solid waste disposal facilities or as otherwise specified above | Same fee as for a new application for the activity |
| b. Minor modifications of Standard Form and Short Form Permits, including mitigation banks, where the modification will not require substantial technical evaluation by the Department, will not lead to substantially different environmental impacts or | |

| | |
|---|---|
| will lessen the impacts of the original permit, and as further determined by Rule 62-312.100, F.A.C., other than for Class I solid waste disposal facilities or as otherwise specified above: | |
| (I) To correct minor errors or typographical mistakes and that do not involve technical review | $0.00 |
| (II) To incorporate changes requested by the Department or required through permits issued by other regulatory agencies, and to change due dates for reporting or performance deadlines when such changes in the due date do not involve any new work, any new work locations, or any new activities, and will not alter, replace, or otherwise eliminate the requirements for otherwise performing the work required by the permit | $0.00 |
| (III) That consist of transfers of permits or time extensions | $80.00 |
| (IV) That consist of minor technical changes which involve new work, new work locations, new activities, or any other change which alters, replaces, or otherwise eliminates the work authorized by the permit when the original permit fee of the issued permit is less than $300, except for modifications to permits issued pursuant to Section 403.816, F.S. | $250.00 |
| (V) That consist of minor technical changes which involve new work, new work locations, new activities, or any other change which alters, replaces, or otherwise eliminates the work authorized by the permit when the original permit fee of the issued permit is more than or equal to $300, except for permits issued pursuant to Section 403.816, F.S. | $420.00 |
| (VI) For minor modifications for Class I solid waste disposal facilities | $2,110.00 |

5. For the purposes of determining the fee for wetlands resource management permits, the term of duration for the permit shall be reduced by the period of time (in yearly increments) during which no dredging or filling activity occurs or no reclamation, restoration, or mitigation occurs and only minor monitoring and maintenance activities are required. The fee for the full term shall be submitted with the application. After the Department determines the period of time that the term of the permit can be reduced, the excess fee shall be returned.

6. For permit applications which involve a combination of the project fee categories listed above, the highest fee that applies to the appropriate standard form or short form project, pursuant to Rule 62-312.070, F.A.C., shall be charged.

7. Variances from permitting standards, permit conditions, or water quality standards associated with a wetland resource or mangrove alteration permit application:

| | |
|---|---|
| a. Under Section 403.812, F.S. | |
| (I) From the prohibition of subsection 62-312.080(7), F.A.C. | $170.00 |
| (II) Other variances | $830.00 |
| b. Under Section 120.542, F.S. | $0.00 |
| 8. Verification of qualification to use a general permit, except: | $250.00 |
| a. Paving of existing municipally owned roads under Rule 62-312.824, F.A.C. | $0.00 |
| b. Environmental enhancement and restoration activities conducted by the U.S. Army Corps of Engineers under Rule 62-312.825, F.A.C. | $0.00 |
| 9. Verification that an activity is exempt from regulation under Section 403.813, F.S., or Part IV of Chapter 373, F.S. | $100.00 |
| (f) Mangrove Alteration and Trimming | |
| 1. Alteration of less than 20 mangroves under Section 403.9328, F.S. | $420.00 |
| 2. Alteration of 20 or more mangroves under Section 403.9328, F.S. | $830.00 |
| 3. General Permit under Section 403.9327, F.S. | $250.00 |
| 4. Verification of an exemption for trimming or alteration | $0.00 |
| 5. Minor modification, other than transfer & time extensions | $250.00 |
| 6. Transfer of ownership or permit | $90.00 |
| 7. Time extension | $90.00 |
| 8. Variance under Section 403.9333, F.S. | $170.00 |
| (g) Stormwater Permits under Chapter 62-25, F.A.C. | |
| 1. Notice to use stormwater general permit per paragraphs 62-25.801(1)(a) through (d), F.A.C. | $420.00 |
| 2. Conversion of construction permit to operation | $100.00 |

(h) Environmental Resource Permits. Processing fees required by the Department and the Northwest Florida Water Management District (NWFWMD) for activities regulated under Chapter 62-330, F.A.C., are listed below. For purposes of determining the applicable processing fee, the terms "activity," "project," "project area," and "works" are as defined in Section 2.0 of the Applicant's Handbook Volume I incorporated by reference in paragraph 62-330.010(4)(a), F.A.C.

| | |
|---|---|
| 1. Activities qualifying for an Agency's electronic self-certification: | |
| a. Self-certification in accordance with the general permit under Section 403.814(12), F.S. | $0.00 |
| b. Self-certification for activities other than those under Section 403.814(12), F.S. | $0.00 |
| 2. Determination of qualification for an activity exemption: | |
| a. Under Rules 62-330.050 and 62-330.051, F.A.C. | $100.00 |
| b. Under Rule 62-330.0511, F.A.C. | $0 |
| 3. Determination of qualification to use a general permit. | $250.00 |
| 4. Individual or conceptual approval permit, excluding permits for a mitigation bank: | |
| a. New application – the processing fee for a new permit application shall be as determined from the categories below: | |
| (I) Total project area of less than 10 acres and less than 1 acre of works in, on, or over wetlands and other surface waters, and less than 10 new boat slips. | $420.00 |
| (II) Project exceeds any of the thresholds in 4.a.(I), above, but involves a total project area of less than 40 acres, less than 3 acres of works in, on, or over wetlands and other surface waters, and less than 30 new boat slips. | $1,500.00 |
| (III) Project exceeds any of the thresholds in 4.a.(II), above, but involves a total project area of less than 100 acres, less than 10 acres of works in, on, or over wetlands and other surface waters, and less than 50 new boat slips. | $5,000.00 |
| (IV) Project exceeds any of the thresholds in 4.a.(III), above, but involves a total project area of less than 640 acres, and less than 50 acres of works in, on, or over wetlands and other surface waters. | $9,000.00 |
| (V) Project exceeds any of the thresholds in 4.a.(IV), above. | $14,000.00 |
| (VI) Project exclusively for agricultural or silvicultural purposes; the fee for projects that are solely for agricultural or silvicultural purposes shall be the same as that required by the Water Management District in which the majority of the project area is located, in accordance with Rule 40A-44.201, F.A.C, (7-1-98) incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-02680), and Rules 40B-1.706, 40C-1.603, 40D-1.607, or 40E-1.607, F.A.C., as applicable, as incorporated by reference in Rule 62-330.071, F.A.C. | The fee shall be the same as that required by the Water Management District in which the majority of the project area is located. |
| (VII) Individual or conceptual approval permit solely for environmental restoration or enhancement, provided such activities are not associated with a mitigation bank and are not being implemented as mitigation for other activities that require a permit under Part IV of Chapter 373, F.S. For purposes of this provision, the term "environmental restoration or enhancement" means an action or actions designed and implemented solely to convert degraded or altered uplands, wetlands, or other surface waters to intact communities typical of those historically present, or to improve the quality and condition of currently degraded wetlands or other surface waters to a more healthy, functional, and sustaining condition for fish, wildlife, and listed species | $250.00 |
| (VIII) Individual or conceptual approval permit solely to retrofit an existing stormwater management system or to add treatment to and reduce stormwater pollutant loadings from an existing stormwater management system | $250.00 |
| (IX) Individual permit to construct, alter, maintain or operate a project that is consistent with a valid conceptual approval permit | 50% of the fee otherwise required for an |

| | |
|---|---|
| | individual permit under sub-sub-subparagraphs 4.a.(I) through (VIII), above, but not below the minimum required processing fee of $250.00 |
| b. Major modification exceeding any of the thresholds in subsection 62-330.315(3), F.A.C. | Same fee as for new permit for the same activity under sub-sub-subparagraphs 4.a.(I) through (IX), above |
| 5. Individual or conceptual approval permit for a mitigation bank: | |
| a. New application | $6,050.00 |
| b. Major modification exceeding any of the thresholds in subsection 62-330.315(3), F.A.C.: | |
| (I) Major modification affecting one of the following: the service area, credit assessment, success or release criteria, hydrologic structures or alterations, elimination of lands, monitoring or management plans, or construction or mitigation design that does not increase the project area | $1,340.00 |
| (II) Affecting two of the components in 5.b.(I), above | $2,680.00 |
| (III) Affecting three of the components in 5.b.(I), above | $4,020.00 |
| (IV) All other major modifications | $6,050.00 |
| c. Mitigation bank credit release | $330.00 |
| d. Mitigation bank credit withdrawal | $0.00 |
| 6. Minor modification of an individual or conceptual approval permit, including a permit for a mitigation bank, that does not exceed any of the thresholds in subsection 62-330.315(3), F.A.C.: | |
| a. Extension of permit duration, where not exempt from payment of fees under Florida Statutes | $80.00 |
| b. To correct minor errors that do not involve technical review | $0.00 |
| c. To transfer ownership of a permit or to transfer the permit to an operation and maintenance entity | $0.00 |
| d. All other minor modifications | $250.00 |
| 7. Variance or waiver: | |
| a. Under Section 120.542, F.S. | $0.00 |
| b. Under Section 373.414(17), F.S. | $170.00 |
| 8. Fee reductions: | |
| a. Applications for an individual or conceptual approval permit or modification thereof submitted using the Agency's electronic application system where the processing fee in subparagraph (h)4. or 5., above, exceeds $250.00 | Fee shall be reduced by $100.00, but not below the minimum required processing fee of $250.00 |

| | |
|---|---|
| b. Applications for any activity by an entity qualifying under Section 218.075, F.S. when the fee under paragraph (h), exceeds $100.00 | $100.00 |
| c. Applications for any activity when submitted by the U.S. Department of Defense | $0.00 |

(i) Determinations of the Landward Extent of Wetlands and Other Surface Waters:

1. Informal determination – fees shall be based on the acreage of the entire property for which the request applies, as follows:

| | |
|---|---|
| a. Total area to be included in the determination is up to 1 acre | $100.00 |
| b. Additional fee per acre (or portion thereof) beyond the first acre; total fee not to exceed $500.00 | $50.00 |

2. Petitions for formal determination – fees shall be based on the acreage of the entire property for which the petition is filed, as follows:

| | |
|---|---|
| a. Total area to be included in the determination is less than 10 acres | $780.00 |
| b. Total area to be included in the determination is at least 10, but less than 40 acres | $1,060.00 |
| c. Total area to be included in the determination is at least 40, but no more than 100 acres | $2,110.00 |
| d. Additional fee per 100 acres (or portion thereof) beyond the first 100 acres | $290.00 |
| 3. Reissuance of a formal determination, in accordance with section 7.2.4 of Applicant's Handbook Volume I. | $350.00 |

(j) Solid Waste Permits.

| | |
|---|---|
| 1. Construction permit for a Class I facility. | $10,000.00 |
| 2. Construction permit for a Class II facility. | $10,000.00 |
| 3. Construction permit for a Class III facility. | $6,000.00 |
| 4. Construction permit for a waste-to-energy facility not covered by the Electric Power Plant Siting Act. | $10,000.00 |
| 5. Construction permit for other resource recovery facilities. | $2,000.00 |
| 6. Construction permit for an incinerator. | $3,000.00 |
| 7. Construction permit for a yard trash composting facility. | $2,000.00 |
| 8. Construction permit for a manure composting facility. | $2,000.00 |
| 9. Construction permit for a solid waste composting facility. | $5,000.00 |
| 10. Construction/operation permit for a waste tire processing facility. | $1,250.00 |
| 11. Construction permit for all other solid waste facilities. | $1,000.00 |
| 12. Construction permit for an offsite Biohazardous Waste Treatment | $2,000.00 |
| Facility other than a biohazardous waste incinerator. | |

13. Construction permit and/or an operation permit for a facility which has multiple solid waste management components which normally would require individual solid waste permits. A single application may be submitted and the permit fee will be the sum of each individual permit; however, the total permit fees for the facility shall not exceed $25,000, exclusive of modifications and renewals.

| | |
|---|---|
| 14. Operation permit for a Class I facility. | $10,000.00 |
| 15. Operation permit for a Class II facility. | $10,000.00 |
| 16. Operation permit for a Class III facility. | $4,000.00 |
| 17. Operation permit for a waste-to-energy facility not covered by the Electric Power Plant Siting Act. | $10,000.00 |
| 18. Operation permit for other resource recovery facilities. | $1,000.00 |
| 19. Operation permit for an incinerator. | $1,000.00 |
| 20. Operation permit for a yard trash composting facility. | $1,000.00 |
| 21. Operation permit for a manure composting facility. | $1,000.00 |
| 22. Operation permit for a solid waste composting facility. | $3,000.00 |
| 23. Operation permit for an offsite Biohazardous Waste Treatment Facility other than a biohazardous waste incinerator. | $1,000.00 |
| 24. Operation permit for all other solid waste facilities. | $500.00 |
| 25. Request for an Alternate Procedure. | |
| a. Landfill | $2,000.00 |
| b. Other | $500.00 |

| | |
|---|---|
| 26. Research, Development and Demonstration permits (one year permit). | $1,000.00 |
| 27. Closure permit for a Class I facility. | $7,500.00 |
| 28. Closure permit for a Class II facility. | $7,500.00 |
| 29. Closure permit for a Class III facility. | $4,000.00 |
| 30. Closure permit for all other solid waste facilities. | $1,000.00 |
| 31. Renewal of Closure permit for landfills which address only long term care. | $1,000.00 |
| 32. Construction or Operation permits for Materials Recovery Facility. | $2,000.00 |
| 33. Ground Water Monitoring Plan Approvals for solid waste landfills with no other Department permit. | $500.00 |
| (k) Petroleum Cleanup General Permits. | |
| 1. Soil thermal treatment – mobile. | $500.00 |
| 2. Soil thermal treatment – stationary. | $500.00 |
| (l) Hazardous Waste Permits. | |
| 1. Construction of container and/or tank hazardous waste storage facilities. | $15,000.00 |
| 2. Construction of container and/or tank hazardous waste storage and treatment facilities. | $20,000.00 |
| 3. Construction of landfill, surface impoundment, waste pile, land treatment, and miscellaneous unit facilities. | $25,000.00 |
| 4. Construction of hazardous waste storage, treatment and/or disposal facilities with an incinerator, boiler or industrial furnace for treatment of hazardous wastes generated onsite. | $25,000.00 |
| 5. Construction of commercial treatment, storage, and/or disposal facility with a commercial incinerator, boiler or industrial furnace managing hazardous wastes generated off-site. | $32,500.00 |
| 6. Operation of container and/or tank hazardous waste storage facilities. | $10,000.00 |
| 7. Operation of container and/or tank hazardous waste storage and treatment facilities. | $10,000.00 |
| 8. Operation of landfill, surface impoundment, waste pile, land treatment, and miscellaneous unit facilities. | $15,000.00 |
| 9. Operation of hazardous waste storage, treatment and/or disposal facilities with an incinerator, boiler or industrial furnace for treatment of hazardous wastes generated on-site. | $15,000.00 |
| 10. Operation of commercial treatment, storage, and/or disposal facilities with a commercial incinerator, boiler or industrial furnace managing hazardous wastes generated off-site. | $32,500.00 |
| 11. Closure of container and/or tank hazardous waste storage facilities. | $10,000.00 |
| 12. Closure of container and/or tank hazardous waste storage and treatment facilities. | $10,000.00 |
| 13. Closure of landfill, surface impoundment, waste pile, land treatment, previously closed units required to demonstrate equivalent clean closure, and miscellaneous unit facilities. | $20,000.00 |
| 14. Closure of hazardous waste storage, treatment and/or disposal facilities with an incinerator, boiler or industrial furnace for treatment of hazardous wastes generated on-site. | $15,000.00 |
| 15. Closure of commercial treatment, storage, and/or disposal facilities with a commercial incinerator, boiler or industrial furnace managing hazardous wastes generated off-site. | $32,500.00 |
| 16. Hazardous waste research, development and demonstration facilities. | $4,000.00 |
| 17. Fees for modifications to hazardous waste permits proposed by the permittee or required by Department rules shall be determined as stated below. All modifications listed below require public notice. Contact the appropriate District Office for guidance on how to determine which fee applies before submitting the required information. | |
| a. Substantial modifications that require significant changes to the existing permit and require an extensive evaluation by the Department. These shall require the same fee as a new application. Examples in this category include alteration of the existing facility, change in the facility plan, ground water monitoring program assessment or remediation/engineering design or other general facility standard. The fee schedule for new permit applications is listed above. | |
| b. Substantial modifications that require a moderate technical evaluation by the Department. Examples in this category include alterations of the existing facility or its operation which will require additional site-specific evaluation. | $10,000.00 |
| c. Moderate modifications that require moderate technical evaluation by the Department. These require a new site inspection, lead to different environmental impacts, or lessen the impacts of the original permit. | $5,000.00 |
| d. Minor modifications, as defined in this subsection, that are not otherwise specified, including common or | $1,000.00 |

| | |
|---|---|
| frequently occurring changes needed to maintain a facility's capacity to manage wastes safely, minor changes in ground water monitoring plans, or modifications to conform to new requirements. | |
| 18. Department variance from federal regulations under 40 C.F.R. 260.30. | $32,500.00 |
| 19. All other hazardous waste facility permits or authorizations for which a specific fee is not specified. | $32,500.00 |
| (m) Underground Injection Control Permits. | |
| 1. Construction permit for each Class I test/injection well. | $12,500.00 |
| 2. Construction permit for each Class I exploratory well. | $5,000.00 |
| 3. Construction permit for each monitoring well associated with a Class I injection facility when not permitted under a Class I exploratory well or Class I test/injection well permit. | $1,000.00 per well not to exceed $10,000.00 for the facility |
| 4. Permit to convert each well from a Class I to a Class V well. | $10,000.00 |
| 5. Operation permit for each Class I well. | $10,000.00 |
| 6. Permit to convert a Class I injection well or exploratory well to a monitoring well when not proposed under a construction permit. | $500.00 |
| 7. Abandonment permit for each Class I well. | $100.00 |
| 8. Construction permit for each Class III well. | $1,000.00 |
| 9. Operation permit for each Class III well. | $1,000.00 |
| 10. Abandonment permit for each Class III well. | $100.00 |
| 11. Construction permit for each Class V well. | $750.00 |
| 12. Operation permit for each Class V well. | $750.00 |
| 13. Abandonment permit for each Class V well. | $25.00 |
| 14. General permit for each Class V well. | |
| a. General permits requiring Professional Engineer or Professional Geologist certification | $250.00 |
| b. General permits not requiring Professional Engineer or Professional Geologist certification | $25.00 |

15. Major modifications are modifications to an injection facility requiring substantial technical evaluation by the Department, and which will not lead to substantially different environmental impacts (unless those impacts will lessen the impacts of the original permit).

| | |
|---|---|
| a. Major modification to a Class I injection facility. | $1,000.00 |
| b. Major modification to a Class III injection facility. | $500.00 |
| c. Major modification to a Class V injection facility. | $250.00 |

16. Minor modifications are modifications to an injection facility that do not require a substantial technical evaluation by the Department, will not result in increased capacity of the injection system, do not require a new site inspection by the Department, and will not lead to substantially different environmental impacts or will lessen the impacts of the original permit.

| | |
|---|---|
| a. Minor modification to a Class I or Class III injection facility. | $250.00 |
| b. Minor modification to a Class V injection facility. | $100.00 |
| 17. Rerating of the permitted capacity of a Class I injection well to the maximum injection velocity allowed under paragraph 62-28.230(1)(e), F.A.C. | $250.00 |

(n) Drinking Water (Public Water Supply) Permits.

1. Construction permit for each Category I through III treatment plant, as defined in Rule 62-699.310, F.A.C.

| | |
|---|---|
| a. Treatment plant – 5 MGD and above | $12,500.00 |
| b. Treatment plant – 1 MGD up to 5 MGD | $10,000.00 |
| c. Treatment plant – 0.25 MGD up to 1 MGD | $7,000.00 |
| d. Treatment plant – 0.1 MGD up to 0.25 MGD | $4,000.00 |
| e. Treatment plant – up to 0.1 MGD | $2,000.00 |

2. Construction permit for each Category IV treatment plant, as defined in Rule 62-699.310, F.A.C.

| a. Treatment plant – 5 MGD and above | $12,500.00 |
| b. Treatment plant – 1 MGD up to 5 MGD | $10,000.00 |
| c. Treatment plant – 0.25 MGD up to 1 MGD | $7,000.00 |
| d. Treatment plant – 0.1 MGD up to 0.25 MGD | $4,000.00 |
| e. Treatment plant – .01 MGD up to 0.1 MGD | $2,000.00 |
| f. Treatment plant – up to 0.01 MGD | $800.00 |

3. Construction permit for each Category V treatment plant, as defined in Rule 62-699.310, F.A.C.

| a. Treatment plant – 5 MGD and above | $10,000.00 |
| b. Treatment plant – 1 MGD up to 5 MGD | $6,000.00 |
| c. Treatment plant – 0.25 MGD up to 1 MGD | $2,000.00 |
| d. Treatment plant – up to 0.25 MGD | $1,000.00 |
| e. Treatment plant – up to 0.1 MGD | $600.00 |

4. Distribution and transmission systems, including raw water lines into the plant, except those under general permit.

| a. Serving a community public water system | $900.00 |
| b. Serving a non-transient non-community public water system | $700.00 |
| c. Serving a non-community public water system | $500.00 |

5. Construction permit for each public water supply well.

| a. Well located in a delineated area pursuant to Chapter 62-524, F.A.C. | $1,000.00 |
| b. Any other public water supply well. | $500.00 |

6. Major modifications to systems that alter the existing treatment without expanding the capacity of the system and are not considered substantial changes pursuant to subsection 62-4.050(7), F.A.C., below.

| a. 1 MGD and above | $4,000.00 |
| b. 0.1 MGD up to 1 MGD | $2,000.00 |
| c. 0.01 MGD up to 0.1 MGD | $1,000.00 |
| d. Up to 0.01 MGD | $500.00 |

7. Minor modifications to systems that result in no change in the treatment or capacity.

| a. 0.1 MGD and above | $1,000.00 |
| b. Up to 0.1 MGD | $500.00 |

8. General Permit fee for any General Permit not specifically in subparagraphs 1. through 7. above:

| a. General permits requiring Professional Engineer or Professional Geologist certification. | $650.00 |
| b. General permits not requiring Professional Engineer or Professional Geologist certificaiton. | $500.00 |

(o) Temporary operation permits shall be 20 percent over the fee for the operation permit for the activity to be permitted.

(p) General Permit fee for any General Permit not specifically listed in paragraphs (a) through (l).

| 1. General permits requiring Professional Engineer or Professional Geologist certification | $250.00 |
| 2. General permits not requiring Professional Engineer or Professional Geologist certification. | $100.00 |

(q) Unless otherwise specified in this rule, the fee for applications for relief mechanisms shall be as follows:

| 1. Site specific alternative criteria for each application | $15,000.00 |
| 2. Variance or exemption for each water quality criteria | $6,000.00 |
| 3. Variance or exemption for public water system from maximum contaminant level/treatment techniques | $1,000.00 |
| 4. Variance from other permitting standards or conditions | $2,000.00 |
| 5. Aquifer exemption – major | $15,000.00 |
| 6. Aquifer exemption – minor | $7,500.00 |

(r) Permits to construct or operate any other type of facility or stationary installation not specifically listed in paragraphs (a) through (n). | $100.00 |

(s) Minor modifications of permits that do not require substantial technical evaluation by the Department, do not require a new site inspection by the Department, and will not lead to substantially different environmental impacts or will lessen the impacts of the original permit:

| 1. To correct minor errors or typographical mistakes and that do not involve technical review | $0.00 |

| | |
|---|---|
| 2. To incorporate changes requested by the Department or required through permits issued by other regulatory agencies, and to change due dates for reporting or performance deadlines when such changes in the due date do not involve any new work, any new work locations, or any new activities, and will not alter, replace, or otherwise eliminate the requirements for otherwise performing the work required by the permit | $0.00 |
| 3. That consist of transfers of permits or time extensions | $50.00 |
| 4. That consist of minor technical changes which involve new work, new work locations, new activities, or any other change which alters, replaces, or otherwise eliminates the work authorized by the permit when the original permit fee of the issued permit is less than $300, except for modifications to permits issued pursuant to Section 403.816, F.S. | $50.00 |
| 5. That consist of minor technical changes which involve new work, new work locations, new activities, or any other change which alters, replaces, or otherwise eliminates the work authorized by the permit when the original permit fee of the issued permit is more than or equal to $300, except for Domestic Wastewater Facility Permits, Industrial Wastewater Facility Permits, Drinking Water (Public Water Supply) Permits, Underground Injection Control Permits and permits issued pursuant to Section 403.816, F.S. | $250.00 |

(t) For purposes of requiring a permit application and fee for the following facility types, each non-contiguous project shall be considered a stationary installation and shall require a separate application and fee.

1. Domestic wastewater collection system.

2. Drinking water distribution system.

(u) All fees shall be deposited in the Florida Permit Fee Trust Fund created pursuant to Section 403.087(5), F.S.

(v) If the department requires by rule or permit condition that any specific permit be renewed more frequently than once every five years, the permit fee shall be prorated based upon the permit fee schedule in effect at the time of permit renewal. Upon issuance of such a permit, a prorated refund of the fee shall be returned to the applicant. This provision does not apply to permits issued for less than five years which could be extended to five years without the filing of an application for renewal. However, applications for permits to continue operation of a facility where an existing permit has or is about to expire in accordance with Section 403.087(1), F.S., shall be accompanied by the appropriate processing fee.

(w) This fee schedule does not apply to applications for certification pursuant to Sections 288.501-.518, F.S., Florida Industrial Siting Act; Sections 341.321-.386, F.S., the High Speed Rail Transportation Commission, except that fees may be assessed for the permitting of Ancillary Facilities under the Act for which a master plan approval was granted under the Act; to Sections 403.501-.519, F.S., Florida Electrical Power Plant Siting Act; or to Sections 403.52-.539, F.S., the Transmission Line Siting Act.

(x) This fee schedule will supersede all other references to fees in Department rules or forms, where in conflict except as noted in paragraph 62-4.050(4)(n), F.A.C.

(y) In the jurisdiction of an approved local program which in accordance with an interagency agreement assists the Department in the processing of permits the fee paid to the Department shall be reduced by the amount specified in the agreement. That amount shall be commensurate with the savings to the Department resulting from the assistance of the local program.

(z) The fees in paragraphs (e) through (i), and (n), shall be increased March 1, 2013, and at subsequent 5-year intervals, to adjust the fees for inflation using the percentage change in the Consumer Price Index for the "CPI-U, U.S. City Average, All Items" established by the Bureau of Labor Statistics (BLS) (www.bls.gov/cpi/), computed as provided in the BLS publication "Handbook of Methods," Chapter 17 (www.bls.gov/opub/hom/pdf/homch17.pdf). The Department shall use the percentage change in the Consumer Price Index from March 2008 to December 2012 for the 2013 fee calculations and the percentage change in the rates from March to December for subsequent five-year periods. The Department shall round any increased fees to the next highest whole ten dollar increment. In the event of deflation during the 5-year interval, the Department shall consult with the Executive Office of the Governor and the Legislature to determine whether downward fee adjustments are appropriate based on the current budget and appropriation considerations.

(5)(a) To be considered by the Department, each application must be accompanied by the proper processing fee. The fee shall be paid by check, payable to the Department of Environmental Protection. The fee is non-refundable except as provided in Section 120.60, F.S., and in this section.

(b) When an application is received without the required fee, the Department shall acknowledge receipt of the application and shall immediately notify the applicant by certified mail that the required fee was not received and advise the applicant of the correct fee. The Department shall take no further action until the correct fee is received. If a fee was received by the Department which is

less than the amount required, the Department shall return the fee along with the written notification.

(c) Upon receipt of the proper application fee, the permit processing time requirements of Sections 120.60(1) and 403.0876, F.S., shall begin.

(d) If the applicant does not submit the required fee within ten days of receipt of written notification, the Department shall either return the unprocessed application or arrange with the applicant for the pick up of the application.

(e) If an applicant submits an application fee in excess of the required fee, the permit processing time requirements of Sections 120.60(1) and 403.0876, F.S., shall begin upon receipt, and the Department shall refund to the applicant the amount received in excess of the required fee.

(6) Any substantial modification to a complete application shall require an additional processing fee determined pursuant to the schedule set forth in Rule 62-4.050, F.A.C., and shall restart the time requirements of Sections 120.60 and 403.0876, F.S. For purposes of this subsection, the term "substantial modification" shall mean a modification which is reasonably expected to lead to substantially different environmental impacts which require a detailed review.

(7) Modifications to existing permits proposed by the permittee which require substantial changes in the existing permit or require substantial evaluation by the Department of potential impacts of the proposed modifications shall require the same fee as a new application for the same time duration except for modification under Chapter 62-45, F.A.C.

(8) The difference between the processing fee for applications for individual permits and the processing fee for general permits shall be refunded only for those applications that qualify for a general permit solely as a result of a change in Department rules while the application is being processed. Processing fees for applications for individual permits shall not be refunded in whole or in part where an applicant modifies a project to qualify for a general permit when the project did not qualify for a general permit when processing commenced.

*Rulemaking Authority 373.026, 373.043, 373.109, 373.4131, 373.414, 373.418, 373.421, 403.061, 403.087, 403.704(30), 403.805 FS. Law Implemented 373.109, 373.309, 373.409, 373.413, 373.4135, 373.414(9), (11), (12)(a), (13), (14), (15), (16), 373.4145, 373.418, 373.421, 403.061, 403.087, 403.0877, 403.088, 403.0885, 403.722, 403.861(7) FS. History–New 5-17-72, Amended 6-19-74, 7-8-82, Formerly 17-4.05, Amended 11-15-87, 8-31-88, 10-3-88, 4-4-89, 3-19-90, 6-11-90, 3-7-91, 3-18-91, 5-30-91, 10-30-91, 11-16-92, 12-21-92, 7-11-93, 2-2-94, Formerly 17-4.050, Amended 11-23-94, 4-30-95, 7-4-95, 12-15-98, 10-22-00, 6-1-01, 1-30-03, 2-19-03, 4-3-03, 5-1-03, 2-7-06, 10-31-07, 4-21-09, 5-9-13, 10-1-13, 2-17-16.*

**62-4.052 Regulatory Program and Surveillance Fees for Wastewater Facilities or Activities Discharging to Surface Waters.**

(1) Scope and Intent. As authorized in Section 403.087(6), F.S., this rule implements annual regulatory program and surveillance fees (annual fees) for wastewater and stormwater permits. These fees are in addition to the application fees described in Rule 62-4.050, F.A.C., and effect the legislative intent that the Department's costs for administering the National Pollutant Discharge Elimination System (NPDES) be borne by regulated parties. As such, the annual fees are applicable only to facilities and activities subject to regulation under Chapters 62-620, 62-621 and 62-624, F.A.C., pursuant to Section 403.0885, F.S., and the NPDES program.

(2) Annual fees for the regulatory program and surveillance of wastewater and stormwater facilities are not refundable and shall be due and payable as follows:

(a) In the initial year the Department administers a new component of the NPDES program, annual fees shall be required for all facilities which have an NPDES permit for which the Department is granted administrative authority. The amount due shall be the applicable annual fee described in subsection (5), (6), (8), (9), (10), (11) or (13), of this rule, pro-rated to the portion of the calendar year from October 22, 2000 to the end of the calendar year, and are due and payable no later than 60 days after October 22, 2000.

(b) In all subsequent years, the entire annual fee shall be due and payable no later than January 15 each year for all facilities that are subject to regulation under Section 403.0885, F.S., on that date.

(c) When a new wastewater facility or activity is issued a permit under either Chapter 62-620, 62-621, or 62-624, F.A.C., pursuant to Section 403.0885, F.S., the first annual fee shall be due no later than 60 days after permit issuance. The amount due shall be the applicable annual fee described in subsection (5), (6), (8), (9), (10), (11), or (13), of this rule, pro-rated to the remaining portion of the calendar year in which the permit is issued. Thereafter, the fee shall be due and payable pursuant to paragraph (b), above.

(d) When a new wastewater facility or activity is provided notice of coverage by the Department under a generic permit, the

first annual fee shall be due no later than 60 days after notice of coverage is received by the permittee. The amount due shall be the applicable annual fee under this section, pro-rated to the remaining portion of the calendar year in which generic permit coverage is obtained. Thereafter, the fee shall be due and payable pursuant to paragraph (b), above.

(3) Non-payment or late payment of an annual fee shall be grounds for enforcement action pursuant to Sections 403.121, 403.141 and 403.161, F.S. Non-payment of an annual fee shall be grounds for revocation of the wastewater or stormwater permit or denial of an application for renewal of the wastewater or stormwater permit.

(4) When a permit is revised in a manner which places the facility in a different annual fee category, the fee shall be changed as appropriate and the new fee shall be due no later than the January 15 following permit revision.

(5) The annual fees for domestic wastewater facilities authorized to discharge to surface waters shall be based on the permitted capacity of the discharge to surface waters except for discharges to surface waters which serve as backup discharges for permitted reuse systems. The annual fees for permits to discharge to surface waters which serve as backup discharges for permitted reuse systems, including limited wet weather discharges, shall be based on an adjusted surface water discharge permitted capacity. This adjusted capacity shall be used only for the purpose of establishing the annual fee under this section. The adjusted surface water discharge permitted capacity shall be equal to the actual permitted capacity of the discharge to surface waters minus 70 percent of that portion of the discharge to surface waters which serves as a backup:

| | |
|---|---|
| (a) 20 mgd and above | $7,000.00 |
| (b) 10 mgd up to, but less than, 20 mgd | $6,750.00 |
| (c) 5 mgd up to, but less than, 10 mgd | $6,500.00 |
| (d) 2 mgd up to, but less than, 5 mgd | $6,250.00 |
| (e) 1 mgd up to, but less than, 2 mgd | $6,000.00 |
| (f) 0.5 mgd up, but less than, 1 mgd | $5,625.00 |
| (g) 0.1 mgd up to, but less than, 0.5 mgd | $3,375.00 |
| (h) 0.025 mgd up to, but less than, 0.1 mgd | $1,125.00 |
| (i) 0.010 mgd up to, but less than, 0.025 mgd | $300.00 |
| (j) Less than 0.010 mgd | $200.00 |

(6) The annual fees for industrial wastewater facilities or activities permitted to discharge to surface waters are based, using only their discharges to surface waters, on the group classifications used in subparagraphs 62-4.050(4)(c)1. through 7., F.A.C., and the classification of Minor or Major as defined in subsection 62-620.200(22), F.A.C., and are as follows:

| | Major | Minor |
|---|---|---|
| (a) Group 1 | $11,500.00 | $8,600.00 |
| (b) Group 2 | $7,700.00 | $5,800.00 |
| (c) Group 3 | $3,800.00 | $2,900.00 |
| (d) Group 4 | $3,800.00 | $2,900.00 |
| (e) Group 5A | $9,200.00 | $6,900.00 |
| (f) Group 5B | $6,100.00 | $4,600.00 |
| (g) Group 5C | $3,100.00 | $2,300.00 |
| (h) Group 5D | $1,150.00 | $850.00 |
| (i) Group 6A | $9,200.00 | $6,900.00 |
| (j) Group 6B | $4,600.00 | $3,500.00 |
| (k) Group 6C | $2,300.00 | $1,700.00 |
| (l) Group 6D | $800.00 | $600.00 |
| (m) Group 7A | $7,700.00 | $5,800.00 |
| (n) Group 7B | $4,600.00 | $3,500.00 |
| (o) Group 7C | $3,100.00 | $2,300.00 |
| (p) Group 7D | $1,500.00 | $1,100.00 |

(7) The following provisions apply in specific circumstances:

(a) A permitted facility which falls in more than one of the fee categories in subsection (5) or (6), shall not be subject to multiple fees, but shall pay the larger of the fees. However, multiple wastewater permits issued pursuant to Chapter 62-620, F.A.C.,

authorizing discharges to surface waters through a common outfall shall be subject to individual fees; and

(b) When the discharge to surface waters consists of both stormwater and wastewater, the annual fee for categories which vary according to the flow of the facility shall be based on the volume of the wastewater permitted to be discharged. However, facilities with stormwater-only discharges regulated in its wastewater permit pursuant to Section 62-620.445, F.A.C., shall pay an additional $200.00 per outfall per year, up to the maximum amount set forth in Section 403.087(6), F.S. The additional fee for stormwater-only discharges does not apply to internal stormwater streams.

(8) The annual fee for domestic or industrial wastewater facilities or activities which fall in one of the categories below shall be as follows:

| | |
|---|---|
| (a) Facilities which use an underground injection well for effluent disposal and are permitted to discharge to surface water only during mechanical integrity tests | $200.00 |
| (b) Facilities which use evaporation/percolation ponds or holding ponds and land application as their primary means of disposal and are permitted to discharge to surface waters only after storm events or during control structure testing, as specified in the permit: | |
| 1. That do not include effluent limitations on internal waste streams established to protect surface water quality | $200.00 |
| 2. That include effluent limitations on internal waste streams established to protect surface water quality | $2400.00 |
| (c) Facilities which are permitted to discharge to surface waters only for emergencies, as specified in the permit | $200.00 |

(d) The annual fees described in paragraphs (a) through (c) of this subsection shall be the only annual fee for such facilities, except as provided in subsections 62-4.052(10) and 62-4.052(11), F.A.C., and shall be due and payable regardless of whether a discharge actually occurs during the year.

(9) The annual fee for petroleum contaminated ground water clean up projects authorized to discharge to surface waters for more than 30 days under the generic permit for petroleum fuel contaminated ground water clean up is $2,850.00 annually. There shall be no annual fee for projects authorized to discharge to surface water for less than 30 days or for discharges of uncontaminated produced ground water.

(10) The annual fee for Phase I municipal stormwater facilities, and Phase II facilities subject to an individual permit, as regulated under Chapter 62-624, F.A.C., shall be as follows:

(a) Fees for each Municipal Separate Storm Sewer System (MS4) permit shall cover the cost of surveillance and the regulatory program, including processing of annual reports, revisions, and permit applications and re-applications. Annual fees for MS4s shall be based on the total MS4 permit population. The total MS4 permit population is equal to the sum of the populations of each of the named co-permittees to a MS4 permit. Populations used for all MS4 fee determinations shall be the 2005 estimates as listed in the 2006 edition of the Florida Statistical Abstract, published by the Bureau of Economic and Business Research, University of Florida. Fees are calculated using the formulas established in paragraph 62-4.052(10)(d), F.A.C. Total permit populations and associated fees are indicated for each permit below:

| | Permit | Total Population | Fee |
|---|---|---|---|
| 1. | Bradenton | 54,303 | $4,340.00 |
| 2. | Broward | 1,410,561 | $48,264.00 |
| 3. | Escambia | 303,623 | $20,591.00 |
| 4. | Ft. Lauderdale | 171,344 | $17,284.00 |
| 5. | Hialeah | 230,407 | $18,760.00 |
| 6. | Hillsborough | 783,007 | $32,575.00 |
| 7. | Hollywood | 143,025 | $16,576.00 |
| 8. | Jacksonville | 837,983 | $33,950.00 |
| 9. | Jacksonville Beach | 21,531 | $2,702.00 |
| 10. | Lee | 549,442 | $26,736.00 |
| 11. | Leon | 96,330 | $6,442.00 |
| 12. | Manatee | 247,471 | $19,187.00 |
| 13. | Miami | 386,882 | $22,672.00 |
| 14. | Miami-Dade County | 1,720,800 | $56,020.00 |

| 15. | Orange | 821,519 | $33,538.00 |
|-----|--------|---------|-----------|
| 16. | Orlando | 217,567 | $18,439.00 |
| 17. | Palm Beach County | 1,262,520 | $44,563.00 |
| 18. | Pasco | 404,930 | $23,123.00 |
| 19. | Pinellas | 691,971 | $30,299.00 |
| 20. | Polk | 541,840 | $26,546.00 |
| 21. | Reedy Creek District | 82,300 | $5,740.00 |
| 22. | St. Petersburg | 253,902 | $19,348.00 |
| 23. | Sarasota | 367,867 | $22,197.00 |
| 24. | Seminole | 411,744 | $23,294.00 |
| 25. | Tallahassee | 174,781 | $17,370.00 |
| 26. | Tampa | 326,519 | $21,163.00 |
| 27. | Temple Terrace | 22,020 | $2,726.00 |

(b) Except as provided in paragraph 62-4.052(10)(c), F.A.C., permittees and co-permittees to each permit shall be invoiced individually for their respective share of the annual fee. The individual fee shall be pro-rated based on the percentage of each co-permittee's population as compared to the total permit population listed above. Additional fees apply as follows:

1. Invoices under this subsection shall be a minimum of $100.00 to cover processing costs.

2. For co-permittees that do not have associated populations, such as Florida Department of Transportation Districts and Drainage Districts, other than existing state water management districts, the fee shall be $1,875.00.

(c) For convenience, co-permittees of any one permit may choose to receive only one invoice to cover the entire annual fee. In order to receive one invoice, co-permittees to any one permit shall:

1. Mutually agree to share the cost of the annual fee and be party to an executed interlocal agreement for cost sharing among all co-permittees.

2. Designate a specific co-permittee to act as representative for all co-permittees regarding the annual fee. The fee designee shall notify the Department in writing, not less than 120 days prior to the end of a calendar year, that only one invoice will be required for the annual fee for the forthcoming calendar year.

3. The above notification shall identify the co-permittee responsible for the fee transaction and shall specify the name and address of the contact person for invoicing. The identified co-permittee is responsible for paying the entire annual fee to the Department.

4. After the initial annual fee billing cycle, one invoice shall continue to be sent to the fee designee established by the above process until a change is requested in accordance with subparagraph 62-4.052(10)5., F.A.C., below.

5. To effect a change regarding the fee designee, the Department must be notified in writing, not less than 120 days prior to the end of a calendar year, that the co-permittee responsible for the fee transaction has changed, or that fees should be invoiced individually in accordance with paragraph 62-4.052(10)(b), F.A.C. Notification of such changes shall be in accordance with the requirements of this subsection.

(d) Annual fees for Phase 1 MS4s and Phase 11 MS4s permitted individually and not under a generic permit, that have an initial permit issuance occurring after October 1, 2000, shall be based on the following formulas:

1. For MS4 permits with total populations less than 19,999: $800.00 plus $0.05 times the total permitted population.

2. For MS4 permits with total populations greater than 20,000 but less than 99,999: $1,625.00 plus $0.05 times the total permitted population.

3. For MS4 permits with total populations greater than 100,000: $13,000.00 plus $0.025 times the total permitted population.

(11) Stormwater discharge associated with industrial activity permitted under Chapter 62-620, F.A.C., shall pay an additional $200 per outfall per year, up to the maximum amount set forth in Section 403.087(6), F.S., unless the activity is already subject to the fee provisions of paragraph 62-4.052(7)(b), F.A.C.

(12) There shall be no annual fee for use of the general permits in Chapter 62-660, F.A.C.

(13) In addition to any annual fees described in subsections (5) and (8), of this rule, a municipality which has an approved pretreatment program shall pay an additional $500.00 annually.

*Rulemaking Authority 403.061, 403.087(6) FS. Law Implemented 403.087(6), 403.0885 FS. History–New 4-30-95, Amended 10-22-00, 7-8-02, 10-*

*31-07.*

**62-4.053 Annual Operating License Fees for Public Water Systems.**

(1) Scope and Intent. As authorized in Section 403.087(6), F.S., this rule implements annual regulatory program and surveillance fees (operating license fees) for public drinking water systems. These fees effect the legislative intent that the Department's costs for administering the Florida Safe Drinking Water Act be borne by regulated parties. As such, the annual operating license fees are applicable only to public water systems subject to regulation under Chapters 62-550, 62-555 and 62-560, F.A.C.

(2) The license fees described in paragraphs (a) through (c), of this subsection, shall be the annual operating license fees for such facilities.

(a) Annual operating license fees shall be based on the type of public water system, or the population served, or the sum of permitted capacities of the treatment provided under their unique PWS ID Number, as set forth in subsections (3) through (6), below.

(b) Annual operating license fees are applicable for the period from July 1 to June 30 of the following year.

(c) Annual operating license fees for drinking water systems are not refundable and shall be due and payable as follows:

1. The annual operating license fees set forth in this section shall be required for all public water systems for which the Department is granted administrative authority. The amount due shall be the applicable annual operating license fee described in subsection (3), (4), (5), or (6), of this rule, and is due and payable no later than 45 days after receipt of an operating license fee invoice from the Department for public water systems that are subject to regulation under Section 403.861, F.S., on that date.

2. When a new public water system is issued a permit and is cleared for operation to be put in service under Chapter 62-555, F.A.C., pursuant to Section 403.861, F.S., the first annual operating license fee shall be due no later than 45 days after receipt of an operating license fee invoice from the Department. The amount due shall be the applicable annual operating license fee described in subsection (3), (4), (5) or (6), of this rule. The operating license fee shall be due and payable pursuant to paragraph 62-4.053(2)(b), F.A.C., above.

3. Non-payment or late payment of an annual operating license fee shall be grounds for enforcement action pursuant to Sections 403.121, 403.141, and 403.161, F.S. Non-payment of an annual operating license fee shall be grounds for revocation or denial of an application for a drinking water construction permit.

4. When a public water system changes in a manner which places the facility in a different annual operating license fee category:

a. The operating license fee shall be changed as appropriate and be in effect for the next operating year (July 1-June 30),

b. The new operating license fee shall be due no later than 45 days after receipt of an operating license fee invoice from the Department following the change; and,

c. No operating license fee is due for an inactive system.

(3) The annual operating license fees for community public water systems are based on the system's permitted design capacity, and are as follows:

| Design Capacity | Fee |
| --- | --- |
| (a) 10 MGD and above | $6,000.00 |
| (b) 5 MGD up to 10 MGD | $4,000.00 |
| (c) 1 MGD up to 5 MGD | $2,000.00 |
| (d) .33 MGD up to 1 MGD | $1,000.00 |
| (e) .05 MGD up to 0.33 MGD | $500.00 |
| (f) Less than 0.05 MGD | $100.00 |

(4) The annual operating license fee for consecutive community public water systems shall be based on their population served as reported by the system during their most recent Sanitary Survey as follows:

| Population Served | Fee |
| --- | --- |
| (a) 25-500 | $50.00 |
| (b) 501-3,300 | $100.00 |
| (c) 3,301-10,000 | $500.00 |
| (d) 10,001-50,000 | $1,000.00 |

| (e) 50,001-100,000 | $2,000.00 |
| (f) >100,000 | $4,000.00 |

(5) The annual operating license fee for non-transient, non-community public water systems shall be $100.00.

(6) The annual operating license fee for transient, non-community public water systems shall be $50.00.

(7) Public water systems will be invoiced individually for the annual operating license fee.

(8) The annual operating license fee in this Section shall be adjusted for inflation using the methodology in paragraph 62-4.050(4)(z), F.A.C.

*Rulemaking Authority 403.061, 403.861(7), 403.861(8) FS. Law Implemented 403.087(6) FS. History–New 4-21-09.*

### 62-4.055 Permit Processing.

(1) Within thirty days after receipt of an application for a permit and the correct processing fee the Department shall review the application and shall request submittal of additional information the Department is authorized by law to request. The applicant shall have ninety days after the Department mails a timely request for additional information to submit that information to the Department. If an applicant requires more than ninety days in which to respond to a request for additional information, the applicant may notify the Department in writing of the circumstances, at which time the application shall be held in active status for one additional period of up to ninety days. Additional extensions shall be granted for good cause shown by the applicant. A showing that the applicant is making a diligent effort to obtain the requested additional information shall constitute good cause. Failure of an applicant to provide the timely requested information by the applicable deadline shall result in denial of the application.

(2) If the applicant believes any Department request for additional information is not authorized by law or rule, the applicant may request a hearing pursuant to Section 120.57, F.S.

(3) Within 30 days after receipt of such additional information, the Department shall review it and may request only that information needed to clarify such additional information or to answer new questions raised by or directly related to such additional information.

(4) If the applicant believes the request of the Department for such additional information is not authorized by law or rule, the Department, at the applicant's request, shall begin to process the permit application. Such a request by the applicant shall be in writing and shall be clearly labelled as a request for the Department to process the application. The applicant's request shall state the reasons why the applicant believes the Department's request for additional information is not authorized by law or rule. The applicant shall clearly state that the applicant requests the Department to process the application without that information. The applicant's request shall be submitted to the Department office which made the request.

(5) Permits shall be approved or denied within 90 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application, whichever occurs last.

(6) The procedures in this section do not apply to hazardous waste facility permitting under Rule Chapter 62-730, F.A.C., or to other permitting for which there are other specific procedures.

*Rulemaking Authority 120.54(5), 403.061, 403.087 FS. Law Implemented 403.021, 403.061, 403.062, 403.087, 403.0876 FS. History–New 12-3-84, Amended 8-31-88, 7-11-93, Formerly 17-4.055, Amended 8-16-98.*

### 62-4.060 Consultation.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.06, Amended 8-31-88, Formerly 17-4.060, Repealed 2-16-12.*

### 62-4.070 Standards for Issuing or Denying Permits; Issuance; Denial.

(1) A permit shall be issued to the applicant upon such conditions as the Department may direct, only if the applicant affirmatively provides the Department with reasonable assurance based on plans, test results, installation of pollution control equipment, or other information, that the construction, expansion, modification, operation, or activity of the installation will not discharge, emit, or cause pollution in contravention of Department standards or rules. However, for discharges of wastes to water, the Department may issue temporary operation permits under the criteria set forth in Section 403.088(3), F.S.

(2) If, after review of the application and all the information, the Department determines that the applicant has not provided reasonable assurance that the construction, modification, expansion, or operation of the installation will be in accord with applicable

laws or rules, including rules of approved local programs, the Department shall deny the permit.

(3) The Department may issue any permit with specific conditions necessary to provide reasonable assurance that Department rules can be met.

(4) No Department permits shall be issued for a term of more than five (5) years unless otherwise specified by statute, rule, or order of the Department. However, construction permits for air pollution sources may be issued for a period of time as necessary.

(5) The Department shall take into consideration a permit applicant's violation of any Department rules at any installation when determining whether the applicant has provided reasonable assurances that Department standards will be met.

(6) The applicant shall be promptly notified if the Department intends to deny the application, and shall be informed of the reasons for the intended denial, and of the right to request an administrative hearing.

(7) The issuance of a permit does not relieve any person from complying with the requirements of Chapter 403, F.S., or Department rules.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.087, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History– New 5-17-72, Amended 7-8-82, 2-1-83, 12-3-84, Formerly 17-4.07, Amended 8-31-88, 3-28-91, Formerly 17-4.070.*

### 62-4.080 Modification of Permit Conditions.

(1) For good cause and after notice and an administrative hearing, if requested, the Department may require the permittee to conform to new or additional conditions. The Department shall allow the permittee a reasonable time to conform to the new or additional conditions and on application of the permittee the Department may grant additional time.

For the purpose of this section, good cause shall include, but not be limited to, any of the following:

(a) A showing that an improvement in effluent or emission quality or quantity can be accomplished because of technological advances without unreasonable hardship.

(b) A showing that a higher degree of treatment is necessary to effect the intent and purpose of Chapter 403, F.S.

(c) A showing of any change in the environment or surrounding conditions that requires a modification to conform to applicable air or water quality standards.

(d) For discharges into State waters, a showing that new or changed classification of the water requires a modification of the discharge.

(e) Adoption or revision of Florida Statutes, rules, or standards which require the modification of a permit condition for compliance.

(2) A permittee may request a modification of a permit by applying to the Department.

(3) A permittee may request that a permit be extended as a modification of the permit. Such a request must be submitted to the Department in writing before the expiration of the permit. Upon timely submittal of a request for extension, unless the permit automatically expires by statute or rule, the permit will remain in effect until final agency action is taken on the request. For construction permits, an extension shall be granted if the applicant can demonstrate reasonable assurances that, upon completion, the extended permit will comply with the standards and conditions required by applicable regulation. For all other permits, an extension shall be granted if the applicant can demonstrate reasonable assurances that the extended permit will comply with the standards and conditions applicable to the original permit. A permit for which the permit application fee was prorated in accordance with paragraph 62-4.050(4)(l), F.A.C., shall not be extended. In no event shall a permit be extended or remain in effect longer than the time limits established by statute or rule.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.08, Amended 8-31-88, 3-19-90, Formerly 17-4.080.*

### 62-4.090 Renewals.

Renewals. Prior to 135 days before the expiration of a hazardous waste operation permit, 180 days before the expiration of a hazardous waste closure permit, or sixty days before the expiration of any other Department operation permit except a permit issued pursuant to Chapter 62-213, F.A.C., the permittee shall apply for a renewal of a permit using forms incorporated by reference in the specific rule chapter for that kind of permit. Renewals of permits issued pursuant to Chapter 62-213, F.A.C., shall be processed in accordance with the chapter and not with this rule. A renewal application shall be timely and sufficient. If the application is submitted prior to the days specified above before expiration of the permit, it will be considered timely and sufficient. If the renewal application is submitted at a later date, it will not be considered timely and sufficient unless it is submitted and made complete prior

to the expiration of the operation permit. When the application for renewal is timely and sufficient, the existing permit shall remain in effect until the renewal application has been finally acted upon by the Department or, if there is court review of the Department's final agency action, until a later date is required by Section 120.60, F.S.

*Rulemaking Authority 120.60, 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 120.60, 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.09, Amended 8-31-88, 3-19-90, 7-11-93, Formerly 17-4.090, Amended 4-18-95, 3-16-08.*

### 62-4.100 Suspension and Revocation.

(1) Permits shall be effective until suspended, revoked, surrendered, or expired and shall be subject to the provisions of Chapter 403, F.S., and rules of the Department.

(2) Failure to comply with pollution control laws and rules shall be grounds for suspension or revocation.

(3) A permit issued pursuant to this chapter shall not become a vested property right in the permittee. The Department may revoke any permit issued by it if it finds that the permit holder or his agent:

(a) Submitted false or inaccurate information in his application or operational reports.

(b) Has violated law, Department orders, rules or permit conditions.

(c) Has failed to submit operational reports or other information required by Department rules.

(d) Has refused lawful inspection under Section 403.091, F.S.

(4) No revocation shall become effective except after notice is served by personal service, certified mail, or newspaper notice pursuant to Section 120.60(5), F.S., upon the person or persons named therein and a hearing held if requested within the time specified in the notice. The notice shall specify the provision of the law, or rule alleged to be violated, or the permit condition or Department order alleged to be violated, and the facts alleged to constitute a violation thereof.

*Rulemaking Authority 120.60, 403.061(7) FS. Law Implemented 120.60, 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–Formerly 17-4.07, FAC, New 3-4-70, Revised 5-17-72, Amended 8-7-73, Formerly 17-4.10, Amended 8-31-88, Formerly 17-4.100.*

### 62-4.110 Financial Responsibility.

*Rulemaking Authority 403.061(7) FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Amended 8-7-73, Formerly 17-4.11, Amended 8-31-88, Formerly 17-4.110, Repealed 2-16-12.*

### 62-4.120 Transfer of Permits.

(1) Within 30 days after the sale or legal transfer of a permitted facility, an "Application for Transfer of Permit" (DEP Form 62-1.201(1)) must be submitted to the Department. This form must be completed with the notarized signatures of both the permittee and the proposed new permittee. For air permits, an "Application for Transfer of Air Permit" (DEP Form 62-210.900(7)) shall be submitted.

(2) The Department shall approve the transfer of a permit unless it determines that the proposed new permittee cannot provide reasonable assurances that conditions of the permit will be met. The determination shall be limited solely to the ability of the new permittee to comply with the conditions of the existing permit, and it shall not concern the adequacy of these permit conditions. If the Department proposes to deny the transfer, it shall provide both the permittee and the proposed new permittee a written objection to such transfer together with notice of a right to request a Chapter 120, F.S., proceeding on such determination.

(3) Within 30 days of receiving a properly completed Application for Transfer of Permit form, the Department shall issue a final determination. The Department may toll the time for making a determination on the transfer by notifying both the permittee and the proposed new permittee that additional information is required to adequately review the transfer request. Such notification shall be served within 30 days of receipt of an Application for Transfer of Permit form, completed pursuant to subsection (1). If the Department fails to take action to approve or deny the transfer within 30 days of receipt of the completed Application for Transfer of Permit form, or within 30 days of receipt of the last item of timely requested additional information, the transfer shall be deemed approved.

(4) The permittee is encouraged to apply for a permit transfer prior to the sale or legal transfer of a permitted facility. However, the transfer shall not be effective prior to the sale or legal transfer.

(5) Until this transfer is approved by the Department, the permittee and any other person constructing, operating, or maintaining the permitted facility shall be liable for compliance with the terms of the permit. The permittee transferring the permit shall remain

liable for corrective actions that may be required as a result of any violations occurring prior to the sale or legal transfer of the facility.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 3-4-70, Revised 5-17-72, Formerly 17-4.12, Amended 3-19-90, Formerly 17-4.120, Amended 4-16-01.*

### 62-4.130 Plant Operation - Problems.

If the permittee is temporarily unable to comply with any of the conditions of the permit due to breakdown of equipment or destruction by hazard of fire, wind or by other cause, the permittee shall immediately notify the Department. Notification shall include pertinent information as to the cause of the problem, and what steps are being taken to correct the problem and to prevent its recurrence, and where applicable, the owner's intent toward reconstruction of destroyed facilities. Such notification does not release the permittee from any liability for failure to comply with Department rules.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 3-4-70, Revised 5-17-72, Formerly 17-4.13, Amended 8-31-88, Formerly 17-4.130.*

### 62-4.150 Review.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.15, Amended 8-31-88, Formerly 17-4.150, Repealed 2-16-12.*

### 62-4.160 Permit Conditions.

All permits issued by the Department shall include the following general conditions:

(1) The terms, conditions, requirements, limitations and restrictions set forth in this permit, are "permit conditions" and are binding and enforceable pursuant to Sections 403.141, 403.727, or 403.859 through 403.861, F.S. The permittee is placed on notice that the Department will review this permit periodically and may initiate enforcement action for any violation of these conditions.

(2) This permit is valid only for the specific processes and operations applied for and indicated in the approved drawings or exhibits. Any unauthorized deviation from the approved drawings, exhibits, specifications, or conditions of this permit may constitute grounds for revocation and enforcement action by the Department.

(3) As provided in subsections 403.987(6) and 403.722(5), F.S., the issuance of this permit does not convey any vested rights or any exclusive privileges. Neither does it authorize any injury to public or private property or any invasion of personal rights, nor any infringement of federal, state, or local laws or regulations. This permit is not a waiver of or approval of any other department permit that may be required for other aspects of the total project which are not addressed in this permit.

(4) This permit conveys no title to land or water, does not constitute State recognition or acknowledgment of title, and not constitute authority for the use of submerged lands unless herein provided and the necessary title or leasehold interests have been obtained from the State. Only the Trustees of the Internal Improvement Trust Fund may express State opinion as to title.

(5) This permit does not relieve the permittee from liability for harm or injury to human health or welfare, animal, or plant life, or property caused by the construction or operation of this permitted source, or from penalties therefore; nor does it allow the permittee to cause pollution in contravention of Florida Statutes and Department rules, unless specifically authorized by an order from the Department.

(6) The permittee shall properly operate and maintain the facility and systems of treatment and control (and related appurtenances) that are installed and used by the permittee to achieve compliance with the conditions of this permit, as required by Department rules. This provision includes the operation of backup or auxiliary facilities or similar systems when necessary to achieve compliance with the conditions of the permit and when required by Department rules.

(7) The permittee, by accepting this permit, specifically agrees to allow authorized Department personnel, upon presentation of credentials or other documents as may be required by law and at reasonable times, access to the premises where the permitted activity is located or conducted to:

(a) Have access to and copy any records that must be kept under conditions of the permit;

(b) Inspect the facility, equipment, practices, or operations regulated or required under this permit; and,

(c) Sample or monitor any substances or parameters at any location reasonably necessary to assure compliance with this permit or Department rules.

Reasonable time may depend on the nature of the concern being investigated.

(8) If, for any reason, the permittee does not comply with or will be unable to comply with any condition or limitation specified in this permit, the permittee shall immediately provide the Department with the following information:

(a) A description of and cause of noncompliance; and,

(b) The period of noncompliance, including dates and times; or, if not corrected, the anticipated time the noncompliance is expected to continue, and steps being taken to reduce, eliminate, and prevent recurrence of the noncompliance. The permittee shall be responsible for any and all damages which may result and may be subject to enforcement action by the Department for penalties or for revocation of this permit.

(9) In accepting this permit, the permittee understands and agrees that all records, notes, monitoring data and other information relating to the construction or operation of this permitted source which are submitted to the Department may be used by the Department as evidence in any enforcement case involving the permitted source arising under the Florida Statutes or Department rules, except where such use is prescribed by Sections 403.111 and 403.73, F.S. Such evidence shall only be used to the extent it is consistent with the Florida Rules of Civil Procedure and appropriate evidentiary rules.

(10) The permittee agrees to comply with changes in Department rules and Florida Statutes after a reasonable time for compliance; provided, however, the permittee does not waive any other rights granted by Florida Statutes or Department rules. A reasonable time for compliance with a new or amended surface water quality standard, other than those standards addressed in Rule 62-302.500, F.A.C., shall include a reasonable time to obtain or be denied a mixing zone for the new or amended standard.

(11) This permit is transferable only upon Department approval in accordance with Rules 62-4.120 and 62-730.300, F.A.C., as applicable. The permittee shall be liable for any non-compliance of the permitted activity until the transfer is approved by the Department.

(12) This permit or a copy thereof shall be kept at the work site of the permitted activity.

(13) This permit also constitutes:

(a) Determination of Best Available Control Technology (BACT)

(b) Determination of Prevention of Significant Deterioration (PSD)

(c) Certification of compliance with State Water Quality Standards (Section 401, PL 92-500)

(d) Compliance with New Source Performance Standards

(14) The permittee shall comply with the following:

(a) Upon request, the permittee shall furnish all records and plans required under Department rules. During enforcement actions, the retention period for all records will be extended automatically unless otherwise stipulated by the Department.

(b) The permittee shall hold at the facility or other location designated by this permit records of all monitoring information (including all calibration and maintenance records and all original strip chart recordings for continuous monitoring instrumentation) required by the permit, copies of all reports required by this permit, and records of all data used to complete the application for this permit. These materials shall be retained at least three years from the date of the sample, measurement, report, or application unless otherwise specified by Department rule.

(c) Records of monitoring information shall include:

1. The date, exact place, and time of sampling or measurements,

2. The person responsible for performing the sampling or measurements,

3. The dates analyses were performed,

4. The person responsible for performing the analyses,

5. The analytical techniques or methods used,

6. The results of such analyses.

(15) When requested by the Department, the permittee shall within a reasonable time furnish any information required by law which is needed to determine compliance with the permit. If the permittee becomes aware the relevant facts were not submitted or were incorrect in the permit application or in any report to the Department, such facts or information shall be corrected promptly.

(16) In the case of an underground injection control permit, the following permit conditions also shall apply:

(a) All reports or information required by the Department shall be certified as being true, accurate and complete.

(b) Reports of compliance or noncompliance with, or any progress reports on, requirements contained in any compliance schedule of this permit shall be submitted no later than 14 days following each schedule date.

(c) Notification of any noncompliance which may endanger health or the environment shall be reported verbally to the

Department within 24 hours and again within 72 hours, and a final written report provided within two weeks.

1. The verbal reports shall contain any monitoring or other information which indicate that any contaminant may endanger an underground source of drinking water and any noncompliance with a permit condition or malfunction of the injection system which may cause fluid migration into or between underground sources of drinking water.

2. The written submission shall contain a description of the cause of the noncompliance and, if it has not been corrected, the anticipated time the noncompliance is expected to continue, the steps being taken to reduce, eliminate, and prevent recurrence of the noncompliance, and all information required by paragraph 62-528.415(4)(b), F.A.C.

(d) The Department shall be notified at least 180 days before conversion or abandonment of an injection well, unless abandonment within a lesser period of time is necessary to protect waters of the State.

(17) The following conditions also shall apply to a hazardous waste facility permit.

(a) The following reports shall be submitted to the Department:

1. Manifest discrepancy report. If a significant discrepancy in a manifest is discovered, the permittee shall attempt to rectify the discrepancy. If not resolved within 15 days after the waste is received, the permittee shall immediately submit a letter report, including a copy of the manifest, to the Department.

2. Unmanifested waste report. The permittee shall submit an unmanifested waste report to the Department within 15 days of receipt of unmanifested waste.

3. Biennial report. A biennial report covering facility activities during the previous calendar year shall be submitted by March 1 of each even numbered year pursuant to Chapter 62-730, F.A.C.

(b) Notification of any noncompliance which may endanger health or the environment, including the release of any hazardous waste that may endanger public drinking water supplies or the occurrence of a fire or explosion from the facility which could threaten the environment or human health outside the facility, shall be reported verbally to the Department within 24 hours, and a written report shall be provided within 5 days. The verbal report shall include the name, address, I.D. number, and telephone number of the facility, its owner or operator, the name and quantity of materials involved, the extent of any injuries, an assessment of actual or potential hazards, and the estimated quantity and disposition of recovered material. The written submission shall contain:

1. A description and cause of the noncompliance.

2. If not corrected, the expected time of correction, and the steps being taken to reduce, eliminate, and prevent recurrence of the noncompliance.

(c) Reports of compliance or noncompliance with, or any progress reports on, requirements in any compliance schedule shall be submitted no later than 14 days after each schedule date.

(d) All reports or information required by the department by a hazardous waste permittee shall be signed by a person authorized to sign a permit application.

*Rulemaking Authority 403.061, 403.087, 403.088 FS. Law Implemented 403.061, 403.087, 403.088 FS. History–New 8-31-88, Amended 10-4-89, 7-11-93, Formerly 17-4.160.*

**62-4.200 Scope of Part II.**

This Part sets forth additional requirements for certain Department permits, exemptions from permitting, requirements for mixing zones and zones of discharge, and related requirements. Except as otherwise provided in Chapter 62-330, F.A.C., or in the rules adopted by reference thereunder, this Part shall not apply to activities regulated under Part IV of Chapter 373, F.S. However, this Part shall continue to apply to those activities grandfathered under Sections 373.4131(4), 373.414(11), (12)(a), (13), (14), (15), (16) and 373.4145(6), F.S.

*Rulemaking Authority 373.026, 373.043, 373.044, 373.109, 373.113, 373.4131, 373.4145, 373.418, 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 373.026, 373.044, 373.109, 373.409, 373.413, 373.4135, 373.414(9), (11), (12)(a), (13), (14), (15), (16), 373.4145, 373.418, 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.20, Amended 8-31-88, Formerly 17-4.200, Amended 7-4-95, 10-1-07, 10-1-13.*

**62-4.210 Construction Permits.**

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–New 5-17-72, Formerly 17-4.21, Amended 8-31-88, Formerly 17-4.210, Repealed 2-16-12.*

**62-4.220 Operation Permit for New Sources.**

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088 FS. History–Formerly 17-4.05, New 3-4-70, Revised 5-17-72, Formerly 17-4.22, Amended 8-31-88, Formerly 17-4.220, Repealed 2-16-12.*

**62-4.240 Operation Permits for Water Pollution Sources.**

*Rulemaking Authority 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088, 403.101 FS. History–New 5-17-72, Formerly 17-4.23, Amended 8-31-88, 10-4-89, Formerly 17-4.240, Repealed 2-16-12.*

**62-4.241 Whole Effluent Toxicity Limits.**
(1) Facilities subject to whole effluent toxicity testing as identified in subsection 62-620.620(3), F.A.C., shall meet the following whole effluent toxicity limitations unless a mixing zone as specified in paragraphs 62-4.244(3)(a) through (d), F.A.C., or a variance has been approved by the Department.
(a) For acute whole effluent toxicity, the LC50, as defined in subsection 62-302.200(1), F.A.C., shall not be less than 100% effluent; and
(b) For chronic whole effluent toxicity, the IC25, as defined in subsection 62-302.200(14), F.A.C., shall not be less than 100% effluent.
(2) Facilities granted a chronic toxicity mixing zone in accordance with paragraph 62-4.244(3)(a), F.A.C., shall meet the following whole effluent toxicity limitations.
(a) For acute whole effluent toxicity, the LC50, as defined in subsection 62-302.200(1), F.A.C., shall not be less than 100% effluent; and
(b) For chronic whole effluent toxicity, the IC25, as defined in subsection 62-302.200(14), F.A.C., shall not be less than the effluent concentration allowed by the mixing zone.
(3) Facilities with high rate dilution permitted under paragraph 62-4.244(3)(b), F.A.C., shall meet the following whole effluent toxicity limitations.
(a) For acute whole effluent toxicity, the LC50, as defined in subsection 62-302.200(1), F.A.C., shall not be less than 30% effluent; and
(b) For chronic whole effluent toxicity, the IC25, as defined in subsection 62-302.200(14), F.A.C., shall not be less than 10% effluent.
(4) Facilities permitted as open ocean discharges under paragraph 62-4.244(3)(c), F.A.C., shall meet the following whole effluent toxicity limitations.
(a) For acute whole effluent toxicity, the LC50, as defined in subsection 62-302.200(1), F.A.C., shall not be less than 30% effluent; and
(b) For chronic whole effluent toxicity, the IC25, as defined in subsection 62-302.200(14), F.A.C., shall not be less than 10% effluent.
(5) Water Treatment facilities granted a mixing zone for demineralization concentrate in accordance with paragraph 62-4.244(3)(d), F.A.C., shall meet the following whole effluent toxicity limitations.
(a) For small water utility businesses, as defined in Section 403.0882(2)(b), F.S., the acute whole effluent toxicity LC50, as defined in subsection 62-302.200(1), F.A.C., shall not be less than 20% effluent. For demineralization concentrate discharges other than small water utility businesses, the LC50 shall not be less than the effluent concentration allowed by the mixing zone and shall not be less than 20% effluent; and,
(b) For small water utility businesses, the chronic whole effluent toxicity IC25, as defined in subsection 62-302.200(14), F.A.C., shall not be less than 20% effluent. For demineralization concentrate discharges other than small water utility businesses, the IC25 shall not be less than the effluent concentration allowed by the mixing zone.

*Rulemaking Authority 403.061, 403.087, 403.804, 403.805 FS. Law Implemented 403.021, 403.061, 403.087, 403.088, 403.121, 403.131, 403.141, 403.161 FS. History–New 4-2-08.*

**62-4.242 Antidegradation Permitting Requirements; Outstanding Florida Waters; Outstanding National Resource Waters.**

(1) Antidegradation Permitting Requirements.

(a) Permits shall be issued when consistent with the antidegradation policy set forth in Rule 62-302.300, F.A.C., and, if applicable, Rule 62-302.700, F.A.C.

(b) In determining whether a proposed discharge which results in water quality degradation is necessary or desirable under federal standards and under circumstances which are clearly in the public interest, the department shall consider and balance the following factors:

1. Whether the proposed project is important to and is beneficial to the public health, safety, or welfare (taking into account the policies set forth in Rule 62-302.300, F.A.C., and, if applicable, Rule 62-302.700, F.A.C.); and,

2. Whether the proposed discharge will adversely affect conservation of fish and wildlife, including endangered or threatened species, or their habitats; and,

3. Whether the proposed discharge will adversely affect the fishing or water-based recreational values or marine productivity in the vicinity of the proposed discharge; and,

4. Whether the proposed discharge is consistent with any applicable Surface Water Improvement and Management Plan that has been adopted by a Water Management District and approved by the Department.

(c) For domestic wastewater facilities, in addition to paragraph (b), above, in order for a proposed discharge to be necessary or desirable under federal standards and under circumstances which are clearly in the public interest, the permit applicant must demonstrate that none of the following is economically and technologically reasonable:

1. Implementation of water conservation measures to reduce the flow of domestic wastewater. The engineering report shall include an assessment of the feasibility of implementation of water conservation programs within the area served by the collection system. This paragraph shall apply only to utilities, municipalities, or other entities that have responsibility for both wastewater and water supply,

2. Implementation of infiltration/inflow reduction measures for expansions of domestic wastewater facilities. The engineering report shall include an assessment of an infiltration/inflow reduction program within the area served by the collection system,

3. Reuse of reclaimed water; and,

4. Use of other discharge locations, which would reduce adverse impacts on water quality.

(d) For industrial wastewater facilities proposing new or expanded surface water discharges, in addition to paragraph (b), above, in order for the new or expanded industrial wastewater discharge to be necessary or desirable under federal standards and under circumstances which are clearly in the public interest, the permit applicant:

1. Must demonstrate that use of other discharge locations, land application, or recycling at offsite locations that would avoid the degradation of water quality is not economically and technologically reasonable; and,

2. Shall submit a signed statement under penalty of law that a waste minimization and source reduction analysis was completed consistent with best management practices appropriate for the type of facility or discharge proposed, as identified in paragraph 62-620.100(3)(m), F.A.C., 40 C.F.R. 122.44(k), and Guidance Manual for Developing Best Management Practices (BMP), U.S. Environmental Protection Agency, Office of Water, Washington, DC, EPA 833-B-93-004, October, 1993.

(2) Standards Applying to Outstanding Florida Waters.

(a) No Department permit or water quality certification shall be issued for any proposed activity or discharge within an Outstanding Florida Waters, or which significantly degrades, either alone or in combination with other stationary installations, any Outstanding Florida Waters, unless the applicant affirmatively demonstrates that:

1. With respect to blowdown from a recirculated cooling water system of a steam electrical generating plant, that the discharge:

a. Meets the applicable limitations of subsection 62-302.520(4), F.A.C., at the point of discharge, or

b. Has a mixing zone established pursuant to paragraph 62-302.520(6)(b), F.A.C., which assures the protection and propagation of a balanced indigenous population of shellfish, fish and wildlife in and on the Outstanding Florida Water, and which is established taking into account the recreational or ecological significance of such water; and,

c. Meets the temperature limits of subsection 62-302.520(4), F.A.C., at the boundary of the mixing zone established pursuant to paragraph 62-302.520(6)(b), F.A.C., or

2. The proposed activity of discharge is clearly in the public interest, and either:

a. A Department permit for the activity has been issued or an application for such permit was complete on the effective date of the Outstanding Florida Water designation, or

b. The existing ambient water quality within Outstanding Florida Waters will not be lowered as a result of the proposed activity

or discharge, except on a temporary basis during construction for a period not to exceed thirty days; lowered water quality would occur only within a restricted mixing zone approved by the Department; and, water quality criteria would not be violated outside the restricted mixing zone. The Department may allow an extension of the thirty-day time limit on a construction-caused degradation for a period demonstrated by the applicant to be unavoidable and where suitable management practices and technology approved by the Department are employed to minimize any degradation of water quality.

(b) The Department recognizes that it may be necessary to permit limited activities or discharges in Outstanding Florida Waters to allow for or enhance public use or to maintain facilities that existed prior to the effective date of the Outstanding Florida Water designation, or facilities permitted after adoption of the Outstanding Florida Water designation. However, such activities or discharges will only be permitted if:

1. The discharge or activity is in compliance with the provisions specified in subparagraph (2)(a)2., of this rule, or

2. For dredging beach-quality sand from inlets and related channels, or restoration/nourishment of beaches and the use of offshore borrow areas, the applicant demonstrates that:

a. Turbidity has been minimized for both magnitude and duration to the maximum extent practicable,

b. Turbidity at the edge of the approved mixing zone does not exceed natural background levels by more than the range in natural background turbidity levels measured throughout a normal tidal cycle for the applicable sand dredging or beach restoration/nourishment site; and in no case shall it exceed 29 NTUs above natural background; and,

c. Turbidity levels, both inside and outside of the mixing zone, are not expected to have an adverse impact on marine resources, recreational value or public safety, or

3. Management practices and suitable technology approved by the Department are implemented for all stationary installations including those created for drainage, flood control, or by dredging or filling; and there is no alternative to the proposed activity, including the alternative of not undertaking any change, except at an unreasonably higher cost.

(c) For the purpose of this section the term "existing ambient water quality" shall mean (based on the best scientific information available) the better water quality of either (1) that which could reasonably be expected to have existed for the baseline year of an Outstanding Florida Water designation or (2) that which existed during the year prior to the date of a permit application. It shall include daily, seasonal, and other cyclic fluctuations, taking into consideration the effects of allowable discharges for which Department permits were issued or applications for such permits were filed and complete on the effective date of designation.

(d) Subsection 62-4.242(2), F.A.C., shall not apply to any dredge or fill activity or any discharge to an Outstanding Florida Water permitted by the Department on, or for which a complete permit application was filed on, the effective date of an Outstanding Florida Water designation; nor shall it apply to any renewal of a Department permit where there is no modification in the dredge or fill activity or discharge which would necessitate a permit review.

(e) Any activity that is exempted from permit programs administered by the Department is not subject to the requirements of Rule 62-4.242, F.A.C.

(f) For the Apalachicola River north of Gulf County, this section shall not apply in the federally-authorized nine-foot navigation project, as follows:

1. Maintenance dredging and disposal and snag removal by the Army Corps of Engineers as presently performed pursuant to existing permits and its continuation under renewals thereof,

2. Class A and B emergencies as defined in subsection 62-312.150(5), F.A.C., or

3. Exemptions to permitting specified in Section 403.813, F.S., and Department rules, or

4. Any other permittable project of the Army Corps of Engineers deemed necessary by the Department pursuant to the considerations referenced in paragraph 62-302.100(10)(c), F.A.C.

(3) Standards Applying to Outstanding National Resource Waters:

(a) All discharges or activities that may cause degradation of water quality in Outstanding National Resource Waters are prohibited, other than:

1. Discharges or activities that are exempted by statute from Department permitting or regulation,

2. Those discharges or activities described in sub-subparagraphs 62-4.242(2)(a)1.b., 62-4.242(2)(a)1.c., and 62-4.242(2)(a)2.b., F.A.C.

(b) Discharges or activities that would have the result of clearly enhancing the water quality of Outstanding National Resource Waters are not prohibited.

(c) In addition, the following restrictions apply on Outstanding National Resource Waters. Each is listed below, followed by a

reference to DEP rules or Florida Statutes:

1. Water quality reclassification to a class with less stringent criteria is not allowed (Rule 62-302.400, F.A.C.).

2. New or expanded mixing zones cannot be issued other than those for thermal discharges as allowed in subparagraph 62-4.242(1)(a)1., F.A.C.

3. Temporary Operation Permits cannot be renewed (Rule 62-4.250, F.A.C.).

4. General Permits cannot be used.

5. Exemptions from water quality criteria cannot be issued (Rule 62-4.243; subsections 62-6.020(5), (6), and (7); 62-25.030(3); and Rule 62-528.300, F.A.C.).

6. Variances shall not be issued (Sections 403.201 and 403.938, F.S.).

7. Any special restrictions for water quality protection in Outstanding Florida Waters, whether in Department rules or Florida Statutes, also apply in Outstanding National Resource Waters.

(d) This subsection shall not apply to any existing activity permitted, exempted, or for which a completed application for permit was filed, on or before the effective date of the Outstanding National Resource Water designation; nor shall it apply to any renewal of a Department permit where there is no modification of the activity which would necessitate a permit review.

(e) Paragraph 62-4.242(3)(d), F.A.C., shall not apply to any activity which contributes to the degradation of water quality in an Outstanding National Resource Water beyond those levels established for the baseline year.

*Rulemaking Authority 373.016, 373.171, 403.061, 403.062, 403.087, 403.088, 403.504, 403.704, 403.804, 403.805 FS. Law Implemented 373.016, 373.171, 403.021, 403.061, 403.087, 403.088, 403.101, 403.111, 403.121, 403.141, 403.161, 403.182, 403.502, 403.702 FS. History–New 3-1-79, Amended 5-14-81, 9-30-82, 3-31-83, 4-9-84, 11-29-84, 12-11-84, 5-8-85, 7-22-85, 8-31-88, 9-13-89, 10-4-89, Formerly 17-4.242, Amended 1-23-95, 5-15-02, 8-1-13, 2-17-16.*

### 62-4.243 Exemptions from Water Quality Criteria.

(1) Exemptions for Artificial Water Bodies Classified for Agricultural Water Supplies.

(a) The Secretary shall upon the petition of an affected person or permit applicant, and after public notice in the Florida Administrative Register and in a newspaper of general circulation in the area of the waters affected, and after opportunity for public hearing pursuant to Chapter 120, F.S., issue an Order for the duration of the permit specifically exempting a source of pollution from the Class IV water quality criteria contained in Rule 62-3.131, F.A.C., for wholly artificial bodies of water upon affirmative demonstration by the Petitioner of the following:

1. Granting the exemption is in the public interest; and,

2. The public has limited access to the waters under consideration; and,

3. The waters are not used for recreation; and,

4. Compliance with presently specified criteria is unnecessary for the protection of potable water supplies and animals, plants, or aquatic life using the waters; and,

5. Granting the exemption will not interfere with existing uses or the designated use of the waters or contiguous waters; and,

6. The economic, environmental and social costs of compliance with the existing criteria outweigh the social, environmental, economic and social benefits of compliance; and additionally,

7. The presently specified water quality criteria cannot be met with currently available technology, or

8. The costs of compliance with the presently specified criteria involved are so high that they must be spread over a considerable period of time, or

9. Some other type of hardship will occur.

(b) The Petitioner shall affirmatively demonstrate those criteria which the petitioner believes more appropriately apply to the waters for which the exemption is sought.

(c) The Secretary shall specify, by Order, only those criteria which the Secretary determines to have been demonstrated by the preponderance of competent substantial evidence to be more appropriate.

(d) The Department shall modify the Petitioner's permit consistent with the Secretary's Order.

(2) Exemptions for Water Bodies Classified for Navigation, Utility and Industrial Use.

(a) The Secretary shall, upon the petition of an affected person or permit applicant, and after public notice in the Florida Administrative Register and in a newspaper of general circulation in the area of the waters affected, and after opportunity for public hearing pursuant to Chapter 120, F.S., issue an Order for the duration of the permit specifically exempting sources of pollution from

the Class V water quality criteria contained in Rule 62-3.141, F.A.C., upon affirmative demonstration by the petitioner of the following:

1. Granting the exemption is in the public interest; and,

2. Compliance with presently specified criteria is unnecessary for the protection of potable water supplies and animals, plants, or aquatic life utilizing the waters; and,

3. Granting the exemption will not interfere with existing uses or the designated use of the waters, or of contiguous waters; and,

4. The economic, environmental and social costs of compliance with the existing criteria outweigh the social, environmental and economic benefits of compliance; and additionally,

5. The present specific water quality criteria cannot be met with currently available technology, or

6. The costs of compliance with the presently specified criteria involved are so high that they must be spread over a considerable period of time, or

7. Some other type of hardship will occur.

(b) The Petitioner shall affirmatively demonstrate those criteria which the Petitioner believes more appropriately apply to the waters for which the exemption is sought.

(c) The Secretary shall specify, by Order, only those criteria which the Secretary determines to have been demonstrated by the preponderance of competent substantial evidence to be more appropriate.

(d) The Department shall modify the Petitioner's permit consistent with the Secretary's Order.

*Rulemaking Authority 403.061, 403.062, 403.087, 403.504, 403.704, 403.804, 403.805 FS. Law Implemented 403.021, 403.061, 403.087, 403.088, 403.101, 403.121, 403.141, 403.161, 403.182, 403.201, 403.502, 403.702, 403.708 FS. History–New 3-1-79, Amended 1-1-83, 2-1-83, 8-31-88, Formerly 17-4.243.*

**62-4.244 Mixing Zones: Surface Waters.**

(1) Zones of mixing for non-thermal components of discharges.

(a) The Department may allow the water quality adjacent to a point of discharge to be degraded to the extent that only the minimum conditions described in subsection 62-302.500(1), F.A.C., apply within a limited, defined region known as the mixing zone. Under the circumstances defined elsewhere in this section, a mixing zone may be allowed to provide an opportunity for mixing and thus to reduce the costs of treatment. However, no mixing zone or combination of mixing zones shall be allowed to significantly impair any of the designated uses of the receiving body of water.

(b) A zone of mixing shall be determined based on the following:

1. The condition of the receiving body of water including present and future flow conditions and present and future sources of pollutants.

2. The nature, volume and frequency of the proposed discharge including any possible synergistic effects with other pollutants or substances which may be present in the receiving body of water.

3. The cumulative effect of the proposed mixing zone and other mixing zones in the vicinity.

(c) Except for the thermal components of discharges and nitrogen and phosphorus acting as nutrients, mixing zones which do not adhere to all of provisions paragraphs (1)(d) through (j), shall be presumed to constitute a significant impairment of the designated uses of surface waters of Classes I, II and III. An applicant for a mixing zone may obtain an exemption from these limitations as follows:

1. The applicant shall provide public notice, which shall be prepared or approved by the Department, in a newspaper of general circulation in the area in which the mixing zone is proposed. The notice shall identify the specific exemption it is seeking and notice the time, date and place of a public meeting at which, if the meeting is requested, the Department will consider comments to the requested exemption. The notice shall allow a person to request such a public meeting by contacting the Department within 14 days of the publication of the notice. If there is no such request, a public meeting is not required.

2. The applicant shall arrange for a public meeting which will be held if requested at which the Department will consider public comments on the exemption that is being sought. The Department shall also provide for public notice of the meeting in the Florida Administrative Register.

3. The applicant shall affirmatively demonstrate to the Department that the mixing zone exemption will not produce a significant adverse effect on the established community of organisms in the receiving body of water or otherwise significantly impair any of the designated uses of the receiving body of water.

4. The applicant shall affirmatively demonstrate to the Department that the requirements of paragraph (5)(c), of this rule, will be met.

(d) A mixing zone shall not include an existing drinking water supply intake or any other existing water supply intake if the constituents of such mixing zone would significantly impair the purposes for which the supply is used.

(e) A mixing zone shall not include a nursery area of indigenous aquatic life or any area approved by the Department of Environmental Protection for shellfish harvesting.

(f) In canals, rivers, streams, and other similar water bodies, the maximum length of a mixing zone shall be no more than 800 meters. In no case shall a mixing zone be larger than is necessary for the discharge to completely mix with the receiving water to meet water quality standards, and in no case shall a mixing zone significantly impair the designated use of the water body other than within the boundaries of the mixing zone.

(g) In lakes, estuaries, bays, lagoons, bayous, sounds, and coastal waters, the area of mixing zone shall be 125,600 square meters unless a lesser area is necessary to prevent significant impairment of a designated use. In no case shall a mixing zone be larger than is necessary to meet water quality standards.

(h) In open ocean waters, the area of a mixing zone shall be 502,655 square meters unless a lesser area is necessary to prevent significant impairment of a designated use. In no case shall a mixing zone be larger than is necessary to meet water quality standards.

(i) The mixing zones in a given water body shall not cumulatively exceed the limits described below:

1. In rivers, canals, and streams, and tributaries thereto and other similar water bodies: 10% of the total length,

2. In lakes, estuaries, bays, lagoons, bayous and sounds: 10% of the total area.

(j) Within mixing zones in Class I, Class II, and Class III waters, the turbidity shall not average greater than 41 Nephelometric Turbidity Units above natural background.

(k) Mixing zones in Class IV and V waters are subject only to the provisions of paragraph (d), above, and of Rule 62-302.500, F.A.C., and shall not significantly impair the designated uses of the receiving body of water.

(2) There shall be no mixing zone for any component of any discharge unless a Department permit containing a description of its boundaries has been issued for that component of the discharge.

(3)(a) Waters within mixing zones shall not be degraded below the minimum standards prescribed for all waters at all times in Rule 62-302.500, F.A.C. In determining compliance with the provisions of subsection 62-302.500(1), F.A.C., the average concentration of wastes in the mixing zone shall be measured or computed using generally accepted scientific techniques; provided that, the maximum concentration of wastes in the mixing zone shall not exceed the amount lethal to 50% of the test organisms in 96 hours (96 hr. $LC_{50}$) for a species significant to the indigenous aquatic community, except as provided in paragraph (b), (c) or (d), below. The dissolved oxygen value within any mixing zone shall not be less than 1.5 milligrams per liter at any time or place, except for an open ocean discharge, which must be above 1.5 milligrams per liter within 20 feet of the outfall structure.

(b) Except for open ocean discharges described in paragraph (c), and ionic imbalanced demineralization concentrate discharges, described in paragraph (d), below, the maximum concentration of wastes in the mixing zone may exceed the 96 hr. $LC_{50}$ only when all of the following conditions are satisfied.

1. Dilution ratio of the effluent exceeds 100:1 under critical conditions. That is, flow in the receiving waters exceeds 100 units for every unit of effluent flow under critical conditions. Critical conditions are defined as those under which least dilution of the effluent is expected, e.g., maximum effluent flow and minimum receiving stream flow.

2. High rate diffusers or other similar means are used to induce rapid initial mixing of the effluent with the receiving waters such that exposure of organisms to lethal concentrations is minimized.

3. Toxicity must be less than acute [as defined in subsection 62-302.200(1), F.A.C.] no more than a distance of 50 times the discharge length scale in any spatial direction. The discharge length scale is defined as the square root of the cross-sectional area of any discharge outlet. In the case of a multiport diffuser, this requirement must be met for each port, using the appropriate discharge length scale for that port. This restriction will ensure a dilution factor of at least 10 within this distance under all possible circumstances, including situations of severe bottom interaction, surface interaction, or lateral merging.

4. The effluent when diluted to 30% of full strength, shall not cause more than 50% mortality in 96 hours (96 hr. $LC_{50}$) in a species significant to the indigenous aquatic community.

5. If the following pollutants are present in the effluent, their concentrations (in the effluent) shall not exceed the values listed: Acrylonitrile 65 ug/l

Aldrin 7.5 ng/l

Dieldrin 7.5 ng/l

Benzene 4 mg/l

Benzidine 53 ng/l

Beryllium 6.4 ug/l

Cadmium 100 ug/l

Carbon Tetrachloride 694 ug/l

Chlordane 48 ng/l

Chlorinated ethanes:

    1,2-dichloroethane 24.3 mg/l

    1,1,2-trichloroethane 4.2 mg/l

    1,1,2,2-tetrachloroethane 1 mg/l

Hexachloroethane 874 ug/l

Chloroalkyl Ethers:

    bis(chloromethyl) ether 184 ng/l

    bis(2-chloroethyl) ether 136 ug/l

Chloroform 1.57 mg/l

Chromium (hexavalent) 0.5 mg/l

DDT 2.4 ug/l

Dichlorobenzidine 2 ug/l

1,1-Dichloroethylene 185 ug/l

Dinitrotoluene 11 ug/l

Diphenylydrazine 56 ug/l

Ethylbenzene 33 mg/l

Fluoranthene 540 ug/l

Halomethanes 1.6 mg/l

Heptachlor 29 ng/l

Hexachlorobenzene 74 ng/l

Hexachlorocyclohexane

    $\alpha$Hexachlorocyclohexane 310 ng/l

    $\beta$Hexachlorocyclohexane 547 ng/l

    $\gamma$Hexachlorocyclohexane 625 ng/l

Lead 0.5 mg/l

Mercury 1.5 ug/l

Nickel 1 mg/l

Nitrosamines 124 ug/l

Polynuclear aromatic hydrocarbons 3 ug/l

Polychlorinated biphenyls (PCBs) 8 ng/l

Selenium 100 ug/l

Tetrachloroethylene 885 ug/l

Thallium 480 ug/l

Toxaphene 73 ng/l

Trichloroethylene 8 mg/l

Vinyl Chloride 52 mg/l

    (c) For open ocean discharges:

    1. The effluent, when diluted to 30% full strength with water having a salinity representative of the average receiving-water's salinity, shall not cause more than 50% mortality in 96 hours (96 hr. $LC_{50}$) in a species significant to the indigenous aquatic community.

    2. Rapid dilution shall be ensured by the use of multiport diffusers, or a single port outfall designed (by a professional engineer

registered in Florida) to achieve a minimum of 20:1 dilution of the effluent prior to reaching the surface. This dilution shall be determined using the appropriate plume model described in the EPA document, "Initial Mixing Characteristics of Municipal Ocean Discharges: Volume 1. Procedures and Applications," using the "Single plume, stagnant ambient" procedures or current speeds as established by field measurements. Miami-Dade Central District, Miami-Dade North District, City of Hollywood, and Broward County may use 12.3 cm/sec as a default value for ambient current speed at the present location of their respective outfalls. Alternatively, dilution studies for facilities not using the "Single plume, stagnant ambient" procedures or the 12.3 cm/sec default ambient current speed (as appropriate) shall be conducted in accordance with a site-specific Department approved Plan of Study. The Plan of Study shall be approved upon a demonstration by the applicant that the plan will produce data to characterize the daily, seasonal, and annual fluctuations in current speed and direction. The discharge shall otherwise comply with federal law.

3. For open ocean dischargers that comply with the requirements of subparagraphs 62-4.244(3)(c)1. and 2., F.A.C., compliance with applicable water quality criteria specified in Rule 62-302.530, F.A.C. (criteria), must be achieved by the point the discharge attains 20:1 dilution rather than at the point of discharge. Mixing zones shall not be necessary for any parameter that requires 20:1 dilution or less to attain criteria. However, effluent limitations will be set by permit, and dilutions will be granted up to 20:1 in these limitations, for parameters that exceed criteria at the end-of-pipe.

a. The demonstration of required dilution shall be determined by the ratio of the worst case effluent concentration (WCEC) minus the worst case background concentration to the criterion minus the worst case background concentration, i.e.:

$$\frac{(\text{Worst case effluent concentration} - \text{Worst case background concentration})}{(\text{Criterion} - \text{Worst case background concentration})}$$

b. The WCEC for parameters that exceed criteria in the effluent shall be the 95th percentile effluent concentration (of DMR or other data collected in accordance with the sampling requirements of the permit measured for the most recent 3-year monitoring period, at the time of permit renewal) for each such parameter and not based on the maximum amount of dilution available. The WCEC used to demonstrate the required dilution for a parameter shall also be used as a facility performance check for each such parameter. Any exceedance of the WCEC shall provide sufficient cause for the Department to re-evaluate the applicability of this section and revise the permit. Additionally, any measured value(s) of sufficient concentration to require greater than 20:1 dilution to attain criteria shall be considered as a violation of the permit.

4. Subparagraph 62-4.244(3)(c)3., F.A.C., does not apply to bacterial criteria or silver in marine waters.

(d) Discharges of demineralization concentrate, as defined in Section 403.0882(2)(a), F.S., for which ionic imbalance is demonstrated, may exceed the 96 hr. $LC_{50}$ in a mixing zone no greater than the area defined in sub-subparagraphs 62-4.244(3)(d)1.b. and 2.a., F.A.C. Ionic imbalance is defined as the failure of whole effluent toxicity tests caused predominantly by the presence of major ionic constituents naturally occurring in the source water (limited to calcium, potassium, sodium, magnesium, chloride, bromide, and other constituents designated by the Department). Ionic imbalance is shown using the protocols contained in "Technical Guidance Document for Conducting the Florida Department of Environmental Protection's Protocols for Determining Major-Seawater-Ion Imbalance Toxicity (MSIIT) in Membrane-Technology Water-Treatment Concentrate" (FDEP, Bureau of Laboratories, May 4, 2004), which is adopted and incorporated by reference herein. Mixing zones for toxicity caused by ionic imbalance, as described in this paragraph, are allowed under the following conditions:

1. For all demineralization concentrate discharges defined in Section 403.0882(2)(a), F.S., except for small water utility businesses defined in Section 403.0882(2)(b), F.S.:

a. The effluent, when diluted to 20% full strength with laboratory pure water having a salinity representative of the receiving water's salinity, shall not cause more than 50% mortality in 96 hours (96 hr. $LC_{50}$) in a species significant to the indigenous aquatic community; and,

b. Under all ambient receiving water flow conditions, the effluent, mixed with receiving waters, must meet water quality standards within a distance not in excess of two times the natural water depth at the point of discharge. The natural water depth is defined as either the depth at Mean Lower Low Water (MLLW) Level in tidally affected waters or the depth at the seven-day, ten-year low flow (7Q10) conditions for non-tidal rivers, streams, canals, or ship channels. In no case shall the depth be artificially changed from its existing depth for the purpose of extending the area for complying with water quality standards and the acute toxicity requirements of paragraph 62-4.244(3)(d), F.A.C.

2. For small water utility businesses, as defined in Section 403.0882(2)(b), F.S.;

a. The discharge must achieve a minimum of 4-to-1 dilution within a distance not in excess of two times the natural water depth,

as described in subparagraph 62-4.244(3)(d)1.b., F.A.C., at the point of discharge; and,

b. The effluent, when diluted to 20% full strength with laboratory pure water having a salinity representative of the receiving water's salinity, shall not cause more than 50% mortality in 96 hours (96 hr. $LC_{50}$) in a species significant to the indigenous aquatic community.

(4) Except for the minimum conditions of waters as specified in Rule 62-302.500, F.A.C., and the provisions of Rule 62-4.244, F.A.C., no other water quality criteria apply within a mixing zone.

(5) Mixing zones for dredge and fill permits shall not be subject to the provisions in paragraphs (1)(c) through (j), subsection (2), (3), or (4) of this rule, provided that applicable water quality standards are met at the boundary and outside the mixing zone.

(a) The dimensions of dredge and fill mixing zones shall be proposed by the applicant and approved, modified or denied by the Department.

(b) Criteria for departmental evaluation of a proposed mixing zone shall include site-specific biological and hydrographic or hydrological considerations.

(c) In no case shall the boundary of a Joint Coastal Permit mixing zone be more than 1000 meters from the point of discharge into the waterbody or the boundary of a dredge and fill mixing zone be more than 150 meters downstream in flowing streams or 150 meters in radius in other bodies of water, where these distances are measured from the cutterhead, return flow, discharge, or other points of generation of turbidity or other pollutants.

(d) When determining the appropriate size of a turbidity mixing zone for a Joint Coastal Permit, the Department shall also use the following criteria:

1. Measures will be implemented to minimize the magnitude and duration of turbidity to the maximum extent practicable;

2. Mixing zones shall be kept to the minimum size necessary to meet the turbidity standard; and,

3. Mixing zones shall not encompass hardbottom communities, coral resources, or submerged aquatic vegetation beds outside of the authorized impact sites unless those areas are also evaluated as impact sites.

(6) Where a receiving body of water fails to meet a water quality standard for pollutants set forth in department rules, a steam electric generating plant discharge of pollutants that existed or was licensed July 1, 1984, may be granted a mixing zone, provided that:

(a) The standard would not be met in the water body in the absence of the discharge; and,

(b) The discharge is in compliance with all applicable technology-based effluent limitations; and,

(c) The discharge does not cause a measurable increase in the degree of noncompliance with the standard at the boundary of the mixing zone; and,

(d) The discharge otherwise complies with the mixing zone provisions specified in this section.

(7) Additional relief from mixing zone restrictions necessary to prevent significant impairment of a designated use is through:

(a) Reclassification of the water body pursuant to Rule 62-302.400, F.A.C.;

(b) Variance granted pursuant to Section 403.201, F.S., and Rule 62-103.100, F.A.C.

(c) Modification of the requirements of this section for specific criteria by the Secretary upon compliance with the notice and hearing requirements for mixing zones set forth in paragraph (1)(c), above, and upon affirmative demonstration by an applicant that the applicant's discharge from a source existing on the effective date of this rule complies with best technology economically achievable, best management practices, or other requirements set forth in Chapter 62-600, F.A.C., and the economic, environmental and social costs of compliance with the existing criteria outweigh the social, environmental, and economic benefits of compliance with more stringent discharge limitations necessary to comply with mixing zone requirements of subsection 62-4.244(1), F.A.C., and the provisions relating to dissolved oxygen in Rule 62-4.244, F.A.C.

1. No discharger may be issued more than one permit or permit modification or renewal which allows a modification pursuant to this subsection unless the applicant affirmatively demonstrates that it has undertaken a continuing program, approved by the Department, designed to consider water quality conditions and review or develop any reasonable means of achieving compliance with the water quality criteria from which relief has been granted pursuant to this subsection.

2. With respect to paragraphs 62-4.244(1)(c) and 62-4.244(7)(c), F.A.C., the applicant must affirmatively demonstrate the minimum area of the water body necessary to achieve compliance with either subsection. Within a minimum area determined by the Secretary to be necessary to achieve compliance, the discharger shall be exempt from the criterion for which a demonstration has been made.

(d) Whenever site specific alternative criteria are established pursuant to Rule 62-302.800 or paragraph 62-302.510(2)(g),

F.A.C., a mixing zone may be issued for dissolved oxygen if all provisions of Rule 62-4.244, F.A.C., are met with the exception of subparagraph 62-4.244(1)(j)1., F.A.C.

*Rulemaking Authority 403.051, 403.061, 403.062, 403.087, 403.0882, 403.804, 403.805 FS. Law Implemented 403.021, 403.051, 403.061, 403.087, 403.088, 403.0882, 403.101, 403.121, 403.141, 403.161, 403.182, 403.201, 403.502, 403.702, 403.708 FS. History–Formerly part of 17-3.05, Revised and Renumbered 3-1-79, Amended 10-2-80, 1-1-83, 2-1-83, 2-19-84, 4-26-87, 8-31-88, 10-17-90, Formerly 17-4.244, Amended 3-26-00, 12-13-05, 8-1-13, 2-17-16.*

**62-4.246 Sampling, Testing Methods, and Method Detection Limits for Water Pollution Sources.**

(1) The Department shall require monitoring and sampling for pollutants reasonably expected to be contained in the discharge and to violate the water quality criteria in Chapter 62-302, F.A.C.

(2) Field testing, sample collection and preservation, laboratory testing, including quality control procedures, and all record keeping shall comply with Chapter 62-160, F.A.C.

(3) Subsections (4)-(11), of this rule, apply only to permit applications, permits, monitoring reports, and other sources of data relating to discharges to surface waters.

(4) Using generally accepted scientific procedures, the Department shall establish and publish a method detection limit (MDL) and practical quantification limit (PQL) for each approved analytical method for a parameter (including any pollutant). On request, the Department shall make available a list of all current established MDLs and PQLs. The permittee may request and the Department shall consider approval for alternative methods or for alternative MDLs and PQLs for any approved analytical method, in accordance with the criteria of Rules 62-160.520 (New Methods, Validation Requirements) and 62-160.530 (Approval of Alternate Test Procedures), F.A.C. Permit applications, permits, and monitoring reports shall specify the applicable MDL and PQL established by the Department for each parameter.

(5) When establishing effluent limits in accordance with Rule 62-650, F.A.C., for pollutants for which MDLs are higher than the established water quality criteria, the Department shall base the limits on concentrations in the receiving waters computed in accordance with generally accepted scientific procedures and with subsections (8), (10) and (11), of this rule. Permit applications and monitoring reports shall identify results below the MDL. Except as specified in subsections (8) and (10), below, such results shall demonstrate compliance for that pollutant.

(6) All results submitted to the Department for permit applications and monitoring shall be reported as follows.

(a) The approved analytical method and corresponding Department-established MDL and PQL levels shall be reported for each pollutant. The MDLs and PQLs incorporated in the permit shall constitute the minimum reporting levels for each parameter for the life of the permit. The Department shall not accept results for which the laboratory's MDLs or PQLs are greater than those incorporated in the permit. All results with laboratory MDLs and PQLs lower than those established in the permit shall be reported to the Department. Unless otherwise specified, all subsequent references to MDL and PQL pertain to the MDLs and PQLs incorporated in the permit.

(b) Results greater than or equal to the PQL shall be reported as the measured quantity.

(c) Results less than the PQL and greater than or equal to the MDL shall be reported as less than the PQL and deemed to be equal to the MDL.

(d) Results less than the MDL shall be reported as less than the MDL.

(e) The following table is intended as a guide in the use of paragraphs (6)(b)-(d), for determining compliance with permit limits. Common abbreviations used in this table are as follows:

PQL means practical quantification limit

MDL means method detection limit

> means greater than

38 means less than

= means equal to.

### Table 1 COMPLIANCE DETERMINATION

| PERMIT LIMIT | DATA | COMPLIANCE | NONCOMPLIANCE |
|---|---|---|---|
| (6)(b) | > | | |
| Greater than or | Permit Limit | | * |
| Equal to PQL | | | |

| | | | |
|---|---|---|---|
| | 39 or = | | |
| | Permit Limit | * | |
| (6)(c) | > or = | | |
| Less Than PQL But | 39 PQL | * | |
| Greater Than or | | | |
| Equal to MDL | | | |
| | 39 PQL | * | |
| (6)(d) | > or = | | |
| Less Than MDL | MDL | | * |
| 39 MDL | * | | |

(7) When all the results or projected concentrations for the effluent and the receiving water are below the MDL for a particular parameter, the Department shall deem the permittee to be in compliance with the applicable criterion or permit limit, subject to the provisions of subsections (8) and (10), below, when applicable.

(8) The presence of toxicity (as established through biomonitoring), data from analysis of plant or animal tissue, contamination of sediment in the vicinity of the installation, intermittent violations of effluent limits or water quality standards, or other similar kinds of evidence reasonably related to the installation may indicate that a pollutant in the effluent may cause or contribute to violations of water quality criteria. If there is such evidence of possible water quality violations, then (unless the permittee has complied with subsection (9), below) in reviewing reports and applications to establish permit conditions and determine compliance with permits and water quality criteria, the Department shall treat any result less than the MDL of the method required in the permit or the method as required under subsection (10), below, or any lower MDL reported by the permittee's laboratory as being one half the MDL (if the criterion equals or exceeds the MDL) or one half the criterion (if the criterion is less than the MDL), for any pollutant. Without the permission of the applicant, the Department shall not use any values determined under this subsection or subsection (9) below for results obtained under a MDL superseded later by a lower MDL.

(9) As an alternative to the procedure described in subsection (8), above, for determining the value of any result, the permittee may select and follow any procedure if set forth in any of the sources listed in this subsection below or shown by the permittee to provide equivalent reasonable assurance of accuracy and reliability, and if applicable to the particular discharge. Such equivalency of reasonable assurance and the applicability of each such procedure shall be determined in accordance with generally accepted methods of statistical analysis for that procedure. The following sources are incorporated here by reference.

(a) Gilbert, O.R., 1987. Statistical Methods For Environmental Pollution Monitoring, Van Nostrand Reinhold Company.

(b) Hollander, M., and D.A. Wolfe, 1973. Nonparametric Statistical Methods. Wiley, New York.

(c) USEPA. 1989. Draft Technical Guidance Manual for Performing Wasteload Allocations. Book III: Estuaries. Part 1: Estuaries and WLA Models. Center for Exposure Assessment Modeling. Athens, Ga.

(d) USEPA. 1991. Technical Support Document for Water Quality-Based Toxics Control. Office of Water Regulations and Standards. Washington, DC. EPA/505/2-90-001.

(e) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 1: Biochemical Oxygen Demand/Dissolved Oxygen. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/020.

(f) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 2: Nutrient/Eutrophication Impact. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/021.

(g) USEPA. 1984. Technical Guidance Manual for Performing Wasteload Allocations. Book II: Streams and Rivers. Chapter 3: Toxic Substances. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/022.

(h) USEPA. 1983. Technical Guidance Manual for Performing Wasteload Allocations. Book IV: Lakes and Impoundments. Chapter 2: Nutrient/Eutrophication Impacts. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-84/019.

(i) USEPA. 1986. Technical Guidance Manual for Performing Wasteload Allocations. Book IV: Lakes and Impoundments. Chapter 3: Toxic Substances. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-87/002.

(j) USEPA. 1986. Technical Guidance Manual for Performing Wasteload Allocations. Book VI: Stream Design Flow for Steady-State Modeling. Office of Water Regulations and Standards. Washington, DC. EPA/440/4-87/004.

(k) USEPA. 1985. Water Quality Assessment: A Screening Procedure for Toxic and Conventional Pollutants. Office of Research and Development. Athens, Ga. EPA/600/6-85/002 a and b.

(10) If there is evidence of possible water quality violations as set forth in subsection (8), above, and if the water quality criterion for the pollutant is lower than the MDL, the Department shall require the permittee to use the approved analytical method with the lowest MDL from those published by the Department or established by the permittee's laboratory for each such pollutant, for all reports and applications, to establish permit conditions and determine compliance. The Department shall not require the permittee to use an MDL lower than necessary to demonstrate compliance.

(11) If there is evidence that a pollutant in the effluent is reasonably expected to cause or contribute to water quality violations but there is no evidence of the presence of that pollutant in the ambient background receiving water, the Department shall treat the ambient background value of that pollutant in the receiving water as zero in establishing the pertinent effluent limit.

*Rulemaking Authority 403.051, 403.061, 403.087, 403.504, 403.704, 403.804, 403.805 FS. Law Implemented 403.021, 403.051, 403.061, 403.087, 403.088, 403.091, 403.121, 403.141, 403.161, 403.182, 403.502, 403.702, 403.708 FS. History–Formerly 17-3.03, Amended and Renumbered 3-1-79, Amended 4-26-87, 8-31-88, 6-4-92, 6-13-93, Formerly 17-4.246.*

### 62-4.249 Preservation of Rights.

*Rulemaking Authority 403.061, 403.062, 403.087, 403.504, 403.704, 403.804, 403.805 FS. Law Implemented 403.021, 403.061, 403.087, 403.088, 403.091, 403.101, 403.121, 403.141, 403.161, 403.182, 403.502, 403.702, 402.708 FS. History–New 3-1-79, Amended 8-31-88, Formerly 17-4.249, Repealed 2-16-12.*

### 62-4.250 Water Pollution Temporary Operation Permits; Conditions.

*Rulemaking Authority 403.021, 403.031, 403.061, 403.088 FS. Law Implemented 403.021, 403.031, 403.061, 403.087, 403.088(5)(c) FS. History–New 5-17-72, Amended 3-26-74, Formerly 17-4.25, Amended 8-31-88, 9-13-89, Formerly 17-4.250, Repealed 2-16-12.*

### 62-4.510 Scope of Part III.

This Part defines general permits and establishes the procedures for persons who may wish to use a general permit, except that the procedures for any person who may wish to use a general permit for a source of air pollutant emissions, and all conditions of such a general permit, are established at Chapters 62-210 and 62-213, F.A.C. The provisions of this Part shall not apply to activities regulated under Part IV of Chapter 373, F.S. However, this Part shall continue to apply to those activities grandfathered under Sections 373.414(11), (12)(a), (13), (14), (15), (16) and 373.4145(6), F.S.

*Rulemaking Authority 373.026, 373.043, 373.044, 373.109, 373.113, 373.4145, 373.418, 403.021, 403.031, 403.061, 403.087, 403.814(1) FS. Law Implemented 373.026, 373.044, 373.109, 373.409, 373.413, 373.4135, 373.414(9), (11), (12)(a), (13), (14), (15), (16), 373.4145, 373.418, 403.021, 403.031, 403.061, 403.087, 403.088, 403.814, 403.702-.73, 403.851-.864 FS. History–New 7-8-82, Formerly 17-4.51, Amended 8-31-88, Formerly 17-4.510, Amended 4-18-95, 7-4-95, 10-16-95, 4-16-01, 10-1-07.*

### 62-4.520 Definition.

A general permit is a permit issued by rule of the Department pursuant to Section 403.814, F.S., which authorizes persons to undertake certain activities which cause minimal adverse environmental impact when performed in accordance with specific requirements and practices set forth in the general permit. A general permit also constitutes water quality certification pursuant to Section 401, Public Law 92-500, 33 USC Section 1341, for the activity described in the general permit when the activity is performed in accordance with all applicable rules of the Department.

*Rulemaking Authority 403.814 FS. Law Implemented 403.061, 403.087, 403.088, 403.814, 403.702-.73, 403.851-.864, 403.91-.938 FS. History–New 7-8-82, Formerly 17-4.52, Amended 8-31-88, 7-11-90, Formerly 17-4.520.*

### 62-4.530 Procedures.

(1) Persons wishing to use one or more of the general permits set forth in the Department's rules shall, at least 30 days before beginning any work, notify the Department in writing or on forms adopted by the department. They shall describe the proposed project, and include supporting documents depicting the proposed project, its location, and other pertinent information as required by rule to demonstrate that they qualify for the requested general permit. Persons wishing to use a general permit shall notify the appropriate office of the Department in writing. Persons wishing to use a general permit are hereby placed on notice that projects

undertaken without proof of notice to the Department shall be considered as being undertaken without a permit and shall be subject to enforcement pursuant to Section 403.161, F.S.

(2) A proposed project which may be reasonably expected to violate air quality standards, water quality standards, or drinking water standards or which will not meet the public interest requirements set forth in Chapter 403, F.S., shall not be entitled to use of a general permit.

(3) Pursuant to Section 258.397, F.S., no project which is located in the Biscayne Bay Aquatic Preserve is eligible for a general permit.

(4) Suspension or revocation of the use of a general permit shall be in accordance with Chapter 120, F.S. Good cause for the suspension or revocation shall include:

(a) Submission of false or inaccurate information in the notification for use of a general permit or in the required reports;

(b) Violation of law, Department orders, rules or permit conditions;

(c) Refusal of lawful inspection under Section 403.091, F.S., or

(d) Any other act on the part of the permittee in the use of the general permit which results or may result in harm or injury to human health or welfare, or which causes harm or injury to animal, plant or aquatic life, or to property.

(5) Unless otherwise required as part of a specific category of general permit, persons qualifying for the use of a general permit are not required to, but may, publish in a newspaper of general circulation in the area affected by the proposed project a notice of intent to use a general permit. The notice, if published, shall follow substantially the format in Rule 62-103.150, F.A.C., and shall be published within 14 days of the date when the department receives notification pursuant to subsection 62-4.530(1), F.A.C. No person who has published notice shall begin work until after the 21 days for requesting a hearing has passed or a hearing is held and a decision is rendered.

(6) Any person complying with the requirements of a general permit may use the permit 30 days after giving notice to the Department without any agency action. When no agency action is taken, unless the Department or the applicant publishes notice of the application, the provisions of Chapter 120, F.S., granting to affected parties the right to an administrative hearing do not apply.

*Rulemaking Authority 403.814(1) FS. Law Implemented 258.397, 403.061, 403.087, 403.088, 403.702–.73, 403.814, 403.851–.864 FS. History– New 7-8-82, Amended 6-16-84, Formerly 17-4.53, Amended 8-31-88, 3-19-90, Formerly 17-4.530.*

**62-4.540 General Conditions for All General Permits.**

(1) The terms, conditions, requirements, limitations, and restrictions set forth in this Part are "general permit conditions" and are binding upon the permittee. The conditions are enforceable under Chapter 403, F.S.

(2) The general permit is valid only for the specific activity indicated. Any deviation from the specified activity and the conditions for undertaking that activity shall constitute a violation of the permit. The permittee is placed on notice that violation of the permit may result in suspension or revocation of the permittee's use of the general permit and may cause the Department to begin legal proceedings.

(3) The general permit does not convey any vested rights or any exclusive privileges. It does not authorize any injury to public or private property nor any invasion of personal rights. It does not authorize any infringement of federal, state or local laws or regulations. It does not eliminate the necessity for obtaining any other federal, state or local permits that may be required, or allow the permittee to violate any more stringent standards established by federal or local law.

(4) The general permit does not relieve the permittee from liability and penalties when the construction or operation of the permitted activity causes harm or injury to human health or welfare; causes harm or injury to animal, plant or aquatic life; or causes harm or injury to property. It does not allow the permittee to cause pollution in contravention of Florida Statutes and Department rules.

(5) The general permit conveys no title to land or water, nor does it constitute State recognition or acknowledgment of title. It does not constitute authority for reclamation of submerged lands. Only the Board of Trustees of the Internal Improvement Trust Fund may express State opinion as to title.

(6) No general permit shall authorize the use of state owned land without the prior consent of the Board of Trustees of the Internal Improvement Trust Fund pursuant to Section 253.77, F.S.

(7) The general permit may be modified, suspended or revoked in accordance with Chapter 120, F.S., if the Secretary determines that there has been a violation of any of the terms or conditions of the permit, there has been a violation of state water quality standards or state air quality standards, or the permittee has submitted false, incomplete or inaccurate data or information.

(8) The general permit shall not be transferred to a third party except pursuant to Rule 62-4.120, F.A.C.

(9) The general permit authorizes construction and, where applicable, operation of the permitted facility.

(10) The permittee agrees in using the general permit to make every reasonable effort to conduct the specific activity or construction authorized by the general permit in a manner that will minimize any adverse effects on the adjacent property or on public use of the adjacent property, where applicable, and on the environment, including fish, wildlife, natural resources of the area, water quality or air quality.

(11) The permittee agrees in using the general permit to allow a duly authorized representative of the Department access to the permitted facility or activity at reasonable times to inspect and test upon presentation of credentials or other documents as may be required by law to determine compliance with the permit and the department rules.

(12) The permittee agrees to maintain any permitted facility, or activity in good condition and in accordance with the plans submitted to the department under subsection 62-4.530(1), F.A.C.

(13) A permittee's use of a general permit is limited to five years. However, the permittee may request continued use of the general permit by notifying the department pursuant to subsection 62-4.530(1), F.A.C. However, the permittee shall give notice of continued use of a general permit thirty days before it expires.

*Rulemaking Authority 403.814(1) FS. Law Implemented 253.123, 253.124, 403.061, 403.087, 403.088, 403.702-.73, 403.814, 403.851-.864 FS. History–New 7-8-82, Formerly 17-4.54, Amended 8-31-88, Formerly 17-4.540.*

# CHAPTER 62-110
## EXCEPTIONS TO THE UNIFORM RULES OF PROCEDURE

62-110.103    Rulemaking Procedures
62-110.104    Variances or Waivers
62-110.105    Formal Determinations of the Landward Extent of Wetlands and Surface Waters
62-110.106    Decisions Determining Substantial Interests
62-110.107    Licensing

**62-110.103 Rulemaking Procedures.**

(1) Notice.

(a) In addition to complying with the notice provisions of Rule Chapter 28-103 of the Uniform Rules of Procedure, notice of the Department's intent to adopt, amend, or repeal a rule shall be given in accordance with any applicable federal regulations, and a copy of the notice for any rulemaking hearing before the Environmental Regulation Commission shall be mailed to each Commissioner on the same day the notice is submitted to the Florida Administrative Register.

(b) When a proposed rule is directed toward a particular class of persons, the notice published in the Florida Administrative Register is the prescribed notice unless a statute requires additional notice.

(2) Public Participation.

(a) In conducting the hearing, the Commission or Secretary shall swear all witnesses and shall follow Robert's Rules of Order Newly Revised (9th ed. 1990) when necessary to resolve procedural questions not covered by either the Department's rules or the Uniform Rules of Procedure.

(b) After publication of the notice of proposed rulemaking under Section 120.54(3)(a), F.S., any proposed amendments to the rule as noticed or other comments or objections should be submitted in writing no later than fifteen days before the hearing to the Commission and the Secretary, to allow sufficient time to evaluate the proposed amendments and facilitate greater public participation. Nothing in this paragraph shall be considered to abridge the right of any affected person to participate at a hearing conducted by the Commission or Secretary. Proposed amendments submitted in accordance with this paragraph shall:

1. Be submitted on opaque, unglossed white paper measuring 8 1/2 by 11 inches, with numbered lines, and clearly identify the portion of the rule proposed to be amended,

2. Indicate deletions from the rule as noticed by double struck-through type and additions by double underlining; and,

3. Include an explanation of the reasons for the proposed amendment and objections to the language of the rule as noticed.

(3) Rulemaking proceedings before the Commission shall be recorded. The Department shall make appropriate arrangements to ensure that the Commission rulemaking proceedings are recorded and preserved. A written transcript of the rulemaking proceeding shall be prepared, if requested, at the cost of the requesting party. Rulemaking proceedings before the Secretary shall be mechanically recorded and preserved. If requested, a written transcript of the recording shall be prepared, or a copy of the recording provided, at the cost of the requesting person.

*Rulemaking Authority 120.54(5) FS. Law Implemented 120.52(7), 120.54(3)(a),(c),(5)(b), 120.569, 120.57, 373.026, 373.044, 403.804, 403.805 FS. History–New 7-1-98.*

**62-110.104 Variances or Waivers.**

(1) Although a person seeking a variance under Section 120.542 F.S., must comply with Rule Chapter 28-104, F.A.C., a person seeking a variance under Section 373.414(17) or 403.201, F.S., must demonstrate that any hardship asserted as a basis of the need for a variance is peculiar to the affected property and not self-imposed and that the grant of a variance will be consistent with the general intent and purpose of Section 373.414 or Chapter 403, F.S., as applicable. Any person seeking such a variance shall file a petition containing the following information:

(a) The petitioner's name and signature.

(b) The statute or rule from which the variance is sought.

(c) Facts showing that a variance should be granted for one of the reasons set forth in Section 403.201, F.S.

(d) The time period for which the variance is sought, including the reasons and facts supporting the time period.

(e) The requirements that the petitioner can meet, including the date or time when the requirements will be met.

(f) The steps or measures that the petitioner is taking to meet the requirement from which the variance is sought. If the request is pursuant to Section 403.201(1)(b), F.S., the petitioner shall include a schedule when compliance will be achieved.

(g) The social, economic, and environmental impacts on the applicant and on residents of the area and of the state if the variance is granted.

(h) The social, economic, and environmental impacts on the applicant and on residents of the area and of the state if the variance is denied.

(2) The Department shall review a petition for a variance under Section 373.414(17) or 403.201, F.S., within thirty days after receipt to determine if the application is complete. If the petition is determined to be incomplete, the petitioner shall be afforded an opportunity to supply additional information before the Department evaluates the merits of the request.

(3) The Department shall prepare a notice of intended agency action on the petition for a variance under Section 373.414(17) or 403.201, F.S. The Department shall publish this notice once in the Florida Administrative Register, and the petitioner shall publish notice of intended agency action on the petition once, at his own expense, in a newspaper of general circulation (as defined in Section 50.031, F.S.) in the county in which the property for which the variance is sought is located.

(4) Renewals of variances shall be applied for in the same manner as the initial variance.

(5) Requests for variances from the permitting requirements for air operations shall be governed by subparagraph 62-212.400(4)(a)3.-6., F.A.C., drinking water variances shall be governed by Rule 62-560.510, F.A.C., those for variances for wastewater facilities discharging to surface waters shall be governed by paragraph 62-620.100(3)(p), F.A.C., (incorporating The Department of Environmental Protection Guide to Wastewater Permitting), and those for phosphate land reclamation variances under Section 378.212, F.S., shall be governed by Rule 62C-16.0045, F.A.C.

(6) Requests for waivers of chlorination requirements for public drinking water systems shall be governed by Rule 62-560.530, F.A.C., those for waivers of requirements for certified operators for such systems shall be governed by Rule 62-560.540, F.A.C., those for waivers of monitoring requirements for such systems shall be governed by Rule 62-560.545, F.A.C., and those for waivers of monitoring requirements for asbestos, dioxin, or butachlor in such systems shall be governed by Rule 62-560.546, F.A.C.

(7) Rule 62-620.800, F.A.C., shall govern requests for variances for discharges regulated under Section 403.0885, F.S., authorizing the federally approved state National Pollutant Discharge Elimination System (NPDES) Program for discharges of pollutants into waters of the state.

(8) Subsections 62-160.400(6)-(8), F.A.C., shall govern applications for approval of alternative procedures to the laboratory and field analytical and quality control requirements otherwise imposed by Rule 62-160.400, F.A.C.

(9) Rule 62-297.620, F.A.C., shall govern requests for approval of alternative procedures or requirements for any air pollution "emissions unit" as defined in subsection 62-210.200(111), F.A.C.

(10) Paragraph 62-601.400(1)(b), F.A.C., shall govern requests for approval of alternative methods for sampling and testing for wastewater facilities.

(11) Rule 62-701.310, F.A.C., shall govern requests for approval of alternative procedures and requirements for solid waste management facilities.

(12) For approval of variances and waivers for technical and financial audits under Section 376.3071(12)(k)5.a., F.S., a petitioner shall comply with Rule 28-104, F.A.C., except that the petition need not show why the variance or waiver requested would serve the purposes of the underlying statute.

*Rulemaking Authority 120.54(5), 373.044, 373.113, 373.414(9),(17), 378.212, 403.061(7), 403.087, 403.088, 403.0885, 403.08851, 403.853(3), 403.861(9) FS. Law Implemented 373.414(9),(17), 376.3071, 378.212, 403.031, 403.061, 403.0877, 403.088, 403.0885, 403.201, 403.852(12),(13), 403.853, 403.854(1),(4), 403.857 FS. History–New 7-1-98.*

**62-110.105 Formal Determinations of the Landward Extent of Wetlands and Surface Waters.**

Requests for formal determinations of the landward extent of wetlands and surface waters shall be governed by Rule 62-343.040, F.A.C.

*Rulemaking Authority 120.54(5), 373.026, 373.043, 373.044, 373.421 FS. Law Implemented 120.60, 373.026, 373.117, 373.421 FS. History–New 7-1-98.*

**62-110.106 Decisions Determining Substantial Interests.**

(1) Service. Service of any document shall be deemed complete upon being properly addressed, stamped, and deposited in the

United States Mail, or upon receipt of the complete document by the clerk of the Department or any other party to whom a document is sent by facsimile transmission or hand delivery (including express or courier services such as Federal Express).

(2) "Receipt of Notice of Agency Action" Defined. As an exception to subsection 28-106.111(2), F.A.C., for the purpose of determining the time for filing a petition for hearing on any actual or proposed action of the Department as set forth below in this rule, "receipt of notice of agency action" means either receipt of written notice or publication of the notice in a newspaper of general circulation in the county or counties in which the activity is to take place, whichever first occurs, except for persons entitled to written notice personally or by mail under Section 120.60(3), F.S., or any other statute. For purposes of this section, "publication of the notice" for hazardous waste permits shall mean the publication of the notice in a newspaper or the broadcast of the notice over a local radio station (both of which are required) in accordance with subsection 62-730.220(9), F.A.C., whichever is later. "Notice of agency action" shall include notice of intended agency action as well as actual agency action. For applications reviewed concurrently under Section 373.427, F.S., "notice of agency action" shall mean only the consolidated notice of intent to grant or deny. Except where otherwise provided by statute or this rule chapter, a timely petition requesting an administrative hearing shall be filed within twenty-one days of such receipt of notice of agency action.

(3) Time for Filing Petition.

(a) A petition shall be in the form required by Rule 28-106.201 or 28-106.301, F.A.C., and must be filed (received) in the office of General Counsel of the Department within the following number of days after receipt of notice of agency action, as defined in subsection (2) of this rule above:

1. Petitions concerning Department action or proposed action on applications for permits under Chapter 403, F.S., and related authorizations under Section 373.427, F.S., (except permits for hazardous waste facilities): fourteen days,

2. Petitions concerning Department action or proposed action on applications for hazardous waste facility permits: forty-five days,

3. Petitions concerning notices of violation: twenty days after receipt of the notice of violation,

4. Petitions concerning Department action or proposed action on applications for permits under statutes other than Chapter 403 or Section 373.427, F.S., or concerning other Department actions or proposed actions: twenty-one days.

The petitioner shall also serve a copy of the petition on all other parties to the proceeding, as identified in the notice, at the time of filing.

(b) Failure to file a petition within the applicable time period after receiving notice of agency action shall constitute a waiver of any right to request an administrative proceeding under Chapter 120, F.S.

(4) Enlargement of Time. For good cause shown, the Secretary of the Department (or the Secretary's designee) may grant an enlargement of time for the doing of any act required or allowed to be done under an order of the Department, the Uniform Rules of Procedure, or any rule of the Department or notice given under such a rule, if the request for such enlargement is made before the expiration of the period to be enlarged, or may allow the act to be done even if the period has expired, upon motion showing that the failure to act was the result of excusable neglect.

(5) Notices: General Requirements. Each person who files an application for a Department permit or other approval may publish or be required to publish a notice of application or other notice as set forth below in this section. Except as specifically provided otherwise in this paragraph, each person publishing such a notice under this section shall do so at his own expense in the legal advertisements section of a newspaper of general circulation (i.e., one that meets the requirements of Sections 50.011 and 50.031, F.S.) in the county or counties in which the activity will take place or the effects of the Department's proposed action will occur, and shall provide proof of the publication to the Department within seven days of the publication. For federally enforceable general permits approved by the Department for air operations, however, notice of a draft permit shall be published in the Florida Administrative Register, in accordance with 40 C.F.R. sec. 70.7(h)(1). In addition to the provisions of this section, other specific requirements for notices are as follows: notices for variances and waivers are governed by Rule 62-110.104, F.A.C., notices for federally enforceable air operation permits are governed by Rule 62-210.350, F.A.C., notices for exemptions for water quality criteria are governed by paragraph 62-4.243(1)(a), F.A.C., those for exemptions for water bodies classified for navigation, utility, and industrial use are governed by paragraph 62-4.243(2)(a), F.A.C., notices for exemptions from the limitations imposed on mixing zones are governed by paragraph 62-4.244(1)(c), F.A.C., notices for general permits are generally governed by subsection 62-4.530(5), F.A.C., notices on site-specific alternative criteria are governed by subparagraph 62-302.800(4)(c)7., F.A.C., notices for "noticed general permits" in the environmental resource permitting program are governed by paragraphs 62-343.090(1)(d)-(e), (2)(c), and (2)(h)-(j), F.A.C., notices on permits for underground injection wells are governed by Rule 62-528.315, F.A.C., notices

on wastewater facility permits are governed by Rule 62-620.550, F.A.C., notices for general permits for solid waste transfer stations are governed by subsection 62-701.801(7), F.A.C., and notices (including the federal requirement for such notice to be broadcast over one or more local radio stations) for hazardous waste permits are governed by subsections 62-730.220(9) and (11), F.A.C.

(6) Notice of Application. Publication of a notice of application shall be required for those projects that, because of their size, potential effect on the environment or natural resources, controversial nature, or location, are reasonably expected by the Department to result in a heightened public concern or likelihood of request for administrative proceedings. If required, the notice shall be published by the applicant one time only within fourteen days after a complete application is filed and shall contain the name of the applicant, a brief description of the project and its location, the location of the application file, and the times when it is available for public inspection. The notice shall be prepared by the Department and shall comply with the following format:

Notice of Application

The Department of Environmental Protection announces receipt of an application for permit from [name of applicant] to [brief description of project]. This proposed project will be located at [location] in [city, if applicable] in [county]. This application is being processed and is available for public inspection during normal business hours, 8:00 a.m. to 5:00 p.m., Monday through Friday, except legal holidays, at [name and address of office].

A notice of application for an environmental resource permit shall also contain the information required by Sections 373.413(3)-(4), F.S.

(7) Notice of Proposed Agency Action on Permit Application. After processing a permit application, the Department shall give the applicant either a notice of permit issuance (or denial) or a notice of the Department's intent to issue (or deny). Each such notice shall comply with the requirements for format, content, and publication as set forth below in this subsection.

(a) The Department shall require publication of notice of the Department's proposed action on an application in the following circumstances:

1. The Department shall require applicants to publish an intent to issue for all construction permits for domestic wastewater treatment plants, industrial wastewater treatment plants, Class I, Class III, or major Class V underground injection control wells, solid waste disposal facilities, hazardous waste facilities, and air pollution sources, as well as any other project (including any environmental resource or wetland resource project) that the Department finds is reasonably expected to result in a heightened public concern or likelihood of a request for administrative proceedings because of its size, potential effect on the environment or natural resources, controversial nature, or location. In addition, all applicants shall publish a notice of intent to issue under Rule 62-210.350, F.A.C., for federally enforceable air operation permits, permit revisions, and permit renewals, including those processed under the provisions of Chapter 62-213 of the F.A.C., but not for permit revisions meeting the requirements of subsection 62-213.412(1), F.A.C.

2. Applicants for construction permits for drinking water treatment plants whose facilities will discharge to surface or ground water and will be required to obtain a permit to discharge or any other permit from the Department shall publish a notice of intent to issue a permit.

3. Applicants for construction or expansion of solid waste facilities shall publish a notice of intent to deny a permit.

4. After publication of a notice of intent to issue or intent to deny a permit application, the applicant shall publish an additional notice if the subject activity or project is substantially modified by the applicant and the Department proposes to issue the permit with the modification. The additional notice shall not be required for applications for which a notice of administrative proceeding on a permit application has been published under paragraph (7)(e), below. For the purposes of this subparagraph, the phrase "substantially modified" means a relocation or modification of the activity or project that is reasonably expected to cause new or significantly greater adverse environmental impacts.

(b) The applicant shall cause the notice to be published as soon as possible after notification by the Department of its intended action. The provisions of Section 120.60(1), F.S., shall be tolled by the request of the Department for publication of the notice and shall resume fourteen days after receipt of proof of publication, at the address specified by the Department in its request for publication.

(c) The notice shall be prepared by the Department and shall contain the following:

1. The name of the applicant and a brief description of the proposed activity and its location,

2. The location of the application file and the times when it is available for public inspection,

3. A statement of the Department's intended action; and,

4. A notification of the opportunity to request an administrative hearing and mediation (if available) that reads substantially as

set forth in paragraph (12), of this rule, below.

(d) The notice required by this subsection shall read substantially as follows:

Notice of Intent to [insert "Issue" or "Deny" as appropriate] Permit

The Department of Environmental Protection gives notice of its intent to [issue] [deny] a permit to [name and address of applicant] to [brief description of project or activity]. The application is available for public inspection during normal business hours, 8:00 a.m. to 5:00 p.m., Monday through Friday, except legal holidays, at [name and address of office].

[Insert the language setting forth the notice of rights, as provided in paragraph (12), of this rule, below.]

(e) Notice of Administrative Proceeding. If the applicant initiates an administrative proceeding on a permit denial or an intent to deny and the project or activity is one for which publication of a notice of intent to issue would have been required under subparagraph (7)(a)1., above, the applicant shall publish a notice of administrative proceeding on permit application.

1. The notice shall be published at the applicant's expense either:

a. Within fifteen days after the applicant's petition for administrative proceeding has been forwarded to the Division of Administrative Hearing (DOAH) or within fifteen days after the initiation of an administrative proceeding before the Department under Section 120.569, F.S.; or, at the applicant's option,

b. Within fifteen days after the applicant has filed a request for an extension of time in which to file a petition for an administrative proceeding.

2. The notice shall read substantially as follows:

Notice of Administrative Proceeding on Permit Application

The Department of Environmental Protection gives notice of receipt of a [insert "request for an extension of time in which to file a" if appropriate] petition for an administrative proceeding (hearing) on the Department's [intent to deny] [denial of] a permit to [name and address of applicant, application number, OGC file number, and DOAH case number, if applicable] to [brief description of activity or project and of location].

The administrative hearing process is designed to formulate agency action. Accordingly, the Department's final action may be different from the proposed agency action and may result in the issuance of a permit as requested by the applicant or as modified in the course of the proceeding or by settlement.

[Insert the language setting forth the notice of rights, as provided in paragraph (12), of this rule, below.]

(f) Notices of intent to issue a permit for hazardous waste facilities shall be in the format set forth above but shall include the time frames and meet the federal requirements set forth in subsection 62-730.220(9) of the F.A.C.

(8) Notice of Proposed Agency Action (Non-permitting). On a matter other than a permit application, the Department or any applicant, petitioner for a variance or waiver, party to a consent order, or person seeking the Department's authorization or approval of a report, plan, proposal, or other request (excluding any request for hearing) may publish or be required to publish notice of the proposed action in substantially the following format:

State of Florida Department of Environmental Protection Notice of Proposed Agency Action

The Department of Environmental Protection gives notice that it proposes [insert phrase describing the agency action proposed (e.g., to approve a consent order)] in reference to [a description and location of the subject matter or activity covered by the action, the Department's identification number, and the name and address of any person to whom the action is directed]. Complete copies [of any document and accompanying material expressing the proposed agency action] are available for public inspection during normal business hours 8:00 a.m. to 5:00 p.m., Monday through Friday, except legal holidays, at [name and address of office].

[Insert the language setting forth the notice of rights, as provided in paragraph (12), of this rule, below, except that references in that notice to deadlines of fourteen days shall be replaced by references to twenty-one days.]

(9) Proof of Publication. Notice to substantially affected persons on applications for Department permits or other authorizations is an essential and integral part of the state environmental permitting process. Therefore, no application for a permit or other authorization for which published notice is required shall be granted until proof of publication of notice is made by furnishing a uniform affidavit in substantially the form prescribed in Section 50.051 of the Florida Statutes, to the office of the Department issuing the permit or other authorization. Applicants for hazardous waste permits must also comply with subsection 62-730.220(11), F.A.C.

(10)(a) Any applicant or person benefiting from the Department's action may elect to publish notice of the Department's intended or proposed action (or notice of a proceeding on such intended action) in the manner provided by subsection (7) or (8), above. Upon presentation of proof of publication to the Department before final agency action, any person who has elected to

publish such notice shall be entitled to the same benefits under this rule as a person who is required to publish notice. Since persons whose substantial interests are affected by a Department decision may petition for an administrative proceeding within the time provided in this rule (at subsection (3), above) after receipt of notice of agency action, and since receipt of such notice can occur at any time unless notice is given or published as prescribed in this rule, the applicant or other person requesting a particular action by the Department cannot justifiably rely on the finality of the Department's decision unless the notice has been duly published or otherwise provided to all persons substantially affected by the decision.

(b) The notices required by this rule may be combined with other notices required by the Department under Chapter 373, 376, 378, or 403, F.S., or Title 62 of the Florida Administrative Code. For applications concurrently reviewed under Section 373.427, F.S., the provisions of that statute shall govern.

(c) The provisions of this section shall also apply to the permitting and regulation of hazardous waste facilities, except that subsections 62-730.220(9), 62-730.220(11), and 62-730.310(6), F.A.C., shall govern to the extent that they provide for a different time or notice procedure than that set forth in this section.

(d) In issuing notices on permits or administrative orders under a federally delegated or approved program, the Department shall follow the procedures approved by the federal government for the Department's implementation of the program: Rule 62-210.350 of the F.A.C., for air quality programs, Rule 62-528.315, F.A.C., for the underground injection control program, Rule 62-620.550, F.A.C., for the National Pollutant Discharge Elimination System program, and subsection 62-730.220(9) and 62-730.220(11), F.A.C., for the program regulating hazardous wastes. In general, those rules require that the Department or the applicant give public notice that a draft permit (or an order that is not the result of a hearing under Section 120.569, F.S.) has been prepared, including a statement whether a public meeting has been scheduled on the permit or order. Public notice of such a permit or order shall allow at least thirty days for public comment for air, underground injection control, and national pollution discharge elimination system permits, and forty-five days for such public comment on hazardous waste permits. If a public meeting on such a permit or order is scheduled, public notice of the meeting shall be given at least thirty days before the meeting. The two notices may be combined.

(11) Failure to publish any notice of application, notice of intent to issue permit, or notice of agency action required by the Department shall be an independent basis for the denial of the permit or other pertinent approval or authorization.

(12) Notice of Right to Hearing and to Mediation. Every notice under this section required to include a notice of the right to an administrative hearing and to mediation (when available) shall read substantially as follows, in pertinent part:

[Insert either "The Department will issue the permit with the attached conditions" or "The Department's proposed agency action shall become final"] unless a timely petition for an administrative hearing is filed under Sections 120.569 and 120.57, F.S., before the deadline for filing a petition. [If mediation is available, insert: "Persons who have filed such a petition may seek to mediate the dispute, and choosing mediation will not adversely affect the right to a hearing if mediation does not result in a settlement."] The procedures for petitioning for a hearing are set forth below [if mediation is available, insert, "followed by the procedures for pursuing mediation"].

A person whose substantial interests are affected by the Department's proposed [insert either "permitting decision" or "agency action"] may petition for an administrative proceeding (hearing) under Sections 120.569 and 120.57, F.S. The petition must contain the information set forth below and must be filed (received) in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000.

[For written notice, insert the following: "Petitions by the applicant or any of the parties listed below must be filed within [insert "fourteen," "twenty," or "twenty-one," or "forty-five," as specified for the kind of agency action under subsection (3), of this rule, above] days of receipt of this written notice. Petitions filed by other persons."]

[For published notice related to a permit, insert the following: "Petitions filed by any persons other than those entitled to written notice under Section 120.60(3), F.S."] must be filed within [insert "fourteen," "twenty," or "twenty-one," or "forty-five," as specified for the kind of agency action under subsection (3), of this rule, above] days of publication of the notice or receipt of the written notice, whichever occurs first. [For written notice, insert the following: "Under Section 120.60(3), F.S., however, any person who asked the Department for notice of agency action may file a petition within fourteen days of receipt of such notice, regardless of the date of publication."] The petitioner shall mail a copy of the petition to the applicant at the address indicated above at the time of filing. The failure of any person to file a petition within the appropriate time period shall constitute a waiver of that person's right to request an administrative determination (hearing) under Sections 120.569 and 120.57, F.S., or to intervene in this proceeding and participate as a party to it. Any subsequent intervention (in a proceeding initiated by another party) will be only at the discretion of the presiding officer upon the filing of a motion in compliance with Rule 28-106.205, F.A.C.

A petition that disputes the material facts on which the Department's action is based must contain the following information: [insert the categories of required information listed in subsection 28-106.201(2), F.A.C.]. A petition that does not dispute the material facts on which the Department's action is based shall state that no such facts are in dispute and otherwise shall contain the same information as set forth above, as required by Rule 28-106.301, F.A.C.

Because the administrative hearing process is designed to formulate final agency action, the filing of a petition means that the Department's final action may be different from the position taken by it in this notice. Persons whose substantial interests will be affected by any such final decision of the Department have the right to petition to become a party to the proceeding, in accordance with the requirements set forth above.

[Insert either the statement that "Mediation is not available in this proceeding," or the following statement:

In addition to requesting an administrative hearing, any petitioner may elect to pursue mediation. The election may be accomplished by filing with the Department a mediation agreement with all parties to the proceeding (i.e., the applicant, the Department, and any person who has filed a timely and sufficient petition for a hearing). The agreement must contain all the information required by Rule 28-106.404, F.A.C. The agreement must be received by the clerk in the Office of General Counsel of the Department at 3900 Commonwealth Boulevard, Mail Station 35, Tallahassee, Florida 32399-3000, within ten days after the deadline for filing a petition, as set forth above. Choosing mediation will not adversely affect the right to a hearing if mediation does not result in a settlement.

As provided in Section 120.573, F.S., the timely agreement of all parties to mediate will toll the time limitations imposed by Sections 120.569 and 120.57, F.S., for holding an administrative hearing and issuing a final order. Unless otherwise agreed by the parties, the mediation must be concluded within sixty days of the execution of the agreement. If mediation results in settlement of the administrative dispute, the Department must enter a final order incorporating the agreement of the parties. Persons seeking to protect their substantial interests that would be affected by such a modified final decision must file their petitions within [insert "fourteen," "twenty," or "twenty-one," or "forty-five," as specified for the kind of agency action under subsection (3), of this rule, above] days of receipt of this notice, or they shall be deemed to have waived their right to a proceeding under Sections 120.569 and 120.57, F.S. If mediation terminates without settlement of the dispute, the Department shall notify all parties in writing that the administrative hearing processes under Sections 120.569 and 120.57, F.S., are resumed.]

Any party to this order has the right to seek judicial review of it under Section 120.68, F.S., by filing a notice of appeal under rule 9.110 of the Florida Rules of Appellate Procedure with the clerk of the Department in the Office of General Counsel, Mail Station 35, 3900 Commonwealth Boulevard, Tallahassee, Florida 32399-3000, and by filing a copy of the notice of appeal accompanied by the applicable filing fees with the appropriate district court of appeal. The notice of appeal must be filed within thirty days after this order if filed with the clerk of the Department.

*Rulemaking Authority 120.54(5), 403.061, 403.0876, 403.722(7), 403.815 FS. Law Implemented 120.54(5), 120.569, 120.57, 120.60, 161.0535, 373.413(4), 373.4145, 373.427, 403.0872(4)-(5), 403.0876, 403.121(2)(c), 403.201(3), 403.722, 403.814, 403.815 FS. History–New 7-1-98.*

**62-110.107 Licensing.**

(1) In addition to the requirements for the processing of applications under subsections 28-107.002(2), 62-4.055(1), 62-312.006(5), paragraph 62-343.090(2)(f), and Rules 62-343.040, and 62-620.510, F.A.C., govern the processing of applications by the Department, providing that an applicant or petitioner must respond to a request for additional information within a specified time period or the application or petition will be denied or dismissed. For hazardous waste permits, subsection 62-730.220(9), F.A.C., governs, providing in accordance with federal requirements and Section 403.722(10)(c), F.S., that the Department must give notice of its intent to issue or deny such a permit within 135 days (instead of the ninety-day period provided by Section 120.60(1), F.S.) after receipt of the original permit application, the last item of timely requested additional information, or the applicant's written request to begin processing the application. For Title V permits for air operations, paragraph 62-213.420(1)(b), F.A.C., governs, in accordance with federal requirements.

(2) When the Department has determined that immediate action is necessary to abate an imminent or currently existing serious threat to the public health, safety, welfare, or the environment, the Department shall issue an emergency order authorizing or directing activities necessary to abate the emergency. When such an order is issued in whole or part under the authority of Section 373.119(2), F.S., it may also be based on a serious threat to reasonable recreational, commercial, industrial, or agricultural uses. Such an order shall recite the factual basis for it in accordance with Section 120.569(2)(1), F.S., and include all conditions (including a limitation on the duration of the emergency authorization) required to ensure that the activity authorized or directed does not exceed that which is necessary to abate the threat. When the activity conducted under such an order has an operational or

maintenance aspect that continues beyond the emergency, any necessary permits shall be applied for as soon as practicable. Rule 62-210.700, F.A.C., shall govern the authorization of excess emissions of air contaminants because of startup, shutdown, or malfunction, subsection 62-256.450(4), F.A.C., shall govern authorization of otherwise unapproved devices and fuels for outdoor heating in the event of prolonged cold weather and shortage of approved fuels, subsections 62-256.500(4), 62-256.600(1), and paragraph 62-296.320(3)(b), F.A.C., shall govern the emergency authorization of open burning, and subparagraph 62-296.404(3)(a)3., F.A.C., shall govern the approval of contingency plans for emergency threats to air quality at pulp and paper mills. For the authorization of anticipated bypasses of wastewater discharges (intentionally diverted from any portion of a treatment works), subsection 62-620.610(22), F.A.C., shall govern. Rule 62-730.161, F.A.C., governs the procedures for obtaining an emergency identification number required before offering hazardous wastes for transport under specified special circumstances and emergency situations, and Rule 62-730.320, F.A.C., governs the procedures for emergency detonation or thermal treatment of reactive hazardous wastes.

(3) For certain minor activities related to dredging and filling, Rules 62-4.530, 62-312.800, and paragraph 62-343.090(1)(d), F.A.C., shall govern, providing an expedited procedure that allows the undertaking of an activity thirty days after submission of an application for a general permit, unless the Department has given notice before expiration of the thirty-day period that the proposed activity does not qualify for the general permit. For stormwater permitting within the geographical jurisdiction of the Northwest Florida Water Management District, subsection 62-25.801(1), F.A.C., shall govern, as authorized by Section 373.4145, F.S.

(4) In addition to the provisions of Rules 28-107.004 and 62-531.450, F.A.C., governs the discipline of water well contractors.

(5) Subsection 62-312.210(2), F.A.C., governs the Department's processing of applications for long-term wetland resource permits under Sections 373.414 and 373.4145, F.S., providing that the Department must act on such an application within 135 days of receipt of the original completed application, instead of the ninety days that otherwise would be required by Section 120.60(1), F.S. Subsection 62-730.220(9), F.A.C., governs the processing of applications for hazardous waste permits, likewise providing a deadline of 135 days in which the Department must approve or deny such a permit.

(6) If the Department determines that an applicant has submitted a substantial revision to a complete application, the Department shall notify the applicant of that determination and inform the applicant that the original application cannot be revised unless the applicant agrees in writing to waive the ninety-day deadline of Section 120.60(1), F.S., and restart the time for processing the application under that statute, and submits a complete, additional processing fee determined pursuant to the schedule set forth in Rule 62-4.050, F.A.C. For purposes of this subsection, the term "substantial revision" shall mean a revision reasonably expected to lead to significantly different environmental impacts and requiring a detailed review by the Department.

(7) For wetland resource permits within the geographical territory of the Northwest Florida Water Management District, and for grandfathered wetland resource permits in the rest of the state, the ninety-day period for action on a completed application shall be tolled by a request for a soils assessment.

*Rulemaking Authority 120.54(5), 373.026, 373.043, 373.044, 373.414, 373.418, 403.061, 403.087, 403.0877, 403.0885, 403.704, 403.72, 403.721, 403.726, 403.727, 403.8055, 403.814, 403.9328 FS. Law Implemented 120.54(5), 120.569(2),(1), 120.60, 373.026, 373.109, 373.117, 373.118, 373.119, 373.333, 373.409, 373.413, 373.414, 373.4145, 373.416, 373.417, 373.418, 373.419, 373.423, 373.426, 373.439, 376.13, 376.3078(6)(h), 403.031, 403.061, 403.087, 403.0877, 403.0872, 403.0885, 403.704, 403.721, 403.722(10),(12), 403.726, 403.813, 403.814 FS. History–New 7-1-98.*

## CHAPTER 62-330
## ENVIRONMENTAL RESOURCE PERMITTING

| | |
|---|---|
| 62-330.010 | Purpose and Implementation |
| 62-330.020 | Regulated Activities |
| 62-330.021 | Definitions |
| 62-330.050 | Procedures for Review and Agency Action on Exemption Requests |
| 62-330.051 | Exempt Activities |
| 62-330.0511 | No-fee Noticed Exemptions for Construction, Operation, Maintenance, Alteration, Abandonment, or Removal of Minor Silvicultural Surface Water Management Systems |
| 62-330.052 | General Permits – General |
| 62-330.054 | Individual Permits |
| 62-330.055 | Conceptual Approval Permits for Urban Infill or Redevelopment |
| 62-330.056 | Other Conceptual Approval Permits |
| 62-330.060 | Content of Applications for Individual and Conceptual Approval Permits |
| 62-330.061 | Submittal of Applications and Notices to Agency Offices (Repealed) |
| 62-330.062 | Water Quality Certification and Coastal Zone Consistency Concurrence |
| 62-330.071 | Fees |
| 62-330.075 | Additional Requirements and Procedures for Concurrent Review of Related Applications |
| 62-330.090 | Processing of Individual and Conceptual Approval Permit Applications |
| 62-330.100 | Purpose and Intent (Repealed) |
| 62-330.200 | Rules Adopted by Reference (Repealed) |
| 62-330.201 | Formal Determinations of the Landward Extent of Wetlands and Other Surface Waters |
| 62-330.301 | Conditions for Issuance of Individual and Conceptual Approval Permits |
| 62-330.302 | Additional Conditions for Issuance of Individual and Conceptual Approval Permits |
| 62-330.310 | Operation and Maintenance |
| 62-330.311 | Inspections and Reporting |
| 62-330.315 | Modification of Permits |
| 62-330.320 | Duration of Permits |
| 62-330.340 | Transfer of Permit Upon Change in Ownership or Control |
| 62-330.350 | General Conditions for Individual Permits |
| 62-330.351 | General Conditions for Conceptual Approval Permits |
| 62-330.360 | Emergency Authorizations and Actions |
| 62-330.395 | Variances |
| 62-330.401 | Policy and Purpose |
| 62-330.402 | Submittal and Processing of General Permits |
| 62-330.405 | General Conditions for All General Permits |
| 62-330.407 | General Permit for Geotechnical Investigations in Wetlands or other Surface Waters (Repealed) |
| 62-330.410 | General Permit for Dredging by the West Coast Inland Navigation District in Sarasota and Manatee Counties |
| 62-330.411 | General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Charlotte County |
| 62-330.412 | General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Lee County |
| 62-330.417 | General Permit for Construction, Alteration, Operation, and Maintenance of Boat Ramp Facilities |
| 62-330.420 | General Permit to Local Governments for Public Mooring Fields |
| 62-330.427 | General Permit for Docks, Piers and Associated Structures |
| 62-330.428 | General Permit for Floating Vessel Platforms and Floating Boat Lifts |
| 62-330.431 | General Permit for Installation of Riprap |

62-330.437    General Permit for the Installation of Fences

62-330.439    General Permit for Construction or Maintenance of Culverted Driveway or Roadway Crossings, and Bridges of Artificial Waterways

62-330.441    Noticed General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Lee County (Transferred)

62-330.443    General Permit to the Florida Department of Transportation, Counties, and Municipalities for Minor Bridge Alteration, Placement, Replacement, Removal, Maintenance, and Operation

62-330.447    General Permit to the Florida Department of Transportation, Counties, and Municipalities for Minor Activities within Existing Rights-of-Way or Easements

62-330.448    General Permit to Counties and Municipalities to Pave Existing County or Municipally Owned and Maintained Roads, Including the Repair and Replacement of Bridges That Are Part of the Roadway

62-330.449    General Permit for Construction, Operation, Maintenance, Alteration, Abandonment or Removal of Airport Airside Stormwater Management Systems

62-330.450    General Permit for Construction, Alteration, and Operation of Urban Infill and Redevelopment Activities in Conformance with the Conceptual Approval Permit in Rule 62-330.055, F.A.C.

62-330.451    General Permit to Counties, Municipalities, and other Agencies to Conduct Stormwater Retrofit Activities

62-330.453    General Permit for Installation, Maintenance, Repair, and Removal of Underground Utility Lines

62-330.455    General Permit for the Construction of Aerial Pipeline, Cable, and Conduit Crossings of Certain Waters

62-330.457    General Permit for Subaqueous Utility Crossings of Artificial Waterways

62-330.458    General Permit for the Construction and Maintenance of Electric Power Lines by Electric Utilities

62-330.459    General Permit for Relocation of Aerial Electric and Communication Lines Associated with Road Improvement Projects

62-330.463    General Permit for Breaching Mosquito Control Impoundments and for the Construction and Operation of Culverts and Associated Water Control Structures in Mosquito Control Impoundments by Governmental Mosquito Control Agencies

62-330.467    General Permit for Breaching Mosquito Control Impoundments by Governmental Mosquito Control Agencies (Repealed)

62-330.474    General Permit for Certain Minor Activities

62-330.475    General Permit for Single-family Residential Activities in Isolated Wetlands

62-330.476    General Permit for Private Single-Family Residences within Jupiter Farms, Palm Beach County

62-330.477    General Permit for Single Family Residential Lots within the Indian Trail Water Control District

62-330.483    General Permit to the Department and Water Management Districts to Conduct Minor Activities

62-330.485    General Permit to the Department and Water Management Districts for Environmental Restoration or Enhancement

62-330.487    General Permit to the Department and Water Management Districts to Change Operating Schedules for Water Control Structures

62-330.488    General Permit to Governmental Entities for Certain Public Use Facilities at Public Natural Areas

62-330.490    General Permit for the Reclamation of Eligible Phosphate Lands Mined Before July 1, 1975

62-330.491    Noticed General Permit for Raising the Height of Existing Earthen Embankments for Impoundments at Facilities for Mining Sand and Limestone (Repealed)

62-330.492    General Permit for Prospecting for Limestone, Sand, and Peat

62-330.493    General Permit to Perform Prospecting Activities for Phosphate Minerals

62-330.494    General Permit for Temporary Dragline Crossings of Waterways for Mining Activities

62-330.495    General Permit for Low Water Crossings for Mining Activities

62-330.496    General Permit for Dry Borrow Pits of Less than Five Acres (Repealed)

62-330.500    General Permit for Construction, Operation, Maintenance, Alteration, Abandonment or Removal of Minor Silvicultural Surface Water Management Systems (Repealed)

62-330.501    General Permit for Temporary Agricultural Activities within the South Florida Water Management District

| | |
|---|---|
| 62-330.505 | General Permit to the U.S. Forest Service for Minor Works within National Forests |
| 62-330.550 | General Permit for Construction, Operation and Maintenance of Nonproduction-related Agricultural Facilities |
| 62-330.600 | General Permit for the Construction of Artificial Reefs |
| 62-330.602 | General Permit for Installation and Maintenance of Intake and Discharge Pipes Associated with Marine Bivalve Facilities (Repealed) |
| 62-330.630 | General Permit to U.S. Army Corps of Engineers for Environmental Restoration or Enhancement Activities |
| 62-330.631 | General Permit to Governmental Entities for Limited Environmental Restoration or Enhancement Activities |
| 62-330.632 | General Permit for the Restoration, Establishment and Enhancement of Low Profile Oyster Habitat |
| 62-330.635 | General Permit for Soil Remediation |
| 62-330.901 | Noticed General Permit Forms (Repealed) |

**62-330.010 Purpose and Implementation.**

(1) This chapter, together with the rules and all documents it incorporates by reference, implements the comprehensive, statewide environmental resource permit (ERP) program under section 373.4131, F.S.

(2) The ERP program governs the following: construction, alteration, operation, maintenance, repair, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, and works (including docks, piers, structures, dredging, and filling located in, on or over wetlands or other surface waters, as defined and delineated in chapter 62-340, F.A.C.) (any one or a combination of these may be collectively referred to throughout this chapter as "projects" or "systems").

(3) The responsibilities for implementing this chapter are described in Operating and Delegation Agreements between the Department of Environmental Protection ("Department"), the water management districts ("Districts"), and local governments ("delegated local governments"). The Agreements are incorporated by reference in rule 62-113.100, F.A.C. The term "Agency" applies to the Department, a District, or a delegated local government, as applicable, throughout this chapter.

(4) This chapter is used in conjunction with an Applicant's Handbook, in two volumes, as follows:

(a) Applicant's Handbook Volume I, "General and Environmental" (hereinafter "Volume I") applies statewide to all activities regulated under chapter 62-330, F.A.C. It includes explanations, procedures, guidance, standards, and criteria on what is regulated by this chapter, the types of permits available, how to submit an application or notice for a regulated activity to the Agencies, how applications and notices are reviewed, the standards and criteria for issuance, and permit duration and modification. Volume I, including Appendices G, H, and I only, is incorporated by reference herein, (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09390 and http://www.flrules.org/Gateway/reference.asp?No=Ref-09391).

(b) An Applicant's Handbook Volume II (hereinafter "Volume II"), has been adopted for use within each District. Each District's Volume II is incorporated by reference herein and in the rules listed below, which also are incorporated by reference herein. These rules and Handbook Volumes are available as provided in subsection (5), below.

1. Northwest Florida Water Management District – "Department of Environmental Protection and Northwest Florida Water Management District Environmental Resource Permit Applicant's Handbook – Volume II (Design and Performance Standards Including Basin Design and Criteria)," including all appendices, is incorporated by reference herein (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09392 and http://www.flrules.org/Gateway/reference.asp?No=Ref-03173) or from the Agency as provided in subsection (5).

2. Suwannee River Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (August, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09398), and in subsection 40B-400.091(2), F.A.C., (October 14, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-02523).

3. St. Johns River Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09405), and in subsections 40C-4.091(1) (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09411), and 40C-44.091(1), F.A.C., (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09410).

4. Southwest Florida Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-03176), and in rule 40D-4.091, F.A.C., (October 1, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-02527).

5. South Florida Water Management District, Applicant's Handbook Volume II, including Appendices A through D, is incorporated by reference herein, (October 1, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-02528).

A copy of the incorporated material identified above may be obtained from the Agency Internet site, https://floridadep.gov/water/water/content/water-resource-management-rules#ERP, or as described in subsection 62-330.010(5), F.A.C.

(5) A copy of Volumes I and II and the other Agreements, rules, forms, and other documents incorporated by reference in this chapter also may be obtained from the Agency Internet site or by contacting staff in an Agency office identified in Appendix A of Volume I.

(6) This chapter explains how to submit notices and applications for activities regulated under part IV of chapter 373, F.S., and provides the standards for Agency review and action, which must not be harmful to the water resources and not be inconsistent with the overall objectives of the Agency. This chapter also includes procedures for petitions for a formal determination of the landward extent of wetlands and surface waters under chapter 62-340, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.418, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.409, 373.413, 373.4131, 373.414(9), 373.4141, 373.4142, 373.4145, 373.416, 373.423, 373.426, 373.428, 373.429, 373.441 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.020 Regulated Activities.**

(1) A permit under this chapter is not required for activities that qualify for:

(a) Operation and routine custodial maintenance of projects legally in existence under chapter 403 or part IV of chapter 373, F.S., provided the terms and conditions of the permit, exemption, or other authorization for such projects continue to be met, and provided the activity is conducted in a manner that does not cause violations of state water quality standards. However, this exemption shall not apply to any project that is altered, modified, expanded, abandoned, or removed;

(b) An exemption listed in rule 62-330.051 or 62-330.0511, F.A.C., or in section 1.3 (District-specific exemptions) of the applicable Volume II;

(c) The "grandfathering" provisions of section 373.4131(4), 373.414(11), (12)(a), (13), (14), (15), or (16), F.S.; or

(d) The "10/2" general permit for upland stormwater systems authorized in section 403.814(12), F.S.

(2) Unless the activity qualifies under subsection (1), above, a permit is required prior to the construction, alteration, operation, maintenance, removal, or abandonment of any project that, by itself or in combination with an activity conducted after October 1, 2013, cumulatively results in any of the following:

(a) Any project in, on, or over wetlands or other surface waters;

(b) A total of more than 4,000 square feet of impervious and semi-impervious surface areas subject to vehicular traffic;

(c) A total of more than 9,000 square feet of impervious and semi-impervious surface area;

(d) A total project area of more than five acres;

(e) A capability of impounding more than 40 acre-feet of water;

(f) Any dam having a height of more than 10 feet, as measured from the lowest elevation of the downstream toe to the dam crest;

(g) Any project that is part of a larger common plan of development or sale;

(h) Any dry storage facility storing 10 or more vessels that is functionally associated with a boat launching area;

(i) Any project exceeding the thresholds in section 1.2 (District-specific thresholds) of the applicable Volume II, or

(j) Any modification or alteration of a project previously permitted under part IV of chapter 373, F.S.

(3) Construction and operation of projects under subsection (2), above, are subject to the additional limitations in paragraph 3.1.4(f) of Volume I.

(4) The following types of permits are available:

(a) A general permit, as provided in rule 62-330.052, F.A.C., and rules 62-330.410 through 62-330.635, F.A.C.;

(b) An individual permit, as provided in rule 62-330.054, F.A.C.; and,

(c) A conceptual approval permit, as provided in rule 62-330.055 or 62-330.056, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.117, 373.118, 373.409, 373.413, 373.4131, 373.4132, 373.4145, 373.416, 373.426, 403.0877 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.021 Definitions.**

Terms used in this chapter are defined in section 2.0 of Volume I and section 2.1 of Volume II.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9),373.4141,  373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4141, 373.4145, 373.416, 373.418, 373.426 FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.021, Amended 10-1-13.*

**62-330.050 Procedures for Review and Agency Action on Exemption Requests.**

(1) A notice to the Agency is not required to conduct an activity that is exempt under rule 62-330.051, F.A.C., except where required in a specific exemption. Persons are encouraged, but not required, to use any available electronic self-certification service of the Agency to confirm that the activity meets the exemption.

(2) If a person desires Agency verification of qualification to conduct an exempt activity (other than for silviculture, for which the procedures in rule 62-330.0511, F.A.C., apply), and a self-certification is not available or the person chooses not to use a self-certification, they may submit a written or electronic Form 62-330.050(1) – "Request for Verification of an Exemption," (June 1, 2018), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09360), or a letter that clearly requests an exemption verification. A copy of the form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. Such request must include:

(a) The processing fee prescribed in rule 62-330.071, F.A.C. Only one exemption verification processing fee shall be assessed if the request contains multiple exempt activity types on a single parcel;

(b) A location map(s) of sufficient detail to allow someone who is unfamiliar with the area to locate the site of the activity;

(c) Drawings, calculations, and other supporting information to clearly depict and describe the proposed activities;

(d) The tax parcel identification number from the local government tax rolls;

(e) Contact information for the person requesting the verification; and,

(f) Authorization signed by the property owner allowing Agency staff to inspect the location of the proposed activities.

(3) Additional information on completing and submitting a request for verification of an exemption is contained in sections 3.2, 4.2, 4.2.1, 4.3, and 4.4 of Volume I.

(4) The Agency shall take reasonable efforts to determine within 30 days of receipt of a request whether the submitted materials demonstrate the activity qualifies for an exemption or, if they do not, what information would enable the Agency to make such a determination. If those materials are not received within 60 days of the Agency's request, the Agency shall advise the person that it cannot verify that the activity qualifies for an exemption. The materials submitted and responses received shall not be considered an application for a general, conceptual approval, or individual permit unless requested in writing.

(5) If, after receipt of an application for a permit, the Agency determines the proposed activity qualifies in whole for an exemption under this chapter, the Agency shall make such determination within 30 days of receipt of the application and refund any processing fees received in excess of those required under rule 62-330.071, F.A.C.

(6) The Agency will consider exempt activities included in an application to conduct other activities as part of an entire application requiring a permit, and will review and act upon the entire application at one time. However, an applicant may request the Agency separately determine whether specific activities that are part of the application qualify for an exemption. In such a case, the applicant shall pay an additional processing fee for the exemption verification, but only one additional exemption verification processing fee will be required even if more than one kind of exempt activity is included. In accordance with section 10.27(d) of Volume I, the Agency with consider the secondary impacts arising from activities described in section 403.813(1), F.S., that are very closely linked and causally related to the activities proposed in the application.

(7) The Agency's determination of qualification for an exemption is subject to chapter 120, F.S. Self-certification is not an Agency action subject to chapter 120, F.S., unless the Agency determines the self-certification does not meet all of its applicable terms and conditions.

(8) Activities conducted in accordance with an exemption under this chapter remain subject to other applicable permitting, authorization, and performance requirements (including, but not limited to, those governing the "take" of listed species) of the Agencies, the Board of Trustees, and other federal, state, and local government entities.

(9) The following apply when specified in an exemption in rule 62-330.051, F.A.C.:

(a) Activities shall not exceed a permitting threshold in section 1.2 of the applicable Volume II;

(b) Construction, alteration, and operation shall not:

1. Adversely impound or obstruct existing water flow, cause adverse impacts to existing surface water storage and conveyance

capabilities, or otherwise cause adverse water quantity or flooding impacts to receiving water and adjacent lands;

2. Cause an adverse impact to the minimum flows and levels established pursuant to section 373.042, F.S.;

3. Cause adverse impacts to a Work of the District established pursuant to section 373.086, F.S.;

4. Adversely impede navigation or create a navigational hazard;

5. Cause or contribute to a violation of state water quality standards. Turbidity, sedimentation, and erosion shall be controlled during and after construction to prevent violations of state water quality standards, including any antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), subsections 62-4.242(2) and (3) and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters due to construction-related activities. Erosion and sediment control best management practices shall be installed and maintained in accordance with the guidelines and specifications described in the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual* (Florida Department of Transportation and Florida Department of Environmental Protection, June 2007*)*, incorporated by reference herein ([https://www.flrules.org/Gateway/reference.asp?No=Ref-02530](https://www.flrules.org/Gateway/reference.asp?No=Ref-02530)), and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual* (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008), incorporated by reference herein ([https://www.flrules.org/Gateway/reference.asp?No=Ref-02531](https://www.flrules.org/Gateway/reference.asp?No=Ref-02531)); nor

6. Allow excavated or dredged material to be placed in a location other than a self-contained upland disposal site, except as expressly allowed in an exemption in rule 62-330.051, F.A.C.

(c) When performed in waters accessible to federally- or state-listed aquatic species, such as manatees, marine turtles, smalltooth sawfish, and Gulf sturgeon, all in-water work shall comply with the following:

1. All vessels associated with the project shall operate at "Idle Speed/No Wake" at all times while in the work area and where the draft of the vessels provides less than a four-foot clearance from the bottom. All vessels will follow routes of deep water whenever possible.

2. All deployed siltation or turbidity barriers shall be properly secured, monitored, and maintained to prevent entanglement or entrapment of listed species.

3. All in-water activities, including vessel operation, must be shut down if a listed species comes within 50 feet of the work area. Activities shall not resume until the animal(s) has moved beyond a 50-foot radius of the in-water work, or until 30 minutes elapses since the last sighting within 50 feet. Animals must not be herded away or harassed into leaving. All onsite project personnel are responsible for observing water-related activities for the presence of listed species.

4. Any listed species that is killed or injured by work associated with activities performed shall be reported immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1(888)404-3922 and ImperiledSpecies@myFWC.com.

Copies of incorporated materials identified above may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.109, 373.406, 373.4131, 373.4145, 403.813(1), 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.051 Exempt Activities.**

The activities meeting the limitations and restrictions below are exempt from permitting. However, if located in, on, or over state-owned submerged lands, they are subject to a separate authorization under chapters 253 and 258, F.S., as applicable.

(1) Activities conducted in conformance with the District-specific exemptions in section 1.3 of Volume II applicable to the location of the activity.

(2) Activities conducted in conformance with the exemptions in section 373.406, or 403.813(1), F.S.

(3) Aquatic Plant and Organic Detrital Control and Removal –

(a) Disking and tilling of exposed lake bottoms in accordance with a permit issued by the Florida Fish and Wildlife Conservation Commission or an exemption under chapter 369, F.S.

(b) Organic detrital material removal in accordance with section 403.813(1)(r) or (u), F.S.

(c) Aquatic plant control where the activity qualifies for an exemption authorized under section 369.20, F.S., or in a permit from the Florida Fish and Wildlife Conservation Commission under section 369.20 or 369.22, F.S.; and the harvested plant material is not disposed of in wetlands or other surface waters, or in a manner that adversely affects water quality or flood control.

(d) The mechanical harvesting or shredding of aquatic plants and incidentally associated sediments, including subsequent side casting of the harvested or shredded material, provided:

1. The activity is authorized and conducted by the Florida Fish and Wildlife Conservation Commission, under section 369.20 or 369.22, F.S.;

2. The work involves no dredging and is the minimum amount necessary for maintaining existing navigation corridors and preventing flooding, and in no case shall exceed five total acres of harvesting, shredding, and sidecasting;

3. The work is performed in a manner that does not adversely affect water quality or flood control; and

4. Notice of intent to use this exemption is provided to the Agency five days before performing any work.

(4) Bridges, Driveways, and Roadways –

(a) The replacement and repair of existing open-trestle foot bridges and vehicular bridges in accordance with Section 403.813(1)(l), F.S.

(b) Construction, alteration, or maintenance, and operation, of culverted driveway or roadway crossings and bridges of wholly artificial, non-navigable drainage conveyances, provided:

1. The construction project area does not exceed one acre and is for a discrete project that is not part of a larger plan of development that requires permitting under this chapter. However, these limitations shall not preclude use of this exemption to provide access to activities that qualify for the general permit in section 403.814(12), F.S.;

2. The culvert or bridge shall be sized and installed to pass normal high water stages without causing adverse impacts to upstream or downstream property;

3. Culverts shall not be larger than one, 24-inch diameter pipe, or its hydraulic equivalent, and must not reduce the upstream hydraulic discharge capacity;

4. The crossing shall not:

a. Be longer than 30 feet from top-of-bank to top-of-bank;

b. Have a top width of more than 20 feet or a toe-to-toe width of more than 40 feet; and,

c. Have side slopes steeper than three feet horizontal to one foot vertical;

5. There are no more than two crossings on any total land area, with a minimum distance of 500 feet between crossings.

6. If dewatering is performed, all temporary work and discharges must not cause flooding or impoundment, downstream siltation, erosion, or turbid discharges that violate state water quality standards;

7. Any temporary work shall be completely removed and all upstream and downstream areas that were disturbed shall be restored to pre-work grades, elevations and conditions; and,

8. All work shall comply with subsection 62-330.050(9), F.A.C.

(c) Minor roadway safety construction, alteration, maintenance, and operation, provided:

1. There is no work in, on, or over wetlands other than those in drainage ditches constructed in uplands;

2. There is no reduction in the capacity of existing swales, ditches, or other systems legally in existence under chapter 403 or Part IV of chapter 373, F.S.;

3. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.; and

4. The work is limited to:

a. Sidewalks having a width of six feet or less;

b. Turn lanes less than 0.25 mile in length, and other safety-related intersection improvements; and

c. Road widening and shoulder paving that does not create additional traffic lanes and is necessary to meet current, generally accepted roadway design and safety standards.

(d) Resurfacing and repair of existing paved roads, and grading of existing unpaved roads, provided:

1. Travel lanes are not paved that are not already paved;

2. No substantive changes occur to existing road surface elevations, grades, or profiles; and

3. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(e) Repair, stabilization, paving, or repaving of existing roads, and the repair or replacement of vehicular bridges that are part of the road, where:

1. They were in existence on or before January 1, 2002, and have:

a. Been publicly-used and under county or municipal ownership and maintenance thereafter, including when they have been presumed to be dedicated in accordance with section 95.361, F.S.;

b. Subsequently become county or municipally-owned and maintained; or

c. Subsequently become perpetually maintained by the county or municipality through such means as being accepted by the

county or municipality as part of a Municipal Service Taxing Unit or Municipal Service Benefit Unit; and

2. The work does not realign the road or expand the number of traffic lanes of the existing road, but may include safety shoulders, clearing vegetation, and other work reasonably necessary to repair, stabilize, pave, or repave the road, provided that the work is constructed using generally accepted roadway design standards;

3. Existing bridges are not widened more than is reasonably necessary to properly connect the bridge with the road to match the width of the roadway travel lanes and safely accommodate the traffic expected;

4. No debris from the original bridge shall be allowed to remain in wetlands or other surface waters;

5. Roadside swales or other effective means of stormwater treatment are incorporated as part of the work;

6. No more dredging or filling of wetlands or water of the state is performed than is reasonably necessary to perform the work in accordance with generally accepted roadway design standards;

7. Notice of intent to use this exemption is provided to the Agency 30 days before performing any work; and

8. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(f) The repair of existing concrete bridge pilings by the Florida Department of Transportation, counties, and municipalities, through the construction of pile jackets, provided the permanent outer form is composed of inert materials and the quantity of material shall not exceed 300 cubic yards of dredging or 300 cubic yards of filling per project. The following conditions shall also apply:

1. Although the bottom sediments within the forms may be removed by jetting or pumping, and may not be recoverable, erosion and sediment control best management practices, including turbidity curtains or similar devices, shall be used in accordance with the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual* to prevent violations of state water quality standards.

2. Immediately following completion of any work that involves disturbance of the shoreline or banks of wetlands or other surface waters, the shoreline and banks shall be stabilized with native vegetation or riprap to prevent erosion; in areas where native wetland vegetation was disturbed, the stabilization shall consist of the same species planted in a manner to achieve stability and coverage of a similar wetland community as previously existed. Temporary erosion controls for all exposed soils within wetlands and other surface waters shall be completed within seven calendar days of the most recent construction activity. Prevention of erosion of exposed earth into wetlands and other surface waters is a construction priority and completed slopes shall not remain unstabilized while other construction continues.

3. Pilings shall not be installed or replaced to add additional traffic lanes.

4. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(5) Dock, Pier, Boat Ramp and Other Boating-related Work –

(a) Installation or repair of pilings and dolphins associated with private docking facilities or piers that are exempt under section 403.813(1)(b), F.S.;

(b) Installation of private docks, piers, and recreational docking facilities, and installation of local governmental piers and recreational docking facilities, in accordance with section 403.813(1)(b), F.S. This includes associated structures such as boat shelters, boat lifts, and roofs, provided:

1. The cumulative square footage of the dock or pier and all associated structures located over wetlands and other surface waters does not exceed the limitations in section 403.813(1)(b), F.S.;

2. No structure is enclosed on more than three sides with walls and doors;

3. Structures are not used for residential habitation or commercial purposes, or storage of materials other than those associated with water dependent recreational use; and

4. Any dock and associated structure shall be the sole dock as measured along the shoreline for a minimum distance of 65 feet, unless the parcel of land or individual lot as platted is less than 65 feet in length along the shoreline, in which case there may be one exempt dock allowed per parcel or lot.

(c) Construction of private docks or piers of 1,000 square feet or less of over-water surface area in artificial waters in accordance with section 403.813(1)(i), F.S., and within residential canal systems legally in existence under chapter 403 or part IV of chapter 373, F.S. This includes associated structures such as roofs and boat lifts, provided the cumulative square footage of the dock or pier and all associated structures located over wetlands and other surface waters does not exceed 1,000 square feet.

(d) Replacement or repair of existing docks and piers, including mooring piles, in accordance with section 403.813(1)(d), F.S., provided the existing structure is still functional or has been rendered non-functional within the last year by a discrete event, such as a storm, flood, accident, or fire.

(e) The construction and maintenance to design specifications of boat ramps in accordance with section 403.813(1)(c), F.S., where navigational access to the proposed ramp currently exists:

1. In artificial waters and residential canal systems; or

2. In any wetland or other surface waters when the ramps are open to the public; and

3. The installation of docks associated with and adjoining boat ramps constructed as part of the above ramps is limited to an area of 500 square feet or less over wetlands and other surface waters.

(f) The construction, installation, operation, or maintenance of floating vessel platforms or floating boat lifts in accordance with section 403.813(1)(s), F.S.

(g) The removal of derelict vessels, as defined in section 823.11(1), F.S., by federal, state, and local agencies, provided:

1. The derelict vessel case has been completed as specified in section 705.103, F.S., and has been entered into the Statewide Derelict Vessel Database maintained by the Florida Fish and Wildlife Conservation Commission;

2. All work is done in a manner that, to the greatest extent practicable, avoids additional dredging or filling, grounding or dragging of vessels, and damage to submerged resources such as seagrass beds, oyster beds, coral communities, mangroves, other wetlands, and live bottom; and

3. An absorbent blanket or boom shall be immediately deployed on the surface of the water around the derelict vessel if fuel, oil, or other free-floating pollutants are observed during the work.

(h) The installation of a pile-supported boat lift within an existing mooring area at a docking facility that is legally in existence, provided:

1. Such installation does not conflict with a condition of a permit issued thereunder;

2. The boat lift does not include additional structures, such as platforms, cat walks, and roofs.

(6) Construction, alteration, maintenance, operation, and removal of freshwater fish attractors by the Florida Fish and Wildlife Conservation Commission, U.S. Forest Service, and county and municipal governments, provided:

(a) The material is limited to clean concrete, rock, brush, logs, or trees;

(b) The material is firmly anchored to the bottom of the waterbody;

(c) The size of an individual fish attractor shall be limited to one quarter of an acre in area;

(d) The top of the fish attractor shall be at least three feet below the water surface at expected average low water depth, as determined based on best available information for the waterbody at the specific location of the attractor;

(e) The attractor shall be outside any posted navigational channels and shall not cause a navigational hazard;

(f) No material is placed on or in areas vegetated by native aquatic vegetation; and

(g) The provisions of paragraph 62-330.050(9)(c), F.A.C., also shall apply to protect listed species during the work.

(7) Maintenance and Restoration –

(a) Maintenance dredging under section 403.813(1)(f), F.S.

(b) Maintenance of insect control structures, dikes, and irrigation and drainage ditches under section 403.813(1)(g), F.S.

(c) The restoration of existing insect control impoundment dikes, and the connection of such impoundments to tidally influenced waters under section 403.813(1)(p), F.S., provided:

1. The restored section of dike is limited to 100 feet in length;

2. The connection shall provide sufficient cross-sectional area to allow beneficial tidal influence;

3. Dredging and filling are limited to that needed to restore the dike to original design specifications; and

4. The final elevation of the dredge area shall be within two feet of immediately adjacent bottom elevations.

(d) Alteration and maintenance of treatment or disposal systems under rule 62-340.700, F.A.C.

(e) Construction and maintenance of swales in accordance with section 403.813(1)(j), F.S.

(f) Placement of wooden, composite, metal, or other non-earthen construction mats to provide temporary access to maintain or repair projects within wetlands, provided:

1. There is no cutting or clearing of wetland trees having a diameter four inches (circumference of 12 inches) or greater at breast height;

2. The maximum width of the construction access area shall be 15 feet;

3. Mats shall be removed as soon as practicable after equipment has completed passage through, or work has been completed at, each location along the alignment of the project, but in no case longer than seven days after equipment has completed work or passage through that location; and

4. Areas disturbed for access shall be restored to natural grades immediately after the work is complete.

(g) Port dredging under section 403.813(3), F.S.

(h) The following activities undertaken by the National Oceanic and Atmospheric Administration's (NOAA) Florida Keys National Marine Sanctuary:

1. Seagrass restoration following the procedures of the Final Programmatic Environmental Impact Statement for Seagrass Restoration in the Florida Keys National Marine Sanctuary (NOAA 2004), which is incorporated by reference herein (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09440) and available as provided in subsection 62-330.010(5), F.A.C.; and

2. Coral restoration following the procedures of the Final Programmatic Environmental Impact Statement for Coral Restoration in the Florida Keys and Flower Garden Banks National Marine Sanctuaries (NOAA 2010), which is incorporated by reference herein (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09441) and available as provided in subsection 62-330.010(5), F.A.C.

(8) The installation of aids to navigation, including bridge fender piles, "No Wake" and similar regulatory signs, and buoys associated with such aids, in accordance with section 403.813(1)(k), F.S.

(9) Pipes or Culverts –

(a) Repair or replacement, provided:

1. The pipes or culverts have equivalent hydraulic capacity to those being repaired or replaced;

2. The invert elevation shall not be changed; and

3. The pipes or culverts function to discharge or convey stormwater, and are not associated with the repair, replacement, or alteration of a dam, spillway, or appurtenant works.

(b) Construction, alteration, operation, maintenance, and removal of outfall pipes, together with associated headwalls, and energy dissipation baffles, rocks, and other scour-reduction devices at the outfall locations, provided:

1. The pipes extend less than 20 feet in, on, or over wetlands or other surface waters;

2. The outfall is part of an activity that is exempt under part IV of chapter 373, F.S., or qualifies for the general permit in section 403.814(12), F.S.;

3. The outfall is designed to prevent erosion and scour;

4. Work in natural waterbodies, wetlands, and Outstanding Florida Waters is limited to 0.03 acre;

5. No activities occur in seagrasses;

6. Within waters accessible to manatees, submerged or partially submerged outfall pipes having a diameter larger than eight inches shall have grating such that no opening is larger than eight inches; and

7. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(c) The extension of existing culverts and crossing approaches, and the installation of scour protection structures at such locations, when done to accommodate an activity that does not require a permit under this chapter, provided:

1. Work in wetlands or other surface waters is limited to a total of 100 cubic yards of dredging and filling, and no more than 0.10 acre at any culvert extension or crossing approach location; and

2. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(10) The construction, alteration, maintenance, removal or abandonment of recreational paths for pedestrians, bicycles, and golf carts, provided:

(a) There is no work in, on, or over wetlands or other surface waters other than those in drainage ditches constructed in uplands;

(b) There is no reduction in the capacity of existing swales, ditches, or other stormwater management systems legally in existence under chapter 403 or part IV of chapter 373, F.S.;

(c) The paths have a width of eight feet or less for pedestrian paths, and 14 feet or less for multi-use recreational paths;

(d) The paths are not intended for use by motorized vehicles powered by internal combustion engines or electric-powered roadway vehicles, except when needed for maintenance or emergency purposes; and

(e) The paths comply with the limitations and restrictions in subsection 62-330.050(9), F.A.C.

(11) Sampling and Testing –

(a) Collection of seagrass, macroalgae, and macrobenthos in accordance with the terms and conditions of a permit or license issued by the Florida Fish and Wildlife Conservation Commission.

(b) Construction, operation, maintenance, and removal of scientific sampling, measurement, and monitoring devices, provided:

1. The device's purpose is solely to collect scientific or technical data, such as staff gages, tide and current gages,

meteorological stations, water recording, biological observation and sampling, and water quality testing and improvement. Parshall flumes and other small weirs installed primarily to record water quantity and velocity are authorized, provided the amount of fill is limited to 25 cubic yards;

2. The device and any associated structures or fill, such as foundations, anchors, buoys, and lines, is removed to the maximum extent practicable at the end of the data collection or sampling;

3. The site is restored to pre-construction conditions within 48 hours of completion of use of the device; and

4. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(c) An exemption for geotechnical, geophysical, and cultural resource data surveys, mapping, sounding, sampling, and coring associated with beach restoration and nourishment projects and inlet management activities as provided in section 403.813(1)(v), F.S.

(d) Geotechnical investigations, including soil test borings, standard penetration tests, and other work involving boring, auguring, or drilling for the purposes of collecting geotechnical data, together with clearing for temporary access corridors to perform these investigations, subject to the following:

1. Excavation at each soil boring, auguring, or coring location is limited to no more than one foot in diameter. The total area of work authorized in wetlands and other surface waters is limited to 0.5 acre, including all excavations and clearing for temporary access corridors.

2. No drilling fluid or dredged material shall be left above grade in a wetland or other surface water.

3. Boreholes suspected to have penetrated a confining layer shall be grouted from the bottom up by means of a tremie pipe and the severed materials shall be removed from the wetland or other surface waters.

4. This exemption shall not apply to borings used to place seismographic charges for oil and gas exploration.

5. This exemption does not supersede the exemption in section 403.813(1)(v), F.S., for geotechnical, geophysical, and cultural resource data surveys, mapping, sounding, sampling, and coring associated with beach restoration and nourishment projects and inlet management activities.

6. Turbidity, sedimentation, and erosion shall be controlled during and after investigations to prevent violations of state water quality standards due to construction related activities.

7. Drilling activities associated with construction of wells must comply with chapter 62-532, F.A.C.

8. Temporary vehicular access within wetlands during construction shall be performed using vehicles generating minimum ground pressure to minimize rutting and other environmental impacts. Within forested wetlands, the permittee shall choose alignments that minimize the destruction of mature wetland trees to the greatest extent practicable. When needed to prevent rutting or soil compaction, access vehicles shall be operated on wooden, composite, metal, or other non-earthen construction mats. In all cases, access in wetlands shall comply with the following:

a. Access within forested wetlands shall not include the cutting or clearing of any native wetland tree having a diameter four inches or greater at breast height;

b. The maximum width of the construction access area shall be limited to 15 feet;

c. All mats shall be removed as soon as practicable after equipment has completed passage through, or work has been completed, at any location along the alignment of the project, but in no case longer than seven days after equipment has completed work or passage through that location; and

d. Areas disturbed for access shall be restored to natural grades immediately after the maintenance or repair is completed.

(12) Construction, Replacement, Restoration, Enhancement, and Repair of Seawall, Riprap, and Other Shoreline Stabilization –

(a) Construction, replacement, and repair of seawalls or riprap in artificially created waterways under section 403.813(1)(i), F.S., and within residential canal systems legally in existence under chapter 403 or part IV of chapter 373, F.S, including only that backfilling needed to level the land behind seawalls or riprap.

(b) The restoration of a seawall or riprap under section 403.813(1)(e), F.S., where:

1. The seawall or riprap has been damaged or destroyed within the last year by a discrete event, such as a storm, flood, accident, or fire or where the seawall or riprap restoration or repair involves only minimal backfilling to level the land directly associated with the restoration or repair and does not involve land reclamation as the primary project purpose. See section 3.2.4 of Volume I for factors used to determine qualification under this provision;

2. Restoration shall be no more than 18 inches waterward of its previous location, as measured from the waterward face of the existing seawall to the face of the restored seawall, or from the waterward slope of the existing riprap to the waterward slope of the

restored riprap; and

3. Applicable permits under chapter 161, F.S., are obtained.

(c) The construction of seawalls or riprap in wetlands or other surface waters between and adjoining existing seawalls or riprap at both ends in accordance with section 403.813(1)(o), F.S. For purposes of this exemption, riprap is subject to the same length and orientation limitations as a seawall.

(d) Installation of batter piles, king piles, or a seawall cap, used exclusively to stabilize and repair seawalls, provided they do not impede navigation.

(e) Restoration of an eroding shoreline with native wetland vegetative enhancement plantings, provided:

1. The length of shoreline is 500 linear feet or less;

2. Plantings are native wetland plants appropriate for the site obtained from commercially-grown stock;

3. Plantings extend no farther than 10 feet waterward of the approximate mean high water line (MHWL) or ordinary high water line (OHWL);

4. All invasive and exotic vegetative species along the shoreline is removed in conjunction with the planting to the extent practicable;

5. Biodegradable natural fiber logs or mats that are secured in place, such as with the use of wooden stakes, may be used if necessary to support the vegetative plantings; and

6. No fill is placed other than that needed to support the vegetative plantings, except that a breakwater is authorized to be installed concurrent with the planting if permanent wave attenuation is required to maintain the shoreline vegetation, provided:

a. The waterward toe of the breakwater extends no more than 10 feet waterward of the approximate MHWL or OHWL, with a top height of no more than the mean or ordinary high water elevation;

b. The breakwater is composed predominantly of natural oyster shell culch (clean and fossilized oyster shell) or other stable, non-degradable materials such as oyster reef, reef balls, boulders, clean concrete rubble, riprap, rock sills, or triangular concrete forms. Oyster shell culch, if used, shall be enclosed in mesh bags having openings of no more than three inches, or securely fixed to matting prior to placement in the water. Oyster bags and mats must be anchored to prevent movement of shell from the project area;

c. The breakwater shall not be placed over, or within three feet (in any direction) of any submerged grassbed or existing emergent marsh vegetation;

d. The breakwater shall be placed in units so that there is at least one opening measuring at least five feet in width located every 75 linear feet along the breakwater, with a minimum of one opening, to allow the flow of water and the passage of fish and aquatic wildlife;

e. All equipment used during construction shall be operated from, and be stored in uplands; and

f. All work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(13) Single-Family Residences and Associated Residential Improvements –

(a) The construction, alteration, maintenance, removal, and abandonment of one individual single-family dwelling unit, duplex, triplex, or quadruplex, and associated residential improvements, that:

1. Do not involve any work in wetlands or other surface waters;

2. Are not part of a larger common plan of development or sale requiring a permit or modification of a permit under part IV of chapter 373, F.S.; and

3. Comply with the limitations and restrictions in subsection 62-330.050(9), F.A.C.

(b) The construction, alteration, maintenance, removal, and abandonment of one individual single-family dwelling unit, duplex, triplex, or quadruplex, and associated residential improvements if it will be located:

1. Within the boundaries of a valid permit issued under part IV of chapter 373, F.S., and it was accounted for under the permit; or

2. Within the boundaries of a development that predates the applicable effective date for the permitting program established under part IV of chapter 373, F.S., provided the activity does not involve any work in wetlands or other surface waters.

(c) Construction, operation, or maintenance of a stormwater management facility designed to serve single-family residential projects in conformance with section 403.813(1)(q), F.S.

(14) Utilities –

(a) Installation of overhead transmission lines in accordance with section 403.813(1)(a), F.S.

(b) Installation of subaqueous transmission and distribution lines in accordance with section 403.813(1)(m), F.S.

(c) Replacement or repair of subaqueous transmission and distribution lines in accordance with section 403.813(1)(n), F.S.

(d) Activities necessary to preserve, restore, repair, remove, or replace an existing communication or utility pole or aerial transmission or distribution line, provided there is no dredging or filling in wetlands or other surface waters except to remove poles and replace them with new poles, and temporary mats needed to access the site in accordance with paragraph 62-330.051(7)(f), F.A.C. The activity must not increase the voltage of existing power lines or relocate existing poles or lines more than 10 feet in any direction from their original location.

(e) Installation, removal, and replacement of utility poles that support telecommunication lines or cables, or electric distribution lines of 35kV or less, together with the bases and anchoring devices to support those poles. "Anchoring device" shall mean steel guy wires fastened to the ground, without the need for dredging, and "base" shall mean a concrete or steel foundation not exceeding four feet in radius, used to support a utility pole. Work must comply with the following:

1. No more than 15 utility poles shall be installed, removed, or replaced in wetlands;

2. There shall be no permanent placement of fill other than utility poles and anchoring devices;

3. Work shall not occur in forested wetlands located within 550 feet from the mean or ordinary high water line of an Aquatic Preserve or a named waterbody designated as an Outstanding Florida Water or an Outstanding National Resource Water;

4. Vehicle usage in wetlands shall be conducted so as to minimize tire rutting and erosion impacts;

5. There shall be no dredging or filling to create fill pads or access roads, except to place temporary mats for access within the utility right-of-way in wetlands. All temporary mats shall be removed as soon as practicable, but in no case longer than seven days after equipment has completed passage through, or work has been completed, at any location along the alignment of the project;

6. Temporary disturbance to wetlands shall be limited to a length of 0.5 mile, a width of 30 feet, and a total area of 0.5 acre;

7. Maintenance of the utility right-of-way in wetlands shall be limited to a cleared corridor of up to 15 feet wide and a total area of 0.25 acre;

8. Except for the authorized permanent structures, pre-work ground elevations and contours shall be restored within 30 days of completion of the work;

9. Water jets shall not be used unless they are a pre-engineered part of the pole and the water for the jets is either recirculated on site or is discharged in a self-contained upland disposal site;

10. The installation of the utility poles and associated bases and anchoring devices shall not interfere with navigation or impede water flow in wetlands; and

11. Work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(f) Excavation or dredging of temporary trenches to install utilities such as communication cables, water lines, and electrical lines, provided:

1. Material is not deposited within wetlands or other surface waters other than that needed to backfill the trench to restore ground to pre-work grades;

2. Backfilling is performed to restore pre-work grades within 24 hours of disturbance; and

3. Work is conducted in compliance with subsection 62-330.050(9), F.A.C.

(g) Construction, alteration, maintenance, removal, or abandonment of communication tower sites with 0.5 acre or less of impervious or semi-impervious surface such as access roads, buildings, and equipment pads. The design of above-grade access roads shall not adversely affect the conveyance of surface water flows. No activities, including access to the site, shall be located in wetlands or other surface waters or within a 100-year floodplain.

(h) Construction, alteration, maintenance, removal, or abandonment of electrical distribution substation and electrical switching station sites with one acre or less of impervious or semi-impervious surface such as access roads, buildings, and equipment pads. The design of above-grade access roads shall not adversely affect the conveyance of surface water flows. The site must be surrounded by swales, as defined in section 403.803(14), F.S., or other type of equivalent treatment, and must not have a direct discharge to an Outstanding Florida Water. No activities, including access to the site, may be located in wetlands or other surface waters, or within a 100-year floodplain.

(i) Installation and repair of water intake lawn irrigation waterlines and closed-loop air conditioning cooling lines laid on the bottoms of waters of the state for an individual private single-family or multi-family residence, provided that the intake diameter is less than six inches, or its hydraulic equivalent.

(15) Modification or reconstruction of an existing conveyance system constructed prior to the need to obtain a permit under part IV of chapter 373, F.S., provided:

(a) The work is conducted by a city, county, state agency, or District;

(b) The system alteration is not intended to serve new development; and

(c) The system does not:

1. Discharge directly to Outstanding Florida Waters;

2. Increase pollution loading;

3. Change points of discharge in a manner that would adversely affect the designated uses of wetlands or other surface waters;

4. Result in new adverse water quantity impacts to receiving waters and adjacent lands;

5. Pipe and fill wetlands and other surface waters, including irrigation or drainage ditches; and

6. Replace a functional treatment swale that was authorized under chapter 62-25, F.A.C., or part IV of chapter 373, F.S.

(16) The construction, alteration, maintenance, or filling of wholly-owned, artificial surface waters that:

(a) Were or are created entirely from uplands;

(b) Are isolated such that they do not connect to any other wetlands or other surface waters;

(c) Are not excavated within three feet above any aquitard or karst materials;

(d) Involve no more than a total of 0.5 acre of work in wetlands within the artificial waterbody;

(e) Do not impound water above any surrounding natural grade elevation, or have the capability of impounding more than 40 acre-feet of water;

(f) Were or are not created to provide mitigation under part IV of chapter 373, F.S.;

(g) Excavated materials shall not be used off-site for commercial, industrial, or construction use;

(h) Were not permitted for stormwater treatment or management under chapter 62-25, F.A.C., or part IV of chapter 373, F.S.;

(i) All excavated material shall be deposited and fully contained within uplands;

(j) Are not a farm pond as defined in section 403.927, F.S.; and

(k) Work is conducted in accordance with paragraph 62-330.050(9)(b), F.A.C.;

(17) The construction, alteration, operation, maintenance, repair, reclamation, or abandonment of a dry borrow pit for excavation of sand and other soil materials, provided that all of the following conditions are met:

(a) Notice of intent to use this exemption is provided to the Agency 30 days before performing any work.

(b) The area of excavation for the borrow pit shall be less than five acres, when measured at the natural land surface grade of the pit.

(c) The borrow pit shall be constructed entirely in uplands for the purpose of using the borrow materials as appropriately permitted, authorized, or as exempted. If excavated materials will be used off-site for commercial, industrial, or construction use, the borrow pit is subject to the mine reclamation requirements under part III of chapter 378, F.S.

(d) Borrow pits under this exemption must meet the following conditions:

1. Does not include construction or maintainance of any embankment above the natural land surface grade as a part of the work to construct the pit and remove the soil materials.

2. No above-grade roads are constructed as access to the pit area.

3. Shall not impact wetlands.

4. Shall not be excavated deeper than three feet above seasonal high water level, any surficial aquifer, aquitard, or karst materials.

5. The pit area shall be protected at all times by adequate fencing and gating structures to limit access and provide for safety.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.406, 373.4131, 373.4145, 373.415, 403.813(1) FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.0511 No-fee Noticed Exemptions for Construction, Operation, Maintenance, Alteration, Abandonment, or Removal of Minor Silvicultural Surface Water Management Systems.**

(1) Silviculture activities conducted and noticed in conformance with the best management practices and procedures below shall qualify for this no-fee noticed exemption. The Agencies shall not be compelled to verify qualification for these exemptions following receipt of the notice required in subsection (2), below. However, if a person desires written Agency verification of compliance with this rule, they shall follow the noticing and fee requirements of rule 62-330.050, F.A.C. These exemptions apply to:

(a) Any person constructing, operating, maintaining (including repairing or replacing), altering, abandoning, or removing silvicultural roads, and other minor activities designed to place the property into silvicultural use or to perpetuate the maintenance of

the property in silvicultural use; and

(b) The U.S. Forest Service to construct, operate, maintain, alter, abandon, or remove surface water management systems.

(2) The construction, operation, maintenance, alteration, abandonment, or removal of the minor silvicultural surface water management system described below shall be initiated only after a completed "Notice of Intent to Construct a Minor Silvicultural System," Form 62-330.0511(1), (October 1, 2013), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02510), is received by the Agency, or is properly addressed and stamped and deposited in the United States mail, in which case the postmark date shall be the date of receipt. Persons may also submit annual schedules of proposed silvicultural surface water management systems that meet the requirements of this section, including completed notices for each activity. A copy of the above form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(3) Activities required to implement the following projects qualify for the exemption under this rule:

(a) A permanent culverted fill road with a road surface of 28 feet or less in width placed in or crossing a stream or other watercourse of less than 10 cubic feet per second average discharge at the location of the work or with a drainage area upstream of the work of less than 10 square miles. The design of the work must allow for conveyance of normal flows and for overtopping during large storm events, and any fill placed in wetlands associated with the stream or other watercourse must be less than 0.5 acre in area. Under this paragraph, the fill material shall be no more than 24 inches above culvert structures. The fill material on the road approaches shall be no more than 24 inches above grade except within an area of 100 feet of either side of a culvert. The road must be designed with culvert inlets positioned at or below natural grade of the bed of the stream or other watercourse to prevent the permanent impoundment of water, and to provide an overflow area or areas which will prevent erosion and adverse effects to water levels upstream and downstream of the work.

(b) A temporary culverted fill road or a temporary bridge up to 50 feet long, with a road surface of 28 feet or less in width placed in or crossing a stream or other watercourse of less than 10 cubic feet per second average discharge at the location of the work or a drainage area upstream of the work of less than 10 square miles. The design of the work must allow for conveyance of existing flow during the period of installation and use and any fill placed in wetlands associated with the stream or other watercourse must be less than 0.5 acre in area. The work must be designed only to facilitate the temporary movement of equipment and must be removed immediately after the operation for which the crossing was needed is complete or within 30 months of the filing of the notice in subsection (2), above, whichever is sooner.

(c) A permanent bridge up to 100 feet in length and 28 feet or less in width supported on pilings or trestles, placed in or crossing a stream or other watercourse of less than 10 cubic feet per second average discharge at the location of the work or with a drainage area upstream of the work of less than 10 square miles. The design of the work and associated approach roads, if any, must allow for conveyance of normal flows and for overtopping during large storm events and any fill placed in wetlands associated with the stream or other watercourse must be less than 0.5 acre in area. The height limitation for fill on the bridge approach roads shall be a maximum of 24 inches above natural grade.

(d) A permanent culverted fill road or bridge with a road surface of 28 feet or less in width, placed in or crossing a wetland or other impoundment, excluding reservoirs created by dams, where the road surface area over the wetland or other impoundment is less than 0.5 acre. Such crossings must be located in a manner which minimizes the area of wetlands being filled. Fill material for crossings of isolated wetlands or other isolated impoundments may be excavated from the wetland being crossed, provided that all excavation takes place immediately adjacent to the road surface and that the excavated area consists only of narrow trenches which are not connected to ditches constructed or maintained for drainage purposes. In addition, such excavations shall not result in drainage from the wetland.

(e) Temporary stream channel diversions necessary to complete the works described in paragraph (3)(a), (b), or (c), above, provided that the area used for the temporary diversion is restored to its previous contours and elevations.

(f) Clearing and snagging in a stream or other watercourse within 50 feet of the center line of a culverted fill road or a bridge described in paragraph (3)(a), (b), or (c), above, necessary to construct said work.

(g) A permanent low water, hard surfaced crossing in a stream, other watercourse, wetland or other impoundment consisting of the placement of rock or similar material no more than 12 inches higher than the bed of the stream, other watercourse or impoundment. Such crossings must be designed only to facilitate the movement of equipment by creating a stable foundation in shallow streams, other watercourse, wetlands or other impoundments. Temporary low water, hard surfaced crossings may be constructed using logs, but must be removed immediately following the completion of the silvicultural operation or within 30

months of the filing of the Notice of Intent in subsection (2), whichever is sooner.

(h) Upland field ditches of a temporary nature to facilitate only harvesting, site preparation, and planting, with a maximum cross-sectional area of 18 square feet spaced no closer than 660 feet from any other parallel ditch. After seedling establishment, the ditches shall be allowed to revegetate naturally. The person will not be required to fill field ditches after seedling establishment.

(i) Above grade, unpaved, upland silvicultural roads with an average road surface width of 28 feet within a construction corridor up to 50 feet in width. These roads must also incorporate sufficient culverts at grade to prevent alteration of natural sheet flow and may have associated borrow ditches. Road ditches shall be constructed only to obtain road material for the associated road and to provide only enough storage to maintain a dry road surface. Such road ditches must not provide drainage to the tract adjoining the road, other than to provide drainage of the road surface and minor, incidental drainage of abutting lands. These road ditches may be connected to other roadside ditches that were constructed pursuant to an Agency permit or that were exempt from permitting under part IV of chapter 373, F.S., but must not connect directly or indirectly to any works onsite or off-site which are designed or constructed to provide drainage or conveyance or which would result in drainage or conveyance. Road ditches must be separated from wetlands and other surface waters by a buffer strip of indigenous ground cover and a water turnout prior to said buffer strip. However, road ditches may discharge directly to a wetland when the slope of the uplands within 1,000 feet of the edge of the wetland is equal to or less than two percent, provided the ditch does not result in drainage of the wetland and provided that the ditch does not create a hydrologic connection between two or more wetlands. The width of the buffer strip shall be no less than 35 feet, or 50 feet when located adjacent to an Outstanding Florida Water, an Outstanding National Resource Water, or Class I waters.

(j) Upland borrow areas needed to obtain fill material for crossings of streams, other watercourses, wetlands, and other impoundments authorized by this exemption. These upland borrow areas must not provide drainage and must not be hydrologically connected to roadside ditches or field ditches.

(4) The systems identified in subsection (3), above, must meet the following performance standards:

(a) Except for those areas to be filled for crossings as provided in this section, the activities must not convert wetlands or other surface waters to uplands.

(b) A road or bridge must be designed to convey normal water flow while being adequately stabilized to allow for overtopping during storm events without washing out.

(c) A permanent road or bridge placed in or crossing a stream, other watercourse, wetland or other impoundment may be placed no closer than 0.5 mile from any traversing work which traverses the same stream, other watercourse, wetland or impoundment. A low water crossing or temporary road or bridge placed in or crossing a stream, other watercourse, wetland or other impoundment may be placed no closer than 0.25 mile from any traversing work which traverses the same stream, other watercourse, wetland, or other impoundment. The spacing limitation shall be measured along the stream, other water course, wetland or other impoundment. Notwithstanding the spacing limitation in this paragraph, at least one low water crossing, road or bridge crossing of any stream, other watercourse, wetland or other impoundment may be constructed to each upland area being managed for silviculture that would not otherwise be accessible if these spacing limitations were met.

(d) A low water crossing, road, or bridge placed in or crossing a stream, other watercourse or impoundment must not cause increased velocities downstream of the work that would cause scour outside of the area of clearing and snagging described in paragraph (3)(f), above.

(e) A low water crossing, road, or bridge placed in or crossing a stream, other watercourse or impoundment must not cause increased flooding on property not owned by the person.

(f) Erosion control measures must be undertaken to limit the transfer of suspended solids into the receiving waterbody during and after construction of the proposed work. After removing any temporary crossing, disturbed portions of the stream bank and stream channel shall be restored to approximate their original shape and flow capacity. Erodible ground area associated with the crossing shall be stabilized with riprap, mulch or seeded for appropriate ground cover vegetation within 72 hours after removal.

(g) Upland field ditches may connect only to works that are permitted by the Agency, or exempt from permitting under part IV of chapter 373, F.S., and only if the connection will not cause the work to exceed its conveyance capacity or to increase flooding on property not owned by the person; however, this section does not authorize connection to works without the consent of the owner of the work. Field ditches will be presumed to meet the erosion control requirements of paragraph (4)(f), above, when they are separated from streams, other watercourses, wetlands or other impoundments by a buffer strip of undisturbed vegetation and provided the integrity of this buffer is maintained. The width of the buffer strip shall be the width of the total Special Management Zone (primary zone and secondary zone) as described in the *Silviculture Best Management Practices Manual* (2008), published by

the Division of Forestry, Florida Department of Agriculture and Consumer Services, incorporated by reference herein
(#1 http://www.flrules.org/Gateway/reference.asp?No=Ref-03131,
#2 http://www.flrules.org/Gateway/reference.asp?No=Ref-03132,
#3 http://www.flrules.org/Gateway/reference.asp?No=Ref-03133,
#4 http://www.flrules.org/Gateway/reference.asp?No=Ref-03134,
#5 http://www.flrules.org/Gateway/reference.asp?No=Ref-03135,
#6 http://www.flrules.org/Gateway/reference.asp?No=Ref-03136,
#7 http://www.flrules.org/Gateway/reference.asp?No=Ref-03137,
#8 http://www.flrules.org/Gateway/reference.asp?No=Ref-03138,
#9 http://www.flrules.org/Gateway/reference.asp?No=Ref-03139,
#10 http://www.flrules.org/Gateway/reference.asp?No=Ref-03140, and
#11 http://www.flrules.org/Gateway/reference.asp?No=Ref-03141), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. However, field ditches may discharge directly to a wetland when the slope of the uplands within 1,000 feet of the edge of the wetland is equal to or less than two percent, provided the ditch does not result in drainage of the wetland and provided that the ditch does not create a hydrologic connection between two or more wetlands.

(h) In addition to the performance standards in paragraphs (4)(a) through (g), above, the person undertaking the activities must use the best management practices set forth in the *Silviculture Best Management Practices Manual* referenced in paragraph (4)(g), above.

(i) If climatic or flow conditions prevent the removal of a temporary crossing within the time frame specified in this section, the applicant may re-submit the application identified in subsection (2), above, to extend the time period for removal and restoration of the temporary crossing. The person must provide a written explanation and evidence supporting the need to reauthorize the crossing and must specify the additional time needed to remove the crossing, which may not exceed one year.

(5) Activities are authorized by the exemptions above for the following durations:

(a) One year to complete construction, alteration, abandonment, or removal of the silvicultural surface water management system; and

(b) Permanent for operation and maintenance of the silvicultural surface water management system.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.406(2), 373.4131, 373.4145, 373.415, 403.813(1) FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.052 General Permits – General.**
Rules 62-330.401 through 62-330.635, F.A.C., contain the procedures to submit a notice to use a general permit, the procedures for their review, the general conditions that apply to them, and the terms and specific conditions of each general permit. Those provisions do not apply to activities that qualify for the general permit in section 403.814(12), F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 373.426 FS. History–New 10-1-13.*

**62-330.054 Individual Permits.**
(1) An individual permit is required for activities that require a permit if they:
(a) Do not qualify for a general permit in rules 62-330.410 through 62-330.635, F.A.C.; and
(b) Are not proposed for conceptual approval under rule 62-330.055 or 62-330.056, F.A.C.
(2) Except as otherwise provided in subsection (4), below, an application for an individual permit shall be:
(a) Prepared using the form and procedures in rule 62-330.060, F.A.C.;
(b) Submitted in accordance with sections 4.2.3, 4.3, and 4.4 of Volume 1; and
(c) Reviewed and acted on in accordance with rules 62-330.062, 62-330.071, 62-330.075, 62-330.090, 62-330.301, and 62-330.302, F.A.C., and the Applicants Handbook.

(3) An application for a mitigation bank permit shall be processed as a type of individual permit, but also is subject to the requirements in chapter 62-342, F.A.C. If there is a conflict between this chapter and chapter 62-342, F.A.C., chapter 62-342, F.A.C., will control.

(4) An individual permit required solely pursuant to both paragraph 62-330.020(2)(i), F.A.C., and chapter 40C-44, F.A.C., shall

be reviewed and acted upon in accordance with chapter 40C-44, F.A.C., (October 1, 2013), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02533), and application for such permit shall be made in accordance with that chapter. A copy of chapter 40C-44, F.A.C., may be obtained as provided in subsection 62-330.010(5), F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.4136, 373.414(9), 373.4145, 373.416, 373.418, 373.426 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.055 Conceptual Approval Permits for Urban Infill or Redevelopment.**

A county or municipality may request a conceptual approval permit for activities occurring within urban infill and redevelopment areas or community redevelopment areas created under chapter 163, F.S. Following approval of the conceptual permit, any construction, alteration, operation, maintenance or removal consistent with the conceptual permit may be authorized under a notice of intent to use the general permit for urban infill and redevelopment in rule 62-330.450, F.A.C.

(1) An urban infill or redevelopment conceptual approval permit shall be reviewed as provided below and in rule 62-330.056, F.A.C., but does not have to meet all of the stormwater quality and quantity design and performance criteria of Volume II, provided the county or municipality submits a stormwater management master plan for the urban infill or redevelopment area that includes the following:

(a) Identification of the proposed urban infill or redevelopment area and the total contributing drainage area, including any major drainage basins and sub-basins;

(b) Identification of the receiving waters associated with the proposed urban infill or redevelopment area; and

(c) Calculation and assignment of the predevelopment annual loading of pollutants of concern as determined during the permit application review, on a drainage basin or sub-basin basis, for all areas to be included within the conceptual approval permit. Loadings must be specific to the types of land use and must be expressed as a "mass per area" basis. The basin or sub-basin loading assignments will serve as the pollutant goal for future urban infill or redevelopment in each of those areas (target pollutant load). Future development that meets the predevelopment pollutant load assignment will be presumed to meet the net improvement requirements of paragraph (2)(a), below.

(2) An application for a conceptual approval permit for urban redevelopment and infill activities shall also include the following:

(a) A demonstration that the redevelopment will achieve a net improvement of the quality of stormwater in accordance with section 373.4131(1)(b)2., F.S.

(b) Documentation of the rate and volume of stormwater discharges existing as of the date of the application, and information sufficient to estimate the maximum rate and volume of stormwater discharges that will exist as of the date of issuance of the conceptual approval permit.

(c) A commitment that activities within the redevelopment area will use stormwater best management practices (BMPs) to the maximum extent practicable.

(d) Provisions demonstrating that the individual or regional stormwater management systems within the urban infill or redevelopment area will be operated and maintained in perpetuity, consistent with the terms and conditions of the conceptual approval permit.

(e) An identification of proposed construction and no-construction areas.

(f) An estimate of the maximum extent of impacts to wetlands and other surface waters and details of any proposed mitigation for those impacts.

(g) An estimate of the maximum amount of anticipated impervious surface and description of the stormwater treatment system for those areas.

(h) An identification of the general location and types of activities proposed on any state-owned submerged lands.

(i) A timetable for redevelopment, including the requested duration of the conceptual approval permit.

(3) Consistent with the approved stormwater management master plan, the conceptual approval permit will:

(a) Provide a ledger that indicates the target pollutant load (mass per area) for each drainage basin or sub-basin. Any general permit for construction that is submitted in association with the conceptual permit must demonstrate that the proposed project does not exceed the target pollutant load for the receiving waters.

(b) Provide the annual pollutant load (mass per area) for each type of land use category, and the pollutant removal efficiency for the anticipated BMPs to be employed. Activities requested under the general permit in rule 62-330.450, F.A.C., that use the BMPs

approved in the stormwater master plan, that reduce impervious surfaces, or that otherwise meet the pollutant loading target in the stormwater master plan, and that also comply with all the terms and conditions of the general permit, will result in a debit to the ledger. Once the entire pollutant load target is reached for the receiving waters, no more development is allowed under the general permit.

(c) Contain specific conditions necessary to ensure that the future applications for permits to construct, alter, operate, maintain, remove, or abandon systems authorized in the conceptual approval permit are consistent with the redevelopment conceptual approval permit and the general permit in rule 62-330.450, F.A.C.

(d) Allow the rate and volume of stormwater discharges for stormwater management systems within the urban infill or redevelopment area to continue up to the maximum rate and volume of stormwater discharges allowed under section 373.4131(1)(b)4., F.S.

(4) If changes are proposed to the design of existing or future phases, or where there have been changes to state water quality standards, special basins, or site characteristics during the duration of the conceptual approval permit, the applicant must modify the conceptual approval permit if it wishes to continue to rely on it as a basis that reasonable assurance exists for the Agency to issue future construction or operation permits under the terms and conditions of this section. If the permittee fails to do this, the conceptual approval permit can no longer be relied upon as a basis, in part or whole, under which permits to construct or operate future phases will be issued, and the Agency will reevaluate the terms and conditions of the conceptual approval permit at the time a permit application is received to construct the next phase of activities included in the original conceptual approval permit, or at the next requested extension of the conceptual approval permit duration in accordance with subsection 62-330.056(11), F.A.C., whichever occurs first.

(5) Issuance of the conceptual approval permit and activities undertaken under the general permit in rule 62-330.450, F.A.C., must comply with the provisions of section 373.4131(1)(b)1., F.S.

(6) An individual permit under this chapter is required for the construction, alteration, operation, maintenance, abandonment, or removal of activities covered by this conceptual approval permit that involve work in wetlands or other surface waters. The following must occur before the Agency can determine that the general permit in rule 62-330.450, F.A.C., can be used to construct roads, parking areas, buildings, and other structures within the project area authorized by that individual permit, or on lands served by a stormwater management system authorized by that individual permit:

(a) The individual permit must be obtained;

(b) Dredging and filling necessary to prepare the land for future construction, including construction of any required stormwater management systems, must be completed in accordance with the individual permit; and

(c) Any mitigation required to offset adverse impacts from the work in wetlands and other surface waters must be initiated in conformance with the individual permit. When the applicant proposed the recording of a conservation easement over land as part of its mitigation, then a conservation easement acceptable to the agency must be recorded over the mitigation land consistent with the permitted mitigation plan. If the applicant proposed credits from a mitigation bank or regional offsite mitigation area as part of its mitigation, then such credits must be purchased consistent with the permitted mitigation plan.

(7) An urban infill or redevelopment conceptual permit shall be issued for 20 years, unless a shorter duration is requested. The permit shall be renewed at the request of the permittee for another 20 years, unless a shorter duration is requested, subject to activities remaining in compliance with this section and the terms and conditions of the general permit in rule 62-330.450, F.A.C.

*Rulemaking Authority 373.026, 373.043, 373.044, 373.4131, 373.4145, 373.418, 380.06, 403.805(1) FS. Law Implemented 373.026, 373.409, 373.413, 373.4131, 373.4141, 373.4142, 373.4145, 373.416, 380.06 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.056 Other Conceptual Approval Permits.**

(1) A conceptual approval permit is available for an applicant who desires approval of design concepts for a master or future plan to construct, alter, operate, maintain, or abandon projects that require an individual permit under this chapter. This includes activities that are to be developed in phases, such as phased development master plans and projects for which an Application for Development Approval has been made pursuant to part I of chapter 380, F.S., and whenever an applicant has not yet developed detailed design or construction plans for a future activity.

(2) A conceptual approval permit does not authorize any construction, alteration, operation, maintenance, removal, or abandonment, or the establishment and operation of a mitigation bank. Issuance of a conceptual approval permit does not relieve the holder of such a permit of any requirements to obtain a permit to construct, alter, operate, maintain, remove, or abandon projects that

require a permit under this chapter, or to establish and operate a mitigation bank.

(3) An application for a conceptual approval permit shall be prepared and submitted using the procedures in rule 62-330.060, F.A.C., and sections 4.2.3, 4.2.3.1, 4.3, and 4.4 of Volume I. An application for conceptual approval for a mitigation bank also shall include the materials required by chapter 62-342, F.A.C.

(4) The application shall be reviewed and acted on in accordance with this section, rules 62-330.062, 62-330.071, 62-330.075, 62-330.090, 62-330.301, and 62-330.302, F.A.C., and the Applicant's Handbook. Agency review and action also shall be in accordance with chapter 62-342, F.A.C., when the conceptual approval application involves a mitigation bank.

(5) An application for a conceptual approval permit may include a request for a permit to construct and operate the first phase of the activities. In such a case, a separate application and processing fee to construct and operate the first phase shall not be required. In all other cases, an individual permit to construct, alter, operate, maintain, remove, or abandon projects authorized by the conceptual approval permit must be obtained prior to initiating such activities.

(6) Any delineation of wetlands or other surface waters submitted as part of the conceptual approval permit application, including supporting documentation, shall not be considered binding unless a specific condition of the permit or a formal determination under rule 62-330.201, F.A.C., provides otherwise.

(7) Issuance of a conceptual approval permit is a determination that the conceptual plans are, within the extent of detail provided in the conceptual approval permit application, consistent with applicable rules at the time of issuance. A conceptual approval permit provides the conceptual approval permit holder with a rebuttable presumption, during the duration of the conceptual approval permit, that the engineering design and scientific principles upon which the conceptual approval permit are based (within the extent of detail provided in the conceptual approval permit) are likely to meet applicable rule criteria for issuance of permits for subsequent phases of the project, provided all of the following are met at the time of receipt of a complete application to construct or operate the future phases:

(a) The application to construct and operate the future phases remains consistent with the designs and conditions of the issued conceptual approval permit. Primary areas for consistency comparisons include the size, location and extent of the activities proposed, the type and nature of the activities, percent imperviousness, allowable discharge and points of discharge, location and extent of wetland and other surface water impacts, mitigation plans implemented or proposed, control elevations, extent of stormwater reuse, detention and retention volumes, and the extent of flood elevations.

If an application for construction of any portion of the land area contained within the conceptual approval permit is based upon designs that are inconsistent with the conceptual approval permit, the application will be reviewed to determine the extent to which the inconsistency will affect the designs and conditions for the remainder of the lands contained in the conceptual approval permit. If the inconsistency will materially affect those designs and conditions, then the applicant must demonstrate that the holder of the conceptual approval permit agrees to that inconsistency. In such a case, the holder of the conceptual approval permit may:

1. Modify the conceptual approval permit to conform to the revised design;

2. Abandon reliance on the conceptual approval permit; or

3. Rely on those portions of the conceptual approval permit for only those areas that were not affected by the inconsistency.

(b) There are no changes to state water quality standards, that would be affected by activities authorized in the conceptual approval permit that have not already been authorized for construction or operation.

(c) There have been no amendments to Florida law governing special basin criteria that would affect future activities authorized by the conceptual approval permit that have not already been authorized for construction.

(d) There are no substantive changes in the site characteristics that would affect whether the design concepts approved in the conceptual approval permit can continue to be reasonably expected to meet the conditions for authorizing construction of future phases. This shall include such things as designation of an affected waterbody as impaired, changes in the designation of listed species, and changes to nesting, denning, and critical designation status of listed species that exist within the lands served by the project area.

(8) If changes are proposed to the design of existing or future phases, or where there have been changes to state water quality standards, special basins, or site characteristics as described in paragraphs (7)(a) through (d), above, during the duration of a conceptual approval permit, the applicant must modify the conceptual approval permit if it wishes to continue to rely on it as a basis that reasonable assurance exists for the Agency to issue future construction or operation permits under the terms and conditions of this section. If the permittee fails to do this, the conceptual approval permit can no longer be relied upon as a basis, in part or whole, under which permits to construct or operate future phases will be issued, and the Agency will reevaluate the terms and conditions of

the conceptual approval permit at the time a permit application is received to construct the next phase of activities included in the original conceptual approval permit, or at the next requested extension of the conceptual approval permit duration in accordance with subsection 62-330.056(11), F.A.C., whichever occurs first.

(9) The duration of a conceptual approval permit, other than for urban infill and redevelopment, is 20 years, provided a permit under this chapter is issued for the initial phase of construction or alteration, the authorized construction or alteration has begun within five years of the date the conceptual approval permit was issued, and the work remains in compliance with the terms and conditions of both the conceptual approval permit and all permits authorizing construction or alteration. The time periods of this subsection will be tolled if the reviewing agency is notified in writing, within five years of issuance of the conceptual approval permit, that administrative review under either of the following is pending:

(a) The project approved by the conceptual approval permit is undergoing Development of Regional Impact review pursuant to section 380.06, F.S., and an administrative appeal of that review has been filed; or

(b) The issuance of the construction permit for the first phase is under administrative review pursuant to section 120.569 or 120.57, F.S.

If notice is given as provided above, the five-year time period for obtaining a permit and commencing construction shall be tolled until the date of final action resolving such administrative appeal or review, including any judicial review.

(10) If a permit for construction or alteration of the initial phase is not obtained from the Agency and construction commenced within five-years of issuance of the conceptual approval permit, the conceptual approval permit will expire five years from its date of issuance.

(11) Prior to expiration of the conceptual approval permit, the permittee may submit a request to modify its duration. However, the application will be reviewed in consideration of the factors in subsections 62-330.056(7) and (8), F.A.C., at the time of submittal of each request to extend the duration and each subsequent permit application to construct another phase of the projects under the conceptual approval permit. Where substantive changes in the design are proposed by the applicant, or are required to address the factors in paragraphs (7)(b) through (d), above, the permittee must submit an application for a major modification of the conceptual approval permit, which must be approved prior to the Agency issuing a permit to construct or alter future phases.

(12) A permit under this chapter shall not be required to construct or alter projects consistent with a conceptual approval permit issued under part IV of chapter 373, F.S., prior to October 1, 2013; such construction or alteration shall continue to be governed by the rules in effect prior to October 1, 2013, unless modifications are proposed that will require a permit under this chapter in accordance with subsection 62-330.315(4), F.A.C.

(13) Conceptual approvals for ports are available under section 373.4133, F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 373.426 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.060 Content of Applications for Individual and Conceptual Approval Permits.**

Materials to include in an application or notice for a permit are described below. Applicants are encouraged to have a pre-application meeting or discussion with Agency staff prior to submitting the application or notice.

(1) An application for an individual permit or conceptual approval permit shall be made on Form 62-330.060(1), "Application for Individual and Conceptual Approval Environmental Resource Permit and Authorization to Use State-Owned Submerged Lands," including the information required in the applicable Sections A through H (June 1, 2018), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09361), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., or by use of the equivalent e-application form of the applicable Agency. Attachments 1, 2, and 3 of the form (containing agency contacts and a summary of the application fees related to applications and notices) are not incorporated by reference, but are available at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/forms-environmental-resource.

(2) The application must include all material requested in the application form; the processing fee in accordance with rule 62-330.071, F.A.C.; and other information needed to provide reasonable assurance that the proposed activities meet the conditions for issuance in rule 62-330.301, F.A.C., the additional conditions for issuance in rule 62-330.302, F.A.C., and the Applicant's Handbook.

(3) The applicant must certify that it has sufficient real property interest over the land upon which the activities subject to the application will be conducted, as required in Section A of Form 62-330.060(1) and Section 4.2.3(d) of the Applicant's Handbook

Volume I. The applicant or the applicant's authorized agent must sign Part 4.A. of the application, and the applicant must sign Part 4.B. If the applicant's authorized agent signs Part 4.A, the applicant also must sign Part 4.C.

(4) An application for an individual permit also constitutes an application to operate and maintain the project. The application must specify the entity that will operate and maintain the project. If the applicant proposes an entity other than the current owner to operate and maintain the proposed project, documentation must be included demonstrating how such entity will meet the requirements of sections 12.3 through 12.3.4 of Volume I. A homeowner's or property owner's association ("HOA" or "POA," respectively) draft association documents designating the HOA or POA as the operating entity, and prepared in conformance with sections 12.3 through 12.3.4 of Volume I, shall satisfy this requirement. This provision of the association documents may not be modified without a permit modification in accordance with rule 62-330.315, F.A.C.

*Rulemaking Authority 373.044, 373.113, 373.171, 373.4131 FS. Law Implemented 373.042, 373.413, 373.4131, 373.416, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.061 Submittal of Applications and Notices to Agency Offices.**

*Rulemaking Authority 373.026, 373.043, 373.044, 373.118, 373.4131, 373.4145, 373.418, 403.805(1), 668.003, 668.004, 668.50 FS. Law Implemented 373.026, 373.118, 373.413, 373.4131, 373.4145, 373.416, 373.426, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Repealed 11-26-15.*

**62-330.062 Water Quality Certification and Coastal Zone Consistency Concurrence.**

(1) A State Water Quality Certification under Section 401 of the Clean Water Act, 33 U.S.C. Section 1341, shall be provided as described below.

(a) A complete application for an individual or conceptual approval permit shall constitute an application for certification of compliance with state water quality standards for activities that require an associated Department of the Army permit or license under Section 404 of the Clean Water Act, 33, U.S.C. 1344. Issuance of the individual or conceptual approval permit under this chapter shall constitute certification of compliance with water quality standards, unless water quality certification is waived in accordance with paragraph (1)(c), below.

(b) State water quality certification is granted when an activity meets all the terms and conditions of a general permit under rule 62-330.052, F.A.C., and the applicable rules 62-330.401 through 62-330.635, F.A.C.

(c) State water quality certification is waived for activities:

1. That are not regulated under rule 62-330.020, F.A.C.

2. That are exempt under rule 62-330.051 or 62-330.0511, F.A.C.

3. That require net improvement of water quality under section 373.414(1)(b), F.S., including permits issued under rule 62-330.055, F.A.C.

4. When the individual or conceptual approval permit is not issued or denied within 365 days of the date the application is deemed complete by the Agency.

5. When the permit or authorization expressly waives water quality certification.

(2) A complete application for an individual or conceptual approval permit for activities located in or seaward of coastal counties, and, in whole or in part, in, on, or over wetlands or other surface waters, shall also constitute a request for the State's concurrence that the activities are consistent with the enforceable policies included in the Florida Coastal Management Program (FCMP) under the "Coastal Zone Management Act" (CZMA), 16 U.S.C. Sections 1451-1466, and its implementing regulations, 15 C.F.R. Part 930. In accordance with section 380.23, F.S.:

(a) Qualification for a general permit, or issuance of an individual or conceptual approval permit shall constitute the state's concurrence that the activity is consistent with the enforceable policies included in the FCMP.

(b) Applications for federally permitted or licensed activities that qualify for an exemption under section 373.406 or 403.813(1), F.S., and this chapter, or the "10/2" general permit under section 403.814(12), F.S., are not eligible to be reviewed for federal consistency with part IV of chapter 373, F.S. The U.S. Army Corps of Engineers (Corps) or any designated federal, state or local agency administering general permits on behalf of the Corps under 33 C.F.R. Section 325.2(b)(2) may presume such exempt activities are consistent with the permitting Agency's authorities within the FCMP, provided the activity receives any applicable authorization to use and occupy state-owned submerged lands under chapter 253, F.S., and, as applicable, chapter 258, F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 380.23(4), 403.0877, 403.805(1) FS. Law Implemented 373.026(7), 373.109, 373.117, 373.118, 373.413, 373.4131, 373.4141, 373.4145, 373.416, 373.426, 373.428, 380.23, 403.0877 FS. History–New 10-1-13, Amended 6-1-18.*

### 62-330.071 Fees.

(1) A processing fee is required to be submitted with an application, notice, or petition under this chapter. The amount of the fee is specified in the following rules of the applicable Agency where the application, notice, or petition is submitted. The rules in paragraphs (b) through (e), below, are incorporated by reference herein. A copy of the incorporated material may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(a) Department or Northwest Florida Water Management District – rule 62-4.050, F.A.C.

(b) Suwannee River Water Management District – rule 40B-1.706, F.A.C., (October 1, 2013), (https://www.flrules.org/Gateway/reference.asp?No=Ref-02534)

(c) St. Johns River Water Management District – rule 40C-1.603, F.A.C., (October 1, 2013), (https://www.flrules.org/Gateway/reference.asp?No=Ref-02535)

(d) Southwest Florida Water Management District – rule 40D-1.607, F.A.C., (October 1, 2013), (https://www.flrules.org/Gateway/reference.asp?No=Ref-02536)

(e) South Florida Water Management District Rule – rule 40E-1.607, F.A.C., (October 1, 2013), (https://www.flrules.org/Gateway/reference.asp?No=Ref-02537).

(f) The processing fee for applications, notices, or petitions that are the responsibility of a local government delegated to implement this chapter under section 373.441, F.S., shall be established by the local government in accordance with the Delegation Agreement between the Department and the local government incorporated by reference in chapter 62-113, F.A.C.

(2) Processing fees submitted in the form of a check shall be made payable to the Agency. Electronic payment will be in accordance with the procedures established by the applicable Agency.

(3) If an applicant withdraws an application for individual or conceptual approval permit prior to Agency action, any processing fee submitted with that application shall be applied to the processing fee for a new application or notice received from the same applicant if done within 365 days from when the original application was withdrawn, provided the activity is located within all or part of the same project area. In such a case, additional processing fees will be required only to collect the balance due for the activities proposed in the revised application or notice. Processing fees previously paid for an application or notice that was denied by the Agency shall not be applied to a new or revised application or notice.

(4) A processing fee shall not be assessed for applications and notices under this chapter submitted by the Army, Navy, Air Force, Coast Guard, Marine Corps, or National Guard branches of the U.S. Department of Defense.

*Rulemaking Authority 373.026(7), 373.043, 373.109, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 218.075, 373.109, 373.4131, 373.4145, 373.418, 373.421 FS. History–New 10-1-13, Amended 6-1-18.*

### 62-330.075 Additional Requirements and Procedures for Concurrent Review of Related Applications.

(1) A single application shall be submitted and reviewed for activities that require both an individual permit under this chapter and a proprietary authorization under chapter 253 or 258, F.S., to use state-owned submerged lands. In such cases, the application shall not be deemed complete, and the timeframes for approval or denial shall not commence, until all information required by applicable provisions of part IV of chapter 373, F.S., and proprietary authorization under chapter 253 or 258, F.S., and rules adopted thereunder for both the environmental resource permit and the proprietary authorization is received.

(2) No application under this section shall be approved until all the requirements of applicable provisions of part IV of chapter 373, F.S., and proprietary authorization under chapter 253 or 258, F.S., and rules adopted thereunder for both the individual permit and the proprietary authorization are met. The approval shall be subject to all conditions of the regulatory permit and proprietary authorization, and any additional conditions imposed by such statutes or rules.

(3) For an application reviewed under this section for which a request for proprietary authorization to use state-owned submerged lands has been delegated to the Agency to take final action without action by the Board of Trustees of the Internal Improvement Trust Fund, the Agency shall issue a consolidated notice of intent to issue or deny the individual permit and the proprietary authorization within 60 days of receiving a complete application under this section. Waiving or tolling the timeframes for final action on the application under this section shall constitute a waiver or tolling of the timeframes for final action on the

individual or conceptual approval permit application.

(4) For an application reviewed under this section for which the request for proprietary authorization to use state-owned submerged lands has not been delegated to the Agency to take final action without action by the Board of Trustees of the Internal Improvement Trust Fund, the application shall be reviewed and final agency action taken in accordance with the procedures in sections 373.427(2)(a) through (c), F.S. The recommended consolidated intent, as required in section 373.427(2)(a), F.S., shall be considered issued when the Agency submits it for publication on the Board of Trustees' agenda, and releases it to the applicant and to any person to whom notice is required under rule 62-330.090, F.A.C.

(5) Upon the issuance of the consolidated notice or recommended consolidated notice of intent to issue or deny pursuant to subsection (4), above, the Agency shall be deemed to be in compliance with the timeframes for approval or denial in section 120.60(1), F.S. Failure to satisfy these timeframes shall not result in approval by default of the application to use state-owned submerged lands. Also, if an administrative proceeding under sections 120.569 and 120.57, F.S., is properly requested on both the individual or conceptual approval permit and the proprietary authorization under this section, the review shall be conducted as a single consolidated administrative proceeding, and final agency action shall not be taken on either authorization until the administrative proceeding is concluded.

(6) Appellate review of any consolidated order under this section is governed by section 373.4275, F.S.

(7) For an activity requiring a permit under section 161.041, F.S., and an individual or conceptual approval permit under this chapter, a joint coastal permit shall be required, as provided in chapter 62B-49, F.A.C., in place of the individual or conceptual approval permit under this chapter.

(8) This section shall be applicable to all applications for individual or conceptual approval permits under this chapter, and proprietary authorizations under chapter 253 or 258, F.S., to use state-owned submerged lands, that are received by the Agency after October 1, 2013. If an applicant requests that its application for an individual or conceptual approval permit under this chapter, and proprietary authorizations under chapter 253 or 258, F.S., to use state-owned submerged lands, received prior to October 1, 2013, be processed under this rule, such request shall be granted if the applications for both are incomplete as of October 1, 2013.

(9) Nothing in this section shall be construed to limit an applicant's ability to make separate applications for stages, phases, or portions of a project separate from an activity requiring both a proprietary authorization under chapter 253 or 258, F.S., and an individual or conceptual approval permit under this chapter.

*Rulemaking Authority 161.055, 253.03(7), 253.77, 258.43, 373.026, 373.043, 373.044, 373.4131, 373.418, 373.427, 403.805(1) FS. Law Implemented 120.60, 161.041, 161.055, 253.03, 253.77, 258.42, 258.43, 373.026, 373.413, 373.4131, 373.416, 373.427, 373.4275 FS. History– New 10-1-13, Amended 6-1-18.*

**62-330.090 Processing of Individual and Conceptual Approval Permit Applications.**

(1) The Agency shall review, notice, and issue a request for any required additional information in accordance with section 5.5.3 of Volume I.

(2) Pending applications shall be exempt from changes in the rules adopted after an application has been deemed complete except as otherwise provided by law or in this chapter.

(3) If an applicant submits a processing fee in excess of the required fee, the Agency shall begin processing the application and shall refund to the applicant the amount received in excess of the required fee. If an applicant fails to provide the complete processing fee, the Agency will inform the applicant of the amount of additional fee required, and the application will not be complete until the complete processing fee is received, along with the other materials that have been timely requested in accordance with section 5.5.3 of Volume I. The Agency cannot be compelled to issue a permit in advance of receipt of the required fee or any other material required by the Agency to deem an application complete.

(4) If a substantial revision is submitted to a pending application, other than revisions proposed to reduce adverse impacts identified by the Agency, the applicant shall pay the difference between the processing fees already submitted and any additional fees required for the revised application under rule 62-330.071, F.A.C. In such a case, the time frames in section 5.5.3 of Volume I for processing the application shall be restarted.

(5) In addition to the procedures in this section, processing of the application will be performed in accordance with sections 5.5 through 5.6 of Volume I.

(6) A permit shall only be issued to an entity meeting the requirements of section 4.2.3(d) of Volume I.

(7) The Agency shall cause a "Recorded Notice of Environmental Resource Permit" Form No. 62-330.090(1), (June 1, 2018),

incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09362), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., to be recorded in the public records of the county where the property is located unless otherwise noted in the permit. This notice shall not be considered an encumbrance upon the property. Such notice need not be recorded when the entire activity:

(a) Is for an individual, single-family residence, duplex, triplex, or quadruplex that is not part of a larger common plan of development or sale proposed by the permittee, except when the permit specifies that recording is necessary to ensure future owners are advised of long-term operational and maintenance requirements, or conservation provisions;

(b) Is authorized by a general permit under this chapter;

(c) Is temporary (not to exceed one year) in nature;

(d) Has no long term maintenance or operation requirements associated with it;

(e) Is located within lands encumbered by a real property interest held by a federal, state, county, or municipal government entity, including a school, university, or college;

(f) Is a utility within an easement recorded in the official records; or

(g) Is within the permit area of an existing permit for which a Notice has already been recorded, and the permit modification does not change the permit area.

*Rulemaking Authority 373.026(7), 373.043, 373.116, 373.118, 373.413, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.109, 373.118, 373.4131, 373.4141, 373.4145 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.100 Purpose and Intent.**

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.414, 373.415, 373.418, 373.4211(22), (25), 373.461, 380.06(9), 403.805(1) FS. Law Implemented 373.019, 373.042, 373.0421, 373.085, 373.086, 373.109, 373.118, 373.119, 373.129, 373.136, 373.403, 373.406, 373.413, 373.4135, 373.4136, 373.414, 373.4141, 373.415, 373.416, 373.417, 373.418, 373.419, 373.421(2)-(6), 373.4211(22), 373.439, 373.461, 380.051, 380.06(9), 403.813(1), 403.414, 403.0877 FS. History–New 12-7-92, Formerly 17-330.100, Amended 10-3-95, Repealed 10-1-13.*

**62-330.200 Rules Adopted by Reference.**

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.414, 373.415, 373.418, 373.461, 380.06(9), 403.0877 FS. Law Implemented 373.019, 373.042, 373.0421, 373.085, 373.086, 373.109, 373.118, 373.119, 373.129, 373.136, 373.403, 373.406, 373.413, 373.4135, 373.4136, 373.414, 373.4141, 373.415, 373.416, 373.417, 373.418, 373.419, 373.421(2)-(6), 373.4211(22), (25), 373.422, 373.423, 373.426, 373.427, 373.429, 373.430, 373.433, 373.436, 373.439, 373.461, 380.06(9), 403.0877, 403.813(1) FS. History–New 12-7-92, Formerly 17-330.200, Amended 10-3-95, 6-6-96, 8-21-00, 9-4-05, 12-5-05, 6-5-06, 8-2-06, 8-2-06, 8-1-10, Repealed 10-1-13.*

**62-330.201 Formal Determinations of the Landward Extent of Wetlands and Other Surface Waters.**

(1) A real property owner, an entity having a contract to purchase real property, an entity having the power of eminent domain, or any other person who has legal or equitable interest in real property, may petition the Agency for a formal determination of the landward extent of wetlands and other surface waters for that property pursuant to section 373.421(2), F.S. A formal determination means the Agency will make a binding determination of the landward extent (boundaries) of wetlands and other surface waters as defined by chapter 62-340, F.A.C. A formal determination is binding on the real property for which that determination is sought for as long as the determination is valid, in accordance with sections 373.421(2) and (3), F.S. If the petitioner is not the owner of the land, the petitioner must provide the Agency with information sufficient to contact the current owner, and the Agency shall provide notice of receipt of the petition to the landowner.

(2) Procedures for the submittal, review, noticing, and action on a petition for a formal determination are contained in sections 7.2 through 7.2.7 of Volume I. The petition shall be submitted using Form 62-330.201(1), "Petition for a Formal Determination of the Landward Extent of Wetlands and Other Surface Waters," (June 1, 2018), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09363). It shall be submitted with the fee prescribed in rule 62-330.071, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.421(2), 403.0877 FS. Law Implemented 120.54(5)(a), 373.026, 373.4131, 373.421(2), 373.441 FS. History–New 7-4-95, Amended 8-14-96, 8-16-98, 2-19-03, Formerly 62-343.040, Amended 10-1-13, 6-1-18.*

**62-330.301 Conditions for Issuance of Individual and Conceptual Approval Permits.**

(1) To obtain an individual or conceptual approval permit, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, removal, or abandonment of the projects regulated under this chapter:

(a) Will not cause adverse water quantity impacts to receiving waters and adjacent lands;

(b) Will not cause adverse flooding to on-site or off-site property;

(c) Will not cause adverse impacts to existing surface water storage and conveyance capabilities;

(d) Will not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;

(e) Will not adversely affect the quality of receiving waters such that the state water quality standards set forth in chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62-4.242(2) and (3), F.A.C., and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;

(f) Will not cause adverse secondary impacts to the water resources. In addition to the criteria in this subsection and in subsection 62-330.301(2), F.A.C., in accordance with section 373.4132, F.S., an applicant proposing the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area must also provide reasonable assurance that the facility, taking into consideration any secondary impacts, will meet the provisions of paragraph 62-330.302(1)(a), F.A.C., including the potential adverse impacts to manatees;

(g) Will not adversely impact the maintenance of surface or ground water levels or surface water flows established pursuant to section 373.042, F.S.;

(h) Will not cause adverse impacts to a Work of the District established pursuant to section 373.086, F.S.;

(i) Will be capable, based on generally accepted engineering and scientific principles, of performing and functioning as proposed;

(j) Will be conducted by a person with the financial, legal and administrative capability of ensuring that the activity will be undertaken in accordance with the terms and conditions of the permit, if issued; and

(k) Will comply with any applicable special basin or geographic area criteria established as follows:

1. Within the Northwest Florida Water Management District, Sections 13.0 through 13.4 (Special Basin Criteria for Sensitive Karst Areas, including Appendix A) of Volume II.

2. Within the Suwannee River Water Management District, Section 5.9 (Sensitive Karst Areas) of Volume II.

3. Within the St. Johns River Water Management District:

a. Chapter 40C-41, F.A.C., "Surface Water Management Basin Criteria," (October 1, 2013), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02551).

b. Sections 13.0 through 13.8.3 (Part VI, Basin Criteria), of Volume II.

4. Within the South Florida Water Management District:

a. Chapter 40E-41, F.A.C., "Surface Water Management Basin and Related Criteria," (December 1, 2011), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02554).

b. Chapter 40E-63, F.A.C., "Everglades Program," (November 9, 2010), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02557).

c. For activities within the Outstanding Florida Waters of Monroe County, rules 62-312.400 through 62-312.460, F.A.C.

Copies of incorporated material may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(2) In instances where an applicant is unable to meet state water quality standards because existing ambient water quality does not meet standards and the system will contribute to this existing condition, the applicant must implement mitigation measures that are proposed by, or acceptable to, the applicant that will cause net improvement of the water quality in the receiving waters for those parameters that do not meet standards.

(3) In addition to the criteria in chapter 62-330, F.A.C., applications for a mitigation bank must also meet the criteria of chapter 62-342, F.A.C.

(4) The standards and criteria used to determine whether the reasonable assurances required in this section and rule 62-330.302, F.A.C., have been provided, including the provisions for elimination or reduction of impacts and mitigation to offset adverse impacts, are contained in Volume I, incorporated by reference in subsection 62-330.010(4), F.A.C., and Volume II, incorporated by reference in subsection 62-330.010(4), F.A.C., for the applicable District.

(5) Forms for demonstrating that an applicant has met the financial responsibility requirements of sections 10.3.7 through 10.3.7.9 of Volume I shall be in substantial conformance with the forms incorporated by reference below, a copy of which may be

obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(a) Form 62-330.301(1), "Performance Bond to Demonstrate Financial Assurance for Mitigation," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09364).

(b) Form 62-330.301(2), "Irrevocable Letter of Credit to Demonstrate Financial Assurance for Mitigation," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09365).

(c) Form 62-330.301(3), "Standby Trust Fund Agreement to Demonstrate Financial Assurance for Mitigation," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09367).

(d) Form 62-330.301(4), "Trust Fund Agreement to Demonstrate Financial Assurance for Mitigation," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09368).

(e) Form 62-330.301(5), "Escrow Agreement," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09369).

(f) Form 62-330.301(6), "Guarantee Bond to Demonstrate Financial Assurance for Mitigation," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02488).

(6) Forms for recording of a conservation easement in the public records in favor of the Agency shall be in substantial conformance with the forms incorporated by reference below, a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. The use of these forms shall constitute consistency with section 704.06, F.S. Where the applicant demonstrates that project specific conditions necessitate deviation from language of the accepted forms, alternative language shall be accepted provided that the intent of section 704.06, F.S., and section 10.3.8 of Volume I continue to be met:

(a) Form 62-330.301(8), "Deed of Conservation Easement–Standard," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09370).

(b) Form 62-330.301(9), "Deed of Conservation Easement–Standard, with Third Party Beneficiary Rights," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09371).

(c) Form 62-330.301(10), "Deed of Conservation Easement–Passive Recreational Uses," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09372).

(d) Form 62-330.301(11), "Deed of Conservation Easement–Riparian Uses," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09373).

(e) Form 62-330.301(12), "Deed of Conservation Easement–for Local Governments," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09374).

(f) Form 62-330.301(13), "Deed of Conservation Easement–Third Party Beneficiary Rights to the U.S. Army Corps of Engineers," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09375).

(g) Form 62-330.301(14), "Declaration of Restrictive Covenants," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09376).

(h) Form 62-330.301(15), "Declaration of Restrictive Covenants–Insert," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02496).

(i) Form 62-330.301(16), "Temporary Easement for Construction Access," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02497).

(j) Form 62-330.301(17), "Permanent Access Easement," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02498).

(k) Form 62-330.301(18), "Joint Deed of Conservation Easement–Standard (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09377).

(l) Form 62-330.301(19), "Joint Deed of Conservation Easement–Standard, with Third Party Beneficiary Rights (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09378).

(m) Form 62-330.301(20), "Joint Deed of Conservation Easement–Passive Recreational Uses (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09379).

(n) Form 62-330.301(21), "Joint Deed of Conservation Easement–Riparian Uses (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09380).

(o) Form 62-330.301(22), "Joint Deed of Conservation Easement–Local Governments (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09381).

(p) Form 62-330.301(23), "Joint Deed of Conservation Easement–Third Party Beneficiary Rights to the U.S. Army Corps of Engineers (within Broward County)," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09382).

(q) Form 62-330.301(24), "Deed of Conservation Easement for Mitigation Banks–Third Beneficiary Rights to U.S. Army Corps of Engineers," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09383).

(7) An overwater pier, dock, or similar structure located in a deepwater port listed in section 311.09, F.S., does not require treatment of stormwater runoff from its impervious surfaces subject to the requirements of section 373.406(12), F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.042, 373.409, 373.413, 373.4131, 373.4132, 373.4142, 373.4145, 373.416, 373.426, 373.429, 704.06 FS. History–New 10-1-13, Amended 6-1-18.*

### 62-330.302 Additional Conditions for Issuance of Individual and Conceptual Approval Permits.

(1) In addition to the conditions in rule 62-330.301, F.A.C., to obtain an individual or conceptual approval permit under this chapter, an applicant must provide reasonable assurance that the construction, alteration, operation, maintenance, repair, removal, and abandonment of a project:

(a) Located in, on, or over wetlands or other surface waters will not be contrary to the public interest, or if such activities significantly degrade or are within an Outstanding Florida Water, are clearly in the public interest, as determined by balancing the following criteria as set forth in sections 10.2.3 through 10.2.3.7 of Volume I:

1. Whether the activities will adversely affect the public health, safety, or welfare or the property of others;

2. Whether the activities will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3. Whether the activities will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the activities will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

5. Whether the activities will be of a temporary or permanent nature;

6. Whether the activities will adversely affect or will enhance significant historical and archaeological resources under the provisions of section 267.061, F.S.; and

7. The current condition and relative value of functions being performed by areas affected by the proposed activities.

(b) Will not cause unacceptable cumulative impacts upon wetlands and other surface waters as set forth in sections 10.2.8 through 10.2.8.2 of Volume I.

(c) Located in, adjacent to or in close proximity to Class II waters or located in Class II waters or Class III waters classified by the Department of Agriculture and Consumer Services as approved, restricted, conditionally approved, or conditionally restricted for shellfish harvesting will comply with the additional criteria in section 10.2.5 of Volume I.

(d) Involving vertical seawalls in estuaries or lagoons will comply with the additional criteria provided in section 10.2.6 of Volume I.

(2) When determining whether an applicant has provided reasonable assurances that the permitting standards of this chapter will be met, the Agency shall consider the applicant's violation of any rules adopted pursuant to sections 403.91 through 403.929, F.S. (1984 Supp.), as amended, or part IV, chapter 373, F.S., and efforts taken by the applicant to resolve these violations.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.414(9), 403.805(1) FS. Law Implemented 373.042, 373.413, 373.4131, 373.414, 373.416, 373.426, 380.23 FS. History–New 10-1-13, Amended 6-1-18.*

### 62-330.310 Operation and Maintenance.

(1) The permit authorizing construction or alteration must be converted to the operation and maintenance phase once the construction or alteration has been completed. The construction or alteration authorized under an individual permit must be certified to be in compliance with the permit before conversion of the permit to the operation and maintenance phase. Procedures for converting the permit to the operation and maintenance phase, and transferring the permit to the perpetual operation and maintenance entity are described in sections 12.2 and 12.2.1 of Volume I.

(2) If a separate entity is to operate and maintain the project, the entity must have the financial, legal, and administrative capability to perform operation and maintenance, as described in sections 12.1 through 12.3.4 of Volume I. Transfer of the permit to the operation and maintenance entity that was approved as part of the permit does not require a permit modification.

(3) If the permittee desires to change or add operation and maintenance entities after the permit is issued, or to allow for multiple entities to operate portions of the project, a permit modification under rule 62-330.315, F.A.C., must be requested and approved before transfer of the permit to the new entity or entities. Such permit modification request must include a demonstration

that the new entity or entities meet the requirements of subsection (2), above. If an interdependent system will have multiple operation and maintenance entities, that modification request must also demonstrate that each entity that will operate and maintain an interdependent part of the system has the capability to operate and maintain all parts of the system necessary to remain in compliance with all conditions of the permit.

(4)(a) For individual permits NOT associated with an individual, private single-family dwelling unit, duplex, triplex, or quadruplex:

1. Upon completion of construction, and following the general conditions in paragraphs 62-330.350(1)(f) and (g), F.A.C., the permittee shall submit both of the following to the permitting Agency:

a. Form 62-330.310(1), "As-Built Certification and Request for Conversion to Operation Phase," which is incorporated by reference herein (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09384); and

b. Form 62-330.310(2), "Request for Transfer of Environmental Resource Permit to the Perpetual Operation and Maintenance Entity," which is incorporated by reference herein (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09385).

2. The permit will be converted to the operation and maintenance phase upon a certification by the permittee and concurrence by the Agency that the entire project, or an independent portion of the project, has been constructed in compliance with the permit.

3. The permit will be transferred to the operation and maintenance entity once the Agency has verified that the entity meets the requirements of section 12.3 of Volume I, all applicable operation and maintenance documents have been recorded in accordance with section 12.3.4 of Volume I, and the entity has accepted responsibility for operation and maintenance of the project or independent portion of the project. The entity is required to sign Form 62-330.310(2), except when the operation and maintenance entity has been accepted at the time of issuance of the permit for the construction phase, or as part of a permit modification.

(b) For individual permits for an individual, private single family dwelling unit, duplex, triplex, or quadruplex, the permit will automatically convert to the operation and maintenance phase upon completion of construction and the Agency's receipt from the permittee, in accordance with the general conditions in paragraph 62-330.350(1)(f), F.A.C., of a completed Form 62-330.310(3), "Construction Completion and Inspection Certification for Activities Associated with a Private Single-Family Dwelling Unit," (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09386), which is incorporated by reference herein, certifying that the project was constructed in accordance with the permit.

(c) Copies of the above forms may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(5) Projects authorized under a general permit shall, upon completion, be operated and maintained in perpetuity by the permittee and subsequent owners of the land on which the project is located.

(6) The operation and maintenance entity or entities shall remain liable for compliance with the terms of the permit in perpetuity, unless the permit is transferred in accordance with rule 62-330.340, F.A.C., or the permit is modified in accordance with subsection (3), above.

(7)(a) The operation phase of mining activities subject to the land reclamation requirements of chapter 378, F.S., shall terminate, without the need to apply for abandonment of the permit, after the mine, or its subunits as applicable:

1. Has been successfully reclaimed in accordance with chapter 378, F.S., other than lands disturbed by mining operations that are not subject to the requirements of chapter 378, F.S.;

2. Has met all success requirements of the individual permit issued under part IV of chapter 373, F.S.; when the construction phase of the permit includes all phases of construction, abandonment, reclamation, and final success determination over reclaimed lands; and

3. Does not contain components that require long-term operation or maintenance, such as: stormwater management systems; achievement of mitigation success criteria; work in conservation easements requiring a permit under this chapter; state-owned submerged lands authorizations; dams; above-grade impoundments; works; water control structures; erosion and sedimentation controls; or dewatering pits.

(b) If a mine is already operating under an operation and maintenance phase of an individual permit, such operation and maintenance phase shall be allowed to terminate upon successful completion of all phases of reclamation and receipt of final success determinations by the Agency over lands reclaimed in accordance with the rules adopted pursuant to chapter 378, F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.416, 373.418, 403.805(1) FS. Law Implemented 373.118, 373.4131, 373.4141, 373.416, 373.419, 373.426, 373.429 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.311 Inspections and Reporting.**

(1) The operation and maintenance entity shall provide for the inspection of the permitted project after conversion of the permit to the operation and maintenance phase as provided in section 12.4 of Volume I. Minimum inspection frequencies will be established in Volume II for each District as applicable, but actual inspection and reporting frequencies for the specific project are subject to revision through permit conditions, based on site- and activity-specific operational and maintenance requirements.

(2) Within 30 days of any failure of a stormwater management system or deviation from the permit, a report shall be submitted to the Agency using Form 62-330.311(1), "Operation and Maintenance Inspection Certification," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02502), incorporated by reference herein, describing the remedial actions taken to resolve the failure or deviation.

(3) The operation and maintenance entity of a regional stormwater management facility must notify the Agency on an annual basis, using Form 62-330.311(2), "Regional Stormwater Management System Annual Report," (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02503), incorporated by reference herein, of all new systems and their associated stormwater volumes that have been allowed to discharge stormwater into the regional facility, and must confirm that the maximum allowable treatment volume of stormwater authorized to be accepted by the regional facility has not been exceeded.

(4) A copy of the above forms may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(5) Permits issued prior to the effective date of this section shall continue to be inspected and reported on in accordance with the terms and conditions of the existing permit. However, a permittee may request a modification of the permit to reflect inspection and reporting in accordance with this rule.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.416, 373.418, 403.805(1) FS. Law Implemented 373.118, 373.4131, 373.4141, 373.423, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.315 Modification of Permits.**

(1) Modifications to an unexpired individual or conceptual approval permit may be requested by the permittee and will be processed as a minor or a major modification, as described below and in section 6.2 of Volume I. Permit modification fees are set forth in rule 62-330.071, F.A.C.

(2) Minor modifications may be requested in accordance with section 6.2 of Volume I. Minor modifications are not subject to the public notification requirements of section 5.5 of Volume I. The following types of requests will be considered as minor modifications:

(a) To extend the duration of the construction phase of an individual permit by up to five years, subject to the provisions of subsection 62-330.320(2), F.A.C.;

(b) To correct errors or typographical mistakes;

(c) To incorporate changes requested by the Agency;

(d) To change due dates for reporting or performance deadlines;

(e) To transfer a permit upon a change in ownership or control;

(f) To make minor technical changes; or

(g) To make other minor changes that do not substantially alter the permit authorization, increase permitted off-site discharge, increase the environmental impact of the project, decrease required retention, decrease required detention, decrease required flood control elevations, or decrease pollution removal efficiency. Factors that will be considered in determining whether a change is minor are described in section 6.2.1 of Volume I.

(3) Any application for modification that does not qualify for a minor modification as described above shall be processed as a major modification. An application for a major modification of a permit shall be submitted and processed in the same manner as a new permit application, and those portions of the project proposed for, or affected by, the modification shall be reviewed using the same criteria as a new application.

(4) Modifications of an unexpired permit issued under one or more of the following rules as they were in effect prior to October 1, 2013: chapter 62-330, 62-343, 62-346, 40B-4, 40B-400, 40C-4, 40C-40, 40C-42, 40C-44, 40C-400, 40D-4, 40D-40, 40D-400, 40E-4, 40E-40, or 40E-400, F.A.C., shall be in accordance with the rules under which the permit was issued, except that such modification shall be processed and reviewed under this chapter (effective after October 1, 2013) if:

(a) The modification is reasonably expected to lead to additional or substantially different water resource impacts;

(b) The permittee chooses to modify the permit under this chapter; or

(c) The modification does not qualify as a minor modification under subsection (2), above.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.026(7), 373.043, 373.109, 373.118, 373.413, 373.4131, 373.4141, 373.4142, 373.4145, 373.416, 373.418, 373.429 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.320 Duration of Permits.**

Unless revoked, extended or otherwise modified, the duration of a permit under this chapter is:

(1) General permit – Five years to construct, commencing from the date notice is received by the Agency, or the date the Agency verifies compliance with the terms and conditions of the general permit in accordance with rule 62-330.402, F.A.C., whichever is later.

(2) Individual permit – Five years from the date of issuance to construct, except:

(a) Less than five years for activities such as temporary or experimental work, or when a shorter duration is needed; or

(b) More than five years when the applicant specifically requests a longer duration and provides reasonable assurance that:

1. The activity for which the permit is to be granted cannot reasonably be expected to be completed within five years after commencement of construction; and

2. The impacts of the activity, considering its nature, the size of the project, and any required mitigation, can be accurately assessed and offset where appropriate, and the terms of the permit can be met for the duration of the permit requested.

(3) Operation and maintenance – in perpetuity following:

(a) Construction in conformance with the terms and conditions of a general permit; or

(b) Conversion from the construction to the operation phase of an individual permit in accordance with rule 62-330.310, F.A.C.

(4) Conceptual approval permit – As provided in rule 62-330.055 or 62-330.056, F.A.C.

(5) Mitigation bank permit – As provided in rule 62-342.750, F.A.C.

(6) A modification to extend the duration of the construction phase of an individual permit shall be granted if the extension request is received in writing by the Agency before expiration of the construction phase; and:

(a) The activity remains consistent with plans, terms, and conditions of the permit and the Agency's rules in effect when the extension is granted; and

(b) The request can be approved in consideration of subparagraphs (2)(b)1. and 2., above.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118, 373.413, 373.4131, 373.4136, 373.4142, 373.4145, 373.416, 373.426 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.340 Transfer of Permit Upon Change in Ownership or Control.**

(1) Permits in the Operation and Maintenance Phase – Projects constructed in accordance with the terms and conditions of a general permit are automatically authorized to be operated and maintained by the permittee and subsequent owners. A permittee with a valid individual permit in the operation and maintenance phase under this chapter or chapter 62-342, F.A.C., shall notify the Agency electronically or in writing within 30 days of a change in ownership or control of the entire real property, project, or activity covered by the permit. A processing fee is not required for this notice. The permit shall automatically transfer to the new owner or person in control, except in cases of abandonment, revocation, or modification of a permit as provided in sections 373.426 and 373.429, F.S. If a permittee fails to provide written notice to the Agency within 30 days of the change in ownership or control, or if the change does not include the entire real property or activity covered by the permit, then the transfer shall be governed by subsections (2) through (4), below.

(2) Except as provided in subsection (1), above, and in section 6.3.1 of Volume I, or as otherwise required in an individual or conceptual approval permit, or for activities authorized under a general permit, a permittee shall notify the Agency electronically or in writing within 30 days of any change in ownership or control of any portion of the real property upon which an activity is permitted under this chapter or chapter 62-342, F.A.C. A person who obtains an interest in or control of such real property shall:

(a) Request transfer of the permit to become the new permittee or modification of the permit to become a co-permittee; or

(b) Provide written documentation of the following:

1. Certification that the permittee continues to retain sufficient real property interest over the land upon which the activities subject to the permit will be conducted as described in section 4.2.3(d) of Volume I; and

2. Authorization for Agency staff with proper identification to enter, inspect, sample and test the project or activities to ensure conformity with the plans and specifications authorized in the permit.

(3) The person requesting transfer of the permit shall submit to the Agency a completed Form 62-330.340(1), "Request to

Transfer Environmental Resource Permit," incorporated by reference herein (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09387), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., together with the permit modification fee prescribed by the Agency as set forth in rule 62-330.071, F.A.C. A proposed new permittee shall demonstrate that it has sufficient real property interest in or control over the land consistent with subsection 62-330.060(3), F.A.C.

(a) The Request to Transfer Environmental Resource Permit shall be processed in the same manner as a minor modification as provided in subsection 62-330.315(2), F.A.C.

(b) The proposed new permittee shall include demonstration or documentation with the request that it meets the requirements for being an acceptable operation and maintenance entity provided in subsections 62-330.310(2) and (3), F.A.C., if applicable.

(4) Upon receipt of the completed Request to Transfer Environmental Resource Permit form and applicable processing fee, the Agency shall approve the permit transfer unless it determines that the proposed permittee or co-permittee has failed to provide reasonable assurances that it qualifies to be a permittee or that it can meet the permit conditions.

(a) If the Agency proposes to deny the transfer, it shall provide both the current permittee and the proposed permittee with notice of proposed agency action of denial, and of the right to request an administrative hearing pursuant to chapter 120, F.S.

(b) Failure of the permittee to notify the Agency in writing within 30 days of a change in ownership or control shall not, by itself, render a permit invalid. When it does not appear the current permittee has met the requirements of subsection (2), above, or has not otherwise approved or been made aware of the request to transfer the permit, upon transfer of the permit to the new permittee, the Agency will provide notice to the former permittee, at its last known address, advising of the permit transfer, together with a notice of rights under chapter 120, F.S.

(5) A permittee from whom the permit is transferred shall:

(a) Be jointly and severally liable with the new owner or permittee for compliance with the permit and for any corrective actions that may be required as a result of violations of the permit or Agency rule on the property prior to permit transfer; and

(b) Remain jointly and severally liable for any corrective actions that are required as a result of any violations of the permit that occurred prior to the change in ownership or control of the property upon which the permitted project or activity is located.

(6) Upon transfer of a permit, the new permittee shall comply with all terms and conditions of the permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118, 373.109, 373.413, 373.4131, 373.4142, 373.4145, 373.416, 373.426, 373.429, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.350 General Conditions for Individual Permits.**

(1) The following general conditions are binding on all individual permits issued under this chapter, except where the conditions are not applicable to the authorized activity, or where the conditions must be modified to accommodate project-specific conditions.

(a) All activities shall be implemented following the plans, specifications and performance criteria approved by this permit. Any deviations must be authorized in a permit modification in accordance with rule 62-330.315, F.A.C. Any deviations that are not so authorized may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S.

(b) A complete copy of this permit shall be kept at the work site of the permitted activity during the construction phase, and shall be available for review at the work site upon request by the Agency staff. The permittee shall require the contractor to review the complete permit prior to beginning construction.

(c) Activities shall be conducted in a manner that does not cause or contribute to violations of state water quality standards. Performance-based erosion and sediment control best management practices shall be installed immediately prior to, and be maintained during and after construction as needed, to prevent adverse impacts to the water resources and adjacent lands. Such practices shall be in accordance with the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual (Florida Department of Environmental Protection and Florida Department of Transportation, June 2007)*, and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008)*, which are both incorporated by reference in subparagraph 62-330.050(9)(b)5., F.A.C., unless a project-specific erosion and sediment control plan is approved or other water quality control measures are required as part of the permit.

(d) At least 48 hours prior to beginning the authorized activities, the permittee shall submit to the Agency a fully executed Form 62-330.350(1), "Construction Commencement Notice," (October 1, 2013), (http://www.flrules.org/Gateway/reference.asp?No=Ref-02505), incorporated by reference herein, indicating the expected start and completion dates. A copy of this form may be obtained

from the Agency, as described in subsection 62-330.010(5), F.A.C., and shall be submitted electronically or by mail to the Agency. However, for activities involving more than one acre of construction that also require a NPDES stormwater construction general permit, submittal of the Notice of Intent to Use Generic Permit for Stormwater Discharge from Large and Small Construction Activities, DEP Form 62-621.300(4)(b), shall also serve as notice of commencement of construction under this chapter and, in such a case, submittal of Form 62-330.350(1) is not required.

(e) Unless the permit is transferred under rule 62-330.340, F.A.C., or transferred to an operating entity under rule 62-330.310, F.A.C., the permittee is liable to comply with the plans, terms, and conditions of the permit for the life of the project or activity.

(f) Within 30 days after completing construction of the entire project, or any independent portion of the project, the permittee shall provide the following to the Agency, as applicable:

1. For an individual, private single-family residential dwelling unit, duplex, triplex, or quadruplex – "Construction Completion and Inspection Certification for Activities Associated with a Private Single-Family Dwelling Unit" [Form 62-330.310(3)]; or

2. For all other activities – "As-Built Certification and Request for Conversion to Operation Phase" [Form 62-330.310(1)].

3. If available, an Agency website that fulfills this certification requirement may be used in lieu of the form.

(g) If the final operation and maintenance entity is a third party:

1. Prior to sales of any lot or unit served by the activity and within one year of permit issuance, or within 30 days of as-built certification, whichever comes first, the permittee shall submit, as applicable, a copy of the operation and maintenance documents (see sections 12.3 thru 12.3.4 of Volume I) as filed with the Florida Department of State, Division of Corporations, and a copy of any easement, plat, or deed restriction needed to operate or maintain the project, as recorded with the Clerk of the Court in the County in which the activity is located.

2. Within 30 days of submittal of the as-built certification, the permittee shall submit "Request for Transfer of Environmental Resource Permit to the Perpetual Operation and Maintenance Entity" [Form 62-330.310(2)] to transfer the permit to the operation and maintenance entity, along with the documentation requested in the form. If available, an Agency website that fulfills this transfer requirement may be used in lieu of the form.

(h) The permittee shall notify the Agency in writing of changes required by any other regulatory agency that require changes to the permitted activity, and any required modification of this permit must be obtained prior to implementing the changes.

(i) This permit does not:

1. Convey to the permittee any property rights or privileges, or any other rights or privileges other than those specified herein or in chapter 62-330, F.A.C.;

2. Convey to the permittee or create in the permittee any interest in real property;

3. Relieve the permittee from the need to obtain and comply with any other required federal, state, and local authorization, law, rule, or ordinance; or

4. Authorize any entrance upon or work on property that is not owned, held in easement, or controlled by the permittee.

(j) Prior to conducting any activities on state-owned submerged lands or other lands of the state, title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund, the permittee must receive all necessary approvals and authorizations under chapters 253 and 258, F.S. Written authorization that requires formal execution by the Board of Trustees of the Internal Improvement Trust Fund shall not be considered received until it has been fully executed.

(k) The permittee shall hold and save the Agency harmless from any and all damages, claims, or liabilities that may arise by reason of the construction, alteration, operation, maintenance, removal, abandonment or use of any project authorized by the permit.

(l) The permittee shall notify the Agency in writing:

1. Immediately if any previously submitted information is discovered to be inaccurate; and

2. Within 30 days of any conveyance or division of ownership or control of the property or the system, other than conveyance via a long-term lease, and the new owner shall request transfer of the permit in accordance with rule 62-330.340, F.A.C. This does not apply to the sale of lots or units in residential or commercial subdivisions or condominiums where the stormwater management system has been completed and converted to the operation phase.

(m) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the project or activities to ensure conformity with the plans and specifications authorized in the permit.

(n) If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all

activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S. For project activities subject to prior consultation with the DHR and as an alternative to the above requirements, the permittee may follow procedures for unanticipated discoveries as set forth within a cultural resources assessment survey determined complete and sufficient by DHR and included as a specific permit condition herein.

(o) Any delineation of the extent of a wetland or other surface water submitted as part of the permit application, including plans or other supporting documentation, shall not be considered binding unless a specific condition of this permit or a formal determination under rule 62-330.201, F.A.C., provides otherwise.

(p) The permittee shall provide routine maintenance of all components of the stormwater management system to remove trapped sediments and debris. Removed materials shall be disposed of in a landfill or other uplands in a manner that does not require a permit under chapter 62-330, F.A.C., or cause violations of state water quality standards.

(q) This permit is issued based on the applicant's submitted information that reasonably demonstrates that adverse water resource-related impacts will not be caused by the completed permit activity. If any adverse impacts result, the Agency will require the permittee to eliminate the cause, obtain any necessary permit modification, and take any necessary corrective actions to resolve the adverse impacts.

(r) A Recorded Notice of Environmental Resource Permit may be recorded in the county public records in accordance with subsection 62-330.090(7), F.A.C. Such notice is not an encumbrance upon the property.

(2) In addition to those general conditions in subsection (1), above, the Agency shall impose any additional project-specific special conditions necessary to assure the permitted activities will not be harmful to the water resources, as set forth in rules 62-330.301 and 62-330.302, F.A.C., Volumes I and II, as applicable, and the rules incorporated by reference in this chapter.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.116, 373.117, 373.409, 373.413, 373.4131, 373.4142, 373.4145, 373.416, 373.418, 373.419, 373.422, 373.423, 373.426, 373.428, 403.0877 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.351 General Conditions for Conceptual Approval Permits.**

The following general conditions are binding on all conceptual approval permits issued under this chapter, except where the conditions are not applicable to the activity or where the conditions must be modified to accommodate project-specific situations. In addition to these general conditions, the Agency shall impose any additional special conditions necessary to assure the permitted activities will not be harmful to the water resources, as set forth in rules 62-330.301 and 62-330.302, F.A.C., Volumes I and II, as applicable, and the rules incorporated by reference in this chapter.

(1) This permit does not authorize any construction, alteration, maintenance, operation, removal, or abandonment, except where such activities are specifically authorized as the first phase of an individual permit or are authorized to occur in accordance with a general permit or exemption under chapter 62-330, F.A.C.

(2) This permit does not:

(a) Convey to the permittee any property rights or privileges, or any other rights or privileges other than those specified herein or in chapter 62-330, F.A.C.;

(b) Convey to the permittee or create in the permittee any interest in real property;

(c) Relieve the permittee from the need to obtain and comply with any other required federal, state, and local authorization, law, rule, or ordinance; or

(d) Authorize any entrance upon or work on property that is not owned, held in easement, or controlled by the permittee.

(3) The permittee shall notify the Agency in writing:

(a) Immediately if any previously submitted information is discovered to be inaccurate; and

(b) Within 30 days of any conveyance or division of ownership or control of the property or the system, the name and contact information for the new owner.

(4) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample, and test the project site to ensure conformity with the permit.

(5) Any delineation of the extent of a wetland or other surface water submitted as part of the permit application, including plans

or other supporting documentation, shall not be considered binding unless a specific condition of this permit or a formal determination under rule 62-330.201, F.A.C., provides otherwise.

(6) This conceptual approval permit only authorizes design concepts for a master or future plan to construct, alter, operate, maintain, remove, or abandon projects that require a permit under part IV of chapter 373, F.S. It does not authorize any construction, alteration, operation, maintenance, removal, or abandonment, or the establishment and operation of a mitigation bank, or relieve the permit holder of any requirements to obtain such permits.

(7) Subsequent applications to construct and operate activities shall be prepared and submitted using the applicable procedures in rules 62-330.052, 62-330.054, 62-330.060, and 62-330.402, F.A.C., and sections 4.2.2, 4.2.3, 4.3, and 4.4 of Volume I. An application for conceptual approval for a mitigation bank shall also include the materials required by chapter 62-342, F.A.C.

(8) Issuance of this conceptual approval permit is a determination, within the level of detail provided in the application, that the activities approved in this permit are consistent with applicable rules at the time of issuance. This permit provides the conceptual approval permit holder with a rebuttable presumption, during the duration of this permit, that the engineering design and scientific principles upon which the conceptual approval permit approved herein are likely to meet applicable rule criteria for issuance of permits for subsequent phases of the project, provided all of the following are met at the time of receipt of a complete application to construct and operate the future phases:

(a) The application to construct and operate the future phases remains consistent with the designs and conditions of this permit. Primary areas for consistency comparisons include the size, location, and extent of the activities proposed, the type and nature of the activities, percent imperviousness, allowable discharge and points of discharge, location and extent of wetland and other surface water impacts, mitigation plans implemented or proposed, control elevations, extent of stormwater reuse, detention and retention volumes, and the extent of flood elevations.

If an application for construction of any portion of the land area covered by this permit is inconsistent with the design concepts and conditions approved herein, the application will be reviewed to determine the extent to which the inconsistency will affect the designs and conditions for the remainder of the lands contained in this permit. If the inconsistency will materially affect those designs and conditions, then the applicant must demonstrate that the holder of this permit agrees to that inconsistency. In such a case, the holder of the conceptual approval permit may:

1. Modify the conceptual approval permit to conform to the revised design;

2. Abandon reliance on the conceptual approval permit; or

3. Rely on those portions of the conceptual approval permit for only those areas that were not affected by the inconsistency.

(b) There are no changes to state water quality standards that would be affected by activities authorized in the conceptual approval permit that have not already been authorized for construction or operation.

(c) There have been no amendments to Florida law governing special basin criteria that would affect future activities authorized by the conceptual approval permit that have not already been authorized for construction.

(d) There are no substantive changes in the site characteristics that would affect whether the design concepts approved in the conceptual approval permit can continue to be reasonably expected to meet the conditions for authorizing construction of future phases. This shall include such things as changes in the designation of listed species, and changes to nesting, denning, and critical designation status of listed species that exist within the lands served by the project area.

(9) If changes are proposed to the design of existing or future phases, or where there have been changes to state water quality standards, special basins, or site characteristics as described in conditions paragraphs (3)(a) through (d), above, during the duration of this permit, the applicant must modify this permit if it wishes to continue to rely on this permit as a basis that reasonable assurance exists for the Agency to issue future construction or operation permits under the terms and conditions of this permit. If the permittee fails to do this, this conceptual approval permit can no longer be relied upon as a basis, in part or whole, under which permits to construct or operate future phases will be issued, and the Agency will reevaluate the terms and conditions of this permit at the time a permit application is received to construct the next phase of activities, or at the next requested extension of this permit's duration in accordance with subsection 62-330.056(11), F.A.C., whichever occurs first.

*Rulemaking Authority 373.026(7), 373.118(1), 373.043, 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.116, 373.117, 373.118(1), 373.406(5), 373.409, 373.413, 373.4131, 373.414(9), 373.4142, 373.4145, 373.416, 373.418, 373.419, 373.422, 373.423, 373.426, 373.428, 403.0877 FS. History–New 6-1-18.*

**62-330.360 Emergency Authorizations and Actions.**

When the Agency has determined that immediate action is necessary to abate an emergency condition, the Agency shall use one of the following measures below to authorize the work. "Emergency conditions" are defined as those that pose an imminent or existing serious threat or danger and require immediate action to protect the public health, safety or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural or other reasonable uses. Carelessness or the lack of planning on the part of an applicant for an emergency authorization shall not be sufficient grounds to warrant the granting of an emergency authorization.

(1) Issuance of an emergency order under section 373.119(2), F.S. The order shall recite the factual basis for it in accordance with section 120.569(2)(n), F.S., and include all conditions (including a limitation on the duration of the emergency authorization) required to ensure that the activity authorized or directed does not exceed that necessary to abate the threat. When the activity conducted under the order has an operational or maintenance aspect that continues beyond the emergency, any permits required under this chapter shall be applied for as soon as practicable.

(2) Authorization of construction to begin when the Agency has already received an application for a permit under this chapter, and the applicant has submitted a written request for the work to commence prior to issuance of the permit, together with documentation of the emergency conditions that exist. However, if required upon issuance of the permit, the work initiated shall be modified as necessary to comply with the terms and conditions of the permit.

(3) Issuance of an emergency field authorization when an application is not currently under consideration by the Agency. The entity requesting the emergency field authorization shall complete an "Emergency Field Authorization" Form 62-330.360(1), (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09388), which is incorporated by reference herein. A copy of this form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. The activity authorized by the emergency field authorization may commence upon approval by the Agency's field representative. The recipient of an emergency field authorization is responsible for compliance with all the terms and conditions of the authorization. Within 90 days of issuance of an emergency field authorization, the recipient shall either restore the site to the conditions existing before the emergency, or apply for an application to perform the work in accordance with the requirements for obtaining verification of an exemption or permit, as applicable, under this chapter.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 120.569(2), 373.026(7), 373.119, 373.413, 373.4131, 373.4145, 373.416, 373.418, 373.426, 373.439 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.395 Variances.**

(1) In addition to a variance available under section 120.542, F.S., the Agencies are authorized to grant a variance from the provisions of section 373.414, F.S., paragraph 62-330.301(1)(e), F.A.C., and rule 62-330.302, F.A.C., pursuant to section 373.414(17), F.S. A person seeking a variance under section 373.414(17), F.S., must demonstrate that any hardship asserted as a basis of the need for a variance is peculiar to the affected property and not self-imposed, and that the grant of a variance will be consistent with the general intent and purpose of this chapter.

(a) Any person seeking a variance under section 373.414(17), F.S., shall file a petition for a variance containing the following information:

1. The petitioner's name and signature;

2. The statute or rule from which the variance is sought;

3. Facts showing that a variance should be granted for one of the reasons in section 403.201, F.S.;

4. The time period for which the variance is sought, including the reasons and facts supporting the time period;

5. The requirements the petitioner can meet, including the date or time when the requirements will be met;

6. The steps or measures the petitioner is taking to meet the requirement from which the variance is sought. If the request is pursuant to section 403.201(1)(b), F.S., the petitioner shall include a schedule when compliance will be achieved; and

7. The fee prescribed in rule 62-330.071, F.A.C.

(b) The Agency shall review the application within 30 days after receipt to determine if the petition is complete. If the petition is determined to be incomplete, the petitioner shall be afforded an opportunity to supply additional information before the Agency evaluates the petition.

(c) The Agency shall prepare a notice of intended agency action regarding the petition for a variance, and shall publish it one time in the *Florida Administrative Register*. For variance petitions processed by the Department, the petitioner shall also publish notice of intended agency action one time, at its expense, in a newspaper of general circulation, as defined in section 50.031, F.S., in

the county in which the property for which the variance is sought is located. For variance petitions processed by the District, the District will cause the notice of intended agency action to be published, one time, in a newspaper of general circulation, as defined in section 50.031, F.S., in the county in which the property for which the variance is sought is located.

(2) Renewals of variances shall be applied for in the same manner as the initial variance.

*Rulemaking Authority 373.043, 373.044, 373.113, 373.4131, 373.414(9), (17) FS. Law Implemented 373.4131, 373.414(9), (17), 403.201 FS. History–New 10-1-13, Amended 6-1-18.*

## 62-330.401 Policy and Purpose of General Permits.

(1) General permits authorize activities that, if conducted consistent with the permit requirements, will cause minimal individual and cumulative adverse impacts to the water resources of the Agencies. Mitigation is neither necessary nor required to offset those impacts except when provided for in the general permit. Persons using a general permit must comply with the notice requirements of rule 62-330.402, F.A.C., the general conditions in rule 62-330.405, F.A.C., and all of the terms, conditions, and limitations of the specific general permit.

(2) The general permit in section 403.814(12), F.S., is not a general permit under this chapter and does not require submittal of the notice specified in subsection 62-330.402(1), F.A.C.

(3) General permits that apply to municipalities are also for use by agencies of the United States Department of Defense.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Amended 2-19-03, 10-1-07, Formerly 62-341.201, Amended 10-1-13.*

## 62-330.402 Submittal and Processing of General Permits.

(1) A person wishing to construct, operate, maintain, alter, abandon, or remove projects under a general permit shall provide notice using Form 62-330.402(1), "Notice of Intent to Use an Environmental Resource General Permit," (June 1, 2018), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09389), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. The notice must be received by the applicable Agency at least 30 days prior to initiating the activities authorized by the general permit, or at such other time as specified in the general permit. Notices for general permits that identify the reviewing agency as the Department shall be submitted to the Department instead of a District.

(2) The notice for a general permit must include the processing fee prescribed in rule 62-330.071, F.A.C. If a single notice includes more than one general permit, a separate fee shall be required for each general permit.

(3) The specific procedures of a general permit shall govern if they differ from the procedures in this rule.

(4)(a) Within 30 days of receiving Form 62-330.402(1), the Agency shall determine whether the activity qualifies for a general permit. If the activity does not qualify or the notice does not contain all the required information, the Agency will notify the person as provided in section 5.3.2 of Volume I.

(b) If the notice does not demonstrate that the requested activity qualifies for a general permit due to errors or omissions, the person shall have 60 days to amend the notice as provided in section 5.3.3 of Volume I. An additional processing fee will not be required if the person submits additional information demonstrating compliance with the general permit within that 60 days. Alternatively, the person may request that the submitted information be processed as an application for an individual permit, which must be supplemented with the information required in rule 62-330.060, F.A.C., and sections 4.2.3, 4.3, and 4.4 of Volume I, or the person may withdraw the notice for a general permit.

(c) If the activities do not qualify for a general permit, the processing fee submitted for the general permit shall be applied to the processing fee required for an individual permit, as provided in section 5.3.4 of Volume I. The processing fee will not be returned if the person withdraws the notice or if qualification for the general permit is denied.

(5) The Agency will place notice of the proposed use of a general permit on the Agency website within 10 days of receipt of the request.

(6) At their discretion, persons qualifying for a general permit may publish a notice of qualification to use a general permit in a newspaper of general circulation in the affected area. The Agency will not publish, or require the person to publish, such notice.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.413, 373.4131 FS. Law Implemented 373.116(2), 373.118(3), 373.413, 373.4131, 373.416, 373.426, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.405 General Conditions for All General Permits.**

The following general permit conditions are binding upon the permittee and are enforceable under chapter 373, F.S. These conditions do not apply to the general permit for stormwater management systems under section 403.814(12), F.S.

(1) The general permit is valid only for the specific activity indicated. Any deviation from the specified activity and the conditions for undertaking that activity shall constitute a violation of the permit and may subject the permittee to enforcement action and revocation of the permit under chapter 373, F.S.

(2) The general permit does not eliminate the necessity to obtain any required federal, state, local and special district authorizations prior to the start of any construction, alteration, operation, maintenance, removal or abandonment authorized by this permit; and it does not authorize any violation of any other applicable federal, state, local, or special district laws (including, but not limited to, those governing the "take" of listed species).

(3) The general permit does not convey to the permittee or create in the permittee any property right, or any interest in real property, nor does it authorize any entrance upon or activities on property which is not owned or controlled by the permittee, or convey any rights or privileges other than those specified in the general permit.

(4) The general permit does not relieve the permittee from liability and penalties when the permitted activity causes harm or injury to: human health or welfare; animal, plant or aquatic life; or property. It does not allow the permittee to cause pollution that violates state water quality standards.

(5) Section 253.77, F.S., provides that a person may not commence any excavation, construction, or other activity involving the use of state-owned or other lands of the state, the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund without obtaining the required consent, lease, easement, or other form of authorization authorizing the proposed use. Therefore, the permittee is responsible for obtaining any necessary authorizations from the Board of Trustees prior to commencing activity on state-owned lands.

(6) The authorization to conduct activities under a general permit may be modified, suspended or revoked in accordance with chapter 120, F.S., and section 373.429, F.S.

(7) The general permit is not transferable to a new third party. To be used by a different permittee, a new notice to use a general permit must be submitted in accordance with rule 62-330.402, F.A.C. Activities constructed in accordance with the terms and conditions of a general permit are automatically authorized to be operated and maintained by the permittee and subsequent owners in accordance with subsection 62-330.340(1), F.A.C. Any person holding the general permit, persons working under the general permit, and owners of land while work is conducted under the general permit shall remain liable for any corrective actions that may be required as a result of any permit violations prior to sale, conveyance, or other transfer of ownership or control of the permitted project, activity, or the real property at which the permitted project or activity is located.

(8) Upon reasonable notice to the permittee, Agency staff with proper identification shall have permission to enter, inspect, sample and test the permitted system to ensure conformity with the plans and specifications approved by the general permit.

(9) The permittee shall maintain any permitted project or activity in accordance with the plans submitted to the Agency and authorized in the general permit.

(10) A permittee's right to conduct a specific activity under the general permit is authorized for a duration of five years.

(11) Activities shall be conducted in a manner that does not cause or contribute to violations of state water quality standards. Performance-based erosion and sediment control best management practices shall be implemented and maintained immediately prior to, during, and after construction as needed to stabilize all disturbed areas, including other measures specified in the permit to prevent adverse impacts to the water resources and adjacent lands. Erosion and sediment control measures shall be installed and maintained in accordance with the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual (Florida Department of Environmental Protection and Florida Department of Transportation, June 2007)*, available at https://www.flrules.org/Gateway/reference.asp?No=Ref-04227, and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008)*, available at http://publicfiles.dep.state.fl.us/DEAR/Stormwater_Training_Docs/erosion-inspectors-manual.pdf.

(12) Unless otherwise specified in the general permit, temporary vehicular access within wetlands during construction shall be performed using vehicles generating minimum ground pressure to minimize rutting and other environmental impacts. Within forested wetlands, the permittee shall choose alignments that minimize the destruction of mature wetland trees to the greatest extent practicable. When needed to prevent rutting or soil compaction, access vehicles shall be operated on wooden, composite, metal, or other non-earthen construction mats. In all cases, access in wetlands shall comply with the following:

(a) Access within forested wetlands shall not include the cutting or clearing of any native wetland tree having a diameter four inches or greater at breast height;

(b) The maximum width of the construction access area shall be limited to 15 feet;

(c) All mats shall be removed as soon as practicable after equipment has completed passage through, or work has been completed, at any location along the alignment of the project, but in no case longer than seven days after equipment has completed work or passage through that location; and

(d) Areas disturbed for access shall be restored to natural grades immediately after the maintenance or repair is completed.

(13) Barges or other work vessels used to conduct in-water activities shall be operated in a manner that prevents unauthorized dredging, water quality violations, and damage to submerged aquatic communities.

(14) The construction, alteration, or use of the authorized project shall not adversely impede navigation or create a navigational hazard in the water body.

(15) Except where specifically authorized in the general permit, activities must not:

(a) Impound or obstruct existing water flow, cause adverse impacts to existing surface water storage and conveyance capabilities, or otherwise cause adverse water quantity or flooding impacts to receiving water and adjacent lands; or

(b) Cause an adverse impact to the maintenance of surface or ground water levels or surface water flows established pursuant to section 373.042, F.S., or a Works of the District established pursuant to section 373.086, F.S.

(16) If prehistoric or historic artifacts, such as pottery or ceramics, projectile points, stone tools, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement are encountered at any time within the project site area, the permitted project shall cease all activities involving subsurface disturbance in the vicinity of the discovery. The permittee or other designee shall contact the Florida Department of State, Division of Historical Resources, Compliance Review Section (DHR), at (850)245-6333, as well as the appropriate permitting agency office. Project activities shall not resume without verbal or written authorization from the Division of Historical Resources. If unmarked human remains are encountered, all work shall stop immediately and the proper authorities notified in accordance with section 872.05, F.S.

(17) The activity must be capable, based on generally accepted engineering and scientific principles, of being performed and of functioning as proposed, and must comply with any applicable District special basin and geographic area criteria.

(18) The permittee shall comply with the following when performing work within waters accessible to federally- or state-listed aquatic species, such as manatees, marine turtles, smalltooth sawfish, and Gulf sturgeon:

(a) All vessels associated with the project shall operate at "Idle Speed/No Wake" at all times while in the work area and where the draft of the vessels provides less than a four-foot clearance from the bottom. All vessels will follow routes of deep water whenever possible.

(b) All deployed siltation or turbidity barriers shall be properly secured, monitored, and maintained to prevent entanglement or entrapment of listed species.

(c) All in-water activities, including vessel operation, must be shut down if a listed species comes within 50 feet of the work area. Activities shall not resume until the animal(s) has moved beyond a 50-foot radius of the in-water work, or until 30 minutes elapses since the last sighting within 50 feet. Animals must not be herded away or harassed into leaving. All onsite project personnel are responsible for observing water-related activities for the presence of listed species.

(d) Any listed species that is killed or injured by work associated with activities performed shall be reported immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1(888)404-3922 and ImperiledSpecies@myFWC.com.

(e) Whenever there is a spill or frac-out of drilling fluid into waters accessible to the above species during a directional drilling operation, the FWC shall be notified at ImperiledSpecies@myfwc.com with details of the event within 24 hours following detection of the spill or frac-out.

(19) The permittee shall hold and save the Agency harmless from any and all damages, claims, or liabilities which may arise by reason of the construction, alteration, operation, maintenance, removal, abandonment or use of any activity authorized by the general permit.

(20) The permittee shall immediately notify the Agency in writing of any submitted information that is discovered to be inaccurate.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.044, 373.118(1), 373.129, 373.136, 373.406(5), 373.413, 373.4131, 373.414(9), 373.4145, 373.416, 373.422, 373.423, 373.429, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.215, Amended 10-1-13, 6-1-18.*

**62-330.407 General Permit for Geotechnical Investigations in Wetlands or other Surface Waters.**

*Rulemaking Authority 373.044, 373.113, 373.118, 373.171, 373.4131 FS. Law Implemented 253.034(1), 373.118, 373.406(5), 373.4131, 373.414(9), 403.814(1) FS. History–New 10-1-13, Repealed 6-1-18.*

**62-330.410 General Permit for Dredging by the West Coast Inland Navigation District in Sarasota and Manatee Counties.**

(1) A general permit is granted to the West Coast Inland Navigation District ("WCIND") to dredge public navigation channels and canals within the trafficsheds listed in Table 1 "Trafficsheds, Dredge Depth Limits, and Trafficshed Report Identification Numbers for Use in General Permit 62-330.410" effective [October 1, 2013] (http://www.flrules.org/Gateway/reference.asp?No=Ref-03207), and Figure 1, "Trafficshed Locations" effective August 4, 2002 (http://www.flrules.org/Gateway/reference.asp?No=Ref-03208), and as described in the reports identified in paragraphs (1)(a) through (d), below. Table 1, Figure 1, and the reports are incorporated by reference herein; a copy of each may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.:

(a) Antonini, Gustavo A., and Paul Box,  September 1996, A Regional Waterway Systems Management Strategy for Southwest Florida, TP-83, Florida Sea Grant College Program, Gainesville, Florida, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03143);

(b) Swett, Robert A., Gustavo A. Antonini and Sharon Schulte, July 1999, Regional Waterway Management System for North Manatee County, TD-2, Florida Sea Grant College Program, Gainesville, Florida, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03125);

(c) Antonini, Gustavo A., David Fann, and Robert A. Swett, November 7, 2000, Miguel Bay, Florida: Inventory of Boats, Depths and Signs; and a Waterway Restriction Analysis, TP-2A, Florida Sea Grant College Program, Gainesville, Florida, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03147);

(d) Antonini, Gustavo A., Robert Swett, Sharon Schulte and David Fann, July 1998, Regional Waterway Management System for South Sarasota County, TD-1, Florida Sea Grant College Program, Gainesville, Florida, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03146).

(2) This general permit is further limited as follows:

(a) The area to be dredged shall not contain any live seagrass beds, oyster beds or bars, coral communities, or attached macro-marine algae communities. However, this shall not prevent dredging of incidental individual specimens or scattered (less than one percent coverage within the area to be dredged) occurrences of seagrasses, oysters, or attached macro-algae. To the extent individual or clumped oysters are to be dredged, they shall be relocated to the maximum extent practicable to locations previously approved by the Department.

(b) Channel alignments shall follow existing channels and previously dredged areas to the maximum extent practicable.

(c) Dredging shall not exceed the maximum depths shown in Table 1.

(d) No more than 6,500 cubic yards of dredged material shall be removed over a five-year period within each trafficshed, beginning with the first project authorized under this general permit within the trafficshed. Within 30 days following the conclusion of each dredging event, a report shall be submitted to the local district office of the Department that includes the volume of material excavated from each channel and canal within the trafficshed, and the cumulative total volume of material excavated for the trafficshed under this general permit. This report shall be included with any subsequent notices to dredge channels or canals within the same trafficshed.

(e) The dredging activity is restricted to Class III waters, or Class II waters that are classified by the Department of Agriculture and Consumer Services under chapter 5L-1, F.A.C., as unclassified, prohibited, restricted, or conditionally restricted for shellfish harvesting.

(f) For purposes of this general permit, the term "public navigation channels and canals" shall include the Intracoastal Waterway and any other waterway as determined by the WCIND Board to make a significant contribution to boat traffic in the four county district, including access channels connecting the inland waterways to residential canal systems.

(3) All work under this general permit shall be conducted in conformance with the following specific conditions:

(a) Prior to submittal of a notice to use this general permit, the WCIND shall conduct at least one pre-application meeting with the Department to discuss project designs, implementation details, and any resource concerns, including approval of any oyster relocation sites in accordance with paragraph 62-330.410(2)(a), F.A.C.

(b) Each dredging event for a trafficshed shall require a separate notice to use this general permit. Multiple channels within a single trafficshed may be included in one notice. Each notice shall be submitted with:

1. Scaled plan and cross-sectional drawings that clearly identify the length, width, and depth (referenced to mean lower low water) of the area or areas to be dredged within each channel and canal, locations of any hydraulic pipelines between the dredge

areas and the dredged material disposal sites, and identification of the channels, canals, and names of the trafficsheds that are to be dredged from Table 1;

2. Identification of the source document described in subsection (1) and reference data that specifically describe the project proposed for dredging within the trafficshed. All document titles, page numbers, figures, and other relevant information to the trafficshed must be identified;

3. The location, dimensions, and estimated volumes of dredged material disposal sites, including the location of any oyster relocation or habitat restoration areas required under paragraph 62-330.410(2)(a), F.A.C. If barges or temporary stockpile areas are to be used for temporary disposal and transport, the type and volume capacity of such barges and stockpile areas, including controls that will be used to prevent dredge material runoff from the barges and stockpile areas also must be described;

4. The estimated volume of each proposed dredging area;

5. The dredging and disposal methods, and proposed duration of each;

6. Identification of any special water classifications for the areas to be dredged, such as the water class (rule 62-302.400, F.A.C.); shellfish classification under chapter 5L-1, F.A.C., (approved, conditionally approved, restricted, conditionally restricted, prohibited, or unclassified); aquatic preserve, state park, or state recreation area designation under chapter 258, F.S.; and Outstanding Florida Water or Outstanding National Resource Water designation under rule 62-302.700, F.A.C.;

7. An updated (prepared between May through September within one year prior to the proposed dredging) resource inventory of the areas to be dredged, including the presence of live seagrasses (distinguishing between beds and scattered seagrass growth), oysters (distinguishing between beds, bars, and scattered occurrences), coral communities, or attached macro-marine algae communities (distinguishing between beds and scattered occurrences). This resource inventory must also include all areas within any requested mixing zones associated with the dredging project (including outfall pipes from the dredge material disposal area), and all areas that will be occupied by dredging equipment (including cables, pipelines, dredges, barges, and stockpiling/disposal of dredged material);

8. If the notice applies to a trafficshed that was subject to previous use of this general permit, such notice also shall clearly identify the extent of all previously authorized dredging within the trafficshed by the WCIND; the date of all such dredging events; the estimated cubic yards excavated from each channel and canal, and for the trafficshed as a whole; and the permit numbers assigned to such prior use of this general permit for the trafficshed,

9. The estimated date the dredging activities are planned to begin and the estimated length of time it will take to complete the project. If the project will be accomplished in phases, the estimated starting and ending date of each phase must also be submitted; and,

10. A plan for monitoring water quality in accordance with the requirements of paragraph (3)(e), below.

(c) All dredged material resulting from the activities authorized by this general permit shall be removed and deposited on a self-contained, upland dredged material disposal site. The only exceptions shall be: oyster relocations required under paragraph 62-330.410(2)(a), F.A.C.; or where dredged materials are to be used as part of a habitat restoration plan authorized by the Agency under part IV of chapter 373, F.S., in which case any discharge of dredged material shall be in compliance with all terms of that authorization. In all cases, the dredging operation, the discharge of dredged material, and the dredged material disposal site shall be designed, located, and operated such that there are no water quality violations in wetlands or other surface waters outside of a mixing zone established under paragraph (3)(d), below.

(d) The permittee shall prevent violations of state water quality standards immediately outside of a mixing zone of no more than 150 meters in radius from the dredge site and from any discharge point associated with a dredge material disposal area. This shall minimally consist of: using and maintaining in a functional condition erosion and sediment control devices and best management practices, including turbidity curtains or similar devices; managing dredge pumping rates and volumes so as to minimize discharges from dredged material disposal sites; and managing dredged material disposal site dikes, berms, and water control structures so as to minimize erosion, breaches, and discharges. Mixing zones shall be designed to avoid live seagrass beds, oyster beds and bars, and attached macro-algae communities to the maximum extent practical.

(e) Water quality monitoring shall occur following the monitoring plan required under subparagraph (3)(b)10., above. This shall minimally consist of monitoring at the dredge site, at the location of any waters receiving outfall from dredged material disposal sites, and at background and down-gradient locations in the water body where dredging is occurring and surrounding the dredged material disposal sites. This monitoring shall be designed to measure turbidity and any metals or other toxic materials that have been identified as having a likelihood of entering the water column. All monitoring for turbidity shall occur at intervals not to exceed four

hours during active dredging operations and when there is a discharge from dredge material disposal sites; monitoring for other parameters shall be at intervals specified in the monitoring plan under subparagraph (3)(b)10., above. Results of this monitoring and a copy of the logs shall be submitted to the local office of the Department in accordance with the reporting plan submitted under subparagraph (3)(b)10., above.

(f) In the event the water quality monitoring required under this general permit detects violations of state water quality standards, dredging shall cease immediately until the source of the violation is resolved and the receiving waters again meet applicable water quality standards.

(g) After dredging, the trafficshed shall be marked with appropriate aids to navigation in order to prevent damage to seagrass beds and to minimize turbidity. The permittee is advised that chapter 327, F.S., governs the placement and marking of such aids to navigation.

(h) In addition to the conditions in subsection 62-330.405(18), F.A.C., the following additional manatee conditions shall apply:

1. The permittee shall instruct all personnel associated with the project of the potential presence of manatees and the need to avoid collisions with manatees. All construction personnel shall be responsible for observing water-related activities for the presence of manatees.

2. The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing manatees, which are protected under the Marine Mammal Protection Act of 1972, the Endangered Species Act of 1973, and the Florida Manatee Sanctuary Act of 1978. If the dredging activity results in any manatee being harmed, harassed, or killed as a result of construction activities, the Department will refer the matter to the Florida Fish and Wildlife Conservation Commission for appropriate action.

3. Temporary signs concerning manatees shall be posted prior to and during dredging activities. All signs are to be removed by the permittee upon completion of the project. Temporary signs that have already been approved for this use by the FWC must be used.  One sign that reads "Caution: Boaters" must be posted. A second sign measuring at least 8 1/2 inches by 11 inches explaining the requirements for "Idle Speed/No Wake" and the shut-down of in-water operations must be posted in a location prominently visible to all personnel engaged in water-related activities. These signs can be viewed at www.MyFWC.com/manatee. Questions concerning these signs can be sent to ImperiledSpecies@myfwc.com.

(i) Work under this general permit shall not commence until the Department has provided written confirmation to the notice required under paragraph 62-330.410(3)(b), F.A.C., that the applicant qualifies to use the general permit.

(4) For activities located outside of aquatic preserves and outside of state parks, state preserves, and state recreation areas, this general permit constitutes consent of use by the Board of Trustees of the Internal Improvement Trust Fund (BOT) under Chapter 253, F.S., to enter upon and use state-owned submerged lands to the extent necessary to complete the permitted activities. However, specific written authorization from the BOT is required to use or alter state-owned submerged lands within aquatic preserves, state parks, state preserves, and state recreation areas under chapter 258, F.S.

(5) Dredged material removed from state-owned submerged lands under this general permit shall be exempt from the payment of severed dredged material fees in accordance with section 253.77, F.S. However, dredged material with economic value, such as beach quality sand, shall be used for public purposes to the maximum extent practicable.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1), 403.814(1) FS. Law Implemented 253.002, 253.77(4), 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.426, 403.813(1)(f), 403.813(2), 403.814(1) FS. History– New 8-4-02, Formerly 62-341.490, Amended 10-1-13.*

**62-330.411  General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Charlotte County.**

(1) A general permit is granted to the West Coast Inland Navigation District ("WCIND") to dredge public navigation channels and canals within the trafficsheds and secondary channel systems which have been determined by the WCIND Board to make a significant contribution to public boating traffic, as listed in Robert A. Swett, David A. Fann, and Elizabeth Staugler, Maps of Charlotte County General Permit Trafficshed Channels and Secondary Channels, Florida Sea Grant College Program, Gainesville, Florida (July 2014) (SGEF-209), incorporated by reference herein (12/15) (http://www.flrules.org/Gateway/reference.asp?No=Ref-06200). Copies of SGEF-209 may be obtained from the Department as described in subsection 62-330.010(5), F.A.C.

(2) The following terms are defined for the purpose of this general permit:

(a) "Trafficshed" means an area that contains a concentration of boats that use a common channel, exclusive to the trafficshed,

to gain access to secondary access channels and, ultimately, to deep, open water.

(b) "Secondary channel system" means those channels that provide access to two or more trafficsheds.

(c) "Corals" means true stony corals (order Scleractinia), hydrocorals (order Milleporina), and soft corals and other octocorals (subclass Octocorallia).

(d) "Seagrass" means rooted, vascular plants of the families Potamogetonaceae, Hydrocharitaceae and Cymodoceae.

(e) "Communities" means assemblages of attached benthic organisms with a coverage density of at least one percent, and does not include incidental individual (or clumped) specimens.

(3) In addition to the requirements of rule 62-330.405, F.A.C., this general permit is further limited as follows:

(a) Areas to be dredged shall not contain communities of corals, sponges (Porifera), oysters (Crassostrea spp.) or macroalgae.

(b) To the maximum practicable extent, dredging alignments shall follow existing channels and previously dredged areas, minimize impacts to seagrass communities and avoid adverse impacts to adjacent seagrass, coral, sponge or oyster communities that may reasonably be expected to result from turbidity, deposition of dredged material or sloughing of channel side slopes.

(c) Dredging alignments are limited to a top width of 30 feet and a bottom width of 20 feet, and shall not exceed the depths shown in SGEF-209. Overdredging is not allowed.

(d) Seagrasses and incidental individual (or clumped) oysters, corals or sponges within dredge areas shall be relocated to viable recipient sites, using scientifically accepted methods, to the maximum practicable extent.

(e) This general permit shall not apply to dredging within the limits of an area subject to a valid individual permit issued under part IV of chapter 373, F.S.

(4) Prior to each submittal of notice to use this general permit, WCIND shall conduct a pre-application meeting with the Department to review the specific details of the proposed project. For projects within an aquatic preserve, the meeting shall include the manager (or designated staff) of that aquatic preserve. The Department shall notify FWC prior to the pre-application meeting to provide FWC staff the opportunity to participate in the meeting. At the pre-application meeting, WCIND shall present all information necessary to complete Form 62-330.402(1), F.A.C., specifically including the following:

(a) Scaled plan and cross-sectional drawings that clearly identify:

1. The location, length, width, depth at local mean lower low water (MLLW) and estimated volume of each area to be dredged;

2. The locations of any hydraulic pipelines, barges and dredged material transfer sites;

3. The locations, dimensions and volumetric capacity of all proposed dredged material stockpile and disposal areas, including erosion and sedimentation controls; and,

4. The location and dimensions of all proposed turbidity mixing zones, including work areas to be enclosed within turbidity curtains as described in paragraph (6)(c), below. Such zones shall be of the minimum necessary extent, shall not encompass communities of seagrass, coral, sponge, oysters or macroalgae and shall be evaluated in accordance with rule 62-4.244, F.A.C.

(b) A Benthic Resource Inventory (BRI) consisting of scaled, plan-view depictions of the locations, dimensions and qualitative descriptions of the coverage and density for all seagrasses, oysters, corals, sponges and macroalgae within the areas specified under subparagraph (4)(b)1., below, including incidental specimens to be relocated pursuant to paragraph (3)(d), above. The benthic resource inspections conducted to prepare the BRI shall:

1. Be conducted along at least two transects lying parallel to and five feet within the sides of the dredging alignment, with additional transects conducted every 25 feet throughout all proposed turbidity mixing zones and all areas to receive relocated organisms;

2. Be conducted during May through September within one year prior to submittal; and,

3. Be conducted using scientifically accepted methods by individuals experienced and knowledgeable in benthic resource identification. Additionally, if the project is within an aquatic preserve, the manager (or staff) of that preserve shall be given at least two weeks prior notice and reasonable opportunity to accompany those individuals performing the inspections.

(c) A turbidity monitoring plan that includes the following information:

1. The relative locations of all proposed compliance monitoring stations, which shall be located adjacent to and directly downcurrent of the dredging sites, outfalls from dredged material disposal sites and other areas of active work, including the surrounding floating turbidity barriers and other approved mixing zones, if applicable,

2. The locations of the proposed background monitoring stations, which shall be within the same waterbody as the compliance monitoring stations, representative of ambient conditions for that waterbody and outside the influence of the areas of active work; and,

3. Assurance that monitoring shall be performed in accordance with chapter 62-160, F.A.C., including Department procedure "DEP-SOP-001/01 FT 1600 Field Measurement of Turbidity," which is incorporated in paragraph 62-160.800(1)(a), F.A.C., including the specifications of any non-standard sensors to be used.

(5) Each dredging event for a trafficshed or secondary channel system shall require a separate notice to use this general permit. Multiple areas within a single trafficshed or secondary channel system may be included in one notice.

(6) All work under this general permit shall comply with the following specific conditions:

(a) Relocation of seagrasses, corals, sponges or clumped oysters shall be performed in a manner that avoids adverse impacts to water quality or adjacent submerged resources.

(b) Dredged material resulting from the activities authorized by this general permit shall be removed and deposited on a self-contained, upland disposal site, with the following exceptions:

1. Seagrass, oyster, coral or sponge relocations as required by paragraph (3)(d) of this general permit, or

2. Where such deposition is authorized by a valid permit under part IV of chapter 373, F.S.

(c) Floating turbidity curtains shall be installed and maintained in a manner that effectively contains turbidity within the work area, at all times around areas of active in-water work, including dredging, discharge and spoil transfer. Use of these curtains shall not impede navigation or cause adverse sedimentation or other impacts to benthic communities located outside the work area.

(d) WCIND shall monitor in-situ turbidity in accordance with the Department-approved turbidity monitoring plan, described in paragraph (4)(c), above. Turbidity samples shall be collected at each compliance and background station within four hours prior to commencement of any period of in-water work, and shall continue to be collected every four hours thereafter until in-water work ceases, including at least one additional set of samples within four hours after work ceases. Each station shall be sampled at surface, mid-depth and one foot above bottom, or at mid-depth only, for waters less than five feet deep at the time of sampling. Samples shall be collected with a Kemmerer, Van Dorn or a similar sampler that is designed to collect in-situ water samples. Samples shall be analyzed immediately after collection with a turbidimeter that produces results in Nephelometric measurements. Detailed reports of all monitoring data shall be retained by WCIND and made available to Department staff, upon request. In the event that monitoring detects a violation of state water quality standards, WCIND shall:

1. Cease dredging immediately until the source of the violation is identified;

2. Take corrective measures to avoid future violations;

3. Only resume work once the receiving waters again meet water quality standards; and,

4. Report the violation(s) and corrective measures taken to the Department within 24 hours.

(e) The following conditions apply to in-water activities authorized under this general permit, in the trafficsheds and secondary channels identified as Ainger Creek, Balboa Creek, Canal Waterway, Desoto Canal, Dover Canal, Gottfried Creek-Englewood Secondary Channel, Myakka River Secondary Channel, Oyster Creek, Peace Island East, Punta Gorda Marina, San Marino Canal, San Salvador Canal, Santa Barbara Canal, Santa Clara Canal and Whidden Bay Secondary Channel:

1. Specific personnel shall be designated as manatee observers. The designated observer(s) shall be dedicated only for this task, must be on site during all in-water dredging activities and shall advise personnel to cease operation upon sighting a manatee within 50 feet of any in-water construction activity. The observer(s) shall wear polarized sunglasses during all dredging to aid in observation and shall work in shifts of no longer than 5 hours each. Observers shall maintain a log detailing manatee sightings, work stoppages and other protected species-related incidents. If approved by the Department after consultation with the FWC, the WCIND shall be allowed to implement alternative measures for observing for the presence of manatees when such measures provide reasonable assurance that manatees will not be adversely affected by the alternative methodology.

2. A report, summarizing all activities noted in the observer logs, the location and name of project and the dates and times of work shall be submitted within 30 days following project completion to the FWC's Imperiled Species Management Section at: 620 South Meridian Street, MS #6A, Tallahassee, Florida 32399-1600, or emailed to fcmpmail@myfwc.com.

3. No nighttime mechanical dredging, such as clamshell, shall occur. Movement of a work barge or other associated vessels shall not be performed, except at idle speed, after sunset when the possibility of spotting manatees is negligible.

(7) Within 90 days after completion of dredging under each notice, WCIND shall:

(a) Mark the dredged waterways in accordance with section 327.40, F.S., in a manner to facilitate safe navigation and protection of submerged natural resources.

(b) Submit a post-construction report, signed and sealed by a Registered Professional, detailing all work performed, including:

1. The depths and widths established by the dredging;

2. The total volume of material excavated from each channel and canal dredged; and,

3. A detailed description of all relocation of organisms performed under paragraph (6)(a), above.

(c) The Department shall grant additional time, as reasonably necessary, to satisfy conditions paragraphs (7)(a) and (b), above, upon demonstration of circumstances beyond the control of WCIND that prevented their timely completion.

(8) The No Internal Combustion Motors Zone (NICMZ) covering an area of approximately 89 acres of submerged lands within the Lemon Bay Aquatic Preserve, as described and depicted in the Map and Description of the Whidden Key No Internal Combustion Motor Zone, incorporated by reference herein (12/15) (http://www.flrules.org/Gateway/reference.asp?No=Ref-06201), is hereby established. A copy of that document may be obtained from the Department as described in subsection 62-330.010(5), F.A.C.

(a) WCIND shall install and maintain uniform waterway regulatory markers demarcating the boundaries of the NICMZ established by this general permit, in accordance with all required permits under section 327.41, F.S. WCIND shall provide documentation to the Department that the boundaries of the NICMZ have been so marked, prior to conducting any work under this general permit within Outstanding Florida Waters.

(b) Within the NICMZ, vessels equipped with internal combustion motors (e.g., gasoline or diesel motors) for propulsion must turn off the internal combustion motor and, if possible to do so, tilt or raise the internal combustion motor out of the water. The use of electric motors is not prohibited.

(c) Prior to installing the NICMZ markers under paragraph (8)(a), above, WCIND shall design and implement a program to monitor seagrasses within the NICMZ using scientifically accepted methods after consultation with FWC and Department staff of the local district office and Lemon Bay Aquatic Preserve. The monitoring shall be designed to establish the baseline coverage of seagrasses by species, the locations and coverage of prop scarring and document any change in coverage over time. At a minimum, the first monitoring shall occur within 90 days after the boundaries of the NICMZ have been marked and every two years thereafter for a total of ten years. The monitoring plan shall include metrics that can be used to quantitatively establish the relative success or failure of seagrass restoration and protection following establishment of the NICMZ.

(9) A Letter of Consent is granted for WCIND to enter upon and use state-owned submerged lands to complete the permitted activities, subject to the provisions of subsection 18-21.004(7), F.A.C. Dredged material with economic value, such as beach quality sand, severed from state-owned submerged lands shall be used for public purposes to the maximum practicable extent.

*Rulemaking Authority 373.043, 373.4131, 403.805(1), 403.814(1) FS. Law Implemented 253.002, 253.77, 258.42, 373.4131, 373.414, 403.061(34) FS. History–New 12-28-15.*

### 62-330.412 General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Lee County.

(1) A general permit is granted to the West Coast Inland Navigation District ("WCIND") to dredge public navigation channels and canals within the trafficsheds and secondary channel systems listed in Table 1 "Trafficsheds, Secondary Channel Systems, Dredge Depth Limits, and Trafficshed Report Identification Numbers," effective 18 February 2010, incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03177), and shown in Figures 1 through 48 of Antonini, Gustavo A., Robert A. Swett, and David Fann, 2008, Maps of Lee County Noticed General Permit Trafficshed Channels and Secondary Channels, SGEF-173, Florida Sea Grant College Program, Gainesville, Florida (30 October 2008), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03148). Copies of Table 1 and SGEF-173 may be obtained from the Department as described in subsection 62-330.010(5), F.A.C. Additional information on the background, methodology, and data used in identifying the trafficsheds and secondary channel systems that are the subject of this general permit is described in the following reports:

(a) Antonini, Gustavo A, and Paul Box, 1996, A Regional Waterway Systems Management Strategy for Southwest Florida, TP-83, Florida Sea Grant College Program, Gainesville, Florida;

(b) Swett, Robert A., David A. Fann, Gustavo A. Antonini and Lana Carlin Alexander, 2000, Regional Waterway Management System for Lee County, Phase I, TD-3, Florida Sea Grant College Program, Gainesville, Florida;

(c) Swett, Robert A., David A. Fann, Gustavo A. Antonini and Lana Carlin Alexander, 2001, Regional Waterway Management System for Lee County, Phase 2, TD-4, Florida Sea Grant College Program, Gainesville, Florida;

(d) Fann, D.A., R.A. Swett, and G.A. Antonini, 2002. Regional Waterway Management System for Lee County, Phase 3. TD-5, University of Florida, Gainesville, FL: 21 Florida Sea Grant.

Copies of these documents may be obtained by contacting environmental resource permit program staff in the Department's South District Office (Fort Myers) and from the Department's Internet site at http://www.dep.state.fl.us/legal/Rules/rulelistnum.htm. This general permit is not required for maintenance dredging that qualifies for an exemption under section 403.813(1)(f), F.S.

(2) This general permit is further limited as follows:

(a) For purposes of this general permit, the term "public navigation channels and canals" shall consist of the Intracoastal Waterway and those trafficsheds and secondary channel systems identified on the maps in SGEF-173, which have been determined by the WCIND Board to make a significant contribution to public boating traffic.

(b) The area to be dredged shall not contain any living communities of true stony coral (order Scleractinia), hydrocoral (order Milleporina), octocoral (subclass Octocorallia), or soft coral (Alcynoacea, Gorgonacea and Pennatulacea), sponge beds (Porifera), oyster bars (Crassostrea spp.), or macroalgae of the family Caulerpaceae. This shall not prevent dredging of incidental individual specimens of corals, sponges, or oysters. To the extent individual or clumped oysters, corals, or sponges are to be dredged, they shall be relocated to the maximum extent practicable in accordance with paragraph (3)(c), of this general permit. In addition, the dredging alignments shall be located so as to not adversely affect coral and sponge communities and oyster bars as a result of sloughing of channel side slopes. Seagrass within the proposed dredged area shall be relocated in accordance with paragraph (3)(c), of this general permit.

(c) To the maximum extent practicable, dredging alignments shall follow existing channels and previously dredged areas and avoid and minimize impacts to seagrass communities (Potamogetonaceae, Hydrocharitaceae and Cymodoceae sp.). Dredging alignments also shall be located to minimize the potential for erosion to adjacent seagrass communities as a result of sloughing of channel side slopes.

(d)1. The "No Internal Combustion Motor Zones" (NICMZs) shown and described in the attached Exhibit A, effective February 18, 2010, incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03178), which reflect the boundaries approved in Resolution 07-09-49 of the Lee County Board of County Commissioners on September 25, 2007, are hereby established by this general permit. A copy of Exhibit A may be obtained from the Department as described in subsection 62-330.010(5), F.A.C. Within these NICMZs, the use of electric motors is permitted, but operators of all vessels equipped with internal combustion motors (e.g.: gasoline or diesel motors) for propulsion must turn off the internal combustion motor and, if possible to do so, tilt or raise the internal combustion motor out of the water.

2. Prior to any dredging authorized by this general permit within an Aquatic Preserve, WCIND shall demonstrate that the NICMZ(s) within that aquatic preserve have been established and marked in the field. Nothing in this rule shall be construed to relieve WCIND from obtaining sign permits required by the Florida Fish and Wildlife Conservation Commission (FWC). For this purpose, DEP authorizes WCIND to apply to FWC for all required sign permits to mark the boundaries of the NICMZs established by this general permit. WCIND shall be responsible for installing and maintaining all permitted signs.

3. WCIND will design and implement a program to monitor seagrasses within the NICMZs using various scientifically approved methods after consultation with DEP and FWC staff. The monitoring shall be designed to establish the baseline coverage of seagrasses by species, the number and coverage of prop scarring, and document any change in coverage over time. At a minimum, the first monitoring will occur within 90 days after the boundaries of the NICMZs have been marked with signage as provided in the preceding section of this general permit, and thereafter every two years for a total of ten years. The monitoring plan shall include metrics that can be used to quantitatively establish the relative success or failure of seagrass restoration and protection following establishment of the NICMZs.

(e) Dredging alignments shall not exceed the maximum depths shown in Table 1. All dredging alignments shall not exceed a maximum top width of 30 feet and a maximum bottom width of 20 feet. Overdredging to achieve the final authorized depth and width is not allowed. An as-built survey of the dredging alignment shall be submitted to the Department as provided in paragraph (3)(h), below.

(f) No more than 8,500 cubic yards of dredged material shall be cumulatively removed through authorizations by this general permit over a five-year period within each trafficshed or secondary channel system, beginning with the first project authorized under this general permit within the trafficshed or secondary channel system. Within 30 days following the completion of the as-built survey required in paragraphs (2)(e), above, and (3)(h), below, a report shall be submitted to the South District office of the Department that includes the volume of material excavated from each channel and canal within the trafficshed or secondary channel system, and the cumulative total volume of material excavated for the trafficshed or secondary channel system under this general permit within the previous five years. This report shall be included with any subsequent notices to dredge channels or canals within

the same trafficshed or secondary channel system.

(g) The dredging activity is restricted to Class III Waters, or Class II Waters that are classified by the Department of Agriculture and Consumer Services under chapter 5L-1, F.A.C., as unclassified, prohibited, restricted, or conditionally approved for shellfish harvesting.

(h) This general permit shall not apply to dredging within the limits of areas subject to currently valid individual permits under part IV of chapter 373, F.S.

(3) All work under this general permit shall be conducted in conformance with the general conditions of rule 62-330.405, F.A.C., and the following specific conditions.

(a) Each dredging event for a trafficshed or secondary channel system shall require a separate notice to use this general permit. Multiple areas within a single trafficshed or secondary channel system may be included in one notice. Each notice shall be submitted with all of the following information.

1. Scaled plan and cross-sectional drawings that clearly identify the length, width, and depth (referenced to mean lower low water) of the area or areas to be dredged within each channel and canal; locations of any hydraulic pipelines between the dredge areas and the dredged material disposal sites; and identification of the channels, canals, and names of the trafficsheds or secondary channel system that are to be dredged from Table 1.

2. Identification of the source document described in subsection (1), and reference data that specifically describe the work proposed for dredging within the trafficshed or secondary channel system. All document titles, page numbers, figures, and other relevant information to the trafficshed or secondary channel system must be identified.

3. The location, dimensions, and estimated volumes of dredged material disposal sites, including the location of any water quality or habitat restoration as described in paragraph (3)(d), of this general permit and any relocation areas required under paragraph (2)(b), above. If dredged material fill will be transported over water by barge, the notice will include assurance that the barge will be designed and sized to prevent discharge of dredged material runoff, prop or hull dredging, and discharge during the loading and unloading of material. If stockpile areas are to be used for temporary disposal and transport, the type and volume capacity of such stockpile areas, including controls that will be used to prevent dredge material runoff also must be described. The notice must provide assurance any temporary stockpile areas will have no impacts to jurisdictional wetlands or surface waters.

4. The estimated volume of each proposed dredging area.

5. Identification of any special water classifications for the areas to be dredged, such as the water class (rule 62-302.400, F.A.C.); shellfish classification under chapter 5L-1, F.A.C.; aquatic preserve, state park, or state recreation area designation under chapter 258, F.S.; and Outstanding Florida Water or Outstanding National Resource Water designation under rule 62-302.700, F.A.C.

6. A resource inventory of the dredging alignments which has been prepared or updated between May through September within one year prior to the proposed dredging. The resource inventory must be conducted by an individual experienced and knowledgeable in benthic communities and seagrass identification. The resource inventory must identify the presence and location of seagrasses, oysters, coral communities, sponge beds, and macroalgae of the family Caulerpaceae. This resource inventory must also include all areas within any requested mixing zones associated with the dredging project (including outfall pipes from the dredge material disposal area), and all areas that will be occupied by dredging equipment (including cables, pipelines, dredges, barges, and stockpiling/disposal of dredged material). The resource inventory assessment within channels will be conducted as follows, although the WCIND may use equivalent assessment methods upon receiving prior written approval from the Department:

a. The assessment will be conducted along a minimum of two transects within the dredging alignment. The transects will be along a line parallel with and 5 feet within the sides of the dredging alignment,

b. The resource inventory assessment within any requested mixing zones shall be conducted along grid transects every 10 feet throughout the length and width of the requested mixing zone; and,

c. The resource inventory shall be qualitative in nature but shall include identification and location of corals, sponges, and oysters to be relocated pursuant to paragraph (2)(b), of this general permit, and include general identification and location of the extent of seagrass areas and a qualitative description of their relative extent of coverage, and density. The resource inventory shall be completed and submitted a minimum of 30 days prior to the pre-application meeting required by paragraph (3)(b), of this general permit.

7. Identification of the extent and location of all previous dredging within the past five years authorized under this general permit within the trafficshed or secondary channel system; the date of all such dredging events; the estimated cubic yards excavated

from each distinct portion of the trafficshed or secondary channel system under this general permit; and the permit numbers assigned to such prior use of this general permit for the trafficshed or secondary channel system.

8. The estimated date the dredging activities are planned to begin and the estimated length of time it will take to complete the project. If the project will be accomplished in phases, the estimated starting and ending date of each phase must also be submitted.

9. A plan for monitoring water quality minimally consisting of monitoring at the dredge site, at the location of any waters receiving outfall from dredged material disposal sites, and at background and down-gradient locations in the water body where dredging is occurring and surrounding the dredged material disposal sites. The monitoring shall be designed primarily to measure in-situ turbidity, but is subject to modification based on the pre-application meeting discussion with the Department to ensure the plan is capable of detecting any potential water quality violations from the project or activities. If the dredge area is in close proximity to a facility or location likely to cause a discharge of toxic materials, the water quality monitoring as well as best management practices proposed shall be designed to retain deleterious substances during dredging. Results of the monitoring and a copy of the logs shall be submitted in accordance with paragraph (3)(f), of this general permit.

10. A description of the resources to be relocated pursuant to paragraphs (2)(b) and (3)(c), of this general permit, the methods to be used for their relocation, and the locations to which they will be relocated.

(b) A minimum of 30 days prior to submittal of a notice to use this general permit, the WCIND and Lee County shall conduct at least one pre-application meeting with the Department's South District Environmental Resources Permitting staff to discuss project designs, implementation details, and any resource concerns, including approval of any resource relocation in accordance with paragraph (2)(b), of this general permit or water quality or habitat restoration sites in accordance with paragraph (3)(d), of this general permit. For a proposed project within an aquatic preserve, this meeting shall include the appropriate aquatic preserve manager or their designee. In the event the pre-application meeting adequately addresses all Department questions or concerns, the Department will inform the WCIND that the notice may be submitted immediately for review.

(c) To the extent seagrass, corals, sponges or clumped oysters are within the dredging footprint, they shall be relocated to the maximum extent practicable. Seagrass, oysters, corals, and sponges must be relocated only into areas previously approved in writing by the Department. Relocation shall be done in a manner that avoids adverse impacts to water quality and adjacent submerged resources. If seagrasses are relocated, the donor site within the dredge area and the location of the seagrass transplant shall be described in the application and in the pre-application meeting required under paragraph (3)(b), of this general permit. Any relocation performed under this paragraph shall be described in a detailed report to the Department's South District office within 60 days of project completion. The report shall describe the methods used, the donor site within the dredge area, and the recipient location of the transplant. The WCIND shall provide copies to the Department's South District office of any follow up monitoring or studies performed on the success of the transplants.

(d) All dredged material resulting from the activities authorized by this general permit shall be removed and deposited on a self-contained, upland dredged material disposal site. The only exceptions to the use of a self-contained, upland dredged material disposal site shall be: seagrass, oyster, coral, or sponge relocations as required by this general permit; or where dredged materials are to be used as part of a water quality or habitat restoration plan authorized by the Department or a water management district under part IV of chapter 373, F.S., in which case any discharge of dredged material shall be in compliance with all terms of that authorization. In all cases, the dredging operation, the discharge of dredged material, and the dredged material disposal site shall be designed, located, and operated such that there are no water quality violations in wetlands or other surface waters outside of a mixing zone established under paragraph (3)(e), of this general permit.

(e) In areas outside of aquatic preserves, violations of state water quality standards shall be prevented immediately outside of a mixing zone of no more than 150 meters in radius from the dredge site and from any discharge point associated with a dredge material disposal area. To the greatest extent practicable, the mixing zone shall be restricted to the limits of the dredging alignment. Within aquatic preserves, violations of water quality standards immediately outside the area of active work shall be prevented. This shall minimally consist of the use of erosion and sediment control devices, turbidity curtains or similar devices, and other best management practices, all of which shall be located immediately surrounding the area of active work and maintained in a functional condition. In addition, dredge pumping rates and volumes shall be managed to minimize discharges from dredged material disposal sites; and the management of dredged material disposal site dikes, berms, and water control structures so as to minimize erosion, breaches, and discharges. In all cases, mixing zones shall be designed to avoid living communities of stony corals [true stony corals (order Scleractinia) hydrocorals (order Milleporina)], and octocorals (subclass Octocorallia), sponge bed communities (Porifera), oyster bars (Crassostrea spp.), macroalgae of the family Caulerpaceae, and seagrass (Potamogetaceae, Hydrocharitaceae and

Cymodoceae).

(f) At all times during active dredging, the collection, analysis, and monitoring of the water quality samples required under this general permit must be conducted and performed by individuals who have prior training and experience in collecting and analyzing water quality samples using the Standard Operating Procedures accessible at the Department's Internet site and in accordance with chapter 62-160, F.A.C. Such qualified individual(s) shall be on site at all times necessary to ensure full compliance with the requirements of this general permit. In the event the water quality monitoring required under this general permit detects violations of state water quality standards, dredging shall cease immediately until the source of the violation is identified, measures taken to avoid future violations, and the receiving waters again meet applicable water quality standards. Weekly reports describing the hours of dredging accomplished and the results of the required monitoring will be provided to the South District office of the Department. Any violations of water quality standards and/or other requirements of this general permit shall be immediately reported to the South District office of the Department.

(g) The permittee shall be responsible for ensuring that all contractors and other entities implementing this general permit comply with the following standard manatee and marine turtle conditions.

1. The permittee shall instruct all personnel associated with the project of the potential presence of manatees and the need to avoid collisions with manatees. All construction personnel shall be responsible for observing water-related activities for the presence of manatees.

2. The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing manatees, which are protected under the Marine Mammal Protection Act of 1972, the Endangered Species Act of 1973, and the Florida Manatee Sanctuary Act of 1978. If the dredging activity results in any manatee being harmed, harassed, or killed as a result of construction activities, the Department will refer the matter to the Florida Fish and Wildlife Conservation Commission (FWC) for appropriate action.

3. Siltation barriers associated with any project or activity authorized by this general permit shall not block manatee entry to or exit from manatee feeding areas and the following manatee warm water refuge areas:

a. Entrance of the Chiquita Canal (which provides access to the Eight Lakes area) within the Cape Coral Southwest Trafficshed.

b. Defined manatee protection speed zone within the Franklin Locks East Trafficshed and all waters of the Caloosahatchee River within 1/4 mile east of the easternmost end of the Franklin Lock & Dam.

c. Matlacha channel (which provides access to the Matlacha canal system) including the Matlacha Isles canal system in the vicinity of the Boat Lift within the Matlacha Isles/Cape Coral (northwest) Trafficshed.

d. Mouth and remainder of the Orange River within the Orange River Trafficshed.

e. All waters within the Mullock Creek Trafficshed.

4. Temporary signs concerning manatees shall be posted prior to and during dredging activities. All signs are to be removed by the permittee upon completion of the project. Temporary signs that have already been approved for this use by the FWC must be used. One sign that reads "Caution: Boaters" must be posted. A second sign measuring at least 8 1/2 inches by 11 inches explaining the requirements for "Idle Speed/No Wake" and the shut-down of in-water operations must be posted in a location prominently visible to all personnel engaged in water-related activities. These signs can be viewed at www.MyFWC.com/manatee. Questions concerning these signs can be sent to ImperiledSpecies@myfwc.com.

5. Specific personnel shall be designated as manatee observers. The designated observer(s) shall be dedicated only for this task, must be on site during all in-water dredging activities, and will advise personnel to cease operation upon sighting a manatee within 50 feet of any in-water construction activity. The observer(s) shall wear polarized sunglasses during all dredging to aid in observation, and shall work in shifts of no longer than 5 hours each. Observers shall maintain a log detailing manatee sightings, work stoppages, and other protected species-related incidents. If approved by the Department after consultation with the FWC, the WCIND shall be allowed to implement alternative measures for observing for the presence of manatees when such measures provide reasonable assurance that manatees will not be adversely affected by the alternative methodology.

6. A report, summarizing all activities noted in the observer logs, the location and name of project, and the dates and times of work shall be submitted within 30 days following project completion, to the FWC's Imperiled Species Management Section at: 620 South Meridian Street, MS #6A, Tallahassee, Florida 32399-1600, or emailed at fcmpmail@myfwc.com.

7. No nighttime mechanical dredging, such as clamshell, shall occur. Movement of a work barge or other associated vessels shall not be performed after sunset, when the possibility of spotting manatees is negligible.

8. All channels designated as Cape Coral Southwest, Franklin Locks East, Matlacha Isles/Cape Coral (northwest), Mullock

Creek, and Orange River shall be prohibited from being dredged between November 15th and March 31st of any year due to the high numbers of manatees present at these warm water refuges in the wintertime. When these areas are being dredged between April 1st and November 14th, the manatee protection measures outlined above for all other channel dredging shall be followed.

(h) An as-built survey shall be initiated within two weeks and shall be completed within 60 days after completion of dredging to document depths and widths established by the dredging. The Department shall grant additional time as reasonable to complete the survey upon submittal of written documentation of the existence of inclement weather or situations beyond the control of the permittee that prevented the timely completion of the survey, the submittal of a new timeline for completing the survey.

(i) Within 90 days of completion of each authorized dredge event under this general permit, the affected trafficshed or secondary channel system shall be marked along its entire length with aids to navigation. Markers shall be placed in a manner to facilitate safe navigation and protection of submerged natural resources. In channels dredged to less than 4 foot MLLW depth, signage that identifies areas of shallow water shall be installed, using language such as "Controlling Depth 3 feet, Local Knowledge Required," "Use Caution," or "Stay in Channel." Nothing in this rule shall be construed to relieve the WCIND from obtaining permits for markers and signs required by the FWC.

(j) WCIND shall provide an as-built report and survey detailing all work performed under this authorization and its compliance with the conditions and criteria of this general permit.

(k) All reports and information required by this authorization shall be submitted to the South District DEP office.

(l) WCIND will facilitate an update of the *Lee County Boaters Guide* to reflect the NICMZs established by this general permit. The update will also include computer internet links to additional boater information that will enhance water quality and protection of resources within the aquatic preserves that are the subject of this general permit. WCIND will facilitate the distribution of the updated Boaters Guide to local marinas, commercial boat rental operations, and local residents.

(m) Works under this general permit shall not commence until the Department has provided written confirmation within 30 days that the notice required under paragraph (3)(a), meets all the applicable terms and conditions of this general permit.

(4) Consent is granted for the West Coast Inland Navigation District to enter upon and use state-owned submerged lands to the extent necessary to complete the permitted activities, to Lee County and the West Coast Inland Navigation District to establish, mark, and enforce the NICMZs depicted in Exhibit A.

(5) Dredged material removed from state-owned submerged lands under this general permit is exempt from the payment of severed dredged material fees in accordance with section 253.77, F.S. However, dredged material with economic value, such as beach quality sand, shall be used for public purposes to the maximum extent practicable.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1), 403.814(1) FS. Law Implemented 253.002, 253.77(1), 253.77(4), 258.42, 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(1), 373.414(1)(b), 373.414(9), 373.416, 373.426, 403.061(34), 403.813(3), 403.814(1) FS. History–New 2-18-10, Formerly 62-341.494, Formerly 62-330.441, Amended 10-1-13.*

**62-330.417 General Permit for Construction, Alteration, Operation, and Maintenance of Boat Ramp Facilities.**

(1) A general permit is granted, except in waters that are accessible to manatees within Charlotte, Hillsborough, Levy, Manatee, and Pinellas Counties or the St. Johns River and its tributaries in Lake and Seminole Counties, for construction, alteration, maintenance, and operation of a single boat ramp for the following entities or facilities:

(a) An individual, detached single-family dwelling unit or two adjacent detached single-family dwelling units, provided the ramp is located on the shared property line.

(b) A multi-family dwelling unit, which, for the purpose of this rule, shall include attached multi-family dwelling units, regardless of the legal subdivision of the underlying property.

(c) A commercial entity, provided such ramp is open to the general public for the life of the ramp, with or without a fee and without any membership or qualifying requirements.

(d) A governmental entity, such as a federal, state, county, or municipal agency, or a water management or inland navigation district, provided the boat ramp is open to the general public for the life of the facility, with or without a fee. The following associated facilities are also authorized for governmental entities in accordance with the terms and conditions of this general permit, provided the ramp and associated facilities remain open to the general public for the life of the facility, with or without a fee: ingress and egress traffic lanes, boat trailer parking spaces, an access road, and associated accessory docks.

(2) The boat ramp and associated facilities must meet all of the following conditions:

(a) The work is not part of a larger plan of development that requires a permit under part IV of chapter 373, F.S.

(b) A minimum navigational access of two feet below mean low water in tidal waters or the expected average low depth in non-tidal waters, as determined based on best available information for the water body at the project location, must already exist to the proposed ramp. Depth indicators shall be installed at the ramp to identify the controlling depths of the navigational access.

(c) There shall be no work in, on, or over submerged grassbeds or coral communities.

(d) Dredging shall be limited to no more than 100 cubic yards, and in no case shall be more than is necessary to construct the boat ramp surface or restore the ramp to its original configuration and dimension.

(e) The above-water portion of the boat ramp shall be paved or otherwise stabilized to prevent turbidity.

(f) Work under this general permit shall not commence until the Agency has provided written confirmation that the applicant qualifies to use the general permit.

(g) This general permit is limited to one use per parcel of property and cannot be combined with other general permits or exemptions.

(3) Construction of the boat ramp is limited as follows:

(a) The boat ramp for a single-family or multi-family dwelling unit, under paragraph (1)(a) or (b), above, is limited to a single lane and must not exceed a width of 20 feet, including the side slopes, with the boat ramp surface not to exceed a width of 12 feet.

(b) The boat ramp for a commercial or governmental entity under paragraph (1)(c) or (d), above, is limited to a maximum of two lanes and must not exceed a width of 60 feet, including the side slopes, with the ramp surface not to exceed a width of 36 feet.

(c) Construction or expansion of a multi-family, commercial, or governmental boat ramp under paragraph (1)(b), (c), or (d), above, in waters that are accessible to manatees must meet the following criteria:

1. The proposed boat ramp facility must be consistent with the state approved manatee protection plan in counties required to have a manatee protection plan adopted under section 379.2431(2), F.S., or in counties that have voluntarily completed a state approved manatee protection plan. Documentation of plan consistency must be submitted concurrently with the notice to use the general permit in the form of a letter of consistency concurrence from the Florida Fish and Wildlife Conservation Commission. A review by the Commission can be requested at ImperiledSpecies@myfwc.com.

2. The proposed boat ramp facility must have a kiosk or permanent information display board providing information on manatee protection and applicable manatee zones as adopted in chapter 68C-22, F.A.C., "The Florida Manatee Sanctuary Act" (June 13, 2012) (http://www.flrules.org/Gateway/reference.asp?No=Ref-03179), which is incorporated by reference herein and available as provided in subsection 62-330.010(5), F.A.C., for that county.

(d) A boat ramp for a multi-family residence or for commercial or governmental entities under paragraph (1)(b), (c), or (d), above, can have a maximum of two accessory docks, abutting either one or both sides of the boat ramp, provided that the cumulative square footage of accessory docks over wetlands or other surface waters does not exceed 500 square feet in Outstanding Florida Waters or 1,000 square feet outside Outstanding Florida Waters. In addition, the accessory docks shall not be used for overnight mooring.

(4) The total impervious surface in uplands that is subject to vehicular traffic associated with a boat ramp for a governmental entity under paragraph (1)(d), above, shall not exceed 1.2 acres. Before operating any portion of such a boat ramp facility that contains 4,000 square feet or more impervious surface subject to vehicular traffic, a stormwater management system meeting all of the following requirements must be constructed and fully operational.

(a) Each system must be designed by a registered professional in accordance with chapter 471, 472, 481, or 492, F.S., as applicable, and must be constructed, operated, and maintained to serve the total project area of the boat ramp facility.

(b) No system shall accept or treat runoff from offsite areas not associated with the total project area.

(c) The system must provide treatment for a minimum stormwater retention volume of one-half inch of runoff. Recovery of the specified retention volume must occur within 72 hours by percolation through the sides and bottom of the retention basin.

(d) Impervious traffic lanes and parking areas must be graded such that runoff is directed to the stormwater treatment system.

(e) The system must include a continuous vegetated buffer strip adjacent to the downstream side of impervious areas subject to stormwater treatment. The buffer strip must be at least 25 feet wide and stabilized by well-established natural vegetation.

(f) The permittee must maintain the treatment system and buffer strips at all times for the life of the system.

(g) Upon completing construction of the stormwater management system, the system must be operated and maintained by the permittee in accordance with the terms of this general permit for the life of the system. The permittee shall perform routine inspections of the buffer to check for development of concentrated flow through it, gully erosion, or loss of vegetation, and must repair the buffer as soon as practical to restore shallow overland flow conditions and prevent further concentration of flow and

damage to the buffer.

(5) Commercial or governmental entities proposing to construct a boat ramp under paragraph (1)(c) or (d), above, shall record a fully executed binding agreement in the official records of the county in which the boat ramp is located. Commercial entities shall execute and record the "Agreement to Maintain Public Access," incorporated herein as Form 62-330.417(1), (October 1, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02508), ensuring the facility will remain open to the general public for the life of the facility. Governmental entities shall execute and record the "Agreement to Maintain Public Access and Operate Stormwater     System,"     incorporated     herein     as     Form     62-330.417(2),     (October     1,     2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-02509), ensuring the facility will remain open to the general public for the life of the facility and to ensure that the stormwater management system associated with the boat ramp will be operated and maintained for the life of the system. Copies of incorporated materials may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), (5), 373.406(5), 373.413, 373.4131, 373.414(1), (9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Amended 12-9-09, Formerly 62-341.417, Amended 10-1-13, 6-1-18.*

**62-330.420 General Permit to Local Governments for Public Mooring Fields.**

(1) A general permit is granted to any local government to construct, operate, and maintain a public mooring field for up to 100 vessels, including a dinghy dock and sewage pumpout dock directly supporting the mooring field.

(2) The Notice of Intent to use this general permit required under subsection 62-330.402(1), F.A.C., shall include the following additional information:

(a) Mooring Field Management Plan (Management Plan) that provides reasonable assurance that the mooring field and supporting land-based facility will comply with all of the requirements of this general permit. The Management Plan shall be binding on the permittee for the life of the mooring field. Any revisions or modifications to the Management Plan require written approval, by the Department, prior to becoming effective.

(b) All drawings and documents in support of the proposed mooring field and associated land-based support facility, including details on the anchoring systems proposed for mooring vessels in the mooring field, and any docks, pumpout facilities, kiosks, and in-water navigational signs and markers proposed.

(c) A scaled bathymetry plan showing water depths throughout the proposed mooring field, including any ingress and egress channels directly associated with the mooring field and water depths at any docks proposed at the land-based support facility.

(d) A benthic resource inventory of the proposed mooring field location as well as the areas for the proposed dinghy and pumpout docks.

(3) To qualify for this general permit, the local government must comply with the following specific conditions, in addition to the general conditions in rule 62-330.405, F.A.C.:

(a) Management Plan:

1. At least 30 days prior to submittal of a notice to use this general permit, the local government shall conduct at least one pre-application meeting with the Department to discuss the adequacy of the Management Plan, existing or proposed land-based support facility, project design, and implementation details.

2. Example Management Plans are included in the "References and Design Aids" for Volume I, available at http://www.dep.state.fl.us/water/rulesprog.htm#erp. Entities using this general permit are not required to follow the examples.

(b) Siting Criteria:

1. Navigational access must already exist between the mooring field and the nearest customarily used access channel or navigable waters for the sizes of vessels for which the mooring field is designed to serve, such that no new dredging is required to create access or adequate mooring depths.

2. The mooring field and mooring areas associated with the dinghy dock and pumpout vessel dock shall be sited in an area with adequate circulation and flushing based on the bathymetry plan required in paragraph (2)(c), above, and the proposed drafts and types of vessels to be moored.

3. The mooring field shall be associated with an existing or permitted land-based support facility that is operational prior to the mooring field being occupied. The land-based support facility shall provide amenities and conveniences for the number of occupants that are using the mooring field (e.g., parking, bathrooms, shower facilities, laundry facilities, etc.). These details shall be included in

the Management Plan.

4. The mooring field, dinghy dock, and sewage pumpout dock shall not be located in the following areas.

a. Within any marked or customarily used navigational channel, or within setbacks established by the U.S. Army Corps of Engineers for federal channels.

b. Where they would adversely affect waters classified by the Department of Agriculture and Consumer Services as approved, conditionally approved, restricted, or conditionally restricted for shellfish harvesting as set forth in chapter 5L-1, F.A.C. This can be demonstrated by providing a letter of no objection from the Department of Agriculture and Consumer Services. However, no letter is required if a project will be located in Palm Beach, Broward, or Miami-Dade County.

c. Where they would adversely affect critical habitat designated by the U.S. Fish and Wildlife Service or U.S. National Marine Fisheries Service for any federally-listed threatened or endangered species under the Endangered Species Act of 1973.

d. In predominantly fresh waters as defined in chapter 62-302, F.A.C.

(c) Design criteria:

1. The mooring field shall accommodate no more than 100 vessels (excluding any dinghies that may be attached to parent vessels).

2. Vessel mooring systems and the installation plans must be designed by a Florida registered professional so that the mooring systems with vessels attached withstand, at a minimum, tropical storm force winds and so that the associated tethers, lines, and buoys do not scour or damage the bottom. The mooring system and associated tethers, lines, and buoys shall be maintained for the life of the facility.

3. The mooring field shall be permanently associated with a land-based support facility that provides the following:

a. Pumpout either fixed or portable, or a pumpout vessel under contract for service or owned by the land-based support facility capable of serving all vessels using the mooring field, and a plan for regular pumpouts of vessels when needed.

b. A landing platform or dinghy dock for mooring field users to access the land-based support facility, as well as a dock for a fixed sewage pumpout or mooring for the pumpout vessel if one is requested. Such docks are authorized to be constructed under this general permit, provided neither dock exceeds 500 square feet of structure over wetlands and other surface waters, and sufficient water depth exists at the dock for the sizes of vessels for which the dock is designed to serve.

4. The mooring field shall be marked in accordance with Florida Fish and Wildlife Conservation Commission requirements under chapter 327, F.S., including markings of the outside boundaries of the mooring field.

5. Dredging and filling of wetlands or other surface waters is authorized only for the installation of pilings; mooring buoys; vessel mooring systems; mooring field regulatory; boundary, and information markers; dinghy docks; and sewage pumpout docks.

6. If located in a county with a Manatee Protection Plan (MPP) approved by the Florida Fish and Wildlife Conservation Commission, the mooring field shall be designed and maintained in conformance with the MPP. Documentation of plan consistency must be submitted concurrently with the notice to use the general permit in the form of a letter of consistency from the Commission. A review by the Commission can be requested at ImperiledSpecies@myFWC.com.

(d) Operational Criteria:

1. The local government or its contracted entity shall operate and maintain the mooring field and land-based support facility in accordance with the terms of this general permit, the Management Plan, and sovereign submerged lands lease (if applicable) throughout the life of the mooring field.

2. Occupied vessels with Type III marine sanitation devices shall be required to have their holding tanks pumped out, at a minimum, on a 7-day interval while continuously moored in the mooring field. The Management Plan shall specify a pumpout plan, tracking and inspection times, which generally shall not be less than a minimum 7-day interval. The pumpout plan shall include a flag notification system for facilities that are using a pumpout vessel and a proposed inspection schedule for Type I or II systems.

3. The local government must provide, at the land-based support facility, for the regular collection of solid waste, sewage, and recyclable goods from vessels moored at the mooring field. All collected sewage waste must be discharged at a facility permitted by the Department or the Florida Department of Health.

4. The local government must provide information to users explaining ways to minimize discharges of grey water, including encouragement to use land-based support facilities. This information also shall be included in the Management Plan.

5. The following activities are prohibited in the mooring field and at the dinghy dock and sewage pumpout dock at the land-based support facility, unless specifically authorized in the Management Plan or a separate, valid authorization under part IV of chapter 373, F.S.:

a. Major boat repair and maintenance.

b. Fueling activities. However, this shall not prevent fueling at the land-based support facility.

c. Boat hull scraping or painting.

6. The local government shall identify in the Management Plan whether it will provide brochures, or install and maintain a kiosk or permanent information display board in a clearly visible location at the land-based support facility, providing information on:

a. Operational provisions and restrictions associated with use of the mooring field and land-based support facility,

b. Manatee protection and applicable manatee zones as adopted in chapter 68C-22, F.A.C., which is incorporated by reference in subparagraph 62-330.417(3)(c)2., F.A.C.,

c. Location and availability of sewage pumpout facilities and procedures,

d. Navigational ingress and egress to the mooring field and land-based support facility, including identification of channel markers, shoals, and other significant navigational issues, such as controlling water depths; or by providing charts for sale or a location where they may be purchased,

e. Seagrasses, corals, and other significant resources in the adjacent waters, such as their location, protection, and avoidance of impacts, and their importance to the water resources; and,

f. Prohibitions on discharging trash, sewage, and hazardous wastes into the water, and ways to minimize discharging grey water into the water.

(e) Sovereignty Submerged Lands Lease:

1. All public mooring fields and associated land-based support facilities located on sovereignty submerged lands require a lease from the Board of Trustees of the Internal Improvement Trust Fund in accordance with the application procedures and requirements of chapters 18-18, 18-20, and 18-21, F.A.C., as applicable.

2. The lease boundary shall include the over-water surface area of the mooring field, encompassing all of the swing areas and square footage between the swing areas including internal thoroughfares.

3. The lease boundary shall include the preempted area for the dinghy dock and the sewage pumpout dock that contains a temporary mooring area to access a fixed sewage pumpout and for the mooring of a sewage pumpout vessel, if these structures are proposed and located on sovereignty submerged lands and not part of an existing lease or other forms of authorization by the Board of Trustees of the Internal Improvement Fund.

4. The Management Plan shall be referenced in the lease, when located over sovereignty submerged lands.

*Rulemaking Authority 373.043, 373.044, 373.118(4), 373.4131 FS. Law Implemented 373.117, 373.118, 373.413, 373.414, 373.416, 373.422 FS. History–New 11-19-15.*

**62-330.427 General Permit for Docks, Piers and Associated Structures.**

(1) A general permit is granted to any person to construct, extend, or remove a dock or pier and associated structures as described below:

(a) A private, single-family pier or dock with up to two boat lifts that, together with all existing structures on the shoreline of the property, does not exceed a total area of 2,000 square feet over surface waters. Such a structure:

1. Shall not accommodate the mooring of more than two vessels, either in the water or on a boat lift. Solely for purposes of this general permit, up to two personal watercraft as defined in section 327.02(33), F.S., may be moored in lieu of either or both allowable vessels of another type. These limits shall not apply to the mooring, storage or other use of the dock or pier by:

a. Non-motor-powered vessels less than 16 feet in length that are stored on or under the dock or pier, or within an authorized mooring area; or

b. Personal watercraft, dinghies or similar small vessels that are stowed out of the water, upon a larger parent vessel that is moored at the dock in compliance with this general permit.

2. Shall be located such that all areas used for vessel mooring and navigational access already provide a minimum depth of two feet below the mean low water level for tidal waters, or two feet below the expected average low water depth for non-tidal waters as determined based on best available information for the water body at the project location; and

3. May include a roof over the vessel mooring areas, boat lifts, and terminal platform, or any portions thereof, subject to the applicable provisions of chapters 253 and 258, F.S., and the rules adopted thereunder. Portions of such roofs that overhang beyond the edge of decked portions of the pier or dock shall be included in the calculation of the total square footage of over-water structure allowed under paragraph (1)(a), above.

(b) A public fishing pier that does not exceed a total area of 2,000 square feet provided the structure is designed and built to discourage boat mooring by elevating the fishing pier to a minimum height of five feet above mean high water or ordinary high water, surrounding the pier with handrails, and installing and maintaining signs that state "No Boat Mooring Allowed."

(2) This general permit shall be subject to the following specific conditions:

(a) Construction or extension of the boat lift, boat mooring locations, or terminal platform, shall not occur over submerged grassbeds, coral communities or wetlands. However, the access walkway portion of the pier may traverse these resources provided it is elevated a minimum of five feet above mean high water or ordinary high water, contains handrails that are maintained in such a manner as to prevent use of the access walkways for boat mooring or access, and does not exceed a width of six feet, or a width of four feet in Aquatic Preserves;

(b) There shall be no structures enclosed by walls, screens, or doors on any side;

(c) The dock or pier will not facilitate vessel rentals, charters, or serve any other commercial purpose;

(d) There shall be no fish cleaning facilities, boat repair facilities or equipment, or fueling facilities on the structures authorized by this general permit. In addition, no overboard discharges of trash, human or animal waste, or fuel shall occur from any structures authorized by this general permit;

(e) This general permit shall not authorize the construction or extension of more than one dock or pier per parcel of land or individual lot. For the purposes of this general permit, multi-family living complexes shall be treated as one parcel of property regardless of the legal division of ownership or control of the associated property; and

(f) Notwithstanding any other provisions of this general permit, the design, construction and operation of the dock or pier and associated vessels shall not conflict with any manatee protection plan approved and adopted under section 379.2431(2)(t), F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.427, Amended 10-1-13, 6-1-18.*

**62-330.428 General Permit for Floating Vessel Platforms and Floating Boat Lifts.**

A general permit is granted to the owner of an individual, detached, private single-family residence to construct, alter, operate, maintain, and remove floating vessel platforms or floating boat lifts ("platforms or lifts") at their residence, under the following conditions:

(1) Platforms and lifts are authorized only at a dock or along a seawall associated with an individual, detached, private single-family residence on the contiguous uplands. For purposes of this general permit, an individual, detached, single-family residence does not include duplexes, triplexes or quadruplexes.

(2) The dock or seawall must meet one of the following:

(a) It was built prior to July 1, 1975;

(b) It complies with a permit issued under chapter 403, F.S., or part IV of chapter 373, F.S., or

(c) It was built in accordance with an exemption under section 403.813(1), F.S.

(3) The platforms and lifts:

(a) Shall not be located within an aquatic preserve as designated and described in chapter 258, F.S., or within federally designated critical habitat for Johnson's seagrass (*Halophila johnsonii*);

(b) Shall be limited in size as follows:

1. If built in artificial waters and residential canal systems, the platforms and lifts must not cumulatively exceed 1,000 square feet. "Cumulatively" means either alone or in combination with any other platforms or lifts along the person's shoreline.

2. If built within Outstanding Florida Waters, the platforms or lifts must not cumulatively exceed 300 square feet along the person's shoreline.

3. If built in waters other than those listed above, the platforms and lifts must not cumulatively exceed 675 square feet along the person's shoreline.

(c) Shall not be located over submerged grassbeds, attached macroalgae, coral communities, or wetlands;

(d) Shall be used solely for the purpose of storing a vessel or vessels, such that the vessel or vessels are stored out of the water at all times when not in use;

(e) Shall not be added to structures or located in areas where boat mooring is specifically prohibited under a permit issued under either chapter 403, or part IV of chapter 373, F.S., or an authorization under chapter 253 or 258, F.S.; and,

(4) If located within submerged lands owned by the Board of Trustees of the Internal Improvement Trust Fund, the following additional conditions must also be met to qualify for consent to use and occupy such lands under chapter 253, F.S.

(a) The platforms and lifts must be installed, operated and maintained in conformance with all the applicable terms and conditions of subsections 18-21.004(3) and (7), F.A.C., (March 12, 2012), and rule 18-21.0041, F.A.C. (March 23, 2012);

(b) The platforms and lifts must not extend more than 25 percent into the width of the waterway, as measured from approximate mean high water to approximate mean high water in tidal waters, or from approximate ordinary high water to approximate ordinary high water in non-tidal waters;

(c) Platforms and lifts located on any lands under the jurisdiction or management of the Department's Division of Recreation and Parks must have prior written approval by the Division of Recreation and Parks, and such approval must be submitted with the notice to use this general permit.

*Rulemaking Authority 373.026(7), 373.043, 373.044, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1), 403.813(1), 403.814(1) FS. Law Implemented 253.04, 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.813(1), 403.814(1) FS. History–New 8-4-05, Formerly 62-341.428, Amended 10-1-13.*

## 62-330.431 General Permit for Installation of Riprap.

(1) A general permit is granted to any person to install riprap:

(a) At the toe of an existing vertical seawall, provided the slope of the riprap is no steeper than two horizontal to one vertical and the horizontal distance from the toe of the seawall is no more than 10 feet;

(b) At an individual, private residential single-family property that is not part of a larger plan of common development, provided:

1. The slope of the riprap is no steeper than two horizontal to one vertical, and the toe of the riprap is no more than 10 feet waterward of the existing mean high water line or approximate ordinary high water line;

2. Riprap is not placed along a length of shoreline of more than 100 linear feet, and is not combined as part of any other use of this general permit on the same parcel of land; and

3. Erosion has occurred, or is likely to occur, along the shoreline.

(2) This general permit shall be subject to the following specific conditions:

(a) The riprap consists only of natural boulders or clean concrete rubble one to three feet in diameter in average dimension, and there are no reinforcing rods or other similar protrusions in the concrete rubble;

(b) There is no filling of submerged grassbeds or coral communities;

(c) The amount of wetland area filled shall not exceed 100 square feet; and,

(d) There is no backfilling to obtain useable upland, to straighten an otherwise sinuous shoreline, or to reclaim land lost by avulsion or erosion.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.431, Amended 10-1-13, 6-1-18.*

## 62-330.437 General Permit for Installation of Fences.

A general permit is granted to install, maintain, or remove a fence in wetlands or other surface waters under all of the following conditions:

(1) The fence shall not be located on state-owned submerged lands or in Outstanding Florida Waters, Aquatic Preserves, Outstanding National Resource Waters, Class II waters, or waters approved, conditionally approved, restricted, or conditionally restricted by the Department of Agriculture and Consumer Services for shellfish harvesting.

(2) Fences installed within navigable waters other than isolated waters that are wholly owned by one private entity shall:

(a) Not adversely affect navigation, block any waterway or channel, or cause a navigational hazard;

(b) Be installed such that all fence posts located waterward of the mean or ordinary high water line rise at least two feet above the mean high water or the ordinary high water elevation and are marked and maintained with reflectors visible from all directions; and

(c) Extend no more than 25 feet waterward into the open water, beyond the shoreline, or riparian areas of emergent wetland vegetation, whichever is more waterward.

(3) The fence shall be constructed of horizontal metal wire attached to posts, which may include occasional perpendicular wires to maintain spacing, but shall not include any chain-link or other mesh components.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.437, Amended 10-1-13, 6-1-18.*

**62-330.439 General Permit for Construction or Maintenance of Culverted Driveway or Roadway Crossings, and Bridges of Artificial Waterways.**

(1) A general permit is granted to any person for the purpose of constructing or maintaining a culverted driveway or roadway crossing, or bridge of an artificial waterway, provided:

(a) This general permit shall apply only to wholly artificial, non-navigable drainage conveyances;

(b) A culvert or culverts shall be placed under the roadway or driveway;

(c) The size and number of the culvert(s) shall be adequate to pass normal high water stages of the artificial water body being crossed. In no instance shall the culvert(s) provide a smaller cross-sectional area or hydraulic capacity than any upstream culvert;

(d) The elevation of the culvert invert shall be at the existing bottom grade of the artificial waterway;

(e) The length of the driveway, roadway or bridge crossing the waterway shall not exceed 50 feet top of bank to top of bank;

(f) The top width of the driveway, roadway, or bridge shall not exceed 75 feet, the toe to toe width shall not exceed 100 feet, and the side slopes shall not be steeper than two horizontal to one vertical; and,

(g) The maintenance of the roadway, driveway or bridge shall continue to provide at least the same volume of discharge through the culvert(s).

(2) If dewatering or channel flow diversion is performed, temporary fill dikes and dewatering discharges shall be installed and constructed so that no upstream flooding or impoundment occurs. Any temporary works shall be completely removed and all areas upstream and downstream from the crossing shall be restored to grades, elevations, and conditions existing before construction.

(3) This general permit shall apply only to a maximum of two crossings on a given parcel of property, with a minimum distance of 500 feet between crossings.

(4) This general permit shall not apply if relocation of all or part of the artificial waterway is required.

(5) This general permit does not authorize any road construction or alteration connecting to a crossing.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 10-3-95, Formerly 62-341.439, Amended 10-1-13.*

**62-330.441 Noticed General Permit for Public Navigation Channel and Canal Infrastructure by the West Coast Inland Navigation District within Lee County.**

(1) A general permit is hereby granted to the West Coast Inland Navigation District ("WCIND") to dredge public navigation channels and canals within the trafficsheds and secondary channel systems listed in Table 1 and shown in Figures 1 through 48 of Antonini, Gustavo A., Robert A. Swett, and David Fann, 2008, Maps of Lee County Noticed General Permit Trafficshed Channels and Secondary Channels, SGEF-173, Florida Sea Grant College Program, Gainesville, Florida (30 October 2008), which is hereby incorporated by reference. Additional information on the background, methodology, and data used in identifying the trafficsheds and secondary channel systems that are the subject of this general permit is described in the following reports:

(a) Antonini, Gustavo A, and Paul Box, 1996, A Regional Waterway Systems Management Strategy for Southwest Florida, TP-83, Florida Sea Grant College Program, Gainesville, Florida;

(b) Swett, Robert A., David A. Fann, Gustavo A. Antonini and Lana Carlin Alexander, 2000, Regional Waterway Management System for Lee County, Phase I, TD-3, Florida Sea Grant College Program, Gainesville, Florida;

(c) Swett, Robert A., David A. Fann, Gustavo A. Antonini and Lana Carlin Alexander, 2001, Regional Waterway Management System for Lee County, Phase 2, TD-4, Florida Sea Grant College Program, Gainesville, Florida;

(d) Fann, D.A., R.A. Swett, and G.A. Antonini. 2002. Regional Waterway Management System for Lee County, Phase 3. TD-5, University of Florida, Gainesville, FL: 21 Florida Sea Grant.

Copies of the above documents may be obtained by contacting environmental resource permit program staff in the Department's South District Office (Fort Myers) and from the Department's Internet site at http://www.dep.state.fl.us/legal/Rules/rulelistnum.htm. This general permit is not required for maintenance dredging that qualifies for an exemption under section 403.813(1)(f), F.S.

(2) This general permit is further limited as follows:

(a) For purposes of this general permit, the term "public navigation channels and canals" shall consist of the Intracoastal Waterway and those trafficsheds and secondary channel systems identified on the maps in SGEF-173, which have been determined by the WCIND Board to make a significant contribution to public boating traffic.

(b) The area to be dredged shall not contain any living communities of true stony coral (order Scleractinia), hydrocoral (order Milleporina), octocoral (subclass Octocorallia), or soft coral (Alcyonacea, Gorgonacea and Pennatulacea), sponge beds (Porifera), oyster bars (Crassostrea spp.), or macroalgae of the family Caulerpaceae. This shall not prevent dredging of incidental individual specimens of corals, sponges, or oysters. To the extent individual or clumped oysters, corals, or sponges are to be dredged, they shall be relocated to the maximum extent practicable in accordance with paragraph (3)(c), of this general permit. In addition, the dredging alignments shall be located so as to not adversely affect coral and sponge communities and oyster bars as a result of sloughing of channel side slopes. Seagrass within the proposed dredged area shall be relocated in accordance with paragraph (3)(c), of this general permit.

(c) To the maximum extent practicable, dredging alignments shall follow existing channels and previously dredged areas and avoid and minimize impacts to seagrass communities (Potamogetonaceae, Hydrocharitaceae and Cymodoceae sp.). Dredging alignments also shall be located to minimize the potential for erosion to adjacent seagrass communities as a result of sloughing of channel side slopes.

(d)1. The "No Internal Combustion Motor Zones" (NICMZs) shown and described in the attached Exhibit A, which reflect the boundaries approved in Resolution 07-09-49 of the Lee County Board of County Commissioners on September 25, 2007, are hereby established by this general permit. Within these NICMZs, the use of electric motors is permitted, but operators of all vessels equipped with internal combustion motors (e.g.: gasoline or diesel motors) for propulsion must turn off the internal combustion motor and, if possible to do so, tilt or raise the internal combustion motor out of the water.

2. Prior to any dredging authorized by this general permit within an Aquatic Preserve, WCIND shall demonstrate that the NICMZ(s) within that aquatic preserve have been established and marked in the field. Nothing in this rule shall be construed to relieve WCIND from obtaining sign permits required by the Florida Fish and Wildlife Conservation Commission (FWC). For this purpose, DEP authorizes WCIND to apply to FWC for all required sign permits to mark the boundaries of the NICMZs established by this general permit. WCIND shall be responsible for installing and maintaining all permitted signs.

3. WCIND will design and implement a program to monitor seagrasses within the NICMZs using various scientifically approved methods after consultation with DEP and FWC staff. The monitoring shall be designed to establish the baseline coverage of seagrasses by species, the number and coverage of prop scarring, and document any change in coverage over time. At a minimum, the first monitoring will occur within 90 days after the boundaries of the NICMZs have been marked with signage as provided in the preceding section of this general permit, and thereafter every two years for a total of ten years. The monitoring plan shall include metrics that can be used to quantitatively establish the relative success or failure of seagrass restoration and protection following establishment of the NICMZs.

(e) Dredging alignments shall not exceed the maximum depths shown in Table 1. All dredging alignments shall not exceed a maximum top width of 30 feet and a maximum bottom width of 20 feet. Overdredging to achieve the final authorized depth and width is not allowed. An as-built survey of the dredging alignment shall be submitted to the Department as provided in paragraph (3)(h), below.

(f) No more than 8,500 cubic yards of dredged material shall be cumulatively removed through authorizations by this general permit over a five-year period within each trafficshed or secondary channel system, beginning with the first project authorized under this general permit within the trafficshed or secondary channel system. Within 30 days following the completion of the as-built survey required in paragraphs (2)(e), above, and (3)(h), below, a report shall be submitted to the South District office of the Department that includes the volume of material excavated from each channel and canal within the trafficshed or secondary channel system, and the cumulative total volume of material excavated for the trafficshed or secondary channel system under this general permit within the previous five years. This report shall be included with any subsequent notices to dredge channels or canals within the same trafficshed or secondary channel system.

(g) The dredging activity is restricted to Class III Waters, or Class II Waters that are classified by the Department of Agriculture and Consumer Services under chapter 62R-7, F.A.C., as unclassified, prohibited, restricted, or conditionally approved for shellfish harvesting.

(h) This general permit shall not apply to dredging within the limits of areas subject to currently valid individual ERP dredging permits.

(3) All work under this general permit shall be conducted in conformance with the general conditions of rule 62-341.215, F.A.C., and the following specific conditions.

(a) Each dredging event for a trafficshed or secondary channel system shall require a separate notice to use this general permit. Multiple areas within a single trafficshed or secondary channel system may be included in one notice. Each notice shall be submitted with the following:

1. Scaled plan and cross-sectional drawings that clearly identify the length, width, and depth (referenced to mean lower low water) of the area or areas to be dredged within each channel and canal; locations of any hydraulic pipelines between the dredge areas and the dredged material disposal sites; and identification of the channels, canals, and names of the trafficsheds or secondary channel system that are to be dredged from Table 1.

2. Identification of the source document described in subsection 1 and reference data that specifically describe the work proposed for dredging within the trafficshed or secondary channel system. All document titles, page numbers, figures, and other relevant information to the trafficshed or secondary channel system must be identified.

3. The location, dimensions, and estimated volumes of dredged material disposal sites, including the location of any water quality or habitat restoration as described in paragraph (3)(d), of this general permit and any relocation areas required under paragraph (2)(b), of this general permit. If dredged material fill will be transported over water by barge, the notice will include assurance that the barge will be designed and sized to prevent discharge of dredged material runoff, prop or hull dredging, and discharge during the loading and unloading of material. If stockpile areas are to be used for temporary disposal and transport, the type and volume capacity of such stockpile areas, including controls that will be used to prevent dredge material runoff also must be described. The notice must provide assurance any temporary stockpile areas will have no impacts to jurisdictional wetlands or surface waters.

4. The estimated volume of each proposed dredging area.

5. Identification of any special water classifications for the areas to be dredged, such as the water class (rule 62-302.400, F.A.C.); shellfish classification under chapter 62R-7, F.A.C.; Aquatic Preserve, state park, or state recreation area designation under chapter 258, F.S.; and Outstanding Florida Water or Outstanding National Resource Water designation under rule 62-302.700, F.A.C.

6. A resource inventory of the dredging alignments which has been prepared or updated between May through September within one year prior to the proposed dredging. The resource inventory must be conducted by an individual experienced and knowledgeable in benthic communities and seagrass identification. The resource inventory must identify the presence and location of seagrasses, oysters, coral communities, sponge beds, and macroalgae of the family Caulerpaceae. This resource inventory must also include all areas within any requested mixing zones associated with the dredging project (including outfall pipes from the dredge material disposal area), and all areas that will be occupied by dredging equipment (including cables, pipelines, dredges, barges, and stockpiling/disposal of dredged material). The resource inventory assessment within channels will be conducted as follows, although the WCIND may use equivalent assessment methods upon receiving prior written approval from the Department:

a. The assessment will be conducted along a minimum of two transects within the dredging alignment. The transects will be along a line parallel with and 5 feet within the sides of the dredging alignment;

b. The resource inventory assessment within any requested mixing zones shall be conducted along grid transects every 10 feet throughout the length and width of the requested mixing zone; and,

c. The resource inventory shall be qualitative in nature but shall include identification and location of corals, sponges, and oysters to be relocated pursuant to paragraph (2)(b), of this general permit, and include general identification and location of the extent of seagrass areas and a qualitative description of their relative extent of coverage, and density. The resource inventory shall be completed and submitted a minimum of 30 days prior to the pre-application meeting required by paragraph (3)(b), of this general permit.

7. Identification of the extent and location of all previous dredging within the past five years authorized pursuant to this noticed general permit within the trafficshed or secondary channel system; the date of all such dredging events; the estimated cubic yards excavated from each distinct portion of the trafficshed or secondary channel system pursuant to this general permit; and the permit numbers assigned to such prior use of this general permit for the trafficshed or secondary channel system.

8. The estimated date the dredging activities are planned to begin and the estimated length of time it will take to complete the project. If the project will be accomplished in phases, the estimated starting and ending date of each phase must also be submitted.

9. A plan for monitoring water quality minimally consisting of monitoring at the dredge site, at the location of any waters receiving outfall from dredged material disposal sites, and at background and down-gradient locations in the water body where dredging is occurring and surrounding the dredged material disposal sites. The monitoring shall be designed primarily to measure in-situ turbidity, but is subject to modification based on the pre-application meeting discussion with the Department to ensure the plan is capable of detecting any potential water quality violations from the work. If the dredge area is in close proximity to a facility or location likely to cause a discharge of toxic materials, the water quality monitoring as well as best management practices proposed shall be designed to contain deleterious substances during dredging. Results of the monitoring and a copy of the logs shall be submitted in accordance with the provisions in paragraph (3)(f), of this general permit.

10. A description of the resources to be relocated pursuant to paragraphs (2)(b) and (3)(c), of this general permit, the methods to be used for their relocation, and the locations to which they will be relocated.

(b) A minimum of 30 days prior to submittal of a notice to use this general permit, the WCIND and Lee County shall conduct at least one pre-application meeting with the South District Department Environmental Resources Permitting staff to discuss project designs, implementation details, and any resource concerns, including approval of any resource relocation in accordance with paragraph (2)(b), of this general permit or water quality or habitat restoration sites in accordance with paragraph (3)(d), of this general permit. For a proposed project within an aquatic preserve, this meeting shall include the appropriate aquatic preserve manager or their designee. In the event the pre-application meeting adequately addresses all Department questions or concerns, the Department will inform the WCIND that the notice may be submitted immediately for review.

(c) To the extent seagrass, corals, sponges or clumped oysters are within the dredging footprint, they shall be relocated to the maximum extent practicable. Seagrass, oysters, corals, and sponges must be relocated only into areas previously approved in writing by the Department. Relocation shall be done in a manner that avoids adverse impacts to water quality and adjacent submerged resources. If seagrasses are relocated, the donor site within the dredge area and the recipient location of the seagrass transplant shall be described in the application and in the pre-application meeting required under paragraph (3)(b), of this general permit. Any relocation performed pursuant to this paragraph shall be described in a detailed report to the South District office of the Department within 60 days of project completion. The report shall describe the methods used, the donor site within the dredge area, and the recipient location of the transplant. The WCIND shall provide copies to the South District office of the Department of any follow up monitoring or studies performed on the success of the transplants.

(d) All dredged material resulting from the activities authorized by this general permit shall be removed and deposited on a self-contained, upland dredged material disposal site. The only exceptions to the use of a self-contained, upland dredged material disposal site shall be: seagrass, oyster, coral, or sponge relocations as required by this general permit; or where dredged materials are to be used as part of a water quality or habitat restoration plan authorized by the Department or a water management district under part IV of chapter 373, F.S., in which case any discharge of dredged material shall be in compliance with all terms of that authorization. In all cases, the dredging operation, the discharge of dredged material, and the dredged material disposal site shall be designed, located, and operated such that there are no water quality violations in wetlands or other surface waters outside of a mixing zone established under paragraph (3)(e), of this general permit.

(e) In areas outside of aquatic preserves, violations of state water quality standards shall be prevented immediately outside of a mixing zone of no more than 150 meters in radius from the dredge site and from any discharge point associated with a dredge material disposal area. To the greatest extent practicable, the mixing zone shall be restricted to the limits of the dredging alignment. Within aquatic preserves, violations of state water quality standards immediately outside the area of active work shall be prevented. This shall minimally consist of the use of erosion and sediment control devices, turbidity curtains or similar devices, and other best management practices, all of which shall be located immediately surrounding the area of active work and maintained in a functional condition. In addition, dredge pumping rates and volumes shall be managed to minimize discharges from dredged material disposal sites; and the management of dredged material disposal site dikes, berms, and water control structures so as to minimize erosion, breaches, and discharges. In all cases, mixing zones shall be designed to avoid living communities of stony corals [true stony corals (order Scleractinia) hydrocorals (order Milleporina)], and octocorals (subclass Octocorallia), sponge bed communities (Porifera), oyster bars (Crassostrea spp.), macroalgae of the family Caulerpaceae, and seagrass (Potamogetaceae, Hydrocharitaceae and Cymodoceae).

(f) At all times during active dredging, the collection, analysis, and monitoring of the water quality samples required under this general permit must be conducted and performed by individuals who have prior training and experience in collecting and analyzing water quality samples using the Standard Operating Procedures accessible at the Department's Internet site and in accordance with chapter 62-160, F.A.C. Such qualified individual(s) shall be on site at all times necessary to ensure full compliance with the requirements of this noticed general permit. In the event the water quality monitoring required under this general permit detects violations of state water quality standards, dredging shall cease immediately until the source of the violation is identified, measures taken to avoid future violations, and the receiving waters again meet applicable water quality standards. Weekly reports describing the hours of dredging accomplished and the results of the required monitoring will be provided to the South District office of the Department. Any violations of state water quality standards and/or other requirements of this noticed general permit shall be immediately reported to the South District office of the Department.

(g) The permittee shall be responsible for ensuring that all contractors and other entities implementing this general permit comply with the following standard manatee and marine turtle conditions:

1. The permittee shall instruct all personnel associated with the project of the potential presence of manatees and the need to avoid collisions with manatees. All construction personnel shall be responsible for observing water-related activities for the presence of manatees.

2. The permittee shall advise all construction personnel that there are civil and criminal penalties for harming, harassing, or killing manatees, which are protected under the Marine Mammal Protection Act of 1972, the Endangered Species Act of 1973, and the Florida Manatee Sanctuary Act of 1978. If the dredging activity results in any manatee being harmed, harassed, or killed as a result of construction activities, the Department will refer the matter to the Florida Fish and Wildlife Conservation Commission (FWC) for appropriate action.

3. Siltation barriers shall be made of material in which manatees and turtles cannot become entangled, shall be properly secured, and shall be monitored regularly to avoid manatee entrapment. Barriers associated with any activities authorized by this general permit shall not block manatee entry to or exit from manatee feeding areas and the following manatee warm water refuge areas:

a. Entrance of the Chiquita Canal (which provides access to the Eight Lakes area) within the Cape Coral Southwest Trafficshed.

b. The defined manatee protection speed zone within the Franklin Locks East Trafficshed and all waters of the Caloosahatchee River within 1/4 mile east of the easternmost end of the Franklin Lock & Dam.

c. Matlacha channel (which provides access to the Matlacha Isles canal system) including the Matlacha Isles canal system in the vicinity of the Boat Lift within the Matlacha Isles/Cape Coral (northwest) Trafficshed.

d. Mouth and remainder of the Orange River within the Orange River Trafficshed.

e. All waters within the Mullock Creek Trafficshed.

4. All vessels associated with the project shall operate at "no wake idle" speeds at all times while in water where the draft of the vessel provides less than four-foot clearance from the bottom, and such vessels shall follow routes of deep water whenever possible.

5. If a manatee is sighted within 100 yards of the project area, precautions shall be implemented by the permittee and the contractor to ensure protection of manatees. These precautions shall include not operating any equipment closer than 50 feet to a manatee, and immediately shutting down equipment if a manatee comes within 50 feet of the equipment. Activities will not resume until the manatees have departed the project area of their own volition.

6. Any collision with or injury to a manatee or marine turtle shall be reported immediately to the FWC at 1(888)404-FWCC (1(888)404-3922)).

7. Temporary signs concerning manatees shall be posted prior to and during dredging activities. All signs are to be removed by the permittee upon completion of the project. A sign measuring at least three feet by four feet which reads "Caution: Manatee Area" shall be posted in a location prominently visible to water-related construction crews. A second sign shall be posted if vessels are associated with the construction, and shall be placed visible to the vessel operator. The second sign shall be at least 8 inches by 11 inches and read: Caution: Manatee Habitat. Idle speed is required if operating a vessel in the construction area. All equipment must be shutdown if a manatee comes within 50 feet of the operation. A collision with or injury to a manatee shall be reported immediately to the FWC at 1(888)404-FWCC (1(888)404-3922)). Specific information on obtaining these signs may be obtained by contacting the FWC.

8. Specific personnel shall be designated as manatee observers. The designated observer(s) shall be dedicated only for this task, must be on site during all in-water dredging activities, and will advise personnel to cease operation upon sighting a manatee within 50 feet of any in-water construction activity. The observer(s) shall wear polarized sunglasses during all dredging to aid in

observation, and shall work in shifts of no longer than 5 hours each. Observers shall maintain a log detailing manatee sightings, work stoppages, and other protected species-related incidents. If approved by the Department after consultation with the FWC, the WCIND shall be allowed to implement alternative measures for observing for the presence of manatees when such measures provide reasonable assurance that manatees will not be adversely affected by the alternative methodology.

9. A report, summarizing all activities noted in the observer logs, the location and name of project, and the dates and times of work shall be submitted within 30 days following project completion, to the FWC's Imperiled Species Management Section at: 620 South Meridian Street, 6A, Tallahassee, Florida 32399-1600, or emailed at fcmpmail@myfwc.com.

10. No nighttime mechanical dredging, such as clamshell, shall occur. Movement of a work barge or other associated vessels shall not be performed after sunset, when the possibility of spotting manatees is negligible.

11. All channels designated as Cape Coral Southwest, Franklin Locks East, Matlacha Isles/Cape Coral (northwest), Mullock Creek, and Orange River shall be prohibited from being dredged between November 15th and March 31st of any year due to the high numbers of manatees present at these warm water refuges in the wintertime. When these areas are being dredged between April 1st and November 14th, the manatee protection measures outlined above for all other channel dredging shall be followed.

(h) An as-built survey shall be initiated within two weeks and shall be completed within 60 days after completion of dredging to document depths and widths established by the dredging. The Department shall grant additional time as reasonable to complete the survey upon submittal of written documentation of the existence of inclement weather or situations beyond the control of the permittee that prevented the timely completion of the survey, the submittal of a new timeline for completing the survey.

(i) Within 90 days of completion of each authorized dredge event under this general permit, the affected trafficshed or secondary channel system shall be marked along its entire length with aids to navigation. Markers shall be placed in a manner to facilitate safe navigation and protection of submerged natural resources. In channels dredged to less than 4 foot MLLW depth, signage that identifies areas of shallow water shall be installed, using language such as "Controlling Depth 3 feet, Local Knowledge Required," "Use Caution," or "Stay in Channel." Nothing in this rule shall be construed to relieve the WCIND from obtaining permits for markers and signs required by the FWC.

(j) WCIND shall provide an as-built report and survey detailing all work performed under this authorization and its compliance with the conditions and criteria of this general permit.

(k) All reports and information required by this authorization shall be submitted to the South District DEP office.

(l) WCIND will facilitate an update of the *Lee County Boaters Guide* to reflect the NICMZs established by this general permit. The update will also include computer internet links to additional boater information that will enhance water quality and protection of resources within the aquatic preserves that are the subject of this general permit. WCIND will facilitate the distribution of the updated Boaters Guide to local marinas, commercial boat rental operations, and local residents.

(m) Works under this general permit shall not commence until the Department has provided written confirmation within 30 days that the notice required under paragraph (3)(a), meets all the applicable terms and conditions of this general permit.

(4) WCIND is advised that, pursuant to Section 556.105, F.S., excavating contractors are required to provide certain information concerning the excavation through the one-call notification system not less than two, nor more than five, business days before beginning any excavation.

(5) A Letter of Consent is granted in accordance with subparagraphs 18-21.005(1)(c)10., 15. and 16., F.A.C., by the Board of Trustees of the Internal Improvement Trust Fund (BOT), for the West Coast Inland Navigation District to enter upon and use state-owned submerged lands to the extent necessary to complete the permitted activities. A Letter of Consent also is granted in accordance with subparagraphs 18-21.005(1)(c)15. and 16., F.A.C., from the BOT to Lee County and the West Coast Inland Navigation District to establish, mark, and enforce the NICMZs depicted in Exhibit A.

(6) In accordance with section 253.77, F.S., dredged material removed from sovereign submerged lands under this general permit is exempt from the payment of severed dredged material fees. However, dredged material with economic value, such as beach quality sand, shall be used for public purposes to the maximum extent practicable.

| Table 1. Trafficsheds, Secondary Channel Systems, Dredge Depth Limits, and Trafficshed Report Identification Numbers | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Trafficshed or Secondary Channel System Name | NGP Dredge Depth (ft) | All Channels Length (ft) | Public Channel Length (ft) | Anticipated NGP Dredge Length (ft) | Public Channel Length in AP (ft) | Anticipated Dredge Length in AP (ft) | Anticipated Dredge Length Outside AP (ft) | Anticipated Dredge Length in AP Sea Grass (ft) | Anticipated Dredge Length in Any Sea Grass (ft) |

| Trafficshed or Secondary Channel System Name | NGP Dredge Depth (ft) | All Channels Length (ft) | Public Channel Length (ft) | Anticipated NGP Dredge Length (ft) | Public Channel Length in AP (ft) | Anticipated Dredge Length in AP (ft) | Anticipated Dredge Length Outside AP (ft) | Anticipated Dredge Length in AP Sea Grass (ft) | Anticipated Dredge Length in Any Sea Grass (ft) |
|---|---|---|---|---|---|---|---|---|---|
| Back Channel-South Estero Bay | 3 | 18,252 | 18,252 | 178 | 18,252 | 178 | 0 | 0 | |
| Big Carlos Pass & Vicinity | 4.5 | 9,354 | 9,354 | 0 | 8,082 | 0 | 0 | 0 | |
| Bokeelia (east) | 4.5 | 33,027 | 8,499 | 535 | 6,227 | 450 | 86 | 0 | 0 |
| Bokeelia (west) | 3.5 | 48,391 | 13,807 | 1,982 | 13,807 | 1,982 | 0 | 68 | 68 |
| Caloosa Isle Marina | 5.0 | 28,326 | 8,343 | 2,539 | 0 | 0 | 2,539 | 0 | |
| Cape Coral Southwest | 6.0 | 359,431 | 10,603 | 1,521 | 0 | 0 | 1,521 | 0 | |
| Central Estero Bay | 2.5 | 18,437 | 18,437 | 385 | 18,437 | 385 | 0 | 0 | |
| Chantry Canal | 4.5 | 76,137 | 11,315 | 458 | 0 | 0 | 458 | 0 | |
| Compass Rose | 4.5 | 1,172 | 1,172 | 0 | 97 | 0 | 0 | 0 | |
| Deep Lagoon | 6.0 | 37,861 | 9,242 | 491 | 0 | 0 | 491 | 0 | |
| Demere Key | 3.5 | 21,647 | 19,721 | 1,052 | 18,927 | 896 | 156 | 735 | 735 |
| East Fort Myers | 7.0 | 26,534 | 2,588 | 1,622 | 0 | 0 | 1,622 | 0 | |
| Estero Island-Bayside Channels | 4.5 | 11,955 | 11,955 | 853 | 0 | 0 | 853 | 0 | |
| Everest Canal | 5.0 | 124,094 | 4,928 | 2,494 | 0 | 0 | 2,494 | 0 | |
| Fish Tale Marina | 4.0 | 7,391 | 1,849 | 0 | 305 | 0 | 0 | 0 | |
| Fish Trap Bay 2 | 2.5 | 8,893 | 3,213 | 520 | 3,213 | 520 | 0 | 0 | |
| Fort Myers Yacht Basin | 7.0 | 7,941 | 7,941 | 4,987 | 0 | 0 | 4,987 | 0 | |
| Franklin Locks East | 5.0 | 38,843 | 2,478 | 1,405 | 0 | 0 | 1,405 | 0 | |
| Getaway | 5.0 | 2,604 | 2,604 | 1,066 | 0 | 0 | 1,066 | 0 | 191 |
| Hancock Creek | 5.0 | 57,956 | 26,613 | 2,778 | 0 | 0 | 2,778 | 0 | |
| Hogue | 4.0 | 3,115 | 3,115 | 345 | 3,115 | 345 | 0 | 0 | |
| Hurricane Bay East | 4.5 | 8,602 | 8,602 | 917 | 8,474 | 917 | 0 | 0 | |
| Hurricane Bay West | 5.0 | 8,750 | 8,750 | 1,369 | 0 | 0 | 1,369 | 0 | |
| Imperial River-Lower | 3.5 | 31,336 | 15,203 | 661 | 9,225 | 661 | 0 | 0 | |
| Imperial River-Upper | 2.5 | 37,630 | 9,913 | 713 | 0 | 0 | 713 | 0 | |
| Imperial Shores | 2.5 | 15,526 | 4,106 | 1,685 | 4,106 | 1,685 | 0 | 0 | |
| Marsh Point | 3.0 | 17,783 | 5,729 | 1,201 | 0 | 0 | 1,201 | 0 | |
| Matanzas Harbor | 5.5 | 5,103 | 5,103 | 66 | 0 | 0 | 66 | 0 | |
| Matlacha (northwest) | 4.5 | 26,245 | 1,457 | 654 | 1,457 | 654 | 0 | 0 | |
| Matlacha (southwest 2) | 3.5 | 10,670 | 2,719 | 180 | 2,719 | 180 | 0 | 0 | |
| Matlacha Isles/Cape Coral (northwest) | 4.0 | 265,603 | 14,057 | 1,729 | 8,399 | 1,550 | 257 | 0 | |
| Mullock Creek | 2.5 | 42,168 | 11,374 | 2,099 | 10,161 | 2,099 | 0 | 0 | |
| Normandy Canal | 5.0 | 33,982 | 11,878 | 4,068 | 0 | 0 | 4,068 | 0 | |
| North Matlacha | 4.5 | 62,864 | 62,864 | 84 | 62,864 | 84 | 0 | 0 | |
| Orange River | 6.5 | 46,750 | 3,595 | 100 | 0 | 0 | 100 | 0 | |
| Pelican Landing | 2.5 | 3,992 | 3,992 | 1,169 | 3,992 | 1,169 | 0 | 0 | |
| Plato Canal | 5.5 | 109,235 | 18,520 | 5,487 | 0 | 0 | 5,487 | 0 | |
| Punta Rassa/Connie Mack Island | 5.0 | 28,784 | 14,869 | 4,084 | 0 | 0 | 4,084 | 0 | 103 |
| Redfish Point | 6.0 | 33,806 | 13,023 | 4,436 | 0 | 0 | 4,436 | 0 | |
| Rookery Trace | 3.5 | 8,496 | 8,496 | 1,028 | 1,621 | 819 | 231 | 0 | |
| Roosevelt Channel-Bayside | 3.0 | 2,249 | 1,509 | 0 | 1,292 | 0 | 0 | 0 | |
| Roosevelt Channel-North | 5.0 | 27,369 | 17,918 | 694 | 17,918 | 694 | 0 | 0 | |

| Trafficshed or Secondary Channel System Name | NGP Dredge Depth (ft) | All Channels Length (ft) | Public Channel Length (ft) | Anticipated NGP Dredge Length (ft) | Public Channel Length in AP (ft) | Anticipated Dredge Length in AP (ft) | Anticipated Dredge Length Outside AP (ft) | Anticipated Dredge Length in AP Sea Grass (ft) | Anticipated Dredge Length in Any Sea Grass (ft) |
|---|---|---|---|---|---|---|---|---|---|
| Saint James City (east) | 5.0 | 23,006 | 16,137 | 3,266 | 0 | 0 | 3,266 | 0 | |
| Saint James City (south 1) | 5.0 | 52,518 | 18,385 | 6,531 | 5,459 | 502 | 6,030 | 252 | 252 |
| Siesta Isles | 5.0 | 17,962 | 1,088 | 713 | 0 | 0 | 713 | 0 | |
| South Estero Bay | 4.0 | 27,694 | 27,694 | 327 | 27,694 | 327 | 0 | 0 | |
| South Matlacha | 3.5 | 71,465 | 71,465 | 889 | 28,408 | 381 | 508 | 381 | 381 |
| Sunset Bay | 2.5 | 2,681 | 2,440 | 376 | 2,440 | 376 | 0 | 0 | |

Exhibit A
Page 1 of 8

The Central Estero Bay No Internal Combustion Motor Zone is described from a point of beginning at N26.3989° W81.8664° (generally east of the South Estero Bay Channel marker presently numbered G13) [POB] continuing generally south-southeast to the east of the marked navigation channel approximately 7215 feet to a point at N26.3803° W81.8589° (generally east of the South Estero Bay Channel marker presently numbered G29) [2]; thence continuing north of the marked navigation channel in a northeasterly direction approximately 4000 feet to a point at N26.3873° W81.8495° (generally west of the Southern Passage Channel marker presently numbered G19) [3]; thence generally north approximately 240 feet to N26.3879° W81.8495° [4]; thence generally northwest approximately 1300 feet to N26.3908° W81.8519° [5]; thence generally north-northwest approximately 2080 feet to N26.3962° W81.8540° [6]; thence generally northwest approximately 1950 feet to N26.4002° W81.8579° [7]; thence due west to the shoreline of Davis Key and following said shoreline to the western end at N26.3992° W81.8658° [8]; thence continuing generally south of west approximately 230 feet to the point of beginning.



EXHIBIT A, PAGE 2 of 8
CENTRAL ESTERO BAY
NO INTERNAL COMBUSTION MOTOR ZONE

Exhibit A
Page 3 of 8

The Big Carlos No Internal Combustion Motor Zone is described from a point of beginning at Goombs Point N26.4092° W81.8655° [POB] continuing generally northwest along the mangrove shoreline to a point at N26.4122° W81.8688° [2]; thence continuing generally northwest approximately 120 feet to the shoreline of an unnamed mangrove island at N26.4124° W81.8690° [3]; thence continuing along the shoreline of said island to a point at N26.4158° W81.8721° [4]; thence continuing generally northwest approximately 266 feet to the shoreline of an unnamed mangrove island at N26.4162° W81.8727° [5]; thence continuing along the shoreline of said island to a point at N26.4179° W81.8757° [6]; thence continuing generally southwest approximately 834 feet to a point at N26.4160° W81.8773° [7]; thence continuing generally south approximately 2615 feet to a point at N26.4089° W81.8778° [8]; thence continuing generally east approximately 605 feet to a point at N26.4087° W81.8760° [9]; thence continuing generally south of east approximately 688 feet to a point at N26.4079° W81.8740° [10]; thence continuing generally southeast approximately 570 feet to a point at N26.4070° W81.8726° [11]; thence continuing generally south of east approximately 613 feet to a point at N26.4066° W81.8708° [12]; thence continuing generally east approximately 913 feet to a point at N26.4066° W81.8680° [13]; thence continuing generally north of east approximately 680 feet to a point at N26.4075° W81.8662° [14]; thence continuing generally northeast approximately 390 feet to a point at N26.4084° W81.8655° [15]; thence continuing generally north approximately 314 feet to the point of beginning.



EXHIBIT A, PAGE 4 of 8
BIG CARLOS
NO INTERNAL COMBUSTION MOTOR ZONE

Exhibit A
Page 5 of 8

The Jug Creek Shoals No Internal Combustion Motor Zone encompasses a portion of Jug Creek Shoals more specifically described from a point of beginning at N26.7128° W82.1802° (generally southwest of the Jug Creek Shoal Channel marker presently numbered G11) [POB]; thence continuing generally southwest approximately 602 feet to a point at N26.7113° W82.1811° [2]; thence continuing generally southwest approximately 1369 feet to a point at N26.7089° W82.1843° [3]; thence continuing generally southwest approximately 3862 feet to a point at N26.7014° W82.1926° [4]; thence continuing generally southwest approximately 908 feet to a point at N26.6994° W82.1943° [5]; thence continuing generally southwest approximately 1201 feet to a point at N26.6968° W82.1966° [6]; thence continuing generally west- southwest approximately 2144 feet to a point at N26.6952° W82.2029° [7]; thence continuing generally west-northwest approximately 918 feet to a point at N26.6959° W82.2056° [8]; thence continuing  generally northwest approximately 571 feet to a point at N26.6971° W82.2067° [9]; thence continuing generally north-northeast approximately 1110 feet to a point at N26.7001° W82.2058° [10]; thence continuing generally northeast approximately 946 feet to a point at N26.7018° W82.2036° [11]; thence continuing generally northeast approximately 876 feet to a point at N26.7030° W82.2013° [12]; thence continuing generally northeast approximately 963 feet to a point at N26.7050° W82.1994° [13]; thence continuing generally northeast approximately 884 feet to a point at N26.7071° W82.1980° [14]; thence continuing generally northeast approximately 893 feet to a point at N26.7089° W82.1962° [15]; thence continuing generally northeast approximately 588 feet to a point at N26.7100° W82.1948° [16]; thence continuing generally northeast approximately 715 feet to a point at N26.7111° W82.1930° [17]; thence continuing generally northeast approximately 1017 feet to a point at N26.7127° W82.1905° [18]; thence continuing generally east approximately 375 feet to a point at N26.7129° W82.1893° [19]; thence continuing generally northeast approximately 553 feet to a point at N26.7136° W82.1879° [20]; thence continuing generally east-northeast approximately 1188 feet to a point at N26.7145° W82.1844° [21]; thence continuing generally east approximately 653 feet to a point at N26.7145° W82.1824° [22]; thence continuing generally east-southeast approximately 741 feet to a point at N26.7139° W82.1802° [23]; thence continuing generally south approximately 393 feet to the point of beginning.



EXHIBIT A, PAGE 6 of 8
JUG CREEK SHOALS
NO INTERNAL COMBUSTION MOTOR ZONE

Exhibit A
Page 7 of 8

The Matlacha Pass No Internal Combustion Motor Zone encompasses an area specifically described from a point of beginning at N26.6490° W82.0819° (generally west of the Matlacha Pass Channel marker presently numbered G65) [POB]; thence continuing generally north-northwest approximately 492 feet to a point at N26.6502° W82.0826° [2]; thence continuing generally northwest approximately 1809 feet to a point at N26.6535° W82.0868° [3]; thence continuing generally north-northwest approximately 2826 feet to a point at N26.6604° W82.0907° [4]; thence continuing generally north of west approximately 389 feet to a point at N26.6607° W82.0919° [5]; thence continuing generally south-southwest approximately 1223 feet to a point at N26.6574° W82.0928° [6]; thence continuing generally east of south approximately 958 feet to a point at N26.6548° W82.0926° [7]; thence continuing generally southeast approximately 1000 feet to a point at N26.6524° W82.0911° [8]; thence continuing  generally east-southeast approximately 1350 feet to a point at N26.6507° W82.0875° [9]; thence continuing generally north of east approximately 532 feet to a point at N26.6509° W82.0859° [10]; thence continuing generally southeast approximately 1127 feet to a point at N26.6487° W82.0834° [11]; thence continuing generally north of east approximately 501 feet to the point of beginning.



EXHIBIT A, PAGE 8 of 8
MATLACHA PASS
NO INTERNAL COMBUSTION MOTOR ZONE

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.414(9), 373.418, 403.805(1), 403.814(1) FS. Law Implemented 253.002, 253.77(1), 253.77(4), 258.42, 373.118(1), 373.406(5), 373.413, 373.414(1), 373.414(1)(b), 373.414(9), 373.416, 373.426, 403.061(34), 403.813(3),*

*403.814(1) FS. History–New 2-18-10, Formerly 62-341.494, Transferred to 62-330.412.*

**62-330.443 General Permit to the Florida Department of Transportation, Counties, and Municipalities for Minor Bridge Alteration, Placement, Replacement, Removal, Maintenance, and Operation.**

(1) A general permit is granted to the Florida Department of Transportation, counties, and municipalities to conduct the activities described below:

(a) For existing maintained roadways and causeways, the alteration, placement, replacement, removal, modification, or maintenance of bridges or bridge culverts and approaches where the combined total of dredging and filling, both temporary and permanent, in wetlands and other surface waters does not exceed 0.5 acre. The total work conducted under notices of intent to use this general permit shall result in the creation of no more than 0.5 acre of new overwater structure for any bridge crossing, including parallel spans, and no new structure area over waters within federally designated critical habitat of Johnson's seagrass (*Halophila johnsonii*).

(b) Channel clearing and shaping, not to exceed a combined total of 0.5 acre of dredging and filling in wetlands and other surface waters, to facilitate maximum hydraulic efficiency of the structures detailed in paragraph (a), above, where the spoil material is used on an upland portion of the project or is deposited on a self-contained, upland spoil site. Escape of spoil material or water from the spoil deposition area into wetlands or other surface waters is prohibited.

(2) This general permit shall be subject to the following specific conditions:

(a) No dredging of access or work channels is authorized by this general permit;

(b) Temporary fill roads shall not be constructed waterward of mean high water or ordinary high water;

(c) All fill placed in wetlands, other than fill on which a bridge or approach is constructed, shall be regraded to the original wetland elevations and revegetated with native wetland species endemic to adjoining, undisturbed wetlands, within seven days of completion of construction. Within "clear zones," revegetation shall be with native herbaceous species endemic to adjoining, undisturbed wetlands. During the five-year period following the initial planting or restoration of the site, these areas shall be maintained to ensure planted or naturally recruited native wetland species are surviving and growing, and that the areal coverage of exotic and invasive species constitutes less than 10% areal coverage;

(d) Hydraulic openings of bridges shall be sufficient to prevent downstream scour, increased downstream water velocities, and increased flood elevations on the property of others;

(e) Minimum horizontal and vertical navigational clearances on bridges over navigable waters of the United States shall be established in accordance with procedures outlined in Chapter 2 of the U.S. Coast Guard Bridge Administration Manual, COMDTINST M16590.5C, (March 26, 2004), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03150), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C, and in no circumstance shall placement or replacement of a bridge result in a reduction of horizontal and vertical navigational clearances;

(f) Replacement or modification of a bridge that includes changes in the configuration of the bridge and fill areas due to changes in materials, construction techniques, or meeting current construction codes or safety standards are authorized under this permit. Any connecting road expansion or alteration associated with such replacement or modification must be authorized by a separate general or individual permit under chapter 62-330, F.A.C., as applicable, before the start of construction; and

(g) This general permit does not authorize the construction of additional travel lanes for motorized vehicles, except that any single-lane bridge may be widened to two travel lanes, provided the bridge widening does not exceed that reasonably necessary to match the existing travel lane alignment of a two-lane road. This permit does not authorize new corridors or  roadway connections where there is no existing structure over wetlands or waterways.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.419, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.443, Amended 10-1-13, 6-1-18.*

**62-330.447 General Permit to the Florida Department of Transportation, Counties, and Municipalities for Minor Activities within Existing Rights-of-Way or Easements.**

(1) A general permit is granted to the Florida Department of Transportation, counties, and municipalities to conduct the activities described below.

(a) The extension of existing culverts and crossing approaches that are authorized under a separate permit or exemption under part IV of chapter 373, F.S., as applicable, to accommodate widening of the roadway where excavation or deposition of material shall not exceed 1,000 cubic yards in wetlands and other surface waters and the area from which material is excavated or to which material is deposited shall not exceed a total of 0.25 acre at any one culverted crossing. The 1,000 cubic yardage limitation shall be separately applied to excavation and deposition of material.

(b) Relocation, recontouring, widening, or reconstruction of existing highway drainage ditches through uplands provided the floor elevation of the ditch is not deepened below the original design elevation and provided that the work does not cause a change in the hydrology of any wetlands which are connected to or which are adjacent to the ditch.

(c) Culvert placement, replacement, and maintenance associated with existing roadways, provided that construction does not cause scour in the downstream waters or increase the velocity of the water downstream, does not reduce existing flood conveyance of the stream for the 100-year flood flow and does not reduce existing flood storage within the 10-year flood plain. The material excavated or deposited as fill shall not exceed 1,000 cubic yards in wetlands and other surface waters. The cross sectional area of the culvert shall not be reduced, unless the reduced cross section provides an equal or greater discharge capability. In the case of a culvert replacement as a wildlife crossing, the cross sectional area shall not be reduced.

(d) Construction of temporary bypass lanes and stream channel diversions necessary to complete projects detailed in paragraph (c), above, provided the area used for the temporary bypass lanes and temporary diversion is restored to its previous contours and elevations.

(e) Channel clearing and shaping, not to exceed a combined total of 0.5 acre of dredging and filling in wetlands and other surface waters, to facilitate maximum hydraulic efficiency of structures authorized by paragraph (c), above, where the spoil material is used on an upland portion of the project or is deposited on a self-contained, upland spoil site. Escape of spoil material and return water from the spoil deposition area into wetlands or other surface waters is prohibited.

(f) Ditch or canal bank and bottom stabilization necessary to repair erosion damage to restore previously existing ditch configurations. Authorized repair methods are placement of riprap, sand cement toe walls, clean fill material, poured concrete, geotechnical textiles and other similar stabilization materials. The placement of riprap or other lining materials shall be limited to a length of 500 feet along the axis of the ditch or canal. This general permit shall not be applicable within one-quarter mile along the length of an area, within the same ditch, which has been stabilized under this general permit within a three-year period.

(g) Roadway safety activities, such as installation of shoulders, sidewalks, guard rails, signs, poles, and mast arms within an existing right-of-way that incur no more dredging or filling than 500 square feet per activity, provided the total impact to wetlands or other surface waters does not involve more than 0.5 acre.

(2) This general permit shall be subject to the following specific conditions:

(a) The permittee shall limit stream channel relocation to streams which have an average discharge of 10 cubic feet per second or less. The length of relocated channels or those significantly altered shall be limited to 200 feet per stream. A stream channel shall be altered only when such a measure will reduce the long term adverse water quality impacts and will maintain or restore the stream's natural hydraulic capability; and

(b) This general permit shall not apply to ditch construction in Class I or Class II surface waters, Outstanding National Resource Waters or waters designated as Outstanding Florida Waters.

(c) Activities under this general permit must not diminish existing stormwater treatment, attenuation, or conveyance capacity.

(d) This general permit does not authorize the construction of additional traffic lanes. Activities that require additional traffic lanes must first obtain an individual environmental resource permit under this chapter, as applicable, before the start of construction.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.419, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.447, Amended 10-1-13, 6-1-18.*

**62-330.448 General Permit to Counties and Municipalities to Pave Existing County or Municipally Owned and Maintained Roads, including the Repair and Replacement of Bridges that are Part of the Roadway.**

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.414(9), 373.4145, 373.418, 403.805(1), 403.813(1)(t) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.414(9), 373.4145, 373.416, 373.418, 373.419, 403.813(1)(t) FS. History–New 2-22-07, Amended 10-1-07, Formerly 62-341.448, Repealed 10-1-13.*

**62-330.449 General Permit for Construction, Operation, Maintenance, Alteration, Abandonment or Removal of Airport Airside Stormwater Management Systems.**

(1) A general permit is granted to the owner of a public or private airport or military airbase for the construction, alteration, abandonment, removal, operation, and maintenance of stormwater management systems that serve permanently-paved airside activities, which, for the purposes of this rule, are defined as those components of an airport, airbase, or runway used for aircraft taxiing, landing, takeoff, loading, unloading, service materials storage and service equipment parking.

(2) The stormwater management systems shall be:

(a) Designed such that the stormwater nutrient loading does not exceed the stormwater nutrient loading from natural vegetative communities. The calculation of such loadings shall be done using the methodology and data set forth in the *Statewide Airport Stormwater Best Management Practices Manual*, ("Airside BMP Manual") Florida Department of Transportation-Aviation Office (April 27, 2013), incorporated by reference herein (pages 1-63: http://www.flrules.org/Gateway/reference.asp?No=Ref-03183, pages 64-Appendix L: http://www.flrules.org/Gateway/reference.asp?No=Ref-03184). A copy may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(b) Constructed, altered, operated, and maintained such that the runoff from airside activities drains directly to pervious areas that employ one or more of the following applicable structural Best Management Practices (BMPs):

1. Overland flow, as described in Section 605.a. of the Airside BMP Manual.

2. Dry retention basin, as described in Section 605.b. of the Airside BMP Manual.

3. Swales, as described in Section 605.c. of the Airside BMP Manual.

(c) This general permit is only authorized for use where post development site conditions comply with the criteria set forth above.

(3) The projects in subsection (2), above, must also be constructed, operated, and maintained to comply with the following design criteria and performance standards:

(a) There shall be no dredging or filling in wetlands or other surface waters other than those within existing stormwater management systems.

(b) Discharges cannot adversely affect the conveyance capacity of receiving waters, and cannot increase flooding of off-site property or to property not owned by the permittee, based on the design storm specified for the site locale.

(4) Stormwater management systems serving airside areas that consist of underdrains, wet detention systems, other retention methods, and/or alternative treatment systems do not qualify for authorization under this general permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.118(6), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), (6), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.450 General Permit for Construction, Alteration, and Operation of Urban Infill and Redevelopment Activities in Conformance with the Conceptual Approval Permit in Rule 62-330.055, F.A.C.**

A general permit is issued that authorizes construction, alteration, operation, and maintenance of urban infill and redevelopment projects contemplated by a conceptual approval permit issued under rule 62-330.055, F.A.C., provided all the following conditions are met:

(1) The activities must be within an urban infill and redevelopment area or a community redevelopment area created under chapter 163, F.S., where a conceptual approval permit has been issued under rule 62-330.055, F.A.C.

(2) The notice of intent to use this general permit must include one set of construction plans and calculations prepared by a registered professional that:

(a) Depict all stormwater management features, all existing and proposed impervious areas, all existing and proposed pervious areas, and the land uses within the site of the proposed activities.

(b) Demonstrate a reduction of loading of pollutants, as identified in the conceptual approval permit, under the existing and proposed conditions at the site of the proposed activities.

(c) Constitute a design consistent with the terms and conditions of the conceptual approval permit, including an identification of the owner and operator of the stormwater management systems, and a demonstration of acceptance of such responsibility by that owner or operator.

(d) Identify the specific location within the urban infill and redevelopment or community redevelopment area where activities are proposed, including any areas within or connected to the development area that have been or will be set-aside for preservation, or

where construction otherwise is not to occur.

(3) The Agency shall have 30 days upon receipt of the notice to respond as to whether the plans and calculations are in substantial compliance with the conceptual approval permit. If they are, construction of that portion of the site addressed by those plans may commence. If the Agency determines that the plans and calculations are not in substantial compliance with the conceptual approval permit, the Agency shall, within 30 days of receipt of the notice, inform the applicant of the inconsistencies, the measures needed to address those inconsistencies, and that verification of qualification to use the general permit is denied without prejudice. The applicant may resubmit a notice to use this general permit once those inconsistencies have been addressed. Construction of the projects that are the subject of the original notice shall not commence until the permittee has resubmitted a revised notice and obtained verification that the activities qualify for the general permit.

(4) Construction must be performed in compliance with the terms and conditions of the conceptual approval permit.

(5) As part of reviewing the qualification to use this general permit, the Agency will verify the number of debits that must be made to the ledger of target pollutant loads (mass per acre) if the activities included in the notice are constructed, and will debit that amount from the master ledger approved in the conceptual approval permit.

(6) Within 30 days of completion of construction, the registered professional shall submit certification that construction was completed in substantial conformance with the plans and calculations that were submitted in the verified qualification to use this general permit.

(7) This general permit authorizes construction of the above authorized projects within a duration of five years from verification of qualification; operation and maintenance of the authorized system shall be the responsibility of the owner and operator for the life of the project or activity.

(8) Unless the conditions of subsection 62-330.055(6), F.A.C. have been met, this general permit cannot be used to construct roads, parking areas, buildings, and other structures on areas where work in wetlands and other surface waters requires an individual permit under this chapter, or on lands served by a stormwater management system authorized by the individual permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.118(6), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), (6), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.451 General Permit to Counties, Municipalities, and other Agencies to Conduct Stormwater Retrofit Activities.**

(1) A general permit is granted to counties, municipalities, state agencies and water management districts to construct, operate, and maintain stormwater retrofit activities as authorized below for improving existing surface water and stormwater systems. This general permit may be used in conjunction with exempt activities.

(2) Types of stormwater retrofit activities authorized under this general permit are:

(a) Construction or alteration that will add additional treatment or attenuation capacity and capability to an existing stormwater management system;

(b) The modification, reconstruction, or relocation of an existing stormwater management system or stormwater discharge facility;

(c) Stabilization of eroding banks, and installation of structures such as gabions to limit bank erosion; or

(d) Excavation or dredging to remove sediments or other pollutants that have accumulated in existing surface waters as a result of stormwater runoff and stormwater discharges, provided the material removed is not deposited in existing wetlands or other surface waters.

(3) Stormwater retrofit activities shall not:

(a) Be proposed or implemented for the purpose of providing the water quality treatment or flood control needed to serve new development or redevelopment; or

(b) Include a dam that has more than 50 acre-feet of storage capacity if the dam is more than five feet high, nor a dam having a height of ten or more feet, regardless of storage capacity. Height is measured from the top of the dam to the natural bed of the stream or watercourse at the downward toe of the dam, or from the lowest elevation of the outside limit of the dam to the maximum elevation of the dam.

(4) There is no limit to the acreage of stormwater retrofit activities in artificial waters. Work in wetlands and non-artificial surface waters shall be limited to no more than 0.5 acre.

(5) A stormwater quality retrofit activity must result in at least one of the following:

(a) Addition of treatment capacity to an existing stormwater management system such that it reduces stormwater pollutant

loadings to receiving waters;

(b) Addition of treatment or attenuation capability to an existing developed area when either the existing stormwater management system or the developed area has substandard stormwater treatment or attenuation capabilities, compared to what would be required for a new system requiring a permit under part IV of chapter 373, F.S.; or

(c) Removal of pollutants generated by, or resulting from, previous stormwater discharges.

(6) A water quantity retrofit project proposed to reduce existing flooding problems must be designed in such a way that the project does not:

(a) Result in a net reduction in water quality treatment provided by the existing stormwater management system; nor

(b) Increase discharges of untreated stormwater entering receiving waters.

(7) The project must be designed, constructed, and implemented as a complete, stand-alone project within the construction phase duration of a general permit, and such that it will not at any time during its construction or operation:

(a) Cause or contribute to any water quality violations;

(b) Contribute to any existing violation if it discharges pollutants into waters where existing ambient water quality does not meet water quality standards for those pollutants. In such a case, the project must include measures that will cause a net improvement in the receiving waters for those pollutants in accordance with section 373.414(1)(b)3., F.S.;

(c) Adversely affect the value of functions provided to fish and wildlife by wetlands or other surface waters;

(d) Adversely affect the hydroperiod of wetlands on adjacent lands or the hydroperiod of other wetlands upstream, downstream, or adjoining to the work area under subsection (4), above;

(e) Cause or contribute to increased flooding of adjacent lands or cause new adverse water quantity impacts to receiving waters;

(f) Add or increase any chemical treatment;

(g) Be operated by pumps or other mechanical or adjustable features; nor

(h) Adversely impact the maintenance of surface or ground water levels or surface water flows established pursuant to section 373.042, F.S.

(8) The entity conducting this general permit must conduct at least one pre-notice meeting with Agency staff having responsibility for the review of the proposed activities. The notice required in rule 62-330.402, F.A.C., shall include materials reflecting the recommendations of the Agency discussed during that meeting, and demonstrating compliance with the above, including a certification by a registered professional that the proposed activity will meet the criteria specified above. Such certification shall include appropriate design analyses, pollutant loading analyses, modeling and other engineering calculations, drawings, specifications and other information to support, describe, verify, and document the registered professional's certification.

(9) Nothing in this general permit will preclude a county or municipality from obtaining and implementing a Basin Management Action Plan with water quality credits for activities performed under this authorization.

(10) Within 30 days after completion of construction, a registered professional shall submit certification that construction was completed in substantial conformance with the plans and calculations that were submitted in the notice to use this general permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.118(6), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), (6), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 10-1-13, Amended 6-1-18.*

### 62-330.453 General Permit for Installation, Maintenance, Repair, and Removal of Utility Lines.

(1) A general permit is granted for the installation, maintenance, repair, and removal of underground utility lines, cable, conduit, or pipeline transmitting electricity, communication signals, potable water, raw water, reclaimed water, domestic wastewater, propane gas or natural gas.

(2) For the purposes of this general permit:

(a) "Directional drilling" means the linear or curvilinear excavation of a tunnel or conduit, in any direction, through the use of drilling equipment that can change direction during excavation; this also includes borehole reaming and pulling following primary drilling.

(b) "Jack-and-bore" means the linear, primarily lateral excavation of a tunnel, typically between excavated subgrade pits, through use of drilling equipment and encasement which is advanced under mechanical force, and includes similar methods commonly termed as "microtunneling."

(c) "Frac-out" means any release of drilling fluid or slurry which results in above-grade discharge of drilling fluid or slurry or significant loss of such fluid or slurry into the surrounding parent material.

(3) This general permit is limited as follows:

(a) No work occurs within Outstanding Florida Waters, Aquatic Preserves, or Class I waters.

(b) The installation of conduit or pipeline to drain wetlands or other surface waters is not authorized.

(c) Prior to work, existing pipelines shall be evacuated of substances which, if released, could result in a violation of state water quality standards.

(d) The maximum width of the disturbed corridor in wetlands shall not exceed 30 feet.

(e) The total area of forested wetland disturbance shall not exceed 0.5 acre per ten miles of cable, conduit, or pipeline.

(f) Minor above-grade improvements may be constructed in uplands under this general permit, but shall be limited to vents, valves, meter assemblies, relays, junction boxes, pads or similar structures that are directly connected to the utility line, do not create discharges, and which cumulatively comprise no more than 100 square feet of impervious surfaces per mile of utility line.

(g) Installation, maintenance, repair, and removal activities performed via trenching or methods other than directional drilling or jack-and-bore, are subject to the following special conditions:

1. The maximum width of the excavated trench shall not exceed eight feet, with temporary spoil storage banks not to exceed ten feet in width;

2. For a trench with a top width greater than three feet in herbaceous wetlands, the upper layer of the soil horizon shall initially be scraped and segregated into a spoil bank that is separated from the spoil bank resulting from the excavation of the trench for the utility line. The upper layer of the soil horizon shall be replaced as the last step of restored grades to facilitate natural revegetation;

3. Trenching in surface waters shall be limited to wetlands, artificial waters, and residential canal systems; and

4. Temporary spoil banks shall contain breaches that prevent impoundment or restriction of surface water flows;

(h) Installation, maintenance, repair, and removal conducted using directional drilling or jack-and-bore methods are subject to the following special conditions:

1. The maximum outside diameter of the cable, conduit or pipeline, including encasement, shall not exceed 30 inches.

2. A minimum depth of cover, equal to the greater of either five feet, or five times the maximum encased diameter of the utility line to be installed, shall be maintained between the top of the utility line and casing and the soil surface or submerged bottom of any wetland or waterbody being crossed.

3. All work areas associated with directional drilling or jack-and-bore activities, including entrance and exit pits, drill rigs, tanks, pumps, drilling fluid mixing and settling pits, dewatering systems and staging areas for pipe, cables, and drill string, shall be located within uplands.

4. The use of drilling fluids shall not cause or contribute to a violation of state ground water quality criteria or standards, as defined in chapter 62-520, F.A.C.

5. The permittee shall, at least 48 hours prior to commencement of any directional drilling or jack-and-bore activities, submit to the agency the name, as registered with the Florida Department of State, and all-hours telephone contact information of all contractors responsible for drilling and for containment and cleanup in the event of a drilling fluid frac-out or spill.

6. The contractor shall, at all times during directional drilling activities, maintain appropriate equipment and materials in a readily-accessible location and condition, to effectively contain and clean up a drilling fluid frac-out or spill.

7. The permittee or the permittee's contractor shall, at all times during directional drilling activities, ensure that appropriately-trained personnel monitor downhole equipment position, drilling fluid circulation and pressures, and actively monitor the entire utility line route for surface frac-out of drilling fluids.

8. Drilling activities shall be discontinued and the drilling fluid or slurry shall be contained using appropriate methods as soon as possible, in the event of a drilling fluid frac-out or spill. Removal of drilling fluid or slurry from wetlands and other surface waters shall be initiated and completed in the most expeditious manner practicable. Removed drilling fluid shall be contained or disposed of in an appropriate upland location. Any frac-out or spill of drilling fluid into wetlands or other surface waters shall be reported to Agency staff within 24 hours following detection of the spill or frac-out.

(i) Utilities must be located a minimum of 14 feet below the authorized depth of a federal navigation channel.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.453, Amended 10-1-13, 6-1-18.*

**62-330.455 General Permit for the Construction of Aerial Pipeline, Cable, and Conduit Crossings of Certain Waters.**

(1) A general permit is granted to construct an aerial or piling-supported pipeline, cable, or conduit crossing of a waterbody having a width of no greater than 25 feet, provided:

(a) The crossing is not located in, on, or over Class I waters, Class II waters, or waters approved, conditionally approved, restricted, or conditionally restricted by the Department of Agriculture and Consumer Services for shellfish harvesting if the pipeline or conduit conveys petroleum, domestic wastewater, phosphate matrix slurry, phosphatic clay or sand tailings, recirculated water from beneficiation processes, or other substances which, if leaked, could contaminate drinking water supplies or result in closure of shellfish harvesting waters;

(b) No pipeline, cable, or conduit shall be lower than existing crossings of the waterbody;

(c) Work to install the aerial crossing shall be restricted to a width of no more than thirty feet on each side of the crossing alignment. In cases where multiple pipes, cables or conduits are to be installed along the same alignment the thirty-foot width shall commence from the outermost pipes, cables or conduits. For the purposes of this general permit, no more than three pipes shall be placed along a given alignment, and in no case shall the total disturbance area exceed 75 feet in width; and,

(d) The Agency shall be notified within 24 hours of any leak or failure of any of the pipes associated with the aerial crossing.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.455, Amended 10-1-13.*

**62-330.457 General Permit for Subaqueous Utility Crossings of Artificial Waterways.**

(1) A general permit is granted to any person constructing, repairing or replacing a subaqueous utility crossing of artificial waters and residential canal systems, provided:

(a) The crossing is not located in Class I waters, Class II waters or waters approved, conditionally approved, restricted, or conditionally restricted by the Department of Agriculture and Consumer Services for shellfish harvesting if the utility line conveys petroleum, domestic wastewater, phosphate matrix slurry, phosphatic clay or sand tailings, recirculated water from beneficiation processes, or other substances which, if leaked, could contaminate drinking water supplies or result in closure of shellfish harvesting waters;

(b) The crossing shall be limited to non-navigable watercourses or to those waterways in which navigation can be maintained at all times without the necessity of constructing temporary berms, dikes, or dams, or removing or relocating turbidity control devices to allow boat passage. Customary navigation through the waterway shall be maintained at all times during installation;

(c) No dredging or filling shall be conducted in wetlands or other surface waters, located landward of the top of the banks of the waterway. Dredging and back filling of littoral zones and wetland vegetation growing on the side slopes of the artificial waterway is authorized as necessary to install the subaqueous utility line crossing;

(d) The maximum length of the utility crossing shall not exceed 150 feet from top of bank to top of bank. Excavated trench dimensions shall be limited to a depth of not more than ten feet below existing bottom contours and a trench top width of not more than ten feet;

(e) The maximum width of the area disturbed by equipment during construction shall be no more than 30 feet wide;

(f) Temporary or permanent spoil disposal sites shall be located exclusively on uplands and shall be sited, designed, and managed to have the capacity to retain all dredged material; and

(g) All previously excavated contours are restored with onsite native backfill, coarse sand, or clean, non-toxic rock bedding or cap material, as appropriate, within 72 hours following installation of the utility line.

(2) Installation, maintenance, repair, and removal conducted using directional drilling or jack-and-bore methods under this general permit are subject to the following special conditions:

(a) The maximum outside diameter of the cable, conduit, or pipeline, including encasement, shall not exceed 30 inches.

(b) A minimum depth of cover, equal to the greater of either five feet, or five times the maximum encased diameter of the utility line to be installed, shall be maintained between the top of the utility line and casing and the soil surface or submerged bottom of any wetland or waterbody being crossed.

(c) All work areas associated with directional drilling or jack-and-bore activities, including entrance and exit pits, drill rigs, tanks, pumps, drilling fluid mixing and settling pits, dewatering systems and staging areas for pipe, cables, and drill string, shall be located within uplands.

(d) The use of drilling fluids shall not cause or contribute to a violation of state ground water quality criteria or standards, as defined in chapter 62-520, F.A.C.

(e) At least 48 hours prior to commencement of any directional drilling or jack-and-bore activities, the permittee shall submit to the agency the name, as registered with the Florida Department of State, and all-hours telephone contact information of all contractors responsible for drilling and for containment and cleanup in the event of a drilling fluid frac-out or spill.

(f) The permittee or the contractor shall, at all times during directional drilling activities, maintain appropriate equipment and materials in a readily-accessible location and condition, to effectively contain and clean up a drilling fluid frac-out or spill.

(g) The permittee or the permittee's contractor shall, at all times during directional drilling activities, ensure that appropriately-trained personnel monitor downhole equipment position, drilling fluid circulation and pressures, and actively monitor the entire utility line route for surface frac-out of drilling fluids.

(h) In the event of a drilling fluid frac-out or spill, drilling activities shall be discontinued and the drilling fluid or slurry shall be contained using appropriate methods as soon as possible. Removal of drilling fluid or slurry from wetlands and other surface waters shall be initiated and completed in the most expeditious manner practicable. Removed drilling fluid shall be contained or disposed of in an appropriate upland location. Any frac-out or spill of drilling fluid into wetlands or other surface waters shall be reported to Agency staff within 24 hours following detection of the spill or frac-out.

(3) Utilities must be located a minimum of 14 feet below the authorized depth of a federal navigation channel.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 10-3-95, Formerly 62-341.457, Amended 10-1-13, 6-1-18.*

**62-330.458 General Permit for the Construction and Maintenance of Electric Power Lines by Electric Utilities.**

(1) A general permit is provided in Section 403.814(6), F.S., for the construction of power lines and electrical support structures by electric utilities. Terms used in this general permit shall have the meanings specified below:

(a) "Access areas" shall mean areas which are cleared to allow equipment to reach existing electrical structures or the proposed location of electrical structures;

(b) "Existing facilities" shall mean existing power lines, substations or power plants;

(c) "Impact site" shall mean that portion of a wetland area within the right-of-way either surrounded by uplands within the right-of-way or lying between upland segments of the right-of-way within which clearing of vegetation to the ground is proposed to occur;

(d) "Power line" shall mean the conductors, supporting structures, and related hardware installed or maintained by electric utilities as defined in section 366.02(2), F.S.;

(e) "Project" shall mean the proposed or existing power line for which use of the general permit is proposed;

(f) "Selective clearing" shall mean the cutting or control of vegetation by hand, herbicide, or mechanized equipment that minimizes soil compaction, to a height no lower than the water level at the time of cutting or ground level in areas without standing water. This would include removal of the cut trees from the wetland in cases where leaving the trees would preclude revegetation or impound water flow. This shall not mean the non-selective aerial or broadcast application of herbicides;

(g) "Siting board" means the Governor and Cabinet as provided in section 403.503(8), F.S.;

(h) "Work areas" shall mean areas surrounding the electrical support structures, towers, poles, and guy wires which must be cleared to enable equipment to install and maintain the power line.

(2) Activities conducted under this general permit shall comply with section 403.814(6), F.S., and the following additional conditions.

(a) The shoreline of forested wetlands is interpreted to be the mean or ordinary high water line.

(b) Any mechanized equipment that is used to cut or remove vegetation shall be of a type and be operated so as to minimize soil compaction. Except for Brazilian pepper (*Schinus terebinthifolius*), Australian pine (*Casuarina* spp.), and punk tree (*Melaleuca quinquinerva*), clearing in the remainder of the project right-of-way within wetlands shall be limited to selective clearing of vegetation which has an expected mature height of 14 feet or more. During construction and while conducting normal maintenance activities, the permittee shall eradicate all Brazilian pepper, Australian pine, and *Melaleuca* from the wetland portion of the right-of-way. During the initial clearing event, and during subsequent maintenance cycles, EPA approved herbicides may be used on the following:

1. Vegetation growing within the area that was formerly cleared to the ground,

2. Vegetation with an expected mature height of over 14 feet growing within the remainder of the right-of-way; and,

3. Exotic vegetation within the right-of-way.

(c) Areas dominated (90 percent or greater aerial coverage) by exotic species shall not be included in the acreage calculation of

clearing to ground of forested wetlands. The ten mile sections shall be measured from the beginning of the project to the terminus of the project, or vice versa, and the sections shall not end in a wetland. In cases where the section does end in a wetland, the closest landward edge of the wetland shall be the section terminus.

(d) Diversion and impoundment of surface waters shall be limited to incidental diversion during construction, and diversion which occurs around support structures, towers, guy wires, and poles.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1), 403.814(6), 403.814(7) FS. History–New 10-3-95, Formerly 62-341.620, Amended 10-1-13.*

**62-330.459 General Permit for Relocation of Aerial Electric and Communication Lines Associated with Road Improvement Projects.**

(1) A general permit is provided for use by electric and communication utilities to relocate aerial transmission and distribution lines, including utility poles and associated bases and anchoring devices within or adjacent to the rights of way of existing roadways.

(2) This general permit applies only to relocation projects necessitated by widening or improvement of existing roads. Documentation of the road widening or improvement that necessitates the relocation shall be submitted at the time the notice to use this general permit is submitted to the Agency.

(3) For the purpose of this general permit, the following definitions shall apply:

(a) "Anchoring device" shall mean steel guy wires fastened to the ground without the need for separate dredging;

(b) "Base" shall mean a man-made, concrete or steel foundation not exceeding four feet in radius, used to support a utility pole; and,

(c) "Utility pole" shall mean a single pole that supports aerial transmission and distribution lines.

(4) This general permit is subject to the following special conditions:

(a) The relocation of the poles shall be either within the existing or proposed road right-of-way or within ten feet adjacent to the existing or proposed road right-of-way;

(b) There shall be no above grade access roads, and no permanent placement of fill in wetlands or other surface waters for access roads or other purposes, other than the utility poles, associated bases, and anchoring devices;

(c) Work shall not impact any living stony coral, soft coral, macro-marine algae community, or submerged grassbeds;

(d) The clearing of wetland vegetation shall be limited to 0.5 acre per 10 miles of transmission or distribution line, unless the clearing of vegetation is addressed in a previously issued permit under part IV, chapter 373, F.S., which authorized the road widening or improvement.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.4137, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.621, Amended 10-1-13.*

**62-330.463 General Permit for Breaching Mosquito Control Impoundments and for the Construction and Operation of Culverts and Associated Water Control Structures in Mosquito Control Impoundments by Governmental Mosquito Control Agencies.**

(1) A general permit is granted to any governmental mosquito control agency to construct and operate culverts and associated water control structures for the control of water levels in mosquito control impoundments, and to breach mosquito control impoundments, provided:

(a) The work is done only to provide improved transport of tidal water and organisms between the impounded wetland and adjacent surface waters or between cells within existing mosquito control impoundments for the purpose of improving water quality and the quality of fish and wildlife values;

(b) The work is not required as mitigation under part IV of chapter 373, F.S.;

(c) Breaches, culverts and associated water control structures shall be installed in locations that restore historic flow patterns, such as at or adjacent to historic locations of tidal creeks, and shall be located and operated such that state water quality standards shall not be violated in the receiving waters outside the impoundment;

(d) Culverts and associated water control structures shall either be left open year-round or shall be only seasonally closed as necessary to control mosquito breeding and to minimize the application of pesticides;

(e) Culverts and water control structures shall not be constructed in the locations of existing breaches of the impoundment dike;

(f) Culverts and water control structures shall be made of a corrosion resistant material;

(g) The diameter and invert elevation of culverts and water control structures shall be sufficient to maintain flow and prevent scouring under expected hydrologic conditions;

(h) Spoil material excavated during construction of the breaches shall be handled and deposited so as to prevent violations of state water quality standards for turbidity, and shall be contained in a self-contained upland disposal site; and,

(i) Wetlands disturbed by construction shall be stabilized with indigenous wetland vegetation or clean riprap, and the uplands disturbed by construction shall be stabilized with vegetation, riprap, or other means.

(2) The Agency shall send a copy of the notice to use this general permit to the Chairman of the Subcommittee on Managed Marshes which is established under section 388.46, F.S.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.463, Amended 10-1-13.*

**62-330.467 General Permit for Breaching Mosquito Control Impoundments by Governmental Mosquito Control Agencies.**

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.414(9), 373.416, 373.418 FS. History–New 10-3-95, Formerly 62-341.467, Repealed 10-1-13.*

**62-330.474 General Permit for Certain Minor Activities.**

(1) A general permit is granted to construct, alter, maintain, operate, abandon, and remove the following:

(a) Piling supported structures, other than docks and piers, without walls, screens, or doors, provided that the structure is not used for mooring, and the cumulative square footage of existing and proposed structures over wetlands or other surface waters does not exceed 500 square feet in Outstanding Florida Waters or 1,000 square feet outside of Outstanding Florida Waters;

(b) Up to 100 square feet of dredging or filling in wetlands or other surface waters; or

(c) Maintenance dredging of up to 50 cubic yards of material from wetlands or other surface waters, provided that the dredged material is placed in uplands.

(2) Persons proposing to use this general permit must provide, as part of the notice required in rule 62-330.402, F.A.C., reasonable assurance that the proposed activity:

(a) Does not cause a violation of state water quality standards;

(b) Does not impede the conveyance of a stream, river, or other watercourse in a manner that would increase off-site flooding;

(c) Does not adversely impact aquatic or wetland dependent listed species;

(d) Does not cause the drainage of wetlands; and

(e) Is not located in, on, or over a community of corals, seagrasses, or attached marine macroalgae.

(3) The Agency will provide written notification to the person proposing to use this general permit whether the proposed activity qualifies for this general permit within 30 days of submittal of the written notice. The proposed activity shall not be commenced until the Agency has provided written notice that the applicant qualifies for the general permit.

(4) A determination that an activity qualifies for a general permit for a minor activity applies only to the site specific activity, location, method of construction, or operation of the authorized project, and the other design and operation features of the authorized activity.

(5) This general permit shall not be applicable on any parcel of property which has been the subject of the successive filing of notices under a general permit within a three-year period where the combination of activities to be conducted exceed the thresholds in this rule.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426 FS. History–New 6-1-18.*

**62-330.475 General Permit for Single-family Residential Activities in Isolated Wetlands.**

(1) A general permit is granted to construct, alter, maintain, operate, abandon, and remove a single family residence and associated residential improvements (such as a driveway, garage, and an onsite sewage disposal system), provided:

(a) The land on which the work is to occur is not part of a larger plan of common development;

(b) The notice required in rule 62-330.402, F.A.C., includes documentation that the tract of land was not divided into two or more parcels after July 1, 1994;

(c) Work occurs only in uplands or in isolated wetlands that are not within an Area of Critical State Concern or within the Wekiva River Basin Riparian Habitat Protection Zone as described in subparagraph 40C-41.063(3)(e)1., F.A.C.;

(d) Wetland impacts shall be eliminated except where unrestricted uplands are insufficient to support the residence and associated residential improvements. "Unrestricted uplands" are uplands that are not restricted by easement, deed restriction, local government regulation, setback, or similar restriction which would prevent construction there. Uplands are not considered restricted until all available variance or waiver procedures have been exhausted;

(e) Wherever possible, structures in isolated wetlands should be built on pilings to minimize fill in wetlands; and

(f) No more than 4,000 square feet of isolated wetlands are dredged or filled and no more than 6,000 square feet of isolated wetlands are cleared (this includes the area dredged or filled for the residence and associated residential improvements).

(2) Persons proposing to use this general permit must provide, as part of the notice required in rule 62-330.402, F.A.C., reasonable assurance that the proposed activity:

(a) Does not cause a violation of state water quality standards;

(b) Does not impede the conveyance of a stream, river, or other watercourse in a manner that would increase off-site flooding;

(c) Does not adversely impact aquatic or wetland dependent listed species;

(d) Does not cause the drainage of wetlands.

(3) The Agency will provide written notification to the person proposing to use this general permit whether the proposed activity qualifies for this general permit within 30 days of submittal of the written notice. The proposed activity shall not be commenced until the Agency has provided written notice that the applicant qualifies for the general permit.

(4) This general permit shall not be applicable on any parcel of property which has been the subject of the successive filing of notices under a general permit within a three-year period where the combination of activities to be conducted exceed the thresholds in this rule.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426 FS. History–New 10-3-95, Formerly 62-341.475, Amended 10-1-13, 6-1-18.*

**62-330.476 General Permit for Private Single-Family Residences within Jupiter Farms, Palm Beach County.**

(1) A general permit is granted for the construction, alteration, maintenance, operation, abandonment, and removal of single-family residences and associated on-site residential improvements within the wetlands and other surface waters in Jupiter Farms, Palm Beach County, as identified below. This includes the construction, alteration, maintenance, operation, abandonment, and removal of culverts or bridges over non-navigable drainage or irrigation ditches to provide access to the residence.

(2) This general permit is limited as follows:

(a) The single-family residence is to be located within:

1. Township 40S, Range 41E – Section 33 or 34;

2. Township 41S, Range 41E – Section 1, 2, 3, 4 (east half), 9 (east half), 10, 11, 12, 13, 14, 15, or 16, or

3. Township 41S, Range 42E – Section 7 or 18.

(b) Only one, single-family residence is authorized per parcel or lot. However, this shall not preclude additional living areas, such as "mother-in-law" and guest quarters that are part of the primary residence or other structures authorized under subsection 62-330.476(4), F.A.C.;

(c) The activities are not part of a larger plan of common development proposed by the applicant;

(d) The total area of dredging, filling, construction, land clearing, and other disturbance in wetlands and other surface waters within a parcel or lot shall not exceed 0.75 acre;

(e) The permittee offsets the functions provided by wetlands and other surface waters that will be lost as a result of the above activities through mitigation, as provided in subsection (3), below; and,

(f) The activities undertaken under this general permit:

1. Are associated with a private single-family residence to be used by the current owner; and,

2. Are not intended for, or being proposed by, a corporation, partnership, or other business entity, and otherwise will not be used

for commercial or industrial purposes. However, this does not preclude an owner from conducting commercial activities on the property that are ancillary to a private single-family residence, such as sale of home-made crafts or home-grown produce; and shall not prohibit a trustee, beneficiary, or current resident from qualifying as an applicant when title to such single-family residence and associated on-site residential improvements is held in trust.

(3) To implement mitigation that will offset impacts from the construction of residences within the above-described sections, persons wishing to use this general permit shall pay Palm Beach County, as described below, an amount calculated as "X" times $4,000, where "X" equals the number of acres of wetlands or other surface waters that will be subject to construction, alteration, maintenance, or operation activities authorized herein, rounded to the nearest 0.01 acre (up to 0.75 acre).

(a) Initially these monies shall be applied to the Palm Beach County Department of Environmental Resources Management South Loxahatchee Slough Wetland Restoration Fund to implement the restoration, enhancement and long-term management of 237 acres of impacted wetlands within a 780-acre undeveloped parcel known as the South Loxahatchee Slough Restoration Project (SLSRP), in accordance with the "Memorandum of Understanding between the Florida Department of Environmental Protection, the U.S. Army Corps of Engineers, Jacksonville District, and Palm Beach County Board of County Commissioners through its Department of Environmental Resources Management Regarding Mitigation for Jupiter Farms and Palm Beach Country Estates," dated August 26, 2002, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03149), which is incorporated by reference herein; a copy of this MOU may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. These wetlands are located south of PGA Boulevard, north of the Bee Line Highway, and west of the eastern leg of the C-18 Canal. This site is acknowledged to have the capability of providing 151.9 acre-credits of mitigation for wetland impacts within the above-described sections of Jupiter Farms.

(b) The Department recognizes that all of the wetland impacts within Jupiter Farms cannot be offset within the SLSRP, and that additional mitigation sites will have to be identified, funded, and implemented in the future. Therefore, the SLSRP shall be available under this general permit to offset impacts within the above-described sections of Jupiter Farms until the available credits within that site are exhausted, at which time the money will be directed to other suitable mitigation sites which shall be approved by the Department and identified through amendments to this rule.

(4) For the purposes of this general permit, "associated onsite residential improvements" include projects that are directly associated with a private single-family residence on the property, such as: a driveway, garage, onsite sewage treatment and disposal systems, wells, utility services (water, electricity, telephone, cable, and gas), recreation structures, sheds, barns, stables and animal pens, walkways, boardwalks, lawns, fences, pools, ponds, and gardens. To be authorized under this general permit, such associated on-site residential improvements must be constructed concurrently with construction of an individual single-family residence, or after such residence has been lawfully constructed, and must conform to all the conditions and criteria of this general permit. For purposes of this general permit, associated on-site residential improvements shall not include docks, piers, boat ramps, or other structures designed to provide boating access in, on, or over surface waters, and also shall not include improvements used in whole or part for commercial agriculture or aquaculture operations.

(5) In addition to the general conditions of rule 62-330.405, F.A.C., and the other limiting conditions of this general permit, the following specific conditions shall also apply:

(a) Onsite sewage treatment and disposal systems shall be constructed in uplands unless there is an insufficient unrestricted area of uplands within the contiguous ownership of the applicant on which such treatment and disposal systems can be located. For the purposes of this section, "unrestricted area of uplands" means an area of uplands that is not restricted by easement, deed restriction, local government regulation, or similar restriction that would prevent the on-site sewage treatment and disposal system from being located in those uplands.

(b) Material and debris resulting from any clearing and grading of the property authorized under this general permit shall not be deposited in wetlands or other surface waters outside of the footprint of the residence and associated onsite residential improvements authorized under this general permit.

(c) Culverts or bridges installed in drainage or irrigation ditches to provide access shall be located and sized so as to maintain existing capacity for water flow and volumes.

(d) Any areas excavated under this general permit shall not result in new connections to canals, ditches, swales, or other existing drainage systems within Jupiter Farms.

(6) Persons wishing to conduct activities under this general permit must file a notice with the local office of the Department, which shall include:

(a) A description of the proposed activity on the parcel or lot, including scaled or fully dimensioned plan and cross section views of the proposed dredging, filling, and construction;

(b) A statement that the residence and associated onsite residential improvements comply with the requirements of paragraph (2)(f), of this general permit;

(c) A statement that the parcel or lot is not part of a larger parcel or lot that was subdivided into two or more parcels or lots after 2-19-03;

(d) A statement that the activities are not part of a plan of common development proposed by the applicant;

(e) A location map showing the relationship of the parcel or lot to existing roads and other land features that can allow a person unfamiliar with the area to locate the site. The map shall include property descriptions from the county tax assessor's office;

(f) The area (in square feet) of wetlands or other surface waters proposed to be subject to dredging, filling, and construction;

(g) A description of the efforts made to locate the on-site sewage treatment and disposal systems in the uplands, including a map depicting the location and extent of the proposed onsite sewage treatment and disposal systems in relation to existing wetlands and other surface waters on the property; and,

(h) Proof of the payment as required in subsection 62-330.476(3), F.A.C., in the form of a receipt from Palm Beach County.

(7) This general permit shall not be applicable on any parcel or lot that has been the subject of a prior filing of a notice under this section when the combination of activities to be conducted pursuant to the prior and pending notices exceeds the thresholds of this general permit. However, use of this general permit does not preclude the use of other permits or exemptions that may be applicable on the parcel or lot, except that the general permit under rule 62-330.475, F.A.C., shall not be used with this general permit.

*Rulemaking Authority 373.026, 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 2-19-03, Amended 11-3-04, Formerly 62-341.476, Amended 10-1-13.*

**62-330.477 General Permit for Single Family Residential Lots within the Indian Trail Water Control District.**

(1) A general permit is hereby granted for individual single family residential lots within the M-1 and M-2 basins of the Indian Trail Water Control District in Palm Beach County, as described in subsection (3).

(2) This general permit authorizes dredging and filling within wetlands or other surface waters on individual, single family residential lots, for the construction, alteration, maintenance, operation, abandonment, and removal of single family residences, structures associated with the residence, and other works located within the wetlands or other surface waters within the lot, provided:

(a) The individual, single family residential lot is 5 acres or less in size;

(b) The residence is not part of a larger common plan of development proposed by the applicant;

(c) The permittee offsets the adverse individual and cumulative impacts from the authorized activities, by donating $250.00 per lot to the Palm Beach County Pollution Recovery Trust Fund, established pursuant to Palm Beach County Resolution R89-576, which monies shall be applied to the purchase, restoration, or management of a minimum of 200 acres of land, including wetlands and other surface waters within Unit 11 of the Indian Trail Water Control District as described in subsection (4). The permittee must submit proof of this donation, in the form of a receipt from Palm Beach County, with the application to use this general permit;

(d) Associated structures and works authorized by this general permit shall be limited to driveways, culverts, storage sheds, garages, septic tanks and drainfields, pools, fences, gardens, and wells; and,

(e) Dredging is limited to the minimum amount necessary to obtain fill material for the residence and associated structures authorized by this general permit. Such dredged areas shall not connect to canals, ditches, swales, or other existing drainage systems within the Indian Trail Water Control District.

(3) The lands within Indian Trail Water Control District to which this general permit applies are:

(a) M-1 basin of the Indian Trail Water Control District consisting of:

1. Township 42 South Range 40 East – the south one-half (S 1/2) of Sections 13, 14 and 15; the north 135 feet of the south one-half (S 1/2) of Sections 16, 17, and 18 and all of Sections 23, 24, 25, 26, 35 and 36,

2. Township 42 South, Range 41 East – the west one-half (W 1/2) of Section 17; all of Sections 18 and 19; all of Section 20 less the northwest one-quarter (NW 1/4) of the northeast one-quarter (NE 1/4) thereof; all of Sections 21, 22, 27, 28, 29, 30 and 31; the west one-half (W 1/2) and the west one-third (W 1/3) of the east one-half (E 1/2) of Section 32, and all of Sections 33, 34 and 35,

3. Township 43 South, Range 41 East – all of Sections 2, 3, 4, 9, 10 and 11; and,

(b) M-2 basin of the Indian Trail Water Control District, consisting of Township 43 South, Range 40 East – all of Sections 10 and 11; the west three-quarters (W 3/4) of Section 13; all of Sections 14 and 15, and the west three-quarters (W 3/4) of Sections 24 and 25.

(4) Unit 11 of the Indian Trail Water Control District, consisting of Township 41 South, Range 41 East, all of Sections 30 and 31, and the west 1/2 of Sections 29 and 32.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418 FS. History–New 4-3-96, Formerly 62-341.630, Amended 10-1-13.*

### 62-330.483 General Permit to the Department and Water Management Districts to Conduct Minor Activities.

A general permit is granted to the Department and Water Management Districts to conduct the activities described below:

(1) The repair, replacement or alteration of any existing bridge, levee, dam, pump station, lock, culvert, spillway, weir, or any other water control structure with structures of the same design or of a comparable design, provided that the maximum discharge rate capacity and control elevation do not exceed that of the structure to be replaced. Minor deviations in the structure's design are authorized, including those due to changes in materials, construction techniques, or current construction codes or safety standards. Associated construction activities authorized by this permit include temporary fill plugs or cofferdams; upland bypass channels; channel shaping needed to accommodate the repair, replacement or alteration of the structure; and channel and bank stabilization, including riprap within 200 feet of the structure. Replacement may occur at the same site, or adjacent to the original structure. The area of wetlands or other surface waters from which material is to be dredged or filled shall not exceed a total of 0.5 acre for any one structure.

(2) Canal bank and bottom stabilization necessary to repair erosion damage and restore previously existing canal configurations. Authorized repair methods include placement of riprap, sand cement toe walls, clean fill material, poured concrete, geotechnical textiles or other similar stabilization materials. The distance to be restored or repaired shall not exceed 2,000 feet at any one location along canal banks and 500 feet along canal bottoms.

(3) Aerial pipeline crossings (including support piles) of man-made canals consistent with the provisions of rule 62-330.455, F.A.C., except that the width of the crossing may be up to 200 feet.

(4) When the activity under this general permit is to be conducted by the Department, the Department shall provide the notice and any processing fee required to the appropriate District.

(5) When the activity under this general permit is to be conducted by a water management district, the District shall provide the notice and any required fee to the appropriate Department office.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.483, Amended 10-1-13.*

### 62-330.485 General Permit to the Department and Water Management Districts for Environmental Restoration or Enhancement.

(1) A general permit is granted to the Department and Districts for the construction, alteration, operation, maintenance, removal and abandonment of projects to implement Department or District environmental restoration or enhancement projects.

(2) The environmental restoration or enhancement project must comply with any one of the following procedures:

(a) The project is part of a Surface Water Improvement and Management Plan developed pursuant to section 373.453, F.S.; or

(b) The project is approved by the District Governing Board or the Secretary of the Department after conducting at least one public meeting; or

(c) The project is wholly or partially funded through the Land Acquisition Trust Fund pursuant to Article X, Section 28 of the Florida Constitution, or through any successor trust fund.

(3) When the activity is to be conducted by the Department, the Department shall provide the notice and any processing fee required by rule 62-330.071, F.A.C., to the appropriate District.

(4) When the activity is to be conducted by a District, the District shall provide the notice and any required fee to the appropriate Department office.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented*

*373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.485, Amended 10-1-13, 6-1-18.*

**62-330.487 General Permit to the Department and Water Management Districts to Change Operating Schedules for Water Control Structures.**

(1) A general permit is granted to the Department and Districts to change the operating schedules for existing water control structures that are owned or operated by the Department or District when such changes are for environmental restoration or enhancement.

(2) The Department or the District Governing Board, as applicable, shall hold at least one public meeting concerning the proposed operating schedule prior to its approval.

(3) When the activity under this general permit is to be conducted by the Department, the Department shall provide the notice to the appropriate District.

(4) When the activity under this general permit is to be conducted by a District, the District shall provide the notice to the appropriate Department office.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Amended 10-1-07, Formerly 62-341.487, Amended 10-1-13.*

**62-330.488 General Permit to Governmental Entities for Certain Public Use Facilities at Public Natural Areas.**

(1) A general permit is granted to governmental entities to construct, operate, and maintain public use facilities on public natural areas. For purposes of this rule, "public natural areas" are predominantly undeveloped lands owned by the governmental entity and that are dedicated and managed for the preservation, restoration and maintenance of those lands. The public use facilities authorized by this permit are a parking lot or parking area and an at-grade access road, not to exceed a total size of 2 acres of impervious surface located entirely in uplands; at-grade access trails located entirely in uplands; restroom buildings and open-air shelters located entirely in uplands; pile-supported boardwalks having a maximum width of 6 feet; and pile-supported observation platforms, any of which shall not exceed 120 square feet in size.

(2) The facilities and work must comply with the following:

(a) No fill shall be placed in, on, or over wetlands or other surface waters, except pilings for pile-supported boardwalks and observation platforms. All structures located in, on, or over wetlands and other surface waters shall be sited and constructed to minimize wetland impacts and the removal of trees having a diameter at breast height of 4 inches or greater. To minimize shading of wetland vegetation, all pile-supported boardwalks and observation platforms located in, on, or over wetlands and other surface waters shall be elevated at least two feet above mean high water for tidal waters, at least two feet above seasonal high water for non-tidal waters, or four feet above ground surface, whichever is greater. The total area pile-supported structures over wetlands and other surface waters shall not exceed 10,000 square feet.

(b) All stormwater flow from the impervious surfaces shall sheet flow into uplands. Impervious surfaces shall be no more than one percent of the total acreage of the public natural area, not to exceed a total size of 2 acres of impervious surface. If pervious or semi-impervious surfaces or materials are used, the maximum area of roads, parking lots, parking areas and trails shall not exceed 2 acres, regardless of the total acreage of the public natural area. Water quality treatment shall be provided for the first inch of runoff from the impervious and semi-impervious surfaces.

(c) Impervious surfaces subject to vehicular traffic shall be constructed a minimum of 75 feet from any wetland or other surface water. Buildings and shelters shall be constructed a minimum of 25 feet away from any wetland or other surface water.

(d) Piling supported structures may not be located over coral, seagrasses or other submerged aquatic vegetation.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 403.814(1) FS. History–New 10-1-13.*

**62-330.490 General Permit for the Reclamation of Eligible Phosphate Lands Mined Before July 1, 1975.**

(1) A general permit is granted to all owners of lands mined or disturbed by the severance of phosphate before July 1, 1975, whose reclamation program application has been approved by the Department under chapter 378, part I, F.S., providing the reclamation program:

(a) Is wholly or partially funded by the Department through the Non-mandatory Land Reclamation Trust Fund pursuant to chapter 378, part I, F.S.; and,

(b) Has an approved detailed non-mandatory land reclamation design plan that meets the standards and criteria in chapter 62C-17, F.A.C.

(2) All work shall be in accordance with the approved non-mandatory land reclamation program and all provisions of chapter 62C-17, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.4145, 373.416, 373.418, 378.034, 378.035, 403.814(1) FS. History–New 10-1-13.*

**62-330.491 Noticed General Permit for Raising the Height of Existing Earthen Embankments for Impoundments at Facilities for Mining Sand and Limestone.**

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118, 373.406(5), 373.413, 373.414(9), 373.416, 373.418, 373.426 FS. History–New 9-4-05, Formerly 62-341.491, Repealed 10-1-13.*

**62-330.492 General Permit for Prospecting for Limestone, Sand, and Peat.**
A general permit is granted for prospecting for limestone, sand, and peat provided that all of the following conditions are met:

(1) Prospecting is conducted by coring, augering, impact boring or other techniques designed to remove samples from an excavated opening less than one foot in diameter.

(2) No prospecting is conducted below the ordinary or mean high water line of natural water bodies such as natural lakes, ponds, streams, rivers, estuaries or lagoons.

(3) Prospecting in wetlands must meet the following conditions:

(a) No activities shall be conducted in Outstanding Florida Waters, Aquatic Preserves, Class I waters, Class II waters, waters which are classified by the Florida Department of Agriculture and Consumer Services as approved, restricted, conditionally approved or conditionally restricted for shellfish harvesting in rule 5L-1.003, F.A.C., or wetlands used by endangered or threatened species. For purposes of this permit, a wetland is used by endangered or threatened species if reasonable scientific judgment indicates that the wetland provides habitat in which endangered or threatened species engage in activities such as resting, feeding, breeding, nesting or denning.

(b) No above-grade roads shall be constructed. Vehicles used for prospecting in wetlands shall be of a type generating minimum ground pressure to minimize rutting and other environmental impacts. Disturbed areas along each prospecting line shall be restored to original contours upon completion of prospecting activities along that specific alignment.

(c) Disturbances within wetlands shall be no wider than 15 feet along any portion of the prospect line, except at the immediate site of the drill hole. At the immediate site of the drill hole the disturbance shall not exceed 25 feet. No debris or spoil shall be placed outside these limits.

(d) Prospecting lines shall be aligned to minimize wetland impacts and avoid the clearing of wetland trees having 4 inches or greater diameter at breast height to the greatest extent practicable.

(e) All drill tailings shall be returned to the drill hole and the excess removed so that no spoil material is left above grade in a wetland.

(f) If the removal or cutting of vegetation is required, there shall be a minimum interval of 300 feet between individual parallel prospecting lines. The removal of vegetation shall not include grubbing, or the pulling or pushing up of root systems.

(g) Any wetland disturbed by prospecting activities shall be restored by replanting native indigenous vegetation of the same species as were displaced. Exotic species such as Schinus terebinthifolius, Melaleuca quinquenervia, and Casuarina spp., and nuisance species Typha spp., and Ludwigia peruviana shall be controlled at densities not exceeding the densities of these species in undisturbed portions of the wetland.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118, 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 9-4-05, Formerly 62-341.492, Amended 10-1-13.*

**62-330.493 General Permit to Perform Prospecting Activities for Phosphate Minerals.**

(1) A general permit is provided for any person engaged in or proposing to engage in the mining of phosphatic ore to perform prospecting activities for phosphate minerals within wetlands and other surface waters except in Outstanding Florida Waters, Aquatic Preserves, Outstanding National Resource Waters, Class I waters, Class II waters, or waters approved, conditionally approved, restricted, or conditionally restricted by the Department of Agriculture and Consumer Services for shellfish harvesting, provided:

(a) "Prospecting activities" shall be defined as those normal and reasonably necessary to retrieve core samples of subsurface geologic sediments for the specific purpose of locating, mapping and determining the quantities and quality of any phosphorus bearing strata or deposits;

(b) Disturbance along any portion of the prospect line within herbaceous wetlands shall be no wider than 25 feet, no wider than 15 feet within forested wetlands, except at the immediate site of the drill hole, where disturbance shall not exceed 25 feet in width and no activities regulated by the Department associated with prospecting shall occur outside the 15-foot and 25-foot limits, respectively;

(c) An individual prospecting line shall not extend into wetlands or other surface waters more than one-third (1/3) of the width of the landward extent of the wetland or other surface waters involved, unless prospecting is conducted by hand carried drilling devices, in which case full penetration of the wetland or other surface waters shall be allowed, except as restricted by paragraph (1)(e), below. When hand carried drilling devices are used all drilling tailings shall be returned to the drill hole and no spoil shall be left on the surface;

(d) No prospecting activities shall occur in open waters (areas of water bodies not supporting emergent vegetation), such as lakes, ponds, streams, and rivers;

(e) A minimum interval of 300 feet shall exist between individual parallel prospecting lines and minimal distance of 300 feet shall be maintained between the alignment of the prospecting line or lines and opposing sides of wetlands and other surface waters. When hand carried drilling devices are to be used for total penetration of the wetland or other surface waters, the minimal interval of 300 feet between prospecting lines shall apply;

(f) No debris or spoil shall be mechanically placed outside of the 15-foot or 25-foot width allowed, respectively, above; and,

(g) The disturbed area along each prospecting line within herbaceous wetlands shall be replanted with native wetland species that are indigenous to adjoining wetlands unless evidence exists that natural revegetation has covered 33 percent of the disturbed ground area within one growing season. If herbaceous plants are planted, they shall be planted at a density to achieve 33 percent cover by herbaceous wetland species within one growing season. The disturbed area along each prospecting line within forested wetlands shall be replanted with indigenous native wetland tree species at a rate to achieve survival and growth of 400 trees per acre, and the permittee shall institute maintenance activities to ensure the survival of the planted indigenous native wetland trees. The disturbed area along each prospecting line within forested wetlands also shall be replanted with indigenous native wetland herbaceous species in the same manner as for the herbaceous wetlands described above. The restored sites shall be maintained free of any new growth of *Schinus terebinthifolius* (Brazilian pepper), *Melaleuca quinquenervia* (punk tree), and *Casuarina* spp. (Australian pine), and managed so that *Typha* spp. (cattails) does not attain vegetative dominance.

(2) A person wishing to use this general permit shall submit to the Department an annual schedule of proposed prospecting activities within the prospect areas including location maps, aerial photographs showing the proposed prospecting lines, and approximate commencement and completion dates for the activities planned for each prospect area. The annual schedule, or modifications to the annual schedule, must be submitted at least 30 days prior to the commencement of the proposed activity. Where practicable, the annual schedule should be filed with the Department no later than June 1 for the fiscal year July 1 through June 30.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.610, Amended 10-1-13, 6-1-18.*

**62-330.494 General Permit for Temporary Dragline Crossings of Waterways for Mining Activities.**

(1) A general permit is provided for any person engaged in or proposing to engage in the mining of a phosphatic ore for the construction of temporary dragline crossings within certain wetlands and other surface waters, except in Outstanding Florida Waters, Aquatic Preserves, Outstanding National Resource Waters, Class I waters, Class II waters, or waters approved, conditionally approved, restricted, or conditionally restricted by the Department for shellfish harvesting, provided:

(a) The crossing is of a ditch or artificially channelized portion of any wetland or other surface water or at a documented

location of a previously existing dragline crossing within the preceding five years, of any wetland or other surface water, and is not a navigable surface waterbody. The term navigable, for the purpose of this permit, means the surface waterbody is capable of use by small craft;

(b) Only clean sand fill or temporary mats shall be used to construct the crossing;

(c) When demucking or removal of topsoil is necessary for the construction of the crossing, the muck and topsoil shall be retained at a nearby upland location and returned to the crossing site for the restoration activities;

(d) Culverts are installed to maintain the natural and seasonal volume and flow of water;

(e) The top width of the fill shall not exceed 150 feet and the toe to toe width of the fill shall not exceed 200 feet and the side slopes shall be no steeper than three horizontal to one vertical, and the lateral limits of disturbance of the wetlands shall be no more than 20 feet on each side of the fill;

(f) The crossing shall not remain in place for more than one year, unless the crossing is for a one-way access in which case it shall not remain in place for more than six months; and,

(g) The area must be restored to original topographic contours within 60 days of the abandonment of the dragline crossing, which shall be after the dragline has crossed the wetland or other surface water.

(2) This general permit shall be subject to the following specific conditions:

(a) Upon restoration of original topographic contours at a temporary dragline crossing site, the permittee shall at the end of the first growing season provide the opportunity for inspection of the site by staff of the Department office that received notice of the general permit. If satisfactory revegetation of the site has not occurred, the permittee shall initiate, conduct and maintain revegetation and maintenance of the wetland until satisfactory revegetation has been achieved. Revegetation of the site shall be with native wetland species in similar composition to those species which were present at the site or in the contiguous wetland prior to the temporary dragline crossing. For the purpose of this general permit, "satisfactory revegetation" means that the herbaceous wetlands that are disturbed under this general permit shall have achieved not less than 33 percent cover of planted or naturally reestablished herbaceous wetland species within one growing season following disturbance of the site, and the forested wetlands that are disturbed under this general permit shall be achieving a survival and growth of not less than 400 wetland trees per acre within one growing season following disturbance of the site, and a maintenance plan has been developed and is being implemented to ensure the survival of the planted or naturally reestablishing wetland species. The restored sites shall be maintained free of any new growth of *Schinus terebinthifolius* (Brazilian pepper), *Melaleuca quinquenervia* (punk tree), and *Casuarina* spp. (Australian pine). The restored site shall also be managed in a manner which precludes *Typha* spp. (cattails) from manifesting vegetative dominance; and,

(b) A person wishing to use this general permit shall submit to the Department office to which the original notice was given, an annual schedule of proposed temporary dragline crossing areas including location maps, aerial photographs with proposed temporary dragline crossings, typical drawings, and approximate commencement and completion dates for the activities planned. Additionally, the plans shall include proposed restoration procedures for each temporary dragline crossing. The annual schedule, or modifications to the annual schedule, must be submitted, together with the required documentation, at least thirty days prior to the commencement of the proposed activity. Where practicable, the annual schedule and documentation should be filed with the Department no later than June 1 for the fiscal year July 1 through June 30.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.611, Amended 10-1-13.*

**62-330.495 General Permit for Low Water Crossings for Mining Activities.**

(1) A general permit is provided for any person engaged in or proposing to engage in the mining of a mineralized non-metallic ore to move equipment and vehicles, excluding dredges, through and across wetlands or other surface waters during periods of low water, except in Outstanding Florida Waters, Aquatic Preserves, Outstanding National Resource Waters, Class I waters, Class II waters, or waters approved, conditionally approved, restricted, or conditionally restricted by the Department of Agriculture and Consumer Services for shellfish harvesting, provided:

(a) The only dredging or filling performed shall be that caused by the movement of the vehicle or equipment through the water;

(b) The maximum water depth along the crossing shall not exceed two feet during the time the crossing is used;

(c) Vegetative debris shall not be deposited within wetlands and other surface waters;

(d) The lateral width of disturbance shall in no case exceed that necessary to move the vehicles and equipment through and

across wetlands or other surface waters and shall in no case be greater than 50 feet; and,

(e) The distance between crossings of an individual wetland or other surface waters shall be at least 5,000 feet, except at sites where a documented four-wheel vehicular access exists, in which case crossings may be at a spacing of 2,500 feet.

(2) This general permit shall be subject to the specific conditions as follows:

(a) The person wishing to use this general permit shall locate crossings at sites that will cause the least environmental impact. The permittee shall coordinate with the appropriate Department office.

(b) Upon restoration of an individual low water crossing site, the permittee shall at the end of the first growing season provide the opportunity for inspection of the site by the appropriate Department office staff. If satisfactory revegetation for the site has not occurred, the permittee shall initiate, conduct and maintain revegetation of the wetland. For the purpose of this general permit, "satisfactory revegetation" means that the herbaceous wetlands that are disturbed under this general permit shall have achieved not less than 33 percent cover of planted or naturally reestablished herbaceous wetland species within one growing season following disturbance of the site, and the forested wetlands that are disturbed under this general permit shall be achieving a survival and growth of not less than 400 wetland trees per acre within one growing season following disturbance of the site, and a maintenance plan has been developed and is being implemented to ensure the survival of the planted or naturally reestablishing wetland species. The restored sites shall be maintained free of any new growth of *Schinus terebinthifolius* (Brazilian pepper), *Melaleuca quinquenervia* (punk tree), and *Casuarina* spp. (Australian pine). The restored site shall also be managed in a manner which precludes *Typha* spp. (cattails) from manifesting vegetative dominance. Revegetation of the site shall be with native wetland species in similar composition to those species which were present at the site or in the contiguous wetland prior to the low water crossing; and,

(c) A person wishing to use this general permit shall submit to the appropriate Department office, an annual schedule of proposed low water crossing sites including location maps, aerial photographs with proposed low water crossing sites, typical drawings, and approximate commencement and completion dates for the activities planned. Additionally, the plans shall include proposed restoration procedures for each low water crossing. The annual schedule, or modifications to the annual schedule, must be submitted, together with the required documentation, at least 30 days prior to the commencement of the proposed activity. The annual schedule and documentation shall be filed with the Department no later than June 1 for the fiscal year July 1 through June 30.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.612, Amended 10-1-13.*

**62-330.496 General Permit for Dry Borrow Pits of Less than Five Acres.**

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426 FS. History–New 10-1-13, Repealed 6-1-18.*

**62-330.500 General Permit for Construction, Operation, Maintenance, Alteration, Abandonment or Removal of Minor Silvicultural Surface Water Management Systems.**

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118, 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.426 FS. History–New 9-4-05, Formerly 62-341.500, Repealed 10-1-13.*

**62-330.501 General Permit for Temporary Agricultural Activities within the South Florida Water Management District.**

(1) A general permit is granted to any property owner for temporary agricultural activities within the South Florida Water Management District, provided all the following criteria are met.

(a) Agricultural activities shall be horticultural and limited to seasonal crops. Seasonal crops are harvested in one growing season, which shall not exceed one year.

(b) This permit is valid only for activities in existing improved or semi-improved pastures or fields that have been cultivated within the last five years. For purposes of this section, improved or semi-improved pastures are lands that have been cleared of native plants by mechanical means.

(c) For purposes of this section, the project area and scope is defined as both farmed and detention areas. In order to qualify for a permit under this section, the project area shall not exceed 320 contiguous acres.

(d) The project outfall structure must be located more than 1 mile from Outstanding Florida Waters.

(e) No works or farming activities shall occur within 50 feet of a wetland as defined in section 373.019(27), F.S. If wetlands are located within the project area, a minimum 50-foot undisturbed buffer must be maintained around the wetland.

(f) Pump rates shall not exceed a volume of 2 inches per day at a rate of 37.7 gallons per minute per acre of farmed area. Pump on/off elevations shall be within 2.5 feet of natural ground within the farmed area. All surface water discharges shall be into detention areas.

(g) Water levels in the detention areas shall not exceed a depth of 1.5 feet above natural ground within the detention area.

(h) Water quality and attenuation requirements shall be met by establishing detention areas at a minimum of fifteen percent of the farmed area.

(i) If wetlands are located within a detention area, then the control elevation of the detention area shall be set at the wetland edge elevation. If no wetlands are located within a detention area, then the control elevation shall be set at natural ground elevation.

(j) Control structures shall be sized according to the following list depending on the project size.

| Project Size | Control Structure |
| --- | --- |
| 0-25 acres | 6" riser and 12" pipe equivalent |
| 26-65 acres | 12" riser and 12" pipe equivalent |
| 66-105 acres | 18" riser and 18" pipe equivalent |
| 106-145 acres | 24" riser and 24" pipe equivalent |
| 146-185 acres | 30" riser and 30" pipe equivalent |
| 186-225 acres | 36" riser and 36" pipe equivalent |
| 226-265 acres | 42" riser and 42" pipe equivalent |
| 266-305 acres | 48" riser and 48" pipe equivalent |
| 306-320 acres | 54" riser and 54" pipe equivalent |

(k) The minimum setback between the project edge and the property boundary line shall be 50 feet for all projects.

(l) Discharges shall be to the existing pre-project surface water conveyance pathway. Existing sheetflow, if any, shall be maintained through the use of a spreader swale.

(m) Detention area dikes shall be constructed with a top elevation of 3.5 feet above the control elevation with a minimum 5 foot top width and side slopes of two horizontal to one vertical.

(n) Internal farm ditches shall be no deeper than 3 feet below natural ground elevation (excluding sump areas for pump placement which shall not be deeper than 6 feet below natural ground elevation).

(o) External perimeter berms of the farmed areas shall not exceed 2 feet in height.

(p) Farming areas must be laid out in a manner that will not block or impede off-site flows.

(q) Access to the fields shall be accomplished by existing roads. Roads into or on the project are not part of this authorization.

(2) The entity must submit a best management plan that addresses sediment control, soil erosion, nutrients, pesticides, herbicides, suspended solids at points of discharge and other agricultural practices appropriate to crop and site conditions. At a minimum the best management plan must include the following best management practices.

(a) Application equipment shall be properly calibrated and in good repair.

(b) Pesticides and fertilizers shall be stored in a secure, contained location, protected from rainfall. Fertilizers and pesticides shall not be stored together.

(c) All mixing and loading operations shall be conducted away from wells, ditches and wetlands.

(d) Pesticide containers shall be rinsed as soon as they are empty. Containers shall be disposed of in accordance with directions on the label.

(e) Equipment shall be used that directs chemicals only to a designated target area. Overspray or application into ditches and wetland buffer areas shall be avoided.

(f) Spills shall be cleaned up as soon as possible.

(g) Equipment shall be cleaned and rinsed away from ditches and wetland buffers.

(h) A soil or leaf analysis shall be used to determine fertilizer application requirements.

(i) Apply seed and mulch or use other methods to stabilize the disturbed areas outside of the planted area within 14 days from

the completion of planting.

(j) Install silt fences around wetland buffer areas prior to construction.

(k) Install silt fences, hay bales or equivalent downstream of outfall structure during construction.

(3) The duration of this permit shall not exceed three years. No more than two years of the permit duration shall be dedicated to the planting and harvesting of crops. The remainder of the duration of the permit must be dedicated to fallow time. At the end of the growing season specified in the permit, all works shall be removed from the site and the site returned to the condition that existed prior to permit issuance. The site shall remain fallow the following year. Within 30 days of the permit expiration, the permittee shall provide written notification to the South Florida Water Management District that the project has been restored to conditions that existed prior to permit issuance.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.4131 FS. Law Implemented 120.60, 373.118, 373.119, 373.413, 373.4131, 373.416, 373.418, 373.423 FS. History–New 10-1-13.*

**62-330.505 General Permit to the U.S. Forest Service for Minor Works within National Forests.**

(1) A general permit is granted to the U.S. Forest Service to conduct the works described below:

(a) Bathing beach restoration at developed recreation sites where maintenance dredging is less than 100 cubic yards per year and less than 100 cubic yards per single occurrence; and,

(b) Dock construction, replacement and maintenance for docks of up to 1,000 square feet of surface area over wetlands and other surface waters in Outstanding Florida Waters and Outstanding National Resource Waters, subject to restrictions listed in sections 403.813(1)(b) and (d), F.S.

(2) The U.S. Forest Service or its contractors shall use turbidity control measures while dredging or filling within wetlands and other surface water to prevent violations of state water quality standards.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.495, Amended 10-1-13.*

**62-330.550 General Permit for Construction, Operation and Maintenance of Nonproduction-related Agricultural Facilities.**

(1) A general permit is granted for the construction, operation, maintenance, alteration, or abandonment of minor systems serving any of the following, provided the activities comply with all of the conditions set forth below.

(a) Seasonal or year-round stands and markets selling exclusively or primarily produce and other farm or nursery products grown onsite.

(b) Farm worker housing and ancillary facilities.

(c) Truck loading and staging areas for transporting farm or nursery products grown onsite.

(d) Nonresidential farm buildings and structures used solely for agricultural purposes and located on a farm or on land that is an integral part of an ongoing farm operation.

(e) Roadway and vehicle parking facilities integral to an activity authorized under this general permit.

(2) This general permit is subject to the following limitations:

(a) Total cumulative building, driveway, parking lot, and other impervious and semi-impervious surfaces will not exceed 20 percent of the total land area, up to four acres. This limitation excludes impervious and semi-impervious areas directly related to agricultural production.

(b) No activities will occur in, on or over wetlands or other surface waters.

(c) The activities will not use new surface water drainage facilities larger than one 24-inch diameter pipe or its hydraulic equivalent.

(d) The activities will not use new drainage pumps or other operable structures for stormwater management.

(e) Finished building floors for residential structures will be above the 100-year flood elevation.

(f) All discharge and project runoff locations, excluding runoff from access driveways, will maintain a minimum 75-foot vegetated buffer. This vegetated buffer must include a 25-foot perpetually undisturbed buffer, upland of any wetlands, other surface waters, and drainage ditches.

(g) Impervious and semi-impervious surfaces, excluding access driveways, will maintain a 25-foot vegetated buffer from property boundaries.

(h) Permitted activities are not conducted within the geographic limits of an existing permit issued under part IV of chapter 373, F.S.

(3) This general permit is not available if the proposed activities, considered separately or in combination with other activities conducted under this permit, exceed or will exceed any of the limitations in subsection (2), above.

(4) The activities undertaken using this permit shall be taken into account in determining the post-development conditions for any subsequent exemption or permitting decision that includes the same project area.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.4131 FS. Law Implemented 373.413, 373.4131, 373.414, 373.416, 373.419 FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.600 General Permit for the Construction of Artificial Reefs.**

(1) A general permit is provided for the construction of an artificial reef by any person, provided:

(a) The material to be used shall be clean concrete or rock, clean steel boat hulls, other clean, heavy gauge steel products with a thickness of 1/4 inch or greater, and prefabricated structures that are a mixture of clean concrete and heavy gauge steel;

(b) The material shall be free of soils, oils and greases, debris, litter, putrescible substances or other pollutants;

(c) The material shall be firmly anchored to the bottom and shall not be indiscriminately dumped; and,

(d) The material shall be placed so that the top of the reef does not exceed 1/2 the distance from the bottom to the surface of the water unless a greater distance from the surface is required for safe navigation. At no time shall the distance between the top of the reef and the surface of the water be less than 6 feet.

(2) This general permit shall be subject to the following specific conditions:

(a) The permittee shall conduct a survey of the bottom of the waterbody on which the reef is to be built and shall submit the survey to the Agency with the notice required in rule 62-330.402, F.A.C., demonstrating that the bottom does not have submerged grassbed communities, shellfish or other hardbottom communities, or corals;

(b) There shall be no reefs constructed in bays, lagoons, or estuaries that are less than 12 feet deep;

(c) There shall be no "white goods" (inoperative and discarded refrigerators, freezers, ranges, water heaters, washers, and other similar domestic and commercial appliances), asphalt material, tires, other polluting materials used in construction of the reef;

(d) The site shall be marked with perimeter buoys during construction to ensure that no material is deposited outside of the site;

(e) The size of the boundaries within which the artificial reef is to be deposited shall not exceed 1/4 nautical mile on any side;

(f) The artificial reef site shall not be established within any shipping lanes; and,

(g) The permittee shall notify the National Ocean Service, National Oceanic and Atmospheric Administration, U.S. Department of Commerce, Rockville, Maryland, and the Florida Fish and Wildlife Conservation Commission (FWC), Division of Marine Fisheries Management, via email at artificialreefdeployments@myfwc.com of the precise location of the reef within 30 days of placement of the reef material.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.600, Amended 10-1-13.*

**62-330.602 General Permit for Installation and Maintenance of Intake and Discharge Pipes Associated with Marine Bivalve Facilities.**

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.416, 373.418, 403.814(1) FS. History–New 10-3-95, Formerly 62-341.602, Amended 10-1-13, Repealed 11-26-15.*

**62-330.630 General Permit to U.S. Army Corps of Engineers for Environmental Restoration or Enhancement Activities.**

(1) A general permit is granted to the U.S. Army Corps of Engineers for the construction, alteration, operation, and maintenance of systems to implement environmental restoration or enhancement projects. In order to qualify for this general permit, the decision documents for the environmental restoration or enhancement activity must have been coordinated through the process described in Section III of the *Interagency Coordination Agreement for Civil Works Projects, Florida Department of Environmental Protection, United States Army Corps of Engineers Jacksonville District, United States Army Corps of Engineers Mobile District* (February 28, 2006), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03128). Copies of incorporated

material may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. In addition, the environmental restoration or enhancement activity must be funded or conducted by the U.S. Army Corps of Engineers, and be authorized under the following documents, which are incorporated by reference herein:

(a) Section 204 of the Water Resources Development Act (WRDA) of 1992, as amended through January 24, 2002 (Beneficial Uses of Dredged Material), and any subsequent amendment by a WRDA through June 1, 2018, (https://www.flrules.org/Gateway/reference.asp?No=Ref-03224);

(b) Section 206 of the Water Resources Development Act of 1996, as amended through January 24, 2002 (Aquatic Ecosystem Restoration), as amended by a WRDA through June 1, 2018 (https://www.flrules.org/Gateway/reference.asp?No=Ref-03225);

(c) Section 1135 of the Water Resources Development Act of 1986, as amended through January 24, 2002 (Project Modifications for Improvement of the Environment), as amended by a WRDA through June 1, 2018, (https://www.flrules.org/Gateway/reference.asp?No=Ref-03226).

(d) Section 101(8) of WRDA 1992 (Kissimmee River Restoration), as amended by a WRDA through June 1, 2018, (http://www.flrules.org/Gateway/reference.asp?No=Ref-03130); or

(e) The Army Corps Federal portion of any project approved as part of the "Estuaries and Clean Waters Act of 2000" (Title I, PL 106-457) (ERA), Sections 102(3), 104(a), and 110(b) and amended by Section 5017 of WRDA 2007, and any subsequent amendment by a WRDA through June 1, 2018, (https://www.flrules.org/Gateway/reference.asp?No=Ref-02600).

(2) The following shall not be eligible for this general permit; copies of the materials incorporated by reference below may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.:

(a) Activities on the sandy beaches of Florida fronting the Atlantic Ocean, the Gulf of Mexico or the Straits of Florida that extend seaward of the mean high water line, including beach restoration, nourishment, disposal of dredged material, beach or inlet structures, or excavation;

(b) Activities proposed to implement mitigation for another activity that requires a permit under part IV of chapter 373, F.S., a water quality certification, or coastal zone consistency concurrence;

(c) Activities that involve replacing a natural biological community type with a different type of biological community, such as filling bay bottom to create a marsh, except:

1. To restore or enhance a community that was previously damaged or destroyed by human activities, such as filling a dredged channel to the elevations and community types that existed before dredging; or

2. To restore or enhance a community type that was previously existing, but has been lost through avulsion when it is determined to be in the public interest; or

3. To reduce or eliminate populations of exotic and nuisance species with the goal of enabling replacement by natural, endemic communities;

(d) Activities that adversely affect animal species that are listed as endangered, threatened or of special concern and endangered or threatened plant species when such plants are located in a wetland or other surface water;

(e) Activities that would adversely affect historic properties listed in or eligible for listing in the National Register of Historic Places under the provisions of section 267.061, F.S.;

(f) Activities requiring a permit under section 373.1502, F.S., or authorized under Section 528 of the Water Resources Development Act of 1996, Public Law 104-303 (Critical Restoration Projects), October 12, 1996, which is incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02602);

(g) Activities authorized under Section 101(8) of the Water Resources Development Act of 1992, Public Law 102-580, (October 31, 1992), which is incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-03127); or

(h) Activities conducted in association with Everglades or Lake Okeechobee restoration.

(3) Prior to submittal of the notice to the agency to use this general permit as required and described in paragraph (5)(a), below, the environmental restoration or enhancement activity must be included in a Feasibility Report, Reevaluation Report, Letter Report or other equivalent federal environmental decision document that has been reviewed by the state of Florida. Documentation that the state has found the environmental restoration or enhancement activity to be consistent with the Florida Coastal Management Program must be submitted with the notice to use this general permit. It is not necessary that the report types cited above be considered final or approved by the Corps.

(4) Activities under this general permit are subject to the following additional provisions and limitations. The activities:

(a) Shall not be available for use as future mitigation credit for a separate activity that requires a permit under part IV of chapter

373, F.S., a water quality certification, or a coastal zone consistency concurrence;

(b) Must be conducted in a manner that will not adversely affect the value of functions provided to fish and wildlife by wetlands or other surface waters;

(c) Must not cause adverse flooding to onsite or off-site property, adverse impacts to existing surface water storage or conveyance capabilities, adverse secondary impacts to the water resources, adverse impacts to the maintenance of surface or ground water levels or surface water flows established pursuant to section 373.042, F.S., adverse impacts to a Works of the District established pursuant to section 373.086, F.S., or adverse effects to properties outside the area to be enhanced or restored;

(d) Must be capable, based on generally accepted engineering and scientific principles, of being performed and of functioning as proposed, and must comply with any applicable special basin and geographic area criteria established in chapter 40C-41 or 40E-41, F.A.C., both of which are incorporated by reference in paragraph 62-330.301(1)(k), F.A.C.; and

(e) Must not be for the primary purpose of providing or enhancing recreation or other public uses of the lands that are enhanced or restored under this general permit, although such areas are not prohibited from being made available for compatible public recreation activities. However, the construction, alteration, operation, removal, maintenance, or abandonment of public recreational facilities, such as parking lots, roads, trails, boardwalks, docks, piers, observation decks, kiosks, and visitor's centers, or any project serving those facilities, are not authorized under this general permit, and must be authorized in accordance with part IV of chapter 373, and chapters 253 and 258, F.S., prior to their construction and use.

(5)(a) The notice required in rule 62-330.402, F.A.C., shall be supplemented with:

1. A copy of the Coastal Zone Consistency Concurrence documentation referenced in subsection (3), above;

2. Documentation of the approved federal authorization under which funding is expected;

3. Copies of the environmental documents that have been developed as part of the early coordination process described in Section III of the *Interagency Coordination Agreement for Civil Works Projects, Florida Department of Environmental Protection, United States Army Corps of Engineers Jacksonville District, United States Army Corps of Engineers Mobile District,* dated February 28, 2006, incorporated by reference in subsection (1), above; and

4. Should the Corps' contractors propose to use flocculating agents such as polymers or alum to consolidate sediments or to otherwise prevent potential water quality violations associated with the project design, the Corps shall coordinate with the Agency in advance of submittal of the notice to use this general permit, and shall submit with the notice reasonable assurance that use of such flocculating agents is not likely to cause chronic or acute toxicity in violation of chapter 62-302, F.A.C., as tested using, at a minimum, elutriate analysis on the specific sediments dredged from or deposited at the project site that require treatment.

5. Should the Corps' contractors identify that a mixing zone for turbidity is required to prevent potential water quality violations associated with the project, the Corps shall coordinate with the Agency in advance of submittal of the notice to use this general permit to discuss the methods proposed that will provide reasonable assurance that there will be no violation of the turbidity standards in chapter 62-302, F.A.C., and, as applicable in rule 62-4.242, F.A.C., outside of the limits established in subsection 62-4.244(5), F.A.C. When the Agency determines that such mixing zone will not cause adverse impacts to the water resources, the Corps will include in the notice to use this general permit a specific request for such a mixing zone and the methods that will be used to comply with its limitations. Projects that require a mixing zone in excess of that allowed under subsection 62-4.244(5), F.A.C., shall not qualify for this general permit.

(b) The Department will provide written notification to the U.S. Army Corps of Engineers whether the proposed activity qualifies for this general permit within 30 days of submittal of the written notice, or 30 days after submittal of any errors or omissions needed to correct the notice, as provided in rule 62-330.402, F.A.C. The proposed activity shall not commence until the Department has provided affirmative, written confirmation that the proposed activity qualifies for this general permit.

*Rulemaking Authority 373.026, 373.043, 373.044, 373.118, 373.406, 373.4131, 373.414(9) FS. Law Implemented 373.026, 373.043, 373.046, 373.118, 373.403, 373.413, 373.4131, 373.414(9), 373.416, 373.418, 373.419, 373.422, 373.423, 373.426, 403.814(1) FS. History–New 12-5-06, Formerly 62-341.486, Amended 10-1-13, 6-1-18.*

**62-330.631 General Permit to Governmental Entities for Limited Environmental Restoration or Enhancement Activities.**

(1) A general permit is granted to governmental entities to construct, operate, alter, or maintain projects for environmental restoration or enhancement, subject to the limitations and conditions of this section. For purposes of this rule, "environmental restoration and enhancement" means activities conducted to improve the habitat value of wetlands or surface waters for fish and wildlife by eliminating harmful drainage, improving water quality, preventing erosion, stabilizing eroding shorelines, planting

wetland vegetation, removing spoil, removing exotic and nuisance vegetation, providing structural habitat, and restoring dredged holes to elevations before they were dredged. The following activities are authorized:

(a) Restoration of an eroding shoreline or the enhancement of a disturbed or altered shoreline by planting appropriate native vegetation in accordance with the following:

1. Preparing grades and contours for planting with no net addition or removal of material.

2. Plantings shall consist of native wetland plant species obtained from commercially-grown stock that is native to the geographic area of the project.

3. All invasive and exotic plant species that occur along the shoreline within the project area are removed in conjunction with the planting.

4. If temporary wave attenuation is needed to protect and ensure survivability of the plantings, turbidity curtains shall be installed and maintained immediately waterward of, and parallel to, the planting area, but must be removed within three months after completion of planting.

5. If permanent wave attenuation is required to maintain shoreline vegetation, an oyster reef or riprap breakwater is authorized to be constructed within tidal waters concurrent with the planting, provided that:

a. The breakwater shall not impede navigation or create a navigational hazard. The outer edge of the breakwater shall be located no more than 15 feet waterward of the mean high water line and have a top height of one foot or less above the mean high water elevation.

b. The breakwater shall be composed of riprap or natural oyster shell cultch such as clean oyster shell and fossilized oyster shell, or combination thereof. Oyster shell shall be packaged within biodegradable bags (e.g., coir fiber) or mesh bags, or securely attached to matting prior to placement in the water to prevent movement of shell out of the project area.

c. The breakwater shall be placed in units so that there is at least one opening measuring at least five feet in width located every 75 linear feet along the breakwater, with a minimum of one opening to allow the flow of water, and the passage of fish and aquatic wildlife.

d. If the breakwater and plantings are located in front of an existing seawall or bulkhead, placement of clean fill for the sole purpose of planting wetland vegetation is authorized, provided that stabilizing riprap or an oyster reef breakwater supports the fill at no more than a two horizontal to one vertical slope and the total area of fill is less than one acre.

(b) Placement of riprap or clean oyster shell, underlain with geotextile filter fabric, within 10 feet waterward of the mean or ordinary high water line of an eroding shoreline. Oyster shell shall be packaged within mesh bags, or securely attached to matting prior to placement in the water to prevent movement of shell out of the project area. Where the shoreline is undercut, sandbags or geotubes filled with sand or hardened concrete placed over geotextile fabric are authorized to prepare the slope for placement of the riprap or oyster shell.

(c) Backfilling, plugging, or installation of weirs within existing drainage ditches or swales, without piping, for the purpose of restoring the hydroperiod of wetlands or other surface waters, and/or the groundwater in uplands, within publicly-owned lands, provided the ditches to be filled are not connected to upstream offsite ditches or canals. Any proposed backfilling, plugging or weir installation shall be supported by a determination, signed and sealed by a registered professional, that such activities will not cause adverse flooding to off-site property.

(d) Scrape down of spoil islands to an intertidal elevation or a lower elevation at which light penetration is expected to allow for seagrass or other native submerged aquatic vegetation recruitment, provided the total area does not exceed 10 acres.

(e) Backfilling of existing dredge holes that are at least five feet deeper than surrounding natural grades to an elevation which is expected to allow for seagrass recruitment, with no displacement of highly organic sediments, provided the total area does not exceed 10 acres.

(f) Placement of rock riprap or clean concrete in existing dredge holes that are at least five feet deeper than surrounding natural grades to enhance habitat values, provided that placed rock or concrete does not extend to within one foot of surrounding natural grades, and the total area does not exceed five acres.

(g) Removal of exotic and nuisance species to allow for the activities listed in paragraphs (1)(a) through (d), above.

(h) Restoration of prop scars and blow holes through previously vegetated grassbeds, including use of sand-filled bags to restore historical natural grades and replanting of seagrass collected from upland nursery sources or donor sites previously permitted under part IV of chapter 373, F.S., for this purpose. Bird stakes may be temporarily placed within the restoration area to promote seagrass growth in settings where, based on best available scientific information, the Agency determines that phosphorus is a limiting nutrient

for seagrass growth. Bird stakes, if used, shall be installed no closer than six feet apart and shall be removed within 18 months of initial placement.

(2) To qualify for this general permit, the activity must comply with all the following:

(a) The project shall not be considered as mitigation for any other activity.

(b) The project shall not be located within an Aquatic Preserve.

(c) The project shall not include placement of fill, riprap, or any type of breakwater over or within three feet of an area of greater than one percent coverage by emergent or submerged natural resources, or placement of fill material within smalltooth sawfish critical habitat, as designated by the U.S. National Marine Fisheries Service. For purposes of this general permit, the term "emergent or submerged natural resources" includes freshwater and marine herbaceous and forested wetland vegetation, seagrass, coral, sponge, oyster beds, and other submerged aquatic vegetation.

(d) The governmental entity shall submit scaled and dimensioned project plans, signed and sealed by a registered professional, showing the entire project area and all proposed activities within the project area. In addition, project plan-view drawings shall be submitted showing the locations of all existing emergent and submerged natural resource communities, however, these community-depiction drawings are not required to be signed and sealed by a registered professional.

(e) Emergent or submerged natural resources, and other fresh water or marine ecological communities shall not be adversely affected and the ecology of such communities shall directly benefit from the authorized activity, as affirmatively agreed to by the Agency after review of the submitted notice and project plans. To facilitate this review, a pre-application meeting with the Agency must be held in advance of submitting notice to use this general permit.

(3) This general permit shall be subject to the following specific conditions.

(a) All disturbed areas, including intertidal slopes, shall be stabilized and re-vegetated with appropriate non-invasive, annual ground cover vegetation within 72 hours after completion of construction. Subsequently, the areas shall be planted and maintained as necessary to ensure that there is at least 33 percent cover of planted or naturally re-established native wetland or upland plant species within 18 months of completion of authorized work. The areas shall also be maintained free of exotic invasive species.

(b) Riprap material shall be clean limestone, granite, other native rock, or clean rebar-free concrete rubble measuring one foot to three feet in diameter.

(c) Except as otherwise allowed under this general permit, fill material used to backfill dredge holes or planting areas shall comply with the standard of not more than 10 percent of the material passing through a number 200 standard sieve and containing no more than 10 percent organic content, and be free of contaminants that cause violations of state water quality standards.

(d) Turbidity shall be monitored at least twice daily during construction. Monitoring records shall be maintained and available for inspection by the Agency for the period of in-water construction and an additional 90 days beyond in-water construction.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.171, 373.4131 FS. Law Implemented 253.034(1), 373.118, 373.406(5), 373.4131, 373.414(9), 403.814(1) FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.632 General Permit for the Restoration, Establishment and Enhancement of Low Profile Oyster Habitat.**

(1) A general permit is hereby provided for the construction, restoration, and enhancement of low profile oyster habitat (LPOH) within estuaries, lagoons, or other tidal waters, subject to the following:

(a) The total footprint of the LPOH is one quarter acre in size or less;

(b) The work shall be conducted or directly supervised by persons having expertise designing and implementing oyster habitat restoration activities;

(c) The LPOH shall not be inconsistent with any management plan approved by a federal, state, regional and/or local agency that addresses oyster habitat, wetland vegetation, submerged resources, water quality, navigation, or fishing and recreational values of the waterbody, including any Aquatic Preserve management plan adopted under chapter 18-20, F.A.C.;

(d) The LPOH shall not be considered as mitigation to offset impacts for any other project;

(e) The LPOH shall not serve or include any aquaculture activity regulated under chapter 597, F.S.; and

(f) The LPOH shall not adversely affect existing natural resources or resource activities within or adjacent to the footprint of the proposed LPOH footprint.

(2) The notice required in rule 62-330.402, F.A.C., shall include documentation, statements, or demonstrations that the above limitations will be met, together with the following:

(a) An explanation of the overall ecological benefit to be achieved by the LPOH;

(b) Documentation that the person using this general permit has authorization from the owner(s) of the submerged lands, if other than the State of Florida, to conduct the proposed activities;

(c) An environmental resource survey of the bottom of the waterbody throughout the LPOH area, including an additional 50 foot-wide perimeter surrounding the LPOH area demonstrating that:

1. The LPOH area, including the 50 foot-wide perimeter area, does not have any submerged aquatic vegetation or hardbottom resources present;

2. The LPOH will not affect an archaeological, cultural, or historical resource area regulated under chapter 267, F.S.;

3. The LPOH will not have any work conducted within 100 meters of actively nesting wading bird colonies or within 180 meters of actively nesting tern or skimmer colonies;

4. The LPOH will not be constructed within:

a. 100 feet from the outside edge of any designated channel marked in accordance with section 327.40 F.S. or federally maintained channel without written approval from the entity responsible for channel maintenance;

b. Any channel traditionally used for navigation;

c. 100 feet of any dock or overwater structure without notice to the current property owner;

d. Any other designated management zone that requires approval to conduct activities unless written approval is received from the managing agency; or

e. Any previously permitted mitigation areas.

(d) Agreement that the activity will comply with the additional conditions of subsection (3), below.

(3) All work under this general permit shall be conducted in conformance with the following specific conditions:

(a) LPOH materials shall consist of only the following:

1. Clean, sediment free culture materials (cultch) that does not contain deleterious substances that have the potential to leach into surface waters. Cultch shall consist of:

a. Recycled shell that has been quarantined for a minimum of three months;

b. Fossil shell;

c. Limerock consisting of a minimum of 20 percent calcium carbonate by volume, with 90 percent of the limerock being no more than six inches in diameter; or

d. Concrete material in which at least 90 percent of the concrete material is no more than six inches in diameter. Concrete shall not be used for a LPOH located in an Aquatic Preserve.

2. Cultch that was intentionally placed in marine or estuarine waters for a period of time to collect oyster larvae, or seedstock (juvenile shellfish species) that has been cultured and placed in marine or estuarine waters for growout; or

3. Cultch or seedstock that has been generated as a result of shellfish aquaculture activities in accordance with section 597.010, F.S.

(b) LPOH materials shall be firmly fixed on the substrate, bagged, or otherwise contained in such a way as to prevent movement away from the LPOH footprint.

(c) LPOH materials shall not be indiscriminately dumped, placed on substrate with more than five live oysters per square meter, or placed outside of the footprint limits.

(d) The LPOH may consist of placement of LPOH materials in locations where no oyster reef currently exists, restoration of an existing degraded oyster reef to its known historical height, or restoration of an existing degraded oyster reef to the average elevation of existing natural oyster reefs in the immediate vicinity of the LPOH area. Final elevation shall not exceed 18 inches above the existing bottom elevation in locations where no oyster reef currently exists. In no circumstance shall LPOH material be placed at a height above the mean high water elevation.

(e) The LPOH shall not cause harmful erosion or shoaling to adjacent submerged areas and shorelines.

(f) The LPOH shall not cause adverse impacts to the fishing and recreational use of the waterbody, aquatic and wetland dependent species, or submerged resources.

(4) A minimum of 60 days prior to submittal of a notice required in subsection (2), above, the person proposing to use this general permit shall conduct at least one pre-notice meeting with the appropriate Agency staff to discuss the project. If the LPOH is proposed within an Aquatic Preserve, the manager of that preserve or their designee shall be invited to the pre-notice meeting.

(5) The activities authorized in this general permit shall not commence until the Agency has provided written verification of qualification in accordance with section 5.3.2 of Applicant's Handbook, Volume I.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.171, 373.4131 FS. Law Implemented 253.034(1), 373.118, 373.406(5), 373.4131, 373.414(9), 403.814(1) FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.635 General Permit for Soil Remediation.**

(1) A general permit is granted to conduct soil removal activities, including installation of wells and work in wetlands and other surface waters necessary to perform soil remediation as part of a Remedial Action Plan approved by the Department. This includes construction, alteration, operation, and removal of a temporary access road for access to conduct this work, subject to the following conditions.

(a) Removal of contaminated soil is limited to no more than a total of five acres of wetlands.

(b) Temporary fill and materials for equipment access shall be removed immediately following completion of the remediation work.

(c) Any wetland area affected by the work shall be restored to pre-construction wetland elevations within 30 days following completion of the work, using sediments consisting of the same soil textural material as the original pre-construction soil material that is also free of vegetated debris, rebar and any other solid waste materials.

(d) Any muck removed from wetlands for construction of temporary fill roads shall be stockpiled in uplands and used in restoring the affected area to wetland conditions and preconstruction wetland elevations, unless this material is required to be removed as part of the remediation plan.

(e) Within seven days of completion of restoration of pre-construction wetland elevations, all wetland areas shall be re-vegetated with native wetland species endemic to adjoining, undisturbed wetlands or the underlying wetland community type historically occurring at the site. The restored wetland areas shall be maintained and planted as necessary to ensure that at least 33 percent cover of planted or naturally reestablished native wetland plant species is appropriate for the wetland community type within 18 months of completion of authorized work. Exotic invasive species, including but not limited to: *Schinus terebinthifolius*, *Melaleuca quinquenervia*, *Casuarina* spp., *Lygodium* spp., and nuisance species *Typha* spp., and *Ludwigia peruviana* shall be controlled at densities not exceeding the densities of these species in undisturbed portions of the wetland.

(f) In addition to compliance with the notice provisions of rule 62-330.402, F.A.C., within 60 days following completion of construction, the permittee will notify the Agency by letter of the date construction activities were completed.

(g) All contaminated soils removed from the site shall be disposed of in an appropriate disposal facility, in accordance with the Remedial Action Plan approved by the Department.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.406(5), 373.4131, 373.414(9), 373.418, 403.805(1) FS. Law Implemented 373.118(1), 373.406(5), 373.413, 373.4131, 373.414(9), 373.418, 376.3071, 403.814(1) FS. History–New 10-1-13, Amended 6-1-18.*

**62-330.901 Noticed General Permit Forms.**

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.406(5), 373.414(9), 373.4145, 373.418 FS. Law Implemented 373.118, 373.406(5), 373.413, 373.414(9), 373.4145, 373.416, 373.418, 373.426 FS. History–New 9-4-05, Amended 10-1-07, Formerly 62-341.900, Repealed 10-1-13.*

**62-330.010 Purpose and Implementation.**

(1) This chapter, together with the rules and all documents it incorporates by reference, implements the comprehensive, statewide environmental resource permit (ERP) program under section 373.4131, F.S.

(2) The ERP program governs the following: construction, alteration, operation, maintenance, repair, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, and works (including docks, piers, structures, dredging, and filling located in, on or over wetlands or other surface waters, as defined and delineated in chapter 62-340, F.A.C.) (any one or a combination of these may be collectively referred to throughout this chapter as "projects" or "systems").

(3) The responsibilities for implementing this chapter are described in Operating and Delegation Agreements between the Department of Environmental Protection ("Department"), the water management districts ("Districts"), and local governments ("delegated local governments"). The Agreements are incorporated by reference in rule 62-113.100, F.A.C. The term "Agency" applies to the Department, a District, or a delegated local government, as applicable, throughout this chapter.

(4) This chapter is used in conjunction with an Applicant's Handbook, in two volumes, as follows:

(a) Applicant's Handbook Volume I, "General and Environmental" (hereinafter "Volume I"), applies statewide to all activities regulated under Chapter 62-330, F.A.C. It includes explanations, procedures, guidance, standards, and criteria on what is regulated by this chapter, the types of permits available, how to submit an application or notice for a regulated activity to the Agencies, how applications and notices are reviewed, the standards and criteria for issuance, and permit duration and modification. Volume I, including Appendices G, H, and I only, is incorporated by reference herein, (effective date ~~June 1 ,~~2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12078).

(b) An Applicant's Handbook Volume II (hereinafter "Volume II"), has been adopted for use within each District. Each District's Volume II is incorporated by reference herein and in the rules listed below, which also are incorporated by reference herein. These rules and Handbook Volumes are available as provided in subsection (5), below.

1. Northwest Florida Water Management District – "Department of Environmental Protection and Northwest Florida Water Management District Environmental Resource Permit Applicant's Handbook – Volume II (Design and Performance Standards Including Basin Design and Criteria)," including all appendices, is incorporated by reference herein (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09392 and http://www.flrules.org/Gateway/reference.asp?No=Ref-03173) or from the Agency as provided in subsection (5).

2. Suwannee River Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (August, 2013) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09398), and in subsection 40B-400.091(2), F.A.C., (October 14, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-02523).

3. St. Johns River Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (June 1, 2018) (http://www.flrules.org/Gateway/reference.asp?No=Ref-09405), and in subsections 40C-4.091(1) (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09411), and 40C-44.091(1), F.A.C., (June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-09410).

4. Southwest Florida Water Management District, Applicant's Handbook Volume II, is incorporated by reference herein, (June 1, 2018October 1, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12079), and in Rule 40D-1.66040D-4.091, F.A.C., (June 1, 2018October 1, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12080).

5. South Florida Water Management District, Applicant's Handbook Volume II, including Appendices A through D, is incorporated by reference herein, (May 22, 2016October 1, 2013) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12081).

A copy of the incorporated material identified above may be obtained from the Agency Internet site, https://floridadep.gov/water/water/content/water-resource-management-rules#ERP, or as described in subsection 62-330.010(5), F.A.C.

(5) A copy of Volumes I and II and the other Agreements, rules, forms, and other documents incorporated by reference in this chapter also may be obtained from the Agency Internet site or by contacting staff in an Agency office identified in Appendix A of Volume I.

(6) This chapter explains how to submit notices and applications for activities regulated under part IV of chapter 373, F.S., and provides the standards for Agency review and action, which must not be harmful to the water resources and not be inconsistent with the overall objectives of the Agency. This chapter also includes procedures for petitions for a formal determination of the landward extent of wetlands and surface waters under chapter 62-340, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.418, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.409, 373.413, 373.4131, 373.414(9), 373.4141, 373.4142, 373.4145, 373.416, 373.423, 373.426, 373.428, 373.429, 373.441 FS. History–New 10-1-13, Amended 6-1-18, _____.*

**62-330.050 Procedures for Review and Agency Action on Exemption Requests.**

(1) A notice to the Agency is not required to conduct an activity that is exempt under rule 62-330.051, F.A.C., except where required in a specific exemption. Persons are encouraged, but not required, to use any available electronic self-certification service of the Agency to confirm that the activity meets the exemption.

(2) If a person desires Agency verification of qualification to conduct an exempt activity (other than for silviculture, for which the procedures in Rule 62-330.0511, F.A.C., apply), and a self-certification is not available or the person chooses not to use a self-certification, they may submit a written or electronic Form 62-330.050(1) – "Request for Verification of an Exemption," (effective date ~~June 1, 2018~~), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12035), or a letter that clearly requests an exemption verification. A copy of the form may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. Such request must include:

(a) The processing fee prescribed in rule 62-330.071, F.A.C. Only one exemption verification processing fee shall be assessed if the request contains multiple exempt activity types on a single parcel;

(b) A location map(s) of sufficient detail to allow someone who is unfamiliar with the area to locate the site of the activity;

(c) Drawings, calculations, and other supporting information to clearly depict and describe the proposed activities;

(d) The tax parcel identification number from the local government tax rolls;

(e) Contact information for the person requesting the verification; and,

(f) Authorization signed by the property owner allowing Agency staff to inspect the location of the proposed activities.

(3) Additional information on completing and submitting a request for verification of an exemption is contained in sections 3.2, 4.2, 4.2.1, 4.3, and 4.4 of Volume I.

(4) The Agency shall take reasonable efforts to determine within 30 days of receipt of a request whether the submitted materials demonstrate the activity qualifies for an exemption or, if they do not, what information would enable the Agency to make such a determination. If those materials are not received within 60 days of the Agency's

request, the Agency shall advise the person that it cannot verify that the activity qualifies for an exemption. The materials submitted and responses received shall not be considered an application for a general, conceptual approval, or individual permit unless requested in writing.

(5) If, after receipt of an application for a permit, the Agency determines the proposed activity qualifies in whole for an exemption under this chapter, the Agency shall make such determination within 30 days of receipt of the application and refund any processing fees received in excess of those required under rule 62-330.071, F.A.C.

(6) The Agency will consider exempt activities included in an application to conduct other activities as part of an entire application requiring a permit, and will review and act upon the entire application at one time. However, an applicant may request the Agency separately determine whether specific activities that are part of the application qualify for an exemption. In such a case, the applicant shall pay an additional processing fee for the exemption verification, but only one additional exemption verification processing fee will be required even if more than one kind of exempt activity is included. In accordance with section 10.27(d) of Volume I, the Agency with consider the secondary impacts arising from activities described in section 403.813(1), F.S., that are very closely linked and causally related to the activities proposed in the application.

(7) The Agency's determination of qualification for an exemption is subject to chapter 120, F.S. Self-certification is not an Agency action subject to chapter 120, F.S., unless the Agency determines the self-certification does not meet all of its applicable terms and conditions.

(8) Activities conducted in accordance with an exemption under this chapter remain subject to other applicable permitting, authorization, and performance requirements (including, but not limited to, those governing the "take" of listed species) of the Agencies, the Board of Trustees, and other federal, state, and local government entities.

(9) The following apply when specified in an exemption in rule 62-330.051, F.A.C.:

(a) Activities shall not exceed a permitting threshold in section 1.2 of the applicable Volume II;

(b) Construction, alteration, and operation shall not:

1. Adversely impound or obstruct existing water flow, cause adverse impacts to existing surface water storage and conveyance capabilities, or otherwise cause adverse water quantity or flooding impacts to receiving water and adjacent lands;

2. Cause an adverse impact to the minimum flows and levels established pursuant to section 373.042, F.S.;

3. Cause adverse impacts to a Work of the District established pursuant to section 373.086, F.S.;

4. Adversely impede navigation or create a navigational hazard;

5. Cause or contribute to a violation of state water quality standards. Turbidity, sedimentation, and erosion shall be controlled during and after construction to prevent violations of state water quality standards, including any antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), subsections 62-4.242(2) and (3) and rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters due to construction-related activities. Erosion and sediment control best management practices shall be installed and maintained in accordance with the guidelines and specifications described in the *State of Florida Erosion and Sediment Control Designer and Reviewer Manual* (Florida Department of Transportation and Florida Department of Environmental Protection, June 2007*)*, incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02530), and the *Florida Stormwater Erosion and Sedimentation Control Inspector's Manual* (Florida Department of Environmental Protection, Nonpoint Source Management Section, Tallahassee, Florida, July 2008), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-02531); nor

6. Allow excavated or dredged material to be placed in a location other than a self-contained upland disposal site, except as expressly allowed in an exemption in rule 62-330.051, F.A.C.

(c) When performed in waters accessible to federally- or state-listed aquatic species, such as manatees, marine turtles, smalltooth sawfish, and Gulf sturgeon, all in-water work shall comply with the following:

1. All vessels associated with the project shall operate at "Idle Speed/No Wake" at all times while in the work area and where the draft of the vessels provides less than a four-foot clearance from the bottom. All vessels will follow routes of deep water whenever possible.

2. All deployed siltation or turbidity barriers shall be properly secured, monitored, and maintained to prevent entanglement or entrapment of listed species.

3. All in-water activities, including vessel operation, must be shut down if a listed species comes within 50 feet of the work area. Activities shall not resume until the animal(s) has moved beyond a 50-foot radius of the in-water work, or until 30 minutes elapses since the last sighting within 50 feet. Animals must not be herded away or harassed into leaving. All onsite project personnel are responsible for observing water-related activities for the presence of listed species.

4. Any listed species that is killed or injured by work associated with activities performed shall be reported

immediately to the Florida Fish and Wildlife Conservation Commission (FWC) Hotline at 1(888)404-3922 and ImperiledSpecies@myFWC.com.

Copies of incorporated materials identified above may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C.

(10) A person requesting verification of an exemption may waive the timeframes in subsections (4) and (5), above, if the project also requires a State 404 Program authorization under Chapter 62-331, F.A.C., that must be reviewed using the timeframes in that chapter. Waiving the timeframes allows the Agency(ies) to issue agency action for the verification of exemption and the State 404 Program authorization at the same time. This is strongly recommended by the Agencies to ensure consistency and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 403.805(1) FS. Law Implemented 373.109, 373.406, 373.4131, 373.4145, 403.813(1), 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18,_____.*


**62-330.060 Content of Applications for Individual and Conceptual Approval Permits.**

Materials to include in an application or notice for a permit are described below. Applicants are encouraged to have a pre-application meeting or discussion with Agency staff prior to submitting the application or notice.

(1) An application for an individual permit or conceptual approval permit shall be made on Form 62-330.060(1), "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands," including the information required in the applicable Sections A through I ~~H~~ (effective date), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12036), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., or by use of the equivalent e-application form of the applicable Agency. Attachments 1, 2, and 3 of the form (containing agency contacts and a summary of the application fees related to applications and notices) are not incorporated by reference, but are available at https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/forms-environmental-resource.

(2) The application must include all material requested in the application form; the processing fee in accordance with rule 62-330.071, F.A.C.; and other information needed to provide reasonable assurance that the proposed

activities meet the conditions for issuance in rule 62-330.301, F.A.C., the additional conditions for issuance in rule 62-330.302, F.A.C., and the Applicant's Handbook.

(3) The applicant must certify that it has sufficient real property interest over the land upon which the activities subject to the application will be conducted, as required in Section A of Form 62-330.060(1) and Section 4.2.3(d) of the Applicant's Handbook Volume I. The applicant or the applicant's authorized agent must sign Part 4.A. of the application, and the applicant must sign Part 4.B. If the applicant's authorized agent signs Part 4.A, the applicant also must sign Part 4.C.

(4) An application for an individual permit also constitutes an application to operate and maintain the project. The application must specify the entity that will operate and maintain the project. If the applicant proposes an entity other than the current owner to operate and maintain the proposed project, documentation must be included demonstrating how such entity will meet the requirements of sections 12.3 through 12.3.4 of Volume I. A homeowner's or property owner's association ("HOA" or "POA," respectively) draft association documents designating the HOA or POA as the operating entity, and prepared in conformance with sections 12.3 through 12.3.4 of Volume I, shall satisfy this requirement. This provision of the association documents may not be modified without a permit modification in accordance with rule 62-330.315, F.A.C.

*Rulemaking Authority 373.044, 373.113, 373.171, 373.4131 FS. Law Implemented 373.042, 373.413, 373.4131, 373.416, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18,_____.*

**62-330.090 Processing of Individual and Conceptual Approval Permit Applications.**

(1) The Agency shall review, notice, and issue a request for any required additional information in accordance with section 5.5.3 of Volume I.

(2) Pending applications shall be exempt from changes in the rules adopted after an application has been deemed complete except as otherwise provided by law or in this chapter.

(3) If an applicant submits a processing fee in excess of the required fee, the Agency shall begin processing the application and shall refund to the applicant the amount received in excess of the required fee. If an applicant fails to provide the complete processing fee, the Agency will inform the applicant of the amount of additional fee required, and the application will not be complete until the complete processing fee is received, along with the other materials that have been timely requested in accordance with section 5.5.3 of Volume I. The Agency cannot be compelled to

issue a permit in advance of receipt of the required fee or any other material required by the Agency to deem an application complete.

(4) If a substantial revision is submitted to a pending application, other than revisions proposed to reduce adverse impacts identified by the Agency, the applicant shall pay the difference between the processing fees already submitted and any additional fees required for the revised application under rule 62-330.071, F.A.C. In such a case, the time frames in section 5.5.3 of Volume I for processing the application shall be restarted.

(5) In addition to the procedures in this section, processing of the application will be performed in accordance with sections 5.5 through 5.6 of Volume I.

(6) A permit shall only be issued to an entity meeting the requirements of section 4.2.3(d) of Volume I.

(7) The Agency shall cause a "Recorded Notice of Environmental Resource Permit" Form No. 62-330.090(1), (June 1, 2018), incorporated by reference herein (http://www.flrules.org/Gateway/reference.asp?No=Ref-09362), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C., to be recorded in the public records of the county where the property is located unless otherwise noted in the permit. This notice shall not be considered an encumbrance upon the property. Such notice need not be recorded when the entire activity:

(a) Is for an individual, single-family residence, duplex, triplex, or quadruplex that is not part of a larger common plan of development or sale proposed by the permittee, except when the permit specifies that recording is necessary to ensure future owners are advised of long-term operational and maintenance requirements, or conservation provisions;

(b) Is authorized by a general permit under this chapter;

(c) Is temporary (not to exceed one year) in nature;

(d) Has no long term maintenance or operation requirements associated with it;

(e) Is located within lands encumbered by a real property interest held by a federal, state, county, or municipal government entity, including a school, university, or college;

(f) Is a utility within an easement recorded in the official records; or

(g) Is within the permit area of an existing permit for which a Notice has already been recorded, and the permit modification does not change the permit area.

(8) An applicant may waive the timeframes in section 5.5.4 of Volume I if the project also requires a State 404 Program authorization under Chapter 62-331, F.A.C., that must be reviewed using the timeframes in that chapter.

Waiving the timeframes allows the Agency(ies) to issue agency action for both authorizations at the same time. This is strongly recommended by the Agencies to ensure consistency between the authorizations and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.

*Rulemaking Authority 373.026(7), 373.043, 373.116, 373.118, 373.413, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented 373.109, 373.118, 373.4131, 373.4141, 373.4145 FS. History–New 10-1-13, Amended 6-1-18, _____.*

**62-330.201** ~~Formal~~ **Determinations of the Landward Extent of Wetlands and Other Surface Waters.**

(1) For any application that requires a determination or assessment of the landward extent of wetlands and other surface waters pursuant to section 7.1 of Volume I, Agency staff shall use Form 62-330.201(1), "Chapter 62-340, F.A.C., Data Form", (effective date), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12037), as described in Volume I section 7.1.1, to document verification of determinations of the landward extent of wetlands and other surface waters for formal determinations and for applications for individual and conceptual approval permits. The "Chapter 62-340, F.A.C., Data Form Guide" in Appendix J of Volume I, and the "Chapter 62-340, F.A.C., Data Form Instructions" in Appendix K of Volume I, is available to assist staff in completion of the form, and to assist other environmental professionals in performing delineations.

(a) For the delineation of the landward extent of wetlands and other surface waters, at least one data point along the delineation boundary shall be verified and documented by the Agency during the visual site inspection pursuant to Chapter 62-340.100(1) F.A.C. A delineation data point will be documented for each homogenous boundary within the site inspection area. One delineation data point representative of homogeneous boundaries found in other locations throughout the site is sufficient for documentation. Documentation of a delineation data point shall include two data forms; one representative of the waterward area adjacent to the data point, the other representative of the landward or upland area adjacent to the data point. The two complete data forms at a delineation data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340 F.A.C., and changes in evidence used to determine the boundary delineation at that point.

 (b) For identification or conclusions regarding the absence or presence of a non-wetland surface water, wetland, or upland classification by the Agency within the site inspection area, at least one data point within homogenous areas of classification shall be verified and documented by the Agency during the visual site inspection pursuant to Chapter 62-340.100(1), F.A.C. One data point representative of homogeneous areas found in other locations throughout the site is sufficient for documentation.  Documentation of an identification data point shall include one data form representative of the area of classification. The data form at an identification data point will document failure or satisfaction of all methodology criteria pursuant to Chapter 62-340, F.A.C., and evidence used to determine the upland, wetland, or non-wetland surface water classification.

(2) (1) Formal determinations.

(a) A real property owner, an entity having a contract to purchase real property, an entity having the power of eminent domain, or any other person who has legal or equitable interest in real property, may petition the Agency for a formal determination of the landward extent of wetlands and other surface waters for that property pursuant to Section 373.421(2), F.S. A formal determination means the Agency will make a binding determination of the landward extent (boundaries) of wetlands and other surface waters as defined by Chapter 62-340, F.A.C. A formal determination is binding on the real property for which that determination is sought for as long as the determination is valid, in accordance with Sections 373.421(2) and (3), F.S. If the petitioner is not the owner of the land, the petitioner must provide the Agency with information sufficient to contact the current owner, and the Agency shall provide notice of receipt of the petition to the landowner.

(b) (2) Procedures for the submittal, review, noticing, and action on a petition for a formal determination are contained in sections 7.2 through 7.2.7 of Volume I. The petition shall be submitted using Form 62-330.201(2 1), "Petition for a Formal Determination of the Landward Extent of Wetlands and Other Surface Waters," (effective date June 1, 2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12038). It shall be submitted with the fee prescribed in Rule 62-330.071, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.421(2), 403.0877 FS. Law Implemented 120.54(5)(a), 373.026, 373.4131, 373.421(2), 373.441 FS. History–New 7-4-95, Amended 8-14-96, 8-16-98, 2-19-03, Formerly 62-343.040, Amended 10-1-13, 6-1-18,_____.*

**62-330.340 Transfer of Permit Upon Change in Ownership or Control.**

(1) Permits in the Operation and Maintenance Phase – Projects constructed in accordance with the terms and conditions of a general permit are automatically authorized to be operated and maintained by the permittee and subsequent owners. A permittee with a valid individual permit in the operation and maintenance phase under this chapter or chapter 62-342, F.A.C., shall notify the Agency electronically or in writing within 30 days of a change in ownership or control of the entire real property, project, or activity covered by the permit. A processing fee is not required for this notice. The permit shall automatically transfer to the new owner or person in control, except in cases of abandonment, revocation, or modification of a permit as provided in sections 373.426 and 373.429, F.S. If a permittee fails to provide written notice to the Agency within 30 days of the change in ownership or control, or if the change does not include the entire real property or activity covered by the permit, then the transfer shall be governed by subsections (2) through (4), below.

(2) Except as provided in subsection (1), above, and in section 6.3.1 of Volume I, or as otherwise required in an individual or conceptual approval permit, or for activities authorized under a general permit, a permittee shall notify the Agency electronically or in writing within 30 days of any change in ownership or control of any portion of the real property upon which an activity is permitted under this chapter or chapter 62-342, F.A.C. A person who obtains an interest in or control of such real property shall:

(a) Request transfer of the permit to become the new permittee or modification of the permit to become a co-permittee; or

(b) Provide written documentation of the following:

1. Certification that the permittee continues to retain sufficient real property interest over the land upon which the activities subject to the permit will be conducted as described in section 4.2.3(d) of Volume I; and

2. Authorization for Agency staff with proper identification to enter, inspect, sample and test the project or activities to ensure conformity with the plans and specifications authorized in the permit. (3) The person requesting transfer of the permit shall submit to the Agency a completed Form 62-330.340(1), "Request to Transfer Environmental Resource and/or State 404 Program Permit," incorporated by reference herein (effective date June 1, 2018) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12039), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C, together with the permit modification fee prescribed by

the Agency as set forth in Rule 62-330.071, FA.C. A proposed new permittee shall demonstrate that it has sufficient real property interest in or control over the land consistent with subsection 62-330.060(3), F.A.C.

(a) The Request to Transfer Environmental Resource and/or State 404 Program Permit shall be processed in the same manner as a minor modification as provided in subsection 62-330.315(2), F.A.C.

(b) The proposed new permittee shall include demonstration or documentation with the request that it meets the requirements for being an acceptable operation and maintenance entity provided in subsections 62-330.310(2), and (3), F.A.C., if applicable.

(4) Upon receipt of the completed Request to Transfer Environmental Resource and/or State 404 Program Permit form and applicable processing fee, the Agency shall approve the permit transfer unless it determines that the proposed permittee or co-permittee has failed to provide reasonable assurances that it qualifies to be a permittee or that it can meet the permit conditions.

(a) If the Agency proposes to deny the transfer, it shall provide both the current permittee and the proposed permittee with notice of proposed agency action of denial, and of the right to request an administrative hearing pursuant to chapter 120, F.S.

(b) Failure of the permittee to notify the Agency in writing within 30 days of a change in ownership or control shall not, by itself, render a permit invalid. When it does not appear the current permittee has met the requirements of subsection (2), above, or has not otherwise approved or been made aware of the request to transfer the permit, upon transfer of the permit to the new permittee, the Agency will provide notice to the former permittee, at its last known address, advising of the permit transfer, together with a notice of rights under chapter 120, F.S.

(5) A permittee from whom the permit is transferred shall:

(a) Be jointly and severally liable with the new owner or permittee for compliance with the permit and for any corrective actions that may be required as a result of violations of the permit or Agency rule on the property prior to permit transfer; and

(b) Remain jointly and severally liable for any corrective actions that are required as a result of any violations of the permit that occurred prior to the change in ownership or control of the property upon which the permitted project or activity is located.

(6) Upon transfer of a permit, the new permittee shall comply with all terms and conditions of the permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.418, 403.805(1) FS. Law Implemented*

*373.118, 373.109, 373.413, 373.4131, 373.4142, 373.4145, 373.416, 373.426, 373.429, 668.003, 668.004, 668.50 FS.*

*History–New 10-1-13, Amended 6-1-18,_____.*

**62-330.402 Submittal and Processing of General Permits.**

(1) A person wishing to construct, operate, maintain, alter, abandon, or remove projects under a general permit shall provide notice using Form 62-330.402(1), "Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit," (effective date ~~June 1, 2018~~), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12040), a copy of which may be obtained from the Agency, as described in subsection 62-330.010(5), F.A.C. The notice must be received by the applicable Agency at least 30 days prior to initiating the activities authorized by the general permit, or at such other time as specified in the general permit. Notices for general permits that identify the reviewing agency as the Department shall be submitted to the Department instead of a District.

(2) The notice for a general permit must include the processing fee prescribed in rule 62-330.071, F.A.C. If a single notice includes more than one general permit, a separate fee shall be required for each general permit.

(3) The specific procedures of a general permit shall govern if they differ from the procedures in this rule.

(4)(a) Within 30 days of receiving Form 62-330.402(1), the Agency shall determine whether the activity qualifies for a general permit. If the activity does not qualify or the notice does not contain all the required information, the Agency will notify the person as provided in section 5.3.2 of Volume I.

(b) If the notice does not demonstrate that the requested activity qualifies for a general permit due to errors or omissions, the person shall have 60 days to amend the notice as provided in section 5.3.3 of Volume I. An additional processing fee will not be required if the person submits additional information demonstrating compliance with the general permit within that 60 days. Alternatively, the person may request that the submitted information be processed as an application for an individual permit, which must be supplemented with the information required in rule 62-330.060, F.A.C., and sections 4.2.3, 4.3, and 4.4 of Volume I, or the person may withdraw the notice for a general permit.

(c) If the activities do not qualify for a general permit, the processing fee submitted for the general permit shall be applied to the processing fee required for an individual permit, as provided in section 5.3.4 of Volume I. The

processing fee will not be returned if the person withdraws the notice or if qualification for the general permit is denied.

(5) The Agency will place notice of the proposed use of a general permit on the Agency website within 10 days of receipt of the request.

(6) At their discretion, persons qualifying for a general permit may publish a notice of qualification to use a general permit in a newspaper of general circulation in the affected area. The Agency will not publish, or require the person to publish, such notice.

(7) A person may waive the timeframes in subsection (4), above, if the project also requires a State 404 Program authorization under Chapter 62-331, F.A.C., that must be reviewed using the timeframes in that chapter. Waiving the timeframes allows the Agency(ies) to issue agency action for both authorizations at the same time. This is strongly recommended by the Agencies to ensure consistency between the authorizations and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.

*Rulemaking Authority 373.044, 373.113, 373.118, 373.413, 373.4131 FS. Law Implemented 373.116(2), 373.118(3), 373.413, 373.4131, 373.416, 373.426, 668.003, 668.004, 668.50 FS. History–New 10-1-13, Amended 6-1-18.*

_____.

Chapter 62-331 (as adopted)

62-331.010   Intent, Purpose, and Implementation
62-331.020   Regulated Activities
62-331.030   Definitions
62-331.040   Procedures for Review and Agency Action on Exemption Requests
62-331.050   Individual Permits
62-331.051   Application for an Individual Permit
62-331.052   Processing of Individual Permit Applications
62-331.053   Additional Conditions for Issuance of Individual Permits
62-331.054   General Conditions for Individual Permits
62-331.060   Public Notice
62-331.070   Water Quality and Coastal Zone Consistency Review
62-331.080   Modification, Suspension, or Revocation of Permits
62-331.090   Duration of Permits
62-331.100   Transfer of Permit Upon Change in Ownership or Control
62-331.110   Emergency Field Authorizations
62-331.120   Fees
62-331.130   Compensatory Mitigation
62-331.140   Mitigation Banks and In-Lieu Fee Programs
62-331.160   Use of Formal Determinations
62-331.200   Policy and Purpose of General Permits
62-331.201   Conditions for General Permits
62-331.210   General Permit for Maintenance or Removal
62-331.211   General Permit for Fish and Wildlife Harvesting, Enhancement, and Attraction Devices
62-331.212   General Permit for Scientific Measurement Devices
62-331.213   General Permit for Survey Activities
62-331.214   General Permit for Outfall and Intake Structures
62-331.215   General Permit for Utility Line Activities
62-331.216   General Permit for Bank Stabilization
62-331.217   General Permit for Linear Transportation Projects
62-331.218   General Permit for Return Water from Upland Contained Disposal Areas
62-331.219   General Permit for Hydropower Projects
62-331.220   General Permit for Minor Activities
62-331.221   General Permit for Response Operations for Oil or Hazardous Substances
62-331.222   General Permit for Removal of Vessels
62-331.223   General Permit for Approved Categorical Exclusions
62-331.224   General Permit for Structural Activities
62-331.225   General Permit for Aquatic Habitat Restoration, Enhancement, and Creation Activities
62-331.226   General Permit for Specific Reversion Activities
62-331.227   General Permit for Residential Developments
62-331.228   General Permit for Moist Soil Management for Wildlife
62-331.229   General Permit for Maintenance of Existing Flood Control Facilities
62-331.230   General Permit for Completed Federal Enforcement Actions
62-331.231   General Permit for Temporary Construction, Access, and Dewatering
62-331.233   General Permit for Boat Ramps
62-331.234   General Permit for Emergency Watershed Protection and Rehabilitation
62-331.235   General Permit for Cleanup of Hazardous and Toxic Waste
62-331.236   General Permit for Commercial and Institutional Developments
62-331.237   General Permit for Agricultural Activities
62-331.238   General Permit for Reshaping Existing Drainage Ditches
62-331.239   General Permit for Recreational Facilities
62-331.240   General Permit for Stormwater Management Facilities
62-331.241   General Permit for Mining Activities
62-331.242   General Permit for Repair of Uplands Damaged by Discreet Events
62-331.243   General Permit for Activities in Ditches
62-331.244   General Permit for Commercial Shellfish Aquaculture Activities

62-331.245    General Permit for Land-Based Renewable Energy Generation Facilities
62-331.246    General Permit for Water-Based Renewable Energy Generation Pilot Projects
62-331.247    General Permit for Removal of Low-Head Dams
62-331.248    General Permit for Florida Department of Transportation and Florida's Turnpike Enterprise

**62-331.010 Intent, Purpose, and Implementation**

(1) This Chapter, together with the rules and all documents it incorporates by reference, implements the State 404 Program under Section 373.4146, F.S.

(2) The State 404 Program governs all dredging and filling in waters of the United States regulated by the State under Section 373.4146, F.S. ("assumed waters" or "state-assumed waters"), and will be implemented in conjunction with the environmental resource permitting (ERP) program established in Part IV of Chapter 373, F.S.

(3) The State wetland delineation methodology in Chapter 62-340, F.A.C., shall be used to determine the boundary of state-assumed waters. Agency staff shall document the boundary of state-assumed waters using Form 62-330.201(1), "Chapter 62-340, F.A.C., Data Form" (effective date), incorporated by reference in subsection 62-330.201(1), F.A.C., and as described in Section 7.1 of Applicant's Handbook Volume I (hereinafter "Volume I") (effective date), incorporated by reference in paragraph 62-330.010(4)(a), F.A.C. (https://www.flrules.org/Gateway/reference.asp?No=Ref-12078).

(4) The term "Agency" applies to the Department or a Water Management District, as applicable, throughout this Chapter.

(5) This Chapter is used in conjunction with Chapter 62-330, F.A.C., Volume I and the State 404 Program Applicant's Handbook (hereinafter "404 Handbook"), incorporated by reference herein (effective date) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12064).

(6) A State 404 Program permit ("permit") is not an authorization under Chapter 62-330, F.A.C., and shall be reviewed as a separate authorization.

(7) Where there are conflicts between this Chapter and other state rules and statutes, this Chapter will control with regard to the State 404 Program (See section 8.4 of the 404 Handbook).

(8) A copy of rules, forms, and other documents incorporated by reference herein and in Chapter 62-330, F.A.C., may also be obtained from the Agency Internet site or by contacting staff in an Agency office identified in Appendix A of Volume I.

(9) This Chapter explains how to submit notices and applications for activities regulated under the State 404 Program and provides the standards for Agency review and action.

(10) Where both an ERP and a State 404 Program authorization are required for a dredge or fill activity, an applicant must receive both authorizations prior to conducting the dredge or fill activity. An applicant may choose to have both authorizations issued concurrently to avoid the need for subsequent modification of the project that may occur if one authorization is issued before the other.

(a) Where an applicant chooses to have the State 404 Program and ERP authorizations issued concurrently, and project modifications are required for one authorization after the other application has been deemed complete by the Agency, the complete application shall return to an "incomplete" status until all additional required information for such modification is received. No additional fee shall be charged for review of such modifications.

(b) Where an applicant chooses to have the ERP and State 404 Program authorizations issued separately, and modifications to the issued ERP authorization are required as a result of the State 404 Program review process, the fee to modify the ERP permit under Rule 62-330.071, F.A.C., shall apply.

(11) Agency actions under this Chapter are state actions subject to the provisions of Sections 120.569 and 120.57, F.S., except as otherwise provided in Section 373.4146(5), F.S. (See sections 5.1 and 5.3.3 of the 404 Handbook).

(12) An authorization or exemption under this Chapter does not relieve the applicant from the need to obtain any other state, federal, or local authorizations that may be required for the project. (See 404 Handbook section 1.3 for guidance).

(13) Notwithstanding any of the provisions of this Rule, to the extent EPA recognizes or authorizes partial assumption for state 404 programs, nothing in this Chapter would restrict or prohibit the State of Florida from amending the State 404 program, in accordance with federal law, to accommodate partial assumption.

(14) The Department strives to operate a wetlands regulatory program that far exceeds the minimum standards set by federal law and is comprised of professional and knowledgeable staff that make science-based decisions regarding the water resources of the state. To continuously exhibit these qualities, the Department will institute continuous improvement and evaluation measures, including but not limited to:

(a) Partnering with a third-party entity to identify the qualities of a state wetlands regulatory program that exhibits a paragon of excellence, and

(b) Conducting an annual staffing analysis of the State 404 Program.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.109, 373.4141, 373.4146, 373.421, 373.4211 FS. History – New _____.*

**62-331.020 Regulated Activities**

(1) A permit under this Chapter is not required for the activities described in 40 CFR § 232.3 as of July 1, 2019, incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12041), and in Appendix B of the 404 Handbook, subject to the limitations described therein.

(2) Unless an activity qualifies under subsection (1), above, a permit is required prior to conducting any dredge or fill activities in, on, or over state-assumed waters.

(3) The following types of permits are available:

(a) A general permit, as provided in Rule 62-331.200, F.A.C.; and

(b) An individual permit, as provided in Rule 62-331.050, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.413, 373.4131, 373.4132, 373.4135, 373.4136, 373.4145, 373.4146, 373.416, 373.414, 373.426 FS. History – New _____.*

**62-331.030 Definitions**

Terms used in this Chapter are defined in section 2.0 of the 404 Handbook.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416 FS. History – New _____.*

**62-331.040 Procedures for Review and Agency Action on Exemption Requests**

(1) A notice to the Agency is not required to conduct an activity that is exempt under subsection 62-331.020(1), F.A.C., except where the activity requires an authorization or notification under Chapter 62-330, F.A.C. Exemptions under Rule 62-330.051, F.A.C., are not applicable to the State 404 Program.

(2) If a person desires Agency verification of qualification to conduct an exempt activity under this Chapter, they shall apply as described in subsections 62-330.050(2) and (3), F.A.C.

4

(3) The verification of qualification to conduct an exempt activity under this Chapter shall be conducted as described in subsections 62-330.050(4) through (7), F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4131, 373.4141, 373.4146(4) FS. History – New _____.*

**62-331.050 Individual Permits**

(1) An individual permit is required for activities within state-assumed waters if they do not qualify for an exemption under subsection 62-331.020(1), F.A.C., or a general permit under Rules 62-331.200 through 62-331.248, F.A.C.

(2) An application for an individual permit shall be:

(a) Prepared in accordance with Rule 62-331.051, F.A.C.;

(b) Submitted in accordance with section 4.3 of the 404 Handbook and section 4.4 of Volume I; and

(c) Reviewed and acted on in accordance with Rule 62-331.052, F.A.C., Rule 62-331.053, F.A.C., and sections 5.0 through 8.5 of the 404 Handbook.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.413, 373.4131, 373.4135, 373.4136, 373.414, 373.4146, 373.416 FS. History – New _____.*

**62-331.051 Application for an Individual Permit**

Materials to include in an application for an individual permit are described below. Applicants are encouraged to have a pre-application meeting or discussion with Agency staff prior to submitting the application.

(1) The application shall be made on Form 62-330.060(1), "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands" (effective date), including the information required in the applicable Sections A, B, C, D, G, H, and I, incorporated by reference in subsection 62-330.060(1), F.A.C. (https://www.flrules.org/Gateway/reference.asp?No=Ref-12036); or by use of the applicable Agency's equivalent e-application form.

(2) All activities which the applicant plans to undertake which are reasonably related to the same project shall be included in the same permit application. Projects that will take longer than the maximum duration allowed under

federal law to complete shall follow the long-term conceptual planning process in 404 Handbook section 5.3.2. Subsequent state 404 permits to complete the project shall undergo an expedited review process pursuant to subsections 62-331.052(1) and 62-331.060(8), F.A.C., provided there are no material changes in the scope of the project as originally proposed, site and surrounding environmental conditions have not changed, and the applicant does not have a history of noncompliance with the existing permit.

(3) An application for a permit to complete a project that a permittee is unable to complete within the original duration of the permit shall undergo an expedited review process pursuant to subsections 62-331.052(1) and 62-331.060(8), F.A.C., provided there are no material changes in the scope of the project as originally proposed, site and surrounding environmental conditions have not changed, and the applicant does not have a history of noncompliance with the existing permit.

(4) In addition to the information described in subsection (1), above, the applicant will be required to provide additional information as necessary to assist in the evaluation of the application. Such additional information may include environmental data and information on alternate methods and sites as necessary for the preparation of the required environmental documentation. Further, such additional information shall include data and information necessary for purposes of reviewing impacts to state and federal listed species, including compliance with any applicable requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.061(44), 403.805(1) FS. Law Implemented 373.413, 373.4131, 373.4135, 373.4136, 373.414, 373.4146, 373.416, 668.003, 668.004, 668.50 FS. History – New _____.*

### 62-331.052 Processing of Individual Permit Applications

(1) Within 30 days of receipt of an application for a permit in accordance with Rule 62-331.051, F.A.C., or receipt of any additional information provided by the applicant in response to the Agency's request for additional information, or within 15 days of receipt of an application for a subsequent phase of a project where the first phase was previously permitted in accordance with section 5.3.2 of the 404 Handbook or where a new permit is needed to complete a project that was unable to be completed during the duration of the original permit, the Agency shall

review the application for administrative and technical completeness and shall request any additional information required by the Agency to publish public notice pursuant to Rule 62-331.060, F.A.C., and to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. The applicant may voluntarily submit a written waiver of the above timeclock requirement to allow the Agency additional time to determine if additional information is required; the Agency is not obligated to accept the waiver or to delay sending the request for additional information.

(a) An application will be considered administratively incomplete if it does not include the information required in subsection 62-331.060(1), F.A.C., and will be considered technically incomplete if additional information is needed to determine if the proposed activity meets the conditions for issuance in Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. Permit applications shall not be considered technically complete until the ERP review, if required, is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met. (See Rule 62-331.070, F.A.C., and section 5.0 of the 404 Handbook)

(b) The timeframes and other provisions described in Volume I, sections 5.5.3.5 through 5.5.3.7 shall also apply to applications for permits under this Chapter.

(c) The Agency may request additional information as necessary during its review of any information that the Agency receives during the public comment period, at a public meeting, or during federal review.

(2) Within 10 days of the Agency determining that an application is administratively complete pursuant to subsection 62-331.060(1), F.A.C., the Agency shall provide public notice as described in subsection 62-331.060(2), F.A.C. In addition, the Agency shall send a copy of the public notice to EPA for those projects that EPA reviews, in accordance with section 5.2.5 of the 404 Handbook.

(3) For those projects that are subject to federal review in accordance with section 5.2.5 of the 404 Handbook:

(a) If the EPA does not comment on, provide notice to the Agency of its intent to comment on, object to, make recommendations with respect to, or notify the Agency that it is reserving its right to object to, a permit application within 30 days of the date EPA receives the notice, the Agency shall make a final permit decision within 60 days after either the close of the public comment period described in subsection 62-331.060(3), F.A.C., or the project is declared technically complete, whichever occurs later.

1. If the decision is to issue a permit, the permit becomes effective when it is signed by the Agency and the applicant.

2. If the decision is to deny the permit, the Agency will notify the applicant in writing of the reason(s) for denial.

(b) If the EPA intends to comment on, object to, or make recommendations with respect to a permit application, or if EPA does not wish to comment but wishes to reserve the right to object based on any new information brought out by the public during the comment period or at a public meeting, EPA shall notify the Agency of its intent within 30 days of receipt of the public notice or the Agency's notice to EPA of failure to accept the recommendations of an affected state or tribe. Once the Agency is notified by EPA, or if the Agency fails to accept the recommendations of an affected state or tribe and EPA must review the reasons for failing to accept the recommendations, the following procedures shall apply:

1. Subject to subparagraphs 2. through 5., below, the permit shall not be issued until after the receipt of such comments, objections, or recommendations, or within 90 days of EPA's receipt of the notice, whichever occurs first.

2. When the Agency has received an EPA objection or requirement for a permit condition under this section, the Agency shall not issue the permit unless the steps required by the EPA to eliminate the objection or condition the permit have been taken. If the Agency chooses not to perform the required steps, the Agency may still issue an ERP permit under Chapter 62-330, F.A.C., but shall not issue a permit under this Chapter. In such a case, the applicant is responsible for obtaining any necessary authorizations under section 404 of the CWA from the Corps.

3. Within 90 days after Agency receipt of an objection or a requirement for a permit condition from the EPA, the Agency or any interested party may request that the EPA hold a public meeting on the objection or requirement. EPA shall conduct a public meeting if requested by the Agency, or if warranted by significant public interest based on requests received.

4. If EPA does not hold a public meeting under subparagraph 3., above, the Agency shall, within 90 days of receipt of the objection or requirement for a permit condition, either issue the permit revised to satisfy EPA's objections or notify EPA of its intent to deny the permit.

5. If EPA holds a public meeting under subparagraph 3., above, EPA shall reaffirm, modify, or withdraw the objection or requirement for a permit condition, and notify the Agency of that decision.

6. If EPA holds a public meeting, the Agency shall have 30 days after EPA gives the Agency notice of its decision under subparagraph 4., above, to take one of the following actions:

a. If EPA has withdrawn the objection or requirement for a permit condition, and the application is technically complete, the Agency may issue the permit; or

b. If EPA has not withdrawn the objection or requirement for a permit condition, the Agency shall do one of the following:

(I) Issue a permit that includes the required permit condition and/or otherwise satisfies EPA's objection;

(II) Notify EPA of its intent to deny the permit; or

(III) Notify EPA and the applicant that the Agency intends to take no action, in which case, the Corps shall process the section 404 authorization.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.042, 373.409, 373.413, 373.4131, 373.4132, 373.4135, 373.4136, 373.414, 373.4141, 373.4142, 373.4145, 373.4146, 373.416, 373.426, 373.429, 704.06 FS. History – New _____.*

**62-331.053 Additional Conditions for Issuance of Individual Permits**

In addition to the conditions in Rules 62-330.301 and 62-330.302, F.A.C., individual permits under this Chapter are subject to the following conditions:

(1) No dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. The Agency shall require the applicant to submit an alternatives analysis completed in accordance with the provisions below. Guidance for completing an alternatives analysis is in Appendix C of the 404 Handbook.

(a) For the purpose of this condition, practicable alternatives shall include, but shall not be limited to:

1. Activities which do not involve dredging or filling in state-assumed waters;

2. Locations where dredge or fill activities would have less adverse impact than the proposed project location, so long as the alternative does not have other significant adverse environmental consequences.

(b) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes. If it is otherwise a practicable alternative, an

area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed to fulfill the basic purpose of the proposed activity may be considered.

(c) Where the dredge or fill activity proposed within a special aquatic site does not require access or proximity to or siting within the special aquatic site to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a dredge or fill activity is proposed within a special aquatic site, all practicable alternatives to the proposed activity which do not involve dredging or filling within a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

(d) To the extent that practicable alternatives have been identified and evaluated under the Coastal Zone Management Program, a CWA section 208 program, or other planning process, such evaluation shall be considered by the Agency as part of the consideration of alternatives under this section. Where such evaluation does not contain all information required under this section, the additional information shall be provided to the Agency for review.

(2) The activity shall not significantly adversely affect the aesthetics of the aquatic ecosystem as they apply to the quality of life enjoyed by the general public and property owners as described in section 8.3.2 of the 404 Handbook.

(3) No permit shall be issued for the following:

(a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project:

1. Causes or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved by the Agency;

2. Causes or contributes to violations of any applicable water quality standard within other states or Tribal lands;

3. Violates any applicable toxic effluent standard or prohibition under section 307 of the CWA, 33 U.S.C. § 1317 (2018), incorporated herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12065), or state law;

4. Jeopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat for endangered or threatened species. Compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission,

the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency as described in subsection 62-331.052(2), F.A.C., shall be determinative for purposes of evaluating violations of this subparagraph. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

5. Violates any requirement imposed by the Secretary of Commerce to protect any area designated as a marine sanctuary.

6. Causes or contributes to significant degradation of wetlands or other surface waters. Effects contributing to significant degradation considered individually or collectively, include:

i. Significant adverse effects on human health or welfare, including but not limited to, effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

ii. Significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the project site through biological, physical, and chemical processes;

iii. Significant adverse effects on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

iv. Significant adverse effects on recreational, aesthetic, and economic values.

(b) When appropriate and practicable steps have not been taken to minimize potential adverse impacts of the activity on the aquatic ecosystem;

(c) When there does not exist sufficient information to make a reasonable judgement as to whether the proposed activity will comply with the requirements of this Chapter;

(d) When the EPA has objected to issuance of the permit and the objection has not been resolved, or placed a requirement for a permit condition that has not been addressed, as described in paragraph 62-331.052(3)(b), F.A.C.;

(e) When the proposed dredge or fill activity would be in an area which has been prohibited, withdrawn, or denied as a disposal site by the EPA under section 404(c) of the CWA, or when the activity would fail to comply with a restriction imposed thereunder;

(f) If the Corps determines, after consultation with the Secretary of the Department in which the Coast Guard is operating, that anchorage and navigation of any of the navigable waters would be substantially impaired.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4146 FS. History – New _____.*

### 62-331.054 General Conditions for Individual Permits

(1) Individual permits shall contain the general conditions for individual permits in subsection 62-330.350(1), F.A.C., as applicable, and any specific conditions necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation requirements and protection measures for listed species or historical resources.

(2) Individual permits shall contain the following conditions in addition to those described in (1), above:

(a) The permittee shall comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of Part IV of Chapter 373, F.S., and this Chapter, as well as a violation of the CWA.

(b) The permittee shall take all reasonable steps to prevent any unauthorized dredging or filling in violation of this permit.

(c) The permittee shall timely notify the Agency of any expected or known actual noncompliance.

(d) Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination.

(e) Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:

1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,

2. Have access to and copy any records that must be kept under the conditions of the permit,

3. Inspect operations regulated or required under the permit, and

4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the CWA, any substances or parameters at any location.

12

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4135, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.042, 373.409, 373.413, 373.4131, 373.4132, 373.4135, 373.4136, 373.414, 373.4141, 373.4142, 373.4145, 373.4146, 373.416, 373.426, 373.429, 704.06 FS. History – New _____.*

### 62-331.060 Public Notice

(1) The Agency shall provide public notice, as described in subsection (2), below, within 10 days of the following: agency determination that an application for an individual permit or major modification is administratively complete; Agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. The Agency shall provide public notice 30 days prior to any scheduled public meeting for such projects. An administratively complete application, as defined and described in sections 2.0 and 8.1, respectively, of the 404 Handbook, shall include the following information:

(a) Name, address, and telephone number of the applicant;

(b) Name(s) and address(es) of owners of property adjoining the property where the activity is proposed to occur;

(c) Self-addressed, stamped envelopes and/or email addresses for each adjoining property owner. These will be used by the Agency to send the public notice. Do not include a return address; it will be added by the Agency;

(d) A complete description of the activity including necessary drawings, sketches, or plans sufficient for public notice; the location, purpose, and intended use of the proposed activity; the long-term conceptual plan described in 404 Handbook, section 5.3.2, if applicable; scheduling of the activity; the location and dimensions of adjacent structures; and a list of authorizations required by other agencies including federal, interstate, state, or local agencies for the work, including all approvals received or denials already made;

(e) A description of the type, composition, source, and quantity of the material to be dredged or used as fill; construction methods; and the site and plans for disposal of any dredged material including a description of spoil cells, dredged material management areas (DMMAs), and final disposal plans if the dredged material is not proposed to remain onsite;

(f) A summary of proposed wetland and other surface water impacts and compensatory mitigation including acres, habitat type, and Uniform Mitigation Assessment Method (UMAM) score developed pursuant to Chapter 62-345, F.A.C., for each assessment area;

(g) The alternatives analysis required by subsection 62-331.053(1), F.A.C.; and

(h) A certification that all information contained in the application is true and accurate and acknowledging awareness of penalties for submitting false information.

(i) Any other information relevant to the project that would significantly assist the public and commenting agencies in reviewing, understanding, and commenting on the proposed project, including information needed for review of impacts to state or federal listed species.

(2) Public notice shall be prepared in accordance with section 5.3.1 of the 404 Handbook and provided as follows:

(a) The Agency shall mail and/or email the notice to the following parties:

1. The applicant;

2. Any other agency with jurisdiction over the activity or the project site, whether or not the agency issues a permit;

3. Owners of property adjoining the property where the regulated activity is proposed or is permitted to occur;

4. Any State or tribe whose waters may be affected by the proposed or permitted activity; and

5. All persons, other than those listed above, who have specifically requested copies of public notices. The Agency may require the use of an existing online notification system to request and receive such notices, except where the requestor asks to be notified by an alternative method because of a technical or financial hardship.

6. The Seminole Tribe of Florida Environmental Resource Management Department (ERMD) for any activity that is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.

7. The Seminole Tribe of Florida's Tribal Historic Preservation Office (THPO) for activities in the State of Florida.

8. The Miccosukee Tribe of Indians of Florida for any activity that is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also for any activity within the Miccosukee

Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A.

(b) Notice shall be published on the Agency website.

(c) The notice provided in subsection (a) or (b), above, may be combined with notice required for ERP permits or certain activities on sovereign submerged lands pursuant to Volume I, section 5.5.2.3, provided the provisions of this section are met.

(3) From the date of publication, interested parties may express their views concerning the permit application, modification, revocation, or suspension for a period of:

(a) 30 days; or

(b) 15 days for the following projects:

1. Mosquito control activities including rotary ditching;

2. Erosion control activities not to exceed 0.2 acre of fill;

3. Restoration efforts required by the Agency that do not exceed 0.5 acre of dredge or fill activities into state-assumed waters;

4. The placement of fill material in freshwater wetlands for residential development, not to exceed 0.2 acre, except within the following areas:

a. Wetlands in or adjacent to Outstanding Florida Waters (OFWs);

b. Wetlands in or adjacent to National Parks, National Wildlife Sanctuaries, National Preserves, and National Marine Sanctuaries;

c. Wetlands in Areas of Critical State Concern;

d. Timicuan Ecological and Historical Preserve in Duval County;

e. Golden Gate Estates, Collier County, south of Alligator Alley;

f. The Florida Keys.

(c) The public notice comment period shall automatically be extended to the close of any public meeting, if one is held. The presiding officer may also extend the comment period at the public meeting.

(4) The Agency may hold a public meeting for a proposed project, modification, revocation, or suspension if it is determined that there is a significant degree of public interest in the application. A public meeting may also be

held at the discretion of the Agency, when the Agency determines a public meeting may be useful to a decision on the permit application. Interested parties may request a public meeting during the comment period in subsection (3), above.

(a) Any request for a public meeting shall be in writing and shall state the nature of the issues proposed to be raised at the public meeting.

(b) The Agency shall provide notice of a public meeting at least 30 days prior to the scheduled public meeting date.

(c) Any person may submit oral or written statements or data concerning the permit application at the public meeting. Public meetings shall be reported verbatim. Copies of the record of proceedings may be obtained from the Agency or the reporter of such meeting. A copy of the transcript (or, if none is prepared, a recording of the proceedings) shall be made available for public inspection at the local Agency office.

(5) Any state whose waters may be affected by the proposed activity, or any tribe whose waters or resources, including historical resources, may be affected by the proposed activity, may submit written comments and suggest permit conditions within the public notice comment period provided in subsection (3), above. If the Agency does not accept the recommendations of the state or tribe, the Agency shall notify the state or tribe and EPA in writing, prior to permit issuance, of the Agency's failure to accept the recommendations, with the reasons for so doing. The application shall then be subject to the review process in paragraph 62-331.052(3)(b), F.A.C.

(6) The Agency shall consider all comments received in response to the public notice, and public meeting if a meeting is held. All comments, as well as the record of any public meeting, shall be made part of the official record on the application.

(7) Revocation or suspension of permits shall be subject to the review process in subsection 62-331.052(3), F.A.C.

(8) Notice for subsequent phases of a long-term project permitted in accordance with section 5.3.2 of the 404 Handbook, or for permits to complete a project that was unable to be completed during the duration of the original permit, shall include only those changes not considered during permitting of a previous phase. Where there are no changes to the project, the notice shall provide the public an opportunity to submit comments, materials, or evidence pertaining to identification of material site changes or potential noncompliance.

16

*Rulemaking Authority 373.026(7), 373.043, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4146 FS.*

*History – New _____.*

### 62-331.070 Water Quality and Coastal Zone Consistency Review

(1) Compliance with applicable state water quality standards shall be required for issuance of a permit.

(2) Compliance with the Coastal Zone Management Program shall be required for issuance of a permit.

(3) To ensure compliance with subsections (1) and (2), above, a verification of exemption or permit under this Chapter shall not be issued unless the activity is exempt under Chapter 62-330, F.A.C., or the applicable ERP under Chapter 62-330, F.A.C., is issued.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4131, 373.4145, 380.23(4), 403.0877, 403.805(1) FS. Law Implemented 373.026(7), 373.109, 373.117, 373.118, 373.413, 373.4131, 373.4141, 373.4145, 373.4136, 373.4146, 373.416, 373.426, 373.428, 380.23, 403.0877 FS. History – New _____.*

### 62-331.080 Modification, Suspension, or Revocation of Permits

Modification of permits shall be conducted in accordance with subsections 62-330.315(1) through (3), F.A.C., and section 6.2 of Volume I, as applicable. Suspension or revocation of permits shall be conducted in accordance with Section 373.429, F.S. In addition, modification, suspension, or revocation of permits is subject to the following:

(1) The following shall be processed as minor modifications. Any activity not covered below shall be processed as a major modification:

(a) Correction of typographical errors;

(b) Requiring more frequent monitoring or reporting by permittee;

(c) Changing ownership or operational control of a project or activity where the Agency determines that no other change in the permit is necessary, provided that a written agreement containing a specific date for transfer of permit responsibility, coverage, and liability between the current and new permittees has been submitted to the Agency;

(d) Minor modifications of project plans that do not significantly change the character, scope, and/or purpose of the project or result in significant change in environmental impact. The Agency shall use the factors in section 6.2.1(d) of Volume I, as applicable, to determine whether the modification will be considered minor;

(e) Extending the term of an individual permit to the amount of time reasonably needed to complete the project, but not to exceed the maximum duration allowed under federal law and so long as the modification does not result in any increase in the amount of material to be dredged or used as fill.

(2) The Agency shall reevaluate the circumstances and conditions of a permit at any time, either on its own motion or at the request of the permittee or a third party and determine whether to initiate action to modify, suspend, or revoke a permit if sufficient cause exists. Sufficient cause exists when any one of the following factors are present:

(a) Permittee's noncompliance with any of the terms or conditions of the permit;

(b) Permittee's failure in the application or during the permit issuance process to fully disclose all relevant facts or the permittee's misrepresentation of any relevant facts at the time;

(c) Information that activities authorized by a general permit are having more than minimal individual or cumulative adverse effect on the environment, or that the permitted activities are more appropriately regulated by individual permits;

(d) Circumstances relating to the authorized activity have changed since the permit was issued and changed permit conditions or temporary or permanent cessation of any dredge or fill activity controlled by the permit are justified;

(e) Any significant information relating to the activity authorized by the permit if such information was not available at the time the permit was issued and would have justified the imposition of different permit conditions or denial at the time of issuance;

(f) Revisions to applicable statutory or regulatory authority, including toxic effluent standards or prohibitions or water quality standards.

(3) Extensions of permits.

(a) Individual permits shall not be extended beyond the maximum duration allowed under federal law.

(b) General permits shall not be extended.

(4) Public notice.

(a) Minor modifications shall not be subject to the public notice requirements in Rule 62-331.060, F.A.C.

(b) Major modifications shall be subject to the public notice requirements in Rule 62-331.060, F.A.C. However, only the conditions subject to modification shall be re-opened.

18

(c) Revocation and suspension of permits shall be effective upon the permittee's receipt of notification from the Agency of such revocation or suspension. Public notice of the revocation or suspension shall be made in accordance with Rule 62-331.060, F.A.C.

*Rulemaking Authority 373.026(7), 373.043, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4146, 373.429 FS. History – New_____.*

### 62-331.090 Duration of Permits

Unless revoked or otherwise modified, the duration of a permit under this Chapter is:

(1) General permits shall be effective for a fixed term not to exceed five years as provided in subsection 62-331.200(5), F.A.C.

(2) The duration of individual permits shall be specified in each permit and shall not exceed the maximum timeframe allowable under federal law and reasonably necessary to complete the project.

*Rulemaking Authority 373.026(7), 373.043, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4146(5) FS. History – New_____.*

### 62-331.100 Transfer of Permit Upon Change of Ownership or Control

(1) Transfer of an individual permit shall be in accordance with Rule 62-330.340, F.A.C. The phrase "under this Chapter" shall mean Chapter 62-331, F.A.C.

(2) If the permittee sells the property associated with a general permit verification, the permittee shall transfer the general permit verification to the new owner by submitting a completed Form 62-331.100(1) – "Transfer of State 404 Program General Permit Verification", incorporated by reference herein (effective date) (https://flrules.org/Gateway/reference.asp?No=Ref-12042), within 30 days of the sale, to the Agency that processed the original notice.

*Rulemaking Authority 373.026(7), 373.043, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.4131, 373.4135, 373.4136, 373.4145, 373.4146, 373.416, 373.426 FS. History – New_____.*

### 62-331.110 Emergency Field Authorizations

(1) The Agency shall issue an emergency field authorization for dredge or fill activities to abate an emergency condition before a permit could be issued or modified under this Chapter. "Emergency conditions" are defined as

those that pose an imminent or existing serious threat or danger and require immediate action to protect the public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural or other reasonable uses. Carelessness or the lack of planning on the part of an applicant shall not be sufficient grounds to warrant the granting of an emergency field authorization.

(2) The entity requesting an emergency field authorization shall complete an "State 404 Program Emergency Field Authorization", Form 62-331.110(1) (effective date), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12066).  A copy of this form may be obtained from the Agency, as described in subsection 62-331.010(8), F.A.C. The activity authorized by the emergency field authorization may commence upon written approval by the Agency's field representative. The recipient of an emergency field authorization is responsible for compliance with all the terms and conditions of the authorization.

(3) Any emergency field authorization shall be limited to the duration of time (typically no more than 90 days) required to complete the authorized emergency action.

(4) The emergency field authorization may be terminated at any time, effective immediately upon the Agency notifying the permittee of the termination either orally or in writing, if the Agency determines that termination is necessary to protect human health or the environment. If oral termination is given, the Agency shall follow up with a written termination within five business days.

(5) Notice of the emergency field authorization shall be published and public comments solicited in accordance with Rule 62-331.060, F.A.C., as soon as possible, but no later than 10 days after the issuance date.

(6) If required by a condition in the emergency field authorization, the permittee shall, within 90 days of issuance of the emergency field authorization, apply for a permit. Such permit, if issued, shall, where applicable, include requirements for restoration of aquatic resources or modification of the work completed under the emergency field authorization to comply with the provisions of this Chapter.

(7) The Agency shall consult with EPA, the Corps, the tribes, FWC, FWS, and NMFS, as applicable, about issuance of an emergency permit as soon as possible after the emergency permit is requested, but no later than the day of issuance of the emergency permit.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.4145, 373.4146, 403.805(1) FS. Law Implemented 373.119, 373.413, 373.4131, 373.4145,373.4146, 373.416, 373.426, 373.439 FS. History – New*

**62-331.120 Fees**

There shall be no additional fee charged for verifications, notices, applications, or permits under this Chapter.

*Rulemaking Authority 373.026(7), 373.043, 373.118, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.109, 373.4146 FS. History – New*

**62-331.130 Compensatory Mitigation**

Compensatory mitigation shall be considered only after the requirements of Rule 62-331.053(1), F.A.C., have been met. Compensatory mitigation required for authorizations or compliance actions under this Chapter shall be conducted in accordance with section 10.3 of Volume I, section 8.5 of the 404 Handbook, and this section:

(1) Mitigation Hierarchy. The preferential hierarchy in the 404 Handbook section 8.5.1 shall be followed when compensatory mitigation is required for authorizations and compliance actions.

(2) Mitigation proposals other than the purchase of mitigation bank or in-lieu fee program credits shall include an adaptive management plan. The plan shall include information about the party or parties responsible for implementing adaptive management measures, including the information required in Volume I, section 10.3.1.2.1.

(3) Federal credits from mitigation banks or in-lieu fee programs approved by the Corps shall be accepted by the Agencies to offset impacts for permits when the number and resource type of credits available are appropriate to offset impacts.

(4) Mining reclamation activities may be considered appropriate compensatory mitigation for impacts from mining projects undertaken pursuant to Chapter 378, F.S., and rules promulgated thereunder, if they maintain or improve the water quality and the function of biological systems present at the site prior to the commencement of mining activities, subject to the following additional requirements:

(a) Additional compensatory mitigation shall be required if the Agency determines that the onsite reclamation activities will not fully offset the regulated activity's adverse impacts.

(b) Section 373.414(6)(b), F.S., and paragraph 62-345.600(1)(b), F.A.C., pertaining to time lag for phosphate and heavy minerals mines, shall not apply to compensatory mitigation for permits or compliance actions.

(c) Additional compensatory mitigation, if required, shall be subject to the mitigation hierarchy in subsection (1), above.

21

(5) Compensatory mitigation for Florida Department of Transportation (FDOT) projects, proposed in accordance with Section 373.4137, F.S., shall be consistent with this Chapter to be used for State 404 Program permits.

(6) Compensatory mitigation for mining in the Miami-Dade County Lake Belt Area requiring a State 404 permit conducted in accordance with Section 373.41492, F.S. shall be consistent with this Chapter to be used for State 404 Program permits. Activities authorized by the permit cannot commence until the specific compensatory mitigation project for which the mitigation funds will be used are identified and approved by the Lake Belt Mitigation Committee.

*Rulemaking Authority 373.026(7), 373.043, 373.414, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.413, 373.4131, 373.4132, 373.4135, 373.4136, 373.414, 373.4144, 373.4145, 373.4146, 373.416 FS. History – New        .*

**62-331.140 Mitigation Banks and In-Lieu Fee Programs**

(1) Mitigation banks and in-lieu fee program instruments shall be reviewed and processed by the Corps in accordance with federal law. However, the Agency shall be responsible for issuing any permits required for dredge or fill activities needed to implement the mitigation bank or in-lieu fee program within state-assumed waters.

(2) Federal mitigation bank and in-lieu fee credits shall be acceptable to provide compensatory mitigation for State 404 Program permits, where appropriate. (See 404 Handbook, section 8.5.1).

(3) A designated representative of the Agency shall serve as a member of the Interagency Review Team.

*Rulemaking Authority 373.026(7), 373.043, 373.4135, 373.414, 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.413, 373.4131, 373.4132, 373.4135, 373.4136, 373.4146 FS. History – New*

**62-331.160 Use of Formal Determinations**

A valid formal determination completed in accordance with subsection 62-330.201(2), F.A.C., and Volume I, section 7.2 shall be accepted in an application for a permit.

*Rulemaking Authority 373.026(7), 373.043, 373.4131, 373.421(2), 373.4146(2), 403.805(1), 403.0877 FS. Law Implemented 373.026, 373.4131, 373.4146, 373.421(2), 373.441 FS. History – New      .*

**62-331.200 Policy and Purpose of General Permits**

(1) The general permits apply to those activities that do not otherwise qualify for an exemption under subsection 62-331.020(1), F.A.C., and that qualify under the general permit requirements in this section and within the specific general permit for which notice of intent to use a general permit is given.

(2) General permits authorize activities that, if conducted consistent with the permit requirements, will cause only minimal individual and cumulative adverse environmental effects. Compensatory mitigation shall be required, when necessary, to offset impacts authorized under a general permit, unless the general permit specifically states otherwise. Any required compensatory mitigation must comply with provisions in Rule 62-331.130, F.A.C., and section 8.5 of the 404 Handbook.

(3) If required, notice of intent to use the general permit shall be given pursuant to subsection 62-330.402(1), F.A.C., and section 4.3 of the 404 Handbook, and acted upon in accordance with subsection 62-330.402(4), F.A.C., section 5.0 of the 404 Handbook, and this section. Submittal of a notice of intent to the Agency is required if:

(a) Indicated in the general permit;

(b) The activity requires a notification or authorization under Chapter 62-330, F.A.C.;

(c) The project is in state-assumed waters accessible to any state or federal listed species;

(d) The activity is adjacent to the river segments identified in the Nationwide Rivers Inventory: https://www.nps.gov/ncrc/programs/rtca/nri/index.html;

(e) The activity is in the Florida Keys;

(f) The project is adjacent to a federal project;

(g) The project is adjacent to or may impact Tribal lands or Tribal Trust Resources;

(h) The project is within six miles of the Seminole Tribe of Florida's Big Cypress or Brighton Reservations; within two miles of the Seminole Tribe of Florida's Immokalee, Lakeland, or Fort Pierce Reservations; within one mile of the Seminole Tribe of Florida's Tampa, Coconut Creek, or Hollywood Reservations; within the Seminole Tribe's reserved rights areas, including but not limited to: within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A;

(i)  The project is within two miles of the Miccosukee Federal Reservation; Miccosukee Reserve Area; Krome Avenue, Dade Corners, Cherry Ranch, or Sherrod Ranch Reservations; and Coral Way, Lambick, or Sema Trust Properties. Also for any activity within the Miccosukee Tribe's reserved rights areas, including but not limited to:

within Big Cypress National Preserve; within Big Cypress National Preserve addition lands; within Everglades National Park; within Rotenberger Wildlife Management Area; or within Water Conservation Area 3-A; or

(j) The State Historic Preservation Office (SHPO) determines that the Florida Master Site File (FMSF) includes a historic property within 50 meters of the project area that is listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places. To obtain this determination, any person who intends to use a general permit that does not otherwise require notice shall contact the FMSF to conduct a historic properties search. The applicant shall provide the FMSF with a description of project area, project area map, and Section/Township/Range and/or latitude/longitude coordinates to sitefile@dos.myflorida.com or contact the FMSF office at (850) 245-6440.

1. Where the FMSF Report for the property (or all properties if more than one) shows the SHPO Evaluation ('SHPO Eval' column) to be "Not Eligible" and also shows the property(ies) are not listed or proposed for listing on the National Register of Historic Places ('NR Status' column), and notice is not otherwise required under this section, then submittal of a notice of intent is not required.

2. Notice is required if the applicant has knowledge of a historic property that is listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties.

(4) Each permittee who receives a general permit verification letter under this Chapter must submit a completed Form 62-331.200(1) – "Certification of Compliance with a State 404 Program General Permit", incorporated by reference herein (effective date) (https://www.flrules.org/Gateway/reference.asp?No=Ref-12067), within 30 days of completion of the authorized activity, or the implementation of any required compensatory mitigation, whichever is later.

(5) General permits shall expire five years from the date the general permit becomes effective in rule. If the general permits are not renewed before the expiration date, an individual permit will be required for the activities.

(6) The Agency shall have discretionary authority to require any person authorized under a general permit to apply for an individual permit where sufficient cause exists. Sufficient cause shall include a likelihood that the project will cause more than minimal adverse environmental effects to the aquatic environment; including individual, secondary, and cumulative impacts; and the ability to comply with the conditions in Rule 62-331.201, F.A.C., below.

24

(7) The Agency may administer, upon agreement with the Corps, Corps regional general permits that are still effective upon the date of assumption for projects within assumed waters, where appropriate, until the date that they expire. The Department shall keep a list of any regional general permits administered by the state after the date of assumption at the following website [address].

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1), FS. Law Implemented 373.118, 373.4131, 373.414, 373.4144, 373.4145, 373.4146, 373.416, 373.426 FS. History – New _____.*

### 62-331.201 Conditions for General Permits

(1) General permits shall be subject to the conditions in subsections (2) and (3), below, and the general conditions for all general permits in Rule 62-330.405, F.A.C., except subsections 62-330.405(7) and (10), F.A.C. The Agency may revise the general conditions in Rule 62-330.405, F.A.C. to include references to applicable rules under this Chapter, as necessary.

(2) When a project requires submittal of a notice of intent to use a general permit, the Agency shall impose specific conditions as necessary to assure that the activities will be conducted in compliance with this Chapter, and in a manner which minimizes adverse impacts upon the physical, chemical, and biological integrity of wetlands or other surface waters, such as mitigation, monitoring, reporting, or recordkeeping requirements and protection measures for listed species or historical resources.

(3) In addition, general permits under this Chapter are subject to the following conditions:

(a) Aquatic Life Movements. No activity may substantially disrupt the necessary life cycle movements of those species of aquatic life indigenous to the waterbody, including those species that normally migrate through the area, unless the activity's primary purpose is to impound water. All permanent and temporary crossings of waterbodies shall be suitably culverted, bridged, or otherwise designed and constructed to maintain low flows to sustain the movement of those aquatic species. If a bottomless culvert cannot be used, then the crossing shall be designed and constructed to minimize adverse effects to aquatic life movements.

(b) Spawning Areas. Activities in spawning areas during spawning seasons must be avoided to the maximum extent practicable. Activities that result in the physical destruction (e.g., through excavation, fill, or downstream smothering by substantial turbidity) of an important spawning area are not authorized.

(c) Migratory Bird Breeding Areas. Activities in state-assumed waters that serve as breeding areas for migratory birds must be avoided to the maximum extent practicable.

(d) Shellfish Beds. No activity may occur in areas of concentrated shellfish populations, unless the activity is directly related to a shellfish harvesting activity authorized by general permits in Rule 62-331.211 or 62-331.244, F.A.C., or is a shellfish seeding or habitat restoration activity authorized by the general permit in Rule 62-331.225, F.A.C.

(e) Suitable Material. No activity may use unsuitable material (e.g., trash, debris, car bodies, asphalt, etc.). Material used for construction or fill must be free from toxic pollutants in toxic amounts as listed in section 307 of the CWA, which is incorporated by reference in subparagraph 62-331.053(3)(a)3., F.A.C., or state law.

(f) Water Supply Intakes. No activity may occur within 1000 feet of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization.

(g) Fills Within 100-year Floodplains. The activity shall comply with applicable FEMA-approved state or local floodplain management requirements.

(h) Single and Complete Project. The activity must be a single and complete project. The same general permit cannot be used more than once for the same single and complete project unless otherwise stated within the general permit. (See 404 Handbook, section 3.2.1.)

(i) Wild and Scenic Rivers. No general permit activity may occur in a component of the National Wild and Scenic Rivers System, or in a river officially designated by Congress as a study river for possible inclusion in the System while the river is in an official study status, unless the appropriate federal agency with direct management responsibility for such river has determined in writing that the proposed activity will not adversely affect the Wild and Scenic River designation or study status.

(j) Tribal Rights. No general permit activity may cause more than minimal adverse effects on tribal rights (including treaty rights, settlement rights, or rights reserved under state or federal law), protected tribal resources (including cultural or burial resources off reservation), tribal waters, or to tribal lands.

(k) Listed species. No activity is authorized under any general permit which is likely to directly or indirectly jeopardize the continued existence of an endangered or threatened species or a species proposed for such designation, or which will directly or indirectly destroy or adversely modify the critical habitat of such species. No activity is authorized under any general permit which may affect a listed species or critical habitat, unless the

Agency has consulted with, or been provided technical assistance by the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service under their respective authorities and appropriate measures to address the effects of the proposed activity have been implemented or are required as a specific condition to the general permit.

(l) Migratory Birds and Bald and Golden Eagles. The permittee is responsible for ensuring their action complies with the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 – 712 (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12068), and the Bald and Golden Eagle Protection Act, 16 U.S.C. §§ 668 – 668(d) (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12069). The permittee is responsible for contacting the appropriate local office of the U.S. Fish and Wildlife Service to determine applicable measures to reduce impacts to migratory birds or eagles, including whether incidental take permits are necessary and available under the Migratory Bird Treaty Act or Bald and Golden Eagle Protection Act for a particular activity.

(m) Historic Properties. In cases where the Agency determines, based on information from SHPO, that the activity may have the potential to cause effects to properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized until a determination of "no effect" or "no adverse effect" is provided by SHPO.

(n) Manatees. In waters that are accessible to manatees, the permittee shall follow the "Standard Manatee Conditions for In-Water Work (2011)", incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12070).

(o) Sea turtles, smalltooth sawfish, Gulf sturgeon, or shortnose sturgeon. In waters that are accessible to these species, the permittee shall follow the "Sea Turtle and Smalltooth Sawfish Construction Conditions" (March 23, 2006), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12071).

(p) Use of Multiple General Permits. The use of more than one general permit under this Chapter for a single and complete project is prohibited, except when specified within a specific general permit, or when the acreage loss of state-assumed waters authorized by the general permits does not exceed the acreage limit of the general permit with the highest specified acreage limit.

(q) Transfer of General Permit Verifications. If the permittee sells the property associated with the general permit verification, the permittee shall transfer the general permit verification to the new owner by submitting a

completed Form 62-331.100(1) – "Transfer of State 404 Program General Permit Verification" (effective date), incorporated by reference in subsection 62-331.100(2), F.A.C., within 30 days of the sale, to the Agency that processed the original notice.

(r) Compliance Certification. Each permittee who receives a general permit verification letter under this Chapter must submit a completed Form 62-331.200(1) – "Certification of Compliance with a State 404 Program General Permit" (effective date), incorporated by reference in subsection 62-331.200(4), F.A.C., within 30 days of completion of the authorized activity, or the implementation of any required compensatory mitigation, whichever is later.

(s) Activities Affecting Structures or Work Built by the United States. If an activity also requires permission from the Corps pursuant to 33 U.S.C. § 408 because it will alter or temporarily or permanently occupy or use a Corps federally authorized Civil Works project, the prospective permittee is responsible for obtaining such permission separately from the Corps prior to commencing activities authorized by the general permit.

(t) If during the ground disturbing activities and construction work within the permit area, there are archaeological or cultural materials encountered which were not the subject of a previous cultural resources assessment survey or to which such impacts were not anticipated, including but not limited to pottery, modified shell, flora, fauna, human remains, ceramics, stone tools or metal implements, dugout canoes, evidence of structures or any other physical remains that could be associated with Native American cultures or early colonial or American settlement; the Permittee shall immediately stop all work  and ground-disturbing activities within a 100-meter diameter of the discovery and notify the Agency within the same business day. The Agency shall then notify the State Historic Preservation Officer (SHPO) and the appropriate Tribal Historic Preservation Officer(s) (THPO(s)) or tribe when the interested tribe does not have a THPO, to assess the significance of the discovery and devise appropriate actions.

(u) Additional cultural resources assessments may be required of the permit area in the case of unanticipated discoveries or effects to historic properties as referenced in accordance with condition (t), above, and if deemed necessary by the SHPO, or THPO(s), Tribes, or Agency. Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Agency may modify, suspend, or revoke the permit in accordance with Rule 62-331.080, F.A.C. Such activity shall not resume without written authorization from the

SHPO and THPO(s), or tribe when the interested tribe does not have a THPO, concerning potential effects to cultural resources or historic properties for finds under their jurisdiction, and from the Agency.

(v) In the event that unmarked human remains are identified, they shall be treated in accordance with Section 872.05, F.S. All work and ground-disturbing activities within a 100-meter diameter of the unmarked human remains shall immediately cease and the Permittee shall immediately notify the medical examiner, Agency, and State Archaeologist within the same business day. The Agency shall then notify the appropriate SHPO and THPO(s) and appropriate tribes and other appropriate consulting parties. Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Agency may modify, suspend, or revoke the permit in accordance with Rule 62-331.080, F.A.C. Such activity shall not resume without written authorization from the medical examiner, State Archaeologist, and from the Agency. Additionally, if the unmarked remains were identified on federal lands, or lands where the Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa – 470mm (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12072), or the Native American Graves Protection Repatriation 25 U.S.C. §§ 3001-3013 (2018), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12073), applies, such activity shall not resume without written authorization from the SHPO, the appropriate THPO(s), and the federal land manager.

(w) Noncompliance. The permittee shall timely notify the Agency of any expected or known actual noncompliance.

(x) Inspection and entry. The permittee shall allow the Agency, upon presentation of proper identification, at reasonable times to:

1. Enter upon the permittee's premises where a regulated activity is located or where records must be kept under the conditions of the permit,

2. Have access to and copy any records that must be kept under the conditions of the permit,

3. Inspect operations regulated or required under the permit, and

4. Sample or monitor, for the purposes of assuring permit compliance or as otherwise authorized by the Act, any substances or parameters at any location.

(y) The permittee shall comply with all conditions of the permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of Part IV of Chapter 373, F.S., and this Chapter, as well as a violation of the CWA.

(z) The permittee shall take all reasonable steps to prevent any unauthorized dredging or filling in violation of this permit.

(aa) Upon Agency request, the permittee shall provide information necessary to determine compliance status, or whether cause exists for permit modification, revocation, or termination.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


### 62-331.210 General Permit for Maintenance or Removal

(1) This general permit authorizes the following activities:

(a) The repair, rehabilitation, or replacement of any previously authorized, currently serviceable structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR § 330.3 as of July 1, 2019, incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12074), provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, requirements of other regulatory agencies, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized.

(b)  The removal of previously authorized structures or fills. Any stream channel modification is limited to the minimum necessary for the repair, rehabilitation, or replacement of the structure or fill; such modifications, including the removal of material from the stream channel, must be immediately adjacent to the project.

(c) The removal of accumulated sediment and debris within, and in the immediate vicinity of, the structure or fill.

(d) The repair, rehabilitation, or replacement of those structures or fills destroyed or damaged by storms, floods, fire or other discrete events, provided the repair, rehabilitation, or replacement is commenced, or is under contract to commence, within two years of the date of their destruction or damage. In cases of catastrophic events, such as hurricanes or tornadoes, this two-year limit may be waived by the Agency, provided the permittee can demonstrate funding, contract, or other similar delays.

(e) The removal of accumulated sediments and debris outside the immediate vicinity of existing structures (e.g., bridges, culverted road crossings, water intake structures, etc.). The removal of sediment is limited to the minimum necessary to restore the waterway in the vicinity of the structure to the approximate dimensions that existed when the structure was built but cannot extend farther than 200 feet in any direction from the structure. This 200-foot limit does not apply to maintenance dredging to remove accumulated sediments blocking or restricting outfall and intake structures. All dredged or excavated materials must be deposited and retained in an area that has no state-assumed waters unless otherwise specifically approved by the Agency under separate authorization.

(f) Temporary structures, fills, and work, including the use of temporary mats, necessary to conduct the maintenance activity. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and fill, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. After conducting the maintenance activity, temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations. The areas affected by temporary fills must be revegetated.

(2) This general permit does not authorize:

(a) Beach restoration.

(b) New stream channelization or stream relocation projects.

(c) Maintenance or removal of projects that capture and store water, such as Dispersed Water Management Projects (DWMPs).

(3) Notice of intent to use this general permit is required for activities authorized by paragraph (1)(e), The notice must include information regarding the original design capacities and configurations of the outfalls, intakes, and small impoundments.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373. 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.211 General Permit for Fish and Wildlife Harvesting, Enhancement, and Attraction Devices**

(1) This general permit authorizes fish and wildlife harvesting devices and activities such as pound nets, crab traps, crab dredging, eel pots, lobster traps, duck blinds, and clam and oyster digging, fish aggregating devices (for research purposes only), and small fish attraction devices.

(2) This general permit does not authorize:

(a) Artificial reefs.

(b) Impoundments and semi-impoundments of state-assumed waters for the culture or holding of motile species such as lobster.

(c) The use of covered oyster trays or clam racks.

(d) Placement of materials for Live Rock culture.

(e) Harvesting of Live Rock.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

### 62-331.212 General Permit for Scientific Measurement Devices

(1) This general permit authorizes the following activities:

(a) Installation and removal of devices, whose purpose is to measure and record scientific data, such as staff gages, meteorological stations, water recording and biological observation devices, water quality testing and improvement devices, and similar structures.

(b) Installation and removal of small weirs and flumes constructed primarily to record water quantity and velocity, provided the dredging or filling is limited to 25 cubic yards.

(2) Upon completion of the use of the device to measure and record scientific data, the measuring device and any other structures or fills associated with that device (e.g., foundations, anchors, buoys, lines, etc.) must be removed to the maximum extent practicable and the site restored to pre-construction elevations.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.213 General Permit for Survey Activities**

(1) This general permit authorizes the following activities:

(a) Survey activities, such as core sampling, seismic exploratory operations, plugging of seismic shot holes and other exploratory-type bore holes, exploratory trenching, soil surveys, sampling, sample plots or transects for wetland delineations, and historic resources surveys. For the purposes of this general permit, the term "exploratory trenching" means mechanical land clearing of the upper soil profile to expose bedrock or substrate, for the purpose of mapping or sampling the exposed material. The area in which the exploratory trench is dug must be restored to its pre-construction elevation upon completion of the work and must not drain a state-assumed water. In wetlands, the top 6 to 12 inches of the trench shall be backfilled with topsoil from the trench.

(b) The construction of temporary pads, provided the fill does not exceed 1/10-acre in waters of the U.S.

(2) This general permit does not authorize:

(a) Dredging, filling, or structures associated with the recovery of historic resources.

(b) Drilling and the sidecasting of excavated material from test wells for oil and gas exploration; however, the plugging of such wells is authorized.

(c) Fill placed for roads and other similar activities.

(d) Permanent structures.

(e) Seismic exploratory devices within the limits of the Everglades as defined in Sections 403.031(13)(a) and (b), F.S., and the Big Cypress and Water Conservation Areas 1, 2A, 2B, 3, and 3A.

(3) Notice of intent to use this general permit is required for Seismic exploratory activities in state-assumed waters accessible to any federal listed species.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.214 General Permit for Outfall and Intake Structures**

(1) This general permit authorizes activities related to the construction or modification of outfall structures and associated intake structures, where the effluent from the outfall is authorized, conditionally authorized, or specifically exempted by, or otherwise in compliance with regulations issued under Part I of Chapter 403, F.S.

(2) This general permit does not authorize the construction of intake structures, unless they are directly associated with an authorized outfall structure.

(3) Notification: The permittee must submit a notice to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.215 General Permit for Utility Line Activities**

(1) This general permit authorizes the following activities:

(a) Activities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in state-assumed waters, provided the activity does not result in the loss of greater than 1/2-acre of state-assumed waters for each single and complete project.

1. A "utility line" is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and internet, radio, and television communication. The term "utility line" does not include activities that drain a state-assumed water, such as drainage tile or French drains, but it does apply to pipes conveying drainage from another area.

2. Material resulting from trench excavation may be temporarily sidecast into state-assumed waters for no more than three months, provided the material is not placed in such a manner that it is dispersed by stormwater or other forces. The Agency may extend the period of temporary side casting for no more than a total of 180 days, where appropriate. For a trench with a top width greater than three feet in herbaceous wetlands, the upper layer of the soil horizon shall initially be scraped and segregated into a spoil bank that is separated from the spoil bank resulting from the excavation of the trench for the utility line. The upper layer of the soil horizon shall be replaced as the last step of restored grades to facilitate natural revegetation. The trench cannot be constructed or backfilled in such a manner as to drain state-assumed waters (e.g., backfilling with extensive gravel layers, creating a French drain effect).

3. Any exposed slopes and stream banks must be stabilized immediately upon completion of the utility line crossing of each waterbody.

4. For overhead utility lines authorized by this general permit, a copy of the notice will be provided to the Department of Defense Siting Clearinghouse, which will evaluate potential effects on military activities.

(b) Construction, maintenance, or expansion of substation facilities associated with a power line or utility line in state-assumed waters, provided the activity, in combination with all other activities included in one single and complete project, does not result in the loss of greater than 1/2-acre of state-assumed waters.

(c) Construction or maintenance of foundations for overhead utility line towers, poles, and anchors in state-assumed waters, provided the foundations are the minimum size necessary and separate footings for each tower leg (rather than a larger single pad) are used where feasible.

(d) Construction of access roads for the construction and maintenance of utility lines, including overhead power lines and utility line substations, in state-assumed waters, provided the activity, in combination with all other activities included in one single and complete project, does not cause the loss of greater than 1/2-acre of state-assumed waters.

1. Access roads must be the minimum width necessary.

2. Access roads must be constructed so that the length of the road minimizes any adverse effects on state-assumed waters and must be as near as possible to pre-construction contours and elevations (e.g., at grade corduroy roads or geotextile/gravel roads). Access roads constructed above pre-construction contours and elevations in state-assumed waters must be properly bridged or culverted to maintain surface flows.

3. Access roads used for both construction and maintenance may be authorized, provided they meet the terms and conditions of this general permit.

4. Access roads used solely for construction of the utility line must be removed upon completion of the work, in accordance with the requirements for temporary fills as referenced in paragraph (f), below.

(e) Temporary structures, fills, and work necessary for the remediation of inadvertent returns of drilling fluids to state-assumed waters through sub-soil fissures or fractures that might occur during horizontal directional drilling activities conducted for the purpose of installing or replacing utility lines.

1. These remediation activities must be done as soon as practicable, to restore the affected waterbody.

2. Permittees must prepare a frac-out plan prior to construction that meets the requirements of section 3.2.1.3 of the 404 Handbook.

(f) Temporary structures, fills, and work, including the use of temporary mats, necessary to conduct the utility line activity.

1. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and fill, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites.

2. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows or stormwater.

3. After construction, temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations.

4. The areas affected by temporary fills must be revegetated.

(2) This general permit does not authorize:

(a) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters to construct, maintain, or expand substation facilities.

(b) Dredging or filling in nontidal wetlands adjacent to tidal retained waters for access roads.

(3) A notice of intent to use this general permit is required prior to commencing the activity if any of the following criteria are met:

(a) The activity involves mechanized land clearing in a forested wetland for the utility line right-of-way.

(b) The utility line in state-assumed waters, excluding overhead lines, exceeds 500 feet.

(c) The utility line is placed within a state-assumed water, and it runs parallel to or along a stream bed that is within that area of state-assumed waters.

(d) Activities that result in the loss of greater than 1/10-acre of state-assumed waters.

(e) The activity is within forested wetlands.  (f) Permanent access roads are constructed above grade in state-assumed waters for a distance of more than 500 feet.

(g) Permanent access roads are constructed in state-assumed waters with impervious materials.

(l) The project is in the following rivers, creeks, and their tributaries:

1. Escambia River

2. Yellow River

3. Shoal River

4. Choctawhatchee River

5. Chipola River

6. Apalachicola River

7. Ochlockonee River

8. Santa Fe River

9. New River (Bradford and Union County line)

10. Econfina Creek (4) For utility line activities crossing a single waterbody more than one time at separate and distant locations, or multiple waterbodies at separate and distant locations, each crossing is considered a single and complete project for purposes of general permit authorization.

(5) For activities that require notice of intent to use this general permit, the notice must include any other general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity, including other separate and distant crossings that require a general permit authorization but do not require submittal of a notice of intent.

(6) The agency shall require mitigation, when necessary, to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.216 General Permit for Bank Stabilization**

(1) This general permit authorizes the following activities:

(a) Bank stabilization activities necessary for erosion control or prevention, such as vegetative stabilization, bioengineering, sills, rip rap, revetment, gabion baskets, stream barbs, and bulkheads, or combinations of bank stabilization techniques, provided the activity meets all of the following criteria:

1. No material is placed in excess of the minimum needed for erosion protection;

2. The activity is no more than 500 feet in length along the bank, unless the Agency waives this criterion by making a written determination concluding that the activity will result in no more than minimal adverse

environmental effects (an exception is for bulkheads—the Agency cannot issue a waiver for a bulkhead that is greater than 1,000 feet in length along the bank);

3. The activity will not exceed an average of one cubic yard per running foot, as measured along the length of the treated bank, below the plane of the mean or ordinary high water line, unless the Agency waives this criterion by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects;

4. The activity does not involve dredging or filling into special aquatic sites, unless the Agency waives this criterion by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects;

5. No material is of a type, or is placed in any location, or in any manner, that will impair surface water flow into or out of any state-assumed water;

6. No material is placed in a manner that will be eroded by normal or expected high flows (properly anchored native trees and treetops may be used in low energy areas);

7. Native plants appropriate for current site conditions, including salinity, must be used for bioengineering or vegetative bank stabilization;

8. The activity is not a stream channelization activity; and

9. The activity must be properly maintained, which may require repairing it after severe storms or erosion events.

(b) Maintenance and repair of the bank stabilization activities if they require authorization.

(c) Temporary structures, fills, and work, including the use of temporary mats, necessary to construct the bank stabilization activity.

1. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and fill [including cofferdams] are necessary for construction activities, access fills, or dewatering of construction sites.

2. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows or stormwater.

3. After construction, temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations.

4. The areas affected by temporary fills must be revegetated.

(2) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity if the bank stabilization activity:

(a) Involves dredging or filling into special aquatic sites;

(b) Is in excess of 500 feet in length;

(c) Will involve filling greater than an average of one cubic yard per running foot as measured along the length of the treated bank, below the plane of the mean or ordinary high water line;

or

(d) The project is in the following rivers, creeks, and their tributaries:

1. Escambia River

2. Yellow River

3. Shoal River

4. Choctawhatchee River

5. Chipola River

6. Apalachicola River

7. Ochlockonee River

8. Santa Fe River

9. New River (Bradford and Union County line)

10. Econfina Creek

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

## 62-331.217 General Permit for Linear Transportation Projects

(1) This general permit authorizes the following activities:

(a) Activities required for crossings of state-assumed waters associated with the construction, expansion, modification, or improvement of linear transportation projects (e.g., roads, highways, railways, trails, airport runways, and taxiways) in state-assumed waters.

1. The activity cannot cause the loss of greater than 1/2-acre of state-assumed waters.

2. Any stream channel modification, including bank stabilization, is limited to the minimum necessary to construct or protect the linear transportation project; such modifications must be in the immediate vicinity of the project.

(b) Temporary structures, fills, and work, including the use of temporary mats, necessary to construct the linear transportation project.

1. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and fill, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites.

2. Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows.

3. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations.

4. The areas affected by temporary fills must be revegetated.

(2) This general permit does not authorize:

(a) Non-linear features commonly associated with transportation projects, such as vehicle maintenance or storage buildings, parking lots, train stations, or aircraft hangars.

(b) Activities within the Belle Meade South area bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within Golden Gate Estates, that together with other activities exceed 0.5 acres of dredging or filling within Golden Gate Estates north of Alligator Alley in Collier County.

(3) The permittee must submit a notice of intent to use this general permit to the agency prior to commencing the activity if:

(a) The loss of state-assumed waters exceeds 1/10-acre.

(b) There is dredging or filling in a special aquatic site, including wetlands.

 (c) The project is in the following rivers, creeks, and their tributaries.

1. Escambia River

2. Yellow River

3. Shoal River

4. Choctawhatchee River

5. Chipola River

6. Apalachicola River

7. Ochlockonee River

8. Santa Fe River

9. New River (Bradford and Union County line)

10. Econfina Creek

(4) For activities that require notice of intent to use this general permit, the notice must include any other general permit(s), or individual permit(s) used or intended to be used to authorize any part of the proposed project or any related activity, including other separate and distant crossings that require authorization but do not require submittal of a notice of intent.

(5) For linear transportation projects crossing a single waterbody more than one time at separate and distant locations, or multiple waterbodies at separate and distant locations, each crossing is considered a single and complete project for purposes of the general permit authorization.

(6) The Agency shall require mitigation, when necessary, to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental effects.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


**62-331.218 General Permit for Return Water from Upland Contained Disposal Areas**

(1) This general permit authorizes return water from an upland contained dredged material disposal area, when:

(a) The return water will not adversely affect the quality of receiving waters such that the state water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including the antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), F.A.C., subsections 62- 4.242(2) and (3), F.A.C., and Rule 62-302.300,

F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated;

(b) The return water is not part of an activity that requires an individual permit (if so, return water will be addressed within the individual permit).

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


### 62-331.219 General Permit for Hydropower Projects

(1) This general permit authorizes dredging or filling associated with hydropower projects having:

(a) Less than 5000 kW of total generating capacity at existing reservoirs, where the project, including the fill, is licensed by the Federal Energy Regulatory Commission (FERC) under the Federal Power Act of 1920; or

(b) A licensing exemption granted by the FERC pursuant to section 408 of the Energy Security Act of 1980 (16 U.S.C. §§ 2705 and 2708) and section 30 of the Federal Power Act.

(2) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


### 62-331.220 General Permit for Minor Activities

(1) This general permit authorizes minor dredge or fill activities in state-assumed waters, provided the activity meets all of the following criteria:

(a) The quantity of fill and the volume of material excavated do not exceed 25 cubic yards below the plane of the mean or ordinary high water line;

(b) The activity will not cause the loss of more than 1/10-acre of state-assumed waters; and

(c) The activity is not conducted for the purpose of a stream diversion.

(2) This general permit does not authorize projects that capture and store water, such as Dispersed Water Management Projects (DWMP).

(3) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity if:

(a) The fill or the volume of material excavated exceeds 10 cubic yards below the plane of the mean or ordinary high water line;

(b) The activity is in a special aquatic site, including wetlands;

or

(c) The project is in the following rivers, creeks, and their tributaries:

1. Escambia River

2. Yellow River

3. Shoal River

4. Choctawhatchee River

5. Chipola River

6. Apalachicola River

7. Ochlockonee River

8. Santa Fe River

9. New River (Bradford and Union County line)

10. Econfina Creek

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.221 General Permit for Response Operations for Oil or Hazardous Substances**

(1) This general permit authorizes:

(a) Activities conducted in response to a spill or release of oil or hazardous substances that are subject to the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR Part 300 as of July 1, 2019,

incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12043)), including

containment, cleanup, and mitigation efforts, provided that the activities are done under either:

1. The Spill Control and Countermeasure Plan required by 40 CFR § 112.3 as of July 1, 2019, incorporated by

reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12044));

2. The direction or oversight of the federal on-scene coordinator designated by 40 CFR Part 300; or

3. Any approved existing state, regional or local contingency plan provided that the Regional Response Team

(if one exists in the area) concurs with the proposed response efforts.

(b) Activities required for the cleanup of oil releases in state-assumed waters from electrical equipment that are

governed by EPA's polychlorinated biphenyl spill response regulations at 40 CFR Part 761 as of July 1, 2019,

incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12045)).

(c) The use of temporary structures and fills in state-assumed waters for spill response training exercises.

(2) Use of this general permit is subject to the following conditions:

(a) Activities shall be conducted in conformance with the National Response Team Integrated Contingency Plan

Guidance (June 5, 1996), incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12046);

(b) Activities shall be conducted in conformance with any applicable emergency order for oil spill or hazardous

waste control, clean-up, and recovery/restoration issued by the Department.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1)*

*FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416,*

*373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.222 General Permit for Removal of Vessels**

(1) This general permit authorizes temporary structures or minor dredging or filling required for the removal of

wrecked, abandoned, or disabled vessels.

(2) This general permit does not authorize maintenance dredging, shoal removal, or riverbank snagging.

(3) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing

the activity if:

(a) The activity is conducted in a special aquatic site, including wetlands;

or

(b) The vessel is listed or eligible for listing in the National Register of Historic Places. If this condition is triggered, the permittee cannot commence the activity until informed by the Agency that compliance with the "Historic Properties" general condition is completed.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.223 General Permit for Approved Categorical Exclusions**

(1) This general permit authorizes activities undertaken, assisted, authorized, regulated, funded, or financed, in whole or in part, by a federal agency or department, where:

(a) That agency or department has determined, pursuant to the Council on Environmental Quality's implementing regulations for the National Environmental Policy Act, that the activity is categorically excluded from the requirement to prepare an environmental impact statement or environmental assessment analysis, because it is included within a category of actions which neither individually nor cumulatively have a significant effect on the human environment; and

(b) The Office of the Chief of Engineers (Corps) has concurred that the activity is categorically excluded. The list of activity types for which the Office of the Chief of Engineers has concurred categorical exclusion can be found in the current Corps' Regulatory Guidance Letter (RGL) regarding categorical exclusions. Current RGLs can be found online in the Corps' Jacksonville District Regulatory Division Sourcebook.

(2) Use of this general permit is subject to any specific conditions required by the Agency or listed in the current RGL by the Office of the Chief of Engineers.

(3) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity if the current RGL regarding categorical exclusions require submittal of a pre-construction notice for the activity;

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.224 General Permit for Structural Activities**

(1) This general permit authorizes the placement of fill material such as concrete, sand, rock, etc., into tightly sealed forms or cells where the material will be used as a structural member for standard pile supported structures, such as bridges, transmission line footings, and walkways, including the excavation of bottom material from within the form prior to the placement of concrete, sand, rock, etc.

(2) This general permit does not authorize filled structural members that would support buildings, building pads, homes, house pads, parking areas, storage areas and other such structures.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.225 General Permit for Aquatic Habitat Restoration, Enhancement, and Creation Activities**

(1) This general permit authorizes the following activities:

(a) Activities in state-assumed waters associated with the restoration, enhancement, and creation of non-tidal wetlands and riparian areas, the restoration and enhancement of streams and other open waters, provided those activities result in net increases in aquatic resource functions and services. To the extent that an activity requires a Section 404 permit, the activities authorized by this general permit, include, but are not limited to:

1. The removal of accumulated sediments;

2. The installation, removal, and maintenance of small water control structures, dikes, and berms, as well as dredging or filling to restore appropriate stream channel configurations after small water control structures, dikes, and berms, are removed;

3. The installation of current deflectors;

4. The enhancement, rehabilitation, or re-establishment of riffle and pool stream structure;

5. The placement of in-stream habitat structures;

6. Modifications of the stream bed and/or banks to enhance, rehabilitate, or re-establish stream meanders;

7. The removal of stream barriers, such as undersized culverts, fords, and grade control structures;

8. The backfilling of artificial channels;

9. The removal of existing drainage structures, such as drain tiles, and the filling, blocking, or reshaping of drainage ditches to restore wetland hydrology;

10. The installation of structures or fills necessary to restore or enhance wetland or stream hydrology;

11. The construction of open water areas;

12. Activities needed to reestablish vegetation, including plowing or discing for seed bed preparation and the planting of appropriate wetland species;

13. Re-establishment of submerged aquatic vegetation in areas where those plant communities previously existed;

14. Mechanized land clearing to remove non-native invasive, exotic, or nuisance vegetation;

15. Other related activities.

(b) Relocation of waters, including wetlands and streams, on the project site provided there are net increases in aquatic resource functions and services.

(2) This general permit does not authorize:

(a) The conversion of a stream or natural wetlands to another aquatic habitat type (*e.g.*, the conversion of a stream to wetland or vice versa) or uplands, except for the relocation of waters on the project site. Changes in wetland plant communities that occur when wetland hydrology is more fully restored during wetland rehabilitation activities are not considered a conversion to another aquatic habitat type.

(b) Stream channelization.

(c) Lake restoration projects proposing any type of in-lake disposal of dredged or fill material.

(3) Authorized activities are subject to the following conditions:

(a) The aquatic habitat restoration, enhancement, or creation activity must be planned, designed, and implemented so that it results in aquatic habitat that resembles an ecological reference. An ecological reference may be based on the characteristics of an intact aquatic habitat or riparian area of the same type that exists in the region, or it may be based on a conceptual model developed from regional ecological knowledge of the target aquatic habitat type or riparian area.

(b) Only native plant species shall be planted at the site.

47

(c) Reporting. For those activities that do not require submittal of a notice of intent, the permittee must submit a report the to the Agency at least 30 days prior to commencing activities in state-assumed waters authorized by this general permit. The report shall include:

1. Information on baseline ecological conditions on the project site, such as a delineation of wetlands, streams, and/or other aquatic habitats; and

2. A copy of:

a. The binding stream enhancement or restoration agreement or wetland enhancement, restoration, or creation agreement, or a project description, including project plans and location map;

b. The Natural Resources Conservation (NRCS) or U.S. Department of Agriculture (USDA) Technical Service Provider documentation for the voluntary stream enhancement or restoration action or wetland restoration, enhancement, or creation action; or

c. The Surface Mining Control and Reclamation Act permit issued by Office of Surface Mining Reclamation and Enforcement or the applicable state agency.

(4) Compensatory mitigation is not required for activities authorized by this general permit since these activities must result in net increases in aquatic resource functions and services.

(5) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing any activity, except for the following activities:

(a) Activities conducted on non-Federal public lands and private lands, in accordance with the terms and conditions of a binding stream enhancement or restoration agreement or wetland enhancement, restoration, or creation agreement between the landowner and the U.S. Fish and Wildlife Service (FWS), NRCS, the Farm Service Agency (FSA), the National Marine Fisheries Service (NMFS), the National Ocean Service (NOS), the U.S. Forest Service (USFS), or their designated state cooperating agencies; or

(b) Voluntary stream or wetland restoration or enhancement action, or wetland creation action, documented by the NRCS or USDA Technical Service Provider pursuant to NRCS Field Office Technical Guide standards.

(6) This general permit can be used to authorize compensatory mitigation projects, including mitigation banks and in-lieu fee projects.

(7) If a site is to be reverted back to its documented prior condition, when the reversion will be conducted as described in paragraphs (a) through (c), below, the agreement or general permit shall contain language specifically

stating the intent to revert at a later date. The reversion activities will require authorization through the use of the general permit in Rule 62-331.226, F.A.C., or a State 404 Program individual permit for activities associated with reversion but outside of the scope of the original permit.

(a) In accordance with the terms and conditions of a binding stream or wetland enhancement or restoration agreement, or a wetland creation agreement, between the landowner and the FWS, NRCS, FSA, NMFS, NOS, USFS, or their designated state cooperating agencies; or

(b) As a component of voluntary wetland restoration, enhancement, and creation actions documented by the NRCS or USDA Technical Service Provider pursuant to NRCS Field Office Technical Guide standards.

(c) In state-assumed waters for reversion of wetlands that were restored, enhanced, or established on prior-converted cropland or on uplands, in accordance with a binding agreement between the landowner and NRCS, FSA, FWS, or state agencies (even though the restoration, enhancement, or creation activity did not require a Section 404 permit).

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.226 General Permit for Specific Reversion Activities**

(1) This general permit authorizes dredging or filling associated with the reversion of an area permitted under Corps Nationwide Permit 27, the general permit under Rule 62-331.225, F.A.C., or any other applicable ERP or Section 404 permit that specifically references reversion, to its documented prior condition when the reversion is conducted:

(a) In accordance with the terms and conditions of a binding stream or wetland enhancement or restoration agreement, or a wetland creation agreement, between the landowner and the U.S. Fish and Wildlife Service (FWS), the Natural Resources Conservation Service (NRCS), the Farm Service Agency (FSA), the National Marine Fisheries Service (NMFS), the National Ocean Service (NOS), U.S. Forest Service (USFS), or a state agency; or

(b) As a component of voluntary wetland restoration, enhancement, and creation actions documented by the NRCS or USDA Technical Service Provider pursuant to NRCS Field Office Technical Guide standards.

(c) In state-assumed waters for reversion of wetlands that were restored, enhanced, or established on prior-converted cropland or on uplands, in accordance with a binding agreement between the landowner and NRCS, FSA, FWS, or state agencies (even though the restoration, enhancement, or creation activity did not require a Section 404 permit).

(2) This general permit does not authorize reversion of an area used for a compensatory mitigation project to its prior condition, since compensatory mitigation is generally intended to be permanent.

(3) Authorized activities are subject to the following conditions:

(a) The reversion activity has been evaluated by FWS under Section 7 or Section 10 consultation, and a Section 7 incidental take statement or Section 10 incidental take permit has been issued for the activity, if required. If Section 7 or Section 10 consultation for the reversion activities was completed for the original permit or agreement, specifically addresses the reversion, and there are no unexpected site conditions that had not previously been addressed, then a new consultation shall not be required.

(b) The prior condition and the option for reversion shall be documented in the original agreement or permit, and the determination of return to prior conditions will be made by the federal agency or appropriate state agency executing the agreement or permit in which the reversion was identified.

(c) The reversion must be completed within five years after expiration of a limited term stream or wetland enhancement or restoration agreement, or a wetland creation agreement or permit.

(d) Reporting. The permittee must submit a report the to the Agency at least 30 days prior to commencing activities in state-assumed waters authorized by this general permit. The report shall include:

1. Information on baseline ecological conditions on the project site, such as a delineation of wetlands, streams, and/or other aquatic habitats; and

2. A copy of:

a. The binding stream enhancement or restoration agreement or wetland enhancement, restoration, or creation agreement, or a project description, including project plans and location map;

b. The NRCS or USDA Technical Service Provider documentation for the voluntary stream enhancement or restoration action or wetland restoration, enhancement, or creation action;

c. The SMCRA permit issued by OSMRE or the applicable state agency;

d. The FWS biological assessment, including any applicable incidental take statement or permit.

(e) Once an area has been reverted to its prior physical condition, it will be subject to any regulatory requirements applicable to that type of land at the time.

(4) Notwithstanding the provisions of paragraphs 62-331.200(3)(c) through (j), F.A.C., notice of intent to use this general permit, other than submittal of the information in paragraph (3)(d), above, is not required for activities authorized under this general permit.

(5) Compensatory mitigation is not required for activities authorized by this general permit.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

### 62-331.227 General Permit for Residential Developments

(1) This general permit authorizes the following activities:

(a) Dredge or fill activities in state-assumed waters for the construction or expansion of a single residence, a multiple unit residential development, or a residential subdivision.

(b)  The construction of building foundations and building pads and attendant features that are necessary for the use of the residence or residential development. Attendant features may include but are not limited to roads, parking lots, garages, yards, utility lines, storm water management facilities, septic fields, and recreation facilities such as playgrounds, playing fields, and golf courses (provided the golf course is an integral part of the residential development).

(2) The activity is subject to the following conditions:

(a) The activity must not cause the loss of greater than 1/2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1/2-acre.

(d) For residential subdivisions, the aggregate total loss of state-assumed surface waters authorized by this general permit cannot exceed 1/2-acre. This includes any loss of state-assumed waters associated with development of individual subdivision lots.

(3) This general permit does not authorize:

(a) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(b) Activities in Golden Gate Estates, south of Alligator Alley in Collier County.

(c) Activities in the Belle Meade South area bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(d) Activities in the Florida panther consultation area (south of the Caloosahatchee River) as defined in the Florida panther effect determination key, incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12047), and also available at https://www.fws.gov/verobeach/MammalsPDFs/20070219LetterSFESOtoCOEPantherKey.pdf.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


**62-331.228 General Permit for Moist Soil Management for Wildlife**

(1) This general permit authorizes the following activities dredging or filling in state-assumed waters and maintenance activities that are associated with moist soil management for wildlife for the purpose of continuing ongoing, site specific, wildlife management activities where soil manipulation is used to manage habitat and feeding areas for wildlife. Such activities include but are not limited to: plowing or discing to impede succession, preparing seed beds, or establishing fire breaks. Sufficient riparian areas must be maintained adjacent to all open water bodies, including streams, to preclude water quality degradation due to erosion and sedimentation.

(2) This general permit does not authorize:

(a) Construction of new dikes, roads, water control structures, or similar features associated with the management areas.

(b) The conversion of wetlands to uplands, impoundments, or other open water bodies.

(3) Activities authorized under this general permit must not result in a net loss of aquatic resource functions and services.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New          .*

**62-331.229 General Permit for Maintenance of Existing Flood Control Facilities**

(1) This general permit authorizes the following activities:

(a) Dredging or filling resulting from activities associated with the maintenance of existing flood control facilities, including debris basins, retention/detention basins, levees, and channels that:

1. Were previously authorized by a Section 404 individual permit, general permit, or 33 CFR § 330.3, incorporated by reference in paragraph 62-331.210(1)(a), F.A.C., or did not require a permit at the time they were constructed; or

2. Were constructed by the Corps and transferred to a non-Federal sponsor for operation and maintenance.

(b) Dredging or filling associated with maintenance activities in flood control facilities in any watercourse that have previously been determined to be within the maintenance baseline. The maintenance baseline is a description of the physical characteristics (e.g., depth, width, length, location, configuration, or design flood capacity, etc.) of a flood control project within which maintenance activities are normally authorized by this general permit, subject to any case-specific conditions required by the Agency. The Agency will approve the maintenance baseline based on the approved or constructed capacity of the flood control facility, whichever is smaller, including any areas where there are no constructed channels but which are part of the facility. The prospective permittee will provide documentation of the physical characteristics of the flood control facility (which will normally consist of as-built or approved drawings) and documentation of the approved and constructed design capacities of the flood control facility. If no evidence of the constructed capacity exists, the approved capacity will be used. The documentation will also include best management practices to ensure that the adverse environmental impacts caused by the maintenance activities are no more than minimal, especially in maintenance areas where there are no constructed channels. (The Agency may request maintenance records in areas where there has not been recent maintenance.) Revocation or modification of the final determination of the maintenance baseline can only be done in accordance

53

with Rule 62-331.080, F.A.C. Except in emergencies as described below, this general permit cannot be used until the Agency approves the maintenance baseline and determines the need for mitigation and any regional or activity-specific conditions. Once determined, the maintenance baseline will remain valid for any subsequent reissuance of this general permit.

(c) The removal of vegetation from levees associated with the flood control project.

(2) Activities authorized by this general permit are limited to those resulting from maintenance activities that are conducted within the "maintenance baseline", as described above.

(3) This general permit does not authorize:

(a) The removal of sediment and associated vegetation from natural water courses except when these activities have been included in the maintenance baseline.

(b) Maintenance of a flood control facility that has been abandoned.

1. A flood control facility will be considered abandoned if it has been operating at a significantly reduced capacity or is nonfunctional because routine maintenance was not being accomplished for an extended period of time.

2. A flood control facility will not be considered abandoned if the prospective permittee is in the process of obtaining other authorizations or approvals required for maintenance activities and is experiencing delays in obtaining those authorizations or approvals.

(4) The activities must meet the following conditions:

(a) All dredged and excavated material must be deposited and retained in an area that has no state-assumed waters unless otherwise specifically approved by the Agency under separate State 404 permit authorization.

(b) Proper sediment controls must be used.

(5) The Agency will determine any required mitigation one-time only for impacts associated with maintenance work at the same time that the maintenance baseline is approved.

(a) Such one-time mitigation will be required when necessary to ensure that adverse environmental effects are no more than minimal, both individually and cumulatively.

(b) Such mitigation will only be required once for any specific reach of a flood control project. However, if one-time mitigation is required for impacts associated with maintenance activities, the Agency will not delay needed

maintenance, provided the Agency and the permittee establish a schedule for identification, approval, development, construction and completion of any such required mitigation.

(c) Once the one-time mitigation described above has been completed, or a determination made that mitigation is not required, no further mitigation will be required for maintenance activities within the maintenance baseline.

(d) In determining appropriate mitigation, the Agency will give special consideration to natural water courses that have been included in the maintenance baseline and require mitigation and/or best management practices as appropriate.

(e) If mitigation was previously required and completed for the specific reach of the flood control project, additional mitigation for that specific reach will not be required.

(6) In emergency situations, this general permit may be used to authorize maintenance activities in flood control facilities for which no maintenance baseline has been approved.

(a) Emergency situations are those which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if action is not taken before a maintenance baseline can be approved.

(b) In such situations, the determination of mitigation requirements, if any, may be deferred until the emergency has been resolved.

(c) Once the emergency has ended, a maintenance baseline must be established expeditiously, and mitigation, including mitigation for maintenance conducted during the emergency, must be required as appropriate.

(d) The permittee must submit notice of intent to use this general permit to the Agency before any maintenance work is conducted.

1. The notice of intent to use this general permit may be for activity-specific maintenance or for maintenance of the entire flood control facility by submitting a five-year (or less) maintenance plan.

2. The notice of intent to use this general permit must include a description of the maintenance baseline and the disposal site for dredged or excavated material.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.230 General Permit for Completed Federal Enforcement Actions**

(1) This general permit authorizes any structure, work, or activity remaining in place or undertaken for mitigation, restoration, or environmental benefit in compliance with either:

(a) The terms of a final written Corps non-judicial settlement agreement resolving a violation of Section 404 of the Clean Water Act; or the terms of an EPA 309(a) order on consent resolving a violation of section 404 of the Clean Water Act, provided that:

1. The activities authorized by this general permit cannot adversely affect more than five acres of state-assumed waters;

2. The settlement agreement provides for environmental benefits, to an equal or greater degree, than the environmental detriments caused by the unauthorized activity that this general permit is authorizing; and

3. The Agency issues a verification letter authorizing the activity subject to the terms and conditions of this general permit and the settlement agreement, including a specified completion date; or

(b) The terms of a final federal court decision decree, or settlement agreement resulting from an enforcement action brought by the United States under section 404 of the Clean Water Act; or

(c) The terms of a final court decision, consent decree, settlement agreement, or non-judicial settlement agreement resulting from a natural resource damage claim brought by a trustee or trustees for natural resources (as defined by the National Contingency Plan at 40 CFR, part 300, subpart G, incorporated by reference in paragraph 62-331.221(1)(a), F.A.C., under Section 311 of the Clean Water Act, Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act, Section 312 of the National Marine Sanctuaries Act, section 1002 of the Oil Pollution Act of 1990, or the Park System Resource Protection Act at 16 U.S.C. 19jj, to the extent that a State 404 program permit is required.

(2) Compliance is a condition of this general permit itself. Non-compliance of the terms and conditions of an authorization under this general permit may result in an additional federal and state enforcement action. Any authorization under this general permit is automatically revoked if the permittee does not comply with the terms of this general permit or the terms of the court decision, consent decree, or judicial/non-judicial settlement agreement.

(3) This general permit does not authorize any activities occurring after the date of the decision, decree, or agreement that are not for the purpose of mitigation, restoration, or environmental benefit.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.231 General Permit for Temporary Construction, Access, and Dewatering**

(1) This general permit authorizes the following activities:

(a) Temporary structures, work, dredging, and filling, including cofferdams, necessary for construction activities or access fills or dewatering of construction sites, provided that the associated primary activity is authorized by the Agency.

(b) Temporary structures, work, dredging, and filling, including cofferdams, necessary for construction activities not otherwise subject to permit requirements.

(2) The activities authorized by this general permit must meet the following conditions:

(a) Appropriate measures must be taken to maintain near normal downstream flows and to minimize flooding.

(b) Fill must consist of materials, and be placed in a manner, that will not be eroded by expected high flows or stormwater. The use of dredged material may be allowed if the Agency determines that it will not cause more than minimal adverse environmental effects.

(c) Following completion of construction, temporary fill must be entirely removed to an area that has no state-assumed waters, dredged material must be returned to its original location, and the affected areas must be restored to pre-construction elevations.

(d) The affected areas must be revegetated.

(3) This general permit does not authorize the use of cofferdams to dewater wetlands or other aquatic areas to change their use.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.233 General Permit for Boat Ramps**

(1) This general permit authorizes the following activities required for the construction of boat ramps, provided the activity meets all of the following criteria:

(a) Fill in state-assumed waters does not exceed 50 cubic yards of concrete, rock, crushed stone or gravel into forms, or in the form of pre-cast concrete planks or slabs, unless the Agency waives the 50 cubic yard limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects;

(b) The boat ramp does not exceed 20 feet in width, unless the Agency waives this criterion by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects;

(c) The base material is crushed stone, gravel, or other suitable material;

(d) The excavation is limited to the area necessary for site preparation and all excavated material is removed to an area that has no state-assumed waters; and

(e) No material is placed in special aquatic sites, including wetlands.

(2) This general permit does not authorize:

(a) The use of unsuitable material that is structurally unstable.

(b) Dredging in navigable waters. This general permit shall not be used in areas without existing access to navigation channels where the minimum water depth for ingress or egress from the navigation channels is less than -3 feet at mean or ordinary low water.

(3) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity if:

(a) Fill to be placed in state-assumed waters exceeds 50 cubic yards.

(b) The boat ramp exceeds 20 feet in width.

 (c) The project is in the following rivers, creeks, and their tributaries.

1. Escambia River

2. Yellow River

3. Shoal River

4. Choctawhatchee River

5. Chipola River

6. Apalachicola River

7. Ochlockonee River

8. Santa Fe River

9. New River (Bradford and Union County line)

10. Econfina Creek

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


**62-331.234 General Permit for Emergency Watershed Protection and Rehabilitation**

(1) This general permit authorizes work done by or funded by:

(a) The Natural Resources Conservation Service for a situation requiring immediate action under its emergency Watershed Protection Program (7 CFR Part 624 (Jan. 1, 2019));

(b) The U.S. Forest Service under its Burned-Area Emergency Rehabilitation Handbook (FSH 2509.13 (Jan. 12, 1995));

(c)  The Department of the Interior for wildland fire management burned area emergency stabilization and rehabilitation (DOI Manual part 620, Ch. 3 (Jan. 18, 2017));

(d)  The Office of Surface Mining, Reclamation and Enforcement, or states with approved programs, for abandoned mine land reclamation activities under Title IV of the Surface Mining Control and Reclamation Act or 30 CFR subchapter R (July 1, 2019); or

(e)  The Farm Service Agency under its Emergency Conservation Program (7 CFR Part 701 (Jan. 1, 2019)).

(2)  In general, the prospective permittee shall wait until the Agency issues a general permit verification or 45 calendar days have passed before proceeding with the watershed protection and rehabilitation activity. However, in cases where there is an unacceptable hazard to life or a significant loss of property or economic hardship will occur, the emergency watershed protection and rehabilitation activity may proceed immediately, and the Agency will consider the information in the notice of intent to use this general permit and any comments received as a result of agency coordination to decide whether the general permit authorization should be modified, suspended, or revoked.

(3) Except in cases where delay would cause an unacceptable hazard to life or a significant loss of property or economic hardship will occur, the permittee must submit a notice of intent to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.235 General Permit for Cleanup of Hazardous and Toxic Waste**

(1) This general permit authorizes the following activities:

(a) Specific activities required to affect the containment, stabilization, or removal of hazardous or toxic waste materials that are performed, ordered, or sponsored by a government agency with established legal or regulatory authority.

(b) Court ordered remedial action plans or related settlements.

(2) This general permit does not authorize the establishment of new disposal sites or the expansion of existing sites used for the disposal of hazardous or toxic waste.

(3) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.236 General Permit for Commercial and Institutional Developments**

(1) This general permit authorizes dredging or filling in state-assumed waters for the construction or expansion of commercial and institutional building foundations and building pads and attendant features that are necessary for the use and maintenance of the structures.

(a) Attendant features may include, but are not limited to, roads, parking lots, garages, yards, utility lines, storm water management facilities, wastewater treatment facilities, and recreation facilities such as playgrounds and playing fields.

(b) Examples of commercial developments include retail stores, industrial facilities, restaurants, business parks, and shopping centers.

(c) Examples of institutional developments include schools, fire stations, government office buildings, judicial buildings, public works buildings, libraries, hospitals, and places of worship.

(2) This general permit does not authorize:

(a) The construction of new golf courses and new ski areas.

(b) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(e) Activities in the Florida panther consultation area (south of the Caloosahatchee River) as defined in the Florida panther effect determination key, incorporated by reference in paragraph 62-331.227(3)(d), F.A.C., and also available at https://www.fws.gov/verobeach/MammalsPDFs/20070219LetterSFESOtoCOEPantherKey.pdf.

(3) This general permit is subject to the following conditions:

(a) The activity must not cause the loss of greater than 1/2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the general permit activity cannot exceed 1/2-acre.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

(5) For any activity that involves the construction of a wind energy generating structure, solar tower, or overhead transmission line, a copy of the Notice and general permit verification will be provided to the Department of Defense Siting Clearinghouse, which will evaluate potential effects on military activities.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.237 General Permit for Agricultural Activities**

(1) This general permit authorizes the following activities:

(a) Dredging and filling in state-assumed waters for agricultural activities, including the construction of building pads for farm buildings. Authorized activities include the installation, placement, or construction of drainage tiles, ditches, or levees; mechanized land clearing; land leveling; the relocation of existing serviceable drainage ditches constructed in state-assumed waters; and similar activities.

(b) Construction of farm ponds in state-assumed waters, excluding perennial streams, provided the farm pond is used solely for agricultural purposes.

(c) Dredging or filling in state-assumed waters to relocate existing serviceable drainage ditches constructed in streams.

(2) This general permit does not authorize:

(a) Construction of aquaculture ponds.

(b) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(e) Projects that capture and store water, such as Dispersed Water Management Projects (DWMP).

(3) The activities authorized by this general permit are subject to the following conditions:

(a) The activity must not cause the loss of greater than 1⁄2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1⁄2-acre.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

### 62-331.238 General Permit for Reshaping Existing Drainage Ditches

(1) This general permit authorizes dredging or filling in state-assumed waters, excluding non-tidal wetlands adjacent to tidal retained waters, to modify the cross-sectional configuration of currently serviceable drainage ditches constructed in state-assumed waters, for the purpose of improving water quality by regrading the drainage ditch with gentler slopes, which can reduce erosion, increase growth of vegetation, and increase uptake of nutrients and other substances by vegetation.

(2) The reshaping of the ditch cannot:

(a) Increase drainage capacity beyond the original as-built capacity;

(b) Expand the area drained by the ditch as originally constructed;

(c) Change the rate or volume of water discharged from the site from original design capacity conditions.

(d) Cause erosion or sedimentation, or violate state water quality standards.

(3) Compensatory mitigation is not required because the work is designed to improve water quality.

(4) This general permit does not authorize:

(a) Relocation of drainage ditches constructed in state-assumed waters; the location of the centerline of the reshaped drainage ditch must be approximately the same as the location of the centerline of the original drainage ditch.

(b) Stream channelization or stream relocation projects.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(e) Projects that capture and store water, such as Dispersed Water Management Projects (DWMP).

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.239 General Permit for Recreational Facilities**

(1) This general permit authorizes the following activities:

(a) Dredging or filling in state-assumed waters for the construction or expansion of recreational facilities. Examples of recreational facilities that may be authorized by this general permit include playing fields (*e.g.,* football fields, baseball fields), basketball courts, tennis courts, hiking trails, bike paths, golf courses, ski areas, horse paths, nature centers, and campgrounds (excluding recreational vehicle parks).

(b) Construction or expansion of small support facilities, such as maintenance and storage buildings and stables that are directly related to the recreational activity,

(2) This general permit does not authorize:

(a) Construction of hotels, restaurants, racetracks, stadiums, arenas, or similar facilities.

(b) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(3) The activities are subject to the following conditions:

(a) The activity must not cause the loss of greater than 1⁄2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1⁄2-acre.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New         .*

**62-331.240 General Permit for Stormwater Management Facilities**

(1) This general permit authorizes the following activities:

(a) Dredging or filling in state-assumed waters for the construction of stormwater management facilities, including stormwater detention basins and retention basins and other stormwater management facilities;

(b) The construction of water control structures, outfall structures and emergency spillways;

(c) The construction of low impact development integrated management features such as bioretention facilities (e.g., rain gardens), vegetated filter strips, grassed swales, and infiltration trenches; and the construction of pollutant reduction green infrastructure features designed to reduce inputs of sediments, nutrients, and other pollutants into waters to meet reduction targets established under Total Daily Maximum Loads set under the Clean Water Act.

(d) To the extent that a Section 404 permit is required, dredging or filling in state-assumed waters for the maintenance of stormwater management facilities, low impact development integrated management features, and pollutant reduction green infrastructure features.

(2) This general permit does not authorize:

(a) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(b) Dredging or filling for the construction of new stormwater management facilities in perennial streams.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(3) The authorized activities are subject to the following conditions:

(a) The activity must not cause the loss of greater than 1/2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1/2-acre.

(4) A notice of intent to use this general permit shall be submitted to the Agency for:

(a) Dredging or filling in state-assumed waters for the construction of new stormwater management facilities or pollutant reduction green infrastructure features,

(b) Expansion of existing stormwater management facilities or pollutant reduction green infrastructure features,

65

(c) Activities in wetlands adjacent to Deer Lake and its tributaries, Bay County.

(d) Maintenance activities do not require notice of intent if they are limited to restoring the original design capacities of the stormwater management facility or pollutant reduction green infrastructure feature.

(5) Projects adjacent to Tribal lands shall not be authorized without prior written approval from the respective Tribal entity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.241 General Permit for Mining Activities**

(1) This general permit authorizes dredging or filling in state-assumed waters for mining activities, provided the activity meets all of the following criteria:

(a) For mining activities involving dredging or filling in wetlands, the activity must not cause the loss of greater than 1⁄2-acre of wetlands;

(b) For mining activities involving dredging or filling in open waters (e.g., streams, lakes, and ponds) the mined area, including permanent and temporary impacts due to dredging or filling in state-assumed waters, must not exceed 1⁄2-acre; and

(c) The acreage loss under subparagraph (1)(a)1. plus, the acreage impact under subparagraph (1)(a)2. does not exceed 1⁄2-acre.

(2) This general permit does not authorize:

(a) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(b) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(c) Activities in the Belle Meade North bounded by I-75 to the south, Golden Gate Canal to the west, and Miller Canal to the east, and Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County, Florida.

(d) Activities within the Corkscrew Marsh Basin, south of S.R. 82, east of I-75 in Collier and Lee Counties.

(3) The authorized activities are subject to the following conditions:

(a) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(b) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1⁄2-acre.

(4) A notice of intent to use this general permit is required if reclamation is required by other laws. A copy of the final reclamation plan must be submitted with the notice of intent.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.242 General Permit for Repair of Uplands Damaged by Discreet Events**

(1) This general permit authorizes the following activities:

(a) Dredging or filling in state-assumed waters for activities associated with the restoration of upland areas damaged by storms, floods, or other discrete events.

(b) Bank stabilization to protect the restored uplands.

(2) This general permit does not authorize:

(a) Beach restoration or nourishment.

(b) Reclamation of lands lost to normal erosion processes over an extended period

(3) The authorized activities are subject to the following conditions:

(a) The restoration of the damaged areas, including any bank stabilization, must not exceed the contours, or the mean or ordinary high water line, that existed before the damage occurred.

(b) The work must commence, or be under contract to commence, within two years of the date of damage, unless this condition is waived in writing by the Agency.

(c) Dredging is limited to the amount necessary to restore the damaged upland area and shall not significantly alter the pre-existing bottom contours of the waterbody.

(4) The Agency shall determine the extent of the pre-existing conditions using best available evidence and shall limit the extent of any restoration work authorized by this general permit to pre-existing conditions that were legally in existence prior to the discreet event.

(5) The permittee must submit a notice of intent to use this general permit to the Agency within 12 months of the date of the damage; for major storms, floods, or other discrete events, the Agency may waive the 12-month limit for submitting a notice of intent if the permittee can demonstrate funding, contract, or other similar delays. The notice of intent must include the following:

(a) Documentation, such as a recent topographic survey or photographs, to justify the extent of the proposed restoration; and

(b) A sediment and erosion control plan.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.243 General Permit for Activities in Ditches**

(1) This general permit authorizes activities in ditches that:

(a) Are constructed in uplands,

(b)  Receive water from an area determined to be a water of the United States prior to the construction of the ditch,

(c) Divert water to an area determined to be a water of the United States prior to the construction of the ditch, and

(d) Are determined to be state-assumed waters.

(2) This general permit does not authorize:

(a) Dredging or filling in ditches constructed in streams or other state-assumed waters, or in streams that have been relocated in uplands.

(b) Activities that increase the capacity of the ditch and drain those areas determined to be state-assumed waters prior to construction of the ditch.

(c) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(d) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(e) Projects that capture and store water, such as Dispersed Water Management Projects (DWMP).

(3) The authorized activities are subject to the condition that the activity must not cause the loss of greater than one acre of state-assumed waters.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


**62-331.244 General Permit for Commercial Shellfish Aquaculture Activities**

(1) This general permit authorizes the following activities:

(a) Dredging or filling in state-assumed waters for new and continuing commercial shellfish aquaculture operations in authorized project areas. For the purposes of this general permit, the project area is the area in which the operator is authorized to conduct commercial shellfish aquaculture activities, as identified through a lease or permit issued by an appropriate state or local government agency, a treaty, or any easement, lease, deed, contract, or other legally binding agreement that establishes an enforceable property interest for the operator. A "new commercial shellfish aquaculture operation" is an operation in a project area where commercial shellfish aquaculture activities have not been conducted during the past 100 years.

(b) The installation of buoys, floats, racks, trays, nets, lines, tubes, containers, and other structures into state-assumed waters.

(c) Dredging or filling in state-assumed waters necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting activities. Rafts and other floating structures must be securely anchored and clearly marked.

(2) This general permit does not authorize:

(a) The cultivation of a nonindigenous species unless that species has been previously cultivated in the waterbody;

(b) The cultivation of an aquatic nuisance species as defined in the Aquatic Nuisance Prevention and Control Act, 16 U.S.C. §§ 4701 – 4751 (2018), incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12048);

(c) Attendant features such as docks, piers, boat ramps, stockpiles, or staging areas, or the deposition of shell material back into state-assumed waters as waste;

(d) Activities that directly affect more than 1⁄2-acre of submerged aquatic vegetation beds in project areas that have not been used for commercial shellfish aquaculture activities during the past 100 years;

(e) Placement of materials for Live Rock culture; or

(f) Harvesting of Live Rock.

(3) This general permit is subject to the condition that in order to prevent introduction of aquatic nuisance species, no material that has been taken from a different waterbody may be reused in the current project area, unless it has been treated in accordance with the applicable regional nuisance species management plan.

(4) The permittee must submit a notice of intent to use this general permit to the Agency if:

(a) The activity will include a species that has never been cultivated in the waterbody;

(b) The activity occurs in a project area that has not been used for commercial shellfish aquaculture activities during the past 100 years;

(5) If a notice of intent is required, the permittee must include the following with the notification:

(a) A map showing the boundaries of the project area(s), with latitude and longitude coordinates for each corner of each project area;

(b) The name(s) of the species that will be cultivated during the period this general permit is in effect;

(c) Whether canopy predator nets will be used;

(d) Whether suspended cultivation techniques will be used;

(e) General water depths in the project area(s) (a detailed survey is not required); and

(f) A description of all species and culture activities the operator expects to undertake in the project area or group of contiguous project areas during the effective period of this general permit.

(6) If an operator intends to undertake unanticipated changes to the commercial shellfish aquaculture operation during the effective period of this general permit, and those changes require authorization under this Chapter, the operator must contact the Agency to request a modification of the general permit verification; a new notice of intent does not need to be submitted.

(7) No more than one notice of intent per project area or group of contiguous project areas shall be submitted for the commercial shellfish operation during the effective period of this general permit.

70

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

**62-331.245 General Permit for Land-Based Renewable Energy Generation Facilities**

(1) This general permit authorizes dredging or filling in state-assumed waters for the construction, expansion, or modification of land-based renewable energy production facilities, including attendant features.

(a) Such facilities include infrastructure to collect solar (concentrating solar power and photovoltaic), wind, biomass, or geothermal energy.

(b) Attendant features may include, but are not limited to roads, parking lots, and stormwater management facilities within the land-based renewable energy generation facility.

(2) This general permit does not authorize:

(a) Dredging or filling in non-tidal wetlands adjacent to tidal retained waters.

(b) Activities within Golden Gate Estates, south of Alligator Alley in Collier County.

(c) Activities within the Belle Meade South bounded by I-75 to the north, CR 951 to the west, Miller Canal to the east, and U.S. 41 to the south in Collier County.

(3) The activities are subject to the following conditions:

(a) The activity must not cause the loss of greater than 1⁄2-acre of state-assumed waters.

(b) The activity must not cause the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(c) The loss of stream bed plus any other losses of state-assumed waters caused by the activity cannot exceed 1⁄2-acre.

(d) Projects must comply with the USFWS Land-Based Wind Energy Guidelines, incorporated by reference herein (https://flrules.org/Gateway/reference.asp?No=Ref-12049), and also available at (https://www.fws.gov/ecological-services/es-library/pdfs/WEG_final.pdf).

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity if the activity results in the loss of greater than 1/10- acre of state-assumed waters.

(5) Utility lines constructed to transfer the energy from the land-based renewable energy generation facility to a distribution system, regional grid, or other facility are generally considered to be linear projects and each separate and distant crossing of a waterbody is eligible for treatment as a separate single and complete linear project. Those utility lines may be authorized by the general permit in Rule 62-331.215, F.A.C.

(6) For any activity that involves the construction of a wind energy generating structure, solar tower, or overhead transmission line, a copy of the notice and general permit verification will be provided to the Department of Defense Siting Clearinghouse, which will evaluate potential effects on military activities.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*


**62-331.246 General Permit for Water-Based Renewable Energy Generation Pilot Projects**

(1) This general permit authorizes dredging or filling in state-assumed waters for the construction, expansion, modification, or removal of water-based wind, water-based solar, wave energy, or hydrokinetic renewable energy generation pilot projects and their attendant features.

(a) Attendant features may include, but are not limited to, land-based collection and distribution facilities, control facilities, roads, parking lots, and stormwater management facilities.

(b) For the purposes of this general permit, the term "pilot project" means an experimental project where the water-based renewable energy generation units will be monitored to collect information on their performance and environmental effects at the project site.

(2) This general permit is subject to the following conditions:

(a) The activity must not cause the loss of greater than 1⁄2-acre of state-assumed waters, including the loss of more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds when the Agency waives the 300 linear foot limit by making a written determination concluding that the activity will result in no more than minimal adverse environmental effects.

(b) The loss of stream bed plus any other losses of state-assumed waters caused by the general permit activity cannot exceed 1⁄2-acre.

(c) For each single and complete project, no more than 10 generation units (e.g., wind turbines, wave energy devices, or hydrokinetic devices) are authorized.

(d) For floating solar panels, each single and complete project cannot exceed 1⁄2- acre in water surface area covered by the floating solar panels.

(e) Upon completion of the pilot project, the generation units, transmission lines, and other structures or fills associated with the pilot project must be removed to the maximum extent practicable unless they are authorized by a separate authorization under this Chapter. Completion of the pilot project will be identified as the date of expiration of the Federal Energy Regulatory Commission (FERC) license, or the expiration date of the general permit authorization if no FERC license is required.

(3) This general permit is not applicable within Designated Critical Resource Waters or other state and federally managed areas such as marine sanctuaries, Habitat Areas of Particular Concern (HAPC), aquatic preserves, and parks.

(4) The permittee must submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

(5) Utility lines constructed to transfer the energy from the land-based collection facility to a distribution system, regional grid, or other facility are generally considered to be linear projects and each separate and distant crossing of a waterbody is eligible for treatment as a separate single and complete linear project. Those utility lines may be authorized by general permit Rule 62-331.215, F.A.C. or another authorization under this Chapter.

(6) An activity that is located on an existing locally or federally maintained U.S. Army Corps of Engineers project requires separate approval from the Chief of Engineers or District Engineer under 33 U.S.C. § 408. The permittee is responsible for obtaining such approval separately from the Corps.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New_____.*

**62-331.247 General Permit for Removal of Low-Head Dams**

(1) This general permit authorizes structures, work, dredging, and filling associated with the removal of low-head dams. For the purposes of this general permit, the term "low-head dam" is defined as a dam built across a

stream to pass flows from upstream over all, or nearly all, of the width of the dam crest on a continual and uncontrolled basis. During a drought, there might not be water flowing over the dam crest. Low-head dams do not have a separate spillway or spillway gates, but it may have an uncontrolled spillway. The dam crest is the top of the dam from left abutment to right abutment, and if present, an uncontrolled spillway. A low-head dam provides little storage function.

(2) This general permit is subject to the following conditions:

(a) The removed low-head dam structure must be deposited and retained in an upland area, unless otherwise specifically approved by the Agency under separate authorization;

(b) The Agency may require compensatory mitigation if the net increase in ecological function from the removal and any related restoration activities does not fully offset any loss in ecological function resulting from the dam removal.

(c) In waters accessible to manatees, the Agency shall coordinate with the appropriate state or federal wildlife agency so that appropriate action can be taken to limit potential adverse effects to manatees.

(3) This general permit does not authorize:

(a) Dredging, filling, work, or structures to restore the stream in the vicinity of the low-head dam, including the former impoundment area. Such projects may be authorized under the general permit in Rule 62-331.225, F.A.C., or an individual permit.

(b) Dredging, filling, work or structures to stabilize stream banks. Bank stabilization activities may be authorized by the general permit in Rule 62-331.216, F.A.C., or an individual permit.

(4) The permittee shall submit a notice of intent to use this general permit to the Agency prior to commencing the activity.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New_____.*

**62-331.248 General Permit for Florida Department of Transportation and Florida's Turnpike Enterprise**

(1) This general permit authorizes activities required for the construction of Florida Department of Transportation (FDOT) and Florida's Turnpike Enterprise (FTE) projects, with a Federal Highway Administration (FHWA) and/or FDOT approved Environmental Document (PD&E, Categorical Exclusion, Environmental

Assessment, Environmental Impact Statement, or State Environmental Impact Report), including non-capacity and capacity improvements, where dredge and fill impacts do not result in the loss of greater than 5.0 acres of state-assumed waters (wetlands and surface waters) for any 1-mile segment of roadway length up to a maximum loss of 50 acres of state-assumed waters per project. This includes FTE projects with an approved state Environmental Document. Secondary impacts associated with projects authorized under this general permit shall be assessed, however, secondary impact acreages will not count toward the impact acreage limits (5.0 acres/1-mile and 50 acres total) within this general permit.

(2) This general permit does not authorize construction of a new alignment (non-existing roadway).

(3) This general permit is subject to the following conditions:

(a) Use of this general permit is limited to linear transportation projects that have been reviewed through the FDOT Efficient Transportation Decision Making (ETDM) and/or Project Development and Environment (PD&E) Study. The environmental documents must have been evaluated, re-evaluated, or confirmed to be current within five years of submittal of an application.

(b) The term "capacity" is used to express the maximum number of vehicles or persons that can pass a point on a roadway during a given time period under prevailing roadway and traffic conditions. A capacity improvement project is normally implemented by the addition of through travel lanes. A capacity improvement project can also be a new interchange or new intersection that is contiguous and connects to an existing roadway but would not include a new interchange or intersection that results in a new roadway alignment. Non-capacity improvement projects may include safety improvements, maintenance, bike lane, or sidewalk additions.

(c) No work shall be performed until the permittee submits satisfactory plans for the proposed activity and receives written authorization from the Agency.

(d) If the project includes modification of a federal project, no work shall be performed until the permittee receives authorization under 33 U.S.C § 408 from the Corps of Engineers.

(e) Conformance with the descriptions, quantities, and criteria in this general permit does not guarantee authorization under this general permit. The Agency reserves the right to require that any request for authorization under this general permit be evaluated as an individual permit.

(f) A copy of all "Commitments" related to the avoidance and minimization of impacts to state-assumed waters identified in any completed Environmental Documents and the Quality Enhancement Strategies (QES) (effective

date), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12075), shall be submitted with the permit application prior to verification of this general permit.

(g) Prior to the verification of qualification for this general permit; the applicant shall provide the Agency with copies of the concurrence documents from the State Historic Preservation Officer (SHPO) in Tallahassee and the Tribal Historic Preservation Officer (THPO) where applicable.

(h) Cultural Resources and/or Historic Properties. In addition to the conditions for general permits in Rule 62-331.200, F.A.C., the following shall apply:

1. No structure or work shall adversely affect, impact, or disturb properties listed in the National Register of Historic Places (NRHP), or those eligible for listing in the NRHP where the adverse effect, impact, or disturbance has not been resolved through consultation with the SHPO.

2. The applicant shall determine and document, in consultation with SHPO, the scope of identification efforts for cultural resources within the undertaking's area of potential effect and establish a determination of effects based upon these efforts. Documentation of this scope of identification efforts and determination shall be provided in summary form to the Agency along with the concurrence documents from SHPO.

3. If an archaeological monitor is required, A professional archeologist who meets the "Archeology and Historic Preservation: Secretary of Interior's Standards and Guidelines" shall be onsite during the initial ground-disturbing activities. The professional archeologist shall be responsible for monitoring the spoil and ground disturbance for archaeological deposits. Should potential significant archaeological deposits (which shall include, but not be limited to: pottery, modified shell, flora, fauna, human remains, ceramics, stone tools or metal implements, dugout canoes, evidence of structures or any other physical remains that could be associated with Native American cultures or early colonial or American settlement), recovery be encountered, all work and ground disturbing activities must cease within a 100-meter diameter of the discovery to allow for proper assessment, recording, and recovery of the cultural deposits in a professional manner. The archeologist on site shall notify the Permittee, SHPO, and the Agency the same business day to assess the significance of the discovery and devise appropriate actions, including salvage operations, coordination with the SHPO/THPO, Tribes, and other consulting parties, as appropriate and in compliance with applicable historic preservation laws. Upon completion of the monitoring activities, an archaeological letter must be submitted to the Director of Florida's Division of Historical Resources (who also serves as the SHPO), along with an updated Florida Master Site File form and, as appropriate, a monitoring report.

(i) Compensatory Mitigation.

1. Mitigation may be accomplished by one or more of the following mechanisms and preference hierarchy.

a. Securing appropriate number and resource type of credits from approved mitigation bank within the project's service area;

b. Payment of mitigation fees to an approved in-lieu program within the project's service area;

c. Through a "permittee-responsible" mitigation, including those mitigation projects that are part of the FDOT Mitigation Program in Section 373.4137, F.S.; on-site and in-kind mitigation; or off-site or out-of-kind compensatory mitigation.

d. It is the responsibility of the applicant to demonstrate to the Agency that the mitigation proposal is the environmentally preferable option to replace the ecological functions and services that would be lost though the implementation of any work proposed. All mitigation proposals must be approved prior to verification of this general permit.

2. Prior to proceeding with the activity authorized in this general permit, a final mitigation plan must be approved by the Agency. If the approved mitigation plan is the purchase of mitigation bank or in lieu fee credits, the credits must be purchased or in-lieu fees paid prior to proceeding.

3. When the purchase of mitigation credits is applicable, the Permittee shall provide verification to the Agency indicating the number and type of credits purchased and the specific federal mitigation bank from which credits have been purchased. When payment of in-lieu fees is applicable, evidence of fee payment shall be provided to the Agency. The above-described verification or notification shall be provided to the Agency before commencement of the activities authorized by this general permit.

4. If the general permit verification includes permittee-responsible mitigation, the mitigation plan shall address the components of a complete mitigation plan as described in Rule 62-331.130, F.A.C.

(j) Prior to the verification of projects pursuant to this general permit, the applicant (FDOT, FTE, FHWA, or others) shall provide the Agency with a copy of either a concurrence document (May Affect, Not Likely to Adversely Affect determinations) or a finalized biological opinion (for May Affect, Likely to Adversely Affect determinations) written by the U.S. Fish and Wildlife Service (USFWS), These documents demonstrate that project consultation for federally listed species has been completed.

(k) No authorizations under this general permit shall be made for projects that jeopardize the continued existence of a threatened or endangered species or destroy or adversely modify designated critical habitat.

(l) No authorizations under this general permit shall be made for projects resulting in any direct, indirect, or cumulative effect on very rare species, specifically the endangered Perdido Key beach mouse, Choctawhatchee beach mouse, and the St. Andrew beach mouse.

(m) All terms and conditions provided by the USFWS and/or the FWC shall be included as a special condition of any projects verified under this general permit.

(n) This general permit does not authorize stream channelization or the bank-to-bank filling and relocating and/or culverting of more than 300 linear feet of perennial or intermittent natural stream systems. Ditches, canals, swales or other non-natural channelized systems are not included in this restriction. The authorized activities shall not increase flooding, or negatively impact the pre-project hydrologic flow characteristics or water quality of any affected stream. This permit does not authorize severance of connections to upstream or downstream waters.

(o) To the maximum extent practicable, the pre-construction course, condition, capacity, and location of open waters shall be maintained for each activity, including stream channelization and stormwater management activities, except as provided below. The activity shall be constructed to withstand expected high flows. The activity shall not restrict nor impede the passage of normal or high flows, unless the primary purpose of the activity is to impound water or manage high flows. The activity may alter the pre-construction course, condition, capacity, and location of open water if it benefits the aquatic environment (e.g., stream restoration or relocation activities).

(p) This general permit does not authorize fill activities which would sever hydrologic connection between wetlands or other surface waters.

(q) Best management practices for erosion and sediment control shall be used to prevent water quality violations during and after construction. These shall include a construction-phase stormwater management and erosion control plan that is designed and implemented to include site-specific measures adapted from practices and procedures described in "The State of Florida Erosion and Sediment Control Designer and Reviewer Manual, FDOT and FDEP" (June 2007), incorporated by reference in subparagraph 62-330.050(9)(b)5., F.A.C. (https://www.flrules.org/Gateway/reference.asp?No=Ref-02530).

(r) Authorization under this general permit is void at any time if the information provided by the applicant in support of the permit application proves to have been false, incomplete, or inaccurate.

(s) The permittee shall comply with USFWS "Standard Protection Measures for the Eastern Indigo Snake" (Aug. 12, 2013), incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12076).

(t) For projects accessible to manatees, the Permittee shall comply with the "Standard Manatee Conditions for In-Water Work" (2011), incorporated by reference in paragraph 62-331.201(4)(n), F.A.C.

(u) As-Built Certification. Within 60 days of completion of the work authorized by this permit, the Permittee shall submit to the Agency as-built drawings of the authorized work and a completed Form 62-331.248(1) "As-Built Certification By Professional Engineer", incorporated by reference herein (https://www.flrules.org/Gateway/reference.asp?No=Ref-12077). The as-built drawings shall be signed and sealed by a registered professional engineer and include the following:

1. A plan view drawing of the location of the authorized work footprint, as shown on the permit drawings, with transparent overlay of the work as constructed in the same scale as the permit drawings on 8½-inch by 11-inch sheets. The plan view drawing should show all "earth disturbance," including wetland impacts and water management structures.

2. A list of any deviations between the work authorized by this permit and the work as constructed. In the event that the completed work deviates, in any manner, from the authorized work, describe on the attached "As-Built Certification By Professional Engineer" form the deviations between the work authorized by this permit and the work as constructed. Clearly indicate on the as-built drawings any deviations that have been listed. Please note that the depiction and/or description of any deviations on the drawings and/or "As-Built Certification By Professional Engineer" form does not constitute approval of any deviations by the Agency.

3. Include the permit number on all sheets submitted.

*Rulemaking Authority 373.026(7), 373.043, 373.118(1), 373.4131, 373.414(9), 373.4145, 373.4146(2), 403.805(1) FS. Law Implemented 373.118, 373.129, 373.136, 373.413, 373.4131, 373.414, 373.4145, 373.4146, 373.416, 373.422, 373.423, 373.429 FS. History – New _____.*

CHAPTER 62-340
**DELINEATION OF THE LANDWARD EXTENT OF WETLANDS AND SURFACE WATERS**

| | |
|---|---|
| 62-340.100 | Intent |
| 62-340.200 | Definitions |
| 62-340.300 | Delineation of Wetlands |
| 62-340.400 | Selection of Appropriate Vegetative Stratum |
| 62-340.450 | Vegetative Index |
| 62-340.500 | Hydrologic Indicators |
| 62-340.550 | Wetland Hydrology |
| 62-340.600 | Surface Waters |
| 62-340.700 | Exemptions for Treatment or Disposal Systems |
| 62-340.750 | Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities |

**62-340.100 Intent.**

(1) This rule's intent is to provide a unified statewide methodology for the delineation of the extent of wetlands and surface waters to satisfy the mandate of Section 373.421, F.S. This delineation methodology is intended to approximate the combined landward extent of wetlands as determined by a water management district and the Department immediately before the effective date of this rule. Before implementing the specific provisions of this methodology, the regulating agency shall attempt to identify wetlands according to the definition for wetlands in Section 373.019(25), F.S., and subsection 62-340.200(19), F.A.C., below. The landward extent of wetlands shall be determined by the dominance of plant species, soils and other hydrologic evidence indicative of regular and periodic inundation or saturation. In all cases, attempts shall be made to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing, without quantitative sampling. If this cannot be accomplished, the quantitative methods in paragraph 62-301.400(1)(c), F.A.C., shall be used unless the applicant or petitioner and regulating agency agree, in writing, on an alternative method for quantitatively analyzing the vegetation onsite. The methodology shall not be used to delineate areas which are not wetlands as defined in subsection 62-340.200(19), F.A.C., nor to delineate as wetlands or surface waters areas exempted from delineation by statute or agency rule.

(2) The Department shall be responsible for ensuring statewide coordination and consistency in the delineation of surface waters and wetlands pursuant to this rule, by providing training and guidance to the Department, Districts, and local governments in implementing the methodology.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.100.*

**62-340.200 Definitions.**

When used in this chapter, the following terms shall mean:

(1) "Aquatic plant" means a plant, including the roots, which typically floats on water or requires water for its entire structural support, or which will desiccate outside of water.

(2) "Canopy" means the plant stratum composed of all woody plants and palms with a trunk four inches or greater in diameter at breast height, except vines.

(3) "Diameter at Breast Height (DBH)" means the diameter of a plant's trunk or main stem at a height of 4.5 feet above the ground.

(4) "Facultative plants" means those plant species listed in subsection 62-340.450(3), F.A.C., of this chapter. For the purposes of this rule, facultative plants are not indicators of either wetland or upland conditions.

(5) "Facultative Wet plants" means those plant species listed in subsection 62-340.450(2), F.A.C., of this chapter.

(6) "Ground Cover" means the plant stratum composed of all plants not found in the canopy or subcanopy, except vines and aquatic plants.

(7) "Ground truthing" means verification on the ground of conditions on a site.

(8) "Hydric Soils" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

(9) "Hydric Soil Indicators" means those indicators of hydric soil conditions as identified in Soil and Water Relationships of

Florida's Ecological Communities (Florida Soil Conservation ed. Staff 1992).

(10) "Inundation" means a condition in which water from any source regularly and periodically covers a land surface.

(11) "Obligate plants" means those plant species listed in subsection 62-340.450(1), F.A.C., of this chapter.

(12) "Regulating agency" means the Department of Environmental Protection, the water management districts, state or regional agencies, local governments, and any other governmental entities.

(13) "Riverwash" means areas of unstabilized sandy, silty, clayey, or gravelly sediments. These areas are flooded, washed, and reworked by rivers or streams so frequently that they may support little or no vegetation.

(14) "Saturation" means a water table six inches or less from the soil surface for soils with a permeability equal to or greater than six inches per hour in all layers within the upper 12 inches, or a water table 12 inches or less from the soil surface for soils with a permeability less than six inches per hour in any layer within the upper 12 inches.

(15) "Seasonal High Water" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

(16) "Subcanopy" means the plant stratum composed of all woody plants and palms, exclusive of the canopy, with a trunk or main stem with a DBH between one and four inches, except vines.

(17) "Upland plants" means those plant species, not listed as Obligate, Facultative Wet, or Facultative by this rule, excluding vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of this rule.

(18) "U.S.D.A.-S.C.S." means the United States Department of Agriculture, Soil Conservation Service.

(19) "Wetlands," as defined in Section 373.019(25), F.S., means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.200.*

### 62-340.300 Delineation of Wetlands.

The landward extent (i.e., the boundary) of wetlands as defined in subsection 62-340.200(19), F.A.C., shall be determined by applying reasonable scientific judgment to evaluate the dominance of plant species, soils, and other hydrologic evidence of regular and periodic inundation and saturation as set forth below. In applying reasonable scientific judgment, all reliable information shall be evaluated in determining whether the area is a wetland as defined in subsection 62-340.200(19), F.A.C.

(1) Before using the wetland delineation methodology described below, the regulating agency shall attempt to identify and delineate the landward extent of wetlands by direct application of the definition of wetlands in subsection 62-340.200(19), F.A.C., with particular attention to the vegetative communities which the definition lists as wetlands and non-wetlands. If the boundary cannot be located easily by use of the definition in subsection 62-340.200(19), F.A.C., the provisions of this rule shall be used to locate the landward extent of a wetland. In applying the provisions of this rule, the regulating agency shall attempt to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing.

(2) The landward extent of a wetland as defined in subsection 62-340.200(19), F.A.C., shall include any of the following areas:

(a) Those areas where the areal extent of obligate plants in the appropriate vegetative stratum is greater than the areal extent of all upland plants in that stratum, as identified using the method in Rule 62-340.400, F.A.C., and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrological mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance,

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area, or

3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment

indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(b) Those areas where the areal extent of obligate or facultative wet plants, or combinations thereof, in the appropriate stratum is equal to or greater than 80% of all the plants in that stratum, excluding facultative plants, and either:

1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance,

2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area, or

3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(c) Those areas, other than pine flatwoods and improved pastures, with undrained hydric soils which meet, in situ, at least one of the criteria listed below. A hydric soil is considered undrained unless reasonable scientific judgment indicates permanent artificial alterations to the on site hydrology have resulted in conditions which would not support the formation of hydric soils.

1. Soils classified according to United States Department of Agriculture's *Keys to Soil Taxonomy* (4th ed. 1990) as Umbraqualfs, Sulfaquents, Hydraquents, Humaquepts, Histosols (except Folists), Argiaquolls, or Umbraquults.

2. Saline sands (salt flats-tidal flats).

3. Soil within a hydric mapping unit designated by the U.S.D.A.-S.C.S. as frequently flooded or depressional, when the hydric nature of the soil has been field verified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida. If a permit applicant, or a person petitioning for a formal determination pursuant to Section 373.421(2), F.S., disputes the boundary of a frequently flooded or depressional mapping unit, the applicant or petitioner may request that the regulating agency, in cooperation with the U.S.D.A.-S.C.S., confirm the boundary. For the purposes of Section 120.60(2), F.S., a request for a boundary confirmation pursuant to this subparagraph shall have the same effect as a timely request for additional information by the regulating agency. The regulating agency's receipt of the final response provided by the U.S.D.A.-S.C.S. to the request for boundary confirmation shall have the same effect as a receipt of timely requested additional information.

4. For the purposes of this paragraph only, "pine flatwoods" means a plant community type in Florida occurring on flat terrain with soils which may experience a seasonal high water table near the surface. The canopy species consist of a monotypic or mixed forest of long leaf pine or slash pine. The subcanopy is typically sparse or absent. The ground cover is dominated by saw palmetto with areas of wire grass, gallberry, and other shrubs, grasses, and forbs, which are not obligate or facultative wet species. Pine flatwoods do not include those wetland communities as listed in the wetland definition contained in subsection 62-340.200(19), F.A.C., which may occur in the broader landscape setting of pine flatwoods and which may contain slash pine. Also for the purposes of this paragraph only, "improved pasture" means areas where the dominant native plant community has been replaced with planted or natural recruitment of herbaceous species which are not obligate or facultative wet species and which have been actively maintained for livestock through mechanical means or grazing.

(d) Those areas where one or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present, and which have hydric soils, as identified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida, and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C. These areas shall not extent beyond the seasonal high water elevation.

(3)(a) If the vegetation or soils of an upland or wetland area have been altered by natural or man-induced factors such that the boundary between wetlands and uplands cannot be delineated reliably by use of the methodology in subsection 62-340.300(2), F.A.C., as determined by the regulating agency, and the area has hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a non hydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance, then the most reliable available information shall be used with reasonable scientific judgment to determine where the methodology in subsection 62-340.300(2), F.A.C., would have delineated the boundary between wetlands and uplands. Reliable available information may include, but is not limited to, aerial photographs, remaining vegetation, authoritative site-specific documents, or topographical consistencies.

(b) This subsection shall not apply to any area where regional or site-specific permitted activity, or activities which did not require a permit, under Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., have altered the

hydrology of the area to the extent that reasonable scientific judgment, or application of the provisions of Section 62-340.550, F.A.C., indicate that under normal circumstances the area no longer inundates or saturates at a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C.

(c) This subsection shall not be construed to limit the type of evidence which may be used to delineate the landward extent of a wetland under this chapter when an activity violating the regulatory requirements of Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., has disturbed the vegetation or soils of an area.

(4) The regulating agency shall maintain sufficient soil scientists on staff to provide evaluation or consultation regarding soil determinations in applying the methodologies set forth in subsection 62-340.300(2) or (3), F.A.C. Services provided by the U.S.D.A.-S.C.S., or other competent soil scientists, under contract or agreement with the regulating agency, may be used in lieu of, or to augment, agency staff.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.300.*

**62-340.400 Selection of Appropriate Vegetative Stratum.**

Dominance of plant species, as described in paragraphs 62-340.300(2)(a) and 62-340.300(2)(b), F.A.C., shall be determined in a plant stratum (canopy, subcanopy, or ground cover). The top stratum shall be used to determine dominance unless the top stratum, exclusive of facultative plants, constitutes less than 10 percent areal extent, or unless reasonable scientific judgment establishes that the indicator status of the top stratum is not indicative of the hydrologic conditions on site. In such cases, the stratum most indicative of on site hydrologic conditions, considering the seasonal variability in the amount and distribution of rainfall, shall be used. The evidence concerning the presence or absence of regular and periodic inundation or saturation shall be based on in situ data. All facts and factors relating to the presence or absence of regular and periodic inundation or saturation shall be weighed in deciding whether the evidence supports shifting to a lower stratum. The presence of obligate, facultative wet, or upland plants in a lower stratum does not by itself constitute sufficient evidence to shift strata, but can be considered along with other physical data in establishing the weight of evidence necessary to shift to a lower stratum. The burden of proof shall be with the party asserting that a stratum other than the top stratum should be used to determine dominance. Facultative plants shall not be considered for purposes of determining appropriate strata or dominance.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.400.*

**62-340.450 Vegetative Index.**

(1) Obligate Species:

| Scientific Name | Common Name |
| --- | --- |
| *Acer saccharinum* | maple, silver |
| *Acoelorraphe wrightii* | palm, paurotis |
| *Acrostichum spp.* | leather fern |
| *Aeschynomene pratensis* | joint-vetch, meadow |
| *Agalinis linifolia* | false-foxglove, flax-leaf |
| *Agalinis maritima* | false-foxglove, saltmarsh |
| *Alisma subcordatum* | water-plantain, subcordate |
| *Alnus serrulata* | alder, hazel |
| *Alternanthera philoxeroides* | alligator-weed |
| *Alternanthera sessilis* | alligator weed, sessile |
| *Amaranthus australis* | amaranth, southern |
| *Amaranthus cannabinus* | amaranth, tidemarsh |
| *Amaranthus floridanus* | amaranth, Florida |
| *Ammannia spp.* | toothcup |
| *Annona glabra* | pond apple |
| *Aristida affinis* | three-awn grass, long-leaf |
| *Armoracia aquatica* | lakecress |

| | |
|---|---|
| *Arnoglossum sulcatum* | indian-plantain, Georgia |
| *Asclepias incarnata* | milkweed, swamp |
| *Asclepias lanceolata* | milkweed, fen-flower |
| *Asclepias perennis* | milkweed, aquatic |
| *Asclepias rubra* | milkweed, red |
| *Aster carolinianus* | aster, climbing |
| *Aster elliottii* | aster, Elliott's |
| *Aster subulatus* | aster, saltmarsh |
| *Aster tenuifolius* | aster, saltmarsh |
| *Avicennia germinans* | mangrove, black |
| *Baccharis angustifolia* | false-willow |
| *Bacopa spp.* | water-hyssop |
| *Batis maritima* | saltwort |
| *Betula nigra* | birch, river |
| *Bidens spp.* | beggar-ticks |
| except *Bidens pilosa* | beggar-ticks, white (FAC) |
| *Bidens bipinnata* | Spanish needles (U) |
| *Boehmeria cylindrica* | false-nettle, small-spike |
| *Borrichia spp.* | sea oxeye |
| *Burmannia spp.* | burmannia |
| *Callitriche spp.* | water-starwort |
| *Campanula floridana* | bellflower |
| *Canna spp.* | canna |
| except *Canna x generalis* | canna, common (FAC) |
| *Cardamine bulbosa* | bitter-cress |
| *Cardamine pensylvanica* | spring-cress |
| *Carex atlantica* | sedge, prickly bog |
| *Carex comosa* | sedge, bearded |
| *Carex crinita* | sedge, fringed |
| *Carex crus-corvi* | sedge, raven-foot |
| *Carex decomposita* | sedge, cypress-knee |
| *Carex elliottii* | sedge, Elliott's |
| *Carex folliculata* | sedge, long |
| *Carex gigantea* | sedge, large |
| *Carex howei* | sedge, Howe's |
| *Carex hyalinolepis* | sedge, shoreline |
| *Carex leptalea* | sedge, bristly-stalk |
| *Carex louisianica* | sedge, Louisiana |
| *Carex lupulina* | sedge, hop |
| *Carex lurida* | sedge, shallow |
| *Carex stipata* | sedge, stalk-grain |
| *Carex walteriana* | sedge, Walter's |
| *Carya aquatica* | hickory, water |
| *Cephalanthus occidentalis* | buttonbush |
| *Chamaecyparis thyoides* | cedar, Atlantic white |
| *Cicuta spp.* | water-hemlock |
| *Cirsium muticum* | thistle, swamp |

| | |
|---|---|
| *Cladium spp.* | sawgrass |
| *Cleistes divaricata* | rosebud |
| *Colocasia esculenta* | elephant's ear |
| *Coreopsis nudata* | tickseed, Georgia |
| *Cornus amomum* | dogwood, silky |
| *Crataegus aestivalis* | mayhaw |
| *Crinum americanum* | swamp-lily, southern |
| *Cyperus alternifolius* | flatsedge, alternate-leaf |
| *Cyperus articulatus* | flatsedge, jointed |
| *Cyperus difformis* | flatsedge, variable |
| *Cyperus distinctus* | flatsedge, marshland |
| *Cyperus drummondii* | flatsedge |
| *Cyperus entrerianus* | flatsedge |
| *Cyperus erythrorhizos* | flatsedge, red-root |
| *Cyperus haspan* | flatsedge, sheathed |
| *Cyperus lanceolatus* | flatsedge, epiphytic |
| *Cyperus papyrus* | flatsedge, papyrus |
| *Decodon verticillatus* | swamp-loosestrife |
| *Dichromena latifolia* | white-top sedge, giant |
| *Distichlis spicata* | saltgrass, seashore |
| *Drosera filiformis* | sundew, thread-leaf |
| *Drosera intermedia* | sundew, spoon-leaf |
| *Drosera tracyi* | sundew, Gulf coast |
| *Dulichium arundinaceum* | sedge, three-way |
| *Echinodorus spp.* | burhead |
| *Eleocharis spp.* | spikerush |
| *Erianthus giganteus* | plumegrass, sugarcane |
| *Erianthus strictus* | plumegrass, narrow |
| *Eriocaulon spp.* | pipewort |
| *Eryngium aquaticum* | corn snakeroot |
| *Eupatorium leptophyllum* | marsh thoroughwort |
| *Fimbristylis spp.* | fringe-rush |
| except *Fimbristylis annua* | fringe-rush, annual (FACW) |
| *F. puberula* | fringe-rush, Vahl's (FACW) |
| *F. spathacea* | hurricane-grass (FAC) |
| *Fraxinus spp.* | ash |
| except *Fraxinum americana* | ash, white (U) |
| *Fuirena spp.* | umbrella-sedge |
| *Gleditsia aquatica* | water-locust |
| *Glyceria striata* | fowl mannagrass |
| *Heteranthera reniformis* | mud-plantain, kidney-leaf |
| *Hibiscus coccineus* | rosemallow, scarlet |
| *Hibiscus grandiflorus* | rosemallow, swamp |
| *Hibiscus laevis* | rosemallow, halberd-leaf |
| *Hibiscus moscheutos* | rosemallow, swamp |
| *Hydrochloa caroliniensis* | watergrass |
| *Hydrocleis nymphoides* | water-poppy |

| | |
|---|---|
| *Hydrocotyle ranunculoides* | penny-wort, floating |
| *Hydrolea spp.* | false-fiddle-leaf |
| *Hygrophila spp.* | hygrophila |
| *Hymenachne amplexicaulis* | trompetilla |
| *Hymenocallis spp.* | spider-lily |
| *Hypericum chapmanii* | St. John's-wort, Chapman's |
| *Hypericum edisonianum* | St. John's-wort, Edison's |
| *Hypericum fasciculatum* | St. John's-wort, marsh |
| *Hypericum lissophloeus* | St. John's-wort, smooth-bark |
| *Hypericum nitidum* | St. John's-wort, Carolina |
| *Ilex amelanchier* | holly, sarvis |
| *Ilex cassine* | holly, dahoon |
| *Ilex myrtifolia* | holly, myrtle |
| *Ilex verticillata* | winterberry |
| *Illicium floridanum* | anise, Florida |
| *Impatiens capensis* | touch-me-not, spotted |
| *Iris spp.* | Iris |
| except *I. verna* | dwarf iris (U) |
| *Isoetes spp.* | quillwort |
| *Itea virginica* | virginia willow |
| *Iva frutescens* | marsh elder |
| *Juncus spp.* | Rush |
| except *J. tenuis* | rush (FAC) |
| *J. marginatus* | rush (FACW) |
| *Justicia spp.* | water-willow |
| except J. *brandegeana* | shrimp plant (U) |
| *Kosteletzkya virginica* | mallow, seashore |
| *Lachnocaulon digynum* | bogbutton, pineland |
| *Lachnocaulon engleri* | bogbutton, Engler's |
| *Lachnocaulon minus* | bogbutton, Small's |
| *Laguncularia racemosa* | mangrove, white |
| *Leersia spp.* | cutgrass |
| *Leitneria floridana* | corkwood |
| *Lilaeopsis spp.* | lilaeopsis |
| *Lilium iridollae* | lily, panhandle |
| *Limnobium spongia* | frogbit |
| *Limnophila spp.* | marshweed |
| *Limonium carolinianum* | sea-lavender |
| *Lindera melissaefolia* | spicebush, southern |
| *Linum westii* | flax, West's |
| *Liparis elata = (L. nervosa)* | liparis, tall |
| *Litsea aestivalis* | pondspice |
| *Lobelia cardinalis* | cardinal flower |
| *Lobelia floridana* | lobelia, Florida |
| *Ludwigia spp.* | ludwigia; water-primrose |
| except *Ludwigia hirtella* | seedbox, hairy (FACW) |
| *Ludwigia maritima* | seedbox, seaside (FACW) |

| *L. suffruticosa* | seedbox, headed (FACW) |
|---|---|
| *Ludwigia virgata* | seedbox, savanna (FACW) |
| *Lycium carolinianum* | Christmas berry |
| *Lycopus spp.* | bugleweed |
| *Lysimachia spp.* | loosestrife |
| *Lythrum spp.* | marsh loosestrife |
| *Macranthera flammea* | flameflower |
| *Magnolia virginiana var. australis* | magnolia, sweetbay |
| *Malaxis spicata* | adder's-mouth, Florida |
| *Maxillaria crassifolia* | orchid, hidden |
| *Melanthium virginicum* | bunchflower, Virginia |
| *Micranthemum spp.* | baby tears |
| *Micromeria brownei* | savory, Brown's |
| *Mimulus alatus* | monkey-flower |
| *Monanthochloe littoralis* | keygrass |
| *Muhlenbergia capillaris* | muhly grass |
| *Nasturtium spp.* | water-cress |
| *Nelumbo spp.* | water-lotus |
| *Nuphar luteum* | cow-lily, yellow |
| *Nymphaea spp.* | water-lily |
| *Nymphoides spp.* | floating hearts |
| *Nyssa aquatica* | tupelo, water |
| *Nyssa ogeche* | tupelo, ogeechee |
| *Nyssa sylvatica var. biflora* | tupelo, swamp |
| *Orontium aquaticum* | golden club |
| *Osmunda regalis* | fern, royal |
| *Oxypolis spp.* | water drop-wort |
| *Panicum ensifolium* | panic grass |
| *Panicum erectifolium* | witchgrass, erect-leaf |
| *Panicum gymnocarpon* | panicum, savannah |
| *Panicum hemitomon* | maidencane |
| *Panicum longifolium* | panicum, tall thin |
| *Panicum scabriusculum* | panicum, woolly |
| *Panicum tenerum* | panicum, bluejoint |
| *Parnassia spp.* | grass-of-parnassus |
| *Paspalidium geminatum* | water panicum |
| *Paspalum dissectum* | paspalum, mudbank |
| *Paspalum distichum* | paspalum, joint |
| *Paspalum monostachyum* | paspalum, gulf |
| *Paspalum praecox* | paspalum, early |
| *Paspalum repens* | paspalum, water |
| *Peltandra spp.* | arum; spoon flower |
| *Penthorum sedoides* | ditch stonecrop |
| *Pentodon pentandrus* | pentodon, Hall's |
| *Persea palustris* | bay, swamp |
| *Phragmites australis* | reed, common |
| *Physostegia godfreyi* | dragon-head, Godfrey's |

| | |
|---|---|
| *Physostegia leptophylla* | dragon-head, slender-leaf |
| *Pinckneya bracteata* | fever-tree |
| *Pinguicula spp.* | butterwort |
| *Planera aquatica* | planer tree |
| *Platanthera spp.* | orchid, fringed |
| *Pleea tenuifolia* | rush-feathering |
| *Pogonia ophioglossoides* | pogonia, rose |
| *Polygala cymosa* | milkwort, tall |
| *Polygonum spp.* | smartweed |
| except *P. argyrocoleon* | smartweed, silversheath (U) |
| *P. virginianum* | jumpseed (FACW) |
| *Pontederia cordata* | pickerelweed |
| *Populus heterophylla* | cottonwood, swamp |
| *Proserpinaca spp.* | mermaid-weed |
| *Psilocarya spp.* | baldrush |
| *Quercus lyrata* | oak, overcup |
| *Rhexia parviflora* | meadow-beauty white |
| *Rhexia salicifolia* | meadow-beauty panhandle |
| *Rhizophora mangle* | mangrove, red |
| *Rhynchospora cephalantha* | beakrush, clustered |
| *Rhynchospora chapmanii* | beakrush, Chapman's |
| *Rhynchospora corniculata* | beakrush, short-bristle |
| *Rhynchospora decurrens* | beakrush, swamp-forest |
| *Rhynchospora divergens* | beakrush, spreading |
| *Rhynchospora harperi* | beakrush, Harper's |
| *Rhynchospora inundata* | beakrush, horned |
| *Rhynchospora macra* | beakrush, large |
| *Rhynchospora microcarpa* | beakrush, southern |
| *Rhynchospora miliacea* | beakrush, millet |
| *Rhynchospora mixta* | beakrush, mingled |
| *Rhynchospora oligantha* | beakrush, few-flower |
| *Rhynchospora stenophylla* | beakrush, Chapman's |
| *Rhynchospora tracyi* | beakrush, Tracy's |
| *Rorippa spp.* | yellow-cress |
| *Rosa palustris* | rose, swamp |
| *Rotala ramosior* | toothcup |
| *Rudbeckia mohrii* | coneflower, Mohr's |
| *Sabatia bartramii* | rose-gentian, Bartram's |
| *Sabatia calycina* | rose-gentian, coast |
| *Sabatia dodecandra* | rose-gentian, large |
| *Sacciolepis striata* | cupscale, American |
| *Sagittaria spp.* | arrowhead |
| *Salicornia spp.* | glasswort |
| *Salix spp.* | willow |
| *Samolus spp.* | pimpernel, water |
| *Sarracenia spp.* | pitcher-plant |
| except *Sarracenia minor* | pitcher-plant, hooded (FACW) |

| *Saururus cernuus* | lizard's tail |
|---|---|
| *Scirpus spp.* | bulrush |
| *Scutellaria lateriflora* | skullcap, blue |
| *Scutellaria racemosa* | skullcap |
| *Senecio aureus* | ragwort, golden |
| *Senecio glabellus* | butterweed |
| *Setaria magna* | foxtail |
| *Sium suave* | water-parsnip |
| *Solidago elliottii* | golden-rod, Elliott's |
| *Solidago patula* | golden-rod, rough-leaf |
| *Sparganium americanum* | burreed |
| *Spartina alterniflora* | cordgrass, saltmarsh |
| *Spartina cynosuroides* | cordgrass, big |
| *Spartina spartinae* | cordgrass, gulf |
| *Spergularia marina* | sandspurry, saltmarsh |
| *Sphagnum spp.* | sphagnum moss |
| *Sphenopholis pensylvanica* | wedgescale, swamp |
| *Sporobolus virginicus* | dropseed, seashore |
| *Stachys lythroides* | hedgenettle |
| *Stillingia aquatica* | corkwood |
| *Styrax americana* | snowbell; storax |
| *Suaeda spp.* | sea-blite |
| *Taxodium ascendens* | cypress, pond |
| *Taxodium distichum* | cypress, bald |
| *Thalia geniculata* | thalia; fire flag |
| *Tofieldia racemosa* | false-asphodel, coastal |
| *Triadenum spp.* | St. John's-wort, marsh |
| *Triglochin striatam* | arrow-grass |
| *Typha spp.* | cattail |
| *Utricularia spp.* | bladderwort |
| *Veronica anagallis-aquat ica* | speedwell, water |
| *Vicia ocalensis* | vetch, Ocala |
| *Viola lanceolata* | violet, lance-leaf |
| *Websteria confervoides* | water-meal |
| *Woodwardia aereolata* | chainfern |
| *Xyris spp.* | yellow-eyed grass |
|    except *Xyris caroliniana* | yellow-eyed grass, Carolina (FACW) |
|    *Xyris jupicai* | yellow-eyed grass, tropical (FACW) |
| *Zizania aquatica* | wildrice |
| *Zizaniopsis miliacea* | wildrice, southern |

(2) Facultative Wet Species:

| Scientific Name | Common Name |
|---|---|
| *Abildgaardia ovata* | rush, flat-spike |
| *Acer negundo* | box-elder |
| *Acer rubrum* | maple, red |
| *Aeschynomene indica* | joint-vetch, India |
| *Agalinis aphylla* | false-foxglove, scale-leaf |

| | |
|---|---|
| *Agalinis pinetorum (=A. pulchella)* | false-foxglove |
| *Agalinis purpurea* | false-foxglove, large purple |
| *Agarista populifolia* | hobble-bush |
| *Agrostis stolonifera* | redtop |
| *Amorpha fruticosa* | indigo-bush |
| *Amphicarpum muhlenbergian um* | blue maidencane |
| *Amsonia rigida* | slimpod, stiff |
| *Amsonia tabernaemontana* | slimpod, eastern |
| *Andropogon glomeratus* (Campbell) | bluestem, bushy |
| *Andropogon liebmanii var. pungensis* (Campbell) *(A. mohrii)* | bluestem, Mohr's |
| *Anthaenantia rufa* | silky-scale, purple |
| *Apteria aphylla* | nodding nixie |
| *Arenaria godfreyi* | stitchwort, Godfrey's |
| *Arisaema spp.* | jack-in-the-pulpit; green-dragon |
| *Aristida purpurascens (s.l.)* | three-awn grass, wand-like |
| *Arnoglossum diversifolium* | indian-plantain, variable-leaf |
| *Arnoglossum ovatum* | indian-plantain, egg-leaf |
| *Aronia arbutifolia* | red chokeberry |
| *Arundinaria gigantea* | giant cane |
| *Asclepias connivens* | milkweed, large-flower |
| *Asclepias longifolia* | milkweed, long-leaf |
| *Asclepias pedicellata* | milkweed, savannah |
| *Asclepias viridula* | milkweed, southern |
| *Aster chapmanii* | aster, savannah |
| *Aster eryngiifolius* | aster, coyote-thistle |
| *Aster lateriflorus* | aster, calico |
| *Aster spinulosus* | aster, bog |
| *Aster vimineus* | aster, small white |
| *Athyrium filix-femina* | fern, subarctic lady |
| *Atriplex patula* | saltbush, halberd-leaf |
| *Balduina atropurpurea* | honeycomb-head, purple |
| *Balduina uniflora* | honeycomb-head, one-flower |
| *Bartonia spp.* | screwstem |
| *Bigelowia nudata* | golden-rod, rayless |
| *Blechnum serrulatum* | swamp fern |
| *Boltonia spp.* | boltonia |
| *Brachiaria purpurascens* | paragrass |
| *Cacalia suaveolens* | indian-plantain, sweet-scent |
| *Calamovilfa curtissii* | Curtiss' reed grass |
| *Calopogon spp.* | grass-pinks |
| *Calycocarpum lyonii* | cupseed |
| *Caperonia spp.* | caperonia |
| *Capparis flexuosa* | caper-tree |
| *Carex spp.* | sedges |
| except *Carex atlantica* | sedge, prickly bog (OBL) |
| *Carex comosa* | sedge, bearded (OBL) |
| *Carex crinita* | sedge, fringed (OBL) |

| | |
|---|---|
| *Carex crus-corvi* | sedge, raven-foot (OBL) |
| *Carex decomposita* | sedge, cypress-knee (OBL) |
| *Carex elliottii* | sedge, Elliott's (OBL) |
| *Carex folliculata* | sedge, long (OBL) |
| *Carex gigantea* | sedge, large (OBL) |
| *Carex howei* | sedge, Howe's (OBL) |
| *Carex hyalinolepis* | sedge, shoreline (OBL) |
| *Carex leptalea* | sedge, bristly-stalk (OBL) |
| *Carex louisianica* | sedge, Louisiana (OBL) |
| *Carex lupulina* | sedge, hop (OBL) |
| *Carex lurida* | sedge, shallow (OBL) |
| *Carex stipata* | sedge, stalk-grain (OBL) |
| *Carex walteriana* | sedge, Walter's (OBL) |
| *Carphephorus carnosus* | chaffhead, pineland |
| *Carphephorus pseudoliatris* | chaffhead, bristle-leaf |
| *Carpinus caroliniana* | hornbeam, American |
| *Celtis laevigata* | sugar-berry; hackberry |
| *Centella asiatica* | coinwort |
| *Chaptalia tomentosa* | sunbonnet; pineland daisy |
| *Chasmanthium spp.* | spanglegrass |
| except *C. latifolum* | spanglegrass (FAC) |
| *C. sessiliflorum* | long-leaf Chasmanthium (FAC) |
| *Chrysobalanus icaco* | cocoplum |
| *Cirsium lecontei* | thistle, Leconte's |
| *Cirsium nuttallii* | thistle, Nuttall's |
| *Clethra alnifolia* | sweet pepper bush |
| *Cliftonia monophylla* | buckwheat-tree |
| *Commelina spp.* | dayflower |
| except *Commelina erecta* | dayflower, sandhill (U) |
| *Conocarpus erectus* | buttonwood |
| *Coreopsis falcata* | tickseed, sickle |
| *Coreopsis floridana* | tickseed, Florida |
| *Coreopsis gladiata* | tickseed, southeastern |
| *Coreopsis integrifolia* | tickseed, ciliate-leaf |
| *Coreopsis leavenworthii* | tickseed, Leavenworth's |
| *Coreopsis linifolia* | tickseed, Texas |
| *Cornus foemina* | swamp dogwood |
| *Crataegus marshallii* | haw, parsley |
| *Crataegus viridis* | haw, green |
| *Croton elliottii* | croton, Elliott's |
| *Ctenitis submarginalis* | fern, brown-hair comb |
| *Ctenium spp.* | toothache grass |
| *Cuphea aspera* | common waxweed |
| *Cyperus spp.* | flatsedge |
| except *C. alternifolius* | flatsedge, alternate-leaf (OBL) |
| *Cyperus articulatus* | flatsedge, jointed (OBL) |
| *Cyperus difformis* | flatsedge, variable (OBL) |

| | |
|---|---|
| *Cyperus distinctus* | flatsedge, marshland (OBL) |
| *Cyperus drummondii* | flatsedge (OBL) |
| *Cyperus entrerianus* | flatsedge (OBL) |
| *C. erythrorhizos* | flatsedge, red-root (OBL) |
| *Cyperus haspan* | flatsedge, sheathed (OBL) |
| *Cyperus lanceolatus* | flatsedge, epiphytic (OBL) |
| *Cyperus papyrus* | flatsedge, papyrus (OBL) |
| *Cyperus cuspidatus* | flatsedge, coastal-plain (FAC) |
| *Cyperus esculentus* | flatsedge (FAC) |
| *Cyperus giganteus* | flatsedge (FAC) |
| *Cyperus globulosus* | flatsedge, baldwin (FAC) |
| *Cyperus huarmensis* | flatsedge, black knotty-root (FAC) |
| *Cyperus metzii* | flatsedge (FAC) |
| *Cyperus retrorsus* | flatsedge (FAC) |
| *Cyperus rotundus* | flatsedge, purple (FAC) |
| *Cyperus filiculmis* | flatsedge, sandhill (U) |
| *Cyperus ovularis* | flatsedge (U) |
| *Cyperus reflexus* | flatsedge (U) |
| *Cyperus refractus* | flatsedge (U) |
| *C. retrofractus* | flatsedge (U) |
| *Cyperus tetragonus* | flatsedge (U) |
| *Dichromena colorata* | white-top sedge, starbrush |
| *Dichromena floridensis* | white-top sedge, Everglades |
| *Dicliptera brachiata* | mudwort, wild |
| *Digitaria pauciflora* | everglades grass |
| *Diodia virginiana* | button-weed |
| *Dionaea muscipula* | Venus' flytrap |
| *Drosera brevifolia* | sundew, dwarf |
| *Drosera capillaris* | sundew, pink |
| *Dryopteris ludoviciana* | shield-fern, southern |
| *Dyschoriste humistrata* | dyschoriste, swamp |
| *Echinochloa spp.* | jungle-rice; cockspur grass |
| *Eclipta alba* | yerba de Tajo |
| *Elyonurus tripsacoides* | balsam-scale, Pan-American |
| *Equisetum hyemale* | horsetail |
| *Erianthus brevibarbus* | plume grass, short-beard |
| *Erigeron vernus* | fleabane, early whitetop |
| *Eriochloa spp.* | cupgrass |
| *Eryngium integrifolium* | coyote-thistle, blue-flower |
| *Eryngium prostratum* | coyote-thistle, creeping |
| *Eryngium yuccifolium* | Rattlesnake master |
| *Erythrodes querceticola* | erythrodes, low |
| *Eulophia alta* | coco, wild |
| *Eupatoriadelph us fistulosus* | joe-pye-weed |
| *Eupatorium leucolepis* | thoroughwort, white-bract |
| *Eupatorium mikanioides* | thoroughwort, semaphore |
| *Eupatorium perfoliatum* | boneset |

| *Euphorbia humistrata (=Chamaesyce humistrata)* | broomspurge, spreading |
|---|---|
| *Euphorbia inundata* | spurge, Florida |
| *Euphorbia polyphylla* | spurge, many-leaved |
| *Eustachys glauca (=Chloris glauca)* | fingergrass, saltmarsh |
| *Eustoma exaltatum* | prairie-gentian |
| *Evolvulus convolvuloides* | evolvulus |
| *Evolvulus sericeus* | silky bindweed |
| *Fimbristylis annua* | fimbry, annual |
| *Fimbristylis puberula* | fimbry, Vahl's hairy |
| *Flaveria floridana* | yellowtop |
| *Flaveria linearis* | yellowtop |
| *Forestiera acuminata* | privet, swamp |
| *Fothergilla gardenii* | witch-alder, dwarf |
| *Galium tinctorium* | bedstraw, stiff marsh |
| *Gaylussacia mosieri* | woolly-berry |
| *Gentiana spp.* | gentian |
| *Gleditsia triacanthos* | honey-locust |
| *Gordonia lasianthus* | bay, loblolly |
| *Gratiola spp.* | hedgehyssop |
|     except *Gratiola hispida* | hedgehyssop (FAC) |
| *Habenaria spp.* | rein orchid |
| *Halesia diptera* | silver-bell |
| *Harperocallis flava* | Harper's beauty |
| *Hartwrightia floridana* | hartwrightia, Florida |
| *Hedychium coronarium* | ginger |
| *Helenium spp.* | sneezeweed |
|     except *Helenium amarum* | sneezeweed, pasture (FAC) |
| *Helianthus agrestis* | sunflower, southeastern |
| *Helianthus angustifolius* | sunflower, swamp |
| *Helianthus carnosus* | sunflower, lakeside |
| *Helianthus heterophyllus* | sunflower, wetland |
| *Helianthus simulans* | sunflower, muck |
| *Heliotropium procumbens* | heliotrope, four-spike |
| *Hemicarpha spp.* | dwarf-bullrush |
| *Hibiscus aculeatus* | rosemallow |
| *Hydrocotyle spp.* | pennywort |
|     except *H. ranunculoides* | pennywort, floating (OBL) |
| *Hypericum spp.* | St. John's-wort |
|     except *Hypericum chapmanii* | St. John's-wort, Chapman's (OBL) |
|     *H. edisonianum* | St. John's-wort, Edison's (OBL) |
|     *H. fasciculatum* | St. John's-wort, marsh (OBL) |
|     *H. lissophloeus* | St. John's-wort, smooth-bark (OBL) |
|     *Hypericum nitidum* | St. John's-wort, Carolina (OBL) |
|     *H. hypericoides* | St. Andrew's cross (FAC) |
|     *H. tetrapetalum* | St. John's-wort, four-petal (FAC) |
|     *H. cumulicola* | St. John's-wort, scrub (U) |
|     *H. drummondii* | St. John's-wort, Drummond's (U) |

| | |
|---|---|
| *H. gentianoides* | pineweed (U) |
| *H. microsepalum* | St. John's-wort, small-sepal (U) |
| *H. prolificum* | St. John's-wort, shrubby (U) |
| *Hypericum punctatum* | St. John's-wort, dotted (U) |
| *Hypericum reductum* | St. John's-wort, Atlantic (U) |
| *Hypolepis repens* | fern, bead |
| *Hypoxis spp.* | Stargrasses, yellow |
| *Hyptis alata* | musky mint |
| *Ilex coriacea* | holly, bay-gall |
| *Ilex decidua* | holly, deciduous |
| *Illicium parviflorum* | star anise |
| *Iva microcephala* | little marsh elder |
| *Juncus marginatus* | shore rush |
| *Kalmia latifolia* | laurel, mountain |
| *Lachnocaulon anceps* | bogbutton, white-head |
| *Lachnocaulon beyrichianum* | bogbutton, southern |
| *Laportea canadensis* | wood-nettle, Canada |
| *Leptochloa spp.* | sprangle-top |
| except *Leptochloa virgata* | sprangle-top, tropic (FAC) |
| *Leucothoe spp.* | dog-hobble |
| *Liatris garberi* | gayfeather, garber's |
| *Lindera benzoin* | spicebush, northern |
| *Lindernia spp.* | false-pimpernel |
| except *Lindernia crustacea* | false-pimpernel, Malayan (FAC) |
| *Linum carteri* | flax, Carter's |
| *Linum striatum* | flax, ridged yellow |
| *Lipocarpha spp.* | lipocarpha |
| *Liquidambar styraciflua* | sweetgum |
| *Liriodendron tulipifera* | tulip tree |
| *Listera spp.* | twayblade |
| *Lobelia spp.* | lobelia |
| except *Lobelia cardinalis* | flower, cardinal (OBL) |
| *Lobelia floridana* | lobelia, Florida (OBL) |
| *Lophiola americana* | golden-crest |
| *Ludwigia hirtella* | seedbox, hairy |
| *Ludwigia maritima* | seedbox, seaside |
| *Ludwigia suffruticosa* | seedbox, headed |
| *Ludwigia virgata* | seedbox, savanna |
| *Lycopodium spp.* | clubmoss |
| *Lyonia lucida* | fetter-bush |
| *Lyonia mariana* | fetter-bush |
| *Macbridea spp.* | birds-in-a-nest |
| *Manisuris spp.* | jointgrass |
| except *M. cylindrica* | jointgrass, pitted (FAC) |
| *Marshallia graminifolia* | barbara's-buttons, grass-leaf |
| *Marshallia tenuifolia* | barbara's-buttons, slim-leaf |
| *Mecardonia spp.* | mecardonia |

| | |
|---|---|
| *Melanthera nivea* | squarestem |
| *Mitreola spp.* | hornpod |
| *Muhlenbergia schreberi* | nimblewill |
| *Myrica heterophylla* | bayberry, evergreen |
| *Myrica inodora* | bayberry, odorless |
| *Nemastylis floridana* | pleatleaf, fall-flowering |
| *Nemophila aphylla* | baby-blue-eyes, small-flower |
| *Oldenlandia spp.* | bluets, water |
| *Onoclea sensibilis* | fern, sensitive |
| *Osmunda cinnamomea* | fern, cinnamon |
| *Panicum abscissum* (Hall) | cut-throat grass |
| *Panicum dichotomiflorum* | panicum, fall |
| *Panicum dichotomum* | panicum |
| *Panicum pinetorum* | panicum |
| *Panicum repens* | grass, torpedo |
| *Panicum rigidulum* | panicum, red-top |
| *Panicum scoparium* | panicum |
| *Panicum spretum* | panicum |
| *Panicum verrucosum* | panicum, warty |
| *Panicum virgatum* | switchgrass |
| *Paspalum acuminatum* | paspalum, brook |
| *Paspalum boscianum* | paspalum, bull |
| *Paspalum floridanum* | paspalum, Florida |
| *Paspalum laeve* | paspalum, field |
| *Paspalum pubiflorum* | paspalum, hairy-seed |
| *Pavonia spicata* | mangrove mallow |
| *Philoxerus vermicularis* | silverhead |
| *Phyllanthus caroliniensis* | leaf-flower, Carolina |
| *Phyllanthus liebmannianus* | leaf-flower, Florida |
| *Physostegia purpurea* | dragon-head, purple |
| *Physostegia virginiana* | dragon-head, false |
| *Pieris phillyreifolia* | fetter-bush, climbing |
| *Pilea spp.* | clearweed |
| *Pinus glabra* | pine, spruce |
| *Pinus serotina* | pine, pond |
| *Platanus occidentalis* | sycamore |
| *Pluchea spp.* | camphor-weed |
| *Polygala spp.* | milkwort |
| except *Polygala cymosa* | milkwort, tall yellow (OBL) |
| *P. leptostachys* | milkwort, sandhill (U) |
| *Polygala lewtonii* | milkwort, scrub (U) |
| *Polygala polygama* | milkwort, racemed (U) |
| *P. verticillata* | milkwort, whorled (U) |
| *Polygonum virginianum* | jumpseed |
| *Ponthieva racemosa* | shadow-witch |
| *Populus deltoides* | cotton-wood, eastern |
| *Pteris tripartita* | brake, giant |

| | |
|---|---|
| *Ptilimnium capillaceum* | mock bishop-weed |
| *Pycnanthemum nudum* | mountain-mint, coastal-plain |
| *Quercus laurifolia* | oak, laurel |
| *Quercus michauxii* | oak, swamp chestnut |
| *Quercus nigra* | oak, water |
| *Quercus pagoda* | oak, cherry-bark |
| *Quercus phellos* | oak, willow |
| *Ranunculus spp.* | butter-cup |
| *Reimarochloa oligostachya* | grass, Florida reimar |
| *Rhapidophyllu m hystrix* | palm, needle |
| *Rhexia spp.* | meadow-beauty |
|    except *Rhexia parviflora* | meadow-beauty white (OBL) |
|    *Rhexia salicifolia* | meadow-beauty panhandle (OBL) |
| *Rhododendron viscosum* | azalea, swamp |
| *Rhynchospora spp.* | beakrush |
|    except *R. cephalantha* | beakrush, clustered (OBL) |
|    *R. chapmanii* | beakrush, Chapman's (OBL) |
|    *R. corniculata* | beakrush, short-bristle (OBL) |
|    *R. decurrens* | beakrush, swamp-forest (OBL) |
|    *R. divergens* | beakrush, spreading (OBL) |
|    *R. harperi* | beakrush, Harper's (OBL) |
|    *R. inundata* | beakrush, horned (OBL) |
|    *Rhynchospora macra* | beakrush, large (OBL) |
|    *R. microcarpa* | beakrush, southern (OBL) |
|    *R. miliacea* | beakrush, millet (OBL) |
|    *Rhynchospora mixta* | beakrush, mingled (OBL) |
|    *R. oligantha* | beakrush, few-flower (OBL) |
|    *R. stenophylla* | beakrush, Chapman's (OBL) |
|    *Rhynchospora tracyi* | beakrush, Tracy's (OBL) |
|    *Rhynchospora grayi* | beakrush, Gray's (U) |
|    *R. intermedia* | beakrush, pinebarren (U) |
|    *R. megalocarpa* | beakrush, giant-fruited (U) |
| *Roystonea spp.* | palm, royal |
| *Rudbeckia fulgida* | coneflower, orange |
| *Rudbeckia graminifolia* | coneflower, grass-leaf |
| *Rudbeckia laciniata* | coneflower, cut-leaf |
| *Rudbeckia nitida* | coneflower, shiny |
| *Ruellia noctiflora* | wild-petunia, night-flowering |
| *Rumex spp.* | dock |
| *Sabal minor* | palmetto, dwarf |
| *Sabatia spp.* | rose-gentian |
|    except *Sabatia bartramii* | rose-gentian, Bartram's (OBL) |
|    *Sabatia calycina* | rose-gentian, coast (OBL) |
|    *Sabatia dodecandra* | rose-gentian, large (OBL) |
| *Sachsia polycephala* | sachsia |
| *Sarracenia minor* | pitcher-plant, hooded |
| *Schoenolirion croceum* | sunny bells |

| | |
|---|---|
| *Schoenolirion elliottii* | sunny bells |
| *Schoenus nigricans* | black-sedge |
| *Scleria spp.* | nutrush |
| *Sclerolepis uniflora* | hardscale, one flower |
| *Selaginella apoda* | spike-moss, meadow |
| *Sesuvium spp.* | sea-purslane |
| *Sisyrinchium atlanticum* | blue-eye-grass, eastern |
| *Sisyrinchium capillare* | blue-eye-grass |
| *Sisyrinchium mucronatum* | blue-eye-grass, Michaux's |
| *Solanum bahamense* | canker-berry |
| *Solanum erianthum* | night-shade, shrub |
| *Solidago fistulosa* | golden-rod, marsh |
| *Solidago leavenworthii* | golden-rod, leavenworth's |
| *Solidago sempervirens* | golden-rod, seaside |
| *Solidago stricta* | golden-rod, willow-leaf |
| *Sophora tomentosa* | coast sophora |
| *Spartina bakeri* | cordgrass, sand |
| *Spartina patens* | cordgrass, saltmeadow |
| *Spermacoce glabra* | button-plant, smooth |
| *Sphenoclea zeylandica* | chicken-spike |
| *Sphenostigma coelestinum* | ixia, Bartram's |
| *Spigelia loganioides* | pink-root |
| *Spilanthes americana* | spotflower, creeping |
| *Spiranthes spp.* | ladies'-tresses |
| *Sporobolus floridanus* | dropseed, Florida |
| *Staphylea trifolia* | bladdernut, American |
| *Stenandrium floridanum* | stenandrium |
| *Stenanthium gramineum* | feather-bells, eastern |
| *Stipa avenacioides* | grass, Florida needle |
| *Stokesia laevis* | stokesia |
| *Syngonanthus flavidulus* | bantam-buttons |
| *Teucrium canadense* | germander, American |
| *Thalictrum spp.* | meadow-rue |
| *Thelypteris spp.* | shield fern |
| *Tilia americana* | American basswood |
| *Toxicodendron vernix* | poison sumac |
| *Trachelosperm um difforme* | climbing-dogbane |
| *Trepocarpus aethusae* | trepocarpus, aethusa-like |
| *Trianthema portulacastrum* | horse-purslane |
| *Tridens ambiguus* | tridens, savannah |
| *Tridens strictus* | tridens, long-spike |
| *Triphora spp.* | pogonias, nodding |
| *Ulmus spp.* | elm |
| except *Ulmus rubra* | elm, slippery (U) |
| *Urechites lutea* | allamanda, wild |
| *Uvularia floridana* | bellwort, Florida |
| *Vaccinium corymbosum* | blueberry, highbush |

| | |
|---|---|
| *Verbena scabra* | vervain, sandpaper |
| *Verbesina chapmanii* | crownbeard, Chapman's |
| *Verbesina heterophylla* | crownbeard, diverse-leaf |
| *Vernonia spp.* | ironweed |
| except *V. angustifolia* | ironweed, narrow-leaf (U) |
| *Veronicastrum virginicum* | culver's root |
| *Viburnum dentatum* | arrow-wood |
| *Viburnum nudum* | viburnum, possum-haw |
| *Viburnum obovatum* | viburnum, walter |
| *Vicia acutifolia* | vetch, four-leaf |
| *Vicia floridana* | vetch, Florida |
| *Viola affinis* | violet, Leconte's |
| *Viola esculenta* | violet, edible |
| *Viola primulifolia* | violet, primrose-leaf |
| *Woodwardia virginica* | chainfern |
| *Xanthorhiza simplicissima* | yellow-root, shrubby |
| *Xanthosoma sagittifolium* | elephant ear |
| *Xyris caroliniana* | yellow-eyed-grass, Carolina |
| *Xyris jupicai* | yellow-eyed-grass, Richard's |
| *Yeatesia viridiflora* | yeatesia, green-flower |
| *Zephyranthes atamasco* | lily, atamasco |
| *Zigadenus densus* | crow poison |
| *Zigadenus glaberrimus* | deathcamas, Atlantic |

Within Monroe County and the Key Largo portion of Miami-Dade County only, the following species shall be listed as Facultative Wet:

| Scientific Name | Common Name |
|---|---|
| *Alternanthera maritima* | beach alternanthera |
| *Morinda royoc* | Keys rhubarb |
| *Strumpfia maritima* | strumpia |

(3) Facultative Species:

| Scientific Name | Common Name |
|---|---|
| *Acacia* | ear-leaved acacia |
| *Aletris spp.* | colic-root |
| *Alopecurus carolinianus* | foxtail, tufted |
| *Anagallis pumila* | pimpernel, Florida |
| *Andropogon arctatus* (Campbell) | bluestem, savannah |
| *Andropogon brachystachys* (Campbell) | bluestem, short-spike |
| *Andropogon gerardii* (Campbell) | bluestem, big |
| *Andropogon perangustatus* (Campbell) | bluestem, slim |
| *Andropogon virginicus* (Campbell) | broom-sedge |
| *Ardisia spp.* | marlberry |
| *Aristida rhizomophora* | grass, rhizomatous three-awn |
| *Aristida spiciformis* | bottlebrush, three-awn |
| *Aristida stricta* | grass, pineland three-awn |
| *Arundo donax* | reed, giant |
| *Aster dumosus* | aster, bushy |
| *Aster umbellatus* | aster, flat-top white |

| | |
|---|---|
| *Axonopus spp.* | carpet grass |
| *Baccharis dioica* | false-willow, broom-bush |
| *Baccharis glomeruliflora* | groundsel tree |
| *Baccharis halimifolia* | false-willow, eastern |
| *Bucida buceras* | gregory wood |
| *Bidens pilosa* | beggar-ticks, hairy |
| *Bumelia celastrina* | bumelia, coastal |
| *Bumelia lycioides* | bumelia, buckthorn |
| *Bumelia reclinata* | bumelia |
| *Campanula americana* | bellflower, American |
| *Canna x generalis* | garden canna |
| *Carphephorus odoratissimus* | vanilla plant |
| *Carphephorus paniculatus* | deer-tongue |
| *Casuarina spp.* | casuarina |
| *Cayaponia guingueloba* | cyaponia, five-lobe |
| *Cestrum diurnum* | day jessamine |
| *Chasmanthium latifolium* | spanglegrass |
| *Chasmanthium sessiliflorum* | long-leaf Chasmanthium |
| *Chiococca spp.* | snowberry |
| *Colubrina asiatica* | snakewood, Asian |
| *Conoclinium coelestinum* | mistflower |
| *Coreopsis tripteris* | tickseed, tall |
| *Cupaniopsis anacardioides* | carrotwood |
| *Cuphea carthagenensis* | waxweed, Columbia |
| *Cyperus cuspidatus* | flatsedge, coastal-plain |
| *Cyperus giganteus* | flatsedge |
| *Cyperus globulosus* | flatsedge, baldwin |
| *Cyperus huarmensis* | flatsedge, black knotty-root |
| *Cyperus metzii* | flatsedge |
| *Cyperus retrorsus* | flatsedge |
| *Cyperus rotundus* | flatsedge, purple |
| *Cypselea humifusa* | panal |
| *Cyrilla racemiflora* | cyrilla, swamp |
| *Dichondra caroliniensis* | pony-foot |
| *Digitaria serotina* | crabgrass, dwarf |
| *Diospyros virginiana* | persimmon, common |
| *Drymaria cordata* | West Indian chickweed |
| *Elytraria caroliniensis* | scaly-stem, Carolina |
| *Eragrostis spp.* | lovegrass |
| *Erechites hieraciifolia* | fireweed |
| *Erigeron guercifolius* | fleabane |
| *Erithralis fruticosa* | black torchwood |
| *Eryngium bladwini* | coyote-thistle, Baldwin's |
| *Eupatorium spp.* | thoroughworts |
| except *E. leptophyllum* | thoroughwort, secund (OBL) |
| *E. leucolepis* | thoroughwort, white-bract (FACW) |
| *E. mikanioides* | thoroughwort, semaphore (FACW) |

| | |
|---|---|
| *E. perfoliatum* | boneset, common (FACW) |
| *Eustachys petracea* | finger grass |
| *Euthamia spp.* | bushy goldenrod |
| *Ficus aurea* | fig, Florida strangler |
| *Fimbristylis spathacea* | hurricane-grass |
| *Flaveria bidentis* | yellowtop |
| *Flaveria trinervia* | yellowtop |
| *Forestiera segregata* | privet, Florida |
| *Gaylussacia dumosa* | dwarf huckleberry |
| *Gaylussacia frondosa* | dangleberry |
| *Gratiola hispida* | hyssop, hispid |
| *Helenium amarum* | sneezeweed, pasture |
| *Helianthus floridanus* | sunflower, Florida |
| *Heliotropium curassavicum* | heliotrope, seaside |
| *Heliotropium polyphyllum* | heliotrope |
| *Hibiscus tiliaceus* | rosemallow, sea |
| *Hypericum hypericoides* | St. Andrew's cross |
| *Ilex opaca var. opaca* | American holly |
| *Ilex vomitoria* | yaupon holly |
| *Jacquinia keyensis* | Joewood |
| *Juncus tenuis* | rush, path |
| *Kosteletzkya pentasperma* | mallow, coastal |
| *Lachnanthes caroliniana* | redroot |
| *Leptochloa virgata* | sprangle-top, tropic |
| *Liatris gracilis* | blazing star |
| *Liatris spicata* | gayfeather, spiked |
| *Lilium catesbaei* | lily, southern red |
| *Lindernia crustacea* | false-pimpernel, Malayan |
| *Linum floridanum* | flax, Florida yellow |
| *Linum medium* | flax, stiff yellow |
| *Lyonia ligustrina* | maleberry |
| *Manisuris cylindrica* | joint grass, pitted |
| *Maytenus phyllanthoides* | Florida mayten |
| *Melaleuca guinguenervia* | punk tree |
| *Melochia corchorifolia* | chocolate-weed |
| *Metopium toxiferum* | poison wood |
| *Mimosa pigra* | mimosa, black |
| *Morus rubra* | mulberry, red |
| *Muhlenbergia expansa* | cutover muhly |
| *Murdannia spp.* | dewflower |
| *Myosurus minimus* | mouse-tail, tiny |
| *Myrica cerifera* | bayberry, southern |
| *Myrsine guianensis* | myrsine, guiana |
| *Nephrolepis spp.* | sword ferns |
| *Neyraudia reynaudiana* | reed, silk |
| *Oplismenus setarius* | grass, woods |
| *Oryza sativa* | rice, cultivated |

| | |
|---|---|
| *Panicum anceps* | panicum, beaked |
| *Panicum commutatum* (Hall) | panicum |
| *Panicum hians* | panicum, gaping |
| *Panicum strigosum* | panicum |
| *Panicum tenue* | panicum |
| *Parietaria spp.* | pellitory |
| *Paspalum conjugatum* | paspalum, sour |
| *Paspalum dilatatum* | dallisgrass |
| *Paspalum fimbriatum* | paspalum, Panama |
| *Paspalum plicatulum* | paspalum, brown-seed |
| *Paspalum setaceum* | paspalum, thin |
| *Paspalum urvillei* | grass, vasey |
| *Pennisetum purpureum* | elephant ear grass |
| *Phalaris spp.* | grass, canary |
| *Phyla spp.* | frog-fruit |
| *Phyllanthus urinaria* | leaf-flower, water |
| *Piriqueta caroliniana* | piriqueta |
| *Polypogon spp.* | grass, rabbit-foot |
| *Polypremium procumbens* | rustweed |
| *Psidium cattleianun* | guava, strawberry |
| *Psychotria spp.* | wild coffee |
| *Rhodomyrtus tomentosus* | downy rose myrtle |
| *Rubus spp.* | blackberries |
| *Ruellia brittoniana* | wild-petunia, Britton's |
| *Ruellia caroliniensis* | wild petunia |
| *Sabal palmetto* | palm, cabbage |
| *Sacciolepis indica* | grass, glenwood |
| *Sambucus canadensis* | elderberry |
| *Sapium sebiferum* | tallow-tree, Chinese |
| *Schinus terebinthifolius* | pepper-tree, Brazilian |
| *Schizachyrium spp.* | bluestem |
| *Scoparia dulcis* | sweet broom |
| *Scutellaria floridana* | skullcap |
| *Scutellaria integrifolia* | rough skullcap |
| *Sebastiana fruticosa* | sebastian-bush, gulf |
| *Sesbania spp.* | rattle-bush |
| *Setaria geniculata* | grass, bristle |
| *Seymeria cassiodes* | black senna |
| *Solidago rugosa* | golden-rod, wrinkled |
| *Stillingia sylvatica var. tenuis* | queen's-delight, marsh |
| *Suriana maritima* | bay-cedar |
| *Syzygium spp.* | Java plum |
| *Thespesia populnea* | seaside mahoe |
| *Tradescantia fluminensis* | trailing spiderwort |
| *Trema spp.* | trema |
| *Tripsacum dactyloides* | grass, eastern gama |
| *Vaccinium elliottii* | blueberry, Elliott |

| *Verbesina virginica* | crownbeard, white |
| *Wedelia trilobata* | creeping ox-eye |

Within Monroe County and the Key Largo portion of Miami-Dade County only, the following species shall be listed as Facultative:

| Scientific Name | Common Name |
| --- | --- |
| *Alternanthera paronychioides* | Smooth chaff-flower |
| *Byrsonima lucida* | locust-berry |
| *Ernodea littoralis* | golden creeper |
| *Guapira discolor* | blolly |
| *Manilkara bahamensis* | wild dilly |
| *Pisonia rotundata* | pisonia |
| *Pithecellobium keyensis* | blackbead |
| *Pithecellobium unguis-cati* | catsclaw |
| *Randia aculeata* | box briar |
| *Reynosia septentrionalis* | darling plum |
| *Thrinax radiata* | Florida thatch palm |

(4) Nomenclature. Use of plants in this rule is based solely on the scientific names. Common names are included in the above lists for information purposes only. The following references shall be used by the regulating agency to resolve any uncertainty about the nomenclature or taxonomy of any plant listed by a given scientific name in this section: R. Godfrey, Trees, Shrubs and Woody Vines of Northern Florida and Adjacent Georgia & Alabama (Univ. Ga. Press, Athens 1988) and D. Lellinger, Ferns & Fern-Allies of the United States & Canada (Smithsonian Institution Press, Washington D.C. 1985) for all species covered by these references. For all other listed scientific names the following references will be followed unless the species list in this section designates a different authority next to an individual species name: R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Monocotyledons (Univ. Ga. Press, Athens 1979); R. Godfrey & J. Wooten, Aquatic and Wetland Plants of Southeastern United States: Dicotyledons (Univ. Ga. Press, Athens 1979); D. & H. Correll, Flora of the Bahama Archipelago (A.R. Gantner, Germany 1982). When the species list in this section designates a different authority next to an individual species name, the regulating agency shall resolve any ambiguity in nomenclature by using the name identified in D. Hall, The Grasses of Florida (Doctoral Dissertation, Univ. of Fla., Gainesville 1978); or C. Campbell, Systematics of the Andropogon Virginicus Complex (GRAMINEAE), 64 Journal of the Arnold Arboretum 171-254 (1983).

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.450.*

**62-340.500 Hydrologic Indicators.**

The indicators below may be used as evidence of inundation or saturation when used as provided in Rule 62-340.300, F.A.C. Several of the indicators reflect a specific water elevation. These specific water elevation indicators are intended to be evaluated with meteorological information, surrounding topography and reliable hydrologic data or analyses when provided, to ensure that such indicators reflect inundation or saturation of a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C., and not rare or aberrant events. These specific water elevation indicators are not intended to be extended from the site of the indicator into surrounding areas when reasonable scientific judgment indicates that the surrounding areas are not wetlands as defined in subsection 62-340.200(19), F.A.C.

(1) Algal mats. The presence or remains of nonvascular plant material which develops during periods of inundation and persists after the surface water has receded.

(2) Aquatic mosses or liverworts on trees or substrates. The presence of those species of mosses or liverworts tolerant of or dependent on surface water inundation.

(3) Aquatic plants. Defined in subsection 62-340.200(1), F.A.C.

(4) Aufwuchs. The presence or remains of the assemblage of sessile, attached or free-living, nonvascular plants and invertebrate animals (including protozoans) which develop a community on inundated surfaces.

(5) Drift lines and rafted debris. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris

represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(6) Elevated lichen lines. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

(7) Evidence of aquatic fauna. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

(8) Hydrologic data. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation Staff 1992).

(9) Morphological plant adaptations. Specialized structures or tissues produced by certain plants in response to inundation or saturation which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

(10) Secondary flow channels. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

(11) Sediment deposition. Mineral or organic matter deposited in or shifted to positions indicating water transport.

(12) Vegetated tussocks or hummocks. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

(13) Water marks. A distinct line created on fixed objects, including vegetation, by a sustained water elevation.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.500.*

**62-340.550 Wetland Hydrology.**

A wetland delineation using the methodology described above, can be refuted by either reliable hydrologic records or site specific hydrologic data which indicate that neither inundation for at least seven consecutive days, nor saturation for at least twenty consecutive days, occurs during conditions which represent long-term hydrologic conditions. Hydrologic records or site specific hydrologic data must be of such a duration, frequency, and accuracy to demonstrate that the records or data are representative of the long-term hydrologic conditions, including the variability in quantity and seasonality of rainfall. When sufficient amounts of either reliable hydrologic records or site specific hydrologic data are not available to prove that the wetland area of concern does not inundate or saturate as described above, a site-specific field-verified analytic or numerical model may be used to demonstrate that the wetland area no longer inundates or saturates regularly or periodically under typical long-term hydrologic conditions. Before initiating the use of a model to evaluate if a wetland delineation should be refuted based on hydrologic conditions, the applicant or petitioner shall first meet with the appropriate regulating agency and reach an agreement on the terms of study, including data collection, the specific model, model development and calibration, and model verification. If the data, analyses, or models are deemed inadequate based on the hydrologic conditions being addressed, the regulating agency shall provide a case-by-case review of the applicability of any data, analyses, or models and shall provide specific reasons, based on generally accepted scientific and engineering practices, why they are inadequate.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.550.*

**62-340.600 Surface Waters.**

(1) For the purposes of Section 373.421, F.S., surface waters are waters on the surface of the earth, contained in bounds created naturally or artificially, including, the Atlantic Ocean, the Gulf of Mexico, bays, bayous, sounds, estuaries, lagoons, lakes, ponds, impoundments, rivers, streams, springs, creeks, branches, sloughs, tributaries, and other watercourses. However, state water quality standards apply only to those waters defined in Section 403.031(13), F.S.

(2) The landward extent of a surface water in the State for the purposes of implementing Section 373.414, F.S., shall be the more landward of the following:

(a) Wetlands as located by Rule 62-340.300, F.A.C., of this chapter;

(b) The mean high water line elevation for tidal water bodies;

(c) The ordinary high water line for non-tidal natural water bodies;

(d) The top of the bank for artificial lakes, borrow pits, canals, ditches and other artificial water bodies with side slopes of 1 foot vertical to 4 feet horizontal or steeper, excluding spoil banks when the canals and ditches have resulted from excavation into the ground, or

(e) The seasonal high water line for artificial lakes, borrow pits, canals, ditches, and other artificial water bodies with side slopes flatter than 1 foot vertical to 4 feet horizontal along with any artificial water body created by diking or impoundment above the ground.

(3) Determinations made pursuant to paragraphs (2)(b) and (2)(c), shall be for regulatory purposes and are not intended to be a delineation of the boundaries of lands for the purposes of title.

*Rulemaking Authority 373.421 FS. Law Implemented 373.421, 373.4211, 403.031(13) FS. History–New 7-1-94, Formerly 17-340.600.*

**62-340.700 Exemptions for Treatment or Disposal Systems.**

(1) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement Sections 373.414(1) through 373.414(6), 373.414(8) and 373.414(10), F.S.; and Section 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991):

(a) Works, impoundments, reservoirs, and other watercourses constructed and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapter 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(b) Works, impoundments, reservoirs, and other watercourses constructed solely for wastewater treatment or disposal before a construction permit was required under Chapter 403, F.S., and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(c) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C., except those permitted as wetland stormwater treatment systems, or

(d) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapter 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(2) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement Sections 373.414(1), 373.414(2)(a), 373.414(8), and 373.414(10), F.S.; and Sections 373.414(3) through 373.414(6), F.S.; and Section 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991), except for authority to protect threatened and endangered species in isolated wetlands:

(a) Works, impoundments, reservoirs, and other watercourses of 0.5 acre or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, 40E-4, F.A.C., except those permitted as wetland stormwater treatment systems, or

(b) Works, impoundments, reservoirs, and other watercourses of 0.5 acres or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapter 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(3) The exemptions in subsections 62-340.700(1) and (2), shall not apply to works, impoundments, reservoirs or other watercourses that:

(a) Are currently wetlands which existed before construction of the stormwater treatment system and were incorporated in it;

(b) Are proposed to be altered through expansion into wetlands or other surface waters, or

(c) Are wetlands created, enhanced, or restored as mitigation for wetland or surface water impacts under a permit issued by the Department or a water management district.

(4) Alterations and maintenance of works, impoundments, reservoirs, and other watercourses exempt under this subsection shall

not be considered in determining whether any wetland permitting threshold is met or exceeded under Part IV of Chapter 373, F.S.

(5) Works, impoundments, reservoirs, and other watercourses exempt under this subsection, other than isolated wetlands in systems described in subsection 62-340.700(2), F.A.C., above, shall not be delineated under Section 373.421, F.S.

(6) This exemption shall not affect the application of state water quality standards, including those applicable to Outstanding Florida Waters, at the point of discharge to waters as defined in subsection 403.031(13), F.S.

(7) As used in this subsection, "solely for" means the reason for which a work, impoundment, reservoir, or other watercourse is constructed and operated; and such construction and operation would not have occurred but for the purposes identified in subsection 62-340.700(1) or 62-340.700(2), F.A.C. Furthermore, the phrase does not refer to a work, impoundment, reservoir, or other watercourse constructed or operated for multiple purposes. Incidental uses, such as occasional recreational uses, will not render the exemption inapplicable, so long as the incidental uses are not part of the original planned purpose of the work, impoundment, reservoir, or other watercourse. However, for those works, impoundments, reservoirs, or other watercourses described in paragraphs 62-340.700(1)(c) and 62-340.700(2)(a), F.A.C., use of the system for flood attenuation, whether originally planned or unplanned, shall be considered an incidental use, so long as the works, impoundments, reservoirs, and other watercourses are no more than 2 acres larger than the minimum area required to comply with the stormwater treatment requirements of the district or department. For the purposes of this subsection, reuse from a work, impoundment, reservoir, or other watercourse is part of treatment or disposal.

*Rulemaking Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.700.*

### 62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

Construction, alteration, operation, maintenance, removal, and abandonment of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works, in, on or over lands that have become surface waters or wetlands solely because of mosquito control activities undertaken as part of a governmental mosquito control program, and which lands were neither surface waters nor wetlands before such activities, shall be exempt from the rules adopted by the department and water management districts to implement Sections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), and 373.414(7), F.S., regarding any authority granted pursuant to Section 373.414, F.S. (1991). Activities exempted under this section shall not be considered in determining whether any wetland permitting threshold is met or exceeded under Part IV of Chapter 373, F.S. This exemption shall not affect the regulation of impacts on other surface waters or wetlands, or the application of state water quality standards to waters as defined in subsection 403.031(13), F.S., including standards applicable to Outstanding Florida Waters.

*Rulemaking Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.750.*

Select Year:  2018 ▾  Go

# The 2018 Florida Statutes

Title X
PUBLIC OFFICERS, EMPLOYEES, AND
RECORDS

Chapter 120
ADMINISTRATIVE PROCEDURE
ACT

View Entire
Chapter

**CHAPTER 120**

**ADMINISTRATIVE PROCEDURE ACT**

120.50    Exception to application of chapter.

120.51    Short title.

120.515    Declaration of policy.

120.52    Definitions.

120.525    Meetings, hearings, and workshops.

120.53    Maintenance of agency final orders.

120.533    Coordination of the transmittal, indexing, and listing of agency final orders by Department of State.

120.536    Rulemaking authority; repeal; challenge.

120.54    Rulemaking.

120.541    Statement of estimated regulatory costs.

120.542    Variances and waivers.

120.545    Committee review of agency rules.

120.55    Publication.

120.555    Summary removal of published rules no longer in force and effect.

120.56    Challenges to rules.

120.565    Declaratory statement by agencies.

120.569    Decisions which affect substantial interests.

120.57    Additional procedures for particular cases.

120.573    Mediation of disputes.

120.574    Summary hearing.

120.595    Attorney's fees.

120.60    Licensing.

120.62    Agency investigations.

120.63    Exemption from act.

120.65    Administrative law judges.

120.651    Designation of two administrative law judges to preside over actions involving department or boards.

120.655    Withholding funds to pay for administrative law judge services to school boards.

120.66    Ex parte communications.

120.665    Disqualification of agency personnel.

120.68    Judicial review.

120.69    Enforcement of agency action.

120.695    Notice of noncompliance; designation of minor violation of rules.

120.72    Legislative intent; references to chapter 120 or portions thereof.

120.73    Circuit court proceedings; declaratory judgments.

120.74   Agency annual rulemaking and regulatory plans; reports.
120.80   Exceptions and special requirements; agencies.
120.81   Exceptions and special requirements; general areas.

**120.50     Exception to application of chapter.**—This chapter shall not apply to:

(1)   The Legislature.

(2)   The courts.

History.—s. 1, ch. 74-310; s. 3, ch. 77-468; s. 1, ch. 78-162.

**120.51     Short title.**—This chapter may be known and cited as the "Administrative Procedure Act."

History.—s. 1, ch. 74-310.

**120.515     Declaration of policy.**—This chapter provides uniform procedures for the exercise of specified authority. This chapter does not limit or impinge upon the assignment of executive power under Article IV of the State Constitution or the legal authority of an appointing authority to direct and supervise those appointees serving at the pleasure of the appointing authority. For purposes of this chapter, adherence to the direction and supervision of an appointing authority does not constitute delegation or transfer of statutory authority assigned to the appointee.

History.—s. 7, ch. 2012-116.

**120.52     Definitions.**—As used in this act:

(1)   "Agency" means the following officers or governmental entities if acting pursuant to powers other than those derived from the constitution:

(a)   The Governor; each state officer and state department, and each departmental unit described in s. 20.04; the Board of Governors of the State University System; the Commission on Ethics; the Fish and Wildlife Conservation Commission; a regional water supply authority; a regional planning agency; a multicounty special district, but only if a majority of its governing board is comprised of nonelected persons; educational units; and each entity described in chapters 163, 373, 380, and 582 and s. 186.504.

(b)   Each officer and governmental entity in the state having statewide jurisdiction or jurisdiction in more than one county.

(c)   Each officer and governmental entity in the state having jurisdiction in one county or less than one county, to the extent they are expressly made subject to this chapter by general or special law or existing judicial decisions.

This definition does not include a municipality or legal entity created solely by a municipality; a legal entity or agency created in whole or in part pursuant to part II of chapter 361; a metropolitan planning organization created pursuant to s. 339.175; a separate legal or administrative entity created pursuant to s. 339.175 of which a metropolitan planning organization is a member; an expressway authority pursuant to chapter 348 or any transportation authority or commission under chapter 343 or chapter 349; or a legal or administrative entity created by an interlocal agreement pursuant to s. 163.01(7), unless any party to such agreement is otherwise an agency as defined in this subsection.

(2)   "Agency action" means the whole or part of a rule or order, or the equivalent, or the denial of a petition to adopt a rule or issue an order. The term also includes any denial of a request made under s. 120.54(7).

(3)   "Agency head" means the person or collegial body in a department or other governmental unit statutorily responsible for final agency action. An agency head appointed by and serving at the pleasure of an appointing authority remains subject to the direction and supervision of the appointing authority, but actions taken by the agency head as authorized by statute are official acts.

(4)   "Committee" means the Administrative Procedures Committee.

(5)   "Division" means the Division of Administrative Hearings. Any document filed with the division by a party represented by an attorney shall be filed by electronic means through the division's website. Any document filed

with the division by a party not represented by an attorney shall, whenever possible, be filed by electronic means through the division's website.

(6) "Educational unit" means a local school district, a community college district, the Florida School for the Deaf and the Blind, or a state university when the university is acting pursuant to statutory authority derived from the Legislature.

(7) "Final order" means a written final decision which results from a proceeding under s. 120.56, s. 120.565, s. 120.569, s. 120.57, s. 120.573, or s. 120.574 which is not a rule, and which is not excepted from the definition of a rule, and which has been filed with the agency clerk, and includes final agency actions which are affirmative, negative, injunctive, or declaratory in form. A final order includes all materials explicitly adopted in it. The clerk shall indicate the date of filing on the order.

(8) "Invalid exercise of delegated legislative authority" means action that goes beyond the powers, functions, and duties delegated by the Legislature. A proposed or existing rule is an invalid exercise of delegated legislative authority if any one of the following applies:

(a) The agency has materially failed to follow the applicable rulemaking procedures or requirements set forth in this chapter;

(b) The agency has exceeded its grant of rulemaking authority, citation to which is required by s. 120.54(3)(a)1.;

(c) The rule enlarges, modifies, or contravenes the specific provisions of law implemented, citation to which is required by s. 120.54(3)(a)1.;

(d) The rule is vague, fails to establish adequate standards for agency decisions, or vests unbridled discretion in the agency;

(e) The rule is arbitrary or capricious. A rule is arbitrary if it is not supported by logic or the necessary facts; a rule is capricious if it is adopted without thought or reason or is irrational; or

(f) The rule imposes regulatory costs on the regulated person, county, or city which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.

A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency's class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the enabling statute.

(9) "Law implemented" means the language of the enabling statute being carried out or interpreted by an agency through rulemaking.

(10) "License" means a franchise, permit, certification, registration, charter, or similar form of authorization required by law, but it does not include a license required primarily for revenue purposes when issuance of the license is merely a ministerial act.

(11) "Licensing" means the agency process respecting the issuance, denial, renewal, revocation, suspension, annulment, withdrawal, or amendment of a license or imposition of terms for the exercise of a license.

(12) "Official reporter" means the publication in which an agency publishes final orders, the index to final orders, and the list of final orders which are listed rather than published.

(13) "Party" means:

(a) Specifically named persons whose substantial interests are being determined in the proceeding.

(b) Any other person who, as a matter of constitutional right, provision of statute, or provision of agency regulation, is entitled to participate in whole or in part in the proceeding, or whose substantial interests will be affected by proposed agency action, and who makes an appearance as a party.

(c)  Any other person, including an agency staff member, allowed by the agency to intervene or participate in the proceeding as a party. An agency may by rule authorize limited forms of participation in agency proceedings for persons who are not eligible to become parties.

(d)  Any county representative, agency, department, or unit funded and authorized by state statute or county ordinance to represent the interests of the consumers of a county, when the proceeding involves the substantial interests of a significant number of residents of the county and the board of county commissioners has, by resolution, authorized the representative, agency, department, or unit to represent the class of interested persons. The authorizing resolution shall apply to a specific proceeding and to appeals and ancillary proceedings thereto, and it shall not be required to state the names of the persons whose interests are to be represented.

The term "party" does not include a member government of a regional water supply authority or a governmental or quasi-judicial board or commission established by local ordinance or special or general law where the governing membership of such board or commission is shared with, in whole or in part, or appointed by a member government of a regional water supply authority in proceedings under s. 120.569, s. 120.57, or s. 120.68, to the extent that an interlocal agreement under ss. 163.01 and 373.713 exists in which the member government has agreed that its substantial interests are not affected by the proceedings or that it is to be bound by alternative dispute resolution in lieu of participating in the proceedings. This exclusion applies only to those particular types of disputes or controversies, if any, identified in an interlocal agreement.

(14)  "Person" means any person described in s. 1.01, any unit of government in or outside the state, and any agency described in subsection (1).

(15)  "Recommended order" means the official recommendation of an administrative law judge assigned by the division or of any other duly authorized presiding officer, other than an agency head or member of an agency head, for the final disposition of a proceeding under ss. 120.569 and 120.57.

(16)  "Rule" means each agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the procedure or practice requirements of an agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule. The term also includes the amendment or repeal of a rule. The term does not include:

(a)  Internal management memoranda which do not affect either the private interests of any person or any plan or procedure important to the public and which have no application outside the agency issuing the memorandum.

(b)  Legal memoranda or opinions issued to an agency by the Attorney General or agency legal opinions prior to their use in connection with an agency action.

(c)  The preparation or modification of:

1.  Agency budgets.

2.  Statements, memoranda, or instructions to state agencies issued by the Chief Financial Officer or Comptroller as chief fiscal officer of the state and relating or pertaining to claims for payment submitted by state agencies to the Chief Financial Officer or Comptroller.

3.  Contractual provisions reached as a result of collective bargaining.

4.  Memoranda issued by the Executive Office of the Governor relating to information resources management.

(17)  "Rulemaking authority" means statutory language that explicitly authorizes or requires an agency to adopt, develop, establish, or otherwise create any statement coming within the definition of the term "rule."

(18)  "Small city" means any municipality that has an unincarcerated population of 10,000 or less according to the most recent decennial census.

(19)  "Small county" means any county that has an unincarcerated population of 75,000 or less according to the most recent decennial census.

(20)  "Unadopted rule" means an agency statement that meets the definition of the term "rule," but that has not been adopted pursuant to the requirements of s. 120.54.

(21)  "Variance" means a decision by an agency to grant a modification to all or part of the literal requirements of an agency rule to a person who is subject to the rule. Any variance shall conform to the standards for variances outlined in this chapter and in the uniform rules adopted pursuant to s. 120.54(5).

(22) "Waiver" means a decision by an agency not to apply all or part of a rule to a person who is subject to the rule. Any waiver shall conform to the standards for waivers outlined in this chapter and in the uniform rules adopted pursuant to s. 120.54(5).

History.—s. 1, ch. 74-310; s. 1, ch. 75-191; s. 1, ch. 76-131; s. 1, ch. 77-174; s. 12, ch. 77-290; s. 2, ch. 77-453; s. 1, ch. 78-28; s. 1, ch. 78-425; s. 1, ch. 79-20; s. 55, ch. 79-40; s. 1, ch. 79-299; s. 2, ch. 81-119; s. 1, ch. 81-180; s. 7, ch. 82-180; s. 1, ch. 83-78; s. 2, ch. 83-273; s. 10, ch. 84-170; s. 15, ch. 85-80; s. 1, ch. 85-168; s. 2, ch. 87-385; s. 1, ch. 88-367; s. 1, ch. 89-147; s. 1, ch. 91-46; s. 9, ch. 92-166; s. 50, ch. 92-279; s. 55, ch. 92-326; s. 3, ch. 96-159; s. 1, ch. 97-176; s. 2, ch. 97-286; s. 1, ch. 98-402; s. 64, ch. 99-245; s. 2, ch. 99-379; s. 895, ch. 2002-387; s. 1, ch. 2003-94; s. 138, ch. 2003-261; s. 7, ch. 2003-286; s. 3, ch. 2007-196; s. 13, ch. 2007-217; s. 2, ch. 2008-104; s. 1, ch. 2009-85; s. 1, ch. 2009-187; s. 10, ch. 2010-5; s. 2, ch. 2010-205; s. 7, ch. 2011-208; s. 8, ch. 2012-116; s. 14, ch. 2013-173.

## 120.525 Meetings, hearings, and workshops.—

(1) Except in the case of emergency meetings, each agency shall give notice of public meetings, hearings, and workshops by publication in the Florida Administrative Register and on the agency's website not less than 7 days before the event. The notice shall include a statement of the general subject matter to be considered.

(2) An agenda shall be prepared by the agency in time to ensure that a copy of the agenda may be received at least 7 days before the event by any person in the state who requests a copy and who pays the reasonable cost of the copy. The agenda, along with any meeting materials available in electronic form excluding confidential and exempt information, shall be published on the agency's website. The agenda shall contain the items to be considered in order of presentation. After the agenda has been made available, a change shall be made only for good cause, as determined by the person designated to preside, and stated in the record. Notification of such change shall be at the earliest practicable time.

(3) If an agency finds that an immediate danger to the public health, safety, or welfare requires immediate action, the agency may hold an emergency public meeting and give notice of such meeting by any procedure that is fair under the circumstances and necessary to protect the public interest, if:

(a) The procedure provides at least the procedural protection given by other statutes, the State Constitution, or the United States Constitution.

(b) The agency takes only that action necessary to protect the public interest under the emergency procedure.

(c) The agency publishes in writing at the time of, or prior to, its action the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and its reasons for concluding that the procedure used is fair under the circumstances. The agency findings of immediate danger, necessity, and procedural fairness shall be judicially reviewable.

History.—s. 4, ch. 96-159; s. 3, ch. 2009-187; s. 3, ch. 2013-14.

## 120.53 Maintenance of agency final orders.—

(1) In addition to maintaining records contained in s. 119.021(3), each agency shall also electronically transmit a certified text-searchable copy of each agency final order listed in subsection (2) rendered on or after July 1, 2015, to a centralized electronic database of agency final orders maintained by the division. The database must allow users to research and retrieve the full texts of agency final orders by:

(a) The name of the agency that issued the final order.

(b) The date the final order was issued.

(c) The type of final order.

(d) The subject of the final order.

(e) Terms contained in the text of the final order.

(2) The agency final orders that must be electronically transmitted to the centralized electronic database include:

(a) Each final order resulting from a proceeding under s. 120.57 or s. 120.573.

(b) Each final order rendered pursuant to s. 120.57(4) which contains a statement of agency policy that may be the basis of future agency decisions or that may otherwise contain a statement of precedential value.

(c) Each declaratory statement issued by an agency.

(d) Each final order resulting from a proceeding under s. 120.56 or s. 120.574.

(3)   Each agency shall maintain a list of all final orders rendered pursuant to s. 120.57(4) that are not required to be electronically transmitted to the centralized electronic database because they do not contain statements of agency policy or statements of precedential value. The list must include the name of the parties to the proceeding and the number assigned to the final order.

(4)   Each final order, whether rendered by the agency or the division, that must be electronically transmitted to the centralized electronic database or maintained on a list pursuant to subsection (3) must be electronically transmitted to the database or added to the list within 90 days after the final order is rendered. Each final order that must be electronically transmitted to the database or added to the list must have attached a copy of the complete text of any materials incorporated by reference; however, if the quantity of the materials incorporated makes attachment of the complete text of the materials impractical, the final order may contain a statement of the location of such materials and the manner in which the public may inspect or obtain copies of the materials incorporated by reference.

(5)   Nothing in this section relieves an agency from its responsibility for maintaining a subject matter index of final orders rendered before July 1, 2015, and identifying the location of the subject matter index on the agency's website. In addition, an agency may electronically transmit to the centralized electronic database certified copies of all of the final orders that were rendered before July 1, 2015, which were required to be in the subject matter index. The centralized electronic database constitutes the official compilation of administrative final orders rendered on or after July 1, 2015, for each agency.

History.—s. 1, ch. 74-310; s. 2, ch. 75-191; s. 2, ch. 76-131; s. 2, ch. 79-299; s. 1, ch. 81-296; s. 2, ch. 81-309; s. 8, ch. 83-92; s. 34, ch. 83-217; s. 3, ch. 83-273; s. 1, ch. 84-203; s. 77, ch. 85-180; s. 2, ch. 87-100; s. 2, ch. 88-384; s. 44, ch. 90-136; s. 35, ch. 90-302; s. 2, ch. 91-30; s. 79, ch. 91-45; s. 1, ch. 91-191; s. 1, ch. 92-166; s. 143, ch. 92-279; s. 55, ch. 92-326; s. 757, ch. 95-147; s. 5, ch. 96-159; s. 2, ch. 96-423; s. 2, ch. 97-176; s. 3, ch. 2008-104; s. 2, ch. 2015-155.

## 120.533   Coordination of the transmittal, indexing, and listing of agency final orders by Department of State.—The Department of State shall:

(1)   Coordinate the transmittal, indexing, management, preservation, and availability of agency final orders that must be transmitted, indexed, or listed pursuant to s. 120.53.

(2)   Provide guidelines for indexing agency final orders. More than one system for indexing may be approved by the Department of State, including systems or methods in use, or proposed for use, by an agency. More than one system may be approved for use by a single agency as best serves the needs of that agency and the public.

(3)   Provide for storage and retrieval systems to be maintained by agencies pursuant to s. 120.53(5) for indexing, and making available agency final orders by subject matter. The Department of State may authorize more than one system, including systems in use by an agency. Storage and retrieval systems that may be used by an agency include, without limitation, a designated reporter or reporters, a microfilming system, an automated system, or any other system considered appropriate by the Department of State.

(4)   Provide standards and guidelines for the certification and electronic transmittal of copies of agency final orders to the division, as required under s. 120.53, and, to protect the integrity and authenticity of information publicly accessible through the electronic database, coordinate and provide standards and guidelines to ensure the security of copies of agency final orders transmitted and maintained in the electronic database by the division under s. 120.53(1).

(5)   For each agency, determine which final orders must be indexed or transmitted.

(6)   Require each agency to report to the department concerning which types or categories of agency orders establish precedent for each agency.

(7)   Adopt rules as necessary to administer its responsibilities under this section, which shall be binding on all agencies including the division acting in the capacity of official compiler of administrative final orders under s. 120.53, notwithstanding s. 120.65. The Department of State may provide for an alternative official compiler to manage and operate the division's database and related services if the Administration Commission determines that the performance of the division as official compiler is unsatisfactory.

History.—s. 9, ch. 91-30; s. 1, ch. 91-191; s. 7, ch. 96-159; s. 3, ch. 2015-155.

**120.536    Rulemaking authority; repeal; challenge.—**

(1)   A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency's class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the enabling statute.

(2)   Unless otherwise expressly provided by law:

(a)   The repeal of one or more provisions of law implemented by a rule that on its face implements only the provision or provisions repealed and no other provision of law nullifies the rule. Whenever notice of the nullification of a rule under this subsection is received from the committee or otherwise, the Department of State shall remove the rule from the Florida Administrative Code as of the effective date of the law effecting the nullification and update the historical notes for the code to show the rule repealed by operation of law.

(b)   The repeal of one or more provisions of law implemented by a rule that on its face implements the provision or provisions repealed and one or more other provisions of law nullifies the rule or applicable portion of the rule to the extent that it implements the repealed law. The agency having authority to repeal or amend the rule shall, within 180 days after the effective date of the repealing law, publish a notice of rule development identifying all portions of rules affected by the repealing law, and if no notice is timely published the operation of each rule implementing a repealed provision of law shall be suspended until such notice is published.

(c)   The repeal of one or more provisions of law that, other than as provided in paragraph (a) or paragraph (b), causes a rule or portion of a rule to be of uncertain enforceability requires the Department of State to treat the rule as provided by s. 120.555. A rule shall be considered to be of uncertain enforceability under this paragraph if the division notifies the Department of State that a rule or a portion of the rule has been invalidated in a division proceeding based upon a repeal of law, or the committee gives written notification to the Department of State and the agency having power to amend or repeal the rule that a law has been repealed creating doubt about whether the rule is still in full force and effect.

(3)   The Administrative Procedures Committee or any substantially affected person may petition an agency to repeal any rule, or portion thereof, because it exceeds the rulemaking authority permitted by this section. Not later than 30 days after the date of filing the petition if the agency is headed by an individual, or not later than 45 days if the agency is headed by a collegial body, the agency shall initiate rulemaking proceedings to repeal the rule, or portion thereof, or deny the petition, giving a written statement of its reasons for the denial.

(4)   Nothing in this section shall be construed to change the legal status of a rule that has otherwise been judicially or administratively determined to be invalid.

History.—s. 9, ch. 96-159; s. 3, ch. 99-379; s. 15, ch. 2000-151; s. 15, ch. 2005-2; s. 4, ch. 2008-104; s. 1, ch. 2012-31.

**120.54    Rulemaking.—**

(1)   GENERAL PROVISIONS APPLICABLE TO ALL RULES OTHER THAN EMERGENCY RULES.—

(a)   Rulemaking is not a matter of agency discretion. Each agency statement defined as a rule by s. 120.52 shall be adopted by the rulemaking procedure provided by this section as soon as feasible and practicable.

1.   Rulemaking shall be presumed feasible unless the agency proves that:

a.   The agency has not had sufficient time to acquire the knowledge and experience reasonably necessary to address a statement by rulemaking; or

b.   Related matters are not sufficiently resolved to enable the agency to address a statement by rulemaking.

2.   Rulemaking shall be presumed practicable to the extent necessary to provide fair notice to affected persons of relevant agency procedures and applicable principles, criteria, or standards for agency decisions unless the agency proves that:

a. Detail or precision in the establishment of principles, criteria, or standards for agency decisions is not reasonable under the circumstances; or

b. The particular questions addressed are of such a narrow scope that more specific resolution of the matter is impractical outside of an adjudication to determine the substantial interests of a party based on individual circumstances.

(b) Whenever an act of the Legislature is enacted which requires implementation of the act by rules of an agency within the executive branch of state government, such rules shall be drafted and formally proposed as provided in this section within the times provided in s. 120.74(4) and (5).

(c) No statutory provision shall be delayed in its implementation pending an agency's adoption of implementing rules unless there is an express statutory provision prohibiting its application until the adoption of implementing rules.

(d) In adopting rules, all agencies must, among the alternative approaches to any regulatory objective and to the extent allowed by law, choose the alternative that does not impose regulatory costs on the regulated person, county, or city which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.

(e) No agency has inherent rulemaking authority, nor has any agency authority to establish penalties for violation of a rule unless the Legislature, when establishing a penalty, specifically provides that the penalty applies to rules.

(f) An agency may adopt rules authorized by law and necessary to the proper implementation of a statute prior to the effective date of the statute, but the rules may not be effective until the statute upon which they are based is effective. An agency may not adopt retroactive rules, including retroactive rules intended to clarify existing law, unless that power is expressly authorized by statute.

(g) Each rule adopted shall contain only one subject.

(h) In rulemaking proceedings, the agency may recognize any material which may be judicially noticed, and it may provide that materials so recognized be incorporated into the record of the proceeding. Before the record of any proceeding is completed, all parties shall be provided a list of these materials and given a reasonable opportunity to examine them and offer written comments or written rebuttal.

(i)1. A rule may incorporate material by reference but only as the material exists on the date the rule is adopted. For purposes of the rule, changes in the material are not effective unless the rule is amended to incorporate the changes.

2. An agency rule that incorporates by specific reference another rule of that agency automatically incorporates subsequent amendments to the referenced rule unless a contrary intent is clearly indicated in the referencing rule. A notice of amendments to a rule that has been incorporated by specific reference in other rules of that agency must explain the effect of those amendments on the referencing rules.

3. In rules adopted after December 31, 2010, material may not be incorporated by reference unless:

a. The material has been submitted in the prescribed electronic format to the Department of State and the full text of the material can be made available for free public access through an electronic hyperlink from the rule making the reference in the Florida Administrative Code; or

b. The agency has determined that posting the material on the Internet for purposes of public examination and inspection would constitute a violation of federal copyright law, in which case a statement to that effect, along with the address of locations at the Department of State and the agency at which the material is available for public inspection and examination, must be included in the notice required by subparagraph (3)(a)1.

4. A rule may not be amended by reference only. Amendments must set out the amended rule in full in the same manner as required by the State Constitution for laws.

5. Notwithstanding any contrary provision in this section, when an adopted rule of the Department of Environmental Protection or a water management district is incorporated by reference in the other agency's rule to implement a provision of part IV of chapter 373, subsequent amendments to the rule are not effective as to the incorporating rule unless the agency incorporating by reference notifies the committee and the Department of State of its intent to adopt the subsequent amendment, publishes notice of such intent in the Florida

Administrative Register, and files with the Department of State a copy of the amended rule incorporated by reference. Changes in the rule incorporated by reference are effective as to the other agency 20 days after the date of the published notice and filing with the Department of State. The Department of State shall amend the history note of the incorporating rule to show the effective date of such change. Any substantially affected person may, within 14 days after the date of publication of the notice of intent in the Florida Administrative Register, file an objection to rulemaking with the agency. The objection shall specify the portions of the rule incorporated by reference to which the person objects and the reasons for the objection. The agency shall not have the authority under this subparagraph to adopt those portions of the rule specified in such objection. The agency shall publish notice of the objection and of its action in response in the next available issue of the Florida Administrative Register.

6. The Department of State may adopt by rule requirements for incorporating materials pursuant to this paragraph.

(j) A rule published in the Florida Administrative Code must be indexed by the Department of State within 90 days after the rule is filed. The Department of State shall by rule establish procedures for indexing rules.

(k) An agency head may delegate the authority to initiate rule development under subsection (2); however, rulemaking responsibilities of an agency head under subparagraph (3)(a)1., subparagraph (3)(e)1., or subparagraph (3)(e)6. may not be delegated or transferred.

(2) RULE DEVELOPMENT; WORKSHOPS; NEGOTIATED RULEMAKING.—

(a) Except when the intended action is the repeal of a rule, agencies shall provide notice of the development of proposed rules by publication of a notice of rule development in the Florida Administrative Register before providing notice of a proposed rule as required by paragraph (3)(a). The notice of rule development shall indicate the subject area to be addressed by rule development, provide a short, plain explanation of the purpose and effect of the proposed rule, cite the specific legal authority for the proposed rule, and include the preliminary text of the proposed rules, if available, or a statement of how a person may promptly obtain, without cost, a copy of any preliminary draft, if available.

(b) All rules should be drafted in readable language. The language is readable if:

1. It avoids the use of obscure words and unnecessarily long or complicated constructions; and

2. It avoids the use of unnecessary technical or specialized language that is understood only by members of particular trades or professions.

(c) An agency may hold public workshops for purposes of rule development. An agency must hold public workshops, including workshops in various regions of the state or the agency's service area, for purposes of rule development if requested in writing by any affected person, unless the agency head explains in writing why a workshop is unnecessary. The explanation is not final agency action subject to review pursuant to ss. 120.569 and 120.57. The failure to provide the explanation when required may be a material error in procedure pursuant to s. 120.56(1)(c). When a workshop or public hearing is held, the agency must ensure that the persons responsible for preparing the proposed rule are available to explain the agency's proposal and to respond to questions or comments regarding the rule being developed. The workshop may be facilitated or mediated by a neutral third person, or the agency may employ other types of dispute resolution alternatives for the workshop that are appropriate for rule development. Notice of a rule development workshop shall be by publication in the Florida Administrative Register not less than 14 days prior to the date on which the workshop is scheduled to be held and shall indicate the subject area which will be addressed; the agency contact person; and the place, date, and time of the workshop.

(d)1. An agency may use negotiated rulemaking in developing and adopting rules. The agency should consider the use of negotiated rulemaking when complex rules are being drafted or strong opposition to the rules is anticipated. The agency should consider, but is not limited to considering, whether a balanced committee of interested persons who will negotiate in good faith can be assembled, whether the agency is willing to support the work of the negotiating committee, and whether the agency can use the group consensus as the basis for its proposed rule. Negotiated rulemaking uses a committee of designated representatives to draft a mutually acceptable proposed rule.

2. An agency that chooses to use the negotiated rulemaking process described in this paragraph shall publish in the Florida Administrative Register a notice of negotiated rulemaking that includes a listing of the representative groups that will be invited to participate in the negotiated rulemaking process. Any person who believes that his or her interest is not adequately represented may apply to participate within 30 days after publication of the notice. All meetings of the negotiating committee shall be noticed and open to the public pursuant to the provisions of this chapter. The negotiating committee shall be chaired by a neutral facilitator or mediator.

3. The agency's decision to use negotiated rulemaking, its selection of the representative groups, and approval or denial of an application to participate in the negotiated rulemaking process are not agency action. Nothing in this subparagraph is intended to affect the rights of an affected person to challenge a proposed rule developed under this paragraph in accordance with s. 120.56(2).

(3) ADOPTION PROCEDURES.—

(a) *Notices.*—

1. Prior to the adoption, amendment, or repeal of any rule other than an emergency rule, an agency, upon approval of the agency head, shall give notice of its intended action, setting forth a short, plain explanation of the purpose and effect of the proposed action; the full text of the proposed rule or amendment and a summary thereof; a reference to the grant of rulemaking authority pursuant to which the rule is adopted; and a reference to the section or subsection of the Florida Statutes or the Laws of Florida being implemented or interpreted. The notice must include a summary of the agency's statement of the estimated regulatory costs, if one has been prepared, based on the factors set forth in s. 120.541(2); a statement that any person who wishes to provide the agency with information regarding the statement of estimated regulatory costs, or to provide a proposal for a lower cost regulatory alternative as provided by s. 120.541(1), must do so in writing within 21 days after publication of the notice; and a statement as to whether, based on the statement of the estimated regulatory costs or other information expressly relied upon and described by the agency if no statement of regulatory costs is required, the proposed rule is expected to require legislative ratification pursuant to s. 120.541(3). The notice must state the procedure for requesting a public hearing on the proposed rule. Except when the intended action is the repeal of a rule, the notice must include a reference both to the date on which and to the place where the notice of rule development that is required by subsection (2) appeared.

2. The notice shall be published in the Florida Administrative Register not less than 28 days prior to the intended action. The proposed rule shall be available for inspection and copying by the public at the time of the publication of notice.

3. The notice shall be mailed to all persons named in the proposed rule and to all persons who, at least 14 days prior to such mailing, have made requests of the agency for advance notice of its proceedings. The agency shall also give such notice as is prescribed by rule to those particular classes of persons to whom the intended action is directed.

4. The adopting agency shall file with the committee, at least 21 days prior to the proposed adoption date, a copy of each rule it proposes to adopt; a copy of any material incorporated by reference in the rule; a detailed written statement of the facts and circumstances justifying the proposed rule; a copy of any statement of estimated regulatory costs that has been prepared pursuant to s. 120.541; a statement of the extent to which the proposed rule relates to federal standards or rules on the same subject; and the notice required by subparagraph 1.

(b) *Special matters to be considered in rule adoption.*—

1. Statement of estimated regulatory costs.—Before the adoption, amendment, or repeal of any rule other than an emergency rule, an agency is encouraged to prepare a statement of estimated regulatory costs of the proposed rule, as provided by s. 120.541. However, an agency must prepare a statement of estimated regulatory costs of the proposed rule, as provided by s. 120.541, if:

a. The proposed rule will have an adverse impact on small business; or

b. The proposed rule is likely to directly or indirectly increase regulatory costs in excess of $200,000 in the aggregate in this state within 1 year after the implementation of the rule.

2. Small businesses, small counties, and small cities.—

a. Each agency, before the adoption, amendment, or repeal of a rule, shall consider the impact of the rule on small businesses as defined by s. 288.703 and the impact of the rule on small counties or small cities as defined by s. 120.52. Whenever practicable, an agency shall tier its rules to reduce disproportionate impacts on small businesses, small counties, or small cities to avoid regulating small businesses, small counties, or small cities that do not contribute significantly to the problem the rule is designed to address. An agency may define "small business" to include businesses employing more than 200 persons, may define "small county" to include those with populations of more than 75,000, and may define "small city" to include those with populations of more than 10,000, if it finds that such a definition is necessary to adapt a rule to the needs and problems of small businesses, small counties, or small cities. The agency shall consider each of the following methods for reducing the impact of the proposed rule on small businesses, small counties, and small cities, or any combination of these entities:

(I) Establishing less stringent compliance or reporting requirements in the rule.

(II) Establishing less stringent schedules or deadlines in the rule for compliance or reporting requirements.

(III) Consolidating or simplifying the rule's compliance or reporting requirements.

(IV) Establishing performance standards or best management practices to replace design or operational standards in the rule.

(V) Exempting small businesses, small counties, or small cities from any or all requirements of the rule.

b.(I) If the agency determines that the proposed action will affect small businesses as defined by the agency as provided in sub-subparagraph a., the agency shall send written notice of the rule to the rules ombudsman in the Executive Office of the Governor at least 28 days before the intended action.

(II) Each agency shall adopt those regulatory alternatives offered by the rules ombudsman in the Executive Office of the Governor and provided to the agency no later than 21 days after the rules ombudsman's receipt of the written notice of the rule which it finds are feasible and consistent with the stated objectives of the proposed rule and which would reduce the impact on small businesses. When regulatory alternatives are offered by the rules ombudsman in the Executive Office of the Governor, the 90-day period for filing the rule in subparagraph (e)2. is extended for a period of 21 days.

(III) If an agency does not adopt all alternatives offered pursuant to this sub-subparagraph, it shall, before rule adoption or amendment and pursuant to subparagraph (d)1., file a detailed written statement with the committee explaining the reasons for failure to adopt such alternatives. Within 3 working days after the filing of such notice, the agency shall send a copy of such notice to the rules ombudsman in the Executive Office of the Governor.

(c) *Hearings.*—

1. If the intended action concerns any rule other than one relating exclusively to procedure or practice, the agency shall, on the request of any affected person received within 21 days after the date of publication of the notice of intended agency action, give affected persons an opportunity to present evidence and argument on all issues under consideration. The agency may schedule a public hearing on the rule and, if requested by any affected person, shall schedule a public hearing on the rule. When a public hearing is held, the agency must ensure that staff are available to explain the agency's proposal and to respond to questions or comments regarding the rule. If the agency head is a board or other collegial body created under s. 20.165(4) or s. 20.43(3)(g), and one or more requested public hearings is scheduled, the board or other collegial body shall conduct at least one of the public hearings itself and may not delegate this responsibility without the consent of those persons requesting the public hearing. Any material pertinent to the issues under consideration submitted to the agency within 21 days after the date of publication of the notice or submitted to the agency between the date of publication of the notice and the end of the final public hearing shall be considered by the agency and made a part of the record of the rulemaking proceeding.

2. Rulemaking proceedings shall be governed solely by the provisions of this section unless a person timely asserts that the person's substantial interests will be affected in the proceeding and affirmatively demonstrates to the agency that the proceeding does not provide adequate opportunity to protect those interests. If the agency determines that the rulemaking proceeding is not adequate to protect the person's interests, it shall suspend the rulemaking proceeding and convene a separate proceeding under the provisions of ss. 120.569 and 120.57. Similarly

situated persons may be requested to join and participate in the separate proceeding. Upon conclusion of the separate proceeding, the rulemaking proceeding shall be resumed.

(d)  *Modification or withdrawal of proposed rules.—*

1.  After the final public hearing on the proposed rule, or after the time for requesting a hearing has expired, if the rule has not been changed from the rule as previously filed with the committee, or contains only technical changes, the adopting agency shall file a notice to that effect with the committee at least 7 days prior to filing the rule for adoption. Any change, other than a technical change that does not affect the substance of the rule, must be supported by the record of public hearings held on the rule, must be in response to written material submitted to the agency within 21 days after the date of publication of the notice of intended agency action or submitted to the agency between the date of publication of the notice and the end of the final public hearing, or must be in response to a proposed objection by the committee. In addition, when any change is made in a proposed rule, other than a technical change, the adopting agency shall provide a copy of a notice of change by certified mail or actual delivery to any person who requests it in writing no later than 21 days after the notice required in paragraph (a). The agency shall file the notice of change with the committee, along with the reasons for the change, and provide the notice of change to persons requesting it, at least 21 days prior to filing the rule for adoption. The notice of change shall be published in the Florida Administrative Register at least 21 days prior to filing the rule for adoption. This subparagraph does not apply to emergency rules adopted pursuant to subsection (4).

2.  After the notice required by paragraph (a) and prior to adoption, the agency may withdraw the rule in whole or in part.

3.  After adoption and before the rule becomes effective, a rule may be modified or withdrawn only in the following circumstances:

a.  When the committee objects to the rule; or

b.  When a final order, which is not subject to further appeal, is entered in a rule challenge brought pursuant to s. 120.56 after the date of adoption but before the rule becomes effective pursuant to subparagraph (e)6.;

c.  If the rule requires ratification, when more than 90 days have passed since the rule was filed for adoption without the Legislature ratifying the rule, in which case the rule may be withdrawn but may not be modified; or

d.  When the committee notifies the agency that an objection to the rule is being considered, in which case the rule may be modified to extend the effective date by not more than 60 days.

4.  The agency shall give notice of its decision to withdraw or modify a rule in the first available issue of the publication in which the original notice of rulemaking was published, shall notify those persons described in subparagraph (a)3. in accordance with the requirements of that subparagraph, and shall notify the Department of State if the rule is required to be filed with the Department of State.

5.  After a rule has become effective, it may be repealed or amended only through the rulemaking procedures specified in this chapter.

(e)  *Filing for final adoption; effective date.—*

1.  If the adopting agency is required to publish its rules in the Florida Administrative Code, the agency, upon approval of the agency head, shall file with the Department of State three certified copies of the rule it proposes to adopt; one copy of any material incorporated by reference in the rule, certified by the agency; a summary of the rule; a summary of any hearings held on the rule; and a detailed written statement of the facts and circumstances justifying the rule. Agencies not required to publish their rules in the Florida Administrative Code shall file one certified copy of the proposed rule, and the other material required by this subparagraph, in the office of the agency head, and such rules shall be open to the public.

2.  A rule may not be filed for adoption less than 28 days or more than 90 days after the notice required by paragraph (a), until 21 days after the notice of change required by paragraph (d), until 14 days after the final public hearing, until 21 days after a statement of estimated regulatory costs required under s. 120.541 has been provided to all persons who submitted a lower cost regulatory alternative and made available to the public, or until the administrative law judge has rendered a decision under s. 120.56(2), whichever applies. When a required notice of change is published prior to the expiration of the time to file the rule for adoption, the period during which a rule must be filed for adoption is extended to 45 days after the date of publication. If notice of a public

hearing is published prior to the expiration of the time to file the rule for adoption, the period during which a rule must be filed for adoption is extended to 45 days after adjournment of the final hearing on the rule, 21 days after receipt of all material authorized to be submitted at the hearing, or 21 days after receipt of the transcript, if one is made, whichever is latest. The term "public hearing" includes any public meeting held by any agency at which the rule is considered. If a petition for an administrative determination under s. 120.56(2) is filed, the period during which a rule must be filed for adoption is extended to 60 days after the administrative law judge files the final order with the clerk or until 60 days after subsequent judicial review is complete.

3.    At the time a rule is filed, the agency shall certify that the time limitations prescribed by this paragraph have been complied with, that all statutory rulemaking requirements have been met, and that there is no administrative determination pending on the rule.

4.    At the time a rule is filed, the committee shall certify whether the agency has responded in writing to all material and timely written comments or written inquiries made on behalf of the committee. The department shall reject any rule that is not filed within the prescribed time limits; that does not comply with all statutory rulemaking requirements and rules of the department; upon which an agency has not responded in writing to all material and timely written inquiries or written comments; upon which an administrative determination is pending; or which does not include a statement of estimated regulatory costs, if required.

5.    If a rule has not been adopted within the time limits imposed by this paragraph or has not been adopted in compliance with all statutory rulemaking requirements, the agency proposing the rule shall withdraw the rule and give notice of its action in the next available issue of the Florida Administrative Register.

6.    The proposed rule shall be adopted on being filed with the Department of State and become effective 20 days after being filed, on a later date specified in the notice required by subparagraph (a)1., on a date required by statute, or upon ratification by the Legislature pursuant to s. 120.541(3). Rules not required to be filed with the Department of State shall become effective when adopted by the agency head, on a later date specified by rule or statute, or upon ratification by the Legislature pursuant to s. 120.541(3). If the committee notifies an agency that an objection to a rule is being considered, the agency may postpone the adoption of the rule to accommodate review of the rule by the committee. When an agency postpones adoption of a rule to accommodate review by the committee, the 90-day period for filing the rule is tolled until the committee notifies the agency that it has completed its review of the rule.

For the purposes of this paragraph, the term "administrative determination" does not include subsequent judicial review.

(4)    EMERGENCY RULES.—

(a)    If an agency finds that an immediate danger to the public health, safety, or welfare requires emergency action, the agency may adopt any rule necessitated by the immediate danger. The agency may adopt a rule by any procedure which is fair under the circumstances if:

1.    The procedure provides at least the procedural protection given by other statutes, the State Constitution, or the United States Constitution.

2.    The agency takes only that action necessary to protect the public interest under the emergency procedure.

3.    The agency publishes in writing at the time of, or prior to, its action the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and its reasons for concluding that the procedure used is fair under the circumstances. In any event, notice of emergency rules, other than those of educational units or units of government with jurisdiction in only one or a part of one county, including the full text of the rules, shall be published in the first available issue of the Florida Administrative Register and provided to the committee along with any material incorporated by reference in the rules. The agency's findings of immediate danger, necessity, and procedural fairness shall be judicially reviewable.

(b)    Rules pertaining to the public health, safety, or welfare shall include rules pertaining to perishable agricultural commodities or rules pertaining to the interpretation and implementation of the requirements of chapters 97-102 and chapter 105 of the Election Code.

(c)   An emergency rule adopted under this subsection shall not be effective for a period longer than 90 days and shall not be renewable, except when the agency has initiated rulemaking to adopt rules addressing the subject of the emergency rule and either:

1.   A challenge to the proposed rules has been filed and remains pending; or

2.   The proposed rules are awaiting ratification by the Legislature pursuant to s. 120.541(3).

Nothing in this paragraph prohibits the agency from adopting a rule or rules identical to the emergency rule through the rulemaking procedures specified in subsection (3).

(d)   Subject to applicable constitutional and statutory provisions, an emergency rule becomes effective immediately on filing, or on a date less than 20 days thereafter if specified in the rule, if the adopting agency finds that such effective date is necessary because of immediate danger to the public health, safety, or welfare.

(5)   UNIFORM RULES.—

(a)1.   By July 1, 1997, the Administration Commission shall adopt one or more sets of uniform rules of procedure which shall be reviewed by the committee and filed with the Department of State. Agencies must comply with the uniform rules by July 1, 1998. The uniform rules shall establish procedures that comply with the requirements of this chapter. On filing with the department, the uniform rules shall be the rules of procedure for each agency subject to this chapter unless the Administration Commission grants an exception to the agency under this subsection.

2.   An agency may seek exceptions to the uniform rules of procedure by filing a petition with the Administration Commission. The Administration Commission shall approve exceptions to the extent necessary to implement other statutes, to the extent necessary to conform to any requirement imposed as a condition precedent to receipt of federal funds or to permit persons in this state to receive tax benefits under federal law, or as required for the most efficient operation of the agency as determined by the Administration Commission. The reasons for the exceptions shall be published in the Florida Administrative Register.

3.   Agency rules that provide exceptions to the uniform rules shall not be filed with the department unless the Administration Commission has approved the exceptions. Each agency that adopts rules that provide exceptions to the uniform rules shall publish a separate chapter in the Florida Administrative Code that delineates clearly the provisions of the agency's rules that provide exceptions to the uniform rules and specifies each alternative chosen from among those authorized by the uniform rules. Each chapter shall be organized in the same manner as the uniform rules.

(b)   The uniform rules of procedure adopted by the commission pursuant to this subsection shall include, but are not limited to:

1.   Uniform rules for the scheduling of public meetings, hearings, and workshops.

2.   Uniform rules for use by each state agency that provide procedures for conducting public meetings, hearings, and workshops, and for taking evidence, testimony, and argument at such public meetings, hearings, and workshops, in person and by means of communications media technology. The rules shall provide that all evidence, testimony, and argument presented shall be afforded equal consideration, regardless of the method of communication. If a public meeting, hearing, or workshop is to be conducted by means of communications media technology, or if attendance may be provided by such means, the notice shall so state. The notice for public meetings, hearings, and workshops utilizing communications media technology shall state how persons interested in attending may do so and shall name locations, if any, where communications media technology facilities will be available. Nothing in this paragraph shall be construed to diminish the right to inspect public records under chapter 119. Limiting points of access to public meetings, hearings, and workshops subject to the provisions of s. 286.011 to places not normally open to the public shall be presumed to violate the right of access of the public, and any official action taken under such circumstances is void and of no effect. Other laws relating to public meetings, hearings, and workshops, including penal and remedial provisions, shall apply to public meetings, hearings, and workshops conducted by means of communications media technology, and shall be liberally construed in their application to such public meetings, hearings, and workshops. As used in this subparagraph, "communications

media technology" means the electronic transmission of printed matter, audio, full-motion video, freeze-frame video, compressed video, and digital video by any method available.

3.    Uniform rules of procedure for the filing of notice of protests and formal written protests. The Administration Commission may prescribe the form and substantive provisions of a required bond.

4.    Uniform rules of procedure for the filing of petitions for administrative hearings pursuant to s. 120.569 or s. 120.57. Such rules shall require the petition to include:

a.    The identification of the petitioner, including the petitioner's e-mail address, if any, for the transmittal of subsequent documents by electronic means.

b.    A statement of when and how the petitioner received notice of the agency's action or proposed action.

c.    An explanation of how the petitioner's substantial interests are or will be affected by the action or proposed action.

d.    A statement of all material facts disputed by the petitioner or a statement that there are no disputed facts.

e.    A statement of the ultimate facts alleged, including a statement of the specific facts the petitioner contends warrant reversal or modification of the agency's proposed action.

f.    A statement of the specific rules or statutes that the petitioner contends require reversal or modification of the agency's proposed action, including an explanation of how the alleged facts relate to the specific rules or statutes.

g.    A statement of the relief sought by the petitioner, stating precisely the action petitioner wishes the agency to take with respect to the proposed action.

5.    Uniform rules for the filing of request for administrative hearing by a respondent in agency enforcement and disciplinary actions. Such rules shall require a request to include:

a.    The name, address, e-mail address, and telephone number of the party making the request and the name, address, and telephone number of the party's counsel or qualified representative upon whom service of pleadings and other papers shall be made;

b.    A statement that the respondent is requesting an administrative hearing and disputes the material facts alleged by the petitioner, in which case the respondent shall identify those material facts that are in dispute, or that the respondent is requesting an administrative hearing and does not dispute the material facts alleged by the petitioner; and

c.    A reference by file number to the administrative complaint that the party has received from the agency and the date on which the agency pleading was received.

The agency may provide an election-of-rights form for the respondent's use in requesting a hearing, so long as any form provided by the agency calls for the information in sub-subparagraphs a. through c. and does not impose any additional requirements on a respondent in order to request a hearing, unless such requirements are specifically authorized by law.

6.    Uniform rules of procedure for the filing and prompt disposition of petitions for declaratory statements. The rules shall also describe the contents of the notices that must be published in the Florida Administrative Register under s. 120.565, including any applicable time limit for the filing of petitions to intervene or petitions for administrative hearing by persons whose substantial interests may be affected.

7.    Provision of a method by which each agency head shall provide a description of the agency's organization and general course of its operations. The rules shall require that the statement concerning the agency's organization and operations be published on the agency's website.

8.    Uniform rules establishing procedures for granting or denying petitions for variances and waivers pursuant to s. 120.542.

(6)    ADOPTION OF FEDERAL STANDARDS.—Notwithstanding any contrary provision of this section, in the pursuance of state implementation, operation, or enforcement of federal programs, an agency is empowered to adopt rules substantively identical to regulations adopted pursuant to federal law, in accordance with the following procedures:

(a)    The agency shall publish notice of intent to adopt a rule pursuant to this subsection in the Florida Administrative Register at least 21 days prior to filing the rule with the Department of State. The agency shall provide a copy of the notice of intent to adopt a rule to the committee at least 21 days prior to the date of filing with the Department of State. Prior to filing the rule with the Department of State, the agency shall consider any written comments received within 14 days after the date of publication of the notice of intent to adopt a rule. The rule shall be adopted upon filing with the Department of State. Substantive changes from the rules as noticed shall require republishing of notice as required in this subsection.

(b)    Any rule adopted pursuant to this subsection shall become effective upon the date designated by the agency in the notice of intent to adopt a rule; however, no such rule shall become effective earlier than the effective date of the substantively identical federal regulation.

(c)    Any substantially affected person may, within 14 days after the date of publication of the notice of intent to adopt a rule, file an objection to rulemaking with the agency. The objection shall specify the portions of the proposed rule to which the person objects and the specific reasons for the objection. The agency shall not proceed pursuant to this subsection to adopt those portions of the proposed rule specified in an objection, unless the agency deems the objection to be frivolous, but may proceed pursuant to subsection (3). An objection to a proposed rule, which rule in no material respect differs from the requirements of the federal regulation upon which it is based, is deemed to be frivolous.

(d)    Whenever any federal regulation adopted as an agency rule pursuant to this subsection is declared invalid or is withdrawn, revoked, repealed, remanded, or suspended, the agency shall, within 60 days thereafter, publish a notice of repeal of the substantively identical agency rule in the Florida Administrative Register. Such repeal is effective upon publication of the notice. Whenever any federal regulation adopted as an agency rule pursuant to this subsection is substantially amended, the agency may adopt the amended regulation as a rule. If the amended regulation is not adopted as a rule within 180 days after the effective date of the amended regulation, the original rule is deemed repealed and the agency shall publish a notice of repeal of the original agency rule in the next available Florida Administrative Register.

(e)    Whenever all or part of any rule proposed for adoption by the agency is substantively identical to a regulation adopted pursuant to federal law, such rule shall be written in a manner so that the rule specifically references the regulation whenever possible.

(7)   PETITION TO INITIATE RULEMAKING.—

(a)    Any person regulated by an agency or having substantial interest in an agency rule may petition an agency to adopt, amend, or repeal a rule or to provide the minimum public information required by this chapter. The petition shall specify the proposed rule and action requested. Not later than 30 calendar days following the date of filing a petition, the agency shall initiate rulemaking proceedings under this chapter, otherwise comply with the requested action, or deny the petition with a written statement of its reasons for the denial.

(b)    If the petition filed under this subsection is directed to an unadopted rule, the agency shall, not later than 30 days following the date of filing a petition, initiate rulemaking, or provide notice in the Florida Administrative Register that the agency will hold a public hearing on the petition within 30 days after publication of the notice. The purpose of the public hearing is to consider the comments of the public directed to the agency rule which has not been adopted by the rulemaking procedures or requirements of this chapter, its scope and application, and to consider whether the public interest is served adequately by the application of the rule on a case-by-case basis, as contrasted with its adoption by the rulemaking procedures or requirements set forth in this chapter.

(c)    If the agency does not initiate rulemaking or otherwise comply with the requested action within 30 days after the public hearing provided for in paragraph (b), the agency shall publish in the Florida Administrative Register a statement of its reasons for not initiating rulemaking or otherwise complying with the requested action and of any changes it will make in the scope or application of the unadopted rule. The agency shall file the statement with the committee. The committee shall forward a copy of the statement to the substantive committee with primary oversight jurisdiction of the agency in each house of the Legislature. The committee or the committee with primary oversight jurisdiction may hold a hearing directed to the statement of the agency. The

committee holding the hearing may recommend to the Legislature the introduction of legislation making the rule a statutory standard or limiting or otherwise modifying the authority of the agency.

(d)　If the agency initiates rulemaking after the public hearing provided for in paragraph (b), the agency shall publish a notice of rule development within 30 days after the hearing and file a notice of proposed rule within 180 days after the notice of rule development unless, before the 180th day, the agency publishes in the Florida Administrative Register a statement explaining its reasons for not having filed the notice. If rulemaking is initiated under this paragraph, the agency may not rely on the unadopted rule unless the agency publishes in the Florida Administrative Register a statement explaining why rulemaking under paragraph (1)(a) is not feasible or practicable until the conclusion of the rulemaking proceeding.

(8)　RULEMAKING RECORD.—In all rulemaking proceedings the agency shall compile a rulemaking record. The record shall include, if applicable, copies of:

(a)　All notices given for the proposed rule.

(b)　Any statement of estimated regulatory costs for the rule.

(c)　A written summary of hearings on the proposed rule.

(d)　The written comments and responses to written comments as required by this section and s. 120.541.

(e)　All notices and findings made under subsection (4).

(f)　All materials filed by the agency with the committee under subsection (3).

(g)　All materials filed with the Department of State under subsection (3).

(h)　All written inquiries from standing committees of the Legislature concerning the rule.

Each state agency shall retain the record of rulemaking as long as the rule is in effect. When a rule is no longer in effect, the record may be destroyed pursuant to the records-retention schedule developed under s. 257.36(6).

History.—s. 1, ch. 74-310; s. 3, ch. 75-191; s. 3, ch. 76-131; ss. 1, 2, ch. 76-276; s. 1, ch. 77-174; s. 13, ch. 77-290; s. 3, ch. 77-453; s. 2, ch. 78-28; s. 2, ch. 78-425; s. 7, ch. 79-3; s. 3, ch. 79-299; s. 69, ch. 79-400; s. 5, ch. 80-391; s. 1, ch. 81-309; s. 2, ch. 83-351; s. 1, ch. 84-173; s. 2, ch. 84-203; s. 7, ch. 85-104; s. 1, ch. 86-30; s. 3, ch. 87-385; s. 36, ch. 90-302; ss. 2, 4, 7, ch. 92-166; s. 63, ch. 93-187; s. 758, ch. 95-147; s. 6, ch. 95-295; s. 10, ch. 96-159; s. 6, ch. 96-320; s. 9, ch. 96-370; s. 3, ch. 97-176; s. 3, ch. 98-200; s. 4, ch. 99-379; s. 9, ch. 2001-75; s. 2, ch. 2003-94; s. 50, ch. 2005-278; s. 3, ch. 2006-82; ss. 5, 6, ch. 2008-104; s. 7, ch. 2008-149; s. 4, ch. 2009-187; ss. 1, 5, ch. 2010-279; HJR 9-A, 2010 Special Session A; s. 49, ch. 2011-142; s. 8, ch. 2011-208; s. 1, ch. 2011-225; s. 2, ch. 2012-27; s. 1, ch. 2012-63; s. 4, ch. 2013-14; s. 13, ch. 2013-15; s. 1, ch. 2015-162; s. 1, ch. 2016-116.

**120.541　　Statement of estimated regulatory costs.—**

(1)(a)　Within 21 days after publication of the notice required under s. 120.54(3)(a), a substantially affected person may submit to an agency a good faith written proposal for a lower cost regulatory alternative to a proposed rule which substantially accomplishes the objectives of the law being implemented. The proposal may include the alternative of not adopting any rule if the proposal explains how the lower costs and objectives of the law will be achieved by not adopting any rule. If such a proposal is submitted, the 90-day period for filing the rule is extended 21 days. Upon the submission of the lower cost regulatory alternative, the agency shall prepare a statement of estimated regulatory costs as provided in subsection (2), or shall revise its prior statement of estimated regulatory costs, and either adopt the alternative or provide a statement of the reasons for rejecting the alternative in favor of the proposed rule.

(b)　If a proposed rule will have an adverse impact on small business or if the proposed rule is likely to directly or indirectly increase regulatory costs in excess of $200,000 in the aggregate within 1 year after the implementation of the rule, the agency shall prepare a statement of estimated regulatory costs as required by s. 120.54(3)(b).

(c)　The agency shall revise a statement of estimated regulatory costs if any change to the rule made under s. 120.54(3)(d) increases the regulatory costs of the rule.

(d)　At least 21 days before filing the rule for adoption, an agency that is required to revise a statement of estimated regulatory costs shall provide the statement to the person who submitted the lower cost regulatory alternative and to the committee and shall provide notice on the agency's website that it is available to the public.

(e)   Notwithstanding s. 120.56(1)(c), the failure of the agency to prepare a statement of estimated regulatory costs or to respond to a written lower cost regulatory alternative as provided in this subsection is a material failure to follow the applicable rulemaking procedures or requirements set forth in this chapter.

(f)   An agency's failure to prepare a statement of estimated regulatory costs or to respond to a written lower cost regulatory alternative may not be raised in a proceeding challenging the validity of a rule pursuant to s. 120.52(8)(a) unless:

1.   Raised in a petition filed no later than 1 year after the effective date of the rule; and

2.   Raised by a person whose substantial interests are affected by the rule's regulatory costs.

(g)   A rule that is challenged pursuant to s. 120.52(8)(f) may not be declared invalid unless:

1.   The issue is raised in an administrative proceeding within 1 year after the effective date of the rule;

2.   The challenge is to the agency's rejection of a lower cost regulatory alternative offered under paragraph (a) or s. 120.54(3)(b)2.b.; and

3.   The substantial interests of the person challenging the rule are materially affected by the rejection.

(2)   A statement of estimated regulatory costs shall include:

(a)   An economic analysis showing whether the rule directly or indirectly:

1.   Is likely to have an adverse impact on economic growth, private sector job creation or employment, or private sector investment in excess of $1 million in the aggregate within 5 years after the implementation of the rule;

2.   Is likely to have an adverse impact on business competitiveness, including the ability of persons doing business in the state to compete with persons doing business in other states or domestic markets, productivity, or innovation in excess of $1 million in the aggregate within 5 years after the implementation of the rule; or

3.   Is likely to increase regulatory costs, including any transactional costs, in excess of $1 million in the aggregate within 5 years after the implementation of the rule.

(b)   A good faith estimate of the number of individuals and entities likely to be required to comply with the rule, together with a general description of the types of individuals likely to be affected by the rule.

(c)   A good faith estimate of the cost to the agency, and to any other state and local government entities, of implementing and enforcing the proposed rule, and any anticipated effect on state or local revenues.

(d)   A good faith estimate of the transactional costs likely to be incurred by individuals and entities, including local government entities, required to comply with the requirements of the rule. As used in this section, "transactional costs" are direct costs that are readily ascertainable based upon standard business practices, and include filing fees, the cost of obtaining a license, the cost of equipment required to be installed or used or procedures required to be employed in complying with the rule, additional operating costs incurred, the cost of monitoring and reporting, and any other costs necessary to comply with the rule.

(e)   An analysis of the impact on small businesses as defined by s. 288.703, and an analysis of the impact on small counties and small cities as defined in s. 120.52. The impact analysis for small businesses must include the basis for the agency's decision not to implement alternatives that would reduce adverse impacts on small businesses.

(f)   Any additional information that the agency determines may be useful.

(g)   In the statement or revised statement, whichever applies, a description of any regulatory alternatives submitted under paragraph (1)(a) and a statement adopting the alternative or a statement of the reasons for rejecting the alternative in favor of the proposed rule.

(3)   If the adverse impact or regulatory costs of the rule exceed any of the criteria established in paragraph (2)(a), the rule shall be submitted to the President of the Senate and Speaker of the House of Representatives no later than 30 days prior to the next regular legislative session, and the rule may not take effect until it is ratified by the Legislature.

[1](4)   Subsection (3) does not apply to the adoption of:

(a)   Federal standards pursuant to s. 120.54(6).

(b)   Triennial updates of and amendments to the Florida Building Code which are expressly authorized by s. 553.73.

(c)　Triennial updates of and amendments to the Florida Fire Prevention Code which are expressly authorized by s. 633.202.

(5)　For purposes of subsections (2) and (3), adverse impacts and regulatory costs likely to occur within 5 years after implementation of the rule include adverse impacts and regulatory costs estimated to occur within 5 years after the effective date of the rule. However, if any provision of the rule is not fully implemented upon the effective date of the rule, the adverse impacts and regulatory costs associated with such provision must be adjusted to include any additional adverse impacts and regulatory costs estimated to occur within 5 years after implementation of such provision.

History.—s. 11, ch. 96-159; s. 4, ch. 97-176; ss. 2, 5, ch. 2010-279; HJR 9-A, 2010 Special Session A; s. 1, ch. 2011-222; s. 2, ch. 2011-225; s. 92, ch. 2013-183; s. 1, ch. 2016-232.

[1]Note.—As amended by s. 92, ch. 2013-183, which amended subsection (4) as amended by s. 1, ch. 2011-222. Section 2, ch. 2011-225, also amended subsection (4), and the language of that version conflicted with the version by s. 1, ch. 2011-222. As amended by s. 2, ch. 2011-225, subsection (4) reads:

(4)　This section does not apply to the adoption of emergency rules pursuant to s. 120.54(4) or the adoption of federal standards pursuant to s. 120.54(6).

## 120.542　Variances and waivers.—

(1)　Strict application of uniformly applicable rule requirements can lead to unreasonable, unfair, and unintended results in particular instances. The Legislature finds that it is appropriate in such cases to adopt a procedure for agencies to provide relief to persons subject to regulation. A public employee is not a person subject to regulation under this section for the purpose of petitioning for a variance or waiver to a rule that affects that public employee in his or her capacity as a public employee. Agencies are authorized to grant variances and waivers to requirements of their rules consistent with this section and with rules adopted under the authority of this section. An agency may limit the duration of any grant of a variance or waiver or otherwise impose conditions on the grant only to the extent necessary for the purpose of the underlying statute to be achieved. This section does not authorize agencies to grant variances or waivers to statutes or to rules required by the Federal Government for the agency's implementation or retention of any federally approved or delegated program, except as allowed by the program or when the variance or waiver is also approved by the appropriate agency of the Federal Government. This section is supplemental to, and does not abrogate, the variance and waiver provisions in any other statute.

(2)　Variances and waivers shall be granted when the person subject to the rule demonstrates that the purpose of the underlying statute will be or has been achieved by other means by the person and when application of a rule would create a substantial hardship or would violate principles of fairness. For purposes of this section, "substantial hardship" means a demonstrated economic, technological, legal, or other type of hardship to the person requesting the variance or waiver. For purposes of this section, "principles of fairness" are violated when the literal application of a rule affects a particular person in a manner significantly different from the way it affects other similarly situated persons who are subject to the rule.

(3)　The Governor and Cabinet, sitting as the Administration Commission, shall adopt uniform rules of procedure pursuant to the requirements of s. 120.54(5) establishing procedures for granting or denying petitions for variances and waivers. The uniform rules shall include procedures for the granting, denying, or revoking of emergency and temporary variances and waivers. Such provisions may provide for expedited timeframes, waiver of or limited public notice, and limitations on comments on the petition in the case of such temporary or emergency variances and waivers.

(4)　Agencies shall advise persons of the remedies available through this section and shall provide copies of this section, the uniform rules on variances and waivers, and, if requested, the underlying statute, to persons who inquire about the possibility of relief from rule requirements.

(5)　A person who is subject to regulation by an agency rule may file a petition with that agency, with a copy to the committee, requesting a variance or waiver from the agency's rule. In addition to any requirements mandated by the uniform rules, each petition shall specify:

(a)　The rule from which a variance or waiver is requested.

(b)   The type of action requested.

(c)   The specific facts that would justify a waiver or variance for the petitioner.

(d)   The reason why the variance or the waiver requested would serve the purposes of the underlying statute.

(6)   Within 15 days after receipt of a petition for variance or waiver, an agency shall provide notice of the petition to the Department of State, which shall publish notice of the petition in the first available issue of the Florida Administrative Register. The notice shall contain the name of the petitioner, the date the petition was filed, the rule number and nature of the rule from which variance or waiver is sought, and an explanation of how a copy of the petition can be obtained. The uniform rules shall provide a means for interested persons to provide comments on the petition.

(7)   Except for requests for emergency variances or waivers, within 30 days after receipt of a petition for a variance or waiver, an agency shall review the petition and request submittal of all additional information that the agency is permitted by this section to require. Within 30 days after receipt of such additional information, the agency shall review it and may request only that information needed to clarify the additional information or to answer new questions raised by or directly related to the additional information. If the petitioner asserts that any request for additional information is not authorized by law or by rule of the affected agency, the agency shall proceed, at the petitioner's written request, to process the petition.

(8)   An agency shall grant or deny a petition for variance or waiver within 90 days after receipt of the original petition, the last item of timely requested additional material, or the petitioner's written request to finish processing the petition. A petition not granted or denied within 90 days after receipt of a completed petition is deemed approved. A copy of the order granting or denying the petition shall be filed with the committee and shall contain a statement of the relevant facts and reasons supporting the agency's action. The agency shall provide notice of the disposition of the petition to the Department of State, which shall publish the notice in the next available issue of the Florida Administrative Register. The notice shall contain the name of the petitioner, the date the petition was filed, the rule number and nature of the rule from which the waiver or variance is sought, a reference to the place and date of publication of the notice of the petition, the date of the order denying or approving the variance or waiver, the general basis for the agency decision, and an explanation of how a copy of the order can be obtained. The agency's decision to grant or deny the petition shall be supported by competent substantial evidence and is subject to ss. 120.569 and 120.57. Any proceeding pursuant to ss. 120.569 and 120.57 in regard to a variance or waiver shall be limited to the agency action on the request for the variance or waiver, except that a proceeding in regard to a variance or waiver may be consolidated with any other proceeding authorized by this chapter.

(9)   Each agency shall maintain a record of the type and disposition of each petition, including temporary or emergency variances and waivers, filed pursuant to this section.

History.—s. 12, ch. 96-159; s. 5, ch. 97-176; s. 37, ch. 2010-102; s. 5, ch. 2013-14.

## 120.545   Committee review of agency rules.—

(1)   As a legislative check on legislatively created authority, the committee shall examine each proposed rule, except for those proposed rules exempted by s. 120.81(1)(e) and (2), and its accompanying material, and each emergency rule, and may examine any existing rule, for the purpose of determining whether:

(a)   The rule is an invalid exercise of delegated legislative authority.

(b)   The statutory authority for the rule has been repealed.

(c)   The rule reiterates or paraphrases statutory material.

(d)   The rule is in proper form.

(e)   The notice given prior to its adoption was sufficient to give adequate notice of the purpose and effect of the rule.

(f)   The rule is consistent with expressed legislative intent pertaining to the specific provisions of law which the rule implements.

(g)   The rule is necessary to accomplish the apparent or expressed objectives of the specific provision of law which the rule implements.

(h)   The rule is a reasonable implementation of the law as it affects the convenience of the general public or persons particularly affected by the rule.

(i)   The rule could be made less complex or more easily comprehensible to the general public.

(j)   The rule's statement of estimated regulatory costs complies with the requirements of s. 120.541 and whether the rule does not impose regulatory costs on the regulated person, county, or city which could be reduced by the adoption of less costly alternatives that substantially accomplish the statutory objectives.

(k)   The rule will require additional appropriations.

(l)   If the rule is an emergency rule, there exists an emergency justifying the adoption of such rule, the agency is within its statutory authority, and the rule was adopted in compliance with the requirements and limitations of s. 120.54(4).

(2)   The committee may request from an agency such information as is reasonably necessary for examination of a rule as required by subsection (1). The committee shall consult with legislative standing committees having jurisdiction over the subject areas. If the committee objects to a rule, the committee shall, within 5 days after the objection, certify that fact to the agency whose rule has been examined and include with the certification a statement detailing its objections with particularity. The committee shall notify the Speaker of the House of Representatives and the President of the Senate of any objection to an agency rule concurrent with certification of that fact to the agency. Such notice shall include a copy of the rule and the statement detailing the committee's objections to the rule.

(3)   Within 30 days after receipt of the objection, if the agency is headed by an individual, or within 45 days after receipt of the objection, if the agency is headed by a collegial body, the agency shall:

(a)   If the rule is not yet in effect:

1.   File notice pursuant to s. 120.54(3)(d) of only such modifications as are necessary to address the committee's objection;

2.   File notice pursuant to s. 120.54(3)(d) of withdrawal of the rule; or

3.   Notify the committee in writing that it refuses to modify or withdraw the rule.

(b)   If the rule is in effect:

1.   File notice pursuant to s. 120.54(3)(a), without prior notice of rule development, to amend the rule to address the committee's objection;

2.   File notice pursuant to s. 120.54(3)(a) to repeal the rule; or

3.   Notify the committee in writing that the agency refuses to amend or repeal the rule.

(c)   If the objection is to the statement of estimated regulatory costs:

1.   Prepare a corrected statement of estimated regulatory costs, give notice of the availability of the corrected statement in the first available issue of the Florida Administrative Register, and file a copy of the corrected statement with the committee; or

2.   Notify the committee that it refuses to prepare a corrected statement of estimated regulatory costs.

(4)   Failure of the agency to respond to a committee objection to a rule that is not yet in effect within the time prescribed in subsection (3) constitutes withdrawal of the rule in its entirety. In this event, the committee shall notify the Department of State that the agency, by its failure to respond to a committee objection, has elected to withdraw the rule. Upon receipt of the committee's notice, the Department of State shall publish a notice to that effect in the next available issue of the Florida Administrative Register. Upon publication of the notice, the rule shall be stricken from the files of the Department of State and the files of the agency.

(5)   Failure of the agency to respond to a committee objection to a rule that is in effect within the time prescribed in subsection (3) constitutes a refusal to amend or repeal the rule.

(6)   Failure of the agency to respond to a committee objection to a statement of estimated regulatory costs within the time prescribed in subsection (3) constitutes a refusal to prepare a corrected statement of estimated regulatory costs.

(7)   If the committee objects to a rule and the agency refuses to modify, amend, withdraw, or repeal the rule, the committee shall file with the Department of State a notice of the objection, detailing with particularity the committee's objection to the rule. The Department of State shall publish this notice in the Florida Administrative

Register. If the rule is published in the Florida Administrative Code, a reference to the committee's objection and to the issue of the Florida Administrative Register in which the full text thereof appears shall be recorded in a history note.

(8)(a)   If the committee objects to a rule, or portion of a rule, and the agency fails to initiate administrative action to modify, amend, withdraw, or repeal the rule consistent with the objection within 60 days after the objection, or thereafter fails to proceed in good faith to complete such action, the committee may submit to the President of the Senate and the Speaker of the House of Representatives a recommendation that legislation be introduced to address the committee's objection.

(b)1.   If the committee votes to recommend the introduction of legislation to address the committee's objection, the committee shall, within 5 days after this determination, certify that fact to the agency whose rule or proposed rule has been examined. The committee may request that the agency temporarily suspend the rule or suspend the adoption of the proposed rule, pending consideration of proposed legislation during the next regular session of the Legislature.

2.   Within 30 days after receipt of the certification, if the agency is headed by an individual, or within 45 days after receipt of the certification, if the agency is headed by a collegial body, the agency shall:

a.   Temporarily suspend the rule or suspend the adoption of the proposed rule; or

b.   Notify the committee in writing that the agency refuses to temporarily suspend the rule or suspend the adoption of the proposed rule.

3.   If the agency elects to temporarily suspend the rule or suspend the adoption of the proposed rule, the agency shall give notice of the suspension in the Florida Administrative Register. The rule or the rule adoption process shall be suspended upon publication of the notice. An agency may not base any agency action on a suspended rule or suspended proposed rule, or portion of such rule, prior to expiration of the suspension. A suspended rule or suspended proposed rule, or portion of such rule, continues to be subject to administrative determination and judicial review as provided by law.

4.   Failure of an agency to respond to committee certification within the time prescribed by subparagraph 2. constitutes a refusal to suspend the rule or to suspend the adoption of the proposed rule.

(c)   The committee shall prepare proposed legislation to address the committee's objection in accordance with the rules of the Senate and the House of Representatives for prefiling and introduction in the next regular session of the Legislature. The proposed legislation shall be presented to the President of the Senate and the Speaker of the House of Representatives with the committee recommendation.

(d)   If proposed legislation addressing the committee's objection fails to become law, any temporary agency suspension shall expire.

History.—s. 4, ch. 76-131; s. 1, ch. 77-174; s. 6, ch. 80-391; s. 3, ch. 81-309; s. 4, ch. 87-385; s. 8, ch. 92-166; s. 20, ch. 95-280; s. 14, ch. 96-159; s. 16, ch. 2000-151; s. 18, ch. 2008-4; s. 7, ch. 2008-104; s. 6, ch. 2013-14.

**120.55   Publication.—**

(1)   The Department of State shall:

(a)1.   Through a continuous revision and publication system, compile and publish electronically, on a website managed by the department, the "Florida Administrative Code." The Florida Administrative Code shall contain all rules adopted by each agency, citing the grant of rulemaking authority and the specific law implemented pursuant to which each rule was adopted, all history notes as authorized in s. 120.545(7), complete indexes to all rules contained in the code, and any other material required or authorized by law or deemed useful by the department. The electronic code shall display each rule chapter currently in effect in browse mode and allow full text search of the code and each rule chapter. The department may contract with a publishing firm for a printed publication; however, the department shall retain responsibility for the code as provided in this section. The electronic publication shall be the official compilation of the administrative rules of this state. The Department of State shall retain the copyright over the Florida Administrative Code.

2.   Rules general in form but applicable to only one school district, community college district, or county, or a part thereof, or state university rules relating to internal personnel or business and finance shall not be published

Case 1:21-cv-00119-RDM    Document 54-3    Filed 06/22/21    Page 302 of 583

in the Florida Administrative Code. Exclusion from publication in the Florida Administrative Code shall not affect the validity or effectiveness of such rules.

3.   At the beginning of the section of the code dealing with an agency that files copies of its rules with the department, the department shall publish the address and telephone number of the executive offices of each agency, the manner by which the agency indexes its rules, a listing of all rules of that agency excluded from publication in the code, and a statement as to where those rules may be inspected.

4.   Forms shall not be published in the Florida Administrative Code; but any form which an agency uses in its dealings with the public, along with any accompanying instructions, shall be filed with the committee before it is used. Any form or instruction which meets the definition of "rule" provided in s. 120.52 shall be incorporated by reference into the appropriate rule. The reference shall specifically state that the form is being incorporated by reference and shall include the number, title, and effective date of the form and an explanation of how the form may be obtained. Each form created by an agency which is incorporated by reference in a rule notice of which is given under s. 120.54(3)(a) after December 31, 2007, must clearly display the number, title, and effective date of the form and the number of the rule in which the form is incorporated.

5.   The department shall allow adopted rules and material incorporated by reference to be filed in electronic form as prescribed by department rule. When a rule is filed for adoption with incorporated material in electronic form, the department's publication of the Florida Administrative Code on its website must contain a hyperlink from the incorporating reference in the rule directly to that material. The department may not allow hyperlinks from rules in the Florida Administrative Code to any material other than that filed with and maintained by the department, but may allow hyperlinks to incorporated material maintained by the department from the adopting agency's website or other sites.

(b)   Electronically publish on a website managed by the department a continuous revision and publication entitled the "Florida Administrative Register," which shall serve as the official publication and must contain:

1.   All notices required by s. 120.54(2) and (3)(a), showing the text of all rules proposed for consideration.

2.   All notices of public meetings, hearings, and workshops conducted in accordance with s. 120.525, including a statement of the manner in which a copy of the agenda may be obtained.

3.   A notice of each request for authorization to amend or repeal an existing uniform rule or for the adoption of new uniform rules.

4.   Notice of petitions for declaratory statements or administrative determinations.

5.   A summary of each objection to any rule filed by the Administrative Procedures Committee.

6.   A list of rules filed for adoption in the previous 7 days.

7.   A list of all rules filed for adoption pending legislative ratification under s. 120.541(3). A rule shall be removed from the list once notice of ratification or withdrawal of the rule is received.

8.   Any other material required or authorized by law or deemed useful by the department.

The department may contract with a publishing firm for a printed publication of the Florida Administrative Register and make copies available on an annual subscription basis.

(c)   Prescribe by rule the style and form required for rules, notices, and other materials submitted for filing.

(d)   Charge each agency using the Florida Administrative Register a space rate to cover the costs related to the Florida Administrative Register and the Florida Administrative Code.

(e)   Maintain a permanent record of all notices published in the Florida Administrative Register.

(2)   The Florida Administrative Register website must allow users to:

(a)   Search for notices by type, publication date, rule number, word, subject, and agency.

(b)   Search a database that makes available all notices published on the website for a period of at least 5 years.

(c)   Subscribe to an automated e-mail notification of selected notices to be sent out before or concurrently with publication of the electronic Florida Administrative Register. Such notification must include in the text of the e-mail a summary of the content of each notice.

(d)   View agency forms and other materials submitted to the department in electronic form and incorporated by reference in proposed rules.

(e)   Comment on proposed rules.

(3)   Publication of material required by paragraph (1)(b) on the Florida Administrative Register website does not preclude publication of such material on an agency's website or by other means.

(4)   Each agency shall provide copies of its rules upon request, with citations to the grant of rulemaking authority and the specific law implemented for each rule.

(5)   Each agency that provides an e-mail notification service to inform licensees or other registered recipients of notices shall use that service to notify recipients of each notice required under s. 120.54(2) and (3) and provide Internet links to the appropriate rule page on the Secretary of State's website or Internet links to an agency website that contains the proposed rule or final rule.

(6)   Any publication of a proposed rule promulgated by an agency, whether published in the Florida Administrative Register or elsewhere, shall include, along with the rule, the name of the person or persons originating such rule, the name of the agency head who approved the rule, and the date upon which the rule was approved.

(7)   Access to the Florida Administrative Register website and its contents, including the e-mail notification service, shall be free for the public.

(8)(a)   All fees and moneys collected by the Department of State under this chapter shall be deposited in the Records Management Trust Fund for the purpose of paying for costs incurred by the department in carrying out this chapter.

(b)   The unencumbered balance in the Records Management Trust Fund for fees collected pursuant to this chapter may not exceed $300,000 at the beginning of each fiscal year, and any excess shall be transferred to the General Revenue Fund.

(9)   The failure to comply with this section may not be raised in a proceeding challenging the validity of a rule pursuant to s. 120.52(8)(a).

History.—s. 1, ch. 74-310; s. 1, ch. 75-107; s. 4, ch. 75-191; s. 5, ch. 76-131; s. 1, ch. 77-174; s. 4, ch. 77-453; s. 3, ch. 78-425; s. 4, ch. 79-299; s. 7, ch. 80-391; s. 4, ch. 81-309; s. 1, ch. 82-19; s. 1, ch. 82-47; s. 3, ch. 83-351; s. 3, ch. 84-203; s. 17, ch. 87-224; s. 1, ch. 87-322; s. 20, ch. 91-45; s. 15, ch. 96-159; s. 896, ch. 2002-387; s. 5, ch. 2004-235; s. 14, ch. 2004-335; s. 4, ch. 2006-82; ss. 8, 9, ch. 2008-104; ss. 11, 12, ch. 2010-5; s. 2, ch. 2012-63; s. 2, ch. 2016-116.

**120.555   Summary removal of published rules no longer in force and effect.**—When, as part of the continuous revision system authorized in s. 120.55(1)(a)1. or as otherwise provided by law, the Department of State is in doubt whether a rule published in the official version of the Florida Administrative Code is still in full force and effect, the procedure in this section shall be employed.

(1)   The Department of State shall submit to the head of the agency with authority to repeal or amend the rule, if any, or if no such agency can be identified, to the Governor, a written request for a statement as to whether the rule is still in full force and effect. A copy of the request shall be promptly delivered to the committee and to the Attorney General. The Department of State shall publish a notice of the request together with a copy of the request in the Florida Administrative Register next available after delivery of the request to the head of the agency or the Governor.

(2)   No later than 90 days after the date the notice required in subsection (1) is published, the agency or the Governor, notified pursuant to subsection (1), shall file a written response with the Department of State stating whether the rule is in full force and effect and under the jurisdiction of an agency with full authority to amend or repeal the rule. Failure to respond timely under this subsection constitutes an acknowledgment by the agency or the Governor that the rule is no longer in effect and is subject to summary repeal under this section.

(3)   The Department of State shall publish a notice of the agency's or Governor's timely response or the acknowledgment determined under subsection (2) in the Florida Administrative Register next available after receipt of the response or the expiration of the response period, whichever occurs first.

(4)   If the response states that the rule is no longer in effect, or if no response is filed timely with the Department of State, the notice required in subsection (3) shall also give notice of the following:

(a)   Based on the agency's or Governor's written response or the acknowledgment determined under subsection (2), the rule will be repealed summarily pursuant to this section and removed from the Florida Administrative

Code.

(b)   Any objection to the summary repeal under this section must be filed as a petition challenging a proposed rule under s. 120.56 and must be filed no later than 21 days after the date the notice is published in the Florida Administrative Register.

(c)   For purposes only of challenging a summary repeal under this section, the agency with current authority to repeal the rule under s. 120.54 shall be named as the respondent in the petition and shall be the proper party in interest. In such circumstances, the Department of State shall not be named as a party in a petition filed under paragraph (b) and this paragraph.

(d)   If no agency currently has authority to repeal the rule under s. 120.54, the Department of State shall be named as the respondent in a petition filed under paragraph (b) and this paragraph. The Attorney General shall represent the Department of State in all proceedings under this paragraph.

(5)   Upon the expiration of the 21-day period to file an objection to a notice of summary repeal published pursuant to subsection (4), if no timely objection is filed, or, if a timely objection is filed, on the date a decision finding the rule is no longer in effect becomes final, the Department of State shall update the Florida Administrative Code to remove the rule and shall provide historical notes identifying the manner in which the rule ceased to have effect, including the summary repeal pursuant to this section.

History.—s. 2, ch. 2012-31; s. 7, ch. 2013-14.

**120.56    Challenges to rules.**—

(1)   GENERAL PROCEDURES.—

(a)   Any person substantially affected by a rule or a proposed rule may seek an administrative determination of the invalidity of the rule on the ground that the rule is an invalid exercise of delegated legislative authority.

(b)   The petition challenging the validity of a proposed or adopted rule under this section must state:

1.   The particular provisions alleged to be invalid and a statement of the facts or grounds for the alleged invalidity.

2.   Facts sufficient to show that the petitioner is substantially affected by the challenged adopted rule or would be substantially affected by the proposed rule.

(c)   The petition shall be filed by electronic means with the division which shall, immediately upon filing, forward by electronic means copies to the agency whose rule is challenged, the Department of State, and the committee. Within 10 days after receiving the petition, the division director shall, if the petition complies with paragraph (b), assign an administrative law judge who shall conduct a hearing within 30 days thereafter, unless the petition is withdrawn or a continuance is granted by agreement of the parties or for good cause shown. Evidence of good cause includes, but is not limited to, written notice of an agency's decision to modify or withdraw the proposed rule or a written notice from the chair of the committee stating that the committee will consider an objection to the rule at its next scheduled meeting. The failure of an agency to follow the applicable rulemaking procedures or requirements set forth in this chapter shall be presumed to be material; however, the agency may rebut this presumption by showing that the substantial interests of the petitioner and the fairness of the proceedings have not been impaired.

(d)   Within 30 days after the hearing, the administrative law judge shall render a decision and state the reasons for his or her decision in writing. The division shall forthwith transmit by electronic means copies of the administrative law judge's decision to the agency, the Department of State, and the committee.

(e)   Hearings held under this section shall be de novo in nature. The standard of proof shall be the preponderance of the evidence. Hearings shall be conducted in the same manner as provided by ss. 120.569 and 120.57, except that the administrative law judge's order shall be final agency action. The petitioner and the agency whose rule is challenged shall be adverse parties. Other substantially affected persons may join the proceedings as intervenors on appropriate terms which shall not unduly delay the proceedings. Failure to proceed under this section does not constitute failure to exhaust administrative remedies.

(2)   CHALLENGING PROPOSED RULES; SPECIAL PROVISIONS.—

(a) A petition alleging the invalidity of a proposed rule shall be filed within 21 days after the date of publication of the notice required by s. 120.54(3)(a); within 10 days after the final public hearing is held on the proposed rule as provided by s. 120.54(3)(e)2.; within 20 days after the statement of estimated regulatory costs or revised statement of estimated regulatory costs, if applicable, has been prepared and made available as provided in s. 120.541(1)(d); or within 20 days after the date of publication of the notice required by s. 120.54(3)(d). The petitioner has the burden to prove by a preponderance of the evidence that the petitioner would be substantially affected by the proposed rule. The agency then has the burden to prove by a preponderance of the evidence that the proposed rule is not an invalid exercise of delegated legislative authority as to the objections raised. A person who is not substantially affected by the proposed rule as initially noticed, but who is substantially affected by the rule as a result of a change, may challenge any provision of the resulting proposed rule.

(b) The administrative law judge may declare the proposed rule wholly or partly invalid. Unless the decision of the administrative law judge is reversed on appeal, the proposed rule or provision of a proposed rule declared invalid shall not be adopted. After a petition for administrative determination has been filed, the agency may proceed with all other steps in the rulemaking process, including the holding of a factfinding hearing. In the event part of a proposed rule is declared invalid, the adopting agency may, in its sole discretion, withdraw the proposed rule in its entirety. The agency whose proposed rule has been declared invalid in whole or part shall give notice of the decision in the first available issue of the Florida Administrative Register.

(c) When any substantially affected person seeks determination of the invalidity of a proposed rule pursuant to this section, the proposed rule is not presumed to be valid or invalid.

(3) CHALLENGING RULES IN EFFECT; SPECIAL PROVISIONS.—

(a) A petition alleging the invalidity of an existing rule may be filed at any time during which the rule is in effect. The petitioner has the burden of proving by a preponderance of the evidence that the existing rule is an invalid exercise of delegated legislative authority as to the objections raised.

(b) The administrative law judge may declare all or part of a rule invalid. The rule or part thereof declared invalid shall become void when the time for filing an appeal expires. The agency whose rule has been declared invalid in whole or part shall give notice of the decision in the Florida Administrative Register in the first available issue after the rule has become void.

(4) CHALLENGING AGENCY STATEMENTS DEFINED AS UNADOPTED RULES; SPECIAL PROVISIONS.—

(a) Any person substantially affected by an agency statement that is an unadopted rule may seek an administrative determination that the statement violates s. 120.54(1)(a). The petition shall include the text of the statement or a description of the statement and shall state facts sufficient to show that the statement constitutes an unadopted rule.

(b) The administrative law judge may extend the hearing date beyond 30 days after assignment of the case for good cause. Upon notification to the administrative law judge provided before the final hearing that the agency has published a notice of rulemaking under s. 120.54(3), such notice shall automatically operate as a stay of proceedings pending adoption of the statement as a rule. The administrative law judge may vacate the stay for good cause shown. A stay of proceedings pending rulemaking shall remain in effect so long as the agency is proceeding expeditiously and in good faith to adopt the statement as a rule.

(c) If a hearing is held and the petitioner proves the allegations of the petition, the agency shall have the burden of proving that rulemaking is not feasible or not practicable under s. 120.54(1)(a).

(d) The administrative law judge may determine whether all or part of a statement violates s. 120.54(1)(a). The decision of the administrative law judge shall constitute a final order. The division shall transmit a copy of the final order to the Department of State and the committee. The Department of State shall publish notice of the final order in the first available issue of the Florida Administrative Register.

(e) If an administrative law judge enters a final order that all or part of an unadopted rule violates s. 120.54(1) (a), the agency must immediately discontinue all reliance upon the unadopted rule or any substantially similar statement as a basis for agency action.

(f) If proposed rules addressing the challenged unadopted rule are determined to be an invalid exercise of delegated legislative authority as defined in s. 120.52(8)(b)-(f), the agency must immediately discontinue reliance

upon the unadopted rule and any substantially similar statement until rules addressing the subject are properly adopted, and the administrative law judge shall enter a final order to that effect.

(g)   All proceedings to determine a violation of s. 120.54(1)(a) shall be brought pursuant to this subsection. A proceeding pursuant to this subsection may be consolidated with a proceeding under subsection (3) or under any other section of this chapter. This paragraph does not prevent a party whose substantial interests have been determined by an agency action from bringing a proceeding pursuant to s. 120.57(1)(e).

(5)   CHALLENGING EMERGENCY RULES; SPECIAL PROVISIONS.—Challenges to the validity of an emergency rule shall be subject to the following time schedules in lieu of those established by paragraphs (1)(c) and (d). Within 7 days after receiving the petition, the division director shall, if the petition complies with paragraph (1)(b), assign an administrative law judge, who shall conduct a hearing within 14 days, unless the petition is withdrawn. The administrative law judge shall render a decision within 14 days after the hearing.

History.—s. 1, ch. 74-310; s. 5, ch. 75-191; s. 6, ch. 76-131; s. 1, ch. 77-174; s. 4, ch. 78-425; s. 759, ch. 95-147; s. 16, ch. 96-159; s. 6, ch. 97-176; s. 5, ch. 99-379; s. 3, ch. 2003-94; s. 5, ch. 2006-82; ss. 10, 11, ch. 2008-104; ss. 3, 5, ch. 2010-279; HJR 9-A, 2010 Special Session A; s. 10, ch. 2011-208; s. 3, ch. 2011-225; s. 8, ch. 2013-14; s. 3, ch. 2016-116.

## 120.565   Declaratory statement by agencies.—

(1)   Any substantially affected person may seek a declaratory statement regarding an agency's opinion as to the applicability of a statutory provision, or of any rule or order of the agency, as it applies to the petitioner's particular set of circumstances.

(2)   The petition seeking a declaratory statement shall state with particularity the petitioner's set of circumstances and shall specify the statutory provision, rule, or order that the petitioner believes may apply to the set of circumstances.

(3)   The agency shall give notice of the filing of each petition in the next available issue of the Florida Administrative Register and transmit copies of each petition to the committee. The agency shall issue a declaratory statement or deny the petition within 90 days after the filing of the petition. The declaratory statement or denial of the petition shall be noticed in the next available issue of the Florida Administrative Register. Agency disposition of petitions shall be final agency action.

History.—s. 6, ch. 75-191; s. 7, ch. 76-131; s. 5, ch. 78-425; s. 5, ch. 79-299; s. 760, ch. 95-147; s. 17, ch. 96-159; s. 9, ch. 2013-14.

## 120.569   Decisions which affect substantial interests.—

(1)   The provisions of this section apply in all proceedings in which the substantial interests of a party are determined by an agency, unless the parties are proceeding under s. 120.573 or s. 120.574. Unless waived by all parties, s. 120.57(1) applies whenever the proceeding involves a disputed issue of material fact. Unless otherwise agreed, s. 120.57(2) applies in all other cases. If a disputed issue of material fact arises during a proceeding under s. 120.57(2), then, unless waived by all parties, the proceeding under s. 120.57(2) shall be terminated and a proceeding under s. 120.57(1) shall be conducted. Parties shall be notified of any order, including a final order. Unless waived, a copy of the order shall be delivered or mailed to each party or the party's attorney of record at the address of record. Each notice shall inform the recipient of any administrative hearing or judicial review that is available under this section, s. 120.57, or s. 120.68; shall indicate the procedure which must be followed to obtain the hearing or judicial review; and shall state the time limits which apply.

(2)(a)   Except for any proceeding conducted as prescribed in s. 120.56, a petition or request for a hearing under this section shall be filed with the agency. If the agency requests an administrative law judge from the division, it shall so notify the division by electronic means through the division's website within 15 days after receipt of the petition or request. A request for a hearing shall be granted or denied within 15 days after receipt. On the request of any agency, the division shall assign an administrative law judge with due regard to the expertise required for the particular matter. The referring agency shall take no further action with respect to a proceeding under s. 120.57(1), except as a party litigant, as long as the division has jurisdiction over the proceeding under s. 120.57(1). Any party may request the disqualification of the administrative law judge by filing an affidavit with the division prior to the taking of evidence at a hearing, stating the grounds with particularity.

(b)   All parties shall be afforded an opportunity for a hearing after reasonable notice of not less than 14 days; however, the 14-day notice requirement may be waived with the consent of all parties. The notice shall include:

1.   A statement of the time, place, and nature of the hearing.

2.   A statement of the legal authority and jurisdiction under which the hearing is to be held.

(c)   Unless otherwise provided by law, a petition or request for hearing shall include those items required by the uniform rules adopted pursuant to s. 120.54(5)(b). Upon the receipt of a petition or request for hearing, the agency shall carefully review the petition to determine if it contains all of the required information. A petition shall be dismissed if it is not in substantial compliance with these requirements or it has been untimely filed. Dismissal of a petition shall, at least once, be without prejudice to petitioner's filing a timely amended petition curing the defect, unless it conclusively appears from the face of the petition that the defect cannot be cured. The agency shall promptly give written notice to all parties of the action taken on the petition, shall state with particularity its reasons if the petition is not granted, and shall state the deadline for filing an amended petition if applicable. This paragraph does not eliminate the availability of equitable tolling as a defense to the untimely filing of a petition.

(d)   The agency may refer a petition to the division for the assignment of an administrative law judge only if the petition is in substantial compliance with the requirements of paragraph (c).

(e)   All pleadings, motions, or other papers filed in the proceeding must be signed by the party, the party's attorney, or the party's qualified representative. The signature constitutes a certificate that the person has read the pleading, motion, or other paper and that, based upon reasonable inquiry, it is not interposed for any improper purposes, such as to harass or to cause unnecessary delay, or for frivolous purpose or needless increase in the cost of litigation. If a pleading, motion, or other paper is signed in violation of these requirements, the presiding officer shall impose upon the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

(f)   The presiding officer has the power to swear witnesses and take their testimony under oath, to issue subpoenas, and to effect discovery on the written request of any party by any means available to the courts and in the manner provided in the Florida Rules of Civil Procedure, including the imposition of sanctions, except contempt. However, no presiding officer has the authority to issue any subpoena or order directing discovery to any member or employee of the Legislature when the subpoena or order commands the production of documents or materials or compels testimony relating to the legislative duties of the member or employee. Any subpoena or order directing discovery directed to a member or an employee of the Legislature shall show on its face that the testimony sought does not relate to legislative duties.

(g)   Irrelevant, immaterial, or unduly repetitious evidence shall be excluded, but all other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs shall be admissible, whether or not such evidence would be admissible in a trial in the courts of Florida. Any part of the evidence may be received in written form, and all testimony of parties and witnesses shall be made under oath.

(h)   Documentary evidence may be received in the form of a copy or excerpt. Upon request, parties shall be given an opportunity to compare the copy with the original, if available.

(i)   When official recognition is requested, the parties shall be notified and given an opportunity to examine and contest the material.

(j)   A party shall be permitted to conduct cross-examination when testimony is taken or documents are made a part of the record.

(k)1.   Any person subject to a subpoena may, before compliance and on timely petition, request the presiding officer having jurisdiction of the dispute to invalidate the subpoena on the ground that it was not lawfully issued, is unreasonably broad in scope, or requires the production of irrelevant material.

2.   A party may seek enforcement of a subpoena, order directing discovery, or order imposing sanctions issued under the authority of this chapter by filing a petition for enforcement in the circuit court of the judicial circuit in which the person failing to comply with the subpoena or order resides. A failure to comply with an order of the court shall result in a finding of contempt of court. However, no person shall be in contempt while a subpoena is

being challenged under subparagraph 1. The court may award to the prevailing party all or part of the costs and attorney's fees incurred in obtaining the court order whenever the court determines that such an award should be granted under the Florida Rules of Civil Procedure.

3.    Any public employee subpoenaed to appear at an agency proceeding shall be entitled to per diem and travel expenses at the same rate as that provided for state employees under s. 112.061 if travel away from such public employee's headquarters is required. All other witnesses appearing pursuant to a subpoena shall be paid such fees and mileage for their attendance as is provided in civil actions in circuit courts of this state. In the case of a public employee, such expenses shall be processed and paid in the manner provided for agency employee travel expense reimbursement, and in the case of a witness who is not a public employee, payment of such fees and expenses shall accompany the subpoena.

(l)    Unless the time period is waived or extended with the consent of all parties, the final order in a proceeding which affects substantial interests must be in writing and include findings of fact, if any, and conclusions of law separately stated, and it must be rendered within 90 days:

1.    After the hearing is concluded, if conducted by the agency;

2.    After a recommended order is submitted to the agency and mailed to all parties, if the hearing is conducted by an administrative law judge; or

3.    After the agency has received the written and oral material it has authorized to be submitted, if there has been no hearing.

(m)    Findings of fact, if set forth in a manner which is no more than mere tracking of the statutory language, must be accompanied by a concise and explicit statement of the underlying facts of record which support the findings.

(n)    If an agency head finds that an immediate danger to the public health, safety, or welfare requires an immediate final order, it shall recite with particularity the facts underlying such finding in the final order, which shall be appealable or enjoinable from the date rendered.

(o)    On the request of any party, the administrative law judge shall enter an initial scheduling order to facilitate the just, speedy, and inexpensive determination of the proceeding. The initial scheduling order shall establish a discovery period, including a deadline by which all discovery shall be completed, and the date by which the parties shall identify expert witnesses and their opinions. The initial scheduling order also may require the parties to meet and file a joint report by a date certain.

(p)    For any proceeding arising under chapter 373, chapter 378, or chapter 403, if a nonapplicant petitions as a third party to challenge an agency's issuance of a license, permit, or conceptual approval, the order of presentation in the proceeding is for the permit applicant to present a prima facie case demonstrating entitlement to the license, permit, or conceptual approval, followed by the agency. This demonstration may be made by entering into evidence the application and relevant material submitted to the agency in support of the application, and the agency's staff report or notice of intent to approve the permit, license, or conceptual approval. Subsequent to the presentation of the applicant's prima facie case and any direct evidence submitted by the agency, the petitioner initiating the action challenging the issuance of the license, permit, or conceptual approval has the burden of ultimate persuasion and has the burden of going forward to prove the case in opposition to the license, permit, or conceptual approval through the presentation of competent and substantial evidence. The permit applicant and agency may on rebuttal present any evidence relevant to demonstrating that the application meets the conditions for issuance. Notwithstanding subsection (1), this paragraph applies to proceedings under s. 120.574.

History.—s. 18, ch. 96-159; s. 7, ch. 97-176; s. 4, ch. 98-200; s. 4, ch. 2003-94; s. 6, ch. 2006-82; s. 14, ch. 2008-104; s. 11, ch. 2011-208; s. 10, ch. 2011-225.

**120.57    Additional procedures for particular cases.**—

(1)    ADDITIONAL PROCEDURES APPLICABLE TO HEARINGS INVOLVING DISPUTED ISSUES OF MATERIAL FACT.—

(a)    Except as provided in ss. 120.80 and 120.81, an administrative law judge assigned by the division shall conduct all hearings under this subsection, except for hearings before agency heads or a member thereof. If the

administrative law judge assigned to a hearing becomes unavailable, the division shall assign another administrative law judge who shall use any existing record and receive any additional evidence or argument, if any, which the new administrative law judge finds necessary.

(b)   All parties shall have an opportunity to respond, to present evidence and argument on all issues involved, to conduct cross-examination and submit rebuttal evidence, to submit proposed findings of facts and orders, to file exceptions to the presiding officer's recommended order, and to be represented by counsel or other qualified representative. When appropriate, the general public may be given an opportunity to present oral or written communications. If the agency proposes to consider such material, then all parties shall be given an opportunity to cross-examine or challenge or rebut the material.

(c)   Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions.

(d)   Notwithstanding s. 120.569(2)(g), similar fact evidence of other violations, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity. When the state in an administrative proceeding intends to offer evidence of other acts or offenses under this paragraph, the state shall furnish to the party whose substantial interests are being determined and whose other acts or offenses will be the subject of such evidence, no fewer than 10 days before commencement of the proceeding, a written statement of the acts or offenses it intends to offer, describing them and the evidence the state intends to offer with particularity. Notice is not required for evidence of acts or offenses which is used for impeachment or on rebuttal.

(e)1.   An agency or an administrative law judge may not base agency action that determines the substantial interests of a party on an unadopted rule or a rule that is an invalid exercise of delegated legislative authority. This subparagraph does not preclude application of valid adopted rules and applicable provisions of law to the facts.

2.   In a matter initiated as a result of agency action proposing to determine the substantial interests of a party, the party's timely petition for hearing may challenge the proposed agency action based on a rule that is an invalid exercise of delegated legislative authority or based on an alleged unadopted rule. For challenges brought under this subparagraph:

a.   The challenge may be pled as a defense using the procedures set forth in s. 120.56(1)(b).

b.   Section 120.56(3)(a) applies to a challenge alleging that a rule is an invalid exercise of delegated legislative authority.

c.   Section 120.56(4)(c) applies to a challenge alleging an unadopted rule.

d.   This subparagraph does not preclude the consolidation of any proceeding under s. 120.56 with any proceeding under this paragraph.

3.   Notwithstanding subparagraph 1., if an agency demonstrates that the statute being implemented directs it to adopt rules, that the agency has not had time to adopt those rules because the requirement was so recently enacted, and that the agency has initiated rulemaking and is proceeding expeditiously and in good faith to adopt the required rules, then the agency's action may be based upon those unadopted rules if the administrative law judge determines that rulemaking is neither feasible nor practicable and the unadopted rules would not constitute an invalid exercise of delegated legislative authority if adopted as rules. An unadopted rule shall not be presumed valid. The agency must demonstrate that the unadopted rule:

a.   Is within the powers, functions, and duties delegated by the Legislature or, if the agency is operating pursuant to authority vested in the agency by the State Constitution, is within that authority;

b.   Does not enlarge, modify, or contravene the specific provisions of law implemented;

c.   Is not vague, establishes adequate standards for agency decisions, or does not vest unbridled discretion in the agency;

d.   Is not arbitrary or capricious. A rule is arbitrary if it is not supported by logic or the necessary facts; a rule is capricious if it is adopted without thought or reason or is irrational;

e.   Is not being applied to the substantially affected party without due notice; and

f.   Does not impose excessive regulatory costs on the regulated person, county, or city.

4.   The recommended and final orders in any proceeding shall be governed by paragraphs (k) and (l), except that the administrative law judge's determination regarding an unadopted rule under subparagraph 1. or subparagraph 2. shall not be rejected by the agency unless the agency first determines from a review of the complete record, and states with particularity in the order, that such determination is clearly erroneous or does not comply with essential requirements of law. In any proceeding for review under s. 120.68, if the court finds that the agency's rejection of the determination regarding the unadopted rule does not comport with this subparagraph, the agency action shall be set aside and the court shall award to the prevailing party the reasonable costs and a reasonable attorney fee for the initial proceeding and the proceeding for review.

5.   A petitioner may pursue a separate, collateral challenge under s. 120.56 even if an adequate remedy exists through a proceeding under this section. The administrative law judge may consolidate the proceedings.

(f)   The record in a case governed by this subsection shall consist only of:

1.   All notices, pleadings, motions, and intermediate rulings.

2.   Evidence admitted.

3.   Those matters officially recognized.

4.   Proffers of proof and objections and rulings thereon.

5.   Proposed findings and exceptions.

6.   Any decision, opinion, order, or report by the presiding officer.

7.   All staff memoranda or data submitted to the presiding officer during the hearing or prior to its disposition, after notice of the submission to all parties, except communications by advisory staff as permitted under s. 120.66(1), if such communications are public records.

8.   All matters placed on the record after an ex parte communication.

9.   The official transcript.

(g)   The agency shall accurately and completely preserve all testimony in the proceeding, and, on the request of any party, it shall make a full or partial transcript available at no more than actual cost.

(h)   Any party to a proceeding in which an administrative law judge has final order authority may move for a summary final order when there is no genuine issue as to any material fact. A summary final order shall be rendered if the administrative law judge determines from the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that no genuine issue as to any material fact exists and that the moving party is entitled as a matter of law to the entry of a final order. A summary final order shall consist of findings of fact, if any, conclusions of law, a disposition or penalty, if applicable, and any other information required by law to be contained in the final order.

(i)   When, in any proceeding conducted pursuant to this subsection, a dispute of material fact no longer exists, any party may move the administrative law judge to relinquish jurisdiction to the agency. An order relinquishing jurisdiction shall be rendered if the administrative law judge determines from the pleadings, depositions, answers to interrogatories, and admissions on file, together with supporting and opposing affidavits, if any, that no genuine issue as to any material fact exists. If the administrative law judge enters an order relinquishing jurisdiction, the agency may promptly conduct a proceeding pursuant to subsection (2), if appropriate, but the parties may not raise any issues of disputed fact that could have been raised before the administrative law judge. An order entered by an administrative law judge relinquishing jurisdiction to the agency based upon a determination that no genuine dispute of material fact exists, need not contain findings of fact, conclusions of law, or a recommended disposition or penalty.

(j)   Findings of fact shall be based upon a preponderance of the evidence, except in penal or licensure disciplinary proceedings or except as otherwise provided by statute, and shall be based exclusively on the evidence of record and on matters officially recognized.

(k)   The presiding officer shall complete and submit to the agency and all parties a recommended order consisting of findings of fact, conclusions of law, and recommended disposition or penalty, if applicable, and any other information required by law to be contained in the final order. All proceedings conducted under this subsection shall be de novo. The agency shall allow each party 15 days in which to submit written exceptions to the recommended order. The final order shall include an explicit ruling on each exception, but an agency need not

rule on an exception that does not clearly identify the disputed portion of the recommended order by page number or paragraph, that does not identify the legal basis for the exception, or that does not include appropriate and specific citations to the record.

(l)    The agency may adopt the recommended order as the final order of the agency. The agency in its final order may reject or modify the conclusions of law over which it has substantive jurisdiction and interpretation of administrative rules over which it has substantive jurisdiction. When rejecting or modifying such conclusion of law or interpretation of administrative rule, the agency must state with particularity its reasons for rejecting or modifying such conclusion of law or interpretation of administrative rule and must make a finding that its substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected or modified. Rejection or modification of conclusions of law may not form the basis for rejection or modification of findings of fact. The agency may not reject or modify the findings of fact unless the agency first determines from a review of the entire record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law. The agency may accept the recommended penalty in a recommended order, but may not reduce or increase it without a review of the complete record and without stating with particularity its reasons therefor in the order, by citing to the record in justifying the action.

(m)    If a recommended order is submitted to an agency, the agency shall provide a copy of its final order and any exceptions to the division within 15 days after the order is filed with the agency clerk.

(n)    Notwithstanding any law to the contrary, when statutes or rules impose conflicting time requirements for the scheduling of expedited hearings or issuance of recommended or final orders, the director of the division shall have the authority to set the proceedings for the orderly operation of this chapter.

(2)    ADDITIONAL PROCEDURES APPLICABLE TO HEARINGS NOT INVOLVING DISPUTED ISSUES OF MATERIAL FACT.—In any case to which subsection (1) does not apply:

(a)    The agency shall:

1.    Give reasonable notice to affected persons of the action of the agency, whether proposed or already taken, or of its decision to refuse action, together with a summary of the factual, legal, and policy grounds therefor.

2.    Give parties or their counsel the option, at a convenient time and place, to present to the agency or hearing officer written or oral evidence in opposition to the action of the agency or to its refusal to act, or a written statement challenging the grounds upon which the agency has chosen to justify its action or inaction.

3.    If the objections of the parties are overruled, provide a written explanation within 7 days.

(b)    An agency may not base agency action that determines the substantial interests of a party on an unadopted rule or a rule that is an invalid exercise of delegated legislative authority.

(c)    The record shall only consist of:

1.    The notice and summary of grounds.

2.    Evidence received.

3.    All written statements submitted.

4.    Any decision overruling objections.

5.    All matters placed on the record after an ex parte communication.

6.    The official transcript.

7.    Any decision, opinion, order, or report by the presiding officer.

(3)    ADDITIONAL PROCEDURES APPLICABLE TO PROTESTS TO CONTRACT SOLICITATION OR AWARD.—Agencies subject to this chapter shall use the uniform rules of procedure, which provide procedures for the resolution of protests arising from the contract solicitation or award process. Such rules shall at least provide that:

(a)    The agency shall provide notice of a decision or intended decision concerning a solicitation, contract award, or exceptional purchase by electronic posting. This notice shall contain the following statement: "Failure to file a protest within the time prescribed in section 120.57(3), Florida Statutes, or failure to post the bond or other security required by law within the time allowed for filing a bond shall constitute a waiver of proceedings under chapter 120, Florida Statutes."

(b)   Any person who is adversely affected by the agency decision or intended decision shall file with the agency a notice of protest in writing within 72 hours after the posting of the notice of decision or intended decision. With respect to a protest of the terms, conditions, and specifications contained in a solicitation, including any provisions governing the methods for ranking bids, proposals, or replies, awarding contracts, reserving rights of further negotiation, or modifying or amending any contract, the notice of protest shall be filed in writing within 72 hours after the posting of the solicitation. The formal written protest shall be filed within 10 days after the date the notice of protest is filed. Failure to file a notice of protest or failure to file a formal written protest shall constitute a waiver of proceedings under this chapter. The formal written protest shall state with particularity the facts and law upon which the protest is based. Saturdays, Sundays, and state holidays shall be excluded in the computation of the 72-hour time periods provided by this paragraph.

(c)   Upon receipt of the formal written protest that has been timely filed, the agency shall stop the solicitation or contract award process until the subject of the protest is resolved by final agency action, unless the agency head sets forth in writing particular facts and circumstances which require the continuance of the solicitation or contract award process without delay in order to avoid an immediate and serious danger to the public health, safety, or welfare.

(d)1.   The agency shall provide an opportunity to resolve the protest by mutual agreement between the parties within 7 days, excluding Saturdays, Sundays, and state holidays, after receipt of a formal written protest.

2.   If the subject of a protest is not resolved by mutual agreement within 7 days, excluding Saturdays, Sundays, and state holidays, after receipt of the formal written protest, and if there is no disputed issue of material fact, an informal proceeding shall be conducted pursuant to subsection (2) and applicable agency rules before a person whose qualifications have been prescribed by rules of the agency.

3.   If the subject of a protest is not resolved by mutual agreement within 7 days, excluding Saturdays, Sundays, and state holidays, after receipt of the formal written protest, and if there is a disputed issue of material fact, the agency shall refer the protest to the division by electronic means through the division's website for proceedings under subsection (1).

(e)   Upon receipt of a formal written protest referred pursuant to this subsection, the director of the division shall expedite the hearing and assign an administrative law judge who shall commence a hearing within 30 days after the receipt of the formal written protest by the division and enter a recommended order within 30 days after the hearing or within 30 days after receipt of the hearing transcript by the administrative law judge, whichever is later. Each party shall be allowed 10 days in which to submit written exceptions to the recommended order. A final order shall be entered by the agency within 30 days of the entry of a recommended order. The provisions of this paragraph may be waived upon stipulation by all parties.

(f)   In a protest to an invitation to bid or request for proposals procurement, no submissions made after the bid or proposal opening which amend or supplement the bid or proposal shall be considered. In a protest to an invitation to negotiate procurement, no submissions made after the agency announces its intent to award a contract, reject all replies, or withdraw the solicitation which amend or supplement the reply shall be considered. Unless otherwise provided by statute, the burden of proof shall rest with the party protesting the proposed agency action. In a competitive-procurement protest, other than a rejection of all bids, proposals, or replies, the administrative law judge shall conduct a de novo proceeding to determine whether the agency's proposed action is contrary to the agency's governing statutes, the agency's rules or policies, or the solicitation specifications. The standard of proof for such proceedings shall be whether the proposed agency action was clearly erroneous, contrary to competition, arbitrary, or capricious. In any bid-protest proceeding contesting an intended agency action to reject all bids, proposals, or replies, the standard of review by an administrative law judge shall be whether the agency's intended action is illegal, arbitrary, dishonest, or fraudulent.

(g)   For purposes of this subsection, the definitions in s. 287.012 apply.

(4)   INFORMAL DISPOSITION.—Unless precluded by law, informal disposition may be made of any proceeding by stipulation, agreed settlement, or consent order.

(5)   APPLICABILITY.—This section does not apply to agency investigations preliminary to agency action.

History.—s. 1, ch. 74-310; s. 7, ch. 75-191; s. 8, ch. 76-131; s. 1, ch. 77-174; s. 5, ch. 77-453; ss. 6, 11, ch. 78-95; s. 6, ch. 78-425; s. 8, ch. 79-7; s. 7, ch. 80-95; s. 4, ch. 80-289; s. 57, ch. 81-259; s. 2, ch. 83-78; s. 9, ch. 83-216; s. 2, ch. 84-173; s. 4, ch. 84-203; ss. 1, 2, ch. 86-108; s. 44, ch. 87-6; ss. 1, 2, ch. 87-54; s. 5, ch. 87-385; s. 1, ch. 90-283; s. 4, ch. 91-30; s. 1, ch. 91-191; s. 22, ch. 92-315; s. 7, ch. 94-218; s. 1420, ch. 95-147; s. 1, ch. 95-328; s. 19, ch. 96-159; s. 1, ch. 96-423; s. 8, ch. 97-176; s. 5, ch. 98-200; s. 3, ch. 98-279; s. 47, ch. 99-2; s. 6, ch. 99-379; s. 2, ch. 2002-207; s. 5, ch. 2003-94; s. 7, ch. 2006-82; s. 12, ch. 2008-104; s. 12, ch. 2011-208; s. 4, ch. 2016-116.

**120.573    Mediation of disputes.**—Each announcement of an agency action that affects substantial interests shall advise whether mediation of the administrative dispute for the type of agency action announced is available and that choosing mediation does not affect the right to an administrative hearing. If the agency and all parties to the administrative action agree to mediation, in writing, within 10 days after the time period stated in the announcement for election of an administrative remedy under ss. 120.569 and 120.57, the time limitations imposed by ss. 120.569 and 120.57 shall be tolled to allow the agency and parties to mediate the administrative dispute. The mediation shall be concluded within 60 days of such agreement unless otherwise agreed by the parties. The mediation agreement shall include provisions for mediator selection, the allocation of costs and fees associated with mediation, and the mediating parties' understanding regarding the confidentiality of discussions and documents introduced during mediation. If mediation results in settlement of the administrative dispute, the agency shall enter a final order incorporating the agreement of the parties. If mediation terminates without settlement of the dispute, the agency shall notify the parties in writing that the administrative hearing processes under ss. 120.569 and 120.57 are resumed.

History.—s. 20, ch. 96-159; s. 9, ch. 97-176.

**120.574    Summary hearing.**—

(1)(a)    Within 5 business days following the division's receipt of a petition or request for hearing, the division shall issue and serve on all original parties an initial order that assigns the case to a specific administrative law judge and provides general information regarding practice and procedure before the division. The initial order shall also contain a statement advising the addressees that a summary hearing is available upon the agreement of all parties under subsection (2) and briefly describing the expedited time sequences, limited discovery, and final order provisions of the summary procedure.

(b)    Within 15 days after service of the initial order, any party may file with the division a motion for summary hearing in accordance with subsection (2). If all original parties agree, in writing, to the summary proceeding, the proceeding shall be conducted within 30 days of the agreement, in accordance with the provisions of subsection (2).

(c)    Intervenors in the proceeding shall be governed by the decision of the original parties regarding whether the case will proceed in accordance with the summary hearing process and shall not have standing to challenge that decision.

(d)    If a motion for summary hearing is not filed within 15 days after service of the division's initial order, the matter shall proceed in accordance with ss. 120.569 and 120.57.

(2)    In any case to which this subsection is applicable, the following procedures apply:

(a)    Motions shall be limited to the following:

1.    A motion in opposition to the petition.

2.    A motion requesting discovery beyond the informal exchange of documents and witness lists described in paragraph (b). Upon a showing of necessity, additional discovery may be permitted in the discretion of the administrative law judge, but only if it can be completed not later than 5 days prior to the final hearing.

3.    A motion for continuance of the final hearing date.

4.    A motion requesting a prehearing conference, or the administrative law judge may require a prehearing conference, for the purpose of identifying: the legal and factual issues to be considered at the final hearing; the names and addresses of witnesses who may be called to testify at the final hearing; documentary evidence that will be offered at the final hearing; the range of penalties that may be imposed upon final hearing; and any other matter that the administrative law judge determines would expedite resolution of the proceeding. The prehearing conference may be held by telephone conference call.

Statutes & Constitution :View Statutes : Online Sunshine

5.    During or after any preliminary hearing or conference, any party or the administrative law judge may suggest that the case is no longer appropriate for summary disposition. Following any argument requested by the parties, the administrative law judge may enter an order referring the case back to the formal adjudicatory process described in s. 120.57(1), in which event the parties shall proceed accordingly.

(b)    Not later than 5 days prior to the final hearing, the parties shall furnish to each other copies of documentary evidence and lists of witnesses who may testify at the final hearing.

(c)    All parties shall have an opportunity to respond, to present evidence and argument on all issues involved, to conduct cross-examination and submit rebuttal evidence, and to be represented by counsel or other qualified representative.

(d)    The record in a case governed by this subsection shall consist only of:

1.    All notices, pleadings, motions, and intermediate rulings.

2.    Evidence received.

3.    A statement of matters officially recognized.

4.    Proffers of proof and objections and rulings thereon.

5.    Matters placed on the record after an ex parte communication.

6.    The written decision of the administrative law judge presiding at the final hearing.

7.    The official transcript of the final hearing.

(e)    The agency shall accurately and completely preserve all testimony in the proceeding and, upon request by any party, shall make a full or partial transcript available at no more than actual cost.

(f)    The decision of the administrative law judge shall be rendered within 30 days after the conclusion of the final hearing or the filing of the transcript thereof, whichever is later. The administrative law judge's decision, which shall be final agency action subject to judicial review under s. 120.68, shall include the following:

1.    Findings of fact based exclusively on the evidence of record and matters officially recognized.

2.    Conclusions of law.

3.    Imposition of a fine or penalty, if applicable.

4.    Any other information required by law or rule to be contained in a final order.

History.—s. 21, ch. 96-159; s. 10, ch. 97-176; s. 11, ch. 2000-158; s. 10, ch. 2000-336.

**120.595    Attorney's fees.—**

(1)    CHALLENGES TO AGENCY ACTION PURSUANT TO SECTION 120.57(1).—

(a)    The provisions of this subsection are supplemental to, and do not abrogate, other provisions allowing the award of fees or costs in administrative proceedings.

(b)    The final order in a proceeding pursuant to s. 120.57(1) shall award reasonable costs and a reasonable attorney's fee to the prevailing party only where the nonprevailing adverse party has been determined by the administrative law judge to have participated in the proceeding for an improper purpose.

(c)    In proceedings pursuant to s. 120.57(1), and upon motion, the administrative law judge shall determine whether any party participated in the proceeding for an improper purpose as defined by this subsection. In making such determination, the administrative law judge shall consider whether the nonprevailing adverse party has participated in two or more other such proceedings involving the same prevailing party and the same project as an adverse party and in which such two or more proceedings the nonprevailing adverse party did not establish either the factual or legal merits of its position, and shall consider whether the factual or legal position asserted in the instant proceeding would have been cognizable in the previous proceedings. In such event, it shall be rebuttably presumed that the nonprevailing adverse party participated in the pending proceeding for an improper purpose.

(d)    In any proceeding in which the administrative law judge determines that a party participated in the proceeding for an improper purpose, the recommended order shall so designate and shall determine the award of costs and attorney's fees.

(e)    For the purpose of this subsection:

1.    "Improper purpose" means participation in a proceeding pursuant to s. 120.57(1) primarily to harass or to cause unnecessary delay or for frivolous purpose or to needlessly increase the cost of litigation, licensing, or

securing the approval of an activity.

    2.   "Costs" has the same meaning as the costs allowed in civil actions in this state as provided in chapter 57.

    3.   "Nonprevailing adverse party" means a party that has failed to have substantially changed the outcome of the proposed or final agency action which is the subject of a proceeding. In the event that a proceeding results in any substantial modification or condition intended to resolve the matters raised in a party's petition, it shall be determined that the party having raised the issue addressed is not a nonprevailing adverse party. The recommended order shall state whether the change is substantial for purposes of this subsection. In no event shall the term "nonprevailing party" or "prevailing party" be deemed to include any party that has intervened in a previously existing proceeding to support the position of an agency.

    (2)   CHALLENGES TO PROPOSED AGENCY RULES PURSUANT TO SECTION 120.56(2).—If the appellate court or administrative law judge declares a proposed rule or portion of a proposed rule invalid pursuant to s. 120.56(2), a judgment or order shall be rendered against the agency for reasonable costs and reasonable attorney's fees, unless the agency demonstrates that its actions were substantially justified or special circumstances exist which would make the award unjust. An agency's actions are "substantially justified" if there was a reasonable basis in law and fact at the time the actions were taken by the agency. If the agency prevails in the proceedings, the appellate court or administrative law judge shall award reasonable costs and reasonable attorney's fees against a party if the appellate court or administrative law judge determines that a party participated in the proceedings for an improper purpose as defined by paragraph (1)(e). No award of attorney's fees as provided by this subsection shall exceed $50,000.

    (3)   CHALLENGES TO EXISTING AGENCY RULES PURSUANT TO SECTION 120.56(3) AND (5).—If the appellate court or administrative law judge declares a rule or portion of a rule invalid pursuant to s. 120.56(3) or (5), a judgment or order shall be rendered against the agency for reasonable costs and reasonable attorney's fees, unless the agency demonstrates that its actions were substantially justified or special circumstances exist which would make the award unjust. An agency's actions are "substantially justified" if there was a reasonable basis in law and fact at the time the actions were taken by the agency. If the agency prevails in the proceedings, the appellate court or administrative law judge shall award reasonable costs and reasonable attorney's fees against a party if the appellate court or administrative law judge determines that a party participated in the proceedings for an improper purpose as defined by paragraph (1)(e). No award of attorney's fees as provided by this subsection shall exceed $50,000.

    (4)   CHALLENGES TO AGENCY ACTION PURSUANT TO SECTION 120.56(4).—

    (a)   If the appellate court or administrative law judge determines that all or part of an agency statement violates s. 120.54(1)(a), or that the agency must immediately discontinue reliance on the statement and any substantially similar statement pursuant to s. 120.56(4)(f), a judgment or order shall be entered against the agency for reasonable costs and reasonable attorney's fees, unless the agency demonstrates that the statement is required by the Federal Government to implement or retain a delegated or approved program or to meet a condition to receipt of federal funds.

    (b)   Upon notification to the administrative law judge provided before the final hearing that the agency has published a notice of rulemaking under s. 120.54(3)(a), such notice shall automatically operate as a stay of proceedings pending rulemaking. The administrative law judge may vacate the stay for good cause shown. A stay of proceedings under this paragraph remains in effect so long as the agency is proceeding expeditiously and in good faith to adopt the statement as a rule. The administrative law judge shall award reasonable costs and reasonable attorney's fees accrued by the petitioner prior to the date the notice was published, unless the agency proves to the administrative law judge that it did not know and should not have known that the statement was an unadopted rule. Attorneys' fees and costs under this paragraph and paragraph (a) shall be awarded only upon a finding that the agency received notice that the statement may constitute an unadopted rule at least 30 days before a petition under s. 120.56(4) was filed and that the agency failed to publish the required notice of rulemaking pursuant to s. 120.54(3) that addresses the statement within that 30-day period. Notice to the agency may be satisfied by its receipt of a copy of the s. 120.56(4) petition, a notice or other paper containing substantially the same

information, or a petition filed pursuant to s. 120.54(7). An award of attorney's fees as provided by this paragraph may not exceed $50,000.

(c)    Notwithstanding the provisions of chapter 284, an award shall be paid from the budget entity of the secretary, executive director, or equivalent administrative officer of the agency, and the agency shall not be entitled to payment of an award or reimbursement for payment of an award under any provision of law.

(d)    If the agency prevails in the proceedings, the appellate court or administrative law judge shall award reasonable costs and attorney's fees against a party if the appellate court or administrative law judge determines that the party participated in the proceedings for an improper purpose as defined in paragraph (1)(e) or that the party or the party's attorney knew or should have known that a claim was not supported by the material facts necessary to establish the claim or would not be supported by the application of then-existing law to those material facts.

(5)    APPEALS.—When there is an appeal, the court in its discretion may award reasonable attorney's fees and reasonable costs to the prevailing party if the court finds that the appeal was frivolous, meritless, or an abuse of the appellate process, or that the agency action which precipitated the appeal was a gross abuse of the agency's discretion. Upon review of agency action that precipitates an appeal, if the court finds that the agency improperly rejected or modified findings of fact in a recommended order, the court shall award reasonable attorney's fees and reasonable costs to a prevailing appellant for the administrative proceeding and the appellate proceeding.

(6)    OTHER SECTIONS NOT AFFECTED.—Other provisions, including ss. 57.105 and 57.111, authorize the award of attorney's fees and costs in administrative proceedings. Nothing in this section shall affect the availability of attorney's fees and costs as provided in those sections.

History.—s. 25, ch. 96-159; s. 11, ch. 97-176; s. 48, ch. 99-2; s. 6, ch. 2003-94; s. 13, ch. 2008-104; s. 3, ch. 2017-3.


**120.60    Licensing.—**

(1)    Upon receipt of a license application, an agency shall examine the application and, within 30 days after such receipt, notify the applicant of any apparent errors or omissions and request any additional information the agency is permitted by law to require. An agency may not deny a license for failure to correct an error or omission or to supply additional information unless the agency timely notified the applicant within this 30-day period. The agency may establish by rule the time period for submitting any additional information requested by the agency. For good cause shown, the agency shall grant a request for an extension of time for submitting the additional information. If the applicant believes the agency's request for additional information is not authorized by law or rule, the agency, at the applicant's request, shall proceed to process the application. An application is complete upon receipt of all requested information and correction of any error or omission for which the applicant was timely notified or when the time for such notification has expired. An application for a license must be approved or denied within 90 days after receipt of a completed application unless a shorter period of time for agency action is provided by law. The 90-day time period is tolled by the initiation of a proceeding under ss. 120.569 and 120.57. Any application for a license which is not approved or denied within the 90-day or shorter time period, within 15 days after conclusion of a public hearing held on the application, or within 45 days after a recommended order is submitted to the agency and the parties, whichever action and timeframe is latest and applicable, is considered approved unless the recommended order recommends that the agency deny the license. Subject to the satisfactory completion of an examination if required as a prerequisite to licensure, any license that is considered approved shall be issued and may include such reasonable conditions as are authorized by law. Any applicant for licensure seeking to claim licensure by default under this subsection shall notify the agency clerk of the licensing agency, in writing, of the intent to rely upon the default license provision of this subsection, and may not take any action based upon the default license until after receipt of such notice by the agency clerk.

(2)    If an applicant seeks a license for an activity that is exempt from licensure, the agency shall notify the applicant and return any tendered application fee within 30 days after receipt of the original application.

(3)    Each applicant shall be given written notice, personally or by mail, that the agency intends to grant or deny, or has granted or denied, the application for license. The notice must state with particularity the grounds or basis for the issuance or denial of the license, except when issuance is a ministerial act. Unless waived, a copy of

the notice shall be delivered or mailed to each party's attorney of record and to each person who has made a written request for notice of agency action. Each notice must inform the recipient of the basis for the agency decision, inform the recipient of any administrative hearing pursuant to ss. 120.569 and 120.57 or judicial review pursuant to s. 120.68 which may be available, indicate the procedure that must be followed, and state the applicable time limits. The issuing agency shall certify the date the notice was mailed or delivered, and the notice and the certification must be filed with the agency clerk.

(4)   When a licensee has made timely and sufficient application for the renewal of a license which does not automatically expire by statute, the existing license shall not expire until the application for renewal has been finally acted upon by the agency or, in case the application is denied or the terms of the license are limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.

(5)   No revocation, suspension, annulment, or withdrawal of any license is lawful unless, prior to the entry of a final order, the agency has served, by personal service or certified mail, an administrative complaint which affords reasonable notice to the licensee of facts or conduct which warrant the intended action and unless the licensee has been given an adequate opportunity to request a proceeding pursuant to ss. 120.569 and 120.57. When personal service cannot be made and the certified mail notice is returned undelivered, the agency shall cause a short, plain notice to the licensee to be published once each week for 4 consecutive weeks in a newspaper published in the county of the licensee's last known address as it appears on the records of the agency. If no newspaper is published in that county, the notice may be published in a newspaper of general circulation in that county.

(6)   If the agency finds that immediate serious danger to the public health, safety, or welfare requires emergency suspension, restriction, or limitation of a license, the agency may take such action by any procedure that is fair under the circumstances if:

(a)   The procedure provides at least the same procedural protection as is given by other statutes, the State Constitution, or the United States Constitution;

(b)   The agency takes only that action necessary to protect the public interest under the emergency procedure; and

(c)   The agency states in writing at the time of, or prior to, its action the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare and its reasons for concluding that the procedure used is fair under the circumstances. The agency's findings of immediate danger, necessity, and procedural fairness are judicially reviewable. Summary suspension, restriction, or limitation may be ordered, but a suspension or revocation proceeding pursuant to ss. 120.569 and 120.57 shall also be promptly instituted and acted upon.

(7)   No agency shall include as a condition of approval of any license any provision that is based upon a statement, policy, or guideline of another agency unless the statement, policy, or guideline is within the jurisdiction of the other agency. The other agency shall identify for the licensing agency the specific legal authority for each such statement, policy, or guideline. The licensing agency must provide the licensee with an opportunity to challenge the condition as invalid. If the licensing agency bases a condition of approval or denial of the license upon the statement, policy, or guideline of the other agency, any party to an administrative proceeding that arises from the approval with conditions or denial of the license may require the other agency to join as a party in determining the validity of the condition.

**History.**—s. 1, ch. 74-310; s. 10, ch. 76-131; s. 1, ch. 77-174; ss. 6, 9, ch. 77-453; s. 57, ch. 78-95; s. 8, ch. 78-425; s. 1, ch. 79-142; s. 6, ch. 79-299; s. 2, ch. 81-180; s. 6, ch. 84-203; s. 2, ch. 84-265; s. 1, ch. 85-82; s. 14, ch. 90-51; s. 762, ch. 95-147; s. 26, ch. 96-159; s. 326, ch. 96-410; s. 12, ch. 97-176; s. 7, ch. 2003-94; ss. 4, 5, ch. 2010-279; HJR 9-A, 2010 Special Session A; s. 10, ch. 2012-212.

## 120.62   Agency investigations.—

(1)   Every person who responds to a request or demand by any agency or representative thereof for written data or an oral statement shall be entitled to a transcript or recording of his or her oral statement at no more than cost.

(2)   Any person compelled to appear, or who appears voluntarily, before any presiding officer or agency in an investigation or in any agency proceeding has the right, at his or her own expense, to be accompanied,

represented, and advised by counsel or by other qualified representatives.

History.—s. 1, ch. 74-310; s. 763, ch. 95-147; s. 28, ch. 96-159.

### 120.63    Exemption from act.—

(1)   Upon application of any agency, the Administration Commission may exempt any process or proceeding governed by this act from one or more requirements of this act:

(a)   When the agency head has certified that the requirement would conflict with any provision of federal law or rules with which the agency must comply;

(b)   In order to permit persons in the state to receive tax benefits or federal funds under any federal law; or

(c)   When the commission has found that conformity with the requirements of the part or parts of this act for which exemption is sought would be so inconvenient or impractical as to defeat the purpose of the agency proceeding involved or the purpose of this act and would not be in the public interest in light of the nature of the intended action and the enabling act or other laws affecting the agency.

(2)   The commission may not exempt an agency from any requirement of this act pursuant to this section until it establishes alternative procedures to achieve the agency's purpose which shall be consistent, insofar as possible, with the intent and purpose of the act.

(a)   Prior to the granting of any exemption authorized by this section, the commission shall hold a public hearing after notice given as provided in s. 120.525. Upon the conclusion of the hearing, the commission, through the Executive Office of the Governor, shall issue an order specifically granting or denying the exemption and specifying any processes or proceedings exempted and the extent of the exemption; transmit to the committee and to the Department of State a copy of the petition, a certified copy of the order granting or denying the petition, and a copy of any alternative procedures prescribed; and give notice of the petition and the commission's response in the Florida Administrative Register.

(b)   An exemption and any alternative procedure prescribed shall terminate 90 days following adjournment sine die of the then-current or next regular legislative session after issuance of the exemption order, or upon the effective date of any subsequent legislation incorporating the exemption or any partial exemption related thereto, whichever is earlier. The exemption granted by the commission shall be renewable upon the same or similar facts not more than once. Such renewal shall terminate as would an original exemption.

History.—s. 1, ch. 74-310; s. 11, ch. 76-131; s. 1, ch. 77-53; s. 8, ch. 77-453; s. 87, ch. 79-190; s. 7, ch. 79-299; s. 70, ch. 79-400; s. 58, ch. 81-259; s. 29, ch. 96-159; s. 10, ch. 2013-14.

### 120.65    Administrative law judges.—

(1)   The Division of Administrative Hearings within the Department of Management Services shall be headed by a director who shall be appointed by the Administration Commission and confirmed by the Senate. The director, who shall also serve as the chief administrative law judge, and any deputy chief administrative law judge must possess the same minimum qualifications as the administrative law judges employed by the division. The Deputy Chief Judge of Compensation Claims must possess the minimum qualifications established in s. 440.45(2) and shall report to the director. The division shall be a separate budget entity, and the director shall be its agency head for all purposes. The Department of Management Services shall provide administrative support and service to the division to the extent requested by the director. The division shall not be subject to control, supervision, or direction by the Department of Management Services in any manner, including, but not limited to, personnel, purchasing, transactions involving real or personal property, and budgetary matters.

(2)   The director has the right to appeal actions by the Executive Office of the Governor that affect amendments to the division's approved operating budget or any personnel actions pursuant to chapter 216 to the Administration Commission, which shall decide such issue by majority vote. The appropriations committees may advise the Administration Commission on the issue. If the President of the Senate and the Speaker of the House of Representatives object in writing to the effects of the appeal, the appeal may be affirmed by the affirmative vote of two-thirds of the commission members present.

(3)   Each state agency as defined in chapter 216 and each political subdivision shall make its facilities available, at a time convenient to the provider, for use by the division in conducting proceedings pursuant to this chapter.

(4)   The division shall employ administrative law judges to conduct hearings required by this chapter or other law. Any person employed by the division as an administrative law judge must have been a member of The Florida Bar in good standing for the preceding 5 years.

(5)   If the division cannot furnish a division administrative law judge promptly in response to an agency request, the director shall designate in writing a qualified full-time employee of an agency other than the requesting agency to conduct the hearing. The director shall have the discretion to designate such a hearing officer who is located in that part of the state where the parties and witnesses reside.

(6)   The division is authorized to provide administrative law judges on a contract basis to any governmental entity to conduct any hearing not covered by this section.

(7)   Rules promulgated by the division may authorize any reasonable sanctions except contempt for violation of the rules of the division or failure to comply with a reasonable order issued by an administrative law judge, which is not under judicial review.

(8)   Not later than February 1 of each year, the division shall issue a written report to the Administrative Procedures Committee and the Administration Commission, including at least the following information:

(a)   A summary of the extent and effect of agencies' utilization of administrative law judges, court reporters, and other personnel in proceedings under this chapter.

(b)   Recommendations for change or improvement in the Administrative Procedure Act or any agency's practice or policy with respect thereto.

(c)   Recommendations as to those types of cases or disputes which should be conducted under the summary hearing process described in s. 120.574.

(d)   A report regarding each agency's compliance with the filing requirement in s. 120.57(1)(m).

(9)   The division shall be reimbursed for administrative law judge services and travel expenses by the following entities: water management districts, regional planning councils, school districts, community colleges, the Division of Florida Colleges, state universities, the Board of Governors of the State University System, the State Board of Education, the Florida School for the Deaf and the Blind, and the Commission for Independent Education. These entities shall contract with the division to establish a contract rate for services and provisions for reimbursement of administrative law judge travel expenses and video teleconferencing expenses attributable to hearings conducted on behalf of these entities. The contract rate must be based on a total-cost-recovery methodology.

History.—s. 1, ch. 74-310; s. 9, ch. 75-191; s. 14, ch. 76-131; s. 9, ch. 78-425; s. 46, ch. 79-190; s. 1, ch. 86-297; s. 46, ch. 87-6; s. 25, ch. 87-101; s. 54, ch. 88-1; s. 30, ch. 88-277; s. 51, ch. 92-279; s. 23, ch. 92-315; s. 55, ch. 92-326; s. 764, ch. 95-147; s. 31, ch. 96-159; s. 13, ch. 97-176; s. 38, ch. 2000-371; s. 4, ch. 2001-91; s. 1, ch. 2004-247; s. 8, ch. 2006-82; s. 14, ch. 2007-217; s. 8, ch. 2009-228; s. 8, ch. 2013-18.

**120.651   Designation of two administrative law judges to preside over actions involving department or boards.**—The Division of Administrative Hearings shall designate at least two administrative law judges who shall specifically preside over actions involving the Department of Health or boards within the Department of Health. Each designated administrative law judge must be a member of The Florida Bar in good standing and must have legal, managerial, or clinical experience in issues related to health care or have attained board certification in health care law from The Florida Bar.

History.—s. 32, ch. 2003-416.

**120.655   Withholding funds to pay for administrative law judge services to school boards.**—If a district school board fails to make a timely payment for the services provided by an administrative law judge of the Division of Administrative Hearings as provided annually in the General Appropriations Act, the Commissioner of Education shall withhold, from any general revenue funds the district is eligible to receive, an amount sufficient to pay for the administrative law judge's services. The commissioner shall transfer the amount withheld to the Division of Administrative Hearings in payment of such services.

History.—s. 1, ch. 92-121; s. 32, ch. 96-159.

**120.66   Ex parte communications.**—

Case 1:21-cv-00119-RDM    Document 54-3    Filed 06/22/21    Page 320 of 583

(1)   In any proceeding under ss. 120.569 and 120.57, no ex parte communication relative to the merits, threat, or offer of reward shall be made to the agency head, after the agency head has received a recommended order, or to the presiding officer by:

(a)   An agency head or member of the agency or any other public employee or official engaged in prosecution or advocacy in connection with the matter under consideration or a factually related matter.

(b)   A party to the proceeding, the party's authorized representative or counsel, or any person who, directly or indirectly, would have a substantial interest in the proposed agency action.

Nothing in this subsection shall apply to advisory staff members who do not testify on behalf of the agency in the proceeding or to any rulemaking proceedings under s. 120.54.

(2)   A presiding officer, including an agency head or designee, who is involved in the decisional process and who receives an ex parte communication in violation of subsection (1) shall place on the record of the pending matter all written communications received, all written responses to such communications, and a memorandum stating the substance of all oral communications received and all oral responses made, and shall also advise all parties that such matters have been placed on the record. Any party desiring to rebut the ex parte communication shall be allowed to do so, if such party requests the opportunity for rebuttal within 10 days after notice of such communication. The presiding officer may, if necessary to eliminate the effect of an ex parte communication, withdraw from the proceeding, in which case the entity that appointed the presiding officer shall assign a successor.

(3)   Any person who makes an ex parte communication prohibited by subsection (1), and any presiding officer, including an agency head or designee, who fails to place in the record any such communication, is in violation of this act and may be assessed a civil penalty not to exceed $500 or be subjected to other disciplinary action.

History.—s. 1, ch. 74-310; s. 10, ch. 75-191; s. 12, ch. 76-131; s. 1, ch. 77-174; s. 10, ch. 78-425; s. 765, ch. 95-147; s. 33, ch. 96-159; s. 14, ch. 97-176.

## 120.665    Disqualification of agency personnel.—

(1)   Notwithstanding the provisions of s. 112.3143, any individual serving alone or with others as an agency head may be disqualified from serving in an agency proceeding for bias, prejudice, or interest when any party to the agency proceeding shows just cause by a suggestion filed within a reasonable period of time prior to the agency proceeding. If the disqualified individual was appointed, the appointing power may appoint a substitute to serve in the matter from which the individual is disqualified. If the individual is an elected official, the Governor may appoint a substitute to serve in the matter from which the individual is disqualified. However, if a quorum remains after the individual is disqualified, it shall not be necessary to appoint a substitute.

(2)   Any agency action taken by a duly appointed substitute for a disqualified individual shall be as conclusive and effective as if agency action had been taken by the agency as it was constituted prior to any substitution.

History.—s. 1, ch. 74-310; s. 12, ch. 78-425; s. 2, ch. 83-329; s. 767, ch. 95-147; s. 34, ch. 96-159; s. 18, ch. 2013-36.

Note.—Former s. 120.71.

## 120.68    Judicial review.—

(1)(a)   A party who is adversely affected by final agency action is entitled to judicial review.

(b)   A preliminary, procedural, or intermediate order of the agency or of an administrative law judge of the Division of Administrative Hearings is immediately reviewable if review of the final agency decision would not provide an adequate remedy.

(2)(a)   Judicial review shall be sought in the appellate district where the agency maintains its headquarters or where a party resides or as otherwise provided by law. All proceedings shall be instituted by filing a notice of appeal or petition for review in accordance with the Florida Rules of Appellate Procedure within 30 days after the rendition of the order being appealed. If the appeal is of an order rendered in a proceeding initiated under s. 120.56, the agency whose rule is being challenged shall transmit a copy of the notice of appeal to the committee.

(b)   When proceedings under this chapter are consolidated for final hearing and the parties to the consolidated proceeding seek review of final or interlocutory orders in more than one district court of appeal, the courts of

Case 1:21-cv-00119-RDM   Document 54-3   Filed 06/22/21   Page 321 of 583

appeal are authorized to transfer and consolidate the review proceedings. The court may transfer such appellate proceedings on its own motion, upon motion of a party to one of the appellate proceedings, or by stipulation of the parties to the appellate proceedings. In determining whether to transfer a proceeding, the court may consider such factors as the interrelationship of the parties and the proceedings, the desirability of avoiding inconsistent results in related matters, judicial economy, and the burden on the parties of reproducing the record for use in multiple appellate courts.

(3)   The filing of the petition does not itself stay enforcement of the agency decision, but if the agency decision has the effect of suspending or revoking a license, supersedeas shall be granted as a matter of right upon such conditions as are reasonable, unless the court, upon petition of the agency, determines that a supersedeas would constitute a probable danger to the health, safety, or welfare of the state. The agency also may grant a stay upon appropriate terms, but, whether or not the action has the effect of suspending or revoking a license, a petition to the agency for a stay is not a prerequisite to a petition to the court for supersedeas. In any event the court shall specify the conditions, if any, upon which the stay or supersedeas is granted.

(4)   Judicial review of any agency action shall be confined to the record transmitted and any additions made thereto in accordance with paragraph (7)(a).

(5)   The record for judicial review shall be compiled in accordance with the Florida Rules of Appellate Procedure.

(6)(a)   The reviewing court's decision may be mandatory, prohibitory, or declaratory in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition. The court may:

1.   Order agency action required by law; order agency exercise of discretion when required by law; set aside agency action; remand the case for further agency proceedings; or decide the rights, privileges, obligations, requirements, or procedures at issue between the parties; and

2.   Order such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld.

(b)   If the court sets aside agency action or remands the case to the agency for further proceedings, it may make such interlocutory order as the court finds necessary to preserve the interests of any party and the public pending further proceedings or agency action.

(7)   The court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate, when it finds that:

(a)   There has been no hearing prior to agency action and the reviewing court finds that the validity of the action depends upon disputed facts;

(b)   The agency's action depends on any finding of fact that is not supported by competent, substantial evidence in the record of a hearing conducted pursuant to ss. 120.569 and 120.57; however, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact;

(c)   The fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure;

(d)   The agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action; or

(e)   The agency's exercise of discretion was:

1.   Outside the range of discretion delegated to the agency by law;

2.   Inconsistent with agency rule;

3.   Inconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency; or

4.   Otherwise in violation of a constitutional or statutory provision;

but the court shall not substitute its judgment for that of the agency on an issue of discretion.

(8)   Unless the court finds a ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency's action.

(9)   A petition challenging an agency rule as an invalid exercise of delegated legislative authority shall not be instituted pursuant to this section, except to review an order entered pursuant to a proceeding under s. 120.56 or s. 120.57(1)(e)1. or (2)(b) or an agency's findings of immediate danger, necessity, and procedural fairness prerequisite to the adoption of an emergency rule pursuant to s. 120.54(4), unless the sole issue presented by the petition is the constitutionality of a rule and there are no disputed issues of fact.

(10)   If an administrative law judge's final order depends on any fact found by the administrative law judge, the court shall not substitute its judgment for that of the administrative law judge as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside the final order of the administrative law judge or remand the case to the administrative law judge, if it finds that the final order depends on any finding of fact that is not supported by competent substantial evidence in the record of the proceeding.

**History.**—s. 1, ch. 74-310; s. 13, ch. 76-131; s. 38, ch. 77-104; s. 1, ch. 77-174; s. 11, ch. 78-425; s. 4, ch. 84-173; s. 7, ch. 87-385; s. 36, ch. 90-302; s. 6, ch. 91-30; s. 1, ch. 91-191; s. 10, ch. 92-166; s. 35, ch. 96-159; s. 15, ch. 97-176; s. 8, ch. 2003-94; s. 5, ch. 2016-116.

## 120.69   Enforcement of agency action.—

(1)   Except as otherwise provided by statute:

(a)   Any agency may seek enforcement of an action by filing a petition for enforcement, as provided in this section, in the circuit court where the subject matter of the enforcement is located.

(b)   A petition for enforcement of any agency action may be filed by any substantially interested person who is a resident of the state. However, no such action may be commenced:

1.   Prior to 60 days after the petitioner has given notice of the violation of the agency action to the head of the agency concerned, the Attorney General, and any alleged violator of the agency action.

2.   If an agency has filed, and is diligently prosecuting, a petition for enforcement.

(c)   A petition for enforcement filed by a nongovernmental person shall be in the name of the State of Florida on the relation of the petitioner, and the doctrines of res judicata and collateral estoppel shall apply.

(d)   In an action brought under paragraph (b), the agency whose action is sought to be enforced, if not a party, may intervene as a matter of right.

(2)   A petition for enforcement may request declaratory relief; temporary or permanent equitable relief; any fine, forfeiture, penalty, or other remedy provided by statute; any combination of the foregoing; or, in the absence of any other specific statutory authority, a fine not to exceed $1,000.

(3)   After the court has rendered judgment on a petition for enforcement, no other petition shall be filed or adjudicated against the same agency action, on the basis of the same transaction or occurrence, unless expressly authorized on remand. The doctrines of res judicata and collateral estoppel shall apply, and the court shall make such orders as are necessary to avoid multiplicity of actions.

(4)   In all enforcement proceedings:

(a)   If enforcement depends on any facts other than those appearing in the record, the court may ascertain such facts under procedures set forth in s. 120.68(7)(a).

(b)   If one or more petitions for enforcement and a petition for review involving the same agency action are pending at the same time, the court considering the review petition may order all such actions transferred to and consolidated in one court. Each party shall be under an affirmative duty to notify the court when it becomes aware of multiple proceedings.

(c)   Should any party willfully fail to comply with an order of the court, the court shall punish that party in accordance with the law applicable to contempt committed by a person in the trial of any other action.

(5)   In any enforcement proceeding the respondent may assert as a defense the invalidity of any relevant statute, the inapplicability of the administrative determination to respondent, compliance by the respondent, the inappropriateness of the remedy sought by the agency, or any combination of the foregoing. In addition, if the petition for enforcement is filed during the time within which the respondent could petition for judicial review of the agency action, the respondent may assert the invalidity of the agency action.

(6)  Notwithstanding any other provision of this section, upon receipt of evidence that an alleged violation of an agency's action presents an imminent and substantial threat to the public health, safety, or welfare, the agency may bring suit for immediate temporary relief in an appropriate circuit court, and the granting of such temporary relief shall not have res judicata or collateral estoppel effect as to further relief sought under a petition for enforcement relating to the same violation.

(7)  In any final order on a petition for enforcement the court may award to the prevailing party all or part of the costs of litigation and reasonable attorney's fees and expert witness fees, whenever the court determines that such an award is appropriate.

History.—s. 1, ch. 74-310; s. 766, ch. 95-147; s. 36, ch. 96-159.

**120.695    Notice of noncompliance; designation of minor violation of rules.—**

(1)  It is the policy of the state that the purpose of regulation is to protect the public by attaining compliance with the policies established by the Legislature. Fines and other penalties may be provided in order to assure compliance; however, the collection of fines and the imposition of penalties are intended to be secondary to the primary goal of attaining compliance with an agency's rules. It is the intent of the Legislature that an agency charged with enforcing rules shall issue a notice of noncompliance as its first response to a minor violation of a rule in any instance in which it is reasonable to assume that the violator was unaware of the rule or unclear as to how to comply with it.

(2)(a)   Each agency shall issue a notice of noncompliance as a first response to a minor violation of a rule. A "notice of noncompliance" is a notification by the agency charged with enforcing the rule issued to the person or business subject to the rule. A notice of noncompliance may not be accompanied with a fine or other disciplinary penalty. It must identify the specific rule that is being violated, provide information on how to comply with the rule, and specify a reasonable time for the violator to comply with the rule. A rule is agency action that regulates a business, occupation, or profession, or regulates a person operating a business, occupation, or profession, and that, if not complied with, may result in a disciplinary penalty.

(b)   Each agency shall review all of its rules and designate those for which a violation would be a minor violation and for which a notice of noncompliance must be the first enforcement action taken against a person or business subject to regulation. A violation of a rule is a minor violation if it does not result in economic or physical harm to a person or adversely affect the public health, safety, or welfare or create a significant threat of such harm.

(c)1.   No later than June 30, 2017, and after such date within 3 months after any request of the rules ombudsman in the Executive Office of the Governor, each agency shall review its rules and certify to the President of the Senate, the Speaker of the House of Representatives, the committee, and the rules ombudsman those rules that have been designated as rules the violation of which would be a minor violation under paragraph (b), consistent with the legislative intent stated in subsection (1).

2.   Beginning July 1, 2017, each agency shall:

a.   Publish all rules that the agency has designated as rules the violation of which would be a minor violation, either as a complete list on the agency's website or by incorporation of the designations in the agency's disciplinary guidelines adopted as a rule.

b.   Ensure that all investigative and enforcement personnel are knowledgeable about the agency's designations under this section.

3.   For each rule filed for adoption, the agency head shall certify whether any part of the rule is designated as a rule the violation of which would be a minor violation and shall update the listing required by sub-subparagraph 2.a.

(d)   The Governor or the Governor and Cabinet, as appropriate, may evaluate the review and designation effects of each agency subject to the direction and supervision of such authority and may direct a different designation than that applied by such agency.

(e)   Notwithstanding s. 120.52(1)(a), this section does not apply to:

1.   The Department of Corrections;

2. Educational units;

3. The regulation of law enforcement personnel; or

4. The regulation of teachers.

(f) Designation pursuant to this section is not subject to challenge under this chapter.

History.—s. 1, ch. 95-402; s. 6, ch. 2016-116.

**120.72 Legislative intent; references to chapter 120 or portions thereof.**—Unless expressly provided otherwise, a reference in any section of the Florida Statutes to chapter 120 or to any section or sections or portion of a section of chapter 120 includes, and shall be understood as including, all subsequent amendments to chapter 120 or to the referenced section or sections or portions of a section.

History.—s. 3, ch. 74-310; s. 1, ch. 76-207; s. 1, ch. 77-174; s. 57, ch. 78-95; s. 13, ch. 78-425; s. 38, ch. 96-159.

**120.73 Circuit court proceedings; declaratory judgments.**—Nothing in this chapter shall be construed to repeal any provision of the Florida Statutes which grants the right to a proceeding in the circuit court in lieu of an administrative hearing or to divest the circuit courts of jurisdiction to render declaratory judgments under the provisions of chapter 86.

History.—s. 11, ch. 75-191; s. 14, ch. 78-425.

**120.74 Agency annual rulemaking and regulatory plans; reports.**—

(1) REGULATORY PLAN.—By October 1 of each year, each agency shall prepare a regulatory plan.

(a) The plan must include a listing of each law enacted or amended during the previous 12 months which creates or modifies the duties or authority of the agency. If the Governor or the Attorney General provides a letter to the committee stating that a law affects all or most agencies, the agency may exclude the law from its plan. For each law listed by an agency under this paragraph, the plan must state:

1. Whether the agency must adopt rules to implement the law.

2. If rulemaking is necessary to implement the law:

a. Whether a notice of rule development has been published and, if so, the citation to such notice in the Florida Administrative Register.

b. The date by which the agency expects to publish the notice of proposed rule under s. 120.54(3)(a).

3. If rulemaking is not necessary to implement the law, a concise written explanation of the reasons why the law may be implemented without rulemaking.

(b) The plan must also include a listing of each law not otherwise listed pursuant to paragraph (a) which the agency expects to implement by rulemaking before the following July 1, except emergency rulemaking. For each law listed under this paragraph, the plan must state whether the rulemaking is intended to simplify, clarify, increase efficiency, improve coordination with other agencies, reduce regulatory costs, or delete obsolete, unnecessary, or redundant rules.

(c) The plan must include any desired update to the prior year's regulatory plan or supplement published pursuant to subsection (7). If, in a prior year, a law was identified under this paragraph or under subparagraph (a)1. as a law requiring rulemaking to implement but a notice of proposed rule has not been published:

1. The agency shall identify and again list such law, noting the applicable notice of rule development by citation to the Florida Administrative Register; or

2. If the agency has subsequently determined that rulemaking is not necessary to implement the law, the agency shall identify such law, reference the citation to the applicable notice of rule development in the Florida Administrative Register, and provide a concise written explanation of the reason why the law may be implemented without rulemaking.

(d) The plan must include a certification executed on behalf of the agency by both the agency head, or, if the agency head is a collegial body, the presiding officer; and the individual acting as principal legal advisor to the agency head. The certification must:

1. Verify that the persons executing the certification have reviewed the plan.

2.   Verify that the agency regularly reviews all of its rules and identify the period during which all rules have most recently been reviewed to determine if the rules remain consistent with the agency's rulemaking authority and the laws implemented.

(2)   PUBLICATION AND DELIVERY TO THE COMMITTEE.—

(a)   By October 1 of each year, each agency shall:

1.   Publish its regulatory plan on its website or on another state website established for publication of administrative law records. A clearly labeled hyperlink to the current plan must be included on the agency's primary website homepage.

2.   Electronically deliver to the committee a copy of the certification required in paragraph (1)(d).

3.   Publish in the Florida Administrative Register a notice identifying the date of publication of the agency's regulatory plan. The notice must include a hyperlink or website address providing direct access to the published plan.

(b)   To satisfy the requirements of paragraph (a), a board established under s. 20.165(4), and any other board or commission receiving administrative support from the Department of Business and Professional Regulation, may coordinate with the Department of Business and Professional Regulation, and a board established under s. 20.43(3)(g) may coordinate with the Department of Health, for inclusion of the board's or commission's plan and notice of publication in the coordinating department's plan and notice and for the delivery of the required documentation to the committee.

(c)   A regulatory plan prepared under subsection (1) and any regulatory plan published under this chapter before July 1, 2014, shall be maintained at an active website for 10 years after the date of initial publication on the agency's website or another state website.

(3)   DEPARTMENT REVIEW OF BOARD PLAN.—By October 15 of each year:

(a)   For each board established under s. 20.165(4) and any other board or commission receiving administrative support from the Department of Business and Professional Regulation, the Department of Business and Professional Regulation shall file with the committee a certification that the department has reviewed each board's and commission's regulatory plan. A certification may relate to more than one board or commission.

(b)   For each board established under s. 20.43(3)(g), the Department of Health shall file with the committee a certification that the department has reviewed the board's regulatory plan. A certification may relate to more than one board.

(4)   DEADLINE FOR RULE DEVELOPMENT.—By November 1 of each year, each agency shall publish a notice of rule development under s. 120.54(2) for each law identified in the agency's regulatory plan pursuant to subparagraph (1)(a)1. for which rulemaking is necessary to implement but for which the agency did not report the publication of a notice of rule development under subparagraph (1)(a)2.

(5)   DEADLINE TO PUBLISH PROPOSED RULE.—For each law for which implementing rulemaking is necessary as identified in the agency's plan pursuant to subparagraph (1)(a)1. or subparagraph (1)(c)1., the agency shall publish a notice of proposed rule pursuant to s. 120.54(3)(a) by April 1 of the year following the deadline for the regulatory plan. This deadline may be extended if the agency publishes a notice of extension in the Florida Administrative Register identifying each rulemaking proceeding for which an extension is being noticed by citation to the applicable notice of rule development as published in the Florida Administrative Register. The agency shall include a concise statement in the notice of extension identifying any issues that are causing the delay in rulemaking. An extension shall expire on October 1 after the April 1 deadline, provided that the regulatory plan due on October 1 may further extend the rulemaking proceeding by identification pursuant to subparagraph (1)(c)1. or conclude the rulemaking proceeding by identification pursuant to subparagraph (1)(c)2. A published regulatory plan may be corrected at any time to accomplish the purpose of extending or concluding an affected rulemaking proceeding and is deemed corrected as of the October 1 due date. Upon publication of a correction, the agency shall publish in the Florida Administrative Register a notice of the date of the correction identifying the affected rulemaking proceeding by applicable citation to the Florida Administrative Register.

(6)   CERTIFICATIONS.—Each agency shall file a certification with the committee upon compliance with subsection (4) and upon filing a notice under subsection (5) of either a deadline extension or a regulatory plan

correction. A certification may relate to more than one notice or contemporaneous act. The date or dates of compliance shall be noted in each certification.

(7) SUPPLEMENTING THE REGULATORY PLAN.—After publication of the regulatory plan, the agency shall supplement the plan within 30 days after a bill becomes a law if the law is enacted before the next regular session of the Legislature and the law substantively modifies the agency's specifically delegated legal duties, unless the law affects all or most state agencies as identified by letter to the committee from the Governor or the Attorney General. The supplement must include the information required in paragraph (1)(a) and shall be published as required in subsection (2), but no certification or delivery to the committee is required. The agency shall publish in the Florida Administrative Register notice of publication of the supplement, and include a hyperlink on its website or web address for direct access to the published supplement. For each law reported in the supplement, if rulemaking is necessary to implement the law, the agency shall publish a notice of rule development by the later of the date provided in subsection (4) or 60 days after the bill becomes a law, and a notice of proposed rule shall be published by the later of the date provided in subsection (5) or 120 days after the bill becomes a law. The proposed rule deadline may be extended to the following October 1 by notice as provided in subsection (5). If such proposed rule has not been filed by October 1, a law included in a supplement shall also be included in the next annual plan pursuant to subsection (1).

(8) FAILURE TO COMPLY.—If an agency fails to comply with a requirement of paragraph (2)(a) or subsection (5), within 15 days after written demand from the committee or from the chair of any other legislative committee, the agency shall deliver a written explanation of the reasons for noncompliance to the committee, the President of the Senate, the Speaker of the House of Representatives, and the chair of any legislative committee requesting the explanation of the reasons for noncompliance.

(9) EDUCATIONAL UNITS.—This section does not apply to educational units.

**History.**—s. 46, ch. 96-399; s. 16, ch. 97-176; s. 9, ch. 2006-82; s. 15, ch. 2008-104; s. 8, ch. 2008-149; s. 4, ch. 2011-225; s. 20, ch. 2014-17; s. 2, ch. 2014-39; s. 2, ch. 2015-162.

**120.80 Exceptions and special requirements; agencies.—**

(1) DIVISION OF ADMINISTRATIVE HEARINGS.—

(a) *Division as a party.*—Notwithstanding s. 120.57(1)(a), a hearing in which the division is a party may not be conducted by an administrative law judge assigned by the division. An attorney assigned by the Administration Commission shall be the hearing officer.

(b) *Workers' compensation.*—Notwithstanding s. 120.52(1), a judge of compensation claims, in adjudicating matters under chapter 440, is not an agency or part of an agency for purposes of this chapter.

(2) DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES.—

(a) Marketing orders under chapter 527, chapter 573, or chapter 601 are not rules.

(b) Notwithstanding s. 120.57(1)(a), hearings held by the Department of Agriculture and Consumer Services pursuant to chapter 601 need not be conducted by an administrative law judge assigned by the division.

(3) OFFICE OF FINANCIAL REGULATION.—

(a) Notwithstanding s. 120.60(1), in proceedings for the issuance, denial, renewal, or amendment of a license or approval of a merger pursuant to title XXXVIII:

1.a. The Office of Financial Regulation of the Financial Services Commission shall have published in the Florida Administrative Register notice of the application within 21 days after receipt.

b. Within 21 days after publication of notice, any person may request a hearing. Failure to request a hearing within 21 days after notice constitutes a waiver of any right to a hearing. The Office of Financial Regulation or an applicant may request a hearing at any time prior to the issuance of a final order. Hearings shall be conducted pursuant to ss. 120.569 and 120.57, except that the Financial Services Commission shall by rule provide for participation by the general public.

2. Should a hearing be requested as provided by sub-subparagraph 1.b., the applicant or licensee shall publish at its own cost a notice of the hearing in a newspaper of general circulation in the area affected by the application. The Financial Services Commission may by rule specify the format and size of the notice.

3. Notwithstanding s. 120.60(1), and except as provided in subparagraph 4., an application for license for a new bank, new trust company, new credit union, new savings and loan association, or new licensed family trust company must be approved or denied within 180 days after receipt of the original application or receipt of the timely requested additional information or correction of errors or omissions. An application for such a license or for acquisition of such control which is not approved or denied within the 180-day period or within 30 days after conclusion of a public hearing on the application, whichever is later, shall be deemed approved subject to the satisfactory completion of conditions required by statute as a prerequisite to license and approval of insurance of accounts for a new bank, a new savings and loan association, a new credit union, or a new licensed family trust company by the appropriate insurer.

4. In the case of an application for license to establish a new bank, trust company, or capital stock savings association in which a foreign national proposes to own or control 10 percent or more of any class of voting securities, and in the case of an application by a foreign national for approval to acquire control of a bank, trust company, or capital stock savings association, the Office of Financial Regulation shall request that a public hearing be conducted pursuant to ss. 120.569 and 120.57. Notice of such hearing shall be published by the applicant as provided in subparagraph 2. The failure of such foreign national to appear personally at the hearing shall be grounds for denial of the application. Notwithstanding s. 120.60(1) and subparagraph 3., every application involving a foreign national shall be approved or denied within 1 year after receipt of the original application or any timely requested additional information or the correction of any errors or omissions, or within 30 days after the conclusion of the public hearing on the application, whichever is later.

(b) In any application for a license or merger pursuant to title XXXVIII which is referred by the agency to the division for hearing, the administrative law judge shall complete and submit to the agency and to all parties a written report consisting of findings of fact and rulings on evidentiary matters. The agency shall allow each party at least 10 days in which to submit written exceptions to the report.

(4) DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION.—

(a) *Business regulation.*—The Division of Pari-mutuel Wagering is exempt from the hearing and notice requirements of ss. 120.569 and 120.57(1)(a), but only for stewards, judges, and boards of judges when the hearing is to be held for the purpose of the imposition of fines or suspensions as provided by rules of the Division of Pari-mutuel Wagering, but not for revocations, and only upon violations of subparagraphs 1.-6. The Division of Pari-mutuel Wagering shall adopt rules establishing alternative procedures, including a hearing upon reasonable notice, for the following violations:

1. Horse riding, harness riding, greyhound interference, and jai alai game actions in violation of chapter 550.

2. Application and usage of drugs and medication to horses, greyhounds, and jai alai players in violation of chapter 550.

3. Maintaining or possessing any device which could be used for the injection or other infusion of a prohibited drug to horses, greyhounds, and jai alai players in violation of chapter 550.

4. Suspensions under reciprocity agreements between the Division of Pari-mutuel Wagering and regulatory agencies of other states.

5. Assault or other crimes of violence on premises licensed for pari-mutuel wagering.

6. Prearranging the outcome of any race or game.

(b) *Professional regulation.*—Notwithstanding s. 120.57(1)(a), formal hearings may not be conducted by the Secretary of Business and Professional Regulation or a board or member of a board within the Department of Business and Professional Regulation for matters relating to the regulation of professions, as defined by chapter 455.

(5) FLORIDA LAND AND WATER ADJUDICATORY COMMISSION.—Notwithstanding the provisions of s. 120.57(1)(a), when the Florida Land and Water Adjudicatory Commission receives a notice of appeal pursuant to s. 380.07, the commission shall notify the division within 60 days after receipt of the notice of appeal if the commission elects to request the assignment of an administrative law judge.

(6) DEPARTMENT OF LAW ENFORCEMENT.—Law enforcement policies and procedures of the Department of Law Enforcement which relate to the following are not rules as defined by this chapter:

(a)   The collection, management, and dissemination of active criminal intelligence information and active criminal investigative information; management of criminal investigations; and management of undercover investigations and the selection, assignment, and fictitious identity of undercover personnel.

(b)   The recruitment, management, identity, and remuneration of confidential informants or sources.

(c)   Surveillance techniques, the selection of surveillance personnel, and electronic surveillance, including court-ordered and consensual interceptions of communication conducted pursuant to chapter 934.

(d)   The safety and release of hostages.

(e)   The provision of security and protection to public figures.

(f)   The protection of witnesses.

(7)   DEPARTMENT OF CHILDREN AND FAMILIES.—Notwithstanding s. 120.57(1)(a), hearings conducted within the Department of Children and Families in the execution of those social and economic programs administered by the former Division of Family Services of the former Department of Health and Rehabilitative Services prior to the reorganization effected by chapter 75-48, Laws of Florida, need not be conducted by an administrative law judge assigned by the division.

(8)   DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES.—

(a)   *Driver licenses.*—

1.   Notwithstanding s. 120.57(1)(a), hearings regarding driver licensing pursuant to chapter 322 need not be conducted by an administrative law judge assigned by the division.

2.   Notwithstanding s. 120.60(5), cancellation, suspension, or revocation of a driver license shall be by personal delivery to the licensee or by first-class mail as provided in s. 322.251.

(b)   *Wrecker operators.*—Notwithstanding s. 120.57(1)(a), hearings held by the Division of the Florida Highway Patrol of the Department of Highway Safety and Motor Vehicles to deny, suspend, or remove a wrecker operator from participating in the wrecker rotation system established by s. 321.051 need not be conducted by an administrative law judge assigned by the division. These hearings shall be held by a hearing officer appointed by the director of the Division of the Florida Highway Patrol.

(9)   OFFICE OF INSURANCE REGULATION.—Notwithstanding s. 120.60(1), every application for a certificate of authority as required by s. 624.401 shall be approved or denied within 180 days after receipt of the original application. Any application for a certificate of authority which is not approved or denied within the 180-day period, or within 30 days after conclusion of a public hearing held on the application, shall be deemed approved, subject to the satisfactory completion of conditions required by statute as a prerequisite to licensure.

(10)   DEPARTMENT OF ECONOMIC OPPORTUNITY.—

(a)   Notwithstanding s. 120.54, the rulemaking provisions of this chapter do not apply to reemployment assistance appeals referees.

(b)   Notwithstanding s. 120.54(5), the uniform rules of procedure do not apply to appeal proceedings conducted under chapter 443 by the Reemployment Assistance Appeals Commission, special deputies, or reemployment assistance appeals referees.

(c)   Notwithstanding s. 120.57(1)(a), hearings under chapter 443 may not be conducted by an administrative law judge assigned by the division, but instead shall be conducted by the Reemployment Assistance Appeals Commission in reemployment assistance appeals, reemployment assistance appeals referees, and the Department of Economic Opportunity or its special deputies under s. 443.141.

(11)   NATIONAL GUARD.—Notwithstanding s. 120.52(16), the enlistment, organization, administration, equipment, maintenance, training, and discipline of the militia, National Guard, organized militia, and unorganized militia, as provided by s. 2, Art. X of the State Constitution, are not rules as defined by this chapter.

(12)   PUBLIC EMPLOYEES RELATIONS COMMISSION.—

(a)   Notwithstanding s. 120.57(1)(a), hearings within the jurisdiction of the Public Employees Relations Commission need not be conducted by an administrative law judge assigned by the division.

(b)   Section 120.60 does not apply to certification of employee organizations pursuant to s. 447.307.

(13)   FLORIDA PUBLIC SERVICE COMMISSION.—

(a)    Agency statements that relate to cost-recovery clauses, factors, or mechanisms implemented pursuant to chapter 366, relating to public utilities, are exempt from the provisions of s. 120.54(1)(a).

(b)    Notwithstanding ss. 120.569 and 120.57, a hearing on an objection to proposed action of the Florida Public Service Commission may only address the issues in dispute. Issues in the proposed action which are not in dispute are deemed stipulated.

(c)    The Florida Public Service Commission is exempt from the time limitations in s. 120.60(1) when issuing a license.

(d)    Notwithstanding the provisions of this chapter, in implementing the Telecommunications Act of 1996, Pub. L. No. 104-104, the Public Service Commission is authorized to employ procedures consistent with that act.

(e)    Notwithstanding the provisions of this chapter, s. 350.128, or s. 364.381, appellate jurisdiction for Public Service Commission decisions that implement the Telecommunications Act of 1996, Pub. L. No. 104-104, shall be consistent with the provisions of that act.

(f)    Notwithstanding any provision of this chapter, all public utilities and companies regulated by the Public Service Commission shall be entitled to proceed under the interim rate provisions of chapter 364 or the procedures for interim rates contained in chapter 74-195, Laws of Florida, or as otherwise provided by law.

(14)    DEPARTMENT OF REVENUE.—

(a)    *Assessments.*—An assessment of tax, penalty, or interest by the Department of Revenue is not a final order as defined by this chapter. Assessments by the Department of Revenue shall be deemed final as provided in the statutes and rules governing the assessment and collection of taxes.

(b)    *Taxpayer contest proceedings.*—

1.    In any administrative proceeding brought pursuant to this chapter as authorized by s. 72.011(1), the taxpayer shall be designated the "petitioner" and the Department of Revenue shall be designated the "respondent," except that for actions contesting an assessment or denial of refund under chapter 207, the Department of Highway Safety and Motor Vehicles shall be designated the "respondent," and for actions contesting an assessment or denial of refund under chapters 210, 550, 561, 562, 563, 564, and 565, the Department of Business and Professional Regulation shall be designated the "respondent."

2.    In any such administrative proceeding, the applicable department's burden of proof, except as otherwise specifically provided by general law, shall be limited to a showing that an assessment has been made against the taxpayer and the factual and legal grounds upon which the applicable department made the assessment.

3.a.    Prior to filing a petition under this chapter, the taxpayer shall pay to the applicable department the amount of taxes, penalties, and accrued interest assessed by that department which are not being contested by the taxpayer. Failure to pay the uncontested amount shall result in the dismissal of the action and imposition of an additional penalty of 25 percent of the amount taxed.

b.    The requirements of s. 72.011(2) and (3)(a) are jurisdictional for any action under this chapter to contest an assessment or denial of refund by the Department of Revenue, the Department of Highway Safety and Motor Vehicles, or the Department of Business and Professional Regulation.

4.    Except as provided in s. 220.719, further collection and enforcement of the contested amount of an assessment for nonpayment or underpayment of any tax, interest, or penalty shall be stayed beginning on the date a petition is filed. Upon entry of a final order, an agency may resume collection and enforcement action.

5.    The prevailing party, in a proceeding under ss. 120.569 and 120.57 authorized by s. 72.011(1), may recover all legal costs incurred in such proceeding, including reasonable attorney's fees, if the losing party fails to raise a justiciable issue of law or fact in its petition or response.

6.    Upon review pursuant to s. 120.68 of final agency action concerning an assessment of tax, penalty, or interest with respect to a tax imposed under chapter 212, or the denial of a refund of any tax imposed under chapter 212, if the court finds that the Department of Revenue improperly rejected or modified a conclusion of law, the court may award reasonable attorney's fees and reasonable costs of the appeal to the prevailing appellant.

(c)    *Proceedings to establish paternity or paternity and child support; orders to appear for genetic testing; proceedings for administrative support orders.*—In proceedings to establish paternity or paternity and child support

pursuant to s. 409.256 and proceedings for the establishment of administrative support orders pursuant to s. 409.2563, final orders in cases referred by the Department of Revenue to the Division of Administrative Hearings shall be entered by the division's administrative law judge and transmitted to the Department of Revenue for filing and rendering. The Department of Revenue has the right to seek judicial review under s. 120.68 of a final order entered by an administrative law judge. The Department of Revenue or the person ordered to appear for genetic testing may seek immediate judicial review under s. 120.68 of an order issued by an administrative law judge pursuant to s. 409.256(5)(b). Final orders that adjudicate paternity or paternity and child support pursuant to s. 409.256 and administrative support orders rendered pursuant to s. 409.2563 may be enforced pursuant to s. 120.69 or, alternatively, by any method prescribed by law for the enforcement of judicial support orders, except contempt. Hearings held by the Division of Administrative Hearings pursuant to ss. 409.256, 409.2563, and 409.25635 shall be held in the judicial circuit where the person receiving services under Title IV-D resides or, if the person receiving services under Title IV-D does not reside in this state, in the judicial circuit where the respondent resides. If the department and the respondent agree, the hearing may be held in another location. If ordered by the administrative law judge, the hearing may be conducted telephonically or by videoconference.

(15)    DEPARTMENT OF HEALTH.—Notwithstanding s. 120.57(1)(a), formal hearings may not be conducted by the State Surgeon General, the Secretary of Health Care Administration, or a board or member of a board within the Department of Health or the Agency for Health Care Administration for matters relating to the regulation of professions, as defined by chapter 456. Notwithstanding s. 120.57(1)(a), hearings conducted within the Department of Health in execution of the Special Supplemental Nutrition Program for Women, Infants, and Children; Child Care Food Program; Children's Medical Services Program; the Brain and Spinal Cord Injury Program; and the exemption from disqualification reviews for certified nurse assistants program need not be conducted by an administrative law judge assigned by the division. The Department of Health may contract with the Department of Children and Families for a hearing officer in these matters.

(16)    FLORIDA BUILDING COMMISSION.—

(a)    Notwithstanding the provisions of s. 120.542, the Florida Building Commission may not accept a petition for waiver or variance and may not grant any waiver or variance from the requirements of the Florida Building Code.

(b)    The Florida Building Commission shall adopt within the Florida Building Code criteria and procedures for alternative means of compliance with the code or local amendments thereto, for enforcement by local governments, local enforcement districts, or other entities authorized by law to enforce the Florida Building Code. Appeals from the denial of the use of alternative means shall be heard by the local board, if one exists, and may be appealed to the Florida Building Commission.

(c)    Notwithstanding ss. 120.565, 120.569, and 120.57, the Florida Building Commission and hearing officer panels appointed by the commission in accordance with s. 553.775(3)(c)1. may conduct proceedings to review decisions of local building code officials in accordance with s. 553.775(3)(c).

(d)    Section 120.541(3) does not apply to the adoption of amendments and the triennial update to the Florida Building Code expressly authorized by s. 553.73.

(17)    STATE FIRE MARSHAL.—Section 120.541(3) does not apply to the adoption of amendments and the triennial update to the Florida Fire Prevention Code expressly authorized by s. 633.202.

(18)    DEPARTMENT OF TRANSPORTATION.—Sections 120.54(3)(b) and 120.541 do not apply to the adjustment of tolls pursuant to s. 338.165(3).

**History.**—s. 41, ch. 96-159; s. 13, ch. 98-166; s. 10, ch. 99-8; s. 4, ch. 99-397; s. 1, ch. 2000-141; s. 17, ch. 2000-151; s. 2, ch. 2000-160; s. 11, ch. 2000-304; s. 4, ch. 2000-305; ss. 2, 11, ch. 2000-312; s. 4, ch. 2000-355; s. 3, ch. 2000-367; s. 18, ch. 2001-158; s. 2, ch. 2001-279; s. 8, ch. 2002-173; s. 1, ch. 2002-239; s. 3, ch. 2003-36; s. 139, ch. 2003-261; s. 1, ch. 2004-52; s. 7, ch. 2004-334; ss. 12, 13, ch. 2005-39; s. 1, ch. 2005-96; s. 13, ch. 2005-147; s. 1, ch. 2005-209; s. 5, ch. 2006-45; s. 9, ch. 2008-6; s. 16, ch. 2008-104; s. 5, ch. 2009-187; s. 1, ch. 2011-64; s. 50, ch. 2011-142; s. 8, ch. 2011-225; s. 43, ch. 2012-30; s. 12, ch. 2013-14; s. 120, ch. 2013-183; s. 32, ch. 2014-19; s. 37, ch. 2014-97.


**120.81**    **Exceptions and special requirements; general areas.**—

(1)    EDUCATIONAL UNITS.—

(a) Notwithstanding s. 120.536(1) and the flush left provisions of s. 120.52(8), district school boards may adopt rules to implement their general powers under s. 1001.41.

(b) The preparation or modification of curricula by an educational unit is not a rule as defined by this chapter.

(c) Notwithstanding s. 120.52(16), any tests, test scoring criteria, or testing procedures relating to student assessment which are developed or administered by the Department of Education pursuant to s. 1003.4282, s. 1008.22, or s. 1008.25, or any other statewide educational tests required by law, are not rules.

(d) Notwithstanding any other provision of this chapter, educational units shall not be required to include the full text of the rule or rule amendment in notices relating to rules and need not publish these or other notices in the Florida Administrative Register, but notice shall be made:

1. By publication in a newspaper of general circulation in the affected area;

2. By mail to all persons who have made requests of the educational unit for advance notice of its proceedings and to organizations representing persons affected by the proposed rule; and

3. By posting in appropriate places so that those particular classes of persons to whom the intended action is directed may be duly notified.

(e) Educational units, other than the Florida School for the Deaf and the Blind, shall not be required to make filings with the committee of the documents required to be filed by s. 120.54 or s. 120.55(1)(a)4.

(f) Notwithstanding s. 120.57(1)(a), hearings which involve student disciplinary suspensions or expulsions may be conducted by educational units.

(g) Sections 120.569 and 120.57 do not apply to any proceeding in which the substantial interests of a student are determined by a state university or a community college.

(h) Notwithstanding ss. 120.569 and 120.57, in a hearing involving a student disciplinary suspension or expulsion conducted by an educational unit, the 14-day notice of hearing requirement may be waived by the agency head or the hearing officer without the consent of parties.

(i) For purposes of s. 120.68, a district school board whose decision is reviewed under the provisions of s. 1012.33 and whose final action is modified by a superior administrative decision shall be a party entitled to judicial review of the final action.

(j) Notwithstanding s. 120.525(2), the agenda for a special meeting of a district school board under authority of s. 1001.372(1) shall be prepared upon the calling of the meeting, but not less than 48 hours prior to the meeting.

(k) Students are not persons subject to regulation for the purposes of petitioning for a variance or waiver to rules of educational units under s. 120.542.

(l) Sections 120.54(3)(b) and 120.541 do not apply to the adoption of rules pursuant to s. 1012.22, s. 1012.27, s. 1012.335, s. 1012.34, or s. 1012.795.

(2) LOCAL UNITS OF GOVERNMENT.—

(a) Local units of government with jurisdiction in only one county or part thereof shall not be required to make filings with the committee of the documents required to be filed by s. 120.54.

(b) Notwithstanding any other provision of this chapter, units of government with jurisdiction in only one county or part thereof need not publish required notices in the Florida Administrative Register, but shall publish these notices in the manner required by their enabling acts for notice of rulemaking or notice of meeting. Notices relating to rules are not required to include the full text of the rule or rule amendment.

(3) PRISONERS AND PAROLEES.—

(a) Notwithstanding s. 120.52(13), prisoners, as defined by s. 944.02, shall not be considered parties in any proceedings other than those under s. 120.54(3)(c) or (7), and may not seek judicial review under s. 120.68 of any other agency action. Prisoners are not eligible to seek an administrative determination of an agency statement under s. 120.56(4). Parolees shall not be considered parties for purposes of agency action or judicial review when the proceedings relate to the rescission or revocation of parole.

(b) Notwithstanding s. 120.54(3)(c), prisoners, as defined by s. 944.02, may be limited by the Department of Corrections to an opportunity to present evidence and argument on issues under consideration by submission of written statements concerning intended action on any department rule.

Case 1:21-cv-00119-RDM    Document 54-3    Filed 06/22/21    Page 332 of 583

(c)   Notwithstanding ss. 120.569 and 120.57, in a preliminary hearing for revocation of parole, no less than 7 days' notice of hearing shall be given.

(4)   REGULATION OF PROFESSIONS.—Notwithstanding s. 120.569(2)(g), in a proceeding against a licensed professional or in a proceeding for licensure of an applicant for professional licensure which involves allegations of sexual misconduct:

(a)   The testimony of the victim of the sexual misconduct need not be corroborated.

(b)   Specific instances of prior consensual sexual activity between the victim of the sexual misconduct and any person other than the offender is inadmissible, unless:

1.   It is first established to the administrative law judge in a proceeding in camera that the victim of the sexual misconduct is mistaken as to the identity of the perpetrator of the sexual misconduct; or

2.   If consent by the victim of the sexual misconduct is at issue and it is first established to the administrative law judge in a proceeding in camera that such evidence tends to establish a pattern of conduct or behavior on the part of such victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.

(c)   Reputation evidence relating to the prior sexual conduct of a victim of sexual misconduct is inadmissible.

(5)   HUNTING AND FISHING REGULATION.—Agency action which has the effect of altering established hunting or fishing seasons, or altering established annual harvest limits for saltwater fishing if the procedure for altering such harvest limits is set out by rule of the Fish and Wildlife Conservation Commission, is not a rule as defined by this chapter, provided such action is adequately noticed in the area affected through publishing in a newspaper of general circulation or through notice by broadcasting by electronic media.

(6)   RISK IMPACT STATEMENT.—The Department of Environmental Protection shall prepare a risk impact statement for any rule that is proposed for approval by the Environmental Regulation Commission and that establishes or changes standards or criteria based on impacts to or effects upon human health. The Department of Agriculture and Consumer Services shall prepare a risk impact statement for any rule that is proposed for adoption that establishes standards or criteria based on impacts to or effects upon human health.

(a)   This subsection does not apply to rules adopted pursuant to federally delegated or mandated programs where such rules are identical or substantially identical to the federal regulations or laws being adopted or implemented by the Department of Environmental Protection or Department of Agriculture and Consumer Services, as applicable. However, the Department of Environmental Protection and the Department of Agriculture and Consumer Services shall identify any risk analysis information available to them from the Federal Government that has formed the basis of such a rule.

(b)   This subsection does not apply to emergency rules adopted pursuant to this chapter.

(c)   The Department of Environmental Protection and the Department of Agriculture and Consumer Services shall prepare and publish notice of the availability of a clear and concise risk impact statement for all applicable rules. The risk impact statement must explain the risk to the public health addressed by the rule and shall identify and summarize the source of the scientific information used in evaluating that risk.

(d)   Nothing in this subsection shall be construed to create a new cause of action or basis for challenging a rule nor diminish any existing cause of action or basis for challenging a rule.

**History.**—s. 42, ch. 96-159; s. 17, ch. 97-176; s. 49, ch. 99-2; s. 65, ch. 99-245; s. 7, ch. 99-379; s. 28, ch. 99-398; s. 4, ch. 2000-214; s. 897, ch. 2002-387; s. 17, ch. 2008-104; s. 4, ch. 2010-78; s. 9, ch. 2011-225; s. 13, ch. 2013-14; s. 37, ch. 2013-35; s. 21, ch. 2014-17; s. 3, ch. 2014-39; s. 24, ch. 2014-184.

Copyright © 1995-2018 The Florida Legislature • Privacy Statement • Contact Us

Select Year: [ 2018 ▾ ] [ Go ]

# The 2018 Florida Statutes

Title XXVIII
NATURAL RESOURCES; CONSERVATION, RECLAMATION, AND USE

Chapter 373
WATER RESOURCES

View Entire Chapter

**CHAPTER 373**
**WATER RESOURCES**

**PART I**
**STATE WATER RESOURCE PLAN**
**(ss. 373.012-373.200)**

**PART II**
**PERMITTING OF CONSUMPTIVE USES OF WATER**
**(ss. 373.203-373.250)**

**PART III**
**REGULATION OF WELLS**
**(ss. 373.302-373.342)**

**PART IV**
**MANAGEMENT AND STORAGE OF SURFACE WATERS**
**(ss. 373.403-373.468)**

**PART V**
**FINANCE AND TAXATION**
**(ss. 373.470-373.591)**

**PART VI**
**MISCELLANEOUS PROVISIONS**
**(ss. 373.603-373.69)**

**PART VII**
**WATER SUPPLY POLICY, PLANNING, PRODUCTION, AND FUNDING**
**(ss. 373.701-373.715)**

**PART VIII**
**FLORIDA SPRINGS AND AQUIFER PROTECTION ACT**
**(ss. 373.801-373.813)**

**PART I**
**STATE WATER RESOURCE PLAN**

373.012    Topographic mapping.

373.013    Short title.

373.016    Declaration of policy.

373.019    Definitions.

373.023    Scope and application.

373.026    General powers and duties of the department.

373.033    Saltwater barrier line.

373.036    Florida water plan; district water management plans.

373.0363    Southern Water Use Caution Area Recovery Strategy.

373.037    Pilot program for alternative water supply development in restricted allocation areas.

373.0397    Floridan and Biscayne aquifers; designation of prime groundwater recharge areas.

373.042    Minimum flows and minimum water levels.

373.0421    Establishment and implementation of minimum flows and minimum water levels.

373.043    Adoption and enforcement of rules by the department.

373.044    Rules; enforcement; availability of personnel rules.

373.046    Interagency agreements.

373.0465    Central Florida Water Initiative.

373.047    Cooperation between districts.

373.056    State agencies, counties, drainage districts, municipalities, or governmental agencies or public corporations authorized to convey or receive land from water management districts.

373.069    Creation of water management districts.

373.0691    Transfer of areas.

373.0693    Basins; basin boards.

373.0695    Duties of basin boards; authorized expenditures.

373.0697    Basin taxes.

373.0698    Creation and operation of basin boards; other laws superseded.

373.073    Governing board.

373.076    Vacancies in the governing board; removal from office.

373.079    Members of governing board; oath of office; staff.

373.083    General powers and duties of the governing board.

373.084    District works, operation by other governmental agencies.

373.085    Use of works or land by other districts or private persons.

373.086    Providing for district works.

373.087    District works using aquifer for storage and supply.

373.088    Application fees for certain real estate transactions.

373.089    Sale or exchange of lands, or interests or rights in lands.

373.093    Lease of lands or interest in land and personal property.

373.096    Releases.

373.099    Execution of instruments.

373.103    Powers which may be vested in the governing board at the department's discretion.

373.106    Permit required for construction involving underground formation.

373.107    Citation of rule.

373.109    Permit application fees.

373.113    Adoption of rules by the governing board.

373.1131    Consolidated action on permits.

373.1135    Small business program.

373.114    Land and Water Adjudicatory Commission; review of district rules and orders; department review of district rules.

373.116    Procedure for water use and impoundment construction permit applications.

373.117    Certification by professional engineer.

373.1175    Signing and sealing by professional geologists.

373.118    General permits; delegation.

373.119    Administrative enforcement procedures; orders.

373.123    Penalty.

373.129    Maintenance of actions.

373.136    Enforcement of regulations and orders.

373.139    Acquisition of real property.

373.1391    Management of real property.

373.1395    Limitation on liability of water management district with respect to areas made available to the public for recreational purposes without charge.

373.1401    Management of lands of water management districts.

373.145    Information program regarding hydrologic conditioning and consumption of major surface and groundwater sources.

373.146    Publication of notices, process, and papers.

373.149    Existing districts preserved.

373.1501    South Florida Water Management District as local sponsor.

373.1502    Regulation of comprehensive plan project components.

373.171    Rules.

373.1725    Notice of intent by publication.

373.175    Declaration of water shortage; emergency orders.

373.185    Local Florida-friendly landscaping ordinances.

373.187    Water management district implementation of Florida-friendly landscaping.

373.199    Florida Forever Water Management District Work Plan.

373.200    Seminole Tribe Water Rights Compact.

**373.012    Topographic mapping.**—

(1)    In order to accelerate topographic mapping in this state by the United States Geological Survey, the Department of Transportation is hereby authorized and directed to set aside, to pledge, and to make available annually out of its State Transportation Trust Fund the sum of $30,000; and the Board of Trustees of the Internal Improvement Trust Fund is hereby authorized and directed to set aside, to pledge and to make available annually out of the Land Acquisition Trust Fund the sum of $10,000; and the South Florida Water Management District out of its funds to be derived out of the proceeds of special assessments of its flood control taxes, is authorized and directed to set aside, to pledge and to make available annually such sum as may be required to meet the needs for topographic mapping of areas affecting said district. Such sums shall be delivered to the Treasurer of the United States or to other proper officer, to be applied by the Department of the Interior, United States Geological Survey, as to said Department of Transportation and to said Board of Trustees of the Internal Improvement Trust Fund, toward the payment of not exceeding one-half the cost of standard topographic mapping in this state conducted by the United States Geological Survey and as to said flood control district to be applied toward the payment of such proportion or part of such cost as said district may determine. Provided, however, that said sums authorized in this section for the Department of Transportation and for the Board of Trustees of the Internal Improvement Trust Fund shall not prevent either of said agencies from providing additional amounts for topographic mapping of areas which either agency may consider of priority status in the interest of said agencies.

(2)    To further accelerate the rate at which topographic mapping may be carried on in Florida, any state agency having funds available for the purpose, any county or drainage or reclamation or flood control district organized under the laws of this state, any person, firm or corporation, is authorized to contribute to the cost of such mapping by depositing with the Department of Transportation such amounts as may be determined to be applied in like manner toward topographic mapping in this state as set forth in subsection (1).

(3)   The Department of Transportation, the Board of Trustees of the Internal Improvement Trust Fund of this state, and the South Florida Water Management District are hereby authorized to make such arrangements or enter into such agreements with the United States as may be necessary to carry out the purposes of this section.

(4)   The Board of Trustees of the Internal Improvement Trust Fund, as and when copies of topographic maps are made available to it, shall file such maps in the same manner as other maps and plats of land surveys by the United States, and the maps shall be available for examination by any interested person.

**History.**—ss. 1, 2, 3, 4, ch. 57-775; s. 2, ch. 61-119; s. 1, ch. 65-475; ss. 23, 27, 35, ch. 69-106; ss. 2, 3, ch. 73-57; s. 35, ch. 79-65.

**373.013     Short title.**—This chapter shall be known as the "Florida Water Resources Act of 1972."
**History.**—s. 1, part I, ch. 72-299.

**373.016     Declaration of policy.**—

(1)   The waters in the state are among its basic resources. Such waters have not heretofore been conserved or fully controlled so as to realize their full beneficial use.

(2)   The department and the governing board shall take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability.

(3)   It is further declared to be the policy of the Legislature:

(a)   To provide for the management of water and related land resources;

(b)   To promote the conservation, replenishment, recapture, enhancement, development, and proper utilization of surface and groundwater;

(c)   To develop and regulate dams, impoundments, reservoirs, and other works and to provide water storage for beneficial purposes;

(d)   To promote the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems;

(e)   To prevent damage from floods, soil erosion, and excessive drainage;

(f)   To minimize degradation of water resources caused by the discharge of stormwater;

(g)   To preserve natural resources, fish, and wildlife;

(h)   To promote the public policy set forth in s. 403.021;

(i)   To promote recreational development, protect public lands, and assist in maintaining the navigability of rivers and harbors; and

(j)   Otherwise to promote the health, safety, and general welfare of the people of this state.

In implementing this chapter, the department and the governing board shall construe and apply the policies in this subsection as a whole, and no specific policy is to be construed or applied in isolation from the other policies in this subsection.

(4)(a)   Because water constitutes a public resource benefiting the entire state, it is the policy of the Legislature that the waters in the state be managed on a state and regional basis. Consistent with this directive, the Legislature recognizes the need to allocate water throughout the state so as to meet all reasonable-beneficial uses. However, the Legislature acknowledges that such allocations have in the past adversely affected the water resources of certain areas in this state. To protect such water resources and to meet the current and future needs of those areas with abundant water, the Legislature directs the department and the water management districts to encourage the use of water from sources nearest the area of use or application whenever practicable. Such sources shall include all naturally occurring water sources and all alternative water sources, including, but not limited to, desalination, conservation, reuse of nonpotable reclaimed water and stormwater, and aquifer storage and recovery. Reuse of potable reclaimed water and stormwater shall not be subject to the evaluation described in s. 373.223(3)(a)-(g). However, this directive to encourage the use of water, whenever practicable, from sources nearest the area of use or application shall not apply to the transport and direct and indirect use of water within the area encompassed by the Central and Southern Florida Flood Control Project, nor shall it apply anywhere in the state to the transport and use of water supplied exclusively for bottled water as defined in s. 500.03(1)(d), nor

shall it apply to the transport and use of reclaimed water for electrical power production by an electric utility as defined in s. 366.02(2).

(b)   In establishing the policy outlined in paragraph (a), the Legislature realizes that under certain circumstances the need to transport water from distant sources may be necessary for environmental, technical, or economic reasons.

(5)   The Legislature recognizes that the water resource problems of the state vary from region to region, both in magnitude and complexity. It is therefore the intent of the Legislature to vest in the Department of Environmental Protection or its successor agency the power and responsibility to accomplish the conservation, protection, management, and control of the waters of the state and with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts. The department may exercise any power herein authorized to be exercised by a water management district; however, to the greatest extent practicable, such power should be delegated to the governing board of a water management district.

(6)   It is further declared the policy of the Legislature that each water management district, to the extent consistent with effective management practices, shall approximate its fiscal and budget policies and procedures to those of the state.

**History.**—s. 2, part I, ch. 72-299; s. 36, ch. 79-65; s. 70, ch. 83-310; s. 5, ch. 89-279; s. 20, ch. 93-213; s. 250, ch. 94-356; s. 1, ch. 97-160; s. 1, ch. 98-88.

**373.019   Definitions.**—When appearing in this chapter or in any rule, regulation, or order adopted pursuant thereto, the term:

(1)   "Alternative water supplies" means salt water; brackish surface and groundwater; surface water captured predominately during wet-weather flows; sources made available through the addition of new storage capacity for surface or groundwater, water that has been reclaimed after one or more public supply, municipal, industrial, commercial, or agricultural uses; the downstream augmentation of water bodies with reclaimed water; stormwater; and any other water supply source that is designated as nontraditional for a water supply planning region in the applicable regional water supply plan.

(2)   "Capital costs" means planning, design, engineering, and project construction costs.

(3)   "Coastal waters" means waters of the Atlantic Ocean or the Gulf of Mexico within the jurisdiction of the state.

(4)   "Department" means the Department of Environmental Protection or its successor agency or agencies.

(5)   "District water management plan" means the regional water resource plan developed by a governing board under s. 373.036.

(6)   "Domestic use" means the use of water for the individual personal household purposes of drinking, bathing, cooking, or sanitation. All other uses shall not be considered domestic.

(7)   "Florida water plan" means the state-level water resource plan developed by the department under s. 373.036.

(8)   "Governing board" means the governing board of a water management district.

(9)   "Groundwater" means water beneath the surface of the ground, whether or not flowing through known and definite channels.

(10)   "Impoundment" means any lake, reservoir, pond, or other containment of surface water occupying a bed or depression in the earth's surface and having a discernible shoreline.

(11)   "Independent scientific peer review" means the review of scientific data, theories, and methodologies by a panel of independent, recognized experts in the fields of hydrology, hydrogeology, limnology, and other scientific disciplines relevant to the matters being reviewed under s. 373.042.

(12)   "Multijurisdictional water supply entity" means two or more water utilities or local governments that have organized into a larger entity, or entered into an interlocal agreement or contract, for the purpose of more efficiently pursuing water supply development or alternative water supply development projects listed pursuant to a regional water supply plan.

(13) "Nonregulated use" means any use of water which is exempted from regulation by the provisions of this chapter.

(14) "Other watercourse" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted.

(15) "Person" means any and all persons, natural or artificial, including any individual, firm, association, organization, partnership, business trust, corporation, company, the United States of America, and the state and all political subdivisions, regions, districts, municipalities, and public agencies thereof. The enumeration herein is not intended to be exclusive or exhaustive.

(16) "Reasonable-beneficial use" means the use of water in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest.

(17) "Reclaimed water" means water that has received at least secondary treatment and basic disinfection and is reused after flowing out of a domestic wastewater treatment facility. Reclaimed water is not subject to regulation pursuant to s. 373.175 or part II of this chapter until it has been discharged into waters as defined in s. 403.031(13).

(18) "Reclaimed water distribution system" means a network of pipes, pumping facilities, storage facilities, and appurtenances designed to convey and distribute reclaimed water from one or more domestic wastewater treatment facilities to one or more users of reclaimed water.

(19) "Regional water supply plan" means a detailed water supply plan developed by a governing board under s. 373.709.

(20) "Stream" means any river, creek, slough, or natural watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted. The fact that some part of the bed or channel has been dredged or improved does not prevent the watercourse from being a stream.

(21) "Surface water" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface.

(22) "Water" or "waters in the state" means any and all water on or beneath the surface of the ground or in the atmosphere, including natural or artificial watercourses, lakes, ponds, or diffused surface water and water percolating, standing, or flowing beneath the surface of the ground, as well as all coastal waters within the jurisdiction of the state.

(23) "Water management district" means any flood control, resource management, or water management district operating under the authority of this chapter.

(24) "Water resource development" means the formulation and implementation of regional water resource management strategies, including the collection and evaluation of surface water and groundwater data; structural and nonstructural programs to protect and manage water resources; the development of regional water resource implementation programs; the construction, operation, and maintenance of major public works facilities to provide for flood control, surface and underground water storage, and groundwater recharge augmentation; and related technical assistance to local governments, government-owned and privately owned water utilities, and self-suppliers to the extent assistance to self-suppliers promotes the policies as set forth in s. 373.016.

(25) "Water resource implementation rule" means the rule authorized by s. 373.036, which sets forth goals, objectives, and guidance for the development and review of programs, rules, and plans relating to water resources, based on statutory policies and directives. The waters of the state are among its most basic resources. Such waters should be managed to conserve and protect water resources and to realize the full beneficial use of these resources.

(26) "Water supply development" means the planning, design, construction, operation, and maintenance of public or private facilities for water collection, production, treatment, transmission, or distribution for sale, resale, or end use.

(27) For the sole purpose of serving as the basis for the unified statewide methodology adopted pursuant to s. 373.421(1), as amended, "wetlands" means those areas that are inundated or saturated by surface water or groundwater at a frequency and a duration sufficient to support, and under normal circumstances do support, a

prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce, or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto. Upon legislative ratification of the methodology adopted pursuant to s. 373.421(1), as amended, the limitation contained herein regarding the purpose of this definition shall cease to be effective.

(28)   "Works of the district" means those projects and works, including, but not limited to, structures, impoundments, wells, streams, and other watercourses, together with the appurtenant facilities and accompanying lands, which have been officially adopted by the governing board of the district as works of the district.

History.—s. 3, part I, ch. 72-299; s. 37, ch. 79-65; s. 1, ch. 80-259; s. 5, ch. 82-101; s. 6, ch. 89-279; s. 21, ch. 93-213; s. 15, ch. 94-122; s. 251, ch. 94-356; s. 1, ch. 96-339; s. 1, ch. 96-370; s. 2, ch. 97-160; s. 1, ch. 2005-291; s. 10, ch. 2010-205; s. 1, ch. 2012-150; s. 2, ch. 2016-1.

### 373.023   Scope and application.—

(1)   All waters in the state are subject to regulation under the provisions of this chapter unless specifically exempted by general or special law.

(2)   No state or local government agency may enforce, except with respect to water quality, any special act, rule, regulation, or order affecting the waters in the state controlled under the provisions of this act, whether enacted or promulgated before or after the effective date of this act, until such special act, rule, regulation, or order has been filed with the department. However, any agency empowered to issue emergency orders affecting such waters may enforce such emergency orders prior to filing such orders with the department. Any rule or regulation in effect on the effective date of this act which is not filed with the department within 180 days after the effective date of this act shall be deemed repealed if the notice hereinafter called for shall have been received by the state or local agency issuing such rule or regulation. The department is directed to notify by certified or registered mail every state or local government agency known to be authorized to enforce any special act, rule, regulation or order affecting the waters of the state regarding the provisions of this subsection. The department is directed to review periodically such special acts, rules, regulations, and orders and to recommend to the appropriate agencies or the Legislature the amendment, consolidation, or revocation of inconsistencies or duplications therein.

(3)   Any state or local governmental agency or other person having the power of eminent domain or condemnation under the laws of this state must notify the department or the governing board of a water management district prior to exercising that power.

History.—s. 4, part I, ch. 72-299; s. 1, ch. 73-190.

### 373.026   General powers and duties of the department.—The department, or its successor agency, shall be responsible for the administration of this chapter at the state level. However, it is the policy of the state that, to the greatest extent possible, the department may enter into interagency or interlocal agreements with any other state agency, any water management district, or any local government conducting programs related to or materially affecting the water resources of the state. All such agreements shall be subject to the provisions of s. 373.046. In addition to its other powers and duties, the department shall, to the greatest extent possible:

(1)   Conduct, independently or in cooperation with other agencies, topographic surveys, research, and investigations into all aspects of water use and water quality.

(2)   Be the central repository for all scientific and factual information generated by local governments, water management districts, and state agencies relating to water resources and, to that end, collect, maintain, and make available such information to public and private users within the state and assist in the acquisition of

scientific and factual data from water management districts, local governments, and the United States Geological Survey. All local governments, water management districts, and state agencies are directed to cooperate with the department or its agents in making available to it for this purpose such scientific and factual data as they may have, generate, or possess, as the department deems necessary. The department is authorized to prescribe the format and ensure quality control for all data collected or submitted.

(a)  Additionally, the department shall annually publish a bibliography of all water resource investigations conducted in the state.

(b)  The department is additionally directed to establish priorities for the development of a computerized groundwater database upon the following principles:

1.  Regions deemed prone to groundwater contamination due to land use.

2.  Regions that have an identifiable direct connection with any confined aquifer utilized as a drinking water aquifer.

3.  Any region dependent on a single-source aquifer.

(3)  Cooperate with other state agencies, water management districts, and regional, county, or other local governmental organizations or agencies created for the purpose of utilizing and conserving the waters in this state; assist such organizations and agencies in coordinating the use of their facilities; and participate in an exchange of ideas, knowledge, and data with such organizations and agencies. For this purpose, the department may maintain an advisory staff of experts.

(4)  Prepare and provide for dissemination to the public of current and useful information relating to the water resources of the state.

(5)  Identify by continuing study those areas of the state where saltwater intrusion is a threat to freshwater resources and report its findings to the water management districts, boards of county commissioners, and public concerned.

(6)  Conduct, either independently or in cooperation with any person or governmental agency, a program of study, research, and experimentation and evaluation in the field of weather modification.

(7)  Exercise general supervisory authority over all water management districts. The department may exercise any power herein authorized to be exercised by a water management district.

(8)(a)  Provide such coordination, cooperation, or approval necessary to the effectuation of any plan or project of the Federal Government in connection with or concerning the waters in the state. Unless otherwise provided by state or federal law, the department shall, subject to confirmation by the Legislature, have the power to approve or disapprove such federal plans or projects on behalf of the state. If such plan or project is for a coastal inlet, the department shall first determine the impact of the plan or project on the sandy beaches in the state. If the department determines that the plan will have a significant adverse impact on the sandy beaches, the department may not approve the plan or project unless it is revised to mitigate those impacts.

(b)  To ensure to the greatest extent possible that project components will go forward as planned, the department shall collaborate with the South Florida Water Management District in implementing the comprehensive plan as defined in s. 373.470(2)(b), the Lake Okeechobee Watershed Protection Plan as defined in s. 373.4595(2), and the River Watershed Protection Plans as defined in s. 373.4595(2). Before any project component is submitted to Congress for authorization or receives an appropriation of state funds, the department must approve, or approve with amendments, each project component within 60 days following formal submittal of the project component to the department. Prior to the release of state funds for the implementation of the comprehensive plan, department approval shall be based upon a determination of the South Florida Water Management District's compliance with s. 373.1501(5). Once a project component is approved, the South Florida Water Management District shall provide to the President of the Senate and the Speaker of the House of Representatives a schedule for implementing the project component, the estimated total cost of the project component, any existing federal or nonfederal credits, the estimated remaining federal and nonfederal share of costs, and an estimate of the amount of state funds that will be needed to implement the project component. All requests for an appropriation of state funds needed to implement the project component shall be submitted to the department, and such requests shall be included in the department's annual request to the Governor. Prior to the

release of state funds for the implementation of the Lake Okeechobee Watershed Protection Plan or the River Watershed Protection Plans, on an annual basis, the South Florida Water Management District shall prepare an annual work plan as part of the consolidated annual report required in s. 373.036(7). Upon a determination by the secretary of the annual work plan's consistency with the goals and objectives of s. 373.4595, the secretary may approve the release of state funds. Any modifications to the annual work plan shall be submitted to the secretary for review and approval.

(c)   Notwithstanding paragraph (b), the use of state funds for land purchases from willing sellers is authorized for projects within the South Florida Water Management District's approved Florida Forever water management district work plan pursuant to s. 373.199.

(d)   The Executive Office of the Governor, pursuant to its duties under s. 373.536(5) to approve or disapprove, in whole or in part, the budget of each water management district, shall review all proposed expenditures for project components in the district's budget.

(e)   The department, subject to confirmation by the Legislature, shall act on behalf of the state in the negotiation and consummation of any agreement or compact with another state or states concerning waters of the state.

(9)(a)   Hold annually a conference on water resources developmental programs. Each agency, commission, district, municipality, or political subdivision of the state responsible for a specific water resources development program requiring federal assistance shall present at such conference its programs and projects and the needs thereof. Notice of the time and place of the annual conference on water resources developmental programs shall be extended by mail at least 30 days prior to the date of such conference to any person who has filed a written request for notification with the department. Adequate opportunity shall be afforded for participation at the conference by interested members of the general public.

(b)   Upon termination of the water conference, the department shall select those projects for presentation in the Florida program of public works which best represent the public welfare and interest of the people of the state as required for the proper development, use, conservation, and protection of the waters of the state and land resources affected thereby. Thereafter, the department shall present to the appropriate committees and agencies of the Federal Government a program of public works for Florida, requesting authorization for funds for each project.

(10)   Expand the use of Internet-based self-certification services for appropriate exemptions and general permits issued by the department and the water management districts, if such expansion is economically feasible. In addition to expanding the use of Internet-based self-certification services for appropriate exemptions and general permits, the department and water management districts shall identify and develop general permits for appropriate activities currently requiring individual review which could be expedited through the use of applicable professional certification.

**History.**—s. 5, part I, ch. 72-299; s. 4, ch. 74-114; s. 38, ch. 79-65; s. 2, ch. 83-310; s. 11, ch. 86-138; s. 21, ch. 87-97; s. 7, ch. 89-279; s. 252, ch. 94-356; s. 26, ch. 97-160; s. 2, ch. 99-143; s. 1, ch. 2001-172; s. 2, ch. 2007-253; s. 79, ch. 2008-4; s. 31, ch. 2011-34; s. 5, ch. 2012-205; s. 34, ch. 2015-229.

### 373.033   Saltwater barrier line.—

(1)   The department may, at the request of the board of county commissioners of any county, at the request of the governing board of any water management district, or any municipality or water district responsible for the protection of a public water supply, or, having determined by adoption of an appropriate resolution that saltwater intrusion has become a matter of emergency proportions, by its own initiative, establish generally along the seacoast, inland from the seashore and within the limits of the area within which the petitioning board has jurisdiction, a saltwater barrier line inland of which no canal shall be constructed or enlarged, and no natural stream shall be deepened or enlarged, which shall discharge into tidal waters without a dam, control structure or spillway at or seaward of the saltwater barrier line, which shall prevent the movement of salt water inland of the saltwater barrier line. Provided, however, that the department is authorized, in cases where saltwater intrusion is not a problem, to waive the requirement of a barrier structure by specific permit to construct a canal crossing the

saltwater barrier line without a protective device and provided, further that the agency petitioning for the establishment of the saltwater barrier line shall concur in the waiver.

(2)   Application by a board of county commissioners or by the governing board of a water management district, a municipality or a water district for the establishment of a saltwater barrier line shall be made by adoption of an appropriate resolution, agreeing to:

(a)   Reimburse the department the cost of necessary investigation, including, but not limited to, subsurface exploration by drilling, to determine the proper location of the saltwater barrier line in that county or in all or part of the district over which the applying agency has jurisdiction.

(b)   Require compliance with the provisions of this law by county or district forces under their control; by those individuals or corporations filing plats for record and by individuals, corporations or agencies seeking authority to discharge surface or subsurface drainage into tidal waters.

(3)   The board of county commissioners of any county or the governing board of any water management district, municipality or water district desiring to establish a saltwater barrier line is authorized to reimburse the department for any expense entailed in making an investigation to determine the proper location of the saltwater barrier line, from any funds available to them for general administrative purposes.

(4)   The department, any board of county commissioners, and the governing board of any water management district, municipality, or water district having competent jurisdiction over an area in which a saltwater barrier is established shall be charged with the enforcement of the provisions of this section, and authority for the maintenance of actions set forth in s. 373.129 shall apply to this section.

(5)   The board of county commissioners of a county, or the governing board of a water management district, a municipality, or a water district having jurisdiction over an area in which a saltwater barrier line is established, may expend funds from any available source for the purpose of constructing saltwater barrier dams, dikes, and spillways within existing canals and streams in conformity with the purpose and intent of the board in establishing the saltwater barrier line.

**History.**—s. 2, ch. 63-210; ss. 25, 35, ch. 69-106; s. 25, ch. 73-190; s. 14, ch. 78-95; s. 40, ch. 79-65; s. 85, ch. 79-164; s. 10, ch. 2000-212.

**Note.**—Former s. 373.194.

### 373.036    Florida water plan; district water management plans.—

(1)   FLORIDA WATER PLAN.—In cooperation with the water management districts, regional water supply authorities, and others, the department shall develop the Florida water plan. The Florida water plan shall include, but not be limited to:

(a)   The programs and activities of the department related to water supply, water quality, flood protection and floodplain management, and natural systems.

(b)   The water quality standards of the department.

(c)   The district water management plans.

(d)   Goals, objectives, and guidance for the development and review of programs, rules, and plans relating to water resources, based on statutory policies and directives. The state water policy rule, renamed the water resource implementation rule pursuant to s. 373.019(25), shall serve as this part of the plan. Amendments or additions to this part of the Florida water plan shall be adopted by the department as part of the water resource implementation rule. In accordance with s. 373.114, the department shall review rules of the water management districts for consistency with this rule. Amendments to the water resource implementation rule must be adopted by the secretary of the department and be submitted to the President of the Senate and the Speaker of the House of Representatives within 7 days after publication in the Florida Administrative Register. Amendments shall not become effective until the conclusion of the next regular session of the Legislature following their adoption.

(2)   DISTRICT WATER MANAGEMENT PLANS.—

(a)   Each governing board shall develop a district water management plan for water resources within its region, which plan addresses water supply, water quality, flood protection and floodplain management, and natural systems. The district water management plan shall be based on at least a 20-year planning period, shall be

developed and revised in cooperation with other agencies, regional water supply authorities, units of government, and interested parties, and shall be updated at least once every 5 years. The governing board shall hold a public hearing at least 30 days in advance of completing the development or revision of the district water management plan.

(b)   The district water management plan shall include, but not be limited to:

1.   The scientific methodologies for establishing minimum flows and levels under s. 373.042, and all established minimum flows and levels.

2.   Identification of one or more water supply planning regions that singly or together encompass the entire district.

3.   Technical data and information prepared under s. 373.711.

4.   A districtwide water supply assessment, which determines for each water supply planning region:

a.   Existing legal uses, reasonably anticipated future needs, and existing and reasonably anticipated sources of water and conservation efforts; and

b.   Whether existing and reasonably anticipated sources of water and conservation efforts are adequate to supply water for all existing legal uses and reasonably anticipated future needs and to sustain the water resources and related natural systems.

5.   Any completed regional water supply plans.

(c)   If necessary for implementation, the governing board shall adopt by rule or order relevant portions of the district water management plan, to the extent of its statutory authority.

(d)   In the formulation of the district water management plan, the governing board shall give due consideration to:

1.   The attainment of maximum reasonable-beneficial use of water resources.

2.   The maximum economic development of the water resources consistent with other uses.

3.   The management of water resources for such purposes as environmental protection, drainage, flood control, and water storage.

4.   The quantity of water available for application to a reasonable-beneficial use.

5.   The prevention of wasteful, uneconomical, impractical, or unreasonable uses of water resources.

6.   Presently exercised domestic use and permit rights.

7.   The preservation and enhancement of the water quality of the state.

8.   The state water resources policy as expressed by this chapter.

(e)   At its option, a governing board may substitute an annual strategic plan for the requirement to develop a district water management plan and the district water management plan annual report required by subparagraph (7)(b)1., provided that nothing herein affects any other provision or requirement of law concerning the completion of the regional water supply plan and the strategic plan meets the following minimum requirements:

1.   The strategic plan establishes the water management district's strategic priorities for at least a future 5-year period.

2.   The strategic plan identifies the goals, strategies, success indicators, funding sources, deliverables, and milestones to accomplish the strategic priorities.

3.   The strategic plan development process includes at least one publicly noticed meeting to allow public participation in its development.

4.   The strategic plan includes separately, as an addendum, an annual work plan report on the implementation of the strategic plan for the previous fiscal year, addressing success indicators, deliverables, and milestones.

(3)   The department and governing board shall give careful consideration to the requirements of public recreation and to the protection and procreation of fish and wildlife. The department or governing board may prohibit or restrict other future uses on certain designated bodies of water which may be inconsistent with these objectives.

(4)   The governing board may designate certain uses in connection with a particular source of supply which, because of the nature of the activity or the amount of water required, would constitute an undesirable use for which the governing board may deny a permit.

Statutes & Constitution :View Statutes : Online Sunshine

(5)   The governing board may designate certain uses in connection with a particular source of supply which, because of the nature of the activity or the amount of water required, would result in an enhancement or improvement of the water resources of the area. Such uses shall be preferred over other uses in the event of competing applications under the permitting systems authorized by this chapter.

(6)   The department, in cooperation with the Executive Office of the Governor, or its successor agency, may add to the Florida water plan any other information, directions, or objectives it deems necessary or desirable for the guidance of the governing boards or other agencies in the administration and enforcement of this chapter.

(7)   CONSOLIDATED WATER MANAGEMENT DISTRICT ANNUAL REPORT.—

(a)   By March 1, annually, each water management district shall prepare and submit to the department, the Governor, the President of the Senate, and the Speaker of the House of Representatives a consolidated water management district annual report on the management of water resources. In addition, copies must be provided by the water management districts to the chairs of all legislative committees having substantive or fiscal jurisdiction over the districts and the governing board of each county in the district having jurisdiction or deriving any funds for operations of the district. Copies of the consolidated annual report must be made available to the public, either in printed or electronic format.

(b)   The consolidated annual report shall contain the following elements, as appropriate to that water management district:

1.   A district water management plan annual report or the annual work plan report allowed in subparagraph (2)(e)4.

2.   The department-approved minimum flows and minimum water levels annual priority list and schedule required by s. 373.042(3).

3.   The annual 5-year capital improvements plan required by s. 373.536(6)(a)3.

4.   The alternative water supplies annual report required by s. 373.707(8)(n).

5.   The final annual 5-year water resource development work program required by s. 373.536(6)(a)4.

6.   The Florida Forever Water Management District Work Plan annual report required by s. 373.199(7).

7.   The mitigation donation annual report required by s. 373.414(1)(b)2.

8.   Information on all projects related to water quality or water quantity as part of a 5-year work program, including:

a.   A list of all specific projects identified to implement a basin management action plan or a recovery or prevention strategy;

b.   A priority ranking for each listed project for which state funding through the water resources development work program is requested, which must be made available to the public for comment at least 30 days before submission of the consolidated annual report;

c.   The estimated cost for each listed project;

d.   The estimated completion date for each listed project;

e.   The source and amount of financial assistance to be made available by the department, a water management district, or other entity for each listed project; and

f.   A quantitative estimate of each listed project's benefit to the watershed, water body, or water segment in which it is located.

9.   A grade for each watershed, water body, or water segment in which a project listed under subparagraph 8. is located representing the level of impairment and violations of adopted minimum flow or minimum water levels. The grading system must reflect the severity of the impairment of the watershed, water body, or water segment.

(c)   Each of the elements listed in paragraph (b) is to be addressed in a separate chapter or section within the consolidated annual report, although information common to more than one of these elements may be consolidated as deemed appropriate by the individual water management district.

(d)   Each water management district may include in the consolidated annual report such additional information on the status or management of water resources within the district as it deems appropriate.

(e)   In addition to the elements specified in paragraph (b), the South Florida Water Management District shall include in the consolidated annual report the following elements:

1. The Lake Okeechobee Protection Program annual progress report required by s. 373.4595(6).

2. The Everglades annual progress reports specified in s. 373.4592(4)(d)5., (13), and (14).

3. The Everglades restoration annual report required by s. 373.470(7).

4. The Everglades Trust Fund annual expenditure report required by s. 373.45926(3).

History.—s. 6, part I, ch. 72-299; ss. 2, 3, ch. 73-190; s. 122, ch. 79-190; s. 3, ch. 97-160; s. 7, ch. 98-88; s. 164, ch. 99-13; s. 4, ch. 2005-36; s. 38, ch. 2006-1; s. 11, ch. 2010-205; s. 24, ch. 2011-4; s. 32, ch. 2011-34; s. 4, ch. 2012-150; s. 33, ch. 2013-14; s. 73, ch. 2014-17; s. 3, ch. 2016-1; s. 37, ch. 2018-110.

**373.0363    Southern Water Use Caution Area Recovery Strategy.—**

(1)    As used in this section, the term:

(a)    "Central Florida Coordination Area" means all of Polk, Osceola, Orange, and Seminole Counties, and southern Lake County, as designated by the Southwest Florida Water Management District, the South Florida Water Management District, and the St. Johns River Water Management District.

(b)    "District" means the Southwest Florida Water Management District.

(c)    "Southern Water Use Caution Area" means an area that the district designated, after extensive collection of data and numerous studies, in order to comprehensively manage water resources in the Southern West-Central Groundwater Basin, which includes all of Desoto, Hardee, Manatee, and Sarasota Counties and parts of Charlotte, Highlands, Hillsborough, and Polk Counties.

(d)    "Southern Water Use Caution Area Recovery Strategy" means the district's planning, regulatory, and financial strategy for ensuring that adequate water supplies are available to meet growing demands while protecting and restoring the water and related natural resources of the area.

(e)    "West-Central Florida Water Restoration Action Plan" means the district's regional environmental restoration and water-resource sustainability program for the Southern Water Use Caution Area.

(2)    The Legislature finds that:

(a)    In response to the growing demands from public supply, agriculture, mining, power generation, and recreational users, groundwater withdrawals in the Southern Water Use Caution Area have steadily increased for nearly a century before peaking in the mid-1970s. These withdrawals resulted in declines in aquifer levels throughout the groundwater basin, which in some areas exceeded 50 feet.

(b)    While groundwater withdrawals have since stabilized as a result of the district's management efforts, depressed aquifer levels continue to result in saltwater intrusion, reduced flows in the Upper Peace River, lowered water levels, and adverse water quality impacts for some lakes in the Lake Wales Ridge areas of Polk and Highlands Counties.

(c)    In response to these resource concerns, and as directed by s. 373.036, the district determined that traditional sources of water in the region are not adequate to supply water for all existing and projected reasonable and beneficial uses and to sustain the water resources and related natural systems.

(d)    The expeditious implementation of the Southern Water Use Caution Area Recovery Strategy is needed to meet the minimum flow requirement for the Upper Peace River, slow saltwater intrusion, provide for improved lake levels and water quality along the Lake Wales Ridge, and ensure sufficient water supplies for all existing and projected reasonable and beneficial uses.

(e)    Sufficient research has been conducted and sufficient plans developed to immediately expand and accelerate programs to sustain the water resources and related natural systems in the Southern Water Use Caution Area.

(f)    The implementation of components of the Southern Water Use Caution Area Recovery Strategy, which are contained in the West-Central Florida Water Restoration Action Plan, is for the benefit of the public health, safety, and welfare and is in the public interest.

(g)    The implementation of the West-Central Florida Water Restoration Action Plan is necessary to meet the minimum flow requirement for the Upper Peace River, slow saltwater intrusion, provide for improved lake levels and water quality along the Lake Wales Ridge, and ensure sufficient water supplies for all existing and projected reasonable and beneficial uses.

(h)   A continuing source of funding is needed to effectively implement the West-Central Florida Water Restoration Action Plan.

(3)   The district shall implement the West-Central Florida Water Restoration Action Plan in a manner that furthers progressive strategies for the management of water resources, is watershed-based, provides for consideration of water quality issues, and includes monitoring, the development and implementation of best management practices, and structural and nonstructural projects, including public works projects. The district shall coordinate its implementation of the plan with regional water supply authorities, public and private partnerships, and local, state, and federal partners in order to maximize opportunities for the most efficient and timely expenditures of public funds.

(4)   The West-Central Florida Water Restoration Action Plan includes:

(a)   The Central West Coast Surface Water Enhancement Initiative. The purpose of this initiative is to make additional surface waters available for public supply through restoration of surface waters, natural water flows, and freshwater wetland communities. This initiative is designed to allow limits on groundwater withdrawals in order to slow the rate of saltwater intrusion. The initiative shall be an ongoing program in cooperation with the Peace River-Manasota Regional Water Supply Authority created under s. 373.713.

(b)   The Facilitating Agricultural Resource Management Systems Initiative. The purpose of this initiative is to expedite the implementation of production-scale, best management practices in the agricultural sector, which will result in reductions in groundwater withdrawals and improvements in water quality, water resources, and ecology. The initiative is a cost-share reimbursement program to provide funding incentives to agricultural landowners for the implementation of best management practices. The initiative shall be implemented by the district in cooperation with the Department of Agriculture and Consumer Services. Cooperative funding programs approved by the governing board shall not be subject to the rulemaking requirements of chapter 120. However, any portion of an approved program which affects the substantial interests of a party shall be subject to s. 120.569.

(c)   The Ridge Lakes Restoration Initiative. The purpose of this initiative is to protect, restore, and enhance natural systems and flood protection by improving and protecting the water quality of approximately 130 lakes located along the Lake Wales Ridge in Polk and Highlands Counties, which quality is threatened by stormwater runoff, wastewater effluent, fertilizer applications, groundwater pollution, degradation of shoreline habitats, and hydrologic alterations. This initiative shall be accomplished through the construction of systems designed to treat the stormwater runoff that threatens the water quality of such lakes. Such systems include swales, retention basins, and long infiltration basins, if feasible.

(d)   The Upper Peace River Watershed Restoration Initiative. The purpose of this initiative is to improve the quality of waters and ecosystems in the watershed of the Upper Peace River by recharging aquifers, restoring the flow of surface waters, and restoring the capacity of natural systems to store surface waters. The Legislature finds that such improvements are necessary because the quantity and quality of the fresh water that flows to the basin of the Peace River and Charlotte Harbor are adversely affected by the significant alteration and degradation of the watershed of the Upper Peace River and because restoration of the watershed of the Upper Peace River is a critical component of the Charlotte Harbor National Estuary Program's Comprehensive Conservation and Management Plan, the Southwest Florida Water Management District's Surface Water Improvement and Management Plan, and the Southern Water Use Caution Area Recovery Strategy. This initiative shall include an Upper Peace River Component. In addition to the initiative's other purposes, this component will provide a critical link to a major greenway that extends from the lower southwest coast of this state through the watershed of the Peace River and the Green Swamp and further north to the Ocala National Forest.

(e)   The Central Florida Water Resource Development Initiative. The purpose of this initiative is to create and implement a long-term plan that takes a comprehensive approach to limit groundwater withdrawals in the Southern Water Use Caution Area and to identify and develop alternative water supplies for Polk County. The project components developed pursuant to this initiative are eligible for state and regional funding under s. 373.707 as an alternative water supply, as defined in s. 373.019, or as a supplemental water supply under the rules of the Southwest Florida Water Management District or the South Florida Water Management District. The initiative

shall be implemented by the district as an ongoing program in cooperation with Polk County and the South Florida Water Management District.

(5)   As part of the consolidated annual report required pursuant s. 373.036(7), the district may include:

(a)   A summary of the conditions of the Southern Water Use Caution Area, including the status of the components of the West-Central Florida Water Restoration Action Plan.

(b)   An annual accounting of the expenditure of funds. The accounting must, at a minimum, provide details of expenditures separately by plan component and any subparts of a plan component, and include specific information about amount and use of funds from federal, state, and local government sources. In detailing the use of these funds, the district shall indicate those funds that are designated to meet requirements for matching funds.

History.—s. 1, ch. 2009-243; s. 12, ch. 2010-205; s. 74, ch. 2014-17.

### 373.037     Pilot program for alternative water supply development in restricted allocation areas.—

(1)   As used in this section, the term:

(a)   "Central Florida Water Initiative Area" means all of Orange, Osceola, Polk, and Seminole Counties, and southern Lake County, as designated by the Central Florida Water Initiative Guiding Document of January 30, 2015.

(b)   "Lower East Coast Regional Water Supply Planning Area" means the areas withdrawing surface and groundwater from Water Conservation Areas 1, 2A, 2B, 3A, and 3B, Grassy Waters Preserve/Water Catchment Area, Pal Mar, J.W. Corbett Wildlife Management Area, Loxahatchee Slough, Loxahatchee River, Riverbend Park, Dupuis Reserve, Jonathan Dickinson State Park, Kitching Creek, Moonshine Creek, Cypress Creek, Hobe Grove Ditch, the Holey Land and Rotenberger Wildlife Management Areas, and the freshwater portions of the Everglades National Park, as designated by the South Florida Water Management District.

(c)   "Restricted allocation area" means an area within a water supply planning region of the Southwest Florida Water Management District, the South Florida Water Management District, or the St. Johns River Water Management District where the governing board of the water management district has determined that existing sources of water are not adequate to supply water for all existing and future reasonable-beneficial uses and to sustain the water resources and related natural systems for the planning period pursuant to ss. 373.036 and 373.709 and where the governing board of the water management district has applied allocation restrictions with regard to the use of specific sources of water. For the purposes of this section, the term includes the Central Florida Water Initiative Area, the Lower East Coast Regional Water Supply Planning Area, the Southern Water Use Caution Area, and the Upper East Coast Regional Water Supply Planning Area.

(d)   "Southern Water Use Caution Area" means all of Desoto, Hardee, Manatee, and Sarasota Counties and parts of Charlotte, Highlands, Hillsborough, and Polk Counties, as designated by the Southwest Florida Water Management District.

(e)   "Upper East Coast Regional Water Supply Planning Area" means the areas withdrawing surface and groundwater from the Central and Southern Florida canals or the Floridan Aquifer, as designated by the South Florida Water Management District.

(2)   The Legislature finds that:

(a)   Local governments, regional water supply authorities, and government-owned and privately owned water utilities face significant challenges in securing funds for implementing large-scale alternative water supply projects in certain restricted allocation areas due to a variety of factors, such as the magnitude of the water resource challenges, the large number of water users, the difficulty of developing multijurisdictional solutions across district, county, or municipal boundaries, and the expense of developing large-scale alternative water supply projects identified in the regional water supply plans pursuant to s. 373.709.

(b)   These factors make it necessary to provide other options for the Southwest Florida Water Management District, the South Florida Water Management District, and the St. Johns River Water Management District to be able to take the lead in developing and implementing one alternative water supply project within a restricted allocation area as a pilot alternative water supply development project.

(c)   Each pilot project must provide water supply and environmental benefits. Consideration should be given to projects that provide reductions in damaging discharges to tide or that are part of a recovery or prevention strategy for minimum flows and minimum water levels.

(3)   The water management districts specified in paragraph (2)(b) may, at their sole discretion, designate and implement an existing alternative water supply project that is identified in each district's regional water supply plan as its one pilot project or amend their respective regional water supply plans to add a new alternative water supply project as their district pilot project. A pilot project designation made pursuant to this section should be made no later than July 1, 2017, and is not subject to the rulemaking requirements of chapter 120 or subject to legal challenge pursuant to ss. 120.569 and 120.57. A water management district may designate an alternative water supply project located within another water management district if the project is located in a restricted allocation area designated by the other water management district and a substantial quantity of water provided by the alternative water supply project will be used within the boundaries of the water management district that designated the alternative water supply project.

(4)   In addition to the other powers granted and duties imposed under this chapter, if a district specified in paragraph (2)(b) elects to implement a pilot project pursuant to this section, its governing board has the following powers and is subject to the following restrictions in implementing the pilot project:

(a)   The governing board may not develop and implement a pilot project on privately owned land without the voluntary consent of the landowner, which consent may be evidenced by deed, easement, license, contract, or other written legal instrument executed by the landowner after July 1, 2016.

(b)   The governing board may not engage in local water supply distribution or sell water to the pilot project participants.

(c)   The governing board may join with one or more other water management districts and counties, municipalities, special districts, publicly owned or privately owned water utilities, multijurisdictional water supply entities, regional water supply authorities, self-suppliers, or other entities for the purpose of carrying out its powers, and may contract with any such other entities to finance or otherwise implement acquisitions, construction, and operation and maintenance, if such contracts are consistent with the public interest and based upon independent cost estimates, including comparisons with other alternative water supply projects. The contracts may provide for contributions to be made by each party to the contract for the division and apportionment of resulting costs, including operations and maintenance, benefits, services, and products. The contracts may contain other covenants and agreements necessary and appropriate to accomplish their purposes.

(5)   A water management district may provide up to 50 percent of funding assistance for a pilot project.

(6)   If a water management district specified in paragraph (2)(b) elects to implement a pilot project, it shall submit a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by July 1, 2020, on the effectiveness of its pilot project. The report must include all of the following information:

(a)   A description of the alternative water supply project selected as a pilot project, including the quantity of water the project has produced or is expected to produce and the consumptive users who are expected to use the water produced by the pilot project to meet their existing and future reasonable-beneficial uses.

(b)   Progress made in developing and implementing the pilot project in comparison to the development and implementation of other alternative water supply projects in the restricted allocation area.

(c)   The capital and operating costs to be expended by the water management district in implementing the pilot project in comparison to other alternative water supply projects being developed and implemented in the restricted allocation area.

(d)   The source of funds to be used by the water management district in developing and implementing the pilot project.

(e)   The benefits to the district's water resources and natural systems from implementation of the pilot project.

(f)   A recommendation as to whether the traditional role of water management districts regarding the development and implementation of alternative water supply projects, as specified in ss. 373.705 and 373.707, should be revised and, if so, identification of the statutory changes necessary to expand the scope of the pilot program.

History.—s. 4, ch. 2016-1.

**373.0397    Floridan and Biscayne aquifers; designation of prime groundwater recharge areas.**—Upon preparation of an inventory of prime groundwater recharge areas for the Floridan or Biscayne aquifers, but prior to adoption by the governing board, the water management district shall publish a legal notice of public hearing on the designated areas for the Floridan and Biscayne aquifers, with a map delineating the boundaries of the areas, in newspapers defined in chapter 50 as having general circulation within the area to be affected. The notice shall be at least one-fourth page and shall read as follows:

<div align="center">

NOTICE OF PRIME RECHARGE
AREA DESIGNATION
</div>

The _(name of taxing authority)_ proposes to designate specific land areas as areas of prime recharge to the _(name of aquifer)_ Aquifer.

All concerned citizens are invited to attend a public hearing on the proposed designation to be held on _(date and time)_ at _(meeting place)_.

A map of the affected areas follows.

The governing board of the water management district shall adopt a designation of prime groundwater recharge areas to the Floridan and Biscayne aquifers by rule within 120 days after the public hearing, subject to the provisions of chapter 120.

History.—s. 2, ch. 85-42; s. 5, ch. 2005-36.

**373.042    Minimum flows and minimum water levels.**—

(1)    Within each section, or within the water management district as a whole, the department or the governing board shall establish the following:

(a)    Minimum flow for all surface watercourses in the area. The minimum flow for a given watercourse is the limit at which further withdrawals would be significantly harmful to the water resources or ecology of the area.

(b)    Minimum water level. The minimum water level is the level of groundwater in an aquifer and the level of surface water at which further withdrawals would be significantly harmful to the water resources or ecology of the area.

The minimum flow and minimum water level shall be calculated by the department and the governing board using the best information available. When appropriate, minimum flows and minimum water levels may be calculated to reflect seasonal variations. The department and the governing board shall consider, and at their discretion may provide for, the protection of nonconsumptive uses in the establishment of minimum flows and minimum water levels.

(2)(a)    If a minimum flow or minimum water level has not been adopted for an Outstanding Florida Spring, a water management district or the department shall use the emergency rulemaking authority provided in paragraph (c) to adopt a minimum flow or minimum water level no later than July 1, 2017, except for the Northwest Florida Water Management District, which shall use such authority to adopt minimum flows and minimum water levels for Outstanding Florida Springs no later than July 1, 2026.

(b)    For Outstanding Florida Springs identified on a water management district's priority list developed pursuant to subsection (3) which have the potential to be affected by withdrawals in an adjacent district, the adjacent district or districts and the department shall collaboratively develop and implement a recovery or prevention strategy for an Outstanding Florida Spring not meeting an adopted minimum flow or minimum water level.

(c)    The Legislature finds as provided in s. 373.801(3)(b) that the adoption of minimum flows and minimum water levels or recovery or prevention strategies for Outstanding Florida Springs requires immediate action. The department and the districts are authorized, and all conditions are deemed to be met, to use emergency rulemaking provisions pursuant to s. 120.54(4) to adopt minimum flows and minimum water levels pursuant to this subsection and to adopt recovery or prevention strategies concurrently with a minimum flow or minimum water

level pursuant to s. 373.805(2). The emergency rules shall remain in effect during the pendency of procedures to adopt rules addressing the subject of the emergency rules.

(d)   As used in this subsection, the term "Outstanding Florida Spring" has the same meaning as in s. 373.802.

(3)   By November 15, annually, each water management district shall submit to the department for review and approval a priority list and schedule for the establishment of minimum flows and minimum water levels for surface watercourses, aquifers, and surface waters within the district. The priority list and schedule shall identify those listed water bodies for which the district will voluntarily undertake independent scientific peer review; any reservations proposed by the district to be established pursuant to s. 373.223(4); and those listed water bodies that have the potential to be affected by withdrawals in an adjacent district for which the department's adoption of a reservation pursuant to s. 373.223(4) or a minimum flow or minimum water level pursuant to subsection (1) may be appropriate. By March 1, annually, each water management district shall include its approved priority list and schedule in the consolidated annual report required by s. 373.036(7). The priority list shall be based upon the importance of the waters to the state or region and the existence of or potential for significant harm to the water resources or ecology of the state or region, and shall include those waters which are experiencing or may reasonably be expected to experience adverse impacts. Each water management district's priority list and schedule shall include all first magnitude springs, and all second magnitude springs within state or federally owned lands purchased for conservation purposes. The specific schedule for establishment of spring minimum flows and minimum water levels shall be commensurate with the existing or potential threat to spring flow from consumptive uses. Springs within the Suwannee River Water Management District, or second magnitude springs in other areas of the state, need not be included on the priority list if the water management district submits a report to the Department of Environmental Protection demonstrating that adverse impacts are not now occurring nor are reasonably expected to occur from consumptive uses during the next 20 years. The priority list and schedule is not subject to any proceeding pursuant to chapter 120. Except as provided in subsection (4), the development of a priority list and compliance with the schedule for the establishment of minimum flows and minimum water levels pursuant to this subsection satisfies the requirements of subsection (1).

(4)   Minimum flows or minimum water levels for priority waters in the counties of Hillsborough, Pasco, and Pinellas shall be established by October 1, 1997. Where a minimum flow or minimum water level for the priority waters within those counties has not been established by the applicable deadline, the secretary of the department shall, if requested by the governing body of any local government within whose jurisdiction the affected waters are located, establish the minimum flow or minimum water level in accordance with the procedures established by this section. The department's reasonable costs in establishing a minimum flow or minimum water level shall, upon request of the secretary, be reimbursed by the district.

(5)   A water management district shall provide the department with technical information and staff support for the development of a reservation, minimum flow or minimum water level, or recovery or prevention strategy to be adopted by the department by rule. A water management district shall apply any reservation, minimum flow or minimum water level, or recovery or prevention strategy adopted by the department by rule without the district's adoption by rule of such reservation, minimum flow or minimum water level, or recovery or prevention strategy.

(6)(a)   Upon written request to the department or governing board by a substantially affected person, or by decision of the department or governing board, before the establishment of a minimum flow or minimum water level and before the filing of any petition for administrative hearing related to the minimum flow or minimum water level, all scientific or technical data, methodologies, and models, including all scientific and technical assumptions employed in each model, used to establish a minimum flow or minimum water level shall be subject to independent scientific peer review. Independent scientific peer review means review by a panel of independent, recognized experts in the fields of hydrology, hydrogeology, limnology, biology, and other scientific disciplines, to the extent relevant to the establishment of the minimum flow or minimum water level.

(b)   If independent scientific peer review is requested, it shall be initiated at an appropriate point agreed upon by the department or governing board and the person or persons requesting the peer review. If no agreement is reached, the department or governing board shall determine the appropriate point at which to initiate peer review. The members of the peer review panel shall be selected within 60 days of the point of initiation by

agreement of the department or governing board and the person or persons requesting the peer review. If the panel is not selected within the 60-day period, the time limitation may be waived upon the agreement of all parties. If no waiver occurs, the department or governing board may proceed to select the peer review panel. The cost of the peer review shall be borne equally by the district and each party requesting the peer review, to the extent economically feasible. The panel shall submit a final report to the governing board within 120 days after its selection unless the deadline is waived by agreement of all parties. Initiation of peer review pursuant to this paragraph shall toll any applicable deadline under chapter 120 or other law or district rule regarding permitting, rulemaking, or administrative hearings, until 60 days following submittal of the final report. Any such deadlines shall also be tolled for 60 days following withdrawal of the request or following agreement of the parties that peer review will no longer be pursued. The department or the governing board shall give significant weight to the final report of the peer review panel when establishing the minimum flow or minimum water level.

(c)   If the final data, methodologies, and models, including all scientific and technical assumptions employed in each model upon which a minimum flow or level is based, have undergone peer review pursuant to this subsection, by request or by decision of the department or governing board, no further peer review shall be required with respect to that minimum flow or minimum water level.

(d)   No minimum flow or minimum water level adopted by rule or formally noticed for adoption on or before May 2, 1997, shall be subject to the peer review provided for in this subsection.

(7)   If a petition for administrative hearing is filed under chapter 120 challenging the establishment of a minimum flow or minimum water level, the report of an independent scientific peer review conducted under subsection (6) is admissible as evidence in the final hearing, and the administrative law judge must render the order within 120 days after the filing of the petition. The time limit for rendering the order shall not be extended except by agreement of all the parties. To the extent that the parties agree to the findings of the peer review, they may stipulate that those findings be incorporated as findings of fact in the final order.

(8)   The rules adopted pursuant to this section are not subject to s. 120.541(3).

History.—s. 6, part I, ch. 72-299; s. 2, ch. 73-190; s. 2, ch. 96-339; s. 5, ch. 97-160; s. 52, ch. 2002-1; s. 1, ch. 2002-15; s. 6, ch. 2005-36; s. 1, ch. 2013-229; s. 5, ch. 2016-1; s. 16, ch. 2017-3; s. 38, ch. 2018-110.

Note.—Former s. 373.036(7).

**373.0421     Establishment and implementation of minimum flows and minimum water levels.**—

(1)   ESTABLISHMENT.—

(a)   *Considerations.*—When establishing minimum flows and minimum water levels pursuant to s. 373.042, the department or governing board shall consider changes and structural alterations to watersheds, surface waters, and aquifers and the effects such changes or alterations have had, and the constraints such changes or alterations have placed, on the hydrology of an affected watershed, surface water, or aquifer, provided that nothing in this paragraph shall allow significant harm as provided by s. 373.042(1) caused by withdrawals.

(b)   *Exclusions.*—

1.   The Legislature recognizes that certain water bodies no longer serve their historical hydrologic functions. The Legislature also recognizes that recovery of these water bodies to historical hydrologic conditions may not be economically or technically feasible, and that such recovery effort could cause adverse environmental or hydrologic impacts. Accordingly, the department or governing board may determine that setting a minimum flow or minimum water level for such a water body based on its historical condition is not appropriate.

2.   The department or the governing board is not required to establish minimum flows or minimum water levels pursuant to s. 373.042 for surface water bodies less than 25 acres in area, unless the water body or bodies, individually or cumulatively, have significant economic, environmental, or hydrologic value.

3.   The department or the governing board shall not set minimum flows or minimum water levels pursuant to s. 373.042 for surface water bodies constructed before the requirement for a permit, or pursuant to an exemption, a permit, or a reclamation plan which regulates the size, depth, or function of the surface water body under the provisions of this chapter, chapter 378, or chapter 403, unless the constructed surface water body is of significant hydrologic value or is an essential element of the water resources of the area.

The exclusions of this paragraph shall not apply to the Everglades Protection Area, as defined in s. 373.4592(2)(i).

(2)   If, at the time a minimum flow or minimum water level is initially established for a water body pursuant to s. 373.042 or is revised, the existing flow or water level in the water body is below, or is projected to fall within 20 years below, the applicable minimum flow or minimum water level, the department or governing board, as part of the regional water supply plan described in s. 373.709, shall concurrently adopt or modify and implement a recovery or prevention strategy. If a minimum flow or minimum water level has been established for a water body pursuant to s. 373.042, and the existing flow or water level in the water body falls below, or is projected to fall within 20 years below, the applicable minimum flow or minimum water level, the department or governing board shall expeditiously adopt a recovery or prevention strategy. A recovery or prevention strategy shall include the development of additional water supplies and other actions, consistent with the authority granted by this chapter, to:

(a)   Achieve recovery to the established minimum flow or minimum water level as soon as practicable; or

(b)   Prevent the existing flow or water level from falling below the established minimum flow or minimum water level.

The recovery or prevention strategy must include a phased-in approach or a timetable which will allow for the provision of sufficient water supplies for all existing and projected reasonable-beneficial uses, including development of additional water supplies and implementation of conservation and other efficiency measures concurrent with and, to the maximum extent practical, to offset reductions in permitted withdrawals, consistent with this chapter. The recovery or prevention strategy may not depend solely on water shortage restrictions declared pursuant to s. 373.175 or s. 373.246.

(3)   To ensure that sufficient water is available for all existing and future reasonable-beneficial uses and the natural systems, the applicable regional water supply plan prepared pursuant to s. 373.709 shall be amended to include any water supply development project or water resource development project identified in a recovery or prevention strategy. Such amendment shall be approved concurrently with relevant portions of the recovery or prevention strategy.

(4)   The water management district shall notify the department if an application for a water use permit is denied based upon the impact that the use will have on an adopted minimum flow or minimum water level. Upon receipt of such notice, the department shall, as soon as practicable and in cooperation with the water management district, conduct a review of the applicable regional water supply plan prepared pursuant to s. 373.709. Such review shall include an assessment by the department of the adequacy of the plan in addressing the legislative intent of s. 373.705(2)(a) which provides that sufficient water be available for all existing and future reasonable-beneficial uses and natural systems and that the adverse effects of competition for water supplies be avoided. If the department determines, based upon this review, that the regional water supply plan does not adequately address the legislative intent of s. 373.705(2)(a), the water management district shall immediately initiate an update of the plan consistent with s. 373.709.

(5)   The provisions of this section are supplemental to any other specific requirements or authority provided by law. Minimum flows and minimum water levels shall be reevaluated periodically and revised as needed.

History.—s. 6, ch. 97-160; s. 36, ch. 2004-5; s. 13, ch. 2010-205; s. 6, ch. 2016-1.

### 373.043    Adoption and enforcement of rules by the department.—The department has authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this chapter.

History.—s. 8, part I, ch. 72-299; s. 5, ch. 74-114; s. 81, ch. 98-200.

### 373.044    Rules; enforcement; availability of personnel rules.—The governing board of the district is authorized to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this chapter. Rules and orders may be enforced by mandatory injunction or other appropriate action in the courts of the state. Rules relating to personnel matters shall be made available to the public and affected persons at no more than cost but need not be published in the Florida Administrative Code or the Florida Administrative Register.

History.—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 3, ch. 84-341; s. 82, ch. 98-200; s. 34, ch. 2013-14.

Note.—Former s. 378.151.

**373.046    Interagency agreements.—**

(1)   The department may enter into interagency agreements with or among any other state agencies conducting programs or exercising powers related to or affecting the water resources of the state. Such agreements may establish principal-agency or contract relationships; provide for cross-deputization of enforcement personnel; provide for consolidation of facilities, equipment, or personnel; or provide such other relationships as may be deemed beneficial to the public interest. Such interagency agreements shall be promulgated in the same manner as rules and regulations, subject to chapter 120. All state agencies conducting programs or exercising powers relating to or affecting the water resources of the state are hereby authorized to delegate such authority to the department or any of the several water management districts pursuant to such interagency agreements.

(2)   The St. Johns River Water Management District and the Southwest Florida Water Management District shall enter into an interagency agreement allowing the Southwest Florida Water Management District to process all permit applications for activities within Polk County requiring a permit from the St. Johns River Water Management District.

(3)   Each water management district is authorized to adopt rules or enter into interagency agreements with the Department of Environmental Protection providing that the water management districts shall have an opportunity to review and comment upon matters within the jurisdiction of each district that are addressed by reclamation activities subject to the provisions of ss. 378.201-378.212 or s. 378.601. Activities covered by such rules or interagency agreements shall not be subject to the permitting requirement of part IV of this chapter. However, to the extent that any dam, impoundment, dike, levee, work, or appurtenant work remains after completion of all reclamation activities, such facilities shall be subject to the requirements of part IV of this chapter pertaining to operation, maintenance, and abandonment. A water management district, upon entering into such interagency agreement with the Department of Environmental Protection, shall provide notice of such action by publication in a newspaper having general circulation in the affected area.

(4)   The Legislature recognizes and affirms the division of responsibilities between the department and the water management districts as set forth in ss. III. and X. of each of the operating agreements codified as rules 17-101.040(12)(a)3., 4., and 5., Florida Administrative Code. Section IV.A.2.a. of each operating agreement regarding individual permit oversight is rescinded. The department is responsible for permitting those activities under part IV of this chapter which, because of their complexity and magnitude, need to be economically and efficiently evaluated at the state level, including, but not limited to, mining, hazardous waste management facilities, and solid waste management facilities that do not qualify for a general permit under chapter 403. With regard to postcertification information submittals for activities authorized under chapters 341 and 403 siting act certifications, the department, after consultation with the appropriate water management district and other agencies having applicable regulatory jurisdiction, shall determine the permittee's compliance with conditions of certification which are based upon the nonprocedural requirements of part IV of this chapter. The water management districts and the department may modify the division of responsibilities referenced in this section and enter into further interagency agreements by rulemaking, including incorporation by reference, pursuant to chapter 120, to provide for greater efficiency and to avoid duplication in the administration of part IV of this chapter by designating activities that will be regulated by either the water management districts or the department. In developing such interagency agreements, the water management districts and the department shall consider the technical and fiscal ability of each water management district to implement all or some of the provisions of part IV of this chapter. This subsection does not rescind or restrict the authority of the districts to regulate silviculture and agriculture pursuant to part IV of this chapter or s. 403.927.

(5)   Notwithstanding the provisions of s. 403.927, when any operating agreement is developed pursuant to subsection (4), the department shall have regulatory responsibility under part IV of this chapter for aquaculture activities that meet or exceed the thresholds for aquaculture general permits authorized pursuant to ss. 379.2523 and 403.814.

(6)   When the geographic area of a project or local government crosses water management district boundaries, the affected districts may designate a single affected district by interagency agreement to implement in that area, under the rules of the designated district, all or part of the applicable regulatory responsibilities under this chapter. Interagency agreements entered into under this subsection which apply to the geographic area of a local government must have the concurrence of the affected local government. The application under this subsection, by rule, of any existing district rule that was adopted or formally noticed for adoption on or before May 11, 1995, is not subject to s. 70.001.

(7)   If the geographic area of a resource management activity, study, or project crosses water management district boundaries, the affected districts may designate a single affected district to conduct all or part of the applicable resource management responsibilities under this chapter, with the exception of those regulatory responsibilities that are subject to subsection (6). If funding assistance is provided to a resource management activity, study, or project, the district providing the funding must ensure that some or all of the benefits accrue to the funding district. This subsection does not impair any interagency agreement in effect on July 1, 2013.

History.—s. 9, part I, ch. 72-299; s. 3, ch. 85-211; s. 41, ch. 89-279; s. 22, ch. 93-213; s. 253, ch. 94-356; s. 16, ch. 96-247; s. 7, ch. 97-160; s. 20, ch. 98-333; s. 17, ch. 2000-364; s. 200, ch. 2008-247; s. 69, ch. 2010-5; s. 83, ch. 2010-102; s. 2, ch. 2013-229.

### 373.0465   Central Florida Water Initiative.—

(1)   The Legislature finds that:

(a)   Historically, the Floridan Aquifer system has supplied the vast majority of the water used in the Central Florida Coordination Area.

(b)   Because the boundaries of the St. Johns River Water Management District, the South Florida Water Management District, and the Southwest Florida Water Management District meet within the Central Florida Coordination Area, the three districts and the Department of Environmental Protection have worked cooperatively to determine that the Floridan Aquifer system is locally approaching the sustainable limits of use and are exploring the need to develop sources of water to meet the long-term water needs of the area.

(c)   The Central Florida Water Initiative is a collaborative process involving the Department of Environmental Protection, the St. Johns River Water Management District, the South Florida Water Management District, the Southwest Florida Water Management District, the Department of Agriculture and Consumer Services, regional public water supply utilities, and other stakeholders. As set forth in the Central Florida Water Initiative Guiding Document of January 30, 2015, the initiative has developed an initial framework for a unified process to address the current and long-term water supply needs of Central Florida without causing harm to the water resources and associated natural systems.

(d)   Developing water sources as an alternative to continued reliance on the Floridan Aquifer will benefit existing and future water users and natural systems within and beyond the boundaries of the Central Florida Water Initiative.

(2)(a)   As used in this section, the term "Central Florida Water Initiative Area" means all of Orange, Osceola, Polk, and Seminole Counties, and southern Lake County, as designated by the Central Florida Water Initiative Guiding Document of January 30, 2015.

(b)   The department, the St. Johns River Water Management District, the South Florida Water Management District, the Southwest Florida Water Management District, and the Department of Agriculture and Consumer Services shall:

1.   Provide for a continuation of the collaborative process in the Central Florida Water Initiative Area among the state agencies, affected water management districts, regional public water supply utilities, and other stakeholders;

2.   Build upon the guiding principles and goals set forth in the Central Florida Water Initiative Guiding Document of January 30, 2015, and the work that has already been accomplished by the Central Florida Water Initiative participants;

3.   Develop and implement, as set forth in the Central Florida Water Initiative Guiding Document of January 30, 2015, a single multidistrict regional water supply plan, including any needed recovery or prevention strategies and

a list of water supply development projects or water resource projects; and

4. Provide for a single hydrologic planning model to assess the availability of groundwater in the Central Florida Water Initiative Area.

(c) In developing the water supply planning program consistent with the goals set forth in this subsection, the department, the St. Johns River Water Management District, the South Florida Water Management District, the Southwest Florida Water Management District, and the Department of Agriculture and Consumer Services shall:

1. Consider limitations on groundwater use together with opportunities for new, increased, or redistributed groundwater uses that are consistent with the conditions established under s. 373.223;

2. Establish a coordinated process for the identification of water resources requiring new or revised conditions. Any new or revised condition must be consistent with s. 373.223;

3. Consider existing recovery or prevention strategies;

4. Include a list of water supply options sufficient to meet the water needs of all existing and future reasonable-beneficial uses consistent with the conditions established under s. 373.223; and

5. Identify, as necessary, which of the water supply sources are preferred water supply sources pursuant to s. 373.2234.

(d) The department, in consultation with the St. Johns River Water Management District, the South Florida Water Management District, the Southwest Florida Water Management District, and the Department of Agriculture and Consumer Services, shall adopt uniform rules for application within the Central Florida Water Initiative Area that include:

1. A single, uniform definition of the term "harmful to the water resources" consistent with the term's usage in s. 373.219;

2. A single method for calculating residential per capita water use;

3. A single process for permit reviews;

4. A single, consistent process, as appropriate, to set minimum flows and minimum water levels and water reservations;

5. A goal for residential per capita water use for each consumptive use permit; and

6. An annual conservation goal for each consumptive use permit consistent with the regional water supply plan.

The uniform rules must include existing recovery strategies within the Central Florida Water Initiative Area adopted before July 1, 2016. The department may grant variances to the uniform rules if there are unique circumstances or hydrogeological factors that make application of the uniform rules unrealistic or impractical.

(e) The department shall initiate rulemaking for the uniform rules by December 31, 2016. The department's uniform rules shall be applied by the water management districts only within the Central Florida Water Initiative Area. Upon adoption of the rules, the water management districts shall implement the rules without further rulemaking pursuant to s. 120.54. The rules adopted by the department pursuant to this section are considered the rules of the water management districts.

(f) Water management district planning programs developed pursuant to this subsection shall be approved or adopted as required under this chapter. However, such planning programs may not serve to modify planning programs in areas of the affected districts that are not within the Central Florida Water Initiative Area, but may include interregional projects located outside the Central Florida Water Initiative Area which are consistent with planning and regulatory programs in the areas in which they are located.

History.—s. 7, ch. 2016-1.

**373.047 Cooperation between districts.**—Any water management district is authorized to advise flood control districts or other water management districts of the state in processing matters with the federal government and to render such technical assistance as may be helpful to the efficient operation of such districts.

History.—s. 1, ch. 61-245; s. 25, ch. 73-190; s. 2, ch. 86-22.
Note.—Former s. 378.52.

**373.056    State agencies, counties, drainage districts, municipalities, or governmental agencies or public corporations authorized to convey or receive land from water management districts.—**

(1)(a)    When it is found to be in the public interest and for the public convenience and welfare, and for the public benefit, and necessary for carrying out the works or improvement of any water management district referred to in this chapter for the protection of property and the inhabitants in the district against the effects of water, either from its surplus or deficiency, and for assisting the district in acquiring land for the purposes of the district at least public expense, any state agency, any county, any drainage district, any municipality, or any governmental agency or public corporation in this state holding title to land is hereby authorized, in the discretion of the proper officer or officers, the county commissioners of any county, or the governing board of any agency referred to in this section, to convey the title to or to dedicate land, title to which is in such agency, including tax-reverted land, or to grant use rights therein to any water management district.

(b)    The land to which this section applies shall be located within the boundaries of the water management district.

(2)    Land granted or conveyed to the district or dedicated to the purposes thereof, or use rights in such land granted thereto, shall be for the public purposes of the district, and may be made subject to the condition that in the event such land is not so used, or if used and subsequently its use for such purpose is abandoned, that granted shall cease as to the district and shall automatically revert to the granting agency.

(3)    Any county, municipality, drainage district, or other taxing agency holding title to land through tax reversion, foreclosure, or forfeiture, or through other procedure by which tax title vested in such agency, may, pending the determination of needs of such district, withhold from sale or other disposition from time to time such land as in the judgment of such agency may be needed or helpful in facilitating the purposes of this chapter. In the event more than one taxing agency holds tax title to the same land, resulting in multiple reversion, each of the agencies may grant to such district such right, title, or interest as it may have in such land.

(4)    Any water management district within this chapter shall have authority to convey or lease to any governmental entity, other agency described herein or to the United States Government, including its agencies, land or rights in land owned by such district not required for its purposes under such terms and conditions as the governing board of such district may determine. In addition to other general law authorizing the grant of utility easements, any water management district may grant utility easements on land owned by such district to any private or public utility for the limited purpose of obtaining utility service to district property under such terms and conditions as the governing board of such district may determine.

(5)    Any land granted or conveyed to such district, or dedicated to the purposes thereof, or the use right of which has been granted thereto shall not be subject to the district taxes or other taxes or special assessments so long as such title or such rights remain in such district.

(6)    All rights-of-way of a water management district which are within the boundaries of a drainage district shall not be liable for maintenance taxes of the drainage district.

**History.**—ss. 1, 2, 3, 4, 5, ch. 25213, 1949; s. 6, ch. 61-497; s. 25, ch. 73-190; s. 3, ch. 86-22; s. 10, ch. 2001-256.
**Note.**—Former s. 378.46.

**373.069    Creation of water management districts.—**

(1)    At 11:59 p.m. on December 31, 1976, the state shall be divided into the following water management districts:

(a)    Northwest Florida Water Management District.

(b)    Suwannee River Water Management District.

(c)    St. Johns River Water Management District.

(d)    Southwest Florida Water Management District.

(e)    South Florida Water Management District.

(2)    Notwithstanding the provisions of any other special or general act to the contrary, the boundaries of the respective districts named in subsection (1) shall include the areas within the following boundaries:

(a) *Northwest Florida Water Management District.*—Begin at the point where the section line between Sections 26 and 27, Township 4 South, Range 3 East intersects the Gulf of Mexico; thence north along the section line to the northwest corner of Section 2, Township 1 South, Range 3 East; thence east along the Tallahassee Base Line to the southeast corner of Section 36, Township 1 North, Range 4 East; thence north along the range line to the northwest corner of Section 6, Township 1 North, Range 5 East; thence east along the township line to the southeast corner of Section 36, Township 2 North, Range 5 East; thence north along the range line to the northeast corner of Section 24, Township 2 North, Range 5 East; thence west along the section line to the southwest corner of the east $\frac{1}{2}$ of Section 13, Township 2 North, Range 5 East; thence north to the northwest corner of the east $\frac{1}{2}$ of Section 13, Township 2 North, Range 5 East; thence east along the section line to the southeast corner of Section 12, Township 2 North, Range 5 East; thence north along the range line to the northeast corner of Section 24, Township 3 North, Range 5 East; thence west along the Watson Line to the southwest corner of Lot Number 168; thence north along the line between Lot Numbers 168 and 169, 154 and 155 to the Georgia line; thence westward along the Georgia-Florida line to the intersection of the south boundary of the State of Alabama; thence west along the Alabama-Florida line to the intersection of the northwest corner Alabama-Florida Boundary; thence south along the Alabama-Florida line to the Gulf of Mexico; thence east along the Gulf of Mexico, including the waters of said Gulf within the jurisdiction of the State of Florida, to the Point of Beginning.

(b) *Suwannee River Water Management District.*—Begin in the Gulf of Mexico on the section line between Sections 29 and 32, Township 15 South, Range 15 East; thence east along the section lines to the southwest corner of Section 27, Township 15 South, Range 17 East; thence north along the section line to the northwest corner of Section 3, Township 15 South, Range 17 East; thence east along the section line to the easterly right-of-way line of State Road No. 337; thence northerly along said easterly right-of-way line of State Road No. 337 to the southerly right-of-way line of State Road No. 24; thence northeasterly along said southerly right-of-way line of State Road No. 24 to the Levy-Alachua county line; thence south along the Levy-Alachua county line, also being the range line between Range 17 and 18 East to the southeast corner of Section 36, Township 11 South, Range 17 East; thence easterly along the Levy-Alachua county line, also being the township line between Townships 11 and 12 South, to the southeast corner of Section 36, Township 11 South, Range 18 East; thence north along the range line to the northwest corner of Section 19, Township 9 South, Range 19 East; thence east along the section line to the southeast corner of Section 13, Township 9 South, Range 19 East; thence north along the range line to the northwest corner of Section 6, Township 9 South, Range 20 East; thence eastward along the township line to the southeast corner of Section 36, Township 8 South, Range 20 East; thence north along the township line to the northwest corner of Section 18, Township 8 South, Range 21 East; thence east along the section line to the northeast corner of Section 15, Township 8 South, Range 21 East; thence south along the section line to the southwest corner of Section 23, Township 8 South, Range 21 East; thence east along the section line to the northeast corner of Section 26, Township 8 South, Range 21 East; thence south along the section line to the southwest corner of the north $\frac{1}{2}$ of Section 25, Township 8 South, Range 21 East; thence east along a line to the northeast corner of the south half of Section 25, Township 8 South, Range 21 East; thence south along the range line to the southwest corner of Section 30, Township 8 South, Range 22 East; thence east along the section line to the northeast corner of Section 32, Township 8 South, Range 22 East; thence south along the section line to the southwest corner of Section 16, Township 9 South, Range 22 East; thence eastward along the section line to the southeast corner of the west $\frac{1}{8}$ of Section 18, Township 9 South, Range 23 East; thence northward to the northeast corner of the west $\frac{1}{8}$ of Section 18, Township 9 South, Range 23 East; thence west to the southwest corner of Section 7, Township 9 South, Range 23 East; thence northward along the Bradford-Clay County line to the northeast corner of Section 36, Township 8 South, Range 22 East; thence west along the section line to the southwest corner of the east $\frac{1}{2}$ of Section 25, Township 8 South, Range 22 East; thence north to the northeast corner of the west $\frac{1}{2}$ of Section 24, Township 8 South, Range 22 East; thence west along the section line to the southwest corner of Section 13, Township 8 South, Range 22 East; thence north along the section line to the northwest corner of Section 25, Township 7 South, Range 22 East; thence east along the section line to the southeast corner of Section 24, Township 7 South, Range 22 East; thence north along the Bradford-Clay County line to the intersection of the south boundary of Baker County; thence west along the Baker-Bradford County line to the intersection of the east

boundary of Union County; thence west along the Union-Baker County line to the southwest corner of Section 18, Township 4 South, Range 20 East; thence north along the range line to the northeast corner of Section 1, Township 3 South, Range 19 East; thence west along the township line to the intersection of the east boundary of Columbia County; thence north along the Baker-Columbia County line to the intersection of the north boundary line of the State of Florida; thence westward along the Georgia-Florida line to the northwest corner of Lot Number 155; thence south along the line between Lot Number 154 and 155, 168 and 169 to the Watson Line; thence east along the Watson Line to the northeast corner of Section 24, Township 3 North, Range 5 East; thence south along the range line between Ranges 5 and 6 East to the southeast corner of Section 12, Township 2 North, Range 5 East; thence west along the section line to the northwest corner of the east $\frac{1}{2}$ of Section 13, Township 2 North, Range 5 East; thence south to the southwest corner of the east $\frac{1}{2}$ of Section 13, Township 2 North, Range 5 East; thence east along the section line to the northeast corner of Section 24, Township 2 North, Range 5 East; thence south along the range line between Ranges 5 and 6 East to the southeast corner of Section 36, Township 2 North, Range 5 East; thence west along the township line between Townships 1 and 2 North to the northwest corner of Section 6, Township 1 North, Range 5 East; thence south along the range line between Ranges 4 and 5 East to the southeast corner of Section 36, Township 1 North, Range 4 East; thence west along the Tallahassee Base Line to the northwest corner of Section 2, Township 1 South, Range 3 East; thence south along the section line to the Gulf of Mexico; thence along the shore of the Gulf of Mexico, including the waters of said gulf within the jurisdiction of the State of Florida, to the point of the beginning.

   (c)   *St. Johns River Water Management District.*—Begin at the intersection of the south boundary of Indian River County with the Atlantic Ocean; thence west along the Indian River-St. Lucie County line to the intersection of the west boundary of St. Lucie County; thence south along the Okeechobee-St. Lucie County line to the southeast corner of Section 1, Township 34 South, Range 36 East; thence west along the section line to the northwest corner of Section 10, Township 34 South, Range 36 East; thence south along the section line to the southeast corner of Section 9, Township 34 South, Range 36 East; thence west along the section line to the northwest corner of Section 18, Township 34 South, Range 36 East; thence south along the range line between Ranges 35 and 36 East to the southeast corner of Section 12, Township 34 South, Range 35 East; thence west along the section line to the northwest corner of Section 13, Township 34 South, Range 35 East; thence south along the section line to the southeast corner of Section 35, Township 34 South, Range 35 East; thence west along the township line between Townships 34 and 35 south to the southwest corner of Section 35, Township 34 South, Range 34 East; thence north along the section line to the Okeechobee-Osceola County line; thence west along the Okeechobee-Osceola County line to the southwest corner of Section 34, Township 32 South, Range 33 East; thence north along the section line to the northwest corner of Section 3, Township 31 South, Range 33 East; thence east along the township line between Townships 30 and 31 South to the southeast corner of Section 36, Township 30 South, Range 33 East; thence north along the range line between Ranges 33 and 34 East to the northeast corner of Section 1, Township 30 South, Range 33 East; thence west along the township line between Townships 29 and 30 south to the southwest corner of Section 31, Township 29 South, Range 33 East; thence north along the range line between Ranges 32 and 33 East to the northwest corner of Section 6, Township 28 South, Range 33 East; thence east along the township line between Townships 27 and 28 south to the southeast corner of Section 36, Township 27 South, Range 32 East; thence north along the range line between Ranges 32 and 33 East to the northeast corner of Section 1, Township 26 South, Range 32 East; thence west along the township line between Townships 25 and 26 South to the southwest corner of Section 33, Township 25 South, Range 32 East; thence north along the section line to the Orange-Osceola County line; thence westerly along the Orange-Osceola County line to the Southwest corner of Section 31, Township 24 South, Range 32 East; thence north along the range line to the intersection with the northerly right-of-way line of State Road 528, also known as the Bee Line Expressway; thence westerly along the northerly right-of-way line of State Road 528 to the intersection with the northerly right-of-way line of State Road 528A; thence westerly along the northerly right-of-way line of State Road 528A to the westerly right-of-way line of U.S. Highway 441; thence northerly along the right-of-way line to the section line between sections 22 and 27 of Township 22 South, Range 29 East; thence west along the section lines to the Northeast corner of Section 25, Township 22 South, Range 28 East; thence south along the range line between Ranges 28 and 29 East to the Southeast corner of

Section 36, Township 22 South, Range 28 East; thence west along the township line between Townships 22 and 23 South to the Northeast corner of Section 2, Township 23 South, Range 27 East; thence south to the Southeast corner of Section 11, Township 23 South, Range 27 East; thence west along the section lines to the Southwest corner of Section 7, Township 23 South, Range 27 East, also being the Lake-Orange County line; thence south along the range line between Ranges 26 and 27 East to the Lake-Polk County line; thence west along the county line to the southwest corner of Section 32, Township 24 South, Range 26 East; thence into Lake County, north along the section lines to the northeast corner of Section 30, Township 24 South, Range 26 East; thence west along the section lines to the northeast corner of Section 28, Township 24 South, Range 25 East; thence north along the section lines to the northeast corner of Section 16, Township 24 South, Range 25 East; thence west along the section line to the northwest corner of Section 16, Township 24 South, Range 25 East; thence north along the section line to the northeast corner of Section 8, Township 24 South, Range 25 East; thence west along the section lines to the range line between Ranges 24 and 25; thence north along the range line to the northeast corner of Section 1, Township 23 South, Range 24 East, also being on the township line between Townships 22 and 23 South; thence west along the township line to the northwest corner of Section 6, Township 23 South, Range 24 East, also being on the Sumter-Lake County line; thence north along the Sumter-Lake County line, also being the range line between Ranges 23 and 24 East, to the northeast corner of Section 1, Township 18 South, Range 23 East, and the Marion County line; thence west along the Sumter-Marion County line, also being the township line between Townships 17 and 18 South, to the westerly right-of-way line of Interstate Highway 75; thence northerly along the westerly right-of-way line of Interstate Highway 75 to the Alachua-Marion County line, said line also being the township line between Townships 11 and 12 South; thence west along the Alachua-Marion County line to the northwest corner of Section 3, Township 12 South, Range 19 East, and the Levy County line; thence westerly along the Levy-Alachua County line, also being the township line between Townships 11 and 12 South, to the southeast corner of Section 36, Township 11 South, Range 18 East; thence north along the range line between Ranges 18 and 19 East to the northwest corner of Section 19, Township 9 South, Range 19 East; thence east along the section line to the southeast corner of Section 13, Township 9 South, Range 19 East; thence north along the range line between Ranges 19 and 20 East to the northwest corner of Section 6, Township 9 South, Range 20 East; thence easterly along the township line between Townships 8 and 9 South to the southeast corner of Section 36, Township 8 South, Range 20 East; thence north along the range line between Ranges 20 and 21 East to the northwest corner of Section 18, Township 8 South, Range 21 East; thence east along the section line to the northeast corner of Section 15, Township 8 South, Range 21 East; thence south along the section line to the southwest corner of Section 23, Township 8 South, Range 21 East; thence east along the section line to the northeast corner of Section 26, Township 8 South, Range 21 East; thence south along the section line to the southwest corner of the north $\frac{1}{2}$ of Section 25, Township 8 South, Range 21 East; thence east to the northeast corner of the south $\frac{1}{2}$ of Section 25, Township 8 South, Range 21 East; thence south along the range line between Ranges 21 and 22 East to the southwest corner of Section 30, Township 8 South, Range 22 East; thence east along the section line to the northeast corner of Section 32, Township 8 South, Range 22 East; thence south along the section line to the southwest corner of Section 16, Township 9 South, Range 22 East; thence eastward along the section line to the southeast corner of the west $\frac{1}{8}$ of Section 18, Township 9 South, Range 23 East; thence northward to the northeast corner of the west $\frac{1}{8}$ of Section 18, Township 9 South, Range 23 East; thence west to the southwest corner of Section 7, Township 9 South, Range 23 East; thence northward along the Bradford-Clay County line to the northeast corner of Section 36, Township 8 South, Range 22 East; thence west along the section line to the southwest corner of the east $\frac{1}{2}$ of Section 25, Township 8 South, Range 22 East; thence north to the northeast corner of the west $\frac{1}{2}$ of Section 24, Township 8 South, Range 22 East; thence west along the section line to the southwest corner of Section 13, Township 8 South, Range 22 East; thence north along the section line to the northwest corner of Section 25, Township 7 South, Range 22 East; thence east along the section line to the Bradford-Clay County line; thence north along the Bradford-Clay County line to the intersection of the south boundary of Baker County; thence west along the Baker-Bradford County line to the intersection of the east boundary of Union County; thence west along the Baker-Union County line to the southwest corner of Section 18, Township 4 South, Range 20 East; thence north along the range line between Ranges 19 and 20 East to the northeast corner of Section 1, Township 3

South, Range 19 East; thence west along the township line between Townships 2 and 3 South to the Baker-Columbia County line; thence north along the Baker-Columbia County line to the north boundary line of the State of Florida; thence easterly along the Florida-Georgia line to the Atlantic Ocean; thence southerly along the Atlantic Ocean, including the waters of said ocean within the jurisdiction of the State of Florida to the point of beginning.

(d)  *Southwest Florida Water Management District.*—Begin at the intersection of the north boundary of Lee County with the Gulf of Mexico; thence eastward along the Lee-Charlotte County line to the Southeast corner of Section 33, Township 42 South, Range 24 East; thence North into Charlotte County, along the section lines to the Northeast corner of Section 4, Township 42 South, Range 24 East; thence East along the township line between Townships 41 and 42 South to the Southeast corner of Section 36, Township 41 South, Range 25 East; thence north along the section line to the northwest corner of Section 6, Township 41 South, Range 26 East; thence east along the section line to the southeast corner of Section 36, Township 40 South, Range 26 East; thence North along the range line between Ranges 26 and 27 to the Northeast corner of Section 1, Township 40 South, Range 26 East, and the Charlotte-Desoto County line; thence east along the Charlotte-Desoto County line to the southeast corner of Section 36, Township 39 South, Range 27 East; thence north along the DeSoto-Highlands County line to the intersection of the South boundary of Hardee County; thence north along the Hardee-Highlands County line to the southwest corner of Township 35 South, Range 28 East; thence east along the north boundary of Township 36 South to the northeast corner of Section 1, Township 36 South, Range 28 East; thence south along the range line to the southeast corner of Section 12, Township 37 South, Range 28 East; thence east along the section line to the northeast corner of Section 15, Township 37 South, Range 29 East; thence south along the section line to the southeast corner of Section 34, Township 37 South, Range 29 East; thence east along the township line to the northeast corner of Section 1, Township 38 South, Range 29 East; thence south along the range line to the southeast corner of Section 1, Township 39 South, Range 29 East; thence east along the section line to the northwest corner of Section 11, Township 39 South, Range 30 East; thence north along the section line to the southwest corner of Section 35, Township 38 South, Range 30 East; thence east along the township line to the southeast corner of the west $\frac{1}{4}$ of Section 35, Township 38 South, Range 30 East; thence north along the $\frac{1}{4}$ section line of Sections 35, 26, and 23, Township 38 South, Range 30 East to the northeast corner of the west $\frac{1}{4}$ section of Section 23, Township 38 South, Range 30 East; thence west along the section line to the northwest corner of Section 23, Township 38 South, Range 30 East; thence north along the section line to the northwest corner of Section 2, Township 37 South, Range 30 East; thence west along the township line to the southwest corner of Section 34, Township 36 South, Range 30 East; thence north along the section line to the northwest corner of Section 3, Township 36 South, Range 30 East; thence west along the township line to the southwest corner of Section 31, Township 35 South, Range 30 East; thence north along the range line between Ranges 29 and 30 East, through Townships 35, 34, and 33 South, to the northeast corner of Township 33 South, Range 29 East, being on the Highlands-Polk County line; thence west along the Highlands-Polk County line to the southeast corner of Township 32 South, Range 28 East; thence north along the range line between Ranges 28 and 29 East, in Townships 32 and 31 South, to the northeast corner of Section 12 in Township 31 South, Range 28 East; thence east along the section line to the northeast corner of Section 7, Township 31 South, Range 29 East; thence north along the section line to the northwest corner of Section 17, Township 30 South, Range 29 East; thence east along the section line to the northeast corner of the west $\frac{1}{2}$ of Section 17, Township 30 South, Range 29 East; thence north along the $\frac{1}{2}$ section line to the northeast corner of the west $\frac{1}{2}$ of Section 5, Township 30 South, Range 29 East; thence west along the section line to the southwest corner of Section 32, Township 29 South, Range 29 East; thence north along the section line to the northeast corner of Section 19 in Township 29 South, Range 29 East; thence west along the north boundaries of Section 19, Township 29 South, Range 29 East, and Sections 24, 23, 22, 21, and 20, Township 29 South, Range 28 East, to the northwest corner of said Section 20; thence north along the section line to the intersection of said section line with the west shore line of Lake Pierce in Township 29 South, Range 28 East; thence following the west shore of Lake Pierce to its intersection again with the west section line of Section 5, Township 29 South, Range 28 East; thence north along the section line to the northwest corner of Section 5, Township 29 South, Range 28 East; thence east along the township line to the southwest corner of Section 33, Township 28 South, Range 28 East; thence north along the section line to the northwest corner of the southwest $\frac{1}{4}$

of the southwest ¹⁄₄ of Section 28, Township 28 South, Range 28 East; thence east along the ¹⁄₄ section line to the intersection of said ¹⁄₄ section line with Lake Pierce; thence follow the shore line northeasterly to its intersection with the ¹⁄₂ section line of Section 28, Township 28 South, Range 28 East; thence north on the ¹⁄₂ section line to the northwest corner of the southeast ¹⁄₄ of Section 28, Township 28 South, Range 28 East; thence east to the northeast corner of the southeast ¹⁄₄ of Section 28, Township 28 South, Range 28 East; thence south along the section line to the northwest corner of Section 3, Township 29 South, Range 28 East; thence east along the section line to the northeast corner of Section 3, Township 29 South, Range 28 East; thence north along the section line to the northwest corner of Section 23, Township 28 South, Range 28 East; thence west along the section line to the southwest corner of Section 16, Township 28 South, Range 28 East; thence north along the section line to the northwest corner of Section 16, Township 28 South, Range 28 East; thence west along the section line to the northwest corner of Section 8, Township 28 South, Range 28 East; thence north along the section line to the northwest corner of Section 5, Township 28 South, Range 28 East; thence west along the township line to the intersection of said township line with Lake Marion; thence following the south shore line of Lake Marion to its intersection again with said township line; thence west along the township line to the southeast corner of Section 36, Township 37 South, Range 27 East; thence north along the range line between Ranges 27 and 28 East to the intersection of said range line with Lake Marion; thence following the west shore of Lake Marion to its intersection again with the range line between Ranges 27 and 28 East; thence north along said range line, in Townships 27 and 26 South, to the northeast corner of Township 26 South, Range 27 East, being on the Polk-Osceola County line; thence west along the Polk-Osceola County line to the northwest corner of Township 26 South, Range 27 East; thence north along the section line to the Lake-Polk County line; thence west along the county line to the southwest corner of Section 32, Township 24 South, Range 26 East; thence into Lake County, north along the section lines to the northeast corner of Section 30, Township 24 South, Range 26 East; thence west along the section lines to the northeast corner of Section 28, Township 24 South, Range 25 East; thence north along the section lines to the northeast corner of Section 16, Township 24 South, Range 25 East; thence west along the section line to the northwest corner of Section 16, Township 24 South, Range 25 East; thence north along the section line to the northeast corner of Section 8, Township 24 South, Range 25 East; thence west along the section lines to the range line between Ranges 24 and 25; thence north along the range line to the northeast corner of Section 1, Township 23 South, Range 24 East, also being on the township line between Townships 22 and 23 South; thence west along the township line to the northwest corner of Section 6, Township 23 South, Range 24 East also being on the Sumter-Lake County line; thence north along the Sumter-Lake County line, also being the range line between Ranges 23 and 24, to the northeast corner of Section 1, Township 18 South, Range 23 East and the Marion County line; thence west, along the Sumter-Marion County line, also being the township line between Townships 17 and 18 South, to the westerly right-of-way line of Interstate Highway 75; thence northerly along the westerly right-of-way line of Interstate Highway 75 to the Alachua-Marion County line, said line also being the township line between Townships 11 and 12 South; thence west along the Alachua-Marion County line to the northwest corner of Section 3, Township 12 South, Range 19 East and the Levy County line; thence westerly along the Levy-Alachua County line, also being the township line between Townships 11 and 12 South, to the southeast corner of Section 36, Township 11 South, Range 17 East; thence north along the Levy-Alachua County line, also being the range line between Ranges 17 and 18 East, to the southerly right-of-way line of State Road No. 24; thence southwesterly along said southerly right-of-way line to the easterly right-of-way line of State Road No. 337; thence southerly, along said easterly right-of-way line of State Road No. 337, to the south line of Section 35, Township 14 South, Range 17 East; thence west along the section line to the northwest corner of Section 3, Township 15 South, Range 17 East; thence south along the section lines to the southwest corner of Section 27, Township 15 South, Range 17 East; thence west to the Gulf of Mexico; thence south along the Gulf of Mexico, including the waters of said gulf within the jurisdiction of the State of Florida, to the point of beginning.

(e) *South Florida Water Management District.*—Begin at the intersection of the north boundary of Lee County with the Gulf of Mexico; thence easterly along the Lee-Charlotte County line to the southwest corner of Section 34, Township 42 South, Range 24 East; thence northerly along the section lines to the northwest corner of Section 3, Township 42 South, Range 24 East; thence easterly along the Township line between Townships 41 and 42 South to

the southwest corner of Section 31, Township 41 South, Range 26 East; thence northerly along the Range line between Ranges 25 and 26 East to the northwest corner of Section 6, Township 41 South, Range 26 East; thence easterly along the Township line between Townships 40 and 41 South to the southwest corner of Section 31, Township 40 South, Range 27 East; thence northerly along the Range line between Ranges 26 and 27 East to the Charlotte-DeSoto County line; thence easterly along the Charlotte-Desoto County line to the west line of Highlands County; thence northerly along the Highlands-Desoto County line and along the Highlands-Hardee County line to the northwest corner of Township 36 South, Range 28 East; thence east along the north boundary of Township 36 South to the northeast corner of Section 1, Township 36 South, Range 28 East; thence south along the range line to the southeast corner of Section 12, Township 37 South, Range 28 East; thence east along the section line to the northeast corner of Section 15, Township 37 South, Range 29 East; thence south along the section line to the southeast corner of Section 34, Township 37 South, Range 29 East; thence east along the township line to the northeast corner of Section 1, Township 38 South, Range 29 East; thence south along the range line to the southeast corner of Section 1, Township 39 South, Range 29 East; thence east along the section line to the northwest corner of Section 11, Township 39 South, Range 30 East; thence north along the section line to the southwest corner of Section 35, Township 38 South, Range 30 East; thence east along the township line to the southeast corner of the west $\frac{1}{4}$ of Section 35, Township 38 South, Range 30 East; thence north along the $\frac{1}{4}$ section line of Sections 35, 26, and 23, Township 38 South, Range 30 East to the northeast corner of the west $\frac{1}{4}$ section of Section 23, Township 38 South, Range 30 East; thence west along the section line to the northwest corner of Section 23, Township 38 South, Range 30 East; thence north along the section line to the northwest corner of Section 2, Township 37 South, Range 30 East; thence west along the township line to the southwest corner of Section 34, Township 36 South, Range 30 East; thence north along the section line to the northwest corner of Section 3, Township 36 South, Range 30 East; thence west along the township line to the southwest corner of Section 31, Township 35 South, Range 30 East; thence north along the range line between Ranges 29 and 30 East, through Townships 35, 34, and 33 South, to the northwest corner of Township 33 South, Range 30 East, being on the Highlands-Polk County line; thence west along the Highlands-Polk County line to the southwest corner of Township 32 South, Range 29 East; thence north along the range line between Ranges 28 and 29 East, in Townships 32 and 31 South, to the northwest corner of Section 7 in Township 31 South, Range 29 East; thence east along the section line to the northeast corner of Section 7, Township 31 South, Range 29 East; thence north along the section line to the northwest corner of Section 17, Township 30 South, Range 29 East; thence east along the section line to the northeast corner of the west $\frac{1}{2}$ of Section 17, Township 30 South, Range 29 East; thence north along the $\frac{1}{2}$ section line to the northeast corner of the west $\frac{1}{2}$ of Section 5, Township 30 South, Range 29 East; thence west along the section line to the southwest corner of Section 32, Township 29 South, Range 29 East; thence north along the section line to the northeast corner of Section 19 in Township 29 South, Range 29 East; thence west along the south boundaries of Section 18, Township 29 South, Range 29 East and Sections 13, 14, 15, 16, and 17 in Township 29 South, Range 28 East, to the southwest corner of said Section 17; thence north along the section line to the intersection of said section line with the west shore line of Lake Pierce in Township 29 South, Range 28 East; thence following the west shore of Lake Pierce to its intersection again with the west section line of Section 5, Township 29 South, Range 28 East; thence north along the section line to the northwest corner of Section 5, Township 29 South, Range 28 East; thence east along the township line to the southwest corner of Section 33, Township 28 South, Range 28 East; thence north along the section line to the northwest corner of the southwest $\frac{1}{4}$ of the southwest $\frac{1}{4}$ of Section 28, Township 28 South, Range 28 East; thence east along the $\frac{1}{4}$ section line to the intersection of said $\frac{1}{4}$ section line with Lake Pierce; thence follow the shore line northeasterly to its intersection with the $\frac{1}{2}$ section line of Section 28, Township 28 South, Range 28 East; thence north on the $\frac{1}{2}$ section line to the northwest corner of the southeast $\frac{1}{4}$ of Section 28, Township 28 South, Range 28 East; thence east along the $\frac{1}{2}$ section line to the northeast corner of the southeast $\frac{1}{4}$ of Section 28, Township 28 South, Range 28 East; thence south along the section line to the northwest corner of Section 3, Township 29 South, Range 28 East; thence east along the section line to the northeast corner of Section 3, Township 29 South, Range 28 East; thence north along the section line to the northwest corner of Section 23, Township 28 South, Range 28 East; thence west along the section line to the southwest corner of Section 16, Township 28 South, Range 28 East; thence north along the

section line to the northwest corner of Section 16, Township 28 South, Range 28 East; thence west along the section line to the southwest corner of Section 8, Township 28 South, Range 28 East; thence north along the section line to the northwest corner of Section 5, Township 28 South, Range 28 East; thence west along the township line to the intersection of said township line with Lake Marion; thence following the south shore line of Lake Marion to its intersection again with said township line; thence west along the township line to the southeast corner of Section 36, Township 27 South, Range 27 East; thence north along the range line between Ranges 27 and 28 East to the intersection of said range line with Lake Marion; thence following the west shore of Lake Marion to its intersection again with the range line between Ranges 27 and 28 East; thence north along said range line, in Townships 27 and 26 South, to the northwest corner of Township 26 South, Range 28 East, being on the Polk-Osceola County line; thence west along the Polk-Osceola County line to the southwest corner of Township 25 South, Range 27 East; thence northerly along the range line between Ranges 26 and 27 East to the northwest corner of Section 18, Township 23 South, Range 27 East; thence easterly along the section lines to the southwest corner of Section 12, Township 23 South, Range 27 East; thence northerly along the section lines to the northwest corner of Section 1, Township 23 South, Range 27 East; thence easterly along the Township line between Townships 22 and 23 South to the southwest corner of Section 31, Township 22 South, Range 29 East; thence northerly along the Range line between Ranges 28 and 29 East to the northwest corner of Section 30, Township 22 South, Range 29 East; thence easterly along the section lines to the westerly right-of-way line of U.S. Highway 441; thence southerly along the westerly right-of-way line to the intersection with the northerly right-of-way line of State Road 528A; thence easterly along the northerly right-of-way line to the intersection with the northerly right-of-way line of State Road 528, also known as the Bee Line Expressway; thence easterly along the northerly right-of-way line of State Road 528 to the intersection with the range line between Township 23 South, Range 31 East and Township 23 South, Range 32 East; thence southerly along the Range line between Ranges 31 and 32 East to the Orange-Osceola County line; thence easterly along said county line between Townships 24 and 25 South to the northeast corner of Section 5, Township 25 South, Range 32 East; thence southerly along the section lines to the southeast corner of Section 32, Township 25 South, Range 32 East; thence easterly along the Township line between Townships 25 and 26 South to the northeast corner of Section 1, Township 26 South, Range 32 East; thence southerly along the Range line between Ranges 32 and 33 East to the southeast corner of Section 36, Township 27 South, Range 32 East; thence westerly along the township line between Townships 27 and 28 South, to the northeast corner of Section 1, Township 28 South, Range 32 East; thence southerly along the Range line between Ranges 32 and 33 East to the southeast corner of Section 36, Township 29 South, Range 32 East; thence easterly along the Township line between Townships 29 and 30 South to the northeast corner of Section 1, Township 30 South, Range 33 East; thence southerly along the Range line between Ranges 33 and 34 East to the southeast corner of Section 36, Township 30 South, Range 33 East; thence westerly along the Township line between Townships 30 and 31 South to the northeast corner of Section 4, Township 31 South, Range 33 East; thence southerly along the section lines to the Osceola-Okeechobee County line; thence easterly along said county line to the northeast corner of Section 3, Township 33 South, Range 34 East; thence southerly along the section lines to the southeast corner of Section 34, Township 34 South, Range 34 East; thence easterly along the Township line between Townships 34 and 35 South to the southwest corner of Section 36, Township 34 South, Range 35 East; thence northerly along the section lines to the northwest corner of Section 13, Township 34 South, Range 35 East; thence easterly along the section line to the Range line between Ranges 35 and 36 East; thence northerly along said Range line to the northwest corner of Section 18, Township 34 South, Range 36 East; thence easterly along the section lines to the southwest corner of Section 10, Township 34 south, Range 36 East; thence northerly along the section line to the northwest corner of said Section 10; thence easterly along the section lines to the Okeechobee-St. Lucie County line; thence northerly along said county line to the south line of Indian River County; thence easterly along the St. Lucie-Indian River County line to the Atlantic Ocean; thence southerly along the Atlantic Ocean to the Gulf of Mexico; thence northerly along the Gulf of Mexico, including the waters of said Ocean and of said Gulf and the islands therein within the jurisdiction of the State of Florida, to the point of beginning.

History.—s. 12, part 1, ch. 72-299; s. 6, ch. 73-190; s. 1, ch. 75-125; s. 1, ch. 76-243; s. 113, ch. 77-104; s. 1, ch. 78-65; s. 12, ch. 2003-265; s. 3, ch. 2009-243.

**373.0691    Transfer of areas.—**

(1)    At the time of change of boundaries of the respective districts under s. 373.069(3), 1976 Supplement to Florida Statutes 1975, all contractual obligations with respect to an area being transferred to another district shall be assumed by the district receiving such area; all real property interests owned by a district within an area to be transferred shall be conveyed to the district receiving such area; and all equipment, vehicles, other personal property, and records owned, located, and used by a district solely within an area being transferred shall be delivered to the district receiving such area. However, if an area is transferred from a district with a contractual obligation to the United States of America for the operation and maintenance of works within such area, then the deliveries and conveyances required in this section shall be deferred until the United States has approved the assumption of the contractual obligations by the receiving district.

(2)    Effective at 12:01 a.m. on July 1, 2003, that portion of Polk County formerly within the St. Johns River Water Management District as set forth in s. 373.069 is transferred to the Southwest Florida Water Management District. With respect to the area transferred and at the time of change of boundaries, all contractual obligations of the St. Johns River Water Management District, all real property interests owned by the St. Johns River Water Management District, all regulatory responsibilities of the St. Johns River Water Management District, all equipment and other personal property used solely by the St. Johns River Water Management District in that area, and all records of the St. Johns River Water Management District shall be transferred and delivered to the Southwest Florida Water Management District.

(3)    The change of boundaries shall not affect the continuing authority, obligations, and commitments of the water management districts, except as set forth in this section.

History.—s. 2, ch. 76-243; s. 165, ch. 99-13; s. 15, ch. 2003-265.

**373.0693    Basins; basin boards.—**

(1)(a)    Any areas within a district may be designated by the district governing board as subdistricts or basins. The designations of such basins shall be made by the district governing board by resolutions thereof. The governing board of the district may change the boundaries of such basins, or create new basins, by resolution.

(b)    No subdistrict or basin in the St. Johns River Water Management District other than established by this act shall become effective until approved by the Legislature.

(2)    Each basin shall be under the control of a basin board which shall be composed of not less than three members, but shall include one representative from each of the counties included in the basin.

(3)    Each member of the various basin boards shall serve for a period of 3 years or until a successor is appointed, but not more than 180 days after the end of the term, except that the board membership of each new basin shall be divided into three groups as equally as possible, with members in such groups to be appointed for 1, 2, and 3 years, respectively. Each basin board shall choose a vice chair and a secretary to serve for a period of 1 year. The term of office of a basin board member shall be construed to commence on March 2 preceding the date of appointment and to terminate March 1 of the year of the end of a term or may continue until a successor is appointed, but not more than 180 days after the end of the expired term.

(4)    Members of basin boards shall be appointed by the Governor, subject to confirmation by the Senate at the next regular session of the Legislature; and the refusal or failure of the Senate to confirm an appointment shall create a vacancy in the office to which the appointment was made.

(5)    Basin board members shall receive no compensation for services as such; but, while officially on work for the district, they shall receive their actual travel expenses between their respective places of residence and the place where official district business is conducted, subsistence, lodging, and other expenses in the amount actually incurred. These expenses may not exceed the statutory amount allowed state officers and employees. This subsection applies retroactively to the effective date of the creation of each of the five separate water management districts.

(6)(a)    Notwithstanding the provisions of any other general or special law to the contrary, a member of the governing board of the district residing in the basin or, if no member resides in the basin, a member of the governing board designated by the chair of the governing board shall be the chair of the basin board. The chair

shall preside at all meetings of the basin board, except that the vice chair may preside in his or her absence. The chair shall be the liaison officer of the district in all affairs in the basin and shall be kept informed of all such affairs.

(b)    Basin boards within the Southwest Florida Water Management District shall meet regularly as determined by a majority vote of the basin board members. Subject to notice requirements of chapter 120, special meetings, both emergency and nonemergency, may be called either by the chair or the elected vice chair of the basin board or upon request of two basin board members. The district staff shall include on the agenda of any basin board meeting any item for discussion or action requested by a member of that basin board. The district staff shall notify any basin board, as well as their respective counties, of any vacancies occurring in the district governing board or their respective basin boards.

(7)    At 11:59 p.m. on December 31, 1976, the Manasota Watershed Basin of the Ridge and Lower Gulf Coast Water Management District, which is annexed to the Southwest Florida Water Management District by change of its boundaries pursuant to chapter 76-243, Laws of Florida, shall be formed into a subdistrict or basin of the Southwest Florida Water Management District, subject to the same provisions as the other basins in such district. Such subdistrict shall be designated initially as the Manasota Basin. The members of the governing board of the Manasota Watershed Basin of the Ridge and Lower Gulf Coast Water Management District shall become members of the governing board of the Manasota Basin of the Southwest Florida Water Management District. Notwithstanding other provisions in this section, beginning on July 1, 2001, the membership of the Manasota Basin Board shall be comprised of two members from Manatee County and two members from Sarasota County. Matters relating to tie votes shall be resolved pursuant to subsection (6) by the chair designated by the governing board to vote in case of a tie vote.

(8)(a)    At 11:59 p.m. on June 30, 1988, the area transferred from the Southwest Florida Water Management District to the St. Johns River Water Management District by change of boundaries pursuant to chapter 76-243, Laws of Florida, shall cease to be a subdistrict or basin of the St. Johns River Water Management District known as the Oklawaha River Basin and said Oklawaha River Basin shall cease to exist. However, any recognition of an Oklawaha River Basin or an Oklawaha River Hydrologic Basin for regulatory purposes shall be unaffected. The area formerly known as the Oklawaha River Basin shall continue to be part of the St. Johns River Water Management District.

(b)    Also, the entire area of the St. Johns River Water Management District, less those areas formerly in the Oklawaha Basin, shall cease to be a subdistrict or basin of the St. Johns River Water Management District known as the Greater St. Johns River Basin and said Greater St. Johns River Basin shall cease to exist. The area formerly known as the Greater St. Johns River Basin shall continue to be part of the St. Johns River Water Management District.

(c)    As of 11:59 p.m. on June 30, 1988, assets and liabilities of the former Oklawaha River and Greater St. Johns River Basins shall be assets and liabilities of the St. Johns River Water Management District. Any contracts, plans, orders, or agreements of such basins shall continue to be in effect, but may be modified or repealed by the St. Johns River Water Management District in accordance with law. For all purposes for assessing and levying the millage rate authorized under s. 373.503, subsequent to December 31, 1987, including the purposes of certifying the millage rate for fiscal year 1988-1989, pursuant to chapter 200, said millage rate shall be levied retroactive to January 1, 1988.

(9)    At 11:59 p.m. on December 31, 1976, a portion of the Big Cypress Basin of the Ridge and Lower Gulf Coast District which is being annexed into the South Florida Water Management District by change of boundaries pursuant to chapter 76-243, Laws of Florida, shall be formed into a subdistrict or basin of the South Florida Water Management District. Such portion shall be designated as the Big Cypress Basin. On or before December 31, 1976, the Governor shall appoint not fewer than five persons residing in the area to serve as members of the governing board of the basin, effective at the time of transfer and subject to confirmation by the Senate as provided in subsection (4).

(a)    The initial boundaries of the Big Cypress Basin shall be established by resolution of the governing board of Central and Southern Florida Flood Control District, after notice and hearing, and generally shall encompass the Big

Cypress Swamp and southwestern coastal area hydrologic cataloging unit, as indicated on River Basin and Hydrologic Unit Map of Florida—1975, Florida Department of Natural Resources, Bureau of Geology Map Series No. 72.

(b)    If the governing board shall fail to establish the initial boundaries on or before December 31, 1976, the initial boundaries shall be the same boundaries as described for the Big Cypress Basin of the Ridge and Lower Gulf Coast District.

(c)    The governing board of the South Florida Water Management District subsequently may change the boundaries of the basin, but may not abolish the basin.

(10)    At 11:59 p.m. on December 31, 1976, the entire area of the South Florida Water Management District, including all areas being annexed into the district pursuant to chapter 76-243, Laws of Florida, but less those areas in the Big Cypress Basin, shall be formed into a subdistrict or basin of the South Florida Water Management District. Such area shall be designated as the Okeechobee Basin.

(a)    The governing board of the South Florida Water Management District shall also serve as the governing board of the Okeechobee Basin.

(b)    The governing board of the South Florida Water Management District may change the boundaries of the Okeechobee Basin or may subdivide the basin into smaller basins to be governed by basin boards to be appointed by the Governor, subject to confirmation by the Senate as provided in subsection (4). However, the basin may not be enlarged to include the area included within the initial boundaries of the Big Cypress Basin.

(c)    The local effort required in connection with construction, operation, and maintenance of the cooperative federal project referred to as the Central and Southern Florida Flood Control Project, which remains after the upper St. Johns portion is transferred to the St. Johns River Water Management District, shall be funded by tax levies on all taxable property within the Okeechobee Basin. In the event the Okeechobee Basin is subdivided into smaller basins, as authorized in paragraph (b), the governing board shall ascertain the equitable pro rata share for each smaller basin and charge back such share so as to ensure that the portion of the Central and Southern Florida Flood Control Project remaining in the South Florida Water Management District shall continue to be funded on an equal basis throughout the entire Okeechobee Basin as initially described on December 31, 1976.

**History.**—s. 6, ch. 73-190; s. 3, ch. 76-243; s. 1, ch. 77-382; s. 1, ch. 79-50; s. 1, ch. 82-46; s. 1, ch. 82-64; s. 4, ch. 84-341; s. 1, ch. 85-146; ss. 6, 25, 26, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 595, ch. 95-148; s. 20, ch. 97-100; s. 8, ch. 97-160; s. 7, ch. 2001-256; s. 7, ch. 2001-258; s. 1, ch. 2003-265; s. 4, ch. 2009-243.

### 373.0695    Duties of basin boards; authorized expenditures.—

(1)    The various boards shall be responsible for discharging the following described functions in their respective basins:

(a)    The preparation of engineering plans for development of the water resources of the basin and the conduct of public hearings on such plans.

(b)    The development and preparation of overall basin plan of secondary water control facilities for the guidance of subdrainage districts and private land owners in the development of their respective systems of water control which will be connected to the primary works of the basin to complement the engineering plan of primary works for the basin.

(c)    The preparation of the annual budget for the basin and the submission of such budget to the governing board of the district for inclusion in the district budget.

(d)    The consideration and prior approval of final construction plans of the district for works to be constructed in the basin.

(e)    The administration of the affairs of the basin.

(f)    Planning for and, upon request by a county, municipality, private utility, or regional water supply authority, providing water supply and transmission facilities for the purpose of assisting such counties, municipalities, private utilities, or regional water supply authorities within or serving the basin.

(2)    Basin board moneys shall be utilized for:

(a)    Engineering studies of works of the basin.

(b)    Payment for the preparation of final plans and specifications for construction of basin works executed by the district.

(c)    Payment of costs of construction of works of the basin executed by the district.

(d)    Payment for maintenance and operation of basin works as carried out by the district.

(e)    Administrative and regulatory activities of the basin.

(f)    Payment for real property interests for works of the basin.

(g)    Payment of costs of road, bridge, railroad, and utilities modifications and changes resulting from basin works.

(3)    The works of the basin shall be those adopted by the respective basin boards. Such works may be adopted jointly with other basins and may be within or without the area of the basin.

(4)    In the exercise of the duties and powers granted herein, the basin boards shall be subject to all the limitations and restrictions imposed on the water management districts in s. 373.703.

History.—s. 6, ch. 73-190; s. 3, ch. 74-114; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 9, ch. 95-323; s. 14, ch. 2010-205.

**373.0697    Basin taxes.**—The respective basins may, pursuant to s. 9(b), Art. VII of the State Constitution, by resolution request the governing board of the district to levy ad valorem taxes within such basin. Upon receipt of such request, a basin tax levy shall be made by the governing board of the district to finance basin functions enumerated in s. 373.0695, notwithstanding the provisions of any other general or special law to the contrary, and subject to the provisions of s. 373.503(3).

(1)    The amount of money to be raised by said tax levy shall be determined by the adoption of an annual budget by the district board of governors, and the average millage for the basin shall be that amount required to raise the amount called for by the annual budget when applied to the total assessment of the basin as determined for county taxing purposes. However, no such tax shall be levied within the basin unless and until the annual budget and required tax levy shall have been approved by formal action of the basin board, and no county in the district shall be taxed under this provision at a rate to exceed 1 mill.

(2)    The taxes provided for in this section shall be extended by the county property appraiser on the county tax roll in each county within, or partly within, the basin and shall be collected by the tax collector in the same manner and time as county taxes, and the proceeds therefrom paid to the district for basin purposes. Said taxes shall be a lien, until paid, on the property against which assessed and enforceable in like manner as county taxes. The property appraisers, tax collectors, and clerks of the circuit court of the respective counties shall be entitled to compensation for services performed in connection with such taxes at the same rates as apply to county taxes.

(3)    It is hereby determined that the taxes authorized by this subsection are in proportion to the benefits to be derived by the several parcels of real estate within the basin from the works authorized herein.

History.—s. 6, ch. 73-190; s. 2, ch. 75-125; s. 5, ch. 76-243.

**373.0698    Creation and operation of basin boards; other laws superseded.**—The provisions of ss. 373.0693-373.0697 shall govern the creation and operation of basin boards within any water management district, the provisions of any other general or special law to the contrary notwithstanding.

History.—s. 5, ch. 84-341.

**373.073    Governing board.**—

(1)(a)    The governing board of each water management district shall be composed of 9 members who shall reside within the district, except that the Southwest Florida Water Management District shall be composed of 13 members who shall reside within the district. Members of the governing boards shall be appointed by the Governor, subject to confirmation by the Senate at the next regular session of the Legislature, and the refusal or failure of the Senate to confirm an appointment creates a vacancy in the office to which the appointment was made. The term of office for a governing board member is 4 years and commences on March 2 of the year in which the appointment is made and terminates on March 1 of the fourth calendar year of the term or may continue until a successor is appointed, but not more than 180 days. Terms of office of governing board members shall be staggered

to help maintain consistency and continuity in the exercise of governing board duties and to minimize disruption in district operations.

(b)　Commencing January 1, 2011, the Governor shall appoint the following number of governing board members in each year of the Governor's 4-year term of office:

1.　In the first year of the Governor's term of office, the Governor shall appoint four members to the governing board of the Southwest Florida Water Management District and appoint three members to the governing board of each other district.

2.　In the second year of the Governor's term of office, the Governor shall appoint three members to the governing board of the Southwest Florida Water Management District and two members to the governing board of each other district.

3.　In the third year of the Governor's term of office, the Governor shall appoint three members to the governing board of the Southwest Florida Water Management District and two members to the governing board of each other district.

4.　In the fourth year of the Governor's term of office, the Governor shall appoint three members to the governing board of the Southwest Florida Water Management District and two members to the governing board of each other district.

For any governing board vacancy that occurs before the date scheduled for the office to be filled under this paragraph, the Governor shall appoint a person meeting residency requirements of subsection (2) for a term that will expire on the date scheduled for the term of that office to terminate under this subsection. In addition to the residency requirements for the governing boards as provided by subsection (2), the Governor shall consider appointing governing board members to represent an equitable cross-section of regional interests and technical expertise.

(2)　Membership on governing boards shall be selected from candidates who have significant experience in one or more of the following areas, including, but not limited to: agriculture, the development industry, local government, government-owned or privately owned water utilities, law, civil engineering, environmental science, hydrology, accounting, or financial businesses. Notwithstanding the provisions of any other general or special law to the contrary, vacancies in the governing boards of the water management districts shall be filled according to the following residency requirements, representing areas designated by the United States Water Resources Council in United States Geological Survey, River Basin and Hydrological Unit Map of Florida—1975, Map Series No. 72:

(a)　Northwest Florida Water Management District:

1.　One member shall reside in the area generally designated as the "Perdido River Basin-Perdido Bay Coastal Area-Lower Conecuh River-Escambia River Basin" hydrologic units and that portion of the "Escambia Bay Coastal Area" hydrologic unit which lies west of Pensacola Bay and Escambia Bay.

2.　One member shall reside in the area generally designated as the "Blackwater River Basin-Yellow River Basin-Choctawhatchee Bay Coastal Area" hydrologic units and that portion of the "Escambia Bay Coastal Area" hydrologic unit which lies east of Pensacola Bay and Escambia Bay.

3.　One member shall reside in the area generally designated as the "Choctawhatchee River Basin-St. Andrews Bay Coastal Area" hydrologic units.

4.　One member shall reside in the area generally designated as the "Lower Chattahoochee-Apalachicola River-Chipola River Basin-Coastal Area between Ochlockonee River Apalachicola Rivers-Apalachicola Bay coastal area and offshore islands" hydrologic units.

5.　One member shall reside in the area generally designated as the "Ochlockonee River Basin-St. Marks and Wakulla Rivers and coastal area between Aucilla and Ochlockonee River Basin" hydrologic units.

6.　Four members shall be appointed at large, except that no county shall have more than two members on the governing board.

(b)　Suwannee River Water Management District:

1.　One member shall reside in the area generally designated as the "Aucilla River Basin" hydrologic unit.

2. One member shall reside in the area generally designated as the "Coastal Area between Suwannee and Aucilla Rivers" hydrologic unit.

3. One member shall reside in the area generally designated as the "Withlacoochee River Basin-Alapaha River Basin-Suwannee River Basin above the Withlacoochee River" hydrologic units.

4. One member shall reside in the area generally designated as the "Suwannee River Basin below the Withlacoochee River excluding the Santa Fe River Basin" hydrologic unit.

5. One member shall reside in the area generally designated as the "Santa Fe Basin-Waccasassa River and coastal area between Withlacoochee and Suwannee River" hydrologic units.

6. Four members shall be appointed at large, except that no county shall have more than two members on the governing board.

(c) St. Johns River Water Management District:

1. One member shall reside in the area generally designated as the "St. Marys River Basin-Coastal area between St. Marys and St. Johns Rivers" hydrologic units.

2. One member shall reside in the area generally designated as the "St. Johns River Basin below Oklawaha River-Coastal area between the St. Johns River and Ponce de Leon Inlet" hydrologic units.

3. One member shall reside in the area generally designated as the "Oklawaha River Basin" hydrologic unit.

4. One member shall reside in the area generally designated as the "St. Johns River Basin above the Oklawaha River" hydrologic unit.

5. One member shall reside in the area generally designated as the "Coastal area between Ponce de Leon Inlet and Sebastian Inlet-Coastal area Sebastian Inlet to St. Lucie River" hydrologic units.

6. Four members shall be appointed at large, except that no county shall have more than two members on the governing board.

(d) South Florida Water Management District:

1. Two members shall reside in Miami-Dade County.

2. One member shall reside in Broward County.

3. One member shall reside in Palm Beach County.

4. One member shall reside in Collier County, Lee County, Hendry County, or Charlotte County.

5. One member shall reside in Glades County, Okeechobee County, Highlands County, Polk County, Orange County, or Osceola County.

6. Two members, appointed at large, shall reside in an area consisting of St. Lucie, Martin, Palm Beach, Broward, Miami-Dade, and Monroe Counties.

7. One member, appointed at large, shall reside in an area consisting of Collier, Lee, Charlotte, Hendry, Glades, Osceola, Okeechobee, Polk, Highlands, and Orange Counties.

8. No county shall have more than three members on the governing board.

(e) Southwest Florida Water Management District:

1. Two members shall reside in Hillsborough County.

2. One member shall reside in the area consisting of Hillsborough and Pinellas Counties.

3. Two members shall reside in Pinellas County.

4. One member shall reside in Manatee County.

5. Two members shall reside in Polk County.

6. One member shall reside in Pasco County.

7. One member shall be appointed at large from Levy, Citrus, Sumter, and Lake Counties.

8. One member shall be appointed at large from Hardee, DeSoto, and Highlands Counties.

9. One member shall be appointed at large from Marion and Hernando Counties.

10. One member shall be appointed at large from Sarasota and Charlotte Counties.

**History.**—s. 13, part I, ch. 72-299; s. 11, ch. 75-22; s. 6, ch. 76-243; s. 1, ch. 77-72; s. 3, ch. 80-259; s. 226, ch. 81-259; s. 1, ch. 82-46; ss. 1, 7, 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 1, ch. 91-18; s. 9, ch. 97-160; s. 2, ch. 2005-215; s. 1, ch. 2007-120; s. 80, ch. 2008-4; s. 5, ch. 2009-243.

**373.076    Vacancies in the governing board; removal from office.**—

(1)   Vacancies occurring in the governing board of a district prior to the expiration of the affected term shall be filled for the unexpired term.

(2)   The Governor shall have authority to remove from office any officer of said district in the manner and for cause defined by the laws of this state applicable to situations which may arise in said district.

History.—s. 14, part I, ch. 72-299; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217.

**373.079    Members of governing board; oath of office; staff.**—

(1)   Each member of the governing board of the district, before entering upon his or her official duties, shall take and subscribe to an oath, before some officer authorized by law to administer oaths, that the member will honestly, faithfully, and impartially perform the duties devolving upon him or her in office as member of the governing board of the district to which the member was appointed and that he or she will not neglect any of the duties imposed upon him or her by this chapter.

(2)   Immediately after their appointment, and every 2 years thereafter, the governing board shall meet at some convenient place and choose some suitable person, who may or may not be a member of the governing board, and who may be required to execute bond for the faithful performance of his or her duties as the governing board may determine, as secretary. Such board shall adopt a seal with a suitable device and shall keep a well-bound book entitled, in effect, "Record of Governing Board of   District," in which shall be recorded minutes of all meetings, resolutions, proceedings, certificates, bonds given by all employees, and any and all corporate acts, which book shall at reasonable times be open to the inspection of any citizen of this state or taxpayer in the district or his or her agent or attorney.

(3)   The chair and members of the board shall receive no compensation for services as such; but, while officially on work for the district, they shall receive their actual travel expenses between their respective places of residence and the place where official district business is conducted, subsistence, lodging, and other expenses in the actual amount incurred therefor. These expenses may not exceed the statutory amount allowed state officers and employees. Payment or reimbursement to governing board members for the use of private or charter aircraft may be no greater than that allowed for commercial air travel for equivalent distances. This subsection applies retroactively to the effective date of the creation of each of the five separate water management districts.

(4)   The governing board of the district shall employ:

(a)   An executive director, ombudsman, and such engineers, other professional persons, and other personnel and assistants as it deems necessary and under such terms and conditions as it may determine and to terminate such employment. The appointment of an executive director by the governing board is subject to approval by the Governor and must be initially confirmed by the Senate. The governing board may delegate all or part of its authority under this paragraph to the executive director. However, the governing board shall delegate to the executive director all of its authority to take final action on permit applications under part IV or petitions for variances or waivers of permitting requirements under part IV. The executive director may execute such delegated authority through designated staff members. Such delegations shall not be subject to the rulemaking requirements of chapter 120. The governing board must provide a process for referring a denial of such application or petition to the governing board for the purpose of taking final action. The executive director must be confirmed by the Senate upon employment and must be confirmed or reconfirmed by the Senate during the second regular session of the Legislature following a gubernatorial election.

(b)   An inspector general, who shall report directly to the board. However, the governing boards of the Suwannee River Water Management District and the Northwest Florida Water Management District may jointly employ an inspector general, or provide for inspector general services by interagency agreement with a state agency or water management district inspector general. An inspector general must have the same qualifications and perform the applicable duties of state agency inspectors general as provided in s. 20.055.

(5)   The executive director may employ a legal staff for the purposes of:

(a)   Providing legal counsel to the executive director and district staff on matters relating to the day-to-day operations of the district;

(b)    Representing the district in all proceedings of an administrative or judicial nature; and

(c)    Otherwise assisting in the administration of the provisions of this chapter.

Attorneys employed by the governing board must represent the legal interest or position of the governing board.

(6)    By resolution the governing board may determine the location of its principal office and provide for the change thereof.

(7)    The governing board shall meet at least once a month and upon call of the chair. The governing board, a basin board, a committee, or an advisory board may conduct meetings by means of communications media technology in accordance with rules adopted pursuant to s. 120.54.

**History.**—s. 15, part I, ch. 72-299; s. 1, ch. 82-46; ss. 6, 12, ch. 84-341; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 23, ch. 93-213; s. 8, ch. 94-235; s. 254, ch. 94-356; s. 1006, ch. 95-148; s. 10, ch. 97-160; s. 21, ch. 2001-256; s. 13, ch. 2003-265; s. 6, ch. 2009-243; s. 51, ch. 2010-205; s. 7, ch. 2012-6.

## 373.083    General powers and duties of the governing board.—In addition to other powers and duties allowed it by law, the governing board is authorized to:

(1)    Contract with public agencies, private corporations, or other persons; sue and be sued; and appoint and remove agents and employees, including specialists and consultants.

(2)    Issue orders to implement or enforce any of the provisions of this chapter or regulations thereunder.

(3)    Make surveys and investigations of the water supply and resources of the district and cooperate with other governmental agencies in similar activities.

(4)    Solicit and accept donations or grants of funds or services from both public and private sources for the planning and implementation of district undertakings and delegations, including, but not limited to, projects, programs, works, and delegations.

(5)    Execute any of the powers, duties, and functions vested in the governing board through a member, the executive director, or other district staff as designated by the governing board. The governing board may establish the scope and terms of any delegation, and no delegation shall be subject to the rulemaking requirements of chapter 120. However, if the governing board delegates to the executive director its authority to take final action on permit applications under part II or petitions for variances or waivers of permitting requirements under part II, the executive director may execute such delegated authority through designated staff. However, the governing board must provide a process for referring a denial of such application or petition to the governing board for the purpose of taking final action. The authority to delegate under this subsection is supplemental to any other provision of this chapter granting authority to the governing board to delegate specific powers, duties, or functions.

**History.**—s. 16, part I, ch. 72-299; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 1, ch. 97-70; s. 1, ch. 2000-133; s. 2, ch. 2001-256; s. 7, ch. 2009-243; s. 52, ch. 2010-205.

## 373.084    District works, operation by other governmental agencies.—The district may permit governing bodies of water conservation districts, drainage and other improvement districts, and federal, state and local governments, authorities or agencies to operate and maintain the works of the district under conditions which the governing board may deem advisable.

**History.**—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217.
**Note.**—Former s. 378.161.

## 373.085    Use of works or land by other districts or private persons.—

(1)(a)    In order to promote water quantity and water resource development, projects that improve flood control, and conservation of lands, the district and other governmental agencies shall encourage public-private partnerships by collaborating, when possible, with those partnerships when procuring materials for infrastructure and restoration work projects, consistent with district and state procurement procedures.

(b)    The governing board has authority to prescribe the manner in which local works provided by other districts or by private persons will connect with and make use of the works or land of the district, to issue permits therefor, and to cancel the permits for noncompliance with the conditions thereof or for other cause. It is unlawful to

connect with or make use of the works or land of the district without consent in writing from its governing board, and the board has authority to prevent or, if done, estop or terminate the same. The use of the works or land of the district for access is governed by this section and is not subject to the provisions of s. 704.01. However, any land or works of the district which have historically been used for public access to the ocean by means of the North New River Canal and its tributaries may not be closed for this purpose unless the district can demonstrate that significant harm to the resource would result from such public use.

(2) Damage resulting from unlawful use of such works, or from violations of the conditions of permit issued by the board shall, if made by other than a public agency, be subject to such penalty as is or may be prescribed by law and in addition thereto by a date and in a manner prescribed by the board, repair of said damage to the satisfaction of said board, or deposit with said board a sum sufficient therefor, and if by a public agency, then at the expense of such agency the repair of said damage to the satisfaction of the board or the deposit with said board of a sum sufficient therefor.

History.—s. 17, ch. 25209, 1949; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 7, ch. 84-341; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 53, ch. 2010-205.

Note.—Former s. 378.17.


### 373.086    Providing for district works.—

(1) In order to carry out the works for the district, and for effectuating the purposes of this chapter, the governing board is authorized to clean out, straighten, enlarge, or change the course of any waterway, natural or artificial, within or without the district; to provide such canals, levees, dikes, dams, sluiceways, reservoirs, holding basins, floodways, pumping stations, bridges, highways, and other works and facilities which the board may deem necessary; to establish, maintain, and regulate water levels in all canals, lakes, rivers, channels, reservoirs, streams, or other bodies of water owned or maintained by the district; to cross any highway or railway with works of the district and to hold, control, and acquire by donation, lease, or purchase, or to condemn any land, public or private, needed for rights-of-way or other purposes, and may remove any building or other obstruction necessary for the construction, maintenance, and operation of the works; and to hold and have full control over the works and rights-of-way of the district.

(2) The works of the district shall be those adopted by the governing board of the district. The district may require or take over for operation and maintenance such works of other districts as the governing board may deem advisable under agreement with such districts.

(3)(a) Notwithstanding the provisions of chapter 120, the temporary construction, operation, or maintenance of water supply backpumping facilities to be used for storage of surplus water shall not require a permit under this chapter, chapter 253, or chapter 403 from the Department of Environmental Protection if the governing board issues an order declaring a water emergency which order is approved by the Secretary of Environmental Protection. Such approval may be given by telephone and confirmed by appropriate order at a later date. The temporary construction, operation, or maintenance of the facilities shall cease when the governing board or the secretary issues an order declaring that the emergency no longer exists. If the district intends to operate any such facilities permanently under nonemergency conditions, it shall apply for the appropriate required permits from the Department of Environmental Protection within 30 days of rescinding the emergency order.

(b) Notwithstanding the provisions of chapter 120, emergency orders issued pursuant to this subsection shall be valid for a period of 90 days and may be renewed for a single 90-day period.

History.—s. 16, ch. 25209, 1949; s. 2, ch. 29790, 1955; s. 1, ch. 61-147; s. 3, ch. 61-497; s. 2, ch. 63-224; s. 1, ch. 67-206; s. 1, part VI, ch. 72-299; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 4, ch. 82-101; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 255, ch. 94-356.

Note.—Former s. 378.16.


### 373.087    District works using aquifer for storage and supply.—The governing board may establish works of the district for the purpose of introducing water into, or drawing water from, the underlying aquifer for storage or supply. However, only water of a compatible quality shall be introduced directly into such aquifer.

History.—s. 1, ch. 72-318; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217.

**373.088**    **Application fees for certain real estate transactions.**—The governing board may adopt rules to provide for the assessment and collection of reasonable fees for the processing of applications for sale, easement, lease, exchange, release, nonuse commitment, disclaimer, quitclaim deed, or reissuance or correction of deed with respect to any interest in lands, such fees to be commensurate with the actual cost of processing such applications.

History.—s. 3, ch. 82-101; s. 34, ch. 83-218; s. 2, ch. 89-279; s. 11, ch. 90-217.

**373.089**    **Sale or exchange of lands, or interests or rights in lands.**—The governing board of the district may sell lands, or interests or rights in lands, to which the district has acquired title or to which it may hereafter acquire title in the following manner:

(1)(a)    Any lands, or interests or rights in lands, determined by the governing board to be surplus may be sold by the district, at any time, for the highest price obtainable; however, the selling price may not be less than the appraised value of the lands, or interests or rights in lands, as determined by a certified appraisal obtained within 360 days before the effective date of a contract for sale.

(b)    A written valuation of land determined to be surplus pursuant to this section; related documents used to form, or which pertain to, the valuation; and written offers to purchase such surplus land are confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. This exemption expires 2 weeks before the contract or agreement regarding the purchase, exchange, or disposal of the surplus land is first considered for approval by the district.

(c)    Before expiration of the exemption established in paragraph (b), and in order to facilitate successful or expedited closure of the sale of surplus land, the district may disclose confidential and exempt valuations and valuation information which are related to surplus land, or written offers to purchase such surplus land, to potential purchasers:

1.    During negotiations for the sale or exchange of the land;

2.    During the marketing effort or bidding process associated with the sale, disposal, or exchange of the land;

3.    When the passage of time has made the conclusions of value invalid; or

4.    When negotiations or marketing efforts concerning the land are concluded.

(d)    Paragraphs (b) and (c) are subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2023, unless reviewed and saved from repeal through reenactment by the Legislature.

(2)    All sales of land, or interests or rights in land, shall be for cash or upon terms and security to be approved by the governing board, but a deed therefor shall not be executed and delivered until full payment is made.

(3)    Before selling any surplus land, or interests or rights in land, the district shall publish a notice of intention to sell on its website and in a newspaper published in the county in which the land, or interests or rights in the land, is situated once each week for 3 successive weeks, three insertions being sufficient. The first publication of the required notice must occur at least 30 days, but not more than 360 days, before any sale is approved by the district and must include a description of lands, or interests or rights in lands, to be offered for sale.

(4)    The governing board of a district may exchange lands, or interests or rights in lands, owned by, or lands, or interests or rights in lands, for which title is otherwise vested in, the district for other lands, or interests or rights in lands, within the state owned by any person. The governing board shall fix the terms and conditions of any such exchange and may pay or receive any sum of money that the board considers necessary to equalize the values of exchanged properties. Land, or interests or rights in land, acquired under former s. 373.59, Florida Statutes 2014, may be exchanged only for lands, or interests or rights in lands, that otherwise meet the requirements of that section for acquisition.

(5)    In any county having a population of 75,000 or fewer, or a county having a population of 100,000 or fewer that is contiguous to a county having a population of 75,000 or fewer, in which more than 50 percent of the lands within the county boundary are federal lands and lands titled in the name of the state, a state agency, a water management district, or a local government, those lands titled in the name of a water management district which are not essential or necessary to meet conservation purposes may, upon request of a public or private entity, be

made available for purchase through the surplusing process in this section. Priority consideration must be given to buyers, public or private, who are willing to return the property to productive use so long as the property can be reentered onto the county ad valorem tax roll. Property acquired with matching funds from a local government shall not be made available for purchase without the consent of the local government.

(6)  Any lands the title to which is vested in the governing board of a water management district may be surplused pursuant to the procedures set forth in this section and s. 373.056 and the following:

(a)  For those lands designated as acquired for conservation purposes, the governing board shall make a determination that the lands are no longer needed for conservation purposes and may dispose of them by a two-thirds vote.

(b)  For all other lands, the governing board shall make a determination that such lands are no longer needed and may dispose of them by majority vote.

(c)  For the purposes of this subsection, all lands for which title has vested in the governing board prior to July 1, 1999, shall be deemed to have been acquired for conservation purposes.

(d)  For any lands acquired on or after July 1, 1999, for which title is vested in the governing board, the governing board shall determine which parcels shall be designated as having been acquired for conservation purposes.

(7)  Notwithstanding other provisions of this section, the governing board shall first offer title to lands acquired in whole or in part with Florida Forever funds which are determined to be no longer needed for conservation purposes to the Board of Trustees of the Internal Improvement Trust Fund unless the disposition of those lands is for the following purposes:

(a)  Linear facilities, including electric transmission and distribution facilities, telecommunication transmission and distribution facilities, pipeline transmission and distribution facilities, public transportation corridors, and related appurtenances.

(b)  The disposition of the fee interest in the land where a conservation easement is retained by the district to fulfill the conservation objectives for which the land was acquired.

(c)  An exchange of the land for other lands that meet or exceed the conservation objectives for which the original land was acquired in accordance with subsection (4).

(d)  To be used by a governmental entity for a public purpose.

(e)  The portion of an overall purchase deemed surplus at the time of the acquisition.

(8)(a)  If a parcel of land is no longer essential or necessary for conservation purposes and is valued at $25,000 or less as determined by a certified appraisal obtained within 360 days before the effective date of a contract for the sale, as specified in subsection (1), the governing board may determine that the parcel of land is surplus and may offer to sell it to the adjacent property owners. If the governing board elects to offer for sale the parcel to adjacent property owners pursuant to this subsection, the governing board must publish the notice of intention to sell as required under subsection (3), one time only and the governing board must send the notice of intention to sell the parcel to adjacent property owners by certified mail and publish the notice on its website. For the purpose of this subsection, the term "adjacent property owners" means those owners whose property abuts the parcel.

(b)  Fourteen days after publication of such notice, the district may sell the parcel to an adjacent property owner or, if there are two or more owners of adjacent property, accept sealed bids and sell the parcel to the highest bidder or reject all offers.

(c)  If the parcel is not sold to an adjacent property owner pursuant to paragraph (b), the district may sell the parcel at any time to the general public for the highest price obtainable.

If the Board of Trustees of the Internal Improvement Trust Fund declines to accept title to the lands offered under this section, the land may be disposed of by the district under the provisions of this section.

History.—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 9, ch. 82-101; s. 2, ch. 85-347; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 2, ch. 91-288; s. 4, ch. 94-212; s. 5, ch. 94-240; s. 32, ch. 99-247; s. 10, ch. 2003-394; s. 15, ch. 2008-229; s. 35, ch. 2015-229; s. 26, ch. 2016-233; s. 1, ch. 2018-155; s. 1, ch. 2018-156.

Note.—Former s. 378.48.

**373.093    Lease of lands or interest in land and personal property.**—The governing board of the district may lease any lands or interest in land, including but not limited to oil and mineral rights, to which the district has acquired title, or to which it may hereafter acquire title in the following manner, as long as the lease is consistent with the purposes for which the lands or any interest in land was acquired:

(1)    For the best price and terms obtainable, to be determined by the board.

(2)    Before leasing any land, or interest in land including but not limited to oil and mineral rights, the district shall cause a notice of intention to lease to be published in a newspaper published in the county in which said land is situated and such other places as the board may determine once each week for 3 successive weeks (three insertions being sufficient), the first publication of which shall be not less than 30 nor more than 90 days prior to the date the board executes the lease, which said notice shall set forth the time and place of leasing and a description of the lands to be leased.

(3)    It shall not be necessary to publish the notice as provided by subsection (2) where the lease is made to a person in connection with land acquisition by the district and the lease results in a diminution of the cost to the district in the acquisition of the land.

(4)    The governing board of the district may lease existing communications towers and other similar structures which the district owns or which it may hereafter acquire, for the best price and terms obtainable, to be determined by the board.

History.—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 11, ch. 92-288; ss. 3, 12, ch. 2001-256.

Note.—Former s. 378.49.

**373.096    Releases.**—The governing board of the district may release any easement, reservation or right-of-way interests, conveyed to it for which it has no present or apparent future use under terms and conditions determined by the board.

History.—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 11, ch. 2001-256.

Note.—Former s. 378.50.

**373.099    Execution of instruments.**—Any instruments of sale, lease, release, or conveyance executed pursuant to the provisions of this chapter shall be executed in the name of the district by its governing board acting by the chair or vice chair of said board and shall have the corporate seal of the board affixed thereto attested by its secretary and any such instrument shall be effective to pass the title or interest of the district in the property conveyed; provided, the district shall not warrant the title to any property sold, leased, released, or conveyed.

History.—s. 4, ch. 29790, 1955; s. 25, ch. 73-190; s. 1, ch. 82-46; s. 25, ch. 88-242; ss. 1, 2, ch. 89-279; ss. 11, 12, ch. 90-217; s. 596, ch. 95-148.

Note.—Former s. 378.51.

**373.103    Powers which may be vested in the governing board at the department's discretion.**—In addition to the other powers and duties allowed it by law, the governing board of a water management district may be specifically authorized by the department to:

(1)    Administer and enforce all provisions of this chapter, including the permit systems established in parts II, III, and IV of this chapter, consistent with the water resource implementation rule.

(2)    Cooperate with the United States in the manner provided by Congress for flood control, reclamation, conservation, and allied purposes in protecting the inhabitants, the land, and other property within the district from the effects of a surplus or a deficiency of water when the same may be beneficial to the public health, welfare, safety, and utility.

(3)    Plan, construct, operate, and maintain works of the district as defined in this chapter.

(4)    Determine, establish, and control the level of waters to be maintained in all canals, lakes, rivers, channels, reservoirs, streams, or other bodies of water controlled by the district; to maintain such waters at the levels so determined and established by means of dams, locks, floodgates, dikes, and other structures; and to regulate the

discharge into, or withdrawal from, the canals, lakes, rivers, channels, reservoirs, streams, or other bodies of water controlled by the district or which are a work of the district, including review of small watershed projects (Pub. L. No. 83-566).

(5)    Expend, at the discretion of the governing board, for purposes of promotion, advertisement, and improvement of the program and objectives of the district, a yearly sum not to exceed 0.25 percent of the moneys collected by taxation within the district.

(6)    Exercise such additional power and authority compatible with this chapter and other statutes and federal laws affecting the district as may be necessary to perform such duties and acts and to decide such matters and dispose of the same as are not specifically defined in or covered by statute.

(7)    Prepare, in cooperation with the department, that part of the Florida water plan applicable to the district.

(8)    Delegate to a local government by rule or agreement the power and duty to administer and enforce any of the statutes, rules, or regulations relating to stormwater permitting or surface water management which the district is authorized or required to administer, including those delegated by a state agency to the district, if the governing board determines that such a delegation is necessary or desirable. Such a delegation shall be made only if the governing board determines that the local government's program for administering the delegated statute, rule, or regulation:

(a)    Provides by ordinance, regulation, or local law for requirements compatible with or stricter or more extensive than those imposed by the statute or the rules and regulations adopted pursuant thereto;

(b)    Provides for the enforcement of such requirements by appropriate administrative and judicial processes; and

(c)    Provides for administrative organization, staff, and financial and other resources necessary to effectively and efficiently enforce such requirements.

The governing board shall give prior notice of its intention to enter into an agreement described in this subsection. At a minimum, such notice shall be published in the Florida Administrative Register at least 21 days in advance of the governing board's action. At least once every 6 months, the district shall update its rules to include a list of the agreements adopted pursuant to this subsection to which the district is a party. The list shall identify the parties to, and the date and location of, each agreement, and shall specify the nature of the authority delegated by the agreement.

History.—s. 17, part I, ch. 72-299; s. 7, ch. 73-190; s. 2, ch. 80-259; s. 1, ch. 82-46; ss. 3, 25, ch. 88-242; ss. 1, 2, 9, ch. 89-279; ss. 11, 12, ch. 90-217; s. 1, ch. 91-231; s. 3, ch. 91-288; s. 20, ch. 97-160; s. 35, ch. 2013-14.

### 373.106    Permit required for construction involving underground formation.—

(1)    No construction may be begun on a project involving artificial recharge or the intentional introduction of water into any underground formation except as permitted in chapter 377, without the written permission of the governing board of any water management district within which the construction will take place. Such application shall contain the detailed plans and specifications for the construction of the project.

(2)    Each water management district has the exclusive authority to process and issue permits under this section and permits and licenses delegated under s. 403.812, except permits required by the department pursuant to 42 U.S.C. s. 300h until delegated by the department to the districts.

(3)    A water management district may do any act necessary to replenish the groundwater of the district. The district may, among other things, for the purposes of replenishing the groundwater supplies within the district:

(a)    Buy water;

(b)    Exchange water;

(c)    Distribute water to persons in exchange for ceasing or reducing groundwater extractions;

(d)    Spread, sink, and inject water into the underground;

(e)    Store, transport, recapture, reclaim, purify, treat, or otherwise manage and control water for the beneficial use of persons or property within the district; and

(f)    Build the necessary works to achieve groundwater replenishment.

History.—s. 18, part I, ch. 72-299; s. 14, ch. 78-95; s. 71, ch. 83-310; s. 2, ch. 84-338; s. 1, ch. 84-341.

**373.107    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 3, ch. 79-161.

**373.109    Permit application fees.**—When a water management district governing board, the department, or a local government implements a regulatory system under this chapter or one which has been delegated pursuant to chapter 403, it may establish a schedule of fees for filing applications for the required permits. Such fees shall not exceed the cost to the district, the department, or the local government for processing, monitoring, and inspecting for compliance with the permit.

(1)(a)   The department shall initiate rulemaking no later than December 1, 2008, to increase each application fee authorized under part IV of this chapter and adopted by rule to ensure that such fees reflect, at a minimum, any upward adjustment in the Consumer Price Index compiled by the United States Department of Labor, or similar inflation indicator, since the original fee was established or most recently revised. The department shall establish by rule the inflation index to be used for this purpose.

(b)   The department shall charge a fee of at least $250 for a noticed general permit or individual permit as established in department rules.

(c)   Notwithstanding s. 120.60(2), the fee for verification that an activity is exempt from regulation under s. 403.813 or part IV of this chapter shall be at least $100 or as otherwise established by department rule, but not to exceed $500.

(d)   The department shall charge a fee of at least $100 and not to exceed $500 for conducting informal wetland boundary determinations as a public service to applicants or potential applicants for permits under part IV of this chapter. An informal wetland boundary determination is not an application for a permit, is not subject to the permit review timeframes established in this chapter or chapter 120, and does not constitute final agency action.

(2)   The department shall review the fees authorized under part IV of this chapter at least once every 5 years and shall adjust the fees upward, as necessary, to reflect changes in the Consumer Price Index or similar inflation indicator. In the event of deflation, the department shall consult with the Executive Office of the Governor and the Legislature to determine whether downward fee adjustments are appropriate based on the current budget and appropriation considerations.

(3)   All moneys received under the provisions of this section shall be allocated for the use of the water management district, the department, or the local government, whichever processed the permit, and shall be in addition to moneys otherwise appropriated in any general appropriations act. All moneys received by the department under the provisions of this section shall be deposited in the Florida Permit Fee Trust Fund established by s. 403.0871 and shall be used by the department as provided therein. Moneys received by a water management district or the department under the provisions of this section shall be in addition to moneys otherwise appropriated in any general appropriations act.

(4)   The failure of any person to pay the fees established hereunder constitutes grounds for revocation or denial of the permit.

(5)   Effective July 1, 2008, the minimum fee amounts shall be the minimum fees prescribed in this section, and such fee amounts shall remain in effect until the effective date of fees adopted by rule by the department.

History.—s. 19, part I, ch. 72-299; s. 7, ch. 76-243; s. 8, ch. 84-341; s. 27, ch. 87-225; s. 10, ch. 89-279; s. 25, ch. 93-213; s. 18, ch. 2008-150.

**373.113    Adoption of rules by the governing board.**—In administering the provisions of this chapter the governing board has authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement provisions of law conferring powers or duties upon it.

History.—s. 20, part I, ch. 72-299; s. 83, ch. 98-200.

**373.1131    Consolidated action on permits.**—

(1) Whenever the implementation of specific authority granted by this chapter, or whenever delegation of another program requiring permits or other authorizations, would result in the department or a water management district processing two or more separate permits or other authorizations for the same activity or project, the department or governing board may procedurally consolidate such separate permits or other authorizations by establishing a single application, permit application fee, noticing procedure, schedule for agency review, and final agency action on the consolidated permit or other authorization.

(2) Procedures to consolidate permitting actions under this section do not constitute rules within the meaning of s. 120.52.

(3) Whenever two or more permits or other authorizations for aquaculture activities have been consolidated into a single process, responsibility for permitting or authorizing such activities shall not be delegated to any unit of local government pursuant to s. 373.103.

History.—s. 17, ch. 96-247.

**373.1135 Small business program.**—Each water management district, as created in this chapter, may implement a small business program designed to help small businesses, including those owned by women and minorities, to participate in district procurement and contract activities. The purpose of the program is to spur economic development and support small businesses, including women-owned and minority-owned businesses, to successfully expand in the marketplace. Program specifics shall be provided by rule pursuant to s. 373.113.

History.—s. 1, ch. 2005-215.

**373.114 Land and Water Adjudicatory Commission; review of district rules and orders; department review of district rules.**—

(1) Except as provided in subsection (2), the Governor and Cabinet, sitting as the Land and Water Adjudicatory Commission, have the exclusive authority to review any order or rule of a water management district, other than a rule relating to an internal procedure of the district or a final order resulting from an evidentiary hearing held under s. 120.569 or s. 120.57 or a rule that has been adopted after issuance of a final order resulting from an evidentiary hearing held under s. 120.56, to ensure consistency with the provisions and purposes of this chapter. Subsequent to the legislative ratification of the delineation methodology pursuant to s. 373.421(1), this subsection also shall apply to an order of the department, or a local government exercising delegated authority, pursuant to ss. 373.403-373.443, except an order pertaining to activities or operations subject to conceptual plan approval pursuant to chapter 378 or a final order resulting from an evidentiary hearing held under s. 120.569 or s. 120.57.

(a) Such review may be initiated by the department or by a party to the proceeding below by filing a request for review with the Land and Water Adjudicatory Commission and serving a copy on the department and on any person named in the rule or order within 20 days after adoption of the rule or the rendering of the order. For the purposes of this section, the term "party" means any affected person who submitted oral or written testimony, sworn or unsworn, of a substantive nature which stated with particularity objections to or support for the rule or order that are cognizable within the scope of the provisions and purposes of this chapter. In order for the commission to accept a request for review initiated by a party below, with regard to a specific order, three members of the commission must determine on the basis of the record below that the activity authorized by the order would substantially affect natural resources of statewide or regional significance. Review of an order may also be accepted if three members of the commission determine that the order raises issues of policy, statutory interpretation, or rule interpretation that have regional or statewide significance from the standpoint of agency precedent. The party requesting the commission to review an order must allege with particularity, and the commission must find, that:

1. The order is in conflict with statutory requirements; or

2. The order is in conflict with the requirements of a duly adopted rule.

(b) Review by the Land and Water Adjudicatory Commission is appellate in nature and shall be based solely on the record below unless the commission determines that a remand for a formal evidentiary proceeding is necessary to develop additional findings of fact. If there is no evidentiary administrative proceeding resulting from a remand or referral for findings of fact by the commission, then the facts contained in the proposed agency action or

proposed water management district action, including any technical staff report, shall be deemed undisputed. The matter shall be heard by the commission not more than 60 days after receipt of the request for review, unless waived by the parties; provided, however, such time limit shall be tolled by a referral or remand pursuant to this paragraph. The commission may refer a request for review to the Division of Administrative Hearings for the production of findings of fact, limited to those needed to render the decision requested, to supplement the record, if a majority of the commission determines that supplementary findings of fact are essential to determine the consistency of a rule or order with the provisions and purposes of this chapter. Alternatively, the commission may remand the matter to the agency below for additional findings of fact, limited to those needed to render the decision requested, to supplement the record, if a majority of the commission determines that supplementary findings of fact are essential to determine the consistency of a rule or order with the provisions and purposes of this chapter. Such proceedings must be conducted and the findings transmitted to the commission within 90 days of the remand or referral.

(c) If the Land and Water Adjudicatory Commission determines that a rule of a water management district is not consistent with the provisions and purposes of this chapter, it may require the water management district to initiate rulemaking proceedings to amend or repeal the rule. If the commission determines that an order is not consistent with the provisions and purposes of this chapter, the commission may rescind or modify the order or remand the proceeding for further action consistent with the order of the Land and Water Adjudicatory Commission only if the commission determines that the activity authorized by the order would substantially affect natural resources of statewide or regional significance. In the case of an order which does not itself substantially affect natural resources of statewide or regional significance, but which raises issues of policy that have regional or statewide significance from the standpoint of agency precedent, the commission may direct the district to initiate rulemaking to amend its rules to assure that future actions are consistent with the provisions and purposes of this chapter without modifying the order.

(d) In a review under this section of a construction permit issued pursuant to a conceptual permit under part IV, which conceptual permit is issued after July 1, 1993, a party to the review may not raise an issue which was or could have been raised in a review of the conceptual permit under this section.

(e) A request for review under this section shall not be a precondition to the seeking of judicial review pursuant to s. 120.68 or the seeking of an administrative determination of rule validity pursuant to s. 120.56.

(f) The Florida Land and Water Adjudicatory Commission may adopt rules to set forth its procedures for reviewing an order or rule of a water management district consistent with the provisions of this section.

(g) For the purpose of this section, it shall be presumed that activity authorized by an order will not affect resources of statewide or regional significance if the proposed activity:

1. Occupies an area less than 10 acres in size, and
2. Does not create impervious surfaces greater than 2 acres in size, and
3. Is not located within 550 feet of the shoreline of a named body of water designated as Outstanding Florida Waters, and
4. Does not adversely affect threatened or endangered species.

This paragraph shall not operate to hold that any activity that exceeds these limits is presumed to affect resources of statewide or regional significance. The determination of whether an activity will substantially affect resources of statewide or regional significance shall be made on a case-by-case basis, based upon facts contained in the record below.

(2) The department shall have the exclusive authority to review rules of the water management districts, other than rules relating to internal management of the districts, to ensure consistency with the water resource implementation rule as set forth in the rules of the department. Within 30 days after adoption or revision of any water management district rule, the department shall initiate a review of such rule pursuant to this section.

(a) Within 30 days after adoption of a rule, any affected person may request that a hearing be held before the secretary of the department, at which hearing evidence and argument may be presented relating to the

consistency of the rule with the water resource implementation rule, by filing a request for hearing with the department and serving a copy on the water management district.

(b)　If the department determines that the rule is inconsistent with the water resource implementation rule, it may order the water management district to initiate rulemaking proceedings to amend or repeal the rule.

(c)　An order of the department requiring amendment or repeal of a rule may be appealed to the Land and Water Adjudicatory Commission by the water management district or any other party to the proceeding before the secretary.

History.—s. 11, ch. 75-22; s. 72, ch. 83-310; s. 26, ch. 93-213; s. 21, ch. 97-160; s. 7, ch. 98-146; s. 8, ch. 2002-261.

### 373.116　Procedure for water use and impoundment construction permit applications.—

(1)　Applications for water use permits, under part II of this chapter; for permits for construction or alteration of dams, impoundments, reservoirs, and appurtenant works, under part IV of this chapter; and for permits under s. 403.812 shall be filed with the water management district on appropriate forms provided by the governing board.

(2)　Upon receipt of an application for a permit of the type referred to in subsection (1), the governing board shall cause a notice thereof to be published in a newspaper having general circulation within the affected area. In addition, the governing board shall send, by regular or electronic mail, a copy of such notice to any person who has filed a written request for notification of any pending applications affecting this particular designated area. At the option of the applicable county or city government, notice of application for the consumptive use of water shall be mailed by regular or electronic mail to the county and appropriate city government from which boundaries the withdrawal is proposed to be made.

(3)　All permits issued under this section shall include the following language:

This permit does not convey to the permittee any property rights or privileges other than those specified herein, nor relieve the permittee from complying with any applicable local government, state, or federal law, rule, or ordinance.

History.—s. 21, part I, ch. 72-299; s. 14, ch. 78-95; s. 73, ch. 83-310; s. 3, ch. 96-339; s. 1, ch. 2003-124; s. 3, ch. 2004-381.

### 373.117　Certification by professional engineer.—

(1)　If an application for a permit or license to conduct an activity regulated under this chapter requires the services of a professional engineer as regulated and defined by chapter 471, the department or governing board of a water management district may require, as a condition of granting a permit or license, that a professional engineer licensed under chapter 471 certify upon completion of the permitted or licensed activity that such activity has been completed in substantial conformance with the plans and specifications approved by the department or board.

(2)　The cost of such certification by a professional engineer shall be borne by the permittee.

(3)　No permitted or licensed activity which is required to be so certified shall be placed into use or operation until the professional engineer's certificate is filed with the department or board.

History.—s. 4, ch. 79-160.

### 373.1175　Signing and sealing by professional geologists.—

(1)　If an application for a permit or license, or the performance of an activity regulated under this chapter, requires the services of a professional geologist as provided for in chapter 492, the department or governing board of a water management district may require that a professional geologist licensed under chapter 492 sign and seal any documents and reports submitted in connection with the permit application or regulated activity.

(2)　The cost of such signing and sealing by a professional geologist shall be borne by the permit applicant or permittee.

(3)　Nothing in this section shall be construed to prevent or prohibit the practice by professional engineers pursuant to chapter 471.

History.—s. 1, ch. 2005-160.

### 373.118　General permits; delegation.—

(1)  The governing board may adopt rules establishing a general permit system under this chapter for projects, or categories of projects, which have, either singly or cumulatively, a minimal adverse impact on the water resources of the district. Such rules shall specify design or performance criteria which, if applied, would result in compliance with the conditions for issuance of permits established in this chapter and district rules.

(2)  A general permit system relating to water use may provide for the granting of permits for the use of water in specified amounts within identified areas of the district. General permits for water use shall be subject to all the provisions of part II except the provisions of s. 373.229.

(3)  In lieu of the publication of notice requirements of ss. 373.116, 373.229, and 373.413, the governing board may establish alternative notice requirements for general permits, which requirements take into account the nature and scope of the projects permitted and the effect the proposed activity may have on other persons.

(4)  The department shall adopt by rule one or more general permits for local governments to construct, operate, and maintain public mooring fields, public boat ramps, including associated courtesy docks, and associated parking facilities located in uplands. Such general permits adopted by rule shall include provisions to ensure compliance with part IV of this chapter, subsection (1), and the criteria necessary to include the general permits in a state programmatic general permit issued by the United States Army Corps of Engineers under s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq. A facility authorized under such general permits is exempt from review as a development of regional impact if the facility complies with the comprehensive plan of the applicable local government. Such facilities shall be consistent with the local government manatee protection plan required pursuant to chapter 379. Mooring fields authorized under such general permits may not exceed 100 vessels. All facilities permitted under this section shall be constructed, maintained, and operated in perpetuity for the exclusive use of the general public. The department is authorized to have delegation of authority from the Board of Trustees of the Internal Improvement Trust Fund to issue leases for mooring fields that meet the requirements of such general permits. The department shall initiate the rulemaking process within 60 days after the effective date of this act.

(5)  To improve efficiency, the governing board may delegate its powers and duties pertaining to general permits to the executive director. The executive director may execute such delegated authority through designated staff. However, when delegating the authority to take final action on permit applications under part II or petitions for variances or waivers of permitting requirements under part II, the governing board must provide a process for referring a denial of such application or petition to the governing board for the purpose of taking final action. Such delegations are not subject to the rulemaking requirements of chapter 120.

(6)  By July 1, 2012, the department shall initiate rulemaking to adopt a general permit for stormwater management systems serving airside activities at airports. The general permit applies statewide and shall be administered by any water management district or any delegated local government pursuant to the operating agreements applicable to part IV, with no additional rulemaking required. Such rules are not subject to any special rulemaking requirements related to small business.

**History.**—s. 1, ch. 83-169; s. 1, ch. 2000-319; s. 6, ch. 2005-158; s. 35, ch. 2009-21; s. 8, ch. 2009-243; s. 54, ch. 2010-205; s. 73, ch. 2012-174; s. 8, ch. 2013-92.

**373.119  Administrative enforcement procedures; orders.**—

(1)  Whenever the executive director of a water management district has reason to believe that a violation of any provision of this chapter or any regulation promulgated thereunder or permits or order issued pursuant thereto has occurred, is occurring, or is about to occur, the executive director may cause a written complaint to be served upon the alleged violator or violators. The complaint shall specify the provision or provisions of this chapter or regulation or permit or order alleged to be violated or about to be violated and the facts alleged to constitute a violation thereof, and may order that necessary corrective action be taken within a reasonable time to be prescribed in such order. Any such order shall become final unless the person or persons named therein request by written petition a hearing no later than 14 days after the date such order is served.

(2)  Whenever the executive director, with the concurrence and advice of the governing board, finds that an emergency exists requiring immediate action to protect the public health, safety, or welfare; the health of

animals, fish or aquatic life; a public water supply; or recreational, commercial, industrial, agricultural or other reasonable uses, the executive director may, without prior notice, issue an order reciting the existence of such an emergency and requiring that such action be taken as the executive director deems necessary to meet the emergency.

(3)　Any person to whom an emergency order is directed pursuant to subsection (2) shall comply therewith immediately, but on petition to the board shall be afforded a hearing as soon as possible.

History.—s. 22, part I, ch. 72-299; s. 14, ch. 78-95.

**373.123**　**Penalty.**—Any person, real or artificial, that shall construct or enlarge, or cause to be constructed or enlarged, a canal or shall enlarge or deepen a natural stream in such a manner as to permit salt water to move inland of an established saltwater barrier line, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.083. Each day such movement of salt water shall continue, shall constitute a separate offense of the provisions of this law.

History.—s. 3, ch. 63-210; s. 324, ch. 71-136; s. 25, ch. 73-190.

Note.—Former s. 373.195.

**373.129**　**Maintenance of actions.**—The department, the governing board of any water management district, any local board, or a local government to which authority has been delegated pursuant to s. 373.103(8), is authorized to commence and maintain proper and necessary actions and proceedings in any court of competent jurisdiction for any of the following purposes:

(1)　To enforce rules, regulations, and orders adopted or issued pursuant to this law.

(2)　To enjoin or abate violations of the provisions of this law or rules, regulations, and orders adopted pursuant hereto.

(3)　To protect and preserve the water resources of the state.

(4)　To defend all actions and proceedings involving its powers and duties pertaining to the water resources of the state.

(5)　To recover a civil penalty for each offense in an amount not to exceed $10,000 per offense. Each date during which such violation occurs constitutes a separate offense.

(a)　A civil penalty recovered by a water management district pursuant to this subsection shall be retained and used exclusively by the water management district that collected the money. A civil penalty recovered by the department pursuant to this subsection must be deposited into the Water Quality Assurance Trust Fund established under s. 376.307.

(b)　A local government that is delegated authority pursuant to s. 373.103(8) may deposit a civil penalty recovered pursuant to this subsection into a local water pollution control program trust fund, notwithstanding the provisions of paragraph (a). However, civil penalties that are deposited in a local water pollution control program trust fund and that are recovered for violations of state water quality standards may be used only to restore water quality in the area that was the subject of the action, and civil penalties that are deposited in a local water pollution control program trust fund and that are recovered for violation of requirements relating to water quantity may be used only to purchase lands and make capital improvements associated with surface water management, or other purposes consistent with the requirements of this chapter for the management and storage of surface water.

(6)　To recover investigative costs, court costs, and reasonable attorney fees.

(7)　Enforce the provisions of part IV of this chapter in the same manner and to the same extent as provided in ss. 373.430, 403.121(1) and (2), 403.131, 403.141, and 403.161.

(8)　In conflicts arising where a water management district is a party to litigation against another governmental entity, as defined in s. 164.1031, a district has an affirmative duty to engage in alternative dispute resolution in good faith as required by chapter 164.

History.—s. 16, ch. 57-380; s. 16, ch. 63-336; ss. 25, 35, ch. 69-106; s. 25, ch. 73-190; s. 42, ch. 79-65; s. 9, ch. 84-341; s. 2, ch. 91-231; s. 4, ch. 91-288; s. 27, ch. 93-213; s. 38, ch. 96-321; s. 46, ch. 2010-205; s. 36, ch. 2015-229.

Note.—Former s. 373.221.

### 373.136 Enforcement of regulations and orders.—

(1)　The governing board may enforce its regulations and orders adopted pursuant to this chapter, by suit for injunction or other appropriate action in the courts of the state.

(2)　The court may award to the prevailing party or parties reasonable attorney's fees for services rendered in actions at law and all appellate proceedings resulting therefrom under the provisions of this chapter. In addition to the above, the court may award all costs and charges incident to such actions.

(3)　Any action by a citizen of the state to seek judicial enforcement of any of the provisions of this chapter shall be governed by the Florida Environmental Protection Act, s. 403.412.

History.—s. 25, part I, ch. 72-299; s. 7, ch. 99-353.

### 373.139 Acquisition of real property.—

(1)　The Legislature declares it to be necessary for the public health and welfare that water and water-related resources be conserved and protected. The acquisition of real property for this objective shall constitute a public purpose for which public funds may be expended.

(2)　The governing board of the district is empowered and authorized to acquire in fee or less than fee title to real property, easements and other interests or rights therein, by purchase, gift, devise, lease, eminent domain, or otherwise for flood control, water storage, water management, conservation and protection of water resources, aquifer recharge, water resource and water supply development, and preservation of wetlands, streams, and lakes. Eminent domain powers may be used only for acquiring real property for flood control and water storage or for curing title defects or encumbrances to real property owned by the district or to be acquired by the district from a willing seller.

(3)　The initial 5-year work plan and any subsequent modifications or additions thereto shall be adopted by each water management district after a public hearing. Each water management district shall provide at least 14 days' advance notice of the hearing date and shall separately notify each county commission within which a proposed work plan project or project modification or addition is located of the hearing date.

(a)　Appraisal reports, offers, and counteroffers are confidential and exempt from s. 119.07(1) until an option contract is executed or, if no option contract is executed, until 30 days before a contract or agreement for purchase is considered for approval by the governing board. However, each district may, at its discretion, disclose appraisal reports to private landowners during negotiations for acquisitions using alternatives to fee simple techniques, if the district determines that disclosure of such reports will bring the proposed acquisition to closure. If negotiation is terminated by the district, the appraisal report, offers, and counteroffers shall become available pursuant to s. 119.07(1). Notwithstanding this section and s. 253.025, a district and the Division of State Lands may share and disclose appraisal reports, appraisal information, offers, and counteroffers when joint acquisition of property is contemplated. A district and the Division of State Lands shall maintain the confidentiality of such appraisal reports, appraisal information, offers, and counteroffers in conformance with this section and s. 253.025, except in those cases in which a district and the division have exercised discretion to disclose such information. A district may disclose appraisal information, offers, and counteroffers to a third party who has entered into a contractual agreement with the district to work with or on the behalf of or to assist the district in connection with land acquisitions. The third party shall maintain the confidentiality of such information in conformance with this section. In addition, a district may use, as its own, appraisals obtained by a third party provided the appraiser is selected from the district's list of approved appraisers and the appraisal is reviewed and approved by the district.

(b)　The Secretary of Environmental Protection shall release moneys from the appropriate account or trust fund to a district for preacquisition costs within 30 days after receipt of a resolution adopted by the district's governing board which identifies and justifies any such preacquisition costs necessary for the purchase of any lands listed in the district's 5-year work plan. The district shall return to the department any funds not used for the purposes stated in the resolution, and the department shall deposit the unused funds into the appropriate account or trust fund.

(c)　The Secretary of Environmental Protection shall release acquisition moneys from the appropriate account or trust fund to a district following receipt of a resolution adopted by the governing board identifying the lands being

acquired and certifying that such acquisition is consistent with the 5-year work plan of acquisition and other provisions of this section. The governing board also shall provide to the Secretary of Environmental Protection a copy of all certified appraisals used to determine the value of the land to be purchased. Each parcel to be acquired must have at least one appraisal. Two appraisals are required when the estimated value of the parcel exceeds $1 million. However, when both appraisals exceed $1 million and differ significantly, a third appraisal may be obtained. If the purchase price is greater than the appraisal price, the governing board shall submit written justification for the increased price. The Secretary of Environmental Protection may withhold moneys for any purchase that is not consistent with the 5-year plan or the intent of this section or that is in excess of appraised value. The governing board may appeal any denial to the Land and Water Adjudicatory Commission pursuant to s. 373.114.

(4)   The governing board of the district may purchase tax certificates or tax deeds issued in accordance with chapter 197 relating to property eligible for purchase under this section.

(5)   This section shall not limit the exercise of similar powers delegated by statute to any state or local governmental agency or other person.

(6)   A district may dispose of land acquired under this section pursuant to s. 373.056 or s. 373.089. However, no such disposition of land shall be made if it would have the effect of causing all or any portion of the interest on any revenue bonds issued pursuant to s. 259.101 or s. 259.105 to fund the acquisition programs detailed in this section to lose the exclusion from gross income for purposes of federal income taxation. Revenue derived from such disposition may not be used for any purpose except the purchase of other lands meeting the criteria specified in this section or payment of debt service on revenue bonds or notes issued under s. 373.584.

(7)   The districts have the authority to promulgate rules that include the specific process by which land is acquired; the selection and retention of outside appraisers, surveyors, and acquisition agents; and public notification. Rules adopted pursuant to this subsection shall be submitted to the President of the Senate and the Speaker of the House of Representatives, for review by the Legislature, no later than 30 days prior to the 2001 Regular Session and shall become effective only after legislative review. In its review, the Legislature may reject, modify, or take no action relative to such rules. The districts shall conform such rules to changes made by the Legislature, or, if no action was taken by the Legislature, such rules shall become effective.

**History.**—s. 26, part I, ch. 72-299; s. 1, ch. 72-318; s. 3, ch. 85-347; s. 7, ch. 86-294; s. 4, ch. 89-117; s. 5, ch. 91-288; s. 6, ch. 94-240; s. 16, ch. 96-389; s. 173, ch. 96-406; s. 12, ch. 97-160; s. 13, ch. 97-164; s. 33, ch. 99-247; s. 13, ch. 2000-170; s. 13, ch. 2001-256; s. 11, ch. 2003-394; s. 38, ch. 2016-233.

### 373.1391   Management of real property.—

(1)(a)   Lands titled to the governing boards of the districts shall be managed and maintained, to the extent practicable, in such a way as to ensure a balance between public access, general public recreational purposes, and restoration and protection of their natural state and condition. Except when prohibited by a covenant or condition described in s. 373.056(2), lands owned, managed, and controlled by the district may be used for multiple purposes, including, but not limited to, agriculture, silviculture, and water supply, as well as boating and other recreational uses.

(b)   Whenever practicable, such lands shall be open to the general public for recreational uses. General public recreational purposes shall include, but not be limited to, fishing, hunting, horseback riding, swimming, camping, hiking, canoeing, boating, diving, birding, sailing, jogging, and other related outdoor activities to the maximum extent possible considering the environmental sensitivity and suitability of those lands. These public lands shall be evaluated for their resource value for the purpose of establishing which parcels, in whole or in part, annually or seasonally, would be conducive to general public recreational purposes. Such findings shall be included in management plans which are developed for such public lands. These lands shall be made available to the public for these purposes, unless the district governing board can demonstrate that such activities would be incompatible with the purposes for which these lands were acquired. The department in its supervisory capacity shall ensure that the districts provide consistent levels of public access to district lands, consistent with the purposes for which the lands were acquired.

(c)  In developing or reviewing land management plans when a dispute arises that has not been resolved by a water management district's final agency action, that dispute must be resolved under chapter 120.

(d)  For any fee simple acquisition of a parcel which is or will be leased back for agricultural purposes, or for any acquisition of a less-than-fee interest in lands that is or will be used for agricultural purposes, the district governing board shall first consider having a soil and water conservation district created pursuant to chapter 582 manage and monitor such interest.

(2)  Interests in real property acquired by the districts under this section with funds other than those appropriated under the Florida Forever Act may be used for permittable water resource development and water supply development purposes under the following conditions: the minimum flows and levels of priority water bodies on such lands have been established; the project complies with all conditions for issuance of a permit under part II of this chapter; and the project is compatible with the purposes for which the land was acquired.

(3)  Each district is encouraged to use volunteers to provide land management and other services. Volunteers shall be covered by liability protection and workers' compensation in the same manner as district employees, unless waived in writing by such volunteers or unless such volunteers otherwise provide equivalent insurance.

(4)  Each water management district is authorized and encouraged to enter into cooperative land management agreements with state agencies or local governments to provide for the coordinated and cost-effective management of lands to which the water management districts, the Board of Trustees of the Internal Improvement Trust Fund, or local governments hold title. Any such cooperative land management agreement must be consistent with any applicable laws governing land use, management duties, and responsibilities and procedures of each cooperating entity. Each cooperating entity is authorized to expend such funds as are made available to it for land management on any such lands included in a cooperative land management agreement.

(5)  The following additional uses of lands acquired pursuant to the Florida Forever program and other state-funded land purchase programs shall be authorized, upon a finding by the governing board, if they meet the criteria specified in paragraphs (a)-(e): water resource development projects, water supply development projects, stormwater management projects, linear facilities, and sustainable agriculture and forestry. Such additional uses are authorized where:

(a)  Not inconsistent with the management plan for such lands;

(b)  Compatible with the natural ecosystem and resource values of such lands;

(c)  The proposed use is appropriately located on such lands and where due consideration is given to the use of other available lands;

(d)  The using entity reasonably compensates the titleholder for such use based upon an appropriate measure of value; and

(e)  The use is consistent with the public interest.

A decision by the governing board pursuant to this subsection shall be given a presumption of correctness. Moneys received from the use of state lands pursuant to this subsection shall be returned to the lead managing agency.

(6)  The districts have the authority to adopt rules that specify: allowable activities on district-owned lands; the amount of fees, licenses, or other charges for users of district-owned lands; the application and reimbursement process for payments in lieu of taxes; the use of volunteers for management activities; and the processes related to entering into or severing cooperative land management agreements. Rules promulgated pursuant to the subsection shall become effective only after submitted to the President of the Senate and Speaker of the House of Representatives for review by the Legislature not later than 30 days prior to the next regular session. In its review, the Legislature may reject, modify, or take no action relative to such rules. The districts shall conform such rules to changes made by the Legislature, or, if no action is taken, such rules shall become effective.

History.—s. 34, ch. 99-247; s. 14, ch. 2000-170; s. 16, ch. 2008-229; s. 37, ch. 2015-229.

**373.1395    Limitation on liability of water management district with respect to areas made available to the public for recreational purposes without charge.**—

(1)   The purpose of this section is to encourage water management districts to make available land, water areas, and park areas to the public for outdoor recreational purposes by limiting their liability to persons going thereon and to third persons who may be damaged by the acts or omissions of persons going thereon.

(2)   Except as provided in subsection (6), a water management district that provides the public with a park area or other land or water area for outdoor recreational purposes, or allows access over or the use of district or other lands or water areas for recreational purposes, owes no duty of care to keep that park area, district or other lands, or water areas safe for entry or use by others or to give warning to persons entering or going on that park area, district or other lands, or water areas of any hazardous conditions, structures, or activities thereon. A water management district that provides the public with a park area, district or other lands, or water areas for outdoor recreational purposes, or that allows access over or the use of a park area, district or other lands, or water areas, does not, by providing that park area, district or other lands, or water areas or by allowing access over or the use of that park area, district or other lands, or water areas, extend any assurance that such park area, district or other lands, or water areas are safe for any purpose, does not incur any duty of care toward a person who goes on that park area, district or other lands, or water areas, and is not responsible for any injury to persons or property caused by an act or omission of a person who goes on that park area, district or other lands, or water areas. This subsection does not apply if there is any charge made or usually made for entering or using the park area, district or other lands, or water areas, or if any commercial or other activity from which profit is derived from the patronage of the public, excluding the temporary sale of food, beverages, plants, or tee shirts at temporary special events or nonprofit organizational activities associated with temporary special events, is conducted on such park area, district or other lands, or water areas or any part thereof.

(3)(a)   This section applies to any park area, district or other lands, or water areas whether the person goes on as an invitee, licensee, or trespasser or otherwise.

(b)   The protections, immunities, and limitations of liability provided in this section to water management districts apply regardless of whether any claimant or person was engaged in an outdoor recreational purpose at the time of an accident or occurrence and applies to park areas, district or other lands, and water areas actually used by the public for recreational activities regardless of whether the park area, district or other lands, or water areas were made available to the public at the time of the accident or occurrence.

(4)(a)   Except as provided in subsection (6), a water management district that leases any land or water area to the state for outdoor recreational purposes, or for access to outdoor recreational purposes, owes no duty of care to keep that land or water area safe for entry or use by others or to give warning to persons entering or going on that land or water of any hazardous conditions, structures, or activities thereon. A water management district that leases a land or water area to the state for outdoor recreational purposes does not, by giving such lease, extend any assurance that such land or water area is safe for any purpose, incur any duty of care toward a person who goes on the leased land or water area, and is not responsible for any injury to persons or property caused by an act or omission of a person who goes on the leased land or water area.

(b)   This subsection applies to any person going on the leased land or water area whether the person goes as an invitee, licensee, trespasser, or otherwise.

(5)   If a water management district has secured an easement or other right that is being used for the purpose of providing access through private land to lands or water areas that the water management district provides or makes available to the public for outdoor recreational purposes, the owner of the private land is covered by the liability protection provided in s. 375.251 with regard to the use of such easement by the general public or by employees and agents of the water management district or other regulatory agencies.

(6)   This section does not relieve any water management district of any liability that would otherwise exist for gross negligence or a deliberate, willful, or malicious injury to a person or property. This section does not create or increase the liability of any water management district or person beyond that which is authorized by s. 768.28.

(7)   As used in this section, the term:

(a)   "Outdoor recreational purposes" includes activities such as, but not limited to, horseback riding, hunting, fishing, bicycling, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, motorcycling, and visiting historical, archaeological, scenic, or scientific sites.

(b)　"Park area, district or other lands, or water areas" includes, but is not limited to, all park areas, district or other land, right of ways, and water areas that the water management district controls, possesses, or maintains, or in which the water management district has a property or other interest, whether in fee simple, easement, leasehold, contract, memorandum of understanding, or otherwise.

History.—s. 12, ch. 92-288; s. 1, ch. 94-144; s. 7, ch. 94-240; s. 1007, ch. 95-148; s. 1, ch. 2009-201.

**373.1401　Management of lands of water management districts.**—In addition to provisions contained in s. 373.1391(1) for soil and water conservation districts, the governing board of each water management district may contract with a nongovernmental person or entity, any federal or state agency, a county, a municipality, or any other governmental entity, or environmental nonprofit organization to provide for the improvement, management, or maintenance of any real property owned by or under the control of the district.

History.—s. 6, ch. 91-288; s. 14, ch. 2001-256.

**373.145　Information program regarding hydrologic conditioning and consumption of major surface and groundwater sources.**—In order to aid in the development of a better understanding of the unique surface and groundwater resources of this state, the water management districts shall develop an information program designed to provide information concerning existing hydrologic conditions of major surface and groundwater sources in this state and suggestions for good conservation practices within those areas. The water management districts shall utilize the most efficient means to regularly distribute this information to members of the Legislature, the media, and the public.

History.—s. 38, ch. 2002-296; s. 39, ch. 2005-2; s. 7, ch. 2005-36.

**373.146　Publication of notices, process, and papers.**—

(1)　Whenever in this chapter the publication of any notice, process, or paper is required or provided for, unless otherwise provided by law, the publication thereof in some newspaper or newspapers as defined in chapter 50 having general circulation within the area to be affected shall be taken and considered as being sufficient.

(2)　Notwithstanding any other provision of law to the contrary, and except in the case of emergency meetings, water management districts may provide reasonable notice of public meetings held to evaluate responses to solicitations issued by the water management district, by publication in a newspaper of general paid circulation in the county where the principal office of the water management district is located, or in the county or counties where the public work will be performed, no less than 7 days before such meeting.

History.—s. 44, ch. 25209, 1949; s. 27, part I, ch. 72-299; s. 25, ch. 73-190; s. 14, ch. 78-95; s. 35, ch. 99-247.

Note.—Former s. 378.44.

**373.149　Existing districts preserved.**—The enactment of this act shall not affect the existence of the Central and Southern Florida Flood Control District created by chapter 25270, 1949, Laws of Florida, or the Southwest Florida Water Management District, created by chapter 61-691, Laws of Florida, or any contract or obligation of such districts entered into prior to the effective date of this act. The two districts shall continue to exercise the taxing powers authorized to them in the territories within their respective boundaries, except that nothing herein shall limit the department in considering and recommending to the 1973 session of the Legislature changes in the boundaries and transfers of funds, appropriations, personnel, property, or equipment between or among the existing districts and districts created by this chapter. The two districts shall continue to exercise the powers presently authorized by chapter 378 and this chapter, notwithstanding provisions contained to the contrary in this chapter, until any such powers shall be specifically revoked or modified by the department pursuant to this chapter, except that the provisions of s. 373.139 relating to acquisition of real property shall apply.

History.—s. 28, part I, ch. 72-299.

**373.1501　South Florida Water Management District as local sponsor.**—

(1)　As used in this section and s. 373.026(8), the term:

(a)　"C-111 Project" means the project identified in the Central and Southern Florida Flood Control Project, Real Estate Design Memorandum, Canal 111, South Miami-Dade County, Florida.

(b) "Department" means the Department of Environmental Protection.

(c) "District" means the South Florida Water Management District.

(d) "Kissimmee River Restoration Project" means the project identified in the Project Cooperation Agreement between the United States Department of the Army and the South Florida Water Management District dated March 22, 1994.

(e) "Pal-Mar Project" means the Pal-Mar (West Jupiter Wetlands) lands identified in the Save Our Rivers 2000 Land Acquisition and Management Plan approved by the South Florida Water Management District on September 9, 1999 (Resolution 99-94).

(f) "Project" means the Central and Southern Florida Project.

(g) "Project component" means any structural or operational change, resulting from the restudy, to the Central and Southern Florida Project as it existed and was operated as of January 1, 1999.

(h) "Restudy" means the Comprehensive Review Study of the Central and Southern Florida Project, for which federal participation was authorized by the federal Water Resources Development Acts of 1992 and 1996 together with related Congressional resolutions and for which participation by the South Florida Water Management District is authorized by this section. The term includes all actions undertaken pursuant to the aforementioned authorizations which will result in recommendations for modifications or additions to the Central and Southern Florida Project.

(i) "Southern Corkscrew Regional Ecosystem Watershed Project" means the area described in the Critical Restoration Project Contract C-9906 Southern Corkscrew Regional Ecosystem Watershed Project Addition/Imperial River Flowway and approved by the South Florida Water Management District on August 12, 1999.

(j) "Water Preserve Areas" means those areas located only within Palm Beach and Broward counties that are designated as Water Preserve Areas, as approved by the South Florida Water Management District Governing Board on September 11, 1997, and shall also include all of those lands within Cell II of the East Coast Buffer in Broward County as delineated in the boundary survey prepared by Stoner and Associates, Inc., dated January 31, 2000, SWFWMD #10953.

(k) "Ten Mile Creek Project" means the Ten Mile Creek Water Preserve Area identified in the Central and Southern Florida Ecosystem Critical Project Letter Report dated April 13, 1998.

(2) The Legislature finds that the restudy is important for restoring the Everglades ecosystem and sustaining the environment, economy, and social well-being of South Florida. It is the intent of the Legislature to facilitate and support the restudy through a process concurrent with Federal Government review and Congressional authorization. Nothing in this section is intended in any way to limit federal agencies or Congress in the exercise of their duties and responsibilities. It is further the intent of the Legislature that all project components be implemented through the appropriate processes of this chapter and be consistent with the balanced policies and purposes of this chapter, specifically s. 373.016.

(3) The Legislature declares that the Kissimmee River Project, the Ten Mile Creek Project, the Water Preserve Areas, the Southern Corkscrew Regional Ecosystem Watershed Project, the Pal-Mar Project, and the C-111 Project are in the public interest, for a public purpose, and necessary for the public health and welfare. The governing board of the district is empowered and authorized to acquire fee title or easement by eminent domain for the limited purposes of implementing the Kissimmee River Project, the Ten Mile Creek Project, the Water Preserve Areas, the Southern Corkscrew Regional Ecosystem Watershed Project, the Pal-Mar Project, and the C-111 Project. Any acquisition of real property, including by eminent domain, for those objectives constitutes a public purpose for which it is in the public interest to expend public funds. Notwithstanding any provision of law to the contrary, such properties shall not be removed from the district's plan of acquisition, and the use of state funds for these properties is authorized. In the absence of willing sellers, any land necessary for implementing the projects in this subsection shall be acquired in accordance with state condemnation law pursuant to chapters 73 and 74.

(4) The district is authorized to act as local sponsor of the project for those project features within the district as provided in this subsection and subject to the oversight of the department as further provided in s. 373.026. The district shall exercise the authority of the state to allocate quantities of water within its jurisdiction, including the

water supply in relation to the project, and be responsible for allocating water and assigning priorities among the other water uses served by the project pursuant to state law. The district may:

(a)   Act as local sponsor for all project features previously authorized by Congress.

(b)   Continue data gathering, analysis, research, and design of project components, participate in preconstruction engineering and design documents for project components, and further refine the Comprehensive Plan of the restudy as a guide and framework for identifying other project components.

(c)   Construct pilot projects that will assist in determining the feasibility of technology included in the Comprehensive Plan of the restudy.

(d)   Act as local sponsor for project components.

(5)   In its role as local sponsor for the project, the district shall comply with its responsibilities under this chapter and implement project components through appropriate provisions of this chapter. In the development of project components, the district shall:

(a)   Analyze and evaluate all needs to be met in a comprehensive manner and consider all applicable water resource issues, including water supply, water quality, flood protection, threatened and endangered species, and other natural system and habitat needs;

(b)   Determine with reasonable certainty that all project components are feasible based upon standard engineering practices and technologies and are the most efficient and cost-effective of feasible alternatives or combination of alternatives, consistent with restudy purposes, implementation of project components, and operation of the project;

(c)   Determine with reasonable certainty that all project components are consistent with applicable law and regulations, and can be permitted and operated as proposed. For purposes of such determination:

1.   The district shall convene a preapplication conference with all state and federal agencies with applicable regulatory jurisdiction;

2.   State agencies with applicable regulatory jurisdiction shall participate in the preapplication conference and provide information necessary for the district's determination; and

3.   The district shall request that federal agencies with applicable regulatory jurisdiction participate in the preapplication conference and provide information necessary for the district's determination;

(d)   Consistent with this chapter, the purposes for the restudy provided in the Water Resources Development Act of 1996, and other applicable federal law, provide reasonable assurances that the quantity of water available to existing legal users shall not be diminished by implementation of project components so as to adversely impact existing legal users, that existing levels of service for flood protection will not be diminished outside the geographic area of the project component, and that water management practices will continue to adapt to meet the needs of the restored natural environment.

(e)   Ensure that implementation of project components is coordinated with existing utilities and public infrastructure and that impacts to or relocation of existing utility or public infrastructure are minimized.

(6)   The department and the district shall expeditiously pursue implementation of project modifications previously authorized by Congress or the Legislature, including the Everglades Construction Project. Project components should complement and should not delay project modifications previously authorized.

(7)   When developing or implementing water control plans or regulation schedules required for the operation of the project, the district shall provide recommendations to the United States Army Corps of Engineers which are consistent with all district programs and plans.

(8)   Notwithstanding any provision of this section, nothing herein shall be construed to modify or supplant the authority of the district or the department to prevent harm to the water resources as provided in this chapter.

(9)   Final agency action with regard to any project component subject to s. 373.026(8)(b) shall be taken by the department. Actions taken by the district pursuant to subsection (5) shall not be considered final agency action. Any petition for formal proceedings filed pursuant to ss. 120.569 and 120.57 shall require a hearing under the summary hearing provisions of s. 120.574, which shall be mandatory. The final hearing under this section shall be held within 30 days after receipt of the petition by the Division of Administrative Hearings.

**History.**—s. 1, ch. 99-143; s. 15, ch. 2000-170; s. 81, ch. 2008-4; s. 8, ch. 2016-1.

**373.1502　Regulation of comprehensive plan project components.**—

(1)　SHORT TITLE.—This section may be cited as the "Comprehensive Everglades Restoration Plan Regulation Act."

(2)　FINDINGS; INTENT.—

(a)　The Legislature finds that implementation of the comprehensive plan, as defined in s. 373.470(2)(b), is in the public interest and is necessary for restoring, preserving, and protecting the South Florida ecosystem, providing for the protection of water quality in and the reduction of the loss of fresh water from the Everglades, and providing such features as are necessary to meet the other water-related needs of the region, including flood control, the enhancement of water supplies, and other objectives served by the project.

(b)　The Legislature intends to provide efficient and effective permitting of project components, taking into account all other statutory responsibilities the department and the South Florida Water Management District are required to consider.

(3)　REGULATION OF COMPREHENSIVE PLAN STRUCTURES AND FACILITIES.—

(a)　This subsection applies to all project components, as defined in s. 373.1501, identified in the comprehensive plan unless the project component is otherwise subject to s. 373.4592, s. 373.4595, or the department's rules on reuse of reclaimed water. Permits issued under this subsection are in lieu of all other permits required under this chapter or chapter 403, except for permits issued under any delegated or approved federal program.

(b)　The department shall issue a permit for a term of 5 years for the construction, operation, modification, or maintenance of a project component based on the criteria set forth in this section. If the department is the entity responsible for the construction, operation, modification, or maintenance of any individual project component, the district shall issue a permit for a term of 5 years based on the criteria set forth in this section. The permit application must provide reasonable assurances that:

1.　The project component will achieve the design objectives set forth in the detailed design documents submitted as part of the application.

2.　State water quality standards, including water quality criteria and moderating provisions, will be met. Under no circumstances shall the project component cause or contribute to violation of state water quality standards.

3.　Discharges from the project component will not pose a serious danger to public health, safety, or welfare.

4.　Any impacts to wetlands or threatened or endangered species resulting from implementation of the project component will be avoided, minimized, and mitigated, as appropriate.

(c)　Construction activities for comprehensive plan project components may be initiated upon submission of a permit application and completion of the department's approval under s. 373.1501, but before final agency action or notice of intended agency action. However, a permit must be obtained before the commencement or modification of operation.

(d)　Permits issued under this subsection must contain reasonable conditions to ensure that water quality resulting from construction and operation of project components is adequately and accurately monitored.

(e)　Permits issued under this subsection may:

1.　Authorize construction, operation, modification, and maintenance of individual or multiple project components under a single permit;

2.　Include any standard conditions provided by department rule which are appropriate and consistent with this subsection; or

3.　Establish reporting requirements that are consolidated with other reports if all reporting requirements are met.

(f)　The permitting entity shall require a processing fee in an amount sufficient to cover the costs of reviewing and acting upon any application for a permit under this section and to cover the costs of surveillance associated with any permit issued under this section.

(g)　At least 60 days before the expiration of any permit issued under this subsection, the permittee may apply for a renewal for a term of 5 years. Such submittals are considered timely and sufficient under s. 120.60(4).

Permits issued under this subsection may be modified upon review and approval by the department or district, as appropriate.

(h)   Project components that would otherwise qualify as exempt pursuant to s. 373.406 shall not need permits under this section.

History.—s. 2, ch. 2001-172; s. 7, ch. 2002-261; s. 19, ch. 2003-394; s. 82, ch. 2008-4.

**373.171    Rules.—**

(1)   In order to obtain the most beneficial use of the water resources of the state and to protect the public health, safety, and welfare and the interests of the water users affected, governing boards, by action not inconsistent with the other provisions of this law and without impairing property rights, may:

(a)   Adopt rules or issue orders affecting the use of water, as conditions warrant, and forbidding the construction of new diversion facilities or wells, the initiation of new water uses, or the modification of any existing uses, diversion facilities, or storage facilities within the affected area.

(b)   Regulate the use of water within the affected area by apportioning, limiting, or rotating uses of water or by preventing those uses which the governing board finds have ceased to be reasonable or beneficial.

(c)   Issue orders and adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this chapter.

(2)   In adopting rules and issuing orders under this law, the governing board shall act with a view to full protection of the existing rights to water in this state insofar as is consistent with the purpose of this law.

(3)   No rule or order shall require any modification of existing use or disposition of water in the district unless it is shown that the use or disposition proposed to be modified is detrimental to other water users or to the water resources of the state.

(4)   All rules adopted by the governing board shall be filed with the Department of State as provided in chapter 120. An information copy will be filed with the Department of Environmental Protection.

(5)   Cooperative funding programs are not subject to the rulemaking requirements of chapter 120. However, any portion of an approved program which affects the substantial interests of a party is subject to s. 120.569.

History.—s. 11, ch. 57-380; s. 8, ch. 63-336; ss. 10, 25, 35, ch. 69-106; s. 8, ch. 76-243; s. 1, ch. 77-117; s. 14, ch. 78-95; s. 256, ch. 94-356; s. 84, ch. 98-200; s. 3, ch. 2013-229.

**373.1725    Notice of intent by publication.—**In addition to rulemaking procedures required pursuant to chapter 120, the water management districts, when proposing to adopt, amend, or repeal any rule, shall provide notice of intent by publication in a newspaper of general circulation in the affected area. The publication notice shall summarize the proposed rule and shall occur at least 14 days prior to the intended action.

History.—s. 12, ch. 91-288.

**373.175    Declaration of water shortage; emergency orders.—**

(1)   The governing board of the district may by order declare that a water shortage exists within all or part of the district when insufficient ground or surface water is available to meet the needs of the users or when conditions are such as to require temporary reduction in total use within the area to protect water resources from serious harm.

(2)   The governing board may impose such restrictions on one or more users of the water resource as may be necessary to protect the water resources of the area from serious harm.

(3)   When a water shortage is declared, the governing board shall cause notice thereof to be published in a prominent place within a newspaper of general circulation throughout the area. Publication of such notice shall serve as notice to all users in the area of the condition of water shortage.

(4)   If an emergency condition exists due to a water shortage within any area of the district and the executive director of the district, with the concurrence of the governing board, finds that the exercise of powers under this section is not sufficient to protect the public health, safety, or welfare, the health of animals, fish, or aquatic life, a public water supply, or recreational, commercial, industrial, agricultural, or other reasonable uses, the executive director may, pursuant to the provisions of chapter 120, issue emergency orders reciting the existence of such an

emergency and requiring that such action, including, but not limited to, apportioning, rotating, limiting, or prohibiting the use of the water resources of the district, be taken as the executive director, with the concurrence of the governing board, deems necessary to meet the emergency.

History.—s. 1, ch. 72-730; s. 25, ch. 73-190; s. 1, ch. 73-295; s. 14, ch. 78-95; s. 35, ch. 83-218; s. 597, ch. 95-148.
Note.—Former s. 378.152.


373.185    Local Florida-friendly landscaping ordinances.—

(1)   As used in this section, the term:

(a)   "Local government" means any county or municipality of the state.

(b)   "Florida-friendly landscaping" means quality landscapes that conserve water, protect the environment, are adaptable to local conditions, and are drought tolerant. The principles of such landscaping include planting the right plant in the right place, efficient watering, appropriate fertilization, mulching, attraction of wildlife, responsible management of yard pests, recycling yard waste, reduction of stormwater runoff, and waterfront protection. Additional components include practices such as landscape planning and design, soil analysis, the appropriate use of solid waste compost, minimizing the use of irrigation, and proper maintenance.

(2)   Each water management district shall design and implement an incentive program to encourage all local governments within its district to adopt new ordinances or amend existing ordinances to require Florida-friendly landscaping for development permitted after the effective date of the new ordinance or amendment. Each district shall assist the local governments within its jurisdiction by providing a model Florida-friendly landscaping ordinance and other technical assistance. Each district may develop its own model or use a model contained in the "Florida-Friendly Landscape Guidance Models for Ordinances, Covenants, and Restrictions" manual developed by the department. To qualify for a district's incentive program, a local government ordinance or amendment must include, at a minimum:

(a)   Landscape design, installation, and maintenance standards that result in water conservation and water quality protection or restoration. Such standards must address the use of plant groupings, soil analysis including the promotion of the use of solid waste compost, efficient irrigation systems, and other water-conserving practices.

(b)   Identification of prohibited invasive exotic plant species consistent with s. 581.091.

(c)   Identification of controlled plant species, accompanied by the conditions under which such plants may be used.

(d)   A provision specifying the maximum percentage of irrigated turf and impervious surfaces allowed in a Florida-friendly landscaped area and addressing the practical selection and installation of turf.

(e)   Specific standards for land clearing and requirements for the preservation of existing native vegetation.

(f)   A monitoring program for ordinance implementation and compliance.

(3)   Each water management district shall also work with the department, local governments, county extension agents or offices, nursery and landscape industry groups, and other interested stakeholders to promote, through educational programs, publications, and other district activities authorized under this chapter, the use of Florida-friendly landscaping practices, including the use of solid waste compost, in residential and commercial development. In conducting these activities, each district shall use the materials developed by the department, the Institute of Food and Agricultural Sciences at the University of Florida, and the Center for Landscape Conservation and Ecology Florida-Friendly Landscaping Program, including, but not limited to, the Florida Yards and Neighborhoods Program for homeowners, the Florida Yards and Neighborhoods Builder Developer Program for developers, and the Green Industries Best Management Practices Program for landscaping professionals. Each district may develop supplemental materials as appropriate to address the physical and natural characteristics of the district. The districts shall coordinate with the department and the Institute of Food and Agricultural Sciences at the University of Florida if revisions to the educational materials are needed.

(a)   The Legislature finds that the use of Florida-friendly landscaping and other water use and pollution prevention measures to conserve or protect the state's water resources serves a compelling public interest and

that the participation of homeowners' associations and local governments is essential to the state's efforts in water conservation and water quality protection and restoration.

(b)    A deed restriction or covenant may not prohibit or be enforced so as to prohibit any property owner from implementing Florida-friendly landscaping on his or her land or create any requirement or limitation in conflict with any provision of part II of this chapter or a water shortage order, other order, consumptive use permit, or rule adopted or issued pursuant to part II of this chapter.

(c)    A local government ordinance may not prohibit or be enforced so as to prohibit any property owner from implementing Florida-friendly landscaping on his or her land.

(4)    This section does not limit the authority of the department or the water management districts to require Florida-friendly landscaping ordinances or practices as a condition of any permit issued under this chapter.

History.—s. 3, ch. 91-41; s. 3, ch. 91-68; s. 7, ch. 2001-252; s. 17, ch. 2009-243.

373.187    **Water management district implementation of Florida-friendly landscaping.**—Each water management district shall use Florida-friendly landscaping, as defined in s. 373.185, on public property associated with buildings and facilities owned by the district and constructed after June 30, 2009. Each district shall also develop a 5-year program for phasing in the use of Florida-friendly landscaping on public property associated with buildings or facilities owned by the district and constructed before July 1, 2009.

History.—s. 18, ch. 2009-243.

373.199    **Florida Forever Water Management District Work Plan.**—

(1)    Over the years, the Legislature has created numerous programs and funded several initiatives intended to restore, conserve, protect, and manage Florida's water resources and the lands and ecosystems associated with them. Although these programs and initiatives have yielded individual successes, the overall quality of Florida's water resources continues to degrade; natural systems associated with surface waters continue to be altered or have not been restored to a fully functioning level; and sufficient quantities of water for current and future reasonable beneficial uses and for natural systems remain in doubt.

(2)    Therefore, in order to further the goals of the Florida Forever Act each water management district shall develop a 5-year work plan that identifies projects that meet the criteria in subsections (3), (4), and (5).

(3)    In developing the list, each water management district shall:

(a)    Integrate its existing surface water improvement and management plans, Save Our Rivers land acquisition lists, stormwater management projects, proposed water resource development projects, proposed water body restoration projects, proposed capital improvement projects necessary to promote reclamation, storage, or recovery of water, and other properties or activities that would assist in meeting the goals of Florida Forever.

(b)    Work cooperatively with the applicable ecosystem management area teams and other citizen advisory groups, the Department of Environmental Protection and its district offices, the Department of Agriculture and Consumer Services, the Fish and Wildlife Conservation Commission, the Department of Economic Opportunity, the Department of Transportation, other state agencies, and federal agencies, where applicable.

(4)    The list submitted by the districts shall include, where applicable, the following information for each project:

(a)    A description of the water body system, its historical and current uses, and its hydrology; a history of the conditions which have led to the need for restoration or protection; and a synopsis of restoration efforts that have occurred to date, if applicable.

(b)    An identification of all governmental units that have jurisdiction over the water body and its drainage basin within the approved surface water improvement and management plan area, including local, regional, state, and federal units.

(c)    A description of land uses within the project area's drainage basin, and of important tributaries, point and nonpoint sources of pollution, and permitted discharge activities associated with that basin.

(d)    A description of strategies and potential strategies, including improved stormwater management, for restoring or protecting the water body to Class III or better surface water quality status. Such strategies may utilize

Case 1:21-cv-00119-RDM    Document 54-3    Filed 06/22/21    Page 394 of 583

alternative technologies for pollutant reduction, such as cost-effective biologically-based, hybrid wetlands/chemical and other innovative nutrient control technologies.

(e)   A listing and synopsis of studies that are being or have been prepared for the water body, stormwater management project, or water resource development project.

(f)   A description of the measures needed to manage and maintain the water body once it has been restored and to prevent future degradation, to manage and maintain the stormwater management system, or to manage and maintain the water resource development project.

(g)   A schedule for restoration and protection of the water body, implementation of the stormwater management project, or development of the water resource development project.

(h)   A clear and concise estimate of the funding needed to carry out the restoration, protection, or improvement project, or the development of new water resources, where applicable, and a clear and concise identification of the projected sources and uses of Florida Forever funds.

(i)   Numeric performance measures for each project. Each performance measure shall include a baseline measurement, which is the current situation; a performance standard, which water management district staff anticipates the project will achieve; and the performance measurement itself, which should reflect the incremental improvements the project accomplishes towards achieving the performance standard. These measures shall reflect the relevant goals detailed in s. 259.105(4).

(j)   A discussion of permitting and other regulatory issues related to the project.

(k)   An identification of the proposed public access for projects with land acquisition components, including the Florida National Scenic Trail.

(l)   An identification of those lands which require a full fee simple interest to achieve water management goals and those lands which can be acquired using alternatives to fee simple acquisition techniques and still achieve such goals. In their evaluation of which lands would be appropriate for acquisition through alternatives to fee simple, district staff shall consider criteria including, but not limited to, acquisition costs, the net present value of future land management costs, the net present value of ad valorem revenue loss to the local government, and potential for revenue generated from activities compatible with acquisition objectives.

(m)   An identification of lands needed to protect or recharge groundwater and a plan for their acquisition as necessary to protect potable water supplies. Lands which serve to protect or recharge groundwater identified pursuant to this paragraph shall also serve to protect other valuable natural resources or provide space for natural resource based recreation.

(5)   The list of projects shall indicate the relative significance of each project within the particular water management district's boundaries, and the schedule of activities and sums of money earmarked should reflect those rankings as much as possible over a 5-year planning horizon.

(6)   Each district shall remove the property of an unwilling seller from its 5-year work plan at the next scheduled update of the plan, if in receipt of a request to do so by the property owner.

(7)   By June 1, 2001, each district shall file with the President of the Senate, the Speaker of the House of Representatives, and the Secretary of Environmental Protection the initial 5-year work plan as required under subsection (2). By March 1 of each year thereafter, as part of the consolidated annual report required by s. 373.036(7), each district shall report on acquisitions completed during the year together with modifications or additions to its 5-year work plan. Included in the report shall be:

(a)   A description of land management activity for each property or project area owned by the water management district.

(b)   A list of any lands surplused and the amount of compensation received.

(c)   The progress of funding, staffing, and resource management of every project funded pursuant to former s. 259.101(3), Florida Statutes 2014, s. 259.105, or former s. 373.59(2), Florida Statutes 2014, for which the district is responsible.

The secretary shall submit the report referenced in this subsection to the Board of Trustees of the Internal Improvement Trust Fund together with the Acquisition and Restoration Council's project list as required under s.

259.105.

History.—s. 36, ch. 99-247; s. 16, ch. 2000-170; s. 9, ch. 2005-36; s. 12, ch. 2005-87; s. 17, ch. 2008-229; s. 248, ch. 2011-142; s. 38, ch. 2015-229.

**373.200**    **Seminole Tribe Water Rights Compact.**—Pursuant to the provisions of s. 285.165, the South Florida Water Management District is authorized to act in accordance with the Seminole Tribe Water Rights Compact incorporated by reference therein.

History.—s. 6, ch. 2000-133.

<div align="center">

PART II
PERMITTING OF CONSUMPTIVE
USES OF WATER

</div>

373.203  Definitions.

373.206  Artesian wells; flow regulated.

373.207  Abandoned artesian wells.

373.209  Artesian wells; penalties for violation.

373.213  Certain artesian wells exempt.

373.216  Implementation of program for regulating the consumptive use of water.

373.217  Superseded laws and regulations.

373.219  Permits required.

373.223  Conditions for a permit.

373.2234  Preferred water supply sources.

373.2235  Effect of prior land acquisition on consumptive use permitting.

373.224  Existing permits.

373.226  Existing uses.

373.227  Water conservation; legislative findings and intent; objectives; comprehensive statewide water conservation program requirements.

373.228  Landscape irrigation design.

373.229  Application for permit.

373.2295  Interdistrict transfers of groundwater.

373.22951  Validation of prior agreements between water management districts.

373.232  Citation of rule.

373.233  Competing applications.

373.236  Duration of permits; compliance reports.

373.239  Modification and renewal of permit terms.

373.243  Revocation of permits.

373.244  Temporary permits.

373.246  Declaration of water shortage or emergency.

373.249  Existing regulatory districts preserved.

373.250  Reuse of reclaimed water.

**373.203**    **Definitions.**—

(1)  "Abandoned artesian well" is defined as an artesian well:

(a)  That does not have a properly functioning valve;

(b)  The use of which has been permanently discontinued;

(c)  That does not meet current well construction standards;

(d)  That is discharging water containing greater than 500 milligrams per liter of chlorides into a drinking water aquifer;

(e)   That is in such a state of disrepair that it cannot be used for its intended purpose without having an adverse impact upon an aquifer which serves as a source of drinking water or which is likely to be such a source in the future; or

(f)   That does not have proper flow control on or below the land surface.

(2)   An "artesian well" is defined as an artificial hole in the ground from which water supplies may be obtained and which penetrates any water-bearing rock, the water in which is raised to the surface by natural flow, or which rises to an elevation above the top of the water-bearing bed. "Artesian wells" are defined further to include all holes, drilled as a source of water, that penetrate any water-bearing beds that are a part of the artesian water system of Florida, as determined by representatives of the Florida Geological Survey or the Department of Environmental Protection.

(3)   "Plugging" is defined as plugging, capping, or otherwise controlling a well as deemed appropriate by the department or by the appropriate water management district.

(4)   "Waste" is defined to be the causing, suffering, or permitting any water flowing from, or being pumped from, an artesian well to run into any river, creek, or other natural watercourse or channel, or into any bay or pond (unless used thereafter for the beneficial purposes of irrigation of land, mining, or other industrial purposes of domestic use), or into any street, road or highway, or upon the land of any person, or upon the public lands of the United States or of the state, unless it is used thereon for the beneficial purposes of the irrigation thereof, industrial purposes, domestic use, or the propagation of fish. The use of any water flowing from an artesian well for the irrigation of land shall be restricted to a minimum by the use of proper structural devices in the irrigation system.

History.—ss. 3, 4, ch. 28253, 1953; s. 1, ch. 59-248; ss. 25, 35, ch. 69-106; s. 25, ch. 73-190; s. 44, ch. 79-65; s. 6, ch. 83-310; s. 261, ch. 94-356.

Note.—Former ss. 370.051, 373.021.


**373.206   Artesian wells; flow regulated.**—Every person, stock company, association, corporation, county, or municipality owning or controlling the real estate upon which is located a flowing artesian well in this state shall, within 90 days after June 15, 1953, provide each such well with a valve capable of controlling the discharge from the well and shall keep the valve so adjusted that only a supply of water is available which is necessary for ordinary use by the owner, tenant, occupant, or person in control of the land for personal use and for conducting his or her business. Upon the determination by the Department of Environmental Protection or the appropriate water management district that the water in an artesian well is of such poor quality as to have an adverse impact upon an aquifer or other water body which serves as a source of public drinking water or which is likely to be such a source in the future, such well shall be plugged in accordance with department or appropriate water management district specifications for well plugging.

History.—s. 1, ch. 28253, 1953; s. 1, ch. 65-460; ss. 25, 35, ch. 69-106; s. 25, ch. 73-190; s. 45, ch. 79-65; s. 7, ch. 83-310; s. 262, ch. 94-356; s. 1009, ch. 95-148.

Note.—Former ss. 370.052, 373.031.


**373.207   Abandoned artesian wells.**—Each water management district shall develop a work plan which identifies the location of all known abandoned artesian wells within its jurisdictional boundaries and defines the actions which the district must take in order to ensure that each such well is plugged on or before January 1, 1992. The work plan shall include the following:

(1)   An initial inventory which accounts for all known abandoned artesian wells in the district.

(2)   The location and owner of each known abandoned well.

(3)   The methodology proposed by the district to accomplish the plugging of all known abandoned wells within the district on or before January 1, 1992.

(4)   Data relating to costs to be incurred for the plugging of all wells, including the per-well cost and personnel costs.

(5)   A schedule of priority for the plugging of wells, which schedule is established to mitigate damage to the groundwater resource due to water quality degradation.

History.—s. 8, ch. 83-310; s. 263, ch. 94-356; s. 10, ch. 2005-36.

**373.209    Artesian wells; penalties for violation.**—

(1)    No owner, tenant, occupant, or person in control of an artesian well shall knowingly and intentionally:

(a)    Allow the well to flow continuously without a valve or mechanical device for checking or controlling the flow.

(b)    Permit the water to flow unnecessarily.

(c)    Pump a well unnecessarily.

(d)    Permit the water from the well to go to waste.

(2)    A well is exempt from the provisions of this section unless the Department of Environmental Protection can show that the uncontrolled flow of water from the well does not have a reasonable-beneficial use, as defined in s. 373.019.

(3)    Any person who violates any provision of this section shall be subject to either:

(a)    The remedial measures provided for in s. 373.436; or

(b)    A civil penalty of $100 a day for each and every day of such violation and for each and every act of violation. The civil penalty may be recovered by the water management board of the water management district in which the well is located or by the department in a suit in a court of competent jurisdiction in the county where the defendant resides, in the county of residence of any defendant if there is more than one defendant, or in the county where the violation took place. The place of suit shall be selected by the board or department, and the suit, by direction of the board or department, shall be instituted and conducted in the name of the board or department by appropriate counsel. The payment of any such damages does not impair or abridge any cause of action which any person may have against the person violating any provision of this section.

(4)    The penalties provided by this section shall apply notwithstanding any provisions of law to the contrary.

**History.**—s. 2, ch. 28253, 1953; s. 323, ch. 71-136; s. 25, ch. 73-190; s. 1, ch. 74-279; s. 46, ch. 79-65; s. 146, ch. 79-400; s. 264, ch. 94-356; s. 93, ch. 95-143; s. 8, ch. 98-88.

**Note.**—Former ss. 370.053, 373.041.


**373.213    Certain artesian wells exempt.**—Nothing in ss. 373.203, 373.206, 373.209, or this section shall be construed to apply to an artesian well feeding a lake already in existence prior to June 15, 1953, which lake is used or intended to be used for public bathing and/or the propagation of fish, where the continuous flow of water is necessary to maintain its purity for bathing and the water level of said lake for fish.

**History.**—s. 6, ch. 28253, 1953; s. 25, ch. 73-190; s. 167, ch. 99-13.

**Note.**—Former ss. 370.055, 373.061.


**373.216    Implementation of program for regulating the consumptive use of water.**—The governing board of each water management district shall, no later than October 31, 1983, implement a program for the issuance of permits authorizing the consumptive use of particular quantities of water covering those areas deemed appropriate by the governing board. Appropriate monitoring efforts shall be a part of any such program implemented. Notice of any required hearing on the proposed implementation of these regulations shall be published at least once a week for 2 weeks in a newspaper of general circulation in the area to be affected by such regulations, the last notice appearing no less than 10 days prior to the date of the public hearing, in addition to any notice required by chapter 120.

**History.**—s. 1, part II, ch. 72-299; s. 8, ch. 73-190; s. 14, ch. 78-95; s. 8, ch. 82-101.


**373.217    Superseded laws and regulations.**—

(1)    It is the intent of the Legislature to provide a means whereby reasonable programs for the issuance of permits authorizing the consumptive use of particular quantities of water may be authorized by the Department of Environmental Protection, subject to judicial review and also subject to review by the Governor and Cabinet, sitting as the Land and Water Adjudicatory Commission as provided in s. 373.114.

(2)    It is the further intent of the Legislature that Part II of the Florida Water Resources Act of 1972, as amended, as set forth in ss. 373.203-373.249, shall provide the exclusive authority for requiring permits for the consumptive use of water and for authorizing transportation thereof pursuant to s. 373.223(2).

(3) If any provision of Part II of the Florida Water Resources Act of 1972, as amended, as set forth in ss. 373.203-373.249, is in conflict with any other provision, limitation, or restriction which is now in effect under any law or ordinance of this state or any political subdivision or municipality, or any rule or regulation promulgated thereunder, Part II shall govern and control, and such other law or ordinance or rule or regulation promulgated thereunder shall be deemed superseded for the purpose of regulating the consumptive use of water. However, this section shall not be construed to supersede the provisions of the Florida Electrical Power Plant Siting Act.

(4) Other than as provided in subsection (3) of this section, Part II of the Florida Water Resources Act of 1972, as amended, preempts the regulation of the consumptive use of water as defined in this act.

History.—s. 9, ch. 76-243; s. 1, ch. 77-174; s. 265, ch. 94-356.

**373.219    Permits required.—**

(1) The governing board or the department may require such permits for consumptive use of water and may impose such reasonable conditions as are necessary to assure that such use is consistent with the overall objectives of the district or department and is not harmful to the water resources of the area. However, no permit shall be required for domestic consumption of water by individual users.

(2) In the event that any person shall file a complaint with the governing board or the department that any other person is making a diversion, withdrawal, impoundment, or consumptive use of water not expressly exempted under the provisions of this chapter and without a permit to do so, the governing board or the department shall cause an investigation to be made, and if the facts stated in the complaint are verified the governing board or the department shall order the discontinuance of the use.

(3) For Outstanding Florida Springs, the department shall adopt uniform rules for issuing permits which prevent groundwater withdrawals that are harmful to the water resources and adopt by rule a uniform definition of the term "harmful to the water resources" to provide water management districts with minimum standards necessary to be consistent with the overall water policy of the state. This subsection does not prohibit a water management district from adopting a definition that is more protective of the water resources consistent with local or regional conditions and objectives.

History.—s. 2, part II, ch. 72-299; s. 9, ch. 73-190; s. 9, ch. 2016-1.

**373.223    Conditions for a permit.—**

(1) To obtain a permit pursuant to the provisions of this chapter, the applicant must establish that the proposed use of water:

(a) Is a reasonable-beneficial use as defined in s. 373.019;

(b) Will not interfere with any presently existing legal use of water; and

(c) Is consistent with the public interest.

(2) The governing board or the department may authorize the holder of a use permit to transport and use ground or surface water beyond overlying land, across county boundaries, or outside the watershed from which it is taken if the governing board or department determines that such transport and use is consistent with the public interest, and no local government shall adopt or enforce any law, ordinance, rule, regulation, or order to the contrary.

(3) Except for the transport and use of water supplied by the Central and Southern Florida Flood Control Project, and anywhere in the state when the transport and use of water is supplied exclusively for bottled water as defined in s. 500.03(1)(d), any water use permit applications pending as of April 1, 1998, with the Northwest Florida Water Management District and self-suppliers of water for which the proposed water source and area of use or application are located on contiguous private properties, when evaluating whether a potential transport and use of ground or surface water across county boundaries is consistent with the public interest, pursuant to paragraph (1)(c), the governing board or department shall consider:

(a) The proximity of the proposed water source to the area of use or application.

(b) All impoundments, streams, groundwater sources, or watercourses that are geographically closer to the area of use or application than the proposed source, and that are technically and economically feasible for the proposed transport and use.

(c)   All economically and technically feasible alternatives to the proposed source, including, but not limited to, desalination, conservation, reuse of nonpotable reclaimed water and stormwater, and aquifer storage and recovery.

(d)   The potential environmental impacts that may result from the transport and use of water from the proposed source, and the potential environmental impacts that may result from use of the other water sources identified in paragraphs (b) and (c).

(e)   Whether existing and reasonably anticipated sources of water and conservation efforts are adequate to supply water for existing legal uses and reasonably anticipated future needs of the water supply planning region in which the proposed water source is located.

(f)   Consultations with local governments affected by the proposed transport and use.

(g)   The value of the existing capital investment in water-related infrastructure made by the applicant.

Where districtwide water supply assessments and regional water supply plans have been prepared pursuant to ss. 373.036 and 373.709, the governing board or the department shall use the applicable plans and assessments as the basis for its consideration of the applicable factors in this subsection.

(4)   The governing board or the department, by regulation, may reserve from use by permit applicants, water in such locations and quantities, and for such seasons of the year, as in its judgment may be required for the protection of fish and wildlife or the public health and safety. Such reservations shall be subject to periodic review and revision in the light of changed conditions. However, all presently existing legal uses of water shall be protected so long as such use is not contrary to the public interest.

(5)   In evaluating an application for consumptive use of water which proposes the use of an alternative water supply project as described in the regional water supply plan and provides reasonable assurances of the applicant's capability to design, construct, operate, and maintain the project, the governing board or department shall presume that the alternative water supply use is consistent with the public interest under paragraph (1)(c). However, where the governing board identifies the need for a multijurisdictional water supply entity or regional water supply authority to develop the alternative water supply project pursuant to s. 373.709(2)(a)2., the presumption shall be accorded only to that use proposed by such entity or authority. This subsection does not affect evaluation of the use pursuant to the provisions of paragraphs (1)(a) and (b), subsections (2) and (3), and ss. 373.2295 and 373.233.

(6)   A new consumptive use permit, or the renewal or modification of a consumptive use permit, that authorizes groundwater withdrawals of 100,000 gallons or more per day from a well with an inside diameter of 8 inches or more shall be monitored for water usage at intervals using methods determined by the applicable water management district, and the results of such monitoring shall be reported to the applicable water management district at least annually. The water management districts may adopt rules to implement this subsection. In lieu of the requirements of this subsection, a water management district may enforce rules that govern water usage monitoring in effect on July 1, 2016, or may adopt rules that are more stringent than this subsection.

**History.**—s. 3, part II, ch. 72-299; s. 10, ch. 73-190; s. 10, ch. 76-243; s. 35, ch. 85-81; s. 4, ch. 98-88; s. 6, ch. 2005-291; s. 15, ch. 2010-205; s. 31, ch. 2015-2; s. 10, ch. 2016-1.

### 373.2234    Preferred water supply sources.—

(1)   The governing board of a water management district is authorized to adopt rules that identify preferred water supply sources for consumptive uses for which there is sufficient data to establish that a preferred source will provide a substantial new water supply to meet the existing and projected reasonable-beneficial uses of a water supply planning region identified pursuant to s. 373.709(1), while sustaining existing water resources and natural systems. At a minimum, such rules must contain a description of the preferred water supply source and an assessment of the water the preferred source is projected to produce.

(2)(a)   If an applicant proposes to use a preferred water supply source, that applicant's proposed water use is subject to s. 373.223(1), except that the proposed use of a preferred water supply source must be considered by a water management district when determining whether a permit applicant's proposed use of water is consistent with the public interest pursuant to s. 373.223(1)(c).

(b)   The governing board of a water management district shall consider the identification of preferred water supply sources for water users for whom access to or development of new water supplies is not technically or financially feasible. Identification of preferred water supply sources for such water users must be consistent with s. 373.016.

(c)   A consumptive use permit issued for the use of a preferred water supply source must be granted, when requested by the applicant, for at least a 20-year period and may be subject to the compliance reporting provisions of s. 373.236(4).

(3)(a)   This section does not:

1.   Exempt the use of preferred water supply sources from ss. 373.016(4) and 373.223(2) and (3);

2.   Provide that permits issued for the use of a nonpreferred water supply source must be issued for a duration of less than 20 years or that the use of a nonpreferred water supply source is not consistent with the public interest; or

3.   Require the use of a preferred water supply source or to restrict or prohibit the use of a nonpreferred water supply source.

(b)   Rules adopted by the governing board of a water management district to implement this section shall specify that the use of a preferred water supply source is not required and that the use of a nonpreferred water supply source is not restricted or prohibited.

History.—s. 4, ch. 2004-381; s. 6, ch. 2006-255; s. 16, ch. 2010-205; s. 11, ch. 2016-1.

**373.2235    Effect of prior land acquisition on consumptive use permitting.**—The fact that any applicant has acquired, by the exercise of eminent domain or otherwise, any land for the specific purpose of serving as a site for a wellfield or right-of-way prior to obtaining a consumptive use permit from a water management district does not create any presumption of entitlement to a consumptive use permit. Evidence relating to such prior acquisition of land or right-of-way by any applicant is not admissible in any proceeding related to consumptive use permitting and has no bearing upon any water management district's determination of reasonable beneficial use in the permitting process. In the event that any applicant elects to acquire land prior to obtaining a consumptive use permit from a water management district, such action shall be considered a voluntary risk assumed by the applicant, and the fact of such prior acquisition shall not be admissible in any administrative or judicial proceeding relating to consumptive use permitting under this chapter, including any appeal taken from a water management district decision.

History.—s. 85, ch. 83-310.

**373.224    Existing permits.**—Any permits or permit agreements for consumptive use of water executed or issued by an existing flood control, water management, or water regulatory district pursuant to this chapter or chapter 378 prior to December 31, 1976, shall remain in full force and effect in accordance with their terms until otherwise modified or revoked as authorized herein.

History.—s. 11, ch. 73-190; s. 3, ch. 75-125.

**373.226    Existing uses.**—

(1)   All existing uses of water, unless otherwise exempted from regulation by the provisions of this chapter, may be continued after adoption of this permit system only with a permit issued as provided herein.

(2)   The governing board or the department shall issue an initial permit for the continuation of all uses in existence before the effective date of implementation of this part if the existing use is a reasonable-beneficial use as defined in s. 373.019 and is allowable under the common law of this state.

(3)   Application for permit under the provisions of subsection (2) must be made within a period of 2 years from the effective date of implementation of these regulations in an area. Failure to apply within this period shall create a conclusive presumption of abandonment of the use, and the user, if he or she desires to revive the use, must apply for a permit under the provisions of s. 373.229.

History.—s. 4, part II, ch. 72-299; s. 12, ch. 73-190; s. 598, ch. 95-148; s. 9, ch. 98-88.

### 373.227　Water conservation; legislative findings and intent; objectives; comprehensive statewide water conservation program requirements.—

(1)　The Legislature recognizes that the proper conservation of water is an important means of achieving the economical and efficient utilization of water necessary, in part, to constitute a reasonable-beneficial use. The overall water conservation goal of the state is to prevent and reduce wasteful, uneconomical, impractical, or unreasonable use of water resources. The Legislature finds that the social, economic, and cultural conditions of the state relating to the use of public water supply vary by service area and that public water supply utilities must have the flexibility to tailor water conservation measures to best suit their individual circumstances. The Legislature encourages the use of efficient, effective, and affordable water conservation measures. Where water is provided by a public water supply utility, the Legislature intends that a variety of conservation measures be made available and used to encourage efficient water use. To achieve these conservation objectives, the state should emphasize goal-based, accountable, tailored, and measurable water conservation programs for public water supply. For purposes of this section, the term "public water supply utility" includes both publicly owned and privately owned public water supply utilities that sell potable water on a retail basis to end users.

(2)　To implement the findings in subsection (1), the department, in cooperation with the water management districts and other stakeholders, shall develop a comprehensive statewide water conservation program for public water supply. The program should:

(a)　Encourage utilities to implement water conservation programs that are economically efficient, effective, affordable, and appropriate;

(b)　Allow no reduction in, and increase where possible, utility-specific water conservation effectiveness over current programs;

(c)　Be goal-based, accountable, measurable, and implemented collaboratively with water suppliers, water users, and water management agencies;

(d)　Include cost and benefit data on individual water conservation practices to assist in tailoring practices to be effective for the unique characteristics of particular utility service areas, focusing upon cost-effective measures;

(e)　Use standardized public water supply conservation definitions and standardized quantitative and qualitative performance measures for an overall system of assessing and benchmarking the effectiveness of water conservation programs and practices;

(f)　Create a clearinghouse or inventory for water conservation programs and practices available to public water supply utilities which will provide an integrated statewide database for the collection, evaluation, and dissemination of quantitative and qualitative information on public water supply conservation programs and practices and their effectiveness. The clearinghouse or inventory should have technical assistance capabilities to aid in the design, refinement, and implementation of water conservation programs and practices. The clearinghouse or inventory shall also provide for continual assessment of the effectiveness of water conservation programs and practices;

(g)　Develop a standardized water conservation planning process for utilities; and

(h)　Develop and maintain a Florida-specific water conservation guidance document containing a menu of affordable and effective water conservation practices to assist public water supply utilities in the design and implementation of goal-based, utility-specific water conservation plans tailored for their individual service areas as provided in subsection (4).

(3)　Regarding the use of water conservation or drought rate structures as a conservation practice, a water management district shall afford a public water supply utility wide latitude in selecting a rate structure and shall limit its review to whether the utility has provided reasonable assurance that the rate structure contains a schedule of rates designed to promote efficient use of water by providing economic incentives. A water management district shall not fix or revise rates.

(4)　As part of an application for a consumptive use permit, a public water supply utility may propose a goal-based water conservation plan that is tailored to its individual circumstances. Progress towards goals must be measurable. If the utility provides reasonable assurance that the plan will achieve effective water conservation at least as well as the water conservation requirements adopted by the appropriate water management district and is

otherwise consistent with s. 373.223, the district must approve the plan which shall satisfy water conservation requirements imposed as a condition of obtaining a consumptive use permit. The conservation measures included in an approved goal-based water conservation plan may be reviewed periodically and updated as needed to ensure efficient water use for the duration of the permit. If the plan fails to meet the water conservation goal or goals by the timeframes specified in the permit, the public water supply utility shall revise the plan to address the deficiency or employ the water conservation requirements that would otherwise apply in the absence of an approved goal-based plan.

(5)  To incentivize water conservation, if actual water use is less than permitted water use due to documented implementation of water conservation measures beyond those required in a consumptive use permit, including, but not limited to, those measures identified in best management practices pursuant to s. 570.93, the permitted allocation may not be modified solely due to such water conservation during the term of the permit. To promote water conservation and the implementation of measures that produce significant water savings beyond those required in a consumptive use permit, each water management district shall adopt rules providing water conservation incentives, which may include limited permit extensions.

(6)  For consumptive use permits for agricultural irrigation, if actual water use is less than permitted water use due to weather events, crop diseases, nursery stock availability, market conditions, or changes in crop type, a district may not, as a result, reduce permitted allocation amounts during the term of the permit.

(7)  The department or a water management district may adopt rules pursuant to ss. 120.536(1) and 120.54 to carry out the purposes of this section.

History.—s. 8, ch. 2004-381; s. 58, ch. 2013-15; s. 12, ch. 2016-1.

### 373.228  Landscape irrigation design.—

(1)  The Legislature finds that multiple areas throughout the state have been identified by water management districts as water resource caution areas, which indicates that in the near future water demand in those areas will exceed the current available water supply and that conservation is one of the mechanisms by which future water demand will be met.

(2)  The Legislature finds that landscape irrigation comprises a significant portion of water use and that current typical landscape irrigation systems and Florida-friendly landscaping designs offer significant potential water conservation benefits.

(3)  It is the intent of the Legislature to improve landscape irrigation water use efficiency by ensuring that landscape irrigation systems meet or exceed minimum design criteria.

(4)  The water management districts shall work with the Florida Nursery, Growers and Landscape Association, the Florida Native Plant Society, the Florida Chapter of the American Society of Landscape Architects, the Florida Irrigation Society, the Department of Agriculture and Consumer Services, the Institute of Food and Agricultural Sciences, the Department of Environmental Protection, the Department of Transportation, the Florida League of Cities, the Florida Association of Counties, and the Florida Association of Community Developers to develop landscape irrigation and Florida-friendly landscaping design standards for new construction which incorporate a landscape irrigation system and develop scientifically based model guidelines for urban, commercial, and residential landscape irrigation, including drip irrigation, for plants, trees, sod, and other landscaping. The standards shall be based on the irrigation code defined in the Florida Building Code, Plumbing Volume, Appendix F. Local governments shall use the standards and guidelines when developing landscape irrigation and Florida-friendly landscaping ordinances. By January 1, 2011, the agencies and entities specified in this subsection shall review the standards and guidelines to determine whether new research findings require a change or modification of the standards and guidelines.

(5)  In evaluating water use applications from public water suppliers, water management districts shall consider whether the applicable local government has adopted ordinances for landscaping and irrigation systems consistent with the Florida-friendly landscaping provisions of s. 373.185.

History.—s. 6, ch. 2004-381; s. 13, ch. 2008-150; s. 19, ch. 2009-243.

### 373.229  Application for permit.—

(1)   All permit applications filed with the governing board or the department under this part and notice thereof required under s. 373.116 shall contain:

(a)   The name of the applicant and his or her address or, in the case of a corporation, the address of its principal business office;

(b)   The date of filing;

(c)   The date set for a hearing, if any;

(d)   The source of the water supply;

(e)   The quantity of water applied for;

(f)   The use to be made of the water and any limitation thereon;

(g)   The place of use;

(h)   The location of the well or point of diversion; and

(i)   Such other information as the governing board or the department may deem necessary.

(2)   The notice shall state that written objections to the proposed permit may be filed with the governing board or the department by a specified date. The governing board or the department, at its discretion, may request further information from either applicant or objectors, and a reasonable time shall be allowed for such responses.

(3)   In addition to the information required in subsection (1), all permit applications filed with the governing board or the department which propose the transport and use of water across county boundaries shall include information pertaining to factors to be considered, pursuant to s. 373.223(3), unless exempt under s. 373.713(9).

(4)   If the proposed application is for less than 100,000 gallons per day, the governing board or the department may consider the application and any objections thereto without a hearing. If the proposed application is for 100,000 gallons per day or more and no objection is received, the governing board or the department, after proper investigation by its staff, may, at its discretion, approve the application without a hearing.

History.—s. 5, part II, ch. 72-299; s. 13, ch. 73-190; s. 11, ch. 76-243; s. 1, ch. 77-174; s. 599, ch. 95-148; s. 5, ch. 98-88; s. 17, ch. 2010-205.

### 373.2295   Interdistrict transfers of groundwater.—

(1)   As used in this section, the term "interdistrict transfer and use" means a consumptive water use that involves the withdrawal of groundwater from a point within one water management district for use outside the boundaries of that district, but does not include a withdrawal and use within the same county. In case of withdrawal of groundwater from a point within one water management district for use outside the boundaries of that district but within the same county, the provisions of subsections (4), (11), and (13) shall apply, and the district considering a permit application for such a consumptive use shall apply the applicable provisions of this chapter, and its rules, to the withdrawal and use.

(2)   To obtain a permit for an interdistrict transfer and use of groundwater, an applicant must file an application in accordance with s. 373.229 with the water management district having jurisdiction over the area from which the applicant proposes to withdraw groundwater and submit a copy of the application to the water management district having jurisdiction over the area where the water is to be used.

(3)   The governing board of the water management district where the groundwater is proposed to be withdrawn shall review the application in accordance with this part, the rules of the district which relate to consumptive water use permitting, and other applicable provisions of this chapter.

(4)   In determining if an application is consistent with the public interest as required by s. 373.223, the projected populations, as contained in the future land use elements of the comprehensive plans adopted pursuant to chapter 163 by the local governments within which the withdrawal areas and the proposed use areas are located, will be considered together with other evidence presented on future needs of those areas. If the proposed interdistrict transfer of groundwater meets the requirements of this chapter, and if the needs of the area where the use will occur and the specific area from which the groundwater will be withdrawn can be satisfied, the permit for the interdistrict transfer and use shall be issued.

(5)   In addition to other requirements contained in this part, the water management district where the groundwater is proposed to be withdrawn shall:

(a)   Furnish copies of any application, information, correspondence, or other related material to the water management district having jurisdiction over the area where the water is to be used; and

(b)   Request comments on the application and the future water needs of the proposed use area from the water management district having jurisdiction over the area where the water is to be used. If comments are received, they must be attached to the preliminary notice of intended agency action and may not create a point of entry for review whether issued by the governing board or district staff.

(6)   Upon completion of review of the application, the water management district where the groundwater is proposed to be withdrawn shall prepare a notice of preliminary intended agency action which shall include an evaluation of the application and a recommendation of approval, denial, or approval with conditions. The notice shall be furnished to the district where the water is to be used, the applicant, the Department of Environmental Protection, the local governments having jurisdiction over the area from which the groundwater is to be withdrawn and where the water is to be used, and any person requesting a copy of the notice.

(a)   Any interested person may, within the time specified in the notice, notify in writing the district from where the groundwater is to be withdrawn of such person's position and comments or objections, if any, to the preliminary intended action.

(b)   The filing of the notice of intended agency action shall toll the time periods contained in s. 120.60 for the granting or denial of a permit for an interdistrict transfer and use of groundwater.

(c)   The preliminary intended agency action and any comments or objections of interested persons made pursuant to paragraph (a) shall be considered by the governing board of the water management district where the groundwater is proposed to be withdrawn. Following such consideration, the governing board shall issue a notice of intended agency action.

(d)   Any substantially affected person who submitted a notification pursuant to paragraph (a) may request review by the department within 14 days after the filing of the notice of intended agency action. If no request for review is filed, the notice of intended agency action shall become the final order of the governing board.

(7)   Notwithstanding the provisions of chapter 120, the department shall, within 30 days after its receipt of a request for review of the water management district's action, approve, deny, or modify the water management district's action on the proposed interdistrict transfer and use of groundwater. The department shall issue a notice of its intended action. Any substantially affected person who requested review pursuant to paragraph (6)(a) may request an administrative hearing pursuant to chapter 120 within 14 days after notice of the department's intended action. The parties to such proceeding shall include, at a minimum, the affected water management districts and the applicant. The proceedings initiated by a petition under ss. 120.569 and 120.57, following the department's issuance of a notice of intended agency action, is the exclusive proceeding authorized for the review of agency action on the interdistrict transfer and use of groundwater. This procedure is to give effect to the legislative intent that this section provide a single, efficient, simplified, coordinated permitting process for the interdistrict transfer and use of groundwater.

(8)   The department shall issue a final order which is subject to review pursuant to s. 120.68 or s. 373.114.

(9)   In administering this part, the department or the water management districts may enter into interagency agreements. However, such agreements are not subject to the provisions of s. 373.046 and chapter 120.

(10)   The state hereby preempts any regulation of the interdistrict transfer and use of groundwater. If any provision of this section is in conflict with any other provision or restriction under any law, administrative rule, or ordinance, this section shall govern and such law, rule, or ordinance shall be deemed superseded for the purposes of this section. A water management district or the department may not adopt special rules which prohibit or restrict interdistrict transfer and use of groundwater in a manner inconsistent with this section.

(11)   If, after the final order of the department or final agency action under this section, the proposed use of the site designated in the application for groundwater production, treatment, or transmission facilities does not conform with the existing zoning ordinances, a rezoning application may be submitted. If local authorities deny the application for rezoning, the applicant may appeal this decision to the Land and Water Adjudicatory Commission, which shall authorize a variance or nonconforming use to the existing comprehensive plan and zoning ordinances,

unless the commission determines after notice and hearing that such variance or nonconforming use is contrary to the public interest.

(12)   The permit required under this section and other sections of this chapter and chapter 403 are the sole permits required for interdistrict transfer and use of groundwater, and such permits are in lieu of any license, permit, or similar document required by any state agency or political subdivision pursuant to chapter 163, chapter 380, or chapter 381, and the Florida Transportation Code.

(13)   When a consumptive use permit under this section is granted for water use beyond the boundaries of a local government from which or through which the groundwater is withdrawn or transferred and a local government denies a permit required under chapter 125 or chapter 153 for a facility or any infrastructure which produces, treats, transmits, or distributes such groundwater, the person or unit of government applying for the permit under chapter 125 or chapter 153 may appeal the denial to the Land and Water Adjudicatory Commission. The commission shall review the local government action for consistency with this chapter and the interdistrict groundwater transfer permit and may reverse, modify, or approve the local government's action.

History.—s. 1, ch. 87-347; s. 266, ch. 94-356; s. 99, ch. 96-410; s. 11, ch. 2000-212; s. 1, ch. 2003-64; s. 2, ch. 2003-265.

**373.22951    Validation of prior agreements between water management districts.**—Any agreements between water management districts entered into before the effective date of this act pursuant to s. 373.046 authorizing the issuance of permits for the interdistrict withdrawal and use of water within a county are validated and shall continue in effect until otherwise rescinded.

History.—s. 2, ch. 2003-64; s. 3, ch. 2003-265.

**373.232    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 4, ch. 79-161.

**373.233    Competing applications.**—

(1)   If two or more applications that otherwise comply with the provisions of this part are pending for a quantity of water that is inadequate for both or all, or that for any other reason are in conflict, and the water management district or department has deemed the applications complete, the water management district or the department has the right to approve or modify the application that best serves the public interest.

(2)(a)   If two or more competing applications qualify equally under subsection (1), the governing board or the department shall give preference to a renewal application over an initial application.

(b)   If two or more competing applications qualify equally under subsection (1) and none of the competing applications is a renewal application, the governing board or the department shall give preference to the application for the use where the source is nearest to the area of use or application consistent with s. 373.016(4) (a).

History.—s. 6, part II, ch. 72-299; s. 9, ch. 2013-92; s. 13, ch. 2016-1.

**373.236    Duration of permits; compliance reports.**—

(1)   Permits shall be granted for a period of 20 years, if requested for that period of time, if there is sufficient data to provide reasonable assurance that the conditions for permit issuance will be met for the duration of the permit; otherwise, permits may be issued for shorter durations which reflect the period for which such reasonable assurances can be provided. The governing board or the department may base the duration of permits on a reasonable system of classification according to source of supply or type of use, or both.

(2)   The Legislature finds that some agricultural landowners remain unaware of their ability to request a 20-year consumptive use permit under subsection (1) for initial permits or for renewals. Therefore, the water management districts shall inform agricultural applicants of this option in the application form.

(3)   The governing board or the department may authorize a permit of duration of up to 50 years in the case of a municipality or other governmental body or of a public works or public service corporation where such a period is

required to provide for the retirement of bonds for the construction of waterworks and waste disposal facilities.

(4)   Where necessary to maintain reasonable assurance that the conditions for issuance of a 20-year permit can continue to be met, the governing board or department, in addition to any conditions required pursuant to s. 373.219, may require a compliance report by the permittee every 10 years during the term of a permit. The Suwannee River Water Management District may require a compliance report by the permittee every 5 years through July 1, 2015, and thereafter every 10 years during the term of the permit. This report shall contain sufficient data to maintain reasonable assurance that the initial conditions for permit issuance are met. Following review of this report, the governing board or the department may modify the permit to ensure that the use meets the conditions for issuance. Permit modifications pursuant to this subsection shall not be subject to competing applications, provided there is no increase in the permitted allocation or permit duration, and no change in source, except for changes in source requested by the district. In order to promote the sustainability of natural systems through the diversification of water supplies through the development of seawater desalination plants, a water management district may not reduce an existing permitted allocation of water during the permit term as a result of planned future construction of, or additional water becoming available from, a new seawater desalination plant that does not receive funding from a water management district. Except as expressly provided in this subsection, this subsection does not alter the existing authority of a water management district to modify a consumptive use permit pursuant to this chapter.

(5)(a)   A permit approved for the development of alternative water supplies shall be granted for a term of at least 20 years if there is sufficient data to provide reasonable assurance that the conditions for permit issuance will be met for the duration of the permit. However, if the permittee issues bonds for the construction of the project, upon request of the permittee before the expiration of the permit, the permit shall be extended for such additional time as is required for the retirement of bonds, not including any refunding or refinancing of such bonds, if the governing board determines that the use will continue to meet the conditions for the issuance of the permit. The permit is subject to compliance reports under subsection (4).

(b)1.   A permit approved on or after July 1, 2013, for the development of alternative water supplies shall be granted for a term of at least 30 years if there is sufficient data to provide reasonable assurance that the conditions for permit issuance will be met for the duration of the permit. If, within 7 years after a permit is granted, the permittee issues bonds to finance the project, completes construction of the project, and requests an extension of the permit duration, the permit shall be extended to expire upon the retirement of such bonds or 30 years after the date that construction of the project is complete, whichever occurs later. However, a permit's duration may not be extended by more than 7 years beyond the permit's original expiration date.

2.   A permit issued under this paragraph is subject to compliance reports under subsection (4). If the permittee demonstrates that bonds issued to finance the project are outstanding, the quantity of alternative water allocated in the permit may not be reduced during a compliance report review unless a reduction is needed to address harm to water resources or to existing legal uses present when the permit was issued. A reduction required by an applicable water shortage order applies to a permit issued under this paragraph.

3.   A permit issued under this paragraph may not authorize the use of nonbrackish groundwater supplies or nonalternative water supplies.

(c)   An entity that wishes to develop alternative water supplies may apply for a permit under paragraph (a) or paragraph (b).

(6)(a)   The Legislature finds that the need for alternative water supply development projects to meet anticipated public water supply demands of the state is so important that it is essential to encourage participation in and contribution to these projects by private-rural-land owners who characteristically have relatively modest near-term water demands but substantially increasing demands after the 20-year planning period in s. 373.709. Therefore, where such landowners make extraordinary contributions of lands or construction funding to enable the expeditious implementation of such projects, water management districts and the department may grant permits for such projects for a period of up to 50 years to municipalities, counties, special districts, regional water supply authorities, multijurisdictional water supply entities, and publicly or privately owned utilities, with the exception of any publicly or privately owned utilities created for or by a private landowner after April 1, 2008, which have

entered into an agreement with the private landowner for the purpose of more efficiently pursuing alternative public water supply development projects identified in a district's regional water supply plan and meeting water demands of both the applicant and the landowner.

(b)　A permit under paragraph (a) may be granted only for that period for which there is sufficient data to provide reasonable assurance that the conditions for permit issuance will be met. Such a permit shall require a compliance report by the permittee every 5 years during the term of the permit. The report shall contain sufficient data to maintain reasonable assurance that the conditions for permit issuance applicable at the time of district review of the compliance report are met. After review of this report, the governing board or the department may modify the permit to ensure that the use meets the conditions for issuance. This subsection does not limit the existing authority of the department or the governing board to modify or revoke a consumptive use permit.

(7)　A permit approved for a renewable energy generating facility or the cultivation of agricultural products on lands consisting of 1,000 acres or more for use in the production of renewable energy, as defined in s. 366.91(2)(d), shall be granted for a term of at least 25 years at the applicant's request based on the anticipated life of the facility if there is sufficient data to provide reasonable assurance that the conditions for permit issuance will be met for the duration of the permit; otherwise, a permit may be issued for a shorter duration that reflects the longest period for which such reasonable assurances are provided. Such a permit is subject to compliance reports under subsection (4).

(8)　A water management district may issue a permit to an applicant, as set forth in s. 163.3245(13), for the same period of time as the applicant's approved master development order if the master development order was issued under s. 380.06(9) by a county which, at the time the order was issued, was designated as a rural area of opportunity under s. 288.0656, was not located in an area encompassed by a regional water supply plan as set forth in s. 373.709(1), and was not located within the basin management action plan of a first magnitude spring. In reviewing the permit application and determining the permit duration, the water management district shall apply s. 163.3245(4)(b).

History.—s. 7, part II, ch. 72-299; s. 13, ch. 97-160; s. 7, ch. 2005-291; s. 7, ch. 2006-255; s. 10, ch. 2009-243; s. 70, ch. 2010-5; ss. 18, 55, ch. 2010-205; s. 10, ch. 2013-92; s. 1, ch. 2013-169; s. 17, ch. 2015-30; s. 37, ch. 2016-10; s. 15, ch. 2018-158.

## 373.239　Modification and renewal of permit terms.—

(1)　A permittee may seek modification of any terms of an unexpired permit.

(2)　If the proposed modification involves water use of 100,000 gallons or more per day, the application shall be treated under the provisions of s. 373.229 in the same manner as the initial permit application. Otherwise, the governing board or the department may at its discretion approve the proposed modification without a hearing, provided the permittee establishes that:

(a)　A change in conditions has resulted in the water allowed under the permit becoming inadequate for the permittee's need, or

(b)　The proposed modification would result in a more efficient utilization of water than is possible under the existing permit.

(3)　All permit renewal applications shall be treated under this part in the same manner as the initial permit application.

History.—s. 8, part II, ch. 72-299; s. 14, ch. 73-190.

## 373.243　Revocation of permits.—The governing board or the department may revoke a permit as follows:

(1)　For any material false statement in an application to continue, initiate, or modify a use, or for any material false statement in any report or statement of fact required of the user pursuant to the provisions of this chapter, the governing board or the department may revoke the user's permit, in whole or in part, permanently.

(2)　For willful violation of the conditions of the permit, the governing board or the department may permanently or temporarily revoke the permit, in whole or in part.

(3)　For violation of any provision of this chapter, the governing board or the department may revoke the permit, in whole or in part, for a period not to exceed 1 year.

(4)　For nonuse of the water supply allowed by the permit for a period of 2 years or more, the governing board or the department may revoke the permit permanently and in whole unless the user can prove that his or her nonuse was due to extreme hardship caused by factors beyond the user's control. For a permit issued pursuant to s. 373.236(7), the governing board or the department may revoke the permit only if the nonuse of the water supply allowed by the permit is for a period of 4 years or more.

(5)　The governing board or the department may revoke a permit, permanently and in whole, with the written consent of the permittee.

History.—s. 9, part II, ch. 72-299; s. 14, ch. 78-95; s. 600, ch. 95-148; s. 11, ch. 2009-243.

### 373.244　Temporary permits.—

(1)　The governing board of a water management district may issue, or may authorize its executive director to issue, temporary permits for the consumptive use of water while an application is pending for a permit pursuant to ss. 373.219 and 373.229.

(2)　Such a temporary permit shall be issued for a period of time to expire on the day following the next regular meeting of the governing board. At such meeting, the governing board shall consider whether it appears that the proposed use meets the criteria set forth in s. 373.223(1) and that such temporary permit is necessary for consumptive use of water prior to final action on an application for a permit pursuant to ss. 373.219 and 373.229.

(3)　The governing board may summarily extend the term of a temporary permit for subsequent periods of time to expire on or before the day following the next regular meeting of the governing board.

(4)　The board shall review temporary permits at each regular meeting and may terminate a temporary permit or refuse to extend it further upon a finding that the water use does not meet the criteria set forth in s. 373.223(1) or that adverse effects are occurring as a result of water use under the temporary permit or that the water authorized to be used under such permit is no longer required by the permitholder.

(5)　The notice and hearing that might otherwise be required pursuant to s. 373.116(2) and chapter 120 shall not be required prior to issuance or extension of a temporary permit pursuant to the provisions of this section.

(6)　Issuance of a temporary permit pursuant to the provisions of this section shall not in any way be construed as a commitment to issue a permit pursuant to ss. 373.219 and 373.229. No action taken by the governing board, or by the executive director if so authorized, shall be construed to estop the governing board from subsequently denying an application for a permit pursuant to ss. 373.219 and 373.229.

History.—s. 1, ch. 79-160.

### 373.246　Declaration of water shortage or emergency.—

(1)　The governing board or the department by regulation shall formulate a plan for implementation during periods of water shortage. As a part of this plan the governing board or the department shall adopt a reasonable system of water-use classification according to source of water supply; method of extraction, withdrawal, or diversion; or use of water or a combination thereof. The plan may include provisions for variances and alternative measures to prevent undue hardship and ensure equitable distribution of water resources.

(2)　The governing board or the department by order may declare that a water shortage exists for a source or sources within all or part of the district when insufficient water is or will be available to meet the present and anticipated requirements of the users or when conditions are such as to require temporary reduction in total use within the area to protect water resources from serious harm. Such orders will be final agency action.

(3)　In accordance with the plan adopted under subsection (1), the governing board or the department may impose such restrictions on one or more classes of water uses as may be necessary to protect the water resources of the area from serious harm and to restore them to their previous condition.

(4)　A declaration of water shortage and any measures adopted pursuant thereto may be rescinded by the governing board or the department.

(5)　When a water shortage is declared, the governing board or the department shall cause notice thereof to be published in a prominent place within a newspaper of general circulation throughout the area. Publication of such notice will serve as notice to all users in the area of the condition of water shortage.

(6)    The governing board or the department shall notify each permittee in the district by electronic mail or regular mail of any change in the condition of his or her permit or any suspension of his or her permit or of any other restriction on the permittee's use of water for the duration of the water shortage.

(7)    If an emergency condition exists due to a water shortage within any area of the district, and if the department, or the executive director of the district with the concurrence of the governing board, finds that the exercise of powers under subsection (1) is not sufficient to protect the public health, safety, or welfare; the health of animals, fish, or aquatic life; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses, it or he or she may, pursuant to the provisions of s. 373.119, issue emergency orders reciting the existence of such an emergency and requiring that such action, including, but not limited to, apportioning, rotating, limiting, or prohibiting the use of the water resources of the district, be taken as the department or the executive director deems necessary to meet the emergency.

(8)    An affected party to whom an emergency order is directed under subsection (7) shall comply immediately, but may challenge such an order in the manner set forth in s. 373.119.

History.—s. 10, part II, ch. 72-299; s. 14, ch. 78-95; s. 11, ch. 82-101; s. 10, ch. 84-341; s. 601, ch. 95-148; s. 168, ch. 99-13; s. 11, ch. 2013-92.

**373.249    Existing regulatory districts preserved.**—The enactment of this chapter shall not affect any existing water regulatory districts pursuant to chapter 373, or orders issued by said regulatory districts, unless specifically revoked, modified, or amended by such regulatory district or by the department.

History.—s. 11, part II, ch. 72-299.

**373.250    Reuse of reclaimed water.**—

(1)(a)    The encouragement and promotion of water conservation and reuse of reclaimed water, as defined by the department and used in this chapter, are state objectives and considered to be in the public interest. The Legislature finds that the use of reclaimed water provided by domestic wastewater treatment plants permitted and operated under a reuse program approved by the department is environmentally acceptable and not a threat to public health and safety.

(b)    The Legislature recognizes that the interest of the state to sustain water resources for the future through the use of reclaimed water must be balanced with the need of reuse utilities to operate and manage reclaimed water systems in accordance with a variety and range of circumstances, including regulatory and financial considerations, which influence the development and operation of reclaimed water systems across the state.

(2)    Reclaimed water is an alternative water supply as defined in s. 373.019(1) and is eligible for alternative water supply funding. A contract for state or district funding assistance for the development of reclaimed water as an alternative water supply may include provisions listed under s. 373.707(9). The use of reclaimed water may not be excluded from regional water supply planning under s. 373.709.

(3)(a)    Reclaimed water may be presumed available to a consumptive use permit applicant when a utility exists which provides reclaimed water, which has determined that it has uncommitted reclaimed water capacity, and which has distribution facilities, which are initially provided by the utility at its cost, to the site of the affected applicant's proposed use.

(b)    A water management district may not require a permit for the use of reclaimed water. However, when a use includes surface water or groundwater, the permit for such sources may include conditions that govern the use of the permitted sources in relation to the feasibility or use of reclaimed water.

(c)    A water management district may require the use of reclaimed water in lieu of all or a portion of a proposed use of surface water or groundwater by an applicant when the use of reclaimed water is available; is environmentally, economically, and technically feasible; and is of such quality and reliability as is necessary to the user. However, a water management district may neither specify any user to whom the reuse utility must provide reclaimed water nor restrict the use of reclaimed water provided by a reuse utility to a customer in a permit or, unless requested by the reuse utility, in a water shortage order or water shortage emergency order.

(d)    The South Florida Water Management District shall require the use of reclaimed water made available by the elimination of wastewater ocean outfall discharges as provided for in s. 403.086(9) in lieu of surface water or

groundwater when the use of reclaimed water is available; is environmentally, economically, and technically feasible; and is of such quality and reliability as is necessary to the user. Such reclaimed water may also be required in lieu of other alternative sources. In determining whether to require such reclaimed water in lieu of other alternative sources, the water management district shall consider existing infrastructure investments in place or obligated to be constructed by an executed contract or similar binding agreement as of July 1, 2011, for the development of other alternative sources.

(4)　The water management district shall, in consultation with the department, adopt rules to implement this section. Such rules shall include, but not be limited to:

(a)　Provisions to permit use of water from other sources in emergency situations or if reclaimed water becomes unavailable, for the duration of the emergency or the unavailability of reclaimed water. These provisions shall also specify the method for establishing the quantity of water to be set aside for use in emergencies or when reclaimed water becomes unavailable. The amount set aside is subject to periodic review and revision. The methodology shall take into account the risk that reclaimed water may not be available in the future, the risk that other sources may be fully allocated to other uses in the future, the nature of the uses served with reclaimed water, the extent to which the applicant intends to rely upon reclaimed water, and the extent of economic harm which may result if other sources are not available to replace the reclaimed water. It is the intent of this paragraph to ensure that users of reclaimed water have the same access to ground or surface water and will otherwise be treated in the same manner as other users of the same class not relying on reclaimed water.

(b)　Provisions to require permit applicants that are not reuse utilities to provide, as part of their reclaimed water feasibility evaluation for a nonpotable use, written documentation from a reuse utility addressing the availability of reclaimed water. This requirement shall apply when the applicant's proposed use is within an area that is or may be served with reclaimed water by a reuse utility within a 5-year horizon, as established by the reuse utility and provided to the district. If the applicable reuse utility fails to respond or does not provide the information required under paragraph (c) within 30 days after receipt of the request, the applicant shall provide to the district a copy of the written request and a statement that the utility failed to provide the requested information. The district is not required to adopt, by rule, the area where written documentation from a reuse utility is required, but the district shall publish the area, and any updates thereto, on the district's website. This paragraph may not be construed to limit the ability of a district to require the use of reclaimed water or to limit a utility's ability to plan reclaimed water infrastructure.

(c)　Provisions specifying the content of the documentation required in paragraph (b), including sufficient information regarding the availability and costs associated with the connection to and the use of reclaimed water, to facilitate the permit applicant's reclaimed water feasibility evaluation.

A water management district may not adopt any rule that gives preference to users within any class of use established under s. 373.246 who do not use reclaimed water over users within the same class who use reclaimed water.

(5)(a)　No later than October 1, 2012, the department shall initiate rulemaking to adopt revisions to the water resource implementation rule, as defined in s. 373.019(25), which shall include:

1.　Criteria for the use of a proposed impact offset derived from the use of reclaimed water when a water management district evaluates an application for a consumptive use permit. As used in this subparagraph, the term "impact offset" means the use of reclaimed water to reduce or eliminate a harmful impact that has occurred or would otherwise occur as a result of other surface water or groundwater withdrawals.

2.　Criteria for the use of substitution credits where a water management district has adopted rules establishing withdrawal limits from a specified water resource within a defined geographic area. As used in this subparagraph, the term "substitution credit" means the use of reclaimed water to replace all or a portion of an existing permitted use of resource-limited surface water or groundwater, allowing a different user or use to initiate a withdrawal or increase its withdrawal from the same resource-limited surface water or groundwater source provided that the withdrawal creates no net adverse impact on the limited water resource or creates a net positive impact if required by water management district rule as part of a strategy to protect or recover a water resource.

(b)   Within 60 days after the final adoption by the department of the revisions to the water resource implementation rule required under paragraph (a), each water management district shall initiate rulemaking to incorporate those revisions by reference into the rules of the district.

(6)   Reuse utilities and the applicable water management district or districts are encouraged to periodically coordinate and share information concerning the status of reclaimed water distribution system construction, the availability of reclaimed water supplies, and existing consumptive use permits in areas served by the reuse utility.

(7)   This section does not impair or limit the authority of a water management district to plan for and regulate consumptive uses of water under this chapter or regulate the use of surface water or groundwater to supplement a reclaimed water system.

(8)   This section applies to applications for new consumptive use permits and renewals and modifications of existing consumptive use permits.

History.—s. 2, ch. 94-243; s. 35, ch. 97-160; s. 18, ch. 97-164; s. 37, ch. 99-247; s. 5, ch. 2004-381; s. 4, ch. 2008-232; s. 56, ch. 2010-205; s. 2, ch. 2012-150; s. 59, ch. 2013-15.

## PART III
## REGULATION OF WELLS

373.302   Legislative findings.

373.303   Definitions.

373.306   Scope.

373.308   Implementation of programs for regulating water wells.

373.309   Authority to adopt rules and procedures.

373.313   Prior permission and notification.

373.314   Citation of rule.

373.316   Existing installations.

373.319   Inspections.

373.323   Licensure of water well contractors; application, qualifications, and examinations; equipment identification.

373.324   License renewal.

373.325   Inactive status.

373.326   Exemptions.

373.329   Fees for licensure.

373.333   Disciplinary guidelines; adoption and enforcement; license suspension or revocation.

373.335   Clearinghouse.

373.336   Unlawful acts; penalties.

373.337   Rules.

373.342   Permits.

**373.302     Legislative findings.**—The Legislature recognizes that the practice of constructing, repairing, and abandoning water wells, if conducted by incompetent contractors, is potentially threatening to the health of the public and to the environment. The Legislature finds that a threat to the public and the environment exists if water resources become contaminated as a result of wells drilled by incompetent or dishonest contractors, and that to prevent contamination, it is necessary to regulate the construction, repair, and abandonment of wells, and the persons and businesses responsible therefor.

History.—s. 9, ch. 88-242.

**373.303     Definitions.**—As used in this part, the term:

(1)   "Abandoned water well" means a well the use of which has been permanently discontinued. Any well shall be deemed abandoned which is in such a state of disrepair, as determined by a representative of the department,

that continued use for the purpose of obtaining groundwater or disposing of water or liquid wastes is impracticable.

(2)　"Construction of water wells" means all parts necessary to obtain groundwater by wells, including the location and excavation of the well, but excluding the installation of pumps and pumping equipment.

(3)　"Department" means the Department of Environmental Protection.

(4)　"Political subdivision" means a city, town, county, district, or other public body created by or pursuant to state law, or any combination thereof acting cooperatively or jointly.

(5)　"Repair" means any action which involves the physical alteration or replacement of any part of a well, but does not include the alteration or replacement of any portion of a well which is above ground surface.

(6)　"Water well contractor" means a person who is responsible for the construction, repair, or abandonment of a water well and who is licensed under this part to engage in the business of construction, repair, or abandonment of water wells.

(7)　"Well" means any excavation that is drilled, cored, bored, washed, driven, dug, jetted, or otherwise constructed when the intended use of such excavation is for the location, acquisition, development, or artificial recharge of groundwater, but such term does not include any well for the purpose of obtaining or prospecting for oil, natural gas, minerals, or products of mining or quarrying; for inserting media to dispose of oil brines or to repressure oil-bearing or natural gas-bearing formation; for storing petroleum, natural gas, or other products; or for temporary dewatering of subsurface formations for mining, quarrying, or construction purposes.

(8)　"Well seal" means an approved arrangement or device to prevent contaminants from entering the well at the upper terminal.

History.—s. 1, part III, ch. 72-299; s. 228, ch. 81-259; ss. 74, 75, ch. 83-310; ss. 10, 24, ch. 88-242; s. 4, ch. 91-429; s. 267, ch. 94-356.

373.306　　　Scope.—No person shall construct, repair, abandon, or cause to be constructed, repaired, or abandoned, any water well contrary to the provisions of this part and applicable rules and regulations. This part shall not apply to equipment used temporarily for dewatering purposes or to the process used in dewatering.

History.—s. 2, part III, ch. 72-299; s. 15, ch. 73-190.

373.308　　　Implementation of programs for regulating water wells.—

(1)　The department shall authorize the governing board of a water management district to implement a program for the issuance of permits for the location, construction, repair, and abandonment of water wells. Upon authorization from the department, issuance of well permits will be the sole responsibility of the water management district, delegated local government, or local county health department. Other local governmental entities may not impose additional or duplicate requirements or fees or establish a separate program for the permitting of the location, abandonment, boring, or other activities reasonably associated with the installation and abandonment of a groundwater well.

(2)　The department shall authorize the governing board of a water management district to exercise any power authorized to be exercised by the department under ss. 373.309, 373.313, 373.316, 373.319, 373.323, 373.329, and 373.333 and shall encourage the district to fully exercise such powers as soon as practicable.

(3)　Delegations pursuant to subsections (1) and (2) and ss. 373.323 and 373.333 may be rescinded only if the secretary determines that such delegations are not being carried out in accordance with the rules of the department.

(4)　Notwithstanding the provision in this section for delegation of authority to a water management district, the department may prescribe minimum standards for the location, construction, repair, and abandonment of water wells throughout all or parts of the state, as may be determined by the department.

History.—s. 2, ch. 79-160; s. 76, ch. 83-310; s. 11, ch. 88-242; s. 12, ch. 2013-92.

373.309　　　Authority to adopt rules and procedures.—

(1)　The department shall adopt, and may from time to time amend, rules governing the location, construction, repair, and abandonment of water wells and shall be responsible for the administration of this part. With respect thereto, the department shall:

(a)    Enforce the provisions of this part and any rules adopted pursuant thereto.

(b)    Delegate, by interagency agreement adopted pursuant to s. 373.046, to water management districts, the Department of Health, or any other political subdivision any of its authority under this part in the administration of the rules adopted hereunder under such terms and conditions as may be agreed upon, and may rescind such delegation upon a determination that the program is not being adequately administered.

(c)    Establish procedures and forms for the submission, review, approval, and rejection of applications, notifications, and reports required under this part.

(d)    Require at its discretion the making and filing of logs, and the saving of cuttings and cores, which shall be delivered to the department.

(e)    Encourage prevention of potable water well contamination and promote cost-effective remediation of contaminated potable water supplies by use of the Water Quality Assurance Trust Fund as provided in s. 376.307(1) (e) and establish by rule:

1.    Delineation of areas of groundwater contamination for implementation of well location and construction, testing, permitting, and clearance requirements as set forth in subparagraphs 2., 3., 4., 5., and 6. The department shall make available to water management districts, regional planning councils, the Department of Health, and county building and zoning departments, maps or other information on areas of contamination, including areas of ethylene dibromide contamination. Such maps or other information shall be made available to property owners, realtors, real estate associations, property appraisers, and other interested persons upon request and upon payment of appropriate costs.

2.    Requirements for testing for suspected contamination in areas of known contamination, as a prerequisite for clearance of a water well for drinking purposes. The department is authorized to establish criteria for acceptance of water quality testing results from the Department of Health and laboratories certified by the Department of Health, and is authorized to establish requirements for sample collection quality assurance.

3.    Requirements for mandatory connection to available potable water systems in areas of known contamination, wherein the department may prohibit the permitting and construction of new potable water wells.

4.    Location and construction standards for public and all other potable water wells permitted in areas of contamination. Such standards shall be designed to minimize the effects of such contamination.

5.    A procedure for permitting all potable water wells in areas of known contamination. Any new water well that is to be used for drinking water purposes and that does not meet construction standards pursuant to subparagraph 4. must be abandoned and plugged by the owner. Water management districts shall implement, through delegation from the department, the permitting and enforcement responsibilities of this subparagraph.

6.    A procedure for clearing for use all potable water wells, except wells that serve a public water supply system, in areas of known contamination. If contaminants are found upon testing pursuant to subparagraph 2., a well may not be cleared for use without a filter or other means of preventing the users of the well from being exposed to deleterious amounts of contaminants. The Department of Health shall implement the responsibilities of this subparagraph.

7.    Fees to be paid for well construction permits and clearance for use. The fees shall be based on the actual costs incurred by the water management districts, the Department of Health, or other political subdivisions in carrying out the responsibilities related to potable water well permitting and clearance for use. The fees shall provide revenue to cover all such costs and shall be set according to the following schedule:

a.    The well construction permit fee may not exceed $500.

b.    The clearance fee may not exceed $50.

8.    Procedures for implementing well-location, construction, testing, permitting, and clearance requirements as set forth in subparagraphs 2.-6. within areas that research or monitoring data indicate are vulnerable to contamination with nitrate, or areas in which the department provides a subsidy for restoration or replacement of contaminated drinking water supplies through extending existing water lines or developing new water supply systems pursuant to s. 376.307(1)(e). The department shall consult with the Florida Ground Water Association in the process of developing rules pursuant to this subparagraph.

All fees and funds collected by each delegated entity pursuant to this part shall be deposited in the appropriate operating account of that entity.

(f)   Issue such additional regulations and take such other actions as may be necessary to carry out the provisions of this part.

(2)   Notwithstanding ss. 373.219 and 373.326 or any other provision of this chapter or any rule adopted pursuant to this chapter, in any area identified by department rule pursuant to subparagraph (1)(e)1. as an area of known groundwater contamination, the department may by rule require a permit to construct or use any well which is or may be used as a source of drinking water. Rules adopted pursuant to paragraph (1)(e) shall specifically provide for uniformity in permitting of potable water wells in areas of groundwater contamination and shall be adopted by each delegated party.

History.—s. 3, part III, ch. 72-299; s. 229, ch. 81-259; s. 5, ch. 88-393; s. 9, ch. 91-305; s. 9, ch. 94-311; s. 39, ch. 96-321; s. 32, ch. 97-160; s. 67, ch. 99-8.

### 373.313   Prior permission and notification.—

(1)   Taking into consideration other applicable state laws, in any geographical area where the department determines such permission to be reasonably necessary to protect the groundwater resources, prior permission shall be obtained from the department for each of the following:

(a)   The construction of any water well;

(b)   The repair of any water well; or

(c)   The abandonment of any water well.

However, in any area where undue hardship might arise by reason of such requirement, prior permission will not be required.

(2)   The department shall be notified of any of the following whenever prior permission is not required:

(a)   The construction of any water well;

(b)   The repair of any water well; or

(c)   The abandonment of any water well.

History.—s. 4, part III, ch. 72-299.

### 373.314   Citation of rule.—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 5, ch. 79-161.

### 373.316   Existing installations.—No well in existence on the effective date of this part shall be required to conform to the provisions of s. 373.313 or any rules or regulations adopted pursuant thereto. However, any well now or hereafter abandoned or repaired as defined in this part shall be brought into compliance with the requirements of this part and any applicable rules or regulations with respect to abandonment of wells, and any well which is determined by the department to be a hazard to the groundwater resources must comply with the provisions of this part and applicable rules and regulations within a reasonable time after notification of such determination has been given.

History.—s. 5, part III, ch. 72-299.

### 373.319   Inspections.—

(1)   The department is authorized to inspect any water well or abandoned water well. Duly authorized representatives of the department may at reasonable times enter upon and shall be given access to any premises for the purpose of such inspection.

(2)   If upon the basis of such inspections the department finds applicable laws, rules, or regulations have not been complied with, it shall disapprove the well. If disapproved, no well shall thereafter be used until brought into compliance with the rules and regulations promulgated under this law.

History.—s. 6, part III, ch. 72-299; s. 14, ch. 78-95.

### 373.323   Licensure of water well contractors; application, qualifications, and examinations; equipment identification.—

(1)   Every person who wishes to engage in business as a water well contractor shall obtain from the water management district a license to conduct such business. Licensure under this part by a water management district shall be the only water well contractor license required for the construction, repair, or abandonment of water wells in the state or any political subdivision thereof.

(2)   Each person desiring to be licensed as a water well contractor shall apply to take the licensure examination. Application shall be made to the water management district in which the applicant resides or in which his or her principal place of business is located. A resident of another state shall apply to the water management district in which most of the business of the applicant will take place. Application shall be made on forms provided by the water management district.

(3)   An applicant who meets the following requirements shall be entitled to take the water well contractor licensure examination:

(a)   Is at least 18 years of age.

(b)   Has at least 2 years of experience in constructing, repairing, or abandoning water wells. Satisfactory proof of such experience shall be demonstrated by providing:

1.   Evidence of the length of time the applicant has been engaged in the business of the construction, repair, or abandonment of water wells as a major activity, as attested to by a letter from a water well contractor or a letter from a water well inspector employed by a governmental agency.

2.   A list of at least 10 water wells that the applicant has constructed, repaired, or abandoned within the preceding 5 years. Of these wells, at least seven must have been constructed, as defined in s. 373.303(2), by the applicant. The list shall also include:

a.   The name and address of the owner or owners of each well.

b.   The location, primary use, and approximate depth and diameter of each well that the applicant has constructed, repaired, or abandoned.

c.   The approximate date the construction, repair, or abandonment of each well was completed.

(c)   Has completed the application form and remitted a nonrefundable application fee.

(4)   The department shall prepare an examination which shall test an applicant's knowledge of rules and regulations adopted under this part; ability to construct, repair, and abandon a well; and ability to supervise, direct, manage, and control the contracting activities of a water well contracting business. The department shall provide each water management district and representatives of the water well contracting industry with meaningful opportunity to participate in the development of the examination.

(5)   The water management district shall issue a water well contracting license to any applicant who receives a passing grade on the examination, has paid the initial application fee, takes and completes, to the satisfaction of the department, a minimum of 12 hours of approved coursework, and has complied with the requirements of this section. A passing grade on the examination shall be as established by the department by rule. A license issued by any water management district shall be valid in every water management district in the state.

(6)   An employee of a political subdivision or of a governmental entity engaged in water well drilling shall be licensed pursuant to this part but shall be exempt from paying fees required pursuant to this part.

(7)   When a water management district has probable cause to believe that any person not licensed as a water well contractor has violated any provision of this part or any statute that relates to the construction, repair, or abandonment of water wells, or any rule adopted pursuant thereto, the water management district may issue and deliver to such person a notice to cease and desist from such violation. In addition, the water management district may issue and deliver a notice to cease and desist to any person who aids and abets the unlicensed construction, repair, or abandonment of a water well by employing an unlicensed person. For the purpose of enforcing a cease and desist order, a water management district may file a proceeding in the name of the state seeking issuance of an injunction or a writ of mandamus against any person who violates any provision of such order.

(8)　The department shall adopt rules which specifically provide for uniformity among all water management districts for the application process and qualifications for licensure, providing each water management district and representatives of the water well contracting industry with meaningful opportunity to participate in the development of the rules as they are drafted. The rules shall be adopted by each water management district.

(9)　Each piece of drilling equipment owned, leased, or operated by a water well contractor shall have the water well contractor's license number prominently displayed thereon.

(10)　Water well contractors licensed under this section may install, repair, and modify pumps and tanks in accordance with the Florida Building Code, Plumbing; Section 612—Wells pumps and tanks used for private potable water systems. In addition, licensed water well contractors may install pumps, tanks, and water conditioning equipment for all water systems.

(11)　A licensed well water contractor may facilitate the performance of additional work by an appropriately licensed contractor which is incidental to the construction, repair, or abandonment of a water well. For purposes of this subsection, incidental work is limited to the electrical connection of a pump, connecting a well to a residential dwelling, constructing a pump house or pump vault of 100 square feet or less, constructing a nonstructural well slab of 100 square feet or less, constructing fencing, and landscaping. This part does not authorize a licensed water well contractor to perform any services or work for which a license under chapter 489 is required.

History.—s. 7, part III, ch. 72-299; s. 114, ch. 77-104; s. 14, ch. 78-95; s. 77, ch. 83-310; s. 1, ch. 84-94; ss. 12, 23, 24, ch. 88-242; s. 4, ch. 91-429; s. 602, ch. 95-148; s. 4, ch. 2001-186; s. 16, ch. 2001-270; s. 1, ch. 2006-87; s. 9, ch. 2009-243; s. 13, ch. 2013-92; s. 2, ch. 2014-154; s. 2, ch. 2016-130.

### 373.324　License renewal.—

(1)　A water well contractor shall submit an application for renewal of a license to the water management district which issued the license.

(2)　The water management district shall renew a license upon receipt of the renewal application, proof of completion of 12 classroom hours of continuing education for each renewal cycle, and renewal fee.

(3)　The department shall prescribe by rule the method for renewal of a license, which shall include continuing education requirements of not less than 12 classroom hours for each renewal cycle. However, if a water well contractor has received his or her first license within 180 days before the end of the biennium renewal of licenses, the continuing education requirements shall be waived for the licensee's first renewal cycle. Notwithstanding s. 373.329, the department by rule shall establish an administrative fee based on the actual costs incurred in administering the responsibilities related to continuing education requirements.

(4)　The department shall adopt rules establishing a procedure for the biennial renewal of licenses, which shall be adopted by each water management district.

(5)　A license which is not renewed at the end of the biennium prescribed by the department shall automatically revert to inactive status. Such license may be reactivated only if the licensee meets the qualifications for reactivation in s. 373.325.

(6)　At least 60 days prior to the automatic reversion of a license to inactive status, the water management district shall mail a notice of such reversion to the last known address of the licensee.

(7)　Notwithstanding the renewal requirements in subsection (3) and s. 250.4815 for members of the Florida National Guard and the United States Armed Forces Reserves, any active water well contractor license issued under this part to a servicemember as defined in s. 250.01 or his or her spouse, both of whom reside in Florida, may not become inactive while the servicemember is serving on military orders which take him or her over 35 miles from his or her residence and shall be considered an active license for up to 180 days after the servicemember returns to his or her Florida residence. If the license renewal requirements are met within the 180-day extension period, the servicemember or his or her spouse may not be charged any additional costs, such as, but not limited to, late fees or delinquency fees, above the normal license fees. This subsection does not waive renewal requirements such as registering, continuing education, and all associated fees. The servicemember must present to the water

management district issuing the license a copy of his or her official military orders or a written verification from the member's commanding officer before the end of the 180-day period in order to qualify for the extension.

History.—ss. 13, 24, ch. 88-242; s. 4, ch. 91-429; s. 17, ch. 2001-270; s. 2, ch. 2006-87.

**373.325    Inactive status.—**A license which has become inactive pursuant to s. 373.324 may be renewed or reactivated upon application to the water management district, as follows:

(1)    A license which has been inactive for 1 year or less after the end of the biennium prescribed by the department may be renewed pursuant to s. 373.324 upon application to the water management district and upon payment of the renewal and penalty fees as provided in s. 373.329. Such renewed license shall expire 2 years after the date the license automatically reverted to inactive status.

(2)    A license which has been inactive for more than 1 year may be reactivated upon application to the water management district for licensure pursuant to the requirements of s. 373.323.

History.—ss. 14, 24, ch. 88-242; s. 4, ch. 91-429.

**373.326    Exemptions.—**

(1)    When the water management district finds that compliance with all requirements of this part would result in undue hardship, an exemption from any one or more such requirements may be granted by the water management district to the extent necessary to ameliorate such undue hardship and to the extent such exemption can be granted without impairing the intent and purpose of this part.

(2)    Nothing in this part shall prevent a person who has not obtained a license pursuant to s. 373.323 from constructing a well that is 2 inches or under in diameter, on the person's own or leased property, intended for use only in a single-family house which is his or her residence, or intended for use only for farming purposes on the person's farm, and when the waters to be produced are not intended for use by the public or any residence other than his or her own, provided that such person complies with all local and state rules and regulations relating to the construction of water wells.

(3)    A permit may not be required under this part for any well authorized pursuant to ss. 403.061 and 403.087 under the State Underground Injection Control Program identified in chapter 62-528, Florida Administrative Code, as Class I, Class II, Class III, Class IV, or Class V Groups 2-9. However, such wells must be constructed by persons who have obtained a license pursuant to s. 373.323 as otherwise required by law.

History.—s. 8, part III, ch. 72-299; s. 1, ch. 84-94; ss. 15, 23, 24, ch. 88-242; s. 4, ch. 91-429; s. 603, ch. 95-148; s. 6, ch. 2012-205.

**373.329    Fees for licensure.—**The department by rule shall establish fees to be paid for application for licensure, application for license renewal, and the penalty fee for renewal of a license which has been inactive for 1 year or less. The fees shall be based on the actual costs incurred by the water management districts in carrying out the responsibilities related to licensure of water well contractors as derived from estimates provided by the water management districts of the revenue required to implement this part, but shall not exceed the following amounts:

(1)    Application for initial licensure, $150.

(2)    Biennial license renewal, $50.

(3)    Penalty for renewal of a license which has been inactive for 1 year or less, $75.

All fees and other moneys collected by a water management district pursuant to this part shall be deposited in the general operating fund of the water management district.

History.—s. 9, part III, ch. 72-299; s. 16, ch. 73-190; s. 1, ch. 84-94; ss. 16, 23, 24, ch. 88-242; s. 4, ch. 91-429.

**373.333    Disciplinary guidelines; adoption and enforcement; license suspension or revocation.—**

(1)    The department shall adopt by rule disciplinary guidelines applicable to each specific ground for disciplinary action which may be imposed by the water management districts, providing each water management district and representatives of the water well contracting industry with meaningful opportunity to participate in the development of the disciplinary guideline rules as they are drafted. The disciplinary guidelines shall be

adopted by each water management district. The guideline rules shall be consistently applied by the water management districts and shall:

(a)   Specify a meaningful range of designated penalties based upon the severity and repetition of specific offenses.

(b)   Distinguish minor violations from those which endanger public health, safety, and welfare or contaminate the water resources.

(c)   Inform the public of likely penalties which may be imposed for proscribed conduct.

A specific finding of mitigating or aggravating circumstances shall allow a water management district to impose a penalty other than that provided in the guidelines. Disciplinary action may be taken by any water management district, regardless of where the contractor's license was issued.

(2)   Whenever the water management district has reasonable grounds for believing that there has been a violation of this part or any rule or regulation adopted pursuant hereto, it shall give written notice to the person alleged to be in violation. Such notice shall identify the provision of this part or regulation issued hereunder alleged to be violated and the facts alleged to constitute such violation.

(3)   Such notice shall be served in the manner required by law for the service of process upon a person in a civil action or by registered United States mail to the last known address of the person. The water management district shall send copies of such notice only to persons who have specifically requested such notice or to entities with which the water management district has formally agreed to provide such notice. Notice alleging a violation of a rule setting minimum standards for the location, construction, repair, or abandonment of wells shall be accompanied by an order of the water management district requiring remedial action which, if taken within the time specified in such order, will effect compliance with the requirements of this part and regulations issued hereunder. Such order shall become final unless a request for hearing as provided in chapter 120 is made within 30 days from the date of service of such order. Upon compliance, notice shall be served by the water management district in a timely manner upon each person and entity who received notice of a violation, stating that compliance with the order has been achieved.

(4)   The following acts constitute grounds for which disciplinary actions specified in subsection (5) may be taken by a water management district:

(a)   Attempting to obtain, obtaining, or renewing a license under this part by bribery or fraudulent misrepresentation.

(b)   Being convicted or found guilty, regardless of adjudication, of fraud or deceit; or of gross negligence, incompetency, or misconduct in the performance of work; or of a crime in any jurisdiction which directly relates to the practice of water well contracting or the ability to practice water well contracting. A plea of nolo contendere shall create a presumption of guilt to the underlying criminal charges, and the water management district shall allow the person being disciplined to present any evidence relevant to the underlying charges and the circumstances surrounding his or her plea.

(c)   Allowing any other person to use the license.

(d)   Violating or refusing to comply with any provision of this part or a rule adopted by the department or water management district, or any order of the water management district previously entered in a disciplinary hearing.

(e)   Constructing, repairing, or abandoning a water well without first obtaining all applicable permits.

(f)   Having had administrative or disciplinary action relating to water well construction, repair, or abandonment taken by any municipality or county or by any state agency, which action shall be reviewed by the water management district before the water management district takes any disciplinary action of its own.

(g)   Practicing with a revoked, suspended, or inactive license.

(5)   When the water management district finds a person guilty of any of the grounds set forth in subsection (4), it may enter an order imposing one or more of the following disciplinary actions:

(a)   Denial of an application for licensure or for renewal of a license.

(b)   Revocation or suspension of a license.

(c)   Imposition of an administrative fine not to exceed $5,000 for each count or separate offense.

(d)   Placement of the water well contractor on probation for a period of time subject to such conditions as the water management district may specify.

(e)   Restriction of the licensee's authorized scope of practice.

(6)   When disciplinary action is taken against a contractor which results in suspension or revocation of the contractor's license, a water management district shall notify each water management district of such action.

(7)   The water management district shall reissue the license of a contractor whose license has been suspended or revoked upon determination by the water management district that the disciplined person has complied with all of the terms and conditions set forth in the final order.

(8)   The water management district may impose through an order an administrative fine not to exceed $5,000 per occurrence against an unlicensed person if it determines that the unlicensed person has engaged in the practice of water well contracting for which a license is required.

History.—s. 10, part III, ch. 72-299; s. 78, ch. 83-310; s. 1, ch. 84-94; s. 3, ch. 84-338; s. 2, ch. 84-341; ss. 17, 23, 24, ch. 88-242; s. 4, ch. 91-429; s. 604, ch. 95-148; s. 3, ch. 2006-87; s. 20, ch. 2009-243.

**373.335   Clearinghouse.**—The department, in conjunction with the water management districts, shall establish a statewide clearinghouse which will allow each water management district to access information regarding water well contractor licensees and their license numbers, any violation by any such licensee, and any disciplinary action taken by a water management district.

History.—ss. 18, 24, ch. 88-242; s. 4, ch. 91-429.

**373.336   Unlawful acts; penalties.**—

(1)   It is unlawful for any person to:

(a)   Practice water well contracting without an active license issued pursuant to this part.

(b)   Construct, repair, or abandon a water well, or operate drilling equipment for such purpose, unless employed by or under the supervision of a licensed water well contractor or exempt under s. 373.326.

(c)   Give false or forged evidence to obtain a license.

(d)   Present as his or her own the license of another.

(e)   Use or attempt to use a license to practice water well contracting which license has been suspended, revoked, or placed on inactive status.

(f)   Engage in willful or repeated violation of this part or of any department rule or regulation or water management district or state agency rule or regulation relating to water wells which endangers the public health, safety, and welfare.

(2)   It is unlawful for a business entity to engage in water well contracting or to perform any activity for which a license as a water well contractor is required unless a licensed water well contractor is responsible for supervising such activity of the business entity.

(3)   Any person who violates any provision of this part or regulation or order issued hereunder shall, upon conviction, be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. Continuing violation after an order or conviction shall constitute a separate violation for each day so continued.

History.—s. 11, part III, ch. 72-299; s. 17, ch. 73-190; s. 1, ch. 84-94; ss. 19, 23, 24, ch. 88-242; s. 57, ch. 91-224; s. 4, ch. 91-429; s. 605, ch. 95-148.

**373.337   Rules.**—The department shall adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this part, providing each water management district and representatives of the water well contracting industry with meaningful opportunity to participate in the development of the rules as they are drafted. The rules shall be adopted by each water management district.

History.—ss. 20, 24, ch. 88-242; s. 4, ch. 91-429; s. 85, ch. 98-200.

**373.342   Permits.**—

(1)   The governing board of any water management district which, pursuant to the authority delegated to it by the department under s. 373.308 or s. 373.309, regulates water wells may in its discretion authorize its executive director to issue permits for the construction, repair, or modification of any water well.

(2)  In granting authority to its executive director under subsection (1), the governing board shall prescribe those certain circumstances in which such a permit may be issued.

**History.**—s. 3, ch. 79-160; s. 1, ch. 84-94; ss. 21, 23, ch. 88-242; s. 10, ch. 91-305.

PART IV
MANAGEMENT AND STORAGE
OF SURFACE WATERS

373.403    Definitions.

373.406    Exemptions.

373.407    Determination of qualification for an agricultural-related exemption.

373.409    Headgates, valves, and measuring devices.

373.413    Permits for construction or alteration.

373.4131    Statewide environmental resource permitting rules.

373.4132    Dry storage facility permitting.

373.4133    Port conceptual permits.

373.4135    Mitigation banks and offsite regional mitigation.

373.4136    Establishment and operation of mitigation banks.

373.4137    Mitigation requirements for specified transportation projects.

373.4138    High Speed Rail Project; determination of mitigation requirements and costs.

373.4139    Local government transportation infrastructure mitigation requirements.

373.414    Additional criteria for activities in surface waters and wetlands.

373.4141    Permits; processing.

373.4142    Water quality within stormwater treatment systems.

373.4143    Declaration of policy.

373.4144    Federal environmental permitting.

373.4145    Part IV permitting program within the geographical jurisdiction of the Northwest Florida Water Management District.

373.4146    State assumption of the federal Clean Water Act, section 404 dredge and fill permitting program.

373.4149    Miami-Dade County Lake Belt Plan.

373.41492    Miami-Dade County Lake Belt Mitigation Plan; mitigation for mining activities within the Miami-Dade County Lake Belt.

373.41495    Lake Belt Mitigation Trust Fund; bonds.

373.415    Protection zones; duties of the St. Johns River Water Management District.

373.416    Permits for maintenance or operation.

373.417    Citation of rule.

373.418    Rulemaking; preservation of existing authority.

373.4185    List of flocculants permitted.

373.419    Completion report.

373.421    Delineation methods; formal determinations.

373.4211    Ratification of chapter 17-340, Florida Administrative Code, on the delineation of the landward extent of wetlands and surface waters.

373.422    Applications for activities on state sovereignty lands or other state lands.

373.423    Inspection.

373.426    Abandonment.

373.427    Concurrent permit review.

373.4271    Conduct of challenge to consolidated environmental resource permit or associated variance or sovereign submerged lands authorization issued in connection with deepwater ports.

373.4275    Review of consolidated orders.

373.428    Federal consistency.

373.429    Revocation and modification of permits.

373.430    Prohibitions, violation, penalty, intent.

373.433    Abatement.

373.436    Remedial measures.

373.439    Emergency measures.

373.441    Role of counties, municipalities, and local pollution control programs in permit processing; delegation.

373.4415    Role of Miami-Dade County in processing permits for limerock mining in Miami-Dade County Lake Belt.

373.443    Immunity from liability.

373.451    Short title; legislative findings and intent.

373.453    Surface water improvement and management plans and programs.

373.459    Funds for surface water improvement and management.

373.4591    Improvements on private agricultural lands.

373.4592    Everglades improvement and management.

373.45922    South Florida Water Management District; permit for completion of Everglades Construction Project; report.

373.45924    South Florida Water Management District; Everglades truth in borrowing.

373.45926    Everglades Trust Fund; allocation of revenues and expenditure of funds for conservation and protection of natural resources and abatement of water pollution.

373.4593    Florida Bay Restoration.

373.45931    Alligator Alley tolls; Everglades and Florida Bay restoration.

373.4595    Northern Everglades and Estuaries Protection Program.

373.4596    State compliance with stormwater management programs.

373.4597    The Geneva Freshwater Lens Protection Act.

373.4598    Water storage reservoirs.

373.461    Lake Apopka improvement and management.

373.462    Legislative findings and intent.

373.463    Heartland headwaters annual report.

373.467    The Harris Chain of Lakes Restoration Council.

373.468    The Harris Chain of Lakes restoration program.

**373.403    Definitions.**—When appearing in this part or in any rule, regulation, or order adopted pursuant thereto, the following terms mean:

(1)    "Dam" means any artificial or natural barrier, with appurtenant works, raised to obstruct or impound, or which does obstruct or impound, any of the surface waters of the state.

(2)    "Appurtenant works" means any artificial improvements to a dam which might affect the safety of such dam or, when employed, might affect the holding capacity of such dam or of the reservoir or impoundment created by such dam.

(3)    "Impoundment" means any lake, reservoir, pond, or other containment of surface water occupying a bed or depression in the earth's surface and having a discernible shoreline.

(4)    "Reservoir" means any artificial or natural holding area which contains or will contain the water impounded by a dam.

(5)    "Works" means all artificial structures, including, but not limited to, ditches, canals, conduits, channels, culverts, pipes, and other construction that connects to, draws water from, drains water into, or is placed in or across the waters in the state.

(6)    "Closed system" means any reservoir or works located entirely within agricultural lands owned or controlled by the user and which requires water only for the filling, replenishing, and maintaining the water level thereof.

(7)  "Alter" means to extend a dam or works beyond maintenance in its original condition, including changes which may increase or diminish the flow or storage of surface water which may affect the safety of such dam or works.

(8)  "Maintenance" or "repairs" means remedial work of a nature as may affect the safety of any dam, impoundment, reservoir, or appurtenant work or works, but excludes routine custodial maintenance.

(9)  "Drainage basin" means a subdivision of a watershed.

(10)  "Stormwater management system" means a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, overdrainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges from the system.

(11)  "State water quality standards" means water quality standards adopted pursuant to chapter 403.

(12)  "Watershed" means the land area which contributes to the flow of water into a receiving body of water.

(13)  "Dredging" means excavation, by any means, in surface waters or wetlands, as delineated in s. 373.421(1). It also means the excavation, or creation, of a water body which is, or is to be, connected to surface waters or wetlands, as delineated in s. 373.421(1), directly or via an excavated water body or series of water bodies.

(14)  "Filling" means the deposition, by any means, of materials in surface waters or wetlands, as delineated in s. 373.421(1).

(15)  "Estuary" means a semienclosed, naturally existing coastal body of water which has a free connection with the open sea and within which seawater is measurably diluted with fresh water derived from riverine systems.

(16)  "Lagoon" means a naturally existing coastal zone depression which is below mean high water and which has permanent or ephemeral communications with the sea, but which is protected from the sea by some type of naturally existing barrier.

(17)  "Seawall" means a manmade wall or encroachment, except riprap, which is made to break the force of waves and to protect the shore from erosion.

(18)  "Ecological value" means the value of functions performed by uplands, wetlands, and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species. These functions include, but are not limited to, providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; and natural water storage, natural flow attenuation, and water quality improvement, which enhances fish, wildlife, and listed species utilization.

(19)  "Mitigation bank" means a project permitted under s. 373.4136 undertaken to provide for the withdrawal of mitigation credits to offset adverse impacts authorized by a permit under this part.

(20)  "Mitigation credit" means a standard unit of measure which represents the increase in ecological value resulting from restoration, enhancement, preservation, or creation activities.

(21)  "Mitigation service area" means the geographic area within which mitigation credits from a mitigation bank may be used to offset adverse impacts of activities regulated under this part.

(22)  "Offsite regional mitigation" means mitigation on an area of land off the site of an activity permitted under this part, where an applicant proposes to mitigate the adverse impacts of only the applicant's specific activity as a requirement of the permit, which provides regional ecological value, and which is not a mitigation bank permitted under s. 373.4136.

**History.**—s. 1, part IV, ch. 72-299; s. 18, ch. 73-190; s. 4, ch. 80-259; s. 1, ch. 82-101; s. 11, ch. 89-279; s. 28, ch. 93-213; s. 4, ch. 96-371.

**373.406    Exemptions.**—The following exemptions shall apply:

(1)  Nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to affect the right of any natural person to capture, discharge, and use water for purposes permitted by law.

(2)  Notwithstanding s. 403.927, nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to affect the right of any person engaged in the occupation of agriculture, silviculture, floriculture, or horticulture to alter the topography of any tract of land, including, but not limited to, activities

that may impede or divert the flow of surface waters or adversely impact wetlands, for purposes consistent with the normal and customary practice of such occupation in the area. However, such alteration or activity may not be for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands. This exemption applies to lands classified as agricultural pursuant to s. 193.461 and to activities requiring an environmental resource permit pursuant to this part. This exemption does not apply to any activities previously authorized by an environmental resource permit or a management and storage of surface water permit issued pursuant to this part or a dredge and fill permit issued pursuant to chapter 403. This exemption has retroactive application to July 1, 1984.

(3)   Nothing herein, or in any rule, regulation, or order adopted pursuant hereto, shall be construed to be applicable to construction, operation, or maintenance of any agricultural closed system. However, part II of this chapter shall be applicable as to the taking and discharging of water for filling, replenishing, and maintaining the water level in any such agricultural closed system. This subsection shall not be construed to eliminate the necessity to meet generally accepted engineering practices for construction, operation, and maintenance of dams, dikes, or levees.

(4)   All rights and restrictions set forth in this section shall be enforced by the governing board or the Department of Environmental Protection or its successor agency, and nothing contained herein shall be construed to establish a basis for a cause of action for private litigants.

(5)   The department or the governing board may by rule establish general permits for stormwater management systems which have, either singularly or cumulatively, minimal environmental impact. The department or the governing board also may establish by rule exemptions or general permits that implement interagency agreements entered into pursuant to s. 373.046, s. 378.202, s. 378.205, or s. 378.402.

(6)   Any district or the department may exempt from regulation under this part those activities that the district or department determines will have only minimal or insignificant individual or cumulative adverse impacts on the water resources of the district. The district and the department are authorized to determine, on a case-by-case basis, whether a specific activity comes within this exemption. Requests to qualify for this exemption shall be submitted in writing to the district or department, and such activities shall not be commenced without a written determination from the district or department confirming that the activity qualifies for the exemption.

(7)   Nothing in this part, or in any rule or order adopted under this part, may be construed to require a permit for mining activities for which an operator receives a life-of-the-mine permit under s. 378.901.

(8)   Certified aquaculture activities which apply appropriate best management practices adopted pursuant to s. 597.004 are exempt from this part.

(9)   Implementation of measures having the primary purpose of environmental restoration or water quality improvement on agricultural lands are exempt from regulation under this part where these measures or practices are determined by the district or department, on a case-by-case basis, to have minimal or insignificant individual and cumulative adverse impact on the water resources of the state. The district or department shall provide written notification as to whether the proposed activity qualifies for the exemption within 30 days after receipt of a written notice requesting the exemption. No activity under this exemption shall commence until the district or department has provided written notice that the activity qualifies for the exemption.

(10)   Implementation of interim measures or best management practices adopted pursuant to s. 403.067 that are by rule designated as having minimal individual or cumulative adverse impacts to the water resources of the state are exempt from regulation under this part.

(11)   Any district or the department may adopt rules to exempt from regulation under this part any system for a mining or mining-related activity that is described in or covered by an exemption confirmation letter issued by the district pursuant to applicable rules implementing this part that were in effect at the time the letter was issued, and that will not be harmful to the water resources. Such rules may include provisions for the duration of this exemption.

(12)   An overwater pier, dock, or a similar structure located in a deepwater port listed in s. 311.09 is not considered to be part of a stormwater management system for which this chapter or chapter 403 requires stormwater from impervious surfaces to be treated if:

(a)    The port has a stormwater pollution prevention plan for industrial activities pursuant to the National Pollutant Discharge Elimination System Program; and

(b)    The stormwater pollution prevention plan also provides similar pollution prevention measures for other activities that are not subject to the National Pollutant Discharge Elimination System Program and that occur on the port's overwater piers, docks, and similar structures.

(13)    Nothing in this part, or in any rule, regulation, or order adopted pursuant to this part, applies to construction, alteration, operation, or maintenance of any wholly owned, manmade excavated farm ponds, as defined in s. 403.927, constructed entirely in uplands. Alteration or maintenance may not involve any work to connect the farm pond to, or expand the farm pond into, other wetlands or other surface waters. This exemption does not apply to any farm pond that covers an area greater than 15 acres and has an average depth greater than 15 feet, or is less than 50 feet from any wetlands.

(14)    Nothing in this part, or in any rule, regulation, or order adopted pursuant to this part, may require a permit for activities affecting wetlands created solely by the unauthorized flooding or interference with the natural flow of surface water caused by an unaffiliated adjoining landowner. Requests to qualify for this exemption must be made within 7 years after the cause of such unauthorized flooding or unauthorized interference with the natural flow of surface water and must be submitted in writing to the district or department. Such activities may not begin without a written determination from the district or department confirming that the activity qualifies for the exemption. This exemption does not expand the jurisdiction of the department or the water management districts and does not apply to activities that discharge dredged or fill material into waters of the United States, including wetlands, subject to federal jurisdiction under s. 404 of the federal Clean Water Act, 33 U.S.C. s. 1344.

History.—s. 2, part IV, ch. 72-299; s. 47, ch. 79-65; s. 5, ch. 80-259; s. 2, ch. 82-101; s. 12, ch. 89-279; s. 268, ch. 94-356; s. 2, ch. 95-215; s. 2, ch. 96-370; s. 15, ch. 98-203; s. 21, ch. 98-333; s. 2, ch. 2000-130; s. 2, ch. 2002-253; s. 6, ch. 2011-164; s. 1, ch. 2011-165; s. 14, ch. 2013-92.

373.407    Determination of qualification for an agricultural-related exemption.—In the event of a dispute as to the applicability of an exemption, a water management district or landowner may request the Department of Agriculture and Consumer Services to make a binding determination as to whether an existing or proposed activity qualifies for an agricultural-related exemption under s. 373.406(2). The Department of Agriculture and Consumer Services and each water management district shall enter into a memorandum of agreement or amend an existing memorandum of agreement which sets forth processes and procedures by which the Department of Agriculture and Consumer Services shall undertake its review, make a determination effectively and efficiently, and provide notice of its determination to the applicable water management district or landowner. The Department of Agriculture and Consumer Services has exclusive authority to make the determination under this section and may adopt rules to implement this section and s. 373.406(2).

History.—s. 8, ch. 2006-255; s. 2, ch. 2011-165.

373.409    Headgates, valves, and measuring devices.—

(1)    The department or the governing board may, by regulation, require the owner of any dam, impoundment, reservoir, appurtenant work, or works subject to the provisions of this part to install and maintain a substantial and serviceable headgate or valve at the point designated by the department or the governing board to measure the water discharged or diverted.

(2)    If any owner shall not have constructed or installed such headgate or valve or such measuring device within 60 days after the governing board or department has ordered its construction, the governing board or department shall have such headgate, valve, or measuring device constructed or installed, and the costs of installing the headgate, valve, or measuring device shall be a lien against the owner's land upon which such installation takes place until the governing board or department is reimbursed in full.

(3)    No person shall alter or tamper with a measuring device so as to cause it to register other than the actual amount of water diverted, discharged, or taken. Violation of this subsection shall be a misdemeanor of the second degree, punishable under s. 775.082(4)(b).

History.—s. 3, part IV, ch. 72-299; s. 28, ch. 87-225; s. 49, ch. 91-221.

**373.413    Permits for construction or alteration.**—

(1)    Except for the exemptions set forth herein, the governing board or the department may require such permits and impose such reasonable conditions as are necessary to assure that the construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works will comply with the provisions of this part and applicable rules promulgated thereto and will not be harmful to the water resources of the district. The department or the governing board may delineate areas within the district wherein permits may be required.

(2)    A person proposing to construct or alter a stormwater management system, dam, impoundment, reservoir, appurtenant work, or works subject to such permit shall apply to the governing board or department for a permit authorizing such construction or alteration. The application shall contain the following:

(a)    Name and address of the applicant.

(b)    Name and address of the owner or owners of the land upon which the works are to be constructed and a legal description of such land.

(c)    Location of the work.

(d)    Sketches of construction pending tentative approval.

(e)    Name and address of the person who prepared the plans and specifications of construction.

(f)    Name and address of the person who will construct the proposed work.

(g)    General purpose of the proposed work.

(h)    Such other information as the governing board or department may require.

(3)    After receipt of an application for a permit, the governing board or department shall publish notice of the application by sending a notice to any persons who have filed a written request for notification of any pending applications affecting the particular designated area. Such notice may be sent by regular mail. The notice shall contain the name and address of the applicant; a brief description of the proposed activity, including any mitigation; the location of the proposed activity, including whether it is located within an Outstanding Florida Water or aquatic preserve; a map identifying the location of the proposed activity subject to the application; a depiction of the proposed activity subject to the application; a name or number identifying the application and the office where the application can be inspected; and any other information required by rule.

(4)    In addition to the notice required by subsection (3), the governing board or department may publish, or require an applicant to publish at the applicant's expense, in a newspaper of general circulation within the affected area, a notice of receipt of the application and a notice of intended agency action. This subsection does not limit the discretionary authority of the department or the governing board of a water management district to publish, or to require an applicant to publish at the applicant's expense, any notice under this chapter. The governing board or department shall also provide notice of this intended agency action to the applicant and to persons who have requested a copy of the intended agency action for that specific application.

(5)    The governing board or department may charge a subscription fee to any person who has filed a written request for notification of any pending applications to cover the cost of duplication and mailing charges.

(6)    It is the intent of the Legislature that the governing board or department exercise flexibility in the permitting of stormwater management systems associated with the construction or alteration of systems serving state transportation projects and facilities. Because of the unique limitations of linear facilities, the governing board or department shall balance the expenditure of public funds for stormwater treatment for state transportation projects and facilities with the benefits to the public in providing the most cost-efficient and effective method of achieving the treatment objectives. In consideration thereof, the governing board or department shall allow alternatives to onsite treatment, including, but not limited to, regional stormwater treatment systems. The Department of Transportation is responsible for treating stormwater generated from state transportation projects but is not responsible for the abatement of pollutants and flows entering its stormwater management systems from offsite sources; however, this subsection does not prohibit the Department of Transportation from receiving and managing such pollutants and flows when cost effective and prudent. Further, in association with right-of-way acquisition for state transportation projects, the Department of Transportation is responsible for providing stormwater treatment and attenuation for the acquired right-of-way but is not

responsible for modifying permits for adjacent lands affected by right-of-way acquisition when it is not the permittee. The governing board or department may establish, by rule, specific criteria to implement the management and treatment alternatives and activities under this subsection.

History.—s. 4, part IV, ch. 72-299; s. 19, ch. 73-190; s. 14, ch. 78-95; s. 13, ch. 89-279; s. 500, ch. 94-356; s. 74, ch. 2012-174.

### 373.4131  Statewide environmental resource permitting rules.—

(1)  The department shall initiate rulemaking to adopt, in coordination with the water management districts, statewide environmental resource permitting rules governing the construction, alteration, operation, maintenance, repair, abandonment, and removal of any stormwater management system, dam, impoundment, reservoir, appurtenant work, works, or any combination thereof, under this part.

(a)  The rules must provide for statewide, consistent regulation of activities under this part and must include, at a minimum:

1.  Criteria and thresholds for requiring permits.

2.  Types of permits.

3.  Procedures governing the review of applications and notices, duration and modification of permits, operational requirements, transfers of permits, provisions for emergencies, and provisions for abandonment and removal of systems.

4.  Exemptions and general permits that do not allow significant adverse impacts to occur individually or cumulatively.

5.  Conditions for issuance.

6.  General permit conditions, including monitoring, inspection, and reporting requirements.

7.  Standardized fee categories for activities under this part to promote consistency. The department and water management districts may amend fee rules to reflect the standardized fee categories but are not required to adopt identical fees for those categories.

8.  Application, notice, and reporting forms. To the maximum extent practicable, the department and water management districts shall provide for electronic submittal of forms and notices.

9.  An applicant's handbook that, at a minimum, contains general program information, application and review procedures, a specific discussion of how environmental criteria are evaluated, and discussion of stormwater quality and quantity criteria.

(b)  The rules must provide for a conceptual permit for a municipality or county that creates a stormwater management master plan for urban infill and redevelopment areas or community redevelopment areas created under chapter 163. Upon approval by the department or water management district, the master plan shall become part of the conceptual permit issued by the department or water management district. The rules must additionally provide for an associated general permit for the construction and operation of urban redevelopment projects that meet the criteria established in the conceptual permit. The following requirements must also be met:

1.  The conceptual permit and associated general permit must not conflict with the requirements of a federally approved program pursuant to s. 403.0885 or with the implementation of s. 403.067(7) regarding total maximum daily loads and basin management action plans.

2.  Before a conceptual permit is granted, the municipality or county must assert that stormwater discharges from the urban redevelopment area do not cause or contribute to violations of water quality standards by demonstrating a net improvement in the quality of the discharged water existing on the date the conceptual permit is approved.

3.  The conceptual permit may not expire for at least 20 years unless a shorter duration is requested and must include an option to renew.

4.  The conceptual permit must describe the rate and volume of stormwater discharges from the urban redevelopment area, including the maximum rate and volume of stormwater discharges as of the date the conceptual permit is approved.

5.  The conceptual permit must contain provisions regarding the use of stormwater best management practices and must ensure that stormwater management systems constructed within the urban redevelopment area are

operated and maintained in compliance with s. 373.416.

(c)   The rules must rely primarily on the rules of the department and water management districts in effect immediately prior to the effective date of this section, except that the department may:

1.   Reconcile differences and conflicts to achieve a consistent statewide approach.

2.   Account for different physical or natural characteristics, including special basin considerations, of individual water management districts.

3.   Implement additional permit streamlining measures.

(d)   The application of the rules must continue to be governed by the first sentence of s. 70.001(12).

(2)(a)   Upon adoption of the rules, the water management districts shall implement the rules without the need for further rulemaking pursuant to s. 120.54. The rules adopted by the department pursuant to this section shall also be considered the rules of the water management districts. The districts and local governments shall have substantive jurisdiction to implement and interpret rules adopted by the department under this part, consistent with any guidance from the department, in any license or final order pursuant to s. 120.60 or s. 120.57(1)(l).

(b)1.   A county, municipality, or local pollution control program that has a delegation of the environmental resource permit program authority or proposes to be delegated such authority under s. 373.441 shall without modification incorporate by reference the rules adopted pursuant to this section.

2.   A county, municipality, or local pollution control program that has a delegation of the environmental resource permit program authority under s. 373.441 must amend its local ordinances or regulations to incorporate by reference the applicable rules adopted pursuant to this section within 12 months after the effective date of the rules.

3.   Consistent with s. 373.441, this section does not prohibit a county, municipality, or local pollution control program from adopting or implementing regulations that are stricter than those adopted pursuant to this section.

4.   The department and each local program with the authority to implement or seeking to implement a delegation of environmental resource permit program authority under s. 373.441 shall identify and reconcile any duplicative permitting processes as part of the delegation.

(c)   Until the rules adopted pursuant to this section become effective, existing rules adopted pursuant to this part remain in full force and effect. Existing rules that are superseded by the rules adopted pursuant to this section may be repealed without further rulemaking pursuant to s. 120.54 by publication of a notice of repeal in the Florida Administrative Register and subsequent filing of a list of the rules repealed with the Department of State.

(3)(a)   The water management districts, with department oversight, may continue to adopt rules governing design and performance standards for stormwater quality and quantity, and the department may incorporate the design and performance standards by reference for use within the geographic jurisdiction of each district.

(b)   If a stormwater management system is designed in accordance with the stormwater treatment requirements and criteria adopted by the department or a water management district under this part, the system design is presumed not to cause or contribute to violations of applicable state water quality standards.

(c)   If a stormwater management system is constructed, operated, and maintained for stormwater treatment in accordance with a valid permit or exemption under this part, the stormwater discharged from the system is presumed not to cause or contribute to violations of applicable state water quality standards.

(4)   Notwithstanding the adoption of rules pursuant to this section, the following activities shall continue to be governed by the rules adopted by the department, the water management districts, and delegated local programs under this part in effect before the effective date of the rules adopted pursuant to this section, unless the applicant elects review in accordance with the rules adopted pursuant to this section:

(a)   The operation and maintenance of any stormwater management system, dam, impoundment, reservoir, appurtenant work, works, or any combination thereof legally in existence before the effective date of the rules adopted pursuant to this section if the terms and conditions of the permit, exemption, or other authorization for such activity continue to be met.

(b)   The activities determined in writing by the department, a water management district, or a local government delegated local pollution control program authority under s. 373.441 to be exempt from the permitting

requirements of this part, including self-certifications submitted to the department, a water management district, or a delegated local government before the effective date of the rules adopted pursuant to this section.

(c)   The activities approved in a permit issued pursuant to this part and the review of activities proposed in a permit application that is complete before the effective date of the rules adopted pursuant to this section. This paragraph applies to any modification of the plans, terms, and conditions of the permit, including new activities, within the geographical area to which the permit applies and to any modification that lessens or does not increase impacts. However, this paragraph does not apply to a modification that is reasonably expected to lead to additional or substantially different impacts.

(5)   To ensure consistent implementation and interpretation of the rules adopted pursuant to this section, the department shall conduct or oversee regular assessment and training of its staff and the staffs of the water management districts and local governments delegated local pollution control program authority under s. 373.441.

History.—s. 1, ch. 2012-94; s. 36, ch. 2013-14; s. 1, ch. 2013-176.

**373.4132    Dry storage facility permitting.**—The governing board or the department shall require a permit under this part, including s. 373.4145, for the construction, alteration, operation, maintenance, abandonment, or removal of a dry storage facility for 10 or more vessels that is functionally associated with a boat launching area. As part of an applicant's demonstration that such a facility will not be harmful to the water resources and will not be inconsistent with the overall objectives of the district, the governing board or department shall require the applicant to provide reasonable assurance that the secondary impacts from the facility will not cause adverse impacts to the functions of wetlands and surface waters, including violations of state water quality standards applicable to waters as defined in s. 403.031(13), and will meet the public interest test of s. 373.414(1)(a), including the potential adverse impacts to manatees. Nothing in this section shall affect the authority of the governing board or the department to regulate such secondary impacts under this part for other regulated activities.

History.—s. 7, ch. 2006-220.

**373.4133    Port conceptual permits.**—

(1)   The Legislature finds that seaport facilities are critical infrastructure facilities that significantly support the economic development of the state. The Legislature further finds that it is necessary to provide a method of priority permit review that allows seaports in this state to become internationally competitive.

(2)   Any port listed in s. 311.09(1) may apply to the department for a port conceptual permit, including any applicable authorization under chapter 253 to use sovereignty submerged lands under a joint coastal permit pursuant to s. 161.055 or an environmental resource permit issued pursuant to this part, for all or a portion of the area within the geographic boundaries of the port. A private entity with a controlling interest in property used for private industrial marine activities in the immediate vicinity of a port listed in s. 311.09(1) may also apply for a port conceptual permit under this section. A port conceptual permit may be issued for a period of up to 20 years and extended one time for an additional 10 years. A port conceptual permit constitutes the state's conceptual certification of compliance with state water quality standards for purposes of s. 401 of the Clean Water Act and the state's conceptual determination that the activities contained in the port conceptual permit are consistent with the state coastal zone management program.

(3)   A port conceptual permit application must contain sufficient information to provide reasonable assurance that the engineering and environmental concepts upon which the designs are based are likely to meet applicable rule criteria for issuance of construction permits for subsequent phases of the project. At a minimum, a port conceptual permit application must include the identification of proposed construction areas and areas where construction will not occur; the estimated or maximum anticipated impacts to wetlands and other surface waters and any proposed mitigation for those impacts; the estimated or maximum amount of anticipated impervious surface and the nature of the stormwater treatment system for those areas; and the general location and types of activities on sovereignty submerged lands. Except where construction approval is requested as part of a port conceptual permit application, the application is not required to include final design specifications and drawings.

The department shall include conditions in the port conceptual permit specifying the additional information that must be submitted as part of any request for a subsequent construction permit or authorization.

(4)   In determining whether a port conceptual permit application shall be approved in whole, approved with modifications or conditions, or denied, the department shall effect a reasonable balance between the potential benefits of the facility and the impacts upon water quality, fish and wildlife, water resources, and other natural resources of the state resulting from the construction and operation of the facility.

(5)   A port conceptual permit provides the permitholder with assurance, during the duration of the permit, that the engineering and environmental concepts upon which the designs of the port conceptual permit are based are likely to meet applicable rule criteria for the issuance of construction permits for subsequent phases of the project, if:

(a)   There are no changes in the rules governing the conditions of issuance of permits for future phases of the project, and the port conceptual permit is not inconsistent with any total maximum daily load or basin management action plan adopted for the waterbody into which the system discharges or is located pursuant to s. 403.067(7) and department rules regarding total maximum daily loads; and

(b)   Applications for proposed future phase activities under the port conceptual permit are consistent with the design and conditions of the issued port conceptual permit. Primary areas for consistency comparisons include the size, location, and extent of the system; type of activity; percent of imperviousness; allowable discharge and points of discharge; location and extent of wetland and other surface water impacts and, if required, a proposed mitigation plan; control elevations; extent of stormwater reuse; and detention or retention volumes. If an application for any subsequent phase activity is made that is not consistent with the terms and conditions of the port conceptual permit, the applicant may request a modification of the port conceptual permit to resolve the inconsistency or that the application be processed independent of the port conceptual permit.

(6)   Notwithstanding any other provision of law, a port conceptual permit or associated construction permit, including any applicable sovereignty submerged lands authorization, may authorize advance mitigation for impacts expected as a result of the activities described in the port conceptual permit. Such advance mitigation shall be credited to offset the impacts of such activities when undertaken, to the extent that the advance mitigation is successful.

(7)   Final agency action on a port conceptual sovereignty submerged lands authorization associated with a port conceptual permit may not be delegated by the Board of Trustees of the Internal Improvement Trust Fund. However, approval of such an authorization by the board shall constitute a delegation of authority to the department to take final agency action on behalf of the board on any sovereignty submerged lands authorization necessary to construct facilities included in the port conceptual sovereignty submerged lands authorization, unless a member of the board specifically requests that final agency action be brought before the board. Any delegation of authority to the department concerning a private project does not exempt the private project from applicable rules of the board, including lease and easement fees.

(8)   Except as otherwise provided in this section, the following procedures apply to the approval or denial of an application for a port conceptual permit or a final permit or authorization:

(a)   Applications for a port conceptual permit, including any request for the conceptual approval of the use of sovereignty submerged lands, shall be processed in accordance with the provisions of ss. 373.427 and 120.60, with the following exceptions:

1.   An application for a port conceptual permit, and any applications for subsequent construction contained in a port conceptual permit, must be approved or denied within 60 days after receipt of a completed application.

2.   The department may request additional information no more than twice, unless the applicant waives this limitation in writing. If the applicant does not provide a response to the second request for additional information within 90 days or another time period mutually agreed upon between the applicant and department, the application shall be considered withdrawn.

3.   If the applicant believes that any request for additional information is not authorized by law or agency rule, the applicant may request an informal hearing pursuant to s. 120.57(2) before the Secretary of Environmental Protection to determine whether the application is complete.

4.    If a third party petitions to challenge the issuance of a port conceptual permit by the department, the petitioner initiating the action has the burden of ultimate persuasion and, in the first instance, has the burden of going forward with the evidence.

(b)    Upon issuance of the department's notice of intent to issue or deny a port conceptual permit, the applicant shall publish a one-time notice of such intent, prepared by the department, in the newspaper with the largest general circulation in the county or counties where the port is located.

(c)    Final agency action on a port conceptual permit is subject to challenge pursuant to ss. 120.569 and 120.57. However, final agency action to authorize subsequent construction of facilities contained in a port conceptual permit may only be challenged by a third party for consistency with the port conceptual permit.

(d)    A person who will be substantially affected by a final agency action described in paragraph (c) must initiate administrative proceedings pursuant to ss. 120.569 and 120.57 within 21 days after the publication of the notice of the proposed action. If administrative proceedings are requested, the proceedings are subject to the summary hearing provisions of s. 120.574. However, if the decision of the administrative law judge will be a recommended order rather than a final order, a summary proceeding must be conducted within 90 days after a party files a motion for summary hearing, regardless of whether the parties agree to the summary proceeding.

(9)    Notwithstanding any other provision of law, the department and the board are authorized to issue permits and authorizations pursuant to this section in advance of the issuance of any take authorization as provided for in the Endangered Species Act and its implementing regulations if the permits and authorizations include a condition requiring that authorized activities shall not commence until such take authorization is issued and shall be consistent with such authorization. The department shall unilaterally modify any permit or authorization issued pursuant to this section to make the permit or authorization consistent with any subsequently issued incidental take authorization. Such a unilateral modification does not create a point of entry for any substantially affected person to request administrative proceedings under ss. 120.569 and 120.57.

(10)    In lieu of meeting the generally applicable stormwater design standards in rules adopted under this part, which create a presumption that stormwater discharged from the system will meet the applicable state water quality standards in the receiving waters, any port listed in s. 311.09(1) may propose alternative stormwater treatment and design criteria for the construction, operation, and maintenance of stormwater management systems serving overwater piers. The proposal shall include such structural components or best management practices to address the stormwater discharge from the pier, including consideration of activities conducted on the pier, as are necessary to provide reasonable assurance that stormwater discharged from the system will meet the applicable state water quality standards in the receiving waters.

(11)    The department and the board may adopt rules to implement the provisions of this section under the joint coastal permit provisions of chapter 161, the sovereignty submerged lands provisions of chapter 253, and the environmental resource permit provisions of this part. The adoption of such rules is not subject to any special rulemaking requirements related to small business.

(12)    This section shall take effect upon this act becoming a law, and its implementation may not be delayed by any rulemaking under this section.

History.—s. 1, ch. 2010-201; s. 7, ch. 2011-164.


373.4135    Mitigation banks and offsite regional mitigation.—

(1)    The Legislature finds that the adverse impacts of activities regulated under this part may be offset by the creation, maintenance, and use of mitigation banks and offsite regional mitigation. Mitigation banks and offsite regional mitigation can enhance the certainty of mitigation and provide ecological value due to the improved likelihood of environmental success associated with their proper construction, maintenance, and management. Therefore, the department and the water management districts are directed to participate in and encourage the establishment of private and public mitigation banks and offsite regional mitigation. Mitigation banks and offsite regional mitigation should emphasize the restoration and enhancement of degraded ecosystems and the preservation of uplands and wetlands as intact ecosystems rather than alteration of landscapes to create wetlands. This is best accomplished through restoration of ecological communities that were historically present.

(a)   The Legislature intends that the provisions for establishing mitigation banks apply equally to both public and private entities, except that the rules of the department and water management districts may set forth different measures governing financial responsibility, and different measures governing legal interest, needed to ensure the construction and perpetual protection of a mitigation bank.

(b)   Notwithstanding the provisions of this section, a governmental entity may not create or provide mitigation for a project other than its own unless the governmental entity uses land that was not previously purchased for conservation and unless the governmental entity provides the same financial assurances as required for mitigation banks permitted under s. 373.4136. This paragraph does not apply to:

1.   Mitigation banks permitted before December 31, 2011, under s. 373.4136;

2.   Offsite regional mitigation areas established before December 31, 2011, under subsection (6);

3.   Mitigation for transportation projects under ss. 373.4137 and 373.4139;

4.   Mitigation for impacts from mining activities under s. 373.41492;

5.   Mitigation provided for single-family lots or homeowners under subsection (7);

6.   Entities authorized in chapter 98-492, Laws of Florida;

7.   Mitigation provided for electric utility impacts certified under part II of chapter 403; or

8.   Mitigation provided on sovereign submerged lands under subsection (6).

(c)   It is the further intent of the Legislature that mitigation banks and offsite regional mitigation be considered appropriate and a permittable mitigation option under the conditions specified by the rules of the department and water management districts.

(d)   Offsite mitigation, including offsite regional mitigation, may be located outside the regional watershed in which the adverse impacts of an activity regulated under this part are located, if such adverse impacts are offset by the offsite mitigation.

(e)   The department or water management district may allow the use of a mitigation bank or offsite regional mitigation alone or in combination with other forms of mitigation to offset adverse impacts of activities regulated under this part.

(f)   When an applicant for a permit under the provisions of this part other than this section and s. 373.4136 submits more than one mitigation proposal to the department or a water management district, the department or water management district shall, in evaluating each proposal, ensure that such proposal adequately offsets the adverse impacts.

(2)   Local governments shall not deny the use of a mitigation bank or offsite regional mitigation due to its location outside of the jurisdiction of the local government.

(3)   Nothing in this section or s. 373.4136 shall be construed to eliminate or diminish any of the regulatory requirements applicable to applicants seeking permits pursuant to other provisions of this part.

(4)   Except as otherwise provided herein, nothing in this section or s. 373.4136 shall be construed to diminish or limit the existing authority of the department, water management districts, or local governments.

(5)   Nothing in this section or s. 373.4136 shall be construed to limit the consideration of forms of mitigation other than mitigation banks and offsite regional mitigation.

(6)   An environmental creation, preservation, enhancement, or restoration project, including regional offsite mitigation areas, for which money is donated or paid as mitigation, that is sponsored by the department, a water management district, or a local government and provides mitigation for five or more applicants for permits under this part, or for 35 or more acres of adverse impacts, shall be established and operated under a memorandum of agreement. The memorandum of agreement shall be between the governmental entity proposing the mitigation project and the department or water management district, as appropriate. Such memorandum of agreement need not be adopted by rule. For the purposes of this subsection, one creation, preservation, enhancement, or restoration project shall mean one or more parcels of land with similar ecological communities that are intended to be created, preserved, enhanced, or restored under a common scheme.

(a)   For any ongoing creation, preservation, enhancement, or restoration project and regional offsite mitigation area sponsored by the department, a water management district, or a local government, for which money was or is paid as mitigation, that was begun prior to the effective date of this subsection and has operated as of the

effective date of this subsection, or is anticipated to operate, in excess of the mitigation thresholds provided in this subsection, the governmental entity sponsoring such project shall submit a draft memorandum of agreement to the water management district or department by October 1, 2000. The governmental entity sponsoring such project shall make reasonable efforts to obtain the final signed memorandum of agreement within 1 year after such submittal. The governmental entity sponsoring such project may continue to receive moneys donated or paid toward the project as mitigation, provided the requirements of this paragraph are met.

(b) The memorandum of agreement shall establish criteria that each environmental creation, preservation, enhancement, or restoration project must meet. These criteria must address the elements listed in paragraph (c). The entity sponsoring such project, or category of projects, shall submit documentation or other evidence to the water management district or department that the project meets, or individual projects within a category meet, the specified criteria.

(c) At a minimum, the memorandum of agreement must address the following for each project authorized:

1. A description of the work that will be conducted on the site and a timeline for completion of such work.

2. A timeline for obtaining any required environmental resource permit.

3. The environmental success criteria that the project must achieve.

4. The monitoring and long-term management requirements that must be undertaken for the project.

5. An assessment of the project in accordance with s. 373.4136(4)(a)-(i), until the adoption of the uniform wetland mitigation assessment method pursuant to s. 373.414(18).

6. A designation of the entity responsible for the successful completion of the mitigation work.

7. A definition of the geographic area where the project may be used as mitigation established using the criteria of s. 373.4136(6).

8. Full cost accounting of the project, including annual review and adjustment.

9. Provision and a timetable for the acquisition of any lands necessary for the project.

10. Provision for preservation of the site.

11. Provision for application of all moneys received solely to the project for which they were collected.

12. Provision for termination of the agreement and cessation of use of the project as mitigation if any material contingency of the agreement has failed to occur.

(d) A single memorandum of understanding may authorize more than one environmental creation, preservation, enhancement, or restoration project, or category of projects, as long as the elements listed in paragraph (c) are addressed for each project.

(e) Projects governed by this subsection, except for projects established pursuant to subsection (7), shall be subject to the provisions of s. 373.414(1)(b)1.

(f) The provisions of this subsection shall not apply to mitigation areas established to implement the provisions of s. 373.4137.

(g) The provisions of this subsection shall not apply when the department, water management district, or local government establishes, or contracts with a private entity to establish, a mitigation bank permitted under s. 373.4136. The provisions of this subsection shall not apply to other entities that establish offsite regional mitigation as defined in this section and s. 373.403.

(7) The department, water management districts, and local governments may elect to establish and manage mitigation sites, including regional offsite mitigation areas, or contract with permitted mitigation banks, to provide mitigation options for private single-family lots or homeowners. The department, water management districts, and local governments shall provide a written notice of their election under this subsection by United States mail to those individuals who have requested, in writing, to receive such notice. The use of mitigation options established under this subsection are not subject to the full-cost-accounting provision of s. 373.414(1)(b)1. To use a mitigation option established under this subsection, the applicant for a permit under this part must be a private, single-family lot or homeowner, and the land upon which the adverse impact is located must be intended for use as a single-family residence by the current owner. The applicant must not be a corporation, partnership, or other business entity. However, the provisions of this subsection shall not apply to other entities that establish offsite regional mitigation as defined in this section and s. 373.403.

History.—s. 29, ch. 93-213; s. 6, ch. 96-371; s. 2, ch. 2000-133; s. 8, ch. 2001-62; s. 4, ch. 2012-174.

### 373.4136　　　Establishment and operation of mitigation banks.—

(1)　MITIGATION BANK PERMITS.—The department and the water management districts may require permits to authorize the establishment and use of mitigation banks. A mitigation bank permit shall also constitute authorization to construct, alter, operate, maintain, abandon, or remove any surface water management system necessary to establish and operate the mitigation bank. To obtain a mitigation bank permit, the applicant must provide reasonable assurance that:

(a)　The proposed mitigation bank will improve ecological conditions of the regional watershed;

(b)　The proposed mitigation bank will provide viable and sustainable ecological and hydrological functions for the proposed mitigation service area;

(c)　The proposed mitigation bank will be effectively managed in perpetuity;

(d)　The proposed mitigation bank will not destroy areas with high ecological value;

(e)　The proposed mitigation bank will achieve mitigation success;

(f)　The proposed mitigation bank will be adjacent to lands that will not adversely affect the perpetual viability of the mitigation bank due to unsuitable land uses or conditions;

(g)　Any surface water management system to be constructed, altered, operated, maintained, abandoned, or removed within the mitigation bank will meet the requirements of this part and the rules adopted thereunder;

(h)　It has sufficient legal or equitable interest in the property to ensure perpetual protection and management of the land within a mitigation bank; and

(i)　It can meet the financial responsibility requirements prescribed for mitigation banks.

(2)　MITIGATION BANK PHASES.—A mitigation bank may be established and operated in phases if each phase independently meets the requirements for the establishment and operation of a mitigation bank. The number of mitigation credits assigned to a phase of a mitigation bank may be less than would be assigned to that phase upon completion of all phases of the mitigation bank. In such case, the department or water management districts shall increase the number of mitigation credits awarded to subsequent phases of the mitigation bank.

(3)　ADDITION OF LANDS.—The department or water management district shall authorize the addition of land to a permitted mitigation bank when it is appropriate to do so and the addition of the land results in an increase in the ecological value of the existing mitigation bank. Any such addition shall be accomplished through a modification to the permit which reflects the corresponding increase in the total number of mitigation credits assigned to the bank.

(4)　MITIGATION CREDITS.—After evaluating the information submitted by the applicant for a mitigation bank permit and assessing the proposed mitigation bank pursuant to the criteria in this section, the department or water management district shall award a number of mitigation credits to a proposed mitigation bank or phase of such mitigation bank. An entity establishing and operating a mitigation bank may apply to modify the mitigation bank permit to seek the award of additional mitigation credits if the mitigation bank results in an additional increase in ecological value over the value contemplated at the time of the original permit issuance, or the most recent modification thereto involving the number of credits awarded. The number of credits awarded shall be based on the degree of improvement in ecological value expected to result from the establishment and operation of the mitigation bank as determined using a functional assessment methodology. In determining the degree of improvement in ecological value, each of the following factors, at a minimum, shall be evaluated:

(a)　The extent to which target hydrologic regimes can be achieved and maintained.

(b)　The extent to which management activities promote natural ecological conditions, such as natural fire patterns.

(c)　The proximity of the mitigation bank to areas with regionally significant ecological resources or habitats, such as national or state parks, Outstanding National Resource Waters and associated watersheds, Outstanding Florida Waters and associated watersheds, and lands acquired through governmental or nonprofit land acquisition programs for environmental conservation; and the extent to which the mitigation bank establishes corridors for fish, wildlife, or listed species to those resources or habitats.

(d)   The quality and quantity of wetland or upland restoration, enhancement, preservation, or creation.

(e)   The ecological and hydrological relationship between wetlands and uplands in the mitigation bank.

(f)   The extent to which the mitigation bank provides habitat for fish and wildlife, especially habitat for species listed as threatened, endangered, or of special concern, or provides habitats that are unique for that mitigation service area.

(g)   The extent to which the lands that are to be preserved are already protected by existing state, local, or federal regulations or land use restrictions.

(h)   The extent to which lands to be preserved would be adversely affected if they were not preserved.

(i)   Any special designation or classification of the affected waters and lands.

(5)   SCHEDULE FOR CREDIT RELEASE.—After awarding mitigation credits to a mitigation bank, the department or the water management district shall set forth a schedule for the release of those credits in the mitigation bank permit. A mitigation credit that has been released may be sold or used to offset adverse impacts from an activity regulated under this part.

(a)   The department or the water management district shall allow a portion of the mitigation credits awarded to a mitigation bank to be released for sale or use prior to meeting all of the performance criteria specified in the mitigation bank permit. The department or the water management district shall allow release of all of a mitigation bank's awarded mitigation credits only after the bank meets the mitigation success criteria specified in the permit.

(b)   The number of credits and schedule for release shall be determined by the department or water management district based upon the performance criteria for the mitigation bank and the success criteria for each mitigation activity. The release schedule for a specific mitigation bank or phase thereof shall be related to the actions required to implement the bank, such as site protection, site preparation, earthwork, removal of wastes, planting, removal or control of nuisance and exotic species, installation of structures, and annual monitoring and management requirements for success. In determining the specific release schedule for a bank, the department or water management district shall consider, at a minimum, the following factors:

1.   Whether the mitigation consists solely of preservation or includes other types of mitigation.

2.   The length of time anticipated to be required before a determination of success can be achieved.

3.   The ecological value to be gained from each action required to implement the bank.

4.   The financial expenditure required for each action to implement the bank.

(c)   Notwithstanding the provisions of this subsection, no credit shall be released for freshwater wetland creation until the success criteria included in the mitigation bank permit are met.

(d)   The withdrawal of mitigation credits from a mitigation bank shall be accomplished as a minor modification of the mitigation bank permit. A processing fee shall not be required by the department or water management district for this minor modification.

(6)   MITIGATION SERVICE AREA.—The department or water management district shall establish a mitigation service area for each mitigation bank permit. The department or water management district shall notify and consider comments received on the proposed mitigation service area from each local government within the proposed mitigation service area. Except as provided herein, mitigation credits may be withdrawn and used only to offset adverse impacts in the mitigation service area. The boundaries of the mitigation service area shall depend upon the geographic area where the mitigation bank could reasonably be expected to offset adverse impacts. Mitigation service areas may overlap, and mitigation service areas for two or more mitigation banks may be approved for a regional watershed.

(a)   In determining the boundaries of the mitigation service area, the department or the water management district shall consider the characteristics, size, and location of the mitigation bank and, at a minimum, the extent to which the mitigation bank:

1.   Contributes to a regional integrated ecological network;

2.   Will significantly enhance the water quality or restoration of an offsite receiving water body that is designated as an Outstanding Florida Water, a Wild and Scenic River, an aquatic preserve, a water body designated in a plan approved pursuant to the Surface Water Improvement and Management Act, or a nationally designated estuarine preserve;

3.   Will provide for the long-term viability of endangered or threatened species or species of special concern;

4.   Is consistent with the objectives of a regional management plan adopted or endorsed by the department or water management districts; and

5.   Can reasonably be expected to offset specific types of wetland impacts within a specific geographic area. A mitigation bank need not be able to offset all expected impacts within its service area.

(b)   The department and water management districts shall use regional watersheds to guide the establishment of mitigation service areas. Drainage basins established pursuant to s. 373.414(8) may be used as regional watersheds when they are established based on the hydrological or ecological characteristics of the basin. A mitigation service area may extend beyond the regional watershed in which the bank is located into all or part of other regional watersheds when the mitigation bank has the ability to offset adverse impacts outside that regional watershed. Similarly, a mitigation service area may be smaller than the regional watershed in which the mitigation bank is located when adverse impacts throughout the regional watershed cannot reasonably be expected to be offset by the mitigation bank because of local ecological or hydrological conditions.

(c)   Once a mitigation bank service area has been established by the department or a water management district for a mitigation bank, such service area shall be accepted by all water management districts, local governments, and the department.

(d)   If the requirements in s. 373.414(1)(b) and (8) are met, the following projects or activities regulated under this part shall be eligible to use a mitigation bank, regardless of whether they are located within the mitigation service area:

1.   Projects with adverse impacts partially located within the mitigation service area.

2.   Linear projects, such as roadways, transmission lines, distribution lines, pipelines, railways, or seaports listed in s. 311.09(1).

3.   Projects with total adverse impacts of less than 1 acre in size.

(7)   ACCOUNTING.—The department or the water management district shall provide for the accounting of the award, release, and use of mitigation credits from a mitigation bank.

(8)   AUTHORITY OF LOCAL GOVERNMENTS.—Local governments may not require permits or otherwise impose regulations governing the operation of a mitigation bank. However, this section shall not be construed to limit the authority of a local government to require an applicant for a mitigation bank to obtain any authorization required by a local ordinance for the construction activities associated with a mitigation bank.

(9)   PRIOR APPLICATIONS.—An application for a mitigation bank conceptual approval or mitigation bank permit which is pending with, and determined complete by, the department or a water management district on or before the effective date of this act, or a mitigation bank conceptual approval or mitigation bank permit issued on or before the effective date of this act, shall continue to be subject to the rules adopted pursuant to s. 373.4135 which were in effect on the effective date of this act, unless the applicant or permittee elects to be subject to the rules governing mitigation banks adopted after that date.

(10)   MODIFICATION WITH RESPECT TO PRIOR APPLICATIONS.—Any application for a modification of a mitigation bank conceptual approval or mitigation bank permit which was pending with, and determined complete by, the department or water management district on or before the effective date of this act, shall continue to be subject to the rules adopted pursuant to s. 373.4135 in effect on the effective date of this act, unless the permittee elects to be subject to the rules governing mitigation banks adopted after that date. Any modification to a mitigation bank conceptual approval or mitigation bank permit issued on or before the effective date of this act, which is applied for within 20 years of the effective date of this act, and which does not involve the addition of new land that was not previously included in the mitigation bank conceptual approval or mitigation bank permit, shall be subject to the rules adopted pursuant to s. 373.4135 which were in effect before the effective date of this act, unless the permittee elects to be subject to the rules governing mitigation banks adopted after that date.

(11)   RULES.—The department and water management district may adopt rules to implement the provisions of s. 373.4135 and this section, which shall include, but not be limited to, provisions:

(a)   Requiring financial responsibility for the construction, operation, and long-term management of a mitigation bank;

(b)   For the perpetual protection and management of mitigation banks; and

(c)   Establishing a system and methodology for the valuation, assessment, and award of mitigation credits.

History.—s. 7, ch. 96-371; s. 3, ch. 2000-133; s. 9, ch. 2003-265; s. 5, ch. 2012-174.

**373.4137    Mitigation requirements for specified transportation projects.**—

(1)   The Legislature finds that environmental mitigation for the impact of transportation projects proposed by the Department of Transportation or a transportation authority established pursuant to chapter 348 or chapter 349 can be more effectively achieved by regional, long-range mitigation planning rather than on a project-by-project basis. It is the intent of the Legislature that mitigation to offset the adverse effects of these transportation projects be funded by the Department of Transportation and be carried out by the use of mitigation banks and any other mitigation options that satisfy state and federal requirements in a manner that promotes efficiency, timeliness in project delivery, and cost-effectiveness.

(2)   Environmental impact inventories for transportation projects proposed by the Department of Transportation or a transportation authority established pursuant to chapter 348 or chapter 349 shall be developed as follows:

(a)   By July 1 of each year, the Department of Transportation, or a transportation authority established pursuant to chapter 348 or chapter 349 which chooses to participate in the program, shall submit to the water management districts a list of its projects in the adopted work program and an environmental impact inventory of habitat impacts and the anticipated mitigation needed to offset impacts as described in paragraph (b). The environmental impact inventory must be based on the rules adopted pursuant to this part, s. 404 of the Clean Water Act, 33 U.S.C. s. 1344, and the Department of Transportation's plan of construction for transportation projects in the next 3 years of the tentative work program. The Department of Transportation or a transportation authority established pursuant to chapter 348 or chapter 349 may also include in its environmental impact inventory the habitat impacts and the anticipated amount of mitigation needed for any future transportation project. The Department of Transportation and each transportation authority established pursuant to chapter 348 or chapter 349 may fund any mitigation activities for future projects using current year funds.

(b)   The environmental impact inventory must include a description of habitat impacts, including location, acreage, and type; the anticipated mitigation needed based on the functional loss as determined through the uniform mitigation assessment method adopted by the Department of Environmental Protection by rule pursuant to s. 373.414(18); identification of the proposed mitigation option; state water quality classification of impacted wetlands and other surface waters; any other state or regional designations for these habitats; and a list of threatened species, endangered species, and species of special concern affected by the proposed project.

(c)   Before projects are identified for inclusion in a water management district mitigation plan as described in subsection (4), the Department of Transportation must consider using credits from a permitted mitigation bank. The Department of Transportation must consider the availability of suitable and sufficient mitigation bank credits within the transportation project's area, the ability to satisfy commitments to regulatory and resource agencies, the availability of suitable and sufficient mitigation purchased or developed under this section, the ability to complete suitable existing water management district or Department of Environmental Protection mitigation sites initiated with Department of Transportation mitigation funds, and the ability to satisfy state and federal requirements, including long-term maintenance and liability.

(3)(a)   To implement the mitigation option identified in the environmental impact inventory described in subsection (2), the Department of Transportation may purchase credits for current and future use directly from a mitigation bank, purchase mitigation services through the water management districts or the Department of Environmental Protection, conduct its own mitigation, or use other mitigation options that meet state and federal requirements. Funding for the identified mitigation option as described in the environmental impact inventory must be included in the Department of Transportation's work program developed pursuant to s. 339.135. The amount programmed each year by the Department of Transportation and participating transportation authorities established pursuant to chapter 348 or chapter 349 must correspond to an estimated cost to mitigate for the functional loss identified in the environmental impact inventory described in subsection (2).

(b)   Each transportation authority established pursuant to chapter 348 or chapter 349 which chooses to participate in this program shall create an escrow account within its financial structure and deposit funds in the account to pay for the environmental mitigation phase of projects budgeted for the current fiscal year. The escrow account shall be maintained by the authority for the benefit of the water management districts. Any interest earnings from the escrow account must remain with the authority.

(c)   For mitigation implemented by the water management district or the Department of Environmental Protection, as appropriate, the amount paid each year must be based on mitigation services provided by the water management districts or the Department of Environmental Protection pursuant to an approved water management district mitigation plan, as described in subsection (4). The water management districts or the Department of Environmental Protection, as appropriate, may request payment no sooner than 30 days before the date the funds are needed to pay for activities associated with development or implementation of permitted mitigation that meets the requirements of this part, 33 U.S.C. s. 1344, and 33 C.F.R. part 332, in the approved water management district mitigation plan described in subsection (4) for the current fiscal year. The projected amount of mitigation shall be reconciled each quarter with the actual amount of mitigation needed for projects as permitted, including permit modifications, pursuant to this part and s. 404 of the Clean Water Act, 33 U.S.C. s. 1344. The subject year's programming of funds shall be adjusted to reflect the mitigation as permitted. If the water management district excludes a project from an approved water management district mitigation plan, if the water management district cannot timely permit a mitigation site to offset the impacts of a Department of Transportation project identified in the environmental impact inventory, or if the proposed mitigation does not meet state and federal requirements, the Department of Transportation may use the associated funds for the purchase of mitigation bank credits or any other mitigation option that satisfies state and federal requirements. Upon final payment for mitigation of a transportation project as permitted, the obligation of the Department of Transportation or the participating transportation authority is satisfied, and the water management district or the Department of Environmental Protection, as appropriate, has continuing responsibility for the mitigation project.

(d)   Beginning with the March 2015 water management district mitigation plans, each water management district or the Department of Environmental Protection, as appropriate, shall invoice the Department of Transportation for mitigation services to offset only the impacts of a Department of Transportation project identified in the environmental impact inventory, including planning, design, construction, maintenance and monitoring, and other costs necessary to meet the requirements of this section, 33 U.S.C. s. 1344, and 33 C.F.R. part 332. If the water management district identifies the use of mitigation bank credits to offset a Department of Transportation impact, the water management district shall exclude that purchase from the mitigation plan, and the Department of Transportation shall purchase the bank credits.

(e)   For mitigation activities occurring on existing water management district or Department of Environmental Protection mitigation sites initiated with Department of Transportation mitigation funds before July 1, 2013, the water management district or the Department of Environmental Protection, as appropriate, shall invoice the Department of Transportation or a participating transportation authority at a cost per acre of $75,000 multiplied by the projected acres of impact as identified in the environmental impact inventory. The cost per acre must be adjusted by the percentage change in the average of the Consumer Price Index issued by the United States Department of Labor for the most recent 12-month period ending September 30, compared to the base year average, which is the average for the 12-month period ending September 30, 1996. When implementing the mitigation activities necessary to offset the permitted impacts as provided in the approved mitigation plan, the water management district shall maintain records of the costs incurred in implementing the mitigation. The records must include, but are not limited to, costs for planning, land acquisition, design, construction, staff support, long-term maintenance and monitoring of the mitigation site, and other costs necessary to meet the requirements of 33 U.S.C. s. 1344 and 33 C.F.R. part 332.

(4)   Before March 1 of each year, each water management district shall develop a mitigation plan to offset only the impacts of transportation projects in the environmental impact inventory for which a water management district is implementing mitigation that meets the requirements of this section, 33 U.S.C. s. 1344, and 33 C.F.R. part 332. The water management district mitigation plan must be developed in consultation with the Department

of Environmental Protection, the United States Army Corps of Engineers, the Department of Transportation, participating transportation authorities established pursuant to chapter 348 or chapter 349, other appropriate federal, state, and local governments, and other interested parties, including entities operating mitigation banks. In developing such plans, the water management districts shall use sound ecosystem management practices to address significant water resource needs and consider activities of the Department of Environmental Protection and the water management districts, such as surface water improvement and management (SWIM) projects and lands identified for potential acquisition for preservation, restoration, or enhancement, and the control of invasive and exotic plants in wetlands and other surface waters, to the extent that the activities comply with the mitigation requirements adopted under this part, 33 U.S.C. s. 1344, and 33 C.F.R. part 332. The water management district mitigation plan must identify each site where the water management district will mitigate for a transportation project. For each mitigation site, the water management district shall provide the scope of the mitigation services; provide the functional gain as determined through the uniform mitigation assessment method adopted by the Department of Environmental Protection by rule pursuant to s. 373.414(18); describe how the mitigation offsets the impacts of each transportation project as permitted; and provide a schedule for the mitigation services. The water management districts shall maintain records of costs incurred and payments received for providing these services. Records must include, but are not limited to, planning, land acquisition, design, construction, staff support, long-term maintenance and monitoring of the mitigation site, and other costs necessary to meet the requirements of 33 U.S.C. s. 1344 and 33 C.F.R. part 332. To the extent moneys paid to a water management district by the Department of Transportation or a participating transportation authority are greater than the amount spent by the water management districts in providing the mitigation services to offset the permitted transportation project impacts, these moneys must be refunded to the Department of Transportation or participating transportation authority. The mitigation plan shall be submitted to the water management district governing board or its designee for review and approval. At least 14 days before approval by the governing board, the water management district shall provide a copy of the draft mitigation plan to the Department of Environmental Protection and any person who has requested a copy. Subsequent to the governing board approval, the mitigation plan shall be submitted to the Department of Environmental Protection for approval. The plan may not be implemented until it is submitted to, and approved in part or in its entirety by, the Department of Environmental Protection.

(a)　Specific projects may be excluded from the mitigation plan, in whole or in part, and are not subject to this section upon the election of the Department of Transportation, a transportation authority if applicable, or the appropriate water management district. The Department of Transportation or a participating transportation authority may not exclude a transportation project from the mitigation plan if mitigation is scheduled for implementation by the water management district in the current fiscal year unless the transportation project is removed from the Department of Transportation's work program or transportation authority funding plan, the mitigation cannot be timely permitted to offset the impacts of a Department of Transportation project identified in the environmental impact inventory, or the proposed mitigation does not meet state and federal requirements. If a project is removed from the work program or the mitigation plan, costs spent by the water management district before removal are eligible for reimbursement by the Department of Transportation or participating transportation authority.

(b)　When determining which projects to include in or exclude from the mitigation plan, the Department of Transportation shall investigate using credits from a permitted mitigation bank before those projects are submitted for inclusion in a water management district mitigation plan. The Department of Transportation shall exclude a project from the mitigation plan if the investigation undertaken pursuant to this paragraph results in the conclusion that the use of credits from a permitted mitigation bank promotes efficiency, timeliness in project delivery, cost-effectiveness, and transfer of liability for success and long-term maintenance.

(5)　The water management district shall ensure that mitigation requirements pursuant to 33 U.S.C. s. 1344 and 33 C.F.R. part 332 are met for the impacts identified in the environmental impact inventory for which the water management district will implement mitigation described in subsection (2), by implementation of the approved mitigation plan described in subsection (4) to the extent funding is provided by the Department of Transportation,

or a transportation authority established pursuant to chapter 348 or chapter 349, if applicable. In developing and implementing the mitigation plan, the water management district shall comply with federal permitting requirements pursuant to 33 U.S.C. s. 1344 and 33 C.F.R. part 332. During the federal permitting process, the water management district may deviate from the approved mitigation plan in order to comply with federal permitting requirements upon notice and coordination with the Department of Transportation or participating transportation authority.

(6) The water management district mitigation plans shall be updated annually to reflect the most current Department of Transportation work program and project list of a transportation authority established pursuant to chapter 348 or chapter 349, if applicable, and may be amended throughout the year to anticipate schedule changes or additional projects that may arise. Before amending the mitigation plan to include new projects, the Department of Transportation must consider mitigation banks and other available mitigation options that meet state and federal requirements. Each update and amendment of the mitigation plan shall be submitted to the governing board of the water management district or its designee for approval. However, such approval shall not apply to a deviation as described in subsection (5).

(7) Upon approval by the governing board of the water management district and the Department of Environmental Protection, the mitigation plan shall satisfy the mitigation requirements under this part for impacts specifically identified in the environmental impact inventory described in subsection (2) and any other mitigation requirements imposed by local, regional, and state agencies for these same impacts. The approval of the governing board of the water management district and the Department of Environmental Protection authorizes the activities proposed in the mitigation plan, and no other state, regional, or local permit or approval is necessary.

(8) This section does not eliminate the need for the Department of Transportation or a transportation authority established pursuant to chapter 348 or chapter 349 to comply with the requirement to implement practicable design modifications, including realignment of transportation projects, to reduce or eliminate the impacts of its transportation projects on wetlands and other surface waters as required by rules adopted pursuant to this part, or to diminish the authority under this part to regulate other impacts, including water quantity or water quality impacts, or impacts regulated under this part which are not identified in the environmental impact inventory described in subsection (2).

History.—s. 1, ch. 96-238; s. 36, ch. 99-385; s. 1, ch. 2000-261; s. 93, ch. 2002-20; s. 39, ch. 2004-269; s. 30, ch. 2005-71; s. 12, ch. 2005-281; s. 1, ch. 2009-11; s. 3, ch. 2012-174; s. 22, ch. 2014-223; s. 5, ch. 2016-11.

**373.4138    High Speed Rail Project; determination of mitigation requirements and costs.**—With respect to the High Speed Rail Project, any mitigation requirements and associated costs shall be determined by negotiation between the Department of Environmental Protection and the Department of Transportation, but if agreement on mitigation costs cannot be reached, the project may proceed at the rates determined under s. 373.4137(3).

History.—s. 5, ch. 96-238.

**373.4139    Local government transportation infrastructure mitigation requirements.**—

(1) The Legislature finds that environmental mitigation for the impact of transportation projects proposed as part of a coordinated multijurisdiction initiative undertaken with substantial funding from a discretionary sales surtax levied under s. 212.055 may be more effectively achieved by long-range mitigation planning by a responsible government rather than on a case-by-case basis.

(2) As used in this section, the county levying the surtax must be the government responsible for developing, permitting, and implementing the long-range mitigation plans, unless the county chooses not to be the responsible government and a responsible government is otherwise designated by an interlocal agreement executed by and between all local governments participating in the transportation initiative. This environmental mitigation process is not mandatory but may be initiated by the county levying the discretionary sales surtax, upon notice to the appropriate water management districts.

(3) The responsible government must develop its long-range mitigation plan for multijurisdictional transportation initiatives as follows:

(a) By May 1 of each year of the transportation initiative, the participating governments shall prepare an inventory of all wetland and surface water resources, subject to this part and 33 U.S.C. s. 1344, which may be impacted in the next 3 years of the participating government's plan of construction for each transportation project and shall submit the environmental inventory to the responsible government. The environmental inventory shall include the information required in s. 373.4137(2)(b).

(b) Upon receipt of the environmental inventory, the responsible government shall develop a mitigation plan in consultation with the other participating governments, as well as with the appropriate water management districts, the United States Army Corps of Engineers, and other appropriate federal and state governments. The responsible government shall submit the mitigation plan to the water management districts having jurisdiction over the mitigation or impact areas.

(c) The water management district having jurisdiction over the impact area shall review the mitigation plan for compliance with rules adopted pursuant to this part. When more than one water management district has responsibility for regulation of the transportation initiative, the water management districts shall enter into an agreement pursuant to s. 373.046(6) to designate a single water management district to review and approve the mitigation plan.

(d) The responsible government shall submit the mitigation plan to all appropriate federal agencies that require permitting or approval of wetland and surface water mitigation. The responsible government shall seek to obtain formal approval of the mitigation plan from the federal agencies.

(e) Specific transportation projects may be excluded from the mitigation plan and shall not be subject to this section upon agreement by the responsible government and the participating governments if the inclusion of the project would hamper the efficiency and timeliness of the mitigation planning and permitting process or the responsible government is unable to identify mitigation that would offset the impacts of the project.

(4) Upon the water management district's approval, the mitigation plan shall be deemed to satisfy the mitigation requirements under this part and any other mitigation requirements imposed by local, regional, and state agencies for impacts identified in the environmental inventory. The approval of the appropriate water management district authorizes the environmental mitigation activities proposed in the mitigation plan, and no additional state, regional, or local permit or approval is necessary.

(5)(a) Concurrent with, or subsequent to, the approval of the mitigation plan, the participating governments shall make any necessary permit applications to the appropriate water management district that will be solely responsible for review and final action on the application required by this chapter. The responsible government must ensure that mitigation requirements specified by 33 U.S.C. s. 1344 are met for the impacts identified in the wetland inventory by implementing the mitigation plan approved by the water management district to the extent that the funding is provided by the participating governments.

(b) This section does not eliminate the need for the participating governments to comply with requirements to implement practicable design modifications, including realignment of transportation projects, to reduce or eliminate impacts of the transportation projects on wetlands and other surface waters as required by rules adopted pursuant to this part.

(6) To fund the long-range mitigation plan, the responsible government shall create an escrow account. The participating governments shall deposit funds into the account to pay for the environmental mitigation phase of projects budgeted for the current fiscal year. The responsible government shall maintain the escrow account for mitigation purposes only. Any interest earned from the escrow account may be used to offset the cost of the mitigation plan and must be credited to the participating governments' transportation projects. The responsible government shall reimburse the water management district the actual costs it incurs in reviewing the mitigation plan.

(7) The mitigation plans shall be updated annually to reflect the most current plan of construction of the participating governments and may be amended throughout the year to anticipate schedule changes or additional projects that may arise.

**History.**—s. 5, ch. 2003-409.

**373.414   Additional criteria for activities in surface waters and wetlands.—**

(1)   As part of an applicant's demonstration that an activity regulated under this part will not be harmful to the water resources or will not be inconsistent with the overall objectives of the district, the governing board or the department shall require the applicant to provide reasonable assurance that state water quality standards applicable to waters as defined in s. 403.031(13) will not be violated and reasonable assurance that such activity in, on, or over surface waters or wetlands, as delineated in s. 373.421(1), is not contrary to the public interest. However, if such an activity significantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the proposed activity will be clearly in the public interest.

(a)   In determining whether an activity, which is in, on, or over surface waters or wetlands, as delineated in s. 373.421(1), and is regulated under this part, is not contrary to the public interest or is clearly in the public interest, the governing board or the department shall consider and balance the following criteria:

1.   Whether the activity will adversely affect the public health, safety, or welfare or the property of others;

2.   Whether the activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3.   Whether the activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4.   Whether the activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity;

5.   Whether the activity will be of a temporary or permanent nature;

6.   Whether the activity will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and

7.   The current condition and relative value of functions being performed by areas affected by the proposed activity.

(b)   If the applicant is unable to otherwise meet the criteria set forth in this subsection, the governing board or the department, in deciding to grant or deny a permit, shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects that may be caused by the regulated activity. Such measures may include, but are not limited to, onsite mitigation, offsite mitigation, offsite regional mitigation, and the purchase of mitigation credits from mitigation banks permitted under s. 373.4136. It shall be the responsibility of the applicant to choose the form of mitigation. The mitigation must offset the adverse effects caused by the regulated activity.

1.   The department or water management districts may accept the donation of money as mitigation only where the donation is specified for use in a duly noticed environmental creation, preservation, enhancement, or restoration project, endorsed by the department or the governing board of the water management district, which offsets the impacts of the activity permitted under this part. However, the provisions of this subsection shall not apply to projects undertaken pursuant to s. 373.4137 or chapter 378. Where a permit is required under this part to implement any project endorsed by the department or a water management district, all necessary permits must have been issued prior to the acceptance of any cash donation. After the effective date of this act, when money is donated to either the department or a water management district to offset impacts authorized by a permit under this part, the department or the water management district shall accept only a donation that represents the full cost to the department or water management district of undertaking the project that is intended to mitigate the adverse impacts. The full cost shall include all direct and indirect costs, as applicable, such as those for land acquisition, land restoration or enhancement, perpetual land management, and general overhead consisting of costs such as staff time, building, and vehicles. The department or the water management district may use a multiplier or percentage to add to other direct or indirect costs to estimate general overhead. Mitigation credit for such a donation shall be given only to the extent that the donation covers the full cost to the agency of undertaking the project that is intended to mitigate the adverse impacts. However, nothing herein shall be construed to prevent the department or a water management district from accepting a donation representing a portion of a larger project, provided that the donation covers the full cost of that portion and mitigation credit is given only for that portion. The department or water management district may deviate from the full cost

requirements of this subparagraph to resolve a proceeding brought pursuant to chapter 70 or a claim for inverse condemnation. Nothing in this section shall be construed to require the owner of a private mitigation bank, permitted under s. 373.4136, to include the full cost of a mitigation credit in the price of the credit to a purchaser of said credit.

2.   The department and each water management district shall report by March 1 of each year, as part of the consolidated annual report required by s. 373.036(7), all cash donations accepted under subparagraph 1. during the preceding water management district fiscal year for wetland mitigation purposes. The report shall exclude those contributions pursuant to s. 373.4137. The report shall include a description of the endorsed mitigation projects and, except for projects governed by s. 373.4135(6), shall address, as applicable, success criteria, project implementation status and timeframe, monitoring, long-term management, provisions for preservation, and full cost accounting.

3.   If the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the governing board or the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards.

4.   If mitigation requirements imposed by a local government for surface water and wetland impacts of an activity regulated under this part cannot be reconciled with mitigation requirements approved under a permit for the same activity issued under this part, including application of the uniform wetland mitigation assessment method adopted pursuant to subsection (18), the mitigation requirements for surface water and wetland impacts shall be controlled by the permit issued under this part.

(c)   Where activities for a single project regulated under this part occur in more than one local government jurisdiction, and where permit conditions or regulatory requirements are imposed by a local government for these activities which cannot be reconciled with those imposed by a permit under this part for the same activities, the permit conditions or regulatory requirements shall be controlled by the permit issued under this part.

(2)   The governing board or the department is authorized to establish by rule specific permitting criteria in addition to the other criteria in this part which provides:

(a)   One or more size thresholds of isolated wetlands below which impacts on fish and wildlife and their habitats will not be considered. These thresholds shall be based on biological and hydrological evidence that shows the fish and wildlife values of such areas to be minimal.

(b)   Criteria for the protection of threatened and endangered species in isolated wetlands regardless of size and land use.

(3)   It is the intent of the Legislature to provide for the use of certain wetlands as a natural means of stormwater management and to incorporate these waters into comprehensive stormwater management when such use is compatible with the ecological characteristics of such waters and with sound resource management. To accomplish this, the governing board or the department is authorized to establish by rule performance standards for the issuance of permits for the use of certain wetlands for stormwater management. The compliance with such standards creates a presumption that the discharge from the stormwater management system meets state water quality standards.

(4)   It is the intent of the Legislature to provide for the use of certain wetlands to receive and treat domestic wastewater that at a minimum has been treated to secondary standards. The department may by rule establish criteria for this activity, which criteria protect the type, nature, and function of the wetlands receiving the wastewater.

(5)(a)   It is the intent of the Legislature to protect estuaries and lagoons from the damage created by construction of vertical seawalls and to encourage construction of environmentally desirable shore protection systems, such as riprap and gently sloping shorelines which are planted with suitable aquatic and wetland vegetation.

(b)   No permit under this part to create a vertical seawall may be issued by the governing board or the department unless one of the following conditions exists:

1.   The proposed construction is located within a port as defined in s. 315.02 or s. 403.021;

2. The proposed construction is necessary for the creation of a marina, the vertical seawalls are necessary to provide access to watercraft, or the proposed construction is necessary for public facilities;

3. The proposed construction is located within an existing manmade canal and the shoreline of such canal is currently occupied in whole or in part by vertical seawalls; or

4. The proposed construction is to be conducted by a public utility when such utility is acting in the performance of its obligation to provide service to the public.

(c) When considering an application for a permit to repair or replace an existing vertical seawall, the governing board or the department shall generally require such seawall to be faced with riprap material, or to be replaced entirely with riprap material unless a condition specified in paragraph (b) exists.

(d) This subsection shall in no way hinder any activity previously exempt or permitted or those activities permitted pursuant to chapter 161.

(6)(a) The Legislature recognizes that some mining activities that may occur in waters of the state must leave a deep pit as part of the reclamation. Such deep pits may not meet the established water quality standard for dissolved oxygen below the surficial layers. Where such mining activities otherwise meet the permitting criteria contained in this section, such activities may be eligible for a variance from the established water quality standard for dissolved oxygen within the lower layers of the reclaimed pit.

(b) Wetlands reclamation activities for phosphate and heavy minerals mining undertaken pursuant to chapter 378 shall be considered appropriate mitigation for this part if they maintain or improve the water quality and the function of the biological systems present at the site prior to the commencement of mining activities.

(c) Wetlands reclamation activities for fuller's earth mining undertaken pursuant to chapter 378 shall be considered appropriate mitigation for this part if they maintain or improve the water quality and the function of the biological systems present at the site prior to the commencement of mining activities, unless the site features make such reclamation impracticable, in which case the reclamation must offset the regulated activities' adverse impacts on surface waters and wetlands.

(d) Onsite reclamation of the mine pit for limerock and sand mining shall be conducted in accordance with the requirements of chapter 378.

1. Mitigation activities for limerock and sand mining must offset the regulated activities' adverse impacts on surface waters and wetlands. Mitigation activities shall be located on site, unless onsite mitigation activities are not feasible, in which case, offsite mitigation as close to the activities as possible shall be required. However, mitigation banking may be an acceptable form of mitigation, whether on or off site, as judged on a case-by-case basis.

2. The ratio of mitigation-to-wetlands loss shall be determined on a case-by-case basis and shall be based on the quality of the wetland to be impacted and the type of mitigation proposed.

(e) The Legislature recognizes that the state's horticultural industry contributes to the economic strength of Florida and that high-quality peat is a limited resource that is an important component of horticultural production. The Legislature further recognizes that obtaining high-quality peat typically and uniquely requires the mining of wetlands and other surface waters and that the use of recycled and renewable material to replace or reduce the use of natural peat is necessary for the future of the horticultural industry.

1. As used in this paragraph, the term:

a. "High-quality peat" means peat from a freshwater herbaceous wetland that grades H1 to H4 on the von Post Humification Scale and has a pH less than 7.

b. "Horticultural industry" means the industry that cultivates plants, including, but not limited to, trees, shrubs, flowers, annuals, perennials, tropical foliage, liners, ferns, vines, bulbs, grafts, scions, or buds, but excludes turf grasses grown or kept for or capable of propagation or distribution for retail, wholesale, or rewholesale purposes.

2. The department shall develop rules for permitting and mitigation of peat mines in herbaceous or historically herbaceous wetlands where high-quality peat is extracted predominately for use in the horticultural industry provided:

a.   The permitting and mitigation rules shall be applicable where no less than 80 percent of the extracted peat is high-quality peat and 80 percent of the high-quality peat is used by the horticultural industry in products that incorporate other renewable or recycled materials to replace or reduce the use of natural peat;

b.   No extraction is occurring in the underlying sand or rock strata;

c.   No portion of the extraction or mitigation area is part of an existing or proposed larger plan of development; and

d.   No portion of the mine is located in a body of water designated as Outstanding Florida Waters.

3.   In adopting rules as directed in subparagraph 2., design modifications shall not be required to reduce or eliminate adverse impacts to herbaceous wetlands that score below a specific value, as provided by rule using the uniform mitigation assessment method of evaluation, except to require that the project meet water quality standards, not cause adverse offsite flooding, not adversely impact significant historical and archaeological resources pursuant to s. 267.061, and not cause adverse impacts to listed species or their habitats. In assessing mitigation for mines that are not required to reduce or eliminate adverse impacts, retaining a percentage of the reclaimed wetland as open water shall be deemed appropriate wetland mitigation. The rules must establish the amount of open water allowable as mitigation based upon a consideration of the type and amount of other wetland mitigation proposed, the value of those wetlands as evaluated using the uniform mitigation assessment method, and the amount of preservation of wetlands. The amount of open water shall not exceed 60 percent of the premining wetlands within the extracted area.

4.   Rule 62-345.600, Florida Administrative Code, shall not be applied to mitigation for mines qualifying under this paragraph.

5.   The department shall initiate rulemaking within 90 days after July 1, 2007, and water management districts may implement the proposed rules without adoption pursuant to s. 120.54.

(7)   This section shall not be construed to diminish the jurisdiction or authority granted prior to the effective date of this act to the water management districts or the department pursuant to this part, including their jurisdiction and authority over isolated wetlands. The provisions of this section shall be deemed supplemental to the existing jurisdiction and authority under this part.

(8)(a)   The governing board or the department, in deciding whether to grant or deny a permit for an activity regulated under this part shall consider the cumulative impacts upon surface water and wetlands, as delineated in s. 373.421(1), within the same drainage basin as defined in s. 373.403(9), of:

1.   The activity for which the permit is sought.

2.   Projects which are existing or activities regulated under this part which are under construction or projects for which permits or determinations pursuant to s. 373.421 or [1]s. 403.914 have been sought.

3.   Activities which are under review, approved, or vested pursuant to s. 380.06, or other activities regulated under this part which may reasonably be expected to be located within surface waters or wetlands, as delineated in s. 373.421(1), in the same drainage basin as defined in s. 373.403(9), based upon the comprehensive plans, adopted pursuant to chapter 163, of the local governments having jurisdiction over the activities, or applicable land use restrictions and regulations.

(b)   If an applicant proposes mitigation within the same drainage basin as the adverse impacts to be mitigated, and if the mitigation offsets these adverse impacts, the governing board and department shall consider the regulated activity to meet the cumulative impact requirements of paragraph (a). However, this paragraph may not be construed to prohibit mitigation outside the drainage basin which offsets the adverse impacts within the drainage basin.

(9)   The department and the governing boards, on or before July 1, 1994, shall adopt rules to incorporate the provisions of this section, relying primarily on the existing rules of the department and the water management districts, into the rules governing the management and storage of surface waters. Such rules shall seek to achieve a statewide, coordinated and consistent permitting approach to activities regulated under this part. Variations in permitting criteria in the rules of individual water management districts or the department shall only be provided to address differing physical or natural characteristics. Such rules adopted pursuant to this subsection shall include the special criteria adopted pursuant to s. 403.061(29) and may include the special criteria adopted pursuant to s.

403.061(34). Such rules shall include a provision requiring that a notice of intent to deny or a permit denial based upon this section shall contain an explanation of the reasons for such denial and an explanation, in general terms, of what changes, if any, are necessary to address such reasons for denial. Such rules may establish exemptions and general permits, if such exemptions and general permits do not allow significant adverse impacts to occur individually or cumulatively. Such rules may require submission of proof of financial responsibility which may include the posting of a bond or other form of surety prior to the commencement of construction to provide reasonable assurance that any activity permitted pursuant to this section, including any mitigation for such permitted activity, will be completed in accordance with the terms and conditions of the permit once the construction is commenced. Until rules adopted pursuant to this subsection become effective, existing rules adopted under this part and rules adopted pursuant to the authority of $^2$ss. 403.91-403.929 shall be deemed authorized under this part and shall remain in full force and effect. Neither the department nor the governing boards are limited or prohibited from amending any such rules.

(10)   The department in consultation with the water management districts by rule shall establish water quality criteria for wetlands, which criteria give appropriate recognition to the water quality of such wetlands in their natural state.

(11)(a)   In addition to the statutory exemptions applicable to this part, dredging and filling permitted under rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, or exempted from regulation under such rules, shall be exempt from the rules adopted pursuant to subsection (9) if the dredging and filling activity did not require a permit under rules adopted pursuant to this part prior to the effective date of the rules adopted pursuant to subsection (9). The exemption from the rules adopted pursuant to subsection (9) shall extend to:

1.   The activities approved by said chapter 403 permit for the term of the permit; or

2.   Dredging and filling exempted from regulation under rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, which is commenced prior to the effective date of the rules adopted pursuant to subsection (9), is completed within 5 years after the effective date of such rules, and regarding which, at all times during construction, the terms of the dredge and fill exemption continue to be met.

(b)   This exemption shall also apply to any modification of such permit which does not constitute a substantial modification. For the purposes of this paragraph, a substantial modification is one which is reasonably expected to lead to substantially different environmental impacts. This exemption shall also apply to a modification which lessens the environmental impact. A modification qualifying for this exemption shall be reviewed under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, in existence prior to the effective date of the rules adopted under subsection (9).

(12)(a)   Activities approved in a conceptual, general, or individual permit issued pursuant to rules adopted pursuant to this part and which were either permitted under rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, or exempt from regulation under such rules, all prior to the effective date of rules adopted pursuant to subsection (9), shall be exempt from the rules adopted pursuant to subsection (9). This exemption shall be for the plans, terms, and conditions approved in the permit issued under rules adopted pursuant to this part or in any permit issued under rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, and shall be valid for the term of such permits. This exemption shall also apply to any modification of the plans, terms, and conditions of the permit, including new activities, within the geographical area to which the permit issued under rules adopted pursuant to this part applies; however, this exemption shall not apply to a modification that would extend the permitted time limit for construction beyond 2 additional years, or to any modification which is reasonably expected to lead to substantially different water resource impacts. This exemption shall also apply to any modification which lessens the impact to water resources. A modification of the permit qualifying for this exemption shall be reviewed under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, and this part, as applicable, in existence prior to the effective date of the rules adopted under subsection (9), unless the applicant elects to have such modifications reviewed under the rules adopted under this part, as amended in accordance with subsection (9).

(b)　Surface water and wetland delineations identified and approved by the permit issued under rules adopted pursuant to this part prior to the effective date of rules adopted pursuant to subsection (9) shall remain valid until expiration of such permit, notwithstanding the methodology ratified in s. 373.4211. For purposes of this section, the term "identified and approved" means:

1.　The delineation was field-verified by the permitting agency and such verification was surveyed as part of the application review process for the permit; or

2.　The delineation was field-verified by the permitting agency and approved by the permit.

Where surface water and wetland delineations were not identified and approved by the permit issued under rules adopted pursuant to this part, delineations within the geographical area to which such permit applies shall be determined pursuant to the rules applicable at the time the permit was issued, notwithstanding the methodology ratified in s. 373.4211. This paragraph shall also apply to any modification of the permit issued under rules adopted pursuant to this part within the geographical area to which the permit applies.

(c)　Within the boundaries of a jurisdictional declaratory statement issued under s. 403.914, 1984 Supplement to the Florida Statutes 1983, as amended, or pursuant to rules adopted thereunder, in which activities have been permitted as described in paragraph (a), the delineation of the landward extent of waters of the state for the purposes of regulation under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, as such rules existed prior to the effective date of the rules adopted pursuant to subsection (9), shall remain valid for the duration of the permit issued pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, and shall be used in the review of any modification of such permit.

(13)　Any declaratory statement issued by the department under s. 403.914, 1984 Supplement to the Florida Statutes 1983, as amended, or pursuant to rules adopted thereunder, or by a water management district under s. 373.421, in response to a petition filed on or before June 1, 1994, shall continue to be valid for the duration of such declaratory statement. Any such petition pending on June 1, 1994, shall be exempt from the methodology ratified in s. 373.4211, but the rules of the department or the relevant water management district, as applicable, in effect prior to the effective date of s. 373.4211, shall apply. Until May 1, 1998, activities within the boundaries of an area subject to a petition pending on June 1, 1994, and prior to final agency action on such petition, shall be reviewed under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, and this part, in existence prior to the effective date of the rules adopted under subsection (9), unless the applicant elects to have such activities reviewed under the rules adopted under this part, as amended in accordance with subsection (9). In the event that a jurisdictional declaratory statement pursuant to the vegetative index in effect prior to the effective date of chapter 84-79, Laws of Florida, has been obtained and is valid prior to the effective date of the rules adopted under subsection (9) or July 1, 1994, whichever is later, and the affected lands are part of a project for which a master development order has been issued pursuant to s. 380.06(9), the declaratory statement shall remain valid for the duration of the buildout period of the project. Any jurisdictional determination validated by the department pursuant to rule 17-301.400(8), Florida Administrative Code, as it existed in rule 17-4.022, Florida Administrative Code, on April 1, 1985, shall remain in effect for a period of 5 years following the effective date of this act if proof of such validation is submitted to the department prior to January 1, 1995. In the event that a jurisdictional determination has been revalidated by the department pursuant to this subsection and the affected lands are part of a project for which a development order has been issued pursuant to s. 380.06(4), a final development order to which s. 163.3167(5) applies has been issued, or a vested rights determination has been issued pursuant to s. 380.06(8), the jurisdictional determination shall remain valid until the completion of the project, provided proof of such validation and documentation establishing that the project meets the requirements of this sentence are submitted to the department prior to January 1, 1995. Activities proposed within the boundaries of a valid declaratory statement issued pursuant to a petition submitted to either the department or the relevant water management district on or before June 1, 1994, or a revalidated jurisdictional determination, prior to its expiration shall continue thereafter to be exempt from the methodology ratified in s. 373.4211 and to be reviewed under the rules adopted pursuant to ss. 403.91-403.929, 1984

Supplement to the Florida Statutes 1983, as amended, and this part, in existence prior to the effective date of the rules adopted under subsection (9), unless the applicant elects to have such activities reviewed under the rules adopted under this part, as amended in accordance with subsection (9).

(14) An application under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, or this part for dredging and filling or other activity, which is pending on June 15, 1994, or which is submitted and complete prior to the effective date of rules adopted pursuant to subsection (9) shall be:

(a) Acted upon by the agency which is responsible for review of the application under the operating agreement adopted pursuant to s. 373.046(4);

(b) Reviewed under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, and this part, in existence prior to the effective date of the rules adopted pursuant to subsection (9), unless the applicant elects to have such activities reviewed under the rules of this part, as amended in accordance with subsection (9); and

(c) Exempt from the methodology ratified in s. 373.4211, but the rules of the department and water management districts to delineate surface waters and wetlands in effect prior to the effective date of s. 373.4211 shall apply, unless the applicant elects to have such ratified methodology apply.

(15) Activities associated with mining operations as defined by and subject to ss. 378.201-378.212 and 378.701-378.703 and included in a conceptual reclamation plan or modification application submitted prior to July 1, 1996, shall continue to be reviewed under the rules of the department adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, the rules of the water management districts under this part, and interagency agreements, in effect on January 1, 1993. Such activities shall be exempt from rules adopted pursuant to subsection (9) and the statewide methodology ratified pursuant to s. 373.4211. As of January 1, 1994, such activities may be issued permits authorizing construction for the life of the mine. Lands added to a conceptual reclamation plan subject to this subsection through a modification submitted after July 1, 1996, which are contiguous to the conceptual reclamation plan area shall be exempt from rules adopted under subsection (9), except that the total acreage of the conceptual reclamation plan may not be increased through such modification and the cumulative acreage added may not exceed 3 percent of the conceptual reclamation plan area. Lands that have been mined or disturbed by mining activities, lands subject to a conservation easement under which the grantee is a state or federal regulatory agency, and lands otherwise preserved as part of a permitting review may not be removed from the conceptual reclamation land area under this subsection.

(16) Until October 1, 2000, regulation under rules adopted pursuant to this part of any sand, limerock, or limestone mining activity which is located in Township 52 South, Range 39 East, sections 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 26, 27, 34, 35, and 36; in Township 52 South, Range 40 East, sections 6, 7, 8, 18, and 19; in Township 53 South, Range 39 East, sections 1, 2, 13, 21, 22, 23, 24, 25, 26, 33, 34, 35, and 36; and in Township 54 South, Range 38 East, sections 24, and 25, and 36, shall not include the rules adopted pursuant to subsection (9). In addition, until October 1, 2000, such activities shall continue to be regulated under the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, as such rules existed prior to the effective date of the rules adopted pursuant to subsection (9) and such dredge and fill jurisdiction shall be that which existed prior to January 24, 1984. In addition, any such sand, limerock, or limestone mining activity shall be approved by Miami-Dade County and the United States Army Corps of Engineers. This section shall only apply to mining activities which are continuous and carried out on land contiguous to mining operations that were in existence on or before October 1, 1984.

(17) The variance provisions of s. 403.201 are applicable to the provisions of this section or any rule adopted pursuant to this section. The governing boards and the department are authorized to review and take final agency action on petitions requesting such variances for those activities they regulate under this part and s. 373.4145.

(18) The department and each water management district responsible for implementation of the environmental resource permitting program shall develop a uniform mitigation assessment method for wetlands and other surface waters. The department shall adopt the uniform mitigation assessment method by rule no later than July 31, 2002. The rule shall provide an exclusive and consistent process for determining the amount of

mitigation required to offset impacts to wetlands and other surface waters, and, once effective, shall supersede all rules, ordinances, and variance procedures from ordinances that determine the amount of mitigation needed to offset such impacts. Once the department adopts the uniform mitigation assessment method by rule, the uniform mitigation assessment method shall be binding on the department, the water management districts, local governments, and any other governmental agencies and shall be the sole means to determine the amount of mitigation needed to offset adverse impacts to wetlands and other surface waters and to award and deduct mitigation bank credits. A water management district and any other governmental agency subject to chapter 120 may apply the uniform mitigation assessment method without the need to adopt it pursuant to s. 120.54. It shall be a goal of the department and water management districts that the uniform mitigation assessment method developed be practicable for use within the timeframes provided in the permitting process and result in a consistent process for determining mitigation requirements. It shall be recognized that any such method shall require the application of reasonable scientific judgment. The uniform mitigation assessment method must determine the value of functions provided by wetlands and other surface waters considering the current conditions of these areas, utilization by fish and wildlife, location, uniqueness, and hydrologic connection, and, when applied to mitigation banks, the factors listed in s. 373.4136(4). The uniform mitigation assessment method shall also account for the expected time-lag associated with offsetting impacts and the degree of risk associated with the proposed mitigation. The uniform mitigation assessment method shall account for different ecological communities in different areas of the state. In developing the uniform mitigation assessment method, the department and water management districts shall consult with approved local programs under s. 403.182 which have an established mitigation program for wetlands or other surface waters. The department and water management districts shall consider the recommendations submitted by such approved local programs, including any recommendations relating to the adoption by the department and water management districts of any uniform mitigation methodology that has been adopted and used by an approved local program in its established mitigation program for wetlands or other surface waters. Environmental resource permitting rules may establish categories of permits or thresholds for minor impacts under which the use of the uniform mitigation assessment method will not be required. The application of the uniform mitigation assessment method is not subject to s. 70.001. In the event the rule establishing the uniform mitigation assessment method is deemed to be invalid, the applicable rules related to establishing needed mitigation in existence prior to the adoption of the uniform mitigation assessment method, including those adopted by a county which is an approved local program under s. 403.182, and the method described in paragraph (b) for existing mitigation banks, shall be authorized for use by the department, water management districts, local governments, and other state agencies.

(a) In developing the uniform mitigation assessment method, the department shall seek input from the United States Army Corps of Engineers in order to promote consistency in the mitigation assessment methods used by the state and federal permitting programs.

(b) An entity which has received a mitigation bank permit prior to the adoption of the uniform mitigation assessment method shall have impact sites assessed, for the purpose of deducting bank credits, using the credit assessment method, including any functional assessment methodology, which was in place when the bank was permitted; unless the entity elects to have its credits redetermined, and thereafter have its credits deducted, using the uniform mitigation assessment method.

(19)(a) Financial responsibility for mitigation for wetlands and other surface waters required by a permit issued pursuant to this part for activities associated with the extraction of limestone and phosphate are subject to approval by the department as part of the permit application review. Financial responsibility for permitted activities that will occur over a period of 3 years or less of mining operations must be provided to the department before the commencement of mining operations and must equal 110 percent of the estimated mitigation costs for wetlands and other surface waters affected under the permit. For permitted activities that will occur over a period of more than 3 years of mining operations, the initial financial responsibility demonstration must equal 110 percent of the estimated mitigation costs for wetlands and other surface waters affected in the first 3 years of operation under the permit. For each year thereafter, the financial responsibility demonstration must be updated, including providing an amount equal to 110 percent of the estimated mitigation costs for the next year of operations under

the permit for which financial responsibility has not already been demonstrated and to release portions of the financial responsibility mechanisms in accordance with applicable rules.

(b) The mechanisms for providing financial responsibility pursuant to the permit shall, at the discretion of the applicant, include the following:

1. Cash or cash equivalent deposited in an escrow account.

2. Irrevocable letter of credit.

3. Performance bond.

4. Trust fund agreement.

5. Guarantee bond.

6. Insurance certificate.

7. A demonstration that the applicant meets the financial test and corporate guarantee requirements set forth in 40 C.F.R. s. 264.143(f).

8. A demonstration that the applicant meets the self-bonding provision set forth in 30 C.F.R. s. 800.23.

The form and content of all financial responsibility mechanisms shall be approved by the department. When utilizing an irrevocable letter of credit, performance bond, or guarantee bond, all payments made thereunder shall be deposited into a standby trust fund established contemporaneously with the posting of the financial assurance instrument. All trust fund agreements and standby trust fund agreements shall provide that distributions therefrom will be made only at the request of the department and that the trustees of such funds shall be either a national or state-chartered banking institution or a state-regulated trust company.

(c) The provisions of this subsection shall not apply to any mitigation for wetlands and other surface waters that is required pursuant to a permit or permits initially issued by the department or district prior to January 1, 2005.

(d) Nothing provided in this subsection supersedes or modifies the financial responsibility requirements of s. 378.208.

History.—ss. 4, 5, ch. 86-186; s. 30, ch. 93-213; s. 4, ch. 94-122; s. 3, ch. 96-370; s. 5, ch. 96-371; ss. 2, 5, ch. 97-222; s. 169, ch. 99-13; s. 26, ch. 99-385; s. 4, ch. 2000-133; s. 1, ch. 2002-253; s. 11, ch. 2005-36; s. 3, ch. 2005-215; s. 1, ch. 2005-273; s. 1, ch. 2007-191; s. 84, ch. 2008-4; s. 4, ch. 2008-150; s. 30, ch. 2010-205; s. 44, ch. 2012-5; s. 8, ch. 2016-130; s. 17, ch. 2017-3; s. 16, ch. 2018-158.

[1]Note.—Repealed by s. 45, ch. 93-213.

[2]Note.—Sections 403.91-403.925 and 403.929 were repealed by s. 45, ch. 93-213, and s. 403.913, as amended by s. 46, ch. 93-213, was transferred to s. 403.939 and subsequently repealed by s. 18, ch. 95-145. The only section remaining within the cited range is s. 403.927.

**373.4141    Permits; processing.—**

(1) Within 30 days after receipt of an application for a permit under this part, the department or the water management district shall review the application and shall request submittal of all additional information the department or the water management district is permitted by law to require. If the applicant believes any request for additional information is not authorized by law or rule, the applicant may request a hearing pursuant to s. 120.57. Within 30 days after receipt of such additional information, the department or water management district shall review it and may request only that information needed to clarify such additional information or to answer new questions raised by or directly related to such additional information. If the applicant believes the request of the department or water management district for such additional information is not authorized by law or rule, the department or water management district, at the applicant's request, shall proceed to process the permit application.

(2) A permit shall be approved, denied, or subject to a notice of proposed agency action within 60 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application.

(3) Processing of applications for permits for affordable housing projects shall be expedited to a greater degree than other projects.

(4) A state agency or an agency of the state may not require as a condition of approval for a permit or as an item to complete a pending permit application that an applicant obtain a permit or approval from any other local,

state, or federal agency without explicit statutory authority to require such permit or approval.

History.—s. 4, ch. 96-370; s. 1, ch. 2002-160; s. 7, ch. 2012-205.

**373.4142　Water quality within stormwater treatment systems.**—State surface water quality standards applicable to waters of the state, as defined in s. 403.031(13), shall not apply within a stormwater management system which is designed, constructed, operated, and maintained for stormwater treatment in accordance with a valid permit or noticed exemption issued pursuant to chapter 62-25, Florida Administrative Code; a valid permit or exemption under s. 373.4145 within the Northwest Florida Water Management District; a valid permit issued on or subsequent to April 1, 1986, within the Suwannee River Water Management District or the St. Johns River Water Management District pursuant to this part; a valid permit issued on or subsequent to March 1, 1988, within the Southwest Florida Water Management District pursuant to this part; or a valid permit issued on or subsequent to January 6, 1982, within the South Florida Water Management District pursuant to this part. Such inapplicability of state water quality standards shall be limited to that part of the stormwater management system located upstream of a manmade water control structure permitted, or approved under a noticed exemption, to retain or detain stormwater runoff in order to provide treatment of the stormwater. The additional use of such a stormwater management system for flood attenuation or irrigation shall not divest the system of the benefits of this exemption. This section shall not affect the authority of the department and water management districts to require reasonable assurance that the water quality within such stormwater management systems will not adversely impact public health, fish and wildlife, or adjacent waters.

History.—s. 7, ch. 94-122; s. 2, ch. 2007-191.

**373.4143　Declaration of policy.**—It is the policy of the Legislature that the state provide efficient government services by consolidating, to the maximum extent practicable, federal and state permitting associated with wetlands and navigable waters within the state.

History.—s. 2, ch. 2005-273.

**373.4144　Federal environmental permitting.**—

(1)　It is the intent of the Legislature to:

(a)　Facilitate coordination and a more efficient process of implementing regulatory duties and functions between the Department of Environmental Protection, the water management districts, the United States Army Corps of Engineers, the United States Fish and Wildlife Service, the National Marine Fisheries Service, the United States Environmental Protection Agency, the Fish and Wildlife Conservation Commission, and other relevant federal and state agencies.

(b)　Authorize the Department of Environmental Protection to obtain issuance by the United States Army Corps of Engineers, pursuant to state and federal law and as set forth in this section, of an expanded state programmatic general permit, or a series of regional general permits, for categories of activities in waters of the United States governed by the Clean Water Act and in navigable waters under the Rivers and Harbors Act of 1899 which are similar in nature, which will cause only minimal adverse environmental effects when performed separately, and which will have only minimal cumulative adverse effects on the environment.

(c)　Use the mechanism of such a state general permit or such regional general permits to eliminate overlapping federal regulations and state rules that seek to protect the same resource and to avoid duplication of permitting between the United States Army Corps of Engineers and the department for minor work located in waters of the United States, including navigable waters, thus eliminating, in appropriate cases, the need for a separate individual approval from the United States Army Corps of Engineers while ensuring the most stringent protection of wetland resources.

(d)　Direct the department not to seek issuance of or take any action pursuant to any such permit or permits unless such conditions are at least as protective of the environment and natural resources as existing state law under this part and federal law under the Clean Water Act and the Rivers and Harbors Act of 1899.

(2)(a)　In order to effectuate efficient wetland permitting and avoid duplication, the department and water management districts are authorized to implement a voluntary state programmatic general permit for all dredge

and fill activities impacting 10 acres or less of wetlands or other surface waters, including navigable waters, subject to agreement with the United States Army Corps of Engineers, if the general permit is at least as protective of the environment and natural resources as existing state law under this part and federal law under the Clean Water Act and the Rivers and Harbors Act of 1899.

(b)   By seeking to use a statewide programmatic general permit, an applicant consents to applicable federal wetland jurisdiction criteria, which are not included pursuant to this part, but which are authorized by the regulations implementing s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and s. 10 of the Rivers and Harbors Act of 1899 as required by the United States Army Corps of Engineers, notwithstanding s. 373.4145 and for the limited purpose of implementing the state programmatic general permit authorized by this subsection.

(3)   The department may pursue a series of regional general permits for construction activities in wetlands or surface waters or delegation or assumption of federal permitting programs regulating the discharge of dredged or fill material pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and s. 10 of the Rivers and Harbors Act of 1899.

History.—s. 3, ch. 2005-273; s. 1, ch. 2012-114; s. 8, ch. 2012-205; s. 1, ch. 2016-195.

### 373.4145     Part IV permitting program within the geographical jurisdiction of the Northwest Florida Water Management District.—

(1)   Within the geographical jurisdiction of the Northwest Florida Water Management District, taking into consideration the differing physical and natural characteristics of the area, the department and the district shall:

(a)   Jointly develop rules to regulate the construction, operation, alteration, maintenance, abandonment, and removal of stormwater management systems. The department shall initiate the rulemaking process within 60 days after the effective date of this act and shall implement the rules no sooner than January 1, 2007; the district may implement the rules without adoption pursuant to s. 120.54. Until the stormwater management system rules take effect, chapter 62-25, Florida Administrative Code, shall remain in full force and effect and shall be implemented by the department. Notwithstanding the provisions of this section, chapter 62-25, Florida Administrative Code, may be amended by the department as necessary to comply with any requirements of state or federal laws or regulations, or any condition imposed by a federal program, or as a requirement for receipt of federal grant funds. The intent of the rules created under this paragraph is to update existing stormwater rules, to improve water quality and flood protection, and to apply the least restrictive measures and criteria adopted in other water management district rules.

(b)   Jointly develop rules for the management and storage of surface waters under this part. The department shall initiate the rulemaking process within 60 days after the effective date of this act and shall implement the rules no sooner than January 1, 2008; the district may implement the rules without adoption pursuant to s. 120.54. Until the rules for the management and storage of surface waters under this part take effect, rules adopted pursuant to the authority of ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, in effect prior to July 1, 1994, shall remain in full force and effect and shall be implemented by the department. However, the department is authorized to establish additional exemptions and general permits for dredging and filling, if such exemptions or general permits do not allow significant adverse impacts to occur individually or cumulatively. However, for the purpose of chapter 62-312, Florida Administrative Code, the landward extent of surface waters of the state identified in rule 62-312.030(2), Florida Administrative Code, shall be determined in accordance with the methodology in rules 62-340.100 through 62-340.600, Florida Administrative Code. In implementing s. 373.421(2), the department shall determine the extent of those surface waters and wetlands within the regulatory authority of the department as described in this paragraph. At the request of the petitioner, the department shall also determine the extent of surface waters and wetlands that can be delineated by the methodology ratified in s. 373.4211, but that are not subject to the regulatory authority of the department as described in this paragraph. The intent of the rules created under this paragraph is to improve the management and storage of surface waters with minimal impact on property interests and to consider the rural nature, current

development trends, and abundant natural resources of the district relative to the permitting thresholds and requirements.

(c)　Pursue streamlining of the federal and state wetland permitting programs pursuant to ss. 373.4143 and 373.4144.

(d)　Implement, to the maximum extent possible, streamlining measures, including electronic permitting, field permitting, and certification programs for activities with minimal individual or cumulative impact, informal wetland determinations, and other similar measures.

(2)　The rules adopted under subsection (1), as applicable, shall:

(a)　Incorporate the exemptions in ss. 373.406 and 403.813(1).

(b)　Incorporate the provisions of rule 62-341.475(1)(f), Florida Administrative Code, applicable to single-family homes located entirely or partially within wholly owned, isolated wetlands.

(c)　Exempt from the notice and permitting requirements of this part the construction or private use of a single-family dwelling unit, duplex, triplex, or quadruplex that:

1.　Is not part of a larger common plan of development or sale proposed by the applicant.

2.　Does not involve wetlands or other surface waters.

(d)　Incorporate the exemptions and general permits that are effective under this part and have been enacted by rule by the department and other water management districts, including the general permits authorized by s. 403.814.

(e)　Provide an exemption for the repair, stabilization, or paving of county-maintained roads existing on or before January 1, 2002, and the repair or replacement of bridges that are part of the roadway consistent with the provisions of s. 403.813(1)(t), notwithstanding the provisions of s. 403.813(1)(t)7. requiring adoption of a general permit applicable within the Northwest Florida Water Management District and the repeal of such exemption upon the adoption of a general permit.

(f)　Exempt from rule criteria under paragraph (1)(b) an alteration of a wholly owned, artificial surface water created entirely from uplands that does not connect to surface waters of the state, except for those created for the purpose of providing mitigation under this part.

(3)　The department and the Northwest Florida Water Management District shall enter into an operating agreement under s. 373.046 to effectively implement this section and provide the district with the amount of responsibility under the agreement that resources allow, including, at a minimum, the responsibility for regulating silviculture and agriculture. The operating agreement shall encourage local delegation of the responsibilities under this section pursuant to s. 373.441.

(4)　The provisions of s. 373.414(11)-(14) shall not apply to rules adopted under this section.

(5)　The following activities shall continue to be governed by the provisions of s. 373.4145, 1994 Supplement to the Florida Statutes 1993:

(a)　The operation and routine custodial maintenance of activities legally in existence before the effective date of the rules adopted under subsection (1), as long as the terms and conditions of the permit, exemption, or other authorization for such activities continue to be met.

(b)　The activities approved in a permit issued pursuant to s. 373.4145, 1994 Supplement to the Florida Statutes 1993, and the review of activities proposed in applications received and completed before the effective date of the rules adopted under subsection (1), as applicable. This paragraph shall also apply to any modification of the plans, terms, and conditions of a permit issued pursuant to s. 373.4145, 1994 Supplement to the Florida Statutes 1993, that lessens the environmental impact, except that any such modification shall not extend the time limit for construction beyond 2 additional years.

This subsection shall not apply to any activity that is altered, modified, expanded, abandoned, or removed after adoption of the applicable rules under subsection (1).

(6)　Unless the petitioner elects to apply chapter 62-340, Florida Administrative Code, to all wetlands, the delineation of the landward extent of wetlands and other surface waters for petitions filed under s. 373.421(2) prior to the effective date of the rules adopted under paragraph (1)(b) shall continue to be determined in

accordance with rule 62-312.030(2), Florida Administrative Code, in effect July 1, 1994, and rules 62-340.100 through 62-340.600, Florida Administrative Code, as ratified in s. 373.4211.

(7)　If the Legislature in any given fiscal year fails to fund and staff the environmental resource permitting program established under this section, the environmental resource permitting program shall be suspended for that fiscal year and the rules and statutes governing development activity in the district shall revert to those in effect on April 1, 2006, until such time as funding and staffing levels are restored consistent with this section.

History.—s. 8, ch. 94-122; s. 18, ch. 96-247; s. 5, ch. 96-370; s. 1, ch. 99-353; s. 1, ch. 2003-167; s. 32, ch. 2005-71; s. 4, ch. 2005-273; ss. 1, 4, ch. 2006-228; s. 36, ch. 2009-21; s. 75, ch. 2014-17.

### 373.4146　State assumption of the federal Clean Water Act, section 404 dredge and fill permitting program.—

(1)　As used in this section, the term "state assumed waters" means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material.

(2)　The department has the power and authority to assume, in accordance with 40 C.F.R. part 233, the dredge and fill permitting program established in s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder. The department may adopt any federal requirements, criteria, or regulations necessary to obtain assumption, including, but not limited to, the guidelines specified in 40 C.F.R. part 230 and the public interest review criteria in 33 C.F.R. s. 320.4(a). Any rule, standard, or other requirement adopted pursuant to the authority granted in this subsection for purposes of obtaining assumption may not become effective or otherwise enforceable until the United States Environmental Protection Agency has approved the state's assumption application. This legislative authority is intended to be sufficient to enable the department to assume and implement the federal section 404 dredge and fill permitting program in conjunction with the environmental resource permitting program established in this chapter.

(3)　To the extent that state law applies and does not conflict with the federal requirements identified in subsection (2), the application of such state law to further regulate discharges in state assumed waters is not prohibited. Provisions of state law which conflict with the federal requirements identified in subsection (2) do not apply to state administered section 404 permits.

(4)　A state administered section 404 permit is not required for activities as specified in 33 U.S.C. s. 1344(f), 40 C.F.R. s. 232.3, or 33 C.F.R. s. 323.4. The exemptions established in ss. 373.406, 373.4145, and 403.813 still apply to environmental resource permits. However, the exemptions identified in ss. 373.406, 373.4145, and 403.813 may not be applied to state administered section 404 permits.

(5)　Upon state assumption of the section 404 dredge and fill permitting program pursuant to subsection (2):

(a)　The department must grant or deny an application for a state administered section 404 permit within the time allowed for permit review under 40 C.F.R. part 233, subparts D and F. The department is specifically exempted from the time limitations provided in ss. 120.60 and 373.4141 for state administered section 404 permits.

(b)　All state administered section 404 permits issued under this section must be for a period of no more than 5 years. Upon an applicant's submittal of a timely application for reissuance, a state administered section 404 permit does not expire until the department takes final action upon the application or until the last day for seeking judicial review of the agency order or a later date fixed by order of the reviewing court. If the department fails to render a permitting decision within the time allowed by s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., 40 C.F.R. part 233, subparts D and F, or a memorandum of agreement executed by the department and the United States Environmental Protection Agency, whichever is shorter, the applicant may apply for an order from the circuit court requiring the department to render a decision within a specified time. The department must adopt by rule an expedited permit review process that is consistent with federal law for the reissuance of state administered section 404 permits where there have been no material changes in the scope of the project as originally permitted, site and surrounding environmental conditions have not

changed, and the applicant does not have a history of noncompliance with the existing permit. The decision by the department to approve the reissuance of any state administered section 404 permit issued pursuant to this section is subject to ss. 120.569 and 120.57 only with respect to any material permit modification or material changes in the scope of the project as originally permitted.

(c)　The department may delegate administration of the state administered section 404 permitting program if such delegation is in accordance with federal law. The department must retain the authority to review, modify, revoke, or rescind a state administered section 404 permit issued by any delegated entity to ensure consistency with federal law.

History.—s. 1, ch. 2018-88.

### 373.4149　Miami-Dade County Lake Belt Plan.—

(1)　The Legislature hereby accepts and adopts the recommendations contained in the Phase I Lake Belt Report and Plan, dated February 1997 and hereby accepts the Phase II Plan, submitted on February 9, 2001, to the Legislature by the Miami-Dade County Lake Belt Plan Implementation Committee. These plans shall collectively be known as the Miami-Dade County Lake Belt Plan. This plan was developed to enhance the water supply for Miami-Dade County and the Everglades, including appropriate wellfield protection measures; to maximize efficient recovery of limestone while promoting the social and economic welfare of the community and protecting the environment; and to educate various groups and the general public of the benefits of the plan.

(2)(a)　The Legislature recognizes that deposits of limestone and sand suitable for production of construction aggregates, cement, and road base materials are located in limited areas of the state.

(b)　The Legislature recognizes that the deposit of limestone available in South Florida is limited due to urbanization to the east and the Everglades to the west.

(3)　The Miami-Dade County Lake Belt Area is that area bounded by the Ronald Reagan Turnpike to the east, the Miami-Dade-Broward County line to the north, Krome Avenue to the west and Tamiami Trail to the south together with the land south of Tamiami Trail in sections 5, 6, 7, 8, 17, and 18, Township 54 South, Range 39 East, sections 24, 25, and 36, Township 54 South, Range 38 East, less those portions of section 3, Township 52 South, Range 39 East south of Krome Avenue and west of U.S. Highway 27, and less sections 35 and 36 and the east one-half of sections 24 and 25, Township 53 South, Range 39 East and Government Lots 1 and 2, lying between Townships 53 and 54 South, Range 39 East and those portions of sections 1 and 2, Township 54 South, Range 39 East, lying north of Tamiami Trail.

(4)　The identification of the Miami-Dade County Lake Belt Area shall not preempt local land use jurisdiction, planning, or regulatory authority in regard to the use of land by private land owners. When amending local comprehensive plans, or implementing zoning regulations, development regulations, or other local regulations, Miami-Dade County shall strongly consider limestone mining activities and ancillary operations, such as lake excavation, including use of explosives, rock processing, cement, concrete and asphalt products manufacturing, and ancillary activities, within the rock mining supported and allowable areas of the Miami-Dade County Lake Belt Plan adopted by subsection (1); provided, however, that limerock mining activities are consistent with wellfield protection. Rezonings, amendments to local zoning and subdivision regulations, and amendments to local comprehensive plans concerning properties that are located within 1 mile of the Miami-Dade County Lake Belt Area shall be compatible with limestone mining activities. No rezonings, variances, amendments to local zoning and subdivision regulations which would result in an increase in residential density, or amendments to local comprehensive plans for any residential purpose may be approved for any property located in sections 35 and 36 and the east one-half of sections 24 and 25, Township 53 South, Range 39 East until such time as there is no active mining within 2 miles of the property. This section does not preclude residential development that complies with current regulations.

(5)　The secretary of the Department of Environmental Protection, the executive director of the Department of Economic Opportunity, the secretary of the Department of Transportation, the Commissioner of Agriculture, the executive director of the Fish and Wildlife Conservation Commission, and the executive director of the South Florida Water Management District may enter into agreements with landowners, developers, businesses, industries,

individuals, and governmental agencies as necessary to effectuate the Miami-Dade County Lake Belt Plan and the provisions of this section.

(6)(a)   All agencies of the state shall review the status of their landholdings within the boundaries of the Miami-Dade County Lake Belt. Those lands for which no present or future use is identified must be made available, together with other suitable lands, to the Department of Environmental Protection for its use in carrying out the objectives of this act.

(b)   It is the intent of the Legislature that lands provided to the Department of Environmental Protection be used for land exchanges to further the objectives of this act.

History.—s. 21, ch. 92-132; s. 5, ch. 94-122; s. 1010, ch. 95-148; s. 10, ch. 97-222; s. 1, ch. 99-298; s. 22, ch. 2000-197; ss. 1, 2, ch. 2000-285; s. 3, ch. 2001-172; s. 1, ch. 2006-13; s. 249, ch. 2011-142; s. 1, ch. 2015-141; s. 38, ch. 2016-10.

### 373.41492   Miami-Dade County Lake Belt Mitigation Plan; mitigation for mining activities within the Miami-Dade County Lake Belt.—

(1)   The Legislature finds that the impact of mining within the rock mining supported and allowable areas of the Miami-Dade County Lake Belt Plan adopted by s. 373.4149(1) can best be offset by the implementation of a comprehensive mitigation plan. The Lake Belt Mitigation Plan consists of those provisions contained in subsections (2)-(8). The per-ton mitigation fee assessed on limestone sold from the Miami-Dade County Lake Belt Area and sections 10, 11, 13, 14, Township 52 South, Range 39 East, and sections 24, 25, 35, and 36, Township 53 South, Range 39 East, shall be used for acquiring environmentally sensitive lands and for restoration, monitoring, maintenance, and other environmental purposes. It is the intent of the Legislature that the per-ton mitigation fee not be a revenue source for purposes other than enumerated in this section. Further, the Legislature finds that the public benefit of a sustainable supply of limestone construction materials for public and private projects requires a coordinated approach to permitting activities on wetlands within Miami-Dade County in order to provide the certainty necessary to encourage substantial and continued investment in the limestone processing plant and equipment required to efficiently extract the limestone resource. It is the intent of the Legislature that the Lake Belt Mitigation Plan satisfy all local, state, and federal requirements for mining activity within the rock mining supported and allowable areas.

(2)   To provide for the mitigation of wetland resources lost to mining activities within the Miami-Dade County Lake Belt Plan, effective October 1, 1999, a mitigation fee is imposed on each ton of limerock and sand extracted by any person who engages in the business of extracting limerock or sand from within the Miami-Dade County Lake Belt Area and the east one-half of sections 24 and 25 and all of sections 35 and 36, Township 53 South, Range 39 East. The mitigation fee is imposed for each ton of limerock and sand sold from within the properties where the fee applies in raw, processed, or manufactured form, including, but not limited to, sized aggregate, asphalt, cement, concrete, and other limerock and concrete products. The mitigation fee imposed by this subsection for each ton of limerock and sand sold shall be 25 cents per ton, beginning on January 1, 2016; 15 cents per ton beginning on January 1, 2017; and 5 cents per ton beginning on January 1, 2018, and thereafter. To pay for seepage mitigation projects, including groundwater and surface water management structures designed to improve wetland habitat and approved by the Lake Belt Mitigation Committee, and to upgrade a water treatment plant that treats water coming from the Northwest Wellfield in Miami-Dade County, a water treatment plant upgrade fee is imposed within the same Lake Belt Area subject to the mitigation fee and upon the same kind of mined limerock and sand subject to the mitigation fee. The water treatment plant upgrade fee imposed by this section for each ton of limerock and sand sold shall be 6 cents per ton, and the collection of this fee shall cease once the total amount of proceeds collected for this fee reaches the amount of the actual moneys necessary to design and construct the water treatment plant upgrade, as determined in an open, public solicitation process. The water treatment plant upgrade fee imposed by this section expires July 1, 2018. Any limerock or sand that is used within the mine from which the limerock or sand is extracted is exempt from the fees. The amount of the mitigation fee and the water treatment plant upgrade fee imposed under this section must be stated separately on the invoice provided to the purchaser of the limerock or sand product from the limerock or sand miner, or its subsidiary or affiliate, for which the fee or fees apply. The limerock or sand miner, or its subsidiary or affiliate, who sells the limerock or sand

product shall collect the mitigation fee and the water treatment plant upgrade fee and forward the proceeds of the fees to the Department of Revenue on or before the 20th day of the month following the calendar month in which the sale occurs. The proceeds of a fee imposed by this section include all funds collected and received by the Department of Revenue relating to the fee, including interest and penalties on a delinquent fee. The amount deducted for administrative costs may not exceed 3 percent of the total revenues collected under this section and may equal only those administrative costs reasonably attributable to the fee.

(3) The mitigation fee and the water treatment plant upgrade fee imposed by this section must be reported to the Department of Revenue. Payment of the mitigation and the water treatment plant upgrade fees must be accompanied by a form prescribed by the Department of Revenue.

(a) The proceeds of the mitigation fee, less administrative costs, must be transferred by the Department of Revenue to the South Florida Water Management District and deposited into the Lake Belt Mitigation Trust Fund.

(b) The proceeds of the water treatment plant upgrade fee, less administrative costs and less 2 cents per ton transferred pursuant to paragraph (c), must be transferred by the Department of Revenue to a trust fund established by Miami-Dade County, for the sole purpose authorized by paragraph (6)(a).

(c) Until December 1, 2016, or until funding for the study is complete, whichever comes earlier, 2 cents per ton, not to exceed $300,000, shall be transferred by the Department of Revenue to the State Fire Marshal to be used to fund the study required under s. 552.30 to review the established statewide ground vibration limits for construction materials mining activities and to review any legitimate claims paid for damages caused by such mining activities. Any amount not used to fund the study shall be transferred to the trust fund established by Miami-Dade County, for the sole purpose authorized by paragraph (6)(a).

(4)(a) The Department of Revenue shall administer, collect, and enforce the mitigation and treatment plant upgrade fees authorized under this section in accordance with the procedures used to administer, collect, and enforce the general sales tax imposed under chapter 212. The provisions of chapter 212 with respect to the authority of the Department of Revenue to audit and make assessments, the keeping of books and records, and the interest and penalties imposed on delinquent fees apply to this section. The fees may not be included in computing estimated taxes under s. 212.11, and the dealer's credit for collecting taxes or fees provided for in s. 212.12 does not apply to the fees imposed by this section.

(b) In administering this section, the Department of Revenue may employ persons and incur expenses for which funds are appropriated by the Legislature. The Department of Revenue shall adopt rules and prescribe and publish forms necessary to administer this section. The Department of Revenue shall establish audit procedures and may assess delinquent fees.

(5) Each January 1, beginning January 1, 2010, through December 31, 2011, the per-ton mitigation fee shall be increased by 2.1 percentage points, plus a cost growth index. The cost growth index shall be the percentage change in the weighted average of the Employment Cost Index for All Civilian Workers (ecu 10001I), issued by the United States Department of Labor for the most recent 12-month period ending on September 30, and the percentage change in the Producer Price Index for All Commodities (WPU 00000000), issued by the United States Department of Labor for the most recent 12-month period ending on September 30, compared to the weighted average of these indices for the previous year. The weighted average shall be calculated as 0.6 times the percentage change in the Employment Cost Index for All Civilian Workers (ecu 10001I), plus 0.4 times the percentage change in the Producer Price Index for All Commodities (WPU 00000000). If either index is discontinued, it shall be replaced by its successor index, as identified by the United States Department of Labor.

(6)(a) The proceeds of the mitigation fee must be used to conduct mitigation activities that are appropriate to offset the loss of the value and functions of wetlands as a result of mining activities and to conduct water quality monitoring to ensure the protection of water resources within the Lake Belt Area. Such mitigation may include the purchase, enhancement, restoration, and management of wetlands and uplands in the Everglades watershed, the purchase of mitigation credit from a permitted mitigation bank, and any structural modifications to the existing drainage system to enhance the hydrology of the Miami-Dade County Lake Belt Area or the Everglades watershed. Funds may also be used to reimburse other funding sources, including the Save Our Rivers Land Acquisition Program, the Internal Improvement Trust Fund, the South Florida Water Management District, and Miami-Dade

County, for the purchase of lands that were acquired in areas appropriate for mitigation due to rock mining and to reimburse governmental agencies that exchanged land under s. 373.4149 for mitigation due to rock mining. The proceeds of the water treatment plant upgrade fee deposited into the Lake Belt Mitigation Trust Fund shall be used solely to pay for seepage mitigation projects, including groundwater or surface water management structures designed to improve wetland habitat and approved by the Lake Belt Mitigation Committee. The proceeds of the water treatment plant upgrade fee which are transmitted to a trust fund established by Miami-Dade County shall be used to upgrade a water treatment plant that treats water coming from the Northwest Wellfield in Miami-Dade County. As used in this section, the terms "upgrade a water treatment plant" or "treatment plant upgrade" mean those works necessary to treat or filter a surface water source or supply or both.

(b) Expenditures of the mitigation fee must be approved by an interagency committee consisting of representatives from each of the following: the Miami-Dade County Department of Environmental Resource Management, the Department of Environmental Protection, the South Florida Water Management District, and the Fish and Wildlife Conservation Commission. In addition, the limerock mining industry shall select a representative to serve as a nonvoting member of the interagency committee. At the discretion of the committee, additional members may be added to represent federal regulatory, environmental, and fish and wildlife agencies.

(7) Payment of the mitigation fee imposed by this section satisfies the mitigation requirements imposed under ss. 373.403-373.439 and any applicable county ordinance for loss of the value and functions from mining of the wetlands identified as rock mining supported and allowable areas of the Miami-Dade County Lake Belt Plan adopted by s. 373.4149(1). In addition, it is the intent of the Legislature that the payment of the mitigation fee imposed by this section satisfy all federal mitigation requirements for the wetlands mined.

(8)(a) The interagency committee established in this section shall annually prepare and submit to the governing board of the South Florida Water Management District a report evaluating the mitigation costs and revenues generated by the mitigation fee.

(b) No sooner than January 31, 2010, and no more frequently than every 2 years thereafter, the interagency committee shall submit to the Legislature a report recommending any needed adjustments to the mitigation fee, including the annual escalator provided for in subsection (5), to ensure that the revenue generated reflects the actual costs of the mitigation.

(9)(a) The Legislature finds that more than 1,000 water samples from quarry lakes and groundwater sources near the Northwest Wellfield have been analyzed without a single detection of pathogens. The Legislature further finds that the best available science indicates that there is no connection between the quarry lakes in the Miami-Dade County Lake Belt and any potential need to upgrade the water treatment plant that receives water from the Northwest Wellfield for pathogen removal and none is expected in the future.

(b) To assist the Legislature in determining whether a portion of the limestone mining fee should be dedicated to a treatment plant upgrade through July 1, 2018, pursuant to subsection (2), Miami-Dade County shall:

1. By January 15, 2016, submit to the President of the Senate and the Speaker of the House of Representatives a detailed accounting of the Lake Belt fees collected through June 30, 2015, and all expenditures of those fees; and

2. By January 15, 2017, submit to the President of the Senate and the Speaker of the House of Representatives a detailed report on all pathogen data collection and analyses related to the Northwest Wellfield and the planning and engineering studies undertaken to upgrade any water treatment plant to provide treatment for pathogens in water from the Northwest Wellfield.

**History.**—s. 2, ch. 99-298; s. 23, ch. 2000-197; s. 2, ch. 2006-13; s. 32, ch. 2010-205; s. 36, ch. 2010-225; s. 1, ch. 2012-107; s. 2, ch. 2015-141; s. 39, ch. 2016-10.


### 373.41495    Lake Belt Mitigation Trust Fund; bonds.—

(1) The Lake Belt Mitigation Trust Fund is hereby created, to be administered by the South Florida Water Management District. Funds shall be credited to the trust fund as provided in s. 373.41492, to be used for the purposes set forth therein.

(2)   The South Florida Water Management District may issue revenue bonds pursuant to s. 373.584, payable from revenues from the Lake Belt Mitigation fee imposed under s. 373.41492.

(3)   Net proceeds from the Lake Belt Mitigation fee and any revenue bonds issued under subsection (2) shall be deposited into the trust fund and, together with any interest earned on such moneys, shall be applied to Lake Belt mitigation projects as provided in s. 373.41492.

(4)   The Lake Belt Mitigation Trust Fund is a trust fund as described in s. 19(f)(3), Art. III of the State Constitution, and therefore is not subject to termination pursuant to s. 19(f)(2), Art. III of the State Constitution.

History.—ss. 1, 2, 3, 4, ch. 98-260; s. 1, ch. 99-297; s. 4, ch. 2015-141.

### 373.415   Protection zones; duties of the St. Johns River Water Management District.—

(1)   Not later than November 1, 1988, the St. Johns River Water Management District shall adopt rules establishing protection zones adjacent to the watercourses in the Wekiva River System, as designated in s. 369.303(10). Such protection zones shall be sufficiently wide to prevent harm to the Wekiva River System, including water quality, water quantity, hydrology, wetlands, and aquatic and wetland-dependent wildlife species, caused by any of the activities regulated under this part. Factors on which the widths of the protection zones shall be based shall include, but not be limited to:

(a)   The biological significance of the wetlands and uplands adjacent to the designated watercourses in the Wekiva River System, including the nesting, feeding, breeding, and resting needs of aquatic species and wetland-dependent wildlife species.

(b)   The sensitivity of these species to disturbance, including the short-term and long-term adaptability to disturbance of the more sensitive species, both migratory and resident.

(c)   The susceptibility of these lands to erosion, including the slope, soils, runoff characteristics, and vegetative cover.

In addition, the rules may establish permitting thresholds, permitting exemptions, or general permits, if such thresholds, exemptions, or general permits do not allow significant adverse impacts to the Wekiva River System to occur individually or cumulatively.

(2)   Notwithstanding the provisions of s. 120.60, the St. Johns River Water Management District shall not issue any permit under this part within the Wekiva River Protection Area, as defined in s. 369.303(9), until the appropriate local government has provided written notification to the district that the proposed activity is consistent with the local comprehensive plan and is in compliance with any land development regulation in effect in the area where the development will take place. The district may, however, inform any property owner who makes a request for such information as to the location of the protection zone or zones on his or her property. However, if a development proposal is amended as the result of the review by the district, a permit may be issued prior to the development proposal being returned, if necessary, to the local government for additional review.

(3)   Nothing in this section shall affect the authority of the water management districts created by this chapter to adopt similar protection zones for other watercourses.

(4)   Nothing in this section shall affect the authority of the water management districts created by this chapter to decline to issue permits for development which have not been determined to be consistent with local comprehensive plans or in compliance with land development regulations in areas outside the Wekiva River Protection Area.

(5)   Nothing in this section shall affect the authority of counties or municipalities to establish setbacks from any surface waters or watercourses.

(6)   The provisions of s. 373.617 are applicable to final actions of the St. Johns River Water Management District with respect to a permit or permits issued pursuant to this section.

History.—s. 2, ch. 88-121; s. 27, ch. 88-393; s. 606, ch. 95-148; s. 12, ch. 2000-212.

### 373.416   Permits for maintenance or operation.—

(1)   Except for the exemptions set forth in this part, the governing board or department may require such permits and impose such reasonable conditions as are necessary to assure that the operation or maintenance of any

stormwater management system, dam, impoundment, reservoir, appurtenant work, or works will comply with the provisions of this part and applicable rules promulgated thereto, will not be inconsistent with the overall objectives of the district, and will not be harmful to the water resources of the district.

(2)   Except as otherwise provided in ss. 373.426 and 373.429, a permit issued by the governing board or department for the maintenance or operation of a stormwater management system, dam, impoundment, reservoir, appurtenant work, or works shall be permanent, and the sale or conveyance of such dam, impoundment, reservoir, appurtenant work, or works, or the land on which the same is located, shall in no way affect the validity of the permit, provided the owner in whose name the permit was granted notifies the governing board or department of such change of ownership within 30 days of such transfer.

(3)   The governing boards shall, by November 1, 1990, establish by rule requirements for the monitoring and maintenance of stormwater management systems.

History.—s. 5, part IV, ch. 72-299; s. 20, ch. 73-190; s. 14, ch. 89-279.

**373.417    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 6, ch. 79-161.

**373.418    Rulemaking; preservation of existing authority.**—

(1)   It is the intent of the Legislature that stormwater management systems be regulated under this part incorporating all of existing requirements contained in or adopted pursuant to this chapter and chapter 403. Neither the department nor governing boards are limited or prohibited from amending any regulatory requirement applicable to stormwater management systems in accordance with the provisions of this part. It is further the intent of the Legislature that all current exemptions under this chapter and chapter 403 shall remain in full force and effect and that this act shall not be construed to remove or alter these exemptions.

(2)   In order to preserve existing requirements, all rules of the department or governing boards existing on July 1, 1989, except for rule 17-25.090, Florida Administrative Code, shall be applicable to stormwater management systems and continue in full force and effect unless amended or replaced by future rulemaking in accordance with this part.

(3)   The department or governing boards have authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this part. Such rules shall be consistent with the water resource implementation rule and shall not allow harm to water resources or be contrary to the policy set forth in s. 373.016.

(4)   The department or the governing boards are authorized to adopt by rule performance criteria for the review of groundwater discharge of stormwater. Upon adoption of such performance criteria the department shall not require a separate groundwater permit for permitted stormwater facilities.

History.—s. 15, ch. 89-279; s. 22, ch. 97-160; s. 86, ch. 98-200.

**373.4185    List of flocculants permitted.**—The Department of Environmental Protection may develop and maintain a list of the flocculants that it has permitted to be used under part IV of this chapter. The list may include information concerning any associated testing to determine compliance with state permitting standards and information on application rates and methods. Publication of this list is not a rule under chapter 120. This section does not prevent an entity from proposing or the department from approving the use of a flocculant that is not on the department's list subject to the entity providing the necessary documentation required by the department to ensure that the use of the flocculant will not cause harm to the water resources of the state.

History.—s. 5, ch. 2008-40.

**373.419    Completion report.**—Within 30 days after the completion of construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works, the permittee shall file a written statement of completion with the governing board or department. The governing board or department shall designate the form of such statement and such information as it shall require.

History.—s. 6, part IV, ch. 72-299; s. 16, ch. 89-279.

**373.421　Delineation methods; formal determinations.**—

(1)　The Environmental Regulation Commission shall adopt a unified statewide methodology for the delineation of the extent of wetlands as defined in s. 373.019(27). This methodology shall consider regional differences in the types of soils and vegetation that may serve as indicators of the extent of wetlands. This methodology shall also include provisions for determining the extent of surface waters other than wetlands for the purposes of regulation under s. 373.414. This methodology shall not become effective until ratified by the Legislature. Subsequent to legislative ratification, the wetland definition in s. 373.019(27) and the adopted wetland methodology shall be binding on the department, the water management districts, local governments, and any other governmental entities. Upon ratification of such wetland methodology, the Legislature preempts the authority of any water management district, state or regional agency, or local government to define wetlands or develop a delineation methodology to implement the definition and determines that the exclusive definition and delineation methodology for wetlands shall be that established pursuant to s. 373.019(27) and this section. Upon such legislative ratification, any existing wetlands definition or wetland delineation methodology shall be superseded by the wetland definition and delineation methodology established pursuant to this chapter. Subsequent to legislative ratification, a delineation of the extent of a surface water or wetland by the department or a water management district, pursuant to a formal determination under subsection (2), or pursuant to a permit issued under this part in which the delineation was field-verified by the permitting agency and specifically approved in the permit, shall be binding on all other governmental entities for the duration of the formal determination or permit. All existing rules and methodologies of the department, the water management districts, and local governments, regarding surface water or wetland definition and delineation shall remain in full force and effect until the common methodology rule becomes effective. However, this shall not be construed to limit any power of the department, the water management districts, and local governments to amend or adopt a surface water or wetland definition or delineation methodology until the common methodology rule becomes effective.

(2)　A water management district or the department may provide a process by rule for formal determinations of the extent of surface waters and wetlands, as delineated in subsection (1). By interagency agreement, the department and each water management district shall determine which agency shall implement the determination process within the district. If a rule is adopted, a property owner, an entity that has the power of eminent domain, or any other person who has a legal or equitable interest in property may petition the district for a formal determination. In such rule, the governing board or the department shall specify information which must be provided and may require authorization to enter upon the property. The rule shall also establish procedures for issuing a formal determination. The governing board may authorize its executive director to issue formal determinations. The governing board must by rule prescribe the circumstances in which its executive director may issue such determinations. The governing board or the department may require a fee to cover the costs of processing and acting upon the petition. That fee must be established by rule. A water management district or the department may publish, or require the petitioner to publish at the petitioner's expense, notice of the intended agency action on the petition for a formal determination in a newspaper of general circulation within the affected area. Within 60 days prior to the expiration of a formal determination, the property owner, an entity that has the power of eminent domain, or any other person who has a legal or equitable interest in the property may petition for a new formal determination for the same parcel of property and such determination shall be issued, approving the same extent of surface waters and wetlands in the previous formal determination, as long as physical conditions on the property have not changed, other than changes which have been authorized by a permit pursuant to this part, so as to alter the boundaries of surface waters or wetlands and the methodology for determining the extent of surface waters and wetlands authorized by subsection (1) has not been amended since the previous formal determination. The application fee for such a subsequent petition shall be less than the application fee for the original determination.

(3)　A formal determination is binding for a period not to exceed 5 years as long as physical conditions on the property do not change, other than changes which have been authorized by a permit pursuant to this part, so as to

alter the boundaries of surface waters or wetlands, as delineated in subsection (1).

(4)   The governing board or the department may revoke a formal determination if it finds that the petitioner has submitted inaccurate information to the district.

(5)   A formal determination obtained under this section is final agency action and is in lieu of a declaratory statement of jurisdiction obtainable under s. 120.565. Sections 120.569 and 120.57 apply to formal determinations under this section.

(6)   The district or the department may also issue nonbinding informal determinations or otherwise institute determinations on its own initiative as provided by law. A nonbinding informal determination of the extent of surface waters and wetlands issued by the South Florida Water Management District or the Southwest Florida Water Management District, between July 1, 1989, and the effective date of the methodology ratified in s. 373.4211, shall be validated by the district if a petition to validate the nonbinding informal determination is filed with the district on or before October 1, 1994, provided:

(a)   The petitioner submits the documentation prepared by the agency, and signed by an agency employee in the course of the employee's official duties, at the time the nonbinding informal determination was issued, showing the boundary of the surface waters or wetlands;

(b)   The request is accompanied by the appropriate fee in accordance with the fee schedule established by district rule;

(c)   Any supplemental information, such as aerial photographs and soils maps, is provided as necessary to ensure an accurate determination;

(d)   District staff verify the delineated surface water or wetland boundary through site inspection; and

(e)   Following district verification, and adjustment if necessary, of the boundary of surface waters or wetlands, the petitioner submits a survey certified pursuant to chapter 472, which depicts the surface water or wetland boundaries. The certified survey shall contain a legal description of, and the acreage contained within, the boundaries of the property for which the determination is sought. The boundaries must be witnessed to the property boundaries and must be capable of being mathematically reproduced from the survey.

Validated informal nonbinding determinations issued by the South Florida Water Management District and the Southwest Florida Water Management District shall remain valid for a period of 5 years from the date of validation by the district, as long as physical conditions on the property do not change so as to alter the boundaries of surface waters or wetlands. A validation obtained under this section is final agency action. Sections 120.569 and 120.57 apply to validations under this section.

(7)(a)   This subsection is intended to restore qualified developments to their pre-Henderson Wetland Protection Act status for contiguous wetlands. This provision will therefore streamline state wetland permitting without loss of wetland protection by other governmental entities.

(b)   Wetlands contiguous to surface waters of the state as defined in s. 403.031(13), Florida Statutes (1991), shall be delineated pursuant to the department's rules as such rules existed prior to January 24, 1984, while wetlands not contiguous to surface waters of the state as defined in s. 403.031(13), Florida Statutes (1991), shall be delineated pursuant to the applicable methodology ratified by s. 373.4211 for any development which obtains an individual permit from the United States Army Corps of Engineers under 33 U.S.C. s. 1344:

1.   Where a jurisdictional determination validated by the department pursuant to rule 17-301.400(8), Florida Administrative Code, as it existed in rule 17-4.022, Florida Administrative Code, on April 1, 1985, is revalidated pursuant to s. 373.414(13) and the affected lands are part of a project for which a vested rights determination has been issued pursuant to s. 380.06, or

2.   Where the lands affected were grandfathered pursuant to s. 403.913(6), Florida Statutes (1991), and proof of prior notification pursuant to s. 403.913(6), Florida Statutes (1991), is submitted to the department within 180 days of the publication of a notice by the department of the existence of this provision. Failure to timely submit the proof of prior notification to the department serves as a waiver of the benefits conferred by this subsection.

3.   This subsection shall not be applicable to lands:

a.    Within the geographical area to which an individual or general permit issued prior to June 1, 1994, under rules adopted pursuant to this part applies; or

b.    Within the geographical area to which a conceptual permit issued prior to June 1, 1994, under rules adopted pursuant to this part applies if wetland delineations were identified and approved by the conceptual permit as set forth in s. 373.414(12)(b)1. or 2.; or

c.    Where no development activity as defined in [1]s. 380.01(1) or (2)(a)-(d) and (f) has occurred within the project boundaries since October 1, 1986; or

d.    Of a project which is not in compliance with this part or the rules adopted pursuant to ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended.

4.    The wetland delineation methodology required in this subsection shall only apply within the geographical area of an individual permit issued by the United States Army Corps of Engineers under 33 U.S.C. s. 1344. The requirement to obtain such individual permit to secure the benefit of this subsection shall not apply to any activities exempt or not subject to regulation under 33 U.S.C. s. 1344.

5.    Notwithstanding subsection (1), the wetland delineation methodology required in this subsection and any wetland delineation pursuant thereto, shall only apply to agency action under this part and shall not be binding on local governments except in their implementation of this part.

History.—s. 7, ch. 91-288; s. 31, ch. 93-213; ss. 6, 18, ch. 94-122; s. 100, ch. 96-410; s. 10, ch. 98-88; s. 170, ch. 99-13; s. 41, ch. 2006-1; s. 5, ch. 2012-150.

[1]Note.—Section 380.01 was transferred to s. 381.492 by the reviser in 1969; it was further redesignated as s. 381.0605 by s. 52, ch. 91-297. Section 381.0605 was repealed by s. 54, ch. 2012-184.


### 373.4211    Ratification of chapter 17-340, Florida Administrative Code, on the delineation of the landward extent of wetlands and surface waters.—Pursuant to s. 373.421, the Legislature ratifies chapter 17-340, Florida Administrative Code, approved on January 13, 1994, by the Environmental Regulation Commission, with the following changes:

(1)    The last sentence of rule 17-340.100(1), Florida Administrative Code, is changed to read: "The methodology shall not be used to delineate areas which are not wetlands as defined in subsection 17-340.200(19), F.A.C., nor to delineate as wetlands or surface waters areas exempted from delineation by statute or agency rule."

(2)    The introductory paragraph of rule 17-340.300, Florida Administrative Code, is changed to read: "The landward extent (i.e., the boundary) of wetlands as defined in subsection 17-340.200(19), F.A.C., shall be determined by applying reasonable scientific judgment to evaluate the dominance of plant species, soils, and other hydrologic evidence of regular and periodic inundation and saturation as set forth below. In applying reasonable scientific judgment, all reliable information shall be evaluated in determining whether the area is a wetland as defined in subsection 17-340.200(19), F.A.C."

(3)    The introductory paragraph of rule 17-340.300(2), Florida Administrative Code, is changed to read: "The landward extent of a wetland as defined in subsection 17-340.200(19), F.A.C., shall include any of the following areas:"

(4)    Rule 17-340.300(2)(a), Florida Administrative Code, is changed to read:

"(a)    Those areas where the areal extent of obligate plants in the appropriate vegetative stratum is greater than the areal extent of all upland plants in that stratum, as identified using the method in section 17-340.400, F.A.C., and either:

"1.    The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

"2.    The substrate is nonsoil, rock outcrop-soil complex, or is located within an artificially created wetland area, or

"3.    One or more of the hydrologic indicators listed in section 17-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 17-340.200(19), F.A.C."

(5)   Rule 17-340.300(2)(b), Florida Administrative Code, is changed to read:

"(b)   Those areas where the areal extent of obligate or facultative wet plants, or combinations thereof, in the appropriate stratum is equal to or greater than 80 percent of all the plants in that stratum, excluding facultative plants, and either:

"1.   The substrate is comprised of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

"2.   The substrate is nonsoil, rock outcrop-soil complex, or is located within an artificially created wetland area; or

"3.   One or more of the hydrologic indicators listed in section 17-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 17-340.200(19), F.A.C."

(6)   Rule 17-340.300(2)(c), Florida Administrative Code, is deleted.

(7)   Rule 17-340.300(2)(d), Florida Administrative Code, is changed to read:

"(c)   Those areas, other than pine flatwoods and improved pastures, with undrained hydric soils which meet, in situ, at least one of the criteria listed below. A hydric soil is considered undrained unless reasonable scientific judgment indicates permanent artificial alterations to the onsite hydrology have resulted in conditions which would not support the formation of hydric soils.

"1.   Soil classified according to United States Department of Agriculture's Keys to Soil Taxonomy (4th ed. 1990) as Umbraqualfs, Sulfaquents, Hydraquents, Humaquepts, Histosols (except Folists), Argiaquolls, or Umbraquults.

"2.   Saline sands (salt flats-tidal flats).

"3.   Soil within a hydric mapping unit designated by the U.S.D.A.-S.C.S. as frequently flooded or depressional, when the hydric nature of the soil has been field verified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida. If a permit applicant, or a person petitioning for a formal determination pursuant to subsection 373.421(2), F.S., disputes the boundary of a frequently flooded or depressional mapping unit, the applicant or petitioner may request that the regulating agency, in cooperation with the U.S.D.A.-S.C.S., confirm the boundary. For the purposes of section 120.60, F.S., a request for a boundary confirmation pursuant to this subparagraph shall have the same effect as a timely request for additional information by the regulating agency. The regulating agency's receipt of the final response provided by the U.S.D.A.-S.C.S. to the request for boundary confirmation shall have the same effect as a receipt of timely requested additional information.

"4.   For the purposes of this paragraph only, 'pine flatwoods' means a plant community type in Florida occurring on flat terrain with soils which may experience a seasonable high water table near the surface. The canopy species consist of a monotypic or mixed forest of long leaf pine or slash pine. The subcanopy is typically sparse or absent. The ground cover is dominated by saw palmetto with areas of wire grass, gallberry, and other shrubs, grasses, and forbs, which are not obligate or facultative wet species. Pine flatwoods do not include those wetland communities as listed in the wetland definition contained in subsection 17-340.200(19) which may occur in the broader landscape setting of pine flatwoods and which may contain slash pine. Also for the purposes of this paragraph only, 'improved pasture' means areas where the dominant native plant community has been replaced with planted or natural recruitment of herbaceous species which are not obligate or facultative wet species and which have been actively maintained for livestock through mechanical means or grazing."

(8)   Rule 17-340.300(2)(e), Florida Administrative Code, is changed to read:

"(d)   Those areas where one or more of the hydrologic indicators listed in section 17-340.500, F.A.C., are present, and which have hydric soils, as identified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida, and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 17-340.200(19), F.A.C. These areas shall not extend beyond the seasonal high water elevation."

(9)   Rule 17-340.300(2)(f), Florida Administrative Code, is deleted.

(10)   Rule 17-340.300(3), Florida Administrative Code, is added to read:

"(3)(a)  If the vegetation or soils of an upland or wetland area have been altered by natural or human-induced factors such that the boundary between wetlands and uplands cannot be delineated reliably by use of the methodology in subsection 17-340.300(2), F.A.C., as determined by the regulating agency, and the area has hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance, then the most reliable available information shall be used with reasonable scientific judgment to determine where the methodology in subsection 17-340.300(2), F.A.C., would have delineated the boundary between wetlands and uplands. Reliable available information may include, but is not limited to, aerial photographs, remaining vegetation, authoritative site-specific documents, or topographical consistencies.

"(b)  This subsection shall not apply to any area where regional or site-specific permitted activities, or activities which did not require a permit, under sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., have altered the hydrology of the area to the extent that reasonable scientific judgment, or application of the provisions of section 17-340.550, F.A.C., indicate that under normal circumstances the area no longer inundates or saturates at a frequency and duration sufficient to meet the wetland definition in subsection 17-340.200(19), F.A.C.

"(c)  This subsection shall not be construed to limit the type of evidence which may be used to delineate the landward extent of a wetland under this chapter when an activity violating the regulatory requirements of sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., has disturbed the vegetation or soils of an area."

(11)  Rule 17-340.300(4), Florida Administrative Code, is created to read:

"17-340.300(4)  The regulating agency shall maintain sufficient soil scientists on staff to provide evaluation or consultation regarding soil determinations in applying the methodologies set forth in subsections 17-340.300(2) or (3), F.A.C. Services provided by the U.S.D.A.-S.C.S., or other competent soil scientists, under contract or agreement with the regulating agency, may be used in lieu of, or to augment, agency staff."

(12)  Rule 17-340.400, Florida Administrative Code, is changed to read:

"17-340.400  Selection of Appropriate Vegetative Stratum.

"Dominance of plant species, as described in paragraphs 17-340.300(2)(a) and 17-340.300(2)(b), shall be determined in a plant stratum (canopy, subcanopy, or ground cover). The top stratum shall be used to determine dominance unless the top stratum, exclusive of facultative plants, constitutes less than 10 percent areal extent, or unless reasonable scientific judgment establishes that the indicator status of the top stratum is not indicative of the hydrologic conditions on site. In such cases, the stratum most indicative of onsite hydrologic conditions, considering the seasonable variability in the amount and distribution of rainfall, shall be used. The evidence concerning the presence or absence of regular and periodic inundation or saturation shall be based on in situ data. All facts and factors relating to the presence or absence of regular and periodic inundation or saturation shall be weighed in deciding whether the evidence supports shifting to a lower stratum. The presence of obligate, facultative wet, or upland plants in a lower stratum does not by itself constitute sufficient evidence to shift strata, but can be considered along with other physical data in establishing the weight of evidence necessary to shift to a lower stratum. The burden of proof shall be with the party asserting that a stratum other than the top stratum should be used to determine dominance. Facultative plants shall not be considered for purposes of determining appropriate strata or dominance."

(13)  Rule 17-340.450(1), Florida Administrative Code, is changed by deletion of the following plant species: *Habenaria repens*, *Schoenus nigricans*, and *Ulmus americana*.

(14)  Rule 17-340.450(2), Florida Administrative Code, is changed by deletion of the following plant species: *Bucida buceras*, *Bumelialycioides*, *Conoclinium coelestinum*, *Coreopsis tripteris*, *Erithralis fruticosa*, *Eryngium baldwini*, *Eustachys petracea*, *Helianthus floridanus*, *Muhlenbergia expansa*, *Myrsine quianensis*, *Peperomia floridana*, *Scutellaria floridana*, *Scutellaria integrifolia*, *Stillingia sylvatica var. tenuis*, *Tripsacum dactyloides*,

*Verbesina virginica,* and *Wisteria frutescens, Aletris spp., Alopecurus carolinianus, Carphephorus odoratissimus, Carphephorus paniculata, Chasmanthium spp., Elytraria caroliniensis, Euthamia spp., Flaveria spp., Gratiola spp., Habenaria spp.* except *Habenaria repens* (OBL), *Hibiscus tiliaceus, Ilex opaca var. opaca, Lilium catesbaei, Metopium toxiferum, Morus rubra, Nephrolepis spp., Oplismenus setarius, Panicum tenue, Vaccinium elliotti, Fimbristylis spathacea, Guapira discolor, Jacquinia keyensis, Morinda royoc, Schizachyrium maritimum, Schizachyrium rhizomatum, Strumpfia maritima, Baccharis glomeruliflora, Lachnanthes caroliniana, Liatris spicata, Lyonia ligustrina, Michella repens, Sambucus conadensis, Sebastiana fruticosa,* and *Setaria geniculata.*

(15) Rule 17-340.450(2) is changed by adding the following species: *Chasmanthium spp.* except *Chasmanthium latifolum* (FAC) and *Chasmanthium sessiliflorum* (FAC), *Flaveria floridana, Flaveria linearis, Gratiola spp.* except *Gratiola hispida* (FAC), and *Habenaria spp., Schoenus nigricans,* and *Ulmus americana.*

(16) Rule 17-340.450(2) is amended by adding, after the species list, the following language:

"Within Monroe County and the Key Largo portion of Miami-Dade County only, the following species shall be listed as Facultative Wet: *Alternanthera maritima, Morinda royoc,* and *Strumpfia maritima.*"

(17) Rule 17-340.450(3) is changed by deleting the following species: *Bischofia javanica, Dioclea multiflora, Canella alba, Ernodea littoralis, Eugenia axillaris, Eugenia foeteda, Eugenia rhombea, Eugenia uniflora, Manilkara bahamensis, Musa spp., Pisonia rotundata, Psidium guajava, Randia aculeata,* and *Reynois septentrionalis, Terminalia catappa, Paspalum bifidum, Ligustrum spp.,* and *Urena lobata.*

(18) Rule 17-340.450(3) is changed by adding the following species: *Bucida buceras, Bumelia lycioides, Conoclinium coelestinum, Coreopsis tripteris, Erithralis fruticosa, Eryngium baldwini, Eustachys petracea, Helianthus floridanus, Muhlenbergia expansa, Myrsine quianensis, Scutellaria floridana, Scutellaria integrifolia, Stillingia sylvatica var. tenuis, Tripsacum dactyloides,* and *Verbesina virginica, Aletris spp., Alopecurus carolianianus, Carphephorus odoratissimus, Carphephorus paniculata, Chasmanthium latifolum, Chasmanthium sessiliflorum, Elytraria caroliniensis, Euthamia spp., Fimbristylis spathacea, Flaveria bidentis, Flaveria trinervia, Gratiola hispida, Heliotropium polyphyllum, Hibiscus tiliaceus, Ilex opaca var. opaca, Jacquinia keyensis, Lilium catesbaei, Metopium toxiferum, Morus rubra, Nephrolepis spp., Oplismenus setarius, Panicum tenue, Schizachyrium spp., Vaccinium elliotti, Baccharis glomeruliflora, Lachnanthes caroliniana, Liatrius spicata, Lyonia ligostrina, Sambucus canadensis, Sebastiana fruticosa,* and *Setaria geniculata.*

(19) Rule 17-340.450(3) is amended by adding, after the species list, the following language:

"Within Monroe County and the Key Largo portion of Miami-Dade County only, the following species shall be listed as facultative: *Alternanthera paronychioides, Byrsonima lucida, Ernodea littoralis, Guapira discolor, Marnilkara bahamensis, Pisonia rotundata, Pithecellobium keyensis, Pithecellobium unquis-cati, Randia aculeata, Reynosia septentrionalis,* and *Thrinax radiata.*"

(20) Rule 17-340.500, Florida Administrative Code, is changed to read: "The indicators below may be used as evidence of inundation or saturation when used as provided in section 17-340.300, F.A.C. Several of the indicators reflect a specific water elevation. These specific water elevation indicators are intended to be evaluated with meteorological information, surrounding topography, and reliable hydrologic data or analyses when provided, to ensure that such indicators reflect inundation or saturation of a frequency and duration sufficient to meet the wetland definition in subsection 17-340.200(19), F.A.C., and not rare or aberrant events. These specific water elevation indicators are not intended to be extended from the site of the indicator into surrounding areas when reasonable scientific judgment indicates that the surrounding areas are not wetlands as defined in subsection 17-340.200(19), F.A.C.

"(1) Algal mats. The presence or remains of nonvascular plant material which develops during periods of inundation and persists after the surface water has receded.

"(2) Aquatic mosses or liverworts on trees or substrates. The presence of those species of mosses or liverworts tolerant of or dependent on surface water inundation.

"(3) Aquatic plants. Defined in subsection 17-340.200(1), F.A.C.

"(4) Aufwuchs. The presence or remains of the assemblage of sessile, attached, or free-living, nonvascular plants and invertebrate animals (including protozoans) which develop a community on inundated surfaces.

"(5)   Drift lines and rafted debris. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 17-340.200(19), F.A.C.

"(6)   Elevated lichen lines. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

"(7)   Evidence of aquatic fauna. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

"(8)   Hydrologic data. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in Soil and Water Relationships of Florida's Ecological Communities (Florida Soil Conservation Staff 1992).

"(9)   Morphological plant adaptations. Specialized structures or tissues produced by certain plants in response to inundation or saturation, which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

"(10)   Secondary flow channels. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

"(11)   Sediment deposition. Mineral or organic matter deposited in or shifted to positions indicating water transport.

"(12)   Vegetated tussocks or hummocks. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

"(13)   Water marks. A distinct line created on fixed objects, including vegetation, by a sustained water elevation."

(21)   Rule 17-340.600(2)(e), Florida Administrative Code, is changed to read:

"(e)   the seasonal high-water line for artificial lakes, borrow pits, canals, ditches, and other artificial water bodies with side slopes flatter than 1 foot vertical to 4 feet horizontal along with any artificial water body created by diking or impoundment above the ground."

(22)   The first sentence of subsection (1) and paragraphs (1)(a) and (b) of rule 17-340.700, Florida Administrative Code, are changed to read:

"(1)   Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to section 373.414, F.S. (1991):

"(a)   Works, impoundments, reservoirs, and other watercourses constructed and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under sections 17-28.700, 17-302.520, F.A.C., Chapters 17-17, 17-600, 17-610, 17-640, 17-650, 17-660, 17-670, 17-671, 17-673, 17-701, F.A.C., or section 403.0885, F.S., or rules implementing section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 17-611, F.A.C., or section 403.0885, F.S., or its implementing rules;

"(b)   Works, impoundments, reservoirs, and other watercourses constructed solely for wastewater treatment or disposal before a construction permit was required under Chapter 403, F.S., and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under sections 17-28.700, 17-302.520, F.A.C., Chapters 17-17, 17-600, 17-610, 17-640, 17-650, 17-660, 17-670, 17-671, 17-673, 17-701, F.A.C., or section

403.0885, F.S., or rules implementing section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 17-611, F.A.C., or section 403.0885, F.S., or its implementing rules;"

(23) The first sentence of rule 17-340.700(2), Florida Administrative Code, is changed to read:

"(2) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1), 373.414(2)(a), 373.414(8), and 373.414(10), F.S.; and subsections 373.414(3) through 373.414(6), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to section 373.414, F.S. (1991), except for authority to protect threatened and endangered species in isolated wetlands:"

(24) Rule 17-340.700(7), Florida Administrative Code, is changed to read:

"(7) As used in this subsection, 'solely for' means the reason for which a work, impoundment, reservoir, or other watercourse is constructed and operated; and such construction and operation would not have occurred but for the purposes identified in subsection 17-340.700(1) or subsection 17-340.700(2), F.A.C. Furthermore, the phrase does not refer to a work, impoundment, reservoir, or other watercourse constructed or operated for multiple purposes. Incidental uses, such as occasional recreational uses, will not render the exemption inapplicable, so long as the incidental uses are not part of the original planned purpose of the work, impoundment, reservoir, or other watercourse. However, for those works, impoundments, reservoirs, or other watercourses described in paragraphs 17-340.700(1)(c) and 17-340.700(2)(a), F.A.C., use of the system for flood attenuation, whether originally planned or unplanned, shall be considered an incidental use, so long as the works, impoundments, reservoirs, and other watercourses are no more than 2 acres larger than the minimum area required to comply with the stormwater treatment requirements of the district or department. For the purposes of this subsection, reuse from a work, impoundment, reservoir, or other watercourse is part of treatment or disposal."

(25) The first sentence of rule 17-340.750, Florida Administrative Code, is changed to read:

"17-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

"Construction, alteration, operation, maintenance, removal, and abandonment of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works, in, on, or over lands that have become surface waters or wetlands solely because of mosquito control activities undertaken as part of a governmental mosquito control program, and which lands were neither surface waters nor wetlands before such activities, shall be exempt from the rules adopted by the department and water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority granted pursuant to section 373.414, F.S. (1991):"

(26) Any future amendments to chapter 17-340, Florida Administrative Code, shall be submitted in bill form to the Speaker of the House of Representatives and to the President of the Senate for their consideration and referral to the appropriate committees. Such chapter amendments shall become effective only upon approval by act of the Legislature.

History.—s. 1, ch. 94-122; s. 101, ch. 96-410; s. 46, ch. 97-96; s. 85, ch. 2008-4.

**373.422  Applications for activities on state sovereignty lands or other state lands.**—If sovereignty lands or other lands owned by the state are the subject of a proposed activity, the issuance of a permit by the department or a water management district must be conditioned upon the receipt by the applicant of all necessary approvals and authorizations under chapters 253 and 258 before the undertaking of the activity. The department or a water management district must issue its permit conditioned upon the securing of the necessary consent or approvals by the applicant. Once the department has adopted rules under s. 373.427 for concurrent review of applications for permits under this part and proprietary authorizations under chapters 253 and 258 to use submerged lands, the permitting conditions required under this section cease to apply to those applications. If the approval or authorization of the board is required, the applicant may not commence any excavation, construction, or other activity until the approval or authorization has been issued.

History.—s. 32, ch. 93-213; s. 503, ch. 94-356.

**373.423  Inspection.—**

(1)  During the construction or alteration of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works, the governing board or department pursuant to s. 403.091 shall make at its expense such periodic inspections as it deems necessary to ensure conformity with the approved plans and specifications included in the permit.

(2)  If during construction or alteration the governing board or department finds that the work is not being done in accordance with the approved plans and specifications as indicated in the permit, it shall give the permittee written notice stating with which particulars of the approved plans and specifications the construction is not in compliance and shall order immediate compliance with such plans and specifications. The failure to act in accordance with the orders of the governing board or department after receipt of written notice shall result in the initiation of revocation proceedings in accordance with s. 373.429.

(3)  Upon completion of the work, the executive director of the district or the Department of Environmental Protection or its successor agency shall have periodic inspections made of permitted stormwater management systems, dams, reservoirs, impoundments, appurtenant work, or works to protect the public health and safety and the natural resources of the state. No person shall refuse immediate entry or access to any authorized representative of the governing board or the department who requests entry for purposes of such inspection and presents appropriate credentials.

History.—s. 7, part IV, ch. 72-299; s. 21, ch. 73-190; s. 48, ch. 79-65; s. 13, ch. 84-341; s. 17, ch. 89-279; s. 269, ch. 94-356.

**373.426  Abandonment.—**

(1)  Any owner of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works wishing to abandon or remove such work may first be required by the governing board or the department to obtain a permit to do so and may be required to meet such reasonable conditions as are necessary to assure that such abandonment will not be inconsistent with the overall objectives of the district.

(2)  Where any permitted stormwater management system, dam, impoundment, reservoir, appurtenant work, or works is not owned nor directly controlled by the state or any of its agencies and is not used nor maintained under the authority of the owner for a period of 3 years, it shall be presumed that the owner has abandoned such stormwater management system, dam, impoundment, reservoir, appurtenant work, or works, and has dedicated the same to the district for the use of the people of the district.

(3)  The title of the district to any such stormwater management system, dam, impoundment, reservoir, appurtenant work, or works may be established and determined in the court appointed by statute to determine the title to real estate.

History.—s. 8, part IV, ch. 72-299; s. 22, ch. 73-190; s. 18, ch. 89-279.

**373.427  Concurrent permit review.—**

(1)  The department, in consultation with the water management districts, may adopt procedural rules requiring concurrent application submittal and establishing a concurrent review procedure for any activity regulated under this part that also requires any authorization, permit, waiver, variance, or approval described in paragraphs (a)-(d). The rules must address concurrent review of applications under this part and any one or more of the authorizations, permits, waivers, variances, and approvals described in paragraphs (a)-(d). Applicants that propose such activities must submit, as part of the permit application under this part, all information necessary to satisfy the requirements for:

(a)  Proprietary authorization under chapter 253 or chapter 258 to use submerged lands owned by the board of trustees;

(b)  Coastal construction permits under s. 161.041;

(c)  Coastal construction control line permits under s. 161.053; and

(d)  Waiver or variance of the setback requirements under s. 161.052.

The rules adopted under this section may also require submittal of such information as is necessary to determine whether the proposed activity will occur on submerged lands owned by the board of trustees. Notwithstanding s.

120.60, an application under this part is not complete and the timeframes for license approval or denial shall not commence until all information required by rules adopted under this section is received. For applications concurrently reviewed under this section, the agency that conducts the concurrent application review shall issue a notice of consolidated intent to grant or deny the applicable authorizations, permits, waivers, variances, and approvals. The issuance of the notice of consolidated intent to grant or deny is deemed in compliance with s. 120.60 timeframes for license approval or denial on the concurrently processed applications for any required permit, waiver, variance, or approval under this chapter or chapter 161. Failure to satisfy these timeframes shall not result in approval by default of the application to use board of trustees-owned submerged lands. If an administrative proceeding pursuant to ss. 120.569 and 120.57 is timely requested, the case shall be conducted as a single consolidated administrative proceeding on all such concurrently processed applications. Once the rules adopted pursuant to this section become effective, they shall establish the concurrent review procedure for applications submitted to both the department and the water management districts, including those applications for categories of activities requiring authorization to use board of trustees-owned submerged lands for which the board of trustees has not delegated authority to take final agency action without action by the board of trustees.

(2)   In addition to the provisions set forth in subsection (1) and notwithstanding s. 120.60, the procedures established in this subsection shall apply to concurrently reviewed applications which request proprietary authorization to use board of trustees-owned submerged lands for activities for which there has been no delegation of authority to take final agency action without action by the board of trustees.

(a)   Unless waived by the applicant, within 90 days of receipt of a complete application, the department or water management district shall issue a recommended consolidated intent to grant or deny on all of the concurrently reviewed applications, and shall submit the recommended consolidated intent to the board of trustees for its consideration of the application to use board of trustees-owned submerged lands. The recommended consolidated intent shall not constitute a point of entry to request a hearing pursuant to ss. 120.569 and 120.57. Unless waived by the applicant, the board of trustees shall consider the board of trustees-owned submerged lands portion of the recommended consolidated intent at its next regularly scheduled meeting for which notice may be properly given, and the board of trustees shall determine whether the application to use board of trustees-owned submerged lands should be granted, granted with modifications, or denied. The board of trustees shall then direct the department or water management district to issue a notice of intent to grant or deny the application to use board of trustees-owned submerged lands. Unless waived by the applicant, within 14 days following the action by the board of trustees, the department or water management district shall issue a notice of consolidated intent to grant or deny on the application to use board of trustees-owned submerged lands, in accordance with the directions of the board of trustees, together with all of the concurrently reviewed applications.

(b)   The timely issuance of a recommended consolidated intent to grant or deny as set forth in paragraph (a) is deemed in compliance with s. 120.60 timeframes for license approval or denial on the concurrently processed applications for any required permit, waiver, variance, or approval under this chapter or chapter 161. Failure to satisfy these timeframes shall not result in approval by default of the application to use board of trustees-owned submerged lands.

(c)   Any petition for an administrative hearing pursuant to ss. 120.569 and 120.57 must be filed within 14 days of the notice of consolidated intent to grant or deny. Unless waived by the applicant, within 60 days after the recommended order is submitted, or at the next regularly scheduled meeting for which notice may be properly given, whichever is latest, the board of trustees shall determine what action to take on any recommended order issued under ss. 120.569 and 120.57 on the application to use board of trustees-owned submerged lands, and shall direct the department or water management district on what action to take in the final order concerning the application to use board of trustees-owned submerged lands. The department or water management district shall determine what action to take on any recommended order issued under ss. 120.569 and 120.57 regarding any concurrently processed permits, waivers, variances, or approvals required by this chapter or chapter 161. The department or water management district shall then take final agency action by entering a consolidated final order addressing each of the concurrently reviewed authorizations, permits, waivers, or approvals. Failure to satisfy

these timeframes shall not result in approval by default of the application to use board of trustees-owned submerged lands. Any provisions relating to authorization to use board of trustees-owned submerged lands shall be as directed by the board of trustees. Issuance of the consolidated final order within 45 days after receipt of the direction of the board of trustees regarding the application to use board of trustees-owned submerged lands is deemed in compliance with the timeframes for issuance of final orders under s. 120.60. The final order shall be subject to the provisions of s. 373.4275.

(3)  After the effective date of rules adopted under this section, neither the department nor a water management district may issue a permit under this part unless the requirements for issuance of any additional required authorizations, permits, waivers, variances, and approvals set forth in this section which are subject to concurrent review are also satisfied.

(4)  When both an environmental resource permit or dredge and fill permit and a waiver, or variance set forth in paragraphs (1)(b)-(d) are granted in a consolidated order, these permits shall be consolidated into a single permit to be known as a joint coastal permit.

(5)  Any application fee required under s. 373.109 for a permit under this part is in addition to any fees required for any of the concurrently reviewed applications for authorizations, permits, waivers, variances, or approvals set forth in subsection (1) or subsection (2). The application fees must be allocated, deposited, and used as provided in s. 373.109.

(6)  Whenever a concurrently processed application includes an application to use board of trustees-owned submerged lands, any noticing requirements of s. 253.115 shall be met, in addition to those in s. 373.413.

(7)  When a water management district acts pursuant to a delegation under s. 253.002, any person instituting an administrative or judicial proceeding regarding such action shall serve a copy of the petition or complaint on the board of trustees. The department or the Department of Legal Affairs, acting on behalf of the board of trustees, may intervene in any such proceeding.

History.—s. 501, ch. 94-356; s. 102, ch. 96-410.

### 373.4271    Conduct of challenge to consolidated environmental resource permit or associated variance or sovereign submerged lands authorization issued in connection with deepwater ports.—Notwithstanding s. 120.569, s. 120.57, or s. 373.427, or any other provision of law to the contrary, a challenge to a consolidated environmental resource permit or any associated variance or any sovereign submerged lands authorization proposed or issued by the Department of Environmental Protection in connection with the state's deepwater ports, as listed in s. 403.021(9), shall be conducted pursuant to the summary hearing provisions of s. 120.574; however, the summary proceeding shall be conducted within 30 days after a party files a motion for a summary hearing, regardless of whether the parties agree to the summary proceeding, and the administrative law judge's decision shall be in the form of a recommended order and does not constitute final agency action of the department. The Department of Environmental Protection shall issue the final order within 45 working days after receipt of the administrative law judge's recommended order. The summary hearing provisions of this section apply to pending administrative proceedings; however, s. 120.574(1)(b) and (d) and (2)(a)3. and 5. do not apply to pending administrative proceedings. This section shall take effect upon this act becoming a law.

History.—s. 42, ch. 2012-128; s. 80, ch. 2012-174.

### 373.4275    Review of consolidated orders.—

(1)  Beginning on the effective date of the rules adopted under s. 373.427(1), review of any consolidated order rendered pursuant to s. 373.427(1) shall be governed by the provisions of s. 373.114(1). However, the term "party" shall mean any person who participated as a party in a proceeding under ss. 120.569 and 120.57 on the concurrently reviewed authorizations, permits, waivers, variances, or approvals, or any affected person who submitted to the department, water management district, or board of trustees oral or written testimony, sworn or unsworn, of a substantive nature which stated with particularity objections to or support for the authorization, permit, waiver, variance, or approval, provided that such testimony was cognizable within the scope of this chapter or the applicable provisions of chapter 161, chapter 253, or chapter 258 when the consolidated notice of intent includes an authorization, permit, waiver, variance, or approval under those chapters. In such cases, the

standard of review shall also ensure consistency with the applicable provisions and purposes of chapter 161, chapter 253, or chapter 258 when the consolidated order includes an authorization, permit, waiver, variance, or approval under those chapters. If the consolidated order subject to review includes approval or denial of proprietary authorization to use submerged lands on which the board of trustees has previously acted, as described in s. 373.427(2), the scope of review under this section shall not encompass such proprietary decision, but the standard of review shall also ensure consistency with the applicable provisions and purposes of chapter 161 when the consolidated order includes a permit, waiver, or approval under that chapter.

(a)   The final order issued under this section shall contain separate findings of fact and conclusions of law, and a ruling that individually addresses each authorization, permit, waiver, variance, and approval that was the subject of the review.

(b)   If a consolidated order includes proprietary authorization under chapter 253 or chapter 258 to use submerged lands owned by the Board of Trustees of the Internal Improvement Trust Fund for an activity for which the authority has been delegated to take final agency action without action of the board of trustees, the following additional provisions and exceptions to s. 373.114(1) apply:

1.   The Governor and Cabinet shall sit concurrently as the Land and Water Adjudicatory Commission and the Board of Trustees of the Internal Improvement Trust Fund in exercising the exclusive authority to review the order;

2.   The review may also be initiated by the Governor or any member of the Cabinet within 20 days after the rendering of the order in which case the other provisions of s. 373.114(1)(a) regarding acceptance of a request for review do not apply; and

3.   If the Governor and Cabinet find that an authorization to use submerged lands is not consistent with chapter 253 or chapter 258, any authorization, permit, waiver, or approval authorized or granted by the consolidated order must be rescinded or modified or the proceeding must be remanded for further action consistent with the order issued under this section.

(2)   Subject to the provisions of subsection (3), appellate review of that part of a consolidated order granting or denying authorization to use board of trustees-owned submerged lands on which the board of trustees has previously acted, as described in s. 373.427(2), shall be only pursuant to s. 120.68.

(3)   As with an appeal under s. 373.114, the proper initiation of discretionary review under this section tolls the time for seeking judicial review under s. 120.68.

History.—s. 502, ch. 94-356; s. 103, ch. 96-410.

373.428   Federal consistency.—When an activity regulated under this part is subject to federal consistency review under s. 380.23, the final agency action on a permit application submitted under this part shall constitute the state's determination as to whether the activity is consistent with the federally approved Florida Coastal Management Program. Agencies with authority to review and comment on such activity pursuant to the Florida Coastal Management Program shall review such activity for consistency with only those statutes and rules incorporated into the Florida Coastal Management Program and implemented by that agency. An agency which submits a determination of inconsistency to the permitting agency shall be an indispensable party to any administrative or judicial proceeding in which such determination is an issue; shall be responsible for defending its determination in such proceedings; and shall be liable for any damages, costs, and attorneys' fees should any be awarded in an appropriate action as a consequence of such determination.

History.—s. 6, ch. 96-370.

373.429   Revocation and modification of permits.—The governing board or the department may revoke or modify a permit at any time if it determines that a stormwater management system, dam, impoundment, reservoir, appurtenant work, or works has become a danger to the public health or safety or if its operation has become inconsistent with the objectives of the district. The affected party may file a written petition for hearing no later than 14 days after notice of revocation or modification is served. If the executive director of the district or the division determines that the danger to the public is imminent, he or she may order a temporary suspension of the construction, alteration, or operation of the works until the hearing is concluded, or may take such action as authorized under s. 373.439.

**History.**—s. 9, part IV, ch. 72-299; s. 14, ch. 78-95; s. 19, ch. 89-279; s. 607, ch. 95-148.

### 373.430    Prohibitions, violation, penalty, intent.—

(1)    It shall be a violation of this part, and it shall be prohibited for any person:

(a)    To cause pollution, as defined in s. 403.031(7), except as otherwise provided in this part, so as to harm or injure human health or welfare, animal, plant, or aquatic life or property.

(b)    To fail to obtain any permit required by this part or by rule or regulation adopted pursuant thereto, or to violate or fail to comply with any rule, regulation, order, or permit adopted or issued by a water management district, the department, or local government pursuant to their lawful authority under this part.

(c)    To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this part, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this part or by any permit, rule, regulation, or order issued under this part.

(2)    Whoever commits a violation specified in subsection (1) is liable for any damage caused and for civil penalties as provided in s. 373.129.

(3)    Any person who willfully commits a violation specified in paragraph (1)(a) is guilty of a felony of the third degree, punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g), by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation occurs constitutes a separate offense.

(4)    Any person who commits a violation specified in paragraph (1)(a) due to reckless indifference or gross careless disregard is guilty of a misdemeanor of the second degree, punishable as provided in ss. 775.082(4)(b) and 775.083(1)(g), by a fine of not more than $5,000 or 60 days in jail, or by both, for each offense.

(5)    Any person who willfully commits a violation specified in paragraph (1)(b) or paragraph (1)(c) is guilty of a misdemeanor of the first degree, punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g), by a fine of not more than $10,000 or by 6 months in jail, or by both, for each offense.

(6)    It is the intent of the Legislature that the civil penalties imposed by the court be of such amount as to ensure immediate and continued compliance with this section.

(7)    All moneys recovered under the provisions of this section shall be allocated to the use of the water management district, the department, or the local government, whichever undertook and maintained the enforcement action. All monetary penalties and damages recovered by the department or the state under the provisions of this section shall be deposited into the Water Quality Assurance Trust Fund. All monetary penalties and damages recovered pursuant to this section by a water management district shall be retained and used exclusively within the territory of the water management district which collected the money. All monetary penalties and damages recovered pursuant to this subsection by a local government to which authority has been delegated pursuant to s. 373.103(8) shall be used to enhance surface water improvement or pollution control activities.

**History.**—s. 33, ch. 93-213; s. 40, ch. 96-321; s. 5, ch. 2014-220; s. 39, ch. 2015-229.

### 373.433    Abatement.—

Any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works which violates the laws of this state or which violates the standards of the governing board or the department shall be declared a public nuisance. The operation of such stormwater management system, dam, impoundment, reservoir, appurtenant work, or works may be enjoined by suit by the state or any of its agencies or by a private citizen. The governing board or the department shall be a necessary party to any such suit. Nothing herein shall be construed to conflict with the provisions of s. 373.429.

**History.**—s. 10, part IV, ch. 72-299; s. 20, ch. 89-279.

### 373.436    Remedial measures.—

(1)    Upon completion of any inspection provided for by s. 373.423(3), the executive director or the department shall determine what alterations or repairs are necessary and order that such alterations and repairs shall be made within a time certain, which shall be a reasonable time. The owner of such stormwater management system, dam,

impoundment, reservoir, appurtenant work, or works may file a written petition for hearing before the governing board or the department no later than 14 days after such order is served. If, after such order becomes final, the owner shall fail to make the specified alterations or repairs, the governing board or the department may, in its discretion, cause such alterations or repairs to be made.

(2) Any cost to the district or the department of alterations or repairs made by it under the provisions of subsection (1) shall be a lien against the property of the landowner on whose lands the alterations or repairs are made until the governing board or department is reimbursed, with reasonable interest and attorney's fees, for its costs.

History.—s. 11, part IV, ch. 72-299; s. 14, ch. 78-95; s. 21, ch. 89-279.

### 373.439    Emergency measures.—

(1) The executive director, with the concurrence of the governing board, or the department shall immediately employ any remedial means to protect life and property if either:

(a) The condition of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works is so dangerous to the safety of life or property as not to permit time for the issuance and enforcement of an order relative to maintenance or operation.

(b) Passing or imminent floods threaten the safety of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works.

(2) In applying the emergency measures provided for in this section, the executive director or the Department of Environmental Protection may in an emergency do any of the following:

(a) Lower the water level by releasing water from any impoundment or reservoir.

(b) Completely empty the impoundment or reservoir.

(c) Take such other steps as may be essential to safeguard life and property.

(3) The executive director or the Department of Environmental Protection shall continue in full charge and control of such stormwater management system, dam, impoundment, reservoir, and its appurtenant works until they are rendered safe or the emergency occasioning the action has ceased.

History.—s. 12, part IV, ch. 72-299; s. 49, ch. 79-65; s. 22, ch. 89-279; s. 270, ch. 94-356.

### 373.441    Role of counties, municipalities, and local pollution control programs in permit processing; delegation.—

(1) The department shall, by December 1, 1994, adopt rules to guide the participation of counties, municipalities, and local pollution control programs in an efficient, streamlined permitting system. Such rules must seek to increase governmental efficiency, maintain environmental standards, and include consideration of:

(a) Provisions under which the environmental resource permit program is delegated, upon approval of the department, only to a county, municipality, or local pollution control program that has the financial, technical, and administrative capabilities and desire to implement and enforce the program;

(b) Provisions under which a locally delegated permit program may have stricter environmental standards than state standards;

(c) Provisions for identifying and reconciling any duplicative permitting by January 1, 1995;

(d) Provisions for timely and cost-efficient notification by the reviewing agency of permit applications, and permit requirements, to counties, municipalities, local pollution control programs, the department, or water management districts, as appropriate;

(e) Provisions for ensuring the consistency of permit applications with local comprehensive plans;

(f) Provisions for the partial delegation of the environmental resource permit program to counties, municipalities, or local pollution control programs, and standards and criteria to be employed in the implementation of such delegation by counties, municipalities, and local pollution control programs;

(g) Special provisions under which the environmental resource permit program may be delegated to counties having populations of 75,000 or fewer, or municipalities with, or local pollution control programs serving, populations of 50,000 or fewer;

(h)    Provisions for the applicability of chapter 120 to local government programs when the environmental resource permit program is delegated to counties, municipalities, or local pollution control programs; and

(i)    Provisions for a local government to petition the Governor and Cabinet for review of a request for a delegation of authority that is not approved or denied within 1 year after being initiated.

(2)    Any denial by the department of a local government's request for a delegation of authority must provide specific detail of those statutory or rule provisions that were not satisfied. Such detail shall also include specific actions that can be taken in order to allow for the delegation of authority. A local government, upon being denied a request for a delegation of authority, may petition the Governor and Cabinet for a review of the request. The Governor and Cabinet may reverse the decision of the department and may provide any necessary conditions to allow the delegation of authority to occur.

(3)    Delegation of authority shall be approved if the local government meets the requirements set forth in rule 62-344, Florida Administrative Code. This section does not require a local government to seek delegation of the environmental resource permit program.

(4)    This section does not affect or modify land development regulations adopted by a local government to implement its comprehensive plan pursuant to chapter 163.

(5)    The department shall review environmental resource permit applications for electrical distribution and transmission lines and other facilities related to the production, transmission, and distribution of electricity which are not certified under ss. 403.52-403.5365, the Florida Electric Transmission Line Siting Act, regulated under this part.

History.—s. 34, ch. 93-213; s. 17, ch. 94-122; s. 33, ch. 95-146; s. 13, ch. 98-258; s. 67, ch. 2006-230; s. 41, ch. 2010-147.

373.4415    **Role of Miami-Dade County in processing permits for limerock mining in Miami-Dade County Lake Belt.**—The department and Miami-Dade County shall cooperate to establish and fulfill reasonable requirements for the departmental delegation to the Miami-Dade County Department of Environmental Resource Management of authority to implement the permitting program under ss. 373.403-373.439 for limerock mining activities within the geographic area of the Miami-Dade County Lake Belt which was recommended for mining in the report submitted to the Legislature in February 1997 under s. 373.4149. The delegation of authority must be consistent with s. 373.441 and chapter 62-344, Florida Administrative Code. To further streamline permitting within the Miami-Dade County Lake Belt, the department and Miami-Dade County are encouraged to work with the United States Army Corps of Engineers to establish a general permit under s. 404 of the Clean Water Act for limerock mining activities within the geographic area of the Miami-Dade County Lake Belt consistent with the report submitted in February 1997. Miami-Dade County is further encouraged to seek delegation from the United States Army Corps of Engineers for the implementation of any such general permit. This section does not limit the authority of the department to delegate other responsibilities to Miami-Dade County under this part.

History.—s. 3, ch. 97-222; s. 3, ch. 99-298; s. 4, ch. 2001-172.

373.443    **Immunity from liability.**—No action shall be brought against the state or district, or any agents or employees of the state or district, for the recovery of damages caused by the partial or total failure of any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works upon the ground that the state or district is liable by virtue of any of the following:

(1)    Approval of the permit for construction or alteration.

(2)    The issuance or enforcement of any order relative to maintenance or operation.

(3)    Control or regulation of stormwater management systems, dams, impoundments, reservoirs, appurtenant work, or works regulated under this chapter.

(4)    Measures taken to protect against failure during emergency.

History.—s. 13, part IV, ch. 72-299; s. 23, ch. 89-279.

373.451    **Short title; legislative findings and intent.**—

(1)    Sections 373.451-373.4595 may be cited as the "Surface Water Improvement and Management Act."

Case 1:21-cv-00119-RDM    Document 54-3    Filed 06/22/21    Page 475 of 583

(2)   Legislative intent.—The Legislature finds that the water quality of many of the surface waters of the state has been degraded, or is in danger of becoming degraded, and that the natural systems associated with many surface waters have been altered so that these surface waters no longer perform the important functions that they once performed. These functions include:

(a)   Providing aesthetic and recreational pleasure for the people of the state;

(b)   Providing habitat for native plants, fish, and wildlife, including endangered and threatened species;

(c)   Providing safe drinking water to the growing population of the state; and

(d)   Attracting visitors and accruing other economic benefits.

(3)   The Legislature finds that the declining quality of the state's surface waters has been detrimental to the public's right to enjoy these surface waters and that it is the duty of the state, through the state's agencies and subdivisions, to enhance the environmental and scenic value of surface waters.

(4)   The Legislature finds that factors contributing to the decline in the ecological, aesthetic, recreational, and economic value of the state's surface waters include:

(a)   Point and nonpoint source pollution; and

(b)   Destruction of the natural systems which purify surface waters and provide habitats.

(5)   The Legislature finds that many surface water problems can be and have been corrected and prevented through plans and programs for surface water improvement and management that are developed and implemented by the water management districts, the department, and local governments.

(6)   It is therefore the intent of the Legislature that each water management district develop plans and programs for the improvement and management of surface waters within its boundaries.

(7)   It is also the intent of the Legislature that the department, the water management districts, and others conduct research to provide a better scientific understanding of the causes and effects of surface water pollution and of the destruction of natural systems in order to improve and manage surface waters and associated natural systems.

History.—s. 1, ch. 87-97; s. 24, ch. 89-279; s. 41, ch. 96-321; s. 4, ch. 2003-265.

**373.453   Surface water improvement and management plans and programs.**—

(1)(a)   Each water management district, in cooperation with the department, the Department of Agriculture and Consumer Services, the Department of Economic Opportunity, the Fish and Wildlife Conservation Commission, local governments, and others, shall maintain a list that prioritizes water bodies of regional or statewide significance within the water management district. The list shall be reviewed and updated every 5 years.

(b)   Criteria to be used in developing the lists shall include, but not be limited to, consideration of violations of water quality standards occurring in the water body, the amounts of nutrients entering the water body and the water body's trophic state, water bodies on the department's list of impaired waters, water bodies with established total maximum daily loads, the existence of or need for a continuous aquatic weed control program in the water body, the biological condition of the water body, reduced fish and wildlife values, threats to agricultural and urban water supplies, threats to public recreational opportunities, the management of the water body through federal, state, or local water quality programs or plans, and public input.

(c)   In maintaining their respective priority water body lists, water management districts shall give consideration to the following priority areas:

1.   The South Florida Water Management District shall give priority to the restoration needs of Lake Okeechobee, Biscayne Bay, the Lake Worth Lagoon, and the Indian River Lagoon system and their tributaries.

2.   The Southwest Florida Water Management District shall give priority to the restoration needs of Tampa Bay and its tributaries.

3.   The St. Johns River Water Management District shall give priority to the restoration needs of Lake Apopka, the Lower St. Johns River, and the Indian River Lagoon system and their tributaries.

(2)   Unless otherwise provided by law, the water management districts, in cooperation with state agencies, local governments, and others, may develop surface water improvement and management plans and programs for

the water bodies identified on the priority lists. Plans developed pursuant to this subsection shall include, but not be limited to:

(a) A description of the water body system, its historical and current uses, its hydrology, and the conditions that have led to the need for restoration or protection;

(b) An identification of all governmental units that have jurisdiction over the water body and its drainage basin within the approved surface water improvement and management plan area, including local, regional, state, and federal units;

(c) A description of land uses within the drainage basin of the priority water body and those of important tributaries;

(d) Identification of point and nonpoint sources of water pollution that are discharged into the water body and its important tributaries;

(e) A description of strategies and a schedule for related management actions for restoring or protecting the water body to Class III or better, including those needed to help achieve state-adopted total maximum daily loads for the water body;

(f) A description of the management actions needed to maintain the water body once it has been restored and to prevent future degradation; and

(g) An estimate of the funding needed to carry out the restoration or protection strategies and a listing of available and potential funding sources and amounts.

(3) The governing board of the appropriate water management district shall hold at least one public hearing and public workshop in the vicinity of a priority water body for which a plan is being developed to obtain public input prior to finalizing the surface water improvement and management plan for the water body. The water management district shall then forward a copy of the plan to the department, the Fish and Wildlife Conservation Commission, the Department of Agriculture and Consumer Services, and appropriate local governmental units for their review and comment within 45 calendar days after the date the plan is forwarded to them. The department shall specifically comment on the likelihood that implementing the plan will significantly improve or protect water quality and associated natural systems. At the end of the 45-day review period, the water management district may proceed to approve the plan, whether or not comments have been submitted.

(4) Plans shall be updated as necessary to ensure that they effectively address the restoration and protection needs of the priority water bodies and that they reflect current scientific understandings and budgetary adjustments. If a district determines that modifications of or additions to a plan are necessary, such modifications or additions shall be subject to the review process established in this section.

(5) The governing board of each water management district is encouraged to appoint advisory committees as necessary to assist in formulating and evaluating strategies for water body protection and restoration activities and to increase public awareness and intergovernmental cooperation. Such committees should include representatives of appropriate local governments, state and federal agencies, existing advisory councils for the priority water body, and representatives of the public who use the water body.

(6) The water management districts may contract with appropriate state, local, and regional agencies and others to perform various tasks associated with the development and implementation of surface water improvement and management plans and programs.

History.—s. 2, ch. 87-97; s. 25, ch. 89-279; s. 271, ch. 94-356; s. 187, ch. 99-245; s. 5, ch. 2003-265; s. 250, ch. 2011-142.

### 373.459    Funds for surface water improvement and management.—

(1) Legislative appropriations provided to the water management districts for surface water improvement and management activities shall be available for detailed planning and plan and program implementation.

(2) An entity that receives state funding for the implementation of programs specified in ss. 373.451-373.459, including a water management district, federal, local, or regional agency, university, or nonprofit or private organization, shall provide a 50-percent match of cash or in-kind services towards the implementation of the specific project for which it is contracting.

(3)   The department shall administer all funds appropriated to or received for surface water improvement and management activities. Expenditure of the moneys shall be limited to the costs of detailed planning and plan and program implementation for priority surface water bodies. Moneys may not be expended for planning for, or construction or expansion of, treatment facilities for domestic or industrial waste disposal.

(4)   The department shall authorize the release of money in accordance with s. 373.501(2).

(5)   The match requirement of subsection (2) does not apply to the Suwannee River Water Management District, the Northwest Florida Water Management District, or a financially disadvantaged small local government as defined in former s. 403.885(3).

History.—s. 5, ch. 87-97; s. 29, ch. 89-279; s. 9, ch. 91-79; s. 11, ch. 91-305; s. 11, ch. 94-115; s. 504, ch. 94-356; s. 44, ch. 96-321; s. 6, ch. 2003-265; s. 8, ch. 2005-291; s. 33, ch. 2006-26; ss. 39, 54, ch. 2007-73; s. 3, ch. 2007-191; s. 17, ch. 2008-5; s. 40, ch. 2015-229.

### 373.4591    Improvements on private agricultural lands.—

(1)   The Legislature encourages public-private partnerships to accomplish water storage, groundwater recharge, and water quality improvements on private agricultural lands. Priority consideration shall be given to public-private partnerships that:

(a)   Store or treat water on private lands for purposes of enhancing hydrologic improvement, improving water quality, or assisting in water supply;

(b)   Provide critical groundwater recharge; or

(c)   Provide for changes in land use to activities that minimize nutrient loads and maximize water conservation.

(2)(a)   When an agreement is entered into between the department, a water management district, or the Department of Agriculture and Consumer Services and a private landowner to establish a public-private partnership that may create or impact wetlands or other surface waters, a baseline condition determining the extent of wetlands and other surface waters on the property shall be established and documented in the agreement before improvements are constructed.

(b)   When an agreement is entered into between the Department of Agriculture and Consumer Services and a private landowner to implement best management practices pursuant to s. 403.067(7)(c), a baseline condition determining the extent of wetlands and other surface water on the property may be established at the option and expense of the private landowner and documented in the agreement before improvements are constructed. The Department of Agriculture and Consumer Services shall submit the landowner's proposed baseline condition documentation to the lead agency for review and approval, and the agency shall use its best efforts to complete the review within 45 days.

(3)   The Department of Agriculture and Consumer Services, the department, and the water management districts shall provide a process for reviewing these requests in the timeframe specified. The determination of a baseline condition shall be conducted using the methods set forth in the rules adopted pursuant to s. 373.421. The baseline condition documented in an agreement shall be considered the extent of wetlands and other surface waters on the property for the purpose of regulation under this chapter for the duration of the agreement and after its expiration.

History.—s. 1, ch. 2012-187; s. 7, ch. 2014-150; s. 14, ch. 2016-1.

### 373.4592    Everglades improvement and management.—

(1)   FINDINGS AND INTENT.—

(a)   The Legislature finds that the Everglades ecological system not only contributes to South Florida's water supply, flood control, and recreation, but serves as the habitat for diverse species of wildlife and plant life. The system is unique in the world and one of Florida's great treasures. The Everglades ecological system is endangered as a result of adverse changes in water quality, and in the quantity, distribution, and timing of flows, and, therefore, must be restored and protected.

(b)   The Legislature finds that, although the district and the department have developed plans and programs for the improvement and management of the surface waters tributary to the Everglades Protection Area, implementation of those plans and programs has not been as timely as is necessary to restore and protect unique flora and fauna of the Everglades, including the Everglades National Park and the Arthur R. Marshall Loxahatchee

National Wildlife Refuge. Therefore, the Legislature determines that an appropriate method to proceed with Everglades restoration and protection is to authorize the district to proceed expeditiously with implementation of the Everglades Program.

(c)   The Legislature finds that, in the last decade, people have come to realize the tremendous cost the alteration of natural systems has exacted on the region. The Statement of Principles of July 1993 among the Federal Government, the South Florida Water Management District, the Department of Environmental Protection, and certain agricultural industry representatives formed a basis to bring to a close 5 years of costly litigation. That agreement should be used to begin the cleanup and renewal of the Everglades ecosystem.

(d)   It is the intent of the Legislature to promote Everglades restoration and protection through certain legislative findings and determinations. The Legislature finds that waters flowing into the Everglades Protection Area contain excessive levels of phosphorus. A reduction in levels of phosphorus will benefit the ecology of the Everglades Protection Area.

(e)   It is the intent of the Legislature to pursue comprehensive and innovative solutions to issues of water quality, water quantity, hydroperiod, and invasion of exotic species which face the Everglades ecosystem. The Legislature recognizes that the Everglades ecosystem must be restored both in terms of water quality and water quantity and must be preserved and protected in a manner that is long term and comprehensive. The Legislature further recognizes that the EAA and adjacent areas provide a base for an agricultural industry, which in turn provides important products, jobs, and income regionally and nationally. It is the intent of the Legislature to preserve natural values in the Everglades while also maintaining the quality of life for all residents of South Florida, including those in agriculture, and to minimize the impact on South Florida jobs, including agricultural, tourism, and natural resource-related jobs, all of which contribute to a robust regional economy.

(f)   The Legislature finds that improved water supply and hydroperiod management are crucial elements to overall revitalization of the Everglades ecosystem, including Florida Bay. It is the intent of the Legislature to expedite plans and programs for improving water quantity reaching the Everglades, correcting long-standing hydroperiod problems, increasing the total quantity of water flowing through the system, providing water supply for the Everglades National Park, urban and agricultural areas, and Florida Bay, and replacing water previously available from the coastal ridge in areas of southern Miami-Dade County. Whenever possible, wasteful discharges of fresh water to tide shall be reduced, and the water shall be stored for delivery at more optimum times. Additionally, reuse and conservation measures shall be implemented consistent with law. The Legislature further recognizes that additional water storage may be an appropriate use of Lake Okeechobee.

(g)   The Legislature finds that the Statement of Principles of July 1993, the Everglades Construction Project, and the regulatory requirements of this section provide a sound basis for the state's long-term cleanup and restoration objectives for the Everglades. It is the intent of the Legislature to provide a sufficient period of time for construction, testing, and research, so that the benefits of the Long-Term Plan will be determined and maximized prior to requiring additional measures. The Legislature finds that STAs and BMPs are currently the best available technology for achieving the water quality goals of the Everglades Program and that implementation of BMPs, funded by the owners and users of land in the EAA, effectively reduces nutrients in waters flowing into the Everglades Protection Area. A combined program of agricultural BMPs, STAs, and requirements of this section is a reasonable method of achieving total phosphorus discharge reductions. The Everglades Program is an appropriate foundation on which to build a long-term program to ultimately achieve restoration and protection of the Everglades Protection Area.

(h)   The Everglades Construction Project represents by far the largest environmental cleanup and restoration program of this type ever undertaken, and the returns from substantial public and private investment must be maximized so that available resources are managed responsibly. To that end, the Legislature directs that the Everglades Construction Project and regulatory requirements associated with the Statement of Principles of July 1993 be pursued expeditiously, but with flexibility, so that superior technology may be utilized when available. Consistent with the implementation of the Everglades Construction Project, landowners shall be provided the maximum opportunity to provide treatment on their land.

(2)   DEFINITIONS.—As used in this section:

Statutes & Constitution :View Statutes : Online Sunshine

(a) "Best available phosphorus reduction technology" or "BAPRT" means a combination of BMPs and STAs which includes a continuing research and monitoring program to reduce outflow concentrations of phosphorus so as to achieve the phosphorus criterion in the Everglades Protection Area.

(b) "Best management practice" or "BMP" means a practice or combination of practices determined by the district, in cooperation with the department, based on research, field-testing, and expert review, to be the most effective and practicable, including economic and technological considerations, on-farm means of improving water quality in agricultural discharges to a level that balances water quality improvements and agricultural productivity.

(c) "C-139 Basin" or "Basin" means those lands described in subsection (16).

(d) "Department" means the Florida Department of Environmental Protection.

(e) "District" means the South Florida Water Management District.

(f) "Everglades Agricultural Area" or "EAA" means the Everglades Agricultural Area, which are those lands described in subsection (15).

(g) "Everglades Construction Project" means the project described in the February 15, 1994, conceptual design document together with construction and operation schedules on file with the South Florida Water Management District, except as modified by this section and further described in the Long-Term Plan.

(h) "Everglades Program" means the program of projects, regulations, and research provided by this section, including the Everglades Construction Project.

(i) "Everglades Protection Area" means Water Conservation Areas 1, 2A, 2B, 3A, and 3B, the Arthur R. Marshall Loxahatchee National Wildlife Refuge, and the Everglades National Park.

(j) "Long-Term Plan" or "Plan" means the district's "Everglades Protection Area Tributary Basins Conceptual Plan for Achieving Long-Term Water Quality Goals Final Report" dated March 2003, as subsequently modified in accordance with paragraph (3)(b), and the district's "Restoration Strategies Regional Water Quality Plan" dated April 27, 2012, as may be subsequently modified pursuant to paragraph (3)(b).

(k) "Master permit" means a single permit issued to a legally responsible entity defined by rule, authorizing the construction, alteration, maintenance, or operation of multiple stormwater management systems that may be owned or operated by different persons and which provides an opportunity to achieve collective compliance with applicable department and district rules and the provisions of this section.

(l) "Optimization" shall mean maximizing the potential treatment effectiveness of the STAs through measures such as additional compartmentalization, improved flow control, vegetation management, or operation refinements, in combination with improvements where practicable in urban and agricultural BMPs, and includes integration with congressionally authorized components of the Comprehensive Everglades Restoration Plan or "CERP".

(m) "Phosphorus criterion" means a numeric interpretation for phosphorus of the Class III narrative nutrient criterion.

(n) "Stormwater management program" shall have the meaning set forth in s. 403.031(15).

(o) "Stormwater treatment areas" or "STAs" means those treatment areas described and depicted in the district's conceptual design document of February 15, 1994, and any modifications as provided in this section.

(p) "Technology-based effluent limitation" or "TBEL" means the technology-based treatment requirements as defined in rule 62-650.200, Florida Administrative Code.

(3) EVERGLADES LONG-TERM PLAN.—

(a) The Legislature finds that the Everglades Program required by this section establishes more extensive and comprehensive requirements for surface water improvement and management within the Everglades than the SWIM plan requirements provided in ss. 373.451 and 373.453. In order to avoid duplicative requirements, and in order to conserve the resources available to the district, the SWIM plan requirements of those sections shall not apply to the Everglades Protection Area and the EAA during the term of the Everglades Program, and the district will neither propose, nor take final agency action on, any Everglades SWIM plan for those areas until the Everglades Program is fully implemented. Funds identified under former s. 259.101(3)(b), Florida Statutes 2014, may be used for acquisition of lands necessary to implement the Everglades Construction Project, to the extent these funds are identified in the Statement of Principles of July 1993. The district's actions in implementing the Everglades

Construction Project relating to the responsibilities of the EAA and C-139 Basin for funding and water quality compliance in the EAA and the Everglades Protection Area shall be governed by this section. Other strategies or activities in the March 1992 Everglades SWIM plan may be implemented if otherwise authorized by law.

(b)   The Legislature finds that the most reliable means of optimizing the performance of STAs and achieving reasonable further progress in reducing phosphorus entering the Everglades Protection Area is to utilize a long-term planning process. The Legislature finds that the Long-Term Plan provides the best available phosphorus reduction technology based upon a combination of the BMPs and STAs described in the Plan provided that the Plan shall seek to achieve the phosphorus criterion in the Everglades Protection Area. The pre-2006 projects identified in the Long-Term Plan shall be implemented by the district without delay, and revised with the planning goal and objective of achieving the phosphorus criterion to be adopted pursuant to subparagraph (4)(e)2. in the Everglades Protection Area, and not based on any planning goal or objective in the Plan that is inconsistent with this section. Revisions to the Long-Term Plan shall be incorporated through an adaptive management approach including a process development and engineering component to identify and implement incremental optimization measures for further phosphorus reductions. Revisions to the Long-Term Plan shall be approved by the department. In addition, the department may propose changes to the Long-Term Plan as science and environmental conditions warrant.

(c)   It is the intent of the Legislature that implementation of the Long-Term Plan shall be integrated and consistent with the implementation of the projects and activities in the congressionally authorized components of the CERP so that unnecessary and duplicative costs will be avoided. Nothing in this section shall modify any existing cost share or responsibility provided for projects listed in s. 528 of the Water Resources Development Act of 1996 (110 Stat. 3769) or provided for projects listed in s. 601 of the Water Resources Development Act of 2000 (114 Stat. 2572). The Legislature does not intend for the provisions of this section to diminish commitments made by the State of Florida to restore and maintain water quality in the Everglades Protection Area, including the federal lands in the settlement agreement referenced in paragraph (4)(e).

(d)   The Long-Term Plan shall be implemented and shall achieve water quality standards relating to the phosphorus criterion in the Everglades Protection Area as determined by a network of monitoring stations established for this purpose. Not later than December 31, 2008, and each 5 years thereafter, the department shall review and approve incremental phosphorus reduction measures.

(4)   EVERGLADES PROGRAM.—

(a)   *Everglades Construction Project.*—The district shall implement the Everglades Construction Project. By the time of completion of the project, the state, district, or other governmental authority shall purchase the inholdings in the Rotenberger and such other lands necessary to achieve a 2:1 mitigation ratio for the use of Brown's Farm and other similar lands, including those needed for the STA 1 Inflow and Distribution Works. The inclusion of public lands as part of the project is for the purpose of treating waters not coming from the EAA for hydroperiod restoration. It is the intent of the Legislature that the district aggressively pursue the implementation of the Everglades Construction Project in accordance with the schedule in this subsection. The Legislature recognizes that adherence to the schedule is dependent upon factors beyond the control of the district, including the timely receipt of funds from all contributors. The district shall take all reasonable measures to complete timely performance of the schedule in this section in order to finish the Everglades Construction Project. The district shall not delay implementation of the project beyond the time delay caused by those circumstances and conditions that prevent timely performance. The district shall not levy ad valorem taxes in excess of 0.1 mill within the Okeechobee Basin for the purposes of the design, construction, and acquisition of the Everglades Construction Project. The ad valorem tax proceeds not exceeding 0.1 mill levied within the Okeechobee Basin for such purposes shall also be used for design, construction, and implementation of the Long-Term Plan, including operation and maintenance, and research for the projects and strategies in the Long-Term Plan, and including the enhancements and operation and maintenance of the Everglades Construction Project and shall be the sole direct district contribution from district ad valorem taxes appropriated or expended for the design, construction, and acquisition of the Everglades Construction Project unless the Legislature by specific amendment to this section increases the 0.1 mill ad valorem tax contribution, increases the agricultural privilege taxes, or otherwise reallocates the relative contribution by ad valorem taxpayers and taxpayers paying the agricultural privilege taxes

toward the funding of the design, construction, and acquisition of the Everglades Construction Project. Notwithstanding the provisions of s. 200.069 to the contrary, any millage levied under the 0.1 mill limitation in this paragraph shall be included as a separate entry on the Notice of Proposed Property Taxes pursuant to s. 200.069. Once the STAs are completed, the district shall allow these areas to be used by the public for recreational purposes in the manner set forth in s. 373.1391(1), considering the suitability of these lands for such uses. These lands shall be made available for recreational use unless the district governing board can demonstrate that such uses are incompatible with the restoration goals of the Everglades Construction Project or the water quality and hydrological purposes of the STAs or would otherwise adversely impact the implementation of the project. The district shall give preferential consideration to the hiring of agricultural workers displaced as a result of the Everglades Construction Project, consistent with their qualifications and abilities, for the construction and operation of these STAs. The following milestones apply to the completion of the Everglades Construction Project as depicted in the February 15, 1994, conceptual design document:

    1.    The district must complete the final design of the STA 1 East and West and pursue STA 1 East project components as part of a cost-shared program with the Federal Government. The district must be the local sponsor of the federal project that will include STA 1 East, and STA 1 West if so authorized by federal law;

    2.    Construction of STA 1 East is to be completed under the direction of the United States Army Corps of Engineers in conjunction with the currently authorized C-51 flood control project;

    3.    The district must complete construction of STA 1 West and STA 1 Inflow and Distribution Works under the direction of the United States Army Corps of Engineers, if the direction is authorized under federal law, in conjunction with the currently authorized C-51 flood control project;

    4.    The district must complete construction of STA 3/4 by October 1, 2003; however, the district may modify this schedule to incorporate and accelerate enhancements to STA 3/4 as directed in the Long-Term Plan;

    5.    The district must complete construction of STA 6;

    6.    The district must, by December 31, 2006, complete construction of enhancements to the Everglades Construction Project recommended in the Long-Term Plan and initiate other pre-2006 strategies in the plan; and

    7.    East Beach Water Control District, South Shore Drainage District, South Florida Conservancy District, East Shore Water Control District, and the lessee of agricultural lease number 3420 shall complete any system modifications described in the Everglades Construction Project to the extent that funds are available from the Everglades Fund. These entities shall divert the discharges described within the Everglades Construction Project within 60 days of completion of construction of the appropriate STA. Such required modifications shall be deemed to be a part of each district's plan of reclamation pursuant to chapter 298.

    (b)    *Everglades water supply and hydroperiod improvement and restoration.*—

    1.    A comprehensive program to revitalize the Everglades shall include programs and projects to improve the water quantity reaching the Everglades Protection Area at optimum times and improve hydroperiod deficiencies in the Everglades ecosystem. To the greatest extent possible, wasteful discharges of fresh water to tide shall be reduced, and water conservation practices and reuse measures shall be implemented by water users, consistent with law. Water supply management must include improvement of water quantity reaching the Everglades, correction of long-standing hydroperiod problems, and an increase in the total quantity of water flowing through the system. Water supply management must provide water supply for the Everglades National Park, the urban and agricultural areas, and the Florida Bay and must replace water previously available from the coastal ridge areas of southern Miami-Dade County. The Everglades Construction Project redirects some water currently lost to tide. It is an important first step in completing hydroperiod improvement.

    2.    The district shall operate the Everglades Construction Project as specified in the February 15, 1994, conceptual design document, to provide additional inflows to the Everglades Protection Area. The increased flow from the project shall be directed to the Everglades Protection Area as needed to achieve an average annual increase of 28 percent compared to the baseline years of 1979 to 1988. Consistent with the design of the Everglades Construction Project and without demonstratively reducing water quality benefits, the regulatory releases will be timed and distributed to the Everglades Protection Area to maximize environmental benefits.

3.   The district shall operate the Everglades Construction Project in accordance with the February 15, 1994, conceptual design document to maximize the water quantity benefits and improve the hydroperiod of the Everglades Protection Area. All reductions of flow to the Everglades Protection Area from BMP implementation will be replaced. The district shall develop a model to be used for quantifying the amount of water to be replaced. The timing and distribution of this replaced water will be directed to the Everglades Protection Area to maximize the natural balance of the Everglades Protection Area.

4.   The Legislature recognizes the complexity of the Everglades watershed, as well as legal mandates under Florida and federal law. As local sponsor of the Central and Southern Florida Flood Control Project, the district must coordinate its water supply and hydroperiod programs with the Federal Government. Federal planning, research, operating guidelines, and restrictions for the Central and Southern Florida Flood Control Project now under review by federal agencies will provide important components of the district's Everglades Program. The department and the district shall use their best efforts to seek the amendment of the authorized purposes of the project to include water quality protection, hydroperiod restoration, and environmental enhancement as authorized purposes of the Central and Southern Florida Flood Control Project, in addition to the existing purposes of water supply, flood protection, and allied purposes. Further, the department and the district shall use their best efforts to request that the Federal Government include in the evaluation of the regulation schedule for Lake Okeechobee a review of the regulatory releases, so as to facilitate releases of water into the Everglades Protection Area which further improve hydroperiod restoration.

5.   The district, through cooperation with the federal and state agencies, shall develop other programs and methods to increase the water flow and improve the hydroperiod of the Everglades Protection Area.

6.   Nothing in this section is intended to provide an allocation or reservation of water or to modify the provisions of part II. All decisions regarding allocations and reservations of water shall be governed by applicable law.

7.   The district shall proceed to expeditiously implement the minimum flows and levels for the Everglades Protection Area as required by s. 373.042 and shall expeditiously complete the Lower East Coast Water Supply Plan.

(c)   *STA 3/4 modification.*—The Everglades Program will contribute to the restoration of the Rotenberger and Holey Land tracts. The Everglades Construction Project provides a first step toward restoration by improving hydroperiod with treated water for the Rotenberger tract and by providing a source of treated water for the Holey Land. It is further the intent of the Legislature that the easternmost tract of the Holey Land, known as the "Toe of the Boot," be removed from STA 3/4 under the circumstances set forth in this paragraph. The district shall proceed to modify the Everglades Construction Project, provided that the redesign achieves at least as many environmental and hydrological benefits as are included in the original design, including treatment of waters from sources other than the EAA, and does not delay construction of STA 3/4. The district is authorized to use eminent domain to acquire alternative lands, only if such lands are located within 1 mile of the northern border of STA 3/4.

(d)   *Everglades research and monitoring program.*—

1.   The department and the district shall review and evaluate available water quality data for the Everglades Protection Area and tributary waters and identify any additional information necessary to adequately describe water quality in the Everglades Protection Area and tributary waters. The department and the district shall also initiate a research and monitoring program to generate such additional information identified and to evaluate the effectiveness of the BMPs and STAs, as they are implemented, in improving water quality and maintaining designated and existing beneficial uses of the Everglades Protection Area and tributary waters. As part of the program, the district shall monitor all discharges into the Everglades Protection Area for purposes of determining compliance with state water quality standards.

2.   The research and monitoring program shall evaluate the ecological and hydrological needs of the Everglades Protection Area, including the minimum flows and levels. Consistent with such needs, the program shall also evaluate water quality standards for the Everglades Protection Area and for the canals of the EAA, so that these canals can be classified in the manner set forth in paragraph (e) and protected as an integral part of the water management system which includes the STAs of the Everglades Construction Project and allows landowners in the

EAA to achieve applicable water quality standards compliance by BMPs and STA treatment to the extent this treatment is available and effective.

3.    The research and monitoring program shall include research seeking to optimize the design and operation of the STAs, including research to reduce outflow concentrations, and to identify other treatment and management methods and regulatory programs that are superior to STAs in achieving the intent and purposes of this section.

4.    The research and monitoring program shall be conducted to allow the department to propose a phosphorus criterion in the Everglades Protection Area, and to evaluate existing state water quality standards applicable to the Everglades Protection Area and existing state water quality standards and classifications applicable to the EAA canals. In developing the phosphorus criterion, the department shall also consider the minimum flows and levels for the Everglades Protection Area and the district's water supply plans for the Lower East Coast.

5.    Beginning March 1, 2006, as part of the consolidated annual report required by s. 373.036(7), the district and the department shall annually issue a peer-reviewed report regarding the research and monitoring program that summarizes all data and findings. The report shall identify water quality parameters, in addition to phosphorus, which exceed state water quality standards or are causing or contributing to adverse impacts in the Everglades Protection Area.

6.    The district shall continue research seeking to optimize the design and operation of STAs and to identify other treatment and management methods that are superior to STAs in achieving optimum water quality and water quantity for the benefit of the Everglades. The district shall optimize the design and operation of the STAs described in the Everglades Construction Project prior to expanding their size. Additional methods to achieve compliance with water quality standards shall not be limited to more intensive management of the STAs.

(e)    *Evaluation of water quality standards.*—

1.    The department and the district shall employ all means practicable to complete by December 31, 1998, any additional research necessary to:

a.    Numerically interpret for phosphorus the Class III narrative nutrient criterion necessary to meet water quality standards in the Everglades Protection Area; and

b.    Evaluate existing water quality standards applicable to the Everglades Protection Area and EAA canals.

2.    In no case shall such phosphorus criterion allow waters in the Everglades Protection Area to be altered so as to cause an imbalance in the natural populations of aquatic flora or fauna. The phosphorus criterion shall be 10 parts per billion (ppb) in the Everglades Protection Area in the event the department does not adopt by rule such criterion by December 31, 2003. However, in the event the department fails to adopt a phosphorus criterion on or before December 31, 2002, any person whose substantial interests would be affected by the rulemaking shall have the right, on or before February 28, 2003, to petition for a writ of mandamus to compel the department to adopt by rule such criterion. Venue for the mandamus action must be Leon County. The court may stay implementation of the 10 parts per billion (ppb) criterion during the pendency of the mandamus proceeding upon a demonstration by the petitioner of irreparable harm in the absence of such relief. The department's phosphorus criterion, whenever adopted, shall supersede the 10 parts per billion (ppb) criterion otherwise established by this section, but shall not be lower than the natural conditions of the Everglades Protection Area and shall take into account spatial and temporal variability. The department's rule adopting a phosphorus criterion may include moderating provisions during the implementation of the initial phase of the Long-Term Plan authorizing discharges based upon BAPRT providing net improvement to impacted areas. Discharges to unimpacted areas may also be authorized by moderating provisions, which shall require BAPRT, and which must be based upon a determination by the department that the environmental benefits of the discharge clearly outweigh potential adverse impacts and otherwise comply with antidegradation requirements. Moderating provisions authorized by this section shall not extend beyond December 2016 unless further authorized by the Legislature.

3.    The department shall use the best available information to define relationships between waters discharged to, and the resulting water quality in, the Everglades Protection Area. The department or the district shall use these relationships to establish discharge limits in permits for discharges into the EAA canals and the Everglades Protection Area necessary to prevent an imbalance in the natural populations of aquatic flora or fauna in the Everglades Protection Area, and to provide a net improvement in the areas already impacted. During the

implementation of the initial phase of the Long-Term Plan, permits issued by the department shall be based on BAPRT and shall include technology-based effluent limitations consistent with the Long-Term Plan. Compliance with the phosphorus criterion shall be based upon a long-term geometric mean of concentration levels to be measured at sampling stations recognized from the research to be reasonably representative of receiving waters in the Everglades Protection Area, and so located so as to assure that the Everglades Protection Area is not altered so as to cause an imbalance in natural populations of aquatic flora and fauna and to assure a net improvement in the areas already impacted. For the Everglades National Park and the Arthur R. Marshall Loxahatchee National Wildlife Refuge, the method for measuring compliance with the phosphorus criterion shall be in a manner consistent with Appendices A and B, respectively, of the settlement agreement dated July 26, 1991, entered in case No. 88-1886-Civ-Hoeveler, United States District Court for the Southern District of Florida, that recognizes and provides for incorporation of relevant research.

4. The department's evaluation of any other water quality standards must include the department's antidegradation standards and EAA canal classifications. In recognition of the special nature of the conveyance canals of the EAA, as a component of the classification process, the department is directed to formally recognize by rulemaking existing actual beneficial uses of the conveyance canals in the EAA. This shall include recognition of the Class III designated uses of recreation, propagation and maintenance of a healthy, well-balanced population of fish and wildlife, the integrated water management purposes for which the Central and Southern Florida Flood Control Project was constructed, flood control, conveyance of water to and from Lake Okeechobee for urban and agricultural water supply, Everglades hydroperiod restoration, conveyance of water to the STAs, and navigation.

(f) *EAA best management practices.*—

1. The district, in cooperation with the department, shall develop and implement a water quality monitoring program to evaluate the effectiveness of the BMPs in achieving and maintaining compliance with state water quality standards and restoring and maintaining designated and existing beneficial uses. The program shall include an analysis of the effectiveness of the BMPs in treating constituents that are not being significantly improved by the STAs. The monitoring program shall include monitoring of appropriate parameters at representative locations.

2. The district shall continue to require and enforce the BMP and other requirements of chapters 40E-61 and 40E-63, Florida Administrative Code, during the terms of the existing permits issued pursuant to those rules. Chapter 40E-61, Florida Administrative Code, may be amended to include the BMPs required by chapter 40E-63, Florida Administrative Code. Prior to the expiration of existing permits, and during each 5-year term of subsequent permits as provided for in this section, those rules shall be amended to implement a comprehensive program of research, testing, and implementation of BMPs that will address all water quality standards within the EAA and Everglades Protection Area. Under this program:

a. EAA landowners, through the EAA Environmental Protection District or otherwise, shall sponsor a program of BMP research with qualified experts to identify appropriate BMPs.

b. Consistent with the water quality monitoring program, BMPs will be field-tested in a sufficient number of representative sites in the EAA to reflect soil and crop types and other factors that influence BMP design and effectiveness.

c. BMPs as required for varying crops and soil types shall be included in permit conditions in the 5-year permits issued pursuant to this section.

d. The district shall conduct research in cooperation with EAA landowners to identify water quality parameters that are not being significantly improved either by the STAs or the BMPs, and to identify further BMP strategies needed to address these parameters.

3. The Legislature finds that through the implementation of the Everglades BMPs Program and the implementation of the Everglades Construction Project, reasonable further progress will be made towards addressing water quality requirements of the EAA canals and the Everglades Protection Area. Permittees within the EAA and the C-139 Basin who are in full compliance with the conditions of permits under chapters 40E-61 and 40E-63, Florida Administrative Code, have made all payments required under the Everglades Program, and are in compliance with subparagraph (a)7., if applicable, shall not be required to implement additional water quality

improvement measures, prior to December 31, 2006, other than those required by subparagraph 2., with the following exceptions:

a. Nothing in this subparagraph shall limit the existing authority of the department or the district to limit or regulate discharges that pose a significant danger to the public health and safety; and

b. New land uses and new stormwater management facilities other than alterations to existing agricultural stormwater management systems for water quality improvements shall not be accorded the compliance established by this section. Permits may be required to implement improvements or alterations to existing agricultural water management systems.

4. As of December 31, 2006, all permits, including those issued prior to that date, shall require implementation of additional water quality measures, taking into account the water quality treatment actually provided by the STAs and the effectiveness of the BMPs. As of that date, no permittee's discharge shall cause or contribute to any violation of water quality standards in the Everglades Protection Area.

5. Effective immediately, landowners within the C-139 Basin shall not collectively exceed an annual average loading of phosphorus based proportionally on the historical rainfall for the C-139 Basin over the period of October 1, 1978, to September 30, 1988. New surface inflows shall not increase the annual average loading of phosphorus stated above. Provided that the C-139 Basin does not exceed this annual average loading, all landowners within the Basin shall be in compliance for that year. Compliance determinations for individual landowners within the C-139 Basin for remedial action, if the Basin is determined by the district to be out of compliance for that year, shall be based on the landowners' proportional share of the total phosphorus loading. The total phosphorus discharge load shall be determined as set forth in Appendix B2 of Rule 40E-63, Everglades Program, Florida Administrative Code.

6. The district, in cooperation with the department, shall develop and implement a water quality monitoring program to evaluate the quality of the discharge from the C-139 Basin. Upon determination by the department or the district that the C-139 Basin is exceeding any presently existing water quality standards, the district shall require landowners within the C-139 Basin to implement BMPs appropriate to the land uses within the C-139 Basin consistent with subparagraph 2. Thereafter, the provisions of subparagraphs 2.-4. shall apply to the landowners within the C-139 Basin.

(g) *Monitoring and control of exotic species.*—

1. The district shall establish a biological monitoring network throughout the Everglades Protection Area and shall prepare a survey of exotic species at least every 2 years.

2. In addition, the district shall establish a program to coordinate with federal, state, or other governmental entities the control of continued expansion and the removal of these exotic species. The district's program shall give high priority to species affecting the largest areal extent within the Everglades Protection Area.

(h) *Use attainability analysis.*—After completion of all projects and improvements in the Long-Term Plan, the district shall complete a use attainability analysis to determine if those projects and improvements will achieve the water-quality-based effluent limits established in permits and orders authorizing the operation of those facilities.

(5) ACQUISITION AND LEASE OF STATE LANDS.—

(a) As used in this subsection, the term:

1. "Available land" means land within the EAA owned by the board of trustees which is covered by any of the following leases: Numbers 3543, 3420, 1447, 1971-5, and 3433, and the southern one-third of number 2376 constituting 127 acres, more or less.

2. "Board of trustees" means the Board of Trustees of the Internal Improvement Trust Fund.

3. "Designated acre," as to any impacted farmer, means an acre of land which is designated for STAs or water retention or storage in the February 15, 1994, conceptual design document and which is owned or leased by the farmer or on which one or more agricultural products were produced which, during the period beginning October 1, 1992, and ending September 30, 1993, were processed at a facility owned by the farmer.

4. "Impacted farmer" means a producer or processor of agricultural commodities and includes subsidiaries and affiliates that have designated acres.

5. "Impacted vegetable farmer" means an impacted farmer in the EAA who uses more than 30 percent of the land farmed by that farmer, whether owned or leased, for the production of vegetables.

6. "Vegetable-area available land" means land within the EAA owned by the board of trustees which is covered by lease numbers 3422 and 1935/1935S.

(b) The Legislature declares that it is necessary for the public health and welfare that the Everglades water and water-related resources be conserved and protected. The Legislature further declares that certain lands may be needed for the treatment or storage of water prior to its release into the Everglades Protection Area. The acquisition of real property for this objective constitutes a public purpose for which public funds may be expended. In addition to other authority pursuant to this chapter to acquire real property, the governing board of the district is empowered and authorized to acquire fee title or easements by eminent domain for the limited purpose of implementing stormwater management systems, identified and described in the Everglades Construction Project or determined necessary to meet water quality requirements established by rule or permit.

(c) The Legislature determines it to be in the public interest to minimize the potential loss of land and related product supply to farmers and processors who are most affected by acquisition of land for Everglades restoration and hydroperiod purposes. Accordingly, subject to the priority established below for vegetable-area available land, impacted farmers shall have priority in the leasing of available land. An impacted farmer shall have the right to lease each parcel of available land, upon expiration of the existing lease, for a term of 20 years and at a rental rate determined by appraisal using established state procedures. For those parcels of land that have previously been competitively bid, the rental rate shall not be less than the rate the board of trustees currently receives. The board of trustees may also adjust the rental rate on an annual basis using an appropriate index, and update the appraisals at 5-year intervals. If more than one impacted farmer desires to lease a particular parcel of available land, the one that has the greatest number of designated acres shall have priority.

(d) Impacted vegetable farmers shall have priority in leasing vegetable-area available land. An impacted vegetable farmer shall have the right to lease vegetable-area available land, upon expiration of the existing lease, for a term of 20 years or a term ending August 25, 2018, whichever term first expires, and at a rental rate determined by appraisal using established state procedures. If the lessee elects, such terms may consist of an initial 5-year term, with successive options to renew at the lessee's option for additional 5-year terms. For extensions of leases on those parcels of land that have previously been competitively bid, the rental rate shall not be less than the rate the board of trustees currently receives. The board of trustees may also adjust the rental rate on an annual basis using an appropriate index, and update the appraisals at 5-year intervals. If more than one impacted vegetable farmer desires to lease vegetable-area available land, the one that has the greatest number of designated acres shall have priority.

(e) Impacted vegetable farmers with farming operations in areas of Florida other than the EAA shall have priority in leasing suitable surplus lands, where such lands are located in the St. Johns River Water Management District and in the vicinity of the other areas where such impacted vegetable farmers operate. The suitability of such use shall be determined solely by the St. Johns River Water Management District. The St. Johns River Water Management District shall make good faith efforts to provide these impacted vegetable farmers with the opportunity to lease such suitable lands to offset their designated acres. The rental rate shall be determined by appraisal using established procedures.

(f) The corporation conducting correctional work programs under part II of chapter 946 shall be entitled to renew, for a period of 20 years, its lease with the Department of Corrections which expires June 30, 1998, which includes the utilization of land for the production of sugar cane, and which is identified as lease number 2671 with the board of trustees.

(g) Except as specified in paragraph (f), once the leases or lease extensions specified in this subsection have been granted and become effective, the trustees shall retain the authority to terminate after 9 years any such lease or lease extension upon 2 years' notice to the lessee and a finding by the trustees that the lessee has ceased to be impacted as provided in this section. In that event, the outgoing lessee is entitled to be compensated for any documented, unamortized planting costs associated with the lease and any unamortized capital costs incurred prior to the notice. In addition, the trustees may terminate such lease or lease extension if the lessee fails to

comply with, and after reasonable notice and opportunity to correct or fails to correct, any material provision of the lease or its obligation under this section.

(6)   EVERGLADES AGRICULTURAL PRIVILEGE TAX.—

(a)   There is hereby imposed an annual Everglades agricultural privilege tax for the privilege of conducting an agricultural trade or business on:

1.   All real property located within the EAA that is classified as agricultural under the provisions of chapter 193; and

2.   Leasehold or other interests in real property located within the EAA owned by the United States, the state, or any agency thereof permitting the property to be used for agricultural purposes in a manner that would allow such property to be classified as agricultural under the provisions of chapter 193 if not governmentally owned, whether or not such property is actually classified as agricultural under the provisions of chapter 193.

It is hereby determined by the Legislature that the privilege of conducting an agricultural trade or business on such property constitutes a reasonable basis for imposition of the Everglades agricultural privilege tax and that logical differences exist between the agricultural use of such property and the use of other property within the EAA for residential or nonagricultural commercial use. The Everglades agricultural privilege tax shall constitute a lien against the property, or the leasehold or other interest in governmental property permitting such property to be used for agricultural purposes, described on the Everglades agricultural privilege tax roll. The lien shall be in effect from January 1 of the year the tax notice is mailed until discharged by payment and shall be equal in rank and dignity with the liens of all state, county, district, or municipal taxes and non-ad valorem assessments imposed pursuant to general law, special act, or local ordinance and shall be superior in dignity to all other liens, titles, and claims.

(b)   The Everglades agricultural privilege tax, other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, shall be collected in the manner provided for ad valorem taxes. By September 15 of each year, the governing board of the district shall certify by resolution an Everglades agricultural privilege tax roll on compatible electronic medium to the tax collector of each county in which a portion of the EAA is located. The district shall also produce one copy of the roll in printed form which shall be available for inspection by the public. The district shall post the Everglades agricultural privilege tax for each parcel on the roll. The tax collector shall not accept any such roll that is not certified on compatible electronic medium and that does not contain the posting of the Everglades agricultural privilege tax for each parcel. It is the responsibility of the district that such rolls be free of errors and omissions. Alterations to such rolls may be made by the executive director of the district, or a designee, up to 10 days before certification. If the tax collector or any taxpayer discovers errors or omissions on such roll, such person may request the district to file a corrected roll or a correction of the amount of any Everglades agricultural privilege tax. Other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, Everglades agricultural privilege taxes collected pursuant to this section shall be included in the combined notice for ad valorem taxes and non-ad valorem assessments provided for in s. 197.3635. Such Everglades agricultural privilege taxes shall be listed in the portion of the combined notice utilized for non-ad valorem assessments. A separate mailing is authorized only as a solution to the most exigent factual circumstances. However, if a tax collector cannot merge an Everglades agricultural privilege tax roll to produce such a notice, the tax collector shall mail a separate notice of Everglades agricultural privilege taxes or shall direct the district to mail such a separate notice. In deciding whether a separate mailing is necessary, the tax collector shall consider all costs to the district and taxpayers of such a separate mailing and the adverse effects to the taxpayers of delayed and multiple notices. The district shall bear all costs associated with any separate notice. Everglades agricultural privilege taxes collected pursuant to this section shall be subject to all collection provisions of chapter 197, including provisions relating to discount for early payment, prepayment by installment method, deferred payment, penalty for delinquent payment, and issuance and sale of tax certificates and tax deeds for nonpayment. Everglades agricultural privilege taxes for leasehold or other interests in property owned by the United States, the state, or any agency thereof permitting such property to be used for agricultural purposes shall be included on the notice

provided pursuant to s. 196.31, a copy of which shall be provided to lessees or other interestholders registering with the district, and shall be collected from the lessee or other appropriate interestholder and remitted to the district immediately upon collection. Everglades agricultural privilege taxes included on the statement provided pursuant to s. 196.31 shall be due and collected on or prior to the next April 1 following provision of the notice. Proceeds of the Everglades agricultural privilege taxes shall be distributed by the tax collector to the district. Each tax collector shall be paid a commission equal to the actual cost of collection, not to exceed 2 percent, on the amount of Everglades agricultural privilege taxes collected and remitted. Notwithstanding any general law or special act to the contrary, Everglades agricultural privilege taxes shall not be included on the notice of proposed property taxes provided for in s. 200.069.

(c)    The initial Everglades agricultural privilege tax roll shall be certified for the tax notices mailed in November 1994. Incentive credits to the Everglades agricultural privilege taxes to be included on the initial Everglades agricultural privilege tax roll, if any, shall be based upon the total phosphorus load reduction for the year ending April 30, 1993. The Everglades agricultural privilege taxes for each year shall be computed in the following manner:

1.    Annual Everglades agricultural privilege taxes shall be charged for the privilege of conducting an agricultural trade or business on each acre of real property or portion thereof. The annual Everglades agricultural privilege tax shall be $24.89 per acre for the tax notices mailed in November 1994 through November 1997; $27 per acre for the tax notices mailed in November 1998 through November 2001; $31 per acre for the tax notices mailed in November 2002 through November 2005; and $35 per acre for the tax notices mailed in November 2006 through November 2013.

2.    It is the intent of the Legislature to encourage the performance of best management practices to maximize the reduction of phosphorus loads at points of discharge from the EAA by providing an incentive credit against the Everglades agricultural privilege taxes set forth in subparagraph 1. The total phosphorus load reduction shall be measured for the entire EAA by comparing the actual measured total phosphorus load attributable to the EAA for each annual period ending on April 30 to the total estimated phosphorus load that would have occurred during the 1979-1988 base period using the model for total phosphorus load determinations provided in chapter 40E-63, Florida Administrative Code, utilizing the technical information and procedures contained in Section IV-EAA Period of Record Flow and Phosphorus Load Calculations; Section V-Monitoring Requirements; and Section VI-Phosphorus Load Allocations and Compliance Calculations of the Draft Technical Document in Support of chapter 40E-63, Florida Administrative Code - Works of the District within the Everglades, March 3, 1992, and the Standard Operating Procedures for Water Quality Collection in Support of the Everglades Water Condition Report, dated February 18, 1994. The model estimates the total phosphorus load that would have occurred during the 1979-1988 base period by substituting the rainfall conditions for such annual period ending April 30 for the conditions that were used to calibrate the model for the 1979-1988 base period. The data utilized to calculate the actual loads attributable to the EAA shall be adjusted to eliminate the effect of any load and flow that were not included in the 1979-1988 base period as defined in chapter 40E-63, Florida Administrative Code. The incorporation of the method of measuring the total phosphorus load reduction provided in this subparagraph is intended to provide a legislatively approved aid to the governing board of the district in making an annual ministerial determination of any incentive credit.

3.    Phosphorus load reductions calculated in the manner described in subparagraph 2. and rounded to the nearest whole percentage point for each annual period beginning on May 1 and ending on April 30 shall be used to compute incentive credits to the Everglades agricultural privilege taxes to be included on the annual tax notices mailed in November of the next ensuing calendar year. Incentive credits, if any, will reduce the Everglades agricultural privilege taxes set forth in subparagraph 1. only to the extent that the phosphorus load reduction exceeds 25 percent. Subject to subparagraph 4., the reduction of phosphorus load by each percentage point in excess of 25 percent, computed for the 12-month period ended on April 30 of the calendar year immediately preceding certification of the Everglades agricultural privilege tax, shall result in the following incentive credits: $0.33 per acre for the tax notices mailed in November 1994 through November 1997; $0.54 per acre for the tax notices mailed in November 1998 through November 2001; $0.61 per acre for the tax notices mailed in November

2002 through November 2005, and $0.65 per acre for the tax notices mailed in November 2006 through November 2013. The determination of incentive credits, if any, shall be documented by resolution of the governing board of the district adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

4.    Notwithstanding subparagraph 3., incentive credits for the performance of best management practices shall not reduce the minimum annual Everglades agricultural privilege tax to less than $24.89 per acre, which annual Everglades agricultural privilege tax as adjusted in the manner required by paragraph (e) shall be known as the "minimum tax." To the extent that the application of incentive credits for the performance of best management practices would reduce the annual Everglades agricultural privilege tax to an amount less than the minimum tax, then the unused or excess incentive credits for the performance of best management practices shall be carried forward, on a phosphorus load percentage basis, to be applied as incentive credits in subsequent years. Any unused or excess incentive credits remaining after certification of the Everglades agricultural privilege tax roll for the tax notices mailed in November 2013 shall be canceled.

5.    Notwithstanding the schedule of Everglades agricultural privilege taxes set forth in subparagraph 1., the owner, lessee, or other appropriate interestholder of any property shall be entitled to have the Everglades agricultural privilege tax for any parcel of property reduced to the minimum tax, commencing with the tax notices mailed in November 1996 for parcels of property participating in the early baseline option as defined in chapter 40E-63, Florida Administrative Code, and with the tax notices mailed in November 1997 for parcels of property not participating in the early baseline option, upon compliance with the requirements set forth in this subparagraph. The owner, lessee, or other appropriate interestholder shall file an application with the executive director of the district prior to July 1 for consideration of reduction to the minimum tax on the Everglades agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the reduction in phosphorus load attributable to such parcel of property. The phosphorus load reduction for each discharge structure serving the parcel shall be measured as provided in chapter 40E-63, Florida Administrative Code, and the permit issued for such property pursuant to chapter 40E-63, Florida Administrative Code. A parcel of property which has achieved the following annual phosphorus load reduction standards shall have the minimum tax included on the annual tax notice mailed in November of the next ensuing calendar year: 30 percent or more for the tax notices mailed in November 1994 through November 1997; 35 percent or more for the tax notices mailed in November 1998 through November 2001; 40 percent or more for the tax notices mailed in November 2002 through November 2005; and 45 percent or more for the tax notices mailed in November 2006 through November 2013. In addition, any parcel of property that achieves an annual flow weighted mean concentration of 50 parts per billion (ppb) of phosphorus at each discharge structure serving the property for any year ending April 30 shall have the minimum tax included on the annual tax notice mailed in November of the next ensuing calendar year. Any annual phosphorus reductions that exceed the amount necessary to have the minimum tax included on the annual tax notice for any parcel of property shall be carried forward to the subsequent years' phosphorus load reduction to determine if the minimum tax shall be included on the annual tax notice. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

6.    The annual Everglades agricultural privilege tax shall be: for the tax notices mailed in November 2014 through November 2026, $25 per acre; for the tax notices mailed in November 2027 through 2029, $20 per acre; for the tax notices mailed in November 2030 through 2035, $15 per acre; and for the tax notices mailed in November 2036 and thereafter, $10 per acre. Proceeds from the tax shall be used for design, construction, and implementation of the Long-Term Plan, including operation and maintenance, and research for the projects and strategies in the Long-Term Plan, including the enhancements and operation and maintenance of the Everglades Construction Project.

(d)    For purposes of this paragraph, "vegetable acreage" means, for each tax year, any portion of a parcel of property used for a period of not less than 8 months for the production of vegetable crops, including sweet corn, during the 12 months ended September 30 of the year preceding the tax year. Land preparation, crop rotation, and

fallow periods shall not disqualify property from classification as vegetable acreage if such property is actually used for the production of vegetable crops.

1. It is hereby determined by the Legislature that vegetable farming in the EAA is subject to volatile market conditions and is particularly subject to crop loss or damage due to freezes, flooding, and drought. It is further determined by the Legislature that, due to the foregoing factors, imposition of an Everglades agricultural privilege tax upon vegetable acreage in excess of the minimum tax could create a severe economic hardship and impair the production of vegetable crops. Notwithstanding the schedule of Everglades agricultural privilege taxes set forth in subparagraph (c)1., the Everglades agricultural privilege tax for vegetable acreage shall be the minimum tax, and vegetable acreage shall not be entitled to any incentive credits.

2. If either the Governor, the President of the United States, or the United States Department of Agriculture declares the existence of a state of emergency or disaster resulting from extreme natural conditions impairing the ability of vegetable acreage to produce crops, payment of the Everglades agricultural privilege taxes imposed for the privilege of conducting an agricultural trade or business on such property shall be deferred for a period of 1 year, and all subsequent annual payments shall be deferred for the same period.

a. If the declaration occurs between April 1 and October 31, the Everglades agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

b. If the declaration occurs between November 1 and March 31 and the Everglades agricultural privilege tax included on the most recent tax notice has not been paid, such Everglades agricultural privilege tax will be deferred to the next annual tax notice.

c. If the declaration occurs between November 1 and March 31 and the Everglades agricultural privilege tax included on the most recent tax notice has been paid, the Everglades agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

3. In the event payment of Everglades agricultural privilege taxes is deferred pursuant to this paragraph, the district must record a notice in the official records of each county in which vegetable acreage subject to such deferment is located. The recorded notice must describe each parcel of property as to which Everglades agricultural privilege taxes have been deferred and the amount deferred for such property. If all or any portion of the property as to which Everglades agricultural privilege taxes have been deferred ceases to be classified as agricultural under the provisions of chapter 193 or otherwise subject to the Everglades agricultural privilege tax, all deferred amounts must be included on the tax notice for such property mailed in November of the first tax year for which such property is not subject to the Everglades agricultural privilege tax. After a property owner has paid all outstanding Everglades agricultural privilege taxes, including any deferred amounts, the district shall provide the property owner with a recordable instrument evidencing the payment of all outstanding amounts.

4. The owner, lessee, or other appropriate interestholder must file an application with the executive director of the district prior to July 1 for classification of a portion of the property as vegetable acreage on the Everglades agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the number of acres used for the production of vegetable crops during the year in which incentive credits are determined and the period of such use. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual Everglades agricultural privilege tax roll to the appropriate tax collector.

5. This paragraph does not relieve vegetable acreage from the performance of best management practices specified in chapter 40E-63, Florida Administrative Code.

(e) If, for any tax year, the number of acres subject to the Everglades agricultural privilege tax is less than the number of acres included on the Everglades agricultural privilege tax roll certified for the tax notices mailed in November 1994, the minimum tax shall be subject to increase in the manner provided in this paragraph. In determining the number of acres subject to the Everglades agricultural privilege tax for purposes of this paragraph, property acquired by a not-for-profit entity for purposes of conservation and preservation, the United States, or the state, or any agency thereof, and removed from the Everglades agricultural privilege tax roll after January 1, 1994, shall be treated as subject to the tax even though no tax is imposed or due: in its entirety, for tax notices mailed prior to November 2000; to the extent its area exceeds 4 percent of the total area of property subject to

the Everglades agricultural tax, for tax notices mailed in November 2000 through November 2005; and to the extent its area exceeds 8 percent of the total area of property subject to the Everglades agricultural tax, for tax notices mailed in November 2006 and thereafter. For each tax year, the district shall determine the amount, if any, by which the sum of the following exceeds $12,367,000:

1.  The product of the minimum tax multiplied by the number of acres subject to the Everglades agricultural privilege tax; and

2.  The ad valorem tax increment, as defined in this subparagraph.

The aggregate of such annual amounts, less any portion previously applied to eliminate or reduce future increases in the minimum tax, as described in this paragraph, shall be known as the "excess tax amount." If for any tax year, the amount computed by multiplying the minimum tax by the number of acres then subject to the Everglades agricultural privilege tax is less than $12,367,000, the excess tax amount shall be applied in the following manner. If the excess tax amount exceeds such difference, an amount equal to the difference shall be deducted from the excess tax amount and applied to eliminate any increase in the minimum tax. If such difference exceeds the excess tax amount, the excess tax amount shall be applied to reduce any increase in the minimum tax. In such event, a new minimum tax shall be computed by subtracting the remaining excess tax amount from $12,367,000 and dividing the result by the number of acres subject to the Everglades agricultural privilege tax for such tax year. For purposes of this paragraph, the "ad valorem tax increment" means 50 percent of the difference between the amount of ad valorem taxes actually imposed by the district for the immediate prior tax year against property included on the Everglades agricultural privilege tax roll certified for the tax notices mailed in November 1994 that was not subject to the Everglades agricultural privilege tax during the immediate prior tax year and the amount of ad valorem taxes that would have been imposed against such property for the immediate prior tax year if the taxable value of each acre had been equal to the average taxable value of all other land classified as agricultural within the EAA for such year; however, the ad valorem tax increment for any year shall not exceed the amount that would have been derived from such property from imposition of the minimum tax during the immediate prior tax year.

(f)   Any owner, lessee, or other appropriate interestholder of property subject to the Everglades agricultural privilege tax may contest the Everglades agricultural privilege tax by filing an action in circuit court.

1.   No action may be brought to contest the Everglades agricultural privilege tax after 60 days from the date the tax notice that includes the Everglades agricultural privilege tax is mailed by the tax collector. Before an action to contest the Everglades agricultural privilege tax may be brought, the taxpayer shall pay to the tax collector the amount of the Everglades agricultural privilege tax which the taxpayer admits in good faith to be owing. The tax collector shall issue a receipt for the payment, and the receipt shall be filed with the complaint. Payment of an Everglades agricultural privilege tax shall not be deemed an admission that such tax was due and shall not prejudice the right to bring a timely action to challenge such tax and seek a refund. No action to contest the Everglades agricultural privilege tax may be maintained, and such action shall be dismissed, unless all Everglades agricultural privilege taxes imposed in years after the action is brought, which the taxpayer in good faith admits to be owing, are paid before they become delinquent. The requirements of this subparagraph are jurisdictional.

2.   In any action involving a challenge of the Everglades agricultural privilege tax, the court shall assess all costs. If the court finds that the amount of tax owed by the taxpayer is greater than the amount the taxpayer has in good faith admitted and paid, it shall enter judgment against the taxpayer for the deficiency and for interest on the deficiency at the rate of 12 percent per year from the date the tax became delinquent. If it finds that the amount of tax which the taxpayer has admitted to be owing is grossly disproportionate to the amount of tax found to be due and that the taxpayer's admission was not made in good faith, the court shall also assess a penalty at the rate of 25 percent of the deficiency per year from the date the tax became delinquent. The court may issue injunctions to restrain the sale of property for any Everglades agricultural privilege tax which appears to be contrary to law or equity.

(g)   Notwithstanding any contrary provisions in chapter 120, or any provision of any other law, an action in circuit court shall be the exclusive remedy to challenge the assessment of an Everglades agricultural privilege tax and owners of property subject to the Everglades agricultural privilege tax shall have no right or standing to initiate administrative proceedings under chapter 120 to challenge the assessment of an Everglades agricultural privilege tax, including specifically, and without limitation, the annual certification by the district governing board of the Everglades agricultural privilege tax roll to the appropriate tax collector, the annual calculation of any incentive credit for phosphorus level reductions, the denial of an application for exclusion from the Everglades agricultural privilege tax, the calculation of the minimum tax adjustments provided in paragraph (e), the denial of an application for reduction to the minimum tax, and the denial of any application for classification as vegetable acreage, deferment of payment for vegetable acreage, or correction of any alleged error in the Everglades agricultural privilege tax roll.

(h)   In recognition of the findings set forth in subsection (1), the Legislature finds that the assessment and use of the Everglades agricultural privilege tax is a matter of concern to all areas of Florida. The Legislature intends this act to be a general law authorization of the Everglades agricultural privilege tax within the meaning of s. 9, Art. VII of the State Constitution and further intends that payment of the tax, in addition to payment of the cost of continuing implementation of BMPs, fulfills the obligations of owners and users of land under s. 7(b), Art. II of the State Constitution.

(7)   C-139 AGRICULTURAL PRIVILEGE TAX.—

(a)   There is hereby imposed an annual C-139 agricultural privilege tax for the privilege of conducting an agricultural trade or business on:

1.   All real property located within the C-139 Basin that is classified as agricultural under the provisions of chapter 193; and

2.   Leasehold or other interests in real property located within the C-139 Basin owned by the United States, the state, or any agency thereof permitting the property to be used for agricultural purposes in a manner that would result in such property being classified as agricultural under the provisions of chapter 193 if not governmentally owned, whether or not such property is actually classified as agricultural under the provisions of chapter 193.

It is hereby determined by the Legislature that the privilege of conducting an agricultural trade or business on such property constitutes a reasonable basis for imposing the C-139 agricultural privilege tax and that logical differences exist between the agricultural use of such property and the use of other property within the C-139 Basin for residential or nonagricultural commercial use. The C-139 agricultural privilege tax shall constitute a lien against the property, or the leasehold or other interest in governmental property permitting such property to be used for agricultural purposes, described on the C-139 agricultural privilege tax roll. The lien shall be in effect from January 1 of the year the tax notice is mailed until discharged by payment and shall be equal in rank and dignity with the liens of all state, county, district, or municipal taxes and non-ad valorem assessments imposed pursuant to general law, special act, or local ordinance and shall be superior in dignity to all other liens, titles, and claims.

(b)   The C-139 agricultural privilege tax, other than for leasehold or other interests in governmental property permitting such property to be used for agricultural purposes, shall be collected in the manner provided for ad valorem taxes. By September 15 of each year, the governing board of the district shall certify by resolution a C-139 agricultural privilege tax roll on compatible electronic medium to the tax collector of each county in which a portion of the C-139 Basin is located. The district shall also produce one copy of the roll in printed form which shall be available for inspection by the public. The district shall post the C-139 agricultural privilege tax for each parcel on the roll. The tax collector shall not accept any such roll that is not certified on compatible electronic medium and that does not contain the posting of the C-139 agricultural privilege tax for each parcel. It is the responsibility of the district that such rolls be free of errors and omissions. Alterations to such rolls may be made by the executive director of the district, or a designee, up to 10 days before certification. If the tax collector or any taxpayer discovers errors or omissions on such roll, such person may request the district to file a corrected roll or a correction of the amount of any C-139 agricultural privilege tax. Other than for leasehold or other interests in

governmental property permitting such property to be used for agricultural purposes, C-139 agricultural privilege taxes collected pursuant to this section shall be included in the combined notice for ad valorem taxes and non-ad valorem assessments provided for in s. 197.3635. Such C-139 agricultural privilege taxes shall be listed in the portion of the combined notice utilized for non-ad valorem assessments. A separate mailing is authorized only as a solution to the most exigent factual circumstances. However, if a tax collector cannot merge a C-139 agricultural privilege tax roll to produce such a notice, the tax collector shall mail a separate notice of C-139 agricultural privilege taxes or shall direct the district to mail such a separate notice. In deciding whether a separate mailing is necessary, the tax collector shall consider all costs to the district and taxpayers of such a separate mailing and the adverse effects to the taxpayers of delayed and multiple notices. The district shall bear all costs associated with any separate notice. C-139 agricultural privilege taxes collected pursuant to this section shall be subject to all collection provisions of chapter 197, including provisions relating to discount for early payment, prepayment by installment method, deferred payment, penalty for delinquent payment, and issuance and sale of tax certificates and tax deeds for nonpayment. C-139 agricultural privilege taxes for leasehold or other interests in property owned by the United States, the state, or any agency thereof permitting such property to be used for agricultural purposes shall be included on the notice provided pursuant to s. 196.31, a copy of which shall be provided to lessees or other interestholders registering with the district, and shall be collected from the lessee or other appropriate interestholder and remitted to the district immediately upon collection. C-139 agricultural privilege taxes included on the statement provided pursuant to s. 196.31 shall be due and collected on or prior to the next April 1 following provision of the notice. Proceeds of the C-139 agricultural privilege taxes shall be distributed by the tax collector to the district. Each tax collector shall be paid a commission equal to the actual cost of collection, not to exceed 2 percent, on the amount of C-139 agricultural privilege taxes collected and remitted. Notwithstanding any general law or special act to the contrary, C-139 agricultural privilege taxes shall not be included on the notice of proposed property taxes provided in s. 200.069.

(c)1. The initial C-139 agricultural privilege tax roll shall be certified for the tax notices mailed in November 1994. The C-139 agricultural privilege taxes for the tax notices mailed in November 1994 through November 2002 shall be computed by dividing $654,656 by the number of acres included on the C-139 agricultural privilege tax roll for such year, excluding any property located within the C-139 Annex.

2. The C-139 agricultural privilege taxes for the tax notices mailed in November 2003 through November 2013 shall be computed by dividing $654,656 by the number of acres included on the C-139 agricultural privilege tax roll for November 2001, excluding any property located within the C-139 Annex.

3. The C-139 agricultural privilege taxes for the tax notices mailed in November 2014 and thereafter shall be $1.80 per acre.

(d) For purposes of this paragraph, "vegetable acreage" means, for each tax year, any portion of a parcel of property used for a period of not less than 8 months for the production of vegetable crops, including sweet corn, during the 12 months ended September 30 of the year preceding the tax year. Land preparation, crop rotation, and fallow periods shall not disqualify property from classification as vegetable acreage if such property is actually used for the production of vegetable crops.

1. If either the Governor, the President of the United States, or the United States Department of Agriculture declares the existence of a state of emergency or disaster resulting from extreme natural conditions impairing the ability of vegetable acreage to produce crops, payment of the C-139 agricultural privilege taxes imposed for the privilege of conducting an agricultural trade or business on such property shall be deferred for a period of 1 year, and all subsequent annual payments shall be deferred for the same period.

a. If the declaration occurs between April 1 and October 31, the C-139 agricultural privilege tax to be included on the next annual tax notice will be deferred to the subsequent annual tax notice.

b. If the declaration occurs between November 1 and March 31 and the C-139 agricultural privilege tax included on the most recent tax notice has not been paid, such C-139 agricultural privilege tax will be deferred to the next annual tax notice.

c. If the declaration occurs between November 1 and March 31 and the C-139 agricultural privilege tax included on the most recent tax notice has been paid, the C-139 agricultural privilege tax to be included on the

next annual tax notice will be deferred to the subsequent annual tax notice.

2.    In the event payment of C-139 agricultural privilege taxes is deferred pursuant to this paragraph, the district must record a notice in the official records of each county in which vegetable acreage subject to such deferment is located. The recorded notice must describe each parcel of property as to which C-139 agricultural privilege taxes have been deferred and the amount deferred for such property. If all or any portion of the property as to which C-139 agricultural privilege taxes have been deferred ceases to be classified as agricultural under the provisions of chapter 193 or otherwise subject to the C-139 agricultural privilege tax, all deferred amounts must be included on the tax notice for such property mailed in November of the first tax year for which such property is not subject to the C-139 agricultural privilege tax. After a property owner has paid all outstanding C-139 agricultural privilege taxes, including any deferred amounts, the district shall provide the property owner with a recordable instrument evidencing the payment of all outstanding amounts.

3.    The owner, lessee, or other appropriate interestholder shall file an application with the executive director of the district prior to July 1 for classification of a portion of the property as vegetable acreage on the C-139 agricultural privilege tax roll to be certified for the tax notice mailed in November of the same calendar year and shall have the burden of proving the number of acres used for the production of vegetable crops during the year in which incentive credits are determined and the period of such use. The governing board of the district shall deny or grant the application by resolution adopted prior to or at the time of the adoption of its resolution certifying the annual C-139 agricultural privilege tax roll to the appropriate tax collector.

4.    This paragraph does not relieve vegetable acreage from the performance of best management practices specified in chapter 40E-63, Florida Administrative Code.

(e)    Any owner, lessee, or other appropriate interestholder of property subject to the C-139 agricultural privilege tax may contest the C-139 agricultural privilege tax by filing an action in circuit court.

1.    No action may be brought to contest the C-139 agricultural privilege tax after 60 days from the date the tax notice that includes the C-139 agricultural privilege tax is mailed by the tax collector. Before an action to contest the C-139 agricultural privilege tax may be brought, the taxpayer shall pay to the tax collector the amount of the C-139 agricultural privilege tax which the taxpayer admits in good faith to be owing. The tax collector shall issue a receipt for the payment and the receipt shall be filed with the complaint. Payment of an C-139 agricultural privilege tax shall not be deemed an admission that such tax was due and shall not prejudice the right to bring a timely action to challenge such tax and seek a refund. No action to contest the C-139 agricultural privilege tax may be maintained, and such action shall be dismissed, unless all C-139 agricultural privilege taxes imposed in years after the action is brought, which the taxpayer in good faith admits to be owing, are paid before they become delinquent. The requirements of this paragraph are jurisdictional.

2.    In any action involving a challenge of the C-139 agricultural privilege tax, the court shall assess all costs. If the court finds that the amount of tax owed by the taxpayer is greater than the amount the taxpayer has in good faith admitted and paid, it shall enter judgment against the taxpayer for the deficiency and for interest on the deficiency at the rate of 12 percent per year from the date the tax became delinquent. If it finds that the amount of tax which the taxpayer has admitted to be owing is grossly disproportionate to the amount of tax found to be due and that the taxpayer's admission was not made in good faith, the court shall also assess a penalty at the rate of 25 percent of the deficiency per year from the date the tax became delinquent. The court may issue injunctions to restrain the sale of property for any C-139 agricultural privilege tax which appears to be contrary to law or equity.

(f)    Notwithstanding any contrary provisions in chapter 120, or any provision of any other law, an action in circuit court shall be the exclusive remedy to challenge the assessment of an C-139 agricultural privilege tax and owners of property subject to the C-139 agricultural privilege tax shall have no right or standing to initiate administrative proceedings under chapter 120 to challenge the assessment of an C-139 agricultural privilege tax including specifically, and without limitation, the annual certification by the district governing board of the C-139 agricultural privilege tax roll to the appropriate tax collector, the denial of an application for exclusion from the C-139 agricultural privilege tax, and the denial of any application for classification as vegetable acreage, deferment of payment for vegetable acreage, or correction of any alleged error in the C-139 agricultural privilege tax roll.

(g)   In recognition of the findings set forth in subsection (1), the Legislature finds that the assessment and use of the C-139 agricultural privilege tax is a matter of concern to all areas of Florida and the Legislature intends this section to be a general law authorization of the tax within the meaning of s. 9, Art. VII of the State Constitution.

(8)   SPECIAL ASSESSMENTS.—

(a)   In addition to any other legally available funding mechanism, the district may create, alone or in cooperation with counties, municipalities, and special districts pursuant to s. 163.01, the Florida Interlocal Cooperation Act of 1969, one or more stormwater management system benefit areas including property located outside the EAA and the C-139 Basin, and property located within the EAA and the C-139 Basin that is not subject to the Everglades agricultural privilege tax or the C-139 agricultural privilege tax. The district may levy special assessments within said benefit areas to fund the planning, acquisition, construction, financing, operation, maintenance, and administration of stormwater management systems for the benefited areas. Any benefit area in which property owners receive substantially different levels of stormwater management system benefits shall include stormwater management system benefit subareas within which different per acreage assessments shall be levied from subarea to subarea based upon a reasonable relationship to benefits received. The assessments shall be calculated to generate sufficient funds to plan, acquire, construct, finance, operate, and maintain the stormwater management systems authorized pursuant to this section.

(b)   The district may use the non-ad valorem levy, collection, and enforcement method as provided in chapter 197 for assessments levied pursuant to paragraph (a).

(c)   The district shall publish notice of the certification of the non-ad valorem assessment roll pursuant to chapter 197 in a newspaper of general circulation in the counties wherein the assessment is being levied, within 1 week after the district certifies the non-ad valorem assessment roll to the tax collector pursuant to s. 197.3632(5). The assessments levied pursuant to paragraph (a) shall be final and conclusive as to each lot or parcel unless the owner thereof shall, within 90 days of certification of the non-ad valorem assessment roll pursuant to s. 197.3632(5), commence an action in circuit court. Absent such commencement of an action within such period of time by an owner of a lot or parcel, such owner shall thereafter be estopped to raise any question related to the special benefit afforded the property or the reasonableness of the amount of the assessment. Except with respect to an owner who has commenced such an action, the non-ad valorem assessment roll as finally adopted and certified by the South Florida Water Management District to the tax collector pursuant to s. 197.3632(5) shall be competent and sufficient evidence that the assessments were duly levied and that all other proceedings adequate to the adoption of the non-ad valorem assessment roll were duly held, taken, and performed as required by s. 197.3632. If any assessment is abated in whole or in part by the court, the amount by which the assessment is so reduced may, by resolution of the governing board of the district, be payable from funds of the district legally available for that purpose, or at the discretion of the governing board of the district, assessments may be increased in the manner provided in s. 197.3632.

(d)   In no event shall the amount of funds collected for stormwater management facilities pursuant to paragraph (a) exceed the cost of providing water management attributable to water quality treatment resulting from the operation of stormwater management systems of the landowners to be assessed. Such water quality treatment may be required by the plan or permits issued by the district. Prior to the imposition of assessments pursuant to paragraph (a) for construction of new stormwater management systems or the acquisition of necessary land, the district shall establish the general purpose, design, and function of the new system sufficient to make a fair and reasonable determination of the estimated costs of water management attributable to water quality treatment resulting from operation of stormwater management systems of the landowners to be assessed. This determination shall establish the proportion of the total anticipated costs attributable to the landowners. In determining the costs to be imposed by assessments, the district shall consider the extent to which nutrients originate from external sources beyond the control of the landowners to be assessed. Costs for hydroperiod restoration within the Everglades Protection Area shall be provided by funds other than those derived from the assessments. The proportion of total anticipated costs attributable to the landowners shall be apportioned to individual landowners considering the factors specified in paragraph (e). Any determination made pursuant to this paragraph or paragraph (e) may be included in the plan or permits issued by the district.

(e)   In determining the amount of any assessment imposed on an individual landowner under paragraph (a), the district shall consider the quality and quantity of the stormwater discharged by the landowner, the amount of treatment provided to the landowner, and whether the landowner has provided equivalent treatment or retention prior to discharge to the district's system.

(f)   No assessment shall be imposed under this section for the operation or maintenance of a stormwater management system or facility for which construction has been completed on or before July 1, 1991, except to the extent that the operation or maintenance, or any modification of such system or facility, is required to provide water quality treatment.

(g)   The district shall suspend, terminate, or modify projects and funding for such projects, as appropriate, if the projects are not achieving applicable goals specified in the plan.

(h)   The Legislature hereby determines that any property owner who contributes to the need for stormwater management systems and programs, as determined for each individual property owner either through the plan or through permits issued to the district or to the property owner, is deemed to benefit from such systems and programs, and such benefits are deemed to be directly proportional to the relative contribution of the property owner to such need. The Legislature also determines that the issuance of a master permit provides benefits, through the opportunity to achieve collective compliance, for all persons within the area of the master permit which may be considered by the district in the imposition of assessments under this section.

(9)   PERMITS.—

(a)   The Legislature finds that construction and operation of the Everglades Construction Project will benefit the water resources of the district and is consistent with the public interest. The district shall construct, maintain, and operate the Everglades Construction Project in accordance with this section.

(b)   The Legislature finds that there is an immediate need to initiate cleanup and restoration of the Everglades Protection Area through the Everglades Construction Project. In recognition of this need, the district may begin construction of the Everglades Construction Project prior to final agency action, or notice of intended agency action, on any permit from the department under this section.

(c)   The department may issue permits to the district to construct, operate, and maintain the Everglades Construction Project based on the criteria set forth in this section. The permits to be issued by the department to the district under this section shall be in lieu of other permits under this part or part VIII of chapter 403, 1992 Supplement to the Florida Statutes 1991.

(d)   By June 1, 1994, the district shall apply to the department for a permit or permits for the construction, operation, and maintenance of the Everglades Construction Project. The district may comply with this paragraph by amending its pending Everglades permit application.

(e)   The department shall issue a permit for a term of 5 years for the construction, operation, and maintenance of the Everglades Construction Project upon the district's providing reasonable assurances that:

1.   The project will be constructed, operated, and maintained in accordance with the Everglades Construction Project;

2.   The BMP program set forth in paragraph (4)(f) has been implemented; and

3.   The final design of the Everglades Construction Project shall minimize wetland impacts, to the maximum extent practicable and consistent with the Everglades Construction Project.

(f)   At least 60 days prior to the expiration of any permit issued under this section, the district may apply for renewal for a period of 5 years.

(g)   Permits issued under this section may include any standard conditions provided by department rule which are appropriate and consistent with this section.

(h)   Discharges shall be allowed, provided the STAs are operated in accordance with this section, if, after a stabilization period:

1.   The STAs achieve the design objectives of the Everglades Construction Project for phosphorus;

2.   For water quality parameters other than phosphorus, the quality of water discharged from the STAs is of equal or better quality than inflows; and

3.   Discharges from STAs do not pose a serious danger to the public health, safety, or welfare.

(i)   The district may discharge from any STA into waters of the state upon issuance of final agency action authorizing such action or in accordance with s. 373.439.

(j)1.   Modifications to the Everglades Construction Project shall be submitted to the department for a determination as to whether permit modification is necessary. The department shall notify the district within 30 days after receiving the submittal as to whether permit modification is necessary.

2.   The Legislature recognizes that technological advances may occur during the construction of the Everglades Construction Project. If superior technology becomes available in the future which can be implemented to more effectively meet the intent and purposes of this section, the district is authorized to pursue that alternative through permit modification to the department. The department may issue or modify a permit provided that the alternative is demonstrated to be superior at achieving the restoration goals of the Everglades Construction Project considering:

a.   Levels of load reduction;

b.   Levels of discharge concentration reduction;

c.   Water quantity, distribution, and timing for the Everglades Protection Area;

d.   Compliance with water quality standards;

e.   Compatibility of treated water with the balance in natural populations of aquatic flora or fauna in the Everglades Protection Area;

f.   Cost-effectiveness; and

g.   The schedule for implementation.

Upon issuance of permit modifications by the department, the district is authorized to use available funds to finance the modification.

3.   The district shall modify projects of the Everglades Construction Project, as appropriate, if the projects are not achieving the design objectives. Modifications that are inconsistent with the permit shall require a permit modification from the department. Modifications which substitute the treatment technology must meet the requirements of subparagraph 2. Nothing in this section shall prohibit the district from refining or modifying the final design of the project based upon the February 14, 1994, conceptual design document in accordance with standard engineering practices.

(k)   By October 1, 1994, the district shall apply for a permit under this section to operate and maintain discharge structures within the control of the district which discharge into, within, or from the Everglades Protection Area and are not included in the Everglades Construction Project. The district may comply with this subsection by amending its pending permit application regarding these structures. In addition to the requirements of ss. 373.413 and 373.416, the application shall include the following:

1.   Schedules and strategies for:

a.   Achieving and maintaining water quality standards;

b.   Evaluation of existing programs, permits, and water quality data;

c.   Acquisition of lands and construction and operation of water treatment facilities, if appropriate, together with development of funding mechanisms; and

d.   Development of a regulatory program to improve water quality, including identification of structures or systems requiring permits or modifications of existing permits.

2.   A monitoring program to ensure the accuracy of data and measure progress toward achieving compliance with water quality standards.

(l)   The department shall issue one or more permits for a term of 5 years for the operation and maintenance of structures identified by the district in paragraph (k) upon the district's demonstration of reasonable assurance that those elements identified in paragraph (k) will provide compliance with water quality standards to the maximum extent practicable and otherwise comply with the provisions of ss. 373.413 and 373.416. The department shall take agency action on the permit application by October 1, 1996. At least 60 days prior to the expiration of any permit, the district may apply for a renewal thereof for a period of 5 years.

(m)　The district may apply for modification of any permit issued pursuant to this subsection, including superior technology in accordance with the procedures set forth in this subsection.

(n)　The district also shall apply for a permit or modification of an existing permit, as provided in this subsection, for any new structure or for any modification of an existing structure.

(o)　Except as otherwise provided in this section, nothing in this subsection shall relieve any person from the need to obtain any permit required by the department or the district pursuant to any other provision of law.

(p)　The district shall publish notice of rulemaking pursuant to chapter 120 by October 1, 1991, allowing for a master permit or permits authorizing discharges from landowners within that area served by structures identified as S-5A, S-6, S-7, S-8, and S-150. For discharges within this area, the district shall not initiate any proceedings to require new permits or permit modifications for nutrient limitations prior to the adoption of the master permit rule by the governing board of the district or prior to April 1, 1992, whichever first occurs. The district's rules shall also establish conditions or requirements allowing for a single master permit for the Everglades Agricultural Area including those structures and water releases subject to chapter 40E-61, Florida Administrative Code. No later than the adoption of rules allowing for a single master permit, the department and the district shall provide appropriate procedures for incorporating into a master permit separate permits issued by the department under this chapter. The district's rules authorizing master permits for the Everglades Agricultural Area shall provide requirements consistent with this section and with interim or other permits issued by the department to the district. Such a master permit shall not preclude the requirement that individual permits be obtained for persons within the master permit area for activities not authorized by, or not in compliance with, the master permit. Nothing in this subsection shall limit the authority of the department or district to enforce existing permit requirements or existing rules, to require permits for new structures, or to develop rules for master permits for other areas. To the greatest extent possible the department shall delegate to the district any authority necessary to implement this subsection which is not already delegated.

(10)　LONG-TERM COMPLIANCE PERMITS.—By December 31, 2006, the department and the district shall take such action as may be necessary to implement the pre-2006 projects and strategies of the Long-Term Plan so that water delivered to the Everglades Protection Area achieves in all parts of the Everglades Protection Area state water quality standards, including the phosphorus criterion and moderating provisions.

(a)　By December 31, 2003, the district shall submit to the department an application for permit modification to incorporate proposed changes to the Everglades Construction Project and other district works delivering water to the Everglades Protection Area as needed to implement the pre-2006 projects and strategies of the Long-Term Plan in all permits issued by the department, including the permits issued pursuant to subsection (9). These changes shall be designed to achieve state water quality standards, including the phosphorus criterion and moderating provisions. During the implementation of the initial phase of the Long-Term Plan, permits issued by the department shall be based on BAPRT, and shall include technology-based effluent limitations consistent with the Long-Term Plan, as provided in subparagraph (4)(e)3.

(b)　If the Everglades Construction Project or other discharges to the Everglades Protection Area are in compliance with state water quality standards, including the phosphorus criterion, the permit application shall include:

1.　A plan for maintaining compliance with the phosphorus criterion in the Everglades Protection Area.

2.　A plan for maintaining compliance in the Everglades Protection Area with state water quality standards other than the phosphorus criterion.

(11)　APPLICABILITY OF LAWS AND WATER QUALITY STANDARDS; AUTHORITY OF DISTRICT AND DEPARTMENT.—

(a)　Except as otherwise provided in this section, nothing in this section shall be construed:

1.　As altering any applicable state water quality standards, laws, or district or department rules in areas impacted by this section; or

2.　To restrict the authority otherwise granted the department and the district pursuant to this chapter or chapter 403, and provisions of this section shall be deemed supplemental to the authority granted pursuant to this chapter and chapter 403.

(b)  Mixing zones, variances, and moderating provisions, or relief mechanisms for compliance with water quality standards as provided by department rules, shall not be permitted for discharges which are subject to paragraph (4)(f) and subject to this section, except that site specific alternative criteria may be allowed for nonphosphorus parameters if the applicant shows entitlement under applicable law. After December 31, 2006, all such relief mechanisms may be allowed for nonphosphorus parameters if otherwise provided for by applicable law.

(c)  Those landowners or permittees who are not in compliance as provided in paragraph (4)(f) must meet a discharge limit for phosphorus of 50 parts per billion (ppb) unless and until some other limit has been established by department rule or order or operation of paragraph (4)(e).

(12)  RIGHTS OF SEMINOLE TRIBE OF FLORIDA.—Nothing in this section is intended to diminish or alter the governmental authority and powers of the Seminole Tribe of Florida, or diminish or alter the rights of that tribe, including, but not limited to, rights under the Water Rights Compact among the Seminole Tribe of Florida, the state, and the South Florida Water Management District as enacted by Pub. L. No. 100-228, 101 Stat. 1556, and chapter 87-292, Laws of Florida, and codified in s. 285.165, and rights under any other agreement between the Seminole Tribe of Florida and the state or its agencies. No land of the Seminole Tribe of Florida shall be used for stormwater treatment without the consent of the tribe.

(13)  ANNUAL REPORTS.—Beginning March 1, 2006, as part of the consolidated annual report required by s. 373.036(7), the district shall report on implementation of the section. The annual report will include a summary of the water conditions in the Everglades Protection Area, the status of the impacted areas, the status of the construction of the STAs, the implementation of the BMPs, and actions taken to monitor and control exotic species. The district must prepare the report in coordination with federal and state agencies.

(14)  EVERGLADES FUND.—The South Florida Water Management District is directed to separately account for all moneys used for the purpose of funding the Everglades Construction Project as part of the consolidated annual report required by s. 373.036(7).

(15)  DEFINITION OF EVERGLADES AGRICULTURAL AREA.—As used in this section, "Everglades Agricultural Area" or "EAA" means the following described property: BEGINNING at the intersection of the North line of Section 2, Township 41, Range 37 East, with the Easterly right-of-way line of U.S. Army Corps of Engineers' Levee D-9, in Palm Beach County, Florida; thence, easterly along said North line of said Section 2 to the Northeast corner of said Section 2; thence, northerly along the West line of Section 36, Township 40 South, Range 37 East, to the West one-quarter corner of said Section 36; thence, easterly along the East-West half section line of said Section 36 to the center of said Section 36; thence northerly along the North-South half section line of said Section 36 to the North one-quarter corner of said Section 36, said point being on the line between Palm Beach and Martin Counties; thence, easterly along said North line of said Section 36 and said line between Palm Beach and Martin Counties to the Westerly right-of-way line of the South Florida Water Management District's Levee 8 North Tieback; thence, southerly along said Westerly right-of-way line of said Levee 8 North Tieback to the Southerly right-of-way line of South Florida Water Management District's Levee 8 at a point near the Northeast corner of Section 12, Township 41 South, Range 37 East; thence, easterly along said Southerly right-of-way line of said Levee 8 to a point in Section 7, Township 41 South, Range 38 East, where said right-of-way line turns southeasterly; thence, southeasterly along the Southwesterly right-of-way line of said Levee 8 to a point near the South line of Section 8, Township 43 South, Range 40 East, where said right-of-way line turns southerly; thence, southerly along the Westerly right-of-way line of said Levee 8 to the Northerly right-of-way line of State Road 80, in Section 32, Township 43 South, Range 40 East; thence, westerly along the Northerly right-of-way line of said State Road 80 to the northeasterly extension of the Northwesterly right-of-way line of South Florida Water Management District's Levee 7; thence, southwesterly along said northeasterly extension, and along the northwesterly right-of-way line of said Levee 7 to a point near the Northwest corner of Section 3, Township 45 South, Range 39 East, where said right-of-way turns southerly; thence, southerly along the Westerly right-of-way line of said Levee 7 to the Northwesterly right-of-way line of South Florida Water Management District's Levee 6, on the East line of Section 4, Township 46 South, Range 39 East; thence, southwesterly along the Northwesterly right-of-way line of said Levee 6 to the Northerly right-of-way line of South Florida Water Management District's Levee 5, near the Southwest corner of Section 22, Township 47 South, Range 38 East; thence, westerly along said Northerly right-of-way lines of said Levee 5 and along the

Northerly right-of-way line of South Florida Water Management District's Levee 4 to the Northeasterly right-of-way line of South Florida Water Management District's Levee 3 and the Northeast corner of Section 12, Township 48 South, Range 34 East; thence, northwesterly along said Northeasterly right-of-way line of said Levee 3 to a point near the Southwest corner of Section 9, Township 47 South, Range 34 East, where said right-of-way line turns northerly; thence, northerly along the Easterly right-of-way lines of said Levee 3 and South Florida Water Management District's Levee 2 to the southerly line of Section 4, Township 46 South, Range 34 East; thence, easterly along said southerly line of said Section 4 to the Southeast corner of said Section 4; thence, northerly along the East lines of said Section 4 and Section 33, Township 45 South, Range 34 East, to the Northeast corner of said Section 33; thence, westerly along the North line of said Section 33 to said Easterly right-of-way line of said Levee 2; thence, northerly along said Easterly right-of-way lines of said Levee 2 and South Florida Water Management District's Levee 1, to the North line of Section 16, Township 44 South, Range 34 East; thence, easterly along the North lines of said Section 16 and Section 15, Township 44 South, Range 34 East, to the Northeast corner of said Section 15; thence, northerly along the West lines of Section 11 and Section 2, Township 44 South, Range 34 East, and the West lines of Section 35, Section 26 and Section 23, Township 43 South, Range 34 East to a point 25 feet north of the West quarter-corner (W$^1$/$_4$) of said Section 23; thence, easterly along a line that is 25 feet north and parallel to the East-West half section line of said Section 23 and Section 24 to a point that is 25 feet north of the center of said Section 24; thence, northerly along the North-South half section lines of said Section 24 and Section 13, Township 43 South, Range 34 East, to the intersection with the North right-of-way line of State Road 80A (old U.S. Highway 27); thence, westerly along said North right-of-way line of said State Road 80A (old U.S. Highway 27) to the intersection with the Southerly right-of-way line of State Road 80; thence, easterly along said Southerly right-of-way line of said State Road 80 to the intersection with the North line of Section 19, Township 43 South, Range 35 East; thence, easterly along said North line of Section 19 to the intersection with Southerly right-of-way of U.S. Army Corps of Engineers Levee D-2; thence, easterly along said Southerly right-of-way of said Levee D-2 to the intersection with the north right-of-way line of State Road 80 (new U.S. Highway 27); thence, easterly along said North right-of-way line of said State Road 80 (new U.S. Highway 27) to the East right-of-way line of South Florida Water Management District's Levee 25 (Miami Canal); thence, North along said East right-of-way line of said Levee 25 to the said south right-of-way line of said Levee D-2; thence, easterly and northeasterly along said Southerly and Easterly right-of-way lines of said Levee D-2 and said Levee D-9 to the point of beginning.

(16) DEFINITION OF C-139 BASIN.—For purposes of this section:

(a) "C-139 Basin" or "Basin" means the following described property: beginning at the intersection of an easterly extension of the south bank of Deer Fence Canal with the center line of South Florida Water Management District's Levee 3 in Section 33, Township 46 South, Range 34 East, Hendry County, Florida; thence, westerly along said easterly extension and along the South bank of said Deer Fence Canal to where it intersects the center line of State Road 846 in Section 33, Township 46 South, Range 32 East; thence, departing from said top of bank to the center line of said State Road 846, westerly along said center line of said State Road 846 to the West line of Section 4, Township 47 South, Range 31 East; thence, northerly along the West line of said section 4, and along the west lines of Sections 33 and 28, Township 46 South, Range 31 East, to the northwest corner of said Section 28; thence, easterly along the North line of said Section 28 to the North one-quarter (N$^1$/$_4$) corner of said Section 28; thence, northerly along the West line of the Southeast one-quarter (SE$^1$/$_4$) of Section 21, Township 46 South, Range 31 East, to the northwest corner of said Southeast one-quarter (SE$^1$/$_4$) of Section 21; thence, easterly along the North line of said Southeast one-quarter (SE$^1$/$_4$) of Section 21 to the northeast corner of said Southeast one-quarter (SE$^1$/$_4$) of Section 21; thence, northerly along the East line of said Section 21 and the East line of Section 16, Township 46 South, Range 31, East, to the northeast corner thereof; thence, westerly along the North line of said Section 16, to the northwest corner thereof; thence, northerly along the West line of Sections 9 and 4, Township 46 South, Range 31, East, to the northwest corner of said Section 4; thence, westerly along the North lines of Section 5 and Section 6, Township 46 South, Range 31 East, to the South one-quarter (S$^1$/$_4$) corner of Section 31, Township 45 South, Range 31 East; thence, northerly to the South one-quarter (S$^1$/$_4$) corner of Section 30, Township 45 South, Range 31 East; thence, easterly along the South line of said Section 30 and the South lines of Sections 29 and 28, Township 45 South, Range 31 East, to the Southeast corner of said Section 28; thence, northerly along the East line of said

Section 28 and the East lines of Sections 21 and 16, Township 45 South, Range 31 East, to the Northwest corner of the Southwest one-quarter of the Southwest one-quarter (SW$^1/_4$ of the SW$^1/_4$) of Section 15, Township 45 South, Range 31 East; thence, northeasterly to the east one-quarter (E$^1/_4$) corner of Section 15, Township 45 South, Range 31 East; thence, northerly along the East line of said Section 15, and the East line of Section 10, Township 45 South, Range 31 East, to the center line of a road in the Northeast one-quarter (NE$^1/_4$) of said Section 10; thence, generally easterly and northeasterly along the center line of said road to its intersection with the center line of State Road 832; thence, easterly along said center line of said State Road 832 to its intersection with the center line of State Road 833; thence, northerly along said center line of said State Road 833 to the north line of Section 9, Township 44 South, Range 32 East; thence, easterly along the North line of said Section 9 and the north lines of Sections 10, 11 and 12, Township 44 South, Range 32 East, to the northeast corner of Section 12, Township 44 South, Range 32 East; thence, easterly along the North line of Section 7, Township 44 South, Range 33 East, to the center line of Flaghole Drainage District Levee, as it runs to the east near the northwest corner of said Section 7, Township 44 South, Range 33 East; thence, easterly along said center line of the Flaghole Drainage District Levee to where it meets the center line of South Florida Water Management District's Levee 1 at Flag Hole Road; thence, continue easterly along said center line of said Levee 1 to where it turns south near the Northwest corner of Section 12, Township 44 South, Range 33 East; thence, Southerly along said center line of said Levee 1 to where the levee turns east near the Southwest corner of said Section 12; thence, easterly along said center line of said Levee 1 to where it turns south near the Northeast corner of said Section 17, Township 44 South, Range 34 East; thence, southerly along said center line of said Levee 1 and the center line of South Florida Water Management District's Levee 2 to the intersection with the north line of Section 33, Township 45 South, Range 34 East; thence, easterly along the north line of said Section 33 to the northeast corner of said Section 33; thence, southerly along the east line of said Section 33 to the southeast corner of said Section 33; thence, southerly along the east line of Section 4, Township 46 South, Range 34 East to the southeast corner of said Section 4; thence, westerly along the south line of said Section 4 to the intersection with the centerline of South Florida Water Management District's Levee 2; thence, southerly along said Levee 2 centerline and South Florida Water Management District's Levee 3 centerline to the POINT OF BEGINNING.

(b) Sections 21, 28, and 33, Township 46 South, Range 31 East, are not included within the boundary of the C-139 Basin.

(c) If the district issues permits in accordance with all applicable rules allowing water from the "C-139 Annex" to flow into the drainage system for the C-139 Basin, the C-139 Annex shall be added to the C-139 Basin for all tax years thereafter, commencing with the next C-139 agricultural privilege tax roll certified after issuance of such permits. "C-139 Annex" means the following described property: that part of the S.E. $^1/_4$ of Section 32, Township 46 South, Range 34 East and that portion of Sections 5 and 6, Township 47 South, Range 34 East lying west of the L-3 Canal and South of the Deer Fence Canal; all of Sections 7, 17, 18, 19, 20, 28, 29, 30, 31, 32, 33, and 34, and that portion of Sections 8, 9, 16, 21, 22, 26, 27, 35, and 36 lying south and west of the L-3 Canal, in Township 47 South, Range 34 East; and all of Sections 2, 3, 4, 5, 6, 8, 9, 10, and 11 and that portion of Section 1 lying south and west of the L-3 Canal all in Township 48 South, Range 34 East.

(17) SHORT TITLE.—This section shall be known as the "Everglades Forever Act."

**History.**—s. 2, ch. 91-80; ss. 1, 2, ch. 94-115; s. 273, ch. 94-356; s. 171, ch. 99-13; s. 1, ch. 2003-12; s. 18, ch. 2003-394; s. 42, ch. 2005-2; s. 12, ch. 2005-36; s. 86, ch. 2008-4; s. 1, ch. 2013-59; s. 76, ch. 2014-17; s. 41, ch. 2015-229; s. 18, ch. 2017-3.

**373.45922 South Florida Water Management District; permit for completion of Everglades Construction Project; report.**—Within 60 days after receipt of any permit issued pursuant to s. 404 of the Clean Water Act, 33 U.S.C. s. 1344, for the completion of the Everglades Construction Project, as defined by s. 373.4592(2)(g), the South Florida Water Management District shall submit a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives that details the differences between the permit and the Everglades Program as defined by s. 373.4592(2)(h) and identifies any changes to the schedule or funding for the Everglades Program that result from the permit. The South Florida Water Management District shall include in the report a complete chronological record of any negotiations related to conditions included in the permit. Such record shall

be documented by inclusion of all relevant correspondence in the report. If any condition of the permit affects the schedule or costs of the Everglades Construction Project, the South Florida Water Management District shall include in the report a detailed explanation of why the condition was imposed and a detailed analysis of whether the condition would promote or hinder the progress of the project.

History.—s. 3, ch. 97-258; s. 37, ch. 2004-5.

### 373.45924    South Florida Water Management District; Everglades truth in borrowing.—

(1)    Definitions.—As used in this section, unless the context otherwise indicates:

(a)    "Debt" means any evidence of indebtedness, including, but not limited to, an agreement to pay principal and any interest thereon, whether in the form of a contract to repay borrowed money or otherwise, and includes moneys borrowed from any source that are directed to a purpose for which they were not originally budgeted.

(b)    "District" means the South Florida Water Management District.

(c)    "Interest" means the compensation for the use or detention of money or its equivalent.

(d)    "Interest rate" means the annual percentage of the outstanding debt or obligation payable as interest.

(e)    "Obligation" means an agreement to pay principal and interest thereon, other than a debt, whether in the form of a lease, lease-purchase, installment purchase, or otherwise, and includes a share, participation, or other interest in any such agreement.

(f)    "Outstanding debt" means any debt or obligation of which the principal has not been paid or for which an amount sufficient to provide for the payment of such debt or obligation and the interest on such debt or obligation to the maturity or early redemption of such debt or obligation has not been set aside for the benefit of the holders of such debt or obligation.

(g)    "Principal" means the face value of the debt or obligation proposed to be issued or incurred.

(2)    Whenever the South Florida Water Management District proposes to borrow or to otherwise finance with debt any fixed capital outlay projects or operating capital outlay for purposes pursuant to s. 373.4592, it shall develop the following documents to explain the issuance of a debt or obligation:

(a)    A summary of outstanding debt, including borrowing.

(b)    A statement of proposed financing, which shall include the following items:

1.    A listing of the purpose of the debt or obligation.

2.    The source of repayment of the debt or obligation.

3.    The principal amount of the debt or obligation.

4.    The interest rate on the debt or obligation.

5.    A schedule of annual debt service payments for each proposed debt or obligation.

(c)    A truth-in-borrowing statement, developed from the information compiled pursuant to this section, in substantially the following form:

The South Florida Water Management District is proposing to incur $ _(insert principal)_ of debt or obligation through borrowing for the purpose of _(insert purpose)_. This debt or obligation is expected to be repaid over a period of _(insert term of issue from subparagraph (b)5.)_ years from the following sources: _(list sources)_. At a forecasted interest rate of _(insert rate of interest from subparagraph (b)4.)_, total interest paid over the life of the debt or obligation will be $ _(insert sum of interest payments)_.

The truth-in-borrowing statement shall be published as a notice in one or more newspapers having a combined general circulation in the counties having land in the district. Such notice must be at least 6 inches square in size and shall not be placed in that portion of the newspaper where legal notices and classified advertisements appear.

History.—s. 4, ch. 97-258.

### 373.45926    Everglades Trust Fund; allocation of revenues and expenditure of funds for conservation and protection of natural resources and abatement of water pollution.—

(1)    LEGISLATIVE FINDINGS AND INTENT.—The Legislature finds and declares the following:

(a)    The Everglades ecological system is unique in the world and one of Florida's great treasures. The Legislature has responded to adverse changes in water quality, and in quantity, distribution, and timing of flows, that endanger the Everglades ecological system, by enacting the Everglades Forever Act. The act authorized the Everglades Construction Project, which is by far the largest environmental cleanup and restoration program of this type ever undertaken and will require substantial expenditures.

(b)    In consideration of both the environmental benefits and public costs of the Everglades Construction Project, the Legislature finds that enhanced oversight and accountability is necessary to ensure that the Everglades Construction Project is completed in a timely manner and within the limits of the funds made available for its completion. The Legislature further finds that the implementation of the Everglades Forever Act is critical to the conservation and protection of natural resources and improvement of water quality in the Everglades Protection Area and the Everglades Agricultural Area.

(2)    The South Florida Water Management District shall administer the Everglades Trust Fund consistent with the requirements of this section, as well as all other applicable laws.

(3)    The South Florida Water Management District shall furnish, as part of the consolidated annual report required by s. 373.036(7), a detailed copy of its expenditures from the Everglades Trust Fund to the Governor, the President of the Senate, and the Speaker of the House of Representatives, and shall make copies available to the public.

(4)    The following funds shall be deposited into the Everglades Trust Fund specifically for the implementation of the Everglades Forever Act.

(a)    Alligator Alley toll revenues pursuant to s. 338.26(3).

(b)    Everglades agricultural privilege tax revenues pursuant to s. 373.4592(6).

(c)    C-139 agricultural privilege tax revenues pursuant to s. 373.4592(7).

(d)    Special assessment revenues pursuant to s. 373.4592(8).

(e)    Ad valorem revenues pursuant to s. 373.4592(4)(a).

(f)    Federal funds appropriated by the United States Congress for any component of the Everglades Construction Project.

(g)    Any additional funds specifically appropriated by the Legislature for this purpose.

(h)    Gifts designated for implementation of the Everglades Forever Act from individuals, corporations, and other entities.

(i)    Any additional funds that become available for this purpose from any other source.

(5)    Funds deposited into the Everglades Trust Fund pursuant to this section shall be expended for implementation of the Everglades Forever Act as provided by s. 373.4592.

(6)    Funds from other sources deposited into the Everglades Trust Fund shall be used consistent with the purposes for which they were received.

(7)    Annually, no later than January 1, the South Florida Water Management District shall report to the President of the Senate and the Speaker of the House of Representatives:

(a)    The unencumbered balance which remains in the Everglades Trust Fund at the end of each fiscal year.

(b)    The revenues deposited in the Everglades Trust Fund pursuant to this section, by source, and the record of expenditures from the Everglades Trust Fund.

History.—s. 5, ch. 97-258; s. 108, ch. 2001-266; s. 13, ch. 2005-36; s. 33, ch. 2011-34; s. 42, ch. 2015-229.

### 373.4593    Florida Bay Restoration.—

(1)    The Legislature declares that an emergency exists regarding Florida Bay due to an environmental crisis manifested in widespread die off of sea grasses, algae blooms, and resulting decreases in marine life. These conditions threaten the ecological integrity of Florida Bay and surrounding areas and the economic viability of Monroe County and the State of Florida. The Legislature further finds that an increase in freshwater flow will assist in the restoration of Florida Bay.

(2)    The South Florida Water Management District shall take all actions within its authority to implement an emergency interim plan. The emergency interim plan shall be designed to provide for the release of water into

Taylor Slough and Florida Bay by up to 800 cfs, in order to optimize the quantity, timing, distribution, and quality of fresh water, and promote sheet flow into Taylor Slough.

(a) Within 60 days of the issuance of the final federal approvals, the South Florida Water Management District shall complete the installation of the necessary facilities required by the emergency interim plan.

(b) The South Florida Water Management District, upon approval of a majority of the Trustees of the Internal Improvement Trust Fund, shall file an eminent domain action to acquire the western three sections of the area known as Frog Pond. The Trustees of the Internal Improvement Trust Fund shall reach a decision on whether to approve the use of eminent domain for such purpose not later than January 1, 1995. The South Florida Water Management District, upon such approval, is granted the specific powers to exercise eminent domain to condemn the lands in these areas.

(c) Within 30 days of the acquisition of the property referred to above and the completion of the actions in paragraph (a) above, the South Florida Water Management District shall implement the emergency interim plan.

The above measures are emergency interim actions intended to enhance the quantity, timing, and distribution of freshwater to Taylor Slough and Florida Bay. These measures will benefit the water resources of the South Florida Water Management District and are consistent with the public interest.

(3) The district shall not be required to obtain a permit which may otherwise be required under this chapter or chapter 403 prior to the construction, installation, and operation of the pumping facilities and related facilities required to implement the emergency interim plan. The district is directed to provide information on the emergency interim plan to the department. The district shall minimize environmental impacts which may occur during construction, and shall submit a construction plan to the department. In the event that the emergency interim plan continues beyond July 1, 1996, the district shall apply to the department for a permit to continue to operate these facilities.

(4) The Legislature recognizes that the United States Army Corps of Engineers is developing a comprehensive plan for restoring freshwater flow into Taylor Slough and Florida Bay over the next several years. The emergency interim plan is not a substitute for or in conflict with the provisions of the United States Army Corps of Engineers currently under development. Further, the Legislature directs that the department and the South Florida Water Management District shall request the Federal Government complete and fund the ongoing restoration efforts so as to increase the quantity, quality, timing, and distribution of water delivered to the Bay. The department and the district shall also request the Federal Government to evaluate the release of fresh water under the demonstration project, consistent with applicable law.

History.—s. 6, ch. 94-115; s. 9, ch. 2001-62.

**373.45931    Alligator Alley tolls; Everglades and Florida Bay restoration.**—The South Florida Water Management District is authorized to expend funds from Alligator Alley tolls which have been deposited in the Everglades Fund of the South Florida Water Management District to fund restoration activities for the Everglades and Florida Bay.

History.—s. 8, ch. 94-115.

**373.4595    Northern Everglades and Estuaries Protection Program.**—

(1) FINDINGS AND INTENT.—

(a) The Legislature finds that the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed are critical water resources of the state, providing many economic, natural habitat, and biodiversity functions benefiting the public interest, including agricultural, public, and environmental water supply; flood control; fishing; navigation and recreation; and habitat to endangered and threatened species and other flora and fauna.

(b) The Legislature finds that changes in land uses, the construction of the Central and Southern Florida Project, and the loss of surface water storage have resulted in adverse changes to the hydrology and water quality of Lake Okeechobee and the Caloosahatchee and St. Lucie Rivers and their estuaries.

Statutes & Constitution :View Statutes : Online Sunshine

(c)   The Legislature finds that improvement to the hydrology, water quality, and associated aquatic habitats within the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed, is essential to the protection of the greater Everglades ecosystem.

(d)   The Legislature also finds that it is imperative for the state, local governments, and agricultural and environmental communities to commit to restoring and protecting the surface water resources of the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed, and that a watershed-based approach to address these issues must be developed and implemented immediately.

(e)   The Legislature finds that phosphorus loads from the Lake Okeechobee watershed have contributed to excessive phosphorus levels throughout the Lake Okeechobee watershed and downstream receiving waters and that a reduction in levels of phosphorus will benefit the ecology of these systems. The excessive levels of phosphorus have also resulted in an accumulation of phosphorus in the sediments of Lake Okeechobee. If not removed, internal phosphorus loads from the sediments are expected to delay responses of the lake to external phosphorus reductions.

(f)   The Legislature finds that the Lake Okeechobee phosphorus loads set forth in the total maximum daily loads established in accordance with s. 403.067 represent an appropriate basis for restoration of the Lake Okeechobee watershed.

(g)   The Legislature finds that, in addition to phosphorus, other pollutants are contributing to water quality problems in the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed, and that the total maximum daily load requirements of s. 403.067 provide a means of identifying and addressing these problems.

(h)   The Legislature finds that the expeditious implementation of the Lake Okeechobee Watershed Protection Program, the Caloosahatchee River Watershed Protection Program, and the St. Lucie River Watershed Protection Program is needed to improve the quality, quantity, timing, and distribution of water in the northern Everglades ecosystem and that this section, in conjunction with s. 403.067, including the implementation of the plans developed and approved pursuant to subsections (3) and (4), and any related basin management action plan developed and implemented pursuant to s. 403.067(7)(a), provide a reasonable means of achieving the total maximum daily load requirements and achieving and maintaining compliance with state water quality standards.

(i)   The Legislature finds that the implementation of the programs contained in this section is for the benefit of the public health, safety, and welfare and is in the public interest.

(j)   The Legislature finds that sufficient research has been conducted and sufficient plans developed to immediately expand and accelerate programs to address the hydrology and water quality in the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed.

(k)   The Legislature finds that a continuing source of funding is needed to effectively implement the programs developed and approved under this section which are needed to address the hydrology and water quality problems within the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed.

(l)   It is the intent of the Legislature to protect and restore surface water resources and achieve and maintain compliance with water quality standards in the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed, and downstream receiving waters, through the phased, comprehensive, and innovative protection program set forth in this section which includes long-term solutions based upon the total maximum daily loads established in accordance with s. 403.067. This program shall be watershed-based, shall provide for consideration of all water quality issues needed to meet the total maximum daily load, and shall include research and monitoring, development and implementation of best management practices, refinement of existing regulations, and structural and nonstructural projects, including public works.

(m)   It is the intent of the Legislature that this section be implemented in coordination with the Comprehensive Everglades Restoration Plan project components and other federal programs in order to maximize opportunities for the most efficient and timely expenditures of public funds.

(n)   It is the intent of the Legislature that the coordinating agencies encourage and support the development of creative public-private partnerships and programs, including opportunities for water storage and quality improvement on private lands and water quality credit trading, to facilitate or further the restoration of the

surface water resources of the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed, consistent with s. 403.067.

(2)   DEFINITIONS.—As used in this section, the term:

(a)   "Best management practice" means a practice or combination of practices determined by the coordinating agencies, based on research, field-testing, and expert review, to be the most effective and practicable on-location means, including economic and technological considerations, for improving water quality in agricultural and urban discharges. Best management practices for agricultural discharges shall reflect a balance between water quality improvements and agricultural productivity.

(b)   "Biosolids" means the solid, semisolid, or liquid residue generated during the treatment of domestic wastewater in a domestic wastewater treatment facility, formerly known as "domestic wastewater residuals" or "residuals," and includes products and treated material from biosolids treatment facilities and septage management facilities regulated by the department. The term does not include the treated effluent or reclaimed water from a domestic wastewater treatment facility, solids removed from pump stations and lift stations, screenings and grit removed from the preliminary treatment components of domestic wastewater treatment facilities, or ash generated during the incineration of biosolids.

(c)   "Caloosahatchee River watershed" means the Caloosahatchee River, its tributaries, its estuary, and the area within Charlotte, Glades, Hendry, and Lee Counties from which surface water flow is directed or drains, naturally or by constructed works, to the river, its tributaries, or its estuary.

(d)   "Coordinating agencies" means the Department of Agriculture and Consumer Services, the Department of Environmental Protection, and the South Florida Water Management District.

(e)   "Corps of Engineers" means the United States Army Corps of Engineers.

(f)   "Department" means the Department of Environmental Protection.

(g)   "District" means the South Florida Water Management District.

(h)   "Lake Okeechobee Watershed Construction Project" means the construction project developed pursuant to this section.

(i)   "Lake Okeechobee Watershed Protection Plan" means the Lake Okeechobee Watershed Construction Project and the Lake Okeechobee Watershed Research and Water Quality Monitoring Program.

(j)   "Lake Okeechobee watershed" means Lake Okeechobee, its tributaries, and the area within which surface water flow is directed or drains, naturally or by constructed works, to the lake or its tributaries.

(k)   "Northern Everglades" means the Lake Okeechobee watershed, the Caloosahatchee River watershed, and the St. Lucie River watershed.

(l)   "Project component" means any structural or operational change, resulting from the Restudy, to the Central and Southern Florida Project as it existed and was operated as of January 1, 1999.

(m)   "Restudy" means the Comprehensive Review Study of the Central and Southern Florida Project, for which federal participation was authorized by the Federal Water Resources Development Acts of 1992 and 1996 together with related Congressional resolutions and for which participation by the South Florida Water Management District is authorized by s. 373.1501. The term includes all actions undertaken pursuant to the aforementioned authorizations which will result in recommendations for modifications or additions to the Central and Southern Florida Project.

(n)   "River Watershed Protection Plans" means the Caloosahatchee River Watershed Protection Plan and the St. Lucie River Watershed Protection Plan developed pursuant to this section.

(o)   "Soil amendment" means any substance or mixture of substances sold or offered for sale for soil enriching or corrective purposes, intended or claimed to be effective in promoting or stimulating plant growth, increasing soil or plant productivity, improving the quality of crops, or producing any chemical or physical change in the soil, except amendments, conditioners, additives, and related products that are derived solely from inorganic sources and that contain no recognized plant nutrients.

(p)   "St. Lucie River watershed" means the St. Lucie River, its tributaries, its estuary, and the area within Martin, Okeechobee, and St. Lucie Counties from which surface water flow is directed or drains, naturally or by constructed works, to the river, its tributaries, or its estuary.

(q) "Total maximum daily load" means the sum of the individual wasteload allocations for point sources and the load allocations for nonpoint sources and natural background adopted pursuant to s. 403.067. Before determining individual wasteload allocations and load allocations, the maximum amount of a pollutant that a water body or water segment can assimilate from all sources without exceeding water quality standards must first be calculated.

(3) LAKE OKEECHOBEE WATERSHED PROTECTION PROGRAM.—The Lake Okeechobee Watershed Protection Program shall consist of the Lake Okeechobee Watershed Protection Plan, the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067, the Lake Okeechobee Exotic Species Control Program, and the Lake Okeechobee Internal Phosphorus Management Program. The Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067 shall be the component of the Lake Okeechobee Watershed Protection Program that achieves phosphorus load reductions for Lake Okeechobee. The Lake Okeechobee Watershed Protection Program shall address the reduction of phosphorus loading to the lake from both internal and external sources. Phosphorus load reductions shall be achieved through a phased program of implementation. In the development and administration of the Lake Okeechobee Watershed Protection Program, the coordinating agencies shall maximize opportunities provided by federal cost-sharing programs and opportunities for partnerships with the private sector.

(a) *Lake Okeechobee Watershed Protection Plan.*—To protect and restore surface water resources, the district, in cooperation with the other coordinating agencies, shall complete a Lake Okeechobee Watershed Protection Plan in accordance with this section and ss. 373.451-373.459. Beginning March 1, 2020, and every 5 years thereafter, the district shall update the Lake Okeechobee Watershed Protection Plan to ensure that it is consistent with the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067. The Lake Okeechobee Watershed Protection Plan shall identify the geographic extent of the watershed, be coordinated with the plans developed pursuant to paragraphs (4)(a) and (c), and include the Lake Okeechobee Watershed Construction Project and the Lake Okeechobee Watershed Research and Water Quality Monitoring Program. The plan shall consider and build upon a review and analysis of the performance of projects constructed during Phase I and Phase II of the Lake Okeechobee Watershed Construction Project, pursuant to subparagraph 1.; relevant information resulting from the Lake Okeechobee Basin Management Action Plan, pursuant to paragraph (b); relevant information resulting from the Lake Okeechobee Watershed Research and Water Quality Monitoring Program, pursuant to subparagraph 2.; relevant information resulting from the Lake Okeechobee Exotic Species Control Program, pursuant to paragraph (c); and relevant information resulting from the Lake Okeechobee Internal Phosphorus Management Program, pursuant to paragraph (d).

1. Lake Okeechobee Watershed Construction Project.—To improve the hydrology and water quality of Lake Okeechobee and downstream receiving waters, including the Caloosahatchee and St. Lucie Rivers and their estuaries, the district, in cooperation with the other coordinating agencies, shall design and construct the Lake Okeechobee Watershed Construction Project. The project shall include:

a. Phase I.—Phase I of the Lake Okeechobee Watershed Construction Project shall consist of a series of project features consistent with the recommendations of the South Florida Ecosystem Restoration Working Group's Lake Okeechobee Action Plan. Priority basins for such projects include S-191, S-154, and Pools D and E in the Lower Kissimmee River. To obtain phosphorus load reductions to Lake Okeechobee as soon as possible, the following actions shall be implemented:

(I) The district shall serve as a full partner with the Corps of Engineers in the design and construction of the Grassy Island Ranch and New Palm Dairy stormwater treatment facilities as components of the Lake Okeechobee Water Retention/Phosphorus Removal Critical Project. The Corps of Engineers shall have the lead in design and construction of these facilities. Should delays be encountered in the implementation of either of these facilities, the district shall notify the department and recommend corrective actions.

(II) The district shall obtain permits and complete construction of two of the isolated wetland restoration projects that are part of the Lake Okeechobee Water Retention/Phosphorus Removal Critical Project. The additional isolated wetland projects included in this critical project shall further reduce phosphorus loading to Lake Okeechobee.

(III) The district shall work with the Corps of Engineers to expedite initiation of the design process for the Taylor Creek/Nubbins Slough Reservoir Assisted Stormwater Treatment Area, a project component of the Comprehensive Everglades Restoration Plan. The district shall propose to the Corps of Engineers that the district take the lead in the design and construction of the Reservoir Assisted Stormwater Treatment Area and receive credit towards the local share of the total cost of the Comprehensive Everglades Restoration Plan.

b. Phase II technical plan and construction.—The district, in cooperation with the other coordinating agencies, shall develop a detailed technical plan for Phase II of the Lake Okeechobee Watershed Construction Project which provides the basis for the Lake Okeechobee Basin Management Action Plan adopted by the department pursuant to s. 403.067. The detailed technical plan shall include measures for the improvement of the quality, quantity, timing, and distribution of water in the northern Everglades ecosystem, including the Lake Okeechobee watershed and the estuaries, and for facilitating the achievement of water quality standards. Use of cost-effective biologically based, hybrid wetland/chemical and other innovative nutrient control technologies shall be incorporated in the plan where appropriate. The detailed technical plan shall also include a Process Development and Engineering component to finalize the detail and design of Phase II projects and identify additional measures needed to increase the certainty that the overall objectives for improving water quality and quantity can be met. Based on information and recommendations from the Process Development and Engineering component, the Phase II detailed technical plan shall be periodically updated. Phase II shall include construction of additional facilities in the priority basins identified in sub-subparagraph a., as well as facilities for other basins in the Lake Okeechobee watershed. The technical plan shall:

(I) Identify Lake Okeechobee Watershed Construction Project facilities designed to contribute to achieving all applicable total maximum daily loads established pursuant to s. 403.067 within the Lake Okeechobee watershed.

(II) Identify the size and location of all such Lake Okeechobee Watershed Construction Project facilities.

(III) Provide a construction schedule for all such Lake Okeechobee Watershed Construction Project facilities, including the sequencing and specific timeframe for construction of each Lake Okeechobee Watershed Construction Project facility.

(IV) Provide a schedule for the acquisition of lands or sufficient interests necessary to achieve the construction schedule.

(V) Provide a detailed schedule of costs associated with the construction schedule.

(VI) Identify, to the maximum extent practicable, impacts on wetlands and state-listed species expected to be associated with construction of such facilities, including potential alternatives to minimize and mitigate such impacts, as appropriate.

(VII) Provide for additional measures, including voluntary water storage and quality improvements on private land, to increase water storage and reduce excess water levels in Lake Okeechobee and to reduce excess discharges to the estuaries.

(VIII) Develop the appropriate water quantity storage goal to achieve the desired Lake Okeechobee range of lake levels and inflow volumes to the Caloosahatchee and St. Lucie estuaries while meeting the other water-related needs of the region, including water supply and flood protection.

(IX) Provide for additional source controls needed to enhance performance of the Lake Okeechobee Watershed Construction Project facilities. Such additional source controls shall be incorporated into the Lake Okeechobee Basin Management Action Plan pursuant to paragraph (b).

c. Evaluation.—Within 5 years after the adoption of the Lake Okeechobee Basin Management Action Plan pursuant to s. 403.067 and every 5 years thereafter, the department, in cooperation with the other coordinating agencies, shall conduct an evaluation of the Lake Okeechobee Watershed Construction Project and identify any further load reductions necessary to achieve compliance with the Lake Okeechobee total maximum daily loads established pursuant to s. 403.067. The district shall identify modifications to facilities of the Lake Okeechobee Watershed Construction Project as appropriate to meet the total maximum daily loads. Modifications to the Lake Okeechobee Watershed Construction Project resulting from this evaluation shall be incorporated into the Lake Okeechobee Basin Management Action Plan and included in the applicable annual progress report submitted pursuant to subsection (6).

d. Coordination and review.—To ensure the timely implementation of the Lake Okeechobee Watershed Construction Project, the design of project facilities shall be coordinated with the department and other interested parties, including affected local governments, to the maximum extent practicable. Lake Okeechobee Watershed Construction Project facilities shall be reviewed and commented upon by the department before the execution of a construction contract by the district for that facility.

2. Lake Okeechobee Watershed Research and Water Quality Monitoring Program.—The coordinating agencies shall implement a Lake Okeechobee Watershed Research and Water Quality Monitoring Program. Results from the program shall be used by the department, in cooperation with the other coordinating agencies, to make modifications to the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067, as appropriate. The program shall:

a. Evaluate all available existing water quality data concerning total phosphorus in the Lake Okeechobee watershed, develop a water quality baseline to represent existing conditions for total phosphorus, monitor long-term ecological changes, including water quality for total phosphorus, and measure compliance with water quality standards for total phosphorus, including any applicable total maximum daily load for the Lake Okeechobee watershed as established pursuant to s. 403.067. Beginning March 1, 2020, and every 5 years thereafter, the department shall reevaluate water quality and quantity data to ensure that the appropriate projects are being designated and incorporated into the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067. The district shall implement a total phosphorus monitoring program at appropriate structures owned or operated by the district and within the Lake Okeechobee watershed.

b. Develop a Lake Okeechobee water quality model that reasonably represents the phosphorus dynamics of Lake Okeechobee and incorporates an uncertainty analysis associated with model predictions.

c. Determine the relative contribution of phosphorus from all identifiable sources and all primary and secondary land uses.

d. Conduct an assessment of the sources of phosphorus from the Upper Kissimmee Chain of Lakes and Lake Istokpoga and their relative contribution to the water quality of Lake Okeechobee. The results of this assessment shall be used by the coordinating agencies as part of the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067 to develop interim measures, best management practices, or regulations, as applicable.

e. Assess current water management practices within the Lake Okeechobee watershed and develop recommendations for structural and operational improvements. Such recommendations shall balance water supply, flood control, estuarine salinity, maintenance of a healthy lake littoral zone, and water quality considerations.

f. Evaluate the feasibility of alternative nutrient reduction technologies, including sediment traps, canal and ditch maintenance, fish production or other aquaculture, bioenergy conversion processes, and algal or other biological treatment technologies and include any alternative nutrient reduction technologies determined to be feasible in the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067.

g. Conduct an assessment of the water volumes and timing from the Lake Okeechobee watershed and their relative contribution to the water level changes in Lake Okeechobee and to the timing and volume of water delivered to the estuaries.

(b) *Lake Okeechobee Basin Management Action Plan.*—The Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067 shall be the watershed phosphorus control component for Lake Okeechobee. The Lake Okeechobee Basin Management Action Plan shall be a multifaceted approach designed to achieve the total maximum daily load by improving the management of phosphorus sources within the Lake Okeechobee watershed through implementation of regulations and best management practices, continued development and continued implementation of improved best management practices, improvement and restoration of the hydrologic function of natural and managed systems, and use of alternative technologies for nutrient reduction. As provided in s. 403.067(7)(a)6., the Lake Okeechobee Basin Management Action Plan must include milestones for implementation and water quality improvement, and an associated water quality monitoring component sufficient to evaluate whether reasonable progress in pollutant load reductions is being achieved over time. An assessment of progress toward these milestones shall be conducted every 5 years and shall be provided to the Governor, the President of the Senate, and the Speaker of the House of Representatives. Revisions to the plan shall be made, as appropriate,

as a result of each 5-year review. Revisions to the basin management action plan shall be made by the department in cooperation with the basin stakeholders. Revisions to best management practices or other measures must follow the procedures set forth in s. 403.067(7)(c)4. Revised basin management action plans must be adopted pursuant to s. 403.067(7)(a)5. The department shall develop an implementation schedule establishing 5-year, 10-year, and 15-year measurable milestones and targets to achieve the total maximum daily load no more than 20 years after adoption of the plan. The initial implementation schedule shall be used to provide guidance for planning and funding purposes and is exempt from chapter 120. Upon the first 5-year review, the implementation schedule shall be adopted as part of the plan. If achieving the total maximum daily load within 20 years is not practicable, the implementation schedule must contain an explanation of the constraints that prevent achievement of the total maximum daily load within 20 years, an estimate of the time needed to achieve the total maximum daily load, and additional 5-year measurable milestones, as necessary. The coordinating agencies shall develop an interagency agreement pursuant to ss. 373.046 and 373.406(5) which is consistent with the department taking the lead on water quality protection measures through the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067; the district taking the lead on hydrologic improvements pursuant to paragraph (a); and the Department of Agriculture and Consumer Services taking the lead on agricultural interim measures, best management practices, and other measures adopted pursuant to s. 403.067. The interagency agreement must specify how best management practices for nonagricultural nonpoint sources are developed and how all best management practices are implemented and verified consistent with s. 403.067 and this section and must address measures to be taken by the coordinating agencies during any best management practice reevaluation performed pursuant to subparagraphs 5. and 10. The department shall use best professional judgment in making the initial determination of best management practice effectiveness. The coordinating agencies may develop an intergovernmental agreement with local governments to implement nonagricultural nonpoint source best management practices within their respective geographic boundaries. The coordinating agencies shall facilitate the application of federal programs that offer opportunities for water quality treatment, including preservation, restoration, or creation of wetlands on agricultural lands.

    1.   Agricultural nonpoint source best management practices, developed in accordance with s. 403.067 and designed to achieve the objectives of the Lake Okeechobee Watershed Protection Program as part of a phased approach of management strategies within the Lake Okeechobee Basin Management Action Plan, shall be implemented on an expedited basis.

    2.   As provided in s. 403.067, the Department of Agriculture and Consumer Services, in consultation with the department, the district, and affected parties, shall initiate rule development for interim measures, best management practices, conservation plans, nutrient management plans, or other measures necessary for Lake Okeechobee watershed total maximum daily load reduction. The rule shall include thresholds for requiring conservation and nutrient management plans and criteria for the contents of such plans. Development of agricultural nonpoint source best management practices shall initially focus on those priority basins listed in sub-subparagraph (a)1.a. The Department of Agriculture and Consumer Services, in consultation with the department, the district, and affected parties, shall conduct an ongoing program for improvement of existing and development of new agricultural nonpoint source interim measures and best management practices. The Department of Agriculture and Consumer Services shall adopt such practices by rule. The Department of Agriculture and Consumer Services shall work with the University of Florida Institute of Food and Agriculture Sciences to review and, where appropriate, develop revised nutrient application rates for all agricultural soil amendments in the watershed.

    3.   As provided in s. 403.067, where agricultural nonpoint source best management practices or interim measures have been adopted by rule of the Department of Agriculture and Consumer Services, the owner or operator of an agricultural nonpoint source addressed by such rule shall either implement interim measures or best management practices or demonstrate compliance with state water quality standards addressed by the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067 by conducting monitoring prescribed by the department or the district. Owners or operators of agricultural nonpoint sources who implement interim measures or best management practices adopted by rule of the Department of Agriculture and Consumer Services shall be subject to s. 403.067.

Case 1:21-cv-00119-RDM Document 54-3 Filed 06/22/21 Page 511 of 583

4.   The district or department shall conduct monitoring at representative sites to verify the effectiveness of agricultural nonpoint source best management practices.

5.   Where water quality problems are detected for agricultural nonpoint sources despite the appropriate implementation of adopted best management practices, a reevaluation of the best management practices shall be conducted pursuant to s. 403.067(7)(c)4. If the reevaluation determines that the best management practices or other measures require modification, the rule shall be revised to require implementation of the modified practice within a reasonable period as specified in the rule.

6.   As provided in s. 403.067, nonagricultural nonpoint source best management practices, developed in accordance with s. 403.067 and designed to achieve the objectives of the Lake Okeechobee Watershed Protection Program as part of a phased approach of management strategies within the Lake Okeechobee Basin Management Action Plan, shall be implemented on an expedited basis.

7.   The department and the district are directed to work with the University of Florida Institute of Food and Agricultural Sciences to develop appropriate nutrient application rates for all nonagricultural soil amendments in the watershed. As provided in s. 403.067, the department, in consultation with the district and affected parties, shall develop nonagricultural nonpoint source interim measures, best management practices, or other measures necessary for Lake Okeechobee watershed total maximum daily load reduction. Development of nonagricultural nonpoint source best management practices shall initially focus on those priority basins listed in sub-subparagraph (a)1.a. The department, the district, and affected parties shall conduct an ongoing program for improvement of existing and development of new interim measures and best management practices. The department or the district shall adopt such practices by rule.

8.   Where nonagricultural nonpoint source best management practices or interim measures have been developed by the department and adopted by the district, the owner or operator of a nonagricultural nonpoint source shall implement interim measures or best management practices and be subject to s. 403.067.

9.   As provided in s. 403.067, the district or the department shall conduct monitoring at representative sites to verify the effectiveness of nonagricultural nonpoint source best management practices.

10.   Where water quality problems are detected for nonagricultural nonpoint sources despite the appropriate implementation of adopted best management practices, a reevaluation of the best management practices shall be conducted pursuant to s. 403.067(7)(c)4. If the reevaluation determines that the best management practices or other measures require modification, the rule shall be revised to require implementation of the modified practice within a reasonable time period as specified in the rule.

11.   Subparagraphs 2. and 7. do not preclude the department or the district from requiring compliance with water quality standards or with current best management practices requirements set forth in any applicable regulatory program authorized by law for the purpose of protecting water quality. Subparagraphs 2. and 7. are applicable only to the extent that they do not conflict with any rules adopted by the department that are necessary to maintain a federally delegated or approved program.

12.   The program of agricultural best management practices set forth in the Everglades Program of the district meets the requirements of this paragraph and s. 403.067(7) for the Lake Okeechobee watershed. An entity in compliance with the best management practices set forth in the Everglades Program of the district may elect to use that permit in lieu of the requirements of this paragraph. The provisions of subparagraph 5. apply to this subparagraph. This subparagraph does not alter any requirement of s. 373.4592.

13.   The Department of Agriculture and Consumer Services, in cooperation with the department and the district, shall provide technical and financial assistance for implementation of agricultural best management practices, subject to the availability of funds. The department and district shall provide technical and financial assistance for implementation of nonagricultural nonpoint source best management practices, subject to the availability of funds.

14.   Projects that reduce the phosphorus load originating from domestic wastewater systems within the Lake Okeechobee watershed shall be given funding priority in the department's revolving loan program under s. 403.1835. The department shall coordinate and provide assistance to those local governments seeking financial assistance for such priority projects.

15.　Projects that make use of private lands, or lands held in trust for Indian tribes, to reduce nutrient loadings or concentrations within a basin by one or more of the following methods: restoring the natural hydrology of the basin, restoring wildlife habitat or impacted wetlands, reducing peak flows after storm events, increasing aquifer recharge, or protecting range and timberland from conversion to development, are eligible for grants available under this section from the coordinating agencies. For projects of otherwise equal priority, special funding priority will be given to those projects that make best use of the methods outlined above that involve public-private partnerships or that obtain federal match money. Preference ranking above the special funding priority be given to projects located in a rural area of opportunity designated by the Governor. Grant applications may be submitted by any person or tribal entity, and eligible projects may include, but are not limited to, the purchase of conservation and flowage easements, hydrologic restoration of wetlands, creating treatment wetlands, development of a management plan for natural resources, and financial support to implement a management plan.

16.　The department shall require all entities disposing of domestic wastewater biosolids within the Lake Okeechobee watershed and the remaining areas of Okeechobee, Glades, and Hendry Counties to develop and submit to the department an agricultural use plan that limits applications based upon phosphorus loading consistent with the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067. The department may not authorize the disposal of domestic wastewater biosolids within the Lake Okeechobee watershed unless the applicant can affirmatively demonstrate that the phosphorus in the biosolids will not add to phosphorus loadings in Lake Okeechobee or its tributaries. This demonstration shall be based on achieving a net balance between phosphorus imports relative to exports on the permitted application site. Exports shall include only phosphorus removed from the Lake Okeechobee watershed through products generated on the permitted application site. This prohibition does not apply to Class AA biosolids that are marketed and distributed as fertilizer products in accordance with department rule.

17.　Private and government-owned utilities within Monroe, Miami-Dade, Broward, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, Highlands, Hendry, and Glades Counties that dispose of wastewater biosolids sludge from utility operations and septic removal by land spreading in the Lake Okeechobee watershed may use a line item on local sewer rates to cover wastewater biosolids treatment and disposal if such disposal and treatment is done by approved alternative treatment methodology at a facility located within the areas designated by the Governor as rural areas of opportunity pursuant to s. 288.0656. This additional line item is an environmental protection disposal fee above the present sewer rate and may not be considered a part of the present sewer rate to customers, notwithstanding provisions to the contrary in chapter 367. The fee shall be established by the county commission or its designated assignee in the county in which the alternative method treatment facility is located. The fee shall be calculated to be no higher than that necessary to recover the facility's prudent cost of providing the service. Upon request by an affected county commission, the Florida Public Service Commission will provide assistance in establishing the fee. Further, for utilities and utility authorities that use the additional line item environmental protection disposal fee, such fee may not be considered a rate increase under the rules of the Public Service Commission and shall be exempt from such rules. Utilities using this section may immediately include in their sewer invoicing the new environmental protection disposal fee. Proceeds from this environmental protection disposal fee shall be used for treatment and disposal of wastewater biosolids, including any treatment technology that helps reduce the volume of biosolids that require final disposal, but such proceeds may not be used for transportation or shipment costs for disposal or any costs relating to the land application of biosolids in the Lake Okeechobee watershed.

18.　No less frequently than once every 3 years, the Florida Public Service Commission or the county commission through the services of an independent auditor shall perform a financial audit of all facilities receiving compensation from an environmental protection disposal fee. The Florida Public Service Commission or the county commission through the services of an independent auditor shall also perform an audit of the methodology used in establishing the environmental protection disposal fee. The Florida Public Service Commission or the county commission shall, within 120 days after completion of an audit, file the audit report with the President of the Senate and the Speaker of the House of Representatives and shall provide copies to the county commissions of the counties set forth in subparagraph 17. The books and records of any facilities receiving compensation from an

environmental protection disposal fee shall be open to the Florida Public Service Commission and the Auditor General for review upon request.

19.   The Department of Health shall require all entities disposing of septage within the Lake Okeechobee watershed to develop and submit to that agency an agricultural use plan that limits applications based upon phosphorus loading consistent with the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067.

20.   The Department of Agriculture and Consumer Services shall initiate rulemaking requiring entities within the Lake Okeechobee watershed which land-apply animal manure to develop resource management system level conservation plans, according to United States Department of Agriculture criteria, which limit such application. Such rules must include criteria and thresholds for the requirement to develop a conservation or nutrient management plan, requirements for plan approval, site inspection requirements, and recordkeeping requirements.

21.   The district shall revise chapter 40E-61, Florida Administrative Code, to be consistent with this section and s. 403.067; provide for a monitoring program for nonpoint source dischargers required to monitor water quality by s. 403.067; and provide for the results of such monitoring to be reported to the coordinating agencies.

(c)   *Lake Okeechobee Exotic Species Control Program.*—The coordinating agencies shall identify the exotic species that threaten the native flora and fauna within the Lake Okeechobee watershed and develop and implement measures to protect the native flora and fauna.

(d)   *Lake Okeechobee Internal Phosphorus Management Program.*—The district, in cooperation with the other coordinating agencies and interested parties, shall evaluate the feasibility of Lake Okeechobee internal phosphorus load removal projects. The evaluation shall be based on technical feasibility, as well as economic considerations, and shall consider all reasonable methods of phosphorus removal. If projects are found to be feasible, the district shall immediately pursue the design, funding, and permitting for implementing such projects.

(e)   *Lake Okeechobee Watershed Protection Program implementation.*—The coordinating agencies shall be jointly responsible for implementing the Lake Okeechobee Watershed Protection Program, consistent with the statutory authority and responsibility of each agency. Annual funding priorities shall be jointly established, and the highest priority shall be assigned to programs and projects that address sources that have the highest relative contribution to loading and the greatest potential for reductions needed to meet the total maximum daily loads. In determining funding priorities, the coordinating agencies shall also consider the need for regulatory compliance, the extent to which the program or project is ready to proceed, and the availability of federal matching funds or other nonstate funding, including public-private partnerships. Federal and other nonstate funding shall be maximized to the greatest extent practicable.

(f)   *Priorities and implementation schedules.*—The coordinating agencies are authorized and directed to establish priorities and implementation schedules for the achievement of total maximum daily loads, compliance with the requirements of s. 403.067, and compliance with applicable water quality standards within the waters and watersheds subject to this section.

(4)   CALOOSAHATCHEE RIVER WATERSHED PROTECTION PROGRAM AND ST. LUCIE RIVER WATERSHED PROTECTION PROGRAM.—A protection program shall be developed and implemented as specified in this subsection. To protect and restore surface water resources, the program shall address the reduction of pollutant loadings, restoration of natural hydrology, and compliance with applicable state water quality standards. The program shall be achieved through a phased program of implementation. In addition, pollutant load reductions based upon adopted total maximum daily loads established in accordance with s. 403.067 shall serve as a program objective. In the development and administration of the program, the coordinating agencies shall maximize opportunities provided by federal and local government cost-sharing programs and opportunities for partnerships with the private sector and local government. The program shall include a goal for salinity envelopes and freshwater inflow targets for the estuaries based upon existing research and documentation. The goal may be revised as new information is available. This goal shall seek to reduce the frequency and duration of undesirable salinity ranges while meeting the other water-related needs of the region, including water supply and flood protection, while recognizing the extent to which water inflows are within the control and jurisdiction of the district.

(a) *Caloosahatchee River Watershed Protection Plan.*—The district, in cooperation with the other coordinating agencies, Lee County, and affected counties and municipalities, shall complete a River Watershed Protection Plan in accordance with this subsection. The Caloosahatchee River Watershed Protection Plan shall identify the geographic extent of the watershed, be coordinated as needed with the plans developed pursuant to paragraph (3)(a) and paragraph (c) of this subsection, and include the Caloosahatchee River Watershed Construction Project and the Caloosahatchee River Watershed Research and Water Quality Monitoring Program.

1. Caloosahatchee River Watershed Construction Project.—To improve the hydrology, water quality, and aquatic habitats within the watershed, the district shall, no later than January 1, 2012, plan, design, and construct the initial phase of the Watershed Construction Project. In doing so, the district shall:

a. Develop and designate the facilities to be constructed to achieve stated goals and objectives of the Caloosahatchee River Watershed Protection Plan.

b. Conduct scientific studies that are necessary to support the design of the Caloosahatchee River Watershed Construction Project facilities.

c. Identify the size and location of all such facilities.

d. Provide a construction schedule for all such facilities, including the sequencing and specific timeframe for construction of each facility.

e. Provide a schedule for the acquisition of lands or sufficient interests necessary to achieve the construction schedule.

f. Provide a schedule of costs and benefits associated with each construction project and identify funding sources.

g. To ensure timely implementation, coordinate the design, scheduling, and sequencing of project facilities with the coordinating agencies, Lee County, other affected counties and municipalities, and other affected parties.

2. Caloosahatchee River Watershed Research and Water Quality Monitoring Program.—The district, in cooperation with the other coordinating agencies and local governments, shall implement a Caloosahatchee River Watershed Research and Water Quality Monitoring Program that builds upon the district's existing research program and that is sufficient to carry out, comply with, or assess the plans, programs, and other responsibilities created by this subsection. The program shall also conduct an assessment of the water volumes and timing from Lake Okeechobee and the Caloosahatchee River watershed and their relative contributions to the timing and volume of water delivered to the estuary.

(b) *Caloosahatchee River Watershed Basin Management Action Plans.*—The basin management action plans adopted pursuant to s. 403.067 for the Caloosahatchee River watershed shall be the Caloosahatchee River Watershed Pollutant Control Program. The plans shall be designed to be a multifaceted approach to reducing pollutant loads by improving the management of pollutant sources within the Caloosahatchee River watershed through implementation of regulations and best management practices, development and implementation of improved best management practices, improvement and restoration of the hydrologic function of natural and managed systems, and utilization of alternative technologies for pollutant reduction, such as cost-effective biologically based, hybrid wetland/chemical and other innovative nutrient control technologies. As provided in s. 403.067(7)(a)6., the Caloosahatchee River Watershed Basin Management Action Plans must include milestones for implementation and water quality improvement, and an associated water quality monitoring component sufficient to evaluate whether reasonable progress in pollutant load reductions is being achieved over time. An assessment of progress toward these milestones shall be conducted every 5 years and shall be provided to the Governor, the President of the Senate, and the Speaker of the House of Representatives. Revisions to the plans shall be made, as appropriate, as a result of each 5-year review. Revisions to the basin management action plans shall be made by the department in cooperation with the basin stakeholders. Revisions to best management practices or other measures must follow the procedures set forth in s. 403.067(7)(c)4. Revised basin management action plans must be adopted pursuant to s. 403.067(7)(a)5. The department shall develop an implementation schedule establishing 5-year, 10-year, and 15-year measurable milestones and targets to achieve the total maximum daily load no more than 20 years after adoption of the plan. The initial implementation schedule shall be used to provide guidance for planning and funding purposes and is exempt from chapter 120. Upon the first 5-year review, the implementation

schedule shall be adopted as part of the plans. If achieving the total maximum daily load within 20 years is not practicable, the implementation schedule must contain an explanation of the constraints that prevent achievement of the total maximum daily load within 20 years, an estimate of the time needed to achieve the total maximum daily load, and additional 5-year measurable milestones, as necessary. The coordinating agencies shall facilitate the use of federal programs that offer opportunities for water quality treatment, including preservation, restoration, or creation of wetlands on agricultural lands.

1.　Nonpoint source best management practices consistent with s. 403.067, designed to achieve the objectives of the Caloosahatchee River Watershed Protection Program, shall be implemented on an expedited basis. The coordinating agencies may develop an intergovernmental agreement with local governments to implement the nonagricultural, nonpoint source best management practices within their respective geographic boundaries.

2.　This subsection does not preclude the department or the district from requiring compliance with water quality standards, adopted total maximum daily loads, or current best management practices requirements set forth in any applicable regulatory program authorized by law for the purpose of protecting water quality. This subsection applies only to the extent that it does not conflict with any rules adopted by the department or district which are necessary to maintain a federally delegated or approved program.

3.　Projects that make use of private lands, or lands held in trust for Indian tribes, to reduce pollutant loadings or concentrations within a basin, or that reduce the volume of harmful discharges by one or more of the following methods: restoring the natural hydrology of the basin, restoring wildlife habitat or impacted wetlands, reducing peak flows after storm events, or increasing aquifer recharge, are eligible for grants available under this section from the coordinating agencies.

4.　The Caloosahatchee River Watershed Basin Management Action Plans shall require assessment of current water management practices within the watershed and shall require development of recommendations for structural, nonstructural, and operational improvements. Such recommendations shall consider and balance water supply, flood control, estuarine salinity, aquatic habitat, and water quality considerations.

5.　The department may not authorize the disposal of domestic wastewater biosolids within the Caloosahatchee River watershed unless the applicant can affirmatively demonstrate that the nutrients in the biosolids will not add to nutrient loadings in the watershed. This demonstration shall be based on achieving a net balance between nutrient imports relative to exports on the permitted application site. Exports shall include only nutrients removed from the watershed through products generated on the permitted application site. This prohibition does not apply to Class AA biosolids that are marketed and distributed as fertilizer products in accordance with department rule.

6.　The Department of Health shall require all entities disposing of septage within the Caloosahatchee River watershed to develop and submit to that agency an agricultural use plan that limits applications based upon nutrient loading consistent with any basin management action plan adopted pursuant to s. 403.067.

7.　The Department of Agriculture and Consumer Services shall require entities within the Caloosahatchee River watershed which land-apply animal manure to develop a resource management system level conservation plan, according to United States Department of Agriculture criteria, which limit such application. Such rules shall include criteria and thresholds for the requirement to develop a conservation or nutrient management plan, requirements for plan approval, site inspection requirements, and recordkeeping requirements.

8.　The district shall initiate rulemaking to provide for a monitoring program for nonpoint source dischargers required to monitor water quality pursuant to s. 403.067(7)(b)2.g. or (c)3. The results of such monitoring must be reported to the coordinating agencies.

(c)　*St. Lucie River Watershed Protection Plan.*—The district, in cooperation with the other coordinating agencies, Martin County, and affected counties and municipalities shall complete a plan in accordance with this subsection. The St. Lucie River Watershed Protection Plan shall identify the geographic extent of the watershed, be coordinated as needed with the plans developed pursuant to paragraph (3)(a) and paragraph (a) of this subsection, and include the St. Lucie River Watershed Construction Project and St. Lucie River Watershed Research and Water Quality Monitoring Program.

1.　St. Lucie River Watershed Construction Project.—To improve the hydrology, water quality, and aquatic habitats within the watershed, the district shall, no later than January 1, 2012, plan, design, and construct the

initial phase of the Watershed Construction Project. In doing so, the district shall:

a.   Develop and designate the facilities to be constructed to achieve stated goals and objectives of the St. Lucie River Watershed Protection Plan.

b.   Identify the size and location of all such facilities.

c.   Provide a construction schedule for all such facilities, including the sequencing and specific timeframe for construction of each facility.

d.   Provide a schedule for the acquisition of lands or sufficient interests necessary to achieve the construction schedule.

e.   Provide a schedule of costs and benefits associated with each construction project and identify funding sources.

f.   To ensure timely implementation, coordinate the design, scheduling, and sequencing of project facilities with the coordinating agencies, Martin County, St. Lucie County, other interested parties, and other affected local governments.

2.   St. Lucie River Watershed Research and Water Quality Monitoring Program.—The district, in cooperation with the other coordinating agencies and local governments, shall establish a St. Lucie River Watershed Research and Water Quality Monitoring Program that builds upon the district's existing research program and that is sufficient to carry out, comply with, or assess the plans, programs, and other responsibilities created by this subsection. The district shall also conduct an assessment of the water volumes and timing from Lake Okeechobee and the St. Lucie River watershed and their relative contributions to the timing and volume of water delivered to the estuary.

(d)   *St. Lucie River Watershed Basin Management Action Plan.*—The basin management action plan for the St. Lucie River watershed adopted pursuant to s. 403.067 shall be the St. Lucie River Watershed Pollutant Control Program and shall be designed to be a multifaceted approach to reducing pollutant loads by improving the management of pollutant sources within the St. Lucie River watershed through implementation of regulations and best management practices, development and implementation of improved best management practices, improvement and restoration of the hydrologic function of natural and managed systems, and use of alternative technologies for pollutant reduction, such as cost-effective biologically based, hybrid wetland/chemical and other innovative nutrient control technologies. As provided in s. 403.067(7)(a)6., the St. Lucie River Watershed Basin Management Action Plan must include milestones for implementation and water quality improvement, and an associated water quality monitoring component sufficient to evaluate whether reasonable progress in pollutant load reductions is being achieved over time. An assessment of progress toward these milestones shall be conducted every 5 years and shall be provided to the Governor, the President of the Senate, and the Speaker of the House of Representatives. Revisions to the plan shall be made, as appropriate, as a result of each 5-year review. Revisions to the basin management action plan shall be made by the department in cooperation with the basin stakeholders. Revisions to best management practices or other measures must follow the procedures set forth in s. 403.067(7) (c)4. Revised basin management action plans must be adopted pursuant to s. 403.067(7)(a)5. The department shall develop an implementation schedule establishing 5-year, 10-year, and 15-year measurable milestones and targets to achieve the total maximum daily load no more than 20 years after adoption of the plan. The initial implementation schedule shall be used to provide guidance for planning and funding purposes and is exempt from chapter 120. Upon the first 5-year review, the implementation schedule shall be adopted as part of the plan. If achieving the total maximum daily load within 20 years is not practicable, the implementation schedule must contain an explanation of the constraints that prevent achievement of the total maximum daily load within 20 years, an estimate of the time needed to achieve the total maximum daily load, and additional 5-year measurable milestones, as necessary. The coordinating agencies shall facilitate the use of federal programs that offer opportunities for water quality treatment, including preservation, restoration, or creation of wetlands on agricultural lands.

1.   Nonpoint source best management practices consistent with s. 403.067, designed to achieve the objectives of the St. Lucie River Watershed Protection Program, shall be implemented on an expedited basis. The coordinating agencies may develop an intergovernmental agreement with local governments to implement the nonagricultural nonpoint source best management practices within their respective geographic boundaries.

2. This subsection does not preclude the department or the district from requiring compliance with water quality standards, adopted total maximum daily loads, or current best management practices requirements set forth in any applicable regulatory program authorized by law for the purpose of protecting water quality. This subsection applies only to the extent that it does not conflict with any rules adopted by the department or district which are necessary to maintain a federally delegated or approved program.

3. Projects that make use of private lands, or lands held in trust for Indian tribes, to reduce pollutant loadings or concentrations within a basin, or that reduce the volume of harmful discharges by one or more of the following methods: restoring the natural hydrology of the basin, restoring wildlife habitat or impacted wetlands, reducing peak flows after storm events, or increasing aquifer recharge, are eligible for grants available under this section from the coordinating agencies.

4. The St. Lucie River Watershed Basin Management Action Plan shall require assessment of current water management practices within the watershed and shall require development of recommendations for structural, nonstructural, and operational improvements. Such recommendations shall consider and balance water supply, flood control, estuarine salinity, aquatic habitat, and water quality considerations.

5. The department may not authorize the disposal of domestic wastewater biosolids within the St. Lucie River watershed unless the applicant can affirmatively demonstrate that the nutrients in the biosolids will not add to nutrient loadings in the watershed. This demonstration shall be based on achieving a net balance between nutrient imports relative to exports on the permitted application site. Exports shall include only nutrients removed from the St. Lucie River watershed through products generated on the permitted application site. This prohibition does not apply to Class AA biosolids that are marketed and distributed as fertilizer products in accordance with department rule.

6. The Department of Health shall require all entities disposing of septage within the St. Lucie River watershed to develop and submit to that agency an agricultural use plan that limits applications based upon nutrient loading consistent with any basin management action plan adopted pursuant to s. 403.067.

7. The Department of Agriculture and Consumer Services shall initiate rulemaking requiring entities within the St. Lucie River watershed which land-apply animal manure to develop a resource management system level conservation plan, according to United States Department of Agriculture criteria, which limit such application. Such rules shall include criteria and thresholds for the requirement to develop a conservation or nutrient management plan, requirements for plan approval, site inspection requirements, and recordkeeping requirements.

8. The district shall initiate rulemaking to provide for a monitoring program for nonpoint source dischargers required to monitor water quality pursuant to s. 403.067(7)(b)2.g. or (c)3. The results of such monitoring must be reported to the coordinating agencies.

(e) *River Watershed Protection Plan implementation.*—The coordinating agencies shall be jointly responsible for implementing the River Watershed Protection Plans, consistent with the statutory authority and responsibility of each agency. Annual funding priorities shall be jointly established, and the highest priority shall be assigned to programs and projects that have the greatest potential for achieving the goals and objectives of the plans. In determining funding priorities, the coordinating agencies shall also consider the need for regulatory compliance, the extent to which the program or project is ready to proceed, and the availability of federal or local government matching funds. Federal and other nonstate funding shall be maximized to the greatest extent practicable.

(f) *Evaluation.*—Beginning March 1, 2020, and every 5 years thereafter, concurrent with the updates of the basin management action plans adopted pursuant to s. 403.067, the department, in cooperation with the other coordinating agencies, shall conduct an evaluation of any pollutant load reduction goals, as well as any other specific objectives and goals, as stated in the River Watershed Protection Programs. The district shall identify modifications to facilities of the River Watershed Construction Projects, as appropriate, or any other elements of the River Watershed Protection Programs. The evaluation shall be included in the annual progress report submitted pursuant to this section.

(g) *Priorities and implementation schedules.*—The coordinating agencies are authorized and directed to establish priorities and implementation schedules for the achievement of total maximum daily loads, the

requirements of s. 403.067, and compliance with applicable water quality standards within the waters and watersheds subject to this section.

(5)  ADOPTION AND IMPLEMENTATION OF TOTAL MAXIMUM DAILY LOADS AND DEVELOPMENT OF BASIN MANAGEMENT ACTION PLANS.—The department is directed to expedite development and adoption of total maximum daily loads for the Caloosahatchee River and estuary. The department is further directed to propose for final agency action total maximum daily loads for nutrients in the tidal portions of the Caloosahatchee River and estuary. The department shall initiate development of basin management action plans for Lake Okeechobee, the Caloosahatchee River watershed and estuary, and the St. Lucie River watershed and estuary as provided in s. 403.067 as follows:

(a)  Basin management action plans shall be developed as soon as practicable as determined necessary by the department to achieve the total maximum daily loads established for the Lake Okeechobee watershed and the estuaries.

(b)  The Phase II technical plan development pursuant to paragraph (3)(a), and the River Watershed Protection Plans developed pursuant to paragraphs (4)(a) and (c), shall provide the basis for basin management action plans developed by the department.

(c)  As determined necessary by the department to achieve the total maximum daily loads, additional or modified projects or programs that complement those in the legislatively ratified plans may be included during the development of the basin management action plan.

(d)  As provided in s. 403.067, management strategies and pollution reduction requirements set forth in a basin management action plan subject to permitting by the department under subsection (7) must be completed pursuant to the schedule set forth in the basin management action plan, as amended. The implementation schedule may extend beyond the 5-year permit term.

(e)  As provided in s. 403.067, management strategies and pollution reduction requirements set forth in a basin management action plan for a specific pollutant of concern are not subject to challenge under chapter 120 at the time they are incorporated, in an identical form, into a department or district issued permit or a permit modification issued in accordance with subsection (7).

(6)  ANNUAL PROGRESS REPORT.—Each March 1 the district, in cooperation with the other coordinating agencies, shall report on implementation of this section as part of the consolidated annual report required in s. 373.036(7). The annual report shall include a summary of the conditions of the hydrology, water quality, and aquatic habitat in the northern Everglades based on the results of the Research and Water Quality Monitoring Programs, the status of the Lake Okeechobee Watershed Construction Project, the status of the Caloosahatchee River Watershed Construction Project, and the status of the St. Lucie River Watershed Construction Project. In addition, the report shall contain an annual accounting of the expenditure of funds from the Save Our Everglades Trust Fund. At a minimum, the annual report shall provide detail by program and plan, including specific information concerning the amount and use of funds from federal, state, or local government sources. In detailing the use of these funds, the district shall indicate those designated to meet requirements for matching funds. The district shall prepare the report in cooperation with the other coordinating agencies and affected local governments. The department shall report on the status of the Lake Okeechobee Basin Management Action Plan, the Caloosahatchee River Watershed Basin Management Action Plan, and the St. Lucie River Watershed Basin Management Action Plan. The Department of Agriculture and Consumer Services shall report on the status of the implementation of the agricultural nonpoint source best management practices, including an implementation assurance report summarizing survey responses and response rates, site inspections, and other methods used to verify implementation of and compliance with best management practices in the Lake Okeechobee, Caloosahatchee River, and St. Lucie River watersheds.

(7)  LAKE OKEECHOBEE PROTECTION PERMITS.—

(a)  The Legislature finds that the Lake Okeechobee Watershed Protection Program will benefit Lake Okeechobee and downstream receiving waters and is in the public interest. The Lake Okeechobee Watershed Construction Project and structures discharging into or from Lake Okeechobee shall be constructed, operated, and maintained in accordance with this section.

(b)   Permits obtained pursuant to this section are in lieu of all other permits under this chapter or chapter 403, except those issued under s. 403.0885, if applicable. Additional permits are not required for the Lake Okeechobee Watershed Construction Project, or structures discharging into or from Lake Okeechobee, if such project or structures are permitted under this section. Construction activities related to implementation of the Lake Okeechobee Watershed Construction Project may be initiated before final agency action, or notice of intended agency action, on any permit from the department under this section.

(c)1.   Owners or operators of existing structures which discharge into or from Lake Okeechobee that were subject to Department Consent Orders 91-0694, 91-0705, 91-0706, 91-0707, and RT50-205564 and that are subject to s. 373.4592(4)(a) do not require a permit under this section and shall be governed by permits issued under ss. 373.413 and 373.416 and the Lake Okeechobee Basin Management Action Plan adopted pursuant to s. 403.067.

2.   For the purposes of this paragraph, owners and operators of existing structures which are subject to s. 373.4592(4)(a) and which discharge into or from Lake Okeechobee shall be deemed in compliance with this paragraph if they are in full compliance with the conditions of permits under chapter 40E-63, Florida Administrative Code.

3.   By January 1, 2017, the district shall submit to the department a complete application for a permit modification to the Lake Okeechobee structure permits to incorporate proposed changes necessary to ensure that discharges through the structures covered by this permit are consistent with the basin management action plan adopted pursuant to s. 403.067.

(d)   The department shall require permits for district regional projects that are part of the Lake Okeechobee Watershed Construction Project. However, projects that qualify as exempt pursuant to s. 373.406 do not require permits under this section. Such permits shall be issued for a term of 5 years upon the demonstration of reasonable assurances that:

1.   District regional projects that are part of the Lake Okeechobee Watershed Construction Project shall achieve the design objectives for phosphorus required in subparagraph (3)(a)1.;

2.   For water quality standards other than phosphorus, the quality of water discharged from the facility is of equal or better quality than the inflows;

3.   Discharges from the facility do not pose a serious danger to public health, safety, or welfare; and

4.   Any impacts on wetlands or state-listed species resulting from implementation of that facility of the Lake Okeechobee Construction Project are minimized and mitigated, as appropriate.

(e)   At least 60 days before the expiration of any permit issued under this section, the permittee may apply for a renewal thereof for a period of 5 years.

(f)   Permits issued under this section may include any standard conditions provided by department rule which are appropriate and consistent with this section.

(g)   Permits issued under this section may be modified, as appropriate, upon review and approval by the department.

(8)   RESTRICTIONS ON WATER DIVERSIONS.—The South Florida Water Management District shall not divert waters to the St. Lucie River, the Indian River estuary, the Caloosahatchee River or its estuary, or the Everglades National Park, in such a way that the state water quality standards are violated, that the nutrients in such diverted waters adversely affect indigenous vegetation communities or wildlife, or that fresh waters diverted to the St. Lucie River or the Caloosahatchee or Indian River estuaries adversely affect the estuarine vegetation or wildlife, unless the receiving waters will biologically benefit by the diversion. However, diversion is permitted when an emergency is declared by the water management district, if the Secretary of Environmental Protection concurs.

(9)   PRESERVATION OF PROVISIONS RELATING TO THE EVERGLADES.—Nothing in this section shall be construed to modify any provision of s. 373.4592.

(10)   RIGHTS OF SEMINOLE TRIBE OF FLORIDA.—Nothing in this section is intended to diminish or alter the governmental authority and powers of the Seminole Tribe of Florida, or diminish or alter the rights of that tribe, including, but not limited to, rights under the water rights compact among the Seminole Tribe of Florida, the state, and the South Florida Water Management District as enacted by Pub. L. No. 100-228, 101 Stat. 1556, and chapter 87-292, Laws of Florida, and codified in s. 285.165, and rights under any other agreement between the Seminole

Tribe of Florida and the state or its agencies. No land of the Seminole Tribe of Florida shall be used for water storage or stormwater treatment without the consent of the tribe.

(11)    RELATIONSHIP TO STATE WATER QUALITY STANDARDS.—Nothing in this section shall be construed to modify any existing state water quality standard or to modify the provisions of s. 403.067(6) and (7)(a).

(12)    RULES.—The governing board of the district is authorized to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this section.

(13)    PRESERVATION OF AUTHORITY.—Nothing in this section shall be construed to restrict the authority otherwise granted to agencies pursuant to this chapter and chapter 403, and provisions of this section shall be deemed supplemental to the authority granted to agencies pursuant to this chapter and chapter 403.

History.—s. 6, ch. 87-97; s. 274, ch. 94-356; s. 1011, ch. 95-148; s. 189, ch. 99-245; s. 1, ch. 2000-130; s. 6, ch. 2001-172; s. 1, ch. 2001-193; s. 3, ch. 2002-165; s. 42, ch. 2002-296; s. 1, ch. 2005-29; s. 14, ch. 2005-36; s. 7, ch. 2005-166; s. 14, ch. 2005-291; s. 4, ch. 2007-191; s. 3, ch. 2007-253; s. 87, ch. 2008-4; s. 1, ch. 2013-146; s. 39, ch. 2014-218; s. 15, ch. 2016-1.

### 373.4596    State compliance with stormwater management programs.—The state, through the Department of Management Services, the Department of Transportation, and other agencies, shall construct, operate, and maintain buildings, roads, and other facilities it owns, leases, or manages to fully comply with state, water management district, and local government stormwater management programs.

History.—s. 40, ch. 89-279; s. 298, ch. 92-279; s. 55, ch. 92-326.

### 373.4597    The Geneva Freshwater Lens Protection Act.—

(1)    The Legislature finds that the Geneva Freshwater Lens, a single source water supply, is a unique and valuable water resource for the citizens of northeast Seminole County and, in general, to the citizens of this state and that the lens is a precious natural resource system vital to the health and diversity of the regional ecosystem. It is the intent of the Legislature that this resource be protected for future generations of citizens of this state and that the St. Johns River Water Management District implement the laws of this state and administrative rules of the district to that end.

(2)    The recharge area of the Geneva Freshwater Lens shall be delineated by rule by the St. Johns River Water Management District, to be based on the 20-foot (NGVD) contour of the recharge area prior to development, using a static line and based on the quadrangle maps referenced in the United States Geological Survey Report titled "Water Resources Investigation 86-4078."

(3)    The Legislature hereby directs the appropriate state agencies to implement, by December 1, 1995, recommendations of the Geneva Freshwater Lens Task Force that do not require rule amendments. The Legislature directs such agencies to act, by July 1, 1996, upon recommendations of the task force that require rule amendments, unless otherwise noted in the report. The requirements of this bill related to actions to be taken by appropriate state agencies shall not require expenditures to be made by the government of Seminole County. The St. Johns River Water Management District shall continue to implement the recommendations contained in the Geneva Freshwater Lens Task Force report to the Legislature.

History.—s. 2, ch. 95-377.

### 373.4598    Water storage reservoirs.—

(1)    LEGISLATIVE FINDINGS AND INTENT.—

(a)    The Legislature declares that an emergency exists regarding the St. Lucie and Caloosahatchee estuaries due to the high-volume freshwater discharges to the east and west of the lake. Such discharges have manifested in widespread algae blooms, public health impacts, and extensive environmental harm to wildlife and the aquatic ecosystem. These conditions, as outlined in the state of emergency declared by the Governor under Executive Orders 16-59, 16-155, and 16-156, threaten the ecological integrity of the estuaries and the economic viability of the state and affected communities.

(b)    The Legislature finds that increasing water storage is necessary to reduce the high-volume freshwater discharges from the lake to the estuaries and restore the hydrological connection to the Everglades. CERP projects necessary to reduce the discharges and improve the flows to the Everglades should receive priority funding, such as the Lake Okeechobee Watershed project to the north of the lake; the Everglades Agricultural Area reservoir

project to the south of the lake; the C-43 West Basin Reservoir Storage project to the west of the lake; and the Indian River Lagoon-South project to the east of the lake.

(c)　The Legislature finds that the rate of funding for CERP must be increased if restoration will be achieved within the timeframe originally envisioned and that the delay in substantial progress toward completing critical elements of restoration, such as southern storage, will cause irreparable harm to natural systems and, ultimately, increase the cost of restoration. A substantial commitment to the advancement of projects identified as part of CERP will reduce ongoing ecological damage to the St. Lucie and Caloosahatchee estuaries.

(d)　The Legislature recognizes that the EAA reservoir project was conditionally authorized in the Water Resources Development Act of 2000 as a project component of CERP. Unless other funding is available, the Legislature directs the district, in the implementation of the reservoir project, to abide by applicable state and federal law in order to do that which is required to obtain federal credit under CERP. If the district implements the EAA reservoir project as a project component as defined in s. 373.1501, the district must abide by all applicable state and federal law relating to such projects.

(e)　This section is not intended to diminish the commitments made by the state in chapter 2016-201, Laws of Florida.

(2)　DEFINITIONS.—As used in this section, the term:

(a)　"A-1 parcel" means an area of district-owned land located between the Miami Canal and North New River Canal consisting of approximately 17,000 acres which is bordered to the north by private agricultural lands, to the east by U.S. Highway 27, to the south by Stormwater Treatment Area 3/4, and to the west by the Holey Land Wildlife Management Area and the A-2 parcel.

(b)　"A-2 parcel" means an area of district-owned land located between the Miami Canal and the North New River Canal consisting of approximately 14,000 acres of land to the east of the Miami Canal which is bordered to the north by private agricultural lands, to the east by the A-1 parcel, and to the south by the Holey Land Wildlife Management Area.

(c)　"Board" means the Board of Trustees of the Internal Improvement Trust Fund.

(d)　"Central Everglades Planning Project" or "CEPP" means the suite of CERP projects authorized as the "Central Everglades" project in the Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322.

(e)　"Comprehensive Everglades Restoration Plan" or "CERP" has the same meaning as the term "comprehensive plan" as defined in s. 373.470.

(f)　"Corps" means the United States Army Corps of Engineers.

(g)　"District" means the South Florida Water Management District.

(h)　"Everglades Agricultural Area" or "EAA" has the same meaning as in s. 373.4592.

(i)　"EAA reservoir project" means the Everglades Agricultural Area storage reservoir, known as Component G of CERP. The term includes any necessary water quality features that are required to meet state and federal water quality standards.

(j)　"Lake" means Lake Okeechobee.

(k)　"Option agreement" means the Second Amended and Restated Agreement for Sale and Purchase between the seller, United States Sugar Corporation, SBG Farms, Inc., and Southern Garden Groves Corporation, and the buyer, the South Florida Water Management District, dated August 12, 2010.

(3)　EAA LEASE AGREEMENTS.—

(a)　The district and the board are authorized to negotiate the amendment or termination of leases on lands within the EAA for exchange or use for the EAA reservoir project. Any such lease must be terminated in accordance with the lease terms or upon the voluntary agreement of the lessor and lessee. In the event of any such lease termination, the lessee must be permitted to continue to farm on a field-by-field basis until such time as the lessee's operations are incompatible with implementation of the EAA reservoir project, as reasonably determined by the lessor. The district and the board may include the swapping of land, assignment of leases, and other methods of providing valuable consideration in negotiating the amendments to or termination of such lease agreements.

(b)    Any lease agreement relating to land in the EAA leased to the Prison Rehabilitative Industries and Diversified Enterprises, Inc., (PRIDE Enterprises) for an agricultural work program is required to be terminated in accordance with the terms of the lease agreement. Any such land previously leased may be made available by the board to the district for exchange for lands suitable for the EAA reservoir project or may be leased for agricultural purposes. The terms of any such lease must include provisions authorizing the lessor to terminate the lease at any time during the lease term as to any portion, or all of the premises, to be used for an environmental restoration purpose. The terms of the lease may not require more than 1 year's notice in order for such termination to be effective. Any agricultural owner managing lands subject to an agreement with PRIDE shall be given the right of first refusal in leasing any such lands.

(c)    If, after any termination of an EAA lease agreement, ratoon, stubble, or residual crop remaining on the lease premises is harvested or otherwise used by the lessor or any third party, the lessee is entitled to be compensated for any documented, unamortized planting costs, and any unamortized capital costs associated with the lease and incurred before notice.

(4)    LAND ACQUISITION.—The Legislature declares that acquiring land to increase water storage south of the lake is in the public interest and that the governing board of the district may acquire land, if necessary, to implement the EAA reservoir project with the goal of providing at least 240,000 acre-feet of water storage south of the lake. The use of eminent domain in the EAA for the purpose of implementing the EAA reservoir project is prohibited.

(a)    Effective May 9, 2017, the district shall identify the lessees of the approximately 3,200 acres of land owned by the state or the district west of the A-2 parcel and east of the Miami Canal and the private property owners of the approximately 500 acres of land surrounded by such lands.

(b)    By July 31, 2017, the district shall contact the lessors and landowners of the land identified pursuant paragraph (a) to express the district's interest in acquiring land through the purchase or exchange of lands or by the amendment or termination of lease agreements. If land swaps or purchases are necessary to assemble the required acreage, the participation of private landowners must be voluntary. The district shall contact the board to request that any lease of land identified pursuant to paragraph (a), the title to which is vested in the board, be amended or terminated. All appraisal reports, offers, and counteroffers in relation to this subsection are confidential and exempt from s. 119.07(1), as provided in s. 373.139.

(c)    The board shall provide to the district, through direct acquisition in fee or by a supplemental agreement, any land, the title to which is vested in the board, that the district identifies as necessary to construct the EAA reservoir project.

(d)    The total acreage necessary for additional water treatment may not exceed the amount reasonably required to meet state and federal water quality standards as determined using the water quality modeling tools of the district. The district shall use the latest version of the Dynamic Model for Stormwater Treatment Areas Model modeling tool and other modeling tools that will be required in the planning and design of the EAA reservoir project. If additional land not identified in paragraph (a) is necessary for the EAA reservoir project, the district shall acquire that land from willing sellers of property in conjunction with the development of the post-authorization change report.

(5)    POST-AUTHORIZATION CHANGE REPORT.—

(a)    The district is directed to request, by July 1, 2017, that the corps jointly develop a post-authorization change report with the district for CEPP to revise the project component located on the A-2 parcel with the goal of increasing water storage provided by the project component to a minimum of 240,000 acre-feet. Upon agreement with the corps, development of the report must begin by August 1, 2017, and does not preclude the implementation of the remaining CEPP project components.

(b)    Using the A-2 parcel and the additional land identified pursuant to subsection (4) and without modifying the A-1 parcel, the report must evaluate:

1.    The optimal configuration of the EAA reservoir project for providing at least 240,000 acre-feet of water storage; and

2. Any necessary increases in canal conveyance capacity to reduce the discharges to the St. Lucie or Caloosahatchee estuaries.

(c) If the district and the corps determine that an alternate configuration of water storage and water quality features providing for significantly more water storage, but no less than 360,000 acre-feet of water storage, south of the lake can be implemented on a footprint that includes modification to the A-1 parcel, the district is authorized to recommend such an alternative configuration in the report. Any such recommendation must include sufficient water quality treatment capacity to meet state and federal water quality standards.

(d) Pending congressional approval of the report, the district may begin the preliminary planning or construction of, or modification to, the project site to the extent appropriate, subject to the availability of funding. Upon receipt of congressional approval of the report, construction of the EAA reservoir project shall be completed parallel with construction of the other CEPP project components, subject to the availability of funding.

(e) The district must report the status of the post-authorization change report to the Legislature by January 9, 2018. The status report must include information on the district's ability to obtain lease modifications and land acquisitions as provided in subsection (4). If the district in good faith believes that the post-authorization change report will receive ultimate approval but that an extension of the deadline provided in paragraph (7)(a) is needed, the district must include such a request in its status report and may be granted an extension by the Legislature. Any such extension must include a corresponding date by which the district must request the corps to initiate the project implementation report for the EAA reservoir project and may proceed with the implementation of CEPP project components in accordance with the final project implementation report.

(6) OPTION AGREEMENT.—The district must terminate the option agreement at the request of the seller if:

(a) The post-authorization change report receives congressional approval; or

(b) The district certifies to the board, the President of the Senate, and the Speaker of the House of Representatives that the acquisition of the land necessary for the EAA reservoir project, as provided in subsection (4), has been completed.

(7) PROJECT IMPLEMENTATION REPORT.—

(a) If, for any reason, the post-authorization change report is not approved by the corps and submitted for congressional approval by October 1, 2018, or the post-authorization change report has not received congressional approval by December 31, 2019, the district, unless granted an extension by the Legislature, must request the corps to initiate a project implementation report, as defined in s. 373.470, for the EAA reservoir project and the district may proceed with the implementation of CEPP project components in accordance with the final project implementation report.

(b) The district, when developing the project implementation report, must focus on the goals of the EAA reservoir project as identified in CERP, which include providing additional water storage and conveyance south of the lake to reduce the volume of regulatory discharges of water from the lake to the east and west.

(c) Upon finalization of the project implementation report, as defined in s. 373.470, the district, in coordination with the corps, shall seek congressional authorization for the EAA reservoir project.

(8) AGRICULTURAL WORKERS.—The district shall give preferential consideration to the hiring of former agricultural workers primarily employed during 36 of the past 60 months in the Everglades Agricultural Area, consistent with their qualifications and abilities, for the construction and operation of the EAA reservoir project. Any contract or subcontract for the construction and operation of the EAA reservoir project in which 50 percent or more of the cost is paid from state-appropriated funds must provide preference and priority in the hiring of such agricultural workers. The district shall give preferential consideration to contract proposals that include in the contractor's hiring practices training programs for such workers.

(9) C-51 RESERVOIR PROJECT.—

(a) The C-51 reservoir project is a water storage facility as defined in s. 373.475. The C-51 reservoir project is located in western Palm Beach County south of the lake and consists of in-ground reservoirs and conveyance structures that will provide water supply and water management benefits to participating water supply utilities and will also provide environmental benefits by reducing freshwater discharges to tide and making water available for natural systems.

(b)  Phase I of the project will provide approximately 14,000 acre-feet of water storage and will hydraulically connect to the district's L-8 Flow Equalization Basin. Phase II of the project will provide approximately 46,000 acre-feet of water storage, for a total increase of 60,000 acre-feet of water storage.

(c)  For Phase II of the C-51 reservoir project, the district may negotiate with the owners of the C-51 reservoir project site for the acquisition of the project or to enter into a public-private partnership. The district may acquire land near the C-51 reservoir through the purchase or exchange of land that is owned by the district or the state as necessary to implement Phase II of the project. The state and the district may consider potential swaps of land that is owned by the state or the district to achieve an optimal combination of water quality and water storage. The district may not exercise eminent domain for the purpose of implementing the C-51 reservoir project.

(d)  If state funds are appropriated for Phase I or Phase II of the C-51 reservoir project:

1.  The district shall operate the reservoir to maximize the reduction of high-volume Lake Okeechobee regulatory releases to the St. Lucie or Caloosahatchee estuaries, in addition to providing relief to the Lake Worth Lagoon;

2.  Water made available by the reservoir shall be used for natural systems in addition to any allocated amounts for water supply; and

3.  Any water received from Lake Okeechobee may not be available to support consumptive use permits.

(e)  Phase I of the C-51 reservoir project may be funded by appropriation or through the water storage facility revolving loan fund as provided in s. 373.475. Phase II of the C-51 reservoir project may be funded pursuant to this section, pursuant to s. 373.475, as a project component of CERP, or pursuant to s. 375.041(3)(b)4.

(10)  FUNDING.—

(a)  The Legislature determines that the authorization and issuance of Florida Forever bonds for the purposes of this section is in the best interest of the state and determines that water storage reservoir projects should be implemented.

(b)  Any cost related to this section, including, but not limited to, the costs for land acquisition, planning, and construction may be funded using proceeds from Florida Forever bonds issued under s. 215.618, in an amount of up to $800 million, as authorized under that section. The bond proceeds from bonds issued for the purposes of this section shall be deposited into the Everglades Trust Fund.

(c)  Notwithstanding s. 373.026(8)(b) or any other provision of law, the use of state funds is authorized for the EAA reservoir project.

(d)  The district shall actively seek additional sources of funding, including federal funding, for the reservoir project.

(11)  LAKE OKEECHOBEE REGULATION SCHEDULE.—The district shall request that the corps pursue the reevaluation of the Lake Okeechobee Regulation Schedule as expeditiously as possible, taking into consideration the repairs made to the Herbert Hoover Dike and implementation of projects designed to reduce high-volume freshwater discharges from the lake, in order to optimally utilize the added water storage capacity to reduce the high-volume freshwater discharges to the St. Lucie and Caloosahatchee estuaries.

History.—ss. 3, 9, ch. 2017-10.

### 373.461  Lake Apopka improvement and management.—

(1)  FINDINGS AND INTENT.—

(a)  The Legislature has expressed its intent that economically and technically feasible methods be developed to restore the Lake Apopka Basin through the Lake Apopka Restoration Act and the Surface Water Improvement and Management Act. It is the Legislature's intent to enhance and accelerate the restoration process begun by those previous acts of the Legislature.

(b)  Technical studies have determined that substantial reductions in or elimination of phosphorus in farm discharges to Lake Apopka will be necessary in order to improve water quality and restore the lake to Class III standards.

(c)  Acquisition of the lands in agricultural production which discharge phosphorus to Lake Apopka, and their related facilities, would serve the public interest by eliminating the impacts of introduction of phosphorus from

these sources into the lake. It is the Legislature's intent that a fair and equitable program of acquisition of the lands necessary to achieve the purposes of this section be implemented.

(d)   The Legislature finds that time is of the essence and that a complete purchase of properties described in this section should be accomplished in an accelerated and economical manner.

(e)   It is the Legislature's intent to provide a process for development of phosphorus discharge limitations that will bring such discharges into compliance with state water quality standards and to provide for interim phosphorus abatement measures designed to further reduce phosphorus discharges from the Zellwood Drainage and Water Control District, which is the largest agricultural entity within the Lake Apopka Basin, unless both of the timeframes specified in paragraph (4)(a) regarding purchase agreements and completion of purchases are met. The Legislature finds that it is in the public interest to jointly share in the cost of implementing such interim phosphorus reduction measures with Zellwood.

(f)   A. Duda and Sons, Inc., has implemented phosphorus treatment and has worked cooperatively with the district to meet applicable water quality standards. An existing settlement agreement outlines treatment measures that should satisfy all discharge limitations and criteria.

(2)   DEFINITIONS.—As used in this section:

(a)   "District" means the St. Johns River Water Management District.

(b)   "Phosphorus criterion" means a numeric interpretation for phosphorus of the Class III narrative nutrient criterion.

(c)   "Stormwater management system" has the meaning set forth in s. 373.403(10).

(d)   "Zellwood" means the Zellwood Drainage and Water Control District as it is described in chapter 20715, Laws of Florida.

(3)   PHOSPHORUS CRITERION AND DISCHARGE LIMITATIONS FOR LAKE APOPKA.—

(a)   In the event the district does not adopt a rule establishing a phosphorus criterion for Lake Apopka by January 1997, the phosphorus criterion for the lake shall be 55 parts per billion (ppb).

(b)   The district shall adopt by rule discharge limitations for all permits issued by the district for discharges into Lake Apopka, the Lake Level Canal, and the McDonald Canal.

(4)   CONSTRUCTION OF STORMWATER MANAGEMENT SYSTEMS.—

(a)   It is the intent of the Legislature that construction of stormwater management facilities to store, treat, and recycle Zellwood's agricultural stormwater runoff will be necessary during the interim period while discharge limitations are being established for Lake Apopka, unless both of the following conditions are met:

1.   Agreements to purchase all the lands within Zellwood are executed by September 30, 1997, or a later execution deadline established by the United States for such agreements before reallocation of Commodity Credit Corporation funds made available to acquire wetland reserve program conservation easements within the Lake Apopka Partnership Project area; and

2.   All such purchases are completed pursuant to the terms of such agreements.

The Legislature finds that it is in the public interest for state, regional, and local revenue sources to be used along with Zellwood's revenue sources to finance the costs of acquiring land and constructing such facilities. One-third of the cost of the facilities shall be contributed by Zellwood, one-third by the state, and one-third by the district.

(b)   Consistent with the funding formula outlined in paragraph (a), the state will provide up to $2 million, with the same amount being committed by both Zellwood and the district, for a total of $6 million. These funds shall be used for the purpose of acquiring the necessary land for and constructing a stormwater management facility, not to exceed 600 acres in total size, for Zellwood's farm runoff, together with the necessary pumps and other infrastructure associated with such facilities, provided that Zellwood's contribution shall be used for project purposes other than acquiring land.

(c)   The district shall be responsible for design of the facilities and for acquiring any necessary interest in land for the facilities. Zellwood will be responsible for construction of the facilities in accordance with the district's design. The district will administer the funds provided for under this section. No later than September 30, 1997, the district and Zellwood will develop an agreement regarding dispersal of funds for construction of the facilities

which shall take into account the financing mechanisms available to the parties. Zellwood shall not be required to assess more than $25 per acre per year in financing its share of the stormwater management facility. However, it must provide its one-third share of the funding within the timeframes outlined for construction of the stormwater construction facility outlined in this section.

(d)　Construction of the stormwater retention and treatment facilities provided for in this section shall begin within 90 days after acquisition of interests in land necessary for the facilities and the district's delivery of the design of the facilities to Zellwood, and shall be completed within 1 year thereafter. After completion of the facilities, Zellwood shall be responsible for operation and maintenance so long as the facilities are used by Zellwood.

(e)　The district may, as appropriate, alter or modify the design of the facility to reduce the cost of the acquisition and construction of the facility if lands presently in production within Zellwood are acquired pursuant to subsection (5) before construction of the facility. The district shall have the flexibility to adjust these dates due to any unforeseen circumstances such as, and not limited to, acts of God, delays due to litigation by outside parties, or unnecessary or unforeseen permitting or construction delays.

(f)　The district and Zellwood shall give preferential consideration to the hiring of agricultural workers displaced as a result of the Lake Apopka Restoration Act, consistent with their qualifications and abilities, for the construction and operation of the stormwater facility.

(5)　PURCHASE OF AGRICULTURAL LANDS.—

(a)　The Legislature finds that it is in the public interest of the state to acquire lands in agricultural production, along with their related facilities, which contribute, directly or indirectly, to phosphorus discharges to Lake Apopka, for the purpose of improving water quality in Lake Apopka. These lands consist of those farming entities on Lake Apopka having consent and settlement agreements with the district and those sand land farms discharging indirectly to Lake Apopka through Lake Level Canal, Apopka-Beauclair Canal, or McDonald Canal. The district is granted the power of eminent domain on those properties.

(b)　In determining the fair market value of lands to be purchased from willing sellers, all appraisals of such lands may consider income from the use of the property for farming and, for this purpose, such income shall be deemed attributable to the real estate.

(c)　The district shall explore the availability of funding from all sources, including any federal, state, regional, and local land acquisition funding programs, to purchase the agricultural lands described in paragraph (a). It is the Legislature's intent that, if such funding sources can be identified, acquisition of the lands described in paragraph (a) may be undertaken by the district to purchase these properties from willing sellers. However, the purchase price paid for acquisition of such lands that were in active cultivation during 1996 may not exceed the highest appraisal obtained by the district for these lands from a state-certified general appraiser following the standards of professional practice established by rule of the Florida Real Estate Appraisal Board, including standards for the development or communication of a real estate appraisal. This maximum purchase price limitation may not include, nor be applicable to, that portion of the purchase price attributable to consideration of income described in paragraph (b), or that portion attributable to related facilities, or closing costs.

(d)　In connection with successful acquisition of any of the lands described in this section which are not needed for stormwater management facilities, the district shall give the seller the option to lease the land for a period not to exceed 5 years, at a fair market lease value for similar agricultural lands. Proceeds derived from such leases shall be used to offset the cost of acquiring the land.

(e)　If all the lands within Zellwood are purchased in accordance with this section prior to expiration of the consent agreement between Zellwood and the district, Zellwood shall be reimbursed for any costs described in subsection (4).

(f)1.　Tangible personal property acquired by the district as part of related facilities pursuant to this section, and classified as surplus by the district, shall be sold by the Department of Management Services. The Department of Management Services shall deposit the proceeds of such sale in the Economic Development Trust Fund in the Department of Economic Opportunity. The proceeds shall be used for the purpose of providing economic and

infrastructure development in portions of northwestern Orange County and east central Lake County which will be adversely affected economically due to the acquisition of lands pursuant to this subsection.

2.　The Department of Economic Opportunity shall, upon presentation of the appropriate documentation justifying expenditure of the funds deposited pursuant to this paragraph, pay any obligation for which it has sufficient funds from the proceeds of the sale of tangible personal property and which meets the limitations specified in paragraph (g). The authority of the Department of Economic Opportunity to expend such funds shall expire 5 years from the effective date of this paragraph. Such expenditures may occur without future appropriation from the Legislature.

3.　Funds deposited under this paragraph may not be used for any purpose other than those enumerated in paragraph (g).

(g)1.　The proceeds of sale of tangible personal property authorized by paragraph (f) shall be distributed as follows: 60 percent to Orange County; 25 percent to the City of Apopka; and 15 percent to Lake County.

2.　Such proceeds shall be used to implement the redevelopment plans adopted by the Orange County Board of County Commissioners, Apopka City Commission, and Lake County Board of County Commissioners.

3.　Of the total proceeds, the Orange County Board of County Commissioners, Apopka City Commission, and Lake County Board of County Commissioners, may not expend more than:

a.　Twenty percent for labor force training related to the redevelopment plan;

b.　Thirty-three percent for financial or economic incentives for business location or expansion in the redevelopment area; and

c.　Four percent for administration, planning, and marketing the redevelopment plan.

4.　The Orange County Board of County Commissioners, Apopka City Commission, and Lake County Board of County Commissioners must spend those revenues not expended under subparagraph 3. for infrastructure needs necessary for the redevelopment plan.

(6)　EXISTING CONSENT OR SETTLEMENT AGREEMENTS PRESERVED.—Except to the extent specifically modified in this section, the district's existing consent or settlement agreements with A. Duda and Sons, Inc., and Zellwood, including requirements regarding compliance with any discharge limitations established for Lake Apopka, shall remain in effect.

(7)　APPLICABILITY OF LAWS AND WATER QUALITY STANDARDS; AUTHORITY OF DISTRICT AND DEPARTMENT.—Except as otherwise provided in this section, nothing in this section shall be construed:

(a)　As altering any applicable state water quality standards, laws, or district or department rules; or

(b)　To restrict the authority otherwise granted the department and the district pursuant to this chapter or chapter 403. The provisions of this section shall be deemed supplemental to the authority granted pursuant to this chapter and chapter 403.

History.—s. 1, ch. 96-207; s. 3, ch. 97-81; s. 5, ch. 2000-153; s. 52, ch. 2000-158; s. 1, ch. 2012-61; s. 57, ch. 2012-96.

## 373.462　Legislative findings and intent.—

(1)　The Legislature recognizes that by law in 1979, portions of Lake and Polk Counties were designated as the Green Swamp Area of Critical State Concern in acknowledgment of its regional and statewide importance in maintaining the quality and quantity of Florida's water supply and water resources for the public and the environment.

(2)　The Legislature also recognizes the Green Swamp, which encompasses approximately 560,000 acres, is located in a regionally significant high recharge area of the Floridan Aquifer system, and it helps protect coastal communities from saltwater intrusion.

(3)　The Legislature finds that the Green Swamp or Polk County make up the headwaters or portions of the headwaters of six major river systems in the state, which are the Alafia, Hillsborough, Kissimmee, Ocklawaha, Peace, and Withlacoochee Rivers. In addition, due to the area's unique topography and geology which receives no other water inputs other than rainfall, the area is essential in maintaining the potentiometric head of the Floridan Aquifer system that directly influences the aquifer's productivity for water supply.

(4)   The Legislature also finds that the Green Swamp and the surrounding areas are economically, environmentally, and socially defined by some of the most important and vulnerable water resources in the state.

(5)   The Legislature recognizes that the Central Florida Water Initiative Guiding Document dated January 30, 2015, and the Southern Water Use Caution Area Recovery Strategy dated March 2006 recognized the fact that the surface water and groundwater resources in the heartland counties of Hardee, Highlands, and Polk are integral to the health, public safety, and economic future of those regions.

(6)   The Legislature declares that there is an important state interest in partnering with regional water supply authorities and local governments, in accordance with s. 373.705, to protect the water resources of the headwaters of the Alafia, Hillsborough, Kissimmee, Ocklawaha, Peace, and Withlacoochee Rivers and the surrounding areas. The Legislature further declares that funding consideration be given to regional collaborative solutions, including, but not limited to, the heartland counties, to manage the water resources of the state.

History.—s. 2, ch. 2017-111.

### 373.463   Heartland headwaters annual report.—

(1)   The Polk Regional Water Cooperative, in coordination with all of its member county and municipal governments, shall prepare a comprehensive annual report for water resource projects identified for state funding consideration within its members' jurisdictions. The report must include, at a minimum:

(a)   A list of projects identified by the cooperative for state funding consideration for each of the following categories. A project may be listed in more than one category.

1.   Drinking water supply.

2.   Wastewater.

3.   Stormwater and flood control.

4.   Environmental restoration.

5.   Conservation.

(b)   A priority ranking for each listed project that will be ready to proceed in the upcoming fiscal year, identified by the categories specified in paragraph (a).

(c)   The estimated cost of each listed project.

(d)   The estimated completion date of each listed project.

(e)   The source and amount of financial assistance to be provided by the cooperative, the member county or municipal governments, or other entities for each listed project.

(2)   By December 1, 2017, and each year thereafter, the cooperative shall submit the comprehensive annual report to the Governor, the President of the Senate, the Speaker of the House of Representatives, the department, and the appropriate water management districts.

(3)   The cooperative shall also annually coordinate with the appropriate water management district to submit a status report on projects receiving priority state funding for inclusion in the consolidated water management district annual report required by s. 373.036(7).

History.—s. 3, ch. 2017-111.

### 373.467   The Harris Chain of Lakes Restoration Council.—There is created within the St. Johns River Water Management District, with assistance from the Fish and Wildlife Conservation Commission and the Lake County Water Authority, the Harris Chain of Lakes Restoration Council.

(1)(a)   The council shall consist of nine voting members which shall include a representative of waterfront property owners, a representative of the sport fishing industry, a person with experience in environmental science or regulation, a person with training in biology or another scientific discipline, an attorney, a physician, an engineer, and two residents of the county who are not required to meet any additional qualifications for membership, each to be appointed by the Lake County legislative delegation. The Lake County legislative delegation may waive the qualifications for membership on a case-by-case basis if good cause is shown. A person serving on the council may not be appointed to a council, board, or commission of any council advisory group agency. The council members shall serve as advisors to the governing board of the St. Johns River Water Management District. The council is subject to chapters 119 and 120.

(b)   There shall be an advisory group to the council which shall consist of one representative each from the St. Johns River Water Management District, the Department of Environmental Protection, the Department of Transportation, the Fish and Wildlife Conservation Commission, the Lake County Water Authority, the United States Army Corps of Engineers, and the University of Florida, each of whom shall be appointed by his or her respective agency, and each of whom, with the exception of the representatives from the Lake County Water Authority and the University of Florida, shall have had training in biology or another scientific discipline.

(2)   Immediately after appointment, the council shall meet and organize by electing a chair, a vice chair, and a secretary, whose terms shall be for 2 years each. Council officers shall not serve consecutive terms. Each council member shall be a voting member.

(3)   The council shall meet at the call of its chair, at the request of six of its members, or at the request of the chair of the governing board of the St. Johns River Water Management District. Resignation by a council member, or failure by a council member to attend three consecutive meetings without an excuse approved by the chair, results in a vacancy on the council.

(4)   The council shall have the powers and duties to:

(a)   Review audits and all data specifically related to lake restoration techniques and sport fish population recovery strategies, including data and strategies for shoreline restoration, sediment control and removal, exotic species management, floating tussock management or removal, navigation, water quality, and fish and wildlife habitat improvement, particularly as they may apply to the Harris Chain of Lakes.

(b)   Evaluate whether additional studies are needed.

(c)   Explore all possible sources of funding to conduct the restoration activities.

(d)   Report to the President of the Senate and the Speaker of the House of Representatives before November 25 of each year on the progress of the Harris Chain of Lakes restoration program and any recommendations for the next fiscal year.

(5)   The St. Johns River Water Management District shall provide staff to assist the council in carrying out the provisions of this act.

(6)   Members of the council shall receive no compensation for their services, but are entitled to be reimbursed for per diem and travel expenses incurred during execution of their official duties, as provided in s. 112.061. State and federal agencies shall be responsible for the per diem and travel expenses of their respective appointees to the council, and the St. Johns River Water Management District shall be responsible for per diem and travel expenses of other appointees to the council.

History.—s. 1, ch. 2001-246; s. 16, ch. 2016-1.

### 373.468   The Harris Chain of Lakes restoration program.—

(1)   The Fish and Wildlife Conservation Commission and the St. Johns River Water Management District, in conjunction with the Department of Environmental Protection, pertinent local governments, and the Harris Chain of Lakes Restoration Council, shall review existing restoration proposals to determine which ones are the most environmentally sound and economically feasible methods of improving the fish and wildlife habitat and natural systems of the Harris Chain of Lakes.

(2)   To initiate the Harris Chain of Lakes restoration program recommended by the Harris Chain of Lakes Restoration Council, the Fish and Wildlife Conservation Commission, with assistance from the St. Johns River Water Management District and in consultation and by agreement with the Department of Environmental Protection and pertinent local governments, shall develop tasks to be undertaken by those entities for the enhancement of fish and wildlife habitat. These agencies shall:

(a)   Evaluate different methodologies for removing the extensive tussocks and buildup of organic matter along the shoreline and of the aquatic vegetation in the lake.

(b)   Conduct any additional studies as recommended by the Harris Chain of Lakes Restoration Council.

(3)   Contingent on the Legislature's appropriating funds for the Harris Chain of Lakes restoration program and in conjunction with financial participation by federal, other state, and local governments, the appropriate agencies

shall, through competitive bid, award contracts to implement the activities of the Harris Chain of Lakes restoration program.

(4) The Fish and Wildlife Conservation Commission is authorized to conduct a demonstration restoration project on the Harris Chain of Lakes for the purpose of creating better habitat for fish and wildlife.

**History.**—ss. 2, 3, ch. 2001-246.

## PART V
## FINANCE AND TAXATION

373.470   Everglades restoration.

373.472   Save Our Everglades Trust Fund.

373.475   Water storage facility revolving loan fund.

373.501   Appropriation of funds to water management districts.

373.503   Manner of taxation.

373.506   Costs of district.

373.5071   Audit report; furnishing to governing board and clerks of circuit courts.

373.535   Preliminary district budgets.

373.536   District budget and hearing thereon.

373.539   Imposition of taxes.

373.543   Land held by Board of Trustees of the Internal Improvement Trust Fund; areas not taxed.

373.546   Unit areas.

373.553   Treasurer of the board; payment of funds; depositories.

373.559   May borrow money temporarily.

373.563   Bonds.

373.566   Refunding bonds.

373.569   Bond election.

373.573   Bonds to be validated.

373.576   Sale of bonds.

373.579   Proceeds from taxes for bond purposes.

373.583   Registration of bonds.

373.584   Revenue bonds.

373.586   Unpaid warrants to draw interest.

373.59   Payment in lieu of taxes for lands acquired for water management district purposes.

373.5905   Reinstatement of payments in lieu of taxes; duration.

373.591   Management review teams.

**373.470   Everglades restoration.**—

(1) SHORT TITLE.—This section may be cited as the "Everglades Restoration Investment Act."

(2) DEFINITIONS.—As used in this section, the term:

(a) "Caloosahatchee River Watershed Protection Plan" means the plan developed pursuant to s. 373.4595.

(b) "Comprehensive plan" means the recommended comprehensive plan contained within the "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement, April 1999" and submitted to Congress on July 1, 1999.

(c) "Corps" means the United States Army Corps of Engineers.

(d) "District" means the South Florida Water Management District.

(e) "Keys Wastewater Plan" means the plan prepared by the Monroe County Engineering Division dated November 2007 and submitted to the Florida House of Representatives on December 4, 2007.

(f) "Lake Okeechobee Watershed Protection Plan" means the plan developed pursuant to ss. 373.4595(3)(a) and 373.451-373.459.

(g)    "Project" means the Central and Southern Florida Project authorized under the heading "CENTRAL AND SOUTHERN FLORIDA" in s. 203 of the Flood Control Act of 1948 (62 Stat. 1176), and any modification to the project authorized by law.

(h)    "Project component" means any structural or operational change, resulting from the comprehensive plan, to the project as it existed and was operated as of January 1, 1999.

(i)    "Project implementation report" means the project implementation report as described in the "Final Integrated Feasibility Report and Programmatic Environmental Impact Statement, April 1999" and submitted to Congress on July 1, 1999.

(j)    "River Watershed Protection Plans" means the Caloosahatchee River Watershed Protection Plan and the St. Lucie River Watershed Protection Plan as defined in this subsection.

(k)    "St. Lucie River Watershed Protection Plan" means the plan developed pursuant to s. 373.4595.

(3)    FURTHER ANALYSIS; AGREEMENTS FOR PROJECT COMPONENTS AND ALLOCATION OF PROJECT BENEFITS.—

(a)    The Legislature intends to establish a full and equal partnership between the state and federal governments for the implementation of the comprehensive plan.

(b)    The comprehensive plan shall be used as a guide and framework for a continuing planning process to:

1.    Reflect new scientific knowledge, the results of pilot projects, and the results of new and continuing feasibility studies with the Corps; and

2.    Ensure that project components will be implemented to achieve the purposes provided in the Federal Water Resource Development Act of 1996 that include restoring, preserving, and protecting the South Florida ecosystem, providing for the protection of water quality in and the reduction of the loss of fresh water from the Everglades, and providing such features as are necessary to meet the other water-related needs of the region, including flood control, the enhancement of water supplies, and other objectives served by the project.

(c)    Prior to executing a project cooperation agreement with the Corps for the construction of a project component, the district, in cooperation with the Corps, shall complete a project implementation report to address the project component's economic and environmental benefits, engineering feasibility, and other factors provided in s. 373.1501 sufficient to allow the district to obtain approval under s. 373.026. Each project implementation report shall also identify the increase in water supplies resulting from the project component. The additional water supply shall be allocated or reserved by the district under this chapter.

(4)    SAVE OUR EVERGLADES TRUST FUND; FUNDS AUTHORIZED FOR DEPOSIT.—The following funds may be deposited into the Save Our Everglades Trust Fund created by s. 373.472 to finance implementation of the comprehensive plan, the Lake Okeechobee Watershed Protection Plan, the River Watershed Protection Plans, and the Keys Wastewater Plan:

(a)    Funds described in subsection (5).

(b)    Federal funds appropriated by Congress for implementation of the comprehensive plan, the Lake Okeechobee Watershed Protection Plan, or the River Watershed Protection Plans.

(c)    Any additional funds appropriated by the Legislature for the purpose of implementing the comprehensive plan, the Lake Okeechobee Watershed Protection Plan, the River Watershed Protection Plans, or the Keys Wastewater Plan.

(d)    Gifts designated for implementation of the comprehensive plan, the Lake Okeechobee Watershed Protection Plan, the River Watershed Protection Plans, or the Keys Wastewater Plan from individuals, corporations, or other entities.

(5)    SAVE OUR EVERGLADES TRUST FUND SUPPLEMENTED.—

(a)    For each year of the 13 consecutive years beginning with fiscal year 2007-2008, state funds may be deposited into the Save Our Everglades Trust Fund created by s. 373.472.

(b)    Proceeds of bonds issued under s. 215.619 may be deposited into the Save Our Everglades Trust Fund created under s. 373.472. To enhance flexibility, funds to be deposited into the Save Our Everglades Trust Fund may consist of any combination of state funds and Everglades restoration bonds.

(6)    DISTRIBUTIONS FROM SAVE OUR EVERGLADES TRUST FUND.—

Statutes & Constitution :View Statutes : Online Sunshine

1(a)   Except as provided in paragraphs (d) and (e) and for funds appropriated for debt service, the department shall distribute funds in the Save Our Everglades Trust Fund to the district in accordance with a legislative appropriation and s. 373.026(8)(b). Distribution of funds to the district from the Save Our Everglades Trust Fund or the Land Acquisition Trust Fund shall be equally matched by the cumulative contributions from the district by fiscal year 2019-2020 by providing funding or credits toward project components. The dollar value of in-kind project design and construction work by the district in furtherance of the comprehensive plan and existing interest in public lands needed for a project component are credits towards the district's contributions.

(b)   The department shall distribute funds in the Save Our Everglades Trust Fund to the district in accordance with a legislative appropriation for debt service for Everglades restoration bonds.

(c)   To the extent that funds are available, the department may reserve a minimum of $10 million annually from the Save Our Everglades Trust Fund for the purpose of implementation of the River Watershed Protection Plans within the Northern Everglades as identified in s. 373.4595. Distribution of funds from the Save Our Everglades Trust Fund for the implementation of the River Watershed Protection Plans shall be in accordance with paragraph (a) and shall be equally matched by the district and Lee and Martin Counties by fiscal year 2019-2020 by providing funding or credits toward project components. The dollar value of in-kind project design and construction work by the district or the counties in furtherance of the River Watershed Protection Plans and existing interest in public lands needed for a project component are credits towards the district's and counties' contributions.

(d)   Subject to a specific appropriation to the Department of Agriculture and Consumer Services for the purpose of implementing agricultural nonpoint source controls as identified in s. 373.4595 or the legislatively ratified Lake Okeechobee Watershed Protection Plan and the River Watershed Protection Plans, and upon written request by the Department of Agriculture and Consumer Services for the transfer, the department shall transfer an amount equal to such specific appropriation from the Save Our Everglades Trust Fund to the Department of Agriculture and Consumer Services General Inspection Trust Fund. All interest earned on the investment of funds transferred from the Save Our Everglades Trust Fund to the General Inspection Trust Fund shall be credited to the Save Our Everglades Trust Fund by June 30 of each year.

(e)   Subject to specific appropriation, the department shall use moneys from the Save Our Everglades Trust Fund to fund projects identified in the Keys Wastewater Plan. The department may establish requirements, through grant agreements or other contractual arrangements, to ensure the timely construction of projects and expenditure of appropriated funds by the local governments in Monroe County, including, but not limited to, project implementation deadlines, local matching requirements, fair and competitive procurement requirements, and financial tracking requirements.

(7)   ANNUAL REPORT.—To provide enhanced oversight of and accountability for the financial commitments established under this section and the progress made in the implementation of the comprehensive plan, the following information must be prepared annually as part of the consolidated annual report required by s. 373.036(7):

(a)   The district, in cooperation with the department, shall provide the following information as it relates to implementation of the comprehensive plan:

1.   An identification of funds, by source and amount, received by the state and by each local sponsor during the fiscal year.

2.   An itemization of expenditures, by source and amount, made by the state and by each local sponsor during the fiscal year.

3.   A description of the purpose for which the funds were expended.

4.   The unencumbered balance of funds remaining in trust funds or other accounts designated for implementation of the comprehensive plan.

5.   A schedule of anticipated expenditures for the next fiscal year.

(b)   The department shall prepare a detailed report on all funds expended by the state and credited toward the state's share of funding for implementation of the comprehensive plan. The report shall include:

1.   A description of all expenditures, by source and amount, from the former Conservation and Recreation Lands Trust Fund, the Land Acquisition Trust Fund, the former Preservation 2000 Trust Fund, the Florida Forever Trust

Fund, the Save Our Everglades Trust Fund, and other named funds or accounts for the acquisition or construction of project components or other features or facilities that benefit the comprehensive plan.

2.    A description of the purposes for which the funds were expended.

3.    The unencumbered fiscal-year-end balance that remains in each trust fund or account identified in subparagraph 1.

(c)    The district, in cooperation with the department, shall provide a detailed report on progress made in the implementation of the comprehensive plan, including the status of all project components initiated after the effective date of this act or the date of the last report prepared under this subsection, whichever is later.

The information required in paragraphs (a), (b), and (c) shall be provided as part of the consolidated annual report required by s. 373.036(7). Each annual report is due by March 1.

History.—s. 5, ch. 2000-129; s. 7, ch. 2001-172; s. 4, ch. 2002-261; s. 32, ch. 2002-402; s. 22, ch. 2003-394; s. 15, ch. 2005-36; s. 4, ch. 2007-253; s. 88, ch. 2008-4; s. 2, ch. 2008-49; s. 43, ch. 2015-229; ss. 38, 39, ch. 2017-71; ss. 67, 68, ch. 2018-10; s. 39, ch. 2018-110.

[1]Note.—

A.    Section 67, ch. 2018-10, reenacted paragraph (6)(a) "[i]n order to implement Specific Appropriation 1581 of the 2018-2019 General Appropriations Act."

B.    Section 68, ch. 2018-10, provides that "[t]he text of s. 373.470(6)(a), Florida Statutes, as carried forward from chapter 2017-71, Laws of Florida, in this act, expires July 1, 2019, and the text of that paragraph shall revert to that in existence on June 30, 2017, except that any amendments to such text enacted other than by this act shall be preserved and continue to operate to the extent that such amendments are not dependent upon the portions of text which expire pursuant to this section." Effective July 1, 2019, paragraph (6)(a), as amended by s. 68, ch. 2018-10, will read:

(a)    Except as provided in paragraphs (d) and (e) and for funds appropriated for debt service, the department shall distribute funds in the Save Our Everglades Trust Fund to the district in accordance with a legislative appropriation and s. 373.026(8)(b). Distribution of funds to the district from the Save Our Everglades Trust Fund shall be equally matched by the cumulative contributions from the district by fiscal year 2019-2020 by providing funding or credits toward project components. The dollar value of in-kind project design and construction work by the district in furtherance of the comprehensive plan and existing interest in public lands needed for a project component are credits towards the district's contributions.

### 373.472    Save Our Everglades Trust Fund.—

(1)    There is created within the Department of Environmental Protection the Save Our Everglades Trust Fund. Funds in the trust fund shall be expended to implement the comprehensive plan as defined in s. 373.470(2); the Lake Okeechobee Watershed Protection Plan as defined in s. 373.4595(2); the Caloosahatchee River Watershed Protection Plan as defined in s. 373.4595(2); the St. Lucie River Watershed Protection Plan as defined in s. 373.4595(2); the Long-Term Plan as defined in s. 373.4592(2); and the Florida Keys Area of Critical State Concern protection program under ss. 380.05 and 380.0552 to restore and conserve natural systems through the implementation of water management projects, including wastewater management projects identified in the "Keys Wastewater Plan" dated November 2007 and submitted to the Florida House of Representatives on December 4, 2007. The trust fund shall serve as the repository for state, local, and federal project contributions in accordance with s. 373.470(4).

(2)    The trust fund is not subject to the service charge described in s. 215.20(1). All income of a revenue nature, including interest or other earnings received or credited by the trust fund, shall be credited to the fund.

(3)    Notwithstanding the provisions of s. 216.301 and pursuant to s. 216.351, any balance in the trust fund at the end of any fiscal year shall remain in the trust fund at the end of the year and shall be available for carrying out the purposes of the trust fund.

History.—s. 1, ch. 2000-132; s. 5, ch. 2002-261; s. 23, ch. 2003-394; s. 5, ch. 2007-253; s. 89, ch. 2008-4; s. 3, ch. 2008-49; s. 45, ch. 2008-153; s. 11, ch. 2010-4; s. 23, ch. 2013-41; s. 44, ch. 2015-229.

### 373.475    Water storage facility revolving loan fund.—

(1)(a)    In recognition that waters of the state are among the state's most basic resources, the Legislature declares that such waters should be managed to conserve and protect water resources and to realize the full beneficial use of such resources.

(b)    As natural storage within the system has been lost due to development, the Legislature finds that additional natural or manmade water storage is required to capture and prevent water from being discharged to

tide or otherwise lost.

(c)　The Legislature finds that establishing infrastructure financing and providing technical assistance to local governments or water supply entities for water storage facilities is necessary to conserve and protect the waters of the state.

(2)　For purposes of this section, the term:

(a)　"Local governmental agency" means any municipality, county, district, or authority, or any agency thereof, or a combination of such, acting jointly in connection with a project, which has jurisdiction over a water storage facility.

(b)　"Water storage facility" or "facility" means all facilities, including land, necessary for an above-ground or in-ground reservoir. Such facilities may be publicly owned, privately owned, investor-owned, or cooperatively held.

(3)　The state, through the department, shall provide funding assistance to local governments or water supply entities for the development and construction of water storage facilities to increase the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems.

(a)　The department may make loans, provide loan guarantees, purchase loan insurance, and refinance local debt through the issue of new loans for water storage facilities approved by the department. Local governments or water supply entities may borrow funds made available pursuant to this section and may pledge any revenues or other adequate security available to them to repay any funds borrowed.

(b)　The department may award loan amounts for up to 75 percent of the costs of planning, designing, constructing, upgrading, or replacing water resource infrastructure or facilities, whether natural or manmade, including the acquisition of real property for water storage facilities.

(4)　The department shall adopt rules to carry out the purposes of this section. Such rules must:

(a)　Establish a priority system for loans based on compliance with state requirements. The priority system must give special consideration to:

1.　Projects that provide for the development of alternative water supply projects and management techniques in areas where existing source waters are limited or threatened by saltwater intrusion, excessive drawdowns, contamination, or other problems;

2.　Projects that contribute to the sustainability of regional water sources;

3.　Projects that produce additional water available for consumptive uses or natural systems;

4.　Projects that diversify water supply so that the needs of consumptive uses and the natural system are met during wet and dry conditions; or

5.　Projects that provide flexibility in addressing the unpredictability of water conditions from water year to water year.

(b)　Establish the requirements for the award and repayment of financial assistance.

(c)　Require evidence of credit worthiness and adequate security, including an identification of revenues to be pledged and documentation of their sufficiency for loan repayment and pledged revenue coverage to ensure that each loan recipient can meet its loan repayment requirements.

(d)　Require each project receiving financial assistance to be cost-effective, environmentally sound, and implementable.

(e)　Require each project to be self-supporting if the project is primarily for the purpose of water supply for consumptive use.

(5)　Before approval of a loan, the local government or water supply entity must, at a minimum, submit all of the following to the department:

(a)　A repayment schedule.

(b)　Evidence of the permittability or implementability of the facility proposed for financial assistance.

(c)　Plans and specifications, biddable contract documents, or other documentation of appropriate procurement of goods and services.

(d)　Written assurance that records will be kept using generally accepted accounting principles and that the department or its agents and the Auditor General will have access to all records pertaining to the loan.

(e)   If the facility is required to be self-supporting according to paragraph (4)(e), documentation that it will be self-supporting.

(f)   Documentation that the water management district within whose boundaries the facility will be located has approved the facility. If the facility crosses jurisdictional boundaries, approval from each applicable district must be documented and provided to the department.

(6)   The department and water management districts are authorized to provide technical assistance to local governments or water supply entities for water storage facilities funded pursuant to this section.

(7)   The minimum amount of a loan is $75,000. The term of loans made pursuant to this section may not exceed 30 years.

(8)   As part of the report required under s. 403.8532, the department shall prepare a report at the end of each fiscal year which details the financial assistance provided under this section, service fees collected, interest earned, and loans outstanding.

(9)   The department may conduct an audit of the loan project upon completion, or may require that a separate project audit, prepared by an independent certified public accountant, be submitted.

(10)   The department may require reasonable service fees on loans made to local governments or water supply entities to ensure that the program will be operated in perpetuity and to implement the purposes authorized under this section. Service fees may not be less than 2 percent or greater than 4 percent of the loan amount exclusive of the service fee. Service fee revenues shall be deposited into the department's Grants and Donations Trust Fund. The fee revenues, and interest earnings thereon, shall be used exclusively for the purposes of this section.

(11)   The Water Protection and Sustainability Program Trust Fund established under s. 403.891 shall be used for the purposes of this section. Any funds that are not needed for immediate financial assistance shall be invested pursuant to s. 215.49. State funds and investment earnings shall be deposited into the fund. The principal and interest of all loans repaid, and investment earnings thereon, shall be deposited into the fund.

(12)(a)   If a local governmental agency defaults under the terms of its loan agreement, the department shall so certify to the Chief Financial Officer, who shall forward the amount delinquent to the department from any unobligated funds due to the local governmental agency under any revenue-sharing or tax-sharing fund established by the state, except as otherwise provided by the State Constitution. Certification of delinquency does not preclude the department from pursuing other remedies available for default on a loan, including accelerating loan repayments, eliminating all or part of the interest rate subsidy on the loan, and court appointment of a receiver to manage the public water system.

(b)   If a water storage facility owned by a person other than a local governmental agency defaults under the terms of its loan agreement, the department may take all actions available under law to remedy the default.

(c)   The department may impose a penalty for delinquent loan payments in the amount of 6 percent of the amount due, in addition to charging the cost to handle and process the debt. Penalty interest accrues on any amount due and payable beginning on the 30th day following the date that the payment was due.

(13)   The department may terminate or rescind a financial assistance agreement if the recipient fails to comply with the terms and conditions of the agreement.

History.—s. 4, ch. 2017-10.

### 373.501   Appropriation of funds to water management districts.—

(1)   The department may allocate to the water management districts, from funds appropriated to the department, such sums as may be deemed necessary to defray the costs of the administrative, regulatory, and other activities of the districts. The governing boards shall submit annual budget requests for such purposes to the department, and the department shall consider such budgets in preparing its budget request for the Legislature.

(2)   Funds appropriated by the Legislature for the purpose of funding a specific water management district project shall be transferred to the water management district when the proposed project has been reviewed by the secretary of the pertinent state agency and upon receipt of a governing board resolution requesting such funds.

History.—s. 11, part I, ch. 72-299; ss. 5, 25, ch. 73-190; s. 22, ch. 2001-256.

**Note.**—Former s. 373.066.

**373.503　Manner of taxation.**—

(1)　It is the finding of the Legislature that the general regulatory and administrative functions of the districts herein authorized are of general benefit to the people of the state and should fully or in part be financed by general appropriations. Further, it is the finding of the Legislature that water resources programs of particular benefit to limited segments of the population should be financed by those most directly benefited. To those ends, this chapter provides for the establishment of permit application fees and a method of ad valorem taxation to finance the activities of the districts.

(2)(a)　The Legislature declares that the millage authorized for water management purposes by s. 9(b), Art. VII of the State Constitution shall be levied only by the water management districts set forth in this chapter and intends by this section to prevent any laws which would allow other units of government to levy any portion of said millage. However, this does not preclude such units of government from financing and engaging in water management programs if otherwise authorized by law.

(b)　Pursuant to s. 11(a)(21), Art. III of the State Constitution, the Legislature hereby prohibits special laws or general laws of local application pertaining to the allocation of any portion of the millage authorized for water management purposes by s. 9(b), Art. VII of the State Constitution to any unit of government other than those districts established by this chapter.

(c)　The authority of the Central and Southern Florida Flood Control District and the Southwest Florida Water Management District to levy ad valorem taxes within the territories specified in chapter 25270, 1949, Laws of Florida, and chapter 61-691, Laws of Florida, respectively, as heretofore amended, shall continue until those districts have authority to levy ad valorem taxes pursuant to this section.

(3)　The districts may levy ad valorem taxes on property within the district solely for the purposes of this chapter and of chapter 25270, 1949, Laws of Florida, as amended, and chapter 61-691, Laws of Florida, as amended. If appropriate, taxes levied by each governing board may be separated by the governing board into a millage necessary for the purposes of the district and a millage necessary for financing basin functions specified in s. 373.0695.

(a)　Notwithstanding any other general or special law, and subject to subsection (4), the maximum total millage rate for district and basin purposes shall be:

1.　Northwest Florida Water Management District: 0.05 mill.

2.　Suwannee River Water Management District: 0.75 mill.

3.　St. Johns River Water Management District: 0.6 mill.

4.　Southwest Florida Water Management District: 1.0 mill.

5.　South Florida Water Management District: 0.80 mill.

(b)　The apportionment in the South Florida Water Management District shall be a maximum of 40 percent for district purposes and a maximum of 60 percent for basin purposes, respectively.

(c)　Within the Southwest Florida Water Management District, the maximum millage assessed for district purposes may not exceed 50 percent of the total authorized millage if there are one or more basins in the district, and the maximum millage assessed for basin purposes may not exceed 50 percent of the total authorized millage.

(4)　To ensure that taxes authorized by this chapter continue to be in proportion to the benefits derived by the parcels of real estate within the districts, the Legislature shall annually review the preliminary budget for each district for the next fiscal year as provided in s. 373.535. Based upon the review, the Legislature may enact legislation to set the authorized maximum millage rate or the maximum amount of property tax revenue to be raised by each district in the next fiscal year from the taxes levied.

(5)　It is hereby determined that the taxes authorized by this chapter are in proportion to the benefits to be derived by the several parcels of real estate within the districts to which territories are annexed and transferred. It is further determined that the cost of conducting elections within the respective districts or within the transferred or annexed territories, including costs incidental thereto in preparing for such election and in informing

the electors of the issues therein, is a proper expenditure of the department, of the respective districts, and of the district to which such territory is or has been annexed or transferred.

(6)   Each water management district created under this chapter which does not receive state shared revenues under part II of chapter 218 shall, before January 1 of each year, certify compliance or noncompliance with s. 200.065 to the Department of Financial Services. Specific grounds for noncompliance must be stated in the certification. In its annual report required by s. 218.32(2), the Department of Financial Services shall report to the Governor and the Legislature those water management districts certifying noncompliance or not reporting.

History.—s. 1, part V, ch. 72-299; s. 24, ch. 73-190; s. 12, ch. 76-243; s. 6, ch. 80-259; s. 41, ch. 80-274; s. 2, ch. 85-146; ss. 1, 2, ch. 85-211; s. 10, ch. 87-97; s. 8, ch. 91-288; s. 384, ch. 2003-261; s. 1, ch. 2011-67; s. 2, ch. 2012-126.

**373.506    Costs of district.**—If it should appear necessary to procure funds with which to pay the expenses of a district, or to meet emergencies, before a sufficient sum can be obtained from the collection of the tax, the board may borrow a sufficient amount of money to pay expenses and to meet emergencies and may issue interest-bearing negotiable notes therefor and pledge the proceeds of the tax imposed under the provisions of this chapter for the repayment thereof. Said board may issue to any person performing work or services or furnishing anything of value interest-bearing negotiable evidence of debt.

History.—s. 19, ch. 25209, 1949; s. 25, ch. 73-190; s. 15, ch. 76-243.
Note.—Former s. 378.19.

**373.5071    Audit report; furnishing to governing board and clerks of circuit courts.**—The audit report required in s. 218.39 shall be furnished to the governing board of the district and the clerks of the circuit courts of each county within or partly within the district.

History.—s. 109, ch. 2001-266.

**373.535    Preliminary district budgets.**—

(1)   BUDGET DEVELOPMENT.—

(a)   By January 15 of each year, each water management district shall submit a preliminary budget for the next fiscal year for legislative review to the President of the Senate, the Speaker of the House of Representatives, and the chairs of each legislative committee and subcommittee having substantive or fiscal jurisdiction over water management districts, as determined by the President of the Senate or the Speaker of the House of Representatives, as applicable, in the form and manner prescribed in s. 373.536(5)(e). Each preliminary budget must also include:

1.   A section that clearly identifies and provides justification for each proposed expenditure listed in s. 373.536(5)(e)4.e. and f. and identifies the source of funds for each proposed expenditure.

2.   A section identifying the justification for proposed expenditures by core mission area of responsibility and the source of funds needed for activities related to water supply, including alternative water supply and water resource development projects identified in the district's regional water supply plans, water quality, flood protection and floodplain management, and natural systems.

3.   A section reviewing the adopted and proposed budget allocations by program area and the performance metrics for the prior year.

4.   An analysis of each preliminary budget to determine the adequacy of fiscal resources available to the district and the adequacy of proposed district expenditures related to the core mission areas of responsibility for water supply, including alternative water supply and water resource development projects identified in the district's regional water supply plans, water quality, flood protection and floodplain management, and natural systems. The analysis must be based on the particular needs within each district for core mission areas of responsibility. The water supply analysis must specifically include a determination of the adequacy of each district's fiscal resources provided in the district's preliminary budget to achieve appropriate progress toward meeting the districtwide 20-year projected water supply demands, including funding for alternative water supply development and conservation projects.

(b)   If applicable, the preliminary budget for each district must specify that the district's first obligation for payment is the debt service on bonds and certificates of participation.

(2)    LEGISLATIVE REVIEW.—

(a)    The Legislature may annually review the preliminary budget for each district, including, but not limited to, those items listed in s. 373.536(5)(e)4.d.-f., specific to regulation, outreach, management, and administration program areas.

(b)    On or before March 1 of each year, the President of the Senate and the Speaker of the House of Representatives may submit comments regarding the preliminary budget to the districts, and provide a copy of the comments to the Executive Office of the Governor. Each district shall respond to the comments in writing on or before March 15 of each year to the President of the Senate, the Speaker of the House of Representatives, and the Executive Office of the Governor.

(c)    If, following such review, the Legislature does not take any action pursuant to s. 373.503 on or before July 1 of each year, a water management district may proceed with budget development as provided in subsection (3) and s. 373.536.

(3)    FUNDING AUTHORITY GRANTED.—Each district shall use the preliminary budget as submitted pursuant to subsection (1), and as may be amended by the district in response to review by the Legislature pursuant to this section and s. 373.503, as the basis for developing the tentative budget for the next fiscal year as provided in s. 373.536(5).

History.—s. 3, ch. 2012-126.

**373.536    District budget and hearing thereon.—**

(1)    FISCAL YEAR.—The fiscal year of districts created under the provisions of this chapter shall extend from October 1 of one year through September 30 of the following year.

(2)    BUDGET SUBMITTAL.—The budget officer of the district shall, on or before July 15 of each year, submit for consideration by the governing board of the district a tentative budget for the district covering its proposed operations and funding requirements for the ensuing fiscal year.

(3)    BUDGET HEARINGS AND WORKSHOPS; NOTICE.—

(a)    Unless alternative notice requirements are otherwise provided by law, notice of all budget hearings conducted by the governing board or district staff must be published in a newspaper of general paid circulation in each county in which the district lies not less than 5 days nor more than 15 days before the hearing.

(b)    Budget workshops conducted for the public and not governed by s. 200.065 must be advertised in a newspaper of general paid circulation in the community or area in which the workshop will occur not less than 5 days nor more than 15 days before the workshop.

(c)    The tentative budget shall be adopted in accordance with the provisions of s. 200.065; however, if the mailing of the notice of proposed property taxes is delayed beyond September 3 in any county in which the district lies, the district shall advertise its intention to adopt a tentative budget and millage rate, pursuant to s. 200.065(3)(g), in a newspaper of general paid circulation in that county.

(d)    As provided in s. 200.065(2)(d), the board shall publish one or more notices of its intention to adopt a final budget for the district for the ensuing fiscal year. The notice shall appear adjacent to an advertisement that sets forth the tentative budget in a format meeting the budget summary requirements of s. 129.03(3)(b). The district shall not include expenditures of federal special revenues and state special revenues when preparing the statement required by s. 200.065(3)(l). The notice and advertisement shall be published in one or more newspapers having a combined general paid circulation in each county in which the district lies. Districts may include explanatory phrases and examples in budget advertisements published under s. 200.065 to clarify or illustrate the effect that the district budget may have on ad valorem taxes.

(e)    The hearing for adoption of a final budget and millage rate shall be by and before the governing board of the district as provided in s. 200.065 and may be continued from day to day until terminated by the board.

(4)    BUDGET CONTROLS; FINANCIAL INFORMATION.—

(a)    The final adopted budget for the district is the operating and fiscal guide for the district for the ensuing year; however, transfers of funds may be made within the budget by action of the governing board at a public meeting of the governing board. A budget amendment greater than $1 million must be reviewed and approved by

the Executive Office of the Governor. The office shall provide notice of approval to the Legislative Budget Commission.

(b) The district shall control its budget, at a minimum, by funds and shall submit to the Executive Office of the Governor a description of its budget control mechanisms for approval.

(c) If the district receives unanticipated funds after the adoption of the final budget, the final budget may be amended, following review and approval by the Executive Office of the Governor, by including such funds, if notice of intention to amend is provided to the Legislative Budget Commission and is published in the notice of the governing board meeting at which the amendment will be considered, pursuant to s. 120.525. The notice must set forth a summary of the proposed amendment.

(d) In the event of a disaster or of an emergency arising to prevent or avert the same, the governing board is not limited by the budget but may expend funds available for the disaster or emergency or as may be procured for such purpose. In such an event, the governing board shall notify the Executive Office of the Governor and the Legislative Budget Commission as soon as practical, but within 30 days after the governing board's action.

(e) By September 1, 2012, each district shall provide a monthly financial statement in the form and manner prescribed by the Department of Financial Services to the district's governing board and make such monthly financial statement available for public access on its website.

(5) TENTATIVE BUDGET CONTENTS AND SUBMISSION; REVIEW AND APPROVAL.—

(a) The Executive Office of the Governor may approve or disapprove, in whole or in part, the budget of each water management district. The Executive Office of the Governor shall analyze each budget as to the adequacy of fiscal resources available to the district and the adequacy of district expenditures related to water supply, including water resource development projects identified in the district's regional water supply plans; water quality; flood protection and floodplain management; and natural systems. This analysis shall be based on the particular needs within each water management district in those four areas of responsibility and shall be provided to the Legislative Budget Commission.

(b) The Executive Office of the Governor, the Legislative Budget Commission, and the districts shall develop a process to facilitate review and communication regarding the tentative budgets of districts, as necessary.

(c) The Legislative Budget Commission may reject any of the following district budget proposals:

1. A single purchase of land in excess of $10 million, except for land exchanges.

2. Any cumulative purchase of land during a single fiscal year in excess of $50 million.

3. Any issuance of debt on or after July 1, 2012.

4. Any program expenditures as described in sub-subparagraphs (e)4.e. and f. in excess of 15 percent of a district's total annual budget.

5. Any individual variances in a district's tentative budget in excess of 25 percent from a district's preliminary budget.

Written disapproval of any provision in the tentative budget must be received by the district at least 5 business days before the final district budget adoption hearing conducted under s. 200.065(2)(d). If written disapproval is not received at least 5 business days before the final budget adoption hearing, the governing board may proceed with final adoption. Any provision rejected by the Executive Office of the Governor or the Legislative Budget Commission may not be included in a district's final budget and may not be acted upon through any other means without the prior approval of the entity rejecting the provision.

(d) Each district shall, by August 1 of each year, submit for review a tentative budget and a description of any significant changes from the preliminary budget submitted to the Legislature pursuant to s. 373.535 to the Governor, the President of the Senate, the Speaker of the House of Representatives, the chairs of all legislative committees and subcommittees having substantive or fiscal jurisdiction over water management districts, as determined by the President of the Senate or the Speaker of the House of Representatives, as applicable, the secretary of the department, and the governing body of each county in which the district has jurisdiction or derives any funds for the operations of the district. The tentative budget must be posted on the district's official website at least 2 days before budget hearings held pursuant to s. 200.065 or other law.

(e)   The tentative budget must be based on the preliminary budget as submitted to the Legislature, and as may be amended by the district in response to review by the Legislature pursuant to ss. 373.503 and 373.535, as the basis for developing the tentative budget for the next fiscal year as provided in this subsection, and must set forth the proposed expenditures of the district, to which may be added an amount to be held as reserve. The tentative budget must include, but is not limited to, the following information for the preceding fiscal year and the current fiscal year, and the proposed amounts for the upcoming fiscal year, in a standard format prescribed by the Executive Office of the Governor, in consultation with the Legislature:

1.   The estimated amount of funds remaining at the beginning of the fiscal year which have been obligated for the payment of outstanding commitments not yet completed.

2.   The estimated amount of unobligated funds or net cash balance on hand at the beginning of the fiscal year; an accounting of the source, balance, and projected future use of the unobligated funds; and the estimated amount of funds to be raised by district taxes or received from other sources to meet the requirements of the district.

3.   The millage rates and the percentage increase above the rolled-back rate, together with a summary of the reasons the increase is required, and the percentage increase in taxable value resulting from new construction within the district.

4.   The salaries and benefits, expenses, operating capital outlay, number of authorized positions, and other personal services for the following program areas of the district:

a.   Water resource planning and monitoring;

b.   Land acquisition, restoration, and public works;

c.   Operation and maintenance of works and lands;

d.   Regulation;

e.   Outreach for which the information provided must contain a full description and accounting of expenditures for water resources education; public information and public relations, including public service announcements and advertising in any media; and lobbying activities related to local, regional, state and federal governmental affairs, whether incurred by district staff or through contractual services; and

f.   Management and administration.

In addition to the program areas reported by all water management districts, the South Florida Water Management District shall include in its budget document separate sections on all costs associated with the Everglades Construction Project and the Comprehensive Everglades Restoration Plan.

5.   The total estimated amount in the district budget for each area of responsibility listed in subparagraph 4. and for water resource, water supply, and alternative water supply development projects identified in the district's regional water supply plans.

6.   A description of each new, expanded, reduced, or eliminated program.

7.   The funding sources, including, but not limited to, ad valorem taxes, Surface Water Improvement and Management Program funds, other state funds, federal funds, and user fees and permit fees for each program area.

(f)   By September 5 of the year in which the budget is submitted, the chairs of each legislative committee and subcommittee having substantive or fiscal jurisdiction may transmit to each district comments and objections to the proposed budgets. Each district governing board shall include a response to such comments and objections in the record of the governing board meeting where final adoption of the budget takes place, and the record of this meeting shall be transmitted to the Executive Office of the Governor, the department, and the chairs of the legislative appropriations committees.

(g)   The Executive Office of the Governor shall annually, on or before December 15, file with the Legislature a report that summarizes its review of the water management districts' tentative budgets and displays the adopted budget allocations by program area. The report must identify the districts that are not in compliance with the reporting requirements of this section. State funds shall be withheld from a water management district that fails to comply with these reporting requirements.

(6)　FINAL BUDGET; ANNUAL AUDIT; CAPITAL IMPROVEMENTS PLAN; WATER RESOURCE DEVELOPMENT WORK PROGRAM.—

(a)　Each district must, by the date specified for each item, furnish copies of the following documents to the Governor, the President of the Senate, the Speaker of the House of Representatives, the chairs of all legislative committees and subcommittees having substantive or fiscal jurisdiction over the districts, as determined by the President of the Senate or the Speaker of the House of Representatives as applicable, the secretary of the department, and the governing board of each county in which the district has jurisdiction or derives any funds for the operations of the district:

1.　The adopted budget, to be furnished within 10 days after its adoption.

2.　A financial audit of its accounts and records, to be furnished within 10 days after its acceptance by the governing board. The audit must be conducted in accordance with s. 11.45 and the rules adopted thereunder. In addition to the entities named above, the district must provide a copy of the audit to the Auditor General within 10 days after its acceptance by the governing board.

3.　A 5-year capital improvements plan, to be included in the consolidated annual report required by s. 373.036(7). The plan must include expected sources of revenue for planned improvements and must be prepared in a manner comparable to the fixed capital outlay format set forth in s. 216.043.

4.　A 5-year water resource development work program to be furnished within 30 days after the adoption of the final budget. The program must describe the district's implementation strategy and include an annual funding plan for each of the 5 years included in the plan for the water resource and water supply development components, including alternative water supply development, of each approved regional water supply plan developed or revised under s. 373.709. The work program must address all the elements of the water resource development component in the district's approved regional water supply plans, as well as the water supply projects proposed for district funding and assistance. The annual funding plan shall identify both anticipated available district funding and additional funding needs for the second through fifth years of the funding plan. The work program must identify projects in the work program which will provide water; explain how each water resource and water supply project will produce additional water available for consumptive uses; estimate the quantity of water to be produced by each project; provide an assessment of the contribution of the district's regional water supply plans in supporting the implementation of minimum flows and minimum water levels and water reservations; and ensure sufficient water is available to timely meet the water supply needs of existing and future reasonable-beneficial uses for a 1-in-10-year drought event and to avoid the adverse effects of competition for water supplies.

(b)　Within 30 days after its submittal, the department shall review the proposed work program and submit its findings, questions, and comments to the district. The review must include a written evaluation of the program's consistency with the furtherance of the district's approved regional water supply plans, and the adequacy of proposed expenditures. As part of the review, the department shall post the proposed work program on its website and give interested parties the opportunity to provide written comments on each district's proposed work program. Within 45 days after receipt of the department's evaluation, the governing board shall state in writing to the department which of the changes recommended in the evaluation it will incorporate into its work program submitted as part of the March 1 consolidated annual report required by s. 373.036(7) or specify the reasons for not incorporating the changes. The department shall include the district's responses in a final evaluation report and shall submit a copy of the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives.

(c)　If any entity listed in paragraph (a) provides written comments to the district regarding any document furnished under this subsection, the district must respond to the comments in writing and furnish copies of the comments and written responses to the other entities.

(d)　The final adopted budget must be posted on the water management district's official website within 30 days after adoption.

**History.**—s. 28, ch. 25209, 1949; s. 3, ch. 29790, 1955; s. 4, ch. 61-497; s. 1, ch. 65-432; s. 1, ch. 67-74; s. 25, ch. 73-190; s. 18, ch. 74-234; s. 46, ch. 80-274; s. 230, ch. 81-259; s. 3, ch. 84-164; s. 2, ch. 86-190; s. 9, ch. 91-288; s. 24, ch. 93-213; s. 276, ch. 94-356; s. 1012,

ch. 95-148; s. 5, ch. 96-339; s. 16, ch. 97-160; s. 6, ch. 98-88; s. 20, ch. 2001-256; s. 12, ch. 2004-381; s. 16, ch. 2005-36; s. 12, ch. 2009-243; s. 19, ch. 2010-205; s. 2, ch. 2011-67; s. 22, ch. 2011-144; s. 4, ch. 2012-126; s. 60, ch. 2013-15; s. 17, ch. 2016-1.

Note.—Former s. 378.28.

### 373.539    Imposition of taxes.—

(1)    Each year the governing board of the district shall certify to the property appraiser of the county in which the property is situate, timely for the preparation of the tax roll, the tax rate to be applied in determining the amount of the district's annual tax, and the property appraiser shall extend on his or her county tax roll the amount of such tax, determined at the rate certified to the property appraiser by the governing board, and shall certify the same to the tax collector at the same time and in like manner as for county taxes.

(2)    Collection of district taxes, the issuance of tax sale certificates for nonpayment thereof, the redemption or sale of said certificates, the vesting of title by tax forfeiture, and the sale of the land and other real estate so forfeited shall be at the same time, in conjunction with, and by like procedure and of like effect as is provided by law with respect to county taxes, nor may either the county or the district taxes be paid or redemption effected without the payment or redemption of both. The title to district tax forfeited land shall vest in the county on behalf of said district along with that of the county for county tax forfeited land, said district tax forfeited land to be held, sold, or otherwise disposed of by said county for the benefit of said district. The proceeds therefrom, after deducting costs, shall be paid to the district in amounts proportionate to the respective tax liens thereon.

(3)    The district tax liens shall be of equal dignity with those of the county.

(4)    The tax officers of the county are hereby authorized and directed to perform the duties devolving upon them under this chapter, and to receive compensation therefor at such rates or charges as are provided by law with respect to similar services or charges in other cases.

History.—s. 29, ch. 25209, 1949; s. 25, ch. 73-190; s. 1, ch. 77-102; s. 608, ch. 95-148.

Note.—Former s. 378.29.

### 373.543    Land held by Board of Trustees of the Internal Improvement Trust Fund; areas not taxed.—

(1)    Land comprising part of the principal of the State School Trust Fund declared by the constitution to be "sacred and inviolate," or other real estate, title to which is in the State Board of Education, shall not be subject to the district tax nor shall there be liability therefor upon any state agency.

(2)    There shall be excluded from district taxes all bodies of navigable water and unreclaimed water areas meandered by the public surveys, all rights-of-way of said district, all areas devoted or dedicated to the use of and for the works of the district, rights-of-way of state and county highways, and streets within the limits of incorporated towns, and property owned by a public agency open to the use of the public or for the public benefit not leased to or operated by a private agency.

History.—s. 30, ch. 25209, 1949; s. 2, ch. 61-119; ss. 27, 35, ch. 69-106; s. 25, ch. 73-190; s. 1, ch. 77-102; s. 231, ch. 81-259.

Note.—Former s. 378.30.

### 373.546    Unit areas.—The governing board may, in its discretion, adopt and effectuate unit areas embracing separate or combined drainage basins, or parts thereof, or areas of related lands and works, for convenience or economy in constructing, maintaining and operating the works of the district, and for the purpose of imposing taxes within each area to meet these requirements of the said area.

History.—s. 31, ch. 25209, 1949; s. 25, ch. 73-190.

Note.—Former s. 378.31.

### 373.553    Treasurer of the board; payment of funds; depositories.—

(1)    The governing board shall designate a treasurer who shall be custodian of all funds belonging to the board and to the district, and such funds shall be disbursed upon the order of, or in the manner prescribed by, the governing board by warrant or check signed by the treasurer or assistant treasurer and countersigned by the chair or vice chair of the board. The board is authorized to establish procedures for disbursement of funds in such amounts and in such manner as the board may prescribe, except that disbursement of funds prior to specific board approval may only be authorized upon certification by its chief executive officer or his or her designated assistant to the treasurer or assistant treasurer and to the chair or vice chair of the board that such disbursement is proper

and in order and is within budgetary limits. Any such disbursements shall be reported to the board at its next regular meeting. The board may establish, by rule, a procedure for the disbursement of funds of the district by means of wire or electronic transfers.

(2)    The board is authorized to select as depositories in which the funds of the board and of the district shall be deposited in any qualified public depository as defined in s. 280.02, and such deposits shall be secured in the manner provided in chapter 280.

History.—s. 33, ch. 25209, 1949; s. 3, ch. 63-224; s. 25, ch. 73-190; s. 1, ch. 73-213; s. 115, ch. 77-104; s. 13, ch. 82-101; s. 10, ch. 91-288; s. 609, ch. 95-148.

Note.—Former s. 378.33.

**373.559**     **May borrow money temporarily.**—In order to provide for the works described by this chapter, the governing board is hereby authorized and empowered to borrow money temporarily, from time to time, for a period not to exceed 1 year at any one time, not including renewals thereof, and to issue its promissory notes therefor upon such terms and at such rates of interest as the said board may deem advisable, payable from the taxes herein levied and imposed, and the increment thereof. Any of such notes may be used in payment of amounts due, or to become due, upon contracts made or to be made by said board for carrying on the work authorized and provided for herein, and the said board may, to secure the payment of any of such notes, hypothecate bonds herein authorized to be issued, and may thereafter redeem such hypothecated bonds. Any of the notes so issued may be paid out of the proceeds of bonds authorized to be issued by this chapter.

History.—s. 34, ch. 25209, 1949; s. 25, ch. 73-190.

Note.—Former s. 378.34.

**373.563**     **Bonds.**—

(1)    The governing board is hereby authorized and empowered to borrow money on permanent loans and incur obligations from time to time on such terms and at such rates of interest as it may deem proper, not exceeding 7.5 percent per annum, for the purpose of raising funds to prosecute to final completion the works and all expenses necessary or needful to be incurred in carrying out the purposes of this chapter; and the better to enable the said board to borrow the money to carry out the purposes aforesaid, the board is hereby authorized and empowered to issue in the corporate name of said board, negotiable coupon bonds of said district.

(2)    The bonds to be issued by authority of this chapter shall be in such form as shall be prescribed by the said board, shall recite that they are issued under the authority of this chapter, and shall pledge the faith and credit of the governing board of the district for the prompt payment of the interest and principal thereof.

(3)    Said bonds shall have all the qualities of negotiable paper under the Law Merchant, and shall not be invalid for any irregularity, or defect in the proceedings for the issue and sale thereof except forgery; and shall be incontestable in the hands of bona fide purchasers or holders thereof for value. The provisions of this chapter shall constitute an irrevocable contract between said board and the district and the holders of any bonds and the coupons thereof, issued pursuant to the provisions hereof. Any holder of any of said bonds or coupons may either at law or in equity by suit, action or mandamus enforce and compel the performance of the duties required by this chapter of any of the officers or persons mentioned in this chapter in relation to the said bonds, or to the collection, enforcement and application of the taxes for the payment thereof.

(4)    The amount of bonds to be issued in any one year, when added to the amount then outstanding, shall be not greater than can be supported for that year in accordance with the bond schedule out of 90 percent of the taxes imposed, or to be imposed, for that year, plus other moneys in the hands of the district usable for bond purposes after deducting therefrom amounts estimated to be required for maintenance and operation of the works of the district, cost of administration, and amounts for such other purposes as the governing board may determine, nor shall the governing board levy in any year taxes insufficient to support said bonds for such year on the basis herein described.

(5)    All bonds and coupons not paid at maturity shall bear interest at a rate not to exceed 7.5 percent per annum from maturity until paid, or until sufficient funds have been deposited at the place of payment.

(6)  The bonds to be issued by authority of this chapter shall be in denominations of not less than $100, bearing interest from date at a rate not to exceed 5 percent per annum, payable semiannually, to mature at annual intervals within 40 years commencing after a period of not later than 10 years, to be determined by said board, both principal and interest payable at some convenient place designated by said board to be named in said bonds, which said bonds shall be signed by the chair of the board, attested with the seal of said district and by the signature of the secretary of said board. In case any of the officers whose signatures, countersignatures, and certificates appear upon the said bonds and coupons shall cease to be such officer before the delivery of such bonds to the purchaser, such signature or countersignature and certificate shall nevertheless be valid and sufficient for all purposes the same as if they had remained in office until the delivery of the bonds.

(7)  Interest coupons shall be attached to the said bonds and the said coupons shall be consecutively numbered, specifying the number of the bond to which they are attached, and shall be attested by the lithographed or engraved facsimile signature of the chair and secretary of said board.

(8)  In the discretion of said board, it may be provided that at any time, after such date as shall be fixed by the said board, said bonds may be redeemed before maturity at the option of said board, or its successors in office. If any bond so issued subject to redemption before maturity shall not be presented when called for redemption, it shall cease to bear interest from and after the date so fixed for redemption.

**History.**—s. 35, ch. 25209, 1949; s. 1, ch. 61-147; s. 25, ch. 73-190; s. 33, ch. 73-302; s. 1, ch. 77-174; s. 147, ch. 79-400; s. 610, ch. 95-148.

**Note.**—Former s. 378.35.

**373.566   Refunding bonds.**—The governing board shall have authority to issue refunding bonds to take up any outstanding bonds of said district falling due and becoming payable, when, in the judgment of said board, it shall be for the best interests of said district so to do. The said board is hereby authorized and empowered to issue refunding bonds to take up and refund all bonds of said district outstanding that are subject to call and termination, and all bonds of said district that are not subject to call or redemption, where the surrender of said bonds can be procured from the holder thereof at prices satisfactory to the board. Such refunding bonds may be issued at any time when in the judgment of said board it will be to the interest of the district financially or economically by securing a lower rate of interest on said bonds or by extending the time of maturity of said bonds, or for any other reason in the judgment of said board advantageous to said district.

**History.**—s. 36, ch. 25209, 1949; s. 25, ch. 73-190.

**Note.**—Former s. 378.36.

**373.569   Bond election.**—When required by the State Constitution, the governing board shall call an election of the freeholders in said district, in which said election the matter of whether or not said bonds shall be issued shall be decided as provided by law with respect to bond elections.

**History.**—s. 37, ch. 25209, 1949; s. 25, ch. 73-190.

**Note.**—Former s. 378.37.

**373.573   Bonds to be validated.**—Whenever the governing board shall have authorized the issuance of bonds under the provisions of this chapter, the said board may, if it shall so elect, have said bonds validated in the manner provided by chapter 75, and to that end the said board may adopt a suitable resolution for the issuance of said bonds.

**History.**—s. 38, ch. 25209, 1949; s. 25, ch. 73-190.

**Note.**—Former s. 378.38.

**373.576   Sale of bonds.**—All of said bonds shall be executed and delivered to the treasurer of said district, who shall sell the same in such quantities and at such rates as the board may deem necessary to meet the payments for the works and improvements in the district. Said bonds shall not be sold for less than 95 cents on the dollar, with accrued interest.

**History.**—s. 39, ch. 25209, 1949; s. 25, ch. 73-190.

**Note.**—Former s. 378.39.

**373.579   Proceeds from taxes for bond purposes.**—It shall be the duty of the treasurer as custodian of the funds belonging to the said board and to the district, out of the proceeds of the taxes levied and imposed by this chapter and out of any other moneys in the treasurer's possession belonging to the district, which moneys so far as necessary shall be set apart and appropriated for the purpose, to apply said moneys and to pay the interest upon the said bonds as the same shall fall due and at the maturity of the said bonds to pay the principal thereof.

History.—s. 40, ch. 25209, 1949; s. 25, ch. 73-190; s. 611, ch. 95-148.
Note.—Former s. 378.40.

**373.583   Registration of bonds.**—

(1)   Whenever the owner of any coupon bond issued pursuant to the provisions of this chapter shall present such bond and all unpaid coupons thereof to the treasurer of the district with request for the conversion of such bond into a registered bond, such treasurer shall cut off and cancel the coupons of any such coupon bond so presented, and shall stamp, print or write upon such coupon bond so presented either upon the back or the face thereof as may be convenient, a statement to the effect that said bond is registered in the name of the owner and that thereafter the interest and principal of said bond are payable to the registered owner. Thereafter and from time to time any such bond may be transferred by such registered owner in person or by attorney duly authorized on presentation of such bond to the treasurer, and the bond again registered as before, a similar statement being stamped or written thereon.

(2)   Such statement stamped, printed or written upon any such bond may be in substantially the following form:

  (Date, giving month, year and day.)

This bond is to be registered pursuant to the statutes in such case made and provided in the name of (here insert name of owner), and the interest and principal thereof are hereafter payable to such owner.

  (Treasurer)

(3)   If any bond shall have been registered as aforesaid, the principal and interest of said bond shall be payable to the registered owner. The treasurer shall enter in the register of said bonds to be kept by him or her, or in a separate book, the fact of the registration of such bonds, and in whose names respectively, so that said register or book shall at all times show what bonds are registered and the name of the registered owner thereof.

History.—s. 41, ch. 25209, 1949; s. 25, ch. 73-190; s. 612, ch. 95-148.
Note.—Former s. 378.41.

**373.584   Revenue bonds.**—

(1)   In addition to issuing general obligation bonds as provided in s. 373.563, districts may also, from time to time, issue revenue bonds to finance the undertaking of any capital or other project for the purposes permitted by the State Constitution, to pay the costs and expenses incurred in carrying out the purposes of this chapter, or to refund revenue bonds of the district issued pursuant to this section. In anticipation of the sale of such revenue bonds, the district may issue negotiable bond anticipation notes and may renew the same from time to time; but the maximum maturity of any such note, including renewals thereof, shall not exceed 5 years from the date of issue of the original note. Such notes shall be paid from the revenues hereinafter provided or from the proceeds of sale of the revenue bonds of such district in anticipation of which they were issued. The notes shall be issued in the same manner as the revenue bonds.

(2)   Revenues derived by the district may be pledged to the payment of revenue bonds; however, the ad valorem taxing powers of the district may not be pledged to the payment of such revenue bonds without prior compliance with the requirements of the State Constitution as to the affirmative vote of the electors of the district and with the requirements of s. 373.563. Revenue bonds and notes shall be, and shall be deemed to be, for all purposes, negotiable instruments, subject only to the provisions of the revenue bonds and notes for registration. The powers and authority of districts to issue revenue bonds, including, but not limited to, bonds to finance a stormwater management system as defined by s. 373.403, and to enter into contracts incidental thereto, and to do all things necessary and desirable in connection with the issuance of revenue bonds, shall be coextensive with the powers and authority of municipalities to issue bonds under state law. The provisions of this section constitute full

and complete authority for the issuance of revenue bonds and shall be liberally construed to effectuate its purpose.

(3)   The revenue bonds may be issued as serial bonds or as term bonds; or the district, in its discretion, may issue bonds of both types. The revenue bonds shall be authorized by resolution of the governing board and shall bear such date or dates; mature at such time or times, not exceeding 40 years from their respective dates; bear interest at such rate or rates; be payable at such time or times; be in such denominations; be in such form; carry such registration privileges; be executed in such manner; be payable in lawful money of the United States at such place or places; and be subject to such terms of redemption, including redemption prior to maturity, as such resolution or resolutions may provide. If any officer whose signature, or a facsimile of whose signature, appears on any bonds or coupons ceases to be such officer before the delivery of such bonds, such signature or facsimile shall nevertheless be valid and sufficient for all purposes as if he or she had remained in office until the delivery. The revenue bonds or notes may be sold at public or private sale for such price or prices as the governing board shall determine. Pending preparation of the definitive bonds, the district may issue interim receipts or certificates which shall be exchanged for such definitive bonds.

(4)   As used in this section:

(a)   "Bonds" means bonds, debentures, notes, certificates of indebtedness, certificates of participation, mortgage certificates, or other obligations or evidences of indebtedness of any type or character.

(b)   "Project" means a governmental undertaking approved by the governing body of a water management district and includes all property rights, easements, and franchises relating thereto and deemed necessary or convenient for the construction, acquisition, or operation thereof, and embraces any capital expenditure which the governing body of a water management district shall deem to be made for a public purpose, including the refunding of any bonded indebtedness which may be outstanding on any existing project.

(c)   "Revenue bonds" means bonds of a water management district to the payment of which the full faith and credit and power to levy ad valorem taxes are not pledged.

(5)(a)   The total annual debt service for bonds issued pursuant to this section and s. 373.563 may not exceed 20 percent of the annual ad valorem tax revenues of the water management district, unless approved by the Joint Legislative Budget Commission.

(b)   The Joint Legislative Budget Commission is authorized to review the financial soundness of a water management district and determine whether bonds may be issued by a water management district in excess of the limitation provided in paragraph (a).

(c)   A water management district may not take any action regarding the issuance of bonds in excess of the limitation of paragraph (a) without prior approval of the Joint Legislative Budget Commission pursuant to joint rules of the House of Representatives and the Senate.

(d)   Bonds issued and outstanding before January 1, 2009, are exempt from this subsection and shall not be included in the calculation of the limitation of paragraph (a).

(e)   This subsection does not affect the validity or enforceability of outstanding revenue bonds.

**History.**—s. 4, ch. 85-347; s. 6, ch. 91-80; s. 613, ch. 95-148; s. 13, ch. 2009-243; s. 45, ch. 2015-229.

**373.586    Unpaid warrants to draw interest.**—If any warrant issued under this chapter is not paid when presented to the treasurer of the district because of lack of funds in the treasury, such fact shall be endorsed on the back of such warrant, and such warrant shall draw interest thereafter at a rate not exceeding 6 percent per annum, until such time as there is money on hand to pay the amount of such warrant and the interest then accumulated; but no interest shall be allowed on warrants after notice to the holder or holders thereof that sufficient funds are in the treasury to pay said endorsed warrants and interest.

**History.**—s. 42, ch. 25209, 1949; s. 25, ch. 73-190; s. 116, ch. 77-104.
**Note.**—Former s. 378.42.

**373.59    Payment in lieu of taxes for lands acquired for water management district purposes.**—

(1)   Beginning July 1, 1999, funds shall be reserved annually by a governing board, during the development of its annual operating budget, for payments in lieu of taxes for all actual ad valorem tax losses incurred as a result of

all governing board acquisitions for water management district purposes.

(2)    Payment in lieu of taxes shall be available:

(a)    To all counties that have a population of 150,000 or fewer. Population levels shall be determined pursuant to s. 186.901. The population estimates published April 1 and used in the revenue-sharing formula pursuant to s. 186.901 shall be used to determine eligibility under this subsection and shall apply to payments made for the subsequent fiscal year.

(b)    To all local governments located in eligible counties and whose lands are bought and taken off the tax rolls.

For properties acquired after January 1, 2000, in the event that such properties otherwise eligible for payment in lieu of taxes under this subsection are leased or reserved and remain subject to ad valorem taxes, payments in lieu of taxes shall commence or recommence upon the expiration or termination of the lease or reservation. If the lease is terminated for only a portion of the lands at any time, the annual payments shall be made for that portion only commencing the year after such termination, without limiting the requirement that annual payments shall be made on the remaining portion or portions of the land as the lease on each expires. For the purposes of this subsection, "local government" includes municipalities and the county school board.

(3)    If sufficient funds are unavailable in any year to make full payments to all qualifying counties and local governments, such counties and local governments shall receive a pro rata share of the moneys available.

(4)    The payment amount shall be based on the average amount of actual ad valorem taxes paid on the property for the 3 years preceding acquisition. Applications for payment in lieu of taxes shall be made no later than May 31 of the year for which payment is sought. No payment in lieu of taxes shall be made for properties which were exempt from ad valorem taxation for the year immediately preceding acquisition.

(5)    If property that was subject to ad valorem taxation was acquired by a tax-exempt entity for ultimate conveyance to the state under this chapter, payment in lieu of taxes shall be made for such property based upon the average amount of ad valorem taxes paid on the property for the 3 years prior to its being removed from the tax rolls. The water management districts shall certify to the Department of Revenue those properties that may be eligible under this provision. Once eligibility has been established, that governmental entity shall receive annual payments for each tax loss until the qualifying governmental entity exceeds the population threshold pursuant to subsection (2).

(6)    Payment in lieu of taxes pursuant to this section shall be made annually to qualifying counties and local governments after certification by the Department of Revenue that the amounts applied for are reasonably appropriate, based on the amount of actual ad valorem taxes paid on the eligible property, and after the water management districts have provided supporting documents to the Chief Financial Officer and have requested that payment be made in accordance with the requirements of this section. With the assistance of the local government requesting payment in lieu of taxes, the water management district that acquired the land is responsible for preparing and submitting application requests for payment to the Department of Revenue for certification.

(7)    If a water management district conveys to a county or local government title to any land owned by the district, any payments in lieu of taxes on the land made to the county or local government shall be discontinued as of the date of the conveyance.

**History.**—ss. 3, 5, ch. 81-33; s. 36, ch. 83-218; s. 5, ch. 85-347; s. 4, ch. 86-22; s. 8, ch. 86-294; s. 13, ch. 90-217; s. 11, ch. 91-288; s. 13, ch. 92-288; s. 277, ch. 94-356; s. 1, ch. 95-311; s. 6, ch. 95-349; s. 21, ch. 95-430; s. 17, ch. 96-389; s. 25, ch. 97-94; s. 17, ch. 97-160; s. 14, ch. 97-164; ss. 27, 38, ch. 98-46; s. 172, ch. 99-13; ss. 26, 53, ch. 99-228; s. 38, ch. 99-247; s. 18, ch. 2000-170; s. 58, ch. 2000-171; ss. 39, 41, 53, 54, ch. 2001-254; s. 23, ch. 2001-256; s. 12, ch. 2003-2; s. 385, ch. 2003-261; s. 12, ch. 2003-394; s. 1, ch. 2004-280; s. 32, ch. 2006-26; s. 11, ch. 2008-5; s. 18, ch. 2008-229; s. 1, ch. 2009-16; s. 30, ch. 2009-82; s. 14, ch. 2009-243; s. 26, ch. 2010-153; s. 20, ch. 2010-205; s. 33, ch. 2011-47; s. 26, ch. 2012-119; s. 24, ch. 2013-41; s. 77, ch. 2014-17; s. 33, ch. 2014-53; s. 46, ch. 2015-229.

**373.5905    Reinstatement of payments in lieu of taxes; duration.**—If a water management district has made a payment in lieu of taxes to a governmental entity and subsequently suspended such payment, beginning July 1, 2009, the water management district shall reinstate appropriate payments and continue the payments for as long as the county population remains below the population threshold pursuant to s. 373.59(2)(a). This section does not authorize or provide for payments in arrears.

History.—s. 52, ch. 99-247; s. 6, ch. 99-353; s. 13, ch. 2003-394; s. 15, ch. 2009-243; s. 47, ch. 2015-229.

**373.591 Management review teams.—**

(1) To determine whether conservation, preservation, and recreation lands titled in the names of the water management districts are being managed for the purposes for which they were acquired and in accordance with land management objectives, the water management districts shall establish land management review teams to conduct periodic management reviews. The land management review teams shall be composed of the following members:

(a) One individual from the county or local community in which the parcel is located.

(b) One employee of the water management district.

(c) A private land manager mutually agreeable to the governmental agency representatives.

(d) A member of the local soil and water conservation district board of supervisors.

(e) One individual from the Fish and Wildlife Conservation Commission.

(f) One individual from the Department of Environmental Protection.

(g) One individual representing a conservation organization.

(h) One individual from the Department of Agriculture and Consumer Services' Florida Forest Service.

(2) The management review team shall use the criteria provided in s. 259.036 in conducting its reviews.

(3) In determining which lands shall be reviewed in any given year, the water management district may prioritize the properties to be reviewed.

(4) If the land management review team finds that the lands reviewed are not being managed in accordance with their management plan, prepared in a manner and form prescribed by the governing board of the district and otherwise meeting the timber resource management requirements of s. 253.036, the land managing agency shall provide a written explanation to the management review team.

(5) Each water management district shall, by October 1 of each year, provide its governing board with a report indicating which properties have been reviewed and the review team's findings.

History.—s. 15, ch. 97-164; s. 3, ch. 98-332; s. 173, ch. 99-13; s. 192, ch. 99-245; s. 18, ch. 2012-7.

<div align="center">

**PART VI**

**MISCELLANEOUS PROVISIONS**

</div>

373.603   Power to enforce.

373.604   Awards to employees for meritorious service.

373.605   Group insurance for water management districts.

373.6055   Criminal history checks for certain water management district employees and others.

373.607   Minority business enterprise procurement goals; implementation of recommendations.

373.608   Patents, copyrights, and trademarks.

373.609   Enforcement; city and county officers to assist.

373.610   Defaulting contractors.

373.611   Modification or limitation of remedy.

373.613   Penalties.

373.614   Unlawful damage to district property or works; penalty.

373.616   Liberal construction.

373.6161   Chapter to be liberally construed.

373.617   Judicial review relating to permits and licenses.

373.618   Public service warnings, alerts, and announcements.

373.619   Recognition of water and sewer-saving devices.

373.62   Water conservation; automatic sprinkler systems.

373.621   Water conservation.

373.63   Preference to State University System in award of projects or studies.

373.69   Apalachicola-Chattahoochee-Flint River Basin Compact.

**373.603    Power to enforce.**—The Department of Environmental Protection or the governing board of any water management district and any officer or agent thereof may enforce any provision of this law or any rule or regulation adopted and promulgated or order issued thereunder to the same extent as any peace officer is authorized to enforce the law. Any officer or agent of any such board may appear before any trial court judge empowered to issue warrants in criminal cases and make an affidavit and apply for the issuance of a warrant in the manner provided by law. If such affidavit alleges the commission of an offense, the trial court judge shall issue a warrant directed to any sheriff or deputy for the arrest of any offender. The provisions of this section shall apply to the Florida Water Resources Act of 1972 in its entirety.

History.—s. 14, ch. 57-380; s. 14, ch. 63-336; ss. 25, 35, ch. 69-106; s. 2, part VI, ch. 72-299; s. 25, ch. 73-190; s. 117, ch. 77-104; s. 51, ch. 79-65; s. 278, ch. 94-356; s. 8, ch. 2004-11.

Note.—Former s. 373.201.

**373.604    Awards to employees for meritorious service.**—The governing board of any water management district may adopt and implement a program of meritorious service awards for district employees who make proposals which are implemented and result in reducing district expenditures or improving district operations, who make exceptional contributions to the efficiency of the district, or who make other improvements in the operations of the district. No award granted under the provisions of this section shall exceed $2,000 or 10 percent of the first year's savings, whichever is less, unless a larger award is made by the Legislature. Awards shall be paid by the district from any available funds.

History.—s. 1, ch. 74-287.

**373.605    Group insurance for water management districts.**—The governing board of a water management district may provide group insurance for its employees, and the employees of another water management district, in the same manner and with the same provisions and limitations authorized for other public employees under ss. 112.08, 112.09, 112.10, 112.11, and 112.14.

History.—ss. 1, 2, ch. 74-218; s. 21, ch. 97-100; s. 5, ch. 2012-126.

**373.6055    Criminal history checks for certain water management district employees and others.**—

(1)    A water management district that has structures or facilities identified as critical infrastructure by the Regional Domestic Security Task Force created pursuant to s. 943.0312 shall conduct a fingerprint-based criminal history check for any current or prospective employee and other persons designated pursuant to the water management district's security plan for buildings, facilities, and structures if those persons are allowed regular access to those buildings, facilities, or structures defined in the water management district's security plan as restricted access areas.

(2)    A water management district that has structures or facilities that are not identified as critical infrastructure by the Regional Domestic Security Task Force may conduct a fingerprint-based criminal history check for any current or prospective employee and others designated pursuant to the water management district's security plan for buildings, facilities, and structures if those persons are allowed regular access to critical buildings, facilities, or structures defined in the water management district's security plan as restricted access areas.

(3)(a)    The fingerprint-based criminal history check shall be performed on any person described in subsection (1) pursuant to the applicable water management district's security plan for buildings, facilities, and structures. With respect to employees or others with regular access, such checks shall be performed at least once every 5 years or at other more frequent intervals as provided by the water management district's security plan for buildings, facilities, and structures. Each individual subject to the criminal history check shall file a complete set of fingerprints which are taken in a manner required by the Department of Law Enforcement and the water management district security plan. Fingerprints shall be submitted to the Department of Law Enforcement for state processing and to the Federal Bureau of Investigation for federal processing. The results of each fingerprint-based check shall be reported to the requesting water management district. The costs of the checks, consistent with s. 943.053(3), shall be paid by the water management district or other employing entity or by the individual checked.

(b)   Each water management district's security plan for buildings, facilities, and structures shall identify criminal convictions or other criminal history factors consistent with paragraph (c) which shall disqualify a person from initial employment or authorization for regular access to buildings, facilities, or structures defined in the water management district's security plan as restricted access areas. Such factors shall be used to disqualify all applicants for employment or others seeking regular access to buildings, facilities, or structures defined in the water management district's security plan as restricted access areas on or after the effective date of the water management district's security plan for buildings, facilities, and structures, and may be used to disqualify all those employed or authorized for regular access as of that date. Each water management district may establish a procedure to appeal a denial of employment or access based upon procedural inaccuracies or discrepancies regarding criminal history factors established pursuant to this paragraph. A water management district may allow waivers on a temporary basis to meet special or emergency needs of the water management district or its users. Policies, procedures, and criteria for implementation of this subsection shall be included in the water management district's security plan for buildings, facilities, and structures.

(c)   In addition to other requirements for employment or access established by any water management district pursuant to its water management district's security plan for buildings, facilities, and structures, each water management district's security plan shall provide that:

1.   Any person who has within the past 7 years been convicted, regardless of whether adjudication was withheld, for a forcible felony as defined in s. 776.08; an act of terrorism as defined in s. 775.30; planting of a hoax bomb as provided in s. 790.165; any violation involving the manufacture, possession, sale, delivery, display, use, or attempted or threatened use of a weapon of mass destruction or hoax weapon of mass destruction as provided in s. 790.166; dealing in stolen property; any violation of s. 893.135; any violation involving the sale, manufacturing, delivery, or possession with intent to sell, manufacture, or deliver a controlled substance; burglary; robbery; any felony violation of s. 812.014; any violation of s. 790.07; any crime an element of which includes use or possession of a firearm; any conviction for any similar offenses under the laws of another jurisdiction; or conviction for conspiracy to commit any of the listed offenses may not be qualified for initial employment within or authorized regular access to buildings, facilities, or structures defined in the water management district's security plan as restricted access areas.

2.   Any person who has at any time been convicted of any of the offenses listed in subparagraph 1. may not be qualified for initial employment within or authorized regular access to buildings, facilities, or structures defined in the water management district's security plan as restricted access areas unless, after release from incarceration and any supervision imposed as a sentence, the person remained free from a subsequent conviction, regardless of whether adjudication was withheld, for any of the listed offenses for a period of at least 7 years prior to the employment or access date under consideration.

History.—s. 1, ch. 2005-121; s. 6, ch. 2016-78; s. 8, ch. 2017-37.

**373.607   Minority business enterprise procurement goals; implementation of recommendations.**—Each water management district, as created in this chapter, may implement the recommendations from any study conducted pursuant to chapter 91-162, Laws of Florida, to achieve minority business enterprise procurement goals.

History.—s. 1, ch. 96-412.

**373.608   Patents, copyrights, and trademarks.**—Each district may, in its own name:

(1)   Perform all things necessary to secure letters of patent, copyrights, and trademarks on any work products of the district and enforce its rights therein. Each district shall consider contributions by district personnel in the development of trademarks, copyrights, and patents and shall enter into written contracts with such personnel in each trademark, copyright, or patent.

(2)   License, lease, assign, or otherwise give written consent to any person, firm, or corporation for the manufacture or use of such district work products, on a royalty basis or for such other consideration as the applicable governing board shall deem proper.

(3)   Take any action necessary, including legal action, to protect such district work products against improper or unlawful use or infringement.

(4)  Enforce the collection of any sums due to the district for the manufacture or use of such district work products by another party.

(5)  Sell any of such district work products and execute all instruments necessary to consummate any such sale.

(6)  Do all other acts necessary and proper for the execution of powers and duties conferred upon the districts by this section, including adopting rules, as necessary, in order to administer this section.

History.—s. 4, ch. 2001-256; s. 53, ch. 2002-1.

**373.609  Enforcement; city and county officers to assist.**—It shall be the duty of every state and county attorney, sheriff, police officer, and other appropriate city and county official, upon request, to assist the department, the governing board of any water management district, or any local board, or any of their agents in the enforcement of the provisions of this law and the rules and regulations adopted thereunder.

History.—s. 15, ch. 57-380; s. 15, ch. 63-336; ss. 25, 35, ch. 69-106; s. 25, ch. 73-190; s. 117, ch. 77-104; s. 232, ch. 81-259.
Note.—Former s. 373.211.

**373.610  Defaulting contractors.**—The district may suspend a contractor on a temporary or permanent basis from doing work with the district if such contractor has materially breached its contract with the district. The district shall adopt rules to administer the provisions of this section to specify the circumstances and conditions that constitute a materially breached contract and conditions that constitute the period for temporary or permanent suspension and for reinstatement.

History.—s. 5, ch. 2001-256; s. 32, ch. 2002-207.

**373.611  Modification or limitation of remedy.**—In order to promote the cost-effective procurement of commodities and contractual services by the water management districts, a district may enter into contracts to limit or alter the measure of damages recoverable from a vendor or contractor by a district when procuring commodities or contractual services, consistent with the provisions contained in s. 672.719.

History.—s. 6, ch. 2001-256; s. 33, ch. 2002-207.

**373.613  Penalties.**—Any person who violates any provision of this law or any rule, regulation or order adopted or issued pursuant thereto is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

History.—s. 18, ch. 57-380; s. 325, ch. 71-136; s. 25, ch. 73-190.
Note.—Former s. 373.241.

**373.614  Unlawful damage to district property or works; penalty.**—The governing board of the district shall have the power, and is authorized, to offer and pay rewards of up to $1,000 to any person furnishing information leading to the arrest and conviction of any person who has committed an unlawful act or acts upon the rights-of-way, land, or land interests of the district or has destroyed or damaged district properties or works.

History.—s. 25, ch. 73-190; s. 1, ch. 73-212.
Note.—Former s. 378.163.

**373.616  Liberal construction.**—The provisions of this chapter shall be liberally construed in order to effectively carry out its purposes.

History.—s. 4, part VI, ch. 72-299.

**373.6161  Chapter to be liberally construed.**—This chapter shall be construed liberally for effectuating the purposes described herein, and the procedure herein prescribed shall be followed and applied with such latitude consistent with the intent thereof as shall best meet the requirements or necessities therefor.

History.—s. 46, ch. 25209; s. 6, ch. 25213, 1949; s. 25, ch. 73-190.
Note.—Former s. 378.47.

**373.617  Judicial review relating to permits and licenses.**—

(1)  As used in this section, unless the context otherwise requires:

(a)  "Agency" means any official, officer, commission, authority, council, committee, department, division, bureau, board, section, or other unit or entity of state government.

(b)   "Permit" means any permit or license required by this chapter.

(2)   Any person substantially affected by a final action of any agency with respect to a permit may seek review within 90 days of the rendering of such decision and request monetary damages and other relief in the circuit court in the judicial circuit in which the affected property is located; however, circuit court review shall be confined solely to determining whether final agency action is an unreasonable exercise of the state's police power constituting a taking without just compensation. Review of final agency action for the purpose of determining whether the action is in accordance with existing statutes or rules and based on competent substantial evidence shall proceed in accordance with chapter 120.

(3)   If the court determines the decision reviewed is an unreasonable exercise of the state's police power constituting a taking without just compensation, the court shall remand the matter to the agency which shall, within a reasonable time:

(a)   Agree to issue the permit;

(b)   Agree to pay appropriate monetary damages; however, in determining the amount of compensation to be paid, consideration shall be given by the court to any enhancement to the value of the land attributable to governmental action; or

(c)   Agree to modify its decision to avoid an unreasonable exercise of police power.

(4)   The agency shall submit a statement of its agreed-upon action to the court in the form of a proposed order. If the action is a reasonable exercise of police power, the court shall enter its final order approving the proposed order. If the agency fails to submit a proposed order within a reasonable time not to exceed 90 days which specifies an action that is a reasonable exercise of police power, the court may order the agency to perform any of the alternatives specified in subsection (3).

(5)   The court shall award reasonable attorney's fees and court costs to the agency or substantially affected person, whichever prevails.

(6)   The provisions of this section are cumulative and shall not be deemed to abrogate any other remedies provided by law.

History.—ss. 1, 2, 3, 4, 5, 6, ch. 78-85.

**373.618   Public service warnings, alerts, and announcements.**—The Legislature believes it is in the public interest that all water management districts created pursuant to s. 373.069 own, acquire, develop, construct, operate, and manage public information systems. Public information systems may be located on property owned by the water management district, upon terms and conditions approved by the water management district, and must display messages to the general public concerning water management services, activities, events, and sponsors, as well as other public service announcements, including watering restrictions, severe weather reports, amber alerts, and other essential information needed by the public. Local government review or approval is not required for a public information system owned or hereafter acquired, developed, or constructed by the water management district on its own property. A public information system is subject to the requirements of the Highway Beautification Act of 1965 and all federal laws and agreements, when applicable. Water management district funds may not be used to pay the cost to acquire, develop, construct, operate, or manage a public information system. Any necessary funds for a public information system shall be paid for and collected from private sponsors who may display commercial messages.

History.—s. 6, ch. 2012-126; s. 2, ch. 2014-215; s. 23, ch. 2014-223.

**373.619   Recognition of water and sewer-saving devices.**—The Legislature urges all public-owned or investor-owned water and sewerage systems to reduce connection fees and regular service charges for customers who utilize water or sewer-saving devices, including, but not limited to, individual graywater disposal systems.

History.—s. 2, ch. 82-10.

**373.62   Water conservation; automatic sprinkler systems.**—

(1)   Any person who purchases and installs an automatic landscape irrigation system must properly install, maintain, and operate technology that inhibits or interrupts operation of the system during periods of sufficient

moisture.

(2)   A licensed contractor who installs or performs work on an automatic landscape irrigation system must test for the correct operation of each inhibiting or interrupting device or switch on that system. If such devices or switches are not installed in the system or are not in proper operating condition, the contractor must install new ones or repair the existing ones and confirm that each device or switch is in proper operating condition before completing other work on the system.

(3)   The department shall create a model ordinance by January 15, 2010, that may be adopted and enforced by local governments. The ordinance must, at a minimum:

(a)   Require licensed contractors to report automatic landscape irrigation systems that are not in compliance with this section to the appropriate authority.

(b)   Provide penalties for licensed contractors who do not comply with this section. The minimum penalty must be $50 for a first offense, $100 for a second offense, and $250 for a third or subsequent offense.

Regular maintenance and replacement of worn or broken technology which interrupts or inhibits the operation of an automatic landscape irrigation system is not a violation of this section if such repairs are conducted within a reasonable time.

(4)   Local governments may adopt the model ordinance by October 1, 2010. Local governments that impose requirements that are more stringent than the model ordinance are exempt from adopting the ordinance.

(5)   Funds generated by penalties imposed under the ordinance shall be used by the local government for the administration and enforcement of this section and to further water conservation activities.

(6)   For purposes of this section, a licensed contractor includes an individual who holds a specific irrigation contractor's license issued by a county.

(7)(a)   The Legislature recognizes that lawn and landscape irrigation systems use a substantial amount of the state's potable water. The Legislature finds that smart irrigation systems that use soil moisture sensors with remote monitoring and adjustment capabilities, if properly installed and monitored, provide more efficient irrigation and save substantially more water than conventional time-controlled irrigation systems. This is because smart irrigation systems apply water to lawns and plants only as necessary to maintain required soil moisture, thus minimizing the overwatering or unnecessary watering that occurs with conventional irrigation systems. However, in order for this technology to optimize the efficient application of water it cannot be subject to day or days-of-the-week watering restrictions. The Legislature, therefore, recognizes that enacting a statewide process to provide an exemption from local water restriction ordinances will accelerate the adoption of this water saving technology. Further, a uniform exemption process will streamline variance procedures and minimize delay in implementing such technology. The longer it takes to approve soil moisture sensor control systems, the more potable water is wasted. A uniform variance process will allow state residents to maintain their property and protect water resources while enjoying their landscapes.

(b)   For purposes of this subsection, the term:

1.   "Monitoring entity" means a local government, community development district created pursuant to chapter 190, a homeowners' association created pursuant to chapter 720, a condominium association created pursuant to chapter 718, a cooperative created pursuant to chapter 719, or a public or private utility.

2.   "Soil moisture sensor" means a soil-based device that assesses the available plant soil moisture in order to minimize the unnecessary use of water and optimize the effectiveness of an irrigation system.

3.   "Soil moisture sensor control system" is the collective term for an entire soil moisture sensor system that has remote monitoring and adjustment capability.

(c)   A variance from day or days-of-the-week watering restrictions, which shall include the maximum soil set point for different soil types within the monitoring entity's jurisdiction, shall be granted by the applicable water management district for any residential, commercial, or recreational user within a monitoring entity's jurisdiction having a soil moisture sensor control system if the monitoring entity certifies that:

1.   Each soil moisture sensor control system installed within its jurisdiction will have multiple soil sensors that conform to different soil types and slopes in order to optimize water use for each user, adjust irrigation schedules

based on soil moisture requirements, and be installed by a licensed contractor in a manner that is consistent with the Field Guide to Soil Moisture Sensor Use in Florida by the University of Florida IFAS Extension Program for Resource Efficient Communities.

2.    It has the ability to monitor the status of each individual user's system and to remotely modify the system settings for irrigation cycles and run times.

3.    It will electronically post and update a list of active users of soil moisture sensor control systems within its jurisdiction on a monthly basis and provide Internet access to such listing and the monitoring database to the water management district and the local government.

4.    It shall provide notice to a user of noncompliant activity within 48 hours after such activity and, if the user does not take corrective action within 48 hours after such notice, it will remove the posted notice required in subparagraph 5. and remove the user from the active users list required by subparagraph 3.

5.    It shall post a notice at each parcel that has installed a compliant soil moisture sensor control system in plain view from the nearest roadway stating: "Irrigating with Smart Irrigation Controller," with the address of the parcel, and shall remove the notice if the user is no longer being monitored by the monitoring entity.

(d)    Upon installation of a soil moisture sensor control system, the licensed contractor shall certify to the monitoring entity that subparagraphs (c)1. and (c)2. have been met.

1.    The monitoring entity shall post the notice required by subparagraph (c)5. on the user's property and update the Internet listing of users of active soil moisture sensor control systems to include the new user.

2.    On an annual basis a professional engineer licensed under chapter 471 or a professional landscape architect licensed under chapter 481 shall perform an annual maintenance review of all soil moisture sensor control systems within the monitoring entity's jurisdiction and certify to the monitoring entity which systems are properly operating and in compliance with paragraph (c). The monitoring entity shall update its Internet listing of users of active soil moisture sensor control systems based on the certification.

(e)    Failure by the monitoring entity to ensure continual compliance with the condition of this variance shall be cause for the appropriate water management district to revoke the variance upon proper notice to the monitoring entity.

(f)    The variance provided in this subsection applies to day or days-of-the-week watering restrictions of the water management district as preempted by s. 373.217. All other applicable local government and water management district restrictions related to irrigation, including, but not limited to, a prohibition on irrigation and time-of-day watering requirements and water shortage or emergency orders issued pursuant to s. 373.246(2) and (7), remain applicable to the soil moisture sensor control system users within a monitoring entity's jurisdiction.

(g)    This subsection does not require a property owner to install a soil moisture sensor control system. This subsection also does not prohibit a property owner from installing soil moisture sensors and seeking an individual variance from the applicable water management district even if such property is located within the jurisdiction of a monitoring entity that has been granted a variance pursuant to paragraph (c).

History.—s. 7, ch. 91-41; s. 7, ch. 91-68; s. 6, ch. 2001-252; s. 1, ch. 2009-199.

**373.621    Water conservation.**—The Legislature recognizes the significant value of water conservation in the protection and efficient use of water resources. Accordingly, consideration in the administration of ss. 373.223, 373.233, and 373.236 shall be given to applicants who implement water conservation practices pursuant to s. 570.93 or other applicable water conservation measures as determined by the department or a water management district.

History.—s. 51, ch. 2001-279; s. 8, ch. 2014-150.

**373.63    Preference to State University System in award of projects or studies.**—Notwithstanding any provision of law to the contrary, the governing boards of the water management districts, in considering the awarding of projects or studies relating to research, restoration, or similar projects or studies, shall give preferential consideration to universities in the State University System.

History.—s. 14, ch. 92-288.

**373.69** **Apalachicola-Chattahoochee-Flint River Basin Compact.**—

The states of Alabama, Florida and Georgia and the United States of America hereby agree to the following compact which shall become effective upon enactment of concurrent legislation by each respective state legislature and the Congress of the United States.

### SHORT TITLE

This Act shall be known and may be cited as the "Apalachicola-Chattahoochee-Flint River Basin Compact" and shall be referred to hereafter in this document as the "ACF Compact" or "Compact."

### ARTICLE I
### COMPACT PURPOSES

This Compact among the states of Alabama, Florida and Georgia and the United States of America has been entered into for the purposes of promoting interstate comity, removing causes of present and future controversies, equitably apportioning the surface waters of the ACF, engaging in water planning, and developing and sharing common data bases.

### ARTICLE II
### SCOPE OF THE COMPACT

This Compact shall extend to all of the waters arising within the drainage basin of the ACF in the states of Alabama, Florida and Georgia.

### ARTICLE III
### PARTIES

The parties to this Compact are the states of Alabama, Florida and Georgia and the United States of America.

### ARTICLE IV
### DEFINITIONS

For the purposes of this Compact, the following words, phrases and terms shall have the following meanings:

(a)  "ACF Basin" or "ACF" means the area of natural drainage into the Apalachicola River and its tributaries, the Chattahoochee River and its tributaries, and the Flint River and its tributaries. Any reference to the rivers within this Compact will be designated using the letters "ACF" and when so referenced will mean each of these three rivers and each of the tributaries to each such river.

(b)  "Allocation formula" means the methodology, in whatever form, by which the ACF Basin Commission determines an equitable apportionment of surface waters within the ACF Basin among the three states. Such formula may be represented by a table, chart, mathematical calculation or any other expression of the Commission's apportionment of waters pursuant to this compact.

(c)  "Commission" or "ACF Basin Commission" means the Apalachicola-Chattahoochee-Flint River Basin Commission created and established pursuant to this Compact.

(d)  "Ground waters" means waters within a saturated zone or stratum beneath the surface of land, whether or not flowing through known and definite channels.

(e)  "Person" means any individual, firm, association, organization, partnership, business, trust, corporation, public corporation, company, the United States of America, any state, and all political subdivisions, regions, districts, municipalities, and public agencies thereof.

(f)  "Surface waters" means waters upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be considered "surface waters" when it exits from the spring onto the surface of the earth.

(g) "United States" means the executive branch of the government of the United States of America, and any department, agency, bureau or division thereof.

(h) "Water Resource Facility" means any facility or project constructed for the impoundment, diversion, retention, control or regulation of waters within the ACF Basin for any purpose.

(i) "Water resources," or "waters" means all surface waters and ground waters contained or otherwise originating within the ACF Basin.

<div align="center">

ARTICLE V

CONDITIONS PRECEDENT TO LEGAL

VIABILITY OF THE COMPACT

</div>

This Compact shall not be binding on any party until it has been enacted into law by the legislatures of the states of Alabama, Florida and Georgia and by the Congress of the United States of America.

<div align="center">

ARTICLE VI

ACF BASIN COMMISSION CREATED

</div>

(a) There is hereby created an interstate administrative agency to be known as the "ACF Basin Commission." The Commission shall be comprised of one member representing the state of Alabama, one member representing the state of Florida, one member representing the state of Georgia, and one non-voting member representing the United States of America. The state members shall be known as "State Commissioners" and the federal member shall be known as the "Federal Commissioner." The ACF Basin Commission is a body politic and corporate, with succession for the duration of this Compact.

(b) The Governor of each of the states shall serve as the State Commissioner for his or her state. Each State Commissioner shall appoint one or more alternate members and one of such alternates as designated by the State Commissioner shall serve in the State Commissioner's place and carry out the functions of the State Commissioner, including voting on Commission matters, in the event the State Commissioner is unable to attend a meeting of the Commission. The alternate members from each state shall be knowledgeable in the field of water resources management. Unless otherwise provided by law of the state for which an alternate State Commissioner is appointed, each alternate State Commissioner shall serve at the pleasure of the State Commissioner. In the event of a vacancy in the office of an alternate, it shall be filled in the same manner as an original appointment.

(c) The President of the United States of America shall appoint the Federal Commissioner who shall serve as the representative of all federal agencies with an interest in the ACF. The President shall also appoint an alternate Federal Commissioner to attend and participate in the meetings of the Commission in the event the Federal Commissioner is unable to attend meetings. When at meetings, the alternate Federal Commissioner shall possess all of the powers of the Federal Commissioner. The Federal Commissioner and alternate appointed by the President shall serve until they resign or their replacements are appointed.

(d) Each state shall have one vote on the ACF Basin Commission and the Commission shall make all decisions and exercise all powers by unanimous vote of the three State Commissioners. The Federal Commissioner shall not have a vote, but shall attend and participate in all meetings of the ACF Basin Commission to the same extent as the State Commissioners.

(e) The ACF Basin Commission shall meet at least once a year at a date set at its initial meeting. Such initial meeting shall take place within ninety days of the ratification of the Compact by the Congress of the United States and shall be called by the chair of the Commission. Special meetings of the Commission may be called at the discretion of the chair of the Commission and shall be called by the chair of the Commission upon written request of any member of the Commission. All members shall be notified of the time and place designated for any regular or special meeting at least five days prior to such meeting in one of the following ways: by written notice mailed to the last mailing address given to the Commission by each member, by facsimile, telegram or by telephone. The Chairmanship of the Commission shall rotate annually among the voting members of the Commission on an alphabetical basis, with the first chair to be the State Commissioner representing the State of Alabama.

(f)   All meetings of the Commission shall be open to the public.

(g)   The ACF Basin Commission, so long as the exercise of power is consistent with this Compact, shall have the following general powers:

(1)   To adopt bylaws and procedures governing its conduct;

(2)   To sue and be sued in any court of competent jurisdiction;

(3)   To retain and discharge professional, technical, clerical and other staff and such consultants as are necessary to accomplish the purposes of this Compact;

(4)   To receive funds from any lawful source and expend funds for any lawful purpose;

(5)   To enter into agreements or contracts, where appropriate, in order to accomplish the purposes of this Compact;

(6)   To create committees and delegate responsibilities;

(7)   To plan, coordinate, monitor, and make recommendations for the water resources of the ACF Basin for the purposes of, but not limited to, minimizing adverse impacts of floods and droughts and improving water quality, water supply, and conservation as may be deemed necessary by the Commission;

(8)   To participate with other governmental and non-governmental entities in carrying out the purposes of this Compact;

(9)   To conduct studies, to generate information regarding the water resources of the ACF Basin, and to share this information among the Commission members and with others;

(10)   To cooperate with appropriate state, federal, and local agencies or any other person in the development, ownership, sponsorship, and operation of water resource facilities in the ACF Basin; provided, however, that the Commission shall not own or operate a federally-owned water resource facility unless authorized by the United States Congress;

(11)   To acquire, receive, hold and convey such personal and real property as may be necessary for the performance of its duties under the Compact; provided, however, that nothing in this Compact shall be construed as granting the ACF Basin Commission authority to issue bonds or to exercise any right of eminent domain or power of condemnation;

(12)   To establish and modify an allocation formula for apportioning the surface waters of the ACF Basin among the states of Alabama, Florida and Georgia; and

(13)   To perform all functions required of it by this Compact and to do all things necessary, proper or convenient in the performance of its duties hereunder, either independently or in cooperation with any state or the United States.

ARTICLE VII
EQUITABLE APPORTIONMENT

(a)   It is the intent of the parties to this Compact to develop an allocation formula for equitably apportioning the surface waters of the ACF Basin among the states while protecting the water quality, ecology and biodiversity of the ACF, as provided in the Clean Water Act, 33 U.S.C. Sections 1251 et seq., the Endangered Species Act, 16 U.S.C. Sections 1532 et seq., the National Environmental Policy Act, 42 U.S.C. Sections 4321 et seq., the Rivers and Harbors Act of 1899, 33 U.S.C. Sections 401 et seq., and other applicable federal laws. For this purpose, all members of the ACF Basin Commission, including the Federal Commissioner, shall have full rights to notice of and participation in all meetings of the ACF Basin Commission and technical committees in which the basis and terms and conditions of the allocation formula are to be discussed or negotiated. When an allocation formula is unanimously approved by the State Commissioners, there shall be an agreement among the states regarding an allocation formula. The allocation formula thus agreed upon shall become effective and binding upon the parties to this Compact upon receipt by the Commission of a letter of concurrence with said formula from the Federal Commissioner. If, however, the Federal Commissioner fails to submit a letter of concurrence to the Commission within two hundred ten (210) days after the allocation formula is agreed upon by the State Commissioners, the Federal Commissioner shall within forty-five (45) days thereafter submit to the ACF Basin Commission a letter of

nonconcurrence with the allocation formula setting forth therein specifically and in detail the reasons for nonconcurrence; provided, however, the reasons for nonconcurrence as contained in the letter of nonconcurrence shall be based solely upon federal law. The allocation formula shall also become effective and binding upon the parties to this Compact if the Federal Commissioner fails to submit to the ACF Basin Commission a letter of nonconcurrence in accordance with this Article. Once adopted pursuant to this Article, the allocation formula may only be modified by unanimous decision of the State Commissioners and the concurrence by the Federal Commissioner in accordance with the procedures set forth in this Article.

(b) The parties to this Compact recognize that the United States operates certain projects within the ACF Basin that may influence the water resources within the ACF Basin. The parties to this Compact further acknowledge and recognize that various agencies of the United States have responsibilities for administering certain federal laws and exercising certain federal powers that may influence the water resources within the ACF Basin. It is the intent of the parties to this Compact, including the United States, to achieve compliance with the allocation formula adopted in accordance with this Article. Accordingly, once an allocation formula is adopted, each and every officer, agency, and instrumentality of the United States shall have an obligation and duty, to the maximum extent practicable, to exercise their powers, authority, and discretion in a manner consistent with the allocation formula so long as the exercise of such powers, authority, and discretion is not in conflict with federal law.

(c) Between the effective date of this Compact and the approval of the allocation formula under this Article, the signatories to this Compact agree that any person who is withdrawing, diverting, or consuming water resources of the ACF Basin as of the effective date of this Compact, may continue to withdraw, divert or consume such water resources in accordance with the laws of the state where such person resides or does business and in accordance with applicable federal laws. The parties to this Compact further agree that any such person may increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water between the effective date of this Compact and the date on which an allocation formula is approved by the ACF Basin Commission as permitted by applicable law. Each of the state parties to this Compact further agree to provide written notice to each of the other parties to this Compact in the event any person increases the withdrawal, diversion or consumption of such water resources by more than 10 million gallons per day on an average annual daily basis, or in the event any person, who was not withdrawing, diverting or consuming any water resources from the ACF Basin as of the effective date of this Compact, seeks to withdraw, divert or consume more than one million gallons per day on an average annual daily basis from such resources. This Article shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used between January 3, 1992 and the date on which the Commission adopts an allocation formula.

(d) As the owner, operator, licensor, permitting authority or regulator of a water resource facility under its jurisdiction, each state shall be responsible for using its best efforts to achieve compliance with the allocation formula adopted pursuant to this Article. Each such state agrees to take such actions as may be necessary to achieve compliance with the allocation formula.

(e) This Compact shall not commit any state to agree to any data generated by any study or commit any state to any allocation formula not acceptable to such state.

<div align="center">

ARTICLE VIII

CONDITIONS RESULTING IN

TERMINATION OF THE COMPACT

</div>

(a) This Compact shall be terminated and thereby be void and of no further force and effect if any of the following events occur:

(1) The legislatures of the states of Alabama, Florida and Georgia each agree by general laws enacted by each state within any three consecutive years that this Compact should be terminated.

(2) The United States Congress enacts a law expressly repealing this Compact.

(3) The States of Alabama, Florida and Georgia fail to agree on an equitable apportionment of the surface waters of the ACF as provided in Article VII(a) of this Compact by December 31, 1998, unless the voting members

of the ACF Basin Commission unanimously agree to extend this deadline.

(4)　The Federal Commissioner submits to the Commission a letter of nonconcurrence in the initial allocation formula in accordance with Article VII(a) of the Compact, unless the voting members of the ACF Basin Commission unanimously agree to allow a single 45 day period in which the non-voting Federal Commissioner and the voting State Commissioners may renegotiate an allocation formula and the Federal Commissioner withdraws the letter of nonconcurrence upon completion of this renegotiation.

(b)　If the Compact is terminated in accordance with this Article it shall be of no further force and effect and shall not be the subject of any proceeding for the enforcement thereof in any federal or state court. Further, if so terminated, no party shall be deemed to have acquired a specific right to any quantity of water because it has become a signatory to this Compact.

ARTICLE IX
COMPLETION OF STUDIES PENDING
ADOPTION OF ALLOCATION FORMULA

The ACF Basin Commission, in conjunction with one or more interstate, federal, state or local agencies, is hereby authorized to participate in any study in process as of the effective date of this Compact, including, without limitation, all or any part of the Alabama-Coosa-Tallapoosa/Apalachicola-Chattahoochee-Flint River Basin Comprehensive Water Resource Study, as may be determined by the Commission in its sole discretion.

ARTICLE X
RELATIONSHIP TO OTHER LAWS

(a)　It is the intent of the party states and of the United States Congress by ratifying this Compact, that all state and federal officials enforcing, implementing or administering other state and federal laws affecting the ACF Basin shall, to the maximum extent practicable, enforce, implement or administer those laws in furtherance of the purposes of this Compact and the allocation formula adopted by the Commission insofar as such actions are not in conflict with applicable federal laws.

(b)　Nothing contained in this Compact shall be deemed to restrict the executive powers of the President in the event of a national emergency.

(c)　Nothing contained in this Compact shall impair or affect the constitutional authority of the United States or any of its powers, rights, functions or jurisdiction under other existing or future laws in and over the area or waters which are the subject of the Compact, including projects of the Commission, nor shall any act of the Commission have the effect of repealing, modifying or amending any federal law. All officers, agencies and instrumentalities of the United States shall exercise their powers and authority over water resources in the ACF Basin and water resource facilities, and to the maximum extent practicable, shall exercise their discretion in carrying out their responsibilities, powers, and authorities over water resources in the ACF Basin and water resource facilities in the ACF Basin in a manner consistent with and that effectuates the allocation formula developed pursuant to this Compact or any modification of the allocation formula so long as the actions are not in conflict with any applicable federal law. The United States Army Corps of Engineers, or its successors, and all other federal agencies and instrumentalities shall cooperate with the ACF Basin Commission in accomplishing the purposes of the Compact and fulfilling the obligations of each of the parties to the Compact regarding the allocation formula.

(d)　Once adopted by the three states and ratified by the United States Congress, this Compact shall have the full force and effect of federal law, and shall supersede state and local laws operating contrary to the provisions herein or the purposes of this Compact; provided, however, nothing contained in this Compact shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective signatory states relating to water quality, and riparian rights as among persons exclusively within each state.

ARTICLE XI
PUBLIC PARTICIPATION

All meetings of the Commission shall be open to the public. The signatory parties recognize the importance and necessity of public participation in activities of the Commission, including the development and adoption of the initial allocation formula and any modification thereto. Prior to the adoption of the initial allocation formula, the Commission shall adopt procedures ensuring public participation in the development, review, and approval of the initial allocation formula and any subsequent modification thereto. At a minimum, public notice to interested parties and a comment period shall be provided. The Commission shall respond in writing to relevant comments.

## ARTICLE XII
## FUNDING AND EXPENSES OF THE COMMISSION

Commissioners shall serve without compensation from the ACF Basin Commission. All general operational funding required by the Commission and agreed to by the voting members shall obligate each state to pay an equal share of such agreed upon funding. Funds remitted to the Commission by a state in payment of such obligation shall not lapse; provided, however, that if any state fails to remit payment within 90 days after payment is due, such obligation shall terminate and any state which has made payment may have such payment returned. Costs of attendance and participation at meetings of the Commission by the Federal Commissioner shall be paid by the United States.

## ARTICLE XIII
## DISPUTE RESOLUTION

(a) In the event of a dispute between two or more voting members of this Compact involving a claim relating to compliance with the allocation formula adopted by the Commission under this Compact, the following procedures shall govern:

(1) Notice of claim shall be filed with the Commission by a voting member of this Compact and served upon each member of the Commission. The notice shall provide a written statement of the claim, including a brief narrative of the relevant matters supporting the claimant's position.

(2) Within twenty (20) days of the Commission's receipt of a written statement of a claim, the party or parties to the Compact against whom the complaint is made may prepare a brief narrative of the relevant matters and file it with the Commission and serve it upon each member of the Commission.

(3) Upon receipt of a claim and any response or responses thereto, the Commission shall convene as soon as reasonably practicable, but in no event later than twenty (20) days from receipt of any response to the claim, and shall determine if a resolution of the dispute is possible.

(4) A resolution of a dispute under this Article through unanimous vote of the State Commissioners shall be binding upon the state parties and any state party determined to be in violation of the allocation formula shall correct such violation without delay.

(5) If the Commission is unable to resolve the dispute within 10 days from the date of the meeting convened pursuant to subparagraph (a)(3) of this Article, the Commission shall select, by unanimous decision of the voting members of the Commission, an independent mediator to conduct a non-binding mediation of the dispute. The mediator shall not be a resident or domiciliary of any member state, shall not be an employee or agent of any member of the Commission, shall be a person knowledgeable in water resource management issues, and shall disclose any and all current or prior contractual or other relations to any member of the Commission. The expenses of the mediator shall be paid by the Commission. If the mediator becomes unwilling or unable to serve, the Commission by unanimous decision of the voting members of the Commission, shall appoint another independent mediator.

(6) If the Commission fails to appoint an independent mediator to conduct a non-binding mediation of the dispute within seventy-five (75) days of the filing of the original claim or within thirty (30) days of the date on which the Commission learns that a mediator is unwilling or unable to serve, the party submitting the claim shall have no further obligation to bring the claim before the Commission and may proceed by pursuing any appropriate remedies, including any and all judicial remedies.

(7)   If an independent mediator is selected, the mediator shall establish the time and location for the mediation session or sessions and may request that each party to the Compact submit, in writing, to the mediator a statement of its position regarding the issue or issues in dispute. Such statements shall not be exchanged by the parties except upon the unanimous agreement of the parties to the mediation.

(8)   The mediator shall not divulge confidential information disclosed to the mediator by the parties or by witnesses, if any, in the course of the mediation. All records, reports, or other documents received by a mediator while serving as a mediator shall be considered confidential. The mediator shall not be compelled in any adversary proceeding or judicial forum to divulge the contents of such documents or the fact that such documents exist or to testify in regard to the mediation.

(9)   Each party to the mediation shall maintain the confidentiality of the information received during the mediation and shall not rely on or introduce in any judicial proceeding as evidence:

a.   Views expressed or suggestions made by another party regarding a settlement of the dispute;

b.   Proposals made or views expressed by the mediator; or

c.   The fact that another party to the hearing had or had not indicated a willingness to accept a proposal for settlement of the dispute.

(10)   The mediator may terminate the non-binding mediation session or sessions whenever, in the judgment of the mediator, further efforts to resolve the dispute would not lead to a resolution of the dispute between or among the parties. Any party to the dispute may terminate the mediation process at any time by giving written notification to the mediator and the Commission. If terminated prior to reaching a resolution, the party submitting the original claim to the Commission shall have no further obligation to bring its claim before the Commission and may proceed by pursuing any appropriate remedies, including any and all judicial remedies.

(11)   The mediator shall have no authority to require the parties to enter into a settlement of any dispute regarding the Compact. The mediator may simply attempt to assist the parties in reaching a mutually acceptable resolution of their dispute. The mediator is authorized to conduct joint and separate meetings with the parties to the mediation and to make oral or written recommendations for a settlement of the dispute.

(12)   At any time during the mediation process, the Commission is encouraged to take whatever steps it deems necessary to assist the mediator or the parties to resolve the dispute.

(13)   In the event of a proceeding seeking enforcement of the allocation formula, this Compact creates a cause of action solely for equitable relief. No action for money damages may be maintained. The party or parties alleging a violation of the Compact shall have the burden of proof.

(b)   In the event of a dispute between any voting member and the United States relating to a state's noncompliance with the allocation formula as a result of actions or a refusal to act by officers, agencies or instrumentalities of the United States, the provisions set forth in paragraph (a) of this Article (other than the provisions of subparagraph (a)(4)) shall apply.

(c)   The United States may initiate dispute resolution under paragraph (a) in the same manner as other parties to this Compact.

(d)   Any signatory party who is affected by any action of the Commission, other than the adoption or enforcement of or compliance with the allocation formula, may file a complaint before the ACF Basin Commission seeking to enforce any provision of this Compact.

(1)   The Commission shall refer the dispute to an independent hearing officer or mediator, to conduct a hearing or mediation of the dispute. If the parties are unable to settle their dispute through mediation, a hearing shall be held by the Commission or its designated hearing officer. Following a hearing conducted by a hearing officer, the hearing officer shall submit a report to the Commission setting forth findings of fact and conclusions of law, and making recommendations to the Commission for the resolution of the dispute.

(2)   The Commission may adopt or modify the recommendations of the hearing officer within 60 days of submittal of the report. If the Commission is unable to reach unanimous agreement on the resolution of the dispute within 60 days of submittal of the report with the concurrence of the Federal Commissioner in disputes involving or affecting federal interests, the affected party may file an action in any court of competent jurisdiction to enforce

the provisions of this Compact. The hearing officer's report shall be of no force and effect and shall not be admissible as evidence in any further proceedings.

(e)   All actions under this Article shall be subject to the following provisions:

(1)   The Commission shall adopt guidelines and procedures for the appointment of hearing officers or independent mediators to conduct all hearings and mediations required under this Article. The hearing officer or mediator appointed under this Article shall be compensated by the Commission.

(2)   All hearings or mediations conducted under this article may be conducted utilizing the Federal Administrative Procedures Act, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence. The Commission may also choose to adopt some or all of its own procedural and evidentiary rules for the conduct of hearings or mediations under this Compact.

(3)   Any action brought under this Article shall be limited to equitable relief only. This Compact shall not give rise to a cause of action for money damages.

(4)   Any signatory party bringing an action before the Commission under this Article shall have the burdens of proof and persuasion.

## ARTICLE XIV
## ENFORCEMENT

The Commission may, upon unanimous decision, bring an action against any person to enforce any provision of this Compact, other than the adoption or enforcement of or compliance with the allocation formula, in any court of competent jurisdiction.

## ARTICLE XV
## IMPACTS ON OTHER STREAM SYSTEMS

This Compact shall not be construed as establishing any general principle or precedent applicable to any other interstate streams.

## ARTICLE XVI
## IMPACT OF COMPACT ON USE OF WATER
## WITHIN THE BOUNDARIES
## OF THE COMPACTING STATES

The provisions of this Compact shall not interfere with the right or power of any state to regulate the use and control of water within the boundaries of the state, providing such state action is not inconsistent with the allocation formula.

## ARTICLE XVII
## AGREEMENT REGARDING WATER QUALITY

(a)   The States of Alabama, Florida, and Georgia mutually agree to the principle of individual State efforts to control man-made water pollution from sources located and operating within each State and to the continuing support of each State in active water pollution control programs.

(b)   The States of Alabama, Florida, and Georgia agree to cooperate, through their appropriate State agencies, in the investigation, abatement, and control of sources of alleged interstate pollution within the ACF River Basin whenever such sources are called to their attention by the Commission.

(c)   The States of Alabama, Florida, and Georgia agree to cooperate in maintaining the quality of the waters of the ACF River Basin.

(d)   The States of Alabama, Florida, and Georgia agree that no State may require another state to provide water for the purpose of water quality control as a substitute for or in lieu of adequate waste treatment.

## ARTICLE XVIII

EFFECT OF OVER OR UNDER DELIVERIES
UNDER THE COMPACT

No state shall acquire any right or expectation to the use of water because of any other state's failure to use the full amount of water allocated to it under this Compact.

ARTICLE XIX
SEVERABILITY

If any portion of this Compact is held invalid for any reason, the remaining portions, to the fullest extent possible, shall be severed from the void portion and given the fullest possible force, effect, and application.

ARTICLE XX
NOTICE AND FORMS OF SIGNATURE

Notice of ratification of this Compact by the legislature of each state shall promptly be given by the Governor of the ratifying state to the Governors of the other participating states. When all three state legislatures have ratified the Compact, notice of their mutual ratification shall be forwarded to the Congressional delegation of the signatory states for submission to the Congress of the United States for ratification. When the Compact is ratified by the Congress of the United States, the President, upon signing the federal ratification legislation, shall promptly notify the Governors of the participating states and appoint the Federal Commissioner. The Compact shall be signed by all four Commissioners as their first order of business at their first meeting and shall be filed of record in the party states.

**History.**—s. 1, ch. 97-25; s. 14, ch. 99-7; s. 27, ch. 2010-205.

**Note.**—Former s. 373.71.

PART VII
WATER SUPPLY POLICY, PLANNING,
PRODUCTION, AND FUNDING

373.701    Declaration of policy.

373.703    Water production; general powers and duties.

373.705    Water resource development; water supply development.

373.707    Alternative water supply development.

373.709    Regional water supply planning.

373.711    Technical assistance to local governments.

373.713    Regional water supply authorities.

373.715    Assistance to West Coast Regional Water Supply Authority.

**373.701    Declaration of policy.**—It is declared to be the policy of the Legislature:

(1)    To promote the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems.

(2)(a)    Because water constitutes a public resource benefiting the entire state, it is the policy of the Legislature that the waters in the state be managed on a state and regional basis. Consistent with this directive, the Legislature recognizes the need to allocate water throughout the state so as to meet all reasonable-beneficial uses. However, the Legislature acknowledges that such allocations have in the past adversely affected the water resources of certain areas in this state. To protect such water resources and to meet the current and future needs of those areas with abundant water, the Legislature directs the department and the water management districts to encourage the use of water from sources nearest the area of use or application whenever practicable. Such sources shall include all naturally occurring water sources and all alternative water sources, including, but not limited to, desalination, conservation, reuse of nonpotable reclaimed water and stormwater, and aquifer storage and recovery. Reuse of potable reclaimed water and stormwater shall not be subject to the evaluation described in s.

373.223(3)(a)-(g). However, this directive to encourage the use of water, whenever practicable, from sources nearest the area of use or application shall not apply to the transport and direct and indirect use of water within the area encompassed by the Central and Southern Florida Flood Control Project, nor shall it apply anywhere in the state to the transport and use of water supplied exclusively for bottled water as defined in s. 500.03(1)(d), nor shall it apply to the transport and use of reclaimed water for electrical power production by an electric utility as defined in s. 366.02(2).

(b)　In establishing the policy outlined in paragraph (a), the Legislature realizes that under certain circumstances the need to transport water from distant sources may be necessary for environmental, technical, or economic reasons.

(3)　Cooperative efforts between municipalities, counties, utility companies, private landowners, water consumers, water management districts, the Department of Environmental Protection, and the Department of Agriculture and Consumer Services are necessary in order to meet water needs in a manner that will supply adequate and dependable supplies of water where needed without resulting in adverse effects upon the areas from which water is withdrawn. Such efforts should employ all practical means of obtaining water, including, but not limited to, withdrawals of surface water and groundwater, reuse, and desalination, and will require cooperation and well-coordinated activities. Municipalities, counties, and special districts are encouraged to create multijurisdictional water supply entities or regional water supply authorities as authorized in s. 373.713.

History.—s. 1, ch. 2010-205; s. 1, ch. 2013-177.

**373.703　Water production; general powers and duties.**—In the performance of, and in conjunction with, its other powers and duties, the governing board of a water management district existing pursuant to this chapter:

(1)　Shall engage in planning to assist counties, municipalities, special districts, publicly owned and privately owned water utilities, multijurisdictional water supply entities, regional water supply authorities, or self-suppliers in meeting water supply needs in such manner as will give priority to encouraging conservation and reducing adverse environmental effects of improper or excessive withdrawals of water from concentrated areas. As used in this section and s. 373.707, regional water supply authorities are regional water authorities created under s. 373.713 or other laws of this state.

(2)　Shall assist counties, municipalities, special districts, publicly owned or privately owned water utilities, multijurisdictional water supply entities, regional water supply authorities, or self-suppliers in meeting water supply needs in such manner as will give priority to encouraging conservation and reducing adverse environmental effects of improper or excessive withdrawals of water from concentrated areas.

(3)　May establish, design, construct, operate, and maintain water production and transmission facilities for the purpose of supplying water to counties, municipalities, special districts, publicly owned and privately owned water utilities, multijurisdictional water supply entities, or regional water supply authorities. The permit required by part II of this chapter for a water management district engaged in water production and transmission shall be granted, denied, or granted with conditions by the department.

(4)　Shall not engage in local water supply distribution.

(5)　Shall not deprive, directly or indirectly, any county wherein water is withdrawn of the prior right to the reasonable and beneficial use of water which is required to supply adequately the reasonable and beneficial needs of the county or any of the inhabitants or property owners therein.

(6)　May provide water and financial assistance to regional water supply authorities, but may not provide water to counties and municipalities which are located within the area of such authority without the specific approval of the authority or, in the event of the authority's disapproval, the approval of the Governor and Cabinet sitting as the Land and Water Adjudicatory Commission. The district may supply water at rates and upon terms mutually agreed to by the parties or, if they do not agree, as set by the governing board and specifically approved by the Governor and Cabinet sitting as the Land and Water Adjudicatory Commission.

(7)　May acquire title to such interest as is necessary in real property, by purchase, gift, devise, lease, eminent domain, or otherwise, for water production and transmission consistent with this section and s. 373.707. However, the district shall not use any of the eminent domain powers herein granted to acquire water and water rights

already devoted to reasonable and beneficial use or any water production or transmission facilities owned by any county, municipality, or regional water supply authority. The district may exercise eminent domain powers outside of its district boundaries for the acquisition of pumpage facilities, storage areas, transmission facilities, and the normal appurtenances thereto, provided that at least 45 days prior to the exercise of eminent domain, the district notifies the district where the property is located after public notice and the district where the property is located does not object within 45 days after notification of such exercise of eminent domain authority.

(8)   In addition to the power to issue revenue bonds pursuant to s. 373.584, may issue revenue bonds for the purposes of paying the costs and expenses incurred in carrying out the purposes of this chapter or refunding obligations of the district issued pursuant to this section. Such revenue bonds shall be secured by, and be payable from, revenues derived from the operation, lease, or use of its water production and transmission facilities and other water-related facilities and from the sale of water or services relating thereto. Such revenue bonds may not be secured by, or be payable from, ad valorem taxes received by the district or from moneys appropriated by the Legislature, unless otherwise specifically authorized by law. All provisions of s. 373.584 relating to the issuance of revenue bonds which are not inconsistent with this section shall apply to the issuance of revenue bonds pursuant to this section. The district may also issue bond anticipation notes in accordance with the provisions of s. 373.584.

(9)   May join with one or more other water management districts, counties, municipalities, special districts, publicly owned or privately owned water utilities, multijurisdictional water supply entities, regional water supply authorities, private landowners, or self-suppliers for the purpose of carrying out its powers, and may contract with such other entities to finance acquisitions, construction, operation, and maintenance, provided that such contracts are consistent with the public interest. The contract may provide for contributions to be made by each party to the contract for the division and apportionment of the expenses of acquisitions, construction, operation, and maintenance, and for the division and apportionment of resulting benefits, services, and products. The contracts may contain other covenants and agreements necessary and appropriate to accomplish their purposes.

History.—s. 1, ch. 2010-205; s. 2, ch. 2013-177; s. 48, ch. 2015-229; s. 18, ch. 2016-1.

### 373.705   Water resource development; water supply development.—

(1)   The Legislature finds that:

(a)   The proper role of the water management districts in water supply is primarily planning and water resource development, but this does not preclude them from providing assistance with water supply development.

(b)   The proper role of local government, regional water supply authorities, and government-owned and privately owned water utilities in water supply is primarily water supply development, but this does not preclude them from providing assistance with water resource development.

(c)   Water resource development and water supply development must receive priority attention, where needed, to increase the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems.

(2)   It is the intent of the Legislature that:

(a)   Sufficient water be available for all existing and future reasonable-beneficial uses and the natural systems, and that the adverse effects of competition for water supplies be avoided.

(b)   Water management districts take the lead in identifying and implementing water resource development projects, and be responsible for securing necessary funding for regionally significant water resource development projects, including regionally significant projects that prevent or limit adverse water resource impacts, avoid competition among water users, or support the provision of new water supplies in order to meet a minimum flow or minimum water level or to implement a recovery or prevention strategy or water reservation.

(c)   Local governments, regional water supply authorities, and government-owned and privately owned water utilities take the lead in securing funds for and implementing water supply development projects. Generally, direct beneficiaries of water supply development projects should pay the costs of the projects from which they benefit, and water supply development projects should continue to be paid for through local funding sources.

(d)   Water supply development be conducted in coordination with water management district regional water supply planning and water resource development.

(3)(a)   The water management districts shall fund and implement water resource development as defined in s. 373.019. The water management districts are encouraged to implement water resource development as expeditiously as possible in areas subject to regional water supply plans.

(b)   Each governing board shall include in its annual budget submittals required under this chapter:

1.   The amount of funds for each project in the annual funding plan developed pursuant to s. 373.536(6)(a)4.; and

2.   The total amount needed for the fiscal year to implement water resource development projects, as prioritized in its regional water supply plans.

(4)(a)   Water supply development projects that are consistent with the relevant regional water supply plans and that meet one or more of the following criteria shall receive priority consideration for state or water management district funding assistance:

1.   The project supports establishment of a dependable, sustainable supply of water which is not otherwise financially feasible;

2.   The project provides substantial environmental benefits by preventing or limiting adverse water resource impacts, but requires funding assistance to be economically competitive with other options; or

3.   The project significantly implements reuse, storage, recharge, or conservation of water in a manner that contributes to the sustainability of regional water sources.

(b)   Water supply development projects that meet the criteria in paragraph (a) and that meet one or more of the following additional criteria shall be given first consideration for state or water management district funding assistance:

1.   The project brings about replacement of existing sources in order to help implement a minimum flow or minimum water level;

2.   The project implements reuse that assists in the elimination of domestic wastewater ocean outfalls as provided in s. 403.086(9); or

3.   The project reduces or eliminates the adverse effects of competition between legal users and the natural system.

(5)   The water management districts shall promote expanded cost-share criteria for additional conservation practices, such as soil and moisture sensors and other irrigation improvements, water-saving equipment, and water-saving household fixtures, and software technologies that can achieve verifiable water conservation by providing water use information to utility customers.

History.—s. 1, ch. 2010-205; s. 19, ch. 2016-1.

### 373.707   Alternative water supply development.—

(1)   The purpose of this section is to encourage cooperation in the development of water supplies and to provide for alternative water supply development.

(a)   Demands on natural supplies of fresh water to meet the needs of a rapidly growing population and the needs of the environment, agriculture, industry, and mining will continue to increase.

(b)   There is a need for the development of alternative water supplies for Florida to sustain its economic growth, economic viability, and natural resources.

(c)   Cooperative efforts between municipalities, counties, special districts, water management districts, and the Department of Environmental Protection are mandatory in order to meet the water needs of rapidly urbanizing areas in a manner that will supply adequate and dependable supplies of water where needed without resulting in adverse effects upon the areas from which such water is withdrawn. Such efforts should use all practical means of obtaining water, including, but not limited to, withdrawals of surface water and groundwater, reuse, and desalination, and will necessitate not only cooperation but also well-coordinated activities. Municipalities, counties, and special districts are encouraged to create regional water supply authorities as authorized in s. 373.713 or multijurisdictional water supply entities.

(d)   Alternative water supply development must receive priority funding attention to increase the available supplies of water to meet all existing and future reasonable-beneficial uses and to benefit the natural systems.

(e)    Cooperation between counties, municipalities, regional water supply authorities, multijurisdictional water supply entities, special districts, and publicly owned and privately owned water utilities in the development of countywide and multicountywide alternative water supply projects will allow for necessary economies of scale and efficiencies to be achieved in order to accelerate the development of new, dependable, and sustainable alternative water supplies.

(f)    It is in the public interest that county, municipal, industrial, agricultural, and other public and private water users; the Department of Environmental Protection; and the water management districts cooperate and work together in the development of alternative water supplies to avoid the adverse effects of competition for limited supplies of water. Public moneys or services provided to private entities for alternative water supply development may constitute public purposes that also are in the public interest.

(2)(a)    Sufficient water must be available for all existing and future reasonable-beneficial uses and the natural systems, and the adverse effects of competition for water supplies must be avoided.

(b)    Water supply development and alternative water supply development must be conducted in coordination with water management district regional water supply planning.

(c)    Funding for the development of alternative water supplies shall be a shared responsibility of water suppliers and users, the State of Florida, and the water management districts, with water suppliers and users having the primary responsibility and the State of Florida and the water management districts being responsible for providing funding assistance.

(3)    The primary roles of the water management districts in water resource development as it relates to supporting alternative water supply development are:

(a)    The formulation and implementation of regional water resource management strategies that support alternative water supply development;

(b)    The collection and evaluation of surface water and groundwater data to be used for a planning level assessment of the feasibility of alternative water supply development projects;

(c)    The construction, operation, and maintenance of major public works facilities for flood control, surface and underground water storage, and groundwater recharge augmentation to support alternative water supply development;

(d)    Planning for alternative water supply development as provided in regional water supply plans in coordination with local governments, regional water supply authorities, multijurisdictional water supply entities, special districts, and publicly owned and privately owned water utilities and self-suppliers;

(e)    The formulation and implementation of structural and nonstructural programs to protect and manage water resources in support of alternative water supply projects; and

(f)    The provision of technical and financial assistance to local governments and publicly owned and privately owned water utilities for alternative water supply projects and to self-suppliers for alternative water supply projects to the extent that such assistance to self-suppliers promotes the policies in paragraph (1)(f).

(4)    The primary roles of local government, regional water supply authorities, multijurisdictional water supply entities, special districts, and publicly owned and privately owned water utilities in alternative water supply development shall be:

(a)    The planning, design, construction, operation, and maintenance of alternative water supply development projects;

(b)    The formulation and implementation of alternative water supply development strategies and programs;

(c)    The planning, design, construction, operation, and maintenance of facilities to collect, divert, produce, treat, transmit, and distribute water for sale, resale, or end use; and

(d)    The coordination of alternative water supply development activities with the appropriate water management district having jurisdiction over the activity.

(5)    Nothing in this section shall be construed to preclude the various special districts, municipalities, and counties from continuing to operate existing water production and transmission facilities or to enter into cooperative agreements with other special districts, municipalities, and counties for the purpose of meeting their respective needs for dependable and adequate supplies of water; however, the obtaining of water through such

operations shall not be done in a manner that results in adverse effects upon the areas from which such water is withdrawn.

(6)(a)    If state funds are provided through specific appropriation or pursuant to the Water Protection and Sustainability Program, such funds serve to supplement existing water management district or basin board funding for alternative water supply development assistance and should not result in a reduction of such funding. For each project identified in the annual funding plans prepared pursuant to s. 373.536(6)(a)4., the water management districts shall include in the annual tentative and adopted budget submittals required under this chapter the amount of funds allocated for water resource development that supports alternative water supply development and the funds allocated for alternative water supply projects. It shall be the goal of each water management district and basin boards that the combined funds allocated annually for these purposes be, at a minimum, the equivalent of 100 percent of the state funding provided to the water management district for alternative water supply development. If this goal is not achieved, the water management district shall provide in the budget submittal an explanation of the reasons or constraints that prevent this goal from being met and an explanation of how the goal will be met in future years, and affirmation of match is required during the budget review process as established under s. 373.536(5). The Suwannee River Water Management District and the Northwest Florida Water Management District shall not be required to meet the match requirements of this paragraph; however, they shall try to achieve the match requirement to the greatest extent practicable.

(b)    State funds from the Water Protection and Sustainability Program created in s. 403.890 shall be made available for financial assistance for the project construction costs of alternative water supply development projects selected by a water management district governing board for inclusion in the program.

(7)    The water management district shall implement its responsibilities as expeditiously as possible in areas subject to regional water supply plans. Each district's governing board shall include in its annual budget the amount needed for the fiscal year to assist in implementing alternative water supply development projects.

(8)(a)    The water management districts and the state shall share a percentage of revenues with water providers and users, including local governments, water, wastewater, and reuse utilities, municipal, special district, industrial, and agricultural water users, and other public and private water users, to be used to supplement other funding sources in the development of alternative water supplies and conservation projects that result in quantifiable water savings.

(b)    Beginning in the 2005-2006 fiscal year, the state shall annually provide a portion of those revenues deposited into the Water Protection and Sustainability Program Trust Fund for the purpose of providing funding assistance for the development of alternative water supplies and conservation projects that result in quantifiable water savings pursuant to the Water Protection and Sustainability Program. At the beginning of each fiscal year, beginning with the 2005-2006 fiscal year, such revenues shall be distributed by the department into the alternative water supply trust fund accounts created by each district for the purpose of alternative water supply development under the following funding formula:

1.    Thirty percent to the South Florida Water Management District;

2.    Twenty-five percent to the Southwest Florida Water Management District;

3.    Twenty-five percent to the St. Johns River Water Management District;

4.    Ten percent to the Suwannee River Water Management District; and

5.    Ten percent to the Northwest Florida Water Management District.

(c)    The financial assistance for alternative water supply projects allocated in each district's budget as required in subsection (6) shall be combined with the state funds and used to assist in funding the project construction costs of alternative water supply projects and the project costs of conservation projects that result in quantifiable water savings selected by the governing board. If the district has not completed any regional water supply plan, or the regional water supply plan does not identify the need for any alternative water supply projects, funds deposited in that district's trust fund may be used for water resource development projects, including, but not limited to, springs protection.

(d)    All projects submitted to the governing board for consideration shall reflect the total capital cost for implementation. The costs shall be segregated pursuant to the categories described in the definition of capital

Statutes & Constitution :View Statutes : Online Sunshine

costs.

(e) Applicants for projects that may receive funding assistance pursuant to the Water Protection and Sustainability Program shall, at a minimum, be required to pay 60 percent of the project's construction costs. The water management districts may, at their discretion, totally or partially waive this requirement for projects sponsored by:

1. Financially disadvantaged small local governments as defined in former s. 403.885(5); or

2. Water users for projects determined by a water management district governing board to be in the public interest pursuant to paragraph (1)(f), if the projects are not otherwise financially feasible.

The water management districts or basin boards may, at their discretion, use ad valorem or federal revenues to assist a project applicant in meeting the requirements of this paragraph.

(f) The governing boards shall determine those projects that will be selected for financial assistance. The governing boards may establish factors to determine project funding; however, significant weight shall be given to the following factors:

1. Whether the project provides substantial environmental benefits by preventing or limiting adverse water resource impacts.

2. Whether the project reduces competition for water supplies.

3. Whether the project brings about replacement of traditional sources in order to help implement a minimum flow or level or a reservation.

4. Whether the project will be implemented by a consumptive use permittee that has achieved the targets contained in a goal-based water conservation program approved pursuant to s. 373.227.

5. The quantity of water supplied by the project as compared to its cost.

6. Projects in which the construction and delivery to end users of reuse water is a major component.

7. Whether the project will be implemented by a multijurisdictional water supply entity or regional water supply authority.

8. Whether the project implements reuse that assists in the elimination of domestic wastewater ocean outfalls as provided in s. 403.086(9).

9. Whether the county or municipality, or the multiple counties or municipalities, in which the project is located has implemented a high-water recharge protection tax assessment program as provided in s. 193.625.

(g) Additional factors to be considered in determining project funding shall include:

1. Whether the project is part of a plan to implement two or more alternative water supply projects, all of which will be operated to produce water at a uniform rate for the participants in a multijurisdictional water supply entity or regional water supply authority.

2. The percentage of project costs to be funded by the water supplier or water user.

3. Whether the project proposal includes sufficient preliminary planning and engineering to demonstrate that the project can reasonably be implemented within the timeframes provided in the regional water supply plan.

4. Whether the project is a subsequent phase of an alternative water supply project that is underway.

5. Whether and in what percentage a local government or local government utility is transferring water supply system revenues to the local government general fund in excess of reimbursements for services received from the general fund, including direct and indirect costs and legitimate payments in lieu of taxes.

(h) After conducting one or more meetings to solicit public input on eligible projects, including input from those entities identified pursuant to s. 373.709(2)(a)3.d. for implementation of alternative water supply projects, the governing board of each water management district shall select projects for funding assistance based upon the criteria set forth in paragraphs (f) and (g). The governing board may select a project identified or listed as an alternative water supply development project in the regional water supply plan, or allocate up to 20 percent of the funding for alternative water supply projects that are not identified or listed in the regional water supply plan but are consistent with the goals of the plan.

(i) Without diminishing amounts available through other means described in this paragraph, the governing boards are encouraged to consider establishing revolving loan funds to expand the total funds available to

accomplish the objectives of this section. A revolving loan fund created under this paragraph must be a nonlapsing fund from which the water management district may make loans with interest rates below prevailing market rates to public or private entities for the purposes described in this section. The governing board may adopt resolutions to establish revolving loan funds which must specify the details of the administration of the fund, the procedures for applying for loans from the fund, the criteria for awarding loans from the fund, the initial capitalization of the fund, and the goals for future capitalization of the fund in subsequent budget years. Revolving loan funds created under this paragraph must be used to expand the total sums and sources of cooperative funding available for the development of alternative water supplies. The Legislature does not intend for the creation of revolving loan funds to supplant or otherwise reduce existing sources or amounts of funds currently available through other means.

(j)　For each utility that receives financial assistance from the state or a water management district for an alternative water supply project, the water management district shall require the appropriate rate-setting authority to develop rate structures for water customers in the service area of the funded utility that will:

1.　Promote the conservation of water; and

2.　Promote the use of water from alternative water supplies.

(k)　The governing boards shall establish a process for the disbursal of revenues pursuant to this subsection.

(l)　All revenues made available pursuant to this subsection must be encumbered annually by the governing board when it approves projects sufficient to expend the available revenues.

(m)　This subsection is not subject to the rulemaking requirements of chapter 120.

(n)　By March 1 of each year, as part of the consolidated annual report required by s. 373.036(7), each water management district shall submit a report on the disbursal of all budgeted amounts pursuant to this section. Such report shall describe all alternative water supply projects funded as well as the quantity of new water to be created as a result of such projects and shall account separately for any other moneys provided through grants, matching grants, revolving loans, and the use of district lands or facilities to implement regional water supply plans.

(o)　The Florida Public Service Commission shall allow entities under its jurisdiction constructing or participating in constructing facilities that provide alternative water supplies to recover their full, prudently incurred cost of constructing such facilities through their rate structure. If construction of a facility or participation in construction is pursuant to or in furtherance of a regional water supply plan, the cost shall be deemed to be prudently incurred. Every component of an alternative water supply facility constructed by an investor-owned utility shall be recovered in current rates. Any state or water management district cost share is not subject to the recovery provisions allowed in this paragraph.

(9)　Funding assistance provided by the water management districts for a water reuse system may include the following conditions for that project if a water management district determines that such conditions will encourage water use efficiency:

(a)　Metering of reclaimed water use for residential irrigation, agricultural irrigation, industrial uses, except for electric utilities as defined in s. 366.02(2), landscape irrigation, golf course irrigation, irrigation of other public access areas, commercial and institutional uses such as toilet flushing, and transfers to other reclaimed water utilities;

(b)　Implementation of reclaimed water rate structures based on actual use of reclaimed water for the reuse activities listed in paragraph (a);

(c)　Implementation of education programs to inform the public about water issues, water conservation, and the importance and proper use of reclaimed water; or

(d)　Development of location data for key reuse facilities.

History.—ss. 1, 28, 29, 49, ch. 2010-205; s. 20, ch. 2016-1; s. 19, ch. 2017-3.

### 373.709　Regional water supply planning.—

(1)　The governing board of each water management district shall conduct water supply planning for a water supply planning region within the district identified in the appropriate district water supply plan under s. 373.036, where it determines that existing sources of water are not adequate to supply water for all existing and future

reasonable-beneficial uses and to sustain the water resources and related natural systems for the planning period. The planning must be conducted in an open public process, in coordination and cooperation with local governments, regional water supply authorities, government-owned and privately owned water and wastewater utilities, multijurisdictional water supply entities, self-suppliers, reuse utilities, the Department of Environmental Protection, the Department of Agriculture and Consumer Services, and other affected and interested parties. The districts shall actively engage in public education and outreach to all affected local entities and their officials, as well as members of the public, in the planning process and in seeking input. During preparation, but before completion of the regional water supply plan, the district shall conduct at least one public workshop to discuss the technical data and modeling tools anticipated to be used to support the regional water supply plan. The district shall also hold several public meetings to communicate the status, overall conceptual intent, and impacts of the plan on existing and future reasonable-beneficial uses and related natural systems. During the planning process, a local government may choose to prepare its own water supply assessment to determine if existing water sources are adequate to meet existing and projected reasonable-beneficial needs of the local government while sustaining water resources and related natural systems. The local government shall submit such assessment, including the data and methodology used, to the district. The district shall consider the local government's assessment during the formation of the plan. A determination by the governing board that initiation of a regional water supply plan for a specific planning region is not needed pursuant to this section is subject to s. 120.569. The governing board shall reevaluate the determination at least once every 5 years and shall initiate a regional water supply plan, if needed, pursuant to this subsection.

(2) Each regional water supply plan must be based on at least a 20-year planning period and must include, but need not be limited to:

(a) A water supply development component for each water supply planning region identified by the district which includes:

1. A quantification of the water supply needs for all existing and future reasonable-beneficial uses within the planning horizon. The level-of-certainty planning goal associated with identifying the water supply needs of existing and future reasonable-beneficial uses must be based upon meeting those needs for a 1-in-10-year drought event.

a. Population projections used for determining public water supply needs must be based upon the best available data. In determining the best available data, the district shall consider the University of Florida Bureau of Economic and Business Research (BEBR) medium population projections and population projection data and analysis submitted by a local government pursuant to the public workshop described in subsection (1) if the data and analysis support the local government's comprehensive plan. Any adjustment of or deviation from the BEBR projections must be fully described, and the original BEBR data must be presented along with the adjusted data.

b. Agricultural demand projections used for determining the needs of agricultural self-suppliers must be based upon the best available data. In determining the best available data for agricultural self-supplied water needs, the district shall consider the data indicative of future water supply demands provided by the Department of Agriculture and Consumer Services pursuant to s. 570.93 and agricultural demand projection data and analysis submitted by a local government pursuant to the public workshop described in subsection (1), if the data and analysis support the local government's comprehensive plan. Any adjustment of or deviation from the data provided by the Department of Agriculture and Consumer Services must be fully described, and the original data must be presented along with the adjusted data.

2. A list of water supply development project options, including traditional and alternative water supply project options that are technically and financially feasible, from which local government, government-owned and privately owned utilities, regional water supply authorities, multijurisdictional water supply entities, self-suppliers, and others may choose for water supply development. In addition to projects listed by the district, such users may propose specific projects for inclusion in the list of alternative water supply projects. If such users propose a project to be listed as an alternative water supply project, the district shall determine whether it meets the goals of the plan, and, if so, it shall be included in the list. The total capacity of the projects included in the plan must exceed the needs identified in subparagraph 1. and take into account water conservation and other

demand management measures, as well as water resources constraints, including adopted minimum flows and minimum water levels and water reservations. Where the district determines it is appropriate, the plan should specifically identify the need for multijurisdictional approaches to project options that, based on planning level analysis, are appropriate to supply the intended uses and that, based on such analysis, appear to be permittable and financially and technically feasible. The list of water supply development options must contain provisions that recognize that alternative water supply options for agricultural self-suppliers are limited.

3. For each project option identified in subparagraph 2., the following must be provided:

a. An estimate of the amount of water to become available through the project.

b. The timeframe in which the project option should be implemented and the estimated planning-level costs for capital investment and operating and maintaining the project.

c. An analysis of funding needs and sources of possible funding options. For alternative water supply projects, the water management districts shall provide funding assistance pursuant to s. 373.707(8).

d. Identification of the entity that should implement each project option and the current status of project implementation.

(b) A water resource development component that includes:

1. A listing of those water resource development projects that support water supply development for all existing and future reasonable-beneficial uses as described in paragraph (a) and for the natural systems as identified in the recovery or prevention strategies for adopted minimum flows and minimum water levels or water reservations.

2. For each water resource development project listed:

a. An estimate of the amount of water to become available through the project for all existing and future reasonable-beneficial uses as described in paragraph (a) and for the natural systems as identified in the recovery or prevention strategies for adopted minimum flows and minimum water levels or water reservations.

b. The timeframe in which the project option should be implemented and the estimated planning-level costs for capital investment and for operating and maintaining the project.

c. An analysis of funding needs and sources of possible funding options.

d. Identification of the entity that should implement each project option and the current status of project implementation.

(c) The recovery and prevention strategy described in s. 373.0421(2).

(d) A funding strategy for water resource development projects, which shall be reasonable and sufficient to pay the cost of constructing or implementing all of the listed projects.

(e) Consideration of how the project options addressed in paragraph (a) serve the public interest or save costs overall by preventing the loss of natural resources or avoiding greater future expenditures for water resource development or water supply development. However, unless adopted by rule, these considerations do not constitute final agency action.

(f) The technical data and information applicable to each planning region which are necessary to support the regional water supply plan.

(g) The minimum flows and minimum water levels established for water resources within each planning region.

(h) Reservations of water adopted by rule pursuant to s. 373.223(4) within each planning region.

(i) Identification of surface waters or aquifers for which minimum flows and minimum water levels are scheduled to be adopted.

(j) An analysis, developed in cooperation with the department, of areas or instances in which the variance provisions of s. 378.212(1)(g) or s. 378.404(9) may be used to create water supply development or water resource development projects.

(k) An assessment of how the regional water supply plan and the projects identified in the funding plans prepared pursuant to sub-subparagraphs (a)3.c. and (b)2.c. support the recovery or prevention strategies for implementation of adopted minimum flows and minimum water levels or water reservations, including minimum flows and minimum water levels for Outstanding Florida Springs adopted pursuant to s. 373.805; while ensuring

that sufficient water will be available for all existing and future reasonable-beneficial uses and the natural systems identified herein; and that the adverse effects of competition for water supplies will be avoided.

(3)   The water supply development component of a regional water supply plan which deals with or affects public utilities and public water supply for those areas served by a regional water supply authority and its member governments shall be developed jointly by the authority and the applicable water management district. In areas not served by regional water supply authorities, or other multijurisdictional water supply entities, and where opportunities exist to meet water supply needs more efficiently through multijurisdictional projects identified pursuant to paragraph (2)(a), water management districts are directed to assist in developing multijurisdictional approaches to water supply project development jointly with affected water utilities, special districts, self-suppliers, and local governments.

(4)   The South Florida Water Management District shall include in its regional water supply plan water resource and water supply development projects that promote the elimination of wastewater ocean outfalls as provided in s. 403.086(9).

(5)   Governing board approval of a regional water supply plan shall not be subject to the rulemaking requirements of chapter 120. However, any portion of an approved regional water supply plan which affects the substantial interests of a party shall be subject to s. 120.569.

(6)   Annually and in conjunction with the reporting requirements of s. 373.536(6)(a)4., the department shall submit to the Governor and the Legislature a report on the status of regional water supply planning in each district. The report shall include:

(a)   A compilation of the estimated costs and an analysis of the sufficiency of potential sources of funding from all sources for water resource development and water supply development projects as identified in the water management district regional water supply plans.

(b)   The percentage and amount, by district, of district ad valorem tax revenues or other district funds made available to develop alternative water supplies.

(c)   A description of each district's progress toward achieving its water resource development objectives, including the district's implementation of its 5-year water resource development work program.

(d)   An assessment of the specific progress being made to implement each alternative water supply project option chosen by the entities and identified for implementation in the plan.

(e)   An overall assessment of the progress being made to develop water supply in each district, including, but not limited to, an explanation of how each project in the 5-year water resource development work program developed pursuant to s. 373.536(6)(a)4., either alternative or traditional, will produce, contribute to, or account for additional water being made available for consumptive uses, minimum flows and minimum water levels, or water reservations; an estimate of the quantity of water to be produced by each project; and an assessment of the contribution of the district's regional water supply plan in providing sufficient water to meet the needs of existing and future reasonable-beneficial uses for a 1-in-10-year drought event, as well as the needs of the natural systems.

(7)   Nothing contained in the water supply development component of a regional water supply plan shall be construed to require local governments, government-owned or privately owned water utilities, special districts, self-suppliers, regional water supply authorities, multijurisdictional water supply entities, or other water suppliers to select a water supply development project identified in the component merely because it is identified in the plan. Except as provided in s. 373.223(3) and (5), the plan may not be used in the review of permits under part II of this chapter unless the plan or an applicable portion thereof has been adopted by rule. However, this subsection does not prohibit a water management district from employing the data or other information used to establish the plan in reviewing permits under part II, nor does it limit the authority of the department or governing board under part II.

(8)   Where the water supply component of a water supply planning region shows the need for one or more alternative water supply projects, the district shall notify the affected local governments and make every reasonable effort to educate and involve local public officials in working toward solutions in conjunction with the districts and, where appropriate, other local and regional water supply entities.

(a)   Within 6 months following approval or amendment of its regional water supply plan, each water management district shall notify by certified mail each entity identified in sub-subparagraph (2)(a)3.d. of that portion of the plan relevant to the entity. Upon request of such an entity, the water management district shall appear before and present its findings and recommendations to the entity.

(b)   Within 1 year after the notification by a water management district pursuant to paragraph (a), each entity identified in sub-subparagraph (2)(a)3.d. shall provide to the water management district written notification of the following: the alternative water supply projects or options identified in paragraph (2)(a) which it has developed or intends to develop, if any; an estimate of the quantity of water to be produced by each project; and the status of project implementation, including development of the financial plan, facilities master planning, permitting, and efforts in coordinating multijurisdictional projects, if applicable. The information provided in the notification shall be updated annually, and a progress report shall be provided by November 15 of each year to the water management district. If an entity does not intend to develop one or more of the alternative water supply project options identified in the regional water supply plan, the entity shall propose, within 1 year after notification by a water management district pursuant to paragraph (a), another alternative water supply project option sufficient to address the needs identified in paragraph (2)(a) within the entity's jurisdiction and shall provide an estimate of the quantity of water to be produced by the project and the status of project implementation as described in this paragraph. The entity may request that the water management district consider the other project for inclusion in the regional water supply plan.

History.—ss. 1, 28, 49, 50, ch. 2010-205; s. 3, ch. 2013-177; s. 4, ch. 2013-229; s. 9, ch. 2014-150; s. 21, ch. 2016-1; s. 40, ch. 2018-110.

**373.711   Technical assistance to local governments.**—The water management districts shall assist local governments in the development and future revision of local government comprehensive plan elements or public facilities report as required by s. 189.08, related to water resource issues.

History.—s. 82, ch. 2010-102; ss. 1, 28, 49, ch. 2010-205; s. 85, ch. 2014-22.

**373.713   Regional water supply authorities.**—

(1)   By interlocal agreement between counties, municipalities, or special districts, as applicable, pursuant to the Florida Interlocal Cooperation Act of 1969, s. 163.01, and upon the approval of the Secretary of Environmental Protection to ensure that such agreement will be in the public interest and complies with the intent and purposes of this act, regional water supply authorities may be created for the purpose of developing, recovering, storing, and supplying water for county or municipal purposes in such a manner as will give priority to reducing adverse environmental effects of excessive or improper withdrawals of water from concentrated areas. In approving said agreement the Secretary of Environmental Protection shall consider, but not be limited to, the following:

(a)   Whether the geographic territory of the proposed authority is of sufficient size and character to reduce the environmental effects of improper or excessive withdrawals of water from concentrated areas.

(b)   The maximization of economic development of the water resources within the territory of the proposed authority.

(c)   The availability of a dependable and adequate water supply.

(d)   The ability of any proposed authority to design, construct, operate, and maintain water supply facilities in the locations, and at the times necessary, to ensure that an adequate water supply will be available to all citizens within the authority.

(e)   The effect or impact of any proposed authority on any municipality, county, or existing authority or authorities.

(f)   The existing needs of the water users within the area of the authority.

(2)   In addition to other powers and duties agreed upon, and notwithstanding the provisions of s. 163.01, such authority may:

(a)   Upon approval of the electors residing in each county or municipality within the territory to be included in any authority, levy ad valorem taxes, not to exceed 0.5 mill, pursuant to s. 9(b), Art. VII of the State Constitution.

Statutes & Constitution :View Statutes : Online Sunshine

No tax authorized by this paragraph shall be levied in any county or municipality without an affirmative vote of the electors residing in such county or municipality.

(b) Acquire water and water rights; develop, store, and transport water; provide, sell, and deliver water for county or municipal uses and purposes; and provide for the furnishing of such water and water service upon terms and conditions and at rates which will apportion to parties and nonparties an equitable share of the capital cost and operating expense of the authority's work to the purchaser.

(c) Collect, treat, and recover wastewater.

(d) Not engage in local distribution.

(e) Exercise the power of eminent domain in the manner provided by law for the condemnation of private property for public use to acquire title to such interest in real property as is necessary to the exercise of the powers herein granted, except water and water rights already devoted to reasonable and beneficial use or any water production or transmission facilities owned by any county or municipality.

(f) Issue revenue bonds in the manner prescribed by the Revenue Bond Act of 1953, as amended, part I, chapter 159, to be payable solely from funds derived from the sale of water by the authority to any county or municipality. Such bonds may be additionally secured by the full faith and credit of any county or municipality, as provided by s. 159.16 or by a pledge of excise taxes, as provided by s. 159.19. For the purpose of issuing revenue bonds, an authority shall be considered a "unit" as defined in s. 159.02(2) and as that term is used in the Revenue Bond Act of 1953, as amended. Such bonds may be issued to finance the cost of acquiring properties and facilities for the production and transmission of water by the authority to any county or municipality, which cost shall include the acquisition of real property and easements therein for such purposes. Such bonds may be in the form of refunding bonds to take up any outstanding bonds of the authority or of any county or municipality where such outstanding bonds are secured by properties and facilities for production and transmission of water, which properties and facilities are being acquired by the authority. Refunding bonds may be issued to take up and refund all outstanding bonds of said authority that are subject to call and termination, and all bonds of said authority that are not subject to call or redemption, when the surrender of said bonds can be procured from the holder thereof at prices satisfactory to the authority. Such refunding bonds may be issued at any time when, in the judgment of the authority, it will be to the best interest of the authority financially or economically by securing a lower rate of interest on said bonds or by extending the time of maturity of said bonds or, for any other reason, in the judgment of the authority, advantageous to said authority.

(g) Sue and be sued in its own name.

(h) Borrow money and incur indebtedness and issue bonds or other evidence of such indebtedness.

(i) Join with one or more other public corporations for the purpose of carrying out any of its powers and for that purpose to contract with such other public corporation or corporations for the purpose of financing such acquisitions, construction, and operations. Such contracts may provide for contributions to be made by each party thereto, for the division and apportionment of the expenses of such acquisitions and operations, and for the division and apportionment of the benefits, services, and products therefrom. Such contract may contain such other and further covenants and agreements as may be necessary and convenient to accomplish the purposes hereof.

(3) A regional water supply authority is authorized to develop, construct, operate, maintain, or contract for alternative sources of potable water, including desalinated water, and pipelines to interconnect authority sources and facilities, either by itself or jointly with a water management district; however, such alternative potable water sources, facilities, and pipelines may also be privately developed, constructed, owned, operated, and maintained, in which event an authority and a water management district are authorized to pledge and contribute their funds to reduce the wholesale cost of water from such alternative sources of potable water supplied by an authority to its member governments.

(4) When it is found to be in the public interest, for the public convenience and welfare, for a public benefit, and necessary for carrying out the purpose of any regional water supply authority, any state agency, county, water control district existing pursuant to chapter 298, water management district existing pursuant to this chapter, municipality, governmental agency, or public corporation in this state holding title to any interest in land is hereby

authorized, in its discretion, to convey the title to or dedicate land, title to which is in such entity, including tax-reverted land, or to grant use-rights therein, to any regional water supply authority created pursuant to this section. Land granted or conveyed to such authority shall be for the public purposes of such authority and may be made subject to the condition that in the event said land is not so used, or if used and subsequently its use for said purpose is abandoned, the interest granted shall cease as to such authority and shall automatically revert to the granting entity.

(5) Each county, special district, or municipality that is a party to an agreement pursuant to subsection (1) shall have a preferential right to purchase water from the regional water supply authority for use by such county, special district, or municipality.

(6) In carrying out the provisions of this section, any county wherein water is withdrawn by the authority shall not be deprived, directly or indirectly, of the prior right to the reasonable and beneficial use of water which is required adequately to supply the reasonable and beneficial needs of the county or any of the inhabitants or property owners therein.

(7) Upon a resolution adopted by the governing body of any county or municipality, the authority may, subject to a majority vote of its voting members, include such county or municipality in its regional water supply authority upon such terms and conditions as may be prescribed.

(8) The authority shall design, construct, operate, and maintain facilities in the locations and at the times necessary to ensure that an adequate water supply will be available to all citizens within the authority.

(9) Where a water supply authority exists pursuant to this section or s. 373.715 under a voluntary interlocal agreement that is consistent with requirements in s. 373.715(1)(b) and receives or maintains consumptive use permits under this voluntary agreement consistent with the water supply plan, if any, adopted by the governing board, such authority shall be exempt from consideration by the governing board or department of the factors specified in s. 373.223(3)(a)-(g) and the submissions required by s. 373.229(3). Such exemptions shall apply only to water sources within the jurisdictional areas of such voluntary water supply interlocal agreements.

History.—s. 1, ch. 2010-205.

**373.715 Assistance to West Coast Regional Water Supply Authority.—**

(1) It is the intent of the Legislature to authorize the implementation of changes in governance recommended by the West Coast Regional Water Supply Authority in its reports to the Legislature dated February 1, 1997, and January 5, 1998. The authority and its member governments may reconstitute the authority's governance and rename the authority under a voluntary interlocal agreement with a term of not less than 20 years. The interlocal agreement must comply with this subsection as follows:

(a) The authority and its member governments agree that cooperative efforts are mandatory to meet their water needs in a manner that will provide adequate and dependable supplies of water where needed without resulting in adverse environmental effects upon the areas from which the water is withdrawn or otherwise produced.

(b) In accordance with s. 4, Art. VIII of the State Constitution and notwithstanding s. 163.01, the interlocal agreement may include the following terms, which are considered approved by the parties without a vote of their electors, upon execution of the interlocal agreement by all member governments and upon satisfaction of all conditions precedent in the interlocal agreement:

1. All member governments shall relinquish to the authority their individual rights to develop potable water supply sources, except as otherwise provided in the interlocal agreement.

2. The authority shall be the sole and exclusive wholesale potable water supplier for all member governments.

3. The authority shall have the absolute and unequivocal obligation to meet the wholesale needs of the member governments for potable water.

4. A member government may not restrict or prohibit the use of land within a member's jurisdictional boundaries by the authority for water supply purposes through use of zoning, land use, comprehensive planning, or other form of regulation.

5.    A member government may not impose any tax, fee, or charge upon the authority in conjunction with the production or supply of water not otherwise provided for in the interlocal agreement.

6.    The authority may use the powers provided in part II of chapter 159 for financing and refinancing water treatment, production, or transmission facilities, including, but not limited to, desalinization facilities. All such water treatment, production, or transmission facilities are considered a "manufacturing plant" for purposes of s. 159.27(5) and serve a paramount public purpose by providing water to citizens of the state.

7.    A member government and any governmental or quasi-judicial board or commission established by local ordinance or general or special law where the governing membership of such board or commission is shared, in whole or in part, or appointed by a member government agreeing to be bound by the interlocal agreement shall be limited to the procedures set forth therein regarding actions that directly or indirectly restrict or prohibit the use of lands or other activities related to the production or supply of water.

(c)    The authority shall acquire full or lesser interests in all regionally significant member government wholesale water supply facilities and tangible assets, and each member government shall convey such interests in the facilities and assets to the authority, at an agreed value.

(d)    The authority shall charge a uniform per gallon wholesale rate to member governments for the wholesale supply of potable water. All capital, operation, maintenance, and administrative costs for existing facilities and acquired facilities, authority master water plan facilities, and other future projects must be allocated to member governments based on water usage at the uniform per gallon wholesale rate.

(e)    The interlocal agreement may include procedures for resolving the parties' differences regarding water management district proposed agency action in the water use permitting process within the authority. Such procedures should minimize the potential for litigation and include alternative dispute resolution. Any governmental or quasi-judicial board or commission established by local ordinance or general or special law where the governing members of such board or commission is shared, in whole or in part, or appointed by a member government, may agree to be bound by the dispute resolution procedures set forth in the interlocal agreement.

(f)    Upon execution of the voluntary interlocal agreement provided for herein, the authority shall jointly develop with the Southwest Florida Water Management District alternative sources of potable water and transmission pipelines to interconnect regionally significant water supply sources and facilities of the authority in amounts sufficient to meet the needs of all member governments for a period of at least 20 years and for natural systems. Nothing herein, however, shall preclude the authority and its member governments from developing traditional water sources pursuant to the voluntary interlocal agreement. Development and construction costs for alternative source facilities, which may include a desalination facility and significant regional interconnects, must be borne as mutually agreed to by both the authority and the Southwest Florida Water Management District. Nothing herein shall preclude authority or district cost sharing with private entities for the construction or ownership of alternative source facilities. By December 31, 1997, the authority and the Southwest Florida Water Management District shall enter into a mutually acceptable agreement detailing the development and implementation of directives contained in this paragraph. Nothing in this section shall be construed to modify the rights or responsibilities of the authority or its member governments, except as otherwise provided herein, or of the Southwest Florida Water Management District or the department pursuant to this chapter or chapter 403 and as otherwise set forth by statutes.

(g)    Unless otherwise provided in the interlocal agreement, the authority shall be governed by a board of commissioners consisting of nine voting members, all of whom must be elected officers, as follows:

1.    Three members from Hillsborough County who must be selected by the county commission; provided, however, that one member shall be selected by the Mayor of Tampa in the event that the City of Tampa elects to be a member of the authority;

2.    Three members from Pasco County, two of whom must be selected by the county commission and one of whom must be selected by the City Council of New Port Richey; and

3.    Three members from Pinellas County, two of whom must be selected by the county commission and one of whom must be selected by the City Council of St. Petersburg.

Except as otherwise provided in this section or in the voluntary interlocal agreement between the member governments, a majority vote shall bind the authority and its member governments in all matters relating to the funding of wholesale water supply, production, delivery, and related activities.

(2) The provisions of this section supersede any conflicting provisions contained in all other general or special laws or provisions thereof as they may apply directly or indirectly to the exclusivity of water supply or withdrawal of water, including provisions relating to the environmental effects, if any, in conjunction with the production and supply of potable water, and the provisions of this section are intended to be a complete revision of all laws related to a regional water supply authority created under s. 373.713 and this section.

(3) In lieu of the provisions in s. 373.713(2)(a), the Southwest Florida Water Management District shall assist the West Coast Regional Water Supply Authority for a period of 5 years, terminating December 31, 1981, by levying an ad valorem tax, upon request of the authority, of not more than 0.05 mill on all taxable property within the limits of the authority. During such period the corresponding basin board ad valorem tax levies shall be reduced accordingly.

(4) The authority shall prepare its annual budget in the same manner as prescribed for the preparation of basin budgets, but such authority budget shall not be subject to review by the respective basin boards or by the governing board of the district.

(5) The annual millage for the authority shall be the amount required to raise the amount called for by the annual budget when applied to the total assessment on all taxable property within the limits of the authority, as determined for county taxing purposes.

(6) The authority may, by resolution, request the governing board of the district to levy ad valorem taxes within the boundaries of the authority. Upon receipt of such request, together with formal certification of the adoption of its annual budget and of the required tax levy, the authority tax levy shall be made by the governing board of the district to finance authority functions.

(7) The taxes provided for in this section shall be extended by the property appraiser on the county tax roll in each county within, or partly within, the authority boundaries and shall be collected by the tax collector in the same manner and time as county taxes, and the proceeds therefrom paid to the district which shall forthwith pay them over to the authority. Until paid, such taxes shall be a lien on the property against which assessed and enforceable in like manner as county taxes. The property appraisers, tax collectors, and clerks of the circuit court of the respective counties shall be entitled to compensation for services performed in connection with such taxes at the same rates as apply to county taxes.

(8) The governing board of the district shall not be responsible for any actions or lack of actions by the authority.

History.—s. 1, ch. 2010-205.


## PART VIII
## FLORIDA SPRINGS AND AQUIFER PROTECTION ACT

373.801    Legislative findings and intent.
373.802    Definitions.
373.803    Delineation of priority focus areas for Outstanding Florida Springs.
373.805    Minimum flows and minimum water levels for Outstanding Florida Springs.
373.807    Protection of water quality in Outstanding Florida Springs.
373.811    Prohibited activities within a priority focus area.
373.813    Rules.

**373.801    Legislative findings and intent.**—

(1) The Legislature finds that springs are a unique part of this state's scenic beauty. Springs provide critical habitat for plants and animals, including many endangered or threatened species. Springs also provide immeasurable natural, recreational, economic, and inherent value. Springs are of great scientific importance in understanding the diverse functions of aquatic ecosystems. Water quality of springs is an indicator of local

conditions of the Floridan Aquifer, which is a source of drinking water for many residents of this state. Water flows in springs may reflect regional aquifer conditions. In addition, springs provide recreational opportunities for swimming, canoeing, wildlife watching, fishing, cave diving, and many other activities in this state. These recreational opportunities and the accompanying tourism they provide are a benefit to local economies and the economy of the state as a whole.

(2) The Legislature finds that the water quantity and water quality in springs may be related. For regulatory purposes, the department has primary responsibility for water quality; the water management districts have primary responsibility for water quantity; and the Department of Agriculture and Consumer Services has primary responsibility for the development and implementation of agricultural best management practices. Local governments have primary responsibility for providing domestic wastewater collection and treatment services and stormwater management. The foregoing responsible entities must coordinate to restore and maintain the water quantity and water quality of the Outstanding Florida Springs.

(3) The Legislature recognizes that:

(a) A spring is only as healthy as its aquifer system. The groundwater that supplies springs is derived from water that recharges the aquifer system in the form of seepage from the land surface and through direct conduits, such as sinkholes. Springs may be adversely affected by polluted runoff from urban and agricultural lands; discharges resulting from inadequate wastewater and stormwater management practices; stormwater runoff; and reduced water levels of the Floridan Aquifer. As a result, the hydrologic and environmental conditions of a spring or spring run are directly influenced by activities and land uses within a springshed and by water withdrawals from the Floridan Aquifer.

(b) Springs, whether found in urban or rural settings, or on public or private lands, may be threatened by actual or potential flow reductions and declining water quality. Many of this state's springs are demonstrating signs of significant ecological imbalance, increased nutrient loading, and declining flow. Without effective remedial action, further declines in water quality and water quantity may occur.

(c) Springshed boundaries and areas of high vulnerability within a springshed need to be identified and delineated using the best available data.

(d) Springsheds typically cross water management district boundaries and local government jurisdictional boundaries, so a coordinated statewide springs protection plan is needed.

(e) The aquifers and springs of this state are complex systems affected by many variables and influences.

(4) The Legislature recognizes that action is urgently needed and, as additional data is acquired, action must be modified.

History.—s. 23, ch. 2016-1.

**373.802 Definitions.**—As used in this part, the term:

(1) "Department" means the Department of Environmental Protection, which includes the Florida Geological Survey or its successor agencies.

(2) "Local government" means a county or municipal government the jurisdictional boundaries of which include an Outstanding Florida Spring or any part of a springshed or delineated priority focus area of an Outstanding Florida Spring.

(3) "Onsite sewage treatment and disposal system" means a system that contains a standard subsurface, filled, or mound drainfield system; an aerobic treatment unit; a graywater system tank; a laundry wastewater system tank; a septic tank; a grease interceptor; a pump tank; a solids or effluent pump; a waterless, incinerating, or organic waste-composting toilet; or a sanitary pit privy that is installed or proposed to be installed beyond the building sewer on land of the owner or on other land on which the owner has the legal right to install such system. The term includes any item placed within, or intended to be used as a part of or in conjunction with, the system. The term does not include package sewage treatment facilities and other treatment works regulated under chapter 403.

(4) "Outstanding Florida Spring" includes all historic first magnitude springs, including their associated spring runs, as determined by the department using the most recent Florida Geological Survey springs bulletin, and the

following additional springs, including their associated spring runs:

(a)   De Leon Springs;

(b)   Peacock Springs;

(c)   Poe Springs;

(d)   Rock Springs;

(e)   Wekiwa Springs; and

(f)   Gemini Springs.

The term does not include submarine springs or river rises.

(5)   "Priority focus area" means the area or areas of a basin where the Floridan Aquifer is generally most vulnerable to pollutant inputs where there is a known connectivity between groundwater pathways and an Outstanding Florida Spring, as determined by the department in consultation with the appropriate water management districts, and delineated in a basin management action plan.

(6)   "Springshed" means the areas within the groundwater and surface water basins which contribute, based upon all relevant facts, circumstances, and data, to the discharge of a spring as defined by potentiometric surface maps and surface watershed boundaries.

(7)   "Spring run" means a body of flowing water that originates from a spring or whose primary source of water is a spring or springs under average rainfall conditions.

(8)   "Spring vent" means a location where groundwater flows out of a natural, discernible opening in the ground onto the land surface or into a predominantly fresh surface water body.

History.—s. 24, ch. 2016-1.

373.803    Delineation of priority focus areas for Outstanding Florida Springs.—Using the best data available from the water management districts and other credible sources, the department, in coordination with the water management districts, shall delineate priority focus areas for each Outstanding Florida Spring or group of springs that contains one or more Outstanding Florida Springs and is identified as impaired in accordance with s. 373.807. In delineating priority focus areas, the department shall consider groundwater travel time to the spring, hydrogeology, nutrient load, and any other factors that may lead to degradation of an Outstanding Florida Spring. The delineation of priority focus areas must be completed by July 1, 2018, shall use understood and identifiable boundaries such as roads or political jurisdictions for ease of implementation, and is effective upon incorporation in a basin management action plan.

History.—s. 25, ch. 2016-1.

373.805    Minimum flows and minimum water levels for Outstanding Florida Springs.—

(1)   At the time a minimum flow or minimum water level is adopted pursuant to s. 373.042 for an Outstanding Florida Spring, if the spring is below or is projected within 20 years to fall below the minimum flow or minimum water level, a water management district or the department shall concurrently adopt a recovery or prevention strategy.

(2)   When a minimum flow or minimum water level for an Outstanding Florida Spring is revised pursuant to s. 373.0421(3), if the spring is below or is projected within 20 years to fall below the minimum flow or minimum water level, a water management district or the department shall concurrently adopt a recovery or prevention strategy or modify an existing recovery or prevention strategy. A district or the department may adopt the revised minimum flow or minimum water level before the adoption of a recovery or prevention strategy if the revised minimum flow or minimum water level is less constraining on existing or projected future consumptive uses.

(3)   For an Outstanding Florida Spring without an adopted recovery or prevention strategy, if a district or the department determines the spring has fallen below, or is projected within 20 years to fall below, the adopted minimum flow or minimum water level, a water management district or the department shall expeditiously adopt a recovery or prevention strategy.

(4)   The recovery or prevention strategy for each Outstanding Florida Spring must, at a minimum, include:

(a)   A listing of all specific projects identified for implementation of the plan;

(b)   A priority listing of each project;

(c)   For each listed project, the estimated cost of and the estimated date of completion;

(d)   The source and amount of financial assistance to be made available by the water management district for each listed project, which may not be less than 25 percent of the total project cost unless a specific funding source or sources are identified which will provide more than 75 percent of the total project cost. The Northwest Florida Water Management District and the Suwannee River Water Management District are not required to meet the minimum requirement to provide financial assistance pursuant to this paragraph;

(e)   An estimate of each listed project's benefit to an Outstanding Florida Spring; and

(f)   An implementation plan designed with a target to achieve the adopted minimum flow or minimum water level no more than 20 years after the adoption of a recovery or prevention strategy.

The water management district or the department shall develop a schedule establishing 5-year, 10-year, and 15-year targets for achieving the adopted minimum flows or minimum water levels. The schedule shall be used to provide guidance for planning and funding purposes and is exempt from chapter 120.

(5)   A local government may apply to the department for a single extension of up to 5 years for any project in an adopted recovery or prevention strategy. The department may grant the extension if the local government provides to the department sufficient evidence that an extension is in the best interest of the public. For a local government in a rural area of opportunity, as defined in s. 288.0656, the department may grant a single extension of up to 10 years.

History.—s. 26, ch. 2016-1.

373.807    **Protection of water quality in Outstanding Florida Springs.**—By July 1, 2016, the department shall initiate assessment, pursuant to s. 403.067(3), of Outstanding Florida Springs or spring systems for which an impairment determination has not been made under the numeric nutrient standards in effect for spring vents. Assessments must be completed by July 1, 2018.

(1)(a)   Concurrent with the adoption of a nutrient total maximum daily load for an Outstanding Florida Spring, the department, or the department in conjunction with a water management district, shall initiate development of a basin management action plan, as specified in s. 403.067. For an Outstanding Florida Spring with a nutrient total maximum daily load adopted before July 1, 2016, the department, or the department in conjunction with a water management district, shall initiate development of a basin management action plan by July 1, 2016. During the development of a basin management action plan, if the department identifies onsite sewage treatment and disposal systems as contributors of at least 20 percent of nonpoint source nitrogen pollution or if the department determines remediation is necessary to achieve the total maximum daily load, the basin management action plan shall include an onsite sewage treatment and disposal system remediation plan pursuant to subsection (3) for those systems identified as requiring remediation.

(b)   A basin management action plan for an Outstanding Florida Spring shall be adopted within 2 years after its initiation and must include, at a minimum:

1.   A list of all specific projects and programs identified to implement a nutrient total maximum daily load;

2.   A list of all specific projects identified in any incorporated onsite sewage treatment and disposal system remediation plan, if applicable;

3.   A priority rank for each listed project;

4.   For each listed project, a planning level cost estimate and the estimated date of completion;

5.   The source and amount of financial assistance to be made available by the department, a water management district, or other entity for each listed project;

6.   An estimate of each listed project's nutrient load reduction;

7.   Identification of each point source or category of nonpoint sources, including, but not limited to, urban turf fertilizer, sports turf fertilizer, agricultural fertilizer, onsite sewage treatment and disposal systems, wastewater treatment facilities, animal wastes, and stormwater facilities. An estimated allocation of the pollutant load must be provided for each point source or category of nonpoint sources; and

8.　An implementation plan designed with a target to achieve the nutrient total maximum daily load no more than 20 years after the adoption of a basin management action plan.

The department shall develop a schedule establishing 5-year, 10-year, and 15-year targets for achieving the nutrient total maximum daily load. The schedule shall be used to provide guidance for planning and funding purposes and is exempt from chapter 120.

(c)　For a basin management action plan adopted before July 1, 2016, which addresses an Outstanding Florida Spring, the department or the department in conjunction with a water management district must revise the plan if necessary to comply with this section by July 1, 2018.

(d)　A local government may apply to the department for a single extension of up to 5 years for any project in an adopted basin management action plan. A local government in a rural area of opportunity, as defined in s. 288.0656, may apply for a single extension of up to 10 years for such a project. The department may grant the extension if the local government provides to the department sufficient evidence that an extension is in the best interest of the public.

(2)　By July 1, 2017, each local government, as defined in s. 373.802(2), that has not adopted an ordinance pursuant to s. 403.9337, shall develop, enact, and implement an ordinance pursuant to that section. It is the intent of the Legislature that ordinances required to be adopted under this subsection reflect the latest scientific information, advancements, and technological improvements in the industry.

(3)　As part of a basin management action plan that includes an Outstanding Florida Spring, the department, the Department of Health, relevant local governments, and relevant local public and private wastewater utilities shall develop an onsite sewage treatment and disposal system remediation plan for a spring if the department determines onsite sewage treatment and disposal systems within a priority focus area contribute at least 20 percent of nonpoint source nitrogen pollution or if the department determines remediation is necessary to achieve the total maximum daily load. The plan shall identify cost-effective and financially feasible projects necessary to reduce the nutrient impacts from onsite sewage treatment and disposal systems and shall be completed and adopted as part of the basin management action plan no later than the first 5-year milestone required by subparagraph (1)(b)8. The department is the lead agency in coordinating the preparation of and the adoption of the plan. The department shall:

(a)　Collect and evaluate credible scientific information on the effect of nutrients, particularly forms of nitrogen, on springs and springs systems; and

(b)　Develop a public education plan to provide area residents with reliable, understandable information about onsite sewage treatment and disposal systems and springs.

In addition to the requirements in s. 403.067, the plan shall include options for repair, upgrade, replacement, drainfield modification, addition of effective nitrogen reducing features, connection to a central sewerage system, or other action for an onsite sewage treatment and disposal system or group of systems within a priority focus area that contribute at least 20 percent of nonpoint source nitrogen pollution or if the department determines remediation is necessary to achieve a total maximum daily load. For these systems, the department shall include in the plan a priority ranking for each system or group of systems that requires remediation and shall award funds to implement the remediation projects contingent on an appropriation in the General Appropriations Act, which may include all or part of the costs necessary for repair, upgrade, replacement, drainfield modification, addition of effective nitrogen reducing features, initial connection to a central sewerage system, or other action. In awarding funds, the department may consider expected nutrient reduction benefit per unit cost, size and scope of project, relative local financial contribution to the project, and the financial impact on property owners and the community. The department may waive matching funding requirements for proposed projects within an area designated as a rural area of opportunity under s. 288.0656.

(4)　The department shall provide notice to a local government of all permit applicants under s. 403.814(12) in a priority focus area of an Outstanding Florida Spring over which the local government has full or partial jurisdiction.

History.—s. 27, ch. 2016-1.

**373.811    Prohibited activities within a priority focus area.**—The following activities are prohibited within a priority focus area in effect for an Outstanding Florida Spring:

(1)   New domestic wastewater disposal facilities, including rapid infiltration basins, with permitted capacities of 100,000 gallons per day or more, except for those facilities that meet an advanced wastewater treatment standard of no more than 3 mg/l total nitrogen, expressed as N, on an annual permitted basis, or a more stringent treatment standard if the department determines the more stringent standard is necessary to attain a total maximum daily load for the Outstanding Florida Spring.

(2)   New onsite sewage treatment and disposal systems on lots of less than 1 acre, if the addition of the specific systems conflicts with an onsite treatment and disposal system remediation plan incorporated into a basin management action plan in accordance with s. 373.807(3).

(3)   New facilities for the disposal of hazardous waste.

(4)   The land application of Class A or Class B domestic wastewater biosolids not in accordance with a department approved nutrient management plan establishing the rate at which all biosolids, soil amendments, and sources of nutrients at the land application site can be applied to the land for crop production while minimizing the amount of pollutants and nutrients discharged to groundwater or waters of the state.

(5)   New agriculture operations that do not implement best management practices, measures necessary to achieve pollution reduction levels established by the department, or groundwater monitoring plans approved by a water management district or the department.

History.—s. 28, ch. 2016-1.

**373.813    Rules.**—

(1)   The department shall adopt rules to improve water quantity and water quality to administer this part, as applicable.

(2)(a)   The Department of Agriculture and Consumer Services is the lead agency coordinating the reduction of agricultural nonpoint sources of pollution for the protection of Outstanding Florida Springs. The Department of Agriculture and Consumer Services and the department, pursuant to s. 403.067(7)(c)4., shall study new or revised agricultural best management practices for improving and protecting Outstanding Florida Springs and, if necessary, in cooperation with applicable local governments and stakeholders, initiate rulemaking to require the implementation of such practices within a reasonable period.

(b)   The department, the Department of Agriculture and Consumer Services, and the University of Florida Institute of Food and Agricultural Sciences shall cooperate in conducting the necessary research and demonstration projects to develop improved or additional nutrient management tools, including the use of controlled release fertilizer that can be used by agricultural producers as part of an agricultural best management practices program. The development of such tools must reflect a balance between water quality improvement and agricultural productivity and, if applicable, must be incorporated into the revised agricultural best management practices adopted by rule by the Department of Agriculture and Consumer Services.

History.—s. 29, ch. 2016-1.

Copyright © 1995-2018 The Florida Legislature • Privacy Statement • Contact Us