Select Year: 2018 ▾  Go

# The 2018 Florida Statutes

Title XXIX
PUBLIC HEALTH

Chapter 403
ENVIRONMENTAL CONTROL

View Entire Chapter

CHAPTER 403
ENVIRONMENTAL CONTROL

PART I
POLLUTION CONTROL
(ss. 403.011-403.42)

PART II
ELECTRICAL POWER PLANT AND TRANSMISSION LINE
SITING
(ss. 403.501-403.539)

PART III
INTERSTATE ENVIRONMENTAL CONTROL COMPACT
(s. 403.60)

PART IV
RESOURCE RECOVERY AND MANAGEMENT
(ss. 403.702-403.7721)

PART V
ENVIRONMENTAL REGULATION
(ss. 403.801-403.8163)

PART VI
WATER SUPPLY; WATER TREATMENT PLANTS
(ss. 403.850-403.891)

PART VII
MISCELLANEOUS PROVISIONS
(ss. 403.90-403.9338)

PART VIII
NATURAL GAS TRANSMISSION PIPELINE
SITING
(ss. 403.9401-403.9425)

PART IX
EXPEDITED PERMITTING
(s. 403.973)

PART I

POLLUTION CONTROL

403.011   Short title.

403.021   Legislative declaration; public policy.

403.031   Definitions.

403.051   Meetings; hearings and procedure.

403.061   Department; powers and duties.

403.0611   Alternative methods of regulatory permitting; department duties.

403.0615   Water resources restoration and preservation.

403.0617   Innovative nutrient and sediment reduction and conservation pilot project program.

403.062   Pollution control; underground, surface, and coastal waters.

403.0623   Environmental data; quality assurance.

403.0625   Environmental laboratory certification; water quality tests conducted by a certified laboratory.

403.063   Groundwater quality monitoring.

403.064   Reuse of reclaimed water.

403.0645   Reclaimed water use at state facilities.

403.067   Establishment and implementation of total maximum daily loads.

403.0675   Progress reports.

403.072   Pollution Prevention Act.

403.073   Pollution prevention; state goal; agency programs; public education.

403.074   Technical assistance by the department.

403.075   Legislative findings.

403.0752   Ecosystem management agreements.

403.076   Short title.

403.077   Public notification of pollution.

403.078   Effect on other law.

403.081   Performance by other state agencies.

403.085   Sanitary sewage disposal units; advanced and secondary waste treatment; industrial waste treatment.

403.086   Sewage disposal facilities; advanced and secondary waste treatment.

403.08601   Leah Schad Memorial Ocean Outfall Program.

403.0862   Discharge of waste from state groundwater cleanup operations to publicly owned treatment works.

403.087   Permits; general issuance; denial; revocation; prohibition; penalty.

403.0871   Florida Permit Fee Trust Fund.

403.0872   Operation permits for major sources of air pollution; annual operation license fee.

403.0873   Florida Air-Operation License Fee Account.

403.08735   Air emissions trading.

403.0874   Air Pollution Control Trust Fund.

403.0875   Citation of rule.

403.0876   Permits; processing.

403.0877   Certification by professionals regulated by the Department of Business and Professional Regulation.

403.088   Water pollution operation permits; conditions.

403.0881   Wastewater or reuse or disposal systems or water treatment works; construction permits.

403.0882   Discharge of demineralization concentrate.

403.0885   Establishment of federally approved state National Pollutant Discharge Elimination System (NPDES) Program.

403.08852   Clarification of requirements under rule 62-302.520(2), F.A.C.

403.0891   State, regional, and local stormwater management plans and programs.

403.0893   Stormwater funding; dedicated funds for stormwater management.

403.0896   Training and assistance for stormwater management system personnel.

403.091   Inspections.

403.092   Package sewage treatment facilities; inspection.

403.111   Confidential records.

403.121   Enforcement; procedure; remedies.

403.131   Injunctive relief, remedies.

403.135   Persons who accept wastewater for spray irrigation; civil liability.

403.141   Civil liability; joint and several liability.

403.151   Compliance with rules or orders of department.

403.161   Prohibitions, violation, penalty, intent.

403.1655   Environmental short-term emergency response program.

403.1815   Construction of water distribution mains and sewage collection and transmission systems; local regulation.

403.182   Local pollution control programs.

403.1832   Grants and Donations Trust Fund.

403.1834   State bonds to finance or refinance facilities; exemption from taxation.

403.1835   Water pollution control financial assistance.

403.1837   Florida Water Pollution Control Financing Corporation.

403.1838   Small Community Sewer Construction Assistance Act.

403.191   Construction in relation to other law.

403.201   Variances.

403.231   Department of Legal Affairs to represent the state.

403.251   Safety clause.

403.281   Definitions; weather modification law.

403.291   Purpose of weather modification law.

403.301   Artificial weather modification operation; license required.

403.311   Application for weather modification licensing; fee.

403.321   Proof of financial responsibility.

403.331   Issuance of license; suspension or revocation; renewal.

403.341   Filing and publication of notice of intention to operate; limitation on area and time.

403.351   Contents of notice of intention.

403.361   Publication of notice of intention.

403.371   Proof of publication.

403.381   Record and reports of operations.

403.391   Emergency licenses.

403.401   Suspension or revocation of license.

403.411   Penalty.

403.412   Environmental Protection Act.

403.413   Florida Litter Law.

403.4131   Litter control.

403.41315   Comprehensive illegal dumping, litter, and marine debris control and prevention.

403.4132   Litter pickup and removal.

403.4133   Adopt-a-Shore Program.

403.4135   Litter receptacles.

403.414   Environmental award program.

403.415   Motor vehicle noise.

403.4151   Exempt motor vehicles.

403.4153   Federal preemption.

403.4154   Phosphogypsum management program.

403.4155   Phosphogypsum management; rulemaking authority.

403.42   Florida Clean Fuel Act.

**403.011      Short title.**—This act shall be known and cited as the "Florida Air and Water Pollution Control Act."
History.—s. 2, ch. 67-436.

**403.021      Legislative declaration; public policy.**—

(1)   The pollution of the air and waters of this state constitutes a menace to public health and welfare; creates public nuisances; is harmful to wildlife and fish and other aquatic life; and impairs domestic, agricultural, industrial, recreational, and other beneficial uses of air and water.

(2)   It is declared to be the public policy of this state to conserve the waters of the state and to protect, maintain, and improve the quality thereof for public water supplies, for the propagation of wildlife and fish and other aquatic life, and for domestic, agricultural, industrial, recreational, and other beneficial uses and to provide that no wastes be discharged into any waters of the state without first being given the degree of treatment necessary to protect the beneficial uses of such water.

(3)   It is declared to be the public policy of this state and the purpose of this act to achieve and maintain such levels of air quality as will protect human health and safety and, to the greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of the people, promote the economic and social development of this state, and facilitate the enjoyment of the natural attractions of this state. In accordance with the public policy established herein, the Legislature further declares that the citizens of this state should be afforded reasonable protection from the dangers inherent in the release of toxic or otherwise hazardous vapors, gases, or highly volatile liquids into the environment.

(4)   It is declared that local and regional air and water pollution control programs are to be supported to the extent practicable as essential instruments to provide for a coordinated statewide program of air and water pollution prevention, abatement, and control for the securing and maintenance of appropriate levels of air and water quality.

(5)   It is hereby declared that the prevention, abatement, and control of the pollution of the air and waters of this state are affected with a public interest, and the provisions of this act are enacted in the exercise of the police powers of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state.

(6)   The Legislature finds and declares that control, regulation, and abatement of the activities which are causing or may cause pollution of the air or water resources in the state and which are or may be detrimental to human, animal, aquatic, or plant life, or to property, or unreasonably interfere with the comfortable enjoyment of life or property be increased to ensure conservation of natural resources; to ensure a continued safe environment; to ensure purity of air and water; to ensure domestic water supplies; to ensure protection and preservation of the public health, safety, welfare, and economic well-being; to ensure and provide for recreational and wildlife needs as the population increases and the economy expands; and to ensure a continuing growth of the economy and industrial development.

(7)   The Legislature further finds and declares that:

(a)   Compliance with this law will require capital outlays of hundreds of millions of dollars for the installation of machinery, equipment, and facilities for the treatment of industrial wastes which are not productive assets and increased operating expenses to owners without any financial return and should be separately classified for assessment purposes.

(b)   Industry should be encouraged to install new machinery, equipment, and facilities as technology in environmental matters advances, thereby improving the quality of the air and waters of the state and benefiting the citizens of the state without pecuniary benefit to the owners of industries; and the Legislature should prescribe methods whereby just valuation may be secured to such owners and exemptions from certain excise taxes should be offered with respect to such installations.

(c)   Facilities as herein defined should be classified separately from other real and personal property of any manufacturing or processing plant or installation, as such facilities contribute only to general welfare and health and are assets producing no profit return to owners.

(d)   In existing manufacturing or processing plants it is more difficult to obtain satisfactory results in treating industrial wastes than in new plants being now planned or constructed and that with respect to existing plants in many instances it will be necessary to demolish and remove substantial portions thereof and replace the same with new and more modern equipment in order to more effectively treat, eliminate, or reduce the objectionable characteristics of any industrial wastes and that such replacements should be classified and assessed differently from replacements made in the ordinary course of business.

(8)   The Legislature further finds and declares that the public health, welfare, and safety may be affected by disease-carrying vectors and pests. The department shall assist all governmental units charged with the control of such vectors and pests. Furthermore, in reviewing applications for permits, the department shall consider the total well-being of the public and shall not consider solely the ambient pollution standards when exercising its powers, if there may be danger of a public health hazard.

(9)(a)   The Legislature finds and declares that it is essential to preserve and maintain authorized water depth in the existing navigation channels, port harbors, turning basins, and harbor berths of this state in order to provide for the continued safe navigation of deepwater shipping commerce. The department shall recognize that maintenance of authorized water depths consistent with port master plans developed pursuant to s. 163.3178(2)(k) is an ongoing, continuous, beneficial, and necessary activity that is in the public interest; and it shall develop a regulatory process that shall enable the ports of this state to conduct such activities in an environmentally sound, safe, expeditious, and cost-efficient manner. It is the further intent of the Legislature that the permitting and enforcement of dredging, dredged-material management, and other related activities for Florida's deepwater ports pursuant to this chapter and chapters 161, 253, and 373 shall be consolidated within the department's Division of Water Resource Management and, with the concurrence of the affected deepwater port or ports, may be administered by a district office of the department or delegated to an approved local environmental program.

(b)   The provisions of paragraph (a) apply only to the port waters, dredged-material management sites, port harbors, navigation channels, turning basins, and harbor berths used for deepwater commercial navigation in the ports of Jacksonville, Tampa, Port Everglades, Miami, Port Canaveral, Ft. Pierce, Palm Beach, Port Manatee, Port St. Joe, Panama City, St. Petersburg, Pensacola, Fernandina, and Key West.

(10)   It is the policy of the state to ensure that the existing and potential drinking water resources of the state remain free from harmful quantities of contaminants. The department, as the state water quality protection agency, shall compile, correlate, and disseminate available information on any contaminant which endangers or may endanger existing or potential drinking water resources. It shall also coordinate its regulatory program with the regulatory programs of other agencies to assure adequate protection of the drinking water resources of the state.

(11)   It is the intent of the Legislature that water quality standards be reasonably established and applied to take into account the variability occurring in nature. The department shall recognize the statistical variability inherent in sampling and testing procedures that are used to express water quality standards. The department shall also recognize that some deviations from water quality standards occur as the result of natural background conditions. The department shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body.

History.—s. 3, ch. 67-436; s. 1, ch. 78-98; ss. 1, 5, ch. 81-228; s. 4, ch. 84-79; s. 46, ch. 84-338; s. 11, ch. 85-269; s. 1, ch. 85-277; s. 8, ch. 86-186; s. 3, ch. 86-213; s. 143, ch. 96-320; s. 1004, ch. 97-103; s. 4, ch. 99-353.


**403.031   Definitions.**—In construing this chapter, or rules and regulations adopted pursuant hereto, the following words, phrases, or terms, unless the context otherwise indicates, have the following meanings:

(1)   "Contaminant" is any substance which is harmful to plant, animal, or human life.

(2)   "Department" means the Department of Environmental Protection.

(3)  "Effluent limitations" means any restriction established by the department on quantities, rates, or concentrations of chemical, physical, biological, or other constituents which are discharged from sources into waters of the state.

(4)  "Installation" is any structure, equipment, or facility, or appurtenances thereto, or operation which may emit air or water contaminants in quantities prohibited by rules of the department.

(5)  "Person" means the state or any agency or institution thereof, the United States or any agency or institution thereof, or any municipality, political subdivision, public or private corporation, individual, partnership, association, or other entity and includes any officer or governing or managing body of the state, the United States, any agency, any municipality, political subdivision, or public or private corporation.

(6)  "Plant" is any unit operation, complex, area, or multiple of unit operations that produce, process, or cause to be processed any materials, the processing of which can, or may, cause air or water pollution.

(7)  "Pollution" is the presence in the outdoor atmosphere or waters of the state of any substances, contaminants, noise, or manmade or human-induced impairment of air or waters or alteration of the chemical, physical, biological, or radiological integrity of air or water in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property, including outdoor recreation unless authorized by applicable law.

(8)  "Pollution prevention" means the steps taken by a potential generator of contamination or pollution to eliminate or reduce the contamination or pollution before it is discharged into the environment. The term includes nonmandatory steps taken to use alternative forms of energy, conserve or reduce the use of energy, substitute nontoxic materials for toxic materials, conserve or reduce the use of toxic materials and raw materials, reformulate products, modify manufacturing or other processes, improve in-plant maintenance and operations, implement environmental planning before expanding a facility, and recycle toxic or other raw materials.

(9)  "Sewerage system" means pipelines or conduits, pumping stations, and force mains and all other structures, devices, appurtenances, and facilities used for collecting or conducting wastes to an ultimate point for treatment or disposal.

(10)  "Source" is any and all points of origin of the item defined in subsection (1), whether privately or publicly owned or operated.

(11)  "Treatment works" and "disposal systems" mean any plant or other works used for the purpose of treating, stabilizing, or holding wastes.

(12)  "Wastes" means sewage, industrial wastes, and all other liquid, gaseous, solid, radioactive, or other substances which may pollute or tend to pollute any waters of the state.

(13)  "Waters" include, but are not limited to, rivers, lakes, streams, springs, impoundments, wetlands, and all other waters or bodies of water, including fresh, brackish, saline, tidal, surface, or underground waters. Waters owned entirely by one person other than the state are included only in regard to possible discharge on other property or water. Underground waters include, but are not limited to, all underground waters passing through pores of rock or soils or flowing through in channels, whether manmade or natural. Solely for purposes of s. 403.0885, waters of the state also include navigable waters or waters of the contiguous zone as used in s. 502 of the Clean Water Act, as amended, 33 U.S.C. ss. 1251 et seq., as in existence on January 1, 1993, except for those navigable waters seaward of the boundaries of the state set forth in s. 1, Art. II of the State Constitution. Solely for purposes of this chapter, waters of the state also include the area bounded by the following:

(a)  Commence at the intersection of State Road (SRD) 5 (U.S. 1) and the county line dividing Miami-Dade and Monroe Counties, said point also being the mean high-water line of Florida Bay, located in section 4, township 60 south, range 39 east of the Tallahassee Meridian for the point of beginning. From said point of beginning, thence run northwesterly along said SRD 5 to an intersection with the north line of section 18, township 58 south, range 39 east; thence run westerly to a point marking the southeast corner of section 12, township 58 south, range 37 east, said point also lying on the east boundary of the Everglades National Park; thence run north along the east boundary of the aforementioned Everglades National Park to a point marking the northeast corner of section 1, township 58 south, range 37 east; thence run west along said park to a point marking the northwest corner of said

section 1; thence run northerly along said park to a point marking the northwest corner of section 24, township 57 south, range 37 east; thence run westerly along the south lines of sections 14, 15, and 16 to the southwest corner of section 16; thence leaving the Everglades National Park boundary run northerly along the west line of section 16 to the northwest corner of section 16; thence east along the northerly line of section 16 to a point at the intersection of the east one-half and west one-half of section 9; thence northerly along the line separating the east one-half and the west one-half of sections 9, 4, 33, and 28; thence run easterly along the north line of section 28 to the northeast corner of section 28; thence run northerly along the west line of section 22 to the northwest corner of section 22; thence easterly along the north line of section 22 to a point at the intersection of the east one-half and west one-half of section 15; thence run northerly along said line to the point of intersection with the north line of section 15; thence easterly along the north line of section 15 to the northeast corner of section 15; thence run northerly along the west lines of sections 11 and 2 to the northwest corner of section 2; thence run easterly along the north lines of sections 2 and 1 to the northeast corner of section 1, township 56 south, range 37 east; thence run north along the east line of section 36, township 55 south, range 37 east to the northeast corner of section 36; thence run west along the north line of section 36 to the northwest corner of section 36; thence run north along the west line of section 25 to the northwest corner of section 25; thence run west along the north line of section 26 to the northwest corner of section 26; thence run north along the west line of section 23 to the northwest corner of section 23; thence run easterly along the north line of section 23 to the northeast corner of section 23; thence run north along the west line of section 13 to the northwest corner of section 13; thence run east along the north line of section 13 to a point of intersection with the west line of the southeast one-quarter of section 12; thence run north along the west line of the southeast one-quarter of section 12 to the northwest corner of the southeast one-quarter of section 12; thence run east along the north line of the southeast one-quarter of section 12 to the point of intersection with the east line of section 12; thence run east along the south line of the northwest one-quarter of section 7 to the southeast corner of the northwest one-quarter of section 7; thence run north along the east line of the northwest one-quarter of section 7 to the point of intersection with the north line of section 7; thence run northerly along the west line of the southeast one-quarter of section 6 to the northwest corner of the southeast one-quarter of section 6; thence run east along the north lines of the southeast one-quarter of section 6 and the southwest one-quarter of section 5 to the northeast corner of the southwest one-quarter of section 5; thence run northerly along the east line of the northwest one-quarter of section 5 to the point of intersection with the north line of section 5; thence run northerly along the line dividing the east one-half and the west one-half of Lot 5 to a point intersecting the north line of Lot 5; thence run east along the north line of Lot 5 to the northeast corner of Lot 5, township 54$\frac{1}{2}$ south, range 38 east; thence run north along the west line of section 33, township 54 south, range 38 east to a point intersecting the northwest corner of the southwest one-quarter of section 33; thence run easterly along the north line of the southwest one-quarter of section 33 to the northeast corner of the southwest one-quarter of section 33; thence run north along the west line of the northeast one-quarter of section 33 to a point intersecting the north line of section 33; thence run easterly along the north line of section 33 to the northeast corner of section 33; thence run northerly along the west line of section 27 to a point intersecting the northwest corner of the southwest one-quarter of section 27; thence run easterly to the northeast corner of the southwest one-quarter of section 27; thence run northerly along the west line of the northeast one-quarter of section 27 to a point intersecting the north line of section 27; thence run west along the north line of section 27 to the northwest corner of section 27; thence run north along the west lines of sections 22 and 15 to the northwest corner of section 15; thence run easterly along the north lines of sections 15 and 14 to the point of intersection with the L-31N Levee, said intersection located near the southeast corner of section 11, township 54 south, range 38 east; thence run northerly along Levee L-31N crossing SRD 90 (U.S. 41 Tamiami Trail) to an intersection common to Levees L-31N, L-29, and L-30, said intersection located near the southeast corner of section 2, township 54 south, range 38 east; thence run northeasterly, northerly, and northeasterly along Levee L-30 to a point of intersection with the Miami-Dade/Broward Levee, said intersection located near the northeast corner of section 17, township 52 south, range 39 east; thence run due east to a point of intersection with SRD 27 (Krome Ave.); thence run northeasterly along SRD 27 to an intersection with SRD 25 (U.S. 27), said intersection located in section 3, township 52 south, range 39 east; thence run northerly along said SRD 25, entering into

Broward County, to an intersection with SRD 84 at Andytown; thence run southeasterly along the aforementioned SRD 84 to an intersection with the southwesterly prolongation of Levee L-35A, said intersection being located in the northeast one-quarter of section 5, township 50 south, range 40 east; thence run northeasterly along Levee L-35A to an intersection of Levee L-36, said intersection located near the southeast corner of section 12, township 49 south, range 40 east; thence run northerly along Levee L-36, entering into Palm Beach County, to an intersection common to said Levees L-36, L-39, and L-40, said intersection located near the west quarter corner of section 19, township 47 south, range 41 east; thence run northeasterly, easterly, and northerly along Levee L-40, said Levee L-40 being the easterly boundary of the Loxahatchee National Wildlife Refuge, to an intersection with SRD 80 (U.S. 441), said intersection located near the southeast corner of section 32, township 43 south, range 40 east; thence run westerly along the aforementioned SRD 80 to a point marking the intersection of said road and the northeasterly prolongation of Levee L-7, said Levee L-7 being the westerly boundary of the Loxahatchee National Wildlife Refuge; thence run southwesterly and southerly along said Levee L-7 to an intersection common to Levees L-7, L-15 (Hillsborough Canal), and L-6; thence run southwesterly along Levee L-6 to an intersection common to Levee L-6, SRD 25 (U.S. 27), and Levee L-5, said intersection being located near the northwest corner of section 27, township 47 south, range 38 east; thence run westerly along the aforementioned Levee L-5 to a point intersecting the east line of range 36 east; thence run northerly along said range line to a point marking the northeast corner of section 1, township 47 south, range 36 east; thence run westerly along the north line of township 47 south, to an intersection with Levee L-23/24 (Miami Canal); thence run northwesterly along the Miami Canal Levee to a point intersecting the north line of section 22, township 46 south, range 35 east; thence run westerly to a point marking the northwest corner of section 21, township 46 south, range 35 east; thence run southerly to the southwest corner of said section 21; thence run westerly to a point marking the northwest corner of section 30, township 46 south, range 35 east, said point also being on the line dividing Palm Beach and Hendry Counties; from said point, thence run southerly along said county line to a point marking the intersection of Broward, Hendry, and Collier Counties, said point also being the northeast corner of section 1, township 49 south, range 34 east; thence run westerly along the line dividing Hendry and Collier Counties and continuing along the prolongation thereof to a point marking the southwest corner of section 36, township 48 south, range 29 east; thence run southerly to a point marking the southwest corner of section 12, township 49 south, range 29 east; thence run westerly to a point marking the southwest corner of section 10, township 49 south, range 29 east; thence run southerly to a point marking the southwest corner of section 15, township 49 south, range 29 east; thence run westerly to a point marking the northwest corner of section 24, township 49 south, range 28 east, said point lying on the west boundary of the Big Cypress Area of Critical State Concern as described in rule 28-25.001, Florida Administrative Code; thence run southerly along said boundary crossing SRD 84 (Alligator Alley) to a point marking the southwest corner of section 24, township 50 south, range 28 east; thence leaving the aforementioned west boundary of the Big Cypress Area of Critical State Concern run easterly to a point marking the northeast corner of section 25, township 50 south, range 28 east; thence run southerly along the east line of range 28 east to a point lying approximately 0.15 miles south of the northeast corner of section 1, township 52 south, range 28 east; thence run southwesterly 2.4 miles more or less to an intersection with SRD 90 (U.S. 41 Tamiami Trail), said intersection lying 1.1 miles more or less west of the east line of range 28 east; thence run northwesterly and westerly along SRD 90 to an intersection with the west line of section 10, township 52 south, range 28 east; thence leaving SRD 90 run southerly to a point marking the southwest corner of section 15, township 52 south, range 28 east; thence run westerly crossing the Faka Union Canal 0.6 miles more or less to a point; thence run southerly and parallel to the Faka Union Canal to a point located on the mean high-water line of Faka Union Bay; thence run southeasterly along the mean high-water line of the various bays, rivers, inlets, and streams to the point of beginning.

   (b)    The area bounded by the line described in paragraph (a) generally includes those waters to be known as waters of the state. The landward extent of these waters shall be determined by the delineation methodology ratified in s. 373.4211. Any waters which are outside the general boundary line described in paragraph (a) but which are contiguous thereto by virtue of the presence of a wetland, watercourse, or other surface water, as determined by the delineation methodology ratified in s. 373.4211, shall be a part of this water body. Any areas

within the line described in paragraph (a) which are neither a wetland nor surface water, as determined by the delineation methodology ratified in s. 373.4211, shall be excluded therefrom. If the Florida Environmental Regulation Commission designates the waters within the boundaries an Outstanding Florida Water, waters outside the boundaries shall not be included as part of such designation unless a hearing is held pursuant to notice in each appropriate county and the boundaries of such lands are specifically considered and described for such designation.

(14)  "State water resource implementation rule" means the rule authorized by s. 373.036, which sets forth goals, objectives, and guidance for the development and review of programs, rules, and plans relating to water resources, based on statutory policies and directives. The waters of the state are among its most basic resources. Such waters should be managed to conserve and protect water resources and to realize the full beneficial use of these resources.

(15)  "Stormwater management program" means the institutional strategy for stormwater management, including urban, agricultural, and other stormwater.

(16)  "Stormwater management system" means a system which is designed and constructed or implemented to control discharges which are necessitated by rainfall events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, overdrainage, environmental degradation and water pollution or otherwise affect the quantity and quality of discharges from the system.

(17)  "Stormwater utility" means the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need. It is operated as a typical utility which bills services regularly, similar to water and wastewater services.

(18)  "Watershed" means the land area which contributes to the flow of water into a receiving body of water.

(19)  "Regulated air pollutant" means any pollutant regulated under the federal Clean Air Act.

(20)  "Electrical power plant" means, for purposes of this part of this chapter, any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant.

(21)  "Total maximum daily load" is defined as the sum of the individual wasteload allocations for point sources and the load allocations for nonpoint sources and natural background. Prior to determining individual wasteload allocations and load allocations, the maximum amount of a pollutant that a water body or water segment can assimilate from all sources without exceeding water quality standards must first be calculated.

History.—s. 4, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 71-36; s. 2, ch. 71-137; s. 153, ch. 71-377; s. 1, ch. 73-46; s. 112, ch. 73-333; ss. 1, 2, ch. 74-133; s. 1, ch. 77-174; s. 72, ch. 79-65; s. 13, ch. 84-79; s. 1, ch. 89-143; s. 30, ch. 89-279; s. 22, ch. 91-305; s. 1, ch. 92-132; s. 1, ch. 93-94; ss. 35, 69, ch. 93-213; ss. 12, 13, ch. 94-122; s. 355, ch. 94-356; s. 7, ch. 96-370; s. 1005, ch. 97-103; s. 24, ch. 97-160; s. 2, ch. 99-223; s. 9, ch. 99-353; s. 42, ch. 2001-62; s. 105, ch. 2008-4; s. 15, ch. 2008-150; s. 64, ch. 2008-227.

### 403.051   Meetings; hearings and procedure.—

(1)  The department shall cause a transcript of the proceedings at all meetings to be made.

(2)(a)  Any department planning, permitting, design, construction, modification, or operating standards, criteria, and requirements for treatment works, disposal systems, and sewerage systems for wastes from any source shall be promulgated as a rule or regulation.

(b)  The department shall not withhold the issuance of a permit to consider matters not addressed by the permit application or to consider standards, criteria, and requirements not adopted as required by paragraph (a).

History.—s. 6, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 70-84; s. 2, ch. 71-137; s. 1, ch. 71-138; s. 154, ch. 71-377; s. 1, ch. 72-223; s. 1, ch. 74-308; s. 14, ch. 78-95; s. 58, ch. 83-218; s. 70, ch. 93-213.

### 403.061   Department; powers and duties.—The department shall have the power and the duty to control and prohibit pollution of air and water in accordance with the law and rules adopted and promulgated by it and, for this purpose, to:

(1)  Approve and promulgate current and long-range plans developed to provide for air and water quality control and pollution abatement.

(2)  Hire only such employees as may be necessary to effectuate the responsibilities of the department.

(3)  Utilize the facilities and personnel of other state agencies, including the Department of Health, and delegate to any such agency any duties and functions as the department may deem necessary to carry out the purposes of this act.

(4)  Secure necessary scientific, technical, research, administrative, and operational services by interagency agreement, by contract, or otherwise. All state agencies, upon direction of the department, shall make these services and facilities available.

(5)  Accept state appropriations and loans and grants from the Federal Government and from other sources, public or private, which loans and grants shall not be expended for other than the purposes of this act.

(6)  Exercise general supervision of the administration and enforcement of the laws, rules, and regulations pertaining to air and water pollution.

(7)  Adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this act. Any rule adopted pursuant to this act shall be consistent with the provisions of federal law, if any, relating to control of emissions from motor vehicles, effluent limitations, pretreatment requirements, or standards of performance. No county, municipality, or political subdivision shall adopt or enforce any local ordinance, special law, or local regulation requiring the installation of Stage II vapor recovery systems, as currently defined by department rule, unless such county, municipality, or political subdivision is or has been in the past designated by federal regulation as a moderate, serious, or severe ozone nonattainment area. Rules adopted pursuant to this act shall not require dischargers of waste into waters of the state to improve natural background conditions. Discharges from steam electric generating plants existing or licensed under this chapter on July 1, 1984, shall not be required to be treated to a greater extent than may be necessary to assure that the quality of nonthermal components of discharges from nonrecirculated cooling water systems is as high as the quality of the makeup waters; that the quality of nonthermal components of discharges from recirculated cooling water systems is no lower than is allowed for blowdown from such systems; or that the quality of noncooling system discharges which receive makeup water from a receiving body of water which does not meet applicable department water quality standards is as high as the quality of the receiving body of water. The department may not adopt standards more stringent than federal regulations, except as provided in s. 403.804.

(8)  Issue such orders as are necessary to effectuate the control of air and water pollution and enforce the same by all appropriate administrative and judicial proceedings.

(9)  Adopt a comprehensive program for the prevention, control, and abatement of pollution of the air and waters of the state, and from time to time review and modify such program as necessary.

(10)  Develop a comprehensive program for the prevention, abatement, and control of the pollution of the waters of the state. In order to effect this purpose, a grouping of the waters into classes may be made in accordance with the present and future most beneficial uses. Such classifications may from time to time be altered or modified. However, before any such classification is made, or any modification made thereto, public hearings shall be held by the department.

(11)  Establish ambient air quality and water quality standards for the state as a whole or for any part thereof, and also standards for the abatement of excessive and unnecessary noise. The department is authorized to establish reasonable zones of mixing for discharges into waters. For existing installations as defined by rule 62-520.200(10), Florida Administrative Code, effective July 12, 2009, zones of discharge to groundwater are authorized horizontally to a facility's or owner's property boundary and extending vertically to the base of a specifically designated aquifer or aquifers. Such zones of discharge may be modified in accordance with procedures specified in department rules. Exceedance of primary and secondary groundwater standards that occur within a zone of discharge does not create liability pursuant to this chapter or chapter 376 for site cleanup, and the exceedance of soil cleanup target levels is not a basis for enforcement or site cleanup.

(a)  When a receiving body of water fails to meet a water quality standard for pollutants set forth in department rules, a steam electric generating plant discharge of pollutants that is existing or licensed under this chapter on July 1, 1984, may nevertheless be granted a mixing zone, provided that:

1.  The standard would not be met in the water body in the absence of the discharge;

2.  The discharge is in compliance with all applicable technology-based effluent limitations;

3.   The discharge does not cause a measurable increase in the degree of noncompliance with the standard at the boundary of the mixing zone; and

4.   The discharge otherwise complies with the mixing zone provisions specified in department rules.

(b)   Mixing zones for point source discharges are not permitted in Outstanding Florida Waters except for:

1.   Sources that have received permits from the department prior to April 1, 1982, or the date of designation, whichever is later;

2.   Blowdown from new power plants certified pursuant to the Florida Electrical Power Plant Siting Act;

3.   Discharges of water necessary for water management purposes which have been approved by the governing board of a water management district and, if required by law, by the secretary; and

4.   The discharge of demineralization concentrate which has been determined permittable under s. 403.0882 and which meets the specific provisions of s. 403.0882(4)(a) and (b), if the proposed discharge is clearly in the public interest.

(c)   The department, by rule, shall establish water quality criteria for wetlands which criteria give appropriate recognition to the water quality of such wetlands in their natural state.

This act may not be construed to invalidate any existing department rule relating to mixing zones. The department shall cooperate with the Department of Highway Safety and Motor Vehicles in the development of regulations required by s. 316.272(1).

(12)(a)   Cause field studies to be made and samples to be taken out of the air and from the waters of the state periodically and in a logical geographic manner so as to determine the levels of air quality of the air and water quality of the waters of the state.

(b)   Determine the source of the pollution whenever a study is made or a sample collected which proves to be below the air or water quality standard set for air or water.

(13)   Require persons engaged in operations which may result in pollution to file reports which may contain information relating to locations, size of outlet, height of outlet, rate and period of emission, and composition and concentration of effluent and such other information as the department shall prescribe to be filed relative to pollution.

(14)   Establish a permit system whereby a permit may be required for the operation, construction, or expansion of any installation that may be a source of air or water pollution and provide for the issuance and revocation of such permits and for the posting of an appropriate bond to operate.

(a)   Notwithstanding any other provision of this chapter, the department may authorize, by rule, the Department of Transportation to perform any activity requiring a permit from the department covered by this chapter, upon certification by the Department of Transportation that it will meet all requirements imposed by statute, rule, or standard for environmental control and protection as such statute, rule, or standard applies to a governmental program. To this end, the department may accept such certification of compliance for programs of the Department of Transportation, may conduct investigations for compliance, and, if a violation is found to exist, may take all necessary enforcement action pertaining thereto, including, but not limited to, the revocation of certification. The authorization shall be by rule of the department, shall be limited to the maintenance, repair, or replacement of existing structures, and shall be conditioned upon compliance by the Department of Transportation with specific guidelines or requirements which are set forth in the formal acceptance and deemed necessary by the department to assure future compliance with this chapter and applicable department rules. The failure of the Department of Transportation to comply with any provision of the written acceptance shall constitute grounds for its revocation by the department.

(b)   The provisions of chapter 120 shall be accorded any person when substantial interests will be affected by an activity proposed to be conducted by the Department of Transportation pursuant to its certification and the acceptance of the department. If a proceeding is conducted pursuant to ss. 120.569 and 120.57, the department may intervene as a party. Should an administrative law judge of the Division of Administrative Hearings of the Department of Management Services submit a recommended order pursuant to ss. 120.569 and 120.57, the

department shall issue a final department order adopting, rejecting, or modifying the recommended order pursuant to such action.

(15)   Consult with any person proposing to construct, install, or otherwise acquire a pollution control device or system concerning the efficacy of such device or system, or the pollution problem which may be related to the source, device, or system. Nothing in any such consultation shall be construed to relieve any person from compliance with this act, rules and regulations of the department, or any other provision of law.

(16)   Encourage voluntary cooperation by persons and affected groups to achieve the purposes of this act.

(17)   Encourage local units of government to handle pollution problems within their respective jurisdictions on a cooperative basis and provide technical and consultative assistance therefor.

(18)   Encourage and conduct studies, investigations, and research relating to pollution and its causes, effects, prevention, abatement, and control.

(19)   Make a continuing study of the effects of the emission of air contaminants from motor vehicles on the quality of the outdoor atmosphere of this state and the several parts thereof and make recommendations to appropriate public and private bodies with respect thereto.

(20)   Collect and disseminate information and conduct educational and training programs relating to pollution.

(21)   Advise, consult, cooperate, and enter into agreements with other agencies of the state, the Federal Government, other states, interstate agencies, groups, political subdivisions, and industries affected by the provisions of this act, rules, or policies of the department. However, the secretary of the department shall not enter into any interstate agreement relating to the transport of ozone precursor pollutants, nor modify its rules based upon a recommendation from the Ozone Transport Assessment Group or any other such organization that is not an official subdivision of the United States Environmental Protection Agency but which studies issues related to the transport of ozone precursor pollutants, without prior review and specific legislative approval.

(22)   Adopt, modify, and repeal rules governing the specifications, construction, and maintenance of industrial reservoirs, dams, and containers which store or retain industrial wastes of a deleterious nature.

(23)   Adopt rules and regulations to ensure that no detergents are sold in Florida which are reasonably found to have a harmful or deleterious effect on human health or on the environment. Any regulations adopted pursuant to this subsection shall apply statewide. Subsequent to the promulgation of such rules and regulations, no county, municipality, or other local political subdivision shall adopt or enforce any local ordinance, special law, or local regulation governing detergents which is less stringent than state law or regulation. Regulations, ordinances, or special acts adopted by a county or municipality governing detergents shall be subject to approval by the department, except that regulations, ordinances, or special acts adopted by any county or municipality with a local pollution control program approved pursuant to s. 403.182 shall be approved as an element of the local pollution control program.

(24)(a)   Establish a permit system to provide for spoil site approval, as may be requested and required by local governmental agencies as defined in s. 403.1835(2)(c), or mosquito control districts as defined in s. 388.011(5), to facilitate these agencies in providing spoil sites for the deposit of spoil from maintenance dredging of navigation channels, port harbors, turning basins, and harbor berths, as part of a federal project, when the agency is acting as sponsor of a contemplated dredge and fill operation involving an established navigation channel, harbor, turning basin, or harbor berth. A spoil site approval granted to the agency shall be granted for a period of 10 to 25 years when such site is not inconsistent with an adopted local governmental comprehensive plan and the requirements of this chapter. The department shall periodically review each permit to determine compliance with the terms and conditions of the permit. Such review shall be conducted at least once every 10 years.

(b)   This subsection applies only to those maintenance dredging operations permitted after July 1, 1980, where the United States Army Corps of Engineers is the prime dredge and fill agent and the local governmental agency is acting as sponsor for the operation, and does not require the redesignation of currently approved spoil sites under such previous operations.

(25)   Establish and administer a program for the restoration and preservation of bodies of water within the state. The department shall have the power to acquire lands, to cooperate with other applicable state or local

agencies to enhance existing public access to such bodies of water, and to adopt all rules necessary to accomplish this purpose.

(26)(a)    Develop standards and criteria for waters used for deepwater shipping which standards and criteria consider existing water quality; appropriate mixing zones and other requirements for maintenance dredging in previously constructed deepwater navigation channels, port harbors, turning basins, or harbor berths; and appropriate mixing zones for disposal of spoil material from dredging and, where necessary, develop a separate classification for such waters. Such classification, standards, and criteria shall recognize that the present dedicated use of these waters is for deepwater commercial navigation.

(b)    The provisions of paragraph (a) apply only to the port waters, spoil disposal sites, port harbors, navigation channels, turning basins, and harbor berths used for deepwater commercial navigation in the ports of Jacksonville, Tampa, Port Everglades, Miami, Port Canaveral, Ft. Pierce, Palm Beach, Port Manatee, Port St. Joe, Panama City, St. Petersburg, Port Bartow, Florida Power Corporation's Crystal River Canal, Boca Grande, Green Cove Springs, and Pensacola.

(27)    Establish rules which provide for a special category of water bodies within the state, to be referred to as "Outstanding Florida Waters," which water bodies shall be worthy of special protection because of their natural attributes. Nothing in this subsection shall affect any existing rule of the department.

(28)    Perform any other act necessary to control and prohibit air and water pollution, and to delegate any of its responsibilities, authority, and powers, other than rulemaking powers, to any state agency now or hereinafter established.

(29)(a)    Adopt by rule special criteria to protect Class II and Class III shellfish harvesting waters. Such rules may include special criteria for approving docking facilities that have 10 or fewer slips if the construction and operation of such facilities will not result in the closure of shellfish waters.

(b)    Adopt by rule a specific surface water classification to protect surface waters used for treated potable water supply. These designated surface waters shall have the same water quality criteria protections as waters designated for fish consumption, recreation, and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife, and shall be free from discharged substances at a concentration that, alone or in combination with other discharged substances, would require significant alteration of permitted treatment processes at the permitted treatment facility or that would otherwise prevent compliance with applicable state drinking water standards in the treated water. Notwithstanding this classification or the inclusion of treated water supply as a designated use of a surface water, a surface water used for treated potable water supply may be reclassified to the potable water supply classification.

(30)    Establish requirements by rule that reasonably protect the public health and welfare from electric and magnetic fields associated with existing 230 kV or greater electrical transmission lines, new 230 kV and greater electrical transmission lines for which an application for certification under the Florida Electric Transmission Line Siting Act, ss. 403.52-403.5365, is not filed, new or existing electrical transmission or distribution lines with voltage less than 230 kV, and substation facilities. Notwithstanding any other provision in this chapter or any other law of this state or political subdivision thereof, the department shall have exclusive jurisdiction in the regulation of electric and magnetic fields associated with all electrical transmission and distribution lines and substation facilities. However, nothing herein shall be construed as superseding or repealing the provisions of s. 403.523(1) and (10).

(31)    Adopt rules necessary to obtain approval from the United States Environmental Protection Agency to administer the Federal National Pollution Discharge Elimination System (NPDES) permitting program in Florida under ss. 318, 402, and 405 of the federal Clean Water Act, Pub. L. No. 92-500, as amended. This authority shall be implemented consistent with the provisions of part II, which shall be applicable to facilities certified thereunder. The department shall establish all rules, standards, and requirements that regulate the discharge of pollutants into waters of the United States as defined by and in a manner consistent with federal regulations; provided, however, that the department may adopt a standard that is stricter or more stringent than one set by the United States Environmental Protection Agency if approved by the Governor and Cabinet in accordance with the procedures of s. 403.804(2).

(32)  Coordinate the state's stormwater program.

(33)  Establish and administer programs providing appropriate incentives that have the following goals, in order of importance:

(a)  Preventing and reducing pollution at its source.

(b)  Recycling contaminants that have the potential to pollute.

(c)  Treating and neutralizing contaminants that are difficult to recycle.

(d)  Disposing of contaminants only after other options have been used to the greatest extent practicable.

(34)  Adopt rules which may include stricter permitting and enforcement provisions within Outstanding Florida Waters, aquatic preserves, areas of critical state concern, and areas subject to chapter 380 resource management plans adopted by rule by the Administration Commission, when the plans for an area include waters that are particularly identified as needing additional protection, which provisions are not inconsistent with the applicable rules adopted for the management of such areas by the department and the Governor and Cabinet.

(35)  Exercise the duties, powers, and responsibilities required of the state under the federal Clean Air Act, 42 U.S.C. ss. 7401 et seq. The department shall implement the programs required under that act in conjunction with its other powers and duties. Nothing in this subsection shall be construed to repeal or supersede any of the department's existing rules.

(36)  Establish statewide standards for persons engaged in determining visible air emissions and to require these persons to obtain training to meet such standards.

(37)  Provide a supplemental permitting process for the issuance of a joint coastal permit pursuant to s. 161.055 or environmental resource permit pursuant to part IV of chapter 373, to a port listed in s. 311.09(1), for maintenance dredging and the management of dredged materials from maintenance dredging of all navigation channels, port harbors, turning basins, and harbor berths. Such permit shall be issued for a period of 5 years and shall be annually extended for an additional year if the port is in compliance with all permit conditions at the time of extension. The department is authorized to adopt rules to implement this subsection.

(38)  Provide a supplemental permitting process for the issuance of a conceptual joint coastal permit pursuant to s. 161.055 or environmental resource permit pursuant to part IV of chapter 373, to a port listed in s. 311.09(1), for dredging and the management of materials from dredging and for other related activities necessary for development, including the expansion of navigation channels, port harbors, turning basins, harbor berths, and associated facilities. Such permit shall be issued for a period of up to 15 years. The department is authorized to adopt rules to implement this subsection.

(39)  Enter into a memorandum of agreement with the Florida Inland Navigation District and the West Coast Inland Navigation District, or their successor agencies, to provide a supplemental process for issuance of joint coastal permits pursuant to s. 161.055 or environmental resource permits pursuant to part IV of chapter 373 for regional waterway management activities, including, but not limited to, maintenance dredging, spoil disposal, public recreation, inlet management, beach nourishment, and environmental protection directly related to public navigation and the construction, maintenance, and operation of Florida's inland waterways. The department is authorized to adopt rules to implement this subsection.

(40)  Maintain a list of projects or activities, including mitigation banks, which applicants may consider when developing proposals in order to meet the mitigation or public interest requirements of this chapter, chapter 253, or chapter 373. The contents of such list are not a rule as defined in chapter 120, and listing a specific project or activity does not imply department approval for such project or activity. Each county government is encouraged to develop an inventory of projects or activities for inclusion on the list by obtaining input from local stakeholders in the public, private, and nonprofit sectors, including local governments, port authorities, marine contractors, other representatives of the marine construction industry, environmental or conservation organizations, and other interested parties. A county may establish dedicated trust funds for depositing public interest donations to be used for future public interest projects, including improving on-water law enforcement capabilities.

[1](41)  Expand the use of online self-certification for appropriate exemptions and general permits issued by the department or the water management districts if such expansion is economically feasible. Notwithstanding any other provision of law, a local government may not specify the method or form for documenting that a project

qualifies for an exemption or meets the requirements for a permit under chapter 161, chapter 253, chapter 373, or this chapter. This limitation of local government authority extends to Internet-based department programs that provide for self-certification.

(42) Serve as the state's single point of contact for performing the responsibilities described in Presidential Executive Order 12372, including administration and operation of the Florida State Clearinghouse. The Florida State Clearinghouse shall be responsible for coordinating interagency reviews of the following: federal activities and actions subject to the federal consistency requirements of s. 307 of the Coastal Zone Management Act; documents prepared pursuant to the National Environmental Policy Act, 42 U.S.C. ss. 4321 et seq., and the Outer Continental Shelf Lands Act, 43 U.S.C. ss. 1331 et seq.; applications for federal funding pursuant to s. 216.212; and other notices and information regarding federal activities in the state, as appropriate. The Florida State Clearinghouse shall ensure that state agency comments and recommendations on the environmental, social, and economic impact of proposed federal actions are communicated to federal agencies, applicants, local governments, and interested parties.

(43)(a) Implement ss. 403.067 and 403.088 in flowing waters consistent with the attainment and maintenance of:

1. The narrative criterion for nutrients and any in-stream numeric interpretation of the narrative water quality criterion for nutrients adopted by the department in streams, canals, and other conveyances; and

2. Nutrient water quality standards applicable to downstream waters.

(b) The loading of nutrients to downstream waters from a stream, canal, or other conveyance shall be limited to provide for the attainment and maintenance of nutrient water quality standards in the downstream waters.

1. If the downstream water does not have a total maximum daily load adopted under s. 403.067 and has not been verified as impaired by nutrient loadings, then the department shall implement its authority in a manner that prevents impairment of the downstream water due to loadings from the upstream water.

2. If the downstream water does not have a total maximum daily load adopted under s. 403.067 but has been verified as impaired by nutrient loadings, then the department shall adopt a total maximum daily load under s. 403.067.

3. If the downstream water has a total maximum daily load adopted under s. 403.067 that interprets the narrative water quality criterion for nutrients, then allocations shall be set for upstream water bodies in accordance with s. 403.067(6), and if applicable, the basin management action plan established under s. 403.067(7).

(c) Compliance with an allocation calculated under s. 403.067(6) or, if applicable, the basin management action plan established under s. 403.067(7) for the downstream water shall constitute reasonable assurance that a discharge does not cause or contribute to the violation of the downstream nutrient water quality standards.

(44) Adopt rules requiring or incentivizing the electronic submission of forms, documents, fees, or reports required under chapter 161, chapter 253, chapter 373, chapter 376, chapter 377, or this chapter. The rules must reasonably accommodate technological or financial hardship and provide procedures for obtaining an exemption due to such hardship.

The department shall implement such programs in conjunction with its other powers and duties and shall place special emphasis on reducing and eliminating contamination that presents a threat to humans, animals or plants, or to the environment.

History.—s. 7, ch. 67-436; ss. 19, 26, 35, ch. 69-106; s. 1, ch. 71-35; s. 2, ch. 71-36; s. 3, ch. 72-39; s. 1, ch. 72-53; s. 113, ch. 73-333; s. 3, ch. 74-133; s. 1, ch. 77-21; s. 137, ch. 77-104; s. 268, ch. 77-147; s. 2, ch. 77-369; s. 14, ch. 78-95; s. 2, ch. 78-437; s. 73, ch. 79-65; s. 1, ch. 79-130; s. 96, ch. 79-164; s. 160, ch. 79-400; s. 1, ch. 80-66; ss. 2, 5, ch. 81-228; s. 5, ch. 82-27; s. 1, ch. 82-79; s. 2, ch. 82-80; ss. 66, ch. 83-310; s. 5, ch. 84-79; s. 1, ch. 84-338; s. 1, ch. 85-296; s. 5, ch. 85-345; s. 5, ch. 86-173; s. 52, ch. 86-186; s. 22, ch. 88-393; s. 31, ch. 89-279; s. 54, ch. 90-331; s. 24, ch. 91-305; s. 23, ch. 92-303; s. 127, ch. 92-279; s. 55, ch. 92-326; s. 36, ch. 93-213; s. 5, ch. 94-311; s. 1, ch. 94-321; s. 356, ch. 94-356; s. 55, ch. 95-144; s. 144, ch. 96-320; s. 8, ch. 96-370; s. 129, ch. 96-410; s. 26, ch. 97-160; s. 100, ch. 98-200; s. 3, ch. 98-326; s. 155, ch. 99-8; s. 2, ch. 2001-188; s. 1, ch. 2001-224; s. 8, ch. 2002-275; s. 68, ch. 2006-230; s. 42, ch. 2010-147; s. 4, ch. 2010-201; s. 2, ch. 2010-208; s. 12, ch. 2012-205; s. 1, ch. 2013-71; s. 17, ch. 2013-92; s. 94, ch. 2014-17; s. 30, ch. 2016-1; s. 47, ch. 2018-110.

[1]**Note.**—As enacted by s. 42, ch. 2010-147. For a description of multiple acts in the same session affecting a statutory provision, *see* preface to the *Florida Statutes*, "Statutory Construction." Subsection (41) was also added by s. 2, ch. 2010-208, and that version reads:

   (41)  Expand the use of online self-certification and other forms of online authorization for appropriate exemptions, general permits, and individual permits by the department and the water management districts if such expansion is economically feasible. The department shall report on the progress of these activities to the President of the Senate, the Speaker of the House of Representatives, and the Legislative Committee on Intergovernmental Relations by February 15, 2011. Notwithstanding any other provision of law, a local government may not specify the method or form for documenting that a project meets the requirements for authorization under chapter 161, chapter 253, chapter 373, or this chapter. This includes Internet-based department programs that provide for self-certification.

**403.0611   Alternative methods of regulatory permitting; department duties.**—The Department of Environmental Protection is directed to explore alternatives to traditional methods of regulatory permitting, provided that such alternative methods will not allow a material increase in pollution emissions or discharges. Working with industry, business associations, other government agencies, and interested parties, the department is directed to consider specific limited pilot projects to test new compliance measures. These measures should include, but not be limited to, reducing transaction costs for business and government and providing economic incentives for emissions reductions. The department shall report to the Legislature prior to implementation of a pilot project initiated pursuant to this section.

   **History.**—s. 12, ch. 2000-304.

**403.0615   Water resources restoration and preservation.**—

   (1)   This section may be cited as the "Water Resources Restoration and Preservation Act."

   (2)   Subject to specific legislative appropriation, the department shall establish a program to assist in the restoration and preservation of bodies of water and to enhance existing public access when deemed necessary for the enhancement of the restoration effort.

   (3)   The department shall adopt, by rule, criteria for the allocation of restoration and preservation funds. Such criteria shall include, but not be limited to, the following:

   (a)   The degree of water quality degradation;

   (b)   The degree to which sources of pollution which have contributed to the need for restoration or preservation have been abated;

   (c)   The public uses which can be made of the subject waters;

   (d)   The ecological value of the subject waters in relation to other waters proposed for restoration and preservation;

   (e)   The implementation by local government of regulatory or management programs to prevent further and subsequent degradation of the subject waters; and

   (f)   The commitment of local government resources to assist in the proposed restoration and preservation.

   (4)   The provisions of this act are for the benefit of the public and shall be liberally construed to accomplish the purposes set forth in this act.

   **History.**—ss. 1, 4, 5, ch. 77-369; s. 2, ch. 79-130; s. 25, ch. 93-120; s. 357, ch. 94-356; s. 59, ch. 96-321; s. 69, ch. 2015-229.

**403.0617   Innovative nutrient and sediment reduction and conservation pilot project program.**—

   (1)   Contingent upon a specific appropriation in the General Appropriation Act, the department may fund innovative nutrient and sediment reduction and conservation pilot projects selected pursuant to this section. These pilot projects are intended to test the effectiveness of innovative or existing nutrient reduction or water conservation technologies, programs, or practices designed to minimize nutrient pollution or restore flows in the water bodies of the state.

   (2)   By October 1, 2016, the department shall initiate rulemaking to establish criteria by which the department will evaluate and rank pilot projects for funding. The criteria must include a determination by the department that the pilot project will not be harmful to the ecological resources in the study area. The criteria must give preference to projects that will result in the greatest improvement to water quality and water quantity for the dollars to be expended for the project. At a minimum, the department shall consider all of the following:

(a)　The level of nutrient impairment of the water body, watershed, or water segment in which the project is located.

(b)　The quantity of nutrients the project is estimated to remove from a water body, watershed, or water segment with a nutrient total maximum daily load.

(c)　The potential for the project to provide a cost-effective solution to pollution, including pollution caused by onsite sewage treatment and disposal systems.

(d)　The anticipated impact the project will have on restoring or increasing flow or water level.

(e)　The amount of matching funds for the project which will be provided by the entities responsible for implementing the project.

(f)　Whether the project is located in a rural area of opportunity, as defined in s. 288.0656, with preference given to the local government responsible for implementing the project.

(g)　For multiple-year projects, whether the project has funding sources that are identified and assured through the expected completion date of the project.

(h)　The cost of the project and the length of time it will take to complete relative to its expected benefits.

(i)　Whether the entities responsible for implementing the project have used their own funds for projects to improve water quality or conserve water use with preference given to those entities that have expended such funds.

**History.**—s. 31, ch. 2016-1.

**403.062　Pollution control; underground, surface, and coastal waters.**—The department and its agents shall have general control and supervision over underground water, lakes, rivers, streams, canals, ditches, and coastal waters under the jurisdiction of the state insofar as their pollution may affect the public health or impair the interest of the public or persons lawfully using them.

**History.**—s. 2, ch. 29834, 1955; ss. 26, 35, ch. 69-106.
**Note.**—Former s. 381.43; s. 381.251.

**403.0623　Environmental data; quality assurance.**—

(1)　The department must establish, by rule, appropriate quality assurance requirements for environmental data submitted to the department and the criteria by which environmental data may be rejected by the department. The department may adopt and enforce rules to establish data quality objectives and specify requirements for training of laboratory and field staff, sample collection methodology, proficiency testing, and audits of laboratory and field sampling activities. Such rules may be in addition to any laboratory certification provisions under ss. 403.0625 and 403.863.

(2)(a)　The department, in coordination with the water management districts, regional water supply authorities, and the Department of Agriculture and Consumer Services, shall establish standards for the collection and analysis of water quantity, water quality, and related data to ensure quality, reliability, and validity of the data and testing results.

(b)　To the extent practicable, the department shall coordinate with federal agencies to ensure that its collection and analysis of water quality, water quantity, and related data, which may be used by any state agency, water management district, or local government, is consistent with this subsection.

(c)　To receive state funds for the acquisition of land or the financing of a water resource project, state agencies and water management districts must show that they followed the department's collection and analysis standards, if available, as a prerequisite for any such request for funding.

(d)　The department and the water management districts may adopt rules to implement this subsection.
**History.**—s. 1, ch. 98-43; s. 16, ch. 2008-150; s. 32, ch. 2016-1.

**403.0625　Environmental laboratory certification; water quality tests conducted by a certified laboratory.**—

(1)　To assure the acceptable quality, reliability, and validity of testing results, the department and the Department of Health shall jointly establish criteria for certification of laboratories that perform analyses of

environmental samples that are not covered by the provisions in s. 403.863. The Department of Health shall have the responsibility for the operation and implementation of such laboratory certification. The Department of Health may charge and collect fees for the certification of such laboratories. The fee schedule shall be based on the number of analytical functions for which certification is sought. Such fees shall be sufficient to meet the costs incurred by the Department of Health in administering this program in coordination with the department. All fees collected pursuant to this section shall be deposited in a trust fund to be administered by the Department of Health and shall be used only for the purposes of this section.

(2) An environmental water quality test to determine the quality of the effluent of a domestic wastewater facility must be conducted by a laboratory certified under this section if such test results are to be submitted to the department or a local pollution control program pursuant to s. 403.182.

(3) The Department of Health may adopt and enforce rules to administer this section, including, but not limited to, definitions of terms, certified laboratory personnel requirements, sample collection methodology and proficiency testing, the format and frequency of reports, onsite inspections of laboratories, and quality assurance.

(4) The following acts constitute grounds for which the disciplinary actions specified in subsection (5) may be taken:

(a) Making false statements on an application or on any document associated with certification.

(b) Making consistent errors in analyses or erroneous reporting.

(c) Permitting personnel who are not qualified, as required by rules of the Department of Health, to perform analyses.

(d) Falsifying the results of analyses.

(e) Failing to employ approved laboratory methods in performing analyses as outlined in rules of the Department of Health.

(f) Failing to properly maintain facilities and equipment according to the laboratory's quality assurance plan.

(g) Failing to report analytical test results or maintain required records of test results as outlined in rules of the Department of Health.

(h) Failing to participate successfully in a performance evaluation program approved by the Department of Health.

(i) Violating any provision of this section or of the rules adopted under this section.

(j) Falsely advertising services or credentials.

(k) Failing to pay fees for initial certification or renewal certification or to pay inspection expenses incurred by the Department of Health.

(l) Failing to report any change of an item included in the initial or renewal certification application.

(m) Refusing to allow representatives of the department or the Department of Health to inspect a laboratory and its records during normal business hours.

(5) When the Department of Health finds any applicant or certificateholder guilty of any of the grounds set forth in subsection (4), it may enter an order imposing one or more of the following penalties:

(a) Denial of an application for certification.

(b) Revocation or suspension of certification.

(c) Imposition of an administrative fine not to exceed $1,000 for each count or separate offense.

(d) Issuance of a reprimand.

(e) Placement of the certification on probation for a period of time and subject to such conditions as the Department of Health specifies.

(f) Restricting the authorized scope of the certification.

(6) The certification program shall be governed by chapter 120.

History.—s. 7, ch. 85-269; s. 3, ch. 88-89; s. 358, ch. 94-356; s. 22, ch. 98-151.


**403.063**   **Groundwater quality monitoring.**—

(1) The department, in cooperation with other state and federal agencies, water management districts, and local governments, shall establish a groundwater quality monitoring network designed to detect or predict

contamination of the groundwater resources of the state.

(2)  The department may by rule determine the priority of sites to be monitored within such groundwater quality monitoring network, based upon the following criteria:

(a)  The degree of danger to the public health caused or potentially caused by contamination.

(b)  The susceptibility of each site to contamination.

(3)  This information shall be made available to state and federal agencies and local governments to facilitate their regulatory and land use planning decisions.

(4)  To the greatest extent practicable, the actual sampling and testing of groundwater pursuant to the provisions of this section may be conducted by local and regional agencies.

History.—s. 3, ch. 83-310.

### 403.064  Reuse of reclaimed water.—

(1)  The encouragement and promotion of water conservation, and reuse of reclaimed water, as defined by the department, are state objectives and are considered to be in the public interest. The Legislature finds that the reuse of reclaimed water is a critical component of meeting the state's existing and future water supply needs while sustaining natural systems. The Legislature further finds that for those wastewater treatment plants permitted and operated under an approved reuse program by the department, the reclaimed water shall be considered environmentally acceptable and not a threat to public health and safety. The Legislature encourages the development of incentive-based programs for reuse implementation.

(2)  All applicants for permits to construct or operate a domestic wastewater treatment facility located within, serving a population located within, or discharging within a water resource caution area shall prepare a reuse feasibility study as part of their application for the permit. Reuse feasibility studies shall be prepared in accordance with department guidelines adopted by rule and shall include, but are not limited to:

(a)  Evaluation of monetary costs and benefits for several levels and types of reuse.

(b)  Evaluation of water savings if reuse is implemented.

(c)  Evaluation of rates and fees necessary to implement reuse.

(d)  Evaluation of environmental and water resource benefits associated with reuse.

(e)  Evaluation of economic, environmental, and technical constraints.

(f)  A schedule for implementation of reuse. The schedule shall consider phased implementation.

(3)  The permit applicant shall prepare a plan of study for the reuse feasibility study consistent with the reuse feasibility study guidelines adopted by department rule. The plan of study shall include detailed descriptions of applicable treatment and water supply alternatives to be evaluated and the methods of analysis to be used. The plan of study shall be submitted to the department for review and approval.

(4)  The study required under subsection (2) shall be performed by the applicant, and, if the study shows that the reuse is feasible, the applicant must give significant consideration to its implementation if the study complies with the requirements of subsections (2) and (3).

(5)  A reuse feasibility study is not required if:

(a)  The domestic wastewater treatment facility has an existing or proposed permitted or design capacity less than 0.1 million gallons per day; or

(b)  The permitted reuse capacity equals or exceeds the total permitted capacity of the domestic wastewater treatment facility.

(6)  A reuse feasibility study prepared under subsection (2) satisfies a water management district requirement to conduct a reuse feasibility study imposed on a local government or utility that has responsibility for wastewater management. The data included in the study and the conclusions of the study must be given significant consideration by the applicant and the appropriate water management district in an analysis of the economic, environmental, and technical feasibility of providing reclaimed water for reuse under part II of chapter 373 and must be presumed relevant to the determination of feasibility. A water management district may not require a separate study when a reuse feasibility study has been completed under subsection (2).

(7)   Local governments may allow the use of reclaimed water for inside activities, including, but not limited to, toilet flushing, fire protection, and decorative water features, as well as for outdoor uses, provided the reclaimed water is from domestic wastewater treatment facilities which are permitted, constructed, and operated in accordance with department rules.

(8)   Permits issued by the department for domestic wastewater treatment facilities shall be consistent with requirements for reuse included in applicable consumptive use permits issued by the water management district, if such requirements are consistent with department rules governing reuse of reclaimed water. This subsection applies only to domestic wastewater treatment facilities which are located within, or serve a population located within, or discharge within water resource caution areas and are owned, operated, or controlled by a local government or utility which has responsibility for water supply and wastewater management.

(9)   Local governments may and are encouraged to implement programs for the reuse of reclaimed water. Nothing in this chapter shall be construed to prohibit or preempt such local reuse programs.

(10)   A local government that implements a reuse program under this section shall be allowed to allocate the costs in a reasonable manner.

(11)   Pursuant to chapter 367, the Florida Public Service Commission shall allow entities under its jurisdiction which conduct studies or implement reuse projects, including, but not limited to, any study required by subsection (2) or facilities used for reliability purposes for a reclaimed water reuse system, to recover the full, prudently incurred cost of such studies and facilities through their rate structure.

(12)   In issuing consumptive use permits, the permitting agency shall consider the local reuse program.

(13)   A local government shall require a developer, as a condition for obtaining a development order, to comply with the local reuse program.

(14)   After conducting a feasibility study under subsection (2), domestic wastewater treatment facilities that dispose of effluent by Class I deep well injection, as defined in 40 C.F.R. s. 144.6(a), must implement reuse to the degree that reuse is feasible, based upon the applicant's reuse feasibility study. Applicable permits issued by the department shall be consistent with the requirements of this subsection.

(a)   This subsection does not limit the use of a Class I deep well injection facility as backup for a reclaimed water reuse system.

(b)   This subsection applies only to domestic wastewater treatment facilities located within, serving a population located within, or discharging within a water resource caution area.

(15)   After conducting a feasibility study under subsection (2), domestic wastewater treatment facilities that dispose of effluent by surface water discharges or by land application methods must implement reuse to the degree that reuse is feasible, based upon the applicant's reuse feasibility study. This subsection does not apply to surface water discharges or land application systems which are currently categorized as reuse under department rules. Applicable permits issued by the department shall be consistent with the requirements of this subsection.

(a)   This subsection does not limit the use of a surface water discharge or land application facility as backup for a reclaimed water reuse system.

(b)   This subsection applies only to domestic wastewater treatment facilities located within, serving a population located within, or discharging within a water resource caution area.

(16)   Utilities implementing reuse projects are encouraged, except in the case of use by electric utilities as defined in s. 366.02(2), to meter use of reclaimed water by all end users and to charge for the use of reclaimed water based on the actual volume used when such metering and charges can be shown to encourage water conservation. Metering and the use of volume-based rates are effective water management tools for the following reuse activities: residential irrigation, agricultural irrigation, industrial uses, landscape irrigation, irrigation of other public access areas, commercial and institutional uses such as toilet flushing, and transfers to other reclaimed water utilities. Each domestic wastewater utility that provides reclaimed water for the reuse activities listed in this section shall include a summary of its metering and rate structure as part of its annual reuse report to the department.

**History.**—s. 7, ch. 89-324; s. 3, ch. 94-243; s. 8, ch. 95-323; s. 37, ch. 2002-296; s. 13, ch. 2004-381; s. 48, ch. 2018-110.

**403.0645    Reclaimed water use at state facilities.—**

(1)    The encouragement and promotion of reuse of reclaimed water has been established as a state objective in ss. 373.250 and 403.064. Reuse has become an integral part of water and wastewater management in Florida, and Florida is recognized as a national leader in water reuse.

(2)    The state and various state agencies and water management districts should take a leadership role in using reclaimed water in lieu of other water sources. The use of reclaimed water by state agencies and facilities will conserve potable water and will serve an important public education function.

(3)    Each state agency and water management district shall use reclaimed water to the greatest extent practicable for landscape irrigation, toilet flushing, aesthetic features such as decorative ponds and fountains, cooling water, and other useful purposes allowed by department rules at state facilities, including, but not limited to, parks, rest areas, visitor welcome centers, buildings, college campuses, and other facilities.

(4)    Each state agency and water management district shall submit to the Secretary of Environmental Protection by February 1 of each year a summary of activities designed to utilize reclaimed water at its facilities along with a summary of the amounts of reclaimed water actually used for beneficial purposes.

History.—s. 14, ch. 2004-381.

**403.067    Establishment and implementation of total maximum daily loads.—**

(1)    LEGISLATIVE FINDINGS AND INTENT.—In furtherance of public policy established in s. 403.021, the Legislature declares that the waters of the state are among its most basic resources and that the development of a total maximum daily load program for state waters as required by s. 303(d) of the Clean Water Act, Pub. L. No. 92-500, 33 U.S.C. ss. 1251 et seq. will promote improvements in water quality throughout the state through the coordinated control of point and nonpoint sources of pollution. The Legislature finds that, while point and nonpoint sources of pollution have been managed through numerous programs, better coordination among these efforts and additional management measures may be needed in order to achieve the restoration of impaired water bodies. The scientifically based total maximum daily load program is necessary to fairly and equitably allocate pollution loads to both nonpoint and point sources. Implementation of the allocation shall include consideration of a cost-effective approach coordinated between contributing point and nonpoint sources of pollution for impaired water bodies or water body segments and may include the opportunity to implement the allocation through nonregulatory and incentive-based programs. The Legislature further declares that the Department of Environmental Protection shall be the lead agency in administering this program and shall coordinate with local governments, water management districts, the Department of Agriculture and Consumer Services, local soil and water conservation districts, environmental groups, regulated interests, other appropriate state agencies, and affected pollution sources in developing and executing the total maximum daily load program.

(2)    LIST OF SURFACE WATERS OR SEGMENTS.—In accordance with s. 303(d) of the Clean Water Act, Pub. L. No. 92-500, 33 U.S.C. ss. 1251 et seq., the department must submit periodically to the United States Environmental Protection Agency a list of surface waters or segments for which total maximum daily load assessments will be conducted. The assessments shall evaluate the water quality conditions of the listed waters and, if such waters are determined not to meet water quality standards, total maximum daily loads shall be established, subject to the provisions of subsection (4). The department shall establish a priority ranking and schedule for analyzing such waters.

(a)    The list, priority ranking, and schedule cannot be used in the administration or implementation of any regulatory program. However, this paragraph does not prohibit any agency from employing the data or other information used to establish the list, priority ranking, or schedule in administering any program.

(b)    The list, priority ranking, and schedule prepared under this subsection shall be made available for public comment, but shall not be subject to challenge under chapter 120.

(c)    The provisions of this subsection are applicable to all lists prepared by the department and submitted to the United States Environmental Protection Agency pursuant to s. 303(d) of the Clean Water Act, Pub. L. No. 92-500, 33 U.S.C. ss. 1251 et seq., including those submitted prior to the effective date of this act, except as provided in subsection (4).

(d)   If the department proposes to implement total maximum daily load calculations or allocations established prior to the effective date of this act, the department shall adopt those calculations and allocations by rule by the secretary pursuant to ss. 120.536(1) and 120.54 and paragraph (6)(c).

(3)   ASSESSMENT.—

(a)   Based on the priority ranking and schedule for a particular listed water body or water body segment, the department shall conduct a total maximum daily load assessment of the basin in which the water body or water body segment is located using the methodology developed pursuant to paragraph (b). In conducting this assessment, the department shall coordinate with the local water management district, the Department of Agriculture and Consumer Services, other appropriate state agencies, soil and water conservation districts, environmental groups, regulated interests, and other interested parties.

(b)   The department shall adopt by rule a methodology for determining those waters which are impaired. The rule shall provide for consideration as to whether water quality standards codified in chapter 62-302, Florida Administrative Code, are being exceeded, based on objective and credible data, studies and reports, including surface water improvement and management plans approved by water management districts and pollutant load reduction goals developed according to department rule. Such rule also shall set forth:

1.   Water quality sample collection and analysis requirements, accounting for ambient background conditions, seasonal and other natural variations;

2.   Approved methodologies;

3.   Quality assurance and quality control protocols;

4.   Data modeling; and

5.   Other appropriate water quality assessment measures.

(c)   If the department has adopted a rule establishing a numerical criterion for a particular pollutant, a narrative or biological criterion may not be the basis for determining an impairment in connection with that pollutant unless the department identifies specific factors as to why the numerical criterion is not adequate to protect water quality. If water quality nonattainment is based on narrative or biological criteria, the specific factors concerning particular pollutants shall be identified prior to a total maximum daily load being developed for those criteria for that surface water or surface water segment.

(4)   APPROVED LIST.—If the department determines, based on the total maximum daily load assessment methodology described in subsection (3), that water quality standards are not being achieved and that technology-based effluent limitations and other pollution control programs under local, state, or federal authority, including Everglades restoration activities pursuant to s. 373.4592 and the National Estuary Program, which are designed to restore such waters for the pollutant of concern are not sufficient to result in attainment of applicable surface water quality standards, it shall confirm that determination by issuing a subsequent, updated list of those water bodies or segments for which total maximum daily loads will be calculated. In association with this updated list, the department shall establish priority rankings and schedules by which water bodies or segments will be subjected to total maximum daily load calculations. If a surface water or water segment is to be listed under this subsection, the department must specify the particular pollutants causing the impairment and the concentration of those pollutants causing the impairment relative to the water quality standard. This updated list shall be approved and amended by order of the department subsequent to completion of an assessment of each water body or water body segment, and submitted to the United States Environmental Protection Agency. Each order shall be subject to challenge under ss. 120.569 and 120.57.

(5)   REMOVAL FROM LIST.—At any time throughout the total maximum daily load process, surface waters or segments evaluated or listed under this section shall be removed from the lists described in subsection (2) or subsection (4) upon demonstration that water quality criteria are being attained, based on data equivalent to that required by rule under subsection (3).

(6)   CALCULATION AND ALLOCATION.—

(a)   Calculation of total maximum daily load.

1.   Prior to developing a total maximum daily load calculation for each water body or water body segment on the list specified in subsection (4), the department shall coordinate with applicable local governments, water

management districts, the Department of Agriculture and Consumer Services, other appropriate state agencies, local soil and water conservation districts, environmental groups, regulated interests, and affected pollution sources to determine the information required, accepted methods of data collection and analysis, and quality control/quality assurance requirements. The analysis may include mathematical water quality modeling using approved procedures and methods.

2. The department shall develop total maximum daily load calculations for each water body or water body segment on the list described in subsection (4) according to the priority ranking and schedule unless the impairment of such waters is due solely to activities other than point and nonpoint sources of pollution. For waters determined to be impaired due solely to factors other than point and nonpoint sources of pollution, no total maximum daily load will be required. A total maximum daily load may be required for those waters that are impaired predominantly due to activities other than point and nonpoint sources. The total maximum daily load calculation shall establish the amount of a pollutant that a water body or water body segment may receive from all sources without exceeding water quality standards, and shall account for seasonal variations and include a margin of safety that takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality. The total maximum daily load may be based on a pollutant load reduction goal developed by a water management district, provided that such pollutant load reduction goal is promulgated by the department in accordance with the procedural and substantive requirements of this subsection.

(b) Allocation of total maximum daily loads. The total maximum daily loads shall include establishment of reasonable and equitable allocations of the total maximum daily load between or among point and nonpoint sources that will alone, or in conjunction with other management and restoration activities, provide for the attainment of the pollutant reductions established pursuant to paragraph (a) to achieve water quality standards for the pollutant causing impairment. The allocations may establish the maximum amount of the water pollutant that may be discharged or released into the water body or water body segment in combination with other discharges or releases. Allocations may also be made to individual basins and sources or as a whole to all basins and sources or categories of sources of inflow to the water body or water body segments. An initial allocation of allowable pollutant loads among point and nonpoint sources may be developed as part of the total maximum daily load. However, in such cases, the detailed allocation to specific point sources and specific categories of nonpoint sources shall be established in the basin management action plan pursuant to subsection (7). The initial and detailed allocations shall be designed to attain the pollutant reductions established pursuant to paragraph (a) and shall be based on consideration of the following:

1. Existing treatment levels and management practices;

2. Best management practices established and implemented pursuant to paragraph (7)(c);

3. Enforceable treatment levels established pursuant to state or local law or permit;

4. Differing impacts pollutant sources and forms of pollutant may have on water quality;

5. The availability of treatment technologies, management practices, or other pollutant reduction measures;

6. Environmental, economic, and technological feasibility of achieving the allocation;

7. The cost benefit associated with achieving the allocation;

8. Reasonable timeframes for implementation;

9. Potential applicability of any moderating provisions such as variances, exemptions, and mixing zones; and

10. The extent to which nonattainment of water quality standards is caused by pollution sources outside of Florida, discharges that have ceased, or alterations to water bodies prior to the date of this act.

(c) Adoption of rules. The total maximum daily load calculations and allocations established under this subsection for each water body or water body segment shall be adopted by rule by the secretary pursuant to ss. 120.536(1), 120.54, and 403.805. Where additional data collection and analysis are needed to increase the scientific precision and accuracy of the total maximum daily load, the department is authorized to adopt phased total maximum daily loads that are subject to change as additional data becomes available. Where phased total maximum daily loads are proposed, the department shall, in the detailed statement of facts and circumstances justifying the rule, explain why the data are inadequate so as to justify a phased total maximum daily load. The rules adopted pursuant to this paragraph are not subject to approval by the Environmental Regulation Commission

and are not subject to the provisions of s. 120.541(3). As part of the rule development process, the department shall hold at least one public workshop in the vicinity of the water body or water body segment for which the total maximum daily load is being developed. Notice of the public workshop shall be published not less than 5 days nor more than 15 days before the public workshop in a newspaper of general circulation in the county or counties containing the water bodies or water body segments for which the total maximum daily load calculation and allocation are being developed.

(7)   DEVELOPMENT OF BASIN MANAGEMENT PLANS AND IMPLEMENTATION OF TOTAL MAXIMUM DAILY LOADS.—

(a)   *Basin management action plans.*—

1.   In developing and implementing the total maximum daily load for a water body, the department, or the department in conjunction with a water management district, may develop a basin management action plan that addresses some or all of the watersheds and basins tributary to the water body. Such plan must integrate the appropriate management strategies available to the state through existing water quality protection programs to achieve the total maximum daily loads and may provide for phased implementation of these management strategies to promote timely, cost-effective actions as provided for in s. 403.151. The plan must establish a schedule implementing the management strategies, establish a basis for evaluating the plan's effectiveness, and identify feasible funding strategies for implementing the plan's management strategies. The management strategies may include regional treatment systems or other public works, where appropriate, and voluntary trading of water quality credits to achieve the needed pollutant load reductions.

2.   A basin management action plan must equitably allocate, pursuant to paragraph (6)(b), pollutant reductions to individual basins, as a whole to all basins, or to each identified point source or category of nonpoint sources, as appropriate. For nonpoint sources for which best management practices have been adopted, the initial requirement specified by the plan must be those practices developed pursuant to paragraph (c). Where appropriate, the plan may take into account the benefits of pollutant load reduction achieved by point or nonpoint sources that have implemented management strategies to reduce pollutant loads, including best management practices, before the development of the basin management action plan. The plan must also identify the mechanisms that will address potential future increases in pollutant loading.

3.   The basin management action planning process is intended to involve the broadest possible range of interested parties, with the objective of encouraging the greatest amount of cooperation and consensus possible. In developing a basin management action plan, the department shall assure that key stakeholders, including, but not limited to, applicable local governments, water management districts, the Department of Agriculture and Consumer Services, other appropriate state agencies, local soil and water conservation districts, environmental groups, regulated interests, and affected pollution sources, are invited to participate in the process. The department shall hold at least one public meeting in the vicinity of the watershed or basin to discuss and receive comments during the planning process and shall otherwise encourage public participation to the greatest practicable extent. Notice of the public meeting must be published in a newspaper of general circulation in each county in which the watershed or basin lies not less than 5 days nor more than 15 days before the public meeting. A basin management action plan does not supplant or otherwise alter any assessment made under subsection (3) or subsection (4) or any calculation or initial allocation.

4.   Each new or revised basin management action plan shall include:

a.   The appropriate management strategies available through existing water quality protection programs to achieve total maximum daily loads, which may provide for phased implementation to promote timely, cost-effective actions as provided for in s. 403.151;

b.   A description of best management practices adopted by rule;

c.   A list of projects in priority ranking with a planning-level cost estimate and estimated date of completion for each listed project;

d.   The source and amount of financial assistance to be made available by the department, a water management district, or other entity for each listed project, if applicable; and

e.   A planning-level estimate of each listed project's expected load reduction, if applicable.

5.   The department shall adopt all or any part of a basin management action plan and any amendment to such plan by secretarial order pursuant to chapter 120 to implement the provisions of this section.

6.   The basin management action plan must include milestones for implementation and water quality improvement, and an associated water quality monitoring component sufficient to evaluate whether reasonable progress in pollutant load reductions is being achieved over time. An assessment of progress toward these milestones shall be conducted every 5 years, and revisions to the plan shall be made as appropriate. Revisions to the basin management action plan shall be made by the department in cooperation with basin stakeholders. Revisions to the management strategies required for nonpoint sources must follow the procedures set forth in subparagraph (c)4. Revised basin management action plans must be adopted pursuant to subparagraph 5.

7.   In accordance with procedures adopted by rule under paragraph (9)(c), basin management action plans, and other pollution control programs under local, state, or federal authority as provided in subsection (4), may allow point or nonpoint sources that will achieve greater pollutant reductions than required by an adopted total maximum daily load or wasteload allocation to generate, register, and trade water quality credits for the excess reductions to enable other sources to achieve their allocation; however, the generation of water quality credits does not remove the obligation of a source or activity to meet applicable technology requirements or adopted best management practices. Such plans must allow trading between NPDES permittees, and trading that may or may not involve NPDES permittees, where the generation or use of the credits involve an entity or activity not subject to department water discharge permits whose owner voluntarily elects to obtain department authorization for the generation and sale of credits.

8.   The provisions of the department's rule relating to the equitable abatement of pollutants into surface waters do not apply to water bodies or water body segments for which a basin management plan that takes into account future new or expanded activities or discharges has been adopted under this section.

(b)   *Total maximum daily load implementation.*—

1.   The department shall be the lead agency in coordinating the implementation of the total maximum daily loads through existing water quality protection programs. Application of a total maximum daily load by a water management district must be consistent with this section and does not require the issuance of an order or a separate action pursuant to s. 120.536(1) or s. 120.54 for the adoption of the calculation and allocation previously established by the department. Such programs may include, but are not limited to:

a.   Permitting and other existing regulatory programs, including water-quality-based effluent limitations;

b.   Nonregulatory and incentive-based programs, including best management practices, cost sharing, waste minimization, pollution prevention, agreements established pursuant to s. 403.061(21), and public education;

c.   Other water quality management and restoration activities, for example surface water improvement and management plans approved by water management districts or basin management action plans developed pursuant to this subsection;

d.   Trading of water quality credits or other equitable economically based agreements;

e.   Public works including capital facilities; or

f.   Land acquisition.

2.   For a basin management action plan adopted pursuant to paragraph (a), any management strategies and pollutant reduction requirements associated with a pollutant of concern for which a total maximum daily load has been developed, including effluent limits set forth for a discharger subject to NPDES permitting, if any, must be included in a timely manner in subsequent NPDES permits or permit modifications for that discharger. The department may not impose limits or conditions implementing an adopted total maximum daily load in an NPDES permit until the permit expires, the discharge is modified, or the permit is reopened pursuant to an adopted basin management action plan.

a.   Absent a detailed allocation, total maximum daily loads must be implemented through NPDES permit conditions that provide for a compliance schedule. In such instances, a facility's NPDES permit must allow time for the issuance of an order adopting the basin management action plan. The time allowed for the issuance of an order adopting the plan may not exceed 5 years. Upon issuance of an order adopting the plan, the permit must be reopened or renewed, as necessary, and permit conditions consistent with the plan must be established.

Notwithstanding the other provisions of this subparagraph, upon request by an NPDES permittee, the department as part of a permit issuance, renewal, or modification may establish individual allocations before the adoption of a basin management action plan.

    b.    For holders of NPDES municipal separate storm sewer system permits and other stormwater sources, implementation of a total maximum daily load or basin management action plan must be achieved, to the maximum extent practicable, through the use of best management practices or other management measures.

    c.    The basin management action plan does not relieve the discharger from any requirement to obtain, renew, or modify an NPDES permit or to abide by other requirements of the permit.

    d.    Management strategies set forth in a basin management action plan to be implemented by a discharger subject to permitting by the department must be completed pursuant to the schedule set forth in the basin management action plan. This implementation schedule may extend beyond the 5-year term of an NPDES permit.

    e.    Management strategies and pollution reduction requirements set forth in a basin management action plan for a specific pollutant of concern are not subject to challenge under chapter 120 at the time they are incorporated, in an identical form, into a subsequent NPDES permit or permit modification.

    f.    For nonagricultural pollutant sources not subject to NPDES permitting but permitted pursuant to other state, regional, or local water quality programs, the pollutant reduction actions adopted in a basin management action plan must be implemented to the maximum extent practicable as part of those permitting programs.

    g.    A nonpoint source discharger included in a basin management action plan must demonstrate compliance with the pollutant reductions established under subsection (6) by implementing the appropriate best management practices established pursuant to paragraph (c) or conducting water quality monitoring prescribed by the department or a water management district. A nonpoint source discharger may, in accordance with department rules, supplement the implementation of best management practices with water quality credit trades in order to demonstrate compliance with the pollutant reductions established under subsection (6).

    h.    A nonpoint source discharger included in a basin management action plan may be subject to enforcement action by the department or a water management district based upon a failure to implement the responsibilities set forth in sub-subparagraph g.

    i.    A landowner, discharger, or other responsible person who is implementing applicable management strategies specified in an adopted basin management action plan may not be required by permit, enforcement action, or otherwise to implement additional management strategies, including water quality credit trading, to reduce pollutant loads to attain the pollutant reductions established pursuant to subsection (6) and shall be deemed to be in compliance with this section. This subparagraph does not limit the authority of the department to amend a basin management action plan as specified in subparagraph (a)6.

    (c)    *Best management practices.—*

    1.    The department, in cooperation with the water management districts and other interested parties, as appropriate, may develop suitable interim measures, best management practices, or other measures necessary to achieve the level of pollution reduction established by the department for nonagricultural nonpoint pollutant sources in allocations developed pursuant to subsection (6) and this subsection. These practices and measures may be adopted by rule by the department and the water management districts and, where adopted by rule, shall be implemented by those parties responsible for nonagricultural nonpoint source pollution.

    2.    The Department of Agriculture and Consumer Services may develop and adopt by rule pursuant to ss. 120.536(1) and 120.54 suitable interim measures, best management practices, or other measures necessary to achieve the level of pollution reduction established by the department for agricultural pollutant sources in allocations developed pursuant to subsection (6) and this subsection or for programs implemented pursuant to paragraph (12)(b). These practices and measures may be implemented by those parties responsible for agricultural pollutant sources and the department, the water management districts, and the Department of Agriculture and Consumer Services shall assist with implementation. In the process of developing and adopting rules for interim measures, best management practices, or other measures, the Department of Agriculture and Consumer Services shall consult with the department, the Department of Health, the water management districts, representatives from affected farming groups, and environmental group representatives. Such rules must also incorporate

provisions for a notice of intent to implement the practices and a system to assure the implementation of the practices, including site inspection and recordkeeping requirements.

3. Where interim measures, best management practices, or other measures are adopted by rule, the effectiveness of such practices in achieving the levels of pollution reduction established in allocations developed by the department pursuant to subsection (6) and this subsection or in programs implemented pursuant to paragraph (12)(b) must be verified at representative sites by the department. The department shall use best professional judgment in making the initial verification that the best management practices are reasonably expected to be effective and, where applicable, must notify the appropriate water management district or the Department of Agriculture and Consumer Services of its initial verification before the adoption of a rule proposed pursuant to this paragraph. Implementation, in accordance with rules adopted under this paragraph, of practices that have been initially verified to be effective, or verified to be effective by monitoring at representative sites, by the department, shall provide a presumption of compliance with state water quality standards and release from the provisions of s. 376.307(5) for those pollutants addressed by the practices, and the department is not authorized to institute proceedings against the owner of the source of pollution to recover costs or damages associated with the contamination of surface water or groundwater caused by those pollutants. Research projects funded by the department, a water management district, or the Department of Agriculture and Consumer Services to develop or demonstrate interim measures or best management practices shall be granted a presumption of compliance with state water quality standards and a release from the provisions of s. 376.307(5). The presumption of compliance and release is limited to the research site and only for those pollutants addressed by the interim measures or best management practices. Eligibility for the presumption of compliance and release is limited to research projects on sites where the owner or operator of the research site and the department, a water management district, or the Department of Agriculture and Consumer Services have entered into a contract or other agreement that, at a minimum, specifies the research objectives, the cost-share responsibilities of the parties, and a schedule that details the beginning and ending dates of the project.

4. Where water quality problems are demonstrated, despite the appropriate implementation, operation, and maintenance of best management practices and other measures required by rules adopted under this paragraph, the department, a water management district, or the Department of Agriculture and Consumer Services, in consultation with the department, shall institute a reevaluation of the best management practice or other measure. Should the reevaluation determine that the best management practice or other measure requires modification, the department, a water management district, or the Department of Agriculture and Consumer Services, as appropriate, shall revise the rule to require implementation of the modified practice within a reasonable time period as specified in the rule.

5. Agricultural records relating to processes or methods of production, costs of production, profits, or other financial information held by the Department of Agriculture and Consumer Services pursuant to subparagraphs 3. and 4. or pursuant to any rule adopted pursuant to subparagraph 2. are confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. Upon request, records made confidential and exempt pursuant to this subparagraph shall be released to the department or any water management district provided that the confidentiality specified by this subparagraph for such records is maintained.

6. The provisions of subparagraphs 1. and 2. do not preclude the department or water management district from requiring compliance with water quality standards or with current best management practice requirements set forth in any applicable regulatory program authorized by law for the purpose of protecting water quality. Additionally, subparagraphs 1. and 2. are applicable only to the extent that they do not conflict with any rules adopted by the department that are necessary to maintain a federally delegated or approved program.

(d) *Enforcement and verification of basin management action plans and management strategies.*—

1. Basin management action plans are enforceable pursuant to this section and ss. 403.121, 403.141, and 403.161. Management strategies, including best management practices and water quality monitoring, are enforceable under this chapter.

2. No later than January 1, 2017:

a.   The department, in consultation with the water management districts and the Department of Agriculture and Consumer Services, shall initiate rulemaking to adopt procedures to verify implementation of water quality monitoring required in lieu of implementation of best management practices or other measures pursuant to sub-subparagraph (b)2.g.;

b.   The department, in consultation with the water management districts and the Department of Agriculture and Consumer Services, shall initiate rulemaking to adopt procedures to verify implementation of nonagricultural interim measures, best management practices, or other measures adopted by rule pursuant to subparagraph (c)1.; and

c.   The Department of Agriculture and Consumer Services, in consultation with the water management districts and the department, shall initiate rulemaking to adopt procedures to verify implementation of agricultural interim measures, best management practices, or other measures adopted by rule pursuant to subparagraph(c)2.

The rules required under this subparagraph shall include enforcement procedures applicable to the landowner, discharger, or other responsible person required to implement applicable management strategies, including best management practices or water quality monitoring as a result of noncompliance.

(8)   WATER QUALITY CREDIT TRADING.—

(a)   Water quality credit trading must be consistent with federal law and regulation.

(b)   Water quality credit trading must be implemented through permits, including water quality credit trading permits, other authorizations, or other legally binding agreements as established by department rule.

(c)   The department shall establish the pollutant load reduction value of water quality credits and is responsible for authorizing their use.

(d)   A person who acquires water quality credits ("buyer") shall timely submit to the department an affidavit, signed by the buyer and the credit generator ("seller"), disclosing the term of acquisition, number of credits, unit credit price paid, and any state funding received for the facilities or activities that generate the credits. The department may not participate in the establishment of credit prices.

(e)   Sellers of water quality credits are responsible for achieving the load reductions on which the credits are based and complying with the terms of the department authorization and any trading agreements into which they may have entered.

(f)   Buyers of water quality credits are responsible for complying with the terms of the department water discharge permit.

(g)   The department shall take appropriate action to address the failure of a credit seller to fulfill its obligations, including, as necessary, deeming the seller's credits invalid if the seller cannot achieve the load reductions on which the credits were based in a reasonable time. If the department determines duly acquired water quality credits to be invalid, in whole or in part, thereby causing the credit buyer to be unable to timely meet its pollutant reduction obligations under this section, the department shall issue an order establishing the actions required of the buyer to meet its obligations by alternative means and a reasonable schedule for completing the actions. The invalidation of credits does not, in and of itself, constitute a violation of the buyer's water discharge permit.

(h)   The department may authorize water quality credit trading in adopted basin management action plans. Participation in water quality credit trading is entirely voluntary. Entities that participate in water quality credit trades shall timely report to the department the prices for credits, how the prices were determined, and any state funding received for the facilities or activities that generated the credits. The department may not participate in the establishment of credit prices.

(i)   Land set-asides and land use modifications not otherwise required by state law or a permit, including constructed wetlands or other water quality improvement projects, that reduce nutrient loads into nutrient impaired surface waters may be used under this subsection.

(9)   RULES.—The department may adopt rules for:

(a)   Delisting water bodies or water body segments from the list developed under subsection (4) pursuant to the guidance under subsection (5).

(b) Administering of funds to implement the total maximum daily load and basin management action planning programs.

(c) Water quality credit trading among the pollutant sources to a water body or water body segment. The rules must provide for the following:

1. The process to be used to determine how credits are generated, quantified, and validated.

2. A publicly accessible water quality credit trading registry that tracks water quality credits, trading activities, and prices paid for credits.

3. Limitations on the availability and use of water quality credits, including a list of eligible pollutants or parameters and minimum water quality requirements and, where appropriate, adjustments to reflect best management practice performance uncertainties and water-segment-specific location factors.

4. The timing and duration of credits and allowance for credit transferability.

5. Mechanisms for determining and ensuring compliance with trading procedures, including recordkeeping, monitoring, reporting, and inspections.

At the time of publication of the draft rules on water quality credit trading, the department shall submit a copy to the United States Environmental Protection Agency for review.

(d) The total maximum daily load calculation in accordance with paragraph (6)(a) immediately upon the effective date of this act, for those eight water segments within Lake Okeechobee proper as submitted to the United States Environmental Protection Agency pursuant to subsection (2).

(e) Implementation of other specific provisions.

(10) APPLICATION.—The provisions of this section are intended to supplement existing law, and may not be construed as altering any applicable state water quality standards or as restricting the authority otherwise granted to the department or a water management district under this chapter or chapter 373. The exclusive means of state implementation of s. 303(d) of the Clean Water Act, Pub. L. No. 92-500, 33 U.S.C. ss. 1251 et seq. shall be in accordance with the identification, assessment, calculation and allocation, and implementation provisions of this section.

(11) CONSTRUCTION.—This section does not limit the applicability or consideration of any mixing zone, variance, exemption, site specific alternative criteria, or other moderating provision.

(12) IMPLEMENTATION OF ADDITIONAL PROGRAMS.—

(a) The department may not implement, without prior legislative approval, any additional regulatory authority pursuant to s. 303(d) of the Clean Water Act or 40 C.F.R. part 130, if such implementation would result in water quality discharge regulation of activities not currently subject to regulation.

(b) Interim measures, best management practices, or other measures may be developed and voluntarily implemented pursuant to paragraph (7)(c) for any water body or segment for which a total maximum daily load or allocation has not been established. The implementation of such pollution control programs may be considered by the department in the determination made pursuant to subsection (4).

(13) RULE CHALLENGES.—In order to provide adequate due process while ensuring timely development of total maximum daily loads, proposed rules and orders authorized by this act are ineffective pending resolution of a s. 120.54(3), s. 120.56, s. 120.569, or s. 120.57 administrative proceeding. However, the department may go forward prior to resolution of such administrative proceedings with subsequent agency actions authorized by subsections (2)-(6) if the department can support and substantiate those actions using the underlying bases for the rules or orders without the benefit of any legal presumption favoring, or in deference to, the challenged rules or orders.

**History.**—s. 3, ch. 99-223; s. 10, ch. 99-353; s. 3, ch. 2000-130; s. 1, ch. 2001-74; s. 1, ch. 2002-165; s. 17, ch. 2002-295; s. 10, ch. 2003-265; s. 6, ch. 2005-166; s. 13, ch. 2005-291; s. 1, ch. 2006-76; s. 10, ch. 2006-289; s. 1, ch. 2008-189; s. 1, ch. 2013-70; s. 2, ch. 2013-146; s. 44, ch. 2015-2; s. 33, ch. 2016-1; s. 4, ch. 2016-130.

**403.0675    Progress reports.**—On or before July 1 of each year, beginning in 2018:

(1) The department, in conjunction with the water management districts, shall post on its website and submit electronically an annual progress report to the Governor, the President of the Senate, and the Speaker of the House of Representatives on the status of each total maximum daily load, basin management action plan, minimum flow

or minimum water level, and recovery or prevention strategy adopted pursuant to s. 403.067 or parts I and VIII of chapter 373. The report must include the status of each project identified to achieve a total maximum daily load or an adopted minimum flow or minimum water level, as applicable. If a report indicates that any of the 5-year, 10-year, or 15-year milestones, or the 20-year target date, if applicable, for achieving a total maximum daily load or a minimum flow or minimum water level will not be met, the report must include an explanation of the possible causes and potential solutions. If applicable, the report must include project descriptions, estimated costs, proposed priority ranking for project implementation, and funding needed to achieve the total maximum daily load or the minimum flow or minimum water level by the target date. Each water management district shall post the department's report on its website.

(2)   The Department of Agriculture and Consumer Services shall post on its website and submit electronically an annual progress report to the Governor, the President of the Senate, and the Speaker of the House of Representatives on the status of the implementation of the agricultural nonpoint source best management practices, including an implementation assurance report summarizing survey responses and response rates, site inspections, and other methods used to verify implementation of and compliance with best management practices pursuant to basin management action plans.

History.—s. 34, ch. 2016-1.

**403.072     Pollution Prevention Act.**—Sections 403.072-403.074 may be cited as the "Pollution Prevention Act."

History.—s. 25, ch. 91-305.

**403.073     Pollution prevention; state goal; agency programs; public education.**—

(1)   It is a goal of the state that all its agencies, the State University System, community colleges, and all municipalities, counties, regional agencies, and special districts develop and implement strategies to prevent pollution, including public information programs and education programs.

(2)   It is the policy of the state that pollution prevention is necessary for all materials and waste management activities.

History.—s. 26, ch. 91-305; s. 1, ch. 95-144; s. 48, ch. 2007-217.

**403.074     Technical assistance by the department.**—

(1)   To help develop effective programs to eliminate or reduce the use of materials that are toxic to humans, plants, or animals and to prevent pollution at its source, the department shall implement and administer a program of technical assistance in pollution prevention to business, industry, agriculture, and state and local government.

(2)   The program shall include onsite, nonregulatory technical assistance and shall promote and sponsor conferences on pollution prevention techniques. The program may be conducted in cooperation with trade associations, trade schools, the State University System, community colleges, or other appropriate entities.

(3)   Proprietary information obtained by the department during a visit to provide onsite technical assistance requested under ss. 403.072-403.074 shall be treated in accordance with the provisions of s. 403.111, unless such confidentiality is waived by the party who requested the assistance.

History.—s. 27, ch. 91-305; s. 1, ch. 95-366; s. 49, ch. 2007-217.

**403.075     Legislative findings.**—In addition to the declarations contained in s. 403.021, the Legislature finds that:

(1)   Ecosystem management is a concept that includes coordinating the planning activities of state and other governmental units, land management, environmental permitting and regulatory programs, and voluntary programs, together with the needs of the business community, private landowners, and the public, as partners in a streamlined and effective program for the protection of the environment. It is particularly in the interest of persons residing and doing business within the boundaries of a particular ecosystem to share in the responsibility of ecosystem restoration or maintenance. The proper stewardship of an ecosystem by its affected residents will, in general, enhance the economic and social welfare of all Floridians by maintaining the natural beauty and functions

of that ecosystem, which will, in turn, contribute to the beauty and function of larger inclusive ecosystems and add immeasurably to the quality of life and the economy of all Florida counties dependent on those ecosystems, thus serving a public purpose.

(2)   Most ecosystems are subject to multiple governmental jurisdictions. Therefore, there is a need for a unified and stable mechanism to plan for restoration and continued long-term maintenance of ecosystems.

(3)   It is in the public interest and serves a public purpose that the Department of Environmental Protection take a leading role among the agencies of the state in developing and implementing comprehensive ecosystem management solutions, in cooperation with both public and private regulated entities, which improves the integration between land use planning and regulation, and which achieves positive environmental results in an efficient and cost-effective manner.

History.—s. 26, ch. 97-164.

**403.0752   Ecosystem management agreements.—**

(1)   Upon the request of an applicant, the secretary of the department is authorized to enter into an ecosystem management agreement regarding any environmental impacts with regulated entities to better coordinate the legal requirements and timelines applicable to a regulated activity, which may include permit processing, project construction, operations monitoring, enforcement actions, proprietary approvals, and compliance with development orders and regional and local comprehensive plans. Entering into an ecosystem management agreement shall be voluntary for both the regulated entity and the department.

(2)   An ecosystem management agreement may be entered into by the department and regulated entities when the department determines that:

(a)   Implementation of such agreement meets all applicable standards and criteria so that there is a net ecosystem benefit to the subject ecosystem more favorable than operation under applicable rules;

(b)   Entry into such agreement will not interfere with the department's obligations under any federally delegated or approved program;

(c)   Implementation of the agreement will result in a reduction in overall risks to human health and the environment compared to activities conducted in the absence of the agreement; and

(d)   Each regulated entity has certified to the department that it has in place internal environmental management systems or alternative internal controls sufficient to implement the agreement.

(3)(a)   An ecosystem management agreement shall include provision for the department to terminate the agreement by written notice to all other parties to the agreement when the department demonstrates that:

1.   There has been a material change in conditions from the original agreement such that the intended net ecosystem benefit is not being, and may not reasonably be expected to be, achieved through continuation of the agreement;

2.   Continuation of the agreement will result in economic hardship or competitive disadvantage; or

3.   A party has violated the terms of the agreement.

(b)   Termination of an ecosystem management agreement by the department shall be subject to the requirements of ss. 120.569 and 120.57.

(c)   The applicant for an ecosystem management agreement may terminate such agreement at any time. Governmental parties, other than the department, may withdraw in accordance with the terms of the agreement at any time, but may not terminate the agreement.

(4)   An ecosystem management agreement may include incentives for participation and implementation by a regulated entity, including, but not limited to, any or all of the following:

(a)   Coordinated regulatory contact per facility.

(b)   Permitting process flexibility.

(c)   Expedited permit processing.

(d)   Alternative monitoring and reporting requirements.

(e)   Coordinated permitting and inspections.

(f)    Cooperative inspections that provide opportunity for informal resolution of compliance issues before enforcement action is initiated.

(g)    Alternative means of environmental protection which provide for equivalent or reduced overall risk to human health and the environment and which are available under existing law such as variances, waivers, or other relief mechanisms.

(5)    The Executive Director of the Department of Economic Opportunity, the Secretary of Transportation, the Commissioner of Agriculture, the Executive Director of the Fish and Wildlife Conservation Commission, and the executive directors of the water management districts are authorized to participate in the development of ecosystem management agreements with regulated entities and other governmental agencies as necessary to effectuate the provisions of this section. Local governments are encouraged to participate in ecosystem management agreements.

(6)    The secretary of the department may form ecosystem management advisory teams for consultation and participation in the preparation of an ecosystem management agreement. The secretary shall request the participation of at least the state and regional and local government entities having regulatory authority over the activities to be subject to the ecosystem management agreement. Such teams may also include representatives of other participating or advisory government agencies, which may include regional planning councils, private landowners, public landowners and managers, public and private utilities, corporations, and environmental interests. Team members shall be selected in a manner that ensures adequate representation of the diverse interests and perspectives within the designated ecosystem. Participation by any department of state government is at the discretion of that agency.

(7)    An application for a binding ecosystem management agreement shall include:

(a)    The name and address of the applicant;

(b)    The location and a description of the project; and

(c)    All application materials required for any requested permit, license, approval, variance, or waiver under all applicable statutes and rules.

(8)(a)    An applicant for a binding ecosystem management agreement shall, at the applicant's own expense, publish a notice of its request to enter into the agreement in a newspaper of general circulation in the county in which the activity that is the subject of the agreement will be located or take place. Proof of publication shall be provided to the department by the applicant. Actual mailed notice of the application shall also be provided to owners of property adjacent to the activity that is the subject of the agreement and to any other person whose interest is known to the department or the applicant.

(b)    A binding ecosystem management agreement is subject to the following requirements:

1.    Notice of intent to enter into the agreement shall be published by the regulated entity in a newspaper of general circulation in each county where the ecosystem management area is located. The notice shall specifically identify any standards, rules, or other legal or regulatory requirements proposed to be subject to variance or waiver under the agreement and any permit, license, or approval to be granted. The notice shall include the opportunity to request a hearing on the agreement under the provisions of ss. 120.569 and 120.57.

2.    Substantially affected persons may challenge the terms of the agreement and the proposed issuance of any permit, license, approval, variance, or waiver contained in the agreement pursuant to ss. 120.569 and 120.57.

3.    A substantially affected person may challenge the subsequent issuance of any permit, license, approval, variance, or waiver pursuant to the agreement, but which is not contained in the agreement, pursuant to ss. 120.569 and 120.57. In any such proceeding, any relevant and material elements of the agreement shall be admissible.

4.    Any substantial modification or amendment to the agreement shall be subject to the same processes as the original agreement.

(c)    The parties to an ecosystem management agreement may elect to enter into a nonbinding agreement that does not constitute agency action. Such agreements shall be considered advisory in nature and are not binding on any party to the agreement. If such election is made, any permit, license, approval, waiver, or variance subsequently issued by an agency shall be subject to the provisions of chapter 120.

(d)   Waivers and variances available under applicable statutes and rules may be granted as a part of a binding ecosystem management agreement.

(e)   A person who requests a binding ecosystem management agreement and as a part of that request seeks a permit, license, approval, variance, or waiver that is subject to a statutory application review time limit waives her or his right to a default permit, license, approval, variance, or waiver.

(9)   Implementation of this section by the department must be consistent with federally delegated programs and federal law.

History.—s. 27, ch. 97-164; s. 15, ch. 99-7; s. 203, ch. 99-245; s. 285, ch. 2011-142.

**403.076   Short title.**—Sections 403.076-403.078 may be cited as the "Public Notice of Pollution Act."
History.—s. 1, ch. 2017-95.

**403.077   Public notification of pollution.**—

(1)   DEFINITION.—As used in this section, the term "reportable pollution release" means the release or discharge of a substance from an installation to the air, land, or waters of the state which is discovered by the owner or operator of the installation, which is not authorized by law, and which is reportable to the State Watch Office within the Division of Emergency Management pursuant to any department rule, permit, order, or variance.

(2)   OWNER AND OPERATOR RESPONSIBILITIES.—

(a)   In the event of a reportable pollution release, an owner or operator of the installation at which the reportable pollution release occurs must provide to the department information reported to the State Watch Office within the Division of Emergency Management pursuant to any department rule, permit, order, or variance, within 24 hours after the owner's or operator's discovery of such reportable pollution release.

(b)   If multiple parties are subject to the notification requirements based on a single reportable pollution release, a single notification made by one party in accordance with this section constitutes compliance on behalf of all parties subject to the requirement. However, if the notification is not made in accordance with this section, the department may pursue enforcement against all parties subject to the requirement.

(c)   If, after providing notice pursuant to paragraph (a), the owner or operator of the installation determines that a reportable pollution release did not occur or that an amendment to the notice is warranted, the owner or operator may submit a letter to the department documenting such determination.

(d)   If, after providing notice pursuant to paragraph (a), the installation owner or operator discovers that a reportable pollution release has migrated outside the property boundaries of the installation, the owner or operator must provide an additional notice to the department that the release has migrated outside the property boundaries within 24 hours after its discovery of the migration outside of the property boundaries.

(3)   DEPARTMENT RESPONSIBILITIES.—

(a)   The department shall publish on a website accessible to the public all notices submitted by an owner or operator pursuant to subsection (2) within 24 hours after receipt.

(b)   The department shall create an electronic mailing list for such notices and allow the public, including local governments, health departments, news media, and other interested persons, to subscribe to and receive periodic direct announcement of any notices submitted pursuant to subsection (2). The department shall establish regional electronic mailing lists, such as by county or district boundaries, to allow subscribers to determine the notices they wish to receive by geographic area.

(c)   The department shall establish an e-mail address and an online form as options for owners and operators to provide the notice specified in subsection (2). The online form may not require the submission of information in addition to what is required for submission pursuant to paragraph (2)(a).

(d)   The department shall adopt rules necessary to implement the requirements of this subsection.

(4)   ADMISSION OF LIABILITY OR HARM.—Providing notice under subsection (2) does not constitute an admission of liability or harm.

(5)   VIOLATIONS.—Failure to provide the notification required by subsection (2) shall subject the owner or operator to the civil penalties specified in s. 403.121.

History.—s. 2, ch. 2017-95.

**403.078    Effect on other law.**—The Public Notice of Pollution Act does not alter or affect the emergency management responsibilities of the Governor, the Division of Emergency Management, or the governing body of any political subdivision of the state pursuant to chapter 252.

History.—s. 3, ch. 2017-95.

**403.081    Performance by other state agencies.**—All state agencies, including the Department of Health, shall be available to the department to perform, at its direction, the duties required of the department under this act.

History.—s. 9, ch. 67-436; ss. 19, 26, 35, ch. 69-106; s. 269, ch. 77-147; s. 359, ch. 94-356; s. 156, ch. 99-8.

**403.085    Sanitary sewage disposal units; advanced and secondary waste treatment; industrial waste treatment.**—

(1)    Neither the Department of Health nor any other state agency, county, special district, or municipality shall approve construction of any disposal well for sanitary sewage disposal which does not provide for secondary waste treatment and, in addition thereto, advanced waste treatment as deemed necessary and ordered by the department.

(2)    Sanitary sewage disposal treatment plants which discharge effluent through disposal wells shall provide for secondary waste treatment and, in addition thereto, advanced waste treatment as deemed necessary and ordered by the Department of Environmental Protection. Failure to conform may be punishable by a fine of $500 for each 24-hour day or fraction thereof that such failure is allowed to continue thereafter.

(3)    Neither the Department of Health nor any other state agency, county, special district, or municipality shall approve construction of any ocean outfall, inland outfall, or disposal well for the discharge of industrial waste of any kind which does not provide for secondary waste treatment or such other treatment as is deemed necessary and ordered by the department.

(4)    Industrial plants or facilities which discharge industrial waste of any kind through ocean outfalls, inland outfalls, or disposal wells shall provide for secondary waste treatment or such other waste treatment as deemed necessary and ordered by the former Department of Environmental Regulation. Failure to conform shall be punishable as provided in s. 403.161(2).

History.—ss. 1, 2, ch. 70-82; s. 2, ch. 71-137; s. 1, ch. 71-274; s. 270, ch. 77-147; s. 74, ch. 79-65; s. 360, ch. 94-356; s. 157, ch. 99-8; s. 11, ch. 2000-211; s. 5, ch. 2008-232.

**403.086    Sewage disposal facilities; advanced and secondary waste treatment.**—

(1)(a)    Neither the Department of Health nor any other state agency, county, special district, or municipality shall approve construction of any facilities for sanitary sewage disposal which do not provide for secondary waste treatment and, in addition thereto, advanced waste treatment as deemed necessary and ordered by the department.

(b)    No facilities for sanitary sewage disposal constructed after June 14, 1978, shall dispose of any wastes by deep well injection without providing for secondary waste treatment and, in addition thereto, advanced waste treatment deemed necessary by the department to protect adequately the beneficial use of the receiving waters.

(c)    Notwithstanding any other provisions of this chapter or chapter 373, facilities for sanitary sewage disposal may not dispose of any wastes into Old Tampa Bay, Tampa Bay, Hillsborough Bay, Boca Ciega Bay, St. Joseph Sound, Clearwater Bay, Sarasota Bay, Little Sarasota Bay, Roberts Bay, Lemon Bay, or Charlotte Harbor Bay, or into any river, stream, channel, canal, bay, bayou, sound, or other water tributary thereto, without providing advanced waste treatment, as defined in subsection (4), approved by the department. This paragraph shall not apply to facilities which were permitted by February 1, 1987, and which discharge secondary treated effluent, followed by water hyacinth treatment, to tributaries of tributaries of the named waters; or to facilities permitted to discharge to the nontidally influenced portions of the Peace River.

(2)    Any facilities for sanitary sewage disposal shall provide for secondary waste treatment and, in addition thereto, advanced waste treatment as deemed necessary and ordered by the Department of Environmental

Protection. Failure to conform shall be punishable by a civil penalty of $500 for each 24-hour day or fraction thereof that such failure is allowed to continue thereafter.

(3)   This section shall not be construed to prohibit or regulate septic tanks or other means of individual waste disposal which are otherwise subject to state regulation.

(4)   For purposes of this section, the term "advanced waste treatment" means that treatment which will provide a reclaimed water product that:

(a)   Contains not more, on a permitted annual average basis, than the following concentrations:

1.   Biochemical Oxygen Demand (CBOD5). . . . . . . . . . 5mg/l

2.   Suspended Solids. . . . . . . . . . 5mg/l

3.   Total Nitrogen, expressed as N. . . . . . . . . . 3mg/l

4.   Total Phosphorus, expressed as P. . . . . . . . . . 1mg/l

(b)   Has received high level disinfection, as defined by rule of the department.

In those waters where the concentrations of phosphorus have been shown not to be a limiting nutrient or a contaminant, the department may waive or alter the compliance levels for phosphorus until there is a demonstration that phosphorus is a limiting nutrient or a contaminant.

(5)(a)   Notwithstanding any other provisions of this chapter or chapter 373, when a reclaimed water product has been established to be in compliance with the standards set forth in subsection (4), that water shall be presumed to be allowable, and its discharge shall be permitted in the waters described in paragraph (1)(c) at a reasonably accessible point where such discharge results in minimal negative impact. This presumption may be overcome only by a demonstration that one or more of the following would occur:

1.   That the discharge of reclaimed water that meets the standards set forth in subsection (4) will be, by itself, a cause of considerable degradation to an Outstanding Florida Water or to other waters and is not clearly in the public interest.

2.   That the reclaimed water discharge will have a substantial negative impact on an approved shellfish harvesting area or a water used as a public domestic water supply.

3.   That the increased volume of fresh water contributed by the reclaimed water product will seriously alter the natural fresh-salt water balance of the receiving water after reasonable opportunity for mixing.

(b)   If one or more of the conditions described in subparagraphs (a)1.-3. have been demonstrated, remedies may include, but are not limited to, the following:

1.   Require more stringent effluent limitations;

2.   Order the point or method of discharge changed;

3.   Limit the duration or volume of the discharge; or

4.   Prohibit the discharge only if no other alternative is in the public interest.

(6)   Any facility covered in paragraph (1)(c) shall be permitted to discharge if it meets the standards set forth in subsections (4) and (5). All of the facilities covered in paragraph (1)(c) shall be required to meet the standards set forth in subsections (4) and (5).

(7)(a)   The department shall allow backup discharges pursuant to permit only. The backup discharge shall be limited to 30 percent of the permitted reuse capacity on an annual basis. For purposes of this subsection, a "backup discharge" is a surface water discharge that occurs as part of a functioning reuse system which is permitted under department rules and which provides reclaimed water for irrigation of public access areas, residential properties, or edible food crops, or for industrial cooling or other acceptable reuse purposes. Backup discharges may occur during periods of reduced demand for reclaimed water in the reuse system.

(b)   Notwithstanding any other provisions of this chapter or chapter 373, backup discharges of reclaimed water meeting the standards set forth in subsection (4) shall be presumed to be allowable and shall be permitted in all waters in the state at a reasonably accessible point where such discharge results in minimal negative impact. Wet weather discharges as provided in s. 2(3)(c), chapter 90-262, Laws of Florida, shall include backup discharges as

provided in this section. The presumption of the allowability of a backup discharge may be overcome only by a demonstration that one or more of the following conditions is present:

1.   The discharge will be to an Outstanding Florida Water, except as provided in chapter 90-262, Laws of Florida;

2.   The discharge will be to Class I or Class II waters;

3.   The increased volume of fresh water contributed by a backup discharge will seriously alter the natural freshwater to saltwater balance of receiving waters after reasonable opportunity for mixing;

4.   The discharge will be to a water body having a pollutant load reduction goal established by a water management district or the department, and the discharge will cause or contribute to a violation of the established goal;

5.   The discharge fails to meet the requirements of the antidegradation policy contained in department rules; or

6.   The discharge will be to waters that the department determines require more stringent nutrient limits than those set forth in subsection (4).

(c)   Any backup discharge shall be subject to the provisions of the antidegradation policy contained in department rules.

(d)   If one or more of the conditions described in paragraph (b) have been demonstrated, a backup discharge may still be allowed in conjunction with one or more of the remedies provided in paragraph (5)(b) or other suitable measures.

(e)   The department shall allow lower levels of treatment of reclaimed water if the applicant affirmatively demonstrates that water quality standards will be met during periods of backup discharge and if all other requirements of this subsection are met.

(8)   The department may require backflow prevention devices on potable water lines within reclaimed water service areas to protect public health and safety. The department shall establish rules that determine when backflow prevention devices on potable water lines are necessary and when such devices are not necessary.

(9)   The Legislature finds that the discharge of domestic wastewater through ocean outfalls wastes valuable water supplies that should be reclaimed for beneficial purposes to meet public and natural systems demands. The Legislature also finds that discharge of domestic wastewater through ocean outfalls compromises the coastal environment, quality of life, and local economies that depend on those resources. The Legislature declares that more stringent treatment and management requirements for such domestic wastewater and the subsequent, timely elimination of ocean outfalls as a primary means of domestic wastewater discharge are in the public interest.

(a)   The construction of new ocean outfalls for domestic wastewater discharge and the expansion of existing ocean outfalls for this purpose, along with associated pumping and piping systems, are prohibited. Each domestic wastewater ocean outfall shall be limited to the discharge capacity specified in the department permit authorizing the outfall in effect on July 1, 2008, which discharge capacity shall not be increased. Maintenance of existing, department-authorized domestic wastewater ocean outfalls and associated pumping and piping systems is allowed, subject to the requirements of this section. The department is directed to work with the United States Environmental Protection Agency to ensure that the requirements of this subsection are implemented consistently for all domestic wastewater facilities in the state which discharge through ocean outfalls.

(b)   The discharge of domestic wastewater through ocean outfalls must meet advanced wastewater treatment and management requirements by December 31, 2018. For purposes of this subsection, the term "advanced wastewater treatment and management requirements" means the advanced waste treatment requirements set forth in subsection (4), a reduction in outfall baseline loadings of total nitrogen and total phosphorus which is equivalent to that which would be achieved by the advanced waste treatment requirements in subsection (4), or a reduction in cumulative outfall loadings of total nitrogen and total phosphorus occurring between December 31, 2008, and December 31, 2025, which is equivalent to that which would be achieved if the advanced waste treatment requirements in subsection (4) were fully implemented beginning December 31, 2018, and continued through December 31, 2025. The department shall establish the average baseline loadings of total nitrogen and total phosphorus for each outfall using monitoring data available for calendar years 2003 through 2007 and

establish required loading reductions based on this baseline. The baseline loadings and required loading reductions of total nitrogen and total phosphorus shall be expressed as an average annual daily loading value. The advanced wastewater treatment and management requirements of this paragraph are deemed met for any domestic wastewater facility discharging through an ocean outfall on July 1, 2008, which has installed by December 31, 2018, a fully operational reuse system comprising 100 percent of the facility's baseline flow on an annual basis for reuse activities authorized by the department.

(c)1.    Each utility that had a permit for a domestic wastewater facility that discharged through an ocean outfall on July 1, 2008, must install, or cause to be installed, a functioning reuse system within the utility's service area or, by contract with another utility, within Miami-Dade County, Broward County, or Palm Beach County by December 31, 2025. For purposes of this subsection, a "functioning reuse system" means an environmentally, economically, and technically feasible system that provides a minimum of 60 percent of a facility's baseline flow on an annual basis for irrigation of public access areas, residential properties, or agricultural crops; aquifer recharge; groundwater recharge; industrial cooling; or other acceptable reuse purposes authorized by the department. For purposes of this subsection, the term "baseline flow" means the annual average flow of domestic wastewater discharging through the facility's ocean outfall, as determined by the department, using monitoring data available for calendar years 2003 through 2007.

2.    Flows diverted from facilities to other facilities that provide 100 percent reuse of the diverted flows before December 31, 2025, are considered to contribute to meeting the reuse requirement. For utilities operating more than one outfall, the reuse requirement may be apportioned between the facilities served by the outfalls, including flows diverted to other facilities for 100 percent reuse before December 31, 2025. Utilities that shared a common ocean outfall for the discharge of domestic wastewater on July 1, 2008, regardless of which utility operates the ocean outfall, are individually responsible for meeting the reuse requirement and may enter into binding agreements to share or transfer such responsibility among the utilities. If treatment in addition to the advanced wastewater treatment and management requirements described in paragraph (b) is needed to support a functioning reuse system, the treatment must be fully operational by December 31, 2025.

3.    If a facility that discharges through an ocean outfall contracts with another utility to install a functioning reuse system, the department must approve any apportionment of the reuse generated from the new or expanded reuse system that is intended to satisfy all or a portion of the reuse requirements pursuant to subparagraph 1. If a contract is between two utilities that have reuse requirements pursuant to subparagraph 1., the reuse apportioned to each utility's requirement may not exceed the total reuse generated by the new or expanded reuse system. A utility shall provide the department a copy of any contract with another utility that reflects an agreement between the utilities which is subject to the requirements of this subparagraph.

(d)    The discharge of domestic wastewater through ocean outfalls is prohibited after December 31, 2025, except as a backup discharge that is part of a functioning reuse system or other wastewater management system authorized by the department. Except as otherwise provided in this subsection, a backup discharge may occur only during periods of reduced demand for reclaimed water in the reuse system, such as periods of wet weather, or as the result of peak flows from other wastewater management systems, and must comply with the advanced wastewater treatment and management requirements of paragraph (b). Peak flow backup discharges from other wastewater management systems may not cumulatively exceed 5 percent of a facility's baseline flow, measured as a 5-year rolling average, and are subject to applicable secondary waste treatment and water-quality-based effluent limitations specified in department rules. If peak flow backup discharges are in compliance with the effluent limitations, the discharges are deemed to meet the advanced wastewater treatment and management requirements of this subsection.

(e)    The holder of a department permit authorizing the discharge of domestic wastewater through an ocean outfall as of July 1, 2008, shall submit the following to the secretary of the department:

1.    A detailed plan to meet the requirements of this subsection, including the identification of the technical, environmental, and economic feasibility of various reuse options; the identification of each land acquisition and facility necessary to provide for reuse of the domestic wastewater; an analysis of the costs to meet the requirements, including the level of treatment necessary to satisfy state water quality requirements and local

water quality considerations and a cost comparison of reuse using flows from ocean outfalls and flows from other domestic wastewater sources; and a financing plan for meeting the requirements, including identifying any actions necessary to implement the financing plan, such as bond issuance or other borrowing, assessments, rate increases, fees, other charges, or other financing mechanisms. The plan must evaluate reuse demand in the context of future regional water supply demands, the availability of traditional water supplies, the need for development of alternative water supplies, the degree to which various reuse options offset potable water supplies, and other factors considered in the Lower East Coast Regional Water Supply Plan of the South Florida Water Management District. The plan must include a detailed schedule for the completion of all necessary actions and be accompanied by supporting data and other documentation. The plan must be submitted by July 1, 2013.

2. By July 1, 2016, an update of the plan required in subparagraph 1. documenting any refinements or changes in the costs, actions, or financing necessary to eliminate the ocean outfall discharge in accordance with this subsection or a written statement that the plan is current and accurate.

(f) By December 31, 2009, and by December 31 every 5 years thereafter, the holder of a department permit authorizing the discharge of domestic wastewater through an ocean outfall shall submit to the secretary of the department a report summarizing the actions accomplished to date and the actions remaining and proposed to meet the requirements of this subsection, including progress toward meeting the specific deadlines set forth in paragraphs (b) through (e). The report shall include the detailed schedule for and status of the evaluation of reuse and disposal options, preparation of preliminary design reports, preparation and submittal of permit applications, construction initiation, construction progress milestones, construction completion, initiation of operation, and continuing operation and maintenance.

(g) By July 1, 2010, and by July 1 every 5 years thereafter, the department shall submit a report to the Governor, the President of the Senate, and the Speaker of the House of Representatives on the implementation of this subsection. In the report, the department shall summarize progress to date, including the increased amount of reclaimed water provided and potable water offsets achieved, and identify any obstacles to continued progress, including all instances of substantial noncompliance.

(h) The renewal of each permit that authorizes the discharge of domestic wastewater through an ocean outfall as of July 1, 2008, must be accompanied by an order in accordance with s. 403.088(2)(e) and (f) which establishes an enforceable compliance schedule consistent with the requirements of this subsection.

(i) An entity that diverts wastewater flow from a receiving facility that discharges domestic wastewater through an ocean outfall must meet the reuse requirement of paragraph (c). Reuse by the diverting entity of the diverted flows shall be credited to the diverting entity. The diverted flow shall also be correspondingly deducted from the receiving facility's baseline flow from which the required reuse is calculated pursuant to paragraph (c), and the receiving facility's reuse requirement shall be recalculated accordingly.

The department, the South Florida Water Management District, and the affected utilities must consider the information in the detailed plan in paragraph (e) for the purpose of adjusting, as necessary, the reuse requirements of this subsection. The department shall submit a report to the Legislature by February 15, 2015, containing recommendations for any changes necessary to the requirements of this subsection.

(10) The Legislature finds that the discharge of inadequately treated and managed domestic wastewater from dozens of small wastewater facilities and thousands of septic tanks and other onsite systems in the Florida Keys compromises the quality of the coastal environment, including nearshore and offshore waters, and threatens the quality of life and local economies that depend on those resources. The Legislature also finds that the only practical and cost-effective way to fundamentally improve wastewater management in the Florida Keys is for the local governments in Monroe County, including those special districts established for the purpose of collection, transmission, treatment, or disposal of sewage, to timely complete the wastewater or sewage treatment and disposal facilities initiated under the work program of Administration Commission rule 28-20, Florida Administrative Code, and the Monroe County Sanitary Master Wastewater Plan, dated June 2000. The Legislature therefore declares that the construction and operation of comprehensive central wastewater systems in accordance with this subsection is in the public interest. To give effect to those findings, the requirements of this

subsection apply to all domestic wastewater facilities in Monroe County, including privately owned facilities, unless otherwise provided under this subsection.

(a)   The discharge of domestic wastewater into surface waters is prohibited.

(b)   Monroe County, each municipality, and those special districts established for the purpose of collection, transmission, treatment, or disposal of sewage in Monroe County shall complete the wastewater collection, treatment, and disposal facilities within its jurisdiction designated as hot spots in the Monroe County Sanitary Master Wastewater Plan, dated June 2000, specifically listed in Exhibits 6-1 through 6-3 of Chapter 6 of the plan and mapped in Exhibit F-1 of Appendix F of the plan. The required facilities and connections, and any additional facilities or other adjustments required by rules adopted by the Administration Commission under s. 380.0552, must be completed by December 31, 2015, pursuant to specific schedules established by the commission. Domestic wastewater facilities located outside local government and special district service areas must meet the treatment and disposal requirements of this subsection by December 31, 2015.

(c)   After December 31, 2015, all new or expanded domestic wastewater discharges must comply with the treatment and disposal requirements of this subsection and department rules.

(d)   Wastewater treatment facilities having design capacities:

1.   Greater than or equal to 100,000 gallons per day must provide basic disinfection as defined by department rule and the level of treatment which, on a permitted annual average basis, produces an effluent that contains no more than the following concentrations:

a.   Biochemical Oxygen Demand (CBOD5) of 5 mg/l.

b.   Suspended Solids of 5 mg/l.

c.   Total Nitrogen, expressed as N, of 3 mg/l.

d.   Total Phosphorus, expressed as P, of 1 mg/l.

2.   Less than 100,000 gallons per day must provide basic disinfection as defined by department rule and the level of treatment which, on a permitted annual average basis, produces an effluent that contains no more than the following concentrations:

a.   Biochemical Oxygen Demand (CBOD5) of 10 mg/l.

b.   Suspended Solids of 10 mg/l.

c.   Total Nitrogen, expressed as N, of 10 mg/l.

d.   Total Phosphorus, expressed as P, of 1 mg/l.

(e)   Class V injection wells, as defined by department or Department of Health rule, must meet the following requirements and otherwise comply with department or Department of Health rules, as applicable:

1.   If the design capacity of the facility is less than 1 million gallons per day, the injection well must be at least 90 feet deep and cased to a minimum depth of 60 feet or to such greater cased depth and total well depth as may be required by department rule.

2.   Except as provided in subparagraph 3. for backup wells, if the design capacity of the facility is equal to or greater than 1 million gallons per day, each primary injection well must be cased to a minimum depth of 2,000 feet or to such greater depth as may be required by department rule.

3.   If an injection well is used as a backup to a primary injection well, the following conditions apply:

a.   The backup well may be used only when the primary injection well is out of service because of equipment failure, power failure, or the need for mechanical integrity testing or repair;

b.   The backup well may not be used for more than a total of 500 hours during any 5-year period unless specifically authorized in writing by the department;

c.   The backup well must be at least 90 feet deep and cased to a minimum depth of 60 feet, or to such greater cased depth and total well depth as may be required by department rule; and

d.   Fluid injected into the backup well must meet the requirements of paragraph (d).

(f)   The requirements of paragraphs (d) and (e) do not apply to:

1.   Class I injection wells as defined by department rule, including any authorized mechanical integrity tests;

2.   Authorized mechanical integrity tests associated with Class V wells as defined by department rule; or

3.   The following types of reuse systems authorized by department rule:

a.   Slow-rate land application systems;

b.   Industrial uses of reclaimed water; and

c.   Use of reclaimed water for toilet flushing, fire protection, vehicle washing, construction dust control, and decorative water features.

However, disposal systems serving as backups to reuse systems must comply with the other provisions of this subsection.

(g)   For wastewater treatment facilities in operation as of July 1, 2010, which are located within areas to be served by Monroe County, municipalities in Monroe County, or those special districts established for the purpose of collection, transmission, treatment, or disposal of sewage but which are owned by other entities, the requirements of paragraphs (d) and (e) do not apply until January 1, 2016. Wastewater operating permits issued pursuant to this chapter and in effect for these facilities as of June 30, 2010, are extended until December 31, 2015, or until the facility is connected to a local government central wastewater system, whichever occurs first. Wastewater treatment facilities in operation after December 31, 2015, must comply with the treatment and disposal requirements of this subsection and department rules.

(h)   If it is demonstrated that a discharge, even if the discharge is otherwise in compliance with this subsection, will cause or contribute to a violation of state water quality standards, the department shall:

1.   Require more stringent effluent limitations;

2.   Order the point or method of discharge changed;

3.   Limit the duration or volume of the discharge; or

4.   Prohibit the discharge.

(i)   All sewage treatment facilities must monitor effluent for total nitrogen and total phosphorus concentration as required by department rule.

(j)   The department shall require the levels of operator certification and staffing necessary to ensure proper operation and maintenance of sewage facilities.

(k)   The department may adopt rules necessary to carry out this subsection.

(l)   The authority of a local government, including a special district, to mandate connection of a wastewater facility, as defined by department rule, is governed by s. 4, chapter 99-395, Laws of Florida.

History.—ss. 1, 2, 3, ch. 71-259; s. 2, ch. 71-137; s. 1, ch. 72-58; s. 271, ch. 77-147; s. 1, ch. 78-206; s. 75, ch. 79-65; s. 1, ch. 80-371; s. 1, ch. 81-246; s. 262, ch. 81-259; s. 2, ch. 86-173; s. 1, ch. 87-303; s. 71, ch. 93-213; s. 2, ch. 94-153; s. 361, ch. 94-356; s. 158, ch. 99-8; s. 25, ch. 2000-153; s. 12, ch. 2000-211; s. 6, ch. 2008-232; s. 38, ch. 2010-205; s. 73, ch. 2013-15; s. 1, ch. 2013-31.

**403.08601    Leah Schad Memorial Ocean Outfall Program.**—The Legislature declares that as funds become available the state may assist the local governments and agencies responsible for implementing the Leah Schad Memorial Ocean Outfall Program pursuant to s. 403.086(9). Funds received from other sources provided for in law, the General Appropriations Act, from gifts designated for implementation of the plan from individuals, corporations, or other entities, or federal funds appropriated by Congress for implementation of the plan, may be deposited into an account of the Water Quality Assurance Trust Fund.

History.—s. 7, ch. 2008-232; s. 70, ch. 2015-229.

**403.0862    Discharge of waste from state groundwater cleanup operations to publicly owned treatment works.**—

(1)   Upon agreement between a local governmental agency and the department, treated waste resulting from the department's cleanup or restoration of contaminated groundwater may be discharged to a publicly owned treatment works under the jurisdiction of the local governmental agency.

(2)   Upon a demonstration by the local government that it incurred damages and costs, including attorney's fees, as a result of the discharge from the department's cleanup operations, the department shall pay for all actual damages and costs, including, but not limited to, the cost of bringing the facility into compliance with any state or federal requirements.

(3)   Should the discharge from the department's cleanup operations exceed agreed upon pretreatment limits, the department shall pay the local government an agreed upon sum for each occasion that the discharge exceeds pretreatment limits without proof of damages as required by subsection (2).

(4)   The limitation on damages provided by s. 768.28(5) shall not apply to any obligation or payment which may become due under this section.

History.—s. 10, ch. 86-186.

**403.087   Permits; general issuance; denial; revocation; prohibition; penalty.**—

(1)   A stationary installation that is reasonably expected to be a source of air or water pollution must not be operated, maintained, constructed, expanded, or modified without an appropriate and currently valid permit issued by the department, unless exempted by department rule. In no event shall a permit for a water pollution source be issued for a term of more than 10 years, nor may an operation permit issued after July 1, 1992, for a major source of air pollution have a fixed term of more than 5 years. However, upon expiration, a new permit may be issued by the department in accordance with this chapter and the rules of the department.

(2)   The department shall adopt, and may amend or repeal, rules for the issuance, denial, modification, and revocation of permits under this section.

(3)   A renewal of an operation permit for a domestic wastewater treatment facility other than a facility regulated under the National Pollutant Discharge Elimination System (NPDES) Program under s. 403.0885 must be issued upon request for a term of up to 10 years, for the same fee and under the same conditions as a 5-year permit, in order to provide the owner or operator with a financial incentive, if:

(a)   The waters from the treatment facility are not discharged to Class I municipal injection wells or the treatment facility is not required to comply with the federal standards under the Underground Injection Control Program under chapter 62-528 of the Florida Administrative Code;

(b)   The treatment facility is not operating under a temporary operating permit or a permit with an accompanying administrative order and does not have any enforcement action pending against it by the United States Environmental Protection Agency, the department, or a local program approved under s. 403.182;

(c)   The treatment facility has operated under an operation permit for 5 years and, for at least the preceding 2 years, has generally operated in conformance with the limits of permitted flows and other conditions specified in the permit;

(d)   The department has reviewed the discharge-monitoring reports required under department rule and is satisfied that the reports are accurate;

(e)   The treatment facility has generally met water quality standards in the preceding 2 years, except for violations attributable to events beyond the control of the treatment plant or its operator, such as destruction of equipment by fire, wind, or other abnormal events that could not reasonably be expected to occur; and

(f)   The department, or a local program approved under s. 403.182, has conducted, in the preceding 12 months, an inspection of the facility and has verified in writing to the operator of the facility that it is not exceeding the permitted capacity and is in substantial compliance.

The department shall keep records of the number of 10-year permits applied for and the number and duration of permits issued for longer than 5 years.

(4)   The department shall issue permits on such conditions as are necessary to effect the intent and purposes of this section.

(5)   The department shall issue permits to construct, operate, maintain, expand, or modify an installation which may reasonably be expected to be a source of pollution only when it determines that the installation is provided or equipped with pollution control facilities that will abate or prevent pollution to the degree that will comply with the standards or rules adopted by the department, except as provided in s. 403.088 or s. 403.0872. However, separate construction permits shall not be required for installations permitted under s. 403.0885, except that the department may require an owner or operator proposing to construct, expand, or modify such an installation to submit for department review, as part of application for permit or permit modification, engineering

plans, preliminary design reports, or other information 90 days prior to commencing construction. The department may also require the engineer of record or another registered professional engineer, within 30 days after construction is complete, to certify that the construction was completed in accordance with the plans submitted to the department, noting minor deviations which were necessary because of site-specific conditions.

(6)(a)　The department shall require a processing fee in an amount sufficient, to the greatest extent possible, to cover the costs of reviewing and acting upon any application for a permit or request for site-specific alternative criteria or for an exemption from water quality criteria and to cover the costs of surveillance and other field services and related support activities associated with any permit or plan approval issued pursuant to this chapter. The department shall review the fees authorized under this chapter at least once every 5 years and shall adjust the fees upward, as necessary, within the fee caps established in this paragraph to reflect changes in the Consumer Price Index or similar inflation indicator. The department shall establish by rule the inflation index to be used for this purpose. In the event of deflation, the department shall consult with the Executive Office of the Governor and the Legislature to determine whether downward fee adjustments are appropriate based on the current budget and appropriation considerations. However, when an application is received without the required fee, the department shall acknowledge receipt of the application and shall immediately return the unprocessed application to the applicant and shall take no further action until the application is received with the appropriate fee. The department shall adopt a schedule of fees by rule, subject to the following limitations:

1.　The fee for any of the following may not exceed $32,500:

a.　Hazardous waste, construction permit.

b.　Hazardous waste, operation permit.

c.　Hazardous waste, postclosure permit, or clean closure plan approval.

d.　Hazardous waste, corrective action permit.

2.　The permit fee for a drinking water construction or operation permit, not including the operation license fee required under s. 403.861(7), shall be at least $500 and may not exceed $15,000.

3.　The permit fee for a Class I injection well construction permit may not exceed $12,500.

4.　The permit fee for any of the following permits may not exceed $10,000:

a.　Solid waste, construction permit.

b.　Solid waste, operation permit.

c.　Class I injection well, operation permit.

5.　The permit fee for any of the following permits may not exceed $7,500:

a.　Air pollution, construction permit.

b.　Solid waste, closure permit.

c.　Domestic waste residuals, construction or operation permit.

d.　Industrial waste, operation permit.

e.　Industrial waste, construction permit.

6.　The permit fee for any of the following permits may not exceed $5,000:

a.　Domestic waste, operation permit.

b.　Domestic waste, construction permit.

7.　The permit fee for any of the following permits may not exceed $4,000:

a.　Wetlands resource management—(dredge and fill and mangrove alteration).

b.　Hazardous waste, research and development permit.

c.　Air pollution, operation permit, for sources not subject to s. 403.0872.

d.　Class III injection well, construction, operation, or abandonment permits.

8.　The permit fee for a drinking water distribution system permit, including a general permit, shall be at least $500 and may not exceed $1,000.

9.　The permit fee for Class V injection wells, construction, operation, and abandonment permits may not exceed $750.

10.　The permit fee for domestic waste collection system permits may not exceed $500.

11.　The permit fee for stormwater operation permits may not exceed $100.

12.   Except as provided in subparagraph 8., the general permit fees for permits that require certification by a registered professional engineer or professional geologist may not exceed $500, and the general permit fee for other permit types may not exceed $100.

13.   The fee for a permit issued pursuant to s. 403.816 is $5,000, and the fee for any modification of such permit requested by the applicant is $1,000.

14.   The regulatory program and surveillance fees for facilities permitted pursuant to s. 403.088 or s. 403.0885, or for facilities permitted pursuant to s. 402 of the Clean Water Act, as amended, 33 U.S.C. ss. 1251 et seq., and for which the department has been granted administrative authority, shall be limited as follows:

a.   The fees for domestic wastewater facilities shall not exceed $7,500 annually. The department shall establish a sliding scale of fees based on the permitted capacity and shall ensure smaller domestic waste dischargers do not bear an inordinate share of costs of the program.

b.   The annual fees for industrial waste facilities shall not exceed $11,500. The department shall establish a sliding scale of fees based upon the volume, concentration, or nature of the industrial waste discharge and shall ensure smaller industrial waste dischargers do not bear an inordinate share of costs of the program.

c.   The department may establish a fee, not to exceed the amounts in subparagraphs 5. and 6., to cover additional costs of review required for permit modification or construction engineering plans.

(b)   If substantially similar air pollution sources are to be constructed or modified at the same facility, the applicant may submit a single application and permit fee for construction or modification of the sources at that facility. If substantially similar air pollution sources located at the same facility do not constitute a major source of air pollution subject to permitting under s. 403.0872, the applicant may submit a single application and permit fee for the operation of those sources. The department may develop, by rule, criteria for determining what constitutes substantially similar sources.

(c)   The fee schedule shall be adopted by rule. The amount of each fee shall be reasonably related to the costs of permitting, field services, and related support activities for the particular permitting activity taking into consideration consistently applied standard cost-accounting principles and economies of scale. If the department requires, by rule or by permit condition, that a permit be renewed more frequently than once every 5 years, the permit fee shall be prorated based upon the permit fee schedule in effect at the time of permit renewal.

(d)   Nothing in this subsection authorizes the construction or expansion of any stationary installation except to the extent specifically authorized by department permit or rule.

(e)   For all domestic waste collection system permits and drinking water distribution system permits, the department shall adopt a fee schedule, by rule, based on a sliding scale relating to pipe diameter, length of the proposed main, or equivalent dwelling units, or any combination of these factors. The department shall require a separate permit application and fee for each noncontiguous project within the system.

(7)   A permit issued pursuant to this section does not become a vested right in the permittee. The department may revoke any permit issued by it if it finds that the permitholder has:

(a)   Submitted false or inaccurate information in the application for the permit;

(b)   Violated law, department orders, rules, or conditions which directly relate to the permit;

(c)   Failed to submit operational reports or other information required by department rule which directly relate to the permit and has refused to correct or cure such violations when requested to do so; or

(d)   Refused lawful inspection under s. 403.091 at the facility authorized by the permit.

(8)   The department shall not issue a permit to any person for the purpose of engaging in, or attempting to engage in, any activity relating to the extraction of solid minerals not exempt pursuant to chapter 211 within any state or national park or state or national forest when the activity will degrade the ambient quality of the waters of the state or the ambient air within those areas. In the event the Federal Government prohibits the mining or leasing of solid minerals on federal park or forest lands, then, and to the extent of such prohibition, this act shall not apply to those federal lands.

(9)   A violation of this section is punishable as provided in this chapter.

(10)   Effective July 1, 2008, the minimum fee amounts shall be the minimum fees prescribed in this section, and such fee amounts shall remain in effect until the effective date of fees adopted by rule by the department.

History.—s. 1, ch. 71-203; s. 4, ch. 74-133; s. 14, ch. 78-95; s. 14, ch. 82-27; s. 1, ch. 82-54; s. 1, ch. 82-122; s. 59, ch. 83-218; s. 24, ch. 84-338; s. 11, ch. 86-186; s. 2, ch. 87-125; s. 17, ch. 88-393; s. 29, ch. 91-305; s. 2, ch. 92-132; s. 72, ch. 93-213; s. 1, ch. 97-103; s. 20, ch. 97-236; s. 4, ch. 2000-304; s. 5, ch. 2003-173; s. 19, ch. 2008-150; s. 46, ch. 2009-21; s. 13, ch. 2012-205.

**403.0871    Florida Permit Fee Trust Fund.**—There is established within the department a nonlapsing trust fund to be known as the "Florida Permit Fee Trust Fund." All funds received from applicants for permits pursuant to ss. 161.041, 161.053, 161.0535, 403.087(6), and 403.861(7)(a) shall be deposited in the Florida Permit Fee Trust Fund and shall be used by the department with the advice and consent of the Legislature to supplement appropriations and other funds received by the department for the administration of its responsibilities under this chapter and chapter 161. In no case shall funds from the Florida Permit Fee Trust Fund be used for salary increases without the approval of the Legislature.

History.—s. 2, ch. 82-122; s. 12, ch. 86-186; s. 30, ch. 91-305; s. 362, ch. 94-356; s. 60, ch. 96-321; s. 21, ch. 97-236; s. 47, ch. 2009-21.

**403.0872    Operation permits for major sources of air pollution; annual operation license fee.**—Provided that program approval pursuant to 42 U.S.C. s. 7661a has been received from the United States Environmental Protection Agency, beginning January 2, 1995, each major source of air pollution, including electrical power plants certified under s. 403.511, must obtain from the department an operation permit for a major source of air pollution under this section. This operation permit is the only department operation permit for a major source of air pollution required for such source; provided, at the applicant's request, the department shall issue a separate acid rain permit for a major source of air pollution that is an affected source within the meaning of 42 U.S.C. s. 7651a(1). Operation permits for major sources of air pollution, except general permits issued pursuant to s. 403.814, must be issued in accordance with the procedures contained in this section and in accordance with chapter 120; however, to the extent that chapter 120 is inconsistent with the provisions of this section, the procedures contained in this section prevail.

(1)  For purposes of this section, a major source of air pollution means a stationary source of air pollution, or any group of stationary sources within a contiguous area and under common control, which emits any regulated air pollutant and which is:

(a)  A major source within the meaning of 42 U.S.C. s. 7412(a)(1);

(b)  A major stationary source or major emitting facility within the meaning of 42 U.S.C. s. 7602(j) or 42 U.S.C. subchapter I, part C or part D;

(c)  An affected source within the meaning of 42 U.S.C. s. 7651a(1);

(d)  An air pollution source subject to standards or regulations under 42 U.S.C. s. 7411 or s. 7412; provided that a source is not a major source solely because of its regulation under 42 U.S.C. s. 7412(r); or

(e)  A stationary air pollution source belonging to a category designated as a 40 C.F.R. part 70 source by regulations adopted by the administrator of the United States Environmental Protection Agency under 42 U.S.C. ss. 7661 et seq. The department shall exempt those facilities that are subject to this section solely because they are subject to requirements under 42 U.S.C. s. 7411 or s. 7412 or solely because they are subject to reporting requirements under 42 U.S.C. s. 7412 for as long as the exemption is available under federal law.

(2)  An application for an operation permit for a major source of air pollution must be submitted in accordance with rules of the department governing permit applications. The department shall adopt rules defining the timing, content, and distribution of an application for a permit under this section. A permit application processing fee is not required. The department may issue an operation permit for a major source of air pollution only when it has reasonable assurance that the source applies pollution control technology, including fuel or raw material selection, necessary to enable it to comply with the standards or rules adopted by the department or an approved compliance plan for that source. If two or more major air pollution sources that belong to the same Major Group as described in the Standard Industrial Classification Manual, 1987, are operated at a single site, the owner may elect to receive a single operation permit covering all such sources at the site.

(a)  An application for a permit under this section is timely and complete if it is submitted in accordance with department rules governing the timing of applications and substantially addresses the information specified in

completeness criteria determined by department rule in accordance with applicable regulations of the United States Environmental Protection Agency governing the contents of applications for permits under 42 U.S.C. s. 7661b(d). Unless the department requests additional information or otherwise notifies the applicant of incompleteness within 60 days after receipt of an application, the application is complete.

(b)   Any permitted air pollution source that submits a timely and complete application for a permit under this section is entitled to operate in compliance with its existing air permit pending the conclusion of proceedings associated with its application. Notwithstanding the timing requirements of paragraph (c) and subsection (3), the department may process applications received during the first year of permit processing under this section, in a manner consistent with 42 U.S.C. s. 7661b(c).

(c)   The department may request additional information necessary to process a permit application subsequent to a determination of completeness in accordance with s. 403.0876(1).

(3)   Within 90 days after the date on which the department receives all information necessary to process an application for a permit under this section, the department shall issue a draft permit or a determination that the requested permit should be denied. A draft permit must contain all conditions that the department finds necessary to ensure that operation of the source will be in compliance with applicable law, rules, or compliance plans. If the department proposes to deny the permit application, the department's determination must provide an explanation for the denial. The department shall furnish a copy of each draft permit to the United States Environmental Protection Agency and to any contiguous state whose air quality could be affected or which is within 50 miles of the source pursuant to procedures established by department rule.

(4)   The department shall require the applicant to publish notice of any draft permit in accordance with department rule. The department must accept public comment with respect to a draft permit for 30 days following the date of notice publication. The notice must be published in a newspaper of general circulation as defined in s. 403.5115(2). If comments received during this period result in a change in the draft permit, the department must issue a revised draft permit, which shall be supplied to the United States Environmental Protection Agency and to any contiguous state whose air quality could be affected or which is within 50 miles of the source.

(5)   Any person whose substantial interests are affected by a draft permit or the denial determination may request an administrative hearing under ss. 120.569 and 120.57, in accordance with the rules of the department. A draft permit must notify the permit applicant of any review process applicable to the permit decision of the department. The department shall prescribe, by rule, a suitable standard format for such notification.

(6)   If a hearing is not requested under ss. 120.569 and 120.57, the draft permit will become the department's proposed permit but does not become final until the time for federal review of the proposed permit has elapsed. The department shall furnish the United States Environmental Protection Agency a copy of each proposed permit and its written response to any comments regarding the permit submitted by contiguous states. If no objection to the proposed permit is made by the United States Environmental Protection Agency within the time established by 42 U.S.C. s. 7661d, the proposed permit must become final no later than 55 days after the date on which the proposed permit was mailed to the United States Environmental Protection Agency. The department shall issue a conformed copy of the final permit as soon as is practicable thereafter.

(7)   If a draft permit is the subject of an administrative hearing under ss. 120.569 and 120.57, a proposed permit containing changes, if any, resulting from the hearing process, after the conclusion of the hearing, must be issued and a copy must be provided to the applicant, to the United States Environmental Protection Agency, and to any contiguous state whose air quality could be affected or which is within 50 miles of the source, as soon as practicable. The proposed permit shall not become final until the time for review, by the United States Environmental Protection Agency, of the proposed permit has elapsed. If comments from a contiguous state regarding the permit are received, the department must provide a written response to the applicant, to the state, and to the United States Environmental Protection Agency. If no objection to the proposed permit is made by the United States Environmental Protection Agency within the time established by 42 U.S.C. s. 7661d, the proposed permit must become final no later than 55 days after the date on which the proposed permit was mailed to the United States Environmental Protection Agency. The department shall issue a conformed copy of the final permit as soon as is practicable thereafter.

(8) If the administrator of the United States Environmental Protection Agency timely objects to a proposed permit under this section, the department must not issue a final permit until the objection is resolved or withdrawn. A copy of the written objection of the administrator must be provided to the permit applicant as soon as practicable after the department receives it. Within 45 days after the date on which the department serves the applicant with a copy of an objection by the United States Environmental Protection Agency to a proposed permit, the applicant may file a written reply to the objection. The written reply must include any supporting materials that the applicant desires to include in the record relevant to the issues raised by the objection. The written reply must be considered by the department in issuing a final permit to resolve the objection of the administrator. A final permit issued by the department to resolve an objection of the administrator is not subject to ss. 120.569 and 120.57.

(9) A final permit issued under this section is subject to judicial review under s. 120.68. If judicial review of a final permit results in material changes to the conditions of the permit, the department shall notify the United States Environmental Protection Agency and any state that is contiguous to this state whose air quality could be affected or that is within 50 miles of the source, pursuant to rules of the department.

(10) If the department is notified by the administrator of the United States Environmental Protection Agency that cause exists to terminate, modify, or revoke and reissue a permit under this section, the department shall, within 90 days after receipt of such notification, furnish to the administrator and the permittee a proposed determination of termination, modification, or revocation and reissuance as appropriate. Within 45 days after the date on which the department notifies the permittee that the United States Environmental Protection Agency proposes action regarding its permit, the permittee may file a written response concerning the proposed action. The written response must include any supporting materials that the permittee desires to include in the record relevant to the issues raised by the proposed action. The permittee's written response must be considered by the department in formulating its proposed determination under this subsection.

(11) Each major source of air pollution permitted to operate in this state must pay between January 15 and April 1 of each year, upon written notice from the department, an annual operation license fee in an amount determined by department rule. The annual operation license fee shall be terminated immediately in the event the United States Environmental Protection Agency imposes annual fees solely to implement and administer the major source air-operation permit program in Florida under 40 C.F.R. s. 70.10(d).

(a) The annual fee must be assessed based upon the source's previous year's emissions and must be calculated by multiplying the applicable annual operation license fee factor times the tons of each regulated air pollutant actually emitted, as calculated in accordance with the department's emissions computation and reporting rules. The annual fee shall only apply to those regulated pollutants,except carbon monoxide and greenhouse gases, for which an allowable numeric emission limiting standard is specified in the source's most recent construction or operation permit; provided, however, that:

1. The license fee factor is $25 or another amount determined by department rule which ensures that the revenue provided by each year's operation license fees is sufficient to cover all reasonable direct and indirect costs of the major stationary source air-operation permit program established by this section. The license fee factor may be increased beyond $25 only if the secretary of the department affirmatively finds that a shortage of revenue for support of the major stationary source air-operation permit program will occur in the absence of a fee factor adjustment. The annual license fee factor may never exceed $35.

2. The amount of each regulated air pollutant in excess of 4,000 tons per year emitted by any source, or group of sources belonging to the same Major Group as described in the Standard Industrial Classification Manual, 1987, may not be included in the calculation of the fee. Any source, or group of sources, which does not emit any regulated air pollutant in excess of 4,000 tons per year, is allowed a one-time credit not to exceed 25 percent of the first annual licensing fee for the prorated portion of existing air-operation permit application fees remaining upon commencement of the annual licensing fees.

3. If the department has not received the fee by March 1 of the calendar year, the permittee must be sent a written warning of the consequences for failing to pay the fee by April 1. If the fee is not postmarked by April 1 of the calendar year, the department shall impose, in addition to the fee, a penalty of 50 percent of the amount of

the fee, plus interest on such amount computed in accordance with s. 220.807. The department may not impose such penalty or interest on any amount underpaid, provided that the permittee has timely remitted payment of at least 90 percent of the amount determined to be due and remits full payment within 60 days after receipt of notice of the amount underpaid. The department may waive the collection of underpayment and shall not be required to refund overpayment of the fee, if the amount due is less than 1 percent of the fee, up to $50. The department may revoke any major air pollution source operation permit if it finds that the permitholder has failed to timely pay any required annual operation license fee, penalty, or interest.

4. Notwithstanding the computational provisions of this subsection, the annual operation license fee for any source subject to this section shall not be less than $250, except that the annual operation license fee for sources permitted solely through general permits issued under s. 403.814 shall not exceed $50 per year.

5. Notwithstanding the provisions of s. 403.087(6)(a)5.a., authorizing air pollution construction permit fees, the department may not require such fees for changes or additions to a major source of air pollution permitted pursuant to this section, unless the activity triggers permitting requirements under Title I, Part C or Part D, of the federal Clean Air Act, 42 U.S.C. ss. 7470-7514a. Costs to issue and administer such permits shall be considered direct and indirect costs of the major stationary source air-operation permit program under s. 403.0873. The department shall, however, require fees pursuant to the provisions of s. 403.087(6)(a)5.a. for the construction of a new major source of air pollution that will be subject to the permitting requirements of this section once constructed and for activities triggering permitting requirements under Title I, Part C or Part D, of the federal Clean Air Act, 42 U.S.C. ss. 7470-7514a.

(b) Annual operation license fees collected by the department must be sufficient to cover all reasonable direct and indirect costs required to develop and administer the major stationary source air-operation permit program, which shall consist of the following elements to the extent that they are reasonably related to the regulation of major stationary air pollution sources, in accordance with United States Environmental Protection Agency regulations and guidelines:

1. Reviewing and acting upon any application for such a permit.

2. Implementing and enforcing the terms and conditions of any such permit, excluding court costs or other costs associated with any enforcement action.

3. Emissions and ambient monitoring.

4. Preparing generally applicable regulations or guidance.

5. Modeling, analyses, and demonstrations.

6. Preparing inventories and tracking emissions.

7. Implementing the Small Business Stationary Source Technical and Environmental Compliance Assistance Program.

8. Any audits conducted under paragraph (c).

(c) An audit of the major stationary source air-operation permit program must be conducted 2 years after the United States Environmental Protection Agency has given full approval of the program to ascertain whether the annual operation license fees collected by the department are used solely to support any reasonable direct and indirect costs as listed in paragraph (b). A program audit must be performed biennially after the first audit.

(12) Permits issued under this section must allow changes within a permitted facility without requiring a permit revision, if the changes are not physical changes in, or changes in the method of operation of, the facility which increase the amount of any air pollutant emitted by the facility or which result in the emission of any air pollutant not previously emitted by the facility, and the changes do not exceed the emissions allowable under the permit (whether expressed therein as a rate of emissions or in terms of total emissions), provided that the facility provides the administrator and the department with 30 days' written, advance notice of the proposed changes. The department shall adopt rules implementing this flexibility requirement.

(13)(a) In order to ensure statewide consistency in the implementation of the national Acid Deposition Control Allowance Transfer System, a department district office or local pollution control program may not issue or administer permits under this section for any electrical power plant or any source that participates in the allowance transfer system.

(b)   For emission units that are subject to continuous monitoring requirements under 42 U.S.C. ss. 7661-7661f or 40 C.F.R. part 75, compliance with nitrogen oxides emission limits shall be demonstrated based on a 30-day rolling average, except as specifically provided by 40 C.F.R. part 60 or part 76.

(14)   In order to ensure statewide consistency in the permitting of major sources, a local pollution control program may not issue permits under this section for sources that belong to Major Group 26, Paper and Allied Products; for sources that belong to Major Group 28, Chemicals and Allied Products; or for sources that belong to Industry Number 2061, Cane Sugar, Except Refining, as defined in the Standard Industrial Classification Manual, 1987.

(15)   Any permittee that operates in compliance with an air-operation permit issued under this section is deemed to be in compliance with applicable permit requirements of the Clean Air Act and all implementing state, local, and federal air pollution control rules and regulations and all provisions of this chapter, relating to air pollution, and rules adopted thereunder.

(16)   The department shall adopt a rule to provide for a procedure for notice to the appropriate approved local pollution control programs, pursuant to s. 403.182, of any draft permits, amended draft permits, or final permits issued by the department.

(17)   The administrator of the United States Environmental Protection Agency may intervene as a matter of right in any administrative or judicial proceeding relating to an operation permit for a major source of air pollution required under this section.

(18)   The department shall require certification of all applications, submittals, and reports by a responsible official of a major source of air pollution and shall require the inclusion of those specific federal requirements listed at 42 U.S.C. s. 7661a(f)(1), (2), and (3) in all permits to which such terms apply.

History.—s. 3, ch. 92-132; s. 3, ch. 93-94; s. 2, ch. 94-321; s. 1, ch. 95-223; s. 3, ch. 95-292; s. 10, ch. 96-370; s. 130, ch. 96-410; s. 8, ch. 97-222; s. 22, ch. 97-236; s. 18, ch. 97-277; s. 26, ch. 2000-153; s. 59, ch. 2000-158; s. 13, ch. 2000-211; s. 13, ch. 2000-304; s. 17, ch. 2008-150; s. 85, ch. 2010-5; s. 18, ch. 2013-92.

**403.0873   Florida Air-Operation License Fee Account.**—The "Florida Air-Operation License Fee Account" is established as a nonlapsing account within the Department of Environmental Protection's Air Pollution Control Trust Fund. All license fees paid pursuant to s. 403.0872(11) shall be deposited in such account and must be used solely by the department and approved local programs under the advice and consent of the Legislature to pay the direct and indirect costs required to develop and administer the major stationary source air-operation permit program. Any approved local pollution control program that accepts funds from the department as reimbursement for services it performs in the implementation of the major source air-operation permit program, receives delegation from the department or the United States Environmental Protection Agency for implementation of the major source air-operation permit program, or performs functions, duties, or activities substantially similar to or duplicative of the services performed by the department or the United States Environmental Protection Agency in the implementation of the major source air-operation permit program is prohibited from collecting additional fees attributable to such services from any source permitted under s. 403.0872.

History.—s. 5, ch. 92-132; s. 3, ch. 94-321; s. 363, ch. 94-356.

**403.08735   Air emissions trading.**—

(1)   GENERIC AIR EMISSIONS BUBBLE RULE.—The department shall promulgate by July 1, 1996, a generic air emissions bubble rule to the fullest extent consistent with federal law that includes all elements necessary to obtain approval from the United States Environmental Protection Agency to administer the program. The generic air emissions bubble rule shall eliminate the need for case-by-case federal determinations on individual emissions trades within a single facility as individual State Implementation Plan revisions. For purposes of promulgating a generic air emissions bubble rule:

(a)   The term "bubble" shall mean an air pollution control strategy which allows multiunit aggregate emission limits to be established within a facility, in lieu of unit-specific emission limits, on a pollutant-specific basis at the request of the facility owner or operator. The application of a bubble to a facility would allow emissions at one or more emissions points or units to fluctuate within a facility as long as the multiunit limit is not exceeded. Multiunit

limits shall be established by aggregating unit-specific limits for all new or existing units being included in the bubble. The bubble shall also allow the department to establish, at the request of the owner or operator of a facility, alternative emission limits for individual units as long as the aggregated emissions limit for all involved units is not increased.

(b)    The term "facility" shall mean all emissions units that are located on one or more contiguous or adjacent properties that are under common control of the same person or persons. For purposes of this section, the terms "plantwide" and "facilitywide" are used interchangeably.

(2)    VOLUNTARY LIMITS ON AIR EMISSIONS.—The department shall adopt rules to allow facilities to voluntarily limit their emissions to avoid otherwise applicable requirements.

History.—s. 1, ch. 95-292; s. 36, ch. 99-5.

### 403.0874    Air Pollution Control Trust Fund.—

(1)    The Air Pollution Control Trust Fund is established in and administered by the Department of Environmental Protection.

(2)    Funds to be credited to and uses of the trust fund shall be administered in accordance with ss. 320.03, 376.60, 403.0872, and 403.0873.

(3)    Notwithstanding s. 216.301 and pursuant to s. 216.351, any balance in the trust fund at the end of a fiscal year shall remain in the trust fund and shall be available for carrying out the purposes of the trust fund.

History.—s. 3, ch. 2015-8.

### 403.0875    Citation of rule.—In addition to any other provisions within this part or any rules promulgated

hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 7, ch. 79-161.

### 403.0876    Permits; processing.—

(1)    Within 30 days after receipt of an application for a permit under this chapter, the department shall review the application and shall request submittal of all additional information the department is permitted by law to require. If the applicant believes any departmental request for additional information is not authorized by law or departmental rule, the applicant may request a hearing pursuant to ss. 120.569 and 120.57. Within 30 days after receipt of such additional information, the department shall review it and may request only that information needed to clarify such additional information or to answer new questions raised by or directly related to such additional information. If the applicant believes the request of the department for such additional information is not authorized by law or departmental rule, the department, at the applicant's request, shall proceed to process the permit application.

(2)(a)    A permit shall be approved or denied within 90 days after receipt of the original application, the last item of timely requested additional material, or the applicant's written request to begin processing the permit application.

(b)    The failure of the department to approve or deny a permit for an underground injection well, within the 90-day time period shall not result in the automatic approval or denial of the permit and shall not prevent the inclusion of specific permit conditions which are necessary to ensure compliance with applicable statutes and rules. If the department fails to approve or deny such a permit within the 90-day period, the applicant may petition for a writ of mandamus to compel the department to act consistently with applicable regulatory requirements.

(c)    The failure of the department to approve or deny an application for an operation permit for a major source of air pollution, as defined in s. 403.0872, within the 90-day time period shall not result in the automatic approval or denial of the permit and shall not prevent the inclusion of specific permit conditions which are necessary to ensure compliance with applicable statutes and rules. If the department fails to approve or deny an operation permit for a major source of air pollution within the 90-day period specified in s. 403.0872, the applicant or a

party who participated in the public comment process may petition for a writ of mandamus to compel the department to act.

(d)   Permits issued pursuant to s. 403.088 or s. 403.0885 shall be processed in accordance with s. 403.0885(3).

(3)(a)   The department shall establish a special unit for permit coordination and processing to provide expeditious processing of department permits which the district offices are unable to process expeditiously and to provide accelerated processing of certain permits or renewals for economic and operating stability. The ability of the department to process applications under this subsection in a more timely manner than allowed by subsections (1) and (2) is dependent upon the timely exchange of information between the applicant and the department and the intervention of outside parties as allowed by law. An applicant may request the processing of its permit application by the special unit if the application is from an area of high unemployment or low per capita income, is from a business or industry that is the primary employer within an area's labor market, or is in an industry with respect to which the complexities involved in the review of the application require special skills uniquely available in the headquarters office. The department may require the applicant to waive the 90-day time limitation for department issuance or denial of the permit once for a period not to exceed 90 days. The department may require a special fee to cover the direct cost of processing special applications in addition to normal permit fees and costs. The special fee may not exceed $10,000 per permit required. Applications for renewal permits, but not applications for initial permits, required for facilities pursuant to the Electrical Power Plant Siting Act or the Florida Electric Transmission Line Siting Act may be processed under this subsection. Personnel staffing the special unit shall have lengthy experience in permit processing.

(b)   At the applicant's discretion and notwithstanding any other provisions of chapter 120, a permit processed under this subsection is subject to an expedited administrative hearing pursuant to ss. 120.569 and 120.57. To request such hearing, the applicant must notify the Division of Administrative Hearings, the department, and all other parties in writing within 15 days after his or her receipt of notice of assignment of an administrative law judge from the division. The division shall conduct a hearing within 45 days after receipt of the request for such expedited hearing.

History.—s. 2, ch. 80-66; s. 25, ch. 84-338; s. 13, ch. 86-186; s. 14, ch. 88-393; s. 6, ch. 92-132; s. 4, ch. 93-94; s. 73, ch. 93-213; s. 364, ch. 94-356; s. 131, ch. 96-410; s. 1006, ch. 97-103; s. 69, ch. 2006-230.

### 403.0877    Certification by professionals regulated by the Department of Business and Professional Regulation.—

(1)   Nothing in this section shall be construed as specific authority for a water management district or the department to require certification by a professional engineer licensed under chapter 471, a professional landscape architect licensed under part II of chapter 481, a professional geologist licensed under chapter 492, or a professional surveyor and mapper licensed under chapter 472, for an activity that is not within the definition or scope of practice of the regulated profession.

(2)   If an application for a permit or license to conduct an activity regulated under this chapter, chapter 373, chapter 376, or any permitting program delegated to a water management district by a state agency, or to undertake corrective action of such activity or program ordered by the department or a water management district, requires the services of a professional as enumerated in subsection (1), the department or governing board of a water management district may require, by rule, in conjunction with such an application or any submittals required as a condition of granting a permit or license, or in conjunction with the order of corrective action, such certification by the professional as is necessary to ensure that the proposed activity or corrective action is designed, constructed, operated, and maintained in accordance with applicable law and rules of the department or district and in conformity with proper and sound design principles, or other such certification by the professional as may be necessary to ensure compliance with applicable law or rules of the department or district. The department or governing board of a water management district may further require as a condition of granting a permit or license, or in conjunction with ordering corrective action that the professional certify upon completion of the permitted or licensed activity or corrective action that such activity or corrective action has, to the best of

his or her knowledge, been completed in substantial conformance with the plans and specifications approved by the department or board.

(3)   The cost of such certifications by the professional shall be borne by the permittee or the person ordered to correct the permitted activity.

(4)   A permitted or licensed activity or corrective action that is required to be so certified upon completion of the activity or action may not be placed into use or operation until the professional's certificate is filed with the department or board.

History.—s. 9, ch. 89-324; s. 31, ch. 91-305; s. 115, ch. 94-119; s. 53, ch. 94-218; s. 2, ch. 97-103.

403.088    Water pollution operation permits; conditions.—

(1)   Without the written authorization of the department, a person may not discharge any waste into the waters of the state which, by itself or in combination with the wastes of other sources, reduces the quality of the receiving waters below the classification established for such waters. However, this section does not prohibit the application of pesticides to such waters for the control of insects, aquatic weeds, algae, or other pests if the application is performed in accordance with this section.

(a)   Upon execution of the agreement required in s. 487.163(3), the department may develop a permit or other authorization as required by 33 U.S.C. s. 1342 for the application of pesticides. A person must obtain such permit or other authorization before applying pesticides to the waters of the state.

(b)   In consultation with the Department of Agriculture and Consumer Services and the Fish and Wildlife Conservation Commission, the department shall also develop a general permit under s. 403.0885(2), for the application of pesticides.

(c)   The department shall also enter into agreements with the Department of Agriculture and Consumer Services in the case of insect or other pest control, and with the Fish and Wildlife Conservation Commission in the case of aquatic weed, other aquatic pests, or algae control. Such agreements must provide for public health, welfare, and safety, as well as environmental factors, and must ensure that pesticides applied to waters of the state are regulated uniformly, including provisions for the coordination of agency staff and resources, through the implementation of permitting, compliance, and enforcement activities under s. 403.0885 and this section. Pesticides that are approved for a particular use by the United States Environmental Protection Agency or by the Department of Agriculture and Consumer Services and applied in accordance with registered label instructions, state standards for such application, including any permit or other authorization required by this subsection, and the Florida Pesticide Law, part I of chapter 487, are allowed a temporary deviation from the acute toxicity provisions of the department's rule establishing surface water quality standards, not to exceed the time necessary to control the target pests and only if the application does not reduce the quality of the receiving waters below the classification for such waters and is not likely to adversely affect any threatened or endangered species.

(2)(a)   Any person intending to discharge wastes into waters of the state shall make application to the department for any appropriate permit required by this chapter. Application shall be made on a form prescribed by the department and shall contain such information as the department requires.

(b)1.   If the department finds that the proposed discharge will reduce the quality of the receiving waters below the classification established for them, it shall deny the application and refuse to issue a permit. The department may not use the results from a field procedure or laboratory method to make such a finding or determine facility compliance unless the field procedure or laboratory method has been adopted by rule or noticed and approved by department order pursuant to department rule. Field procedures and laboratory methods must satisfy the quality assurance requirements of department rule and must produce data of known and verifiable quality. The results of field procedures and laboratory methods shall be evaluated for sources of uncertainty to assure suitability for the intended purposes as properly documented with each procedure or method.

2.   If the department finds that the proposed discharge will not reduce the quality of the receiving waters below the classification established for them, it may issue an operation permit if it finds that such degradation is necessary or desirable under federal standards and under circumstances which are clearly in the public interest.

(c)   A permit shall:

1. Specify the manner, nature, volume, and frequency of the discharge permitted;

2. Require proper operation and maintenance of any pollution abatement facility by qualified personnel in accordance with standards established by the department;

3. Contain such additional conditions, requirements, and restrictions as the department deems necessary to preserve and protect the quality of the receiving waters;

4. Be valid for the period of time specified therein; and

5. Constitute the state National Pollutant Discharge Elimination System permit when issued pursuant to the authority in s. 403.0885.

(d) An operation permit may be renewed upon application to the department if the discharge complies with permit conditions and applicable statutes and rules. No operation permit shall be renewed or issued if the department finds that the discharge will not comply with permit conditions or applicable statutes and rules.

(e) However, if the discharge will not meet permit conditions or applicable statutes and rules, the department may issue, renew, revise, or reissue the operation permit if:

1. The applicant is constructing, installing, or placing into operation, or has submitted plans and a reasonable schedule for constructing, installing, or placing into operation, an approved pollution abatement facility or alternative waste disposal system;

2. The applicant needs permission to pollute the waters within the state for a period of time necessary to complete research, planning, construction, installation, or operation of an approved and acceptable pollution abatement facility or alternative waste disposal system;

3. There is no present, reasonable, alternative means of disposing of the waste other than by discharging it into the waters of the state;

4. The granting of an operation permit will be in the public interest;

5. The discharge will not be unreasonably destructive to the quality of the receiving waters; or

6. A water quality credit trade that meets the requirements of s. 403.067.

(f) A permit issued, renewed, or reissued pursuant to paragraph (e) shall be accompanied by an order establishing a schedule for achieving compliance with all permit conditions. Such permit may require compliance with the accompanying order.

(g) The Legislature finds that the restoration of the South Florida ecosystem is in the public interest. Accordingly, whenever a facility to be constructed, operated, or maintained in accordance with s. 373.1501, s. 373.1502, s. 373.4595, or s. 373.4592 is subjected to permitting requirements pursuant to chapter 373 or this chapter, and the issuance of the initial permit for a new source, a new discharger, or a recommencing discharger is subjected to a request for hearing pursuant to s. 120.569, the administrative law judge may, upon motion by the permittee, issue a recommended order to the secretary who, within 5 days, shall issue an order authorizing the interim construction, operation, and maintenance of the facility if it complies with all uncontested conditions of the proposed permit and all other conditions recommended by the administrative law judge during the period until the final agency action on the permit.

1. An order authorizing such interim construction, operation, and maintenance shall be granted if requested by motion and no party opposes it.

2. If a party to the administrative hearing pursuant to ss. 120.569 and 120.57 opposes the motion, the administrative law judge shall issue a recommended order granting the motion if the administrative law judge finds that:

a. The facility is likely to receive the permit; and

b. The environment will not be irreparably harmed by the construction, operation, or maintenance of the facility pending final agency action on the permit.

3. Prior to granting a contested motion for interim construction, operation, or maintenance of a facility regulated or otherwise permitted by s. 373.1501, s. 373.1502, s. 373.4595, or s. 373.4592, the administrative law judge shall conduct a hearing using the summary hearing process defined in s. 120.574, which shall be mandatory for motions made pursuant to this paragraph. Notwithstanding the provisions of s. 120.574(1), summary hearing proceedings for these facilities shall begin within 30 days of the motion made by the permittee. Within 15 days of

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 53 of 694

the conclusion of the summary proceeding, the administrative law judge shall issue a recommended order either denying or approving interim construction, operation, or maintenance of the facility, which shall be submitted to the secretary who shall within 5 days thereafter, enter an order granting or denying interim construction operation or maintenance of the facility. The order shall remain in effect until final agency action is taken on the permit.

(3)(a)   The provisions of this section shall not be construed to repeal or restrict any other provisions of this chapter, but shall be cumulative thereto.

(b)   This section shall not be construed to exempt any permittee from the pollution control requirements of any local air and water pollution control rule, regulation, ordinance, or code, or to authorize or allow any violation thereof.

(4)   Notwithstanding any act to the contrary, if the discharge from any sewage disposal or treatment plant is permitted pursuant to this chapter and by a local pollution control program, the discharge shall be deemed lawful. Further, any person, firm, corporation, or public body that constructs, reconstructs, extends, or increases the capacity or volume of any sewage disposal or treatment plant pursuant to permits or authorizations under this chapter and through any local pollution control program shall not be subject to an action by the state attorney to restrain, enjoin, or otherwise prevent such construction, reconstruction, extension, or increase.

History.—ss. 2, 3, 5, ch. 71-203; s. 1, ch. 73-360; s. 5, ch. 74-133; s. 2, ch. 76-112; s. 1, ch. 77-174; s. 14, ch. 78-95; s. 2, ch. 78-98; s. 97, ch. 79-164; s. 60, ch. 83-218; s. 14, ch. 86-186; s. 74, ch. 93-213; s. 365, ch. 94-356; s. 1, ch. 97-98; s. 159, ch. 99-8; s. 1, ch. 99-11; s. 27, ch. 2000-153; s. 8, ch. 2001-172; s. 5, ch. 2004-64; s. 2, ch. 2008-189; s. 47, ch. 2009-86; ss. 4, 11, ch. 2010-277; HJR 5-A, Special Session A; s. 19, ch. 2013-92; s. 3, ch. 2013-146.

## 403.0881   Wastewater or reuse or disposal systems or water treatment works; construction permits.—The
department may issue construction permits under s. 403.087 for wastewater systems, treatment works, or reuse or disposal systems based upon review of a preliminary design report, application forms, and other required information, all of which shall be formulated by department rule. Detailed construction plans and specifications shall not be required prior to issuance of a permit or a modification to a permit required under s. 403.087 or an operation permit required under s. 403.0885 unless such plans and specifications are required to secure federal funding and the project is expected to receive federal funding. Upon a demonstration that a system constructed in accordance with a construction permit issued pursuant to s. 403.087 operates as designed, the department shall issue a permit for operation of the system. However, an operation permit may be issued prior to the initiation of discharge, provided the department has reasonable assurance, based on the system design, that the provisions of s. 403.088 will be met.

History.—s. 3, ch. 87-125; s. 75, ch. 93-213.

## 403.0882   Discharge of demineralization concentrate.—

(1)   The Legislature finds and declares that it is in the public interest to conserve and protect water resources, provide adequate water supplies and provide for natural systems, and promote brackish water demineralization as an alternative to withdrawals of freshwater groundwater and surface water by removing institutional barriers to demineralization and, through research, including demonstration projects, to advance water and water byproduct treatment technology, sound waste byproduct disposal methods, and regional solutions to water resources issues. In order to promote the state objective of alternative water supply development, including the use of demineralization technologies, and to encourage the conservation and protection of the state's natural resources, the concentrate resulting from demineralization must be classified as potable water byproduct regardless of flow quantity and must be appropriately treated and discharged or reused.

(2)   For the purposes of this section, the term:

(a)   "Demineralization concentrate" means the concentrated byproduct water, brine, or reject water produced by ion exchange or membrane separation technologies such as reverse osmosis, membrane softening, ultrafiltration, membrane filtration, electrodialysis, and electrodialysis reversal used for desalination, softening, or reducing total dissolved solids during water treatment for public water supply purposes.

(b)   "Small water utility business" means any facility that distributes potable water to two or more customers with a concentrate discharge of less than 50,000 gallons per day.

(3)   The department shall initiate rulemaking no later than October 1, 2001, to address facilities that discharge demineralization concentrate. The department shall convene a technical advisory committee to assist in the development of the rules, which committee shall include one representative each from the demineralization industry, local government, water and wastewater utilities, the engineering profession, business, and environmental organizations. The technical advisory committee shall also include one member representing the five water management districts and one representative from the Fish and Wildlife Research Institute. In convening the technical advisory committee, consideration must be given to geographical balance. The rules must address, at a minimum:

(a)   Permit application forms for concentrate disposal;

(b)   Specific options and requirements for demineralization concentrate disposal, including a standardized list of effluent and monitoring parameters, which may be adjusted or expanded by the department as necessary to protect water quality;

(c)   Specific requirements and accepted methods for evaluating mixing of effluent in receiving waters; and

(d)   Specific toxicity provisions.

(4)(a)   For facilities that discharge demineralization concentrate, the failure of whole effluent toxicity tests predominantly due to the presence of constituents naturally occurring in the source water, limited to calcium, potassium, sodium, magnesium, chloride, bromide, and other constituents designated by the department, may not be the basis for denial of a permit, denial of a permit renewal, revocation of a permit, or other enforcement action by the department as long as the volume of water necessary to achieve water quality standards is available within a distance not in excess of two times the natural water depth at the point of discharge under all flow conditions.

(b)   If failure of whole effluent toxicity tests is due predominately to the presence of the naturally occurring constituents identified in paragraph (a), the department shall issue a permit for the demineralization concentrate discharge if:

1.   The volume of water necessary to achieve water quality standards is available within a distance not in excess of two times the natural water depth at the point of discharge under all flow conditions; and

2.   All other permitting requirements are met.

A variance for toxicity under the circumstance described in this paragraph is not required.

(c)   Facilities that fail to meet the requirements of this subsection may be permitted in accordance with department rule, including all applicable moderating provisions such as variances, exemptions, and mixing zones.

(5)   Blending of demineralization concentrate with reclaimed water shall be allowed in accordance with the department's reuse rules.

(6)   This subsection applies only to small water utility businesses.

(a)   The discharge of demineralization concentrate from small water utility businesses is presumed to be allowable and permittable in all waters in the state if:

1.   The discharge meets the effluent limitations in s. 403.086(4), except that high level disinfection is not required unless the presence of fecal coliforms in the source water will result in the discharge not meeting applicable water quality standards;

2.   The discharge of demineralization concentrate achieves a minimum of 4-to-1 dilution within a distance not in excess of two times the natural water depth at the point of discharge under all flow conditions; and

3.   The point of discharge is located at a reasonably accessible point that minimizes water quality impacts to the greatest extent possible.

(b)   The presumption in paragraph (a) may be overcome only by a demonstration that one or more of the following conditions is present:

1.   The discharge will be made directly into an Outstanding Florida Water, except as provided in chapter 90-262, Laws of Florida;

2.   The discharge will be made directly to Class I or Class II waters;

3.    The discharge will be made to a water body having a total maximum daily load established by the department and the discharge will cause or contribute to a violation of the established load;

4.    The discharge fails to meet the requirements of the antidegradation policy contained in the department rules;

5.    The discharge will be made to a sole-source aquifer;

6.    The discharge fails to meet applicable surface water and groundwater quality standards; or

7.    The results of any toxicity test performed by the applicant under paragraph (d) or by the department indicate that the discharge does not meet toxicity requirements at the boundary of the mixing zone under subparagraph (a)2.

(c)    If one or more of the conditions in paragraph (b) has been demonstrated, the department may:

1.    Require more stringent effluent limitations;

2.    Require relocation of the discharge point or a change in the method of discharge;

3.    Limit the duration or volume of the discharge; or

4.    Prohibit the discharge if there is no alternative that meets the conditions of subparagraphs 1.-3.

(d)    For facilities owned by small water utility businesses, the department may not:

1.    Require those businesses to perform toxicity testing at other than the time of permit application, permit renewal, or any requested permit modification, unless the initial toxicity test or any subsequent toxicity test performed by the department does not meet toxicity requirements.

2.    Require those businesses to obtain a water-quality-based effluent limitation determination.

(7)    The department may adopt additional rules for the regulation of demineralization and to administer this section and s. 403.061(11)(b).

History.—s. 43, ch. 97-160; s. 1, ch. 2001-188; s. 12, ch. 2004-264.


403.0885    Establishment of federally approved state National Pollutant Discharge Elimination System (NPDES) Program.—

(1)    The Legislature finds and declares that it is in the public interest to promote effective and efficient regulation of the discharge of pollutants into waters of the state and eliminate duplication of permitting programs by the United States Environmental Protection Agency under s. 402 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and the department under this chapter. It is further found that state implementation of the federal NPDES program, with sufficient time for legislative revision prior to the implementation of the state NPDES permit program by the department, would promote the orderly establishment of a state-administered NPDES program. It is the specific intent of the Legislature that permit fees charged by the department for processing of federally approved NPDES permits be adequate to cover the entire cost to the department of program management, for reviewing and acting upon any permit application, and to cover the cost of surveillance and other field services of any permits issued pursuant to this section.

(2)    The department is empowered to establish a state NPDES program in accordance with s. 402 of the Clean Water Act, as amended. The department shall have the power and authority to assume the NPDES permitting program from the United States Environmental Protection Agency and to implement the program, including the general permitting program under 40 C.F.R. s. 122.28 and the pretreatment program under 40 C.F.R. part 403, in accordance with s. 402(b) of the Clean Water Act, as amended, and 40 C.F.R. part 123. Variance, thermal variance, and provisions for relief from criteria set forth in the Clean Water Act, as amended, and corresponding United States Environmental Protection Agency regulations shall be part of the assumed NPDES permitting program. The department may not accept authorization to administer a state NPDES program for municipal stormwater for a period of 4 years following federal approval of the state NPDES program. The provisions governing upset and bypass conditions contained in 40 C.F.R. s. 122.41 shall apply to the state National Pollutant Discharge Elimination System Program. The state NPDES permit shall be the sole permit issued by the state under this chapter regulating the discharge of pollutants or wastes into surface waters within the state for discharges covered by the United States Environmental Protection Agency approved state NPDES program. This legislative authority is intended to be sufficient to enable the department to qualify for delegation of the federal NPDES program to the state and

operate such program in accordance with federal law. Only that portion of the facility permit which authorizes a discharge pursuant to s. 402 of the Clean Water Act, as amended, shall be submitted to the United States Environmental Protection Agency for review under that section. To the extent other sections of this chapter apply and do not conflict with federal requirements, the application of such sections to discharges regulated under this section is not prohibited.

(3)    An application for an NPDES permit and other approvals from the state relating to the permitted activity shall be granted or denied by the department within the time allowed for permit review under 40 C.F.R. part 124, subpart A. Other than for stormwater discharge permitting, the decision on issuance or denial of such permit may not be delegated to another agency or governmental authority. The department is specifically exempted from the time limitations provided in ss. 120.60 and 403.0876; provided that upon timely application for renewal, a permit issued under this section shall not expire until the application has been finally acted upon or until the last day for seeking judicial review of the agency order or a later date fixed by order of the reviewing court. However, if the department fails to render a permitting decision within the time allowed by 40 C.F.R. part 124, subpart A, or a memorandum of agreement executed by the department and the United States Environmental Protection Agency, whichever is shorter, the applicant may apply for an order from the circuit court requiring the department to render a decision within a specified time.

(4)    The department shall respond, in writing, to any written comments on a pending application for a state NPDES permit which the department receives from the executive director, or his or her designee, of the Fish and Wildlife Conservation Commission on matters within the commenting agency's jurisdiction. The department's response shall not constitute agency action for purposes of ss. 120.569 and 120.57 or other provisions of chapter 120.

(5)    Certified aquaculture activities under s. 597.004 that have individual production units whose annual production and water discharge are less than the parameters established by the NPDES program are exempt from wastewater management regulations. For purposes herein, the term "individual production units" shall be determined by rule of the Department of Agriculture and Consumer Services.

History.—s. 23, ch. 88-393; s. 16, ch. 92-132; s. 76, ch. 93-213; s. 366, ch. 94-356; s. 132, ch. 96-410; s. 1007, ch. 97-103; s. 16, ch. 98-203; s. 22, ch. 98-333; s. 204, ch. 99-245.

**403.08852     Clarification of requirements under rule 62-302.520(2), F.A.C.**—For purposes of rule 62-302.520(2), Florida Administrative Code, new sources of heated water discharges shall include an expansion, modification, alteration, replacement, or repair of an existing source only if that charge increases the potential thermal loading to surface waters of the state by 10 percent or more compared to the potential thermal loading from that source as of August 1972.

History.—s. 6, ch. 95-215.

**403.0891     State, regional, and local stormwater management plans and programs.**—The department, the water management districts, and local governments shall have the responsibility for the development of mutually compatible stormwater management programs.

(1)    The department shall include goals in the water resource implementation rule for the proper management of stormwater.

(2)    Each water management district to which the state's stormwater management program is delegated shall establish district and, where appropriate, watershed or drainage basin stormwater management goals which are consistent with the goals adopted by the state and with plans adopted pursuant to ss. 373.451-373.4595, the Surface Water Improvement and Management Act.

(3)(a)    Each local government required by chapter 163 to submit a comprehensive plan, whose plan is submitted after July 1, 1992, and the others when updated after July 1, 1992, in the development of its stormwater management program described by elements within its comprehensive plan shall consider the water resource implementation rule, district stormwater management goals, plans approved pursuant to the Surface Water Improvement and Management Act, ss. 373.451-373.4595, and technical assistance information provided by the water management districts pursuant to s. 373.711.

(b)   Local governments are encouraged to consult with the water management districts, the Department of Transportation, and the department before adopting or updating their local government comprehensive plan or public facilities report as required by s. 189.08, whichever is applicable.

(4)   The department, in coordination and cooperation with water management districts and local governments, shall conduct a continuing review of the costs of stormwater management systems and the effect on water quality and quantity, and fish and wildlife values. The department, the water management districts, and local governments shall use the review for planning purposes and to establish priorities for watersheds and stormwater management systems which require better management and treatment of stormwater with emphasis on the costs and benefits of needed improvements to stormwater management systems to better meet needs for flood protection and protection of water quality, and fish and wildlife values.

(5)   The results of the review shall be maintained by the department and the water management districts and shall be provided to appropriate local governments or other parties on request. The results also shall be used in the development of the goals developed pursuant to subsections (1) and (2).

(6)   The department and the Department of Economic Opportunity, in cooperation with local governments in the coastal zone, shall develop a model stormwater management program that could be adopted by local governments. The model program shall contain dedicated funding options, including a stormwater utility fee system based upon an equitable unit cost approach. Funding options shall be designed to generate capital to retrofit existing stormwater management systems, build new treatment systems, operate facilities, and maintain and service debt.

History.—s. 15, ch. 86-186; s. 32, ch. 89-279; s. 73, ch. 93-206; s. 367, ch. 94-356; s. 25, ch. 97-160; s. 23, ch. 2010-205; s. 62, ch. 2012-96; s. 86, ch. 2014-22.

## 403.0893   Stormwater funding; dedicated funds for stormwater management.—In addition to any other funding mechanism legally available to local government to construct, operate, or maintain stormwater systems, a county or municipality may:

(1)   Create one or more stormwater utilities and adopt stormwater utility fees sufficient to plan, construct, operate, and maintain stormwater management systems set out in the local program required pursuant to s. 403.0891(3);

(2)   Establish and set aside, as a continuing source of revenue, other funds sufficient to plan, construct, operate, and maintain stormwater management systems set out in the local program required pursuant to s. 403.0891(3); or

(3)   Create, alone or in cooperation with counties, municipalities, and special districts pursuant to the Interlocal Cooperation Act, s. 163.01, one or more stormwater management system benefit areas. All property owners within said area may be assessed a per acreage fee to fund the planning, construction, operation, maintenance, and administration of a public stormwater management system for the benefited area. Any benefit area containing different land uses which receive substantially different levels of stormwater benefits shall include stormwater management system benefit subareas which shall be assessed different per acreage fees from subarea to subarea based upon a reasonable relationship to benefits received. The fees shall be calculated to generate sufficient funds to plan, construct, operate, and maintain stormwater management systems called for in the local program required pursuant to s. 403.0891(3). For fees assessed pursuant to this section, counties or municipalities may use the non-ad valorem levy, collection, and enforcement method as provided for in chapter 197.

History.—s. 16, ch. 86-186; s. 34, ch. 89-279.

## 403.0896   Training and assistance for stormwater management system personnel.—The Stormwater Management Assistance Consortium of the State University System, working in cooperation with the community colleges in the state, interested accredited private colleges and universities, the department, the water management districts, and local governments, shall develop training and assistance programs for persons responsible for designing, building, inspecting, or operating and maintaining stormwater management systems.

History.—s. 33, ch. 89-279.

**403.091  Inspections.**—

(1)(a)  Any duly authorized representative of the department may at any reasonable time enter and inspect, for the purpose of ascertaining the state of compliance with the law or rules and regulations of the department, any property, premises, or place, except a building which is used exclusively for a private residence, on or at which:

1.  A hazardous waste generator, transporter, or facility or other air or water contaminant source;

2.  A discharger, including any nondomestic discharger which introduces any pollutant into a publicly owned treatment works;

3.  Any facility, as defined in s. 376.301; or

4.  A resource recovery and management facility

is located or is being constructed or installed or where records which are required under this chapter, ss. 376.30-376.317, or department rule are kept.

(b)  Any duly authorized representative may at reasonable times have access to and copy any records required under this chapter or ss. 376.30-376.317; inspect any monitoring equipment or method; sample for any pollutants as defined in s. 376.301, effluents, or wastes which the owner or operator of such source may be discharging or which may otherwise be located on or underlying the owner's or operator's property; and obtain any other information necessary to determine compliance with permit conditions or other requirements of this chapter, ss. 376.30-376.317, or department rules.

(c)  No person shall refuse reasonable entry or access to any authorized representative of the department who requests entry for purposes of inspection and who presents appropriate credentials; nor shall any person obstruct, hamper, or interfere with any such inspection. The owner or operator of the premises shall receive a report, if requested, setting forth all facts found which relate to compliance status.

(2)  An inspection pursuant to subsection (1) may be conducted only after:

(a)  Consent for the inspection is received from the owner, operator, or person in charge; or

(b)  The appropriate inspection warrant as provided in this section is obtained.

(3)(a)  An inspection warrant as authorized by this chapter may be issued by a judge of any county court or circuit court of this state which has jurisdiction of the place or thing to be searched.

(b)  Upon proper affidavit being made, an inspection warrant may be issued under the provisions of this chapter or ss. 376.30-376.317:

1.  When it appears that the properties to be inspected may be connected with or contain evidence of the violation of any of the provisions of this chapter or ss. 376.30-376.317 or any rule properly promulgated thereunder; or

2.  When the inspection sought is an integral part of a larger scheme of systematic routine inspections which are necessary to, and consistent with, the continuing efforts of the department to ensure compliance with the provisions of this chapter or ss. 376.30-376.317 and any rules adopted thereunder.

(c)  The judge shall, before issuing the warrant, have the application for the warrant duly sworn to and subscribed by a representative of the department; and may receive further testimony from witnesses, supporting affidavits, or depositions in writing to support the application. The affidavit and further proof, if had or required, shall set forth the facts tending to establish the grounds specified in paragraph (b) or the reasons for believing that such grounds exist.

(d)  Upon examination of the application and proofs submitted and if satisfied that cause exists for the issuing of the inspection warrant, the judge shall thereupon issue a warrant, signed by him or her with the name of his or her office, to any department representative, which warrant will authorize the representative forthwith to inspect the property described in the warrant.

**History.**—s. 10, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 80-302; s. 6, ch. 82-27; s. 26, ch. 84-338; s. 25, ch. 86-159; s. 9, ch. 89-188; s. 69, ch. 91-221; s. 3, ch. 97-103; s. 81, ch. 2007-5.

**403.092  Package sewage treatment facilities; inspection.**—The department shall implement a program to conduct regular and continuing inspection of package sewage treatment facilities. To the greatest extent possible

consistent with the abilities and the financial resources of local governments, the inspection program shall be delegated to local governments.

History.—s. 4, ch. 83-310; s. 368, ch. 94-356.

### 403.111　Confidential records.—

(1)　Any information, other than effluent data and those records described in 42 U.S.C. s. 7661a(b)(8), relating to secret processes or secret methods of manufacture or production, or relating to costs of production, profits, or other financial information which is otherwise not public record, which may be required, ascertained, or discovered by inspection or investigation shall be exempt from the provisions of s. 119.07(1), shall not be disclosed in public hearings, and shall be kept confidential by any member, officer, or employee of the department, upon a showing satisfactory to the department that the information should be kept confidential. The person from whom the information is obtained must request that the department keep such information confidential and must inform the department of the basis for the claim of confidentiality. The department shall, subject to notice and opportunity for hearing, determine whether the information requested to be kept confidential should or should not be kept confidential. The department shall determine whether the information submitted should be kept confidential pursuant to the public purpose test as stated in [1]s. 119.14(4)(b)3.

(2)　Nothing in this section shall be construed to prevent the use of such records in judicial or administrative proceedings when ordered to be produced by appropriate subpoena or by order of the court or an administrative law judge. No such subpoena or order of the court or administrative law judge shall abridge or alter the rights or remedies of persons affected in the protection of trade secrets or secret processes, in the manner provided by law, and such persons affected may take any and all steps available by law to protect such trade secrets or processes.

(3)　Information submitted by or required of permit applicants or permittees pursuant to s. 403.0885 is not subject to the provisions of this section but is subject to the provisions of 40 C.F.R. s. 122.7.

History.—s. 12, ch. 67-436; ss. 26, 35, ch. 69-106; s. 6, ch. 74-133; s. 1, ch. 90-74; s. 5, ch. 93-94; s. 77, ch. 93-213; s. 239, ch. 96-406; s. 133, ch. 96-410.

[1]Note.—Repealed by s. 1, ch. 95-217.

### 403.121　Enforcement; procedure; remedies.—The department shall have the following judicial and administrative remedies available to it for violations of this chapter, as specified in s. 403.161(1).

(1)　Judicial remedies:

(a)　The department may institute a civil action in a court of competent jurisdiction to establish liability and to recover damages for any injury to the air, waters, or property, including animal, plant, and aquatic life, of the state caused by any violation.

(b)　The department may institute a civil action in a court of competent jurisdiction to impose and to recover a civil penalty for each violation in an amount of not more than $10,000 per offense. However, the court may receive evidence in mitigation. Each day during any portion of which such violation occurs constitutes a separate offense.

(c)　Except as provided in paragraph (2)(c), it shall not be a defense to, or ground for dismissal of, these judicial remedies for damages and civil penalties that the department has failed to exhaust its administrative remedies, has failed to serve a notice of violation, or has failed to hold an administrative hearing prior to the institution of a civil action.

(2)　Administrative remedies:

(a)　The department may institute an administrative proceeding to establish liability and to recover damages for any injury to the air, waters, or property, including animal, plant, or aquatic life, of the state caused by any violation. The department may order that the violator pay a specified sum as damages to the state. Judgment for the amount of damages determined by the department may be entered in any court having jurisdiction thereof and may be enforced as any other judgment.

(b)　If the department has reason to believe a violation has occurred, it may institute an administrative proceeding to order the prevention, abatement, or control of the conditions creating the violation or other appropriate corrective action. Except for violations involving hazardous wastes, asbestos, or underground injection, the department shall proceed administratively in all cases in which the department seeks administrative

penalties that do not exceed $10,000 per assessment as calculated in accordance with subsections (3), (4), (5), (6), and (7). Pursuant to 42 U.S.C. s. 300g-2, the administrative penalty assessed pursuant to subsection (3), subsection (4), or subsection (5) against a public water system serving a population of more than 10,000 shall be not less than $1,000 per day per violation. The department shall not impose administrative penalties in excess of $10,000 in a notice of violation. The department shall not have more than one notice of violation seeking administrative penalties pending against the same party at the same time unless the violations occurred at a different site or the violations were discovered by the department subsequent to the filing of a previous notice of violation.

(c) An administrative proceeding shall be instituted by the department's serving of a written notice of violation upon the alleged violator by certified mail. If the department is unable to effect service by certified mail, the notice of violation may be hand delivered or personally served in accordance with chapter 48. The notice shall specify the provision of the law, rule, regulation, permit, certification, or order of the department alleged to be violated and the facts alleged to constitute a violation thereof. An order for corrective action, penalty assessment, or damages may be included with the notice. When the department is seeking to impose an administrative penalty for any violation by issuing a notice of violation, any corrective action needed to correct the violation or damages caused by the violation must be pursued in the notice of violation or they are waived. However, no order shall become effective until after service and an administrative hearing, if requested within 20 days after service. Failure to request an administrative hearing within this time period shall constitute a waiver thereof, unless the respondent files a written notice with the department within this time period opting out of the administrative process initiated by the department to impose administrative penalties. Any respondent choosing to opt out of the administrative process initiated by the department in an action that seeks the imposition of administrative penalties must file a written notice with the department within 20 days after service of the notice of violation opting out of the administrative process. A respondent's decision to opt out of the administrative process does not preclude the department from initiating a state court action seeking injunctive relief, damages, and the judicial imposition of civil penalties.

(d) If a person timely files a petition challenging a notice of violation, that person will thereafter be referred to as the respondent. The hearing requested by the respondent shall be held within 180 days after the department has referred the initial petition to the Division of Administrative Hearings unless the parties agree to a later date. The department has the burden of proving with the preponderance of the evidence that the respondent is responsible for the violation. No administrative penalties should be imposed unless the department satisfies that burden. Following the close of the hearing, the administrative law judge shall issue a final order on all matters, including the imposition of an administrative penalty. When the department seeks to enforce that portion of a final order imposing administrative penalties pursuant to s. 120.69, the respondent shall not assert as a defense the inappropriateness of the administrative remedy. The department retains its final-order authority in all administrative actions that do not request the imposition of administrative penalties.

(e) After filing a petition requesting a formal hearing in response to a notice of violation in which the department imposes an administrative penalty, a respondent may request that a private mediator be appointed to mediate the dispute by contacting the Florida Conflict Resolution Consortium within 10 days after receipt of the initial order from the administrative law judge. The Florida Conflict Resolution Consortium shall pay all of the costs of the mediator and for up to 8 hours of the mediator's time per case at $150 per hour. Upon notice from the respondent, the Florida Conflict Resolution Consortium shall provide to the respondent a panel of possible mediators from the area in which the hearing on the petition would be heard. The respondent shall select the mediator and notify the Florida Conflict Resolution Consortium of the selection within 15 days of receipt of the proposed panel of mediators. The Florida Conflict Resolution Consortium shall provide all of the administrative support for the mediation process. The mediation must be completed at least 15 days before the final hearing date set by the administrative law judge.

(f) In any administrative proceeding brought by the department, the prevailing party shall recover all costs as provided in ss. 57.041 and 57.071. The costs must be included in the final order. The respondent is the prevailing party when an order is entered awarding no penalties to the department and such order has not been reversed on appeal or the time for seeking judicial review has expired. The respondent shall be entitled to an award of

attorney's fees if the administrative law judge determines that the notice of violation issued by the department seeking the imposition of administrative penalties was not substantially justified as defined in s. 57.111(3)(e). No award of attorney's fees as provided by this subsection shall exceed $15,000.

(g)   Nothing herein shall be construed as preventing any other legal or administrative action in accordance with law. Nothing in this subsection shall limit the department's authority provided in ss. 403.131, 403.141, and this section to judicially pursue injunctive relief. When the department exercises its authority to judicially pursue injunctive relief, penalties in any amount up to the statutory maximum sought by the department must be pursued as part of the state court action and not by initiating a separate administrative proceeding. The department retains the authority to judicially pursue penalties in excess of $10,000 for violations not specifically included in the administrative penalty schedule, or for multiple or multiday violations alleged to exceed a total of $10,000. The department also retains the authority provided in ss. 403.131, 403.141, and this section to judicially pursue injunctive relief and damages, if a notice of violation seeking the imposition of administrative penalties has not been issued. The department has the authority to enter into a settlement, either before or after initiating a notice of violation, and the settlement may include a penalty amount different from the administrative penalty schedule. Any case filed in state court because it is alleged to exceed a total of $10,000 in penalties may be settled in the court action for less than $10,000.

(h)   Chapter 120 shall apply to any administrative action taken by the department or any delegated program pursuing administrative penalties in accordance with this section.

(3)   Except for violations involving hazardous wastes, asbestos, or underground injection, administrative penalties must be calculated according to the following schedule:

(a)   For a drinking water contamination violation, the department shall assess a penalty of $2,000 for a Maximum Containment Level (MCL) violation; plus $1,000 if the violation is for a primary inorganic, organic, or radiological Maximum Contaminant Level or it is a fecal coliform bacteria violation; plus $1,000 if the violation occurs at a community water system; and plus $1,000 if any Maximum Contaminant Level is exceeded by more than 100 percent. For failure to obtain a clearance letter prior to placing a drinking water system into service when the system would not have been eligible for clearance, the department shall assess a penalty of $3,000.

(b)   For failure to obtain a required wastewater permit, other than a permit required for surface water discharge, the department shall assess a penalty of $1,000. For a domestic or industrial wastewater violation not involving a surface water or groundwater quality violation, the department shall assess a penalty of $2,000 for an unpermitted or unauthorized discharge or effluent-limitation exceedance. For an unpermitted or unauthorized discharge or effluent-limitation exceedance that resulted in a surface water or groundwater quality violation, the department shall assess a penalty of $5,000.

(c)   For a dredge and fill or stormwater violation, the department shall assess a penalty of $1,000 for unpermitted or unauthorized dredging or filling or unauthorized construction of a stormwater management system against the person or persons responsible for the illegal dredging or filling, or unauthorized construction of a stormwater management system plus $2,000 if the dredging or filling occurs in an aquatic preserve, Outstanding Florida Water, conservation easement, or Class I or Class II surface water, plus $1,000 if the area dredged or filled is greater than one-quarter acre but less than or equal to one-half acre, and plus $1,000 if the area dredged or filled is greater than one-half acre but less than or equal to one acre. The administrative penalty schedule shall not apply to a dredge and fill violation if the area dredged or filled exceeds one acre. The department retains the authority to seek the judicial imposition of civil penalties for all dredge and fill violations involving more than one acre. The department shall assess a penalty of $3,000 for the failure to complete required mitigation, failure to record a required conservation easement, or for a water quality violation resulting from dredging or filling activities, stormwater construction activities or failure of a stormwater treatment facility. For stormwater management systems serving less than 5 acres, the department shall assess a penalty of $2,000 for the failure to properly or timely construct a stormwater management system. In addition to the penalties authorized in this subsection, the department shall assess a penalty of $5,000 per violation against the contractor or agent of the owner or tenant that conducts unpermitted or unauthorized dredging or filling. For purposes of this paragraph, the

preparation or signing of a permit application by a person currently licensed under chapter 471 to practice as a professional engineer shall not make that person an agent of the owner or tenant.

(d) For mangrove trimming or alteration violations, the department shall assess a penalty of $5,000 per violation against the contractor or agent of the owner or tenant that conducts mangrove trimming or alteration without a permit as required by s. 403.9328. For purposes of this paragraph, the preparation or signing of a permit application by a person currently licensed under chapter 471 to practice as a professional engineer shall not make that person an agent of the owner or tenant.

(e) For solid waste violations, the department shall assess a penalty of $2,000 for the unpermitted or unauthorized disposal or storage of solid waste; plus $1,000 if the solid waste is Class I or Class III (excluding yard trash) or if the solid waste is construction and demolition debris in excess of 20 cubic yards, plus $1,000 if the waste is disposed of or stored in any natural or artificial body of water or within 500 feet of a potable water well, plus $1,000 if the waste contains PCB at a concentration of 50 parts per million or greater; untreated biomedical waste; friable asbestos greater than 1 cubic meter which is not wetted, bagged, and covered; used oil greater than 25 gallons; or 10 or more lead acid batteries. The department shall assess a penalty of $3,000 for failure to properly maintain leachate control; unauthorized burning; failure to have a trained spotter on duty at the working face when accepting waste; failure to provide access control for three consecutive inspections. The department shall assess a penalty of $2,000 for failure to construct or maintain a required stormwater management system.

(f) For an air emission violation, the department shall assess a penalty of $1,000 for an unpermitted or unauthorized air emission or an air-emission-permit exceedance, plus $1,000 if the emission results in an air quality violation, plus $3,000 if the emission was from a major source and the source was major for the pollutant in violation; plus $1,000 if the emission was more than 150 percent of the allowable level.

(g) For storage tank system and petroleum contamination violations, the department shall assess a penalty of $5,000 for failure to empty a damaged storage system as necessary to ensure that a release does not occur until repairs to the storage system are completed; when a release has occurred from that storage tank system; for failure to timely recover free product; or for failure to conduct remediation or monitoring activities until a no-further-action or site-rehabilitation completion order has been issued. The department shall assess a penalty of $3,000 for failure to timely upgrade a storage tank system. The department shall assess a penalty of $2,000 for failure to conduct or maintain required release detection; failure to timely investigate a suspected release from a storage system; depositing motor fuel into an unregistered storage tank system; failure to timely assess or remediate petroleum contamination; or failure to properly install a storage tank system. The department shall assess a penalty of $1,000 for failure to properly operate, maintain, or close a storage tank system.

(4) In an administrative proceeding, in addition to the penalties that may be assessed under subsection (3), the department shall assess administrative penalties according to the following schedule:

(a) For failure to satisfy financial responsibility requirements or for violation of s. 377.371(1), $5,000.

(b) For failure to install, maintain, or use a required pollution control system or device, $4,000.

(c) For failure to obtain a required permit before construction or modification, $3,000.

(d) For failure to conduct required monitoring or testing; failure to conduct required release detection; or failure to construct in compliance with a permit, $2,000.

(e) For failure to maintain required staff to respond to emergencies; failure to conduct required training; failure to prepare, maintain, or update required contingency plans; failure to adequately respond to emergencies to bring an emergency situation under control; or failure to submit required notification to the department, $1,000.

(f) Except as provided in subsection (2) with respect to public water systems serving a population of more than 10,000, for failure to prepare, submit, maintain, or use required reports or other required documentation, $500.

(5) Except as provided in subsection (2) with respect to public water systems serving a population of more than 10,000, for failure to comply with any other departmental regulatory statute or rule requirement not otherwise identified in this section, the department may assess a penalty of $500.

(6) For each additional day during which a violation occurs, the administrative penalties in subsection (3), subsection (4), and subsection (5) may be assessed per day per violation.

(7)   The history of noncompliance of the violator for any previous violation resulting in an executed consent order, but not including a consent order entered into without a finding of violation, or resulting in a final order or judgment after the effective date of this law involving the imposition of $2,000 or more in penalties shall be taken into consideration in the following manner:

(a)   One previous such violation within 5 years prior to the filing of the notice of violation will result in a 25-percent per day increase in the scheduled administrative penalty.

(b)   Two previous such violations within 5 years prior to the filing of the notice of violation will result in a 50-percent per day increase in the scheduled administrative penalty.

(c)   Three or more previous such violations within 5 years prior to the filing of the notice of violation will result in a 100-percent per day increase in the scheduled administrative penalty.

(8)   The direct economic benefit gained by the violator from the violation, where consideration of economic benefit is provided by Florida law or required by federal law as part of a federally delegated or approved program, shall be added to the scheduled administrative penalty. The total administrative penalty, including any economic benefit added to the scheduled administrative penalty, shall not exceed $10,000.

(9)   The administrative penalties assessed for any particular violation shall not exceed $5,000 against any one violator, unless the violator has a history of noncompliance, the economic benefit of the violation as described in subsection (8) exceeds $5,000, or there are multiday violations. The total administrative penalties shall not exceed $10,000 per assessment for all violations attributable to a specific person in the notice of violation.

(10)   The administrative law judge may receive evidence in mitigation. The penalties identified in subsection (3), subsection (4), and subsection (5) may be reduced up to 50 percent by the administrative law judge for mitigating circumstances, including good faith efforts to comply prior to or after discovery of the violations by the department. Upon an affirmative finding that the violation was caused by circumstances beyond the reasonable control of the respondent and could not have been prevented by respondent's due diligence, the administrative law judge may further reduce the penalty.

(11)   Penalties collected pursuant to this section shall be deposited into the Water Quality Assurance Trust Fund or other trust fund designated by statute and shall be used to fund the restoration of ecosystems, or polluted areas of the state, as defined by the department, to their condition before pollution occurred. The Florida Conflict Resolution Consortium may use a portion of the fund to administer the mediation process provided in paragraph (2)(e) and to contract with private mediators for administrative penalty cases.

(12)   The purpose of the administrative penalty schedule and process is to provide a more predictable and efficient manner for individuals and businesses to resolve relatively minor environmental disputes. Subsection (3), subsection (4), subsection (5), subsection (6), or subsection (7) shall not be construed as limiting a state court in the assessment of damages. The administrative penalty schedule does not apply to the judicial imposition of civil penalties in state court as provided in this section.

**History.**—s. 13, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 70-114; s. 1, ch. 70-139; s. 349, ch. 71-136; s. 112, ch. 71-355; s. 1, ch. 72-286; s. 138, ch. 77-104; s. 1, ch. 77-117; s. 14, ch. 78-95; s. 263, ch. 81-259; s. 3, ch. 90-82; s. 61, ch. 96-321; s. 2, ch. 2001-258; s. 2, ch. 2002-165; ss. 43, 44, 76, ch. 2004-269; s. 15, ch. 2004-381; s. 71, ch. 2015-229.

### 403.131    Injunctive relief, remedies.—

(1)   The department may institute a civil action in a court of competent jurisdiction to seek injunctive relief to enforce compliance with this chapter or any rule, regulation, permit certification, or order; to enjoin any violation specified in s. 403.161(1); and to seek injunctive relief to prevent irreparable injury to the air, waters, and property, including animal, plant, and aquatic life, of the state and to protect human health, safety, and welfare caused or threatened by any violation.

(2)   All the judicial and administrative remedies to recover damages and penalties in this section and s. 403.121 are alternative and mutually exclusive.

**History.**—s. 14, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 70-139; s. 1, ch. 70-439; s. 2, ch. 72-286; s. 3, ch. 2001-258.

### 403.135    Persons who accept wastewater for spray irrigation; civil liability.—

(1)   Any person who in good faith accepts from any owner or operator of a permitted wastewater treatment or disposal plant any wastewater permitted and intended to be used for disposal through spray irrigation is not liable for any civil damages as a result of the acceptance and disposal of such wastewater through approved spray irrigation practices.

(2)   Subsection (1) does not limit or otherwise affect the liability of:

(a)   Any person for damages resulting from such person's negligence, gross negligence, or reckless, wanton, or intentional misconduct;

(b)   Any person for the improper management and use of the wastewater after its delivery to such person by any permitted wastewater treatment or disposal plant owner or operator; or

(c)   The owner or operator of the plant for damages caused as a result of the spray irrigation.

(3)   Nothing in this section shall prohibit any governmental entity from taking such action within its jurisdiction as may be necessary to protect the public health, safety, or welfare or the environment.

(4)   Terms used in this section have the meaning specified in this chapter and in the rules of the department under this chapter.

History.—s. 1, ch. 87-207; s. 369, ch. 94-356.

### 403.141   Civil liability; joint and several liability.—

(1)   Whoever commits a violation specified in s. 403.161(1) is liable to the state for any damage caused to the air, waters, or property, including animal, plant, or aquatic life, of the state and for reasonable costs and expenses of the state in tracing the source of the discharge, in controlling and abating the source and the pollutants, and in restoring the air, waters, and property, including animal, plant, and aquatic life, of the state to their former condition, and furthermore is subject to the judicial imposition of a civil penalty for each offense in an amount of not more than $10,000 per offense. However, the court may receive evidence in mitigation. Each day during any portion of which such violation occurs constitutes a separate offense. Nothing herein shall give the department the right to bring an action on behalf of any private person.

(2)   Whenever two or more persons pollute the air or waters of the state in violation of this chapter or any rule, regulation, or order of the department so that the damage is indivisible, each violator shall be jointly and severally liable for such damage and for the reasonable cost and expenses of the state incurred in tracing the source of discharge, in controlling and abating the source and the pollutants, and in restoring the air, waters, and property, including the animal, plant, and aquatic life of the state, to their former condition. However, if said damage is divisible and may be attributed to a particular violator or violators, each violator is liable only for that damage attributable to his or her violation.

(3)   In assessing damages for fish killed, the value of the fish is to be determined in accordance with a table of values for individual categories of fish which shall be promulgated by the department. At the time the table is adopted, the department shall use tables of values established by the Department of Environmental Protection and the Fish and Wildlife Conservation Commission. The total number of fish killed may be estimated by standard practices used in estimating fish population.

(4)   The damage provisions of this section shall not apply to damage resulting from the application of federally approved or state-approved chemicals to the waters in the state for the control of insects, aquatic weeds, or algae, provided the application of such chemicals is done in accordance with a program approved pursuant to s. 403.088(1) and provided said application is not done negligently.

History.—s. 15, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 70-141; s. 1, ch. 71-204; s. 3, ch. 72-286; s. 7, ch. 74-133; s. 1, ch. 76-112; s. 3, ch. 78-98; s. 370, ch. 94-356; s. 4, ch. 97-103; s. 24, ch. 2000-197.

### 403.151   Compliance with rules or orders of department.—All rules or orders of the department which require action to comply with standards adopted by it, or orders to comply with any provisions of this act, may specify a reasonable time for such compliance.

History.—s. 16, ch. 67-436; ss. 26, 35, ch. 69-106.

### 403.161   Prohibitions, violation, penalty, intent.—

(1)   It shall be a violation of this chapter, and it shall be prohibited for any person:

(a)   To cause pollution, except as otherwise provided in this chapter, so as to harm or injure human health or welfare, animal, plant, or aquatic life or property.

(b)   To fail to obtain any permit required by this chapter or by rule or regulation, or to violate or fail to comply with any rule, regulation, order, permit, or certification adopted or issued by the department pursuant to its lawful authority.

(c)   To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this chapter or by any permit, rule, regulation, or order issued under this chapter.

(d)   For any person who owns or operates a facility to fail to report to the representative of the department, as established by department rule, within one working day of discovery of a release of hazardous substances from the facility if the owner or operator is required to report the release to the United States Environmental Protection Agency in accordance with 42 U.S.C. s. 9603.

(e)   To fail to provide required notice pursuant to s. 403.077.

(2)   Whoever commits a violation specified in subsection (1) is liable to the state for any damage caused and for civil penalties as provided in s. 403.141.

(3)   Any person who willfully commits a violation specified in paragraph (1)(a) is guilty of a felony of the third degree punishable as provided in ss. 775.082(3)(e) and 775.083(1)(g) by a fine of not more than $50,000 or by imprisonment for 5 years, or by both, for each offense. Each day during any portion of which such violation occurs constitutes a separate offense.

(4)   Any person who commits a violation specified in paragraph (1)(a) due to reckless indifference or gross careless disregard is guilty of a misdemeanor of the second degree, punishable as provided in ss. 775.082(4)(b) and 775.083(1)(g) by a fine of not more than $5,000 or by 60 days in jail, or by both, for each offense.

(5)   Any person who willfully commits a violation specified in paragraph (1)(b) or paragraph (1)(c) is guilty of a misdemeanor of the first degree punishable as provided in ss. 775.082(4)(a) and 775.083(1)(g) by a fine of not more than $10,000 or by 6 months in jail, or by both for each offense.

(6)   It is the legislative intent that the civil penalties and criminal fines imposed by the court be of such amount as to ensure immediate and continued compliance with this section.

**History.**—s. 17, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 70-356; s. 1, ch. 70-439; s. 4, ch. 72-286; s. 8, ch. 74-133; s. 139, ch. 77-104; s. 1, ch. 77-174; s. 21, ch. 88-393; s. 2, ch. 89-143; s. 8, ch. 89-324; s. 6, ch. 2014-220; s. 4, ch. 2017-95.

### 403.1655   Environmental short-term emergency response program.—

(1)   It is the purpose of this section to provide a mechanism through which the state can immediately respond to short-term emergencies involving a threat to or an actual contamination of surface and ground water. It is the intent of the Legislature that the department provide not only technical assistance when responding to these short-term emergencies, but also financial resources to respond to emergencies which pose an immediate environmental or public health threat.

(2)   The department shall be the lead agency for interdepartmental coordination relating to water pollution, toxic substances, and hazardous waste and other environmental and health emergencies not specifically designated within other statutes.

(3)   Based upon the nature of the incident, the Water Quality Assurance Trust Fund or the Inland Protection Trust Fund, whichever is appropriate, shall be utilized to enable the department to respond during an emergency to incidents which threaten the environment or public health when otherwise responsible parties do not adequately respond.

(4)   The department shall adopt rules for the purposes of this section.

**History.**—s. 42, ch. 83-310; s. 26, ch. 86-159.

### 403.1815   Construction of water distribution mains and sewage collection and transmission systems; local regulation.—Notwithstanding any other provision of this chapter to the contrary, the department may, upon

request, allow any county or municipality to independently regulate the construction of water distribution mains of 12 inches or less, gravity sewage collection systems of 12 inches or less, and sewage force mains of 12 inches or less, and pump stations appurtenant to such force mains, provided the plant is owned by the county or municipality making the request for approval or, pursuant to interlocal agreement, plant capacity is provided from a plant owned by another county or municipality or by a regional water supply authority of which the county or municipality requesting approval is a member. The approval may apply to all or any part of such systems. In considering such request, the department shall determine the administrative and engineering ability of a county or municipality to administer and comply with the requirements of this section. In the event the department allows any county or municipality to independently regulate the construction of such systems, these construction projects shall be exempt from department permit requirements. However, nothing in this section shall relieve a county or a municipality from any requirement to obtain the necessary permits for construction activities in waters of the state or of the United States or from complying with all other provisions of this chapter and rules promulgated thereunder. The exemption provided by this section shall not apply to any connection to any water or sewerage system which the department has deemed to be in substantial noncompliance with applicable laws and standards if the department has so notified the respective county or municipality. Each county or municipality granted such authority shall submit monthly reports to the department of the number of connections and geographical location of such connections made pursuant to any independent regulation allowed under this section and shall, not later than July 1 of each year, submit an updated map of any water distribution system and sewage collection and transmission system independently regulated pursuant to this section, which map also shows any plant to which such system connects or interconnects. Such map shall indicate the extensions of such systems constructed for the preceding year.

History.—s. 1, ch. 80-394; s. 33, ch. 91-305; s. 1, ch. 94-132.

### 403.182　Local pollution control programs.—

(1)　Each county and municipality or any combination thereof may establish and administer a local pollution control program if it complies with this act. Local pollution control programs in existence on the effective date of this act shall not be ousted of jurisdiction if such local program complies with this act. All local pollution control programs, whether established before or after the effective date of this act, must:

(a)　Be approved by the department as adequate to meet the requirements of this act and any applicable rules and regulations pursuant thereto.

(b)　Provide by ordinance, regulation, or local law for requirements compatible with, or stricter or more extensive than those imposed by this act and regulations issued thereunder.

(c)　Provide for the enforcement of such requirements by appropriate administrative and judicial process.

(d)　Provide for administrative organization, staff, financial and other resources necessary to effectively and efficiently carry out its program.

(2)　The department shall have the exclusive authority and power to require and issue permits; provided, however, that the department may delegate its power and authority to local pollution control organizations if the department finds it necessary or desirable to do so.

(3)　If the department finds that the location, character or extent of particular concentrations of population, contaminant sources, the geographic, topographic or meteorological considerations, or any combinations thereof, are such as to make impracticable the maintenance of appropriate levels of air and water quality without an areawide pollution control program, the department may determine the boundaries within which such program is necessary and require it as the only acceptable alternative to direct state administration.

(4)(a)　If the department has reason to believe that a pollution control program in force pursuant to this section is inadequate to prevent and control pollution in the jurisdiction to which such program relates, or that such program is being administered in a manner inconsistent with the requirements of this act, it shall proceed to determine the matter.

(b)　If the department determines that such program is inadequate to prevent and control pollution in the municipality or county or municipalities or counties to which such program relates, or that such program is not

accomplishing the purposes of this act, it shall require that necessary corrective measures be taken within a reasonable period of time, not to exceed 90 days.

(c)   If the municipality, county, or municipalities or counties fail to take such necessary corrective action within the time required, the department shall administer within such municipality, county, or municipalities or counties all of the regulatory provisions of this act. Such pollution control program shall supersede all municipal or county pollution laws, regulations, ordinances and requirements in the affected jurisdiction.

(d)   If the department finds that the control of a particular class of contaminant source because of its complexity or magnitude is beyond the reasonable capability of the local pollution control authorities or may be more efficiently and economically performed at the state level, it may assume and retain jurisdiction over that class of contaminant source. Classifications pursuant to this paragraph may be either on the basis of the nature of the sources involved or on the basis of their relationship to the size of the communities in which they are located.

(5)   Any municipality or county in which the department administers its pollution control program pursuant to subsection (4) may with the approval of the department establish or resume a municipal or county pollution control program which meets the requirements of subsection (1).

(6)   Notwithstanding the existence of any local pollution control program, whether created by a county or municipality or a combination thereof or by a special law, the department shall have jurisdiction to enforce the provisions of this chapter and any rules, regulations, or orders issued pursuant to this chapter throughout the state; however, whenever rules, regulations, or orders of a stricter or more stringent nature have been adopted by a local pollution control program, the department, if it elects to assert its jurisdiction, shall then enforce the stricter rules, regulations, or orders in the jurisdiction where they apply.

(7)   It shall be a violation of this chapter to violate, or fail to comply with, a rule, regulation, or order of a stricter or more stringent nature adopted by a local pollution control program, and the same shall be punishable as provided by s. 403.161. If any local program changes any rule, regulation, or order, whether or not of a stricter or more stringent nature, such change shall not apply to any installation or source operating at the time of such change in conformance with a currently valid permit issued by the department.

(8)   If any local program changes any rule, regulation, or order, whether or not of a stricter or more stringent nature, such change shall not apply to any installation or source located north of the Cross Florida Greenway, permitted and under construction as of May 1, 1997. Provisions of this subsection shall not apply to any facility which primarily generates electric power.

(9)   Nothing in this act shall prevent any local pollution control program from enforcing its own rules, regulations, or orders. All remedies of the department under this chapter shall be available, as an alternative to local enforcement provisions, to each local pollution control program to enforce any provision of local law. When the department and a local program institute separate lawsuits against the same party for violation of a state or local pollution law, rule, regulation, or order arising out of the same act, the suits shall be consolidated when possible.

(10)   Each local pollution control program shall cooperate with and assist the department in carrying out its powers, duties, and functions.

**History.**—s. 19, ch. 67-436; ss. 26, 35, ch. 69-106; s. 2, ch. 71-137; ss. 1, 2, ch. 73-256; s. 14, ch. 78-95; s. 76, ch. 79-65; s. 6, ch. 89-143; s. 371, ch. 94-356; s. 9, ch. 97-222.

**403.1832   Grants and Donations Trust Fund.**—The Grants and Donations Trust Fund is administered by the Department of Environmental Protection. The fund is intended to serve as the depository for grants and funds to be used for allowable grant or donor agreement activities funded by restricted contractual revenue from private and public nonfederal sources.

**History.**—s. 12, ch. 70-251; s. 1, ch. 70-439; s. 53, ch. 83-310; s. 63, ch. 96-321; s. 14, ch. 2001-270; s. 4, ch. 2015-8; s. 8, ch. 2017-4.

**403.1834   State bonds to finance or refinance facilities; exemption from taxation.**—

(1)   The issuance of state bonds to finance or refinance the construction of water supply and distribution facilities, stormwater control and treatment facilities, and air and water pollution control and abatement and solid waste disposal facilities, payable primarily from the pledged revenues provided for by s. 14, Art. VII of the State

Constitution or from such pledged revenues and the full faith and credit of any county, municipality, district, authority, or any agency thereof, and pledging the full faith and credit of the state as additional security, is authorized, subject and pursuant to the provisions of s. 14, Art. VII of the State Constitution, the provisions of the State Bond Act, ss. 215.57-215.83, as amended, and the provisions of this section.

(2)   The State Board of Administration is designated as the state fiscal agency to make the determinations required by s. 14, Art. VII of the State Constitution in connection with the issuance of such bonds.

(3)   The amount of the state bonds to be issued shall be determined by the Division of Bond Finance of the State Board of Administration. However, the total principal amount issued shall not exceed $300 million in any state fiscal year. This limitation does not apply to bonds issued to refinance outstanding bonds that were issued pursuant to this section in a previous fiscal year.

(4)   The facilities to be financed or refinanced with the proceeds of such state shall be determined and approved by the department and may be constructed, acquired, maintained, and operated by any county, municipality, district, or authority, or any agency thereof, or by the department.

(5)   The department and the Division of Bond Finance of the State Board of Administration are hereby authorized to enter into lease-purchase agreements between such departments or to enter into lease-purchase agreements or loan agreements between either of such departments and any county, municipality, district, or authority, or any agency thereof, for such periods and under such other terms and conditions as may be mutually agreed upon by the parties thereto in order to carry out the purposes of s. 14, Art. VII of the State Constitution and this section.

(6)   The department shall have power to fix, establish, and collect fees, rentals, or other charges for the use or benefit of said facilities or may delegate such power to any county, municipality, district, authority, or any agency thereof under such terms and conditions and for such periods as may be mutually agreed upon.

(7)   It is found and declared that said facilities will constitute a public governmental purpose necessary for the health and welfare of all the inhabitants of the state, and none of said facilities or said state bonds or the interest thereon shall ever be subject to taxation by the state or any political subdivision or agency thereof. However, a leasehold interest in property of the state or the facilities thereon may not be exempted from ad valorem taxation when a nongovernmental lessee uses such property for the operation of a multipurpose hazardous waste treatment facility. The exemption granted by this subsection shall not be applicable to any tax imposed by chapter 220 on interest, income, or profits on debt obligations owned by corporations.

(8)   As used in this section, "water supply and distribution facilities" means a waterworks system as defined in s. 159.02(9) which is constructed, owned, or operated by a county, municipality, water management district created by chapter 373, or regional water supply authority created pursuant to chapter 373, or a water facility of an authority created by chapter 76-441, Laws of Florida, as amended by chapter 80-546, Laws of Florida.

**History.**—ss. 1, 2, 3, 4, 5, 6, 7, ch. 70-270; s. 1, ch. 70-439; s. 2, ch. 71-137; s. 4, ch. 73-256; s. 14, ch. 73-327; s. 78, ch. 79-65; s. 1, ch. 81-21; s. 61, ch. 83-218; s. 19, ch. 86-186; s. 1, ch. 87-203; s. 82, ch. 88-130; s. 303, ch. 92-279; s. 55, ch. 92-326; s. 374, ch. 94-356.

### 403.1835   Water pollution control financial assistance.—

(1)   The purpose of this section is to assist in implementing the legislative declaration of public policy as contained in s. 403.021 by establishing a self-perpetuating program to accelerate the implementation of water pollution control projects. Projects and activities that may be funded are those eligible under s. 603 of the Federal Water Pollution Control Act (Clean Water Act), Pub. L. No. 92-500, as amended; including, but not limited to, planning, design, construction, and implementation of wastewater management systems, stormwater management systems, nonpoint source pollution management systems, and estuary conservation and management.

(2)   As used in this section and s. 403.1837, the term:

(a)   "Bonds" means bonds, certificates, or other obligations of indebtedness issued by the corporation under this section and s. 403.1837.

(b)   "Corporation" means the Florida Water Pollution Control Financing Corporation created under s. 403.1837.

(c)   "Local governmental agencies" refers to any municipality, county, district, or authority, or any agency thereof, or a combination of two or more of the foregoing, acting jointly in connection with a project having

jurisdiction over collection, transmission, treatment, or disposal of sewage, industrial wastes, stormwater, or other wastes and includes a district or authority whose principal responsibility is to provide airport, industrial or research park, or port facilities to the public.

(3) The department may provide financial assistance through any program authorized under 33 U.S.C. s. 1383, as amended, including, but not limited to, making grants and loans, providing loan guarantees, purchasing loan insurance or other credit enhancements, and buying or refinancing local debt. This financial assistance must be administered in accordance with this section and applicable federal authorities.

(a) The department may make or request the corporation to make loans to local government agencies, which may pledge any revenue available to them to repay any funds borrowed.

(b) The department may make or request the corporation to make loans, grants, and deposits to other entities eligible to participate in the financial assistance programs authorized under the Federal Water Pollution Control Act, or as a result of other federal action, which may pledge any revenue available to them to repay any funds borrowed. Notwithstanding s. 17.57, the department may make deposits to financial institutions that earn less than the prevailing rate for United States Treasury securities that have corresponding maturities for the purpose of enabling such financial institutions to make below-market interest rate loans to entities qualified to receive loans under this section and the rules of the department.

(c) The department shall administer financial assistance so that at least 15 percent of the funding made available each year under this section is reserved for use by small communities during the year it is reserved.

(d) The department may make grants to financially disadvantaged small communities, as defined in s. 403.1838, using funds made available from grant allocations on loans authorized under subsection (4). The grants must be administered in accordance with s. 403.1838.

(4) The department may assess grant allocations on the loans made under this section for the purpose of making grants to financially disadvantaged small communities.

(5) The department shall prepare an annual report detailing the amount of grants, amount loaned, interest earned, grant allocations, and loans outstanding at the end of each fiscal year.

(6) Prior to approval of financial assistance, the applicant shall:

(a) Submit evidence of credit worthiness, loan security, and a loan repayment schedule in support of a request for a loan.

(b) Submit plans and specifications and evidence of permittability in support of a request for funding of construction or other activities requiring a permit from the department.

(c) Provide assurance that records will be kept using generally accepted accounting principles and that the department, the Auditor General, or their agents will have access to all records pertaining to the financial assistance provided.

(d) Provide assurance that the subject facilities, systems, or activities will be properly operated and maintained.

(e) Identify the revenues to be pledged and document their sufficiency for loan repayment and pledged revenue coverage in support of a request for a loan.

(f) Provide assurance that financial information will be provided as required by the department.

(g) Provide assurance that a project audit prepared by an independent certified public accountant upon project completion will be submitted to the department in support of a request for a grant.

(h) Submit project planning documentation demonstrating a cost comparison of alternative methods, environmental soundness, public participation, and financial feasibility for any proposed project or activity.

(7) Eligible projects must be given priority according to the extent each project is intended to remove, mitigate, or prevent adverse effects on surface or ground water quality and public health. The relative costs of achieving environmental and public health benefits must be taken into consideration during the department's assignment of project priorities. The department shall adopt a priority system by rule. In developing the priority system, the department shall give priority to projects that:

(a) Eliminate public health hazards;

(b)  Enable compliance with laws requiring the elimination of discharges to specific water bodies, including the requirements of s. 403.086(9) regarding domestic wastewater ocean outfalls;

(c)  Assist in the implementation of total maximum daily loads adopted under s. 403.067;

(d)  Enable compliance with other pollution control requirements, including, but not limited to, toxics control, wastewater residuals management, and reduction of nutrients and bacteria;

(e)  Assist in the implementation of surface water improvement and management plans and pollutant load reduction goals developed under state water policy;

(f)  Promote reclaimed water reuse;

(g)  Eliminate failing onsite sewage treatment and disposal systems or those that are causing environmental damage; or

(h)  Reduce pollutants to and otherwise promote the restoration of Florida's surface and ground waters.

(8)(a)  If a local governmental agency becomes delinquent on its loan, the department shall so certify to the Chief Financial Officer, who shall forward the amount delinquent to the department from any unobligated funds due to the local governmental agency under any revenue-sharing or tax-sharing fund established by the state, except as otherwise provided by the State Constitution. Certification of delinquency shall not limit the department from pursuing other remedies available for default on a loan. The department may impose a penalty for delinquent loan payments in an amount not to exceed an interest rate of 18 percent per annum on the amount due in addition to charging the cost to handle and process the debt. Penalty interest shall accrue on any amount due and payable beginning on the 30th day following the date upon which payment is due.

(b)  If a loan recipient, other than a local government agency, defaults under the terms of a loan, the department may pursue any remedy available to it at law or in equity. The department may impose a penalty in an amount not to exceed an interest rate of 18 percent per annum on any amount due in addition to charging the cost to handle and process the debt. Penalty interest accrues on any amount due and payable beginning on the 30th day following the date upon which the amount is due.

(9)  Funds for the loans and grants authorized under this section must be managed as follows:

(a)  A nonlapsing trust fund with revolving loan provisions to be known as the "Wastewater Treatment and Stormwater Management Revolving Loan Trust Fund" is established in the State Treasury to be used as a revolving fund by the department to carry out the purpose of this section. Any funds therein which are not needed on an immediate basis for grants or loans may be invested pursuant to s. 215.49. The cost of administering the program shall be paid from federal funds, from reasonable service fees that may be imposed upon loans, and from proceeds from the sale of loans as permitted by federal law so as to enhance program perpetuity. Grants awarded by the Federal Government, state matching funds, and investment earnings thereon shall be deposited into the trust fund. Proceeds from the sale of loans must be deposited into the trust fund. All moneys available in the trust fund, including investment earnings, are hereby designated to carry out the purpose of this section. The principal and interest payments of all loans held by the trust fund shall be deposited into this trust fund.

1.  The department may obligate moneys available in the Wastewater Treatment and Stormwater Management Revolving Loan Trust Fund for payment of amounts payable under any service contract entered into by the department under s. 403.1837, subject to annual appropriation by the Legislature. Amounts on deposit in the trust fund in each fiscal year shall first be applied or allocated for the payment of amounts payable by the department under this subparagraph and appropriated each year by the Legislature before making or providing for other disbursement from the trust fund.

2.  Under the provisions of s. 19(f)(3), Art. III of the State Constitution, the Wastewater Treatment and Stormwater Management Revolving Loan Trust Fund is exempt from the termination provisions of s. 19(f)(2), Art. III of the State Constitution.

(b)  Revenues from the loan grant allocations authorized under subsection (4), federal appropriations used for the purpose of administering this section, and service fees, and all earnings thereon, shall be deposited into the department's Federal Grants Trust Fund. Service fees and all earnings thereon must be used solely for program administration and other water quality activities specifically authorized pursuant to the Federal Water Pollution Control Act (Clean Water Act), Pub. L. No. 92-500, as amended, and set forth in 40 C.F.R. part 35, Guidance on

Fees Charged by States to Recipients of Clean Water State Revolving Fund Program Assistance. The loan grant allocation revenues and earnings thereon must be used solely for the purpose of making grants to financially disadvantaged small communities. Federal appropriations and state matching funds for grants authorized by federal statute or other federal action, and earnings thereon, must be used solely for the purposes authorized. All deposits into the department's Federal Grants Trust Fund under this section, and earnings thereon, must be accounted for separately from all other moneys deposited into the fund.

(10)   The department may adopt rules regarding program administration; project eligibilities and priorities, including the development and management of project priority lists; financial assistance application requirements associated with planning, design, construction, and implementation activities, including environmental and engineering requirements; financial assistance agreement conditions; disbursement and repayment provisions; auditing provisions; program exceptions; the procedural and contractual relationship between the department and the corporation under s. 403.1837; and other provisions consistent with the purposes of this section.

(11)   Any projects for reclaimed water reuse in Monroe County funded from the Wastewater Treatment and Stormwater Management Revolving Loan Trust Fund must take into account water balances and nutrient balances in order to prevent the runoff of pollutants into surface waters.

History.—s. 1, ch. 72-723; s. 79, ch. 79-65; s. 20, ch. 86-186; s. 37, ch. 89-279; s. 34, ch. 91-305; s. 304, ch. 92-279; s. 55, ch. 92-326; s. 12, ch. 93-51; s. 375, ch. 94-356; s. 26, ch. 97-236; s. 101, ch. 98-200; s. 1, ch. 98-316; s. 23, ch. 99-205; s. 2, ch. 99-372; s. 1, ch. 2000-271; s. 15, ch. 2001-270; s. 427, ch. 2003-261; s. 11, ch. 2003-265; s. 16, ch. 2004-381; s. 9, ch. 2008-232; s. 40, ch. 2010-205; s. 1, ch. 2011-58.

### 403.1837   Florida Water Pollution Control Financing Corporation.—

(1)   The Florida Water Pollution Control Financing Corporation is created as a nonprofit public-benefit corporation for the purpose of financing or refinancing the costs of projects and activities described in ss. 403.1835 and 403.8532. The projects and activities described in those sections constitute a public governmental purpose; are necessary for the health, safety, and welfare of all residents; and include legislatively approved fixed capital outlay projects. Fulfilling the purposes of the corporation promotes the health, safety, and welfare of the people of the state and serves essential governmental functions and a paramount public purpose. The activities of the corporation are specifically limited to assisting the department in implementing financing activities to provide funding for the programs authorized in ss. 403.1835 and 403.8532. All other activities relating to the purposes for which the corporation raises funds are the responsibility of the department, including, but not limited to, development of program criteria, review of applications for financial assistance, decisions relating to the number and amount of loans or other financial assistance to be provided, and enforcement of the terms of any financial assistance agreements provided through funds raised by the corporation. The corporation shall terminate upon fulfilling the purposes of this section.

(2)   The corporation shall be governed by a board of directors consisting of the Governor's Budget Director or designee, the Chief Financial Officer or designee, and the Secretary of Environmental Protection or designee. The executive director of the State Board of Administration shall be the chief executive officer of the corporation; shall direct and supervise the administrative affairs of the corporation; and shall control, direct, and supervise operation of the corporation. The corporation shall have such other officers as may be determined by the board of directors.

(3)   The corporation shall have all the powers of a corporate body under the laws of the state, consistent with this section, including, but not limited to, the power to:

(a)   Adopt, amend, and repeal bylaws consistent with this section.

(b)   Sue and be sued.

(c)   Adopt and use a common seal.

(d)   Acquire, purchase, hold, lease, and convey any real and personal property as may be proper or expedient to carry out the purposes of the corporation and this section, and to sell, lease, or otherwise dispose of that property.

(e)   Elect or appoint and employ such officers, agents, and employees as the corporation considers advisable to operate and manage the affairs of the corporation, who may be officers or employees of the department and the

state agencies represented on the board of directors of the corporation.

(f)    Borrow money and issue notes, bonds, certificates of indebtedness, or other obligations or evidences of indebtedness described in s. 403.1835 or s. 403.8532.

(g)    Operate, as specifically directed by the department, any program to provide financial assistance authorized under s. 403.1835(3) or s. 403.8532(3), which may be funded from any funds received under a service contract with the department, from the proceeds of bonds issued by the corporation, or from any other funding sources obtained by the corporation.

(h)    Sell all or any portion of the loans issued under s. 403.1835 or s. 403.8532 to accomplish the purposes of those sections.

(i)    Make and execute any contracts, trust agreements, and other instruments and agreements necessary or convenient to accomplish the purposes of the corporation and this section.

(j)    Select, retain, and employ professionals, contractors, or agents, which may include the Division of Bond Finance of the State Board of Administration, as necessary or convenient to enable or assist the corporation in carrying out its purposes and this section.

(k)    Do any act or thing necessary or convenient to carry out the purposes of the corporation and this section.

(4)    The corporation shall evaluate all financial and market conditions necessary and prudent for the purpose of making sound, financially responsible, and cost-effective decisions in order to secure additional funds to fulfill the purposes of this section and ss. 403.1835 and 403.8532.

(5)    The corporation may enter into one or more service contracts with the department under which the corporation shall provide services to the department in connection with financing the functions, projects, and activities provided in ss. 403.1835 and 403.8532. The department may enter into one or more service contracts with the corporation and provide for payments under those contracts pursuant to s. 403.1835(9) or s. 403.8533, subject to annual appropriation by the Legislature.

(a)    The service contracts may provide for the transfer of all or a portion of the funds in the Wastewater Treatment and Stormwater Management Revolving Loan Trust Fund and the Drinking Water Revolving Loan Trust Fund to the corporation for use by the corporation for costs incurred by the corporation in its operations, including, but not limited to, payment of debt service, reserves, or other costs in relation to bonds issued by the corporation, for use by the corporation at the request of the department to directly provide the types of local financial assistance provided in ss. 403.1835(3) and 403.8532(3), or for payment of the administrative costs of the corporation.

(b)    The department may not transfer funds under any service contract with the corporation without a specific appropriation for such purpose in the General Appropriations Act, except for administrative expenses incurred by the State Board of Administration or other expenses necessary under documents authorizing or securing previously issued bonds of the corporation. The service contracts may also provide for the assignment or transfer to the corporation of any loans made by the department.

(c)    The service contracts may establish the operating relationship between the department and the corporation and must require the department to request the corporation to issue bonds before any issuance of bonds by the corporation, to take any actions necessary to enforce the agreements entered into between the corporation and other parties, and to take all other actions necessary to assist the corporation in its operations.

(d)    In compliance with s. 287.0641 and other applicable provisions of law, the obligations of the department under the service contracts do not constitute a general obligation of the state or a pledge of the faith and credit or taxing power of the state, nor may the obligations be construed as an obligation of the State Board of Administration or entities for which it invests funds, or of the department except as provided in this section as payable solely from amounts available under any service contract between the corporation and the department, subject to appropriation.

(e)    In compliance with this subsection and s. 287.0582, service contracts must expressly include the following statement: "The State of Florida's performance and obligation to pay under this contract is contingent upon an annual appropriation by the Legislature."

(6)   The corporation may issue and incur notes, bonds, certificates of indebtedness, or other obligations or evidences of indebtedness payable from and secured by amounts received from payment of loans and other moneys received by the corporation, including, but not limited to, amounts payable to the corporation by the department under a service contract entered into under subsection (5). The proceeds of the bonds may be used for the purpose of providing funds for projects and activities provided in subsection (1) or for refunding bonds previously issued by the corporation. The corporation may select a financing team and issue obligations through competitive bidding or negotiated contracts, whichever is most cost-effective. Such indebtedness of the corporation does not constitute a debt or obligation of the state or a pledge of the faith and credit or taxing power of the state.

(7)   The corporation is exempt from taxation and assessments of any nature whatsoever upon its income and any property, assets, or revenues acquired, received, or used in the furtherance of the purposes provided in ss. 403.1835, 403.1838, and 403.8532. The obligations of the corporation incurred under subsection (6) and the interest and income on the obligations and all security agreements, letters of credit, liquidity facilities, or other obligations or instruments arising out of, entered into in connection with, or given to secure payment of the obligations are exempt from all taxation; however, the exemption does not apply to any tax imposed by chapter 220 on the interest, income, or profits on debt obligations owned by corporations.

(8)   The corporation shall validate any bonds issued under this section, except refunding bonds, which may be validated at the option of the corporation, by proceedings under chapter 75. The validation complaint must be filed in the Circuit Court for Leon County. The notice required under s. 75.06 must be published in Leon County, and the complaint and order of the circuit court shall be served only on the State Attorney for the Second Judicial Circuit. Sections 75.04(2) and 75.06(2) do not apply to a validation complaint filed as authorized in this subsection. The validation of the first bonds issued under this section may be appealed to the Supreme Court, and the appeal shall be handled on an expedited basis.

(9)   The corporation and the department may not take any action that materially and adversely affects the rights of holders of any obligations issued under this section as long as the obligations are outstanding.

(10)   The corporation is not a special district for purposes of chapter 189 or a unit of local government for purposes of part III of chapter 218. The provisions of chapters 120 and 215, except the limitation on interest rates provided by s. 215.84, which applies to obligations of the corporation issued under this section, and part I of chapter 287, except ss. 287.0582 and 287.0641, do not apply to this section, the corporation, the service contracts entered into under this section, or debt obligations issued by the corporation as provided in this section.

(11)   The benefits or earnings of the corporation may not inure to the benefit of any private person, except persons receiving grants and loans under s. 403.1835 or s. 403.8532.

(12)   Upon dissolution of the corporation, title to all property owned by the corporation reverts to the department.

(13)   The corporation may contract with the State Board of Administration to serve as trustee with respect to debt obligations issued by the corporation as provided by this section; to hold, administer, and invest proceeds of those debt obligations and other funds of the corporation; and to perform other services required by the corporation. The State Board of Administration may perform these services and may contract with others to provide all or a part of those services and to recover the costs and expenses of providing those services.

History.—s. 2, ch. 2000-271; s. 141, ch. 2001-266; s. 428, ch. 2003-261; s. 14, ch. 2003-265; s. 41, ch. 2010-205.

### 403.1838    Small Community Sewer Construction Assistance Act.—

(1)   This section may be cited as the "Small Community Sewer Construction Assistance Act."

(2)   The department shall use funds specifically appropriated to award grants under this section to assist financially disadvantaged small communities with their needs for adequate sewer facilities. For purposes of this section, the term "financially disadvantaged small community" means a county, municipality, or special district that has a population of 10,000 or fewer, according to the latest decennial census, and a per capita annual income less than the state per capita annual income as determined by the United States Department of Commerce. For purposes of this subsection, the term "special district" has the same meaning as provided in s. 189.012 and

includes only those special districts whose public purpose includes water and sewer services, utility systems and services, or wastewater systems and services.

(3)(a)   In accordance with rules adopted by the Environmental Regulation Commission under this section, the department may provide grants, from funds specifically appropriated for this purpose, to financially disadvantaged small communities for up to 100 percent of the costs of planning, designing, constructing, upgrading, or replacing wastewater collection, transmission, treatment, disposal, and reuse facilities, including necessary legal and administrative expenses.

(b)   The rules of the Environmental Regulation Commission must:

1.   Require that projects to plan, design, construct, upgrade, or replace wastewater collection, transmission, treatment, disposal, and reuse facilities be cost-effective, environmentally sound, permittable, and implementable.

2.   Require appropriate user charges, connection fees, and other charges sufficient to ensure the long-term operation, maintenance, and replacement of the facilities constructed under each grant.

3.   Require grant applications to be submitted on appropriate forms with appropriate supporting documentation, and require records to be maintained.

4.   Establish a system to determine eligibility of grant applications.

5.   Establish a system to determine the relative priority of grant applications. The system must consider public health protection and water pollution abatement.

6.   Establish requirements for competitive procurement of engineering and construction services, materials, and equipment.

7.   Provide for termination of grants when program requirements are not met.

(c)   The department must perform adequate overview of each grant, including technical review, regular inspections, disbursement approvals, and auditing, to successfully implement this section.

(d)   The department may use up to 2 percent of the grant funds made available each year for the costs of program administration.

(e)   Any grant awarded before July 1, 1994, under this section, remains subject to the applicable department rules in existence on June 30, 1993, until all rule requirements have been met.

**History.**—s. 55, ch. 83-310; s. 29, ch. 84-338; s. 53, ch. 85-81; s. 38, ch. 89-279; s. 4, ch. 94-243; s. 376, ch. 94-356; s. 64, ch. 96-321; s. 37, ch. 2002-402; s. 10, ch. 2004-6; s. 14, ch. 2012-205; s. 1, ch. 2016-55.

### 403.191   Construction in relation to other law.—

(1)   It is the purpose of this act to provide additional and cumulative remedies to prevent, abate, and control the pollution of the air and waters of the state. Nothing contained herein shall be construed to abridge or alter rights of action or remedies in equity under the common law or statutory law, criminal or civil, nor shall any provisions of this act, or any act done by virtue thereof, be construed as estopping the state or any municipality, or person affected by air or water pollution, in the exercise of their rights in equity or under the common law or statutory law to suppress nuisances or to abate pollution.

(2)   No civil or criminal remedy for any wrongful action which is a violation of any rule or regulation of the department shall be excluded or impaired by the provisions of this chapter.

(3)   This act shall limit and restrict the application of chapter 24952, 1947, Laws of Florida, to any person operating any industrial plant that has located in the State of Florida in reliance thereon and exercised rights and powers granted thereby on and before the effective date of this act; provided such person shall henceforth in the exercise of such rights and powers install and use treatment works or control measures generally equivalent to those installed and used by other similar industrial plants pursuant to the requirements of the department.

**History.**—s. 20, ch. 67-436; ss. 26, 35, ch. 69-106.

### 403.201   Variances.—

(1)   Upon application, the department in its discretion may grant a variance from the provisions of this act or the rules and regulations adopted pursuant hereto. Variances and renewals thereof may be granted for any one of the following reasons:

(a)   There is no practicable means known or available for the adequate control of the pollution involved.

(b)   Compliance with the particular requirement or requirements from which a variance is sought will necessitate the taking of measures which, because of their extent or cost, must be spread over a considerable period of time. A variance granted for this reason shall prescribe a timetable for the taking of the measures required.

(c)   To relieve or prevent hardship of a kind other than those provided for in paragraphs (a) and (b). Variances and renewals thereof granted under authority of this paragraph shall each be limited to a period of 24 months, except that variances granted pursuant to part II may extend for the life of the permit or certification.

(2)   A variance may not be granted from any provision or requirement concerning discharges of waste into waters of the state or hazardous waste management which would result in the provision or requirement being less stringent than a comparable federal provision or requirement, except as provided in s. 403.70715. However, this subsection does not prohibit the issuance of moderating provisions or requirements under state law, subject to any necessary approval by the United States Environmental Protection Agency.

(3)   The department shall publish notice, or shall require a petitioner for a variance to publish notice, in the Florida Administrative Register and in a newspaper of general circulation in the area affected, of proposed agency action; and the department shall afford interested persons an opportunity for a hearing on each application for a variance. If no request for hearing is filed with the department within 14 days of published notice, the department may proceed to final agency action without a hearing.

(4)   The department may require by rule a processing fee for and may prescribe such time limits and other conditions to the granting of a variance as it deems appropriate.

History.—s. 21, ch. 67-436; ss. 26, 35, ch. 69-106; s. 1, ch. 74-170; s. 14, ch. 78-95; s. 7, ch. 82-27; s. 21, ch. 86-186; s. 78, ch. 93-213; s. 106, ch. 2008-4; s. 41, ch. 2013-14; s. 5, ch. 2016-130.

**403.231    Department of Legal Affairs to represent the state.**—The Department of Legal Affairs shall represent the state and its agencies as legal adviser in carrying out the provisions of this act.

History.—s. 24, ch. 67-436; ss. 11, 35, ch. 69-106.

**403.251    Safety clause.**—The Legislature hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health and safety.

History.—s. 27, ch. 67-436.

**403.281    Definitions; weather modification law.**—As used in this chapter relating to weather modification:

(1)   "Department" means the Department of Environmental Protection.

(2)   "Person" includes any public or private corporation.

History.—s. 1, ch. 57-128; ss. 26, 35, ch. 69-106; s. 2, ch. 71-137; s. 156, ch. 71-377; s. 80, ch. 79-65; s. 377, ch. 94-356.

Note.—Former s. 373.261.

**403.291    Purpose of weather modification law.**—The purpose of this law is to promote the public safety and welfare by providing for the licensing, regulation and control of interference by artificial means with the natural precipitation of rain, snow, hail, moisture or water in any form contained in the atmosphere.

History.—s. 2, ch. 57-128.

Note.—Former s. 373.271.

**403.301    Artificial weather modification operation; license required.**—No person without securing a license from the department, shall cause or attempt to cause by artificial means condensation or precipitation of rain, snow, hail, moisture or water in any form contained in the atmosphere, or shall prevent or attempt to prevent by artificial means the natural condensation or precipitation of rain, snow, hail, moisture or water in any form contained in the atmosphere.

History.—s. 3, ch. 57-128; ss. 26, 35, ch. 69-106.

Note.—Former s. 373.281.

**403.311    Application for weather modification licensing; fee.**—

(1) Any person desiring to do or perform any of the acts specified in s. 403.301 may file with the department an application for a license on a form to be supplied by the department for such purpose setting forth all of the following:

(a) The name and post office address of the applicant.

(b) The education, experience, and qualifications of the applicant, or if the applicant is not an individual, the education, experience, and qualifications of the persons who will be in control and in charge of the operation of the applicant.

(c) The name and post office address of the person on whose behalf the weather modification operation is to be conducted if other than the applicant.

(d) The nature and object of the weather modification operation which the applicant proposes to conduct, including a general description of such operation.

(e) The method and type of equipment and the type and composition of materials that the applicant proposes to use.

(f) Such other pertinent information as the department may require.

(2) Each application shall be accompanied by a filing fee in the sum of $1,000 and proof of financial responsibility as required by s. 403.321.

**History.**—s. 4, ch. 57-128; ss. 26, 35, ch. 69-106; s. 18, ch. 88-393.
**Note.**—Former s. 373.291.


**403.321    Proof of financial responsibility.**—

(1) No license shall be issued to any person until he or she has filed with the department proof of ability to respond in damages for liability on account of accidents arising out of the weather modification operations to be conducted by him or her in the amount of $10,000 because of bodily injury to or death of one person resulting from any one incident, and subject to said limit for one person, in the amount of $100,000 because of bodily injury to or death of two or more persons resulting from any one incident, and in the amount of $100,000 because of injury to or destruction of property of others resulting from any one incident.

(2) Proof of financial responsibility may be given by filing with the department a certificate of insurance or a bond in the required amount.

**History.**—s. 5, ch. 57-128; ss. 26, 35, ch. 69-106; s. 5, ch. 97-103.
**Note.**—Former s. 373.301.


**403.331    Issuance of license; suspension or revocation; renewal.**—

(1) The department shall issue a license to each applicant who:

(a) By education, skill and experience appears to be qualified to undertake the weather modification operation proposed in his or her application.

(b) Files proof of financial responsibility as required by s. 403.321.

(c) Pays filing fee required in s. 403.311.

(2) Each such license shall entitle the licensee to conduct the operation described in the application for the calendar year for which the license is issued unless the license is sooner revoked or suspended. The conducting of any weather modification operation or the use of any equipment or materials other than those described in the application shall be cause for revocation or suspension of the license.

(3) The license may be renewed annually by payment of a filing fee in the sum of $50.

**History.**—s. 6, ch. 57-128; ss. 26, 35, ch. 69-106; s. 6, ch. 97-103.
**Note.**—Former s. 373.311.


**403.341    Filing and publication of notice of intention to operate; limitation on area and time.**—Prior to undertaking any operation authorized by the license, the licensee shall file with the department and cause to be published a notice of intention. The licensee shall then confine his or her activities substantially within the time and area limits set forth in the notice of intention.

**History.**—s. 7, ch. 57-128; ss. 26, 35, ch. 69-106; s. 7, ch. 97-103.
**Note.**—Former s. 373.321.

**403.351**     **Contents of notice of intention.**—The notice of intention shall set forth all of the following:

(1)    The name and post office address of the licensee.

(2)    The name and post office address of the persons on whose behalf the weather modification operation is to be conducted if other than the licensee.

(3)    The nature and object of the weather modification operation which licensee proposes to conduct, including a general description of such operation.

(4)    The method and type of equipment and the type and composition of the materials the licensee proposes to use.

(5)    The area in which and the approximate time during which the operation will be conducted.

(6)    The area which will be affected by the operation as nearly as the same may be determined in advance.

History.—s. 8, ch. 57-128.

Note.—Former s. 373.331.


**403.361**     **Publication of notice of intention.**—The licensee shall cause the notice of intention to be published at least once a week for 2 consecutive weeks in a newspaper having general circulation and published within any county wherein the operation is to be conducted and in which the affected area is located, or if the operation is to be conducted in more than one county or if the affected area is located in more than one county or is located in a county other than the one in which the operation is to be conducted, then such notice shall be published in like manner in a newspaper having a general circulation and published within each of such counties. In case there is no newspaper published within the appropriate county, publication shall be made in a newspaper having a general circulation within the county.

History.—s. 9, ch. 57-128.

Note.—Former s. 373.341.


**403.371**     **Proof of publication.**—Proof of publication shall be filed by the licensee with the department 15 days from the date of the last publication of notice. Proof of publication shall be by copy of the notice as published, attached to and made a part of the affidavit of the publisher or foreman of the newspaper publishing the notice.

History.—s. 10, ch. 57-128; ss. 26, 35, ch. 69-106.

Note.—Former s. 373.351.


**403.381**     **Record and reports of operations.**—

(1)    Each licensee shall keep and maintain a record of all operations conducted by him or her pursuant to his or her license showing the method employed, the type and composition of materials used, the times and places of operation, the name and post office address of each person participating or assisting in the operation other than licensee and such other information as may be required by the department and shall report the same to the department at such times as it may require.

(2)    The records of the department and the reports of all licensees shall be available for public examination.

History.—s. 11, ch. 57-128; ss. 26, 35, ch. 69-106; s. 8, ch. 97-103.

Note.—Former s. 373.361.


**403.391**     **Emergency licenses.**—Notwithstanding any provisions of this act to the contrary, the department may grant a license permitting a weather modification operation without compliance by the licensee with the provisions of ss. 403.351-403.371, and without publication of notice of intention as required by s. 403.341 if the operation appears to the department to be necessary or desirable in aid of the extinguishment of fire, dispersal of fog, or other emergency.

History.—s. 12, ch. 57-128; ss. 26, 35, ch. 69-106.

Note.—Former s. 373.371.


**403.401**     **Suspension or revocation of license.**—Any license may be revoked or suspended if the department finds that the licensee has failed or refused to comply with any of the provisions of this act.

History.—s. 13, ch. 57-128; s. 21, ch. 63-512; ss. 26, 35, ch. 69-106; s. 14, ch. 78-95.

Note.—Former s. 373.381.

**403.411    Penalty.**—Any person conducting a weather modification operation without first having procured a license, or who shall make a false statement in his or her application for license, or who shall fail to file any report or reports as required by this act, or who shall conduct any weather modification operation after revocation or suspension of his or her license, or who shall violate any other provision of this act, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083; and, if a corporation, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.083. Each such violation shall be a separate offense.

History.—s. 14, ch. 57-128; s. 351, ch. 71-136; s. 9, ch. 97-103.
Note.—Former s. 373.391.

**403.412    Environmental Protection Act.**—

(1)    This section shall be known and may be cited as the "Environmental Protection Act of 1971."

(2)(a)    The Department of Legal Affairs, any political subdivision or municipality of the state, or a citizen of the state may maintain an action for injunctive relief against:

1.    Any governmental agency or authority charged by law with the duty of enforcing laws, rules, and regulations for the protection of the air, water, and other natural resources of the state to compel such governmental authority to enforce such laws, rules, and regulations;

2.    Any person, natural or corporate, or governmental agency or authority to enjoin such persons, agencies, or authorities from violating any laws, rules, or regulations for the protection of the air, water, and other natural resources of the state.

(b)    In any suit under paragraph (a), the Department of Legal Affairs may intervene to represent the interests of the state.

(c)    As a condition precedent to the institution of an action pursuant to paragraph (a), the complaining party shall first file with the governmental agencies or authorities charged by law with the duty of regulating or prohibiting the act or conduct complained of a verified complaint setting forth the facts upon which the complaint is based and the manner in which the complaining party is affected. Upon receipt of a complaint, the governmental agency or authority shall forthwith transmit, by registered or certified mail, a copy of such complaint to those parties charged with violating the laws, rules, and regulations for the protection of the air, water, and other natural resources of the state. The agency receiving such complaint shall have 30 days after the receipt thereof within which to take appropriate action. If such action is not taken within the time prescribed, the complaining party may institute the judicial proceedings authorized in paragraph (a). However, failure to comply with this subsection shall not bar an action for a temporary restraining order to prevent immediate and irreparable harm from the conduct or activity complained of.

(d)    In any action instituted pursuant to paragraph (a), the court, in the interest of justice, may add as party defendant any governmental agency or authority charged with the duty of enforcing the applicable laws, rules, and regulations for the protection of the air, water, and other natural resources of the state.

(e)    No action pursuant to this section may be maintained if the person (natural or corporate) or governmental agency or authority charged with pollution, impairment, or destruction of the air, water, or other natural resources of the state is acting or conducting operations pursuant to currently valid permit or certificate covering such operations, issued by the appropriate governmental authorities or agencies, and is complying with the requirements of said permits or certificates.

(f)    In any action instituted pursuant to this section, other than an action involving a state NPDES permit authorized under s. 403.0885, the prevailing party or parties shall be entitled to costs and attorney's fees. Any award of attorney's fees in an action involving such a state NPDES permit shall be discretionary with the court. If the court has reasonable ground to doubt the solvency of the plaintiff or the plaintiff's ability to pay any cost or judgment which might be rendered against him or her in an action brought under this section, the court may order the plaintiff to post a good and sufficient surety bond or cash.

(3)    The court may grant injunctive relief and impose conditions on the defendant which are consistent with and in accordance with law and any rules or regulations adopted by any state or local governmental agency which is

charged to protect the air, water, and other natural resources of the state from pollution, impairment, or destruction.

(4)   The doctrines of res judicata and collateral estoppel shall apply. The court shall make such orders as necessary to avoid multiplicity of actions.

(5)   In any administrative, licensing, or other proceedings authorized by law for the protection of the air, water, or other natural resources of the state from pollution, impairment, or destruction, the Department of Legal Affairs, a political subdivision or municipality of the state, or a citizen of the state shall have standing to intervene as a party on the filing of a verified pleading asserting that the activity, conduct, or product to be licensed or permitted has or will have the effect of impairing, polluting, or otherwise injuring the air, water, or other natural resources of the state. As used in this section and as it relates to citizens, the term "intervene" means to join an ongoing s. 120.569 or s. 120.57 proceeding; this section does not authorize a citizen to institute, initiate, petition for, or request a proceeding under s. 120.569 or s. 120.57. Nothing herein limits or prohibits a citizen whose substantial interests will be determined or affected by a proposed agency action from initiating a formal administrative proceeding under s. 120.569 or s. 120.57. A citizen's substantial interests will be considered to be determined or affected if the party demonstrates it may suffer an injury in fact which is of sufficient immediacy and is of the type and nature intended to be protected by this chapter. No demonstration of special injury different in kind from the general public at large is required. A sufficient demonstration of a substantial interest may be made by a petitioner who establishes that the proposed activity, conduct, or product to be licensed or permitted affects the petitioner's use or enjoyment of air, water, or natural resources protected by this chapter.

(6)   Any Florida corporation not for profit which has at least 25 current members residing within the county where the activity is proposed, and which was formed for the purpose of the protection of the environment, fish and wildlife resources, and protection of air and water quality, may initiate a hearing pursuant to s. 120.569 or s. 120.57, provided that the Florida corporation not for profit was formed at least 1 year prior to the date of the filing of the application for a permit, license, or authorization that is the subject of the notice of proposed agency action.

(7)   In a matter pertaining to a federally delegated or approved program, a citizen of the state may initiate an administrative proceeding under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution.

(8)   Venue of any causes brought under this law shall lie in the county or counties wherein the cause of action is alleged to have occurred.

History.—ss. 1, 2, 3, 4, 5, 6, ch. 71-343; s. 24, ch. 88-393; s. 10, ch. 97-103; s. 9, ch. 2002-261.


**403.413   Florida Litter Law.—**

(1)   SHORT TITLE.—This section may be cited as the "Florida Litter Law."

(2)   DEFINITIONS.—As used in this section:

(a)   "Aircraft" means a motor vehicle or other vehicle that is used or designed to fly but does not include a parachute or any other device used primarily as safety equipment.

(b)   "Commercial purpose" means for the purpose of economic gain.

(c)   "Commercial vehicle" means a vehicle that is owned or used by a business, corporation, association, partnership, or sole proprietorship or any other entity conducting business for a commercial purpose.

(d)   "Dump" means to dump, throw, discard, place, deposit, or dispose of.

(e)   "Law enforcement officer" means any officer of the Florida Highway Patrol, a county sheriff's department, a municipal law enforcement department, a law enforcement department of any other political subdivision, or the Fish and Wildlife Conservation Commission. In addition, and solely for the purposes of this section, "law enforcement officer" means any employee of a county or municipal park or recreation department designated by the department head as a litter enforcement officer.

(f)   "Litter" means any garbage; rubbish; trash; refuse; can; bottle; box; container; paper; tobacco product; tire; appliance; mechanical equipment or part; building or construction material; tool; machinery; wood; motor vehicle or motor vehicle part; vessel; aircraft; farm machinery or equipment; sludge from a waste treatment

facility, water supply treatment plant, or air pollution control facility; or substance in any form resulting from domestic, industrial, commercial, mining, agricultural, or governmental operations.

(g) "Motor vehicle" means an automobile, motorcycle, truck, trailer, semitrailer, truck tractor, or semitrailer combination or any other vehicle that is powered by a motor.

(h) "Person" means any individual, firm, sole proprietorship, partnership, corporation, or unincorporated association.

(i) "Vessel" means a boat, barge, or airboat or any other vehicle used for transportation on water.

(3) RESPONSIBILITY OF LOCAL GOVERNING BODY OF A COUNTY OR MUNICIPALITY.—The local governing body of a county or a municipality shall determine the training and qualifications of any employee of the county or municipality or any employee of the county or municipal park or recreation department designated to enforce the provisions of this section if the designated employee is not a regular law enforcement officer.

(4) DUMPING LITTER PROHIBITED.—Unless otherwise authorized by law or permit, it is unlawful for any person to dump litter in any manner or amount:

(a) In or on any public highway, road, street, alley, or thoroughfare, including any portion of the right-of-way thereof, or any other public lands, except in containers or areas lawfully provided therefor. When any litter is thrown or discarded from a motor vehicle, the operator or owner of the motor vehicle, or both, shall be deemed in violation of this section;

(b) In or on any freshwater lake, river, canal, or stream or tidal or coastal water of the state, including canals. When any litter is thrown or discarded from a boat, the operator or owner of the boat, or both, shall be deemed in violation of this section; or

(c) In or on any private property, unless prior consent of the owner has been given and unless the dumping of such litter by such person will not cause a public nuisance or otherwise be in violation of any other state or local law, rule, or regulation.

(5) DUMPING RAW HUMAN WASTE PROHIBITED.—Unless otherwise authorized by law or permit, it is unlawful for any person to dump raw human waste from any train, aircraft, motor vehicle, or vessel upon the public or private lands or waters of the state.

(6) PENALTIES; ENFORCEMENT.—

(a) Any person who dumps litter in violation of subsection (4) in an amount not exceeding 15 pounds in weight or 27 cubic feet in volume and not for commercial purposes is guilty of a noncriminal infraction, punishable by a civil penalty of $100, from which $50 shall be deposited into the Solid Waste Management Trust Fund to be used for the solid waste management grant program pursuant to s. 403.7095. In addition, the court may require the violator to pick up litter or perform other labor commensurate with the offense committed.

(b) Any person who dumps litter in violation of subsection (4) in an amount exceeding 15 pounds in weight or 27 cubic feet in volume, but not exceeding 500 pounds in weight or 100 cubic feet in volume and not for commercial purposes is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. In addition, the court shall require the violator to pick up litter or perform other community service commensurate with the offense committed. Further, if the violation involves the use of a motor vehicle, upon a finding of guilt, whether or not adjudication is withheld or whether imposition of sentence is withheld, deferred, or suspended, the court shall forward a record of the finding to the Department of Highway Safety and Motor Vehicles, which shall record a penalty of three points on the violator's driver license pursuant to the point system established by s. 322.27.

(c) Any person who dumps litter in violation of subsection (4) in an amount exceeding 500 pounds in weight or 100 cubic feet in volume or in any quantity for commercial purposes, or dumps litter which is a hazardous waste as defined in s. 403.703, is guilty of a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083. In addition, the court may order the violator to:

1. Remove or render harmless the litter that he or she dumped in violation of this section;

2. Repair or restore property damaged by, or pay damages for any damage arising out of, his or her dumping litter in violation of this section; or

3.　Perform public service relating to the removal of litter dumped in violation of this section or to the restoration of an area polluted by litter dumped in violation of this section.

(d)　A court may enjoin a violation of this section.

(e)　A motor vehicle, vessel, aircraft, container, crane, winch, or machine used to dump litter that exceeds 500 pounds in weight or 100 cubic feet in volume is declared contraband and is subject to forfeiture in the same manner as provided in ss. 932.703 and 932.704.

(f)　If a person sustains damages arising out of a violation of this section that is punishable as a felony, a court, in a civil action for such damages, shall order the person to pay the injured party threefold the actual damages or $200, whichever amount is greater. In addition, the court shall order the person to pay the injured party's court costs and attorney's fees. A final judgment rendered in a criminal proceeding against a defendant under this section estops the defendant from asserting any issue in a subsequent civil action under this paragraph which he or she would be estopped from asserting if such judgment were rendered in the civil action unless the criminal judgment was based upon a plea of no contest or nolo contendere.

(g)　For the purposes of this section, if a person dumps litter or raw human waste from a commercial vehicle, that person is presumed to have dumped the litter or raw human waste for commercial purposes.

(h)　In the criminal trial of a person charged with violating this section, the state does not have the burden of proving that the person did not have the right or authority to dump the litter or raw human waste or that litter or raw human waste dumped on private property causes a public nuisance. The defendant has the burden of proving that he or she had authority to dump the litter or raw human waste and that the litter or raw human waste dumped does not cause a public nuisance.

(i)　It shall be the duty of all law enforcement officers to enforce the provisions of this section.

(j)　Any person who violates the provisions of subsection (5) is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083; provided, however, that any person who dumps more than 500 pounds or more than 100 cubic feet of raw human waste, or who dumps any quantity of such waste for commercial purposes, is guilty of a felony of the third degree, punishable as provided in paragraph (c).

(7)　ENFORCEMENT BY CERTAIN COUNTY OR MUNICIPAL EMPLOYEES.—Employees of counties or municipalities whose duty it is to ensure code compliance or to enforce codes and ordinances may be designated by the governing body of the county or the municipality to enforce the provisions of this section. Designation of such employees shall not provide the employees with the authority to bear arms or to make arrests.

(8)　ENFORCEMENT OF OTHER REGULATIONS.—This section does not limit the authority of any state or local agency to enforce other laws, rules, or ordinances relating to litter or solid waste management.

History.—ss. 1, 2, 3, 4, 4A, ch. 71-239; s. 1, ch. 75-266; s. 1, ch. 77-82; s. 1, ch. 78-202; s. 7, ch. 80-382; s. 1, ch. 82-63; s. 1, ch. 88-79; s. 56, ch. 88-130; s. 12, ch. 89-175; s. 14, ch. 89-268; s. 1, ch. 90-76; ss. 16, 17, ch. 91-286; s. 378, ch. 94-356; s. 1, ch. 95-165; s. 11, ch. 97-103; s. 205, ch. 99-245; s. 1, ch. 2005-200; s. 2, ch. 2007-184; s. 26, ch. 2012-88; s. 3, ch. 2016-174.

### 403.4131　Litter control.—

(1)　The Department of Transportation shall establish an "adopt-a-highway" program to allow local organizations to be identified with specific highway cleanup and highway beautification projects authorized under s. 339.2405. The department shall monitor compliance with the provisions of the adopt-a-highway program to ensure that organizations participating in the program comply with the goals identified by the department.

(2)　The Department of Transportation shall place signs discouraging litter at all off-ramps of the interstate highway system in the state. The department shall place other highway signs as necessary to discourage littering.

(3)　Each county is encouraged to initiate a litter control and prevention program or to expand upon its existing program. The department shall establish a system of grants for municipalities and counties to implement litter control and prevention programs. In addition to the activities described in subsection (1), such grants shall at a minimum be used for litter cleanup, grassroots educational programs involving litter removal and prevention, and the placement of litter and recycling receptacles. Counties are encouraged to form working public private partnerships as authorized under this section to implement litter control and prevention programs at the

community level. Counties that have a population under 100,000 are encouraged to develop a regional approach to administering and coordinating their litter control and prevention programs.

History.—s. 55, ch. 88-130; s. 1, ch. 89-37; s. 2, ch. 89-296; s. 5, ch. 91-429; s. 39, ch. 93-207; s. 379, ch. 94-356; s. 14, ch. 98-258; s. 37, ch. 99-5; s. 3, ch. 99-294; s. 19, ch. 2000-331; s. 3, ch. 2007-184; s. 111, ch. 2010-102; s. 37, ch. 2010-225.

### 403.41315　Comprehensive illegal dumping, litter, and marine debris control and prevention.—

(1)　The Legislature finds that a comprehensive illegal dumping, litter, and marine debris control and prevention program is necessary to protect the beauty and the environment of Florida. The Legislature also recognizes that a comprehensive illegal dumping, litter, and marine debris control and prevention program will have a positive effect on the state's economy. The Legislature finds that the state's rapid population growth, the ever-increasing mobility of its population, and the large number of tourists contribute to the need for a comprehensive illegal dumping, litter, and marine debris control and prevention program. The Legislature further finds that the program must be coordinated and capable of having statewide identity and grassroots community support.

(2)　The comprehensive illegal dumping, litter, and marine debris control and prevention program at a minimum must include the following:

(a)　A local public awareness and educational campaign to educate individuals, government, businesses, and other organizations concerning the role they must assume in preventing and controlling litter.

(b)　Enforcement provisions authorized under s. 403.413.

(c)　Enforcement officers whose responsibilities include grassroots education along with enforcing litter and illegal dumping violations.

(d)　Local illegal dumping, litter, and marine debris control and prevention programs operated at the county level with emphasis placed on grassroots educational programs designed to prevent and remove litter and marine debris.

(e)　A statewide adopt-a-highway program as authorized under s. 403.4131.

(f)　The highway beautification program authorized under s. 339.2405.

(g)　A statewide Adopt-a-Shore program that includes beach, river, and lake shorelines and emphasizes litter and marine debris cleanup and prevention.

(h)　The prohibition of balloon releases as authorized under s. 379.233.

(i)　The placement of approved identifiable litter and recycling receptacles.

(j)　Other educational programs that are implemented at the grassroots level involving volunteers and community programs that clean up and prevent litter, including Youth Conservation Corps activities.

History.—s. 35, ch. 93-207; s. 4, ch. 2007-184; s. 201, ch. 2008-247.

### 403.4132　Litter pickup and removal.—Local governments are encouraged to initiate programs to supplement the existing litter-removal program for public places and highway systems operated by the Department of Transportation. To the extent that funds are available from the department for litter pickup and removal programs beyond those annually available to the Department of Corrections, priority shall be given to contracting with nonprofit organizations for supplemental litter-removal programs that use youth employment programs.

History.—s. 58, ch. 88-130; s. 16, ch. 96-423.

### 403.4133　Adopt-a-Shore Program.—

(1)　The Legislature finds that litter and illegal dumping present a threat to the state's wildlife, environment, and shorelines. The Legislature further finds that public awareness and education will assist in preventing litter from being illegally deposited along the state's shorelines.

(2)　The Adopt-a-Shore Program shall be created within the Department of Environmental Protection. The program shall be designed to educate the state's citizens and visitors about the importance of litter prevention and shall include approaches and techniques to remove litter from the state's shorelines.

(3)　For the purposes of this section, the term "shoreline" includes, but is not limited to, beaches, rivershores, and lakeshores.

History.—s. 60, ch. 93-207; s. 5, ch. 2007-184.

### 403.4135    Litter receptacles.—

(1)    DEFINITIONS.—As used in this section "litter" and "vessel" have the same meanings as provided in s. 403.413.

(2)    RECEPTACLES REQUIRED.—All ports, terminal facilities, boatyards, marinas, and other commercial facilities which house vessels and from which vessels disembark shall provide or ensure the availability of litter receptacles of sufficient size and capacity to accommodate the litter and other waste materials generated on board the vessels using its facilities, except for large quantities of spoiled or damaged cargoes not usually discharged by a ship. The department may enforce violations of this section pursuant to ss. 403.121 and 403.131.

History.—s. 13, ch. 89-175; s. 18, ch. 91-286; s. 380, ch. 94-356.

### 403.414    Environmental award program.—

(1)    The department shall administer an environmental award program to recognize outstanding efforts in the protection, conservation, or restoration of the air, water, or other natural resources of the state by agencies, municipalities, counties, and other governmental units; private organizations, institutions, and industries; the communications media; and individuals.

(2)    Awards may be approved by the secretary in the following areas:

(a)    Water resources and quality.

(b)    Air quality.

(c)    Solid and hazardous waste management.

(d)    Communications through any media.

(3)    An agency, municipality, county, or other governmental unit; a private organization, institution, or industry; the communications media; or an individual may submit a nomination for an award to the department at any time. A nomination must be submitted on a form adopted by the department and must include information required by the department to consider that nomination.

(4)    The department may accept money from any public agency or other source to be used for the environmental award program.

History.—ss. 1, 2, 3, 4, 5, 6, ch. 74-60; s. 81, ch. 79-65; s. 264, ch. 81-259; s. 35, ch. 91-305; s. 20, ch. 2015-4.

### 403.415    Motor vehicle noise.—

(1)    SHORT TITLE.—This act shall be known and may be cited as the "Florida Motor Vehicle Noise Prevention and Control Act of 1974."

(2)(a)    LEGISLATIVE INTENT.—The intent of the Legislature is to implement the state constitutional mandate of s. 7, Art. II of the State Constitution to improve the quality of life in the state by limiting the noise of new motor vehicles sold in the state and the noise of motor vehicles used on the highways of the state.

(b)    It is also the intent of the Legislature to recognize the proposed United States Environmental Protection Act Noise Commission Standards Regulations for medium and heavy-duty trucks as being the most comprehensive available and in the best interest of Florida's citizenry and, further, that such regulation shall preempt all state standards not identical to such regulation.

(3)    DEFINITIONS.—The following words and phrases when used in this section shall have the meanings respectively assigned to them in this subsection, except where the context otherwise requires:

(a)    "dB A" means the composite abbreviation for A-weighted sound level, and the unit of sound level, the decibel.

(b)    "Gross combination weight rating" or "GCWR" means the value specified by the manufacturer as the loaded weight of a combination vehicle.

(c)    "Gross vehicle weight rating" or "GVWR" means the value specified by the manufacturer as the loaded weight of a single vehicle.

(d)    "Motor vehicle" means any vehicle which is self-propelled and any vehicle which is propelled by electric power obtained from overhead trolley wires, but not operated upon rails.

(e)    "Motorcycle" means any motor vehicle having a seat or saddle for the use of the rider and designed to travel on not more than three wheels in contact with the ground, including an autocycle, as defined in s. 316.003,

and excluding a vehicle in which the operator is enclosed by a cabin unless it meets the requirements set forth by the National Highway Traffic Safety Administration for a motorcycle. The term "motorcycle" does not include a tractor or a moped.

(f)   "Moped" means any vehicle with pedals to permit propulsion by human power, having a seat or saddle for the use of the rider and designed to travel on not more than three wheels, with a motor rated not in excess of 2 brake horsepower and not capable of propelling the vehicle at a speed greater than 30 miles per hour on level ground, and with a power-drive system that functions directly or automatically without clutching or shifting gears by the operator after the drive system is engaged. If an internal combustion engine is used, the displacement may not exceed 50 cubic centimeters.

(g)   "Sound level" means the A-weighted sound pressure level measured with fast response using an instrument complying with the specification for sound level meters of the American National Standards Institute, Inc., or its successor bodies, except that only A-weighting and fast dynamic response need be provided.

(h)   "Vehicle" means any device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power or used exclusively upon stationary rails or tracks.

(i)   "Department" means the Department of Environmental Protection.

(4)   NEW VEHICLE NOISE LIMITS.—No person shall sell, offer for sale, or lease a new motor vehicle that produces a maximum sound level exceeding the following limits at a distance of 50 feet from the center of the lane of travel under test procedures established under subsection (5):

(a)   For motorcycles:

| Date of manufacture | Sound level limit |
|---|---|
| From January 1, 1973, to December 31, 1974. . . . . . . . . . | 86 dB A |
| On or after January 1, 1975. . . . . . . . . . | 83 dB A |

(b)   For any motor vehicle with a GVWR over 10,000 pounds, for any school bus, and for any multipurpose passenger vehicle, which is defined as a motor vehicle with motive power designed to carry 10 persons or less and constructed either on a truck chassis or with special features for occasional off-road operation:

| Date of manufacture | Sound level limit |
|---|---|
| From January 1, 1973, to December 31, 1976. . . . . . . . . . | 86 dB A |
| On or after January 1, 1977. . . . . . . . . . | 83 dB A |

(5)   TEST PROCEDURES.—The test procedures for determining compliance with this section shall be established by regulation of the department and in cooperation with the Department of Highway Safety and Motor Vehicles in substantial conformance with applicable standards and recommended practices established by the Society of Automotive Engineers, Inc., or its successor bodies, and the American National Standards Institute, Inc., or its successor bodies, for the measurement of motor vehicle sound levels.

(6)   CERTIFICATION.—The manufacturer, distributor, importer, or designated agent thereof shall file a written certificate with the department stating that the specific makes and models of motor vehicles described thereon comply with the provisions of this section. No new motor vehicle shall be sold, offered for sale, or leased unless such certificate has been filed.

(7)   NOTIFICATION OF CERTIFICATION.—The department shall notify the Department of Highway Safety and Motor Vehicles of all makes and models of motor vehicles for which valid certificates of compliance with the provisions of this section are filed.

(8)   REPLACEMENT EQUIPMENT.—

(a)   No person shall sell or offer for sale for use as a part of the equipment of a motor vehicle any exhaust muffler, intake muffler, or other noise abatement device which, when installed, will permit the vehicle to be operated in a manner that the emitted sound level of the vehicle is increased above that emitted by the vehicle as

originally manufactured and determined by the test procedures for new motor vehicle sound levels established under this section.

(b) The manufacturer, distributor, or importer, or designated agent thereof, shall file a written certificate with the department that his or her products sold within this state comply with the requirements of this section for their intended applications.

(9) OPERATING VEHICLE NOISE MEASUREMENTS.—The department shall establish, with the cooperation of the Department of Highway Safety and Motor Vehicles, measurement procedures for determining compliance of operating vehicles with the noise limits of s. 316.293(2). The department shall advise the Department of Highway Safety and Motor Vehicles on technical aspects of motor vehicle noise enforcement regulations, assist in the training of enforcement officers, and administer a sound-level meter loan program for local enforcement agencies.

(10) ENACTMENT OF LOCAL ORDINANCES LIMITED.—The provisions of this section shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein, and no local authority shall enact or enforce any ordinance on a matter covered by this section unless expressly authorized. However, this subsection shall not prevent any local authority from enacting an ordinance when such enactment is necessary to vest jurisdiction of violation of this section in the local court.

History.—ss. 1, 2, 3, ch. 74-110; ss. 1, 2, ch. 75-59; s. 1, ch. 76-289; s. 1, ch. 78-280; s. 82, ch. 79-65; s. 98, ch. 79-164; s. 1, ch. 80-338; s. 1, ch. 82-49; s. 22, ch. 87-161; s. 381, ch. 94-356; s. 12, ch. 97-103; s. 11, ch. 2018-130.

**403.4151 Exempt motor vehicles.**—The provisions of this act shall not apply to any motor vehicle which is not required to be licensed under the provisions of chapter 320.

History.—s. 7, ch. 74-110.

**403.4153 Federal preemption.**—On and after the date of promulgation of noise emission standards by the administrator of the United States Environmental Protection Agency for a class of new motor vehicles as described in s. 403.415(4)(a) or (b), the state sound level limits in effect at that time for that class of vehicles shall be maintained until the federal standards become effective.

History.—s. 2, ch. 76-289; s. 2, ch. 95-144.

**403.4154 Phosphogypsum management program.**—

(1) DEFINITIONS.—As used in this section, the term:

(a) "Department" means the Department of Environmental Protection.

(b) "Existing stack" means a phosphogypsum stack, as defined in paragraph (d), that is:

1. In existence in this state on May 12, 1993; or

2. Constructed in this state after May 12, 1993, and for which the department has received a certification of completion of construction submitted by the owner of the newly constructed phosphogypsum stack.

The term "existing stack" does not include a phosphogypsum stack that has been closed pursuant to a department permit or order.

(c) "Phosphogypsum" means calcium sulfate and byproducts produced by the reaction of sulfuric acid with phosphate rock to produce phosphoric acid.

(d) "Phosphogypsum stack" means any defined geographic area associated with a phosphoric acid production facility in which phosphogypsum is disposed of or stored, other than within a fully enclosed building, container, or tank.

(e) "Phosphogypsum stack system" means the phosphogypsum stack, pile, or landfill, together with all pumps, piping, ditches, drainage conveyances, water-control structures, collection pools, cooling ponds, surge ponds, and any other collection or conveyance system associated with the transport of phosphogypsum from the plant to the phosphogypsum stack, its management at the stack, and the process-wastewater return to the phosphoric acid production or other process. This definition specifically includes toe drain systems and ditches and other leachate collection systems but does not include conveyances within the confines of the fertilizer production plant or existing areas used in emergency circumstances caused by rainfall events of high volume or duration for the temporary storage of process wastewater to avoid discharges to surface waters of the state, which process

wastewater must be removed from the temporary storage area as expeditiously as possible, but not to exceed 120 days after each emergency.

(f) "Process wastewater" means any water that, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, byproduct, or waste product, along with any leachate or runoff from the phosphogypsum stack system. This term does not include contaminated nonprocess wastewater as that term is defined in 40 C.F.R. s. 418.11(c).

(2) REGULATORY PROGRAM.—

(a) It is the intent of the Legislature that the department develop a program for the sound and effective regulation of phosphogypsum stack systems in the state.

(b) The department shall adopt rules that prescribe acceptable construction designs for new or expanded phosphogypsum stack systems and that prescribe permitting criteria for operation, long-term-care requirements, and closure financial responsibility requirements for phosphogypsum stack systems.

(c) Whoever willfully, knowingly, or with reckless indifference or gross carelessness misstates or misrepresents the financial condition or closure costs of an entity engaged in managing, owning, or operating a phosphogypsum stack or stack system commits a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083 by a fine of not more than $50,000 and by imprisonment for 5 years for each offense.

(d) If an owner or operator of a phosphogypsum stack or stack system fails to comply with department rules requiring demonstration of closure financial responsibility, no distribution may be made which would be prohibited under s. 607.06401(3) until the noncompliance is corrected. Whoever willfully, knowingly, or with reckless indifference or gross carelessness violates this prohibition commits a felony of the third degree, punishable as provided in s. 775.082 or s. 775.083 by a fine of not more than $50,000 or by imprisonment for 5 years for each offense.

(3) ABATEMENT OF IMMINENT HAZARD.—

(a) The department may take action to abate or substantially reduce any imminent hazard caused by the physical condition, maintenance, operation, or closure of a phosphogypsum stack system.

(b) An imminent hazard exists if the physical condition, maintenance, operation, or closure of a phosphogypsum stack system creates an immediate and substantial danger to human health, safety, or welfare or to the environment. A phosphogypsum stack system is presumed not to cause an imminent hazard if the physical condition and operation of the system are in compliance with all applicable department rules.

(c) The failure of an owner or operator of a phosphogypsum stack system to comply with department rules requiring demonstration of closure financial responsibility may be considered by the department as evidence that a phosphogypsum stack poses an imminent hazard for purposes of initiating actions authorized by paragraph (d).

(d) If the department determines that the failure of an owner or operator to comply with department rules requiring demonstration of financial responsibility or that the physical condition, maintenance, operation, or closure of a phosphogypsum stack system poses an imminent hazard, the department shall request access to the property on which such stack system is located from the owner or operator of the stack system for the purposes of taking action to abate or substantially reduce the imminent hazard. If the department, after reasonable effort, is unable to timely obtain the necessary access to abate or substantially reduce the imminent hazard, the department may institute action in its own name, using the procedures and remedies of s. 403.121 or s. 403.131, to abate or substantially reduce an imminent hazard. Whenever serious harm to human health, safety, or welfare, to the environment, or to private or public property may occur prior to completion of an administrative hearing or other formal proceeding that might be initiated to abate the risk of serious harm, the department may obtain from the court, ex parte, an injunction without paying filing and service fees prior to the filing and service of process.

(e) To abate or substantially reduce an imminent hazard, the department may take any appropriate action, including, but not limited to, using employees of the department or contracting with other state or federal agencies, with private third-party contractors, or with the owner or operator of the stack system, or financing, compensating, or funding a receiver, trustee, or owner of the stack system, to perform all or part of the work.

(f) The department shall recover from the owner or operator of the phosphogypsum stack system to the use of the Nonmandatory Land Reclamation Trust Fund all moneys expended from the fund, including funds expended

prior to the effective date of this section, to abate an imminent hazard posed by the phosphogypsum stack system plus a penalty equal to an amount calculated at 30 percent of such funds expended. This penalty shall be imposed annually, and prorated from the date of payment from the fund until the expended funds and the penalty are repaid. If the department prevails in any action to recover funds pursuant to this subsection, it may recover reasonable attorney's fees and costs incurred. Phosphogypsum may not be deposited on a stack until all moneys expended from the fund in connection with the stack have been repaid, unless the department determines that such placement is necessary to abate or avoid an imminent hazard or unless otherwise authorized by the department.

(g)   The department may impose a lien on the real property on which the phosphogypsum stack system that poses an imminent hazard is located and on the real property underlying and other assets located at associated phosphate fertilizer production facilities equal in amount to the moneys expended from the Nonmandatory Land Reclamation Trust Fund pursuant to paragraph (e), including attorney's fees and court costs. The owner of any property on which such a lien is imposed is entitled to a release of the lien upon payment to the department of the lien amount. The lien imposed by this section does not take priority over any other prior perfected lien on the real property, personal property, or other assets referenced in this paragraph, including, but not limited to, the associated phosphate rock mine and reserves.

(h)   Upon a declaration by the Governor of an environmental emergency concerning the abatement of an imminent hazard involving a phosphogypsum stack or stack system, the state and any agent under contract with the state for the provision of services directly related to the abatement of such hazard shall not become liable under state laws for environmental protection for any costs, damages, or penalties associated with the abatement of the imminent hazard. The Legislature finds that provision of this limited immunity is in the public interest and necessary for the abatement of the imminent hazard.

(4)   REGISTRATION FEES.—

(a)1.   The owner or operator of each existing phosphogypsum stack who has not provided a performance bond, letter of credit, trust fund agreement, or closure insurance to demonstrate financial responsibility for closure and long-term care shall pay to the department a fee as set forth in this paragraph. All fees shall be deposited in the Nonmandatory Land Reclamation Trust Fund.

2.   The amount of the fee for each existing stack shall be $75,000 for each of the five 12-month periods following July 1, 2001.

3.   The amount of the fee for any new stack for which the owner or operator has not provided a performance bond, letter of credit, trust fund agreement, or closure insurance to demonstrate financial responsibility for closure and long-term care shall be $75,000 for each of the five 12-month periods following the issuance by the department of a construction permit for that stack.

4.   Within 30 days after a phosphogypsum stack has been certified as closed pursuant to rule 62-673.620(2) and (3), Florida Administrative Code, the department shall refund to the owner of the closed phosphogypsum stack an amount from the Nonmandatory Land Reclamation Trust Fund equal to the total amount of fee payments made by the owner or operator to the fund in connection with the closed phosphogypsum stack. However, a refund may not be paid until the Mulberry and Piney Point phosphogypsum stack systems have been closed and a satisfactory reserve has been established in the Nonmandatory Reclamation Lands Trust Fund.

(b)   On or before August 1 of each year, the department shall provide written notice to each owner of an existing stack of any fee payable for the 12-month period commencing on the immediately preceding July 1. Each owner shall remit the fee to the department on or before August 31 of each year.

(5)   CLOSURE OF ABANDONED SYSTEMS.—

(a)   The department may expend money from the Nonmandatory Land Reclamation Trust Fund to take all steps necessary to close a phosphogypsum stack system and to carry out postclosure care in accordance with department rules in effect as of the date of commencement of closure activities, subject to the conditions set forth in this subsection. To accomplish such closure and postclosure care, the department may take any appropriate action, including, but not limited to, using employees of the department or by contracting with other state or federal

agencies, with private third-party contractors, or with the owner or operator of the stack system, to perform all or part of the work.

(b)    The department may close a phosphogypsum stack system through agreement with the owner or by court order. In determining whether closure is appropriate, the court shall consider whether closing the stack will protect human health, safety, or welfare or the environment; the useful life of the stack; the effect of delaying closure on the stability of the fund; the likelihood that the stack will be operated again; and any other relevant factors. If the court finds that closure is appropriate, the court may appoint a receiver to oversee the closure or shall authorize department employees, agents, and contractors to enter all land owned by the owner of the phosphogypsum stack system for the performance of closure and postclosure activities.

(c)    The department may impose a lien on the real property on which a closed phosphogypsum stack system is located and on the real property underlying and other assets located at its formerly associated phosphate fertilizer production facilities equal in amount to the moneys expended from the Nonmandatory Land Reclamation Trust Fund pursuant to this subsection for closure and postclosure care. The owner of any property on which such a lien is imposed is entitled to a release of the lien upon payment to the department of the lien amount and execution of an agreement to carry out postclosure care in accordance with applicable department rules. The lien imposed by this section does not take priority over any other prior perfected lien on the real property, personal property, or other assets referenced in this paragraph, including, but not limited to, the associated phosphate rock mine and reserves.

History.—s. 62, ch. 93-207; s. 382, ch. 94-356; s. 3, ch. 2001-134; s. 8, ch. 2003-423; s. 64, ch. 2005-2.

### 403.4155    Phosphogypsum management; rulemaking authority.—

(1)    The Department of Environmental Protection shall adopt rules to amend existing chapter 62-672, Florida Administrative Code, to ensure that impoundment structures and water conveyance piping systems used in phosphogypsum management are designed and maintained to meet critical safety standards. The rules must require that any impoundment structure used in a phosphogypsum stack system, together with all pumps, piping, ditches, drainage conveyances, water control structures, collection pools, cooling ponds, surge ponds, and any other collection or conveyance system associated with phosphogypsum transport, cooling water, or the return of process wastewater, is constructed using sound engineering practices and is operated to avoid spills or discharges of materials which adversely affect surface or ground waters. The rules must require that a phosphogypsum stack system owner maintain a log detailing the owner's operating inspection schedule, results, and any corrective action taken based on the inspection results. The rules must require phosphogypsum stack owners to maintain an emergency contingency plan and demonstrate the ability to mobilize equipment and manpower to respond to emergency situations at phosphogypsum stack systems. The rules must establish a reasonable time period not to exceed 12 months for facilities to meet the provisions of the rules adopted pursuant to this section.

(2)(a)    By October 1, 2004, the department shall initiate rulemaking to require that phosphogypsum stack system operation plans required by department rule be amended by adding an interim stack system management (ISSM) plan that provides written instructions for the operation of the system, assuming that no phosphoric acid would be produced at the facility for a 2-year period. The initial ISSM plan must be completed as of the first July 1 following the adoption of the rule required by this section. The ISSM plan must include:

1.    A detailed description of process water management procedures that will be implemented to ensure that the stack system operates in accordance with all applicable department permit conditions and rules. The procedures must address the actual process water levels present at the facility 30 days prior to the completion of the plan and must assume that the facility will receive annual average rainfall during the 2-year planning period.

2.    A detailed description of the procedures to be followed for the daily operation and routine maintenance of the stack system, including required environmental sampling and analyses, as well as for any maintenance or repairs recommended following annual inspections of the system.

3.    Identification of all machinery, equipment, and materials necessary to implement the plan.

4.    Identification of the sources of power or fuel necessary to implement the plan.

5.    Identification of the personnel necessary to implement the plan.

(b)    The ISSM plan shall be updated annually, taking into account process water levels as of June 1 of each year and the existing stack system configuration.

(c)    The requirements listed in paragraphs (a) and (b) are applicable to all phosphogypsum stack systems except those that have been closed, that are undergoing closure, or for which an application for a closure permit has been submitted pursuant to department rule.

(3)(a)    By October 1, 2004, the department shall initiate rulemaking to require that general plans and schedules for the closure of phosphogypsum stack systems include:

1.    A description of the physical configuration of the phosphogypsum stack system anticipated at the time of closure at the end of useful life of the system.

2.    A site-specific water management plan describing the procedures to be employed at the end of the useful life of the system to manage the anticipated volume of process water in an environmentally sound manner.

3.    An estimate of the cost of management of the anticipated volume of process water in accordance with the site-specific water management plan.

4.    A description of all construction work necessary to properly close the system in accordance with department rules.

5.    An estimate of all costs associated with long-term care of the closed system, including maintenance and monitoring, in accordance with department rules.

(b)    The department shall revise chapter 62-673, Florida Administrative Code, to require the owner or operator of a phosphogypsum stack management system to demonstrate financial responsibility for the costs of terminal closure of the phosphogypsum stack system in a manner that protects the public health and safety, and must include criteria to evaluate the adequacy of the demonstration of financial responsibility.

1.    The costs of terminal closure shall be estimated based on the stack system configuration as of the end of its useful life as determined by the owner or operator. These costs shall be verified by an independent third party.

2.    The owner or operator may demonstrate financial responsibility by use of one or more of the following methods:

a.    Bond.

b.    Letter of credit.

c.    Cash deposit arrangement.

d.    Closure insurance.

e.    Financial tests.

f.    Corporate guarantee.

For the purposes of this section, the term "cash deposit arrangement" means a trust fund, business or statutory trust, escrow account, or similar cash deposit entity whereby a fiduciary holds and invests funds deposited by the owner or operator, which funds shall be expended only for the purpose of directly implementing all or some portion of phosphogypsum stack system closure requirements of that particular owner or operator.

3.    A trustee, escrow agent, or other fiduciary of a cash deposit arrangement authorized by this section has no liability for any damage or loss of any kind arising out of or caused by performance of duties imposed by the terms of the applicable agreement unless such damage or loss is directly caused by the gross negligence or criminal act of the trustee, escrow agent, or other fiduciary. In performing its duties pursuant to the applicable agreement, a trustee, escrow agent, or other fiduciary is entitled to rely upon information and direction received from the grantor or the department without independent verification unless such information and direction are manifestly in error.

4.    To the extent that a cash deposit arrangement is used to provide proof of financial responsibility for all or a portion of closure costs, the trust, escrow, or cash arrangement deposit entity is considered to have assumed all liability for such closure costs up to the amount of the cash deposit, less any fees or costs of the trustee, escrow agent, or other fiduciary.

5.    Any funds maintained in a cash deposit arrangement authorized by this section are not subject to claims of creditors of the owner or operator and are otherwise exempt from setoff, execution, levy, garnishment, and similar

writs and proceedings.

6.   Any funds remaining in a trust, escrow account, or other cash deposit arrangement after the purpose of such cash deposit arrangement under this section has been accomplished shall be returned to the grantor.

(4)   The department shall revise chapter 62-673, Florida Administrative Code, to require the owner or operator of a phosphogypsum stack system to demonstrate financial responsibility for the costs of terminal closure of the phosphogypsum stack system in a manner that protects the environment and the public health and safety. At a minimum, such rules must include or address the following requirements:

(a)   That the cost of closure and long-term care be re-estimated by a professional engineer and adjusted for inflation on an annual basis. At a minimum, such cost data must include:

1.   The cost of treatment and appropriate disposal of all process wastewater, both ponded and pore, in the system.

2.   All construction work necessary to properly close the system in accordance with department rules.

3.   All costs associated with long-term care of the closed system, including maintenance and monitoring, in accordance with department rules.

(b)   That financial statements and financial data be prepared according to generally accepted accounting principles within the United States and submitted quarterly.

(c)   That audited financial statements be provided annually along with the statement of financial assurance.

(d)   That any owner or operator in default on any of its obligations report such default immediately.
**History.**—s. 1, ch. 98-117; s. 4, ch. 2001-134; s. 9, ch. 2003-423.

**403.42    Florida Clean Fuel Act.**—

(1)   SHORT TITLE AND PURPOSE.—

(a)   This section may be cited as the "Florida Clean Fuel Act."

(b)   The purposes of this act are to establish the Clean Fuel Florida Advisory Board under the Department of Environmental Protection to study the implementation of alternative fuel vehicles and to formulate and provide to the Secretary of Environmental Protection recommendations on expanding the use of alternative fuel vehicles in this state and make funding available for implementation.

(2)   DEFINITIONS.—For purposes of this act:

(a)   "Alternative fuels" include electricity, biodiesel, natural gas, propane, and any other fuel that may be deemed appropriate in the future by the Department of Environmental Protection with guidance from the Clean Fuel Florida Advisory Board.

(b)   "Alternative fuel vehicles" include on-road and off-road transportation vehicles and light-duty, medium-duty, and heavy-duty vehicles that are powered by an alternative fuel or a combination of alternative fuels.

(3)   CLEAN FUEL FLORIDA ADVISORY BOARD ESTABLISHED; MEMBERSHIP; DUTIES AND RESPONSIBILITIES.—

(a)   The Clean Fuel Florida Advisory Board is established within the Department of Environmental Protection.

(b)1.   The advisory board shall consist of the Executive Director of the Department of Economic Opportunity, the Secretary of Environmental Protection, or a designee from that department, the Commissioner of Education, or a designee from that department, the Secretary of Transportation, or a designee from that department, the Commissioner of Agriculture, or a designee from that department, the Secretary of Management Services, or a designee from that department, and a representative of each of the following, who shall be appointed by the Secretary of Environmental Protection:

a.   The Florida biodiesel industry.

b.   The Florida electric utility industry.

c.   The Florida natural gas industry.

d.   The Florida propane gas industry.

e.   An automobile manufacturers' association.

f.   A Florida Clean Cities Coalition designated by the United States Department of Energy.

g.   Enterprise Florida, Inc.

h.   EV Ready Broward.

   i.   The Florida petroleum industry.

   j.   The Florida League of Cities.

   k.   The Florida Association of Counties.

   l.   Floridians for Better Transportation.

   m.   A motor vehicle manufacturer.

   n.   Florida Local Environment Resource Agencies.

   o.   Project for an Energy Efficient Florida.

   p.   Florida Transportation Builders Association.

   2.   The purpose of the advisory board is to serve as a resource for the department and to provide the Governor, the Legislature, and the Secretary of Environmental Protection with private sector and other public agency perspectives on achieving the goal of increasing the use of alternative fuel vehicles in this state.

   3.   Members shall be appointed to serve terms of 1 year each, with reappointment at the discretion of the Secretary of Environmental Protection. Vacancies shall be filled for the remainder of the unexpired term in the same manner as the original appointment.

   4.   The board shall annually select a chairperson.

   5.a.   The board shall meet at least once each quarter or more often at the call of the chairperson or the Secretary of Environmental Protection.

   b.   Meetings are exempt from the notice requirements of chapter 120, and sufficient notice shall be given to afford interested persons reasonable notice under the circumstances.

   6.   Members of the board are entitled to travel expenses while engaged in the performance of board duties.

   7.   The board shall terminate 5 years after the effective date of this act.

   (c)   The board shall review the performance of the state with reference to alternative fuel vehicle implementation in complying with federal laws and maximizing available federal funding and may:

   1.   Advise the Governor, Legislature, and the Secretary of Environmental Protection and make recommendations regarding implementation and use of alternative fuel vehicles in this state.

   2.   Identify potential improvements in this act and the state's alternative fuel policies.

   3.   Request from all state agencies any information the board determines relevant to board duties.

   4.   Regularly report to the Secretary of Environmental Protection, the Governor, the President of the Senate, and the Speaker of the House of Representatives regarding the board's findings and recommendations.

   (d)1.   The advisory board shall make recommendations to the Department of Environmental Protection for establishing pilot programs in this state that provide experience and support the best use expansion of the alternative fuel vehicle industry in this state. No funds shall be released for a project unless there is at least a 50-percent private or local match.

   2.   In addition to the pilot programs, the advisory board shall assess federal, state, and local initiatives to identify incentives that encourage successful alternative fuel vehicle programs; obstacles to alternative fuel vehicle use including legislative, regulatory, and economic obstacles; and programs that educate and inform the public about alternative fuel vehicles.

   3.   The advisory board is charged with determining a reasonable, fair, and equitable way to address current motor fuel taxes as they apply to alternative fuels and at what threshold of market penetration.

   4.   Based on its findings, the advisory board shall develop recommendations to the Legislature on future alternative fuel vehicle programs and legislative changes that provide the best use of state and other resources to enhance the alternative fuel vehicle market in this state and maximize the return on that investment in terms of job creation, economic development, and emissions reduction.

   (e)   The advisory board, working with the Department of Environmental Protection, shall develop a budget for the department's approval, and all expenditures shall be approved by the department. At the conclusion of the first year, the department shall conduct an audit of the board and board programs.

   **History.**—s. 72, ch. 99-248; s. 28, ch. 2000-153; s. 17, ch. 2004-243; s. 286, ch. 2011-142.

## PART II

## ELECTRICAL POWER PLANT AND
## TRANSMISSION LINE SITING

403.501    Short title.

403.502    Legislative intent.

403.503    Definitions relating to Florida Electrical Power Plant Siting Act.

403.504    Department of Environmental Protection; powers and duties enumerated.

403.5055    Application for permits pursuant to s. 403.0885.

403.506    Applicability, thresholds, and certification.

403.5063    Notice of intent to file application.

403.5064    Application; schedules.

403.5065    Appointment of administrative law judge; powers and duties.

403.5066    Determination of completeness.

403.50663    Informational public meetings.

403.50665    Land use consistency.

403.507    Preliminary statements of issues, reports, project analyses, and studies.

403.508    Land use and certification hearings, parties, participants.

403.509    Final disposition of application.

403.5095    Alteration of time limits.

403.510    Superseded laws, regulations, and certification power.

403.511    Effect of certification.

403.5112    Filing of notice of certified corridor route.

403.5113    Postcertification amendments and review.

403.5115    Public notice.

403.5116    County and municipal authority unaffected by ch. 75-22.

403.512    Revocation or suspension of certification.

403.513    Review.

403.514    Enforcement of compliance.

403.515    Availability of information.

403.516    Modification of certification.

403.517    Supplemental applications for sites certified for ultimate site capacity.

403.5175    Existing electrical power plant site certification.

403.518    Fees; disposition.

403.5185    Law applicable to applications processed under ss. 403.501-403.518.

403.519    Exclusive forum for determination of need.

403.52    Short title.

403.521    Legislative intent.

403.522    Definitions relating to the Florida Electric Transmission Line Siting Act.

403.523    Department of Environmental Protection; powers and duties.

403.524    Applicability; certification; exemptions.

403.525    Administrative law judge; appointment; powers and duties.

403.5251    Application; schedules.

403.5252    Determination of completeness.

403.526    Preliminary statements of issues, reports, and project analyses; studies.

403.527    Certification hearing, parties, participants.

403.5271    Alternate corridors.

403.5272    Informational public meetings.

403.5275    Amendment to the application.

403.528    Alteration of time limits.

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 93 of 694

403.529   Final disposition of application.

403.531   Effect of certification.

403.5312   Filing of notice of certified corridor route.

403.5315   Modification of certification.

403.5317   Postcertification activities.

403.532   Revocation or suspension of certification.

403.533   Enforcement of compliance.

403.536   Superseded laws, regulations, and certification power.

403.5363   Public notices; requirements.

403.5365   Fees; disposition.

403.537   Determination of need for transmission line; powers and duties.

403.539   Certification admissible in eminent domain proceedings; attorney's fees and costs.

**403.501**    **Short title.**—Sections 403.501-403.518 shall be known and may be cited as the "Florida Electrical Power Plant Siting Act."

History.—s. 1, ch. 73-33; s. 1, ch. 76-76; s. 1, ch. 90-331.

**403.502**    **Legislative intent.**—The Legislature finds that the present and predicted growth in electric power demands in this state requires the development of a procedure for the selection and utilization of sites for electrical generating facilities and the identification of a state position with respect to each proposed site and its associated facilities. The Legislature recognizes that the selection of sites and the routing of associated facilities, including transmission lines, will have a significant impact upon the welfare of the population, the location and growth of industry, and the use of the natural resources of the state. The Legislature finds that the efficiency of the permit application and review process at both the state and local level would be improved with the implementation of a process whereby a permit application would be centrally coordinated and all permit decisions could be reviewed on the basis of standards and recommendations of the deciding agencies. It is the policy of this state that, while recognizing the pressing need for increased power generation facilities, the state shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life and will not unduly conflict with the goals established by the applicable local comprehensive plans. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interests of the public. Such action will be based on these premises:

(1)   To assure the citizens of Florida that operation safeguards are technically sufficient for their welfare and protection.

(2)   To effect a reasonable balance between the need for the facility and the environmental impact resulting from construction and operation of the facility, including air and water quality, fish and wildlife, and the water resources and other natural resources of the state.

(3)   To meet the need for electrical energy as established pursuant to s. 403.519.

(4)   To assure the citizens of Florida that renewable energy sources and technologies, as well as conservation measures, are utilized to the extent reasonably available.

History.—s. 1, ch. 73-33; s. 2, ch. 90-331; s. 2, ch. 2007-117; s. 66, ch. 2008-227.

**403.503**    **Definitions relating to Florida Electrical Power Plant Siting Act.**—As used in this act:

(1)   "Act" means the Florida Electrical Power Plant Siting Act.

(2)   "Agency," as the context requires, means an official, officer, commission, authority, council, committee, department, division, bureau, board, section, or other unit or entity of government, including a regional or local governmental entity.

(3)   "Alternate corridor" means an area that is proposed by the applicant or a third party within which all or part of an associated electrical transmission line right-of-way is to be located and that is different from the

preferred transmission line corridor proposed by the applicant. The width of the alternate corridor proposed for certification for an associated electrical transmission line may be the width of the proposed right-of-way or a wider boundary not to exceed a width of 1 mile. The area within the alternate corridor may be further restricted as a condition of certification. The alternate corridor may include alternate electrical substation sites if the applicant has proposed an electrical substation as part of the portion of the proposed electrical transmission line.

(4) "Amendment" means a material change in the information provided by the applicant to the application for certification made after the initial application filing.

(5) "Applicant" means any electric utility which applies for certification pursuant to the provisions of this act.

(6) "Application" means the documents required by the department to be filed to initiate a certification review and evaluation, including the initial document filing, amendments, and responses to requests from the department for additional data and information.

(7) "Associated facilities" means, for the purpose of certification, those onsite and offsite facilities which directly support the construction and operation of the electrical power plant such as electrical transmission lines, substations, and fuel unloading facilities; pipelines necessary for transporting fuel for the operation of the facility or other fuel transportation facilities; water or wastewater transport pipelines; construction, maintenance, and access roads; and railway lines necessary for transport of construction equipment or fuel for the operation of the facility.

(8) "Board" means the Governor and Cabinet sitting as the siting board.

(9) "Certification" means the written order of the board, or secretary when applicable, approving an application for the licensing of an electrical power plant, in whole or with such changes or conditions as the board may deem appropriate.

(10) "Completeness" means that the application has addressed all applicable sections of the prescribed application format, and that those sections are sufficient in comprehensiveness of data or in quality of information provided to allow the department to determine whether the application provides the reviewing agencies adequate information to prepare the reports required by s. 403.507.

(11) "Corridor" means the proposed area within which an associated linear facility right-of-way is to be located. The width of the corridor proposed for certification as an associated facility, at the option of the applicant, may be the width of the right-of-way or a wider boundary, not to exceed a width of 1 mile. The area within the corridor in which a right-of-way may be located may be further restricted by a condition of certification. After all property interests required for the right-of-way have been acquired by the licensee, the boundaries of the area certified shall narrow to only that land within the boundaries of the right-of-way. The corridors proper for certification shall be those addressed in the application, in amendments to the application filed under s. 403.5064, and in notices of acceptance of proposed alternate corridors filed by an applicant and the department pursuant to s. 403.5271 as incorporated by reference in s. 403.5064(1)(b) for which the required information for the preparation of agency supplemental reports was filed.

(12) "Department" means the Department of Environmental Protection.

(13) "Designated administrative law judge" means the administrative law judge assigned by the Division of Administrative Hearings pursuant to chapter 120 to conduct the hearings required by this act.

(14) "Electrical power plant" means, for the purpose of certification, any steam or solar electrical generating facility using any process or fuel, including nuclear materials, except that this term does not include any steam or solar electrical generating facility of less than 75 megawatts in capacity unless the applicant for such a facility elects to apply for certification under this act. This term also includes the site; all associated facilities that will be owned by the applicant that are physically connected to the site; all associated facilities that are indirectly connected to the site by other proposed associated facilities that will be owned by the applicant; and associated transmission lines that will be owned by the applicant which connect the electrical power plant to an existing transmission network or rights-of-way to which the applicant intends to connect. At the applicant's option, this term may include any offsite associated facilities that will not be owned by the applicant; offsite associated facilities that are owned by the applicant but that are not directly connected to the site; any proposed terminal or intermediate substations or substation expansions connected to the associated transmission line; or new

transmission lines, upgrades, or improvements of an existing transmission line on any portion of the applicant's electrical transmission system necessary to support the generation injected into the system from the proposed electrical power plant.

(15)    "Electric utility" means cities and towns, counties, public utility districts, regulated electric companies, electric cooperatives, and joint operating agencies, or combinations thereof, engaged in, or authorized to engage in, the business of generating, transmitting, or distributing electric energy.

(16)    "Federally delegated or approved permit program" means any environmental regulatory program approved by an agency of the Federal Government so as to authorize the department to administer and issue licenses pursuant to federal law, including, but not limited to, new source review permits, operation permits for major sources of air pollution, and prevention of significant deterioration permits under the Clean Air Act (42 U.S.C. ss. 7401 et seq.), permits under ss. 402 and 404 of the Clean Water Act (33 U.S.C. ss. 1251 et seq.), and permits under the Resource Conservation and Recovery Act (42 U.S.C. ss. 6901 et seq.).

(17)    "License" means a franchise, permit, certification, registration, charter, comprehensive plan amendment, development order or permit as defined in chapters 163 and 380, or similar form of authorization required by law, including permits issued under federally delegated or approved permit programs, but it does not include a license required primarily for revenue purposes when issuance of the license is merely a ministerial act.

(18)    "Licensee" means an applicant that has obtained a certification order for the subject project.

(19)    "Local government" means a municipality or county in the jurisdiction of which the electrical power plant is proposed to be located.

(20)    "Modification" means any change in the certification order after issuance, including a change in the conditions of certification.

(21)    "Nonprocedural requirements of agencies" means any agency's regulatory requirements established by statute, rule, ordinance, zoning ordinance, land development code, or comprehensive plan, excluding any provisions prescribing forms, fees, procedures, or time limits for the review or processing of information submitted to demonstrate compliance with such regulatory requirements.

(22)    "Notice of intent" means that notice which is filed with the department on behalf of an applicant prior to submission of an application pursuant to this act and which notifies the department of an intent to file an application.

(23)    "Person" means an individual, partnership, joint venture, private or public corporation, association, firm, public service company, political subdivision, municipal corporation, government agency, public utility district, or any other entity, public or private, however organized.

(24)    "Preliminary statement of issues" means a listing and explanation of those issues within the agency's jurisdiction which are of major concern to the agency in relation to the proposed electrical power plant.

(25)    "Public Service Commission" or "commission" means the agency created pursuant to chapter 350.

(26)    "Regional planning council" means a regional planning council as defined in s. 186.503(4) in the jurisdiction of which the electrical power plant is proposed to be located.

(27)    "Right-of-way" means land necessary for the construction and maintenance of a connected associated linear facility, such as a railroad line, pipeline, or transmission line as owned by or proposed to be certified by the applicant. The typical width of the right-of-way shall be identified in the application. The right-of-way shall be located within the certified corridor and shall be identified by the applicant subsequent to certification in documents filed with the department prior to construction.

(28)    "Site" means any proposed location within which will be located an electrical power plant's generating facility and onsite support facilities, or an alteration or addition of electrical generating facilities and onsite support facilities resulting in an increase in generating capacity, including offshore sites within state jurisdiction.

(29)    "State comprehensive plan" means that plan set forth in chapter 187.

(30)    "Ultimate site capacity" means the maximum gross generating capacity for a site as certified by the board, unless otherwise specified as net generating capacity.

(31)    "Water management district" means a water management district, created pursuant to chapter 373, in the jurisdiction of which the electrical power plant is proposed to be located.

History.—s. 1, ch. 73-33; s. 1, ch. 76-76; s. 1, ch. 79-76; s. 3, ch. 81-131; s. 14, ch. 86-173; s. 22, ch. 86-186; s. 3, ch. 90-331; s. 6, ch. 93-94; s. 383, ch. 94-356; s. 134, ch. 96-410; s. 20, ch. 2006-230; s. 67, ch. 2008-227.

**403.504 Department of Environmental Protection; powers and duties enumerated.**—The department shall have the following powers and duties in relation to this act:

(1) To adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this act, including rules setting forth environmental precautions to be followed in relation to the location, construction, and operation of electrical power plants.

(2) To prescribe the form and content of the public notices and the notice of intent and the form, content, and necessary supporting documentation and studies to be prepared by the applicant for electrical power plant certification applications.

(3) To receive applications for electrical power plant certifications and to determine the completeness and sufficiency thereof.

(4) To make, or contract for, studies of electrical power plant certification applications.

(5) To administer the processing of applications for electric power plant certifications and to ensure that the applications are processed as expeditiously as possible.

(6) To require such fees as allowed by this act.

(7) To conduct studies and prepare a project analysis under s. 403.507.

(8) To prescribe the means for monitoring the effects arising from the construction and operation of electrical power plants to assure continued compliance with terms of the certification.

(9) To determine whether an alternate corridor proposed for consideration under s. 403.5064(4) is acceptable.

(10) To act as clerk for the siting board.

(11) To administer and manage the terms and conditions of the certification order and supporting documents and records for the life of the electrical power plant.

(12) To issue emergency orders on behalf of the board for facilities licensed under this act.

History.—s. 1, ch. 73-33; s. 1, ch. 76-76; s. 1, ch. 77-174; s. 132, ch. 79-190; s. 4, ch. 81-131; s. 35, ch. 81-167; s. 35, ch. 83-55; s. 23, ch. 86-186; s. 4, ch. 90-331; s. 7, ch. 93-94; s. 384, ch. 94-356; s. 102, ch. 98-200; s. 21, ch. 2006-230; s. 68, ch. 2008-227.

**403.5055 Application for permits pursuant to s. 403.0885.**—In processing applications for permits pursuant to s. 403.0885 that are associated with applications for electrical power plant certification:

(1) The procedural requirements set forth in 40 C.F.R. s. 123.25, including public notice, public comments, and public hearings, shall be closely coordinated with the certification process established under this part. In the event of a conflict between the certification process and federally required procedures for NPDES permit issuance, the applicable federal requirements shall control.

(2) If available at the time the department issues its project analysis pursuant to s. 403.507(5), the department shall include in its project analysis copies of the department's proposed action pursuant to 40 C.F.R. s. 124.6 on any application for a NPDES permit; any corresponding comments received from the United States Environmental Protection Agency, the applicant, or the general public; and the department's response to those comments.

(3) The department shall not issue or deny the permit pursuant to s. 403.0885 in advance of the issuance of the electrical power plant certification under this part unless required to do so by the provisions of federal law. When possible, any hearing on a permit issued pursuant to s. 403.0885 shall be conducted in conjunction with the certification hearing held pursuant to this act. The department's actions on an NPDES permit shall be based on the record and recommended order of the certification hearing, if the hearing on the NPDES was conducted in conjunction with the certification hearing, and of any other proceeding held in connection with the application for an NPDES permit, timely public comments received with respect to the application, and the provisions of federal law. The department's action on an NPDES permit, if issued, shall differ from the actions taken by the siting board regarding the certification order if federal laws and regulations require different action to be taken to ensure compliance with the Clean Water Act, as amended, and implementing regulations. Nothing in this part shall be construed to displace the department's authority as the final permitting entity under the federally approved state

NPDES program. Nothing in this part shall be construed to authorize the issuance of a state NPDES permit which does not conform to the requirements of the federally approved state NPDES program.

History.—s. 79, ch. 93-213; s. 22, ch. 2006-230.

### 403.506   Applicability, thresholds, and certification.—

(1) The provisions of this act shall apply to any electrical power plant as defined herein, except that the provisions of this act shall not apply to any electrical power plant of less than 75 megawatts in gross capacity, including its associated facilities, unless the applicant has elected to apply for certification of such electrical power plant under this act. The provisions of this act shall not apply to capacity expansions of 75 megawatts or less, in the aggregate, of an existing exothermic reaction cogeneration electrical generating facility that was exempt from this act when it was originally built; however, this exemption shall not apply if the unit uses oil or natural gas for purposes other than unit startup. No construction of any new electrical power plant or expansion in steam generating capacity as measured by an increase in the maximum electrical generator rating of any existing electrical power plant may be undertaken after October 1, 1973, without first obtaining certification in the manner as herein provided, except that this act shall not apply to any such electrical power plant which is presently operating or under construction or which has, upon the effective date of chapter 73-33, Laws of Florida, applied for a permit or certification under requirements in force prior to the effective date of such act.

(2) Except as provided in the certification, modification of nonnuclear fuels, internal related hardware, including increases in steam turbine efficiency, or operating conditions not in conflict with certification which increase the electrical output of a unit to no greater capacity than the maximum electrical generator rating of the existing generator shall not constitute an alteration or addition to generating capacity which requires certification pursuant to this act.

(3) An electric utility may obtain separate licenses, permits, and approvals for the construction of facilities necessary to construct an electrical power plant without first obtaining certification under this act if the utility intends to locate, license, and construct a proposed or expanded electrical power plant that uses nuclear materials as fuel. Such facilities may include, but are not limited to, access and onsite roads, rail lines, electrical transmission facilities to support construction, and facilities necessary for waterborne delivery of construction materials and project components. This exemption applies to such facilities regardless of whether the facilities are used for operation of the power plant. The applicant shall file with the department a statement that declares that the construction of such facilities is necessary for the timely construction of the proposed electrical power plant and identifies those facilities that the applicant intends to seek licenses for and construct prior to or separate from certification of the project. The facilities may be located within or off the site for the proposed electrical power plant. The filing of an application under this act shall not affect other applications for separate licenses which are pending at the time of filing the application. Furthermore, the filing of an application shall not prevent an electric utility from seeking separate licenses for facilities that are necessary to construct the electrical power plant. Licenses, permits, or approvals issued by any state, regional, or local agency for such facilities shall be incorporated by the department into a final certification upon completion of construction. Any facilities necessary for construction of the electrical power plant shall become part of the certified electrical power plant upon completion of the electrical power plant's construction. The exemption in this subsection shall not require or authorize agency rulemaking, and any action taken under this subsection shall not be subject to the provisions of chapter 120. This subsection shall be given retroactive effect and shall apply to applications filed after May 1, 2008.

History.—s. 1, ch. 73-33; s. 3, ch. 76-76; s. 2, ch. 79-76; s. 5, ch. 81-131; s. 15, ch. 86-173; s. 24, ch. 86-186; s. 5, ch. 90-331; s. 80, ch. 93-213; s. 23, ch. 2006-230; s. 69, ch. 2008-227.

### 403.5063   Notice of intent to file application.—

(1) To expedite the processing of the application which may be filed subsequently, the applicant for a proposed power plant may file a notice of intent to file an application with the department.

(2) The department shall establish, by rule, a procedure by which an applicant, after public notice, may enter into binding written agreements with the department and other affected agencies as to the scope, quantity, and

level of information to be provided in the application, as well as the methods to be used in providing such information and the nature of the supporting documents to be included in the application.

History.—s. 6, ch. 81-131.

### 403.5064  Application; schedules.—

(1)  The formal date of filing of a certification application and commencement of the certification review process shall be when the applicant submits:

(a)  Copies of the certification application in a quantity and format as prescribed by rule to the department and other agencies identified in s. 403.507(2)(a).

(b)  A statement affirming that the applicant is opting to allow consideration of alternate corridors for an associated transmission line corridor. If alternate corridors are allowed, at the applicant's option, the portion of the application addressing associated transmission line corridors shall be processed under the schedule set forth in ss. 403.521-403.526, 403.527(4), and 403.5271, including the opportunity for the filing of alternate corridors by third parties; however, if such alternate corridors are filed, the certification hearing shall not be rescheduled as allowed by s. 403.5271(1)(b).

(c)  The application fee specified under s. 403.518 to the department.

(2)  Within 7 days after the filing of an application, the department shall provide to the applicant and the Division of Administrative Hearings the names and addresses of any additional agencies or persons entitled to notice and copies of the application and any amendments. Copies of the application shall be distributed within 5 days by the applicant to these additional agencies. This distribution shall not be a basis for altering the schedule of dates for the certification process.

(3)  Any amendment to the application made prior to certification shall be disposed of as part of the original certification proceeding. Amendment of the application may be considered good cause for alteration of time limits pursuant to s. 403.5095.

(4)  Within 7 days after the filing of an application, the department shall prepare a proposed schedule of dates for determination of completeness, submission of statements of issues, submittal of final reports, and other significant dates to be followed during the certification process, including dates for filing notices of appearance to be a party pursuant to s. 403.508(3). If the application includes one or more associated transmission line corridors, at the request of the applicant filed concurrently with the application, the department shall use the application processing schedule set forth in ss. 403.521-403.526, 403.527(4), and 403.5271 for the associated transmission line corridors, including the opportunity for the filing and review of alternate corridors, if a party proposes alternate transmission line corridor routes for consideration no later than 165 days before the scheduled certification hearing. Notwithstanding an applicant's option for the transmission line corridor portion of its application to be processed under the proposed schedule, only one certification hearing shall be held for the entire plant in accordance with s. 403.508(2). The proposed schedule shall be timely provided by the department to the applicant, the administrative law judge, all agencies identified pursuant to subsection (2), and all parties. Within 7 days after the filing of the proposed schedule, the administrative law judge shall issue an order establishing a schedule for the matters addressed in the department's proposed schedule and other appropriate matters, if any.

(5)  Copies of changes and amendments to the application shall be timely distributed by the applicant to all agencies and parties who have received a copy of the application.

(6)  Notice of the filing of the application shall be published in accordance with the requirements of s. 403.5115.

History.—s. 6, ch. 90-331; s. 135, ch. 96-410; s. 24, ch. 2006-230; s. 70, ch. 2008-227.

### 403.5065  Appointment of administrative law judge; powers and duties.—

(1)  Within 7 days after receipt of an application, the department shall request the Division of Administrative Hearings to designate an administrative law judge to conduct the hearings required by this act. The division director shall designate an administrative law judge within 7 days after receipt of the request from the department. In designating an administrative law judge for this purpose, the division director shall, whenever practicable, assign an administrative law judge who has had prior experience or training in electrical power plant

certification proceedings. Upon being advised that an administrative law judge has been appointed, the department shall immediately file a copy of the application and all supporting documents with the designated administrative law judge, who shall docket the application.

(2) The administrative law judge shall have all powers and duties granted to administrative law judges by chapter 120 and by the laws and rules of the department.

History.—s. 4, ch. 76-76; s. 1, ch. 77-174; s. 7, ch. 81-131; s. 7, ch. 90-331; s. 136, ch. 96-410; s. 25, ch. 2006-230; s. 71, ch. 2008-227.

### 403.5066     Determination of completeness.—

(1)(a) Within 30 days after the filing of an application, affected agencies shall file a statement with the department containing each agency's recommendations on the completeness of the application.

(b) Within 40 days after the filing of an application, the department shall file a statement with the Division of Administrative Hearings, with the applicant, and with all parties declaring its position with regard to the completeness of the application. The department's statement shall be based upon consultation with the affected agencies.

(2) If the department declares the application to be incomplete, the applicant, within 15 days after the filing of the statement by the department, shall file with the Division of Administrative Hearings, with the department, and all parties:

(a) A withdrawal of the application;

(b) A statement agreeing to supply the additional information necessary to make the application complete. Such additional information shall be provided within 30 days after the issuance of the department's statement on completeness of the application. The time schedules under this act shall not be tolled if the applicant makes the application complete within 30 days after the issuance of the department's statement on completeness of the application. A subsequent finding by the department that the application remains incomplete, based upon the additional information submitted by the applicant or upon the failure of the applicant to timely submit the additional information, tolls the time schedules under this act until the application is determined complete;

(c) A statement contesting the department's determination of incompleteness; or

(d) A statement agreeing with the department and requesting additional time beyond 30 days to provide the information necessary to make the application complete. If the applicant exercises this option, the time schedules under this act are tolled until the application is determined complete.

(3)(a) If the applicant contests the determination by the department that an application is incomplete, the administrative law judge shall schedule a hearing on the statement of completeness. The hearing shall be held as expeditiously as possible, but not later than 21 days after the filing of the statement by the department. The administrative law judge shall render a decision within 7 days after the hearing.

(b) Parties to a hearing on the issue of completeness shall include the applicant, the department, and any agency that has jurisdiction over the matter in dispute.

(c) If the administrative law judge determines that the application was not complete, the applicant shall withdraw the application or make such additional submittals as necessary to complete it. The time schedules referencing a complete application under this act shall not commence until the application is determined complete.

(d) If the administrative law judge determines that the application was complete at the time it was declared incomplete, the time schedules referencing a complete application under this act shall commence upon such determination.

(4) If the applicant provides additional information to address the issues identified in the determination of incompleteness, each affected agency may submit to the department, no later than 15 days after the applicant files the additional information, a recommendation on whether the agency believes the application is complete. Within 22 days after receipt of the additional information from the applicant submitted under paragraph (2)(b), paragraph (2)(d), or paragraph (3)(c), the department shall determine whether the additional information supplied by an applicant makes the application complete. If the department finds that the application is still incomplete,

the applicant may exercise any of the options specified in subsection (2) as often as is necessary to resolve the dispute.

History.—s. 8, ch. 90-331; s. 137, ch. 96-410; s. 26, ch. 2006-230.

### 403.50663    Informational public meetings.—

(1)    A local government within whose jurisdiction the power plant is proposed to be sited may hold one informational public meeting in addition to the hearings specifically authorized by this act on any matter associated with the electrical power plant proceeding. Such informational public meetings shall be held by the local government or by the regional planning council if the local government does not hold such meeting within 70 days after the filing of the application. The purpose of an informational public meeting is for the local government or regional planning council to further inform the public about the proposed electrical power plant or associated facilities, obtain comments from the public, and formulate its recommendation with respect to the proposed electrical power plant.

(2)    Informational public meetings shall be held solely at the option of each local government. It is the legislative intent that local governments attempt to hold such public meetings. Parties to the proceedings under this act shall be encouraged to attend; however, no party other than the applicant and the department shall be required to attend such informational public meetings.

(3)    A local government that intends to conduct an informational public meeting must provide notice of the meeting to all parties not less than 5 days prior to the meeting and to the general public in accordance with s. 403.5115(5). The expense for such notice is eligible for reimbursement under s. 403.518(2)(c)1.

(4)    The failure to hold an informational public meeting or the procedure used for the informational public meeting is not grounds for the alteration of any time limitation in this act under s. 403.5095 or grounds to deny or condition certification.

History.—s. 27, ch. 2006-230; s. 72, ch. 2008-227; s. 19, ch. 2015-30.

### 403.50665    Land use consistency.—

(1)    The applicant shall include in the application a statement on the consistency of the site and any associated facilities that constitute a "development," as defined in s. 380.04, with existing land use plans and zoning ordinances that were in effect on the date the application was filed and a full description of such consistency. This information shall include an identification of those associated facilities that the applicant believes are exempt from the requirements of land use plans and zoning ordinances under the Community Planning Act provisions of chapter 163 and s. 380.04(3).

(2)(a)    Within 45 days after the filing of the application, each local government shall file a determination with the department, the applicant, the administrative law judge, and all parties on the consistency of the site, and any associated facilities that are not exempt from the requirements of land use plans and zoning ordinances under chapter 163 and s. 380.04(3), with existing land use plans and zoning ordinances that were in effect on the date the application was filed, based on the information provided in the application. However, this requirement does not apply to any new electrical generation unit proposed to be constructed and operated on the site of a previously certified electrical power plant or on the site of a power plant that was not previously certified that will be wholly contained within the boundaries of the existing site.

(b)    The local government may issue its determination up to 55 days later if the application has been determined incomplete based in whole or in part upon a local government request for additional information on land use and zoning consistency as part of the local government's statement on completeness of the application submitted pursuant to s. 403.5066(1)(a). Incompleteness of information necessary for a local government to evaluate an application may be claimed by the local government as cause for a statement of inconsistency with existing land use plans and zoning ordinances.

(c)    Notice of the consistency determination shall be published in accordance with the requirements of s. 403.5115.

(3)(a)    If the local government issues a determination that the proposed site and any nonexempt associated facilities are not consistent or in compliance with local land use plans and zoning ordinances, the applicant may

apply to the local government for the necessary local approval to address the inconsistencies identified in the local government's determination.

(b)   If the applicant makes such an application to the local government, the time schedules under this act shall be tolled until the local government issues its revised determination on land use and zoning or the applicant otherwise withdraws its application to the local government.

(c)   If the applicant applies to the local government for necessary local land use or zoning approval, the local government shall commence a proceeding to consider the application for land use or zoning approval within 45 days after receipt of the complete request and shall issue a revised determination within 30 days following the conclusion of that local proceeding. The time schedules and notice requirements under this act shall apply to such revised determination.

(4)   If any substantially affected person wishes to dispute the local government's determination, he or she shall file a petition with the designated administrative law judge within 21 days after the publication of notice of the local government's determination. If a hearing is requested, the provisions of s. 403.508(1) shall apply.

(5)   The dates in this section may be altered upon agreement between the applicant, the local government, and the department pursuant to s. 403.5095.

(6)   If it is determined by the local government that the proposed site or nonexempt associated facility does conform with existing land use plans and zoning ordinances in effect as of the date of the application and no petition has been filed, the responsible zoning or planning authority shall not thereafter change such land use plans or zoning ordinances so as to foreclose construction and operation of the proposed site or directly associated facilities unless certification is subsequently denied or withdrawn.

(7)   The issue of land use and zoning consistency for any proposed alternate intermediate electrical substation which is proposed as part of an alternate electrical transmission line corridor which is accepted by the applicant and the department under s. 403.5271(1)(b) shall be addressed in the supplementary report prepared by the local government on the proposed alternate corridor and shall be considered as an issue at any final certification hearing. If such a proposed alternate intermediate electrical substation is determined not to be consistent with local land use plans and zoning ordinances, then that alternate intermediate electrical substation shall not be certified.

History.—s. 28, ch. 2006-230; s. 73, ch. 2008-227; s. 62, ch. 2011-139.

**403.507   Preliminary statements of issues, reports, project analyses, and studies.**—

(1)   Each affected agency identified in paragraph (2)(a) shall submit a preliminary statement of issues to the department, the applicant, and all parties no later than 40 days after the certification application has been determined complete. The failure to raise an issue in this statement shall not preclude the issue from being raised in the agency's report.

(2)(a)   No later than 100 days after the certification application has been determined complete, the following agencies shall prepare reports as provided below and shall submit them to the department and the applicant, unless a final order denying the determination of need has been issued under s. 403.519:

1.   The Department of Economic Opportunity shall prepare a report containing recommendations which address the impact upon the public of the proposed electrical power plant, based on the degree to which the electrical power plant is consistent with the applicable portions of the state comprehensive plan, emergency management, and other such matters within its jurisdiction. The Department of Economic Opportunity may also comment on the consistency of the proposed electrical power plant with applicable strategic regional policy plans or local comprehensive plans and land development regulations.

2.   The water management district shall prepare a report as to matters within its jurisdiction, including but not limited to, the impact of the proposed electrical power plant on water resources, regional water supply planning, and district-owned lands and works.

3.   Each local government in whose jurisdiction the proposed electrical power plant is to be located shall prepare a report as to the consistency of the proposed electrical power plant with all applicable local ordinances,

regulations, standards, or criteria that apply to the proposed electrical power plant, including any applicable local environmental regulations adopted pursuant to s. 403.182 or by other means.

4. The Fish and Wildlife Conservation Commission shall prepare a report as to matters within its jurisdiction.

5. The Department of Transportation shall address the impact of the proposed electrical power plant on matters within its jurisdiction.

(b) Any other agency, if requested by the department, shall also perform studies or prepare reports as to matters within that agency's jurisdiction which may potentially be affected by the proposed electrical power plant.

(3) Each report described in subsection (2) shall contain:

(a) A notice of any nonprocedural requirements not specifically listed in the application from which a variance, exemption, exception, or other relief is necessary in order for the proposed electrical power plant to be certified. Failure of such notification by an agency shall be treated as a waiver from nonprocedural requirements of that agency. However, no variance shall be granted from standards or regulations of the department applicable under any federally delegated or approved permit program, except as expressly allowed in such program.

(b) A recommendation for approval or denial of the application.

(c) Any proposed conditions of certification on matters within the jurisdiction of such agency. For each condition proposed by an agency in its report, the agency shall list the specific statute, rule, or ordinance which authorizes the proposed condition.

(d) The agencies shall initiate the activities required by this section no later than 15 days after the application is distributed. The agencies shall keep the applicant and the department informed as to the progress of the studies and any issues raised thereby.

(4)(a) No later than 150 days after the application is filed, the Public Service Commission shall prepare a report as to the present and future need for electrical generating capacity to be supplied by the proposed electrical power plant. The report shall include the commission's determination pursuant to s. 403.519 and may include the commission's comments with respect to any other matters within its jurisdiction.

(b) Receipt of an affirmative determination of need by the submittal deadline under paragraph (a) shall be a condition precedent to issuance of the department's project analysis and conduct of the certification hearing.

(5) The department shall prepare a project analysis, which shall be filed with the designated administrative law judge and served on all parties no later than 130 days after the application is determined complete, and which shall include:

(a) A statement indicating whether the proposed electrical power plant and proposed ultimate site capacity will be in compliance and consistent with matters within the department's standard jurisdiction, including the rules of the department, as well as whether the proposed electrical power plant and proposed ultimate site capacity will be in compliance with the nonprocedural requirements of the affected agencies.

(b) Copies of the studies and reports required by this section.

(c) The comments received by the department from any other agency or person.

(d) The recommendation of the department as to the disposition of the application, of variances, exemptions, exceptions, or other relief identified by any party, and of any proposed conditions of certification which the department believes should be imposed.

(e) If available, the recommendation of the department regarding the issuance of any license required pursuant to a federally delegated or approved permit program.

(6) Except when good cause is shown, the failure of any agency to submit a preliminary statement of issues or a report, or to submit its preliminary statement of issues or report within the allowed time, shall not be grounds for the alteration of any time limitation in this act. Neither the failure to submit a preliminary statement of issues or a report nor the inadequacy of the preliminary statement of issues or report are grounds to deny or condition certification.

**History.**—s. 1, ch. 73-33; s. 5, ch. 76-76; s. 133, ch. 79-190; s. 8, ch. 81-131; s. 33, ch. 81-169; s. 36, ch. 83-55; s. 25, ch. 86-186; s. 10, ch. 90-331; s. 7, ch. 92-132; s. 8, ch. 93-94; s. 385, ch. 94-356; s. 14, ch. 95-149; s. 139, ch. 96-410; s. 206, ch. 99-245; s. 30, ch. 2006-230; s. 74, ch. 2008-227; s. 287, ch. 2011-142; s. 20, ch. 2015-30.

**403.508    Land use and certification hearings, parties, participants.—**

(1)(a)   Within 5 days after the filing of a petition for a hearing on land use pursuant to s. 403.50665, the designated administrative law judge shall schedule a land use hearing to be conducted in the county of the proposed site or associated facility that is not exempt from the requirements of land use plans and zoning ordinances under chapter 163 and s. 380.04(3), as applicable, as expeditiously as possible but not later than 30 days after the designated administrative law judge's receipt of the petition. The place of such hearing shall be as close as possible to the proposed site or associated facility. If a petition is filed, the hearing shall be held regardless of the status of the completeness of the application.

(b)   Notice of the land use hearing shall be published in accordance with the requirements of s. 403.5115.

(c)   The sole issue for determination at the land use hearing shall be whether or not the proposed site or nonexempt associated facility is consistent and in compliance with existing land use plans and zoning ordinances. If the administrative law judge concludes that the proposed site or nonexempt associated facility is not consistent or in compliance with existing land use plans and zoning ordinances, the administrative law judge shall receive at the hearing evidence on, and address in the recommended order any changes to or approvals or variances under, the applicable land use plans or zoning ordinances which will render the proposed site or nonexempt associated facility consistent and in compliance with the local land use plans and zoning ordinances.

(d)   The designated administrative law judge's recommended order shall be issued within 30 days after completion of the hearing and shall be reviewed by the board within 60 days after receipt of the recommended order by the board.

(e)   If it is determined by the board that the proposed site or nonexempt associated facility does conform with existing land use plans and zoning ordinances in effect as of the date of the application, or as otherwise provided by this act, the responsible zoning or planning authority shall not thereafter change such land use plans or zoning ordinances so as to foreclose construction and operation of the proposed electrical power plant on the proposed site or associated facilities unless certification is subsequently denied or withdrawn.

(f)   If it is determined by the board that the proposed site or nonexempt associated facility does not conform with existing land use plans and zoning ordinances, the board may, if it determines after notice and hearing and upon consideration of the recommended order on land use and zoning issues that it is in the public interest to authorize the use of the land for a site or associated facility, authorize a variance or other necessary approval to the adopted land use plan and zoning ordinances required to render the proposed site or associated facility consistent with local land use plans and zoning ordinances. The board's action shall not be controlled by any other procedural requirements of law. In the event a variance or other approval is denied by the board, it shall be the responsibility of the applicant to make the necessary application for any approvals determined by the board as required to make the proposed site or associated facility consistent and in compliance with local land use plans and zoning ordinances. No further action may be taken on the complete application until the proposed site or associated facility conforms to the adopted land use plan or zoning ordinances or the board grants relief as provided under this act.

(2)(a)   A certification hearing shall be held by the designated administrative law judge no later than 265 days after the application is filed with the department. The certification hearing shall be held at a location in proximity to the proposed site.

(b)   Notice of the certification hearing and notice of the deadline for filing of notice of intent to be a party shall be made in accordance with the requirements of s. 403.5115.

(3)(a)   Parties to the proceeding shall include:

1.   The applicant.

2.   The Public Service Commission.

3.   The Department of Economic Opportunity.

4.   The Fish and Wildlife Conservation Commission.

5.   The water management district.

6.   The department.

7.   The local government.

8. The Department of Transportation.

(b) Any party listed in paragraph (a) other than the department or the applicant may waive its right to participate in these proceedings. If such listed party fails to file a notice of its intent to be a party on or before the 90th day prior to the certification hearing, such party shall be deemed to have waived its right to be a party.

(c) Notwithstanding the provisions of chapter 120, upon the filing with the administrative law judge of a notice of intent to be a party no later than 75 days after the application is filed, the following shall also be parties to the proceeding:

1. Any agency not listed in paragraph (a) as to matters within its jurisdiction.

2. Any domestic nonprofit corporation or association formed, in whole or in part, to promote conservation or natural beauty; to protect the environment, personal health, or other biological values; to preserve historical sites; to promote consumer interests; to represent labor, commercial, or industrial groups; or to promote comprehensive planning or orderly development of the area in which the proposed electrical power plant is to be located.

(d) Notwithstanding paragraph (e), failure of an agency described in subparagraph (c)1. to file a notice of intent to be a party within the time provided herein shall constitute a waiver of the right of that agency to participate as a party in the proceeding.

(e) Other parties may include any person, including those persons enumerated in paragraph (c) who have failed to timely file a notice of intent to be a party, whose substantial interests are affected and being determined by the proceeding and who timely file a motion to intervene pursuant to chapter 120 and applicable rules. Intervention pursuant to this paragraph may be granted at the discretion of the designated administrative law judge and upon such conditions as he or she may prescribe any time prior to 30 days before the commencement of the certification hearing.

(f) Any agency, including those whose properties or works are being affected pursuant to s. 403.509(5), shall be made a party upon the request of the department or the applicant.

(4)(a) The order of presentation at the certification hearing, unless otherwise changed by the administrative law judge to ensure the orderly presentation of witnesses and evidence, shall be:

1. The applicant.

2. The department.

3. State agencies.

4. Regional agencies, including water management districts.

5. Local governments.

6. Other parties.

(b) When appropriate, any person may be given an opportunity to present oral or written communications to the designated administrative law judge. If the designated administrative law judge proposes to consider such communications, then all parties shall be given an opportunity to cross-examine or challenge or rebut such communications.

(5) At the conclusion of the certification hearing, the designated administrative law judge shall, after consideration of all evidence of record, submit to the board a recommended order no later than 45 days after the filing of the hearing transcript.

(6)(a) No earlier than 29 days prior to the conduct of the certification hearing, the department or the applicant may request that the administrative law judge cancel the certification hearing and relinquish jurisdiction to the department if all parties to the proceeding stipulate that there are no disputed issues of fact or law to be raised at the certification hearing, and if sufficient time remains for the applicant and the department to publish public notices of the cancellation of the hearing at least 3 days prior to the scheduled date of the hearing.

(b) The administrative law judge shall issue an order granting or denying the request within 5 days after receipt of the request.

(c) If the administrative law judge grants the request, the department and the applicant shall publish notices of the cancellation of the certification hearing, in accordance with s. 403.5115.

(d)1.   If the administrative law judge grants the request, the department shall prepare and issue a final order in accordance with s. 403.509(1)(a).

2.   Parties may submit proposed recommended orders to the department no later than 10 days after the administrative law judge issues an order relinquishing jurisdiction.

(7)   The applicant shall pay those expenses and costs associated with the conduct of the hearings and the recording and transcription of the proceedings.

(8)   In issuing permits under the federally approved new source review or prevention of significant deterioration permit program, the department shall observe the procedures specified under the federally approved state implementation plan, including public notice, public comment, public hearing, and notice of applications and amendments to federal, state, and local agencies, to assure that all such permits issued in coordination with the certification of a power plant under this act are federally enforceable and are issued after opportunity for informed public participation regarding the terms and conditions thereof. When possible, any hearing on a federally approved or delegated program permit such as new source review, prevention of significant deterioration permit, or NPDES permit shall be conducted in conjunction with the certification hearing held under this act. It is the intent of the Legislature that the review, processing, and issuance of such federally delegated or approved permits be closely coordinated with the certification process established under this part. In the event of a conflict between the certification process and federally required procedures, the applicable federal requirements shall control.

History.—s. 1, ch. 73-33; s. 6, ch. 76-76; s. 1, ch. 77-174; s. 134, ch. 79-190; s. 9, ch. 81-131; s. 36, ch. 81-167; s. 37, ch. 83-55; s. 26, ch. 86-186; s. 11, ch. 90-331; s. 9, ch. 93-94; s. 386, ch. 94-356; s. 140, ch. 96-410; s. 1008, ch. 97-103; s. 207, ch. 99-245; s. 31, ch. 2006-230; s. 75, ch. 2008-227; s. 288, ch. 2011-142; s. 21, ch. 2015-30.

### 403.509     Final disposition of application.—

(1)(a)   If the administrative law judge has granted a request to cancel the certification hearing and has relinquished jurisdiction to the department under the provisions of s. 403.508(6), within 40 days thereafter, the secretary of the department shall act upon the application by written order in accordance with the terms of this act and the stipulation of the parties in requesting cancellation of the certification hearing.

(b)   If the administrative law judge has not granted a request to cancel the certification hearing under the provisions of s. 403.508(6), within 60 days after receipt of the designated administrative law judge's recommended order, the board shall act upon the application by written order, approving or denying certification, in accordance with the terms of this act, and stating the reasons for issuance or denial. If certification is denied, the board shall set forth in writing the action the applicant would have to take to secure the board's approval of the application.

(2)   The issues that may be raised in any hearing before the board shall be limited to those matters raised in the certification proceeding before the administrative law judge or raised in the recommended order. All parties, or their representatives, or persons who appear before the board shall be subject to the provisions of s. 120.66.

(3)   In determining whether an application should be approved in whole, approved with modifications or conditions, or denied, the board, or secretary when applicable, shall consider whether, and the extent to which, the location, construction, and operation of the electrical power plant will:

(a)   Provide reasonable assurance that operational safeguards are technically sufficient for the public welfare and protection.

(b)   Comply with applicable nonprocedural requirements of agencies.

(c)   Be consistent with applicable local government comprehensive plans and land development regulations.

(d)   Meet the electrical energy needs of the state in an orderly, reliable, and timely fashion.

(e)   Effect a reasonable balance between the need for the facility as established pursuant to s. 403.519 and the impacts upon air and water quality, fish and wildlife, water resources, and other natural resources of the state resulting from the construction and operation of the facility.

(f)   Minimize, through the use of reasonable and available methods, the adverse effects on human health, the environment, and the ecology of the land and its wildlife and the ecology of state waters and their aquatic life.

(g)   Serve and protect the broad interests of the public.

(4)(a)   Any transmission line corridor certified by the board, or secretary if applicable, shall meet the criteria of this section. When more than one transmission line corridor is proper for certification under s. 403.503(11) and meets the criteria of this section, the board, or secretary if applicable, shall certify the transmission line corridor that has the least adverse impact regarding the criteria in subsection (3), including costs.

(b)   If the board, or secretary if applicable, finds that an alternate corridor rejected pursuant to s. 403.5271 as incorporated by reference in s. 403.5064(1)(b) meets the criteria of subsection (3) and has the least adverse impact regarding the criteria in subsection (3), the board, or secretary if applicable, shall deny certification or shall allow the applicant to submit an amended application to include the corridor.

(c)   If the board, or secretary if applicable, finds that two or more of the corridors that comply with subsection (3) have the least adverse impacts regarding the criteria in subsection (3), including costs, and that the corridors are substantially equal in adverse impacts regarding the criteria in subsection (3), including costs, the board, or secretary if applicable, shall certify the corridor preferred by the applicant if the corridor is one proper for certification under s. 403.503(11).

(5)   The department's action on a federally required new source review or prevention of significant deterioration permit shall differ from the actions taken by the siting board regarding the certification if the federally approved state implementation plan requires such a different action to be taken by the department. Nothing in this part shall be construed to displace the department's authority as the final permitting entity under the federally approved permit program. Nothing in this part shall be construed to authorize the issuance of a new source review or prevention of significant deterioration permit which does not conform to the requirements of the federally approved state implementation plan.

(6)   For certifications issued by the board in regard to the properties and works of any agency which is a party to the certification hearing, the board shall have the authority to decide issues relating to the use, the connection thereto, or the crossing thereof, for the electrical power plant and to direct any such agency to execute, within 30 days after the entry of certification, the necessary license or easement for such use, connection, or crossing, subject only to the conditions set forth in such certification. For certifications issued by the department in regard to the properties and works of any agency that is a party to the proceeding, any stipulation filed pursuant to s. 403.508(6)(a) must include a stipulation regarding any issues relating to the use, the connection thereto, or the crossing thereof, for the electrical power plant. Any agency stipulating to the use of, connection to, or crossing of its property must agree to execute, within 30 days after the entry of certification, the necessary license or easement for such use, connection, or crossing, subject only to the conditions set forth in such certification.

(7)   The issuance or denial of the certification by the board or secretary of the department shall be the final administrative action required as to that application.

History.—s. 1, ch. 73-33; s. 7, ch. 76-76; s. 141, ch. 77-104; s. 27, ch. 86-186; s. 12, ch. 90-331; s. 8, ch. 92-132; s. 10, ch. 93-94; s. 4, ch. 94-321; s. 141, ch. 96-410; s. 32, ch. 2006-230; s. 76, ch. 2008-227.

**403.5095    Alteration of time limits.**—Any time limitation in this act may be altered by the designated administrative law judge upon stipulation between the department and the applicant, unless objected to by any party within 5 days after notice, or for good cause shown by any party.

History.—s. 8, ch. 76-76; s. 13, ch. 90-331; s. 142, ch. 96-410.

**403.510    Superseded laws, regulations, and certification power.**—

(1)   If any provision of this act is in conflict with any other provision, limitation, or restriction under any law, rule, regulation, or ordinance of this state or any political subdivision, municipality, or agency, this act shall govern and control, and such law, rule, regulation, or ordinance shall be deemed superseded for the purposes of this act.

(2)   The state hereby preempts the regulation and certification of electrical power plant sites and electrical power plants as defined in this act.

(3)   The board shall have the power to adopt reasonable procedural rules to carry out its duties under this act and to give effect to the legislative intent that this act is to provide an efficient, simplified, centrally coordinated, one-stop licensing process.

History.—s. 1, ch. 73-33; s. 9, ch. 76-76; s. 14, ch. 90-331.

**403.511    Effect of certification.—**

(1)    Subject to the conditions set forth therein, any certification shall constitute the sole license of the state and any agency as to the approval of the location of the site and any associated facility and the construction and operation of the proposed electrical power plant, except for the issuance of department licenses required under any federally delegated or approved permit program and except as otherwise provided in subsection (4).

(2)(a)    The certification shall authorize the licensee named therein to construct and operate the proposed electrical power plant, subject only to the conditions of certification set forth in such certification, and except for the issuance of department licenses or permits required under any federally delegated or approved permit program.

(b)1.    Except as provided in subsection (4), and in consideration of the standard for granting variances pursuant to s. 403.201, the certification may include conditions which constitute variances, exemptions, or exceptions from nonprocedural requirements of the department or any agency which were expressly considered during the proceeding, including, but not limited to, any site specific criteria, standards, or limitations under local land use and zoning approvals which affect the proposed electrical power plant or its site, unless waived by the agency and which otherwise would be applicable to the construction and operation of the proposed electrical power plant.

2.    No variance, exemption, exception, or other relief shall be granted from a state statute or rule for the protection of endangered or threatened species, aquatic preserves, Outstanding National Resource Waters, or Outstanding Florida Waters or for the disposal of hazardous waste, except to the extent authorized by the applicable statute or rule or except upon a finding in the certification order that the public interests set forth in s. 403.509(3) in certifying the electrical power plant at the site proposed by the applicant overrides the public interest protected by the statute or rule from which relief is sought.

(3)    The certification and any order on land use and zoning issued under this act shall be in lieu of any license, permit, certificate, or similar document required by any state, regional, or local agency pursuant to, but not limited to, chapter 125, chapter 161, chapter 163, chapter 166, chapter 186, chapter 253, chapter 298, chapter 373, chapter 376, chapter 379, chapter 380, chapter 381, chapter 403, except for permits issued pursuant to any federally delegated or approved permit program and except as provided in chapter 404 or the Florida Transportation Code, or 33 U.S.C. s. 1341.

(4)    This act shall not affect in any way the Public Service Commission's ratemaking powers or its exclusive jurisdiction to require transmission lines to be located underground under chapter 366; nor shall this act in any way affect the right of any local government to charge appropriate fees or require that construction be in compliance with applicable building construction codes.

(5)(a)    An electrical power plant certified pursuant to this act shall comply with rules adopted by the department subsequent to the issuance of the certification which prescribe new or stricter criteria, to the extent that the rules are applicable to electrical power plants. Except when express variances, exceptions, exemptions, or other relief have been granted, subsequently adopted rules which prescribe new or stricter criteria shall operate as automatic modifications to certifications.

(b)    Upon written notification to the department, any holder of a certification issued pursuant to this act may choose to operate the certified electrical power plant in compliance with any rule subsequently adopted by the department which prescribes criteria more lenient than the criteria required by the terms and conditions in the certification which are not site-specific.

(c)    No term or condition of certification shall be interpreted to preclude the postcertification exercise by any party of whatever procedural rights it may have under chapter 120, including those related to rulemaking proceedings. This subsection shall apply to previously issued certifications.

(6)    No term or condition of an electrical power plant certification shall be interpreted to supersede or control the provisions of a final operation permit for a major source of air pollution issued by the department pursuant to s. 403.0872 to a facility certified under this part.

(7)    Pursuant to s. 380.23, electrical power plants are subject to the federal coastal consistency review program. Issuance of certification shall constitute the state's certification of coastal zone consistency.

History.—s. 1, ch. 73-33; s. 2, ch. 74-170; s. 10, ch. 76-76; s. 1, ch. 77-174; s. 83, ch. 79-65; s. 28, ch. 86-186; s. 15, ch. 90-331; s. 11, ch. 93-94; s. 81, ch. 93-213; s. 33, ch. 2006-230; s. 77, ch. 2008-227; s. 48, ch. 2009-21; s. 74, ch. 2013-15; s. 3, ch. 2018-34.

### 403.5112    Filing of notice of certified corridor route.—

(1)    Within 60 days after certification of an associated linear facility pursuant to this act, the applicant shall file, in accordance with s. 28.222, with the department and the clerk of the circuit court for each county through which the corridor will pass, a notice of the certified route.

(2)    The notice shall consist of maps or aerial photographs in the scale of 1:24,000 which clearly show the location of the certified route and shall state that the certification of the corridor will result in the acquisition of rights-of-way within the corridor. Each clerk shall record the filing in the official record of the county for the duration of the certification or until such time as the applicant certifies to the department and the clerk that all lands required for the transmission line rights-of-way within the corridor have been acquired within such county, whichever is sooner.

History.—s. 34, ch. 2006-230; s. 78, ch. 2008-227.

### 403.5113    Postcertification amendments and review.—

(1)    POSTCERTIFICATION AMENDMENTS.—

(a)    If, subsequent to certification by the board, a licensee proposes any material change to the application and revisions or amendments thereto, as certified, the licensee shall submit a written request for amendment and a description of the proposed change to the application to the department. Within 30 days after the receipt of the request for the amendment, the department shall determine whether the proposed change to the application requires a modification of the conditions of certification.

(b)    If the department concludes that the change would not require a modification of the conditions of certification, the department shall provide written notification of the approval of the proposed amendment to the licensee, all agencies, and all other parties.

(c)    If the department concludes that the change would require a modification of the conditions of certification, the department shall provide written notification to the licensee that the proposed change to the application requires a request for modification pursuant to s. 403.516.

(2)    POSTCERTIFICATION REVIEW.—Postcertification submittals filed by the licensee with one or more agencies are for the purpose of monitoring for compliance with the issued certification and must be reviewed by the agencies on an expedited and priority basis because each facility certified under this act is a critical infrastructure facility. In no event shall a postcertification review be completed in more than 90 days after complete information is submitted to the reviewing agencies.

History.—s. 35, ch. 2006-230; s. 79, ch. 2008-227.

### 403.5115    Public notice.—

(1)    The following notices are to be published by the applicant for all applications:

(a)    Notice of the filing of a notice of intent under s. 403.5063, which shall be published within 21 days after the filing of the notice. The notice shall be published as specified by subsection (2), except that the newspaper notice shall be one-fourth page in size in a standard size newspaper or one-half page in size in a tabloid size newspaper.

(b)    Notice of filing of the application, which shall include a description of the proceedings required by this act, within 21 days after the date of the application filing. Such notice shall give notice of the provisions of s. 403.511(1) and (2).

(c)    If applicable, notice of the land use determination made pursuant to s. 403.50665(2) within 21 days after the deadline for the filing of the determination.

(d)    If applicable, notice of the land use hearing, which shall be published as specified in subsection (2), no later than 15 days before the hearing.

(e)    Notice of the certification hearing and notice of the deadline for filing notice of intent to be a party, which shall be published as specified in subsection (2), at least 65 days before the date set for the certification hearing.

If one or more alternate corridors have been accepted for consideration, the notice of the certification hearing shall include a map of all corridors proposed for certification.

(f)    Notice of revised deadline for filing alternate corridors if the certification hearing is rescheduled to a date other than as published in the notice of filing of the application. This notice shall be published at least 185 days before the rescheduled certification hearing and as specified in subsection (2), except no map is required and the size of the notice shall be no smaller than 6 square inches.

(g)    Notice of the cancellation of the certification hearing, if applicable, no later than 3 days before the date of the originally scheduled certification hearing. The newspaper notice shall be one-fourth page in size in a standard size newspaper or one-half page in size in a tabloid size newspaper.

(h)    Notice of modification when required by the department, based on whether the requested modification of certification will significantly increase impacts to the environment or the public. Such notice shall be published as specified under subsection (2):

1.    Within 21 days after receipt of a request for modification. The newspaper notice shall be of a size as directed by the department commensurate with the scope of the modification.

2.    If a hearing is to be conducted in response to the request for modification, then notice shall be published no later than 30 days before the hearing.

(2)    Notices provided by the applicant shall be published in newspapers of general circulation within the county or counties in which the proposed electrical power plant will be located. The newspaper notices, unless otherwise specified, shall be at least one-half page in size in a standard size newspaper or a full page in a tabloid size newspaper. These notices shall include a map generally depicting the project and all associated facilities corridors. A newspaper of general circulation shall be the newspaper which has the largest daily circulation in that county and has its principal office in that county. If the newspaper with the largest daily circulation has its principal office outside the county, the notices shall appear in both the newspaper having the largest circulation in that county and in a newspaper authorized to publish legal notices in that county.

(3)    All notices published by the applicant shall be paid for by the applicant and shall be in addition to the application fee.

(4)    The department shall arrange for publication of the following notices in the manner specified by chapter 120 and provide copies of those notices to any persons who have requested to be placed on the departmental mailing list for this purpose:

(a)    Notice of the filing of the notice of intent within 15 days after receipt of the notice.

(b)    Notice of the filing of the application, no later than 21 days after the application filing.

(c)    Notice of the land use determination made pursuant to s. 403.50665(2) within 21 days after the determination is filed.

(d)    Notice of the land use hearing before the administrative law judge, if applicable, no later than 15 days before the hearing.

(e)    Notice of the land use hearing before the board, if applicable.

(f)    Notice of the certification hearing at least 45 days before the date set for the certification hearing.

(g)    Notice of the revised deadline for filing alternate corridors if the certification hearing is rescheduled to a date other than as published in the notice of filing of the application. This notice shall be published at least 185 days before the rescheduled certification hearing.

(h)    Notice of the cancellation of the certification hearing, if applicable, no later than 3 days prior to the date of the originally scheduled certification hearing.

(i)    Notice of the hearing before the board, if applicable.

(j)    Notice of stipulations, proposed agency action, or petitions for modification.

(5)    A local government that proposes to conduct an informational public meeting pursuant to s. 403.50663 must publish notice of the meeting in a newspaper of general circulation within the county or counties in which the proposed electrical power plant will be located no later than 7 days prior to the meeting. A newspaper of general circulation shall be the newspaper that has the largest daily circulation in that county and has its principal office in that county. If the newspaper with the largest daily circulation has its principal office outside the county, the

notices shall appear in both the newspaper having the largest circulation in that county and in a newspaper authorized to publish legal notices in that county.

(6)(a)   A good faith effort shall be made by the applicant to provide direct written notice of the filing of an application for certification by United States mail or hand delivery no later than 45 days after filing of the application to all local landowners whose property, as noted in the most recent local government tax records, and residences are located within the following distances of the proposed project:

1.   Three miles of the proposed main site boundaries of the proposed electrical power plant.

2.   One-quarter mile for a transmission line corridor that only includes a transmission line as defined by s. 403.522(22).

3.   One-quarter mile for all other linear associated facilities extending away from the main site boundary except for a transmission line corridor that includes a transmission line that operates below those defined by s. 403.522(22).

(b)   No later than 60 days from the filing of an application for certification, the applicant shall file a list with the department's Siting Coordination Office of landowners and residences that were notified.

(7)(a)   A good faith effort shall be made by the proponent of an alternate corridor that includes a transmission line, as defined by s. 403.522(22), to provide direct written notice of the filing of an alternate corridor for certification by United States mail or hand delivery of the filing no later than 30 days after filing of the alternate corridor to all local landowners whose property, as noted in the most recent local government tax records, and residences, are located within one-quarter mile of the proposed boundaries of a transmission line corridor that includes a transmission line as defined by s. 403.522(22).

(b)   No later than 45 days from the filing of an alternate corridor for certification, the proponent of an alternate corridor shall file a list with the department's Siting Coordination Office of landowners and residences that were notified.

History.—s. 16, ch. 90-331; s. 12, ch. 93-94; s. 36, ch. 2006-230; s. 80, ch. 2008-227; s. 49, ch. 2009-21; s. 22, ch. 2015-30.


**403.5116   County and municipal authority unaffected by ch. 75-22.**—Except as provided in ss. 403.510 and 403.511, nothing in chapter 75-22, Laws of Florida, shall be construed to have altered the authority of county and municipal governments as provided by law.

History.—s. 22, ch. 75-22; s. 17, ch. 90-331.
Note.—Former s. 403.5111.


**403.512   Revocation or suspension of certification.**—Any certification may be revoked or suspended:

(1)   For any material false statement in the application or in the supplemental or additional statements of fact or studies required of the applicant when a true answer would have warranted the board's refusal to recommend a certification in the first instance.

(2)   For failure to comply with the terms or conditions of the certification.

(3)   For violation of the provisions of this act or regulations or orders issued hereunder.

History.—s. 1, ch. 73-33; s. 11, ch. 76-76; s. 18, ch. 90-331.


**403.513   Review.**—Proceedings under this act shall be subject to judicial review as provided in chapter 120. When possible, separate appeals of the certification order issued by the board and of any department permit issued pursuant to a federally delegated or approved permit program may be consolidated for purposes of judicial review.

History.—s. 1, ch. 73-33; s. 12, ch. 76-76; s. 29, ch. 86-186; s. 19, ch. 90-331; s. 37, ch. 2006-230.


**403.514   Enforcement of compliance.**—Failure to obtain a certification, or to comply with the conditions thereof, or to comply with this act shall constitute a violation of chapter 403.

History.—s. 1, ch. 73-33; s. 12, ch. 76-76; s. 20, ch. 90-331.


**403.515   Availability of information.**—The department shall make available for public inspection and copying during regular office hours, at the expense of any person requesting copies, any information filed or

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 111 of 694

submitted pursuant to this act.

History.—s. 1, ch. 73-33.

### 403.516 Modification of certification.—

(1) A certification may be modified after issuance in any one of the following ways:

(a) The board may delegate to the department the authority to modify specific conditions in the certification.

(b)1. The department may modify specific conditions of a certification which are inconsistent with the terms of any federally delegated or approved permit for the certified electrical power plant.

2. Such modification may be made without further notice if the matter has been previously noticed under the requirements for any federally delegated or approved permit program.

(c) The licensee may file a petition for modification with the department, or the department may initiate the modification upon its own initiative.

1. A petition for modification must set forth:

a. The proposed modification.

b. The factual reasons asserted for the modification.

c. The anticipated environmental effects of the proposed modification.

2. The department may modify the terms and conditions of the certification if no party to the certification hearing objects in writing to such modification within 45 days after notice by mail to such party's last address of record, and if no other person whose substantial interests will be affected by the modification objects in writing within 30 days after issuance of public notice.

3. If objections are raised or the department denies the request, the applicant or department may file a request for a hearing on the modification with the department. Such request shall be handled pursuant to chapter 120.

4. Requests referred to the Division of Administrative Hearings shall be disposed of in the same manner as an application, but with time periods established by the administrative law judge commensurate with the significance of the modification requested.

(d) As required by s. 403.511(5).

(2) Any agreement or modification under this section must be in accordance with the terms of this act. No modification to a certification shall be granted that constitutes a variance from standards or regulations of the department applicable under any federally delegated or approved permit program, except as expressly allowed in such program.

History.—s. 13, ch. 76-76; s. 10, ch. 81-131; s. 30, ch. 86-186; s. 21, ch. 90-331; s. 9, ch. 92-132; s. 143, ch. 96-410; s. 38, ch. 2006-230; s. 81, ch. 2008-227.

### 403.517 Supplemental applications for sites certified for ultimate site capacity.—

(1)(a) Supplemental applications may be submitted for certification of the construction and operation of electrical power plants to be located at sites which have been previously certified for an ultimate site capacity pursuant to this act. Supplemental applications shall be limited to electrical power plants using the fuel type previously certified for that site. Such applications shall include all new associated facilities that support the construction and operation of the electrical power plant.

(b) The review shall use the same procedural steps and notices as for an initial application.

(c) The time limits for the processing of a complete supplemental application shall be designated by the department commensurate with the scope of the supplemental application, but shall not exceed any time limitation governing the review of initial applications for certification pursuant to this act, it being the legislative intent to provide shorter time limitations for the processing of supplemental applications for electrical power plants to be constructed and operated at sites which have been previously certified for an ultimate site capacity.

(d) Any time limitation in this section or in rules adopted pursuant to this section may be altered pursuant to s. 403.5095.

(2) The land use and zoning consistency determination of s. 403.50665 shall not be applicable to the processing of supplemental applications pursuant to this section so long as:

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 112 of 694

(a) The previously certified ultimate site capacity is not exceeded; and

(b) The lands required for the construction or operation of the electrical power plant which is the subject of the supplemental application are within the boundaries of the previously certified site.

History.—s. 14, ch. 76-76; s. 11, ch. 81-131; s. 34, ch. 81-169; s. 38, ch. 83-55; s. 22, ch. 90-331; s. 144, ch. 96-410; s. 39, ch. 2006-230; s. 82, ch. 2008-227.

**403.5175   Existing electrical power plant site certification.—**

(1) An electric utility that owns or operates an existing electrical power plant as defined in s. 403.503(14) may apply for certification of an existing power plant and its site in order to obtain all agency licenses necessary to ensure compliance with federal or state environmental laws and regulation using the centrally coordinated, one-stop licensing process established by this part. An application for certification under this section must be in the form prescribed by department rule. Applications must be reviewed and processed using the same procedural steps and notices as for an application for a new facility, except that a determination of need by the Public Service Commission is not required.

(2) An application for certification under this section must include:

(a) A description of the site and existing power plant installations and associated facilities;

(b) A description of all proposed changes or alterations to the site and all new associated facilities that are the subject of the application;

(c) A description of the environmental and other impacts caused by the existing utilization of the site and associated facilities, and the operation of the electrical power plant that is the subject of the application, and of the environmental and other benefits, if any, to be realized as a result of the proposed changes or alterations if certification is approved and such other information as is necessary for the reviewing agencies to evaluate the proposed changes and the expected impacts;

(d) The justification for the proposed changes or alterations;

(e) Copies of all existing permits, licenses, and compliance plans authorizing utilization of the site and associated facilities or operation of the electrical power plant that is the subject of the application.

(3) The land use and zoning determination requirements of s. 403.50665 do not apply to an application under this section if the applicant does not propose to expand the boundaries of the existing site or to add additional offsite associated facilities that are not exempt from the provisions of s. 403.50665. If the applicant proposes to expand the boundaries of the existing site or to add additional offsite associated facilities that are not exempt from the provisions of s. 403.50665 to accommodate portions of the electrical generating facility or associated facilities, a land use and zoning determination shall be made as specified in s. 403.50665; provided, however, that the sole issue for determination is whether the proposed site expansion or additional nonexempt associated facilities are consistent and in compliance with the existing land use plans and zoning ordinances.

(4) In considering whether an application submitted under this section should be approved in whole, approved with appropriate conditions, or denied, the board shall consider whether, and to the extent to which the proposed changes to the electrical power plant and its continued operation under certification will:

(a) Comply with the provisions of s. 403.509(3).

(b) Result in environmental or other benefits compared to current utilization of the site and operations of the electrical power plant if the proposed changes or alterations are undertaken.

(5) An applicant's failure to receive approval for certification of an existing site or an electrical power plant under this section is without prejudice to continued operation of the electrical power plant or site under existing agency licenses.

History.—s. 10, ch. 92-132; s. 40, ch. 2006-230; s. 82, ch. 2007-5; s. 83, ch. 2008-227.

**403.518   Fees; disposition.—**The department shall charge the applicant the following fees, as appropriate, which, unless otherwise specified, shall be paid into the Florida Permit Fee Trust Fund:

(1) A fee for a notice of intent pursuant to s. 403.5063, in the amount of $2,500, to be submitted to the department at the time of filing of a notice of intent. The notice-of-intent fee shall be used and disbursed in the same manner as the application fee.

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 113 of 694

(2)   An application fee, which shall not exceed $200,000. The fee shall be fixed by rule on a sliding scale related to the size, type, ultimate site capacity, or increase in electrical generating capacity proposed by the application.

(a)   Sixty percent of the fee shall go to the department to cover any costs associated with coordinating the review and acting upon the application, to cover any field services associated with monitoring construction and operation of the facility, and to cover the costs of the public notices published by the department.

(b)   The following percentages shall be transferred to the Operating Trust Fund of the Division of Administrative Hearings of the Department of Management Services:

1.   Five percent to compensate expenses from the initial exercise of duties associated with the filing of an application.

2.   An additional 5 percent if a land use hearing is held pursuant to s. 403.508.

3.   An additional 10 percent if a certification hearing is held pursuant to s. 403.508.

(c)1.   Upon written request with proper itemized accounting within 90 days after final agency action by the board or department or withdrawal of the application, the agencies that prepared reports pursuant to s. 403.507 or participated in a hearing pursuant to s. 403.508 may submit a written request to the department for reimbursement of expenses incurred during the certification proceedings. The request shall contain an accounting of expenses incurred which may include time spent reviewing the application, preparation of any studies required of the agencies by this act, agency travel and per diem to attend any hearing held pursuant to this act, and for any local government's or regional planning council's provision of notice of public meetings required as a result of the application for certification. The department shall review the request and verify that the expenses are valid. Valid expenses shall be reimbursed; however, in the event the amount of funds available for reimbursement is insufficient to provide for full compensation to the agencies requesting reimbursement, reimbursement shall be on a prorated basis.

2.   If the application review is held in abeyance for more than 1 year, the agencies may submit a request for reimbursement. This time period shall be measured from the date the applicant has provided written notification to the department that it desires to have the application review process placed on hold. The fee disbursement shall be processed in accordance with subparagraph 1.

(d)   If any sums are remaining, the department shall retain them for its use in the same manner as is otherwise authorized by this act; provided, however, that if the certification application is withdrawn, the remaining sums shall be refunded to the applicant within 90 days after the submittal of the written notification of withdrawal.

(3)(a)   A certification modification fee, which shall not exceed $30,000. The department shall establish rules for determining such a fee based on the number of agencies involved in the review, equipment redesign, change in site size, type, increase in generating capacity proposed, or change in an associated facility location.

(b)   The fee shall be submitted to the department with a petition for modification pursuant to s. 403.516. This fee shall be established, disbursed, and processed in the same manner as the application fee in subsection (2), except that the Division of Administrative Hearings shall not receive a portion of the fee unless the petition for certification modification is referred to the Division of Administrative Hearings for hearing. If the petition is so referred, only $10,000 of the fee shall be transferred to the Operating Trust Fund of the Division of Administrative Hearings of the Department of Management Services.

(4)   A supplemental application fee, not to exceed $75,000, to cover all reasonable expenses and costs of the review, processing, and proceedings of a supplemental application. This fee shall be established, disbursed, and processed in the same manner as the certification application fee in subsection (2).

(5)   An existing certification application fee, not to exceed $200,000, to cover all reasonable costs and expenses of the review processing and proceedings for certification of an existing power plant site under s. 403.5175. This fee must be established, disbursed, and processed in the same manner as the certification application fee in subsection (2).

(6)   An application fee for an alternate corridor filed pursuant to s. 403.5064(4). The application fee shall be $750 per mile for each mile of the alternate corridor located within an existing electric transmission line right-of-way or within an existing right-of-way for a road, highway, railroad, or other aboveground linear facility, or $1,000

per mile for each mile of an electric transmission line corridor proposed to be located outside the existing right-of-way.

History.—s. 23, ch. 90-331; s. 11, ch. 92-132; s. 13, ch. 93-94; s. 387, ch. 94-356; s. 65, ch. 96-321; s. 208, ch. 99-245; s. 29, ch. 2000-153; s. 13, ch. 2006-79; s. 41, ch. 2006-230; s. 84, ch. 2008-227.

**403.5185    Law applicable to applications processed under ss. 403.501-403.518.**—Any application for electrical power plant certification filed pursuant to ss. 403.501-403.518 shall be processed under the provisions of the law applicable at the time the application was filed, except that the provisions relating to cancellation of the certification hearing under s. 403.508(6), the provisions relating to the final disposition of the application and issuance of the written order by the secretary under s. 403.509(1)(a), and notice of the cancellation of the certification hearing under s. 403.5115 may apply to any application for electrical power plant certification.

History.—s. 42, ch. 2006-230.

**403.519    Exclusive forum for determination of need.**—

(1)    On request by an applicant or on its own motion, the commission shall begin a proceeding to determine the need for an electrical power plant subject to the Florida Electrical Power Plant Siting Act.

(2)    The applicant shall publish a notice of the proceeding in a newspaper of general circulation in each county in which the proposed electrical power plant will be located. The notice shall be at least one-quarter of a page and published at least 21 days prior to the scheduled date for the proceeding. The commission shall publish notice of the proceeding in the manner specified by chapter 120 at least 21 days prior to the scheduled date for the proceeding.

(3)    The commission shall be the sole forum for the determination of this matter, which accordingly shall not be raised in any other forum or in the review of proceedings in such other forum. In making its determination, the commission shall take into account the need for electric system reliability and integrity, the need for adequate electricity at a reasonable cost, the need for fuel diversity and supply reliability, whether the proposed plant is the most cost-effective alternative available, and whether renewable energy sources and technologies, as well as conservation measures, are utilized to the extent reasonably available. The commission shall also expressly consider the conservation measures taken by or reasonably available to the applicant or its members which might mitigate the need for the proposed plant and other matters within its jurisdiction which it deems relevant. The commission's determination of need for an electrical power plant shall create a presumption of public need and necessity and shall serve as the commission's report required by s. 403.507(4). An order entered pursuant to this section constitutes final agency action.

(4)    In making its determination on a proposed electrical power plant using nuclear materials or synthesis gas produced by integrated gasification combined cycle power plant as fuel, the commission shall hold a hearing within 90 days after the filing of the petition to determine need and shall issue an order granting or denying the petition within 135 days after the date of the filing of the petition. The commission shall be the sole forum for the determination of this matter and the issues addressed in the petition, which accordingly shall not be reviewed in any other forum, or in the review of proceedings in such other forum. In making its determination to either grant or deny the petition, the commission shall consider the need for electric system reliability and integrity, including fuel diversity, the need for base-load generating capacity, the need for adequate electricity at a reasonable cost, and whether renewable energy sources and technologies, as well as conservation measures, are utilized to the extent reasonably available.

(a)    The applicant's petition shall include:

1.    A description of the need for the generation capacity.

2.    A description of how the proposed nuclear or integrated gasification combined cycle power plant will enhance the reliability of electric power production within the state by improving the balance of power plant fuel diversity and reducing Florida's dependence on fuel oil and natural gas.

3.    A description of and a nonbinding estimate of the cost of the nuclear or integrated gasification combined cycle power plant, including any costs associated with new, expanded, or relocated electrical transmission lines or facilities of any size that are necessary to serve the nuclear power plant.

4. The annualized base revenue requirement for the first 12 months of operation of the nuclear or integrated gasification combined cycle power plant.

5. Information on whether there were any discussions with any electric utilities regarding ownership of a portion of the nuclear or integrated gasification combined cycle power plant by such electric utilities.

(b) In making its determination, the commission shall take into account matters within its jurisdiction, which it deems relevant, including whether the nuclear or integrated gasification combined cycle power plant will:

1. Provide needed base-load capacity.

2. Enhance the reliability of electric power production within the state by improving the balance of power plant fuel diversity and reducing Florida's dependence on fuel oil and natural gas.

3. Provide the most cost-effective source of power, taking into account the need to improve the balance of fuel diversity, reduce Florida's dependence on fuel oil and natural gas, reduce air emission compliance costs, and contribute to the long-term stability and reliability of the electric grid.

(c) No provision of rule 25-22.082, Florida Administrative Code, shall be applicable to a nuclear or integrated gasification combined cycle power plant sited under this act, including provisions for cost recovery, and an applicant shall not otherwise be required to secure competitive proposals for power supply prior to making application under this act or receiving a determination of need from the commission.

(d) The commission's determination of need for a nuclear or integrated gasification combined cycle power plant shall create a presumption of public need and necessity and shall serve as the commission's report required by s. 403.507(4)(a). An order entered pursuant to this section constitutes final agency action. Any petition for reconsideration of a final order on a petition for need determination shall be filed within 5 days after the date of such order. The commission's final order, including any order on reconsideration, shall be reviewable on appeal in the Florida Supreme Court. Inasmuch as delay in the determination of need will delay siting of a nuclear or integrated gasification combined cycle power plant or diminish the opportunity for savings to customers under the federal Energy Policy Act of 2005, the Supreme Court shall proceed to hear and determine the action as expeditiously as practicable and give the action precedence over matters not accorded similar precedence by law.

(e) After a petition for determination of need for a nuclear or integrated gasification combined cycle power plant has been granted, the right of a utility to recover any costs incurred prior to commercial operation, including, but not limited to, costs associated with the siting, design, licensing, or construction of the plant and new, expanded, or relocated electrical transmission lines or facilities of any size that are necessary to serve the nuclear power plant, shall not be subject to challenge unless and only to the extent the commission finds, based on a preponderance of the evidence adduced at a hearing before the commission under s. 120.57, that certain costs were imprudently incurred. Proceeding with the construction of the nuclear or integrated gasification combined cycle power plant following an order by the commission approving the need for the nuclear or integrated gasification combined cycle power plant under this act shall not constitute or be evidence of imprudence. Imprudence shall not include any cost increases due to events beyond the utility's control. Further, a utility's right to recover costs associated with a nuclear or integrated gasification combined cycle power plant may not be raised in any other forum or in the review of proceedings in such other forum. Costs incurred prior to commercial operation shall be recovered pursuant to chapter 366.

History.—s. 5, ch. 80-65; s. 24, ch. 90-331; s. 43, ch. 2006-230; s. 3, ch. 2007-117; s. 85, ch. 2008-227.

**403.52**    **Short title.**—Sections 403.52-403.5365 may be cited as the "Florida Electric Transmission Line Siting Act."

History.—s. 1, ch. 80-65; s. 25, ch. 90-331; s. 45, ch. 2006-230.

**403.521**    **Legislative intent.**—The legislative intent of this act is to establish a centralized and coordinated licensing process for the location of electric transmission line corridors and the construction, operation, and maintenance of electric transmission lines, which are critical infrastructure facilities. This necessarily involves several broad interests of the public addressed through the subject matter jurisdiction of several agencies. The Legislature recognizes that electric transmission lines will have an effect upon the reliability of the electric power system, the environment, land use, and the welfare of the population. Recognizing the need to ensure electric

power system reliability and integrity, and in order to meet electric energy needs in an orderly and timely fashion, the centralized and coordinated licensing process established by this act is intended to further the legislative goal of ensuring through available and reasonable methods that the location of transmission line corridors and the construction, operation, and maintenance of electric transmission lines produce minimal adverse effects on the environment and public health, safety, and welfare. It is the intent of this act to fully balance the need for transmission lines with the broad interests of the public in order to effect a reasonable balance between the need for the facility as a means of providing reliable, economical, and efficient electric energy and the impact on the public and the environment resulting from the location of the transmission line corridor and the construction, operation, and maintenance of the transmission lines. The Legislature intends that the provisions of chapter 120 apply to this act and to proceedings under it except as otherwise expressly exempted by other provisions of this act.

History.—s. 1, ch. 80-65; s. 2, ch. 83-222; s. 26, ch. 90-331; s. 46, ch. 2006-230.

**403.522  Definitions relating to the Florida Electric Transmission Line Siting Act.**—As used in this act:

(1)  "Act" means the Florida Electric Transmission Line Siting Act.

(2)  "Agency," as the context requires, means an official, officer, commission, authority, council, committee, department, division, bureau, board, section, or other unit or entity of government, including a county, municipality, or other regional or local governmental entity.

(3)  "Amendment" means a material change in information provided by the applicant to the application for certification made after the initial application filing.

(4)  "Applicant" means any electric utility that applies for certification under this act.

(5)  "Application" means the documents required by the department to be filed to initiate and support a certification review and evaluation, including the initial document filing, amendments, and responses to requests from the department for additional data and information. An electric utility may file a comprehensive application encompassing all or a part of one or more proposed transmission lines.

(6)  "Board" means the Governor and Cabinet sitting as the siting board.

(7)  "Certification" means the approval by the board of the license for a corridor proper for certification pursuant to subsection (10) and the construction, operation, and maintenance of transmission lines within the corridor with the changes or conditions as the siting board deems appropriate. Certification shall be evidenced by a written order of the board.

(8)  "Commission" means the Florida Public Service Commission.

(9)  "Completeness" means that the application has addressed all applicable sections of the prescribed application format and that those sections are sufficient in comprehensiveness of data or in quality of information provided to allow the department to determine whether the application provides the reviewing agencies adequate information to prepare the reports required by s. 403.526.

(10)  "Corridor" means the proposed area within which a transmission line right-of-way, including maintenance and access roads, is to be located. The width of the corridor proposed for certification by an applicant or other party, at the option of the applicant, may be the width of the transmission line right-of-way, or a wider boundary, not to exceed a width of 1 mile. The area within the corridor in which a right-of-way may be located may be further restricted by a condition of certification. After all property interests required for the transmission line right-of-way and maintenance and access roads have been acquired by the applicant, the boundaries of the area certified shall narrow to only that land within the boundaries of the transmission line right-of-way. The corridors proper for certification shall be those addressed in the application, in amendments to the application filed under s. 403.5275, and in notices of acceptance of proposed alternate corridors filed by an applicant and the department pursuant to s. 403.5271 for which the required information for the preparation of agency supplemental reports was filed.

(11)  "Department" means the Department of Environmental Protection.

(12)  "Electric utility" means cities and towns, counties, public utility districts, regulated electric companies, electric cooperatives, regional transmission organizations, operators of independent transmission systems, or other

transmission organizations approved by the Federal Energy Regulatory Commission or the commission for the operation of transmission facilities, and joint operating agencies, or combinations thereof, engaged in, or authorized to engage in, the business of generating, transmitting, or distributing electric energy.

(13)   "License" means a franchise, permit, certification, registration, charter, comprehensive plan amendment, development order, or permit as defined in chapters 163 and 380, or similar form of authorization required by law, but it does not include a license required primarily for revenue purposes when issuance of the license is merely a ministerial act.

(14)   "Licensee" means an applicant that has obtained a certification order for the subject project.

(15)   "Local government" means a municipality or county in the jurisdiction of which the project is proposed to be located.

(16)   "Maintenance and access roads" means roads constructed within the transmission line right-of-way. Nothing in this act prohibits an applicant from constructing a road to support construction, operation, or maintenance of the transmission line that lies outside the transmission line right-of-way.

(17)   "Modification" means any change in the certification order after issuance, including a change in the conditions of certification.

(18)   "Nonprocedural requirements of agencies" means any agency's regulatory requirements established by statute, rule, ordinance, or comprehensive plan, excluding any provisions prescribing forms, fees, procedures, or time limits for the review or processing of information submitted to demonstrate compliance with such regulatory requirements.

(19)   "Person" means an individual, partnership, joint venture, private or public corporation, association, firm, public service company, political subdivision, municipal corporation, government agency, public utility district, or any other entity, public or private, however organized.

(20)   "Preliminary statement of issues" means a listing and explanation of those issues within the agency's jurisdiction which are of major concern to the agency in relation to the proposed electric transmission line corridor.

(21)   "Regional planning council" means a regional planning council as defined in s. 186.503(4) in the jurisdiction of which the project is proposed to be located.

(22)   "Transmission line" or "electric transmission line" means structures, maintenance and access roads, and all other facilities that need to be constructed, operated, or maintained for the purpose of conveying electric power extending from, but not including, an existing or proposed substation or power plant to, but not including, an existing or proposed transmission network or rights-of-way or substation to which the applicant intends to connect which defines the end of the proposed project and which is designed to operate at 230 kilovolts or more. The transmission line may include, at the applicant's option, any proposed terminal or intermediate substations or substation expansions necessary to serve the transmission line.

(23)   "Transmission line right-of-way" means land necessary for the construction, operation, and maintenance of a transmission line. The typical width of the right-of-way shall be identified in the application. The right-of-way shall be located within the certified corridor and shall be identified by the applicant in documents filed with the department before construction.

(24)   "Water management district" means a water management district created pursuant to chapter 373 in the jurisdiction of which the project is proposed to be located.

History.—s. 1, ch. 80-65; s. 3, ch. 83-222; s. 54, ch. 85-81; s. 27, ch. 90-331; s. 388, ch. 94-356; s. 47, ch. 2006-230.

**403.523    Department of Environmental Protection; powers and duties.**—The department has the following powers and duties:

(1)   To adopt procedural rules pursuant to ss. 120.536(1) and 120.54 to administer this act and to adopt or amend rules to implement the provisions of subsection (10).

(2)   To prescribe the form and content of the public notices and the form, content, and necessary supporting documentation, and any required studies, for certification applications. All data and studies shall be related to the jurisdiction of the agencies relevant to the application.

(3)　To receive applications for transmission line and corridor certifications and initially determine the completeness thereof.

(4)　To make or contract for studies of certification applications. All studies shall be related to the jurisdiction of the agencies relevant to the application. For studies in areas outside the jurisdiction of the department and in the jurisdiction of another agency, the department may initiate such studies, but only with the consent of the agency.

(5)　To administer the processing of applications for certification and ensure that the applications, including postcertification reviews, are processed on an expeditious and priority basis.

(6)　To collect and process such fees as allowed by this act.

(7)　To prepare a report and project analysis as required by s. 403.526.

(8)　To prescribe the means for monitoring the effects arising from the location of the transmission line corridor and the construction, operation, and maintenance of the transmission lines to assure continued compliance with the terms of the certification.

(9)　To make a determination of acceptability of any alternate corridor proposed for consideration under s. 403.5271.

(10)　To set requirements that reasonably protect the public health and welfare from the electric and magnetic fields of transmission lines for which an application is filed under this act.

(11)　To present rebuttal evidence on any issue properly raised at the certification hearing.

(12)　To issue final orders after receipt of the administrative law judge's order relinquishing jurisdiction pursuant to s. 403.527(6).

(13)　To act as clerk for the siting board.

(14)　To administer and manage the terms and conditions of the certification order and supporting documents and records for the life of the facility.

(15)　To issue emergency orders on behalf of the board for facilities licensed under this act.

**History.**—s. 1, ch. 80-65; s. 37, ch. 81-167; s. 265, ch. 81-259; s. 39, ch. 83-55; s. 4, ch. 83-222; s. 8, ch. 86-173; s. 55, ch. 86-186; s. 28, ch. 90-331; s. 389, ch. 94-356; s. 103, ch. 98-200; s. 48, ch. 2006-230.

### 403.524　Applicability; certification; exemptions.—

(1)　This act applies to each transmission line, except a transmission line certified under the Florida Electrical Power Plant Siting Act.

(2)　Except as provided in subsection (1), construction of a transmission line may not be undertaken without first obtaining certification under this act, but this act does not apply to:

(a)　Transmission lines for which development approval has been obtained under chapter 380.

(b)　Transmission lines that have been exempted by a binding letter of interpretation issued under s. 380.06(3), or in which the Department of Economic Opportunity or its predecessor agency has determined the utility to have vested development rights within the meaning of s. 380.05(18) or s. 380.06(8).

(c)　Transmission line development in which all construction is limited to established rights-of-way. Established rights-of-way include rights-of-way established at any time for roads, highways, railroads, gas, water, oil, electricity, or sewage and any other public purpose rights-of-way. If an established transmission line right-of-way is used to qualify for this exemption, the transmission line right-of-way must have been established at least 5 years before notice of the start of construction under subsection (4) of the proposed transmission line. If an established transmission line right-of-way is relocated to accommodate a public project, the date the original transmission line right-of-way was established applies to the relocated transmission line right-of-way for purposes of this exemption.

(d)　Unless the applicant has applied for certification under this act, transmission lines that are less than 15 miles in length or are located in a single county within the state.

(3)　The exemption of a transmission line under this act does not constitute an exemption for the transmission line from other applicable permitting processes under other provisions of law or local government ordinances.

(4)　An electric utility shall notify the department in writing, before the start of construction, of its intent to construct a transmission line exempted under this section. The notice is only for information purposes, and action

by the department is not required pursuant to the notice. This notice may be included in any submittal filed with the department before the start of construction demonstrating that a new transmission line complies with the applicable electric and magnetic field standards.

History.—s. 1, ch. 80-65; s. 14, ch. 81-131; s. 38, ch. 81-167; s. 40, ch. 83-55; s. 5, ch. 83-222; s. 49, ch. 85-55; s. 29, ch. 90-331; s. 49, ch. 2006-230; s. 289, ch. 2011-142; s. 20, ch. 2018-158.

### 403.525　Administrative law judge; appointment; powers and duties.—

(1)(a)　Within 7 days after receipt of an application, whether complete or not, the department shall request the Division of Administrative Hearings to designate an administrative law judge to conduct the hearings required by this act.

(b)　The division director shall designate an administrative law judge to conduct the hearings required by this act within 7 days after receipt of the request from the department. Whenever practicable, the division director shall assign an administrative law judge who has had prior experience or training in this type of certification proceeding.

(c)　Upon being advised that an administrative law judge has been designated, the department shall immediately file a copy of the application and all supporting documents with the administrative law judge, who shall docket the application.

(2)　The administrative law judge has all powers and duties granted to administrative law judges under chapter 120 and by the laws and rules of the department.

History.—s. 1, ch. 80-65; s. 6, ch. 83-222; s. 30, ch. 90-331; s. 145, ch. 96-410; s. 50, ch. 2006-230.

### 403.5251　Application; schedules.—

(1)(a)　The formal date of the filing of the application for certification and commencement of the review process for certification is the date on which the applicant submits:

1.　Copies of the application for certification in a quantity and format, electronic or otherwise as prescribed by rule, to the department and other agencies identified in s. 403.526(2).

2.　The application fee as specified under s. 403.5365 to the department.

The department shall provide to the applicant and the Division of Administrative Hearings the names and addresses of any additional agencies or persons entitled to notice and copies of the application and amendments, if any, within 7 days after receiving the application for certification and the application fees.

(b)　In the application, the starting point and ending point of a transmission line must be specifically defined by the applicant.

(2)　Within 15 days after the formal date of the application filing, the department shall prepare a proposed schedule of dates for determination of completeness, submission of statements of issues, submittal of final reports, and other significant dates to be followed during the certification process, including dates for filing notices of appearances to be a party under s. 403.527(2). This schedule shall be provided by the department to the applicant, the administrative law judge, and the agencies identified under subsection (1). Within 7 days after the filing of this proposed schedule, the administrative law judge shall issue an order establishing a schedule for the matters addressed in the department's proposed schedule and other appropriate matters, if any.

(3)　Copies of changes and amendments to the application shall be timely distributed by the applicant to all agencies and parties who have received a copy of the application.

(4)　Notice of the filing of the application shall be made in accordance with the requirements of s. 403.5363.

History.—s. 31, ch. 90-331; s. 146, ch. 96-410; s. 51, ch. 2006-230.

### 403.5252　Determination of completeness.—

(1)(a)　Within 30 days after the filing of an application, the affected agencies shall file a statement with the department containing the recommendations of each agency concerning the completeness of the application for certification.

(b)　Within 37 days after the filing of the application, the department shall file a statement with the Division of Administrative Hearings, with the applicant, and with all parties declaring its position with regard to the

completeness of the application. The statement of the department shall be based upon its consultation with the affected agencies.

(2)   If the department declares the application to be incomplete, the applicant, within 14 days after the filing of the statement by the department, shall file with the Division of Administrative Hearings, with all parties, and with the department:

(a)   A withdrawal of the application;

(b)   Additional information necessary to make the application complete. After the department first determines the application to be incomplete, the time schedules under this act are not tolled if the applicant makes the application complete within the 14-day period. A subsequent finding by the department that the application remains incomplete tolls the time schedules under this act until the application is determined complete;

(c)   A statement contesting the department's determination of incompleteness; or

(d)   A statement agreeing with the department and requesting additional time to provide the information necessary to make the application complete. If the applicant exercises this option, the time schedules under this act are tolled until the application is determined complete.

(3)(a)   If the applicant contests the determination by the department that an application is incomplete, the administrative law judge shall schedule a hearing on the statement of completeness. The hearing shall be held as expeditiously as possible, but not later than 21 days after the filing of the statement by the department. The administrative law judge shall render a decision within 7 days after the hearing.

(b)   Parties to a hearing on the issue of completeness shall include the applicant, the department, and any agency that has jurisdiction over the matter in dispute. Any substantially affected person who wishes to become a party to the hearing on the issue of completeness must file a motion no later than 10 days before the date of the hearing.

(c)   If the administrative law judge determines that the application was not complete, the applicant shall withdraw the application or make such additional submittals as necessary to complete it. The time schedules referencing a complete application under this act do not commence until the application is determined complete.

(d)   If the administrative law judge determines that the application was complete at the time it was declared incomplete, the time schedules referencing a complete application under this act shall commence upon such determination.

(4)   If the applicant provides additional information to address the issues identified in the determination of incompleteness, each affected agency may submit to the department, no later than 14 days after the applicant files the additional information, a recommendation on whether the agency believes the application is complete. Within 21 days after receipt of the additional information from the applicant submitted under paragraph (2)(b), paragraph (2)(d), or paragraph (3)(c) and considering the recommendations of the affected agencies, the department shall determine whether the additional information supplied by an applicant makes the application complete. If the department finds that application is still incomplete, the applicant may exercise any of the options specified in subsection (2) as often as is necessary to resolve the dispute.

History.—s. 32, ch. 90-331; s. 147, ch. 96-410; s. 52, ch. 2006-230; s. 86, ch. 2008-227.

**403.526   Preliminary statements of issues, reports, and project analyses; studies.—**

(1)   Each affected agency that is required to file a report in accordance with this section shall submit a preliminary statement of issues to the department and all parties no later than the submittal of each agency's recommendation that the application is complete. The failure to raise an issue in this preliminary statement of issues does not preclude the issue from being raised in the agency's report.

(2)(a)   No later than 90 days after the filing of the application, the following agencies shall prepare reports as provided below, unless a final order denying the determination of need has been issued under s. 403.537:

1.   The department shall prepare a report as to the impact of each proposed transmission line or corridor as it relates to matters within its jurisdiction.

2.   Each water management district in the jurisdiction of which a proposed transmission line or corridor is to be located shall prepare a report as to the impact on water resources and other matters within its jurisdiction.

3.    The Department of Economic Opportunity shall prepare a report containing recommendations which address the impact upon the public of the proposed transmission line or corridor, based on the degree to which the proposed transmission line or corridor is consistent with the applicable portions of the state comprehensive plan, emergency management, and other matters within its jurisdiction. The Department of Economic Opportunity may also comment on the consistency of the proposed transmission line or corridor with applicable strategic regional policy plans or local comprehensive plans and land development regulations.

4.    The Fish and Wildlife Conservation Commission shall prepare a report as to the impact of each proposed transmission line or corridor on fish and wildlife resources and other matters within its jurisdiction.

5.    Each local government shall prepare a report as to the impact of each proposed transmission line or corridor on matters within its jurisdiction, including the consistency of the proposed transmission line or corridor with all applicable local ordinances, regulations, standards, or criteria that apply to the proposed transmission line or corridor, including local comprehensive plans, zoning regulations, land development regulations, and any applicable local environmental regulations adopted pursuant to s. 403.182 or by other means. A change by the responsible local government or local agency in local comprehensive plans, zoning ordinances, or other regulations made after the date required for the filing of the local government's report required by this section is not applicable to the certification of the proposed transmission line or corridor unless the certification is denied or the application is withdrawn.

6.    The Department of Transportation shall prepare a report as to the impact of the proposed transmission line or corridor on state roads, railroads, airports, aeronautics, seaports, and other matters within its jurisdiction.

7.    The commission shall prepare a report containing its determination under s. 403.537, and the report may include the comments from the commission with respect to any other subject within its jurisdiction.

8.    Any other agency, if requested by the department, shall also perform studies or prepare reports as to subjects within the jurisdiction of the agency which may potentially be affected by the proposed transmission line.

(b)    Each report must contain:

1.    A notice of any nonprocedural requirements not specifically listed in the application from which a variance, exemption, exception, or other relief is necessary in order for the proposed corridor to be certified. Failure to include the notice shall be treated as a waiver from the nonprocedural requirements of that agency.

2.    A recommendation for approval or denial of the application.

3.    The proposed conditions of certification on matters within the jurisdiction of each agency. For each condition proposed by an agency, the agency shall list the specific statute, rule, or ordinance, as applicable, which authorizes the proposed condition.

(c)    Each reviewing agency shall initiate the activities required by this section no later than 15 days after the application is filed. Each agency shall keep the applicant and the department informed as to the progress of its studies and any issues raised thereby.

(d)    When an agency whose agency head is a collegial body, such as a commission, board, or council, is required to submit a report pursuant to this section and is required by its own internal procedures to have the report reviewed by its agency head prior to finalization, the agency may submit to the department a draft version of the report by the deadline indicated in paragraph (a), and shall submit a final version of the report after review by the agency head, no later than 15 days after the deadline indicated in paragraph (a).

(e)    Receipt of an affirmative determination of need from the commission by the submittal deadline for agency reports under paragraph (a) is a condition precedent to further processing of the application.

(3)    The department shall prepare a project analysis containing a compilation of agency reports and summaries of the material contained therein which shall be filed with the administrative law judge and served on all parties no later than 115 days after the application is filed, and which shall include:

(a)    A statement indicating whether the proposed electric transmission line will be in compliance with the rules of the department and affected agencies.

(b)    The studies and reports required by this section and s. 403.537.

(c)    Comments received from any other agency or person.

(d)   The recommendation of the department as to the disposition of the application, of variances, exemptions, exceptions, or other relief identified by any party, and of any proposed conditions of certification which the department believes should be imposed.

(4)   The failure of any agency to submit a preliminary statement of issues or a report, or to submit its preliminary statement of issues or report within the allowed time, is not grounds for the alteration of any time limitation in this act under s. 403.528. The failure to submit a preliminary statement of issues or a report, or the inadequacy of the preliminary statement of issues or report, is not grounds to deny or condition certification.

History.—s. 1, ch. 80-65; s. 39, ch. 81-167; s. 41, ch. 83-55; s. 7, ch. 83-222; s. 34, ch. 90-331; s. 390, ch. 94-356; s. 15, ch. 95-149; s. 149, ch. 96-410; s. 209, ch. 99-245; s. 53, ch. 2006-230; s. 83, ch. 2007-5; s. 87, ch. 2008-227; s. 290, ch. 2011-142; s. 23, ch. 2015-30.

### 403.527   Certification hearing, parties, participants.—

(1)(a)   No later than 145 days after the application is filed, the administrative law judge shall conduct a certification hearing pursuant to ss. 120.569 and 120.57 at a central location in proximity to the proposed transmission line or corridor.

(b)   Notice of the certification hearing and other public hearings provided for in this section and notice of the deadline for filing of notice of intent to be a party shall be made in accordance with the requirements of s. 403.5363.

(2)(a)   Parties to the proceeding shall be:

1.   The applicant.

2.   The department.

3.   The commission.

4.   The Department of Economic Opportunity.

5.   The Fish and Wildlife Conservation Commission.

6.   The Department of Transportation.

7.   Each water management district in the jurisdiction of which the proposed transmission line or corridor is to be located.

8.   The local government.

(b)   Any party listed in paragraph (a), other than the department or the applicant, may waive its right to participate in these proceedings. If any listed party fails to file a notice of its intent to be a party on or before the 30th day before the certification hearing, the party is deemed to have waived its right to be a party unless its participation would not prejudice the rights of any party to the proceeding.

(c)   Notwithstanding the provisions of chapter 120 to the contrary, upon the filing with the administrative law judge of a notice of intent to be a party by an agency, corporation, or association described in subparagraphs 1. and 2. or a petition for intervention by a person described in subparagraph 3. no later than 30 days before the date set for the certification hearing, the following shall also be parties to the proceeding:

1.   Any agency not listed in paragraph (a) as to matters within its jurisdiction.

2.   Any domestic nonprofit corporation or association formed, in whole or in part, to promote conservation of natural beauty; to protect the environment, personal health, or other biological values; to preserve historical sites; to promote consumer interests; to represent labor, commercial, or industrial groups; or to promote comprehensive planning or orderly development of the area in which the proposed transmission line or corridor is to be located.

3.   Any person whose substantial interests are affected and being determined by the proceeding.

(d)   Any agency whose properties or works may be affected shall be made a party upon the request of the agency or any party to this proceeding.

(3)(a)   The order of presentation at the certification hearing, unless otherwise changed by the administrative law judge to ensure the orderly presentation of witnesses and evidence, shall be:

1.   The applicant.

2.   The department.

3.   State agencies.

4.   Regional agencies, including water management districts.

5.   Local governments.

6.   Other parties.

(b)   When appropriate, any person may be given an opportunity to present oral or written communications to the administrative law judge. If the administrative law judge proposes to consider such communications, all parties shall be given an opportunity to cross-examine, challenge, or rebut the communications.

(4)(a)   One public hearing where members of the public who are not parties to the certification hearing may testify shall be held in conjunction with the certification hearing.

(b)   Upon the request of the local government, one public hearing where members of the public who are not parties to the certification hearing and who reside within the jurisdiction of the local government may testify shall be held within the boundaries of each county in which a local government that made such a request is located.

(c)   A local government shall notify the administrative law judge and all parties not later than 50 days after the filing of the application as to whether the local government wishes to have a public hearing within the boundaries of its county. The local government is responsible for providing the location of the public hearing if held separately from the certification hearing.

(d)   Within 5 days after notification, the administrative law judge shall determine the date of the public hearing, which shall be held before or during the certification hearing. If two or more local governments within one county request a public hearing, the hearing shall be consolidated so that only one public hearing is held in any county. The location of a consolidated hearing shall be determined by the administrative law judge.

(e)   If a local government does not request a public hearing within 50 days after the filing of the application, members of the public who are not parties to the certification hearing and who reside within the jurisdiction of the local government may testify during the hearing held under paragraph (b).

(5)   At the conclusion of the certification hearing, the administrative law judge shall, after consideration of all evidence of record, issue a recommended order disposing of the application no later than 45 days after the transcript of the certification hearing and the public hearings is filed with the Division of Administrative Hearings.

(6)(a)   No later than 29 days before the certification hearing, the department or the applicant may request that the administrative law judge cancel the certification hearing and relinquish jurisdiction to the department if all parties to the proceeding stipulate that there are no disputed issues of material fact or law.

(b)   The administrative law judge shall issue an order granting or denying the request within 5 days.

(c)   If the administrative law judge grants the request, the department and the applicant shall publish notices of the cancellation of the certification hearing in accordance with s. 403.5363.

(d)1.   If the administrative law judge grants the request, the department shall prepare and issue a final order in accordance with s. 403.529(1)(a).

2.   Parties may submit proposed final orders to the department no later than 10 days after the administrative law judge issues an order relinquishing jurisdiction.

(7)   The applicant shall pay those expenses and costs associated with the conduct of the hearing and the recording and transcription of the proceedings.

History.—s. 1, ch. 80-65; s. 40, ch. 81-167; s. 42, ch. 83-55; s. 8, ch. 83-222; s. 55, ch. 85-81; s. 35, ch. 90-331; s. 391, ch. 94-356; s. 150, ch. 96-410; s. 210, ch. 99-245; s. 54, ch. 2006-230; s. 88, ch. 2008-227; s. 291, ch. 2011-142; s. 24, ch. 2015-30.

### 403.5271   Alternate corridors.—

(1)   No later than 45 days before the originally scheduled certification hearing, any party may propose alternate transmission line corridor routes for consideration under the provisions of this act.

(a)   A notice of a proposed alternate corridor must be filed with the administrative law judge, all parties, and any local governments in whose jurisdiction the alternate corridor is proposed. The filing must include the most recent United States Geological Survey 1:24,000 quadrangle maps specifically delineating the corridor boundaries, a description of the proposed corridor, and a statement of the reasons the proposed alternate corridor should be certified.

(b)1.   Within 7 days after receipt of the notice, the applicant and the department shall file with the administrative law judge and all parties a notice of acceptance or rejection of a proposed alternate corridor for consideration. If the alternate corridor is rejected by the applicant or the department, the certification hearing and the public hearings shall be held as scheduled. If both the applicant and the department accept a proposed alternate corridor for consideration, the certification hearing and the public hearings shall be rescheduled, if necessary. If a filing for an alternate corridor is accepted for consideration by the department and the applicant, any newly affected local government must notify the administrative law judge and all parties not later than 10 days after the data concerning the alternate corridor has been determined complete as to whether the local government wishes to have such a public hearing. The local government is responsible for providing the location of the public hearing if held separately from the certification hearing. The provisions of s. 403.527(4)(b) and (c) shall apply. Notice of the local hearings shall be published in accordance with s. 403.5363.

2.   If rescheduled, the certification hearing shall be held no more than 90 days after the previously scheduled certification hearing, unless the data submitted under paragraph (d) is determined to be incomplete, in which case the rescheduled certification hearing shall be held no more than 105 days after the previously scheduled certification hearing. If additional time is needed due to the alternate corridor crossing a local government jurisdiction that was not previously affected, the remainder of the schedule listed below shall be appropriately adjusted by the administrative law judge to allow that local government to prepare a report pursuant to s. 403.526(2)(a)5. Notice that the certification hearing has been deferred due to the acceptance of the alternate corridor shall be published in accordance with s. 403.5363.

(c)   Notice of the filing of the alternate corridor shall be published by the alternate proponent in accordance with s. 403.5363(2). If the notice is not timely published or does not meet the notice requirements, the alternate shall be deemed withdrawn.

(d)   Within 21 days after acceptance of an alternate corridor by the department and the applicant, the party proposing an alternate corridor shall have the burden of providing all data to the agencies listed in s. 403.526(2) and newly affected agencies necessary for the preparation of a supplementary report on the proposed alternate corridor.

(e)1.   Reviewing agencies shall advise the department of any issues concerning completeness no later than 15 days after the submittal of the data required by paragraph (d). Within 22 days after receipt of the data, the department shall issue a determination of completeness.

2.   If the department determines that the data required by paragraph (d) is not complete, the party proposing the alternate corridor must file such additional data to correct the incompleteness. This additional data must be submitted within 14 days after the determination by the department.

3.   Reviewing agencies may advise the department of any issues concerning completeness of the additional data within 10 days after the filing by the party proposing the alternate corridor. If the department, within 14 days after receiving the additional data, determines that the data remains incomplete, the incompleteness of the data is deemed a withdrawal of the proposed alternate corridor. The department may make its determination based on recommendations made by other affected agencies.

(f)   The agencies listed in s. 403.526(2) and any newly affected agencies shall file supplementary reports with the applicant and the department which address the proposed alternate corridors no later than 24 days after the data submitted pursuant to paragraph (d) or paragraph (e) is determined to be complete.

(g)   The agency reports on alternate corridors must include all information required by s. 403.526(2).

(h)   When an agency whose agency head is a collegial body, such as a commission, board, or council, is required to submit a report pursuant to this section and is required by its own internal procedures to have the report reviewed by its agency head prior to finalization, the agency may submit to the department a draft version of the report by the deadline indicated in paragraph (f), and shall submit a final version of the report after review by the agency head no later than 7 days after the deadline indicated in paragraph (f).

(i)   The department shall file with the administrative law judge, the applicant, and all parties a project analysis consistent with s. 403.526(3) no more than 16 days after submittal of agency reports on the proposed alternate corridor.

(2)   If the original certification hearing date is rescheduled, the rescheduling shall not provide the opportunity for parties to file additional alternate corridors to the applicant's proposed corridor or any accepted alternate corridor. However, an amendment to the application which changes the alignment of the applicant's proposed corridor shall require rescheduling of the certification hearing, if necessary, so as to allow time for a party to file alternate corridors to the realigned proposed corridor for which the application has been amended. Any alternate corridor proposal shall have the same starting and ending points as the realigned portion of the corridor proposed by the applicant's amendment, provided that the administrative law judge for good cause shown may authorize another starting or ending point in the area of the applicant's amended corridor.

(3)(a)   Notwithstanding the rejection of a proposed alternate corridor by the applicant or the department, any party may present evidence at the certification hearing to show that a corridor proper for certification does not satisfy the criteria listed in s. 403.529 or that a rejected alternate corridor would meet the criteria set forth in s. 403.529. Evidence may not be admitted at the certification hearing on any alternate corridor, unless the alternate corridor was proposed by the filing of a notice at least 45 days before the originally scheduled certification hearing pursuant to this section. Rejected alternate corridors shall be considered by the board as provided in s. 403.529(4) and (5).

(b)   The party proposing an alternate corridor has the burden to prove that the alternate corridor can be certified at the certification hearing. This act does not require an applicant or agency that is not proposing the alternate corridor to submit data in support of the alternate corridor.

(4)   If an alternate corridor is accepted by the applicant and the department pursuant to a notice of acceptance as provided in this subsection and the corridor is ultimately determined to be the corridor that would meet the criteria set forth in s. 403.529(4) and (5), the board shall certify that corridor.

History.—s. 36, ch. 90-331; s. 392, ch. 94-356; s. 151, ch. 96-410; s. 55, ch. 2006-230; s. 84, ch. 2007-5; s. 89, ch. 2008-227.

## 403.5272   Informational public meetings.—

(1)   A local government whose jurisdiction is to be crossed by a proposed corridor may hold one informational public meeting in addition to the hearings specifically authorized by this act on any matter associated with the transmission line proceeding. The informational public meeting may be conducted by the local government or the regional planning council and shall be held no later than 55 days after the application is filed. The purpose of an informational public meeting is for the local government or regional planning council to further inform the public about the transmission line proposed, obtain comments from the public, and formulate its recommendation with respect to the proposed transmission line.

(2)   Informational public meetings shall be held solely at the option of each local government. It is the legislative intent that local governments attempt to hold such public meetings. Parties to the proceedings under this act shall be encouraged to attend; however, a party other than the applicant and the department is not required to attend the informational public meetings.

(3)   A local government that intends to conduct an informational public meeting must provide notice of the meeting, with notice sent to all parties listed in s. 403.527(2)(a), not less than 15 days before the meeting and to the general public in accordance with s. 403.5363(4).

(4)   The failure to hold an informational public meeting or the procedure used for the informational public meeting is not grounds for the alteration of any time limitation in this act under s. 403.528 or grounds to deny or condition certification.

History.—s. 9, ch. 83-222; s. 56, ch. 2006-230; s. 90, ch. 2008-227; s. 25, ch. 2015-30.

## 403.5275   Amendment to the application.—

(1)   Any amendment made to the application before certification shall be sent by the applicant to the administrative law judge and to all parties to the proceeding.

(2)   Any amendment to the application made before certification shall be disposed of as part of the original certification proceeding. Amendment of the application may be considered "good cause" for alteration of time limits pursuant to s. 403.528.

History.—s. 1, ch. 80-65; s. 10, ch. 83-222; s. 37, ch. 90-331; s. 152, ch. 96-410; s. 57, ch. 2006-230.

**403.528    Alteration of time limits.—**

(1)   Any time limitation in this act may be altered by the administrative law judge upon stipulation between the department and the applicant unless objected to by any party within 5 days after notice or for good cause shown by any party.

(2)   A comprehensive application encompassing more than one proposed transmission line may be good cause for alteration of time limits.

History.—s. 1, ch. 80-65; s. 11, ch. 83-222; s. 153, ch. 96-410; s. 58, ch. 2006-230; s. 85, ch. 2007-5.

**403.529    Final disposition of application.—**

(1)(a)   If the administrative law judge has granted a request to cancel the certification hearing and has relinquished jurisdiction to the department under s. 403.527(6), within 40 days thereafter, the secretary of the department shall act upon the application by written order in accordance with the terms of this act and state the reasons for issuance or denial.

(b)   If the administrative law judge does not grant a request to cancel the certification hearing under the provisions of s. 403.527(6) within 60 days after receipt of the administrative law judge's recommended order, the board shall act upon the application by written order, approving in whole, approving with such conditions as the board deems appropriate, or denying the certification and stating the reasons for issuance or denial.

(2)   The issues that may be raised in any hearing before the board shall be limited to matters raised in the certification proceeding before the administrative law judge or raised in the recommended order of the administrative law judge. All parties, or their representatives, or persons who appear before the board shall be subject to s. 120.66.

(3)   If certification is denied, the board, or secretary if applicable, shall set forth in writing the action the applicant would have to take to secure the approval of the application.

(4)   In determining whether an application should be approved in whole, approved with modifications or conditions, or denied, the board, or secretary when applicable, shall consider whether, and the extent to which, the location of the transmission line corridor and the construction, operation, and maintenance of the transmission line will:

(a)   Ensure electric power system reliability and integrity;

(b)   Meet the electrical energy needs of the state in an orderly, economical, and timely fashion;

(c)   Comply with applicable nonprocedural requirements of agencies;

(d)   Be consistent with applicable provisions of local government comprehensive plans, if any; and

(e)   Effect a reasonable balance between the need for the transmission line as a means of providing reliable, economically efficient electric energy, as determined by the commission, under s. 403.537, and the impact upon the public and the environment resulting from the location of the transmission line corridor and the construction, operation, and maintenance of the transmission lines.

(5)(a)   Any transmission line corridor certified by the board, or secretary if applicable, shall meet the criteria of this section. When more than one transmission line corridor is proper for certification under s. 403.522(10) and meets the criteria of this section, the board, or secretary if applicable, shall certify the transmission line corridor that has the least adverse impact regarding the criteria in subsection (4), including costs.

(b)   If the board, or secretary if applicable, finds that an alternate corridor rejected pursuant to s. 403.5271 meets the criteria of subsection (4) and has the least adverse impact regarding the criteria in subsection (4), including cost, of all corridors that meet the criteria of subsection (4), the board, or secretary if applicable, shall deny certification or shall allow the applicant to submit an amended application to include the corridor.

(c)   If the board, or secretary if applicable, finds that two or more of the corridors that comply with subsection (4) have the least adverse impacts regarding the criteria in subsection (4), including costs, and that the corridors are substantially equal in adverse impacts regarding the criteria in subsection (4), including costs, the board, or secretary if applicable, shall certify the corridor preferred by the applicant if the corridor is one proper for certification under s. 403.522(10).

(6)   The issuance or denial of the certification is the final administrative action required as to that application.

History.—s. 1, ch. 80-65; s. 12, ch. 83-222; s. 38, ch. 90-331; s. 154, ch. 96-410; s. 59, ch. 2006-230.

### 403.531    Effect of certification.—

(1)    Subject to the conditions set forth therein, certification shall constitute the sole license of the state and any agency as to the approval of the location of transmission line corridors and the construction, operation, and maintenance of transmission lines. The certification is valid for the life of the transmission line, if construction on, or condemnation or acquisition of, the right-of-way is commenced within 5 years after the date of certification or such later date as may be authorized by the board.

(2)(a)    The certification authorizes the licensee to locate the transmission line corridor and to construct and maintain the transmission lines subject only to the conditions of certification set forth in the certification.

(b)    In consideration of the standard for granting variances pursuant to s. 403.201, the certification may include conditions that constitute variances and exemptions from nonprocedural standards or rules of the department or any other agency which were expressly considered during the certification review unless waived by the agency as provided in s. 403.526 and which otherwise would be applicable to the location of the proposed transmission line corridor or the construction, operation, and maintenance of the transmission lines.

(3)(a)    The certification shall be in lieu of any license, permit, certificate, or similar document required by any state, regional, or local agency under, but not limited to, chapter 125, chapter 161, chapter 163, chapter 166, chapter 186, chapter 253, chapter 258, chapter 298, chapter 373, chapter 376, chapter 379, chapter 380, chapter 381, chapter 403, chapter 404, the Florida Transportation Code, or 33 U.S.C. s. 1341.

(b)    On certification, any license, easement, or other interest in state lands, except those the title of which is vested in the Board of Trustees of the Internal Improvement Trust Fund, shall be issued by the appropriate agency as a ministerial act. The applicant shall seek any necessary interest in state lands the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund from the board of trustees before, during, or after the certification proceeding, and certification may be made contingent upon issuance of the appropriate interest in realty. However, the applicant and any party to the certification proceeding may not directly or indirectly raise or relitigate any matter that was or could have been an issue in the certification proceeding in any proceeding before the Board of Trustees of the Internal Improvement Trust Fund wherein the applicant is seeking a necessary interest in state lands, but the information presented in the certification proceeding shall be available for review by the board of trustees and its staff.

(4)    This act does not in any way affect the commission's ratemaking powers or its exclusive jurisdiction to require transmission lines to be located underground under chapter 366. This act does not in any way affect the right of any local government to charge appropriate fees or require that construction be in compliance with the National Electrical Safety Code, as prescribed by the commission.

(5)    A term or condition of certification may not be interpreted to preclude the postcertification exercise by any party of whatever procedural rights it may have under chapter 120, including those related to rulemaking proceedings.

History.—s. 1, ch. 80-65; s. 266, ch. 81-259; s. 13, ch. 83-222; s. 39, ch. 90-331; s. 60, ch. 2006-230; s. 50, ch. 2009-21; s. 4, ch. 2018-34.

### 403.5312    Filing of notice of certified corridor route.—

(1)    Within 60 days after certification of a transmission line corridor under ss. 403.52-403.5365, the applicant shall file with the department and, in accordance with s. 28.222, with the clerk of the circuit court for each county through which the corridor will pass, a notice of the certified route.

(2)    The notice must consist of maps or aerial photographs in the scale of 1:24,000 which clearly show the location of the certified route and must state that the certification of the corridor will result in the acquisition of rights-of-way within the corridor. Each clerk shall record the filing in the official record of the county for the duration of the certification or until such time as the applicant certifies to the department and the clerk that all lands required for the transmission line rights-of-way within the corridor have been acquired within the county, whichever is sooner.

(3)    The recording of this notice does not constitute a lien, cloud, or encumbrance on real property.

History.—s. 12, ch. 81-131; s. 40, ch. 90-331; s. 61, ch. 2006-230; s. 91, ch. 2008-227.

**403.5315　　Modification of certification.**—A certification may be modified after issuance in any one of the following ways:

(1)　The board may delegate to the department the authority to modify specific conditions in the certification.

(2)　The licensee may file a petition for modification with the department, or the department may initiate the modification upon its own initiative.

(a)　A petition for modification must set forth:

1.　The proposed modification;

2.　The factual reasons asserted for the modification; and

3.　The anticipated additional environmental effects of the proposed modification.

(b)　The department may modify the terms and conditions of the certification if no party objects in writing to the modification within 45 days after notice by mail to the last address of record in the certification proceeding, and if no other person whose substantial interests will be affected by the modification objects in writing within 30 days after issuance of public notice.

(c)　If objections are raised or the department denies the proposed modification, the licensee may file a request for hearing on the modification with the department. Such a request shall be handled pursuant to chapter 120.

(d)　A request for hearing referred to the Division of Administrative Hearings shall be disposed of in the same manner as an application but with time periods established by the administrative law judge commensurate with the significance of the modification requested.

History.—s. 1, ch. 80-65; s. 15, ch. 83-222; s. 41, ch. 90-331; s. 155, ch. 96-410; s. 62, ch. 2006-230.

**403.5317　　Postcertification activities.**—

(1)(a)　If, subsequent to certification, a licensee proposes any material change to the application or prior amendments, the licensee shall submit to the department a written request for amendment and description of the proposed change to the application. The department shall, within 30 days after the receipt of the request for the amendment, determine whether the proposed change to the application requires a modification of the conditions of certification.

(b)　If the department concludes that the change would not require a modification of the conditions of certification, the department shall notify, in writing, the licensee, all agencies, and all parties of the approval of the amendment.

(c)　If the department concludes that the change would require a modification of the conditions of certification, the department shall notify the licensee that the proposed change to the application requires a request for modification under s. 403.5315.

(2)　Postcertification submittals filed by a licensee with one or more agencies are for the purpose of monitoring for compliance with the issued certification. Each submittal must be reviewed by each agency on an expedited and priority basis because each facility certified under this act is a critical infrastructure facility. Postcertification review may not be completed more than 90 days after complete information for a segment of the certified transmission line is submitted to the reviewing agencies.

History.—s. 63, ch. 2006-230.

**403.532　　Revocation or suspension of certification.**—Any certification may be revoked or suspended:

(1)　For any material false statement in the application or in the supplemental or additional statements of fact or studies required of the applicant when a true answer would have warranted the board's refusal to recommend a certification in the first instance.

(2)　For failure to comply with the terms or conditions of the certification.

(3)　For violation of the provisions of this act or rules or orders issued hereunder.

History.—s. 1, ch. 80-65.

**403.533**    **Enforcement of compliance.**—Failure to obtain a certification, or to comply with the conditions thereof, or to comply with this act shall constitute a violation of chapter 403.

History.—s. 1, ch. 80-65; s. 42, ch. 90-331.

**403.536**    **Superseded laws, regulations, and certification power.**—

(1) If any provision of this act is in conflict with any other provision, limitation, or restriction under any law, rule, regulation, or ordinance of this state or any political subdivision, municipality, or agency, this act shall control and such law, rule, regulation, or ordinance shall be deemed superseded for the purposes of this act.

(2) The state hereby preempts the certification of transmission lines and transmission line corridors.

(3) The board shall have the power to adopt reasonable procedural rules to carry out its duties under this act and to give effect to the legislative intent that this act provide an efficient, centrally coordinated, one-stop licensing process.

History.—s. 1, ch. 80-65; s. 43, ch. 90-331.

**403.5363**    **Public notices; requirements.**—

(1)(a) The applicant shall arrange for the publication of the notices specified in paragraph (b).

1. The notices shall be published in newspapers of general circulation within counties crossed by the transmission line corridors proper for certification. The required newspaper notices shall be published in a section of the newspaper other than the section for legal notices. A newspaper of general circulation shall be the newspaper within a county crossed by a transmission line corridor proper for certification which newspaper has the largest daily circulation in that county and has its principal office in that county. If the newspaper having the largest daily circulation has its principal office outside the county, the notices must appear in both the newspaper having the largest circulation in that county and in a newspaper authorized to publish legal notices in that county.

2. The department shall adopt rules specifying the content of the newspaper notices.

3. All notices published by the applicant shall be paid for by the applicant and shall be in addition to the application fee.

(b) Public notices that must be published under this section include:

1. The notice of the filing of an application, which must include a description of the proceedings required by this act. The notice must describe the provisions of s. 403.531(1) and (2) and give the date by which notice of intent to be a party or a petition to intervene in accordance with s. 403.527(2) must be filed. This notice must be published no more than 21 days after the application is filed. The notice shall, at a minimum, be one-half page in size in a standard size newspaper or a full page in a tabloid size newspaper. The notice must include a map generally depicting all transmission corridors proper for certification.

2. The notice of the certification hearing and any public hearing held under s. 403.527(4). The notice must include the date by which a person wishing to appear as a party must file the notice to do so. The notice of the originally scheduled certification hearing must be published at least 65 days before the date set for the certification hearing. The notice shall meet the size and map requirements set forth in subparagraph 1.

3. The notice of the cancellation of the certification hearing under s. 403.527(6), if applicable. The notice must be published at least 3 days before the date of the originally scheduled certification hearing. The notice shall, at a minimum, be one-fourth page in size in a standard size newspaper or one-half page in a tabloid size newspaper. The notice shall not require a map to be included.

4. The notice of the deferment of the certification hearing due to the acceptance of an alternate corridor under s. 403.5271(1)(b)2. The notice must be published at least 7 days before the date of the originally scheduled certification hearing. The notice shall, at a minimum, be one-eighth page in size in a standard size newspaper or one-fourth page in a tabloid size newspaper. The notice shall not require a map to be included.

5. If the notice of the rescheduled certification hearing required of an alternate proponent under s. 403.5271(1)(c) is not timely published or does not meet the notice requirements such that an alternate corridor is withdrawn under the provisions of s. 403.5271(1)(c), the notice of the rescheduled hearing and any local hearings shall be provided by the applicant at least 30 days prior to the rescheduled certification hearing.

6. The notice of the filing of a proposal to modify the certification submitted under s. 403.5315, if the department determines that the modification would require relocation or expansion of the transmission line right-of-way or a certified substation.

(2)(a) Each proponent of an alternate corridor shall arrange for newspaper notice of the publication of the filing of the proposal for an alternate corridor. If there is more than one alternate proponent, the proponents may jointly publish notice, so long as the content requirements below are met and the maps are legible.

(b) The notice shall specify the revised time schedules, the date by which newly affected persons or agencies may file the notice of intent to become a party, the date of the rescheduled hearing, and the date of any public hearing held under s. 403.5271(1)(b)1.

(c) A notice listed in this subsection must be published in a newspaper of general circulation within the county or counties crossed by the proposed alternate corridor and comply with the content, size, and map requirements set forth in this section.

(d) The notice of the alternate corridor proposal must be published not less than 45 days before the rescheduled certification hearing.

(3) The department shall arrange for the publication of the following notices in the manner specified by chapter 120:

(a) The notice of the filing of an application and the date by which a person intending to become a party must file a petition to intervene or a notice of intent to be a party. The notice must be published no later than 21 days after the application has been filed.

(b) The notice of any administrative hearing for certification, if applicable. The notice must be published not less than 65 days before the date set for a hearing, except that notice for a rescheduled certification hearing after acceptance of an alternative corridor must be published not less than 50 days before the date set for the hearing.

(c) The notice of the cancellation of a certification hearing under s. 403.527(6), if applicable. The notice must be published not later than 7 days before the date of the originally scheduled certification hearing.

(d) The notice of the deferment of the certification hearing due to the acceptance of an alternate corridor under s. 403.5271(1)(b)2. The notice must be published at least 7 days before the date of the originally scheduled certification hearing.

(e) The notice of the hearing before the siting board, if applicable.

(f) The notice of stipulations, proposed agency action, or a petition for modification.

(4) A local government or regional planning council that proposes to conduct an informational public meeting pursuant to s. 403.5272 must publish notice of the meeting in a newspaper of general circulation within the county or counties in which the proposed electrical transmission line will be located no later than 7 days prior to the meeting. A newspaper of general circulation shall be the newspaper that has the largest daily circulation in that county and has its principal office in that county. If the newspaper with the largest daily circulation has its principal office outside the county, the notices shall appear in both the newspaper having the largest circulation in that county and in a newspaper authorized to publish legal notices in that county.

(5)(a) A good faith effort shall be made by the applicant to provide direct notice of the filing of an application for certification by United States mail or hand delivery no later than 45 days after filing of the application to all local landowners whose property, as noted in the most recent local government tax records, and residences are located within one-quarter mile of the proposed boundaries of a transmission line corridor that only includes a transmission line as defined by s. 403.522(22).

(b) No later than 60 days after the filing of an application for certification, the applicant shall file a list with the department's Siting Coordination Office of landowners and residences that were notified.

(6)(a) A good faith effort shall be made by the proponent of an alternate corridor that includes a transmission line, as defined by s. 403.522(22), to provide direct notice of the filing of an alternate corridor for certification by United States mail or hand delivery of the filing no later than 30 days after filing of the alternate corridor to all local landowners whose property, as noted in the most recent local government tax records, and residences are located within one-quarter mile of the proposed boundaries of a transmission line corridor that includes a transmission line as defined by s. 403.522(22).

(b)  No later than 45 days after the filing of an alternate corridor for certification, the proponent of an alternate corridor shall file a list with the department's Siting Coordination Office of landowners and residences that were notified.

History.—s. 64, ch. 2006-230; s. 92, ch. 2008-227; s. 50, ch. 2016-10.

**403.5365    Fees; disposition.**—The department shall charge the applicant the following fees, as appropriate, which, unless otherwise specified, shall be paid into the Florida Permit Fee Trust Fund:

(1)  An application fee.

(a)  The application fee shall be $100,000, plus $750 per mile for each mile of corridor in which the transmission line right-of-way is proposed to be located within an existing electric transmission line right-of-way or within any existing right-of-way for any road, highway, railroad, or other aboveground linear facility, or $1,000 per mile for each mile of electric transmission line corridor proposed to be located outside the existing right-of-way.

(b)  Sixty percent of the fee shall go to the department to cover any costs associated with coordinating the review of and acting upon the application and any costs for field services associated with monitoring construction and operation of the electric transmission line facility.

(c)  The following percentages shall be transferred to the Operating Trust Fund of the Division of Administrative Hearings of the Department of Management Services:

1.  Five percent to compensate for expenses from the initial exercise of duties associated with the filing of an application.

2.  An additional 10 percent if an administrative hearing under s. 403.527 is held.

(d)1.  Upon written request with proper itemized accounting within 90 days after final agency action by the siting board or the department or the written notification of the withdrawal of the application, the agencies that prepared reports under s. 403.526 or s. 403.5271 or participated in a hearing under s. 403.527 or s. 403.5271 may submit a written request to the department for reimbursement of expenses incurred during the certification proceedings. The request must contain an accounting of expenses incurred, which may include time spent reviewing the application, preparation of any studies required of the agencies by this act, agency travel and per diem to attend any hearing held under this act, and for the local government or regional planning council providing additional notice of the informational public meeting. The department shall review the request and verify whether a claimed expense is valid. Valid expenses shall be reimbursed; however, if the amount of funds available for reimbursement is insufficient to provide for full compensation to the agencies, reimbursement shall be on a prorated basis.

2.  If the application review is held in abeyance for more than 1 year, the agencies may submit a request for reimbursement under subparagraph 1. This time period shall be measured from the date the applicant has provided written notification to the department that it desires to have the application review process placed on hold. The fee disbursement shall be processed in accordance with subparagraph 1.

(e)  If any sums are remaining, the department shall retain them for its use in the same manner as is otherwise authorized by this section; however, if the certification application is withdrawn, the remaining sums shall be refunded to the applicant within 90 days after submittal of the written notification of withdrawal.

(2)  An amendment fee.

(a)  If no corridor alignment change is proposed by the amendment, no amendment fee shall be charged.

(b)  If a corridor alignment change under s. 403.5275 is proposed by the applicant, an additional fee of a minimum of $2,000 and $750 per mile shall be submitted to the department for use in accordance with this act.

(c)  If an amendment is required to address issues, including alternate corridors under s. 403.5271, raised by the department or other parties, no fee for the amendment shall be charged.

(3)  A certification modification fee.

(a)  If no corridor alignment change is proposed by the licensee, the modification fee shall be $4,000.

(b)  If a corridor alignment change is proposed by the licensee, the fee shall be $1,000 for each mile of realignment plus an amount not to exceed $10,000 to be fixed by rule on a sliding scale based on the load-carrying capability and configuration of the transmission line for use in accordance with subsection (1).

History.—s. 44, ch. 90-331; s. 14, ch. 93-94; s. 393, ch. 94-356; s. 66, ch. 96-321; s. 211, ch. 99-245; s. 14, ch. 2006-79; s. 65, ch. 2006-230; s. 93, ch. 2008-227.

### 403.537   Determination of need for transmission line; powers and duties.—

(1)(a)   Upon request by an applicant or upon its own motion, the Florida Public Service Commission shall schedule a public hearing, after notice, to determine the need for a transmission line regulated by the Florida Electric Transmission Line Siting Act, ss. 403.52-403.5365. The notice shall be published at least 21 days before the date set for the hearing and shall be published by the applicant in at least one-quarter page size notice in newspapers of general circulation, and by the commission in the manner specified in chapter 120, by giving notice to counties and regional planning councils in whose jurisdiction the transmission line could be placed, and by giving notice to any persons who have requested to be placed on the mailing list of the commission for this purpose. Within 21 days after receipt of a request for determination by an applicant, the commission shall set a date for the hearing. The hearing shall be held pursuant to s. 350.01 within 45 days after the filing of the request, and a decision shall be rendered within 60 days after such filing.

(b)   The commission shall be the sole forum in which to determine the need for a transmission line. The need for a transmission line may not be raised or be the subject of review in another proceeding.

(c)   In the determination of need, the commission shall take into account the need for electric system reliability and integrity, the need for abundant, low-cost electrical energy to assure the economic well-being of the residents of this state, the appropriate starting and ending point of the line, and other matters within its jurisdiction deemed relevant to the determination of need. The appropriate starting and ending points of the electric transmission line must be verified by the commission in its determination of need.

(d)   The determination by the commission of the need for the transmission line, as defined in s. 403.522(22), is binding on all parties to any certification proceeding under the Florida Electric Transmission Line Siting Act and is a condition precedent to the conduct of the certification hearing prescribed therein. An order entered pursuant to this section constitutes final agency action.

(2)   The commission shall have the following powers and duties:

(a)   To adopt or amend reasonable procedural rules to implement the provisions of this section.

(b)   To prescribe the form, content, and necessary supporting documentation and the required studies for the determination of need.

(3)   Any time limitation in this section may be altered by the commission upon stipulation between the commission and the applicant or for good cause shown by any party.

History.—s. 3, ch. 80-65; s. 13, ch. 81-131; s. 19, ch. 83-222; s. 45, ch. 90-331; s. 66, ch. 2006-230.

### 403.539   Certification admissible in eminent domain proceedings; attorney's fees and costs.—

(1)   Certification pursuant to ss. 403.52-403.5365 shall be admissible as evidence of public need and necessity in proceedings under chapter 73 or chapter 74.

(2)   No party may rely on this section or any provision of chapter 73 or chapter 74 to request the award of attorney's fees or costs incurred as a result of participation in the certification proceeding.

History.—s. 2, ch. 80-65; s. 20, ch. 83-222; s. 46, ch. 90-331.

PART III

INTERSTATE ENVIRONMENTAL

CONTROL COMPACT

403.60   Environmental Control Compact; execution authorized.

### 403.60   Environmental Control Compact; execution authorized.—The Governor on behalf of this state is hereby authorized to execute a compact, in substantially the following form, with any one or more of the states of the United States, and the Legislature hereby signifies in advance its approval and ratification of such compact:

MEMBER JURISDICTION.—The environmental compact is entered into with all jurisdictions legally joining therein and enacted into law in the following form:

INTERSTATE ENVIRONMENTAL COMPACT

## ARTICLE I

FINDINGS, PURPOSES AND RESERVATIONS OF POWERS.—

A. Findings.—Signatory states hereby find and declare:

1. The environment of every state is affected with local, state, regional and national interests and its protection, under appropriate arrangements for intergovernmental cooperation, is a public purpose of the respective signatories.

2. Certain environmental pollution problems transcend state boundaries and thereby become common to adjacent states requiring cooperative efforts.

3. The environment of each state is subject to the effective control of the signatories, and coordinated, cooperative or joint exercise of control measures is in their common interests.

B. Purposes.—The purposes of the signatories in enacting this compact are:

1. To assist and participate in the national environment protection programs as set forth in federal legislation; to promote intergovernmental cooperation for multistate action relating to environmental protection through interstate agreements; and to encourage cooperative and coordinated environmental protection by the signatories and the Federal Government;

2. To preserve and utilize the functions, powers and duties of existing state agencies of government to the maximum extent possible consistent with the purposes of the compact.

C. Powers of the United States.—

1. Nothing contained in this compact shall impair, affect or extend the constitutional authority of the United States.

2. The signatories hereby recognize the power and right of the Congress of the United States at any time by any statute expressly enacted for that purpose to revise the terms and conditions of its consent.

D. Powers of the states.—Nothing contained in this compact shall impair or extend the constitutional authority of any signatory state, nor shall the police powers of any signatory state be affected except as expressly provided in a supplementary agreement under Article IV.

## ARTICLE II

SHORT TITLE, DEFINITIONS, PURPOSES AND LIMITATIONS.—

A. Short title.—This compact shall be known and may be cited as the "Interstate Environmental Compact."

B. Definitions.—For the purpose of this compact and of any supplemental or concurring legislation enacted pursuant or in relation hereto, except as may be otherwise required by the context:

1. "State" shall mean any one of the 50 states of the United States of America, the Commonwealth of Puerto Rico and the Territory of the Virgin Islands, but shall not include the District of Columbia.

2. "Interstate environment pollution" shall mean any pollution of a stream or body of water crossing or marking a state boundary, interstate air quality control region designated by an appropriate federal agency or solid waste collection and disposal district or program involving the jurisdiction or territories of more than one state.

3. "Government" shall mean the governments of the United States and the signatory states.

4. "Federal Government" shall mean the government of the United States of America and any appropriate department, instrumentality, agency, commission, bureau, division, branch or other unit thereof, as the case may be, but shall not include the District of Columbia.

5. "Signator" shall mean any state which enters into this compact and is a party thereto.

## ARTICLE III

INTERGOVERNMENTAL COOPERATION.—

Agreements with the Federal Government and other agencies.—Signatory states are hereby authorized jointly to participate in cooperative or joint undertakings for the protection of the interstate environment with the Federal

Government or with any intergovernmental or interstate agencies.

ARTICLE IV

SUPPLEMENTARY AGREEMENTS, JURISDICTION AND ENFORCEMENT.—

A. Signatories may enter into agreements for the purpose of controlling interstate environmental problems in accordance with applicable federal legislation and under terms and conditions as deemed appropriate by the agreeing states under Paragraph F. and Paragraph H. of this Article.

B. Recognition of existing nonenvironmental intergovernmental arrangements.—The signatories agree that existing federal-state, interstate or intergovernmental arrangements which are not primarily directed to environmental protection purposes as defined herein are not affected by this compact.

C. Recognition of existing intergovernmental agreements directed to environmental objectives.—All existing interstate compacts directly relating to environmental protection are hereby expressly recognized and nothing in this compact shall be construed to diminish or supersede the powers and functions of such existing intergovernmental agreements and the organizations created by them.

D. Modification of existing commissions and compacts.—Recognition herein of multistate commissions and compacts shall not be construed to limit directly or indirectly the creation of additional multistate organizations or interstate compacts, nor to prevent termination, modification, extension, or supplementation of such multistate organizations and interstate compacts recognized herein by the Federal Government or states party thereto.

E. Recognition of future multistate commissions and interstate compacts.—Nothing in this compact shall be construed to prevent signatories from entering into multistate organizations or other interstate compacts which do not conflict with their obligations under this compact.

F. Supplementary agreements.—Any two or more signatories may enter into supplementary agreements for joint, coordinated or mutual environmental management activities relating to interstate pollution problems common to the territories of such states and for the establishment of common or joint regulation, management, services, agencies or facilities for such purposes or may designate an appropriate agency to act as their joint agency in regard thereto. No supplementary agreement shall be valid to the extent that it conflicts with the purposes of this compact and the creation of a joint agency by supplementary agreement shall not affect the privileges, powers, responsibilities or duties under this compact of signatories participating therein as embodied in this compact.

G. Execution of supplementary agreements and effective date.—The Governor is authorized to enter into supplementary agreements for the state and his or her official signature shall render the agreement immediately binding upon the state; provided that:

1. The legislature of any signatory entering into such a supplementary agreement shall at its next legislative session by concurrent resolution bring the supplementary agreement before it and by appropriate legislative action approve, reverse, modify or condition the agreement of that state.

2. Nothing in this agreement shall be construed to limit the right of Congress by act of law expressly enacted for that purpose to disapprove or condition a supplementary agreement.

H. Special supplementary agreements.—Signatories may enter into special supplementary agreements with the District of Columbia or foreign nations for the same purposes and with the same powers as under Paragraph F., Article IV, upon the condition that such nonsignatory party accept the general obligations of signatories under this compact. Provided, that such special supplementary agreements shall become effective only after being consented to by the Congress.

I. Jurisdiction of signatories reserved.—Nothing in this compact or in any supplementary agreement thereunder shall be construed to restrict, relinquish or be in derogation of, any power or authority constitutionally possessed by any signatory within its jurisdiction, except as specifically limited by this compact or a supplementary agreement.

J. Complementary legislation by signatories.—Signatories may enact such additional legislation as may be deemed appropriate to enable its officers and governmental agencies to accomplish effectively the purposes of this

compact and supplementary agreements recognized or entered into under the terms of this Article.

K.   Legal rights of signatories.—Nothing in this compact shall impair the exercise by any signatory of its legal rights or remedies established by the United States Constitution or any other laws of this nation.

ARTICLE V

CONSTRUCTION, AMENDMENT AND EFFECTIVE DATE.—

A.   Construction.—It is the intent of the signatories that no provision of this compact or supplementary agreement entered into hereunder shall be construed as invalidating any provision of law of any signatory and that nothing in this compact shall be construed to modify or qualify the authority of any signatory to enact or enforce environmental protection legislation within its jurisdiction and not inconsistent with any provision of this compact or a supplementary agreement entered into pursuant hereto.

B.   Severability.—The provisions of this compact or of agreements hereunder shall be severable and if any phrase, clause, sentence or provisions of this compact, or such an agreement is declared to be contrary to the constitution of any signatory or of the United States or is held invalid, the constitutionality of the remainder of this compact or of any agreement and the applicability thereof to any participating jurisdiction, agency, person or circumstance shall not be affected thereby and shall remain in full force and effect as to the remaining participating jurisdictions and in full force and effect as to the signatory affected as to all severable matters. It is the intent of the signatories that the provisions of this compact shall be reasonably and liberally construed in the context of its purposes.

C.   Amendments.—Amendments to this compact may be initiated by legislative action of any signatory and become effective when concurred in by all signatories and approved by Congress.

D.   Effective date.—This compact shall become binding on a state when enacted by it into law and such state shall thereafter become a signatory and party hereto with any and all states legally joining herein.

E.   Withdrawal from the compact.—A state may withdraw from this compact by authority of an act of its legislature 1 year after it notifies all signatories in writing of an intention to withdraw from the compact. Provided, withdrawal from the compact affects obligations of a signatory imposed on it by supplementary agreements to which it may be a party only to the extent and in accordance with the terms of such supplementary agreements.

**History.**—s. 1, ch. 71-79; s. 13, ch. 97-103.

PART IV
RESOURCE RECOVERY AND MANAGEMENT

403.702   Legislative findings; public purpose.

403.703   Definitions.

403.7031   Limitations on definitions adopted by local ordinance.

403.7032   Recycling.

403.7033   Departmental analysis of particular recyclable materials.

403.704   Powers and duties of the department.

403.7043   Compost standards and applications.

403.7045   Application of act and integration with other acts.

403.7046   Regulation of recovered materials.

403.7047   Regulation of fossil fuel combustion products.

403.7049   Determination of full cost for solid waste management; local solid waste management fees.

403.705   State solid waste management program.

403.7055   Methane capture.

403.706   Local government solid waste responsibilities.

403.70605   Solid waste collection services in competition with private companies.

403.7061   Requirements for review of new waste-to-energy facility capacity by the Department of Environmental Protection.

403.70611   Requirements relating to solid waste disposal facility permitting.

403.7063   Use of private services in solid waste management.

403.7065   Procurement of products or materials with recycled content.

403.707   Permits.

403.7071   Management of storm-generated debris.

403.70715   Research, development, and demonstration permits.

403.7072   Citation of rule.

403.708   Prohibition; penalty.

403.709   Solid Waste Management Trust Fund; use of waste tire fees.

403.7095   Solid waste management grant program.

403.712   Revenue bonds.

403.7125   Financial assurance.

403.713   Ownership and control of solid waste and recovered materials.

403.714   Duties of state agencies.

403.7145   Recycling.

403.715   Certification of resource recovery or recycling equipment.

403.716   Training of operators of solid waste management and other facilities.

403.717   Waste tire and lead-acid battery requirements.

403.718   Waste tire fees.

403.7185   Lead-acid battery fees.

403.71851   Electronic recycling grants.

403.71852   Collection of lead-containing products.

403.7186   Environmentally sound management of mercury-containing devices and lamps.

403.7191   Toxics in packaging.

403.7192   Batteries; requirements for consumer, manufacturers, and sellers; penalties.

403.7193   Environmental representations.

403.72   Identification, listing, and notification.

403.721   Standards, requirements, and procedures for generators and transporters of hazardous waste and owners and operators of hazardous waste facilities.

403.7211   Hazardous waste facilities managing hazardous wastes generated offsite; federal facilities managing hazardous waste.

403.7215   Tax on gross receipts of commercial hazardous waste facilities.

403.722   Permits; hazardous waste disposal, storage, and treatment facilities.

403.7222   Prohibition of hazardous waste landfills.

403.7223   Waste elimination and reduction assistance program.

403.7225   Local hazardous waste management assessments.

403.7226   Technical assistance by the department.

403.723   Siting of hazardous waste facilities.

403.7234   Small quantity generator notification and verification program.

403.7236   Local government information to be sent to the department.

403.7238   Expanded local hazardous waste management programs.

403.724   Financial responsibility.

403.7255   Placement of signs.

403.726   Abatement of imminent hazard caused by hazardous substance.

403.7264   Amnesty days for purging small quantities of hazardous wastes.

403.7265   Local hazardous waste collection program.

403.727   Violations; defenses, penalties, and remedies.

403.728   Qualifications of operation personnel of hazardous waste facilities.

403.73   Trade secrets; confidentiality.

403.74   Management of hazardous materials by governmental agencies.

403.75   Definitions relating to used oil.

403.751   Prohibited actions; used oil.

403.753   Public educational program about collection and recycling of used oil.

403.7531   Notice by retail dealer.

403.754   Registration of persons transporting, processing, burning, or marketing used oil; fees; reports and records.

403.7545   Regulation of used oil as hazardous waste.

403.757   Coordination with other state agencies.

403.758   Enforcement and penalty.

403.759   Disposition of fees, fines, and penalties.

403.760   Public used oil collection centers.

403.761   Incentives program.

403.763   Grants to local governments.

403.767   Certification of used oil transporters.

403.769   Permits for used oil processing and rerefining facilities.

403.7721   Rule of construction; chs. 85-269 and 85-277.

**403.702    Legislative findings; public purpose.**—

(1)    In order to enhance the beauty and quality of our environment; conserve and recycle our natural resources; prevent the spread of disease and the creation of nuisances; protect the public health, safety, and welfare; and provide a coordinated statewide solid waste management program, the Legislature finds that:

(a)    Inefficient and improper methods of managing solid waste create hazards to public health, cause pollution of air and water resources, constitute a waste of natural resources, have an adverse effect on land values, and create public nuisances.

(b)    Problems of solid waste management have become a matter statewide in scope and necessitate state action to assist local government in improving methods and processes to promote more efficient methods of solid waste collection and disposal.

(c)    The continuing technological progress and improvements in methods of manufacture, packaging, and marketing of consumer products have resulted in an ever-mounting increase of the mass of material discarded by the purchasers of such products, thereby necessitating a statewide approach to assist local governments around the state with their solid waste management programs.

(d)    The economic and population growth of our state and the improvements in the standard of living enjoyed by our population have required increased industrial production together with related commercial and agricultural operations to meet our needs, which have resulted in a rising tide of unwanted and discarded materials.

(e)    The failure or inability to economically recover material and energy resources from solid waste results in the unnecessary waste and depletion of our natural resources, and, therefore, maximum resource recovery from solid waste and maximum recycling and reuse of such resources must be considered goals of the state.

(f)    Certain solid waste, due to its quantity; concentration; or physical, chemical, biological, or infectious characteristics, is hazardous to human health, safety, and welfare and to the environment, and exceptional attention to the transportation, disposal, storage, and treatment of such waste is necessary to protect human health, safety, and welfare and the environment.

(g)    This act should be integrated with other acts and parts of this chapter such that nonhazardous waste discharges currently regulated under this chapter, water or solid waste construction, modification, or operating permits, air emissions, special wastes, and other activities regulated under other more appropriate provisions of law remain in full force and effect and are not preempted by the requirements of this act.

(2)    It is declared to be the purpose of this act to:

(a)    Plan for and regulate in the most economically feasible, cost-effective, and environmentally safe manner the storage, collection, transport, separation, processing, recycling, and disposal of solid waste in order to protect

the public safety, health, and welfare; enhance the environment for the people of this state; and recover resources which have the potential for further usefulness.

(b)   Establish and maintain a cooperative state program of planning and technical and financial assistance for solid waste management.

(c)   Provide the authority and require counties and municipalities to adequately plan and provide efficient, environmentally acceptable solid waste management and require counties to plan for proper hazardous waste management.

(d)   Require review of the design, and issue permits for the construction, operation, and closure of solid waste management facilities.

(e)   Promote the application of resource recovery systems which preserve and enhance the quality of air, water, and land resources.

(f)   Ensure that hazardous waste is transported, disposed of, stored, and treated in a manner adequate to protect human health, safety, and welfare and the environment.

(g)   Promote the reduction, recycling, reuse, or treatment of solid waste, specifically including hazardous waste, in lieu of disposal of such wastes.

(h)   Promote the application of methods and technology for the treatment, disposal, and transportation of hazardous wastes which are practical, cost-effective, and economically feasible.

(i)   Encourage counties and municipalities to utilize all means reasonably available to promote efficient and proper methods of managing solid waste and to promote the economical recovery of material and energy resources from solid waste, including, but not limited to, contracting with persons to provide or operate resource recovery services or facilities on behalf of the county or municipality.

(j)   Promote the education of the general public and the training of solid waste professionals to reduce the production of solid waste, to ensure proper disposal of solid waste, and to encourage recycling.

(k)   Encourage the development of waste reduction and recycling as a means of managing solid waste, conserving resources, and supplying energy through planning, grants, technical assistance, and other incentives.

(l)   Encourage the development of the state's recycling industry by promoting the successful development of markets for recycled items and by promoting the acceleration and advancement of the technology used in manufacturing processes that use recycled items.

(m)   Require all state agencies to aid and promote the development of recycling through their procurement policies for the general welfare and economy of the state.

(n)   Require counties to develop and implement recycling programs within their jurisdictions to return valuable materials to productive use, to conserve energy and natural resources, and to protect capacity at solid waste management facilities.

(o)   Ensure that biomedical waste is treated and disposed of in a manner adequate to protect human health, safety, and welfare and the environment.

(p)   Require counties, municipalities, and state agencies to determine the full cost for providing, in an environmentally safe manner, storage, collection, transport, separation, processing, recycling, and disposal of solid waste material, and encourage counties, municipalities, and state agencies affected to contract with private persons for any or all such services in order to assure that such services are provided on the most cost-effective basis.

History.—s. 1, ch. 74-342; s. 3, ch. 80-302; s. 20, ch. 83-310; s. 30, ch. 84-338; s. 3, ch. 87-107; s. 2, ch. 88-130; s. 7, ch. 93-207; s. 2, ch. 96-284.

**403.703   Definitions.**—As used in this part, the term:

(1)   "Ash residue" has the same meaning as in the department rule governing solid waste combustors which defines the term.

(2)   "Biological waste" means solid waste that causes or has the capability of causing disease or infection and includes, but is not limited to, biomedical waste, diseased or dead animals, and other wastes capable of

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 139 of 694

transmitting pathogens to humans or animals. The term does not include human remains that are disposed of by persons licensed under chapter 497.

(3) "Biomedical waste" means any solid waste or liquid waste that may present a threat of infection to humans. The term includes, but is not limited to, nonliquid human tissue and body parts; laboratory and veterinary waste that contains human-disease-causing agents; discarded disposable sharps; human blood and human blood products and body fluids; and other materials that in the opinion of the Department of Health represent a significant risk of infection to persons outside the generating facility. The term does not include human remains that are disposed of by persons licensed under chapter 497.

(4) "Clean debris" means any solid waste that is virtually inert, that is not a pollution threat to groundwater or surface waters, that is not a fire hazard, and that is likely to retain its physical and chemical structure under expected conditions of disposal or use. The term includes uncontaminated concrete, including embedded pipe or steel, brick, glass, ceramics, and other wastes designated by the department.

(5) "Closure" means the cessation of operation of a solid waste management facility and the act of securing such facility so that it will pose no significant threat to human health or the environment and includes long-term monitoring and maintenance of a facility if required by department rule.

(6) "Construction and demolition debris" means discarded materials generally considered to be not water-soluble and nonhazardous in nature, including, but not limited to, steel, glass, brick, concrete, asphalt roofing material, pipe, gypsum wallboard, and lumber, from the construction or destruction of a structure as part of a construction or demolition project or from the renovation of a structure, and includes rocks, soils, tree remains, trees, and other vegetative matter that normally results from land clearing or land development operations for a construction project, including such debris from construction of structures at a site remote from the construction or demolition project site. Mixing of construction and demolition debris with other types of solid waste will cause the resulting mixture to be classified as other than construction and demolition debris. The term also includes:

(a) Clean cardboard, paper, plastic, wood, and metal scraps from a construction project;

(b) Except as provided in s. 403.707(9)(j), yard trash and unpainted, nontreated wood scraps and wood pallets from sources other than construction or demolition projects;

(c) Scrap from manufacturing facilities which is the type of material generally used in construction projects and which would meet the definition of construction and demolition debris if it were generated as part of a construction or demolition project. This includes debris from the construction of manufactured homes and scrap shingles, wallboard, siding concrete, and similar materials from industrial or commercial facilities; and

(d) De minimis amounts of other nonhazardous wastes that are generated at construction or destruction projects, provided such amounts are consistent with best management practices of the industry.

(7) "County," or any like term, means a political subdivision of the state established pursuant to s. 1, Art. VIII of the State Constitution and, when s. 403.706(19) applies, means a special district or other entity.

(8) "Department" means the Department of Environmental Protection or any successor agency performing a like function.

(9) "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or upon any land or water so that such solid waste or hazardous waste or any constituent thereof may enter other lands or be emitted into the air or discharged into any waters, including groundwaters, or otherwise enter the environment.

(10) "Gasification" means a process through which post-use polymers are heated and converted to synthesis gas in an oxygen-deficient atmosphere, and then converted to crude oil, fuels, or chemical feedstocks.

(11) "Generation" means the act or process of producing solid or hazardous waste.

(12) "Guarantor" means any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator under this part.

(13) "Hazardous substance" means any substance that is defined as a hazardous substance in the United States Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 94 Stat. 2767.

(14) "Hazardous waste" means solid waste, or a combination of solid wastes, which, because of its quantity, concentration, or physical, chemical, or infectious characteristics, may cause, or significantly contribute to, an

increase in mortality or an increase in serious irreversible or incapacitating reversible illness or may pose a substantial present or potential hazard to human health or the environment when improperly transported, disposed of, stored, treated, or otherwise managed. The term does not include human remains that are disposed of by persons licensed under chapter 497.

(15)  "Hazardous waste facility" means any building, site, structure, or equipment at or by which hazardous waste is disposed of, stored, or treated.

(16)  "Hazardous waste management" means the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, recycling, and disposal of hazardous waste.

(17)  "Land disposal" means any placement of hazardous waste in or on the land and includes, but is not limited to, placement in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt bed formation, salt dome formation, or underground mine or cave, or placement in a concrete vault or bunker intended for disposal purposes.

(18)  "Landfill" means any solid waste land disposal area for which a permit, other than a general permit, is required by s. 403.707 and which receives solid waste for disposal in or upon land. The term does not include a land-spreading site, an injection well, a surface impoundment, or a facility for the disposal of construction and demolition debris.

(19)  "Manifest" means the recordkeeping system used for identifying the concentration, quantity, composition, origin, routing, and destination of hazardous waste during its transportation from the point of generation to the point of disposal, storage, or treatment.

(20)  "Materials recovery facility" means a solid waste management facility that provides for the extraction from solid waste of recyclable materials, materials suitable for use as a fuel or soil amendment, or any combination of such materials.

(21)  "Municipality," or any like term, means a municipality created pursuant to general or special law authorized or recognized pursuant to s. 2 or s. 6, Art. VIII of the State Constitution and, when s. 403.706(19) applies, means a special district or other entity.

(22)  "Operation," with respect to any solid waste management facility, means the disposal, storage, or processing of solid waste at and by the facility.

(23)  "Person" means any and all persons, natural or artificial, including any individual, firm, or association; any municipal or private corporation organized or existing under the laws of this state or any other state; any county of this state; and any governmental agency of this state or the Federal Government.

(24)  "Post-use polymer" means a plastic polymer that is derived from any domestic, commercial, or municipal activity and which might otherwise become waste if not converted to manufacture crude oil, fuels, or other raw materials or intermediate or final products using gasification or pyrolysis. As used in this part, post-use polymer may contain incidental contaminants or impurities, such as paper labels or metal rings. Post-use polymers intended to be converted as described in this subsection are not solid waste.

(25)  "Processing" means any technique designed to change the physical, chemical, or biological character or composition of any solid waste so as to render it safe for transport; amenable to recovery, storage, or recycling; safe for disposal; or reduced in volume or concentration.

(26)  "Pyrolysis" means a process through which post-use polymers are heated in the absence of oxygen until melted and thermally decomposed, and then cooled, condensed, and converted to any of the following:

(a)  Crude oil, diesel, gasoline, home heating oil, or another fuel.

(b)  Feedstocks.

(c)  Diesel and gasoline blendstocks.

(d)  Chemicals, waxes, or lubricants.

(e)  Other raw materials or intermediate or final products.

(27)  "Pyrolysis facility" means a facility that receives, separates, stores, and converts post-use polymers, using gasification or pyrolysis. A pyrolysis facility meeting the conditions of s. 403.7045(1)(e) is not a solid waste management facility.

(28) "Recovered materials" means metal, paper, glass, plastic, textile, or rubber materials that have known recycling potential, can be feasibly recycled, and have been diverted and source separated or have been removed from the solid waste stream for sale, use, or reuse as raw materials, whether or not the materials require subsequent processing or separation from each other, but the term does not include materials destined for any use that constitutes disposal. Recovered materials as described in this subsection are not solid waste.

(29) "Recovered materials processing facility" means a facility engaged solely in the storage, processing, resale, or reuse of recovered materials. Such a facility is not a solid waste management facility if it meets the conditions of s. 403.7045(1)(e).

(30) "Recyclable material" means those materials that are capable of being recycled and that would otherwise be processed or disposed of as solid waste.

(31) "Recycling" means any process by which solid waste, or materials that would otherwise become solid waste, are collected, separated, or processed and reused or returned to use in the form of raw materials or intermediate or final products. Such raw materials or intermediate or final products include, but are not limited to, crude oil, fuels, and fuel substitutes.

(32) "Resource recovery" means the process of recovering materials or energy from solid waste, excluding those materials or solid waste under the control of the Nuclear Regulatory Commission.

(33) "Resource recovery equipment" means equipment or machinery exclusively and integrally used in the actual process of recovering material or energy resources from solid waste.

(34) "Sludge" includes the accumulated solids, residues, and precipitates generated as a result of waste treatment or processing, including wastewater treatment, water supply treatment, or operation of an air pollution control facility, and mixed liquids and solids pumped from septic tanks, grease traps, privies, or similar waste disposal appurtenances.

(35) "Special wastes" means solid wastes that can require special handling and management, including, but not limited to, white goods, waste tires, used oil, lead-acid batteries, construction and demolition debris, ash residue, yard trash, and biological wastes.

(36) "Solid waste" means sludge unregulated under the federal Clean Water Act or Clean Air Act, sludge from a waste treatment works, water supply treatment plant, or air pollution control facility, or garbage, rubbish, refuse, special waste, or other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from domestic, industrial, commercial, mining, agricultural, or governmental operations. Recovered materials as defined in subsection (28) and post-use polymers as defined in subsection (24) are not solid waste.

(37) "Solid waste disposal facility" means any solid waste management facility that is the final resting place for solid waste, including landfills and incineration facilities that produce ash from the process of incinerating municipal solid waste.

(38) "Solid waste management" means the process by which solid waste is collected, transported, stored, separated, processed, or disposed of in any other way according to an orderly, purposeful, and planned program, which includes closure.

(39) "Solid waste management facility" means any solid waste disposal area, volume reduction plant, transfer station, materials recovery facility, or other facility, the purpose of which is resource recovery or the disposal, recycling, processing, or storage of solid waste. The term does not include recovered materials processing facilities or pyrolysis facilities that meet the requirements of s. 403.7046, except the portion of such facilities, if any, which is used for the management of solid waste.

(40) "Source separated" means that the recovered materials are separated from solid waste at the location where the recovered materials and solid waste are generated. The term does not require that various types of recovered materials be separated from each other, and recognizes de minimis solid waste, in accordance with industry standards and practices, may be included in the recovered materials. Materials are not considered source separated when two or more types of recovered materials are deposited in combination with each other in a commercial collection container located where the materials are generated and when such materials contain more than 10 percent solid waste by volume or weight. For purposes of this subsection, the term "various types of recovered materials" means metals, paper, glass, plastic, textiles, and rubber.

(41)   "Storage" means the containment or holding of a hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste.

(42)   "Transfer station" means a site the primary purpose of which is to store or hold solid waste for transport to a processing or disposal facility.

(43)   "Transport" means the movement of hazardous waste from the point of generation or point of entry into the state to any offsite intermediate points and to the point of offsite ultimate disposal, storage, treatment, or exit from the state.

(44)   "Treatment," when used in connection with hazardous waste, means any method, technique, or process, including neutralization, which is designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize it or render it nonhazardous, safe for transport, amenable to recovery, amenable to storage or disposal, or reduced in volume or concentration. The term includes any activity or processing that is designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

(45)   "Volume reduction plant" includes incinerators, pulverizers, compactors, shredding and baling plants, composting plants, and other plants that accept and process solid waste for recycling or disposal.

(46)   "White goods" includes discarded air conditioners, heaters, refrigerators, ranges, water heaters, freezers, and other similar domestic and commercial large appliances.

(47)   "Yard trash" means vegetative matter resulting from landscaping maintenance and land clearing operations and includes associated rocks and soils.

History.—s. 1, ch. 74-342; s. 2, ch. 78-329; s. 1, ch. 78-387; s. 84, ch. 79-65; s. 4, ch. 80-302; s. 1, ch. 81-45; s. 267, ch. 81-259; s. 31, ch. 83-310; s. 33, ch. 84-338; s. 31, ch. 86-186; s. 3, ch. 88-130; s. 67, ch. 90-331; s. 2, ch. 92-104; s. 8, ch. 93-207; s. 394, ch. 94-356; s. 1, ch. 96-381; s. 54, ch. 97-237; s. 160, ch. 99-8; s. 30, ch. 2000-153; s. 18, ch. 2000-211; s. 1, ch. 2000-221; s. 2, ch. 2002-291; s. 139, ch. 2004-301; s. 6, ch. 2007-184; s. 1, ch. 2017-167.

**403.7031    Limitations on definitions adopted by local ordinance.**—A county or a municipality shall not adopt by ordinance any definition that is inconsistent with the definitions in s. 403.703.

History.—s. 9, ch. 93-207.

**403.7032    Recycling.**—

(1)   The Legislature finds that the failure or inability to economically recover material and energy resources from solid waste results in the unnecessary waste and depletion of our natural resources. As the state continues to grow, so will the potential amount of discarded material that must be treated and disposed of, necessitating the improvement of solid waste collection and disposal. Therefore, the maximum recycling and reuse of such resources are considered high-priority goals of the state.

(2)   By the year 2020, the long-term goal for the recycling efforts of state and local governmental entities, private companies and organizations, and the general public is to recycle at least 75 percent of the municipal solid waste that would otherwise be disposed of in waste management facilities, landfills, or incineration facilities. However, any solid waste used for the production of renewable energy shall count toward the long-term recycling goal as set forth in this part.

(3)   Each state agency, public institution of higher learning, community college, and state university, including all buildings that are occupied by municipal, county, or state employees and entities occupying buildings managed by the Department of Management Services, must, at a minimum, annually report all recycled materials to the county using the department's designated reporting format. Private businesses, other than certified recovered materials dealers, that recycle paper, metals, glass, plastics, textiles, rubber materials, and mulch, are encouraged to report the amount of materials they recycle to the county annually beginning January 1, 2011, using the department's designated reporting format. Using the information provided, the department shall recognize those private businesses that demonstrate outstanding recycling efforts. Notwithstanding any other provision of state or county law, private businesses, other than certified recovered materials dealers, shall not be required to report recycling rates. Cities with less than a population of 2,500 and per capita taxable value less than $48,000

and cities with a per capita taxable value less than $30,000 are exempt from the reporting requirement specified in this subsection.

(4)  The Department of Environmental Protection shall develop a comprehensive recycling program that is designed to achieve the percentage under subsection (2) and submit the program to the President of the Senate and the Speaker of the House of Representatives by January 1, 2010. The program may not be implemented until approved by the Legislature. The program must be developed in coordination with input from state and local entities, private businesses, and the public. Under the program, recyclable materials shall include, but are not limited to, metals, paper, glass, plastic, textile, rubber materials, and mulch. Components of the program shall include, but are not limited to:

(a)  Programs to identify environmentally preferable purchasing practices to encourage the purchase of recycled, durable, and less toxic goods. The Department of Management Services shall modify its procurement system to report on green and recycled products purchased through the system by September 30, 2011.

(b)  Programs to educate students in grades K-12 in the benefits of, and proper techniques for, recycling.

(c)  Programs for statewide recognition of successful recycling efforts by schools, businesses, public groups, and private citizens.

(d)  Programs for municipalities and counties to develop and implement efficient recycling efforts to return valuable materials to productive use, conserve energy, and protect natural resources.

(e)  Programs by which the department can provide technical assistance to municipalities and counties in support of their recycling efforts.

(f)  Programs to educate and train the public in proper recycling efforts.

(g)  Evaluation of how financial assistance can best be provided to municipalities and counties in support of their recycling efforts.

(h)  Evaluation of why existing waste management and recycling programs in the state have not been better used.

(5)  The Department of Environmental Protection shall create the Recycling Business Assistance Center by December 1, 2010. In carrying out its duties under this subsection, the department shall consult with state agency personnel appointed to serve as economic development liaisons under s. 288.021 and seek technical assistance from Enterprise Florida, Inc., to ensure the Recycling Business Assistance Center is positioned to succeed. The purpose of the center shall be to serve as the mechanism for coordination among state agencies and the private sector in order to coordinate policy and overall strategic planning for developing new markets and expanding and enhancing existing markets for recyclable materials in this state, other states, and foreign countries. The duties of the center must include, at a minimum:

(a)  Identifying and developing new markets and expanding and enhancing existing markets for recyclable materials.

(b)  Pursuing expanded end uses for recycled materials.

(c)  Targeting materials for concentrated market development efforts.

(d)  Developing proposals for new incentives for market development, particularly focusing on targeted materials.

(e)  Providing guidance on issues such as permitting, finance options for recycling market development, site location, research and development, grant program criteria for recycled materials markets, recycling markets education and information, and minimum content.

(f)  Coordinating the efforts of various governmental entities having market development responsibilities in order to optimize supply and demand for recyclable materials.

(g)  Evaluating source-reduced products as they relate to state procurement policy. The evaluation shall include, but is not limited to, the environmental and economic impact of source-reduced product purchases to the state. For the purposes of this paragraph, the term "source-reduced" means any method, process, product, or technology that significantly or substantially reduces the volume or weight of a product while providing, at a minimum, equivalent or generally similar performance and service to and for the users of such materials.

(h)   Providing evaluation of solid waste management grants, pursuant to s. 403.7095, to reduce the flow of solid waste to disposal facilities and encourage the sustainable recovery of materials from Florida's waste stream.

(i)   Providing below-market financing for companies that manufacture products from recycled materials or convert recyclable materials into raw materials for use in manufacturing pursuant to the Florida Recycling Loan Program as administered by the Florida First Capital Finance Corporation.

(j)   Maintaining a continuously updated online directory listing the public and private entities that collect, transport, broker, process, or remanufacture recyclable materials in the state.

(k)   Providing information on the availability and benefits of using recycled materials to private entities and industries in the state.

(l)   Distributing any materials prepared in implementing this subsection to the public, private entities, industries, governmental entities, or other organizations upon request.

(m)   Coordinating with the Department of Economic Opportunity and its partners to provide job placement and job training services to job seekers through the state's workforce services programs.

History.—s. 95, ch. 2008-227; s. 3, ch. 2010-143; s. 31, ch. 2011-4; s. 293, ch. 2011-142; s. 1, ch. 2013-35; s. 4, ch. 2016-174.

**403.7033   Departmental analysis of particular recyclable materials.**—The Legislature finds that prudent regulation of recyclable materials is crucial to the ongoing welfare of Florida's ecology and economy. As such, the Department of Environmental Protection shall undertake an analysis of the need for new or different regulation of auxiliary containers, wrappings, or disposable plastic bags used by consumers to carry products from retail establishments. The analysis shall include input from state and local government agencies, stakeholders, private businesses, and citizens, and shall evaluate the efficacy and necessity of both statewide and local regulation of these materials. To ensure consistent and effective implementation, the department shall submit a report with conclusions and recommendations to the Legislature no later than February 1, 2010. Until such time that the Legislature adopts the recommendations of the department, no local government, local governmental agency, or state government agency may enact any rule, regulation, or ordinance regarding use, disposition, sale, prohibition, restriction, or tax of such auxiliary containers, wrappings, or disposable plastic bags.

History.—s. 96, ch. 2008-227.

**403.704   Powers and duties of the department.**—The department shall have responsibility for the implementation and enforcement of this act. In addition to other powers and duties, the department shall:

(1)   Develop and implement, in consultation with local governments, a state solid waste management program, as defined in s. 403.705.

(2)   Provide technical assistance to counties, municipalities, and other persons, and cooperate with appropriate federal agencies and private organizations in carrying out this act.

(3)   Promote the planning and application of recycling and resource recovery systems which preserve and enhance the quality of the air, water, and other natural resources of the state and assist in and encourage, where appropriate, the development of regional solid waste management facilities.

(4)   Serve as the official state representative for all purposes of the federal Solid Waste Disposal Act, as amended by Pub. L. No. 91-512, or as subsequently amended.

(5)   Use private industry or the State University System through contractual arrangements for implementation of some or all of the requirements of the state solid waste management program and for such other activities as may be considered necessary, desirable, or convenient.

(6)   Encourage recycling and resource recovery as a source of energy and materials.

(7)   Assist in and encourage, as much as possible, the development within the state of industries and commercial enterprises which are based upon resource recovery, recycling, and reuse of solid waste.

(8)   Determine by rule the facilities, equipment, personnel, and number of monitoring wells to be provided at each solid waste disposal facility.

(9)   Adopt rules pursuant to ss. 120.536(1) and 120.54 to implement and enforce this act, including requirements for the classification, construction, operation, maintenance, and closure of solid waste management facilities and requirements for, and conditions on, solid waste disposal in this state, whether such solid waste is

generated within this state or outside this state as long as such requirements and conditions are not based on the out-of-state origin of the waste and are consistent with applicable law. When classifying solid waste management facilities, the department shall consider the hydrogeology of the site for the facility, the types of wastes to be handled by the facility, and methods used to control the types of waste to be handled by the facility and shall seek to minimize the adverse effects of solid waste management on the environment. Whenever the department adopts any rule stricter or more stringent than one that has been set by the United States Environmental Protection Agency, the procedures set forth in s. 403.804(2) shall be followed. The department shall not, however, adopt hazardous waste rules for solid waste for which special studies were required prior to October 1, 1988, under s. 8002 of the Resource Conservation and Recovery Act, 42 U.S.C. s. 6982, as amended, until the studies are completed by the United States Environmental Protection Agency and the information is available to the department for consideration in adopting its own rule.

(10)    Issue or modify permits on such conditions as are necessary to effect the intent and purposes of this act, and may deny or revoke permits.

(11)    Develop and implement or contract for services to develop information on recovered materials markets and strategies for market development and expansion for use of these materials. Additionally, the department shall maintain a directory of recycling businesses operating in the state and shall serve as a coordinator to match recovered materials with markets. Such directory shall be made available to the public and to local governments to assist with their solid waste management activities.

(12)    Establish accounts and deposit to the Solid Waste Management Trust Fund and control and administer moneys it may withdraw from the fund.

(13)    Manage a program of grants, using funds from the Solid Waste Management Trust Fund and funds provided by the Legislature for solid waste management, for programs for recycling, composting, litter control, and special waste management and for programs that provide for the safe and proper management of solid waste.

(14)    Budget and receive appropriated funds and accept, receive, and administer grants or other funds or gifts from public or private agencies, including the state and the Federal Government, for the purpose of carrying out this act.

(15)    Delegate its powers, enter into contracts, or take such other actions as may be necessary to implement this act.

(16)    Receive and administer funds appropriated for county hazardous waste management assessments.

(17)    Provide technical assistance to local governments and regional agencies to ensure consistency between county hazardous waste management assessments; coordinate the development of such assessments with the assistance of the appropriate regional planning councils; and review and make recommendations to the Legislature relative to the sufficiency of the assessments to meet state hazardous waste management needs.

(18)    Increase public education and public awareness of solid and hazardous waste issues by developing and promoting statewide programs of litter control, recycling, volume reduction, and proper methods of solid waste and hazardous waste management.

(19)    Assist the hazardous waste storage, treatment, or disposal industry by providing to the industry any data produced on the types and quantities of hazardous waste generated.

(20)    Institute a hazardous waste emergency response program which would include emergency telecommunication capabilities and coordination with appropriate agencies.

(21)    Adopt rules necessary to accept delegation of the hazardous waste management program from the Environmental Protection Agency under the Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98-616.

(22)    Adopt rules, if necessary, to address the incineration and disposal of biomedical waste and the management of biological waste within the state, whether such waste is generated within this state or outside this state, as long as such requirements and conditions are not based on the out-of-state origin of the waste and are consistent with applicable provisions of law.

**History.**—s. 1, ch. 74-342; s. 1, ch. 75-54; s. 2, ch. 78-387; s. 5, ch. 80-302; ss. 21, 32, ch. 83-310; s. 31, ch. 84-338; s. 32, ch. 86-186; s. 6, ch. 88-130; s. 10, ch. 93-207; s. 3, ch. 96-284; s. 67, ch. 96-321; s. 104, ch. 98-200; s. 7, ch. 2007-184.

**403.7043    Compost standards and applications.**—

(1)    In order to protect the state's land and water resources, compost produced, utilized, or disposed of by the composting process at solid waste management facilities in the state must meet criteria established by the department.

(2)    The department shall establish and maintain rules addressing standards for the production of compost, including rules establishing:

(a)    Requirements necessary to produce hygienically safe compost products for varying applications.

(b)    A classification scheme for compost based on the types of waste composted, the maturity of the compost, and the levels of organic and inorganic constituents in the compost. This scheme shall address:

1.    Methods for measurement of the compost maturity.

2.    Particle sizes.

3.    Moisture content.

4.    Average levels of organic and inorganic constituents, including heavy metals, for such classes of compost as the department establishes, and the analytical methods to determine those levels.

History.—s. 7, ch. 88-130; s. 38, ch. 99-5; s. 86, ch. 2007-5; s. 8, ch. 2007-184.

**403.7045    Application of act and integration with other acts.**—

(1)    The following wastes or activities may not be regulated pursuant to this act:

(a)    Byproduct material, source material, and special nuclear material, the generation, transportation, disposal, storage, or treatment of which is regulated under chapter 404 or the federal Atomic Energy Act of 1954, ch. 1073, 68 Stat. 923, as amended.

(b)    Suspended solids and dissolved materials in domestic sewage effluent or irrigation return flows or other discharges which are point sources subject to permits pursuant to this chapter or s. 402 of the Clean Water Act, Pub. L. No. 95-217.

(c)    Emissions to the air from a stationary installation or source regulated under this chapter or the Clean Air Act, Pub. L. No. 95-95.

(d)    Drilling fluids, produced waters, and other wastes associated with the exploration for, or development and production of, crude oil or natural gas which are regulated under chapter 377.

(e)    Recovered materials, post-use polymers, recovered materials processing facilities, or pyrolysis facilities, except as provided in s. 403.7046, if:

1.    A majority of the recovered materials or post-use polymers at the facility are demonstrated to be sold, used, or reused within 1 year. As used in this subparagraph, the terms "used" or "reused" include, but are not limited to, the conversion of post-use polymers into crude oil, fuels, feedstocks, or other raw materials or intermediate or final products by gasification or pyrolysis, as defined in s. 403.703.

2.    The recovered materials or post-use polymers handled by the facility or the products or byproducts of operations that process recovered materials or post-use polymers are not discharged, deposited, injected, dumped, spilled, leaked, or placed into or upon any land or water by the owner or operator of the facility so that the recovered materials or post-use polymers, products or byproducts, or any constituent thereof may enter other lands or be emitted into the air or discharged into any waters, including groundwaters, or otherwise enter the environment such that a threat of contamination in excess of applicable department standards and criteria is caused.

3.    The recovered materials or post-use polymers handled by the facility are not hazardous wastes as defined in s. 403.703 and rules adopted under this section.

4.    The facility is registered as required in s. 403.7046.

(f)    Industrial byproducts, if:

1.    A majority of the industrial byproducts are demonstrated to be sold, used, or reused within 1 year.

2.    The industrial byproducts are not discharged, deposited, injected, dumped, spilled, leaked, or placed upon any land or water so that such industrial byproducts, or any constituent thereof, may enter other lands or be emitted into the air or discharged into any waters, including groundwaters, or otherwise enter the environment

such that a threat of contamination in excess of applicable department standards and criteria or a significant threat to public health is caused.

3.   The industrial byproducts are not hazardous wastes as defined in s. 403.703 and rules adopted under this section.

Sludge from an industrial waste treatment works that meets the exemption requirements of this paragraph is not solid waste as defined in s. 403.703.

(2)   Except as provided in s. 403.704(9), the following wastes shall not be regulated as a hazardous waste pursuant to this act, except when determined by the United States Environmental Protection Agency to be a hazardous waste:

(a)   Ashes and scrubber sludges generated from the burning of boiler fuel for generation of electricity or steam.

(b)   Agricultural and silvicultural byproduct material and agricultural and silvicultural process waste from normal farming or processing.

(c)   Discarded material generated by the mining and beneficiation and chemical or thermal processing of phosphate rock, and precipitates resulting from neutralization of phosphate chemical plant process and nonprocess waters.

(3)   The following wastes or activities shall be regulated pursuant to this act in the following manner:

(a)   Dredged material that is generated as part of a project permitted under part IV of chapter 373 or chapter 161, or that is authorized to be removed from sovereign submerged lands under chapter 253, shall be managed in accordance with the conditions of that permit or authorization unless the dredged material is regulated as hazardous waste pursuant to this part. If the dredged material contains hazardous substances, the department may further limit or restrict the disposal, sale, or use of the dredged material and may specify such other conditions relative to this material as are reasonably necessary to protect the public from the potential hazards. However, this paragraph does not require the routine testing of dredge material for hazardous substances unless there is a reasonable expectation that such substances will be present.

(b)   Hazardous wastes that are contained in artificial recharge waters or other waters intentionally introduced into any underground formation and that are permitted pursuant to s. 373.106 shall also be handled in compliance with the requirements and standards for disposal, storage, and treatment of hazardous waste under this act.

(c)   Solid waste or hazardous waste facilities that are operated as a part of the normal operation of a power generating facility and which are licensed by certification pursuant to the Florida Electrical Power Plant Siting Act, ss. 403.501-403.518, shall undergo such certification subject to the substantive provisions of this act.

(d)   Biomedical waste and biological waste shall be disposed of only as authorized by the department. However, any person who unknowingly disposes into a sanitary landfill or waste-to-energy facility any such waste that has not been properly segregated or separated from other solid wastes by the generating facility is not guilty of a violation under this act. This paragraph does not prohibit the department from seeking injunctive relief pursuant to s. 403.131 to prohibit the unauthorized disposal of biomedical waste or biological waste.

(4)   Disposal of dead animals, including those which were diseased, shall be consistent with applicable federal and state laws and regulations.

(5)   Ash residue generated by a solid waste management facility from the burning of solid waste must be disposed of in a properly designed solid waste disposal area that complies with standards developed by the department for the disposal of such ash residue. The department shall work with solid waste management facilities that burn solid waste to identify and develop methods for recycling and reuse of ash residue or treated ash residue, and the department may allow such recycling or reuse by an applicant who demonstrates that no significant threat to public health will result and that applicable department standards and criteria will not be violated. The Division of Waste Management shall direct the district offices and bureaus on matters relating to the interpretation and applicability of this subsection. The department may adopt rules necessary for administering this subsection, but the department is not required to amend its existing rules.

History.—s. 6, ch. 80-302; s. 3, ch. 82-125; s. 28, ch. 83-215; s. 62, ch. 83-218; s. 8, ch. 88-130; s. 55, ch. 90-331; s. 11, ch. 93-207; s. 125, ch. 97-237; s. 1, ch. 98-112; s. 9, ch. 2007-184; s. 15, ch. 2012-205; s. 2, ch. 2017-167.

**403.7046    Regulation of recovered materials.**—

(1)    Any person who handles, purchases, receives, recovers, sells, or is an end user of recovered materials or post-use polymers shall annually certify to the department on forms provided by the department. The department may by rule exempt from this requirement generators of recovered materials or post-use polymers; persons who handle or sell recovered materials or post-use polymers as an activity which is incidental to the normal primary business activities of that person; or persons who handle, purchase, receive, recover, sell, or are end users of recovered materials or post-use polymers in small quantities as defined by the department. The department shall adopt rules for the certification of and reporting by such persons and shall establish criteria for revocation of such certification. Such rules shall be designed to elicit, at a minimum, the amount and types of recovered materials or post-use polymers handled by registrants, and the amount and disposal site, or name of person with whom such disposal was arranged, of any solid waste generated by such facility. By February 1 of each year, registrants shall report all required information to the department and to all counties from which it received materials. Such rules may provide for the department to conduct periodic inspections. The department may charge a fee of up to $50 for each registration, which shall be deposited into the Solid Waste Management Trust Fund for implementation of the program.

(2)    Information reported pursuant to this section or any rule adopted pursuant to this section which, if disclosed, would reveal a trade secret, as defined in s. 812.081, is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. For reporting or information purposes, however, the department may provide this information in such form that the names of the persons reporting such information and the specific information reported are not revealed. This subsection is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2021, unless reviewed and saved from repeal through reenactment by the Legislature.

(3)    Except as otherwise provided in this section or pursuant to a special act in effect on or before January 1, 1993, a local government may not require a commercial establishment that generates source-separated recovered materials to sell or otherwise convey its recovered materials to the local government or to a facility designated by the local government, nor may the local government restrict such a generator's right to sell or otherwise convey such recovered materials to any properly certified recovered materials dealer who has satisfied the requirements of this section. A local government may not enact any ordinance that prevents such a dealer from entering into a contract with a commercial establishment to purchase, collect, transport, process, or receive source-separated recovered materials.

(a)    The local government may require that the recovered materials generated at the commercial establishment be source separated at the premises of the commercial establishment.

(b)1.    Before engaging in business within the jurisdiction of the local government, a recovered materials dealer or pyrolysis facility must provide the local government with a copy of the certification provided for in this section. In addition, the local government may establish a registration process whereby a recovered materials dealer or pyrolysis facility must register with the local government before engaging in business within the jurisdiction of the local government. Such registration process is limited to requiring the dealer or pyrolysis facility to register its name, including the owner or operator of the dealer or pyrolysis facility, and, if the dealer or pyrolysis facility is a business entity, its general or limited partners, its corporate officers and directors, its permanent place of business, evidence of its certification under this section, and a certification that the recovered materials or post-use polymers will be processed at a recovered materials processing facility or pyrolysis facility satisfying the requirements of this section. The local government may not use the information provided in the registration application to compete unfairly with the recovered materials dealer until 90 days after receipt of the application. All counties, and municipalities whose population exceeds 35,000 according to the population estimates determined pursuant to s. 186.901, may establish a reporting process that must be limited to the regulations, reporting format, and reporting frequency established by the department pursuant to this section, which must, at a minimum, include requiring the dealer or pyrolysis facility to identify the types and approximate amount of recovered materials or post-use polymers collected, recycled, or reused during the reporting period; the approximate percentage of recovered materials or post-use polymers reused, stored, or delivered to a recovered

materials processing facility or pyrolysis facility or disposed of in a solid waste disposal facility; and the locations where any recovered materials or post-use polymers were disposed of as solid waste. The local government may charge the dealer or pyrolysis facility a registration fee commensurate with and no greater than the cost incurred by the local government in operating its registration program. Registration program costs are limited to those costs associated with the activities described in this subparagraph. Any reporting or registration process established by a local government with regard to recovered materials or post-use polymers is governed by this section and department rules adopted pursuant thereto.

2.    Information reported under this subsection which, if disclosed, would reveal a trade secret, as defined in s. 812.081, is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. This subparagraph is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2021, unless reviewed and saved from repeal through reenactment by the Legislature.

(c)    A local government may establish a process in which the local government may temporarily or permanently revoke the authority of a recovered materials dealer to do business within the local government if the local government finds the recovered materials dealer, after reasonable notice of the charges and an opportunity to be heard by an impartial party, has consistently and repeatedly violated state or local laws, ordinances, rules, and regulations.

(d)    In addition to any other authority provided by law, a local government is hereby expressly authorized to prohibit a person or entity not certified under this section from doing business within the jurisdiction of the local government; to enter into a nonexclusive franchise or to otherwise provide for the collection, transportation, and processing of recovered materials at commercial establishments, provided that a local government may not require a certified recovered materials dealer to enter into such franchise agreement in order to enter into a contract with any commercial establishment located within the local government's jurisdiction to purchase, collect, transport, process, or receive source-separated recovered materials; and to enter into an exclusive franchise or to otherwise provide for the exclusive collection, transportation, and processing of recovered materials at single-family or multifamily residential properties.

(e)    Nothing in this section shall prohibit a local government from enacting ordinances designed to protect the public's general health, safety, and welfare.

(f)    As used in this section:

1.    "Commercial establishment" means a property or properties zoned or used for commercial or industrial uses, or used by an entity exempt from taxation under s. 501(c)(3) of the Internal Revenue Code, and excludes property or properties zoned or used for single-family residential or multifamily residential uses.

2.    "Local government" means a county or municipality.

3.    "Certified recovered materials dealer" means a dealer certified under this section.

(4)    A recovered materials dealer or an association whose members include recovered materials dealers may initiate an action for injunctive relief or damages for alleged violations of this section. The court may award to the prevailing party or parties reasonable attorney fees and costs.

**History.**—s. 12, ch. 93-207; s. 5, ch. 95-311; s. 2, ch. 95-366; s. 240, ch. 96-406; s. 17, ch. 2000-211; s. 5, ch. 2000-304; s. 4, ch. 2010-143; s. 20, ch. 2013-92; s. 7, ch. 2016-6; s. 3, ch. 2017-167.

**403.7047    Regulation of fossil fuel combustion products.**—

(1)    As used in this section, the term:

(a)    "Beneficial use" means the use of fossil fuel combustion products in building products, and as substitutes for raw materials, necessary ingredients, or additives in products, according to accepted industry practices, including the following:

1.    Asphalt, concrete or cement products, flowable fill, and roller-compacted concrete.

2.    Structural fill or pavement aggregate that meets the following requirements:

a.    The fossil fuel combustion product is not placed within 3 feet of groundwater or 15 feet of wetlands or natural water bodies, or within 100 feet of a potable well that is being used or might be used for human or livestock water consumption;

b.   The placement of the fossil fuel combustion product does not extend beyond the outside edge of the structure or pavement. Placement of the structure or pavement must be completed as soon as practicable after placement of the fossil fuel combustion product;

c.   The fossil fuel combustion product is not placed so that such product, or any constituent thereof, may enter other lands or be emitted into the air or discharged into any waters, including groundwaters, or otherwise enter the environment in a manner that causes a significant threat to public health or contamination in excess of applicable department standards and criteria; and

d.   The owner or duly authorized agent of the owner of the property where the product is placed has given the department written notice, which may be submitted electronically, of the dates, placement locations, and types of fossil fuel combustion products used for structural fill or pavement aggregate.

3.   Use of flue-gas emission control materials which meet the definition of gypsum and are used in accordance with applicable Florida Department of Agriculture and Consumer Services rules.

4.   Waste stabilization, or initial or intermediate cover material used for lined Class I or III landfills, provided that the material meets applicable department rules for landfill cover or a landfill's permit conditions for cover.

5.   Any other use that meets the criteria of s. 403.7045(1)(f) or that is approved by the department prior to use as having an equivalent or reduced potential for environmental impacts, when used in equivalent quantities, compared to the substituted raw products or materials.

(b)   "Fossil fuel combustion products" means fly ash, bottom ash, boiler slag, flue-gas emission control materials, and other non-hazardous materials, such as gasifier slag, fluidized-bed combustion system products, and similar combustion materials produced from the operation of a fossil fuel-fired electric or steam generation facility, from a clean coal or other innovative technology process at a fossil fuel-fired electric or steam generation facility, or from any combination thereof.

(c)   "Fossil fuel-fired electric or steam generation facility" means any electric or steam generation facility that is fueled with coal, alone or in combination with petroleum coke, oil, coal gas, natural gas, other fossil fuels, or alternative fuels.

(d)   "Pavement aggregate" means fossil fuel combustion products used as sub-base material under a paved road, sidewalk, walkway, or parking lot as a substitute for conventional aggregate, raw material, or soil.

(e)   "Structural fill" means the use of a fossil fuel combustion product as a substitute for a conventional aggregate, raw material, or soil under an industrial or commercial building or structure. Structural fill does not include uses of fossil fuel combustion products that involve general filling or grading operations or valley fills.

(2)   The storage of fossil fuel combustion products destined for beneficial use must comply with applicable department rules and be conducted in a manner that does not pose a significant risk to public health or violate applicable air or water quality standards.

(3)   Fossil fuel combustion products beneficially used in accordance with this section are not subject to regulation as a solid or hazardous waste, but the department may take appropriate action if the beneficial use is demonstrated to be causing violations of applicable air or water quality standards or criteria in department rules, or if such beneficial use poses a significant risk to public health. This section does not limit any other requirements applicable to the beneficial use of fossil fuel combustion products established under this chapter or chapter 376 or under local or federal laws, including requirements governing air pollution control permits, national pollutant discharge elimination system permits, and water quality certifications pursuant to s. 401 of the Clean Water Act.

(4)   Nothing in this section shall be construed to limit the department's authority to approve the beneficial use of materials other than fossil fuel combustion products as defined in this section pursuant to other provisions of this part. This section may not be construed to limit or otherwise modify any fossil fuel combustion product beneficial use previously approved by the department, use in the onsite construction of surface impoundments, roads, or similar works at fossil fuel-fired electric or steam generation facilities, or the recovery of these products for beneficial use from fossil fuel combustion product landfills, impoundments, or storage areas.

History.—s. 1, ch. 2013-68.

**403.7049   Determination of full cost for solid waste management; local solid waste management fees.—**

(1)   Each county and each municipality shall determine each year the full cost for solid waste management within the service area of the county or municipality. The department shall establish by rule the method for local governments to use in calculating full cost. In developing the rule, the department shall examine the feasibility of the use of an enterprise fund process by local governments in operating their solid waste management systems.

(2)(a)   Each municipality shall establish a system to inform, no less than once a year, residential and nonresidential users of solid waste management services within the municipality's service area of the user's share, on an average or individual basis, of the full cost for solid waste management as determined pursuant to subsection (1). Counties shall provide the information required of municipalities only to residential and nonresidential users of solid waste management services within the county's service area that are not served by a municipality. Municipalities shall include costs charged to them or persons contracting with them for disposal of solid waste in the full cost information provided to residential and nonresidential users of solid waste management services.

(b)   Counties and municipalities are encouraged to operate their solid waste management systems through use of an enterprise fund.

(3)   For purposes of this section, "service area" means the area in which the county or municipality provides, directly or by contract, solid waste management services. The provisions of this section shall not be construed to require a person operating under a franchise agreement to collect or dispose of solid waste within the service area of a county or municipality to make the calculations or to establish a system to provide the information required under this section, unless such person agrees to do so as part of such franchise agreement.

(4)   Each county and each municipality which provides solid waste collection services, either through its own operations or by contract, is encouraged to charge fees to each residential and nonresidential user of the solid waste collection service which vary based upon the volume or weight of solid waste that is collected from each user.

(5)   In order to assist in achieving the municipal solid waste reduction goal and the recycling provisions of s. 403.706(2), a county or a municipality which owns or operates a solid waste management facility is hereby authorized to charge solid waste disposal fees which may vary based on a number of factors, including, but not limited to, the amount, characteristics, and form of recyclable materials present in the solid waste that is brought to the county's or the municipality's facility for processing or disposal.

(6)   In addition to all other fees required or allowed by law, a county or a municipality, at the discretion of its governing body, may impose a fee for the services the county or municipality provides with regard to the collection, processing, or disposal of solid waste, to be used for developing and implementing a recycling program. For such fees, the local governing body of any county or municipality may use the non-ad valorem levy, collection, and enforcement method as provided for in chapter 197.

(7)   This section does not prohibit a county, municipality, or other person from providing grants, loans, or other aid to low-income persons to pay part or all of the costs of such persons' solid waste management services.

**History.**—s. 9, ch. 88-130; s. 13, ch. 93-207; s. 19, ch. 2000-211; s. 5, ch. 2010-143.

### 403.705    State solid waste management program.—

(1)   The state solid waste management program shall:

(a)   Provide guidelines for the orderly storage, separation, processing, recovery, recycling, and disposal of solid waste throughout the state;

(b)   Encourage coordinated local activity for solid waste management within a common geographical area;

(c)   Investigate the present status of solid waste management in the state with positive proposals for local action to correct deficiencies in present solid waste management processes;

(d)   Provide planning, technical, and financial assistance to local governments and state agencies for reduction, recycling, reuse, and processing of solid waste and for safe and environmentally sound solid waste management and disposal;

(e)   Assist in the development of solid waste reduction and recycling programs to properly manage solid waste and conserve resources; and

(f)  Provide for the education of the general public and the training of solid waste management professionals to reduce the production of solid waste, to ensure proper processing and disposal of solid waste, and to encourage recycling and solid waste reduction.

(2)  The state solid waste management program shall include, at a minimum:

(a)  Procedures and requirements to ensure cooperative efforts in solid waste management by counties and municipalities and groups of counties and municipalities where appropriate.

(b)  Provisions for the continuation of existing effective regional resource recovery, recycling, and solid waste management facilities and programs.

(c)  Planning guidelines and technical assistance to counties and municipalities to aid in meeting the municipal solid waste recycling goals established in s. 403.706(2).

(d)  Planning guidelines and technical assistance to counties and municipalities to develop and implement recycling programs.

(e)  Technical assistance to counties and municipalities in determining the full cost for solid waste management pursuant to s. 403.7049(1).

(f)  Planning guidelines and technical assistance to counties and municipalities to develop and implement programs for alternative disposal or processing or recycling of the solid wastes prohibited from disposal in landfills under s. 403.708(12) and for special wastes.

(g)  A public education program, to be developed in cooperation with the Department of Education, local governments, other state agencies, and business and industry organizations, to inform the public of the need for and the benefits of recycling of solid waste and reducing the amounts of solid and hazardous waste generated and disposed of in the state. The public education program shall be implemented through public workshops and through the use of brochures, reports, public service announcements, and other materials.

(3)  The department shall evaluate and report biennially to the President of the Senate and the Speaker of the House of Representatives on the state's success in meeting the solid waste recycling goal as described in s. 403.706(2).

(4)  The department shall adopt rules creating a voluntary certification program for materials recovery facilities. The certification criteria shall be based upon the amount and type of materials recycled and the compliance record of the facility and may vary depending on the location in the state and the available markets for the materials that are processed. Any materials recovery facility seeking certification shall file an application to modify its permit, or shall include a certification application as part of its original permit application, which application shall not require an additional fee. The department shall adopt a form for certification applications, and shall require at least annual reports to verify the continued qualification for certification. In order to assist in the development of the certification program, the department shall appoint a technical advisory committee.

**History.**—s. 1, ch. 74-342; s. 2, ch. 75-54; s. 10, ch. 88-130; s. 14, ch. 93-207; s. 395, ch. 94-356; s. 56, ch. 95-144; s. 31, ch. 2000-153; s. 3, ch. 2002-291; s. 10, ch. 2007-184; s. 6, ch. 2010-143.

### 403.7055  Methane capture.—

(1)  Each county is encouraged to form multicounty regional solutions to the capture and reuse or sale of methane gas from landfills and wastewater treatment facilities.

(2)  The department shall provide planning guidelines and technical assistance to each county to develop and implement such multicounty efforts.

**History.**—s. 94, ch. 2008-227.

### 403.706  Local government solid waste responsibilities.—

(1)  The governing body of a county has the responsibility and power to provide for the operation of solid waste disposal facilities to meet the needs of all incorporated and unincorporated areas of the county. Unless otherwise approved by an interlocal agreement or special act, municipalities may not operate solid waste disposal facilities unless a municipality demonstrates by a preponderance of the evidence that the use of a county designated facility, when compared to alternatives proposed by the municipality, places a significantly higher and disproportionate financial burden on the citizens of the municipality when compared to the financial burden

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 153 of 694

placed on persons residing within the county but outside of the municipality. However, a municipality may construct and operate a resource recovery facility and related onsite solid waste disposal facilities without an interlocal agreement with the county if the municipality can demonstrate by a preponderance of the evidence that the operation of such facility will not significantly impair financial commitments made by the county with respect to solid waste management services and facilities or result in significantly increased solid waste management costs to the remaining persons residing within the county but not served by the municipality's facility. This section shall not prevent a municipality from continuing to operate or use an existing disposal facility permitted on or prior to October 1, 1988. Any municipality which establishes a solid waste disposal facility under this subsection and subsequently abandons such facility shall be responsible for the payment of any capital expansion necessary to accommodate the municipality's solid waste for the remaining projected useful life of the county disposal facility. Pursuant to this section and notwithstanding any other provision of this chapter, counties shall have the power and authority to adopt ordinances governing the disposal of solid waste generated outside of the county at the county's solid waste disposal facility. In accordance with this section, municipalities are responsible for collecting and transporting solid waste from their jurisdictions to a solid waste disposal facility operated by a county or operated under a contract with a county. Counties may charge reasonable fees for the handling and disposal of solid waste at their facilities. The fees charged to municipalities at a solid waste management facility specified by the county shall not be greater than the fees charged to other users of the facility except as provided in s. 403.7049(5). Solid waste management fees collected on a countywide basis shall be used to fund solid waste management services provided countywide.

(2)(a)    Each county shall implement a recyclable materials recycling program that shall have a goal of recycling recyclable solid waste by 40 percent by December 31, 2012; 50 percent by December 31, 2014; 60 percent by December 31, 2016; 70 percent by December 31, 2018; and 75 percent by December 31, 2020. Counties and municipalities are encouraged to form cooperative arrangements for implementing recycling programs.

(b)    In order to assist counties in attaining the goals set forth in paragraph (a), the Legislature finds that the recycling of construction and demolition debris fulfills an important state interest. Therefore, each county must implement a program for recycling construction and demolition debris.

(c)    In accordance with applicable local government ordinances, newly developed property receiving a certificate of occupancy, or its equivalent, on or after July 1, 2012, that is used for multifamily residential or commercial purposes, must provide adequate space and an adequate receptacle for recycling by tenants and owners of the property. This provision is limited to counties and municipalities that have an established residential, including multifamily, or commercial recycling program that provides recycling receptacles to residences and businesses and regular pickup services for those receptacles.

(d)    If, by January 1 of 2013, 2015, 2017, 2019, or 2021, the county, as determined by the department in accordance with applicable rules, has not reached the recycling goals as set forth in paragraph (a), the department may direct the county to develop a plan to expand recycling programs to existing commercial and multifamily dwellings, including, but not limited to, apartment complexes.

(e)    If the state's recycling rate for the 2013 calendar year is below 40 percent; below 50 percent by January 1, 2015; below 60 percent by January 1, 2017; below 70 percent by January 1, 2019; or below 75 percent by January 1, 2021, the department shall provide a report to the President of the Senate and the Speaker of the House of Representatives. The report shall identify those additional programs or statutory changes needed to achieve the goals set forth in paragraph (a). The report shall be provided no later than 30 days prior to the beginning of the regular session of the Legislature. The department is not required to provide a report to the Legislature if the state reaches its recycling goals as described in this paragraph.

(f)    Such programs shall be designed to recover a significant portion of at least four of the following materials from the solid waste stream prior to final disposal at a solid waste disposal facility and to offer these materials for recycling: newspaper, aluminum cans, steel cans, glass, plastic bottles, cardboard, office paper, and yard trash. Local governments which operate permitted waste-to-energy facilities may retrieve ferrous and nonferrous metal as a byproduct of combustion.

(g)   Local governments are encouraged to separate all plastics, metal, and all grades of paper for recycling prior to final disposal and are further encouraged to recycle yard trash and other mechanically treated solid waste into compost available for agricultural and other acceptable uses.

(h)   The department shall adopt rules establishing the method and criteria to be used by a county in calculating the recycling rates pursuant to this subsection.

(i)   Each county is encouraged to consider plans for composting or mulching organic materials that would otherwise be disposed of in a landfill. The composting or mulching plans are encouraged to address partnership with the private sector.

(3)   Each county shall ensure, to the maximum extent possible, that municipalities within its boundaries participate in the preparation and implementation of recycling and solid waste management programs through interlocal agreements pursuant to s. 163.01 or other means provided by law. Nothing in a county's solid waste management or recycling program shall affect the authority of a municipality to franchise or otherwise provide for the collection of solid waste generated within the boundaries of the municipality.

(4)(a)   In order to promote the production of renewable energy from solid waste, each megawatt-hour produced by a renewable energy facility using solid waste as a fuel shall count as 1 ton of recycled material and shall be applied toward meeting the recycling goals set forth in this section. If a county creating renewable energy from solid waste implements and maintains a program to recycle at least 50 percent of municipal solid waste by a means other than creating renewable energy, that county shall count 1.25 tons of recycled material for each megawatt-hour produced. If waste originates from a county other than the county in which the renewable energy facility resides, the originating county shall receive such recycling credit. Any byproduct resulting from the creation of renewable energy that is recycled shall count towards the county recycling goals in accordance with the methods and criteria developed pursuant to paragraph (2)(h).

(b)   A county may receive credit for one-half of the recycling goal set forth in subsection (2) from the use of yard trash, or other clean wood waste or paper waste, in innovative programs including, but not limited to, programs that produce alternative clean-burning fuels such as ethanol or that provide for the conversion of yard trash or other clean wood waste or paper waste to clean-burning fuel for the production of energy for use at facilities other than a waste-to-energy facility as defined in s. 403.7061. The provisions of this paragraph apply only if a county can demonstrate that:

1.   The county has implemented a yard trash mulching or composting program, and

2.   As part of the program, compost and mulch made from yard trash is available to the general public and in use at county-owned or maintained and municipally owned or maintained facilities in the county and state agencies operating in the county as required by this section.

(c)   A county with a population of 100,000 or less may provide its residents with the opportunity to recycle in lieu of achieving the goal set forth in this section. For the purposes of this section, the "opportunity to recycle" means that the county:

1.a.   Provides a system for separating and collecting recyclable materials prior to disposal that is located at a solid waste management facility or solid waste disposal area; or

b.   Provides a system of places within the county for collection of source-separated recyclable materials.

2.   Provides a public education and promotion program that is conducted to inform its residents of the opportunity to recycle, encourages source separation of recyclable materials, and promotes the benefits of reducing, reusing, recycling, and composting materials.

(5)   As used in this section, "municipal solid waste" includes any solid waste, except for sludge, resulting from the operation of residential, commercial, governmental, or institutional establishments that would normally be collected, processed, and disposed of through a public or private solid waste management service. The term includes yard trash but does not include solid waste from industrial, mining, or agricultural operations.

(6)   The department may reduce or modify the municipal solid waste recycling goal that a county is required to achieve pursuant to subsection (2) if the county demonstrates to the department that:

(a)   The achievement of the goal set forth in subsection (2) would have an adverse effect on the financial obligations of a county that are directly related to a waste-to-energy facility owned or operated by or on behalf of

the county; and

(b)   The county cannot remove normally combustible materials from solid waste that is to be processed at a waste-to-energy facility because of the need to maintain a sufficient amount of solid waste to ensure the financial viability of the facility.

The goal shall not be waived entirely and may only be reduced or modified to the extent necessary to alleviate the adverse effects of achieving the goal on the financial viability of a county's waste-to-energy facility. Nothing in this subsection shall exempt a county from developing and implementing a recycling program pursuant to this act.

(7)   In order to assess the progress in meeting the goal set forth in subsection (2), each county shall, by April 1 each year, provide information to the department regarding its annual solid waste management program and recycling activities.

(a)   The information submitted to the department by the county must, at a minimum, include:

1.   The amount of municipal solid waste disposed of at solid waste disposal facilities, by type of waste such as yard trash, white goods, clean debris, tires, and unseparated solid waste;

2.   The amount and type of materials from the municipal solid waste stream that were recycled; and

3.   The percentage of the population participating in various types of recycling activities instituted.

(b)   Beginning with the data for the 2012 calendar year, the department shall by July 1 each year post on its website the recycling rates of each county for the prior calendar year.

(8)   A county or municipality may enter into a written agreement with other persons, including persons transporting solid waste on October 1, 1988, to undertake to fulfill some or all of the county's or municipality's responsibilities under this section.

(9)   In the development and implementation of a curbside recyclable materials collection program, a county or municipality shall enter into negotiations with a franchisee who is operating to exclusively collect solid waste within a service area of a county or municipality to undertake curbside recyclable materials collection responsibilities for a county or municipality. If the county or municipality and such franchisee fail to reach an agreement within 60 days from the initiation of such negotiations, the county or municipality may solicit proposals from other persons to undertake curbside recyclable materials collection responsibilities for the county or municipality as it may require. Upon the determination of the lowest responsible proposal, the county or municipality may undertake, or enter into a written agreement with the person who submitted the lowest responsible proposal to undertake, the curbside recyclable materials collection responsibilities for the county or municipality, notwithstanding the exclusivity of such franchise agreement.

(10)   In developing and implementing recycling programs, counties and municipalities shall give consideration to the collection, marketing, and disposition of recyclable materials by persons engaged in the business of recycling, whether or not the persons are operating for profit. Counties and municipalities are encouraged to use for-profit and nonprofit organizations in fulfilling their responsibilities under this act.

(11)   A county and the municipalities within the county's boundaries may jointly develop a recycling program, provided that the county and each such municipality must enter into a written agreement to jointly develop a recycling program. If a municipality does not participate in jointly developing a recycling program with the county within which it is located, the county may require the municipality to provide information on recycling efforts undertaken within the boundaries of the municipality in order to determine whether the goal for municipal solid waste reduction is being achieved.

(12)   It is the policy of the state that a county and its municipalities may jointly determine, through an interlocal agreement pursuant to s. 163.01 or by requesting the passage of special legislation, which local governmental agency shall administer a solid waste management or recycling program.

(13)   The county shall provide written notice to all municipalities within the county when recycling program development begins and shall provide periodic written progress reports to the municipalities concerning the preparation of the recycling program.

(14)   Nothing in this act shall be construed to prevent the governing body of any county or municipality from providing by ordinance or regulation for solid waste management requirements which are stricter or more

extensive than those imposed by the state solid waste management program and rules, regulations, and orders issued thereunder.

(15)   Nothing in this act or in any rule adopted by any agency shall be construed to require any county or municipality to participate in any regional solid waste management or regional resource recovery program until the governing body of such county or municipality has determined that participation in such a program is economically feasible for that county or municipality. Nothing in this act or in any special or local act or in any rule adopted by any agency shall be construed to limit the authority of a municipality to regulate the disposal of solid waste within its boundaries or generated within its boundaries so long as a facility for any such disposal has been approved by the department, unless the municipality is included within a solid waste management program created by interlocal agreement or special or local act. If bonds had been issued to finance a resource recovery or management program or a solid waste management program in reliance on state law granting to a county the responsibility for the resource recovery or management program or a solid waste management program, nothing herein shall permit any governmental agency to withdraw from said program if said agency's participation is necessary for the financial feasibility of the project, so long as said bonds are outstanding.

(16)   Nothing in this chapter or in any rule adopted by any state agency hereunder shall require any person to subscribe to any private solid waste collection service.

(17)   To effect the purposes of this part, counties and municipalities are authorized, in addition to other powers granted pursuant to this part:

(a)   To contract with persons to provide resource recovery services or operate resource recovery facilities on behalf of the county or municipality.

(b)   To indemnify persons providing resource recovery services or operating resource recovery facilities for liabilities or claims arising out of the provision or operation of such services or facilities that are not the result of the sole negligence of the persons providing such services or operating such facilities.

(c)   To waive sovereign immunity and immunity from suit in federal court by vote of the governing body of the county or municipality to the extent necessary to carry out the authority granted in paragraphs (a) and (b), notwithstanding the limitations prescribed in s. 768.28.

(d)   To grant a solid waste fee waiver to nonprofit organizations that are engaged in the collection of donated goods for charitable purposes and that have a recycling or reuse rate of 50 percent or better.

(18)   Each operator of a solid waste management facility owned or operated by or on behalf of a county or municipality shall weigh all solid waste when it is received. The scale used to measure the solid waste shall conform to the requirements of chapter 531 and any rules promulgated thereunder.

(19)   In the event the power to manage solid waste has been granted to a special district or other entity by special act or interlocal agreement, any duty or responsibility or penalty imposed under this part on a county or municipality shall apply to such special district or other entity to the extent of the grant of such duty or responsibility or imposition of such penalty. To the same extent, such special district or other entity shall be eligible for grants or other benefits provided pursuant to this part.

(20)   In addition to any other penalties provided by law, a local government that does not comply with the requirements of subsections (2) and (4) shall not be eligible for grants from the Solid Waste Management Trust Fund, and the department may notify the Chief Financial Officer to withhold payment of all or a portion of funds payable to the local government by the department from the General Revenue Fund or by the department from any other state fund, to the extent not pledged to retire bonded indebtedness, unless the local government demonstrates that good faith efforts to meet the requirements of subsections (2) and (4) have been made or that the funds are being or will be used to finance the correction of a pollution control problem that spans jurisdictional boundaries.

(21)   Local governments are authorized to enact ordinances that require and direct all residential properties, multifamily dwellings, and apartment complexes and industrial, commercial, and institutional establishments as defined by the local government to establish programs for the separation of recyclable materials designated by the local government, which recyclable materials are specifically intended for purposes of recycling and for which a market exists, and to provide for their collection. Such ordinances may include, but are not limited to, provisions

that prohibit any person from knowingly disposing of recyclable materials designated by the local government and that ensure the collection of recovered materials as necessary to protect public health and safety.

(22)    Nothing in this act shall limit the authority of the state or any local government to regulate the collection, transportation, processing, or handling of recovered materials or solid waste in order to protect the public health, safety, and welfare.

History.—s. 1, ch. 74-342; s. 142, ch. 77-104; s. 1, ch. 77-466; s. 3, ch. 78-329; s. 1, ch. 79-118; s. 7, ch. 80-302; s. 2, ch. 87-107; s. 11, ch. 88-130; s. 15, ch. 93-207; s. 15, ch. 98-258; s. 32, ch. 2000-153; s. 20, ch. 2000-211; s. 6, ch. 2000-304; s. 4, ch. 2002-291; s. 42, ch. 2003-1; s. 429, ch. 2003-261; s. 97, ch. 2008-227; s. 112, ch. 2010-102; s. 7, ch. 2010-143; s. 16, ch. 2012-205.

### 403.70605    Solid waste collection services in competition with private companies.—

(1)    SOLID WASTE COLLECTION SERVICES IN COMPETITION WITH PRIVATE COMPANIES.—

(a)    A local government that provides specific solid waste collection services in direct competition with a private company:

1.    Shall comply with the provisions of local environmental, health, and safety standards that also are applicable to a private company providing such collection services in competition with the local government.

2.    Shall not enact or enforce any license, permit, registration procedure, or associated fee that:

a.    Does not apply to the local government and for which there is not a substantially similar requirement that applies to the local government; and

b.    Provides the local government with a material advantage in its ability to compete with a private company in terms of cost or ability to promptly or efficiently provide such collection services. Nothing in this sub-subparagraph shall apply to any zoning, land use, or comprehensive plan requirement.

(b)1.    A private company with which a local government is in competition may bring an action to enjoin a violation of paragraph (a) against any local government. No injunctive relief shall be granted if the official action which forms the basis for the suit bears a reasonable relationship to the health, safety, or welfare of the citizens of the local government unless the court finds that the actual or potential anticompetitive effects outweigh the public benefits of the challenged action.

2.    As a condition precedent to the institution of an action pursuant to this paragraph, the complaining party shall first file with the local government a notice referencing this paragraph and setting forth the specific facts upon which the complaint is based and the manner in which the complaining party is affected. The complaining party may provide evidence to substantiate the claims made in the complaint. Within 30 days after receipt of such a complaint, the local government shall respond in writing to the complaining party explaining the corrective action taken, if any. If no response is received within 30 days or if appropriate corrective action is not taken within a reasonable time, the complaining party may institute the judicial proceedings authorized in this paragraph. However, failure to comply with this subparagraph shall not bar an action for a temporary restraining order to prevent immediate and irreparable harm from the conduct or activity complained of.

3.    The court may, in its discretion, award to the prevailing party or parties costs and reasonable attorneys' fees.

(c)    This subsection does not apply when the local government is exclusively providing the specific solid waste collection services itself or pursuant to an exclusive franchise.

(2)    SOLID WASTE COLLECTION SERVICES OUTSIDE JURISDICTION.—

(a)    Notwithstanding s. 542.235, or any other provision of law, a local government that provides solid waste collection services outside its jurisdiction in direct competition with private companies is subject to the same prohibitions against predatory pricing applicable to private companies under ss. 542.18 and 542.19.

(b)    Any person injured by reason of violation of this subsection may sue therefor in the circuit courts of this state and shall be entitled to injunctive relief and to recover the damages and the costs of suit. The court may, in its discretion, award to the prevailing party or parties reasonable attorneys' fees. An action for damages under this subsection must be commenced within 4 years. No person may obtain injunctive relief or recover damages under this subsection for any injury that results from actions taken by a local government in direct response to a natural disaster or similar occurrence for which an emergency is declared by executive order or proclamation of the

Governor pursuant to s. 252.36 or for which such a declaration might be reasonably anticipated within the area covered by such executive order or proclamation.

(c)    As a condition precedent to the institution of an action pursuant to this subsection, the complaining party shall first file with the local government a notice referencing this subsection and setting forth the specific facts upon which the complaint is based and the manner in which the complaining party is affected. Within 30 days after receipt of such complaint, the local government shall respond in writing to the complaining party explaining the corrective action taken, if any. If the local government denies that it has engaged in conduct that is prohibited by this subsection, its response shall include an explanation showing why the conduct complained of does not constitute predatory pricing.

(d)    For the purposes of this subsection, the jurisdiction of a county, special district, or solid waste authority shall include all incorporated and unincorporated areas within the county, special district, or solid waste authority.

(3)    DISPLACEMENT OF PRIVATE WASTE COMPANIES.—

(a)    As used in this subsection, the term "displacement" means a local government's provision of a collection service which prohibits a private company from continuing to provide the same service that it was providing when the decision to displace was made. The term does not include:

1.    Competition between the public sector and private companies for individual contracts;

2.    Actions by which a local government, at the end of a contract with a private company, refuses to renew the contract and either awards the contract to another private company or decides for any reason to provide the collection service itself;

3.    Actions taken against a private company because the company has acted in a manner threatening to the public health or safety or resulting in a substantial public nuisance;

4.    Actions taken against a private company because the company has materially breached its contract with the local government;

5.    Refusal by a private company to continue operations under the terms and conditions of its existing agreement during the 3-year notice period;

6.    Entering into a contract with a private company to provide garbage, trash, or refuse collection which contract is not entered into under an ordinance that displaces or authorizes the displacement of another private company providing garbage, trash, or refuse collection;

7.    Situations in which a majority of the property owners in the displacement area petition the governing body to take over the collection service;

8.    Situations in which the private companies are licensed or permitted to do business within the local government for a limited time and such license or permit expires and is not renewed by the local government. This subparagraph does not apply to licensing or permitting processes enacted after May 1, 1999, or to occupational licenses; or

9.    Annexations, but only to the extent that the provisions of s. 171.062(4) apply.

(b)    A local government or combination of local governments may not displace a private company that provides garbage, trash, or refuse collection service without first:

1.    Holding at least one public hearing seeking comment on the advisability of the local government or combination of local governments providing the service.

2.    Providing at least 45 days' written notice of the hearing, delivered by first-class mail to all private companies that provide the service within the jurisdiction.

3.    Providing public notice of the hearing.

(c)    Following the final public hearing held under paragraph (b), but not later than 1 year after the hearing, the local government may proceed to take those measures necessary to provide the service. A local government shall provide 3 years' notice to a private company before it engages in the actual provision of the service that displaces the company. As an alternative to delaying displacement 3 years, a local government may pay a displaced company an amount equal to the company's preceding 15 months' gross receipts for the displaced service in the displacement area. The 3-year notice period shall lapse as to any private company being displaced when the

company ceases to provide service within the displacement area. Nothing in this paragraph prohibits the local government and the company from voluntarily negotiating a different notice period or amount of compensation.

(4)   DEFINITIONS.—As used in this section:

(a)   "In competition" or "in direct competition" means the vying between a local government and a private company to provide substantially similar solid waste collection services to the same customer.

(b)   "Private company" means any entity other than a local government or other unit of government that provides solid waste collection services.

History.—s. 1, ch. 2000-304; s. 3, ch. 2002-23.

### 403.7061     Requirements for review of new waste-to-energy facility capacity by the Department of Environmental Protection.—

(1)   The Legislature recognizes the need to use an integrated approach to municipal solid waste management. Accordingly, the solid waste management legislation adopted in 1988 was guided by policies intended to foster integrated solid waste management by using waste reduction, recycling, waste-to-energy facilities, and landfills. Progress is being made in the state using this integrated approach to municipal solid waste management, and this approach should be continued. Waste-to-energy facilities will continue to be an integral part of the state's solid waste management practices. However, the state is committed to achieving its recycling and waste reduction goals and must ensure that waste-to-energy facilities are fully integrated with the state's waste management goals. Therefore, the Legislature finds that the department should evaluate applications for waste-to-energy facilities in accordance with the new criteria in subsection (3) to confirm that the facilities are part of an integrated waste management plan.

(2)   Notwithstanding any other provisions of state law, the department shall not issue a construction permit or certification to build a waste-to-energy facility or expand an existing waste-to-energy facility unless the facility meets the requirements set forth in subsection (3). Any construction permit issued by the department between January 1, 1993, and May 12, 1993, which does not address these new requirements is invalid. These new requirements do not apply to the issuance of permits or permit modifications to retrofit existing facilities with new or improved pollution control equipment to comply with state or federal law.

(3)   An applicant must provide reasonable assurance that the construction of a new waste-to-energy facility or the expansion of an existing waste-to-energy facility will comply with the following criteria:

(a)   The facility is a necessary part of the local government's integrated solid waste management program in the jurisdiction where the facility is located and cannot be avoided through feasible and practical efforts to use recycling or waste reduction.

(b)   The use of capacity at existing waste-to-energy facilities within reasonable transportation distance of the proposed facility must have been evaluated and found not to be economically feasible when compared to the use of the proposed facility for the expected life of the proposed facility. This paragraph does not apply to:

1.   Applications to build or expand waste-to-energy facilities received by the department before March 1, 1993, or amendments to such applications that do not increase combustion capacity beyond that requested as of March 1, 1993; or

2.   Any modification to waste-to-energy facility construction or operating permits or certifications or conditions thereto, including certifications under ss. 403.501-403.518, that do not increase combustion capacity above that amount applied for before March 1, 1993.

(c)   The local government in which the facility is located has implemented a mulching, composting, or other waste reduction program for yard trash.

(d)   The local governments served by the facility will have implemented or participated in a separation program designed to remove small-quantity generator and household hazardous waste, mercury containing devices, and mercuric-oxide batteries from the waste stream prior to incineration, by the time the facility begins operation.

(e)   The local government in which the facility is located has implemented a program to procure products or materials with recycled content, pursuant to s. 403.7065.

(f)   A program will exist in the local government in which the facility is located for collecting and recycling recovered material from the institutional, commercial, and industrial sectors by the time the facility begins operation.

(g)   The facility will be in compliance with applicable local ordinances and with the approved state and local comprehensive plans required by chapter 163.

(h)   The facility is in substantial compliance with its permit, conditions of certification, and any agreements or orders resulting from environmental enforcement actions by state agencies.

(4)   For the purposes of this section, the term "waste-to-energy facility" means a facility that uses an enclosed device using controlled combustion to thermally break down solid, liquid, or gaseous combustible solid waste to an ash residue that contains little or no combustible material and that produces electricity, steam, or other energy as a result. The term does not include facilities that primarily burn fuels other than solid waste even if such facilities also burn some solid waste as a fuel supplement. The term also does not include facilities that burn vegetative, agricultural, or silvicultural wastes, bagasse, clean dry wood, methane or other landfill gas, wood fuel derived from construction or demolition debris, or waste tires, alone or in combination with fossil fuels.

History.—s. 56, ch. 93-207; s. 396, ch. 94-356; s. 16, ch. 98-258; s. 39, ch. 99-5; s. 5, ch. 2002-291; s. 3, ch. 2005-259; s. 11, ch. 2007-184; s. 8, ch. 2010-143; s. 21, ch. 2015-4.

**403.70611      Requirements relating to solid waste disposal facility permitting.**—Local government applicants for a permit to construct or expand a Class I landfill are encouraged to consider construction of a waste-to-energy facility as an alternative to additional landfill space.

History.—s. 4, ch. 2005-259.

**403.7063      Use of private services in solid waste management.**—In providing services or programs for solid waste management, local governments and state agencies should use the most cost-effective means for the provision of services and are encouraged to contract with private persons for any or all of such services or programs in order to assure that such services are provided on the most cost-effective basis. Notwithstanding any special or general law to the contrary, no county or municipality shall adopt or enforce regulations that discriminate against privately owned solid waste management facilities because they are privately owned. However, nothing in this section shall interfere with the county's or municipality's ability to control the flow of solid waste within its boundaries pursuant to this chapter.

History.—s. 62, ch. 88-130.

**403.7065      Procurement of products or materials with recycled content.**—

(1)   Except as provided in [1]s. 287.045, any state agency or agency of a political subdivision of the state which is using state funds, or any person contracting with any such agency with respect to work performed under contract, is required to procure products or materials with recycled content when the Department of Management Services determines that those products or materials are available. A decision not to procure such items must be based on the Department of Management Services' determination that such procurement is not reasonably available within an acceptable period of time, fails to meet the performance standards set forth in the applicable specifications, or fails to meet the performance standards of the agency. When the requirements of [1]s. 287.045 are met, agencies shall be subject to the procurement requirements of that section for procuring products or materials with recycled content.

(2)   For the purposes of this section, "recycled content" means materials that have been recycled that are contained in the products or materials to be procured, including, but not limited to, paper, aluminum, steel, plastic, glass, and composted material. The term does not include the virgin component of internally generated scrap that is commonly used in the industrial or manufacturing processes from which it was generated or waste or scrap purchased from another manufacturer who manufactures the same or a closely related product.

History.—s. 2, ch. 83-293; s. 12, ch. 88-130; s. 32, ch. 90-268; s. 16, ch. 93-207; s. 104, ch. 98-279.

[1]Note.—Repealed by s. 17, ch. 2010-151.

**403.707      Permits.**—

(1)   A solid waste management facility may not be operated, maintained, constructed, expanded, modified, or closed without an appropriate and currently valid permit issued by the department. The department may by rule exempt specified types of facilities from the requirement for a permit under this part if it determines that construction or operation of the facility is not expected to create any significant threat to the environment or public health. For purposes of this part, and only when specified by department rule, a permit may include registrations as well as other forms of licenses as defined in s. 120.52. Solid waste construction permits issued under this section may include any permit conditions necessary to achieve compliance with the recycling requirements of this act. The department shall pursue reasonable timeframes for closure and construction requirements, considering pending federal requirements and implementation costs to the permittee. The department shall adopt a rule establishing performance standards for construction and closure of solid waste management facilities. The standards shall allow flexibility in design and consideration for site-specific characteristics. For the purpose of permitting under this chapter, the department shall allow waste-to-energy facilities to maximize acceptance and processing of nonhazardous solid and liquid waste.

(2)   Except as provided in s. 403.722(6), a permit under this section is not required for the following:

(a)   Disposal by persons of solid waste resulting from their own activities on their own property, if such waste is ordinary household waste from their residential property or is rocks, soils, trees, tree remains, and other vegetative matter that normally result from land development operations. Disposal of materials that could create a public nuisance or adversely affect the environment or public health, such as white goods; automotive materials, such as batteries and tires; petroleum products; pesticides; solvents; or hazardous substances, is not covered under this exemption.

(b)   Storage in containers by persons of solid waste resulting from their own activities on their property, leased or rented property, or property subject to a homeowners' or maintenance association for which the person contributes association assessments, if the solid waste in such containers is collected at least once a week.

(c)   Disposal by persons of solid waste resulting from their own activities on their property, if the environmental effects of such disposal on groundwater and surface waters are:

1.   Addressed or authorized by a site certification order issued under part II or a permit issued by the department under this chapter or rules adopted pursuant to this chapter; or

2.   Addressed or authorized by, or exempted from the requirement to obtain, a groundwater monitoring plan approved by the department. If a facility has a permit authorizing disposal activity, new areas where solid waste is being disposed of which are monitored by an existing or modified groundwater monitoring plan are not required to be specifically authorized in a permit or other certification.

(d)   Disposal by persons of solid waste resulting from their own activities on their own property, if such disposal occurred prior to October 1, 1988.

(e)   Disposal of solid waste resulting from normal farming operations as defined by department rule. Polyethylene agricultural plastic, damaged, nonsalvageable, untreated wood pallets, and packing material that cannot be feasibly recycled, which are used in connection with agricultural operations related to the growing, harvesting, or maintenance of crops, may be disposed of by open burning if a public nuisance or any condition adversely affecting the environment or the public health is not created by the open burning and state or federal ambient air quality standards are not violated.

(f)   The use of clean debris as fill material in any area. However, this paragraph does not exempt any person from obtaining any other required permits, and does not affect a person's responsibility to dispose of clean debris appropriately if it is not to be used as fill material.

(g)   Compost operations that produce less than 50 cubic yards of compost per year when the compost produced is used on the property where the compost operation is located.

(3)(a)   All applicable provisions of ss. 403.087 and 403.088, relating to permits, apply to the control of solid waste management facilities.

(b)   A permit, including a general permit, issued to a solid waste management facility that is designed with a leachate control system meeting department requirements shall be issued for a term of 20 years unless the applicant requests a shorter permit term. This paragraph applies to a qualifying solid waste management facility

that applies for an operating or construction permit or renews an existing operating or construction permit on or after October 1, 2012.

(c)   A permit, including a general permit, but not including a registration, issued to a solid waste management facility that does not have a leachate control system meeting department requirements shall be renewed for a term of 10 years, unless the applicant requests a shorter permit term, if the following conditions are met:

1.   The applicant has conducted the regulated activity at the same site for which the renewal is sought for at least 4 years and 6 months before the date that the permit application is received by the department; and

2.   At the time of applying for the renewal permit:

a.   The applicant is not subject to a notice of violation, consent order, or administrative order issued by the department for violation of an applicable law or rule;

b.   The department has not notified the applicant that it is required to implement assessment or evaluation monitoring as a result of exceedances of applicable groundwater standards or criteria or, if applicable, the applicant is completing corrective actions in accordance with applicable department rules; and

c.   The applicant is in compliance with the applicable financial assurance requirements.

(d)   The department may adopt rules to administer this subsection. However, the department is not required to submit such rules to the Environmental Regulation Commission for approval. Notwithstanding the limitations of s. 403.087(6)(a), permit fee caps for solid waste management facilities shall be prorated to reflect the extended permit term authorized by this subsection.

(4)   When application for a construction permit for a Class I solid waste disposal facility is made, it is the duty of the department to provide a copy of the application, within 7 days after filing, to the water management district having jurisdiction where the area is to be located. The water management district may prepare an advisory report as to the impact on water resources. This report must contain the district's recommendations as to the disposition of the application and shall be submitted to the department no later than 30 days prior to the deadline for final agency action by the department. However, the failure of the department or the water management district to comply with the provisions of this subsection shall not be the basis for the denial, revocation, or remand of any permit or order issued by the department.

(5)   The department may not issue a construction permit pursuant to this part for a new solid waste landfill within 3,000 feet of Class I surface waters.

(6)   The department may issue a construction permit pursuant to this part only to a solid waste management facility that provides the conditions necessary to control the safe movement of wastes or waste constituents into surface or ground waters or the atmosphere and that will be operated, maintained, and closed by qualified and properly trained personnel. Such facility must if necessary:

(a)   Use natural or artificial barriers that are capable of controlling lateral or vertical movement of wastes or waste constituents into surface or ground waters.

(b)   Have a foundation or base that is capable of providing support for structures and waste deposits and capable of preventing foundation or base failure due to settlement, compression, or uplift.

(c)   Provide for the most economically feasible, cost-effective, and environmentally safe control of leachate, gas, stormwater, and disease vectors and prevent the endangerment of public health and the environment.

Open fires, air-curtain incinerators, or trench burning may not be used as a means of disposal at a solid waste management facility, unless permitted by the department under s. 403.087.

(7)   Prior to application for a construction permit, an applicant shall designate to the department temporary backup disposal areas or processes for the resource recovery facility. Failure to designate temporary backup disposal areas or processes shall result in a denial of the construction permit.

(8)   The department may refuse to issue a permit to an applicant who by past conduct in this state has repeatedly violated pertinent statutes, rules, or orders or permit terms or conditions relating to any solid waste management facility and who is deemed to be irresponsible as defined by department rule. For the purposes of this subsection, an applicant includes the owner or operator of the facility, or if the owner or operator is a business

entity, a parent of a subsidiary corporation, a partner, a corporate officer or director, or a stockholder holding more than 50 percent of the stock of the corporation.

(9)   The department shall establish a separate category for solid waste management facilities that accept only construction and demolition debris for disposal or recycling. The department shall establish a reasonable schedule for existing facilities to comply with this section to avoid undue hardship to such facilities. However, a permitted solid waste disposal unit that receives a significant amount of waste prior to the compliance deadline established in this schedule shall not be required to be retrofitted with liners or leachate control systems.

(a)   The department shall establish reasonable construction, operation, monitoring, recordkeeping, financial assurance, and closure requirements for such facilities. The department shall take into account the nature of the waste accepted at various facilities when establishing these requirements, and may impose less stringent requirements, including a system of general permits or registration requirements, for facilities that accept only a segregated waste stream which is expected to pose a minimal risk to the environment and public health, such as clean debris. The Legislature recognizes that incidental amounts of other types of solid waste are commonly generated at construction or demolition projects. In any enforcement action taken pursuant to this section, the department shall consider the difficulty of removing these incidental amounts from the waste stream.

(b)   The department shall require liners and leachate collection systems at individual disposal units and lateral expansions of existing disposal units that have not received a department permit authorizing construction or operation prior to July 1, 2010, unless the owner or operator demonstrates, based upon the types of waste received, the methods for controlling types of waste disposed of, the proximity of the groundwater and surface water, and the results of the hydrogeological and geotechnical investigations, that the facility is not expected to result in violations of the groundwater standards and criteria if built without a liner.

(c)   The owner or operator shall provide financial assurance for closing of the facility in accordance with the requirements of s. 403.7125. The financial assurance shall cover the cost of closing the facility and 5 years of long-term care after closing, unless the department determines, based upon hydrogeologic conditions, the types of wastes received, or the groundwater monitoring results, that a different long-term care period is appropriate. However, unless the owner or operator of the facility is a local government, the escrow account described in s. 403.7125(2) may not be used as a financial assurance mechanism.

(d)   The department shall establish training requirements for operators of facilities, and shall work with the State University System or other providers to assure that adequate training courses are available. The department shall also assist the Florida Home Builders Association in establishing a component of its continuing education program to address proper handling of construction and demolition debris, including best management practices for reducing contamination of the construction and demolition debris waste stream.

(e)   The issuance of a permit under this subsection does not obviate the need to comply with all applicable zoning and land use regulations.

(f)   A permit is not required under this section for the disposal of construction and demolition debris on the property where it is generated, but such property must be covered, graded, and vegetated as necessary when disposal is complete.

(g)   By January 1, 2012, the amount of construction and demolition debris processed and recycled prior to disposal at a permitted materials recovery facility or at any other permitted disposal facility shall be reported by the county of origin to the department and to the county on an annual basis in accordance with rules adopted by the department. The rules shall establish criteria to ensure accurate and consistent reporting for purposes of determining the recycling rate in s. 403.706 and shall also require that, to the extent economically feasible, all construction and demolition debris must be processed prior to disposal, either at a permitted materials recovery facility or at a permitted disposal facility. This paragraph does not apply to recovered materials, any materials that have been source separated and offered for recycling, or materials that have been previously processed.

(h)   The department shall ensure that the requirements of this section are applied and interpreted consistently throughout the state. In accordance with s. 20.255, the Division of Waste Management shall direct the district offices and bureaus on matters relating to the interpretation and applicability of this section.

(i)   The department shall provide notice of receipt of a permit application for the initial construction of a construction and demolition debris disposal facility to the local governments having jurisdiction where the facility is to be located.

(j)   The Legislature recognizes that recycling, waste reduction, and resource recovery are important aspects of an integrated solid waste management program and as such are necessary to protect the public health and the environment. If necessary to promote such an integrated program, the county may determine, after providing notice and an opportunity for a hearing prior to April 30, 2008, that some or all of the material described in s. 403.703(6)(b) shall be excluded from the definition of "construction and demolition debris" in s. 403.703(6) within the jurisdiction of such county. The county may make such a determination only if it finds that, prior to June 1, 2007, the county has established an adequate method for the use or recycling of such wood material at an existing or proposed solid waste management facility that is permitted or authorized by the department on June 1, 2007. The county is not required to hold a hearing if the county represents that it previously has held a hearing for such purpose, or if the county represents that it previously has held a public meeting or hearing that authorized such method for the use or recycling of trash or other nonputrescible waste materials and that such materials include those materials described in s. 403.703(6)(b). The county shall provide written notice of its determination to the department by no later than April 30, 2008; thereafter, the materials described in s. 403.703(6) shall be excluded from the definition of "construction and demolition debris" in s. 403.703(6) within the jurisdiction of such county. The county may withdraw or revoke its determination at any time by providing written notice to the department.

(k)   Brazilian pepper and other invasive exotic plant species as designated by the department resulting from eradication projects may be processed at permitted construction and demolition debris recycling facilities or disposed of at permitted construction and demolition debris disposal facilities or Class III facilities. The department may adopt rules to implement this paragraph.

(10)   If the department and a local government independently require financial assurance for the closure of a privately owned solid waste management facility, the department and that local government shall enter into an interagency agreement that will allow the owner or operator to provide a single financial mechanism to cover the costs of closure and any required long-term care. The financial mechanism may provide for the department and local government to be cobeneficiaries or copayees, but shall not impose duplicative financial requirements on the owner or operator. These closure costs must include at least the minimum required by department rules and must also include any additional costs required by local ordinance or regulation.

(11)   Before or on the same day of filing with the department of an application for a permit to construct or substantially modify a solid waste management facility, the applicant shall notify the local government having jurisdiction over the facility of the filing of the application. The applicant also shall publish notice of the filing of the application in a newspaper of general circulation in the area where the facility will be located. Notice shall be given and published in accordance with applicable department rules. The department shall not issue the requested permit until the applicant has provided the department with proof that the notices required by this subsection have been given. Issuance of a permit does not relieve an applicant from compliance with local zoning or land use ordinances, or with any other law, rules, or ordinances.

(12)   Construction and demolition debris must be separated from the solid waste stream and segregated in separate locations at a solid waste disposal facility or other permitted site.

(13)   A facility shall not be considered a solid waste disposal facility solely by virtue of the fact that it uses processed yard trash or clean wood or paper waste as a fuel source.

(14)(a)   A permit to operate a solid waste management facility may not be transferred by the permittee to any other entity without the consent of the department. If the permitted facility is sold or transferred, or if control of the facility is transferred, the permittee must submit to the department an application for transfer of permit no later than 30 days after the transfer of ownership or control. The department shall approve the transfer of a permit unless it determines that the proposed new permittee has not provided reasonable assurance that the conditions of the permit will be met. A permit may not be transferred until any proof of financial assurance required by department rule is provided by the proposed new permittee. If the existing permittee is under a continuing obligation to perform corrective actions as a result of a department enforcement action or consent

order, the permit may not be transferred until the proposed new permittee agrees in writing to accept responsibility for performing such corrective actions.

(b)    Until the transfer is approved by the department, the existing permittee is liable for compliance with the permit, including the financial assurance requirements. When the transfer has been approved, the department shall return to the transferring permittee any means of proof of financial assurance which the permittee provided to the department and the permittee is released from obligations to comply with the transferred permit.

(c)    An application for the transfer of a permit must clearly state in bold letters that the permit may not be transferred without proof of compliance with financial assurance requirements. Until the permit is transferred, the new owner or operator may not operate the facility without the express consent of the permittee.

(d)    The department may adopt rules to administer this subsection, including procedural rules and the permit transfer form.

History.—s. 1, ch. 74-342; s. 3, ch. 78-387; s. 14, ch. 82-101; s. 63, ch. 83-218; s. 33, ch. 83-310; s. 32, ch. 84-338; s. 1, ch. 85-269; s. 1, ch. 85-334; s. 13, ch. 88-130; s. 1, ch. 91-284; s. 1, ch. 91-301; s. 1, ch. 92-346; s. 17, ch. 93-207; s. 82, ch. 93-213; s. 397, ch. 94-356; s. 4, ch. 96-284; s. 2, ch. 96-381; s. 2, ch. 98-316; s. 25, ch. 2000-197; s. 21, ch. 2000-211; s. 2, ch. 2001-224; s. 6, ch. 2002-291; s. 18, ch. 2002-295; s. 12, ch. 2007-184; s. 107, ch. 2008-4; s. 9, ch. 2010-143; s. 47, ch. 2010-205; s. 17, ch. 2012-205.

**403.7071    Management of storm-generated debris.**—Solid waste generated as a result of a storm event that is the subject of an emergency order issued by the department may be managed as follows:

(1)    Recycling and reuse of storm-generated vegetative debris is encouraged to the greatest extent practicable. Such recycling and reuse must be conducted in accordance with applicable department rules and may include, but is not limited to, chipping and grinding of the vegetative debris to be beneficially used as a ground cover or soil amendment, compost, or as a combustible fuel for any applicable commercial or industrial application.

(2)    The department may issue field authorizations for staging areas in those counties affected by a storm event. Such staging areas may be used for the temporary storage and management of storm-generated debris, including the chipping, grinding, or burning of vegetative debris. Field authorizations may include specific conditions for the operation and closure of the staging area and must specify the date that closure is required. To the greatest extent possible, staging areas may not be located in wetlands or other surface waters. The area that is used or affected by a staging area must be fully restored upon cessation of the use of the area.

(3)    Storm-generated vegetative debris managed at a staging area may be disposed of in a permitted lined or unlined landfill, a permitted land clearing debris facility, a permitted or certified waste-to-energy facility, or a permitted construction and demolition debris disposal facility. Vegetative debris may also be managed at a permitted waste processing facility or a registered yard trash processing facility.

(4)    Construction and demolition debris that is mixed with other storm-generated debris need not be segregated from other solid waste before disposal in a lined landfill. Construction and demolition debris that is source separated or is separated from other hurricane-generated debris at an authorized staging area, or at another area permitted or specifically authorized by the department, may be managed at a permitted construction and demolition debris disposal facility, a Class III landfill, or a recycling facility upon approval by the department of the methods and operational practices used to inspect the waste during segregation.

(5)    Unsalvageable refrigerators and freezers containing solid waste, such as rotting food, which may create a sanitary nuisance may be disposed of in a permitted lined landfill; however, chlorofluorocarbons and capacitors must be removed and recycled to the greatest extent practicable.

(6)    Local governments or their agents may conduct the burning of storm-generated yard trash, other storm-generated vegetative debris, or untreated wood from construction and demolition debris in air-curtain incinerators without prior notice to the department. Within 10 days after commencing such burning, the local government shall notify the department in writing describing the general nature of the materials burned; the location and method of burning; and the name, address, and telephone number of the representative of the local government to contact concerning the work. The operator of the air-curtain incinerator is subject to any requirement of the Florida Forest Service or of any other agency concerning authorization to conduct open burning. Any person conducting open burning of vegetative debris is also subject to such requirements.

History.—s. 13, ch. 2007-184; s. 20, ch. 2012-7.

**403.70715    Research, development, and demonstration permits.**—

(1)    The department may issue a research, development, and demonstration permit to the owner or operator of any solid waste management facility or hazardous waste management facility who proposes to utilize an innovative and experimental solid waste treatment technology or process for which permit standards have not been promulgated. Permits shall:

(a)    Provide for construction and operation of the facility for not longer than 3 years, renewable no more than 3 times.

(b)    Provide for the receipt and treatment by the facility of only those types and quantities of solid waste which the department deems necessary for purposes of determining the performance capabilities of the technology or process and the effects of such technology or process on human health and the environment.

(c)    Include requirements the department deems necessary which may include monitoring, operation, testing, financial responsibility, closure, and remedial action.

(2)    The department may apply the criteria set forth in this section in establishing the conditions of each permit without separate establishment of rules implementing such criteria.

(3)    For the purpose of expediting review and issuance of permits under this section, the department may, consistent with the protection of human health and the environment, modify or waive permit application and permit issuance requirements, except that there shall be no modification or waiver of regulations regarding financial responsibility or of procedures established regarding public participation.

(4)    The department may order an immediate termination of all operations at the facility at any time upon a determination that termination is necessary to protect human health and the environment.

History.—s. 35, ch. 86-186; s. 80, ch. 88-130; s. 20, ch. 2007-184.
Note.—Former s. 403.7221.

**403.7072    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 8, ch. 79-161.

**403.708    Prohibition; penalty.**—

(1)    A person may not:

(a)    Place or deposit any solid waste in or on the land or waters located within the state except in a manner approved by the department and consistent with applicable approved programs of counties or municipalities. However, this act does not prohibit the disposal of solid waste without a permit as provided in s. 403.707(2).

(b)    Burn solid waste except in a manner prescribed by the department and consistent with applicable approved programs of counties or municipalities.

(c)    Construct, alter, modify, or operate a solid waste management facility or site without first having obtained from the department any permit required by s. 403.707.

(2)    A beverage may not be sold or offered for sale within the state in a beverage container designed and constructed so that the container is opened by detaching a metal ring or tab. As used in this subsection, the term:

(a)    "Beverage" means soda water, carbonated natural or mineral water, or other nonalcoholic carbonated drinks; soft drinks, whether or not carbonated; beer, ale, or other malt drink of whatever alcoholic content; or a mixed wine drink or a mixed spirit drink.

(b)    "Beverage container" means an airtight container that at the time of sale contains 1 gallon or less of a beverage, or the metric equivalent of 1 gallon or less, and that is composed of metal, plastic, or glass or a combination thereof.

(3)    The Division of Alcoholic Beverages and Tobacco of the Department of Business and Professional Regulation may impose a fine of not more than $100 on any person currently licensed pursuant to s. 561.14 for each violation of subsection (2). If the violation is of a continuing nature, each day during which such violation occurs constitutes a separate offense and is subject to a separate fine.

(4)   The Department of Agriculture and Consumer Services may impose a fine of not more than $100 against any person not currently licensed pursuant to s. 561.14 for each violation of the provisions of subsection (2). If the violation is of a continuing nature, each day during which such violation occurs constitutes a separate offense and is subject to a separate fine.

(5)   Fifty percent of each fine collected pursuant to subsections (3) and (4) shall be deposited into the Solid Waste Management Trust Fund. The balance of fines collected pursuant to subsection (3) shall be deposited into the Alcoholic Beverage and Tobacco Trust Fund for the use of the division for inspection and enforcement of this section. The balance of fines collected pursuant to subsection (4) shall be deposited into the General Inspection Trust Fund for the use of the Department of Agriculture and Consumer Services for inspection and enforcement of this section.

(6)   The Division of Alcoholic Beverages and Tobacco and the Department of Agriculture and Consumer Services shall coordinate their responsibilities under this section to ensure that inspections and enforcement are accomplished in an efficient, cost-effective manner.

(7)   A person may not distribute, sell, or expose for sale in this state any plastic bottle or rigid container intended for single use unless such container has a molded label indicating the plastic resin used to produce the plastic container. The label must appear on or near the bottom of the plastic container product and be clearly visible. This label must consist of a number placed inside a triangle and letters placed below the triangle. The triangle must be equilateral and must be formed by three arrows, and, in the middle of each arrow, there must be a rounded bend that forms one apex of the triangle. The pointer, or arrowhead, of each arrow must be at the midpoint of a side of the triangle, and a short gap must separate each pointer from the base of the adjacent arrow. The three curved arrows that form the triangle must depict a clockwise path around the code number. Plastic bottles of less than 16 ounces, rigid plastic containers of less than 8 ounces, and plastic casings on lead-acid storage batteries are not required to be labeled under this subsection. The numbers and letters must be as follows:

(a)   For polyethylene terephthalate, the letters "PETE" and the number 1.

(b)   For high-density polyethylene, the letters "HDPE" and the number 2.

(c)   For vinyl, the letter "V" and the number 3.

(d)   For low-density polyethylene, the letters "LDPE" and the number 4.

(e)   For polypropylene, the letters "PP" and the number 5.

(f)   For polystyrene, the letters "PS" and the number 6.

(g)   For any other, the letters "OTHER" and the number 7.

(8)   A person may not distribute, sell, or expose for sale in this state any product packaged in a container or packing material manufactured with fully halogenated chlorofluorocarbons. Producers of containers or packing material manufactured with chlorofluorocarbons are urged to introduce alternative packaging materials that are environmentally compatible.

(9)   The packaging of products manufactured or sold in the state may not be controlled by governmental rule, regulation, or ordinance adopted after March 1, 1974, other than as expressly provided in this act.

(10)   Violations of this part or rules, regulations, permits, or orders issued thereunder by the department and violations of approved local programs of counties or municipalities or rules, regulations, or orders issued thereunder are punishable by a civil penalty as provided in s. 403.141.

(11)   The department or any county or municipality may also seek to enjoin the violation of, or enforce compliance with, this part or any program adopted hereunder as provided in s. 403.131.

(12)   A person who knows or should know of the nature of the following types of solid waste may not dispose of such solid waste in landfills:

(a)   Lead-acid batteries. Lead-acid batteries also may not be disposed of in any waste-to-energy facility. To encourage proper collection and recycling, all persons who sell lead-acid batteries at retail shall accept used lead-acid batteries as trade-ins for new lead-acid batteries.

(b)   Used oil.

(c)1.   Yard trash in lined landfills classified by department rule as Class I landfills, unless the Class I landfill uses an active gas-collection system to collect landfill gas generated at the disposal facility and provides or arranges for

a beneficial use of the gas. A Class I landfill may also accept yard trash for the purpose of mulching and using the yard trash to provide landfill cover for municipal solid waste disposed at the landfill. The department shall, by rule, develop and adopt a methodology to award recycling credit for the use or disposal of yard trash at a Class I landfill having a gas-collection system that makes beneficial use of the collected landfill gas. A qualifying permitted Class I landfill must obtain a minor permit modification to its operating permit which describes the beneficial use being made of the landfill gas and modifies the facility's operation plan before receiving yard trash as authorized under this subparagraph. The permittee must certify that gas collection and beneficial use will continue after closure of the disposal facility that is accepting yard trash. If the landfill is located in a county that owns and operates a compost facility, waste-to-energy facility, or biomass facility that sells renewable energy to a public utility and that is authorized to accept yard trash, the department shall provide the county with notice of, and opportunity to comment on, the application for permit modification.

2.    Yard trash that is source separated from solid waste may be accepted at a solid waste disposal area if separate yard trash composting facilities are provided and maintained. The department recognizes that incidental amounts of yard trash may be disposed of in Class I landfills. In any enforcement action taken pursuant to this paragraph, the department shall consider the difficulty of removing incidental amounts of yard trash from a mixed solid waste stream. This limited exception applies in all units of local government, including, but not limited to, municipalities, counties, and special districts. However, the exception does not apply to a county that currently operates under a constitutional home rule charter authorized in 1956 in a statewide referendum. The limited exception to the ban on disposing of yard trash in a Class I landfill is not intended to have a material impact on current operations at existing waste-to-energy or biomass facilities.

(d)    White goods.

**History.**—s. 1, ch. 74-342; s. 15, ch. 88-130; s. 18, ch. 93-207; s. 54, ch. 94-218; s. 398, ch. 94-356; s. 6, ch. 96-284; s. 1, ch. 97-23; s. 33, ch. 2000-153; s. 22, ch. 2000-211; s. 87, ch. 2007-5; s. 14, ch. 2007-184; ss. 1, 2, ch. 2010-276; HJR 3-A, 2010 Special Session A.

**403.709**    **Solid Waste Management Trust Fund; use of waste tire fees.**—There is created the Solid Waste Management Trust Fund, to be administered by the department.

(1)    From the annual revenues deposited in the trust fund, unless otherwise specified in the General Appropriations Act:

(a)    Up to 40 percent shall be used for funding solid waste activities of the department and other state agencies, such as providing technical assistance to local governments and the private sector, performing solid waste regulatory and enforcement functions, preparing solid waste documents, and implementing solid waste education programs.

(b)    Up to 4.5 percent shall be used for funding research and training programs relating to solid waste management through the Center for Solid and Hazardous Waste Management and other organizations that can reasonably demonstrate the capability to carry out such projects.

(c)    Up to 14 percent shall be used for funding to supplement any other funds provided to the Department of Agriculture and Consumer Services for mosquito control. This distribution shall be annually transferred to the General Inspection Trust Fund in the Department of Agriculture and Consumer Services to be used for mosquito control, especially control of West Nile Virus.

(d)    Up to 4.5 percent shall be used for funding to the Department of Transportation for litter prevention and control programs through a certified Keep America Beautiful Affiliate at the local level.

(e)    Up to 37 percent shall be used for funding a waste tire abatement program and a solid waste management grant program pursuant to s. 403.7095 for activities relating to recycling and waste reduction, including waste tires requiring final disposal. Of the funding specified in this paragraph, no more than 5 percent of the total may be used for funding the waste tire abatement program.

(2)    Notwithstanding subsection (1), a solid waste landfill closure account is established within the Solid Waste Management Trust Fund to provide funding for the closing and long-term care of solid waste management facilities.

(a)    The department may use funds from the account to contract with a third party for the closing and long-term care of a solid waste management facility if:

1.    The facility has, had, or was not required to obtain a department permit to operate the facility;

2.    The permittee, where required by permit or rule, provided proof of financial assurance for closure in the form of an insurance certificate or an alternative form of financial assurance mechanism established pursuant to s. 403.7125;

3.    The department has ordered the facility closed or has deemed the facility abandoned;

4.    The closure of the facility is accomplished in substantial accordance with a closure plan approved by the department; and

5.    The department has sufficient documentation to confirm that the issuer of the insurance policy or alternative form of financial assurance will provide or reimburse the funds required to complete the closing and long-term care of the facility.

(b)    The department shall deposit all funds received from the insurer or other parties for reimbursing the costs of closing or long-term care of the facility under this subsection into the solid waste landfill closure account.

(c)    If the amount available under the insurance policy or alternative form of financial assurance is insufficient, or is otherwise unavailable, to perform or complete the facility closing or long-term care under this subsection, and the department has used all such funds from the insurance policy or alternative form of financial assurance, the department may use funds from the Solid Waste Management Trust Fund to pay for or reimburse additional expenses needed for performing or completing the approved facility closure or long-term care activities.

(3)    The department shall recover to the use of the fund from the site owner or the person responsible for the accumulation of tires at the site, jointly and severally, all sums expended from the fund pursuant to this section to manage tires at an illegal waste tire site, except that the department may decline to pursue such recovery if it finds the amount involved too small or the likelihood of recovery too uncertain. If a court determines that the owner is unable or unwilling to comply with the rules adopted pursuant to this section or s. 403.717, the court may authorize the department to take possession and control of the waste tire site in order to protect the health, safety, and welfare of the community and the environment.

(4)    The department may impose a lien on the real property on which the waste tire site is located and the waste tires equal to the estimated cost to bring the tire site into compliance, including attorney's fees and court costs. Any owner whose property has such a lien imposed may release her or his property from any lien claimed under this subsection by filing with the clerk of the circuit court a cash or surety bond, payable to the department in the amount of the estimated cost of bringing the tire site into compliance with department rules, including attorney's fees and court costs, or the value of the property after the abatement action is complete, whichever is less. A lien provided by this subsection may not continue for a period longer than 4 years after the abatement action is completed, unless within that period an action to enforce the lien is commenced in a court of competent jurisdiction. The department may take action to enforce the lien in the same manner used for construction liens under part I of chapter 713.

(5)    This section does not limit the use of other remedies available to the department.

**History.**—s. 18, ch. 74-342; s. 17, ch. 88-130; s. 3, ch. 90-332; s. 11, ch. 92-290; s. 20, ch. 93-207; s. 400, ch. 94-356; s. 3, ch. 95-311; s. 18, ch. 95-430; s. 8, ch. 97-94; s. 14, ch. 97-103; s. 7, ch. 2002-291; s. 19, ch. 2002-295; s. 15, ch. 2007-184; s. 10, ch. 2010-143; s. 26, ch. 2013-41; s. 12, ch. 2015-3; s. 5, ch. 2015-8; s. 53, ch. 2015-222; ss. 88, 126, ch. 2016-62; s. 6, ch. 2016-130; s. 1, ch. 2016-174.

### 403.7095    Solid waste management grant program.—

(1)    The department shall develop a consolidated grant program for small counties having populations fewer than 110,000, with grants to be distributed equally among eligible counties. Programs to be supported with the small-county consolidated grants include those for the purpose of general solid waste management, litter prevention and control, waste tire abatement, and recycling and education programs.

(2)    The department may adopt rules necessary to administer this section, including, but not limited to, rules governing timeframes for submitting grant applications, criteria for prioritizing, matching criteria, maximum grant amounts, and allocation of appropriated funds based upon project and applicant size.

**History.**—s. 18, ch. 88-130; s. 21, ch. 93-207; s. 3, ch. 95-144; ss. 34, 35, ch. 97-153; s. 22, ch. 98-46; s. 17, ch. 98-258; s. 24, ch. 99-228; s. 57, ch. 2000-171; s. 38, ch. 2001-254; s. 8, ch. 2002-2; s. 8, ch. 2002-291; ss. 33, 34, ch. 2002-402; s. 11, ch. 2004-6; s. 16, ch. 2007-184; s. 38, ch. 2008-153; s. 35, ch. 2009-82; s. 17, ch. 2010-4; s. 11, ch. 2010-143; s. 31, ch. 2010-153; s. 37, ch. 2011-47; s. 28, ch.

2012-119; s. 27, ch. 2013-41; s. 35, ch. 2014-53; s. 6, ch. 2015-8; s. 7, ch. 2016-11; ss. 89, 126, ch. 2016-62; s. 2, ch. 2016-174; s. 18, ch. 2018-111.

#### 403.712    Revenue bonds.—

(1)   Revenue bonds payable from funds which result from the revenues derived from the operation of solid waste management facilities and from any revenues which may be pledged under s. 14, Art. VII of the State Constitution, and s. 403.1834, including, without limiting the generality of the foregoing, any legally available revenues derived from public or private sources, may be issued by the Division of Bond Finance of the State Board of Administration on behalf of the state or any county or municipality in the manner provided by the State Bond Act, ss. 215.57 et seq., except as otherwise provided herein, and the Revenue Bond Act of 1953, as amended, part I, chapter 159. Such bonds shall be issued only to finance the cost of construction or maintenance of solid waste management facilities, which cost may include the acquisition of real property and easements therein for such purposes, and the closure of solid waste landfills.

(2)   Upon a determination by the Division of Bond Finance of the State Board of Administration that a public competitive sale is not feasible or that it would not be desirable to award such revenue bonds solely on the basis of the lowest net interest cost bid, the Division of Bond Finance may negotiate the sale of any such revenue bonds after the receipt of one or more proposals, taking into consideration the lowest total cost and such other factors as may be deemed appropriate.

History.—s. 1, ch. 74-342; s. 5, ch. 75-54; s. 19, ch. 88-130; s. 305, ch. 92-279; s. 55, ch. 92-326.

#### 403.7125    Financial assurance.—

(1)   Every owner or operator of a landfill is jointly and severally liable for the improper operation and closure of the landfill, as provided by law. As used in this section, the term "owner or operator" means any owner of record of any interest in land wherein a landfill is or has been located and any person or corporation that owns a majority interest in any other corporation that is the owner or operator of a landfill.

(2)   The owner or operator of a landfill owned or operated by a local or state government or the Federal Government shall establish a fee, or a surcharge on existing fees or other appropriate revenue-producing mechanism, to ensure the availability of financial resources for the proper closure of the landfill. However, the disposal of solid waste by persons on their own property, as described in s. 403.707(2), is exempt from this section.

(a)   The revenue-producing mechanism must produce revenue at a rate sufficient to generate funds to meet state and federal landfill closure requirements.

(b)   The revenue shall be deposited in an interest-bearing escrow account to be held and administered by the owner or operator. The owner or operator shall file with the department an annual audit of the account. The audit shall be conducted by an independent certified public accountant. Failure to collect or report such revenue, except as allowed in subsection (3), is a noncriminal violation punishable by a fine of not more than $5,000 for each offense. The owner or operator may make expenditures from the account and its accumulated interest only for the purpose of landfill closure and, if such expenditures do not deplete the fund to the detriment of eventual closure, for planning and construction of resource recovery or landfill facilities. Any moneys remaining in the account after paying for proper and complete closure, as determined by the department, shall, if the owner or operator does not operate a landfill, be deposited by the owner or operator into the general fund or the appropriate solid waste fund of the local government of jurisdiction.

(c)   The revenue generated under this subsection and any accumulated interest thereon may be applied to the payment of, or pledged as security for, the payment of revenue bonds issued in whole or in part for the purpose of complying with state and federal landfill closure requirements. Such application or pledge may be made directly in the proceedings authorizing such bonds or in an agreement with an insurer of bonds to assure such insurer of additional security therefor.

(d)   The provisions of s. 212.055 which relate to raising of revenues for landfill closure or long-term maintenance do not relieve a landfill owner or operator from the obligations of this section.

(e)   The owner or operator of any landfill that had established an escrow account in accordance with this section and the conditions of its permit prior to January 1, 2007, may continue to use that escrow account to

provide financial assurance for closure of that landfill, even if that landfill is not owned or operated by a local or state government or the Federal Government.

(3)   An owner or operator of a landfill owned or operated by a local or state government or by the Federal Government may provide financial assurance to the department in lieu of the requirements of subsection (2). An owner or operator of any other landfill, or any other solid waste management facility designated by department rule, shall provide financial assurance to the department for the closure of the facility. Such financial assurance may include surety bonds, certificates of deposit, securities, letters of credit, or other documents showing that the owner or operator has sufficient financial resources to cover, at a minimum, the costs of complying with applicable closure requirements. The owner or operator shall estimate such costs to the satisfaction of the department.

(4)   This section does not repeal, limit, or abrogate any other law authorizing local governments to fix, levy, or charge rates, fees, or charges for the purpose of complying with state and federal landfill closure requirements.

(5)   The department shall by rule require that the owner or operator of a solid waste management facility that receives waste after October 9, 1993, and that is required by department rule to undertake corrective actions for violations of water quality standards provide financial assurance for the cost of completing such corrective actions. The same financial assurance mechanisms that are available for closure costs shall be available for costs associated with undertaking corrective actions.

(6)   The department shall adopt rules to implement this section.

**History.**—s. 40, ch. 88-130; s. 70, ch. 91-221; s. 22, ch. 93-207; s. 17, ch. 2007-184; s. 18, ch. 2012-205.

### 403.713   Ownership and control of solid waste and recovered materials.—

(1)   Nothing in this act or in any local act or ordinance shall be construed to limit the free flow of solid waste across municipal or county boundaries provided such solid waste is transported or disposed of pursuant to the provisions of this part. However, any local government that undertakes resource recovery from solid waste pursuant to general law or special act may control the collection and disposal of solid waste, as defined by general law or such special act, which is generated within the territorial boundaries of such local government and other local governments which enter into interlocal agreements for the disposal of solid waste with the local government sponsoring the resource recovery facility.

(2)   Any local government which undertakes resource recovery from solid waste pursuant to general law or special act may institute a flow control ordinance for the purpose of ensuring that the resource recovery facility receives an adequate quantity of solid waste from solid waste generated within its jurisdiction. Such authority shall not extend to recovered materials, whether separated at the point of generation or after collection, that are intended to be held for purposes of recycling pursuant to requirements of this part; however, the handling of such materials shall be subject to applicable state and local public health and safety laws.

**History.**—s. 1, ch. 74-342; s. 1, ch. 83-293; s. 20, ch. 88-130; s. 23, ch. 93-207.

### 403.714   Duties of state agencies.—

(1)   Each state agency, the judicial branch of state government, and the State University System shall:

(a)   Establish a program, in cooperation with the department and the Department of Management Services, for the collection of all recyclable materials generated in state offices and institutions throughout the state, including, at a minimum, aluminum, high-grade office paper, and corrugated paper.

(b)   Provide procedures for collecting and storing recyclable materials, containers for storing materials, and contractual or other arrangements with buyers of the recyclable materials.

(c)   Evaluate the amount of recyclable material recycled and make all necessary modifications to said recycling program to ensure that all recyclable materials are effectively and practicably recycled.

(d)   Establish and implement, in cooperation with the department and the Department of Management Services, a solid waste reduction program for materials used in the course of agency operations. The program shall be designed and implemented to achieve the maximum feasible reduction of solid waste generated as a result of agency operations.

(2)   The Department of Agriculture and Consumer Services shall investigate the potential markets for composted materials and shall submit its findings to the department for the waste registry informational program

administered by the department in order to stimulate absorption of available composted materials into such markets.

(3) All state agencies, including, but not limited to, the Department of Transportation, the department, and the Department of Management Services and local governments, are required to procure compost products when they can be substituted for, and cost no more than, regular soil amendment products, provided the compost products meet all applicable state standards, specifications, and regulations.

(4) The Department of Agriculture and Consumer Services, in consultation with the Department of Transportation and the department, and appropriate trade associations, shall undertake to stimulate the development of sustainable state markets for compost through demonstration projects and other approaches the Department of Agriculture and Consumer Services may develop.

(5)(a) The Department of Education, in cooperation with the State University System and the department, shall develop, distribute, and encourage the use of guidelines for the collection of recyclable materials and for solid waste reduction in the state system of education. At a minimum, the guidelines shall address solid waste generated in administrative offices, classrooms, dormitories, and cafeterias.

(b) In order to orient students and their families to the recycling of waste and to encourage the participation of schools, communities, and families in recycling programs, the school board of each school district in the state shall provide a program of student instruction in the recycling of waste materials. The instruction shall be provided at both the elementary and secondary levels of education.

(c) The Department of Education is directed to develop, from funds appropriated for environmental education, curriculum materials and resource guides for a recycling awareness program for instruction at the elementary, middle, and high school levels.

History.—s. 2, ch. 74-342; s. 85, ch. 79-65; s. 21, ch. 88-130; s. 306, ch. 92-279; s. 55, ch. 92-326; s. 24, ch. 93-207; s. 401, ch. 94-356; s. 40, ch. 99-5; s. 43, ch. 2001-62; s. 8, ch. 2001-279.

### 403.7145    Recycling.—

(1) The Capitol and the House and Senate office buildings constitute the Capitol recycling area. The Florida House of Representatives, the Florida Senate, and the Office of the Governor, the Secretary of State, and each Cabinet officer who heads a department that occupies office space in the Capitol, shall institute a recycling program for their respective offices in the House and Senate office buildings and the Capitol. Provisions shall be made to collect and sell wastepaper and empty beverage containers generated by employee activities in these offices. The collection and sale of such materials shall be reported to Leon County using the department's designated reporting format and coordinated with Department of Management Services recycling activities to maximize the efficiency and economy of this program. The Governor, the Speaker of the House of Representatives, the President of the Senate, the Secretary of State, and the Cabinet officers may authorize the use of proceeds from recyclable material sales for employee benefits and other purposes, in order to provide incentives to their respective employees for participation in the recycling program. Such proceeds may also be used to offset any costs of the recycling program. As a demonstration of leading by example, the Capitol Building's recycling rates shall be posted on the website of the Department of Management Services and shall include the details of the recycling rates for each Department of Management Services pool facility. The Department of Environmental Protection shall post recycling rates of each state-owned facility reported to the Department of Management Services.

(2) Each state agency, the judicial branch of state government, and the State University System shall collect and sell, to the greatest extent practicable, recyclable materials and products used during the operation of facilities and offices and may use the proceeds of the sale of such materials and products for employee benefits and other purposes and thereby provide incentives for employees to participate in the recycling program. Such proceeds may also be used to offset any recycling program costs.

(3) The department shall develop and contract for an innovative recycling pilot project for the Capitol recycling area. The project shall be designed to collect recyclable materials and create a more sustainable

recycling system. Components of the project shall be designed to increase convenience, incentivize and measure participation, reduce material volume, and assist in achieving the recycling goals enumerated in s. 403.706.

History.—s. 22, ch. 88-130; s. 307, ch. 92-279; s. 55, ch. 92-326; s. 74, ch. 93-207; s. 37, ch. 2000-258; s. 12, ch. 2010-143.

**403.715    Certification of resource recovery or recycling equipment.**—For purposes of implementing the tax exemption provided by s. 212.08(7)(q), the department shall establish a system for the examination and certification of resource recovery or recycling equipment. Application for certification of equipment shall be submitted to the department on forms prescribed by it which include such pertinent information as the department may require. The department may require appropriate certification by a certified public accountant or professional engineer that the equipment for which this exemption is being sought complies with the exemption criterion set forth in s. 212.08(7)(q). Within 30 days after receipt of an application by the department, a representative of the department may inspect the equipment. Within 30 days after such inspection, the department shall issue a written decision granting or denying certification.

History.—s. 4, ch. 78-329; s. 29, ch. 87-6; s. 23, ch. 88-130; s. 34, ch. 2000-153; s. 6, ch. 2000-228.

**403.716    Training of operators of solid waste management and other facilities.**—

(1)    The department shall establish qualifications for, and encourage the development of training programs for, operators of landfills, coordinators of local recycling programs, and operators of other solid waste management facilities.

(2)    The department shall work with accredited community colleges, career centers, state universities, and private institutions in developing educational materials, courses of study, and other such information to be made available for persons seeking to be trained as operators of solid waste management facilities.

(3)    A person may not perform the duties of an operator of a landfill without first completing an operator training course approved by the department or qualifying as an interim operator in compliance with requirements established by the department by rule. An owner of a landfill may not employ any person to perform the duties of an operator unless such person has completed an approved landfill operator training course or qualified as an interim operator in compliance with requirements established by the department by rule. The department may establish by rule operator training requirements for other solid waste management facilities and facility operators.

(4)    The department has authority to adopt minimum standards and other rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this section. The department shall ensure the safe, healthy, and lawful operation of solid waste management facilities in this state. The department may establish by rule various classifications for operators to cover the need for differing levels of training required to operate various types of solid waste management facilities due to different operating requirements at such facilities.

(5)    For purposes of this section, the term "operator" means any person, including the owner, who is principally engaged in, and is in charge of, the actual operation, supervision, and maintenance of a solid waste management facility and includes the person in charge of a shift or period of operation during any part of the day.

History.—s. 39, ch. 88-130; s. 63, ch. 90-331; s. 93, ch. 91-221; s. 25, ch. 93-207; s. 402, ch. 94-356; s. 15, ch. 97-103; s. 105, ch. 98-200; s. 23, ch. 2000-211; s. 34, ch. 2004-357; s. 18, ch. 2007-184.

**403.717    Waste tire and lead-acid battery requirements.**—

(1)    For purposes of this section and ss. 403.718 and 403.7185:

(a)    "Department" means the Department of Environmental Protection.

(b)    "Motor vehicle" means an automobile, motorcycle, truck, trailer, semitrailer, truck tractor and semitrailer combination, or any other vehicle operated in this state, used to transport persons or property and propelled by power other than muscular power. The term does not include traction engines, road rollers, vehicles that run only upon a track, bicycles, mopeds, or farm tractors and trailers.

(c)    "Tire" means a continuous solid or pneumatic rubber covering encircling the wheel of a motor vehicle.

(d)    "Waste tire" means a tire that has been removed from a motor vehicle and has not been retreaded or regrooved. The term includes, but is not limited to, used tires and processed tires. The term does not include solid rubber tires and tires that are inseparable from the rim.

(e) "Waste tire collection center" means a site where waste tires are collected from the public prior to being offered for recycling and where fewer than 1,500 tires are kept on the site on any given day.

(f) "Waste tire processing facility" means a site where equipment is used to treat waste tires mechanically, chemically, or thermally so that the resulting material is a marketable product or is suitable for proper disposal. The term includes mobile waste tire processing equipment.

(g) "Waste tire site" means a site at which 1,500 or more waste tires are accumulated.

(h) "Lead-acid battery" means a lead-acid battery designed for use in motor vehicles, vessels, and aircraft, and includes such batteries when sold new as a component part of a motor vehicle, vessel, or aircraft, but not when sold to recycle components.

(i) "Indoor" means within a structure that excludes rain and public access and would control air flows in the event of a fire.

(j) "Processed tire" means a tire that has been treated mechanically, chemically, or thermally so that the resulting material is a marketable product or is suitable for proper disposal.

(k) "Used tire" means a waste tire which has a minimum tread depth of $^3/_{32}$ inch or greater and is suitable for use on a motor vehicle.

(2) The owner or operator of any waste tire site shall provide the department with information concerning the site's location, size, and the approximate number of waste tires that are accumulated at the site and shall initiate steps to comply with subsection (3).

(3)(a) A person may not maintain a waste tire site unless such site is:

1. An integral part of the person's permitted waste tire processing facility; or

2. Used for the storage of waste tires prior to processing and is located at a permitted solid waste management facility.

(b) It is unlawful for any person to dispose of waste tires or processed tires in the state except at a permitted solid waste management facility. Collection or storage of waste tires at a permitted waste tire processing facility or waste tire collection center prior to processing or use does not constitute disposal, provided that the collection and storage complies with rules established by the department.

(c) Whole waste tires may not be deposited in a landfill as a method of ultimate disposal.

(d) A person may not contract with a waste tire collector for the transportation, disposal, or processing of waste tires unless the collector is registered with the department or exempt from requirements provided under this section. Any person who contracts with a waste tire collector for the transportation of more than 25 waste tires per month from a single business location must maintain records for that location and make them available for review by the department or by law enforcement officers, which records must contain the date when the tires were transported, the quantity of tires, the registration number of the collector, and the name of the driver.

(4) The department shall adopt rules to administer this section and s. 403.718. Such rules:

(a) Must provide for the administration or revocation of waste tire processing facility permits, including mobile processor permits;

(b) Must provide for the administration or revocation of waste tire collector registrations, the fee for which may not exceed $50 per vehicle registered annually;

(c) Must provide for the administration or revocation of waste tire collection center permits, the fee for which may not exceed $250 annually;

(d) Must set standards, including financial assurance standards, for waste tire processing facilities and associated waste tire sites, waste tire collection centers, waste tire collectors, and for the storage of waste tires and processed tires, including storage indoors;

(e) May exempt not-for-hire waste tire collectors and processing facilities from financial assurance requirements;

(f) Must authorize the final disposal of waste tires at a permitted solid waste disposal facility provided the tires have been cut into sufficiently small parts to assure their proper disposal; and

(g) Must allow waste tire material that has been cut into sufficiently small parts to be used as daily cover material for a landfill.

(5)(a)   The department shall encourage the voluntary establishment of waste tire collection centers at retail tire-selling businesses, waste tire processing facilities, and solid waste disposal facilities, to be open to the public for the deposit of waste tires.

(b)   The department may establish an incentives program to encourage individuals to return their waste tires to a waste tire collection center. The incentives may involve the use of discount or prize coupons, prize drawings, promotional giveaways, or other activities the department determines will promote collection, reuse, volume reduction, and proper disposal of waste tires.

(c)   The department may contract with a promotion company to administer the incentives program.

History.—s. 41, ch. 88-130; s. 6, ch. 89-171; s. 4, ch. 90-332; s. 120, ch. 91-112; s. 12, ch. 92-290; s. 26, ch. 93-207; s. 403, ch. 94-356; s. 5, ch. 99-215; s. 1, ch. 99-281; s. 9, ch. 2002-291; s. 19, ch. 2007-184.

## 403.718   Waste tire fees.—

(1)   For the privilege of engaging in business, a fee for each new motor vehicle tire sold at retail, including those sold to any governmental entity, is imposed on any person engaging in the business of making retail sales of new motor vehicle tires within this state. The fee imposed under this section shall be stated separately on the invoice to the purchaser. Such fee shall be imposed at the rate of $1 for each new tire sold. The fee imposed shall be paid to the Department of Revenue on or before the 20th day of the month following the month in which the sale occurs. For purposes of this section, a motor vehicle tire sold at retail includes such tires when sold as a component part of a motor vehicle. The terms "sold at retail" and "retail sales" do not include the sale of new motor vehicle tires to a person solely for the purpose of resale provided the subsequent retail sale in this state is subject to the fee. This fee does not apply to recapped tires. Such fee shall be subject to all applicable taxes imposed in chapter 212.

(2)   The fee imposed by this section shall be reported to the Department of Revenue. The payment shall be accompanied by such form as the Department of Revenue may prescribe. The proceeds of the waste tire fee, less administrative costs, shall be transferred by the Department of Revenue into the Solid Waste Management Trust Fund. For the purposes of this section, "proceeds" of the fee means all funds collected and received by the department hereunder, including interest and penalties on delinquent fees. The amount deducted for the costs of administration must not exceed 3 percent of the total revenues collected hereunder and may include only those costs reasonably attributable to the fee.

(3)(a)   The Department of Revenue shall administer, collect, and enforce the fee authorized under this section pursuant to the same procedures used in the administration, collection, and enforcement of the general state sales tax imposed under chapter 212, except as provided in this section. The provisions of this section regarding the authority to audit and make assessments, keeping of books and records, and interest and penalties on delinquent fees apply. The fee shall not be included in the computation of estimated taxes pursuant to s. 212.11 nor shall the dealer's credit for collecting taxes or fees in s. 212.12 apply to this fee.

(b)   The Department of Revenue is authorized to employ persons and incur other expenses for which funds are appropriated by the Legislature. The department is empowered to adopt such rules and shall prescribe and publish such forms as are necessary to effectuate the purposes of this section. The department is authorized to establish audit procedures and to assess delinquent fees.

History.—s. 42, ch. 88-130; s. 7, ch. 89-171; s. 17, ch. 89-324; s. 33, ch. 90-132; s. 121, ch. 91-112; s. 19, ch. 93-233; s. 12, ch. 97-99; s. 35, ch. 2000-153; s. 44, ch. 2001-62; s. 10, ch. 2002-291; s. 1, ch. 2005-174.

## 403.7185   Lead-acid battery fees.—

(1)   For the privilege of engaging in business, a fee for each new or remanufactured lead-acid battery sold at retail, including those sold to any governmental entity, is imposed on any person engaging in the business of making retail sales of lead-acid batteries within this state. Such fee shall be imposed at the rate of $1.50 for each new or remanufactured lead-acid battery sold. However, the fee shall not be imposed on any battery which has previously been taxed pursuant to s. 206.9935(2), provided the person claiming exemption from the tax can document payment of such tax. The fee imposed shall be paid to the Department of Revenue on or before the 20th day of the month following the calendar month in which the sale occurs. The department may authorize a

quarterly return under the conditions described in s. 212.11(1)(c). A dealer selling motor vehicles, vessels, or aircraft at retail can purchase lead-acid batteries exempt as a sale for resale by presenting a sales tax resale certificate. However, if a dealer thereafter withdraws any such battery from inventory to put into a new or used motor vehicle, vessel, or aircraft for sale, to use on her or his own motor vehicle, vessel, or aircraft, to give away, or any purpose other than for resale, the dealer will owe the fee at the time the battery is withdrawn from inventory. If the dealer sells the battery at retail, that sale will be subject to the fee. If the dealer sells it to a purchaser who presents her or him a sales tax resale certificate, the dealer will owe no fee. The terms "sold at retail" and "retail sales" do not include the sale of lead-acid batteries to a person solely for the purpose of resale; however, a subsequent retail sale of a new or remanufactured battery in this state is subject to the fee one time. Such fee shall be subject to all applicable taxes imposed in chapter 212. The provisions of s. 212.07(4) shall not apply to the provisions of this section. When a sale of a lead-acid battery, upon which the fee has been paid, is canceled or the battery is returned to the seller, and the sale price, taxes, and fees are refunded in full to the purchaser, the seller may take credit for the fee previously paid. If, instead of refunding the purchase price of the battery, the customer is given a new or remanufactured battery in exchange for the returned battery, the dealer cannot take credit for the fee on the returned battery, but no fee is due on the new or remanufactured battery that is given in exchange. However, no credit shall be taken by the dealer for returns resulting in partial refunds or partial credits on purchase of replacement batteries.

(2)    The fee imposed by this section shall be reported to the Department of Revenue. The payment shall be accompanied by such form as the Department of Revenue may prescribe. The proceeds of the lead-acid battery fee, less administrative costs, shall be transferred by the Department of Revenue into the Water Quality Assurance Trust Fund. For the purposes of this section, "proceeds" of the fee shall mean all funds collected and received by the department hereunder, including interest and penalties on delinquent fees. The amount deducted for the costs of administration shall not exceed 3 percent of the total revenues collected hereunder and shall be only those costs reasonably attributable to the fee.

(3)(a)    The Department of Revenue shall administer, collect, and enforce the fee authorized under this section pursuant to the same procedures used in the administration, collection, and enforcement of the general state sales tax imposed under chapter 212, except as provided in this section. The provisions of chapter 212 regarding the authority to audit and make assessments, keeping of books and records, and interest and penalties on delinquent fees shall apply. The fee shall not be included in the computation of estimated taxes pursuant to s. 212.11, nor shall the dealer's credit for collecting taxes or fees in s. 212.12 or the exemptions in chapter 212 apply to this fee.

(b)    The Department of Revenue is authorized to employ persons and incur other expenses for which funds are appropriated by the Legislature. The department is empowered to adopt such rules and shall prescribe and publish such forms as may be necessary to effectuate the purposes of this section. The department is authorized to establish audit procedures and to assess delinquent fees.

History.—s. 8, ch. 89-171; s. 34, ch. 90-132; s. 122, ch. 91-112; s. 20, ch. 93-233; s. 13, ch. 97-99; s. 16, ch. 97-103; s. 2, ch. 99-281; s. 2, ch. 2005-174.

**403.71851    Electronic recycling grants.**—The Department of Environmental Protection is authorized to use funds from the Solid Waste Management Trust Fund as grants to Florida-based businesses with 5 or more years' experience in electronics recycling that recycle electronics such as commercial telephone switching equipment, computers, televisions, computer monitors, and other products that utilize lead-containing cathode ray tubes. This funding shall be used for demonstration projects with one or more counties for countywide comprehensive electronics recycling where that term means recycling that provides service to the private sector, nonprofit organizations, governmental agencies, and the residential sector. This funding may also be used for grants to counties to develop methods to collect and transport electronics to be recycled provided such methods are comprehensive in nature.

History.—s. 2, ch. 99-215; s. 3, ch. 2001-224.

**403.71852    Collection of lead-containing products.**—The Department of Environmental Protection is directed to work with the Department of Management Services to implement a pilot program to collect lead-

containing products, including end-of-life computers and other electronic equipment from state and local agencies. Local governments are encouraged to establish collection and recycling programs for publicly and privately owned lead-containing products, including end-of-life televisions, computers, and other electronic products, through existing recycling and household hazardous-waste-management programs.

History.—s. 3, ch. 99-215.

**403.7186   Environmentally sound management of mercury-containing devices and lamps.**—

(1)   DEFINITIONS.—For the purposes of this section, unless the context otherwise requires, the term:

(a)   "Department" means the Department of Environmental Protection.

(b)   "Mercury-containing device" means any electrical product, or other device, excluding batteries and lamps, that is determined by the department as proven to release mercury into the environment.

(c)   "Reclamation facility" means a site where equipment is used to recapture mercury from mercury-containing devices and lamps for the purpose of recycling the mercury. The term does not include those facilities that process mercury-containing devices and lamps that are manufactured at the facility and that have not been sold or distributed.

(d)   "Lamp" means any type of high or low pressure lighting device which contains mercury and generates light through the discharge of electricity either directly or through a fluorescing coating. The term lamp includes, but is not limited to, fluorescent lamps, mercury lamps, metal halide lamps, and high pressure sodium lamps. The term excludes mercury-containing lamps used in residential applications and disposed of as part of ordinary household waste.

(e)   "Spent mercury-containing lamp" or "spent lamp" means a lamp for which mercury is required for its operation that has been used and removed from service and that is to be discarded.

(2)   PROHIBITION ON INCINERATION OR DISPOSAL OF MERCURY-CONTAINING DEVICES.—Mercury-containing devices may not be disposed of or incinerated in any manner prohibited by this section or by the rules of the department promulgated under this section. If the secretary of the department determines that sufficient recycling capacity exists to recycle mercury-containing devices generated in the state, the secretary may, by rule, designate regions of the state in which a person shall not place such a device that was purchased for use or used by a government agency or an industrial or commercial facility in a mixed solid waste stream. A mercury-containing device shall not knowingly be incinerated or disposed of in a landfill.

(3)   PROHIBITION ON INCINERATION OF SPENT LAMPS.—Spent mercury-containing lamps shall not knowingly be incinerated in any municipal or other incinerator. This subsection shall not apply to incinerators that are permitted to operate under state or federal hazardous waste regulations.

(4)   WASTE MANAGEMENT REQUIREMENT FOR SPENT LAMPS.—

(a)   Any person owning or operating an industrial, institutional, or commercial facility in this state or providing outdoor lighting for public places in this state, including streets and highways, that disposes of more than 10 spent lamps per month shall arrange for disposal of such lamps in permitted lined landfills or at appropriately permitted reclamation facilities.

(b)   The department may, by rule, designate regions of the state wherein any person owning or operating an industrial, institutional, or commercial facility in such a designated region, or providing lighting for public places in such designated region, including streets and highways, that disposes of more than 10 spent lamps per month shall arrange for disposal of such lamps at appropriately permitted reclamation facilities; provided, however, that before such rule is adopted, the secretary of the department first determines that appropriately permitted reclamation facilities are reasonably available and afford sufficient recycling capacity.

(5)   MERCURY RECYCLING PROGRAM FUNDS.—

(a)   Moneys received, as provided in this section, shall be deposited into the Solid Waste Management Trust Fund and shall be accounted for separately within the fund, to be used upon appropriation in the following manner:

1.   To provide grants to local governments and other public and private entities to develop and operate mercury recycling programs. It is the intent of the Legislature that adequate funding continue to be available for such

programs.

2.    To fund the research of mercury in the environment by the Governor's Mercury Task Force.

3.    To provide funding for the public service information and other requirements of subsection (7).

4.    For administrative costs and other authorized expenses necessary to carry out the responsibilities of this section.

(b)    Grants, moneys, or gifts from public or private agencies or entities shall be deposited into the fund and used for activities related to mercury or mercury recycling as specified in paragraph (a).

(6)    DEPARTMENT RULES.—The department shall adopt rules to carry out the provisions of this section. Such rules shall:

(a)    Provide the criteria and procedures for obtaining a reclamation facility permit, the fee for which may not exceed $2,000 annually.

(b)    Set standards for reclamation facilities and associated collection centers and set standards for the storage of mercury-containing devices and spent lamps at collection centers.

(7)    PUBLIC SERVICE INFORMATION AND WARNING SIGNS.—As funds become available, the department shall inform the public about the provisions of this section and about the dangers of mercury contamination in game and fish by:

(a)    Posting warning signs at contaminated areas and wherever boaters or hunters regularly embark to reach such areas.

(b)    Distributing informational materials at tackle shops and other places where fishing and hunting licenses are sold.

(c)    Distributing, in primary and secondary schools within the state, informational materials relating to recycling of mercury-containing devices and spent lamps.

(d)    Informational materials discussing either the use of mercury in lamps or the provisions of this act concerning reclamation and disposal of spent lamps, including the prohibition on incineration. The materials shall also disclose that the energy efficiency of lamps, compared to other types of lighting, results in reduced emissions of sulfur dioxide, carbon dioxide, and other pollutants, including mercury, from fossil-fuel-fired generating facilities and results in benefits recognized by the state in its Green Lights relamping project.

(8)    CIVIL PENALTY.—A person who engages in any act or practice declared in this section to be prohibited or unlawful, or who violates any of the rules of the department promulgated under this section, is liable to the state for any damage caused and for civil penalties in accordance with s. 403.141. The provisions of s. 403.161 are not applicable to this section. The penalty may be waived if the person previously has taken appropriate corrective action to remedy the actual damages, if any, caused by the unlawful act or practice or rule violation. A civil penalty so collected shall accrue to the state and shall be deposited as received into the Solid Waste Management Trust Fund for the purposes specified in paragraph (5)(a).

History.—s. 55, ch. 93-207; s. 404, ch. 94-356; s. 2, ch. 97-98; s. 24, ch. 2000-211.

**403.7191    Toxics in packaging.**—

(1)    FINDINGS AND INTENT.—The Legislature finds that:

(a)    Managing solid waste poses a wide range of hazards to public health and safety and to the environment.

(b)    Packaging comprises a significant percentage of total solid waste.

(c)    Heavy metals used in packaging contribute to solid waste management problems when present in emissions or ash when packaging waste is incinerated, in leachate when packaging waste is placed in landfills, or in compost when packaging waste is composted.

(d)    Based upon available scientific and medical evidence, lead, mercury, cadmium, and hexavalent chromium are of particular concern.

(e)    Eliminating or reducing heavy metals in packaging is a necessary first step in reducing the toxicity of packaging waste.

It is the intent of the Legislature to reduce the toxicity of packaging without impeding or discouraging the expanded use of recycled materials in the production of packaging and its components.

(2)  DEFINITIONS.—As used in this section:

(a)  "Distributor" means any person, firm, or corporation who takes title to goods purchased for resale. The term does not include a person, firm, or corporation that uses packages or packaging components to encase another product.

(b)  "Manufacturer" means any person, firm, or corporation who manufactures packages, packaging, or packaging components.

(c)  "Package" means any container providing a means of marketing, protecting, or handling a product and includes a unit package, an intermediate package, or a shipping container as defined in ASTM D996. The term includes, but is not limited to, unsealed receptacles such as carrying cases, crates, cups, pails, rigid foil, and other trays, wrappers, and wrapping films, bags, and tubs.

(d)  "Packaging component" means any individual assembled part or component of a package, including, but not limited to, any interior or exterior blocking, bracing, cushioning, weatherproofing, exterior strapping, coatings, closures, inks, and labels. Tin-plated steel that meets ASTM specification A-263 shall be considered a single packaging component. "Packaging component" does not include an industrial packaging component intended to protect, secure, close, unitize, and provide pilferage protection for any product destined for commercial use.

(3)  PROHIBITIONS; SCHEDULE FOR REMOVAL OF INCIDENTAL AMOUNTS.—Except as provided in subsection (4), a manufacturer or distributor may not sell a package or packaging component, and a manufacturer or distributor of products shall not offer for sale or promotional purposes in this state, any package or any packaging component with a total concentration of lead, cadmium, mercury, and hexavalent chromium that exceeds 100 parts per million by weight (.01 percent).

(4)  EXEMPTIONS.—All packages and packaging components shall be subject to the provisions of this section except:

(a)  Packages or packaging components manufactured prior to May 12, 1993, with a code indicating the date of manufacture, or a package containing an alcoholic beverage that was bottled before July 1, 1993.

(b)  Packages or packaging components to which lead, cadmium, mercury, or hexavalent chromium has been added in the manufacturing, forming, printing, or distribution process in order to comply with health or safety requirements of federal or state law or for which there is no feasible alternative. The manufacturer of a package or a packaging component must petition the department for any exemption from the provisions of this paragraph for a particular package or packaging component based upon either criterion. The department may grant a 2-year exemption if warranted, and may, upon the package or packaging component meeting either criterion of this paragraph, renew the exemption for an additional 2 years. For the purposes of this paragraph, a use for which there is no feasible alternative is one in which the use of the regulated substance is essential for the protection, safe handling, or function of the contents of the package.

(5)  CERTIFICATE OF COMPLIANCE.—Each manufacturer or distributor of a package or packaging component shall provide, if required, to the purchaser of such package or packaging component, a certificate of compliance stating that the package or packaging component is in compliance with the provisions of this section. If compliance is achieved under any of the exemptions provided in paragraph (4)(b), the certificate shall state the specific basis upon which the exemption is claimed. The certificate of compliance shall be signed by an authorized official of the manufacturing or distributing company. The manufacturer or distributor shall retain the certificate of compliance for as long as the package or packaging component is in use. A copy of the certificate of compliance shall be kept on file by the manufacturer or distributor of the package or packaging component for at least 3 years from the date of the last sale or distribution by the manufacturer or distributor. Certificates of compliance, or copies thereof, shall be furnished within 60 days to the department upon the department's request. If the manufacturer or distributor of the package or packaging component reformulates or creates a new package or packaging component, including a reformulation or creation to meet the maximum levels set forth in subsection (3), the manufacturer or distributor shall provide an amended or new certificate of compliance for the reformulated or new package or packaging component.

(6)  PUBLIC ACCESS.—Any request by the public for any certificate of compliance from the manufacturer or distributor of a package or packaging component shall:

(a)  Be in writing, with a copy provided to the department.

(b)  Specify the package or packaging component information requested.

(c)  Be responded to by the manufacturer or distributor within 90 days from receipt of the request.

(7)  ENFORCEMENT.—It is unlawful for any person to:

(a)  Violate any provision of this section or any rule adopted or order issued thereunder by the department.

(b)  Tender for sale to a purchaser any package, packaging component, or packaged product in violation of this section or any rule adopted or order issued thereunder.

(c)  Furnish a certificate of compliance with respect to any package or packaging component which does not comply with the provisions of subsection (3).

(d)  Provide a certificate of compliance that contains false information.

Violations shall be punishable by a civil penalty as provided in s. 403.141.

History.—s. 28, ch. 93-207; s. 41, ch. 99-5; s. 36, ch. 2000-153; s. 25, ch. 2000-211; s. 45, ch. 2001-62; s. 53, ch. 2013-18.

**403.7192    Batteries; requirements for consumer, manufacturers, and sellers; penalties.—**

(1)  As used in this section, the term:

(a)  "Cell" means a galvanic or voltaic device weighing 25 pounds or less consisting of an enclosed or sealed container containing a positive and negative electrode in which one or both electrodes consist primarily of cadmium or lead and which container contains a gel or liquid starved electrolyte.

(b)  "Cell manufacturer" means an entity which manufactures cells in the United States; or imports into the United States cells or units for which no unit management program has been put into effect by the actual manufacturer of the cell or unit.

(c)  "Marketer" means any person who manufactures, sells, distributes, assembles, or affixes a brand name or private label or licenses the use of a brand name on a unit or rechargeable product. Marketer does not include a person engaged in the retail sale of a unit or rechargeable product.

(d)  "Rechargeable battery" means any small, nonvehicular, rechargeable nickel-cadmium or sealed lead-acid battery, or battery pack containing such a battery, weighing less than 25 pounds and not used for memory backup.

(e)  "Unit" means a cell, a rechargeable battery, or a rechargeable product with nonremovable rechargeable batteries.

(f)  "Unit management program" means a program or system for the collection, recycling, or disposal of units put in place by a marketer in accordance with this section.

(2)(a)  A person may not distribute, sell, or offer for sale in this state an alkaline-manganese or zinc-carbon battery that contains any intentionally introduced mercury and more than 0.0004 percent mercury by weight.

(b)  For any alkaline-manganese battery resembling a button or coin in size and shape, the limitation shall be 25 milligrams of mercury.

(c)  A person may not distribute, sell, or offer for sale in this state a consumer button dry cell battery containing a mercuric oxide electrode or a product containing such a battery.

(d)  The secretary of the department may exempt a specific type of battery from this subsection if there is not a battery that meets those requirements and that reasonably can be substituted for the battery for which the exemption is sought.

(3)(a)  A person may not knowingly place in a mixed solid waste stream a dry cell battery that uses a mercuric oxide electrode or a product containing such a battery, and that was purchased for use or used by a consumer or by a government, industrial, communications, or medical facility that is a conditionally exempt small quantity generator of hazardous waste under 40 C.F.R. s. 261.5.

(b)  A person may not knowingly place in a mixed solid waste stream a rechargeable battery, or a product containing such a rechargeable battery, which was purchased for use or used by a consumer or by a government,

industrial, commercial, communications, or medical facility that is a conditionally exempt small quantity generator of hazardous waste under 40 C.F.R. s. 261.5.

(c) Each government, industrial, commercial, communications, or medical facility shall collect and segregate its batteries to which the prohibitions in paragraphs (a) and (b) apply and send each segregated collection of batteries back to a collection site designated by the manufacturer or distributor in the case of mercuric oxide batteries, to a collection site designated by a marketer or cell manufacturer of rechargeable batteries, or the products powered by nonremovable batteries, or to a facility permitted to dispose of those batteries.

(4) A cell manufacturer or marketer shall not sell or offer for sale in this state any consumer product or nonconsumer product that is powered by a rechargeable battery unless:

(a) In the case of consumer products, the battery can be easily removed by the consumer, or the battery is contained in a battery pack that is separate from the product and can be easily removed from the product.

(b) In the case of nonconsumer products, the battery can be removed or is contained in a battery pack that is separate from the product.

(c) The product or the battery, or the package in the case of a consumer product, is labeled with a recycling symbol and includes, as an indication of the chemical composition of the battery, the term "Cd" for nickel-cadmium batteries or "Pb" for small sealed lead batteries.

(d) The instruction manual for the product or, in the case of a consumer product, the package containing the product states that the sealed lead or nickel-cadmium battery must be recycled or disposed of properly.

(5) The secretary of the department may authorize the sale of a consumer or nonconsumer product that does not comply with paragraphs (4)(a) and (b), if the secretary finds that the design of the product, to comply with the requirements of this subsection, would result in significant danger to public health and safety.

(6) Manufacturers and distributors of mercuric oxide batteries and products containing these batteries and marketers of rechargeable batteries or the products powered by such batteries, excluding those used solely for memory, whose batteries and products are sold and distributed in this state and that are subject to the requirements of subsection (3), must:

(a) Implement a unit management program, other than a local government curbside program and other local government collection system, unless the local government agrees otherwise, through which the discarded batteries or products powered by nonremovable batteries may be returned to designated collection sites and submit this information to the department. The unit management program must be accessible for consumers or local governments collecting batteries or products from consumers, for returning the discarded batteries or products. In addition to other requirements which cell manufacturers have as marketers, cell manufacturers shall accept rechargeable batteries collected in this state. Cell manufacturers shall accept rechargeable batteries returned to them of the same general type, including differing brands, not to exceed the same annual rate as batteries manufactured by them are sold in this state. Cell manufacturers shall have the sole responsibility for reclamation and disposal of rechargeable batteries returned to them.

(b) Clearly inform each purchaser of the prohibition on the disposal in the solid waste stream of these batteries and products powered by nonremovable batteries and of the system for return available to the purchaser for their proper collection, transportation, recycling, or disposal. A telephone number must be provided to each final purchaser of the batteries, or products powered by these batteries, so that the final purchasers can call to get information on returning the discarded batteries or products for recycling or proper disposal. The telephone number must also be provided to the department.

(c) Accept waste batteries or products containing these batteries returned to their designated collection sites as allowed by federal, state, and local laws and regulations.

(d) Ensure that each battery is clearly identifiable as to the type of electrode used in the battery.

(7) Representative organizations of manufacturers shall supply to the department a list of those organization members for whom the association is conducting the unit management program.

(8) Manufacturers and importers of mercuric oxide batteries and cell manufacturers and marketers of rechargeable batteries or products powered by these batteries that do not comply with the requirements in subsection (6) may not sell, distribute, or offer for sale in this state these batteries or products powered by these

batteries. Manufacturers or marketers may satisfy the requirements of subsection (6) individually, as part of a representative organization of manufacturers, or by contracting with private or government parties. Any such contractual arrangements may include appointment of agents, allocation of costs and duties, and such indemnifications as the parties deem appropriate.

(9)　Any person who violates any provision of this section commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. A manufacturer or distributor who violates such provision is subject to a minimum fine of $100 per violation.

(10)　In an enforcement action under this section in which the state prevails, the state may recover reasonable administrative expenses, court costs, and attorney's fees incurred to take the enforcement action, in an amount to be determined by the court.

History.—s. 29, ch. 93-207; s. 42, ch. 99-5; s. 26, ch. 2000-211; s. 46, ch. 2001-62; s. 46, ch. 2004-5.

### 403.7193　Environmental representations.—

(1)　Any person who represents in advertising or on the label or container of a consumer product that the consumer product that the person manufactures or distributes is not harmful to, or is beneficial to, the environment through the use of such terms as "environmentally friendly," "ecologically sound," "environmentally safe," "recyclable," "recycled," "biodegradable," "photodegradable," "ozone friendly," or any other like term must maintain records documenting and supporting the validity of such representation. The Department of Legal Affairs may request copies of those records at any time. For purposes of this section, a wholesaler or retailer who does not initiate a representation by advertising or by placing the representation on a package has not made the representation. This section does not apply to instructions for recycling on the label or container of a product.

(2)　Any person who makes false representations regarding the environment about any consumer product that the person manufactures or distributes commits a misdemeanor of the first degree, punishable by a fine as provided in s. 775.083.

History.—s. 30, ch. 93-207.

### 403.72　Identification, listing, and notification.—

(1)　The department shall adopt rules which list hazardous wastes and identify their characteristics and shall establish procedures by which hazardous waste may be identified. The department may consider ignitability, corrosivity, reactiveness, toxicity, infectiousness, radioactivity, mutagenicity, carcinogenicity, teratogenicity, bioaccumulative effect, and persistence and degradability in nature and any other characteristics relevant to each particular waste material.

(2)　Any generator or transporter of, or any person who owns or operates a facility that disposes of, stores, or treats, hazardous waste which is identified or listed by rule of the department shall, within 90 days of the effective date of the rule, file a written notification with the department, unless previous notification was given to the United States Environmental Protection Agency pursuant to federal law. The notification shall state the location of the generator, transporter, or facility; shall generally describe the activity engaged in; and shall state the hazardous waste handled. The department shall adopt and make available to the public a notification form for this purpose.

History.—s. 8, ch. 80-302; s. 8, ch. 82-27.

### 403.721　Standards, requirements, and procedures for generators and transporters of hazardous waste and owners and operators of hazardous waste facilities.—

(1)　Persons who generate or transport hazardous waste, or who own or operate a hazardous waste facility, shall comply with the applicable standards, requirements, and procedures of this act and the rules adopted pursuant to it.

(2)　The department shall establish by rule such standards, requirements, and procedures as are needed to protect human health and the environment, which standards, requirements, and procedures shall apply to persons who generate or transport hazardous waste; to persons who own or operate hazardous waste disposal, storage, or treatment facilities; and to hazardous waste disposal facilities. The department may establish standards,

requirements, and procedures which may vary based on differences in amounts of, types of, concentrations of, and methods of handling hazardous waste and on differences in the size and location of hazardous waste facilities and which may take into account standards, requirements, and procedures imposed by other laws not in conflict with this act. Solid waste determined to be special wastes by the United States Environmental Protection Agency shall be regulated pursuant to this act consistent with federal regulations for special wastes under Subtitle C of the Resource Conservation and Recovery Act.

(3)   The department, with respect to generators of hazardous waste identified or listed pursuant to this act, shall adopt rules governing:

(a)   Recordkeeping practices that accurately identify the quantities of such hazardous waste generated, the constituents thereof which are significant in quantity or in potential harm to human health or the environment, and the method of disposal of such wastes;

(b)   Labeling practices for any containers used for the disposal, storage, or transport of such hazardous waste which accurately identify such waste;

(c)   The use of appropriate containers for such hazardous waste;

(d)   The furnishing of information on the general elemental and chemical composition of such hazardous waste to persons transporting, treating, storing, or disposing of such wastes;

(e)   The use of a manifest system to assure that all such hazardous waste generated is designated for treatment, storage, or disposal in treatment, storage, or disposal facilities, other than facilities on the premises where the waste is generated, for which a permit has been issued; and

(f)   Submission of reports and inspection of manifests to describe the quantities of hazardous waste which are identified or listed pursuant to this act and which have been generated or transported during a particular time period to show their disposition and certification of the generator's efforts to reduce their amount and toxicity.

(4)   The department, with respect to transporters of hazardous waste identified or listed pursuant to this act, shall adopt rules governing:

(a)   Liability and financial responsibility for any liability which may be incurred in the transport of hazardous waste;

(b)   Recordkeeping concerning the source, transport, and delivery of hazardous waste;

(c)   The transportation of hazardous waste, requiring that such waste be properly labeled;

(d)   Compliance with the manifest system required in paragraph (3)(e);

(e)   The transportation of all such hazardous waste only to the hazardous waste treatment, storage, or disposal facilities designated by the shipper on the manifest form, which facility shall be a facility holding a permit; and

(f)   The use of appropriate containers for transporting such hazardous waste.

(5)   With respect to any hazardous waste and transporters of hazardous waste, which also meet the definitions and criteria for hazardous materials and transporters of hazardous materials regulated by the Hazardous Materials Transportation Act, 88 Stat. 2156, 49 U.S.C. ss. 1801 et seq., the department shall consider and adopt, as appropriate, rules which are consistent with such act and the rules adopted pursuant thereto.

(6)   The department, with respect to owners and operators of hazardous waste disposal, storage, or treatment facilities, and with respect to such facilities, shall adopt rules governing:

(a)   The maintenance of records concerning all hazardous wastes which are identified or listed pursuant to this act and which are treated, stored, or disposed of and the manner of treatment, storage, or disposal;

(b)   Satisfactory reporting, monitoring, and inspection for compliance with the manifest system required in paragraph (3)(e);

(c)   The treatment, storage, or disposal of all hazardous waste received by the facility pursuant to operating methods, techniques, and practices approved by the department;

(d)   The location, design, and construction of such hazardous waste treatment, disposal, or storage facilities;

(e)   Contingency plans for effective action to minimize unanticipated damage resulting from any accident occurring during the treatment, storage, or disposal of any such hazardous waste;

(f)   The maintenance or operation of such facilities and the requirement of such additional qualifications as to ownership, continuity of operation, training for personnel, and financial responsibility as may be necessary or

desirable; and

(g)   Compliance with s. 403.722.

(h)   Corrective action at a hazardous waste facility which shall be taken beyond a facility boundary where necessary to protect human health and the environment, unless the owner or operator demonstrates that despite her or his best efforts she or he was unable to obtain the necessary permission to undertake such action.

(i)   Conditions on a permit which require cleanup of releases of hazardous waste and hazardous constituents from any solid waste management unit, regardless of when the waste was placed in the unit.

(j)   Groundwater monitoring, unsaturated zone monitoring, and corrective action requirements for land disposal facilities accepting hazardous waste after July 26, 1982.

(k)   The prohibition of the land disposal and storage of certain hazardous waste based on the requirements and criteria set forth in s. 201(g)-(j) of the Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98-616.

(7)   The department shall adopt rules governing the production, burning, marketing, sale, and distribution of hazardous waste fuel. The department may provide for exemptions to such rules so long as the exemptions are no less stringent than those provided by federal law or regulation.

History.—s. 8, ch. 80-302; s. 22, ch. 83-310; s. 33, ch. 86-186; s. 66, ch. 90-331; s. 17, ch. 97-103.

### 403.7211    Hazardous waste facilities managing hazardous wastes generated offsite; federal facilities managing hazardous waste.—

(1)   This section applies to facilities managing hazardous waste generated offsite. This section does not apply to manufacturers, power generators, or other industrial operations that have received or apply for a permit or a modification to a permit from the department for the treatment, storage, or disposal of hazardous waste generated only onsite or from other sites owned or acquired by the permittee. Power generators are electric utilities as defined in s. 403.522 which own or operate facilities necessary for the generation, transmission, or distribution of electric energy; federally qualified facilities under the Public Utility Regulatory Act of 1978, or exempt wholesale generators under the Energy Policy Act of 1992. Notwithstanding the foregoing, this section shall apply to all federal facilities that manage hazardous waste.

(2)   The department may not issue any permit under s. 403.722 for the construction, initial operation, or substantial modification of a facility for the disposal, storage, or treatment of hazardous waste generated offsite which is proposed to be located in any of the following locations:

(a)   Any area where life-threatening concentrations of hazardous substances could accumulate at any residence or residential subdivision as the result of a catastrophic event at the proposed facility, unless each such residence or residential subdivision is served by at least one arterial road or urban minor arterial road, as determined under the procedures referenced in s. 334.03(10), which provides safe and direct egress by land to an area where such life-threatening concentrations of hazardous substances could not accumulate in a catastrophic event. Egress by any road leading from any residence or residential subdivision to any point located within 1,000 yards of the proposed facility is unsafe for the purposes of this paragraph. In determining whether egress proposed by the applicant is safe and direct, the department shall also consider, at a minimum, the following factors:

1.   Natural barriers such as water bodies, and whether any road in the proposed evacuation route is impaired by a natural barrier such as a water body.

2.   Potential exposure during egress and potential increases in the duration of exposure.

3.   Whether any road in a proposed evacuation route passes in close proximity to the facility.

4.   Whether any portion of the evacuation route is inherently directed toward the facility.

(b)   Any location within 1,500 yards of any hospital, prison, school, nursing home facility, day care facility, stadium, place of assembled worship, or any other similar site where individuals are routinely confined or assembled in such a manner that reasonable access to immediate evacuation is likely to be unavailable.

(c)   Any location within 1,000 yards of any residence.

(d)   Any location which is inconsistent with rules adopted by the department under this part.

For the purposes of this subsection, all distances shall be measured from the outer limit of the active hazardous waste management area. "Substantial modification" includes: any physical change in, change in the operations of, or addition to a facility which could increase the potential offsite impact, or risk of impact, from a release at that facility; and any change in permit conditions which is reasonably expected to lead to greater potential impacts or risks of impacts, from a release at that facility. "Substantial modification" does not include a change in operations, structures, or permit conditions which does not substantially increase either the potential impact from, or the risk of, a release. Physical or operational changes to a facility related solely to the management of nonhazardous waste at the facility is not considered a substantial modification. The department shall, by rule, adopt criteria to determine whether a facility has been substantially modified. "Initial operation" means the initial commencement of operations at the facility.

(3) It shall be presumed, for the purposes of paragraph (2)(a) only, that life-threatening concentrations of hazardous substances could accumulate in a catastrophic event in any area within a radius of 3 miles of a hazardous waste transfer, disposal, storage, or treatment facility. This presumption may be rebutted by a demonstration that such life-threatening concentrations could accumulate at a greater distance, or that such life-threatening concentrations could accumulate only at a lesser distance, in light of the composition, quantity, and concentration of hazardous waste proposed to be disposed of, treated, or stored at the proposed facility. This demonstration may be made, at the election of the facility, in the form of the submissions required under Program 3 of the Accidental Release Prevention Program of s. 112(r)(7) of the Clean Air Act.

(4) For the purposes of this section, a concentration of hazardous substances shall be deemed to be life-threatening when the concentration could cause susceptible or sensitive individuals, excluding hypersensitive or hypersusceptible individuals, to experience irreversible or other serious, long-lasting effects or impaired ability to escape.

(5) No person shall construct or operate a transfer facility for the management of hazardous waste unless the facility meets the siting requirements of subsection (2).

(6) This section shall not prohibit the operation of existing transfer facilities that have commenced operation as of the effective date of this section, if the transfer facility is not relocated or if there is no substantial modification in the structure or operation of the facility after the effective date of this section.

History.—s. 1, ch. 98-334; s. 93, ch. 2012-174.

### 403.7215 Tax on gross receipts of commercial hazardous waste facilities.—

(1) The owner or operator of each privately owned, permitted, commercial hazardous waste transfer, storage, treatment, or disposal facility shall, on or before January 25 of each year, file with the chief fiscal officer of the primary host local government a certified, notarized statement. The statement shall indicate the gross receipts from all charges imposed during the preceding calendar year for the storage, treatment, or disposal of hazardous waste at the facility.

(2) A 3-percent tax is hereby levied on the annual gross receipts of a privately owned, permitted, commercial hazardous waste transfer, storage, treatment, or disposal facility, which tax is payable annually on or before July 1 by the owner of the facility to the primary host local government.

(3) All moneys received by the appropriate local government pursuant to subsection (2) shall be appropriated and used to pay for:

(a) The costs of collecting the tax;

(b) Any local inspection costs incurred by the local government to ensure that the facility is operated pursuant to the provisions of this part and any rule adopted pursuant thereto;

(c) Additional security costs incurred as a result of operating the facility, including monitoring, fire protection, and police protection;

(d) Hazardous waste contingency planning implementation;

(e) Road construction or repair costs for public roads adjacent to and within 1,000 feet of the facility;

(f) Any other cost incurred by the local government as a result of the operation of the facility, if all other costs specified in paragraphs (a)-(e) have been paid; and

(g)  Any other purposes relating to environmental protection within the jurisdiction of the local government, including, but not limited to, the establishment of a system for the collection and disposal of household, agricultural and other types of hazardous waste, the protection or improvement of the quality of the air or water, or the acquisition of environmentally sensitive lands, provided all other costs specified in this section have been paid.

(4)  The primary host local government is responsible for regulating, controlling, administering, and enforcing the provisions of this section.

History.—s. 17, ch. 83-310; s. 24, ch. 88-130; s. 33, ch. 88-393; s. 1, ch. 89-285; s. 36, ch. 91-305.

Note.—Former s. 203.10.

### 403.722     Permits; hazardous waste disposal, storage, and treatment facilities.—

(1)  Each person who intends to or is required to construct, modify, operate, or close a hazardous waste disposal, storage, or treatment facility shall obtain a construction permit, operation permit, postclosure permit, clean closure plan approval, or corrective action permit from the department prior to constructing, modifying, operating, or closing the facility. By rule, the department may provide for the issuance of a single permit instead of any two or more hazardous waste facility permits.

(2)  Any owner or operator of a hazardous waste facility in operation on the effective date of the department rule listing and identifying hazardous wastes shall file an application for a temporary operation permit within 6 months after the effective date of such rule. The department, upon receipt of a properly completed application, shall identify any department rules that are being violated by the facility and establish a compliance schedule. However, if the department determines that an imminent hazard exists, the department may take any necessary action pursuant to s. 403.726 to abate the hazard. The department shall issue a temporary operation permit to such facility within the time constraints of s. 120.60 upon submission of a properly completed application that is in conformance with this subsection. Temporary operation permits for such facilities shall be issued for up to 3 years only. Upon termination of the temporary operation permit and upon proper application by the facility owner or operator, the department shall issue an operation permit for such existing facilities if the applicant has corrected all of the deficiencies identified in the temporary operation permit and is in compliance with all other rules adopted pursuant to this act.

(3)  Applicants shall provide any information that will enable the department to determine that the proposed construction, modification, operation, closure, or corrective action will comply with this act and any applicable rules. In no instance shall any person construct, modify, operate, or close a facility or perform corrective actions at a facility in contravention of the standards, requirements, or criteria for a hazardous waste facility. Authorizations issued under this section may include any permit conditions necessary to achieve compliance with applicable hazardous waste rules and necessary to protect human health and the environment.

(4)  The department may require, in an application, submission of information concerning matters specified in s. 403.721(6) as well as information respecting:

(a)  Estimates of the composition, quantity, and concentration of any hazardous waste identified or listed under this act or combinations of any such waste and any other solid waste, proposed to be disposed of, treated, transported, or stored and the time, frequency, or rate at which such waste is proposed to be disposed of, treated, transported, or stored; and

(b)  The site to which such hazardous waste or the products of treatment of such hazardous waste will be transported and at which it will be disposed of, treated, or stored.

(5)  An authorization issued pursuant to this section is not a vested right. The department may revoke or modify any such authorization.

(a)  Authorizations may be revoked for failure of the holder to comply with this act, the terms of the authorization, the standards, requirements, or criteria adopted pursuant to this act, or an order of the department; for refusal by the holder to allow lawful inspection; for submission by the holder of false or inaccurate information in the permit application; or if necessary to protect the public health or the environment.

(b) Authorizations may be modified, upon request of the holder, if such modification is not in violation of this act or department rules or if the department finds the modification necessary to enable the facility to remain in compliance with this act and department rules.

(c) An owner or operator of a hazardous waste facility in existence on the effective date of a department rule changing an exemption or listing and identifying the hazardous wastes that require that facility to be permitted who notifies the department pursuant to s. 403.72, and who has applied for a permit pursuant to subsection (2), may continue to operate until issued a temporary operation permit. If such owner or operator intends to or is required to discontinue operation, the temporary operation permit must include final closure conditions.

(6) A hazardous waste facility permit issued pursuant to this section shall satisfy the permit requirements of s. 403.707(1). The permit exemptions provided in s. 403.707(2) do not apply to hazardous waste.

(7) The department may establish application procedures for hazardous waste facilities, which procedures may vary based on differences in amounts, types, and concentrations of hazardous waste and on differences in the size and location of facilities and which procedures may take into account permitting procedures of other laws not in conflict with this act.

(8) For authorizations required by this section, the department may require that a fee be paid and may establish, by rule, a fee schedule based on the degree of hazard and the amount and type of hazardous waste disposed of, stored, or treated at the facility.

(9) It shall not be a requirement for the issuance of a hazardous waste authorization that the facility complies with an adopted local government comprehensive plan, local land use ordinances, zoning ordinances or regulations, or other local ordinances. However, the issuance of such an authorization by the department does not override any local plan, ordinance, or regulation.

(10) Notwithstanding ss. 120.60(1) and 403.815:

(a) The time specified by law for permit review shall be tolled by the request of the department for publication of notice of proposed agency action to issue a permit for a hazardous waste treatment, storage, or disposal facility and shall resume 45 days after receipt by the department of proof of publication. If, within 45 days after publication of the notice of the proposed agency action, the department receives written notice of opposition to the intention of the agency to issue such permit and receives a request for a hearing, the department shall provide for a hearing pursuant to ss. 120.569 and 120.57, if requested by a substantially affected party, or an informal public meeting, if requested by any other person. The failure to request a hearing within 45 days after publication of the notice of the proposed agency action constitutes a waiver of the right to a hearing under ss. 120.569 and 120.57. The permit review time period shall continue to be tolled until the completion of such hearing or meeting and shall resume within 15 days after conclusion of a public hearing held on the application or within 45 days after the recommended order is submitted to the agency and the parties, whichever is later.

(b) Within 60 days after receipt of an application for a hazardous waste facility permit, the department shall examine the application, notify the applicant of any apparent errors or omissions, and request any additional information the department is permitted by law to require. The failure to correct an error or omission or to supply additional information shall not be grounds for denial of the permit unless the department timely notified the applicant within the 60-day period, except that this paragraph does not prevent the department from denying an application if the department does not possess sufficient information to ensure that the facility is in compliance with applicable statutes and rules.

(c) The department shall approve or deny each hazardous waste facility permit within 135 days after receipt of the original application or after receipt of the requested additional information or correction of errors or omissions. However, the failure of the department to approve or deny within the 135-day time period does not result in the automatic approval or denial of the permit and does not prevent the inclusion of specific permit conditions which are necessary to ensure compliance with applicable statutes and rules. If the department fails to approve or deny the permit within the 135-day period, the applicant may petition for a writ of mandamus to compel the department to act consistently with applicable regulatory requirements.

(11) Hazardous waste facility operation permits shall be issued for no more than 5 years.

(12)   On the same day of filing with the department of an application for a permit for the construction modification, or operation of a hazardous waste facility, the applicant shall notify each city and county within 1 mile of the facility of the filing of the application and shall publish notice of the filing of the application. The applicant shall publish a second notice of the filing within 14 days after the date of filing. Each notice shall be published in a newspaper of general circulation in the county in which the facility is located or is proposed to be located. Notwithstanding the provisions of chapter 50, for purposes of this section, a "newspaper of general circulation" shall be the newspaper within the county in which the installation or facility is proposed which has the largest daily circulation in that county and has its principal office in that county. If the newspaper with the largest daily circulation has its principal office outside the county, the notice shall appear in both the newspaper with the largest daily circulation in that county, and a newspaper authorized to publish legal notices in that county. The notice shall contain:

(a)   The name of the applicant and a brief description of the project and its location.

(b)   The location of the application file and when it is available for public inspection.

The notice shall be prepared by the applicant and shall comply with the following format:

Notice of Application

The Department of Environmental Protection announces receipt of an application for a permit from _(name of applicant)_ to _(brief description of project)_. This proposed project will be located at _(location)_ in _(county)_ _(city)_.

This application is being processed and is available for public inspection during normal business hours, 8:00 a.m. to 5:00 p.m., Monday through Friday, except legal holidays, at _(name and address of office)_.

(13)   A permit for the construction, modification, or operation of a hazardous waste facility which initially was issued under authority of this section, may not be transferred by the permittee to any other entity, except in conformity with the requirements of this subsection.

(a)   At least 30 days prior to the sale or legal transfer of a permitted facility, the permittee shall file with the department an application for transfer of the permits on such form as the department shall establish by rule. The form must be completed with the notarized signatures of both the transferring permittee and the proposed permittee.

(b)   The department shall approve the transfer of a permit unless it determines that the proposed permittee has not provided reasonable assurances that the proposed permittee has the administrative, technical, and financial capability to properly satisfy the requirements and conditions of the permit, as determined by department rule. The determination shall be limited solely to the ability of the proposed permittee to comply with the conditions of the existing permit, and it shall not concern the adequacy of the permit conditions. If the department proposes to deny the transfer, it shall provide both the transferring permittee and the proposed permittee a written objection to such transfer together with notice of a right to request a proceeding on such determination under chapter 120.

(c)   Within 90 days after receiving a properly completed application for transfer of permit, the department shall issue a final determination. The department may toll the time for making a determination on the transfer by notifying both the transferring permittee and the proposed permittee that additional information is required to adequately review the transfer request. Such notification shall be served within 30 days after receipt of an application for transfer of permit, completed pursuant to paragraph (a). However, the failure of the department to approve or deny within the 90-day time period does not result in the automatic approval or denial of the transfer. If the department fails to approve or deny the transfer within the 90-day period, the applicant may petition for a writ of mandamus to compel the department to act consistently with applicable regulatory requirements.

(d)   The transferring permittee is encouraged to apply for a permit transfer well in advance of the sale or legal transfer of a permitted facility. However, the transfer or the permit shall not be effective prior to the sale or legal transfer of the facility.

(e)   Until the transfer of the permit is approved by the department, the transferring permittee and any other person constructing, operating, or maintaining the permitted facility shall be liable for compliance with the terms of the permit. Nothing in this section shall relieve the transferring permittee of liability for corrective actions that may be required as a result of any violations occurring prior to the legal transfer of the permit.

History.—s. 8, ch. 80-302; s. 2, ch. 82-79; s. 4, ch. 82-122; s. 64, ch. 83-218; s. 24, ch. 83-310; s. 34, ch. 86-186; s. 19, ch. 88-393; s. 2, ch. 91-284; s. 2, ch. 91-301; s. 408, ch. 94-356; s. 157, ch. 96-410; s. 44, ch. 99-5; s. 7, ch. 2000-304; s. 6, ch. 2003-173; s. 21, ch. 2007-184.

### 403.7222    Prohibition of hazardous waste landfills.—

(1)   As used in this section, the term "hazardous waste landfill" means a disposal facility or part of a facility at which hazardous waste that has not undergone treatment is placed in or on land, including an injection well, which is not a land treatment facility. However, hazardous waste may not be disposed of through an injection well or other subsurface method of disposal, which is defined as a Class IV well in 40 C.F.R. s. 144.6(d), except those Class I wells permitted for hazardous waste disposal as of January 1, 1992. The department shall annually review the operations of any such Class I well permitted as of January 1, 1992, and prepare a report analyzing any impact on groundwater systems. This section may not be construed to refer to the products of membrane technology, including reverse osmosis, for the production of potable water where disposal is through a Class I well as defined in 40 C.F.R. s. 144.6(a), or to refer to remedial or corrective action activities conducted in accordance with 40 C.F.R. s. 144.13.

(2)   The Legislature declares that, due to the permeability of the soil and high water table in Florida, future hazardous waste landfills are prohibited. Therefore, the department may not issue a permit pursuant to s. 403.722 for a newly constructed hazardous waste landfill. However, if by executive order the Governor declares a hazardous waste management emergency, the department may issue a permit for a temporary hazardous waste landfill. Any such landfill shall be used only until such time as an appropriate alternative method of disposal can be derived and implemented. Such a permit may not be issued for a period exceeding 6 months without a further declaration of the Governor. A Class IV injection well, as defined in 40 C.F.R. s. 144.6(d), may not be permitted for construction or operation under this section.

(3)   This section does not prohibit the department from banning the disposal of hazardous waste in other types of waste management units in a manner consistent with federal requirements, except as provided under s. 403.804(2).

(4)   This section does not apply to a disposal facility or part of a facility that accepts fly ash, bottom ash, boiler slag, or flue-gas emission control materials from the operation of a fossil fuel-fired electric or steam generation facility, from a clean coal or other innovative technology process at a fossil fuel-fired electric or steam generation facility, or from any combination thereof.

History.—s. 38, ch. 83-310; s. 36, ch. 86-186; s. 5, ch. 89-285; s. 64, ch. 90-331; s. 1, ch. 93-91; s. 409, ch. 94-356; s. 2, ch. 2013-68.

### 403.7223    Waste elimination and reduction assistance program.—

(1)   The Legislature finds that the reduction of the volume and toxicity of hazardous waste generated in the state is the most environmentally, economically, and technically efficient method of protecting the public health and the environment from the improper management of hazardous waste.

(2)   The department shall establish a waste reduction and elimination assistance program designed to assist all persons in reducing the amount and toxicity of the hazardous waste generated in the state to the maximum extent possible. The waste reduction assistance program may include, but not be limited to:

(a)   The establishment of a waste reduction clearinghouse of all available information concerning waste reduction, waste minimization, recycling programs, economic and energy savings, and production environmental improvements;

(b)   Assistance in transferring information concerning waste reduction technologies through workshops, conferences, and handbooks;

(c)   Cooperation with university programs to develop waste reduction curricula and training;

(d)   Onsite technical assistance for hazardous waste generators; and

(e)   Researching and recommending incentive programs for innovative waste management and reduction programs.

**History.**—s. 6, ch. 88-393.


**403.7225   Local hazardous waste management assessments.**—

(1)   The Legislature recognizes that there is a need for identifying the amount, type, sources, and management of hazardous waste generated by small quantity generators in the state. There is also a need for facilitating responsible waste storage, transportation, volume reduction, recycling treatment, disposal, and the introduction of waste reduction opportunities to small quantity generators of hazardous waste. Responsible management of these wastes is imperative in order to protect the public health, safety, and welfare and the environment.

(2)   The department shall establish guidelines for local hazardous waste management assessments and shall specify a standard format. The local hazardous waste management assessments shall include, but not be limited to, the identification of the following:

(a)   All small quantity generators of hazardous waste within a county as defined pursuant to federal regulations under 40 C.F.R. s. 260.10.

(b)   The types and quantities of hazardous waste generated by small quantity generators within a county.

(c)   Current hazardous waste management practices of small quantity generators within a county.

(d)   Effective waste management practices for small quantity generators of hazardous waste.

(3)   Each county or regional planning council shall coordinate the local hazardous waste management assessments within its jurisdiction according to guidelines established under s. 403.7226. If a county declines to perform the local hazardous waste management assessment, the county shall make arrangements with its regional planning council to perform the assessment.

(4)   County-designated areas under the original assessments in which hazardous waste storage facilities have been located are recognized by the Legislature. However, this section does not prohibit a county from amending its comprehensive plan to designate other areas for this purpose, nor does this section prohibit construction of a facility on any other locally approved or state-approved site.

(5)   No county may amend its comprehensive plan or undertake rezoning actions in order to prevent areas designated pursuant to subsection (4) from being used as hazardous waste storage facilities.

(6)   Unless performed by the county pursuant to subsection (3), the regional planning councils shall upon successful arrangements with a county:

(a)   Perform local hazardous waste management assessments;

(b)   Provide any technical expertise needed by the counties in developing the assessments.

(7)   The selection of a regional storage facility site during the original assessment will not preclude the siting of a storage facility at some other site which is locally or state approved.

(8)   The department shall assemble the data collected from the local hazardous waste management assessments and determine if the needs of small quantity generators of hazardous waste will be met by in-state commercial hazardous waste facilities or if additional storage, treatment, or disposal facilities are needed in the state and which regions have the greatest need.

(9)   Storage facility area selections, or regional storage facility site selections from the original assessments shall not prevent siting of storage or treatment facilities in any area of the state.

(10)   Except as provided in this part, no local government law, ordinance, or rule pertaining to the subject of hazardous waste regulation may be more stringent than department rules adopted under the authority of this chapter.

(11)   Local hazardous waste management assessments shall be renewed every 5 years, based on the schedule determined by the department. More frequent assessments shall not be required by the state. However, at their option, counties may update such assessments at more frequent intervals. The assessment rolls shall be brought up to date annually before the end of the 5-year interval by including the applicable names from department sources, occupational licenses, building permits, and from not less than one complete survey of the business pages of the county local telephone systems. The roll shall be updated continuously thereafter in the same manner.

(12)   The Legislature recognizes the expense incurred by county governments in the proper identification, notification, and verification of small quantity generators of hazardous waste within their jurisdictions. When required to support the local hazardous waste assessments required by this section, the small quantity generator notification and verification program required pursuant to s. 403.7234, and the reporting requirements of s. 403.7236, a county may impose a small quantity generator notification and verification surcharge of up to $50 on the business or occupational license or renewal of any firm that is classified as a small quantity generator of hazardous wastes. A county may contract with or otherwise enter into an agreement with the county tax collector to collect the annual surcharge.

History.—s. 25, ch. 83-310; s. 34, ch. 84-338; s. 3, ch. 85-269; s. 11, ch. 87-374; s. 37, ch. 91-305; s. 40, ch. 93-207.

### 403.7226    Technical assistance by the department.—The department shall:

(1)   Provide technical assistance to county governments and regional planning councils to ensure consistency in implementing local hazardous waste management assessments as provided in ss. 403.7225, 403.7234, and 403.7236. In order to ensure that each local assessment is properly implemented and that all information gathered during the assessment is uniformly compiled and documented, each county or regional planning council shall contact the department during the preparation of the local assessment to receive technical assistance. Each county or regional planning council shall follow guidelines established by the department, and adopted by rule as appropriate, in order to properly implement these assessments.

(2)   Identify short-term needs and long-term needs for hazardous waste management for the state on the basis of the information gathered through the local hazardous waste management assessments and other information from state and federal regulatory agencies and sources. The state needs assessment must be ongoing and must be updated when new data concerning waste generation and waste management technologies become available.

History.—s. 26, ch. 83-310; s. 2, ch. 89-285; s. 41, ch. 93-207; s. 410, ch. 94-356; s. 22, ch. 2007-184.

### 403.723    Siting of hazardous waste facilities.—It is the intent of the Legislature to facilitate siting of proper hazardous waste storage facilities in each region and any additional storage, treatment, or disposal facilities as required. The Legislature recognizes the need for facilitating disposal of waste produced by small generators, reducing the volume of wastes generated in the state, reducing the toxicity of wastes generated in the state, and providing treatment and disposal facilities in the state.

(1)   Each county shall complete a hazardous waste management assessment and designate areas within the county at which a hazardous waste storage facility could be constructed to meet a demonstrated need.

(2)   After each county designates areas for storage facilities, each regional planning council shall designate one or more sites at which a regional hazardous waste storage or treatment facility could be constructed.

(3)   The department, within 30 days of receipt of a complete application for a hazardous waste facility construction or modification permit, shall notify each unit of local government within 3 miles of the proposed facility that a permit application has been received and shall publish a notice in a newspaper of general circulation in the area of the proposed facility that a complete permit application has been received.

(4)   Upon request by a person who has applied for a hazardous waste facility permit from the department, the local government having jurisdiction over the proposed site shall, within 90 days of such request, determine whether or not the proposed site is consistent and in compliance with adopted local government comprehensive plans, local land use ordinances, local zoning ordinances or regulations, and other local ordinances in effect at the time a hazardous waste facility construction or modification permit application is made or is an area or site designated for the purpose of such facility according to this act.

(5)   If the local government determines within 90 days of the request that construction or modification of the facility does not comply with such plans, ordinances, regulations, or area or site designations pursuant to this act, the person requesting the determination may request a variance from such plans, ordinances, regulations, or designations.

(6)   If the variance requested by the applicant is denied by local government or if there is no determination made by local government pursuant to subsection (4) within 90 days of the request, or if there is no action on the variance requested by the applicant within 90 days of the request for the variance, the person requesting such

determination or variance may petition the Governor and Cabinet for a variance from the local ordinances, assessments, regulations, plans, or area and site designations.

(7) The Governor and Cabinet shall grant the variance from any local ordinances, assessments, area and site designations, regulations, or plans only if a hazardous waste permit has been issued by the department and if the Governor and Cabinet find, based upon competent substantial evidence that clearly and convincingly establishes, that the facility:

(a) Will not have a significant adverse impact on the environment, including ground and surface water resources, of the region; and

(b) Will not have a significant adverse impact on the economy of the region.

(8) The Governor and Cabinet shall also consider the record of the proceeding before the local government, when determining whether to grant a petition for a variance from local ordinances, regulations, or plans.

(9) The Governor and Cabinet may adopt rules of procedure that govern these proceedings.

History.—s. 8, ch. 80-302; s. 41, ch. 81-167; s. 269, ch. 81-259; s. 43, ch. 83-55; s. 28, ch. 83-310.

### 403.7234    Small quantity generator notification and verification program.—

(1) Each county shall notify, according to guidelines established under s. 403.7226, each small quantity generator identified on its assessment roll, during the first year of the local hazardous waste management assessment. Annually thereafter, the county shall notify each small quantity generator not notified previously. The notification of small quantity generators shall:

(a) Detail the legal responsibilities of the small quantity generator with regard to proper waste management practices, including penalties for noncompliance.

(b) Include a list of hazardous waste management alternatives and waste reduction opportunities which are available to the small quantity generator.

(2) Alternatively, a county may perform this notification either through the mail or during the annual business licensing of new or existing facilities that potentially may generate hazardous waste.

(3) Counties shall collect information on the types, amounts, and management of waste generated by small quantity generators according to guidelines established under s. 403.7226.

(4) Within 30 days of receipt of a notification, which includes a survey form, a small quantity generator shall disclose its management practices and the types and quantities of waste to the county government. Annually, each county shall verify the management practices of at least 20 percent of its small quantity generators. The procedure for verification used by the county shall be developed as part of the guidance established by the department under s. 403.7226. The department may also regulate the waste management practices of small quantity generators in order to ensure proper management of hazardous waste in a manner consistent with federal requirements, except as provided under s. 403.804(2).

(5) Any small quantity generator who does not comply with the requirements of subsection (4) and who has received a notification and survey in person or through one certified letter from the county is subject to a fine of between $50 and $100 per day for a maximum of 100 days. The county may collect such fines and deposit them in its general revenue fund. Fines collected by the county shall be used to carry out the notification and verification procedure established in this section. If there are excess funds after the notification and verification procedures have been completed, such funds shall be used for hazardous and solid waste management purposes only.

History.—s. 29, ch. 83-310; s. 35, ch. 84-338; s. 37, ch. 86-186; s. 12, ch. 87-374; s. 42, ch. 93-207.

### 403.7236    Local government information to be sent to the department.—Each county shall transmit the following information to the department, according to guidelines established under s. 403.7226:

(1) A summary of the information gathered during its local hazardous waste management assessment;

(2) Information gathered from each small quantity generator not notified or verified previously; and

(3) Onsite information gathered from each existing small quantity generator verification.

History.—s. 30, ch. 83-310; s. 4, ch. 85-269; s. 43, ch. 93-207.

### 403.7238    Expanded local hazardous waste management programs.—

(1)    The Legislature recognizes the need for increased participation by local governments in ensuring that small quantity generators are properly managing their hazardous waste and that waste reduction opportunities are promoted and realized. In order to promote this participation, the department shall establish a grant program on a competitive basis for counties that meet the following criteria:

(a)    The county has established a funding mechanism to support its local hazardous waste management assessments and the expanded local hazardous waste management program.

(b)    The county has adopted a local ordinance approved by the department that addresses the compliance with and enforcement of the federal and state hazardous waste regulations for small quantity generators.

(c)    The county has established a plan that is designed to reduce the generation of hazardous waste and hazardous emissions from local governmental agencies and departments.

(d)    The county certifies that it will continue to implement its expanded local hazardous waste management assessment program after the grant assistance ceases.

(2)    Grants are authorized to cover startup costs incurred to establish the expanded local hazardous waste management program, including training for personnel, and materials and equipment necessary for education, compliance activities, and program administration. The total costs of administration shall not exceed 10 percent of the county's grant award.

(3)    The maximum amount of a grant for a county establishing an expanded local hazardous waste management program shall be $50,000.

History.—s. 44, ch. 93-207; s. 3, ch. 97-98.

### 403.724    Financial responsibility.—

(1)    An owner or operator of a hazardous waste facility, as a prerequisite to the operation, closure, postclosure, or corrective action at a facility in the state, shall guarantee the financial responsibility of such owner or operator for any liability which may be incurred in the operation of the facility and provide that, upon closure, abandonment, or interruption of operation of the facility, all appropriate measures are taken to prevent present and future damage to human health, safety, and welfare; the environment; and private and public property.

(2)    Cash, the establishment of a trust fund, surety bonds, a letter of credit, or casualty insurance, a financial test, a corporate guarantee, or a combination thereof, may be used to satisfy the financial responsibility requirement. Any method of financial responsibility used to satisfy this requirement shall be maintained in the amount approved by the department and shall be maintained until the department determines that the waste is no longer a hazard and authorizes cancellation, modification, or liquidation of the financial responsibility.

(3)    The amount of financial responsibility required shall be approved by the department upon each issuance, renewal, or modification of a hazardous waste facility authorization. Such factors as inflation rates and changes in operation may be considered when approving financial responsibility for the duration of the authorization. The Office of Insurance Regulation of the Department of Financial Services shall be available to assist the department in making this determination. In approving or modifying the amount of financial responsibility, the department shall consider:

(a)    The amount and type of hazardous waste involved;

(b)    The probable damage to human health and the environment;

(c)    The danger and probable damage to private and public property near the facility;

(d)    The probable time that the hazardous waste and facility involved will endanger the public health, safety, and welfare or the environment; and

(e)    The probable costs of properly closing the facility and performing corrective action.

(4)    The department may adopt rules which establish the procedures and guidelines it will use to approve or modify the amount of financial responsibility.

(5)    Hazardous waste facilities shall, within 1 year after the effective date of rules regarding financial responsibility pursuant to this act, establish financial responsibility or have the requirement waived.

(6)    By rule, the department may create exemptions from the financial responsibility requirement when, due to the size or magnitude of the operation, waiving the requirement will not conflict with the purposes of the

requirement.

(7)   A transporter of hazardous waste shall be bonded or insured to guarantee the financial responsibility of such transporter for any liability which may be incurred in the transportation of such hazardous waste and to provide that all appropriate measures are taken to prevent damage to human health, safety, and welfare, to the environment, and to private and public property. Financial guarantees specified in subsection (2) shall be used to satisfy the financial responsibility requirement.

(8)(a)   In any case where the owner or operator is in bankruptcy, reorganization, or arrangement pursuant to the Federal Bankruptcy Code or where with reasonable diligence jurisdiction in any state court or any of the federal courts cannot be obtained over an owner or operator likely to be solvent at the time of judgment, any claim arising from conduct for which evidence of financial responsibility must be provided under this section may be asserted directly against the guarantor providing such evidence of financial responsibility. In the case of any action pursuant to this subsection, such guarantor shall be entitled to invoke all rights and defenses which would have been available to the owner or operator if any action had been brought against the owner or operator by the claimant and which would have been available to the guarantor if an action had been brought against the guarantor by the owner or operator. The total liability of any guarantor shall be limited to the aggregate amount which the guarantor has provided as evidence of financial responsibility to the owner or operator under this act.

(b)1.   Nothing in this subsection shall be construed to limit any other state or federal statutory, contractual, or common-law liability of a guarantor to its owner or operator, including, but not limited to, the liability of such guarantor for bad faith either in negotiating or in failing to negotiate the settlement of any claim.

2.   Nothing in this subsection shall be construed to diminish the liability of any person under s. 107 or s. 111 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or other applicable law.

History.—s. 8, ch. 80-302; s. 23, ch. 83-310; s. 38, ch. 86-186; s. 65, ch. 90-331; s. 28, ch. 2000-211; s. 430, ch. 2003-261; s. 23, ch. 2007-184.

### 403.7255     Placement of signs.—

(1)   Signs must be placed by the owner or operator at any site in the state which is listed or proposed for listing on the Superfund Site List of the United States Environmental Protection Agency or any site identified by the department as a site contaminated by hazardous waste where there is a risk of exposure to the public. This section does not apply to sites reported under ss. 376.3071 and 376.3072. The department shall establish requirements and procedures for the placement of signs, and may do so in rules, permits, orders, or other authorizations. The authorization shall establish the appropriate size for such signs, which size shall be no smaller than 2 feet by 2 feet, and shall provide in clearly legible print appropriate warning language for the waste or other materials at the site and a telephone number that may be called for further information.

(2)   Violations of this act are punishable as provided in s. 403.161(4).

(3)   The provisions of this act are independent of and cumulative to any other requirements and remedies in this chapter or chapter 376, or any rules promulgated thereunder.

History.—ss. 2, 3, 4, ch. 90-15; s. 412, ch. 94-356; s. 24, ch. 2007-184.

### 403.726     Abatement of imminent hazard caused by hazardous substance.—

(1)   The Legislature finds that hazardous waste which has been improperly generated, transported, disposed of, stored, or treated may pose an imminent hazard to the public health, safety, and welfare and the environment.

(2)   The department shall take any action necessary pursuant to s. 403.121 or s. 403.131 to abate or substantially reduce any imminent hazard caused by a hazardous substance, including a spill into the environment of a hazardous substance. The department is authorized to use moneys from the Water Quality Assurance Trust Fund to finance such actions, and such expenditures from the fund shall be recoverable pursuant to s. 376.307.

(3)   An imminent hazard exists if any hazardous substance creates an immediate and substantial danger to human health, safety, or welfare or to the environment. The department may institute action in its own name, using the procedures and remedies of s. 403.121 or s. 403.131, to abate an imminent hazard. However, the department is authorized to recover a civil penalty of not more than $25,000 for each day of continued violation. Whenever serious harm to human health, safety, and welfare; the environment; or private or public property may

occur prior to completion of an administrative hearing or other formal proceeding which might be initiated to abate the risk of serious harm, the department may obtain, ex parte, an injunction without paying filing and service fees prior to the filing and service of process.

(4)   The department may implement the provisions of chapter 386 in its own name whenever a hazardous substance is being generated, transported, disposed of, stored, or treated in violation of those provisions of law.

(5)   The department may issue a permit or order requiring prompt abatement of an imminent hazard.

(6)   The department may remove or dispose of any hazardous substance which has become an imminent hazard, or take any other emergency action, when the owner or operator of a hazardous waste facility or a generator or transporter of a hazardous substance does not take appropriate action to abate or neutralize the hazard.

(7)   Where a hazardous substance is discharged into waters of the state and abatement action is taken pursuant to this section, the department may require that the affected body of water be restored to meet, but not exceed, either the standards established by department rule for that particular body of water or ambient water quality prior to the discharge, whichever is higher. However, under no circumstances would the subject water have to be restored to a more pure state than ambient water quality prior to the discharge.

History.—s. 8, ch. 80-302; s. 36, ch. 84-338; s. 4, ch. 95-144; s. 68, ch. 96-321; s. 38, ch. 2000-153; s. 25, ch. 2007-184.

**403.7264    Amnesty days for purging small quantities of hazardous wastes.**—Amnesty days are authorized by the state for the purpose of purging small quantities of hazardous waste, free of charge, from the possession of homeowners, farmers, schools, state agencies, and small businesses. These entities have no appropriate economically feasible mechanism for disposing of their hazardous wastes at the present time. In order to raise public awareness on this issue, provide an educational process, accommodate those entities which have a need to dispose of small quantities of hazardous waste, and preserve the waters of the state, amnesty days shall be carried out in the following manner:

(1)(a)   The department shall administer and supervise amnesty days and shall contract with a department-approved, bonded waste handling company for implementation. The waste collected from the entities named in this section shall be transported out of the state for proper disposal at a federally approved facility.

(b)   If a local government has established a local or regional hazardous waste collection center pursuant to s. 403.7265(2) and such center is in operation, the department and the local government may enter into a contract whereby the local government shall administer and supervise amnesty days. If a contract is entered into, the department shall provide to the local government, from funds appropriated to the department for amnesty days, an amount of money as determined by the department that is equal to the amount of money that would have been spent by the department to administer and supervise amnesty days in the local government's area. A local government that wishes to administer and supervise amnesty days shall notify the department at least 30 days prior to the beginning of the state fiscal year during which the amnesty days are scheduled to be held in the local government's area.

(2)   The department shall establish maximum amounts of hazardous waste to be accepted from any one entity during amnesty days. Amnesty days shall continue, at no cost to participants reporting with less than 100 pounds of hazardous waste, until funds appropriated by the Legislature for this purpose have been exhausted.

(3)   Local governments are required to participate in the program by selecting a highly visible site for amnesty days, publicizing the event, and sending a representative to work at amnesty days activities when they occur.

(4)   Amnesty days shall be funded on a continuing basis, as needed, from the Water Quality Assurance Trust Fund. The department is authorized to use up to 5 percent of the funds appropriated for amnesty days for administrative costs and up to 5 percent of such funds for public education related to amnesty days.

History.—s. 34, ch. 83-310; s. 37, ch. 84-338; s. 39, ch. 86-186; s. 7, ch. 88-393; s. 413, ch. 94-356; s. 51, ch. 2009-21; s. 26, ch. 2015-30.

**403.7265    Local hazardous waste collection program.**—

(1)   The Legislature recognizes the need for local governments to establish local hazardous waste management programs and local collection centers throughout the state. Local hazardous waste management programs are to educate and assist small businesses and households in properly managing the hazardous waste they generate. Local

collection centers are to serve a purpose similar to the collection locations used in the amnesty days program described in s. 403.7264. Such collection centers are to be operated to provide a service to homeowners, farmers, and conditionally exempt small quantity generators to encourage proper hazardous waste management. Local collection centers will allow local governments the opportunity to provide a location for collection and temporary storage of small quantities of hazardous waste. A private hazardous waste management company should be responsible for collecting the waste within 90 days for transfer to a permitted recycling, disposal, or treatment facility. In time, local collection centers are to become privately operated businesses in order to reduce the burden of hazardous waste collection on local government.

(2)   For the purposes of this section, the phrase:

(a)   "Collection center" means a secured site approved by the department to be used as a base for a hazardous waste collection facility.

(b)   "Regional collection center" means a facility permitted by the department for the storage of hazardous wastes.

(3)   The department shall establish a grant program for local governments that desire to provide a local or regional hazardous waste collection center. Grants shall be authorized to cover collection center costs associated with capital outlay for preparing a facility or site to safely serve as a collection center and to cover costs of administration, public awareness, and local amnesty days programs. The total cost for administration and public awareness may not exceed 10 percent of the grant award. Grants shall be available on a competitive basis to local governments which:

(a)   Comply with ss. 403.7225 and 403.7264;

(b)   Design a collection center which is approved by the department; and

(c)   Provide up to 33 percent of the capital outlay money needed for the facility as matching money.

(4)   The maximum amount of a grant for any local government participating in the development of a collection center is $100,000. If a regional collection facility is designed, each participating county is eligible for up to $100,000. The department may use up to 1 percent of the funds appropriated for the local hazardous waste collection center grant program for administrative costs and public education relating to proper hazardous waste management.

(5)   The department shall establish a cooperative collection center arrangement grant program enabling a local hazardous waste collection center grantee to receive a financial incentive for hosting an amnesty days program in a neighboring county that is currently unable to establish a permanent collection center, but desires a local hazardous waste collection. The grant may reimburse up to 75 percent of the neighboring county's amnesty days. Grants shall be available, on a competitive basis, to local governments that:

(a)   Have established operational hazardous waste collection centers and are willing to assume a host role, similar to that of the state in the amnesty days program described in s. 403.7264, in organizing a local hazardous waste collection in the neighboring county.

(b)   Enter into, and jointly submit, an interlocal agreement outlining department-established duties for both the host local government and neighboring county.

(6)   The maximum amount for the cooperative collection center arrangement grant is $35,000, with a maximum amnesty days reimbursement of $25,000, and a limit of $10,000 for the host local government. The host local government may receive up to $10,000 per cooperative collection center arrangement in addition to its maximum local hazardous waste collection center grant.

(7)   The department may establish an additional local project grant program enabling a local hazardous waste collection center grantee to receive funding for unique projects that improve the collection and lower the incidence of improper management of conditionally exempt or household hazardous waste. Eligible local governments may receive up to $50,000 in grant funds for these unique and innovative projects, provided they match 25 percent of the grant amount. If the department finds that the project has statewide applicability and immediate benefits to other local hazardous waste collection programs in the state, matching funds are not required. This grant will not count toward the $100,000 maximum grant amount for development of a collection center.

(8)   The department may use grant funds authorized under this section to assist local governments in carrying out the responsibilities and programs specified in ss. 403.7225, 403.7226, 403.7234, 403.7236, and 403.7238.

History.—s. 9, ch. 85-269; s. 40, ch. 86-186; s. 13, ch. 87-374; s. 8, ch. 88-393; s. 45, ch. 93-207; s. 29, ch. 2000-211; s. 26, ch. 2007-184.

### 403.727     Violations; defenses, penalties, and remedies.—

(1)   It is unlawful for any hazardous waste generator, transporter, or facility owner or operator to:

(a)   Fail to comply with the provisions of this act or departmental rules or orders;

(b)   Operate without a valid permit;

(c)   Fail to comply with a permit;

(d)   Cause, authorize, create, suffer, or allow an imminent hazard to occur or continue;

(e)   Knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained pursuant to the provisions of this act;

(f)   Fail to notify the department pursuant to s. 403.72(2); or

(g)   Refuse lawful inspection.

(2)   In addition to the "imminent hazard" provision, ss. 403.121 and 403.131 are available to the department to abate violations of this act.

(3)   Violations of the provisions of this act are punishable as follows:

(a)   Any person who violates the provisions of this act, the rules or orders of the department, or the conditions of a permit is liable to the state for any damages specified in s. 403.141 and for a civil penalty of not more than $50,000 for each day of continued violation, except as otherwise provided herein. The department may revoke any permit issued to the violator. In any action by the department against a small hazardous waste generator for the improper disposal of hazardous wastes, a rebuttable presumption of improper disposal shall be created if the generator was notified pursuant to s. 403.7234; the generator shall then have the burden of proving that the disposal was proper. If the generator was not so notified, the burden of proving improper disposal shall be placed upon the department.

(b)   Any person who knowingly or by exhibiting reckless indifference or gross careless disregard for human health:

1.   Transports or causes to be transported any hazardous waste, as defined in s. 403.703, to a facility which does not have a permit when such a permit is required under s. 403.707 or s. 403.722;

2.   Disposes of, treats, or stores hazardous waste:

a.   At any place but a hazardous waste facility which has a current and valid permit pursuant to s. 403.722;

b.   In knowing violation of any material condition or requirement of such permit if such violation has a substantial likelihood of endangering human health, animal or plant life, or property; or

c.   In knowing violation of any material condition or requirement of any applicable rule or standard if such violation has a substantial likelihood of endangering human health, animal or plant life, or property;

3.   Makes any false statement or representation or knowingly omits material information in any hazardous waste application, label, manifest, record, report, permit, or other document required by this act;

4.   Generates, stores, treats, transports, disposes of, or otherwise handles any hazardous waste and who knowingly destroys, alters, conceals, or fails to file any record, application, manifest, report, or other document required to be maintained or filed for purposes of compliance with this act; or

5.   Transports without a manifest, or causes to be transported without a manifest, any hazardous waste required by rules adopted by the department to be accompanied by a manifest

is, upon conviction, guilty of a felony of the third degree, punishable for the first such conviction by a fine of not more than $50,000 for each day of violation or imprisonment not to exceed 5 years, or both, and for any subsequent conviction by a fine of not more than $100,000 per day of violation or imprisonment of not more than 10 years, or both.

(4)   In addition to any other liability under this chapter, and subject only to the defenses set forth in subsections (5), (6), (7), and (8):

(a)   The owner and operator of a facility;

(b)   Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance was disposed of;

(c)   Any person who, by contract, agreement, or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person or by any other party or entity at any facility owned or operated by another party or entity and containing such hazardous substances; and

(d)   Any person who accepts or has accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person,

is liable for all costs of removal or remedial action incurred by the department under this section and damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from the release or threatened release of a hazardous substance as defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. No. 96-510.

(5)   The following defenses are available to a person alleged to be in violation of this act, who shall plead and prove that the alleged violation was solely the result of any of the following or combination of the following:

(a)   An act of war.

(b)   An act of government, either state, federal, or local, unless the person claiming the defense is a governmental body, in which case this defense is available only by acts of other governmental bodies.

(c)   An act of God, which means only an unforeseeable act exclusively occasioned by the violence of nature without the interference of any human agency.

(d)   An act or omission of a third party other than an employee or agent of the defendant or other than one whose act or omission occurs in connection with a contractual relationship existing, directly or indirectly, with the defendant, except when the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail, if the defendant establishes by a preponderance of the evidence that:

1.   The defendant exercised due care with respect to the hazardous waste concerned, taking into consideration the characteristics of such biomedical or hazardous waste, in light of all relevant facts and circumstances; and

2.   The defendant took precautions against foreseeable acts or omissions of any such third party and against the consequences that could foreseeably result from such acts or omissions.

(6)   A generator or transporter of hazardous wastes who has complied with this act and with the applicable rules adopted under this act and who has contracted for the disposal of hazardous wastes with a licensed hazardous waste disposal or processing facility is relieved from liability for those wastes upon receipt of a certificate of disposal from the disposal or processing facility.

(7)   A generator of hazardous waste who has complied with this act and with the applicable rules under this act and who has contracted for the transportation of hazardous waste to a licensed hazardous waste facility is relieved of liability to the extent that such liability is covered by the insurance or bond of the transporter obtained pursuant to this act.

(8)   In order to promote the reuse and recycling of recovered materials and to remove potential impediments to recycling, notwithstanding s. 376.308 and this section, a person who sells, transfers, or arranges for the transfer of recycled and recovered materials to a facility owned or operated by another person for the purpose of reclamation, recycling, manufacturing, or reuse of such materials is relieved from liability for hazardous substances released or threatened to be released from the receiving facility. This relief from liability does not apply if the person fails to exercise reasonable care with respect to the management and handling of the recycled and recovered materials, or if the arrangement for reclamation, recycling, manufacturing, or reuse of such materials was not reasonably expected to be legitimate based on information generally available to the person at the time of the arrangement. For the purpose of this subsection, the term "recycled and recovered materials" means scrap paper; scrap plastic; scrap glass; scrap textiles; scrap rubber, other than whole tires; scrap metal; or spent lead-acid or nickel-cadmium batteries or other spent batteries. The term includes minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use before becoming scrap.

The term does not include hazardous waste. This subsection applies to causes of action accruing on or after July 1, 2015, and applies retroactively to causes of action accruing before July 1, 2015, for which a lawsuit has not been filed.

(9)   A party liable for a violation of this section shall have a right to contribution from other parties identified in subsection (4) as liable for the pollution conditions.

History.—s. 8, ch. 80-302; s. 10, ch. 82-27; s. 35, ch. 83-310; s. 38, ch. 84-338; s. 41, ch. 86-186; s. 3, ch. 89-143; s. 4, ch. 90-82; s. 52, ch. 93-207; s. 414, ch. 94-356; s. 5, ch. 96-284; s. 69, ch. 96-321; s. 4, ch. 2001-258; s. 1, ch. 2015-150.

**403.728    Qualifications of operation personnel of hazardous waste facilities.**—The owner and operator of a hazardous waste facility shall employ persons who are adequately trained, or who are registered in a training program, to operate and maintain a hazardous waste facility. The department may develop and conduct onsite or classroom training programs for persons who operate or maintain hazardous waste facilities. The department may do so through its employees or by contract. The program may include training in personal and public safety, emergency measures, properties of the waste, and such other items as the department deems necessary.

History.—s. 8, ch. 80-302.

**403.73    Trade secrets; confidentiality.**—

(1)   Records, reports, or information obtained from any person under this part, unless otherwise provided by law, must be available to the public, except upon a showing satisfactory to the department by the person from whom the records, reports, or information is obtained that such records, reports, or information, or a particular part thereof, contains trade secrets as defined in s. 812.081. Such trade secrets are confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution. The person submitting such trade secret information to the department must request that it be kept confidential and must inform the department of the basis for the claim of trade secret. The department shall, subject to notice and opportunity for hearing, determine whether the information, or portions thereof, claimed to be a trade secret is or is not a trade secret. Such trade secrets may be disclosed, however, to authorized representatives of the department or, pursuant to request, to other governmental entities in order for them to properly perform their duties, or when relevant in any proceeding under this part. Authorized representatives and other governmental entities receiving such trade secret information shall retain its confidentiality. Those involved in any proceeding under this part, including an administrative law judge, a hearing officer, or a judge or justice, shall retain the confidentiality of any trade secret information revealed at such proceeding.

(2)   This section is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2021, unless reviewed and saved from repeal through reenactment by the Legislature.

History.—s. 8, ch. 80-302; s. 3, ch. 90-74; s. 5, ch. 95-366; s. 243, ch. 96-406; s. 158, ch. 96-410; s. 8, ch. 2016-6.

**403.74    Management of hazardous materials by governmental agencies.**—

(1)   For the purposes of this section, "hazardous materials" are those substances which are:

(a)   Listed as constituents of waste streams F001, F002, F003, F004, and F005 in 40 C.F.R. s. 261.31, or

(b)   Listed in 40 C.F.R. s. 261.33, including those substances which are "pesticides" as defined by s. 487.021.

(2)   Every local, state, or other governmental agency and every institution of the State University System that disposes of hazardous materials shall:

(a)   Notify the department of the type and approximate annual quantity of each hazardous material that is generated.

(b)   Notify the department of the management practices used for disposal of its hazardous materials.

(3)   Each such agency shall develop written plans for the management of the disposal of hazardous material.

(4)   Each such agency shall develop plans for spill prevention control and countermeasures for hazardous materials incidents.

(5)   Hazardous materials which are used by governmental agencies in annual quantities of less than 1 kilogram, except for those hazardous materials which are listed because of reactivity, are exempt from this section.

History.—s. 36, ch. 83-310; s. 39, ch. 84-338; s. 56, ch. 85-81; s. 35, ch. 92-115; s. 415, ch. 94-356.

Note.—Former s. 501.118.

**403.75    Definitions relating to used oil.**—As used in ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida, the term:

(1)  "Public used oil collection center" means:

(a)  Automotive service facilities or governmentally sponsored collection facilities, which in the course of business accept for disposal small quantities of used oil from households; and

(b)  Facilities which store used oil in aboveground tanks, which are approved by the department, and which in the course of business accept for disposal small quantities of used oil from households.

(2)  "Department" means the Department of Environmental Protection.

(3)  "Person" means any individual, private or public corporation, partnership, cooperative, association, estate, political subdivision, or governmental agency or instrumentality.

(4)  "Processing" means chemical or physical operations designed to produce from used oil, or to make used oil more amenable for production of, fuel oils, lubricants, or other used oil-derived products. Processing includes, but is not limited to: blending used oil with virgin petroleum products, blending used oils to meet the fuel specifications, filtration, simple distillation, chemical or physical separation and rerefining.

(5)  "Recycling" means to prepare used oil for reuse as a petroleum product by rerefining, reclaiming, reprocessing, or other means or to use used oil in a manner that substitutes for a petroleum product made from new oil.

(6)  "Rerefining" means the use of refining processes on used oil to produce high-quality base stocks for lubricants or other petroleum products. Rerefining may include distillation, hydrotreating, or treatments employing acid, caustic, solvent, clay, or other chemicals, or other physical treatments.

(7)  "Used oil" means any oil which has been refined from crude oil or synthetic oil and, as a result of use, storage, or handling, has become contaminated and unsuitable for its original purpose due to the presence of physical or chemical impurities or loss of original properties.

History.—s. 57, ch. 84-338; s. 25, ch. 88-130; s. 46, ch. 93-207; s. 416, ch. 94-356.

**403.751    Prohibited actions; used oil.**—

(1)(a)  No person may collect, transport, store, recycle, use, or dispose of used oil in any manner which endangers the public health or welfare.

(b)  No person may discharge used oil into sewers, drainage systems, septic tanks, surface or ground waters, watercourses, or marine waters.

(c)  No person may mix or commingle used oil with solid waste that is to be disposed of in landfills or directly dispose of used oil in landfills in Florida unless approved by the department.

(d)  Any person who unknowingly disposes into a landfill any used oil which has not been properly segregated or separated from other solid wastes by the generator is not guilty of a violation under this act.

(e)  No person may mix or commingle used oil with hazardous substances that make it unsuitable for recycling or beneficial use.

(2)  Used oil shall not be used for road oiling, dust control, weed abatement, or other similar uses that have the potential to release used oil into the environment.

History.—s. 58, ch. 84-338; s. 26, ch. 88-130.

**403.753    Public educational program about collection and recycling of used oil.**—The department shall conduct a public education program to inform the public of the needs for and benefits of collecting and recycling used oil and shall:

(1)  Encourage persons who annually sell at retail, in containers for use off the premises, more than 500 gallons of oil to provide the purchasers with information on the locations of collection facilities and information on proper disposal practices.

(2)  Establish, maintain, and publicize a used oil information center that disperses materials or information explaining local, state, and federal laws and rules governing used oil and informing the public of places and

methods for proper disposal of used oil.

(3)   Encourage the voluntary establishment of used oil collection and recycling programs and provide technical assistance to persons who organize such programs.

(4)   Encourage the procurement of recycled automotive, industrial, and fuel oils, and oils blended with recycled oils, for all state and local government uses. Recycled oils procured under this section shall meet equipment manufacturer's specifications. A 5-percent price preference may be given in procuring these recycled products.
   History.—s. 59, ch. 84-338; s. 27, ch. 88-130.

   **403.7531      Notice by retail dealer.**—A retail dealer who annually sells directly to the public more than 500 gallons of oil in containers for use off-premises shall post in a prominent place the toll-free telephone number the public can call to learn the location of a public used oil collection center.
   History.—s. 47, ch. 93-207.

   **403.754      Registration of persons transporting, processing, burning, or marketing used oil; fees; reports and records.**—

   (1)   The following persons shall register annually with the department pursuant to rules of the department on forms prescribed by it:

   (a)   Used oil transporters and transfer facilities. However, no registration will be issued by the department unless the requirements of s. 403.767 are met.

   (b)   Used oil processors and rerefiners. However, no registration will be issued by the department unless the requirements of s. 403.769 are met.

   (c)   Used oil burners.

   (d)   Used oil fuel marketers.

   (2)   An electric utility the operations of which generate used oil and which used oil is then reclaimed, recycled, or rerefined by the electric utility for use in its operations is not required to register or report pursuant to this section, but may be subject to other applicable federal or state rules pertaining to used oil processors and rerefiners.

   (3)   An onsite burner which only burns a specification used oil generated by such burner is not required to register or report pursuant to this section, provided that such burning is done in compliance with any air permits issued by the department, but may be subject to other applicable federal or state rules pertaining to used oil processors and rerefiners.

   (4)   The department may prescribe a fee for the registration required by this section in an amount which is sufficient to cover the cost of processing applications.

   (5)   The department shall require each registered person to submit, no later than March 1 of each year, a report which specifies the type and quantity of used oil transported, recycled, burned, or processed during the preceding calendar year.

   (6)   Each registered person who transports, processes, burns, or recycles used oil shall maintain records which identify at least:

   (a)   The source of the materials transported or recycled;

   (b)   The quantity of materials received;

   (c)   The date of receipt; and

   (d)   The destination or end use of the materials.

   (7)   The department shall perform technical studies to sample used oil at facilities of representative used oil transporters and at representative processing facilities to determine the incidence of contamination of used oil with hazardous, toxic, or other harmful substances.
   History.—s. 60, ch. 84-338; s. 28, ch. 88-130; s. 48, ch. 93-207.

   **403.7545      Regulation of used oil as hazardous waste.**—Nothing in ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida, shall prohibit the department from regulating used oil in a manner

consistent with the United States Environmental Protection Agency, or as a hazardous waste in a manner consistent with s. 241 of the Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98-616.

History.—s. 42, ch. 86-186; s. 29, ch. 88-130; s. 49, ch. 93-207.

**403.757    Coordination with other state agencies.**—

(1)    The department shall coordinate its activities and functions under ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida, with the Department of Economic Opportunity and other state agencies to avoid duplication in reporting and information gathering.

(2)    The nonprofit corporation established pursuant to s. 946.502 shall examine the feasibility of using used oil to fuel boilers and furnaces of state government buildings.

(3)    The Department of Transportation shall examine the feasibility of using recycled oil products in road construction activities.

History.—s. 62, ch. 84-338; s. 30, ch. 88-130; s. 14, ch. 91-113; s. 292, ch. 2011-142.

**403.758    Enforcement and penalty.**—

(1)    Except as provided in subsection (2), the department may enforce ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida, pursuant to ss. 403.121, 403.131, and 403.161.

(2)    Any person who fails to register with the department as required by ss. 403.754 and 526.01, as amended by chapter 84-338, Laws of Florida, is subject to a fine of $300.

History.—s. 63, ch. 84-338; s. 31, ch. 88-130; s. 50, ch. 93-207.

**403.759    Disposition of fees, fines, and penalties.**—The proceeds from the registration fees, fines, and penalties imposed by ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida, shall be deposited into the Solid Waste Management Trust Fund for use by the department in implementing the provisions of ss. 403.75-403.769 and s. 526.01, as amended by chapter 84-338, Laws of Florida.

History.—s. 64, ch. 84-338; s. 32, ch. 88-130.

**403.760    Public used oil collection centers.**—

(1)    The department shall encourage the voluntary establishment of public used oil collection centers and recycling programs and provide technical assistance to persons who organize such programs.

(2)    All government agencies, and businesses that change motor oil for the public, are encouraged to serve as public used oil collection centers.

(3)    A public used oil collection center must:

(a)    Notify the department annually that it is accepting used oil from the public; and

(b)    Annually report quantities of used oil collected from the public.

(4)    The Department of Agriculture and Consumer Services shall assist the department in inspecting public used oil collection centers.

(5)    No person may recover from the owner or operator of a used oil collection center any costs of response actions, as defined in s. 376.301, resulting from a release of either used oil or a hazardous substance or use the authority of ss. 376.307, 376.3071, and 403.724 against the owner or operator of a used oil collection center if such used oil is:

(a)    Not mixed with any hazardous substance by the owner or operator of the used oil collection center;

(b)    Not knowingly accepted with any hazardous substances contained therein;

(c)    Transported from the used oil collection center by a certified transporter pursuant to s. 403.767;

(d)    Stored in a used oil collection center that is in compliance with this section; and

(e)    In compliance with s. 114(c) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

This subsection applies only to that portion of the public used oil collection center used for the collection of used oil and does not apply if the owner or operator is grossly negligent in the operation of the public used oil collection center. Nothing in this section shall affect or modify in any way the obligations or liability of any person under any

other provisions of state or federal law, including common law, for injury or damage resulting from a release of used oil or hazardous substances. For the purpose of this section, the owner or operator of a used oil collection center may presume that a quantity of no more than 5 gallons of used oil accepted from any member of the public is not mixed with a hazardous substance, provided that such owner or operator acts in good faith.

History.—s. 33, ch. 88-130; s. 10, ch. 89-188.

### 403.761　　Incentives program.—

(1)　The department is authorized to establish an incentives program for individuals who change their own oil to encourage them to return their used oil to a used oil collection center.

(2)　The incentives used by the department may involve the use of discount or prize coupons, prize drawings, promotional giveaways, or other activities the department determines will promote collection, reuse, or proper disposal of used oil.

(3)　The department may contract with a promotion company to administer the incentives program.

History.—s. 34, ch. 88-130.

### 403.763　　Grants to local governments.—

(1)　The department shall develop a grants program for local governments to encourage the collection, reuse, and proper disposal of used oil. No grant may be made for any project unless such project is approved by the department.

(2)　The department shall consider for grant assistance any local government project that uses one or more of the following programs or any activity that the department feels will reduce the improper disposal and reuse of used oil:

(a)　Curbside pickup of used oil containers by a local government or its designee.

(b)　Retrofitting of solid waste equipment to promote curbside pickup or disposal of used oil at used oil collection centers designated by the local government.

(c)　Establishment of publicly operated used oil collection centers at landfills or other public places.

(d)　Providing containers and other materials and supplies that the public can utilize in an environmentally sound manner to store used oil for pickup or return to a used oil collection center.

(e)　Providing incentives for the establishment of privately operated public used oil collection centers.

(3)　Eligible projects shall be funded according to provisions established by the department. However, in no case shall one grant exceed $25,000.

History.—s. 35, ch. 88-130; s. 22, ch. 2015-4.

### 403.767　　Certification of used oil transporters.—

(1)　Any person who transports over public highways more than 500 gallons annually of used oil must be a certified transporter. This subsection does not apply to:

(a)　Local governments or private solid waste haulers under contract to a local government that transport used oil collected from households to a public used oil collection center.

(b)　Persons who transport less than 55 gallons of used oil at one time that is stored in tightly closed containers which are secured in a totally enclosed section of the transport vehicle.

(c)　Persons who transport their own used oil, which is generated at their own noncontiguous facilities, to their own central collection facility for storage, processing, or energy recovery. However, such persons shall provide the same proof of liability insurance or other means of financial responsibility for liability which may be incurred in the transport of used oil as provided by certified transporters under subsection (3).

(2)　The department shall develop a certification program for transporters of used oil and shall issue, deny, or revoke certifications authorizing the holder to transport used oil. Certification requirements shall help assure that a used oil transporter is familiar with appropriate rules and used oil management procedures.

(3)　The department shall adopt rules governing certification, which shall include requirements for the following:

(a)　Registration and annual reporting pursuant to s. 403.754.

(b) Evidence of familiarity with applicable state laws and rules governing used oil transportation.

(c) Proof of liability insurance or other means of financial responsibility for any liability which may be incurred in the transport of used oil.

History.—s. 36, ch. 88-130; s. 17, ch. 97-277; s. 30, ch. 2000-211.

### 403.769    Permits for used oil processing and rerefining facilities.—

(1) Each person who intends to operate, modify, or close a used oil processing facility shall obtain an operation or closure permit from the department prior to operating, modifying, or closing the facility.

(2) The department shall develop a permitting system for used oil processing facilities after reviewing and considering the applicability of the permit system for hazardous waste treatment, storage, or disposal facilities.

(3) Permits shall not be required under this section for the burning of used oil as a fuel, provided:

(a) A valid department air permit is in effect for the facility; and

(b) The facility burns used oil in accordance with applicable United States Environmental Protection Agency regulations, local government regulations, and the requirements of its department air permit.

(4) No permit is required under this section for the use of used oil for the beneficiation or flotation of phosphate rock, but may be subject to other applicable federal or state used oil rules.

History.—s. 37, ch. 88-130; s. 51, ch. 93-207; s. 31, ch. 2000-211.

### 403.7721    Rule of construction; chs. 85-269 and 85-277.—The provisions of chapters 85-269 and 85-277, Laws of Florida, shall be construed to supplement rather than to diminish or supersede the powers exercised by the department under chapter 376 and this chapter. In accordance with chapter 376 and this chapter, the department may fully exercise its authority under said chapters to collect information for other purposes and may coordinate such efforts with the information gathering duties imposed by chapters 85-269 and 85-277, where deemed practicable and advisable, in order to provide for cost-effective use of state resources.

History.—s. 15, ch. 85-269; s. 5, ch. 85-277; s. 417, ch. 94-356.

PART V

ENVIRONMENTAL REGULATION

403.801    Short title.

403.802    Declaration of policy.

403.803    Definitions.

403.804    Environmental Regulation Commission; powers and duties.

403.805    Secretary; powers and duties; review of specified rules.

403.8051    Small Business Air Pollution Compliance Advisory Council; members; duties.

403.8052    Small Business Stationary Air Pollution Source Technical and Environmental Compliance Assistance Program.

403.8055    Department adoption of federal standards.

403.809    Environmental districts; establishment; managers; functions.

403.811    Dredge and fill permits issued pursuant to this chapter and s. 373.414.

403.812    Dredge and fill permitting in stormwater management systems.

403.813    Permits issued at district centers; exceptions.

403.8135    Citation of rule.

403.814    General permits; delegation.

403.8141    Special event permits.

403.815    Public notice; waiver of hearings.

403.816    Permits for maintenance dredging of deepwater ports and beach restoration projects.

403.8163    Sites for disposal of spoil from maintenance dredge operations; selection.

### 403.801    Short title.—Chapter 75-22, Laws of Florida, shall be known and may be cited as the "Florida Environmental Reorganization Act of 1975."

Case 1:21-cv-00119-RDM Document 55 Filed 06/22/21 Page 205 of 694

History.—s. 1, ch. 75-22.

**403.802 Declaration of policy.**—Reasserting the policies of the Governmental Reorganization Act of 1969 and the Florida Environmental Reorganization Act of 1975 which recognize that structural reorganization should be a continuing process, and recognizing that many years have passed since the passage of those acts, it is the intent of the Legislature to promote more efficient, effective, and economical operation of certain environmental agencies by transferring decisionmaking authority to environmental district centers and delegating to the water management districts permitting functions related to water quality. Further, it is the intent of this act to promote proper administration of Florida's landmark environmental laws.

History.—s. 2, ch. 75-22; s. 61, ch. 83-310.

**403.803 Definitions.**—When used in this act, the term, phrase, or word:

(1) "Branch office" means a geographical area, the boundaries of which may be established as a part of a district.

(2) "Canal" is a manmade trench, the bottom of which is normally covered by water with the upper edges of its sides normally above water.

(3) "Channel" is a trench, the bottom of which is normally covered entirely by water, with the upper edges of its sides normally below water.

(4) "Commission" means the Environmental Regulation Commission.

(5) "Department" means the Department of Environmental Protection.

(6) "District" or "environmental district" means one of the geographical areas, the boundaries of which are established pursuant to this act.

(7) "Drainage ditch" or "irrigation ditch" is a manmade trench dug for the purpose of draining water from the land or for transporting water for use on the land and is not built for navigational purposes.

(8) "Environmental district center" means the facilities and personnel which are centralized in each district for the purposes of carrying out the provisions of this act.

(9) "Headquarters" means the physical location of the offices of the secretary and the division directors of the department.

(10) "Insect control impoundment dikes" means artificial structures, including earthen berms, constructed and used to impound waters for the purpose of insect control.

(11) "Manager" means the head of an environmental district or branch office who shall supervise all environmental functions of the department within such environmental district or branch office.

(12) "Secretary" means the Secretary of Environmental Protection.

(13) "Standard" means any rule of the Department of Environmental Protection relating to air and water quality, noise, solid-waste management, and electric and magnetic fields associated with electrical transmission and distribution lines and substation facilities. The term "standard" does not include rules of the department which relate exclusively to the internal management of the department, the procedural processing of applications, the administration of rulemaking or adjudicatory proceedings, the publication of notices, the conduct of hearings, or other procedural matters.

(14) "Swale" means a manmade trench which:

(a) Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than 3 feet horizontal to 1 foot vertical;

(b) Contains contiguous areas of standing or flowing water only following a rainfall event;

(c) Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and

(d) Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge.

History.—s. 3, ch. 75-22; s. 62, ch. 83-310; s. 40, ch. 84-338; s. 9, ch. 86-173; s. 56, ch. 86-186; s. 422, ch. 94-356.

**403.804 Environmental Regulation Commission; powers and duties.**—

(1)  Except as provided in subsection (2) and s. 120.54(4), the commission, pursuant to s. 403.805(1), shall exercise the standard-setting authority of the department under this chapter; part II of chapter 373; and ss. 373.309(1)(e), 373.414(4) and (10), 373.4145(1)(a), 373.421(1), and 373.4592(4)(d)4. and (e). The commission, in exercising its authority, shall consider scientific and technical validity, economic impacts, and relative risks and benefits to the public and the environment. The commission shall not establish department policies, priorities, plans, or directives. The commission may adopt procedural rules governing the conduct of its meetings and hearings.

(2)  The department shall have a study conducted of the economic and environmental impact which sets forth the benefits and costs to the public of any proposed standard that would be stricter or more stringent than one which has been set by federal agencies pursuant to federal law or regulation. Such study as is provided for in this subsection shall be submitted to the commission, which shall initially adopt the standard. Final action shall be by the Governor and Cabinet, who shall accept, reject, modify, or remand for further proceedings the standard within 60 days from the submission. Such review shall be appellate in nature. Hearings shall be in accordance with the provisions of chapter 120.

History.—s. 6, ch. 75-22; ss. 4, 5, ch. 80-66; s. 54, ch. 83-310; s. 41, ch. 84-338; s. 1, ch. 88-343; s. 3, ch. 95-295; s. 167, ch. 96-410; s. 41, ch. 2002-296; s. 95, ch. 2014-17.

### 403.805    Secretary; powers and duties; review of specified rules.—

(1)  The secretary shall have the powers and duties of heads of departments set forth in chapter 20, including the authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of chapters 253, 373, and 376 and this chapter. The secretary shall have rulemaking responsibility under chapter 120, but shall submit any proposed rule containing standards to the Environmental Regulation Commission for approval, modification, or disapproval pursuant to s. 403.804, except for total maximum daily load calculations and allocations developed pursuant to s. 403.067(6). The secretary shall have responsibility for final agency action regarding total maximum daily load calculations and allocations developed pursuant to s. 403.067(6). The secretary shall employ legal counsel to represent the department in matters affecting the department. Except for appeals on permits specifically assigned by this act to the Governor and Cabinet, and unless otherwise prohibited by law, the secretary may delegate the authority assigned to the department by this act to the assistant secretary, division directors, and district and branch office managers and to the water management districts.

(2)  No person who is responsible for final agency action to approve any portion of a permit issued pursuant to s. 403.0885 shall receive or shall have received after appointment or during the 2 years prior to appointment directly or indirectly from such permitholders or applicants 10 percent or more of his or her gross personal income for a calendar year or 50 percent of his or her gross personal income for a calendar year if the recipient is over 60 years of age and is receiving such portion pursuant to a retirement pension or similar arrangement. "Permitholders" or "applicants for a permit" as used in this section shall not include any department or agency of state government. The term "income" shall include, but not be limited to, retirement benefits, consultant fees, and stock dividends. Income shall not be deemed received "directly or indirectly from permitholders or applicants for a permit" where it is derived from mutual fund payments, or from other diversified investments, for which the recipient does not know the identity of the primary source of income.

(3)  After adoption of proposed rule 62-302.531(9), Florida Administrative Code, a nonseverability and effective date provision approved by the commission on December 8, 2011, in accordance with the commission's legislative authority under s. 403.804, notice of which was published by the department on December 22, 2011, in the Florida Administrative Register, Vol. 37, No. 51, page 4446, any subsequent rule or amendment altering the effect of such rule shall be submitted to the President of the Senate and the Speaker of the House of Representatives no later than 30 days before the next regular legislative session, and such amendment may not take effect until it is ratified by the Legislature.

History.—s. 6, ch. 75-22; s. 6, ch. 80-66; s. 2, ch. 80-394; s. 63, ch. 83-310; s. 3, ch. 87-337; s. 10, ch. 87-374; s. 13, ch. 88-393; s. 83, ch. 93-213; ss. 4, 8, ch. 95-295; s. 9, ch. 96-370; s. 1010, ch. 97-103; s. 106, ch. 98-200; s. 4, ch. 99-223; s. 11, ch. 99-353; s. 1, ch. 2012-3; s. 42, ch. 2013-14.

**403.8051 Small Business Air Pollution Compliance Advisory Council; members; duties.—**

(1) The Small Business Air Pollution Compliance Advisory Council is created within the department. The council shall have seven members, appointed as follows:

(a) Two members who are not owners or representatives of owners of small business stationary sources, appointed by the Governor to represent the public.

(b) Two members, one each appointed by the President of the Senate and the Minority Leader of the Senate, who are owners or who represent owners of small business stationary sources.

(c) Two members, one each appointed by the Speaker of the House of Representatives and the Minority Leader of the House of Representatives, who are owners or who represent owners of small business stationary sources.

(d) One member appointed by the Secretary of Environmental Protection to represent the department.

(2) The council shall:

(a) Render advice on the effectiveness of the department's small business stationary air pollution source technical and environmental compliance assistance program, the difficulties encountered, and the degree and severity of enforcement.

(b) Review information for small business stationary air pollution sources to assure such information is understandable by the layperson.

(c) Make periodic reports to the administrator of the United States Environmental Protection Agency as required by federal law.

**History.**—s. 12, ch. 92-132; s. 423, ch. 94-356.

**403.8052 Small Business Stationary Air Pollution Source Technical and Environmental Compliance Assistance Program.—**

(1) The department shall establish a technical and environmental compliance assistance program for small business stationary air pollution sources. The program shall assist such stationary sources in determining applicable permit requirements; collect and disseminate information concerning compliance methods and technologies; and provide information regarding pollution prevention and accidental release detection and prevention, including alternative technologies, process changes, products, and methods of operation that help reduce air pollution. For purposes of this section, a small business stationary air pollution source means a stationary source of air pollution which:

(a) Is owned or operated by a person who employs 100 or fewer individuals.

(b) Is a small business concern as defined in 15 U.S.C. s. 632.

(c) Is other than a major stationary source within the meaning of 42 U.S.C. s. 7602(j) or 42 U.S.C. subchapter I, part C or part D.

(d) Emits less than 50 tons per year of any regulated pollutant.

(e) Emits less than 75 tons per year of all regulated pollutants.

(2) The department shall designate a person with suitable technical qualifications as the head of the program. The program office shall serve as ombudsman for small business stationary air pollution sources in the implementation of s. 403.0872 by the department. The program office shall serve as the staff for the Small Business Air Pollution Compliance Advisory Council and shall assist in the development and dissemination of the reports and opinions of the council.

(3) The department shall establish, by rule, a notice procedure to ensure that small business stationary air pollution sources receive notice of their rights under s. 403.0872 in such a way as to provide reasonable and adequate time for such sources to evaluate compliance methods and any relevant or applicable proposed or final rules or standards of the department.

(4) Any stationary source that does not meet the criteria of paragraph (1)(c), paragraph (1)(d), or paragraph (1)(e) may petition the department for inclusion in the program as a small business stationary air pollution source, if the source does not emit more than 100 tons per year of all regulated pollutants. The department shall establish, by rule, notice procedures to assure an opportunity for public comment on any petition filed under this subsection.

**History.**—s. 13, ch. 92-132; s. 2, ch. 93-94.

Note.—Former s. 403.0852.

**403.8055    Department adoption of federal standards.**—Notwithstanding ss. 120.54 and 403.804, the secretary is empowered to adopt rules substantively identical to regulations adopted in the Federal Register by the United States Environmental Protection Agency pursuant to federal law, in accordance with the following procedures:

(1)    The secretary shall publish notice of intent to adopt a rule pursuant to this section in the Florida Administrative Register at least 21 days prior to filing the rule with the Department of State. The secretary shall mail a copy of the notice of intent to adopt a rule to the Administrative Procedures Committee at least 21 days prior to the date of filing with the Department of State. Prior to filing the rule with the Department of State, the secretary shall consider any written comments received within 21 days after the date of publication of the notice of intent to adopt a rule. The rule shall be adopted upon filing with the Department of State. Substantive changes from the rules as noticed shall require republishing of notice as required in this section.

(2)    Any rule adopted pursuant to this section shall become effective upon the date designated in the rule by the secretary; however, no such rule shall become effective earlier than the effective date of the substantively identical United States Environmental Protection Agency regulation.

(3)    The secretary shall stay any terms or conditions of a permit implementing department rules adopted pursuant to this section if the substantively identical provisions of a United States Environmental Protection Agency regulation have been stayed under federal judicial review. A stay issued pursuant to this subsection shall terminate upon completion of federal judicial review.

(4)    Any domestic for-profit or nonprofit corporation or association formed, in whole or in part:

(a)    To promote conservation or natural beauty;

(b)    To protect the environment, personal health, or other biological values;

(c)    To preserve historical sites;

(d)    To promote consumer interests;

(e)    To represent labor, commercial, or industrial groups; or

(f)    To promote orderly development;

and any other substantially affected person may, within 14 days after the date of publication of the notice of intent to adopt a rule, file an objection to rulemaking with the Environmental Regulation Commission. The objection shall specify the portions of the proposed rule to which the person objects and the reasons for the objection. The secretary shall not have the authority under this section to adopt those portions of a proposed rule specified in such objection. Objections which are frivolous shall not be considered sufficient to prohibit the secretary from adopting rules under this section.

(5)    Whenever all or part of any rule proposed for adoption by the department is substantively identical to a regulation adopted in the Federal Register by the United States Environmental Protection Agency pursuant to federal law, such rule shall be written in a manner so that the rule specifically references such regulation whenever possible.

History.—s. 7, ch. 80-66; s. 11, ch. 82-27; s. 38, ch. 88-130; s. 43, ch. 2013-14.

**403.809    Environmental districts; establishment; managers; functions.**—

(1)    The secretary shall establish environmental districts. The boundaries of the environmental districts shall coincide with the boundaries of the water management districts, and a water management district may be divided into more than one environmental district. The secretary has the authority to adjust the environmental district boundaries upon a determination that exceptional circumstances require such adjustment in order to more properly serve the needs of the public or the environment. The secretary may establish branch offices for the purpose of making services more accessible to the citizens of each district. In the Suwannee River Water Management District, a branch office may serve as the environmental district center. By July 1, 1984, the department shall collocate part of its permitting operations with each of the central offices of the water

management districts, and the water management districts shall collocate part of their permitting operations with each of the district offices of the department.

(2)    There shall be a manager for each environmental district who shall be appointed by, and serve at the pleasure of, the secretary. The district manager shall maintain his or her office in the environmental district center, which shall be collocated with an office of a water management district. Each branch office shall have a branch office manager. The water management districts are encouraged to collocate part of their permitting operations with the branch offices of the department to the maximum extent practicable.

(3)(a)    Field services and inspections required in support of the decisions of the department relating to the issuance of permits, licenses, certificates, or exemptions shall be accomplished at the environmental district center level to the maximum extent practicable, except where otherwise delegated by the secretary.

(b)    The processing of all applications for permits, licenses, certificates, and exemptions shall be accomplished at the district center or the branch office, except for those applications specifically assigned elsewhere in the department under s. 403.805 or to the water management districts under [1]s. 403.812 and those applications assigned by interagency agreement as provided in this act. However, the secretary, as head of the department, may not delegate to district or subdistrict managers, water management districts, or any unit of local government the authority to act on the following types of permit applications:

1.    Permits issued under s. 403.0885, except such permit issuance may be delegated to district managers.

2.    Construction of major air pollution sources.

3.    Certifications under the Florida Electrical Power Plant Siting Act or the Florida Electric Transmission Line Siting Act and the associated permit issued under s. 403.0885, if applicable.

4.    Permits issued under s. 403.0885 to steam electric generating facilities regulated pursuant to 40 C.F.R. part 423.

5.    Permits issued under s. 378.901.

History.—ss. 4, 6, ch. 75-22; s. 67, ch. 83-310; s. 42, ch. 84-338; s. 15, ch. 88-393; s. 84, ch. 93-213; s. 3, ch. 95-215; s. 18, ch. 97-103; s. 70, ch. 2006-230.

[1]Note.—Section 39, ch. 89-279, substantially reworded s. 403.812, removing all references to the delegation of functions to water management districts.

**403.811    Dredge and fill permits issued pursuant to this chapter and s. 373.414.**—Permits or other orders addressing dredging and filling in, on, or over waters of the state issued pursuant to this chapter or s. 373.414(9) before the effective date of rules adopted under s. 373.414(9) and permits or other orders issued in accordance with s. 373.414(13), (14), (15), or (16) shall remain valid through the duration specified in the permit or order, unless revoked by the agency issuing the permit. The agency issuing the permit or other order may seek to enjoin the violation of, or to enforce compliance with, the permit or other order as provided in ss. 403.121, 403.131, 403.141, and 403.161. A violation of a permit or other order addressing dredging or filling issued pursuant to this chapter is punishable by a civil penalty as provided in s. 403.141 or a criminal penalty as provided in s. 403.161.

History.—s. 37, ch. 93-213.

**403.812    Dredge and fill permitting in stormwater management systems.**—The department shall not require dredge and fill permits for stormwater management systems where such systems are located landward of the point of connection to waters of the state and are designed, constructed, operated, and maintained for stormwater treatment, flood attenuation, or irrigation. The waters within such systems, unless designed, constructed, operated, and maintained for in-water recreational uses, such as swimming and boating, shall not be considered waters of the state; however, if the system provides other incidental uses and is accessible to the public, then the department may require reasonable assurance that water quality within the system will not adversely impact public health, fish and wildlife in adjacent waters, or adjacent waters. The department shall not require dredge and fill permits for structures designed solely to connect stormwater management systems to waters of the state provided that the connection of such system to waters of the state is regulated pursuant to chapter 373. The department shall initiate rulemaking to implement the provisions of this section.

History.—s. 6, ch. 75-22; s. 68, ch. 83-310; s. 6, ch. 84-79; s. 3, ch. 85-154; s. 39, ch. 89-279.

**403.813   Permits issued at district centers; exceptions.**—

(1)   A permit is not required under this chapter, chapter 373, chapter 61-691, Laws of Florida, or chapter 25214 or chapter 25270, 1949, Laws of Florida, for activities associated with the following types of projects; however, except as otherwise provided in this subsection, this subsection does not relieve an applicant from any requirement to obtain permission to use or occupy lands owned by the Board of Trustees of the Internal Improvement Trust Fund or a water management district in its governmental or proprietary capacity or from complying with applicable local pollution control programs authorized under this chapter or other requirements of county and municipal governments:

(a)   The installation of overhead transmission lines, with support structures which are not constructed in waters of the state and which do not create a navigational hazard.

(b)   The installation and repair of mooring pilings and dolphins associated with private docking facilities or piers and the installation of private docks, piers and recreational docking facilities, or piers and recreational docking facilities of local governmental entities when the local governmental entity's activities will not take place in any manatee habitat, any of which docks:

1.   Has 500 square feet or less of over-water surface area for a dock which is located in an area designated as Outstanding Florida Waters or 1,000 square feet or less of over-water surface area for a dock which is located in an area which is not designated as Outstanding Florida Waters;

2.   Is constructed on or held in place by pilings or is a floating dock which is constructed so as not to involve filling or dredging other than that necessary to install the pilings;

3.   Shall not substantially impede the flow of water or create a navigational hazard;

4.   Is used for recreational, noncommercial activities associated with the mooring or storage of boats and boat paraphernalia; and

5.   Is the sole dock constructed pursuant to this exemption as measured along the shoreline for a distance of 65 feet, unless the parcel of land or individual lot as platted is less than 65 feet in length along the shoreline, in which case there may be one exempt dock allowed per parcel or lot.

Nothing in this paragraph shall prohibit the department from taking appropriate enforcement action pursuant to this chapter to abate or prohibit any activity otherwise exempt from permitting pursuant to this paragraph if the department can demonstrate that the exempted activity has caused water pollution in violation of this chapter.

(c)   The installation and maintenance to design specifications of boat ramps on artificial bodies of water where navigational access to the proposed ramp exists or the installation of boat ramps open to the public in any waters of the state where navigational access to the proposed ramp exists and where the construction of the proposed ramp will be less than 30 feet wide and will involve the removal of less than 25 cubic yards of material from the waters of the state, and the maintenance to design specifications of such ramps; however, the material to be removed shall be placed upon a self-contained upland site so as to prevent the escape of the spoil material into the waters of the state.

(d)   The replacement or repair of existing docks and piers, except that fill material may not be used and the replacement or repaired dock or pier must be in the same location and of the same configuration and dimensions as the dock or pier being replaced or repaired. This does not preclude the use of different construction materials or minor deviations to allow upgrades to current structural and design standards.

(e)   The restoration of seawalls at their previous locations or upland of, or within 18 inches waterward of, their previous locations. However, this shall not affect the permitting requirements of chapter 161, and department rules shall clearly indicate that this exception does not constitute an exception from the permitting requirements of chapter 161.

(f)   The performance of maintenance dredging of existing manmade canals, channels, intake and discharge structures, and previously dredged portions of natural water bodies within drainage rights-of-way or drainage easements which have been recorded in the public records of the county, where the spoil material is to be removed and deposited on a self-contained, upland spoil site which will prevent the escape of the spoil material into the waters of the state, provided that no more dredging is to be performed than is necessary to restore the

canals, channels, and intake and discharge structures, and previously dredged portions of natural water bodies, to original design specifications or configurations, provided that the work is conducted in compliance with s. 379.2431(2)(d), provided that no significant impacts occur to previously undisturbed natural areas, and provided that control devices for return flow and best management practices for erosion and sediment control are utilized to prevent bank erosion and scouring and to prevent turbidity, dredged material, and toxic or deleterious substances from discharging into adjacent waters during maintenance dredging. Further, for maintenance dredging of previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements, an entity that seeks an exemption must notify the department or water management district, as applicable, at least 30 days prior to dredging and provide documentation of original design specifications or configurations where such exist. This exemption applies to all canals and previously dredged portions of natural water bodies within recorded drainage rights-of-way or drainage easements constructed prior to April 3, 1970, and to those canals and previously dredged portions of natural water bodies constructed on or after April 3, 1970, pursuant to all necessary state permits. This exemption does not apply to the removal of a natural or manmade barrier separating a canal or canal system from adjacent waters. When no previous permit has been issued by the Board of Trustees of the Internal Improvement Trust Fund or the United States Army Corps of Engineers for construction or maintenance dredging of the existing manmade canal or intake or discharge structure, such maintenance dredging shall be limited to a depth of no more than 5 feet below mean low water. The Board of Trustees of the Internal Improvement Trust Fund may fix and recover from the permittee an amount equal to the difference between the fair market value and the actual cost of the maintenance dredging for material removed during such maintenance dredging. However, no charge shall be exacted by the state for material removed during such maintenance dredging by a public port authority. The removing party may subsequently sell such material; however, proceeds from such sale that exceed the costs of maintenance dredging shall be remitted to the state and deposited in the Internal Improvement Trust Fund.

(g)   The maintenance of existing insect control structures, dikes, and irrigation and drainage ditches, provided that spoil material is deposited on a self-contained, upland spoil site which will prevent the escape of the spoil material into waters of the state. In the case of insect control structures, if the cost of using a self-contained upland spoil site is so excessive, as determined by the Department of Health, pursuant to s. 403.088(1), that it will inhibit proposed insect control, then-existing spoil sites or dikes may be used, upon notification to the department. In the case of insect control where upland spoil sites are not used pursuant to this exemption, turbidity control devices shall be used to confine the spoil material discharge to that area previously disturbed when the receiving body of water is used as a potable water supply, is designated as shellfish harvesting waters, or functions as a habitat for commercially or recreationally important shellfish or finfish. In all cases, no more dredging is to be performed than is necessary to restore the dike or irrigation or drainage ditch to its original design specifications.

(h)   The repair or replacement of existing functional pipes or culverts the purpose of which is the discharge or conveyance of stormwater. In all cases, the invert elevation, the diameter, and the length of the culvert shall not be changed. However, the material used for the culvert may be different from the original.

(i)   The construction of private docks of 1,000 square feet or less of over-water surface area and seawalls in artificially created waterways where such construction will not violate existing water quality standards, impede navigation, or affect flood control. This exemption does not apply to the construction of vertical seawalls in estuaries or lagoons unless the proposed construction is within an existing manmade canal where the shoreline is currently occupied in whole or part by vertical seawalls.

(j)   The construction and maintenance of swales.

(k)   The installation of aids to navigation and buoys associated with such aids, provided the devices are marked pursuant to s. 327.40.

(l)   The replacement or repair of existing open-trestle foot bridges and vehicular bridges that are 100 feet or less in length and two lanes or less in width, provided that no more dredging or filling of submerged lands is performed other than that which is necessary to replace or repair pilings and that the structure to be replaced or repaired is the same length, the same configuration, and in the same location as the original bridge. No debris from the original bridge shall be allowed to remain in the waters of the state.

(m)   The installation of subaqueous transmission and distribution lines laid on, or embedded in, the bottoms of waters in the state, except in Class I and Class II waters and aquatic preserves, provided no dredging or filling is necessary.

(n)   The replacement or repair of subaqueous transmission and distribution lines laid on, or embedded in, the bottoms of waters of the state.

(o)   The construction of private seawalls in wetlands or other surface waters where such construction is between and adjoins at both ends existing seawalls; follows a continuous and uniform seawall construction line with the existing seawalls; is no more than 150 feet in length; and does not violate existing water quality standards, impede navigation, or affect flood control. However, in estuaries and lagoons the construction of vertical seawalls is limited to the circumstances and purposes stated in s. 373.414(5)(b)1.-4. This paragraph does not affect the permitting requirements of chapter 161, and department rules must clearly indicate that this exception does not constitute an exception from the permitting requirements of chapter 161.

(p)   The restoration of existing insect control impoundment dikes which are less than 100 feet in length. Such impoundments shall be connected to tidally influenced waters for 6 months each year beginning September 1 and ending February 28 if feasible or operated in accordance with an impoundment management plan approved by the department. A dike restoration may involve no more dredging than is necessary to restore the dike to its original design specifications. For the purposes of this paragraph, restoration does not include maintenance of impoundment dikes of operating insect control impoundments.

(q)   The construction, operation, or maintenance of stormwater management facilities which are designed to serve single-family residential projects, including duplexes, triplexes, and quadruplexes, if they are less than 10 acres total land and have less than 2 acres of impervious surface and if the facilities:

1.   Comply with all regulations or ordinances applicable to stormwater management and adopted by a city or county;

2.   Are not part of a larger common plan of development or sale; and

3.   Discharge into a stormwater discharge facility exempted or permitted by the department under this chapter which has sufficient capacity and treatment capability as specified in this chapter and is owned, maintained, or operated by a city, county, special district with drainage responsibility, or water management district; however, this exemption does not authorize discharge to a facility without the facility owner's prior written consent.

(r)   The removal of aquatic plants, the removal of tussocks, the associated replanting of indigenous aquatic plants, and the associated removal from lakes of organic detrital material when such planting or removal is performed and authorized by permit or exemption granted under s. 369.20 or s. 369.25, provided that:

1.   Organic detrital material that exists on the surface of natural mineral substrate shall be allowed to be removed to a depth of 3 feet or to the natural mineral substrate, whichever is less;

2.   All material removed pursuant to this paragraph shall be deposited in an upland site in a manner that will prevent the reintroduction of the material into waters in the state except when spoil material is permitted to be used to create wildlife islands in freshwater bodies of the state when a governmental entity is permitted pursuant to s. 369.20 to create such islands as a part of a restoration or enhancement project;

3.   All activities are performed in a manner consistent with state water quality standards; and

4.   No activities under this exemption are conducted in wetland areas, as defined in s. 373.019(27), which are supported by a natural soil as shown in applicable United States Department of Agriculture county soil surveys, except when a governmental entity is permitted pursuant to s. 369.20 to conduct such activities as a part of a restoration or enhancement project.

The department may not adopt implementing rules for this paragraph, notwithstanding any other provision of law.

(s)   The construction, installation, operation, or maintenance of floating vessel platforms or floating boat lifts, provided that such structures:

1.   Float at all times in the water for the sole purpose of supporting a vessel so that the vessel is out of the water when not in use;

2.   Are wholly contained within a boat slip previously permitted under ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, or part IV of chapter 373, or do not exceed a combined total of 500 square feet, or 200 square feet in an Outstanding Florida Water, when associated with a dock that is exempt under this subsection or associated with a permitted dock with no defined boat slip or attached to a bulkhead on a parcel of land where there is no other docking structure;

3.   Are not used for any commercial purpose or for mooring vessels that remain in the water when not in use, and do not substantially impede the flow of water, create a navigational hazard, or unreasonably infringe upon the riparian rights of adjacent property owners, as defined in s. 253.141;

4.   Are constructed and used so as to minimize adverse impacts to submerged lands, wetlands, shellfish areas, aquatic plant and animal species, and other biological communities, including locating such structures in areas where seagrasses are least dense adjacent to the dock or bulkhead; and

5.   Are not constructed in areas specifically prohibited for boat mooring under conditions of a permit issued in accordance with ss. 403.91-403.929, 1984 Supplement to the Florida Statutes 1983, as amended, or part IV of chapter 373, or other form of authorization issued by a local government.

Structures that qualify for this exemption are relieved from any requirement to obtain permission to use or occupy lands owned by the Board of Trustees of the Internal Improvement Trust Fund and, with the exception of those structures attached to a bulkhead on a parcel of land where there is no docking structure, shall not be subject to any more stringent permitting requirements, registration requirements, or other regulation by any local government. Local governments may require either permitting or one-time registration of floating vessel platforms to be attached to a bulkhead on a parcel of land where there is no other docking structure as necessary to ensure compliance with local ordinances, codes, or regulations. Local governments may require either permitting or one-time registration of all other floating vessel platforms as necessary to ensure compliance with the exemption criteria in this section; to ensure compliance with local ordinances, codes, or regulations relating to building or zoning, which are no more stringent than the exemption criteria in this section or address subjects other than subjects addressed by the exemption criteria in this section; and to ensure proper installation, maintenance, and precautionary or evacuation action following a tropical storm or hurricane watch of a floating vessel platform or floating boat lift that is proposed to be attached to a bulkhead or parcel of land where there is no other docking structure. The exemption provided in this paragraph shall be in addition to the exemption provided in paragraph (b). The department shall adopt a general permit by rule for the construction, installation, operation, or maintenance of those floating vessel platforms or floating boat lifts that do not qualify for the exemption provided in this paragraph but do not cause significant adverse impacts to occur individually or cumulatively. The issuance of such general permit shall also constitute permission to use or occupy lands owned by the Board of Trustees of the Internal Improvement Trust Fund. No local government shall impose a more stringent regulation, permitting requirement, registration requirement, or other regulation covered by such general permit. Local governments may require either permitting or one-time registration of floating vessel platforms as necessary to ensure compliance with the general permit in this section; to ensure compliance with local ordinances, codes, or regulations relating to building or zoning that are no more stringent than the general permit in this section; and to ensure proper installation and maintenance of a floating vessel platform or floating boat lift that is proposed to be attached to a bulkhead or parcel of land where there is no other docking structure.

(t)   The repair, stabilization, or paving of existing county maintained roads and the repair or replacement of bridges that are part of the roadway, within the Northwest Florida Water Management District and the Suwannee River Water Management District, provided:

1.   The road and associated bridge were in existence and in use as a public road or bridge, and were maintained by the county as a public road or bridge on or before January 1, 2002;

2.   The construction activity does not realign the road or expand the number of existing traffic lanes of the existing road; however, the work may include the provision of safety shoulders, clearance of vegetation, and other work reasonably necessary to repair, stabilize, pave, or repave the road, provided that the work is constructed by generally accepted engineering standards;

3.   The construction activity does not expand the existing width of an existing vehicular bridge in excess of that reasonably necessary to properly connect the bridge with the road being repaired, stabilized, paved, or repaved to safely accommodate the traffic expected on the road, which may include expanding the width of the bridge to match the existing connected road. However, no debris from the original bridge shall be allowed to remain in waters of the state, including wetlands;

4.   Best management practices for erosion control shall be employed as necessary to prevent water quality violations;

5.   Roadside swales or other effective means of stormwater treatment must be incorporated as part of the project;

6.   No more dredging or filling of wetlands or water of the state is performed than that which is reasonably necessary to repair, stabilize, pave, or repave the road or to repair or replace the bridge, in accordance with generally accepted engineering standards; and

7.   Notice of intent to use the exemption is provided to the department, if the work is to be performed within the Northwest Florida Water Management District, or to the Suwannee River Water Management District, if the work is to be performed within the Suwannee River Water Management District, 30 days prior to performing any work under the exemption.

Within 30 days after this act becomes a law, the department shall initiate rulemaking to adopt a no fee general permit for the repair, stabilization, or paving of existing roads that are maintained by the county and the repair or replacement of bridges that are part of the roadway where such activities do not cause significant adverse impacts to occur individually or cumulatively. The general permit shall apply statewide and, with no additional rulemaking required, apply to qualified projects reviewed by the Suwannee River Water Management District, the St. Johns River Water Management District, the Southwest Florida Water Management District, and the South Florida Water Management District under the division of responsibilities contained in the operating agreements applicable to part IV of chapter 373. Upon adoption, this general permit shall, pursuant to the provisions of subsection (2), supersede and replace the exemption in this paragraph.

(u)   Notwithstanding any provision to the contrary in this subsection, a permit or other authorization under chapter 253, chapter 369, chapter 373, or this chapter is not required for an individual residential property owner for the removal of organic detrital material from freshwater rivers or lakes that have a natural sand or rocky substrate and that are not Aquatic Preserves or for the associated removal and replanting of aquatic vegetation for the purpose of environmental enhancement, providing that:

1.   No activities under this exemption are conducted in wetland areas, as defined in s. 373.019(27), which are supported by a natural soil as shown in applicable United States Department of Agriculture county soil surveys.

2.   No filling or peat mining is allowed.

3.   No removal of native wetland trees, including, but not limited to, ash, bay, cypress, gum, maple, or tupelo, occurs.

4.   When removing organic detrital material, no portion of the underlying natural mineral substrate or rocky substrate is removed.

5.   Organic detrital material and plant material removed is deposited in an upland site in a manner that will not cause water quality violations.

6.   All activities are conducted in such a manner, and with appropriate turbidity controls, so as to prevent any water quality violations outside the immediate work area.

7.   Replanting with a variety of aquatic plants native to the state shall occur in a minimum of 25 percent of the preexisting vegetated areas where organic detrital material is removed, except for areas where the material is removed to bare rocky substrate; however, an area may be maintained clear of vegetation as an access corridor. The access corridor width may not exceed 50 percent of the property owner's frontage or 50 feet, whichever is less, and may be a sufficient length waterward to create a corridor to allow access for a boat or swimmer to reach open water. Replanting must be at a minimum density of 2 feet on center and be completed within 90 days after removal of existing aquatic vegetation, except that under dewatered conditions replanting must be completed

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 215 of 694

within 90 days after reflooding. The area to be replanted must extend waterward from the ordinary high water line to a point where normal water depth would be 3 feet or the preexisting vegetation line, whichever is less. Individuals are required to make a reasonable effort to maintain planting density for a period of 6 months after replanting is complete, and the plants, including naturally recruited native aquatic plants, must be allowed to expand and fill in the revegetation area. Native aquatic plants to be used for revegetation must be salvaged from the enhancement project site or obtained from an aquatic plant nursery regulated by the Department of Agriculture and Consumer Services. Plants that are not native to the state may not be used for replanting.

8.   No activity occurs any farther than 100 feet waterward of the ordinary high water line, and all activities must be designed and conducted in a manner that will not unreasonably restrict or infringe upon the riparian rights of adjacent upland riparian owners.

9.   The person seeking this exemption notifies the applicable department district office in writing at least 30 days before commencing work and allows the department to conduct a preconstruction site inspection. Notice must include an organic-detrital-material removal and disposal plan and, if applicable, a vegetation-removal and revegetation plan.

10.   The department is provided written certification of compliance with the terms and conditions of this paragraph within 30 days after completion of any activity occurring under this exemption.

(v)   Notwithstanding any other provision in this chapter, chapter 373, or chapter 161, a permit or other authorization is not required for the following exploratory activities associated with beach restoration and nourishment projects and inlet management activities:

1.   The collection of geotechnical, geophysical, and cultural resource data, including surveys, mapping, acoustic soundings, benthic and other biologic sampling, and coring.

2.   Oceanographic instrument deployment, including temporary installation on the seabed of coastal and oceanographic data collection equipment.

3.   Incidental excavation associated with any of the activities listed under subparagraph 1. or subparagraph 2.

(2)   The provisions of subsection (1) are superseded by general permits established pursuant to ss. 373.118 and 403.814 which include the same activities. Until such time as general permits are established, or should general permits be suspended or repealed, the exemptions under subsection (1) shall remain or shall be reestablished in full force and effect.

(3)   A permit is not required under this chapter, chapter 373, chapter 61-691, Laws of Florida, or chapter 25214 or chapter 25270, 1949, Laws of Florida, for maintenance dredging conducted under this section by the seaports of Jacksonville, Port Canaveral, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina or by inland navigation districts if the dredging to be performed is no more than is necessary to restore previously dredged areas to original design specifications or configurations, previously undisturbed natural areas are not significantly impacted, and the work conducted does not violate the protections for manatees under s. 379.2431(2)(d). In addition:

(a)   A mixing zone for turbidity is granted within a 150-meter radius from the point of dredging while dredging is ongoing, except that the mixing zone may not extend into areas supporting wetland communities, submerged aquatic vegetation, or hardbottom communities.

(b)   The discharge of the return water from the site used for the disposal of dredged material shall be allowed only if such discharge does not result in a violation of water quality standards in the receiving waters. The return-water discharge into receiving waters shall be granted a mixing zone for turbidity within a 150-meter radius from the point of discharge into the receiving waters during and immediately after the dredging, except that the mixing zone may not extend into areas supporting wetland communities, submerged aquatic vegetation, or hardbottom communities. Ditches, pipes, and similar types of linear conveyances may not be considered receiving waters for the purposes of this paragraph.

(c)   The state may not exact a charge for material that this subsection allows a public port or an inland navigation district to remove. In addition, consent to use any sovereignty submerged lands pursuant to this section is hereby granted.

(d)   The use of flocculants at the site used for disposal of the dredged material is allowed if the use, including supporting documentation, is coordinated in advance with the department and the department has determined that the use is not harmful to water resources.

(e)   The spoil material from maintenance dredging may be deposited in a self-contained, upland disposal site. The site is not required to be permitted if:

1.   The site exists as of January 1, 2011;

2.   A professional engineer certifies that the site has been designed in accordance with generally accepted engineering standards for such disposal sites;

3.   The site has adequate capacity to receive and retain the dredged material; and

4.   The site has operating and maintenance procedures established that allow for discharge of return flow of water and to prevent the escape of the spoil material into the waters of the state.

(f)   The department must be notified at least 30 days before the commencement of maintenance dredging. The notice shall include, if applicable, the professional engineer certification required by paragraph (e).

(g)   This subsection does not prohibit maintenance dredging of areas where the loss of original design function and constructed configuration has been caused by a storm event, provided that the dredging is performed as soon as practical after the storm event. Maintenance dredging that commences within 3 years after the storm event shall be presumed to satisfy this provision. If more than 3 years are needed to commence the maintenance dredging after the storm event, a request for a specific time extension to perform the maintenance dredging shall be submitted to the department, prior to the end of the 3-year period, accompanied by a statement, including supporting documentation, demonstrating that contractors are not available or that additional time is needed to obtain authorization for the maintenance dredging from the United States Army Corps of Engineers.

History.—s. 7, ch. 75-22; s. 143, ch. 77-104; s. 4, ch. 78-98; s. 1, ch. 78-146; s. 86, ch. 79-65; s. 1, ch. 80-44; s. 8, ch. 80-66; s. 3, ch. 82-80; s. 6, ch. 82-185; s. 65, ch. 83-218; s. 69, ch. 83-310; s. 43, ch. 84-338; s. 39, ch. 85-55; s. 12, ch. 86-138; s. 44, ch. 86-186; ss. 1, 3, ch. 89-324; s. 4, ch. 96-238; s. 3, ch. 97-22; s. 3, ch. 98-131; s. 163, ch. 99-8; s. 1, ch. 2000-145; s. 1, ch. 2002-164; s. 4, ch. 2002-253; s. 1, ch. 2004-16; s. 46, ch. 2006-1; s. 12, ch. 2006-220; s. 8, ch. 2006-309; s. 4, ch. 2008-40; s. 202, ch. 2008-247; s. 52, ch. 2009-21; s. 5, ch. 2010-201; s. 3, ch. 2010-208; s. 8, ch. 2011-164; s. 4, ch. 2012-65; s. 6, ch. 2012-150; s. 21, ch. 2013-92.

**403.8135    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 9, ch. 79-161.

**403.814    General permits; delegation.**—

(1)   The secretary is authorized to adopt rules establishing and providing for a program of general permits under chapter 253 and this chapter for projects, or categories of projects, which have, either singly or cumulatively, a minimal adverse environmental effect. Such rules shall specify design or performance criteria which, if applied, would result in compliance with appropriate standards adopted by the commission. Except as provided for in subsection (3), any person complying with the requirements of a general permit may use the permit 30 days after giving notice to the department without any agency action by the department.

(2)   After giving public notice and, upon the request of any person, holding a public hearing in the area affected, the department may issue a general permit in the Biscayne Bay Aquatic Preserve for the placement of riprap waterward of vertical seawalls or as replacement for vertical seawalls, for the purpose of enhancing the water quality and fish and wildlife habitats of the Biscayne Bay area. No other general permits shall be issued within the preserve. Nothing herein shall be construed to abrogate the rights of any person under the provisions of chapter 120. In addition to the public notice required by this subsection, public notice shall be provided by United States mail to any person who requests, in writing, to have her or his name placed on a mailing list by the department. Notice of activities allowed pursuant to such general permit shall also be mailed, at least monthly, to all persons on the list.

(3)   The department may publish or by rule require the applicant to publish, or the applicant may elect to publish, in a newspaper of general circulation in the area affected, notice of application for a general permit. If published, such public notice of application shall be published within 14 days after the applicant notifies the department; and, within 21 days after publication of notice, any person whose substantial interests are affected may request a hearing in accordance with ss. 120.569 and 120.57. The failure to request a hearing within 21 days after publication of notice constitutes a waiver of any right to a hearing under ss. 120.569 and 120.57. If notice is published, no person shall begin work pursuant to a general permit until after the time for requesting a hearing has passed or until after a hearing is held and a decision is rendered.

(4)   The department is authorized to delegate any of its general permit authority to the district offices of the department or to water management districts.

(5)   Notwithstanding the procedures set forth in subsections (1) and (3), the department may specify by rule alternative notice procedures for certain activities which are of a routine and repetitive nature and which are an integral part of agricultural activities or silvicultural activities or are activities of another state agency.

(6)   Construction and maintenance of electric transmission or distribution lines in wetlands by electric utilities, as defined in s. 366.02, shall be authorized by general permit provided the following provisions are implemented:

(a)   All permanent fill shall be at grade. Fill shall be limited to that necessary for the electrical support structures, towers, poles, guy wires, stabilizing backfill, and at-grade access roads limited to 20-foot widths; and

(b)   The permittee may utilize access and work areas limited to the following: a linear access area of up to 25 feet wide between electrical support structures, an access area of up to 25 feet wide to electrical support structures from the edge of the right-of-way, and a work area around the electrical support structures, towers, poles, and guy wires. These areas may be cleared to ground, including removal of stumps as necessary; and

(c)   Vegetation within wetlands may be cut or removed no lower than the soil surface under the conductor, and 20 feet to either side of the outermost conductor, while maintaining the remainder of the project right-of-way within the wetland by selectively clearing vegetation which has an expected mature height above 14 feet. Brazilian pepper, Australian pine, and melaleuca shall be eradicated throughout the wetland portion of the right-of-way; and

(d)   Erosion control methods shall be implemented as necessary to ensure that state water quality standards for turbidity are met. Diversion and impoundment of surface waters shall be minimized; and

(e)   The proposed construction and clearing shall not adversely affect threatened and endangered species; and

(f)   The proposed construction and clearing shall not result in a permanent change in existing ground surface elevation; and

(g)   Where fill is placed in wetlands, the clearing to ground of forested wetlands is restricted to 4.0 acres per 10-mile section of the project, with no more than one impact site exceeding 0.5 acres. The impact site which exceeds 0.5 acres shall not exceed 2.0 acres. The total forested wetland clearing to the ground per 10-mile section shall not exceed 15 acres. The 10-mile sections shall be measured from the beginning to the terminus, or vice versa, and the section shall not end in a wetland; and

(h)   The general permit authorized by this subsection shall not apply in forested wetlands located within 550 feet from the shoreline of a named water body designated as an Outstanding Florida Water; and

(i)   This subsection also applies to transmission lines and appurtenances certified under part II of this chapter. However, the criteria of the general permit shall not affect the authority of the siting board to condition certification of transmission lines as authorized under part II of this chapter.

Maintenance of existing electric lines and clearing of vegetation in wetlands conducted without the placement of structures in wetlands or other dredge and fill activities does not require an individual or general construction permit. For the purpose of this subsection, wetlands shall mean the landward extent of waters of the state regulated under s. 403.927 and isolated and nonisolated wetlands regulated under part IV of chapter 373. The provisions provided in this subsection apply to the permitting requirements of the department, any water management district, and any local government implementing part IV of chapter 373 or [1]part VIII of this chapter.

(7)   The department and the water management districts may provide by rule for general permits with special criteria including acreage thresholds authorizing the construction of transmission and distribution lines in forested wetlands located within 550 feet of the shoreline of a named water body designated as an Outstanding Florida Water. If a portion of a project qualifies for the general permit under subsection (6) and another portion of that project qualifies under this subsection, then a single general permit may be issued pursuant to both subsections.

(8)   An aquaculture general permit shall be established for the cultivation of aquatic fish and other marine organisms, except alligators, in upland aquaculture facilities when such facilities have individual production units whose annual production and water discharge meet or exceed the parameters established by the NPDES program. Activities that have individual production units whose annual production and water discharge are less than the parameters established by the NPDES program shall be regulated pursuant to s. 403.0885(5).

(9)   An aquaculture general permit under s. 403.088 shall be established for the freshwater cultivation of fish and other aquatic animals, except alligators, in upland aquaculture facilities.

(10)   The authority to issue or deny general permits developed by the department pursuant to subsection (8) for aquaculture facilities is hereby delegated to the water management districts when they have regulatory responsibility for the facility pursuant to s. 373.046.

(11)   Upon agreement by the applicant, the department, and the applicable water management district, the department and water management district may reassign the regulatory responsibilities described in s. 373.046(5), based on the specific aquaculture operation, to achieve a more efficient and effective permitting process.

(12)   A general permit is granted for the construction, alteration, and maintenance of a stormwater management system serving a total project area of up to 10 acres meeting the criteria of this subsection. Such stormwater management systems must be designed, operated, and maintained in accordance with applicable rules adopted pursuant to part IV of chapter 373. There is a rebuttable presumption that the discharge from such systems complies with state water quality standards. The construction of such a system may proceed without any further agency action by the department or water management district if, before construction begins, an electronic self-certification is submitted to the department or water management district which certifies that the proposed system was designed by a Florida registered professional and that the registered professional has certified that the proposed system will meet the following additional requirements:

(a)   The total project area involves less than 10 acres and less than 2 acres of impervious surface;

(b)   Activities will not impact wetlands or other surface waters;

(c)   Activities are not conducted in, on, or over wetlands or other surface waters;

(d)   Drainage facilities will not include pipes having diameters greater than 24 inches, or the hydraulic equivalent, and will not use pumps in any manner;

(e)   The project is not part of a larger common plan, development, or sale; and

(f)   The project does not:

1.   Cause adverse water quantity or flooding impacts to receiving water and adjacent lands;

2.   Cause adverse impacts to existing surface water storage and conveyance capabilities;

3.   Cause a violation of state water quality standards; or

4.   Cause an adverse impact to the maintenance of surface or ground water levels or surface water flows established pursuant to s. 373.042 or a work of the district established pursuant to s. 373.086.

**History.**—s. 9, ch. 80-66; s. 12, ch. 82-27; s. 7, ch. 84-79; s. 60, ch. 86-186; s. 2, ch. 86-295; s. 1, ch. 93-24; s. 19, ch. 96-247; s. 168, ch. 96-410; s. 1011, ch. 97-103; s. 23, ch. 98-333; s. 18, ch. 2000-364; s. 98, ch. 2008-227; s. 19, ch. 2012-205; s. 7, ch. 2016-130.

[1]**Note.**—Section 18, ch. 95-145, repealed s. 403.939, which constituted the entirety of former part VIII.

**403.8141    Special event permits.**—

(1)   The department shall issue permits for special events under s. 253.0345. The permits must be for a period that runs concurrently with the lease or letter of consent issued pursuant to s. 253.0345 and must allow for the movement of temporary structures within the footprint of the lease area.

(2)   An administrative challenge to any proposed regulatory permit related to a special event is subject to the summary hearing provisions of s. 120.574, except that the summary proceeding must be conducted within 30 days

after a party files a motion for a summary hearing regardless of whether the parties agree to the summary proceeding.

History.—s. 22, ch. 2013-92; s. 7, ch. 2016-116.

403.815    Public notice; waiver of hearings.—The department may publish or by rule require the applicant to publish, or the applicant may elect to publish, in a newspaper of general circulation in the area affected, notice of application for a permit submitted under this chapter or chapter 253. The notice of application shall be published within 14 days after the application is filed with the department. Notwithstanding any provision of s. 120.60, the department may publish or by rule require the applicant to publish, or the applicant may elect to publish, in a newspaper of general circulation in the area affected, notice of proposed agency action on any permit application submitted under this chapter or chapter 253. The department shall require the applicant for a permit to construct or expand a solid waste facility to publish such notice. The notice of proposed agency action shall be published at least 14 days prior to final agency action. The 90-day time period specified in s. 120.60 shall be tolled by the request of the department for publication of notice of proposed agency action and shall resume 14 days after receipt by the department of proof of publication. However, if a petition is filed for a proceeding pursuant to ss. 120.569 and 120.57, the time periods and tolling provisions of s. 120.60 shall apply. The cost of publication of notice under this section shall be paid by the applicant. The secretary may, by rule, specify the format and size of such notice. Within 14 days after publication of notice of proposed agency action, any person whose substantial interests are affected may request a hearing in accordance with ss. 120.569 and 120.57. The failure to request a hearing within 14 days after publication of notice of proposed agency action constitutes a waiver of any right to a hearing on the application under ss. 120.569 and 120.57.

History.—s. 10, ch. 80-66; s. 13, ch. 82-27; s. 44, ch. 84-338; s. 48, ch. 87-225; s. 169, ch. 96-410.

403.816    Permits for maintenance dredging of deepwater ports and beach restoration projects.—

(1)    The department shall establish a permit system under this chapter and chapter 253 which provides for the performance, for up to 25 years from the issuance of the original permit, of maintenance dredging of permitted navigation channels, port harbors, turning basins, harbor berths, and beach restoration projects approved pursuant to chapter 161. However, permits issued for dredging river channels which are not a part of a deepwater port shall be valid for no more than five years. No charge shall be exacted by the state for material removed during such maintenance dredging by a public port authority.

(2)    The provisions of s. 253.77 do not apply to a permit for maintenance dredging and spoil site approval when there is no change in the size or location of the spoil disposal site and when the applicant provides documentation to the department that the appropriate lease, easement, or consent of use for the project site issued pursuant to chapter 253 is recorded in the county where the project is located.

(3)    The provisions of this section relating to ports apply only to the port waters, spoil disposal sites, port harbors, navigation channels, turning basins, and harbor berths used for deepwater commercial navigation in the ports of Jacksonville, Tampa, Port Everglades, Miami, Port Canaveral, Ft. Pierce, Palm Beach, Port Manatee, Port St. Joe, Panama City, St. Petersburg, Port Bartow, Florida Power Corporation's Crystal River Canal, Boca Grande, Green Cove Springs, and Pensacola.

History.—ss. 3, 5, ch. 81-228; s. 8, ch. 84-79; s. 2, ch. 85-296; s. 13, ch. 86-138; s. 20, ch. 89-175; s. 4, ch. 89-324.

403.8163    Sites for disposal of spoil from maintenance dredge operations; selection.—Lands created by spoil or used as dredge spoil sites must be given priority consideration as sites for disposal of spoil in maintenance dredge operations, except when the [1]Division of Beaches and Shores of the Department of Environmental Protection determines that the spoil, or some substantial portion thereof, may be placed as compatible sediment into the littoral system of an adjacent sandy beach or coastal barrier dune system for the preservation and protection of such beach or dune system.

History.—s. 48, ch. 84-338; s. 14, ch. 86-138; s. 424, ch. 94-356.

[1]Note.—The Division of Beaches and Shores was abolished by s. 1, ch. 94-356.

PART VI

**WATER SUPPLY; WATER TREATMENT PLANTS**

403.850    Short title.

403.851    Declaration of policy; intent.

403.852    Definitions; ss. 403.850-403.864.

403.853    Drinking water standards.

403.8532    Drinking water state revolving loan fund; use; rules.

403.8533    Drinking Water Revolving Loan Trust Fund.

403.8535    Citation of rule.

403.854    Variances, exemptions, and waivers.

403.855    Imminent hazards.

403.856    Plan for emergency provision of water.

403.857    Notification of users and regulatory agencies.

403.858    Inspections.

403.859    Prohibited acts.

403.860    Penalties and remedies.

403.861    Department; powers and duties.

403.8615    Determination of capability and capacity development.

403.862    Department of Health; public water supply duties and responsibilities; coordinated budget requests with department.

403.863    State public water supply laboratory certification program.

403.8635    State drinking water sample laboratory certification program.

403.864    Public water supply accounting program.

403.8645    Intended Use Plan.

403.865    Water and wastewater facility personnel; legislative purpose.

403.866    Definitions; ss. 403.865-403.876.

403.867    License required.

403.868    Requirements by a utility.

403.869    Authority to adopt rules.

403.87    Technical advisory council for water and domestic wastewater operator certification.

403.871    Fees.

403.872    Requirements for licensure.

403.873    Renewal of license.

403.874    Inactive status.

403.875    Prohibitions; penalties.

403.876    Grounds for disciplinary action.

403.88    Classification of water and wastewater treatment facilities and facility operators.

403.885    Water Projects Grant Program.

403.890    Water Protection and Sustainability Program.

403.891    Water Protection and Sustainability Program Trust Fund of the Department of Environmental Protection.

**403.850    Short title.**—This act may be cited as the "Florida Safe Drinking Water Act."

History.—s. 1, ch. 77-337.

**403.851    Declaration of policy; intent.**—It is the policy of the state that the citizens of Florida shall be assured of the availability of safe drinking water. Recognizing that this policy encompasses both environmental and public health aspects, it is the intent of the Legislature to provide a water supply program operated jointly by the department, in a lead-agency role of primary responsibility for the program, and by the Department of Health and its units, including county health departments, in a supportive role with specific duties and responsibilities of its

own. Without any relinquishment of Florida's sovereign powers and responsibilities to provide for the public health, public safety, and public welfare of the people of Florida, the Legislature intends:

(1) To give effect to Pub. L. No. 93-523 promulgated under the commerce clause of the United States Constitution, to the extent that interstate commerce is directly affected.

(2) To encourage cooperation between federal, state, and local agencies, not only in their enforcement role, but also in their service and assistance roles to city and county elected bodies.

(3) To provide for safe drinking water at all times throughout the state, with due regard for economic factors and efficiency in government.

History.—s. 2, ch. 77-337; s. 162, ch. 79-400; s. 425, ch. 94-356; s. 164, ch. 99-8.

**403.852    Definitions; ss. 403.850-403.864.**—As used in ss. 403.850-403.864:

(1) "Department" means the Department of Environmental Protection, which is charged with the primary responsibility for the administration and implementation of the Florida Safe Drinking Water Act.

(2) "Public water system" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances if such system has at least 15 service connections or regularly serves at least 25 individuals daily at least 60 days out of the year. A public water system is either a community water system or a noncommunity water system. The term "public water system" includes:

(a) Any collection, treatment, storage, and distribution facility or facilities under control of the operator of such system and used primarily in connection with such system.

(b) Any collection or pretreatment storage facility or facilities not under control of the operator of such system but used primarily in connection with such system.

(3) "Community water system" means a public water system which serves at least 15 service connections used by year-round residents or regularly serves at least 25 year-round residents.

(4) "Noncommunity water system" means a public water system that is not a community water system. A noncommunity water system is either a nontransient noncommunity water system or a transient noncommunity water system.

(5) "Person" means an individual, public or private corporation, company, association, partnership, municipality, agency of the state, district, federal agency, or any other legal entity, or its legal representative, agent, or assigns.

(6) "Municipality" means a city, town, or other public body created by or pursuant to state law or an Indian tribal organization authorized by law.

(7) "Federal agency" means any department, agency, or instrumentality of the United States Government.

(8) "Supplier of water" means any person who owns or operates a public water system.

(9) "Contaminant" means any physical, chemical, biological, or radiological substance or matter in water.

(10) "Administrator" means the administrator of the United States Environmental Protection Agency.

(11) "Federal act" means the Safe Drinking Water Act, Pub. L. No. 93-523.

(12) "Primary drinking water regulation" means a rule which:

(a) Applies to public water systems;

(b) Specifies contaminants which, in the judgment of the department, after consultation with the Department of Health, may have an adverse effect on the health of the public;

(c) Specifies for each such contaminant either:

1. A maximum contaminant level if, in the judgment of the department, it is economically and technologically feasible to ascertain the level of such contaminant in water in public water systems; or

2. Each treatment technique known to the department which leads to a reduction in the level of the contaminant sufficient to satisfy the requirements of s. 403.853 if, in the judgment of the department, it is not economically or technologically feasible to ascertain the level of such contaminant; and

(d) Contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels, including quality control and testing procedures to assure compliance with such levels and to ensure proper operation and maintenance of the system, and which contains requirements as to:

1.    The minimum quality of water which may be taken into the system; and

2.    Siting for new facilities for public water systems.

(13)    "Secondary drinking water regulation" means a rule which:

(a)    Applies to public water systems; and

(b)    Specifies the maximum contaminant levels which, in the judgment of the department after public hearings, are requisite to protect the public welfare. Such regulation may apply to any contaminant in drinking water:

1.    Which may adversely affect the odor or appearance of such water and consequently may cause a substantial number of the persons served by the public water system providing such water to discontinue its use; or

2.    Which may otherwise adversely affect the public welfare.

Such regulations may vary according to geographic and other circumstances.

(14)    "National primary drinking water regulations" means primary drinking water regulations promulgated by the administrator pursuant to the federal act.

(15)    "National secondary drinking water regulations" means secondary drinking water regulations promulgated by the administrator pursuant to the federal act.

(16)    "Sanitary survey" means an onsite review of the water source, facilities, equipment, operation, and maintenance of a public water system for the purpose of evaluating the adequacy of such source, facilities, equipment, operation, and maintenance for producing and distributing safe drinking water.

(17)    "Nontransient noncommunity water system" means a noncommunity water system that regularly serves at least 25 of the same persons over 6 months per year.

(18)    "Transient noncommunity water system" means a noncommunity water system that has at least 15 service connections or regularly serves at least 25 persons daily at least 60 days out of the year but that does not regularly serve 25 or more of the same persons for more than 6 months per year.

History.—s. 3, ch. 77-337; s. 1, ch. 82-80; s. 10, ch. 89-324; s. 38, ch. 91-305; s. 426, ch. 94-356; s. 165, ch. 99-8; s. 1, ch. 2001-270.

### 403.853    Drinking water standards.—

(1)    The department shall adopt and enforce:

(a)1.    State primary drinking water regulations that shall be no less stringent at any given time than the complete interim or revised national primary drinking water regulations in effect at such time; and

2.    State secondary drinking water regulations patterned after the national secondary drinking water regulations.

(b)    Primary and secondary drinking water regulations for nontransient noncommunity water systems and transient noncommunity water systems, which shall be no more stringent than the corresponding national primary or secondary drinking water regulations in effect at such time, except that nontransient noncommunity systems shall monitor and comply with additional primary drinking water regulations as determined by the department.

(2)    Subject to the exceptions authorized pursuant to s. 403.854, state primary drinking water regulations apply to each public water system in the state, except that such regulations do not apply to any public water system which meets all of the following criteria; namely, that the system:

(a)    Consists of distribution and storage facilities only and does not have any collection or treatment facilities;

(b)    Obtains all of its water from, but is not owned or operated by, a public water system to which such regulations apply;

(c)    Does not sell water to any person; and

(d)    Is not a carrier which conveys passengers in interstate commerce.

(3)    The department shall adopt and implement adequate rules specifying procedures for the enforcement of state primary and secondary drinking water regulations, including monitoring and inspection procedures, that comply with regulations established by the administrator pursuant to the federal act.

(4)    The department shall keep such records and make such reports, with respect to its activities under subsections (1) and (3), as may be required by regulations established by the administrator pursuant to the federal act. Such records and reports shall be available for public inspection.

(5)    No state primary drinking water regulation may require the addition of any substance for preventive health care purposes unrelated to the contamination of drinking water.

(6)    Upon the request of the owner or operator of a transient noncommunity water system using groundwater as a source of supply and serving religious institutions or businesses, other than restaurants or other public food service establishments or religious institutions with school or day care services, the department, or a local county health department designated by the department, shall perform a sanitary survey of the facility. Upon receipt of satisfactory survey results according to department criteria, the department shall reduce the requirements of such owner or operator from monitoring and reporting on a quarterly basis to performing these functions on an annual basis. Any revised monitoring and reporting schedule approved by the department under this subsection shall apply until such time as a violation of applicable state or federal primary drinking water standards is determined by the system owner or operator, by the department, or by an agency designated by the department, after a random or routine sanitary survey. Certified operators are not required for transient noncommunity water systems of the type and size covered by this subsection. Any reports required of such system shall be limited to the minimum as required by federal law. When not contrary to the provisions of federal law, the department may, upon request and by rule, waive additional provisions of state drinking water regulations for such systems.

(7)    Unless otherwise required by federal act, the department may require testing of public water supply systems only for those contaminants for which maximum contaminant levels have been set by the administrator or the department or for which the United States Environmental Protection Agency or the department has established a correlation between pollutant concentration and human health effects.

**History.**—s. 4, ch. 77-337; s. 1, ch. 79-358; s. 45, ch. 84-338; s. 45, ch. 86-186; s. 11, ch. 89-324; s. 103, ch. 97-101; s. 2, ch. 2001-270; s. 20, ch. 2012-205.

**403.8532    Drinking water state revolving loan fund; use; rules.**—

(1)    The purpose of this section is to assist in implementing the legislative declarations of public policy contained in ss. 403.021 and 403.851 by establishing infrastructure financing, technical assistance, and source water protection programs to assist public drinking water systems in achieving and maintaining compliance with the Florida Safe Drinking Water Act and the federal Safe Drinking Water Act, as amended, and to conserve and protect the quality of waters of the state.

(2)    For purposes of this section, the term:

(a)    "Bonds" means bonds, certificates, or other obligations of indebtedness issued by the corporation under this section and s. 403.1837.

(b)    "Corporation" means the Florida Water Pollution Control Financing Corporation created pursuant to s. 403.1837.

(c)    "Financially disadvantaged community" means the service area of a project to be served by a public water system that meets criteria established by department rule and in accordance with federal guidance.

(d)    "Local governmental agency" means any municipality, county, district, or authority, or any agency thereof, or a combination of two or more of the foregoing acting jointly in connection with a project, having jurisdiction over a public water system.

(e)    "Public water system" means all facilities, including land, necessary for the treatment and distribution of water for human consumption and includes public water systems as defined in s. 403.852 and as otherwise defined in the federal Safe Drinking Water Act, as amended. Such systems may be publicly owned, privately owned, investor-owned, or cooperatively held.

(f)    "Small public water system" means a public water system that regularly serves fewer than 10,000 people.

(3)    The department may make, or request that the corporation make, loans, grants, and deposits to community water systems; for-profit, privately owned, or investor-owned water systems; nonprofit, transient, noncommunity water systems; and nonprofit, nontransient, noncommunity water systems to assist them in planning, designing, and constructing public water systems. The department may provide loan guarantees, purchase loan insurance, and refinance local debt through the issue of new loans for projects approved by the department. Public water systems

may borrow funds made available pursuant to this section and may pledge any revenues or other adequate security available to them to repay any funds borrowed.

(a)    The department shall administer loans so that amounts credited to the Drinking Water Revolving Loan Trust Fund in any fiscal year are reserved for the following purposes:

1.    At least 15 percent for qualifying small public water systems.

2.    Up to 15 percent for qualifying financially disadvantaged communities.

(b)    If an insufficient number of the projects for which funds are reserved under this subsection have been submitted to the department at the time the funding priority list authorized under this section is adopted, the reservation of these funds no longer applies. The department may award the unreserved funds as otherwise provided in this section.

(4)    The department is authorized, subject to legislative appropriation authority and authorization of positions, to use funds from the annual capitalization grant for activities authorized under the federal Safe Drinking Water Act, as amended, such as:

(a)    Program administration.

(b)    Technical assistance.

(c)    Source water protection program development and implementation, including wellhead and aquifer protection programs, programs to alleviate water quality and water supply problems associated with saltwater intrusion, programs to identify, monitor, and assess source waters, and contaminant source inventories.

(d)    Capacity development and financial assessment program development and administration.

(e)    The costs of establishing and administering an operator certification program for drinking water treatment plant operators, to the extent such costs cannot be paid for from fees.

This subsection does not limit the department's ability to apply for and receive other funds made available for specific purposes under the federal Safe Drinking Water Act, as amended.

(5)    The term of loans made pursuant to this section shall not exceed 30 years. The interest rate on such loans shall be no greater than that paid on the last bonds sold pursuant to s. 14, Art. VII of the State Constitution.

(6)(a)    The department may provide financial assistance to financially disadvantaged communities for the purpose of planning, designing, and constructing public water systems. Such assistance may include the forgiveness of loan principal.

(b)    The department shall establish by rule the criteria for determining whether a public water system serves a financially disadvantaged community. Such criteria shall be based on the median household income of the service population or other reliably documented measures of disadvantaged status.

(7)    To the extent not allowed by federal law, the department shall not provide financial assistance for projects primarily intended to serve future growth.

(8)    In order to ensure that public moneys are managed in an equitable, prudent, and cost-effective manner, the total amount of money loaned to any public water system during a fiscal year shall be no more than 25 percent of the total funds available for making loans during that year. The minimum amount of a loan shall be $75,000.

(9)    The department may adopt rules regarding the procedural and contractual relationship between the department and the corporation under s. 403.1837 and to carry out the purposes of this section and the federal Safe Drinking Water Act, as amended. Such rules shall:

(a)    Set forth a priority system for loans based on public health considerations, compliance with state and federal requirements relating to public drinking water systems, and affordability. The priority system shall give special consideration to:

1.    Projects that provide for the development of alternative drinking water supply projects and management techniques in areas where existing source waters are limited or threatened by saltwater intrusion, excessive drawdowns, contamination, or other problems;

2.    Projects that provide for a dependable, sustainable supply of drinking water and that are not otherwise financially feasible; and

3.    Projects that contribute to the sustainability of regional water sources.

(b)    Establish the requirements for the award and repayment of financial assistance.

(c)    Require evidence of credit worthiness and adequate security, including an identification of revenues to be pledged, and documentation of their sufficiency for loan repayment and pledged revenue coverage, to ensure that each loan recipient can meet its loan repayment requirements.

(d)    Require each project receiving financial assistance to be cost-effective, environmentally sound, implementable, and self-supporting.

(e)    Implement other provisions of the federal Safe Drinking Water Act, as amended.

(10)    The department shall prepare a report at the end of each fiscal year, detailing the financial assistance provided under this section, service fees collected, interest earned, and loans outstanding.

(11)    Prior to approval of a loan, the local government or public water system shall, at a minimum:

(a)    Provide a repayment schedule.

(b)    Submit evidence of the permittability or implementability of the project proposed for financial assistance.

(c)    Submit plans and specifications, biddable contract documents, or other documentation of appropriate procurement of goods and services.

(d)    Provide assurance that records will be kept using generally accepted accounting principles and that the department or its agents and the Auditor General will have access to all records pertaining to the loan.

(e)    Provide assurance that the public water system will be properly operated and maintained in order to achieve or maintain compliance with the requirements of the Florida Safe Drinking Water Act and the federal Safe Drinking Water Act, as amended.

(f)    Document that the public water system will be self-supporting.

(12)    The department may conduct an audit of the loan project upon completion, or may require that a separate project audit, prepared by an independent certified public accountant, be submitted.

(13)    The department may require reasonable service fees on loans made to public water systems to ensure that the Drinking Water Revolving Loan Trust Fund will be operated in perpetuity and to implement the purposes authorized under this section. Service fees shall not be less than 2 percent nor greater than 4 percent of the loan amount exclusive of the service fee. Service fee revenues shall be deposited into the department's Grants and Donations Trust Fund. The fee revenues, and interest earnings thereon, shall be used exclusively to carry out the purposes of this section.

(14)    The Drinking Water Revolving Loan Trust Fund established under s. 403.8533 shall be used exclusively to carry out the purposes of this section. Any funds that are not needed on an immediate basis for financial assistance shall be invested pursuant to s. 215.49. State revolving fund capitalization grants awarded by the Federal Government, state matching funds, and investment earnings thereon shall be deposited into the fund. The principal and interest of all loans repaid and investment earnings thereon shall be deposited into the fund.

(15)(a)    If a local governmental agency defaults under the terms of its loan agreement, the department shall so certify to the Chief Financial Officer, who shall forward the amount delinquent to the department from any unobligated funds due to the local governmental agency under any revenue-sharing or tax-sharing fund established by the state, except as otherwise provided by the State Constitution. Certification of delinquency shall not limit the department from pursuing other remedies available for default on a loan, including accelerating loan repayments, eliminating all or part of the interest rate subsidy on the loan, and court appointment of a receiver to manage the public water system.

(b)    If a public water system owned by a person other than a local governmental agency defaults under the terms of its loan agreement, the department may take all actions available under law to remedy the default.

(c)    The department may impose a penalty for delinquent loan payments in the amount of 6 percent of the amount due, in addition to charging the cost to handle and process the debt. Penalty interest shall accrue on any amount due and payable beginning on the 30th day following the date upon which payment is due.

(16)    The department is authorized to terminate or rescind a financial assistance agreement when the recipient fails to comply with the terms and conditions of the agreement.

**History.**—s. 5, ch. 94-243; s. 1, ch. 97-236; s. 112, ch. 2001-266; s. 3, ch. 2001-270; s. 431, ch. 2003-261; s. 42, ch. 2010-205; s. 8, ch. 2016-226.

**403.8533    Drinking Water Revolving Loan Trust Fund.**—

(1)   There is created the Drinking Water Revolving Loan Trust Fund to be administered by the Department of Environmental Protection for the purposes of:

(a)   Funding for low-interest loans for planning, engineering design, and construction of public drinking water systems and improvements to such systems;

(b)   Funding for compliance activities, operator certification programs, and source water protection programs;

(c)   Funding for administering loans by the department; and

(d)   Paying amounts payable under any service contract entered into by the department under s. 403.1837, subject to annual appropriation by the Legislature.

(2)   The trust fund shall be used for the deposit of all moneys awarded by the Federal Government to fund revolving loan programs. All moneys in the fund that are not needed on an immediate basis for loans shall be invested pursuant to s. 215.49. The principal and interest of all loans repaid and investment earnings shall be deposited into this fund.

(3)   Pursuant to s. 19(f)(3), Art. III of the State Constitution, the Drinking Water Revolving Loan Trust Fund is exempt from the termination provisions of s. 19(f)(2), Art. III of the State Constitution.

History.—s. 1, ch. 97-232; s. 2, ch. 99-108; s. 8, ch. 2001-65; s. 43, ch. 2010-205.


**403.8535    Citation of rule.**—In addition to any other provisions within this part or any rules promulgated hereunder, the permitting agency shall, when requesting information for a permit application pursuant to this part or such rules promulgated hereunder, cite a specific rule. If a request for information cannot be accompanied by a rule citation, failure to provide such information cannot be grounds to deny a permit.

History.—s. 10, ch. 79-161.


**403.854    Variances, exemptions, and waivers.**—

(1)   The department may authorize variances or exemptions from the regulations issued pursuant to s. 403.853 under conditions and in such manner as it deems necessary and desirable, provided that such variances or exemptions are authorized under such conditions and in such manner as are no less stringent than the conditions under which and the manner in which variances and exemptions may be granted under the federal act.

(2)(a)   The department shall exempt public water systems from any requirements respecting a maximum contaminant level or any treatment technique requirement, or both, when:

1.   Due to compelling factors (which may include economic factors), the public water system is unable to comply with such contaminant level or treatment technique requirement;

2.   The public water system was in operation on the effective date of such contaminant level or treatment technique requirement; and

3.   The granting of the exemption will not result in an unreasonable risk to health.

(b)   Proposed additions to existing treatment plants not under contract for construction on July 1, 1977, shall not be automatically exempt.

(3)(a)   When the department receives an application for exemption, it shall act upon such application within a time period under Pub. L. No. 93-523, s. 1416(g), or the Florida Administrative Procedure Act, whichever is earlier.

(b)   The department shall prescribe a compliance schedule for the exempted system and shall notify the Environmental Protection Agency Administrator personally by certified mail pursuant to Pub. L. No. 93-523, s. 1416(b) and (c).

(4)(a)   The department shall, except upon a showing of good cause, waive on a case-by-case basis any disinfection requirement applicable to transient noncommunity water systems using groundwater as a source of supply upon an affirmative showing by the supplier of water that no hazard to health will result. This showing shall be based upon the following:

1.   The completion of a satisfactory sanitary survey;

2.   The history of the quality of water provided by the system and monthly monitoring tests for bacteriological contamination;

3. Evaluation of the well and the site on which it is located, including geology, depth of well, casing, grouting, and other relevant factors which have an impact on the quality of water supplied; and

4. The number of connections and size of the distribution system.

(b) The department may as a condition of waiver require a monitoring program of sufficient frequency to assure that safe drinking water standards are being met.

(5) The department shall, except upon a showing of good cause, waive on a case-by-case basis any requirement for a certified operator for a transient noncommunity water system using groundwater as a source of supply upon an affirmative showing by the supplier of water that the system can be properly maintained without a certified operator. The department shall consider:

(a) The results of a sanitary survey if deemed necessary;

(b) The operation and maintenance records for the year preceding an application for waiver;

(c) The adequacy of monitoring procedures for maximum contaminant levels included in primary drinking water regulations;

(d) The feasibility of the supplier of water becoming a certified operator; and

(e) Any threat to public health that could result from nonattendance of the system by a certified operator.

(6) A waiver shall be granted for 3 years and shall be renewable upon application to the department pursuant to subsection (4) or subsection (5).

(7) The department may revoke any waiver to protect the public health, provided the department finds, on the basis of technical evidence, that revocation is necessary to achieve compliance with state quality standards for safe drinking water or that the supplier of water fails to comply with any conditions of the waiver. The department may proceed under s. 403.855 or s. 403.860.

(8) Neither the department nor any of its employees shall be held liable for money damages for any injury, sickness, or death sustained by any person as a result of drinking water from any transient noncommunity water system granted a waiver under subsection (4) or subsection (5).

History.—s. 5, ch. 77-337; s. 1, ch. 80-417; s. 70, ch. 90-331; s. 39, ch. 91-305; s. 4, ch. 2001-270.

**403.855 Imminent hazards.**—In coordination with the Department of Health, the department, upon receipt of information that a contaminant which is present in, or is likely to enter, public or private water supplies may present an imminent and substantial danger to the public health, may take such actions as it may deem necessary in order to protect the public health. Department actions shall include, but are not limited to:

(1) Adopting emergency rules pursuant to s. 120.54(4).

(2) Issuing such corrective orders as may be necessary to protect the health of persons who are or may be users of such supplies, including travelers. An order issued by the department under this section shall become effective upon service of such order on the alleged violator, notwithstanding the provisions of s. 403.860(3).

(3) Establishing a program designed to prevent contamination or to minimize the danger of contamination to potable water supplies.

(4) Contracting for clinical tests on samples of the affected population if the department determines there is a real and immediate danger to the public health.

(5) Commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction.

History.—s. 6, ch. 77-337; s. 163, ch. 79-400; s. 5, ch. 83-310; s. 170, ch. 96-410; s. 166, ch. 99-8.

**403.856 Plan for emergency provision of water.**—The department shall adopt an adequate plan, after consultation with the Department of Health, for the provision of safe drinking water under emergency circumstances. When, in the judgment of the department, emergency circumstances exist in the state with respect to a need for safe drinking water, it may issue such rule or order as it may deem necessary in order to provide such water where it would not otherwise be available.

History.—s. 7, ch. 77-337; s. 167, ch. 99-8.

**403.857 Notification of users and regulatory agencies.**—Whenever a public water supply system:

(1)    Is not in compliance with the state primary and secondary drinking water regulations;

(2)    Fails to perform monitoring required by rules or regulations adopted by the department;

(3)    Is subject to a variance granted for an inability to meet a maximum contaminant level requirement;

(4)    Is subject to an exemption; or

(5)    Fails to comply with the requirements prescribed by a variance or exemption,

the owner or operator of the system shall, as soon as practicable, notify the local public health departments, the department, and the communications media serving the area served by the system of that fact and of the extent, nature, and possible health effects of such fact. Such notice shall also be given by the owner or operator of the system by publication in a newspaper of general circulation, as determined by the department, within the area served by such water system at least once every 3 months as long as the violation, variance, or exemption continues. Such notice shall also be given with the water bills of the system as long as the violation, variance, or exemption continues, as follows: if the water bills of a public water system are issued at least as often as once every 3 months, such notice shall be included in at least one water bill of the system for each customer every 3 months; if the system issues its water bills less often than once every 3 months, such notice shall be included in each of the water bills issued by the system for each customer. However, the provisions of this section notwithstanding, the department may prescribe by rule reasonable alternative notice requirements.

History.—s. 8, ch. 77-337.

**403.858    Inspections.**—Any duly authorized representative of the department or of the Department of Health may enter, take water samples from, and inspect any property, premises, or place, except a building which is used exclusively for a private residence, on or at which a public water system is located or is being constructed or installed, at any reasonable time, for the purpose of ascertaining the state of compliance with the law or with rules or orders of the department.

History.—s. 9, ch. 77-337; s. 168, ch. 99-8.

**403.859    Prohibited acts.**—The following acts and the causing thereof are prohibited and are violations of this act:

(1)    Failure by a supplier of water to comply with the requirements of s. 403.857 or dissemination by such supplier of any false or misleading information with respect to notices required pursuant to s. 403.857 or with respect to remedial actions being undertaken to achieve compliance with state primary and secondary drinking water regulations.

(2)    Failure by a supplier of water to comply with regulations adopted pursuant to s. 403.853, with any rule adopted by the department pursuant to this act, or with conditions for variances or exemptions authorized under s. 403.854.

(3)    Failure by any person to comply with any order issued by the department pursuant to this act.

(4)    Failure by a supplier of water to allow any duly authorized representative of the department or of the Department of Health to conduct inspections pursuant to s. 403.858.

(5)    Submission by any person of any false statement or representation in any application, record, report, plan, or other document filed, or required to be filed by this act or rules adopted by the department pursuant to its lawful authority.

(6)    Failure by a supplier of water to comply with the requirements of a permit issued under s. 403.861(7).

(7)    The artificial recharge by the direct pumping of treated or untreated waste into any geologic formation of the Floridan Aquifer or the Biscayne Aquifer containing total dissolved solids of 500 milligrams per liter or less, except such injection of reclaimed water from domestic wastewater treatment reuse facilities if the effluent quality meets the water quality standards established by the Department of Environmental Protection as part of the operation permit to construct the treatment facility.

(a)    By January 1, 1995, the Department of Environmental Protection shall promulgate by rule effluent standards and conditions for any project proposing wastewater reuse of reclaimed water, for injection of the reclaimed water into the Floridan Aquifer or Biscayne Aquifer. Any injection into a geologic formation of the

Floridan Aquifer or Biscayne Aquifer containing total dissolved solids of 500 milligrams per liter or less must meet the requirements of these rules.

(b)   In the event a facility does not receive, as a part of its operation permit, permission for injection which assures compliance with department rules promulgated pursuant to this subsection, the treated or untreated effluent shall be returned to the wastewater treatment plant from which the effluent was diverted during any testing period required by department rules or to another legally acceptable reuse or disposal alternative.

The provisions of this subsection do not apply to treated or untreated effluent currently discharging into the Floridan Aquifer or Biscayne Aquifer on June 22, 1983. However, any expansion of existing facilities on or after the effective date of this act are subject to the requirements of this subsection.

History.—s. 10, ch. 77-337; s. 164, ch. 79-400; s. 1, ch. 83-161; s. 3, ch. 94-153; s. 169, ch. 99-8; s. 5, ch. 2001-270.

### 403.860    Penalties and remedies.—

(1)   A fine, not to exceed $5,000 for each day in which a violation occurs, may be imposed by a court of competent jurisdiction on any person who violates s. 403.859(1), (2), (4), (5), or (6).

(2)   A fine, not to exceed $5,000 for each day in which such violation occurs or failure to comply continues, may be imposed by a court of competent jurisdiction upon any person who violates, or fails or refuses to comply with, any order issued by the department pursuant to this act.

(3)   The department may initiate an administrative proceeding to establish liability and require corrective action. Such proceeding shall be instituted by the department's serving a written notice of violation upon the alleged violator by certified mail. The notice shall specify the provision of law or rule of the department alleged to have been violated and the facts alleged to constitute a violation thereof. An order for corrective action may be included with the notice. However, no order shall become effective until after service and an administrative hearing, if requested within 20 days after service. Failure to request an administrative hearing within this time period shall constitute a waiver thereof. A department order, entered after a hearing pursuant to chapter 120 or a waiver thereof, shall be final and constitute a final adjudication of the matters alleged. Such order may require, in addition to corrective action, that the violator pay the state for its reasonable costs and expenses incurred in investigating the violation and prosecuting the administrative proceeding.

(4)   The department or a county health department that has been approved by the department under s. 403.862(1)(c) may institute a civil action in any court of appropriate jurisdiction for injunctive relief to prevent violation of any order, rule, or regulation issued pursuant to this act, in addition to any other remedies provided under this section.

(5)   In addition to any judicial or administrative remedy authorized by this part, the department or a county health department that has received approval by the department pursuant to s. 403.862(1)(c) shall assess administrative penalties for violations of this section in accordance with s. 403.121.

(6)   Fees collected pursuant to this section shall be deposited in the Water Quality Assurance Trust Fund or the appropriate County Health Department Trust Fund, in accordance with s. 381.0063, to be used to carry out the provisions of this part. The department may use a portion of the fund to contract for services to help collect noncompliance fees assessed pursuant to this section.

History.—s. 11, ch. 77-337; s. 71, ch. 90-331; s. 2, ch. 93-50; s. 3, ch. 93-264; s. 104, ch. 97-101; s. 3, ch. 97-236; s. 5, ch. 2001-258.

### 403.861    Department; powers and duties.—The department shall have the power and the duty to carry out the provisions and purposes of this act and, for this purpose, to:

(1)   Administer and enforce the provisions of this act and all rules and orders adopted, issued, or made effective hereunder.

(2)   Enter into agreements, contracts, or cooperative arrangements, under such terms and conditions as it deems appropriate, with other local, state, federal, or interstate agencies; municipalities; political subdivisions; educational institutions; or other organizations or persons.

(3)   Receive financial and technical assistance from the Federal Government and other public or private agencies.

(4)    Participate in related programs conducted by federal agencies, other states, interstate agencies, or other public or private agencies or organizations.

(5)    Establish adequate fiscal controls and accounting procedures to assure proper disbursement of, and accounting for, funds appropriated or otherwise provided for the purpose of carrying out provisions of this act.

(6)    Delegate those responsibilities and duties deemed appropriate for the purpose of administering requirements of this act.

(7)    Issue permits for constructing, altering, extending, or operating a public water system, based upon the size of the system, type of treatment provided by the system, or population served by the system, including issuance of an annual operation license.

(a)    The department may issue a permit for a public water system based upon review of a preliminary design report or plans and specifications, a completed permit application form, and other required information as set forth in department rule, including receipt of an appropriate fee. The department may require a fee in an amount sufficient to cover the costs of viewing and acting upon any application for the construction and operation of a public water supply system and the costs of surveillance and other field services associated with any permit issued, but the amount in no case shall exceed $15,000. The fee schedule shall be adopted by rule based on a sliding scale relating to the size, type of treatment, or population served by the system that is proposed by the applicant.

(b)    Each public water system that operates in this state shall submit annually to the department an operation license fee, separate from and in addition to any permit application fees required under paragraph (a), in an amount established by department rule. The amount of each fee shall be reasonably related to the size of the public water system, type of treatment, population served, amount of source water used, or any combination of these factors, but the fee may not be less than $50 or greater than $7,500. Public water systems shall pay annual operation license fees at a time and in a manner prescribed by department rule.

(8)    Initiate rulemaking no later than July 1, 2008, to increase each drinking water permit application fee authorized under s. 403.087(6) and this part and adopted by rule to ensure that such fees are increased to reflect, at a minimum, any upward adjustment in the Consumer Price Index compiled by the United States Department of Labor, or similar inflation indicator, since the original fee was established or most recently revised.

(a)    The department shall establish by rule the inflation index to be used for this purpose. The department shall review the drinking water permit application fees authorized under s. 403.087(6) and this part at least once every 5 years and shall adjust the fees upward, as necessary, within the established fee caps to reflect changes in the Consumer Price Index or similar inflation indicator. In the event of deflation, the department shall consult with the Executive Office of the Governor and the Legislature to determine whether downward fee adjustments are appropriate based on the current budget and appropriation considerations. The department shall also review the drinking water operation license fees established pursuant to paragraph (7)(b) at least once every 5 years to adopt, as necessary, the same inflationary adjustments provided for in this subsection.

(b)    Effective July 1, 2008, the minimum fee amount shall be the minimum fee prescribed in this section, and such fee amount shall remain in effect until the effective date of fees adopted by rule by the department.

(9)    Adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of this act.

(10)    Review and approve record drawings prior to allowing operation of any new, altered, or extended public water system for which a valid permit has been issued under subsection (7).

(11)    Establish and maintain laboratories for radiological, microbiological, and chemical analyses of water samples from public water systems, if the department determines that an additional laboratory capability beyond that provided by the Department of Health is necessary.

(12)    Plan, develop, and coordinate program activities for the management and implementation of the state primary and secondary drinking water regulations, including taking sanitary surveys.

(13)    Collect and disseminate information and conduct educational and training programs relating to drinking water and public water systems.

(14)    Conduct data management activities to maintain essential records needed for administration of the public water system supervision program and for submission to the administrator, including the maintenance of an inventory for all public water systems.

(15)   Establish and collect fees for conducting state laboratory analyses as may be necessary, to be collected and used by either the department or the Department of Health in conducting its public water supply laboratory functions.

(16)   Require suppliers of water to collect samples of water as required by state primary drinking water regulations, to submit such samples to an appropriate laboratory for analysis, and to keep sampling records as required under the federal act and make such records available to the department upon request.

(17)   Require suppliers of water to submit periodic operating reports and testing data which the department determines are reasonably necessary to ascertain the adequacy of water supply systems. The information may include raw water data to determine whether additional treatment will be required to ensure that water at the consumer's tap meets applicable drinking water standards and action levels.

(18)   Issue such orders as may be necessary to effectuate the intent and purposes of this act.

(19)   Assist state and local agencies in the determination and investigation of suspected waterborne disease outbreaks, including diseases associated with chemical contaminants.

(20)   Encourage public involvement and participation in the planning and implementation of the state public water system supervisory plans.

(21)(a)   Upon issuance of a construction permit to construct a new public water system drinking water treatment facility to provide potable water supply using a surface water that, at the time of the permit application, is not being used as a potable water supply, and the classification of which does not include potable water supply as a designated use, the department shall add treated potable water supply as a designated use of the surface water segment in accordance with s. 403.061(29)(b).

(b)   For existing public water system drinking water treatment facilities that use a surface water as a treated potable water supply, which surface water classification does not include potable water supply as a designated use, the department shall add treated potable water supply as a designated use of the surface water segment in accordance with s. 403.061(29)(b).

History.—s. 12, ch. 77-337; s. 165, ch. 79-400; s. 46, ch. 86-186; s. 40, ch. 91-305; s. 107, ch. 98-200; s. 170, ch. 99-8; s. 6, ch. 2001-270; s. 20, ch. 2008-150; s. 35, ch. 2016-1.

### 403.8615    Determination of capability and capacity development.—

(1)   The department shall require all new community water systems and new nontransient, noncommunity water systems seeking to commence operations after October 1, 1999, to demonstrate the technical, managerial, and financial capabilities to comply with national primary drinking water regulations as required by the federal Safe Drinking Water Act, as amended. The department shall establish by rule, consistent with any federal guidance on capacity development, the criteria for determining technical, managerial, and financial capabilities. At a minimum, such water systems must:

(a)   Employ or contract for the services of a certified operator, unless the department has waived this requirement pursuant to s. 403.854(5).

(b)   Demonstrate the capabilities to conduct required monitoring and reporting programs and maintain appropriate records of such monitoring.

(c)   Demonstrate financial soundness through the posting of a bond, creation of a reserve, documentation of an unreserved revenue source, or other appropriate means established by department rule.

(2)   If the department determines that such a water system cannot demonstrate technical, managerial, or financial capability, a permit may not be issued for that system pursuant to s. 403.861(7) until the water system has been determined to have the required capabilities.

History.—s. 4, ch. 97-236.

### 403.862    Department of Health; public water supply duties and responsibilities; coordinated budget requests with department.—

(1)   Recognizing that supervision and control of county health departments of the Department of Health is retained by the State Surgeon General, and that public health aspects of the state public water supply program

require joint participation in the program by the Department of Health and its units and the department, the Department of Health shall:

(a) Establish and maintain laboratories for the conducting of radiological, microbiological, and chemical analyses of water samples from public water systems, which are submitted to such laboratories for analysis. Copies of the reports of such analyses and quarterly summary reports shall be submitted to the appropriate department district or subdistrict office.

(b) Require each county health department to:

1. Collect such water samples for analysis as may be required by the terms of this act, from public water systems within its jurisdiction. The duty to collect such samples may be shared with the appropriate department district or subdistrict office and shall be coordinated by field personnel involved.

2. Submit the collected water samples to the appropriate laboratory for analysis.

3. Maintain reports of analyses for its own records.

4. Conduct complaint investigation of public water systems to determine compliance with federal, state, and local standards and permit compliance.

5. Notify the appropriate department district or subdistrict office of potential violations of federal, state, and local standards and permit conditions by public water systems and assist the department in enforcement actions with respect to such violations to the maximum extent practicable.

6. Review and evaluate laboratory analyses of water samples from private water systems.

(c) Require those county health departments designated by the Department of Health and approved by the department as having qualified sanitary engineering staffs and available legal resources, in addition to the duties prescribed in paragraph (b), to:

1. Review, evaluate, and approve or disapprove each application for the construction, modification, or expansion of a public water system to determine compliance with federal, state, and local requirements. A copy of the completed permit application and a report of the final action taken by the county health department shall be forwarded to the appropriate department district office.

2. Review, evaluate, and approve or disapprove applications for the expansion of distribution systems. Written notification of action taken on such applications shall be forwarded to the appropriate department district or subdistrict office.

3. Maintain inventory, operational, and bacteriological records and carry out monitoring, surveillance, and sanitary surveys of public water systems to ensure compliance with federal, state, and local regulations.

4. Participate in educational and training programs relating to drinking water and public water systems.

5. Enforce the provisions of this part and rules adopted under this part.

(d) Require those county health departments designated by the Department of Health as having the capability of performing bacteriological analyses, in addition to the duties prescribed in paragraph (b), to:

1. Perform bacteriological analyses of water samples submitted for analysis.

2. Submit copies of the reports of such analyses to the appropriate department district or subdistrict office.

(e) Make available to the central and branch laboratories funds sufficient, to the maximum extent possible, to carry out the public water supply functions and responsibilities required of such laboratories as provided in this section.

(f) Have general supervision and control over all private water systems and all public water systems not otherwise covered or included in this part. This shall include the authority to adopt and enforce rules, including definitions of terms, to protect the health, safety, or welfare of persons being served by all private water systems and all public water systems not otherwise covered by this part.

(g) Assist state and local agencies in the determination and investigation of suspected waterborne disease outbreaks, including diseases associated with chemical contaminants.

(h) Upon request, consult with and advise any county or municipal authority as to water supply activities.

(2) Funds appropriated to support activities of county health departments of the Department of Health pursuant to this act shall be deposited to the County Health Department Trust Fund and used exclusively for the purposes of this act.

(3)   The Department of Health and the department shall coordinate their respective budget requests to ensure that sufficient funding is provided to the Department of Health in order that it may carry out its public water supply functions and responsibilities as provided in this section. In the event the Department of Health lacks sufficient funds in any fiscal year to the extent that it is unable adequately to carry out its public water supply duties, an interagency agreement may be entered into between the two departments in order to remedy administratively, either through the transfer of funds or of services, the lack of sufficient public water supply funds within the Department of Health.

(4)   If the department determines that a county health department or other unit of the Department of Health is not performing its public water supply responsibilities satisfactorily, the secretary of the department shall certify such determination in writing to the State Surgeon General. The State Surgeon General shall evaluate the determination of the department and shall inform the secretary of the department of his or her evaluation. Upon concurrence, the State Surgeon General shall take immediate corrective action.

(5)   Nothing in this section shall serve to negate the powers, duties, and responsibilities of the State Surgeon General relating to the protection of the public from the spread of communicable disease, epidemics, and plagues.

(6)   No county health department may be designated and approved unless it can carry out all functions of the drinking water program. Each year, the department, in conjunction with the Department of Health, shall review approved county health departments to determine continued qualification for approved status. To receive and maintain approved status, a county health department shall meet the following criteria and other reasonable and necessary requirements established by the department for its district offices:

(a)   The staff shall be under the direction of a qualified individual who is a registered professional engineer in Florida pursuant to chapter 471.

(b)   The county health department shall have sufficient legal resources to carry out the requirements of this part.

(7)   Fees and penalties received from suppliers of water pursuant to ss. 403.860(3), (4), and (5) and 403.861(7)(a) in counties where county health departments have been approved by the department pursuant to paragraph (1)(c) shall be deposited in the appropriate County Health Department Trust Fund to be used for the purposes stated in paragraph (1)(c).

**History.**—s. 13, ch. 77-337; s. 166, ch. 79-400; s. 12, ch. 89-324; s. 73, ch. 90-331; s. 41, ch. 91-305; s. 3, ch. 93-50; s. 427, ch. 94-356; s. 105, ch. 97-101; s. 19, ch. 97-103; s. 171, ch. 99-8; s. 28, ch. 2000-242; s. 54, ch. 2008-6; s. 53, ch. 2009-21.

**403.863     State public water supply laboratory certification program.**—

(1)   The department and the Department of Health shall jointly develop a state program, and the Department of Health shall adopt rules for the evaluation and certification of all laboratories, other than the principal state laboratory, which perform or make application to perform analyses pursuant to the Florida Safe Drinking Water Act or which conduct a water analysis business. Such joint development shall be funded in part through the use of a portion of the State Public Water Systems Supervision Program grants received by the department from the Federal Government in order to implement the federal act.

(2)   The Department of Health may adopt and enforce rules to administer this section, including, but not limited to, definitions of terms, certified laboratory personnel requirements, methodologies for the collection of samples, the handling and analysis of samples, methodology and proficiency testing, the format and frequency of reports, onsite inspections of laboratories, and quality assurance.

(3)   The Department of Health shall have the responsibility for the operation and implementation of the state laboratory certification program. The Department of Health shall contract for the evaluation and review of laboratory certification applications and laboratory inspections. Upon completion of the evaluation and review of the laboratory certification application, the evaluation shall be forwarded, along with recommendations, to the department for review and comment, prior to final approval or disapproval by the Department of Health.

(4)   The following acts constitute grounds for which the disciplinary actions specified in subsection (5) may be taken:

(a)   Making false statements on an application or on any document associated with certification.

(b)   Making consistent errors in analyses or erroneous reporting.

(c)   Permitting personnel who are not qualified, as required by rules of the Department of Health, to perform analyses.

(d)   Falsifying the results of analyses.

(e)   Failing to employ approved laboratory methods in performing analyses as outlined in rules of the Department of Health.

(f)   Failing to properly maintain facilities and equipment according to the laboratory's quality assurance plan.

(g)   Failing to report analytical test results or maintain required records of test results as outlined in rules of the Department of Health.

(h)   Failing to participate successfully in a performance evaluation program approved by the Department of Health.

(i)   Violating any provision of this section or of the rules adopted under this section.

(j)   Falsely advertising services or credentials.

(k)   Failing to pay fees for initial certification or renewal certification or to pay inspection expenses incurred.

(l)   Failing to report any change of an item included in the initial or renewal certification application.

(m)   Refusing to allow representatives of the department or the Department of Health to inspect a laboratory and its records during normal business hours.

(5)   When the Department of Health finds any applicant or certificateholder guilty of any of the grounds set forth in subsection (4), it may enter an order imposing one or more of the following penalties:

(a)   Denial of an application for certification.

(b)   Revocation or suspension of certification.

(c)   Imposition of an administrative fine not to exceed $1,000 for each count or separate offense.

(d)   Issuance of a reprimand.

(e)   Placement of the certification on probation for a period of time and subject to such conditions as the Department of Health specifies.

(f)   Restricting the authorized scope of the certification.

(6)   Any federal grant funds received by the department for the operation and implementation of the state laboratory certification program shall be transferred to the Department of Health by interagency agreement between the two departments. Such agreement shall require the Department of Health to provide the department with a quarterly accounting of the funds transferred.

(7)   A laboratory that conducts a water analysis business, except the principal state laboratory, may not perform analyses pursuant to the Florida Safe Drinking Water Act without having applied for and received certification under the state certification program to perform such analyses.

(8)   For the purposes of this section, the term "principal state laboratory" means the central laboratory of the Department of Health.

(9)   For the purposes of this section, the term "certification" means regulatory recognition given to a laboratory that performs analyses pursuant to the Florida Safe Drinking Water Act, that it meets minimum analytical performance standards.

(10)   The certification program shall be governed by chapter 120.

History.—s. 14, ch. 77-337; s. 167, ch. 79-400; s. 23, ch. 98-151; s. 90, ch. 2012-184.

**403.8635   State drinking water sample laboratory certification program.—**

(1)   In addition to certifying laboratories pursuant to s. 403.863, the Department of Health is authorized to establish a periodic certification and approval program for laboratories that perform analyses of drinking water samples, which program will assure the acceptable quality, reliability, and validity of all testing results.

(2)   The Department of Health has the responsibility for the operation and implementation of laboratory certification pursuant to this section, except that, upon completion of the evaluation and review of an application for laboratory certification, the evaluation shall be forwarded, along with recommendations, to the department for review and comment prior to final approval or disapproval.

(3)  The Department of Health is authorized to charge and collect fees for the evaluation and certification of laboratories pursuant to this part. The fee schedule shall be based on the number of analytical functions for which certification is sought. Such fees shall be sufficient to meet the costs incurred by the Department of Health in the administration and operation of this program. All fees shall be deposited in a trust fund administered by the Department of Health to be used for the sole purpose of this section.

History.—s. 49, ch. 84-338; s. 428, ch. 94-356; s. 172, ch. 99-8.

### 403.864  Public water supply accounting program.—

(1)  It is the intent of the Legislature to require a yearly accounting of funds, overhead, personnel, and property used by the department and the Department of Health and its units, including each of the county health departments, in conducting their respective responsibilities for the state public water supply program. Such accounting shall be presented to the Governor, the President of the Senate, and the Speaker of the House of Representatives by the department and the Department of Health no later than February 1 of each year.

(2)  In furtherance of this intent, the Department of Health and the department shall jointly develop an accounting program for use by the department and the Department of Health and its units, including the county health departments, to determine the funds, overhead, personnel, and property used by each of the departments in conducting its respective public water supply functions and responsibilities for each fiscal year. The accounting program shall provide information sufficient to satisfy state auditing and federal grant and aid reporting requirements and shall include provisions requiring the Department of Health to:

(a)  Segregate, from an accounting standpoint, funds distributed to county health departments for public water supply functions from other county health department trust funds.

(b)  Segregate, from an accounting standpoint, funds distributed to the central and branch laboratories of the Department of Health for public water supply functions from other laboratory funds.

(c)  Require each county health department, the central and each branch laboratory of the Department of Health, and any other entity of the Department of Health involved in and carrying out public water supply functions to account to the Department of Health on a semiannual basis for the funds received, from whatever source, and used for public water supply functions.

(d)  Require each county health department, the central and each branch laboratory of the Department of Health, and any other entity of the Department of Health involved in carrying out public water supply functions either wholly or partially with funds, either federal or state, received from the department through an interagency agreement or other means to account to the department on a semiannual basis for such funds received and used for public water supply functions.

History.—s. 15, ch. 77-337; s. 100, ch. 79-164; s. 5, ch. 95-144; s. 173, ch. 99-8; s. 113, ch. 2001-266.

### 403.8645  Intended Use Plan.—

(1)  The Florida Legislature recognizes that over 80 percent of the state's population lives in coastal areas and is dependent on groundwater sources for drinking water supplies. Further, the Legislature recognizes that saltwater intrusion is an increased threat to healthful and safe drinking water supplies.

(2)  The Intended Use Plan required of the department under the federal Safe Drinking Water Act, as amended, shall provide, in general, to the maximum extent practicable, that priority for the use of funds be given to projects that:

(a)  Address the most serious risk to human health, especially projects that would develop alternative water supply in areas with saltwater intrusion problems;

(b)  Are necessary to ensure compliance with the requirements of the federal Safe Drinking Water Act, as amended, including requirements for filtration; and

(c)  Assist systems most in need on a per-household basis according to affordability criteria established by the Department of Environmental Protection by rule.

History.—s. 2, ch. 97-236.

**403.865    Water and wastewater facility personnel; legislative purpose.**—The Legislature finds that the threat to the public health and the environment from the operation of water and wastewater treatment plants and water distribution systems mandates that qualified personnel operate these facilities. It is the legislative intent that any person who performs the duties of an operator and who falls below minimum competency or who otherwise presents a danger to the public be prohibited from operating a plant or system in this state.

History.—s. 5, ch. 97-236; s. 7, ch. 2001-270.

**403.866    Definitions; ss. 403.865-403.876.**—As used in ss. 403.865-403.876, the term:

(1)    "Domestic wastewater collection system" means pipelines or conduits, pumping stations, and force mains and all other structures, devices, appurtenances, and facilities used for collecting or conducting wastes to an ultimate point for treatment or disposal.

(2)    "Domestic wastewater treatment plant" means any plant or other works used for the purpose of treating, stabilizing, or holding domestic wastes.

(3)    "Operator" means any person, including the owner, who is in onsite charge of the actual operation, supervision, and maintenance of a water treatment plant, water distribution system, or domestic wastewater treatment plant and includes the person in onsite charge of a shift or period of operation during any part of the day.

(4)    "Public water system" has the same meaning as it has in s. 403.852.

(5)    "Water distribution system" means those components of a public water system used in conveying water for human consumption from the water treatment plant to the consumer's property, including pipes, tanks, pumps, and other constructed conveyances.

(6)    "Water treatment plant" means those components of a public water system used in collection, treatment, and storage of water for human consumption, whether or not such components are under the control of the operator of such system.

History.—s. 6, ch. 97-236; s. 8, ch. 2001-270.

**403.867    License required.**—A person may not perform the duties of an operator of a water treatment plant, water distribution system, or a domestic wastewater treatment plant unless he or she holds a current operator's license issued by the department.

History.—s. 7, ch. 97-236; s. 9, ch. 2001-270.

**403.868    Requirements by a utility.**—A utility may have more stringent requirements than set by law, including certification requirements for water distribution systems and domestic wastewater collection systems operations, except that a utility may not require a licensed contractor, as defined in s. 489.105(3) to have any additional license for work in water distribution systems or domestic wastewater collection systems.

History.—s. 8, ch. 97-236.

**403.869    Authority to adopt rules.**—The department may adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of ss. 403.865-403.876.

History.—s. 9, ch. 97-236; s. 108, ch. 98-200.

**403.87    Technical advisory council for water and domestic wastewater operator certification.**—Within 90 days of the effective date of this act, the secretary of the department shall appoint a technical advisory council as necessary for the purposes of ss. 403.865-403.876. The technical advisory council shall meet upon the request of the chair, upon request of a majority of its members, or upon request of the secretary. Members shall provide for their own expenses. The council shall consist of not less than five persons who, collectively, are expert in domestic wastewater and drinking water treatment, facilities operation, public health, and environmental protection, including at least one licensed wastewater treatment plant operator and one licensed water treatment plant operator.

History.—s. 10, ch. 97-236.

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 237 of 694

**403.871**    **Fees.**—The department shall establish fees to be paid by persons seeking licensure or license renewal to cover the entire cost to the department of administering ss. 403.865-403.876, including, but not limited to, the costs associated with application review and examination, reexamination, licensing and renewal, renewal of an inactive license, reactivation of an inactive license, recordmaking, and recordkeeping, and the costs of ensuring compliance with ss. 403.865-403.876. The fees for license application and license renewal shall be nonrefundable. The department shall establish fees adequate to administer and implement ss. 403.865-403.876.

(1)    The application fee may not exceed $100 and is not refundable.

(2)    The renewal fee may not exceed $100 and is not refundable.

(3)    All fees collected under this section must be deposited into the Water Quality Assurance Trust Fund. The fees shall be used exclusively to implement the provisions of ss. 403.865-403.876.

History.—s. 11, ch. 97-236; s. 10, ch. 2001-270; s. 23, ch. 2015-4.

**403.872**    **Requirements for licensure.**—

(1)    Any person desiring to be licensed as a water treatment plant operator, a water distribution system operator, or a domestic wastewater treatment plant operator must apply to the department to take the licensure examination.

(2)    The department shall examine the qualifications of any applicant who meets the criteria established by the department for licensure, submits a completed application, and remits the required fee.

(3)    The department shall license as an operator any applicant who has passed the examination and meets the other criteria established under this section.

(4)    The department shall establish, by rule, the criteria for licensure, including, but not limited to, a requirement of a high school diploma or its equivalent, a training course approved by the department, and onsite operational experience.

(5)    The department may also include a requirement that an operator must not be the subject of a disciplinary or enforcement action in another state at the time of application for licensure in this state.

History.—s. 12, ch. 97-236; s. 11, ch. 2001-270.

**403.873**    **Renewal of license.**—

(1)    The department shall renew a license upon receipt of the renewal application, proof of completion of department-approved continuing education units during the current biennium, and the renewal fee, and in accordance with the other provisions of ss. 403.865-403.876.

(2)    The department shall adopt a procedure for the biennial renewal of licenses, including the requirements for continuing education.

History.—s. 13, ch. 97-236; s. 21, ch. 2008-150; s. 24, ch. 2015-4.

**403.874**    **Inactive status.**—

(1)    The department shall reactivate an inactive license upon receipt of the reactivation application and fee within the 2-year period immediately following the expiration date of the license. Any license not reactivated within this 2-year period shall be null and void, and an operator seeking a license thereafter must meet the training, examination, and experience requirements for the type and class or level of license sought.

(2)    The department shall adopt procedures for null and void licenses and how to obtain a new license after a license has become null and void.

History.—s. 14, ch. 97-236; s. 22, ch. 2008-150; s. 25, ch. 2015-4.

**403.875**    **Prohibitions; penalties.**—

(1)    A person may not:

(a)    Perform the duties of an operator of a water treatment plant, water distribution system, or domestic wastewater treatment plant unless he or she is licensed under ss. 403.865-403.876.

(b)    Use the name or title "water treatment plant operator," "water distribution system operator," "domestic wastewater treatment plant operator" or any other words, letters, abbreviations, or insignia indicating or implying

that he or she is an operator, or otherwise holds himself or herself out as an operator, unless the person is the holder of a valid license issued under ss. 403.865-403.876.

(c)   Present as his or her own the license of another.

(d)   Knowingly give false or forged evidence to the department.

(e)   Use or attempt to use a license that has been suspended, revoked, or placed on inactive or delinquent status.

(f)   Employ unlicensed persons to perform the duties of an operator of a water treatment or domestic wastewater treatment plant or a water distribution system.

(g)   Conceal information relative to any violation of ss. 403.865-403.876.

(2)   Any person who violates any provision of this section commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

History.—s. 15, ch. 97-236; s. 12, ch. 2001-270.

### 403.876      Grounds for disciplinary action.—

(1)   The department shall establish the grounds for taking disciplinary action, including suspending or revoking a valid license, placing a licensee on probation, refusing to issue a license, refusing to renew a license, or refusing to reactivate a license, and the imposition of an administrative fine, not to exceed $1,000 per count or offense. The fines collected under this section shall be deposited into the Water Quality Assurance Trust Fund.

(2)   The department shall conduct disciplinary proceedings in accordance with chapter 120.

(3)   The department shall reissue the license of a disciplined operator when that operator has complied with all terms and conditions of the department's final order.

History.—s. 16, ch. 97-236; s. 26, ch. 2015-4.

### 403.88      Classification of water and wastewater treatment facilities and facility operators.—

(1)   The department shall classify water treatment plants, wastewater treatment plants, and water distribution systems by size, complexity, and level of treatment necessary to render the wastewater or source water suitable for its intended purpose in compliance with this chapter and department rules.

(2)   The department shall establish the levels of certification and the staffing requirements for water treatment plant, water distribution system, and wastewater treatment plant operators certified under ss. 403.865-403.876 necessary to carry out subsection (1).

(3)   A water treatment plant operator's license is also valid as a water distribution system license of the same classification or lower.

(4)   The department shall adopt rules necessary to carry out this section.

History.—s. 1, ch. 98-62; s. 13, ch. 2001-270.

### 403.885      Water Projects Grant Program.—

(1)   The Department of Environmental Protection shall administer a grant program to use funds appropriated by the Legislature for water quality improvement, stormwater management, wastewater management, and water restoration and other water projects as specifically appropriated by the Legislature. Eligible recipients of such grants include counties, municipalities, water management districts, and special districts that have legal responsibilities for water quality improvement, water management, stormwater management, wastewater management, lake and river water restoration projects, and drinking water projects pursuant to this section.

(2)   The grant program shall provide for the evaluation of annual grant proposals. The department shall evaluate such proposals to determine if they:

(a)   Protect public health or the environment.

(b)   Implement plans developed pursuant to the Surface Water Improvement and Management Act created in part IV of chapter 373, other water restoration plans required by law, management plans prepared pursuant to s. 403.067, or other plans adopted by local government for water quality improvement and water restoration.

History.—s. 11, ch. 2002-291; s. 16, ch. 2005-291; s. 34, ch. 2006-26; s. 73, ch. 2006-230; s. 14, ch. 2008-5; s. 73, ch. 2015-229.

### 403.890      Water Protection and Sustainability Program.—

(1)    Revenues deposited into or appropriated to the Water Protection and Sustainability Program Trust Fund shall be distributed by the Department of Environmental Protection for the following purposes:

(a)    The alternative water supply program as provided in s. 373.707.

(b)    The water storage facility revolving loan fund as provided in s. 373.475.

(2)    Revenues deposited into or appropriated to the Water Protection and Sustainability Program Trust Fund for purposes of the water storage facility revolving loan fund may only be used for such purposes.

(3)    On June 30, 2009, and every 24 months thereafter, the Department of Environmental Protection shall request the return of all unencumbered funds distributed for the purposes of the alternative water supply program. These funds shall be deposited into the Water Protection and Sustainability Program Trust Fund and redistributed for such purposes.

**History.**—s. 17, ch. 2005-291; s. 41, ch. 2007-73; s. 2, ch. 2007-335; s. 108, ch. 2008-4; s. 12, ch. 2008-114; s. 42, ch. 2008-153; s. 8, ch. 2009-2; s. 10, ch. 2009-20; s. 54, ch. 2009-21; s. 3, ch. 2009-23; s. 18, ch. 2010-4; s. 24, ch. 2010-205; s. 6, ch. 2017-10.

**403.891    Water Protection and Sustainability Program Trust Fund of the Department of Environmental Protection.**—

(1)    The Water Protection and Sustainability Program Trust Fund is created within the Department of Environmental Protection. The purpose of the trust fund is to implement the Water Protection and Sustainability Program created in s. 403.890.

(2)    Notwithstanding s. 216.301 and pursuant to s. 216.351, any balance in the trust fund at the end of any fiscal year shall remain in the trust fund at the end of the year and shall be available for carrying out the purposes of the trust fund.

**History.**—s. 1, ch. 2005-289; s. 13, ch. 2008-114; s. 2, ch. 2009-23; s. 25, ch. 2010-205; s. 32, ch. 2011-4.

## PART VII
## MISCELLANEOUS PROVISIONS

403.90    Judicial review relating to permits and licenses.

403.905    Removal of fill on sovereignty lands.

403.927    Use of water in farming and forestry activities.

403.928    Assessment of water resources and conservation lands.

403.9321    Short title.

403.9322    Legislative findings.

403.9323    Legislative intent.

403.9324    Mangrove protection rule; delegation of mangrove protection to local governments.

403.9325    Definitions.

403.9326    Exemptions.

403.9327    General permits.

403.93271    Applicability to multifamily residential units.

403.9328    Alteration and trimming of mangroves; permit requirement.

403.9329    Professional mangrove trimmers.

403.9331    Applicability; rules and policies.

403.9332    Mitigation and enforcement.

403.9333    Variance relief.

403.9334    Effect of ch. 96-206.

403.93345    Coral reef protection.

403.9335    Short title.

403.9336    Legislative findings.

403.9337    Model Ordinance for Florida-Friendly Fertilizer Use on Urban Landscapes.

403.9338    Training.

**403.90**    **Judicial review relating to permits and licenses.**—

(1)   As used in this section, unless the context otherwise requires:

(a)   "Agency" means any official, officer, commission, authority, council, committee, department, division, bureau, board, section, or other unit or entity of state government.

(b)   "Permit" means any permit or license required by this chapter.

(2)   Any person substantially affected by a final action of any agency with respect to a permit may seek review within 90 days of the rendering of such decision and request monetary damages and other relief in the circuit court in the judicial circuit in which the affected property is located; however, circuit court review shall be confined solely to determining whether final agency action is an unreasonable exercise of the state's police power constituting a taking without just compensation. Review of final agency action for the purpose of determining whether the action is in accordance with existing statutes or rules and based on competent substantial evidence shall proceed in accordance with chapter 120.

(3)   If the court determines the decision reviewed is an unreasonable exercise of the state's police power constituting a taking without just compensation, the court shall remand the matter to the agency which shall, within a reasonable time:

(a)   Agree to issue the permit;

(b)   Agree to pay appropriate monetary damages; however, in determining the amount of compensation to be paid, consideration shall be given by the court to any enhancement to the value of the land attributable to governmental action; or

(c)   Agree to modify its decision to avoid an unreasonable exercise of police power.

(4)   The agency shall submit a statement of its agreed-upon action to the court in the form of a proposed order. If the action is a reasonable exercise of police power, the court shall enter its final order approving the proposed order. If the agency fails to submit a proposed order within a reasonable time not to exceed 90 days which specifies an action that is a reasonable exercise of police power, the court may order the agency to perform any of the alternatives specified in subsection (3).

(5)   The court shall award reasonable attorney's fees and court costs to the agency or substantially affected person, whichever prevails.

(6)   The provisions of this section are cumulative and shall not be deemed to abrogate any other remedies provided by law.

**History.**—ss. 1, 2, 3, 4, 5, 6, ch. 78-85.

**403.905**    **Removal of fill on sovereignty lands.**—The department or the Board of Trustees of the Internal Improvement Trust Fund has the authority to direct an abutting upland owner to remove from submerged sovereignty lands or state-owned lands any fill created in violation of [1]ss. 403.91-403.929 or part IV of chapter 373, except that the department or the board may consider the time at which the submerged land was filled, the length of upland ownership by the current owner, and any other equitable consideration. In the event that the abutting upland owner does not remove such fill as directed, the department or board may remove it at its own expense, and the costs of removal will become a lien upon the property of such abutting upland owner. However, the department and board may, if they choose, allow such fill to remain as state-owned land and may employ a surveyor to determine the boundary between such state land and that of the abutting upland owner. The amount of the cost of such survey will become a lien on the property of the abutting upland owner. Nothing herein may be construed to grant the department or the board authority to direct an upland owner to adjust, alter, or remove silt, fill, or other solid material which has accumulated or has been deposited seaward of his or her property, through no fault of the owner.

**History.**—s. 38, ch. 93-213; s. 20, ch. 97-103.

[1]**Note.**—Sections 403.91-403.925 and 403.929 were repealed by s. 45, ch. 93-213, and s. 403.913, as amended by s. 46, ch. 93-213, was transferred to s. 403.939 and subsequently repealed by s. 18, ch. 95-145. The only section remaining within the cited range is s. 403.927.

**403.927**    **Use of water in farming and forestry activities.**—

(1)  The Legislature recognizes the great value of farming and forestry to this state and that continued agricultural activity is compatible with wetlands protection. In order to avoid unnecessary expense and delay from duplicative programs, it is the intent of the Legislature to provide for the construction and operation of agricultural water management systems under authority granted to water management districts and to control, by the department or by delegation of authority to water management districts, the ultimate discharge from agricultural water management systems.

(2)  Agricultural activities and agricultural water management systems are authorized by this section and are not subject to the provisions of s. 403.087 or [1]ss. 403.91-403.929. Except for aquaculture water management systems located within waters of the state, the department shall not enforce water quality standards within an agricultural water management system. The department may require a stormwater permit or appropriate discharge permit at the ultimate point of discharge from an agricultural water management system or a group of connected agricultural water management systems. Impacts of agricultural activities and agricultural water management systems on groundwater quality shall be regulated by water management districts.

(3)  If land served by a water management system is converted to a use other than an agricultural use, the water management system, or the portion of the system which serves that land, will be subject to the provisions of this chapter. However, mitigation under chapter 373 or this chapter to offset any adverse effects caused by agricultural activities that occurred before the conversion of the land is not required if the activities occurred on the land in the last 4 years preceding the conversion.

(4)  As used in this section, the term:

(a)  "Agricultural activities" includes all necessary farming and forestry operations which are normal and customary for the area, such as site preparation, clearing, fencing, contouring to prevent soil erosion, soil preparation, plowing, planting, cultivating, harvesting, fallowing, leveling, construction of access roads, placement of bridges and culverts, and implementation of best management practices adopted by the Department of Agriculture and Consumer Services or practice standards adopted by the United States Department of Agriculture's Natural Resources Conservation Service, provided such operations are not for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands.

(b)  "Agricultural water management systems" means farming and forestry water management or irrigation systems and farm ponds which are permitted pursuant to chapter 373 or which are exempt from the permitting provisions of that chapter.

(c)  "Farm pond" means a pond located on a farm, used for farm purposes, as determined by water management district rule.

History.—s. 1, ch. 84-79; s. 25, ch. 91-192; s. 23, ch. 91-305; s. 44, ch. 93-213; s. 20, ch. 96-247; s. 3, ch. 2011-165.
[1]Note.—Sections 403.91-403.925 and 403.929 were repealed by s. 45, ch. 93-213, and s. 403.913, as amended by s. 46, ch. 93-213, was transferred to s. 403.939 and subsequently repealed by s. 18, ch. 95-145. The only section remaining within the cited range is s. 403.927.

**403.928    Assessment of water resources and conservation lands.**—The Office of Economic and Demographic Research shall conduct an annual assessment of Florida's water resources and conservation lands.

(1)  WATER RESOURCES.—The assessment must include all of the following:

(a)  Historical and current expenditures and projections of future expenditures by federal, state, regional, and local governments and public and private utilities based upon historical trends and ongoing projects or initiatives associated with:

1.  Water supply and demand; and

2.  Water quality protection and restoration.

(b)  An analysis and estimates of future expenditures by federal, state, regional, and local governments and public and private utilities necessary to comply with federal and state laws and regulations governing subparagraphs (a)1. and 2. The analysis and estimates must address future expenditures by federal, state, regional, and local governments and all public and private utilities necessary to achieve the Legislature's intent that sufficient water be available for all existing and future reasonable-beneficial uses and the natural systems, and that adverse effects of competition for water supplies be avoided. The assessment must include a compilation

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 242 of 694

of projected water supply and demand data developed by each water management district pursuant to ss. 373.036 and 373.709, with notations regarding any significant differences between the methods used by the districts to calculate the data.

(c)    Forecasts of federal, state, regional, and local government revenues dedicated in current law for the purposes specified in subparagraphs (a)1. and 2. or that have been historically allocated for these purposes, as well as public and private utility revenues.

(d)    An identification of gaps between projected revenues and projected and estimated expenditures.

(2)    CONSERVATION LANDS.—The assessment must include all of the following:

(a)    Historical and current expenditures and projections of future expenditures by federal, state, regional, and local governments based upon historical trends and ongoing projects or initiatives associated with real property interests eligible for funding under s. 259.105.

(b)    An analysis and estimates of future expenditures by federal, state, regional, and local governments necessary to purchase lands identified in plans set forth by state agencies or water management districts.

(c)    An analysis of the ad valorem tax impacts, by county, resulting from public ownership of conservation lands.

(d)    Forecasts of federal, state, regional, and local government revenues dedicated in current law to maintain conservation lands and the gap between projected expenditures and revenues.

(e)    The total percentage of Florida real property that is publicly owned for conservation purposes.

(f)    A comparison of the cost of acquiring and maintaining conservation lands under fee simple or less than fee simple ownership.

(3)    The assessment shall include analyses on a statewide, regional, or geographic basis, as appropriate, and shall identify analytical challenges in assessing information across the different regions of the state.

(4)    The assessment must identify any overlap in the expenditures for water resources and conservation lands.

(5)    The water management districts, the Department of Environmental Protection, the Department of Agriculture and Consumer Services, the Fish and Wildlife Conservation Commission, counties, municipalities, and special districts shall provide assistance to the Office of Economic and Demographic Research related to their respective areas of expertise.

(6)    The Office of Economic and Demographic Research must be given access to any data held by an agency as defined in s. 112.312 if the Office of Economic and Demographic Research considers the data necessary to complete the assessment, including any confidential data.

(7)    The assessment shall be submitted to the President of the Senate and the Speaker of the House of Representatives by January 1, 2017, and by January 1 of each year thereafter.

**History.**—s. 36, ch. 2016-1.

**403.9321**    **Short title.**—Sections 403.9321-403.9333 may be cited as the "Mangrove Trimming and Preservation Act."

**History.**—s. 1, ch. 95-299.

**403.9322**    **Legislative findings.**—

(1)    The Legislature finds that there are over 555,000 acres of mangroves now existing in Florida. Of this total, over 80 percent are under some form of government or private ownership or control and are expressly set aside for preservation or conservation purposes.

(2)    The Legislature finds that mangroves play an important ecological role as habitat for various species of marine and estuarine vertebrates, invertebrates, and other wildlife, including mammals, birds, and reptiles; as shoreline stabilization and storm protection; and for water quality protection and maintenance and as food-web support. The mangrove forest is a tropical ecosystem that provides nursery support to the sports and commercial fisheries. Through a combination of functions, mangroves contribute to the economies of many coastal counties in the state.

(3)    The Legislature finds that many areas of mangroves occur as narrow riparian mangrove fringes that do not provide all the functions of mangrove forests or provide such functions to a lesser degree.

(4)  The Legislature finds that scientific studies have shown that mangroves are amenable to standard horticultural treatments and that waterfront property owners can live in harmony with mangroves by incorporating such treatments into their landscaping systems.

(5)  The Legislature finds that the trimming of mangroves by professional mangrove trimmers has a significant potential to maintain the beneficial attributes of mangrove resources and that professional mangrove trimmers should be authorized to conduct mangrove trimming, under certain circumstances, without prior government authorization.

History.—s. 2, ch. 95-299; s. 1, ch. 96-206.

### 403.9323    Legislative intent.—

(1)  It is the intent of the Legislature to protect and preserve mangrove resources valuable to our environment and economy from unregulated removal, defoliation, and destruction.

(2)  It is the intent of the Legislature that no trimming or alteration of mangroves may be permitted on uninhabited islands which are publicly owned or on lands set aside for conservation and preservation, or mitigation, except where necessary to protect the public health, safety, and welfare, or to enhance public use of, or access to, conservation areas in accordance with approved management plans.

(3)  It is the intent of the Legislature to provide waterfront property owners their riparian right of view, and other rights of riparian property ownership as recognized by s. 253.141 and any other provision of law, by allowing mangrove trimming in riparian mangrove fringes without prior government approval when the trimming activities will not result in the removal, defoliation, or destruction of the mangroves.

(4)  It is the intent of the Legislature that ss. 403.9321-403.9333 shall be administered so as to encourage waterfront property owners to voluntarily maintain mangroves, encourage mangrove growth, and plant mangroves along their shorelines.

(5)  It is the intent of the Legislature that all trimming of mangroves pursuant to this act conducted on parcels having multifamily residential units result in an equitable distribution of the riparian rights provided herein.

(6)  It is the intent of the Legislature to grandfather certain historically established mangrove maintenance activities.

History.—s. 3, ch. 95-299; s. 2, ch. 96-206.

### 403.9324    Mangrove protection rule; delegation of mangrove protection to local governments.—

(1)  Sections 403.9321-403.9333 and any lawful regulations adopted by a local government that receives a delegation of the department's authority to administer and enforce the regulation of mangroves as provided by this section shall be the sole regulations in this state for the trimming and alteration of mangroves on privately or publicly owned lands. All other state and local regulation of mangrove is as provided in subsection (3).

(2)  The department shall delegate its authority to regulate the trimming and alteration of mangroves to any local government that makes a written request for delegation, if the local government meets the requirements of this section. To receive delegation, a local government must demonstrate that it has sufficient resources and procedures for the adequate administration and enforcement of a delegated mangrove-regulatory program. When a county receives delegation from the department, it may, through interlocal agreement, further delegate the authority to administer and enforce regulation of mangrove trimming and alteration to municipalities that meet the requirements of this section. In no event shall more than one permit for the alteration or trimming of mangroves be required within the jurisdiction of any delegated local government.

(3)  A local government that wants to establish a program for the regulation of mangroves may request delegation from the department at any time. However, all local government regulation of mangroves, except pursuant to a delegation as provided by this section, is abolished 180 days after this section takes effect.

(4)  Within 45 days after receipt of a written request for delegation from a local government, the department shall grant or deny the request in writing. The request is deemed approved if the department fails to respond within the 45-day time period. In reviewing requests for delegation, the department shall limit its review to whether the request complies with the requirements of subsection (2). The department shall set forth in writing

with specificity the reasons for denial of a request for delegation. The department's determination regarding delegation constitutes final agency action and is subject to review under chapter 120.

(5)   The department may biannually review the performance of a delegated local program and, upon a determination by the department that the delegated program has failed to properly administer and enforce the program, may seek to revoke the authority under which the program was delegated. The department shall provide a delegated local government with written notice of its intent to revoke the authority to operate a delegated program. The department's revocation of the authority to operate a delegated program is subject to review under chapter 120.

(6)   A local government that receives delegation of the department's authority to regulate mangroves shall issue all permits required by law and in lieu of any departmental permit provided for by ss. 403.9321-403.9333. The availability of the exemptions to trim mangroves in riparian mangrove fringe areas provided in s. 403.9326 may not be restricted or qualified in any way by any local government. This subsection does not preclude a delegated local government from imposing stricter substantive standards or more demanding procedural requirements for mangrove trimming or alteration outside of riparian mangrove fringe areas.

History.—s. 4, ch. 95-299; s. 3, ch. 96-206.

403.9325    Definitions.—For the purposes of ss. 403.9321-403.9333, the term:

(1)   "Alter" means anything other than trimming of mangroves.

(2)   "Local government" means a county or municipality.

(3)   "Mangrove" means any specimen of the species *Laguncularia racemosa* (white mangrove), *Rhizophora mangle* (red mangrove), or *Avicennia germinans* (black mangrove).

(4)   "Mangroves on lands that have been set aside as mitigation" means mangrove areas on public or private land which have been created, enhanced, restored, or preserved as mitigation under a dredge and fill permit issued under ss. 403.91-403.929, Florida Statutes (1984 Supplement, as amended), or a dredge and fill permit, management and storage of surface waters permit, or environmental resource permit issued under part IV of chapter 373, applicable dredge and fill licenses or permits issued by a local government, a resolution of an enforcement action, or a conservation easement that does not provide for trimming.

(5)   "Professional mangrove trimmer" means a person who meets the qualifications set forth in s. 403.9329.

(6)   "Public lands that have been set aside for conservation or preservation" means:

(a)   Lands and interests acquired with funds deposited into the Land Acquisition Trust Fund pursuant to s. 28(a), Art. X of the State Constitution;

(b)   Conservation and recreation lands under chapter 259;

(c)   State and national parks;

(d)   State and national reserves and preserves, except as provided in s. 403.9326(3);

(e)   State and national wilderness areas;

(f)   National wildlife refuges (only those lands under Federal Government ownership);

(g)   Lands acquired under the Save Our Rivers Program;

(h)   Lands acquired under the Save Our Coast program;

(i)   Lands acquired under the environmentally endangered lands bond program;

(j)   Public lands designated as conservation or preservation under a local government comprehensive plan;

(k)   Lands purchased by a water management district, the Fish and Wildlife Conservation Commission, or any other state agency for conservation or preservation purposes;

(l)   Public lands encumbered by a conservation easement that does not provide for the trimming of mangroves; and

(m)   Public lands designated as critical wildlife areas by the Fish and Wildlife Conservation Commission.

(7)   "Riparian mangrove fringe" means mangroves growing along the shoreline on private property, property owned by a governmental entity, or sovereign submerged land, the depth of which does not exceed 50 feet as measured waterward from the trunk of the most landward mangrove tree in a direction perpendicular to the shoreline to the trunk of the most waterward mangrove tree. Riparian mangrove fringe does not include mangroves

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 245 of 694

on uninhabited islands, or public lands that have been set aside for conservation or preservation, or mangroves on lands that have been set aside as mitigation, if the permit, enforcement instrument, or conservation easement establishing the mitigation area did not include provisions for the trimming of mangroves.

(8)  "Trim" means to cut mangrove branches, twigs, limbs, and foliage, but does not mean to remove, defoliate, or destroy the mangroves.

**History.**—s. 5, ch. 95-299; s. 4, ch. 96-206; s. 215, ch. 99-245; s. 75, ch. 2015-229.

**403.9326    Exemptions.**—

(1)    The following activities are exempt from the permitting requirements of ss. 403.9321-403.9333 and any other provision of law if no herbicide or other chemical is used to remove mangrove foliage:

(a)    Mangrove trimming in riparian mangrove fringe areas that meet the following criteria:

1.    The riparian mangrove fringe must be located on lands owned or controlled by the person who will supervise or conduct the trimming activities or on sovereign submerged lands immediately waterward and perpendicular to the lands.

2.    The mangroves that are the subject of the trimming activity may not exceed 10 feet in pretrimmed height as measured from the substrate and may not be trimmed so that the overall height of any mangrove is reduced to less than 6 feet as measured from the substrate.

This exemption applies to property with a shoreline of 150 feet or less. Owners of property with a shoreline of more than 150 feet may not trim, under an exemption, more than 65 percent of the mangroves along the shoreline.

(b)    Mangrove trimming supervised or conducted exclusively by a professional mangrove trimmer, as defined in s. 403.9325, in riparian mangrove fringe areas that meet the following criteria:

1.    The riparian mangrove fringe must be located on lands owned or controlled by the professional mangrove trimmer or by the person contracting with the professional mangrove trimmer to perform the trimming activities, or on sovereign submerged lands immediately waterward and perpendicular to such lands.

2.    The mangroves that are the subject of the trimming activity may not exceed 24 feet in pretrimmed height and may not be trimmed so that the overall height of any mangrove is reduced to less than 6 feet as measured from the substrate.

3.    The trimming of mangroves that are 16 feet or greater in pretrimmed height must be conducted in stages so that no more than 25 percent of the foliage is removed annually.

4.    A professional mangrove trimmer that is trimming red mangroves for the first time under the exemption provided by this paragraph must notify the department or delegated local government in writing at least 10 days before commencing the trimming activities.

This exemption applies to property with a shoreline of 150 feet or less. Owners of property with a shoreline of more than 150 feet may not trim, under an exemption, more than 65 percent of the mangroves along the shoreline.

(c)    Mangrove trimming in riparian mangrove fringe areas which is designed to reestablish or maintain a previous mangrove configuration if the mangroves to be trimmed do not exceed 24 feet in pretrimmed height. The reestablishment of a previous mangrove configuration must not result in the destruction, defoliation, or removal of mangroves. Documentation of a previous mangrove configuration may be established by affidavit of a person with personal knowledge of such configuration, through current or past permits from the state or local government, or by photographs of the mangrove configuration. Trimming activities conducted under the exemption provided by this paragraph shall be conducted by a professional mangrove trimmer when the mangroves that are the subject of the trimming activity have a pretrimmed height which exceeds 10 feet as measured from the substrate. A person trimming red mangroves for the first time under the exemption provided by this paragraph must notify the department or delegated local government in writing at least 10 days before commencing the trimming activities.

(d)    The maintenance trimming of mangroves that have been previously trimmed in accordance with an exemption or government authorization, including those mangroves that naturally recruited into the area and any

mangrove growth that has expanded from the area subsequent to the authorization, if the maintenance trimming does not exceed the height and configuration previously established. Historically established maintenance trimming is grandfathered in all respects, notwithstanding any other provisions of law. Documentation of established mangrove configuration may be verified by affidavit of a person with personal knowledge of the configuration or by photographs of the mangrove configuration.

(e)   The trimming of mangrove trees by a state-licensed surveyor in the performance of her or his duties, if the trimming is limited to a swath of 3 feet or less in width.

(f)   The trimming of mangrove trees by a duly constituted communications, water, sewerage, electrical, or other utility company, or by a federal, state, county, or municipal agency, or by an engineer or a surveyor and mapper working under a contract with such utility company or agency, when the trimming is done as a governmental function of the agency.

(g)   The trimming of mangrove trees by a duly constituted communications, water, sewerage, electrical, or other utility company in or adjacent to a public or private easement or right-of-way, if the trimming is limited to those areas where it is necessary for the maintenance of existing lines or facilities or for the construction of new lines or facilities in furtherance of providing utility service to its customers and if work is conducted so as to avoid any unnecessary trimming of mangrove trees.

(h)   The trimming of mangrove trees by a duly constituted communications, water, sewerage, or electrical utility company on the grounds of a water treatment plant, sewerage treatment plant, or electric power plant or substation in furtherance of providing utility service to its customers, if work is conducted so as to avoid any unnecessary trimming of mangrove trees.

(2)   Any rule, regulation, or other provision of law must be strictly construed so as not to limit directly or indirectly the exemptions provided by this section for trimming in riparian mangrove fringe areas except as provided in s. 403.9329(7)(b). Any rule or policy of the department, or local government regulation, that directly or indirectly serves as a limitation on the exemptions provided by this section for trimming in riparian mangrove fringe areas is invalid.

(3)   The designation of riparian mangrove fringe areas as aquatic preserves or Outstanding Florida Waters shall not affect the use of the exemptions provided by this section.

History.—s. 6, ch. 95-299; s. 5, ch. 96-206; s. 1012, ch. 97-103.

**403.9327   General permits.**—

(1)   The following general permits are created for the trimming of mangroves that do not qualify for an exemption provided by s. 403.9326:

(a)   A general permit to trim mangroves for riparian property owners, if:

1.   The trimming is conducted in an area where the department has not delegated the authority to regulate mangroves to a local government;

2.   The trimming is supervised or conducted exclusively by a professional mangrove trimmer;

3.   The mangroves subject to trimming under the permit do not extend more than 500 feet waterward as measured from the trunk of the most landward mangrove tree in a direction perpendicular to the shoreline;

4.   No more than 65 percent of the mangroves along the shoreline which exceed 6 feet in pretrimmed height as measured from the substrate will be trimmed, and no mangrove will be trimmed so that the overall height of any mangrove is reduced to less than 6 feet as measured from the substrate; and

5.   No herbicide or other chemical will be used for the purpose of removing leaves of a mangrove.

(b)   A general permit for the limited trimming of mangroves within existing navigational channels, basins, or canals to provide clearance for navigation of watercraft, if:

1.   The trimming is conducted in an area where the department has not delegated the authority to regulate mangroves to a local government;

2.   The trimming is supervised or conducted exclusively by a professional mangrove trimmer;

3.   The mangroves are located on lands owned or controlled by the professional mangrove trimmer or by the person contracting with the professional mangrove trimmer to perform the trimming activities, or on sovereign

submerged lands immediately waterward and perpendicular to such lands;

4.    The trimming is limited to those portions of branches or trunks of mangroves which extend into the navigation channel beyond a vertical plane of the most waterward prop root or root system; and

5.    No herbicide or other chemical will be used for the purpose of removing leaves of a mangrove.

(2)    The department may establish additional general permits for mangrove trimming.

(3)    The general permits under this section are subject to the following conditions:

(a)    A general permit may be used only once on any parcel of property to achieve a mangrove height of no less than 6 feet;

(b)    Trimming must be conducted in stages so that no more than 25 percent of the foliage is removed annually; and

(c)    The height and configuration of mangroves trimmed under these general permits may be maintained under s. 403.9326(1)(d).

(4)    Notice of intent to use a general permit must be made in writing to the department and must contain sufficient information to enable the department to determine the scope of the proposed trimming and whether the activity will comply with the conditions of this section.

(5)    The department shall grant or deny in writing each request for a general permit within 30 days after receipt, unless the applicant agrees to an extension. If the applicant does not agree to an extension and the department fails to act on the request within the 30-day period, the request is approved. The department's denial of a request for a general permit is subject to review under chapter 120. The department's action may not receive a presumption of validity in any administrative or judicial proceeding for review.

(6)    Trimming that does not qualify for an exemption under s. 403.9326 or a general permit under this section requires a permit as provided in s. 403.9328.

(7)    If a local government receives delegation of the department's authority to regulate mangroves, the delegated local government shall issue permits for mangrove trimming in lieu of a general permit from the department, but the local government may not directly or indirectly limit the use of the exemptions in s. 403.9326. A delegated local government may impose stricter substantive standards than those of the department for the issuance of a permit authorized by this section; however, such regulations may not prohibit all mangrove trimming.

History.—s. 7, ch. 95-299; s. 6, ch. 96-206.

### 403.93271    Applicability to multifamily residential units.—

(1)    When trimming under s. 403.9327(1)(a) occurs on property developed for multifamily residential use, the 65-percent shoreline trimming limit must be equitably distributed so that each owner's riparian view is similarly affected.

(2)    If it is necessary to trim more than 65 percent of the mangroves along the shoreline in order to provide a water view from each unit, the department or delegated local government may authorize a greater percentage of trimming under s. 403.9327(1)(a). This subsection applies only to property on which multifamily residential units exist as of June 1, 1996.

History.—s. 7, ch. 96-206.

### 403.9328    Alteration and trimming of mangroves; permit requirement.—

(1)    A person may not alter or trim, or cause to be altered or trimmed, any mangrove within the landward extent of wetlands and other surface waters, as defined in chapter 62-340.200(19), Florida Administrative Code, using the methodology in s. 373.4211 and chapter 62-340, Florida Administrative Code, when the trimming does not meet the criteria in s. 403.9326 or s. 403.9327 except under a permit issued under this section by the department or a delegated local government or as otherwise provided by ss. 403.9321-403.9333. Any violation of ss. 403.9321-403.9333 is presumed to have occurred with the knowledge and consent of any owner, trustee, or other person who directly or indirectly has charge, control, or management, either exclusively or with others, of the property upon which the violation occurs. However, this presumption may be rebutted by competent, substantial evidence that the violation was not authorized by the owner, trustee, or other person.

(2)(a)   The department, when deciding to issue or deny a permit for mangrove alteration or trimming under this section, shall use the criteria in s. 373.414(1) and (8). If the applicant is unable to meet these criteria, the department and the applicant shall first consider measures to reduce or eliminate the unpermittable impacts. If unpermittable impacts still remain, the applicant may propose, and the department shall consider, measures to mitigate the otherwise unpermittable impacts. A request for a permit to alter mangroves must be submitted in writing with sufficient specificity to enable the department to determine the scope and impacts of the proposed alteration activities.

(b)   The department shall issue or deny a permit for mangrove alteration in accordance with chapter 120 and s. 403.0876.

(3)   The use of herbicides or other chemicals for the purposes of removing leaves from a mangrove is strictly prohibited.

(4)   If a local government receives delegation of the department's authority to regulate mangroves, the delegated local government shall issue permits for mangrove trimming when the trimming does not meet the criteria in s. 403.9326 or for mangrove alteration in lieu of a departmental permit. A delegated local government may impose stricter substantive standards than those of the department for the issuance of a permit authorized by this section but may not prohibit all mangrove trimming.

(5)   A permit is not required under ss. 403.9321-403.9333 to trim or alter mangroves if the trimming or alteration is part of an activity that is exempt under s. 403.813 or is permitted under part IV of chapter 373. The procedures for permitting under part IV of chapter 373 will control in those instances.

History.—s. 8, ch. 95-299; s. 8, ch. 96-206; s. 38, ch. 97-98.

### 403.9329   Professional mangrove trimmers.—

(1)   For purposes of ss. 403.9321-403.9333, the following persons are considered professional mangrove trimmers:

(a)   Certified arborists, certified by the International Society of Arboriculture;

(b)   Professional wetland scientists, certified by the Society of Wetland Scientists;

(c)   Certified environmental professionals, certified by the Academy of Board Certified Environmental Professionals;

(d)   Certified ecologists certified by the Ecological Society of America;

(e)   Persons licensed under part II of chapter 481. The Board of Landscape Architecture shall establish appropriate standards and continuing legal education requirements to assure the competence of licensees to conduct the activities authorized under ss. 403.9321-403.9333. Trimming by landscape architects as professional mangrove trimmers is not allowed until the establishment of standards by the board. The board shall also establish penalties for violating ss. 403.9321-403.9333. Only those landscape architects who are certified in the state may qualify as professional mangrove trimmers under ss. 403.9321-403.9333, notwithstanding any reciprocity agreements that may exist between this state and other states;

(f)   Persons who have conducted mangrove trimming as part of their business or employment and who are able to demonstrate to the department or a delegated local government, as provided in subsection (2) or subsection (3), a sufficient level of competence to assure that they are able to conduct mangrove trimming in a manner that will ensure the survival of the mangroves that are trimmed; and

(g)   Persons who have been qualified by a delegated local government through a mangrove-trimming qualification program as provided in subsection (7).

(2)   A person who seeks to assert professional mangrove trimmer status under paragraph (1)(f) to trim mangroves under the exemptions and general permits provided in ss. 403.9326 and 403.9327, in areas where a local government has not established a professional mangrove trimmer qualification program as provided in subsection (7), must request in writing professional mangrove trimmer status from the department. The department shall grant or deny any written request for professional mangrove trimmer status within 60 days after receipt of the request. If professional mangrove trimmer status has been granted by the department, no additional requests for professional mangrove trimmer status need be made to the department to trim mangroves under the

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 249 of 694

exemptions provided in s. 403.9326. Persons applying for professional mangrove trimmer status must provide to the department a notarized sworn statement attesting:

(a) That the applicant has successfully completed a minimum of 10 mangrove-trimming projects authorized by the department or a local government program. Each project must be separately identified by project name and permit number;

(b) That a mangrove-trimming or alteration project of the applicant is not in violation of ss. 403.9321-403.9333 or any lawful rules adopted thereunder; and

(c) That the applicant possesses the knowledge and ability to correctly identify mangrove species occurring in this state.

(3) A person asserting professional mangrove trimmer status who wishes to use a general permit authorized under s. 403.9327 must complete and sign a notice of intent to use the general permit, along with the individual who owns or controls the property, and provide a copy of the department's qualification of professional mangrove trimmer status as provided for in subsection (2). A professional mangrove trimmer signing a notice of intent to use the general permit must conduct or supervise the trimming at the site specified in the notice.

(4) The department may deny a request for professional mangrove trimmer status if the department finds that the information provided by the applicant is incorrect or incomplete, or if the applicant has demonstrated a past history of noncompliance with the provisions of ss. 403.9321-403.9333 or any adopted mangrove rules.

(5) A professional mangrove trimmer status granted by the department may be revoked by the department for any person who is responsible for any violations of ss. 403.9321-403.9333 or any adopted mangrove rules.

(6) The department's decision to grant, deny, or revoke a professional mangrove trimmer status is subject to review under chapter 120.

(7)(a) A local government that receives delegation of the department's mangrove regulatory authority may establish criteria for qualification of persons as professional mangrove trimmers working within the jurisdiction of the local government. A delegated local government that establishes a program shall provide procedures and minimum qualifications and may develop training programs for those persons wishing to become qualified as professional mangrove trimmers. A delegated local government may establish criteria for disciplining persons qualified as professional mangrove trimmers working within its jurisdiction.

(b) A delegated local government may require that any person qualifying as a professional mangrove trimmer within the jurisdiction of the local government:

1. Be registered with the local government.

2. Pay an annual registration fee that may not exceed $500.

3. Provide prior written notice to the delegated local government before conducting the trimming activities authorized under the exemptions provided by s. 403.9326.

4. Be onsite when mangrove-trimming activities are performed.

(c) The department may require a person who qualifies as a professional mangrove trimmer and works in an area where a local government has not received delegation to provide written notice to the department 10 days before conducting trimming activities under the exemptions and general permits provided in ss. 403.9326 and 403.9327 and to be onsite when mangrove-trimming activities are performed.

(d) Any person who qualifies as a professional mangrove trimmer under this subsection may conduct trimming activities within the jurisdiction of a delegated local government if the person registers and pays any appropriate fee required by a delegated local government. A delegated local government that wishes to discipline persons licensed under part II of chapter 481 for mangrove-trimming or alteration activities may file a complaint against the licensee as provided for by chapter 481 and may take appropriate local disciplinary action. Any local disciplinary action imposed against a licensee is subject to administrative and judicial review.

(e) A locally registered mangrove trimmer may use the exemptions and general permits in ss. 403.9326 and 403.9327 only within the jurisdiction of delegated local governments in which the mangrove trimmer is registered. Nothing in ss. 403.9321-403.9333 shall prevent any person who qualifies as a professional mangrove trimmer under subsection (1) from using the exemptions and general permits in ss. 403.9326 and 403.9327 outside the jurisdiction of delegated local governments.

(f)   Any local governmental regulation imposed on professional mangrove trimmers that has the effect of limiting directly or indirectly the availability of the exemptions provided by s. 403.9326 is invalid.

History.—s. 9, ch. 95-299; s. 9, ch. 96-206.

### 403.9331   Applicability; rules and policies.—

(1)   The regulation of mangrove protection under ss. 403.9321-403.9333 is intended to be complete and effective without reference to or compliance with other statutory provisions.

(2)   Any rule or policy applicable to permits provided for by s. 403.9327 or s. 403.9328 which establishes a standard applicable to mangrove trimming or alteration is invalid unless a scientific basis for the rule or policy is established. Such rules or policies shall not receive a presumption of validity in any administrative or judicial proceeding for review. Any such rule or policy must be demonstrated to substantially advance a fundamental purpose of the statute cited as authority for the rule or policy or shall be invalid.

History.—s. 10, ch. 95-299.

### 403.9332   Mitigation and enforcement.—

(1)(a)   Any area in which 5 percent or more of the trimmed mangrove trees have been trimmed below 6 feet in height, except as provided in s. 403.9326(1)(c), (d), (f), (g), and (h), destroyed, defoliated, or removed as a result of trimming conducted under s. 403.9326 or s. 403.9327 must be restored or mitigated. Restoration must be accomplished by replanting mangroves, in the same location and of the same species as each mangrove destroyed, defoliated, removed, or trimmed, to achieve within 5 years a canopy area equivalent to the area destroyed, removed, defoliated, or trimmed; or mitigation must be accomplished by replanting offsite, in areas suitable for mangrove growth, mangroves to achieve within 5 years a canopy area equivalent to the area destroyed, removed, defoliated, or trimmed. Where all or a portion of the restoration or mitigation is not practicable, as determined by the department or delegated local government, the impacts resulting from the destruction, defoliation, removal, or trimming of the mangroves must be offset by donating a sufficient amount of money to offset the impacts, which must be used for the restoration, enhancement, creation, or preservation of mangrove wetlands within a restoration, enhancement, creation, or preservation project approved by the department or delegated local government; or by purchasing credits from a mitigation bank created under s. 373.4135 at a mitigation ratio of 2-to-1 credits to affected area. The donation must be equivalent to the cost, as verified by the department or delegated local government, of creating mangrove wetlands at a 2-to-1, created versus affected ratio, based on canopy area. The donation may not be less than $4 per square foot of created wetland area.

(b)   In all cases, the applicant, permittee, landowner, and person performing the trimming are jointly and severally liable for performing restoration under paragraph (a) and for ensuring that the restoration successfully results in a variable mangrove community that can offset the impacts caused by the removal, destruction, or defoliation of mangroves. The applicant, landowner, and person performing the trimming are also jointly and severally subject to penalties.

(c)   If mangroves are to be trimmed or altered under a permit issued under s. 403.9328, the department or delegated local government may require mitigation. The department or delegated local government shall establish reasonable mitigation requirements that must include, as an option, the use of mitigation banks created under s. 373.4135, where appropriate. The department's mitigation requirements must ensure that payments received as mitigation are sufficient to offset impacts and are used for mangrove creation, preservation, protection, or enhancement.

(d)   Any replanting for restoration and mitigation under this subsection must result in at least 80 percent survival of the planted mangroves 1 year after planting. If the survival requirement is not met, additional mangroves must be planted and maintained until 80 percent survival is achieved 1 year after the last mangrove planting.

(2)   The department or delegated local government shall enforce the provisions of ss. 403.9321-403.9333 in the same manner and to the same extent provided for in ss. 403.141 and 403.161 for the first violation.

(3)   For second and subsequent violations, the department or delegated local government, in addition to the provisions of ss. 403.141 and 403.161, shall impose additional monetary penalties for each mangrove illegally

trimmed or altered as follows:

(a)    Up to $100 for each mangrove illegally trimmed; or

(b)    Up to $250 for each mangrove illegally altered.

(4)    In addition to the penalty provisions provided in subsections (1)-(3), for second and all subsequent violations by a professional mangrove trimmer, the department or delegated local government shall impose a separate penalty upon the professional mangrove trimmer up to $250 for each mangrove illegally trimmed or altered.

(5)    This section does not limit or restrict a delegated local government from enforcing penalty, restoration, and mitigation provisions under its local authority.

History.—s. 11, ch. 95-299; s. 10, ch. 96-206.

**403.9333    Variance relief.**—Upon application, the department or delegated local government may grant a variance from the provisions of ss. 403.9321-403.9333 if compliance therewith would impose a unique and unnecessary hardship on the owner or any other person in control of the affected property. Relief may be granted upon demonstration that such hardship is not self-imposed and that the grant of the variance will be consistent with the general intent and purpose of ss. 403.9321-403.9333. The department or delegated local government may grant variances as it deems appropriate.

History.—s. 55, ch. 84-338; s. 44, ch. 93-213; s. 12, ch. 95-299.

Note.—Former s. 403.938.

**403.9334    Effect of ch. 96-206.**—Nothing in chapter 96-206, Laws of Florida, shall invalidate any permit or order related to mangrove activities which has been approved by the department or any other governmental entity, nor shall it affect any application for permits related to mangrove activities deemed sufficient and substantially complete prior to July 1, 1996.

History.—s. 11, ch. 96-206.

**403.93345    Coral reef protection.**—

(1)    This section may be cited as the "Florida Coral Reef Protection Act."

(2)    This act applies to the sovereign submerged lands that contain coral reefs as defined in this act off the coasts of Broward, Martin, Miami-Dade, Monroe, and Palm Beach Counties.

(3)    As used in this section, the term:

(a)    "Aggravating circumstances" means operating, anchoring, or mooring a vessel in a reckless or wanton manner; under the influence of drugs or alcohol; or otherwise with disregard for boating regulations concerning speed, navigation, or safe operation.

(b)    "Coral" means species of the phylum Cnidaria found in state waters including:

1.    Class Anthozoa, including the subclass Octocorallia, commonly known as gorgonians, soft corals, and telesteaceans; and

2.    Orders Scleractinia, commonly known as stony corals; Stolonifera, including, among others, the organisms commonly known as organ-pipe corals; Antipatharia, commonly known as black corals; and Hydrozoa, including the family Millaporidae and family Stylasteridae, commonly known as hydrocoral.

(c)    "Coral reefs" mean:

1.    Limestone structures composed wholly or partially of living corals, their skeletal remains, or both, and hosting other coral, associated benthic invertebrates, and plants; or

2.    Hard-bottom communities, also known as live bottom habitat or colonized pavement, characterized by the presence of coral and associated reef organisms or worm reefs created by the *Phragmatopoma* species.

(d)    "Damages" means moneys paid by any person or entity, whether voluntarily or as a result of administrative or judicial action, to the state as compensation, restitution, penalty, civil penalty, or mitigation for causing injury to or destruction of coral reefs.

(e)    "Department" means the Department of Environmental Protection.

(f)    "Fund" means the Water Quality Assurance Trust Fund.

(g)  "Person" means any and all persons, natural or artificial, foreign or domestic, including any individual, firm, partnership, business, corporation, and company and the United States and all political subdivisions, regions, districts, municipalities, and public agencies thereof.

(h)  "Responsible party" means the owner, operator, manager, or insurer of any vessel.

(4)  The Legislature finds that coral reefs are valuable natural resources that contribute ecologically, aesthetically, and economically to the state. Therefore, the Legislature declares it is in the best interest of the state to clarify the department's powers and authority to protect coral reefs through timely and efficient recovery of monetary damages resulting from vessel groundings and anchoring-related injuries. It is the intent of the Legislature that the department be recognized as the state's lead trustee for coral reef resources located within waters of the state or on sovereignty submerged lands unless preempted by federal law. This section does not divest other state agencies and political subdivisions of the state of their interests in protecting coral reefs.

(5)  The responsible party who knows or should know that their vessel has run aground, struck, or otherwise damaged coral reefs must notify the department of such an event within 24 hours after its occurrence. Unless otherwise prohibited or restricted by the United States Coast Guard, the responsible party must remove or cause the removal of the grounded or anchored vessel within 72 hours after the initial grounding or anchoring absent extenuating circumstances such as weather, or marine hazards that would prevent safe removal of the vessel. The responsible party must remove or cause the removal of the vessel or its anchor in a manner that avoids further damage to coral reefs and shall consult with the department in accomplishing this task. The responsible party must cooperate with the department to undertake damage assessment and primary restoration of the coral reef in a timely fashion.

(6)  In any action or suit initiated pursuant to chapter 253 on the behalf of the Board of Trustees of the Internal Improvement Trust Fund, or under chapter 373 or this chapter for damage to coral reefs, the department may recover all damages from the responsible party, including, but not limited to:

(a)  Compensation for the cost of replacing, restoring, or acquiring the equivalent of the coral reef injured and the value of the lost use and services of the coral reef pending its restoration, replacement, or acquisition of the equivalent coral reef, or the value of the coral reef if the coral reef cannot be restored or replaced or if the equivalent cannot be acquired.

(b)  The cost of damage assessments, including staff time.

(c)  The cost of activities undertaken by or at the request of the department to minimize or prevent further injury to coral or coral reefs pending restoration, replacement, or acquisition of an equivalent.

(d)  The reasonable cost of monitoring the injured, restored, or replaced coral reef for at least 10 years. Such monitoring is not required for a single occurrence of damage to a coral reef damage totaling less than or equal to 1 square meter.

(e)  The cost of enforcement actions undertaken in response to the destruction or loss of or injury to a coral reef, including court costs, attorney's fees, and expert witness fees.

(7)  The department may use habitat equivalency analysis as the method by which the compensation described in subsection (5) is calculated. The parameters for calculation by this method may be prescribed by rule adopted by the department.

(8)  In addition to the compensation described in subsection (5), the department may assess, per occurrence, civil penalties according to the following schedule:

(a)  For any anchoring of a vessel on a coral reef or for any other damage to a coral reef totaling less than or equal to an area of 1 square meter, $150, provided that a responsible party who has anchored a recreational vessel as defined in s. 327.02 which is lawfully registered or exempt from registration pursuant to chapter 328 is issued, at least once, a warning letter in lieu of penalty; with aggravating circumstances, an additional $150; occurring within a state park or aquatic preserve, an additional $150.

(b)  For damage totaling more than an area of 1 square meter but less than or equal to an area of 10 square meters, $300 per square meter; with aggravating circumstances, an additional $300 per square meter; occurring within a state park or aquatic preserve, an additional $300 per square meter.

(c)   For damage exceeding an area of 10 square meters, $1,000 per square meter; with aggravating circumstances, an additional $1,000 per square meter; occurring within a state park or aquatic preserve, an additional $1,000 per square meter.

(d)   For a second violation, the total penalty may be doubled.

(e)   For a third violation, the total penalty may be tripled.

(f)   For any violation after a third violation, the total penalty may be quadrupled.

(g)   The total of penalties levied may not exceed $250,000 per occurrence.

(9)   To carry out the intent of this section, the department may enter into delegation agreements with another state agency or any coastal county with coral reefs within its jurisdiction. In deciding to execute such agreements, the department must consider the ability of the potential delegee to adequately and competently perform the duties required to fulfill the intent of this section. When such agreements are executed by the parties and incorporated in department rule, the delegee shall have all rights accorded the department by this section. Nothing herein shall be construed to require the department, another state agency, or a coastal county to enter into such an agreement.

(10)   Nothing in this section shall be construed to prevent the department or other state agencies from entering into agreements with federal authorities related to the administration of the Florida Keys National Marine Sanctuary.

(11)   All damages recovered by or on behalf of this state for injury to, or destruction of, the coral reefs of the state that would otherwise be deposited in the general revenue accounts of the State Treasury or in the Internal Improvement Trust Fund shall be deposited into the Water Quality Assurance Trust Fund in the department and shall remain in such account until expended by the department for the purposes of this section. Moneys in the fund received from damages recovered for injury to, or destruction of, coral reefs must be expended only for the following purposes:

(a)   To provide funds to the department for reasonable costs incurred in obtaining payment of the damages for injury to, or destruction of, coral reefs, including administrative costs and costs of experts and consultants. Such funds may be provided in advance of recovery of damages.

(b)   To pay for restoration or rehabilitation of the injured or destroyed coral reefs or other natural resources by a state agency or through a contract to any qualified person.

(c)   To pay for alternative projects selected by the department. Any such project shall be selected on the basis of its anticipated benefits to the residents of this state who used the injured or destroyed coral reefs or other natural resources or will benefit from the alternative project.

(d)   All claims for trust fund reimbursements under paragraph (a) must be made within 90 days after payment of damages is made to the state.

(e)   Each private recipient of fund disbursements shall be required to agree in advance that its accounts and records of expenditures of such moneys are subject to audit at any time by appropriate state officials and to submit a final written report describing such expenditures within 90 days after the funds have been expended.

(f)   When payments are made to a state agency from the fund for expenses compensable under this subsection, such expenditures shall be considered as being for extraordinary expenses, and no agency appropriation shall be reduced by any amount as a result of such reimbursement.

(12)   The department may adopt rules pursuant to ss. 120.536 and 120.54 to administer this section.

**History.**—s. 57, ch. 2009-86; s. 86, ch. 2010-5; s. 76, ch. 2015-229.

**403.9335    Short title.**—Sections 403.9335-403.9338 may be cited as the "Protection of Urban and Residential Environments and Water Act."

**History.**—s. 2, ch. 2009-199.

**403.9336    Legislative findings.**—The Legislature finds that the implementation of the Model Ordinance for Florida-Friendly Fertilizer Use on Urban Landscapes (2008), which was developed by the department in conjunction with the Consumer Fertilizer Task Force, the Department of Agriculture and Consumer Services, and the University of Florida Institute of Food and Agricultural Sciences, will assist in protecting the quality of Florida's surface water

Case 1:21-cv-00119-RDM    Document 55    Filed 06/22/21    Page 254 of 694

and groundwater resources. The Legislature further finds that local conditions, including variations in the types and quality of water bodies, site-specific soils and geology, and urban or rural densities and characteristics, may necessitate the implementation of additional or more stringent fertilizer management practices at the local government level.

**History.**—s. 3, ch. 2009-199; s. 87, ch. 2010-5.

**403.9337    Model Ordinance for Florida-Friendly Fertilizer Use on Urban Landscapes.**—

(1) All county and municipal governments are encouraged to adopt and enforce the Model Ordinance for Florida-Friendly Fertilizer Use on Urban Landscapes or an equivalent requirement as a mechanism for protecting local surface and groundwater quality.

(2) Each county and municipal government located within the watershed of a water body or water segment that is listed as impaired by nutrients pursuant to s. 403.067, shall, at a minimum, adopt the department's Model Ordinance for Florida-Friendly Fertilizer Use on Urban Landscapes. A local government may adopt additional or more stringent standards than the model ordinance if the following criteria are met:

(a) The local government has demonstrated, as part of a comprehensive program to address nonpoint sources of nutrient pollution which is science-based, and economically and technically feasible, that additional or more stringent standards than the model ordinance are necessary in order to adequately address urban fertilizer contributions to nonpoint source nutrient loading to a water body.

(b) The local government documents that it has considered all relevant scientific information, including input from the department, the institute, the Department of Agriculture and Consumer Services, and the University of Florida Institute of Food and Agricultural Sciences, if provided, on the need for additional or more stringent provisions to address fertilizer use as a contributor to water quality degradation. All documentation must become part of the public record before adoption of the additional or more stringent criteria.

(3) Any county or municipal government that adopted its own fertilizer use ordinance before January 1, 2009, is exempt from this section. Ordinances adopted or amended on or after January 1, 2009, must substantively conform to the most recent version of the model fertilizer ordinance and are subject to subsections (1) and (2), as applicable.

(4) This section does not apply to the use of fertilizer on farm operations as defined in s. 823.14 or on lands classified as agricultural lands pursuant to s. 193.461.

**History.**—s. 4, ch. 2009-199; s. 16, ch. 2012-83.

**403.9338    Training.**—

(1) The department, in cooperation with the Institute of Food and Agricultural Sciences, shall:

(a) Provide training and testing programs in urban landscape best management practices and may issue certificates demonstrating satisfactory completion of the training.

(b) Approve training and testing programs that are equivalent to or more comprehensive than the training provided by the department under paragraph (a). Such programs must be reviewed and reapproved by the department if significant changes are made.

(2) After receiving a certificate demonstrating successful completion of a department or department-approved training program under this section, a person may apply to the Department of Agriculture and Consumer Services to receive a limited certification for urban landscape commercial fertilizer application under s. 482.1562. A person possessing such certification is not subject to additional local testing.

**History.**—s. 5, ch. 2009-199; s. 96, ch. 2014-17.

**PART VIII**

**NATURAL GAS TRANSMISSION**

**PIPELINE SITING**

403.9401    Short title.
403.9402    Legislative intent.

403.9403  Definitions.

403.9404  Department of Environmental Protection; powers and duties.

403.9405  Applicability; certification; exemption; notice of intent.

403.94055  Application contents; corridor requirements.

403.9406  Appointment of an administrative law judge.

403.9407  Distribution of application; schedules.

403.9408  Determination of completeness.

403.9409  Determination of sufficiency.

403.941  Preliminary statements of issues, reports, and studies.

403.9411  Notice; proceedings; parties and participants.

403.9412  Alternate corridors.

403.9413  Amendment to the application.

403.9414  Alteration of time limits.

403.9415  Final disposition of application.

403.9416  Effect of certification.

403.9417  Recording of notice of certified corridor route.

403.9418  Modification of certification.

403.9419  Enforcement of compliance.

403.942  Superseded laws, regulations, and certification power.

403.9421  Fees; disposition.

403.9422  Determination of need for natural gas transmission pipeline; powers and duties.

403.9423  Certification admissible in eminent domain proceedings; attorney's fees and costs.

403.9424  Local governments; informational public meetings.

403.9425  Revocation or suspension of certification.

**403.9401    Short title.**—Sections 403.9401-403.9425 may be cited as the "Natural Gas Transmission Pipeline Siting Act."

**History.**—s. 1, ch. 92-284.

**403.9402    Legislative intent.**—It is the Legislature's intent by adoption of ss. 403.9401-403.9425 to establish a centralized and coordinated permitting process for the location of natural gas transmission pipeline corridors and the construction and maintenance of natural gas transmission pipelines, which necessarily involves several broad interests of the public addressed through the subject matter jurisdiction of several agencies. Recognizing the need to ensure natural gas delivery reliability, safety, and integrity, and in order to meet natural gas energy needs in an orderly and timely fashion, the centralized and coordinated permitting process established by ss. 403.9401-403.9425 is intended to further the legislative goal of ensuring, through available and reasonable methods, that the location of natural gas transmission pipelines produce minimal adverse effect on the environment and public health, safety, and welfare. It is the intent of ss. 403.9401-403.9425 to fully balance the need for natural gas supplies with the broad interests of the public in order to effect a reasonable balance between the need for the natural gas transmission pipeline as a means of providing abundant clean-burning natural gas and the impact on the public and the environment resulting from the location of the natural gas transmission pipeline corridor and the construction and maintenance of the natural gas transmission pipelines. The Legislature intends that the provisions of chapter 120 apply to ss. 403.9401-403.9425 and to proceedings pursuant to those sections except as otherwise expressly exempted by other provisions of ss. 403.9401-403.9425. It is not the intent of this legislation that the natural gas transmission pipeline certification process prevent, delay, or prohibit the issuance of government permits by the appropriate agencies necessary to locate or construct other natural gas pipelines regulated by the state, pipelines regulated by the Federal Energy Regulatory Commission, and natural gas distribution companies, provided all applicable agency permit requirements are met. Nothing in ss. 403.9401-403.9425 shall be deemed to

supersede the department's authority to administer federally delegated or approved permit programs in accordance with the terms of such programs.

History.—s. 1, ch. 92-284; s. 11, ch. 94-321.

403.9403     Definitions.—As used in ss. 403.9401-403.9425, the term:

(1)    "Agency," as the context requires, means an official, officer, commission, authority, council, committee, department, division, bureau, board, section, or other unit or entity of government, including a county, municipality, or other regional or local governmental entity.

(2)    "Amendment" means a material change in information provided in the application made after the initial application filing.

(3)    "Applicant" means any natural gas transmission pipeline company that applies for certification pursuant to ss. 403.9401-403.9425.

(4)    "Application" means the documents required by the department to be filed by a natural gas transmission pipeline company to initiate the certification process.

(5)    "Board" means the Governor and Cabinet sitting as the Natural Gas Transmission Pipeline Siting Board.

(6)    "Certification" means the approval by the board of a corridor and of the construction and maintenance of a pipeline within that corridor with any changes or conditions that the board considers appropriate. Certification is evidenced by a written order of the board.

(7)    "Commission" means the Florida Public Service Commission.

(8)    "Complete" means that the applicant has addressed all applicable sections of the application, but does not mean that those sections are sufficient in comprehensiveness of data or in quality of information provided.

(9)    "Corridor" means the area within which a natural gas transmission pipeline right-of-way is to be located.

(10)   "Department" means the Department of Environmental Protection.

(11)   "Federally delegated or approved permit program" means any environmental regulatory program delegated or approved by an agency of the Federal Government so as to authorize the department to administer the program and issue licenses.

(12)   "License" means a franchise, permit, certification, registration, charter, comprehensive plan amendment, development order or permit as defined in chapter 163 or chapter 380, or similar form of authorization required by law, but it does not include a license required primarily for revenue purposes if issuance of the license is merely a ministerial act.

(13)   "Local government" means a municipality or a county in the jurisdiction of which the project is proposed to be located.

(14)   "Modification" means any change in a certification order after issuance, including a change in the conditions of certification.

(15)   "Natural gas" means either natural gas in a gaseous state unmixed or a mixture of natural and artificial gas.

(16)   "Natural gas transmission pipeline" or "pipeline" means the transmission pipeline and any related equipment, facility, or building used in the transportation of natural gas or its treatment or storage during the course of transportation. The term does not include a gathering line, but the term includes a transmission pipeline that transports gas from a gathering line or a storage facility to a distribution center or a storage facility or that operates at a hoop stress of 20 percent or more of specified minimum yield strength, as defined by federal law, or that transports gas within a storage field.

(17)   "Natural gas transmission pipeline company" means a person engaged in the transportation, by natural gas transmission pipeline, of natural gas.

(18)   "Natural gas transmission pipeline right-of-way" or "pipeline right-of-way" means land necessary for the construction and maintenance of a natural gas transmission pipeline.

(19)   "Nonprocedural requirements of agencies" means an agency's regulatory requirements established by statute, rule, ordinance, or comprehensive plan, excluding any provisions prescribing forms, fees, procedures, or

time limits for the review or processing of information submitted to demonstrate compliance with those regulatory requirements.

(20)   "Person" means an individual, partnership, joint venture, private or public corporation, association, firm, public service company, political subdivision, municipal corporation, government agency, public utility district, or any other entity, public or private, however organized.

(21)   "Preliminary statement of issues" means a listing and explanation of those issues within the agency's jurisdiction which are of major concern to the agency in relation to the proposed corridor.

(22)   "Regional planning council" means a regional planning council created pursuant to chapter 186 in the jurisdiction of which the project is proposed to be located.

(23)   "Sufficient" means that an application is not only complete but also that all sections are adequate in the comprehensiveness of data and the quality of information provided to enable the department to determine whether the application provides the reviewing agencies adequate information to prepare the reports required by s. 403.941.

(24)   "Water management district" means a water management district created pursuant to chapter 373 in the jurisdiction of which the project is proposed to be located.

History.—s. 1, ch. 92-284; s. 12, ch. 94-321; s. 431, ch. 94-356.

**403.9404    Department of Environmental Protection; powers and duties.**—The Department of Environmental Protection shall have the following powers and duties:

(1)   To adopt procedural rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of ss. 403.9401-403.9425 and to adopt rules to implement the provisions of subsection (8).

(2)   To prescribe the form and content of the public notices and the form, content, and necessary supporting documentation, and any required studies, for certification applications. All such data and studies shall be related to the jurisdiction of the agencies relevant to the application.

(3)   To receive applications for natural gas transmission pipeline and corridor certifications and initially determine the completeness and sufficiency thereof.

(4)   To make or contract for studies of certification applications. All such studies shall be related to the jurisdiction of the agencies relevant to the application. For studies in areas outside the jurisdiction of the department and in the jurisdiction of another agency, the department may initiate such studies, but only with the consent of such agency.

(5)   To administer the processing of applications for certification and ensure that the applications are processed as expeditiously as possible.

(6)   To require such fees as allowed by ss. 403.9401-403.9425.

(7)   To prepare a report and written analysis as required by s. 403.941.

(8)   To prescribe the means for monitoring the effects arising from the construction, operation, and maintenance of the natural gas transmission pipelines to assure continued compliance with the terms of the certification.

(9)   To make a determination of acceptability of any alternate corridor proposed for consideration pursuant to s. 403.9412.

(10)   To act as clerk for the board.

(11)   To enforce compliance with the provisions of ss. 403.9401-403.9425.

(12)   To function as staff to the board, when appropriate.

History.—s. 1, ch. 92-284; s. 432, ch. 94-356; s. 109, ch. 98-200.

**403.9405    Applicability; certification; exemption; notice of intent.**—

(1)   The provisions of ss. 403.9401-403.9425 apply to each natural gas transmission pipeline, except as provided in subsection (2).

(2)   No construction of a natural gas transmission pipeline may be undertaken after October 1, 1992, without first obtaining certification under ss. 403.9401-403.9425, but these sections do not apply to:

(a) Natural gas transmission pipelines which are less than 15 miles in length or which do not cross a county line, unless the applicant has elected to apply for certification under ss. 403.9401-403.9425.

(b) Natural gas transmission pipelines for which a certificate of public convenience and necessity has been issued under s. 7(c) of the Natural Gas Act, 15 U.S.C. s. 717f, or a natural gas transmission pipeline certified as an associated facility to an electrical power plant pursuant to the Florida Electrical Power Plant Siting Act, ss. 403.501-403.518, unless the applicant elects to apply for certification of that pipeline under ss. 403.9401-403.9425.

(c) Natural gas transmission pipelines that are owned or operated by a municipality or any agency thereof, by any person primarily for the local distribution of natural gas, or by a special district created by special act to distribute natural gas, unless the applicant elects to apply for certification of that pipeline under ss. 403.9401-403.9425.

(3) Except as otherwise provided in this section, the exemption of a natural gas transmission pipeline under ss. 403.9401-403.9425 does not constitute an exemption for the natural gas transmission pipeline from other applicable permitting processes under other provisions of law or local government ordinances.

(4) All natural gas transmission pipeline companies except those engaged in activities pursuant to paragraph (2)(c) shall notify the department in writing, prior to the start of construction, of their intent to construct a natural gas transmission pipeline exempted pursuant to this section. Such notice shall be only for information purposes, and no action by the department shall be required pursuant to such notice.

(5) No natural gas transmission pipeline certified pursuant to ss. 403.9401-403.9425 shall be used for the transport of any substance other than natural gas.

History.—s. 1, ch. 92-284.

### 403.94055 Application contents; corridor requirements.—

(1) A natural gas transmission pipeline company may file an application encompassing all or a part of one or more proposed pipelines. The beginning and ending points of a pipeline must be specified in the application and must be verified by the commission in its determination of need. The application must include all structures and maintenance and access roads required to be constructed. The applicant may include metering and compressor stations and other facilities directly related to the transportation of natural gas which will serve the pipeline.

(2) The width of the corridor may be the width of the pipeline right-of-way or wider, but may not exceed $^1/_3$ mile. After the property interests required for the pipeline right-of-way have been acquired by the applicant, the boundaries of the corridor shall be narrowed to include only that land within pipeline right-of-way. The corridor must be specified in the application, in amendments to the application filed pursuant to s. 403.9413, and in notices of acceptance of alternate corridors filed by an applicant and the department pursuant to s. 403.9412.

History.—s. 1, ch. 92-284.

### 403.9406 Appointment of an administrative law judge.—

Within 7 days after receipt of an application, whether complete or not, the department shall request the Division of Administrative Hearings to designate an administrative law judge to conduct the hearings required by ss. 403.9401-403.9425. The division director shall designate an administrative law judge to conduct the hearings required by ss. 403.9401-403.9425 within 7 days after receipt of the request from the department. Whenever practicable, the division director shall assign an administrative law judge who has had prior experience or training in the certification of linear facilities. Upon being advised that an administrative law judge has been designated, the department shall immediately file a copy of the application and all supporting documents with the administrative law judge who shall docket the application.

History.—s. 1, ch. 92-284; s. 171, ch. 96-410.

### 403.9407 Distribution of application; schedules.—

(1) Within 7 days after the filing of an application, the department shall provide the applicant and the Division of Administrative Hearings the names and addresses of those affected or other agencies entitled to notice and copies of the application and any amendments.

(2)   Within 7 days after completeness has been determined, the department shall prepare a schedule of dates for submission of statements of issues, determination of sufficiency, and submittal of final reports from affected and other agencies and other significant dates to be followed during the certification process, including dates for filing notices of appearance to be a party pursuant to s. 403.9411(4). This schedule shall be provided by the department to the applicant, the administrative law judge, and the agencies identified pursuant to subsection (1).

(3)   Within 7 days after completeness has been determined, the applicant shall distribute copies of the application to all agencies identified by the department pursuant to subsection (1). Copies of changes and amendments to the application shall be timely distributed by the applicant to all agencies and parties who have received a copy of the application.

History.—s. 1, ch. 92-284; s. 172, ch. 96-410.

**403.9408    Determination of completeness.**—Within 15 days after receipt of an application, the department shall file a statement with the Division of Administrative Hearings and with the applicant declaring its position with regard to the completeness, not the sufficiency, of the application.

(1)   If the department declares the application to be incomplete, the applicant, within 15 days after the filing of the statement by the department, shall file with the Division of Administrative Hearings and with the department a statement:

(a)   Agreeing with the statement of the department and withdrawing the application;

(b)   Agreeing with the statement of the department and agreeing to amend the application without withdrawing it. The time schedules referencing a complete application under ss. 403.9401-403.9425 shall not commence until the application is determined complete; or

(c)   Contesting the statement of the department.

(2)   If the applicant contests the determination by the department that an application is incomplete, the administrative law judge shall schedule a hearing on the statement of completeness. The hearing shall be held as expeditiously as possible, but not later than 30 days after the filing of the statement by the department. The administrative law judge shall render a decision within 10 days after the hearing.

(a)   If the administrative law judge determines that the application was not complete as filed, the applicant shall withdraw the application or make such additional submittals as necessary to complete it. The time schedules referencing a complete application under ss. 403.9401-403.9425 shall not commence until the application is determined complete.

(b)   If the administrative law judge determines that the application was complete at the time it was filed, the time schedules referencing a complete application under ss. 403.9401-403.9425 shall commence upon such determination.

History.—s. 1, ch. 92-284; s. 173, ch. 96-410.

**403.9409    Determination of sufficiency.**—Within 45 days after the distribution of the complete application or amendment, the department shall file a statement with the Division of Administrative Hearings and with the applicant declaring its position with regard to the sufficiency of the application or amendment. The department's statement shall be based upon consultation with the affected agencies, which shall submit to the department recommendations on the sufficiency of the application within 30 days after distribution of the complete application.

(1)   If the department declares the application or amendment insufficient, the applicant may:

(a)   Withdraw the application or amendment;

(b)   File additional information necessary to make the application or amendment sufficient; or

(c)   Contest the notice of insufficiency by filing a request for hearing with the administrative law judge within 15 days after the filing of the statement of insufficiency. If a hearing is requested by the applicant, all time schedules under ss. 403.9401-403.9425 shall be tolled as of the date of the department's statement of insufficiency, pending the administrative law judge's decision concerning the dispute. A hearing shall be held no later than 30 days after the filing of the statement by the department, and a decision shall be rendered within 10 days after the hearing, unless otherwise agreed by the department and the applicant.

(2)(a)   If the administrative law judge determines, contrary to the department, that an application or amendment is sufficient, all time schedules under ss. 403.9401-403.9425 shall resume as of the date of the administrative law judge's determination.

(b)   If the administrative law judge agrees that the application is insufficient, all time schedules under ss. 403.9401-403.9425 shall remain tolled until the applicant files additional information and the application or amendment is determined sufficient by the department or the administrative law judge.

(3)   If, within 30 days after receipt of the additional information submitted pursuant to paragraph (1)(b), or paragraph (2)(b), based upon the recommendations of the affected agencies, the department determines that the additional information supplied by an applicant does not render the application or amendment sufficient, the applicant may exercise any of the options specified in subsection (1) as often as may be necessary to resolve the matter.

History.—s. 1, ch. 92-284; s. 174, ch. 96-410.

**403.941   Preliminary statements of issues, reports, and studies.**—

(1)   Each affected agency which received an application in accordance with s. 403.9407(3) shall submit a preliminary statement of issues to the department and the applicant no later than 60 days after distribution of the complete application. Such statements of issues shall be made available to each local government for use as information for public meetings held pursuant to s. 403.9424. The failure to raise an issue in this preliminary statement of issues shall not preclude the issue from being raised in the agency's report.

(2)(a)   The affected agencies shall prepare reports as provided in this paragraph and shall submit them to the department and the applicant within 60 days after the application is determined sufficient:

1.   The department shall prepare a report as to the impact of each proposed natural gas transmission pipeline or corridor as it relates to matters within its jurisdiction.

2.   Each water management district in the jurisdiction of which a proposed natural gas transmission pipeline or corridor is to be located shall prepare a report as to the impact on water resources and other matters within its jurisdiction.

3.   The Department of Economic Opportunity shall prepare a report containing recommendations which address the impact upon the public of the proposed natural gas transmission pipeline or corridor, based on the degree to which the proposed natural gas transmission pipeline or corridor is consistent with the applicable portions of the state comprehensive plan and other matters within its jurisdiction. The Department of Economic Opportunity may also comment on the consistency of the proposed natural gas transmission pipeline or corridor with applicable strategic regional policy plans or local comprehensive plans and land development regulations.

4.   The Fish and Wildlife Conservation Commission shall prepare a report as to the impact of each proposed natural gas transmission pipeline or corridor on fish and wildlife resources and other matters within its jurisdiction.

5.   Each local government in which the natural gas transmission pipeline or natural gas transmission pipeline corridor will be located shall prepare a report as to the impact of each proposed natural gas transmission pipeline or corridor on matters within its jurisdiction, including the consistency of the proposed natural gas transmission pipeline or corridor with all applicable local ordinances, regulations, standards, or criteria that apply to the proposed natural gas transmission pipeline or corridor, including local comprehensive plans, zoning regulations, land development regulations, and any applicable local environmental regulations adopted pursuant to s. 403.182 or by other means. No change by the responsible local government or local agency in local comprehensive plans, zoning ordinances, or other regulations made after the date required for the filing of the local government's report required by this section shall be applicable to the certification of the proposed natural gas transmission pipeline or corridor unless the certification is denied or the application is withdrawn.

6.   The Department of Transportation shall prepare a report on the effect of the natural gas transmission pipeline or natural gas transmission pipeline corridor on matters within its jurisdiction, including roadway crossings by the pipeline. The report shall contain at a minimum:

a.   A report by the applicant to the department stating that all requirements of the department's utilities accommodation guide have been or will be met in regard to the proposed pipeline or pipeline corridor; and

b.   A statement by the department as to the adequacy of the report to the department by the applicant.

7.   The Department of State, Division of Historical Resources, shall prepare a report on the impact of the natural gas transmission pipeline or natural gas transmission pipeline corridor on matters within its jurisdiction.

8.   The commission shall prepare a report addressing matters within its jurisdiction. The commission's report shall include its determination of need issued pursuant to s. 403.9422.

(b)   Each report shall contain the information on variances required by s. 403.9416(2) and proposed conditions of certification on matters within the jurisdiction of each agency. For each condition proposed by an agency, the agency shall list the specific statute, rule, or ordinance, as applicable, which authorizes the proposed condition.

(c)   Each reviewing agency shall initiate the activities required by this section no later than 15 days after the complete application is distributed. Each agency shall keep the applicant and the department informed as to the progress of its studies and any issues raised thereby.

(3)   The department shall prepare a written analysis which contains a compilation of agency reports and summaries of the material contained therein which shall be filed with the administrative law judge and served on all parties no later than 115 days after the application has been determined sufficient, and which shall include:

(a)   The studies and reports required by this section and s. 403.9422.

(b)   Comments received from any other agency or person.

(c)   The recommendation of the department as to the disposition of the application; of variances, exemptions, exceptions, or other relief identified by any party; and of any proposed conditions of certification which the department believes should be imposed.

(4)   The failure of any agency to submit a preliminary statement of issues or a report, or to submit its preliminary statement of issues or report within the allowed time, shall not be grounds for the alteration of any time limitation in ss. 403.9401-403.9425 pursuant to s. 403.9414. Neither the failure to submit a preliminary statement of issues or a report, nor the inadequacy of the preliminary statement of issues or report, shall be grounds to deny or condition certification. However, the failure of an agency to raise issues in its report shall preclude the agency from raising those issues at the certification hearing.

History.—s. 1, ch. 92-284; s. 433, ch. 94-356; s. 16, ch. 95-149; s. 175, ch. 96-410; s. 216, ch. 99-245; s. 294, ch. 2011-142; s. 27, ch. 2015-30.

**403.9411   Notice; proceedings; parties and participants.**—

(1)(a)   No later than 15 days after an application has been determined complete, the applicant shall arrange for publication of a notice of the application and of the proceedings required by ss. 403.9401-403.9425. Such notice shall give notice of the provisions of s. 403.9416(1) and (2).

(b)   The applicant shall arrange for publication of a notice of the certification hearing and other public hearings provided for in this section and notice of the deadline for filing of notice of intent to be a party. Such notices shall be published at least 80 days before the date set for the hearing.

(c)   The applicant shall arrange for publication of a reminder notice in the newspapers specified in paragraph (d) no more than 10 days prior to the certification hearing, reminding the public of the date and location of the hearing. This notice shall not constitute a point of entry for intervention in the proceeding.

(d)   Notices to be published by the applicant shall be published in newspapers of general circulation within counties crossed by the natural gas transmission pipeline corridors proper for certification. The required newspaper notices, other than the reminder notice, shall be one-half page in size in a standard size newspaper or a full page in a tabloid size newspaper and published in a section of the newspaper other than the legal notices section. These notices shall include a map generally depicting all natural gas transmission pipeline corridors proper for certification. A newspaper of general circulation shall be the newspaper within a county crossed by a natural gas transmission pipeline corridor proper for certification, which newspaper has the largest daily circulation in that county and has its principal office in that county. If the newspaper with the largest daily circulation has its principal office outside the county, the notices shall appear in both the newspaper having the largest circulation in that county and in a newspaper authorized to publish legal notices in that county.

(e)   The department shall publish in the Florida Administrative Register notices of the application; of the certification hearing; of the hearing before the board; and of stipulations, proposed agency action, or petitions for modification.

(f)   The department shall adopt rules specifying the content of notices required by this section. All notices published by the applicant shall be paid for by the applicant and shall be in addition to the application fee.

(2)   No later than 215 days after receipt of a complete application by the department, the administrative law judge shall conduct a certification hearing pursuant to ss. 120.569 and 120.57 at a central location in proximity to the proposed natural gas transmission pipeline or corridor. One public hearing where members of the public who are not parties to the certification hearing may testify shall be held within the boundaries of each county, at the option of any local government. The local government shall notify the administrative law judge and all parties not later than 50 days after the receipt of a complete application as to whether the local government wishes to have such a public hearing. The local government shall be responsible for determining the location of the public hearing. Within 5 days after such notification, the administrative law judge shall determine the date of such public hearing, which shall be held before or during the certification hearing. In the event two or more local governments within one county request such a public hearing, the hearing shall be consolidated so that only one such public hearing is held in any county. The location of a consolidated hearing shall be determined by the administrative law judge. If a local government does not request a public hearing within 50 days after the receipt of a complete application, persons residing within the jurisdiction of such local government may testify at the public hearing portion of the certification hearing.

(3)(a)   At the conclusion of the certification hearing, the administrative law judge shall, after consideration of all evidence of record, issue a recommended order disposing of the application no later than 60 days after the transcript of the certification hearing and the public hearings is filed with the Division of Administrative Hearings. The recommended order shall include findings of fact and conclusions of law to enable the board to effect the balance in s. 403.9415(4).

(b)   Any exceptions to a recommended order shall be filed with the clerk of the department, within 15 days after the date the order is rendered.

(4)(a)   Parties to the proceeding shall be:

1.   The applicant.

2.   The department.

3.   The commission.

4.   The Department of Economic Opportunity.

5.   The Fish and Wildlife Conservation Commission.

6.   Each water management district in the jurisdiction of which the proposed natural gas transmission pipeline or corridor is to be located.

7.   The local government.

8.   The Department of Transportation.

9.   The Department of State, Division of Historical Resources.

(b)   Any party listed in paragraph (a), other than the department or the applicant, may waive its right to participate in these proceedings. If any listed party fails to file a notice of its intent to be a party on or before the 30th day prior to the certification hearing, such party shall be deemed to have waived its right to be a party.

(c)   Notwithstanding the provisions of chapter 120 to the contrary, upon the filing with the administrative law judge of a notice of intent to be a party by an agency, corporation, or association described in subparagraph 1. or subparagraph 2., or a petition for intervention by a person described in subparagraph 3., no later than 30 days prior to the date set for the certification hearing, the following shall also be parties to the proceeding:

1.   Any agency not listed in paragraph (a) as to matters within its jurisdiction.

2.   Any domestic nonprofit corporation or association formed, in whole or in part, to promote conservation of natural beauty; to protect the environment, personal health, or other biological values; to preserve historical sites; to promote consumer interests; to represent labor, commercial, or industrial groups; or to promote

comprehensive planning or orderly development of the area in which the proposed natural gas transmission pipeline or corridor is to be located.

3.   Any person whose substantial interests are affected and being determined by the proceeding.

4.   Any agency whose properties or works might be affected shall be made a party upon the request of the agency or any party to this proceeding.

(5)   At an appropriate time in the hearing, members of the public who are not parties shall be given an opportunity to present unsworn oral or written communications to the administrative law judge. The administrative law judge shall give parties an opportunity to challenge or rebut such communications.

(6)   The order of presentation at the certification hearing, unless otherwise changed by the administrative law judge to ensure the orderly presentation of witnesses and evidence, shall be:

(a)   The applicant.

(b)   The department.

(c)   State agencies.

(d)   Regional agencies, including water management districts.

(e)   Local governments.

(f)   Other parties.

(7)   The applicant shall pay those expenses and costs associated with the conduct of the hearings and the recording and transcription of the proceedings.

History.—s. 1, ch. 92-284; s. 434, ch. 94-356; s. 57, ch. 95-144; s. 176, ch. 96-410; s. 217, ch. 99-245; s. 295, ch. 2011-142; s. 44, ch. 2013-14; s. 28, ch. 2015-30.

**403.9412    Alternate corridors.**—

(1)   No later than 50 days prior to the originally scheduled certification hearing, any party may propose alternate natural gas transmission pipeline corridor routes for consideration pursuant to ss. 403.9401-403.9425.

(a)   A notice of any such proposed alternate corridor shall be filed with the administrative law judge, all parties, and any local governments in whose jurisdiction the alternate corridor is proposed. Such filing shall include the most recent United States Geological Survey 1:24,000 quadrangle maps specifically delineating the corridor boundaries, a description of the proposed corridor, and a statement of the reasons the proposed alternate corridor should be certified.

(b)   Within 7 days after receipt of such notice, the applicant and the department shall file with the administrative law judge and all parties a notice of acceptance or rejection of a proposed alternate corridor for consideration. If the alternate corridor is rejected either by the applicant or the department, the certification hearing and the public hearings shall be held as scheduled. If both the applicant and the department accept a proposed alternate corridor for consideration, the certification hearing and the public hearings shall be rescheduled, if necessary. If rescheduled, the certification hearing shall be held no later than 135 days after the previously scheduled certification hearing, unless additional time is needed due to the alternate corridor crossing a local government jurisdiction not previously affected, in which case the remainder of the schedule listed in this section shall be appropriately adjusted by the administrative law judge to allow that local government to prepare a report pursuant to s. 403.941(2)(a)5.

(c)   Notice pursuant to s. 403.9411(1)(b) and (c) shall be published.

(d)   Within 25 days after acceptance of an alternate corridor by the department and the applicant, the party proposing an alternate corridor shall have the burden of providing additional data to the agencies listed in s. 403.941 necessary for the preparation of a supplementary report on the proposed alternate corridor.

(e)   If the department determines within 15 days that this additional data is insufficient, the party proposing the alternate corridor shall file such additional data that corrects the insufficiency within 15 days after the filing of the department's determination. If such additional data is determined insufficient, such insufficiency of data shall be deemed a withdrawal of the proposed alternate corridor. The party proposing an alternate corridor shall have the burden of proof on the certifiability, pursuant to s. 403.9415(4), of the alternate corridor at the certification

hearing. Sections 403.9401-403.9425 do not require the applicant or agencies not proposing the alternate corridor to submit data in support of such alternate corridor.

(f) The agencies listed in s. 403.941 shall file supplementary reports addressing the proposed alternate corridors no later than 45 days after additional data submitted pursuant to paragraph (e) is determined sufficient. The agencies shall submit supplementary notice pursuant to s. 403.9416(2) at the time of filing of their supplemental report.

(g) The department shall prepare a written analysis consistent with s. 403.941(3) at least 40 days prior to the rescheduled certification hearing addressing the proposed alternate corridor.

(2) If the original certification hearing date is rescheduled, the rescheduling shall not provide the opportunity for parties to file additional alternate corridors to the applicant's proposed corridor or any accepted alternate corridor. However, an amendment to the application which changes the alignment of the applicant's proposed corridor shall require rescheduling of the certification hearing, if necessary, so as to allow time for a party to file alternate corridors to the realigned proposed corridor for which the application has been amended. Any such alternate corridor proposal shall have the same starting and ending points as the realigned portion of the corridor proposed by the applicant's amendment, provided that the administrative law judge for good cause shown may authorize another starting or ending point in the area of the applicant's amended corridor.

(3) Notwithstanding the rejection of a proposed alternate corridor by the applicant or the department, any party may present evidence at the certification hearing to show that a corridor proper for certification does not satisfy the criteria listed in s. 403.9415 or that a rejected alternate corridor would meet the criteria set forth in s. 403.9415. No evidence shall be admitted at the certification hearing on any alternate corridor, unless the alternate corridor was proposed by the filing of a notice at least 50 days prior to the originally scheduled certification hearing pursuant to this section. Rejected alternate corridors shall be considered by the board as provided in s. 403.9415(4) and (5).

(4) If an alternate corridor is accepted by the applicant and the department pursuant to a notice of acceptance as provided in this subsection and such corridor is ultimately determined to be the corridor that would meet the criteria set forth in s. 403.9415(4) and (5), the board shall certify that corridor.

History.—s. 1, ch. 92-284; s. 435, ch. 94-356; s. 177, ch. 96-410.


### 403.9413    Amendment to the application.—

(1) Any amendment made to the application shall be sent by the applicant to the administrative law judge and to all parties to the proceeding.

(2) Any amendment to the application made prior to certification shall be disposed of as part of the original certification proceeding. Amendment of the application may be considered good cause for alteration of time limits pursuant to s. 403.9414.

History.—s. 1, ch. 92-284; s. 178, ch. 96-410.


### 403.9414    Alteration of time limits.—Any time limitation in ss. 403.9401-403.9425 may be altered by the administrative law judge upon stipulation between the department and the applicant unless objected to by any party within 5 days after notice or for good cause shown.

History.—s. 1, ch. 92-284; s. 179, ch. 96-410.


### 403.9415    Final disposition of application.—

(1) Within 60 days after receipt of the administrative law judge's recommended order, the board shall act upon the application by written order, approving in whole, approving with such conditions as the board deems appropriate, or denying the certification and stating the reasons for issuance or denial.

(2) The issues that may be raised in any hearing before the board shall be limited to matters raised in the certification proceeding before the administrative law judge or raised in the recommended order. All parties, or their representatives, or persons who appear before the board shall be subject to the provisions of s. 120.66.

(3) If certification is denied, the board shall set forth in writing the action the applicant would have to take to secure the approval of the application by the board.

(4)    In determining whether an application should be approved in whole, approved with modifications or conditions, or denied, the board shall consider whether, and the extent to which, the location of the natural gas transmission pipeline corridor and the construction and maintenance of the natural gas transmission pipeline will effect a reasonable balance between the need for the natural gas transmission pipeline as a means of providing natural gas energy and the impact upon the public and the environment resulting from the location of the natural gas transmission pipeline corridor and the construction, operation, and maintenance of the natural gas transmission pipeline. In effecting this balance, the board shall consider, based on all relevant, competent and substantial evidence in the record, subject to s. 120.57(1)(l), whether and the extent to which the project will:

(a)    Ensure natural gas delivery reliability and integrity;

(b)    Meet the natural gas energy needs of the state in an orderly and timely fashion;

(c)    Comply with the nonprocedural requirements of agencies;

(d)    Adversely affect historical sites and the natural environment;

(e)    Adversely affect the health, safety, and welfare of the residents of the affected local government jurisdictions;

(f)    Be consistent with applicable local government comprehensive plans and land development regulations; and

(g)    Avoid densely populated areas to the maximum extent feasible. If densely populated areas cannot be avoided, locate, to the maximum extent feasible, within existing utility corridors or rights-of-way.

(5)(a)    Any natural gas transmission pipeline corridor certified by the board shall meet the criteria of this section. When more than one natural gas transmission pipeline corridor is proper for certification pursuant to s. 403.94055(2) and meets the criteria of this section, the board shall certify the natural gas transmission pipeline corridor that has the least adverse impact regarding the criteria in subsection (4), including costs.

(b)    If the board finds that an alternate corridor rejected pursuant to s. 403.9412 meets the criteria of subsection (4) and has the least adverse impact regarding the criteria in subsection (4) of all corridors that meet the criteria of subsection (4), the board shall deny certification or shall allow the applicant to submit an amended application to include such corridor.

(c)    If the board finds that two or more of the corridors that comply with the provisions of subsection (4) have the least adverse impacts regarding the criteria in subsection (4) and that such corridors are substantially equal in adverse impacts regarding the criteria in subsection (4), the board shall certify the corridor preferred by the applicant if the corridor is one proper for certification pursuant to s. 403.94055(2).

(6)    The issuance or denial of the certification by the board shall be the final administrative action required as to that application.

(7)    Within 60 days after the date a certification becomes final, an applicant which has been authorized to locate a pipeline right-of-way within a certified corridor shall pay to the department the appropriate postcertification fee prescribed by s. 403.9421(2). Failure of an applicant to pay its postcertification fee in a timely manner shall be grounds for revocation of its authorization to locate a pipeline right-of-way in the certified corridor.

(8)    An applicant which has been authorized to locate a pipeline right-of-way within a certified corridor shall file documents with the department prior to construction, identifying the location of the right-of-way within the certified corridor.

History.—s. 1, ch. 92-284; s. 180, ch. 96-410; s. 40, ch. 2000-153.

### 403.9416    Effect of certification.—

(1)    Subject to the conditions set forth therein, certification shall constitute the sole license of the state and any agency as to the approval of the location of a natural gas transmission pipeline corridor and, except for permits issuable pursuant to a federally delegated or approved permit program and permits issuable under s. 403.0872 or s. 403.0885, for the construction and maintenance of a natural gas transmission pipeline therein. The certification shall be valid for the life of the natural gas transmission pipeline. If construction on, or condemnation or acquisition of, the right-of-way is not commenced within 5 years after the date of certification or such later date as may be authorized by the board, the certification shall become void.

(2)(a)   The certification shall authorize the applicant to locate the natural gas transmission pipeline corridor and to construct and maintain the natural gas transmission pipelines subject only to the conditions of certification set forth in such certification.

(b)   The certification may include conditions which constitute variances and exemptions from nonprocedural standards or regulations of the department or any other agency which were expressly considered during the proceeding unless waived by the agency as provided in this paragraph and which otherwise would be applicable to the location of the proposed natural gas transmission pipeline corridor or the construction and maintenance of the natural gas transmission pipelines. Each party shall notify the applicant and other parties at the time scheduled for the filing of the agency reports of any nonprocedural requirements not specifically listed in the application from which a variance, exemption, exception, or other relief is necessary in order for the board to certify any corridor proposed for certification. However, no variance shall be granted from standards or regulations of the department applicable under any federally delegated or approved permit program, except as expressly allowed in such program. Failure of such notification shall be treated as a waiver from the nonprocedural requirements of that agency.

(3)   The certification shall be in lieu of any license, permit, certificate, or similar document required by any agency pursuant to, but not limited to, chapter 125, chapter 161, chapter 163, chapter 166, chapter 186, chapter 253, chapter 258, chapter 298, chapter 373, chapter 376, chapter 377, chapter 379, chapter 380, chapter 381, chapter 403, the Florida Transportation Code, or 33 U.S.C. s. 1341. On certification, any license, easement, or other interest in state lands, except those the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund or a water management district created pursuant to chapter 373, shall be issued by the appropriate agency as a ministerial act. The applicant shall be required to seek any necessary interest in state lands the title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund from the board of trustees or from the governing board of the water management district before, during, or after the certification proceeding, and certification may be made contingent upon issuance of the appropriate interest in realty. However, neither the applicant nor any party to the certification proceeding may directly or indirectly raise or relitigate any matter which was or could have been an issue in the certification proceeding in any proceeding before the Board of Trustees of the Internal Improvement Trust Fund wherein the applicant is seeking a necessary interest in state lands, but the information presented in the certification proceeding shall be available for review by the board of trustees and its staff.

(4)   No term or condition of certification shall be interpreted to preclude the postcertification exercise by any party of whatever procedural rights it may have under chapter 120, including those related to rulemaking proceedings.

(5)   A certification does not represent an exclusive license limiting the number of natural gas transmission pipelines which may be located within the geographical boundaries of a certified corridor, nor shall it prevent a natural gas transmission pipeline company which has been issued a certificate of public convenience and necessity under s. 7(c) of the Natural Gas Act, 15 U.S.C. s. 717f, from obtaining permits from this state for the construction of such pipeline within the geographical area encompassed by a certified corridor, upon the satisfaction of applicable permitting criteria. No term or condition of an existing certification shall be interpreted to preclude an applicant from submitting an application for certification of a natural gas transmission pipeline corridor which encompasses part or all of an existing certified corridor.

(6)   No term or condition of a site certification shall be interpreted to supersede or control the provisions of a final permit issued pursuant to a federally delegated or approved permit program, including any permit issued under s. 403.0872 or s. 403.0885.

(7)   This act shall not in any way affect the right of any local government to charge appropriate fees.

**History.**—s. 1, ch. 92-284; s. 13, ch. 94-321; s. 55, ch. 2009-21; s. 75, ch. 2013-15.

**403.9417   Recording of notice of certified corridor route.**—Within 60 days after certification of a natural gas transmission pipeline corridor pursuant to ss. 403.9401-403.9425, the applicant shall file, in accordance with s. 28.222, with the clerk of the circuit court for each county through which the corridor will pass, a notice of the

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 267 of 694

certified route. The notice shall consist of maps or aerial photographs in the scale of 1:24,000 which clearly show the location of the certified route and shall state that the certification of the corridor will result in the acquisition of rights-of-way within the corridor. Each clerk shall record the filing in the official record of the county for the duration of the certification or until such time as the applicant certifies to the clerk that all lands required for the natural gas transmission pipeline rights-of-way within the corridor have been acquired within such county, whichever is sooner. The recording of this notice shall not constitute a lien, cloud, or encumbrance on real property.

History.—s. 1, ch. 92-284.

**403.9418     Modification of certification.—**

(1)   A certification may be modified after issuance in any one of the following ways:

(a)   The board may delegate to the department the authority to modify specific conditions in the certification.

(b)   The department may modify the terms and conditions of the certification if no party objects in writing to such modification within 45 days after notice by mail to the last address of record in the certification proceeding, and, if no other person whose substantial interests will be affected by the modification objects in writing within 30 days after issuance of public notice. If objections are raised, the applicant or department may file a petition for modification with the department and the Division of Administrative Hearings setting forth:

1.   The proposed modification.

2.   The factual reasons asserted for the modification.

3.   The anticipated additional environmental effects of the proposed modification.

(2)   Petitions filed pursuant to paragraph (1)(b) shall be disposed of in the same manner as an application but within the times established by the administrative law judge commensurate with the significance of the modification requested.

(3)   In the event that any of the terms and conditions of any permit issued pursuant to a federally delegated or approved permit program are modified under the requirements of the program and the modified permit conflicts with the terms and conditions of the site certification, the terms and conditions of the permit shall control and the site certification shall be deemed modified to incorporate the permit requirements.

History.—s. 1, ch. 92-284; s. 14, ch. 94-321; s. 181, ch. 96-410.

**403.9419     Enforcement of compliance.—**Failure to obtain a certification, to comply with the conditions of certification, or to comply with ss. 403.9401-403.9425 shall constitute a violation of this chapter. The department shall enforce compliance with the conditions of certification issued under ss. 403.9401-403.9425, in accordance with the provisions of ss. 403.061 and 403.121.

History.—s. 1, ch. 92-284.

**403.942     Superseded laws, regulations, and certification power.—**

(1)   Except for those provisions related to or rules adopted pursuant to a federally delegated or approved permit program, including ss. 403.0872 and 403.0885, if any provision of ss. 403.9401-403.9425 is in conflict with any other provision, limitation, or restriction under any law, rule, regulation, or ordinance of this state or any political subdivision, municipality, or agency, ss. 403.9401-403.9425 shall control and such law, rule, regulation, or ordinance shall be deemed superseded.

(2)   The state preempts the certification and regulation of natural gas transmission pipelines and natural gas transmission pipeline corridors subject to ss. 403.9401-403.9425.

History.—s. 1, ch. 92-284; s. 15, ch. 94-321; s. 27, ch. 2015-4.

**403.9421     Fees; disposition.—**The department shall charge the applicant the following fees, as appropriate, which shall be paid into the Florida Permit Fee Trust Fund:

(1)   An application fee of $240,000, plus $500 per mile for each mile of natural gas transmission pipeline corridor proposed to be located in an existing electrical transmission line right-of-way or in existing rights-of-way for roads, highways, railroads, gas, water, oil, sewer, or any other public purpose, and $1,000 per mile for each

mile of natural gas transmission pipeline proposed to be located outside existing rights-of-way, not to exceed a total fee of $890,000.

(2)    A postcertification fee determined as follows:

(a)    For pipelines of 50 miles or less in total length, the fee shall be $75,000.

(b)    For pipelines of between 50 and 150 miles in total length, the fee shall be $125,000.

(c)    For pipelines of a total length greater than 150 miles, the fee shall be $175,000.

(3)    An application amendment fee which shall apply only when a corridor alignment change is proposed by an applicant prior to the issuance of the department's written analysis as to a proposed corridor.

(a)    The fee shall be $5,000 plus $500 for each mile of natural gas transmission pipeline corridor proposed to be located in an existing electrical transmission line right-of-way or in existing rights-of-way for roads, highways, railroads, gas, water, oil, sewer, or any other public purpose, and $1,000 per mile for each mile of natural gas transmission pipeline proposed to be located outside existing rights-of-way.

(b)    No fee shall be required if an applicant adopts an alternate corridor alignment which is timely proposed under s. 403.9412.

(4)    A certification modification fee determined as follows:

(a)    If no corridor alignment change is involved, the fee shall be $10,000.

(b)    If a corridor alignment change is proposed, the fee shall be $10,000 plus $500 for each mile of natural gas transmission pipeline corridor proposed to be located in an existing electrical transmission line right-of-way or in existing rights-of-way for roads, highways, railroads, gas, water, oil, sewer, or any other public purpose, and $1,000 per mile for each mile of natural gas transmission pipeline proposed to be located outside existing rights-of-way.

(5)    In administering fee revenues received under this section, the department shall allocate the funds as follows:

(a)    The department shall retain fee revenues to be utilized as follows:

1.    Fifty percent of the fees specified under this section, except for postcertification fees, shall be retained by the department to cover its costs associated with reviewing and acting upon applications and requests for modification of certification.

2.    Sixty percent of postcertification fees shall be retained by the department exclusively to cover its costs associated with postcertification review of natural gas transmission pipeline rights-of-way which are established, constructed, and maintained under certification issued under ss. 403.9401-403.9425.

(b)    Sixteen percent of the fees specified under this section, except for postcertification fees, shall be transferred to the Operating Trust Fund of the Division of Administrative Hearings to cover its costs associated with reviewing and hearing applications, amendments, modifications, and disputes related to ss. 403.9401-403.9425.

(c)    The balance of fees remaining shall be used by the department to reimburse affected agencies included in s. 403.941(2)(a) for costs incurred in application and postcertification review, respectively.

1.    For application processing costs, upon presentation by an affected agency of a proper itemized accounting within 90 days after the date of the board's order approving certification or the date on which a pending application is otherwise disposed of, the department shall reimburse the agencies for authorized costs from the fee balances remaining. Such reimbursement shall be authorized for studies and the preparation of any reports required of the agencies by ss. 403.9401-403.9425, for agency travel and per diem to attend any hearing held, and for participation in the proceedings. In the event the amount available for allocation is insufficient to provide for complete reimbursement to the agencies, reimbursement shall be on a prorated basis. If any sums are remaining, the department shall retain them for use in the same manner as is otherwise authorized by this section; however, if the certification application is withdrawn, the remaining sums shall be refunded to the applicant within 120 days after withdrawal.

2.    For postcertification costs, an invoice may be submitted on an annual basis, commencing from the date of certification, for expenses incurred by affected agencies conducting postcertification review work pursuant to the conditions of certification. In the event the amount available for allocation is insufficient to provide for complete reimbursement to the agencies, reimbursement shall be on a prorated basis.

**History.**—s. 1, ch. 92-284; s. 70, ch. 96-321; s. 15, ch. 2006-79.

**403.9422**    **Determination of need for natural gas transmission pipeline; powers and duties.**—

(1)(a)    Upon request by an applicant or upon its own motion, the commission shall schedule a public hearing, after notice, to determine the need for a natural gas transmission pipeline regulated by ss. 403.9401-403.9425. Such notice shall be published at least 45 days before the date set for the hearing and shall be published in at least one-quarter page size in newspapers of general circulation and in the Florida Administrative Register, by giving notice to counties and regional planning councils in whose jurisdiction the natural gas transmission pipeline could be placed, and by giving notice to any persons who have requested to be placed on the mailing list of the commission for this purpose. Within 21 days after receipt of a request for determination by an applicant, the commission shall set a date for the hearing. The hearing shall be held pursuant to s. 350.01 within 75 days after the filing of the request, and a decision shall be rendered within 90 days after such filing.

(b)    In the determination of need, the commission shall take into account the need for natural gas delivery reliability, safety, and integrity; the need for abundant, clean-burning natural gas to assure the economic well-being of the public; the appropriate commencement and terminus of the line; and other matters within its jurisdiction deemed relevant to the determination of need.

(c)    The commission shall be the sole forum for the determination of need. The determination by the commission of the need for the natural gas transmission pipeline is binding on all parties to any certification proceeding pursuant to ss. 403.9401-403.9425 and is a condition precedent to the conduct of the certification hearing prescribed therein. An order entered pursuant to this section constitutes final agency action.

(d)    For pipelines regulated under the Natural Gas Act, 15 U.S.C. ss. 717f et seq., a certificate of public convenience and necessity under s. 7(c) of the Natural Gas Act is considered equivalent to the determination of need by the commission for all purposes under ss. 403.9401-403.9425, notwithstanding any provision in paragraph (c) to the contrary.

(2)    The commission shall have the following powers and duties:

(a)    To adopt or amend reasonable procedural rules to implement the provisions of this section.

(b)    To prescribe the form, content, and necessary supporting documentation and the required studies for the determination of need.

(3)    Any time limitation in this section may be altered by the commission upon stipulation between the commission and the applicant or for good cause shown by any party.

History.—s. 1, ch. 92-284; s. 45, ch. 2013-14.

**403.9423**    **Certification admissible in eminent domain proceedings; attorney's fees and costs.**—

(1)    Certification pursuant to ss. 403.9401-403.9425 shall be admissible as evidence of public need and necessity in proceedings under chapter 73 or chapter 74.

(2)    No party may rely on this section or any provision of chapter 73 or chapter 74 to request the award of attorney's fees or costs incurred as a result of participation in the certification proceeding.

History.—s. 1, ch. 92-284.

**403.9424**    **Local governments; informational public meetings.**—

(1)    Local governments may hold informational public meetings in addition to the hearings specifically authorized by ss. 403.9401-403.9425 on any matter associated with the natural gas transmission pipeline siting proceeding. Such informational public meetings should be held no later than 80 days after the complete application is filed. The purpose of an informational public meeting is for the local government to further inform the public about the natural gas transmission pipeline proposed, obtain comments from the public, and formulate its recommendation with respect to the proposed natural gas transmission pipeline. Neither the meetings held nor the recommendations made by the local government pursuant to this section shall address the need for the pipeline.

(2)    Informational public meetings shall be held solely at the option of each local government. It is the legislative intent that local governments attempt to hold such public meetings. Parties to the proceedings under ss. 403.9401-403.9425 shall be encouraged to attend; however, no party shall be required to attend such informational public meetings.

(3)   The failure to hold an informational public meeting or the procedure used for the informational public meeting shall not be grounds for the alteration of any time limitation in ss. 403.9401-403.9425 pursuant to s. 403.9414 or grounds to deny or condition certification.

History.—s. 1, ch. 92-284.

**403.9425     Revocation or suspension of certification.**—Any certification may be revoked or suspended:

(1)   For any material false statement in the application or in the supplemental or additional statements of fact or studies required of the applicant when a true answer would have warranted the board's refusal to recommend a certification in the first instance.

(2)   For failure to comply with the terms or conditions of the certification.

(3)   For violation of the provisions of ss. 403.9401-403.9425 or rules or orders issued thereunder.

History.—s. 1, ch. 92-284.

PART IX

EXPEDITED PERMITTING

403.973   Expedited permitting; amendments to comprehensive plans.

**403.973       Expedited permitting; amendments to comprehensive plans.**—

(1)   It is the intent of the Legislature to encourage and facilitate the location and expansion of those types of economic development projects which offer job creation and high wages, strengthen and diversify the state's economy, and have been thoughtfully planned to take into consideration the protection of the state's environment. It is also the intent of the Legislature to provide for an expedited permitting and comprehensive plan amendment process for such projects.

(2)   As used in this section, the term:

(a)   "Duly noticed" means publication in a newspaper of general circulation in the municipality or county with jurisdiction. The notice shall appear on at least 2 separate days, one of which shall be at least 7 days before the meeting. The notice shall state the date, time, and place of the meeting scheduled to discuss or enact the memorandum of agreement, and the places within the municipality or county where such proposed memorandum of agreement may be inspected by the public. The notice must be one-eighth of a page in size and must be published in a portion of the paper other than the legal notices section. The notice shall also advise that interested parties may appear at the meeting and be heard with respect to the memorandum of agreement.

(b)   "Jobs" means permanent, full-time equivalent positions not including construction jobs.

(c)   "Permit applications" means state permits and licenses, and at the option of a participating local government, local development permits or orders.

(d)   "Secretary" means the Secretary of Environmental Protection or his or her designee.

(3)(a)   The secretary shall direct the creation of regional permit action teams for the purpose of expediting review of permit applications and local comprehensive plan amendments submitted by:

1.   Businesses creating at least 50 jobs or a commercial or industrial development project that will be occupied by businesses that would individually or collectively create at least 50 jobs; or

2.   Businesses creating at least 25 jobs if the project is located in an enterprise zone, or in a county having a population of fewer than 75,000 or in a county having a population of fewer than 125,000 which is contiguous to a county having a population of fewer than 75,000, as determined by the most recent decennial census, residing in incorporated and unincorporated areas of the county.

(b)   On a case-by-case basis and at the request of a county or municipal government, the Department of Economic Opportunity may certify as eligible for expedited review a project not meeting the minimum job creation thresholds but creating a minimum of 10 jobs. The recommendation from the governing body of the county or municipality in which the project may be located is required in order for the Department of Economic Opportunity to certify that any project is eligible for expedited review under this paragraph. When considering projects that do not meet the minimum job creation thresholds but that are recommended by the governing body in which the

project may be located, the Department of Economic Opportunity shall consider economic impact factors that include, but are not limited to:

1.    The proposed wage and skill levels relative to those existing in the area in which the project may be located;

2.    The project's potential to diversify and strengthen the area's economy;

3.    The amount of capital investment; and

4.    The number of jobs that will be made available for persons served by the welfare transition program.

(c)    At the request of a county or municipal government, the Department of Economic Opportunity or a Quick Permitting County may certify projects located in counties where the ratio of new jobs per participant in the welfare transition program, as determined by CareerSource Florida, Inc., is less than one or otherwise critical, as eligible for the expedited permitting process. Such projects must meet the numerical criteria for job creation specified in this subsection, but the jobs created by the project do not have to be high-wage jobs that diversify the state's economy.

(d)    Projects located in a designated brownfield area are eligible for the expedited permitting process.

(e)    Projects that are part of the state-of-the-art biomedical research institution and campus to be established in this state by the grantee under s. 288.955 are eligible for the expedited permitting process, if the projects are designated as part of the institution or campus by the board of county commissioners of the county in which the institution and campus are established.

(f)    Projects resulting in the production of biofuels cultivated on lands that are 1,000 acres or more or in the construction of a biofuel or biodiesel processing facility or a facility generating renewable energy, as defined in s. 366.91(2)(d), are eligible for the expedited permitting process.

(g)    Projects for natural gas storage facilities that are permitted under chapter 377 are eligible for the expedited permitting process.

(h)    Projects to construct interstate natural gas pipelines subject to certification by the Federal Energy Regulatory Commission are eligible for the expedited permitting process.

(4)    The regional teams shall be established through the execution of a project-specific memorandum of agreement developed and executed by the applicant and the secretary, with input solicited from the respective heads of the Department of Transportation and its district offices, the Department of Agriculture and Consumer Services, the Fish and Wildlife Conservation Commission, appropriate regional planning councils, appropriate water management districts, and voluntarily participating municipalities and counties. The memorandum of agreement should also accommodate participation in this expedited process by other local governments and federal agencies as circumstances warrant.

(5)    In order to facilitate local government's option to participate in this expedited review process, the secretary shall, in cooperation with local governments and participating state agencies, create a standard form memorandum of agreement. The standard form of the memorandum of agreement shall be used only if the local government participates in the expedited review process. In the absence of local government participation, only the project-specific memorandum of agreement executed pursuant to subsection (4) applies. A local government shall hold a duly noticed public workshop to review and explain to the public the expedited permitting process and the terms and conditions of the standard form memorandum of agreement.

(6)    The local government shall hold a duly noticed public hearing to execute a memorandum of agreement for each qualified project. Notwithstanding any other provision of law, and at the option of the local government, the workshop provided for in subsection (5) may be conducted on the same date as the public hearing held under this subsection. The memorandum of agreement that a local government signs shall include a provision identifying necessary local government procedures and time limits that will be modified to allow for the local government decision on the project within 90 days. The memorandum of agreement applies to projects, on a case-by-case basis, that qualify for special review and approval as specified in this section. The memorandum of agreement must make it clear that this expedited permitting and review process does not modify, qualify, or otherwise alter existing local government nonprocedural standards for permit applications, unless expressly authorized by law.

(7) Appeals of local government comprehensive plan approvals for a project shall be pursuant to the summary hearing provisions of s. 120.574, pursuant to subsection (14), and consolidated with the challenge of any applicable state agency actions.

(8) Each memorandum of agreement shall include a process for final agency action on permit applications and local comprehensive plan amendment approvals within 90 days after receipt of a completed application, unless the applicant agrees to a longer time period or the secretary determines that unforeseen or uncontrollable circumstances preclude final agency action within the 90-day timeframe. Permit applications governed by federally delegated or approved permitting programs whose requirements would prohibit or be inconsistent with the 90-day timeframe are exempt from this provision, but must be processed by the agency with federally delegated or approved program responsibility as expeditiously as possible.

(9) The secretary shall inform the Legislature by October 1 of each year which agencies have not entered into or implemented an agreement and identify any barriers to achieving success of the program.

(10) The memoranda of agreement may provide for the waiver or modification of procedural rules prescribing forms, fees, procedures, or time limits for the review or processing of permit applications under the jurisdiction of those agencies that are members of the regional permit action team. Notwithstanding any other provision of law to the contrary, a memorandum of agreement must to the extent feasible provide for proceedings and hearings otherwise held separately to be combined into one proceeding or held jointly and at one location. Such waivers or modifications are not authorized for permit applications governed by federally delegated or approved permitting programs, the requirements of which would prohibit, or be inconsistent with, such a waiver or modification.

(11) The memoranda of agreement shall include guidelines to be used in working with state, regional, and local permitting authorities. Guidelines may include, but are not limited to, the following:

(a) A central contact point for filing permit applications and local comprehensive plan amendments and for obtaining information on permit and local comprehensive plan amendment requirements.

(b) Identification of the individual or individuals within each respective agency who will be responsible for processing the expedited permit application or local comprehensive plan amendment for that agency.

(c) A mandatory preapplication review process to reduce permitting conflicts by providing guidance to applicants regarding the permits needed from each agency and governmental entity, site planning and development, site suitability and limitations, facility design, and steps the applicant can take to ensure expeditious permit application and local comprehensive plan amendment review. As a part of this process, the first interagency meeting to discuss a project shall be held within 14 days after the secretary's determination that the project is eligible for expedited review. Subsequent interagency meetings may be scheduled to accommodate the needs of participating local governments that are unable to meet public notice requirements for executing a memorandum of agreement within this timeframe. This accommodation may not exceed 45 days from the secretary's determination that the project is eligible for expedited review.

(d) The preparation of a single coordinated project description form and checklist and an agreement by state and regional agencies to reduce the burden on an applicant to provide duplicate information to multiple agencies.

(e) Establishment of a process for the adoption and review of any comprehensive plan amendment needed by any certified project within 90 days after the submission of an application for a comprehensive plan amendment. However, the memorandum of agreement may not prevent affected persons as defined in s. 163.3184 from appealing or participating in this expedited plan amendment process and any review or appeals of decisions made under this paragraph.

(f) Additional incentives for an applicant who proposes a project that provides a net ecosystem benefit.

(12) The applicant, the regional permit action team, and participating local governments may agree to incorporate into a single document the permits, licenses, and approvals that are obtained through the expedited permit process. This consolidated permit is subject to the summary hearing provisions set forth in subsection (14).

(13) Notwithstanding any other provisions of law, projects qualified under this section are not subject to interstate highway level-of-service standards adopted by the Department of Transportation for concurrency purposes. The memorandum of agreement specified in subsection (5) must include a process by which the applicant will be assessed a fair share of the cost of mitigating the project's significant traffic impacts, as defined

in chapter 380 and related rules. The agreement must also specify whether the significant traffic impacts on the interstate system will be mitigated through the implementation of a project or payment of funds to the Department of Transportation. Where funds are paid, the Department of Transportation must include in the 5-year work program transportation projects or project phases, in an amount equal to the funds received, to mitigate the traffic impacts associated with the proposed project.

(14)(a)   Challenges to state agency action in the expedited permitting process for projects processed under this section are subject to the summary hearing provisions of s. 120.574, except that the administrative law judge's decision, as provided in s. 120.574(2)(f), shall be in the form of a recommended order and does not constitute the final action of the state agency. In those proceedings where the action of only one agency of the state other than the Department of Environmental Protection is challenged, the agency of the state shall issue the final order within 45 working days after receipt of the administrative law judge's recommended order, and the recommended order shall inform the parties of their right to file exceptions or responses to the recommended order in accordance with the uniform rules of procedure pursuant to s. 120.54. In those proceedings where the actions of more than one agency of the state are challenged, the Governor shall issue the final order within 45 working days after receipt of the administrative law judge's recommended order, and the recommended order shall inform the parties of their right to file exceptions or responses to the recommended order in accordance with the uniform rules of procedure pursuant to s. 120.54. For the issuance of department licenses required under any federally delegated or approved permit program, the department, and not the Governor, shall enter the final order. The participating agencies of the state may opt at the preliminary hearing conference to allow the administrative law judge's decision to constitute the final agency action.

(b)   Projects identified in paragraphs (3)(f)-(h) or challenges to state agency action in the expedited permitting process for establishment of a state-of-the-art biomedical research institution and campus in this state by the grantee under s. 288.955 are subject to the same requirements as challenges brought under paragraph (a), except that, notwithstanding s. 120.574, summary proceedings must be conducted within 30 days after a party files the motion for summary hearing, regardless of whether the parties agree to the summary proceeding.

(15)   The Department of Economic Opportunity, working with the agencies providing cooperative assistance and input regarding the memoranda of agreement, shall review sites proposed for the location of facilities that the Department of Economic Opportunity has certified to be eligible for the Innovation Incentive Program under s. 288.1089. Within 20 days after the request for the review by the Department of Economic Opportunity, the agencies shall provide to the Department of Economic Opportunity a statement as to each site's necessary permits under local, state, and federal law and an identification of significant permitting issues, which if unresolved, may result in the denial of an agency permit or approval or any significant delay caused by the permitting process.

(16)   This expedited permitting process shall not modify, qualify, or otherwise alter existing agency nonprocedural standards for permit applications or local comprehensive plan amendments, unless expressly authorized by law. If it is determined that the applicant is not eligible to use this process, the applicant may apply for permitting of the project through the normal permitting processes.

(17)   The Department of Economic Opportunity shall be responsible for certifying a business as eligible for undergoing expedited review under this section. Enterprise Florida, Inc., a county or municipal government, or the Rural Economic Development Initiative may recommend to the Department of Economic Opportunity that a project meeting the minimum job creation threshold undergo expedited review.

(18)   The Department of Economic Opportunity, working with the Rural Economic Development Initiative, shall provide technical assistance in preparing permit applications and local comprehensive plan amendments for counties having a population of fewer than 75,000 residents, or counties having fewer than 125,000 residents which are contiguous to counties having fewer than 75,000 residents. Additional assistance may include, but not be limited to, guidance in land development regulations and permitting processes, working cooperatively with state, regional, and local entities to identify areas within these counties which may be suitable or adaptable for preclearance review of specified types of land uses and other activities requiring permits.

(19)   The following projects are ineligible for review under this part:

(a)   A project funded and operated by a local government, as defined in s. 377.709, and located within that government's jurisdiction.

(b)   A project, the primary purpose of which is to:

1.   Effect the final disposal of solid waste, biomedical waste, or hazardous waste in this state.

2.   Produce electrical power, unless the production of electricity is incidental and not the primary function of the project or the electrical power is derived from a fuel source for renewable energy as defined in s. 366.91(2)(d).

3.   Extract natural resources.

4.   Produce oil.

5.   Construct, maintain, or operate an oil, petroleum, or sewage pipeline.

**History.**—s. 148, ch. 96-320; s. 2, ch. 97-28; s. 9, ch. 99-244; s. 221, ch. 99-245; s. 91, ch. 2000-165; s. 14, ch. 2000-317; s. 3, ch. 2003-420; s. 6, ch. 2006-55; s. 23, ch. 2007-105; s. 110, ch. 2008-4; s. 62, ch. 2010-205; s. 63, ch. 2011-139; s. 296, ch. 2011-142; s. 21, ch. 2012-205; s. 23, ch. 2013-92; s. 24, ch. 2013-205; s. 14, ch. 2015-98.

Copyright © 1995-2018 The Florida Legislature • Privacy Statement • Contact Us

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

1
2        An act relating to environmental accountability;
3        creating ss. 125.569 and 166.0481, F.S.; defining the
4        term "sanitary sewer lateral"; encouraging counties
5        and municipalities, respectively, to establish a
6        sanitary sewer lateral inspection program by a
7        specified date; providing parameters for such a
8        program; creating s. 689.301, F.S.; requiring a seller
9        of real property to disclose any known defects in the
10       property's sanitary sewer lateral; defining the term
11       "sanitary sewer lateral"; amending s. 161.054, F.S.;
12       revising administrative penalties for violations of
13       certain provisions relating to beach and shore
14       construction and activities; making technical changes;
15       amending ss. 258.397, 258.46, 373.129, 376.16, 376.25,
16       377.37, 378.211, and 403.141, F.S.; revising civil
17       penalties for violations of certain provisions
18       relating to the Biscayne Bay Aquatic Preserve, aquatic
19       preserves, water resources, the Pollutant Discharge
20       Prevention and Control Act, the Clean Ocean Act,
21       regulation of oil and gas resources, the Phosphate
22       Land Reclamation Act, and other provisions relating to
23       pollution and the environment, respectively; providing
24       that each day that certain violations occur
25       constitutes a separate offense; making technical

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                2020 Legislature

26 |        changes; amending ss. 373.209, 376.065, 376.071,
27 |        403.086, 403.413, 403.7234, and 403.93345, F.S.;
28 |        revising civil penalties for violations of certain
29 |        provisions relating to artesian wells, terminal
30 |        facilities, discharge contingency plans for vessels,
31 |        sewage disposal facilities, dumping litter, small
32 |        quantity generators, and coral reef protection,
33 |        respectively; making technical changes; amending ss.
34 |        373.430 and 403.161, F.S.; revising criminal penalties
35 |        for violations of certain provisions relating to
36 |        pollution and the environment; providing that each day
37 |        that the cause of unauthorized discharges of domestic
38 |        wastewater is not addressed constitutes a separate
39 |        offense; making technical changes; amending s.
40 |        403.121, F.S.; revising civil and administrative
41 |        penalties for violations of certain provisions
42 |        relating to pollution and the environment; providing
43 |        that each day that the cause of unauthorized
44 |        discharges of domestic wastewater is not addressed
45 |        constitutes a separate offense; increasing the amount
46 |        of penalties that can be assessed administratively;
47 |        making technical changes; amending ss. 403.726 and
48 |        403.727, F.S.; revising civil penalties for violations
49 |        of certain provisions relating to hazardous waste;
50 |        making technical changes; reenacting s. 823.11(5),

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

51          F.S., to incorporate the amendment made to s. 376.16,
52          F.S., in a reference thereto; reenacting ss.
53          403.077(5), 403.131(2), 403.4154(3)(d), and
54          403.860(5), F.S., to incorporate the amendment made to
55          s. 403.121, F.S., in a reference thereto; reenacting
56          ss. 403.708(10), 403.7191(7), and 403.811, F.S., to
57          incorporate the amendment made to s. 403.141, F.S., in
58          a reference thereto; reenacting s. 403.7186(8), F.S.,
59          to incorporate the amendment made to ss. 403.141 and
60          403.161, F.S., in references thereto; reenacting s.
61          403.7255(2), F.S., to incorporate the amendment made
62          to s. 403.161, F.S., in a reference thereto; providing
63          an effective date.
64
65   Be It Enacted by the Legislature of the State of Florida:
66
67          Section 1.  Section 125.569, Florida Statutes, is created
68   to read:
69          125.569  Sanitary sewer lateral inspection programs for
70   counties.—
71          (1)  As used in this section, the term "sanitary sewer
72   lateral" means a privately owned pipeline connecting a property
73   to the main sewer line which is maintained and repaired by the
74   property owner.
75          (2)  By July 1, 2022, each county is encouraged to

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

76  establish an evaluation and rehabilitation program for sanitary
77  sewer laterals on residential and commercial properties within
78  the county's jurisdiction to identify and reduce extraneous flow
79  from leaking sanitary sewer laterals. At a minimum, the program
80  may do all of the following:
81      (a)  Establish a system to identify defective, damaged, or
82  deteriorated sanitary sewer laterals on residential and
83  commercial properties within the jurisdiction of the county.
84      (b)  Consider economical methods for a property owner to
85  repair or replace a defective, damaged, or deteriorated sanitary
86  sewer lateral.
87      (c)  Establish and maintain a publicly accessible database
88  to store information concerning properties where a defective,
89  damaged, or deteriorated sanitary sewer lateral has been
90  identified. For each property, the database must include, but is
91  not limited to, the address of the property, the names of any
92  persons the county notified concerning the faulty sanitary sewer
93  lateral, and the date and method of such notification.
94      Section 2.  Section 166.0481, Florida Statutes, is created
95  to read:
96      166.0481  Sanitary sewer lateral inspection programs for
97  municipalities.—
98      (1)  As used in this section, the term "sanitary sewer
99  lateral" means a privately owned pipeline connecting a property
100  to the main sewer line which is maintained and repaired by the

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

101  property owner.
102       (2)  By July 1, 2022, each municipality is encouraged to
103  establish an evaluation and rehabilitation program for sanitary
104  sewer laterals on residential and commercial properties within
105  the municipality's jurisdiction to identify and reduce
106  extraneous flow from leaking sanitary sewer laterals. At a
107  minimum, the program may do all of the following:
108       (a)  Establish a system to identify defective, damaged, or
109  deteriorated sanitary sewer laterals on residential and
110  commercial properties within the jurisdiction of the
111  municipality.
112       (b)  Consider economical methods for a property owner to
113  repair or replace a defective, damaged, or deteriorated sanitary
114  sewer lateral.
115       (c)  Establish and maintain a publicly accessible database
116  to store information concerning properties where a defective,
117  damaged, or deteriorated sanitary sewer lateral has been
118  identified. For each property, the database must include, but is
119  not limited to, the address of the property, the names of any
120  persons the municipality notified concerning the faulty sanitary
121  sewer lateral, and the date and method of such notification.
122       Section 3.  Section 689.301, Florida Statutes, is created
123  to read:
124       689.301  Disclosure of known defects in sanitary sewer
125  laterals to prospective purchaser.—Before executing a contract

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

126  for sale, a seller of real property shall disclose to a
127  prospective purchaser any defects in the property's sanitary
128  sewer lateral which are known to the seller. As used in this
129  section, the term "sanitary sewer lateral" means the privately
130  owned pipeline connecting a property to the main sewer line.
131      Section 4.  Subsection (1) of section 161.054, Florida
132  Statutes, is amended to read:
133      161.054  Administrative fines; liability for damage;
134  liens.—
135      (1)  In addition to the penalties provided for in ss.
136  161.052, 161.053, and 161.121, any person, firm, corporation, or
137  governmental agency, or agent thereof, refusing to comply with
138  or willfully violating ~~any of the provisions of~~ s. 161.041, s.
139  161.052, or s. 161.053, or any rule or order prescribed by the
140  department thereunder, shall incur a fine for each offense in an
141  amount up to $15,000 ~~$10,000~~ to be fixed, imposed, and collected
142  by the department. Each day during any portion of which such
143  violation occurs constitutes a separate offense.
144      Section 5.  Subsection (7) of section 258.397, Florida
145  Statutes, is amended to read:
146      258.397  Biscayne Bay Aquatic Preserve.—
147      (7)  ENFORCEMENT.—~~The provisions of~~ This section may be
148  enforced in accordance with ~~the provisions of~~ s. 403.412. In
149  addition, the Department of Legal Affairs may ~~is authorized to~~
150  bring an action for civil penalties of $7,500 ~~$5,000~~ per day

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

151  against any person, natural or corporate, who violates ~~the~~
152  ~~provisions of~~ this section or any rule or regulation issued
153  hereunder. <u>Each day during any portion of which such violation</u>
154  <u>occurs constitutes a separate offense.</u> Enforcement of applicable
155  state regulations shall be supplemented by the Miami-Dade County
156  Department of Environmental Resources Management through the
157  creation of a full-time enforcement presence along the Miami
158  River.
159      Section 6.  Section 258.46, Florida Statutes, is amended to
160  read:
161      258.46  Enforcement; violations; penalty.—~~The provisions of~~
162  This act may be enforced by the Board of Trustees of the
163  Internal Improvement Trust Fund or in accordance with ~~the~~
164  ~~provisions of~~ s. 403.412. However, any violation by any person,
165  natural or corporate, of ~~the provisions of~~ this act or any rule
166  or regulation issued hereunder <u>is</u> ~~shall be~~ further punishable by
167  a civil penalty of not less than <u>$750</u> ~~$500~~ per day or more than
168  <u>$7,500</u> ~~$5,000~~ per day of such violation. <u>Each day during any</u>
169  <u>portion of which such violation occurs constitutes a separate</u>
170  <u>offense.</u>
171      Section 7.  Subsections (5) and (7) of section 373.129,
172  Florida Statutes, are amended to read:
173      373.129  Maintenance of actions.—The department, the
174  governing board of any water management district, any local
175  board, or a local government to which authority has been

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                  2020 Legislature

176   delegated pursuant to s. 373.103(8), is authorized to commence
177   and maintain proper and necessary actions and proceedings in any
178   court of competent jurisdiction for any of the following
179   purposes:
180        (5)  To recover a civil penalty for each offense in an
181   amount not to exceed $15,000 $10,000 per offense. Each date
182   during which such violation occurs constitutes a separate
183   offense.
184        (a)  A civil penalty recovered by a water management
185   district pursuant to this subsection shall be retained and used
186   exclusively by the water management district that collected the
187   money. A civil penalty recovered by the department pursuant to
188   this subsection must be deposited into the Water Quality
189   Assurance Trust Fund established under s. 376.307.
190        (b)  A local government that is delegated authority
191   pursuant to s. 373.103(8) may deposit a civil penalty recovered
192   pursuant to this subsection into a local water pollution control
193   program trust fund, notwithstanding the provisions of paragraph
194   (a). However, civil penalties that are deposited in a local
195   water pollution control program trust fund and that are
196   recovered for violations of state water quality standards may be
197   used only to restore water quality in the area that was the
198   subject of the action, and civil penalties that are deposited in
199   a local water pollution control program trust fund and that are
200   recovered for violation of requirements relating to water

Page 8 of 45

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                2020 Legislature

201  quantity may be used only to purchase lands and make capital
202  improvements associated with surface water management, or other
203  purposes consistent with the requirements of this chapter for
204  the management and storage of surface water.
205      (7)  To enforce ~~the provisions of~~ part IV of this chapter
206  in the same manner and to the same extent as provided in ss.
207  373.430, 403.121(1) and (2), 403.131, 403.141, and 403.161.
208      Section 8.  Subsection (3) of section 373.209, Florida
209  Statutes, is amended to read:
210      373.209  Artesian wells; penalties for violation.—
211      (3)  Any person who violates ~~any provision of~~ this section
212  is ~~shall be~~ subject to either:
213      (a)  The remedial measures provided for in s. 373.436; or
214      (b)  A civil penalty of <u>$150</u> ~~$100~~ a day for each and every
215  day of such violation and for each and every act of violation.
216  The civil penalty may be recovered by the water management board
217  of the water management district in which the well is located or
218  by the department in a suit in a court of competent jurisdiction
219  in the county where the defendant resides, in the county of
220  residence of any defendant if there is more than one defendant,
221  or in the county where the violation took place. The place of
222  suit shall be selected by the board or department, and the suit,
223  by direction of the board or department, shall be instituted and
224  conducted in the name of the board or department by appropriate
225  counsel. The payment of any such damages does not impair or

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                         2020 Legislature

226  abridge any cause of action which any person may have against
227  the person violating ~~any provision of~~ this section.
228      Section 9.  Subsections (2) through (5) of section 373.430,
229  Florida Statutes, are amended to read:
230      373.430  Prohibitions, violation, penalty, intent.—
231      (2)  A person who ~~Whoever~~ commits a violation specified in
232  subsection (1) is liable for any damage caused and for civil
233  penalties as provided in s. 373.129.
234      (3)  A ~~Any~~ person who willfully commits a violation
235  specified in paragraph (1)(a) <u>commits</u> ~~is guilty of~~ a felony of
236  the third degree, punishable as provided in ss. 775.082(3)(e)
237  and 775.083(1)(g), by a fine of not more than $50,000 or by
238  imprisonment for 5 years, or by both, for each offense. Each day
239  during any portion of which such violation occurs constitutes a
240  separate offense.
241      (4)  A ~~Any~~ person who commits a violation specified in
242  paragraph (1)(a) <u>or paragraph (1)(b)</u> due to reckless
243  indifference or gross careless disregard <u>commits</u> ~~is guilty of~~ a
244  misdemeanor of the second degree, punishable as provided in ss.
245  775.082(4)(b) and 775.083(1)(g), by a fine of not more than
246  <u>$10,000</u> ~~$5,000~~ or 60 days in jail, or by both, for each offense.
247      (5)  A ~~Any~~ person who willfully commits a violation
248  specified in paragraph (1)(b) or <u>who commits a violation</u>
249  <u>specified in</u> paragraph (1)(c) <u>commits</u> ~~is guilty of~~ a misdemeanor
250  of the first degree, punishable as provided in ss. 775.082(4)(a)

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                           2020 Legislature

251  and 775.083(1)(g), by a fine of not more than $10,000 or by 6
252  months in jail, or by both, for each offense.
253       Section 10.  Paragraphs (a) and (e) of subsection (5) of
254  section 376.065, Florida Statutes, are amended to read:
255       376.065  Operation of terminal facility without discharge
256  prevention and response certificate prohibited; penalty.—
257       (5)(a)  A person who violates this section or the terms and
258  requirements of such certification commits a noncriminal
259  infraction. The civil penalty for any such infraction shall be
260  $750 $500, except as otherwise provided in this section.
261       (e)  A person who elects to appear before the county court
262  or who is required to so appear waives the limitations of the
263  civil penalty specified in paragraph (a). The court, after a
264  hearing, shall make a determination as to whether an infraction
265  has been committed. If the commission of the infraction is
266  proved, the court shall impose a civil penalty of $750 $500.
267       Section 11.  Paragraphs (a) and (e) of subsection (2) of
268  section 376.071, Florida Statutes, are amended to read:
269       376.071  Discharge contingency plan for vessels.—
270       (2)(a)  A master of a vessel that violates subsection (1)
271  commits a noncriminal infraction and shall be cited for such
272  infraction. The civil penalty for such an infraction shall be
273  $7,500 $5,000, except as otherwise provided in this subsection.
274       (e)  A person who elects to appear before the county court
275  or who is required to appear waives the limitations of the civil

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

276 | penalty specified in paragraph (a). The court, after a hearing,
277 | shall make a determination as to whether an infraction has been
278 | committed. If the commission of the infraction is proved, the
279 | court shall impose a civil penalty of $7,500 $5,000.
280 | Section 12. Section 376.16, Florida Statutes, is amended
281 | to read:
282 | 376.16 Enforcement and penalties.—
283 | (1) It is unlawful for any person to violate any provision
284 | of ss. 376.011-376.21 or any rule or order of the department
285 | made pursuant to this act. A violation is shall be punishable by
286 | a civil penalty of up to $75,000 $50,000 per violation per day
287 | to be assessed by the department. Each day during any portion of
288 | which the violation occurs constitutes a separate offense. The
289 | penalty provisions of this subsection do shall not apply to any
290 | discharge promptly reported and removed by a person responsible,
291 | in accordance with the rules and orders of the department, or to
292 | any discharge of pollutants equal to or less than 5 gallons.
293 | (2) In addition to the penalty provisions which may apply
294 | under subsection (1), a person responsible for two or more
295 | discharges of any pollutant reported pursuant to s. 376.12
296 | within a 12-month period at the same facility commits a
297 | noncriminal infraction and shall be cited by the department for
298 | such infraction.
299 | (a) For discharges of gasoline or diesel over 5 gallons,
300 | the civil penalty for the second discharge shall be $750 $500

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

301  and the civil penalty for each subsequent discharge within a 12-
302  month period shall be $1,500 $1,000, except as otherwise
303  provided in this section.
304       (b)  For discharges of any pollutant other than gasoline or
305  diesel, the civil penalty for a second discharge shall be $3,750
306  $2,500 and the civil penalty for each subsequent discharge
307  within a 12-month period shall be $7,500 $5,000, except as
308  otherwise provided in this section.
309       (3)  A person responsible for two or more discharges of any
310  pollutant reported pursuant to s. 376.12 within a 12-month
311  period at the same facility commits a noncriminal infraction and
312  shall be cited by the department for such infraction.
313       (a)  For discharges of gasoline or diesel equal to or less
314  than 5 gallons, the civil penalty shall be $75 $50 for each
315  discharge subsequent to the first.
316       (b)  For discharges of pollutants other than gasoline or
317  diesel equal to or less than 5 gallons, the civil penalty shall
318  be $150 $100 for each discharge subsequent to the first.
319       (4)  A person charged with a noncriminal infraction
320  pursuant to subsection (2) or subsection (3) may:
321       (a)  Pay the civil penalty;
322       (b)  Post a bond equal to the amount of the applicable
323  civil penalty; or
324       (c)  Sign and accept a citation indicating a promise to
325  appear before the county court.

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                           2020 Legislature

326
327  The department employee authorized to issue these citations may
328  indicate on the citation the time and location of the scheduled
329  hearing and shall indicate the applicable civil penalty.
330      (5)  Any person who willfully refuses to post bond or
331  accept and sign a citation commits a misdemeanor of the second
332  degree, punishable as provided in s. 775.082 or s. 775.083.
333      (6)  After compliance with paragraph (4)(b) or paragraph
334  (4)(c), any person charged with a noncriminal infraction under
335  subsection (2) or subsection (3) may:
336      (a)  Pay the civil penalty, either by mail or in person,
337  within 30 days after the date of receiving the citation; or
338      (b)  If the person has posted bond, forfeit the bond by not
339  appearing at the designated time and location.
340
341  A person cited for an infraction under this section who pays the
342  civil penalty or forfeits the bond has admitted the infraction
343  and waives the right to a hearing on the issue of commission of
344  the infraction. Such admission may not be used as evidence in
345  any other proceeding.
346      (7)  Any person who elects to appear before the county
347  court or who is required to appear waives the limitations of the
348  civil penalties specified in subsection (2). The court, after a
349  hearing, shall make a determination as to whether an infraction
350  has been committed. If the commission of an infraction is

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

351  proved, the court may impose a civil penalty up to, but not
352  exceeding, $750 $500 for the second discharge of gasoline or
353  diesel and a civil penalty up to, but not exceeding, $1,500
354  $1,000 for each subsequent discharge of gasoline or diesel
355  within a 12-month period.

356      (8)  Any person who elects to appear before the county
357  court or who is required to appear waives the limitations of the
358  civil penalties specified in subsection (2) or subsection (3).
359  The court, after a hearing, shall make a determination as to
360  whether an infraction has been committed. If the commission of
361  an infraction is proved, the court may impose a civil penalty up
362  to, but not exceeding, $7,500 $5,000 for the second discharge of
363  pollutants other than gasoline or diesel and a civil penalty up
364  to, but not exceeding, $15,000 $10,000 for each subsequent
365  discharge of pollutants other than gasoline or diesel within a
366  12-month period.

367      (9)  At a hearing under this section, the commission of a
368  charged offense must be proved by the greater weight of the
369  evidence.

370      (10)  A person who is found by a hearing official to have
371  committed an infraction may appeal that finding to the circuit
372  court.

373      (11)  Any person who has not posted bond and who neither
374  pays the applicable civil penalty, as specified in subsection
375  (2) or subsection (3) within 30 days of receipt of the citation

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

376  nor appears before the court commits a misdemeanor of the second
377  degree, punishable as provided in s. 775.082 or s. 775.083.
378      (12)  Any person who makes or causes to be made a false
379  statement that ~~which~~ the person does not believe to be true in
380  response to requirements of ~~the provisions of~~ ss. 376.011-376.21
381  commits a felony of the second degree, punishable as provided in
382  s. 775.082, s. 775.083, or s. 775.084.
383      Section 13.  Paragraph (a) of subsection (6) of section
384  376.25, Florida Statutes, is amended to read:
385      376.25  Gambling vessels; registration; required and
386  prohibited releases.—
387      (6)  PENALTIES.—
388      (a)  A person who violates this section is subject to a
389  civil penalty of not more than $75,000 ~~$50,000~~ for each
390  violation. Each day during any portion of which such violation
391  occurs constitutes a separate offense.
392      Section 14.  Paragraph (a) of subsection (1) of section
393  377.37, Florida Statutes, is amended to read:
394      377.37  Penalties.—
395      (1)(a)  Any person who violates ~~any provision of~~ this law
396  or any rule, regulation, or order of the division made under
397  this chapter or who violates the terms of any permit to drill
398  for or produce oil, gas, or other petroleum products referred to
399  in s. 377.242(1) or to store gas in a natural gas storage
400  facility, or any lessee, permitholder, or operator of equipment

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

401  or facilities used in the exploration for, drilling for, or
402  production of oil, gas, or other petroleum products, or storage
403  of gas in a natural gas storage facility, who refuses inspection
404  by the division as provided in this chapter, is liable to the
405  state for any damage caused to the air, waters, or property,
406  including animal, plant, or aquatic life, of the state and for
407  reasonable costs and expenses of the state in tracing the source
408  of the discharge, in controlling and abating the source and the
409  pollutants, and in restoring the air, waters, and property,
410  including animal, plant, and aquatic life, of the state.
411  Furthermore, such person, lessee, permitholder, or operator is
412  subject to the judicial imposition of a civil penalty in an
413  amount of not more than $15,000 $10,000 for each offense.
414  However, the court may receive evidence in mitigation. Each day
415  during any portion of which such violation occurs constitutes a
416  separate offense. This section does not Nothing herein shall
417  give the department the right to bring an action on behalf of
418  any private person.
419       Section 15.  Subsection (2) of section 378.211, Florida
420  Statutes, is amended to read:
421       378.211  Violations; damages; penalties.—
422       (2)  The department may institute a civil action in a court
423  of competent jurisdiction to impose and recover a civil penalty
424  for violation of this part or of any rule adopted or order
425  issued pursuant to this part. The penalty may shall not exceed

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

426    the following amounts, and the court shall consider evidence in
427    mitigation:
428        (a)   For violations of a minor or technical nature, $150
429    $100 per violation.
430        (b)   For major violations by an operator on which a penalty
431    has not been imposed under this paragraph during the previous 5
432    years, $1,500 $1,000 per violation.
433        (c)   For major violations not covered by paragraph (b),
434    $7,500 $5,000 per violation.
435
436    Subject to the provisions of subsection (4), each day or any
437    portion thereof in which the violation continues shall
438    constitute a separate violation.
439        Section 16.   Subsection (2) of section 403.086, Florida
440    Statutes, is amended to read:
441        403.086   Sewage disposal facilities; advanced and secondary
442    waste treatment.—
443        (2)   Any facilities for sanitary sewage disposal shall
444    provide for secondary waste treatment and, in addition thereto,
445    advanced waste treatment as deemed necessary and ordered by the
446    Department of Environmental Protection. Failure to conform shall
447    be punishable by a civil penalty of $750 $500 for each 24-hour
448    day or fraction thereof that such failure is allowed to continue
449    thereafter.
450        Section 17.   Section 403.121, Florida Statutes, is amended

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

451  to read:

452      403.121  Enforcement; procedure; remedies.—The department

453  shall have the following judicial and administrative remedies

454  available to it for violations of this chapter, as specified in

455  s. 403.161(1).

456      (1)  Judicial remedies:

457      (a)  The department may institute a civil action in a court

458  of competent jurisdiction to establish liability and to recover

459  damages for any injury to the air, waters, or property,

460  including animal, plant, and aquatic life, of the state caused

461  by any violation.

462      (b)  The department may institute a civil action in a court

463  of competent jurisdiction to impose and to recover a civil

464  penalty for each violation in an amount of not more than $15,000

465  $10,000 per offense. However, the court may receive evidence in

466  mitigation. Each day during any portion of which such violation

467  occurs constitutes a separate offense.

468      (c)  Except as provided in paragraph (2)(c), it is shall

469  not be a defense to, or ground for dismissal of, these judicial

470  remedies for damages and civil penalties that the department has

471  failed to exhaust its administrative remedies, has failed to

472  serve a notice of violation, or has failed to hold an

473  administrative hearing before prior to the institution of a

474  civil action.

475      (2)  Administrative remedies:

Page 19 of 45

CODING: Words stricken are deletions; words underlined are additions.

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

476        (a)  The department may institute an administrative
477  proceeding to establish liability and to recover damages for any
478  injury to the air, waters, or property, including animal, plant,
479  or aquatic life, of the state caused by any violation. The
480  department may order that the violator pay a specified sum as
481  damages to the state. Judgment for the amount of damages
482  determined by the department may be entered in any court having
483  jurisdiction thereof and may be enforced as any other judgment.
484        (b)  If the department has reason to believe a violation
485  has occurred, it may institute an administrative proceeding to
486  order the prevention, abatement, or control of the conditions
487  creating the violation or other appropriate corrective action.
488  Except for violations involving hazardous wastes, asbestos, or
489  underground injection, the department shall proceed
490  administratively in all cases in which the department seeks
491  administrative penalties that do not exceed $50,000 $10,000 per
492  assessment as calculated in accordance with subsections (3),
493  (4), (5), (6), and (7). Pursuant to 42 U.S.C. s. 300g-2, the
494  administrative penalty assessed pursuant to subsection (3),
495  subsection (4), or subsection (5) against a public water system
496  serving a population of more than 10,000 shall be not less than
497  $1,000 per day per violation. The department may shall not
498  impose administrative penalties in excess of $50,000 $10,000 in
499  a notice of violation. The department may shall not have more
500  than one notice of violation seeking administrative penalties

Page 20 of 45

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                    2020 Legislature

501  pending against the same party at the same time unless the
502  violations occurred at a different site or the violations were
503  discovered by the department subsequent to the filing of a
504  previous notice of violation.
505      (c)  An administrative proceeding shall be instituted by
506  the department's serving of a written notice of violation upon
507  the alleged violator by certified mail. If the department is
508  unable to effect service by certified mail, the notice of
509  violation may be hand delivered or personally served in
510  accordance with chapter 48. The notice shall specify the
511  provision of the law, rule, regulation, permit, certification,
512  or order of the department alleged to be violated and the facts
513  alleged to constitute a violation thereof. An order for
514  corrective action, penalty assessment, or damages may be
515  included with the notice. When the department is seeking to
516  impose an administrative penalty for any violation by issuing a
517  notice of violation, any corrective action needed to correct the
518  violation or damages caused by the violation must be pursued in
519  the notice of violation or they are waived. However, an no order
520  is not shall become effective until after service and an
521  administrative hearing, if requested within 20 days after
522  service. Failure to request an administrative hearing within
523  this time period constitutes shall constitute a waiver thereof,
524  unless the respondent files a written notice with the department
525  within this time period opting out of the administrative process

CODING: Words stricken are deletions; words underlined are additions.

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

526  initiated by the department to impose administrative penalties.
527  Any respondent choosing to opt out of the administrative process
528  initiated by the department in an action that seeks the
529  imposition of administrative penalties must file a written
530  notice with the department within 20 days after service of the
531  notice of violation opting out of the administrative process. A
532  respondent's decision to opt out of the administrative process
533  does not preclude the department from initiating a state court
534  action seeking injunctive relief, damages, and the judicial
535  imposition of civil penalties.
536        (d)  If a person timely files a petition challenging a
537  notice of violation, that person will thereafter be referred to
538  as the respondent. The hearing requested by the respondent shall
539  be held within 180 days after the department has referred the
540  initial petition to the Division of Administrative Hearings
541  unless the parties agree to a later date. The department has the
542  burden of proving with the preponderance of the evidence that
543  the respondent is responsible for the violation. ~~No~~
544  Administrative penalties should not be imposed unless the
545  department satisfies that burden. Following the close of the
546  hearing, the administrative law judge shall issue a final order
547  on all matters, including the imposition of an administrative
548  penalty. When the department seeks to enforce that portion of a
549  final order imposing administrative penalties pursuant to s.
550  120.69, the respondent may ~~shall~~ not assert as a defense the

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

551  inappropriateness of the administrative remedy. The department
552  retains its final-order authority in all administrative actions
553  that do not request the imposition of administrative penalties.
554      (e)  After filing a petition requesting a formal hearing in
555  response to a notice of violation in which the department
556  imposes an administrative penalty, a respondent may request that
557  a private mediator be appointed to mediate the dispute by
558  contacting the Florida Conflict Resolution Consortium within 10
559  days after receipt of the initial order from the administrative
560  law judge. The Florida Conflict Resolution Consortium shall pay
561  all of the costs of the mediator and for up to 8 hours of the
562  mediator's time per case at $150 per hour. Upon notice from the
563  respondent, the Florida Conflict Resolution Consortium shall
564  provide to the respondent a panel of possible mediators from the
565  area in which the hearing on the petition would be heard. The
566  respondent shall select the mediator and notify the Florida
567  Conflict Resolution Consortium of the selection within 15 days
568  of receipt of the proposed panel of mediators. The Florida
569  Conflict Resolution Consortium shall provide all of the
570  administrative support for the mediation process. The mediation
571  must be completed at least 15 days before the final hearing date
572  set by the administrative law judge.
573      (f)  In any administrative proceeding brought by the
574  department, the prevailing party shall recover all costs as
575  provided in ss. 57.041 and 57.071. The costs must be included in

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

576  the final order. The respondent is the prevailing party when an
577  order is entered awarding no penalties to the department and
578  such order has not been reversed on appeal or the time for
579  seeking judicial review has expired. The respondent is ~~shall be~~
580  entitled to an award of attorney's fees if the administrative
581  law judge determines that the notice of violation issued by the
582  department seeking the imposition of administrative penalties
583  was not substantially justified as defined in s. 57.111(3)(e).
584  An ~~No~~ award of attorney's fees as provided by this subsection
585  may not ~~shall~~ exceed $15,000.
586       (g)  This section does not prevent ~~Nothing herein shall be~~
587  ~~construed as preventing~~ any other legal or administrative action
588  in accordance with law and does not~~. Nothing in this subsection~~
589  ~~shall~~ limit the department's authority provided in ss. 403.131,
590  403.141, and this section to judicially pursue injunctive
591  relief. When the department exercises its authority to
592  judicially pursue injunctive relief, penalties in any amount up
593  to the statutory maximum sought by the department must be
594  pursued as part of the state court action and not by initiating
595  a separate administrative proceeding. The department retains the
596  authority to judicially pursue penalties in excess of $50,000
597  ~~$10,000~~ for violations not specifically included in the
598  administrative penalty schedule, or for multiple or multiday
599  violations alleged to exceed a total of $50,000 ~~$10,000~~. The
600  department also retains the authority provided in ss. 403.131,

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

601  403.141, and this section to judicially pursue injunctive relief
602  and damages, if a notice of violation seeking the imposition of
603  administrative penalties has not been issued. The department has
604  the authority to enter into a settlement, either before or after
605  initiating a notice of violation, and the settlement may include
606  a penalty amount different from the administrative penalty
607  schedule. Any case filed in state court because it is alleged to
608  exceed a total of $50,000 $10,000 in penalties may be settled in
609  the court action for less than $50,000 $10,000.
610      (h)  Chapter 120 applies shall apply to any administrative
611  action taken by the department or any delegated program pursuing
612  administrative penalties in accordance with this section.
613      (3)  Except for violations involving hazardous wastes,
614  asbestos, or underground injection, administrative penalties
615  must be calculated according to the following schedule:
616      (a)  For a drinking water contamination violation, the
617  department shall assess a penalty of $3,000 $2,000 for a Maximum
618  Containment Level (MCL) violation; plus $1,500 $1,000 if the
619  violation is for a primary inorganic, organic, or radiological
620  Maximum Contaminant Level or it is a fecal coliform bacteria
621  violation; plus $1,500 $1,000 if the violation occurs at a
622  community water system; and plus $1,500 $1,000 if any Maximum
623  Contaminant Level is exceeded by more than 100 percent. For
624  failure to obtain a clearance letter before prior to placing a
625  drinking water system into service when the system would not

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

626   have been eligible for clearance, the department shall assess a
627   penalty of $4,500 $3,000.
628       (b)   For failure to obtain a required wastewater permit,
629   other than a permit required for surface water discharge, the
630   department shall assess a penalty of $2,000 $1,000. For a
631   domestic or industrial wastewater violation not involving a
632   surface water or groundwater quality violation, the department
633   shall assess a penalty of $4,000 $2,000 for an unpermitted or
634   unauthorized discharge or effluent-limitation exceedance. For an
635   unpermitted or unauthorized discharge or effluent-limitation
636   exceedance that resulted in a surface water or groundwater
637   quality violation, the department shall assess a penalty of
638   $10,000 $5,000. Each day the cause of an unauthorized discharge
639   of domestic wastewater is not addressed constitutes a separate
640   offense.
641       (c)   For a dredge and fill or stormwater violation, the
642   department shall assess a penalty of $1,500 $1,000 for
643   unpermitted or unauthorized dredging or filling or unauthorized
644   construction of a stormwater management system against the
645   person or persons responsible for the illegal dredging or
646   filling, or unauthorized construction of a stormwater management
647   system plus $3,000 $2,000 if the dredging or filling occurs in
648   an aquatic preserve, an Outstanding Florida Water, a
649   conservation easement, or a Class I or Class II surface water,
650   plus $1,500 $1,000 if the area dredged or filled is greater than

CODING: Words stricken are deletions; words underlined are additions.

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

651  one-quarter acre but less than or equal to one-half acre, and
652  plus $1,500 $1,000 if the area dredged or filled is greater than
653  one-half acre but less than or equal to one acre. The
654  administrative penalty schedule does shall not apply to a dredge
655  and fill violation if the area dredged or filled exceeds one
656  acre. The department retains the authority to seek the judicial
657  imposition of civil penalties for all dredge and fill violations
658  involving more than one acre. The department shall assess a
659  penalty of $4,500 $3,000 for the failure to complete required
660  mitigation, failure to record a required conservation easement,
661  or for a water quality violation resulting from dredging or
662  filling activities, stormwater construction activities or
663  failure of a stormwater treatment facility. For stormwater
664  management systems serving less than 5 acres, the department
665  shall assess a penalty of $3,000 $2,000 for the failure to
666  properly or timely construct a stormwater management system. In
667  addition to the penalties authorized in this subsection, the
668  department shall assess a penalty of $7,500 $5,000 per violation
669  against the contractor or agent of the owner or tenant that
670  conducts unpermitted or unauthorized dredging or filling. For
671  purposes of this paragraph, the preparation or signing of a
672  permit application by a person currently licensed under chapter
673  471 to practice as a professional engineer does shall not make
674  that person an agent of the owner or tenant.
675        (d)  For mangrove trimming or alteration violations, the

CODING: Words stricken are deletions; words underlined are additions.

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

676   department shall assess a penalty of $7,500 $5,000 per violation
677   against the contractor or agent of the owner or tenant that
678   conducts mangrove trimming or alteration without a permit as
679   required by s. 403.9328. For purposes of this paragraph, the
680   preparation or signing of a permit application by a person
681   currently licensed under chapter 471 to practice as a
682   professional engineer does shall not make that person an agent
683   of the owner or tenant.
684        (e)  For solid waste violations, the department shall
685   assess a penalty of $3,000 $2,000 for the unpermitted or
686   unauthorized disposal or storage of solid waste; plus $1,000 if
687   the solid waste is Class I or Class III (excluding yard trash)
688   or if the solid waste is construction and demolition debris in
689   excess of 20 cubic yards, plus $1,500 $1,000 if the waste is
690   disposed of or stored in any natural or artificial body of water
691   or within 500 feet of a potable water well, plus $1,500 $1,000
692   if the waste contains PCB at a concentration of 50 parts per
693   million or greater; untreated biomedical waste; friable asbestos
694   greater than 1 cubic meter which is not wetted, bagged, and
695   covered; used oil greater than 25 gallons; or 10 or more lead
696   acid batteries. The department shall assess a penalty of $4,500
697   $3,000 for failure to properly maintain leachate control;
698   unauthorized burning; failure to have a trained spotter on duty
699   at the working face when accepting waste; or failure to provide
700   access control for three consecutive inspections. The department

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

701  shall assess a penalty of $3,000 $2,000 for failure to construct
702  or maintain a required stormwater management system.
703      (f)  For an air emission violation, the department shall
704  assess a penalty of $1,500 $1,000 for an unpermitted or
705  unauthorized air emission or an air-emission-permit exceedance,
706  plus $1,000 if the emission results in an air quality violation,
707  plus $4,500 $3,000 if the emission was from a major source and
708  the source was major for the pollutant in violation; plus $1,500
709  $1,000 if the emission was more than 150 percent of the
710  allowable level.
711      (g)  For storage tank system and petroleum contamination
712  violations, the department shall assess a penalty of $7,500
713  $5,000 for failure to empty a damaged storage system as
714  necessary to ensure that a release does not occur until repairs
715  to the storage system are completed; when a release has occurred
716  from that storage tank system; for failure to timely recover
717  free product; or for failure to conduct remediation or
718  monitoring activities until a no-further-action or site-
719  rehabilitation completion order has been issued. The department
720  shall assess a penalty of $4,500 $3,000 for failure to timely
721  upgrade a storage tank system. The department shall assess a
722  penalty of $3,000 $2,000 for failure to conduct or maintain
723  required release detection; failure to timely investigate a
724  suspected release from a storage system; depositing motor fuel
725  into an unregistered storage tank system; failure to timely

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

726  assess or remediate petroleum contamination; or failure to
727  properly install a storage tank system. The department shall
728  assess a penalty of $1,500 $1,000 for failure to properly
729  operate, maintain, or close a storage tank system.
730       (4)  In an administrative proceeding, in addition to the
731  penalties that may be assessed under subsection (3), the
732  department shall assess administrative penalties according to
733  the following schedule:
734       (a)  For failure to satisfy financial responsibility
735  requirements or for violation of s. 377.371(1), $7,500 $5,000.
736       (b)  For failure to install, maintain, or use a required
737  pollution control system or device, $6,000 $4,000.
738       (c)  For failure to obtain a required permit before
739  construction or modification, $4,500 $3,000.
740       (d)  For failure to conduct required monitoring or testing;
741  failure to conduct required release detection; or failure to
742  construct in compliance with a permit, $3,000 $2,000.
743       (e)  For failure to maintain required staff to respond to
744  emergencies; failure to conduct required training; failure to
745  prepare, maintain, or update required contingency plans; failure
746  to adequately respond to emergencies to bring an emergency
747  situation under control; or failure to submit required
748  notification to the department, $1,500 $1,000.
749       (f)  Except as provided in subsection (2) with respect to
750  public water systems serving a population of more than 10,000,

Page 30 of 45

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

751  for failure to prepare, submit, maintain, or use required
752  reports or other required documentation, $750 $500.
753      (5)  Except as provided in subsection (2) with respect to
754  public water systems serving a population of more than 10,000,
755  for failure to comply with any other departmental regulatory
756  statute or rule requirement not otherwise identified in this
757  section, the department may assess a penalty of $1,000 $500.
758      (6)  For each additional day during which a violation
759  occurs, the administrative penalties in subsections subsection
760  (3), subsection (4), and subsection (5) may be assessed per day
761  per violation.
762      (7)  The history of noncompliance of the violator for any
763  previous violation resulting in an executed consent order, but
764  not including a consent order entered into without a finding of
765  violation, or resulting in a final order or judgment after the
766  effective date of this law involving the imposition of $3,000
767  $2,000 or more in penalties shall be taken into consideration in
768  the following manner:
769      (a)  One previous such violation within 5 years before
770  prior to the filing of the notice of violation will result in a
771  25-percent per day increase in the scheduled administrative
772  penalty.
773      (b)  Two previous such violations within 5 years before
774  prior to the filing of the notice of violation will result in a
775  50-percent per day increase in the scheduled administrative

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

776  penalty.

777      (c)  Three or more previous such violations within 5 years
778  before prior to the filing of the notice of violation will
779  result in a 100-percent per day increase in the scheduled
780  administrative penalty.

781      (8)  The direct economic benefit gained by the violator
782  from the violation, where consideration of economic benefit is
783  provided by Florida law or required by federal law as part of a
784  federally delegated or approved program, shall be added to the
785  scheduled administrative penalty. The total administrative
786  penalty, including any economic benefit added to the scheduled
787  administrative penalty, may shall not exceed $15,000 $10,000.

788      (9)  The administrative penalties assessed for any
789  particular violation may shall not exceed $10,000 $5,000 against
790  any one violator, unless the violator has a history of
791  noncompliance, the economic benefit of the violation as
792  described in subsection (8) exceeds $10,000 $5,000, or there are
793  multiday violations. The total administrative penalties may
794  shall not exceed $50,000 $10,000 per assessment for all
795  violations attributable to a specific person in the notice of
796  violation.

797      (10)  The administrative law judge may receive evidence in
798  mitigation. The penalties identified in subsections subsection
799  (3), subsection (4), and subsection (5) may be reduced up to 50
800  percent by the administrative law judge for mitigating

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                    2020 Legislature

801  circumstances, including good faith efforts to comply <u>before</u>
802  ~~prior to~~ or after discovery of the violations by the department.
803  Upon an affirmative finding that the violation was caused by
804  circumstances beyond the reasonable control of the respondent
805  and could not have been prevented by respondent's due diligence,
806  the administrative law judge may further reduce the penalty.
807      (11)  Penalties collected pursuant to this section shall be
808  deposited into the Water Quality Assurance Trust Fund or other
809  trust fund designated by statute and shall be used to fund the
810  restoration of ecosystems, or polluted areas of the state, as
811  defined by the department, to their condition before pollution
812  occurred. The Florida Conflict Resolution Consortium may use a
813  portion of the fund to administer the mediation process provided
814  in paragraph (2)(e) and to contract with private mediators for
815  administrative penalty cases.
816      (12)  The purpose of the administrative penalty schedule
817  and process is to provide a more predictable and efficient
818  manner for individuals and businesses to resolve relatively
819  minor environmental disputes. <u>Subsections (3)-(7) may</u> ~~Subsection~~
820  ~~(3), subsection (4), subsection (5), subsection (6), or~~
821  ~~subsection (7) shall~~ not be construed as limiting a state court
822  in the assessment of damages. The administrative penalty
823  schedule does not apply to the judicial imposition of civil
824  penalties in state court as provided in this section.
825      Section 18.  Subsection (1) of section 403.141, Florida

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

826  Statutes, is amended to read:
827       403.141  Civil liability; joint and several liability.—
828       (1)  A person who Whoever commits a violation specified in
829  s. 403.161(1) is liable to the state for any damage caused to
830  the air, waters, or property, including animal, plant, or
831  aquatic life, of the state and for reasonable costs and expenses
832  of the state in tracing the source of the discharge, in
833  controlling and abating the source and the pollutants, and in
834  restoring the air, waters, and property, including animal,
835  plant, and aquatic life, of the state to their former condition,
836  and furthermore is subject to the judicial imposition of a civil
837  penalty for each offense in an amount of not more than $15,000
838  $10,000 per offense. However, the court may receive evidence in
839  mitigation. Each day during any portion of which such violation
840  occurs constitutes a separate offense. If a violation is an
841  unauthorized discharge of domestic wastewater, each day the
842  cause of the violation is not addressed constitutes a separate
843  offense until the violation is resolved by order or judgment.
844  This section does not Nothing herein shall give the department
845  the right to bring an action on behalf of any private person.
846       Section 19.  Subsections (2) through (5) of section
847  403.161, Florida Statutes, are amended to read:
848       403.161  Prohibitions, violation, penalty, intent.—
849       (2)  A person who Whoever commits a violation specified in
850  subsection (1) is liable to the state for any damage caused and

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

851  for civil penalties as provided in s. 403.141.

852       (3)  A ~~Any~~ person who willfully commits a violation

853  specified in paragraph (1)(a) <u>commits</u> ~~is guilty of~~ a felony of

854  the third degree<u>,</u> punishable as provided in ss. 775.082(3)(e)

855  and 775.083(1)(g) by a fine of not more than $50,000 or by

856  imprisonment for 5 years, or by both, for each offense. Each day

857  during any portion of which such violation occurs constitutes a

858  separate offense.

859       (4)  A ~~Any~~ person who commits a violation specified in

860  paragraph (1)(a) <u>or paragraph (1)(b)</u> due to reckless

861  indifference or gross careless disregard <u>commits</u> ~~is guilty of~~ a

862  misdemeanor of the second degree, punishable as provided in ss.

863  775.082(4)(b) and 775.083(1)(g) by a fine of not more than

864  <u>$10,000</u> ~~$5,000~~ or by 60 days in jail, or by both, for each

865  offense.

866       (5)  A ~~Any~~ person who willfully commits a violation

867  specified in paragraph (1)(b) or <u>who commits a violation</u>

868  <u>specified in</u> paragraph (1)(c) <u>commits</u> ~~is guilty of~~ a misdemeanor

869  of the first degree punishable as provided in ss. 775.082(4)(a)

870  and 775.083(1)(g) by a fine of not more than $10,000 or by 6

871  months in jail, or by both for each offense.

872       Section 20.  Paragraph (a) of subsection (6) of section

873  403.413, Florida Statutes, is amended to read:

874       403.413  Florida Litter Law.—

875       (6)  PENALTIES; ENFORCEMENT.—

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

876        (a)  Any person who dumps litter in violation of subsection
877   (4) in an amount not exceeding 15 pounds in weight or 27 cubic
878   feet in volume and not for commercial purposes commits ~~is guilty~~
879   ~~of~~ a noncriminal infraction, punishable by a civil penalty of
880   $150 ~~$100~~, from which $50 shall be deposited into the Solid
881   Waste Management Trust Fund to be used for the solid waste
882   management grant program pursuant to s. 403.7095. In addition,
883   the court may require the violator to pick up litter or perform
884   other labor commensurate with the offense committed.
885        Section 21.  Subsection (5) of section 403.7234, Florida
886   Statutes, is amended to read:
887        403.7234  Small quantity generator notification and
888   verification program.—
889        (5)  Any small quantity generator who does not comply with
890   the requirements of subsection (4) and who has received a
891   notification and survey in person or through one certified
892   letter from the county is subject to a fine of between $75 ~~$50~~
893   and $150 ~~$100~~ per day for a maximum of 100 days. The county may
894   collect such fines and deposit them in its general revenue fund.
895   Fines collected by the county shall be used to carry out the
896   notification and verification procedure established in this
897   section. If there are excess funds after the notification and
898   verification procedures have been completed, such funds shall be
899   used for hazardous and solid waste management purposes only.
900        Section 22.  Subsection (3) of section 403.726, Florida

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

901  Statutes, is amended to read:
902      403.726  Abatement of imminent hazard caused by hazardous
903  substance.—
904      (3)  An imminent hazard exists if any hazardous substance
905  creates an immediate and substantial danger to human health,
906  safety, or welfare or to the environment. The department may
907  institute action in its own name, using the procedures and
908  remedies of s. 403.121 or s. 403.131, to abate an imminent
909  hazard. However, the department is authorized to recover a civil
910  penalty of not more than $37,500 $25,000 for each day of
911  continued violation. Whenever serious harm to human health,
912  safety, and welfare; the environment; or private or public
913  property may occur before prior to completion of an
914  administrative hearing or other formal proceeding that which
915  might be initiated to abate the risk of serious harm, the
916  department may obtain, ex parte, an injunction without paying
917  filing and service fees before prior to the filing and service
918  of process.
919      Section 23.  Paragraph (a) of subsection (3) of section
920  403.727, Florida Statutes, is amended to read:
921      403.727  Violations; defenses, penalties, and remedies.—
922      (3)  Violations of the provisions of this act are
923  punishable as follows:
924      (a)  Any person who violates the provisions of this act,
925  the rules or orders of the department, or the conditions of a

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

926  permit is liable to the state for any damages specified in s.
927  403.141 and for a civil penalty of not more than $75,000 $50,000
928  for each day of continued violation, except as otherwise
929  provided herein. The department may revoke any permit issued to
930  the violator. In any action by the department against a small
931  hazardous waste generator for the improper disposal of hazardous
932  wastes, a rebuttable presumption of improper disposal shall be
933  created if the generator was notified pursuant to s. 403.7234;
934  the generator shall then have the burden of proving that the
935  disposal was proper. If the generator was not so notified, the
936  burden of proving improper disposal shall be placed upon the
937  department.
938       Section 24.  Subsection (8) of section 403.93345, Florida
939  Statutes, is amended to read:
940       403.93345  Coral reef protection.—
941       (8)  In addition to the compensation described in
942  subsection (5), the department may assess, per occurrence, civil
943  penalties according to the following schedule:
944       (a)  For any anchoring of a vessel on a coral reef or for
945  any other damage to a coral reef totaling less than or equal to
946  an area of 1 square meter, $225 $150, provided that a
947  responsible party who has anchored a recreational vessel as
948  defined in s. 327.02 which is lawfully registered or exempt from
949  registration pursuant to chapter 328 is issued, at least once, a
950  warning letter in lieu of penalty; with aggravating

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                                2020 Legislature

951  circumstances, an additional $225 $150; occurring within a state
952  park or aquatic preserve, an additional $225 $150.
953      (b)  For damage totaling more than an area of 1 square
954  meter but less than or equal to an area of 10 square meters,
955  $450 $300 per square meter; with aggravating circumstances, an
956  additional $450 $300 per square meter; occurring within a state
957  park or aquatic preserve, an additional $450 $300 per square
958  meter.
959      (c)  For damage exceeding an area of 10 square meters,
960  $1,500 $1,000 per square meter; with aggravating circumstances,
961  an additional $1,500 $1,000 per square meter; occurring within a
962  state park or aquatic preserve, an additional $1,500 $1,000 per
963  square meter.
964      (d)  For a second violation, the total penalty may be
965  doubled.
966      (e)  For a third violation, the total penalty may be
967  tripled.
968      (f)  For any violation after a third violation, the total
969  penalty may be quadrupled.
970      (g)  The total of penalties levied may not exceed $375,000
971  $250,000 per occurrence.
972      Section 25.  For the purpose of incorporating the amendment
973  made by this act to s. 376.16, Florida Statutes, in a reference
974  thereto, subsection (5) of s. 823.11, Florida Statutes, is
975  reenacted to read:

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

976        823.11  Derelict vessels; relocation or removal; penalty.—
977        (5)  A person, firm, or corporation violating this section
978   commits a misdemeanor of the first degree and shall be punished
979   as provided by law. A conviction under this section does not bar
980   the assessment and collection of the civil penalty provided in
981   s. 376.16 for violation of s. 376.15. The court having
982   jurisdiction over the criminal offense, notwithstanding any
983   jurisdictional limitations on the amount in controversy, may
984   order the imposition of such civil penalty in addition to any
985   sentence imposed for the first criminal offense.
986        Section 26.  For the purpose of incorporating the amendment
987   made by this act to section 403.121, Florida Statutes, in a
988   reference thereto, subsection (5) of section 403.077, Florida
989   Statutes, is reenacted to read:
990        403.077  Public notification of pollution.—
991        (5)  VIOLATIONS.—Failure to provide the notification
992   required by subsection (2) shall subject the owner or operator
993   to the civil penalties specified in s. 403.121.
994        Section 27.  For the purpose of incorporating the amendment
995   made by this act to section 403.121, Florida Statutes, in a
996   reference thereto, subsection (2) of section 403.131, Florida
997   Statutes, is reenacted to read:
998        403.131  Injunctive relief, remedies.—
999        (2)  All the judicial and administrative remedies to
1000  recover damages and penalties in this section and s. 403.121 are

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

ENROLLED

CS/CS/HB 1091, Engrossed 1                          2020 Legislature

1001  alternative and mutually exclusive.
1002      Section 28.  For the purpose of incorporating the amendment
1003  made by this act to section 403.121, Florida Statutes, in a
1004  reference thereto, paragraph (d) of subsection (3) of section
1005  403.4154, Florida Statutes, is reenacted to read:
1006      403.4154  Phosphogypsum management program.—
1007      (3)  ABATEMENT OF IMMINENT HAZARD.—
1008      (d)  If the department determines that the failure of an
1009  owner or operator to comply with department rules requiring
1010  demonstration of financial responsibility or that the physical
1011  condition, maintenance, operation, or closure of a phosphogypsum
1012  stack system poses an imminent hazard, the department shall
1013  request access to the property on which such stack system is
1014  located from the owner or operator of the stack system for the
1015  purposes of taking action to abate or substantially reduce the
1016  imminent hazard. If the department, after reasonable effort, is
1017  unable to timely obtain the necessary access to abate or
1018  substantially reduce the imminent hazard, the department may
1019  institute action in its own name, using the procedures and
1020  remedies of s. 403.121 or s. 403.131, to abate or substantially
1021  reduce an imminent hazard. Whenever serious harm to human
1022  health, safety, or welfare, to the environment, or to private or
1023  public property may occur before ~~prior to~~ completion of an
1024  administrative hearing or other formal proceeding that might be
1025  initiated to abate the risk of serious harm, the department may

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                    2020 Legislature

1026    obtain from the court, ex parte, an injunction without paying
1027    filing and service fees before ~~prior to~~ the filing and service
1028    of process.
1029         Section 29.  For the purpose of incorporating the amendment
1030    made by this act to section 403.121, Florida Statutes, in a
1031    reference thereto, subsection (5) of section 403.860, Florida
1032    Statutes, is reenacted to read:
1033         403.860  Penalties and remedies.—
1034         (5)  In addition to any judicial or administrative remedy
1035    authorized by this part, the department or a county health
1036    department that has received approval by the department pursuant
1037    to s. 403.862(1)(c) shall assess administrative penalties for
1038    violations of this section in accordance with s. 403.121.
1039         Section 30.  For the purpose of incorporating the amendment
1040    made by this act to section 403.141, Florida Statutes, in a
1041    reference thereto, subsection (10) of section 403.708, Florida
1042    Statutes, is reenacted to read:
1043         403.708  Prohibition; penalty.—
1044         (10)  Violations of this part or rules, regulations,
1045    permits, or orders issued thereunder by the department and
1046    violations of approved local programs of counties or
1047    municipalities or rules, regulations, or orders issued
1048    thereunder are punishable by a civil penalty as provided in s.
1049    403.141.
1050         Section 31.  For the purpose of incorporating the amendment

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                              2020 Legislature

1051  made by this act to section 403.141, Florida Statutes, in a
1052  reference thereto, subsection (7) of section 403.7191, Florida
1053  Statutes, is reenacted to read:
1054      403.7191  Toxics in packaging.—
1055      (7)  ENFORCEMENT.—It is unlawful for any person to:
1056      (a)  Violate any provision of this section or any rule
1057  adopted or order issued thereunder by the department.
1058      (b)  Tender for sale to a purchaser any package, packaging
1059  component, or packaged product in violation of this section or
1060  any rule adopted or order issued thereunder.
1061      (c)  Furnish a certificate of compliance with respect to
1062  any package or packaging component which does not comply with
1063  the provisions of subsection (3).
1064      (d)  Provide a certificate of compliance that contains
1065  false information.
1066
1067  Violations shall be punishable by a civil penalty as provided in
1068  s. 403.141.
1069      Section 32.  For the purpose of incorporating the amendment
1070  made by this act to section 403.141, Florida Statutes, in a
1071  reference thereto, section 403.811, Florida Statutes, is
1072  reenacted to read:
1073      403.811  Dredge and fill permits issued pursuant to this
1074  chapter and s. 373.414.—Permits or other orders addressing
1075  dredging and filling in, on, or over waters of the state issued

Page 43 of 45

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

FLORIDA  HOUSE  OF  REPRESENTATIVES

ENROLLED

CS/CS/HB 1091, Engrossed 1                                2020 Legislature

1076    pursuant to this chapter or s. 373.414(9) before the effective
1077    date of rules adopted under s. 373.414(9) and permits or other
1078    orders issued in accordance with s. 373.414(13), (14), (15), or
1079    (16) shall remain valid through the duration specified in the
1080    permit or order, unless revoked by the agency issuing the
1081    permit. The agency issuing the permit or other order may seek to
1082    enjoin the violation of, or to enforce compliance with, the
1083    permit or other order as provided in ss. 403.121, 403.131,
1084    403.141, and 403.161. A violation of a permit or other order
1085    addressing dredging or filling issued pursuant to this chapter
1086    is punishable by a civil penalty as provided in s. 403.141 or a
1087    criminal penalty as provided in s. 403.161.
1088        Section 33.  For the purpose of incorporating the
1089    amendments made by this act to sections 403.141 and 403.161,
1090    Florida Statutes, in references thereto, subsection (8) of
1091    section 403.7186, Florida Statutes, is reenacted to read:
1092        403.7186  Environmentally sound management of mercury-
1093    containing devices and lamps.—
1094        (8)  CIVIL PENALTY.—A person who engages in any act or
1095    practice declared in this section to be prohibited or unlawful,
1096    or who violates any of the rules of the department promulgated
1097    under this section, is liable to the state for any damage caused
1098    and for civil penalties in accordance with s. 403.141. The
1099    provisions of s. 403.161 are not applicable to this section. The
1100    penalty may be waived if the person previously has taken

Page 44 of 45

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

F L O R I D A   H O U S E   O F   R E P R E S E N T A T I V E S

ENROLLED

CS/CS/HB 1091, Engrossed 1                                  2020 Legislature

1101  appropriate corrective action to remedy the actual damages, if
1102  any, caused by the unlawful act or practice or rule violation. A
1103  civil penalty so collected shall accrue to the state and shall
1104  be deposited as received into the Solid Waste Management Trust
1105  Fund for the purposes specified in paragraph (5)(a).
1106        Section 34.  For the purpose of incorporating the amendment
1107  made by this act to section 403.161, Florida Statutes, in a
1108  reference thereto, subsection (2) of section 403.7255, Florida
1109  Statutes, is reenacted to read:
1110        403.7255  Placement of signs.—
1111        (2)  Violations of this act are punishable as provided in
1112  s. 403.161(4).
1113        Section 35.  This act shall take effect July 1, 2020.

CODING: Words stricken are deletions; words underlined are additions.

hb1091-04-er

2020712er

```
 1
 2        An act relating to environmental resource management;
 3        providing a short title; requiring the Department of
 4        Health to provide a specified report to the Governor
 5        and the Legislature by a specified date; requiring the
 6        Department of Health and the Department of
 7        Environmental Protection to submit to the Governor and
 8        the Legislature, by a specified date, certain
 9        recommendations relating to the transfer of the Onsite
10        Sewage Program; requiring the departments to enter
11        into an interagency agreement that meets certain
12        requirements by a specified date; transferring the
13        Onsite Sewage Program within the Department of Health
14        to the Department of Environmental Protection by a
15        type two transfer by a specified date; providing that
16        certain employees retain and transfer certain types of
17        leave upon the transfer; amending s. 373.036, F.S.;
18        directing water management districts to submit
19        consolidated annual reports to the Office of Economic
20        and Demographic Research; requiring such reports to
21        include connection and conversion projects for onsite
22        sewage treatment and disposal systems; requiring the
23        Department of Environmental Protection, in
24        coordination with the water management districts, to
25        conduct a study on the bottled water industry in this
26        state; providing requirements for the study; requiring
27        the department to submit a report containing the
28        findings of the study to the Governor and the
29        Legislature by a specified date; defining terms;
```

CODING: Words stricken are deletions; words underlined are additions.

2020712er

30          amending s. 373.4131, F.S.; requiring the Department
31          of Environmental Protection to include stormwater
32          structural control inspections as part of its regular
33          staff training; requiring the department and the water
34          management districts to adopt rules regarding
35          stormwater design and operation regulations by a
36          specified date and address specified information as
37          part of such rule development; requiring the
38          department to review and evaluate data relating to
39          self-certification and provide the Legislature with
40          recommendations for improvements; amending s.
41          381.0065, F.S.; requiring the department to implement
42          an approval process for the use of specified nutrient-
43          reducing onsite sewage treatment and disposal systems
44          by a specified date; defining the term "department"
45          for the regulation of onsite sewage treatment and
46          disposal systems; revising the duties of the
47          department; requiring the Department of Environmental
48          Protection to adopt rules relating to the location of
49          onsite sewage treatment and disposal systems and
50          complete such rulemaking by a specified date;
51          providing requirements for such rules; requiring the
52          department to determine that a hardship exists for
53          certain variance applicants; providing that certain
54          provisions relating to existing setback requirements
55          are applicable to permits only until the effective
56          date of certain rules adopted by the department;
57          removing provisions requiring certain onsite sewage
58          treatment and disposal system research projects to be

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

59    approved by a Department of Health technical review
60    and advisory panel; removing provisions prohibiting
61    the award of research projects to certain entities;
62    removing provisions establishing a Department of
63    Health onsite sewage treatment and disposal system
64    research review and advisory committee; conforming
65    provisions to changes made by the act; creating s.
66    381.00652, F.S.; defining the term "department";
67    creating the onsite sewage treatment and disposal
68    systems technical advisory committee within the
69    Department of Environmental Protection; authorizing
70    the department, in consultation with the Department of
71    Health, to appoint an onsite sewage treatment and
72    disposal systems technical advisory committee;
73    providing for committee purpose, membership, and
74    expiration; requiring the committee to submit its
75    recommendations to the Governor and Legislature;
76    providing for the expiration of the committee;
77    repealing s. 381.0068, F.S., relating to the
78    Department of Health onsite sewage treatment and
79    disposal systems technical review and advisory panel;
80    amending s. 403.061, F.S.; requiring the department to
81    adopt rules relating to domestic wastewater collection
82    and transmission system pipe leakages and inflow and
83    infiltration; requiring the department to adopt rules
84    to require public utilities or their affiliated
85    companies holding, applying for, or renewing a
86    domestic wastewater discharge permit to file certain
87    annual reports and data with the department; creating

CODING: Words stricken are deletions; words underlined are additions.

2020712er

```
 88          s. 403.0616, F.S.; requiring the department, subject
 89          to legislative appropriation, to establish a real-time
 90          water quality monitoring program; encouraging the
 91          formation of public-private partnerships; amending s.
 92          403.064, F.S.; requiring the Department of
 93          Environmental Protection to initiate rule revisions
 94          based on certain potable reuse recommendations by a
 95          specified date; providing requirements for such rules;
 96          providing that reclaimed water is deemed a water
 97          source for public water supply systems; amending s.
 98          403.067, F.S.; requiring basin management action plans
 99          for nutrient total maximum daily loads to include
100          wastewater treatment and onsite sewage treatment and
101          disposal system remediation plans that meet certain
102          requirements; requiring the Department of Agriculture
103          and Consumer Services to collect fertilizer
104          application records from certain agricultural
105          producers and provide the information to the
106          department annually by a specified date; requiring the
107          Department of Agriculture and Consumer Services to
108          perform onsite inspections of the agricultural
109          producers at specified intervals; providing for
110          prioritization of such inspections; requiring certain
111          basin management action plans to include cooperative
112          agricultural regional water quality improvement
113          elements; requiring the Department of Agriculture and
114          Consumer Services, in cooperation with specified
115          entities, to annually develop research plans and
116          legislative budget requests relating to best
```

CODING: Words stricken are deletions; words underlined are additions.

2020712er

117    management practices by a specified date; requiring
118    such entities to submit such plans to the Department
119    of Environmental Protection and the Department of
120    Agriculture and Consumer Services by a specific date;
121    requiring the Department of Environmental Protection
122    to work with specified entities to consider the
123    adoption of best management practices for nutrient
124    impacts from golf courses; creating s. 403.0671, F.S.;
125    directing the Department of Environmental Protection,
126    in coordination with specified entities, to submit
127    reports regarding wastewater projects identified in
128    the basin management action plans to the Governor and
129    the Legislature and to submit certain wastewater
130    project cost estimates to the Office of Economic and
131    Demographic Research by specified dates; creating s.
132    403.0673, F.S.; establishing a wastewater grant
133    program within the Department of Environmental
134    Protection; authorizing the department to distribute
135    appropriated funds for certain projects; providing
136    requirements for the distribution; requiring the
137    department to coordinate with each water management
138    district to identify grant recipients; requiring an
139    annual report to the Governor and Legislature by a
140    specified date; creating s. 403.0855, F.S.; providing
141    legislative findings regarding the regulation of
142    biosolids management in this state; requiring the
143    department to adopt rules for biosolids management;
144    providing that such rules are not effective until
145    ratified by the Legislature; providing permitting

CODING: Words stricken are deletions; words underlined are additions.

2020712er

146          requirements for biosolids land application sites and
147          facilities; requiring biosolids application sites and
148          facilities to be enrolled in a specified best
149          management practices program or be within a specified
150          agricultural operation; providing requirements for the
151          land application of biosolids; providing a definition;
152          authorizing the enforcement or extension of certain
153          local government regulations relating to the land
154          application of biosolids until such regulations are
155          repealed; amending s. 403.086, F.S.; prohibiting
156          sewage disposal facilities from disposing waste into
157          the Indian River Lagoon beginning on a specified date
158          without certain advanced waste treatment; directing
159          the Department of Environmental Protection, in
160          consultation with specified entities, to submit a
161          report to the Governor and the Legislature by a
162          specified date; requiring sewage disposal facilities
163          to have a power outage contingency plan, to take steps
164          to prevent overflows and leaks and ensure that the
165          wastewater reaches the facility for appropriate
166          treatment, and to provide the Department of
167          Environmental Protection with certain information;
168          requiring the department to adopt rules; limiting the
169          scope of such rules; authorizing utilities and
170          operating entities to consolidate certain reports;
171          providing that specified compliance is evidence in
172          mitigation for assessment of certain penalties;
173          amending s. 403.087, F.S.; requiring the department to
174          issue operation permits for certain domestic

CODING: Words stricken are deletions; words underlined are additions.

2020712er

175        wastewater treatment facilities under certain
176        circumstances; amending s. 403.088, F.S.; revising the
177        permit conditions for a water pollution operation
178        permit; requiring permittees to submit annual reports
179        to the department; requiring the department to submit
180        an annual report identifying all domestic wastewater
181        treatment facilities that experienced sanitary sewer
182        overflows to the Governor and the Legislature by a
183        specified date; amending s. 403.0891, F.S.; requiring
184        model stormwater management programs to contain model
185        ordinances for nutrient reduction practices and green
186        infrastructure; amending s. 403.121, F.S.; revising
187        administrative penalties for violations of ch. 403,
188        F.S.; amending ss. 403.1835 and 403.1838, F.S.;
189        requiring the Department of Environmental Protection
190        to give funding priority to certain domestic
191        wastewater utility projects; amending s. 403.412,
192        F.S.; prohibiting local governments from recognizing
193        or granting certain legal rights to the natural
194        environment or granting such rights relating to the
195        natural environment to a person or political
196        subdivision; providing construction; providing a
197        declaration of important state interest; amending ss.
198        153.54, 153.73, 163.3180, 180.03, 311.105, 327.46,
199        373.250, 373.414, 373.705, 373.707, 373.709, 373.807,
200        376.307, 380.0552, 381.006, 381.0061, 381.0064,
201        381.00651, 381.0101, 403.08601, 403.0871, 403.0872,
202        403.707, 403.861, 489.551, and 590.02, F.S.;
203        conforming cross-references and provisions to changes

CODING: Words stricken are deletions; words underlined are additions.

2020712er

```
204        made by the act; providing a directive to the Division
205        of Law Revision upon the adoption of certain rules by
206        the Department of Environmental Protection; providing
207        effective dates.
208
209  Be It Enacted by the Legislature of the State of Florida:
210
211        Section 1. This act may be cited as the "Clean Waterways
212  Act."
213        Section 2. (1) By July 1, 2020, the Department of Health
214  must provide a report to the Governor, the President of the
215  Senate, and the Speaker of the House of Representatives
216  detailing the following information regarding the Onsite Sewage
217  Program:
218        (a) The average number of permits issued each year;
219        (b) The number of department employees conducting work on
220  or related to the program each year; and
221        (c) The program's costs and expenditures, including, but
222  not limited to, salaries and benefits, equipment costs, and
223  contracting costs.
224        (2) By December 31, 2020, the Department of Health and the
225  Department of Environmental Protection shall submit
226  recommendations to the Governor, the President of the Senate,
227  and the Speaker of the House of Representatives regarding the
228  transfer of the Onsite Sewage Program from the Department of
229  Health to the Department of Environmental Protection. The
230  recommendations must address all aspects of the transfer,
231  including the continued role of the county health departments in
232  the permitting, inspection, data management, and tracking of
```

CODING: Words stricken are deletions; words underlined are additions.

2020712er

233  onsite sewage treatment and disposal systems under the direction
234  of the Department of Environmental Protection.

235      (3) By June 30, 2021, the Department of Health and the
236  Department of Environmental Protection shall enter into an
237  interagency agreement based on the Department of Health report
238  required under subsection (2) and on recommendations from a plan
239  that must address all agency cooperation for a period not less
240  than 5 years after the transfer, including:

241      (a) The continued role of the county health departments in
242  the permitting, inspection, data management, and tracking of
243  onsite sewage treatment and disposal systems under the direction
244  of the Department of Environmental Protection.

245      (b) The appropriate proportionate number of administrative,
246  auditing, inspector general, attorney, and operational support
247  positions, and their related funding levels and sources and
248  assigned property, to be transferred from the Office of General
249  Counsel, the Office of Inspector General, and the Division of
250  Administrative Services or other relevant offices or divisions
251  within the Department of Health to the Department of
252  Environmental Protection.

253      (c) The development of a recommended plan to address the
254  transfer or shared use of buildings, regional offices, and other
255  facilities used or owned by the Department of Health.

256      (d) Any operating budget adjustments that are necessary to
257  implement the requirements of this act. Adjustments made to the
258  operating budgets of the agencies in the implementation of this
259  act must be made in consultation with the appropriate
260  substantive and fiscal committees of the Senate and the House of
261  Representatives. The revisions to the approved operating budgets

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

262 for the 2021-2022 fiscal year which are necessary to reflect the
263 organizational changes made by this act must be implemented
264 pursuant to s. 216.292(4)(d), Florida Statutes, and are subject
265 to s. 216.177, Florida Statutes. Subsequent adjustments between
266 the Department of Health and the Department of Environmental
267 Protection which are determined necessary by the respective
268 agencies and approved by the Executive Office of the Governor
269 are authorized and subject to s. 216.177, Florida Statutes. The
270 appropriate substantive committees of the Senate and the House
271 of Representatives must also be notified of the proposed
272 revisions to ensure their consistency with legislative policy
273 and intent.

274     (4) Effective July 1, 2021, all powers, duties, functions,
275 records, offices, personnel, associated administrative support
276 positions, property, pending issues, existing contracts,
277 administrative authority, administrative rules, and unexpended
278 balances of appropriations, allocations, and other funds for the
279 regulation of onsite sewage treatment and disposal systems
280 relating to the Onsite Sewage Program in the Department of
281 Health are transferred by a type two transfer, as defined in s.
282 20.06(2), Florida Statutes, to the Department of Environmental
283 Protection.

284     (5) Notwithstanding chapter 60L-34, Florida Administrative
285 Code, or any law to the contrary, employees who are transferred
286 from the Department of Health to the Department of Environmental
287 Protection to fill positions transferred by this act retain and
288 transfer any accrued annual leave, sick leave, and regular and
289 special compensatory leave balances.

290     Section 3. Paragraphs (a) and (b) of subsection (7) of

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

291   section 373.036, Florida Statutes, are amended to read:

292       373.036 Florida water plan; district water management

293   plans.—

294       (7) CONSOLIDATED WATER MANAGEMENT DISTRICT ANNUAL REPORT.—

295       (a) By March 1, annually, each water management district

296   shall prepare and submit to <u>the Office of Economic and</u>

297   <u>Demographic Research,</u> the department, the Governor, the

298   President of the Senate, and the Speaker of the House of

299   Representatives a consolidated water management district annual

300   report on the management of water resources. In addition, copies

301   must be provided by the water management districts to the chairs

302   of all legislative committees having substantive or fiscal

303   jurisdiction over the districts and the governing board of each

304   county in the district having jurisdiction or deriving any funds

305   for operations of the district. Copies of the consolidated

306   annual report must be made available to the public, either in

307   printed or electronic format.

308       (b) The consolidated annual report shall contain the

309   following elements, as appropriate to that water management

310   district:

311       1. A district water management plan annual report or the

312   annual work plan report allowed in subparagraph (2)(e)4.

313       2. The department-approved minimum flows and minimum water

314   levels annual priority list and schedule required by s.

315   373.042(3).

316       3. The annual 5-year capital improvements plan required by

317   s. 373.536(6)(a)3.

318       4. The alternative water supplies annual report required by

319   s. 373.707(8)(n).

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

320      5. The final annual 5-year water resource development work
321 program required by s. 373.536(6)(a)4.
322      6. The Florida Forever Water Management District Work Plan
323 annual report required by s. 373.199(7).
324      7. The mitigation donation annual report required by s.
325 373.414(1)(b)2.
326      8. Information on all projects related to water quality or
327 water quantity as part of a 5-year work program, including:
328      a. A list of all specific projects identified to implement
329 a basin management action plan, including any projects to
330 connect onsite sewage treatment and disposal systems to central
331 sewerage systems and convert onsite sewage treatment and
332 disposal systems to enhanced nutrient-reducing onsite sewage
333 treatment and disposal systems, or a recovery or prevention
334 strategy;
335      b. A priority ranking for each listed project for which
336 state funding through the water resources development work
337 program is requested, which must be made available to the public
338 for comment at least 30 days before submission of the
339 consolidated annual report;
340      c. The estimated cost for each listed project;
341      d. The estimated completion date for each listed project;
342      e. The source and amount of financial assistance to be made
343 available by the department, a water management district, or
344 other entity for each listed project; and
345      f. A quantitative estimate of each listed project's benefit
346 to the watershed, water body, or water segment in which it is
347 located.
348      9. A grade for each watershed, water body, or water segment

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

349  in which a project listed under subparagraph 8. is located
350  representing the level of impairment and violations of adopted
351  minimum flow or minimum water levels. The grading system must
352  reflect the severity of the impairment of the watershed, water
353  body, or water segment.

354      Section 4. Bottled water industry study.—The department
355  shall, in coordination with the water management districts,
356  conduct a study on the bottled water industry in this state.

357      (1) The study must:
358      (a) Identify all springs statewide that have an associated
359  consumptive use permit for a bottled water facility producing
360  its product with water derived from a spring. Such
361  identification must include:

362      1. The magnitude of the spring;
363      2. Whether the spring has been identified as an Outstanding
364  Florida Spring as defined in s. 373.802, Florida Statutes;
365      3. Any department- or water management district-adopted
366  minimum flow or minimum water levels, the status of any adopted
367  minimum flow or minimum water levels, and any associated
368  recovery or prevention strategy;
369      4. The permitted and actual use associated with the
370  consumptive use permits;
371      5. The reduction in flow associated with the permitted and
372  actual use associated with the consumptive use permits;
373      6. The impact on springs of bottled water facilities as
374  compared to other users; and
375      7. Types of water conservation measures employed at bottled
376  water facilities permitted to derive water from a spring.
377      (b) Identify the labeling and marketing regulations

CODING: Words stricken are deletions; words underlined are additions.

2020712er

378  associated with the identification of bottled water as spring
379  water, including whether these regulations incentivize the
380  withdrawal of water from springs.

381      (c) Evaluate the direct and indirect economic benefits to
382  the local communities resulting from bottled water facilities
383  that derive water from springs, including, but not limited to,
384  tax revenue, job creation, and wages.

385      (d) Evaluate the direct and indirect costs to the local
386  communities located in proximity to springs impacted by
387  withdrawals from bottled water production, including, but not
388  limited to, the decreased recreational value of the springs and
389  the cost to other users for the development of alternative water
390  supply or reductions in permit durations and allocations.

391      (e) Include a cost-benefit analysis of withdrawing,
392  producing, marketing, selling, and consuming spring water as
393  compared to other sources of bottled water.

394      (f) Evaluate how much bottled water derived from Florida
395  springs is sold in this state.

396      (2) By June 30, 2021, the department shall submit a report
397  containing the findings of the study to the Governor, the
398  President of the Senate, the Speaker of the House of
399  Representatives, and the Office of Economic and Demographic
400  Research.

401      (3) As used in this section, the term "bottled water" has
402  the same meaning as in s. 500.03, Florida Statutes, and the term
403  "water derived from a spring" means water derived from an
404  underground formation from which water flows naturally to the
405  surface of the earth in the manner described in 21 C.F.R. s.
406  165.110(a)(2)(vi).

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

407     Section 5. Subsection (5) of section 373.4131, Florida
408 Statutes, is amended, and subsection (6) is added to that
409 section, to read:

410     373.4131 Statewide environmental resource permitting
411 rules.—

412     (5) To ensure consistent implementation and interpretation
413 of the rules adopted pursuant to this section, the department
414 shall conduct or oversee regular assessment and training of its
415 staff and the staffs of the water management districts and local
416 governments delegated local pollution control program authority
417 under s. 373.441. The training must include field inspections of
418 publicly and privately owned stormwater structural controls,
419 such as stormwater retention and detention ponds.

420     (6) By January 1, 2021:
421     (a) The department and the water management districts shall
422 initiate rulemaking to update the stormwater design and
423 operation regulations, including updates to the Environmental
424 Resource Permit Applicant's Handbook, using the most recent
425 scientific information available. As part of rule development,
426 the department shall consider and address low-impact design best
427 management practices and design criteria that increase the
428 removal of nutrients from stormwater discharges, and measures
429 for consistent application of the net improvement performance
430 standard to ensure significant reductions of any pollutant
431 loadings to a waterbody.

432     (b) The department shall review and evaluate permits and
433 inspection data by those entities that submit a self-
434 certification under s. 403.814(12) for compliance with state
435 water quality standards and provide the Legislature with

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

436 recommendations for improvements to the self-certification
437 process, including, but not limited to, additional staff
438 resources for department review of portions of the process where
439 high-priority water quality issues justify such action.
440     Section 6. Subsection (7) is added to section 381.0065,
441 Florida Statutes, to read:
442     381.0065 Onsite sewage treatment and disposal systems;
443 regulation.—
444     (7) USE OF ENHANCED NUTRIENT-REDUCING ONSITE SEWAGE
445 TREATMENT AND DISPOSAL SYSTEMS.—To meet the requirements of a
446 total maximum daily load, the department shall implement a fast-
447 track approval process of no longer than 6 months for the
448 determination of the use of American National Standards
449 Institute 245 systems approved by NSF International before July
450 1, 2020.
451     Section 7. Effective July 1, 2021, present paragraphs (d)
452 through (q) of subsection (2) of section 381.0065, Florida
453 Statutes, are redesignated as paragraphs (e) through (r),
454 respectively, subsections (3) and (4) of that section are
455 amended, and a new paragraph (d) is added to subsection (2) of
456 that section, to read:
457     381.0065 Onsite sewage treatment and disposal systems;
458 regulation.—
459     (2) DEFINITIONS.—As used in ss. 381.0065-381.0067, the
460 term:
461     (d) "Department" means the Department of Environmental
462 Protection.
463     (3) DUTIES AND POWERS OF THE DEPARTMENT OF ENVIRONMENTAL
464 PROTECTION HEALTH.—The department shall:

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

465     (a) Adopt rules to administer ss. 381.0065-381.0067,
466 including definitions that are consistent with the definitions
467 in this section, ~~decreases to setback requirements where no~~
468 ~~health hazard exists,~~ increases for the lot-flow allowance for
469 performance-based systems, requirements for separation from
470 water table elevation during the wettest season, requirements
471 for the design and construction of any component part of an
472 onsite sewage treatment and disposal system, application and
473 permit requirements for persons who maintain an onsite sewage
474 treatment and disposal system, requirements for maintenance and
475 service agreements for aerobic treatment units and performance-
476 based treatment systems, and recommended standards, including
477 disclosure requirements, for voluntary system inspections to be
478 performed by individuals who are authorized by law to perform
479 such inspections and who shall inform a person having ownership,
480 control, or use of an onsite sewage treatment and disposal
481 system of the inspection standards and of that person's
482 authority to request an inspection based on all or part of the
483 standards.

484     (b) Perform application reviews and site evaluations, issue
485 permits, and conduct inspections and complaint investigations
486 associated with the construction, installation, maintenance,
487 modification, abandonment, operation, use, or repair of an
488 onsite sewage treatment and disposal system for a residence or
489 establishment with an estimated domestic sewage flow of 10,000
490 gallons or less per day, or an estimated commercial sewage flow
491 of 5,000 gallons or less per day, which is not currently
492 regulated under chapter 403.

493     (c) Develop a comprehensive program to ensure that onsite

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

494  sewage treatment and disposal systems regulated by the
495  department are sized, designed, constructed, installed, sited,
496  repaired, modified, abandoned, used, operated, and maintained in
497  compliance with this section and rules adopted under this
498  section to prevent groundwater contamination, including impacts
499  from nutrient pollution, and surface water contamination and to
500  preserve the public health. The department is the final
501  administrative interpretive authority regarding rule
502  interpretation. In the event of a conflict regarding rule
503  interpretation, the Secretary of Environmental Protection State
504  Surgeon General, or his or her designee, shall timely assign a
505  staff person to resolve the dispute.

506      (d) Grant variances in hardship cases under the conditions
507  prescribed in this section and rules adopted under this section.

508      (e) Permit the use of a limited number of innovative
509  systems for a specific period of time, when there is compelling
510  evidence that the system will function properly and reliably to
511  meet the requirements of this section and rules adopted under
512  this section.

513      (f) Issue annual operating permits under this section.

514      (g) Establish and collect fees as established under s.
515  381.0066 for services provided with respect to onsite sewage
516  treatment and disposal systems.

517      (h) Conduct enforcement activities, including imposing
518  fines, issuing citations, suspensions, revocations, injunctions,
519  and emergency orders for violations of this section, part I of
520  chapter 386, or part III of chapter 489 or for a violation of
521  any rule adopted under this section, part I of chapter 386, or
522  part III of chapter 489.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

523      (i) Provide or conduct education and training of department
524 personnel, service providers, and the public regarding onsite
525 sewage treatment and disposal systems.

526      (j) Supervise research on, demonstration of, and training
527 on the performance, environmental impact, and public health
528 impact of onsite sewage treatment and disposal systems within
529 this state. Research fees collected under s. 381.0066(2)(k) must
530 be used to develop and fund hands-on training centers designed
531 to provide practical information about onsite sewage treatment
532 and disposal systems to septic tank contractors, master septic
533 tank contractors, contractors, inspectors, engineers, and the
534 public and must also be used to fund research projects which
535 focus on improvements of onsite sewage treatment and disposal
536 systems, including use of performance-based standards and
537 reduction of environmental impact. Research projects shall be
538 initially approved by the technical review and advisory panel
539 and shall be applicable to and reflect the soil conditions
540 specific to this state Florida. Such projects shall be awarded
541 through competitive negotiation, using the procedures provided
542 in s. 287.055, to public or private entities that have
543 experience in onsite sewage treatment and disposal systems in
544 this state Florida and that are principally located in this
545 state Florida. Research projects shall not be awarded to firms
546 or entities that employ or are associated with persons who serve
547 on either the technical review and advisory panel or the
548 research review and advisory committee.

549      (k) Approve the installation of individual graywater
550 disposal systems in which blackwater is treated by a central
551 sewerage system.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

(l) Regulate and permit the sanitation, handling, treatment, storage, reuse, and disposal of byproducts from any system regulated under this chapter ~~and not regulated by the Department of Environmental Protection~~.

(m) Permit and inspect portable or temporary toilet services and holding tanks. The department shall review applications, perform site evaluations, and issue permits for the temporary use of holding tanks, privies, portable toilet services, or any other toilet facility that is intended for use on a permanent or nonpermanent basis, including facilities placed on construction sites when workers are present. The department may specify standards for the construction, maintenance, use, and operation of any such facility for temporary use.

(n) Regulate and permit maintenance entities for performance-based treatment systems and aerobic treatment unit systems. To ensure systems are maintained and operated according to manufacturer's specifications and designs, the department shall establish by rule minimum qualifying criteria for maintenance entities. The criteria shall include~~:~~ training, access to approved spare parts and components, access to manufacturer's maintenance and operation manuals, and service response time. The maintenance entity shall employ a contractor licensed under s. 489.105(3)(m), or part III of chapter 489, or a state-licensed wastewater plant operator, who is responsible for maintenance and repair of all systems under contract.

(4) PERMITS; INSTALLATION; AND CONDITIONS.—A person may not construct, repair, modify, abandon, or operate an onsite sewage treatment and disposal system without first obtaining a permit

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

581  approved by the department. The department may issue permits to
582  carry out this section, but shall not make the issuance of such
583  permits contingent upon prior approval by the department of
584  Environmental Protection, except that the issuance of a permit
585  for work seaward of the coastal construction control line
586  established under s. 161.053 shall be contingent upon receipt of
587  any required coastal construction control line permit from the
588  department of Environmental Protection. A construction permit is
589  valid for 18 months after from the date of issuance date and may
590  be extended by the department for one 90-day period under rules
591  adopted by the department. A repair permit is valid for 90 days
592  after from the date of issuance. An operating permit must be
593  obtained before prior to the use of any aerobic treatment unit
594  or if the establishment generates commercial waste. Buildings or
595  establishments that use an aerobic treatment unit or generate
596  commercial waste shall be inspected by the department at least
597  annually to assure compliance with the terms of the operating
598  permit. The operating permit for a commercial wastewater system
599  is valid for 1 year after from the date of issuance and must be
600  renewed annually. The operating permit for an aerobic treatment
601  unit is valid for 2 years after from the date of issuance and
602  must be renewed every 2 years. If all information pertaining to
603  the siting, location, and installation conditions or repair of
604  an onsite sewage treatment and disposal system remains the same,
605  a construction or repair permit for the onsite sewage treatment
606  and disposal system may be transferred to another person, if the
607  transferee files, within 60 days after the transfer of
608  ownership, an amended application providing all corrected
609  information and proof of ownership of the property. A There is

CODING: Words stricken are deletions; words underlined are additions.

2020712er

610  ~~no~~ fee is not associated with the processing of this
611  supplemental information. A person may not contract to
612  construct, modify, alter, repair, service, abandon, or maintain
613  any portion of an onsite sewage treatment and disposal system
614  without being registered under part III of chapter 489. A
615  property owner who personally performs construction,
616  maintenance, or repairs to a system serving his or her own
617  owner-occupied single-family residence is exempt from
618  registration requirements for performing such construction,
619  maintenance, or repairs on that residence, but is subject to all
620  permitting requirements. A municipality or political subdivision
621  of the state may not issue a building or plumbing permit for any
622  building that requires the use of an onsite sewage treatment and
623  disposal system unless the owner or builder has received a
624  construction permit for such system from the department. A
625  building or structure may not be occupied and a municipality,
626  political subdivision, or any state or federal agency may not
627  authorize occupancy until the department approves the final
628  installation of the onsite sewage treatment and disposal system.
629  A municipality or political subdivision of the state may not
630  approve any change in occupancy or tenancy of a building that
631  uses an onsite sewage treatment and disposal system until the
632  department has reviewed the use of the system with the proposed
633  change, approved the change, and amended the operating permit.

634      (a) Subdivisions and lots in which each lot has a minimum
635  area of at least one-half acre and either a minimum dimension of
636  100 feet or a mean of at least 100 feet of the side bordering
637  the street and the distance formed by a line parallel to the
638  side bordering the street drawn between the two most distant

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

639  points of the remainder of the lot may be developed with a water
640  system regulated under s. 381.0062 and onsite sewage treatment
641  and disposal systems, provided the projected daily sewage flow
642  does not exceed an average of 1,500 gallons per acre per day,
643  and provided satisfactory drinking water can be obtained and all
644  distance and setback, soil condition, water table elevation, and
645  other related requirements of this section and rules adopted
646  under this section can be met.

647       (b) Subdivisions and lots using a public water system as
648  defined in s. 403.852 may use onsite sewage treatment and
649  disposal systems, provided there are no more than four lots per
650  acre, provided the projected daily sewage flow does not exceed
651  an average of 2,500 gallons per acre per day, and provided that
652  all distance and setback, soil condition, water table elevation,
653  and other related requirements that are generally applicable to
654  the use of onsite sewage treatment and disposal systems are met.

655       (c) Notwithstanding paragraphs (a) and (b), for
656  subdivisions platted of record on or before October 1, 1991,
657  when a developer or other appropriate entity has previously made
658  or makes provisions, including financial assurances or other
659  commitments, acceptable to the department ~~of Health~~, that a
660  central water system will be installed by a regulated public
661  utility based on a density formula, private potable wells may be
662  used with onsite sewage treatment and disposal systems until the
663  agreed-upon densities are reached. In a subdivision regulated by
664  this paragraph, the average daily sewage flow may not exceed
665  2,500 gallons per acre per day. This section does not affect the
666  validity of existing prior agreements. After October 1, 1991,
667  the exception provided under this paragraph is not available to

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

668  a developer or other appropriate entity.

669      (d) Paragraphs (a) and (b) do not apply to any proposed
670  residential subdivision with more than 50 lots or to any
671  proposed commercial subdivision with more than 5 lots where a
672  publicly owned or investor-owned sewage treatment ~~sewerage~~
673  system is available. ~~It is the intent of~~ This paragraph does not
674  ~~to~~ allow development of additional proposed subdivisions in
675  order to evade the requirements of this paragraph.

676      (e) The department shall adopt rules relating to the
677  location of onsite sewage treatment and disposal systems,
678  including establishing setback distances, to prevent groundwater
679  contamination and surface water contamination and to preserve
680  the public health. The rulemaking process for such rules must be
681  completed by July 1, 2022, and the department shall notify the
682  Division of Law Revision of the date such rules take effect. The
683  rules must consider conventional and enhanced nutrient-reducing
684  onsite sewage treatment and disposal system designs, impaired or
685  degraded water bodies, domestic wastewater and drinking water
686  infrastructure, potable water sources, nonpotable wells,
687  stormwater infrastructure, the onsite sewage treatment and
688  disposal system remediation plans developed pursuant to s.
689  403.067(7)(a)9.b., nutrient pollution, and the recommendations
690  of the onsite sewage treatment and disposal systems technical
691  advisory committee established pursuant to s. 381.00652. The
692  rules must also allow a person to apply for and receive a
693  variance from a rule requirement upon demonstration that the
694  requirement would cause an undue hardship and granting the
695  variance would not cause or contribute to the exceedance of a
696  total maximum daily load.

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 344 of 694
ENROLLED
2020 Legislature                         CS for CS for SB 712, 1st Engrossed

2020712er

697         (f)(e) Onsite sewage treatment and disposal systems that
698  are permitted before the rules in paragraph (e) take effect may
699  must not be placed closer than:

700         1. Seventy-five feet from a private potable well.

701         2. Two hundred feet from a public potable well serving a
702  residential or nonresidential establishment having a total
703  sewage flow of greater than 2,000 gallons per day.

704         3. One hundred feet from a public potable well serving a
705  residential or nonresidential establishment having a total
706  sewage flow of less than or equal to 2,000 gallons per day.

707         4. Fifty feet from any nonpotable well.

708         5. Ten feet from any storm sewer pipe, to the maximum
709  extent possible, but in no instance shall the setback be less
710  than 5 feet.

711         6. Seventy-five feet from the mean high-water line of a
712  tidally influenced surface water body.

713         7. Seventy-five feet from the mean annual flood line of a
714  permanent nontidal surface water body.

715         8. Fifteen feet from the design high-water line of
716  retention areas, detention areas, or swales designed to contain
717  standing or flowing water for less than 72 hours after a
718  rainfall or the design high-water level of normally dry drainage
719  ditches or normally dry individual lot stormwater retention
720  areas.

721         (f) Except as provided under paragraphs (e) and (t), no
722  limitations shall be imposed by rule, relating to the distance
723  between an onsite disposal system and any area that either
724  permanently or temporarily has visible surface water.

725         (g) All provisions of This section and rules adopted under

CODING: Words stricken are deletions; words underlined are additions.

2020712er

726 this section relating to soil condition, water table elevation,
727 distance, and other setback requirements must be equally applied
728 to all lots, with the following exceptions:

729     1. Any residential lot that was platted and recorded on or
730 after January 1, 1972, or that is part of a residential
731 subdivision that was approved by the appropriate permitting
732 agency on or after January 1, 1972, and that was eligible for an
733 onsite sewage treatment and disposal system construction permit
734 on the date of such platting and recording or approval shall be
735 eligible for an onsite sewage treatment and disposal system
736 construction permit, regardless of when the application for a
737 permit is made. If rules in effect at the time the permit
738 application is filed cannot be met, residential lots platted and
739 recorded or approved on or after January 1, 1972, shall, to the
740 maximum extent possible, comply with the rules in effect at the
741 time the permit application is filed. At a minimum, however,
742 those residential lots platted and recorded or approved on or
743 after January 1, 1972, but before January 1, 1983, shall comply
744 with those rules in effect on January 1, 1983, and those
745 residential lots platted and recorded or approved on or after
746 January 1, 1983, shall comply with those rules in effect at the
747 time of such platting and recording or approval. In determining
748 the maximum extent of compliance with current rules that is
749 possible, the department shall allow structures and
750 appurtenances thereto which were authorized at the time such
751 lots were platted and recorded or approved.

752     2. Lots platted before 1972 are subject to a 50-foot
753 minimum surface water setback and are not subject to lot size
754 requirements. The projected daily flow for onsite sewage

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

755  treatment and disposal systems for lots platted before 1972 may
756  not exceed:

757       a. Two thousand five hundred gallons per acre per day for
758  lots served by public water systems as defined in s. 403.852.

759       b. One thousand five hundred gallons per acre per day for
760  lots served by water systems regulated under s. 381.0062.

761       (h)1. The department may grant variances in hardship cases
762  which may be less restrictive than the provisions specified in
763  this section. If a variance is granted and the onsite sewage
764  treatment and disposal system construction permit has been
765  issued, the variance may be transferred with the system
766  construction permit, if the transferee files, within 60 days
767  after the transfer of ownership, an amended construction permit
768  application providing all corrected information and proof of
769  ownership of the property and if the same variance would have
770  been required for the new owner of the property as was
771  originally granted to the original applicant for the variance. A
772  ~~There is no~~ fee is not associated with the processing of this
773  supplemental information. A variance may not be granted under
774  this section until the department is satisfied that:

775       a. The hardship was not caused intentionally by the action
776  of the applicant;

777       b. A ~~No~~ reasonable alternative, taking into consideration
778  factors such as cost, does not exist ~~exists~~ for the treatment of
779  the sewage; and

780       c. The discharge from the onsite sewage treatment and
781  disposal system will not adversely affect the health of the
782  applicant or the public or significantly degrade the groundwater
783  or surface waters.

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

784
785 Where soil conditions, water table elevation, and setback
786 provisions are determined by the department to be satisfactory,
787 special consideration must be given to those lots platted before
788 1972.
789     2. The department shall appoint and staff a variance review
790 and advisory committee, which shall meet monthly to recommend
791 agency action on variance requests. The committee shall make its
792 recommendations on variance requests at the meeting in which the
793 application is scheduled for consideration, except for an
794 extraordinary change in circumstances, the receipt of new
795 information that raises new issues, or when the applicant
796 requests an extension. The committee shall consider the criteria
797 in subparagraph 1. in its recommended agency action on variance
798 requests and shall also strive to allow property owners the full
799 use of their land where possible. The committee consists of the
800 following:
801     a. The Secretary of Environmental Protection State Surgeon
802 General or his or her designee.
803     b. A representative from the county health departments.
804     c. A representative from the home building industry
805 recommended by the Florida Home Builders Association.
806     d. A representative from the septic tank industry
807 recommended by the Florida Onsite Wastewater Association.
808     e. A representative from the Department of Health
809 Environmental Protection.
810     f. A representative from the real estate industry who is
811 also a developer in this state who develops lots using onsite
812 sewage treatment and disposal systems, recommended by the

CODING: Words stricken are deletions; words underlined are additions.

2020712er

813  Florida Association of Realtors.

814       g. A representative from the engineering profession

815  recommended by the Florida Engineering Society.

816

817  Members shall be appointed for a term of 3 years, with such

818  appointments being staggered so that the terms of no more than

819  two members expire in any one year. Members shall serve without

820  remuneration, but if requested, shall be reimbursed for per diem

821  and travel expenses as provided in s. 112.061.

822       (i) A construction permit may not be issued for an onsite

823  sewage treatment and disposal system in any area zoned or used

824  for industrial or manufacturing purposes, or its equivalent,

825  where a publicly owned or investor-owned sewage treatment system

826  is available, or where a likelihood exists that the system will

827  receive toxic, hazardous, or industrial waste. An existing

828  onsite sewage treatment and disposal system may be repaired if a

829  publicly owned or investor-owned sewage treatment ~~sewerage~~

830  system is not available within 500 feet of the building sewer

831  stub-out and if system construction and operation standards can

832  be met. This paragraph does not require publicly owned or

833  investor-owned sewage ~~sewerage~~ treatment systems to accept

834  anything other than domestic wastewater.

835       1. A building located in an area zoned or used for

836  industrial or manufacturing purposes, or its equivalent, when

837  such building is served by an onsite sewage treatment and

838  disposal system, must not be occupied until the owner or tenant

839  has obtained written approval from the department. The

840  department may ~~shall~~ not grant approval when the proposed use of

841  the system is to dispose of toxic, hazardous, or industrial

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

842 wastewater or toxic or hazardous chemicals.

843     2. Each person who owns or operates a business or facility
844 in an area zoned or used for industrial or manufacturing
845 purposes, or its equivalent, or who owns or operates a business
846 that has the potential to generate toxic, hazardous, or
847 industrial wastewater or toxic or hazardous chemicals, and uses
848 an onsite sewage treatment and disposal system that is installed
849 on or after July 5, 1989, must obtain an annual system operating
850 permit from the department. A person who owns or operates a
851 business that uses an onsite sewage treatment and disposal
852 system that was installed and approved before July 5, 1989, does
853 not need to not obtain a system operating permit. However, upon
854 change of ownership or tenancy, the new owner or operator must
855 notify the department of the change, and the new owner or
856 operator must obtain an annual system operating permit,
857 regardless of the date that the system was installed or
858 approved.

859     3. The department shall periodically review and evaluate
860 the continued use of onsite sewage treatment and disposal
861 systems in areas zoned or used for industrial or manufacturing
862 purposes, or its equivalent, and may require the collection and
863 analyses of samples from within and around such systems. If the
864 department finds that toxic or hazardous chemicals or toxic,
865 hazardous, or industrial wastewater have been or are being
866 disposed of through an onsite sewage treatment and disposal
867 system, the department shall initiate enforcement actions
868 against the owner or tenant to ensure adequate cleanup,
869 treatment, and disposal.

870     (j) An onsite sewage treatment and disposal system designed

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

871  by a professional engineer registered in the state and certified
872  by such engineer as complying with performance criteria adopted
873  by the department must be approved by the department subject to
874  the following:

875      1. The performance criteria applicable to engineer-designed
876  systems must be limited to those necessary to ensure that such
877  systems do not adversely affect the public health or
878  significantly degrade the groundwater or surface water. Such
879  performance criteria shall include consideration of the quality
880  of system effluent, the proposed total sewage flow per acre,
881  wastewater treatment capabilities of the natural or replaced
882  soil, water quality classification of the potential surface-
883  water-receiving body, and the structural and maintenance
884  viability of the system for the treatment of domestic
885  wastewater. However, performance criteria shall address only the
886  performance of a system and not a system's design.

887      2. A person electing to use utilize an engineer-designed
888  system shall, upon completion of the system design, submit such
889  design, certified by a registered professional engineer, to the
890  county health department. The county health department may use
891  utilize an outside consultant to review the engineer-designed
892  system, with the actual cost of such review to be borne by the
893  applicant. Within 5 working days after receiving an engineer-
894  designed system permit application, the county health department
895  shall request additional information if the application is not
896  complete. Within 15 working days after receiving a complete
897  application for an engineer-designed system, the county health
898  department either shall issue the permit or, if it determines
899  that the system does not comply with the performance criteria,

CODING: Words stricken are deletions; words underlined are additions.

2020712er

900 shall notify the applicant of that determination and refer the
901 application to the department for a determination as to whether
902 the system should be approved, disapproved, or approved with
903 modification. The department engineer's determination shall
904 prevail over the action of the county health department. The
905 applicant shall be notified in writing of the department's
906 determination and of the applicant's rights to pursue a variance
907 or seek review under the provisions of chapter 120.

908     3. The owner of an engineer-designed performance-based
909 system must maintain a current maintenance service agreement
910 with a maintenance entity permitted by the department. The
911 maintenance entity shall inspect each system at least twice each
912 year and shall report quarterly to the department on the number
913 of systems inspected and serviced. The reports may be submitted
914 electronically.

915     4. The property owner of an owner-occupied, single-family
916 residence may be approved and permitted by the department as a
917 maintenance entity for his or her own performance-based
918 treatment system upon written certification from the system
919 manufacturer's approved representative that the property owner
920 has received training on the proper installation and service of
921 the system. The maintenance service agreement must conspicuously
922 disclose that the property owner has the right to maintain his
923 or her own system and is exempt from contractor registration
924 requirements for performing construction, maintenance, or
925 repairs on the system but is subject to all permitting
926 requirements.

927     5. The property owner shall obtain a biennial system
928 operating permit from the department for each system. The

CODING: Words stricken are deletions; words underlined are additions.

2020712er

929  department shall inspect the system at least annually, or on
930  such periodic basis as the fee collected permits, and may
931  collect system-effluent samples if appropriate to determine
932  compliance with the performance criteria. The fee for the
933  biennial operating permit shall be collected beginning with the
934  second year of system operation.

935      6. If an engineer-designed system fails to properly
936  function or fails to meet performance standards, the system
937  shall be re-engineered, if necessary, to bring the system into
938  compliance with the provisions of this section.

939      (k) An innovative system may be approved in conjunction
940  with an engineer-designed site-specific system that ~~which~~ is
941  certified by the engineer to meet the performance-based criteria
942  adopted by the department.

943      (l) For the Florida Keys, the department shall adopt a
944  special rule for the construction, installation, modification,
945  operation, repair, maintenance, and performance of onsite sewage
946  treatment and disposal systems which considers the unique soil
947  conditions and water table elevations, densities, and setback
948  requirements. On lots where a setback distance of 75 feet from
949  surface waters, saltmarsh, and buttonwood association habitat
950  areas cannot be met, an injection well, approved and permitted
951  by the department, may be used for disposal of effluent from
952  onsite sewage treatment and disposal systems. The following
953  additional requirements apply to onsite sewage treatment and
954  disposal systems in Monroe County:

955      1. The county, each municipality, and those special
956  districts established for the purpose of the collection,
957  transmission, treatment, or disposal of sewage shall ensure, in

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

958 accordance with the specific schedules adopted by the
959 Administration Commission under s. 380.0552, the completion of
960 onsite sewage treatment and disposal system upgrades to meet the
961 requirements of this paragraph.

962     2. Onsite sewage treatment and disposal systems must cease
963 discharge by December 31, 2015, or must comply with department
964 rules and provide the level of treatment which, on a permitted
965 annual average basis, produces an effluent that contains no more
966 than the following concentrations:

967     a. Biochemical Oxygen Demand (CBOD5) of 10 mg/l.

968     b. Suspended Solids of 10 mg/l.

969     c. Total Nitrogen, expressed as N, of 10 mg/l or a
970 reduction in nitrogen of at least 70 percent. A system that has
971 been tested and certified to reduce nitrogen concentrations by
972 at least 70 percent shall be deemed to be in compliance with
973 this standard.

974     d. Total Phosphorus, expressed as P, of 1 mg/l.

975

976 In addition, onsite sewage treatment and disposal systems
977 discharging to an injection well must provide basic disinfection
978 as defined by department rule.

979     3. In areas not scheduled to be served by a central
980 sewerage system sewer, onsite sewage treatment and disposal
981 systems must, by December 31, 2015, comply with department rules
982 and provide the level of treatment described in subparagraph 2.

983     4. In areas scheduled to be served by a central sewerage
984 system sewer by December 31, 2015, if the property owner has
985 paid a connection fee or assessment for connection to the
986 central sewerage sewer system, the property owner may install a

CODING: Words stricken are deletions; words underlined are additions.

2020712er

987  holding tank with a high water alarm or an onsite sewage
988  treatment and disposal system that meets the following minimum
989  standards:

990      a. The existing tanks must be pumped and inspected and
991  certified as being watertight and free of defects in accordance
992  with department rule; and

993      b. A sand-lined drainfield or injection well in accordance
994  with department rule must be installed.

995      5. Onsite sewage treatment and disposal systems must be
996  monitored for total nitrogen and total phosphorus concentrations
997  as required by department rule.

998      6. The department shall enforce proper installation,
999  operation, and maintenance of onsite sewage treatment and
1000 disposal systems pursuant to this chapter, including ensuring
1001 that the appropriate level of treatment described in
1002 subparagraph 2. is met.

1003     7. The authority of a local government, including a special
1004 district, to mandate connection of an onsite sewage treatment
1005 and disposal system is governed by s. 4, chapter 99-395, Laws of
1006 Florida.

1007     8. Notwithstanding any other provision of law, an onsite
1008 sewage treatment and disposal system installed after July 1,
1009 2010, in unincorporated Monroe County, excluding special
1010 wastewater districts, that complies with the standards in
1011 subparagraph 2. is not required to connect to a central sewerage
1012 sewer system until December 31, 2020.

1013     (m) A No product sold in the state for use in onsite sewage
1014 treatment and disposal systems may not contain any substance in
1015 concentrations or amounts that would interfere with or prevent

**CODING:** Words stricken are deletions; words underlined are additions.

2020712er

1016  the successful operation of such system, or that would cause
1017  discharges from such systems to violate applicable water quality
1018  standards. The department shall publish criteria for products
1019  known or expected to meet the conditions of this paragraph. If
1020  In the event a product does not meet such criteria, such product
1021  may be sold if the manufacturer satisfactorily demonstrates to
1022  the department that the conditions of this paragraph are met.

1023      (n) Evaluations for determining the seasonal high-water
1024  table elevations or the suitability of soils for the use of a
1025  new onsite sewage treatment and disposal system shall be
1026  performed by department personnel, professional engineers
1027  registered in the state, or such other persons with expertise,
1028  as defined by rule, in making such evaluations. Evaluations for
1029  determining mean annual flood lines shall be performed by those
1030  persons identified in paragraph (2)(k) (2)(j). The department
1031  shall accept evaluations submitted by professional engineers and
1032  such other persons as meet the expertise established by this
1033  section or by rule unless the department has a reasonable
1034  scientific basis for questioning the accuracy or completeness of
1035  the evaluation.

1036      (o) The department shall appoint a research review and
1037  advisory committee, which shall meet at least semiannually. The
1038  committee shall advise the department on directions for new
1039  research, review and rank proposals for research contracts, and
1040  review draft research reports and make comments. The committee
1041  is comprised of:

1042      1. A representative of the State Surgeon General, or his or
1043  her designee.

1044      2. A representative from the septic tank industry.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1045    3. A representative from the home building industry.
1046    4. A representative from an environmental interest group.
1047    5. A representative from the State University System, from
1048  a department knowledgeable about onsite sewage treatment and
1049  disposal systems.
1050    6. A professional engineer registered in this state who has
1051  work experience in onsite sewage treatment and disposal systems.
1052    7. A representative from local government who is
1053  knowledgeable about domestic wastewater treatment.
1054    8. A representative from the real estate profession.
1055    9. A representative from the restaurant industry.
1056    10. A consumer.
1057
1058  Members shall be appointed for a term of 3 years, with the
1059  appointments being staggered so that the terms of no more than
1060  four members expire in any one year. Members shall serve without
1061  remuneration, but are entitled to reimbursement for per diem and
1062  travel expenses as provided in s. 112.061.
1063    (o)(p) An application for an onsite sewage treatment and
1064  disposal system permit shall be completed in full, signed by the
1065  owner or the owner's authorized representative, or by a
1066  contractor licensed under chapter 489, and shall be accompanied
1067  by all required exhibits and fees. No Specific documentation of
1068  property ownership is not shall be required as a prerequisite to
1069  the review of an application or the issuance of a permit. The
1070  issuance of a permit does not constitute determination by the
1071  department of property ownership.
1072    (p)(q) The department may not require any form of
1073  subdivision analysis of property by an owner, developer, or

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1074  subdivider before prior to submission of an application for an
1075  onsite sewage treatment and disposal system.
1076      (q)(r) Nothing in This section does not limit limits the
1077  power of a municipality or county to enforce other laws for the
1078  protection of the public health and safety.
1079      (r)(s) In the siting of onsite sewage treatment and
1080  disposal systems, including drainfields, shoulders, and slopes,
1081  guttering may shall not be required on single-family residential
1082  dwelling units for systems located greater than 5 feet from the
1083  roof drip line of the house. If guttering is used on residential
1084  dwelling units, the downspouts shall be directed away from the
1085  drainfield.
1086      (s)(t) Notwithstanding the provisions of subparagraph
1087  (g)1., onsite sewage treatment and disposal systems located in
1088  floodways of the Suwannee and Aucilla Rivers must adhere to the
1089  following requirements:
1090      1. The absorption surface of the drainfield may shall not
1091  be subject to flooding based on 10-year flood elevations.
1092  Provided, however, for lots or parcels created by the
1093  subdivision of land in accordance with applicable local
1094  government regulations before prior to January 17, 1990, if an
1095  applicant cannot construct a drainfield system with the
1096  absorption surface of the drainfield at an elevation equal to or
1097  above 10-year flood elevation, the department shall issue a
1098  permit for an onsite sewage treatment and disposal system within
1099  the 10-year floodplain of rivers, streams, and other bodies of
1100  flowing water if all of the following criteria are met:
1101      a. The lot is at least one-half acre in size;
1102      b. The bottom of the drainfield is at least 36 inches above

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1103  the 2-year flood elevation; and

1104       c. The applicant installs ~~either:~~ a waterless,
1105  incinerating, or organic waste composting toilet and a graywater
1106  system and drainfield in accordance with department rules; an
1107  aerobic treatment unit and drainfield in accordance with
1108  department rules; a system ~~approved by the State Health Office~~
1109  that is capable of reducing effluent nitrate by at least 50
1110  percent <u>in accordance with department rules</u>; or a system <u>other</u>
1111  <u>than a system using alternative drainfield materials in</u>
1112  <u>accordance with department rules</u> ~~approved by the county health~~
1113  ~~department pursuant to department rule other than a system using~~
1114  ~~alternative drainfield materials~~. The United States Department
1115  of Agriculture Soil Conservation Service soil maps, State of
1116  Florida Water Management District data, and Federal Emergency
1117  Management Agency Flood Insurance maps are resources that shall
1118  be used to identify flood-prone areas.

1119       2. The use of fill or mounding to elevate a drainfield
1120  system out of the 10-year floodplain of rivers, streams, or
1121  other bodies of flowing water <u>may</u> ~~shall~~ not be permitted if such
1122  a system lies within a regulatory floodway of the Suwannee and
1123  Aucilla Rivers. In cases where the 10-year flood elevation does
1124  not coincide with the boundaries of the regulatory floodway, the
1125  regulatory floodway will be considered for the purposes of this
1126  subsection to extend at a minimum to the 10-year flood
1127  elevation.

1128       (t)1.~~(u)1.~~ The owner of an aerobic treatment unit system
1129  shall maintain a current maintenance service agreement with an
1130  aerobic treatment unit maintenance entity permitted by the
1131  department. The maintenance entity shall inspect each aerobic

2020712er

1132 treatment unit system at least twice each year and shall report
1133 quarterly to the department on the number of aerobic treatment
1134 unit systems inspected and serviced. The reports may be
1135 submitted electronically.

1136     2. The property owner of an owner-occupied, single-family
1137 residence may be approved and permitted by the department as a
1138 maintenance entity for his or her own aerobic treatment unit
1139 system upon written certification from the system manufacturer's
1140 approved representative that the property owner has received
1141 training on the proper installation and service of the system.
1142 The maintenance entity service agreement must conspicuously
1143 disclose that the property owner has the right to maintain his
1144 or her own system and is exempt from contractor registration
1145 requirements for performing construction, maintenance, or
1146 repairs on the system but is subject to all permitting
1147 requirements.

1148     3. A septic tank contractor licensed under part III of
1149 chapter 489, if approved by the manufacturer, may not be denied
1150 access by the manufacturer to aerobic treatment unit system
1151 training or spare parts for maintenance entities. After the
1152 original warranty period, component parts for an aerobic
1153 treatment unit system may be replaced with parts that meet
1154 manufacturer's specifications but are manufactured by others.
1155 The maintenance entity shall maintain documentation of the
1156 substitute part's equivalency for 2 years and shall provide such
1157 documentation to the department upon request.

1158     4. The owner of an aerobic treatment unit system shall
1159 obtain a system operating permit from the department and allow
1160 the department to inspect during reasonable hours each aerobic

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1161 treatment unit system at least annually, and such inspection may
1162 include collection and analysis of system-effluent samples for
1163 performance criteria established by rule of the department.

1164    (u)(v) The department may require the submission of
1165 detailed system construction plans that are prepared by a
1166 professional engineer registered in this state. The department
1167 shall establish by rule criteria for determining when such a
1168 submission is required.

1169    (v)(w) Any permit issued and approved by the department for
1170 the installation, modification, or repair of an onsite sewage
1171 treatment and disposal system shall transfer with the title to
1172 the property in a real estate transaction. A title may not be
1173 encumbered at the time of transfer by new permit requirements by
1174 a governmental entity for an onsite sewage treatment and
1175 disposal system which differ from the permitting requirements in
1176 effect at the time the system was permitted, modified, or
1177 repaired. An inspection of a system may not be mandated by a
1178 governmental entity at the point of sale in a real estate
1179 transaction. This paragraph does not affect a septic tank phase-
1180 out deferral program implemented by a consolidated government as
1181 defined in s. 9, Art. VIII of the State Constitution (1885).

1182    (w)(x) A governmental entity, including a municipality,
1183 county, or statutorily created commission, may not require an
1184 engineer-designed performance-based treatment system, excluding
1185 a passive engineer-designed performance-based treatment system,
1186 before the completion of the Florida Onsite Sewage Nitrogen
1187 Reduction Strategies Project. This paragraph does not apply to a
1188 governmental entity, including a municipality, county, or
1189 statutorily created commission, which adopted a local law,

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1190  ordinance, or regulation on or before January 31, 2012.
1191  Notwithstanding this paragraph, an engineer-designed
1192  performance-based treatment system may be used to meet the
1193  requirements of the variance review and advisory committee
1194  recommendations.
1195     (x)1.(y)1. An onsite sewage treatment and disposal system
1196  is not considered abandoned if the system is disconnected from a
1197  structure that was made unusable or destroyed following a
1198  disaster and if the system was properly functioning at the time
1199  of disconnection and was not adversely affected by the disaster.
1200  The onsite sewage treatment and disposal system may be
1201  reconnected to a rebuilt structure if:
1202     a. The reconnection of the system is to the same type of
1203  structure which contains the same number of bedrooms or fewer,
1204  if the square footage of the structure is less than or equal to
1205  110 percent of the original square footage of the structure that
1206  existed before the disaster;
1207     b. The system is not a sanitary nuisance; and
1208     c. The system has not been altered without prior
1209  authorization.
1210     2. An onsite sewage treatment and disposal system that
1211  serves a property that is foreclosed upon is not considered
1212  abandoned.
1213     (y)(z) If an onsite sewage treatment and disposal system
1214  permittee receives, relies upon, and undertakes construction of
1215  a system based upon a validly issued construction permit under
1216  rules applicable at the time of construction but a change to a
1217  rule occurs within 5 years after the approval of the system for
1218  construction but before the final approval of the system, the

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1219  rules applicable and in effect at the time of construction
1220  approval apply at the time of final approval if fundamental site
1221  conditions have not changed between the time of construction
1222  approval and final approval.

1223      (z)(aa) An existing-system inspection or evaluation and
1224  assessment, or a modification, replacement, or upgrade of an
1225  onsite sewage treatment and disposal system is not required for
1226  a remodeling addition or modification to a single-family home if
1227  a bedroom is not added. However, a remodeling addition or
1228  modification to a single-family home may not cover any part of
1229  the existing system or encroach upon a required setback or the
1230  unobstructed area. To determine if a setback or the unobstructed
1231  area is impacted, the local health department shall review and
1232  verify a floor plan and site plan of the proposed remodeling
1233  addition or modification to the home submitted by a remodeler
1234  which shows the location of the system, including the distance
1235  of the remodeling addition or modification to the home from the
1236  onsite sewage treatment and disposal system. The local health
1237  department may visit the site or otherwise determine the best
1238  means of verifying the information submitted. A verification of
1239  the location of a system is not an inspection or evaluation and
1240  assessment of the system. The review and verification must be
1241  completed within 7 business days after receipt by the local
1242  health department of a floor plan and site plan. If the review
1243  and verification is not completed within such time, the
1244  remodeling addition or modification to the single-family home,
1245  for the purposes of this paragraph, is approved.

1246      Section 8. Section 381.00652, Florida Statutes, is created
1247  to read:

CODING: Words stricken are deletions; words underlined are additions.

2020712er

381.00652 Onsite sewage treatment and disposal systems technical advisory committee.—

(1) As used in this section, the term "department" means the Department of Environmental Protection.

(2) An onsite sewage treatment and disposal systems technical advisory committee, a committee as defined in s. 20.03(8), is created within the department. The committee shall:

(a) Provide recommendations to increase the availability of enhanced nutrient-reducing onsite sewage treatment and disposal systems in the marketplace, including such systems that are cost-effective, low maintenance, and reliable.

(b) Consider and recommend regulatory options, such as fast-track approval, prequalification, or expedited permitting, to facilitate the introduction and use of enhanced nutrient-reducing onsite sewage treatment and disposal systems that have been reviewed and approved by a national agency or organization, such as the American National Standards Institute 245 systems approved by the NSF International.

(c) Provide recommendations for appropriate setback distances for onsite sewage treatment and disposal systems from surface water, groundwater, and wells.

(3) The department shall use existing and available resources to administer and support the activities of the committee.

(4)(a) By August 1, 2021, the department, in consultation with the Department of Health, shall appoint no more than 10 members to the committee, as follows:

1. A professional engineer.

2. A septic tank contractor.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

1277        3. Two representatives from the home building industry.

1278        4. A representative from the real estate industry.

1279        5. A representative from the onsite sewage treatment and

1280   disposal system industry.

1281        6. A representative from local government.

1282        7. Two representatives from the environmental community.

1283        8. A representative of the scientific and technical

1284   community who has substantial expertise in the areas of the fate

1285   and transport of water pollutants, toxicology, epidemiology,

1286   geology, biology, or environmental sciences.

1287        (b) Members shall serve without compensation and are not

1288   entitled to reimbursement for per diem or travel expenses.

1289        (5) By January 1, 2022, the committee shall submit its

1290   recommendations to the Governor, the President of the Senate,

1291   and the Speaker of the House of Representatives.

1292        (6) This section expires August 15, 2022.

1293        Section 9. Effective July 1, 2021, section 381.0068,

1294   Florida Statutes, is repealed.

1295        Section 10. Present subsections (14) through (44) of

1296   section 403.061, Florida Statutes, are redesignated as

1297   subsections (15) through (45), respectively, subsection (7) is

1298   amended, and a new subsection (14) is added to that section, to

1299   read:

1300        403.061 Department; powers and duties.—The department shall

1301   have the power and the duty to control and prohibit pollution of

1302   air and water in accordance with the law and rules adopted and

1303   promulgated by it and, for this purpose, to:

1304        (7) Adopt rules pursuant to ss. 120.536(1) and 120.54 to

1305   implement ~~the provisions of~~ this act. Any rule adopted pursuant

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1306  to this act must ~~shall~~ be consistent with the provisions of
1307  federal law, if any, relating to control of emissions from motor
1308  vehicles, effluent limitations, pretreatment requirements, or
1309  standards of performance. A ~~No~~ county, municipality, or
1310  political subdivision may not ~~shall~~ adopt or enforce any local
1311  ordinance, special law, or local regulation requiring the
1312  installation of Stage II vapor recovery systems, as currently
1313  defined by department rule, unless such county, municipality, or
1314  political subdivision is or has been in the past designated by
1315  federal regulation as a moderate, serious, or severe ozone
1316  nonattainment area. Rules adopted pursuant to this act may ~~shall~~
1317  not require dischargers of waste into waters of the state to
1318  improve natural background conditions. <u>The department shall</u>
1319  <u>adopt rules to reasonably limit, reduce, and eliminate domestic</u>
1320  <u>wastewater collection and transmission system pipe leakages and</u>
1321  <u>inflow and infiltration.</u> Discharges from steam electric
1322  generating plants existing or licensed under this chapter on
1323  July 1, 1984, may ~~shall~~ not be required to be treated to a
1324  greater extent than may be necessary to assure that the quality
1325  of nonthermal components of discharges from nonrecirculated
1326  cooling water systems is as high as the quality of the makeup
1327  waters; that the quality of nonthermal components of discharges
1328  from recirculated cooling water systems is no lower than is
1329  allowed for blowdown from such systems; or that the quality of
1330  noncooling system discharges which receive makeup water from a
1331  receiving body of water which does not meet applicable
1332  department water quality standards is as high as the quality of
1333  the receiving body of water. The department may not adopt
1334  standards more stringent than federal regulations, except as

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1335  provided in s. 403.804.

1336      (14) In order to promote resilient utilities, require

1337  public utilities or their affiliated companies holding, applying

1338  for, or renewing a domestic wastewater discharge permit to file

1339  annual reports and other data regarding transactions or

1340  allocations of common costs and expenditures on pollution

1341  mitigation and prevention among the utility's permitted systems,

1342  including, but not limited to, the prevention of sanitary sewer

1343  overflows, collection and transmission system pipe leakages, and

1344  inflow and infiltration. The department shall adopt rules to

1345  implement this subsection.

1346

1347  The department shall implement such programs in conjunction with

1348  its other powers and duties and shall place special emphasis on

1349  reducing and eliminating contamination that presents a threat to

1350  humans, animals or plants, or to the environment.

1351      Section 11. Section 403.0616, Florida Statutes, is created

1352  to read:

1353      403.0616 Real-time water quality monitoring program.—

1354      (1) Subject to appropriation, the department shall

1355  establish a real-time water quality monitoring program to assist

1356  in the restoration, preservation, and enhancement of impaired

1357  water bodies and coastal resources.

1358      (2) In order to expedite the creation and implementation of

1359  the program, the department is encouraged to form public-private

1360  partnerships with established scientific entities that have

1361  proven existing real-time water quality monitoring equipment and

1362  experience in deploying the equipment.

1363      Section 12. Subsection (17) is added to section 403.064,

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1364  Florida Statutes, to read:

1365      403.064 Reuse of reclaimed water.—

1366      (17) By December 31, 2020, the department shall initiate

1367  rule revisions based on the recommendations of the Potable Reuse

1368  Commission's 2020 report "Advancing Potable Reuse in Florida:

1369  Framework for the Implementation of Potable Reuse in Florida."

1370  Rules for potable reuse projects must address contaminants of

1371  emerging concern and meet or exceed federal and state drinking

1372  water quality standards and other applicable water quality

1373  standards. Reclaimed water is deemed a water source for public

1374  water supply systems.

1375      Section 13. Subsection (7) of section 403.067, Florida

1376  Statutes, is amended to read:

1377      403.067 Establishment and implementation of total maximum

1378  daily loads.—

1379      (7) DEVELOPMENT OF BASIN MANAGEMENT PLANS AND

1380  IMPLEMENTATION OF TOTAL MAXIMUM DAILY LOADS.—

1381      (a) *Basin management action plans.*—

1382      1. In developing and implementing the total maximum daily

1383  load for a water body, the department, or the department in

1384  conjunction with a water management district, may develop a

1385  basin management action plan that addresses some or all of the

1386  watersheds and basins tributary to the water body. Such plan

1387  must integrate the appropriate management strategies available

1388  to the state through existing water quality protection programs

1389  to achieve the total maximum daily loads and may provide for

1390  phased implementation of these management strategies to promote

1391  timely, cost-effective actions as provided for in s. 403.151.

1392  The plan must establish a schedule implementing the management

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1393  strategies, establish a basis for evaluating the plan's
1394  effectiveness, and identify feasible funding strategies for
1395  implementing the plan's management strategies. The management
1396  strategies may include regional treatment systems or other
1397  public works, when where appropriate, and voluntary trading of
1398  water quality credits to achieve the needed pollutant load
1399  reductions.

1400      2. A basin management action plan must equitably allocate,
1401  pursuant to paragraph (6)(b), pollutant reductions to individual
1402  basins, as a whole to all basins, or to each identified point
1403  source or category of nonpoint sources, as appropriate. For
1404  nonpoint sources for which best management practices have been
1405  adopted, the initial requirement specified by the plan must be
1406  those practices developed pursuant to paragraph (c). When Where
1407  appropriate, the plan may take into account the benefits of
1408  pollutant load reduction achieved by point or nonpoint sources
1409  that have implemented management strategies to reduce pollutant
1410  loads, including best management practices, before the
1411  development of the basin management action plan. The plan must
1412  also identify the mechanisms that will address potential future
1413  increases in pollutant loading.

1414      3. The basin management action planning process is intended
1415  to involve the broadest possible range of interested parties,
1416  with the objective of encouraging the greatest amount of
1417  cooperation and consensus possible. In developing a basin
1418  management action plan, the department shall assure that key
1419  stakeholders, including, but not limited to, applicable local
1420  governments, water management districts, the Department of
1421  Agriculture and Consumer Services, other appropriate state

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1422  agencies, local soil and water conservation districts,
1423  environmental groups, regulated interests, and affected
1424  pollution sources, are invited to participate in the process.
1425  The department shall hold at least one public meeting in the
1426  vicinity of the watershed or basin to discuss and receive
1427  comments during the planning process and shall otherwise
1428  encourage public participation to the greatest practicable
1429  extent. Notice of the public meeting must be published in a
1430  newspaper of general circulation in each county in which the
1431  watershed or basin lies at least ~~not less than~~ 5 days, but not
1432  ~~nor~~ more than 15 days, before the public meeting. A basin
1433  management action plan does not supplant or otherwise alter any
1434  assessment made under subsection (3) or subsection (4) or any
1435  calculation or initial allocation.

1436      4. Each new or revised basin management action plan shall
1437  include:

1438      a. The appropriate management strategies available through
1439  existing water quality protection programs to achieve total
1440  maximum daily loads, which may provide for phased implementation
1441  to promote timely, cost-effective actions as provided for in s.
1442  403.151;

1443      b. A description of best management practices adopted by
1444  rule;

1445      c. A list of projects in priority ranking with a planning-
1446  level cost estimate and estimated date of completion for each
1447  listed project;

1448      d. The source and amount of financial assistance to be made
1449  available by the department, a water management district, or
1450  other entity for each listed project, if applicable; and

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1451        e. A planning-level estimate of each listed project's
1452    expected load reduction, if applicable.

1453        5. The department shall adopt all or any part of a basin
1454    management action plan and any amendment to such plan by
1455    secretarial order pursuant to chapter 120 to implement ~~the~~
1456    ~~provisions of~~ this section.

1457        6. The basin management action plan must include milestones
1458    for implementation and water quality improvement, and an
1459    associated water quality monitoring component sufficient to
1460    evaluate whether reasonable progress in pollutant load
1461    reductions is being achieved over time. An assessment of
1462    progress toward these milestones shall be conducted every 5
1463    years, and revisions to the plan shall be made as appropriate.
1464    Revisions to the basin management action plan shall be made by
1465    the department in cooperation with basin stakeholders. Revisions
1466    to the management strategies required for nonpoint sources must
1467    follow the procedures ~~set forth~~ in subparagraph (c)4. Revised
1468    basin management action plans must be adopted pursuant to
1469    subparagraph 5.

1470        7. In accordance with procedures adopted by rule under
1471    paragraph (9)(c), basin management action plans, and other
1472    pollution control programs under local, state, or federal
1473    authority as provided in subsection (4), may allow point or
1474    nonpoint sources that will achieve greater pollutant reductions
1475    than required by an adopted total maximum daily load or
1476    wasteload allocation to generate, register, and trade water
1477    quality credits for the excess reductions to enable other
1478    sources to achieve their allocation; however, the generation of
1479    water quality credits does not remove the obligation of a source

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1480 or activity to meet applicable technology requirements or
1481 adopted best management practices. Such plans must allow trading
1482 between NPDES permittees, and trading that may or may not
1483 involve NPDES permittees, where the generation or use of the
1484 credits involve an entity or activity not subject to department
1485 water discharge permits whose owner voluntarily elects to obtain
1486 department authorization for the generation and sale of credits.

1487     8. ~~The provisions of~~ The department's rule relating to the
1488 equitable abatement of pollutants into surface waters do not
1489 apply to water bodies or water body segments for which a basin
1490 management plan that takes into account future new or expanded
1491 activities or discharges has been adopted under this section.

1492     9. In order to promote resilient wastewater utilities, if
1493 the department identifies domestic wastewater treatment
1494 facilities or onsite sewage treatment and disposal systems as
1495 contributors of at least 20 percent of point source or nonpoint
1496 source nutrient pollution or if the department determines
1497 remediation is necessary to achieve the total maximum daily
1498 load, a basin management action plan for a nutrient total
1499 maximum daily load must include the following:

1500     a. A wastewater treatment plan developed by each local
1501 government, in cooperation with the department, the water
1502 management district, and the public and private domestic
1503 wastewater treatment facilities within the jurisdiction of the
1504 local government, that addresses domestic wastewater. The
1505 wastewater treatment plan must:

1506     (I) Provide for construction, expansion, or upgrades
1507 necessary to achieve the total maximum daily load requirements
1508 applicable to the domestic wastewater treatment facility.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1509      (II) Include the permitted capacity in average annual
1510  gallons per day for the domestic wastewater treatment facility;
1511  the average nutrient concentration and the estimated average
1512  nutrient load of the domestic wastewater; a projected timeline
1513  of the dates by which the construction of any facility
1514  improvements will begin and be completed and the date by which
1515  operations of the improved facility will begin; the estimated
1516  cost of the improvements; and the identity of responsible
1517  parties.
1518
1519  The wastewater treatment plan must be adopted as part of the
1520  basin management action plan no later than July 1, 2025. A local
1521  government that does not have a domestic wastewater treatment
1522  facility in its jurisdiction is not required to develop a
1523  wastewater treatment plan unless there is a demonstrated need to
1524  establish a domestic wastewater treatment facility within its
1525  jurisdiction to improve water quality necessary to achieve a
1526  total maximum daily load. A local government is not responsible
1527  for a private domestic wastewater facility's compliance with a
1528  basin management action plan unless such facility is operated
1529  through a public-private partnership to which the local
1530  government is a party.
1531      b. An onsite sewage treatment and disposal system
1532  remediation plan developed by each local government in
1533  cooperation with the department, the Department of Health, water
1534  management districts, and public and private domestic wastewater
1535  treatment facilities.
1536      (I) The onsite sewage treatment and disposal system
1537  remediation plan must identify cost-effective and financially

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1538  feasible projects necessary to achieve the nutrient load
1539  reductions required for onsite sewage treatment and disposal
1540  systems. To identify cost-effective and financially feasible
1541  projects for remediation of onsite sewage treatment and disposal
1542  systems, the local government shall:
1543      (A) Include an inventory of onsite sewage treatment and
1544  disposal systems based on the best information available;
1545      (B) Identify onsite sewage treatment and disposal systems
1546  that would be eliminated through connection to existing or
1547  future central domestic wastewater infrastructure in the
1548  jurisdiction or domestic wastewater service area of the local
1549  government, that would be replaced with or upgraded to enhanced
1550  nutrient-reducing onsite sewage treatment and disposal systems,
1551  or that would remain on conventional onsite sewage treatment and
1552  disposal systems;
1553      (C) Estimate the costs of potential onsite sewage treatment
1554  and disposal system connections, upgrades, or replacements; and
1555      (D) Identify deadlines and interim milestones for the
1556  planning, design, and construction of projects.
1557      (II) The department shall adopt the onsite sewage treatment
1558  and disposal system remediation plan as part of the basin
1559  management action plan no later than July 1, 2025, or as
1560  required for Outstanding Florida Springs under s. 373.807.
1561      10. When identifying wastewater projects in a basin
1562  management action plan, the department may not require the
1563  higher cost option if it achieves the same nutrient load
1564  reduction as a lower cost option. A regulated entity may choose
1565  a different cost option if it complies with the pollutant
1566  reduction requirements of an adopted total maximum daily load

**CODING:** Words stricken are deletions; words underlined are additions.

2020712er

and meets or exceeds the pollution reduction requirement of the
original project.

(b) *Total maximum daily load implementation.*—

1. The department shall be the lead agency in coordinating
the implementation of the total maximum daily loads through
existing water quality protection programs. Application of a
total maximum daily load by a water management district must be
consistent with this section and does not require the issuance
of an order or a separate action pursuant to s. 120.536(1) or s.
120.54 for the adoption of the calculation and allocation
previously established by the department. Such programs may
include, but are not limited to:

a. Permitting and other existing regulatory programs,
including water-quality-based effluent limitations;

b. Nonregulatory and incentive-based programs, including
best management practices, cost sharing, waste minimization,
pollution prevention, agreements established pursuant to s.
403.061(22) s. 403.061(21), and public education;

c. Other water quality management and restoration
activities, for example surface water improvement and management
plans approved by water management districts or basin management
action plans developed pursuant to this subsection;

d. Trading of water quality credits or other equitable
economically based agreements;

e. Public works including capital facilities; or

f. Land acquisition.

2. For a basin management action plan adopted pursuant to
paragraph (a), any management strategies and pollutant reduction
requirements associated with a pollutant of concern for which a

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1596  total maximum daily load has been developed, including effluent
1597  limits set forth for a discharger subject to NPDES permitting,
1598  if any, must be included in a timely manner in subsequent NPDES
1599  permits or permit modifications for that discharger. The
1600  department may not impose limits or conditions implementing an
1601  adopted total maximum daily load in an NPDES permit until the
1602  permit expires, the discharge is modified, or the permit is
1603  reopened pursuant to an adopted basin management action plan.

1604      a. Absent a detailed allocation, total maximum daily loads
1605  must be implemented through NPDES permit conditions that provide
1606  for a compliance schedule. In such instances, a facility's NPDES
1607  permit must allow time for the issuance of an order adopting the
1608  basin management action plan. The time allowed for the issuance
1609  of an order adopting the plan may not exceed 5 years. Upon
1610  issuance of an order adopting the plan, the permit must be
1611  reopened or renewed, as necessary, and permit conditions
1612  consistent with the plan must be established. Notwithstanding
1613  the other provisions of this subparagraph, upon request by an
1614  NPDES permittee, the department as part of a permit issuance,
1615  renewal, or modification may establish individual allocations
1616  before the adoption of a basin management action plan.

1617      b. For holders of NPDES municipal separate storm sewer
1618  system permits and other stormwater sources, implementation of a
1619  total maximum daily load or basin management action plan must be
1620  achieved, to the maximum extent practicable, through the use of
1621  best management practices or other management measures.

1622      c. The basin management action plan does not relieve the
1623  discharger from any requirement to obtain, renew, or modify an
1624  NPDES permit or to abide by other requirements of the permit.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1625     d. Management strategies ~~set forth~~ in a basin management
1626 action plan to be implemented by a discharger subject to
1627 permitting by the department must be completed pursuant to the
1628 schedule ~~set forth~~ in the basin management action plan. This
1629 implementation schedule may extend beyond the 5-year term of an
1630 NPDES permit.

1631     e. Management strategies and pollution reduction
1632 requirements ~~set forth~~ in a basin management action plan for a
1633 specific pollutant of concern are not subject to challenge under
1634 chapter 120 at the time they are incorporated, in an identical
1635 form, into a subsequent NPDES permit or permit modification.

1636     f. For nonagricultural pollutant sources not subject to
1637 NPDES permitting but permitted pursuant to other state,
1638 regional, or local water quality programs, the pollutant
1639 reduction actions adopted in a basin management action plan must
1640 be implemented to the maximum extent practicable as part of
1641 those permitting programs.

1642     g. A nonpoint source discharger included in a basin
1643 management action plan must demonstrate compliance with the
1644 pollutant reductions established under subsection (6) by
1645 implementing the appropriate best management practices
1646 established pursuant to paragraph (c) or conducting water
1647 quality monitoring prescribed by the department or a water
1648 management district. A nonpoint source discharger may, in
1649 accordance with department rules, supplement the implementation
1650 of best management practices with water quality credit trades in
1651 order to demonstrate compliance with the pollutant reductions
1652 established under subsection (6).

1653     h. A nonpoint source discharger included in a basin

**CODING**: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1654  management action plan may be subject to enforcement action by
1655  the department or a water management district based upon a
1656  failure to implement the responsibilities set forth in sub-
1657  subparagraph g.

1658      i. A landowner, discharger, or other responsible person who
1659  is implementing applicable management strategies specified in an
1660  adopted basin management action plan may not be required by
1661  permit, enforcement action, or otherwise to implement additional
1662  management strategies, including water quality credit trading,
1663  to reduce pollutant loads to attain the pollutant reductions
1664  established pursuant to subsection (6) and shall be deemed to be
1665  in compliance with this section. This subparagraph does not
1666  limit the authority of the department to amend a basin
1667  management action plan as specified in subparagraph (a)6.

1668      (c) *Best management practices*.—

1669      1. The department, in cooperation with the water management
1670  districts and other interested parties, as appropriate, may
1671  develop suitable interim measures, best management practices, or
1672  other measures necessary to achieve the level of pollution
1673  reduction established by the department for nonagricultural
1674  nonpoint pollutant sources in allocations developed pursuant to
1675  subsection (6) and this subsection. These practices and measures
1676  may be adopted by rule by the department and the water
1677  management districts and, where adopted by rule, shall be
1678  implemented by those parties responsible for nonagricultural
1679  nonpoint source pollution.

1680      2. The Department of Agriculture and Consumer Services may
1681  develop and adopt by rule pursuant to ss. 120.536(1) and 120.54
1682  suitable interim measures, best management practices, or other

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1683  measures necessary to achieve the level of pollution reduction
1684  established by the department for agricultural pollutant sources
1685  in allocations developed pursuant to subsection (6) and this
1686  subsection or for programs implemented pursuant to paragraph
1687  (12)(b). These practices and measures may be implemented by
1688  those parties responsible for agricultural pollutant sources and
1689  the department, the water management districts, and the
1690  Department of Agriculture and Consumer Services shall assist
1691  with implementation. In the process of developing and adopting
1692  rules for interim measures, best management practices, or other
1693  measures, the Department of Agriculture and Consumer Services
1694  shall consult with the department, the Department of Health, the
1695  water management districts, representatives from affected
1696  farming groups, and environmental group representatives. Such
1697  rules must also incorporate provisions for a notice of intent to
1698  implement the practices and a system to assure the
1699  implementation of the practices, including site inspection and
1700  recordkeeping requirements.

1701       3. When Where interim measures, best management practices,
1702  or other measures are adopted by rule, the effectiveness of such
1703  practices in achieving the levels of pollution reduction
1704  established in allocations developed by the department pursuant
1705  to subsection (6) and this subsection or in programs implemented
1706  pursuant to paragraph (12)(b) must be verified at representative
1707  sites by the department. The department shall use best
1708  professional judgment in making the initial verification that
1709  the best management practices are reasonably expected to be
1710  effective and, when where applicable, shall must notify the
1711  appropriate water management district or the Department of

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1712  Agriculture and Consumer Services of its initial verification
1713  before the adoption of a rule proposed pursuant to this
1714  paragraph. Implementation, in accordance with rules adopted
1715  under this paragraph, of practices that have been initially
1716  verified to be effective, or verified to be effective by
1717  monitoring at representative sites, by the department, shall
1718  provide a presumption of compliance with state water quality
1719  standards and release from ~~the provisions of~~ s. 376.307(5) for
1720  those pollutants addressed by the practices, and the department
1721  is not authorized to institute proceedings against the owner of
1722  the source of pollution to recover costs or damages associated
1723  with the contamination of surface water or groundwater caused by
1724  those pollutants. Research projects funded by the department, a
1725  water management district, or the Department of Agriculture and
1726  Consumer Services to develop or demonstrate interim measures or
1727  best management practices shall be granted a presumption of
1728  compliance with state water quality standards and a release from
1729  ~~the provisions of~~ s. 376.307(5). The presumption of compliance
1730  and release is limited to the research site and only for those
1731  pollutants addressed by the interim measures or best management
1732  practices. Eligibility for the presumption of compliance and
1733  release is limited to research projects on sites where the owner
1734  or operator of the research site and the department, a water
1735  management district, or the Department of Agriculture and
1736  Consumer Services have entered into a contract or other
1737  agreement that, at a minimum, specifies the research objectives,
1738  the cost-share responsibilities of the parties, and a schedule
1739  that details the beginning and ending dates of the project.
1740      4. When ~~Where~~ water quality problems are demonstrated,

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

1741  despite the appropriate implementation, operation, and
1742  maintenance of best management practices and other measures
1743  required by rules adopted under this paragraph, the department,
1744  a water management district, or the Department of Agriculture
1745  and Consumer Services, in consultation with the department,
1746  shall institute a reevaluation of the best management practice
1747  or other measure. If Should the reevaluation determines
1748  determine that the best management practice or other measure
1749  requires modification, the department, a water management
1750  district, or the Department of Agriculture and Consumer
1751  Services, as appropriate, shall revise the rule to require
1752  implementation of the modified practice within a reasonable time
1753  period as specified in the rule.
1754       5. Subject to subparagraph 6., the Department of
1755  Agriculture and Consumer Services shall provide to the
1756  department information obtained pursuant to subparagraph (d)3.
1757       6.5. Agricultural records relating to processes or methods
1758  of production, costs of production, profits, or other financial
1759  information held by the Department of Agriculture and Consumer
1760  Services pursuant to subparagraphs 3., and 4., and 5. or
1761  pursuant to any rule adopted pursuant to subparagraph 2. are
1762  confidential and exempt from s. 119.07(1) and s. 24(a), Art. I
1763  of the State Constitution. Upon request, records made
1764  confidential and exempt pursuant to this subparagraph shall be
1765  released to the department or any water management district
1766  provided that the confidentiality specified by this subparagraph
1767  for such records is maintained.
1768       7.6. The provisions of Subparagraphs 1. and 2. do not
1769  preclude the department or water management district from

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1770 requiring compliance with water quality standards or with
1771 current best management practice requirements ~~set forth~~ in any
1772 applicable regulatory program authorized by law for the purpose
1773 of protecting water quality. Additionally, subparagraphs 1. and
1774 2. are applicable only to the extent that they do not conflict
1775 with any rules adopted by the department that are necessary to
1776 maintain a federally delegated or approved program.

1777     (d) *Enforcement and verification of basin management action*
1778 *plans and management strategies.*—

1779     1. Basin management action plans are enforceable pursuant
1780 to this section and ss. 403.121, 403.141, and 403.161.
1781 Management strategies, including best management practices and
1782 water quality monitoring, are enforceable under this chapter.

1783     2. No later than January 1, 2017:

1784     a. The department, in consultation with the water
1785 management districts and the Department of Agriculture and
1786 Consumer Services, shall initiate rulemaking to adopt procedures
1787 to verify implementation of water quality monitoring required in
1788 lieu of implementation of best management practices or other
1789 measures pursuant to sub-subparagraph (b)2.g.;

1790     b. The department, in consultation with the water
1791 management districts and the Department of Agriculture and
1792 Consumer Services, shall initiate rulemaking to adopt procedures
1793 to verify implementation of nonagricultural interim measures,
1794 best management practices, or other measures adopted by rule
1795 pursuant to subparagraph (c)1.; and

1796     c. The Department of Agriculture and Consumer Services, in
1797 consultation with the water management districts and the
1798 department, shall initiate rulemaking to adopt procedures to

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

1799  verify implementation of agricultural interim measures, best
1800  management practices, or other measures adopted by rule pursuant
1801  to subparagraph(c)2.
1802
1803  The rules required under this subparagraph shall include
1804  enforcement procedures applicable to the landowner, discharger,
1805  or other responsible person required to implement applicable
1806  management strategies, including best management practices or
1807  water quality monitoring as a result of noncompliance.
1808      3. At least every 2 years, the Department of Agriculture
1809  and Consumer Services shall perform onsite inspections of each
1810  agricultural producer that enrolls in a best management practice
1811  to ensure that such practice is being properly implemented. Such
1812  verification must include a collection and review of the best
1813  management practice documentation from the previous 2 years
1814  required by rules adopted pursuant to subparagraph (c)2.,
1815  including, but not limited to, nitrogen and phosphorus
1816  fertilizer application records, which must be collected and
1817  retained pursuant to subparagraphs (c)3., 4., and 6. The
1818  Department of Agriculture and Consumer Services shall initially
1819  prioritize the inspection of agricultural producers located in
1820  the basin management action plans for Lake Okeechobee, the
1821  Indian River Lagoon, the Caloosahatchee River and Estuary, and
1822  Silver Springs.
1823      (e) Cooperative agricultural regional water quality
1824  improvement element.—
1825      1. The department, the Department of Agriculture and
1826  Consumer Services, and owners of agricultural operations in the
1827  basin shall develop a cooperative agricultural regional water

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1828 quality improvement element as part of a basin management action
1829 plan only if:
1830     a. Agricultural measures have been adopted by the
1831 Department of Agriculture and Consumer Services pursuant to
1832 subparagraph (c)2. and have been implemented and the waterbody
1833 remains impaired;
1834     b. Agricultural nonpoint sources contribute to at least 20
1835 percent of nonpoint source nutrient discharges; and
1836     c. The department determines that additional measures, in
1837 combination with state-sponsored regional projects and other
1838 management strategies included in the basin management action
1839 plan, are necessary to achieve the total maximum daily load.
1840     2. The element will be implemented through the use of cost-
1841 sharing projects. The element must include cost-effective and
1842 technically and financially practical cooperative regional
1843 agricultural nutrient reduction projects that can be implemented
1844 on private properties on a site-specific, cooperative basis.
1845 Such cooperative regional agricultural nutrient reduction
1846 projects may include land acquisition in fee or conservation
1847 easements on the lands of willing sellers and site-specific
1848 water quality improvement or dispersed water management projects
1849 on the lands of project participants.
1850     3. To qualify for participation in the cooperative
1851 agricultural regional water quality improvement element, the
1852 participant must have already implemented and be in compliance
1853 with best management practices or other measures adopted by the
1854 Department of Agriculture and Consumer Services pursuant to
1855 subparagraph (c)2. The element may be included in the basin
1856 management action plan as a part of the next 5-year assessment

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1857  under subparagraph (a)6.

1858      4. The department may submit a legislative budget request
1859  to fund projects developed pursuant to this paragraph. In
1860  allocating funds for projects funded pursuant to this paragraph,
1861  the department shall provide at least 20 percent of its annual
1862  appropriation for projects in subbasins with the highest
1863  nutrient concentrations within a basin management action plan.

1864      (f) *Data collection and research*.—

1865      1. The Department of Agriculture and Consumer Services, in
1866  cooperation with the University of Florida Institute of Food and
1867  Agricultural Sciences and other state universities and Florida
1868  College System institutions that have agricultural research
1869  programs, shall annually develop research plans and legislative
1870  budget requests to:

1871      a. Evaluate and suggest enhancements to the existing
1872  adopted agricultural best management practices to reduce
1873  nutrient runoff;

1874      b. Develop new best management practices that, if proven
1875  effective, the Department of Agriculture and Consumer Services
1876  may adopt by rule pursuant to subparagraph (c)2.; and

1877      c. Develop agricultural nutrient runoff reduction projects
1878  that willing participants could implement on a site-specific,
1879  cooperative basis, in addition to best management practices. The
1880  department may consider these projects for inclusion in a basin
1881  management action plan. These nutrient runoff reduction projects
1882  must reduce the nutrient impacts from agricultural operations on
1883  water quality when evaluated with the projects and management
1884  strategies currently included in the basin management action
1885  plan.

CODING: Words stricken are deletions; words underlined are additions.

2. To be considered for funding, the University of Florida
Institute of Food and Agricultural Sciences and other state
universities and Florida College System institutions that have
agricultural research programs must submit such plans to the
department and the Department of Agriculture and Consumer
Services by August 1, 2021, and each May 1 thereafter.

3. The department shall work with the University of Florida
Institute of Food and Agricultural Sciences and regulated
entities to consider the adoption by rule of best management
practices for nutrient impacts from golf courses. Such adopted
best management practices are subject to the requirements of
paragraph (c).

Section 14. Section 403.0671, Florida Statutes, is created
to read:

403.0671 Basin management action plan wastewater reports.—

(1) By July 1, 2021, the department, in coordination with
the county health departments, wastewater treatment facilities,
and other governmental entities, shall submit a report to the
Governor, the President of the Senate, and the Speaker of the
House of Representatives evaluating the costs of wastewater
projects identified in the basin management action plans
developed pursuant to ss. 373.807 and 403.067(7) and the onsite
sewage treatment and disposal system remediation plans and other
restoration plans developed to meet the total maximum daily
loads required under s. 403.067. The report must include:

(a) Projects to:

1. Replace onsite sewage treatment and disposal systems
with enhanced nutrient-reducing onsite sewage treatment and
disposal systems.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1915        2. Install or retrofit onsite sewage treatment and disposal
1916  systems with enhanced nutrient-reducing technologies.
1917        3. Construct, upgrade, or expand domestic wastewater
1918  treatment facilities to meet the wastewater treatment plan
1919  required under s. 403.067(7)(a)9.
1920        4. Connect onsite sewage treatment and disposal systems to
1921  domestic wastewater treatment facilities;
1922        (b) The estimated costs, nutrient load reduction estimates,
1923  and other benefits of each project;
1924        (c) The estimated implementation timeline for each project;
1925        (d) A proposed 5-year funding plan for each project and the
1926  source and amount of financial assistance the department, a
1927  water management district, or other project partner will make
1928  available to fund the project; and
1929        (e) The projected costs of installing enhanced nutrient-
1930  reducing onsite sewage treatment and disposal systems on
1931  buildable lots in priority focus areas to comply with s.
1932  373.811.
1933        (2) By July 1, 2021, the department shall submit a report
1934  to the Governor, the President of the Senate, and the Speaker of
1935  the House of Representatives that provides an assessment of the
1936  water quality monitoring being conducted for each basin
1937  management action plan implementing a nutrient total maximum
1938  daily load. In developing the report, the department may
1939  coordinate with water management districts and any applicable
1940  university. The report must:
1941        (a) Evaluate the water quality monitoring prescribed for
1942  each basin management action plan to determine if it is
1943  sufficient to detect changes in water quality caused by the

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

1944  implementation of a project.
1945      (b) Identify gaps in water quality monitoring.
1946      (c) Recommend water quality monitoring needs.
1947      (3) Beginning January 1, 2022, and each January 1
1948  thereafter, the department shall submit to the Office of
1949  Economic and Demographic Research the cost estimates for
1950  projects required in s. 403.067(7)(a)9. The office shall include
1951  the project cost estimates in its annual assessment conducted
1952  pursuant to s. 403.928.
1953      Section 15. Section 403.0673, Florida Statutes, is created
1954  to read:
1955      403.0673 Wastewater grant program.—A wastewater grant
1956  program is established within the Department of Environmental
1957  Protection.
1958      (1) Subject to the appropriation of funds by the
1959  Legislature, the department may provide grants for the following
1960  projects within a basin management action plan, an alternative
1961  restoration plan adopted by final order, or a rural area of
1962  opportunity under s. 288.0656 which will individually or
1963  collectively reduce excess nutrient pollution:
1964      (a) Projects to retrofit onsite sewage treatment and
1965  disposal systems to upgrade such systems to enhanced nutrient-
1966  reducing onsite sewage treatment and disposal systems.
1967      (b) Projects to construct, upgrade, or expand facilities to
1968  provide advanced waste treatment, as defined in s. 403.086(4).
1969      (c) Projects to connect onsite sewage treatment and
1970  disposal systems to central sewer facilities.
1971      (2) In allocating such funds, priority must be given to
1972  projects that subsidize the connection of onsite sewage

CODING: Words stricken are deletions; words underlined are additions.

2020712er

1973  treatment and disposal systems to wastewater treatment
1974  facilities. First priority must be given to subsidize the
1975  connection of onsite sewage treatment and disposal systems to
1976  existing infrastructure. Second priority must be given to any
1977  expansion of a collection or transmission system that promotes
1978  efficiency by planning the installation of wastewater
1979  transmission facilities to be constructed concurrently with
1980  other construction projects occurring within or along a
1981  transportation facility right-of-way. Third priority must be
1982  given to all other connections of onsite sewage treatment and
1983  disposal systems to wastewater treatment facilities. The
1984  department shall consider the estimated reduction in nutrient
1985  load per project; project readiness; the cost-effectiveness of
1986  the project; the overall environmental benefit of a project; the
1987  location of a project; the availability of local matching funds;
1988  and projected water savings or quantity improvements associated
1989  with a project.
1990      (3) Each grant for a project described in subsection (1)
1991  must require a minimum of a 50 percent local match of funds.
1992  However, the department may, at its discretion, waive, in whole
1993  or in part, this consideration of the local contribution for
1994  proposed projects within an area designated as a rural area of
1995  opportunity under s. 288.0656.
1996      (4) The department shall coordinate with each water
1997  management district, as necessary, to identify grant recipients
1998  in each district.
1999      (5) Beginning January 1, 2021, and each January 1
2000  thereafter, the department shall submit a report regarding the
2001  projects funded pursuant to this section to the Governor, the

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2002  President of the Senate, and the Speaker of the House of
2003  Representatives.
2004      Section 16. Section 403.0855, Florida Statutes, is created
2005  to read:
2006      403.0855 Biosolids management.—
2007      (1) The Legislature finds that it is in the best interest
2008  of this state to regulate biosolids management in order to
2009  minimize the migration of nutrients that impair water bodies.
2010  The Legislature further finds that permitting according to site-
2011  specific application conditions, an increased inspection rate,
2012  groundwater and surface water monitoring protocols, and nutrient
2013  management research will improve biosolids management and assist
2014  in protecting this state's water resources and water quality.
2015      (2) The department shall adopt rules for biosolids
2016  management. Rules adopted by the department pursuant to this
2017  section may not take effect until ratified by the Legislature.
2018      (3) For a new land application site permit or a permit
2019  renewal issued after July 1, 2020, the permittee of a biosolids
2020  land application site shall:
2021      (a) Ensure a minimum unsaturated soil depth of 2 feet
2022  between the depth of biosolids placement and the water table
2023  level at the time the Class A or Class B biosolids are applied
2024  to the soil. Biosolids may not be applied on soils that have a
2025  seasonal high-water table less than 6 inches from the soil
2026  surface or within 6 inches of the intended depth of biosolids
2027  placement, unless a department-approved nutrient management plan
2028  and water quality monitoring plan provide reasonable assurances
2029  that the land application of biosolids at the site will not
2030  cause or contribute to a violation of the state's surface water

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2031 quality standards or groundwater standards. As used in this
2032 subsection, the term "seasonal high water" means the elevation
2033 to which the ground and surface water may be expected to rise
2034 due to a normal wet season.
2035      (b) Be enrolled in the Department of Agriculture and
2036 Consumer Service's best management practices program or be
2037 within an agricultural operation enrolled in the program for the
2038 applicable commodity type.
2039      (4) All permits shall comply with the requirements of
2040 subsection (3) by July 1, 2022.
2041      (5) New or renewed biosolids land application site or
2042 facility permits issued after July 1, 2020, must comply with
2043 this section and include a permit condition that requires the
2044 permit to be reopened to insert a compliance date of no later
2045 than 1 year after the effective date of the rules adopted
2046 pursuant to subsection (2). All permits must meet the
2047 requirements of the rules adopted pursuant to subsection (2) no
2048 later than 2 years after the effective date of such rules.
2049      (6) A municipality or county may enforce or extend a local
2050 ordinance, regulation, resolution, rule, moratorium, or policy,
2051 any of which was adopted before November 1, 2019, relating to
2052 the land application of Class A or Class B biosolids until the
2053 ordinance, regulation, resolution, rule, moratorium, or policy
2054 is repealed by the municipality or county.
2055      Section 17. Present subsections (7) through (10) of section
2056 403.086, Florida Statutes, are redesignated as subsections (8)
2057 through (11), respectively, subsections (1) and (2) are amended,
2058 and a new subsection (7) is added to that section, to read:
2059      403.086 Sewage disposal facilities; advanced and secondary

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2060   waste treatment.—

2061       (1)(a) ~~Neither~~ The Department of Health <u>or</u> ~~nor~~ any other

2062   state agency, county, special district, or municipality <u>may not</u>

2063   ~~shall~~ approve construction of any <u>sewage disposal</u> facilities ~~for~~

2064   ~~sanitary sewage disposal~~ which do not provide for secondary

2065   waste treatment and~~, in addition thereto,~~ advanced waste

2066   treatment as deemed necessary and ordered by the department.

2067       (b) <u>Sewage disposal</u> ~~No~~ facilities ~~for sanitary sewage~~

2068   ~~disposal~~ constructed after June 14, 1978, <u>may not</u> ~~shall~~ dispose

2069   of any wastes by deep well injection without providing for

2070   secondary waste treatment and~~, in addition thereto,~~ advanced

2071   waste treatment deemed necessary by the department to protect

2072   adequately the beneficial use of the receiving waters.

2073       (c) Notwithstanding ~~any other provisions of~~ this chapter or

2074   chapter 373, <u>sewage disposal</u> facilities ~~for sanitary sewage~~

2075   ~~disposal~~ may not dispose of any wastes into Old Tampa Bay, Tampa

2076   Bay, Hillsborough Bay, Boca Ciega Bay, St. Joseph Sound,

2077   Clearwater Bay, Sarasota Bay, Little Sarasota Bay, Roberts Bay,

2078   Lemon Bay, ~~or~~ Charlotte Harbor Bay, <u>or, beginning July 1, 2025,</u>

2079   <u>Indian River Lagoon,</u> or into any river, stream, channel, canal,

2080   bay, bayou, sound, or other water tributary thereto, without

2081   providing advanced waste treatment, as defined in subsection

2082   (4), approved by the department. This paragraph <u>does</u> ~~shall~~ not

2083   apply to facilities which were permitted by February 1, 1987,

2084   and which discharge secondary treated effluent, followed by

2085   water hyacinth treatment, to tributaries of tributaries of the

2086   named waters; or to facilities permitted to discharge to the

2087   nontidally influenced portions of the Peace River.

2088       <u>(d) By December 31, 2020, the department, in consultation</u>

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 392 of 694
**ENROLLED**
**2020 Legislature**                    **CS for CS for SB 712, 1st Engrossed**

2020712er

2089 with the water management districts and sewage disposal
2090 facilities, shall submit to the Governor, the President of the
2091 Senate, and the Speaker of the House of Representatives a
2092 progress report on the status of upgrades made by each facility
2093 to meet the advanced waste treatment requirements under
2094 paragraph (c). The report must include a list of sewage disposal
2095 facilities required to upgrade to advanced waste treatment, the
2096 preliminary cost estimates for the upgrades, and a projected
2097 timeline of the dates by which the upgrades will begin and be
2098 completed and the date by which operations of the upgraded
2099 facility will begin.
2100    (2) All sewage disposal ~~Any~~ facilities ~~for sanitary sewage~~
2101 ~~disposal~~ shall provide for secondary waste treatment, a power
2102 outage contingency plan that mitigates the impacts of power
2103 outages on the utility's collection system and pump stations,
2104 and~~, in addition thereto,~~ advanced waste treatment as deemed
2105 necessary and ordered by the Department of Environmental
2106 Protection. Failure to conform is ~~shall be~~ punishable by a civil
2107 penalty of $500 for each 24-hour day or fraction thereof that
2108 such failure is allowed to continue thereafter.
2109    (7) All sewage disposal facilities under subsection (2)
2110 which control a collection or transmission system of pipes and
2111 pumps to collect and transmit wastewater from domestic or
2112 industrial sources to the facility shall take steps to prevent
2113 sanitary sewer overflows or underground pipe leaks and ensure
2114 that collected wastewater reaches the facility for appropriate
2115 treatment. Facilities must use inflow and infiltration studies
2116 and leakage surveys to develop pipe assessment, repair, and
2117 replacement action plans with a 5-year planning horizon that

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

2118 comply with department rule to limit, reduce, and eliminate
2119 leaks, seepages, or inputs into wastewater treatment systems'
2120 underground pipes. The pipe assessment, repair, and replacement
2121 action plans must be reported to the department. The facility
2122 action plans must include information regarding the annual
2123 expenditures dedicated to the inflow and infiltration studies
2124 and the required replacement action plans; expenditures that are
2125 dedicated to pipe assessment, repair, and replacement; and
2126 expenditures designed to limit the presence of fats, roots,
2127 oils, and grease in the facility's collection system. The
2128 department shall adopt rules regarding the implementation of
2129 inflow and infiltration studies and leakage surveys; however,
2130 such rules may not fix or revise utility rates or budgets. A
2131 utility or an operating entity subject to this subsection and s.
2132 403.061(14) may submit one report to comply with both
2133 requirements. Substantial compliance with this subsection is
2134 evidence in mitigation for the purposes of assessing penalties
2135 pursuant to ss. 403.121 and 403.141.

2136     Section 18. Present subsections (4) through (10) of section
2137 403.087, Florida Statutes, are redesignated as subsections (5)
2138 through (11), respectively, and a new subsection (4) is added to
2139 that section, to read:

2140     403.087 Permits; general issuance; denial; revocation;
2141 prohibition; penalty.—

2142     (4) The department shall issue an operation permit for a
2143 domestic wastewater treatment facility other than a facility
2144 regulated under the National Pollutant Discharge Elimination
2145 System Program under s. 403.0885 for a term of up to 10 years if
2146 the facility is meeting the stated goals in its action plan

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2147  adopted pursuant to s. 403.086(7).

2148      Section 19. Present subsections (3) and (4) of section

2149  403.088, Florida Statutes, are redesignated as subsections (4)

2150  and (5), respectively, paragraph (c) of subsection (2) is

2151  amended, and a new subsection (3) is added to that section, to

2152  read:

2153      403.088 Water pollution operation permits; conditions.—

2154      (2)

2155      (c) A permit shall:

2156      1. Specify the manner, nature, volume, and frequency of the

2157  discharge permitted;

2158      2. Require proper operation and maintenance of any

2159  pollution abatement facility by qualified personnel in

2160  accordance with standards established by the department;

2161      3. Require a deliberate, proactive approach to

2162  investigating or surveying a significant percentage of the

2163  domestic wastewater collection system throughout the duration of

2164  the permit to determine pipe integrity, which must be

2165  accomplished in an economically feasible manner. The permittee

2166  shall submit an annual report to the department which details

2167  facility revenues and expenditures in a manner prescribed by

2168  department rule. The report must detail any deviation of annual

2169  expenditures from identified system needs related to inflow and

2170  infiltration studies; model plans for pipe assessment, repair,

2171  and replacement; and pipe assessment, repair, and replacement

2172  required under s. 403.086(7). Substantial compliance with this

2173  subsection is evidence in mitigation for the purposes of

2174  assessing penalties pursuant to ss. 403.121 and 403.141;

2175      4.3. Contain such additional conditions, requirements, and

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2176 restrictions as the department deems necessary to preserve and
2177 protect the quality of the receiving waters;
2178      5.4. Be valid for the period of time specified therein; and
2179      6.5. Constitute the state National Pollutant Discharge
2180 Elimination System permit when issued pursuant to the authority
2181 in s. 403.0885.
2182      (3) No later than March 1 of each year, the department
2183 shall submit a report to the Governor, the President of the
2184 Senate, and the Speaker of the House of Representatives which
2185 identifies all domestic wastewater treatment facilities that
2186 experienced a sanitary sewer overflow in the preceding calendar
2187 year. The report must identify the name of the utility or
2188 responsible operating entity, permitted capacity in annual
2189 average gallons per day, number of overflows, type of water
2190 discharged, total volume of sewage released, and, to the extent
2191 known and available, volume of sewage recovered, volume of
2192 sewage discharged to surface waters, and cause of the sanitary
2193 sewer overflow, including whether the overflow was caused by a
2194 third party. The department shall include with this report the
2195 annual report specified under subparagraph (2)(c)3. for each
2196 utility that experienced an overflow.
2197      Section 20. Subsection (6) of section 403.0891, Florida
2198 Statutes, is amended to read:
2199      403.0891 State, regional, and local stormwater management
2200 plans and programs.—The department, the water management
2201 districts, and local governments shall have the responsibility
2202 for the development of mutually compatible stormwater management
2203 programs.
2204      (6) The department and the Department of Economic

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2205  Opportunity, in cooperation with local governments in the
2206  coastal zone, shall develop a model stormwater management
2207  program that could be adopted by local governments. The model
2208  program must contain model ordinances that target nutrient
2209  reduction practices and use green infrastructure. The model
2210  program shall contain dedicated funding options, including a
2211  stormwater utility fee system based upon an equitable unit cost
2212  approach. Funding options shall be designed to generate capital
2213  to retrofit existing stormwater management systems, build new
2214  treatment systems, operate facilities, and maintain and service
2215  debt.

2216      Section 21. Paragraphs (b) and (g) of subsection (2),
2217  paragraph (b) of subsection (3), and subsections (8) and (9) of
2218  section 403.121, Florida Statutes, are amended to read:

2219      403.121 Enforcement; procedure; remedies.—The department
2220  shall have the following judicial and administrative remedies
2221  available to it for violations of this chapter, as specified in
2222  s. 403.161(1).

2223      (2) Administrative remedies:

2224      (b) If the department has reason to believe a violation has
2225  occurred, it may institute an administrative proceeding to order
2226  the prevention, abatement, or control of the conditions creating
2227  the violation or other appropriate corrective action. Except for
2228  violations involving hazardous wastes, asbestos, or underground
2229  injection, the department shall proceed administratively in all
2230  cases in which the department seeks administrative penalties
2231  that do not exceed $50,000 $10,000 per assessment as calculated
2232  in accordance with subsections (3), (4), (5), (6), and (7).
2233  Pursuant to 42 U.S.C. s. 300g-2, the administrative penalty

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2234 assessed pursuant to subsection (3), subsection (4), or
2235 subsection (5) against a public water system serving a
2236 population of more than 10,000 may not ~~shall~~ be ~~not~~ less than
2237 $1,000 per day per violation. The department may ~~shall~~ not
2238 impose administrative penalties in excess of $50,000 ~~$10,000~~ in
2239 a notice of violation. The department may ~~shall~~ not have more
2240 than one notice of violation seeking administrative penalties
2241 pending against the same party at the same time unless the
2242 violations occurred at a different site or the violations were
2243 discovered by the department subsequent to the filing of a
2244 previous notice of violation.

2245     (g) This subsection does not prevent ~~Nothing herein shall~~
2246 ~~be construed as preventing~~ any other legal or administrative
2247 action in accordance with law and does not~~. Nothing in this~~
2248 ~~subsection shall~~ limit the department's authority provided in s.
2249 ~~ss.~~ 403.131, s. 403.141, and this section to judicially pursue
2250 injunctive relief. When the department exercises its authority
2251 to judicially pursue injunctive relief, penalties in any amount
2252 up to the statutory maximum sought by the department must be
2253 pursued as part of the state court action and not by initiating
2254 a separate administrative proceeding. The department retains the
2255 authority to judicially pursue penalties in excess of $50,000
2256 ~~$10,000~~ for violations not specifically included in the
2257 administrative penalty schedule, or for multiple or multiday
2258 violations alleged to exceed a total of $50,000 ~~$10,000~~. The
2259 department also retains the authority provided in ss. 403.131,
2260 403.141, and this section to judicially pursue injunctive relief
2261 and damages, if a notice of violation seeking the imposition of
2262 administrative penalties has not been issued. The department has

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

2263 the authority to enter into a settlement, ~~either~~ before or after
2264 initiating a notice of violation, and the settlement may include
2265 a penalty amount different from the administrative penalty
2266 schedule. Any case filed in state court because it is alleged to
2267 exceed a total of $50,000 ~~$10,000~~ in penalties may be settled in
2268 the court action for less than $50,000 ~~$10,000~~.

2269     (3) Except for violations involving hazardous wastes,
2270 asbestos, or underground injection, administrative penalties
2271 must be calculated according to the following schedule:

2272     (b) For failure to obtain a required wastewater permit,
2273 other than a permit required for surface water discharge, the
2274 department shall assess a penalty of $2,000 ~~$1,000~~. For a
2275 domestic or industrial wastewater violation not involving a
2276 surface water or groundwater quality violation, the department
2277 shall assess a penalty of $4,000 ~~$2,000~~ for an unpermitted or
2278 unauthorized discharge or effluent-limitation exceedance <u>or for</u>
2279 <u>failure to comply with s. 403.061(14) or s. 403.086(7) or rules</u>
2280 <u>adopted thereunder</u>. For an unpermitted or unauthorized discharge
2281 or effluent-limitation exceedance that resulted in a surface
2282 water or groundwater quality violation, the department shall
2283 assess a penalty of $10,000 ~~$5,000~~.

2284     (8) The direct economic benefit gained by the violator from
2285 the violation, where consideration of economic benefit is
2286 provided by Florida law or required by federal law as part of a
2287 federally delegated or approved program, <u>must</u> ~~shall~~ be added to
2288 the scheduled administrative penalty. The total administrative
2289 penalty, including any economic benefit added to the scheduled
2290 administrative penalty, <u>may</u> ~~shall~~ not exceed $10,000.

2291     (9) The administrative penalties assessed for any

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2292  particular violation may shall not exceed $10,000 $5,000 against
2293  any one violator, unless the violator has a history of
2294  noncompliance, the economic benefit of the violation as
2295  described in subsection (8) exceeds $10,000 $5,000, or there are
2296  multiday violations. The total administrative penalties may
2297  shall not exceed $50,000 $10,000 per assessment for all
2298  violations attributable to a specific person in the notice of
2299  violation.

2300       Section 22. Subsection (7) of section 403.1835, Florida
2301  Statutes, is amended to read:

2302       403.1835 Water pollution control financial assistance.—

2303       (7) Eligible projects must be given priority according to
2304  the extent each project is intended to remove, mitigate, or
2305  prevent adverse effects on surface or ground water quality and
2306  public health. The relative costs of achieving environmental and
2307  public health benefits must be taken into consideration during
2308  the department's assignment of project priorities. The
2309  department shall adopt a priority system by rule. In developing
2310  the priority system, the department shall give priority to
2311  projects that:

2312       (a) Eliminate public health hazards;

2313       (b) Enable compliance with laws requiring the elimination
2314  of discharges to specific water bodies, including the
2315  requirements of s. 403.086(10) s. 403.086(9) regarding domestic
2316  wastewater ocean outfalls;

2317       (c) Assist in the implementation of total maximum daily
2318  loads adopted under s. 403.067;

2319       (d) Enable compliance with other pollution control
2320  requirements, including, but not limited to, toxics control,

CODING: Words stricken are deletions; words underlined are additions.

Case 1:21-cv-00119-RDM   Document 55   Filed 06/22/21   Page 400 of 694
ENROLLED
2020 Legislature                    CS for CS for SB 712, 1st Engrossed

2020712er

2321 wastewater residuals management, and reduction of nutrients and
2322 bacteria;
2323     (e) Assist in the implementation of surface water
2324 improvement and management plans and pollutant load reduction
2325 goals developed under state water policy;
2326     (f) Promote reclaimed water reuse;
2327     (g) Eliminate failing onsite sewage treatment and disposal
2328 systems or those that are causing environmental damage; ~~or~~
2329     (h) Reduce pollutants to and otherwise promote the
2330 restoration of Florida's surface and ground waters;~~.~~
2331     (i) Implement the requirements of s. 403.086(7) or s.
2332 403.088(2)(c); or
2333     (j) Promote efficiency by planning for the installation of
2334 wastewater transmission facilities to be constructed
2335 concurrently with other construction projects occurring within
2336 or along a transportation facility right-of-way.
2337     Section 23. Paragraph (b) of subsection (3) of section
2338 403.1838, Florida Statutes, is amended to read:
2339     403.1838 Small Community Sewer Construction Assistance
2340 Act.—
2341     (3)
2342     (b) The rules of the Environmental Regulation Commission
2343 must:
2344     1. Require that projects to plan, design, construct,
2345 upgrade, or replace wastewater collection, transmission,
2346 treatment, disposal, and reuse facilities be cost-effective,
2347 environmentally sound, permittable, and implementable.
2348     2. Require appropriate user charges, connection fees, and
2349 other charges sufficient to ensure the long-term operation,

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2350  maintenance, and replacement of the facilities constructed under
2351  each grant.
2352      3. Require grant applications to be submitted on
2353  appropriate forms with appropriate supporting documentation, and
2354  require records to be maintained.
2355      4. Establish a system to determine eligibility of grant
2356  applications.
2357      5. Establish a system to determine the relative priority of
2358  grant applications. The system must consider public health
2359  protection and water pollution prevention or abatement and must
2360  prioritize projects that plan for the installation of wastewater
2361  transmission facilities to be constructed concurrently with
2362  other construction projects occurring within or along a
2363  transportation facility right-of-way.
2364      6. Establish requirements for competitive procurement of
2365  engineering and construction services, materials, and equipment.
2366      7. Provide for termination of grants when program
2367  requirements are not met.
2368      Section 24. Subsection (9) is added to section 403.412,
2369  Florida Statutes, to read:
2370      403.412 Environmental Protection Act.—
2371      (9)(a) A local government regulation, ordinance, code,
2372  rule, comprehensive plan, charter, or any other provision of law
2373  may not recognize or grant any legal rights to a plant, an
2374  animal, a body of water, or any other part of the natural
2375  environment that is not a person or political subdivision as
2376  defined in s. 1.01(8) or grant such person or political
2377  subdivision any specific rights relating to the natural
2378  environment not otherwise authorized in general law or

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2379  specifically granted in the State Constitution.

2380      (b) This subsection does not limit the power of an
2381  adversely affected party to challenge the consistency of a
2382  development order with a comprehensive plan as provided in s.
2383  163.3215 or to file an action for injunctive relief to enforce
2384  the terms of a development agreement or challenge compliance of
2385  the agreement as provided in s. 163.3243.

2386      (c) This subsection does not limit the standing of the
2387  Department of Legal Affairs, a political subdivision or
2388  municipality of the state, or a citizen of the state to maintain
2389  an action for injunctive relief as provided in this section.

2390      Section 25. The Legislature determines and declares that
2391  this act fulfills an important state interest.

2392      Section 26. Effective July 1, 2021, subsection (5) of
2393  section 153.54, Florida Statutes, is amended to read:

2394      153.54 Preliminary report by county commissioners with
2395  respect to creation of proposed district.—Upon receipt of a
2396  petition duly signed by not less than 25 qualified electors who
2397  are also freeholders residing within an area proposed to be
2398  incorporated into a water and sewer district pursuant to this
2399  law and describing in general terms the proposed boundaries of
2400  such proposed district, the board of county commissioners if it
2401  shall deem it necessary and advisable to create and establish
2402  such proposed district for the purpose of constructing,
2403  establishing or acquiring a water system or a sewer system or
2404  both in and for such district (herein called "improvements"),
2405  shall first cause a preliminary report to be made which such
2406  report together with any other relevant or pertinent matters,
2407  shall include at least the following:

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2408    (5) For the construction of a new proposed <u>central</u> sewerage
2409 system or the extension of an existing sewerage system that was
2410 not previously approved, the report shall include a study that
2411 includes the available information from the Department of
2412 <u>Environmental Protection</u> ~~Health~~ on the history of onsite sewage
2413 treatment and disposal systems currently in use in the area and
2414 a comparison of the projected costs to the owner of a typical
2415 lot or parcel of connecting to and using the proposed sewerage
2416 system versus installing, operating, and properly maintaining an
2417 onsite sewage treatment <u>and disposal</u> system that is approved by
2418 the Department of <u>Environmental Protection</u> ~~Health~~ and that
2419 provides for the comparable level of environmental and health
2420 protection as the proposed central sewerage system;
2421 consideration of the local authority's obligations or reasonably
2422 anticipated obligations for water body cleanup and protection
2423 under state or federal programs, including requirements for
2424 water bodies listed under s. 303(d) of the Clean Water Act, Pub.
2425 L. No. 92-500, 33 U.S.C. ss. 1251 et seq.; and other factors
2426 deemed relevant by the local authority.
2427
2428 Such report shall be filed in the office of the clerk of the
2429 circuit court and shall be open for the inspection of any
2430 taxpayer, property owner, qualified elector or any other
2431 interested or affected person.
2432    Section 27. Effective July 1, 2021, paragraph (c) of
2433 subsection (2) of section 153.73, Florida Statutes, is amended
2434 to read:
2435    153.73 Assessable improvements; levy and payment of special
2436 assessments.—Any district may provide for the construction or

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2437 reconstruction of assessable improvements as defined in s.
2438 153.52, and for the levying of special assessments upon
2439 benefited property for the payment thereof, under ~~the provisions~~
2440 ~~of~~ this section.
2441     (2)
2442     (c) For the construction of a new proposed <u>central</u> sewerage
2443 system or the extension of an existing sewerage system that was
2444 not previously approved, the report shall include a study that
2445 includes the available information from the Department of
2446 <u>Environmental Protection</u> ~~Health~~ on the history of onsite sewage
2447 treatment and disposal systems currently in use in the area and
2448 a comparison of the projected costs to the owner of a typical
2449 lot or parcel of connecting to and using the proposed sewerage
2450 system versus installing, operating, and properly maintaining an
2451 onsite sewage treatment <u>and disposal</u> system that is approved by
2452 the Department of <u>Environmental Protection</u> ~~Health~~ and that
2453 provides for the comparable level of environmental and health
2454 protection as the proposed central sewerage system;
2455 consideration of the local authority's obligations or reasonably
2456 anticipated obligations for water body cleanup and protection
2457 under state or federal programs, including requirements for
2458 water bodies listed under s. 303(d) of the Clean Water Act, Pub.
2459 L. No. 92-500, 33 U.S.C. ss. 1251 et seq.; and other factors
2460 deemed relevant by the local authority.
2461     Section 28. Effective July 1, 2021, subsection (2) of
2462 section 163.3180, Florida Statutes, is amended to read:
2463     163.3180 Concurrency.—
2464     (2) Consistent with public health and safety, sanitary
2465 sewer, solid waste, drainage, adequate water supplies, and

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2466 potable water facilities shall be in place and available to
2467 serve new development no later than the issuance by the local
2468 government of a certificate of occupancy or its functional
2469 equivalent. Prior to approval of a building permit or its
2470 functional equivalent, the local government shall consult with
2471 the applicable water supplier to determine whether adequate
2472 water supplies to serve the new development will be available no
2473 later than the anticipated date of issuance by the local
2474 government of a certificate of occupancy or its functional
2475 equivalent. A local government may meet the concurrency
2476 requirement for sanitary sewer through the use of onsite sewage
2477 treatment and disposal systems approved by the Department of
2478 Environmental Protection Health to serve new development.

2479     Section 29. Effective July 1, 2021, subsection (3) of
2480 section 180.03, Florida Statutes, is amended to read:

2481     180.03 Resolution or ordinance proposing construction or
2482 extension of utility; objections to same.—

2483     (3) For the construction of a new proposed central sewerage
2484 system or the extension of an existing central sewerage system
2485 that was not previously approved, the report shall include a
2486 study that includes the available information from the
2487 Department of Environmental Protection Health on the history of
2488 onsite sewage treatment and disposal systems currently in use in
2489 the area and a comparison of the projected costs to the owner of
2490 a typical lot or parcel of connecting to and using the proposed
2491 central sewerage system versus installing, operating, and
2492 properly maintaining an onsite sewage treatment and disposal
2493 system that is approved by the Department of Environmental
2494 Protection Health and that provides for the comparable level of

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2495  environmental and health protection as the proposed central
2496  sewerage system; consideration of the local authority's
2497  obligations or reasonably anticipated obligations for water body
2498  cleanup and protection under state or federal programs,
2499  including requirements for water bodies listed under s. 303(d)
2500  of the Clean Water Act, Pub. L. No. 92-500, 33 U.S.C. ss. 1251
2501  et seq.; and other factors deemed relevant by the local
2502  authority. The results of such a study shall be included in the
2503  resolution or ordinance required under subsection (1).

2504       Section 30. Subsections (2), (3), and (6) of section
2505  311.105, Florida Statutes, are amended to read:

2506       311.105 Florida Seaport Environmental Management Committee;
2507  permitting; mitigation.—

2508       (2) Each application for a permit authorized pursuant to s.
2509  403.061(38) s. 403.061(37) must include:

2510       (a) A description of maintenance dredging activities to be
2511  conducted and proposed methods of dredged-material management.

2512       (b) A characterization of the materials to be dredged and
2513  the materials within dredged-material management sites.

2514       (c) A description of dredged-material management sites and
2515  plans.

2516       (d) A description of measures to be undertaken, including
2517  environmental compliance monitoring, to minimize adverse
2518  environmental effects of maintenance dredging and dredged-
2519  material management.

2520       (e) Such scheduling information as is required to
2521  facilitate state supplementary funding of federal maintenance
2522  dredging and dredged-material management programs consistent
2523  with beach restoration criteria of the Department of

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2524  Environmental Protection.

2525      (3) Each application for a permit authorized pursuant to s.
2526  403.061(39) s. 403.061(38) must include the provisions of
2527  paragraphs (2)(b)-(e) and the following:

2528      (a) A description of dredging and dredged-material
2529  management and other related activities associated with port
2530  development, including the expansion of navigation channels,
2531  dredged-material management sites, port harbors, turning basins,
2532  harbor berths, and associated facilities.

2533      (b) A discussion of environmental mitigation as is proposed
2534  for dredging and dredged-material management for port
2535  development, including the expansion of navigation channels,
2536  dredged-material management sites, port harbors, turning basins,
2537  harbor berths, and associated facilities.

2538      (6) Dredged-material management activities authorized
2539  pursuant to s. 403.061(38) s. 403.061(37) or s. 403.061(39) (38)
2540  shall be incorporated into port master plans developed pursuant
2541  to s. 163.3178(2)(k).

2542      Section 31. Paragraph (d) of subsection (1) of section
2543  327.46, Florida Statutes, is amended to read:

2544      327.46 Boating-restricted areas.—

2545      (1) Boating-restricted areas, including, but not limited
2546  to, restrictions of vessel speeds and vessel traffic, may be
2547  established on the waters of this state for any purpose
2548  necessary to protect the safety of the public if such
2549  restrictions are necessary based on boating accidents,
2550  visibility, hazardous currents or water levels, vessel traffic
2551  congestion, or other navigational hazards or to protect
2552  seagrasses on privately owned submerged lands.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2553     (d) Owners of private submerged lands that are adjacent to
2554 Outstanding Florida Waters, as defined in s. 403.061(28) ~~s.~~
2555 ~~403.061(27)~~, or an aquatic preserve established under ss.
2556 258.39-258.399 may request that the commission establish
2557 boating-restricted areas solely to protect any seagrass and
2558 contiguous seagrass habitat within their private property
2559 boundaries from seagrass scarring due to propeller dredging.
2560 Owners making a request pursuant to this paragraph must
2561 demonstrate to the commission clear ownership of the submerged
2562 lands. The commission shall adopt rules to implement this
2563 paragraph, including, but not limited to, establishing an
2564 application process and criteria for meeting the requirements of
2565 this paragraph. Each approved boating-restricted area shall be
2566 established by commission rule. For marking boating-restricted
2567 zones established pursuant to this paragraph, owners of
2568 privately submerged lands shall apply to the commission for a
2569 uniform waterway marker permit in accordance with ss. 327.40 and
2570 327.41, and shall be responsible for marking the boating-
2571 restricted zone in accordance with the terms of the permit.
2572     Section 32. Paragraph (d) of subsection (3) of section
2573 373.250, Florida Statutes, is amended to read:
2574     373.250 Reuse of reclaimed water.—
2575     (3)
2576     (d) The South Florida Water Management District shall
2577 require the use of reclaimed water made available by the
2578 elimination of wastewater ocean outfall discharges as provided
2579 for in s. 403.086(10) ~~s. 403.086(9)~~ in lieu of surface water or
2580 groundwater when the use of reclaimed water is available; is
2581 environmentally, economically, and technically feasible; and is

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2582  of such quality and reliability as is necessary to the user.
2583  Such reclaimed water may also be required in lieu of other
2584  alternative sources. In determining whether to require such
2585  reclaimed water in lieu of other alternative sources, the water
2586  management district shall consider existing infrastructure
2587  investments in place or obligated to be constructed by an
2588  executed contract or similar binding agreement as of July 1,
2589  2011, for the development of other alternative sources.

2590      Section 33. Subsection (9) of section 373.414, Florida
2591  Statutes, is amended to read:

2592      373.414 Additional criteria for activities in surface
2593  waters and wetlands.—

2594      (9) The department and the governing boards, on or before
2595  July 1, 1994, shall adopt rules to incorporate ~~the provisions of~~
2596  this section, relying primarily on the existing rules of the
2597  department and the water management districts, into the rules
2598  governing the management and storage of surface waters. Such
2599  rules shall seek to achieve a statewide, coordinated and
2600  consistent permitting approach to activities regulated under
2601  this part. Variations in permitting criteria in the rules of
2602  individual water management districts or the department shall
2603  only be provided to address differing physical or natural
2604  characteristics. Such rules adopted pursuant to this subsection
2605  shall include the special criteria adopted pursuant to <u>s.</u>
2606  <u>403.061(30)</u> ~~s. 403.061(29)~~ and may include the special criteria
2607  adopted pursuant to <u>s. 403.061(35)</u> ~~s. 403.061(34)~~. Such rules
2608  shall include a provision requiring that a notice of intent to
2609  deny or a permit denial based upon this section shall contain an
2610  explanation of the reasons for such denial and an explanation,

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2611 in general terms, of what changes, if any, are necessary to
2612 address such reasons for denial. Such rules may establish
2613 exemptions and general permits, if such exemptions and general
2614 permits do not allow significant adverse impacts to occur
2615 individually or cumulatively. Such rules may require submission
2616 of proof of financial responsibility which may include the
2617 posting of a bond or other form of surety prior to the
2618 commencement of construction to provide reasonable assurance
2619 that any activity permitted pursuant to this section, including
2620 any mitigation for such permitted activity, will be completed in
2621 accordance with the terms and conditions of the permit once the
2622 construction is commenced. Until rules adopted pursuant to this
2623 subsection become effective, existing rules adopted under this
2624 part and rules adopted pursuant to the authority of ss. 403.91-
2625 403.929 shall be deemed authorized under this part and shall
2626 remain in full force and effect. Neither the department nor the
2627 governing boards are limited or prohibited from amending any
2628 such rules.

2629     Section 34. Paragraph (b) of subsection (4) of section
2630 373.705, Florida Statutes, is amended to read:

2631     373.705 Water resource development; water supply
2632 development.—

2633     (4)

2634     (b) Water supply development projects that meet the
2635 criteria in paragraph (a) and that meet one or more of the
2636 following additional criteria shall be given first consideration
2637 for state or water management district funding assistance:

2638     1. The project brings about replacement of existing sources
2639 in order to help implement a minimum flow or minimum water

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2640 level;

2641    2. The project implements reuse that assists in the

2642 elimination of domestic wastewater ocean outfalls as provided in

2643 s. 403.086(10) s. 403.086(9); or

2644    3. The project reduces or eliminates the adverse effects of

2645 competition between legal users and the natural system.

2646    Section 35. Paragraph (f) of subsection (8) of section

2647 373.707, Florida Statutes, is amended to read:

2648    373.707 Alternative water supply development.—

2649    (8)

2650    (f) The governing boards shall determine those projects

2651 that will be selected for financial assistance. The governing

2652 boards may establish factors to determine project funding;

2653 however, significant weight shall be given to the following

2654 factors:

2655    1. Whether the project provides substantial environmental

2656 benefits by preventing or limiting adverse water resource

2657 impacts.

2658    2. Whether the project reduces competition for water

2659 supplies.

2660    3. Whether the project brings about replacement of

2661 traditional sources in order to help implement a minimum flow or

2662 level or a reservation.

2663    4. Whether the project will be implemented by a consumptive

2664 use permittee that has achieved the targets contained in a goal-

2665 based water conservation program approved pursuant to s.

2666 373.227.

2667    5. The quantity of water supplied by the project as

2668 compared to its cost.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2669        6. Projects in which the construction and delivery to end
2670    users of reuse water is a major component.

2671        7. Whether the project will be implemented by a
2672    multijurisdictional water supply entity or regional water supply
2673    authority.

2674        8. Whether the project implements reuse that assists in the
2675    elimination of domestic wastewater ocean outfalls as provided in
2676    s. 403.086(10) ~~s. 403.086(9)~~.

2677        9. Whether the county or municipality, or the multiple
2678    counties or municipalities, in which the project is located has
2679    implemented a high-water recharge protection tax assessment
2680    program as provided in s. 193.625.

2681        Section 36. Subsection (4) of section 373.709, Florida
2682    Statutes, is amended to read:

2683        373.709 Regional water supply planning.—

2684        (4) The South Florida Water Management District shall
2685    include in its regional water supply plan water resource and
2686    water supply development projects that promote the elimination
2687    of wastewater ocean outfalls as provided in s. 403.086(10) ~~s.~~
2688    ~~403.086(9)~~.

2689        Section 37. Effective July 1, 2021, subsection (3) of
2690    section 373.807, Florida Statutes, is amended to read:

2691        373.807 Protection of water quality in Outstanding Florida
2692    Springs.—By July 1, 2016, the department shall initiate
2693    assessment, pursuant to s. 403.067(3), of Outstanding Florida
2694    Springs or spring systems for which an impairment determination
2695    has not been made under the numeric nutrient standards in effect
2696    for spring vents. Assessments must be completed by July 1, 2018.

2697        (3) As part of a basin management action plan that includes

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2020712er

2698  an Outstanding Florida Spring, the department, ~~the Department of~~
2699  ~~Health,~~ relevant local governments, and relevant local public
2700  and private wastewater utilities shall develop an onsite sewage
2701  treatment and disposal system remediation plan for a spring if
2702  the department determines onsite sewage treatment and disposal
2703  systems within a priority focus area contribute at least 20
2704  percent of nonpoint source nitrogen pollution or if the
2705  department determines remediation is necessary to achieve the
2706  total maximum daily load. The plan shall identify cost-effective
2707  and financially feasible projects necessary to reduce the
2708  nutrient impacts from onsite sewage treatment and disposal
2709  systems and shall be completed and adopted as part of the basin
2710  management action plan no later than the first 5-year milestone
2711  required by subparagraph (1)(b)8. The department is the lead
2712  agency in coordinating the preparation of and the adoption of
2713  the plan. The department shall:

2714      (a) Collect and evaluate credible scientific information on
2715  the effect of nutrients, particularly forms of nitrogen, on
2716  springs and springs systems; and

2717      (b) Develop a public education plan to provide area
2718  residents with reliable, understandable information about onsite
2719  sewage treatment and disposal systems and springs.

2720

2721  In addition to the requirements in s. 403.067, the plan shall
2722  include options for repair, upgrade, replacement, drainfield
2723  modification, addition of effective nitrogen reducing features,
2724  connection to a central sewerage system, or other action for an
2725  onsite sewage treatment and disposal system or group of systems
2726  within a priority focus area that contribute at least 20 percent

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2727  of nonpoint source nitrogen pollution or if the department
2728  determines remediation is necessary to achieve a total maximum
2729  daily load. For these systems, the department shall include in
2730  the plan a priority ranking for each system or group of systems
2731  that requires remediation and shall award funds to implement the
2732  remediation projects contingent on an appropriation in the
2733  General Appropriations Act, which may include all or part of the
2734  costs necessary for repair, upgrade, replacement, drainfield
2735  modification, addition of effective nitrogen reducing features,
2736  initial connection to a central sewerage system, or other
2737  action. In awarding funds, the department may consider expected
2738  nutrient reduction benefit per unit cost, size and scope of
2739  project, relative local financial contribution to the project,
2740  and the financial impact on property owners and the community.
2741  The department may waive matching funding requirements for
2742  proposed projects within an area designated as a rural area of
2743  opportunity under s. 288.0656.

2744      Section 38. Paragraph (k) of subsection (1) of section
2745  376.307, Florida Statutes, is amended to read:

2746      376.307 Water Quality Assurance Trust Fund.—

2747      (1) The Water Quality Assurance Trust Fund is intended to
2748  serve as a broad-based fund for use in responding to incidents
2749  of contamination that pose a serious danger to the quality of
2750  groundwater and surface water resources or otherwise pose a
2751  serious danger to the public health, safety, or welfare. Moneys
2752  in this fund may be used:

2753      (k) For funding activities described in s. 403.086(10) s.
2754  403.086(9) which are authorized for implementation under the
2755  Leah Schad Memorial Ocean Outfall Program.

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2756        Section 39. Paragraph (i) of subsection (2), paragraph (b)
2757   of subsection (4), paragraph (j) of subsection (7), and
2758   paragraph (a) of subsection (9) of section 380.0552, Florida
2759   Statutes, are amended to read:

2760        380.0552 Florida Keys Area; protection and designation as
2761   area of critical state concern.—

2762        (2) LEGISLATIVE INTENT.—It is the intent of the Legislature
2763   to:

2764        (i) Protect and improve the nearshore water quality of the
2765   Florida Keys through federal, state, and local funding of water
2766   quality improvement projects, including the construction and
2767   operation of wastewater management facilities that meet the
2768   requirements of ss. 381.0065(4)(l) and 403.086(11) 403.086(10),
2769   as applicable.

2770        (4) REMOVAL OF DESIGNATION.—

2771        (b) Beginning November 30, 2010, the state land planning
2772   agency shall annually submit a written report to the
2773   Administration Commission describing the progress of the Florida
2774   Keys Area toward completing the work program tasks specified in
2775   commission rules. The land planning agency shall recommend
2776   removing the Florida Keys Area from being designated as an area
2777   of critical state concern to the commission if it determines
2778   that:

2779        1. All of the work program tasks have been completed,
2780   including construction of, operation of, and connection to
2781   central wastewater management facilities pursuant to s.
2782   403.086(11) s. 403.086(10) and upgrade of onsite sewage
2783   treatment and disposal systems pursuant to s. 381.0065(4)(l);

2784        2. All local comprehensive plans and land development

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2785 regulations and the administration of such plans and regulations
2786 are adequate to protect the Florida Keys Area, fulfill the
2787 legislative intent specified in subsection (2), and are
2788 consistent with and further the principles guiding development;
2789 and

2790    3. A local government has adopted a resolution at a public
2791 hearing recommending the removal of the designation.

2792    (7) PRINCIPLES FOR GUIDING DEVELOPMENT.—State, regional,
2793 and local agencies and units of government in the Florida Keys
2794 Area shall coordinate their plans and conduct their programs and
2795 regulatory activities consistent with the principles for guiding
2796 development as specified in chapter 27F-8, Florida
2797 Administrative Code, as amended effective August 23, 1984, which
2798 is adopted and incorporated herein by reference. For the
2799 purposes of reviewing the consistency of the adopted plan, or
2800 any amendments to that plan, with the principles for guiding
2801 development, and any amendments to the principles, the
2802 principles shall be construed as a whole and specific provisions
2803 may not be construed or applied in isolation from the other
2804 provisions. However, the principles for guiding development are
2805 repealed 18 months from July 1, 1986. After repeal, any plan
2806 amendments must be consistent with the following principles:

2807    (j) Ensuring the improvement of nearshore water quality by
2808 requiring the construction and operation of wastewater
2809 management facilities that meet the requirements of ss.
2810 381.0065(4)(l) and 403.086(11) 403.086(10), as applicable, and
2811 by directing growth to areas served by central wastewater
2812 treatment facilities through permit allocation systems.

2813    (9) MODIFICATION TO PLANS AND REGULATIONS.—

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2814    (a) Any land development regulation or element of a local
2815  comprehensive plan in the Florida Keys Area may be enacted,
2816  amended, or rescinded by a local government, but the enactment,
2817  amendment, or rescission becomes effective only upon approval by
2818  the state land planning agency. The state land planning agency
2819  shall review the proposed change to determine if it is in
2820  compliance with the principles for guiding development specified
2821  in chapter 27F-8, Florida Administrative Code, as amended
2822  effective August 23, 1984, and must approve or reject the
2823  requested changes within 60 days after receipt. Amendments to
2824  local comprehensive plans in the Florida Keys Area must also be
2825  reviewed for compliance with the following:

2826    1. Construction schedules and detailed capital financing
2827  plans for wastewater management improvements in the annually
2828  adopted capital improvements element, and standards for the
2829  construction of wastewater treatment and disposal facilities or
2830  collection systems that meet or exceed the criteria in s.
2831  403.086(11) s. 403.086(10) for wastewater treatment and disposal
2832  facilities or s. 381.0065(4)(l) for onsite sewage treatment and
2833  disposal systems.

2834    2. Goals, objectives, and policies to protect public safety
2835  and welfare in the event of a natural disaster by maintaining a
2836  hurricane evacuation clearance time for permanent residents of
2837  no more than 24 hours. The hurricane evacuation clearance time
2838  shall be determined by a hurricane evacuation study conducted in
2839  accordance with a professionally accepted methodology and
2840  approved by the state land planning agency.

2841    Section 40. Effective July 1, 2021, subsections (7) and
2842  (18) of section 381.006, Florida Statutes, are amended to read:

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2843        381.006 Environmental health.—The department shall conduct
2844   an environmental health program as part of fulfilling the
2845   state's public health mission. The purpose of this program is to
2846   detect and prevent disease caused by natural and manmade factors
2847   in the environment. The environmental health program shall
2848   include, but not be limited to:

2849        (7) An onsite sewage treatment and disposal function.

2850        (17)(18) A food service inspection function for domestic
2851   violence centers that are certified by the Department of
2852   Children and Families and monitored by the Florida Coalition
2853   Against Domestic Violence under part XII of chapter 39 and group
2854   care homes as described in subsection (15) (16), which shall be
2855   conducted annually and be limited to the requirements in
2856   department rule applicable to community-based residential
2857   facilities with five or fewer residents.

2858

2859   The department may adopt rules to carry out the provisions of
2860   this section.

2861        Section 41. Effective July 1, 2021, subsection (1) of
2862   section 381.0061, Florida Statutes, is amended to read:

2863        381.0061 Administrative fines.—

2864        (1) In addition to any administrative action authorized by
2865   chapter 120 or by other law, the department may impose a fine,
2866   which may shall not exceed $500 for each violation, for a
2867   violation of s. 381.006(15) s. 381.006(16), s. 381.0065, s.
2868   381.0066, s. 381.0072, or part III of chapter 489, for a
2869   violation of any rule adopted under this chapter, or for a
2870   violation of any of the provisions of chapter 386. Notice of
2871   intent to impose such fine shall be given by the department to

CODING: Words stricken are deletions; words underlined are additions.

2020712er

2872 the alleged violator. Each day that a violation continues may
2873 constitute a separate violation.

2874     Section 42. Effective July 1, 2021, subsection (1) of
2875 section 381.0064, Florida Statutes, is amended to read:

2876     381.0064 Continuing education courses for persons
2877 installing or servicing septic tanks.—

2878     (1) The Department of Environmental Protection Health shall
2879 establish a program for continuing education which meets the
2880 purposes of ss. 381.0101 and 489.554 regarding the public health
2881 and environmental effects of onsite sewage treatment and
2882 disposal systems and any other matters the department determines
2883 desirable for the safe installation and use of onsite sewage
2884 treatment and disposal systems. The department may charge a fee
2885 to cover the cost of such program.

2886     Section 43. Effective July 1, 2021, paragraph (d) of
2887 subsection (7), subsection (8), and paragraphs (b), (c), and (d)
2888 of subsection (9) of section 381.00651, Florida Statutes, are
2889 amended to read:

2890     381.00651 Periodic evaluation and assessment of onsite
2891 sewage treatment and disposal systems.—

2892     (7) The following procedures shall be used for conducting
2893 evaluations:

2894     (d) *Assessment procedure.*—All evaluation procedures used by
2895 a qualified contractor shall be documented in the environmental
2896 health database of the Department of Environmental Protection
2897 Health. The qualified contractor shall provide a copy of a
2898 written, signed evaluation report to the property owner upon
2899 completion of the evaluation and to the county health department
2900 within 30 days after the evaluation. The report must shall

**CODING:** Words stricken are deletions; words underlined are additions.

2020712er

2901 contain the name and license number of the company providing the
2902 report. A copy of the evaluation report shall be retained by the
2903 local county health department for a minimum of 5 years and
2904 until a subsequent inspection report is filed. The front cover
2905 of the report must identify any system failure and include a
2906 clear and conspicuous notice to the owner that the owner has a
2907 right to have any remediation of the failure performed by a
2908 qualified contractor other than the contractor performing the
2909 evaluation. The report must further identify any crack, leak,
2910 improper fit, or other defect in the tank, manhole, or lid, and
2911 any other damaged or missing component; any sewage or effluent
2912 visible on the ground or discharging to a ditch or other surface
2913 water body; any downspout, stormwater, or other source of water
2914 directed onto or toward the system; and any other maintenance
2915 need or condition of the system at the time of the evaluation
2916 which, in the opinion of the qualified contractor, would
2917 possibly interfere with or restrict any future repair or
2918 modification to the existing system. The report shall conclude
2919 with an overall assessment of the fundamental operational
2920 condition of the system.

2921     (8) The county health department, in coordination with the
2922 department, shall administer any evaluation program on behalf of
2923 a county, or a municipality within the county, that has adopted
2924 an evaluation program pursuant to this section. In order to
2925 administer the evaluation program, the county or municipality,
2926 in consultation with the county health department, may develop a
2927 reasonable fee schedule to be used solely to pay for the costs
2928 of administering the evaluation program. Such a fee schedule
2929 shall be identified in the ordinance that adopts the evaluation

**CODING:** Words stricken are deletions; words underlined are additions.

2020712er

2930 program. When arriving at a reasonable fee schedule, the
2931 estimated annual revenues to be derived from fees may not exceed
2932 reasonable estimated annual costs of the program. Fees shall be
2933 assessed to the system owner during an inspection and separately
2934 identified on the invoice of the qualified contractor. Fees
2935 shall be remitted by the qualified contractor to the county
2936 health department. The county health department's administrative
2937 responsibilities include the following:

2938     (a) Providing a notice to the system owner at least 60 days
2939 before the system is due for an evaluation. The notice may
2940 include information on the proper maintenance of onsite sewage
2941 treatment and disposal systems.

2942     (b) In consultation with the department of Health,
2943 providing uniform disciplinary procedures and penalties for
2944 qualified contractors who do not comply with the requirements of
2945 the adopted ordinance, including, but not limited to, failure to
2946 provide the evaluation report as required in this subsection to
2947 the system owner and the county health department. Only the
2948 county health department may assess penalties against system
2949 owners for failure to comply with the adopted ordinance,
2950 consistent with existing requirements of law.

2951     (9)

2952     (b) Upon receipt of the notice under paragraph (a), the
2953 department of Environmental Protection shall, within existing
2954 resources, notify the county or municipality of the potential
2955 use of, and access to, program funds under the Clean Water State
2956 Revolving Fund or s. 319 of the Clean Water Act, provide
2957 guidance in the application process to receive such moneys, and
2958 provide advice and technical assistance to the county or

CODING: Words stricken are deletions; words underlined are additions.

2959  municipality on how to establish a low-interest revolving loan
2960  program or how to model a revolving loan program after the low-
2961  interest loan program of the Clean Water State Revolving Fund.
2962  This paragraph does not obligate the department ~~of Environmental~~
2963  ~~Protection~~ to provide any county or municipality with money to
2964  fund such programs.

2965      (c) The department ~~of Health~~ may not adopt any rule that
2966  alters ~~the provisions of~~ this section.

2967      (d) The department ~~of Health~~ must allow county health
2968  departments and qualified contractors access to the
2969  environmental health database to track relevant information and
2970  assimilate data from assessment and evaluation reports of the
2971  overall condition of onsite sewage treatment and disposal
2972  systems. The environmental health database must be used by
2973  contractors to report each service and evaluation event and by a
2974  county health department to notify owners of onsite sewage
2975  treatment and disposal systems when evaluations are due. Data
2976  and information must be recorded and updated as service and
2977  evaluations are conducted and reported.

2978      Section 44. Effective July 1, 2021, paragraph (g) of
2979  subsection (1) of section 381.0101, Florida Statutes, is amended
2980  to read:

2981      381.0101 Environmental health professionals.—

2982      (1) DEFINITIONS.—As used in this section:

2983      (g) "Primary environmental health program" means those
2984  programs determined by the department to be essential for
2985  providing basic environmental and sanitary protection to the
2986  public. At a minimum, these programs shall include food
2987  protection program work ~~and onsite sewage treatment and disposal~~

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

2988 ~~system evaluations~~.

2989    Section 45. Section 403.08601, Florida Statutes, is amended
2990 to read:

2991    403.08601 Leah Schad Memorial Ocean Outfall Program.—The
2992 Legislature declares that as funds become available the state
2993 may assist the local governments and agencies responsible for
2994 implementing the Leah Schad Memorial Ocean Outfall Program
2995 pursuant to s. 403.086(10) ~~s. 403.086(9)~~. Funds received from
2996 other sources provided for in law, the General Appropriations
2997 Act, from gifts designated for implementation of the plan from
2998 individuals, corporations, or other entities, or federal funds
2999 appropriated by Congress for implementation of the plan, may be
3000 deposited into an account of the Water Quality Assurance Trust
3001 Fund.

3002    Section 46. Section 403.0871, Florida Statutes, is amended
3003 to read:

3004    403.0871 Florida Permit Fee Trust Fund.—There is
3005 established within the department a nonlapsing trust fund to be
3006 known as the "Florida Permit Fee Trust Fund." All funds received
3007 from applicants for permits pursuant to ss. 161.041, 161.053,
3008 161.0535, 403.087(7) ~~403.087(6)~~, and 403.861(7)(a) shall be
3009 deposited in the Florida Permit Fee Trust Fund and shall be used
3010 by the department with the advice and consent of the Legislature
3011 to supplement appropriations and other funds received by the
3012 department for the administration of its responsibilities under
3013 this chapter and chapter 161. In no case shall funds from the
3014 Florida Permit Fee Trust Fund be used for salary increases
3015 without the approval of the Legislature.

3016    Section 47. Paragraph (a) of subsection (11) of section

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

403.0872, Florida Statutes, is amended to read:

403.0872 Operation permits for major sources of air pollution; annual operation license fee.—Provided that program approval pursuant to 42 U.S.C. s. 7661a has been received from the United States Environmental Protection Agency, beginning January 2, 1995, each major source of air pollution, including electrical power plants certified under s. 403.511, must obtain from the department an operation permit for a major source of air pollution under this section. This operation permit is the only department operation permit for a major source of air pollution required for such source; provided, at the applicant's request, the department shall issue a separate acid rain permit for a major source of air pollution that is an affected source within the meaning of 42 U.S.C. s. 7651a(1). Operation permits for major sources of air pollution, except general permits issued pursuant to s. 403.814, must be issued in accordance with the procedures contained in this section and in accordance with chapter 120; however, to the extent that chapter 120 is inconsistent with ~~the provisions of~~ this section, the procedures contained in this section prevail.

(11) Each major source of air pollution permitted to operate in this state must pay between January 15 and April 1 of each year, upon written notice from the department, an annual operation license fee in an amount determined by department rule. The annual operation license fee shall be terminated immediately in the event the United States Environmental Protection Agency imposes annual fees solely to implement and administer the major source air-operation permit program in Florida under 40 C.F.R. s. 70.10(d).

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

3046     (a) The annual fee must be assessed based upon the source's
3047 previous year's emissions and must be calculated by multiplying
3048 the applicable annual operation license fee factor times the
3049 tons of each regulated air pollutant actually emitted, as
3050 calculated in accordance with the department's emissions
3051 computation and reporting rules. The annual fee shall only apply
3052 to those regulated pollutants, except carbon monoxide and
3053 greenhouse gases, for which an allowable numeric emission
3054 limiting standard is specified in the source's most recent
3055 construction or operation permit; provided, however, that:

3056     1. The license fee factor is $25 or another amount
3057 determined by department rule which ensures that the revenue
3058 provided by each year's operation license fees is sufficient to
3059 cover all reasonable direct and indirect costs of the major
3060 stationary source air-operation permit program established by
3061 this section. The license fee factor may be increased beyond $25
3062 only if the secretary of the department affirmatively finds that
3063 a shortage of revenue for support of the major stationary source
3064 air-operation permit program will occur in the absence of a fee
3065 factor adjustment. The annual license fee factor may never
3066 exceed $35.

3067     2. The amount of each regulated air pollutant in excess of
3068 4,000 tons per year emitted by any source, or group of sources
3069 belonging to the same Major Group as described in the Standard
3070 Industrial Classification Manual, 1987, may not be included in
3071 the calculation of the fee. Any source, or group of sources,
3072 which does not emit any regulated air pollutant in excess of
3073 4,000 tons per year, is allowed a one-time credit not to exceed
3074 25 percent of the first annual licensing fee for the prorated

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

3075 portion of existing air-operation permit application fees
3076 remaining upon commencement of the annual licensing fees.

3077     3. If the department has not received the fee by March 1 of
3078 the calendar year, the permittee must be sent a written warning
3079 of the consequences for failing to pay the fee by April 1. If
3080 the fee is not postmarked by April 1 of the calendar year, the
3081 department shall impose, in addition to the fee, a penalty of 50
3082 percent of the amount of the fee, plus interest on such amount
3083 computed in accordance with s. 220.807. The department may not
3084 impose such penalty or interest on any amount underpaid,
3085 provided that the permittee has timely remitted payment of at
3086 least 90 percent of the amount determined to be due and remits
3087 full payment within 60 days after receipt of notice of the
3088 amount underpaid. The department may waive the collection of
3089 underpayment and may shall not be required to refund overpayment
3090 of the fee, if the amount due is less than 1 percent of the fee,
3091 up to $50. The department may revoke any major air pollution
3092 source operation permit if it finds that the permitholder has
3093 failed to timely pay any required annual operation license fee,
3094 penalty, or interest.

3095     4. Notwithstanding the computational provisions of this
3096 subsection, the annual operation license fee for any source
3097 subject to this section may shall not be less than $250, except
3098 that the annual operation license fee for sources permitted
3099 solely through general permits issued under s. 403.814 may shall
3100 not exceed $50 per year.

3101     5. Notwithstanding s. 403.087(7)(a)5.a., which authorizes
3102 the provisions of s. 403.087(6)(a)5.a., authorizing air
3103 pollution construction permit fees, the department may not

**CODING:** Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

3104 require such fees for changes or additions to a major source of
3105 air pollution permitted pursuant to this section, unless the
3106 activity triggers permitting requirements under Title I, Part C
3107 or Part D, of the federal Clean Air Act, 42 U.S.C. ss. 7470-
3108 7514a. Costs to issue and administer such permits shall be
3109 considered direct and indirect costs of the major stationary
3110 source air-operation permit program under s. 403.0873. The
3111 department shall, however, require fees pursuant to s.
3112 403.087(7)(a)5.a. ~~the provisions of s. 403.087(6)(a)5.a.~~ for the
3113 construction of a new major source of air pollution that will be
3114 subject to the permitting requirements of this section once
3115 constructed and for activities triggering permitting
3116 requirements under Title I, Part C or Part D, of the federal
3117 Clean Air Act, 42 U.S.C. ss. 7470-7514a.
3118      Section 48. Paragraph (d) of subsection (3) of section
3119 403.707, Florida Statutes, is amended to read:
3120      403.707 Permits.—
3121      (3)
3122      (d) The department may adopt rules to administer this
3123 subsection. However, the department is not required to submit
3124 such rules to the Environmental Regulation Commission for
3125 approval. Notwithstanding the limitations of s. 403.087(7)(a) ~~s.~~
3126 ~~403.087(6)(a)~~, permit fee caps for solid waste management
3127 facilities shall be prorated to reflect the extended permit term
3128 authorized by this subsection.
3129      Section 49. Subsections (8) and (21) of section 403.861,
3130 Florida Statutes, are amended to read:
3131      403.861 Department; powers and duties.—The department shall
3132 have the power and the duty to carry out the provisions and

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2020712er

3133 purposes of this act and, for this purpose, to:

3134     (8) Initiate rulemaking to increase each drinking water

3135 permit application fee authorized under s. 403.087(7) s.

3136 403.087(6) and this part and adopted by rule to ensure that such

3137 fees are increased to reflect, at a minimum, any upward

3138 adjustment in the Consumer Price Index compiled by the United

3139 States Department of Labor, or similar inflation indicator,

3140 since the original fee was established or most recently revised.

3141     (a) The department shall establish by rule the inflation

3142 index to be used for this purpose. The department shall review

3143 the drinking water permit application fees authorized under s.

3144 403.087(7) s. 403.087(6) and this part at least once every 5

3145 years and shall adjust the fees upward, as necessary, within the

3146 established fee caps to reflect changes in the Consumer Price

3147 Index or similar inflation indicator. In the event of deflation,

3148 the department shall consult with the Executive Office of the

3149 Governor and the Legislature to determine whether downward fee

3150 adjustments are appropriate based on the current budget and

3151 appropriation considerations. The department shall also review

3152 the drinking water operation license fees established pursuant

3153 to paragraph (7)(b) at least once every 5 years to adopt, as

3154 necessary, the same inflationary adjustments provided for in

3155 this subsection.

3156     (b) The minimum fee amount shall be the minimum fee

3157 prescribed in this section, and such fee amount shall remain in

3158 effect until the effective date of fees adopted by rule by the

3159 department.

3160     (21)(a) Upon issuance of a construction permit to construct

3161 a new public water system drinking water treatment facility to

CODING: Words stricken are deletions; words underlined are additions.

2020712er

3162  provide potable water supply using a surface water that, at the
3163  time of the permit application, is not being used as a potable
3164  water supply, and the classification of which does not include
3165  potable water supply as a designated use, the department shall
3166  add treated potable water supply as a designated use of the
3167  surface water segment in accordance with s. 403.061(30)(b) s.
3168  403.061(29)(b).

3169      (b) For existing public water system drinking water
3170  treatment facilities that use a surface water as a treated
3171  potable water supply, which surface water classification does
3172  not include potable water supply as a designated use, the
3173  department shall add treated potable water supply as a
3174  designated use of the surface water segment in accordance with
3175  s. 403.061(30)(b) s. 403.061(29)(b).

3176      Section 50. Effective July 1, 2021, subsection (1) of
3177  section 489.551, Florida Statutes, is amended to read:

3178      489.551 Definitions.—As used in this part:

3179      (1) "Department" means the Department of Environmental
3180  Protection Health.

3181      Section 51. Paragraph (b) of subsection (10) of section
3182  590.02, Florida Statutes, is amended to read:

3183      590.02 Florida Forest Service; powers, authority, and
3184  duties; liability; building structures; Withlacoochee Training
3185  Center.—

3186      (10)

3187      (b) The Florida Forest Service may delegate to a county,
3188  municipality, or special district its authority:

3189      1. As delegated by the Department of Environmental
3190  Protection pursuant to ss. 403.061(29) ss. 403.061(28) and

CODING: Words stricken are deletions; words underlined are additions.

2020712er

3191  403.081, to manage and enforce regulations pertaining to the

3192  burning of yard trash in accordance with s. 590.125(6).

3193      2. To manage the open burning of land clearing debris in

3194  accordance with s. 590.125.

3195      Section 52. The Division of Law Revision is directed to

3196  replace the phrase "before the rules identified in paragraph (e)

3197  take effect" as it is used in the amendment made by this act to

3198  s. 381.0065(4)(f), Florida Statutes, with the date such rules

3199  are adopted, as provided by the Department of Environmental

3200  Protection pursuant to s. 381.0065(4)(e), Florida Statutes, as

3201  amended by this act.

3202      Section 53. Except as otherwise expressly provided in this

3203  act, this act shall take effect July 1, 2020.

**CODING:** Words ~~stricken~~ are deletions; words underlined are additions.

# The State of Florida's Program Application Submission to Assume the Clean Water Act Section 404 Permitting Program

Submitted August 20, 2020

# <u>TABLE OF CONTENTS</u>

A.    Letters from the Governor of the State of Florida and the Secretary of the Florida

Department of Environmental Protection requesting program approval.

B.    A complete program description, as set forth in 40 C.F.R. § 233.11.

C.    A Genera Counsel's statement, as set forth in 40 C.F.R. § 233.12.

D.    A Memorandum of Agreement with the Regional Administrator, as set forth in 40

C.F.R. § 233.13.

E.    A Memorandum of Agreement with the Secretary, as set forth in 40 C.F.R. § 233.14.

F.    Copies of all applicable State statutes and regulations, including those governing

applicable State administrative procedures.



# RON DeSANTIS
GOVERNOR

August 18, 2020

Ms. Mary S. Walker
Administrator
Environmental Protection Agency, Southeast Region 4
61 Forsyth Street, S.W. Mail Code: 9T25
Atlanta, GA 30303

Dear Ms. Walker:

On behalf of the State of Florida, please accept this program application submission for the state to assume the Clean Water Act 404 Permitting Program. I fully endorse the Florida Department of Environmental Protection's assumption of this program and respectfully request that you approve the application.

Sincerely,

Ron DeSantis
Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399 • (850) 717-9249



# FLORIDA DEPARTMENT OF
# Environmental Protection

Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, FL 32399

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Noah Valenstein**
Secretary

August 7, 2020

Ms. Mary S. Walker
Administrator
Environmental Protection Agency, Southeast Region 4
61 Forsyth Street, S.W. Mail Code: 9T25
Atlanta, Ga 30303

Dear Ms. Walker,

The cooperative federalism structure of the Clean Water Act (CWA) provides an avenue for states and tribes to assume responsibility for the dredge and fill permitting program under Section 404. After successfully administering the Environmental Resource Permit (ERP) program within the state for over 20 years, Florida has the structure and resources ready and in place to support the administration and enforcement of the Section 404 permitting program. Accordingly, I respectfully request approval from the United States Environmental Protection Agency (EPA) to assume the CWA Section 404 permitting program.

Upon assumption, the Section 404 program will be administered by the Florida Department of Environmental Protection (FDEP), through its dedicated staff of wetland scientists and professionals across the state. FDEP's intimate knowledge of state aquatic resources, coupled with the efficiency and proven success of its ERP program, will ensure that the Section 404 program will be implemented in a scientifically sound and protective manner. Moreover, Florida is well-prepared to address the administration and enforcement responsibilities of the 404 program. Governor DeSantis recently signed into law the Environmental Accountability bill, House Bill 1091, which strengthens FDEP's enforcement capabilities by increasing civil and criminal penalties by 50% for violations of Florida's rules and statutes that protect wetland resources.

I firmly believe Florida is uniquely positioned to assume the 404 permitting program. Our state is home to 20% of all wetlands in the United States, and for years we have worked together with the Army Corps of Engineers in protecting and ensuring conservation of these vital resources. I am excited for Florida to become the third state to implement this program and look forward to assuming this essential responsibility.

Sincerely,

Noah Valenstein
Secretary of the Florida Department of Environmental Protection

*Florida's State 404 Program*

*Program Description*

**Division of Water Resource Management**

**Florida Department of Environmental Protection**

**August 20, 2020**

# Introduction

## Purpose

The following program description documents the structure, organization, and procedures that the Florida Department of Environmental Protection (Department) will follow to administer Section 404 of the Clean Water Act (CWA) in the state of Florida, pursuant to 33 USC §1344 (g).

## Guidance

This document is a full and complete description of the Florida State 404 Program that will be established and administered under state law. It includes all information necessary for the Environmental Protection Agency's (EPA) review and approval in accordance with the provisions of 40 C.F.R. Part 233. The program description is organized in sections with each section corresponding to the lettered requirement in 40 C.F.R. Part 233, with one additional section titled "Additional Information" that includes information that may not fit exactly within a lettered category. In instances where detailed descriptions of the permitting program standards and procedures are required, a reference is provided to the memorandum of agreement (MOA), Memorandum of Understanding (MOU), document, or State 404 Program regulation that describes those standards and procedures. The standards and procedures are not repeated in detail within this document. Helpful links to the Department website are provided throughout for convenience.

## Legislative Authority

In 2018 the Florida Legislature passed section 373.4146, Florida Statutes (F.S.) providing the Department the "… power and authority to assume, in accordance with 40 C.F.R. part 233, the dredge and fill permitting program established in s. 404 of the Clean Water Act…" The Department will implement Chapter 62-331, Florida Administrative Code (F.A.C.), including the State 404 Program Applicant's Handbook to fulfill the legislative mandate.

## Overview

State assumption of the 404 program will provide a streamlined permitting procedure where both federal and state requirements are addressed by state permits. This would provide greater certainty to the regulated community, conserve resources of both applicant and regulator, and afford the state greater control over its natural resources while complying with federal law.

If Florida's program is approved, it will be the first state in decades to assume authority to implement the section 404 permitting program, and only the third state to do so. Assumption of the dredge and fill permitting program under section 404 of the Clean Water Act will result in significant efficiencies for permittees and allow better engagement with the public, all while rigorously protecting the environment.

The State 404 Program will apply to any project proposing dredge or fill activities within state assumed waters. Such projects include, but are not limited to: single family residences; commercial developments; utility projects; environmental restoration and enhancement; linear

transportation projects; governmental development; certain agricultural and silvicultural activities; and in-water work within assumed fresh water bodies such as docks, piers, marinas, living shorelines, and other shoreline stabilization.

A Notice of Rule Development for the State 404 Program rules was published on May 11, 2018. As part of the rule development process the Department held three rulemaking workshops throughout the state.  Workshops were held in Tallahassee and online via webinar on May 30, 2018; in Orlando on May 31, 2018; and in Fort Myers on June 1, 2018. The public comment period ran from May 11, 2018 until July 31, 2018. All comments and public input were reviewed and incorporated into the draft rule as appropriate. The Department then published the Notice of Proposed Rule on February 19, 2020. Five public hearings were held via webinar on April 2, 6, and 10, 2020, and by teleconference on April 24 and 27, 2020. The public comments and input were reviewed and incorporated as appropriate, and Notices of Change were published on June 8, and June 11, 2020. The final rule certification packages were filed on July 21, 2020 for modifications to Chapter 62-330, F.A.C. (Environmental Resource Permitting) and Chapter 62-331, F.A.C. (State 404 Program). The rules will become effective on the date that EPA publishes approval of Florida's program in the Federal Register. The finalized rules are included in this submission, along with other required components of the assumption package such as Memoranda of Agreement (MOAs) between the Department and the Corps and the Department and U.S. Environmental Protection Agency (EPA).

The Department continues to prepare for assumption by conducting both beginner and advanced-level wetland delineation training and State 404 Program regulatory and compliance training, which will be provided to existing staff prior to the effective date of assumption and will be provided on regular intervals and as needed into the future.

The Department worked diligently with EPA, the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) to ensure that the state's process for complying with the requirements of the Endangered Species Act (ESA) is at least as stringent as the federal program. Additionally, the Department has been working with EPA, the State Historic Preservation Office, and Indian Tribes in Florida to ensure that the outcomes of the state's process for protection of historical and cultural resources are at least as protective as those under the federal process.

(a) Description of the Scope and Structure of the State's Program
(Required by 40 C.F.R. § 233.11(a))

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

## Purpose of Section (a)

The purpose of Section (a) is to provide the information required in 40 C.F.R. § 233.11(a), which states: *"The program description as required under §233.10 shall include: (a) A description of the scope and structure of the State's program. The description should include extent of State's jurisdiction, scope of activities regulated, anticipated coordination, scope of permit exemptions if any, and permit review criteria;"*

## State 404 Program Jurisdiction

In accordance with section 373.4146, Florida Statutes (F.S.), the State 404 Program governs all dredging and filling ("activity") in waters of the United States regulated by the State under section 404(g)-(l) of the Clean Water Act (CWA), 33 U.S.C. §§ 1344(g)-(l). The State will administer the CWA section 404 dredge and fill permitting program within assumed waters. The Army Corps of Engineers (USACE) will retain administration of the CWA section 404 dredge and fill permitting program within retained waters. The state defines the preceding terms in rule or statute as:

"Activity", for the purposes of the State 404 Program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 C.F.R. § 232.2. The terms "dredge", "fill", "dredging", and "filling" when used within Chapter 62-331, Florida Administrative Code (F.A.C.), or this handbook shall be interchangeable with "activity" as defined herein. [State 404 Program Applicant's Handbook section 2.0 (b) 1.]

"Material," when used in the context of "filling," means matter of any kind, such as, sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster cultch pursuant to Section 597.010, F.S. [Applicant's Handbook Volume I section 2.0 (a) 60.]

"State assumed waters" means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material. [State 404 Program Applicant's Handbook section 2.0 (b) 47. and Section 373.4146(1), F.S.]

"Retained waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List, as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary of adjacent retained waters will be

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

the landward project boundary of each project that proposes discharges of dredged or fill material waterward of a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. [State 404 Program Applicant's Handbook section 2.0 (b) 41.]

"Surface water" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused.  Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface. [373.019(21),F.S.]

"Wetlands" means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils.  Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions.  The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above.  These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow reproduce or persist in aquatic environments or anaerobic soil conditions.  Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas.  Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.[Section 373.019(27), F.S.]

The Department will determine the landward extent of wetlands and other surface waters in accordance with Florida's methodology in Chapter 62-340, F.A.C. Detailed information regarding Florida's method can be found in section (h) of this program description.

The State 404 Program applies to state-assumed waters of the United States (WOTUS) as defined at 40 C.F.R. Part 120. To provide certainty, streamlining, and efficiency, the Department will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered waters of the United States, and will treat them as if they are, unless the applicant requests a WOTUS jurisdictional determination, and provides documentation that clearly demonstrates a water is not a WOTUS, subject to Department verification and agreement.

## Anticipated Coordination

## Coordination with Florida's Five Water Management Districts

The Department will implement the State 404 Program through its six district offices, the Mining and Mitigation Program (MMP), and Mitigation Banking Program (MBP) with oversight from the Tallahassee headquarters office in Leon County. The district offices, MMP, and MBP will process all State 404 Program authorizations and compliance actions.  Each district will process the applications for projects within their respective administrative boundaries (Figure (a)-1), except authorizations for mining projects will be processed by MMP, and dredge and fill permits

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

for mitigation banks will be processed by the MBP.  More information about each of the Department's district offices may be found at https://floridadep.gov/districts.



*Figure (a)-1: Florida Department of Environmental Protection District Office Boundaries*

Florida's existing Environmental Resource Permitting program (ERP, Chapter 62-330, F.A.C.) will continue to be implemented in conjunction with the State 404 Program. ERP regulates the construction, alteration, operation, maintenance, repair, abandonment, and removal of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, and works (including docks, piers, structures, dredging, and filling located in, on or over wetlands or other surface waters).  The ERP program is implemented by the Department's six district offices and the five Water Management Districts (WMDs) (Figure (a)-2). More information about the WMDs may be found at https://floridadep.gov/water-policy/water-policy/content/water-management-districts.

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*



*Figure (a)-2: Florida's Five Water Management Districts*

The Department will coordinate with the WMDs for those projects where the ERP permit is processed by the WMD in accordance with the division of responsibilities outlined in Operating Agreements between the Department and each WMD, which can be viewed at https://floridadep.gov/ogc/ogc/content/operating-agreements. The Department has general supervisory authority over the WMDs' implementation of ERP in accordance with Section 373.026(7), F.S., which ensures consistency in the application of the ERP rule statewide.

The Department estimates that approximately 85% of ERP and State 404 Program requirements overlap. Coordination with the WMDs for those overlapping requirements will serve to eliminate

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

duplication of review, streamline the State 404 Program and ERP permitting processes, and provide consistency between the ERP and State 404 Program authorization.

Most projects that require State 404 Program authorization will also require ERP authorization. Where both ERP and State 404 Program authorization are required, an applicant must receive both authorizations prior to commencing the activity.  An applicant may choose to have both authorizations issued concurrently to avoid the need for subsequent modification of the project that may occur if one authorization is issued before the other (subsection 62-331.010(10), F.A.C.).

If the WMD receives an application for a project that requires authorization under the State 404 Program, the WMD will immediately forward a copy of the application file to the Department. The Department and WMD processing staff will do a joint site visit to review site conditions and verify the landward extent of wetlands and other surface waters in accordance with Chapter 62-340, F.A.C. If requested, the Department will also review the wetlands and other surface waters to determine if they are Waters of the United States (WOTUS). To facilitate streamlining and efficiency of application reviews, the Department will assume that all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C. are also WOTUS unless specifically requested by the applicant in accordance with the State 404 Program Applicant's Handbook, section 1.1.

The Department and WMD processing staff will maintain frequent communication about the project and will share any determinations or requests for additional information received from commenting agencies and any additional information received by the applicant during the review process. The staff will discuss any suggested or required modifications to the project and any mitigation that will be required to ensure that any authorizations issued are not in conflict, to the greatest extent practicable. If the WMD authorizes an ERP that is in conflict with any State 404 Program permit issued by the Department, the applicant will be responsible for obtaining an appropriate permit modification prior to conducting the activity.

## Coordination with Delegated Local Programs

The Department has delegated all or portions of the ERP program to two local governments in accordance with Section 373.441, F.S., and Chapter 62-344, F.A.C. Currently, Broward and Hillsborough Counties process ERP permits in accordance with delegation agreements which may be viewed at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/erp-local-program-delegation. The Department may coordinate with the delegated local governments in a similar manner as with the WMDs, described above. If the local government authorizes an ERP that is in conflict with any State 404 Program permit issued by the Department, the applicant will be responsible for obtaining an appropriate permit modification prior to conducting the activity.

## Coordination with Other Entities

The Department shall coordinate with other entities as described in the State 404 Program Applicant's Handbook, section 5.2, and in any EPA-approved Memoranda of Agreement, Understanding, or Operating Agreement. The Department may enter into Memoranda of

Agreement, Understanding, or Operating Agreements with other entities regarding coordination for the State 404 Program if those memoranda or agreements are approved by EPA prior to being implemented. The Department has or will enter into such agreements with the USACE, EPA, State Historic Preservation Office (SHPO), and the US Fish and Wildlife Service (USFWS)/Florida Fish and Wildlife Conservation Commission (FWC). Copies of the USACE and EPA MOAs are located in Sections D and E of this package. Copies of the SHPO OA and USFWS/FWC MOU may be found in section (j) of the program description. Other entities that may coordinate with the Department include:

- Federally Recognized Tribes
- Adjacent States (Alabama and Georgia), when a State 404 Program activity may affect the water resources of that adjacent state.

## Scope of Activities Regulated by the State 404 Program

Subsection 62-331.020(2), F.A.C. requires that an applicant receive a State 404 Program permit prior to conducting any dredge or fill activities in, on, or over state-assumed waters unless the activity qualifies for an exemption. The State 404 Program provides three types of authorizations: verifications of exemption, general permits, and individual permits. Where required, applicants must submit the appropriate application with supporting documentation to the Department for review and authorization prior to commencing any regulated activity. A matrix to assist applicants in determining the appropriate application form based on the type of ERP and/or State 404 Program authorization required is located in the State 404 Program Applicant's Handbook, section 4.3.

Typical dredge and fill activities in Florida include, but are not limited to:

- Dredging
- Filling
- Ecological restoration
- Excavation
- Conversion of waters type
- Commercial developments
- Residential developments
- Single-family residences
- Agriculture
- Aquaculture
- Utilities
- Transmission lines
- Roadways
- Airports
- Marinas
- Docks
- Piers
- Boat ramps
- Dams
- Levees
- Mining activities
- Mitigation

## State 404 Program Permit Exemptions

Pursuant to section 62-331.020(1), F.A.C., a State 404 Program is not required for the activities described in 40 C.F.R. §232.3. Notice to the Department is not required to conduct an exempt activity unless the activity also requires notification or authorization under ERP.

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

## State 404 Program General Permits

Projects that do not qualify for an exemption may meet the requirements of a general permit. General permits authorize activities that, if conducted consistent with permit requirements, will cause only minimal individual and cumulative adverse environmental effects. The State 404 Program provides 48 general permits. The general permits described in Rules 62-331.201-.248, F.A.C., were modelled on the existing USACE nationwide permits (NWP) and an existing regional general permit (SAJ 92). This approach was taken to provide consistency between the federal and State 404 Programs. References and requirements for use in tidal waters are removed from the general permit language because tidal waters are not assumable. Those NWPs authorized only under Section 10 of the Rivers and Harbors Act were not included in the State 404 Program rules. An application, where required, will be submitted to the Department or forwarded to the Department by a WMD where the WMD reviews the ERP permit.  The Department will review the application following the procedures described in 62-331.200(3), F.A.C.

The Department believes the general permits in Chapter 62-331, F.A.C. meet the requirements of 40 C.F.R. § 233.21(b), which states "The Director may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment. Any general permit issued shall be in compliance with the section 404(b)(1) Guidelines." The Department is relying on the USACE  analysis of the nationwide or regional general permits on which the State 404 Program general permits were modeled for the first five years of the program. Those analysis are not included with this submission.

General permits must be reevaluated every five years. At the end of five years, the Department shall reassess the effects of the State 404 Program general permits by evaluating permitting data gathered during the first five years of program implementation. The Department believes this approach is consistent with the intent of the provision in 40 C.F.R. § 233.21(a), which allows a state to administer and enforce general permits previously issued by the USACE in State assumed waters and will provide the State greater control over assumed waters because the Department can reassess the effects of each general permit on state-assumed waters every five years.

In addition to the general permits adopted in state rule as described above, and in accordance with 40 C.F.R. § 233.21(a) and paragraph 62-331.200(7), F.A.C., the Department intends to assume administration of several existing regional general permits issued by the USACE within state-assumed waters. These include SAJ-13 (Aerial Transmission Lines in Florida); SAJ-14 (Sub-aqueous Utility and Transmission Lines in Florida); SAJ-86 (Residential, Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay, Lake Powell, and West Bay Basins, Bay and Walton Counties, Florida); SAJ-90 (Residential, Commercial & Institutional Developments in Northeast Florida); SAJ-103 (Residential Fill in Holley By The Sea, a Subdivision in Santa Rosa County); SAJ-105 (Residential, Commercial, Recreational and Institutional Fill in the West Bay Watershed of Bay County, Florida); and SAJ-114 (Residential,

*Florida Department of Environmental Protection*
*Program Description, Section (a) – Scope and Structure of the State's Program*

Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay and St. Andrew's Bay Watersheds located in Bay County and Walton County, Florida). These existing general permits may be viewed in the USACE Jacksonville District Regulatory Division Sourcebook at https://www.saj.usace.army.mil/Missions/Regulatory/Source-Book/. The Department may choose to enter rulemaking to create similar general permits prior to expiration of the USACE regional general permit.

Any new general permits created by the state must be reviewed by EPA in accordance with 40 C.F.R. § 233.50.

## State 404 Program Individual Permits

An individual permit is required for any activity that does not qualify for an exemption or meet the requirements of a general permit. Applications for individual permits will be prepared in accordance with Rule 62-331.050, F.A.C., and submitted to the Department or forwarded to the Department by a WMD where the WMD reviews the ERP application. The Department will review the application following the procedures described in 62-331.052 -.053, F.A.C. Public Notice of individual permit applications shall be in accordance with section 62-331.060, F.A.C. The permitting decision will be documented in accordance with section 8.2 of the State 404 Program Applicant's Handbook using a Technical Staff Report (see template in section (f) of this program description).

## More Information

A detailed and holistic view of Florida's wetland programs and how they all work together may be found in the "Overview of the Wetland and Other Surface Water Regulatory and Proprietary Programs in Florida" (Appendix (a)-1).

# Appendix (a)-1
# Overview of The Wetland and Other Surface Water Regulatory and Proprietary Programs in Florida
### July 1, 2020

## TABLE OF CONTENTS

SUMMARY OF PROGRAMS ........................................................................................... 5
  Regulatory ..................................................................................................................... 5
    General........................................................................................................................ 5
    Wetland and Other Surface Waters Delineation Methodology ................................. 6
    Goal of Programs ....................................................................................................... 7
    What Needs a Permit? ................................................................................................ 7
    Components of the ERP Program ............................................................................... 8
    Components of the State 404 Program ..................................................................... 15
    Related Programs ..................................................................................................... 24
  Proprietary (State-owned Submerged Lands) ............................................................. 25
    General overview ..................................................................................................... 25
    Delegations of Authority ......................................................................................... 26
    Forms of Authorizations ......................................................................................... 27
    Aquatic Preserves ................................................................................................... 27
    Fees ......................................................................................................................... 27
    Processing ............................................................................................................... 28
    Evaluation Criteria .................................................................................................. 28
  Mangroves................................................................................................................... 29
RELATIONSHIP TO FEDERAL PROGRAMS ........................................................... 30
  Water Quality Certification ......................................................................................... 30
  Coastal Zone Consistency Concurrence (CZCC) ....................................................... 30
  Nationwide Permits (NWP) ........................................................................................ 30
  State Programmatic General Permit (SPGP) .............................................................. 31
  NPDES......................................................................................................................... 31
  Agricultural Conservation Easement Program (ACEP) .............................................. 32
  Special Area Management Plan (SAMP) and Advanced Identification (ADID) ......... 32
STATUTES AND RULES .............................................................................................. 32
  Regulatory Statutes and Administrative Rules ........................................................... 32
  Proprietary Statutes and Administrative Rules ........................................................... 33
  General......................................................................................................................... 34
COMPLIANCE ASSURANCE ...................................................................................... 34
PERMIT TRACKING ..................................................................................................... 34
ROLE OF LOCAL GOVERNMENTS ........................................................................... 34
WATER QUALITY REGULATIONS ............................................................................ 35
  Rules and General Overview ...................................................................................... 35
  Designated Uses .......................................................................................................... 35
  Narrative and Numeric Water Quality Criteria........................................................... 36
  Antidegradation Policy ............................................................................................... 36
  Other Water Quality Criteria (Applicable to Wetlands) ............................................. 36

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 2

OUTREACH, TRAINING, and EDUCATION ..................................................................................... 37
   Public Outreach/Education ............................................................................................................ 37
   Internal Training ............................................................................................................................ 37
   External Training ........................................................................................................................... 38
COORDINATION ............................................................................................................................... 38
CONTACTS .......................................................................................................................................... 38

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 3

ACRONYMS

| ACRONYM | TERM |
| --- | --- |
| ADID | Advanced Identification |
| AGSWM | Agricultural Ground and Surface Water Management |
| BMP | Best Management Practice |
| BOT | Board of Trustees of the Internal Improvement Trust Fund |
| BTLDS | Board of Trustees Land Database System |
| CARL | Conservation and Recreation Lands |
| CCCL | Coastal Construction Control Line |
| CERPRA | Comprehensive Everglades Restoration Plan Regulation Act |
| CZCC | Coastal Zone Consistency Concurrence |
| CZM | Coastal Zone Management |
| DACS | Department of Agriculture and Consumer Services |
| DSL | Division of State Lands, Department of Environmental Protection |
| EFA | Everglades Forever Act |
| EPA | Environmental Protection Agency |
| ERP | Environmental Resource Permit |
| ERPce | Environmental Resource Permit Compliance and Enforcement (Database) |
| ERPpa | Environmental Resource Permit Permit Application (Database) |
| F.A.C. | Florida Administrative Code |
| F.S. | Florida Statutes |
| FDOT | Florida Department of Transportation |
| FWC | Florida Fish and Wildlife Conservation Commission |
| USFWS | US Fish and Wildlife Service |
| GIS | Geographic Information System |
| JCP | Joint Coastal Permit |
| LIFE | Learning in Florida's Environment |
| MDC | Miami-Dade County |
| MHW | Mean High Water |
| MOA | Memorandum of Agreement |
| MS4 | Municipal Separate Storm Sewer System |
| MSA | Mitigation Service Area |
| NEEPP | Northern Everglades and Estuaries Protection Plan |
| NPDES | National Pollutant Discharge Elimination System |
| NWFWMD | Northwest Florida Water Management District |
| NWPs | Nationwide Permits |
| OA | Operating Agreement |
| OFWs | Outstanding Florida Waters |
| PA | Permit Application |
| ROMA | Regional Offsite Mitigation Area |

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 4

| SAMP | Special Area Management Plan |
|------|------------------------------|
| SFWMD | South Florida Water Management District |
| SJRWMD | Saint Johns River Water Management District |
| SLER | Submerged Land and Environmental Resources |
| SOR | Save Our Rivers |
| SPGP | State Programmatic General Permit |
| SSL | Sovereign Submerged Lands |
| SWIM | Surface Water Improvement and Management program |
| TSS | Total Suspended Solids |
| TSV | Technical Service Department |
| USACE | U.S. Army Corps of Engineers |
| USDA-NRCS | United States Department of Agriculture-Natural Resources Conservation Service |
| WGSS | Water Quality Standards Section |
| WMDs | Water Management Districts |
| WOTUS | Waters of the United States |
| WQC | Water Quality Certification |
| WRP | Wetland Resource Permit |
| WUP | Water Use Permitting |

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 5

## Summary of Programs

Florida has an existing, comprehensive state regulatory program called the Environmental Resource Permitting Program (ERP) that regulates most alterations of the land that change the flow of water in uplands, wetlands, and other surface waters. In addition, activities on or using state-owned submerged lands also require applicable proprietary authorizations (including Consent by Rule, Letters of Consent, Leases, and Easements). Separate programs regulate trimming and alteration of mangroves and National Pollutant Discharge Elimination System Permits.

Florida is proposing to assume authority to implement the dredge and fill permitting program under Section 404 of the Clean Water Act. This document includes information specific to the proposed State 404 Program, however, the program and its rules will not become effective until the state's proposal is approved by the US Environmental Protection Agency (EPA). For ease of reading and to prevent confusion the proposed program will be referred to in future tense or labeled "proposed".

Major features of Florida's wetland and surface water related regulatory and proprietary programs are summarized below:

**Regulatory**
General

> Florida implements a regulatory Environmental Resource Permit (ERP) program under the independent state authority of Part IV of Chapter 373 of the Florida Statutes (F.S.). It is in effect statewide and is implemented jointly by the Department of Environmental Protection (Department) and five water management districts (WMDs) under Operating Agreements that provide a division of responsibilities between the agencies. Provisions exist for local programs to be delegated authority to implement the program on behalf of the Department and WMDs (currently delegated to Broward and Hillsborough Counties). The ERP program operates *in addition to* the federal 404 dredge and fill permitting program that regulates activities in waters of the United States.

> Florida is proposing to streamline permitting under ERP and section 404 of the Clean Water Act by pursuing assumption of the section 404 dredge and fill permitting program. The separation of ERP and the section 404 dredge and fill permitting program (State 404 Program) will continue upon approval of the State 404 Program by EPA. Florida estimates that assumption will reduce the nearly 85% duplication of effort that currently exists between ERP and 404 because applicants will be able to get both authorizations from the state.

> While the ERP application is issued, withdrawn, or denied in accordance with state statutory and rule criteria, agency action on the ERP also constitutes any needed water quality certification (WQC, or waiver thereto) under Section 401 of the Clean Water Act and Coastal Zone Consistency Concurrence with Florida's federally approved Coastal Zone Management program under Section 307 (Coastal Zone Management Act), which then enables the section 404 permitting entity (Department or USACE) to take separate action to issue or deny any permit needed under Section 404 of the Clean Water Act and/or Section 10 of the Rivers and Harbors Act of 1899. Additional information on the relationship of the Florida programs to the federal programs is provided later in this document.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 6

Stormwater construction National Pollutant Discharge Elimination System (NPDES) permits are not integrated into the ERP permit and are issued separately.

Florida also implements a separate permitting program for trimming or altering mangroves under Section 403.9321 through 403.9333, F.S., although mangrove trimming and alteration can be incorporated into an ERP permit. The Submerged Lands and Environmental Resources Program implements ERP, the State 404 Program, and the mangrove permitting program.

Wetland and Other Surface Waters Delineation Methodology

All state, local, and regional governments in Florida delineate wetlands in accordance with state methodology (Chapter 62-340, F.A.C.) instead of the federal method. The federal government's 2012 decision to use USDA-NRCS hydric soils criteria ensured that the state and federal lines are either identical or the state's line is more stringent because Florida's delineation rule requires that only two of the three parameters (vegetation, hydric soils, hydrologic indicators) are met, while the USACE requires all three. Currently, ERP applications are received by the Department, WMD, or delegated local government in accordance with the operating agreements referenced above. The ERP/404 applications will be received in the same manner, but any applications in wetlands and other surface waters that require both an ERP and a State 404 authorization received by the WMD or local government will be forwarded to the Department for joint processing of the ERP/404. This means that the ERP will still be processed by the WMD or local government, but the Department will work closely with the ERP processing agency to eliminate duplication in the 404 review process while the Department processes the State 404 Program application.

- Under Section 373.421, F.S., Florida adopted a wetland delineation methodology that is binding on all state, regional, and local governments throughout Florida. This methodology was adopted as Chapter 62-340 of the Florida Administrative Code (F.A.C.), which is ratified in Section 373.4211, F.S., for statewide applicability. It became effective on July 1, 1994. This methodology is a unified statewide approach to wetland and other surface water delineation and is specific to Florida, in recognition of the vegetation, hydrologic, and soil features that specifically exist in Florida.
- Florida's methodology differs from the USACE 1987 manual methodology. The USACE continues to use the 1987 federal wetland delineation manual with regional supplements for permits processed by the USACE. In real-world application, the state and federal wetland lines typically are very close or identical to one another.
- Florida has not produced a map of the wetlands as they would be delineated using the state methodology in Sections 373.421 and 373.4211, F.S. Instead, staff in the Department's Tallahassee office, Department's, district offices, and the WMDs perform wetland delineations for a specific parcel of property on request or as part of a permit application review. There are three ways such requests for wetland delineations may occur:
    - By petition for a formal determination of the landward extent of wetlands and other surface waters. These determinations are done for a fee, depending on the size of the total parcel, are subject to specified time frames, typically require the petitioner to produce a survey of the delineated wetlands, and are binding on the

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 7

    petitioner and the state agencies for a period of five years (which may be re-issued or renewed if certain criteria are met).

- As part of a permit application. There is no additional charge for this service above that required to process the permit application.

- Through an informal determination. These are normally done only for private single family landowners. A fee is required for these determinations, but they are done on an "as-resources allow" basis, are not subject to any time frames, and are not binding on any of the parties. The Department and the NWFWMD charge between $100 and $500 for this service, depending on the size of the parcel, and all other WMDs have their own fee schedules. Due to staffing limitations, it is not always possible for the district staff to do informal determinations. When that is the case, property owners are encouraged to file a petition for a formal determination or to hire a private environmental professional to perform the service.

- Additional information regarding Wetland Evaluation and Delineation can be found at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/wetland-evaluation-and

Goal of Programs

It is the intent of the Department and WMDs that the environmental permitting criteria be implemented in a manner which achieves a programmatic goal, and a project permitting goal, of no net loss of wetland and other surface water functions. Wetland functional loss and gain is determined using the Uniform Mitigation Assessment Method (UMAM) in Chapter 62-345, F.A.C. The state and the USACE both use UMAM.

What Needs a Permit?

Environmental Resource Permits:

- The ERP program regulates virtually all alterations to the landscape that exceed permitting thresholds or that are not otherwise exempt by statute or rule from regulation. Surface water management systems include activities involving the construction, alteration, operation, maintenance or repair, removal, and abandonment of dams, impoundments, reservoirs, appurtenant works, and works, which includes dredging and filling in wetlands and other surface waters (including isolated wetlands) and alterations of uplands. This includes: clearing; grading; paving; erection, alteration, or removal of structures; and new or altered stormwater management systems; all of those are generally referred to as "surface water management systems."  Most routine, customary agricultural, silvicultural, floricultural, and horticultural activities do not require a permit as long as alterations are not for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands.

- Certain activities have been exempted by statute and/or rule from the need for ERP regulatory permits; most of these exemptions are established in Section 403.813(1), and Section 373.406, F.S. Examples of exempt activities include, but are not limited to:

- Agricultural activities described above;

- Construction, repair, and replacement of certain private docking facilities below certain size thresholds;

- Maintenance dredging of existing navigational channels and canals;

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 8

-    –    Construction and alteration of boat ramps within certain size limits;
-    –    Construction, repair, and replacement of seawalls and rip rap in artificial waters;
-    –    Repair and replacement of docks, seawalls, culverts, and other structures; and
-    –    Certain agricultural activities (see below).
- The Department has issued a number of general permits (GPs) for activities that are slightly larger than those that qualify for exemptions and that otherwise have been determined to have the potential for no more than minimal individual direct and secondary impacts (see the general permits in sections 62-330.402 – 62-330.635, F.A.C.). These include, but are not limited to:
  - –    construction and modification of boat ramps of certain sizes;
  - –    installation and repair of riprap at the base of existing seawalls;
  - –    installation of culverts associated with stormwater discharge facilities; and
  - –    construction and modification of certain utility and public roadway construction activities.

  Qualifying activities generally are allowed to be initiated 30 days after notice of qualification is provided to the agency, unless the agency informs the applicant that the work does not meet the terms and conditions of the GP.
- Regulated activities that exceed permitting thresholds and that do not specifically qualify for an exemption or GP require an ERP individual permit.

Components of the ERP Program
Stormwater

- Untreated stormwater runoff can significantly affect wetland and other surface water quality and functions. Activities involving new stormwater management systems that exceed permitting thresholds and that are not exempt require an ERP, whether located in uplands, wetlands, or other surface waters. In addition, all surface water management systems are evaluated for adverse effects to surface water quality and quantity.
- The ERP rule criteria for stormwater are technology-based, founded on the principle that compliance with Best Management Practices (BMP) design and performance standards (desired levels of treatment) provides a rebuttable presumption that new work will not cause violations of state water quality standards in receiving waters or adverse quantity impacts to on-site and off-site property. Currently, the stormwater quality design and performance-based rule requires stormwater systems to remove at least 80% of the post-development total suspended solids (TSS) loading (95% removal of TSSs if the stormwater system directly discharges to an Outstanding Florida Water (see Rule 62-302.700, F.A.C.); meeting these TSS requirements is a surrogate for compliance with other constituents in stormwater runoff.
- BMPs and performance standards also apply to water quantity to assure that the stormwater peak discharge rate, volume, and pollutant loading are no greater after a site is developed than before. There are certain exemptions from the need for an ERP permit for these activities, such as for individual, private single family residences constructed in the uplands that are not part of a larger plan of common development, and projects that are below certain size thresholds, depending on the WMD.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 9

- Monitoring is a requirement to ensure practices are correctly designed and applied, and to determine the effectiveness of the BMPs in meeting water quality and quantity criteria and reasonably assuring protection of beneficial uses.

Environmental (Dredging and Filling in Wetlands or Other Surface Waters)
- In addition to stormwater, an ERP addresses dredging and filling in wetlands and other surface waters, including isolated wetlands. "Dredging" means excavation, by any means, in surface waters or wetlands, as delineated in Section 373.421(1), F.S. It also means the excavation, or creation, of a water body which is, or is to be, connected to surface waters or wetlands, as delineated in Section 373.421(1), F.S., directly or via an excavated water body or series of water bodies. "Filling" means the deposition, by any means, of materials in surface waters or wetlands, as delineated in Section 373.421(1), F.S. "Materials" means matter of any kind, such as, sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term shall not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster cultch pursuant to Section 370.16, F.S.

Evaluation Criteria
- All activities requiring a permit must be found to:
  – Not cause adverse water quantity impacts to receiving waters and adjacent lands;
  – Not cause adverse flooding to on-site or off-site property;
  – Not cause adverse impacts to existing surface water storage and conveyance capabilities;
  – Not adversely impact the value of functions provided to fish and wildlife and listed species by wetlands and other surface waters;
  – Not adversely affect the quality of receiving waters such that state water quality standards will be violated, which includes surface and groundwaters. Special provisions apply to allow no degradation of the water quality of OFWs (listed in Chapter 62-302.700, F.A.C.). Anti-degradation of existing uses is generally met through compliance with the ERP permitting criteria. The siting of marinas and other activities that may affect the flow of waters includes requirements for hydrographic evaluations that are useful in predicting whether water quality standards will be met.
  – Not cause adverse secondary impacts to water resources;
  – Not adversely impact the maintenance of surface or ground water levels or surface water flows;
  – Not adversely impact a work of a WMD (typically water control projects);
  – Be capable, based on generally accepted engineering and scientific principles, of being performed and of functioning as proposed;
  – Will be conducted by an entity with the financial, legal, and administrative capability of ensuring that the activity will be undertaken in accordance with the terms and conditions of the permit, if issued; and
  – Will comply with applicable special basin or geographic area criteria adopted by rule.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 10

- In addition, activities in wetlands and other surface waters must not be contrary to the public interest, or, if the activity is located in an Outstanding Florida Water (these waters are listed in Chapter 62-302.700, F.A.C.), the activity must be clearly in the public interest. This test is based on weighing and balancing of the following criteria:
    - Whether the regulated activity will adversely affect public health, safety, or welfare, or the property of others (based solely on environmental, not economic, considerations);
    - Whether the regulated activity will adversely affect the conservation of fish and wildlife, including endangered and threatened species, or their habitats;
    - Whether the regulated activity will adversely affect navigation or the flow of water, or will cause harmful erosion or shoaling;
    - Whether the regulated activity will adversely affect fishing or recreational values or marine productivity in the vicinity of the activity;
    - Whether the regulated activity will be of a temporary or permanent nature;
    - Whether the regulated activity will adversely affect or will enhance significant historical and archaeological resources under the provisions of Section 267.061, F.S.; and
    - The current condition and relative value of the functions being performed by areas affected by the proposed regulated activity.
- Direct, secondary, and cumulative impacts are considered for all activities requiring a permit.
    - Secondary impacts are those impacts that are very closely related and directly linked to the activity under review that may affect wetlands and other surface waters and that would not occur but for the proposed activity. Secondary impacts to the habitat functions of wetlands associated with adjacent upland activities are not considered adverse if buffers of a certain minimum size are provided abutting the wetlands (with some exclusionary provisions).
    - Cumulative impacts are residual adverse impacts to wetlands and other surface waters in the same drainage basin that have or are likely to result from similar activities (to that under review) that have been built in the past, that are under current review, or that can reasonably be expected to be located in the same drainage basin as the activity under review. Projects with mitigation that fully offsets impacts within the drainage basin where the project impacts occur are assumed to not have any adverse cumulative impacts.
- Consideration is given to upland buffers that are designed to protect the functions that uplands provide to wetlands and other surface waters. When considering impacts to the listed (endangered, threatened and special concern) species under the environmental resource permit program, the agencies may only consider adverse impacts to aquatic or wetland dependent listed species that use upland habitats for nesting and denning.
- Special provisions exist to protect waters used for shellfish harvesting.
- Florida does not have special water quality standards for wetlands. Water quality standards applicable to other surface waters (in Chapter 62-302, F.A.C.) are applied to wetlands, with consideration given to natural daily and seasonal fluctuations.
- Many local governments in Florida have their own environmental regulatory program that requires compliance with local regulatory ordinances and Acts. These local

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 11

requirements are *in addition* to the above state and federal requirements, and do not replace or supersede state and federal permitting requirements.

- As discussed below under "Proprietary", to be issued, any activity requiring an individually-issued ERP that is located on state-owned submerged lands must also qualify for the applicable conditions for work on state-owned submerged lands.
- Provisions exist for applicants to obtain a Conceptual Approval Permit for phased activities. These permits do not authorize construction but do provide assurances that future construction permits can be issued commensurate with the level of detail contained in the Conceptual Approval permit. The Department and WMDs have Applicant's Handbook Volumes I (environmental) and II (engineering) (AH I and II) that contain detailed explanations of the criteria that are used to evaluate impacts to wetlands and other surface waters. The Department and the WMDs share AH I. There is a separate AH II for use within the boundaries of each WMD that are tailored to the geographic differences of each.

Mitigation

- Elimination and reduction of otherwise unpermittable adverse impacts to wetlands and other surface waters is required to the maximum extent practicable prior to considering whether mitigation can be accepted. However, ERP does not have an alternatives analysis like that required by Section 404 of the Clean Water Act. An alternatives analysis will be required by the State 404 Program and is described later in this document.  In some cases, mitigation may not be able to offset impacts sufficiently to yield a permittable project.
- Mitigation is best accomplished through restoration, creation, enhancement, or preservation of ecological communities similar to those being impacted. However, other means or communities may be acceptable and can be considered on a case-by-case basis, as long as the impacts are offset, and the proposed mitigation provides similar functions to those that are proposed to be lost.
- Mitigation may be off-site if on-site mitigation is not expected to have long-term viability or if off-site mitigation would provide greater ecological value. Mitigation is typically located within the same basin as the impacts to avoid potential unacceptable cumulative impacts within the basin.
- Once the Department or WMD determines that mitigation is acceptable, a Unified Mitigation Assessment Method (Chapter 62-345, F.A.C.) is used to determine the amount of mitigation that is appropriate and how much "credit" can be applied to a mitigation proposal.
- Mitigation in the form of net improvement is required when an activity will cause or contribute to violations or exceedances of state water quality standards in waters that do not currently meet state water quality standards for the standard being violated/exceeded.
- Cash donation is not considered mitigation, unless specified for use in an endorsed environmental project that will serve to offset the impacts.
- Mitigation banks and "in-lieu-fee" programs are allowed, provided that they are authorized by the state and serve to offset the impacts.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 12

Mitigation Banks and In-Lieu Fee (Regional Offsite Mitigation Areas) Programs

- Florida adopted a mitigation banking rule in 1994 (Chapter 62-342, F.A.C.; also referenced in Applicant's Handbook Volume I). This rule establishes guidelines for the operation of public or private banks. Each bank must obtain an environmental resource/mitigation bank permit, from the Department or WMD that provides for the following requirements:

  – The banker must have sufficient legal interest in the property to preserve it by a perpetual conservation easement or donation to the state prior to any release of credits;

  – A detailed mitigation plan to support viable and sustainable functional improvements for the regional watershed;

  – The number and type of potential mitigation credits must be established, as well as the environmental criteria and schedule for the release of those credits for use;

  – The mitigation bank must maintain a ledger to track the number and type of credits released and used;

  – A mitigation service area (MSA), based on watersheds and other ecological criteria, must be established;

  – A long-term management plan must be established to maintain the mitigation success in perpetuity;

  – Financial assurance must be established for both the implementation and perpetual management of the bank.

  – For more information about mitigation banks in the state, see: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mitigation-and-mitigation-banking

- In Lieu Fee Program:

  – Section 373.4135, F.S., stipulates the requirements by which the Department, WMDs, and local governments can sponsor a regional offsite mitigation area (ROMA) project that is paid for by monies accepted as mitigation.

  – A memorandum of agreement (MOA) is required between the sponsoring agency, and the Department or WMD, as appropriate, for any ROMA used for five or more projects or for more than 35 acres of impact. The MOA must address most of the same requirements required by mitigation bank permits, including: the mitigation plan and timeline, success criteria, mitigation credit and tracking, service area, acquisition, preservation, and long-term management provisions. In addition, the sponsoring agency must provide a full cost accounting of the monies received to ensure that all monies were used in the purchase, preservation, permitting, implementation and management of the mitigation area.

  – The 2012 revision of Section 373.4135, F.S. prevents governmental entities from creating or providing mitigation for a project that is not its own (including mitigation banks and ROMAs) unless the governmental entity uses land that was not previously purchased for conservation and unless it provides the same financial assurances as required for mitigation banks. Several exceptions to this are listed in Section 373.4135(1)(b), F.S.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 13

- The major difference between a ROMA and a mitigation bank is that a ROMA can include an acquisition element.
- Florida Department of Transportation Mitigation
  - In 1995, the state established a mitigation program specific to meet the Florida Department of Transportation's (FDOT) mitigation needs (Section 373.4137, F.S.), whereby FDOT annually provides an inventory of anticipated wetland impacts to each of the regional WMDs.
  - The state's five WMDs develop mitigation plans that would serve to offset those impacts, in coordination with other state and federal regulatory agencies. The plan is presented to the WMD's governing board for conceptual approval, then submitted to the Department for state authorization and approval. Once approved, the mitigation work may commence.
  - This program does not relieve DOT from eliminating or reducing impacts to the extent practicable or obtaining permits for the impacts.
  - DOT appropriates a specified amount of money (adjusted annually) for the mitigation needed to offset each acre of impact, and this money is disbursed to the WMDs to conduct the mitigation work.
- Mitigation Database
  - Mitigation bank credit releases and uses are tracked by ledgers, which are updated when credits are released or sold. Credits used are attributed to specific permits or agency actions.
  - At this time, the Department does not maintain a central database of permitted mitigation projects, other than mitigation banks, or the success thereof.
  - Each WMD has its own tracking system:

Processing
- The Department and the WMDs use the same application forms for ERP exemption verifications and permits.
- The Department and all of the WMDs have developed electronic applications (E-app) where applicants can submit applications and supporting documents online.
- Upon receipt, the Department, WMDs, and delegated local governments have 30 days to review the application and inform the applicant of any material needed to evaluate the application in accordance with statutory and rule criteria. An applicant has 90 days to respond to the request, and upon receipt of new material submitted by the applicant, the agencies have another 30 days to review the material for completeness.
- In accordance with Section 120, F.S., and Applicant's Handbook Volume I, Section 5.5.4, the Department and WMDs must issue or deny an ERP within 60 days of receiving a complete application. Application completeness is determined by whether the applicant has submitted all the materials required by review as specified by rule and statute.
- Upon receipt, a copy of each application is also copied to the state's Fish and Wildlife Conservation Commission (FWC), and as appropriate, the State Historical Preservation Office (SHPO), Department of Economic Opportunity (DEO), and Department of Agriculture and Consumer Services, Division of Aquaculture (DACS). Comments and suggestions from these agencies are considered during processing of the application. The agencies may object to issuance of an ERP under Florida's Approved Coastal Zone

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 14

Management Act coordination process. For ERP permits, the Department and WMDs do not rely on, but will also consider, comments from the federal resources agencies (U.S. Fish and Wildlife Service and the National Marine Fisheries Service) when such comments are made in a timely manner during the processing of a state permit. Comments from federal agencies that are received for state 404 permits will be considered for the corresponding ERP permits to facilitate consistency between the ERP and 404 authorizations.

Permit Duration
ERP permits are valid for the life of the system (includes all structures and works authorized for construction or land alteration). The ERP permit does not automatically expire after the construction phase (typically a five-year period) and continues to cover *operation* (use of) and maintenance of the system.

Fees
Fees charged by Department and the NWFWMD range from $100 to verify that an activity is exempt from regulation to $14,000 for an activity that involves a project area of more than 640 acres with more than 50 acres of work in wetlands and surface waters. The other four WMDs have their own fee structure.

Special Provisions for Agriculture and Forestry
- Sections 373.406 and 403.927, F.S., exempt certain agricultural activities from the need for an ERP. These include the rights of any person engaged in the occupation of agriculture, silviculture, floriculture, or horticulture to alter the topography for purposes consistent with the practice of such occupation, provided the alteration is not for the sole or predominant purpose of impeding or diverting the flow of surface waters or adversely impacting wetlands. The review of all agricultural activities under ERP, including permitting, compliance, and enforcement, is the responsibility of the WMDs. Florida's Department of Agriculture and Consumer Services (DACS), in cooperation with the Department and the WMDs also have developed various Best Management Practices handbooks to assist the agriculture community in working in a manner that will minimize adverse impacts to wetlands and other surface waters.
- Certified aquaculture activities that apply appropriate best management practices adopted under Section 597.004 are exempt from the need for permits under part IV of Chapter 373, F.S. Compliance, enforcement, and permitting of such aquacultural activities are the responsibility of DACS. Compliance, enforcement, and permitting of activities that are not so certified continue to be the responsibility of the Department.
- The SWFWMD has developed a unique Agricultural Ground and Surface Water Management (AGSWM) exemption confirmation program.
  - The SWFWMD utilizes "Ag Team" staff. These staff members that operate District wide, having agricultural backgrounds and who have received specialized agricultural training, provide full service water management regulatory assistance for the agricultural community. This initiative has been underway since 1990 and is the central part of the SWFWMD AGSWM program which has received state-wide recognition.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 15

    –    Ag Team members specialize in Water Use, Surface Water, and Environmental (wetland) regulation for agriculture. AGSWM was jointly developed by District staff and members of the agriculture community. AGSWM is an alternative regulatory process for agricultural operations that uses field visits, site specific conservation management planning, and technical provisions to foster agricultural production and environmental resource protection. SWFWMD staff encourages farmers who are planning activities that are subject to Environmental Resource Permitting (ERP) or Water Use Permitting (WUP) regulation to use the AGSWM pre-application review process, which can help facilitate exemption determination and/or permitting review. A few years ago, a Senate report, entitled "A Bridge Over Troubled Waters", cited the District's alternative agricultural regulatory process as a model for future practices.

    –    The SWFWMD has provided funding for the AGSWM program yearly since 1991. Currently, the funding is about $245,000 per year for USDA-NRCS to support technical assistance that helps farmers and SWFWMD staff to implement site specific ecosystem based conservation management planning. Agricultural projects that qualify for an ERP/AGSWM exemption letter must be planned and implemented according to prescribed conservation management planning practices.

## Components of the State 404 Program

Florida is proposing to streamline permitting under ERP and section 404 of the Clean Water Act by pursuing assumption of the section 404 dredge and fill permitting program. The State 404 Program will be administered separately from, but in tandem with the ERP Program. The State 404 Program and its implementing rules will not become effective until the program is approved by EPA, on a date specified by EPA in the federal register. At such time, the Department will be responsible for reviewing and acting on all applications for a State 404 Program permit.

### Jurisdiction

- "Assumed waters" or "State-assumed waters" are those Waters of the United States (WOTUS) where the state will assume dredge and fill permitting authority under Section 404 of the Clean Water Act. In general, these include non-navigable freshwaters and wetlands that fall outside of a 300-foot guide line established from the ordinary high water mark or mean high tide line of a "retained water".

- "Retained waters" are those waters where the USACE will retain Section 404 dredge and fill permitting authority. They are more specifically defined in the State 404 Program Handbook as "Those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A in the State 404 Program Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 16

adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

- Florida will use the state's ratified wetland delineation rule, Chapter 62-340, F.A.C., to determine the boundary of wetlands and other surface waters. Isolated wetlands delineated in accordance with Chapter 62-340, F.A.C. will be presumed to be WOTUS unless an applicant demonstrates, and the Agency agrees, otherwise. This is a streamlining measure to eliminate the processing time it would take to perform WOTUS determinations which are often complex, especially in urban areas.

Regulated Activities

- Dredging and filling activities within assumed waters that are not otherwise exempt under Rule 62-331.020, F.A.C. Exemptions available under the State 404 Program are limited to certain agricultural, silvicultural, and maintenance activities listed in 40 C.F.R. § 232.3.

Types of Authorizations

- Available authorizations/verifications will include exemption verifications, general permits, and individual permits. Conceptual approval permits like those available under ERP are not available under the State 404 Program because such permits would conflict with federal law.

Evaluation Criteria

- Evaluation criteria required under Section 404 of the Clean Water Act are highly duplicative with the evaluation criteria of the ERP program. It is estimated that approximately 85 percent of the requirements overlap. For this reason, the State 404 Program rule, Chapter 62-331, F.A.C., references the ERP rule wherever possible. The State 404 Program Rule is intended to "bridge the gap" between existing state ERP requirements and those requirements of federal law that are not addressed under ERP, or to address those areas where the ERP rules or statutes are in conflict with federal law.
- Evaluation criteria unique to the State 404 Program include, but are not limited to:
  - Alternatives analysis – this is a detailed analysis required to demonstrate and document avoidance and minimization of impacts to resources. The alternatives analysis is described in the 404 Handbook, Appendix C - "Guidance for Conducting an Alternatives Analysis".
  - Aesthetics review – this review is intended to evaluate potential effects on human-use characteristics.
  - Mitigation hierarchy – while all types of mitigation may be proposed and considered regardless of type under ERP, the State 404 Program will require that mitigation be evaluated on a preferential scale with mitigation bank credits being the most preferred type of mitigation, where the appropriate type of credits exist to offset the proposed impacts.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 17

- o More detailed information may be found in the State 404 Program Handbook, section 8.3.
- ERP criteria that are not applicable to the State 404 Program include, but may not be limited to:
  - o Section 120.60, F.S., pertaining to default of processing timeframes;
  - o Section 373.4141, F.S., containing timeframes for review of ERP permits;
  - o Certain provisions of Section 373.414, F.S., pertaining to mining mitigation;
  - o Any provision of Chapter 378, F.S., pertaining to "life-of-the-mine" permits;
  - o Sections 378.212(1)(g), and 378.404(9), F.S., pertaining to variances for certain mining reclamation activities;
  - o Subsection 378.403(19), F.S., containing a definition of "Wetlands" with special provisions for certain areas included in an approved conceptual reclamation plan or modification application;
  - o Section 252.363(1)(a)3., F.S., pertaining to the tolling and extension of permits pursuant to part IV of chapter 373, F.S., when the Governor declares a state of emergency, if the State 404 permit would be extended beyond five years from its effective date.
  - o Paragraph 62-345.600(1)(b), F.A.C., pertaining to time lag for phosphate and heavy minerals mines;
  - o AH I, Section 10.2.1.2 providing certain exceptions for reduction or elimination of impacts;
  - o Rule 62-348.600, F.A.C., pertaining to mitigation for high fiber peat mines.
  - o More detailed information may be found in the State 404 Program Handbook, section 8.4.
- Listed species evaluation
  Any federal requirement for the conservation of ESA-listed species not already addressed by the Environmental Resource Permitting program has been addressed by adding additional criteria to the State 404 Program rules (Chapter 62-331, F.A.C.). The Clean Water Act, Section 404(b)(1) Guidelines include protections against potential impacts to the biological characteristics of aquatic ecosystems and on special aquatic sites. Major potential impacts and possible loss of values, including threatened or endangered species, from the discharge of dredged or fill material is discussed in 40 C.F.R. § 230.30. Federal requirements and permit evaluation criteria can be summarized as follows:

  - o Where consultation under section 7 of the Endangered Species Act occurs between the Environmental Protection Agency and the Secretary of the Department of Interior, the conclusions of the Department of Interior concerning the impact(s) of the discharge on endangered and threatened species and their habitat is considered final.

  - o The Endangered Species Act of 1973 requires federal agencies to consult with the USFWS and/or NMFS to ensure that actions they authorize, fund, or carry out are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat of such species.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 18

    o   The Endangered Species Act of 1973 also prohibits any action that causes a "taking" of any listed species of endangered fish or wildlife, incidental or intentional.

If the dredge and fill permitting program under Section 404 of the Clean Water Act is assumed by the State of Florida, the above referenced requirements of the Clean Water Act and the Endangered Species Act directs the State to participate in the efforts to conserve ecosystems and conserve federally endangered and threatened species dependent upon those ecosystems. State 404 Program requirements and permit evaluation criteria that fulfill the needed federal requirements can be summarized as follows:

    o   Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Services (NMFS) for permits reviewed under the State 404 Program (Chapter 62-331, F.A.C., State 404 Handbook section 1.3.3, subsection 62-331.053(3)(a)4 F.A.C., and subsection 62-331.201(3)(k) F.A.C.)

    o   No permit shall be issued…[that] jeopardizes the continued existence of endangered or threatened species, or results in the likelihood of the destruction or adverse modification of a habitat which is determined to be….a critical habitat for endangered or threatened species (State 404 Program subsections 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k) F.A.C.).

    o   If EPA enters into section 7 consultation with the USFWS, a programmatic biological opinion for the State 404 Program may be written that includes an incidental take statement (ITS). The ITS will be included if the USFWS concludes that the State 404 program implementation is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat. For the Department and the permittee, the ITS would provide an ESA section 9 exemption from the prohibition of "take", contingent upon the Department's incorporation of the ITS's reasonable and prudent measures and terms and conditions as State 404 permit conditions and the permittee's compliance with those conditions.

Draft general permits will be subject to the same wildlife review criteria as individual permits, and will need to go through EPA review, public notice, and state rulemaking prior to becoming effective. General permits that have been adopted by rule and require notice to the Department will also be subject to the same wildlife review criteria during permit review and will need to go through the technical assistance process with the USFWS.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 19

- Public Notice will be required upon receipt of an "administratively complete" individual permit application, and will be conducted in accordance with Rule 62-331.060, F.A.C. Comments received during the public notice period will be considered during application review. An "administratively complete" application is one that contains sufficient information for the public to review and provide meaningful comments but may not be "technically complete". A "technically complete" application is one that contains sufficient information for the project to be reviewed in accordance with all evaluation requirements. (See definitions in the State 404 Program Handbook, section 2.0)

Compensatory Mitigation
- Elimination and reduction of impacts will be required before any compensatory mitigation plan can be considered.
- Compensatory mitigation proposals will be required to comply with a mitigation hierarchy, outlined in section 8.5.1 of the 404 Handbook.
- To maintain consistency between state and federal 404 programs, purchase of federal mitigation credits will be required for impacts authorized by a State 404 permit where compensatory mitigation will be provided through purchase of bank credits. The USACE will maintain responsibility for reviewing and issuing mitigation banking instruments for mitigation banks under Section 404 of the Clean Water Act. However, the state will be responsible for the review of any section 404 dredge and fill permit needed to implement the bank within assumed waters.

Processing
Processing details to expand on the information below may be found in the 404 Handbook, section 5.0.
- The same application form will be used for the ERP and State 404 programs.
- The application will be available through the electronic application (E-app) systems of the Department and the WMDs.
- Where the processing timeframes and agency action procedures in Chapter 62-330, F.A.C., Applicant's Handbook Volume I, and Chapter 120, F.S., do not conflict with the requirements of the State 404 Program, those processing timeframes shall be used, as outlined in the 404 Handbook. Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes. For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.
- The ERP and State 404 applications will be processed concurrently as much as possible. To prevent the need for subsequent modifications of an ERP where the ERP review is completed before the 404 review, the applicant will be given the choice, in the

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 20

application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete.

- If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete, unless the activity is exempt under Chapter 62-330, F.A.C., or qualifies for a general permit under Chapter 62-330, F.A.C. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met.

- Coordination with other State or federal agencies, other states, and tribes may be required during review of a notice or application for a State 404 Program authorization. Coordination agencies may include EPA, WMDs, USACE, State Historic Preservation Office (SHPO), Florida Fish and Wildlife Conservation Commission (FWC), US Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Miccosukee and Seminole Tribes, and Alabama or Georgia for projects that cross into waters of those adjacent states.

- Public notice will be required for State 404 individual permits. The public notice process may add additional permitting time depending on the nature and type of comments received from the public and commenting agencies, and whether or not a public meeting is scheduled for the project.

- When a proposed activity includes agricultural activities and the State 404 Program permit or verification of qualification for an exemption is processed by the Department, the Department shall consult with the District within whose boundaries the project lies to determine whether the proposed activity may be considered "normal farming, silviculture or ranching" activities, and whether the activity may be considered "ongoing" for the purposes of the exemption in 40 C.F.R. Part 232.3(c)(1).

Permit Duration

- As of the date of submittal of the state's assumption package to EPA, State 404 permits will be valid (effective) for up to five years. However, if federal law changes to allow a longer duration, the State 404 Program rules are written to accommodate such a change.

- General permits expire five years from the date that they become effective in rule. General permits must be re-evaluated and re-approved by EPA before they can be re-issued. This review is not on an individual project basis but is a review of the General Permit in rule.

- Individual permits become effective when they are signed by the Agency and the applicant. Each State 404 Individual permit, when issued, will contain a signature page with signature blocks for the person who has authority to sign permits for the Department district where the permit is issued and for the applicant. The applicant will be required to sign the page and send it back to the Agency for Agency signature.

- Individual permits cannot be extended but may be administratively continued while an application for a new permit is under review in accordance with section 5.3.3 of the 404 Handbook when unexpected project delays cause a project to require more than five years to complete. The 404 Handbook, section 5.3.2 contains instructions for long-term conceptual planning for projects that will take more than five years to complete. These instructions are intended to provide guidance and a streamlined approach to permitting

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 21

such projects. Typical project types include mines, large subdivisions, and certain large commercial projects.

Existing USACE Permits
- Existing USACE permits within assumed waters will remain effective until their expiration dates, except where the project is modified after the date of assumption and the Department processes the modification.
- Any modifications other than administrative modifications will need to be processed by the Department after the date of assumption. Such modifications will be processed as a new permit and will only be valid for up to five years.
- Existing USACE permits within assumed waters will not be extended by the USACE. The permittee will need to apply for and obtain a new 404 permit from the state.

Fees
- There will be no processing fees for State 404 Program verifications, notices, applications, or permits.

Agriculture and Forestry Exemptions
- The exemptions that will apply to agriculture and forestry activities under the State 404 Program (see 40 C.F.R. § 232.3) are different from the exemptions available under ERP. The exemptions for agriculture in Section 373.406(2), F.S., Rules 62-330.051, and 62-330.0511, F.A.C., allow new activities within wetlands and other surface waters, while the State 404 Program exemption under 40 C.F.R. § 232.3 may require a permit for such activities. The requirements of both program's exemptions should be read carefully when deciding if an activity is exempt or needs a permit.

Streamlining and Coordinating ERP & 404 Reviews
The Department will issue all State 404 Program permits. Department and WMD staff will coordinate review of the ERP and State 404 permits to the greatest extent practicable. Such coordination shall include:
- When an application or notice that contains activities within state-assumed waters is received by the WMD, the WMD shall forward a copy of the application or notice to the appropriate local office of the Department.
- Department staff will accompany WMD staff on the initial site visit to verify the delineation of wetlands and other surface waters for the State 404 Program permit.
- The Department and WMD will communicate frequently to streamline the permit reviews and ensure consistency between the ERP and State 404 authorization.

The Department will coordinate review of all wildlife-related issues for ERP and State 404 permits.

The Department will provide an opportunity to the Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) to review all applications, and technical assistance will be required when a project has been determined to have a potential to affect listed species. The Department will determine whether a project may have a

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 22

potential to affect listed species by using available resources, or it may observe signs that the site is used by listed species during the site visit. In addition, the federal and state wildlife agencies will also assist in the determination as to whether a project has a potential to affect listed species within their jurisdictions and will provide recommendations during the technical assistance process. The Department will incorporate any requirements resulting from consultation or technical assistance into any State 404 permit issued for the project (section 5.2.3 of the State 404 Program Applicant's Handbook). The Department will also provide a copy of the public notice for all individual applications to the USFWS.

This State 404 program species assessment process is modeled after the federal processes for determining, avoiding, and minimizing effects to listed species and ensures compliance with the ESA and the CWA during State 404 Program permit application review and permit issuance. FWC is already involved in the review of many ERP applications and provides the Department with recommended wildlife-related permit conditions, including those that are federally proposed to be listed. In many cases, FWC is the lead conservation agency for federally proposed or candidate species in Florida. The FWC has partnered with the Department to assist with the coordination of federally listed species reviews, which would take place during their current review of impacts to state-listed species for the State ERP program (per Chapters 62-330, F.A.C. and 68A-27, F.A.C.). When needed, the FWC may assist the Department as the species coordination lead to be the point of contact for coordination with the USFWS.

The Department's processes and procedures to review State 404 applications will be similar to and will utilize the USFWS-approved permitting guidance that is currently used by the USACE, to ensure consistency with CWA and ESA protections. All State 404 applications will be forwarded to USFWS for review, the majority of which will include Department or FWC preliminary determinations for effects to endangered or threatened species or species proposed to be listed. These preliminary determinations my include possible effects for species found onsite, potential impacts to critical habitat, and potential protective measures that may address the effects and impacts.

The USFWS will review the applications and supplemental information provided by the Department and FWC, and provide, through technical assistance, recommendations to the Department/FWC on a project-by-project basis. This coordination will ensure adverse effects to ESA-listed species are avoided and minimized.  Because the Department has committed to incorporate all avoidance and minimization measures provided by the USFWS as conditions to State 404 permits, no State 404 permits will be issued that will jeopardize the continued existence of a listed or proposed to be listed species, or result in adverse modification of critical habitat (State 404 Program subsections 62-331.053(3)(a)4, 62-331.201(3)(k), and 62-331-248(3)(k), F.A.C.).  If the USFWS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level, the Department will issue a Notice of Intent to Deny the permit.

In addition, if the applicant for a State 404 Program permit is the holder of a valid and

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 23

active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the USFWS and the species and activities described in the State 404 permit application are covered in the Program assumption BiOp, HCP/ITP (or similar agreement), then no additional avoidance and minimization measures would be required. The Department would provide the documentation in order for USFWS review the project.

The State 404 program's species coordination process will include a training program and technical team to monitor and improve the process over time. Staff members from the Department, FWC, and USFWS will participate in a State 404 program species coordination technical team. This technical team will oversee the species coordination process, including but not limited to: assisting in the transition of 404 permitting by participating in training efforts; providing a process to elevate questions and decision-making to a group with technical expertise, as needed; assist in refining coordination processes, procedures, and future improvements, as needed, related to State of Florida permitting under Chapter 62-331, F.A.C.  The team will collaborate on developing the training materials, and the FWC and the USFWS be invited to participate in the in-person and/or virtual training meetings for Department permit review staff.

The following Figure depicts an overview of the species coordination process.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 24



Related Programs

- Mining and Mitigation Program – Regulates activities related to mining, reclamation, and mitigation for mining activities. Mines are subject to additional and separate reclamation requirements per Chapter 378, F.S.
  - For heavy mineral, fuller's earth, and phosphate mines, the wetland mitigation is based on the reclamation requirements if the reclamation maintains or improves the water quality and the function of the biological systems present at the site prior to the commencement of mining activities (Section 373.414(6)(b) and (c), F.S.).
  - Operators of some types of mines may apply for a Life-of-the-Mine Permit, which combines the requirements of the ERP with the reclamation requirements into a single permit.
  - State 404 Program permits will be required for any dredge and fill activities within assumed waters.
  - Additional information is available at: http://www.dep.state.fl.us/mainpage/programs/mines.htm

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 25

- Beaches, Inlets, and Ports Program – Activities on or affecting Florida's sandy beaches and adjacent beach and dune systems are subject to additional and separate permitting requirements per Chapter 161, F.S.:
  – Activities waterward of established Coastal Construction Control Lines (CCCL) but landward of mean high water (MHW) line require a separate CCCL or Coastal Construction permit per Chapter 62B-33 or 62B-41, F.A.C. See http://www.dep.state.fl.us/beaches/programs/ccclprog.htm for additional information
  – Activities seaward of the MHW line or Erosion Control Line along the Atlantic Ocean, the Gulf of Mexico, the Straits of Florida, or associated inlets that are located on state-owned submerged lands and are likely to affect the distribution of sand along the beach (such as groins, jetties, beach nourishment and re-nourishment, and offshore sand harvesting require a Joint Coastal Permit (JCP) under Chapter 62B-49, F.A.C.; a separate ERP is not required for activities authorized by under the JCP. See http://www.dep.state.fl.us/beaches/programs/envpermit.htm for additional information.
- Office of Ecosystem Projects – Restoration activities within the greater south Florida ecosystem in the area encompassing the Lake Okeechobee watershed, the Everglades, and coastal estuaries are regulated under the Everglades Forever Act (EFA; Section 373.4592, Florida Statutes (F.S.), the Comprehensive Everglades Restoration Plan Regulation Act (CERPRA; Section 373.1502, F.S.), and the Northern Everglades and Estuaries Protection Plan (NEEPP; 373.4595, F.S.). A separate ERP is not required for activities authorized under these programs, though ERP permits are issued for restoration projects that fall within the umbrella of south Florida restoration activities, but were not specifically identified in statute (e.g., Kissimmee River Restoration). State 404 Permits will be required for any dredge and fill activities within assumed waters. See http://www.dep.state.fl.us/everglades/permit.htm for additional information.

**Proprietary (State-owned Submerged Lands)**
General overview
- In addition to the above *regulatory* permit programs, activities that are located on submerged lands owned by the state of Florida, otherwise called state-owned, or sovereign, submerged lands (SSL) also require a *proprietary* authorization for use under Chapter 253, F.S., and Chapter 18-21, F.A.C. Such lands generally extend waterward from the mean high water line (of tidal waters) or the ordinary high water line (of fresh waters) both inland and out to the state's territorial limit (approximately three miles into the Atlantic Ocean, and nine miles in the Gulf of Mexico).
- SSL authorizations typically are in the form of consent by rule, letter of consent, easement, or lease. Authorizations consider issues such as water dependency, riparian rights, impacts to submerged land resources, and preemption from other uses of the water by the public. These considerations originate from Public Trust Doctrine. In Florida, public lands owned by the State and the resources upon them are held in trust by the Board of Trustees of the Internal Improvement Trust Fund (BOT) for the benefit of all of the people for a public use, such as fishing, boating, and swimming. The BOT is

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 26

comprised of the Governor, the Attorney General, the Chief Financial Officer, and the Commissioner of Agriculture.
- The program is structured such that an application for both an SSL authorization and an individually-processed ERP cannot become complete until all the information required for both has been supplied, and the ERP and the SSL authorization must be issued concurrently, such that neither the ERP, nor the SSL authorization can be issued if all the conditions for issuance of *both* the ERP permit and the SSL authorization are not met. Activities that qualify for ERP exemptions and general permits are not required to be processed concurrently, but usually are processed together when the time frames for the ERP decision can be met and the activity meets all the conditions for issuance of the SSL authorization.
- Activities located within designated Aquatic Preserves must meet the requirements of Chapter 258, F.S., and Chapter 18-20, F.A.C. (all Aquatic Preserves except Biscayne Bay) or Chapter 18-18, F.A.C. (activities within Biscayne Bay).

Delegations of Authority
- The BOT has delegated the Department and WMDs to act as their staff in the review of activities that require authorizations to use SSL. For most activities, the BOT has also delegated authority to the Department and the WMDs to take final action to approve or deny the authorization, although some activities are required to be acted on directly by the BOT. The Department and the WMDs divide responsibilities for reviewing and acting on the SSL authorization in accordance with the same operating agreement that governs the ERP program, although, per Section 253.002, F.S., The Department is responsible for enforcing violations of the SSL rules and statutes.
- In accordance with Rule 18-21.0051, F.A.C., the BOT has retained authority to take final action on the following, although staff of the Department and the WMDs process the application for presentation to the BOT in the form of an agenda item:
  – Proposed leases or modifications to existing leases having a preempted areas of more than 150,000 square feet, including proposed leases for mooring fields that don't qualify for the general permit under Rule 62-330.420, F.A.C. and additions to existing docking facilities where the size of the proposed additional preempted area exceeds 10% of the existing preempted area and the total of existing and proposed additional preempted area exceeds 150,000 feet;
  – Private easements of more than 5 acres, with some exceptions;
  – Certain open-air dining areas;
  – The establishment of mitigation banks on SSL;
  – Exceptions to the maximum preemption limits for a private residential multi-family dock or pier;
  – Public mooring fields that have a preempted area of more than 150,000 square feet that don't qualify for a general permit or mooring fields that exceed certain tenancy times;
  – Activities having heightened public concern, as determined by the BOT or by Department and WMD staff.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 27

Forms of Authorizations
- Exceptions – A limited number of activities can be conducted without authorization per section 18-21.005(1)(a), F.A.C.
- Consent by Rule – Certain regulatory exempt activities outside aquatic preserves and protected manatee areas are authorized in section 18-21.005(1)(b), F.A.C., to occur without the need for an application.
- Letter of Consent – Written authorization is required to verify that certain activities will be conducted in compliance with rule and statutory criteria to ensure they will have minimal impact to environmental resources or public use, including some public activities, per section 18-21.005(1)(c), F.A.C.; this includes all activities in an aquatic preserve that do not require a lease, easement, or other form of authorization.
- Leases – Required for all commercial (revenue generating) activities and activities that have more than a minimal impact to resources, per section 18-21.005(1)(d), F.A.C. Leases require payment of annual lease fees.
- Easements – Required for activities such as bridges, submerged cables, or breakwaters that permanently limit or preempt an area's public use per section 18-21.005(1)(e), F.A.C.


Aquatic Preserves
There are 41 aquatic preserves in Florida. These are areas of state-owned submerged land designated in Chapter 258, F.S., for special and additional protection. Aquatic preserves are established for the purpose of being preserved in an essentially natural or existing condition so that their aesthetic, biological, and scientific values may endure for future generations. All activities, except single family docks, must be determined to be clearly in the public interest. Special criteria apply to activities in aquatic preserves, as discussed under "Evaluation Criteria."

Fees
- Processing fee – Leases and easements require a processing fee separate from the ERP permitting fee. A processing fee is not required for consent by rule or letter of consent authorizations.
- Activities involving dredging and removal of the dredged material from SSL are subject to payment of severance fees, based upon the quality of the material, the amount of material removed, and by location (County). The fees are established in Rule 18-21.011(3)(a), F.A.C.
- Private easements require an appraisal, and the easement fee is based on that appraisal and an enhanced value factor, if applicable. When a private easement is renewed a new easement fee is charged based on a new appraisal and applicable enhanced value factor. Public easements are not charged an easement fee.
- Lease fees are assessed for the life of the facility and are collected annually. The annual lease fee is based on 6 percent of the annual income of the facility, the base fee, or the minimum annual fee. There are discounts for facilities open to the public and facilities designated as Clean Marinas (https://floridadep.gov/rcp/clean-marina ). Annual lease fees are higher in Aquatic Preserves, and additional fees are required for extended term leases having lease terms of greater than 5-year duration.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 28

- Special event leases (boat shows) are assessed a special event fee as outlined in Rule 18-21.011(1)(d), F.A.C.
- Fees may be waived for public projects.

Processing
- Exceptions do not require SSL authorization, but qualification may be verified by the Department, the WMD, or delegated local program during processing of an application for an activity that qualifies for an exception under 18-21.005(1)(a), F.A.C.
- Consent by Rule is granted automatically for certain qualified regulatory exempt activities in section 18-21.005(1)(b), F.A.C., and no application is required. However, qualification may be verified by the Department, the WMD, or delegated local program during processing of a regulatory "Request for Verification of Exemption".
- If a Letter of Consent is required under section 18-21.005(1)(c), F.A.C., the authorization may be processed at the same time as the regulatory authorization, if one is required, or it may be applied for and processed separately if the project is a regulatory exempt activity.
- Leases and Easements required under sections 18-21.005(1)(d) and (e), F.A.C., are processed at the same time as any required regulatory permit. The ERP application form is used to apply for both the regulatory permit and the SSL authorization. When staff determines that the project qualifies for both the regulatory and SSL authorization, the SSL authorization is processed as follows:
  - Single-Family Leases processed by the Department
    - The lease instrument is prepared by Department district staff and sent to the Lessee for execution. The executed lease is then sent to DSL for billing and uploading into the BTLDS electronic database.
  - Single-Family Leases processed by WMDs
    - WMD staff prepares a Delegation of Authority (DOA) document, then sends the DOA to DSL. DSL prepares the lease instrument, sends it to the lessee for execution, uploads the executed document into BTLDS, and processes the billing.
  - Multi-Family and Commercial Leases, Easements
    - The Department or WMD district staff prepare a DOA document, then send the DOA to DSL. DSL prepares the lease/easement instrument, sends it to the lessee/grantee for execution, uploads the executed document into BTLDS, and processes the billing.

Evaluation Criteria
- The review criteria for an application to use SSL include a requirement that an activity not be contrary to the public interest, and any sale (transfer of ownership) of SSL must be clearly in the public interest. Also, any activity in an aquatic preserve must be clearly in the public interest, except single family docks which have been already determined to be in the public interest.
- Evaluation factors are contained in Chapter 18-21, F.A.C.; if in an aquatic preserve, additional factors apply per Chapter 18-20, F.A.C. (all aquatic preserves except Biscayne Bay) or Chapter 18-18, F.A.C. (in the Biscayne Bay Aquatic Preserve).

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 29

Considerations include whether the activity will adversely affect state-owned submerged lands resources (such as salt marsh, grassbeds, and oyster bars), the rights of riparian property owners, navigation, water dependency, and preemption of uses of the waters by the public-at-large. Only uses that are water dependent can be approved, except for certain non-water dependent activities that have been "grandfathered", and incidental uses that may be approved on a case-by-case basis for public projects. Many of the approval factors are very detailed, with specific restrictions on the sizes, types, and designs of activities that can be authorized as a component of managing state-owned land.

- In addition to the above, in an aquatic preserve, dredging is strongly discouraged and multi-family docks, except those that conform to single-family dock criteria, must obtain a lease. In addition to public interest, cumulative impacts are also assessed for applications in aquatic preserves.
- Docks in Biscayne Bay Aquatic Preserve, other than for a single-family residence, must meet the extreme hardship test in Chapter 18-18, F.A.C.

**Mangroves**
- The trimming or alteration of mangroves (tropical to sub-tropical tree species growing along the coastal areas of Florida) is regulated in accordance with the Mangrove Trimming and Preservation Act of 1996 (Sections 403.9321-403.9333, F.S.). The regulations only apply to the three native species of mangroves, *Rhizophora mangle* (red mangrove)*, Avicennia germinans* (black mangrove)*, and *Laguncularia racemosa,* (white mangrove).
- Levels of regulation include exemptions, general permits, and individual permits, depending on the extent of trimming or alteration. For example, exemptions exist for trimming within a riparian mangrove fringe, for maintenance trimming, to restore configurations previously attained by legal trimming, and for some governmental, utility, and surveying activities. Exemptions and general permits are limited by conditions applicable to each. The Individual Permit process involves review using criteria in Part IV of Chapter 373, F.S., and may require a mitigation assessment under Chapter 62-345, F.A.C. A separate mangrove permit is not required if mangrove trimming or alteration is associated with work that requires an individually-processed ERP permit.
- Provisions exist for delegating the mangrove trimming and alteration program to local governments; to date there are seven delegated local governments.
- Special provisions apply to trimming or alteration conducted by Professional Mangrove Trimmers.
- The Department provides a certification program for Professional Mangrove Trimmers (PMT) and maintains a list of certified PMTs to assist property owners in locating a PMT for their mangrove trimming project.
- Additional information is available at: https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/mangroves

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 30

## RELATIONSHIP TO FEDERAL PROGRAMS

The USACE cannot act on applications that require a federal dredge and fill permit until the state ERP, which contains the federal water quality certification and coastal zone consistency concurrence determination (or waiver thereto), has been issued, or until 180 days has passed since the time an application is considered complete if it had not yet been issued. State 404 permits will be state, not federal, actions, and will therefore not require water quality or CZM certification. However, it will be a requirement that any State 404 program permit that also requires an ERP authorization will not be considered complete until the ERP review is complete because an applicant must meet water quality standards and coastal zone management program criteria to receive an ERP.

Water Quality Certification
When a corresponding federal dredge and fill permit is required, issuance of the ERP also constitutes a water quality certification (WQC) or waiver thereto under section 401 of the Clean Water Act, 33 U.S.C. 1341. Upon issuance of an ERP, a copy of the permit containing the applicable WQC is sent to the USACE so the federal permit can be issued. The Department, WMDs, and USACE have executed an Operating Agreement (OA) that reflects how the agencies are to coordinate to process applications
(https://floridadep.gov/ogc/ogc/content/operating-agreements)   In accordance with that OA, the Department, WMD, or delegated local program has 180 days upon receipt of a complete ERP application to issue, deny, or affirmatively waive the WQC. In addition, by letter from the Governor of Florida to the U.S. Environmental Protection Agency, Florida has identified those activities for which agency action will constitute a water quality certification or waiver thereto:



0710_EPA_WQCert_95
.pdf          0710_EPA_WQCert_98
            .pdf

and

Coastal Zone Consistency Concurrence (CZCC)
Issuance of an ERP in coastal counties constitutes a finding of consistency under Florida's federally approved Coastal Zone Management Program under Section 307 (Coastal Zone Management Act).

Nationwide Permits (NWP)
Every five years, the Department reviews the USACE Nationwide Permits (NWPs) for consistency with WQC and CZM within Florida. The Department certifies many of the NWPs, with conditions. Four of the 2017 NWP activities do not apply in Florida, and one (NWP 8, Oil and Gas Structures on the Outer Continental Shelf) was denied a CZM. Most of the NWPs that were granted a WQC and CZM were regionally conditioned to provide that projects qualifying for the NWP must be authorized by the applicable permit or exemption required under Part IV of Chapter 373, F.S., by the Department or WMD under Section 373.069, F.S., or a local government with delegated authority under Section 373.441, F.S., and receive WQC and applicable CZCC or waiver thereto, as well as any authorizations required for the use of state-owned submerged lands under Chapter 253, F.S., and, as applicable, Chapter 258, F.S. When Florida assumes the 404 program, NWPs will no longer be applicable within assumed waters,

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 31

however, the state program plans to include general permits that are modeled after the USACE NWPs in the State 404 Program rule to provide consistency between state and federal 404 programs.

Additional information on the NWPs can be found at:
https://www.saj.usace.army.mil/Missions/Regulatory/Source-Book/

State Programmatic General Permit (SPGP)
On December 31, 2018, the Jacksonville District of the USACE reauthorized a revised SPGP (SPGP V-R1) to the State of Florida. The SPGPs are reviewed and re-issued every five years. SPGP V-R1 covers the geographic area throughout Florida, excluding some specified geographical areas. The purpose of the SPGP V-R1 is to avoid duplication of permitting between the USACE and the Department for minor work located in waters of the United States, including navigable waters. Delegations may also be granted to WMDs and local governments. Currently, SJRWMD, SWFWMD, and Hillsborough County are the only additional delegations.

The USACE has delegated to the Department the ability to issue the federal permit under Section 10 of the Rivers and Harbors Act and Section 404 of the Clean Water Act for the following activities that qualify for an ERP general permit or exemption:

- Construction of shoreline stabilization activities, such as riprap and seawalls (Groins, jetties, breakwaters, and beach nourishment/re-nourishment are excluded);
- Docks, piers, associated facilities, and other minor piling-supported structures;
- Derelict vessel removal;
- Boat ramps and boat launch areas and structures; and
- Scientific devices.

Applications that are received for the above activities are first reviewed to determine if they meet all of the conditions of the SPGP. Those that do are processed as "green," in which case issuance of the Department, WMD, or local government authorization includes verification of qualification for the corresponding federal authorization. Those that do not meet the conditions are designated "red" by the Department, the WMD, or the local government, and the applicant is directed to go to the USACE for processing.

SPGP V-R1 will not be applicable within assumed waters after assumption.

NPDES
Florida has statewide authorization to implement the federal National Pollutant Discharge Elimination System (NPDES) permit program for stormwater. Areas of regulation include municipal separate storm sewer systems, certain industrial activities, and construction activities. The municipal program has jurisdiction over large and medium municipalities. The industrial program covers selected industries and are identified by Standard Industrial Code. New construction requires an NPDES stormwater permit if the clearing, grading, or excavation work disturbs one or more acres of land and discharges to either a surface water of the state or to a Municipal Separate Storm Sewer System (MS4).

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 32

The NPDES permit is not linked to the ERP program; therefore, applications and notices for NPDES activities must be submitted separately from the ERP application. Copies of the permit, application forms, guidance materials, and other information about the permit and NPDES stormwater program can be downloaded from the following website: https://floridadep.gov/water/stormwater. An NPDES permit can be applied for and received electronically by submitting a Notice of Intent at: http://www.fldepportal.com/go/

Agricultural Conservation Easement Program (ACEP)
The 2014 Farm Bill replaced the NRCS Wetland Reserve Program with ACEP. The Wetland Reserve Program provided funding for farmers to voluntarily preserve and enhance wetlands on their agricultural lands through conservation easements. ACEP includes provisions for farmers to voluntarily enter into Wetland Reserve Easements and/or to enroll in the Wetland Reserve Enhancement Partnership. Funding is available through these programs for wetland restoration/protection in critical areas, restoration or enhancement beyond NRCS requirements, and use of innovative restoration methods and practices.

Special Area Management Plan (SAMP) and Advanced Identification (ADID)
A SAMP was developed by the USACE for Bird Drive Basin in Dade County in between 1992 and June 1995 and is still in effect. The Department and Miami-Dade County's (MDC) Department of Environmental Resources Management entered into a Memorandum of Understanding dated April 27, 1993, that directs that applicants requiring mitigation within the basin will contribute a specified amount of money to MDC, which is in turn used to implement the Hole in the Donut Mitigation Bank within Everglades National Park.

ADIDs have been developed for western Biscayne Bay (for the shoreline east of Cutler Ridge), the Florida Keys (Monroe County), the Loxahatchee River (Palm Beach County), Eastern Everglades (near the 8 1/2 square mile area), and Rookery Bay (Collier County). These help applicants identify areas where permitting difficulties can be expected, but they do not otherwise directly affect the state permitting process.

In addition to the above, the Jacksonville office of the USACE has developed an innovative Comprehensive Conservation, Mitigation and Permitting Strategy that targets areas around the state that are experiencing significant development pressure with concurrent concerns with long term habitat and water quality impacts, or where large scale projects are underway that can be expected to result in significant regional impacts. These include the Dade County Lake Belt, Santa Rosa County, St. Joe Development (in the panhandle), Walt Disney World, and an Environmental Impact Statement for South West Florida. Each of these has involved coordination with the Department and the WMDs.

## STATUTES AND RULES

Regulatory Statutes and Administrative Rules
The statewide environmental resource permitting regulatory program is authorized under Part IV of Chapter 373, F.S., specifically by Section 373.4131, F.S. Overall protection of water quality and the other programs of the Department are contained in Chapter 403, F.S. The

Mangrove Trimming and Preservation Act of 1996 is contained in Sections 403.9321 through 403.9333, F.S. The WMDs are created by Section 373.069, F.S.

Florida Administrative Code regulatory rules of general applicability include chapters:

- 62-4 (including general permitting criteria, Department and NWFWMD fee requirements, water quality protection criteria for special waters, and anti-degradation criteria)
- 62-40 (Water Resource Implementation Rule)
- 62-110 (Exceptions to the Uniform Rules of Procedure)
- 62-113 (ERP Operation and Delegation Agreements)
- 62-302 (Surface Water Quality Standards)
- 62-312 (Part IV—additional criteria within Monroe County, applicable to the ERP program)
- 62-330 and Applicant's Handbook Volumes I and II (Statewide Environmental Resource Permitting)
- 62-331 and the State 404 Program Handbook (State 404 Program)
- 62-340 (statewide delineation of the landward extent of wetlands and other surface waters)
- 62-342 (mitigation banking)
- 62-344 (delegation of the ERP permit program to local governments)
- 62-345 (Uniform Mitigation Assessment Method)
- 40A-44 (ERP Agricultural and Forestry Surface Water Management Systems – NWFWMD)
- 40B-400, (Environmental Resource Permits – SRWMD)
- 40C-4 (Environmental Resource Permits –SJRWMD)
- 40C-42 (ERP Stormwater Systems – SJRWMD)
- 40C-44 (ERP Agricultural Surface Water Management Systems – SJRWMD)
- 40D-4 (Environmental Resource Permits – SWFWMD)
- 40E-4 (Environmental Resource Permits – SFWMD)
- Rules that may apply to grandfathered projects:
    - 62-25 (Old stormwater rule)
    - 62-312 (Except Part IV - old WRP/dredge and fill rule)
    - 62-343 (Old ERP rule, did not include areas within the jurisdiction of NWFWMD)
    - 62-346 (ERP within the jurisdictional boundaries of the NWFWMD)
    - Other "40X" rules within the WMDs (40B-4, 40C-1, 40C-8, 40C-40, 40C-41, 40C-400, 40D-1, 40D-40, 40D-400, 40E-1, 40E-40, 40E-41, 40E-400)

Proprietary Statutes and Administrative Rules
The proprietary program is authorized under Chapter 253, F.S. Activities on sovereign submerged lands in aquatic preserves are further authorized by Chapter 258, F.S.

Florida Administrative Code rules implementing the proprietary program include chapters:

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 34

- 18-14 (Administrative Fines)
- 18-18 (Biscayne Bay Aquatic Preserve)
- 18-20 (Aquatic Preserves)
- 18-21 (Sovereignty Submerged Lands Management)

General

All licensing and agency action determinations under the above statutes and rules are further governed by the Administrative Procedures Act, Chapter 120, F.S., and by the Rules of Uniform Procedures under Chapter 28, F.A.C., and the Exceptions to the Uniform Procedures under Chapter 62-110, F.A.C. However, the State 404 Program is not subject to the default issuance provisions of Chapter 120, F.S., because these provisions are in conflict with federal law.

The above statutes may be accessed at: http://www.leg.state.fl.us/statutes/
The above rules may be accessed at: https://www.flrules.org/

## COMPLIANCE ASSURANCE

Staff from the Department that have responsibility for an ERP activity under the respective Operating Agreements are responsible for compliance and enforcement of both the regulatory and the proprietary aspects of an ERP permit or other authorization and applicable sovereign submerged lands authorization. The WMDs have full responsibility for compliance and enforcement of the regulatory components of an ERP activity but can enforce the proprietary components only if they can be corrected as part of the regulatory corrections (such as reducing the size of a dock built on SSL to comply with the regulatory permit). Enforcement remedies that are proprietary in nature (such as assessing past-due lease fees for an unauthorized structure and authorizing the structure with a lease) is the responsibility of the Department, whether the Department or a WMD processed a permit for the activity. Compliance and enforcement of State 404 Program authorizations or violations are the responsibility of the Department.

## PERMIT TRACKING

The Department and each WMD have their own tracking system to record the progress of each permit application and all enforcement cases. These systems track processing time, status, and collect data about each permit/compliance case.

## ROLE OF LOCAL GOVERNMENTS

- Section 373.441, F.S., and its implementing rule Chapter 62-344, F.A.C., provide the procedures and considerations for the Department to delegate the ERP program to local governments. Delegations can be granted only where:
  - the local government can demonstrate that delegation would further the goal of providing an efficient, effective, and streamlined permitting program; and
  - the local government can demonstrate that it has the financial, technical, and administrative capabilities and desire to effectively and efficiently implement and enforce the program, and protection of environmental resources will be maintained.
- Section 373.441, F.S., was amended in 2010 to make the Department responsible for processing all petitions for delegation submitted by a local government, including where

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 35

- the local government is seeking delegation of WMD responsibilities in the ERP program.
- To date, two local governments (Broward County and Hillsborough County) have received limited delegations of the ERP program.
- Broward County received delegation from both the Department and the SFWMD for permitting, compliance, and enforcement of activities identified in a Delegation Agreement adopted in Chapter 62-113, F.A.C. The County was not delegated authority to process proprietary authorizations for activities.
- Environmental Protection Commission of Hillsborough County received delegation from the Department for permitting, compliance, and enforcement of activities identified in a Delegation Agreement adopted in Chapter 62-113, F.A.C. The County was not delegated authority to process proprietary authorizations.
- Miami-Dade County has a limited delegation from the Department to confirm sovereign submerged lands consents of use under Chapter 253, F.S., for activities that qualify for the Section 403.813(1)(b), F.S., regulatory exemption for private single-family docks.
- Section 403.9324, F.S. authorizes delegation of the mangrove program. To date, the following local governments have been delegated authority to implement the program: Miami-Dade, Broward, Hillsborough, Pinellas, and Sarasota Counties; the Town of Jupiter Island, and the City of Sanibel.

## WATER QUALITY REGULATIONS

### Rules and General Overview

- Florida's surface water quality standards are authorized under Section 403.061, F.S., and are adopted in Chapter 62-302, F.A.C. This chapter includes antidegradation policies, water classifications, specific narrative and numeric standards, and an identification of Outstanding Florida Waters (which receive the highest water quality protection).
- Additional water quality standards for Outstanding Florida Waters, including antidegradation standards for all waters are contained in Rule 62-4.242, F.A.C.
- Standards for granting mixing zones are contained in Rule 62-4.244, F.A.C.
- Chapter 62-4, F.A.C., contains additional provisions for exemptions from water quality standards, and for sampling, testing, and method detection limits for water pollution sources. An antidegradation policy is applied to wetlands, based upon designated use classifications. Special standards have been adopted for discharge of treated stormwater and wastewater into wetlands.
- ERP permits also must consider whether a regulated activity will adversely affect the groundwater standards contained in Chapters 62-520, 62-522, and 62-550, F.A.C.

### Designated Uses

- All surface waters in Florida fall into one of six classifications based upon their present and future most beneficial use (designated use). The six classifications include:

| Class | Designated Use |
|-------|----------------|
| I | Potable Water Supplies |
| II | Shellfish Propagation or Harvesting |

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 36

| III | Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife |
| III-Limited | Fish Consumption; Recreation or Limited Recreation; and/or Propagation and Maintenance of a Limited Population of Fish and Wildlife (Used for some wholly artificial or altered waters) |
| IV | Agricultural Water Supplies |
| V | Navigation, Utility and Industrial Use |

**Narrative and Numeric Water Quality Criteria**

- Narrative and numeric water quality criteria as listed in Chapter 62-302, F.A.C., are designed to support the aforementioned designated uses. More stringent criteria apply to waters in a "higher" classification (e.g., Class I waters have more stringent criteria than Class III waters). There are a number of biological water quality criteria contained in Chapter 62-302, F.A.C., including bacteriological quality, biological integrity, nuisance species, and nutrients.

- Wetlands are considered "waters of the State," and are included in the six classes of waters above. Most waterbodies in Florida, including most wetlands, are classified as Class III waters. Section 373.414(10), F.S., provides the authority for the Department, in consultation with the WMDs, to establish by rule water quality criteria for wetlands, giving appropriate recognition to the water quality of such wetlands in their natural state. However, to date, no rules governing specifically the water quality in wetlands have been adopted.

- Natural background conditions (condition of waters in the absence of man-induced alterations based on the best scientific information available to the Department), such as those that exist naturally in wetlands, are considered. For example, notwithstanding specific numeric criteria, dissolved oxygen levels, which are naturally low in wetlands, that can be attributed to natural background conditions, and man-induced conditions that cannot be controlled or abated, may be established as alternative dissolved oxygen criteria for a waterbody or portion of a waterbody.

**Antidegradation Policy**

- Florida's antidegradation policy is contained in and implement by sections 62-302.300, 62-302.700, and 62-4.242, F.A.C. It generally provides that permit applicants demonstrate that lowering of water quality is necessary or desirable under federal standards and under circumstances that are clearly in the public interest. Paragraph 62-302.300(17), F.A.C., specifically provides that projects permitted under Part IV of Chapter 373, F.S., shall be considered to be in compliance with the antidegradation policy.

**Other Water Quality Criteria (Applicable to Wetlands)**

- Chapter 62-4, F.A.C., provides several relief mechanisms allowing for limited lowering of water quality, including Site Specific Alternative Criteria, mixing zones, variances, and exemptions, provided certain conditions are met.

- Certain portions of Chapter 62-611, F.A.C., are considered as water quality standards. This chapter allows for the use of some wetlands for treatment of wastewater in very limited cases.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 37

- The review of water quality certifications for specific applications is done by the environmental resource permitting staff. The ability for an activity to meet applicable state water quality standards is determined as part of the permit application review, and the water quality certification is issued, waived, or denied in the same document that issues or denies the environmental resource permit.

# OUTREACH, TRAINING, and EDUCATION

## Public Outreach/Education

- The Department and the WMDs have active public outreach and education programs that provide materials on wetlands, other surface waters, and about the state's regulatory and proprietary programs. Public outreach and education programs include:
  – Visits to schools to provide interactive information in the classroom or out in the schoolyard;
  – Demonstrations involving the use of "Enviroscape" Models--including stormwater (also used for wetland education), and coastal models;
  – Programs at specific events, such as scheduled wetland activities at local state park events, fairs, or scout jamborees;
  – Staff may speak at community events;
  – Development of online activities, some with specific sites for children;
  – Involvement in specific programs such as:
    - the Florida Envirothon
    - Technical reports
    - Science fairs
    - Earth Day
- The development of many of the above programs and program tools are in part cost shared with other organizations and regulated entities capable of supplying funding and materials for wetland outreach efforts.

## Internal Training

- Department and WMD staff are provided frequent training opportunities. Some training initiatives include, but are not limited to:
  – Basic ERP permitting training for new hires
  – State 404 Program permit processing and compliance training
  – CAPS Discipline Training – basic compliance training for new hires
  – Webinars – varying topics including such things as identifying wetland plants, hydrographic reviews, sovereign submerged lands authorizations, how to conduct stormwater inspections, and other ERP permitting topics.
  – Cross-training – staff are encouraged and sometimes required to cross-train across Department programs. This helps to build the knowledge base of staff, assists staff in identifying issues that may affect other Department programs, and provides opportunities for staff to transfer into other programs, if desired.

Summary of Florida's Wetland and Other Surface Waters Regulatory Programs
Page 38

**External Training**
- The Department and the WMD training programs concentrate on building productive relationships with stakeholders by providing education and training on delineation of wetlands and implementation of the regulatory and proprietary rules.
- Staff regularly organize public workshops and invite appropriate stakeholders to attend (i.e., a dock permitting workshop targeted to dock contractors, a wetlands workshop targeted to consultants). Staff may also travel to professional, public, or private organizations to provide training upon request. Some of the Department's public workshops provide continuing education credits for registered professionals.
- All of the Department and WMD programs have developed websites with program information and publications concerning wetlands and surface water regulations. See "Guidebooks, Brochures, Websites, Other Educational Materials" below.

## COORDINATION

There is no one "wetland team" in Florida to guide or control all the programs that regulate, acquire, and manage Florida's wetlands. However, mechanisms are in place to foster communication on issues related to wetlands and other surface waters. These include
- The Department and the WMDs frequently coordinate on individual permitting actions;
- The Department and the WMDs meet approximately four times per year on statewide issues involving implementation and coordination of the environmental resource permit program;
- The Department and the WMDs meet frequently to discuss issues related to water use and water consumption, both of which may adversely affect wetland and other surface water levels and functions;
- The Department, WMDs, local governments, and the USACE meet frequently to discuss implementation and improvement of the SPGP and other state programmatic permits.
- The Department, FWC, and USFWS meet frequently to discuss issues related to ESA-listed species conservation and protection during State 404 Program permit reviews, and coordinate on training for Department permit review staff. A technical team between all three agencies will meet annually to monitor the coordination process and develop additional training or efficiency tools. This team would also provide opinions to Department permit review staff for projects that have wildlife issues or when there is a need to resolve disputes.

## CONTACTS

https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/contacts-submerged-lands-and

(b) Description of the State's Permitting, Administrative, Judicial Review, and
Other Applicable Procedures
(Required by 40 C.F.R. § 233.11(b))

## Purpose of Section (b)

The purpose of Section (b) is to provide the information required in 40 C.F.R. § 233.11(b), which states: *"The program description as required under §233.10 shall include: (b) A description of the State's permitting, administrative, judicial review, and other applicable procedures;"*

Section (b) does not include a description of compliance procedures, which can be found in section (g) of the program description.

## General Summary of Procedures

The State 404 Program requires authorization from the Department prior to conducting any regulated activities. The State 404 Program Rules (Chapter 62-331, F.A.C.), State 404 Program Applicant's Handbook (404 Handbook), and applicable memoranda of agreement or understanding (See section D and E of the package and section (j) of the program description) contain the regulations and procedures the Department will follow to administer the State 404 Program under Section 373.4146, F.S. The 404 Handbook is adopted and incorporated by Rule 62-331.010(5), F.A.C. The following information summarizes the procedures and processes. For a full, detailed description, consult the documents referenced above.

The State 404 Program provides three forms of authorization: verifications of exemption, general permits, and individual permits. The Department will implement the State 404 Program through its six district offices, and its Mining and Mitigation Program (MMP) and Mitigation Banking Program (MBP) in Tallahassee. The headquarters for State 404 Program located in Tallahassee under the Division of Water Resource Management, Submerged Lands and Environmental Resources Coordination (SLERC) program.

Applicants are encouraged to schedule a pre-application meeting to discuss the proposed activity with the Department and gain a better understanding of the application and permitting process. The applicant must submit an application to the district office, or Water Management District (WMD) office when the WMD processes the ERP, where the proposed activity will occur, or to the MMP or MBP in Tallahassee for mining projects and dredge and fill projects associated with mitigation banks. When a WMD receives the application, the WMD will immediately forward a copy of the application to the Department so the Department may process the State 404 Program application. Upon receipt, the application will be uploaded into Oculus, the Department's electronic document management system, and assigned to the staff member responsible for reviewing the project. The Department will follow the procedures detailed in Section 5.0 of the 404 Handbook to evaluate the application.

The Department will verify that the location of the proposed activity is within state assumed waters. If the proposed activity is located within retained waters, within five days of receipt, the Department will refer the applicant to the USACE and no further action on the 404 application will be taken by the Department. Should the USACE receive an application for an activity located within state-assumed waters, within five days of receipt, the USACE will refer the applicant to the Department and no further action on the 404 application will be taken by the USACE. The Department will also determine if the proposed activity may require Section 408 permission from USACE. A project that requires Section 408 permission will have an additional special condition included in the authorization that requires the permittee to receive 408

permission from the USACE prior to commencing the activity. (See the MOA between the Department and the USACE in section E of the package for further detail)

The Department will review the application to determine if all the necessary information is present to evaluate the proposed activity. Verification of delineations of wetlands and other surface waters and any Uniform Mitigation Assessment Method (UMAM) analysis will be performed by a staff member who has passed the Department's internal Certified Wetland Evaluator testing. If additional information is required a Request for Additional Information (RAI) will be sent to the applicant requesting the specific items that are needed or that require additional clarification. If the applicant does not provide a timely response to the RAI within the required timeframes (See the State 404 Handbook, section 5.0), the Department will inform the applicant that the regulated activity does not qualify for a general permit, or if the application is for an individual permit, the permit may be denied. After receiving the applicant's response to the RAI, the Department will have 30 days to determine if the information is sufficient to evaluate the application and advance to the next stage of the review process. When the application meets the conditions for issuance and has undergone any required public notice period or EPA review, the Department will make a final permitting decision on the proposed activity.

Most State 404 Program applications will also require Environmental Resource Permitting (ERP) authorizations established in Part IV of Chapter 373, F.S. Where both an ERP and a State 404 Program authorization are required for a regulated activity, an applicant must receive both authorizations prior to conducting the activity. The ERP authorization must be issued prior to or concurrent with the State 404 Program authorization to provide assurance that the project is in compliance with state water quality standards and the Coastal Zone Management Program (Rule 62-331.070, F.A.C.).

Interagency coordination with the State Historical Preservation Office (SHPO) and Tribal Historical Preservation Office (THPO), Florida Fish and Wildlife Conservation Commission (FWC), U.S. Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Water Management Districts (WMDs), and Environmental Protection Agency (EPA) will be conducted, as required, following the procedures described in their respective operating agreements (See sections D (DEP/EPA MOA) and E (DEP/USACE MOA) of the package and section (j) (DEP/FWC/FWS MOU and DEP/SHPO OA) of the program description) and section 5.2 of the 404 Handbook. A commenting agency may submit questions or comments for the Department to include in the RAI. A commenting agency may also provide comments to EPA and request EPA object to a proposed activity. The Department will forward the applicant's response to the RAI to each commenting agency for review, if applicable. Additional conditions may be included in the final authorization based upon the recommendation of a commenting agency to avoid or minimize potential adverse effects due to the project.

An individual permit is valid for a period not to exceed the time allowed under federal law. If the permittee has commenced construction but construction will not be completed before the authorization expires, the permittee may receive an administrative continuance of the authorization as long as the applicant submits an application for a new permit at least 180 days prior to the expiration of the authorization. Projects that are reasonably expected to take more than one phase to complete shall follow the long-term conceptual planning process described in Section 5.3.2 of the 404 Handbook. General permits are valid until 5 years from the date the general permit becomes effective in rule.

*Florida Department of Environmental Protection*
*Program Description, Section (b) – Description of the State's Procedures*

## Specific Permitting and Verification Procedures

## Verifications of Exemption

Review procedures for State 404 Program verifications of exemption are in Rule 62-331.040, F.A.C. The rule should be consulted for a detailed description of the process. The following is only a summary of the process:

Notification to the Department is not required to perform an activity that is exempt under subsection 62-331.020(1), F.A.C., unless the activity also requires an ERP authorization or notification under Chapter 62-330, F.A.C.

Rule 62-331.040, F.A.C., provides a procedure for review and agency action on exemption requests. If a person desires verification of qualification for an exemption they shall apply as described in subsections 62-330.050(2) and (3), F.A.C. An applicant shall submit the "Request for Verification of an Exemption" Form 62-330.050(1) (see section (f) of the program description). The verification of qualification to conduct an exempt activity is conducted as described in subsections 62-330.050(4) through (7), F.A.C. Where the information in the request is insufficient to determine if the activity is exempt, the Department will provide the applicant a RAI following the procedure previously described. The applicant is provided 60 days to respond to the RAI. The Department will consult with WMDs to ensure the exempt activity is part of on-going operations and is consistent with normal farming, silviculture or ranching practices. Within 30 days of receipt of the completed request or RAI, the Department will use the "Verification of Exemption" template (See section (f) of the program description) to notify the applicant whether the proposed activity is exempt from regulation.

## General Permits

Review procedures for State 404 Program general permits are in Rule 62-331.200, F.A.C. The rule should be consulted for a detailed description of the process. The following is only a summary of the process:

The general permits provided by the State 404 Program are adopted from the Nationwide permits (NWPs), and one Regional General Permit (RGP) currently offered by the USACE. Because they are modeled closely on the previously reviewed and authorized USACE general permits, they are presumed consistent with 404 (b)(1) guidelines. General permits authorize activities that, if conducted consistent with the permit requirements, will cause only minimal individual and cumulative adverse environmental effects. Compensatory mitigation shall be required, when necessary, to offset impacts authorized under a general permit, unless the general permit specifically states otherwise.

Some general permits do not require notification. Applicants that intend to use a no-notice general permit must coordinate with SHPO to determine if their property is eligible or potentially eligible for listing on the National Register of Historic Places. Notice is required if the property is listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places.

For general permits that require notification, the applicant will submit a "Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit" Form 62-330.402(1) (see section (f) of the program description) with the appropriate supporting information. The notice must be received by the Department at least 30 days prior to initiating the activities authorized by the general permit (or at such other time as specified in the general permit). Within five days of receipt of the notice, the Department will e-mail SHPO a hyperlink to the application (see DEP/SHPO OA in section (j) of the program description).

*Florida Department of Environmental Protection*
*Program Description, Section (b) – Description of the State's Procedures*

Within 30 days of receipt of the notice, the Department may send a "Does Not Qualify (DNQ) letter, which may include a RAI to notify the applicant if they do not qualify for a general permit or if additional information is required. The applicant is provided 60 days to respond to the letter. If the Department determines a project has potential to impact listed species or their habitat, the Department will coordinate with FWS and/or FWC to provide recommendations for project design modifications or permit conditions that will avoid or minimize impacts to the listed species or their habitats. For projects that occur within areas of tribal concern, the Department will consult with the tribe to avoid or minimize impacts to tribal resources.

If the Department determines the application meets the conditions for issuance, the applicant will receive a general permit authorizing the proposed activity. The Department will use the general permit template in section (f) of the program description for this purpose. Where the Department determines the application does not meet the conditions for issuance, the general permit will be denied, or the applicant may request that the application be processed as an individual permit.

## Individual Permits

Review procedures for State 404 Program individual permits are in Rule 62-331.052, F.A.C. The rule should be consulted for a detailed description of the process. The following is only a summary of the process:

The State 404 Program requires individual authorization for any regulated activity that does not qualify for a general permit or is not otherwise exempt. An applicant must submit the "Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands" Form 62-330.060(1) (see section (f) of the program description) along with any supporting information. The Department first evaluates the application to ensure the activity does not qualify for an exemption or general permit.

The Department will review the contents of the application to determine if the application is administratively complete. "Administratively complete" means the application contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C. "Technically complete" means an application where each application item is adequate to allow the Department to determine if the proposed project complies with the applicable requirements of Chapter 62-331, F.A.C. Once an application is technically complete, the Department is responsible for ensuring the proposed activity is consistent with the State 404 Program. In doing so, the Department will follow the sequence of review detailed in section 8.2 of the 404 Handbook to evaluate the individual permit application. This process will be followed for all individual permit applications, including those reviewed under section 5.3.2. of the 404 Handbook. A Technical Staff Report (TSR) will be completed by the Department to detail the deciding factors for issuing or denying an authorization. The TSR will include notes of field visits, photographs, and any additional relevant information that was relied upon to make the final permitting decision (see TSR template in section (f) of the program description). The Department will use a RAI to inform the applicant of any deficiencies that cause the application to be administratively or technically incomplete. The applicant is provided 90 days to respond to the RAI.

## Public Notice

Public notice provisions may be found in Rule 62-331.060, F.A.C, and section 5.3.1 of the 404 Handbook. Public notices will comply with all requirements therein, even for those projects being reviewed under section 5.3.2 of the Handbook and noticed under paragraph 62-331.060(8), F.A.C. The rule and handbook should be consulted for a detailed description of the public notice procedures. The following is a summary:

*Florida Department of Environmental Protection*
*Program Description, Section (b) – Description of the State's Procedures*

Within 10 days of the determination the application is administratively complete the Department will publish the public notice. The public notice requirements are detailed in section 5.3.1 of the 404 Handbook and Rule 62-331.060, F.A.C.

Copies of the public notice will be distributed to the relevant and appropriate parties and commenting agencies. The distribution list may include: applicant, owners of adjoining properties, interested parties, EPA, SHPO, FWS, FWC, federally recognized tribes, or an adjacent state (Alabama or Georgia). The public notice will also be published on the Department's website. Following publication of the public notice there shall be a public comment period of 15 days for certain small projects, or 30 days. The Department will review all comments received from the public or commenting agencies and may, when necessary, send a RAI to ask the applicant to address concerns introduced in the public comment period. During the public comment period, any of the commenting agencies may recommend conditions or project modifications that would reduce or eliminate adverse effects of the proposed activity.

## Public Meeting and Public Comment

A public meeting may be held on the proposed activity at the discretion of the Department, when requested by the public, or where there is significant public interest. The public meeting will be scheduled at least 30 days after publishing the public notice. The Department will provide notice of a public meeting at least 30 days prior to the scheduled public meeting. When a public meeting is held the public comment period will be extended until the end of the meeting.

## EPA Review

EPA review procedures are described in Rule 62-331.052, F.A.C. and in the DEP/EPA MOA in section D of the package. The rule and MOA should be consulted for a detailed description of the process. The following is a summary:

The Department will provide EPA with the public notice for federal review of the proposed activity. EPA may choose to comment, condition, or object to the proposed activity. Within 30 days of receipt of the public notice, EPA may notify the Department of its intent to comment on the proposed activity. If EPA does not notify the Department of an intent to comment the Department will make a final permit decision to issue or deny the permit 60 days after the end of the public comment period and after the application is technically complete.

Where EPA notifies the Department of an intent to comment the Department will provide EPA 90 days to comment on the proposed activity. When necessary, the Department may use a RAI to communicate any of EPA's comments or concerns with the applicant. The Department will make a final agency action to issue or deny the permit after receiving EPA's comments (and RAI response) and the application is technically complete.

EPA may also choose to condition or object to the proposed activity. When necessary, the Department may provide a RAI to the applicant regarding EPA's conditions or to address an objection. The Department may choose to add EPA's conditions and make a final permitting decision to issue or deny the permit within 90 days of receipt of the objection or condition.

The Department or any interested party may request EPA hold a public meeting within 90 days after receipt of EPA's conditions or objections. EPA will hold a public meeting if requested by the Department or there is significant public interest. If EPA does not hold a public meeting, the Department will make a final permitting decision to issue or deny the permit within 90 days of receipt of the conditions or objections. The Department must notify EPA of its intent to deny the permit prior to a final action.

*Florida Department of Environmental Protection*
*Program Description, Section (b) – Description of the State's Procedures*

In circumstances where EPA holds a public meeting. EPA will notify the Department of its decision to affirm, modify, or withdraw the conditions or objection following the public meeting. The Department will have 30 days after EPA gives notice of its decision to make a final permitting decision. The Department may add the terms and conditions and make a final permitting decision to issue or deny the permit or take no action.

The Department will issue an individual permit using the template in section (f) of the program description to notify the applicant the proposed activity is authorized. An individual permit becomes effective when it is signed by the Department and the applicant. If the Department elects to take no action on the application, the Department will notify the applicant and EPA of the intent to take no action and EPA may choose to federalize the project, sending it to the USACE for review. When the Department chooses to deny the authorization or EPA's objections are not resolved, the Department will notify EPA of its intent to deny and the applicant will be notified of the reason for the denial using the template in section (f) of the program description. The denial will include directions for the applicant to appeal the agency decision.

## Administrative and Judicial Review

The Department is required to follow procedural statutes and rules to review and act on applications and notices, and to provide a point of entry with respect to agency actions. The applicable statutes and rules include: Chapter 120, F.S., (Florida Administrative Procedures Act), Chapter 28-106 (Uniform Rules of Procedure), and Chapter 62-110, F.A.C. (Department's Exceptions to the Uniform Rules of Procedure.

After processing a permit application, the Department may require a permit applicant to publish a Notice of Proposed Agency Action on Permit Application. The notice must comply with the requirements for format, content, and publication set forth in Rule 62-110.106(7), F.A.C. The applicable timelines for the filing of a petition for administrative hearing following "Receipt of Notice of Agency Action" are set forth in Rule 62-110.106(3), F.A.C. The term "Receipt of Notice of Agency Action" is defined in Rule 62-110.106(2), F.A.C.

Rule 28-106.201(1), F.A.C., provides the initiation of an administrative proceeding shall be made by written petition to the agency responsible for rendering final agency action. A petition for hearing must include all of those items required by Rule 28-106.201(2), F.A.C. If the petition contains all of the required information, the petition may be referred to the Division of Administrative Hearings (DOAH) for the assignment of an administrative law judge (ALJ). Section 120.569(2)(d), F.S.

Section 120.569(1), F.S, applies in any proceeding in which the substantial interests of a party are determined by the Department. Section 120.57(1), F.S., sets forth additional procedures applicable to hearings involving disputed issues of material fact. The ALJ has the power to swear witnesses and take testimony under oath, to issue subpoenas, and to effect discovery on the written request of any party by the manner provided under the Florida Rules of Civil Procedure. Section 120.569(2)(j), F.S. All parties shall have an opportunity to respond, to present evidence, to conduct cross-examination and submit rebuttal evidence, to submit proposed findings of facts and orders, to file exceptions to the presiding officer's recommended order, and to be represented by counsel or other qualified representative. Section 120.57(1)(b), F.S.

The ALJ submits to the Department a recommended order consisting of findings of fact, conclusions of law, and a recommended disposition. All proceedings conducted under this subsection shall be de novo. The Department allows each party 15 days in which to submit written exceptions to the recommended

*Florida Department of Environmental Protection*
*Program Description, Section (b) – Description of the State's Procedures*

order. With limited exceptions, the Department's final order must include an explicit ruling on each exception. Section 120.57(1)(k), F.S.

The Department may adopt the recommended order as the final order of the agency. Subject to certain limitations, the Department may reject or modify the conclusions of law over which it has substantive jurisdiction and interpretation of administrative rules over which it has substantive jurisdiction. The agency may not reject or modify the findings of fact unless the agency first determines from a review of the entire record that the findings of fact were not based upon competent substantial evidence. Section 120.57(1)(l), F.S.

A party who is adversely affected by final agency action is entitled to judicial review. Section 120.68(1)(a), F.S. Appellate proceedings are instituted by filing a notice of appeal or petition for review in accordance with the Florida Rules of Appellate Procedure within 30 days after the rendition of the order being appealed. The filing of the petition does not itself stay enforcement of the agency decision; however, the agency also may grant a stay upon appropriate terms. Section 120.68(3) F.S.

(c) Description of the Basic Organization and Structure of the Florida
Department of Environmental Protection, which will have Responsibility for
Administering the State 404 Program
(Required by 40 C.F.R. § 233.11(c))

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*

## Purpose of Section (c)

The purpose of Section (c) is to provide the information required in 40 C.F.R. § 233.11(c), which states: "The program description as required under §233.10 shall include: (c) A description of the basic organization and structure of the State agency (agencies) which will have responsibility for administering the program. If more than one State agency is responsible for the administration of the program, the description shall address the responsibilities of each agency and how the agencies intend to coordinate administration and evaluation of the program;"

## The Department

The Florida Department of Environmental Protection (Department) is the state's lead agency for environmental management and stewardship, protecting our air, water and land. The Department is led by a Secretary. The Department is divided into three primary areas, each headed by a Deputy Secretary:

- **Land and Recreation** programs acquire and protect lands for preservation and recreation. DEP oversees 175 state parks and trails and more than 12 million acres of public lands and 4 million acres of coastal uplands and submerged lands.

- **Regulatory** programs safeguard natural resources by overseeing permitting and compliance activities that protect air and water quality and manage waste cleanups. The State 404 Program will be a regulatory program.

- **Ecosystem Restoration** programs protect and improve water quality and aquatic resources including America's Everglades, Florida's iconic springs and Florida's world-renowned coastal resources. DEP works with communities, local governments and other agencies to protect and restore water quality and supply and to provide funding assistance for water restoration and infrastructure projects, as well as coordinates the protection of Florida's submerged lands and coastal areas.

## Regulatory Programs

Each regulatory program is headed by a Director. The Department's regulatory programs include:

- The Division of Air Resource Management protects and manages Florida's air resource, including air quality monitoring, permitting and compliance of emission sources.

- The Division of Water Resource Management implements state laws that protect the quality of Florida's water, rivers, lakes, estuaries and wetlands, and preservation of the state's beach and dune systems. The State 404 Program will be under this Division.

- The Division of Waste Management works to protect the environment from the improper handling and disposal of solid and hazardous wastes.

- The Florida Geological Survey collects, interprets and provides information about Florida's water, mineral and energy resources.

- The Office of Emergency Response works to assess and minimize threats to the environment.

- Six regulatory district offices review permit applications, conduct inspections of permitted facilities, and conduct compliance assistance and enforcement activities. The State 404 Program

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*

will be implemented through the district offices, led by the Division of Water Resource
Management.

## The Division

The State 404 Program will be under the Division of Water Resource Management (DWRM). The
Division is led by a Director.

The Division of Water Resource Management (division) is responsible for implementing state laws
providing for the protection of the quality of Florida's drinking water, ground water, rivers, lakes,
estuaries, and wetlands; reclamation of mined lands; and the preservation of the State's beach and dune
systems. The division is the central point of contact for Florida's federally delegated water programs such
as National Pollutant Discharge Elimination Systems (NPDES), Drinking Water, and Underground
Injection Control (UIC).

The division consists of sixteen programs overseen by the Division Director, two Deputy Division
Directors, a Manager of Executive Services, and a Support Services Director. Each program is led by a
Program Administrator. These programs perform water facilities regulation, beach permitting and
management, wetland and surface water permitting, and operational support services and functions. Two
additional programs within the division (Mining and Mitigation and Oil and Gas) report directly to the
Deputy Secretary for Regulatory Programs. Most division staff are located in Tallahassee; however, the
Mining & Reclamation and Oil & Gas programs have staff operating in satellite offices throughout the
state.

The division's funding comes from seven trust funds: Federal Grants, Land Acquisition, Minerals, Non-
mandatory Land Reclamation, Florida Permit Fee, and Water Quality Assurance. The division also
receives federal funding from the U.S. Environmental Protection Agency (EPA) through the following
grants: 106 Water Pollution Control, State Public Water System, and State Underground Water Source
Protection. Revenue from the Permit Fee Trust Fund and the Water Quality Assurance Trust Fund are
derived from various sources such as NPDES Stormwater permits, Wastewater permits, Drinking Water
fees, Beach Construction permits, and Operator Certification fees.

The division continues to work toward safeguarding Florida's water resources and enhancing natural
systems through partnering with local communities and providing a more certain, consistent, and effective
regulatory process.

The State 404 Program will be led by the Submerged Lands and Environmental Resources Coordination
Program (SLERC) within the Division. SLERC is led by a Program Administrator.

## The Program

SLERC is responsible for the consistent implementation of the Environmental Resource Permitting
program (ERP) and will also be responsible for consistent implementation of the State 404 Program,
statewide. SLERC provides rule interpretation, guidance, and is responsible for auditing the ERP and
State 404 permits and compliance actions produced by the six regulatory districts.

The ERP program regulates activities in, on or over surface waters or wetlands, as well as any activity
involving the alteration of surface water flows. This includes new activities in uplands that generate
stormwater runoff from upland construction, as well as dredging and filling in wetlands and other surface
waters. ERP applications are processed by either the department or one of the state's water management
districts, in accordance with the division of responsibilities specified in operating agreements between the
department and the water management districts. The ERP Program is in effect throughout the state.

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*

The State 404 Program is based heavily on the dredge and fill permitting aspects of the ERP program, with additional requirements added to comply with the requirements of Section 404 of the Clean Water Act. The State 404 Program regulates dredge and fill activities within state-assumed waters. The State 404 Program will be in effect within state-assumed waters throughout the state. The US Army Corps of Engineers (USACE) retains responsibility for dredge and fill permitting under Section 404 of the Clean Water act within retained waters. See the State 404 Program Applicant's Handbook, Section 2.0 for the definitions of state-assumed and retained waters.

## The Six Regulatory District Offices

The State 404 Program will be implemented by the six regulatory district offices and the Mining and Mitigation Program (MMP) and Mitigation Banking Program (MBP) with SLERC's oversight. The district offices are located regionally throughout the state (Figure (c)-1). MMP and MBP are located in Tallahassee. The district offices, MMP, and MMB review permit applications, conduct inspections of permitted facilities, respond to reports of environmental damage and conduct compliance assistance and enforcement activities. Each district office is led by a District Director. The permitting programs in the districts are led by a Permitting Program Administrator, and the compliance programs are led by the Assistant District Directors.



*Figure (c)-1: Boundaries of the six Department regulatory district offices.*

The current ERP permitting and compliance staff within the district offices, MMP, and MBP will also be responsible for reviewing State 404 Program permit applications and compliance actions.

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*

## Typical Organizational Charts

Figure (c)-2 is a typical organization chart for the Department, focusing on the Division of Water Resource Management, MMP, and SLERC (including MBP). The most current Department organizational chart may be viewed at: https://floridadep.gov/org-chart.

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*



*Figure (c)-2: Typical division organizational chart.*

*Florida Department of Environmental Protection*
*Program Description, Section (c) – Basic Organization and Structure of the Department*

Figure (c)-3 depicts the typical structure of a regulatory district office, focusing on ERP/State 404 Program staff. The most current organization charts for each district may be viewed on each district office website.



*Figure (c)-3: Typical district office organizational structure.*

(d) Description of the Funding and Person-Power Which Will Be Available
for Program Administration
(Required by 40 C.F.R. § 233.11(d))

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

## Purpose of Section (d)

The purpose of Section (d) is to provide the information required in 40 C.F.R. § 233.11(d), which states: *"A description of the funding and manpower which will be available for program administration;"*

# Introduction

The Department intends to create and administer the State 404 Program using existing resources. This is largely possible because Florida already administers the comprehensive state Environmental Resource Permitting (ERP) Program, which includes permitting dredge and fill activities. The Department estimates that review requirements of the existing ERP program overlap with the federal Clean Water Act (CWA) Section 404 permitting program approximately 85%.

The ERP program is staffed with permit processors, compliance processors, and support professionals that are experts in or familiar with the subject matter required for effective review of applications under Section 404 of the Clean Water Act. The Department plans to have 229 staff working on ERP and the State 404 Program throughout the Division (Headquarters) and district offices including planning/training/support, administrative, permit processors, and compliance staff with a total annual salary and benefits of approximately $15,182,822.00. These positions are funded through various trust funds, shown in Tables (d)-1 and (d)-2. A breakdown of the number and responsibilities of staff in the Division and each district office are shown in the State 404 Program Person-Power section, below.

The Department conducted an assessment to determine approximately how many existing Department staff would need to be reallocated or re-trained to effectively handle the additional workload associated with the approximately 15% of tasks that do not overlap with the ERP program. The expected number of section 404 permits statewide was calculated using USACE permitting data in Florida for the past 5 years and a draft GIS layer of retained waters, prepared by the USACE. The number of expected permits and additional task time were considered together to determine the number of staff to be reallocated or re-trained. The results of the assessment are included in section (e) of the program description. Considerations for calculation of additional task time included coordination with WMDs when the WMD reviews the ERP permit; review categories unique to the State 404 Program (See section 8.3. of the State 404 Program Applicant's Handbook); public notice requirements; additional coordination for listed species, historical and tribal resources, and delineation of wetlands and other surface waters; and quality control auditing of permit or compliance files and wetland and other surface water delineations/jurisdictional determinations. These positions are currently funded, and the typical amount of resources to be reallocated are shown in Table (d)-3, below.

## Staff Funding

The Department has 211 existing staff currently working in the ERP program and plans to redirect existing positions and staff time as necessary to accomplish the State 404 Program. The Department plans to have a total of 229 staff once 18 positions are reallocated for the State 404 Program.

### District Office Funding Sources

The Department has six district offices. Staff include administrative, permit processors, and compliance processors. Staff salaries and benefits are funded through the following sources:

| Funding Source | Amount | # Staff Supported (Salaries and Benefits) |
|---|---|---|
| Administrative Trust Fund | $467,467.40 | 8 |
| Air Pollution Control Trust Fund | $1,035,409.72 | 14 |
| Air Pollution Trust Fund | $195,744.63 | 3 |
| Coastal Protection Trust Fund | $49,250.64 | 1 |
| Federal Grants Trust Fund | $251,277.60 | 5 |
| General Revenue Fund | $96,243.36 | 2 |
| Inland Protection Trust Fund | $311,426.81 | 5 |
| Internal Improvement Trust Fund | $372,304.26 | 7 |
| Land Acquisition Trust Fund | $4,671,579.07 | 72 |
| Permit Fee Trust Fund | $1,985,667.48 | 32 |
| Solid Waste Management | $236,682.16 | 4 |
| Solid Waste Trust Fund | $162,961.24 | 3 |
| Water Quality Assurance Trust Fund | $1,079,320.58 | 15 |
| Water Quality Trust Fund | $94,474.94 | 2 |
| **Total** | **$11,009,809.80** | **173** |

*Table (d)-1: Funding sources for district office staff salaries and benefits.*

## Division Office Funding Sources

The Department has a Division office in Tallahassee (Division of Water Resource Management, DWRM). Supported Division programs include the Submerged Lands and Environmental Resources Coordination Program (ERP and 404 training, rulemaking, mitigation banking, and auditing); Mining and Mitigation Program; and the Engineering, Hydrology, and Geology Program. Staff include administration, training/delineation/auditing/, ERP/404 support, permit processors, and compliance. Staff salaries and benefits are funded through the following sources:

| Funding Source | Amount | # Staff Supported (Salaries and Benefits) |
|---|---|---|
| Federal Grants Trust Fund | $336,445 | 5 |
| Florida Permit Fee Trust Fund | $73,534 | 1 |
| Land Acquisition Trust Fund | $518,244 | 6 |
| Minerals Trust Fund | $1,122,634 | 15 |
| Nonmandatory Land Recreation Trust Fund | $474,368 | 6 |
| Permit Fee Trust Fund | $76,575 | 1 |
| Water Quality Assurance Trust Fund | $309,286 | 4 |
| **Total** | **$2,911,086** | **38** |

*Table (d)-2: Funding sources for Division office staff salaries and benefits*

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

## Resources to be Reallocated to the State 404 Program

These positions will be reallocated from elsewhere in the Department based on the workload analysis in section (e) of the program description. Operating expenses include: office space, office furniture, office supplies, computer hardware/software, and travel.

| Position Type | Districts | | | | | | Division | | Statewide |
|---|---|---|---|---|---|---|---|---|---|
| | Northwest | Northeast | Central | Southeast | Southwest | South | Mining | SLERC | |
| ES I | 1 | 1 | 2 | 1 | 1 | 1 | 1 | | 9 |
| Salary | $34,822 | $34,822 | $69,644 | $34,822 | $34,822 | $34,822 | $34,822 | | $313,398 |
| Benefits | $24,128 | $24,128 | $48,256 | $24,128 | $24,128 | $24,128 | $24,128 | | $217,152 |
| Operating Exp. | $4,500 | $4,500 | $9,000 | $4,500 | $4,500 | $4,500 | $4,500 | | $40,500 |
| ES III | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 8 |
| Salary | $45,321 | $45,321 | $45,321 | $45,321 | $45,321 | $45,321 | $45,321 | $45,321 | $362,568 |
| Benefits | $25,820 | $25,820 | $25,820 | $25,820 | $25,820 | $25,820 | $25,820 | $25,820 | $206,560 |
| Operating Exp. | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $36,000 |
| EC | 0 | 0 | 0 | 0 | | | 0 | 1 | 1 |
| Salary | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 54,025 | $54,025 |
| Benefits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 27,224 | $27,224 |
| Operating Exp. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,500 | $4,500 |
| Total Positions | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 3 | 18 |
| Salary | $80,143 | $80,143 | $114,965 | $80,143 | $80,143 | $80,143 | $80,143 | $134,168 | $729,991 |
| Benefits | $49,948 | $49,948 | $74,076 | $49,948 | $49,948 | $49,948 | $49,948 | $77,172 | $450,936 |
| Operating Exp. | $9,000 | $9,000 | $13,500 | $9,000 | $9,000 | $9,000 | $9,000 | $13,500 | $81,000 |
| Sum | $139,091 | $139,091 | $202,541 | $139,091 | $139,091 | $139,091 | $139,091 | $224,840 | $1,261,927 |

*Table (d)-3: Estimated resources to be reallocated to the State 404 Program*

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

## State 404 Program Person-Power

Staffing structure and functions related to ERP and State 404 Program permitting and compliance is illustrated below. For a detailed workload analysis, see section (e) of the program description.

Division

Submerged Lands and Environmental Resources Coordination (SLERC) Program

The Submerged Lands and Environmental Resource Coordination program (SLERC) is responsible for the consistent implementation of the Environmental Resource Program and State 404 Program statewide. SLERC has two program sections – 1) ERP/404 Training, Coordination, and Rulemaking, and 2) Mitigation Banking (MBP). SLERC will have 18 staff with the following duties:

1 Administrative

3 Management

4 Mitigation Bank Processing and compliance

8 Regulatory and Delineation training, coordination, and consistency

2 Auditing assistants


Mining and Mitigation Program (MMP)

Between 2014 and 2019, the Mining and Mitigation Program processed an average of 6 ERP individual permits, 8 ERP major modifications (mining major modifications are typically the same effort as an individual permit), 1 ERP conceptual approval permit, 4 ERP general permits, and 3 ERP exemption verifications per year. It is estimated that this program will process approximately  21 State 404 Program Individual permits per year. The program will have 18 staff that will perform ERP/404 functions, as follows:

1 Administrative

3 Management

14 Permit processing and compliance

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

Engineering, Hydrology, and Geology (EHG)

The Engineering, Hydrology, and Geology program provides scientific and engineering support services to DEP's division and district office permitting programs as needed. They assist with development engineering and stormwater reviews, mining permits, hydrographic reviews, sediment transport analysis, and water quality and quantity concerns. EHG staff that assist with ERP/404 – related topics include:

1 Management

2 Stormwater engineers

2 Geologists/Hydrologists

1 Hydrologist/Hydrographic engineer

1 State dam safety officer

## Districts

The Department's district offices will process and enforce the majority of State 404 Permits, the only exceptions being that mining permits will be processed by the MMP in Tallahassee, and dredge and fill permits associated with mitigation bank will be processed by MBP under SLERC. This section contains a breakdown of staff that will be responsible for permitting and compliance functions by district. More detailed information about the workload analysis can be viewed in section (e) of the program description.

Central District

Between 2014 and 2019, the Central District processed an average of 113 ERP individual permits, 1 ERP conceptual approval permit, 134 ERP general permits, and 89 ERP exemption verifications per year. It is estimated that this district will process approximately 48 State 404 Individual permits, and 112 State 404 general permits per year. The Central District has an administrative staff pool that clerks and processes permit-related correspondence for all of the district offices. The district will have 39 staff that will perform ERP/404 functions, as follows:

2 Administrative managers

13 Administrative staff

2 Permitting managers

10 Permit processors

2 Compliance managers

10 Compliance staff working on ERP and other program compliance

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

Northeast District

Between 2014 and 2019, the Northeast District processed an average of 140 ERP individual permits, 0 ERP conceptual approval permits, 124 ERP general permits, 137 ERP exemption verifications, and 3 ERP major modifications per year. It is estimated that this district will process approximately 37 State 404 Individual permits, and 80 State 404 general permits per year. The district will have 30 staff that will perform ERP/404 functions, as follows:

1 Administrative staff

2 Permitting managers

18 Permit processors (11 of these process ERP/404 and other program permits, 7 are dedicated to ERP/404)

7 Permitting and compliance processors (These staff process both permits and compliance actions)

2 Compliance managers


Northwest District

Between 2014 and 2019, the Northwest District processed an average of 206 ERP individual permits, 2 ERP conceptual approval permits, 129 ERP general permits, 319 ERP exemption verifications, 10 ERP major modifications per year. It is estimated that this district will process approximately 25 State 404 Individual permits and 92 State 404 general permits per year. The district will have 28 staff that will perform ERP/404 functions, as follows:

5 Administrative staff that work on ERP/404 and other programs

1 Permitting managers

14 Permit processors

1 Compliance managers

7 Compliance staff working on ERP/404 and other program compliance


South District

Between 2014 and 2019, the South District processed an average of 223 ERP individual permits, 0 ERP conceptual approval permits, 198 ERP general permits, 2,180 ERP exemption verifications, and 11 ERP major modifications per year. It is estimated that this district will process approximately 32 State 404 Individual permits, and 98 State 404 general permits per year. The district will have 38 staff that will perform ERP/404 functions, as follows:

*Florida Department of Environmental Protection*
*Program Description, Section (d) – Funding and Person-Power*

7 Administrative staff that work on ERP/404 and other programs

6 Permitting and compliance managers

25 Permitting and compliance processors

## Southeast District

Between 2014 and 2019, the Southeast District processed an average of 114 ERP individual permits, 1 ERP conceptual approval permits, 148 ERP general permits, 1,380 ERP exemption verifications, and 18 ERP major modifications per year. It is estimated that this district will process approximately 54 State 404 Individual permits, and 68 State 404 general permits per year. The district will have 27 staff that will perform ERP/404 functions, as follows:

4 Administrative staff

4 Permitting managers

12 Permit processors

2 Compliance managers

5 Compliance processors

## Southwest District

Between 2014 and 2019, the Southwest District processed an average of 71 ERP individual permits, 1 ERP conceptual approval permit, 167 ERP general permits, 348 ERP exemption verifications, and 8 ERP major modifications per year. It is estimated that this district will process approximately 29 State 404 Individual permits, and 94 State 404 general permits per year. The district will have 24 staff that will perform ERP/404 functions, as follows:

2 Permitting managers

1 Compliance manager

1 Permitting/compliance manager

11 Compliance processors

9 Permit processors

*Florida Department of Environmental Protection*
*Program Description, Section (f) – Forms*

(f) Copies of Permit Application Forms, Permit Forms, and Reporting Forms
(Required by 40 C.F.R. § 233.11(f))

*Florida Department of Environmental Protection*
*Program Description, Section (f) – Forms*

## Purpose of Section (f)

The purpose of Section (f) is to provide the information required in 40 C.F.R. § 233.11(f), which states: *"Copies of permit application forms, permit forms, and reporting forms;"*

The following is a list of forms included as attachments to this section.:

This section includes:

| Form Name | Purpose |
|---|---|
| Application Forms | |
| 62-330_050_req_verify_exemption_404 | An applicant may use the verification of exemption from to request the Department verify an activity is exempt from regulation under the State 404 program. |
| 62-330_060_sec_a_app_404 | The State 404 Program Individual Permit application, section a. |
| 62-330_060_sec_b_singlefam_404 | The State 404 Program Individual Permit application, section b. |
| 62-330_060_sec_c_wetlands_404 | The State 404 Program Individual Permit application, section c. |
| 62-330_060_sec_d_not_sf_404 | The State 404 Program Individual Permit application, section d. |
| 62-330_060_sec_e_swm_404 | The State 404 Program Individual Permit application, section e. |
| 62-330_060_sec_f_ssl_404 | The State 404 Program Individual Permit application, section f. |
| 62-330_060_sec_g_mit_404 | The State 404 Program Individual Permit application, section g. |
| 62-330_060_sec_h_mines_404 | The State 404 Program Individual Permit application, section h. |
| 62-330_060_sec_i_app_404_2-4-2020 | The State 404 Program Individual Permit application, section i. |
| 62-330_201_2_jd_request_404 | An applicant may use this form to request a formal jurisdictional determination. |
| 62-330_402_1_gp_notice_form_404 | An applicant for a general permit will use the Notice of Intent to use a General Permit form to receive the Department's authorization. |
| Other Forms | |
| 62-330_340_1_req_xfer_permit_404 | A permittee will use this form to transfer an individual permit upon a change in ownership or control of the property. |
| 62-331.100_1_GP_Transfer_Form | A permittee will use this form to transfer a general permit upon a change in ownership or control of the property. |
| 62-331.200_1_GP_compliance_form | A permittee will use this form to certify compliance with the requirements of the |

|  |  |
|---|---|
|  | general permit within 30 days of completion of the authorized activity |
| 62-331_110_1_emergency_field_authorization | An entity requesting authorization to abate an emergency condition will use this form. |
| 62-331_248_1_As_Built_Form | An entity performing activities authorized by the general permit in 62-331.248, F.A.C., must provide this form within 60 days of completion of the authorized work along with as-built engineering drawings. |
| 62-340DataForm_Aug2019 | The Department will use this form to document the presence or absence of wetlands or surface waters. |

| Permit Templates | |
|---|---|
| 404_GP | The Department will use this template to provide authorization for general permits. |
| 404_GP_does_not_qualify | The Department will use this template to notify applicants an activity does not qualify for authorization under a general permit. |
| 404_Indv_Sep | The Department will use this template to provide authorization for Individual Permits. |
| 404_only_exempt_template | The Department will use this template to notify applicants if an activity is exempt from regulation under the State 404 Program. |
| 404_Program_T_S_R | The Department will use this template to document findings in support of the final agency decision. |

| Other Templates | |
|---|---|
| Permit Public Notice Template | The Department will use this template to put an individual permit application out on public notice. |
| Enforcement Public Notice Template | The Department will use this template to provide public notice for any proposed settlement of a State 404 Program enforcement action. |

# Request for Verification of an Exemption

**Instructions**: This form is used to request verification whether an activity qualifies for an exemption from the Environmental Resource Permit (ERP) requirements of Sections 373.406 or 403.813(1) of the Florida Statutes (F.S.) and Rule 62-330.051 of the Florida Administrative Code (F.A.C.); and from the State 404 Program requirements of Rule 62-331, F.A.C. Alternatively, you can use the on-line self-certification site of the applicable Agency for activities that qualify for a self-certification (see below).

Notice is **not required** to conduct most exempt activities However, verification of such qualification is helpful for the following reasons:

- Certain projects in retained waters may qualify for the State Programmatic General Permit (SPGP). If the project qualifies for and receives SPGP authorization, you do not need to apply separately to the Corps; and
- To provide assurance to persons who are unsure whether the requested work qualifies for an exemption. If it does not, the information provided will expedite the process of applying for the applicable ERP and/or State 404 Program permit.

Prior notice to the Agency **is required** before conducting one or more of the following:

- Activities having minimal impact under Section 373.406(6), F.S., often referred to as a "*de minimis*" exemption.
- Maintenance dredging under Section 403.813(1)(f), F.S., and paragraph 62-330.050(7)(a), F.A.C., when the dredging is within previously dredged portions of natural water bodies within drainage rights-of-way or drainage easements which have been recorded in the public records of the county.
- The repair, stabilization, or paving of existing county-maintained roads and the repair or replacement of bridges that are part of the roadway under Section 403.813(1)(t), F.S., and paragraph 62-330.050(4)(e), F.A.C.
- Removal by an individual, residential property owner of organic detrital material from freshwater rivers or lakes that have a natural sand or rocky substrate and that are not located in an Aquatic Preserve under Section 403.813(1)(u), F.S., and paragraph 62-330.050(3)(b), F.A.C.
- Maintenance dredging at seaports under Section 403.813(3), F.S., and paragraph 62-330.050(7)(g), F.A.C.
- Minor silvicultural surface water management systems under Rule 62-330.0511, F.A.C. (Note—do not use THIS form for that notice; instead use the procedures in Rule 62-330.0511, F.A.C.)
- Dry borrow pits of less than five acres located entirely in uplands in accordance with subsection 62-330.051(16), F.A.C.

Exempt activities on state-owned submerged lands (SSL), other than those excepted in paragraph 18-21.0051(1)(a), F.A.C., must also be authorized by the Board of Trustees of the Internal Improvement Trust Fund (BOT). Authorization to use SSL is not linked with regulatory exemptions; therefore, it is possible to qualify for a regulatory exemption, yet not be authorized to conduct the activity until the separate SSL authorization is granted. If an activity may be located in, on, or over SSL, we recommend completing Section F of the Environmental Resource Permit Application form.

Requests to "self-certify" a private, single-family dock or a boat lift associated with such a dock must be submitted to the Department's Internet site at: http://www.fldepportal.com/go/ and CANNOT be made using this form. However, requests to verify construction of a dock or boat lift that does not qualify for self-certification may be made using this form.

Any submittal requesting verification of an exemption must also include:

- Location map(s) of sufficient detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity.
- One set of plans and drawings, calculations, environmental information, and other supporting documents that clearly and legibly depict and describe the proposed activities in sufficient detail to demonstrate that the work qualifies for the exemption.
- The required fee.

     

**We recommend contacting your local Corps district office if your project is not within state-assumed waters regulated under Chapter 62-331, F.A.C., does not qualify for the State Programmatic General Permit (SPGP), and you are not sure whether the project requires separate Corps authorization. If Corps authorization is required, you will need to submit the appropriate federal application form separately to the Corps. Corps contact information may be found online in the Jacksonville District Regulatory Division website.**

**Please identify the exemption(s) you are requesting to use:**

☐ Subsection/Paragraph 62-330.        (        ), F.A.C.
☐ Section 373.406(6), F.S. (known as the "*de minimis*" exemption — see section 3.2.7(c) of Applicant's Handbook Volume I for additional information)
☐ Section 373.406(        ), F.S.
☐ Section 373.4145(6)(        ), F.S. (for certain "grandfathered" activities in the Panhandle of Florida)
☐ Section 403.813(1)(        ), F.S. (generally, "dredge and fill" exemptions)
☐ 40 CFR § 232.3(c)(        ) (State 404 Program exemptions incorporated in 62-331.020, F.A.C.)
☐ I do not know the exemption number

Please provide numbers for additional or other exemptions if you are requesting to use more than one in one of the above list categories:

## *Part 1: General Information*

### A.  Contact

Last Name:                          First Name:                          Middle:

Title:              Company:

Address:

City:              State:                          Zip:

Home Telephone:                          Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:☐

### B.  Land Owner(s) (if different or in addition to contact identified above)

Last Name:                          First Name:                          Middle:

Title:              Company:

Address:

City:              State:                          Zip:

Home Telephone:                          Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail:☐

**C.   Consultant/Agent (if different or in addition to contact identified above)**

Last Name:                              First Name:                        Middle:

Title:            Company:

Address:

City:              State:                          Zip:

Home Telephone:                        Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail:☐

**D.   Location of Proposed Activities**

Tax Parcel Identification Number:

Address:

City:                County:                        Zip:

Latitude (DMS)        °         '         "        Longitude (DMS)        °        '         "

**E.   Name of Project** (if there is one):

**F.   Date Activity is Proposed:**        To Commence:                To be Completed:

**G.   Proposed Activities** (be specific; use additional sheets as necessary)

Describe in general terms the proposed project, system, or activity (including materials to be used and construction methods), and means of accessing the property (for construction, maintenance, and inspections, including any need for an access easement):

**H.   Is any work proposed in wetlands or other surface waters?** ☐ Yes  ☐ No. If yes, please specifically describe, with specific references as to how the limits of the proposed work will comply with the terms and conditions of the above exemption:

**I.**   Please provide a description of all **sediment and erosion controls** to be used during the completion of this activity (such as use of turbidity screens and silt fences):

## *Part 2: Acknowledgement*

I understand this form is being provided solely to seek verification of qualification to use one or more Environmental Resource Permit (ERP) and/or State 404 Program exemption(s), and that I am NOT requesting the Agency to process this form as an application for a permit.

☐ **By checking this box**, I hereby waive, in accordance with Rule 62-330.050(10), F.A.C., the 30-day deadline for issuance of the verification set forth in Rule 62-330.050(4), F.A.C. in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP exemption and State 404 Program authorization be issued at the same time. *(This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times)*. If this box is checked and the Agency determines that no State 404 Program authorization is required, the Agency(ies) will continue to abide by subsection 62-330.050(4), F.A.C.

I understand that the Agency will make a reasonable effort to determine, within 30 days of receipt of this form, whether the proposed activities qualify for an exemption, unless this timeframe has been waived, above. If they do not, the Agency will provide its determination that the requested activity does not meet the terms and conditions of an ERP or State 404 Program exemption, at which time I may provide a new form with additional or modified information, or I may submit an application for an ERP and/or State 404 Program permit. In either case, denial of qualification to use an exemption will be made without prejudice, pending submittal of clarification of any errors or omissions contained in this form or other information that demonstrates compliance with the terms and conditions of the exemption.

Typed/Printed Name:                          Signature: _____          Date:

**Certification of Sufficient Real Property Interest and Authorization for Staff to Access to the Property:**
**I certify that:**

I, or the person I represent, hereby certify that I, or that person, possess sufficient real property interest in or control, as defined in **Section 4.2.3(d) of Applicant's Handbook Volume I**, over the land upon which the activities described in this form are proposed, and that I have, or that landowner has given me, legal authority to grant permission for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed activities specified in this form. If such sufficient real property interest is based on an entity having *the power of eminent domain and condemnation authority*, I/we shall make appropriate arrangements to enable staff of the Agency to access, inspect, and sample the property as described above.

Typed/Printed Name:                          Signature: _____          Date:

(Corporate Title if applicable):

## *Part 3: Submittal and Fees*

This form and the appropriate fee should be submitted to the agency having regulatory authority for the activity. Operating Agreements between the Department and the water management districts spell out which agency will process any given application. For more information go to https://floridadep.gov/water/submerged-lands-environmental-resources-coordination/content/submitting-erp.

This form may be submitted online; to do so, follow the online submittal requirements of the agency:

- **Florida Department of Environmental Protection:**
  **http://www.fldepportal.com/go/**

- **Northwest Florida Water Management District:**
  **https://permitting.sjrwmd.com/nwepermitting/jsp/start.jsp**
- **Suwannee River Water Management District:**
  **https://permitting.sjrwmd.com/srepermitting/jsp/start.jsp**
- **St. Johns River Water Management District:**
  **https://permitting.sjrwmd.com/epermitting/jsp/AccountOverview.do?command=init**
- **Southwest Florida Water Management District:**
  **http://www.swfwmd.state.fl.us/permits/epermitting/**
- **South Florida Water Management District:**
  **http://my.sfwmd.gov/ePermitting/MainPage.do**

If submitting a paper version of this form, please see (Appendix A) of the Environmental Resource Permit Applicant's Handbook Volume I for submittal locations.

# Application for
# Individual and Conceptual Approval
# Environmental Resource Permit,
# State 404 Program Permit,
# and Authorization to Use State-Owned
# Submerged Lands

Florida Department of Environmental Protection/

Water Management Districts

Effective [date]



**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**,
Page 1 of 10

**Instructions for Use of This Form:**

This form is designed to assist you in submitting a complete application. All applications must include Section A-General Information for All Activities. Sections B through H list typical information that is needed based on the proposed activities and are only required as applicable. Part 1-C of Section A will guide you to the correct sections needed based on your proposed activities. Applicants are advised to consult Chapter 62-330, F.A.C., and the Environmental Resource Permit Applicant's Handbook Volumes I and II for information regarding the ERP permitting process and requirements while preparing their application. Internet addresses for Chapter 62-330, F.A.C., and the Applicant's Handbook, Agency contact information, and additional instructions for this form can be found in Attachment 1.

# What Sections of the Application Must I Fill Out?

| Type of Activity | Section A | Section B | Section C | Section D | Section E | Section F | Section G | Section H | Section I |
|---|---|---|---|---|---|---|---|---|---|
| Fill in wetlands or waters for a single family residence? | Y | Y | N | N | N | N | N | N | Y, if in assumed waters |
| Docks, shoreline stabilization, seawalls associated with a single family residence? | Y | Y | N | N | N | Y, as needed | N | N | Y, if in assumed waters |
| Wetland impacts (other than association with an individual residence)? | Y | N | Y | N | N | N | N | N | Y, if in assumed waters |
| Boating facilities, a marina, jetty, reef, or dredging? | Y | N | Y | Y | N | Y, as needed | N | N | Y, if in assumed waters |
| Any work on state owned submerged land? | Y | N | Y | N | N | Y | N | N | Y, if in assumed waters |
| Construction of a stormwater management system? | Y | N | Y, as needed | N | Y | N | N | N | N |
| Constructing a mitigation bank? | Y | N | Y | N | Y, as needed | N | Y | N | Y, if in assumed waters |
| Creating a mine? | Y | N | Y, as needed | N | N | N | N | Y | Y, if in assumed waters |

**If you have any questions, or would like assistance completing this form, please contact the staff of the nearest office of either the Florida Department of Environmental Protection (DEP) or a Water Management District (WMD) (see Attachment 2).**

# Section A:
# General Information for All Activities

## Part 1: Name, Application Type, Location, and Description of Activity

A.  Name of project, including phase if applicable:

B.  This is for (check all that apply):

☐   Construction and operation of **new** works, activities, and/ or a stormwater management system

☐   **Conceptual Approval** of proposed works, activities and/ or a stormwater management system

☐   Modification or alteration of **existing** works, activities, and/or a stormwater management system. Provide the existing DEP or WMD permit #, if known:          Note: Minor modifications do not require completion of this form, and may instead be requested by letter in accordance with section 6.2 of Applicant's Handbook Volume I.

☐   **Maintenance or repair** of works, activities, and/ or a stormwater management system previously permitted by the DEP or WMD. Provide existing permit #, if known:

☐   Abandonment or removal of works, activities, and/ or a stormwater management system.

Provide existing DEP or WMD permit #, if known:

☐   Operation of an **existing unpermitted** work, activity, and/or stormwater management system.

☐   Construction of additional phases of a permitted work, activity, or system.

Provide the existing DEP or WMD permit #, if known:

☐   A State 404 Program authorization:

☐ Exemption   ☐ General Permit   ☐ Individual Permit

If requesting an Exemption or General Permit provide Rule #, if known:

☐   **By checking this box**, I hereby voluntarily waive, in accordance with Rule 62-330.090(8), F.A.C., the agency action deadlines in section 5.5.3 of Volume I in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP and State 404 Program authorizations be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.) If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency will continue to abide by section 5.5.3 of Volume I.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)
**Section A,**                                                                                                                    Page 3 of 10

C. **List the type of activities proposed. Check all that apply**, **and provide the supplemental information requested in each of the referenced application sections.** Please also reference Applicant's Handbook Volumes I and II for the type of information that may be needed.

☐  Activities associated with one single-family residence, duplex, triplex, or quadruplex that do not qualify for an exemption or a General Permit: **Provide the information requested in Section B. Do not complete Section C.**

☐  Activities within wetlands or surface waters, or within 25 feet of a wetland or surface water, (not including the activities associated with an individual single-family residence). Examples include dredging, filling, outfall structures, docks, piers, over-water structures, shoreline stabilization, mitigation, reclamation, and restoration/enhancement. **Provide the information requested in Section C.**

☐  Activities within navigable or flowing surface waters such as a multi-slip dock or marina, dry storage facility, dredging, bridge, breakwaters, reefs, or other offshore structures: **In addition to Section C, also provide the information requested in Section D.**

☐  Activities that are (or may be) located within, on, or over state-owned submerged lands (See Chapter 18-21, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=18-21): **In addition to Section B or C, also provide the information requested in Section F.**

☐  Construction or alteration of a stormwater management system serving residential, commercial, transportation, industrial, agricultural, or other land uses, or a solid waste facility (excluding mines that are regulated by DEP). **Provide the information requested in Section E.**

☐  Creation or modification of a Mitigation Bank (refer to Chapter 62-342, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=62-342): **Provide the information requested in Section G.**

☐  Mines (as defined in Section 2.0 of Applicant's Handbook Volume I) that are regulated by the DEP: **Provide the information requested in Section H.**

☐  Other, describe:        Please contact the Agency to determine which additional sections of the application are needed. See Attachment 2 for Agency contacts.

D. Describe in general terms the proposed project, system, works, or other activities. For permit modifications, please briefly describe the changes requested to the permit:

E. Project/Activity Street/Road Address or other location (if applicable):
City:                          County(ies):                          Zip:

Note: For utility, road, or ditch/canal activities, provide a starting and ending point using street names and nearest house numbers or provide length of project in miles along named streets or highways.

Form 62-330.060(1) - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**,
Page 4 of 10

F.  Project location map and Section, Township, and Range information (use additional sheets if needed)

**Please attach a location map showing the location and boundaries of the proposed activity in relation to major intersections or other landmarks. The map should also contain a north arrow and a graphic scale; show Section(s), Township(s), and Range(s); and must be of sufficient detail to allow a person unfamiliar with the site to find it.**
Section(s):        Township:            Range:          Land Grant name, if applicable:
Section(s):        Township:            Range:

    1.  Section(s):        Township:                    Range:

G.  Latitude (DMS)        °        '        " Longitude (DMS)        °        '        " (Taken from central location of the activity). Explain source for obtaining latitude and longitude (i.e. U.S.G.S. Quadrangle Map, GPS, online resource):

H.  Tax Parcel Identification Number(s):

[Number may be obtained from property tax bill or from the county property appraiser's office; if on multiple parcels, provide multiple Tax Parcel Identification Numbers]

I.  Directions to Site (from major roads; include distances and landmarks as applicable):        .

J.  Project area or phase area:            acres

K.  Name of waterbody(ies) (if known) in which activities will occur or into which the system will discharge:

**The following questions (M-O) are not applicable to activities related to an individual single-family residence, including a dock, pier, and/or seawall associated with that residence.**

L.  Is it part of a larger plan of development or sale?        ☐ yes ☐ no

M.  Impervious or semi-impervious area excluding wetlands and other surface waters (if applicable):

      acres or        square feet

N.  Volume of water the system is capable of impounding (if applicable):

Normal Pool:        acre-feet.  Depth        ft.
Maximum Pool:        acre-feet.  Depth        ft.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)        **Section A**,
Page 5 of 10

**Part 2: Supplemental Information, and Permit History**

A.  Is this an application to modify an existing Environmental Resource Permit or to construct or implement part of a multi-phase project, such as a project with a Conceptual Approval permit?  ☐ Yes   ☐ No (If you answered "yes", please provide permit numbers below):

| Agency | Date | Permit/Application No. | Project Name |
|--------|------|------------------------|--------------|
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |

B.  Indicate if there have been any **pre-application meeting(s)** with the DEP, WMD, or delegated local government, or other discussions, meetings, or coordination with other stakeholders or agencies about the proposed project, system or activity. If so, please provide the date(s), location(s) of the meeting, and the name(s) of Agency staff that attended the meeting(s):

| Agency | Date | Location | Meeting Attendees |
|--------|------|----------|-------------------|
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |

C.  **Attach a depiction (plan and section views), which clearly shows the works or other activities proposed to be constructed.** Use multiple sheets, if necessary, a scale sufficient to show the location and type of works, and include a north arrow and a key to any symbols used. **Specific information to be included in the plans is based on the activities proposed and is further described in Sections B-H**. However, supplemental information may be required based on the specific circumstances or location of the proposed works or other activies.

D.  Processing Fee: **Please submit the application processing fee along with this application form and supplemental information.** Processing fees vary based on the size of the activity, the type of permit applied for, and the reviewing Agency. Please reference Appendix D of Applicant's Handbook Volume I to determine the appropriate fee.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**,
Page 6 of 10

## Part 3:  Applicant and Associated Parties Information

Instructions: Please complete the following sections. For corporations, list a person who is a registered agent or officer of the corporation who has the legal authority to bind the corporation.

### A.  Applicant (Entity Must Have Sufficient Real Property Interest)
☐ **This is a Contact Person for Additional Information**

Last Name:                              First Name:                         Middle Initial:
Title:                                        Company:
Address:
City:                                         State:                                Zip:
Home Telephone:                       Work Telephone:
Cell Phone:                               E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### B.  Land Owner(S) (If Different or in Addition to Applicant)
☐ **Check here if land owner is also a co-applicant**

Last Name:                              First Name:                         Middle Initial:
Title:                                        Company:
Address:
City:                                         State:                                Zip:
Home Telephone:                       Work Telephone:
Cell Phone:                               E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### C.  Operation and Maintenance Entity (see Applicant's Handbook I, Section 12.3)

Last Name:                              First Name:                         Middle Initial:
Title:                                        Company:
Address:
City:                                         State:                                Zip:
Home Telephone:                       Work Telephone:
Cell Phone:                               E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### D.  Co-Applicant (If Different or In Addition to Applicant and Owner)

Last Name:                              First Name:                         Middle Initial:
Title:                                        Company:
Address:
City:                                         State:                                Zip:
Home Telephone:                       Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                    **Section A**,
Page 7 of 10

**E.   Registered Professional Consultant**
☐ **This is a contact person for additional information**

Last Name:                          First Name:                          Middle Initial:
Title:                                    Company:
Address:
City:                                     State:                                   Zip:
Home Telephone:                  Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**F.   Environmental Consultant**
☐ **This is a contact person for additional information**

Last Name:                          First Name:                          Middle Initial:
Title:                                    Company:
Address:
City:                                     State:                                   Zip:
Home Telephone:                  Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**G.  Agent Authorized to Secure Permit (If Different from Consultant)**

Last Name:                          First Name:                          Middle Initial:
Title:                                    Company:
Address:
City:                                     State:                                   Zip:
Home Telephone:                  Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**If necessary, please add additional pages for other contacts and property owners related to this project.**

**H.   Real Property Interest**

a.   Permits are only issued to entities having sufficient real property interest as described in Section 4.2.3(d) of Applicant's Handbook Volume I. **Please attach evidence of the applicant's real property interest over the land upon which the activities subject to the application will be conducted, including mitigation areas (if applicable).** Refer to Sections 4.2.3(d)-(e) for sufficient real property interest documentation.

b.   For activities that require a recorded notice in accordance with rule 62-330.090(7), F.A.C., please provide either the complete legal description of the property or a copy of the pages of the document recorded in the public records that contains the complete legal description. If the land upon which the proposed activities are to occur is not owned by the applicant, the applicant must also provide copies of any right-of-way, leases, easements, or other legal agreement which authorizes the applicant to perform the activities on those lands.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and
Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                    **Section A**,
                                                                                                                                                 Page 8 of 10

## Part 4: Signatures and Authorization to Access Property

Instructions: For multiple applicants please provide a separate Part 4 for each applicant. For corporations, the application must be signed by a person authorized to bind the corporation. A person who has sufficient real property interest (see Section 4.2.3(d) of Applicant's Handbook Volume I) is required in (B) to authorize access to the property, except when the applicant has the power of eminent domain.

**A.**   By signing this application form, I am applying for the permit and any proprietary authorizations identified above, according to the supporting data and other incidental information filed with this application. I am familiar with the information contained in this application and represent that such information is true, complete and accurate. I understand this is an application and not a permit, and that work prior to approval is a violation. I understand that this application and any permit issued or proprietary authorization issued pursuant thereto does not relieve me of any obligation for obtaining any other required federal, state, water management district, or local permit prior to commencement of construction. I agree to operate and maintain the permitted system unless the permitting agency authorizes transfer of the permit to a different responsible operation and maintenance entity. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S. and 18 U.S.C. Section 1001.


_____

Typed/Printed Name of Applicant or      Signature of Applicant or Applicant's      Date
Applicant's Authorized Agent        Authorized Agent


(Corporate Title if applicable)


**B.   Certification of Sufficient Real Property Interest And Authorization For Staff To Access The Property:**

**I certify that:**

☐ **I possess sufficient real property interest in or control, as defined in Section 4.2.3 (d) of Applicant's Handbook Volume I,** over the land upon which the activities described in this application are proposed and I have legal authority to grant permission to access those lands. I hereby grant permission, evidenced by my signature below, for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed works and other activities specified in this application, upon advance notice. I authorize these agents or personnel to enter the property as many times as may be necessary to make such review, inspection, and/ or sampling. Further, if a permit is granted, upon advance notice, I agree to provide entry to the project site for such agents or personnel with proper identification to determine compliance with permit conditions and permitted plans and specifications.

**OR**

☐ I represent an entity having **the power of eminent domain and condemnation authority**, and I/we shall make appropriate arrangements to enable staff of the Agency to legally access, inspect, and sample the property as described above.


_____

Typed/Printed Name            Signature            Date


(Corporate Title if applicable)


**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                    **Section A**,
Page 9 of 10

**C.   Designation of Authorized Agent (If Applicable):**

I hereby designate and authorize          to act on my behalf, or on behalf of my corporation, as the agent in the processing of this application for the permit and/or proprietary authorization indicated above and to furnish, on request, supplemental information in support of the application. In addition, I authorize the above-listed agent to bind me, or my corporation, to perform any requirements which may be necessary to procure the permit or authorization indicated above. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S., and 18 U.S.C. Section 1001.

| | | |
|---|---|---|
| _____ | _____ | |
| Typed/Printed Name of Applicant | Signature of Applicant | Date |

(Corporate Title if applicable)

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                **Section A**,
Page 10 of 10

# Section B:
# For Single-Family Projects

Instructions: This section is for providing supplemental information required for works or other activities involving one individual single-family (including a duplex, triplex or quadruplex) residential property that do not qualify for an exemption or general permit. This is intended to be used in conjunction with the Applicant's Handbook, Vol. I & II, and the State 404 Program Applicant's Handbook. The Agency will also provide a copy of the application to the Florida Fish and Wildlife Conservation Commission, the Department of State's Division of Historical Resources, and other agencies as applicable for review. Activities reviewed under the State 404 Program will be placed on public notice upon receipt of an administratively complete application. Project modifications may be required as a result of comments received by those agencies or through public notice. The supplemental information required by this section is in addition to the information required by Section A of the application.

## Part I: Project Information Summary

1. Does the project include construction of any docks, piers, or other types of over-water structures or mooring areas?
   ☐ yes (complete items a. through f., below)    ☐ no (skip to #2)

   a. Total square feet of structure(s) over water:
      existing:        new:              proposed total:

   b. Type of materials (e.g., treated wood, plastic, concrete, etc.) for the:
      dock structure:                    pilings:

   c. Proposed dock plank spacing (if applicable):

   d. Number of in-water slips or mooring areas for vessels:
      existing:        new:              proposed total:

   e. Please indicate the size (length and draft) and type of vessels that will be mooring at the dock or structure:

   f. Please address how the dock, pier, or other structures or mooring areas will not significantly impede navigation within the waterbody:

2. Does the project include construction of any shoreline stabilization, such as riprap revetment, living shoreline, or seawall?
   ☐ yes (complete items a. through f., below)    ☐ no (skip to #3)

   a. Linear feet of shoreline (at the mean or ordinary high water line) proposed to be stabilized or modified:

   b. Describe the existing condition of the shoreline, including vegetation:

   c. Is the proposed shoreline stabilization limited solely to repair/replacement of existing structures of the same type and design?
      ☐ Yes          ☐ No          ☐ I don't know

   d. Type(s) of shoreline stabilization proposed (check all that apply):
      ☐ living shoreline  ☐ vertical seawall  ☐ riprap or other sloped revetment

     

e.  Please describe the type(s) of material (e.g. riprap, treated wood, concrete, plastic or steel sheetpile) to be used to construct the shoreline stabilization structure(s). If riprap is proposed, describe the type and average diameter or size:

f.  If the project involves construction or repair of any vertical seawalls, will it be located entirely within a manmade canal that is currently occupied (at least in part) by vertical seawalls?
    ☐ Yes        ☐ No        ☐ Not applicable/no vertical seawalls proposed
    *If the answer is "no", it is recommended that you contact the reviewing agency prior to submitting your application.*

3.  Does the project include construction of any boat ramp or launch area?
    ☐ yes (complete items a. through e., below)        ☐ no (skip to #4)

    a.  Material to be used as a base and surface fill:

    b.  Methods and materials for side slope stabilization:

    c.  Method and equipment to be used during dredging and construction:

    d.  Approximate amount of material that needs to be dredged, if any. Please indicate the total square footage of area and the number of cubic yards of material.

    e.  Approximate amount of fill material, if any. Please indicate the total square footage of area and the number of cubic yards of material.

4.  Does the project include any other type of dredging or filling of wetlands or other surface waters?
    ☐ yes (complete items a. through f., below)        ☐ no (skip to #5)

    a.  Total square feet of the area(s) to be dredged:

    b.  Total square feet of the area(s) to be filled:

    c.  Total volume of material to be dredged:          cubic yards

    d.  Final depth of proposed dredge area in feet, relative to mean low water (tidal waters) or ordinary or seasonal high water (for non-tidal waters):

    e.  Methods and equipment to be used during dredging and/or filling:

    f.  How and where will dredged material be stored and disposed? *Include a description of any temporary stockpile areas and best management practices (BMPs)*:

5.  Total area of work (dredging, filling, construction, alteration, or removal) in, on, or over wetlands or other surface waters:          square feet;          acres

6.  Please provide the name (if known) of the wetland or other surface waterbody in which the proposed work or activities will occur. *Be advised that individual waterbodies or wetlands, or geographic areas, may have certain legal designations that affect the permitting requirements for your project. Examples of such designations include Aquatic Preserves, Outstanding Florida Waters, Special Basins, Riparian Habitat Protection Zones, Class II or other classified shellfishing waters, and impaired waters. It is recommended that you contact your local agency office to determine if your project is located within any such waters prior to submitting your application.*
    Waterbody:          ☐ I don't know

**Part II: Environmental Considerations**

1. **Elimination or Reduction of Impacts (Avoidance and Minimization)** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.1 through 10.2.1.3)*

   Please describe measures taken to eliminate or reduce impacts to wetlands and other surface waters.

   *If all practicable modifications have been made to reduce or eliminate adverse impacts to wetland or surface water functions, including functions provided to fish, wildlife and listed species, and adverse impacts remain, mitigation may be required. It is recommended that you discuss mitigation requirements with the reviewing agency, prior to submitting this application. For more information, refer to Applicant's Handbook, Vol. I, s. 10.2.2 through 10.2.2.4, and s. 10.3 through 10.3.8; and the State 404 Program Applicant's Handbook s. 8.5., if applicable. If you have a mitigation proposal, you may include it with your application submittal.*

2. **Public Interest Test** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.3 through 10.2.3.7)*

   **You are not required to complete this question – it is optional.** Please be advised that the reviewing agency will determine whether the proposed activity will be ***not contrary*** to the public interest, **OR** if such activity will significantly degrade or is located within an Outstanding Florida Water (OFW), that the activity will be ***clearly in*** the public interest. To make this determination, the agency will consider the following:

   a. Whether the regulated activity will adversely affect public health, safety, or the welfare or the property of others

   b. Whether the regulated activity will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats

   c. Whether the regulated activity will adversely affect navigation or the flow of water or cause harmful erosion or shoaling

   d. Whether the regulated activity will adversely affect the fishing or recreational values or marine productivity in the vicinity of the activity

   e. Whether the regulated activity will be of a temporary or permanent nature

   f. Whether the regulated activity will adversely affect significant historical and archaeological resources, under the provisions of section 267.061, F.S.

   g. Whether the regulated activity will adversely affect the current condition and relative value of functions being performed by areas affected by the proposed regulated activity.

   If you wish to describe additional measures taken to place your project clearly in (or not contrary to) the public interest, as described above, please do so here:

3. **Water Quality** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.4 through 10.2.4.5)*

   Please describe how the proposed project will be designed to not violate water quality standards. *Include descriptions of all proposed turbidity, erosion, and sedimentation control measures:*

**4. Secondary Impacts** *(Refer to Applicant's Handbook, Vol. I, s. 10.2.7)*

Will an upland buffer, **with a minimum width of 15' and an average width of at least 25'**, be provided between the proposed project and all wetlands and other surface waters to be preserved, enhanced, restored, or created? ☐ Yes    ☐ No

If no, please describe how the project will be designed and constructed to avoid adverse secondary impacts to the water resource:

**5. Water Quantity** *(Refer to the Design and Performance Guidance for an Individual Private, Residential Single-Family Residence Involving Dredging or Filling in Wetlands or Other Surface Waters found in Applicant's Handbook, Vol. I, References and Design Aids)*

Please describe how the proposed project will be designed and constructed to avoid causing the following:

Adverse water quantity impacts to receiving waters and adjacent lands:

Adverse flooding to on-site or off-site property:

Adverse impacts to existing surface water storage and conveyance capabilities.

**Part III: Plans**
Attach depictions (plan and section views), which clearly show all proposed structures or works. Use multiple sheets if necessary. Plans should be scaled, dimensioned, and legible. Use a scale sufficient to show the location and type of works. *Be advised that certain items may require the services of a Florida registered professional.* At a minimum, plans must include the information listed below as applicable, based on the activity proposed:

**1. All Activities**
☐ Project location map that clearly depicts the location of all proposed activities
☐ Location of property lines, including linear feet of shoreline owned by the applicant
☐ Mean high water line (MHWL) (tidal waters) or ordinary (or seasonal) high water line (OHWL) (non-tidal waters)
☐ The location and dimensions (length, width, height) of all existing and proposed structures or works located in, on, or over wetlands or other surface waters, within the project area
☐ Detailed cross-section views with complete dimensions
☐ The boundaries, size (square feet and acres), and type of each wetland (including herbaceous, forested, mangroves, seagrass, and other submerged/emergent vegetation) and other surface water in the project area
☐ Clearly shade or hatch each dredge or fill area, and label with the area (acres and square feet) and volume (cubic yards)
☐ Location and type of all proposed turbidity, erosion, and sedimentation control measures

**2. Docks, Piers, Boat Slips, and Ramps**
☐ Profile-view drawings that clearly show the elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters) and water depth, in relation to mean low water (tidal waters) or ordinary or seasonal low water (non-tidal waters) at mooring sites and the bottom of the boat ramp (if applicable)
☐ Show width of waterway and the path and distance between the waterward end of the structure and the nearest marked navigation channel
☐ Number each slip
☐ Show and label width of deck planks and plank spacing

### 3. Seawalls and Other Shoreline Stabilization

☐ Location of the proposed structures in relation to MHWL (tidal waters), or OHWL (non-tidal waters), including measurements from at least 3 fixed structures or in relation to the existing structure(s), and location of new structure

☐ Cross-section drawings depicting the proposed shoreline stabilization structures (including geotextile fabric, anchors/tiebacks, and other features, if applicable) that clearly show the slope ratio (horizontal:vertical)

☐ Show how your structure will tie into neighboring structures, if applicable

☐ For living shorelines, identify the proposed plant species, and for each species, indicate the locations, spacing, and elevations relative to the mean high and low (for tidal waters) or ordinary or seasonal high (for non-tidal waters) water line

**NOTE: If any part of your project has a potential to be located on state-owned submerged lands (i.e., waterward of the line of mean or ordinary high water of rivers, streams, bays, bayous, sounds, the Gulf of Mexico, the Atlantic Ocean, or natural lakes), please complete Section F of this application, as a separate authorization may be required to conduct activities on such lands.**

# Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters

Instructions: **This section is for applications that do not involve activities associated with an individual single-family residence, duplex, triplex, or quadruplex. For those activities, please use Section B.** This form is to be completed if the proposed work or activity will occur in, on, over, or within 25 feet of a wetland or other surface water. The supplemental information required by this section is in addition to the information required by Section A of the application.

**Part 1: Wetland or Other Surface Water Impact Summary**

1. Describe the basic purpose of the project or activity:

2. Total area of work (dredging, filling, construction, alteration, or removal) in, on, or over wetlands or other surface waters:          sq. ft.;          ac.

3. Total volume of material to be dredged or filled in wetlands or other surface waters:
   a. to be dredged:          cubic yards,
   b. to be filled:          cubic yards.

4. Identify the seasonal high water level (SHWL) and wetland normal pool elevations for each wetland or surface water within the project site. For tidal wetlands and/or surface waters provide the elevation of mean high and mean low water. Include an aerial photograph showing the location of each sampling location, dates, datum, and methods used to determine these elevations.

5. Name of waterbody(ies) (if applicable & if known) in which work will occur?

6. Is the activity proposed in an Outstanding Florida Water or Aquatic Preserve?
   ☐ yes, name:          ☐ no          ☐ I don't know

7. Has there ever been a formal or informal wetland determination for the project site? If yes, provide the identifying number and/or a copy of the jurisdictional map.

8. Provide a map(s) of the project area and vicinity delineating USDA/NRCS soil types.

9. Provide recent aerials legible for photointerpretation (no photocopies) with a scale of 1" = 400 ft, or more detailed, with project boundaries and wetland boundaries delineated on the aerial.

10. Provide maps accurately portraying the existing and proposed natural vegetative community types and land cover classifications using recognized classification schemes. Suggested sources include: the Florida Natural Areas Inventory Guide to the Natural Communities of Florida (2010) available at http://www.fnai.org/naturalcommguide.cfm, or the Florida Land Use and Cover Classification System (FLUCCS) (FDOT 1999, available at http://www.dot.state.fl.us/surveyingandmapping/documentsandpubs/fluccmanual1999.pdf). For

     

vegetated areas dominated by exotic vegetation, use the descriptors representative of the native community type that was present prior to exotic infestation.

11. Impact Summary Tables (located at the end of this section):
    a.  For all projects, complete Table 1, 2 and 3 as applicable.
    b.  For shoreline stabilization projects, provide the information requested in Table 4.

12. If the activity is located on state owned submerged lands and requires a lease or easement, provide a list of names and addresses from the latest county tax assessment roll of all property owners located within a 500 ft. radius of the proposed lease or easement boundary in mailing label format, or you may elect to send notice to those persons by certified mail, with the return-receipt card addressed to the DEP or water management district, as applicable, in accordance with subsection 18-21.005(3), F.A.C., and Section 253.115, F.S. Attach additional sheets if necessary.
    1.  Name:
        Mailing Address:
        City, State, Zip Code:

    2.  Name:
        Mailing Address:
        City, State, Zip Code:

    3.  Name:
        Mailing Address:
        City, State, Zip Code:

    4.  Name:
        Mailing Address:
        City, State, Zip Code:

    5.  Name:
        Mailing Address:
        City, State, Zip Code:

    6.  Name:
        Mailing Address:
        City, State, Zip Code:

## Part 2: Environmental Considerations

Note: for many questions, a state statute/Applicant's Handbook Volume I (AH I)/State 404 Program Applicant's Handbook section is cited to assist the applicant in addressing these questions.

1.  Elimination or Reduction of Impacts (Avoidance and Minimization). Describe measures taken to eliminate or reduce impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.1*).

2.  Fish, Wildlife, Listed Species, and their Habitats. Provide results of any wildlife assessments that have been conducted on the project site and provide any comments, biological opinions, formal or informal consultation decisions, or recommended actions you have received pertaining to the project from the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service. (*Refer to AH I Section 10.2.2*).

3.  Water quantity impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.2.4 and AH II*).

    a.  Does the activity include a proposed surface water management system with a control elevation different than the wetland normal pool elevation(s) of existing or proposed created wetlands or other surface waters?

    b.  If yes to (a), provide documentation (e.g. drawdown assessment or other methods) that shows the proposed surface water management system will not change the hydroperiod of the existing or created wetland or other surface water.

4.  Public Interest Test. Please describe how the proposed activity will **not be contrary** to the public interest, OR if such an activity significantly degrades or is located within an Outstanding Florida Water (OFW), that the regulated activity will be **clearly in** the public interest (*Refer to AH I Section 10.2.3*).

    a.  Please describe how the project will be designed to avoid adverse effects to public health, safety, or the welfare or the property of others.

    b.  Please describe how the project will be designed to avoid adverse effects to the conservation of fish and wildlife, including endangered or threatened species, or their habitats.

    c.  Please describe how the project will be designed to avoid adverse effects to navigation or the flow of water or cause harmful erosion or shoaling.

    d.  Please describe how the project will be designed to avoid adverse effects to the fishing or recreational values or marine productivity in the vicinity of the activity.

    e.  Will the project be of a temporary or permanent nature?

    f.  Please describe how the project will be designed to avoid adverse impacts to significant historical and archaeological resources, under the provisions of section 267.061, F.S.

    g.  Please describe how the project will be designed to avoid adverse effects to the current condition and relative value of functions being performed by areas affected by the proposed regulated activity.

5.  Water Quality.
    Provide a description of how water quality will be maintained in wetlands and other surface waters that will be preserved or will remain undisturbed, both on and offsite. Please address both short-term (such as during construction) and long-term water quality considerations (*Refer to AH I Section 10.2.4*).

6.  Class II Waters; Waters approved for shellfish harvesting *(Refer to AH I Section 10.2.5)*.

    a.  Will the project occur in Class II that are NOT approved for shellfish harvesting? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(a)*.

    b.  Is the project located adjacent to or in close proximity to Class II waters? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(b)*.

c.  Is the project located in Class II or Class III waters that are classified as "approved", "restricted", "conditionally approved", or "conditionally restricted"? If yes, demonstrate that the project meets the requirements of *AH I Section 10.2.5(c)*.

7.  Vertical seawalls. Are vertical seawalls proposed in an estuary or lagoon as part of the project? If yes, please describe how the project meets the requirements of *AH I Section 10.2.6*.

8.  Secondary Impacts (*AH I Section 10.2.7*).

a.  Will an upland buffer, with a minimum width of 15' and an average width of 25', be provided between the proposed activities and existing wetlands or wetlands to be preserved, enhanced, restored, or created? Provide the location and dimension of all buffers on the plans.        If not, demonstrate that secondary impacts will not occur or describe how they will be offset.

b.  If listed species are present or may be present, then coordination with wildlife agencies is needed. Have you coordinated with the FFWCC and/or USFWS? If so, please provide correspondence from the wildlife agencies indicating concurrence with the species management plan(s).

c.  What measures will be taken to avoid impacts to wetland-dependent wildlife and/or listed species that use uplands for nesting or denning?

d.  Describe whether there are any other relevant activities that are very closely linked and causally related to any proposed dredging or filling in wetlands or other surface waters that have the potential to cause impacts to significant historical and archaeological resources.

e.  Are there additional future phases or extensions of the proposed activities that are not shown? If yes, please describe.

9.  Cumulative Impacts. Is the proposed mitigation located within the same drainage basin (*Refer to AH I Figures 10.2.8.1 – 10.2.8.5)* as the proposed wetland impacts?        If not, please submit a Cumulative Impact Evaluation in accordance with *AH I Section 10.2.8*.

10. Mitigation Plan (*Refer to AH I Section 10.3*).

a.  If a mitigation bank is proposed to offset wetland/other surface water impacts, provide:

i.   the name of the bank:        . A letter of reservation from the banker will be required once the application has been evaluated.
ii.  If the mitigation bank was assessed using UMAM, provide UMAM worksheets for impact area(s). If the bank was assessed using a method other than UMAM, then prepare the impact assessment using the same method.

b.  If mitigation is proposed to offset wetland/other surface water impacts, please provide a mitigation plan that includes, at a minimum, the following:

i.   ☐ Proposed mitigation narrative:
     (1) ☐ Describe the current and proposed condition for each type of mitigation component (restoration, enhancement, creation, preservation), including:
         (a) ☐ Describe current and proposed vegetation

(b) ☐ Describe current and proposed hydrologic conditions for the proposed mitigation.

(c) ☐ Describe the soil types from NRCS maps and confirm if actual soil conditions appear to match.

(2) ☐ Provide details of the proposed construction/mitigation activities including phasing and timing, as appropriate.

(3) ☐ Identify measures that will be implemented during and after construction to avoid adverse impacts related to the proposed activities.

(4) ☐ A mitigation implementation and monitoring schedule with dates.

(5) ☐ Identify the success criteria.

(6) ☐ Describe the anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented.

(7) ☐ Provide a comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented.

ii. ☐ Provide a Management Plan that includes, as appropriate, aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access.

iii. ☐ Maps:

(1) ☐ Soil map (include soil names/codes, hydrologic soil groups and hydric soil types).

(2) ☐ Topographic map of the mitigation area and adjacent contributing and receiving areas.

(3) ☐ Hydrologic features map of the mitigation area and adjacent contributing and receiving areas.

(4) ☐ Vegetative communities map (using FLUCCS or other appropriate classification system).

(5) ☐ For all maps, identify source.

iv. Provide the necessary supporting information for the application of sections 62-345.400 - .600 (Uniform Mitigation Assessment Method (UMAM)). To meet this requirement, submittal of UMAM worksheets is acceptable for impact and mitigation areas.

v. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a draft Conservation Easement document or other form of restrictive covenant that provides for protection of the mitigation area in perpetuity. Standard forms, as described in subsection 62-330.301(6), F.A.C., are available from the Agency or on its website.

vi. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a cost estimate for completing the mitigation, including monitoring and maintenance.

vii. If onsite and/or offsite applicant-responsible mitigation is proposed and the proposed mitigation exceeds $25,000, please provide a draft financial assurance document. Standard forms, as described in subsection 62-330.301(5), F.A.C., are available from the agency or on its website.

viii. Identify the entity responsible for monitoring, maintenance, and long-term stewardship of the mitigation area (i.e. the landowner or homeowner association, not the consultant or contractor that will do the work).

Note: If your project is in retained waters, it is highly recommended that you coordinate the design of any mitigation plan that also may be required for the Corps permit to meet the requirements of both permits. Pre-application meetings with both the applicable Agency and the Corps can help you to choose a mitigation option that is acceptable to both the applicable Agency and the Corps.

**Part 3: Plans**

Plans: The information listed in the checklist below represents the typical information required on the submitted project plans. The Plans checklists in each application section are cumulative unless otherwise noted. Separate plans for each application section are not required.

1. ☐ Include the following on the construction plans and cross sections:

   a. ☐ An Existing Conditions sheet showing the entire project and wetland/other surface water boundaries. Include the following: Acreage and type (herbaceous, forested or other surface water) of each wetland/other surface water.
   b. ☐ A Proposed Conditions sheet showing the entire project and wetland/other surface water boundaries with construction plan overlay.
   c. ☐ A Proposed Wetland Impact sheet that includes the following:
      i. ☐ Acreage and type (herbaceous, forested, or other surface water) of each wetland/other surface water to be impacted.
      ii. ☐ Proposed upland buffers with dimensions.
      iii. ☐ Identify the seasonal high water and wetland normal pool elevations on the plans.
   d. ☐ Include wetland boundaries on all construction plan sheets.

2. ☐ If onsite and/or offsite applicant-responsible mitigation is proposed, submit mitigation plans and cross sections including, at a minimum:

   a. ☐ existing conditions plan sheet identifying upland and wetland communities and acreage of each, topography, drainage patterns, and location of cross-section detail.
   b. ☐ proposed conditions plan sheet identifying proposed improvements by type (restoration, enhancement, creation, preservation), acreage of each, topography, drainage patterns, and location of cross-section detail.
   c. ☐ monitoring plan sheet including proposed improvements, monitoring transects, photostations, and mitigation signage (if applicable).
   d. ☐ cross-section and/or profile detail(s) sheet(s) including representative section of each type of mitigation component. Include existing and proposed conditions and representative elevations.
   e. ☐ planting schedule, plant species including common and scientific names divided into three sections (canopy, shrub, herbaceous) by mitigation component, quantity, spacing, size, and elevation range.

**Table 1 - Project Wetland (WI) And Other Surface Water (SW) And Impact Summary**

| WL & SW ID | UMAM ASSESSMENT AREA NAME(S) | WL & SW TYPE | WL & SW SIZE (acres) | WL & SW NOT IMPACTED (acres) | TEMPORARY WL &SW IMPACT SIZE (acres) | TEMPORARY WL & SW IMPACT TYPE | PERMANENT WL &SW IMPACT SIZE (acres) | PERMANENT WL & SW IMPACT TYPE | MITIGATION ID |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
| PROJECT TOTALS: |  |  |  |  |  |  |  |  |  |

Comments:

Codes (multiple entries per cell not allowed):

- Wetland & Surface Water ID: Include ID on submitted wetland and surface water impact maps
- Wetland Type: from an established wetland classification system
- Impact Type:  D=dredge;  F=fill;  H=change hydrology;  S=shading;  C=clearing;  O=other

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

Section C, Page 7 of 10

**Table 2 - Project On-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):

- Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Table 3 - Project Off-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):

- Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C**, Page 9 of 10

**Table 4 - Shoreline Stabilization**

| Stabilization | Linear Ft. New | Linear Ft. Replaced | Linear Ft. Repaired | Linear Ft. Removed | Slope H: V: | Toe Width (Ft.) |
|---|---|---|---|---|---|---|
| Natural Vegetation (living shoreline) | | | | | **N/A** | **N/A** |
| Rip Rap + Vegetation | | | | | | |
| Rip Rap | | | | | | |
| Seawall + Rip Rap | | | | | | |
| Vertical Seawall | | | | | | |
| Other Shoreline Stabilization Type | | | | | | |

Size of Rip Rap

Type of Rip Rap

# Section D: Supplemental Information for Works or Activities Within Surface Waters
### (Other Than a Single-Family Project)

Instructions: This section is to be completed for projects that involve works such as dredging of channels, breakwaters, jetties, shoreline protection structures, reefs, piers, marinas and other docking facilities, bridges, causeways, and other structures or activities within surface waters that involve boating activities or that will, or have the potential to, substantively alter water flow and circulation or affect the bottom profile of open surface waters. This section is not intended for activities associated with individual single-family residential property or activities that are located entirely within wetlands.

This section must be used in conjunction with sections A and C. Activities that occur (or that may occur) on state-owned submerged lands will also require section F. Other sections may also be required, based on the scope of the proposed activities. All items required under this section are in addition to those required under other sections, as applicable.

## Part I: General Project Information
Please identify all proposed activities (select all that apply):

☐ Pier, dock, wharf, mooring field, marina (including dry storage associated with a boat launch), boat ramp, ski course or other boating-related activity

☐ Breakwater, groin, jetty, shoreline stabilization structures, artificial reefs, intake or discharge structures, subaqueous utility lines, or other submerged structures

☐ Bridge, causeway, culverted crossing, or other traversing work or structure

☐ Dredging (for navigation channels, boat basins, or other purposes) or filling in surface waters

☐ Any other structures, works, or other in-water activities

**A. Piers, Docks, Boat Ramps, Marinas, Mooring Fields, And Other Boating-Related Activities**
☐ Not applicable

1. Please provide a detailed description of the proposed activities and uses of the facility; include a description of the existing activities and uses, if applicable. For example, "reconfigure existing 20-slip multifamily residential docking facility to create a 35-slip commercial marina with boat ramp, 4 temporary mooring areas and a fuel dock":

2. Does the proposed facility, including existing structures and activities, consist *solely* of a pier, observation platform, or other over-water structure that will not accommodate the mooring of vessels or any other boating-related activities?
    ☐ Yes  (Skip to question #8)      ☐ No

3. Please describe the types and the maximum size (length and draft) of vessels expected to use or proposed to be mooring at the facility.

4. Please complete the table below. Information provided should concur with that provided on the plans/drawings:

     

| TOTALS: | Existing | Proposed |
|---|---|---|
| Square Feet* over the water | | |
| # of wet slips (permanent**) | | |
| # of wet slips (temporary***) | | |
| # of dry slips**** | | |

* Total square footage of all structures (fixed or floating) over wetlands or surface waters
** Slips and other areas designed for overnight or longer-term mooring
*** Short-term mooring areas, such as accessory docks, fuel docks, etc.
**** Includes upland boat storage, such as trailer parking spaces and dry storage racks

5. Is there is at least one foot of clearance at mean low water between the top of all submerged resources (such as seagrass beds, corals, etc.) or the submerged bottom (if such resources are absent) and the deepest draft of any vessels expected to use the proposed facility, along the route(s) of ingress/egress between the proposed facility and a marked navigation channel? *If vessels will not have this clearance, the applicant may be required to provide other assurances that the project will not cause adverse secondary, cumulative and/or water quality impacts.*

☐ Yes, vessels will have at least 1' clearance at MLW    ☐ No/I'm not sure

6. Please specify whether the facility will provide:

Liveaboard slips:        ☐ Yes; Number:        ☐ No
Fueling facilities:       ☐ Yes; Number:        ☐ No
Sewage pump-outs:        ☐ Yes; Number:        ☐ No
Other boating-related supplies or services (e.g. boat maintenance or washdown areas, fish cleaning stations, etc.):  ☐ Yes; Describe:        ☐ No

7. Did you answer "yes" to any item in question #6, above?

☐ Yes; please complete the items below    ☐ No;  (Skip to question #8)

Please provide a facility management plan to address maintenance and unexpected spills of fuels or other pollutants. This plan should include, at a minimum, the following information, as applicable to the proposed project/activities:

a. ☐ An education plan for all employees as it relates to fueling, sewage and gray water pump-out operations, waste management, and facility maintenance;
b. ☐ A spill response plan for fuel and oil that clearly identifies spill response procedures, responsible parties and emergency contact telephone numbers, and containment and cleanup equipment;
c. ☐ Locations of fuel shut-off valves and (if floating docks are utilized) assurance that if floating docks separate, fuel lines will not continue to discharge fuel into surface waters;
d. ☐ Plan for maintenance of gray water collection and return systems;
e. ☐ Plan for maintenance of garbage and fish cleaning systems to prevent disposal into wetlands or other surface waters;

8. Please describe the design and type(s) of materials that will be used to construct the proposed facility (check all that apply):

Main pier/access walkways:   ☐ Piling-supported   ☐ Floating   ☐ Wharf/bulkhead

Finger piers (if applicable):   ☐ Piling-supported   ☐ Floating

Other Structures (please list and describe):

Pilings:   ☐ treated wood; type (e.g. CCA, ACQ, etc.), if known:
If pilings will be of treated wood materials, will they be completely wrapped (in sleeves of impermeable PVC, plastic, or similar material) from at least one foot below the mud line to at least one foot above the mean high water line (or seasonal high water line in non-tidal waters)? ☐ Yes ☐ No

☐ concrete/steel   ☐ plastic/composite   ☐ other

Decking:   ☐ wood   ☐ plastic/composite   ☐ grated   ☐ floating docks/other

**B.  Breakwaters, Jetties, Groins, Artificial Reefs, Intake or Discharge Structures, Subaqueous Utility Lines, or Other Submerged Structures** ☐ Not applicable

1. Please describe the nature and purpose of the proposed structure(s). For example, "construct a 200-foot-long, 20 foot wide offshore breakwater to protect a restored living shoreline from waves and boat wakes from the nearby channel":

2. Please describe the design and type(s) of structures that are proposed (check all that apply):

☐ Breakwater (structures generally designed to attenuate wave energy and typically located entirely waterward of, and oriented parallel or oblique to the shoreline)
☐ Jetty or groin (structures generally designed to alter longshore currents or sediment transport, and typically extending waterward from the shore at an angle perpendicular or oblique to the shoreline)
☐ Seawall or revetment (hardened shoreline stabilization structure located along the shoreline)
☐ Artificial reef, fish attractor or similar structure
☐ Submerged intake, outfall, utility line, or similar structure
☐ Other; please describe:

3. Please provide a description of the existing erosional or depositional conditions of at the site, including amounts of natural and artificial shoreline, type(s) of vegetation, rates of erosion/deposition, and supporting documentation, such as surveys, rectified aerials, or other photographs:

4. Please provide a detailed description of all proposed activities that includes, at a minimum, the following information, as applicable:

a.   ☐ Summary of the proposed construction materials, method(s), and equipment (including types and drafts of vessels that will be used)

b. ☐ Description of proposed turbidity control and monitoring method(s), and other best management practices

c. ☐ Description of any proposed measures for the protection of listed species and their habitats

5. Please describe how the project will be designed and constructed in a manner that will not cause adverse effects to navigation. Include the following, as applicable:

a. ☐ Descriptions vessels (if any) customarily using the water body in the vicinity of the project, including representative types (e.g. sail, motor, etc.), sizes (length, width, draft), and use (e.g. recreational, commercial, military, etc.)

b. ☐ Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation

c. ☐ The minimum navigation clearance at mean low water for all proposed submerged structures

d. ☐ Proposed navigational safety features (advisory signs, lighting, etc.) for structures

e. ☐ If structures are proposed within 100 feet of any navigation channel or shipping fairway, provide an assessment of the navigational safety requirements or recommendations for the proposed project from the U.S. Coast Guard, if available

**C. Bridge, Causeway, Culvert, Traversing Work, or Structure**     ☐ Not applicable

1. Please describe the nature and purpose of the proposed structure(s), works, or activities. *For example, "construct a 30-foot-wide, piling-supported bridge to support a 2-lane road"*:

2. Will the proposed structure(s) support or accommodate motorized vehicular traffic?
☐ Yes     ☐ No (for pedestrian or non-motorized traffic, only)

3. Please describe the design and type(s) of structures that are proposed (check all that apply):

☐ free-spanning bridge (i.e. with no supporting structures in wetlands or surface waters)
☐ piling-supported (or trestle) bridge
☐ causeway
☐ culverted crossing
☐ other traversing work or structure; please describe:

Pilings/supports:
☐ Not applicable
☐ treated wood; type (e.g. CCA, ACQ, etc.), if known:
☐ concrete/steel     ☐ other
If pilings will be of treated wood materials, will they be completely wrapped (in sleeves of impermeable PVC, plastic, or similar material) from at least one foot below the mud line to at least one foot above the mean high water line (or seasonal high water line in non-tidal waters)?
☐ Yes     ☐ No

Surface:

☐ pavement (concrete or asphalt)    ☐ grated    ☐ wood    ☐ other

If the roadway will support motorized vehicular traffic, please provide a detailed description of how stormwater and other potential sources of runoff and pollution will be managed. Include supporting calculations, figures, or other documents, prepared by a Florida-registered professional, if applicable:    ☐ Not applicable

Fill and design:

☐ Earthen fill; please describe type, specifications, and source (if known):

☐ Riprap or other armored revetment; please describe type, specifications, and source (if known) of proposed materials:

☐ Vegetated shoreline; please describe species, sizes, planting spacing (on-center) and elevations (relative to mean or ordinary high and low water), application methods, and source (if known), as applicable, of all proposed plants, sod, or seed:

Culverts:

☐ Box    ☐ round/elliptical    ☐ other

☐ Please describe, in detail, the number, type, and dimensions of all proposed culverts:

Other works or structures:

☐ Please describe, in detail, the purpose, design, and dimensions of all other proposed traversing work or structures:

4. Please provide a detailed description of the proposed construction activities that includes, at a minimum, the following information, as applicable:

a. ☐ Summary of the proposed construction method(s) and equipment, including types of vessels or vehicles

b. ☐ A detailed plan for all proposed turbidity control and monitoring method(s), at all dredging or filling locations, and at proposed spoil offloading, disposal, or dewatering locations

c. ☐ Description of any proposed measures for the protection of listed species and their habitats, including statements of whether all work will be limited exclusively to daylight hours

d. ☐ For causeways, culverts, and traversing works, a description of construction methods and sequencing that ensures that construction of the proposed project will not impound waters, cause flooding, or cause adverse impacts to wetlands or surface waters, including surface water flows or levels

5. Please describe how the project will be designed and constructed to avoid adverse effects to navigation. Include the following, as applicable:

a. ☐ Descriptions of representative types of vessels (if any) customarily using the water body in the vicinity of the project, including

b. ☐ Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation

    c. ☐ The minimum navigational clearance beneath the proposed structure(s), at mean (or ordinary) high water

    d. ☐ The minimum navigational clearance, at mean low water for all proposed submerged structures (if applicable)

    e. ☐ If within 100 feet of a federally maintained or regulated navigation channel or shipping fairway, an assessment of the navigational safety requirements or recommendations (advisory signs, lighting, etc.) for the proposed project from the U.S. Coast Guard

**D. Dredging (For Navigation Basins, Channels, Or Other Purposes) and/or Filling** ☐ Not applicable

1. Please describe the nature and purpose of the proposed dredging or filling activities. For example, "dredge a 1,000 foot long, 50 foot wide navigation channel to a depth of six feet mean low water, to serve a commercial marina":

2. Please provide a detailed description of all proposed dredging and filing activities that includes, at a minimum, the following information, as applicable:

    a. ☐ Summary of the proposed dredging and filling method(s) (e.g. clamshell, hydraulic, etc.) and equipment, including types of vessels

    b. ☐ A detailed plan for all proposed turbidity control and monitoring method(s) at all dredging or filling locations, and at proposed spoil offloading, disposal, or dewatering locations

    c. ☐ Description of any proposed measures for the protection of listed species and their habitats, including statements of whether all work will be limited exclusively to daylight hours

3. Please describe how the project will be designed and constructed to avoid adverse effects to navigation. Include the following, as applicable:

    a. ☐ Descriptions of representative types of vessels (if any) customarily using the water body in the vicinity of the project, including

    b. ☐ Scaled and dimensioned drawings or aerial photographs depicting the proposed structures or activities in relation to existing structures and navigation channels, or other documents that provide assurance that the project will not unreasonably infringe upon local navigation

    c. ☐ A description of construction methods and sequencing that ensures that the proposed project will not obstruct local navigation during construction

    d. ☐ If within 100 feet of a federally maintained or regulated navigation channel or shipping fairway, an assessment of the navigational safety requirements or recommendations (advisory signs, lighting, etc.) for the proposed project from the U.S. Coast Guard

    e. ☐ For projects that include in-water filling of submerged lands, the minimum navigation clearance at mean low water for all proposed fill areas (if applicable)

4. For dredging projects, please describe how dredged spoil material will be managed and disposed. At a minimum, this description should include:

    a. ☐ Grain size distribution and silt/clay content percentage of the material proposed to be dredged (the reviewing agency may require additional sediment testing, based upon the percentage of silt/clay sediments)

    b. ☐ Proposed dredging, pumping, and outfall design, including turbidity containment, pipe hydraulic specifications and spillway placement and hydraulic design

    c. ☐ Calculations regarding the spoil area volume requirements including bulking factors, surface overflow rate, settling times, freeboard, etc.

    d. ☐ Description of how spoil material will be ultimately disposed of, including proposed stabilization methods and post-closure storm retention/detention capacity

    e. ☐ If flocculents, coagulants, or other additives are proposed (to aid with dewatering or settling), provide the names, descriptions, Material Safety Data Sheets, proposed application rates, and ecotoxicity data and testing methods for all such additives

## Part II: Hydrographic Information

The following information is necessary to determine whether the proposed activities may cause or contribute to a violation of state water quality standards. This information is required for activities or facilities that may either add pollutants to, or result in an adverse change to the patterns of flow, circulation, erosion, deposition, or littoral transport of a waterbody. Additional information may be required, such as water and sediment testing data, tidal conditions, tidal current measurements, bathymetric surveys, and simulations of hydrodynamic conditions and water quality, to fully assess the potential adverse impacts associated with your project. Please complete and provide all items as appropriate for your proposed project. Failure to do so may delay the processing of your application.

1. **Complete item 1. only if you are not providing additional information under Part II, with your application.** *Selecting options here does not relieve you of the need to submit information at a later time, if necessary to fully assess the potential adverse environmental impacts associated with your project.* I certify that, (check as appropriate for your project):

    ☐ I have been informed by the reviewing agency, during a pre-application meeting or conference, that hydrographic information, testing, and/or hydrographic analysis will not be required for my project. *Please identify the date and location of the meeting and the agency staff members who participated.*

    ☐ My project consists solely of the modification, construction, or operation of a docking facility that will accommodate the mooring of fewer than 10 vessels, including dry storage, when associated with a boat ramp or launch, **AND I have not been previously informed by the reviewing agency that hydrographic information will be required.**

    ☐ I am submitting a certification from a Florida-registered professional clearly stating that, due to the design, nature, and/or location of the proposed structures, works, or other activities, that the project does not have the potential to add pollutants to, or result in an adverse change to, the patterns of flow, circulation, erosion, deposition, or littoral transport of a waterbody; **AND I have not been previously informed by the reviewing agency that hydrographic information will be required.** *A copy of the Florida-registered professional's certification must be included with this application.*

    If none of the above apply, please provide all applicable items listed in items 2. through 7., below, based on the specific works or activities proposed for construction, alteration, maintenance, abandonment, or removal, as part of your project. In addition, a hydrographic report (including complete hydrodynamics and water quality analysis) may be necessary based upon the particulars of your project.

2. All structures or works

    a. ☐ Existing water body bathymetry and shoreline topography, if applicable

b. ☐ Structural details for the proposed structure(s)
c. ☐ Sediment grain size distribution and silt/clay content percentage within project area and adjacent areas
d. ☐ For activities in tidal waters, mean high and low water elevations, range, and periodicity

3. Piers, docks, wharves, marinas, mooring fields, and other boating-related activities (refer to Applicant's Handbook, Volume I, s. 10.2.4)    ☐ Not applicable

a. ☐ Details of existing and proposed systems including all dimensions (length, width, depth), location of junctions, connections to open waters, and dead-end(s), if applicable.
b. ☐ Site-specific characteristics of the wind field
c. ☐ For tidal systems, provide the longest path length, phase lag, and the flow amplitude (at mid-tide) between the head or center of the system to open waters
d. ☐ For non-tidal systems, provide the water surface elevation difference between the head (or center) and mouth of the system, and provide representative flow conditions at selected locations
e. ☐ Estimate the time needed to reduce the concentration of a hypothetical conservative pollutant, placed at the head of the system, to ten percent (10%) of initial
f. ☐ Verify (e.g. by using a tracer dye) the model(s) used to determine the advective/dispersive characteristics of the system. Provide a concentration gradient map depicting the size, distance of travel, and time of dispersion to the 10% concentration isopleth

4. Breakwaters, groins, jetties, seawalls, and revetments    ☐ Not applicable

a. ☐ Monthly averaged wave height, direction, and period for the project area shoreline
b. ☐ Wind data (direction and velocity) for project area
c. ☐ Estimate the mean annual and mean monthly littoral drift direction and volume
d. ☐ Existing structures within the zone of influence of proposed structures
e. ☐ Existing shoreline topography – dune crest to offshore bar break
f. ☐ Estimated changes in littoral transport, erosion, and deposition rates and patterns due to the proposed structures

5. Bridges, causeways, and culverts    ☐ Not applicable

a. ☐ For tidal waters, the maximum, minimum, and mean flow volumes and amplitudes, at ebb and flood tide
b. ☐ For non-tidal waters, the maximum, minimum, and mean flow volume and amplitude and mean range and periodicity of the water level variation
c. ☐ Existing circulation patterns in the waterway at the location of the proposed structure
d. ☐ Culvert or channel dimensions, cross-sectional area, and invert elevations
e. ☐ Maximum design discharge, and change in flow due to change in culvert or channel cross-section, if applicable
f. ☐ Drainage basin map and backwater calculations for area served by culvert, if applicable
g. ☐ Existing and proposed flow cross-sections and volumes at high and low water, for specified storm (flood) events, if applicable

6. Basins, channels, residential canals, and canal networks    ☐ Not applicable

a. ☐ Maximum and mean tidal flow rates for ebb and flood along the channel
b. ☐ Baseline bathymetry for the existing channel and adjacent areas

c.  ☐ Detailed descriptions of all areas of erosion and deposition, including existing deeps that can result in debris traps and zones of stratified water

7.  Outfalls and intakes        ☐ Not applicable

   a.  ☐ Design maximum and normal operational flows for the outfall/intake and criteria used
   b.  ☐ Dimensions and invert elevations for the proposed structures
   c.  ☐ Details of the construction at the shoreline/waterline intercept


## Part III: Plans

Provide plan and section view drawings that clearly show the facility, structure, or other works to be constructed, as applicable for the proposed project. Drawings must be signed and sealed by a Florida-registered professional, and must be of a scale sufficient to show the location and dimensions of all works. Use multiple sheets, if necessary. This information is **in addition to** that required under Section C (and others, if applicable) of the application.

1.  All structures

   Plan-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐ The location and orientation of all corresponding section, profile, and detail drawings
   b.  ☐ Location of the riparian upland parcel or property boundary lines, if applicable
   c.  ☐ Mean high water line (MHWL), ordinary high water line (OHWL), or safe upland line (SUL)
   d.  ☐ Complete dimensions (length, width, height) of all structures, works, or other activities in, on, or over wetlands or surface waters, including existing structures within 100 feet of the proposed facility
   e.  ☐ Separate and label square footage of structure over wetlands, open water, and uplands
   f.  ☐ Existing and proposed water depths throughout project area – isobaths or spot elevations must be clearly labeled with depths depicted in relation to mean low water (MLW), controlled water elevation (in non-tidal waters where the water is fairly controlled), mean annual low water (in other non-tidal waters), or an established vertical datum
   g.  ☐ Show proposed turbidity, erosion, and sedimentation control locations

   Section- and profile-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐ Complete dimensions of all proposed structures, including elevation above mean high water or ordinary high water (as applicable)
   b.  ☐ Water depth at mooring sites (mean low water, ordinary low water, or seasonal low water)
   c.  ☐ In tidal areas – approximate tidal range

2.  Piers, docks, marinas, boat ramps, and other docking or boating-related facilities    ☐ Not applicable

   Plan-view drawings should include the following, as applicable to the proposed activity:

   a.  ☐ Show and label width of deck planks and plank spacing, or if grated decking is to be used, provide technical specifications

    b.  ☐ Show the locations of all proposed sewage pumpouts, fuel pumps, and spill cleanup equipment

    c.  ☐ Show the locations of all proposed informational signage (manatee awareness, fueling safety, etc.)

    d.  ☐ Number each slip

    e.  ☐ Width of waterway and the location of the navigation channel and water depths (in relation to MLW) and distance along the most direct route(s) between the facility and the nearest marked navigation channel(s)

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

    a.  ☐ Elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters), and water depth at mooring sites and the bottom of the boat ramp (if applicable)

    b.  ☐ Structural details of all proposed pilings, anchors, moorings, buoys, and similar structures

3. Basins, channels, and other dredging and/or filling works or activities    ☐ Not applicable

Plan-view drawings should include the following:

    a.  ☐ The location, boundaries, and water depths (in relation to MLW) of all nearby navigation channels

    b.  ☐ The locations and detail drawings of all proposed navigational safety markers (signs, lights, etc.) for the structure(s)

    c.  ☐ The location, dimensions, and engineering specifications (including BMPs) for all proposed dredged material offloading, management, and disposal sites, if applicable

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

    a.  ☐ Representative section and/or profile views of all proposed structures that clearly show the existing and proposed depths, widths, and side slopes of all dredge and fill areas in relation to MHWL and MLWL (tidal waters), OHWL (non-tidal waters), and the submerged bottom, at representative locations

4. Groins, jetties, seawalls, revetments, and artificial reefs    ☐ Not applicable

Plan-view drawings should include the following:

    a.  ☐ The location and water depths (in relation to MLW) of all nearby navigation channels

    b.  ☐ The locations and detail drawings of all proposed navigational safety markers (signs, lights, etc.) for the structure(s)

Section- and profile-view drawings should include the following, as applicable to the proposed activity:

    a.  ☐ Representative section and/or profile views of all proposed structures that clearly show the height, width and side slopes of each structure in relation to MHWL and MLWL (tidal waters), OHWL (non-tidal waters), and the submerged bottom, at representative locations

5.  Bridges, causeways, culverted crossings, and other traversing works or structures ☐ Not applicable

    Plan-view drawings should include the following, as applicable to the proposed activity:

    a.  ☐  Width of waterway and the location, orientation, and water depths (in relation to MLW) of the navigation channel (if applicable)
    b.  ☐  Dimensions and technical specifications of the road, decking, or other surface, including drainage features, if applicable

    Section- and profile-view drawings should include the following, as applicable to the proposed activity:

    a.  ☐  Elevation of the structure above MHWL (tidal waters) or OHWL (non-tidal waters)
    b.  ☐  Representative sections through the culvert or channel

# Section E: Supplemental Information Required for Works or Other Activities Involving a Stormwater Management System
## (Other Than a Single-Family Project)

Instructions: The information listed in the checklists below represents the level of information that is usually required to evaluate an application. Information can be provided within reports, plans, and documents. The level of information required for a specific project will vary depending on the nature and location of the site and the activity proposed. Conceptual approvals generally do not require the same level of detail as a construction permit. However, providing a greater level of detail will reduce the need to submit additional information at a later date. If an item does not apply to your project, proceed to the next item. The supplemental information required by this section is in addition to the information required by Section            A              of                the                    application.

**Part 1:  Stormwater Management System Summary**

Provide drainage calculations, signed and sealed by an appropriate registered professional, and supporting documentation demonstrating that the proposed project meets the conditions for issuance under 62-330.301(1)(a),(b),(c),(e), F.A.C. The drainage calculations should include, but not necessarily be limited to, the following:

1.  General Site Information:

    a.  ☐  Provide pre-development and post-development drainage map(s), as appropriate, that include drainage patterns and basin boundaries with acreage served by each hydraulically separate system, showing the direction of flows, including any off-site runoff being routed through or around the system; topographic information; and connections between wetlands and other surface waters.

    b.  ☐  Provide the results of any percolation tests, where appropriate, and soil borings that are representative of the actual site conditions. Identify the wet season high water table elevations, soil profiles, and hydraulic conductivity. Include dates, datum, and methods used to determine these soil parameters.

    c.  ☐  Identify the onsite hydrologic soil classification (e.g. Type A, B/D, D). Reference the source, such as the USDA/NRCS Soil Survey, used in estimating the onsite hydrologic soil classification. Provide maps, as appropriate, with the project limits delineated.

    d.  ☐  Identify the seasonal high water or mean high tide elevation for receiving waters/wetlands into which runoff will be discharged. Include dates, datum, and methods used to determine these elevations.

    e.  ☐  Identify the name of each receiving waterbody to which the proposed stormwater management system will discharge:            .

    f.  ☐  Indicate the existing land use and land cover.

    g.  ☐   Provide the acreage and percentages of the total project, of the following:
        1.  Impervious surfaces (excluding buildings, wetlands, and other surface waters);

     

2.  Buildings;
3.  Pervious surfaces (green areas not including wetlands);
4.  Lakes, canals, retention areas, other open water areas; and
5.  Wetlands (Please compare to Section C to ensure consistency in wetland acreages).

h.  ☐  Provide the location and description of any nearby existing offsite features (such as wetlands and other surface waters, stormwater management ponds, and buildings or other structures) which might be affected by or affect the proposed construction or development.

2.  Water Quality Analysis:

a.  ☐  Provide a description of the proposed stormwater treatment methodology that addresses the type of treatment, pollution abatement volumes, and recovery analysis.

b.  ☐  Is the receiving waterbody known to be impaired and/or have an established Total Maximum Daily Load (TMDL) or Basin Management Action Plan (BMAP)? If so, please provide specific descriptions of all water quality parameters for which the waterbody is known to be impaired. For more information about water quality, impaired waters, and to determine whether a TMDL has been adopted in your project area, refer to: https://floridadep.gov/dear/water-quality-evaluation-tmdl/content/final-tmdl-reports. To determine whether a BMAP exists, or is being developed in your project area, refer to: https://floridadep.gov/dear/water-quality-restoration/content/basin-management-action-plans-bmaps.
    ☐ yes ☐ no ☐ don't know
    If yes, provide calculations demonstrating that the proposed project will not contribute to violations of state water quality standards in accordance with the applicable Applicant's Handbook, Vol. II.

c.  ☐  Does the project have a direct discharge to  Class I or II waters; Outstanding Florida Waters (OFW); or Class III waters, which are approved, conditionally approved, restricted, or conditionally restricted for shellfish harvesting? *To determine whether your project is within or will discharge to an OFW, or for more information about OFWs in general, refer to: https://floridadep.gov/dear/water-quality-standards/content/outstanding-florida-waters.*
    ☐ yes ☐ no ☐ don't know
    If yes, additional treatment in accordance with the applicable Applicant's Handbook, Vol. II, may be required.

d.  ☐  Provide construction plans and calculations that address the required treatment volume and recovery, as well as stage-storage and design elevations, which demonstrate compliance with the appropriate water quality treatment criteria in the applicable Applicant's Handbook, Vol. II.

e.  ☐  Provide a description of the engineering methodology, assumptions, and references for the parameters listed above and a copy of all  computations, engineering plans, and specifications used to analyze the system. If a computer program is used for the analysis, provide the name of the program, a description of the program, input and output data, and justification for model selection.

3.  Water Quantity Analysis:

Provide calculations and documentations demonstrating that the project, as proposed, meets the applicable design criteria as indicated in the applicable Applicant's Handbook, Vol. II. Typically, the information would include, at a minimum, but  not necessarily limited to, the following:

a.  ☐  For projects requiring pre-development analysis, provide an analysis of the pre-development peak rate of discharge and/or volume of runoff for all design storm events. Account for all onsite depressional storage and offsite contributing area. Please refer to the

applicable Applicant's Handbook, Vol. II for the design storm event(s) that apply to your project.

b. ☐ Provide an analysis of the post-development peak rate of discharge and/or volume of runoff for all applicable design storm events. Account for all onsite storage and offsite contributing area. Please refer to the applicable Applicant's Handbook, Vol. II for the design storm event(s) and criteria that apply to your project.

These analyses should include:

1. ☐ Runoff characteristics, including area, runoff curve number or runoff coefficient, and time of concentration for each drainage basin in the pre-development and post-development condition;

2. ☐ Design storms used including rainfall depth, duration, frequency, and distribution;

3. ☐ Runoff hydrograph(s) for each drainage basin for all required design storm event(s);

4. ☐ Stage-storage computations for any area, such as a reservoir, closed basin, detention area, or channel, used in storage routing;

5. ☐ Stage-discharge computations for any storage areas at a selected control point, such as control structure or natural restriction;

6. ☐ Flood routings through on-site conveyance and storage areas;

7. ☐ Water surface profiles in the primary drainage system for each required design storm event(s);

8. ☐ Runoff peak rates and volumes discharged from the site for each required design storm event(s);

9. ☐ Design tailwater elevation(s) for each storm event at all points of discharge (include source or method of estimate); and

10. ☐ Pump specifications and operating curves for range of possible operating conditions (if used in system).

c. ☐ Provide a description of the engineering methodology, assumptions, and references for the parameters listed above, and a copy of all such computations, engineering plans, and specifications used to analyze the system. If a computer program is used for the analysis, provide the name of the program, input and output data, justification for model selection, and, if necessary, a description of the program.

4. Floodplain Analysis (where applicable).

a. ☐ If the project is in a known floodplain of a stream or other water course, identify the appropriate floodplain boundary and approximate flooding elevations of any lake, stream, or other watercourse located on or adjacent to the site.

b. ☐ For traversing works, in accordance with the applicable Applicant's Handbook, Vol. II, provide:

1. ☐ Hydraulic calculations for all proposed traversing works; and

2. ☐ Water surface profiles showing upstream impact of traversing works.

c. ☐ For impacts to regulated floodplains, in accordance with the applicable Applicant's Handbook, Vol. II, provide:

1. ☐ Location and volume of encroachment within regulated floodplain(s); and

2. ☐ Plans and calculations for compensating floodplain storage, if necessary, and calculations required for determining minimum building and road flood elevations.

**Part 2: Construction Plans**

1. Provide clear, construction level detailed plans for the system. The plans must be signed and sealed by an appropriate registered professional as required by law. These plans should include cumulative information from all applicable sections, as well as the following:

   a. ☐ Project area boundary and total land area (as defined in A.H. Vol. I, subsection 2.0(a)(107), including distances and orientation from roads or other landmarks.

   b. ☐ Existing topography extending at least 100 feet off the project area. All topography shall include location and description of benchmarks, reference to NGVD 1929 or NAVD 1988 along with the conversion factor.

   c. ☐ Proposed site plan with acreage, including the following:
      1. ☐ plan view of proposed development, including impervious surfaces and water management areas;
      2. ☐ land cover and natural communities*;
      3. ☐ wetlands and other surface waters*;
      4. ☐ undisturbed uplands*;
      5. ☐ aquatic communities*;
      6. ☐ proposed buffers*;
      7. ☐ proposed impacts to wetlands and other surface waters, and any proposed connections/outfalls to other surface waters or wetlands, (if applicable); and
      8. ☐ onsite wetland mitigation areas*.
      9. ☐ For phased projects, provide a master development plan clearly delineating the limits of each phase of construction.
      *Information should reflect that provided in Section C.

   d. ☐ Paving, Grading, and Drainage Information, which includes, but is not necessarily limited to, the following:
      1. ☐ Existing topography;
      2. ☐ Boundaries of wetlands and other surface waters and upland buffers (see Section C);
      3. ☐ Plan view of proposed development;
      4. ☐ Proposed elevations and/or profiles, including:
         a) ☐ roadway, parking, and pavement grades;
         b) ☐ floor slabs, walkways, and other paved surfaces;
         c) ☐ earthwork grades for pervious landscaped areas; and
         d) ☐ perimeter site grading, tying back into existing grades.
      5. ☐ Location of all water management areas, including elevations, dimensions, side slopes, and design water depths;
      6. ☐ Location, size, and invert elevations of existing and proposed stormwater conveyance systems;
      7. ☐ Vegetative cover plan for all on-site and off-site earth surfaces disturbed by construction; and
      8. ☐ Rights-of-way and easements for the system, including all on-site and off-site areas to be reserved for water management purposes (including access), and rights-of-way and easements for the existing drainage system, if any.

   e. ☐ Stormwater detail information, including but not necessarily limited to, the following:
      1. ☐ Cross section of all stormwater management areas, including elevations, dimensions, side slopes, and proposed stabilization measures (with location of the cross section(s) shown on the corresponding plan view);
      2. ☐ Detail of all proposed control structures, including elevations, dimensions, and skimmer, where applicable; and

       3. ☐ Details of proposed stormwater management systems, such as underdrains, exfiltration trenches, vaults, and other proposed Best Management Practices (BMPs).

f. ☐ Location and description of any nearby existing offsite features (such as wetland and other surface waters, stormwater management ponds, and building or other structures) which might be affected by or affect the proposed construction or development.

## Part 3: Construction Schedule and Techniques

Provide a construction schedule and a description of construction techniques, sequencing, and equipment. This information should include, as applicable, the following.

a. ☐ Access and staging of equipment;

b. ☐ Location and details of the erosion, sediment, and turbidity control measures to be implemented during each phase of construction and all permanent control measures to be implemented in post-development conditions.

c. ☐ The location of disposal site(s) for any excavated material, including temporary and permanent disposal sites.

d. ☐ A demolition plan for any existing structures to be removed.

e. ☐ Dewatering plan details. If dewatering is required, detail the dewatering proposal including the methods that are proposed to contain the discharge, methods of isolating dewatering areas, and indicate the period dewatering structures will be in place. **Note: A Consumptive Use or Water Use permit may be required for dewatering.**

f. ☐ Methods for transporting equipment and materials to and from the work site. If barges are required for access, provide the low water depths and draft of the fully loaded barge;

## Part 4: Operation and Maintenance and Legal Documentation:

a. ☐ Describe the overall maintenance and operation schedule for the proposed system.

b. ☐ Identify the entity (or entities) that will be responsible for operating and maintaining the system (or parts of the system) to demonstrate that the entity (or entities) meet(s) the requirements of section 12.3 of the Applicant's Handbook, Vol. I.
       1. ☐ If different from the permittee, provide a draft document enumerating the enforceable affirmative obligations on the entity to properly operate and maintain the system for its expected life and documentation of the entity's financial responsibility for long-term maintenance.
       2. ☐ If the proposed operation and maintenance entity is not a property owner's association, provide proof of the existence of an entity or the future acceptance of the system by an entity which will operate and maintain the system.

c. ☐ Provide drafts of all proposed conservation easements, stormwater management system easements, draft property owner's association documents, and plats for the property containing the proposed system.

d. ☐ Provide legal reservations for access to the treatment system for maintenance and operation by future maintenance entities for subdivided projects.

e. ☐ Provide indication of how water and wastewater service will be supplied.

f.  ☐ Provide a copy of the boundary survey and/or legal description and acreage of the total land area of contiguous property owned/controlled by the applicant.

g.  ☐ If any associated land agreements are required to implement the proposed activities, such as flowage easements across lands not owned by the applicant, include such documentation. If negotiations are underway, but not yet concluded, regarding such land use agreements, please indicate that and provide an anticipated date for providing that documentation. A permit cannot be issued for an activity to use lands that are not owned by the applicant or for which the applicant does not hold a sufficient real property interest to use those lands.

**Part 5: Water Use**

a.  ☐ Describe how irrigation will be provided to the project. Will the surface water system be used for water supply, including landscape irrigation, or recreation?

b.  ☐ If a Consumptive Use or Water Use permit has been issued for the project, state the permit number:

c.  ☐ If a Consumptive Use or Water Use permit has not been issued for the project, indicate if such a permit will be required. ☐ yes  ☐ no  ☐ don't know
    If yes, please indicate when the application for a permit will be submitted:

d.  ☐ Indicate how any existing wells located within the project site will be utilized or abandoned.

**Part 6:  Special Basin Information**

a.  Is your project within a special basin as described in the applicable Applicant's Handbook, Vol. II?

    ☐ yes  ☐ no  ☐ don't know

b.  If yes, please demonstrate that the project will meet the applicable special basin criteria.

# Section F:  Application for Authorization to Use State-Owned Submerged Lands

Instructions: If you were referred to this section from Section A, please provide the following additional information. Please note that if your proposed project is on state-owned submerged lands and the below requested information is not provided, your application will be considered incomplete. All items required under this section are in addition to those required under other sections, as applicable.

**Part 1: Type of Authorization Requested**

**Please check the most applicable activity that applies to your project(s):**

A. Exceptions: The following activities do not require authorization to use state-owned submerged lands. If you are certain that your project (including all components/phases) qualifies, please check the appropriate box, and no further action is required to complete this section.

- ☐ Construction or maintenance of a county water or sewer system under Section 153.04, F.S.
- ☐ Removal of material from the area adjacent to an intake or discharge structure under 403.813(1)(f), F.S.
- ☐ Removal of organic detrital material under Section 403.813(1)(r) or (u), F.S.
- ☐ Construction of floating vessel platforms under Section 403.813(1)(s), F.S.
- ☐ Trimming or alteration of mangroves under Sections 403.9321 through 403.9334, F.S.

B. Consent by Rule: Except for activities authorized under Section 253.77(4), F.S., no application or written authorization for the use of state-owned submerged lands is required for an activity that complies with the criteria listed in subparagraphs 18-21.005(1)(b)1. through 5., F.A.C., and that is exempt from the requirements of obtaining a permit under the provisions of:

- Section 403.813(1)(a) and (b), F.S., provided that the structure is the only dock or pier on a parcel and it is not a private residential multi-family dock with three or more slips.
- Section 403.813(1)(c), (d), (e), and (f), F.S., provided that no severance fee is required under Rule 18-21.011, F.A.C., and the existing activity has a valid Board of Trustees authorization.
- Section 403.813(1)(g), (h), and (i), F.S., provided that no private residential multi-family dock or pier is constructed.
- Section 403.813(1)(k), F.S., provided that any channel markers delineate existing and authorized or permitted navigation channels.

Such activities must still comply with the General Conditions for Authorizations under subsection 18-21.004(7), F.A.C. Agency staff will determine whether the proposed project qualifies for Consent by Rule. Be advised that if your project does not qualify for an Exception or Consent by Rule for one of the reasons listed above, then it will require one of the forms of authorization listed below.

C. Letter of Consent: Written authorization is required for each of the following activities:

- ☐ One minimum-size private residential single-family dock (see definition in Rule 18-21.003, F.A.C.).
- ☐ Private residential single-family or multi-family docks, piers, boat ramps, and similar existing and proposed activities that cumulatively preempt no more than 10 square feet of sovereignty submerged land for each linear foot of the applicant's riparian shoreline, along sovereignty

     

submerged land on the affected waterbody within a single plan of development (see "preempted area" definition in Rule 18-21.003, F.A.C.).

☐   Private channels that provide access to an upland single-family or multi-family residential parcel and that measures no more than 10 square feet of sovereignty submerged land for each linear foot of the applicant's riparian shoreline along sovereignty submerged land on the affected waterbody within a single plan of development.

☐   Seawalls, bulkheads, or other shoreline stabilization structures no more than three feet waterward of mean or ordinary high water.

☐   Placement, replacement, or repair of riprap, groins, breakwaters, or intake and discharge structures no more than ten feet waterward of the line of mean or ordinary high water.

☐   Restoration and nourishment of naturally occurring sandy beaches, including borrow areas to be used for five years or less.

☐   Artificial reefs or fish attractors that are constructed for public use.

☐   Public docks or piers that are exempt from permit requirements under Section 403.813(1), F.S., or that qualify as minimum-size docks or piers or are less than or equal to the 10:1 preempted area to shoreline ratio; public boat ramps; public channels; or public swimming areas, provided that all such structures or activities are owned and operated by governmental entities and any revenues collected are used solely for operation and maintenance of the structure or adjacent public recreational facilities.

☐   Ski course buoys and ski jumps not associated with revenue-generating water skiing activities.

☐   Removal of wrecked, abandoned, or derelict vessels or structures.

☐   Habitat restoration.

D.   Lease: A state-owned submerged land lease is required for the following activities.

☐   Private residential single-family or multi-family docks or piers, other docks or piers, boat ramps, or other similar activities that do not qualify for a letter of consent.

☐   Private residential multi-family docks designed or used to moor three or more vessels within aquatic preserves.

☐   Docks designed or used to moor ten or more vessels in Monroe County.

☐   Commercial/industrial docks, as defined in Rule 18-18.004, F.A.C., in Biscayne Bay Aquatic Preserve, as required by paragraph 18-18.006(3)(c), F.A.C.

☐   All revenue-generating activities.

☐   Oil and gas exploration and development.

☐   Open-water mooring fields.

☐   Mining.

E.   Easement: A state-owned submerged land easement is required for the following public or private activities.

☐   Utility crossings and rights of way.

☐   Road and bridge crossings and rights of way, including such structures built prior to the need to obtain an easement when proposed for modification or repair.

☐   Groins, breakwaters, and shoreline protection structures, except when constructed as part of a docking facility that requires a lease.

☐   Public navigation projects other than public channels.

☐   Private residential channels that do not qualify for a letter of consent and channels that provide access to revenue-generating facilities in uplands.

☐   Oil, gas, and other pipelines.

☐   Intake and discharge structures more than 10 feet waterward of the mean or ordinary high

water line.
- [ ] Spoil disposal sites.
- [ ] Borrow areas that will be used for longer than five years for beach nourishment.
- [ ] Public water management projects other than public channels.
- [ ] Treasure salvage (Cultural Resource Recovery).

**Part 2: Submittal Requirements**

If state-owned submerged lands will be affected by your project, we will notify you in writing, and the items in this section will also be required. For expediency, if you acknowledge or believe that your project affects state-owned submerged lands you may submit the items in the appropriate section of Part 2 prior to receiving written confirmation of state ownership. This will not jeopardize any future claim of ownership.

Unless your proposed project qualifies for an Exception or Consent by Rule, as described in Part 1 A or B, then your application to use state-owned submerged lands must include the following items, as applicable to your project.

A. All applications for Letter of Consent, Lease, or Easement must include the following:

- [ ] Satisfactory evidence of sufficient upland interest to the extent required by paragraph 18-21.004(3)(b), F.A.C.
- [ ] Detailed statement of the proposed activity.
- [ ] If dredging is proposed, an estimate of the number of cubic yards of sovereignty materials to be removed showing how the amount was calculated.

B. Applications for a **Letter of Consent** shall also include the following:

- [ ] Multiple boat slip facilities may require an affidavit certifying that the facility will not be a revenue generating/income producing facility.
- [ ] Two copies of a dimensioned site plan drawing(s) with the following requirements:
    a. Utilizing an appropriate scale;
    b. Showing the approximate location of the mean high/ordinary high/or safe upland line;
    c. Showing the location of the shoreline vegetation, if existing;
    d. Showing the location of the proposed structures and any existing structures;
    e. Showing the applicant's upland parcel property lines;
    f. Showing the riparian lines; and
    g. Showing the primary navigation channels or direction to the center of the affected waterbody.

C. Applications for **Leases** shall also include the following:

- [ ] Lease processing fee as specified in subparagraph 18-21.008(1)(a)8, F.A.C.
- [ ] Location of the proposed activity including: county; section, township and range; affected waterbody; and a vicinity map, preferably a reproduction of the appropriate portion of United States Geological Survey quadrangle map.
- [ ] Two prints of a survey prepared, signed, and sealed by a person properly licensed by the Board of Professional Surveyors and Mappers, including the following:
    a. Use an appropriate scale;
    b. Show the location of ordinary or mean high water;
    c. Show the location of the shoreline vegetation, if existing;
    d. Show the location of the proposed structures and any existing structures;

      e.   Show the applicant's upland parcel property lines;

      f.   Show the primary navigation channels or direction to the center of the affected waterbody

      g.   Show the riparian lines;

      h.   Include a legal description of the preempted area to be leased; and

      i.   For those lease applications in the Florida Keys, indicate the water depths referenced to mean low water within the lease area and out to the navigation channel.

☐ Noticing information as required by subsection 18-21.005(3), F.A.C.

☐ Billing Information Form, which provides billing information; sales tax information; and other data required in accordance with Section 24.115(4), F.S.

☐ Computation of the total square footage of preempted sovereignty land to be leased.

D.   Applications for **Easements** shall also include the following:

☐ Easement processing fee as specified in either (for public easements) paragraph 18-21.009(1)(g), or (for private easements) paragraph 18-21.010(1)(i), F.A.C.

☐ Vicinity map.

☐ Detailed statement of proposed use and satisfactory evidence of need for installation of telecommunication lines and associated conduits that are subject to the provisions of paragraph 18-21.004(2)(l), F.A.C. If the applicant is a local governing body, the request shall be by official resolution or minutes.

☐ Two prints of a survey prepared by a Licensed Florida Surveyor and Mapper, including the following:

      a.   Use an appropriate scale;

      b.   Showing boundaries of the parcel sought;

      c.   Showing ownership lines of the riparian uplands;

      d.   Showing the line of ordinary or mean high water;

      e.   Showing the location of the shoreline vegetation, if existing;

      f.   Showing the location of any proposed or existing structures;

      g.   Showing the riparian lines; and

      h.   Legal description and acreage of the parcel sought.

☐ Noticing information as required by subsection 18-21.005(3), F.A.C.

# Section G: Supplemental Information Required for Mitigation Banks

Instructions: Please provide the information requested below if you are applying for a mitigation bank permit or a mitigation bank conceptual approval in accordance with Chapter 62-342, F.A.C. To obtain a mitigation bank permit, the applicant must provide reasonable assurance in accordance with 373.4136(1), F.S. that:

a) The proposed mitigation bank will improve ecological conditions of the regional watershed;
b) The proposed mitigation bank will provide viable and sustainable ecological and hydrological functions for the proposed mitigation service area;
c) The proposed mitigation bank will be effectively managed in perpetuity;
d) The proposed mitigation bank will not destroy areas with high ecological value;
e) The proposed mitigation bank will achieve mitigation success;
f) The proposed mitigation bank will be adjacent to lands that will not adversely affect the perpetual viability of the mitigation bank due to unsuitable land uses or conditions;
g) Any surface water management system to be constructed, altered, operated, maintained, abandoned, or removed within the mitigation bank will meet the requirements of the rules adopted under Part IV of Chapter 373, F.S., including Section E of the application;
h) It has sufficient legal or equitable interest in the property to ensure perpetual protection and management of the land within a mitigation bank; and
i) It can meet the financial responsibility requirements prescribed for mitigation banks.

In addition, a phased Mitigation Bank must demonstrate that each phase independently meets the mitigation bank establishment and operation requirements above (Section 373.4136, F.S.).

## Part 1: Location of The Proposed Mitigation Bank (62-342.450(1), F.A.C.)

Please provide the following information:

1. ☐ A map, at regional scale, of the mitigation bank in relation to the regional watershed and proposed mitigation service area;

2. ☐ A vicinity map showing the mitigation bank in relation to adjacent lands and off-site areas of ecological or hydrologic significance which could affect the long-term viability or ecological value of the bank;

3. ☐ A recent aerial photo of the mitigation bank (in color; 11x17 inches or greater) identifying boundaries of the project area and showing the proposed assessment areas;

4. ☐ One or more historical aerial photos of the mitigation bank (no photocopies) identifying boundaries of the project area and the proposed assessment areas, if substantially different from current conditions;

5. ☐ A highway map showing points of access to the mitigation bank for site inspection; and

     

6. ☐ A legal description of the proposed mitigation bank.

**Part 2: Ecological Significance (62-342.450(2), F.A.C.)**

Please provide the following information:

1. ☐ A description of the ecological significance of the proposed mitigation bank to the regional watershed in which is it is located

**Part 3: Current Site Conditions (62-342.450(3), F.A.C.)**

Please provide the following information:

1. ☐ A soils map of the mitigation bank site;

2. ☐ A topographic map of the mitigation bank site and adjacent hydrologic contributing and receiving areas;

3. ☐ A hydrologic features map of the mitigation bank and adjacent hydrologic contributing and receiving areas;

4. ☐ Current hydrologic conditions in the mitigation bank site;

5. ☐ A vegetation communities map of the mitigation bank site and site-specific descriptions of each significantly different aerial signature or assessment area, including the native community types, a species list of the dominant canopy and groundcover plants, its structure relative to reference condition, and historical impacts;

6. ☐ Ecological benefits currently provided to the regional watershed by the mitigation bank site;

7. ☐ Adjacent lands, including existing land uses and conditions, projected land uses according to comprehensive plans adopted pursuant to Chapter 163, F.S., by local governments having jurisdiction, and any special designations or classifications associated with adjacent lands or waters; and,

8. ☐ A disclosure statement of any material fact which may affect the contemplated use of the property.

**Part 4: Mitigation Plan (62-342.450(4), F.A.C.)**

Please provide the following information:

1. ☐ Proposed construction/mitigation activities, including a detailed schedule for implementation;

2. ☐ The proposed vegetation enhancement activities, such as plant removal/eradication, planting, seeding, or prescribed fire, and detailed schedule for implementation;

3. ☐ Measures to be implemented during and after construction/implementation to avoid adverse impacts related to proposed activities;

4. ☐ A detailed perpetual management plan comprising all aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species

control, fire management,  control of access, and inspection and implementation schedule of each activity; and

5. ☐ A proposed monitoring plan to demonstrate mitigation success.

**Part 5: Assessment of Improvements in Ecological Value (62-342.450(5), F.A.C.)**

Please provide the following information:

1. ☐ A description of anticipated site conditions in the mitigation bank after the mitigation plan is successfully implemented, including proposed community map and GIS shapefile, and proposed quantitative and qualitative success criteria;

2. ☐ A comparison of current fish and wildlife habitat and utilization functions to those after the mitigation plan is successfully implemented; and

3. ☐ A description of the expected ecological benefits to the regional watershed and the timeframe to achieve these benefits.

**Part 6: Evidence of Sufficient Legal or Equitable Interest in the Property (62-342.450(6), F.A.C.)**

Please provide the following information:

1. ☐ Evidence of sufficient legal or equitable interest in the property which is to become the mitigation bank to meet the requirements of Rule 62-342.650, F.A.C.

**Part 7: Financial Responsibility (62-342.450(7), F.A.C.)**

Please provide the following information:

1. ☐ Cost estimates and draft documentation of financial responsibility for the construction and implementation phase and the perpetual management phase of the mitigation bank meeting the requirements of 62-342.700, F.A.C.

**Part 8: Additional Information (62-342.450(8), F.A.C.)**

Please provide the following information:

1. ☐ Any additional information which the Agency requests or would need in order to evaluate whether the proposed Mitigation Bank meets the criteria of Section 373.4136, F.S., and this chapter.

2. ☐ Any engineering calculations and/or computer modeling (such as hydrograph or staging) needed to assess the effects of the project on the hydrologic characteristics of the mitigation bank site and upstream and downstream areas.

**Part 9: Land Use Restrictions (62-342.650)**

Please provide the following information:

1. ☐ Documentation in the form of: (a) a draft warranty deed for the fee interest to be conveyed to the Agency, or (b) a draft conservation easement to be conveyed to both the Department and the District in accordance with Rule 62-342.650, F.A.C.;
2. ☐ A boundary survey of the real property interest being conveyed. The survey must be certified by a land surveyor and mapper registered in the State of Florida;
3. ☐ A certified appraisal or other documentation demonstrating the market value of the property or interest to be conveyed to determine the appropriate amount of title insurance;
4. ☐ A marketable title commitment issued to the Agency as beneficiary in an amount at least equal to the fair market value;
5. ☐ A Phase I environmental audit; and
6. ☐ If applicable, evidence that all abandoned personal property, solid waste, or hazardous substances have been removed from the property.

# Section H:
# Supplemental Information for Stormwater Management Systems for Mines

Instructions: The supplemental information required by this section is in addition to the information required by Section A and Section C (if applicable) of this application. This section is only required for mines for which the Department has permitting, compliance, and enforcement responsibilities under the interagency operating agreements with the water management districts and mines within assumed waters regulated under Chapter 62-331, F.A.C., but is not applicable to borrow pits.

***The design options and considerations applicable to stormwater management systems for mines are referenced in Section 8.2.7 and described in Appendix I of Volume I of the Applicant's Handbook. The applicant is strongly encouraged to contact the Department to arrange a pre-application review meeting prior to finalizing the proposed project activities, including monitoring well and piezometer installation and water quality sampling. The information requested below represents the level of information that is usually required to evaluate an application. Information can be provided within reports, plans and other documents. Provide a response after each item below indicating specifically where in the reports, plans, and other documents the information will be found. If an item does not apply to your project, indicate that it does not and proceed to the next item. The level of information required for a specific project will vary depending on the nature and location of the site and the activities proposed. Conceptual approvals generally do not require as much detail as a construction permit. However, providing a greater level of detail will reduce the need to submit additional information at a later date.***

**Part 1: Project Information and Environmental Considerations**

a. ☐ Provide a detailed description of the proposed activities, including specifics about the stormwater management system(s), water treatment methodologies, and operation and maintenance procedures for the construction (during-mining and reclamation) and post-reclamation (also known as "operation" or "post-development") conditions.

b. ☐ Respond to the following items if Section C was not completed (because the proposed work or activity will not occur in, on, over, or within 25 feet of a wetland or other surface water):

   1. ☐ Identify the seasonal high water or mean high tide elevation and normal pool or mean low tide elevation for each wetland and other surface water, both within and contiguous to the proposed permit area. Include an aerial photograph identifying each area, the elevation source and datum, and method of evaluation.

   2. ☐ Describe how the proposed project will be designed to avoid adverse effects to public health, safety, or welfare or the property of others.

c. ☐ Provide the results of percolation tests, soil boring logs, cross-sections, and stratigraphic thickness contour maps, if available, that are representative of the actual site conditions to the proposed excavation depth(s). Provide the hydraulic conductivity values and proposed average and maximum depths of excavation.

d. ☐ Provide a hydrostratigraphic column that is representative of the proposed project site. Describe the hydrostratigraphic units and define all aquifer(s) and/or aquiclude(s) (semiconfining/confining beds) present at the project site. Identify the wet season high water table elevations for the proposed project area. Include the dates, datum, and methods used to determine these parameters.

e. ☐ Changes to pre-construction groundwater elevations on the proposed mining site may adversely impact the hydrology of onsite or offsite wetlands and other surface waters (including lakes, streams, and spring discharges). Provide the following:

   1. ☐ A hydrologic analysis, such as a seepage analysis, water budget analysis, and/or drawdown analysis, for the existing, construction, and post-reclamation conditions. State

     

the assumptions, scope of the analysis, the source(s) of the data used in the calculation(s) and the name of the computer model or program, if used. If applicable, provide input and output Geographic Information System (GIS) data layers in digital format that were used in the hydrological analysis. Provide the relevant metadata, including data sources and map projection systems. Input and output data tables, such as excel, access, or a similar format, should also be provided in digital format.

2.  ☐ For a proposed water elevation maintenance system, such as a recharge system, provide a plan view drawing of the system indicating the source and routing of the water; a cross section drawing of the hydration system, injection well, or recharge ditch in relation to features such as the mine-cut face, cast overburden/seepage face, the ground surface, the overburden and matrix layers, and the water table; and a monitoring and maintenance plan for the system.

f.  ☐ Provide a water level monitoring plan for any avoided wetlands and other surface waters adjacent to the proposed project boundary or excavation. The monitoring plan shall include a staff gauge and/or piezometer location map, monitoring instrumentation, data collection methods, data recording and/or downloading frequency, available remedial measures, a typical gauge/piezometer schematic and datum, and reporting frequency and report contents. Propose a monitoring period that starts prior to mining and ends after the completion of reclamation.

g.  ☐ Identify public water supply wells within 1000 feet of the proposed extraction area. Identify the wellfield cone of depression, if available, well depths and screen or open-hole intervals, and source of information for public water supply wells.

h.  ☐ To the extent possible, through publically available information and field reconnaissance from the project boundary, identify private water supply wells located within 1000 feet of the proposed extraction area. This shall not be construed to require trespassing on the property of others. Provide the well construction details, if available.

i.  ☐ Provide ambient surface water and groundwater quality characterization for the proposed project for intervals extending to the proposed depth of mining. The applicant is strongly encouraged to arrange a pre-application meeting prior to performing monitoring well installation and water quality sampling activities.

j.  ☐ If the proposed project site is located within a mile of a karst-sensitive area, a springshed, other karst features, or a public supply wellfield, submit a geotechnical assessment report, which includes a location map of these features. Provide information about site grading or other stormwater management practices designed to direct runoff from any areas that are potential sources of pollutants into stormwater treatment areas that are designed, constructed, operated, and maintained in compliance with the requirements of the applicable Applicant's Handbook, Volume II, prior to any discharge to the mine excavation.

k.  ☐ If a floating dredge will be used, specify the approximate depth and area that will need to be excavated before the dredge will become operational. Describe the initial excavation method, including the approximate length of time from initiation of excavation to the time that the floating dredge will become operational. If temporary dewatering will be conducted, please provide the projected drawdown of the water table in the avoided wetlands. If necessary based on the results, provide protective measures such as the construction of recharge ditches. Describe any measures that will be used to manage the extracted water.

l.  ☐ If the water table will be augmented to use a floating dredge, specify the water source (e.g. offsite recycled wastewater) and pumping and conveyance system details.

m.  ☐ If the proposed project area is in the watershed of a first order stream (headwater), second order stream, etc., of a river where Minimum Flows and Levels (MFLs) have been established, provide a water quantity simulation representing the peak severance/dewatering conditions to demonstrate that the proposed activity will not contribute to violations of the established MFLs.

n.  ☐ Following reclamation, if a mine pit or reclaimed created lake will connect to offsite wetlands or other surface waters during storms less than the 25-year, 24-hour design storm event, or if the water body will have more than one property owner, then the water body meets the definition for

"waters of the state". Waters of the state must meet the surface water quality standards of Chapter 62-302, F.A.C. To demonstrate the absence of such a connection, the applicant must show through volumetric calculations or hydrologic modeling that the mine pit or reclaimed created lake will have sufficient capacity when operating at the average annual water elevation (normal pool) for the storage of direct runoff and rainfall for the 25-year, 24-hour design storm event. If the proposed project will result in waters of the state in the post-reclamation condition, provide reasonable assurance that the surface water quality standards will be met.

o. ☐ Identify the classification(s) (e.g. Class F-1, G-1, G-II, G-III and G-IV) of the groundwater in the proposed project area and immediate vicinity according to the designated uses provided in Rule 62-520.410, F.A.C.

p. ☐ Provide the names, locations, and storage conditions for any chemicals that will be stored onsite. This includes all pH adjusters, water conditioners, and other material that will be used in the process water. Additionally, include how the chemicals will be utilized, e.g. blasting, vehicle maintenance, vegetation maintenance, and process water treatment. Identify separate containment areas on the construction plans that meet the requirements of the applicable Applicant's Handbook, Volume II for equipment maintenance and the storage of petroleum and hazardous substances.

q. ☐ For previously-mined lands that are proposed for construction, provide the following:
   1. ☐ Bathymetric map for each existing lake.
   2. ☐ Identify the existing lakes to be excavated deeper and the proposed maximum depth of excavation.
   3. ☐ Identify any onsite lake that has penetrated a confining layer between the water table aquifer and a deeper aquifer.
   4. ☐ Provide a discussion of the existing site-specific geology (including sand tailings, waste clay disposal, and overburden deposition and orientation, if known) and aquifers and aquitards.

r. ☐ Provide all of the known historical and current activity information for the project area, such as specific crops grown, vehicle maintenance, waste disposal, and indicate the aerial extent of each activity on a plan map. Provide soil sample quality data, a summary of the soil characterization procedures, and sampling results. The applicant is strongly encouraged to arrange a pre-application meeting prior to performing soil sampling activities.

s. ☐ Provide a hydrological analysis, as applicable, for proposed wetland mitigation (excluding permitted mitigation banks). If applicable, provide input and output GIS data layers in digital format that were used in the hydrological analysis. Provide the relevant metadata, including data sources and map projection systems. Input and output data tables, such as Excel, Access, or a similar format should also be provided in digital format. The hydrological analysis shall evaluate the wetland types and appropriate hydroperiods, historical and proposed hydrologic conditions, including whether the wetlands were perched, surface water dependent, seepage dependent, or groundwater-supported. Propose monitoring locations for piezometers and staff gauges, construction details, the measurement frequency, the data collection methodology, and reporting format.

t. ☐ Applicants that elect to use alternative wetland mitigation associated with the mining of high-quality peat, in accordance with Section 373.414(6)(e), F.S., shall provide all information required by Chapter 62-348, F.A.C.

u. ☐ If onsite and/or offsite applicant-responsible mitigation is proposed, submit a cost estimate for completing the mitigation, including monitoring and maintenance, as required by Section C of the application. For phosphate and limestone mines only, mitigation costs shall be presented as provided by Section 373.414(19), F.S. If the proposed mitigation costs exceeds $25,000, provide draft financial assurance documents, as required by Section C of the application.

v. ☐ For phosphate and heavy mineral mines, provide, within the footprint of the current ERP application, the number of acres of land mined before July 1, 1975; land mined from June 30, 1975 to the present; land to be mined; land disturbed before June 1, 1975; land disturbed from June 30, 1975 to present; land to be disturbed; land to remain undisturbed; and the sum of these acres.

w. ☐ For fuller's earth mines, provide, within the footprint of the current ERP application, the number of acres of land mined or disturbed before July 1, 1975; land mined or disturbed from July 1, 1975 to October 1, 1986; land mined or disturbed from October 2, 1986 to present; land to be mined or disturbed, land to remain undisturbed; and the sum of these acres.

x. ☐ For limestone and other resources mines that began operations on or before October 1, 1986, provide, within the footprint of the current ERP application, a figure that shows areas disturbed by mining operations on or before January 1, 1989 and the number of acres and current status for each area. Examples of status include: reclaimed, reclamation in progress, mined out, mining, disturbed only, stock piles, overburden piles, and tailings disposal. Include aerial photographs as a basis for this figure.

y. ☐ For phosphate, heavy mineral and fuller's earth mines, provide, within the footprint of the current ERP application, the information below in acres for lands mined or disturbed prior to July 1, 1975. For limestone and other resources mines that began operations on or before October 1, 1986, provide the information below in acres for lands mined or disturbed on or before January 1, 1989.

|  | In Use* | Unreclaimed | Reclaimed |
|---|---|---|---|
| 1. ☐ Mined only |  |  |  |
| 2. ☐ Mined – waste disposal use |  |  |  |
| 3. ☐ Disturbed only |  |  |  |
| 4. ☐ Disturbed by waste disposal |  |  |  |
| 5. ☐ Total *For mining operations |  |  |  |

z. ☐ For above grade settling or disposal areas provide the geometric characteristics of each area, including the average dike height (feet), dike crest elevation (feet & datum), maximum operating water level (feet & datum), crest width (feet), outside and inside slopes (below and above grade), effective area (acres), effective depth (feet & datum), effective pit bottom depth below grade (feet), and effective storage volume (acre-feet).

aa. ☐ For phosphate mines, estimate the following information for each disposal site:

| Waste Clay Disposal Site Designation | Site 1 | Site 2 | Site 3 | Site 4 |
|---|---|---|---|---|
| Disposal Acres |  |  |  |  |
| Dam Height Above Grade (ft.) |  |  |  |  |
| Minimum/Maximum/Average |  |  |  |  |
| Type of Disposal |  |  |  |  |
| Cap Thickness (ft.) |  |  |  |  |
| Average Storage Depth (ft.) |  |  |  |  |
| Storage (acre-feet) |  |  |  |  |
| Infill Rate (Dry Tons/yr.) |  |  |  |  |
| Percent Solids in Fill* |  |  |  |  |
| Immediate Percent Solids** |  |  |  |  |

* At entry into CSA          **Point at which self-weight consolidation begins

bb. ☐ For phosphate mines, provide the following drainage information and acreages based on the Florida Land Use Cover and Forms Classification System, Level III:

| Drainage Information | Pre-mining Quantity | Pre-mining Acres | Post-reclamation Quantity | Post-reclamation Acres |
|---|---|---|---|---|
| 1st order drainage basins | | | | |
| 2nd order drainage basins | | | | |
| wetlands under 20 acres | | | | |
| wetlands 20 acres or over | | | | |
| Lakes (waterbodies) | | | | |

cc. ☐ If the proposed project will include stream disturbances, provide a stream assessment and mitigation/reclamation plan that includes maps and an analysis of the existing streams. Identify the stream type (Rosgen Level II or other classification system approved by the Department), flow type (perennial, intermittent, or ephemeral), stream order, stream habitat quality, and channel lengths. Distinguish between natural streams and ditched or channelized natural steams and identify which streams are proposed for disturbance. The plan shall also describe how the streams proposed for disturbance will be reclaimed and include the reference reach or regional curve information used in the design, stream type, stream order, individual stream lengths and designs (dimension, pattern, and profile), and stream construction specifics, including construction staking, erosion control, streambank construction, riparian corridor revegetation, and in-stream habitat creation.

**Part 2: Construction Plans**

Provide clear, construction level detailed plans for the proposed project, including specifications, plan (overhead) views, cross section views (with the locations of cross section shown on the corresponding plan view) and profile (longitudinal) views. Include a scale, scale bar, county name, Section, Township, and Range, and a north arrow on each sheet. The plans must be signed, dated, and sealed by an appropriate Florida-licensed   professional. These plans shall include cumulative information from all applicable sections of the application.

a. ☐ Provide the project, permit, and property boundaries and total acreages, including distances and orientation from roads or other landmarks on a recent aerial legible for photo interpretation with a scale of 1 inch = 400 feet, or more detailed. The project boundary shall only include the portions of the property that will be altered or disturbed by permitted activities, e.g. surface areas where there will be construction, alteration, operation, maintenance or repair; abandonment; or removal of any stormwater management system, dam, impoundment, reservoir, work (including dredging or filling), or appurtenant work. The permit boundary includes the proposed project areas and mitigation areas. Include the date of the photo.

b. ☐ Provide individual plans for the existing, during–mining (and intermediate stages, if necessary), and post-reclamation conditions. Include the following:

    1. ☐ Topography extending at least 100 feet off the permit area shown on a recent aerial map. All topography shall include location and description of benchmarks referenced to NGVD 1929 or NAVD 1988 along with the conversion factor(s) if the application documents refer to more than one datum. Blend the proposed contours into the undisturbed contours in the construction and post-reclamation conditions.

    2. ☐ US Geological Survey topographic map.

    3. ☐ Provide existing and proposed maps accurately describing the vegetative community and landscape types. Generally, this is best done using the Florida Land Use and Cover Classification System (FLUCCS) (FDOT 1999) or the Florida Natural Areas Inventory

Guide to the Natural Communities of Florida. Additional or alternative descriptions may also be used if the overall submittal provides a clear, complete, and scientifically accepted description of all vegetative community and landscape types. For vegetated areas dominated by exotic vegetation, use the descriptors representative of the native community type that was present prior to exotic infestation. Also identify each community with a unique identification number which must be consistent in all exhibits.

4. ☐ Wetlands and other surface waters to be impacted or avoided and mitigation areas, including acreages.

5. ☐ Undisturbed upland buffers adjacent to wetlands and other surface waters, including width of each buffer.

6. ☐ Areas and acreages to be excavated, the proposed mine cells and sequence of mining or excavation.

7. ☐ Staging/temporary overburden storage areas, product stockpiles areas, processing areas, and waste disposal areas (e.g. disposal areas for humate, waste clays, and tailings).

8. ☐ Utility, pipeline, equipment, dredge, and dragline crossings and corridors. Distinguish between temporary (single use) and long-term crossings and corridors. Provide an approximate length of time and schedule to perform the construction and removal activities for each crossing or corridor.

9. ☐ Impervious surfaces (including directly connected impervious surfaces), vehicle parking areas, and haul roads, including stormwater management systems for these areas.

10. ☐ Internal and external perimeter berms.

11. ☐ Recirculation ditches, recharge ditches, and stormwater ditches.

12. ☐ Connections/outfalls to wetlands or other surface waters.

13. ☐ Normal mine operation water elevation, the seasonal high and low water elevations, and the average annual water elevation.

14. ☐ All water management structures, volumes, and invert elevations.

15. ☐ Where the proposed water management system for a mine will partially replace an existing surface water management system, provide drainage plans and reports showing how the system outside of the mine will function as mining and reclamation proceed.

16. ☐ For phased projects where each phase is a stand-alone system, provide a master development plan clearly delineating the limits of each phase of construction.

17. ☐ For post-reclamation plans, show how areas subject to the reclamation requirements of Chapter 378, F.S., will meet the standards of the applicable reclamation rules. A separate Conceptual Reclamation Plan or a Notice of Intent to Mine shall be provided prior to the start of mining activities in accordance with the applicable reclamation rules. For mines using the provisions of Section 373.414(6)(b) or (c), F.S., for wetland mitigation, the Conceptual Reclamation Plan shall be provided with the ERP application.

c. ☐ Where agricultural ditches are present, illustrate how the area hydrology will be altered due to the proposed project. Provide plan drawings that show the internal, perimeter, and surrounding agricultural ditches for the existing, construction, and post-reclamation conditions. Clearly indicate whether the perimeter ditches are within or outside the project area. Flow direction arrows (include any seasonal flow reversals with an explanation of use, if applicable) and proposed alterations to the ditches must be shown in each drawing. Provide maps that clearly depict the progression of ditch severance as the stormwater management system expands.

d. ☐ Paving, grading, and drainage information for the existing, construction (and intermediate stages, if necessary), and post-reclamation conditions, which includes, but is not necessarily limited to, the following:

   1. ☐ Plan view of proposed construction, including processing area and water quality treatment areas.
   2. ☐ Proposed elevations and/or profiles, including datum.
   3. ☐ Roadway, parking, and pavement grades.
   4. ☐ Floor slabs, walkways, and other paved surfaces.
   5. ☐ Earthwork grades for pervious landscaped areas.
   6. ☐ Perimeter site grading, tying back into existing grades.
   7. ☐ Location of all water management areas, including elevations, dimensions, side slopes, and design water depths.
   8. ☐ Location, size, and invert elevations of existing and proposed stormwater conveyance systems.
   9. ☐ Vegetative cover plan for all on-site and off-site earth surfaces disturbed by construction.
   10. ☐ Rights-of-way and easements for the system, including all on-site and off-site areas to be reserved for water management purposes (including access), and rights-of-way and easements for the existing drainage system, if any.

e. ☐ Stormwater detail information, including but not necessarily limited to, the following:

   1. ☐ Cross section of all stormwater management areas, including elevations, dimensions, crest widths, side slopes, and proposed stabilization measures (with location of the cross section(s) shown on the corresponding plan view).
   2. ☐ Provision for permanent stabilization of the slopes through the establishment of permanent vegetative cover or other appropriate methods.
   3. ☐ Detail of all proposed control structures, including elevations, dimensions, and skimmer, where applicable.
   4. ☐ Details of proposed stormwater management systems, such as underdrains, exfiltration trenches, vaults, and other proposed Best Management Practices (BMPs).

f. ☐ Provide a cross sectional view of the reclamation lake(s) and shoreline. Show the lake configuration, including side slopes and grade-break; elevations for the shoreline; lake bottom elevation; the average (normal pool), seasonal high, and seasonal low water elevations; littoral zone; vegetation cover designation; and associated control structures.

g. ☐ For limestone mines, provide a cross-sectional view of reclaimed sheer walls, including transition shelves and other means of access control. Refer to Rule 62C-36.008, F.A.C., for sheer wall design requirements. Provide a plan view showing the location and extent of areas to be reclaimed with sheer walls. For fuller's earth and other resources (gravel, sand, clay) mines provide a cross-sectional view of reclaimed high walls. Provide a plan view showing the location and extent of areas to be reclaimed with high walls. Refer to Rules 62C-38.008 or 62C-39.008, F.A.C., fuller's earth and other resources, respectively, for limits on steepness of slopes. Provide the appropriate geotechnical engineering study whenever the proposed slopes will be steeper than the limits provided by rule.

h. ☐ Provide groundwater elevation contour maps showing existing, construction, and post-reclamation elevations extending at least 100 feet off the proposed permit area. All elevations shall be referenced to the common benchmark or datum (NGVD/NAVD) being utilized for the permit area. Cite the date and data source for the existing condition. If the elevations are compiled data, identify if the contours represent average seasonal high water, average annual, or seasonal low water table elevations.

i. ☐ Provide a Federal Emergency Management Agency (FEMA) flood map (include the proposed permit boundary on the map).

j.   ☐ If the proposed project will impede or restrict the flow of offsite stormwater runoff, provide plan and cross-section figures showing the locations and elevations of the proposed berms and water control structures (to prevent erosion) that will allow offsite runoff to either enter the stormwater management system or be routed around the project area. Present these drainage conditions for the construction and post-reclamation scenarios.

k.   ☐ Provide the location of any nearby existing offsite features (such as wetland and other surface waters, municipal well fields, large irrigation wells, stormwater management ponds, gas pipelines, and buildings or other structures) which might be affected by or affect the proposed permit activities.

l.   ☐ Provide the digital GIS data layers for the wetlands, Land Reclamation Units, and mandatory mined areas and relevant metadata, including the source data and map projection systems for the existing and post-reclamation conditions for the proposed project.

### Part 3: Stormwater Drainage and Treatment Information and Analyses

Provide drainage calculations signed, dated, and sealed by an appropriate Florida-licensed professional, and supporting documentation demonstrating that the proposed project meets the conditions for issuance under Rules 62-330.301(1)(a), (b), (c), and (e), F.A.C. **Larger mines or more complex mine plans require one or more intermediate stage maps or GIS data layers and drainage calculations to explain how the proposed water management system and offsite flows will change as mining and reclamation progress.** The plans and calculations shall include the following:

a.   ☐ Provide separate drainage maps for the existing, construction, and post-reclamation conditions that include the drainage patterns and basin/sub-basin boundaries. Provide the acreage for each basin/sub-basin and include flow direction arrows showing any off-site runoff being routed through or around the system, topographic information, and connections between wetlands and other surface waters below the 25-year 24-hour design storm event applied to the average annual water table. Merge the construction and post-reclamation elevation contours with the existing elevation contours in areas that will remain undisturbed.

b.   ☐ Identify the existing and proposed onsite hydrologic soil names and classifications (e.g. Type A, C, B/D, D). Reference the source, such as the U.S. Department of Agriculture/Natural Resource Conservation Service Soil Survey (NRCS), used in estimating the existing onsite hydrologic soil name and classifications. Provide maps, as appropriate, on which the permit area has been delineated.

c.   ☐ Indicate the existing and post-reclamation land use and land cover. Provide the acreages and percentages of the total project, for the following:

  1.   ☐ Impervious surfaces (and directly-connected impervious surfaces) excluding buildings, wetlands and other surface waters;
  2.   ☐ Buildings;
  3.   ☐ Pervious surfaces (green areas not including wetlands);
  4.   ☐ Lakes, canals, retention areas, other open water areas; and
  5.   ☐ Wetlands (Please refer to Section C to ensure consistency in wetland acreages).

d.   ☐ Identify the wetland and/or waterbody that will receive discharge from the stormwater management system. Provide the receiving wetland/waterbody seasonal high water or mean high tide elevation, including the dates, datum, and methods used to determine these elevations.

e. ☐ Provide mine-wide drainage analyses for the existing and post-reclamation peak rates of discharge, volumes of runoff, and peak stages for the appropriate design storm events demonstrating that the proposed project meets the stormwater design criteria in the applicable Applicant's Handbook, Volume II. Account for all onsite depressional storage and offsite contributing areas. Refer to the applicable Volume II for the design storm event(s) that applies to the project area. Typically, the information includes the following:

    1. ☐ Runoff characteristics, including area; runoff curve number or runoff coefficient; hydrologic soil classifications; and time of concentration for each drainage basin/subbasin in the existing and post-reclamation conditions;

    2. ☐ Design storms used including rainfall depth, duration, frequency, and distribution;

    3. ☐ Runoff hydrograph(s) for each basin/subbasin, for the required design storm event(s);

    4. ☐ Stage-storage computations for any area such as a reservoir, closed basin/subbasin, detention area, or channel, used in storage routing;

    5. ☐ Stage-discharge computations for any storage areas at a selected control point, such as a flow control structure or natural flow restriction;

    6. ☐ Flood routings through on-site flow conveyance and storage areas;

    7. ☐ Water surface profiles in the primary drainage system for each required design storm event(s);

    8. ☐ Runoff peak rates and volumes discharged from the site for each required design storm event(s);

    9. ☐ Design tailwater elevation(s) (peak stages) for each storm event at all points of discharge (include source or method of estimate);

    10. ☐ Pump specifications and operating curves for range of possible operating conditions (if used in the system); and

    11. ☐ Discharge rate comparisons for the mean annual, 25-year and 100-year, 24-hour design storm events and necessary erosion control measures and locations.

f. ☐ Provide a description of the engineering methodology, assumptions, and references for the drainage parameters listed above, and a copy of all computations, engineering plans, and design specifications used to analyze the system. Include basin-node-reach schematics and show the time of concentrations, flow conveyance structures, and flow comparison locations (Flow Evaluation Points or Critical Points) in the engineering plans and/or drainage maps. If a computer model is used for the analysis, provide the name of the model, the input and output GIS data layers listed below in digital format that were used in the hydrological analysis. Provide the relevant metadata, including the source data and map projection systems, for the existing and post-reclamation conditions for the proposed project. The data layers shall include the project boundary, topography, basins, land use, evaluation points, nodes, reaches, drainage patterns, time of concentration, and hydrologic soil groups. Provide the input and output data tables in digital table format, such as Excel, Access, or a similar format.

g. ☐ If there will be no discharge, provide sufficient freeboard in compliance with Appendix I of the Applicant's Handbook, Volume I, in the stormwater management system to prevent the occurrence of overtopping. Provide the basis for determination of the freeboard, such as staging the applicable design storm event on the seasonal high water elevation (or control elevation) plus an effective freeboard. Perform a wave run-up analysis, if required.

h. ☐ For traversing works, in accordance with the applicable Applicant's Handbook, Volume II, provide the following:

    1. ☐ Hydraulic calculations for all proposed traversing works; and

    2.  ☐ Water surface profiles showing upstream impact of traversing works.

i.  ☐ For impacts to regulated floodplains, in accordance with the applicable Applicant's Handbook, Volume II, provide the following:

    1.  ☐ Location and volume of encroachment within regulated floodplain(s); and
    2.  ☐ Plans and calculations for compensating floodplain storage, if necessary, and calculations required for determining minimum flood elevations for buildings and roads.

j.  ☐ For treatment other than or prior to containment, provide construction plans and calculations that address the required treatment volume and recovery, as well as stage-storage and design elevations, which demonstrate compliance with the water quality treatment design criteria in the applicable Applicant's Handbook, Volume II. If a computer model is used for the analysis, provide the name and a description of the model, the input and output data, and a justification for the model selected.

k.  ☐ If the receiving waterbody is known to be impaired, and/or has an established Total Maximum Daily Load (TMDL) or Basin Management Action Plan (BMAP), provide specific descriptions of all water quality parameters for which the waterbody is known to be impaired. Provide reasonable assurance that the proposed project will not contribute to violations of state water quality standards for TMDLs in accordance with the applicable Applicant's Handbook, Volume II.

l.  ☐ If the proposed project will have a direct discharge to a Class I, Class II, Outstanding Florida Waters (OFW), or Class III waters that are approved, conditionally approved, restricted, or conditionally restricted for shellfish harvesting, provide additional water quality treatment in accordance with the applicable Volume II.

## Part 4: Construction Schedule and Techniques

Provide a construction schedule and a description of construction techniques, sequencing, and equipment. This information shall include, as applicable, the following.

a.  ☐ Access and staging of equipment.

b.  ☐ Location and details of the temporary erosion, sediment, and turbidity control measures to be implemented during each phase of construction and all permanent control measures to be implemented in post-reclamation condition.

c.  ☐ A demolition plan for any existing structures to be removed.

d.  ☐ Dewatering plan details. Provide the dewatering location(s), methods to contain the discharge, methods of isolating dewatering areas, the period of time the dewatering structures will be in place, and the hydrologic monitoring plan. Contact the appropriate water management district regarding the need and requirements for a Consumptive Use or Water Use permit for dewatering.

e.  ☐ Methods for transporting equipment and materials to and from the work site. If barges are required for access, provide the low water depths and draft of the fully loaded barge.

f.  ☐ Describe the measures that will be taken to protect and secure monitoring wells, piezometers, and staff gauges during mining and reclamation activities so that they will be available for water quality and/or quantity sampling through the duration of the permit. Also, describe how the elevations of the monitoring equipment will be surveyed and a schedule, if the elevations will be intermittently confirmed.

g. ☐ Identify the schedules and parties responsible for completing hydrologic and vegetative monitoring, record drawings, and as-built certifications for the proposed project when completed.

h. ☐ Provide a detailed "Erosion and Sediment Control Plan" in accordance with the requirements of the Applicant's Handbook, Volume I, Part IV, Erosion and Sediment Control.

i. ☐ Provide the projected production and disposal schedule for waste materials, such as waste clay, humate, and tailings, by year and location. Provide the total storage capacity for each disposal location and the remaining capacity (if it is an existing disposal location).

j. ☐ Provide a production and utilization schedule for the backfill materials to demonstrate that there is sufficient backfill material available to construct the proposed post-reclamation elevations.

**Part 5:  Operation and Maintenance and Legal Documentation**

a. ☐ Describe the overall maintenance and operation schedule for the proposed system.

b. ☐ Identify the entity (or entities) that will be responsible for operating and maintaining the system (or parts of the system) to demonstrate that the entity (or entities) meet(s) the requirements of Section 12.3 of the Applicant's Handbook, Volume I. Provide information for the construction and post-reclamation conditions.

c. ☐ If different from the permittee, provide a draft document enumerating the enforceable affirmative obligations on the entity to properly operate and maintain the system for its expected life, and documentation of the entity's financial responsibility for long-term maintenance.

d. ☐ If the proposed operation and maintenance entity is not a property owner's association, provide proof of the existence of an entity or the future acceptance of the system by an entity which will operate and maintain the system.

e. ☐ Provide drafts of all proposed conservation easements, stormwater management system easements, draft property owner's association documents, and survey plats for the property containing the proposed system. For onsite and/or offsite applicant-responsible mitigation proposed for preservation (as defined in Volume I), submit draft conservation easement documents or other forms of restrictive covenants, as required by Section C of the application.

f. ☐ Provide legal reservations for access to the treatment system for maintenance and operation by future maintenance entities for subdivided projects.

g. ☐ Provide a description or letters from utility providers documenting how potable water and wastewater service will be supplied.

h. ☐ Provide a copy of the boundary survey and/or legal description and acreage of the total land area within the permit boundary, including all areas with proposed works or activities, and any mitigation areas.

**Part 6:  Water Use**

a. ☐ Identify if any part of the stormwater management system will be used as a water supply source, e.g. for irrigation or recreation.

b. ☐ If a Consumptive Use or Water Use permit has been issued for the project, provide the permit number:

c. ☐ If a Consumptive Use or Water Use permit has not been issued for the project, indicate if such a permit will be required and when the application will be submitted.

d. ☐ Indicate how any existing water use wells (private or public) located within the project site will be utilized or properly abandoned.

**Part 7:  Special Basin Information**

a. Is the proposed project located within a Special Basin identified in the applicable Applicant's Handbook, Volume II?

☐ yes  ☐ no  ☐ don't know

b. If yes, please demonstrate that the project will meet the applicable Special Basin criteria.

# Section I:
# Supplemental Information for State 404 Program Permits

State 404 Program authorization is required for activities within state-assumed waters under Chapter 62-331, F.A.C. The following information is necessary to facilitate the State 404 Program review when a project is within state-assumed waters.

1.  Identify the project purpose. (*Describe the purpose and need for the proposed project. Why are you proposing the work? How will you use the proposed structure(s); and/or, how will the proposed fill area(s) be used?)* Include a description of any related activities that may be developed as a result of the proposed project. Provide the approximate dates you plan to both begin and complete all work:

2.  List all other certificates or approvals/denials received or pending from federal, state, or local agencies for work affecting wetlands and/or other surface waters encompassed by the overall project site: (*You need not have obtained all other permits before applying for a State 404 Program permit.)*

| Agency | Action Type | ID Number | Date Applied | Date Approved/Denied |
|--------|-------------|-----------|--------------|----------------------|
|        |             |           |              |                      |
|        |             |           |              |                      |
|        |             |           |              |                      |

4.  Identify the specific reason/need for the proposed activity (What will the activity be used for and why? Include activities that are linked to or reasonably related to the proposed activity.)

5.  Provide an alternatives analysis as described in the 404 Handbook, Appendix C.

6.  Describe any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity. Include the name(s) of those listed species or critical habitat areas. Describe any actions proposed to be taken to avoid or minimize adverse effects to listed species. Provide any other available data and information necessary for purposes of reviewing impacts to state and federal listed species.

7.  Clearly show location and extent of all wetlands and other surface waters, delineated in accordance with Chapter 62-340, F.A.C. Label all special aquatic sites (e.g., wetlands, sanctuaries and refuges, mudflats, vegetated shallows, and riffle and pool complexes). Each type of boundary (for example, ordinary high water line, mean high water line, wetlands, or other special aquatic sites) must be clearly annotated and/or symbolized to ensure they are differentiable on the map. Unless indicated below, all wetlands and other surface waters on the site, as delineated in accordance with Chapter 62-340, F.A.C., that will be impacted by the proposed activities will be evaluated for permitting purposes under Section 404 of the Clean Water Act.

Check this box if you do not accept that all or a portion of the wetlands and other surface waters on the site are jurisdictional under Section 404 of the Clean Water Act, and provide documentation demonstrating which wetlands and other surface waters on the site are not jurisdictional, using reasonable scientific judgement.

     

8.  Provide the complete names and full correct mailing address of the owners (public and private) of properties contiguous to the overall project site where the work is proposed. You may also provide email addresses, if available. Use additional sheets as necessary. (*This information may be obtained from your County Property Appraiser Office, which is typically accessible on the Internet; this information is needed so that, if required, the contiguous owners may be notified of the proposed activity (for example, through a public notice*.)

1.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

2.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

3.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

4.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

5.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

6.  Name:
    Mailing Address:
    City, State, Zip Code:
    Email:

# Petition for a Formal Determination
# of the Landward Extent of Wetlands and
# Other Surface Waters

Instructions: This form constitutes a petition to the Agency for a formal determination of the extent of wetlands and other surface waters in accordance with Chapter 62-340, F.A.C. Submit this form with the requested copies of supporting information and the non-refundable fee (please contact the appropriate agency for current fee schedule). Refer to Section 62-330.201, F.A.C., for procedural information.

## Part 1: Applicant and Associated Parties Information

### A.  Property Owner

Last Name:                              First Name:                          Middle:

Title:                      Company:

Address:

City:                      State:                                Zip:

Home Telephone:                        Work Telephone:

Cell Phone:                            E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes  ☐ no

### B.  Petitioner/Entity to Receive Formal Determination

Company:                              Title:

Last Name:                              First Name:                          Middle:

Address:

City:                      State:                                Zip:

Home Telephone:                        Work Telephone:

Cell Phone:                            E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes  ☐ no

### C.  Agent

Last Name:                              First Name:                          Middle:

Title:                      Company:

Address:

City:                      State:                                Zip:

Home Telephone:                        Work Telephone:

Cell Phone:                            E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes  ☐ no

     

**D.  Individual Who Established the Boundary Line**

Last Name:                                    First Name:                                    Middle:

Title:                            Company:

Address:

City:                       State:                              Zip:

Home Telephone:                              Work Telephone:

Cell Phone:                                   E-mail Address:

Will this individual be the representative to accompany staff during the site inspection? ☐ yes ☐ no

## Part 2:  Project Information

A.  Name of Property/Project:_____ Acreage: _____

    Address:  _____

    City: _____ County: _____ Zip: _____

    Tax Parcel ID No.: _____ Section/Township/Range: _____

B.  Amount of Fee Submitted:

C.  If the project includes any areas for which Agency permits, applications, declaratory statements,
    or Consent Orders have been received, list name, file numbers, type of activity, and provide a
    copy of all pertinent documents:

    DEP:      _____

    WMD:      _____

    Corps:    _____

D.  Have you had a pre-application conference with Agency Staff? ☐ yes ☐ no

    If yes, with whom?         _____ Date(s): _____

    For What Purpose?         _____

E.  Have any Agency Staff or USDA/NRCS soil science personnel previously visited the site? ☐ yes
    ☐ no   ☐ I'm not sure

    If yes, with whom?         _____ Date(s): _____

    For What Purpose?         _____

F.  Briefly describe past and present land use activities within the boundaries of the property for which
    this determination is sought.

G.  Please provide an original USGS Topo Quad(s) with the property boundaries depicted. USGS
    Topo Quad Map(s) Name:

Form 62-330.201(2) – Petition for a Formal Determination of the Landward Extent of Wetlands
And Other Surface Waters
Incorporated by reference in paragraph 62-330.201(2)(b), F.A.C. (effective date )          Page **2** of 4

H.  Please submit three copies (no photocopies) of the most recent aerial photographs at a scale of 1 in. equals 200 ft. or more detailed which accurately reflect the current conditions on site. Clearly delineate on the photos the boundaries of the area to be inspected. Show on at least one aerial the direction of surface water flow throughout the property, all major roads, and the north bearing. The date and scale of the attached photo(s) is:

I.  Provide a copy of a USDA/NRCS(SCS) soil survey with the project boundaries delineated, if available for the county. The Sheet No.(s) of the soil survey is:

J.  Property boundaries must be clearly flagged or marked in the field prior to the site inspection. Indicate how the boundaries will be identified:

K.  Attach documentation showing petitioner's legal or equitable interest in the property, or if petitioner has the power of eminent domain, please indicate on an attached paper by what authority petitioner has such power.

L.  Attach a legal description of the property for which this determination is sought.

M.  Select the form (type) of verification requested for the formal determination (see section 7.2.2(e) of Applicant's Handbook Volume I):
☐ a certified survey,  ☐ an approximate delineation,  ☐ a combination (certified survey and approximate delineation)

If a combination is requested, please clearly identify the portions of the determination that will be processed by certified survey and the portions that will be processed by approximate delineation.

In order for your petition to be deemed complete, the Agency must receive the verified delineation as described in section 7.2.2(e) of Applicant's Handbook Volume I.

## Part 3:  Certification

A.  I certify that the petitioner has a legal or equitable interest in the property or that the petitioner is an entity which has the power of eminent domain.

B.  I understand I have to provide any additional information/data that may be necessary to complete this petition.

C.  I am familiar with the information contained in this petition, and to the best of my knowledge and belief, such information is true, complete, and accurate. I further certify that I possess the authority to petition for a formal determination in accordance with Section 373.421, F.S., or am acting as the duly authorized agent of person with such authority. I understand that knowingly making any false statement or representation in this petition is a violation of Chapter 373, F.S., and Chapter 837, F.S.


Typed/Printed Name of Petitioner or Agent                Signature of Petitioner or Agent


Corporate Title (if applicable)                                Date

Form 62-330.201(2) – Petition for a Formal Determination of the Landward Extent of Wetlands
And Other Surface Waters
Incorporated by reference in paragraph 62-330.201(2)(b), F.A.C. (effective date )                Page 3 of 4

An agent may sign above if the petitioner completes the following:

I hereby designate and authorize the agent listed above to act on my behalf as my agent in the processing of this petition for a formal determination and to furnish, upon request, supplemental information in support of the petition. I am familiar with the information contained in this petition, and to the best of my knowledge and belief, such information is true, complete, and accurate. I further certify that I possess the authority to petition for a formal determination in accordance with section 373.421, F.S. I understand that knowingly making any false statement or representation in this petition is a violation of Chapter 373, F.S., and Chapter 837, F.S.


Typed/Printed Name of Petitioner                    Signature of Petitioner


Corporate Title (if applicable)                     Date


Person authorizing access to the property must complete the following:

I certify that I either own the property described in this petition or I have legal authority to allow access to the property, and that I consent to a formal determination being made on the property as described in Chapter 62-340, F.A.C. I authorize representatives or personnel from the Agency to enter the property as many times as may be necessary to make the formal determination, or to perform a post-site inspection for the purpose of quality control/quality analysis, up to 12 months from the date of final agency action, and I will provide access throughout the property sufficient to perform the determination or inspection. I agree to indemnify and defend the Agency for all liability it may incur from accessing the property including, but not limited to, actions for trespass. I will attach to this petition documentation demonstrating that I am the owner of the property or that I have legal authority to allow access to the property.


Typed/Printed Name of Petitioner                    Signature


Corporate Title (if applicable)                     Date


Form 62-330.201(2) – Petition for a Formal Determination of the Landward Extent of Wetlands
And Other Surface Waters
Incorporated by reference in paragraph 62-330.201(2)(b), F.A.C. (effective date )                    Page 4 of 4

# Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit

**Instructions**: This form is for projects that qualify for a General Permit in accordance with Chapter 62-330 F.A.C., and/or Chapter 62-331, F.A.C. General Permits (GP) are provided for certain activities that have been determined to have minimal impacts to the water resources of the state when conducted in compliance with the terms and conditions of the general permit. Complete and submit this form to the appropriate agency as identified in Part 3 below.

If activity is located on, or has the potential to be located on, state-owned sovereignty submerged lands (SSL), the reviewing Agency will begin processing the request for state-owned sovereignty submerged lands authorization. If you know that your project is located on SSL, (i.e., waterward of the line of mean or ordinary high water of rivers, streams, bays, bayous, sounds, the Gulf of Mexico, the Atlantic Ocean, or certain natural lakes, we recommend completing Section F of the Environmental Resource Permit Application. You are not required to complete Section F to receive a General Permit, but it will help the agency process the SSL authorization. Both authorizations are required prior to construction on SSL.

## Part 1: General Information

**A. Rule section number of the GP(s) for which you are applying:**
62-330.        / 62-331.        ,F.A.C.

**We recommend contacting your local Corps district office if your project is not within state-assumed waters regulated under Chapter 62-331, F.A.C., does not qualify for the State Programmatic General Permit (SPGP) and you are not sure whether the project requires separate Corps authorization. If Corps authorization is required, you will need to submit the appropriate federal application form separately to the Corps. Corps contact information may be found online at the Jacksonville District Regulatory Division website.**

**B. Applicant** ☐ **This is a Contact Person for Additional Information**

Name: Last:                          First:                          Middle:

Title:                    Company:

Address:

City:                    State:          Zip:

Home Telephone:                          Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via ☐ US Mail

     

**C.  Consultant/Agent** ☐ **This is a Contact Person for Additional Information**

Name: Last:                          First:                          Middle:

Title:                    Company:

Address:

City:                    State:              Zip:

Home Telephone:                          Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via ☐ US Mail

**D.  Land Owner(s) (If Different or in Addition to Applicant Identified Above)**

Name: Last:                          First:                          Middle:

Title:                    Company:

Address:

City:                    State:              Zip:

Home Telephone:                          Work Telephone:

Cell Phone:

E-mail Address:

**Correspondence will be sent via email**, unless you check here to receive it via US Mail: ☐

**E.  Location of proposed activities:**

Tax Parcel Identification Number:

Address:

City:                          County:                          Zip:

Latitude (DMS)            °        '        "              Longitude (DMS)        °        '        "

**F.  Date activity is proposed**:    To Commence:                    To be Completed:

**G.  Describe in general terms the proposed project, system, or activity:**

**H.  Describe wetland and aquatic habitats to be affected:**

**I.   Construction methods and schedule:**

**J.   Additional information that demonstrates that you qualify for the general permit, addressing all the parameters, thresholds, and conditions required in the general permit**.

**K.  Additional information for State 404 Program General Permits (available within state-assumed waters only - leave blank if not applicable)**

1. Describe the project purpose (*Describe the purpose and need for the proposed project. Why are you proposing the work? How will you use the proposed structure(s); and/or, how will the proposed fill area(s) be used?*):

2. Describe direct and indirect adverse environmental effects the activity will cause, including the anticipated amount of loss of wetlands, other special aquatic sites, and other waters expected to result from the activity. Include acres and square feet of impact. If this notice is for a linear project that includes multiple "single and complete projects", include quantity of impact for each single and complete crossing. (see section 3.2.1 of the 404 Handbook):

3. If the General Permit specifically requires mitigation, or if the proposed activity will result in the loss of more than 1/10 acre of wetlands, describe proposed mitigation measures (see preferential mitigation hierarchy in Rule 62-331.130, F.A.C.). If no mitigation is proposed, explain why the adverse environmental effects are no more than minimal and why compensatory mitigation should not be required. The Agency shall determine if the described mitigation or explanation is appropriate and sufficient.

4. List any other State 404 Program general permits or individual permits used or intended to be used to authorize any part of the proposed project or any related activity, including, but not limited to other separate and distant crossings for linear projects that require a GP but do not require pre-construction notification:

5. Include a delineation of wetlands, other special aquatic sites, and other waters, such as lakes and ponds, and perennial, intermittent, and ephemeral streams, on the project site. Wetland delineations shall be prepared in accordance with Chapter 62-340, F.A.C.

6. Describe any listed species or designated critical habitat that might be affected by, or is in the vicinity of, the proposed activity. Include the name(s) of those listed species or critical habitat areas. Describe any actions proposed to be taken to avoid or minimize adverse effects to listed species.

7. If the activity might have the potential to cause effects to a historic property listed on, determined to be eligible for listing on, or potentially eligible for listing on, the National Register of Historic Places, describe which historic property might have the potential to be affected by the proposed activity and include a vicinity map indicating the location of the historic property (see paragraph 62-331.200(3)(j), F.A.C.)

8. If the activity will occur in a component of the National Wild and Scenic River System, or is a river officially designated by congress as a "study river" for possible inclusion in the system while the river is in an official study status, identify the Wild and Scenic River or the "study river" (see paragraph 62-331.200(3)(d), F.A.C.)

9. For activities that require permission from the Corps pursuant to 33 U.S.C. 408 because it will alter or temporarily or permanently occupy or use a Corps federally authorized civil works project, include a statement confirming that a written request for section 408 permission has been submitted to the Corps office having jurisdiction over that Corps project. The permittee is responsible for obtaining such permission separately from the Corps. Failure to obtain permission from the Corps may subject you to enforcement action by the Corps.

## Part 2: Certification

I hereby certify I have read and will conduct the above activities in accordance with the criteria, limitations, and specific conditions of the general permit(s) identified in Part 1 Section A, and in accordance with the general conditions of Rule 62-330.405, and/or 62-331.201, F.A.C, as applicable. Unless otherwise provided in Chapter 62-330, F.A.C., or unless the timeframes in 62-330.402(4), F.A.C. have been waived below, activities conducted pursuant to an ERP general permit may commence thirty (30) days after providing written notice to the Department of Environmental Protection or the Water Management District, along with any required additional documentation which may be required to fulfill the requirements of the general permit, unless the Agency responds that the proposed work does not qualify for a general permit. For State 404 Program general permits that require pre-construction notice under Chapter 62-331, F.A.C., the activity shall not commence until the permittee receives written confirmation of qualification for the general permit from the Agency. If both an ERP and State 404 Program general permit is required for such projects, the activity shall not commence until thirty (30) days after notice is received by the Agency, or until written confirmation of qualification for the State 404 Program general permit is received by the permittee, whichever is later.

I understand I may have to provide any additional information/data that may be necessary to provide reasonable assurance or evidence that the proposed project will comply with the applicable state water quality standards or other environmental standards both before construction and after the process is completed.

I further acknowledge that work done under the general permit(s) may also require the review and approval of other federal, state, or local agencies, and that commencement of construction before such federal, state, or local agency approvals or permits are obtained may subject me to enforcement action and fines or penalties by such agencies. Further, the work shall be conducted in a manner that does not violate applicable water quality standards.

☐ **By checking this box**, I hereby voluntarily waive, in accordance with subsection 62-330.402(7), F.A.C., the 30-day or 60-day deadline in subsection 62-330.402(4), F.A.C., in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP general permit and State 404 Program be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions for the ERP and State 404 Program are issued at different times). If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency(ies) will continue to abide by subsection 62-330.402(4), F.A.C.

_____

Typed/Printed Name of Applicant or Agent         Signature of Applicant or Agent         Date

An Agent May Sign Above If Applicant Completes the Following:
I hereby designate and authorize the agent listed in Item Part 1 Section C to act on my behalf as my agent in the processing of this permit application and to furnish on request, supplemental information in support of the application.

_____

Typed/Printed Name of Applicant                  Signature of Applicant                  Date
(And corporate title, if applicable)

**Certification of Sufficient Real Property Interest and Authorization for Staff to Access the Property:**

**I certify that:**

☐ **I possess sufficient real property interest in or control, as defined in Section 4.2.3(d) of Applicant's Handbook Volume I,** over the land upon which the activities described in this application are proposed and I have legal authority to grant permission to access those lands. I hereby grant permission, evidenced by my signature below, for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed works and other activities specified in this application. I authorize these agents or personnel to enter the property as many times as may be necessary to make such review, inspection, and/ or sampling. Further, I agree to provide entry to the project site for such agents or personnel to monitor and inspect permitted work if a permit is granted.

**OR**

☐ I represent an entity having **the power of eminent domain and condemnation authority**, and I/we shall make appropriate arrangements to enable staff of the Agency to access, inspect, and sample the property as described above.

_____  _____

Typed/Printed Name of Applicant          Signature of Applicant                          Date
(And corporate title, if applicable)

## *Part 3: Submittal*

In addition to the information described in this form, any Notice of Intent to use a General Permit must also include the following, as described in Section 4.2.2 of the Applicant's Handbook, Volume I:

- Location map(s) of sufficient detail to allow someone who is unfamiliar with the site to travel to and locate the specific site of the activity.
- One set of plans and drawings, calculations, environmental information, and other supporting documents that clearly and legibly depict and describe the proposed activities in sufficient detail to demonstrate that the work qualifies for the specified General Permit(s).
- The required fee made payable to the appropriate agency.

Fees for the appropriate agency are established in the rules adopted in subsection 62-330.071(1), F.A.C., as listed below:

Rule 62-4.050, F.A.C. (Department of Environmental Protection or the Northwest Florida Water Management District)
Rule 40B-1.706, F.A.C. (Suwannee River Water Management District)
Rule 40C-1.603, F.A.C. (St. Johns River Water Management District)
Rule 40D-1.607, F.A.C. (Southwest Florida Water Management District)
Rule 40E-1.607, F.A.C. (South Florida Water Management District)

Operating Agreements between the Department and the water management districts specify which agency will process any given application.    For copies of the operating agreements, go to https://floridadep.gov/ogc/ogc/content/operating-agreements

This application form may be submitted online; to do so, follow the on-line submittal requirements of the agency:

o **Florida Department of Environmental Protection: http://www.fldepportal.com/go/**
o **Northwest Florida Water Management District:**
  **https://permitting.sjrwmd.com/nwepermitting/jsp/start.jsp**
o **Suwannee River Water Management District:**
  **https://permitting.sjrwmd.com/srepermitting/jsp/start.jsp**

- o **St. Johns River Water Management District:**
  **https://permitting.sjrwmd.com/epermitting/jsp/AccountOverview.do?command=init**
- o **Southwest Florida Water Management District:**
  **http://www.swfwmd.state.fl.us/permits/epermitting/**
- o **South Florida Water Management District: http://my.sfwmd.gov/ePermitting/MainPage.do**

If submitting a paper application, please see Appendix A of Applicant's Handbook, Volume I for submittal locations.

# Request to Transfer
# Environmental Resource and/or State 404 Program Permit

Instructions: To be completed, executed, and submitted by the new owner to the Agency within 30 days after any transfer of ownership or control of the real property where the permitted activity is located.

Use of this form is not required when a valid ERP permit is in the operation and maintenance phase. In such case, the owner must notify the Agency in writing within 30 days of a change in ownership or control of the entire real property, project, or activity covered by the permit. The notification may be by letter or email, or through use of this form, and must be sent to the office that issued the permit. A processing fee is not required for this notice. The permit shall automatically transfer to the new owner or person in control, except in cases of abandonment, revocation, or modification of a permit as provided in Sections 373.426 and 373.429, F.S. (2013). If a permittee fails to provide written notice to the Agency within 30 days of the change in ownership or control, or if the change does not include the entire real property or activity covered by the permit, then the transfer must be requested using this form.

Permit No(s):                          Application No(s).:                          Acres to be Transferred:

Permitted Project:                     Proposed Project Name (if different):

Phase of Project (if applicable):

I hereby notify the Agency that I have acquired ownership or control of the land on which the permitted system is located through the sale or other legal transfer of the land. By signing below, I hereby certify that I have sufficient real property interest or control in the land in accordance with subsection 4.2.3(d) of Applicant's Handbook Volume I; attached is a copy of my title, easement, or other demonstration of ownership or control in the land, including any revised plats, as recorded in the Public Records. I request that the permit(s) be modified to reflect that I agree to be the new permittee. By so doing, I acknowledge that I have examined the permit terms, conditions, and drawings, and agree to accept all rights and obligations as permittee, including agreeing to be liable for compliance with all of the permit terms and conditions and to be liable for any corrective actions required as a result of any violations of the permit after approval of this modification by the Permitting Agency. Also attached are copies of any recorded restrictive covenants, articles of incorporation, and certificate of incorporation that may have been changed as a result of my assuming ownership or control of the lands. As necessary, I agree to furnish the Agency with demonstration that I have the ability to provide for the operation and maintenance of the system for the duration of the permit in accordance with subsection 12.3 of Applicant's Handbook Volume I.

Name of Proposed Permittee:

Mailing Address:

City:                                  State:                          Zip:

Telephone:                             E-mail:

_____          _____
Signature of Proposed Permittee                          Date:


_____
Name and Title


Enclosures:
☐ Copy of title, easement, or other demonstration of ownership or control in the land, as recorded in the Public Records ☐ Copy of current plat(s) (if any), as recorded in the Public Records
☐ Copy of current recorded restrictive covenants and articles of incorporation (if any)
☐ Other

     

# Transfer of State 404 Program General Permit Verification

Instructions: To be completed, executed, and submitted to the Agency at the time of sale of a property subject to a general permit under Chapter 62-331, F.A.C.

Permit No: ⬚

Address Associated with Permit: ⬚

Transferor (previous owner/permittee) Information

Name: ⬚

Telephone Number: ⬚

Email address: ⬚

Transferee (new owner) Information

Name: ⬚

Telephone Number: ⬚

Email address: ⬚

When the structures or work authorized by the State 404 Program general permit are still in existence at the time the property is transferred, the terms and conditions of the permit, including any special conditions, will continue to be binding on the new owner(s) of the property.

I, [transferor], wish to transfer ownership of the State 404 Program general permit (No. ⬚) to [transferee] upon the transfer of ownership of the property associated with said permit.

I [transferee], upon Agency validation of this transfer, accept ownership of the State 404 Program general permit (No. ⬚), along with the liabilities associated with compliance with the terms and conditions set forth in it.

_____

Signature of Transferor                         Date

_____

Signature of Transferee                         Date

Enclosure:

☐ Attach a copy of the general permit to be transferred.

# Certification of Compliance
# with a State 404 Program General Permit

Instructions: To be completed, executed, and submitted to the Agency within 30 days of completion of the authorized activity.

Permit No:                          Permittee's Name:

Permittee's Address:

Telephone Number:

Location of the Work:

Date Work Started:            Date Work Completed:

PROPERTY IS INACCESSIBLE WITHOUT PRIOR NOTIFICATION: YES          NO
TO SCHEDULE AN INSPECTION, PLEASE CONTACT                    AT

Description of the Work (e.g., bank stabilization, residential or commercial filling, docks, dredging, etc.):

Acreage or Square Feet of Impacts to state-assumed waters:

Describe Mitigation completed (if applicable):

Describe any Deviations from Permit (attach drawing(s) depicting the deviations):

I certify that all work, and mitigation (if applicable) was done in accordance with the limitations and conditions as described in the permit. Any deviations as described above are depicted on the attached drawing(s).

_____          _____
Signature of Permittee                              Date:

_____
Name and Title

Enclosures:
☐ Attached drawing(s) depicting deviations from the permit (if any)
☐ Other

# As-Built Certification By Professional Engineer

Instructions: Within sixty (60) days of completion of the authorized work, submit this form and one set of as-built engineering drawings by electronic or standard mail to the Agency office where the permit was issued.

Permit No:                              Permittee's Name:

Location of the Work:

Date Work Started:                      Date Work Completed:

Description of the Work:

Acreage or Square Feet of Impacts to state-assumed waters:

Describe Mitigation completed (if applicable):

Describe any Deviations from Permit (attach drawing(s) depicting the deviations):

I hereby certify that the authorized work, including any mitigation required by Special Conditions to the permit, has been accomplished in accordance with the permit with any deviations noted above. This determination is based upon on-site observation, scheduled and conducted by me or by a project representative under my direct supervision. I have enclosed one set of as-built engineering drawings.

_____        _____
Signature of Engineer                            Date:

_____        _____
Name (Please type or print legibly)              FL. Reg. Number

_____
Company Name and Address

(Affix Seal)

_____                    _____
Date                                             Telephone Number

Enclosures:
☐ Attached drawing(s) depicting deviations from the permit (if any)
☐ Other

# STATE 404 PROGRAM
# EMERGENCY FIELD AUTHORIZATION

The Choose an item. has determined that emergency conditions exist as a result of (insert a description of event precipitating emergency conditions and a description of the emergency conditions):

that require immediate action, as authorized herein, to protect the public health, safety, or welfare; the health of animals, fish, or aquatic life; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses.

Field Authorization Number:

Date of Issuance:                                    Expiration Date:

Owner:

Authorized Entity:

        Name

        Street Address

        City                                    State                Zip

        Telephone Number                        Email Address

**1. Project Location:**

[Please attach the location map or site directions.]

Water body name, if applicable:

County:                        Section:                Township:                Range:

Or    Street Address and Nearest Intersection:

Requested by:                                        Date Received:

**2.    Authorized Activity: This Emergency Field Authorization authorizes the activity described below, and as further detailed in the attached aerial photographs or plans, as applicable (include a description of the type and estimated quantity of materials to be used as fill):**

**3.    Provide addresses for owners of property adjacent to the property where the activity will occur:**

**4.      This Emergency Field Authorization is subject to the following general conditions:** This authorization is effective as of the date of issuance shown above, and expires on the date of expiration shown above, unless otherwise extended by the Agency. All work must be completed by the date of expiration of this authorization or the expiration date of any extension.

a.  All activities will be implemented as set forth in the plans, specifications, or performance criteria as approved in this Emergency Field Authorization and any attachments hereto. Only the activities specifically described in this permit are authorized.

b.  Activities undertaken in accordance with this authorization will be conducted in a manner that does not cause, or contribute to, violations of state water quality standards.

c.  This authorization does not waive the requirement to obtain any other federal, state, or local permits or other authorizations that may be required.

d.  Any structure(s) rebuilt pursuant to this Emergency Field Authorization must comply with all applicable local, state, and federal building standards, and the requirements of the Federal Emergency Management Act (FEMA).

e.  The authorized entity shall provide access to authorized Agency representatives to enter the property at any reasonable time to inspect the facility. The authorized entity or its representative shall either accompany Agency staff onto the property or make provision for access onto the property.

f.  This authorization does not convey any property right, or any interest in real property, nor does it authorize any entrance upon or activities on property that is not owned or controlled by the authorized entity.

g.  By accepting this authorization, the authorized entity agrees that it is solely responsible for compliance with the terms of the authorization. The permittee shall comply with all conditions of this permit, even if that requires halting or reducing the permitted activity to maintain compliance. Any permit violation constitutes a violation of the Clean Water Act as well as a violation of the State 404 Program.

h.  This authorization does not authorize reconstruction of any structures or land that did not legally exist before the emergency.

i.  The authorized entity will hold and save the Agency harmless from any and all damages, claims, or liabilities that may arise by reason of the activities authorized by this Emergency Field Authorization or use of the authorized system.

j.  The authorized entity will immediately notify the Agency in writing of any previously provided information that is later discovered to be inaccurate.

k.  The authorized activity shall not cause any adverse water resource impacts.

l.  If the special condition for restoration is checked in 5., below, the site shall be restored as described in the special condition.

m.  The permittee shall inform the Agency of any expected or known actual noncompliance.

**5.      This Field Authorization is subject to the following checked special conditions (Agency shall fill out this section):**

☐  Storing or stockpiling of material is authorized only in uplands (or specific location described). No materials may be stored or stockpiled in wetlands.

☐  Best management practices for erosion control will be implemented and maintained at all times during construction to prevent siltation and turbid discharges in excess of state water quality standards. Methods will include, but are not limited to, the use of staked hay bales, staked filter cloth, sodding, seeding, and mulching; staged construction; and the installation of turbidity screens around the project site. The authorized entity will be responsible for ensuring that erosion controls are inspected and maintained daily during all phases of construction, and until all disturbed areas are sufficiently stabilized to prevent erosion, siltation, or turbid discharges.

☐  All wetlands or other surface waters adjacent to the project site will be protected from erosion, sedimentation, siltation, scouring, excessive turbidity, or dewatering.

☐   Dredging is limited to that necessary to remove sediment deposited from the emergency event. No dredging in excess of amounts attributable to the emergency event is authorized.

☐   Agency staff must be notified in advance of any proposed construction dewatering. If the dewatering activity is likely to result in offsite discharge or sediment transport into wetlands or surface waters, a written dewatering plan must be submitted to and approved by the Agency prior to any dewatering. Dewatering activity pursuant to this Emergency Field Authorization may not exceed the permitting thresholds in Chapter ☐ 40A-2, F.A.C. (NWFWMD); ☐ 40B-2, F.A.C. (SRWMD); ☐ 40C-2, F.A.C. (SJRWMD); ☐ 40D-2, F.A.C. (SWFWMD); or ☐ 40E-2, F.A.C. (SFWMD).

☐   Where shoreline stabilization is required, riprap will consist of unconsolidated boulders, rocks, or clean concrete rubble without exposed reinforcing rods or similar protrusions.
The riprap will be free of sediment, debris, and toxic or otherwise harmful substances.
The riprap shall have a diameter of 12 to 36 inches. Filter cloth will be placed under the riprap to prevent shoreline erosion and leaching of shoreline soils through the riprap.

☐   Trimming or alteration of mangroves will be supervised or conducted by a professional mangrove trimmer in order to minimize damage to mangroves.

☐   Activities shall not disturb marked or known marine turtle nests or  damage existing native salt-tolerant or submerged vegetation, threatened, and endangered species, or historical and archeological resources.

☐   The authorized entity is required to maintain documentation (such as photos) of the condition of structures or lands as they existed prior to initiating any activities authorized under this Emergency Field Authorization, and provide such documentation to the Agency if requested.

☐   Restoration of the project site shall be accomplished as follows:

☐   Within 90 days of completion of issuance of this Emergency Field Authorization, the authorized entity will apply for a state 404 Program permit for the activity.

**5.   This Emergency Field Authorization is issued this**     day of           20   , by:

Printed Name                        Title

**6.   The undersigned has read the foregoing and agrees to comply with the conditions contained herein. The undersigned acknowledges that any deviation from the attached drawings or conditions of this Emergency Field Authorization may result in enforcement action, including financial penalties.**

Owner/Authorized Agent Signature          Date

Printed Name                        Title

cc:     (Water Management District, if applicable)
        City
        County

**[Insert Notice of Rights]**

# Chapter 62-340, F.A.C.
# Data Form Guide

Wetland and Other Surface Water Delineation
Version: February 2021 ©



From the Staff of
Wetland Evaluation and Training
Submerged Lands and Environmental Resources Coordination
Florida Department of Environmental Protection

The content of this guide was compiled by members of the Florida Department of Environmental Protection, Submerged Lands and Environmental Resources Coordination, Wetland Evaluation and Training Team. The express purpose of this document is to provide guidance to regulatory staff in order to maintain consistency in the applied field methodologies for wetland delineation pursuant to Chapter 62-340, F.A.C. The information contained in this guide was garnered from various sources pertinent to the field application of wetland delineation methodology outlined in Chapter 62-340, F.A.C. FDEP does not warrant data provided by other sources for accuracy or for any particular use that may require accurate information. This guide is for information purposes only.

**Table of Contents**                                                                                      **Page**

Appendix A: subsection 62-340.450(1), (2), (3), F.A.C..................................... 4
Chapter 62-340, F.A.C.
62-340.100 Intent.................................................................................................. 21
62-340.200 Definitions. ......................................................................................... 22
62-340.300 Delineation of Wetlands. .................................................................... 23
62-340.400 Selection of Appropriate Vegetative Stratum. ................................... 27
62-340.450 Vegetative Index. ................................................................................ 27
62-340.500 Hydrologic Indicators. ........................................................................ 28
62-340.550 Wetland Hydrology. ........................................................................... 30
62-340.600 Surface Waters .................................................................................... 30
62-340.700 Exemptions for Treatment or Disposal Systems ................................ 31
62-340.750 Exemptions for Surface Waters or
        Wetlands Created by Mosquito Control Activities................................ 33
Surface Water Definitions...................................................................................... 34
Field Identification of Hydric Soils........................................................................ 35
Estimating Seasonal High Saturation (SHWT depth) ............................................ 36
Stand-alone D Test Indicators................................................................................. 37
Field Determination of Soil Indicator Texture ....................................................... 38
Tips for Texturing Soils with High Organic Content ("Rub Tests") ...................... 38
Tips for Approximating Composition of Soil ("Volume Tests")............................ 39
Tips for Determining Boundary Types of Features in Soil ..................................... 40
Tips for Determining Contrast Between Soil Colors............................................... 40
Round 10X % Coating Charts................................................................................. 42
Feature % Volume Charts ....................................................................................... 43
Tips for Determining Shapes of Features in Soil .................................................... 48
Tips for Determining Areal Extent of Plants .......................................................... 48
Map of Land Resource Regions.............................................................................. 49
Map of Major Land Resource Areas ...................................................................... 50
Hydric Soil Field Indicators Simplified Checklist ................................................. 51
Glossary from NRCS Field Indicators of Hydric Soils ......................................... 60
Hydric Soil Field Indicators for LRRs: P T U........................................................ 67
Hydric Soil Field Indicators Starting Depth Summary Table................................. 73
Appendix B: Histosol and Histic Epipedon Definitions ........................................ 74
NRCS Hydric Soil Technical Notes #4 & #13 ....................................................... 75
Appendix C: Hydric Soils Criteria and Technical Standard .................................. 76
Root Size Estimation Chart and Quantity Classes ................................................. 77
Supplemental Soil Data .......................................................................................... 78
FNAI Natural Communities of Florida List ........................................................... 78
Appendix A2: Common Name Listing of Vegetative Index ................................... 79
Recommended 5-Step Field Wetland Delineation Procedure ................................. 95
Required and Suggested Field Equipment .............................................................. 95

## Appendix A: subsection 62-340.450(1), (2), (3), F.A.C.

## Vegetative Index Plant List *(See Appendix A2 (p. 79) for plants listed by common name)*

## Botanical Name/ Common Name/ Wetland Status

***Abildgaardia ovata***   flat-spike rush FACW
***Acacia auriculiformis***   ear-leaved acacia FAC
***Acer negundo***   box-elder FACW
***Acer rubrum***   red maple FACW
***Acer saccharinum***   silver maple OBL
***Acoelorraphe wrightii***   paurotis palm OBL
***Acrostichum*** spp.   leather fern OBL
***Aeschynomene indica***   India joint-vetch FACW
***Aeschynomene pratensis***   meadow joint-vetch OBL
***Agalinis aphylla***   scale-leaf false-foxglove FACW
***Agalinis linifolia***   flax-leaf false-foxglove OBL
***Agalinis maritima***   saltmarsh false-foxglove OBL
***Agalinis pinetorum*** (*A. pulchella*)   false-foxglove FACW
***Agalinis purpurea***   large purple false-foxglove FACW
***Agarista populifolia***   hobble-bush FACW
***Agrostis stolonifera***   redtop FACW
***Aletris*** spp.   colic-root FAC
***Alisma subcordatum***   subcordate water-plantain OBL
***Alnus serrulata***   hazel alder OBL
***Alopecurus carolinianus***   tufted foxtail FAC
***Alternanthera maritima***   beach alternanthera FACW - Keys only
***Alternanthera paronychioides*** smooth chaff-flower FAC - Keys only
***Alternanthera philoxeroides***   alligator-weed OBL
***Alternanthera sessilis***   sessile alligator-weed OBL
***Amaranthus australis***   southern amaranth OBL
***Amaranthus cannabinus***   tidemarsh amaranth OBL
***Amaranthus floridanus***   Florida amaranth OBL
***Ammannia*** spp.   toothcup OBL
***Amorpha fruticosa***   indigo-bush FACW
***Amphicarpum muhlenbergianum***   blue maidencane FACW
***Amsonia rigida***   stiff slimpod FACW
***Amsonia tabernaemontana***   eastern slimpod FACW
***Anagallis pumila***   Florida pimpernel FAC
***Andropogon arctatus***   (Campbell) savannah bluestem FAC
***Andropogon brachystachys*** (Campbell) short-spike bluestem FAC
***Andropogon gerardii***   (Campbell) big bluestem FAC
***Andropogon glomeratus***   (Campbell) bushy bluestem FACW
***Andropogon liebmanii*** var. ***pungensis***   (Campbell)
              (***A. mohrii***) Mohr's bluestem FACW
***Andropogon perangustatus***   (Campbell) slim bluestem FAC
***Andropogon virginicus***   (Campbell) broom-sedge FAC
***Annona glabra***   pond apple OBL
***Anthaenantia rufa***   purple silky-scale FACW
***Apteria aphylla***   nodding nixie FACW

4

*Ardisia* spp.   marlberry FAC
*Arenaria godfreyi*   Godfrey's stitchwort FACW
*Arisaema* spp.   jack-in-the-pulpit; green-dragon FACW
*Aristida affinis*   long-leaf three-awn grass OBL
*Aristida purpurascens* (s.l.)   wand-like three-awn grass FACW
*Aristida rhizomophora*   rhizomatous three-awn grass FAC
*Aristida spiciformis*   three-awn bottlebrush FAC
*Aristida stricta*   pineland three-awn grass FAC
*Armoracia aquatica*   lakecress OBL
*Arnoglossum diversifolium*   variable-leaf indian-plantain FACW
*Arnoglossum ovatum*   egg-leaf indian-plantain FACW
*Arnoglossum sulcatum* indian-plantain, Georgia OBL
*Aronia arbutifolia*   red chokeberry FACW
*Arundinaria gigantea*   giant cane FACW
*Arundo donax*   giant reed FAC
*Asclepias connivens*   large-flower milkweed FACW
*Asclepias incarnata*   swamp milkweed OBL
*Asclepias lanceolata*   fen-flower milkweed OBL
*Asclepias longifolia*   long-leaf milkweed FACW
*Asclepias pedicellata*   savannah milkweed FACW
*Asclepias perennis*   aquatic milkweed OBL
*Asclepias rubra*   red milkweed OBL
*Asclepias viridula*   southern milkweed  FACW
*Aster carolinianus*   climbing aster OBL
*Aster chapmanii*   savannah aster FACW
*Aster dumosus*   bushy aster FAC
*Aster elliottii*   Elliott's aster OBL
*Aster eryngiifolius*   coyote-thistle aster FACW
*Aster lateriflorus*   calico aster FACW
*Aster spinulosus*   bog aster FACW
*Aster subulatus*   saltmarsh aster OBL
*Aster tenuifolius*   saltmarsh aster OBL
*Aster umbellatus*   flat-top white aster FAC
*Aster vimineus*   small white aster FACW
*Athyrium filix-femina*   subarctic lady fern FACW
*Atriplex patula*   halberd-leaf saltbush FACW
*Avicennia germinans*   black mangrove OBL
*Axonopus* spp.   carpet grass FAC
*Baccharis angustifolia*   false-willow OBL
*Baccharis dioica*   broom-bush false-willow FAC
*Baccharis glomeruliflora*   groundsel tree FAC
*Baccharis halimifolia*   eastern false-willow FAC
*Bacopa* spp.   water-hyssop OBL
*Balduina atropurpurea*   purple honeycomb-head FACW
*Balduina uniflora*   one-flower honeycomb-head FACW
*Bartonia* spp.  screwstem FACW
*Batis maritima*   saltwort OBL

*Betula nigra*   river birch OBL
*Bidens bipinnata*   Spanish needles U
*Bidens pilosa*   white beggar-ticks FAC
*Bidens* spp.   beggar-ticks OBL
*Bigelowia nudata*   rayless golden-rod FACW
*Blechnum serrulatum*   swamp fern FACW
*Boehmeria cylindrica*   small-spike false-nettle OBL
*Boltonia* spp.   boltonia FACW
*Borrichia* spp.   sea oxeye OBL
*Brachiaria purpurascens*   paragrass FACW
*Bucida buceras*   gregory wood FAC
*Bumelia celastrina*   coastal bumelia FAC
*Bumelia lycioides*   buckthorn bumelia FAC
*Bumelia reclinata*   bumelia FAC
*Burmannia* spp.   burmannia OBL
*Byrsonima lucida*   locust-berry FAC - Keys only
*Cacalia suaveolens*   sweet-scent indian-plantain FACW
*Calamovilfa curtissii*   Curtiss' reed grass FACW
*Callitriche* spp.   water-starwort OBL
*Calopogon* spp.   grass-pinks FACW
*Calycocarpum lyonii*   cupseed FACW
*Campanula americana*   American bellflower FAC
*Campanula floridana*   bellflower OBL
*Canna* spp.   canna OBL
*Canna x generalis*   common canna FAC
*Caperonia* spp.   caperonia FACW
*Capparis flexuosa*   caper-tree FACW
*Cardamine bulbosa*   bitter-cress OBL
*Cardamine pensylvanica*   spring-cress OBL
*Carex atlantica*   prickly bog sedge OBL
*Carex comosa*   bearded sedge OBL
*Carex crinita*   fringed sedge OBL
*Carex crus-corvi*   raven-foot sedge OBL
*Carex decomposita*   cypress-knee sedge OBL
*Carex elliottii*   Elliott's sedge OBL
*Carex folliculata*   long sedge OBL
*Carex gigantea*   large sedge OBL
*Carex howei*   Howe's sedge OBL
*Carex hyalinolepis* sedge, shoreline sedge OBL
*Carex leptalea*   bristly-stalk sedge OBL
*Carex louisianica*   Louisiana sedge OBL
*Carex lupulina*   hop sedge OBL
*Carex lurida*   shallow sedge OBL
*Carex* spp.   sedges FACW
*Carex stipata*   stalk-grain sedge OBL
*Carex walteriana*   Walter's sedge OBL
*Carphephorus carnosus*   pineland chaffhead FACW

6

*Carphephorus odoratissimus*    vanilla plant FAC
*Carphephorus paniculatus*    deer-tongue FAC
*Carphephorus pseudoliatris*    bristle-leaf chaffhead FACW
*Carpinus caroliniana*    American hornbeam FAC
*Carya aquatica*    water hickory OBL
*Casuarina* spp.    casuarina FAC
*Cayaponia quinqueloba*    five-lobe cayaponia FAC
*Celtis laevigata*    sugar-berry; hackberry FACW
*Centella asiatica*    coinwort FACW
*Cephalanthus occidentalis*    buttonbush OBL
*Cestrum diurnum*    day jessamine FAC
*Chamaecyparis thyoides*    Atlantic white cedar OBL
*Chaptalia tomentosa*    sunbonnet; pineland daisy FACW
*Chasmanthium latifolium*    spanglegrass FAC
*Chasmanthium sessiliflorum*    long-leaf Chasmanthium FAC
*Chasmanthium* spp.    spanglegrass FACW
*Chiococca* spp.    snowberry FAC
*Chrysobalanus icaco*    cocoplum FACW
*Cicuta* spp.    water-hemlock OBL
*Cirsium lecontei*    Leconte's thistle FACW
*Cirsium muticum*    swamp thistle OBL
*Cirsium nuttallii*    Nuttall's thistle FACW
*Cladium* spp.    sawgrass OBL
*Cleistes divaricata*    rosebud OBL
*Clethra alnifolia*    sweet pepper bush FACW
*Cliftonia monophylla*    buckwheat-tree FACW
*Colocasia esculenta*    elephant's ear OBL
*Colubrina asiatica*    Asian snakewood FAC
*Commelina erecta*    sandhill dayflower U
*Commelina* spp.    dayflower FACW
*Conocarpus erectus*    buttonwood FACW
*Conoclinium coelestinum*    mistflower FAC
*Coreopsis falcata*    sickle tickseed FACW
*Coreopsis floridana*    Florida tickseed FACW
*Coreopsis gladiata*    southeastern tickseed FACW
*Coreopsis integrifolia*    ciliate-leaf tickseed FACW
*Coreopsis leavenworthii*    Leavenworth's tickseed FACW
*Coreopsis linifolia*    Texas tickseed FACW
*Coreopsis nudata*    Georgia tickseed OBL
*Coreopsis tripteris*    tall tickseed FAC
*Cornus amomum*    silky dogwood OBL
*Cornus foemina*    swamp dogwood FACW
*Crataegus aestivalis*    mayhaw OBL
*Crataegus marshallii*    parsley haw FACW
*Crataegus viridis*    green haw FACW
*Crinum americanum*    southern swamp-lily OBL
*Croton elliottii*    Elliott's croton FACW

***Ctenitis submarginalis***   brown-hair comb fern FACW

***Ctenium*** spp.   toothache grass FACW

***Cupaniopsis anacardioides***   carrotwood FAC

***Cuphea aspera***   common waxweed FACW

***Cuphea carthagenensis***   Columbia waxweed FAC

***Cyperus alternifolius***   alternate-leaf flatsedge OBL

***Cyperus articulatus***   jointed flatsedge OBL

***Cyperus cuspidatus***   coastal-plain flatsedge FAC

***Cyperus difformis***   variable flatsedge OBL

***Cyperus distinctus***   marshland flatsedge OBL

***Cyperus drummondii***   flatsedge OBL

***Cyperus entrerianus***   flatsedge OBL

***Cyperus erythrorhizos***   red-root flatsedge OBL

***Cyperus esculentus***   flatsedge FAC

***Cyperus filiculmis***   sandhill flatsedge U

***Cyperus giganteus***   flatsedge FAC

***Cyperus globulosus***   Baldwin's flatsedge FAC

***Cyperus haspan***   sheathed flatsedge OBL

***Cyperus huarmensis***   black knotty-root flatsedge FAC

***Cyperus lanceolatus***   epiphytic flatsedge OBL

***Cyperus metzii***   flatsedge FAC

***Cyperus ovularis***   flatsedge U

***Cyperus papyrus***   papyrus flatsedge OBL

***Cyperus reflexus***   flatsedge U

***Cyperus refractus***   flatsedge U

***Cyperus retrofractus***   flatsedge U

***Cyperus retrorsus***   flatsedge FAC

***Cyperus rotundus***   purple flatsedge FAC

***Cyperus*** **spp.**   flatsedge FACW

***Cyperus tetragonus***   flatsedge U

***Cypselea humifusa***   panal FAC

***Cyrilla racemiflora***   swamp cyrilla FAC

***Decodon verticillatus***   swamp-loosestrife OBL

***Dichondra caroliniensis***   pony-foot FAC

***Dichromena colorata***   starbrush white-top sedge FACW

***Dichromena floridensis***   Everglades white-top sedge FACW

***Dichromena latifolia***   giant white-top sedge OBL

***Dicliptera brachiata***   wild mudwort FACW

***Digitaria pauciflora***   everglades grass FACW

***Digitaria serotina***   dwarf crabgrass FAC

***Diodia virginiana***   button-weed FACW

***Dionaea muscipula***   Venus' flytrap FACW

***Diospyros virginiana***   common persimmon FAC

***Distichlis spicata***   seashore saltgrass OBL

***Drosera brevifolia***   dwarf sundew FACW

***Drosera capillaris***   pink sundew FACW

***Drosera filiformis***   thread-leaf sundew OBL

*Drosera intermedia*   spoon-leaf sundew OBL
*Drosera tracyi*   Gulf coast sundew OBL
*Drymaria cordata*   West Indian chickweed FAC
*Dryopteris ludoviciana*   southern shield-fern FACW
*Dulichium arundinaceum*   three-way sedge OBL
*Dyschoriste humistrata*   swamp dyschoriste FACW
*Echinochloa* spp.   jungle-rice; cockspur grass FACW
*Echinodorus* spp.   burhead OBL
*Eclipta alba*   yerba de Tajo FACW
*Eleocharis* spp.   spikerush OBL
*Elyonurus tripsacoides*   Pan-American balsam-scale FACW
*Elytraria caroliniensis*   Carolina scaly-stem FAC
*Equisetum hyemale*   horsetail FACW
*Eragrostis* spp.   lovegrass FAC
*Erechtites hieraciifolia*   fireweed FAC
*Erianthus brevibarbis*   short-beard plumegrass FACW
*Erianthus giganteus*   sugarcane plumegrass OBL
*Erianthus strictus*   narrow plumegrass OBL
*Erigeron quercifolius*   fleabane FAC
*Erigeron vernus*   early whitetop fleabane FACW
*Eriocaulon* spp.   pipewort OBL
*Eriochloa* spp.   cupgrass FACW
*Erithalis fruticosa*   black torchwood FAC
*Ernodea littoralis*   golden-creeper FAC - Keys only
*Eryngium aquaticum*   corn snakeroot OBL
*Eryngium baldwinii*   Baldwin's coyote-thistle FAC
*Eryngium integrifolium*   blue-flower coyote-thistle FACW
*Eryngium prostratum*   creeping coyote-thistle FACW
*Eryngium yuccifolium*   rattlesnake master FACW
*Erythrodes querceticola*   low erythrodes FACW
*Eulophia alta*   wild coco FACW
*Eupatoriadelphus fistulosus*   joe-pye-weed FACW
*Eupatorium leptophyllum*   marsh thoroughwort OBL
*Eupatorium leucolepis*   white-bract thoroughwort FACW
*Eupatorium mikanioides*   semaphore thoroughwort FACW
*Eupatorium perfoliatum*   boneset FACW
*Eupatorium* spp.   thoroughworts FAC
*Euphorbia humistrata* (*Chamaesyce humistrata*)   spreading broomspurge FACW
*Euphorbia inundata*   Florida spurge FACW
*Euphorbia polyphylla*   many-leaved spurge FACW
*Eustachys glauca* (*Chloris glauca*)   saltmarsh fingergrass FACW
*Eustachys petraea*   fingergrass FAC
*Eustoma exaltatum*   prairie-gentian FACW
*Euthamia* spp.   bushy goldenrod FAC
*Evolvulus convolvuloides*   evolvulus FACW
*Evolvulus sericeus*   silky bindweed FACW
*Ficus aurea*   Florida strangler fig FAC

9

*Fimbristylis annua*   annual fringe-rush FACW

*Fimbristylis puberula*   Vahl's hairy fringe-rush FACW

*Fimbristylis spathacea*   hurricane-grass FAC

*Fimbristylis* spp.   fringe-rush OBL

*Flaveria bidentis*   yellowtop FAC

*Flaveria floridana*   yellowtop FACW

*Flaveria linearis*   yellowtop FACW

*Flaveria trinervia*   yellowtop FAC

*Forestiera acuminata*   swamp privet FACW

*Forestiera segregata*   Florida privet FAC

*Fothergilla gardenii*   dwarf witch-alder FACW

*Fraxinus americana*   white ash U

*Fraxinus* spp.   ash OBL

*Fuirena* spp.   umbrella-sedge OBL

*Galium tinctorium*   stiff marsh bedstraw FACW

*Gaylussacia dumosa*   dwarf huckleberry FAC

*Gaylussacia frondosa*   dangleberry FAC

*Gaylussacia mosieri*   woolly-berry FACW

*Gentiana* spp.   gentian FACW

*Gleditsia aquatica*   water-locust OBL

*Gleditsia triacanthos*   honey-locust FACW

*Glyceria striata*   fowl mannagrass OBL

*Gordonia lasianthus*   loblolly bay FACW

*Gratiola hispida*   hispid hyssop FAC

*Gratiola* spp.   hedgehyssop FACW

*Guapira discolor*   blolly FAC - Keys only

*Habenaria* spp.   rein orchid FACW

*Halesia diptera*   silver-bell FACW

*Harperocallis flava*   Harper's beauty FACW

*Hartwrightia floridana*   Florida hartwrightia FACW

*Hedychium coronarium*   ginger FACW

*Helenium amarum*   pasture sneezeweed FAC

*Helenium* spp.   sneezeweed FACW

*Helianthus agrestis*   southeastern sunflower FACW

*Helianthus angustifolius*   swamp sunflower FACW

*Helianthus carnosus*   lakeside sunflower FACW

*Helianthus floridanus*   Florida sunflower FAC

*Helianthus heterophyllus*   wetland sunflower FACW

*Helianthus simulans*   muck sunflower FACW

*Heliotropium curassavicum*   seaside heliotrope FAC

*Heliotropium polyphyllum*   heliotrope FAC

*Heliotropium procumbens*   four-spike heliotrope FACW

*Hemicarpha* spp.   dwarf-bulrush FACW

*Heteranthera reniformis*   kidney-leaf mud-plantain OBL

*Hibiscus aculeatus*   rosemallow FACW

*Hibiscus coccineus*   scarlet rosemallow OBL

*Hibiscus grandiflorus*   swamp rosemallow OBL

***Hibiscus laevis***   halberd-leaf rosemallow OBL
***Hibiscus moscheutos***   swamp rosemallow OBL
***Hibiscus tiliaceus***   sea rosemallow FAC
***Hydrochloa caroliniensis***   watergrass OBL
***Hydrocleis nymphoides***   water-poppy OBL
***Hydrocotyle ranunculoides***   floating pennywort OBL
***Hydrocotyle*** spp.   pennywort FACW
***Hydrolea*** spp.   false-fiddle-leaf OBL
***Hygrophila*** spp.   hygrophila OBL
***Hymenachne amplexicaulis***   trompetilla OBL
***Hymenocallis*** spp.   spider-lily OBL
***Hypericum chapmanii***   Chapman's St. John's-wort OBL
***Hypericum cumulicola***   scrub St. John's-wort U
***Hypericum drummondii***   Drummond's St. John's-wort U
***Hypericum edisonianum***   Edison's St. John's-wort OBL
***Hypericum fasciculatum***   marsh St. John's-wort OBL
***Hypericum gentianoides***   pineweed U
***Hypericum hypericoides***   St. Andrew's cross FAC
***Hypericum lissophloeus***   smooth-bark St. John's-wort OBL
***Hypericum microsepalum***   small-sepal St. John's-wort U
***Hypericum nitidum***   Carolina St. John's-wort OBL
***Hypericum prolificum***   shrubby St. John's-wort U
***Hypericum punctatum***   dotted St. John's-wort U
***Hypericum reductum***   Atlantic St. John's-wort U
***Hypericum*** spp.   St. John's-wort FACW
***Hypericum tetrapetalum***   four-petal St. John's-wort FAC
***Hypolepis repens***   bead fern FACW
***Hypoxis*** spp.   yellow stargrasses FACW
***Hyptis alata***   musky mint FACW
***Ilex amelanchier***   sarvis holly OBL
***Ilex cassine***   dahoon holly OBL
***Ilex coriacea***   bay-gall holly FACW
***Ilex decidua***   deciduous holly FACW
***Ilex myrtifolia***   myrtle holly OBL
***Ilex opaca*** var.***opaca***   American holly FAC
***Ilex verticillata***   winterberry OBL
***Ilex vomitoria***   yaupon holly FAC
***Illicium floridanum***   Florida anise OBL
***Illicium parviflorum***   star anise FACW
***Impatiens capensis***   spotted touch-me-not OBL
***Iris*** spp.   iris OBL
***Iris verna***   dwarf iris U
***Isoetes*** spp.   quillwort OBL
***Itea virginica***   virginia willow OBL
***Iva frutescens***   marsh elder OBL
***Iva microcephala***   little marsh elder FACW
***Jacquinia keyensis***   joewood FAC

*Juncus marginatus*   rush FACW
*Juncus* spp.   rush OBL
*Juncus tenuis*   rush FAC
*Justicia brandegeana*   shrimp plant U
*Justicia* spp.   water-willow OBL
*Kalmia latifolia*   mountain laurel FACW
*Kosteletzkya pentasperma*   coastal mallow FAC
*Kosteletzkya virginica*   seashore mallow OBL
*Lachnanthes caroliniana*   redroot FAC
*Lachnocaulon anceps*   white-head bogbutton FACW
*Lachnocaulon beyrichianum*   southern bogbutton FACW
*Lachnocaulon digynum*   pineland bogbutton OBL
*Lachnocaulon engleri*   Engler's bogbutton OBL
*Lachnocaulon minus*   Small's bogbutton OBL
*Laguncularia racemosa*   white mangrove OBL
*Laportea canadensis*   Canada wood-nettle FACW
*Leersia* spp.   cutgrass OBL
*Leitneria floridana*   corkwood OBL
*Leptochloa* spp.   sprangle-top FACW
*Leptochloa virgata*   tropic sprangle-top FAC
*Leucothoe* spp.   dog-hobble FACW
*Liatris garberi*   Garber's gayfeather FACW
*Liatris gracilis*   blazing star FAC
*Liatris spicata*   spiked gayfeather FAC
*Lilaeopsis* spp.   lilaeopsis OBL
*Lilium catesbaei*   southern red lily FAC
*Lilium iridollae*   panhandle lily OBL
*Limnobium spongia*   frogbit OBL
*Limnophila* spp.   marshweed OBL
*Limonium carolinianum*   sea-lavender OBL
*Lindera benzoin*   northern spicebush FACW
*Lindera melissifolia*   southern spicebush OBL
*Lindernia crustacea*   Malayan false-pimpernel FAC
*Lindernia* spp.   false-pimpernel FACW
*Linum carteri*   Carter's flax FACW
*Linum floridanum*   Florida yellow flax FAC
*Linum medium*   stiff yellow flax FAC
*Linum striatum*   ridged yellow flax FACW
*Linum westii*   West's flax OBL
*Liparis elata* (*L. nervosa*)   tall liparis OBL
*Lipocarpha* spp.   lipocarpha FACW
*Liquidambar styraciflua*   sweetgum FACW
*Liriodendron tulipifera*   tulip tree FACW
*Listera* spp.   twayblade FACW
*Litsea aestivalis*   pondspice OBL
*Lobelia cardinalis*   cardinal flower OBL
*Lobelia floridana*   Florida lobelia OBL

*Lobelia* spp.   lobelia FACW
*Lophiola americana*   golden-crest FACW
*Ludwigia hirtella*   hairy seedbox FACW
*Ludwigia maritima*   seaside seedbox FACW
*Ludwigia* spp.   ludwigia; water-primrose OBL
*Ludwigia suffruticosa*   headed seedbox FACW
*Ludwigia virgata*   savanna seedbox FACW
*Lycium carolinianum*   Christmas berry OBL
*Lycopodium* spp.   clubmoss FACW
*Lycopus* spp.   bugleweed OBL
*Lyonia ligustrina*   maleberry FAC
*Lyonia lucida*   fetter-bush FACW
*Lyonia mariana*   fetter-bush FACW
*Lysimachia* spp.   loosestrife OBL
*Lythrum* spp.   marsh loosestrife OBL
*Macbridea* spp.   birds-in-a-nest FACW
*Macranthera flammea*   flameflower OBL
*Magnolia virginiana* var. *australis* sweetbay magnolia OBL
*Malaxis spicata*   Florida adder's-mouth OBL
*Manilkara bahamensis*   wild dilly FAC - Keys only
*Manisuris cylindrica*   pitted jointgrass FAC
*Manisuris* spp.   jointgrass FACW
*Marshallia graminifolia*   grass-leaf barbara's-buttons FACW
*Marshallia tenuifolia*   slim-leaf barbara's-buttons FACW
*Maxillaria crassifolia*   hidden orchid OBL
*Maytenus phyllanthoides*   Florida mayten FAC
*Mecardonia* spp.   mecardonia FACW
*Melaleuca quinquenervia*   punk tree FAC
*Melanthera nivea*   squarestem FACW
*Melanthium virginicum*   Virginia bunchflower OBL
*Melochia corchorifolia*   chocolate-weed FAC
*Metopium toxiferum*   poison wood FAC
*Micranthemum* spp.   baby tears OBL
*Micromeria brownei* (*Satureja brownei*)   Brown's savory OBL
*Mimosa pigra*   black mimosa FAC
*Mimulus alatus*   monkey-flower OBL
*Mitreola* spp.   hornpod FACW
*Monanthochloe littoralis*   keygrass OBL
*Morinda royoc*   Keys rhubarb FACW - Keys only
*Morus rubra*   red mulberry FAC
*Muhlenbergia capillaris*   muhly grass OBL
*Muhlenbergia expansa*   cutover muhly FAC
*Muhlenbergia schreberi*   nimblewill FACW
*Murdannia* spp.   dewflower FAC
*Myosurus minimus*   tiny mouse-tail FAC
*Myrica cerifera*   southern bayberry FAC
*Myrica heterophylla*   evergreen bayberry FACW

*Myrica inodora*    odorless bayberry FACW
*Myrsine guianensis*    guiana myrsine FAC
*Nasturtium* spp.    water-cress OBL
*Nelumbo* spp.    water-lotus OBL
*Nemastylis floridana*    fall-flowering pleatleaf FACW
*Nemophila aphylla*    small-flower baby-blue-eyes FACW
*Nephrolepis* spp.    sword ferns FAC
*Neyraudia reynaudiana*    silk reed FAC
*Nuphar luteum*    yellow cow-lily OBL
*Nymphaea* spp.    water-lily OBL
*Nymphoides* spp.    floating-hearts OBL
*Nyssa aquatica*    water tupelo OBL
*Nyssa ogeche*    ogeechee tupelo OBL
*Nyssa sylvatica* var. *biflora*    swamp tupelo OBL
*Oldenlandia* spp.    water bluets FACW
*Onoclea sensibilis*    sensitive fern FACW
*Oplismenus setarius*    woods grass FAC
*Orontium aquaticum*    golden club OBL
*Oryza sativa*    cultivated rice FAC
*Osmunda cinnamomea*    cinnamon fern FACW
*Osmunda regalis*    royal fern OBL
*Oxypolis* spp.    water drop-wort OBL
*Panicum abscissum* (Hall)    cut-throat grass FACW
*Panicum anceps*    beaked panicum FAC
*Panicum commutatum*    panicum FAC
*Panicum dichotomiflorum*    fall panicum FACW
*Panicum dichotomum*    panicum FACW
*Panicum ensifolium*    panic grass OBL
*Panicum erectifolium*    erect-leaf witchgrass OBL
*Panicum gymnocarpon*    savannah panicum OBL
*Panicum hemitomon*    maiden-cane OBL
*Panicum hians*    gaping panicum FAC
*Panicum longifolium*    tall thin panicum OBL
*Panicum pinetorum*    panicum FACW
*Panicum repens*    torpedo grass FACW
*Panicum rigidulum*    red-top panicum FACW
*Panicum scabriusculum*    woolly panicum OBL
*Panicum scoparium*    panicum FACW
*Panicum spretum*    panicum FACW
*Panicum strigosum*    panicum FAC
*Panicum tenerum*    bluejoint panicum OBL
*Panicum tenue*    panicum FAC
*Panicum verrucosum*    warty panicum FACW
*Panicum virgatum*    switchgrass FACW
*Parietaria* spp.    pellitory FAC
*Parnassia* spp.    grass-of-Parnassus OBL
*Paspalidium geminatum*    water panicum OBL

*Paspalum acuminatum*   brook paspalum FACW
*Paspalum boscianum*   bull paspalum FACW
*Paspalum conjugatum*   sour paspalum FAC
*Paspalum dilatatum*   dallisgrass FAC
*Paspalum dissectum*   mudbank paspalum OBL
*Paspalum distichum*   joint paspalum OBL
*Paspalum fimbriatum*   Panama paspalum FAC
*Paspalum floridanum*   Florida paspalum FACW
*Paspalum laeve*   field paspalum FACW
*Paspalum monostachyum*   gulf paspalum OBL
*Paspalum plicatulum*   brown-seed paspalum FAC
*Paspalum praecox*   early paspalum OBL
*Paspalum pubiflorum*   hairy-seed paspalum FACW
*Paspalum repens*   water paspalum OBL
*Paspalum setaceum*   thin paspalum FAC
*Paspalum urvillei*   vasey grass FAC
*Pavonia spicata*   mangrove mallow FACW
*Peltandra* spp.   arum; spoon flower OBL
*Pennisetum purpureum*   elephant ear grass FAC
*Penthorum sedoides*   ditch stonecrop OBL
*Pentodon pentandrus*   Hall's pentodon OBL
*Persea palustris*   swamp bay OBL
*Phalaris* spp.   canary grass FAC
*Philoxerus vermicularis*   silverhead FACW
*Phragmites australis*   common reed OBL
*Phyla* spp.   frog-fruit FAC
*Phyllanthus caroliniensis*   Carolina leaf-flower FACW
*Phyllanthus liebmannianus*   Florida leaf-flower FACW
*Phyllanthus urinaria*   water leaf-flower FAC
*Physostegia godfreyi*   Godfrey's dragon-head OBL
*Physostegia leptophylla*   slender-leaf dragon-head OBL
*Physostegia purpurea*   purple dragon-head FACW
*Physostegia virginiana*   false dragon-head FACW
*Pieris phillyreifolia*   climbing fetter-bush FACW
*Pilea* spp.   clearweed FACW
*Pinckneya bracteata*   (*P. pubens*) fever-tree OBL
*Pinguicula* spp.   butterwort OBL
*Pinus glabra*   spruce pine FACW
*Pinus serotina*   pond pine FACW
*Piriqueta caroliniana*   piriqueta FAC
*Pisonia rotundata*   pisonia FAC - Keys only
*Pithecellobium keyense*   blackbead FAC - Keys only
*Pithecellobium unguis-cati*   catclaw FAC - Keys only
*Planera aquatica*   planer tree OBL
*Platanthera* spp.   fringed orchid OBL
*Platanus occidentalis*   sycamore FACW
*Pleea tenuifolia*   rush-featherling OBL

15

*Pluchea* spp.    camphor-weed FACW
*Pogonia ophioglossoides*    rose pogonia OBL
*Polygala cymosa*    tall milkwort OBL
*Polygala leptostachys*    sandhill milkwort U
*Polygala lewtonii*    scrub milkwort U
*Polygala polygama*    racemed milkwort U
*Polygala* spp.    milkwort FACW
*Polygala verticillata*    whorled milkwort U
*Polygonum argyrocoleon*    silversheath smartweed U
*Polygonum* spp.    smartweed OBL
*Polygonum virginianum*    jumpseed FACW
*Polypogon* spp.    rabbit-foot grass FAC
*Polypremum procumbens*    rustweed FAC
*Pontederia cordata*    pickerelweed OBL
*Ponthieva racemosa*    shadow-witch FACW
*Populus deltoides*    eastern cottonwood FACW
*Populus heterophylla*    swamp cottonwood OBL
*Proserpinaca* spp.    mermaid-weed OBL
*Psidium cattleianum*    strawberry guava FAC
*Psilocarya* spp.    baldrush OBL
*Psychotria* spp.    wild coffee FAC
*Pteris tripartita*    giant brake FACW
*Ptilimnium capillaceum*    mock bishop-weed FACW
*Pycnanthemum nudum*    coastal-plain mountain-mint FACW
*Quercus laurifolia*    laurel oak FACW
*Quercus lyrata*    overcup oak OBL
*Quercus michauxii*    swamp chestnut oak FACW
*Quercus nigra*    water oak FACW
*Quercus pagoda*    cherry-bark oak FACW
*Quercus phellos*    willow oak FACW
*Randia aculeata*    box briar FAC - Keys only
*Ranunculus* spp.    butter-cup FACW
*Reimarochloa oligostachya*    Florida reimar grass FACW
*Reynosia septentrionalis*    darling plum FAC - Keys only
*Rhapidophyllum hystrix*    needle palm FACW
*Rhexia parviflora*    white meadow-beauty OBL
*Rhexia salicifolia*    panhandle meadow-beauty OBL
*Rhexia* spp.    meadow-beauty FACW
*Rhizophora mangle*    red mangrove OBL
*Rhododendron viscosum*    swamp azalea FACW
*Rhodomyrtus tomentosus*    downy rose-myrtle FAC
*Rhynchospora cephalantha*    clustered beakrush OBL
*Rhynchospora chapmanii*    Chapman's beakrush OBL
*Rhynchospora corniculata*    short-bristle beakrush OBL
*Rhynchospora decurrens*    swamp-forest beakrush OBL
*Rhynchospora divergens*    spreading beakrush OBL
*Rhynchospora grayi*    Gray's beakrush U

*Rhynchospora harperi*    Harper's beakrush OBL
*Rhynchospora intermedia*    pinebarren beakrush U
*Rhynchospora inundata*    horned beakrush OBL
*Rhynchospora macra*    large beakrush OBL
*Rhynchospora megalocarpa*    giant-fruited beakrush U
*Rhynchospora microcarpa*    southern beakrush OBL
*Rhynchospora miliacea*    millet beakrush OBL
*Rhynchospora mixta*    mingled beakrush OBL
*Rhynchospora oligantha*    few-flower beakrush OBL
*Rhynchospora* spp.    beakrush FACW
*Rhynchospora stenophylla*    Chapman's beakrush OBL
*Rhynchospora tracyi*    Tracy's beakrush OBL
*Rorippa* spp.    yellow-cress OBL
*Rosa palustris*    swamp rose OBL
*Rotala ramosior*    toothcup OBL
*Roystonea* spp.    royal palm FACW
*Rubus* spp.    blackberries FAC
*Rudbeckia fulgida*    orange coneflower FACW
*Rudbeckia graminifolia*    grass-leaf coneflower FACW
*Rudbeckia laciniata*    cut-leaf coneflower FACW
*Rudbeckia mohrii*    Mohr's coneflower OBL
*Rudbeckia nitida*    shiny coneflower FACW
*Ruellia brittoniana*    Britton's wild-petunia FAC
*Ruellia caroliniensis*    wild-petunia FAC
*Ruellia noctiflora*    night-flowering wild-petunia FACW
*Rumex* spp.    dock FACW
*Sabal minor*    dwarf palmetto FACW
*Sabal palmetto*    cabbage palm FAC
*Sabatia bartramii*    Bartram's rose-gentian OBL
*Sabatia calycina*    coast rose-gentian OBL
*Sabatia dodecandra*    large rose-gentian OBL
*Sabatia* spp.    rose-gentian FACW
*Sacciolepis indica*    glenwood grass FAC
*Sacciolepis striata*    American cupscale OBL
*Sachsia polycephala*    sachsia FACW
*Sagittaria* **spp.**    arrowhead OBL
*Salicornia* spp.    glasswort OBL
*Salix* spp.    willow OBL
*Sambucus canadensis*    elderberry FAC
*Samolus* spp.    water pimpernel OBL
*Sapium sebiferum*    Chinese tallow-tree FAC
*Sarracenia minor*    hooded pitcher-plant FACW
*Sarracenia* spp.    pitcher-plant OBL
*Saururus cernuus*    lizard's tail OBL
*Schinus terebinthifolius*    Brazilian pepper-tree FAC
*Schizachyrium* spp.    bluestem FAC
*Schoenolirion croceum*    sunny bells FACW

17

*Schoenolirion elliottii*    sunny bells FACW
*Schoenus nigricans*    black-sedge FACW
*Scirpus* spp.    bulrush OBL
*Scleria* spp.    nutrush FACW
*Sclerolepis uniflora*    one-flower hardscale FACW
*Scoparia dulcis*    sweet broom FAC
*Scutellaria floridana*    skullcap FAC
*Scutellaria integrifolia*    rough skullcap FAC
*Scutellaria lateriflora*    blue skullcap OBL
*Scutellaria racemosa*    skullcap OBL
*Sebastiania fruticosa*    gulf sebastian-bush FAC
*Selaginella apoda*    meadow spike-moss FACW
*Senecio aureus*    golden ragwort OBL
*Senecio glabellus*    butterweed OBL
*Sesbania* spp.    rattle-bush FAC
*Sesuvium* spp.    sea-purslane FACW
*Setaria geniculata*    bristle grass FAC
*Setaria magna*    foxtail OBL
*Seymeria cassioides*    black senna FAC
*Sisyrinchium atlanticum*    eastern blue-eye-grass FACW
*Sisyrinchium capillare*    blue-eye-grass FACW
*Sisyrinchium mucronatum*    Michaux's blue-eye-grass FACW
*Sium suave*    water-parsnip OBL
*Solanum bahamense*    canker-berry FACW
*Solanum erianthum*    shrub nightshade FACW
*Solidago elliottii*    Elliott's goldenrod OBL
*Solidago fistulosa*    marsh goldenrod FACW
*Solidago leavenworthii*    Leavenworth's goldenrod FACW
*Solidago patula*    rough-leaf goldenrod OBL
*Solidago rugosa*    wrinkled goldenrod FAC
*Solidago sempervirens*    seaside goldenrod FACW
*Solidago stricta*    willow-leaf goldenrod FACW
*Sophora tomentosa*    coast sophora FACW
*Sparganium americanum*    burreed OBL
*Spartina alterniflora*    saltmarsh cordgrass OBL
*Spartina bakeri*    sand cordgrass FACW
*Spartina cynosuroides*    big cordgrass OBL
*Spartina patens*    saltmeadow cordgrass FACW
*Spartina spartinae*    gulf cordgrass OBL
*Spergularia marina*    saltmarsh sandspurry OBL
*Spermacoce glabra*    smooth button-plant FACW
*Sphagnum* spp.    sphagnum moss OBL
*Sphenoclea zeylanica*    chicken-spike FACW
*Sphenopholis pensylvanica*    swamp wedgescale OBL
*Sphenostigma coelestinum*    Bartram's ixia FACW
*Spigelia loganioides*    pink-root FACW
*Spilanthes americana*    creeping spotflower FACW

*Spiranthes* spp.   ladies'-tresses FACW
***Sporobolus floridanus***   Florida dropseed FACW
***Sporobolus virginicus***   seashore dropseed OBL
***Stachys lythroides***   hedgenettle OBL
***Staphylea trifolia***   American bladdernut FACW
***Stenandrium floridanum***   stenandrium FACW
***Stenanthium gramineum***   eastern feather-bells FACW
***Stillingia aquatica***   corkwood OBL
***Stillingia sylvatica*** var. ***tenuis***   marsh queen's-delight FAC
***Stipa avenacioides***   Florida needle grass FACW
***Stokesia laevis***   stokesia FACW
***Strumpfia maritima***   strumpfia FACW - Keys only
***Styrax americana***   snowbell; storax OBL
***Suaeda*** spp.   sea-blite OBL
***Suriana maritima***   bay-cedar FAC
***Syngonanthus flavidulus***   bantam-buttons FACW
***Syzygium*** spp.   Java plum FAC
***Taxodium ascendens***   pond cypress OBL
***Taxodium distichum***   bald cypress OBL
***Teucrium canadense***   American germander FACW
***Thalia geniculata***   thalia; fire flag OBL
***Thalictrum*** spp.   meadow-rue FACW
***Thelypteris*** spp.   shield fern FACW
***Thespesia populnea***   seaside mahoe FAC
***Thrinax radiata***   Florida thatch palm FAC - Keys only
***Tilia americana***   American basswood FACW
***Tofieldia racemosa***   coastal false-asphodel OBL
***Toxicodendron vernix*** poison sumac FACW
***Trachelospermum difforme***   climbing-dogbane FACW
***Tradescantia fluminensis***   trailing spiderwort FAC
***Trema*** spp.   trema FAC
***Trepocarpus aethusae***   aethusa-like trepocarpus FACW
***Triadenum*** spp.   marsh St. John's-wort OBL
***Trianthema portulacastrum***   horse-purslane FACW
***Tridens ambiguus***   savannah tridens FACW
***Tridens strictus***   long-spike tridens FACW
***Triglochin striata***   arrow-grass OBL
***Triphora*** spp.   nodding pogonias FACW
***Tripsacum dactyloides***   eastern gama grass FAC
***Typha*** spp.   cattail OBL
***Ulmus rubra***   slippery elm U
***Ulmus*** spp.   elm FACW
***Urechites lutea***   wild allamanda FACW
***Utricularia*** spp.   bladderwort OBL
***Uvularia floridana***   Florida bellwort FACW
***Vaccinium corymbosum***   highbush blueberry FACW
***Vaccinium elliottii***   Elliott's blueberry FAC

*Verbena scabra*   sandpaper vervain FACW
*Verbesina chapmanii*   Chapman's crownbeard FACW
*Verbesina heterophylla*   diverse-leaf crownbeard FACW
*Verbesina virginica*   white crownbeard FAC
*Vernonia angustifolia*   narrow-leaf ironweed U
*Vernonia* spp.   ironweed FACW
*Veronica anagallis-aquatica*   water speedwell OBL
*Veronicastrum virginicum*   culver's-root FACW
*Viburnum dentatum*   arrow-wood FACW
*Viburnum nudum*   possum-haw viburnum FACW
*Viburnum obovatum*   walter viburnum FACW
*Vicia acutifolia*   four-leaf vetch FACW
*Vicia floridana*   Florida vetch FACW
*Vicia ocalensis*   Ocala vetch OBL
*Viola affinis*   Leconte's violet FACW
*Viola esculenta*   edible violet FACW
*Viola lanceolata*   lance-leaf violet OBL
*Viola primulifolia*   primrose-leaf violet FACW
*Websteria confervoides*   water-meal OBL
*Wedelia trilobata*   creeping ox-eye FAC
*Woodwardia areolata*   chainfern OBL
*Woodwardia virginica*   chainfern FACW
*Xanthorhiza simplicissima*   shrubby yellow-root FACW
*Xanthosoma sagittifolium*   elephant ear FACW
*Xyris caroliniana*   Carolina yellow-eyed grass FACW
*Xyris jupicai*   tropical yellow-eyed grass FACW
*Xyris* spp.   yellow-eyed grass OBL
*Yeatesia viridiflora*   green-flower yeatesia FACW
*Zephyranthes atamasco*   atamasco lily FACW
*Zigadenus densus*   crow poison FACW
*Zigadenus glaberrimus*   atlantic deathcamas FACW
*Zizania aquatica*   wildrice OBL
*Zizaniopsis miliacea*   southern wildrice OBL

**Any plant not specifically listed is considered an upland plant except vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of Chapter 62-340, F.A.C. (Effective Date July 1, 1994)**

# Chapter 62-340, F.A.C.
# Delineation of the Landward Extent of Wetlands and Surface Waters

62-340.100 Intent.
62-340.200 Definitions.
62-340.300 Delineation.
62-340.400 Selection of Appropriate Vegetative Stratum.
62-340.450 Vegetative Index.
62-340.500 Hydrologic Indicators.
62-340.550 Wetland Hydrology.
62-340.600 Surface Waters.
62-340.700 Exemptions for Treatment or Disposal Systems.
62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

## 62-340.100 Intent.

(1) This rule's intent is to provide a unified statewide methodology for the delineation of the extent of wetlands and surface waters to satisfy the mandate of Section 373.421, F.S. This delineation methodology is intended to approximate the combined landward extent of wetlands as determined by a water management district and the Department immediately before the effective date of this rule. Before implementing the specific provisions of this methodology, the regulating agency shall attempt to identify wetlands according to the definition for wetlands in subsection 373.019(27), F.S., and subsection 62-340.200(19), F.A.C., below. The landward extent of wetlands shall be determined by the dominance of plant species, soils and other hydrologic evidence indicative of regular and periodic inundation or saturation. In all cases, attempts shall be made to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing, without quantitative sampling. If this cannot be accomplished, the quantitative methods in paragraph 62-301.400(1)(c), F.A.C., shall be used unless the applicant or petitioner and regulating agency agree, in writing, on an alternative method for quantitatively analyzing the vegetation on site. The methodology shall not be used to delineate areas which are not wetlands as defined in subsection 62-340.200(19), F.A.C., nor to delineate as wetlands or surface waters areas exempted from delineation by statute or agency rule.

(2) The Department shall be responsible for ensuring statewide coordination and consistency in the delineation of surface waters and wetlands pursuant to this rule, by providing training and guidance to the Department, Districts,

and local governments in implementing the methodology.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.100.*

## 62-340.200 Definitions.

When used in this chapter, the following terms shall mean:

(1)  "**Aquatic plant**" means a plant, including the roots, which typically floats on water or requires water for its entire structural support, or which will desiccate outside of water.

(2)  "**Canopy**" means the plant stratum composed of all woody plants and palms with a trunk four inches or greater in diameter at breast height, except vines.

(3)  "**Diameter at Breast Height (DBH)**" means the diameter of a plant's trunk or main stem at a height of 4.5 feet above the ground.

(4)  "**Facultative plants**" means those plant species listed in subsection 62-340.450(3), F.A.C., of this chapter. For the purposes of this rule, facultative plants are not indicators of either wetland or upland conditions.

(5)  "**Facultative Wet plants**" means those plant species listed in subsection 62-340.450(2), F.A.C., of this chapter.

(6)  "**Ground Cover**" means the plant stratum composed of all plants not found in the canopy or subcanopy, except vines and aquatic plants.

(7)  "**Ground truthing**" means verification on the ground of conditions on a site.

(8)  "**Hydric Soils**" means soils that are saturated, flooded, or ponded long enough during the growing season to develop anaerobic conditions in the upper part of the soil profile.

(9)  "**Hydric Soil Indicators**" means those indicators of hydric soil conditions as identified in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation ed. Staff 1992).

(10)  "**Inundation**" means a condition in which water from any source regularly and periodically covers a land surface.

(11)  "**Obligate plants**" means those plant species listed in subsection 62-340.450(1), F.A.C., of this chapter.

(12)  "**Regulating agency**" means the Department of Environmental Protection, the water management districts, state or regional agencies, local governments, and any other governmental entities.

(13)  "**Riverwash**" means areas of unstabilized sandy, silty, clayey, or gravelly sediments. These areas are flooded, washed, and reworked by rivers or streams so frequently that they may support little or no vegetation.

(14)  "**Saturation**" means a water table six inches or less from the soil surface for soils with a permeability equal to or greater than six inches per

hour in all layers within the upper 12 inches, or a water table 12 inches or less from the soil surface for soils with a permeability less than six inches per hour in any layer within the upper 12 inches.

(15)  "**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

(16)  "**Subcanopy**" means the plant stratum composed of all woody plants and palms, exclusive of the canopy, with a trunk or main stem with a DBH between one and four inches, except vines.

(17)  "**Upland plants**" means those plant species, not listed as Obligate, Facultative Wet, or Facultative by this rule, excluding vines, aquatic plants, and any plant species not introduced into the State of Florida as of the effective date of this rule.

(18)  "**U.S.D.A.-S.C.S.**" means the United States Department of Agriculture, Soil Conservation Service.

(19)  "**Wetlands**," as defined in subsection 373.019(27), F.S., means those areas that are inundated or saturated by surface water or ground water at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.200.*

## 62-340.300 Delineation of Wetlands.

The landward extent (i.e., the boundary) of wetlands as defined in subsection 62-340.200(19), F.A.C., shall be determined by applying reasonable scientific judgment to evaluate the dominance of plant species, soils, and other hydrologic evidence of regular and periodic inundation and saturation as set forth below. In applying reasonable scientific judgment, all reliable information shall be evaluated in determining whether the area is a wetland as defined in subsection 62-340.200(19), F.A.C.

(1) Before using the wetland delineation methodology described below, the regulating agency shall attempt to identify and delineate the landward extent of wetlands by direct application of the definition of wetlands in subsection 62-340.200(19), F.A.C., with particular attention to the vegetative communities which the definition lists as wetlands and non-wetlands. If the boundary cannot be located easily by use of the definition in subsection 62-340.200(19), F.A.C., the provisions of this rule shall be used to locate the landward extent of a wetland. In applying the provisions of this rule, the regulating agency shall attempt to locate the landward extent of wetlands visually by on site inspection, or aerial photointerpretation in combination with ground truthing.

(2) The landward extent of a wetland as defined in subsection 62-340.200(19), F.A.C., shall include any of the following areas:

  (a) Those areas where the areal extent of obligate plants in the appropriate vegetative stratum is greater than the areal extent of all upland plants in that stratum, as identified using the method in Rule 62-340.400, F.A.C., and either:

    1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrological mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

    2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

    3. One or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

  (b) Those areas where the areal extent of obligate or facultative wet plants, or combinations thereof, in the appropriate stratum is equal to or greater than 80% of all the plants in that stratum, excluding facultative plants, and either:

    1. The substrate is composed of hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a nonhydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance;

    2. The substrate is nonsoil, rock outcrop-soil complex, or the substrate is located within an artificially created wetland area; or

    3. One or more of the hydrologic indicators listed in Rule 62-340.500,

F.A.C., are present and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(c) Those areas, other than pine flatwoods and improved pastures, with undrained hydric soils which meet, in situ, at least one of the criteria listed below. A hydric soil is considered undrained unless reasonable scientific judgment indicates permanent artificial alterations to the on site hydrology have resulted in conditions which would not support the formation of hydric soils.

1. Soils classified according to United States Department of Agriculture's *Keys to Soil Taxonomy* (4th ed. 1990) as Umbraqualfs, Sulfaquents, Hydraquents, Humaquepts, Histosols (except Folists), Argiaquolls, or Umbraquults.

2. Saline sands (salt flats-tidal flats).

3. Soil within a hydric mapping unit designated by the U.S.D.A.-S.C.S. as frequently flooded or depressional, when the hydric nature of the soil has been field verified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida. If a permit applicant, or a person petitioning for a formal determination pursuant to subsection 373.421(2), F.S., disputes the boundary of a frequently flooded or depressional mapping unit, the applicant or petitioner may request that the regulating agency, in cooperation with the U.S.D.A.-S.C.S., confirm the boundary. For the purposes of subsection 120.60(2), F.S., a request for a boundary confirmation pursuant to this subparagraph shall have the same effect as a timely request for additional information by the regulating agency. The regulating agency's receipt of the final response provided by the U.S.D.A.-S.C.S. to the request for boundary confirmation shall have the same effect as a receipt of timely requested additional information.

4. For the purposes of this paragraph only, "pine flatwoods" means a plant community type in Florida occurring on flat terrain with soils which may experience a seasonal high water table near the surface. The canopy species consist of a monotypic or mixed forest of long leaf pine or slash pine. The subcanopy is typically sparse or absent. The ground cover is dominated by saw palmetto with areas of wire grass, gallberry, and other shrubs, grasses, and forbs, which are not obligate or facultative wet species. Pine flatwoods do not include those wetland communities as listed in the wetland definition contained in subsection 62-340.200(19), F.A.C., which may occur in the broader landscape setting of pine flatwoods and which may contain slash pine. Also for the purposes of this paragraph only, "improved pasture" means areas where the dominant native plant community has been replaced with planted or natural recruitment of herbaceous species which are not obligate or facultative wet species and which have been actively

maintained for livestock through mechanical means or grazing.

(d) Those areas where one or more of the hydrologic indicators listed in Rule 62-340.500, F.A.C., are present, and which have hydric soils, as identified using the U.S.D.A.-S.C.S. approved hydric soil indicators for Florida, and reasonable scientific judgment indicates that inundation or saturation is present sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C. These areas shall not extend beyond the seasonal high water elevation.

(3)(a) If the vegetation or soils of an upland or wetland area have been altered by natural or man-induced factors such that the boundary between wetlands and uplands cannot be delineated reliably by use of the methodology in subsection 62-340.300(2), F.A.C., as determined by the regulating agency, and the area has hydric soils or riverwash, as identified using standard U.S.D.A.-S.C.S. practices for Florida, including the approved hydric soil indicators, except where the hydric soil is disturbed by a non hydrologic mechanical mixing of the upper soil profile and the regulating agency establishes through data or evidence that hydric soil indicators would be present but for the disturbance, then the most reliable available information shall be used with reasonable scientific judgment to determine where the methodology in subsection 62-340.300(2), F.A.C., would have delineated the boundary between wetlands and uplands. Reliable available information may include, but is not limited to, aerial photographs, remaining vegetation, authoritative site-specific documents, or topographical consistencies.

(b) This subsection shall not apply to any area where regional or site-specific permitted activity, or activities which did not require a permit, under Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., have altered the hydrology of the area to the extent that reasonable scientific judgment, or application of the provisions of Section 62-340.550, F.A.C., indicate that under normal circumstances the area no longer inundates or saturates at a frequency and duration sufficient to meet the wetland definition in subsection 62-340.200(19), F.A.C.

(c) This subsection shall not be construed to limit the type of evidence which may be used to delineate the landward extent of a wetland under this chapter when an activity violating the regulatory requirements of Sections 253.123 and 253.124, F.S. (1957), as subsequently amended, the provisions of Chapter 403, F.S. (1983), relating to dredging and filling activities, Chapter 84-79, Laws of Florida, and Part IV of Chapter 373, F.S., has disturbed the vegetation or soils of an area.

(4) The regulating agency shall maintain sufficient soil scientists on staff to

provide evaluation or consultation regarding soil determinations in applying the methodologies set forth in subsection 62-340.300(2) or (3), F.A.C. Services provided by the U.S.D.A.-S.C.S., or other competent soil scientists, under contract or agreement with the regulating agency, may be used in lieu of, or to augment, agency staff.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.300.*

## 62-340.400 Selection of Appropriate Vegetative Stratum.

Dominance of plant species, as described in paragraphs 62-340.300(2)(a) and 62-340.300(2)(b), F.A.C., shall be determined in a plant stratum (canopy, subcanopy, or ground cover). The top stratum shall be used to determine dominance unless the top stratum, exclusive of facultative plants, constitutes less than 10 percent areal extent, or unless reasonable scientific judgment establishes that the indicator status of the top stratum is not indicative of the hydrologic conditions on site. In such cases, the stratum most indicative of on site hydrologic conditions, considering the seasonal variability in the amount and distribution of rainfall, shall be used. The evidence concerning the presence or absence of regular and periodic inundation or saturation shall be based on in situ data. All facts and factors relating to the presence or absence of regular and periodic inundation or saturation shall be weighed in deciding whether the evidence supports shifting to a lower stratum. The presence of obligate, facultative wet, or upland plants in a lower stratum does not by itself constitute sufficient evidence to shift strata, but can be considered along with other physical data in establishing the weight of evidence necessary to shift to a lower stratum. The burden of proof shall be with the party asserting that a stratum other than the top stratum should be used to determine dominance. Facultative plants shall not be considered for purposes of determining appropriate strata or dominance.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.400.*

## 62-340.450 Vegetative Index.

    (1)     Obligate Species (See Appendix A)

    (2)     Facultative Wet Species (See Appendix A)

    (3)     Facultative Species (See Appendix A)

    (4)     Nomenclature. Use of plants in this rule is based solely on the scientific names. Common names are included in the above lists for information purposes only. The following references shall be used by the regulating agency to resolve any uncertainty about the nomenclature or taxonomy of any plant listed by a given scientific name in this section: R.

Godfrey, Trees, Shrubs and Woody Vines of Northern Florida and Adjacent
Georgia & Alabama (Univ. Ga. Press, Athens 1988) and D. Lellinger, Ferns
& Fern-Allies of the United States & Canada (Smithsonian Institution Press,
Washington D.C. 1985) for all species covered by these references. For all
other listed scientific names the following references will be followed unless
the species list in this section designates a different authority next to an
individual species name: R. Godfrey & J. Wooten, Aquatic and Wetland
Plants of Southeastern United States: Monocotyledons (Univ. Ga. Press,
Athens 1979); R. Godfrey & J. Wooten, Aquatic and Wetland Plants of
Southeastern United States: Dicotyledons (Univ. Ga. Press, Athens 1979);
D. & H. Correll, Flora of the Bahama Archipelago (A.R. Gantner, Germany
1982). When the species list in this section designates a different authority
next to an individual species name, the regulating agency shall resolve any
ambiguity in nomenclature by using the name identified in D. Hall, The
Grasses of Florida (Doctoral Dissertation, Univ. of Fla., Gainesville 1978);
or C. Campbell, Systematics of the Andropogon Virginicus Complex
(GRAMINEAE), 64 Journal of the Arnold Arboretum 171-254 (1983).
*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS.
History–New 7-1-94, Formerly 17-340.450.*

## 62-340.500 Hydrologic Indicators.

The indicators below may be used as evidence of inundation or saturation
when used as provided in Rule 62-340.300, F.A.C. Several of the indicators
reflect a specific water elevation. These specific water elevation indicators
are intended to be evaluated with meteorological information, surrounding
topography and reliable hydrologic data or analyses when provided, to
ensure that such indicators reflect inundation or saturation of a frequency
and duration sufficient to meet the wetland definition in subsection 62-
340.200(19), F.A.C., and not rare or aberrant events. These specific water
elevation indicators are not intended to be extended from the site of the
indicator into surrounding areas when reasonable scientific judgment
indicates that the surrounding areas are not wetlands as defined in subsection
62-340.200(19), F.A.C.

(1) **Algal mats**. The presence or remains of nonvascular plant material
which develops during periods of inundation and persists after the surface
water has receded.

(2) **Aquatic mosses or liverworts on trees or substrates**. The presence of
those species of mosses or liverworts tolerant of or dependent on surface
water inundation.

(3) **Aquatic plants**. Defined in subsection 62-340.200(1), F.A.C.

(4) **Aufwuchs**. The presence or remains of the assemblage of sessile,
attached or free-living, nonvascular plants and invertebrate animals

(including protozoans) which develop a community on inundated surfaces.

(5)  **Drift lines and rafted debris**. Vegetation, litter, and other natural or manmade material deposited in discrete lines or locations on the ground or against fixed objects, or entangled above the ground within or on fixed objects in a form and manner which indicates that the material was waterborne. This indicator should be used with caution to ensure that the drift lines or rafted debris represent usual and recurring events typical of inundation or saturation at a frequency and duration sufficient to meet the wetland definition of subsection 62-340.200(19), F.A.C.

(6)  **Elevated lichen lines**. A distinct line, typically on trees, formed by the water-induced limitation on the growth of lichens.

(7)  **Evidence of aquatic fauna**. The presence or indications of the presence of animals which spend all or portions of their life cycle in water. Only those life stages which depend on being in or on water for daily survival are included in this indicator.

(8)  **Hydrologic data**. Reports, measurements, or direct observation of inundation or saturation which support the presence of water to an extent consistent with the provisions of the definition of wetlands and the criteria within this rule, including evidence of a seasonal high water table at or above the surface according to methodologies set forth in *Soil and Water Relationships of Florida's Ecological Communities* (Florida Soil Conservation Staff 1992).

(9)  **Morphological plant adaptations**. Specialized structures or tissues produced by certain plants in response to inundation or saturation which normally are not observed when the plant has not been subject to conditions of inundation or saturation.

(10) **Secondary flow channels**. Discrete and obvious natural pathways of water flow landward of the primary bank of a stream watercourse and typically parallel to the main channel.

(11) **Sediment deposition**. Mineral or organic matter deposited in or shifted to positions indicating water transport.

(12) **Vegetated tussocks or hummocks**. Areas where vegetation is elevated above the natural grade on a mound built up of plant debris, roots, and soils so that the growing vegetation is not subject to the prolonged effects of soil anoxia.

(13) **Water marks**. A distinct line created on fixed objects, including vegetation, by a sustained water elevation.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.500.*

## 62-340.550 Wetland Hydrology.

A wetland delineation using the methodology described above, can be refuted by either reliable hydrologic records or site specific hydrologic data which indicate that neither inundation for at least seven consecutive days, nor saturation for at least twenty consecutive days, occurs during conditions which represent long-term hydrologic conditions. Hydrologic records or site specific hydrologic data must be of such a duration, frequency, and accuracy to demonstrate that the records or data are representative of the long-term hydrologic conditions, including the variability in quantity and seasonality of rainfall. When sufficient amounts of either reliable hydrologic records or site specific hydrologic data are not available to prove that the wetland area of concern does not inundate or saturate as described above, a site-specific field-verified analytic or numerical model may be used to demonstrate that the wetland area no longer inundates or saturates regularly or periodically under typical long-term hydrologic conditions. Before initiating the use of a model to evaluate if a wetland delineation should be refuted based on hydrologic conditions, the applicant or petitioner shall first meet with the appropriate regulating agency and reach an agreement on the terms of study, including data collection, the specific model, model development and calibration, and model verification. If the data, analyses, or models are deemed inadequate based on the hydrologic conditions being addressed, the regulating agency shall provide a case-by-case review of the applicability of any data, analyses, or models and shall provide specific reasons, based on generally accepted scientific and engineering practices, why they are inadequate.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211 FS. History–New 7-1-94, Formerly 17-340.550.*

## 62-340.600 Surface Waters.

(1) For the purposes of Section 373.421, F.S., surface waters are waters on the surface of the earth, contained in bounds created naturally or artificially, including, the Atlantic Ocean, the Gulf of Mexico, bays, bayous, sounds, estuaries, lagoons, lakes, ponds, impoundments, rivers, streams, springs, creeks, branches, sloughs, tributaries, and other watercourses. However, state water quality standards apply only to those waters defined in subsection 403.031(13), F.S.

(2) The landward extent of a surface water in the State for the purposes of implementing Section 373.414, F.S., shall be the more landward of the following:

   (a) Wetlands as located by Rule 62-340.300, F.A.C., of this chapter;

   (b) The mean high water line elevation for tidal water bodies;

   (c) The ordinary high water line for non-tidal natural water bodies;

(d) The top of the bank for artificial lakes, borrow pits, canals, ditches and other artificial water bodies with side slopes of 1 foot vertical to 4 feet horizontal or steeper, excluding spoil banks when the canals and ditches have resulted from excavation into the ground; or

(e) The seasonal high water line for artificial lakes, borrow pits, canals, ditches, and other artificial water bodies with side slopes flatter than 1 foot vertical to 4 feet horizontal along with any artificial water body created by diking or impoundment above the ground.

(3) Determinations made pursuant to paragraphs (2)(b) and (2)(c) shall be for regulatory purposes and are not intended to be a delineation of the boundaries of lands for the purposes of title.

*Specific Authority 373.421 FS. Law Implemented 373.421, 373.4211, 403.031(13) FS. History–New 7-1-94, Formerly 17-340.600.*

## 62-340.700 Exemptions for Treatment or Disposal Systems.

(1) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8) and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991):

(a) Works, impoundments, reservoirs, and other watercourses constructed and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(b) Works, impoundments, reservoirs, and other watercourses constructed solely for wastewater treatment or disposal before a construction permit was required under Chapter 403, F.S., and operated solely for wastewater treatment or disposal in accordance with a valid permit reviewed or issued under Rules 62-28.700, 62-302.520, F.A.C., Chapters 62-17, 62-600, 62-610, 62-640, 62-650, 62-660, 62-670, 62-671, 62-673, or 62-701, F.A.C., or Section 403.0885, F.S., or rules implementing Section 403.0885, F.S., except for treatment wetlands or receiving wetlands permitted to receive wastewater pursuant to Chapter 62-611, F.A.C., or Section 403.0885, F.S., or its implementing rules;

(c) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated

solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C., except those permitted as wetland stormwater treatment systems; or

(d) Works, impoundments, reservoirs, and other watercourses of less than 0.5 acres in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(2) Alteration and maintenance of the following shall be exempt from the rules adopted by the department and the water management districts to implement subsections 373.414(1), 373.414(2)(a), 373.414(8), and 373.414(10), F.S.; and subsections 373.414(3) through 373.414(6), F.S.; and subsection 373.414(7), F.S., regarding any authority to apply state water quality standards within any works, impoundments, reservoirs, and other watercourses described in this subsection and any authority granted pursuant to Section 373.414, F.S. (1991), except for authority to protect threatened and endangered species in isolated wetlands:

(a) Works, impoundments, reservoirs, and other watercourses of 0.5 acre or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment in accordance with a noticed exemption under Chapter 62-25, F.A.C., or a valid permit issued under Chapters 62-25 (excluding Rule 62-25.042), 62-330, 40B-4, 40C-4, 40C-42 (excluding Rule 40C-42.0265), 40C-44, 40D-4, 40D-40, 40D-45, 40E-4, except those permitted as wetland stormwater treatment systems; or

(b) Works, impoundments, reservoirs, and other watercourses of 0.5 acres or greater in combined area on a project-wide basis, constructed and operated solely for stormwater treatment before a permit was required under Chapters 62-25, 40B-4, 40C-4, 40C-42, 40C-44, 40D-4, 40D-40, 40D-45, or 40E-4, F.A.C.

(3) The exemptions in subsections 62-340.700(1) and (2) shall not apply to works, impoundments, reservoirs or other watercourses that

(a) Are currently wetlands which existed before construction of the stormwater treatment system and were incorporated in it;

(b) Are proposed to be altered through expansion into wetlands or other surface waters; or

(c) Are wetlands created, enhanced, or restored as mitigation for wetland or  surface water impacts under a permit issued by the Department or a water management district.

(4) Alterations and maintenance of works, impoundments, reservoirs, and other watercourses exempt under this subsection shall not be considered in

32

determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S.

(5) Works, impoundments, reservoirs, and other watercourses exempt under this subsection, other than isolated wetlands in systems described in subsection 62-340.700(2), F.A.C., above, shall not be delineated under Section 373.421, F.S.

(6) This exemption shall not affect the application of state water quality standards, including those applicable to Outstanding Florida Waters, at the point of discharge to waters as defined in subsection 403.031(13), F.S.

(7) As used in this subsection, "solely for" means the reason for which a work, impoundment, reservoir, or other watercourse is constructed and operated; and such construction and operation would not have occurred but for the purposes identified in subsection 62-340.700(1) or 62-340.700(2), F.A.C. Furthermore, the phrase does not refer to a work, impoundment, reservoir, or other watercourse constructed or operated for multiple purposes. Incidental uses, such as occasional recreational uses, will not render the exemption inapplicable, so long as the incidental uses are not part of the original planned purpose of the work, impoundment, reservoir, or other watercourse. However, for those works, impoundments, reservoirs, or other watercourses described in paragraphs 62-340.700(1)(c) and 62-340.700(2)(a), F.A.C., use of the system for flood attenuation, whether originally planned or unplanned, shall be considered an incidental use, so long as the works, impoundments, reservoirs, and other watercourses are no more than 2 acres larger than the minimum area required to comply with the stormwater treatment requirements of the district or department. For the purposes of this subsection, reuse from a work, impoundment, reservoir, or other watercourse is part of treatment or disposal.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History–New 7-1-94, Formerly 17-340.700.*

## 62-340.750 Exemption for Surface Waters or Wetlands Created by Mosquito Control Activities.

Construction, alteration, operation, maintenance, removal, and abandonment of stormwater management systems, dams, impoundments, reservoirs, appurtenant works, or works, in, on or over lands that have become surface waters or wetlands solely because of mosquito control activities undertaken as part of a governmental mosquito control program, and which lands were neither surface waters nor wetlands before such activities, shall be exempt from the rules adopted by the department and water management districts to implement subsections 373.414(1) through 373.414(6), 373.414(8), and 373.414(10), F.S.; and subsection 373.414(7), F.S., regarding any authority granted pursuant to Section 373.414, F.S. (1991). Activities exempted under

this section shall not be considered in determining whether any wetland permitting threshold is met or exceeded under part IV of Chapter 373, F.S. This exemption shall not affect the regulation of impacts on other surface waters or wetlands, or the application of state water quality standards to waters as defined in subsection 403.031(13), F.S., including standards applicable to Outstanding Florida Waters.

*Specific Authority 373.414(9) FS. Law Implemented 373.414(9) FS. History– New 7-1-94, Formerly 17-340.750.*

*See The Florida Wetlands Delineation Manual for further clarification.*

---

## Data Form Guide Notes:
## Surface Water Definitions

*Definition from §373.019(19) Florida Statutes*
"**Surface water**" means water upon the surface of the earth, whether contained in bounds created naturally or artificially or diffused. Water from natural springs shall be classified as surface water when it exits from the spring onto the earth's surface.

*Definition from §373.019(14) Florida Statutes*
"**Other watercourse**" means any canal, ditch, or other artificial watercourse in which water usually flows in a defined bed or channel. It is not essential that the flowing be uniform or uninterrupted.

*Definition from §62.340.200(15) Florida Administrative Code*
"**Seasonal High Water**" means the elevation to which the ground and surface water can be expected to rise due to a normal wet season.

*From The Florida Wetlands Delineation Manual pg. 37*
**Ordinary high water** is that point on the slope or bank where the surface water from the water body ceases to exert a dominant influence on the character of the surrounding vegetation and soils. The OHWL frequently encompasses areas dominated by non-listed vegetation and non-hydric soils. When the OHWL is not at a wetland edge, the general view of the area may present an "upland" appearance.

*Definition from §403.803(14) Florida Statutes*
"**Swale**" means a manmade trench which:
(a) Has a top width-to-depth ratio of the cross-section equal to or greater than 6:1, or side slopes equal to or greater than 3 feet horizontal to 1 foot vertical;
(b) Contains contiguous areas of standing or flowing water only following a rainfall event;
(c) Is planted with or has stabilized vegetation suitable for soil stabilization, stormwater treatment, and nutrient uptake; and
(d) Is designed to take into account the soil erodibility, soil percolation, slope, slope length, and drainage area so as to prevent erosion and reduce pollutant concentration of any discharge.

**Data Form Guide Notes:**

**Tips from <u>Field Indicators of Hydric Soils in the United States</u> V8.2, 2018**

- As long as the soil meets the definition of a hydric soil, the lack of an indicator does not preclude the soil from being hydric.
- Concentrate sampling efforts near the wetland edge and, if these soils are hydric, assume that soils in the wetter, interior portions also are hydric. The indicators were developed mostly to identify the boundary of hydric soil areas and generally work best on the margins. Not all of the obviously wetter hydric soils will be identified by the indicators.

**SOIL AND WATER RELATIONSHIPS OF**          July, 1992
**FLORIDA'S ECOLOGICAL COMMUNITIES**          Adapted

<u>**Field Identification of Hydric Soils**</u>

**Hydric Soil Indicator Concept**

The Hydric Soil Indicator concept is based on the premise that hydric soils develop and exhibit characteristic morphologies that result from repeated periods of saturation and/or inundation for more than a few days. Saturation or inundation when combined with anaerobic microbiological activity in the soil causes a depletion of oxygen. This anaerobiosis promotes biogeochemical processes such as the accumulation of organic matter and the reduction, translocation, and/or accumulation of iron and other reducible elements. These processes result in characteristic morphologies which persist in the soil during both wet and dry periods, making them particularly useful for identifying hydric soils.

Hydric soil indicators are formed predominantly by the accumulation or loss of iron, manganese, sulfur, or carbon compounds. The presence of hydrogen sulfide gas (rotten egg odor) is a strong indicator of a hydric soil, but this indicator is found in only the wettest sites containing sulfur.

**Hydric Soil Indicator Identification Procedure**

To document a hydric soil, dig a hole and describe the soil profile to a depth of approximately 50 cm (20 inches). Using the completed soil description specify which of the Hydric Soil Indicators have been matched. Deeper examination of soil may be required where Hydric Soil Indicators are not easily seen within 50 cm (20 in.) of the surface. It is always recommended that soils be excavated and described as deep as necessary to make reliable interpretations. Examination to less than 50 cm (20 in.) may suffice in soils with surface horizons of organic material or mucky mineral material because these shallow organic accumulations only occur in hydric soils. Depths used in are measured from the muck or mineral soil surface unless otherwise indicated. All colors refer to moist Munsell colors.

## Estimating Seasonal High Saturation

### Introduction

Seasonal High Water Table (SHWT) is the shallowest depth to free water that stands in an unlined borehole or where the soil moisture tension is zero for a significant period (more than a few weeks). The depth to the estimated SHWT is the used soil interpretation in Florida. This method of estimating SHWT applies only to areas lacking hydrologic modifications. Hydrologic modifications such as ditches and dikes can make the soil either wetter or drier.

By observing soil features, SHWT predictions can be made for hydric soils as well as other soils.

### Field Identification of SHWT

The procedure for field Identification of SHWT is based on the assumption that, when soils are wet enough, for a long enough duration to develop SHWT, they should exhibit certain visible properties that are to be used to determine on-site SHWT. All SHWT determinations should be based on field observations of moist soils.

### Procedure

SHWT is determined by examining soils with a hydric soil indicator in a freshly dug pit for the SHWT indicators listed below. Presence of the shallowest of the SHWT indicators listed below indicates the depth to SHWT.

1. Soils with the following hydric soil indicators have SHWT at or above the surface:

A1 (Histosol or Histel), A2 (Histic Epipedon), A3 (Black Histic), A4 (Hydrogen Sulfide), A7 (5 cm Mucky Mineral), A8 (Muck Presence) or A9 (1 cm Muck), S4 (Sandy Gleyed Matrix), and F2 (Loamy Gleyed Matrix).

2. Soils with the following hydric soil indicators have SHWT within 6 inches of the surface:

A5 (Stratified Layers), A6 (Organic Bodies), A11 (Depleted Below Dark Surface), A12 (Thick Dark Surface), S5 (Sandy Redox), S6 (Stripped Matrix), S7 (Dark Surface), S8 (Polyvalue Below Surface), S9 (Thin Dark Surface), F10 (Marl), and F13 (Umbric Surface). Depth to SHWT is the depth at which all requirements of a particular indicator are met.

For example, if S6 (Stripped Matrix) starts at 4 inches, depth to SHWT is 4 inches or if S7 (Dark Surface) starts at the soil surface, depth to SHWT is the soil surface.

36

   3. Soils with the following hydric soil indicators have SHWT within 12 inches of the surface:

F3 (Depleted Matrix), F6 (Redox Dark Surface), and F7 (Depleted Dark Surface). Depth to SHWT is the depth at which all requirements of a particular indicator are met.

For example, if F3 (Depleted Matrix) starts at 8 inches, depth to SHWT is 8 inches.

   4. Soils with the following hydric soil indicators lack significant saturation but are inundated for long or very long duration:

     F8 (Redox Depressions) and F12 (Iron/Manganese Masses).

---

**<u>Data Form Guide Note:</u>**
**<u>A stand-alone D Test soil field indicator</u> is both a hydric soil field indicator and a hydrologic indicator.**

**The hydric soil field indicators below indicate SHWT at or above the surface, and therefore may also be used as evidence of hydrologic data under subsection 62-340.500(8), F.A.C.** per <u>Soil and Water Relationships of Florida's Ecological Communities</u> (Florida Soil Conservation Staff 1992 Adapted)**:**

**A1 – Histosol or Histel**
**A2 – Histic Epipedon**
**A3 – Black Histic**
**A4 – Hydrogen Sulfide**
**A7 – 5 cm Mucky Mineral**
**A8 – Muck Presence**
**A9 – 1 cm Muck**
**S4 – Sandy Gleyed Matrix**
**F2 – Loamy Gleyed Matrix**

Or **any NRCS hydric soil field indicator** in which all requirements of that indicator are met starting at the soil surface (see Data Form Guide page 36)

**The hydric soil field indicator below is also a hydrologic indicator under subsection 62-340.500(11), F.A.C. evidence of sediment deposition:**

**A5 - Stratified Layers**

## Field Determination of Soil Indicator Texture

Place a ball of soil between the thumb and forefinger. Attempt to form a ribbon of uniform thickness (~2mm) and width which will extend over the forefinger.

Does the soil form a ribbon?

**No** ↗            ↖ **Yes**



**Sandy Texture Soil**
Use only **A** or **S** indicators

**Fine Texture Soil**
Use only **A** or **F** indicators

---

### Tips for Determining Texture of Soil Materials High in Organic Carbon

#### "Five Rub Texture Test"

If soil appears dark, gently (minimal pressure) rub wet soil material between forefinger and thumb 2 times, then 3 more times (5 total) and note how it feels.

| # of Rubs | Feeling | Texture |
|---|---|---|
| ≤ 2 | Gritty | Sandy Mineral[1] |
| 2 | Greasy | *Continue to next rows* |
| 3 to ≤ 5 | Gritty | Sandy Mucky Mineral[1] |
| 3 to ≤ 5 | Plastic[2] | Check % Organic Carbon[3] to determine if Fine Mineral[1] or Fine Mucky Mineral[1] |
| 5 | Greasy | Muck[1] |

[1] Results of this test only approximate texture; check NRCS hydric soil field indicators to determine if all requirements of an indicator are met

[2] Plastic: able to be molded or deformed into various shapes by moderate pressure

[3] Sufficiency of organic carbon* can be approximated using the "Color Test" (pg. 39)
  *not to be confused with organic coating of sand particles

#### "Ten Rub Fiber Test"

If soil material is all or nearly all organic and has visible, partly decomposed plant materials, firmly rub a moist sample 10 times in the palm of one hand with the thumb of the other and estimate the proportion of fibers visible with a hand lens.

| Proportion of visible fibers[4] | Organic soil texture |
|---|---|
| Less than 1/6 (<17%) | Sapric (Muck) |
| 1/6 to 3/4 (17% - 75%) | Hemic (Mucky Peat) |
| More than 3/4 (>75%) | Fibric (Peat) |

[4] Live roots are not considered

## Tips for Approximating Composition of Soil

### "Volume Tests"

Create two equal pea-sized clumps of soil. Place one aside as reference, and place other in cupped palm of hand. Holding spray bottle close (~3 in.), thoroughly wet soil, filling but not overflowing palm.

Break apart soil material to make a souplike suspension of particles.

### "Color Test"

Keeping solution in palm, note its color.

If solution is dark brown to black, suspended particles are primarily organic. Proceed to "sand content test."

If solution is slightly cloudy or milky but still dark, suspended particles are organic and silt/clay. Proceed to "sand content test," but adjust sand volume thresholds using reasonable scientific judgment.

If solution is mid to light gray, suspended particles are mostly silt and/or clay, and soil is most likely fine mineral texture.

### "Sand Content Test"

Gently decant liquid solution while keeping solid material in palm.

Spray, muddle, examine, drain, and repeat until solution runs nearly clear.

Separate any undecomposed organic material or nonsoil from sand in palm of hand. Compare volume of sand in relation to original (reference) pea sized clump, considering relative loss of fine soil material (silt/clay) indicated by "color test", to approximate the organic vs. mineral (sand/silt/clay) content. Percent volume of sand left in palm after organic content has been "washed" away approximates lab-determined organic carbon dry weight percentages as below. Adjust thresholds if "color test" indicated fine soil material presence.



**Figure 1:** Interpretation of "Sand Content Test" results if "Color Test" solution is black/brown. If solution is cloudy, percent organic carbon thresholds are higher. Adjust sand volume thresholds accordingly.

## Tips for Determining Boundary Types of Features in Soil



Not discernible with naked eye    0.1 mm   0.8 mm   1.3 mm   1.7 mm   2.1 mm   2.6 mm   3.3 mm

| Sharp | Clear | Diffuse |
|---|---|---|
| Color gradation is less than 0.1mm wide | Color gradation is 0.1mm to 2mm wide | Color gradation is greater than 2mm wide |

**Figure 2:** Diagram for determining boundary types of features in the matrix.

---

## Tips for Determining Contrast Between Soil Colors

**Table 1:** Chart of delta hue (Figure 3), delta value, and delta chroma required for each level of color contrast. The last column in each row states what level of contrast exists between two colors when the Δhue, Δvalue, and Δchroma criteria within that row are met.

**\*Note: If both colors have value ≤3 and chroma ≤2, the contrast is faint, regardless of the change in hue.**

| ΔHue | ΔValue | ΔChroma | Contrast |
|---|---|---|---|
| 0 | ≤2 | ≤1 | Faint |
| | ≤2 | >1 to <4 | Distinct |
| | >2 to <4 | <4 | Distinct |
| | any | ≥4 | Prominent |
| | ≥4 | any | Prominent |
| 1 | ≤1 | ≤1 | Faint |
| | ≤1 | >1 to <3 | Distinct |
| | >1 to <3 | <3 | Distinct |
| | any | ≥3 | Prominent |
| | ≥3 | any | Prominent |
| 2 | 0 | 0 | Faint |
| | 0 | >0 to <2 | Distinct |
| | >0 to <2 | <2 | Distinct |
| | any | ≥2 | Prominent |
| | ≥2 | any | Prominent |
| 3+ | any | any | Prominent |

**Figure 3:** Relationships among the hues of the Munsell Color System. Solid lines represent hues contained in the *Munsell Soil Color Charts* (2009). Dotted lines represent all other possible 2.5 unit steps. Moving from one hue line to the adjacent hue line represents a delta hue of 1 (2.5 units). Moving from hue N to any other hue the delta hue is 1.

Adapted from the *Soil Survey Manual* (Soil Survey Staff, 1993)



# Tips for Determining Contrast Between Soil Colors (continued)



**Figure 4:** Using the 7.5 YR 4/3 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009).



**Figure 5:** Using the 7.5 YR 3/2 color chip as an example matrix color, an illustration of faint, distinct, and prominent contrast between colors in relation to the matrix color in the *Munsell Soil Color Charts* (2009). Note that because the matrix has value ≤3 and chroma ≤2, all other colors with value ≤3 and chroma ≤2 are faintly contrasting despite the change in hue.

# Estimating Percent Organic Coating

**The round diagrams represent the appearance of uncoated (clear or white) sand grains versus coated (gray to black) sand grains within a ped face as viewed through a 10X hand lens.**



42



## Estimating Percent Volume

**The squares represent part of a grid drawn on the soil profile to estimate volume of light areas, dark areas, or redox concentrations of larger and smaller sizes.**





**15%**

**20%**

**30%**

**40%**



**50%**

(Note: when a feature (e.g. stripped areas) composes more than 50% of the volume, its color is considered to be the matrix color of the soil profile. When more than two colors are present, the color composing the majority of the volume is the matrix color.)

**60%**

**70%**

**80%**

**The squares represent part of a grid drawn on the soil profile to estimate volume of plant fibers, oxidized rhizospheres, or other linear features.**



**Each square is divided into quarters which depict the same percent volume using features of different sizes. These can also represent areal extents for plants.**



## Tips for Determining Shapes of Features in Soil



**Rounded**
Features with generally curved outlines (do not have to be circular; often amorphous)

**Linear**
Features that are generally long & narrow (typically associated with roots or burrows, sometimes mixing or deposition)

**Angular**
Features with generally straight outlines & defined angles (often resulting from physical mixing of soils)

**Figure 6:** Diagram for determining shape categories of features in the matrix.

## Tips for Estimating Areal Extent of Plant Species



# Tips for Estimating Areal Extent of Plant Species (continued)



In a dense canopy where many trees overlap one another, the total areal extent of species in the evaluation area may exceed 100%, even if open sky is visible between some canopies

Total areal extent = 130%

**Figure 7:** Diagrams for estimating the areal extents of plants within an evaluation area.

## NRCS Hydric Soil Field Indicators
## Land Resource Regions of Florida (LRRs)



Most NRCS Hydric Soil Field Indicators are specific to Land Resource Regions (LRR – see glossary). This map depicts the three LRRs in Florida: P, T, and U.

**LRRs**

□ P
■ T
▨ U

## Major Land Resource Areas (MLRAs)

Two Hydric Soil Field Indicators in Florida (S12 and F22) are specific to Major Land Resource Areas (MLRA – see glossary), which are smaller divisions of LRRs.



This map depicts the MLRA in Florida in which S12 can be used.

■ **MLRA 153B**

This map depicts the three MLRAs in Florida in which F22 can be used.

**MLRAs**
☐ **138**
■ **152A**
▨ **154**

## Hydric Soil Field Indicators Simplified Checklist:

Hydric Soil Field Indicators Simplified Checklist is adapted from Field Indicators of Hydric Soils in the United States, Version 8.2 (USDA NRCS, 2018) using Florida-specific indicators per Rule 62-340.300(2)(a)1., (b)1., (c)3., and (d), F.A.C. The checklist is composed of Yes/No questions for each indicator. If any question in an indicator is answered No then the indicator is not met. If all of the questions for an indicator are answered Yes then the indicator is met.

### Data Form Guide Notes:

**Soil profile documentation:** The top of the uppermost muck (sapric) or mineral surface is the soil surface, or 0 inch depth for purposes of Chapter 62-340, F.A.C. Other materials, such as peat (fibric) or mucky peat (hemic) are documented by a "+" before the thickness in inches of each additional layer above the soil surface. (For example: +4 – 0 inches mucky peat, 0 – 3 inches muck)

Mineral soil texture refers to either sandy, fine, or mucky mineral textures.

Adjacent layers within a soil profile description may be combined to meet a hydric soil field indicator's layer thickness requirements provided the adjacent layers share the required properties referred to in the indicator (*E.g.*, 2 inches of sandy mucky mineral soil and 3 inches of sand with ≥70% organic coating may be combined to meet S7 provided both layers have matrix values of 3 or less and chromas of 1 or less.)

--------------------------------*For use in All texture soils*--------------------------------

### A1. Histosol

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)
✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 16 inches or more thick
        AND
    Starts ≤ 16 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

    **B.** Organic soil material layer(s) constitutes 2/3 or more of the total thickness of the soil from the ground surface to a layer dense or cemented enough to inhibit root growth (e.g. bedrock, sandstone)
        AND
    Total combined thickness of any mineral soil texture layer(s) between the ground surface and the dense/cemented layer is 4 inches or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a Histosol

## A2. Histic Epipedon

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Did the layer(s) form near the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

✓ Is the layer(s) 8 to 16 inches thick

✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

❖ See Appendix B for complete requirements to classify as a histic epipedon

## A3. Black Histic

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of organic soil material (peat, mucky peat, and/or muck soil texture)

✓ Does the layer(s) have matrix hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less

✓ Is the layer(s) 8 inches or more thick

✓ Does the layer(s) start ≤ 6 inches from the ground surface (ground surface begins at the peat, mucky peat, muck, or mineral surface)

✓ Is the layer(s) underlain by mineral soil texture with chroma of 2 or less

## A4. Hydrogen Sulfide

*Note: This is a stand-alone D Test indicator*

✓ Is there a hydrogen sulfide odor (rotten egg smell)

✓ Does the hydrogen sulfide odor start ≤ 12 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## A5. Stratified Layers

*Note: This is a stand-alone D Test indicator (as sediment deposition)*

✓ Are there several stratified layers due to the alternating deposition of organic matter and mineral soil material deposited by flowing water

✓ Do one or more of the stratified layers satisfy either **Option A, B, and/or C**

    **A.** Layer(s) is composed of organic soil material (peat, mucky peat, and/or muck soil texture)

    **B.** Layer(s) is composed of mucky mineral soil texture

    **C.** Layer(s) is composed of sandy or fine soil texture
        AND

Has value of 3 or less and chroma of 1 or less
    AND
If layer(s) texture is sandy at least 70% of the visible sand particles are masked with organic material when viewed through a 10x or 15x hand lens

✓ Other than the layer(s) meeting Option A, B, and/or C, do all of the remaining stratified layers have chroma of 2 or less
✓ Do the stratified layers start ≤ 6 inches from the soil surface

## A6. <u>Organic Bodies</u>
✓ Is there a layer(s) with organic bodies composed of muck or mucky mineral soil texture
✓ Are there 2% or more organic bodies within the layer(s)
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A7. <u>5 cm Mucky Mineral</u>
*Note: This is a stand-alone D Test indicator*
✓ Is there a layer(s) of mucky mineral soil texture
✓ Is the layer(s) 2 inches or more thick
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A8. <u>Muck Presence</u>
*Note: This is a stand-alone D Test indicator*
✓ Is the soil profile located within Land Resource Region U
✓ Is there a layer(s) of muck soil texture
✓ Does the layer(s) have value of 3 or less and chroma of 1 or less
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A9. <u>1 cm Muck</u>
*Note: This is a stand-alone D Test indicator*
✓ Is the soil profile located within Land Resource Region P or T
✓ Is there a layer(s) of muck soil texture
✓ Does the layer(s) have value of 3 or less and chroma of 1 or less
✓ Is the layer(s) 0.5 inch or more thick
✓ Does the layer(s) start ≤ 6 inches from the soil surface

## A11. <u>Depleted Below Dark Surface</u>
✓ Is there a dark layer(s) that satisfies either **Option A and/or B**

    **A.** Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture
        AND
        Has value of 3 or less and chroma of 2 or less

    **B.** Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
        AND
        Has value of 3 or less and chroma of 1 or less
        AND
        Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) start < 6 inches from the soil surface

- ✓ Does the layer(s) immediately below the dark layer(s) satisfy either **Option A and/or B**

  A. The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

  B. The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

- ✓ Does the underlying layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less

- ✓ Does the underlying layer(s) satisfy either **Option A or B**

  A. Layer(s) is 6 inches or more thick

  B. Layer(s) is 2 inches or more thick
     AND
     Is composed of fragmental soil material

- ✓ Does the underlying layer(s) with the gleyed or depleted matrix start ≤ 12 inches from the soil surface

## A12. <u>Thick Dark Surface</u>

- ✓ Is there a dark layer(s) that has value of 2.5 or less and chroma of 1 or less

- ✓ Does the dark layer(s) satisfy either **Option A and/or B**

  A. Layer(s) is composed of muck, fine mucky mineral, and/or fine soil texture

  B. Layer(s) is composed of sandy and/or sandy mucky mineral soil texture
     AND
     Has at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

- ✓ Does the dark layer(s) start < 6 inches from the soil surface and extend to a depth of at least 12 inches

- ✓ Is there a layer(s) below the dark layer(s) that satisfies either **Option A and/or B**

  A. The layer(s) has a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

  B. The layer(s) has a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

- ✓ Does the lower layer(s) with the gleyed or depleted matrix have 60% or more chroma of 2 or less

- ✓ Is the lower layer(s) with the gleyed or depleted matrix 6 inches or more thick

- ✓ Do all remaining layers between the aforementioned dark layer(s) and the layer(s) with the gleyed or depleted matrix have value of 3 or less and chroma of 1 or less

------------------------------*For use in *Sandy texture* soils*------------------------------

## S4. **Sandy Gleyed Matrix**

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of sandy soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S5. **Sandy Redox**

✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Does the matrix of the layer(s) have 60% or more chroma of 2 or less

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 6 inches from the soil surface

## S6. **Stripped Matrix**

✓ Is there a layer(s) of sandy and/or sandy mucky mineral soil texture with two or more **faintly[1] contrasting** colors (Contrast is due to organic matter and/or iron-manganese oxides having been stripped away from the matrix and the primary base color of the soil material has been exposed)

✓ Are there rounded, diffuse[2] boundaries between the faintly contrasting colors

✓ Do the stripped (lighter colored) areas of the faintly contrasting colors compose 10% or more of the layer(s)'s volume

✓ Does the layer(s) start ≤ 6 inches from the soil surface

[1]  See Table 1 (p 40) to determine if contrast is faint
[2]  See Figure 2 (p 40) to determine if boundaries are diffuse

## S7. **Dark Surface**

✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with matrix value of 3 or less and chroma of 1 or less

✓ Does the dark layer(s)'s matrix have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens

✓ Does the dark layer(s) satisfy either **Option A or B**

**A.** The dark layer(s) is more than 4 inches thick

**B.** The dark layer(s) is exactly 4 inches thick
AND
The layer directly below has chroma of 2 or less

✓ Does the dark layer(s) start ≤ 6 inches from the soil surface

## S8. **Polyvalue Below Surface**

✓ Is the soil profile located within Land Resource Region T or U

✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less

✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
✓ Does the soil volume directly below this dark layer(s) to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less, meet both **Criteria 1 and 2**

1. 5% or more of the soil volume has value of 3 or less and chroma of 1 or less AND
2. The remainder of the soil volume has value of 4 or more and chroma of 1 or less

## S9. Thin Dark Surface

✓ Is the soil profile located within Land Resource Region T or U
✓ Is there a dark layer(s) of sandy, sandy mucky mineral, and/or muck soil texture with value of 3 or less and chroma of 1 or less
✓ Does the dark layer(s) have at least 70% of the visible sand particles masked with organic material when viewed through a 10x or 15x hand lens
✓ Is the dark layer(s) 2 inches or more thick
✓ Does the dark layer(s) start ≤ 6 inches from the soil surface
✓ Directly below this dark layer(s) is there a layer(s) with value of 4 or less and chroma of 1 or less
✓ Does the underlying layer(s) extend to a depth of 12 inches from the soil surface or to the spodic horizon, whichever is less

## S12. Barrier Islands 1 cm Muck

✓ Is the soil profile located within the swale portion of dune-and-swale complexes of barrier islands in Major Land Resource Area 153B (See p 50)
✓ Is there a layer(s) of muck soil texture
✓ Does the layer(s) have value of 3 or less and chroma of 2 or less
✓ Is the layer(s) 0.5 inch or more thick
✓ Does the layer(s) start ≤ 6 inches from the soil surface

-------------------------------*For use in <u>Fine texture</u> soils*-------------------------------

## F2. <u>Loamy Gleyed Matrix</u>

*Note: This is a stand-alone D Test indicator*

✓ Is there a layer(s) of fine soil texture in which 60% or more of the layer is a gleyed matrix (value of 4 or more on the Gley 1 or Gley 2 page in the Munsell Soil Color Book, 2009)

✓ Does the layer(s) start ≤ 12 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F3. <u>Depleted Matrix</u>

✓ Is there a layer(s) of fine soil texture with a depleted matrix (value of 4 or more and chroma of 2 or less, along with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings, or a reduced matrix)

✓ Does the layer(s)'s matrix have 60% or more chroma of 2 or less

✓ Does the layer(s) satisfy either **Option A or B**

    **A.** Layer(s) is 2 inches or more thick
        AND
    Starts ≤ 4 inches from the soil surface

    **B.** Layer(s) is 6 inches or more thick
        AND
    Starts ≤ 10 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

    **A.** There are no mineral soil layers above this indicator

    **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

    **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F6. <u>Redox Dark Surface</u>

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Does the layer(s) with redox concentrations satisfy either **Option A and/or B**

    **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
        AND
    Has 2% or more redox concentrations

    **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
        AND
    Has 5% or more redox concentrations

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F7. <u>Depleted Dark Surface</u>

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with redox depletions (lighter areas with associated redox concentrations)

✓ Do the redox depletions have value of 5 or more and chroma of 2 or less

✓ Does the layer(s) with redox depletions satisfy either **Option A and/or B**

   **A.** Layer(s)'s matrix has value of 3 or less and chroma of 1 or less
      AND
   Has 10% or more distinct or prominent redox depletions

   **B.** Layer(s)'s matrix has value of 3 or less and chroma of 2 or less
      AND
   Has 20% or more distinct or prominent redox depletions

✓ Is the layer(s) 4 inches or more thick

✓ Does the layer(s) start ≤ 8 inches from the soil surface

✓ Above the starting depth of this indicator, is either **Option A, B, or C** satisfied:

   **A.** There are no mineral soil layers above this indicator

   **B.** All mineral soil above this indicator has a dominant chroma of 2 or less

   **C.** There are less than 6 inches of mineral soil material with a dominant chroma of more than 2 above this indicator

## F8. <u>Redox Depressions</u>

✓ Is the soil profile located within a closed depression subject to ponding

✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 5% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings

✓ Is the layer(s) 2 inches or more thick

✓ Does the layer(s) start ≤ 4 inches from the soil surface

## F10. <u>Marl</u>

✓ Is the soil profile located within Land Resource Region U

✓ Is there a layer(s) of marl material

✓ Does the layer(s) have value of 5 or more and chroma of 2 or less

✓ Does the layer(s) start ≤ 4 inches from the soil surface

## F12. <u>Iron/Manganese Masses</u>

✓ Is the soil profile located within Land Resource Region P or T

✓ Is the soil profile located within a flood plain

- ✓ Is there a layer(s) of fine and/or fine mucky mineral soil texture with 2% or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings
- ✓ Do the redox concentrations occur as soft iron-manganese masses
- ✓ Do the iron-manganese masses have value and chroma of 3 or less
- ✓ Do the iron-manganese masses have diffuse boundaries[3]
- ✓ Does 40% or more of the layer(s) have chroma of 2 or less
- ✓ Does the layer(s) with iron-manganese masses satisfy either **Option A or B**

  **A.** Layer(s) starts at the soil surface

  **B.** Layer(s) is 4 inches or more thick
  AND
  Starts ≤ 8 inches from the soil surface

[3] See Figure 2 (p 40) to determine if boundaries are diffuse

## F13. <u>Umbric Surface</u>

- ✓ Is there a layer(s) of fine, fine mucky mineral, and/or muck soil texture
- ✓ Is the layer(s) 10 inches or more thick
- ✓ Does the layer(s) satisfy both **Criteria 1 <u>and</u> 2**

  **1.** The upper 6 inches of the layer(s) has value of 3 or less and chroma of 1 or less
  AND
  **2.** The lower 4 inches of the layer(s) has chroma of 2 or less

- ✓ Does the layer(s) start ≤ 6 inches from the soil surface

## F22. <u>Very Shallow Dark Surface</u>

- ✓ Is the soil profile located within Major Land Resource Area 138, 152A, or 154 (See p 50)
- ✓ Is the soil profile located within a depression or flood plain subject to frequent ponding and/or flooding
- ✓ Is there a dark layer(s) of fine, fine mucky mineral, and/or muck soil texture with value of 2.5 or less and chroma of 1 or less
- ✓ Does bedrock occur ≤ 10 inches from the soil surface
- ✓ Does the soil profile satisfy either **Option A or B**

  **A.** The bedrock occurs between 6 and 10 inches from the soil surface
  AND
  The dark layer(s) is 6 inches or more thick
  AND
  Starts ≤ 4 inches from the soil surface

  **B.** The bedrock occurs ≤ 6 inches from the soil surface
  AND
  The dark layer(s) constitutes more than half of the soil thickness

- ✓ Does all remaining soil between the dark layer(s) and the bedrock have chroma of 2 or less

# Glossary from NRCS Field Indicators of Hydric Soils in the United States Version 8.2, 2018

As defined in this Glossary, terms marked with an asterisk (*) have definitions that are slightly different from the definitions in the referenced materials. The definitions in the Glossary are intended to assist users of this document and are not intended to add to or replace definitions in the referenced materials.

**Data Form Guide Note: Definitions expressed in Chapter 62-340, F.A.C. supersede all other definitions contained within this guide when applying the rule.**

**A horizon.** A mineral soil horizon that formed at the surface or below an O horizon where organic material is accumulating. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Accreting areas.** Landscape positions in which soil material accumulates through deposition from higher elevations or upstream positions more rapidly than the rate at which soil material is being lost through erosion.

**Anaerobic.** A condition in which molecular oxygen is virtually absent from the soil.

**Anaerobiosis.** Microbiological activity under anaerobic conditions.

**Aquic conditions.** Conditions in the soil represented by depth of saturation, occurrence of reduction, and redoximorphic features. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Artificial drainage.** The use of human efforts and devices to remove free water from the soil surface or from the soil profile. The hydrology may also be modified by levees and dams, which keep water from entering a site.

**CaCO3 equivalent.** The acid neutralizing capacity of a soil expressed as a weight percentage of CaCO3 (molecular weight of CaCO3 equals 100).

**Calcic horizon.** An illuvial horizon in which carbonates have accumulated to a significant extent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Calcium carbonate.** Calcium carbonate has the chemical formula CaCO3. It effervesces when treated with cold hydrochloric acid.

**Closed depressions.** Low-lying areas that are surrounded by higher ground and have no natural outlet for surface drainage.

**COE.** U.S. Army Corps of Engineers.

**Common.** When referring to redox concentrations, redox depletions, or both, "common" represents 2 to 20 percent of the observed surface.

**Concave landscapes.** Landscapes in which the surface curves downward.

**\*Depleted matrix.** For loamy and clayey material (and sandy material in areas of indicators A11 and A12), a depleted matrix refers to the volume of a soil horizon or subhorizon in which the processes of reduction and translocation have removed or transformed iron, creating colors of low chroma and high value. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent

redox concentrations occurring as soft masses or pore linings. In some areas the depleted matrix may change color upon exposure to air (see Reduced matrix); this phenomenon is included in the concept of depleted matrix. The following combinations of value and chroma identify a depleted matrix:

1. Matrix value of 5 or more and chroma of 1 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

2. Matrix value of 6 or more and chroma of 2 or less with or without redox concentrations occurring as soft masses and/or pore linings; or

3. Matrix value of 4 or 5 and chroma of 2 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings; or

4. Matrix value of 4 and chroma of 1 and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.

**Diffuse boundary.** (Figure 2 *p.40*) Used to describe redoximorphic features that grade gradually from one color to another. The color grade is commonly more than 2 mm wide. "**Clear**" is used to describe boundary color gradations intermediate between sharp and diffuse.

**Distinct.**[1] (Table 1 *p.40*) Readily seen but contrasting only moderately with the color to which compared. The contrast is distinct if:

1. Delta hue[2] = 0, then a) Delta value $\leq 2$ and delta chroma >1 to <4, or
   b) Delta value >2 to <4 and delta chroma <4.

2. Delta hue = 1, then a) Delta value $\leq 1$ and delta chroma >1 to <3, or
   b) Delta value >1 to <3 and delta chroma <3.

3. Delta hue = 2, then a) Delta value = 0 and delta chroma >0 to <2, or
   b) Delta value >0 to <2 and delta chroma <2.

[1]Regardless of the magnitude of hue difference, where both colors have value $\leq 3$ and chroma $\leq 2$, the contrast is faint.

[2]Data Form Guide Note: A delta hue of 1 is equal to 2.5 units (Figure 3 *p.40*), as defined in the *Soil Survey Manual* (Soil Survey Staff, 1993)

**E horizon.** A mineral horizon in which the dominant process is loss of silicate clay, iron, and/or aluminum, leaving a concentration of sand and silt particles. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**EPA.** U.S. Environmental Protection Agency.

**Epipedon.** A horizon that has developed at the soil surface. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Faint.** (Table 1 *p.40*) Evident only on close examination. The contrast is faint if:

1. Delta hue = 0, then delta value $\leq 2$ and delta chroma $\leq 1$, or

2. Delta hue = 1, then delta value $\leq 1$ and delta chroma $\leq 1$, or

3. Delta hue = 2, then delta value = 0 and delta chroma = 0, or

Any delta hue if both colors have value $\leq 3$ and chroma $\leq 2$.

**Fe-Mn concretions.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, concretions have concentric layers. See Vepraskas (1994) for a complete discussion.

**Fe-Mn nodules.** Firm to extremely firm, irregularly shaped bodies with sharp to diffuse boundaries. When broken in half, nodules do not have visibly organized internal structure. See Vepraskas (1994) for a complete discussion.

**Few.** When referring to redox concentrations, redox depletions, or both, "few" represents less than 2 percent of the observed surface.

**Fibric.** See Peat.

**Flood plain.** The nearly level plain that borders a stream and is subject to inundation under flood-stage conditions unless protected artificially. It is usually a constructional landform built of sediment deposited during overflow and lateral migration of the stream.

**Fragmental soil material.** Soil material that consists of 90 percent or more rock fragments. Less than 10 percent of the soil consists of particles 2 mm or smaller.

**Frequently flooded or ponded.** A frequency class in which flooding or ponding is likely to occur often under usual weather conditions (a chance of more than 50 percent in any year, or more than 50 times in 100 years).

**FWS.** U.S. Department of the Interior, Fish and Wildlife Service.

**\*g.** A horizon suffix indicating that the horizon is gray because of wetness but not necessarily that it is gleyed. All gleyed matrices (defined below) should have the suffix "g"; however, not all horizons with the "g" suffix are gleyed. For example, a horizon with the color 10YR 6/2 that is at least seasonally wet, with or without other redoximorphic features, should have the "g" suffix.

**Glauconitic.** Refers to a mineral aggregate that contains a micaceous mineral resulting in a characteristic green color, e.g., glauconitic shale or clay.

**\*Gleyed matrix.** Soils with a gleyed matrix have the following combinations of hue, value, and chroma (the soils are not glauconitic):

1. 10Y, 5GY, 10GY, 10G, 5BG, 10BG, 5B, 10B, or 5PB with value of 4 or more and chroma of 1; or
2. 5G with value of 4 or more and chroma of 1 or 2; or
3. N with value of 4 or more

In some places the gleyed matrix may change color upon exposure to air. (See Reduced matrix). This phenomenon is included in the concept of gleyed matrix.

**\*Hemic.** See Mucky peat.

**Histels.** Organic soils that overlie permafrost and show evidence of cryoturbation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Histic epipedon**. A thick (20- to 60-cm, or 8- to 24- inch) organic soil horizon that is saturated with water at some period of the year (unless the soil is artificially drained) and that is at or near the surface of a mineral soil.

**Histosols.** Organic soils that have organic soil materials in more than half of the upper 80 cm (32 inches) or that have organic materials of any thickness if they overlie rock or fragmental materials that have interstices filled with organic soil materials. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Horizon.** A layer, approximately parallel to the surface of the soil, distinguishable from adjacent layers by a distinctive set of properties produced by soil-forming processes. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Hydric soil definition (1994).** *(See also Ch 62-340, F.A.C. definition)* A soil that formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part.

**Hydrogen sulfide odor.** The odor of $H_2S$. It is similar to the smell of rotten eggs.

**Hydromorphic features.** Features in the soil caused or formed by water.

**Layer(s).** A horizon, subhorizon, or combination of contiguous horizons or subhorizons sharing the properties required by the indicator.

**Lithologic discontinuity.** Occurs in a soil that has developed in more than one type of parent material. Commonly determined by a significant change in particle-size distribution, mineralogy, etc. that indicates a difference in material from which the horizons formed.

**LRR.** Land resource region. LRRs are geographic areas characterized by a particular pattern of soils, climate, water resources, and land use. Each LRR is assigned a different letter of the alphabet (A-Z). LRRs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Many.** When referring to redox concentrations, redox depletions, or both, "many" represents more than 20 percent of the observed surface.

**Marl.** An earthy, unconsolidated deposit consisting chiefly of calcium carbonate mixed with clay in approximately equal proportions; formed primarily under freshwater lacustrine conditions. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Masked.** Through redoximorphic processes, the color of soil particles is hidden by organic material, silicate clay, iron, aluminum, or some combination of these.

**Matrix.** The dominant soil volume that is continuous in appearance. When three colors occur, such as when a matrix, depletions, and concentrations are present, the matrix may represent less than 50 percent of the total soil volume.

**MLRA.** Major land resource areas. MLRAs are geographically associated divisions of land resource regions. MLRAs are defined in U.S. Department of Agriculture Handbook 296 (USDA, NRCS, 2006b).

**Mollic epipedon.** A mineral surface horizon that is relatively thick, dark colored, and humus rich and has high base saturation. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Mollisols.** Mineral soils that have a mollic epipedon. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Muck.** Sapric organic soil material in which virtually all of the organic material is so decomposed that identification of plant forms is not possible. Bulk density is normally 0.2 or more. Muck has less than one-sixth fibers after rubbing, and its sodium pyrophosphate solution extract color has lower value and chroma than 5/1, 6/2, and 7/3.

**\*Mucky modified mineral soil material.** (Figure 8) A USDA soil texture modifier, e.g., mucky sand. Mucky modified mineral soil material that has 0 percent clay has between 5 and 12 percent organic carbon. Mucky modified mineral soil material that has 60 percent clay has between 12 and 18 percent organic carbon. Soils with an intermediate amount of clay have intermediate amounts of organic carbon. Where the organic component is peat (fibric material) or mucky peat (hemic material), mucky mineral soil material does not occur.



**Figure 8:** Percent organic carbon required for organic soil material, mucky modified mineral soil material, and mineral soil material as it is related to content of clay.

**\*Mucky peat.** Hemic organic material, which is characterized by decomposition that is intermediate between that of peat (fibric material) and that of muck (sapric material). Bulk density is normally between 0.1 and 0.2 g/cm3. Mucky peat does not meet the fiber content (after rubbing) or sodium pyrophosphate solution extract color requirements for either peat (fibric) or muck (sapric) soil material.

**Nodules.** See Fe-Mn nodules.

**NRCS.** USDA, Natural Resources Conservation Service (formerly Soil Conservation Service).

**NTCHS.** National Technical Committee for Hydric Soils.

**Organic matter.** Plant and animal residue in the soil in various stages of decomposition.

**Organic soil material.** (Figure 8) Soil material that is saturated with water for long periods or artificially drained and, **excluding live roots**, has 18 percent or more organic carbon with 60 percent or more clay or 12 percent or more organic carbon with 0 percent clay. Soils with an intermediate amount of clay have an intermediate amount of organic carbon. If the soil is never saturated for more than a few days, it contains 20 percent or more organic carbon. Organic soil material includes muck, mucky peat, and peat.

**Data Form Guide Note: Generally, organic soil material is 2 cm or smaller and decomposing.**

**\*Peat.** Fibric organic soil material. The plant forms can be identified in virtually all of the organic material. Bulk density is normally <0.1. Peat has three-fourths or more fibers after rubbing, or it has two-fifths or more fibers after rubbing and has sodium pyrophosphate solution extract color of 7/1, 7/2, 8/2, or 8/3.

**Ped.** A unit of soil structure such as a block, column, granule, plate, or prism, formed by natural processes (in contrast with a clod, which is formed artificially).

**Plinthite.** The sesquioxide-rich, humus-poor, highly weathered mixture of clay with quartz and other diluents. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete discussion.

**Ponding.** Standing water in a closed depression that is removed only by percolation, evaporation, or transpiration. The ponding lasts for more than 7 days.

**Pore linings.** Zones of accumulation that may be either coatings on a ped or pore surface or impregnations of the matrix adjacent to the pore or ped. See Vepraskas (1994) for a complete discussion.

**Prominent.** (Table 1 *p.40*) Contrasts strongly in color. Color contrasts more contrasting than faint and distinct are prominent.

**Red parent material.** The parent material with a natural inherent reddish color attributable to the presence of iron oxides, typically hematite (Elless and Rabenhorst, 1994; Elless et al., 1996), occurring as coatings on and occluded within mineral grains. Soils that formed in red parent material have conditions that greatly retard the development and extent of the redoximorphic features that normally occur under prolonged aquic conditions. They typically have a Color Change Propensity Index (CCPI) of <30 (Rabenhorst and Parikh, 2000). Most commonly, the material consists of dark red, consolidated Mesozoic or Paleozoic sedimentary rocks, such as shale, siltstone, and sandstone, or alluvial materials derived from such rocks. Assistance from a local soil scientist may be needed to determine where red parent material occurs.

**Redox concentrations.** Bodies of apparent accumulation of Fe-Mn oxides. Redox concentrations include soft masses, pore linings, nodules, and concretions. For the purposes of the indicators, nodules and concretions are excluded from the concept of redox concentrations unless otherwise specified by specific indicators. See Vepraskas (1994) for a complete discussion.

**Redox depletions.** Bodies of low chroma (2 or less) having value of 4 or more where Fe- Mn oxides have been stripped or where both Fe-Mn oxides and clay have been stripped. Redox depletions contrast distinctly or prominently with the matrix. See Vepraskas (1994) for a complete discussion.

**Redoximorphic features.** Features formed by the processes of reduction, translocation, and/or oxidation of Fe and Mn oxides; formerly called mottles and low-chroma colors. See Vepraskas (1994) for a complete discussion.

**Reduced matrix.** A soil matrix that has low chroma and high value, but in which the color changes in hue or chroma when the soil is exposed to air. See Vepraskas (1994) for a complete discussion.

**\*Reduction.** For the purpose of the indicators, reduction occurs when the redox potential (Eh) is below the ferric-ferrous iron threshold as adjusted for pH. In hydric soils, this is the point when the transformation of ferric iron (Fe3+) to ferrous iron (Fe2+) occurs.

**Relict features.** Soil morphological features that reflect past hydrologic conditions of saturation and anaerobiosis. See Vepraskas (1994) for a complete discussion.

**\*Sapric.** See Muck.

**Saturation.** *(See also Ch 62-340, F.A.C. definition)* Wetness characterized by zero or positive pressure of the soil water. Almost all of the soil pores are filled with water.

**Sharp boundary.** (Figure 2 *p.40*) Used to describe redoximorphic features that grade sharply from one color to another. The color grade is commonly less than 0.1 mm wide.

**Soft masses.** Noncemented redox concentrations, frequently within the soil matrix, that are of various shapes and cannot be removed as discrete units.

**Soil texture.** The relative proportions, by weight, of sand, silt, and clay particles in the soil material less than 2 mm in size.

**Spodic horizon.** A mineral soil horizon that is characterized by the illuvial accumulation of amorphous materials consisting of aluminum and organic carbon with or without iron. The spodic horizon has a minimum thickness, a minimum quantity of oxalate extractable carbon plus aluminum, and/or specific color requirements.

**Stream Terrace.** Flat-topped landforms in a stream valley that flank and are parallel to the stream channel, originally formed by a previous stream level, and representing the abandoned flood plain, stream bed, or valley floor produced during a past state of fluvial erosion or deposition (i.e., currently very rarely or never flooded; inactive cut and fill and/or scour and fill processes). Stream terraces may occur singularly or as a series. Erosional surfaces cut into bedrock and thinly mantled with stream deposits (alluvium) are called "strath terraces." Remnants of constructional valley floors thickly mantled with alluvium are called alluvial terraces.

**Umbric epipedon.** A thick, dark mineral surface horizon with base saturation of less than 50 percent. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**Vertisol.** A mineral soil with 30 percent or more clay in all layers. These soils expand and shrink, depending on moisture content, and have slickensides or wedge-shaped peds. See *Soil Taxonomy* (Soil Survey Staff, 1999) for a complete definition.

**\*Wetland.** *(See also Ch 62-340, F.A.C. definition)* An area that has hydrophytic vegetation, hydric soils, and wetland hydrology, as per the *National Food Security Act Manual* and the 1987 *Corps of Engineers Wetlands Delineation Manual* (Environmental Laboratory, 1987).

**Hydric Soil Field Indicators:**

Adapted from **Field Indicators of Hydric Soils in the United States, Version 8.2 (USDA NRCS, 2018)** to include Florida-specific indicators per Rule 62-340.300(2)(a)1, (b)1, (c)3, and (d), F.A.C.

**These indicators are subdivided by prefix:**

A - **All texture soils** "All soils" refers to soils with any USDA soil texture, including muck, mucky peat, and peat.

S - **Sandy texture soils** "Sandy soils" refers to those soils with a USDA soil texture of loamy fine sand and coarser (does not include mucky peat or peat).

F - **Fine texture soils** "Loamy and clayey soils" refers to those soils with USDA soil texture of loamy very fine sand and finer (does not include mucky peat or peat).

**LRR or MLRA – refer to the "Land Resource Region" or the "Major Land Resource Area" in which the indicator may be used**

**Overlying layer(s) requirement:** All mineral layers above any of the layers meeting the requirements of any indicators, except S6, F8, and F12, must have a dominant chroma of 2 or less, or the thickness of the layer(s) with a dominant chroma of more than 2 is less than 6 inches.

-----------------------------*For use in **All texture** soils*-----------------------------

**A1. Histosol -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**Classifies as a Histosol (except Folist).**
User Notes: In a Histosol, typically 40 cm (16 inches) or more of the upper 80 cm (32 inches) is organic soil material. Organic soil materials have organic-carbon contents (by weight) of 12 to 18 percent or more, depending on the clay content of the soil. These materials include muck (sapric soil material), mucky peat (hemic soil material), and peat (fibric soil material). See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A2. Histic Epipedon -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A histic epipedon underlain by mineral soil material with chroma of 2 or less.**
User Notes: Most histic epipedons are surface horizons 20 cm (8 inches) or more thick of organic soil material. Aquic conditions or artificial drainage is required. See *Keys to Soil Taxonomy* (Soil Survey Staff, 2014) for a complete definition.

**A3. Black Histic -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A layer of peat, mucky peat, or muck 20 cm (8 inches) or more thick that starts at a depth of ≤ 15 cm (6 inches) from the soil surface; has hue of 10YR or yellower, value of 3 or less, and chroma of 1 or less; and is underlain by mineral soil material with chroma of 2 or less.**
User Notes: Unlike indicator A2, this indicator does not require proof of aquic conditions or artificial drainage.

**A4. Hydrogen Sulfide -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator*
**A hydrogen sulfide odor starting at a depth ≤ 30 cm (12 inches) from the soil surface.**
User Notes: This "rotten egg smell" indicates that sulfate-sulfur has been reduced to hydrogen sulfide gas and therefore the soil is anaerobic.

**A5. Stratified Layers -** LRR: **P, T, U**
*Note: This is a stand-alone D Test indicator (qualifies as sediment deposition)*
**Several stratified layers starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least one of the layers has value of 3 or less and chroma of 1 or less, or it is muck, mucky peat,**

67

**peat, or a mucky modified mineral texture. The remaining layers have chroma of 2 or less. For any sandy material that constitutes the layer with value of 3 or less and chroma of 1 or less, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: Use of this indicator may require assistance from a trained soil scientist with local experience. A stratified layer is depositional and not pedogenic. The minimum organic-carbon content of at least one layer of this indicator is slightly less than is required for indicator A7 (5 cm Mucky Mineral). An undisturbed sample must be observed. Individual strata are dominantly less than 2.5 cm (1 inch) thick. A hand lens is an excellent tool to aid in the identification of this indicator. Many alluvial soils have stratified layers at greater depths; these soils do not meet the requirements of this indicator. Many alluvial soils have stratified layers at the required depths but do not have chroma of 2 or less; these do not meet the requirements of this indicator. The stratified layers occur in any soil texture.

## A6. <u>Organic Bodies</u> - LRR: **P, T, U**

**Presence of 2 percent or more organic bodies of muck or a mucky modified mineral texture starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Organic bodies typically occur at the tips of fine roots. In order to meet the Organic Bodies indicator, the organic carbon content in organic bodies must meet the requirements of muck or mucky modified textures. The size of the organic body is not specifically defined, but the bodies are commonly 1 to 3 cm (0.5 to 1 inch) in diameter. Many organic bodies do not have the required content of organic carbon and as a result do not meet this indicator. For example, organic bodies of mucky peat (hemic material) and/or peat (fibric material) do not meet the requirements of this indicator, nor does material consisting of partially decomposed root tissue. The Organic Bodies indicator includes the indicator previously named "accretions" (Florida Soil Survey Staff, 1992).

## A7. <u>5 cm Mucky Mineral</u> - LRR: **P, T, U**

*Note: This is a stand-alone D Test indicator*

**A layer of mucky modified mineral soil material 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: "Mucky" is a USDA texture modifier for mineral soils. The content of organic carbon is at least 5 percent and ranges to as high as 18 percent. The percentage required depends on the clay content of the soil; the higher the clay content, the higher the content of organic carbon required. For example, a mucky fine sand soil contains between 5 and 12 percent organic carbon. When the amount of clay is increased as in a mucky sandy loam, the organic carbon content increases to between 7 and 14 percent.

## A8. <u>Muck Presence</u> - LRR: **U**

*Note: This is a stand-alone D Test indicator*

**A layer of muck with value of 3 or less and chroma of 1 or less, starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: The presence of muck of any thickness at a depth of ≤ 15 cm (6 inches) is the only requirement. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from 12 to18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to prevent the identification of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

## A9. <u>1 cm Muck</u> - LRR: **P, T**

*Note: This is a stand-alone D Test indicator*

**A layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 1 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Unlike indicator A8 (Muck Presence), this indicator has a minimum thickness requirement of 1 cm. Normally, this expression of anaerobiosis is at the soil surface; however, it may occur at any depth ≤ 15 cm (6 inches). Muck is sapric soil material with a minimum content of organic carbon that ranges from12 to18 percent, depending on the content of clay. Organic soil material is called muck if virtually all of the material has undergone sufficient decomposition to limit the recognition of plant parts. Mucky peat (hemic material) and/or peat (fibric material) do not qualify. Generally, muck is black and has a "greasy" feel; sand grains should not be evident.

**A11. <u>Depleted Below Dark Surface</u> - LRR: P, T, U**
**A layer with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less, starting at a depth ≤ 30 cm (12 inches) from the soil surface, and having a minimum thickness of either:**
> **a. 15 cm (6 inches), or**
> **b. 5 cm (2 inches) if the 5 cm consists of fragmental soil material.**

**Organic, loamy, or clayey layer(s) above the depleted or gleyed matrix must have value of 3 or less and chroma of 2 or less starting at a depth <15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Any sandy material above the depleted or gleyed matrix must have value of 3 or less and chroma of 1 or less starting at a depth ≤15 cm (6 inches) from the soil surface and extend to the depleted or gleyed matrix. Viewed through a 10x or 15x hand lens, at least 70 percent of the visible sand particles must be masked with organic material. Observed without a hand lens, the sand particles appear to be close to 100 percent masked.**

User Notes: This indicator often occurs in Mollisols but also applies to soils with umbric epipedons and dark colored ochric epipedons. For soils with dark colored epipedons more than 30 cm (12 inches) thick, use indicator A12. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

**A12. <u>Thick Dark Surface</u> - LRR: P, T, U**
**A layer at least 15 cm (6 inches) thick with a depleted or gleyed matrix that has 60 percent or more chroma of 2 or less starting below 30 cm (12 inches) of the surface. The layer(s) above the depleted or gleyed matrix and starting at a depth <15 cm (6 inches) from the soil surface must have value of 2.5 or less and chroma of 1 or less to a depth of at least 30 cm (12 inches) and value of 3 or less and chroma of 1 or less in any remaining layers above the depleted or gleyed matrix. In any sandy material above the depleted or gleyed matrix, at least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked.**

User Notes: This indicator applies to soils that have a black layer 30 cm (12 inches) or more thick and have value of 3 or less and chroma of 1 or less in any remaining layers directly above a depleted or gleyed matrix. This indicator is most often associated with overthickened soils in concave landscape positions. A depleted matrix requires value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings.

*----------------------------For use in Sandy texture soils----------------------------*

**S4. <u>Sandy Gleyed Matrix</u> -** LRR: **P, T, U**

*Note: This is a stand-alone D Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages in the Munsell color book (X-Rite, 2009) that have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. For this indicator, the gleyed matrix only has to be present at a depth ≤ 15 cm (6 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

**S5. <u>Sandy Redox</u> -** LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface that is at least 10 cm (4 inches) thick and has a matrix with 60 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses and/or pore linings.**

User Notes: "Distinct" and "prominent" are defined in the Glossary. Redox concentrations include iron and manganese masses (reddish mottles) and pore linings (Vepraskas, 1994). Included within the concept of redox concentrations are iron-manganese bodies occurring as soft masses with diffuse boundaries. Common (2 to less than 20 percent) or many (20 percent or more) redox concentrations are required (USDA, NRCS, 2002). If the soil is saturated at the time of sampling, it may be necessary to let it dry to a moist condition for redox features to become visible.

This is a very common indicator of hydric soils and is often used to identify the hydric/nonhydric soil boundary in sandy soils.

**S6. <u>Stripped Matrix</u> -** LRR: **P, T, U**

**A layer starting at a depth ≤ 15 cm (6 inches) from the soil surface in which iron-manganese oxides and/or organic matter have been stripped from the matrix and the primary base color of the soil material has been exposed. The stripped areas and translocated oxides and/or organic matter form a faintly contrasting pattern of two or more colors with diffuse boundaries. The stripped zones are 10 percent or more of the volume and are rounded.**

User Notes: This indicator includes the indicator previously named "polychromatic matrix" as well as the term "streaking." Common or many areas of stripped (unmasked) soil materials are required. The stripped areas are typically 1 to 3 cm (0.5 to 1 inch) in size but may be larger or smaller. Commonly, the stripped areas have value of 5 or more and chroma of 2 or less, and the unstripped areas have chroma of 3 and/or 4. The matrix (predominant color) may not have the material with chroma of 3 and/or 4. The mobilization and translocation of oxides and/or organic matter is the important process and should result in a splotchy pattern of masked and unmasked soil areas. This may be a difficult pattern to recognize and is more evident when a horizontal slice is observed.

**S7. <u>Dark Surface</u> -** LRR: **P, T, U**

**A layer 10 cm (4 inches) thick, starting at a depth less than or equal to the upper 15 cm (6 inches) from the soil surface, with a matrix value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. The matrix color of the layer directly below the dark layer must have the same colors as those described above or any color that has chroma of 2 or less.**

User Notes: An undisturbed sample must be observed. Many wet soils have a ratio of about 50 percent soil particles that are masked with organic matter and about 50 percent unmasked soil particles, giving the soils a salt-and-pepper appearance. Where the coverage is less than 70 percent, the Dark Surface indicator does not occur.

**S8. Polyvalue Below Surface -** LRR: **T, U**

**A layer with value of 3 or less and chroma of 1 or less starting at a depth ≤ 15 cm (6 inches) from the soil surface. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. Directly below this layer, 5 percent or more of the soil volume has value of 3 or less and chroma of 1 or less, and the remainder of the soil volume has value of 4 or more and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black surface or near-surface layer that is less than 10 cm (4 inches) thick and is underlain by a layer in which organic matter has been differentially distributed within the soils by water movement. The mobilization and translocation of organic matter result in splotchy coated and uncoated soil.

**S9. Thin Dark Surface -** LRR: **T, U**

**A layer 5 cm (2 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, with value of 3 or less and chroma of 1 or less. At least 70 percent of the visible soil particles must be masked with organic material, viewed through a 10x or 15x hand lens. Observed without a hand lens, the particles appear to be close to 100 percent masked. This layer is underlain by a layer or layers with value of 4 or less and chroma of 1 or less to a depth of 30 cm (12 inches) or to the spodic horizon, whichever is less.**

User Notes: This indicator applies to soils with a very dark gray or black near-surface layer that is at least 5 cm (2 inches) thick and is underlain by a layer in which organic matter has been carried downward by flowing water. The mobilization and translocation of organic matter result in an even distribution of organic matter in the eluvial (E) horizon. The chroma of 1 or less is critical because it limits application of this indicator to only those soils that are depleted of iron. This indicator commonly occurs in hydric Spodosols, but a spodic horizon is not required.

**S12. Barrier Islands 1 cm Muck -** MLRA: **153B**

**In the swale portion of dune-and-swale complexes of barrier islands, a layer of muck 1 cm (0.5 inch) or more thick with value of 3 or less and chroma of 2 or less and starting at a depth ≤ 15 cm (6 inches) from the soil surface.**

User Notes: This indicator is similar to A9 but allows chroma of greater than 1, but not greater than 2. The indicator is limited to dune-and-swale complexes on barrier islands.

---------------------------*For use in **Fine texture** soils*----------------------------

**F2. Loamy Gleyed Matrix -** LRR: **P, T, U**

*Note: This is a stand-alone D Test indicator*

**A gleyed matrix that occupies 60 percent or more of a layer starting at a depth ≤ 30 cm (12 inches) from the soil surface.**

User Notes: Gley colors are not synonymous with gray colors. They are the colors on the gley color pages of the Munsell color book (X-Rite, 2009) that have hue of N, 10Y, 5GY, 10GY, 5G, 10G, 5BG, 10BG, 5B, 10B, or 5PB and value of 4 or more. The gleyed matrix only has to be present at a depth ≤ 30 cm (12 inches) from the surface. Soils with gleyed matrices are saturated for periods of a significant duration; as a result, there is no thickness requirement for the layer.

**F3. Depleted Matrix -** LRR: **P, T, U**

**A layer that has a depleted matrix with 60 percent or more chroma of 2 or less and that has a minimum thickness of either:**

> **a.  5 cm (2 inches) if the 5 cm starts at a depth ≤ 10 cm (4 inches) from the soil surface, or**
> **b.  15 cm (6 inches), starting at a depth ≤ 25 cm (10 inches) from the soil surface.**

User Notes: A depleted matrix requires a value of 4 or more and chroma of 2 or less. Redox concentrations, including soft iron-manganese masses and/or pore linings, are required in soils

71

with matrix colors of 4/1, 4/2, or 5/2. A, E, and calcic horizons may have low chromas and high values and may therefore be mistaken for a depleted matrix; however, they are excluded from the concept of depleted matrix unless the soil has common or many distinct or prominent redox concentrations occurring as soft masses or pore linings. The low-chroma matrix must be the result of wetness and not a weathering or parent material feature.

**F6. Redox Dark Surface - LRR: P, T, U**
**A layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
  **a. Matrix value of 3 or less and chroma of 1 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings, or**
  **b. Matrix value of 3 or less and chroma of 2 or less and 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings.**
User Notes: This is a very common indicator used to delineate wetland soils that have a dark surface layer. Redox concentrations in mineral soils with a high content of organic matter and a dark surface layer are commonly small and difficult to see. The organic matter masks some or all of the concentrations that may be present. Careful examination is required to see what are commonly brownish redox concentrations in the darkened materials. If the soil is saturated at the time of sampling, it may be necessary to let it dry at least to a moist condition for redox features to become visible. Soils that are wet because of ponding or have a shallow, perched layer of saturation may have any color below the dark surface. It is recommended that delineators evaluate the hydrologic source and examine and describe the layer below the dark colored surface layer when applying this indicator.

**F7. Depleted Dark Surface - LRR: P, T, U**
**Redox depletions with value of 5 or more and chroma of 2 or less in a layer that is at least 10 cm (4 inches) thick, starting at a depth ≤ 20 cm (8 inches) from the mineral soil surface, and has:**
  **a. Matrix value of 3 or less and chroma of 1 or less and 10 percent or more redox depletions, or**
  **b. Matrix value of 3 or less and chroma of 2 or less and 20 percent or more redox depletions.**
User Notes: Care should be taken not to mistake mixing of an E or calcic horizon into the surface layer for depletions. The "pieces" of E and calcic horizons are not redox depletions. Knowledge of local conditions is required in areas where E and/or calcic horizons may be present. In soils that are wet because of subsurface saturation, the layer directly below the dark surface layer should have a depleted or gleyed matrix. Redox depletions should have associated redox concentrations that occur as Fe pore linings or masses within the depletion(s) or surrounding the depletion(s).

**F8. Redox Depressions - LRR: P, T, U**
**In closed depressions subject to ponding, 5 percent or more distinct or prominent redox concentrations occurring as soft masses or pore linings in a layer that is 5 cm (2 inches) or more thick and starts at a depth ≤ 10 cm (4 inches) from the soil surface.**
User Notes: This indicator occurs on depressional landforms, such as vernal pools, playa lakes, rainwater basins, "Grady" ponds, and potholes. It does not occur in microdepressions (approximately 1 m) on convex or plane landscapes.

**F10. Marl - LRR: U**
**A layer of marl with value of 5 or more and chroma 2 or less starting at a depth ≤ 10 cm (4 inches) from the soil surface.**
User Notes: Marl is a limnic material deposited in water by precipitation of $CaCO_3$ by algae as defined in *Soil Taxonomy* (Soil Survey Staff, 1999). It has a Munsell value of 5 or more and reacts with dilute HCl to evolve $CO_2$. Marl is not the carbonatic substrate material associated with limestone bedrock. Some soils have materials with all of the properties of marl, except for the required Munsell value. These soils are hydric if the required value is present at a depth ≤ 10 cm (4 inches) from the soil surface. Normally, this indicator occurs at the soil surface.

**F12. Iron/Manganese Masses -** LRR: **P, T**
**On flood plains, a layer 10 cm (4 inches) or more thick with 40 percent or more chroma of 2 or less and 2 percent or more distinct or prominent redox concentrations occurring as soft iron-manganese masses with diffuse boundaries. The layer starts at a depth ≤ 20 cm (8 inches) from the soil surface. Iron-manganese masses have value and chroma of 3 or less. Most commonly, they are black. The thickness requirement is waived if the layer is the mineral surface layer.**
User Notes: These iron-manganese masses generally are small (2 to 5 mm in size) and have value and chroma of 3 or less. They can be dominated by manganese and therefore have a color approaching black. The low matrix chroma must be the result of wetness and not be a weathering or parent material feature. Iron-manganese masses should not be confused with the larger and redder iron nodules associated with plinthite or with concretions that have sharp boundaries. This indicator occurs on flood plains along rivers, such as the Apalachicola, Congaree, Mobile, Savannah, and Tennessee Rivers.

**F13. Umbric Surface -** LRR: **P, T, U**
**A layer 25 cm (10 inches) or more thick, starting at a depth ≤ 15 cm (6 inches) from the soil surface, in which the upper 15 cm (6 inches) has value of 3 or less and chroma of 1 or less and in which the lower 10 cm (4 inches) has the same colors as those described above or any other color that has chroma of 2 or less.**
User Notes: The thickness requirements may be slightly less than those for an umbric epipedon.

**F22. Very Shallow Dark Surface -** MLRA: **138, 152A, 154**
**In depressions and flood plains subject to frequent ponding and/or flooding, one of the following must be observed:**
    **a. If bedrock occurs between 15 cm (6 inches) and 25 cm (10 inches) of the soil surface, a layer at least 15 cm (6 inches) thick starting at a depth ≤ 10 cm (4 inches) from the soil surface with value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same colors as above or any other color that has chroma 2 or less; or,**
    **b. If bedrock occurs at a depth ≤ 15 cm (6 inches) from the soil surface, more than half of the soil thickness must have value 2.5 or less and chroma 1 or less, and the remaining soil to bedrock must have the same color as above or any other color that has a chroma 2 or less.**

---

# NRCS Hydric Soil Field Indicators
## Deepest Starting Depth Summary Table

| Depth (in) | Indicator |
|:---:|:---:|
| 0 | A2 |
| < 3 | F22(b) |
| 4 | F3(a), F8, F10, F22(a) |
| 6 | A3, A5, A6, A7, A8, A9, A11, A12, S4, S5, S6, S7, S8, S9, S12, F13 |
| 8 | F6, F7, F12 |
| 10 | F3(b) |
| 12 | A4, F2 |
| 16 | A1 |

# Appendix B: Histosol and Histic Epipedon Definition

From *Keys to Soil Taxonomy* (Soil Survey Staff, 2014)

## Histosols

1. Do not have andic soil properties in 60 percent or more of the thickness between the soil surface and either a depth of 60 cm or a densic, lithic, or paralithic contact or duripan if shallower; *and*
2. Have organic soil materials that meet *one or more* of the following:
   a. Overlie cindery, fragmental, or pumiceous materials and/or fill their interstices *and* directly below these materials, have a densic, lithic, or paralithic contact; *or*
   b. When added with the underlying cindery, fragmental, or pumiceous materials, total 40 cm or more between the soil surface and a depth of 50 cm; *or*
   c. Constitute two-thirds or more of the total thickness of the soil to a densic, lithic, or paralithic contact *and* have no mineral horizons or have mineral horizons with a total thickness of 10 cm or less; *or*
   d. Are saturated with water for 30 days or more per year in normal years (or are artificially drained), have an upper boundary within 40 cm of the soil surface, and have a total thickness of *either*:
      1) 60 cm or more if three-fourths or more of their volume consists of moss fibers or if their bulk density, moist, is less than 0.1 g/cm$^3$; *or*
      2) 40 cm or more if they consist either of sapric or hemic materials, or of fibric materials with less than three-fourths (by volume) moss fibers and a bulk density, moist, of 0.1 g/cm$^3$ or more.

**Folists** (excluded from meeting indicator A1)

Histosols that are saturated with water for less than 30 cumulative days during normal years (and are not artificially drained).

## Histic Epipedon

The histic epipedon is a layer (one or more horizons) that is characterized by saturation (for 30 days or more, cumulative) and reduction for some time during normal years (or is artificially drained) and e*ither*:

1. Consists of organic soil material that:
   a. Is 20 to 60 cm thick and either contains 75 percent or more (by volume) *Sphagnum* fibers or has a bulk density, moist, of less than 0.1; *or*
   b. Is 20 to 40 cm thick; *or*
2. Is an Ap horizon that, when mixed to a depth of 25 cm, has an organic-carbon content (by weight) of:
   a. 16 percent or more if the mineral fraction contains 60 percent or more clay; *or*
   b. 8 percent or more if the mineral fraction contains no clay; *or*
   c. 8 + (clay percentage divided by 7.5) percent or more if the mineral fraction contains less than 60 percent clay.

Most histic epipedons consist of organic soil material. Item 2 provides for a histic epipedon that is an Ap horizon consisting of mineral soil material. A Histic epipedon consisting of mineral soil material can also be part of a mollic or umbric epipedon.

# NRCS National Technical Committee for Hydric Soils

Hydric Soils Technical Notes contain National Technical Committee for Hydric Soils (NTCHS) updates, insights, and clarifications of the publication "Field Indicators of Hydric Soils in the United States" (USDA, NRCS, 1996 and 1998).

## Hydric Soils Technical Note 4: Indicator Insights for Hydric Soil Identification

**Question**: I have a soil with layers that meet the color and redoximorphic requirements of several indicators; however, they do not meet any of the thickness requirements. <u>What guidance is there regarding combining layers to meet a hydric soil indicator?</u>

**Answer**: <u>If layers/indicators are combined, the combination needs to meet the most stringent depth/thickness requirements of the combined indicators.</u>

**Example** (The following table and guidance were adapted by FDEP staff to summarize Technical Note 4 and do not contain the exact text from this Note):

| Layer | Depth | Matrix Color | Matrix Texture | Notes (RC = redox concentrations) |
|-------|-------|--------------|----------------|-----------------------------------|
| 1 | 0-6 | 10YR 2/1 | fine | None |
| 2 | 6-8 | 10YR 3/1 | fine | RC: 10YR 6/8, 5%, diffuse boundaries |
| 3 | 8-12 | 10YR 5/2 | fine | RC: 10YR 6/8, 10%, diffuse boundaries |
| 4 | 12-20+ | 10YR 6/3 | fine | RC: 10YR 6/8, 15%, diffuse boundaries |

In this example, Layer 2 meets the requirements (except thickness) of indicator F6 – Redox Dark Surface. Layer 3 meets the requirements (except thickness) of indicator F3 – Depleted Matrix. Examining the indicator language, F6 requires a layer 4 inches thick starting within 8 inches; F3 requires a layer 6 inches thick starting within 10 inches. In this case, the soil has F6 starting within 8 inches (at 6) and has F3 starting within 10 inches (at 8); the combined thickness is 6 inches. Therefore, this soil meets the combined color, depth, and thickness requirements and should be documented as meeting hydric soil indicator(s) F6 and F3 (combined).

**Hydric Soils Technical Note 13: Altered Hydric Soils**
(The following tables were created by FDEP staff to summarize Technical Note 13 and do not contain the exact text from this Note):

| Altered Hydric Soil Type | What was modified? | Modified by what? | Modified how? | Soil status* | Example |
|---|---|---|---|---|---|
| **Artificial** | Hydrology or Soil | Human activities | Wetter or lower surface elevation | Hydric | Excavation/irrigation/ water impoundment |
| **Drained/ protected** | Hydrology | Human activities | Drier or barriers against flooding | Hydric | Ditches/roads/dams/ pumps/levees |
| **Historic/ buried** | Soil | Human activities | Soil placed on ground surface | Not hydric | Fill/erosional depositions |
| **Relict** | Hydrology | Geologic activities | Hydrology gone by natural means | Not hydric | Stream downcutting/ seismic activity |

*See Appendix C for NRCS Hydric Soil Criteria

Soils that are no longer hydric may still exhibit redoximorphic features (called relict features), but these can be differentiated from those in contemporary (currently) hydric soils by the following characteristics:

| Feature | Boundary | Nodule and Concretion Surfaces | Macropore Associated Depletions | Pore Linings | Value and Chroma |
|---|---|---|---|---|---|
| **Contemporary** | Diffuse | Irregular, or smooth w/ red to yellow corona | Not overlain by iron rich coating | Continuous around live roots | Value $\geq 4$ Chroma $\geq 4$ |
| **Relict** | Sharp | Smooth | Overlain by iron rich coating | Broken, unrelated to live roots | Value <4 Chroma<4 |

## Appendix C: Hydric Soils Criteria and Technical Standard

Note: Hydric soil criteria, standards, and definitions used by the NRCS may differ from and do not supersede the criteria, standards, and definitions outlined in Chapter 62-340, F.A.C. to identify and delineate wetlands in Florida.

Soils are considered hydric by the NRCS if they:
1. Have a hydric soil indicator, or
2. Meet hydric soils list criteria 3 or 4, or
3. By data meet the Hydric Soil Technical Standard (HSTS).

**Hydric Soils List Criteria**
(Updated by NTCHS February 2012)

1. All Histels except Folistels and Histosols except Folists; or
2. Map unit components in Aquic suborders, great groups, or subgroups, Albolls suborder, Historthels great group, Histoturbels great group, or Andic, Cumulic, Pachic, or Vitrandic subgroups that:
    a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
    b. Show evidence that the soil meets the definition of a hydric soil;
3. Map unit components that are frequently ponded for long duration or very long duration during the growing season that:
    a. Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
    b. Show evidence that the soil meets the definition of a hydric soil; or

4.  Map unit components that are frequently flooded for long duration or very long duration during the growing season that:
    a.  Based on the range of characteristics for the soil series, will at least in part meet one or more Field Indicators of Hydric Soils in the United States, or
    b.  Show evidence that the soils meet the definition of a hydric soil.

## Glossary of Terms Used in Hydric Soils List Criteria

Note: The following definitions are specific to the NRCS Hydric Soils List Criteria and do not supersede any conflicting definitions contained within Chapter 62-340, F.A.C.

*Flooded* means a condition in which the soil surface is temporarily covered with flowing water from any source, such as streams overflowing their banks, runoff from adjacent or surrounding slopes, inflow from the high tides, or any combination of sources.

*Frequently flooded, ponded, saturated:* a frequency class in which flooding, ponding, or saturation is likely to occur often under usual weather conditions (more than 50 percent chance in any year, or more than 50 times in 100 years).

*Ponded* means a condition in which water stands in a closed depression. The water is removed only by percolation, evaporation, or transpiration.

*Long duration* means a duration class in which inundation for a single event ranges from 7 days to 1 month.

*Map unit components* means the collection of soils and miscellaneous areas found within a map unit.

*Very long duration* means a duration class in which inundation for a single event is greater than 1 month.

## Hydric Soil Technical Standard (HSTS)

(Updated by NTCHS December 2015)

For a soil to be considered hydric by the Natural Resources Conservation Service (NRCS), Anaerobic Conditions <u>and</u> Saturated Conditions must exist for at least 14 consecutive days.

1.  Anaerobic Conditions (as documented by a, b, or c below)
    a.  Indicator of Reduction in Soils (IRIS) tubes
    b.  Oxidation-reduction potential (Eh) measurements using platinum electrodes
    c.  Alpha-alpha-dipyridyl dye
2.  Saturated Conditions
    •  Confirmed by piezometer data.
    •  NTCHS recommends that the piezometer data be verified by open well data.

(Onsite precipitation data are needed to confirm normal rainfall conditions)

---

### Root Size Estimation and Quantity Classes

Adapted from *Field Book for Describing Sampling Soils* version 3.0 (NRCS 2012)



| Very Fine (<1mm) | Fine (1 to <2mm) | Medium (2 to <5mm) | Coarse (5 to <10mm) | Very Coarse (≥10mm) |
|---|---|---|---|---|

| Quantity Class | Few | Common | Many |
|---|---|---|---|
| **Roots: Average Count per Area\*** | <1 per area* | 1 to <5 per area* | ≥5 per area* |

*Root assessment area = 1x1cm for roots <2mm, 10x10cm for 2 to <10mm, 100x100cm for ≥10mm

77

**Data Form Guide Note:**
## SUPPLEMENTAL SOIL DATA

**HORIZON CRITERIA – MASTER HORIZON DESIGNATIONS**
**O** Organic soil materials (not limnic)
**A** Mineral; organic matter (humus) accumulation, loss of Fe, Al, clay
**E** Mineral; loss of Fe, Al, clay, or organic matter
**B** Subsurface accumulation of clay, Fe, Al, Si, humus, CaCO3, CaSO4; or loss of CaCO3; or
   accumulation of sesquioxides; or subsurface soil structure
**C** Little or no pedogenic alteration, unconsolidated earthy material, soft bedrock
**L** Limnic soil materials
**R** Bedrock, Strongly Cemented to Indurated

**HORIZON CRITERIA – SUFFIX DESIGNATIONS**

| | |
|---|---|
| **a** Highly decomposed organic matter | **n** Pedogenic, exchangeable sodium accumulation |
| **b** Buried genetic horizon (not used with C horizons) | **o** Residual sesquioxide accumulation (pedogenic) |
| **c** Concretions or nodules | **p** Plow layer or other artificial disturbance |
| **e** Moderately decomposed organic matter | **r** Weathered or soft bedrock |
| **g** Strong gley | **s** Illuvial sesquioxide accumulation |
| **h** Illuvial organic matter accumulation | **t** Illuvial accumulation of silicate clay |
| **i** Slightly decomposed organic matter | **v** Plinthite |
| **k** Pedogenic carbonate accumulation | **w** Weak color or structure within B (used only with B) |
| **m** Strong cementation (pedogenic, massive) | **z** Pedogenic accumulation of salt more soluble |
| **ma** Marl (Used only with L) | than gypsum |

## FNAI NATURAL COMMUNITIES OF FLORIDA

**HARDWOOD FORESTED UPLANDS**
Slope Forest
Upland Hardwood Forest
Mesic Hammock
Rockland Hammock
Xeric Hammock
**HIGH PINE AND SCRUB**
Upland Mixed Woodland
Upland Pine
Sandhill
Scrub
**PINE FLATWOODS AND DRY PRAIRIE**
Wet Flatwoods
Mesic Flatwoods
Scrubby Flatwoods
Pine Rockland
Dry Prairie
**COASTAL UPLANDS**
Beach Dune
Coastal Berm
Coastal Grassland
Coastal Strand
Maritime Hammock
Shell Mound

**SINKHOLES AND OUTCROP COMMUNITIES**
Upland Glade
Sinkhole
Limestone Outcrop
Keys Cactus Barren
**FRESHWATER NON-FORESTED WETLANDS**
PRAIRIES AND BOGS
Seepage Slope
Wet Prairie
Marl Prairie
Shrub Bog
MARSHES
Depression Marsh
Basin Marsh
Coastal Interdunal Swale
Floodplain Marsh
Slough Marsh
Glades Marsh
Slough
**FRESHWATER FORESTED WETLANDS**
CYPRESS/TUPELO
Dome Swamp
Basin Swamp
Strand Swamp
Floodplain Swamp

HARDWOOD
Baygall
Hydric Hammock
Bottomland Forest
Alluvial Forest
**MARINE AND ESTUARINE VEGETATED WETLANDS**
Salt Marsh
Mangrove Swamp
Keys Tidal Rock Barren
**LACUSTRINE**
Clastic Upland Lake
Coastal Dune Lake
Coastal Rockland Lake
Flatwoods/Prairie Lake and
   Marsh Lake
River Floodplain Lake and
   Swamp Lake
Sandhill Upland Lake
Sinkhole Lake
**RIVERINE**
Alluvial Stream
Blackwater Stream
Seepage Stream
Spring-run Stream

## Appendix A2: subsection 62-340.450(1), (2), (3), F.A.C.

### Vegetative Index Plant List by Common Name

**Common Name / Botanical Name / Wetland Status**

**acacia, ear-leaved**   *Acacia auriculiformis*   FAC
**alder, hazel**   *Alnus serrulata*   FAC
**algal bulrush**   *Websteria confervoides*   OBL
**allamanda, wild**   *Urechites lutea*   FACW
**alligator flag**   *Thalia geniculata*   OBL
**alligator-weed**   *Alternanthera philoxeroides*   OBL
**alligator-weed, sessile**   *Alternanthera sessilis*   OBL
**amaranth, Florida**   *Amaranthus floridanus*   OBL
**amaranth, southern**   *Amaranthus australis*   OBL
**amaranth, tidemarsh**   *Amaranthus cannabinus*   OBL
**anise, Florida**   *Illicium floridanum*   OBL
**anise, star**   *Illicium parviflorum*   FACW
**arrowhead**   *Sagittaria* spp.   OBL
**arrow-wood**   *Viburnum dentatum*   FACW
**arum**   *Peltandra* spp.   OBL
**ash**   *Fraxinus* spp.   OBL
**ash, white**   *Fraxinus americana*   U
**aster, bog**   *Aster spinulosus*   FACW
**aster, bushy**   *Aster dumosus*   FAC
**aster, calico**   *Aster lateriflorus*   FACW
**aster, climbing**   *Aster carolinianus*   OBL
**aster, coyote-thistle**   *Aster eryngiifolius*   FACW
**aster, Elliott's**   *Aster elliottii*   OBL
**aster, flat-top white**   *Aster umbellatus*   FAC
**aster, saltmarsh**   *Aster subulatus*   OBL
**aster, saltmarsh**   *Aster tenuifolius*   OBL
**aster, savannah**   *Aster chapmanii*   FACW
**aster, small white**   *Aster vimineus*   FACW
**Australian pine**   *Casuarina* spp.   FAC
**axilflower**   *Mecardonia* spp.   FACW
**azalea, swamp**   *Rhododendron viscosum*   FACW
**baby tears**   *Micranthemum* spp.   OBL
**baby-blue-eyes, small-flower**   *Nemophila aphylla*   FACW
**balsam-scale, Pan-American**   *Elionurus tripsacoides*   FACW
**bantam-buttons**   *Syngonanthus flavidulus*   FACW
**barbara's-buttons, grass-leaf**   *Marshallia graminifolia*   FACW
**barbara's-buttons, slim-leaf**   *Marshallia tenuifolia*   FACW
**basswood, American**   *Tilia americana*   FACW
**bay, swamp**   *Persea palustris*   OBL
**bayberry, evergreen**   *Myrica heterophylla*   FACW
**bayberry, odorless**   *Myrica inodora*   FACW
**bayberry, southern**   *Myrica cerifera*   FAC
**bay-cedar**   *Suriana maritima*   FAC
**beach alternanthera**   *Alternanthera maritima*   FACW
**beach creeper**   *Ernodea littoralis*   FAC
**bedstraw, stiff marsh**   *Galium tinctorium*   FACW
**beefwood**   *Guapira discolor*   FAC
**beggar-ticks**   *Bidens* spp.   OBL
**beggar-ticks, white**   *Bidens pilosa (B. alba)*   FAC
**bellflower, American**   *Campanula americana*   FAC
**bellflower, Florida**   *Campanula floridana*   OBL
**bellwort, Florida**   *Uvularia floridana*   FACW
**bindweed, dwarf**   *Evolvulus convolvuloides*   FACW
**bindweed, silky**   *Evolvulus sericeus*   FACW
**birch, river**   *Betula nigra*   OBL
**birds-in-a-nest**   *Macbridea* spp.   FACW
**bitter-cress**   *Cardamine bulbosa*   OBL

This index is for reference purposes only. Scientific names shall be used in all applications of Ch. 62-340, F.A.C. This index contains all plant species in subsection 62-340.450(1), (2), (3), F.A.C., listed alphabetically by their most widely used common names. In this index, plant species within a genus that has a consistent common name are listed by the common name of their genus, followed by the descriptor. For example, *Quercus nigra* is listed as oak, water. For families or larger taxonomic divisions in which all members are collectively referred to by a consistent common name, such as grasses, sedges, palms, orchids, and ferns, all members are listed under that group name, with the last member alphabetically being underlined to denote the end of the group. Plant species may appear multiple times within this list, as many have multiple common names. However, this list is not exhaustive.

**black senna**    *Seymeria cassioides*   FAC
**blackbead**    *Pithecellobium keyensis*   FAC
**blackbead, catclaw**    *Pithecellobium unguis-cati*   FAC
**blackberry**    *Rubus* spp.   FAC
**blackgum**    *Nyssa sylvatica var. biflora*   OBL
**bladdernut, American**    *Staphylea trifolia*   FACW
**bladderpod**    *Sesbania* spp.   FAC
**bladderwort**    *Utricularia* spp.   OBL
**blazing star**    *Liatris gracilis*   FAC
**blolly**    *Guapira discolor*   FAC
**blueberry, Elliott**    *Vaccinium elliottii*   FAC
**blueberry, highbush**    *Vaccinium corymbosum*   FACW
**blue-eye-grass**    *Sisyrinchium capillare*   FACW
**blue-eye-grass, eastern**    *Sisyrinchium atlanticum*   FACW
**blue-eye-grass, Michaux's**    *Sisyrinchium mucronatum*   FACW
**bluestar, eastern**    *Amsonia tabernaemontana*   FACW
**bluethread**    *Burmannia* spp.   OBL
**bluets, water**    *Oldenlandia* spp.   FACW
**bog hemp**    *Boehmeria cylindrica*   OBL
**bogbutton, Engler's**    *Lachnocaulon engleri*   OBL
**bogbutton, pineland**    *Lachnocaulon digynum*   OBL
**bogbutton, Small's**    *Lachnocaulon minus*   OBL
**bogbutton, southern**    *Lachnocaulon beyrichianum*   FACW
**bogbutton, white-head**    *Lachnocaulon anceps*   FACW
**boneset**    *Eupatorium perfoliatum*   FACW
**box briar**    *Randia aculeata*   FAC
**box-elder**    *Acer negundo*   FACW
**bractspike, yellow**    *Yeatesia viridiflora*   FACW
**Brazilian pepper-tree**    *Schinus terebinthifolius*   FAC
**broomspurge, spreading**    *Euphorbia humistrata*   FACW
**buckwheat-tree**    *Cliftonia monophylla*   FACW
**bugleweed**    *Lycopus* spp.   OBL
**bully, buckthorn**    *Bumelia lycioides*   FAC
**bully, Florida**    *Bumelia reclinata*   FAC
**bumelia, buckthorn**    *Bumelia lycioides*   FAC
**bumelia, coastal**    *Bumelia celastrina*   FAC
**bumelia, smooth**    *Bumelia reclinata*   FAC
**bunchflower, Virginia**    *Melanthium virginicum*   OBL
**burhead**    *Echinodorus* spp.   OBL
**burnweed, American**    *Erechtites hieraciifolia*   FAC
**burreed**    *Sparganium americanum*   OBL
**bushy goldenrod**    *Euthamia* spp.   FAC
**butter-cup**    *Ranunculus* spp.   FACW
**butterweed**    *Senecio glabellus*   OBL
**butterwort**    *Pinguicula* spp.   OBL
**buttonbush**    *Cephalanthus occidentalis*   OBL
**button-plant, smooth**    *Spermacoce glabra*   FACW
**button-weed**    *Diodia virginiana*   FACW
**buttonwood**    *Conocarpus erectus*   FACW
**cajeput**    *Melaleuca quinquenervia*   FAC
**camphor-weed**    *Pluchea* spp.   FACW
**canker-berry**    *Solanum bahamense*   FACW
**canna**    *Canna* spp.   OBL
**canna, common**    *Canna x generalis*   FAC
**caperonia**    *Caperonia* spp.   FACW
**caper-tree**    *Capparis flexuosa*   FACW
**cardinal flower**    *Lobelia cardinalis*   OBL
**carrotwood**    *Cupaniopsis anacardioides*   FAC
**catsclaw**    *Pithecellobium unguis-cati*   FAC
**cattail**    *Typha* spp.   OBL
**cayaponia, five-lobe**    *Cayaponia quinqueloba*   FAC

**celestial lily**    *Nemastylis floridana*    FACW
**chaff-flower, beach**    *Alternanthera maritima*    FACW
**chaffhead, bristle-leaf**    *Carphephorus pseudoliatris*    FACW
**chaffhead, hairy**    *Carphephorus paniculatus*    FAC
**chaffhead, pineland**    *Carphephorus carnosus*    FACW
**chamber-bitter**    *Phyllanthus urinaria*    FAC
**chicken-spike**    *Sphenoclea zeylandica*    FACW
**chickweed, West Indian**    *Drymaria cordata*    FAC
**chocolate-weed**    *Melochia corchorifolia*    FAC
**chokeberry, red**    *Aronia arbutifolia*    FACW
**Christmas berry**    *Lycium carolinianum*    OBL
**clearweed**    *Pilea* spp.    FACW
**climbing-dogbane**    *Trachelospermum difforme*    FACW
**clubmoss**    *Lycopodium* spp.    FACW
**cocoplum**    *Chrysobalanus icaco*    FACW
**coinwort**    *Centella asiatica*    FACW
**colic-root**    *Aletris spp*    FAC
**colicwood**    *Myrsine guianensis*    FAC
**coneflower, cut-leaf**    *Rudbeckia laciniata*    FACW
**coneflower, grass-leaf**    *Rudbeckia graminifolia*    FACW
**coneflower, Mohr's**    *Rudbeckia mohrii*    OBL
**coneflower, orange**    *Rudbeckia fulgida*    FACW
**coneflower, Shiny**    *Rudbeckia nitida*    FACW
**coralberry**    *Ardisia* spp.    FAC
**corkwood**    *Leitneria floridana*    OBL
**corkwood**    *Stillingia aquatica*    OBL
**cottonwood, eastern**    *Populus deltoides*    FACW
**cottonwood, swamp**    *Populus heterophylla*    OBL
**coughbush**    *Ernodea littoralis*    FAC
**cowbane**    *Oxypolis* spp.    OBL
**cow-lily, yellow**    *Nuphar luteum*    OBL
**coyote-thistle, Baldwin's**    *Eryngium baldwinii*    FAC
**coyote-thistle, blue-flower**    *Eryngium integrifolium*    FACW
**coyote-thistle, creeping**    *Eryngium prostratum*    FACW
**creeping ox-eye**    *Wedelia trilobata*    FAC
**croton, Elliott's**    *Croton elliottii*    FACW
**crow poison**    *Zigadenus densus*    FACW
**crownbeard, Chapman's**    *Verbesina chapmanii*    FACW
**crownbeard, diverse-leaf**    *Verbesina heterophylla*    FACW
**crownbeard, white**    *Verbesina virginica*    FAC
**culver's-root**    *Veronicastrum virginicum*    FACW
**cupseed**    *Calycocarpum lyonii*    FACW
**cypress, bald**    *Taxodium distichum*    OBL
**cypress, pond**    *Taxodium ascendens*    OBL
**dangleberry**    *Gaylussacia frondosa*    FAC
**danglepod**    *Sesbania* spp.    FAC
**darling-plum**    *Reynosia septentrionalis*    FAC
**dasheen**    *Colocasia esculenta*    OBL
**dayflower**    *Commelina* spp.    FACW
**dayflower, sandhill**    *Commelina erecta*    U
**deathcamas, Atlantic**    *Zigadenus glaberrimus*    FACW
**deer-tongue**    *Carphephorus paniculatus*    FAC
**desert-thorn, Carolina**    *Lycium carolinianum*    OBL
**devil's claws**    *Pisonia rotundata*    FAC
**dewberry**    *Rubus* spp.    FAC
**dewflower**    *Murdannia* spp.    FAC
**ditch stonecrop**    *Penthorum sedoides*    OBL
**dock**    *Rumex* spp.    FACW
**dog-fennel**    *Eupatorium capillifolium*    FAC
**dog-hobble**    *Leucothoe* spp.    FACW
**dogwood, silky**    *Cornus amomum*    OBL

**dogwood, swamp**    *Cornus foemina*    FACW
**dollarweed**    *Hydrocotyle* spp.    FACW
**doll's daisy**    *Boltonia* spp.    FACW
**dragon-head, false**    *Physostegia virginiana*    FACW
**dragon-head, Godfrey's**    *Physostegia godfreyi*    OBL
**dragon-head, purple**    *Physostegia purpurea*    FACW
**dragon-head, slender-leaf**    *Physostegia leptophylla*    OBL
**drymary**    *Drymaria cordata*    FAC
**duck potato**    *Sagittaria* spp.    OBL
**dwarf morning-glory, bindweed**    *Evolvulus convolvuloides*    FACW
**dwarf morning-glory, silver**    *Evolvulus sericeus*    FACW
**elder, American**    *Sambucus canadensis*    FAC
**elderberry**    *Sambucus canadensis*    FAC
**elephant's ear**    *Colocasia esculenta*    OBL
**elephant's ear**    *Xanthosoma sagittifolium*    FACW
**elm**    *Ulmus* spp.    FACW
**elm, slippery**    *Ulmus rubra*    U
**false buttonweed, smooth**    *Spermacoce glabra*    FACW
**false daisy**    *Eclipta alba*    FACW
**false indigo, bastard**    *Amorpha fruticosa*    FACW
**false-asphodel, coastal**    *Tofieldia racemosa*    OBL
**false-croton**    *Caperonia* spp.    FACW
**falsefennel**    *Eupatorium leptophyllum*    OBL
**false-fiddle-leaf**    *Hydrolea* spp.    OBL
**false-foxglove**    *Agalinis pinetorum*    FACW
**false-foxglove, flax-leaf**    *Agalinis linifolia*    OBL
**false-foxglove, large purple**    *Agalinis purpurea*    FACW
**false-foxglove, saltmarsh**    *Agalinis maritima*    OBL
**false-foxglove, scale-leaf**    *Agalinis aphylla*    FACW
**false-nettle**    *Boehmeria cylindrica*    OBL
**false-pimpernel**    *Lindernia* spp.    FACW
**false-pimpernel, Malayan**    *Lindernia crustacea*    FAC
**false-willow, broom-bush**    *Baccharis dioica*    FAC
**false-willow, eastern**    *Baccharis halimifolia*    FAC
**false-willow, saltwater**    *Baccharis angustifolia*    OBL
**feather-bells, eastern**    *Stenanthium gramineum*    FACW

## FERNS

**bead fern**    *Hypolepis repens*    FACW
**Boston fern**    *Nephrolepis exaltata*    FAC
**brake, giant**    *Pteris tripartita*    FACW
**bramble fern, creeping**    *Hypolepis repens*    FACW
**chainfern, netted**    *Woodwardia aereolata*    OBL
**chainfern, Virginia**    *Woodwardia virginica*    FACW
**cinnamon fern**    *Osmunda cinnamomea*    FACW
**comb fern, brown-hair**    *Ctenitis submarginalis*    FACW
**lady fern, subarctic**    *Athyrium filix-femina*    FACW
**leather fern**    *Acrostichum* spp.    OBL
**maiden fern**    *Thelypteris* spp.    FACW
**marsh fern**    *Thelypteris* spp.    FACW
**royal fern**    *Osmunda regalis*    OBL
**sensitive fern**    *Onoclea sensibilis*    FACW
**shield fern**    *Thelypteris* spp.    FACW
**swamp fern**    *Blechnum serrulatum*    FACW
**sword fern**    *Nephrolepis* spp.    FAC
**wood fern, southern**    *Dryopteris ludoviciana*    FACW
**fetter-bush**    *Lyonia lucida*    FACW
**fetter-bush, climbing**    *Pieris phillyreifolia*    FACW
**fever-tree**    *Pinckneya bracteata*    OBL
**fig, Florida strangler**    *Ficus aurea*    FAC
**fire flag**    *Thalia geniculata*    OBL
**fireweed**    *Erechtites hieraciifolia*    FAC

**flameflower**    *Macranthera flammea*    OBL
**flattop goldenrod**    *Euthamia* spp.    FAC
**flax, Carter's**    *Linum carteri*    FACW
**flax, Florida yellow**    *Linum floridanum*    FAC
**flax, ridged yellow**    *Linum striatum*    FACW
**flax, stiff yellow**    *Linum medium*    FAC
**flax, West's**    *Linum westii*    OBL
**fleabane, early whitetop**    *Erigeron vernus*    FACW
**fleabane, oakleaf**    *Erigeron quercifolius*    FAC
**floating hearts**    *Nymphoides* spp.    OBL
**frogbit**    *Limnobium spongia*    OBL
**frog-fruit**    *Phyla* spp.    FAC
**frostweed**    *Verbesina virginica*    FAC
**gayfeather, garber's**    *Liatris garberi*    FACW
**gayfeather, slender**    *Liatris gracilis*    FAC
**gayfeather, spiked**    *Liatris spicata*    FAC
**gentian**    *Gentiana* spp.    FACW
**germander, American**    *Teucrium canadense*    FACW
**ginger**    *Hedychium coronarium*    FACW
**gingerlily, white**    *Hedychium coronarium*    FACW
**glasswort**    *Salicornia* spp.    OBL
**goat-weed**    *Scoparia dulcis*    FAC
**golden club**    *Orontium aquaticum*    OBL
**golden creeper**    *Ernodea littoralis*    FAC
**golden-crest**    *Lophiola americana*    FACW
**golden-rod, Elliott's**    *Solidago elliottii*    OBL
**golden-rod, leavenworth's**    *Solidago leavenworthii*    FACW
**golden-rod, marsh**    *Solidago fistulosa*    FACW
**golden-rod, rough-leaf**    *Solidago patula*    OBL
**golden-rod, seaside**    *Solidago sempervirens*    FACW
**golden-rod, willow-leaf**    *Solidago stricta*    FACW
**golden-rod, wrinkled**    *Solidago rugosa*    FAC
**grass-of-parnassus**    *Parnassia* spp.    OBL
**grasswort**    *Lilaeopsis* spp.    OBL
<u>**GRASSES**</u>
  **arrowfeather grass**    *Aristida purpurascens*    FACW
  **arrow-grass**    *Triglochin striatum*    OBL
  **barnyardgrass**    *Echinochloa* spp.    FACW
  **basketgrass**    *Oplismenus setarius*    FAC
  **blue maidencane**    *Amphicarpum muhlenbergianum*    FACW
  **bluestem**    *Schizachyrium* spp.    FAC
  **bluestem, big**    *Andropogon gerardii*    FAC
  **bluestem, broom-sedge**    *Andropogon virginicus*    FAC
  **bluestem, bushy**    *Andropogon glomeratus*    FACW
  **bluestem, Mohr's**    *Andropogon liebmannii var. pungensis (A. mohrii)*    FACW
  **bluestem, savannah**    *Andropogon arctatus*    FAC
  **bluestem, short-spike**    *Andropogon brachystachys*    FAC
  **bluestem, slim**    *Andropogon perangustatus*    FAC
  **bristlegrass**    *Setaria geniculata*    FAC
  **broom-sedge**    *Andropogon virginicus*    FAC
  **Burma reed**    *Neyraudia reynaudiana*    FAC
  **carpet grass**    *Axonopus* spp.    FAC
  **cockspur grass**    *Echinochloa* spp.    FACW
  **common reed**    *Phragmites australis*    OBL
  **cordgrass, big**    *Spartina cynosuroides*    OBL
  **cordgrass, gulf**    *Spartina spartinae*    OBL
  **cordgrass, saltmarsh**    *Spartina alterniflora*    OBL
  **cordgrass, saltmeadow**    *Spartina patens*    FACW
  **cordgrass, sand**    *Spartina bakeri*    FACW
  **crabgrass, dwarf**    *Digitaria serotina*    FAC
  **crabgrass, twospike**    *Digitaria pauciflora*    FACW

**cupgrass**   *Eriochloa* spp.  FACW
**cupscale, American**   *Sacciolepis striata*  OBL
**cupscale, Indian**   *Sacciolepis indica*  FAC
**cutgrass**   *Leersia* spp.  OBL
**cut-throat grass**   *Panicum abscissum*  FACW
**dallisgrass**   *Paspalum dilatatum*  FAC
**dropseed, Florida**   *Sporobolus floridanus*  FACW
**dropseed, seashore**   *Sporobolus virginicus*  OBL
**elephantgrass**   *Pennisetum purpureum*  FAC
**everglades grass**   *Digitaria pauciflora*  FACW
**fingergrass, pinewoods**   *Eustachys petraea*  FAC
**fingergrass, saltmarsh**   *Eustachys glauca*  FACW
**fluffgrass, pineland**   *Tridens ambiguus*  FACW
**foxtail, giant**   *Setaria magna*  OBL
**foxtail, knotroot**   *Setaria geniculata*  FAC
**foxtail, tufted**   *Alopecurus carolinianus*  FAC
**gamagrass, eastern**   *Tripsacum dactyloides*  FAC
**giant cane**   *Arundinaria gigantea*  FACW
**giant cutgrass**   *Zizaniopsis miliacea*  OBL
**giant reed**   *Arundo donax*  FAC
**hilograss**   *Paspalum conjugatum*  FAC
**indian rice**   *Zizania aquatica*  OBL
**jointgrass; jointtailgrass**   *Manisuris* spp.  FACW
**jointgrass, pitted**   *Manisuris cylindrica*  FAC
**jungle-rice**   *Echinochloa* spp.  FACW
**keygrass**   *Monanthochloe littoralis*  OBL
**kissimmeegrass**   *Paspalidium geminatum*  OBL
**knotgrass**   *Paspalum distichum*  OBL
**lovegrass**   *Eragrostis* spp.  FAC
**maidencane**   *Panicum hemitomon*  OBL
**mannagrass, fowl**   *Glyceria striata*  OBL
**muhly grass, hairawn**   *Muhlenbergia capillaris*  OBL
**muhly grass, nimblewill**   *Muhlenbergia schreberi*  FACW
**muhly, cutover**   *Muhlenbergia expansa*  FAC
**napiergrass**   *Pennisetum purpureum*  FAC
**needlegrass, Florida**   *Stipa avenacioides*  FACW
**panic grass, cypress**   *Panicum ensifolium*  OBL
**panicum, beaked**   *Panicum anceps*  FAC
**panicum, bluejoint**   *Panicum tenerum*  OBL
**panicum, Eaton's**   *Panicum spretum*  FACW
**panicum, fall**   *Panicum dichotomiflorum*  FACW
**panicum, fringed**   *Panicum strigosum*  FAC
**panicum, Ft Myers**   *Panicum pinetorum*  FACW
**panicum, gaping**   *Panicum hians*  FAC
**panicum, red-top**   *Panicum rigidulum*  FACW
**panicum, savannah**   *Panicum gymnocarpon*  OBL
**panicum, shining**   *Panicum dichotomum*  FACW
**panicum, tall thin**   *Panicum longifolium*  OBL
**panicum, variable**   *Panicum commutatum*  FAC
**panicum, velvet**   *Panicum scoparium*  FACW
**panicum, warty**   *Panicum verrucosum*  FACW
**panicum, white-edge**   *Panicum tenue*  FAC
**panicum, woolly**   *Panicum scabriusculum*  OBL
**paragrass**   *Brachiaria purpurascens*  FACW
**paspalum, brook**   *Paspalum acuminatum*  FACW
**paspalum, brown-seed**   *Paspalum plicatulum*  FAC
**paspalum, bull**   *Paspalum boscianum*  FACW
**paspalum, early**   *Paspalum praecox*  OBL
**paspalum, field**   *Paspalum laeve*  FACW
**paspalum, Florida**   *Paspalum floridanum*  FACW
**paspalum, gulf**   *Paspalum monostachyum*  OBL

**paspalum, hairy-seed**   *Paspalum pubiflorum*   FACW
**paspalum, joint**   *Paspalum distichum*   OBL
**paspalum, mudbank**   *Paspalum dissectum*   OBL
**paspalum, Panama**   *Paspalum fimbriatum*   FAC
**paspalum, sour**   *Paspalum conjugatum*   FAC
**paspalum, thin**   *Paspalum setaceum*   FAC
**paspalum, water**   *Paspalum repens*   OBL
**plumegrass, narrow**   *Erianthus strictus*   OBL
**plumegrass, short-beard**   *Erianthus brevibarbus*   FACW
**plumegrass, sugarcane**   *Erianthus giganteus*   OBL
**rabbit-foot grass**   *Polypogon* spp.   FAC
**redtop**   *Agrostis stolonifera*   FACW
**reed grass, Curtiss'**   *Calamovilfa curtissii*   FACW
**reimargrass, Florida**   *Reimarochloa oligostachya*   FACW
**rice, cultivated**   *Oryza sativa*   FAC
**saltgrass, seashore**   *Distichlis spicata*   OBL
**sandgrass, Curtiss'**   *Calamovilfa curtissii*   FACW
**silk reed**   *Neyraudia reynaudiana*   FAC
**silky-scale, purple**   *Anthaenantia rufa*   FACW
**spanglegrass**   *Chasmanthium* spp.   FAC
**spanglegrass, indian**   *Chasmanthium latifolium*   FAC
**spanglegrass, long-leaf**   *Chasmanthium sessiliflorum*   FAC
**switchcane**   *Arundinaria gigantea*   FACW
**switchgrass**   *Panicum virgatum*   FACW
**three-awn grass, bottlebrush**   *Aristida spiciformis*   FAC
**three-awn grass, long-leaf**   *Aristida affinis*   OBL
**three-awn grass, pineland**   *Aristida stricta*   FAC
**three-awn grass, rhizomatous**   *Aristida rhizomophora*   FAC
**three-awn grass, wand-like**   *Aristida purpurascens*   FACW
**toothache grass**   *Ctenium* spp.   FACW
**torpedograss**   *Panicum repens*   FACW
**tridens, long-spike**   *Tridens strictus*   FACW
**tridens, savannah**   *Tridens ambiguus*   FACW
**trompetilla**   *Hymenachne amplexicaulis*   OBL
**vaseygrass**   *Paspalum urvillei*   FAC
**watergrass**   *Hydrochloa caroliniensis*   OBL
**West Indian marsh grass**   *Hymenachne amplexicaulis*   OBL
**wildrice, annual**   *Zizania aquatica*   OBL
**wildrice, southern**   *Zizaniopsis miliacea*   OBL
**wiregrass**   *Aristida stricta*   FAC
**witchgrass, cypress**   *Panicum ensifolium*   OBL
**witchgrass, erect-leaf**   *Panicum erectifolium*   OBL
**witchgrass, roughhair**   *Panicum strigosum*   FAC
**witchgrass, shining**   *Panicum dichotomum*   FACW
**witchgrass, variable**   *Panicum commutatum*   FAC
**witchgrass, velvet**   *Panicum scoparium*   FACW
**witchgrass, woolly**   *Panicum scabriusculum*   OBL
**woodoats**   *Chasmanthium* spp.   FACW
**woodoats, indian**   *Chasmanthium latifolium*   FAC
**woodoats, long-leaf**   *Chasmanthium sessiliflorum*   FAC
**woodsgrass**   *Oplismenus setarius*   FAC
**green-dragon**   *Arisaema* spp.   FACW
**green-haw**   *Crataegus viridis*   FACW
**gregory wood**   *Bucida buceras*   FAC
**groundsel tree**   *Baccharis glomeruliflora*   FAC
**guava, strawberry**   *Psidium cattleianum*   FAC
**hackberry**   *Celtis laevigata*   FACW
**hardscale, one flower**   *Sclerolepis uniflora*   FACW
**Harper's beauty**   *Harperocallis flava*   FACW
**hartwrightia, Florida**   *Hartwrightia floridana*   FACW
**hatpin**   *Eriocaulon* spp.   OBL

**hatpins, yellow**   *Syngonanthus flavidulus*   FACW
**haw, green**   *Crataegus viridis*   FACW
**haw, may**   *Crataegus aestivalis*   OBL
**haw, parsley**   *Crataegus marshallii*   FACW
**hazel-alder**   *Alnus serrulata*   OBL
**hedgehyssop**   *Gratiola* spp.   FACW
**hedgehyssop, rough**   *Gratiola hispida*   FAC
**hedgenettle**   *Stachys lythroides*   OBL
**heliotrope, four-spike**   *Heliotropium procumbens*   FACW
**heliotrope, pineland**   *Heliotropium polyphyllum*   FAC
**heliotrope, seaside**   *Heliotropium curassavicum*   FAC
**hickory, water**   *Carya aquatica*   OBL
**hobble-bush**   *Agarista populifolia*   FACW
**holly, American**   *Ilex opaca var. opaca*   FAC
**holly, bay-gall**   *Ilex coriacea*   FACW
**holly, dahoon**   *Ilex cassine*   OBL
**holly, deciduous**   *Ilex decidua*   FACW
**holly, myrtle**   *Ilex myrtifolia*   OBL
**holly, sarvis**   *Ilex amelanchier*   OBL
**holly, yaupon**   *Ilex vomitoria*   FAC
**honeycomb-head, one-flower**   *Balduina uniflora*   FACW
**honeycomb-head, purple**   *Balduina atropurpurea*   FACW
**honey-locust**   *Gleditsia triacanthos*   FACW
**hornbeam, American**   *Carpinus caroliniana*   FACW
**hornpod**   *Mitreola* spp.   FACW
**horse-purslane**   *Trianthema portulacastrum*   FACW
**horsetail**   *Equisetum hyemale*   FACW
**huckleberry, dwarf**   *Gaylussacia dumosa*   FAC
**hummingbird-flower**   *Macranthera flammea*   OBL
**hygrophila**   *Hygrophila* spp.   OBL
**hyssop, hispid**   *Gratiola hispida*   FAC
**indian-plantain, egg-leaf**   *Arnoglossum ovatum*   FACW
**indian-plantain, Georgia**   *Arnoglossum sulcatum*   OBL
**indian-plantain, sweet-scent**   *Cacalia suaveolens*   FACW
**indian-plantain, variable-leaf**   *Arnoglossum diversifolium*   FACW
**indigoberry, white**   *Randia aculeata*   FAC
**indigo-bush**   *Amorpha fruticosa*   FACW
**iris**   *Iris* spp.   OBL
**iris, dwarf**   *Iris verna*   U
**ironweed**   *Vernonia* spp.   FACW
**ironweed, narrow-leaf**   *Vernonia angustifolia*   U
**ironwood**   *Carpinus caroliniana*   FACW
**ixia, Bartram's**   *Sphenostigma coelestinum*   FACW
**ixia, fall-flowering**   *Nemastylis floridana*   FACW
**jack-in-the-pulpit**   *Arisaema* spp.   FACW
**Java plum**   *Syzygium* spp.   FAC
**jessamine, day**   *Cestrum diurnum*   FAC
**jewel weed**   *Impatiens capensis*   OBL
**joe-pye-weed**   *Eupatoriadelphus fistulosus*   FACW
**Joewood**   *Jacquinia keyensis*   FAC
**joint-vetch, India**   *Aeschynomene indica*   FACW
**joint-vetch, meadow**   *Aeschynomene pratensis*   OBL
**joyweed, seaside**   *Alternanthera maritima*   FACW
**joyweed, sessile**   *Alternanthera sessilis*   OBL
**joyweed, smooth**   *Alternanthera paronychioides*   FAC
**jumpseed**   *Polygonum virginianum*   FACW
**juniperleaf**   *Polypremum procumbens*   FAC
**justiceweed**   *Eupatorium leucolepis*   FACW
**keygrass**   *Monanthochloe littoralis*   OBL
**lakecress**   *Armoracia aquatica*   OBL
**large gallberry**   *Ilex coriacea*   FACW

**latherleaf**   *Colubrina asiatica*   FAC
**leaf-flower, Carolina**   *Phyllanthus caroliniensis*   FACW
**leaf-flower, Florida**   *Phyllanthus liebmannianus*   FACW
**leaf-flower, water**   *Phyllanthus urinaria*   FAC
**lily, atamasco**   *Zephyranthes atamasco*   FACW
**lily, panhandle**   *Lilium iridollae*   OBL
**lily, southern red**   *Lilium catesbaei*   FAC
**lizard's tail**   *Saururus cernuus*   OBL
**lobelia**   *Lobelia* spp.   FACW
**lobelia, Florida**   *Lobelia floridana*   OBL
**loblolly-bay**   *Gordonia lasianthus*   FACW
**locust-berry**   *Byrsonima lucida*   FAC
**loosestrife**   *Lysimachia* spp.   OBL
**loosestrife, marsh**   *Lythrum* spp.   OBL
**lotus, American**   *Nelumbo* spp.   OBL
**magnolia, sweetbay**   *Magnolia virginiana var. australis*   OBL
**Malabar plum**   *Syzygium* spp.   FAC
**maleberry**   *Lyonia ligustrina*   FAC
**mallow, coastal**   *Kosteletzkya pentasperma*   FAC
**mallow, mangrove**   *Pavonia spicata*   FACW
**mallow, seashore**   *Kosteletzkya virginica*   OBL
**mangrove, black**   *Avicennia germinans*   OBL
**mangrove, red**   *Rhizophora mangle*   OBL
**mangrove, white**   *Laguncularia racemosa*   OBL
**maple, red**   *Acer rubrum*   FACW
**maple, silver**   *Acer saccharinum*   OBL
**marlberry**   *Ardisia* spp.   FAC
**marsh elder**   *Iva frutescens*   OBL
**marsh elder, little**   *Iva microcephala*   FACW
**marsh loosestrife**   *Lythrum* spp.   OBL
**marsh St. John's-wort**   *Triadenum* spp.   OBL
**marsh-gentian**   *Eustoma exaltatum*   FACW
**marshpennywort**   *Hydrocotyle* spp.   FACW
**marshweed**   *Limnophila* spp.   OBL
**mayhaw**   *Crataegus aestivalis*   OBL
**mayten, Florida**   *Maytenus phyllanthoides*   FAC
**meadow-beauty**   *Rhexia* spp.   FACW
**meadow-beauty, panhandle**   *Rhexia salicifolia*   OBL
**meadow-beauty, white**   *Rhexia parviflora*   OBL
**meadow-rue**   *Thalictrum* spp.   FACW
**melonleaf, five-lobe**   *Cayaponia quinqueloba*   FAC
**mermaid-weed**   *Proserpinaca* spp.   OBL
**milkweed, aquatic**   *Asclepias perennis*   OBL
**milkweed, fen-flower**   *Asclepias lanceolata*   OBL
**milkweed, large-flower**   *Asclepias connivens*   FACW
**milkweed, long-leaf**   *Asclepias longifolia*   FACW
**milkweed, red**   *Asclepias rubra*   OBL
**milkweed, savannah**   *Asclepias pedicellata*   FACW
**milkweed, southern**   *Asclepias viridula*   FACW
**milkweed, swamp**   *Asclepias incarnata*   OBL
**milkwort**   *Polygala* spp.   FACW
**milkwort, racemed**   *Polygala polygama*   U
**milkwort, sandhill**   *Polygala leptostachys*   U
**milkwort, scrub**   *Polygala lewtonii*   U
**milkwort, tall**   *Polygala cymosa*   OBL
**milkwort, whorled**   *Polygala verticillata*   U
**mille graines**   *Oldenlandia* spp.   FACW
**mimosa, black**   *Mimosa pigra*   FAC
**mistflower**   *Conoclinium coelestinum*   FAC
**miterwort**   *Mitreola* spp.   FACW
**mock bishop-weed**   *Ptilimnium capillaceum*   FACW

**monkey-flower**   *Mimulus alatus*   OBL
**mountain-laurel**   *Kalmia latifolia*   FACW
**mountain-mint, coastal-plain**   *Pycnanthemum nudum*   FACW
**mouse-tail, tiny**   *Myosurus minimus*   FAC
**mudflower**   *Micranthemum* spp.   OBL
**mud-plantain, kidney-leaf**   *Heteranthera reniformis*   OBL
**mudwort, wild**   *Dicliptera brachiata*   FACW
**mulberry, red**   *Morus rubra*   FAC
**musclewood**   *Carpinus caroliniana*   FACW
**musky mint**   *Hyptis alata*   FACW
**myrsine, guiana**   *Myrsine guianensis*   FAC
**nakedwood, Asian**   *Colubrina asiatica*   FAC
**necklacepod, yellow**   *Sophora tomentosa*   FACW
**nettletree**   *Trema* spp.   FAC
**neverwet**   *Orontium aquaticum*   OBL
**nightshade, Bahama**   *Solanum bahamense*   FACW
**nightshade, shrub**   *Solanum erianthum*   FACW
**nodding nixie**   *Apteria aphylla*   FACW
**oak, cherry-bark**   *Quercus pagoda*   FACW
**oak, laurel**   *Quercus laurifolia*   FACW
**oak, overcup**   *Quercus lyrata*   OBL
**oak, swamp chestnut**   *Quercus michauxii*   FACW
**oak, water**   *Quercus nigra*   FACW
**oak, willow**   *Quercus phellos*   FACW
**obedient plant**   *Physostegia virginiana*   FACW

**<u>ORCHIDS</u>**
**adder's-mouth, Florida**   *Malaxis spicata*   OBL
**fringed orchid**   *Platanthera* spp.   OBL
**grass-pinks**   *Calopogon* spp.   FACW
**hidden orchid**   *Maxillaria crassifolia*   OBL
**jug orchid**   *Erythrodes querceticola*   FACW
**ladies'-tresses**   *Spiranthes* spp.   FACW
**liparis, tall**   *Liparis elata*   OBL
**noddingcaps**   *Triphora* spp.   FACW
**pogonia, rose**   *Pogonia ophioglossoides*   OBL
**pogonias, nodding**   *Triphora* spp.   FACW
**rein orchid**   *Habenaria* spp.   FACW
**rosebud orchid**   *Cleistes divaricata*   OBL
**shadow-witch**   *Ponthieva racemosa*   FACW
**snakemouth orchid**   *Pogonia ophioglossoides*   OBL
**twayblade**   *Listera* spp.   FACW
**widelip orchid**   *Liparis elata*   OBL
**<u>wild coco</u>**   *<u>Eulophia alta</u>*   <u>FACW</u>
**ox-eye, creeping**   *Wedelia trilobata*   FAC
**oxeye, seaside**   *Borrichia* spp.   OBL

**<u>PALMS</u>**
**palm, bluestem**   *Sabal minor*   FACW
**palm, cabbage**   *Sabal palmetto*   FAC
**palm, Florida thatch**   *Thrinax radiata*   FAC
**palm, needle**   *Rhapidophyllum hystrix*   FACW
**palm, paurotis**   *Acoelorraphe wrightii*   OBL
**palm, royal**   *Roystonea* spp.   FACW
**<u>palmetto, dwarf</u>**   *<u>Sabal minor</u>*   <u>FACW</u>
**panal**   *Cypselea humifusa*   FAC
**paperbark tree**   *Melaleuca quinquenervia*   FAC
**parsley-haw**   *Crataegus marshallii*   FACW
**peatmoss**   *Sphagnum* spp.   OBL
**pellitory**   *Parietaria* spp.   FAC
**pennywort**   *Hydrocotyle* spp.   FACW
**penny-wort, floating**   *Hydrocotyle ranunculoides*   OBL
**pentodon, Hall's**   *Pentodon pentandrus*   OBL

**persimmon, common**   *Diospyros virginiana*   FAC
**pickerelweed**   *Pontederia cordata*   OBL
**picklewort**   *Salicornia* spp.   OBL
**pimpernel, Florida**   *Anagallis pumila*   FAC
**pimpernel, water**   *Samolus* spp.   OBL
**pine, pond**   *Pinus serotina*   FACW
**pine, spruce**   *Pinus glabra*   FACW
**pineland daisy**   *Chaptalia tomentosa*   FACW
**pineweed**   *Hypericum gentianoides*   U
**pink-root**   *Spigelia loganioides*   FACW
**pipestem**   *Agarista populifolia*   FACW
**pipewort**   *Eriocaulon* spp.   OBL
**pitcher-plant**   *Sarracenia* spp.   OBL
**pitcher-plant, hooded**   *Sarracenia minor*   FACW
**planer tree**   *Planera aquatica*   OBL
**planetree, American**   *Platanus occidentalis*   FACW
**pleatleaf, fall-flowering**   *Nemastylis floridana*   FACW
**poison sumac**   *Toxicodendron vernix*   FACW
**poisonwood**   *Metopium toxiferum*   FAC
**pond apple**   *Annona glabra*   OBL
**pondberry**   *Lindera melissaefolia*   OBL
**pondlily, yellow**   *Nuphar luteum*   OBL
**pondspice**   *Litsea aestivalis*   OBL
**pony-foot**   *Dichondra caroliniensis*   FAC
**popcorn tree**   *Sapium sebiferum*   FAC
**portia tree**   *Thespesia populnea*   FAC
**possum-haw**   *Viburnum nudum*   FACW
**potatotree**   *Solanum erianthum*   FACW
**prairie-gentian**   *Eustoma exaltatum*   FACW
**pride-of-Big-Pine**   *Strumpfia maritima*   FACW
**primrosewillow**   *Ludwigia* spp.   OBL
**privet, swamp**   *Forestiera acuminata*   FACW
**punk tree**   *Melaleuca quinquenervia*   FAC
**queen's-delight, marsh**   *Stillingia sylvatica var. tenuis*   FAC
**quillwort**   *Isoetes* spp.   OBL
**ragwort, golden**   *Senecio aureus*   OBL
**rainlily**   *Zephyranthes atamasco*   FACW
**raspberry**   *Rubus* spp.   FAC
**rattlebox; rattle-bush**   *Sesbania* spp.   FAC
**rattlesnake master**   *Eryngium yuccifolium*   FACW
**rayless golden-rod**   *Bigelowia nudata*   FACW
**redgal**   *Morinda royoc*   FACW
**redroot**   *Lachnanthes caroliniana*   FAC
**redstem**   *Ammannia* spp.   OBL
**rose myrtle, downy**   *Rhodomyrtus tomentosus*   FAC
**rose, swamp**   *Rosa palustris*   OBL
**rose-apple**   *Syzygium* spp.   FAC
**rose-gentian**   *Sabatia* spp.   FACW
**rose-gentian, Bartram's**   *Sabatia bartramii*   OBL
**rose-gentian, coast**   *Sabatia calycina*   OBL
**rose-gentian, large**   *Sabatia dodecandra*   OBL
**rosemallow**   *Hibiscus aculeatus*   OBL
**rosemallow, crimson-eyed**   *Hibiscus moscheutos*   OBL
**rosemallow, halberd-leaf**   *Hibiscus laevis*   OBL
**rosemallow, scarlet**   *Hibiscus coccineus*   OBL
**rosemallow, sea**   *Hibiscus tiliaceus*   FAC
**rosemallow, swamp**   *Hibiscus grandiflorus*   OBL
**rush**   *Juncus* spp.   OBL
**rush, grassleaf**   *Juncus marginatus*   FACW
**rush, path**   *Juncus tenuis*   FAC
**rush, shore**   *Juncus marginatus*   FACW

**rush-featherling**   *Pleea tenuifolia*   OBL
**rustweed**   *Polypremum procumbens*   FAC
**sachsia**   *Sachsia polycephala*   FACW
**saffron plum**   *Bumelia celastrina*   FAC
**saltbush**   *Baccharis halimifolia*   FAC
**saltbush, halberd-leaf**   *Atriplex patula*   FACW
**saltwort**   *Batis maritima*   OBL
**sandmat, spreading**   *Euphorbia humistrata*   FACW
**sandspurry, saltmarsh**   *Spergularia marina*   OBL
**sandwort, Godfrey's**   *Arenaria godfreyi*   FACW
**savory, Brown's**   *Micromeria brownei*   OBL
**sawgrass**   *Cladium* spp.   OBL
**scaly-stem, Carolina**   *Elytraria caroliniensis*   FAC
**scouring-rush**   *Equisetum hyemale*   FACW
**screwstem**   *Bartonia* spp.   FACW
**sea myrtle**   *Baccharis halimifolia*   FAC
**sea oxeye**   *Borrichia* spp.   OBL
**sea-blite**   *Suaeda* spp.   OBL
**sea-lavender**   *Limonium carolinianum*   OBL
**sea-purslane**   *Sesuvium* spp.   FACW
**seaside mahoe**   *Thespesia populnea*   FAC
**sebastian-bush, gulf**   *Sebastiana fruticosa*   FAC

**<u>SEDGES</u>**

  **baldrush**   *Psilocarya* spp.   OBL
  **beakrush**   *Rhynchospora* spp.   FACW
  **beakrush, Chapman's**   *Rhynchospora chapmanii*   OBL
  **beakrush, clustered**   *Rhynchospora cephalantha*   OBL
  **beakrush, few-flower**   *Rhynchospora oligantha*   OBL
  **beakrush, giant-fruited**   *Rhynchospora megalocarpa*   U
  **beakrush, Gray's**   *Rhynchospora grayi*   U
  **beakrush, Harper's**   *Rhynchospora harperi*   OBL
  **beakrush, horned**   *Rhynchospora inundata*   OBL
  **beakrush, large**   *Rhynchospora macra*   OBL
  **beakrush, millet**   *Rhynchospora miliacea*   OBL
  **beakrush, mingled**   *Rhynchospora mixta*   OBL
  **beakrush, narrow**   *Rhynchospora stenophylla*   OBL
  **beakrush, pinebarren**   *Rhynchospora intermedia*   U
  **beakrush, short-bristle**   *Rhynchospora corniculata*   OBL
  **beakrush, southern**   *Rhynchospora microcarpa*   OBL
  **beakrush, spreading**   *Rhynchospora divergens*   OBL
  **beakrush, swamp-forest**   *Rhynchospora decurrens*   OBL
  **beakrush, Tracy's**   *Rhynchospora tracyi*   OBL
  **black-sedge**   *Schoenus nigricans*   FACW
  **bogrush, black**   *Schoenus nigricans*   FACW
  **bulrush**   *Scirpus* spp.   OBL
  **dwarf-bulrush**   *Hemicarpha* spp.   FACW
  **fimbry**   *Fimbristylis* spp.   OBL
  **fimbry, annual**   *Fimbristylis annua*   FACW
  **fimbry, hairy**   *Fimbristylis puberula*   FACW
  **flatsedge**   *Cyperus* spp.   FACW
  **flatsedge, alternate-leaf**   *Cyperus alternifolius*   OBL
  **flatsedge, Asian**   *Cyperus metzii*   FAC
  **flatsedge, baldwin**   *Cyperus globulosus*   FAC
  **flatsedge, bentawn**   *Cyperus reflexus*   U
  **flatsedge, black**   *Cyperus huarmensis*   FAC
  **flatsedge, coastal-plain**   *Cyperus cuspidatus*   FAC
  **flatsedge, Drummond's**   *Cyperus drummondii*   OBL
  **flatsedge, epiphytic**   *Cyperus lanceolatus*   OBL
  **flatsedge, giant**   *Cyperus giganteus*   FAC
  **flatsedge, globe**   *Cyperus ovularis*   U
  **flatsedge, hammock**   *Cyperus tetragonus*   U

**flatsedge, jointed**  *Cyperus articulatus*  OBL
**flatsedge, marshland**  *Cyperus distinctus*  OBL
**flatsedge, papyrus**  *Cyperus papyrus*  OBL
**flatsedge, pinebarrenf**  *Cyperus retrorsus*  FAC
**flatsedge, purple**  *Cyperus rotundus*  FAC
**flatsedge, red-root**  *Cyperus erythrorhizos*  OBL
**flatsedge, rough**  *Cyperus retrofractus*  U
**flatsedge, sandhill**  *Cyperus filiculmis*  U
**flatsedge, sheathed**  *Cyperus haspan*  OBL
**flatsedge, variable**  *Cyperus difformis*  OBL
**flatsedge, woodrush**  *Cyperus entrerianus*  OBL
**flatsedge, yellow**  *Cyperus esculentus*  FAC
**flatspike rush**  *Abildgaardia ovata*  FACW
**fringe-rush**  *Fimbristylis* spp.  OBL
**fringe-rush, annual**  *Fimbristylis annua*  FACW
**fringe-rush, Vahl's**  *Fimbristylis puberula*  FACW
**halfchaff sedge**  *Lipocarpha* spp.  FACW
**hurricane-grass**  *Fimbristylis spathacea*  FAC
**nut-grass, purple**  *Cyperus rotundus*  FAC
**nut-grass, yellow**  *Cyperus esculentus*  FAC
**nutrush**  *Scleria* spp.  FACW
**sedge**  *Carex* spp.  FACW
**sedge, bearded**  *Carex comosa*  OBL
**sedge, bristly-stalk**  *Carex leptalea*  OBL
**sedge, cypress-knee**  *Carex decomposita*  OBL
**sedge, Elliott's**  *Carex elliottii*  OBL
**sedge, fringed**  *Carex crinita*  OBL
**sedge, hop**  *Carex lupulina*  OBL
**sedge, Howe's**  *Carex howei*  OBL
**sedge, large**  *Carex gigantea*  OBL
**sedge, long**  *Carex folliculata*  OBL
**sedge, Louisiana**  *Carex louisianica*  OBL
**sedge, prickly bog**  *Carex atlantica*  OBL
**sedge, raven-foot**  *Carex crus-corvi*  OBL
**sedge, shallow**  *Carex lurida*  OBL
**sedge, shoreline**  *Carex hyalinolepis*  OBL
**sedge, stalk-grain**  *Carex stipata*  OBL
**sedge, Walter's**  *Carex walteriana*  OBL
**spikerush**  *Eleocharis* spp.  OBL
**three-way sedge**  *Dulichium arundinaceum*  OBL
**umbrella-sedge**  *Fuirena* spp.  OBL
**white-top sedge, Everglades**  *Dichromena floridensis*  FACW
**white-top sedge, giant**  *Dichromena latifolia*  OBL
**white-top sedge, starbrush**  *Dichromena colorata*  FACW
**seedbox**  *Ludwigia* spp.  OBL
**seedbox, hairy**  *Ludwigia hirtella*  FACW
**seedbox, headed**  *Ludwigia suffruticosa*  FACW
**seedbox, savanna**  *Ludwigia virgata*  FACW
**seedbox, seaside**  *Ludwigia maritima*  FACW
**seepweed**  *Suaeda* spp.  OBL
**seven-sisters**  *Crinum americanum*  OBL
**shaggytuft**  *Stenandrium floridanum*  FACW
**she-oak**  *Casuarina* spp.  FAC
**shrimp plant**  *Justicia brandegeana*  U
**silver-bell**  *Halesia diptera*  FACW
**silverhead**  *Philoxerus vermicularis*  FACW
**silverling**  *Baccharis glomeruliflora*  FAC
**skullcap, blue**  *Scutellaria lateriflora*  OBL
**skullcap, Florida**  *Scutellaria floridana*  FAC
**skullcap, rough**  *Scutellaria integrifolia*  FAC
**skullcap, South American**  *Scutellaria racemosa*  OBL

**skyflower**   *Hydrolea* spp.   OBL
**slimpod, eastern**   *Amsonia tabernaemontana*   FACW
**slimpod, stiff**   *Amsonia rigida*   FACW
**smartweed**   *Polygonum* spp.   OBL
**smartweed, silversheath**   *Polygonum argyrocoleon*   U
**smooth chaff-flower**   *Alternanthera paronychioides*   FAC
**snakeherb, swamp**   *Dyschoriste humistrata*   FACW
**snakeroot, corn**   *Eryngium aquaticum*   OBL
**snakewood, Asian**   *Colubrina asiatica*   FAC
**sneezeweed**   *Helenium* spp.   FACW
**sneezeweed, pasture**   *Helenium amarum*   FAC
**snowbell**   *Styrax americana*   OBL
**snowberry**   *Chiococca* spp.   FAC
**spadeleaf**   *Centella asiatica*   FACW
**Spanish needles**   *Bidens bipinnata*   U
**spatterdock**   *Nuphar luteum*   OBL
**speedwell, water**   *Veronica anagallis-aquatica*   OBL
**sphagnum moss**   *Sphagnum* spp.   OBL
**spicebush, northern**   *Lindera benzoin*   FACW
**spicebush, southern**   *Lindera melissaefolia*   OBL
**spider-lily**   *Hymenocallis* spp.   OBL
**spiderwort, trailing**   *Tradescantia fluminensis*   FAC
**spike-moss, meadow**   *Selaginella apoda*   FACW
**spindle-root**   *Ludwigia hirtella*   FACW
**spoon flower**   *Peltandra* spp.   OBL
**spotflower, creeping**   *Spilanthes americana*   FACW
**sprangle-top**   *Leptochloa* spp.   FACW
**sprangle-top, tropic**   *Leptochloa virgata*   FAC
**spring-cress**   *Cardamine pensylvanica*   OBL
**spurge, Florida**   *Euphorbia inundata*   FACW
**spurge, many-leaved**   *Euphorbia polyphylla*   FACW
**squarestem**   *Melanthera nivea*   FACW
**St. Andrew's cross**   *Hypericum hypericoides*   FAC
**St. John's-wort**   *Hypericum* spp.   FACW
**St. John's-wort, Atlantic**   *Hypericum reductum*   U
**St. John's-wort, Carolina**   *Hypericum nitidum*   OBL
**St. John's-wort, Chapman's**   *Hypericum chapmanii*   OBL
**St. John's-wort, dotted**   *Hypericum punctatum*   U
**St. John's-wort, Drummond's**   *Hypericum drummondii*   U
**St. John's-wort, Edison's**   *Hypericum edisonianum*   OBL
**St. John's-wort, four-petal**   *Hypericum tetrapetalum*   FAC
**St. John's-wort, marsh**   *Triadenum* spp.   OBL
**St. John's-wort, peelbark**   *Hypericum fasciculatum*   OBL
**St. John's-wort, scrub**   *Hypericum cumulicola*   U
**St. John's-wort, shrubby**   *Hypericum prolificum*   U
**St. John's-wort, small-sepal**   *Hypericum microsepalum*   U
**St. John's-wort, smooth-bark**   *Hypericum lissophloeus*   OBL
**St. John's Susan**   *Rudbeckia nitida*   FACW
**staggerbush, piedmont**   *Lyonia mariana*   FACW
**stargrasses, yellow**   *Hypoxis* spp.   FACW
**stitchwort, Godfrey's**   *Arenaria godfreyi*   FACW
**Stoke's aster**   *Stokesia laevis*   FACW
**storax**   *Styrax americana*   OBL
**string-lily**   *Crinum americanum*   OBL
**stripeseed**   *Piriqueta caroliniana*   FAC
**sugar-berry**   *Celtis laevigata*   FACW
**sumpweed, bigleaf**   *Iva frutescens*   OBL
**sunbonnet**   *Chaptalia tomentosa*   FACW
**sundew, dwarf**   *Drosera brevifolia*   FACW
**sundew, Gulf coast**   *Drosera tracyi*   OBL
**sundew, pink**   *Drosera capillaris*   FACW

**sundew, spoon-leaf**   *Drosera intermedia*   OBL
**sundew, thread-leaf**   *Drosera filiformis*   OBL
**sunflower, Florida**   *Helianthus floridanus*   FAC
**sunflower, lakeside**   *Helianthus carnosus*   FACW
**sunflower, muck**   *Helianthus simulans*   FACW
**sunflower, southeastern**   *Helianthus agrestis*   FACW
**sunflower, swamp**   *Helianthus angustifolius*   FACW
**sunflower, wetland**   *Helianthus heterophyllus*   FACW
**sunny bells, white**   *Schoenolirion elliottii*   FACW
**sunny bells, yellow**   *Schoenolirion croceum*   FACW
**swamp-lily, southern**   *Crinum americanum*   OBL
**swamp-loosestrife**   *Decodon verticillatus*   OBL
**swampprivet, eastern**   *Forestiera acuminata*   FACW
**swampprivet, Florida**   *Forestiera segregata*   FAC
**swampweed**   *Hygrophila* spp.   OBL
**sweet broom**   *Scoparia dulcis*   FAC
**sweet pepper bush**   *Clethra alnifolia*   FACW
**sweetbay**   *Magnolia virginiana var. australis*   OBL
**sweetgum**   *Liquidambar styraciflua*   FACW
**sycamore, American**   *Platanus occidentalis*   FACW
**tallow-tree, Chinese**   *Sapium sebiferum*   FAC
**thistle, Leconte's**   *Cirsium lecontei*   FACW
**thistle, Nuttall's**   *Cirsium nuttallii*   FACW
**thistle, swamp**   *Cirsium muticum*   OBL
**thoroughwort, marsh**   *Eupatorium leptophyllum*   OBL
**thoroughwort, semaphore**   *Eupatorium mikanioides*   FACW
**thoroughwort, white-bract**   *Eupatorium leucolepis*   FACW
**thoroughworts**   *Eupatorium* spp.   FAC
**tickseed, ciliate-leaf**   *Coreopsis integrifolia*   FACW
**tickseed, Florida**   *Coreopsis floridana*   FACW
**tickseed, Georgia**   *Coreopsis nudata*   OBL
**tickseed, Leavenworth's**   *Coreopsis leavenworthii*   FACW
**tickseed, sickle**   *Coreopsis falcata*   FACW
**tickseed, southeastern**   *Coreopsis gladiata*   FACW
**tickseed, tall**   *Coreopsis tripteris*   FAC
**tickseed, Texas**   *Coreopsis linifolia*   FACW
**titi, black**   *Cliftonia monophylla*   FACW
**titi, swamp**   *Cyrilla racemiflora*   FAC
**toothcup**   *Ammannia* spp.   OBL
**toothcup**   *Rotala ramosior*   OBL
**torchwood, black**   *Erithalis fruticosa*   FAC
**touch-me-not, spotted**   *Impatiens capensis*   OBL
**trema**   *Trema* spp.   FAC
**tulip tree**   *Liriodendron tulipifera*   FACW
**tupelo, ogeechee**   *Nyssa ogeche*   OBL
**tupelo, swamp**   *Nyssa sylvatica var. biflora*   OBL
**tupelo, water**   *Nyssa aquatica*   OBL
**turtleweed**   *Batis maritima*   OBL
**twinflower, swamp**   *Dyschoriste humistrata*   FACW
**vanillaleaf; vanilla plant**   *Carphephorus odoratissimus*   FAC
**Venus' flytrap**   *Dionaea muscipula*   FACW
**vervain, sandpaper**   *Verbena scabra*   FACW
**vetch, Florida**   *Vicia floridana*   FACW
**vetch, four-leaf**   *Vicia acutifolia*   FACW
**vetch, Ocala**   *Vicia ocalensis*   OBL
**viburnum, possum-haw**   *Viburnum nudum*   FACW
**viburnum, walter**   *Viburnum obovatum*   FACW
**violet, edible**   *Viola esculenta*   FACW
**violet, lance-leaf**   *Viola lanceolata*   OBL
**violet, Leconte's**   *Viola affinis*   FACW
**violet, primrose-leaf**   *Viola primulifolia*   FACW

**Virginia willow**    *Itea virginica*    OBL
**water drop-wort**    *Oxypolis* spp.    OBL
**water snowflake**    *Nymphoides* spp.    OBL
**water-cress**    *Nasturtium* spp.    OBL
**water-elm**    *Planera aquatica*    OBL
**water-hemlock**    *Cicuta* spp.    OBL
**water-hoarhound**    *Lycopus* spp.    OBL
**water-hyssop**    *Bacopa* spp.    OBL
**water-lily**    *Nymphaea* spp.    OBL
**water-locust**    *Gleditsia aquatica*    OBL
**water-lotus**    *Nelumbo* spp.    OBL
**water-meal**    *Websteria confervoides*    OBL
**water-parsnip**    *Sium suave*    OBL
**water-plantain, subcordate**    *Alisma subcordatum*    OBL
**waterpod**    *Hydrolea* spp.    OBL
**water-poppy**    *Hydrocleis nymphoides*    OBL
**water-primrose**    *Ludwigia* spp.    OBL
**water-starwort**    *Callitriche* spp.    OBL
**water-willow**    *Justicia* spp.    OBL
**wax myrtle**    *Myrica cerifera*    FAC
**waxweed, Columbia**    *Cuphea carthagenensis*    FAC
**waxweed, common**    *Cuphea aspera*    FACW
**wedgescale, swamp**    *Sphenopholis pensylvanica*    OBL
**white-cedar, Atlantic**    *Chamaecyparis thyoides*    OBL
**whitenymph**    *Trepocarpus aethusae*    FACW
**wild coffee**    *Psychotria* spp.    FAC
**wild corndog**    *Typha* spp.    OBL
**wild dilly**    *Manilkara bahamensis*    FAC
**wild petunia**    *Ruellia caroliniensis*    FAC
**wild taro**    *Colocasia esculenta*    OBL
**wild-petunia, Britton's**    *Ruellia brittoniana*    FAC
**wild-petunia, night-flowering**    *Ruellia noctiflora*    FACW
**willow**    *Salix* spp.    OBL
**winterberry**    *Ilex verticillata*    OBL
**witch-alder, dwarf**    *Fothergilla gardenii*    FACW
**wood-nettle, Canada**    *Laportea canadensis*    FACW
**wood-sage**    *Teucrium canadense*    FACW
**woolly-berry**    *Gaylussacia mosieri*    FACW
**yellow stargrasses**    *Hypoxis* spp.    FACW
**yellow-cress**    *Rorippa* spp.    OBL
**yellow-eyed grass**    *Xyris* spp.    OBL
**yellow-eyed-grass, Carolina**    *Xyris caroliniana*    FACW
**yellow-eyed-grass, Richard's**    *Xyris jupicai*    FACW
**yellow-poplar**    *Liriodendron tulipifera*    FACW
**yellow-root, shrubby**    *Xanthorhiza simplicissima*    FACW
**yellowtop, clustered**    *Flaveria trinervia*    FAC
**yellowtop, coastalplain**    *Flaveria bidentis*    FAC
**yellowtop, Florida**    *Flaveria floridana*    FACW
**yellowtop, narrowleaf**    *Flaveria linearis*    FACW
**yerba de Tajo**    *Eclipta alba*    FACW

## Recommended 5-Step Field Wetland Delineation Procedure

1. Identify the indisputable wetland area and the indisputable upland area.
2. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where the <u>vegetation</u> meets A or B test criteria.
3. In the area between the indisputable wetlands and uplands, identify the most landward boundary of where hydrologic indicators are present.
4. Between the vegetation test boundary and the hydrologic indicator boundary, identify the most landward hydric soil boundary.
5. Applying the wetland definition and reasonable scientific judgment, evaluate and modify if necessary the most landward boundary of the wetland based on the A, B, C, or D tests delineated by the previous steps.


## Required Equipment for the Implementation of Chapter 62-340, F.A.C.

FDEP Chapter 62-340, F.A.C. Data Form
FDEP Data Form Guide
Sharpshooter Shovel (minimum soil examination of 20 inch+)
Munsell Soil Color Charts
Hand Lens (10x-15x)
Soil survey map for inspection area
Soil knife
Spray bottle (misting)
Tape measure
Compass
Camera (not a personal phone)


## Suggested Equipment for the Implementation of Chapter 62-340, F.A.C.

Appropriate plant identification manuals
Appropriate soil information documents
A copy of Chapter 62-340, F.A.C.
Florida Wetlands Delineation Manual
Towel
Pens and pencils
Permanent Markers
GPS Units
Flagging tape
Pin flags
4-foot level
Line level and string
Extra camera batteries
First Aid
Sunscreen
Insect Repellent
Plant presses
Auger
Waterproof equipment case